Exhibit A-1

# Investigation of the Puerto Rico Police Department



United States Department of Justice
Civil Rights Division

September 5, 2011

## TABLE OF CONTENTS

ABBREVIATIONS ................................................................................................................ 3

GENERAL METHODOLOGY ........................................................................................... 4

I.   EXECUTIVE SUMMARY ........................................................................................ 5

II.  BACKGROUND ...................................................................................................... 12

A.   Puerto Rico Police Department.............................................................. 12
B.   University College of Criminal Justice (Police Academy).............................. 13
C.   Public Safety ....................................................................................... 13
D.   Police Crime and Corruption ................................................................ 14

III. PATTERN AND PRACTICE OF CONSTITUTIONAL VIOLATIONS ...................... 19

A.   PRPD Engages in a Pattern and Practice of Use of Excessive Force ............... 20
     1.   Officers Use Excessive Force in Violation of the Fourth Amendment ............... 20
     2.   Officers Use Unreasonable Force to Suppress the Exercise of Protected
          First Amendment Rights.......................................................................... 25
     3.   Deficiencies Causing and Contributing to the Pattern and Practice of Excessive
          Force ................................................................................................... 32

B.   PRPD Engages in a Pattern and Practice of Unconstitutional Searches and Seizures...... 45
     1.   Officers Conduct Searches and Seizures in Violation of the
          Fourth Amendment ................................................................................ 46
     2.   Systemic Deficiencies Causing and Contributing to the Pattern and Practice of
          Unlawful Searches and Seizures ............................................................... 50

C.   Additional Areas of Serious Concern ...................................................... 54
     1.   Allegations of Discriminatory Police Practices by PRPD .................... 54
     2.   PRPD's Failure to Address Domestic Violence and Sexual Assault.................. 57

IV.  ADDITIONAL DEFICIENCIES CAUSING THE PATTERN AND PRACTICE OF
     CONSTITUTIONAL VIOLATIONS ........................................................................ 59

A.   Inadequate Policies and Procedures.......................................................... 60

B.   Insufficient Training ............................................................................ 61
     1.   The University College Lacks Accreditation and Independence.......................... 61
     2.   Pre-Service Training Is Insufficient............................................................ 63
     3.   In-Service Training Is Virtually Non-Existent .................................... 65

C.   Inadequate Supervision........................................................................ 67

D.   Seriously Deficient Civilian Complaint Process.......................................... 68
     1.   The Complaint Intake Process Discourages Civilians from Filing Complaints ... 68

     2.     Complaint Investigations Routinely Take Years To Complete ........................... 70

     3.     Procedures and Protocols Are Insufficient To Ensure Proper Investigations....... 74

     4.     Investigators Lack Training and Resources ........................................................ 75

E.     Ineffective Discipline ................................................................................................ 76

     1.     The Police Personnel Regulation Is Sorely Outdated ........................................... 77

     2.     Supervisors Lack Authority and Training To Correct Even Minor Infractions of Their Subordinates ............................................................................................... 78

     3.     Administrative Investigations Take Too Long To Complete ............................... 78

     4.     Disciplinary Action Is Inconsistent and Ineffective in Deterring Misconduct ..... 78

     5.     Protections Against Self-Incrimination Are Offered in Administrative Investigations ....................................................................................................... 80

F.     Limited Risk Management ......................................................................................... 80

G.     Lack of External Oversight and Accountability ........................................................ 83

     1.     CIPA ..................................................................................................................... 84

     2.     Puerto Rico Civil Rights Commission ................................................................. 84

**V.     RECOMMENDED REMEDIAL MEASURES ............................................................ 85**

**VI.  CONCLUSION ........................................................................................................... 110**

     Endnotes..........................................................................................................................111

     Appendix A:    Additional Illustrative Incident……………………………………..A-1

     Appendix B:    Relevant Correspondence……………………………………………..A-10

## ABBREVIATIONS

| | |
|---|---|
| PRPD | Puerto Rico Police Department |
| DOJ | United States Department of Justice |
| CED | Conducted Energy Device |
| CIPA | Commission on Investigations, Processing, and Appeals of Puerto Rico |
| CRC | Civil Rights Commission of Puerto Rico |
| DNVW | Drugs, Narcotics, Vice, and Illegal Weapons Division |
| FBI | Federal Bureau of Investigation |
| FSI | Forensic Sciences Institute of Puerto Rico |
| FY | Fiscal Year (in Puerto Rico, running from July 1 to June 30) |
| GO | General Order of the Puerto Rico Police Department |
| IAD | Internal Affairs Division |
| IACP | International Association of Chiefs of Police |
| LEMAS | Law Enforcement Management and Administrative Statistics |
| PID | Public Integrity Division |
| POST | Peace Officer Standards and Training |
| PRD | Professional Responsibility Division |
| PRDOJ | Puerto Rico Department of Justice |
| SIB | Special Investigations Bureau of the Puerto Rico Department of Justice |
| SO | Special Order of the Puerto Rico Police Department |
| SOU | Special Operations Unit |
| STU | Specialized Tactical Unit |
| TOU | Tactical Operations Unit |
| UPR | University of Puerto Rico |

## GENERAL METHODOLOGY

This report contains the findings of the Civil Rights Division's pattern and practice investigation[1] of the Puerto Rico Police Department ("PRPD").  The investigation was conducted pursuant to the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141, and the Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C. § 3789d.  Section 14141 permits the Attorney General, acting on behalf of the United States, to initiate civil actions against state and local governments to remedy a pattern or practice of conduct that deprives persons of rights, privileges, or immunities secured or protected by the Constitution and federal law.  The Safe Streets Act, together with Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d to 2000d-7, prohibit discrimination on the basis of race, color, sex, or national origin by state or local criminal justice agencies receiving federal funding.

Attorneys and staff from the Civil Rights Division's Special Litigation Section conducted the investigation alongside law enforcement professionals, whose expertise informed our understanding.  These professionals – former police chiefs and supervisors – provided us with in-depth knowledge about how to detect and respond to law enforcement challenges.

We gathered information through many interviews and meetings with PRPD officers, supervisors, and command staff, as well as members of the public, Commonwealth officials, and other community stakeholders.  We interviewed officers from all ranks at PRPD headquarters and ten police areas:  San Juan, Carolina, Bayamón, Fajardo, Humacao, Caguas, Ponce, Guayama, Mayagüez, and Aguadilla.  We also participated in ride-alongs with officers and supervisors.  Our investigation included on- and off-site review of documents, including policies and procedures, incident reports, internal investigation files, disciplinary index cards maintained by PRPD's Legal Affairs Office, external audit reports, and legislative materials.

# I.  EXECUTIVE SUMMARY

The Puerto Rico Police Department is Puerto Rico's primary law enforcement agency. Its mission is critical:  To protect and serve the residents of Puerto Rico by designing and implementing policies and practices that control crime, ensure respect for the Constitution and the rule of law, and enable the Department to enjoy the respect and confidence of the public.

Many hard working and dedicated PRPD officers serve the public with distinction under often challenging conditions.  Unfortunately, PRPD is broken in a number of critical and fundamental respects that are clearly actionable under the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141 ("Section 14141").  Based on our extensive investigation, we find reasonable cause to believe that PRPD officers engage in a pattern and practice of:

- excessive force in violation of the Fourth Amendment;
- unreasonable force and other misconduct designed to suppress the exercise of protected First Amendment rights; and
- unlawful searches and seizures in violation of the Fourth Amendment.

In addition to these findings, our investigation uncovered other deficiencies of serious concern.  In particular, there is troubling evidence that PRPD frequently fails to police sex crimes and incidents of domestic violence, and engages in discriminatory policing practices that target individuals of Dominican descent in violation of the Fourteenth Amendment, the Safe Streets Act, and Title VI.  At this time, we do not make a formal finding of a pattern and practice violation in these areas, in part because PRPD does not adequately collect data to evaluate these issues.  However, we are quite concerned that PRPD lacks basic systems of accountability to ensure that all individuals are treated equally by PRPD officers, regardless of race, ethnicity, national origin, or sex as required by federal law.  Furthermore, our investigation raises serious concerns that PRPD policies and practices are woefully inadequate to prevent and address domestic violence committed by PRPD officers.  We find that these deficiencies will lead to constitutional violations unless they are addressed.  PRPD's continued failure to keep necessary data in light of our findings and despite knowledge of these indicators of a very serious problem, may constitute a pattern and practice that violates federal law.

We recognize that PRPD faces significant challenges as Puerto Rico's primary law enforcement agency.  The unconstitutional acts that we have identified arise at a time of crisis in public safety.  Contrary to national trends, violent crime increased overall in Puerto Rico by 17% from 2007 to 2009.  In 2010, Puerto Rico saw the second highest number of murders in its history, a trend that is escalating in 2011.  The clearance rate for murders remains below the national average.  Some Puerto Rico officials maintain that drug trafficking and social deterioration are fueling the wave of violent crime.  However, increasing crime cannot be used to justify continued civil rights violations or the failure to implement meaningful reforms. Constitutional policing and effective law enforcement are inextricably bound.  Public safety depends on the trust and cooperation of the community, which in turn depends on constitutional police practices that respect civil rights.  Our previous efforts in working with large police departments strongly suggest that by addressing the civil rights concerns we raise in this report,

the Commonwealth will not only meet its constitutional duty, but also reduce crime, improve public safety, and increase community confidence.[2]

For many years, victims' families, civic leaders, legislators, and civil rights advocates have voiced concerns over chronic mistreatment by police.  For example, over the past decade, various legislative measures have called for comprehensive investigations of police misconduct, greater education and training, and an accounting of public funds spent on civil rights lawsuits against the Commonwealth.  Other grass-roots and advocacy organizations have sent letters to Puerto Rico officials denouncing allegations of discrimination against people of Dominican descent, and civic and professional organizations have issued investigative reports detailing numerous civil rights violations at the hands of police.  PRPD officers have also called for agency reforms.  One police affinity group representing thousands of officers attributed widespread low morale among officers to verbal abuse from supervisors, indifference to officers' personal problems, lack of support and training, absence of motivational and educational activities, deficient equipment and materials, and late payment.

The public's demands for remedial action are fueled in part by the appalling number of officer arrests and convictions for serious misconduct and criminal activity.  Among these are: the killing of family members by two police officers in the "Massacre of Las Piedras" in 2007; the videotaped shooting of a civilian by a Tactical Operations Unit ("TOU") officer during a birthday celebration in Humacao in 2007; the shooting death of a PRPD lieutenant by a sergeant at a police station in Yabucoa in 2007; the conviction of multiple officers assigned to the Mayagüez Drug Unit for planting drugs in 2008; the conviction of the director of the Special Arrests and Extraditions Unit and several of his officers on drug-related charges in 2009; the conviction of a lieutenant directing the weapons registry at PRPD headquarters as part of an illegal gun licensing scheme in 2009; the indiscriminate use of batons and chemical irritants against protesters at the Capitol in June 2010; the shooting death of an unarmed young man who was reportedly aiding police following a robbery in September 2010; and the arrest of 61 PRPD officers as part of the largest police corruption operation in the Federal Bureau of Investigation's ("FBI") history in October 2010.

In the report that follows, we discuss the wide range of issues that were the focus of our investigation and the findings that result from our review.  In sum, our investigation reveals the following:

- **The constitutional violations we uncovered are pervasive and plague all levels of PRPD.**

Our investigation concluded that a longstanding pattern and practice exists of PRPD officers violating the Constitution by using force, including deadly force, when no force or lesser force was called for.  As a result, PRPD officers have unnecessarily injured hundreds of people and killed numerous others.  PRPD's overreliance on such tactics is evident in its regular deployment of heavily armed tactical units on routine patrols or "preventive rounds," usually in public housing complexes or low-income neighborhoods.  These units, relying almost exclusively on extreme displays of force and actual force, rather than on more contemporary problem-solving approaches, were neither intended nor trained to perform such patrol functions.

Indeed, the marked disconnect between residents and tactical officers, who routinely enter neighborhoods en masse with high-caliber rifles drawn amid children, seniors, and other bystanders, reveals PRPD's reliance on law enforcement strategies that run counter to widely accepted models of community-oriented policing.  Distressingly, an officer assigned to one of these units told us openly and without objection from his supervisors that officers *need* to violate civil rights to fight crime and meet the goals set by government officials.  This conduct deprives the people of Puerto Rico of their rights guaranteed by the Constitution and federal law.

Officers' use of excessive force also chills speech in violation of the First Amendment. While some individuals may engage in unlawful activity during protests and civil demonstrations, only a fraction of the force used by PRPD is directed at specific threats or criminal behavior, as evidenced by the dearth of arrests supported by probable cause.  Instead, PRPD officers regularly rely on the indiscriminate use of force or threat of force well beyond what is necessary to protect public safety when engaging with crowds.  Specifically, PRPD indiscriminately used chemical agents, batons, and physical force against demonstrators and other individuals on University Avenue in August 2009, at the Sheraton Hotel in May 2010, and at the Capitol in June 2010.  PRPD officers also used choke holds and pressure techniques against protestors who were passively resisting or otherwise not posing any significant threat as recently as December 2010 and January 2011.  In February 2011, officers pushed, struck, and sprayed protestors at a university campus, and officers threw rocks and other objects at individuals who likewise posed no significant threat.  The use of excessive force by PRPD officers in these instances, along with other tactics aimed at intimidating demonstrators, has garnered significant public attention and discouraged residents of Puerto Rico from engaging in protected First Amendment activities.  While we recognize that prolonged strikes and civil demonstrations strain PRPD personnel and resources, Puerto Rico must not waver in its duty to uphold the fundamental rights of all residents, even when their viewpoints or affiliations may be disagreeable.

We also found a pattern and practice of illegal searches and seizures in violation of the Fourth Amendment.  Specifically, our investigation revealed a pattern and practice of PRPD officers conducting searches of civilians' homes without a warrant or consent and in the absence of any exigent circumstance or exception that would render such a search constitutional.  Too frequently, PRPD officers plant evidence during searches, rely on excessive force and intimidation as search aids or tools, and proceed with searches even when knowing that the address, identity of the individual, or other pertinent information is incorrect.  The evidence we uncovered further demonstrates that PRPD officers engage in a regular pattern of detaining, arresting, and searching individuals without reasonable suspicion or probable cause in violation of the Fourth Amendment, and that supervisors and members of specialized units are often involved in these unlawful acts.

- **The staggering level of crime and corruption involving PRPD officers must be addressed in systematic fashion.**

The amount of crime and corruption involving PRPD officers further illustrates that PRPD is an agency in profound disrepair.  From January 2005 to November 2010, there were more than 1,709 arrests of PRPD officers.  The charges varied widely, from theft and simple

assault to rape, drug trafficking, and murder.  Hundreds of officers have also engaged in domestic violence; many have been arrested multiple times for harming their partners.

- **There are many contributing factors to the constitutional violations.**

PRPD has failed to provide officers with the basic understanding and tools they need to safeguard the rights of the people they serve.  Basic systems of accountability are non-existent or profoundly broken, and have been for years.  Although our report focuses on recent constitutional violations, the systemic deficiencies that underlie the misconduct developed over a much longer period.  These systemic deficiencies include the following:

1. **Policies fail to guide officers on lawful policing practices.**  PRPD's policies and procedures on use of force and searches and seizures are out-dated, disorganized, and omit contemporary legal standards.  Officers are not provided with copies of PRPD's policies, or access to policies through other reliable means, to reference as they carry out their day-to-day duties.  As a result, officers develop their own informal practices, and the operations of similar units or components throughout PRPD vary widely.  Officers also expressed a fundamental misunderstanding of critical aspects of their duties.  For instance, officers in different areas and units routinely defined "force" differently.  Many other officers were unfamiliar with the parameters of temporary investigatory detentions, or *Terry* stops, which may, when performed unreasonably, constitute Fourth Amendment violations.  These and other essential concepts are not communicated effectively and consistently to officers on an ongoing basis through policy.

