them to Molina Rosario.  Officer Cotto Rivera offered to drop the drug charges and give
him back his vehicle for $1,000.

- On June 3, 2009, Officer Cotto Rivera entered a guilty plea for extortion in *People v.
  Cotto Rivera*, CEG2008G002.  He was sentenced to six months and a day of
  imprisonment.

Officer Cotto Rivera had a lengthy history of civilian complaints, including allegations of
illegal arrests and abuse.  Administrative investigators were unable to find the final
disposition of two complaints, and two cases recommending discipline were closed
without further action.  Information we obtained also indicates that Cotto Rivera had been
terminated from prior employment for reportedly stealing money, information which had
been communicated to PRPD investigators conducting his background check, yet he was
still permitted to enter PRPD.

Examples of criminal behavior and misconduct by other PRPD officers abound and
indicate a serious problem.  We provide further examples in Appendix A.

### 2.    Systemic Deficiencies Causing and Contributing to the Pattern and Practice of Unlawful Searches and Seizures

The pattern and practice of unlawful searches and seizures described above are primarily
the result of widespread institutional deficiencies within PRPD that remain unabated.  PRPD
lacks adequate controls to ensure lawful searches and seizures.  Specifically, PRPD's arrest
policies are outdated and fail to provide guidance on conducting brief investigatory or *Terry*
stops.  PRPD officers also fail to follow investigative protocols and procedures.  Until recently,
PRPD lacked procedures to review related cases after an officer provided false testimony in
support of an arrest warrant.  PRPD has not demonstrated that these procedures effectively root
out unlawful conduct by officers.

The Fourth Amendment's protection against unreasonable searches and seizures
"requires that arrests be based on probable cause."  *Alexis*, 67 F.3d at 349.  Absent probable
cause, the Fourth Amendment permits law enforcement officers to briefly detain individuals for
investigative purposes if the officers possess reasonable suspicion that criminal activity is afoot.
*Terry*, 392 U.S. at 30.  Reasonable suspicion must be supported by specific and articulable facts
particular to the detained individual, which, combined with "rational inferences from those facts,
reasonably warrant an intrusion."  *United States v. Young*, 105 F.3d at 7 (citing *Kimball*, 25 F.3d
at 6).  Law enforcement agencies should provide clear guidance on the meaning of probable
cause, reasonable suspicion, and the legal parameters that govern an officer's authority to carry
out searches and seizures.  The guidance should include officers' authority to conduct brief
investigatory detentions or *Terry* stops.  The legal contours of searches and seizures constantly
evolve as courts scrutinize various policing methods, tactics, and factual circumstances.  As a
result, officers should receive continuous education and training on developments in the law.
Law enforcement agencies should also collect and analyze data on arrests to provide for ongoing
improvement of the agency's policies and practices.

### a.   Policies are outdated and inaccessible

PRPD's policies concerning searches and arrests are outdated, inaccessible, and impractical.  General Order 98-16, "Internal Policies and Procedures for Handling and Executing Summonses, Arrest Warrants, Searches and Seizures," provides a lengthy, sometimes repetitive, explanation of legal concepts related to searches and seizures.  The 63-page policy covers a broad array of topics, including making warrantless arrests, obtaining search warrants, executing search and arrest warrants, transporting arrestees, detaining individuals for investigative purposes, vehicle stops, vehicle pursuits, suppression of illegally obtained evidence, vehicle searches, strip searches, body cavity searches, and a recitation of rules of criminal procedure.  The structure of GO 98-16 provides limited operational guidance and is overly broad and impractical, focusing primarily on abstract legal concepts and holdings.  GO 98-16 should be written clearly, so as to be comprehensible to the most junior member of the force expected to carry out searches and arrests.  Having been issued more than 12 years ago, GO 98-16 is also outdated and does not reflect current developments in the law and policing techniques.

Searches and seizures are core duties of officers and should be reinforced periodically to optimize comprehension and compliance.  Although GO 98-16 appears to have been amended and documents we obtained demonstrate that unit heads reviewed recent court decisions at local academies – monthly meetings on new policies, procedures, and directives – local academies do not provide sufficient opportunity to discuss and understand this important material.  Supervisors are often required to inform subordinates of dozens of new general and special orders, administrative directives, and general agency announcements at a single meeting.  The agenda for one monthly local academy we reviewed contained approximately 190 items, including new general and special orders on monetary incentives for seized property, use of CEDs, and domestic violence investigations.  Many of the officers we interviewed indicated that supervisors simply read new policies and procedures to them, and provide little opportunity to discuss and understand the subjects presented.  Additionally, as we discuss in Section IV.A *infra*, many officers reported that they are not routinely given copies of new general or special orders for reference.

General Order 98-16 also does not address the consequences of violating laws or agency policies on searches and seizures, beyond explaining that criminal defendants can file motions to suppress evidence.  PRPD's policies should clearly advise officers that making false statements to obtain a search warrant, arresting an individual without probable cause, effecting an arrest based on discriminatory criteria such as race or national origin and fabricating evidence, among other search and seizure violations, could subject the officer to criminal prosecution, disciplinary action, and civil liability.

The lack of clear policy guidance and meaningful training and education on legal requirements for searches and seizures is a serious deficiency.  Officers we interviewed indicated that PRPD does not have standard operating procedures that describe the legal requirements or processes that are required for lawful searches, detentions, and arrests.  As a result, officers routinely improvise and often overlook critical steps, such as not establishing predicate cause for conducting more intrusive searches of an individual's person or property.  Significantly, an officer assigned to a specialized unit told us openly and without objection from his colleagues

and supervisors that officers need to violate people's civil rights to achieve the crime-fighting objectives of government officials.

PRPD has been aware of these serious deficiencies for years, but has failed to take corrective action to ensure the lawful exercise of police authority on searches and seizures. For instance, a 2009 report prepared by Total Quality, a consulting firm contracted by PRPD, found that PRPD fails to train and certify investigators in investigative techniques related to seizing illegal weapons; lacks operational plans for the seizure of illegal weapons; lacks uniform investigative protocols for the seizure of illegal weapons; and does not have sufficient resources and equipment to develop investigations. PRPD has failed to substantively address the problems highlighted by the 2009 Total Quality report in a comprehensive and effective manner.

### b.       Training on lawful searches and seizures is inadequate

PRPD pre-service training related to lawful searches and seizures is inadequate and ill-suited to the needs of PRPD officers. While materials used in University College's course on civil rights cite the United States Constitution as a source of individual rights, they contain no discussion of specific rights, such as the Fourth Amendment's prohibition on searches and seizures without probable cause. The course also lacks any meaningful interaction between instructors and students or engagement using practical examples of lawful and unlawful conduct. Such meager training cannot prepare PRPD officers for the complex situations they will likely face as they carry out their duties.

Available in-service training for PRPD officers is sorely inadequate. A review of the University College's training from January 1 to November 30, 2010 demonstrates how few PRPD officers have received continuing education on searches and seizures and other important police functions.[57] According to the University College, approximately 1,000 officers, or 17%, completed a 16-hour continuing education curriculum during October and November 2010. The curriculum includes a two-hour course titled, "Criminal Procedure" and another four-hour course titled, "Fundamental Civil Rights and Hate Crimes." However, given PRPD's chronic failure to provide officers with legally sufficient policies and training for years and the pattern of pervasive constitutional violations, these general courses do not begin to capacitate PRPD's ranks with the theoretical and practical skills necessary to protect individuals from unlawful searches and seizures. Indeed, the number of officers receiving specific training on searches and seizures for nearly all of 2010 is woefully insufficient. According to the University College, only 60 officers, or less than 1% of active PRPD officers, were trained on arrest and search procedures from January 1 to November 30, 2010. Notably, PRPD trained more officers (197) on vehicle-related topics, such as detailing information on transportation licenses, operating motorcycles, and identifying vehicle parts, than on arrest and search procedures.

Equally troubling is PRPD's failure to implement corrective action, despite reports from its own contractors that officers who lack an understanding of criminal procedure or substantive laws violate individuals' civil rights related to searches and seizures. The 2009 study from Total Quality recommended that the University College provide at least 40 hours of continuous education annually to the Illegal Weapons Bureau on topics such as criminal procedure, civil rights, substantive weapons law, and GO 98-16 concerning searches and seizures. As discussed above, PRPD officers began receiving 16 hours, well below the 40 hours recommended, of in-

service training in October 2010.  Many of Total Quality's other recommendations have not been implemented.

### c.    Guidance on brief investigatory or *Terry* stops is lacking

PRPD provides insufficient guidance on conducting brief investigatory or *Terry* stops and related "pat downs."  Absent probable cause, officers may conduct brief investigatory stops or detentions, typically referred to as *Terry* stops, when they have reasonable suspicion to believe that an individual may be engaging in criminal activity.  Stops and attendant "pat downs" or "frisks" should be limited in focus to officer safety and the grounds giving rise to the officer's suspicion.  While we observed that PRPD officers regularly conduct investigatory stops and "pat downs," we found that PRPD's policies provide insufficient guidance on the legal limits of these temporary stops.  Indeed, many officers we interviewed were unfamiliar with the seminal Supreme Court case authorizing investigatory stops under the Fourth Amendment, *Terry v. Ohio*, *supra*.

General Order 98-16 states that officers do not have free rein to detain an individual without an arrest order or in the absence of probable cause.  Specifically, the Order adds, "[i]n the absence of probable cause to arrest, a person may only be 'detained' for the purpose of obtaining information or dissipating suspicions concerning whether the individual is committing or has committed a crime *when the detention is voluntarily accepted*."  This last clause appears to eviscerate an officer's ability to compel a brief detention to allay a reasonable suspicion that criminal activity is afoot.  However, the Order does not explicitly discuss *Terry v. Ohio* or the limits of temporary detentions and "pat downs."  PRPD officers are also not required to document when they conduct temporary stops or detentions, effectively immunizing such stops from any supervisory review or scrutiny.

Thus, the problems associated with PRPD's failure to address *Terry* stops through formal policy are two-fold.  First, PRPD fails to confer its officers with the full authority permissible under the Fourth Amendment to investigate potential criminal activity.  Second, because officers engage in temporary detentions in practice, PRPD fails to provide officers with sufficient guidance on the constitutional limits of temporary detentions and pat downs to ensure that such interactions do not become unreasonable and overly intrusive.

### d.    Accountability systems related to warrants are insufficient

Until recently, PRPD lacked procedures to review related cases after an officer provided false testimony in support of an arrest warrant.  Despite recent reforms, PRPD policies are still inadequate.  On September 27, 2010, PRPD added procedures that require investigators to review related cases when an officer is suspected of having provided a false statement in support of an arrest or search warrant.  General Order 2010-14 ("GO 2010-14"), which created PRD, requires that the internal affairs bureau conduct a priority investigation of the allegations and search for other warrants issued based on the subject officer's declaration.  The results of the investigation must then be forwarded to the head of PRD and to PRDOJ.  Before the implementation of GO 2010-14, PRPD did not routinely review related cases involving an officer who provided false testimony in support of an arrest or search warrant to identify potential patterns or prior misconduct.  PRPD typically conducted reviews only after high-profile

cases, such as the 2008 arrest of officers in the Mayagüez Drug Division who were convicted of planting drugs and other evidence over the course of several years.  Officers were also unaware of any agency protocols to periodically solicit information from prosecutors and other members of the criminal justice system concerning officers who may have engaged in questionable or unlawful searches or seizures.

General Order 2010-14 fails to create an adequate accountability system.  To provide for supervisory review and data analysis, law enforcement officers should report all searches and seizures in a thorough, factual, and objective manner.  The reports should be completed whether or not property was seized during the course of a search.  Searches completed during an arrest should be addressed in the arrest report.  Pat downs or "frisks" completed during a traffic stop or temporary detention should be documented in a "search and seizure" report.  Supervisors should promptly review and evaluate search and seizure reports to determine whether the search or seizure:  was within agency policy, should result in a misconduct investigation, indicates a need for additional training or other remedial non-disciplinary action for the involved officer, and/or indicates the need to revise policies, tactics, or training.

## C.    Additional Areas of Serious Concern

Although we do not make findings at this time, we uncovered troubling evidence that PRPD officers engage in discriminatory policing practices against individuals of Dominican descent in violation of the Fourteenth Amendment, the Safe Streets Act, and Title VI.  We also uncovered troubling evidence that PRPD officers fail to adequately police sex assault and domestic violence.  While PRPD's failure to adequately collect data regarding these issues makes it difficult to assess PRPD's practices, we believe that PRPD has not implemented sufficient accountability systems to ensure that all residents of Puerto Rico are treated impartially, regardless of race, ethnicity, national origin, sex, sexual orientation, or gender identity.  Furthermore, as previously discussed, PRPD has also failed to effectively address domestic violence when committed by PRPD officers.

The institutional deficiencies noted in the previous sections also contribute to the inability of PRPD to address longstanding concerns related to domestic violence and discriminatory policing practices.  Deficient policies, inadequate supervision, and dysfunctional accountability systems all hinder the ability of PRPD officers to fulfill their mission in a lawful manner.  Without addressing the flaws highlighted throughout this report, PRPD will be unable to effectively ensure that its officers are able to serve all members of the Puerto Rico community.

### 1.    Allegations of Discriminatory Police Practices by PRPD

Evidence suggests that PRPD officers violate the rights of individuals of Dominican descent or appearance through targeted and unjustified police actions, in violation of the Fourteenth Amendment, Title VI, and the Safe Streets Act.  PRPD has faced several complaints regarding its targeting of Dominicans for police actions, including allegations that PRPD officers routinely employ excessive force, unlawful searches and seizures, and intimidation.  Individual PRPD officers have also been accused of using racially charged and biased language in the course of their policing duties.  PRPD's institutional deficiencies, primarily including its failure

to adequately collect and analyze data, make it difficult to assess whether PRPD adequately responds to, and prevents, these incidents.

Discriminatory policing can take many forms, including reliance on bias-based profiling, in which an officer impermissibly decides whom to stop, search, or arrest based upon characteristics such as race, ethnicity, or national origin.  It can also include instances in which a law enforcement agency targets certain communities using particular enforcement and crime prevention tactics on the basis of stereotypes or biased decision-making.  The Equal Protection Clause of the Fourteenth Amendment prohibits selective or discriminatory enforcement of the law.  *Whren v. United States*, 517 U.S. 806, 813 (1996).  Discriminatory policing may arise from an explicit classification or a facially neutral law or policy.  *Id*.  The Equal Protection Clause is violated when the government's administration of a facially neutral law is motivated by a discriminatory purpose and results in a discriminatory effect.  *See Washington v. Davis*, 426 U.S. 229-40 (1976).  Evidence of discriminatory effect may include evidence of similarly situated individuals who were not subjected to the enforcement actions, statistical evidence, or both. *United States v. Armstrong*, 517 U.S. 456, 467 (1996).

