c.      examples of scenarios faced by PRPD officers and interactive exercises that illustrate proper police practices, methods, and tactics in conducting consensual field interviews, investigatory stops, and arrests.  These training scenarios shall address the difference between various police contacts by the scope and level of police intrusion; between probable cause, reasonable suspicion and mere speculation; and between voluntary consent and mere acquiescence to police authority.

(67)    PRPD and the University College should provide all PRPD officers with training on biased-free policing on at least an annual basis and, as necessary, based on developments in applicable law and PRPD policy.  Such training shall include and address the following topics:

    a.      police and community perspectives related to discriminatory policing;
    b.      constitutional and other legal requirements related to equal protection and unlawful discrimination;
    c.      the protection of civil rights as a central part of the police mission;
    d.      arbitrary classifications and stereotyping based on race, ethnicity, national origin, sex, sexual orientation, or gender identity;
    e.      data regarding racial/ethnic/national origin discrimination in policing and the criminal justice system;
    f.      identification of key decision points in which prohibited discrimination can occur at both the incident and strategic-planning levels; and
    g.      methods, strategies, and techniques to reduce misunderstanding, conflict, and complaints due to perceived bias or discrimination, including problem-oriented policing strategies.

(68)    PRPD and the University College should provide supervisors with training in the appropriate evaluation of written reports, including what constitutes a fact-based description and the identification of catch phrases and/or conclusory language not supported by specific facts (or "canned" or perfunctory language) that so regularly appear in police reports that their inclusion requires further explanation by the reporting officer.

(69)    PRPD supervisors should receive leadership and command accountability training and learn techniques designed to promote proper police practices.  This training shall be provided to all PRPD supervisors upon assuming supervisory responsibilities and should be made part of annual in-service training.

(70)    PRPD and the University College should provide training on risk assessment and risk management to all PRPD supervisors, including the operation of the early identification system database.

(71)    PRPD and the University College should provide training to supervisors on fostering positive career development and imposing appropriate disciplinary sanctions and non-disciplinary corrective action, such as counseling.

(72)    PRPD and the University College should provide training on appropriate burdens of proof, interview techniques, and the factors to consider when evaluating officer, complainant or

witness credibility to all officers who conduct investigations to ensure that their investigative findings, conclusions, and recommendations are unbiased, uniform, and legally appropriate.

(73)   PRPD should develop and establish a field training program.  PRPD should develop an implementation plan that provides a time table for full implementation and specifies all program requirements, including management and oversight of the program, development of policies and procedures, selection and training of field training officers, program duration, training standards, assessment methods, and ongoing quality improvement.  The implementation plan and field training program should comply with applicable law, PRPD policy, and current professional standards.

## H.   Supervision

(74)   PRPD should develop and implement a plan to ensure that an adequate number of supervisors are deployed in the field to provide supervision consistent with generally accepted professional standards.

(75)   Supervisors of field operation, investigation, and specialized units should provide daily field presence and maintain an active role in unit operations.  Unit supervisors should brief the Regional Commander regularly regarding the activities of their unit, and shall coordinate unit activities with other unit supervisors.

(76)   Regional Commanders should be responsible for ensuring that supervisors exercise proper control and oversight of the units in their command, including units' tactical and investigative operations.

## I.   Discipline

(77)   Puerto Rico and PRPD should ensure that adequate resources are provided to eliminate the backlog of unresolved complaint investigations and disciplinary cases.

(78)   PRPD should establish guidelines, consistent with applicable law, dictating the maximum period of time that should elapse between each stage of the disciplinary process.

(79)   PRPD should create a disciplinary matrix that:

     a.     establishes a presumptive range of discipline and/or corrective action for each type of rule violation;

     b.     increases the presumptive discipline based on both an officer's prior violations of the same rule as well as violations of other rules;

     c.     requires that any departure from the presumptive range of discipline must be justified in writing;

     d.     provides that PRPD will not take only non-disciplinary corrective action in cases in which the disciplinary matrix calls for the imposition of discipline; and

     e.     provides that PRPD will consider whether non-disciplinary corrective action also is appropriate in a case where discipline has been imposed.

**J.      Civilian Complaints and Internal Investigations**

(80)      Puerto Rico should develop and implement a program to inform persons that they may make complaints regarding the performance of any officer.  This program should include distribution of complaint forms, fact sheets, informational posters, and public service announcements that describe the civilian complaint process.

(81)      Puerto Rico and PRPD should ensure that complaint forms and informational materials are easily accessible by making them available at appropriate government locations, including PRPD headquarters, stations, and substations; other government properties; over the Internet; and, upon request, to community groups, community centers, or members of the public.

(82)      At PRPD headquarters and each station and substation, PRPD should permanently post a placard describing the external complaint process that includes relevant contact information, such as telephone numbers and websites.  These placards should be displayed in both English and Spanish.  PRPD should require that all officers carry informational brochures and complaint forms, in English and Spanish, in their vehicles at all times while on duty.  If a civilian objects to an officer's conduct, that officer should inform the civilian of his or her right to make a complaint.

(83)      PRPD should require that all officers and employees report misconduct or potential criminal behavior by PRPD officers or employees to a supervisor and PRD.

(84)      Puerto Rico and PRPD should expressly prohibit all forms of discouragement, intimidation, coercion, or retaliation against any person who makes a complaint.

(85)      PRPD should accept all complaints, including anonymous and third-party complaints, for review and investigation.  Individuals should be able to make complaints in writing or verbally, in person or by mail, telephone (or TDD), facsimile, or email.  PRPD should also require officers and employees to take complaints received in the field.

(86)      All complaints should be forwarded to PRD within 24 hours, absent exceptional circumstances.

(87)      PRD should maintain a centralized numbering and tracking system for all complaints.  Upon the receipt of a complaint, PRD should promptly assign a unique numerical identifier to the complaint, which should be provided to the complainant.

(88)      PRD should determine whether the complaint will be assigned to a line supervisor for a chain-of-command investigation, retained by PRD for investigation, or referred to PRDOJ for criminal investigation.  PRPD should develop and implement a complaint classification protocol to guide PRD in determining whether a complaint will be assigned for a command investigation, retained for investigation by PRD, or referred to PRDOJ for criminal investigation.  If PRD refers a complaint for a command investigation, copies of all documents, findings, and recommendations should be forwarded immediately after the investigation is complete to PRD for tracking, monitoring, quality control, and adherence to PRPD policy.

(89)      PRD's centralized numbering and tracking system should maintain accurate and reliable data regarding the status of all complaints, from initial intake to final disposition, including all

instances in which the complainant is notified regarding the status of the investigation. Data from the system should be reviewed periodically to assess compliance with PRPD policies and procedures, including requirements on the timeliness of administrative investigations. The system should facilitate the production of reports and should contain information that includes, but is not limited to, the nature and type of complaint, the incident date, the name(s) of the complainant(s) and target officer(s), and PRPD region, precinct, and unit involved.

(90)    PRPD should investigate and resolve all complaints in writing. PRPD should adopt a single policy concerning the investigation of complaints, regardless of whether the investigation is assigned to PRD, a line supervisor, or any other PRPD officer or employee. Complaints should be evaluated based on a preponderance of the evidence standard.

(91)    PRPD should require that all command investigations be completed within 45 days of the date of referral by PRD, including intake, investigation, adjudication, and command approval. All other administrative investigations conducted by PRD should be completed within 60 days of the date of referral, including intake, investigation, adjudication, and command approval.

(92)    PRPD should explicitly prohibit an officer from investigating a use of force incident if that officer used force during the incident, led to the injury to a person, or authorized the conduct that led to the reported incident.

(93)    PRPD should establish comprehensive procedures and training on administrative and criminal investigations consistent with applicable law and current professional standards. The comprehensive procedures and training should address all aspects of administrative and criminal investigations, including appropriate management and oversight of investigative operations.

(94)    PRPD should establish investigation procedures and train all of its investigators on factors to consider when evaluating complainant or witness credibility; examination and interrogation of accused officers and other witnesses; identifying misconduct, even if it is not specifically named in the complaint; and using the preponderance of the evidence standard as the appropriate burden of proof. Consistent with applicable law, PRPD investigators should ensure that all involved officers on the scene of an incident provide a statement regarding the incident. The policy should require that all interviews that may be essential to the outcome of an investigation be mechanically or digitally recorded using an appropriate recording device, unless the interviewee refuses to allow recording. All recordings should be stored and maintained in a secure location within PRD.

(95)     PRPD should enforce its policy requiring officers to cooperate with administrative investigations, including appearing for an interview when duly summoned by a PRPD investigator. Supervisors should be notified when an officer under their supervision is summoned as part of an administrative investigation and should facilitate the officer's appearance, absent extraordinary and documented circumstances.

(96)    PRPD should provide all investigators with clear guidance regarding the handling of criminal misconduct allegations, including referring such allegations to internal or external agencies for criminal investigation and specifying the entity or individual responsible for determining whether a complaint will be investigated criminally. PRPD should continue to require that an administrative investigation be completed, irrespective of the initiation or

outcome of criminal proceedings, provided that the administrative investigation does not interfere with or jeopardize a criminal investigation or proceeding.

(97)     PRPD should develop and implement a protocol for compelled statements that complies with applicable law and current professional standards.

(98)     In each investigation, PRPD should consider all relevant evidence including circumstantial, direct, and physical evidence, as appropriate, and make credibility determinations, if feasible.  PRPD should not automatically prefer an officer's statement over a non-officer's statement, nor should PRPD completely disregard a witness' statement merely because the witness has some connection to the complainant.  PRPD should make efforts to resolve material inconsistencies between witness statements.

(99)     PRPD should not close an investigation simply because the complaint is withdrawn or the alleged victim is unwilling or unable to provide medical records or proof of injury or the complainant will not provide additional statements; rather, the investigating agency should continue its investigation, as necessary, to determine whether the original allegation(s) can be resolved based on the information, evidence, and investigatory procedures and techniques available.  In each investigation, the fact that a complainant pled guilty or was found guilty of an offense should not be considered as evidence of whether a PRPD officer used or did not use a type of force, nor should it justify discontinuing the investigation.

(100)   PRPD should require that administrative investigations determine, as necessary, whether:

>    a.     the police action was in compliance with policy, training, and legal standards, regardless of whether the complainant suffered harm;
>    b.     the incident involved misconduct by any officer;
>    c.     the use of different tactics should or could have been employed;
>    d.     the incident indicates a need for additional training, counseling, or other non-disciplinary corrective measures; and
>    e.     the incident suggests that PRPD should revise its policies, strategies, tactics, or training.

(101)   The complainant should be kept informed periodically regarding the status of the investigation.  The complainant should be notified of the outcome of the investigation, including an appropriate statement regarding whether any disciplinary or non-disciplinary action was taken.  PRPD should notify the complainant that he/she may appeal the outcome of the investigation to the CIPA within 30 days of receipt of PRPD's final determination.

(102)   Each allegation in an administrative investigation should be resolved by making one of the following dispositions:

>    a.     "Unfounded," when the investigation determines, by a preponderance of the evidence, that no facts support that the incident complained of actually occurred;
>    b.     "Sustained," when the investigation determines, by a preponderance of the evidence, that the person's allegation is supported by sufficient evidence to determine that the incident occurred and the actions of the officer were improper;

    c.    "Not Sustained," when the investigation determines, by a preponderance of the evidence, that insufficient facts exist to decide whether the alleged misconduct occurred; and

    d.    "Exonerated," when the investigation determines, by a preponderance of the evidence, that the alleged conduct did occur but did not violate PRPD policies, procedures, or training.

(103)   PRPD should require supervisors to review and take appropriate disciplinary or non-disciplinary corrective action, where warranted, when he/she becomes aware of potential misconduct or criminal behavior by an officer under his or her command.  PRPD should also require unit commanders to evaluate each investigation of an incident under their command to identify underlying problems, including potential deficiencies in supervision and training.  Any such deficiencies or other identified needs should be relayed to the appropriate PRPD unit for corrective action at the officer or agency level, where warranted.

