Exhibit A-1

**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF PUERTO RICO**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>COMMONWEALTH OF PUERTO RICO and the<br>PUERTO RICO POLICE DEPARTMENT,<br><br>Defendants. | No. 3:12-cv-2039 |

**AGREEMENT FOR THE SUSTAINABLE REFORM OF THE
PUERTO RICO POLICE DEPARTMENT**

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................. 1

II.    DEFINITIONS ..................................................................................................... 4

III.   PROFESSIONALIZATION ............................................................................... 14
       A.   Staffing and Community Policing ............................................................. 15
       B.   Promotions ................................................................................................. 15
       C.   Commander Corps ...................................................................................... 16

IV.    USE OF FORCE:  INTERNAL CONTROLS AND ACCOUNTABILITY .............. 17
       A.   General Use of Force .................................................................................. 17
       B.   Specialized Tactical Units.......................................................................... 18
       C.   Crowd Control and Incident Management.................................................. 19
       D.   Force Reporting .......................................................................................... 19
       E.   Force Review, Investigations, and Analysis .............................................. 20
             1.   Supervisory and FRB Reviews ......................................................... 21
             2.   FIU Investigations and Force Reviews by SFRB ............................. 22
       F.   Use of Force Training ................................................................................. 24
       G.   Responding to Behavioral/Mental Health Crisis ...................................... 27

V.     SEARCHES AND SEIZURES:  INTERNAL CONTROLS AND
       ACCOUNTABILITY ......................................................................................... 28
       A.   Stops, Searches, and Seizures Generally ................................................... 28
       B.   Investigatory Stops and Searches............................................................... 28
       C.   Arrests ........................................................................................................ 30
       D.   Searches ...................................................................................................... 33
       E.   Training on Stops, Searches, and Seizures ................................................ 34

VI.    EQUAL PROTECTION AND NON-DISCRIMINATION ................................. 36
       A.   General Provisions ..................................................................................... 36
       B.   Discriminatory Policing.............................................................................. 37
       C.   Sexual Assault and Domestic Violence ..................................................... 39

VII.   RECRUITMENT, SELECTION, AND HIRING................................................ 41
       A.   Recruitment Plan ........................................................................................ 41
       B.   Hiring Reforms ........................................................................................... 42

VIII.  POLICIES AND PROCEDURES ..................................................................... 43

IX.    TRAINING ........................................................................................................ 45
       A.   Pre-Service Education and Training ........................................................... 45
       B.   Field Training Program............................................................................... 47
       C.   In-Service Training ..................................................................................... 48
       D.   Training Records ........................................................................................ 48

X.     SUPERVISION AND MANAGEMENT ........................................................... 49
       A.   Duties of Supervisors ................................................................................. 49
       B.   Supervisor Training .................................................................................... 50

        C.   Performance Evaluation.................................................................... 52
        D.   Early Identification System ............................................................. 52
        E.   Internal Audits and Interagency Feedback ...................................... 54

XI.    CIVILIAN COMPLAINTS, INTERNAL INVESTIGATIONS, AND
        DISCIPLINE ...................................................................................... 56

        A.   Civilian Complaints ........................................................................ 57
        B.   Internal Investigations ..................................................................... 57
        C.   Complaint Intake, Classification, Assignment, and Tracking ......... 58
        D.   Investigation of Complaints ............................................................ 60
        E.   Staffing, Selection, and Training Requirements .............................. 65
        F.   Preventing Retaliation ..................................................................... 65
        G.   Discipline ........................................................................................ 66
        H.   Officer Assistance and Support ....................................................... 66

XII.   COMMUNITY ENGAGEMENT AND PUBLIC INFORMATION ......... 67

        A.   Community Oriented Policing .......................................................... 67
        B.   Community Interaction Councils ...................................................... 68
        C.   Public Information ........................................................................... 69

XIII.  INFORMATION SYSTEMS AND TECHNOLOGY ................................. 70

XIV.   IMPLEMENTATION, COMPLIANCE ASSESSMENT, AND
        ENFORCEMENT ................................................................................. 71

        A.   Technical Compliance Advisor......................................................... 71
        B.   Review and Implementation of Policies, Procedures, and Programs ................. 72
        C.   Development, Implementation, and Assessment of Action Plans ....................... 73
        D.   Compliance Reviews ........................................................................ 77
        E.   Outcome Assessments ...................................................................... 78
        F.   Compliance Assessment Review and Methodology........................... 81
        G.   Comprehensive Reassessment .......................................................... 83
        H.   TCA Reports .................................................................................... 83
        I.   Communication Between the TCA and Parties ................................. 86
        J.   TCA Recommendations and Technical Assistance ............................ 86
        K.   Public Statements, Testimony, Records, and Conflicts of Interest .... 86
        L.   PRPD's Reports and Self-Assessments ............................................ 88
        M.   Access and Confidentiality .............................................................. 88
        N.   Selection and Compensation of the TCA........................................... 90
        O.   General Provisions ........................................................................... 93
        P.   Court Jurisdiction, Modification of the Agreement, and Enforcement ............... 95
        Q.   Termination of the Agreement.......................................................... 98

INDEX ................................................................................................................... 99

**AGREEMENT FOR THE SUSTAINABLE REFORM OF THE
PUERTO RICO POLICE DEPARTMENT**

## I.    <u>INTRODUCTION</u>

1.      The Commonwealth of Puerto Rico and the United States are committed to vigorous and constitutional law enforcement.  The Parties jointly enter into this Agreement to ensure that the Puerto Rico Police Department ("PRPD") delivers policing services in a manner that upholds civil rights guaranteed by the Constitution and laws of the United States and the Commonwealth of Puerto Rico.  This Agreement is also intended to promote public safety by providing PRPD officers with the tools, guidance, and resources that they need to fight crime effectively.  The Parties recognize that public safety, constitutional policing, and the community's trust in its police force are interdependent.  The full and sustained implementation of this Agreement will protect public safety, guarantee individual civil rights, and increase public confidence in the police.

2.      This Agreement is the result of extensive cooperation and consultation between PRPD and the Department of Justice ("DOJ") and builds on reform initiatives begun by PRPD. The Parties recognize that the modernization and professionalization of PRPD are important priorities and have agreed on comprehensive reforms to accomplish these objectives.  This Agreement will serve as a platform for other collaborative efforts between the Parties to enhance PRPD's law enforcement capabilities, increase public safety, and provide PRPD officers with the skills, training, and resources they need to fight crime successfully and to adhere to the highest constitutional policing standards.

3.      As set forth in further detail below, the Parties have worked together and identified measures to enhance each of the following areas:  (1) Professionalization; (2) Use of Force; (3) Searches and Seizures; (4) Equal Protection and Non-Discrimination; (5) Recruitment,

1

Selection, and Hiring; (6) Policies and Procedures; (7) Training; (8) Supervision and

Management; (9) Civilian Complaints, Internal Investigations, and Discipline; (10) Community

Engagement and Public Information; and (11) Information Systems and Technology.  To carry

out these reforms, PRPD will develop Actions Plans in each of these substantive areas.  These

Action Plans will set forth in detail the steps agreed upon to execute and implement the reforms

and achieve the desired outcomes in each area.  These reforms will require the implementation of

policies, practices, training, documentation, internal review, continuous improvement, and

oversight.

4.      To ensure public accountability, this Agreement requires the collection and public

dissemination of information regarding the reform efforts and their results.  It is critical to

strengthen the community's trust in PRPD that there be timely and reliable public information

about PRPD's progress and accomplishments under these reforms.

5.      In 2008, DOJ initiated an investigation of PRPD of an alleged pattern or practice

of use of excessive force, unconstitutional searches and seizures, and discriminatory policing.