2. **Pre-service field training is insufficient.**  Cadets review PRPD's policies and procedures while attending pre-service training, but are not provided with post-academy field training to prepare them for real-life policing.  This training is particularly essential in developing the practical skills, judgment, and understanding necessary to lawfully employ force, effect arrests, treat all persons equally, and solve problems effectively as partners with the community.  Instead, new officers are simply armed and released into the streets and neighborhoods of Puerto Rico.  In many cases, they never return to the academy for regular in-service training.

3. **In-service training is virtually non-existent.**  Effective law enforcement agencies reinforce their expectations on use of force and searches and seizures through consistent and sufficient in-service training.  However, many PRPD officers reported that they do not return to the University College of Criminal Justice ("University College") for in-service training for years, or ever, after completing the pre-service program.  In 2010, the Puerto Rico Legislature confirmed these reports and passed legislation requiring PRPD to provide at least 12 hours of annual in-service training.  The Legislature found the training was "necessary and urgent" in light of domestic violence, corruption, and numerous instances in which officers failed to exercise self-control with civilians.  Even with the new legislation, PRPD still requires less than half the average number of annual training hours required by police departments across the country.

4.  **No external oversight of officer standards and training.**  Unlike every state except Hawaii, Puerto Rico does not have a state-wide authority that establishes minimum law enforcement standards and training requirements, such as Peace Officer Standards and Training ("POST") boards, commissions, or academies.  Instead, Puerto Rico vests sole authority for officer recruitment, hiring, training, and development of core competencies on the discretion of the Superintendent.  PRPD Superintendents, subject to budget and political pressures, have reduced the length of pre-service training programs, authorized deployment of cadets on patrol duties before cadets completed critical training, and changed the criteria used to identify at-risk officers who engage in repetitive misconduct, without any accountability for outcome.

5.  **Tactical units have been allowed to develop violent subcultures.**  PRPD has been on notice for years that officers assigned to tactical units routinely employ excessive force when interacting with civilians.  These units all too frequently rely on intimidation, fear, and extreme use of force to manage crowds and are often deployed to low-income and minority communities on routine patrols.  These units operate with insufficient training and guidance on the lawful exercise of police power.

6.  **Supervision is lacking.**  PRPD has too few qualified supervisors to effectively supervise.  PRPD has not filled many of the 2,100 supervisor vacancies it reported in 2009.  In some instances, supervisors must supervise 18 or more officers, nearly double the generally accepted ratio of 1:10.  In the field, supervisors are not required to independently review the use of force of their subordinates.  As a result, officers engage in multiple incidents of misconduct over prolonged periods, without effective intervention from supervisors.

    Many officers expressed concern that PRPD's promotion practices are driven more by one's affiliations than talents.  For instance, although agency regulations indicate that objective examinations should be used to select candidates for promotion, we found that the vast majority of promotions were carried out as excepted "merit" promotions under special authority granted to the Superintendent.  Only five percent of officers were promoted by examination from January 2008 to September 2010.  Many officers reported that the prevalence of discretionary promotions reinforced their concerns about the quality of supervision.

7.  **Internal investigations take years to complete.**  Profound deficiencies in the conduct of administrative investigations leave misconduct unaddressed, decimate officer morale, and foster the public's mistrust.  We found that administrative investigations routinely take years to complete – in some cases, 10 or more years – well beyond the 180-day timeframe required by existing Puerto Rico regulations.

8.  **Discipline is seriously deficient.**  In 1989, the First Circuit upheld punitive damages against the Superintendent and other supervisors for federal civil rights violations, relying on evidence that PRPD's disciplinary system was "grossly deficient."  As evidence of the dysfunction in PRPD, many aspects of this seriously broken disciplinary system remain unchanged.  For example, immediate supervisors are not involved in the disciplinary process, disciplinary sanctions are too limited in scope, and officers are permitted to

refuse to testify or give a statement to internal investigators.  Discipline is also ineffective because administrative investigations take years to complete, or are never resolved.  In many instances, officers develop pronounced patterns of serious misconduct and face removal only after they are charged with a crime.  Other problem officers, sometimes referred to as "parachuters," are simply transferred from one component to another, without any effort to address their underlying problems, because of the extreme delays in completing internal investigations.

9. **Inoperable risk management system.**  Effective risk management systems help commanders and supervisors take early corrective action when officers exhibit potential problem behaviors.  Interventions typically include targeted training, education, and counseling.  These systems are designed to protect the community and support officers who may be experiencing difficulties.  PRPD developed a limited program in 1990 following a federal civil rights lawsuit that found PRPD supervisors liable for operating a "grossly deficient" disciplinary system.  The program provided a one-size-fits-all intervention, a multiple-day training course, which PRPD stopped offering in 2007.  PRPD did not resume the course until October 2010.

It would be an enormous mistake to continue attributing the widespread and ongoing police misconduct that infects PRPD to an isolated group of individual officers or a seemingly intractable crime problem.  Doing so not only forestalls the implementation of critical reforms, but also prevents PRPD from regaining the credibility and respect it needs and deserves to fight crime effectively and uphold the rule of law.

- **Prior efforts to reform PRPD have been sporadic and superficial, all too often spawned by public outcry over the latest tragic event.**

The Government of Puerto Rico has recognized the public's diminishing confidence in PRPD following tragic and violent incidents involving police corruption and misconduct.  However, the implementation of corrective action has been sporadic and superficial.  In 2007, former Superintendent Pedro Toledo Dávila established an external evaluating committee to assess violence, corruption, and misconduct within PRPD.  The committee issued reports finding patterns of civil rights violations and corruption, and recommended dozens of remedial measures.[3]  In its December 2007 report, the committee urged Puerto Rico to establish a fully resourced commission to develop long-term solutions to PRPD's complex and institutional deficiencies, an endeavor they projected would take up to two years.[4]  No such commission was ever created, and many recommendations were not implemented.  Governor Luis Fortuño acknowledged the need for reform in September 2010 when he called on the Civil Rights Division to "expand its investigation to incidents of possible use of excessive force or other possible violations of civil rights by the Police of Puerto Rico that may have occurred during [his] administration . . ."[5]  Despite longstanding calls for external reviews and investigations, basic reforms have not been implemented and the necessary effort to openly restore the public's trust remains long overdue.

For too long, PRPD has failed to provide its officers with meaningful systems of support and accountability to ensure that officers discharge their duties lawfully and effectively.  Policies

do not delineate the limits of lawful exercise of police power; training is insufficient; supervision is too unquestioning and sparse; and civilian complaints languish for years.  The lack of meaningful external oversight of PRPD policies and actions exacerbates these issues.  The problems outlined in this report are chronic and pervasive.  The public lacks confidence in PRPD at a time when Puerto Rico faces significant public safety challenges.  While Puerto Rico has taken some initial steps to detect, correct, and deter the problems we highlight in this report, it has failed to adequately address the institutional causes that contribute to both its unconstitutional law enforcement and ineffective policing.  It is imperative that Puerto Rico act decisively, openly, and transparently to restore the public's trust and ensure that PRPD becomes an institution that exemplifies the rule of law for all residents in Puerto Rico.

The path toward lasting reform will require nothing less than federal judicial intervention. We believe a court-enforceable agreement will provide the structure, transparency, and accountability that will be necessary to achieve sustainable reform.  Accordingly, we look forward to working with Puerto Rico, rather than engage in contested litigation, to craft a meaningful and collaborative reform plan with judicial oversight that will ensure constitutional policing, improve public safety, and restore the public's confidence.

The report that follows is an account of our findings.  Section II provides background information concerning PRPD, the University College (which serves as PRPD's training academy), public safety, and crime and corruption within PRPD.  Section III discusses the patterns and practices of civil rights violations involving use of excessive force, use of unreasonable force to suppress speech, and unconstitutional searches, detentions, and seizures. We also include illustrative cases demonstrating the deprivation of federal rights and discuss specific deficiencies that cause the pattern and practice for each type of violation.  Section IV evaluates additional systemic deficiencies that are common causes and contributing factors for all the violations we uncovered.  Finally, Section V provides recommendations for remedying PRPD's systemic deficiencies.

## II.  BACKGROUND

**A.**     **Puerto Rico Police Department**

PRPD is the primary law enforcement agency in Puerto Rico, providing a wide array of basic and specialized policing services to its 3,726,000 residents.  PRPD is the second largest law enforcement agency in the country, with approximately 17,153 sworn officers.[6]  There are approximately 4.6 active PRPD officers for every 1,000 residents in Puerto Rico, which represents more than twice the national average for local police departments serving populations of 250,000 or more.[7]  PRPD's jurisdiction is divided into 13 police regions:  Aguadilla, Aibonito, Arecibo, Bayamón, Caguas, Carolina, Fajardo, Guayama, Humacao, Mayagüez, Ponce, San Juan, and Utuado.  Each police region is led by a commander who directly oversees field operations and criminal investigations.  Each regional commander reports to the Superintendent. There are six divisions that are administered from PRPD headquarters, including the Professional Responsibility Division ("PRD"), which conducts internal and administrative investigations of PRPD personnel.  A Technology and Communications Bureau is responsible for operating PRPD's communication command centers throughout Puerto Rico.

Supreme authority over PRPD is vested in the Governor.  The Governor delegates the immediate administration of PRPD to a Superintendent, who is confirmed by the Puerto Rico Senate.  The Governor also approves appointments to PRPD's highest ranks, ranging from inspectors to colonels.  The Superintendent manages PRPD directly through general and special orders that operate as PRPD's policies and procedures.  The Superintendent is charged with the overall administration of PRPD, including recruiting, selecting, training, deploying, and disciplining officers and cadets.  There are no accrediting or regulatory agencies in Puerto Rico that promulgate law enforcement standards or training requirements beyond those established by the Superintendent.

On July 6, 2011, the Governor appointed Emilio Díaz Colón, a former Adjutant General of the Puerto Rico National Guard, as Superintendent of PRPD.  General Díaz Colón replaced Superintendent José Figueroa Sancha, who resigned on July 2, 2011.  Figueroa Sancha, a former Assistant Special-Agent-in-Charge of the FBI's San Juan Division, was preceded by Pedro Toledo Dávila, who also served with the FBI prior to joining PRPD.  Former Superintendent Toledo Dávila served as Superintendent from 1993 to 2001, and again from 2005 to 2009.  Four separate Superintendents served from 2001 to 2005.

PRPD provides basic law enforcement services through comprehensive enforcement of Puerto Rico's penal code.  PRPD also provides specialized security and protective services to airports, highways, coastal boundaries, seats of government, and dignitaries.  PRPD's enabling statute, Law Number 53 of June 10, 1996, known as the "Puerto Rico Police Act," sets forth PRPD's duties and responsibilities, including "pursuing and securing the most complete protection of civil rights of civilians." P.R. Laws Ann. tit. 25, § 3102 (2008) *et seq*.  PRPD's operating budget for FY 2012 is approximately $766 million, an increase of 3.3% from FY 2011. Puerto Rico's Office of Management and Budget reports that PRPD received approximately $15.1 million in federal funding and an additional $43.6 million in American Recovery and Reinvestment Act funds from 2009 to 2011.[8]

**B.      University College of Criminal Justice (Police Academy)**

The University College, located in Gurabo, serves as the training institution for PRPD and other municipal law enforcement agencies.  The University College was established in 1999 after the Puerto Rico Legislature authorized former Superintendent Toledo Dávila to convert PRPD's police academy into an institution of higher education.  The University College is licensed by the Puerto Rico Council on Higher Education and confers associate's degrees in police sciences to cadets completing a pre-approved curriculum.  PRPD requires its officers to hold at least an associate's degree.

A Board of Directors governs University College.  The Board is composed of nine members, eight of whom are appointed by the Governor.  The Superintendent serves as the President and ex officio member of the Board.  The Superintendent also selects the chancellor and associate deans with the Board's approval.  The current chancellor is Dr. Zulma Méndez Ferrer.

**C.      Public Safety**

Public safety is a significant challenge in Puerto Rico.  As illustrated below, according to the FBI's Violent Crime Index, violent crime increased by 17% in Puerto Rico from 2007 to 2009.[9]  Violent crime is composed of murder and non-negligent manslaughter, forcible rape, robbery, and aggravated assault.  In contrast, over the same period, violent crime decreased across the United States.  Although violent crime decreased slightly in 2010, the number of murders and non-negligent manslaughters in Puerto Rico rose steeply from 901 to 983, almost supplanting 1994 (which registered 995 murders) as the year with the highest murders in Puerto Rico's history.  In 2009, Puerto Rico's murder rate was higher than each of the 50 states, at 22.5 per 100,000 persons, nearly double the next highest state, Louisiana, with 11.8 murders per 100,000 persons.  At the same time, PRPD's self-reported murder clearance rate of 43% – defined in the FBI's Uniform Crime Reporting ("UCR") program as offenses "closed" by arrest or exceptional means – was well below the national average of 66.6% in 2009.[10]  The trend continues to escalate, with 568 murders reported in the first six months of 2011, 98 more than in the same period last year.  The month of June 2011 proved to be among the most violent, with 101 murders reported.

A significant number of murders and violent crimes have involved Puerto Rico's lesbian, gay, bisexual, and transgender ("LGBT") communities.  Information we have obtained indicates that at least 18 LGBT Puerto Ricans have been murdered since 2010.  Three of those murders occurred in the span of 72 hours in early June 2011.  According to recent reports from the Puerto Rico Department of Justice ("PRDOJ"), no one has been convicted of a bias-motivated crime under Puerto Rico law.  PRPD acknowledges a need to improve its handling and investigation of hate crimes, particularly crimes against individuals in the LGBT community.  PRPD should continue to work collaboratively with other law enforcement agencies and the community to thoroughly and timely investigate potential hate crimes.  In this regard, on January 27, 2011, DOJ's Community Relations Service ("CRS") helped facilitate an agreement between PRPD, the University College, and the Puerto Rico Civil Rights Commission ("CRC") to improve officer training and community education on hate crimes.  While we have not completed our

investigation into these matters, available data strongly suggest that PRPD's efforts in addressing these deficiencies should be revisited and appropriately modified to ensure the safety of all Puerto Rico residents.



Figure 1:  Violent Crime, by Type, 2007-2010

| | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|
| ■ Forcible Rape | 97 | 95 | 65 | 39 |
| ■ AggravatedAssault | 2983 | 3115 | 3440 | 2757 |
| ■ Robbery | 5134 | 5467 | 6093 | 6590 |
| ■ Murder | 731 | 807 | 894 | 983 |

**D.     Police Crime and Corruption**

The degree of police corruption and criminal misconduct in Puerto Rico is high and contributes to the public safety and civil rights crisis.  More PRPD officers are involved in criminal activity than in any other major law enforcement agency in the country.  PRPD officers have been arrested for criminal activity ranging from simple assault and theft to domestic violence, drug trafficking, and murder.  From January 2005 to November 2010, there have been more than 1,709 arrests of PRPD officers.  These arrest rates are significantly higher than those of comparable jurisdictions.  According to the New York Police Department's Internal Affairs Bureau, authorities made approximately 607 arrests of uniformed officers between 2001 and 2006, out of a force roughly twice the size of PRPD.[11]

1.      **Officers Arrested for Criminal Conduct**

In October 2010, in the largest police corruption operation in the FBI's history, 89 law enforcement officers and other individuals were arrested for drug and firearm violations.  Among the officers arrested, 61 were PRPD officers.  As noted below, several of these officers have already pled guilty.  PRPD officers, including supervisors and members of specialized units, were also convicted in other cases involving serious criminal activity in breach of the public's trust.  The following examples illustrate the breadth and depth of the corruption in PRPD.  We provide additional examples in Appendix A.