Discriminatory law enforcement activities are likewise prohibited by Title VI and the Safe Streets Act.  Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participating in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving [f]ederal financial assistance."  42 U.S.C. § 2000d.  PRPD is a program recipient under Title VI.  Title VI prohibits intentional discrimination. *See Alexander v. Sandoval*, 532 U.S. 275, 281 (2001), and Title VI implementing regulations proscribe law-enforcement activities that exert a discriminatory effect on the basis of race, color, or national origin. *Id.* at 281-82.  The Safe Streets Act, which provides that "[n]o person in any State shall on the ground of race, color, religion, national origin, or sex be excluded from participation in, be denied the benefits of, or be subjected to discrimination under or denied employment in connection with any programs or activity funded in whole or in part with funds made available under this title."  42 U.S.C. § 3789d(c)(1).  PRPD is a program recipient under the Safe Streets Act.  The Safe Streets Act's statutory text and implementing regulations make clear that it applies both to instances of intentional discrimination and to any law-enforcement practices that disparately impact a group falling under the statute's enumerated factors.

PRPD has recently faced numerous accusations of biased treatment of the Dominican population in Puerto Rico.  In 2010, a request was filed with the Inter-American Commission on Human Rights of the Organization of American States calling on it, among other things, to address the treatment of Dominican individuals by PRPD.[58]  The complaint alleges that residents of Villas del Sol, a predominantly Dominican community in the municipality of Toa Baja, have been the subject of intense police action resulting in the use of excessive force.  Incidents include the alleged use of pepper spray on children and passive individuals, the use of unjustified force on women, and an around-the-clock police presence contributing to intimidation.[59]  The Dominican Committee on Human Rights ("DCHR") has also publicly alleged that PRPD officers discriminate against Puerto Ricans of Dominican descent by targeting them in the enforcement of immigration-related laws.[60]  Specifically, DCHR alleges that PRPD officers in San Juan

routinely ask individuals who appear to be Dominican for identity documents without reasonable suspicion or legitimate law enforcement purpose.[61]

PRPD has a history of allegations concerning systematic discriminatory treatment of Dominican individuals.  In *Herrera v. Davila*, 272 F.Supp.2d 154, (D.Puerto Rico 2003), the plaintiff alleged that PRPD unlawfully arrested individuals in the course of "zero tolerance" operations solely because of their Dominican heritage, in violation of the Equal Protection Clause of the Fourteenth Amendment.  The court found that sufficient evidence was presented to establish that PRPD acted in common and mutual concert to deprive the concerned parties of the equal protection of the law based on national origin.  The plaintiffs survived a motion for summary judgment in the First Circuit and ultimately settled the case for an award of $600,000.

We have also uncovered anecdotal evidence of discriminatory animus by PRPD officers in regards to the Dominican community of Puerto Rico.  Incidents include:

- On December 28, 2006, Félix Escolástico Rodríguez was parking his vehicle at his home when a group of PRPD officers approached him, including Officers Griselle Cuesta Báez and Mario Montesino Rivera.  The officers seized Escolástico Rodríguez and, without a legitimate law enforcement purpose, hit him in the head, chest, arms, and legs as they yelled derogatory and xenophobic slurs at him related to his Dominican origin.  On March 27, 2010, the district court dismissed Escolástico Rodríguez's civil rights case after the parties entered into a confidential settlement agreement.[62]

- On August 18, 2006, Ignacio Santos Rosario was at a local bar in Río Piedras when PRPD Officer Gregorio Matías Rosario allegedly made derogatory and xenophobic slurs about Dominicans.  Santos Rosario asked Officer Matías Rosario to show respect and stop making such comments.  Officer Matías Rosario then pointed his service weapon at Santos Rosario and called for back-up.  Santos Rosario left the area and, as he walked away, Officer Matías Rosario shot him twice in the leg.  Additional PRPD officers arrived on the scene and began kicking and hitting Santos Rosario as he lay on the ground.  There was no legitimate law enforcement purpose for Officer Matías Rosario's initial use of lethal force nor for the beating that followed.  On March 19, 2009, the district court dismissed Santos Rosario's civil rights case after the parties entered into a confidential settlement agreement.[63]

PRPD's failure to adequately collect data regarding its law enforcement actions frustrates efforts to statistically establish whether or not discriminatory policing is occurring.  PRPD's documentation related to arrests does not accurately reflect the racial and ethnic diversity of Puerto Rico.  While incident reports allow PRPD officers to record whether an alleged subject or victim is of "Hawaiian" or "Arabic" descent, the forms do not permit PRPD officers to record whether relevant persons are of Dominican descent.  Such forms hinder the ability of PRPD to assess whether individual officers are engaged in discriminatory policing practices.  They also evince a disregard for the Dominican community in general, since they do not permit the kind of data analysis that allows law enforcement agencies to track crime patterns and determine whether a particular population is the subject of crime.  Furthermore, as we discuss throughout this report, the lack of adequate accountability systems and supervision that contribute to the

perpetuation of officer misconduct, including discriminatory policing.  PRPD must address these deficiencies.

### 2.      PRPD's Failure to Address Domestic Violence and Sexual Assault

Based on our investigation, we have serious concerns that PRPD is failing to adequately address sexual assault in Puerto Rico and to prevent and address domestic violence committed by PRPD officers.  While we do not currently have sufficient evidence to find that PRPD systematically denies adequate policing services to women, we believe there are sufficient indicators of a problem to require immediate and sustained remedial efforts.

As an initial matter, we are concerned that PRPD is underreporting sex assaults. Strikingly, Puerto Rico has historically reported fewer forcible rapes than murders.  As illustrated below, the number of forcible rapes reported by PRPD has declined sharply over the last 10 years, from 228 to 39, while murders have seen a sharp increase recently.  Puerto Rico stands alone in these statistics, with virtually all other jurisdictions reporting far more forcible rapes than murders.  At the local level, only a small fraction of cities with populations of 100,000 or more report a significantly higher number of murders than rapes.  These cities include New Orleans and Baltimore, whose figures have been questioned or largely discredited.[64]  Serious concerns have also been raised publicly regarding the reliability of PRPD's crime reporting practices and the integrity of crime statistics.  It is imperative that Puerto Rico take steps to investigate allegations that superiors pressure officers to manipulate crime statistics, and remedy identified problems promptly and transparently.  Puerto Rico should also ensure that violent crimes and sexual assaults are reported, reported accurately, and that victims are provided with necessary support and services.



| | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ---- Forcible Rapes | 228 | 187 | 241 | 204 | 199 | 169 | 118 | 97 | 95 | 65 | 39 |
| —— Murders | 695 | 747 | 781 | 787 | 797 | 771 | 748 | 731 | 807 | 894 | 983 |

Figure 2:  Forcible Rapes and Murders, 2000-2010

A law enforcement agency that systematically fails to address the needs of discrete, recognized communities violates the Fourteenth Amendment.  "[T]he Fourteenth Amendment not only prohibits the making or enforcing of laws which shall abridge the privileges of the citizen, but prohibits the states from denying to all persons within its jurisdiction the equal protection of the laws.  Denying includes inaction as well as action, and denying the equal protection of the laws includes the omission to protect."  *Bell v. Maryland*, 378 U.S. 226, 311 (1964) (Goldberg, J. concurring); *see also Deschaney v. Winnebago County Dep't of Soc. Servs*., 489 U.S. 189, 197, n.3 (states may not "selectively deny its protective services" to certain protected groups without violating the Equal Protection Clause).  The Safe Streets Act, which explicitly bars discrimination on the basis of sex, similarly protects women from discriminatory treatment.

 In order to prevail on an equal protection claim based upon alleged selective denial of protection, "plaintiffs must adduce competent evidence of 'purposeful discrimination.'"  *Hayden v. Grayson*, 134 F.3d 449, 453 (1st Cir. 1998) (quoting *Washington v. Davis*, 426 U.S. 229, 243-44 (1976)).  A plaintiff must show that "'the decisionmaker . . . selected or reaffirmed a course of action at least in part 'because of,' not merely 'in spite of[,]' its adverse effects upon an identifiable group.'"  *Soto v. Flores*, 103 F.3d 1056, 1067 (1st Cir. 1997) (quoting *Pers. Adm'r v. Feeney*, 442 U.S. 256, 279 (1979)) (applying standard in context of allegedly discriminatory treatment of complaints regarding domestic violence against women).  In *Soto*, the First Circuit held that the evidence presented was insufficient to establish that discrimination against women was a motivating factor behind PRPD's alleged policy or custom of providing less protection to female victims of domestic abuse, as required to establish an equal protection violation.

PRPD's longstanding failure to effectively address domestic violence and rape in Puerto Rico is clear and, in conjunction with its institutional deficiencies, may rise to the level of a pattern and practice of violations of the Fourteenth Amendment and the Safe Streets Act.  Of the women murdered by their partners between 1991 and 1999, only 17 percent had orders of protection, 2 percent had orders of arrest against their aggressors, and 4 percent had expired orders of protection.[65]  These statistics strongly suggest that PRPD is not doing enough to ensure that women living under the threat of domestic violence make use of the legal resources available to them.  In 2006, PRPD reported 23 murders of women at the hands of their domestic partners, placing Puerto Rico first on an international list comparing the number of women killed in each country/territory by their partners per million women over the age of fourteen.[66]  Recent data suggest 2006 was not an aberration – in 2008, 26 women were murdered by their partners.[67]

PRPD's failure to address the commission of domestic violence by law enforcement officers reveals a lack of engagement with Puerto Rico's domestic violence crime crisis and may qualify as evidence of discriminatory intent.  As previously discussed, PRPD has repeatedly failed to appropriately discipline officers accused of domestic violence.  Because of its inefficient and faulty systems of accountability, PRPD has allowed officers accused of serious crimes to continue on active duty.  In tandem with the statistics highlighted above, such an institutional oversight evinces an unwillingness to address a very serious problem in Puerto Rico that may rise to the level of a constitutional violation.

# IV.   ADDITIONAL DEFICIENCIES CAUSING THE PATTERN AND PRACTICE OF CONSTITUTIONAL VIOLATIONS

The constitutional violations we uncovered are evidence of a police department that is in disarray.  These findings are hardly surprising since basic systems related to the hiring, training, supervision, accountability, promotion, and dismissal of PRPD officers are non-existent or broken.  PRPD lacks adequate policies and procedures, and existing operational structures are inconsistent and arbitrary.  Fundamental reforms of the most basic police practices are necessary.

The systemic deficiencies that follow, together with the deficiencies discussed above, cause and contribute to the pattern and practice of use of excessive force, use of unreasonable force to chill speech, and unconstitutional searches and seizures.  Specifically, PRPD's policies and procedures are inadequate and do not align with professional standards.  Beyond formulating new policies, Puerto Rico will need to build and maintain necessary organizational structures to ensure the success of new procedures.  Puerto Rico will also need to invest in building and maintaining effective systems of accountability, promote personnel with demonstrated competency and commitment to lawful policing, and instill organizational values at all levels of PRPD that foster meaningful respect for civil rights.[68]

Accountability is the hallmark of an effective and functional police department.  We found little evidence that sufficient systems of accountability are in place to safeguard the federally-protected rights of individuals in Puerto Rico.  For instance, in addition to deficiencies discussed above, we found that PRPD:

- fails to provide officers with policies consistent with constitutional requirements;
- fails to train cadets through a skills-based field training program;
- does not re-train existing officers on current methods and legal standards;
- provides ineffective field supervision;
- fails to complete timely administrative investigations;
- does not impose consistent or progressive discipline to address misconduct;
- lacks a comprehensive risk management system that identifies patterns of at-risk conduct by officers; and
- is not subject to effective external oversight to ensure constitutional policing and public trust in its law enforcement activities.

> "Police are not trained to handle people with rights.  People are mistreated and the police agency mistreats the officers."
>
> - PRPD Administrative Officer

In the sections that follow, we discuss additional systemic deficiencies that cause and contribute to the pattern and practice of civil rights violations.

## A.    Inadequate Policies and Procedures

PRPD's policies, as set forth in general and special orders, are not comprehensive, comprehensible, up-to-date, or consistent with relevant legal standards and contemporary police practices.  In *Building Trust Between the Police and the Citizens They Serve*, IACP underscored the importance of communicating clear expectations:

> [T]he police executive must ensure that the agency's core "values and principles are expressed, communicated, and reinforced throughout all aspects of the departments' operations, administration, and service." . . . [D]epartmental policies and procedures must support the agency's mission, and must be written, clearly defined, and enforced.  These ethical standards and guiding principles should be set forth in a manual for all personnel and should not only define acceptable standards of conduct, but identify conduct that is unacceptable.  These values and principles must be understood and embraced by all executives, supervisors, officers, and civilian employees within the department.[69]

The Superintendent issues PRPD's general and special orders.  The orders are numbered consecutively by year and are not organized by topic.  The general orders date back to 1967.  The oldest general order in effect, GO 68-14, concerning photographs of officers, was issued in April 1968.  Many general orders have been repealed or revised; however, repeals and amendments are not readily identifiable.

Nearly all officers we interviewed indicated that although they reviewed the orders at the academy, PRPD does not provide them with copies of the orders to retain as guides.  In some cases, supervisors in various command areas were unable to show us a complete set of the orders.  One commander reported during our December 2010 tour that supervisors go over the list of newly issued orders and directives during monthly local academies and that officers may get copies of the orders, if they so request.  Otherwise, the orders are not distributed to each officer.

Several commanders explained that officers must ask for copies of policies, if they want them.  This reliance on officers' discretionary interest is reflected in GO 98-16 on searches and seizures, which states:

> The rules and policies of this Order attempt to incorporate the concepts, doctrine, or procedures that apply by legislative or judicial (jurisprudence) means, without meaning that they represent a catalogue of all of the situations that personnel might face on a daily basis, and should be complemented with court decisions that are produced relatively frequently and with related legal articles, since the officer is a professional of justice and should keep current on this topic.

It is unacceptable to place the onus on each patrol officer to locate, review, comprehend, and institute changes based on his or her interpretation of new case law.  It is apparent that PRPD has not devised an effective means of disseminating orders and other operational directives to ensure that all officers read and understand the orders.  While it may be impractical to provide all officers with multiple sets of binders with GOs in paper format dating back to 1967, PRPD

should ensure that all orders, revised to reflect amendments, are accessible at all times, in either paper or electronic format.

PRPD should also develop standard operating procedures to guide operations and ensure uniformity in procedure among units and geographical areas.  Officers currently rely on legalistic regulations and orders that are impractical and offer unclear guidance.  As a result, officers improvise critical aspects of the agency's work.

## B.   Insufficient Training

The effective recruitment and training of police officers is essential to constitutional policing.  PRPD fails in each area.  While PRPD mandates pre-service training for officers, it neither screens inappropriate candidates from the force nor offers an adequate foundation for police work.  In-service training is nearly non-existent.  These failures dramatically reduce public safety and place both residents and police officers at risk.

### 1.   The University College Lacks Accreditation and Independence

The University College of Criminal Justice is an institution of higher education charged with providing pre-service and in-service training to PRPD officers, an arrangement similar to nearly half of all state and local law enforcement academies in the United States.[70]  The University College was formerly a training unit within PRPD.  In 1999, the Puerto Rico Legislature authorized the creation of the University College as an independent entity.  This arrangement allowed cadets to earn an associate's degree at the college, a prerequisite for new officers beginning in 2000.  That same year, in 2000, the Puerto Rico Legislature granted the University College greater control over its financial, academic, and operational affairs to facilitate accreditation by the Middle States Association of Colleges and Schools.  The University College, however, has yet to obtain accreditation, which would make it eligible for federal funding.