(104)   PRPD should develop and implement written requirements for investigator positions in PRD, which include the applicant's complaint and discipline history and investigative experience.  Officers with a sustained complaint of, or who have been disciplined for, excessive use of force, false arrest or charge, unlawful search or seizure, sexual harassment, discrimination, or dishonesty should be disqualified from PRD positions, unless the PRD commanding officer or official recommends and the PRPD Superintendent approves, the selection of the officer despite such complaint or discipline.

(105)   PRPD should establish a term of duty of up to three years for PRD officers and supervisors who conduct investigations, and should reappoint an officer to a new term of duty only if that officer has performed satisfactorily based on an appropriate annual performance evaluation.

(106)   Puerto Rico and PRPD should provide PRPD units and officers with sufficient resources and equipment to conduct adequate criminal and administrative investigations.

## K.    Risk Management

(107)   PRPD should develop and implement an early identification system to include a new computerized relational database for maintaining, integrating, and retrieving information necessary for supervision and management of the entire PRPD.  PRPD should regularly use this data to promote civil rights and professional police practices, manage risk and liability, and evaluate the performance of PRPD officers across all ranks, units, and shifts.

(108)   The early identification system should collect and record a minimum data set to competently develop a risk profile for each officer and identify potential patterns of at-risk behavior, including all uses of force, complaint history, discipline, training history, judicial proceedings involving domestic disputes, and commendations and awards.

(109)   The early identification system should include, for the incidents included in the database, appropriate identifying information for each involved officer (e.g., name, badge number, shift, and supervisor) and civilian (e.g., race, ethnicity, or national origin, if available).

(110)   PRPD should develop and implement a protocol on the use of the early identification system that addresses the following components:  data storage, data retrieval, reporting, data analysis, pattern identification, supervisory assessment, supervisory intervention, documentation and audit, and data retention.

(111)   PRPD should enter information into the early identification system in a timely, accurate, and complete manner, and maintain the data in a secure and confidential manner.

(112)   Prior to implementation of the new early identification system, PRPD should continue to use existing databases and resources, to the fullest extent possible, to identify patterns of conduct by PRPD officers or groups of officers.

(113)   PRPD should incorporate, in a meaningful way, its expectations regarding biased-free policing and equal protection into its hiring, promotion, and performance assessment processes, including appropriately evaluating an individual's character, reputation, and documented history with regard to biased attitudes and behavior through personal interviews, interviews with acquaintances and associates, review of relevant social-networking websites, and review of civilian complaints, as appropriate.

(114)   PRPD should develop a protocol for conducting audits to be used by each officer or supervisor charged with conducting audits.  The protocol should establish a regular and fixed schedule to ensure that such audits occur with sufficient frequency and cover all PRPD units and Regional Commands.  Each audit conducted by PRPD should be documented in a report that provides the methodology, data sources, analyses, conclusions, and recommendations to address any identified deficiencies or areas in need of improvement.

(115)   PRPD should issue a report to the Superintendent on the result of each audit and examine whether there is consistency throughout PRPD.  PRPD should also provide the reports to each precinct or specialized unit commander.  The commander of each precinct or specialized unit should review all audit reports regarding employees under their command and, if appropriate, should take non-disciplinary corrective action or disciplinary action.

(116)   PRPD should develop and implement a plan for organizing and executing regular, targeted, and random integrity audit checks, or "sting" operations (hereinafter "sting audits"), to identify and investigate officers engaging in at-risk behavior, including:  unlawful stops, searches, seizures (including false arrests), excessive uses of force, potential criminal behavior, or other patterns of misconduct.  These operations should also seek to identify officers who discourage the filing of a complaint or fail to report misconduct or complaints.  PRPD should use the relevant early identification system data, and other relevant information, in selecting targets for sting audits.  Sting audits should be conducted each fiscal year.

(117)   PRPD should continue to operate video cameras in all currently equipped vehicles and should repair or replace all non-functioning video cameras, as appropriate.

(118)   PRPD should conduct and document periodic random reviews of police vehicle camera videotapes for training and integrity purposes.  PRPD should require periodic random surveys of police vehicle video recording equipment to confirm proper working order.

(119)   PRPD should develop and implement protocols regarding the supervision and management of specialized units and undercover assignments to ensure compliance with applicable law and PRPD policy regarding use of force, searches and seizures, and discriminatory policing.  Specialized units include TOUs, Special Operations Units, Specialized Tactical Units, Special Weapons and Tactics Units, and the Drug, Vice, and Illegal Firearm Units.

(120)   PRPD should develop and implement appropriate eligibility criteria to select and retain qualified officers and supervisors to serve in specialized units and undercover assignments, and exclude officers and supervisors who may be unprepared or unfit to participate in such units or assignments.  PRPD should disqualify for service on a specialized unit or undercover assignment any officer or supervisor who has generated sustained complaints or adverse judicial findings for use of excessive force, improper search or seizure, false arrest or charge, sexual harassment, discrimination, or dishonesty; is under criminal investigation; or has otherwise engaged in illicit activities, including illegal drug use.

(121)   PRPD should establish pre-screening mechanisms to ensure that all eligibility criteria are met for officers and supervisors selected to participate in specialized units and undercover assignments, including determining whether the officer:

a.   has completed all probationary requirements;
b.   is current with all firearm and service weapon certifications, as necessary;
c.   has demonstrated a proficiency in a variety of law enforcement activities, interpersonal and administrative skills, cultural and community sensitivity, and a commitment to police integrity; and
d.   has received a positive evaluation based on the officer's relevant and appropriate early identification system record.

(122)   PRPD should screen officers interested in participating in specialized units or undercover assignments on an ongoing basis to develop and maintain a pool of seasoned and competent officers with exemplary records and up-to-date training.

(123)   PRPD should ensure that a sufficient number of trained supervisors exist to ensure appropriate supervision of officers assigned to a specialized unit or undercover assignment. Supervisor training should consist of appropriate pre-service and ongoing training in the operation and management of the specialized unit or undercover assignment to ensure compliance with relevant laws and PRPD policy.

(124)   PRPD should provide adequate pre-service and ongoing training to officers in specialized units and undercover assignments to ensure compliance with relevant laws and PRPD policy, including addressing the desired knowledge, skills, and abilities of the officers participating in the unit or assignment.

(125)   PRPD should track all activities relating to officers participating in a specialized unit or undercover assignment, including enforcement actions, complaints, and misconduct investigations, to enable supervisors to determine whether particular officers should be allowed to continue participating in a specialized unit or undercover assignment.  PRD should inform

commanding officers of specialized units or undercover operations of any complaint received regarding the conduct of an officer in a specialized unit or undercover assignment.

## L.    Oversight and Community Engagement

(126)   PRPD should establish and conduct a Community Outreach and Public Information program in each PRPD Regional Command area.  The Community Outreach and Public Information program should require semi-annual open meetings in each of PRPD's 13 Regional Commands to inform the public about its specific reform efforts and the various methods of filing a complaint against an officer.  Puerto Rico should provide sufficient advance notice and publicity for the meetings in English and Spanish.

(127)   The open public meetings should include presentations and information on PRPD and PRPD operations designed to enhance interaction between officers and community members in daily policing activities.  The presentations shall include the following subject areas, with appropriate safeguards to protect ongoing criminal or administrative investigations, confidential or privileged information, or personal information protected from disclosure by applicable laws:

   a.    statistics on arrests, motor vehicle and pedestrians stops, use of force, and geographic deployment of specialized tactical units, broken down by each PRPD Regional Command and precinct, including statistics on race, ethnicity, national origin, and gender;
   b.    a summary of all audits completed and any significant action taken as a result of such audits;
   c.    a summary of all discipline imposed during the period, reported by type of misconduct and broken down by type of discipline, Regional Command, and rank; and
   d.    a summary of all new policies or changes in policies made by PRPD related to civil rights.

(128)   PRPD should continue to use community advisory groups in each Regional Command area and meet periodically with the communities they serve.  PRPD shall establish a liaison, through its community relations units, with members of minority communities to foster dialogue, solicit feedback, increase opportunities for positive interaction, constructively address perceptions and concerns regarding biased policing, and encourage minority group participation in policing activities, including officer recruitment and training.

(129)    PRPD should establish a command-level liaison committee consisting of PRPD command officers who communicate, on at least a monthly basis, with representatives of criminal justice agencies in all regions in Puerto Rico, including judicial courts, prosecutors, and municipal police departments.  The committee should seek feedback and information on performance issues or concerns related to PRPD, its officers, employees, or units.  All PRPD commanders and staff who participate in the command-level liaison committee should ensure that all allegations of misconduct or potential criminal activity are referred to PRD and other pertinent law enforcement agencies.

(130)   Puerto Rico should provide for independent civilian review of PRPD.  The members of the civilian review body should represent a cross-section of the communities in Puerto Rico. CIPA's enabling statute should be amended to increase the number of commissioners and ensure that half of these commissioners are selected by a panel of non-government civil rights organizations instead of the Governor.  If CIPA is not to assert its civilian review role, a new civilian review body should be established.  The civilian review body should develop a program to inform persons that they may make complaints regarding the performance of any officer.  This program will include distribution of complaint forms, fact sheets, informational posters, and public service announcements that describe the civilian complaint process.

(131)   The civilian review body should develop and implement a protocol for the intake, referral, investigation, and disposition of complaints against PRPD consistent with national guidelines and best practices.  The civilian review body should be empowered to access and review PRPD investigations concerning civilian complaints against PRPD.

(132)   PRPD should provide the civilian review body with intake information regarding all complaints received.  PRPD should keep the civilian review body informed on a monthly basis regarding the status and disposition of all complaint investigations.  The civilian review body should review all civilian complaints alleging retaliation against a complainant for reporting possible misconduct or at-risk behavior by a PRPD officer.  The civilian review body should evaluate PRPD investigations to determine whether they conform to applicable standards and requirements.

(133)   The civilian review body should issue a publicly available, semi-annual report summarizing its review activities.  The report should include recommendations on corrective action to address identified deficiencies and promote civil rights protections within PRPD.

# VI.    CONCLUSION

We value the hard work and dedication of the men and women of PRPD who have sworn to protect and serve the people of Puerto Rico.  We also appreciate the great risk that policing entails and the many public safety challenges confronting Puerto Rico.  To meet these challenges, officers are entrusted with unequaled powers, including the authority to use force and detain individuals, to enforce the law and maintain order.  This authority is not unlimited and carries significant responsibilities.  PRPD's motto, *Proteccion, Integridad* ("Protection, Integrity"), showcases these responsibilities and sets out PRPD's vision for ensuring the safety of the people of Puerto Rico while adhering to the highest professional, ethical, and legal standards.  Unfortunately, far too many PRPD officers have broken their oath to uphold the rule of law, as they have been responsible for acts of crime and corruption and have routinely violated the constitutional rights of the residents of Puerto Rico.  These officers have frequently subjected the very people they swore to protect to unreasonable force and unlawful searches and seizures.  In addition, when faced with public demonstrations, PRPD relies on tactics that violate the free speech rights of demonstrators and the press.

The patterns and practices of civil rights violations we identified are profound.  They are the result of chronic institutional and systemic deficiencies that directly contribute to repeated violations of the Constitution and federal law.  PRPD does not currently provide its officers with sufficient or appropriate training, guidance, discipline, or supervision.  As a result, PRPD both fails to equip its officers with the necessary skills to effectively serve the public and address officer misconduct in a timely or effective manner.  Outdated policies and ineffective external oversight exacerbate PRPD's failure to ensure constitutional policing and contribute to continuing violations that erode the public's confidence in its efforts.

To date, Puerto Rico has failed to adequately address the causes that contribute to both its unconstitutional law enforcement and ineffective policing.  Puerto Rico must act decisively, transparently, and immediately to restore the public's trust and correct PRPD's pattern of unconstitutional policing.  We have outlined the minimum measures necessary to remedy PRPD's pattern of constitutional violations.  Implementing these steps, with the oversight of the federal courts, will place PRPD on the path to lasting reform and permit PRPD to meet its public safety challenges while respecting the constitutional rights of the people of Puerto Rico.  We look forward to working with the Commonwealth, PRPD, and the University College to ensure that these efforts succeed.