DOJ conducted the investigation pursuant to the Violent Crime Control and Law Enforcement

Act of 1994, 42 U.S.C. § 14141, and the anti-discrimination provisions of the Omnibus Crime

Control and Safe Streets Act, 42 U.S.C. § 3789d.  PRPD welcomed the investigation and pledged

cooperation, and has worked in partnership with DOJ to establish the reforms in this Agreement.

6.      As part of its investigation, DOJ and its police practices consultants conducted a

detailed fact-finding review with the assistance and full cooperation of PRPD, including tours of

police areas; interviews with PRPD officers, supervisors, command staff, Commonwealth

officials, members of the public, and other stakeholders; review of many thousands of

documents, including policies and procedures, incident reports, internal investigation files,

civilian complaint records, external audit reports, and legislative materials; and ride-alongs with officers and supervisors.  PRPD's Superintendent and high-level officials met personally with DOJ representatives and consultants on multiple occasions and pledged their full support and cooperation.

7.      In response to the concerns raised by DOJ and in recognition of the need to modernize and professionalize its operations, PRPD undertook its own internal reform efforts, with the assistance of well-regarded police consultants.  These efforts culminated in the issuance in March 2011 of PRPD's own internal reform plan:  the Blueprint for Excellence ("the Blueprint").  The reforms in the Blueprint include the development and implementation of new policies regarding use of force and a wide range of other substantive areas; the training of all appropriate officers in the new use of force policies through a new training program based on the "train-the-trainer concept;" the adoption of a reformed disciplinary system; the improvement of citizen complaint procedures; the strengthening of community outreach efforts through Citizen Interaction Committees; and a staffing review to improve supervisor to officer ratios.  A critical component of the Blueprint was the establishment of select precincts as "Zones of Excellence," where best practices would be implemented first and then spread to PRPD at large.  As of this date, one such Zone of Excellence has been established in the Bayamón Oeste region.

8.      In September 2011, DOJ issued a written report of its investigative findings ("Report").  The Report sets forth DOJ's findings related to use of force; use of force to suppress the exercise of First Amendment rights; and searches and seizures.  The Report identifies several additional areas of serious concern such as discriminatory policing and the investigation of sex crimes and incidents of domestic violence.  The Report also identifies systemic deficiencies in PRPD's policies and procedures; the conduct of specialized units; pre-service and in-service

training; supervision; the intake, investigation, and adjudication of misconduct complaints; crime and corruption by officers; promotions; risk management; external oversight and accountability; and community engagement.  The Report concludes that PRPD suffers from a number of deep-rooted problems that have existed for many years that need to be addressed in a systemic manner.

9.      While PRPD did not agree with all of the findings and conclusions in the Report, following the issuance of the Report and throughout 2012, the Parties met to share their ideas and proposals for modernizing and professionalizing PRPD and discussed the numerous reforms already underway at PRPD.  This Agreement is the product of a serious cooperative effort built upon the Parties' mutual commitment to constitutional and effective law enforcement.  This Agreement expands on PRPD's reform efforts to date.

10.     The reforms in this Agreement are intended to protect public safety, promote constitutional policing, and build the community's trust.  The Parties enter into this Agreement to accomplish these critical objectives and ensure that PRPD guarantees all residents of Puerto Rico the benefits of vigorous and constitutional law enforcement.

## II.      DEFINITIONS

11.     The following terms, definitions, and abbreviations shall apply to this Agreement:

a)      "PRPD" means the Puerto Rico Police Department and its agents, officers, supervisors, and employees (both sworn and unsworn).

b)      "Commonwealth of Puerto Rico" means the Government of Puerto Rico, any agencies thereof, and its officials, officers, and employees.

c)      "UCCJ" means the University College of Criminal Justice, including its agents, officers, and employees.

4

d)      "DOJ" means the United States Department of Justice's Civil Rights

Division and its agents and employees.

e)      "Action Plan" means a plan developed by PRPD with the approval of the

Technical Compliance Advisor ("TCA") and DOJ that contains temporal

benchmarks and detailed action steps designed to achieve desired

outcomes within generally accepted professional standards.

f)      "Arrest" means a seizure of greater scope or duration than an investigatory

stop or detention.  An arrest is lawful when supported by probable cause.

g)      "Auditable form" means a discrete and verifiable record of the relevant

information maintained separately and independently of other forms

maintained by PRPD, for the purpose of internal or external review and/or

performance improvement.

h)      "Boilerplate" means language that is stock and/or formulaic and fails to

attest to the unique facts of an incident.

i)      "Chemical agent" means a chemical compound that irritates the eyes to

cause tears and pain. The term includes any form of chemical irritant used

by PRPD as a weapon, including Oleoresion Capiscum spray.

j)      "Civilian Employee" means any non-sworn personnel employed by

PRPD, on either a temporary or permanent basis, in either a paid or unpaid

capacity.

k)      "CIT" stands for Crisis Intervention Team.

l)      "Community-oriented policing" is a policing philosophy that promotes

and relies on collaborative partnerships between a law enforcement

agency and the individuals and organizations it serves to develop solutions to problems, increase trust in police, and improve the effectiveness of policing efforts.

m)      "Complainant" means any person, including a PRPD officer or employee, who makes a complaint against PRPD or an officer or employee of PRPD.

n)      "Complaint" means any complaint or allegation from any source regarding PRPD services, policy or procedure, claims for damages (that allege officer misconduct), or misconduct by PRPD officers or civilian employees.  Complaints may be about the service provided by PRPD officers or employees ("service complaints"), misconduct complaints, or both.  A "misconduct complaint" means any allegation of improper conduct by an officer or other PRPD employee, whether the complaint alleges corruption or other criminal misconduct; a violation of law; or a violation of PRPD policy or procedure.  PRPD shall document and evaluate expressions of dissatisfaction regarding the service provided by PRPD officers or employees to determine whether these complaints include allegations of misconduct and are therefore misconduct complaints, or are purely service complaints.

o)      "Consensual Field Interview" includes questioning for the purpose of eliciting facts or information.  An interview is distinguished from an investigatory stop, investigatory detention, or other custodial interview because the interviewee is free to leave at any time.

p)  "Critical firearm discharge" means each discharge of a firearm by a PRPD officer with the exception of range and training discharges.

q)  "Demographic Category" means age, race, color, ethnicity, national origin, religion, gender, disability, sexual orientation, gender identity or expression, or socioeconomic status.

r)  "Discipline" or "Disciplinary Action" means a personnel action for violation of an established law, regulation, rule, or PRPD policy, including, but not limited to, an admonishment, written reprimand, suspension, demotion, or dismissal.

s)  "Discriminatory Policing" means selective enforcement or non-enforcement of the law, including the selecting or rejecting of particular policing tactics or strategies, based on membership in a demographic category specified in this Agreement.

t)  "ECW" means electronic control weapon, a weapon designed primarily to discharge electrical charges into a subject in order to cause involuntary muscle contractions that will override the subject's voluntary motor response.  TASERS are an example of an ECW.

u)  "EIS" stands for Early Intervention System.

v)  "Exigent circumstances" means unanticipated and unavoidable emergencies in which a reasonable person would believe that imminent bodily harm to a person or persons or the destruction of evidence is likely.

w)  "Firearm" means a pistol, revolver, shotgun, carbine or machine gun, as well as any instrument capable of discharging a bullet or shot.