- In December 2010, Officers Raquel Delgado Marrero and Ángel Rivera Claudio were convicted of three counts each for drug and firearm-related charges for their participation in a July 2009 drug transaction in which they provided armed protection to a drug dealer during the sale of seven kilograms of cocaine.[12]

- On December 16, 2009, Officer Edwin Mercado Irizarry, assigned to the San Juan Stolen Vehicles Division, pled guilty to charges involving aggravated illegal appropriation, fraud, witnesses tampering, preparation and presentation of false documents, and ethics violations.  According to the indictment, Mercado Irizarry stole multiple items from an evidence storage room at PRPD Headquarters and tried to cover-up the theft by falsifying documents and attempting to force witnesses to provide false statements.[13]

- On August 3, 2009, Lieutenant Flores Vázquez, Director of the Special Arrest and Extradition Division, pled guilty to conspiring to possess controlled substances with the intent to distribute when he and officers under his command transported cocaine in marked police vehicles and protected shipments of narcotics.  Lieutenant Flores Vázquez also conspired to extort money in exchange for illegally obtaining temporary prisoner release orders.  He was sentenced to 168 months of imprisonment.[14]  Three other officers pled guilty to the conspiracy and other charges.

- In July 2009, Immigration and Custom Enforcement ("ICE") agents intercepted Sergeant Juan Quiñones Rosario in a marine vessel traveling toward the Dominican Republic.  ICE agents discovered U.S. currency, totaling more than $1,600,000 hidden inside multiple compartments in the vessel.  On August 5, 2010, Sergeant Quiñones Rosario pled guilty to charges that he failed to report the cash as required by federal law and for smuggling the money out of the United States.[15]

- On July 2, 2008, Arecibo Illegal Weapons Division Officer Carlos Ríos González pled guilty to government ethics charges for selling ammunition belonging to PRPD; the court fined him $1000.

- On December 22, 2008, Officer Wilden Semidey Rivera pled guilty to bribery charges for requesting and accepting $200 from a civilian who wanted to avoid DUI charges.[16]

As with much of PRPD's data collection, PRPD data related to police-involved criminal activity are inadequate and inaccurate.  Based on our review of press accounts and local and

federal court dockets, we found an additional 21 arrests of officers that were not included in the 1,709 arrests reported by PRPD:

**Table 1:  Arrests of Officers Not Reported by PRPD**

| Approx. Date | Summary of Charges | Status* |
|---|---|---|
| 10/18/2010 | Weapons violation after allegedly shooting a municipal officer | Convicted |
| 7/18/2010 | Illegal appropriation of public funds and related charges for falsely claiming overtime hours | Pending |
| 7/18/2010 | Illegal appropriation of public funds and related charges for falsely claiming overtime hours | Pending |
| 6/13/2008 | Anti-piracy law violation for filming a movie at a theater | Convicted |
| 2/27/2008 | Conspiracy to provide false statements during the purchase of firearms | Convicted |
| 2/19/2008 | Importing narcotics | Convicted |
| 1/26/2008 | Illegal appropriation after stealing canisters of gasoline | Convicted |
| 12/1/2007 | Attempted murder | Convicted |
| 10/19/2007 | Conspiracy to possess with intent to distribute cocaine | Convicted |
| 9/20/2007 | Child abuse | Pending |
| 8/31/2007 | Interfering with commerce by threat or violence | Convicted |
| 7/21/2007 | Carjacking, conspiracy against civil rights, weapons violation, tampering with a witness | Convicted |
| 7/21/2007 | Carjacking, conspiracy against civil rights, weapons violations, and tampering with a witness | Convicted |
| 7/18/2007 | Conspiracy to commit murder, bribery, and government ethics violations | Pending |
| 7/18/2007 | Conspiracy to commit murder, bribery, and government ethics violations | Pending |
| 7/17/2007 | Fraud and aggravated theft | Convicted |
| 5/11/2007 | Controlled substances and government ethics violations | Convicted |
| 5/11/2007 | Controlled substances and government ethics violations | Pending |
| 5/11/2007 | Controlled substances and government ethics violations | Pending |
| 3/14/2007 | Government ethics violation | Convicted |
| 1/5/2007 | Burglary | Convicted |

*As of May 19, 2011.

## 2.      Officers Involved in Domestic Violence

Domestic violence infects the ranks of PRPD and interferes with the ability of PRPD to provide police services in a constitutional manner.  We found that hundreds of officers were also arrested or the subject of administrative complaints for domestic violence.  From 2005 to 2010, PRPD received 1,459 civilian complaints alleging domestic violence by officers.  Of the complaints resolved during this period, administrative investigators recommended disciplinary or corrective action in 1,018 cases in the form of orientation, admonishment, suspension,

separation, or expulsion.  We also identified 98 officers who have been arrested more than once on domestic violence charges between 2007 and 2010.  Many of these officers, including commanders, remain active on the force.  As the Puerto Rico Supreme Court has observed, it is "antagonistic to be a police officer while engaging in acts of domestic violence in all of its many forms:  physical or emotional abuse, spousal or child abuse." *San Vicente Frau v. Policía,* 142 D.P.R. 1, 1 (1996).

**Table 2:  Officers with Two or More Domestic Violence Arrests (2007-2010)**

|              | Officers | Terminated | Leave | Active |
|--------------|----------|------------|-------|--------|
| Two arrests  | 81       | 6          | 2     | 73     |
| Three arrests| 15       | 2*         | 3     | 10     |
| Four arrests | 2        | 1          | 0     | 1      |
| **TOTAL**    | **98**   | **9**      | **5** | **84** |

*One officer committed suicide, but was listed by PRPD as terminated.

We also identified several instances in which PRPD officers shot their spouses, including at least three in 2010 alone:

- On June 21, 2010, Officer Heriberto Rivera Hernández shot and killed his ex-wife, Marisel Arocho Soto, with a service firearm before killing himself.  At the time of the shooting, Officer Rivera Hernández was under electronic monitoring awaiting trial on domestic violence and weapons charges.  Following his March 2010 arrest, PRPD disarmed Officer Rivera Hernández and reportedly placed his service firearm in a safe deposit box at the stationhouse.

- On May 24, 2010, Sergeant José Manuel Rivera Ortiz shot at his wife six times and then turned the firearm on himself, committing suicide.  His wife was not struck.

- On March 24, 2010, Officer José Gómez González shot his wife, Verónica Martínez Vélez, hitting her eight times, before killing himself.

- On January 13, 2008, Officer Ramos Santiago killed his wife, Deborah Berrocal Lugo, in front of their then-four-year-old daughter.  A jury found him guilty of first-degree murder and a weapons charge.[17]

- On January 26, 2007, Officer López Martínez of the Aibonito Police Athletic League was convicted of first-degree murder when he killed his wife and mother-in-law with his service firearm.[18]

*     *     *

As these incidents illustrate, an indefensible number of PRPD officers commit a wide range of crimes against the very citizens they are charged with serving.  We briefly highlight PRPD's issues with respect to internal crime because the widespread lack of respect for the rule of law affects both public safety and civil rights.  Many of the systemic deficiencies we detail in

Sections III and IV below hinder PRPD's efforts to address its internal crime problem just as they limit PRPD's effectiveness in addressing its pattern of civil rights violations and its failure to effectively address sexual assaults, domestic violence, and allegations of discriminatory policing.  It is thus our belief that by implementing the remedies we outline below, PRPD will gain tools essential for ridding itself of the crime and corruption that currently infect its ranks.

### III.   PATTERN AND PRACTICE OF CONSTITUTIONAL VIOLATIONS

Our investigation has revealed reasonable cause to find that PRPD engages in a pattern and practice of:

- Use of excessive physical force, including deadly force, in violation of the Fourth Amendment;

- Use of unreasonable force and other misconduct designed to suppress the exercise of protected First Amendment rights; and

- Unlawful searches and seizures in violation of the Fourth Amendment.

Contrary to generally accepted law enforcement practices, PRPD does not maintain reliable reports and data that document encounters with the public to permit supervisors to ensure constitutional law enforcement.  PRPD does not require officers to routinely report uses of force or require supervisors to conduct independent reviews of force.  PRPD records concerning police misconduct cases and incidents of police-involved shootings are inaccurate.  Incident reports describing the reason for an arrest are often incomplete.  Even with these problems, the deficiencies we uncovered are so clear that these additional data sets are unnecessary to conclude that civil rights violations constitute a repeated and routine practice, rather than isolated or sporadic instances of misconduct.  Our determination is based on a review of investigative files and other documents produced by PRPD, criminal and civil cases from local and federal courts, and interviews with officers and residents.

As illustrated below, misconduct within PRPD is not isolated to a particular unit or rank. We found that supervisors and members of specialized tactical and investigation units contribute to the pattern and practice of civil rights violations, including officers assigned to TOU and the Drug, Narcotics, Vice, and Illegal Weapons Division ("DNVW").  The involvement of supervisors is particularly egregious in light of their added responsibility to uphold the agency's values and expectations.  In many instances, rather than correcting or reporting problem behavior, we found supervisors acting in concert with subordinates in cases where individuals were beaten or charged with fabricated evidence.  Supervisors and officers also failed to intervene on behalf of civilians to protect them from excessive force or unlawful searches or seizures by fellow officers.

We focused our review on the four-year period from 2004 to 2008.[19]  However, we found that the pattern of misconduct continued through the course of our investigation, as evidenced by PRPD's actions during protests and other civil demonstrations.  We discuss the legal standards governing our findings below and highlight several cases that illustrate the pattern and practice of use of excessive force, the use of unreasonable force to chill speech, and unconstitutional searches and seizures.  Many cases involve more than one type of violation.  We also discuss specific deficiencies that cause and contribute to each of these violations.

A.      **PRPD Engages in a Pattern and Practice of Use of Excessive Force**

1.      **Officers Use Excessive Force in Violation of the Fourth Amendment**

PRPD officers use force, including deadly force, that is unnecessary and unreasonable in the course of arresting or detaining individuals who pose little, if any, risk of harm, or who offer minimal resistance. The use of excessive force includes punching or taking subjects to the ground, as well as striking and jabbing with batons, deploying chemical agents, using choke holds and other neck restraints, and discharging firearms. Many subjects of excessive force were, at the time of the incident, carrying out ordinary activities or committing minor infractions. Officers also use excessive physical force in response to perceived verbal slights or after an individual stops resisting. These practices are the result of woefully inadequate or non-existent policies and accountability systems on officers' use of force, including PRPD's failure to provide effective training and discipline. We discuss additional deficiencies causing and contributing to the pattern and practice of excessive force in Section IV.

Although complaints of excessive force by PRPD officers have existed for many years, the 2007 videotaped shooting of Miguel Cáceres Cruz exposed many of the deep-rooted deficiencies that continue to plague PRPD. On August 11, 2007, Cáceres Cruz was directing traffic as part of a motorcade that had gathered for a birthday celebration in Humacao. Officers Javier Pagán Cruz, Carlos Sustache Sustache, and Zulma Diaz de León drove by Cáceres Cruz and stopped after they heard him say something they believed was an insult. Officer Pagán Cruz, a member of TOU, exited the vehicle, approached Cáceres Cruz, and engaged in a verbal exchange. The officers then told Cáceres Cruz he was under arrest. Officer Pagán Cruz grabbed Cáceres Cruz and wrestled him to the ground. As they struggled, Officer Pagán Cruz discharged his firearm and shot himself in the leg. Officer Pagán Cruz then unholstered his firearm and shot Cáceres Cruz multiple times at close range in the head and body. Officers Sustache Sustache and Díaz de León left Cáceres Cruz lying on the sidewalk as they drove Officer Pagán Cruz to the hospital without notifying central command that anyone else had been shot. Other officers arrived and found Cáceres Cruz bloodied and gasping for air. With the assistance of bystanders, officers placed Cáceres Cruz in a patrol car and drove him to the hospital where he was pronounced dead.

The officers' initial report indicated that Officer Pagán Cruz acted in self-defense because Cáceres Cruz resisted arrest and tried to gain control of the officer's firearm. The line supervisors' reports were based primarily on statements from the involved officers. A preliminary report prepared by a PRPD homicide investigator consisted only of statements from Officers Sustache Sustache, Díaz de León, and an alleged eyewitness who corroborated the officers' version of the events. The homicide investigator added summarily, "Also, various persons at the scene were interviewed, but they said adverse things about the officers." Critically, a video recording taken by a civilian surfaced shortly after the incident and was distributed widely in the media. The recording showed Officer Pagán Cruz standing over Cáceres Cruz and shooting him several times. On August 14, 2007, local prosecutors filed murder charges against Officer Pagán Cruz. He was found guilty of first-degree murder and weapon violations, and was sentenced to 109 years in prison on April 15, 2008.[20]

Officer Pagán Cruz was the subject of seven civilian and internal complaints at the time of the Cáceres Cruz shooting.  As of November 2008, five of these complaints, dating as far back as 1999, remained unresolved.  They included a 1999 complaint for domestic violence in which Officer Pagán Cruz allegedly beat and threatened his partner with a firearm, a 1999 complaint for insubordination, and a 2002 complaint for immoral conduct.  A separate internal affairs report issued four days after the shooting found that Officer Pagán Cruz had a "bad attitude," "strange behavior," and a "tendency for being an aggressive person."  However, his commanding supervisor indicated as part of yet another administrative investigation that Officer Pagán Cruz did not present a pattern of "repetitive conduct."  Despite his complaint history, he was permitted to join, and remain in, the TOU in Humacao.  The unit, consisting of 44 officers, was supervised by only two sergeants, one of whom had been on leave for weeks at the time of the incident.

The tragic events surrounding the Cáceres Cruz shooting served as a stark reminder of PRPD's institutional dysfunction:  officers engaging in verbal altercations with civilians; officers needlessly arresting civilians; officers using excessive force; officers being deliberately indifferent to the well-being of the community; PRPD supervisors failing to supervise; and internal affairs officers failing to timely and objectively investigate matters, or at all.  According to PRD, civilians filed over 1,500 complaints against officers for unjustified or excessive force and assault from 2004 to 2008.  During the course of our investigation, from January 2009 to August 2010, PRD reported an additional 268 complaints based on similar allegations.  Our review of a sample of these cases, as well as civil and criminal cases filed against officers, demonstrates that officers' use of excessive force constitutes a routine practice within PRPD.  We also found that longstanding deficiencies cause the pattern and practice of excessive force.