The University College also has not yet achieved full independence from PRPD.  The Superintendent, as the President of the University College's Board of Directors, continues to direct the school and set its priorities.  The Superintendent selects the chancellor and associate deans with the Board's approval.  Many of the faculty members are PRPD officers designated by the Superintendent and PRPD.  In addition, the Governor, who also appoints the Superintendent, appoints eight of the Board's nine members.

PRPD's leadership changes have thus had a profound impact on the University College's development as an independent, licensed, and fully accredited institution.  In 2006, the Puerto Rico Council on Higher Education, which licenses colleges and universities in Puerto Rico, noted that the University College had "suffered frequent administrative changes" and that PRPD had four Superintendents from 2000 to 2004 with separate visions for the development of the University College.[71]  During one of those years, the University College lacked a functioning Board and PRPD attempted to transform the University College back to a police academy within PRPD.[72]  In 2003, Puerto Rico suspended the associate's degree requirement and permitted a special three-month, pre-service program for new cadets.[73]  Three cadet classes went through the abbreviated training and entered PRPD without an associate's degree.  Following the return of

former Superintendent Toledo Dávila to PRPD in 2005, the Puerto Rico Legislature reinstated the associate's degree requirement.  According to former Superintendent Toledo Dávila, a three-month training period was insufficient to prepare cadets for police work.[74]  During our December 2010 tour, former Superintendent Figueroa Sancha indicated that a significant number of officers who completed the three-month special training program were eventually expelled because of criminal activity or other misconduct.

Further, the Superintendent is responsible for recruiting, selecting, hiring, and terminating cadets who enroll in the University College as PRPD employees.  PRPD pays cadets and affords them civil service benefits and protections while they train and study at the University College.  Although cadets must serve a two-year probationary period, disciplinary actions, including termination, are carried out by PRPD and can only be authorized by the Superintendent.  University College officials have little authority over the termination process if they determine a candidate is unsuitable, academically or otherwise.  According to the University College chancellor, PRPD's human resources office can only recommend termination to the Superintendent when cadets do not meet training requirements.  Cadets who have not met the academic requirements at the University College can therefore potentially remain cadets indefinitely, or at least long enough to gain civil service protections and become permanent PRPD employees by default.  Our police consultants believe this process may result in "less than suitable" officer candidates becoming permanent employees before disciplinary proceedings are completed.  In its December 2007 report, PRPD's external evaluating committee also expressed concern with PRPD's recruitment and selection process, and recommended that Puerto Rico study the viability of allowing the University College to select and enroll students into its academic program.  PRPD would then hire cadets after they successfully complete all academic requirements and graduate from the University College.[75]

We learned that the academic curricula are not tailored to clear and specific learning objectives or to defined policies or standards.  Many officers we interviewed indicated that there was a significant disconnect between what they learned in the University College and actual expectations and requirements from supervisors once they were deployed in the field.  Critical courses are also taught from a technical legal perspective, more suitable to law students, without practical and real-world application for officers.  For instance, the University College's course on civil rights consisted of a lecture and slides on Puerto Rico's rules of criminal procedure, without any discussion on the application of legal concepts to actual encounters with civilians.  While the course cited the United States Constitution as a source of individual rights, it did not discuss specific rights, such as the Fourth Amendment's prohibition on searches and seizures without probable cause or unreasonable uses of force.  As an example, the course defined "illegitimate" force as "unjustified, deviating from the law and professional practice," but did not discuss relevant factors when considering the reasonableness of force, such as the severity of the crime at issue or the subject's level of resistance, or other standards.  The course contained virtually no interaction or engagement with students using practical examples of lawful and unlawful conduct.

Finally, PRPD fails to keep proper records on its instructors.  Despite our request, PRPD could not produce specific information about the instructor certification process followed by the University College, other than reports that instructors had been certified by the University

College at some point in time or had been grandfathered-in. Individuals who conduct cadet training, serve as field training officers, or who conduct in-service training should be selected using heightened eligibility criteria that specially apply to these positions. PRPD should ensure that instructors receive periodic re-training and keep current on new developments in their respective fields. Moreover, the disciplinary records of all instructors should be evaluated to ensure that the selected individuals are suitable to instruct new cadets and re-train officers.

## 2.        Pre-Service Training Is Insufficient

Cadets review PRPD's policies and procedures while attending pre-service training, but are not provided with post-academy field training to prepare them for real-life policing. This training is particularly essential in developing the practical skills, judgment, and tools necessary to lawfully employ force, effect arrests, and treat all persons equally. Instead, new officers are simply armed and released into the streets and neighborhoods of Puerto Rico. In many cases, they never return to the academy for regular in-service training.

PRPD currently requires that all cadets earn at least an associate's degree to become an officer. All cadets enter the University College as salaried public employees while they attend classes and reside in campus dormitories. The University College currently offers two pre-service programs: a degree track for cadets entering without a degree and a basic training track for cadets with advanced degrees.

The number of training hours required by PRPD is well below the hours required by other large police departments. According to the most recent Law Enforcement Management and Administrative Statistics ("LEMAS") report, the average training requirement for new officers exceeded 1,700 hours of academy and field training.[76] PRPD requires cadets entering without an advanced degree to complete 1,170 hours of training, while cadets entering with advanced degrees must complete 855 hours of training. The lower number of training hours in Puerto Rico is due, in large measure, to the lack of a field training program, or an adequate analogue, offered by the University College. For law enforcement agencies serving 1,000,000 residents or more, the average number of hours required for field training was 667 hours.[77] Even when academies do not offer a mandatory field training program as part of their basic training courses, field training is typically provided by the law enforcement agency employing the new officer. However, PRPD also does not provide a field training program.

> "There is a clear projection of an image of the Police that does not understand the civil rights of citizens in its actions . . . this denotes that the actual [training] curriculum is not tempered to functional and operational reality.
>                     - Police Affinity Group

A comprehensive field training program incorporates community policing and problem-solving principles, and produces officers who have the necessary knowledge, skills, and attitude to meet contemporary law enforcement challenges. Field training usually consists of several components or phases. Each training phase should be accompanied by a learning exercise

involving real-life problems that have no easy solution and encourage cadets to view problems in a broad community-focused context.  A field training program should also include a neighborhood familiarization project to teach cadets how to partner with community residents to effectively deal with crime and neighborhood problems.  After successful completion of the field training program, new officers should be assigned to a permanent shift, but continue to be monitored for the remainder of their respective probationary periods – or longer, in the case of officers who became permanent employees prior to the completion of the field training program.

In December 2010, Superintendent Figueroa Sancha reported that PRPD is considering instituting a six-month field training program for all cadets after they complete University College training.  He added that PRPD has begun to select mentors for the implementation of the field work program among sergeants and experienced officers who do not have pending administrative investigations.  PRPD has not provided information indicating that the new field training program is being implemented.  In addition, the most recent class of cadets, which graduated in July 2011, was provided with a shortened pre-service program to allow for prompt deployment to the street.  The effectiveness of a field training program depends on many factors, including the quantity and quality of pre-service training.  A cursory pre-service program will prevent cadets from learning the policing concepts and skills that are applied in a field training program.

The Superintendent has the authority to deploy cadets – carrying regulation firearms – on policing assignments before the cadets complete their pre-service programs.  If this practice continues, PRPD must ensure that cadets complete training in core areas, such as cultural sensitivity and diversity; communication skills (including the importance of courtesy and respect); use of force, including deadly force; verbal disengagement techniques and alternatives to the use of force; and integrity and ethics.  Cadets should complete scenario-based training in these subjects to prepare them for the many situations they are likely to encounter involving interaction with civilians, including traffic enforcement and mass event likes *fiestas patronales*.  Moreover, PRPD supervisors and University College staff  should evaluate the academic performance and disciplinary records of cadets deployed on policing assignments prior to deployment.  Finally, the officers supervising cadets on actual policing assignments should provide the University College with an evaluation of the cadets' performance so that the University College can address any academic deficiencies or refer any incident of criminal or unprofessional conduct for investigation, if the cadets' field supervisors have not already done so.

Undercover officers also engage in use of excessive and illegal searches and seizures.  During our tours, we learned that PRPD recruits individuals to serve as undercover officers before they enter and complete the pre-service program at the University College.  Once the undercover officer completes policing assignments with PRPD, the officer is transferred to the University College to begin the pre-service training program.  The quality and quantity of training offered to undercover officers who do not participate in the regular University College training program appears grossly insufficient.

Several officers reported that undercover officers are only "seen" at the University College when they are taken to the shooting range for target training wearing hoods over their

heads.  If undercover officers are going to participate in PRPD interventions, it is critical that PRPD provide them with civil rights and other training offered to PRPD officers, and keep records of this training.

### 3.      In-Service Training Is Virtually Non-Existent

Effective law enforcement agencies reinforce their expectations on use of force and searches and seizures through consistent and sufficient in-service training.  However, many PRPD officers reported that they do not return to the University College for in-service training for years, or ever, after completing the pre-service program.  The dearth of in-service training and pervasive misconduct has recently prompted the Puerto Rico Legislature to set minimum training requirements for PRPD officers.  But these minimums fall significantly short.

Prior to 2008, there were no formal in-service training requirements for PRPD officers. For instance, PRPD reported that out of approximately 12,500 officers assigned to the Field Operations Division, the largest PRPD component, approximately 1,359 – or only about 11% – received some form of in-service training in 2007. The trainings varied widely and were not uniform across regions, ranging from classes on domestic violence to retention of firearms and handling terrorist bombings.  In July 2008, the Puerto Rico Legislature enacted Law 132 finding that an officer who left the University College would not generally receive any additional training.  P.R. Laws Ann. tit.25, § 3102 (2008), *as amended*.  Law 132 required PRPD to provide training to existing officers every two years "limited to the work division to which the [officer] is assigned."  *Id.*  Law 132 did not establish a minimum number of training hours and charged the Superintendent with developing specific requirements.

> "Continuous training and learning is not part of the organizational culture of the Police Department.  There is a real resistance by the Police hierarchy to send police officers to continuous education programs."
>
> - Former PRPD official

Despite the new two-year training requirement, PRPD officers continued to engage in serious misconduct.  In July 2010, the Puerto Rico Legislature enacted Law 103 and observed:

> We have witnessed various dramatic cases in which members of the police have been involved in domestic violence, police corruption, lack of control in the management of their emotions and force at the moment of exercising their duties. This Assembly believes it is necessary and urgent that . . . members of the Puerto Rico Police comply with a minimum requirement of twelve hours of continuing education.

Law 103 of July 2010 required PRPD to provide officers with a minimum of 12 hours of in-training every year.

During our December 2010 tour, we learned that the University College and PRPD had recently developed a 16-hour continuing education program for existing officers to comply with

Law 103.  PRPD subsequently produced a 16-hour, two-day training schedule, dated October 2010, listing the following courses:  civil rights, hate crimes, police responsibilities, criminal law, human relations, ethics, use of force, and personal defense.  PRPD's 16-hour training schedule did not specify whether communication skills (including the importance of courtesy and respect) and verbal disengagement techniques are part of the curriculum, nor whether the hate crimes course covers cultural diversity and sensitivity issues.  These topics are vital to any continuing education program.  Additionally, the training schedule did not specify whether any courses included scenario-based training to teach practical application of legal and operational concepts.

Although PRPD's 16-hour annual training requirement is an improvement over its prior training practices, the requirement remains insufficient.  According to a 2007 LEMAS study, police departments serving a population of one million or more residents provide an average of 27 hours of in-service training for sworn personnel.[78]  Across police departments of all sizes, the average is 35 hours.  *Id.*  Furthermore, PRPD's own consultant, Total Quality, previously recommended a 40-hour in-service training requirement.[79]  Given the years that PRPD failed to provide consistent and appropriate in-service training, and the irregular practices that have been allowed to develop across PRPD, a 40-hour annual training requirement, at a minimum, is necessary to reform PRPD.

Even though training is now required by local law, a review of the training statistics provided to the Puerto Rico Senate demonstrates how few PRPD officers have received continuing education.  When PRPD has provided training, it has failed to focus on many of the most crucial subjects related to protecting civil rights.[80]  According to the University College's report to the Puerto Rico Senate, approximately 1,000 officers completed the continuing education curriculum during October and November 2010.  At this pace, continuing education training will be provided to only approximately 6,000 officers by September 2011, or roughly one-third of PRPD officers in a year.  Survival training was only provided to 64 officers from January to November 2010.  Notably, PRPD began providing training on civil rights in September 2010 – the same month we told the Governor and other Puerto Rico officials that we would be issuing a public report with our investigative findings.  The number of officers who received training on the use of expandable baton (415), chemical spray (248), and firearms (287) is very low compared to the number of active PRPD officers (approximately 17,100).  All officers should receive continuing education annually and, given the systemic violations we have identified in this report, PRPD should focus its attention on developing and delivering training on core competencies related to civil rights that have been lacking for so long.

PRPD recently identified "local academies" as another new component of PRPD's training program.  On January 24, 2011, Puerto Rico reported that "PRPD now requires all units and division supervisors to carry out monthly 'local academies' where supervisors discuss the PRPD's orders and regulations with officers under their command."  However, PRPD has required monthly "local academies" since at least 1974 when then-Superintendent Astol Calero Toledo issued GO 74-1.  As discussed in Section IV.A, *supra*, many of the officers we interviewed indicated that supervisors simply read new policies and procedures at monthly local academies and provide little opportunity to discuss and understand core material.

## C.    Inadequate Supervision

Many officers we interviewed reported a crisis in supervision.  To date, PRPD has not filled many of the 2,100 supervisor vacancies it announced in 2009.[81]  A commander in a large metropolitan police area reported that the supervisor-to-officer ratio in the San Juan area is 1:30 and that it should not be more than 1:15.  In some specialized units, supervisors are responsible for more than 20 officers.  It is generally accepted practice that spans of control for patrol units should be no more than 1:10, and 1:5 is recommended.  Any span of control should take into account the level of activity and type of assignment of the unit being supervised.  Given the lack of any field training program and the paucity of in-service training for offices and supervisors, a span of control at the lower end of this spectrum for all field units in PRPD is necessary to ensure adequate supervision.  The former Superintendent acknowledged that lack of supervision contributes to civil rights abuses during his confirmation hearings in January 2009.[82]  Unfortunately, although the Superintendent reported that he has filled approximately 500 sergeant positions, the supervisory ranks remain sparsely filled.  Given the high number of supervisor vacancies, it is perplexing that PRPD would promote only four officers in 2009 when PRPD promoted nearly 1,200 officers in 2008.  *See Table 7, below*.

PRPD's promotion practices also contribute to poor supervision.  PRPD currently promotes officers to sergeant using special "merit" promotions that do not require officers to demonstrate their competency in core areas through objective examination.  An adequate examination is designed to reliably measure the officer's proficiency in core areas such as leadership, constitutional law, criminal procedure, agency policies and procedures, risk management, and discipline.  When promotions are carried out through examination, candidates typically devote months to learning and preparing for the examination.  Once candidates pass the examination and are selected as sergeants, the generally accepted practice is for new sergeants to attend an 80-hour first-line supervisor training that allows them to apply their skills and abilities as supervisors.  Because PRPD does not rely on examinations to identify qualified candidates for sergeants, officers are not required to dedicate any time to learning and studying.  Once candidates are selected, they are only offered a 40-hour training course.  This 40-hour course is inadequate given the lack of attendant preparation and demonstrated proficiency that would be necessary if promotions were carried out by examination.  Generally, effective first-line supervision is the cornerstone of constitutional policing and is critical for reform.  PRPD simply does not provide first-line supervisors the opportunity to develop the necessary skills to effectively manage officers and ensure lawful policing.