ENDNOTES

1        Throughout this report, "pattern and practice" refers to conduct of PRPD officers that constitutes a pattern, practice, or both.

2        Nagourney, Adam, *In Los Angeles, A Police Force Transformed*, New York Times, Aug. 11, 2011, http://www.nytimes.com/2011/08/13/us/13lapd.html?pagewanted=1

3        Arturo Negrón García et al., *Report of the External Evaluating Committee of the Puerto Rico Police* (Dec. 21, 2007); Arturo Negrón García et al., *Report of the External Evaluating Committee of the Puerto Rico Police: Corruption in the Puerto Rico Police* (May 1, 2008).

4        Arturo Negrón García et al., *Report of the External Evaluating Committee of the Puerto Rico Police* at 20 (Dec. 21, 2007);

5        Press Release, La Fortaleza, "Gobernador nombra Monitor Independiente para supervisor a la Policía," Sept. 24, 2010, *available at* http://www.fortaleza.gobierno.pr/2011/news.php?cnt_id=562.

6         PRPD also has an additional 9,041 inactive officers on its personnel rolls.  Puerto Rico Office of the Controller, PRPD Audit Report DA-09-27, Audit No. 12781 at 13 (May 27, 2009).

7        The national average is 2.2 officers per 1,000 residents for jurisdictions with 250,000 residents or more. U.S. Dep't.of Justice, Office of Justice Programs, Bureau of Justice Statistics, Local Police Departments 2007, Law Enforcement Management and Administrative Statistics at 9 (Dec. 2010).  This figure does not include municipal police officers.

8        P.R. Office of Mgmt. & Budget, Government of Puerto Rico, Proposed Budget for 2011-12, Statistical Table of Federal Funds to Puerto Rico Distributed by Agency, FY 2009-2012; Statistical Table of American Recovery and Reinvestment Act Distributed by Agency, FY 2009-2012,  *available at* http://www.presupuesto.gobierno.pr.

9        Crime statistics for Puerto Rico were obtained from PRPD, *available at* http://www.policia.gobierno.pr. National crime statistics were obtained from the FBI, *available at* http://www.fbi.gov/stats-services/crimestats.

10        Puerto Rico Police Department, *Crime Clearance Rate Report*, PR S.B. 595 (Aug. 30, 2010).

11        The reports are available at http://www.nyclu.org/news/nyclu-releases-16-years-of-nypd-corruption-reports.  There are approximately 34,500 uniformed officers in NYPD, http://www.nyc.gov/html/nypd/html/faq/faq_police.shtml#1.

12        Press Release, FBI, San Juan Division, "Two Law Enforcement Officers Convicted for Participation in Drug Transaction," Dec. 9, 2010, *available at* www.sanjuan.fbi.gov.

13        Judgment, *People v. Mercado Irizarry*, KBD2009G0925-6; KFJ2009G0013-15; KFJ2009M0005-6; and KLE2009G0321 (Dec. 16, 2009).

14        *U.S. v. Flores Vázquez*, No. 08-CR-0436 (D.P.R. filed on Dec. 18, 2008).

15        Indictment, *U.S. v. Quiñones Rosario*, No. 09-CR-00246 (D.P.R. July 23, 2009).  Plea Agreement filed on August 5, 2010.

16        Administrative Leave, Legal Affairs Card, SAOC-1-2-334 (Sept. 18, 2008).  Judgment, *People v. Semidey Rivera*, JEG2008G0010 (June 15, 2006).

---

[17]     *People v. Ramos Santiago*, JLE2008G0490 to 92.

[18]     *People v. López Martínez*, BVI2007G009.

[19]     We did not include civil suits filed before 2004, although they may have been resolved within the period of our review.  *See, e.g.*, Carmen Guzmán v. ELA, DDP2001-0081 (illegal search; $51,496.03 paid on July 10, 2009); *Ortiz Ortiz v. Policía*, IDP2002-0260 (illegal seizure; $76,500.75 paid on July 10, 2009); *Rodríguez Santiago v. ELA*, JDP 2000-0522 (illegal stop; $93,277.81 and $5,783.17 paid on Feb. 1, 2010); *Casanova García v. ELA*, CDP 2001-0322 (illegal arrest; $50,000 paid on Feb. 27, 2009); *Irizarry Irizarry v. ELA*, JDP 20040544, KLCE200501631 (2005 Westlaw 3741500) (illegal search; $30,000 paid on May 11, 2010); *López Méndez v. ELA*,KDP20031248 (503), KLAN200700494 (2008 Westlaw 2885958) (illegal search and detention) ($142,269.86 paid on Nov. 7, 2008).

[20]     *People v. Pagán Cruz*, HSCR2007-1965-1966.

[21]     Complaint, *Pérez Liz et al v. Toledo Dávila, et al*, No. 08-CV-1659 (D.P.R. filed on June 17, 2008).

[22]     *People v. Pérez Liz*, DLA2007G0875, DLA2007G0875 and DVI2007G0081.Verdict, *Pérez Liz v. Toledo Dávila*, entered on Mar. 25, 2010.

[23]     Complaint, *Cruz Santiago v. Alvarez Boneta, et al.,* No. 08-CV-1311 (D.P.R. filed on Mar. 14, 2008).

[24]     Press Release, Puerto Rico Dep't. of Justice, "Criminal Charges Filed Against Officer Pedro Cruz Sierra," Mar. 13, 2009; Guilty Plea, *People v. Cruz Sierra*, FIC2009G0009 (Apr. 28, 2009).

[25]     Order, *Rodríguez Rivero et al v. Commonwealth of Puerto Rico Police Department, et al.,* No. 08-CV-1016 (D.P.R. entered on Nov. 5, 2009).  Jury Verdict entered on Nov. 10, 2009.

[26]     Complaint, *Leyva Ramos et al v. Toledo Dávila, et al*, No. 07-CV-1178 (D.P.R. filed on Mar. 1, 2007).

[27]     Joint Pretrial Memorandum filed on March 16, 2010.

[28]     *See, e.g.*, CDC, Annual Report 2009-2010 at 16-17 (discussing the requirements of Law 141 of July 3, 1999 requiring police offices to visibly display an identification number and CDC letters to the Superintendent following protests in June and October 2009 in which a significant number of officers were observed not wearing an identification number).

[29]     Arturo Negrón García, *et al.*, *Report of the External Evaluating Committee of the Puerto Rico Police* at 12 (Dec. 21, 2007).

[30]     *Id.*

[31]     The University Avenue incident was not the only confrontation between PRPD officers and the student community.  Numerous clashes between protesting students and officers took place during a 58-day student strike – from April 23 to June 17, 2010 – on various UPR campuses.  On May 4, 2010, officers entered the Río Piedras campus after students reportedly blocked access to the campus gates.  Students and journalists reported that officers, who had removed their name badges, struck them repeatedly with batons.  Confrontations between students and police continue.  One of the most violent of these occurred on February 9, 2011, inside the UPR Río Piedras campus.

[32]     David Helfeld, Carlos Ramos Bellido, William Vázquez Irizarry, *Report of the Commission Investigating the Incidents of August 21, 2009* at 4 (Sept. 25, 2009).

[33]     Nydia Bauzá& Maritza Díaz Alcaide, *Motín en Actividad de Fortuño por Huelga en la UPR*, Primera Hora, May 21, 2010.

[34] Memorandum from Lt. Reinaldo Santiago González to Lt. Col. Miguel A. Mejías Cruz (May 21, 2010).

[35] CRC, Resolution 2010-14, "Resolution to Investigate the Events Transpiring on May 20, 2010 at the Hotel Sheraton, San Juan, Puerto Rico," (Dec. 14, 2010).

[36] *Id.*

[37] PRPD, October 25, 2010, Memorandum.

[38] *See* CRC resolution 2010-014 (Dec. 14, 2010).

[39] CRC, Resolution 2010-10, "Resolution to Investigate the Events Transpiring on June 30, 2010 at the Capitol, San Juan, Puerto Rico," (July 2, 2010).

[40] *Id.*

[41] *See* CRC Resolution 2011-01, "Resolution to Investigate the Events Transpiring in the University of Puerto Rico," (Feb. 14, 2011).

[42] *Id.*

[43] Arturo Negrón García, *et al.*, *Report of the External Evaluating Committee of the Puerto Rico Police* at 12 (Dec. 21, 2007).

[44] Merriam-Webster Dictionary, Medical Terms, *available at* http://www.merriam-webster.com/medical/celiac+plexus.

[45] Office of Community Oriented Policing Services, Dep't of Justice, *2011 Electronic Control Weapon Guidelines* 13 (2011).

[46] NYPD, Office of Management Analysis and Planning, "Annual Firearms Discharge Report, 2009," vii (2009), *available at* http://www.nyc.gov/html/nypd/html/analysis_and_planning/reports.shtml; "NYPD Shooting Restraint," Officer Discharges, Data from 1971-2010, *available at* http://www.nyc.gov/html/nypd/html/analysis_and_planning/reports.shtml.

[47] Arturo Negrón García, *et al.*, *Report of the External Evaluating Committee of the Puerto Rico Police* at 12 (Dec. 21, 2007).

[48] *Id.*

[49] Sample community surveys are published as Appendix C in IACP, *Building Trust Between the Police and the Citizens They Serve:  An Internal Affairs Promising Practices Guide for Local Law Enforcement*, (2010).

[50] Officer Efraín Bey Arce was acquitted, but separated from PRPD on November 9, 2007.

[51] Amended Complaint, *Candelaria Cabán, et al. v. Toledo Dávila*, No. 10-1100 (D.P.R. filed on Dec. 17, 2010).

[52] As discussed further in Section IV, PRPD uses "archive" to administratively close an internal investigation. The term is used to close cases for a variety of reasons, including when an officer is exonerated, the investigation is inconclusive due to insufficient evidence, or the complainant withdraws the complaint and no longer wishes to cooperate.  Critical distinctions between these various circumstances are lost through PRPD's use of this catch-all term.

[53]     Verdict (Santos Soto and Plaza Santiago), *U.S. v. Santos Soto*, No. 07-CR-400 (D.P.R entered on Oct. 28, 2010).

[54]     *U.S. v. Pérez Rosado, et al.,* No. 07-392 (sealed plea agreements filed on Mar. 4, 2008).  State criminal charges for robbery, illegal search, kidnapping, and weapons for this same incident had earlier been dismissed because of delays in presenting the charges in court.  *See People v. Gaud Colón*, VP2007-5843 to 5846(608), KLCE200701709 (2008 Westlaw 949659).

[55]     *Jorge Vargas Torres, et al., v. Toledo Dávila, et al*., No. 08-CV-1527 (D.P.R. filed on May 6, 2008).

[56]     *See* Facts in Controversy filed on May 25, 2010, at p. 37, in *Diaz Román v. Denis, et al.,* No. 08-CV-1420 (GAG), indicating that Officer Ortiz Correa based his statement exclusively on the information he received from a colonel and inspector.

[57]     Zulma Méndez Ferrer, *University College of Criminal Justice:  Report on Accomplishments* (Nov. 30, 2010), *available at* www.senadopr.us.

[58]     ACLU Human Rights Program request to the OAS, *Request by the American Civil Liberties Union, et. al. for Precautionary Measures Under Article 25(2) of the Commission's Rules of Procedure Against the United States of America.*

[59]     *Id.* at 10-11.

[60]     Eugenio Hopgood Davila, *Dominicanos Denuncian Persecucion de Parte de la Policia*, El Nuevo Día, May 26, 2011

[61]     *Id*.

[62]     *Escolástico Rodríguez v. Acevedo Vila, et al.* No. 07-CV-2227 (D.P.R. filed on Dec. 26, 2007).

[63]     *Santos Rosario v. Commonwealth of Puerto Rico, et al.,* No. 06-CV-2155 (D.P.R. filed on Nov. 17, 2006).