7

x)      "FIU" stands for the Force Investigation Unit.

y)      "FRB" stands for Force Review Board.

z)      "Full and Effective Compliance" means sustained compliance with all substantive provisions of this Agreement and sustained and continuing improvement in PRPD policing.  The substantive provisions of this Agreement are all provisions contained in Sections III through XIII.

aa)     "Gender identity" means a person's internal sense of feeling male or female.  "Gender expression" is the way in which an individual manifests or expresses their gender identity, including but not limited to appearance and manner.

bb)     "Implement" or "implementation" means the development or putting into place of a policy or procedure, including the appropriate training of all relevant personnel, and the consistent and verified performance of that policy or procedure.

cc)     "Including" means "including, but not limited to."

dd)     "Investigatory stop" or "investigatory detention" means a temporary restraint where the subject of the stop or detention is not free to leave.  An investigatory stop or detention is lawful when supported by reasonable suspicion and narrowly tailored in scope and duration to the reasons supporting the seizure.  An investigatory stop or detention may be a pedestrian, vehicle, or bicycle stop.  Stops and detentions conducted as part of a lawful vehicle checkpoint are not investigatory stops or detentions for purposes of this Agreement.

8

ee)   "Less-lethal force" means a force application not intended or expected to cause death or serious injury and which is commonly understood to have less potential for causing death or serious injury than conventional, more lethal police tactics.  Nonetheless, use of less-lethal force can result in death or serious injury.

ff)   "Less-lethal weapon" means any apprehension or restraint tool that, when used as designed and intended, is less likely to cause death or serious injury than a conventional lethal weapon (e.g., firearm).  Nonetheless, use of a less-lethal weapon may result in death or serious injury.

gg)   "Lethal force" means any use of force likely to cause death or serious physical injury, including the use of a firearm, neck hold, or strike to the head, neck, or throat with a hard object, including a fist.

hh)   "LGBTT" stands for Lesbian, Gay, Bisexual, Transgender, and Transsexual, as commonly used in the Puerto Rico.

ii)   "Neck hold" refers to one of the following types of holds:  (1) bar-arm control hold:  a hold that inhibits breathing by compression of the airway in the neck;  (2) carotid restraint hold:  a hold that inhibits blood flow by compression of the blood vessels in the neck; or (3) a lateral vascular neck constraint.  A neck hold shall be considered lethal force.

jj)   "NIBRS" stands for National Incident-Based Reporting System.

kk)   "Non-punitive corrective action" refers to action other than discipline taken by a PRPD supervisor to enable or encourage a PRPD employee to modify or improve his or her performance.  It may include:  oral or written

counseling; training; increased field supervision for a specified period;
mandatory professional assistance; referral to Behavioral Science Services
or to the Employee Assistance Program; a change of an officer's partner;
or a reassignment or transfer.

ll)     "Police officer" or "officer" means any law enforcement officers
employed by PRPD, including cadets, undercover agents, supervisors, and
commanding officers.

mm)    "Policy" means written regulations or directives issued by PRPD
describing the duties, functions, and obligations of PRPD officers and/or
employees, including General and Special Orders issued by the
Superintendent.

nn)     "PRDOJ" stands for the Puerto Rico Department of Justice.

oo)     "PRPD unit" means any designated organization of officers within PRPD,
including specialized, tactical, and investigatory units.

pp)     "Probable cause" means reasonably trustworthy facts and circumstances
that, within the totality of the circumstances, lead an officer to reasonably
believe that an individual has committed, is committing, or is about to
commit an offense.

qq)     "Reasonable force" means that force which an ordinary, prudent, and
reasonable officer placed in the same position with the same knowledge
would find to be reasonable.  In determining whether the force used by a
police officer in effectuating an arrest was reasonable under the
circumstances, factors to be considered are:  (1) the known character of

10

the arrestee; (2) the risks and dangers faced by the officers and third

parties; (3) the nature of the offense involved; (4) the chance of the

arrestee's escape if the particular means are not employed; (5) the

existence of alternative methods of arrest; (6) the physical size, strength,

and weaponry of the officers as compared to the arrestee; and (7) the

exigency of the moment.  Force that is not "reasonable" is "unreasonable."

rr)     "Reasonable suspicion" means articulable facts that, within the totality of

the circumstances, lead an officer to reasonably suspect that criminal

activity has been or is about to be committed.

ss)     "Region" means one of the police service areas of PRPD located

throughout the Commonwealth of Puerto Rico that is led through the chain

of command by a Regional Commander and that is subdivided into

precincts and stations.

tt)     "SARA" stands for Scanning, Analysis, Response, and Assessment

approach.

uu)     "Seizure" or "detention" means any restriction on the liberty interest of an

individual.  A seizure occurs when an officer's words or actions convey to

a reasonable person that he or she is not free to leave.

vv)     "Selection device" means any examination, test, requirement, or criterion

used to evaluate a person's qualifications for employment, assignment to a

specialized unit, or promotion.

ww)    "Serious use of force" means:  (1) all uses of force by a PRPD officer that

cause or create a substantial risk of death, serious disfigurement,

11

disability, or impairment of the functioning of any body part or organ; (2) all critical firearm discharges; (3) all uses of force by a PRPD officer resulting in a significant injury, including a broken bone or an injury requiring treatment above a first aid level of care; (4) all head, neck, and throat strikes; (5) all neck holds; (6) all uses of force by a PRPD officer resulting in a loss of consciousness; (7) all canine bites of humans; (8) more than two applications of an ECW on an individual during a single interaction, regardless of the mode or duration of the application, and whether the applications are by the same or different officers, or an ECW application for longer than 15 seconds, whether continuous or consecutive; and (9) any strike, blow, or kick against a handcuffed subject.

xx)   "Service firearm" means any firearm issued to sworn personnel by PRPD.

yy)   "SFRB" stands for Superintendent's Force Review Board.

zz)   "Shall" means that the provision imposes a mandatory duty.

aaa)  "SPR" stands for the PRPD Superintendency of Professional Responsibility or any other successor unit within PRPD that conducts internal investigations of PRPD officers and employees.

bbb)  "STU" means Specialized Tactical Unit, a temporary or permanent organization of officers within PRPD whose operational objectives are focused on a specific law enforcement purpose beyond general patrol or criminal investigations and that require enhanced training on police tactics, strategies, or techniques.  STUs include the Special Operations Unit, Tactical Operations Unit, and Special Weapons and Tactics units.

ccc)   "Superintendent" means the Superintendent of PRPD.

ddd)   "Supervisor" means a sworn PRPD employee at the rank of sergeant or above (or anyone acting in those capacities) and non-sworn personnel with oversight responsibility for other officers.

eee)   "Supervisory investigation" means an investigation of a civilian complaint conducted by a subject officer's supervisor or higher level official within the officer's chain-of-command.  A supervisory investigation is not a supervisory review, which is triggered when an officer reports a use of force, investigatory stop, search, or seizure.

fff)   "Supervisor's Review Report" means a written report documenting a supervisory review of use of force.

ggg)   "TCA" means "Technical Compliance Advisor," a person or team of people, including any employee, agent, or independent contractor of the TCA, who shall be selected to review, assess, and report on the Commonwealth of Puerto Rico's implementation of this Agreement.

hhh)   "Training" shall refer to all training required by this Agreement.  Training shall comport with generally accepted policing practices and include adult-learning methods that incorporate role-playing scenarios and interactive exercises, as well as traditional lecture formats.  Training shall also include testing and/or writings that indicate that the officer comprehends the material taught.

iii)   "UCR" stands for Uniform Crime Reporting.

jjj)   "Use of force" means any physical coercion used to effect, influence, or

persuade an individual to comply with an order from an officer above

unresisted handcuffing, including unholstering a firearm and acquiring a

target.

kkk)   "Use of force indicating apparent criminal conduct by an officer" means

that force which a reasonable and trained supervisor would conclude could

result in criminal charges due to the apparent circumstances of the use of

force, such as the level of the force used as compared to the resistance

encountered or discrepancies in the use of force as described by the officer

and the use of force as evidenced by any resulting injuries, witness

statements, or other evidence.  It includes, but is not limited to, all strikes,

blows, kicks, ECW applications, or other similar uses of force against a

handcuffed subject, absent exigent circumstances.

lll)   "Use of Force Report" means a written report documenting all force above

un-resisted handcuffing.