Improper and unconstitutional uses of force are rampant throughout PRPD.  Force is frequently used when it is unnecessary and gratuitous, and is often the first and last option considered by PRPD officers.  The use of excessive force by police officers in the course of an arrest, investigatory stop, or other seizure violates the Fourth Amendment.  *Graham v. Connor*, 490 U.S. 386, 394-95 (1989); *see also Jennings v. Jones*, 499 F.3d 2, 11 (1st Cir. 2007).  Courts analyze claims of excessive force, deadly or otherwise, under an objective reasonableness standard.  *Graham*, 490 U.S. at 394.  The analysis requires a balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the governmental interests.  *Id.* at 396.  The criteria courts apply to assess the reasonableness of an officer's use of force include the severity of the crime at issue; whether the subject presents an immediate safety threat to the officers or others; and whether the subject is actively resisting or attempting to evade arrest.  *Id.*; *see also Jennings*, 499 F.3d at 11; *Brenes Laroche v. Toledo Dávila*, 682 F. Supp. 2d 179, 189 (D.P.R. 2010).

Determining the reasonableness of an officer's use of force is a fact-dependent inquiry, based on the "totality of the circumstances."  *Graham*, 490 U.S. at 394-96.

Whether the force used to effect a particular seizure is reasonable 'must be judged from the perspective of the reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'  The reasonableness inquiry is objective, to be determined 'in light of the facts and circumstances confronting [the officers], without regard to their underlying intent or motivation.'

21

*Brenes Laroche*, 682 F. Supp. 2d at 189.  Our review of hundreds of force incidents revealed frequent violent reactions by officers that serve no public safety or law enforcement purpose.

Force can be excessive even when it results in only minor injury.  *Bastien v. Goddard*, 279 F.3d 10, 14 (1st Cir. 2002); *Alexis v. McDonalds Rests. of Mass., Inc.*, 67 F.3d 341, 353 & n.11 (1st Cir. 1995); *see also Glenn v. City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2001); *Headwaters Forest Def. v. Cnty. of Humboldt*, 240 F.3d 1185, 1199 (9th Cir.), *vacated and remanded on other grounds sub. nom.*, *Cnty. of Humboldt v. Headwaters Forest Def.*, 534 U.S. 801 (2001) ("Whether the use of force poses a risk of permanent or significant injury is a factor to be considered in evaluating the need for the force used in a particular case – but it is certainly not dispositive.").  PRPD's reliance on batons and other less lethal force to suppress demonstrators is no less unconstitutional, despite the fact that demonstrators have not yet experienced life-threatening injury.

The propriety of the use of deadly force is measured by *Graham*'s objective reasonableness test.  *See Scott v. Harris*, 550 U.S. 372, 384 (2007).  Courts generally find that deadly force is unreasonable "unless it is necessary to prevent escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others."  *Tennessee v. Garner*, 471 U.S. 1, 3 (1985); *see also Whitfield v. Meléndez-Rivera*, 431 F.3d 1 (1st Cir. 2005) (citing *Garner*, 471 U.S. at 11; *Jarret v. Town of Yarmouth*, 331 F.3d 140, 149 (1st Cir. 2003)).  Because it constitutes deadly force, the shooting of a suspect with a firearm requires the highest level of justification to be found reasonable.

A police officer may not seize an unarmed, non-dangerous suspect by shooting the subject.  *See Garner*, 471 U.S. at 11.  The Supreme Court indicated that it may, however, be reasonable for a police officer to use deadly force to prevent the escape of a suspect in cases in which there is probable cause to believe the suspect has committed a crime involving the infliction or threatened infliction of serious physical harm.  *Id.* at 11-12; *see also Scott*, 550 U.S. at 382 n.9.  Yet, even in those circumstances, police should provide a warning (if feasible) before using deadly force.  *Garner*, 471 U.S. at 11-12.  Moreover, while the initial shots fired at a suspect may be determined justifiable, continuous shooting at a suspect may not be.  *See Napier v. Town of Windham*, 187 F.3d 177, 185-87 (1st Cir. 1999); *Parker v. Town of Swansea*, 270 F. Supp. 2d 92, 99 (D. Mass. 2003).  As illustrated below, PRPD officers apply deadly force without necessary justification.

While many PRPD officers observe the Constitution while using force, few take steps to prevent other officers from improper conduct.  Officers may not just stand by and watch other officers use excessive force.  *See Calvi v. Knox County*, 470 F.3d 422, 428 (1st Cir. 2006) ("[A] bystander officer who has a realistic opportunity to prevent the use of excessive force by a fellow officer may in certain circumstances be held liable for failure to intervene."); *Davis v. Rennie*, 264 F.3d 86, 98 (1st Cir. 2001); *Hathaway v. Stone*, 687 F. Supp. 708, 712 (D. Mass. 1988).

In the following incidents, officers used unreasonable force to arrest or detain individuals who posed little, if any, threat of harm; used force in response to perceived insults or as retaliation to ensure later silence; or continued using force even after an initial threat or other resistance had dissipated.  In some instances, officers struck handcuffed subjects gratuitously.  We focus primarily on matters in which criminal and civil litigation has concluded so as to not

interfere with ongoing judicial proceedings.  Our investigation reveals that the conditions that led to these incidents – lack of adequate training, poor supervision, grossly inadequate policies, and a lack of meaningful accountability – remain significantly unchanged to this day.  We provide additional examples in Appendix A.

- On June 21, 2007, Juan Carlos Pérez Liz was at home with his friends and family when he heard multiple gunshots.  While on the telephone with a police dispatcher, approximately 12 PRPD officers entered his home with their weapons drawn.  Officers handcuffed Pérez Liz and the other individuals while they searched the home.  Officers took Pérez Liz to a separate room and questioned him about weapons.  As they escorted Pérez Liz through the house, an officer hit Pérez Liz in the head and told him that if they found a weapon, the officers would kill him.  During the search, Officer José Sánchez Abraham struck Pérez Liz in the face and allowed other officers to beat him.  Officer Sánchez Abraham struck Pérez Liz in the face again as officers escorted him to a police vehicle.  The officers took him to the Bayamón TOU station, where they continued to punch and hit him.[21]  At all times while being beaten, Pérez Liz was restrained and posed no threat to the officers or other persons.  The force used against him served no legitimate law enforcement purpose.

  On March 25, 2010, after the conclusion of a federal civil trial, a jury found Officer Sánchez Abraham and Sergeant Luis Pacheco Albizu liable for using excessive force in violation of Pérez Liz's Fourth Amendment rights.[22]

- On March 17, 2007, Betzaida Cruz Santiago and her daughter, Luz Cecilia Esmuria Cruz, were on their way home when they noticed TOU officers deploying chemical agents in the area.  As they approached their home, an officer ordered them to stop and blocked their path.  When Cruz Santiago pleaded with the officer to let them go, the officer grabbed Esmuria Cruz and slammed her to the ground.  The officer then hit Cruz Santiago in the leg with his baton, breaking her leg.  As she tried to get up, the officer hit her again, causing a compound fracture.  Other officers observed the incident, but did not intervene to protect Cruz Santiago and Esmuria Cruz.  The two women lay on the pavement for over an hour awaiting an ambulance to take them to the hospital.  At the hospital, Cruz Santiago was treated for leg fractures and shoulder pain.[23]  At no time did Cruz Santiago pose a risk to the officers or others.  The force they used was unnecessary.

  On June 10, 2008, the district court entered default judgment against Ponce TOU Director Alvarez Boneta and Supervisor Rosario García.  After the default judgment was set aside, Cruz Santiago and Esmuria Cruz settled the case with PRPD.

- On March 3, 2007, Officer Pedro Cruz Sierra arrested Rafael Ortiz Bermúdez without probable cause as he panhandled by the side of a road.  Officer Cruz Sierra took Ortiz Bermúdez to the back of a shopping center and beat him until he lost consciousness.  The force used against him served no legitimate law enforcement purpose.  Instead of taking Ortiz Bermúdez to a police station for booking, Officer Cruz Sierra abandoned him behind the shopping mall with injuries to his face and body.  A passerby found Ortiz Bermúdez the next day and transported him to the hospital.

On March 13, 2009, Officer Cruz Sierra pled guilty to aggravated assault and aggravated restraint on liberty, and the court sentenced him to three years of probation.[24]

- On January 8, 2007, Harry Rodríguez Rivero drove his car out of a store parking lot when a group of officers in plainclothes wielding firearms surrounded his car and demanded that he get out.  Fearing for his safety, Rodríguez Rivero attempted to drive away, but struck the car behind him.  He continued a short way down the road and pulled over when he heard sirens.  Police then surrounded him with their weapons drawn.  The police pulled him out of the car, threatened to kill him, dropped him on the ground, hit his mouth, grabbed his legs, and dragged him face down on the pavement before handcuffing him.  During this time, Rodríguez Rivero was not resisting and posed no threat to the officers or other persons.  The show of force and force the officers used against him served no legitimate law enforcement purpose.

  On November 10, 2009, at the conclusion of a federal civil trial, a jury found Officer Ramos Vélez liable for violating Rodríguez Rivero's Fourth Amendment rights and awarded Rodríguez Rivero $100,000 in damages.[25]

- On March 12, 2006, Jorge López Acosta was driving his vehicle with his brother when Officers José Alvarado Almódovar and Juan Meléndez Rivera stopped them.  With no legitimate law enforcement purpose, Officer Alvarado Almódovar drew his service weapon and shot López Acosta through the rear of his shoulder, breaking two ribs and injuring his lungs.

  On April 4, 2007, the district court entered default judgment against Officer Alvarado Almódovar on the excessive force claims.  López Acosta ultimately settled the case with PRPD.

- On March 2, 2006, Carl Leyva Ramos drove to a gas station he owned after learning that PRPD officers were blocking the station's entrance and searching customers and their cars.  Leyva Ramos then began to photograph the officers' actions.  Sergeant Antonio Rodríguez Nieves ordered officers to seize Leyva Ramos' camera.[26]  Several officers restrained Leyva Ramos and Officer Angel Díaz Casiano hit him in the hand with a flashlight, although Leyva Ramos posed no threat and the force was unnecessary to restrain him.[27]

  On March 3, 2010, the district court entered default judgment against Officer Díaz Casiano and Sergeant Rodríguez Nieves.  On March 26, 2010, a jury found that the officers unreasonably injured Leyva Ramos in violation of his federal civil rights and awarded him $4.7 million in damages.  On April 8, 2010, Leyva Ramos settled the case against other PRPD supervisors for an unspecified amount.

  Sergeant Rodríguez Nieves has served as a defendant in other federal civil rights cases, including a case involving the 2004 shooting death of Luis Cepeda and the 2004 false arrest of David Rodríguez Román.  On June 24, 2011, Luis Cepeda's family members settled the case against Rodríguez Nieves for an unspecified amount.  On May 13, 2009,

at the conclusion of a civil trial, a jury found Rodríguez Nieves liable for violating Rodríguez Román's rights and awarded Rodríguez Román $120,000 in damages.

### 2.     Officers Use Unreasonable Force to Suppress the Exercise of Protected First Amendment Rights

Demonstrators are frequently the target of PRPD's use of unreasonable force. Specifically, we found that officers use batons, chemical agents, and other physical force indiscriminately against individuals who are either participants or bystanders in protests and who pose little or no threat to officers or others. In many cases, the infliction of harm has no legitimate purpose, such as to effect an arrest or protect public safety. Instead, PRPD's repeated reliance on indiscriminate and unreasonable force instills fear in individuals and discourages future actions protected by the First Amendment. The actions of PRPD officers during demonstrations have been widely reported in the press and have prompted criticism within Puerto Rico and nationally.

The First Amendment prohibits government actors from "abridging the freedom of speech," U.S. Const. amend. I, and prohibits a government official from subjecting an individual to retaliatory actions for speech that falls under the protections of the First Amendment. *Hartman v. Moore*, 547 U.S. 250, 251 (2006) (holding that official reprisal for protected speech offends the Constitution because it threatens to inhibit exercise of the protected right) (internal citations omitted).

The frequency and severity of excessive force by PRPD against individuals engaging in protected speech is designed to chill speech in violation of the First Amendment. For years, individuals engaged in protests and other public demonstrations have been harmed and injured at the hands of PRPD officers. PRPD also has a long history of tolerating officers' clear disregard of Puerto Rican laws requiring officers to visibly display their badge numbers to allow the public to identify officers who may be engaging in misconduct.[28] In the following incidents, officers in TOU and other units used unreasonable force and inflicted pain and injury against civilians who were protesting government action. Many of these individuals were not posing a significant threat or violating the law, as evidenced by the paucity of arrests or findings of probable cause by the courts. PRPD reports following these incidents routinely fail to account for widespread civilian injuries and specific uses of force. In each instance, there is no evidence that officers issued effective dispersal orders, employed alternatives to force, or relied on adequate planning or tactics to prevent pervasive and arbitrary use of force. Many civilians complained that officers concealed their badge numbers to prevent civilians from identifying officers who engaged in misconduct. Supervisors who were on hand also failed to exert sufficient command and control to maintain discipline among the officers.

Government actions that threaten to chill protected activity can occur in a variety of situations. *See, e.g.*, *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 674 (1996) (holding that First Amendment protections apply to government contractors as well as government employees, noting that in either case government efforts "may chill speech on matters of public concern"). Generally, the First Circuit has held that claims alleging violations of the First Amendment by law enforcement officers fall under the analysis used in the employment context. *Willoughby v. Town of Tisbury*, No. Civ. A. 09-11398-JLT, 2010 WL 4502290, at *6 (D. Mass. Nov. 10, 2010)

(quoting *Tatro v. Kervin*, 41 F.3d 9, 18 (1st Cir. 1994)) (applying a "but for" standard of proof used in the employment context to a First Amendment claim against a police officer). The analysis considers whether government actions chill or intimidate speech, and whether such actions are motivated by an "intent or desire to curb . . . expression." *Id.* (quotations omitted). The government action must be such that it would curb the expression of a "reasonably hardy individual." *Agosto de Feliciano v. Aponte Roque,* 889 F.2d 1209, 1217 (1st Cir. 1989) (informal harassment can support a retaliation claim if the "government's actions are sufficiently severe to cause reasonably hardy individuals to compromise their political beliefs and associations"), *abrogated on other grounds by Maldonado*, 568 F.3d 263; *see also Barton v. Clancy*, 632 F.3d 9, 30 (1st Cir. 2011) (even "relatively minor events" can give rise to liability for retaliation). Furthermore, intent to discourage First Amendment rights can be inferred from an aggregation of "parallel or interrelated actions." *Rosario Urdaz v. Velazco*, 433 F.3d 174, 179-180 (1st Cir. 2006) (noting that incidents can take color from, and accumulate with, other incidents to establish sufficient basis for supervisory liability in a First Amendment claim for harassment). The First Circuit has also held that the threat of arrest may constitute a chilling act in the First Amendment context. *McGuire v. Reilly*, 386 F.3d 45, 59 (1st Cir. 2004) (holding that protesters had standing to assert a First Amendment violation when they alleged that their speech rights had been chilled by fear of arrest when protesters had been threatened with arrest).