### Table 7:  Number of Promotions by Type

| Year | Merit | Examination | Total |
|------|-------|-------------|-------|
| 2008 | 1,172 | 9 | 1,181 |
| 2009 | 0 | 4 | 4 |
| 2010* | 443 | 79 | 522 |
| **Total** | **1,615** | **92** | **1,707** |

*As of September 10, 2010.

Officers repeatedly complained during our tours that one's political affiliations, rather than skills and competencies, drive promotion decisions.  While law enforcement organizations are typically managed by executives who are either directly elected by the people or appointed by elected officials, PRPD is unique in terms of the role that politics plays in internal promotions. Considering political affiliation in promotions to PRPD's command ranks negatively impacts the degree of confidence that line officers have in their superiors, inhibits the cultivation of institutional competence, and contravenes efforts to initiate and secure reforms. Although the agency policy is to promote officers by standardized examination,[83] we found that PRPD promoted the vast majority of officers under special authority granted to the Superintendent as "merit" promotions.  As illustrated below, only 5 percent of officers were promoted by examination from January 2008 to September 2010.  Generally, these promotions were "merit" in name only, with many awarded based on political affiliation or patronage.

As discussed previously, the Governor of Puerto Rico possesses supreme authority over PRPD.  The Governor delegates this authority in several ways, including most clearly by the appointment, with consent of the Puerto Rico Senate, of the Superintendent.  However, the Governor also maintains final approval of all promotions to PRPD's highest ranks, from auxiliary superintendents to captains.  It is clear from our discussions with PRPD officers that they believe political affiliation plays a significant role in advancement within PRPD, a belief that likely stems, in part, from the Governor's unique role.  This belief, in turn, fosters a dysfunctional professional atmosphere and encourages subordinates to question the qualifications and competence of command officers.

The use of political considerations in promotions also threatens reform of PRPD policies and practices.  Efforts to instill change in large and complex organizations require a consistent and stable commitment from leadership.  Here, however, each time a new Governor is elected there is significant turnover within the command ranks.  Such turnover stunts the cultivation of institutional competency and expertise.  It also hinders efforts to initiate and maintain reform within PRPD.

**D.      Seriously Deficient Civilian Complaint Process**

We found pervasive and longstanding deficiencies in PRPD's civilian complaint process.  Specifically, we found that:

- The complaint intake process discourages civilians from filing complaints;
- Procedures and protocols are insufficient to ensure complete and timely investigations; and
- Investigators lack training and resources to complete adequate investigations.

**1.       The Complaint Intake Process Discourages Civilians from Filing Complaints**

Civilians should have a full and fair opportunity to file complaints alleging officer misconduct.  Civilians should be provided with alternative means of filing complaints, including in person, by mail, by telephone, or by email.  PRPD should offer citizens a complaint form, but should not require completion of the form to initiate a complaint.  Individuals should be able to obtain and file complaint forms at places other than law enforcement agencies.  Law

enforcement agencies should prohibit officers and other employees from refusing to accept complaints, or attempting to dissuade civilians from filing complaints. Meeting with or speaking to a supervisory officer should not be a prerequisite for filing a complaint. PRPD should accept complaints from all individuals, including those who request anonymity. PRPD should also accept complaints from third parties to ensure that witnesses of abuse or misconduct can file complaints. PRPD policy should require officers to report misconduct, either witnessed or discovered, by other officers. Officers who fail to report misconduct should be subject to appropriate discipline. PRPD should establish appropriate protections against retaliation for officers who report misconduct.

PRPD's intake practices discourage civilians from filing complaints. Although not required by regulation,[84] PRPD officers explained that in practice, civilians are required to appear before an administrative investigator (or "officer of the day") and provide a sworn statement or declaration to file a complaint against an officer. On some occasions, when the complainant cannot or choses not to appear at a stationhouse, an investigator would travel to the complainant to take the declaration. During our December 2010 tour, the PRD commander confirmed this practice, indicating that an administrative investigator would attempt to take a complainant's declaration once PRD receives a complaint.

The pre-printed form provided by PRPD for civilian complaints also includes a statement admonishing the complainant about the veracity of the complaint. Language warning civilians about potential criminal prosecution for false or untrue complaints may intimidate some would-be complainants into silence.[85] For over 20 years, PRPD has been on notice that its system for receiving civilian complaints was problematic, ineffective, and backward. In *Gutiérrez-Rodríguez*, 882 F.2d at 565-66, the First Circuit upheld a lower court decision imposing liability on PRPD's supervisors based on deficient disciplinary practices, including requiring complainants to appear at a stationhouse to provide a sworn statement. The court summarized the plaintiff's expert's testimony, emphasizing that the policy ultimately served to "'frighten[] most of the average citizen[s], particularly minorities. . . .' By its formality, the system discouraged people from coming forward with information. This hampered [PRPD's] ability to discover the truth surrounding alleged incidents of misconduct. *Id.* at 565-66 (second and third alterations in original).

PRPD's Regulation 6506 on civilian complaints ("Complaint Regulation") does not expressly require that all supervisors and officers accept civilian complaints, including when they are out in the field. Not surprisingly, officers told us that PRPD officers do not accept complaints while out on assignment. The PRD commander reported during our December 2010 tour that a civilian can come to any PRPD unit to make a complaint. A precinct commander during the same tour indicated that civilian complaints against officers can only be made in person and must be made at a local police station. PRPD should clarify that complaints may be made in any form (in person, in writing, by telephone, etc.) and require that all supervisors and officers accept civilian complaints, even while out in the field. All officers should also be required to demonstrate familiarity with the referral process to ensure that complaints are submitted timely to administrative investigators. PRPD should also notify all officers that failing to accept a complaint or discouraging a civilian from filing a complaint may subject the officer to disciplinary action.

Finally, the Complaint Regulation does not specify that PRPD should accept third-party and anonymous complaints. The regulations states simply, "A complaint may be presented by any citizen or agency employee." Although third-party complaints are fairly common, the PRD commander informed us that he had never seen a third-party complaint at PRPD, although they were acceptable. PRPD informed us that it currently accepts anonymous complaints, and transfers them to the Internal Affairs Bureau ("IAB"), a sub-unit within PRD, to determine whether the complaint is credible. If IAB finds the complaint credible, it returns the complaint for a separate administrative investigation. If not, IAB "archives" or closes the investigation. PRPD should specifically instruct officers to accept and investigate third-party and anonymous complaints. In addition, even if complaints are transferred to direct supervisors for investigation, PRD should continue to log and track civilian complaints through their final disposition.

## 2.    Complaint Investigations Routinely Take Years To Complete

Officers and civilians consistently reported pervasive and inordinate delays in completing administrative investigations. A former associate superintendent reported in 2008 that the average length of an investigation was nearly four years. Many officers and superintendents reported that investigations could take up to ten years or more to complete. In a May 2010 budget report, PRPD indicated that the accumulation of unresolved complaints – some from the 1990s – was preventing promotions, steps increases, and other benefits. More recently, in February 2011, an officer affinity group observed, "[a]t present, an efficient and diligent process to investigate administrative complaints has not been established. . . . The Agency should improve this process because the current process creates unnecessary delays in the resolution of [administrative complaints].[86] The Complaint Regulation provides that all civilian complaints are to be resolved no more than 180 days from the date of receiving the complaint. Significant delays in the investigation process also impair PRPD's ability to hold officers accountable. For civilians, extraordinary delays breed distrust and a lack of confidence in PRPD. Table 8, below, details the complaint history of a PRPD Lieutenant that reflects several delays.

**Table 8:  Civilian Complaint History, PRPD Lieutenant**

| Type | Year | Disposition |
|------|------|-------------|
| Hiding info on entry application | 1986 | Expulsion; reduced to admonishment |
| Assault | 1989 | 15-day suspension |
| Immoral conduct | 1994 | Archived |
| Accident | 1994 | Archived |
| Misuse of vehicle | 1994 | Archived |
| Misused of donated money | 1994 | Archived |
| Stealing official property | 1995 | Archived |
| Assigned equipment disappeared | 1995 | Archived |
| Assigned equipment disappeared | 1995 | Archived |
| Immoral conduct | 1996 | Archived |
| Disobeyed order | 1997 | No record |
| Incident at ombudsman's office | 2003 | 30-day suspension; reduced to counseling |
| Negligence | 2003 | Archived |
| Negligence | 2003 | Archived |

| | | |
|---|---|---|
| Changed schedule to serve alcoholic beverages | 2004 | 30-day suspension |
| Failure to correct irregularities at precinct | 2005 | Archived |
| Harassment (Dominicans) | 2006 | Archived (two complaints) |

During our December 2010 tour, Superintendent Figueroa Sancha reported that PRPD had made significant progress in resolving the backlog of civilian complaints, and had no remaining cases from 2005 or 2006. He further reported that PRPD had closed approximately 7,000 cases over the past 12 to 13 months. This is remarkable, but inconsistent with statistics published by PRPD. For instance, PRPD reports that administrative investigators resolved 5,067 complaints in 2009 and 2010 by recommending "archive" or a specific disciplinary measure. In the preceding two years, 2007 and 2008, administrative investigators resolved 6,288 complaints. In 2005 and 2006, administrative investigators resolved 7,734 complaints. The data thus demonstrate that administrative investigators are resolving fewer complaints. It is possible that the 7,000 cases reported as "cleared" by the Superintendent were cases backlogged at another PRPD component, such as the Legal Affairs Office, which receives and reviews discipline recommendations before transmitting them to the Superintendent for final approval. Reviewers in the Legal Affairs Office reported significant delays in getting discipline recommendations from administrative investigators, but many other officers reported similar, if not more acute, delays at the Legal Affairs Office. Administrative investigators and staff in the Legal Affairs Office reported needing additional staff, including civil personnel, to resolve the backlog of cases. PRPD has not reported the outcomes of the 7,000 complaints that it "cleared" over the last year.

We also found a significant number of officer complaint histories with missing or unresolved complaints. In the case of missing dispositions, the complaint history would indicate "*no consta*" or "not evidenced." Table 9, below, provides the unresolved complaint history of an officer who was terminated from PRPD in May 2008 after falsely arresting several members of a family during a search in 2006. Had PRPD determined that earlier complaints were sustained, PRPD might have acted to retrain, discipline, or even expel this officer prior to the 2006 incident.

**Table 9:  Civilian Complaint History, Terminated Officer**

| Type | Year | Disposition |
|---|---|---|
| Aggression | 2003 | Pending after investigator recommended admonishment |
| Abandoned service | 2005 | Pending after investigator recommended admonishment |
| Insubordination | 2005 | Archived; investigator recommendation is unknown |
| Negligence; irregularities at the Drug Unit | 2005 | Pending after investigator recommended orientation |
| Immoral conduct; taking $4,700 during search | 2005 | Pending after investigator recommended archive |

| | | |
|---|---|---|
| Domestic violence | 2005 | Pending after investigator recommended 5-day suspension |
| Immoral conduct; $600 taken during search | 2005 | Pending after investigator recommended admonishment |
| Persecution; multiple detentions | 2005 | Pending after investigator recommended archive |
| Lawsuit for illegal search | 2005 | Informational |
| Domestic violence | 2006 | Pending after investigator recommended expulsion |
| Domestic violence | 2006 | Pending after investigator recommended expulsion |
| Domestic violence | 2006 | Pending after investigator recommended expulsion |
| Domestic violence | 2006 | Pending after investigator recommended expulsion |
| Failure to appear in court | 2006 | Pending after investigator recommended expulsion |

*As of Jan 17, 2008.

     The civilian complaint history of the following PRPD lieutenant, who is currently on the force, includes numerous missing dispositions for allegations of misconduct.  In addition, we found troubling variations between two history profiles taken of the same lieutenant only 18 months apart.  The first history, prepared by an administrative investigator in June 2006, consists of nine civilian complaints through the end of 2005.  *See Table 10A.*  The second history, prepared by a separate investigator in December 2007, consists of 12 civilian complaints for the same period; the disposition of four complaints is also unknown.  *See Table 10B.*  These discrepancies further illustrate the unreliability of PRPD's recordkeeping.  Without reliable internal affairs records, PRPD risks placing unqualified – and even dangerous – officers in the field and promoting them to positions of greater authority within PRPD.

**Table 10A:  Civilian Complaint History, Lieutenant Compiled in June 2006**

| Type | Year | Disposition |
|---|---|---|
| Physical abuse | 1989 | **Expulsion** after investigator recommended 30-day suspension |
| Verbal abuse | 1989 | Archived after investigator recommended 30-day suspension |
| Negligence during an intervention where officer was injured | 1991 | Archived after investigator recommended 5-day suspension |
| Extramarital relations | 1993 | Archived |
| Illegal appropriation; taking wallet | 1993 | Archived |
| Negligence during vehicle intervention | 1994 | Archived after investigator recommended 5-day suspension |

| | | |
|---|---|---|
| Vehicle accident | 1994 | Archived after investigator recommended admonishment |
| Immoral conduct | 2002 | Archived after investigator recommended admonishment |
| Vehicle accident | 2004 | Pending after investigator recommended orientation |

*As of June 19, 2006.

**Table 10B:  Civilian Complaint History, Lieutenant Compiled in December 2007**

| Type | Year | Disposition |
|---|---|---|
| Physical and verbal abuse | 1989 | Archived after investigator recommended 30-day suspension |
| Physical abuse | 1990 | Archived after investigator recommended 30-day suspension |
| Negligence during an intervention where officer were injured | 1991 | Archived after investigator recommended 5-day suspension |
| Physical and verbal abuse | 1992 | **Not found** after investigator recommended expulsion |
| Extramarital relations | 1993 | Archived |
| Illegal appropriation; taking wallet | 1993 | Archived |
| Vehicle accident | 1994 | Archived after investigator recommended 5-day suspension |
| Vehicle accident | 1994 | Archived after investigator recommended orientation |
| Lascivious acts | 2002 | Archived after investigator recommended admonishment |
| Vehicle accident | 2004 | **Not found** after investigator recommended admonishment |
| Negligence in investigation | 2005 | **Not found** after investigator recommended archive |
| Vehicle accident | 2005 | **Not found** after investigator recommended 30-day suspension |

On January 9, 2009, administrative investigators confirmed that the following complaints against the lieutenant remained unresolved.  The oldest of these had been open for approximately seven years.  Notably, our investigation concluded that delays of this magnitude are common. Leaving complaints unresolved places the community at risk by impeding PRPD's ability to identify and effectively counsel, retrain, or remove officers, as needed.