[64]     Justin Fenton, *U.S. Senate Committee to Hold Hearings on Rape Investigations*, Baltimore Sun, Sept. 7, 2010, http://articles.baltimoresun.com/2010-09-07/news/bs-md-senate-hearing-rapes-20100907_1_patrol-officers-philadelphia-police-police-departments.

[65]     Data from United Nations Statistics Division, *Demographics and Social Statistics: Statistics and Indicators on Women and Men*, Table 6.C, Physical Abuse against Women by an Intimate Partner (1991-99), *available at* http://unstats.un.org/unsd/demographic/products/indwm/table6c.html.

[66]     Esplugues, Jose Sanmartin, et al., *3rd International Report: Partner Violence against Women*, *Statistics and Legislation*, Centro Reina Sofia 90 (2006).

[67]     Oficina de La Procuradora de Mujeres, *Mujeres Asesinadas Por Sus Parejas o Ex-parejas, 2000-2009*, *available at* http://www.mujer.gobierno.pr.

[68]     *See e.g.*, U.S. Dep't. of Justice, Community Relations Service, *Principles of Good Policing:  Avoiding Violence Between Police and Citizens*, 1-5 (2003), *available at* http://www.justice.gov/crs/publist.html.

[69]     *Building Trust Between the Police and the Citizens They Serve* at 7 (internal citations omitted).

[70]     U.S. Dep't. of Justice, Bureau of Justice Statistics, Special Report, *State and Local Law Enforcement Training Academies*, 2006,  (Apr. 14, 2009).

[71]     Letter from Justo Reyes Torres, Executive Director of the Puerto Rico Council on Higher Education, to Rep. Liza Fernández Rodríguez, President of the House of Representative's Judiciary and Public Safety Committee, of June 27, 2006 at 2-3.

[72]     Letter from Justo Reyes Torres, Executive Director of the Puerto Rico Council on Higher Education, to Rep. Liza Fernández Rodríguez, President of the House of Representative's Judiciary and Public Safety Committee, of June 27, 2006 at 2.

[73]     Letter from Pedro Toledo Dávila, Superintendent, to Sen. Orlando Parga, President of the Senate Special Committee on PRPD, of Mar. 11, 2008 at 9-10.

[74]     *Id.* at 10.

[75]     Arturo Negrón García, *et al.*, *Report of the External Evaluating Committee of the Puerto Rico Police* at 22 (Dec. 21, 2007).

[76]     U.S. Dep't. of Justice, Office of Justice Programs, Bureau of Justice Statistics, *Local Police Departments 2007*, Law Enforcement Management and Administrative Statistics at 12 (Dec. 2010).

[77]     *Id.* at 12.

[78]     *Id.* at 36.

[79]     Carmen M. Acosta Sanchez, Puerto Rico Police Department, *Resumen de Evaluación del Proceso* at 9, 12.

[80]     Zulma Méndez Ferrer, *University College of Criminal Justice:  Report on Accomplishments* (Nov. 30, 2010), *available at* www.senadopr.us.

[81]     Commonwealth of Puerto Rico, Entering Transition Committee, *Final Report on the Transition Process* 8-9 (2009).

[82]     Commonwealth of Puerto Rico, *Report on Nomination of José Figueroa Sancha to Post of Superintendent of PRPD*, S. Rep. (Jan. 21, 2009).

[83]     Puerto Rico Regulation No. 6644, "Regulation for Special Promotions by Merit and/or Heroism through the Rank of Captain," (2003); *see also* Puerto Rico Office of the Controller, PRPD Audit Report DA-09-27, Audit No. 12781 (May 27, 2009).

[84]     Puerto Rico Regulation 6506, "Regulation for the Handling of Administrative Complaints against Members of the Force and Civil Personnel Who Work in the Puerto Rico Police," (2002).

[85]     IACP, *Protecting Civil Rights:  A Leadership Guide for State, Local, and Tribal Law Enforcement*, at 88 (Sept. 2006), *available at* http://www.theiacp.org/  PublicationsGuides/tabid/71/ Default.aspx.

[86]     Memorandum  from José Taboada de Jesus, President of the Police of Puerto Rico Member Association, to Efraín Rivera Pérez, Police Monitor, of Feb. 8, 2011.

[87]     *Building Trust Between the Police and the Citizens They Serve* at 22.

[88]     *Id.* at 26.

[89]     *Id.* at 3.

[90]     Puerto Rico Regulation No. 4216, "Puerto Rico Police Regulation," as amended (1981).

[91]    Puerto Rico Office of the Controller, PRPD Audit Report DA-09-27, Audit No. 12781 at 14 (May 27, 2009).

[92]    Puerto Rico Regulation No. 4216,  Art. 14.3.2.a.

[93]    *See, e.g.*, Officer Rafael Ramos Vélez (*Rodríguez Rivero v. Commonwealth*, 08-CV-1016, paid on September 9, 2010); Mayagüez Drug/Vice/Illegal Weapons Sergeant José Figueroa Andújar and officers Camille Ortiz Sepúlveda, Robert Martínez Medina and Maritza Nazario Vega (*Vargas Torres v. Toledo Dávila et al.*, 07-CV-2002, undisclosed amount deposited on August 6, 2010, in satisfaction of judgment after a jury awarded $6.7 million on October 13, 2009); Officer Christian Rodríguez Cruz (*Canals Marcano v. Rodríguez Cruz*, E2CI200601018, KLAN0801565 (2009 Westlaw 2351439), paid on August 11, 2009; Officer Daniel Alvarado Alicea (*Velázquez Ramírez v ELA*, EDP2005-0172, paid on February 22, 2008); Sergeant Hermenegildo Rivera Ruiz and officers José Meléndez Meléndez and David Rodríguez Franqui (*Malavé Colón v. Rivera Ríos* (incorrect last name), 06-CV-1381, settlement reached on August 7, 2009).  Sergeant Rivera Ruiz was involved in another incident that resulted in a federal civil suit with officers José Rodríguez Cora and Gerarda Vázquez Quiñones (*Lozano Benítez v. Rivera Ruiz, et al.*, 08-CV-1766, paid on November 13, 2009).

[94]    *Protecting Civil Rights:  A Leadership Guide* at 52-53.

[95]    *Id.* at 54

[96]    *Id.* at 55.

[97]    *Id.* at 65.

[98]    *See* Tom O'Connor, *Employee Review Programs*, http://faculty.ncwc.edu/toconner.

**APPENDIX A:** Additional Illustrative Incidents

I.      **Crime and Corruption Involving PRPD Officers**

The following incidents further illustrate the widespread criminal activity of PRPD officers:

- On October 14, 2009, Officer Félix Rosa Soto pled guilty to possessing five kilograms of cocaine with intent to distribute and escorting a shipment of 75 kilograms of cocaine. The court sentenced Officer Rosa Soto to 70 months of imprisonment.[1]

- On April 30, 2009, Officer Josué López Rivera pled guilty to attempted murder for shooting the companion of his ex-girlfriend with his service weapon.[2]  Officer López Rivera shot the man in the chest, abdomen, right shoulder, and both hands.  At the time of the shooting, Officer López Rivera had two pending administrative complaints against him, including one for misuse of his firearm.

- On December 19, 2008, Lieutenant Carlos Cochran Ortiz, who served as the Director of the Weapons Registration Section at PRPD Headquarters, pled guilty to conspiracy charges for participating in a scheme that enabled applicants to obtain firearm permits by providing false information.  The district court sentenced him to twelve months imprisonment.[3]  Twenty-seven other individuals, including a civilian employee of the PRPD, were also arrested for their participation in the conspiracy.

- On July 29, 2008, Officer Ricardo Rivera Astacio pled guilty to importing narcotics into the United States after conspiring with two individuals to transport 60 to 80 kilograms of cocaine from the Dominican Republic to Puerto Rico.[4]

- On November 15, 2007, Officer Angel Fonseca Guilfú was convicted of sexually assaulting a 13-year-old girl he met through a telephone chat line.[5]

- On June 28, 2007, Officer Meléndez Otero pled guilty to conspiracy to possess illegal substances with the intent to distribute and to a firearm-related charge; he was sentenced to a year and a day of imprisonment.

- On January 20, 2007, in an incident known as "the Massacre of Las Piedras," Officer Javier Santiago Velázquez killed his father-, mother-, and sister-in-law, and wounded his brother-in-law (shooting him nine times) over a property dispute.  Officer Santiago Velázquez was convicted of three counts of first-degree murder, one count of attempted murder in the first-degree, and four weapons charges.  His wife, Officer Jesly Ann Márquez Arés, was also convicted on three counts of first-degree murder, one count of attempted murder, and four counts of weapons charges, although an appeals court reduced Officer Márquez Arés' weapons convictions from four counts to one.[6]

- On May 26, 2006, Officer William Castro Arocho, who was off duty, fired his service weapon at Carmen Ramírez Irizarry during a dispute with his neighbor.  On October 19,

2009, Officer Castro Arocho was found guilty of illegally discharging his service firearm.[7]   At least 23 citizen complaints were filed against Officer Castro Arocho prior to his arrest, including verbal abuse, assault, illegal persecution, and domestic violence.

## II.    PRPD Engages in a Pattern and Practice of Use of Excessive Force

The following incidents and allegations further support the finding that PRPD has engaged in a pattern and practice of use of excessive force in violation of the Fourth Amendment:

- On February 21, 2008, according to a lawsuit, Officer Rashid Feliciano Vázquez shot Kelmit Oquendo Rivera three times without a valid law enforcement purpose while PRPD officers were conducting surveillance of a home.  Oquendo Rivera sued PRPD alleging that he was shot without justification and falsely charged.  He also alleged that 10 to 15 officers, including Sergeant Antonio Rodríguez and Officers José Bracero Sepúlveda, David Colón, and Eddie Rivera Nazario, failed to intervene on his behalf.  In 2010, the parties agreed to settle under undisclosed terms.[8]

- On July 12, 2007, according to a lawsuit, Sergeant Hermenegildo Rivera Ruiz and Officers José Rodríguez Cora and Gerarda Vázquez Quiñones assaulted Oscar Lozano Benítez following a traffic stop, predicated on Lozano Benítez's alleged use of high-intensity headlights.  Without a valid law enforcement purpose, officers twisted Lozano Benítez's arm.  Officers then threw Lozano Benítez against a car causing him to fall to the ground, stepped on his face with a boot, and handcuffed him so tight that he could not feel his fingers.  Lozano Benítez was then arrested and detained overnight at a PRPD station.  Lozano Benítez was not provided medical attention for his injuries.  Lozano Benítez filed suit and in 2009, the parties entered into a confidential settlement.[9]   At the time of the incident, the Legal Affairs Office had not acted on a 2003 recommendation from administrative investigators to expel Sergeant Rivera Ruiz after he submitted false documents and lied to investigators.  Additionally, PRPD closed other investigations into Sergeant Rivera Ruiz's conduct without imposing disciplinary action, even after investigators had sustained misconduct allegations and recommended discipline, as set forth below:

**Table A-1:  Civilian Complaint History, Sergeant Rivera Ruiz**

| Type | Year | Disposition |
| --- | --- | --- |
| Illegal search and verbal abuse | 1989 | Archived after investigators recommended a 2-day suspension |
| Physical and verbal abuse | 1989 | Archived after investigators recommended an admonishment |
| Illegal search and arrest | 1992 | Archived |
| Theft of official vehicle | 1992 | Pending in Legal Affairs Office |
| Damage to official vehicle from bullet | 1994 | Archived |
| Illegal arrest | 1995 | Archived |
| Illegal arrest | 1995 | Archived |

| | | |
|---|---|---|
| Submitting false document and lying to administrative investigator | 2002 | Pending in Legal Affairs Office; expulsion recommendation in 2003 |

*As of May 20, 2008.