### III.   <u>PROFESSIONALIZATION</u>

12.   PRPD shall develop processes and mechanisms that promote professional, ethical, and respectful policing services to effectively address Puerto Rico's public safety challenges; consistently and uniformly apply constitutional police practices; build public confidence; and strengthen its institutional structures.  PRPD shall promote continuous performance improvement among all PRPD personnel that regularly identifies problems or challenges, assesses causal or contributing factors, and takes reasonable measures to achieve performance expectations in areas related to this Agreement.

A.    <u>**Staffing and Community Policing**</u>

13.    PRPD shall assess the appropriate number of sworn and civilian personnel to perform the different department functions necessary to fulfill its mission.  To do so, PRPD shall conduct a staffing allocation and resource study.  The study shall form the basis for a staffing and resource allocation plan that is consistent with community-oriented policing principles and supports the systematic use of partnerships and problem-solving techniques.  To foster community-oriented policing, the plan shall consider deployment practices that offer officers opportunities to serve the communities in which they reside.

B.    <u>**Promotions**</u>

14.    PRPD's promotion practices shall be merit-based and comply with equal opportunity employment principles.

15.    PRPD shall publish detailed job descriptions for each rank among sworn personnel, specifying the duties, responsibilities, and minimum qualifications for each position. PRPD shall develop the job descriptions in consultation with the TCA based on generally accepted policing practices.

16.    PRPD shall ensure that its supervisor selection process is lawful, fair, and consistent with generally accepted policing practices and anti-discrimination laws.  PRPD shall develop objective selection criteria to ensure promotions are based on knowledge, skills, and abilities that are required to perform supervisory and management duties successfully in core substantive areas.  PRPD shall provide clear guidance on promotional criteria, and prioritize effective, ethical, and community-oriented policing as criteria for promotion.  These criteria should account for experience, civil rights and discipline record, training, and skills.

15

17.     PRPD shall utilize competitive written examinations as a component of the selection process to award promotions through the rank of Captain.  Written promotion examinations shall conform to generally-accepted professional standards for test validity and security and be designed to evaluate qualifications that are job related and consistent with business necessity.  PRPD shall develop these examinations in consultation with the TCA based on generally accepted policing practices and in compliance with anti-discrimination laws.

18.     All appointments to ranks above Captain shall be based on objective criteria that account for the knowledge, skills, and abilities to perform core management, supervisory, and leadership duties.

19.     PRPD shall establish procedures that govern the removal of officers from consideration for promotion for disciplinary action related to serious misconduct.

20.     PRPD shall establish specific criteria for the promotion of officers in direct supervisory roles.  Officers in supervisory roles shall not be rendered ineligible for promotion based solely on the number of civilian complaints filed against officers under their supervision. The nature and type of civilian complaints, particularly those complaints that are investigated and substantiated by evidence, shall also be weighed when considering an officer for promotion. Promotions of officers with pending investigations or disciplinary action in a matter alleging serious misconduct shall be held in abeyance until the investigation or disciplinary action is resolved.

**C.      Commander Corps**

21.     PRPD shall provide a developmental career path for officers aspiring to the command ranks that emphasizes leadership, ethics, community-oriented policing, educational achievement, and constitutional policing.

## IV.    USE OF FORCE:  INTERNAL CONTROLS AND ACCOUNTABILITY

22.    PRPD officers shall use force in accordance with the rights, privileges, and immunities secured or protected by the Constitution or laws of the United States and the Commonwealth of Puerto Rico, and shall prohibit the use of unreasonable force.  PRPD shall develop policies and procedures that enable officers to rely primarily on non-force techniques to effectively police; use force only when necessary; and de-escalate the use of force at the earliest possible moment.

### A.    General Use of Force

23.    PRPD shall develop a comprehensive and agency-wide use of force policy that complies with applicable law and comports with generally accepted policing practices.  The comprehensive use of force policy shall include all force techniques, technologies, and weapons, both lethal and less-lethal, that are available to PRPD officers, including officers assigned to specialized tactical units.  The comprehensive use of force policy shall clearly define and describe each force option and the circumstances under which use of such force is appropriate.

24.    PRPD shall develop comprehensive and agency-wide policies that comply with applicable law and comport with generally accepted policing practices concerning the use of:  (a) lethal force; (b) firearms; (c) canines; (d) ECWs; (e) chemical agents; (f) less lethal munitions; (g) batons and impact weapons; and (h) any other force technology, weapon, or implement authorized by PRPD during the life of this Agreement.  PRPD shall also develop a policy on sharing information with the public regarding serious uses of force and the dissemination of information to family members of civilians involved in a use of force incident.

25.    PRPD shall continue to prohibit the use of Chloroacetophenone (commonly referred to as "CN gas").

17

26.     PRPD shall maintain an accurate, current list of officers who successfully qualify with their regulation firearm, including any other firearm that officers are authorized to use or carry.  Officers who fail to re-qualify shall be relieved of police powers and immediately relinquish all firearms, including personal firearms.  Those officers who fail to re-qualify after remedial training within a reasonable time shall be subject to disciplinary action.

## B.     Specialized Tactical Units

27.     PRPD shall develop policies on the use of force by members of specialized tactical units ("STUs").  This policy shall be consistent with PRPD's agency-wide use of force policy.

28.     PRPD shall prohibit STUs from conducting general patrol and policing functions.

29.     PRPD shall develop eligibility criteria and selection devices for assignment to STUs that emphasize demonstrated capacity to carry out the mission of STU in a constitutional manner.  Officers assigned to STUs who are unable to maintain eligibility shall be removed from STUs.  Assignments to STUs shall be for a determined period, as specified by PRPD policy, unless there are extenuating circumstances that justify an extended assignment.

30.     PRPD shall require STUs to document in writing all law enforcement activities to include operational plans and after-action reports prepared in consistent formats for all call-outs and deployments.  Supervisors shall review the law enforcement activities of STUs periodically to ensure compliance with applicable laws and PRPD policies and procedures.

31.     PRPD shall track the number of STU deployments, the reason for each activation and deployment of STU, the legal authority, including type of warrant, if any, for each activation and deployment of STU, and the result of each activation and deployment of STU, including:  (a) the approximate location of the STU deployment; (b) the number of arrests made; (c) the type of

evidence or property seized; (d) whether a forcible entry was made; (e) whether force was used by an STU member or other officer; and (f) whether a person was injured or killed by an STU member.

**C.     Crowd Control and Incident Management**

32.     PRPD shall develop crowd control and incident management policies that comply with applicable law and comport with generally accepted policing practices.

33.     The incident management policy shall provide that a ranking officer or other higher-level PRPD official at the scene of a mass demonstration, civil disturbance, or other crowd situation assume command and control and provide approval prior to deploying force as a crowd dispersal technique.

34.     The crowd control policy shall require the use of crowd control techniques and tactics that respect protected speech and the right to lawful assembly.

35.     PRPD policy shall require the assessment of law enforcement activities following each response to a mass demonstration, civil disturbance, or other crowd situation to ensure compliance with applicable laws and PRPD policies and procedures.

**D.     Force Reporting**

36.     PRPD shall develop a Use of Force Reporting Policy and Use of Force Report Form that comply with applicable law and comport with generally accepted policing practices. The Use of Force Reporting Policy will require officers to notify their immediate supervisor following any use of force, prisoner injury, or allegation of excessive force.  In cases involving a serious use of force, notification will be within one hour, absent exigent circumstances.