PRPD routinely deploys TOUs to engage with crowds and protesters without any meaningful effort to control or restrain the use of excessive force by these units. PRPD has been on notice that TOUs frequently use violent force without justification. For instance, in December 2007, an evaluating committee established by former Superintendent Toledo Dávila found numerous complaints against TOUs for abuse of authority. The committee observed, "The indiscriminate use of batons in total disregard of existing regulation . . . has occasioned totally unjustified, multiple, and serious injuries to citizens."[29] A TOU officer interviewed by the committee told members that unit officers "jump into action to resolve, not to dialogue," further evidencing the officers' propensity for using force, regardless of the circumstances.[30]

The committee's observations are consistent with our findings that TOU officers use extreme displays of force, and actual force, to gain respect through intimidation. In this regard, a high-ranking PRPD official acknowledged in September 2010 that TOU officers do not view arrests, regardless of the force they use, as one of their responsibilities. In response to the paucity of arrests during the June 30, 2010, demonstration at the Capitol, TOU officers reportedly explained that "arrests are someone else's job." PRPD made only two arrests on June 30, despite the widespread use of force against hundreds of demonstrators. Strikingly, during our December 2010 tour, another high-ranking PRPD official indicated that residents in Puerto Rico do not fear or respect PRPD officers, but they do fear and respect TOU officers.

### a.    University Avenue – August 21, 2009

On August 21, 2009, municipal officers attempted to arrest a man for drinking an alcoholic beverage on University Avenue in Río Piedras near the University of Puerto Rico ("UPR"). The man reportedly resisted arrest and ran into a nearby business establishment, but was eventually taken into custody. Bystanders, many of whom were college students, criticized the arrest and some reportedly threw bottles and other objects at officers. Officers from PRPD's tactical units arrived promptly on the scene. They began to clear the street and disperse the

crowds using chemical agents, baton strikes, and other physical force.  Many individuals who were not throwing objects or engaging in other criminal activity were caught in the police action.

After the violence was quelled, officers continued to use batons to push and hit unresisting individuals who were attempting to leave the area.  The use of force against individuals who were not posing any immediate threat to the officers or attempting to evade arrest did not serve any valid law enforcement purpose.  Video recordings and statements from witnesses indicate that officers used their batons in a forceful, arbitrary, and unnecessary manner.  For instance, videos show officers striking a civilian wearing a backpack while he was walking by himself on the sidewalk.  Other videos show officers using batons to forcefully shove individuals who were walking in a single file as they left the area.

At approximately 3:00 a.m., after officers cleared University Avenue, college students gathered at a dormitory and began to criticize officers who were staged across the street.  The students were chanting, calling the officers "abusers," and yelling other insults.  The students remained inside the dormitory's fenced courtyard and were not throwing objects or posing any immediate threat to the officers.  Without warning, the officers then pointed a shotgun directly at the students and fired a gas canister, hitting Michelle Padrón Gauthier in the thigh above the knee while she stood peacefully in the courtyard.  Padrón Gauthier, who sustained an open wound, was unable to walk and fell to the ground.  As other students attempted to aid Padrón Gauthier, officers fired a second gas canister at the students, followed by a third canister.  The canisters emitted noxious chemicals, affecting both protesting students and others who were inside the dormitory and not involved in the demonstration.[31]  The intentional discharge of multiple canisters of chemical irritants directly at students who were expressing their criticism of police action on University Avenue served no legitimate purpose.  A special commission convened by the dean of the UPR campus also found that officers' use of force was directed at students' speech, observing that "the use of tear gas is not acceptably justified as a response to an insult."[32]

According to police reports, students injured officers and damaged police vehicles.  However, the reports do not explain or address the extent of civilian injuries.  Officers arrested five civilians in connection with the incident, but dropped most of the cases because of a lack of probable cause.  The man whose arrest precipitated the events was charged with inciting a riot, but the charges were also ultimately dismissed.

    **b.**    **Sheraton Hotel – May 20, 2010**

On May 20, 2010, approximately 200 students, union leaders, and public employees gathered at the Sheraton Hotel to protest the Governor who was attending a fundraising event.  According to a PRPD report, PRPD deployed TOU and other officers to the area after the crowd began making threats and using obscene language.  However, a commander soon ordered these officers to leave because the police presence at the event appeared excessive.  After the officers left, some of the protesters entered the hotel lobby, chanting and marching, before another group of individuals began pushing security staff to gain access to the hotel's escalators.  As individuals were repelled away from the escalators, a contingency of reinforcing officers arrived and began clearing protesters from the hotel lobby using physical force and baton strikes.  Officers also deployed chemical agents against individuals.[33]

Videos of the incident depict officers using significant force against individuals who already had been dispersed from the hotel lobby. While some of the force was directed at individuals who charged the officers, many were hit and sprayed indiscriminately as they stood by or tried to flee the area. Officers swung batons like baseball bats and used overhead strikes against protesters posing no threat to the officers. Strikes to the head with an impact weapon can cause serious harm or even death and should not be used against individuals who are passively resisting or exiting an area as directed by officers. A union leader was sprayed with chemical irritants when she stepped toward the officers to admonish them, causing her to collapse on the ground.

Inside the lobby, several officers attempted to restrain José Pérez Reisler, who was marching while holding a sign. According to video footage, officers wrestled him to the ground and at least two officers climbed on top of him. One officer pressed his weight on the back of Pérez Reisler's neck, forcing his face to the ground. While Pérez Reisler was face-down – still with officers on top of him – Officer Melvin Rosa Cortés applied a Conducted Energy Device ("CED") three separate times in the stun, or direct contact, mode. We observed from video recordings that Officer Rosa Cortés applied the CED at various points of Pérez Reisler's body while telling him to "cooperate," but not offering other specific commands, such as ordering him to place his hands behind his back. The officer's CED report falsely stated that he gave the proper commands and that the CED was deployed because Pérez Reisler was aggressively fighting. Photographs also depict then-Associate Superintendent José Rosa Carrasquillo kicking Pérez Reisler while Pérez Reisler was restrained on the ground. There was no legitimate law enforcement purpose for this use of force, as Pérez Reisler was not posing a safety threat or attempting to flee. Rosa Carrasquillo resigned in December 2010, reportedly for unrelated reasons.

From our review, Pérez Reisler was not a flight risk or physically combative. Rather, he appeared to be passively resisting the officers when he tucked his hands underneath his body. There were also a sufficient number of officers on hand to control him and even physically lift him, if necessary. The officers thus had no legitimate law enforcement purpose for the force. Despite the officers' claim that Pérez Reisler was non-compliant and aggressively fighting them, the officers released him without any charges. Officers had detained Pérez Reisler just days earlier, on May 14, when he attempted to enter UPR. Officers threw him to the ground, handcuffed him, and sprayed him in the eyes at close range with chemical irritants. Pérez Reisler was not resisting or attempting to evade arrest. PRPD detained him for approximately nine hours but did not charge him with any crime.

Despite the substantial use of force, PRPD detained only four individuals at the Sheraton Hotel. Two individuals were released without charges, and prosecutors declined to prosecute the other two arrestees. Reports provided by PRPD described injuries sustained by officers and property damage, but failed to account for injuries to civilians, such as bruises and lacerations, or specific instances of use of force. In conclusory fashion, a supervisor reported, "The TOU and SOU [Special Operations] units were then activated to contain and control the violent conduct of the students . . . using the necessary physical force."[34]

On December 14, 2010, CRC issued a resolution finding that multiple civilians, journalists, photojournalists, and officers were injured during the incident.[35]  CRC also expressed concern over video footage of individuals who were assaulted as they attempted to exercise their rights, finding that the police action may have resulted in "serious violations of constitutional guarantees, democratic processes, and freedom of expression of all people of Puerto Rico."[36]  Despite reliable video and the civilian complaints that served as the basis for the CRC resolution, the Superintendent reported during our December 2010 tour that no one had come forward with a sworn statement to complain about officers' actions and that PRPD had not identified any officer misconduct.

### c.  Capitol – June 30, 2010

On June 30, 2010, various groups, including labor organizations, journalists, and university students engaged in demonstrations at the Capitol over a series of escalating disputes that included press access to the Capitol.  PRPD was aware of the planned demonstrations and prepared an operational plan, dated the same day as the incident, June 30.  The incident began unfolding by mid-afternoon with two discrete encounters between protesters and police.  First, several individuals and student journalists entered the Capitol, but were denied access to areas traditionally open to the press and public.  When officers used physical force to stop them from entering further into the Capitol, they sat in a hallway in protest.  Security staff and officers acting together then forcibly removed them by spraying chemical irritants, kicking, pushing, and striking them with batons, and throwing them out onto the Capitol's concrete exterior stairs.  At the same time, students and their supporters gathered outside of the Capitol and tried to enter to read a proclamation, but tactical operations officers forcibly repelled them.

The second major encounter occurred approximately two hours later, after the crowd grew and engulfed areas around the Capitol.  Because officers used an open central plaza as a staging area, protesters were forced to spill into the adjacent parking lots.  At a pivotal moment, videos show a predominantly peaceful, but animated, crowd.  After commanders circulated orders among the staged officers, an officer approached the crowd.  Using a protester's megaphone, the officer announced that he needed the crowd's cooperation to move cars from the parking lot.  The officer did not order the crowd to disperse, nor did he impart instructions on where to move or advise the crowd of the consequences for noncompliance.  The announcement caused visible consternation among the protesters who stayed in place and continued chanting.  A group of tactical officers then moved toward the crowd.  The officers and protesters began pushing and shoving each other and some in the crowd began throwing objects at the officers.  Officers charged the crowd, hitting, striking, and pushing anyone in their path, including individuals who were attempting to disperse or had their backs to the officers in a non-threatening manner.  Officers also deployed tear gas and chemical irritants.  Several witnesses also reported seeing a lieutenant unholster and point his firearm at civilians.  One civilian reported that the lieutenant discharged his firearm without justification.  In December 2010, former Superintendent Figueroa Sancha indicated that he was unable to determine whether the lieutenant discharged his firearm because the ballistic tests were inconclusive.

As illustrated below, many individuals participating in the protest were not posing any threat to public safety, and none were arrested:

- A student journalist, Rachel Hiskes, entered the Capitol with other individuals and attempted to access the Senate chambers. PRPD officers, who had been dispatched to the Capitol earlier in the day, stopped Hiskes and hit her. She was not resisting or combative. Hiskes then sat in the hallway with other visitors in protest. A Capitol employee then sprayed Hiskes and others with chemical irritants. As Hiskes tried to get up, an officer hit her across the back with a baton, causing her to fall. An officer continued to push and strike her with his baton, driving her toward the doorway. When she reached the door and had her back to the officer, the officer shoved her out onto the concrete stairs using his baton and hitting her in the neck. Hiskes was not arrested or charged with any crime.

- Juan Ángel Gutiérrez also entered the Capitol and was denied entry to the galleries. He then began photographing the officers hitting journalists. Capitol staff tried to take away his camera and sprayed him with chemical irritants. He fell to the ground covering his face and writhing in apparent pain. While on the ground, officers kicked Gutiérrez several times. Gutiérrez was not combative or resisting. He was not arrested or charged with any crime.

- Omar Silva Meléndez reported that he arrived at the demonstration and observed an officer assaulting several female protesters. As he assisted one of the protesters who had been hit by officers, police deployed a gas canister, hitting Silva Meléndez in the forehead. The blow caused a second-degree burn and an injury requiring stitches. Silva Meléndez was not engaged in criminal activity, resisting officers, or attempting to evade arrest.

- A legislator reported that she arrived at the Capitol vestibule and observed an officer kicking a woman as she sat on the ground. The legislator told the officer to stop and showed her identification. An officer then hit the legislator in the arm with a baton, causing significant bruising.

- An attorney who was serving as a legal observer reported that he saw an officer hit a student in the head and officers throwing students down the Capitol's exterior stairs. He was sprayed with chemical irritants. He later observed officers form a perimeter around the central plaza. He reported that officers did not attempt to dialogue with the protesters or answer questions. Many officers were also not wearing their name or identification badges, as required by Puerto Rico law.

- Betty Peña Peña arrived at the protest with her 17-year-old daughter and reported that about an hour and forty-five minutes after arriving, officers began to attack the crowds. An officer hit Peña's daughter in the head with a baton, causing trauma and other injuries. Officers continued kicking and hitting the daughter with batons. Peña tried to cover her daughter to protect her from further injury. Peña's daughter was then dragged away. Both Peña and her daughter sustained injuries to the head. Peña's daughter also sustained abrasions on various parts of her body. Both also had difficulty breathing because of the tear gas and other chemical irritants used by police. Neither Peña nor her daughter was combative or physically resisting. Neither was arrested or detained.

30

- A university student reported that she arrived after other students were repelled from the Capitol stairs.  Officers pushed her, hit her in the chest, and struck her ear with a baton.  She fell to the ground.  A Capitol employee assisted her to the Capitol health unit where she was given first aid.

- Without provocation, an officer forcefully shoved a photojournalist wearing credentials as he walked past a group of officers in the parking lot.  The photojournalist fell to the asphalt, sustained an abrasion, and broke his camera.  The photojournalist was not posing a threat to public safety or to the officers.

Following the incident, former Superintendent Figueroa Sancha stated publicly that he was responsible for all decisions involving the removal of individuals.  He also publicly justified the officers' use of force.  However, it is evident that the use of excessive force against protesters was directed at chilling speech and intimidating protesters, rather than protecting public safety or restoring order.  First, Figueroa Sancha's claims of widespread lawlessness by protesters are not supported by the number of arrests.  At the conclusion of the barrage, only two individuals were arrested for alleged damage to a police vehicle.  They were released after a judge found no probable cause.  Second, a PRPD committee evaluating the June 30 incident observed a total lack of control by officers.  According to committee minutes dated July 23, 2010, members discussed how to undo the impact of the incident, including whether to make TOUs "disappear."  Third, PRPD recognized the potential chilling effect of its tactics on protected First Amendment activities.  An October 2010 memorandum issued by the Office of the Superintendent detailed the elimination of the Specialized Tactical Unit, a military-style crowd control unit, to secure First Amendment rights.[37]  Finally, CRC has repeatedly warned that the manner in which PRPD engages with crowds who are exercising their First Amendment rights threatens to abridge those rights.  For instance:

- On July 1, 2010, CRC publicly expressed its consternation about the government's intervention with protesters, journalists, and citizens who were attempting to exercise their First Amendment right to free speech at the Sheraton Hotel on May 20, 2010.[38]

- On July 2, 2010, CRC issued a resolution calling for an investigation into the actions of PRPD officers, based on images and news reports of injuries to individuals attempting to exercise their right to free expression.[39]  CRC again expressed concern that the restrictions on individuals' rights by police may represent serious civil rights violations.[40]

- On February 14, 2011, CRC issued yet another resolution expressing concern over police interventions inside and around UPR.[41]  CRC noted that the media continued to depict civil rights violations of civilians exercising their right to protest and that police were undermining these rights through "detentions, discrimination, threats, violence, harassment, persecution, intimidation, including against members of the press."[42]  CRC reminded PRPD of its duty to safeguard civil rights and its responsibility to use proportional force when engaging with citizens.

Officers also began employing pressure point techniques on individuals who were passively resisting.  We also observed the use of choke holds against individuals, including one instance in which an officer used his baton as a neck restraint.  Carotid and choke holds have the

potential of causing death or serious injury and should only be used when subjects pose an immediate risk of death or serious bodily harm.  We also learned that PRPD maintained Chloroacetophenone (commonly referred to as "CN gas") in its inventory and that it continued using substantial amounts of chemical agents against crowds.  Many law enforcement agencies have replaced CN gas with other less toxic chemical agents for crowd control purposes.

The use of compliance techniques and offensive tactics that pose a significant likelihood of serious bodily harm without an apparent and substantial law enforcement purpose causes protesters, witnesses, and other observers to refrain from opposing PRPD and chills citizens' protected speech.  Additionally, we have reasonable cause to believe that the aforementioned instances of PRPD conduct in response to protests and civil demonstrations satisfy both the causal and negative impact requirements necessary for demonstrating a First Amendment violation.