**Table 10C:  Civilian Complaint History, Unresolved Complaints as of January 2009**

| Type | Year | Disposition |
| --- | --- | --- |
| Negligence | 2002 | Pending in Legal Affairs Office |
| Vehicle accident | 2004 | Pending in Legal Affairs Office |
| Vehicle accident | 2005 | Pending in Legal Affairs Office |
| Loss of Government Property | 2005 | Pending in Legal Affairs Office |
| Negligence | 2006 | Pending in Legal Affairs Office |
| Improper searches and seizures | 2007 | Pending investigation by Police Area |
| Loss of official vehicle license plate | 2008 | Pending investigation by Police Area |

### 3.     Procedures and Protocols Are Insufficient To Ensure Proper Investigations

PRPD has not established policies and procedures to appropriately guide the efficient disposition of civilian complaints.  PRPD's Complaint Regulation provides a broad overview of the complaint adjudication process, including intake, classification (formal vs. chain-of-command investigation), summoning declarants, use of scientific tests, reporting the results of the investigation, confidentiality, summary suspensions, and officers' duty to report criminal misconduct.  However, the Complaint Regulation does not provide operational details to ensure consistency between various regional offices, investigators, and supervisors.  For instance, the Complaint Regulation does not address assembling case files, maintaining witness logs, obtaining and storing physical evidence, coordinating parallel criminal investigations, ensuring the impartiality of the investigator, or taking statements from target officers.  Because PRPD has not established policies and procedures to guide administrative investigations, the process varies significantly.  This finding is consistent with a 2009 report from Total Quality, a contractor hired by PRPD to evaluate various administrative processes.  The contractor found, among other things, a lack of coordination among PRPD units, duplicate processes, and lack of standardized disciplinary measures.  For instance, some investigators created their own electronic spreadsheets to track complaints automatically, while others kept handwritten logs that made identifying patterns and trends more difficult.

In addition, PRPD policies provide little guidance as to which complaints must be referred to administrative investigators for a disciplinary recommendation and which may be handled by the involved officer's supervisor.  Article 5, Section C of the Complaint Regulation provides that an administrative investigation director will determine whether a complaint warrants an investigation by an administrative investigator or the officer's supervisor.  The Complaint Regulation indicates that administrative investigators must investigate cases in which a "prima facie" allegation exists that an officer engaged in misuse or abuse of authority or corruption.  However, these broad categories provide insufficient guidance, particularly as PRPD develops plans to transfer certain "less serious" complaints to supervisors.  In *Building Trust Between Police and the Citizens They Serve*, IACP notes, "[i]t is essential to have a written directive that delineates which types of complaints will be investigated by the subject officer's supervisor and which will be referred to Internal Affairs."[87]  IACP includes examples of specific complaint categories, such as "verbal abuse, on-duty, shooting incidents, profiling, and drug and alcohol," that provide for more consistent assignment to appropriate investigators.

Further, PRPD's Complaint Regulation does not provide a standard of proof for administrative investigations, such as preponderance of the evidence. This standard should be clearly delineated in policies and procedures accompanied by extensive examples and training to ensure proper application by investigators. During our tours, many investigators were unable to articulate the standard of proof used to adjudicate administrative complaints.

Separately, the Complaint Regulation requires only that investigators prepare investigation reports containing factual conclusions or determinations, the policies allegedly violated, and the recommended sanction or disciplinary measure, if any. The Complaint Regulation does not require that the report address the substance and process of the investigation, nor does it set out the types of final determinations that should be used. Generally accepted practices include the following disposition categories:

- Unfounded: the allegation was false or devoid of fact.
- Exonerated: the act occurred, but was lawful and within policy.
- Not Sustained: the evidence was insufficient to either prove or disprove the allegation.
- Sustained: the evidence was sufficient to prove the allegation.[88]

PRPD generally employs two types of determinations: (1) "archive," and (2) a specific disciplinary action, such as admonishment, reprimand, or suspension, when the allegation is proven. PRPD uses "archive" (or administratively closed) too broadly as a "catch-all" to cover three distinct scenarios, namely, complaints that are unfounded, exonerated, and not sustained. An officer with a history of five "exonerated" complaints is distinct from an officer with five "not sustained" complaints. In this latter case, investigators may find it necessary to conduct a proactive investigation to determine whether the officer is intimidating or threatening witnesses in order to discourage their cooperation during the administrative investigation. For instance, the lieutenant profiled in Table 10B (above) has an extensive history of complaints. However, the numerous "archive" designations in the lieutenant's history fail to explain whether the officer is a frequent target of false complaints (as may be indicated by repeated exonerations) or whether some other factor is contributing to the high number of complaints.

### 4. Investigators Lack Training and Resources

PRPD units designed to promote integrity and compliance with agency standards, while staffed with dedicated individuals, lack the necessary tools to hold officers accountable. Despite their immense responsibility, officers assigned to internal affairs units reported being outcasts in the agency. These officers included individuals who had no other space but the stationhouse restroom to store internal affairs files or who traveled in their own personal vehicles to conduct surveillance because they lacked serviceable equipment. They were charged with rooting out serious misconduct of all types and at all levels within the agency, but PRPD provided them with few resources, virtually no training, and little support.

Administrative investigators tasked with evaluating civilian complaints do not receive formal training. PRPD's 2009 Total Quality study found that administrative investigators lacked training and that the failure to train investigators results in ongoing delays in investigations. In December 2010, the PRD commander indicated that he had not received any formal training on administrative investigations, although he had directed various PRPD units in his 30-year career

at PRPD.  The Director of the Administrative Complaint Bureau also indicated that he had not received any training on conducting administrative investigations, though he stated that he had studied the Complaint Regulation before taking charge of the unit.  The lack of training they described is consistent with what other investigators reported to us on prior tours.

During our 2008 and 2009 tours, internal affairs and public integrity investigators reported a scarcity of staff to complete timely investigations.  They also indicated that staff lacked necessary equipment, such as video cameras, copiers, and unmarked cars.  During our December 2010 tour, PRD supervisors reported continued shortages in staff and resources.  Although PRPD reports that it recently improved the tracking of civilian complaints by automating a portion of the civilian complaint process, substantial work remains to bring meaningful reforms that will result in greater confidence from the public.

An effective internal investigation and civilian complaint process is essential to preserving public trust.  In 2010, the International Association of Chiefs of Police ("IACP"), as part of a project supported by DOJ's Community Oriented Policing Services ("COPS"), highlighted the role of Internal Affairs as the institution best equipped to build and maintain community trust following allegations of unethical conduct by officers.[89]  According to IACP, investigation and civilian complaint processes should be comprehensive, accessible, fair, thorough, and transparent to ensure that officers are held responsible when violations occur and to deter misconduct.  The process should promote confidence from both civilians and officers.  An objective and thorough investigation also serves to protect the community and officers from complaints based on misunderstandings or false information.

In addition, officers should be required to report to their agency any instance in which they are:  arrested or criminally charged for any conduct; named as a party in a civil suit regarding on-duty conduct; or named as a party in a civil suit regarding off-duty conduct in which the allegations relate to the officer's ability to perform law enforcement duties (e.g., improper force, fraud, or discrimination).  Law enforcement agencies should seek to be notified whenever a court or a prosecutor concludes that an officer engaged in misconduct in the course of criminal investigations or proceedings (e.g., engaged in false testimony or dishonest conduct, or improperly charged an individual with resisting arrest, assault on an officer, or disorderly conduct in an attempt to justify inappropriate use of force).

**E.      Ineffective Discipline**

PRPD operates nearly the same "grossly deficient" disciplinary system observed by the First Circuit when it upheld an award of punitive damages against the PRPD Superintendent and other supervisors in 1989.  *Gutiérrez-Rodríguez v. Cartagena*, 882 F.2d 553, 581-82 (1st Cir. 1989).  The deficiencies included unduly limited sanctions for misconduct and the failure to involve immediate supervisors in the disciplinary process.  *Id.* at 565-66.  More than two decades later, these deficiencies remain.  Specifically:

- PRPD's Personnel Regulation is sorely outdated and does not reflect current types of misconduct and contemporary principles of progressive discipline.
- supervisors lack authority and training to correct even minor infractions of their subordinates;
- disciplinary action is inconsistent, delayed, and ineffective in deterring misconduct; and
- officers are allowed to refuse to provide a statement during administrative investigations.

Law enforcement agencies should appropriately discipline any officer who is the subject of a substantiated misconduct allegation regarding excessive force, false arrest, improper search or seizure, discriminatory law enforcement, or who fails to report misconduct by another officer. The agency should also appropriately discipline any officer who enters a guilty plea or is found guilty in a criminal case regarding on-duty conduct, or who is found in a criminal proceeding to have intentionally committed misconduct.

> "As the expert on police practices and procedures testified, it was a disciplinary system that was going through the procedural motions without any real objective of finding the truth."
>
> - First Circuit in *Gutiérrez-Rodríguez*, 1989

In deciding the appropriate discipline for each officer who is the subject of a substantiated misconduct allegation, the agency should consider the nature and scope of the misconduct, and the involved officer's history of misconduct, investigations, and discipline.  Regardless of whether a misconduct allegation is substantiated or discipline is ordered, the agency should also consider whether other remedial non-disciplinary measures, such as training or counseling, are appropriate to correct underlying problems.

### 1.    The Police Personnel Regulation Is Sorely Outdated

PRPD's disciplinary system is governed by a Police Personnel Regulation issued thirty years ago, in 1981, that does not reflect current types of officer misconduct and contemporary principles of progressive discipline.[90]  The Puerto Rico Legislature recognized this deficiency and passed legislative measures in 1996 and 2004 requiring that the Superintendent update the Regulation to reflect contemporary merit principles.  Specifically, Law No. 184 of August 3, 2004, required government agencies, like PRPD, to adopt regulations that uphold critical merit principles concerning selection, training, promotion, retention, and discipline of employees that do not discriminate based on political affiliation, race, color, national origin, gender, or other prohibited category.  *See* Law 184 art. 2.1, 5.4.  Despite these legislative mandates, PRPD has yet to adopt a new Police Personnel Regulation.  A May 2009 audit report from the Puerto Rico Controller's Office found that PRPD's failure to adopt an updated personnel regulation leads to human resource errors and irregularities that are not detected and corrected in a timely manner.[91]

Consistent with the May 2009 Controller's audit report, we found numerous problems with PRPD's outdated disciplinary system that do not promote accountability.  For instance, the Police Personnel Regulation contains an antiquated list of rules governing officers' conduct.  The

list does not reflect current types of misconduct that should lead to discipline or corrective action.  For instance, the Police Personnel Regulation expressly prohibits officers from threatening or using their firearms against any person, except in legitimate defense of self or others.  However, the Regulation does not prohibit officers from threatening or using other weapons, such as batons, chemical agents, or CEDs, without justification.  The Regulation also prohibits interfering, obstructing, or misusing radio equipment, but does not reference misuse of computers or other electronic communication devices.  Separately, the Regulation does not address how much weight prior instances of misconduct should be given when imposing discipline and does not empower supervisors to take early remedial action to correct misconduct or problem behavior of subordinates.

### 2.        Supervisors Lack Authority and Training To Correct Even Minor Infractions of Their Subordinates

Numerous supervisors indicated that they do not have authority to correct even minor infractions by officers under their supervision.  Instead, supervisors must refer misconduct to administrative investigators before formal discipline or corrective action can be imposed on an officer.  Although the regulation governing civilian complaints allows administrative investigators to refer misconduct allegations to supervisors for a chain-of-command investigation, we found few instances of investigative units employing that option.  As a result, even minor infractions were channeled through the lengthy and backlogged administrative investigation process.  Some officers reported that supervisors simply worked around the cumbersome administrative investigation process by transferring problem officers to other units.

### 3.        Administrative Investigations Take Too Long To Complete

Officers from all ranks and divisions reported that administrative investigations can take up to ten years or more to resolve.  Officers complained that, in some instances, by the time officers are notified of disciplinary action, it is difficult to gather documents and witnesses to challenge the investigator's findings because the incident occurred so long ago.  Officers also told us that they often do not learn about unresolved misconduct allegations against them until they are considered for promotions.  In addition, we learned that the length of time that many administrative investigations take makes it difficult for supervisors to manage the officers working for them.  For example, an officer could have a dozen pending administrative investigations when he/she is assigned to a new precinct.  The supervisor might find out about some of these investigations from PRD, but as discussed below, records on pending and completed investigations are often incomplete.  Without these files, a supervisor cannot reliably determine whether the officer poses a risk to civilians or the integrity of the unit.

### 4.        Disciplinary Action Is Inconsistent and Ineffective in Deterring Misconduct

We found that administrative investigators' findings and recommendations varied widely for similar types of offenses.  PRPD's 30-year-old Police Personnel Regulation classifies misconduct into two categories:  minor and major violations.  The range of disciplinary action reflects these two types of violations.  Discipline for minor violations ranges from a written reprimand to a suspension that cannot exceed ten days.  Discipline for major violations can result in suspension lasting up to five months and in termination of employment.[92]  This range of

corrective actions is unduly limited.  The rules on discipline do not contemplate training, counseling, or other remedial measures that are focused on correcting problem behavior beyond the imposition of written reprimands and more severe sanctions.  Alternative measures should be added to the rules on discipline that provide for professional improvement and early intervention, rather than strictly to punish.  Furthermore, available penalties involving suspension should be more finely calibrated to address the current gap between a ten-day suspension and a five-month suspension.

The PRD Commander reported that he evaluates each recommendation for discipline that comes across his desk so that discipline is consistent, regardless of the subject officer's assigned region or police unit.  While the Commander's dedication is commendable, PRPD should not rely on the efforts of one individual to standardize the disciplinary recommendation process.  During our December 2010 tour, the Superintendent reported that PRPD was developing a new discipline matrix that would recommend discipline within a pre-determined range that considered the type of violation and the officer's history of misconduct.  We have not been provided with a copy of any updated personnel regulations or a disciplinary matrix.  However, such a matrix – if applied consistently – could greatly assist PRPD in imposing consistent sanctions and/or remedial measures for similar misconduct.

In the case of lawsuits filed against officers, we found little, if any, coordination between PRD, which is responsible for administrative investigations, and the Legal Affairs Office, which reviews all disciplinary action recommended by PRD and usually receives notice first of the suits.  The lack of coordination may be due, in large measure, to PRPD's antiquated and paper-based records management system that relies on a card catalogue to track civil actions and other court proceedings.  We also found that PRPD routinely fails to inform officers about the status of pending administrative investigations and civil court proceedings.  In many cases, both proceedings run simultaneously, often reaching contradictory results.  For instance, it is not uncommon to find a civil action that resulted in a substantial settlement or finding of misconduct where the administrative investigation was completed in a cursory manner without a recommendation for discipline.  In such instances, PRPD should review closed administrative investigations and determine whether any disciplinary or corrective action is necessary to prevent the officer from engaging in similar, or more serious, misconduct in the future.

During our review of civil suits involving PRPD officers, we found cases in which officers currently on the active PRPD roster were found liable for Fourth Amendment violations – or no finding was made because settlement was reached prior to trial – and whose conduct led to awards of money damages paid by Puerto Rico.[93]  Even if PRPD conducted administrative investigations against the involved officers for the incidents giving rise to litigation and no disciplinary action was imposed, following these settlements or verdicts, PRPD should consider whether to require training, counseling, or other remedial non-disciplinary measures to correct problem behavior.

5.      **Protections Against Self-Incrimination Are Offered in Administrative Investigations**

In *Gutiérrez-Rodríguez*, 882 F.2d at 565, the First Circuit upheld a lower court decision imposing liability on PRPD's supervisors based on deficient disciplinary practices, including providing officers with Fifth Amendment protections against self-incrimination during administrative investigations.  The plaintiff's expert, quoted in the opinion, stated, "[s]uch a rule is 'a really serious handicap' to an investigation of misconduct; it 'cuts off one of your main sources of investigation . . . the officer that was involved.'  By invoking such a rule an officer could easily block the department from getting to the bottom of the matter."  *Id.* at 565.  We found that PRPD still continues this practice.  For instance, we found that investigators routinely gave officers the following warning during administrative investigations:  "You have the right not to declare if you believe that doing so may be self-incriminating."