- On June 29, 2007, according to a lawsuit, Alsemmi Martín was driving from the Veterans Administration Hospital with passenger Mario Salazar Cintrón when Officers Orlando Rivera Canaan and Nelson Rodríguez pulled up beside them. Salazar Cintrón made an obscene gesture toward the officers, who proceeded to stop Alsemmi's vehicle. After a verbal exchange, an officer pulled Salazar Cintrón out of the vehicle and, without a legitimate law enforcement purpose, began hitting him in the face and body, causing a rib fracture, bleeding, and bruises on his head. The officer deployed a taser to incapacitate Salazar Cintrón, and handcuffed his hands and feet. The officers dragged Salazar Cintrón on the ground and ordered him to squeal like a pig. Martín and Salazar Cintrón filed a federal civil rights suit alleging that the officers had used excessive force and committed an unreasonable search and seizure.

  On September 30, 2009, the district court entered default judgment against Sergeant Samuel Hernández, the supervising officer on the scene. An amended judgment was entered on April 23, 2010, after the parties reached a confidential settlement agreement.[10]

- On May 10, 2007, Juan Salcedo Collazo and his friend, José Negrón Rivera, pulled over on the side of the road in Utuado when their vehicle malfunctioned. Six PRPD officers arrived on the scene. Without a legitimate law enforcement purpose, Officer Freddie Lucena Pérez pulled out his weapon and handcuffed Salcedo Collazo and Negrón Rivera. Officer Lucena Pérez allegedly told Salcedo Collazo, "if you mess with a policeman, you mess with all of us" (referring to an incident where Salcedo Collazo and his cousin, Miguel Figueroa Collazo, stopped a municipal police officer from abusing his wife). Officer Lucena Pérez then allegedly hit Salcedo Collazo, Negrón Rivera and later Figueroa Collazo and played Russian roulette with Salcedo Collazo. The officers then placed Salcedo Collazo, who was bleeding profusely, in the police vehicle's trunk. Neither Officer Carlos Vélez nor the other four officers intervened to stop Officer Lucena Pérez from hitting the plaintiffs. In 2010, the parties entered into a confidential settlement agreement.[11]

- On April 15, 2007, according to a lawsuit, Misael Medero García was driving his father's car with two friends when PRPD officers Samuel Galloza González, Leonardo Vázquez Martínez, and Javier Avilés Crespo stopped Medero García, allegedly without probable cause. The officers told Medero García and his friends that they were not wearing their seat belts, which Medero García denied. Although neither Medero García nor his passengers posed any threat to the officers or others, Officer Galloza González then pointed his firearm at them, punched Medero García in the back, and cited them for not wearing seatbelts. Officer Vázquez Martínez searched the vehicle without consent and found nothing suspicious. Medero García and his friends left and drove toward the Barceloneta police station to file a complaint against the officers. They were followed by the officers who stopped them a second time and assaulted them, again without a legitimate law enforcement purpose. The officers detained Medero García and his

friends at the station, but filed no charges against them.  In 2009, the parties entered into a confidential settlement agreement.[12]

- On March 19, 2007, according to a lawsuit, approximately 15 PRPD officers arrived at Matthew McLeod López's home to execute a search warrant.  Upon opening the door, seven officers, including Juan Rosa Algarín, jumped on McLeod López, threw him to the ground, and hit him all over his body, including in his groin.  The officers had no legitimate law enforcement purpose for this use of force.  Although the officers did not have a search warrant for a safe deposit box, they ordered McLeod López to open it.  The officers took $3,000 from the box and drove McLeod López to PRPD headquarters, where they detained him for more than fourteen hours.  Once released, McLeod López needed emergency surgery due to injuries he sustained during the officers' beating.  In 2011, the parties entered into a settlement agreement.[13]

- On January 1, 2007, according to a lawsuit, Xavier Muñoz Mejías and his cousin, David Santiago Muñoz, exited a business establishment when an argument ensued outside.  Approximately six officers, including a sergeant, arrived and, without a legitimate law enforcement purpose, began hitting Muñoz Mejías with their batons and boots.  Muñoz Mejías lay on the floor bleeding profusely as the officers continued to hit him.  When Santiago Muñoz attempted to protect his cousin, the officers hit him with batons, causing linear bruising and injuries.  In 2009, the parties entered into a confidential settlement agreement.[14]

- On September 26, 2006, according to a lawsuit, Officer Edwin Félix De Jesús attacked José Cancél Vega without a legitimate law enforcement purpose.  On April 3, 2006, Officer Félix De Jesús pleaded guilty to charges of assault.[15]

- On September 19, 2006, according to a lawsuit, Orvil Cabán Torres was sitting in his parked vehicle when an unmarked vehicle approached him with the lights off.  A man dressed in plainclothes, later determined to be an officer assigned to the Aguadilla Narcotics Division, exited the vehicle, ordered Cabán Torres to "freeze," and pointed a firearm at him.  Cabán Torres then grabbed a canister of chemical agent and sprayed it in the direction of the man.  The man responded by shooting Cabán Torres in the hand and abdomen without adequate justification for using lethal force.  Cabán Torres became aware the man who shot him was an officer when the man addressed another person on the scene as "Sergeant."  In 2009, the parties entered into a confidential settlement agreement.[16]

- On July 25, 2006, according to a lawsuit, during a disturbance related to Constitution Day activities in the Plaza de Recreo in Dorado, Esther López Morales's young son, Agustín, was on his way to a restaurant when PRPD officers repeatedly struck him with batons on his head.  Agustín was not involved in the disturbance, and the officers had no legitimate law enforcement reason to strike him.  Agustín required stitches on his forehead, which left a permanent scar.  In 2009, the parties entered into a confidential settlement.[17]

- On March 3, 2005, according to a lawsuit, five officers followed Andrés García Quiñones and a friend, Edwin Sepúlveda, as they were driving.  Without probable cause or justification, the officers got out of their vehicle at a red light and pointed their weapons at García Quiñones and Sepúlveda.  Fearful for their lives, they drove away.  Although Andrés and Sepúlveda posed no threat to the officers or the community, the officers allegedly fired at least 15 times at García Quiñones's vehicle.  On January 13, 2006, four unidentified officers allegedly entered García Quiñones's home without a search warrant or justification, attacked him, and took him to an empty house in Mayagüez while they searched his home.  As a result of the officer's' beating, García Quiñones suffered a cervical sprain, trauma, and other injuries.  In 2010, García Quiñones and Sepúlveda settled their civil rights action against the PRPD.[18]

## III.   UNCONSTITUTIONAL SEARCHES AND SEIZURES

The following incidents and allegations further support the finding that PRPD has engaged in a pattern and practice of unconstitutional searches and seizures in violation of the Fourth and Fourteenth Amendments:

- On May 20, 2008, Elis Manuel Andrades Telleira was pulled over by a marked PRPD vehicle driven by uniformed Officer Osvaldo Hernández Adorno.  A group of individuals posing as federal agents joined Hernández Adorno on the scene.  The group staged Andrades Telleira's stop in order to steal drugs he was reportedly transporting.[19]  Among the individuals posing as a federal agent was Noel Rosario Colón, a sergeant on administrative leave who had engaged in similar activities in 2005 and 2006 where he impersonated a federal agent to detain individuals and seize money from them.

  After Officer Hernández Adorno, Sergeant Rosario Colón, and the other individuals stopped Andrades Telleira, handcuffed him and took him to an auto body repair shop.  They seized the narcotics in Andrades Telleira's car and interrogated him.  With the information obtained during the interrogation, Sergeant Rosario Colón and two other individuals went to Andrades Telleira' home and stole additional narcotics and other property.  They then executed Andrades Telleira.[20]

  On January 8, 2010, Officer Hernández Adorno entered into a plea agreement after being charged with conspiracy to commit carjacking with intent to cause death, motor vehicle theft, and conspiracy against the rights of citizens.[21]  According to the plea agreement, for a payment of $700, Officer Hernández Adorno subjected Andrades Telleira to a traffic stop without probable cause.  Sergeant Rosario Colón was expelled from the PRPD a month after Andrades Telleira's death.  Before the incident, Sergeant Rosario Colón was the subject of multiple civilian complaints.

- On December 5, 2007, Officer David González Pérez of the Arecibo Special Operations Division stopped and searched Ramón Santiago Quiñones' vehicle.  Officer González Pérez reportedly found illegal contraband and subsequently offered not to arrest Santiago Quiñones in exchange for a cash payment.  Officer González Pérez pleaded guilty to extortion on August 5, 2009 and was fined $200.[22]  Officer González Pérez also had an

extensive history of civilian complaints involving illegal searches and seizures, assault, domestic violence, and negligence.  Many of these complaints remained open for years.

- On August 9, 2007, according to a lawsuit, TOU Officer Wendel Delgado Sánchez and a relative were visiting a friend when the Carolina Drug Unit assaulted, arrested, and detained them without probable cause for 12 hours.  Although PRPD alleged in the media that Delgado Sánchez was part of a large drug trafficking organization, no charges were ever filed against Delgado Sánchez or his relative.  Delgado Sánchez was summarily expelled from PRPD.  In 2010, the parties reached a confidential settlement agreement.[23]

- On June 26, 2007, Luis Velázquez González filed a complaint alleging that Officer Osvaldo Acevedo Patiño of the San Juan Narcotics Division stole $606 during a search of his home.  Velázquez González alleged that Officer Acevedo Patiño took the money, did not give him a property receipt, and lied both about returning the money and giving him a receipt.  An investigation later revealed that Officer Acevedo Patiño took the money, but returned it at a later date at the behest of his superior, and that the officer instructed Velázquez González to sign a back-dated receipt.  The investigation also disclosed that Officer Acevedo Patiño was not on duty while he was allegedly conducting surveillance of Velázquez González's home.

  Officer Acevedo Patiño was convicted of making a false statement and violating government ethics laws for theft during an illegal search.  He was sentenced to a year and nine months of imprisonment and fined $1,000.  He was also expelled from PRPD.[24]

- On January 18, 2007, according to a lawsuit, officers from unmarked vehicles stopped Datiz Rodríguez and ordered him to get out of his car at gunpoint and told him they had a search warrant for his vehicle.  The officers then searched his vehicle and home, without a legitimate law enforcement purpose.  They found drugs and detained Datiz Rodríguez without bail on federal drug charges from January 24 to August 28, 2007, when the district court ordered his release.  Datiz Rodríguez alleged malicious prosecution, illegal arrest, seizure, and detention and in 2009, the parties entered into a confidential settlement agreement.[25]

- On December 17, 2006, Officer Diego Santos Pabón arrested Eliseo Pérez Sánchez and another youth for displaying "suspicious attitudes."  Officers subsequently hit the youth , sprayed them with chemical agents, and forced them to kiss.  Officer Emilio Meléndez Santiago and Sergeant José Feliciano Rodríguez did not intervene to protect the youth. Officer Santos Pabón, Officer Meléndez Santiago, and Sergeant Feliciano Rodríguez were separated from PRPD and convicted for unlawfully restraining and assaulting the youth.[26]

- On October 20, 2006, a group of Mayagüez Drug Division officers searched various adjacent homes belonging to the Pietri Vargas family.  Officers Camille Ortiz Sepúlveda, Jorge Vélez Rodríguez, Joel Soto Ramírez, and William Irizarry Cintrón entered the residence of Noel Pietri Figueroa and Marilyn Vargas Vargas without consent or a valid search warrant.  Once inside, they opened the bathroom door while Marilyn was taking a

shower, exposing her naked body to the officers at the scene.  The officers asked about the whereabouts of Carlitos Pietri Vargas, Noel and Marilyn's 19-year-old son.

At the same time, a group of approximately 15 officers searched an adjacent house owned by Marilyn's parents, Carlos Vargas Torres and Miriam Vargas Sepúlveda.  Among the officers searching the house were José Alago Feliciano, Robert Martínez Medina and Maritza Nazario Vega.  At this second residence, the officers conducted an hour-long search and detained five members of the family, including Carlitos Pietri Vargas, who arrived after the search began.  The officers also searched a third neighboring residence.  During the searches, the officers planted an illegal firearm and seized several legally registered weapons.  Four members of the Pietri Vargas family were arrested.  Three of them were charged with weapons violations.  The charges were later dismissed.