37.     The Use of Force Reporting Policy shall require all officers to report any use of force in writing in a Use of Force Report Form before the end of the shift.  The Use of Force

19

Report shall include: (a) a detailed account of the incident from the officer's perspective; (b) the reason for the initial police presence; (c) a specific description of the acts that led to the use of force, including the subject(s)' behavior; (d) the level of resistance encountered; and (e) a description of every type of force used. The Use of Force Reporting Policy shall explicitly prohibit the use of boilerplate or conclusory language in all reports documenting use of force. Failure to report a use of force or prisoner injury by a PRPD officer shall subject an officer, including supervisors and commanders, to disciplinary action.

38. PRPD policy shall require officers to request medical services immediately when an individual is injured or complains of injury following a use of force. The policy shall also require officers who transport a civilian to a medical facility for treatment to take the safest and most direct route to the medical facility. The policy shall further require that officers notify the communications command center of the starting and ending mileage on the transporting vehicle.

39. PRPD's Use of Force Reporting Policy shall require that officers submit copies of Use of Force Reports to their immediate supervisor and to SPR for tracking and analysis. SPR shall maintain master copies of these reports in a central location.

**E.    Force Review, Investigations, and Analysis**

40. PRPD policy shall specify that the conduct of all force reviews and investigations comply with applicable law and comport with generally accepted policing practices. All force reviews and investigations shall, to the extent reasonably possible, determine whether the officers' conduct was justified and within PRPD policy.

41. SPR shall be responsible for maintaining a reliable and accurate tracking system on all officers' use of force; all force reviews carried out by supervisors; all force investigations carried out by Force Investigation Units ("FIU"); and all force reviews conducted by Force

Review Boards ("FRB") and the Superintendent's Force Review Board ("SFRB").  At least annually, SPR shall analyze data on officers' use of force to determine significant trends, identify and correct deficiencies revealed by this analysis, and document its findings in a public report.

42.     The quality of force reviews, force investigations, and investigation reviews shall be taken into account in the performance evaluations of the officers performing such investigations and reviews.

### 1. **Supervisory and FRB Reviews**

43.     A supervisor shall respond to the scene of a serious use of force or allegation of excessive force involving an officer under his/her command upon notification of the incident.

44.     The supervisor shall conduct a supervisory review of all uses of force, prisoner injuries, or allegations of excessive force, except those incidents involving a serious use of force or force indicating apparent criminal conduct by an officer, which shall be investigated by FIU, SPR, and/or PRDOJ.  No supervisor who was involved in the incident, including by participating in, ordering, or authorizing the force being investigated, shall be responsible for the review of the incident.

45.     Supervisors shall complete use of force reviews within 5 business days of receiving the officer's use of force report.  The reviewing supervisor shall:  (a) determine whether the use of force was consistent with PRPD policy and/or raises any policy or operational concerns; (b) review all Use of Force Reports and ensure that all reports include the information required by this Agreement and PRPD policy; (c) document each use of force review promptly using a Supervisor's Force Review Report; and (d) consider whether there are non-punitive corrective actions or training needs.  A higher ranking officer within the investigating supervisor's chain-of-command shall review the Supervisor's Force Review Report for

21

completeness and conformance with PRPD policy.  The reviewing officer shall evaluate the investigating supervisor's conclusions and document whether the reviewing officer concurs, disagrees (with an explanation of the disagreement and the alternate conclusion), or defers until further investigation is completed.

46.     A Force Review Board shall evaluate all supervisory reviews, including Supervisor's Force Review Reports and reviewing officers' determinations.  FRBs shall be composed of command staff from varying units.  PRPD policies shall specify the conduct and requirements of FRB proceedings to ensure thorough, timely, and objective reviews.  FRBs shall review each supervisory review for completeness, evidentiary support, and compliance with PRPD policy.  FRB shall document each FRB proceeding, which shall include findings and recommendations to the regional commander.  FRB may also return force reviews to supervisors for additional review, as necessary, to ensure thorough and complete reviews.  Copies of all Force Review Reports and underlying documents shall be submitted to SPR for tracking and analysis.

47.     Whenever a reviewing supervisor, FRB, or other reviewing officer finds evidence of a use of force indicating apparent misconduct or apparent criminal conduct by an officer, he or she shall immediately notify his or her supervisor for referral to the appropriate investigating unit or the PRDOJ.  The Superintendent shall be notified of the referral.

## 2.     FIU Investigations and Force Reviews by SFRB

48.     PRPD shall ensure that all serious uses of force and allegations of excessive force are investigated fully and fairly by individuals with appropriate expertise, independence, and investigative skills to ensure that uses of force that are contrary to law or policy are identified and appropriately resolved and that policy or operational deficiencies related to the use of force

are identified and corrected.  To this end, PRPD shall create FIUs to conduct investigations of serious uses of force, uses of force indicating apparent criminal conduct by an officer, uses of force by PRPD personnel of a rank higher than sergeant, or uses of force reassigned to FIU by the Superintendent, his or her designee, SPR, or FRB.  PRPD policies shall specify the membership requirements, conduct of investigations, and operational procedures of FIUs.

49.     A supervisor responding to a serious use of force or allegation of excessive force shall immediately notify FIU.  FIU shall respond to the scene and commence an investigation. FIU may decline to respond to the scene following consultation and approval by the FIU supervisor.  Declinations shall be documented in writing.

50.     FIU shall immediately notify and consult with PRDOJ regarding any use of force indicating apparent criminal conduct by an officer.  If PRDOJ indicates that it may proceed criminally, or PRPD requests a criminal prosecution, any compelled interview of the subject officers shall be delayed until after consultation with PRDOJ or expressly permitted by the Superintendent.  No other part of the investigation shall be held in abeyance unless specifically authorized by the Superintendent in consultation with PRDOJ.

51.     FIU shall complete its administrative use of force investigation within 45 days of the use of force, absent exceptional circumstances.  At the conclusion of each use of force investigation, FIU shall prepare a report on the investigation and shall forward the report to SFRB for review and to SPR for tracking and analysis.

52.     The Superintendent's Force Review Board shall evaluate all FIU investigations, including FIU reports and determinations.  SFRB shall be composed of senior command staff from varying units.  PRPD policies shall specify the conduct and requirements of SFRB proceedings to ensure thorough, timely, and objective reviews.  SFRB shall review each FIU

23

investigation for completeness, evidentiary support, and compliance with PRPD policy.  SFRB

shall document each force review proceeding, which shall include findings and

recommendations, to the Superintendent.  SFRB may also return force investigations to FIU for

additional investigation, as necessary, to ensure thorough and complete investigations.  Copies of

all Force Review Reports completed by SFRB and underlying documents shall be submitted to

SPR for tracking and analysis.

**F.**     **Use of Force Training**

53.     PRPD shall train all PRPD officers on PRPD's use of force policies.  Thereafter,

PRPD shall provide all PRPD officers with use of force training at least every two years for the

first four years of this Agreement, and annually thereafter.  PRPD shall also provide training on

use of force as necessary, based on developments in applicable law and PRPD policy.  At least

annually, PRPD shall assess all use of force policies and training.  PRPD's use of force training

program shall include the following topics:

      a)     legal standards for reasonable force;

      b)     PRPD's use of force policy;

      c)     reporting use of force, requesting medical service, and preserving
            evidence;

      d)     scenario-based training and interactive exercises that illustrate proper use
            of force decision-making;

      e)     the proper deployment and use of all weapons or technologies, including
            firearms, batons, chemical agents, and ECWs;

      f)     threat assessment and de-escalation techniques that encourage officers to
            make arrests without using force, and instruction that disengagement, area

24

containment, surveillance, waiting out a subject, summoning

reinforcements, calling in specialized units, or delaying arrest may be the

appropriate response to a situation, even when the use of force would be

legally justified;

g)      crisis intervention and interacting with people with mental illnesses,

including instruction by mental health practitioners and an emphasis on

de-escalation strategies;

h)      factors to consider in initiating or continuing a foot pursuit; and

i)      appropriate training on conflict management.