### 3.    Deficiencies Causing and Contributing to the Pattern and Practice of Excessive Force

The use of excessive force by PRPD officers is a serious problem that has long been recognized by Puerto Rico officials.  For instance, an external evaluating committee convened by former Superintendent Toledo Dávila reported in December 2007 that the use of excessive force by PRPD constituted a "pattern of civil rights violations" that resulted in "nearly a total lack of confidence" in PRPD.[43]  Over two years ago, in April 2009, PRPD reported that it was establishing a policy committee to draft updated policies on use of force.  However, PRPD has yet to develop or revise all necessary use of force policies.  Even with the development of new written policies, without the implementation of effective accountability systems, such as meaningful force reporting and supervisory review processes, Puerto Rico residents will continue to be subjected to preventable harm at the hands of police.

The pattern and practice of excessive force by PRPD is rooted in agency and supervisory deficiencies that have resulted in a culture of indifference to the physical integrity and constitutional rights of Puerto Rico's residents.  In addition to other systemic problems discussed in Section IV, these deficiencies include:

> "No accountability in use of force system.   I can't be the police, judge, and jury.  We can't have that archaic vision."
>
> - PRPD Sergeant

- Non-existent, unclear, and contradictory policies on use of force;
- Lack of reporting requirements and objective supervisory review;
- Inadequate systems to review critical incidents, such as firearm discharges;
- Insufficient training on use of force; and
- Condoned fear and violence by tactical units

### a.  Force policies are severely deficient

PRPD deploys officers without sufficient guidance on the lawful use of force.  Contrary to contemporary policing practices, PRPD has not implemented a comprehensive use of force policy that instructs officers on current legal standards.  Although PRPD reports that it issued a written policy on use of force, it has yet to train officers on the new policy.  Other existing policies, as described below, fail to incorporate current legal requirements, do not define force uniformly, use ambiguous or conflicting terms, and do not emphasize appropriate alternatives to physical force.  PRPD has not implemented policies on force options authorized by PRPD, such as chemical irritants, impact weapons, and less lethal munitions.  PRPD policies also do not provide guidance on how officers should respond to individuals experiencing a mental health crisis or to civil disturbances and crowds.  The lack of basic policies points to PRPD's chronic failure to establish any meaningful or reliable system to manage officers' use of force.

More fundamentally, we found significant inconsistencies in officers' understanding of the meaning of "force."  For instance, some officers defined "force" as "lethal force," "excessive force," or "intervening with an individual."  Rarely did officers describe force in functional or operational terms, such as taking a subject to the ground, employing a choke hold, or punching, kicking, or striking with a baton.  In this regard, an officer who does not believe he is using "lethal force" or "excessive force" when he punches, hits, or otherwise injuries a person will simply not feel obligated to report or justify his actions.  Thus, it is not surprising that unjustified slaps, punches, kicks, choke holds, takedowns, baton strikes, chemical use, and more intrusive forms of force routinely go unnoticed by PRPD commanders and supervisors.  Given the magnitude of excessive force we uncovered from a sample of PRPD documents and the public record, it is extremely troubling that PRPD cannot account for the full scope of force its officers use against the people of Puerto Rico.  Simply put, the failure to instruct officers on the specific actions that they will be held accountable for in the course of their interactions with the public reflects a profound indifference to civil rights.

**Batons**

General Order 98-6, issued more than 12 years ago, governs PRPD officers' use of the baton, a standard-issue impact weapon.  The policy fails to articulate any legal standard on the use of the baton, including the objective reasonableness standard in *Graham* or the criteria that are to be considered in determining the reasonableness of force.  These criteria include the severity of the crime at issue, the extent to which the suspect poses an immediate threat to the safety of the officer or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight.  *Graham*, 490 U.S. at 396.  Instead, GO 98-6 indicates that the purpose of the policy is to "establish guides for the most effective use of the baton when submitting a civilian to obedience."  The policy does not specify when the government has a legitimate interest to submit an individual into "obedience."

General Order 98-6 also uses terms that are ambiguous and do not describe a subject's level of resistance.  Instead, GO 98-6 instructs officers that the baton *must* be used in eight enumerated circumstances, including to "stop or control riots or crowds," "facilitate movement of a person or persons," and "control individuals."  General Order 98-6, as worded, also does not

provide for any meaningful alternatives to the use of the baton, including using verbal persuasion or calling in reinforcements.

Other sections of GO 98-6 are internally inconsistent and place individuals at serious risk of harm.  For instance, Section E instructs officers to avoid striking certain parts of the body because they may be fatal, including areas above the shoulders, genitals, spine, or the *solar/celiac plexus* (the network of nerves situated in the *abdomen* behind the stomach and in front of the aorta and diaphragm).[44]  Section D, however, lists areas of the body that may be struck without causing serious injury, including the *chest* and *abdomen*.  This conflicting language is of particular concern given PRPD's practice of jabbing and ramming batons into individuals' bodies using the metallic ball on the ends of the batons.  Also, Section F merely "suggests" that officers avoid raising the baton above the head when striking an individual, using the baton to provoke a subject, and using the baton against a subject who has been neutralized, rather than clearly prohibiting or restricting these dangerous and unreasonable practices.  The improper use of batons by PRPD officers has contributed to serious injuries, specifically during the large demonstrations discussed above.

### Conducted Energy Devices

There are similar deficiencies in GO 2008-2, which governs PRPD's use of CEDs.  For instance, GO 2008-2 does not specify any legal standard for the use of CEDs, including the objective reasonableness standard in *Graham*, 490 U.S. at 396.  Instead, GO 2008-2 ambiguously references "public safety" as the basis for using CEDs in various sections of the Order.  Section C describes CEDs as "non-lethal" weapons that permit officers to "end violent situations, for security reasons" and states that the use of CEDs "shall be carried out in those circumstances where the officer believes the use of [the CED] is appropriate, based on public safety considerations."  Although Section G indicates that law enforcement officers are required to act "prudently" and "reasonably," GO 2008-2 does not specify the factors that should be considered when determining the reasonableness of CED deployment, such as the level of resistance of a subject or the severity of the crime at issue.

Most significantly, GO 2008-2 fails to acknowledge that CEDs can be lethal.  CEDs have been cited by medical authorities in recent studies as a cause of, or contributing factor in, certain deaths.[45]  In addition, GO 2008-2 does not address situational hazards that could result in serious injury or death.  These situations include using the device against an individual who is in an elevated location, such as a bridge or rooftop, or against individuals who are restrained or handcuffed.  GO 2008-2 also does not:

- require warnings or use of less intrusive alternatives, when feasible;
- require re-assessing the subject's threat or resistance level following each deployment cycle;
- address removal of CED probes that puncture the skin; or
- provide guidance on post-deployment medical attention.

## Firearms

PRPD's firearms policy, GO 2004-3, provides a legal standard for use of deadly force, but leaves critical terms undefined.  For instance, Section D.1 states that "when using a firearm, only the minimum amount of force that is consistent with achieving the mission shall be used." GO 2004-3 does not define "achieving the mission" and fails to reinforce the actual legal standard, which requires that an officer have probable cause to believe that a subject poses a significant risk of death or serious physical injury to the officer or others.  *See Garner*, 471 U.S. at 3.  Other critical terms in GO 2004-3 are unclear and may cause confusion about the necessity or reasonableness of force.  Section D, "Guides for the Use of the Regulation Firearm," states that the firearm is considered a "defensive weapon and not a tool for arrests."  However, the provision does not address whether, and under what circumstances, officers may shoot at fleeing suspects.  Other important aspects that are critical to managing officers' use of deadly force are missing from GO 2004-3.  For example, GO 2004-3 does not cover the appropriateness of warning shots; the consequences of missing the three annual shooting practices required by GO 2004-3; and the reporting requirements when a firearm is discharged or another form of lethal force is used.

PRPD's firearms policy provides the only discussion of lethal or deadly force.  As a result, officers do not receive formal guidance on other types of force that may constitute lethal or deadly force, such as choke holds, carotid holds, and strikes to the head with impact weapons. In addition, PRPD's firearm policy does not address many procedures that should apply to all forms of lethal force, including the use of verbal warnings prior to using force and the supervisor's role in reviewing uses of lethal force.  Indeed, the only post-shooting procedure that is mentioned in GO 2004-3 relates to maintenance of the firearm, rather than to any post-shooting review to determine the appropriateness of the shooting.  In this regard, GO 2004-3 states, "After shooting a firearm, the principle consideration that should be present is the prevention of rust."

## Other Force

On January 26, 2011, we notified Puerto Rico that we were concerned over news reports depicting PRPD officers using force against individuals who offered minimal or passive resistance during student protests.  Specifically, we urged PRPD to restrict the use of choke holds and other carotid pressure techniques to situations warranting lethal force and to require officers to report, at a minimum, when lethal force is used.  We also urged PRPD to prohibit the use of CN gas and to decommission any remaining stock in its inventory because most law enforcement agencies had replaced CN gas with other less toxic chemicals.  On February 10, 2011, Puerto Rico reported that PRPD had banned the use of CN gas, ordered its decommission, and restricted the use of choke holds, carotid holds, pressure point techniques, and rubber stinger ball cartridges.  Puerto Rico also reported that it was completing a new use of force policy, based on model policies and comments we provided.  Although these policy developments are encouraging, without effective accountability measures on use of force, discussed further below, the issuance of new policies or directives provides no guarantee that officers will follow them or that officers will be held accountable when violations occur.

In sum, PRPD's existing policies on use of force are inadequate and do not provide officers with necessary guidance to ensure that force is used in accordance with constitutional requirements and contemporary policing practices.

### b.      Reporting and review requirements fail to hold officers accountable

PRPD has not implemented basic reporting and review requirements to ensure officers use lawful and appropriate force during an arrest or detention, or in other interactions with civilians.  Use of force reports allow supervisors and commanders to collect and analyze essential information about the factual circumstances surrounding a use of force.  At the individual officer level, reliable and accurate information from these reports permits supervisors to formulate objective conclusions about an officer's conduct.  More broadly, aggregate information on use of force allows agencies to improve policies, training, tactics, and management.  Thus, a properly functioning system provides law enforcement agencies with the tools to hold officers and supervisors accountable when misconduct occurs, provides critical feedback to develop safer and more effective policing methods for officers and the community, and helps strengthen the public's confidence in the agency's ability to regulate itself.

As discussed above, PRPD does not provide a uniform definition of "force" that is commonly understood by officers throughout the agency.  This omission prevents officers from consistently distinguishing between reportable uses of force and routine physical contact that does not require formal supervisory review, such as escorting a subject or routine handcuffing.  The facts of every use of reportable force must be established and reviewed.  For the lowest levels of force, such as "soft" control techniques where there is no complaint of injury, a report fully describing the force used may be sufficient.  For intermediate levels of force, such as hand strikes, punches, and use of chemical agents, particularly where there is a complaint of injury or a discrepancy in the description of the force used, some level of investigation and review is required, even in the absence of a formal misconduct complaint.

We found three overarching problems concerning PRPD's policies and practices concerning use of force reporting and review.  First, PRPD's general orders regarding use of force reports are wholly inadequate.  As an initial matter, PRPD does not require officers to report all significant uses of force.  For instance, GO 2004-3 on firearms does not require any notification or report following an intentional or unintentional discharge.  There are no policies requiring written reports when officers use physical force, such as punches, kicks, or take downs, or when officers use chemical irritants or less lethal munitions.  Even where reporting requirements exist, in the case of batons and CEDs, the procedures are vague and do not require supervisors to conduct independent reviews of officers' use of force.  For example, GO 98-6 requires that PRPD officers submit a written report after using a baton that results in serious bodily harm.  However, GO 98-6 neither defines "serious bodily harm," nor does it describe the information that should be included in the report.  In our interviews, officers were unable to provide a clear and consistent operational definition of the type of injury that would require a use of baton report.  For instance, supervisors of specialized units reported that they would not respond to the scene of an incident to review an officer's use of a baton that resulted in a broken arm.  Thus, officers are allowed to escape review by their supervisors when they inflict significant injury, such as a broken bone.

36

In response to our initial document requests for use of force reports, PRPD first indicated that none existed.  Several months later, PRPD explained that officers *may* mention the use of force in incident reports that are prepared when an officer arrests an individual.  However, PRPD was unable to produce these documents.  PRPD explained that production would require already-extended staff to cull through thousands of pages of individual incident reports to glean from handwritten narrative descriptions whether any force was used.  We later learned that some supervisors maintain copies of documents with use of force information.  Based on our review, these records varied significantly by unit and region.  During our March 2009 tours, we requested all documents concerning use of force from the tactical and special operations units for the preceding six months.  These documents demonstrated a significant lack of uniformity in the reporting process, even down to officers' interpretations of the term "force."  For example:

- The SOU in San Juan produced a one-page memorandum indicating that its officers had not used *force* in the last six months.

- TOU in San Juan produced a one-page memorandum indicating that it had not received any *complaints of use of force*.

- TOU and SOU in Guayama produced memoranda regarding three incidents, prepared by supervisors within days of the incidents, informing higher-level commanders that officers had used *chemical agents, batons, and firearms*.  The memoranda were based on officers' accounts of the incidents and did not include any witness statements or information.

- TOU and SOU in Utuado produced memoranda indicating that only SOU had used force in the last six months.  Incident reports for three separate incidents were attached where individuals were arrested.  However, none of these reports described the type of force used by officers.

- TOU in Mayagüez produced a memorandum that referred specifically to our request (i.e., was not produced in the course of business), describing an incident that had taken place weeks before.  The memorandum, whose subject line read, "Interventions Conducted by the Tactical Operations Unit Where *Reasonable Force* Was Used," indicated that the subject "resisted arrest, struggled with the officers, and was injured in the intervention." It did not describe the specific actions taken by officers to subdue the subject, the extent of the subject's injuries, or whether the subject was provided with medical care.

- SOU in Aibonito produced a homicide investigation report concerning a complaint from the son of a PRPD officer who alleged that officers and a sergeant of SOU beat  him following a traffic stop on October 25, 2008.  Notably, there were no reports, memoranda, or any other written documents prepared by any of the officers involved in the incident describing the traffic stop or the circumstances surrounding the use of force.

- TOU and SOU in Arecibo reported jointly that no member assigned to these units had used *excessive force* in any intervention in the preceding six months.

- SOU in Caguas reported that it had not used *tasers or chemical agents* in the preceding six months.

Second, officers routinely reported that they are only expected to report force when a subject is arrested.  This is a serious deficiency because it permits officers to evade supervisory review simply by allowing a subject of force to leave or flee.  Officers should be required to report all uses of force, whether or not the subject of force is apprehended.  For instance, in April 2011, we observed video of an officer openly spraying two boys with chemical irritants without justification, after former Superintendent Figueroa Sancha prohibited the use of chemical agents twice in January 2011.  The boys were playing and were not arrested.  The officer did not report the use of force.  He was questioned about the incident only after a video taken by a bystander surfaced in the media.  Criminal charges have since been filed against the officer for assault.

Third, PRPD supervisors are not required to conduct objective, thorough, and timely reviews of officers' use of force to ensure the force was consistent with constitutional standards and departmental policies.  As written and in practice, PRPD's policies only require an officer to notify a supervisor for informational purposes.  Once supervisors are notified, supervisors prepare written memoranda to alert higher-level officials about a use of force based on the officers' recitation of the incident.  Supervisors simply take dictation.  PRPD commanders confirmed this practice during our December 2010 tour.