As discussed in Section III, above, administrative investigations should be considered individually.  Conducting a full administrative investigation short of compelling an interview generally does not compromise either investigation and is often critical to ensuring the later success of the administrative investigation.  Regardless of whether or for how long a compelled statement is delayed, a meaningful and timely administrative investigation is particularly important in cases alleging criminal misconduct, given the usually egregious nature of the allegations, the often slow wheels of the criminal justice system, and the very low rate at which these cases are prosecuted (regardless of jurisdiction).  Where officers are not guilty of committing the misconduct, they deserve to have the case adjudicated internally and be brought back to work; where an officer is guilty, the community and department have an interest in seeing the officer disciplined or removed from the force without having to wait months or years with the officer on paid or unpaid suspension.

F.      **Limited Risk Management**

Effective risk management systems help commanders and supervisors take early corrective action when officers exhibit potential problem behaviors.  Interventions typically include targeted training, education, and counseling.  These systems are designed to protect the community and support officers who may be experiencing difficulties.  Information that agencies generally collect in their early intervention systems include:  information on shootings, other uses of force, searches and seizures, civilian complaints, civilian commendations, criminal charges against officers, civil suits alleging misconduct, other misconduct allegations, disciplinary actions, non-disciplinary remedial actions, training history, and civilian arrests.

An early intervention system should provide supervisors and managers with both statistical information and descriptive information for individual officers, regions/specialized units, and the entire law enforcement agency.  When properly implemented, an early intervention system offers numerous benefits, including:  enhancing police integrity; promoting a culture of accountability; emphasizing the department's commitment to ethical policing; decreasing reliance on negative sanctions and punitive actions; providing supportive interventions to sustain, revive, and advance individual careers; supporting and increasing efficiency of first-line supervisors; improving officer morale; and decreasing liability and costs of civil suits associated with misconduct and use of force.[94]

More than 20 years ago, PRPD recognized its responsibility to detect potential patterns of problematic behavior and intervene to avoid and deter serious misconduct.  However, PRPD's risk management system remains woefully inadequate.  PRPD currently relies on a system referred to as "repetitive conduct," first developed in 1990 by former Superintendent Betancourt Lebrón.  In Special Order 90-5, "Repetitive Conduct," Superintendent Betancourt Lebrón observed that PRPD needed to do more to address officers that "have shown signs of emotional maladjustment" and "an inability to control their behavior in tense moments."

Special Order 90-5 highlighted three circumstances that triggered the need for an intervention:  (1) a substantial number of citizen complaints filed against a member of PRPD, even when these have not culminated in a disciplinary action; (2) actions of a PRPD officer that evidence any failure to control his/her conduct in stressful situations, thus presenting a potential danger to the citizenry or the officer; and (3) a supervisor's conclusion that a member of the force may be emotionally unbalanced or in need of re-training.  The sole intervention consisted of a referral to a course titled, "Professional Improvement."

On June 14, 2007, PRPD published an internal memorandum intended to clarify various items left undefined by SO 90-5.  The memorandum defined the term "substantial number of complaints" as three complaints within a five-year period, and required the complaints to be related to a perceived failure by the officer to control his/her conduct in stressful situations.  Despite this new definition, PRPD stopped offering the "Professional Improvement" training to PRPD officers for three years, until October 2010.

On September 27, 2010, PRPD modified its repetitive conduct policy with GO 2010-14.  The new parameters provide various triggers based on the number of administrative complaints or use of force reports involving an officer.  The Order also provides a referral for supervisors whose subordinates are subjects of ongoing complaints.  Under the new Order, PRPD requires a referral to the "Professional Improvement" training following three or more civilian complaints within a 12-month period.

General Order 2010-14 is a significant step backward from prior procedures.  For one, it shortened the relevant period for consideration of complaints from five years to one year.  Thus, under the new system, an officer can continue to receive two civilian complaints every year, without triggering a referral for an intervention.  Under the former parameters, a referral would be triggered.  The new system also diminishes the role of supervisors in submitting referrals.  Under SO 90-5, a supervisor could make a referral when an officer showed any failure to control his conduct in stressful situations, or when the supervisor found that the officer was emotionally unbalanced or in need of re-training.  Currently, supervisors have less discretion to make these referrals because referrals are based on the receipt of civilian complaints.  Even assuming that GO-2010-14 permits discretionary referrals, it discourages them.  A supervisor who makes a referral under GO 2010-14 regarding an incident that happened under his command could see his opportunities for promotion delayed since such a referral would be counted as one of the complaint notifications against him.

Separately, during our tours, we found that information on investigations, citizen complaints (including lawsuits), training histories, supervisory reviews, disciplinary and other corrective actions was not readily available to supervisors.  Although supervisors at the precinct level had access to officers' disciplinary files, the information in them is often incomplete.  Even

when supervisors request the complaint histories of officers under their command, some complaints were listed as "not found."  We further found that PRPD keeps many disciplinary records on note cards, many of which include duplicative or incomplete information, particularly regarding civil suits and criminal prosecutions.  While early intervention programs do not require sophisticated technology to succeed, an automated system permits supervisors to access, organize, and search large volumes of data.  Additionally, an agency can establish automated alerts, whereby the database, relying on previously selected performance indicators, will automatically inform supervisors when an individual officer exhibits potentially problematic behavior.[95]  Such a system is invaluable in an agency the size of PRPD.

Early intervention programs are only a tool, however; they are not a substitute for capable and effective supervisors.  For a program to be effective, "[f]irst and second level supervisors [should] familiarize themselves with their subordinates and routinely observe their demeanor, appearance, and conduct.  Supervisors [should] remain alert for indications of behavioral changes or stressors that may affect a member's performance.  When supervisors perceive or determine that a member has problems or is causing problems, they [should] assess the situation and take appropriate action" in accordance with the agency's policies and procedures, including those on referral to employment assistance programs.[96]  To penalize supervisors and make them automatically ineligible for promotion because a certain number of complaints have been filed against officers under their command – as provided by GO 2010-14 – runs counter to the principles of a good risk management system because it shifts the focus away from correcting officers' problem behaviors.

As we discussed earlier, we are concerned about the high percentage of "merit" promotions in PRPD during the past three years, and how those promotions may impact the quality and effectiveness of supervision.  We are also concerned about PRPD's apparent lack of supervisory training.  Although the University College offers training for new sergeants, more training should be offered to improve the skills of higher-ranking officers so that they can become more effective managers.  During our tours, we met auxiliary superintendents, who serve just under the Superintendent and oversee PRPD components, with no prior experience in the areas in which they now lead.  We also met captains and higher-ranking commanders with limited management experience because they had spent the bulk of their careers working in specialized units.  Sufficiently trained commanders are necessary to make effective decisions on corrective or disciplinary action when an officer requires an early intervention.  In this regard, collecting accurate data as part of an early identification program is but one step in the process.  Supervisors must still be able to interpret the data and take appropriate corrective action.

We are also concerned about the fixed "Professional Improvement" training curriculum that PRPD began offering in October 2010, beginning with TOU officers.  The one-size-fits-all approach, such as the mass training offered to 165 officers on November 22-23, 2010, fails to take into account that referrals for corrective action can be for a wide variety of citizen complaints.  "Professional Improvement" training for a TOU officer with complaints of use of excessive force for actions during a mass demonstration may require different corrective measures than for a precinct officer who is verbally abusive to civilians during traffic stops.  In this regard, supervisors should be consulted about fashioning an appropriate remedy depending on the particular problem behavior.  As one of the University College instructors pointed out,

even experienced traffic officers make mistakes and take short-cuts that can endanger the lives of citizens and the officers themselves.  If such an officer is displaying troubling conduct, specific training tailored to the problem can correct the behavior more effectively, and helps the officer refocus his law enforcement commitment and effort.

After choosing and implementing the appropriate type of intervention, the last element of an effective early intervention program is post-intervention monitoring.  "For instance, if an officer is indicated because of three use-of-force incidents in a year, any subsequent use-of-force incident should be reviewed thoroughly.  Increased supervision, including random roll-bys to observe the officer's performance in the field may also be warranted."[97]  Ideally, the effective use of an early intervention program will result in a decreased need for disciplinary measures.  However, an early intervention system will not replace the need for appropriate discipline.

## G.    Lack of External Oversight and Accountability

External oversight of PRPD is virtually non-existent.  As discussed above, supreme authority over PRPD is vested in the Governor.  The Governor appoints, with approval from the Puerto Rico Senate, a Superintendent who manages the day-to-day operations of PRPD.  The Superintendent exercises plenary discretion over officer recruitment, selection, training, promotion, and discipline.  Unlike all states except Hawaii, Puerto Rico does not have a state-wide authority that promulgates minimum standards and training requirements, such as POST organizations. The Superintendent has, for example, the discretion to reduce the pre-service training program for cadets entering with advanced degrees.  The Superintendent could also authorize deployment of cadets with firearms before they complete the pre-service program, modify the firearm training requirements for officers, or set new standards for the use of CEDs.  PRPD is also not accredited by any professional organization outside of Puerto Rico, such as the Commission on Accreditation for Law Enforcement Agencies.

In most jurisdictions, law enforcement agencies that adhere to contemporary policing practices are increasingly engaging in constructive dialogue with the public on accountability and oversight issues.  "In one recent survey, approximately 80 percent of the American public reports that they favor the use of civilian review."[98]  Many individuals see civilian review as a logical outgrowth of community-oriented policing.  Civilian review of police misconduct takes many forms.  Some civilian review entities are involved in every step of the complaint process, from the receipt of the initial complaint through its review and investigation, to the recommendation for sanctions, if any.  Other entities deal exclusively with appeals, leaving the investigation of civilian complaints to the law enforcement agencies they oversee.

In Puerto Rico, there is no effective external oversight of PRPD.  Currently, Puerto Rico authorizes two external entities by law to investigate civilian complaints of police misconduct.  However, these entities do not have the necessary resources and authority to hold PRPD officers accountable to the public.  As a result, they are unable to provide adequate and timely attention to hundreds of civilian complaints stemming from allegations of civil rights violations.  We discuss each of these entities below.

1.     **CIPA**

The Commission of Investigation, Processing and Appeals ("CIPA") was created in 1972 to replace Puerto Rico's former Police Commission.  Based on its enabling statute, CIPA is an independent, quasi-judicial body charged with investigating civilian complaints against law enforcement officers and adjudicating discipline appeals.  *See* Law No. 32 of May 22, 1972, *as amended*.  CIPA was intended to provide an alternative to the court system for faster and less costly vindication of individuals' civil rights.  Further, the Puerto Rico Legislature designed CIPA to be independent from PRPD in order to "provide maximum protection" to citizens from the "coercive power of the State."  *See* Law No. 23 of July 11, 1992.

CIPA is authorized to review and investigate civilian complaints involving:  (1) illegal or unreasonable arrests or detentions; (2) illegal or unreasonable searches and seizures; (3) excessive or unjustified threats or aggressions; (4) discriminatory conduct; (5) undue delays in presenting a detainee to a magistrate judge; (6) unjustified use of violence, intimidation, and/or psychological abuse during detention or interrogation; (7) misuse or abuse of surveillance mechanisms; and (8) illegal or unreasonable obstruction to the legal and peaceful exercise of the constitutional rights to free speech, press and/or association.  1 L.P.R.A. § 172(1).

Despite CIPA's critical investigative mandate, it functions solely as an appellate body determining the validity of disciplinary action imposed against officers.  In 2008, CIPA reported that budget limitations impaired its ability to hire staff to investigate allegations of police misconduct.  Based on our review, CIPA's budget continues to dissipate.  In its FY 2010-2011 budget, CIPA reduced its staff to six, down from 13 in 2008.  Many residents and even officers interviewed were unaware that CIPA was authorized to investigate police abuse.

2.     **Puerto Rico Civil Rights Commission**

The Puerto Rico Civil Rights Commission is also authorized to receive and investigate civilian complaints.  *See* Law No. 102 of June 28, 1965, *as amended.*  However, CRC's mission expands well beyond police misconduct.  The Puerto Rico Legislature established CRC to:  (1) educate the entire population about the significance of citizens' fundamental rights and the means of respecting and protecting them; (2) promote the protection of human rights and the strict enforcement of the laws that protect them; (3) publish an annual report and any other special reports required by the Governor, the Puerto Rico Supreme Court, or the Legislature, containing the recommendations it deems necessary for the continuous and effective protection of civil rights; (4) evaluate the laws, standards, and acts of the Commonwealth and its municipalities for consistency with civil rights, and suggest reforms as needed; and (5) survey citizens as to the effectiveness of protections of fundamental rights and investigate complaints and grievances by any citizen regarding violations of those rights.  Again, with significant budget limitations and a broad mandate, CRC cannot provide dedicated oversight of PRPD to ensure public accountability.

## V.   RECOMMENDED REMEDIAL MEASURES

For years, victims' families, civic leaders, legislators, civil rights advocates, and others have called for reforms in response to incidents involving civil rights violations, corruption, criminal activity, and other misconduct by PRPD officers.  Despite the calls for reform, PRPD has yet to build and maintain the necessary systems of accountability to protect individuals against unreasonable searches and seizures, including use of excessive force, and other arbitrary uses of force by officers.  Without fundamental and sustainable changes to the agency's standards, procedures, and practices, the pattern of civil rights violations will continue.

The recommendations we outline below are based on professional and generally-accepted practices in the field of local law enforcement.  As part of our investigation, we solicited feedback from various stakeholders on remedies to reform PRPD.  We received thoughtful and candid assessments from civilians, advocacy organizations, and professional associations. Notably, many of the officers we interviewed also offered recommendations, demonstrating a genuine commitment to promoting integrity and professionalism within their ranks.  These recommendations also reflect what we heard from various stakeholders, including officers and civilians, who have called for more effective policing to fight crime and uphold civil rights.

At a minimum, Puerto Rico needs to take the steps broadly outlined below to remedy the pattern and practice of constitutional violations and ensure that individuals are not subjected to use of excessive force and unconstitutional searches and seizures.

### A.   Independence and Professionalization

To achieve lasting reform of PRPD that will address the public safety crisis, ensure that constitutional police practices are uniformly applied and sustained, and build public confidence in the police department, PRPD must have stability and protection from politicization.

(1)   Command staff:  Any employees in the command structure who do not report directly to the Superintendent should be career employees not subject to removal or demotion except for cause.

(2)   Promotions:  All promotions should be made by PRPD free from influence by the Governor or the Legislature.  Objective criteria should be developed to ensure promotions based on demonstrated competency in core supervisory and substantive areas.  These criteria should account for experience, civil rights and discipline record, training, and skills.

(3)   The University College should be an independent entity in the government of Puerto Rico with a Board of Trustees consisting of representatives of the Governor, Superintendent, Legislature, and the community.

(4)   Police Officer Standards and Training: PRPD should develop a POST board or commission that establishes minimum professional standards and training requirements for law enforcement officers in Puerto Rico.