On October 13, 2009, at the conclusion of a federal civil trial, a jury found Officers Martínez Medina, Alago Feliciano, Nazario Vega, and Ortiz Sepúlveda liable for violating the Fourth Amendment rights of various members of the Pietri Vargas family when they conducted an unreasonable search and used excessive force against them.  Notably, the jury also found the officers' supervisors – Mayagüez Illegal Weapons Unit Sergeant José Figueroa Andújar, Colonel Francisco Carbo Marty, who oversaw PRPD's Drug Division, and then-Superintendent Toledo Dávila – liable for having failed to adequately train, supervise and discipline the involved officers.  The jury awarded $6.7 million to the Pietri Vargas family.[27]

- On September 13, 2006, according to a lawsuit, officers dressed in civilian clothing entered Luis Cruz Acevedo's home.  The officers pushed and threatened Cruz Acevedo, identifying themselves as officers of the Mayagüez Drug Division.  The officers asked Cruz Acevedo whether he had drugs or weapons and hit him.  The officers searched Luis' home for more than two hours.  After the incident, Cruz Acevedo went to the Mayagüez Police Station to file a complaint against the officers, but was not permitted to do so.[28]

Approximately two months later, on November 21, 2006, four officers dressed in civilian clothing came to Cruz Acevedo's home and advised him that they had a search warrant.  The officers falsely told Cruz Acevedo that they had a videotape of him taking part in a drug transaction.  The officers entered his home without consent and without a legitimate law enforcement purpose and planted ammunition and marijuana there.  After the search, the officers arrested Cruz Acevedo and transported him to a police station in Aguadilla.  Cruz Acevedo was subsequently released.  In 2009, Cruz Acevedo settled his case against some of the officers.[29]On October 28, 2009, a jury found Officers Víctor Cortés Cabán, Luis Ruperto Torres, and Dennis Muñiz Tirado liable for violating Cruz Acevedo's Fourth Amendment rights.  The jury awarded him $300,000 in damages.[30]

- On June 6, 2006, Officers Abimelec Sosa Díaz, Edwin Ruiz Vellón, and Elliot Fernández López entered a private residence and searched it without a warrant or consent and also stole private property, including jewelry.  On April 19, 2007, Officer Sosa Díaz was found guilty of receiving and transporting stolen items.  On May 23, 2007, Officer Ruiz Vellón was found guilty of performing an illegal search and aggravated illegal appropriation.  On May 23, 2007, Officer Fernández López was found guilty of

performing an illegal search and aggravated illegal appropriation.  All three officers were expelled from PRPD.[31]On December 24, 2005, plainclothes Officers Fundador González Santos and Luis Ortiz Soto stopped Billy Tavares Bruno.  One of the officers was wearing his badge on a chain and identified himself as a PRPD officer.  The officers then searched Tavares Bruno, and one removed $40 from his pocket.  None of these actions were supported by a legitimate law enforcement purpose.  The officers were found guilty of robbery, weapons violations, and possession of an illegal weapon.  Both officers were expelled on July 13, 2007.

---

[1]        Indictment*, U.S. v. Rosa Soto*, No. 08-CR-0099 (Mar. 18, 2008).

[2]        *People v. López Rivera,* GVI2008G0013 (Apr. 30, 2009).

[3]        Superseding Indictment, *U.S. v. Mojica Hernández*, No. 08-CR-0060 (D.P.R. filed on Mar. 6, 2008).  Amended Judgment entered on May 5, 2009.

[4]        Press Release, FBI, San Juan Division, "Arrest of Police of Puerto Rico Officer" (Feb. 28, 2008), *available at* www.sanjuan.fbi.gov; Indictment, *U.S. v. Rivera Astacio*, No. 08-CR-0071 (D.P.R. filed on Feb. 28, 2008).  Plea Agreement filed under seal on July 29, 2008.

[5]        Judgment, *People v. Fonseca Guilfú*, KIS2007G0012 (Nov. 15, 2007).

[6]        *People v. Santiago Velázquez and Márquez Arés*, HSCR200700589 to 596.  *See also*, *People v. Márquez Arés*, KLAN200800914 (June 30, 2009) (2009 Westlaw 2420009); *Liomar Márquez, et al. v. Toledo Dávila*, No. 07-CV-1340 (D.P.R. filed on Apr. 24, 2007).

[7]        Judgment, *People v. Castro Arocho*, ALA2008G0245 (Oct. 19, 2009).  Castro Arocho was acquitted of attempted murder.  Judgment, *People v. Castro Arocho*, AVI2008G0048 (Aug. 31, 2008).

[8]        *Kelmit Oquendo Rivera v. Toledo Dávila, et al.,* No. 09-CV-1154 (D.P.R. filed on Feb. 18, 2009).

[9]        *Oscar Lozano Benítez v. Rivera Ruiz, et al*., No. 08-CV-1766 (D.P.R. filed on Jul. 11, 2008).

[10]        *Salazar Cintrón, et al. v. Rivera Canaan*, 08-CV-1700 (D.P.R. filed on June 27, 2008).

[11]        *Juan Salcedo Collazo, et al., v. Freddie Lucena, et al*., No. 08-CV-1539 (D.P.R. filed on May 9, 2008).

[12]        *César Medero Ponce, et al., v. Toledo Dávila*, No. 08-CV-1446 (D.P.R. filed on Apr. 15, 2008).

[13]        *McLeod López v. Juan Rosa Algarín, et al.* No. 08-CV-1315 (D.P.R. filed on Mar. 14, 2008).

[14]        *Xavier Muñoz Mejías, et al., v. Toledo Dávila*, No. 07-CV-1845 (D.P.R. filed on Sept. 13, 2007).

[15]        Guilty Plea, *People v. Félix De Jesús*, GIC2006G0077 (Apr. 3, 2007).

[16]        *Cabán Torres v. Toledo Dávila, et al.* No. 07-CV-1864 (D.P.R. filed on Sept. 18, 2007).

[17]        *Esther López Morales, et al., v. Toledo Dávila*, No. 07-CV-1659 (D.P.R. filed on Jul. 23, 2007).

[18]        *García Quiñones, et al., v. González Ramos, et al*., No. 06-CV-1211 (D.P.R. filed on Mar. 2, 2006).

[19]    Press Release, FBI, San Juan Division, "Twelve Individuals Indicted for Conspiracy to Commit Carjacking Resulting in Death and Civil Rights Violations" (July 8, 2009), *available at* www.sanjuan.fbi.gov; Indictment, *U.S. v. Torres Sobrado*, No. 09-CR-0228 (D.P.R. filed on July 7, 2009).

[20]    Conviction, *U.S. v. Torres*, No. 08-CR-0213 (D.P.R. entered on Oct. 13, 2009) (sentenced to 24 months of imprisonment); Judgment, *U.S. v. Torres*, No. 06-CR-0270 (D.P.R. entered under seal on Aug. 4, 2008).

[21]    Plea Agreement, *U.S. v. Hernández Adorno*, No. 09-CR-0228 (entered on Jan. 8, 2010).  He was separated from the PRPD on November 17, 2009.

[23]    *Wendel Delgado Sánchez v. Toledo Dávila, et al.,* No. 07-CV-1709 (D.P.R. filed on Aug. 8, 2007).

[24]    *People v. Acevedo Patiño*, KFJ2008G0011and KLE2008G0198.

[25]    *Ovidio Datiz Rodríguez, et al., v. Toledo Dávila*, No. 08-CV-1000 (D.P.R. filed on Jan. 2, 2008).

[26]    *See People v. Santos Pabón*, KDC2008G0018.  Officer Meléndez Santos was separated on June 16, 2008, after being convicted of felonious restraint and assault.  *See People v. Meléndez Santiago*, KDC2008G0020; KIC2008M0044.  The supervisor at the Puerto Nuevo Precinct, Sergeant Feliciano Rodríguez, was separated on June 16, 2008.  *See People v. Feliciano Rodríguez*, KDC2008G0017 (civil rights violations – restriction of liberty – guilty); KDC2008G0018 (aggravated restriction of liberty – guilty); KIC2008M0043 (crime against corporal integrity – assault – guilty).

[27]    *Vargas Torres v. Toledo Dávila, et al*, No. 07-CV-2002 (D.P.R. filed on Oct. 22, 2007).  Judgment was entered on October 13, 2009.  Verdict was entered on October 13, 2009.

[28]    Complaint, *Cruz Acevedo v. Toledo Dávila, et al.,* No. 07-CV-2104 (D.P.R. filed on Sept. 12, 2007).

[29]    Judgment, *Cruz Acevedo v. Pedro Toledo, et al.,* No. 07-CV-2104 (D.P.R. entered on Dec. 2, 2009).  *See also U.S. v. Muñiz Tirado, et al.,* No. 07-CR-0346, in which multiple Mayagüez officers and supervisors were convicted of civil rights violations.

[30]    Verdict, *Cruz Acevedo v. Pedro Toledo, et al.,* No. 07-CV-1844 (D.P.R. entered on Oct. 28, 2009).

[31]    Judgment, *People v. Sosa Díaz,* FDC2006G0022 (Apr. 19, 2007); Judgment, *People v. Ruiz Vellón*, FDC2006G0023 (May 23, 2007); Judgment, *People v. Ruiz Vellón*, FBD2006G0219 (May 23, 2007); Judgment, *People v. Fernández López*, FDC2006G0021 (June 27, 2007); Judgment, *People v. Fernández López*, FBD2006G0217 (June 27, 2007).



**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

JUL  1 2008

Pedro Toledo Dávila
Superintendent
Puerto Rico Police Department
601 F.D. Roosevelt Ave.
San Juan, PR  00936

        RE:  Investigation of the Puerto Rico Police Department

Dear Superintendent Toledo Dávila,

        As you discussed with Special Litigation Section Chief, Shanetta Y. Cutlar, this is to
inform you that the United States Department of Justice is commencing an investigation
concerning allegations of use of excessive force, unconstitutional searches and seizures, and
discriminatory policing by members of the Puerto Rico Police Department ("PRPD"), pursuant to
the pattern or practice provision of the Violent Crime Control and Law Enforcement Act of 1994,
42 U.S.C. § 14141 and the anti-discrimination provisions of the Omnibus Crime Control and
Safe Streets Act of 1968, 42 U.S.C. § 3789d.

        In conducting the investigation, we will seek to determine whether there are systemic
violations of the Constitution or laws of the United States in the use of force and police practices
by members of the PRPD.  We have not reached any conclusions about the subject matter of the
investigation.  We believe that you and other Commonwealth officials want to operate the PRPD
consistent with the requirements of the Constitution and federal law.  During the course of our
investigation, we will consider all relevant information, particularly the efforts Puerto Rico has
undertaken to ensure compliance with federal law.  We also will offer to provide
recommendations on ways to improve use of force and other police practices, when appropriate.
Provided that the PRPD cooperates fully with our investigation, if we conclude that there are not
systemic violations of constitutional or other federal rights, we will notify you that we are closing
the investigation.  In addition, we will identify any financial, technical, or other assistance the
United States may be able to provide to assist PRPD in correcting the identified deficiencies.

        Our enforcement of the Violent Crime Control and Law Enforcement Act of 1994 and the
Omnibus Crime Control and Safe Streets Act of 1968 has involved a variety of state and local
law enforcement agencies, both large and small, in jurisdictions such as New York, California,

A-10

- 2 -

Ohio, New Jersey, Georgia, and the District of Columbia.  In over ten years of enforcing these statutes, the good faith efforts of state and local jurisdictions working with us have enabled us routinely to resolve our claims without resort to contested litigation.  We encourage the PRPD to cooperate with our investigation and can assure you that we will seek to minimize any potential disruption our efforts may have on the operations of the PRPD.  Our Special Litigation Section will be handling the investigation and will continue to be in contact with your office as the investigation progresses.  Ms. Cutlar may be reached at (202) 514-6255.