54.     PRPD shall provide an appropriate firearm training program that:

a)      requires officers to complete and satisfactorily pass firearm training and

qualify on each firearm the officer is required or authorized to carry on an

annual basis;

b)      requires cadets, officers in probationary periods, and officers who return

from unarmed status or extended leave to complete and satisfactorily pass

firearm training and qualify on each firearm the officer is required or

authorized to carry before such personnel are permitted to carry and use

firearms;

c)      incorporates night training, stress training (i.e., training in using a firearm

after undergoing physical exertion), and proper use of force decision-

making training, including continuous threat assessment techniques, in the

annual in-service training program;

      d)     ensures that firearm instructors critically observe students and provide corrective instruction regarding deficient firearm techniques and failure to utilize safe gun handling procedures at all times; and

      e)     requires comprehensive testing that shows complete understanding of rules, regulations, and skills regarding firearm use.

55.     PRPD shall train all supervisors, FIU members, and command officers on PRPD's use of force policies.  Thereafter, PRPD shall provide all supervisors, FIU members, and command officers with training on use of force, force investigations, and force investigation reviews at least annually and, as necessary, based on developments in applicable law and PRPD policy.  PRPD's use of force training for supervisors, FIU members, and command officers shall include the following topics:

      a)     requesting medical services and determining the appropriate use of force reporting levels;

      b)     identifying and interviewing involved officers, witness personnel, subjects upon whom force was used, and civilian witnesses;

      c)     ensuring proper collection of evidence;

      d)     reviewing use of force and supplemental reports for completeness, accuracy, and quality, including recognizing boilerplate language and document discrepancies;

      e)     assessing the legality and appropriateness of a detention and subsequent arrest;

      f)     legal standards governing the use of reasonable force, including legal standards and requirements for criminal accountability, administrative

accountability, and performance improvement related to tactics, training, equipment, and policy sufficiency;

g)     recommending and administering proper discipline and non-punitive corrective action related to use of force; and

h)     report writing.

## G.     Responding to Behavioral/Mental Health Crisis

56.     PRPD shall develop policies and procedures to improve its response to individuals in behavioral or mental health crisis, and to minimize the use of unnecessary force against such individuals.  To achieve this outcome, PRPD shall, in addition to providing all officers with basic training on responding to persons in behavioral or mental health crisis, implement and train a comprehensive first responder Crisis Intervention Team ("CIT") to develop and maintain specially-trained CIT officers.  The CIT shall incorporate the following requirements:

a)     The CIT shall develop policies and procedures for the transfer of custody or voluntary referral of individuals between PRPD, receiving facilities, and local mental health and social service agencies.

b)     The CIT policies and procedures shall require that whenever officers encounter juveniles in mental health crisis that officers refer them to appropriate mental health services located in the community.

c)     The CIT officers shall be assigned to field operations units and maintain their standard patrol duties, except when called to respond to potential behavioral or mental health crisis events where the officers may be required to respond outside of their assigned patrol district.

27

57.     PRPD shall train PRPD field operations unit officers in the CIT program and shall ensure that CIT-trained officers are assigned to each shift in each police region.  PRPD shall provide crisis intervention training to all dispatchers to enable them to identify calls for service that involve behavioral or mental health crisis events.

## V.     SEARCHES AND SEIZURES:  INTERNAL CONTROLS AND ACCOUNTABILITY

58.     PRPD shall ensure that all investigatory stops, searches, and arrests are conducted in accordance with the rights, privileges, or immunities secured or protected by the Constitution and laws of the United States and the Commonwealth of Puerto Rico.  PRPD shall ensure that investigatory stops, searches, and arrests are conducted as part of effective crime prevention strategies that are consistent with community priorities for enforcement.

### A.     Stops, Searches, and Seizures Generally

59.     PRPD shall develop policies and procedures that comply with applicable law and comport with generally accepted policing practices on stops, searches, and arrests; provide training; ensure consistent supervision; and hold officers accountable for complying with applicable law and policy.  PRPD policies shall define all terms clearly and provide guidance on the facts and circumstances that should be considered in initiating, conducting, terminating, and expanding an investigatory stop, detention, or search.

### B.     Investigatory Stops and Searches

60.     PRPD shall develop an Investigatory Stops and Searches Reporting Policy and a system to collect data on all investigatory stops and searches, whether or not they result in an arrest or issuance of a citation.  PRPD's stop data collection system shall be subject to the review and approval of the TCA, and shall require officers to document the following:  (a) the date,

time, location, and duration of the stop and/or search; (b) the reason for the stop and/or search; (c) the subject's apparent race, color, ethnicity or national origin, gender, and age; (d) whether any contraband or evidence was seized, and the nature of the contraband or evidence; and (e) the disposition of the stop, including whether a citation was issued or an arrest made. PRPD shall require that officers submit written reports regarding investigatory stops and searches to their supervisor by end of shift for review. A copy of these reports shall be forwarded to SPR and the Reform Unit for tracking and analysis.

61.     PRPD's Investigatory Stops and Searches Reporting Policy shall explicitly prohibit the use of boilerplate or conclusory language in all reports. PRPD policies shall also expressly prohibit officers from knowingly using or relying on information known to be materially false or incorrect in effectuating an investigatory stop or detention.

62.     A supervisor shall review each report on Investigatory Stops and Searches to determine whether the stop or search was within PRPD policy and this Agreement. For any investigatory stop or search deemed to be outside of PRPD policy or this Agreement, the supervisor shall determine if the stop or search: (a) should result in an internal investigation by SPR; (b) indicates a need for additional training, counseling, or any other non-punitive corrective measure for the involved officer; and (c) suggests the need for revising or reformulating agency policy, strategy, tactics, or training. The supervisor shall document on an auditable form those investigatory stops and searches that are unsupported by reasonable suspicion; are in violation of PRPD policy or this Agreement; or that indicate a need for corrective action or review of agency policy, strategy, tactics, or training. The quality of these supervisory reviews shall be taken into account in the supervisor's performance evaluations.

63.     A command-level officer or official shall review, in writing, all supervisory auditable forms related to investigatory stops and detentions.  The commander's review shall be completed within three business days of receiving the document reporting the event.  The commander shall evaluate the corrective action and recommendations in the supervisor's written report and ensure that all appropriate corrective action is taken, including referring the incident for administrative or criminal investigation.

64.     At least annually, PRPD shall analyze investigatory stop and search data to determine significant trends, identify and correct deficiencies revealed by this analysis, and document its findings in a public report.

## C.     Arrests

65.     PRPD shall revise its policies on arrests to ensure that they comply with applicable law and comport with generally accepted policing practices.

66.     PRPD shall require that officers notify the communications command center and a supervisor immediately after an arrest, or as soon as practicable.  For felony arrests, or an arrest for obstructing or resisting an officer, PRPD shall require a field supervisor to respond to the scene of the incident and approve the officer's arrest recommendation, based on the existence of probable cause.  If an officer's arrest recommendation is insufficient, or otherwise unjustified, the supervisor may, if necessary, interview the subject.  The supervisor shall take appropriate action to address violations or deficiencies in an officer's arrest recommendation, including releasing the subject, recommending non-punitive corrective action for the involved officer, or referring the incident for administrative or criminal investigation.  If a supervisor is unavailable to respond to the scene, the officer shall notify his or her immediate supervisor over a recorded channel of the elements of probable cause for the felony arrest or arrest for obstructing or

resisting an officer.  If the officer's immediate supervisor is unavailable, the officer shall notify

any field supervisor over a recorded channel of the elements of probable cause for the felony

arrest or arrest for obstructing or resisting an officer.