When supervisors are notified of a use of force resulting in significant injury or complaint of injury, they should canvass the scene to obtain as much information as possible from a variety of sources.  For instance, in addition to interviewing the officer involved, supervisors should note all injuries, identify and interview witnesses, and identify other physical evidence.  The review should determine whether the use of force was within agency policy and objectively reasonable, and, if not, whether and what discipline should issue.  The review should also indicate whether the involved officer needs additional training, counseling, or other assistance.  Finally, the review should include an examination of the police tactics and precipitating events that led to the use of force, so that the agency can evaluate whether any revisions to training, policy, practices, or tactics are necessary.  Use of force data should be incorporated into the agency's risk management system to detect potential patterns of at-risk conduct and improve performance.

PRPD's failure to uncover the extent of unjustified use of force during the August 2009 incident on University Avenue, the May 2010 incident at the Sheraton Hotel, and the June 2010 incident at the Capitol, *supra,* illustrates the multiple deficiencies plaguing PRPD's system of accountability on use of force.  For instance, despite the use of significant force by hundreds of officers, including the use of batons, physical force, and chemical agents, only one written report was completed by an officer who deployed a CED at the Sheraton Hotel.  No other officers were required to describe the force they used or the circumstances that led to their use of force.  There is also no evidence that PRPD supervisors attempted to obtain information from subjects of force or other witnesses to evaluate officers' actions.  Instead, PRPD officials indicated that they relied on civilians coming forward with sworn statements complaining about specific officers.  Even if supervisors had attempted to interview subjects or witnesses of force, numerous officers concealed their badge numbers and name plates, preventing individuals from identifying specific officers.  Further, post-incident reports prepared by supervisors included only generalized

references to use of force and failed to make any determination on the appropriateness of specific uses of force or account for specific injuries inflicted by officers. Therefore, it is not surprising that PRPD investigators identified only one instance of misconduct among the widespread use of force against non-violent civilians during all three incidents. The incident involved PRPD officers who fired three gas canisters at students who were merely yelling at police outside a dormitory in August 2009. Notably, PRPD's action came after video of the incident, disseminated widely on the Internet, showed a female student being carried by other students after one of the gas projectiles hit her in the leg, causing an open wound.

By failing to implement meaningful reporting and review requirements, PRPD abdicates its responsibility to ensure that officers use force in accordance with constitutional and agency requirements. Further, relying solely on civilian complaints to initiate use of force reviews is insufficient because victims or witnesses of excessive force may be inhibited from coming forward for a variety of reasons, including perceived or actual intimidation by officers or the inability to identify alleged aggressors.

### c.      Critical incident reviews are ineffective and improperly completed

While all reportable force should be reviewed and investigated, critical incidents, such as firearm discharges by officers (except those that occur in the regular course of training) and other force that results in serious injury or death, require more comprehensive independent review. To be complete, the critical incident review must be conducted from both the criminal and administrative perspectives. Neither investigation should depend on whether anyone has complained about the use of force. The investigations may be conducted at the same time or sequentially, depending on the circumstances.

PRPD's critical incident reviews are deficient. Specifically, we found that PRPD does not have uniform procedures that require notification and coordination among administrative and criminal investigators, resulting in incomplete tracking of critical incidents. A lack of coordination creates a serious risk of tainting or compromising a criminal prosecution or drawing conflicting conclusions regarding the circumstances surrounding a use of force. PRPD also does not routinely conduct critical incident reviews to identify operational deficiencies and implement corrective action.

Our investigation revealed that PRPD criminal investigators, including those assigned to the homicide units, lack investigative protocols that specifically address officer-involved incidents. In this regard, homicide investigators reported that they employ the same methods and techniques as any other civilian-involved homicide and do not take special precautions when the target or suspect is an officer. Criminal investigators reported that they do not ordinarily receive training on officer-involved shooting investigations and were unaware of any specific procedures. The head of one criminal investigative unit further indicated that existing GOs on criminal investigations were too broad to provide operational guidance and that he typically conducted both the criminal and administrative investigation.

The lack of consistent procedures impedes Puerto Rico's ability to track and analyze critical incidents involving PRPD officers. Currently, Puerto Rico is unable to track even police-involved shooting deaths accurately – a figure that nearly all law enforcement agencies account

for.  Puerto Rico's failure in this regard became evident when we requested information on investigations into officer-involved shootings from 2005 through 2010.  PRDOJ reported 27 incidents involving subjects who were shot and killed by PRPD officers from 2005 to 2010.  *See Table 3*.  However, we identified seven additional incidents from publicly-available sources, such as press releases and news clips, in which officers reportedly shot and killed a subject.  *See Table 4*.  Specifically, PRDOJ's report did not include a 2008 incident in which PRDOJ charged the shooting officer with first-degree murder and weapons violations.  PRDOJ also did not report a 2009 shooting that was the subject of a PRDOJ press release.  It is unclear why PRDOJ failed to include these shooting fatalities in the original report.  Because we did not have access to supplemental sources of information covering dates after the middle of 2009, it is possible that PRPD or PRDOJ failed to identify and track additional shooting fatalities between late 2009 and 2010.

**Table 3:  Subjects Shot and Killed by PRPD, As Reported by SIB, 2005-2010**

| Status* | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | Total |
|---|---|---|---|---|---|---|---|
| Open investigation | 1 | 2 | 2 | 0 | 2 | 7 | **14** |
| Open, charges filed | 0 | 0 | 0 | 0 | 0 | 3 | **3** |
| Closed, no charges | 1 | 0 | 3 | 1 | 1 | 2 | **8** |
| Closed, charges dismissed | 1 | 0 | 0 | 0 | 0 | 0 | **1** |
| Closed, conviction | 0 | 0 | 1 | 0 | 0 | 0 | **1** |
| **Total** | **3** | **2** | **6** | **1** | **3** | **12** | **27** |

\* as of December 6, 2010

**Table 4:  Seven Additional Subjects Shot and Killed by PRPD, 2005-2010**

| Date | Alleged Victim | Incident Summary |
|---|---|---|
| 8/4/2007 | Nelson Santiago Rivera | A PRPD officer shot and killed Santiago Rivera, the son of a PRPD officer, following a fight involving several civilians in Las Piedras. |
| 8/15/2007 | Luis Rodriguez Maya | PRPD officers shot and killed Rodriguez Maya during the execution of a search warrant in Cabo Rojo. |
| 4/1/2008 | Carlos Carrasquillo Rodriguez | PRPD officers shot and killed Carrasquillo Rodriguez in San Lorenzo.  Carrasquillo Rodriguez was known to have mental illness and was reportedly holding a knife. |
| 4/28/2008 | Marcos Montes Muñiz | PRPD officers shot and killed Montes Muñiz, who was suspected of committing a robbery and in possession of a weapon. |
| 6/6/2008 | Carlos Santiago Berrios | PRPD officers shot and killed Santiago Berrios, who was suspected of committing a robbery. |
| 8/5/2008 | Victor Sanabria Martinez | PRPD officers assigned to TOU in Humacao shot and killed Sanabria Martinez, who was suspected of committing a robbery.  The shooting officer was charged with first-degree murder and weapons violations. |

| 8/17/2009 | Heriberto Marcial Hernandez | According to a PRDOJ press release, a PRPD officer stopped Marcial Hernandez for a traffic violation. Marcial Hernandez allegedly reached for a weapon as he was being handcuffed and shot at the officer. The officer then shot and killed Marcial Hernandez. |
|---|---|---|

PRPD and PRDOJ recently established protocols to notify various components regarding police-involved deaths and serious injuries. While these are positive steps and should improve the tracking of critical incidents, they do not provide sufficient guidance on parallel criminal and administrative investigations. For instance, the interagency agreement recently entered into by PRPD, PRDOJ, and the Forensic Sciences Institute ("FSI") does not provide for communication or coordination with PRPD administrative investigators. The protocols are also limited to the most basic and immediate steps to be taken on the scene of a critical incident and do not require ongoing coordination.

Further, the "work plans" developed by PRD instruct administrative investigators to interview officers involved in shootings or other critical incidents without exception. While an officer may be ordered (or "compelled") to provide a statement to police department investigators, that statement, and any other evidence that derives from that statement, may not be used against the officer in any subsequent criminal prosecution of the officer. In this regard, officers cannot be forced to choose between losing their jobs because they disobeyed an order to answer questions, and exercising their Fifth Amendment right to avoid self-incrimination. *Garrity v. New Jersey*, 385 U.S. 493 (1967). Thus, a blanket rule requiring compelled statements is problematic because it may prevent prosecutors from using critical evidence in a criminal case involving police misconduct. Similarly, as discussed further below, PRPD's practice of providing blanket protections against self-incrimination in administrative investigations is also problematic because it unnecessarily hinders PRPD's ability to discipline officers. Rather than employing blanket rules, each internal investigation should be considered individually. Where it becomes apparent that an incident may involve criminal conduct, it may be prudent to delay compelling interviews of subject officers, and sometimes other interviews as well, to ensure that prosecutors are able to fully develop evidence that may be critical to a criminal prosecution.

In December 2010, PRPD reported that it was beginning to conduct comprehensive reviews of certain high-profile incidents. PRPD indicated that it was reviewing the August 2009 University Avenue incident, the May 2010 Sheraton Hotel incident, and the June 2010 Capitol incident. While these are positive developments, PRPD should conduct comprehensive reviews of all critical incidents. Without consistent critical incident reviews, PRPD misses crucial opportunities to improve the agency's performance through non-disciplinary, broad-based corrective action. Other agencies have used data collected from critical incident reviews to promote officer and civilian safety. For instance, NYPD adopted procedures in 1969 to collect in-depth information on firearm discharges by officers for the purpose of "[increasing] the safety potential of each member of the force."[46] In 2010, NYPD reported the lowest number of subjects *shot and injured* in 40 years (16 compared to the highest number of subjects shot and injured, 221, in 1971). NYPD also reported the lowest number of subjects *shot and killed*, eight, in 2010. In its 2009 Annual Report, NYPD cited information gleaned from its annual reports as an important tool in its efforts to tailor safer policies and practices.

### d.      Insufficient training on use of force

Insufficient training on use of force further exacerbates PRPD's policy deficiencies. Based on our review of the University College's training reports covering January 1 through November 30, 2010, only a small fraction of active PRPD officers received any training on use of force. For instance, only 415 officers received training on the use of batons during this period, or fewer than 3% of active PRPD officers. Even a smaller number of officers received training on chemical irritants. In the same 11-month period, only 248 officers, or approximately 1.5% of active officers, received training on chemical irritants. PRPD's performance in this regard is deeply troubling and underscores the need for fundamental reform.

All officers should receive in-service training on use of force on an annual basis that covers both current legal requirements and appropriate application of use of force. Officers should also be offered contemporary, scenario-based training that reinforces current legal standards and practices. Ongoing training on use of force should also include:

- use of force reporting requirements;
- examples of scenarios faced by PRPD officers and interactive exercises that illustrate proper use of force decision-making;
- de-escalation techniques that encourage officers to make arrests without using force, and instruction that disengagement, area containment, surveillance, waiting out a subject, summoning reinforcements, calling in specialized units, or delaying arrest may be the appropriate response to a situation, even when the use of force would be legally justified;
- threat assessment;
- crisis intervention and interacting with people with mental illnesses, including instruction by mental health practitioners and an emphasis on de-escalation strategies;
- factors to consider in initiating or continuing a pursuit; and
- training on conflict management.

PRPD also does not consistently train supervisors to independently review officers' use of force. It is crucial that supervisors be taught the skills and judgment necessary to evaluate officers' use of force, not only for compliance with agency policy and appropriate legal standards, but also to identify specific operational, training, or policy needs. In addition, effective law enforcement agencies ensure the lawful use of force by implementing training that reinforces the agency's policies and ongoing auditing that captures and analyzes information to allow for continuous improvement and external accountability.

### e.      Fear and violence by tactical units is condoned

As discussed above, PRPD has been on notice for years that officers assigned to tactical units routinely employ excessive force when interacting with civilians. Members of these units are authorized to use a wide variety of force and special weapons, including chemical sprays, tear gas, CEDs, and less lethal munitions. These units rely on intimidation, fear, and extreme use of force to manage crowds and are often deployed to low-income and minority communities on routine patrols. These units operate with insufficient training and guidance on the lawful exercise of police power.

In 2007, an evaluating committee commissioned by a former Superintendent found that TOU officers use indiscriminate force that is "totally unjustified."[47]  Internal affairs investigators also found serious deficiencies in the operation of TOUs following the August 11, 2007 shooting death of Cáceres Cruz by TOU Officer Javier Pagán Cruz.  *Supra.*  Specifically, an internal affairs investigator found grossly inadequate supervision that contributed to instability and lack of discipline in TOU (two sergeants were assigned to supervise 44 officers in Humacao; one of the sergeants was on leave at the time of the shooting incident).  The investigator also found that sergeant-level supervisors were used to supervise TOUs, in violation of PRPD policies requiring, at least, a lieutenant-level supervisor.  Officers we interviewed in 2008 and 2009 also expressed serious concerns with the lack of supervision of TOUs.

Rather than take steps to manage the use of force by these units, or provide them with sufficient training and supervision in response to PRPD's own troubling reports, PRPD routinely deployed TOUs to engage with crowds and protesters, despite their propensity for using significant force.[48]  Our review of the University Avenue, Sheraton Hotel, and Capitol incidents in 2009 and 2010 confirms that serious deficiencies remain in the deployment of tactical units. For instance:

- PRPD appears to have engaged in little tactical coordination and planning in its responses to major disturbances and demonstrations; instead PRPD relies on physical confrontations by its tactical units.

- PRPD has not sufficiently explored methods that allow civilians to peacefully exercise their constitutional assembly and speech rights.

- Tactical units and other officers displayed a tendency to quickly deploy hand-held or weapon-based chemical agents on civilians without regard for their harmful effects, even upon officers themselves.

- Although the Superintendent (personally in the Capitol incident) and PRPD's high-level commanders claimed responsibility for the tactical decisions made during all three incidents, command and control vanished once tactical officers appeared, leaving the tactical officers unsupervised.

- Supervisors appeared more concerned about public perception than about the actions of their officers.  For example, after an officer inappropriately struck a demonstrator being ejected from the Capitol in June 2010, his commander seemed more concerned about warning the officer about video cameras than with reprimanding the officer for his use of force.

- Reports drafted after these incidents show a lack of concern for the basic facts needed to sustain criminal complaints, omissions that led to the dismissal of most charges against individuals due to lack of sufficient probable cause.

- PRPD failed to report its uses of force.  A significant number of officers used force indiscriminately, yet the only specific use of force report available was a report from an officer who deployed a CED during the Sheraton Hotel incident.

- Officers used force against civilians who were dispersing, even running away, thus not representing a danger to the officers or others.

Publicly, Puerto Rico officials and PRPD commanders have justified the level of force unleashed on protesters by TOU officers.  They have accused protesters of engaging in widespread vandalism and threatening the public safety.  Yet, few protesters were arrested and many that were arrested were released for lack of probable cause.  Shortly after the June 30, 2010 incident at the Capitol, the Governor requested that PRPD thoroughly review the operation of TOUs.  We have not been provided a copy of any final reports, but our review of the committee's minutes revealed that PRPD appeared focused on minimizing public condemnation over PRPD's response to protesters and concealing the committee's findings by assigning attorneys to sub-committees.  With respect to PRPD's actions on June 30, the committee observed that TOUs had not developed operational plans to manage the crowds; communication between the incident commander and TOU commanders was inadequate; TOUs failed to use proper formations when confronting crowds; supervisors did not adequately manage officers' stress; and supporting officers intervened without control or coordination.