**B.      Evaluate PRPD Staffing and Eliminate Unqualified Officers**

(5)      PRPD should assess the size of the force necessary and appropriate to fulfilling its mission.  PRPD should develop a plan to determine the adequate number of officers needed in each geographic region and in each job category.  The plan should identify each function performed by PRPD, the number of officers required to fulfill the function, and level of training, skill, and experience required for each position.  This assessment should be conducted without regard for the current staffing pattern.

(6)      PRPD should develop a plan to remove corrupt and unqualified officers from PRPD. Within 12 months, PRPD should review the discipline, training, and performance record of each officer against objective criteria to determine which officers should be removed from the force. Upon completion of the review, PRPD should immediately begin proceedings, consistent with the civil service and due process rights of officers, to remove those who are unqualified due to misconduct and to retrain those who are unqualified by lack of training.

**C.      Reform of Specialized Tactical Units**

In contravention of established and widely accepted policing practices, PRPD employs its specialized tactical units for routine police functions.  The tactics used by the specialized tactical units have negatively impacted the effectiveness and public perception of PRPD.  To restore public confidence, PRPD must assess the character, policies, and practices of its specialized tactical units.  Along with ensuring that specialized tactical units respect general PRPD policies, PRPD shall also assess and modify its practices as they relate to:

(7)      Recruitment: PRPD shall continue to revise and implement standards related to ensuring that members of its specialized tactical units are of the highest caliber.  Initial and reoccurring evaluations of specialized tactical unit officers shall incorporate psychological tests, extensive background investigations, and drug examinations.

(8)      Training: PRPD shall develop training curricula that comply with professional standards related to specialized tactical units.  Specialized training shall emphasize constitutional standards as they relate to the use of force, searches and seizures, and the prohibition of discrimination.

(9)      Policies: PRPD shall develop, revise, and implement comprehensive standard operating procedures for its specialized tactical units that: (a) prohibit deployment solely to conduct crowd management and control; (b) ban deployment for routine patrol duties; (c) prohibit unnecessary displays of force; and (d) establish reporting requirements following deployments.

(10)     Supervision:  PRPD shall ensure that high-level officials who oversee specialized tactical units are familiar with pertinent training curricula and standard operation procedures.

**D.      Use of Force:  Internal Controls and Accountability**

**1.      Use of Force Policies**

Puerto Rico should ensure that all force, lethal or otherwise, used by PRPD officers is reasonably necessary and in accordance with individuals' federally-protected rights.  In order to

accomplish this, Puerto Rico should take the following specific steps related to PRPD's use of force policies:

(11)    Develop and implement a comprehensive and agency-wide use of force policy that complies with applicable law and current professional standards.  The comprehensive use of force policy shall include all force techniques, technologies, and weapons, both lethal and less lethal that are available to PRPD officers, including officers assigned to specialized tactical units. The comprehensive use of force policy shall clearly define and describe each force option and the circumstances under which use of such force is appropriate.

(12)    Develop, revise, and implement use of force policies, including related policies on each force implement or option available to PRPD officers, that:

     a.     define terms clearly and uniformly;
     b.     incorporate a use of force model that teaches disengagement, area containment, surveillance, waiting out a subject, and summoning reinforcements or calling in specialized units, as appropriate responses to a situation;
     c.     emphasize the goal of de-escalation and the use of advisements, warnings, and verbal persuasion, when appropriate;
     d.     advise that, whenever possible, individuals should be allowed to submit to arrest before force is used;
     e.     reinforce that the use of excessive force will subject officers to discipline, possible criminal prosecution, and/or civil liability;
     f.     ensure that sufficient less lethal alternatives are available to all officers and that officers are provided with appropriate requirements on the proper use of such less lethal alternatives;
     g.     prohibit the use of choke holds and similar carotid holds, except where lethal force is authorized;
     h.     provide that an intentional strike to the head with an instrument constitutes a use of lethal force;
     i.     emphasize that the continued use of force, even if initially justified, may become unreasonable if force is no longer necessary in the course of an arrest, investigatory stop, or other seizure;
     j.     require officers, immediately following a use of force or as soon as practicable, to inspect and observe subjects for injury resulting from the use of force and to obtain any necessary medical care; and
     k.     include canine deployment as a use of force, except in situations involving an on-leash article search or search of a non-fugitive missing person.

(13)    Require that all force implements, such as batons, chemical sprays, CEDs, and firearms be used and maintained in accordance with manufacturer specifications and PRPD policy.  PRPD should explicitly prohibit officers and other persons from altering or modifying force implements beyond manufacturer specifications and PRPD policy.

(14)    Revise and implement a use of firearms policy that complies with applicable law and current professional standards.  The firearms policy should:

a.      prohibit officers from possessing or using unauthorized firearms or ammunition and shall inform officers that failure to follow any disposition from the policy will result in disciplinary action;

b.      establish a single, uniform reporting system for all critical firearm discharges;

c.      prohibit officers from obtaining service ammunition from any source other than official PRPD channels, and specify the number of rounds that PRPD authorizes its officers to carry;

d.      require that all critical firearm discharges by officers, on- or off-duty, be reported and investigated;

e.      prohibit firing at or from a moving vehicle, unless the use of lethal force is justified, and prohibit officers from intentionally placing themselves in the path of a moving vehicle; and

f.      establish requirements that prohibit unholstering, drawing, or exhibiting a firearm, unless the officer reasonably believes that a situation may escalate to the point where lethal force would be authorized, and that delineate proper techniques when unholstering, drawing, or exhibiting a firearm.

(15)   Specify that officers must successfully qualify with their regulation firearm, including any other firearm they are authorized to use or carry on-duty, on an annual basis.  Officers who fail to re-qualify shall be relieved of police powers and immediately relinquish all firearms, including personal firearms.  Those officers who fail to re-qualify after remedial training within a reasonable time shall be subject to disciplinary action, up to and including, termination of employment.

(16)   Revise and implement PRPD's use of CED policy to ensure that it complies with applicable law and current professional standards.  The use of CED policy should:

a.      limit the use of CEDs to only those cases in which such force is necessary to protect the officer, the subject, or another party from physical harm, or is necessary to effectuate the arrest of an actively resisting subject, or to prevent the escape of that subject, and other less intrusive means are ineffective;

b.      require a verbal warning prior to the deployment of a CED, unless the warning would present a danger to the officer or others, and that, where feasible, the officer will defer deploying a CED a reasonable time to allow the subject to comply with the warning;

c.      require officers to minimize collateral injury to an individual, when feasible, by generally prohibiting CED deployment that may cause serious injury or death from situational hazards, including falling, drowning, losing control of a moving vehicle, or ignition from the presence of a potentially explosive or flammable material or substance;

d.      require that officers assess the need for continued CED deployment following each cycle that is applied against a subject, including whether the use of less intrusive force options are appropriate, and require that officers clearly articulate and justify each and every cycle used against a subject in written reports;

e.      provide protocols on the removal of CED probes, including a protocol requiring medical or specially trained PRPD personnel to remove probes embedded in a

88

subject's skin (as opposed to the subject's clothing), except for probes embedded in a subject's head, throat, groin, or other sensitive area, which should be removed by medical personnel only;

f.  require that officers report all CED discharges, except for training discharges, to their supervisor and the communications command center, as soon as possible; and

g.  require a supervisor to respond to the scene of a CED deployment and to conduct an initial review to determine the appropriateness of the CED deployment, including canvassing the scene to identify and interview potential witnesses.

(17)  Implement integrity safeguards on the use of CEDs to ensure compliance with PRPD policy, including conducting random audits of CED deployment data.  The audits should compare the downloaded data to the officer's report on use of force.  Discrepancies within the audits should be addressed and appropriately investigated.

(18)  Develop and implement a chemical spray policy that complies with applicable law and current professional standards.  The chemical spray policy should:

a.  limit the use of chemical spray to only those cases in which such force is necessary to protect the officer, the subject, or another party from physical harm, or is necessary to effectuate the arrest of an actively resisting subject, or to prevent the escape of that subject, and other less intrusive means are ineffective;

b.  require that, unless it would present a danger to the officer or others, a verbal warning to the subject that chemical spray will be used be issued prior to use, and that, where feasible, the officer will defer using chemical spray for a reasonable time to allow the subject to comply with the warning;

c.  require officers to target only the subject's face and upper torso when using hand-held chemical spray canisters;

d.  provide officers with guidance regarding the duration of a chemical spray burst and the distance from which it is applied;

e.  require that, absent exigent circumstances, officers decontaminate every subject exposed to chemical spray within 20 minutes of the application of chemical spray, and specify permissible and appropriate means of decontaminating a subject;

f.  require that officers request medical response or assistance for subjects exposed to chemical spray when they complain of continued effects after having been decontaminated, or they indicate that they have a pre-existing medical condition (e.g., asthma, emphysema, bronchitis, heart ailment, etc.) that may be aggravated by chemical spray;

g.  require that officers remove a subject exposed to chemical spray from a face-down position as soon as it is safe to do so;

h.  require that only agency-issued and approved chemical spray is used; and

i.  require that officers report all uses of chemical spray, except when used for training purposes, to their supervisor and the communications command center, as soon as possible.

(19)     Maintain an accounting of the number of chemical spray canisters annually distributed to, and used by, each officer.  Additionally, PRPD should account for all ammunition or other projectiles containing chemical irritants.  PRPD should continue to ban the use of Chloroacetophenone, or CN gas, by officers.

(20)     Develop and implement a crowd control and management policy that complies with applicable law and current professional standards.  The crowd control and management policy should include procedures on responding to civil disturbances and should:

   a.     emphasize that all use of force, both lethal and less lethal, must be applied in a manner consistent with applicable law and professional standards;

   b.     require that all use of force be reported, reviewed, and investigated;

   c.     provide that a ranking officer or other higher-level PRPD official at the scene of a civil disturbance assume command and control of the incident, and:

      (i)     assess the immediate situation for seriousness and the potential for escalation;

      (ii)    determine the number of personnel and equipment necessary to contain and disperse the disturbance and relay this information to the communications command center; and

      (iii)   establish a temporary command post to coordinate and relay information, as necessary;

   d.     require that the ranking officer or official assuming control and command of a civil disturbance take reasonable and appropriate steps to ensure the safety of bystanders, including providing for the evacuation of bystanders, when feasible, from the immediate area of a civil disturbance;

   e.     require the issuance of a dispersal order, absent exigent circumstances, prior to the deployment of crowd dispersal techniques, including use of force, in a manner reasonably calculated to be heard by the entire crowd under the circumstances and that provides a reasonable period of time for the crowd  to disperse;

   f.     provide for a range of command options to bring civil disturbances under control and disperse illegal gatherings, emphasizing, when feasible, area containment, advisements, and dialogue;

   g.     prohibit the use of police canines for crowd control and management;

   h.     require supervisory approval prior to deploying force as a crowd dispersal technique, including batons and chemical agents, and restrict the use of force beyond that necessary to make lawful arrests, as appropriate;

   i.     prohibit the use of batons against members of a crowd who are attempting to disperse or are otherwise posing no imminent threat to officers or other persons, unless the baton is displayed or used in a pushing or leveraging motion as a justified and authorized crowd management technique against individuals who are intentionally disobeying or delaying dispersal subsequent to a lawful order to disperse.

### 2.      Use of Force Reporting and Review

Puerto Rico should require PRPD officers to report all use of force in writing and require supervisors to independently review each use of force to determine whether the use was in accordance with applicable law and agency policy.  The review should also determine whether corrective action, including disciplinary action, is necessary to prevent misconduct.  Specifically, Puerto Rico should:

(21)     Develop and implement a use of force reporting policy and use of force incident report. The use of force reporting policy should require officers to document all uses of force in writing. The use of force report form should indicate each and every type of force used and require the evaluation of each use of force.  Use of force reports should include the officer(s)' narrative description of the events preceding the use of force and the circumstances related to the use of force, including the subject(s)' behavior.  The use of force reporting policy should explicitly prohibit the use of boilerplate or conclusory language in all reports documenting use of force.

(22)     Require officers to notify the communications command center and their supervisor following any use of force or upon the receipt of an allegation of excessive force.  Supervisors should respond to the scene, examine the subject for injury, interview the subject for complaints of pain, and ensure that the subject receives medical attention from an appropriate medical provider, as necessary.

(23)     Require supervisors to review, evaluate, and document each use of force and complete the supervisor's narrative description section of the use of force report.  The supervisor's narrative description should include a precise description of the facts and circumstances that either justify or fail to justify the officer's conduct based on the supervisor's independent review of the facts and circumstances of the incident.  As part of the review, the supervisor should evaluate the basis for the use of force, determine whether the officer's actions were within PRPD policy, and assess the incident for tactical and training implications.  The supervisor should provide recommendations for corrective action, including disciplinary and non-disciplinary action, as necessary.  An officer who used force during the incident, whose conduct led to an injury, or who authorized conduct leading to the use of force or allegation of excessive force should not be eligible to review the incident.

(24)     Provide that supervisors reviewing an officer's use of force interview all witnesses to the use of force or injury resulting from the use of force.  Consistent with applicable law, supervisors should ensure that all officer witnesses provide a statement regarding the incident.  Supervisors should ensure that all use of force reports identify all officers who were involved in the incident or were on the scene when it occurred.  Supervisors should not ask officers or other witnesses leading questions that improperly suggest legal justifications for the officers' conduct.

(25)     Require that supervisors reviewing an officer's use of force consider all relevant evidence, including circumstantial, direct, and physical evidence, as appropriate, and make credibility determinations, if feasible.  Supervisors should make all reasonable efforts to resolve material inconsistencies between witness statements.  PRPD should train all of its supervisors on the factors to consider when evaluating credibility.

(26)     Require that supervisors reviewing an officer's use of force ensure that all reports indicate whether an injury occurred, whether medical care was provided, and whether the subject refused medical treatment.  Supervisors should ensure that all reports include contemporaneous photographs or videotapes taken of all injuries at the earliest practicable opportunity, both before and after any treatment, including cleansing of wounds.

(27)     Provide that a copy of the completed use of force report, including the supervisor's written review of each use of force, is forwarded to PRD and the supervisor's Regional Commander or higher ranking PRPD officer within five (5) days.

(28)     Require that a Regional Commander or higher ranking PRPD officer evaluate each supervisory review of an officer's use of force, identify any deficiencies in those reports, and require supervisors to correct any deficiencies.  Supervisors should be held accountable for the quality of their reviews.

### 3.     Critical Incident Review

(29)     Require that PRD respond to the scene of, and investigate, all incidents in which evidence of possible criminal misconduct by an officer exists and all serious uses of force.  PRD should evaluate the written supervisory review of the incident as part of its investigation.  PRD should complete its investigation of possible criminal misconduct and serious uses of force within 60 days of the incident.

(30)     Develop and implement critical firearm discharge and in-custody death review policies that comply with applicable law and current professional standards.  The policies should establish a specialized investigative unit or team composed of investigators from PRPD's Homicide Unit, PRD, and PRDOJ.  The specialized investigative unit or team shall respond to the scene and investigate all critical firearm discharges and in-custody deaths.

(31)     Provide that critical firearm discharge and in-custody death review policies include procedures for conducting investigations of critical firearm discharges and in-custody deaths that require:

    a.     an account of all shots fired, all shell casings, and the locations of all officers at the time the officer(s) discharged the(ir) firearm(s), including an account of all other force used by officers;
    b.     an investigator to conduct and preserve all appropriate ballistic or crime scene analyses, including gunshot residue or bullet trajectory tests, in the investigative file; and
    c.     completion of the investigation within 60 days of the incident.  Compelled statements from officers should be obtained in accordance with applicable law.