Sincerely,

Grace Chung Becker
Acting Assistant Attorney General

cc:    The Honorable Aníbal Acevedo Vilá
       Governor of the Commonwealth of Puerto Rico

       The Honorable Roberto Sánchez Ramos
       Secretary of Justice
       Puerto Rico Department of Justice

       The Honorable Rosa Emilia Rodríguez Velez
       United States Attorney
       District of Puerto Rico



**U.S. Department of Justice**

Civil Rights Division

SYC:DHW:LES:ZIL:SSL:NO
DJ 207-65-3

*Special Litigation Section - PHB*
*950 Pennsylvania Avenue, NW*
*Washington, DC 20530*

December 19, 2008

**<u>VIA ELECTRONIC AND U.S. MAIL</u>**

Pedro Toledo Dávila, Esq.
Superintendent
Puerto Rico Police Department
601 F.D. Roosevelt Avenue
San Juan, PR  00936

    RE:  <u>Investigation of the Puerto Rico Police Department</u>

Dear Superintendent Toledo:

    We write to provide you with a brief summary of the concerns we raised regarding the Puerto Rico Police Department ("PRPD") during our exit conference on December 5, 2008.  As you know, the Civil Rights Division is conducting a pattern or practice investigation into alleged police misconduct by members of the PRPD, pursuant to the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141, and the anti-discrimination provisions of the Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C. § 3789d.

    As an initial matter, we wish to express our appreciation to you and your staff for your cooperation and hospitality during our tour.  In particular, we would like to thank all of the PRPD officers and staff who took time to meet with us, including Associate Superintendent Ramón Ortega and other auxiliary superintendents, area commanders, unit directors, educators, supervisors, rank-and-file officers, and support staff.  We especially would like to thank Legal Director Rosa Seguí for her invaluable assistance in coordinating our tour and facilitating our interviews with PRPD officers and staff.  As we indicated during our exit conference, it was apparent from our interviews that the PRPD is staffed with dedicated men and women who are genuinely concerned with providing professional and effective policing services to the citizens and residents of Puerto Rico.

- 2 -

Separately, we recognize that under your leadership, the PRPD has initiated various reform efforts to address allegations of misconduct and improve systems of accountability within the PRPD.  For instance, we understand that you have issued policies and procedures concerning periodic training for existing officers and have reorganized the operational structure of the PRPD to provide for more coordinated support services for officers and their families, including psychological treatment and counseling. We also understand that you have launched initiatives to address significant backlogs of administrative investigations and to upgrade the PRPD's communication and information systems to better manage PRPD personnel and resources.

Consistent with our pledge to conduct our investigation as transparently as possible based on the PRPD's cooperation, we met with you, Associate Superintendent Ortega and PRPD Legal Affairs Director Seguí on December 5 at the conclusion of our five-day tour to share our consultants' initial impressions and observations.  Our intention was to assist the PRPD in identifying policies, practices, and processes at the outset that may warrant further focused review or corrective action by the PRPD as our investigation progresses.

As we indicated during our meeting, our investigation remains ongoing and we have not formulated any formal opinions or conclusions regarding the PRPD or the conduct of its officers and agents.  We also plan to conduct additional interviews and tours, accompanied by our police practices consultants, and plan to review additional documents, including documents that have yet to be provided, such as incident and investigation reports.

At this early juncture, we identified several areas of concern that warrant further attention based on our consultants' preliminary observations.  These areas, which we discussed at our December 5 exit conference, are:

- **Inconsistent guidance on the application of force:**  We are concerned that there may be inconsistent guidance on the application of force by PRPD officers between geographic areas and operational components within the PRPD.

- **Insufficient reporting on use of force:**  We are concerned that PRPD officers may not be required to sufficiently report all uses of force to provide for adequate supervisory review.

- 3 -

- **Inadequate citizen complaint and internal investigation processes:**  We are concerned that systemic deficiencies may impede the effective resolution of citizen complaints and internal investigations.  For instance, we are concerned that the PRPD:  (1) may not accept third party complaints at intake; (2) does not complete timely internal investigations; and (3) issues findings in internal investigations that may not be consistent with generally accepted standards and practices, such as the use of "archive" to close investigations where allegations are found to be unsubstantiated or where an officer is exonerated of misconduct.

- **Lack of an early warning system:**  The PRPD does not appear to have a uniform and integrated system that allows supervisors to proactively detect potential patterns of at-risk conduct by officers.

- **Inadequate supervision of field personnel:**  We are concerned that field personnel, including officers in specialized units, may be inadequately supervised.  We understand that, as of October 2008, there were approximately 2,020 vacancies in sergeant and lieutenant positions reported by the PRPD.  We recognize, however, that other factors may contribute to adequate supervision, including deployment patterns and compliance with deployment orders.

- **Fragmented community engagement:**  We are concerned that the PRPD may not be fully engaging all of the communities it serves on policing priorities and collaborative approaches to law enforcement, which may contribute to allegations of disparate treatment.

- **Limited training:**  We understand that the PRPD does not have a formal field training program for new officers.  We are also concerned that the PRPD may be offering limited re-training to existing officers, which could impair the PRPD's ability to provide up-to-date guidance on issues related to use of force, searches and seizures, and equal protection.

- **Ineffective disciplinary system:**  We are concerned that the PRPD may have a cumbersome and fragmented disciplinary system that may impair its ability to hold its officers accountable and prevent potential misconduct proactively.  For instance, supervisors told us during our interviews that they do not feel

- 4 -

empowered to take action early in the disciplinary process to correct a subordinate's behavior and prevent serious misconduct.  A lack of effective communication between PRPD supervisors and components may also frustrate prompt corrective action when officers are transferred between PRPD units and components.

We hope that the foregoing summary of our consultants' preliminary impressions is useful to future reform efforts.  We look forward to your continued cooperation in furtherance of our mutual goals of ensuring lawful and effective policing in Puerto Rico.  If we can be of any assistance in the future, please do not hesitate to contact us.  You may reach me at (202) 514-6255, Luis Saucedo at (202) 353-0299, or Zazy López at (202) 305-8702.

Sincerely,

Shanetta Y. Cutlar
Chief
Special Litigation Section

cc:  Rosa M. Seguí Cordero, Esq.
     Director
     PRPD Legal Affairs Office

A-15



**U.S. Department of Justice**

Civil Rights Division

SYC:DHW:LES:ZIL:SSL:NO:db
DJ 207-65-3

*Special Litigation Section - PHB*
*950 Pennsylvania Avenue, NW*
*Washington, DC 20530*

March 5, 2009

**VIA ELECTRONIC AND U.S. MAIL**

José Figueroa Sancha
Superintendent
Puerto Rico Police Department
601 F.D. Roosevelt Avenue
San Juan, PR  00936

    RE:  <u>Investigation of the Puerto Rico Police Department</u>

Dear Superintendent Figueroa:

    Thank you for meeting with us during our tour of the Puerto Rico Police Department ("PRPD") on February 2-6, 2009.  As you know, we conducted our tour as part of the Civil Rights Division's ongoing pattern or practice investigation of the PRPD, pursuant to the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141, and the anti-discrimination provisions of the Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C. § 3789d.  This letter summarizes briefly the concerns we raised during our February 6 exit conference and addresses two related issues regarding document preservation and protections against retaliatory conduct.

    At the outset, we would like to reiterate our appreciation for the cooperation and cordial reception we received from you and your staff during our tour.  We understand that the PRPD is charged with significant responsibilities and that our visits require your staff to share their time and resources.  In this regard, we would like to thank all of the dedicated men and women of the PRPD who facilitated our tour and participated in our interviews, many of whom expressed a genuine commitment to the critical mission and the overall success of the PRPD.  We would especially like to thank Legal Director Mirla Rodríguez for her leadership and Staff Attorney Efrén González for his hard work coordinating our tour and facilitating the PRPD's production of documents.

- 2 -

As we mentioned during our exit conference, we have identified several areas of concern based on our consultants' preliminary observations and impressions.  While our investigation remains ongoing, given the serious nature of our concerns, we believe it is appropriate to memorialize these issues to assist the PRPD in identifying policies and practices that may warrant further focused review or corrective action as our investigation progresses.  In this regard, we recognize that under your short tenure at the PRPD, you have demonstrated a firm commitment to pursuing necessary reforms by taking steps to address internal processes of mutual concern that warrant immediate attention.  We appreciate these efforts and look forward to learning more about the PRPD's initiatives.

As you will see, many of the areas we outline below build upon our earlier letter, dated December 19, 2008, following our first tour and exit conference with former Superintendent Pedro Toledo.  Significantly, our preliminary observations indicate strongly that the PRPD appears to lack basic contemporary practices that have been adopted by many law enforcement agencies to safeguard the fundamental constitutional rights of the citizens they serve.  These areas of concern are:

- **Insufficient guidance on the application of force:**  We are concerned that the PRPD lacks basic policies and other written guidance on the use of force by officers. Significantly, the PRPD does not appear to have an integrated policy that is based on contemporary legal standards and generally-accepted law enforcement practices that incorporates all force options available to, and used by, officers.  For instance, the PRPD has developed separate policies for the use of batons, Tasers,[1] and firearms, but has not developed targeted policies on other available force implements, such as chemical irritants and less lethal weapons (e.g., foam projectiles).

- **Lack of formal requirements for reporting and reviewing use of force:**  The PRPD does not appear to have a formal policy that requires uniform and thorough reporting of officers' use of force.  The lack of such a requirement may impair the PRPD's ability to adequately review and investigate officers' use of force and impedes the PRPD's ability to compile

---

[1]     TASER is the brand name of an electro-muscular disruption device that is currently employed by the PRPD.

A-17

- 3 -

statistical information on use of force at the agency-level (to assess policy, training, and supervisory needs) or the officer-level (to provide for early detection of potential patterns of at-risk conduct). The PRPD also does not have a dedicated policy on conducting internal investigations of police-involved shootings or uniform administrative reviews of officers' use of deadly force.

- **Ineffective disciplinary system:**  The PRPD's discipline process does not appear to effectively promote police accountability.  In this regard, supervisors reported that they are not empowered to take corrective action to address minor infractions by subordinates before such officers engage in more serious misconduct. Supervisors consistently identified inordinate delays in completing administrative investigations, many of which have remained unresolved for years, as a significant barrier to the appropriate discipline of officers and as a constant source of low morale among officers who are denied promotions or transfers due to unresolved administrative investigations.  Indeed, the failure to adequately resolve citizen complaints against officers may perpetuate distrust of the agency and may discourage citizens from lodging valid complaints when officers engage in misconduct.

- **Lack of basic processes and resources for internal investigations:**  We are concerned that the PRPD components charged with conducting internal investigations, particularly the Internal Affairs Superintendency, appear to lack basic controls and resources to conduct fair and thorough investigations. The failure to properly equip, train, and develop these units is of particular concern given the fundamental role they play in the investigation of serious allegations of misconduct, including allegations of excessive force, false arrest, improper search and seizure, discriminatory policing, and corruption.  For instance, we understand that Internal Affairs units: lack proper equipment, such as video cameras, secure photocopiers, and vehicles; have little authority to conduct thorough investigations, including investigations of higher-ranking officers; lack basic internal controls, including systems to preserve confidential files and track the disposition of cases; and lack processes to follow-up or otherwise provide

- 4 -

appropriate feedback to field investigators on the status or outcome of investigations.

- **Inadequate guidance on conducting searches and seizures:** We are concerned that PRPD officers lack proper guidance and training on conducting lawful searches and seizures. In some cases, officers reported that violations of citizens' civil rights are necessary to meet agency expectations in the seizure of illegal drugs and weapons.

- **Inadequate supervision:** We are concerned that some units may consistently lack adequate supervision. While this may be due to insufficient numbers of adequately trained supervisors, the deployment pattern of supervisors may also be a contributing factor. A manpower allocation study may assist the PRPD in determining staffing needs and appropriate deployment patterns to ensure that officers are properly supervised within generally-accepted supervisor-to-officer ratios.

- **Fragmented community engagement:** Although our consultants observed instances of proactive community engagement, such efforts appear to be inconsistent and fragmented. The lack of consistent community engagement may lead to perceptions of fear and disparate treatment, particularly in communities that may be exposed exclusively to highly-tactical, military-like operations with little, or no, engagement in collaborative or proactive policing efforts.