67.     When transporting an arrestee, officers shall take the safest and most direct route

to the booking location.  PRPD policy shall require that officers notify the communications

command center of the starting and ending mileage on the transporting vehicle, as well as the

gender, race, ethnicity, national origin, and apparent age of the arrestee.  The officer shall

complete all written arrest forms and booking recommendations at the time an arrestee is

presented at any PRPD precinct, station, or specialized unit for booking.

68.     At the time of presentment at a PRPD precinct, station, or specialized unit, a

watch commander or supervisor shall visually inspect each detainee or arrestee for injury,

interview the detainee or arrestee for complaints of pain, and ensure that the detainee or arrestee

receives medical attention from an appropriate medical provider, as necessary.

69.     PRPD shall require that all booking recommendations be personally reviewed and

approved in writing in an auditable form by a supervisor as to appropriateness, legality, and

conformance with PRPD policies within 12 hours of the arrest, absent exceptional circumstances.

Supervisors shall also examine arrest reports and forms related to the arrest for boilerplate or

conclusory language, inconsistent information, lack of articulation of the legal basis for the

action, or other indicia that the information in the reports or forms is not authentic or correct.

Supervisors shall evaluate each incident in which a person is arrested for interfering with a police

officer, resisting arrest, assault on a police officer, or other similar charge to determine whether

the incident raises any issue or concern regarding the basis for the arrest or implications on

training, policies, or tactics.

70.     As part of the supervisory review, the supervisor shall document on an auditable form those arrests that are unsupported by probable cause, are in violation of PRPD policy or this Agreement, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or training.  The quality of these supervisory reviews shall be taken into account in the supervisor's performance evaluations.

71.     A command-level officer or official shall review, in writing, all auditable forms related to arrests.  The commander's review shall be completed within seven days of receiving the document reporting the event.  The commander shall evaluate the corrective action and recommendations in the supervisor's written report and ensure that all appropriate corrective action is taken.  Whenever a reviewing supervisor or command-level officer finds evidence of an arrest indicating apparent misconduct or apparent criminal conduct by an officer, he or she shall immediately notify his or her supervisor for referral to the appropriate investigating unit or the PRDOJ.  The Superintendent shall be notified of the referral.

72.     PRPD shall require officers to provide written receipts to individuals whenever property is seized from the individuals.  PRPD shall establish procedures that are based on generally accepted policing practices to ensure that all seized property is properly stored and returned, as appropriate.

73.     PRPD shall develop a protocol to seek formal feedback from the prosecutor's office, the public defender's office, and Commonwealth judges on a regular basis regarding the quality of PRPD investigations, arrests, court testimony, and indicia of misconduct and to make operational and policy changes based upon this feedback.  In addition, PRPD shall refer to SPR for investigation any information regarding specific incidents of possible officer misconduct received through this protocol.

D.      <u>**Searches**</u>

74.      PRPD shall revise its policies on searches to ensure that they comply with applicable law and comport with generally accepted policing practices.  PRPD policies shall define all terms clearly and specify procedures for executing search warrants and warrantless searches, including handling, recording, and taking custody of seized property or evidence.

75.      PRPD shall require that a supervisor review and approve in writing each request for a search or arrest warrant, including each affidavit or declaration before it is filed by an officer in support of a warrant application, for appropriateness, legality, and conformance with PRPD policy.

76.      PRPD shall track each search warrant, the case file where a copy of such warrant is maintained, the officer who applied for the warrant, and each supervisor who reviewed the application for a search warrant.

77.      PRPD shall require officers to obtain and document consent from an individual who consents to a voluntary search of his/her person or vehicle when the search is conducted as part of a routine pedestrian or vehicle stop.  The Parties shall determine the form of documentation of consent by April 15, 2013.

**E.**     **Training on Stops, Searches, and Seizures**

78.     PRPD shall train all PRPD officers on PRPD's stop, search, and seizure policies. Thereafter, PRPD shall provide all PRPD officers with training at least every two years for the first four years of this Agreement, and annually thereafter.  PRPD shall also provide training on stops, searches, and seizures as necessary, based on developments in applicable law and PRPD policy.  PRPD shall coordinate and review all policies and training on stops, searches, and seizures to ensure quality, consistency, and compliance with the Constitution and laws of the United States and the Commonwealth of Puerto Rico, this Agreement, and PRPD policy.  PRPD shall conduct regular subsequent reviews of this training at least annually, and report its findings. PRPD's training program shall include the following topics:

a)     PRPD policies and requirements in this Agreement regarding stops, searches, and seizures;

b)     the Fourth Amendment and related law;

c)     examples of scenarios faced by PRPD officers and interactive exercises that illustrate proper police practices, methods, and tactics in conducting consensual field interviews, investigatory stops, consent and non-consent searches, and arrests.  These training scenarios shall address the difference between various police contacts by the scope and level of police intrusion; between probable cause, reasonable suspicion and mere speculation; and voluntary consent from mere acquiescence to police authority; and

d)     comprehensive testing that shows complete understanding of rules and regulations.

79.     PRPD shall train all supervisors and command officers on PRPD's stop, search, and seizure policies.  Thereafter, PRPD shall provide all supervisors and command officers with training on reviewing subordinates' stops, searches, and seizures at least annually and, as necessary, based on developments in applicable law and PRPD policy.  PRPD shall coordinate and review all policies and training on stops, searches, and seizures to ensure quality, consistency, and compliance with the Constitution and laws of the United States and the Commonwealth of Puerto Rico, this Agreement, and PRPD policy.  PRPD shall conduct regular subsequent reviews of this training at least annually, and report its findings.  PRPD's training on stops, searches, and seizures for supervisors and command officers shall include the following topics:

  a)  requesting medical services and questioning detainees and arrestees for pain or injury;

  b)  report writing, including reviewing reports on stops, searches, and seizures for completeness, accuracy, and quality, including recognizing boilerplate language and how to document discrepancies;

  c)  assessing the legality and appropriateness of a stop, search, or seizure;

  d)  legal standards governing searches and seizures, including legal standards and requirements for criminal accountability, administrative accountability, and performance improvement related to tactics, training, equipment, and policy sufficiency; and

  e)  recommending and administering proper discipline and non-punitive corrective action related to searches and seizures.

## VI.   EQUAL PROTECTION AND NON-DISCRIMINATION

80.      PRPD shall ensure that police services are delivered equitably, respectfully, and free of unlawful bias, in a manner that promotes broad community engagement and supports effective crime prevention.  In conducting its activities, PRPD shall ensure that members of the public receive equal protection of the law, without bias based on race, color, ethnicity, national origin, religion, gender, disability, sexual orientation, gender identity, or gender expression, and in accordance with the rights, privileges, or immunities secured or protected by the Constitution and laws of the United States and the Commonwealth of Puerto Rico.

### A.   General Provisions

81.      PRPD shall develop policies and procedures that comply with applicable law and comport with generally accepted policing practices on bias-free policing; provide training as described in this Agreement; ensure consistent supervision; and hold officers accountable for complying with applicable law and policy.

82.      PRPD shall revise its complaint classification policies to effectively capture and track civilian complaints alleging discriminatory policing, even if the complainant does not specifically label the misconduct as such.

83.      PRPD shall revise all documentation produced in relation to officer and civilian interactions, including documentation related to arrests, traffic stops, investigatory stops and detentions, searches, property seizures, and civilian complaints, so that it permits officers to accurately record the demographic information of all involved persons, including alleged subjects and victims.

84.      PRPD shall incorporate concrete requirements regarding bias-free policing and equal protection into its hiring, promotion, and performance assessment processes, including

36

giving significant weight to an individual's documented history of bias-free policing.  PRPD will comply with the non-discrimination requirements of Title VII of the Civil Rights Act of 1964, as amended.