The committee also found other serious deficiencies that have been known to PRPD for years but were ignored.  For instance, the committee found that:  there is no selection protocol for officers entering TOUs; five percent of TOU officers are unfit for tactical duty based only on the number and type of civilian complaints lodged against them (as of September 2010, there were 738 officers assigned to TOUs); and training is inadequate and the curricula do not comply with contemporary standards and constitutional protections against the use of excessive force.

In late 2010, PRPD announced that it was disbanding several tactical units and reducing the size of TOUs.  As of September 2010, PRPD reported that 53 officers were assigned to Special Operations Units in San Juan, 738 officers were assigned to TOUs, and 35 officers were assigned to the Specialized Tactical Unit.  Officers deemed unfit for tactical duties were to be re-deployed to patrol and other units within PRPD.  However, PRPD did not provide specific information about steps it would take to re-train, discipline, or remove unfit officers, before re-assigning them to patrol duties.  We have not obtained information that these units have, in fact, been disbanded or whether problem officers have been removed or re-trained before being transferred to other units.  Based on our review, PRPD continued to deploy tactical officers to engage students and other protesters in January and February 2011, and possibly later.  It is critical that PRPD re-structure its tactical units and re-train officers who are transferred from these units to protect civilians from unreasonable risk of harm.

*     *     *     *     *

In sum, PRPD's systems of accountability on use of force are profoundly broken and do not ensure the lawful and effective use of force.  PRPD continues to demonstrate a deliberate indifference to the public's safety and the civil rights of individuals engaging in protected speech

activities during protests, by failing to control the violence and fear exerted by TOUs.  A functioning system of accountability generally includes:  (1) clear guidance through written policies that are consistent with legal standards, provide for effective alternatives to force, and are accessible to all personnel authorized to use force; (2) ongoing training by qualified instructors that reinforces the agency's policies and guides officers' discretion on the application of force; (3) clear reporting requirements; (4) supervisory review, including collecting information regarding the circumstances of the use of force and an initial, objective assessment to determine whether the force used was within agency policy and legal standards; (5) thorough and timely force investigations by trained investigators to determine whether the use of force involved criminal or administrative violations; (6) critical incident reviews by commanders to identify and implement corrective action; and (7) ongoing auditing that captures and analyzes information to allow for continuous improvement and external accountability.

In addition, law enforcement agencies should develop external strategies to build and foster trust between the community and its officers.  These strategies include external oversight and accountability, public reporting on use of force, and safety surveys to measure the perceptions and needs of the community.[49]

**B.      PRPD Engages in a Pattern and Practice of Unconstitutional Searches and Seizures**

PRPD regularly violates the constitutional rights of civilians through illegal searches, detentions, and arrests.  In particular, we found a pattern and practice of PRPD officers conducting searches of civilians' homes without warrants or consent and in the absence of any exigent circumstance or exception that would render such a search permissible under the Fourth Amendment.  Our findings also indicate that officers plant evidence during searches, rely on excessive force and intimidation as search aids, and proceed with searches even when knowing that the address, identity of the individual, or other pertinent information is incorrect.  The evidence we uncovered further demonstrates that PRPD officers engage in a regular pattern of detaining and arresting individuals without reasonable suspicion or probable cause in violation of the Fourth Amendment, and that supervisors and members of specialized units are often involved in these unlawful acts.

The Fourth Amendment's protection against unreasonable searches and seizures "requires that arrests be based on probable cause."  *Alexis*, 67 F.3d at 349 (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).  Courts analyze the existence of probable cause by "an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time and not [an assessment of] the officer's state of mind at the time the challenged action was taken."  *Id.*  (citing *Maryland v. Macon*, 472 U.S. 463, 470-71 (1985)).  Courts will find probable cause to arrest existed where "the facts and circumstances within [the officer's] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent [person] in believing that the [suspect] had committed or was committing an offense."  *Id.* (citing *Rivera v. Murphy,* 979 F.2d 259, 263 (1st Cir. 1992)).  The probable cause requirement applies both to arrests and searches made pursuant to, and without, a warrant.  *Wilson v. City of Boston*, 421 F.3d 45, 54 (1st Cir. 2005).  While "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted," *Michigan v. Summers*, 452 U.S. 692, 705 (1981), this authority does not give law enforcement carte blanche to execute a search warrant in contravention of the

parameters of the Fourth Amendment.  *See Muehler v. Mena*, 544 U.S. 93,106 (2005) (Stevens, J. concurring).  Regardless of the situation, the ultimate question is whether the facts and circumstances confronting an officer at the time would lead a reasonable person to believe that the arrestee had committed or was committing a crime.  *Alexis*, 67 F.3d at 349.

Absent probable cause, the Fourth Amendment permits law enforcement officers to briefly detain individuals for investigative purposes if the officers possess reasonable suspicion that criminal activity is afoot.  *Terry v. Ohio*, 392 U.S. 1, 30 (1968).  Reasonable suspicion must be supported by specific and articulable facts particular to the detained individual, which, combined with "rational inferences from those facts, reasonably warrant an intrusion." *United States v. Young*, 105 F.3d 1, 7 (1st Cir. 1997) (citing *United States v. Kimball*, 25 F.3d 1, 6 (1st Cir. 1994)).  To justify a stop under *Terry*, officers must possess "more than a hunch" that an individual may engage in wrongdoing.  *United States v. Romain*, 393 F.3d 63, 71 (1st Cir. 2004).

### 1. Officers Conduct Searches and Seizures in Violation of the Fourth Amendment

We found that unconstitutional searches and seizures are a widespread problem.  There is a pattern and practice of searches and seizures without probable cause, for illegal purposes and otherwise in violation of the Constitution.  The following are typical, but not exhaustive illustrations; we provide additional examples of unlawful searches and seizures in Appendix A.

As with the videotaped shooting of Cáceres Cruz in Humacao, described above, the arrest of ten officers assigned to the Mayagüez Drug Division reflects serious deficiencies in PRPD's management and oversight of officers' search and seizure practices.  On August 23, 2007, Lieutenant Dennis Muñiz Tirado, director of the Mayagüez Drug Division, was indicted for conspiring to deprive citizens of their right to be free from unreasonable searches and seizures; their right not to be detained and arrested based on fabricated evidence; and their right not to be deprived of liberty without due process of law.  As part of a three-year conspiracy, Muñiz Tirado and officers under his command stored drugs obtained during the course of ordinary police work in a strong-box in Muñiz Tirado's office and used the drugs to fabricate cases.  According to the plea agreement entered on July 15, 2008, Muñiz Tirado was also aware that officers assigned to his unit were swearing out false affidavits to justify arrests.

The other officers involved in the criminal conspiracy are:[50]

- *Pascual Santiago Méndez:*  found guilty on December 19, 2008, and sentenced to 108 months of imprisonment.
- *Anthony Domínguez Colón:*  found guilty on December 19, 2008, and sentenced to 118 months of imprisonment.
- *Víctor Cortés Pagán:*  found guilty on December 19, 2008, and sentenced to 70 months of imprisonment.  Officer Cortés Pagán was also found personally liable by a jury on October 28, 2009, in *Cruz Acevedo (see Appendix A).*
- *Luis Ruperto Torres:*  found guilty on December 19, 2008, as to the first count of the indictment and sentenced to 50 months of imprisonment.  Sergeant Torres was also found personally liable by a jury on October 28, 2009, in *Cruz Acevedo (see Appendix A).*

- *Luis Vélez Class*:  pled guilty on November 5, 2008, and sentenced to three years of probation.
- *Michael Monsegur González:*  pled guilty on November 5, 2008, and sentenced to six months of imprisonment.
- *Josué Bosques Muñiz:*  pled guilty on November 7, 2008, and sentenced to three years of probation.
- *Ismael Chaparro Vélez:*  pled guilty on November 10, 2008, and sentenced to twelve months and one day of imprisonment.

PRDOJ reviewed numerous cases involving the arrested officers and dismissed or closed 51 cases.  Tanairí Candelaria Cabán was among those arrested by the Mayagüez officers.  She was falsely imprisoned for 18 months after Officer Cortés Pagán and another officer, both working under the supervision of Sergeant Torres and Lieutenant Muñiz Tirado, planted cocaine and marijuana in her backpack on February 21, 2006.  She was released on October 11, 2007, after the Puerto Rico Justice Secretary found that Candelaria Cabán had been convicted based on fabricated evidence.[51]

Clear indications existed for years that some of these officers were engaging in unconstitutional conduct, yet no evidence exists that PRPD took the steps necessary to prevent their improper and illegal conduct.  For example, many of these officers also had numerous civilian complaints filed against them involving, among other things, illegal searches, assault, and malicious prosecution, including the following officers:

**Table 5:  Civilian Complaint History of a Convicted Mayagüez Officer**

| Type | Year | Disposition |
| --- | --- | --- |
| Negligence | 2000 | Admonishment |
| Illegal search | 2001 | Archived[52] |
| Use of weapon | 2001 | Archived |
| Assault | 2004 | Archived |
| Assault | 2005 | Archived |
| Assault | 2006 | Orientation |
| Illegal search | 2006 | Unknown |
| Assault | 2006 | Archived |
| Disobeying order | 2007 | 30-day suspension |

**Table 6:  Civilian Complaint History of a Convicted Mayagüez Officer**

| Type | Year | Disposition |
| --- | --- | --- |
| Illegal search | 2005 | Archived |
| Negligence, partiality, ineptitude | 2005 | Orientation |
| Assault | 2005 | Archived |
| Illegal search | 2006 | Unknown |
| Illegal search | 2006 | Expulsion |
| Malicious prosecution | 2007 | Archived |

| Illegal search | 2007 | Expulsion |
|---|---|---|
| Illegal search | 2007 | Expulsion |

According to PRD, civilians filed 1,302 complaints against PRPD officers for unreasonable or illegal searches and seizures from 2004 to 2008.  During the course of our investigation, from January 2009 to August 2010, PRD reported an additional 221 complaints involving similar allegations.  PRPD did not provide the outcome of these complaints.  Despite PRPD's difficulties producing information, based on our review, we found that unconstitutional searches and seizures are not isolated or sporadic events, but part of a routine pattern of conduct by PRPD officers.  As illustrated below and in Appendix A, PRPD officers conduct searches without probable cause, in violation of the Fourth Amendment.  Officers also plant evidence during searches, rely on excessive force and intimidation as search aids, and engage in a regular pattern of detaining and arresting individuals without reasonable suspicion or probable cause in violation of the Fourth Amendment.

- According to the indictment in *United States v. Santos Soto*, No. 07-CR-400 (CCC), Officer José Rodríguez Vázquez arrived at the residence of Juan Carlos Aquino Méndez on July 5, 2007, accompanied by Officers Carlos Plaza Santiago, Bernie González Vélez, and Norma Santos Soto, as part of an undercover operation of the Arecibo Drug Division. The officers planned to arrest Aquino Méndez after the completion of a drug transaction initiated the day before.  Aquino Méndez, however, refused to accept any money from Officer Rodríguez Vázquez.  Despite Aquino Méndez's refusal, Officer Rodríguez Vázquez signaled to the other officers, who entered Aquino Méndez's home and arrested him.

  After the arrest, Officers Plaza Santiago and González Vélez removed 45 small bags of cocaine from Officer Rodríguez Vázquez's vehicle and planted them inside Aquino Méndez's home.  After illegally searching the property and seizing $2,200, the officers charged Aquino Méndez with drug possession and agreed among themselves to provide false testimony during any future court proceedings.

  On April 2, 2009, Officer González Vélez pled guilty to conspiracy against the rights of civilians.  Although a judgment of discharge was entered in favor of Officer Rodríguez Vázquez, he pled guilty to withholding information concerning the fabrication of cases on May 28, 2010, in *United States v. Rodríguez Vázquez*, No. 10-CR-202 (CCC).  He was sentenced to three years of probation.  On October 28, 2010, a jury found Officers Plaza Santiago and Santos Soto guilty.[53]

- On June 21, 2007, Robert González Ramírez was standing in front of a business with a neighbor when four officers detained González Ramírez and seized his car.  The officers hit González Ramírez with their service weapons and repeatedly threatened him as they asked him about drugs.  The officers took González Ramírez to his home, where they conducted a search but found nothing.  González Ramírez's arrest and the search and seizure of his property were not based on probable cause.

Officers Pérez Rosado and Cano Díaz entered guilty pleas to federal criminal charges for carjacking, deprivation of civil rights, conspiracy against the rights of citizens, and use of weapons during the commission of a felony on March 4, 2008.[54]

- On June 12, 2007, officers from the Mayagüez Illegal Weapons Division conducted a search of the home of Corrections Officer Tetelo Vargas and discovered firearms. Although Vargas provided valid licenses for the firearms, Officers Randy Bayrón López and Juan Ortiz continued the search without showing Vargas a search warrant. Vargas' cousin, David Sepúlveda, arrived during the search and the officers asked Sepúlveda about weapons. Sepúlveda took the officers to his home, where he showed them his hunting guns and licenses. The officers took Vargas and Sepúlveda to the home of Jorge Vargas Torres, where they conducted a similar search. The officers then arrested and detained the three men. Although the officers had a search warrant, they lacked probable cause as it was based on false statements. The men sued PRPD and, on April 8, 2010, the court entered judgment after the parties reached a confidential settlement agreement.[55]

- On April 13, 2007, a group of PRPD officers detained Officer Juan Díaz Román and allegedly found drugs in his possession. Díaz Román was charged with drug offenses and summarily suspended from PRPD. An investigation later disclosed that he had been framed by his ex-girlfriend, who reported to PRPD commanders that Díaz Román was corrupt. Officer René Ortiz Correa swore out a false statement indicating that he had conducted surveillance, which served as the basis for the search warrant of Díaz Román's home.[56]

  Officer Ortiz Correa and Sergeant Rivera Padilla were suspended for fabricating the case against Díaz Román. Díaz Román filed a federal civil law suit and default judgments were entered against Officers Ortiz Correa and Sergeant Rivera Padilla. On November 4, 2010, the case was dismissed after Díaz Román settled with PRPD. Díaz Román was reinstated to PRPD. The warrant used to justify Díaz Román's arrest was not predicated on legitimate probable cause.

In addition to the unlawful searches and seizures illustrated above, we found that officers stop or arrest individuals to commit crimes, such as extortion and robbery. Some of the officers involved had significant complaint histories involving similar acts, which should have alerted their supervisors to potential problem behavior. For example:

- On April 11, 2007, Arecibo Transit Officer Héctor Cotto Rivera stopped Jorge Seiglie and two youths riding in a vehicle without cause. He searched the vehicle and showed the youths a marijuana cigarette. Officer Cotto Rivera arrested the driver and passengers and transported them to a precinct where he interviewed them separately, seeking $1,500 to drop the charges and return the vehicle. Each youth paid Officer Cotto Rivera $500.

- On May 8, 2006, Officer Cotto Rivera arrested Marcos Molina Rosario after he reportedly swallowed a bag with drugs during a traffic stop. Officer Cotto Rivera searched Molina Rosario's vehicle, and told him he had found drugs, but refused to show