(32)     Provide that critical firearm discharge and in-custody death review policies require a command-level review team to evaluate all investigations involving critical firearm discharges and in-custody deaths.  The team should be chaired by the commanding officer or official who directly supervises PRD.  PRPD shall establish criteria for selecting the other members of the team.

(33)    Require that the command-level review team evaluating critical firearm discharge and in-custody death investigations:

    a.    reviews all administrative and internal reports and investigations, including all PRD investigations and supervisory reviews (if applicable), for compliance with PRPD policies, as well as for tactical and training implications;

    b.    interviews principal investigators and/or supervisors, as necessary;

    c.    acts as a quality control mechanism for all critical firearm discharge and in-custody death investigations, with responsibility to return to the investigating unit all incomplete or mishandled investigations and/or supervisory reviews;

    d.    conducts the command-level review contemporaneously with any criminal review, with due regard for compelled statements, and complete the command-level review, absent exceptional circumstances, within 90 days of the end of all criminal reviews;

    e.    prepares a report for the Superintendent, upon completion of the command-level review, that should be made a part of the complete PRPD file regarding the incident and that includes a description of the incident (including all uses of force), a summary and analysis of all relevant evidence, proposed findings, and analysis to support those findings;

    f.    includes specific determinations in the report regarding the following:

        (i)    whether all uses of force during the encounter were consistent with PRPD policy and training;

        (ii)    whether the officer(s) involved employed proper tactics; and

        (iii)    whether lesser force alternatives reasonably were available;

    g.    recommends to the Superintendent the non-disciplinary corrective action that should be taken;

    h.    recommends revisions or amendments to investigative protocols and standards for all internal processes, including administrative investigations and/or supervisory reviews, to the Superintendent; and

    i.    reviews all critical firearm discharges and in-custody deaths annually to detect patterns and/or problems and to report the findings and recommendations to the Superintendent.

## E.    Searches and Seizures

PRPD should ensure that all searches and seizures, including investigatory stops and arrests, are conducted in accordance with the rights, privileges, or immunities secured or protected by the Constitution and/or laws of the United States.  Specifically, PRPD should:

(34)    Revise and implement investigatory stop and detention policies that comply with applicable law and current professional standards.  The policies should:

    a.    define all terms clearly, including the terms "investigatory stop" and "reasonable suspicion;"

    b.    require that all investigatory stops or detentions be based on reasonable suspicion;

    c.       address pedestrian and motor vehicle stops;

    d.       provide guidance on the facts and circumstances that should be considered in initiating, conducting, terminating, and expanding an investigatory stop or detention;

    e.       provide guidance on the nature, scope, and duration of investigatory stops or detentions, including the level of permissible intrusion when conducting related searches, such as "pat downs" or "frisks;"

    f.       explicitly prohibit the use of "canned" or conclusory language in all reports documenting the investigatory stop or detention; and

    g.       explicitly prohibit officers from knowingly using or relying on information known to be materially false or incorrect in effectuating an investigatory stop or detention.

(35)    Require officers to document, in writing, all investigatory stops and detentions, including descriptive details regarding the stop or detention and any related searches that may have been conducted, and to submit the written report to their supervisors by the end of the shift in which the police action occurred.

(36)    Require supervisors to review the report to determine whether the stop and detention:

    a.       was within PRPD policy;

    b.       should result in a misconduct investigation by PRD;

    c.       indicates a need for additional training or counseling, or any other non-disciplinary corrective measure, for the involved officer; and

    d.       suggests the need for revising or reformulating agency policy, strategy, tactics, or training.  The supervisor shall document on an auditable form those investigatory stops and detentions that are unsupported by reasonable suspicion, are in violation of PRPD policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or training.  The quality of these supervisory reviews shall be taken into account in the supervisor's performance evaluations.

(37)    Provide that a command-level officer or official review, in writing, all auditable forms concerning investigatory stops and detentions that are unsupported by reasonable suspicion, are in violation of PRPD policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or training.  The commander should evaluate the corrective action and recommendations in the supervisor's written report and ensure that all appropriate corrective action is taken, including referring the incident for administrative or criminal investigation.

(38)    Revise and implement arrest policies that comply with applicable law and current professional standards.  The policies should:

    a.       define all terms clearly, including the terms "arrest" and "probable cause;"

    b.       prohibit the arrest of an individual with less than probable cause;

    c.       provide guidance on effecting an arrest with and without an arrest warrant;

    d.       provide guidance regarding the nature and scope of searches incident to an arrest;

e.  explicitly prohibit the use of "canned" or conclusory language in all reports documenting an arrest; and

f.  explicitly prohibit officers from knowingly using or relying on information known to be materially false or incorrect in effectuating an arrest.

(39)  Require that officers notify the communications command center and a supervisor immediately after an arrest, or as soon as practicable.  For felony arrests, PRPD should require a field supervisor to respond to the scene of the incident and approve the officer's arrest recommendation, based on the existence of justifiable probable cause and PRPD policy.

(40)  When transporting an arrestee, require that officers notify the communications command center of the starting and ending mileage on the transporting vehicle.  The officer should complete all written arrest forms and booking recommendations at the time an arrestee is presented at any PRPD precinct, station, or other unit for booking.

(41)   Require that the arresting officer take any arrestees with observable injuries or complaints of significant injury for immediate medical attention.

(42)  Require that all booking recommendations be personally reviewed and approved by a supervisor as to appropriateness, legality, and conformance with PRPD policies at the time the arrestee is presented at the precinct, station, or other unit.  The supervisory review should also include examining applicable arrest reports and forms for "canned" or conclusory language, inconsistent information, lack of articulation of the legal basis for the action, or other indicia that the information in the reports or forms is not authentic or correct.

(43)  Provide that, at the time of presentment at a PRPD precinct, station, or other unit, a watch commander or supervisor visually inspect each detainee or arrestee for injury, interview the detainee or arrestee for complaints of pain, and ensure that the detainee or arrestee receives medical attention from an appropriate medical provider, as necessary.

(44)  Require that supervisors evaluate each incident in which a person is detained or arrested for interfering with a police officer, resisting arrest, assault on a police officer, obstruction of justice, or other similar charge, to determine whether the incident raises any issue or concern regarding the basis for the arrest or implications for training, policies, or tactics.

(45)  Require that supervisors memorialize their review of arrests in writing.  As part of the supervisory review, the supervisor should document on an auditable form those arrests that are unsupported by probable cause, are in violation of PRPD policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or training.

(46)  Require that a command-level officer or official review, in writing, all auditable forms related to arrests.  The commander should evaluate the corrective action and recommendations in the supervisor's written report and ensure that all appropriate corrective action is taken, including referring the incident to PRD for investigation.

(47)    Revise and implement policies on searches that comply with applicable law and current professional standards.  The policies should:

    a.    clearly define all terms;

    b.    provide guidance on the legal requirements for conducting searches, with and without a warrant;

    c.    provide guidance on the nature and scope of searches based on the level of permissible intrusion on an individual's privacy interests;

    d.    require that, when seeking a search warrant, an affidavit or sworn declaration supporting the application provides an accurate, complete, and clear description of the offense, the place or thing to be searched, scope of the search, and time and method of the search;

    e.    specify the procedures for executing searches, including handling, recording, and taking custody of seized property or evidence; and

    f.    require written documentation of all searches, including a complete and accurate inventory of all property or evidence seized, by the end of the shift in which the police action occurred.

(48)    Require that a supervisor review each request for a search or arrest warrant, including each affidavit or declaration filed by an officer in support of a warrant application, for appropriateness, legality, and conformance with PRPD policy.  The supervisor should assess the information contained in the warrant application and supporting documents for authenticity, including an examination for "canned" or conclusory language, inconsistent information, and lack of articulation of a legal basis for the warrant.

(49)    Provide that a supervisor review the operational plan for the execution of a search warrant and, when feasible, be present for execution of the search warrant.  Once executed, a supervisor should review the execution of the search warrant and document the review in writing.

(50)    Require that each precinct and specialized unit maintain a log listing each search warrant, the case file where a copy of such warrant is maintained, and the officer who applied for, and each supervisor who reviewed, the application for a search warrant.

(51)    Revise and implement policies to prohibit discriminatory conduct on the basis of race, ethnicity, national origin, sex, sexual orientation, or gender identity in the conduct of its law enforcement activities.  The policies should:

    a.    emphasize that arrests, traffic stops, investigative detentions, searches, and property seizures must be based, to the extent required by federal and Puerto Rico law, on legitimate and articulable reasons consistent with the standards of reasonable suspicion and probable cause;

    b.    restrict the use of race, ethnicity, national origin, sex, sexual orientation, or gender identity in establishing reasonable suspicion or probable cause to appropriate suspect-specific activities involving the identification of a particular person or persons;

c.      apply the restrictions in this recommendation to requests for consensual searches of, and non-custodial encounters with, individuals;

d.      emphasize that discriminatory policing will subject officers to discipline, possible criminal prosecution, and/or civil liability; and

e.      include, as appropriate, provisions related to officer behavior during encounters that can serve to prevent perceptions of biased policing, including:

(i)      introducing themselves at the time of the encounter;

(ii)     stating the reason for the contact as soon as practicable, even if the individual does not ask; and

(iii)    ensuring that the detention or encounter is no longer than necessary to take appropriate action for the known or suspected offense.

## F.    Policies and Procedures Generally

Puerto Rico should ensure that all policies are comprehensive, comprehensible, up-to-date, and consistent with relevant legal standards and contemporary police practices. Specifically, PRPD should:

(52)   Develop and publish an agency policy and procedure manual governing all administrative and operational aspects of PRPD.  The agency policy and procedure manual should be organized by subject-matter area and indexed for reference.  PRPD should review and revise the manual at least annually, as necessary, or upon notice of a policy deficiency during agency audits or reviews.

(53)   Ensure that all PRPD officers and staff, including supervisors, receive a copy of the agency policy and procedures manual, in hard copy or electronically, and sign a statement indicating that they have read and understood the manual.

(54)   Advise all officers that taking police action in violation of PRPD policy shall subject officers to possible discipline, criminal prosecution, and/or civil liability.

(55)   Develop and implement standard operating procedures ("SOPs") that guide the function, operation, and administration of at least the following PRPD components:

a.      Field Operations, including patrol, special and tactical operations, field support, special weapons and tactics, and canines;

b.      PRD, including case and records management, administrative investigations, confidential investigations, critical firearm discharge reviews, in-custody death reviews, parallel criminal and administrative investigations, inspections, and officer drug testing;

c.      Criminal Investigations, including sub-units assigned to investigate homicides, narcotics, vice, illegal firearms, and organized crime.

(56)   Revise and implement policies regarding off-duty officers who take police action to:

a.      provide that off-duty officers shall notify on-duty PRPD or other local law enforcement officers before taking police action, absent exigent circumstances, so

that they may respond with appropriate personnel and resources to handle an incident;

b.    prohibit off-duty officers from carrying or using firearms or taking police action in situations when an officer's performance may be impaired or the officer's ability to take objective action may be compromised; and

c.    provide that, if it appears the officer has consumed alcohol or is otherwise impaired, the officer shall submit to field sobriety, breathalyzer, and/or blood tests.

## G.    Training

(57)    PRPD and the University College should coordinate and review all training to ensure quality, consistency, and compliance with applicable law and PRPD policy.  PRPD and the University College should conduct regular subsequent reviews, at least semi-annually, that are documented in writing.

(58)    PRPD and the University College should develop and implement appropriate training standards to ensure that officers attain and retain necessary knowledge, skills, and competencies, including establishing appropriate passing criteria, attendance and participation requirements, and valid evaluation methods.  PRPD and the University College should conduct regular needs assessments.

(59)    PRPD and the University College should establish appropriate accountability measures to ensure that officers successfully complete all necessary training programs in a timely manner, including taking disciplinary and non-disciplinary corrective action, as necessary.

(60)    PRPD and the University College should select, train, and certify qualified officer and academic instructors and should ensure that instructors teach only mandated objectives and approved lesson plans.  Instructors should engage students in meaningful dialogue regarding particular scenarios, preferably taken from actual incidents involving PRPD officers, with the goal of educating students regarding the legal and tactical issues raised by the scenarios.

(61)    The University College should keep adequate records of lesson plans and other training materials, such that the most current training documents are maintained in a central, commonly accessible file, and are clearly dated.

(62)    PRPD and the University College should continue to maintain training records regarding every PRPD officer that reliably indicate the training each officer has received.  The training records for each officer should, at a minimum, include the course description, duration, curriculum, and instructor.

(63)    PRPD and the University College should establish a curriculum and policy committee that will include core staff from the University College, a broad cross-section of PRPD field personnel, PRPD command staff, and a representative of PRPD's Legal Affairs Office.  The committee should review all training and procedures on at least a monthly basis to ensure compliance with applicable law and PRPD policy.  The committee should report its findings and recommendations in writing to the Superintendent and the University College's Board of Directors on a monthly basis.

(64)    PRPD and the University College should provide all PRPD officers with training on use of force on at least an annual basis and more often as necessary, based on developments in applicable law and PRPD policy.  Such training should include and address the following topics:

      a.      constitutional and other legal requirements regarding use of force;

      b.      PRPD's use of force policies;

      c.      proper use of force decision-making;

      d.      PRPD's use of force reporting requirements;

      e.      examples of scenarios faced by PRPD officers and interactive exercises that illustrate proper use of force decision-making;

      f.      the proper deployment and use of all intermediate weapons or technologies, including batons, chemical spray, canines, and CEDs;

      g.      de-escalation techniques that encourage officers to make arrests without using force, and instruction that disengagement, area containment, surveillance, waiting out a subject, summoning reinforcements, calling in specialized units, or delaying arrest may be the appropriate response to a situation, even when the use of force would be legally justified;

      h.      threat assessment;

      i.      crisis intervention and interactions with people with mental illnesses, including instruction by mental health practitioners and an emphasis on de-escalation strategies;

      j.      factors to consider in initiating or continuing a pursuit; and

      k.      appropriate training on conflict management.

(65)    PRPD and the University College should provide an appropriate firearm training program that:

      a.      requires officers to complete and satisfactorily pass firearm training and qualify for regulation and other service firearms, as necessary, on an annual basis;

      b.      requires cadets, officers in probationary periods, and officers who return from unarmed status to complete and satisfactorily pass firearm training and qualify for regulation and other service firearms, as necessary, before such personnel are permitted to carry and use firearms;

      c.      incorporates professional night training, stress training (i.e., training in using a firearm after undergoing physical exertion) and proper use of force decision-making training, including continuous threat assessment techniques, in the annual in-service training program; and

      d.      ensures that firearm instructors critically observe students and provide corrective instruction regarding deficient firearm techniques and failure to use safe gun handling procedures at all times.

(66)    PRPD and the University College should provide all PRPD officers with training on searches and seizures on at least an annual basis and, as necessary, based on developments in applicable law and PRPD policy.  Such training shall include and address the following topics:

      a.      constitutional and other legal requirements related to searches and seizures;

      b.      PRPD policies regarding searches and seizures; and