During our exit conference, our consultants elaborated on each of the areas discussed above and offered preliminary recommendations based on their experience as reform leaders in law enforcement agencies across the United States. Our consultants also identified various professional and research organizations that may assist the PRPD in developing critical policies and processes, such as the International Association of Chiefs of Police ("IACP") (www.theiacp.org), the Police Executive Research Forum (www.policeforum.org), the Major City Chiefs Association (www.majorcitieschiefs.org), and the National Sheriffs' Association (www.sheriffs.org). Our consultant, Charles Gruber, also provided you with a copy of "Protecting Civil Rights: A Leadership Guide for State, Local, and Tribal Law Enforcement," published by the IACP.

- 5 -

Separately, we take this opportunity to remind you that the PRPD should take all necessary steps to preserve relevant documents and information and to protect PRPD officers and staff from any unlawful or otherwise improper retaliatory action regarding our investigation.  It also is imperative that the Commonwealth take these steps, including protecting all PRPD officers and staff who participate in our investigation from retaliation, as part of the Commonwealth's pledge of cooperation and consistent with applicable laws and regulations.  While we trust that the Commonwealth will take appropriate steps in this regard, we must emphasize that the Department of Justice takes allegations of destruction or spoliation of evidence and improper retaliation of cooperating individuals seriously, and that we will consider all available remedies under federal law should such conduct occur.  We appreciate your assistance in this regard and look forward to your continued cooperation.

Thank you again for taking the time to meet with us and for the PRPD's hospitality during out tour.  Should you have any questions regarding the foregoing, do not hesitate to contact us. You may reach me at (202) 514-6255, Deputy Chief Daniel Weiss at (202) 616-6594, Attorney Luis Saucedo at (202) 353-0299, or Attorney Zazy López at (202) 305-8702.

Sincerely,

Shanetta Y. Cutlar
Chief
Special Litigation Section

cc:  Mirla Rodríguez Marín, Esq.
     Efrén González González, Esq.
     PRPD Legal Affairs Office

A-20



**U.S. Department of Justice**

Civil Rights Division

SYC:DHW:LES:ZIL:SSL:NO:mb          *Special Litigation Section - PHB*
DJ 207-65-3                        *950 Pennsylvania Avenue, NW*
                                   *Washington, DC 20530*

April 10, 2009

**VIA ELECTRONIC AND U.S. MAIL**

José Figueroa Sancha
Superintendent
Puerto Rico Police Department
601 F.D. Roosevelt Avenue
San Juan, PR  00936

RE:   Investigation of the Puerto Rico Police Department

Dear Superintendent Figueroa:

We write to memorialize the issues and concerns that we discussed at our March 20, 2009 exit conference, following our third investigative tour of the Puerto Rico Police Department ("PRPD"). As you know, the Civil Rights Division is conducting a pattern or practice investigation of the PRPD, pursuant to the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141, and the anti-discrimination provisions of the Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C. § 3789d. During our March 17-27 tour, we met with PRPD officers from the Ponce, Mayaguez, and Aguadilla regions; conducted follow-up interviews at PRPD headquarters; observed PRPD training at the University College of Criminal Justice; and reproduced documents as part of an outstanding request for documents. We were accompanied by our police practices consultants Rachel Burgess, Charles Gruber, and Arturo Venegas.

As an initial matter, we would like to express our continued appreciation to the PRPD officers and staff who participated in our tour for their cooperation, professionalism, and hospitality. We would especially like to thank the commanders in Ponce, Mayaguez, and Aguadilla for facilitating our visits to each of their respective regions; the officers and staff of the Legal Affairs Office and the Public Integrity Superintendency for their assistance during our inspection and reproduction of documents; and the staff at the University College of Criminal Justice for coordinating our visits to the various classes and training sessions that we observed.

- 2 -

We would also like to thank you for providing us with an update on the organizational changes that have taken place at the PRPD.  In this regard, we understand that the PRPD has undergone significant restructuring through the development of police regions that are intended to provide for greater localized control over operational planning.  Similarly, we understand that several central-level superintendencies and offices have been reorganized or eliminated to realign functions and responsibilities within the PRPD.  For instance, we understand that the Superintendency for Criminal Investigations was eliminated and its responsibilities transferred to directors in each of the PRPD's thirteen regions.  We also understand that the Superintendencies for Public Integrity and Internal Affairs were consolidated into a newly-created Superintendency for Professional Responsibility.

You also reported that the PRPD has taken steps to address concerns that we raised in prior exit conferences, including: (1) establishing a use of force committee composed of various disciplines to develop related policies and procedures; (2) meeting with Dominican leaders and identifying a liaison officer to work with the Dominican community; (3) re-training officers in the Tactical Operations units; (4) drafting new policies and procedures for internal affairs and administrative investigations, including creating a conciliation or mediation committee to address less serious policy infractions by officers; and (5) discussing civil rights issues at all levels of the agency, including bringing speakers to weekly staff meetings to address related issues.  Finally, we would like to thank you for inviting us to the National Congress of Community Leaders event on March 21 in Aibonito.  We were able to attend near the conclusion of the event and were appreciative to see the many residents and families who attended in support of the PRPD's efforts.

As we noted during our exit conference, our investigation remains ongoing and we have not reached any conclusions on the existence of a pattern or practice of unconstitutional or unlawful conduct by PRPD officers.  However, consistent with our prior tours and our letters of December 19, 2008 and March 5, 2009, we continue to identify areas of concern based on our consultants' preliminary observations and impressions.  At this juncture, our preliminary observations indicate strongly that systemic deficiencies may be impairing the PRPD's ability to ensure the full enjoyment of federal constitutional rights and protections afforded to individuals in Puerto Rico.  These deficiencies appear to be departures of basic contemporary practices that have been implemented by law enforcement agencies

- 3 -

across the country to secure the fundamental constitutional rights of the citizens they serve, and consist of the following areas of concern:

- **Insufficient guidance on the application of force:**  We continue to be concerned that the PRPD lacks policies and other written guidance on the application of force used by officers.  For instance, we understand that the PRPD lacks policies on the use of chemical irritants and less-lethal projectiles, although such weapons are available to officers in the field.  Similarly, clear written instructions for decontaminating individuals who have been subjected to chemical irritants also do not appear to exist.  Such decontamination procedures, as well as procedures related to all types of force authorized by the PRPD, should be clearly addressed through written policy that is provided to all officers.

- **Lack of formal requirements for reporting and reviewing use of force:**  We remain concerned that the PRPD lacks formal reporting and review requirements regarding officers' use of force and that the lack of such requirements has allowed ad hoc practices to develop within the PRPD.  For instance, we found that officers in the Superintendency for Drugs, Narcotics, Vice, and Illegal Firearms ("Drug Superintendency") have developed their own use-of-force forms and review boards that do not appear to be governed by agency-wide policy.  Given the apparent unofficial nature of the process, it is unclear whether any reports or other information regarding the outcome of force reviews are distributed to other agency components, such as internal affairs or public integrity, or whether any use-of-force data is tracked systemically to identify patterns or trends.  We also obtained information that officers are instructed informally in the field not to report their use of force in reports that are required by agency policy, such as PRPD Incident Reports, unless an individual is injured seriously.  As we discussed during our exit conference, the lack of formal written policies – and internal mechanisms to ensure adherence to such policies – allows for informal practices to inure among officers and within units that may be inconsistent with agency expectations.

– 4 –

- **Ineffective disciplinary system:**  We continue to be
  concerned that the PRPD's discipline process does not
  appear to promote police accountability effectively.
  For instance, the PRPD's current system appears to be
  based almost entirely on referrals to the Public
  Integrity Superintendency and the Legal Affairs Office,
  which has resulted in inordinate delays – more than
  five years, in some cases – in imposing discipline
  against officers who violate agency policy.  We
  understand that procedures are currently being
  developed that would allow for minor policy infractions
  to be handled at the regional-level through mediation
  or conciliatory committees.  However, we understand
  that substantial training will still be necessary to
  ensure that fair and consistent discipline is imposed
  by supervisors who have not had such responsibilities
  in the past.  Separately, we obtained information that
  the PRPD's procedures for identifying officers who
  demonstrate "repetitive conduct" in administrative
  complaints (see Special Order 90-5) are not being
  implemented.  For instance, we learned that the
  intervention that the agency offers to all such
  officers – a week-long course entitled, "Human
  Relations" – has not been provided since August 2007,
  despite evidence of continuing referrals by
  supervisors.  We also learned that the PRPD's
  "repetitive conduct" policy was recently changed to
  require identification of only those officers who
  engage in "aggression."  As we noted at the exit
  conference, limiting the triggering event to acts of
  "aggression" may result in patterns of other types of
  significant misconduct – such as unlawful searches and
  seizures – to be missed that may, nonetheless, warrant
  early agency intervention.

- **Lack of basic processes and resources for internal
  investigations:**  We remain concerned that the PRPD
  components charged with conducting internal
  investigations appear to lack basic controls and
  resources to conduct fair, thorough, and timely
  investigations.  We also understand that the PRPD lacks
  written standard operating procedures to ensure
  uniformity in the daily operation of internal
  investigation units.  As a result, there appears to be
  significant inconsistency in the forms, methods, and
  processes employed by members of the same units.  There
  also appear to be inconsistencies in the warnings that
  are provided to officers who are interviewed as targets

- 5 -

of internal investigations.  For instance, we learned
that some officers are warned that they must disclose
all relevant information that is known to them, but
also instructed that they may remain silent.  In this
regard, it appears that administrative investigators
have adopted protections against self-incrimination in
the criminal context without fully understanding the
legal parameters of compelled statements in the
administrative context.  (See, Garrity v. New Jersey,
385 U.S. 493 (1967)).  Separately, we discovered the
existence of an internal affairs unit within the Drug
Superintendency that does not appear in the PRPD's
organizational chart or the current PRPD general order
governing the structure of that superintendency.
Several individuals who handle administrative
investigations at PRPD headquarters also told us that
they were unaware of the existence of the Drug
Superintendency's internal affairs unit.  Unlike
investigators in the Superintendency for Internal
Affairs, we understand that internal affairs
investigators in the Drug Superintendency have
increased access to necessary investigative equipment,
such as video cameras and unmarked vehicles, and were
allowed to be promoted in the last year.  As we
mentioned during our tour, we are concerned that the
existence of multiple internal affairs units within the
same agency may lead to conflict, confusion, and
duplicity in the agency's efforts to adequately address
allegations of officer misconduct.

- **Limited training:**  We recognize that the PRPD has made
  significant efforts to re-train officers in its
  Tactical Operations units in anticipation of labor
  demonstrations or civil unrest that may ensue in the
  coming months.  However, we remain concerned that the
  PRPD's overall training may be too limited to ensure
  compliance with agency policies and constitutional
  requirements.  For instance, the PRPD does not offer a
  field training program to new officers who are assigned
  to patrol duties.  Officers also appear to lack
  training on essential problem-solving techniques that
  may be necessary in implementing community policing
  models and approaches.  We also understand that field
  supervisors will require training on supervision and
  discipline as they assume greater responsibilities in
  the disciplinary process.  Separately, criminal and
  administrative investigators expressed a significant
  need for additional training on investigative methods

A-25

- 6 -

and techniques, particularly in cases involving allegations of officer misconduct.

Thank you again for your continued cooperation.  Should you have any questions regarding the foregoing, do not hesitate to contact us.   You may reach me at (202) 514-6255, Deputy Chief Daniel Weiss at (202) 616-6594, Attorney Luis Saucedo at (202) 353-0299, or Attorney Zazy López at (202) 305-8702.

Sincerely,

Shanetta Y. Cutlar
Chief
Special Litigation Section

cc:  Mirla Rodríguez Marín, Esq.
     Efrén González González, Esq.
     PRPD Legal Affairs Office

     Col. Jose Luis Rivera
     Special Assistant to the Superintendent

A-26