85.     PRPD shall use the National Incident Based Reporting System ("NIBRS") to collect and report crime data.

86.     PRPD shall collect accurate and reliable data on hate crimes on an ongoing basis and shall submit the data to the Federal Bureau of Investigation ("FBI") for analysis and publication in the FBI's Hate Crimes Statistics report in accordance with FBI submission requirements.

**B.     Discriminatory Policing**

87.     PRPD shall apply and administer all programs, initiatives, and activities without discriminating on the basis of race, color, ethnicity, national origin, religion, gender, disability, sexual orientation, gender identity, or gender expression.  PRPD shall develop policies and practices to prohibit selective enforcement or non-enforcement of the law based on these characteristics.  These policies and practices shall comply with applicable law and comport with generally accepted policing practice.

88.     PRPD shall develop policies to provide all individuals within the Commonwealth with police services in a non-discriminatory fashion in order to build and preserve trust among community members and more effectively prevent and solve crime.  As part of these efforts, PRPD shall seek the assistance of community advocates in widely disseminating to the public its written policies on immigration-related laws.

89.     PRPD shall develop a specific policy to guide officers' interactions with transgender or transsexual individuals that addresses gender identification, gender expression, transportation, processing, housing, and medical treatment.

90.     PRPD shall provide all PRPD officers with training on biased-free policing at least every two years for the first four years of this Agreement, and annually thereafter.  PRPD shall also provide training on biased-free policing as necessary, based on developments in applicable law and PRPD policy.  PRPD's training program shall include the following topics:

a)      PRPD policies and requirements in this Agreement regarding biased-free policing;

b)      community perspectives of discriminatory policing;

c)      constitutional and other legal requirements related to equal protection and unlawful discrimination;

d)      the protection of civil rights as a central part of the police mission;

e)      arbitrary classifications and stereotyping based on age, race, color, ethnicity, national origin, religion, gender, disability, sexual orientation, gender identity, and gender expression;

f)      interacting with diverse populations, including persons who are homeless and economically disadvantaged;

g)      identification of key decision points where prohibited discrimination can take effect at both the incident and operational planning levels;

h)      methods, strategies, and techniques to reduce misunderstanding, conflict, and complaints due to perceived bias or discrimination, including community-oriented policing strategies; and

38

> > i)  comprehensive testing that shows complete understanding of rules and
> > regulations.

91.  PRPD shall assess its operational programs, initiatives, and activities at least every two years to ensure that they are applied or administered in a manner that guarantees equal protection.  As part of its assessment, PRPD shall specifically include an assessment of use of force, motor vehicle and pedestrian stops, arrests, and deployment of STUs.  PRPD shall also assess its operations and tactics as part of regulatory inspections, assistance to regulatory agencies, and covert vice activities.  PRPD shall base its assessment of programs, initiatives, and activities on accurate, complete, and reliable data, including data contained in the EIS, stop and detention data, use of force analyses, and operational planning and after action reports.  PRPD shall make this assessment publicly available.

92.  Within five  business days, PRPD shall prepare and provide to PRDOJ and the Puerto Rico Department of the Family the preliminary investigation report prepared in response to each allegation of abuse and mistreatment originating in secure juvenile correctional facilities.  Such allegations include physical and mental abuse, juvenile on juvenile assaults, staff on juvenile abuse, and excessive use of force by staff.

## C.    Sexual Assault and Domestic Violence

93.  PRPD shall respond to and investigate reports of sexual assault and domestic violence professionally, effectively, and in a manner free of gender-based bias.  PRPD shall appropriately classify and investigate reports of sexual assault and domestic violence, collaborate closely with community stakeholders, and apply a victim-centered approach at every stage of its response.  PRPD shall develop policies and procedures on responding to sexual assault and

domestic violence, including incidents involving PRPD officers, that comply with applicable law and comport with generally accepted policing practices.

94.     PRPD's sexual assault policies and procedures shall provide clear and detailed guidelines for each stage of PRPD's response to a reported sexual assault, including (a) dispatch response; (b) initial officer response; (c) initial and follow-up victim interviews; and (d) on-scene and follow-up investigation.  These protocols shall be based on recognized models and guidelines on forensic examinations, such as, for example, the National Protocol for Sexual Assault Medical Forensic Examinations issued by DOJ's Office of Violence Against Women.

95.     PRPD shall re-assess and revise, where needed, its classification protocols for crimes involving sexual assaults.  PRPD shall track all reports of felony sexual assault based on the UCR definitions.

96.     PRPD shall ensure that its dedicated Sex Crimes Investigation Unit hotline is staffed 24-hours a day with trained responders.

97.     PRPD shall track  dispositions of sexual assault investigations, including arrests, whether the prosecutor charged the suspect, and whether a conviction resulted.  PRPD shall also track sexual assaults by gender and incidents in which more than one participant is arrested. PRPD shall report this data as part of its annual report.

98.     PRPD's domestic violence policies and procedures shall clearly delineate the duties of all PRPD officers and staff and provide clear and detailed guidelines for each stage of PRPD's response to a report of domestic violence.

99.     PRPD shall implement measures to respond to reports of domestic violence and sexual assault involving PRPD officers, including disarming officers and assessing their fitness for duty.

40

100.     PRPD shall track dispositions of domestic violence investigations, including arrests, whether the prosecutor charged the suspect, and whether a conviction resulted.  PRPD shall also track domestic violence arrests by gender and incidents in which more than one participant is arrested.  PRPD shall report this data as part of its annual report.

## VII.     RECRUITMENT, SELECTION, AND HIRING

101.     PRPD shall develop a comprehensive recruitment and hiring program that successfully attracts and hires qualified individuals.  PRPD shall develop a recruitment policy and program that establishes clear guidance and objectives for recruiting police officers and clearly and transparently allocates responsibilities for recruitment efforts.

### A.     Recruitment Plan

102.     PRPD shall develop a recruitment plan that includes clear goals, objectives, and action steps for attracting qualified applicants from a broad cross-section of the community.  PRPD's recruitment plan shall establish and clearly identify the goals of PRPD's recruitment efforts and the duties of officers and staff implementing the plan.

103.     The recruitment plan shall include specific strategies for attracting a diverse pool of applicants including members of groups that have been historically underrepresented in PRPD.  A "Recruitment Officer" will be responsible for the development of the plan, together with a working group that includes officers from diverse backgrounds.  The working group will also consult with community stakeholders to receive recommended strategies to attract a diverse pool of applicants.  The plan will include both outreach to the general population and targeted outreach to populations currently underrepresented on the PRPD force including, but not limited to, women and the Dominican population, through media outlets, universities, community

41

colleges, advocacy groups, and other community groups that serve or are likely to reach such populations.  The "Recruitment Officer" and his or her staff, as determined by the Superintendent, will be responsible for the implementation of the plan.

**B.** **Hiring Reforms**

104.    PRPD shall develop an objective system to select recruits to enter into UCCJ. The system will establish minimum standards for recruiting and an objective process for selection that employs reliable and valid selection devices that comport with generally accepted policing practice and anti-discrimination laws.

105.    PRPD shall establish and publish qualifications for sworn personnel that are consistent with generally accepted policing practice.  PRPD shall continue to require a two-year post-secondary degree, or its equivalent, as part of the requirements for sworn personnel.

106.    PRPD shall require all candidates for sworn personnel positions to undergo a psychological, medical, and polygraph examination to assess their fitness for employment with PRPD.

107.    PRPD shall assess and revise its policies and practices to ensure thorough, objective, and timely background investigations of candidates for sworn personnel positions based on generally accepted policing practice.  PRPD's suitability determination shall include an assessment of a candidate's credit history, criminal history, employment history, use and abuse of controlled substances, and ability to work with diverse communities and act without impermissible bias.  Favorable suitability determinations shall expire six months after the determination.