## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **UNITED STATES, OF AMERICA** | |
| **Plaintiffs,** | **Civil Action No. : 12-2039 (JAG)** |
| **v.** | |
| **COMMONWEALTH OF PUERTO RICO AND ITS POLICE DEPARTMENT,** | |
| **Defendants** | |

### APPENDIX II

### BRIEF OF AMICUS CURIAE IN SUPPORT OF PUERTO RICO AS AN INCORPORATED TERRITORY OF THE UNITED STATES

## I.    INTRODUCTION

Puerto Rico has a population of approximately 3.8 million American citizens. Four million former residents of Puerto Rico have moved residence to the fifty states where they enjoy full rights as American Citizens. The residents of Puerto Rico do not have government by consent. They cannot vote in Presidential Elections, nor have they been afforded the right to vote and elect representatives (5) to Congress or Senators (2). The instant complaint constitutes clear evidence of unequal and discriminatory treatment by the Federal Government towards Puerto Rico.

The United States filed  this Complaint alleging that the Puerto Rico Police Department (hereinafter referred to as PRPD) engages in a pattern or practice of unconstitutional and unlawful activity in violation of the First, Fourth, and Fourteenth Amendments to the  U.S. Constitution, and the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. &

14141 ("Section 14141"). Specifically, the United States alleges that the PRPD engages in: (1) a pattern or practice of using excessive force during routine police activities; (2) a pattern or practice of relying on unreasonable force in response to public demonstrations; (3) a pattern of practice of conducting unlawful searches and seizures; and (4) a pattern or practice of engaging in discriminatory police practices.

Plaintiff qualifies the pattern of activity or conduct of the PRPD as unacceptable within the U.S. constitutional framework.  Thus, it seeks through this complaint constitutional protection for the American citizens residing in Puerto Rico.  Contradictorily, Plaintiff claims the full application of the U.S. Constitution and the federal laws to Puerto Rico, while characterizing the island as an unincorporated territory of the United States.  While said assertion (pleading # 10 of the original complaint) has been eliminated, from a reading of the amended complaint as a whole, it is evident that its pleadings and discriminatory assertions are still premised on the assumption that Puerto Rico is an unincorporated territory. Said characterization is not only incorrect and discriminatory, but also has serious legal, political, economic and social consequences.  Consequently, the incorporation issue remains at the heart of the instant case and, thus, must be properly disposed of by the Honorable Court.  The American Citizens residents of Puerto Rico have a substantial interest in the resolution of this issue.  This Brief is submitted in opposition to Plaintiff's explicit and implicit characterization of Puerto Rico as an unincorporated territory.

The political, legal, social, and economic interests of the residents of Puerto Rico have to be pursued based on what we are, American citizens, not on what we might be. Notwithstanding, in their answer to the complaint and as part of their settlement negotiations, Defendant has not opposed Plaintiff's pretention to treat Puerto Rico as an unincorporated

territory.   Therefore, as an American citizen resident of Puerto Rico, and a practicing attorney with full knowledge of the implications and ramifications, the undersigned deems it pertinent to oppose any explicit and/or implicit characterization of Puerto Rico as an unincorporated territory. Silence and acquiescence by omission could lead to an outcome that far outreaches the boundaries of the controversy at hand. It is too vital and important of an issue to allow it to go unnoticed and/or unanswered.

This Appearing Party considers that this Honorable Court cannot dispose judicially of this complaint without once and for all making a determination regarding the issue of incorporation.   Therefore, it is respectfully suggested that this Honorable Court should order Plaintiff to respond to this issue.   It is proposed in this Brief that this Court should reaffirm that Puerto Rico is an incorporated territory of the United States, where the full text of the U.S. Constitution applies. (*Consejo de Salud Playa de Ponce v Rullan, 586 FS 2nd 22 (2008)).*

Within that context, the main controversy before this Court is whether Puerto Rico is currently an incorporated or an unincorporated territory.  Said controversy requires the Honorable Court to determine whether the Constitution allows the Federal Government to continue treating Puerto Rico, a United States territory, as well as its American citizens, differently from stateside jurisdictions and the United States citizens therein. Furthermore and within this context, the Honorable Court must determine if Plaintiffs can claim the full application of the U.S. Constitution for the purpose of supporting the allegations contained in the complaint, while simultaneously characterizing Puerto Rico under a status that would require the implementation of remedies under unequal and discriminatory conditions.   The Court must also determine weather the U.S. can claim the full application of the Constitution for

the purpose of establishing obligations while advocating its selective application for the purpose of recognizing rights.

By its very nature, this analysis requires a brief account of the legal development of the territorial policy in the United States and of the development of the legal relationship between the United States and Puerto Rico.

## II.   U.S. TERRITORIAL POLICY

### A.   <u>Prior to the Insular Cases</u>

Since the adoption of the United States Constitution it is in Congress where the authority to dispose of territories has resided. Article IV Paragraph 3 Clause 2 of the United States Constitution (Territorial Clause) states as follows: "…Congress is empowered to make all needful Rules and Regulations respecting the territory belonging to the United States…"

Within this authority, in 1787 Congress adopted the Northwest Ordinance, which established the statehood requirements for territories north of the Ohio River. These included: a geographical area, a minimum population, an organized republican form of government, and a territorial delegate to Congress (Now Resident Commissioner for Puerto Rico). Hence, it became the National policy that once the requirements set forth in the Ordinance were met it was expected that territories would become States.   The fact that this was the policy for territories acquired up to 1900 finds support in various judicial opinions, including in *Holden v. Hardy*, 169 U.S. 366, 106, where the United States Supreme Court stated:

> "...The territories acquired by Congress, whether by deed of cession from the original states, or by treaty with a foreign country, are held with the object, as soon as their population and condition justify it, of being admitted into the union as states, upon an equal, footing with the original states in all respects...."

> "...In the future growth of the nation, as heretofore, it is not impossible that Congress may see fit to Annex territories whose jurisprudence is that of the

> Civil law. One of the considerations moving to such annexation might be the very fact that the territory so annexed should enter the Union with its tradition, laws and systems of administration unchanged...." (See also: *Loughborough v. Blake. 5 L ed. 98.")*

It is under said legal and historical framework that Puerto Rico was acquired by the United States. By the Treaty of Paris, Spain ceded Puerto Rico to the United States in 1898 (Art.II Treaty of Paris- 30 Stat. 1754). The Treaty granted Congress full powers over Puerto Rico. Article IX of the Treaty specifically provided: "…The civil rights and political status of the native inhabitants of the territories hereby ceded to the United States shall be determined by Congress...".  Within this original legal source of authority, over the years, Congress adopted legislation to organize the government of Puerto Rico in a manner compatible with its federalist structure; a structure similar to the states and their relationship with the federal government.

**B.**   **Territorial Policy after the Insular Cases**

Beginning in 1901, through a series of decisions commonly known as The Insular Cases, the United States Supreme Court established a new judicial framework for applying the United States Constitution to the newly acquired territories.    In essence, the Court determined that territories could be acquired by the United States and incorporated to eventually become states or be kept unincorporated until Congress determined that it was proper to incorporate them. Said determination impacted the degree of application of the United States Constitution to the territory and its residents, including Puerto Rico.  Amongst others and within said context, it is pertinent to highlight the decisions cited below qualifying Puerto Rico as a non-incorporated territory:

*i. Downes v. Bidwell (1901).*

Of the Insular Cases, *Downes v. Bidwell*, 182 U.S. 244 (1901) (hereinafter Downes) is considered to have had the greatest impact in the shaping of Puerto Rico's legal status.    In Downes the U.S. Supreme Court held that, under the Treaty of Paris, Puerto Rico became a "territory appurtenant and belonging to the United States, but not a part of the United States." As such, Congress had plenary powers over acquired territories limited only by "fundamental limitations in favor of personal rights".  Additionally, and as pertinent to the instant case, the Supreme Court held that:

> "…Incorporation into the United States of territory acquired by treaty of cession, in which there are conditions against the incorporation of the territory until Congress provides there for, will not take place until in the wisdom of Congress it is deemed that the acquired territory has reached that state where it is proper that It should enter into and form a part of the American family...".

> "...Puerto Rico though not a foreign country in an international sense, since it was subject to the sovereignty of and was owned by the United States after the treaty of cession, continued to be foreign to the United States in a domestic sense, because it had not been incorporated into the United States, but was merely appurtenant thereto as a possession...".

> "...We are also of opinion that the power to obtain territory by treaty implies, not only the power to govern such territory, but to prescribe upon what terms the United States will receive its inhabitants, and what their status shall be…."

> "**If those possessions are inhabited by alien races, differencing from us in religion, customs, laws, methods of taxation, and modes of thought, the administration of government and. justice, according to Anglo-Saxon principles, may for a time be impossible**, and the question at once arises whether large concessions ought not to be made for a time, that ultimately our own theories may be carried out, and the blessings of a free government under the Constitution extended to them. We decline to hold that there is anything in the Constitution to forbid such action". We are therefore of opinion that the island of Puerto Rico is a territory appurtenant and belonging to the United States, but, not a part of the United States". *Emphasis provided. (Id. Downes).*

### ii. Balzac v. Puerto Rico (1922).-

*Balzac v. Puerto Rico*, 258 U.S. 298 (1922) involved prosecution for criminal libel (a misdemeanor) of an American citizen in a district court of Puerto Rico.  At the time, the Puerto Rico's criminal procedure statutes did not guarantee a jury trial for misdemeanors.   Mr. Balzac insisted that he had a right under the United States Constitution to a trial by jury, but his claim was denied by both the Arecibo District Court and the Puerto Rico Supreme Court.  He then appealed to the U. S. Supreme Court.  In denying his claim, the U.S. Supreme Court affirmed their previous holdings that Puerto Rico was an unincorporated territory and that the application of the Constitution was determined by the locality of the person, not the person's citizenship. There the Court reiterated their prior holding by establishing:

> "… As previously stated, under the Insular Cases doctrine only fundamental constitutional rights extend to unincorporated United States territories, whereas in incorporated territories all constitutional provisions are in force".

### iii. Harris v. Rosario (1980).-

*Harris v. Rosario*, 446 US 651 (1980), is another example of a case decided under the veil of the Insular Cases doctrine that has adversely affected Puerto Rico.  This case involved a question to the validity of a policy under which Puerto Rico received less assistance than states under the Aid to Families with Dependent Children (AFDC) program. In a succinct *per curiam* order, the Court held that a lower level of aid under the program to residents of Puerto Rico did not violate the Equal Protection Clause, because in U.S. territories Congress can discriminate against its citizens by applying a rational basis standard. The Court determined that there was a rational ground for the statutory classification since:

1. Puerto Rican residents do not contribute to the federal treasury;

2. The cost of treating Puerto Rico as a state for purposes of AFDC assistance would be high; and

3.   Granting greater AFDC benefits could disrupt the Puerto Rican economy.

## C. Characteristics of an Unincorporated Territory.-

The doctrines set forth in the above referenced cases are relevant and pertinent to the instant case since they define the contours and constitutive elements of an unincorporated territory.  Plaintiff's characterization of Puerto Rico as an unincorporated territory (pleading #10 of the original complaint) necessarily involves the adoption of the cited statements and criteria (in reference to Puerto Rico).  Plaintiff's cannot accept and adopt a conclusion (that Puerto Rico is an unincorporated territory) without simultaneously accepting the statements and arguments that served as its premise or justification.  Thus, it must be concluded that the following elements, statements and criteria that find a basis, amongst others, on the previously cited cases are part of the pleadings and assertions contained in the complaint filed by the United States Government:

1.   Puerto Rico is an unincorporated territory of the United States.
2.   The American citizens of Puerto Rico are not part of the "American Family" and would only be apt when Congress determines.
3.   Puerto Rico is a territory belonging to the United States, but not a part of the United States.
4.   Only fundamental constitutional rights extend to the American citizens residing in Puerto Rico.
5.   The American citizens of Puerto Rico don't pay federal taxes.
6.   The cost of treating Puerto Rico like a state or an incorporated territory would be high for purposes of this complaint.
7.   Granting greater benefits to Puerto Rico (like to states; including for purposes of this complaint) would disrupt Puerto Rico's economy.
8.   The blessings of a free government under the Constitution cannot still be extended to the American citizens of Puerto Rico.
9.   Puerto Rico is still inhabited by an alien race.
10.  Congress can treat Puerto Rico differently from states, so long as there is a rational basis for its actions.

As evidenced by the preceding, Plaintiff's depiction of Puerto Rico as an unincorporated territory cannot be characterized as a mere legal classification that can be avoided or overlooked by the amendment of a pleading, but a comprehensive legal policy with far-reaching consequences.   Should this Honorable Court dispose of this case under such prejudiced premises? As the discussion that follows will show, said characterization is not only blatantly discriminatory, but incorrect.   None of the ten previously cited statements is applicable to Puerto Rico and/or finds basis in the political and legal development of the relationship between Puerto Rico and the United States.   To the contrary, Puerto Rico has been legally incorporated to be "like a state" to the same (or more) extent as any other territory before becoming a state, or as the territories that were incorporated as states under the Northwest Ordinance.     However, before analyzing Puerto Rico's incorporation process it is necessary to briefly point out various aspects of these decisions that are demonstrative of their limited scope, philosophical ambivalence, and/or factual inaccuracy.

### i. Opposition to the Incorporation Doctrine- Downes v. Bidwell, supra.

While many are under the impression that the incorporation doctrine was overwhelmingly supported by jurists, academics and policymakers (including judges), the fact is that it confronted major opposition from the outset.    Amongst others, this fact is evidenced by the 5-4 split vote which decided the case and the contents of the dissident opinions. Within this context it is pertinent to extensively quote the dissenting opinion written by Hon. Judge Harlan which illustrates many of the legal deficiencies of the incorporation doctrine and presents us with multiples philosophical concerns that remain valid to this day.

"Mr. Justice Harlan, dissenting:

"...I agree in holding that Porto Rico-at least after the ratification of the treaty with Spain-became a part of the United Sates within the meaning of the section of the

constitution enumerating the powers of Congress, and providing that all duties, imposts, and excises shall be uniform throughout the United States......

The idea that this country may acquire territories anywhere upon the earth, by conquest or treaty, and hold them as mere colonies or provinces,-the people inhabiting them to enjoy only such rights as Congress chooses to accord to them is wholly inconsistent with the spirit and genius as well as with the words, of the Constitution.

The wise men who framed the Constitution, and the patriotic people who adopted it, were unwilling to depend for their safety upon what, in the opinion referred to, is described as 'certain principles of natural justice inherent in Anglo Saxon character, which need no expression in constitutions or status to give them effect or to secure dependencies against legislation manifestly hostile to their real interests. They proceeded upon the theory-the wisdom of which experience has vindicated-that the only safe guaranty against governmental oppression was to withhold or restrict the power to oppress.

I confess that I cannot grasp the thought that Congress, which lives and moves and has its being in the Constitution, and is consequently the mere creature of that instrument, can, at its pleasure, legislate or exclude its creator from territories which were acquired only by authority of the Constitution. The authority to make such concessions implies the existence in Congress of power to declare that constitutional provisions may be ignored under special or embarrassing circumstances. No such dispensing power exists in any branch of our government. The Constitution is supreme over every foot of territory, wherever situated, under the jurisdiction of the United Sates, and its full operation cannot be stayed by any branch of the government in order to meet what some may suppose to be extraordinary emergencies.

I reject altogether the theory that Congress, in its discretion, can exclude the Constitution from a domestic territory of the United Sates acquired, and which could only have been acquired, in virtue of the Constitution. The fathers never intended that the authority and influence of this nation should be exerted otherwise than in accordance with the Constitution...

But it is an entirely different question whether a domestic 'territory of the United States, having an organized civil government established by Congress, is not, for all purposes of government by the nation, under the complete jurisdiction of the United States, and therefore a part of, and incorporated into, the United States, subject to all the authority which the national government may exert over such territory or people.

Did it not become ' incorporated into the United States when Congress passed the Foraker Act? (Puerto Rico) (31 stat. at L. 77, chap. 191). In my opinion Puerto Rico became, at least after the ratification of the Treaty with Spain, a part of and

subject to the jurisdiction of the United States in respect of all its territory and people..." Id. At 1140.

### ii. The Philosophical Ambivalence of the Balzac Decision

Former U.S. President Taft, acting as a Supreme Court Chief Justice in 1922, used this decision to classify, as did the Court by judicial fiat in the Insular cases, newly acquired territories as incorporated and unincorporated, a classification not expressly found in the Constitution. He insisted that Congress had to show intention to 'incorporate" by either specific legislation and or public statements. He refused to acknowledge that American citizenship granted in 1917, the presence of a U.S. Federal District Court in San Juan, military service, "extension of revenue, laws, navigation, immigration" and the use of U.S. stamps were de jure and de facto acts of incorporation.

However it is ironic to note that he concludes that U.S. Federal laws can be applied to Puerto Rico (and Hawaii, at the time, not a state), laws based on the Constitution of the U.S., while denying the American citizen of P.R. the applicability of sections of the same Constitution.

### iii. The Inaccuracies of the Harris v. Rosario Decision

The Harris case was decided on erroneous and contradictory juridical premises. Justice Marshall, issued a staunch dissent, again noting that Puerto Ricans are United States citizens and that the Insular Cases are indeed questionable.  Similarly, in the arguments set forth below, the U.S. Supreme Court had clearly called into question the validity of the incorporation doctrine by mid-century:

"....Whatever the validity of the old cases such as *Downes v. Bidwell* ,1 82 U.S. 244 (1901), *Dorr v. United States*, 195 U.S. 138 (1904), and *Balzac v. Puerto Rico* , 258 U.s. 298 (1922), in the particular historical context in which they were decided, those cases are clearly not authority for questioning the application of the Fourth Amendment - or any other provision of the Bill in the 1970 's. As Mr.

Justice Black declared in *Reid v. Covert*, 354 U.S. 1, 14(1957). (plurality opinion)...".

"... [N]either the cases nor their reasoning should be given any further expansion. The concept that the Bill of Rights and other constitutional protections against arbitrary government are inoperative when they become inconvenient or when expediency dictates otherwise is a very dangerous doctrine and if allowed to flourish would destroy the benefit of a written Constitution and undermine the basis of our Government. "(Id.)...."

Likewise, the fiscal and economic premises set forth in the case were and continue to be factually inaccurate. As it will be shown later in the Brief, it patently is incorrect to assert that the American residents of Puerto Rico do not contribute to the Federal Treasury.

In Harris, the Court states that granting equal federal aid could disrupt the Island economy. However, as history has shown, the current scheme based on an unequal federal fiscal structure has depleted the local economic and fiscal system. As espoused by the undersigned in 1984:

> "The fact that the island has a separate fiscal structure with the peculiarity that local tax policies apply in most cases, federal tax policies apply in others and both tax policies in still other cases, makes the economic game completely different. With appropriate tax planning the citizens of Puerto Rico can legally avoid (even completely) paying annual income taxes both to the Local & Federal Treasury. In addition, a citizen of Puerto Rico, who pays local and also federal taxes because of his income from sources within the U.S., will be contributing to a treasury that will treat him differently for purposes of federal aid programs because of the political status of the jurisdiction in which he resides...." (G. Igartua, *U.S. IRC 936 - a Tax Policy Analysis Within the Puerto Rico Perspective-Tax Expenditures v. Government Direct Expenditures* - 45-1-4 P.R. Bar Journal 109 at 112 (Jan-Dec 1984).

### III.   PUERTO RICO'S GRADUAL INCORPORATION TO THE   UNITED STATES TO BE LIKE "A STATE"

Currently, Puerto Rico is an incorporated territory of the United States (See: *Consejo de Salud Playa de Ponce v Rullan*, 586 FS 2nd 22 (2008)). As evidenced by the discussion that

follows, incorporation is the result of a gradual process that began in 1898 and is comprised of many independent but coherent actions by all three branches of the U.S. Government.

A.      **Incorporation By Congress**

      The historical legislative incorporation of Puerto Rico into the U.S. is premised or based on the state model and finds its genesis in the Foraker Act. As evidenced by the legislative enactments listed under this section, by establishing analogous institutions to those in the States, Congress introduced Puerto Rico to the American Federal system, in a way that lead to a system which today resembles that of a State of the Union.

*i.      1900- Foraker Act.-*

      Shortly after the Treaty of Paris was ratified, the Act of April 12, 1900, (31 Stat. 77), known as the Foraker Act, became law. This legislation established a civil government for Puerto Rico, including provisions for courts, and extended the statutory laws of the United States not locally inapplicable. The President was authorized to appoint, with the consent of the Senate, the Governor of Puerto Rico, and its chief executive officers, the justice of the Supreme Court of Puerto Rico, and the judges of the local United States District Court. Congress required that all laws enacted by the Puerto Rico legislative assembly be reported to Congress, which reserved the power and authority to annul the same.

      The Foraker Act was conceived as a transitional measure. It is clear that the aspirations of the people of Puerto Rico were not met by the Act, but its effect in the development of the relationship between Puerto Rico and the United States cannot be undermined.

*ii. 1917- Jones Act; American Citizenship.-*

      On March 2, 1917, President Woodrow Wilson signed the act entitled: "An Act to provide a civil government for Puerto Rico and for other purposes", commonly referred to as

the Jones Act.  The Jones Act separated the Executive, Judicial, and Legislative branches of Puerto Rico's government, and created a locally elected bicameral legislature.  Additionally, the legislation conferred the Federal District Court jurisdiction over all cases cognizable in the district courts of the United States; generally granted Puerto Rico citizens United States citizenship, and codified a bill of rights which remained in effect until 1952 with nearly all of the personal guarantees found in the United States Constitution (99.6% of the inhabitants voted freely and voluntarily to adopt American citizenship in 1917).

In regards to American citizenship, Congress built upon the basis set by the Jones Act and in 1951 legislated as follows: "All persons born in Puerto Rico on or after April 11 1899, and before January 13, 1941 in the jurisdiction of the United States, who subject to the jurisdiction of the United States, who resided on January 13, 1941 in Puerto Rico or other territory over which the United States had jurisdiction under any other statute, were citizens of the United States as of January 13, 1941. All persons born in Puerto Rico on or after January 13, 1941, and subject to the jurisdiction of the United States, become citizens of the United States at birth".  8 U.S.C § 1402.

Citizenship is a crucial element to the incorporation discussion.  American residents of Puerto Rico cannot be deprived by Congress of their citizenship, nor can their citizenship rights be altered (See *Afroyim v. Rusk*. 387 US. 253, at 268 (1967); *Santori v. US* 30 F 3' 126; and, *Lozada Colon v. US Dept.. of State,* #97-1831, US District, DC, 4/23/1998). Thus, by granting American citizenship by birth to the residents of Puerto Rico, these became part of the national federalist cooperative affair, in which the citizens became part of the country.  (Part of the "American Family") (Id. Afroyim). (See also, U.S. *v Lucienne D' Hotelle De Rexach*, 558 F2d 37 (1977).

*iii.*    *1948 - Right to elect a Governor.-*

In 1947, Congress granted the qualified voters of Puerto Rico, for the first time, the right to elect their own governor by popular suffrage. Act of Aug. 5, 147, c 490, 61 Stat. 770.


*iv.*    *Right to Adopt a Constitution as in States. -*

In 1952 Congress enacted the Puerto Rican Federal Relations Act, 64 Stat. 319. (Also referred to as Law 600). One important disposition of said Law was that, within the jurisdictional territorial boundaries, the People of Puerto Rico were authorized to adopt their own constitution. Like those of the different "states" of the Union, it provided for a republican form of government, and was adopted with the consent of the people of Puerto Rico subject to the approval of the US Congress (which it did subject to the condition that any amendment or revision be consistent with the applicable provisions of the Constitution of the United States). (66 Stat. 327).  It was stated in Congress that: "... as regards local matters, the sphere of action and the methods of government bear a resemblance to that of any State of the Union.." (S Rep. No. 1270, 82 d Cong, 2d Sess, 6 1952). (Compare with, Art. IV - Section 4 - US Constitution). Law 600 provided in pertinent part as follows:

> **Organization of government pursuant to constitution - 48USCA731 (b).-**
>
> Fully recognizing the principle of government by consent, sections 731  (b) to 731 (e) of this title are now adopted.... so that the people of Puerto Rico may organize a government pursuant to a constitution of their own adoption.

> **Submission of sections 731 (b) to 731 (e) of this title to people of Puerto Rico for referendum; convening of constitutional convention; requisites of constitution -48USCA731 (c).-**
>
> Sections 731(b) to 731(e) of this title shall be submitted to the qualified voters of Puerto Rico for acceptance or rejection through an island-wide referendum to be held in accordance with the laws of Puerto Rico. Upon the approval of said

sections, by a majority of the voters participating in such referendum, the Legislature of Puerto Rico is authorized to call a constitutional convention to draft a constitution for the said island of Puerto Rico. The said constitution shall provide a republican form of government and shall include a bill of rights.

### Ratification of Constitution by Congress.- 48USCA731 (d)

Upon adoption of the constitution by the People of Puerto Rico, the President of the United States is authorized to transmit such constitution to the Congress of the United States if he finds that such constitution conforms with the applicable provisions of sections 731b to 731e of this title and the Constitution of the United States. Upon approval by the Congress the constitution shall become effective in accordance with its terms.

Following the procedure approved by Congress, a process similar to the one adopted for territories moving to statehood, the People of Puerto Rico adopted a constitution in 1952, which states in its Preamble:

"We, the People of Puerto Rico, in order to organize ourselves politically on a fully democratic basis, to promote the general welfare, and to secure for ourselves and our posterity the complete enjoyment of human rights, placing our trust in Almighty God, do ordain and establish this Constitution for the commonwealth which in the exercise of our natural rights, we now create within our union with the United States of America.
In so doing, we declare:

The democratic system is fundamental to the life of the Puerto Rican community.

We understand that the democratic system of government is one in which the will of the people is the source of public power, the political order is subordinate to the rights of man, and the free participation of the citizen in collective decisions is assured.

We consider as determining factors in our life our citizenship of the United States of America and our aspiration continually to enrich our democratic heritage in the individual and collective enjoyment of its rights and privileges; our loyalty to the principles of the Federal Constitution.". (1 LPRA Constitution de P.R. Preamble).

The approval and adoption of the Constitution to organize a local government (like the "states"), with the requirement that it, or any amendment or revision, be consistent with the applicable provisions of the Constitution of the United States, particularly with its Preamble; by the free and voluntary direct vote of the American citizens residents of Puerto Rico; its free and voluntary transmittal to Congress by the President of the United States; and the free and voluntary ratification by direct vote of the members of the Congress; was a democratic process carried under the veil of U.S. Constitutional requirements. It was a democratic commitment carried on with the mutual consent of the People of the United States and by the People of Puerto Rico, all American citizens; by American citizens and for American citizens (Compare with U.S. Const. Art. IV-4).  It was a democratic commitment by the United States to the People of Puerto Rico, and the legal basis in support of incorporation has to be considered as supported by that commitment.

It is also pertinent for this Court to consider that from the outset the process was legally interpreted from an incorporation perspective.  Within this context, it is relevant to note that:

> - "As to substance Law 600 does not differ at all from the enabling acts passed in the procedure for admission into the Union of new states..." (Rafael Hernandez Colon, The Commonwealth of Puerto Rico: Territory or State. P.R. Bar Journal 207, at 239 (1959). (Honorable Rafael Hernandez Colon is an Ex-Governor of Puerto Rico).

As a result "of Law 600" Puerto Rico's government was presently and permanently restricted by federal law and federal principles. (*Hernandez Agosto v. Romero Barceló* 594 FS 1390). Evidently, this includes democratic and human rights principles. (Id. 48 USCA 731 (b)). (See also, *Consentino v. International Longshoremen Assn. et. als.* 126 FS 420); Examining *Board v. Flores* 426 US 572 (1976)). (See *Hon. .Judge Gustavo A. Gelpi* "Mensaje en Ocasión

de los Actos Conmemorativos del Quincuagésimo Aniversario. La Constitución del Estado Libre Asociado. (July 25, 2002)").

### v.        Privileges and Immunities Clause

It is pertinent to note that Congress, legislatively and without a constitutional amendment, extended to Puerto Rico Article IV Section 2 of the U.S. Constitution (Privileges and Immunities Clause).

"….The rights privileges and inmunities of citizens of the United States shall be respected in Puerto Rico to the same extent as though Puerto Rico were a State of the Union …" (48 U.S.C. 734 (1955).

### vi.       Application of Federal Laws.-

Congress has expressly stated that the laws of the United States, which are not locally inapplicable, apply in Puerto Rico with the same effect and to the same extent and validity as in the Unites States. See 39 STAT 954 LPRA- Law 600, Section 9.

### vii.      Treaty Rights Equal Protection Clause

All treaties under the U.S. Constitution are considered to be the Supreme Law of the Land (U.S. Const. Art. VI). The United States is signatory to various treaties that establish requirements aimed at guaranteeing human rights to all citizens of the signatory countries. This includes rights similar to those espoused in the Bill of Rights, and other rights such as the equal protection of the law and democratic rights aimed at guaranteeing government by consent. The judicial definition of what constitutes an unincorporated territory is incompatible with those treaty provisions. In fact, the treatment afforded to the American citizens residing in Puerto Rico by the United States Government, particularly the deprivation of federal democratic rights, is contrary to multiple treaty obligations, including those contained in the treaties cited below:

US Treaties Requiring Equal Rights to All Citizens of Signatory Countries.-

1. Treaty Covenant of Civil and Political Rights (999 UNTS 171- Articles 1 and 2).

2. OAS American Declaration on the Rights and Duties of Man - Art. 9.

3. UN Human Rights Declaration (G.A Res 217 A III A/810, 1948).

4. OAS Democratic Charter (OAS Dec OEZ/ Serv P/AG/Res 2001).

5. Declaration on the Right and Responsibility of Individuals to Promote and Protect Universally Recognized Human Rights (U.N. General Assembly Resolution 53/144 March 8, 1999).

These international obligations voluntarily undertaken by the United States render the non-incorporation territorial policy presently inapplicable to Puerto Rico (See also, *Igartua v US*, Hon. Judges Toruella and Howard's dissenting opinions, 407 F3 d 30).

## B. Judicial Incorporation of Puerto Rico

### i.     *Federal Judicial Branch in Puerto Rico*

With respect to the Federal Judicial Branch, the Federal District Court of Puerto Rico is included as a judicial district of the United States; and in matters of jurisdiction, powers, and procedures, it is in all respects equal to other United States District Courts. Rules of Federal criminal and civil procedure are applicable and diversity jurisdiction applies as in the states. (Compare with Art. III US Const). (See also: "…the Puerto Rico courts provide an "adequate state forum" for the adjudication of federal constitutional claims…." *Coors Brewing Company v. Mendez –Torres, Secretary of the Treasury of P.R.*, No. 11-1559- 1st Circuit April 27, 2012).

### ii.     *Judicial Opinions Of Constitutional Applicability to Puerto Rico*

If incorporation is a measure of the application of the U.S. Constitution to a territory and its residents, then the following listed decisions, independently and collectively, must be considered as affirmative acts of incorporation since they expressly provide for the application of a particular constitutional provision to Puerto Rico:

❖ Art. 1 Sect. 8.c  - *Sea-Land Services. Inc. v Municipality of San Juan*, 505 F. Supp. 533) (D.P.R. 1980).

❖ Art. I Sect. 10 - *Buscaglia v. Ballester*, 162 F 2d 805 (1st Cir. 1947), cert. denied. 336 U.S. 816 (1947).

❖ Art. IV U.S. Const. Sect. 1 - *Americana of Puerto Rico v. Kaplus*, 368 F. 2d 431 (3d Cir. 1966). See also 28 U. S.C. 1738 (1988).

❖ U. S. Const. Amendment 1 -  *Balzac v People of Porto Rico*, 258 U.S. 298, 314 (1922), implies that the First Amendment applies to Puerto Rico.

❖ U. S. Const. Amendment 4 - *Torres v. Puerto Rico*, 442 U.S. 465 (1979).

❖ U. S. Const. Amendment 8 - *Feliciano v. Barcelo*, 497 F. Supp. 14, 33 (D.P.R. 1979).

❖ Puerto Rico is to be treated as a state for purposes of [ a criminal defendant's protection under] the double jeopardy clause, *US v Lopez Andino* 831 F2d 1164.

❖ Puerto Rico is a state for purposes of the dormant clause of the Constitution, Trailer Marne trasp 977 F2d 7

❖ U. S. Const. Amendment 11 - *Fernandez v. Chardon*, 681 F. 2d 42 (1st Cir.1982); Nieves- Mayaguez v PR, 977 F2d. 1,7 (1st Cir 1992)

❖ US Const. Amendment XI - *Ezratty v Puerto Rico*, 648 F 2''' 770, (1981)- The principles of the Eleventh Amendment which protect a state from suit without its consent, are fully applicable to the Commonwealth of Puerto Rico.

❖ U. S. Const. Amendment XIV equal protection rights - *Examining Board v. Flores de Otero*, 426 U.S. 572,599-601 (1976).

❖ U. S. Const. Amendment XIV - *Rodriguez v. Popular Democratic Party*, 457 U.S. 1. 7-8 (1982).

❖ *Boumediene v Bush* (See comments below)

### iii. Boumediene v. Bush - Puerto Rico No Longer a Non-Incorporated Territory.-

The U.S. Supreme Court's latest expression on the Insular Cases arose in *Boumediene v. Bush*, 553 U.S., 723 128 S. Ct. 2229 (2008).  The case involved aliens detained as enemy combatants at the United States Naval Station in Guantanamo Bay, Cuba. The Court, citing

Justice Brennan's concurrence in Torres, supra, held that "[i] t may well be that over time the ties between the United States and any of its unincorporated territories strengthen in ways that are of constitutional significance. Id. at 2255 (emphasis added). Moreover, the Court raiterated that whatever the validity of the Insular Cases, as early as the 1970's these were not a source of authority to question the applicability of the US Constitution to Puerto Rico.

## C.  Incorporation By The Executive Branch

### i.        Oath of Loyalty by P.R. Govt. Officials 1899

Since 1898 all the Puerto Rico Civil Government officials, including Mr. Luis Muñoz Rivera, former Resident Commissioner of Puerto Rico in Washington DC., were required to subscribe the following document:

> "And, I also swear, that I will support with and defend the United States Constitution against all enemies, exterior or interior; I will accept it with loyalty and submission and that I make this commitment freely and without reserve or purpose to evade it".

Consider that the oath did not require to support or defend the territorial clause only, but the entire U.S. Constitution.

### ii.    The Henry Carrol Report / Executive Order 1899

President William McKinley sent a commission headed by Henry K. Carroll to Puerto Rico to study all aspects of the Island in 1899. The commission studied government, commerce, industries, productions, roads, tariff and currency. The commissioners held hearings in many towns. The report was submitted to President McKinley on October 6, 1899. Some of the recommendations were:

1.  "That the Constitution and laws of the United States be extended to Porto Rico; that all citizens...be declared citizens of the United States...".

2.   "That a Territorial form of government, similar to that established for Oklahoma, be provided for Porto Rico...".

3.   "That the legislative power shall extend to all rightful subjects of legislation consistent with the Constitution of the United States...".

Practically all recommendations were ratified by Congress.

### iii. U. S Agencies Treat Puerto Rico as a State.-

Presently all U. S. Agencies and /or subdivisions of the Executive Branch treat Puerto Rico similar to a "State". Many have offices in Puerto Rico.

### iv. Federal Taxes Paid from Puerto Rico

Most Federal internal revenue laws are applicable within the jurisdiction of Puerto Rico as if Puerto Rico were a state, to the extent that in certain categories more taxes are paid to the Federal Treasury from Puerto Rico than from some states. The Internal Revenue Service operates various offices in different regions within Puerto Rico, and the U.S. Customs service also operates in Puerto Rico. Such revenues collected, as the revenues collected from Federal and state taxes from other American citizens residing in the different states, constitute an active ingredient of the national economy, interacting within the U.S. jurisdictional boundaries, under one national free market system, regulated by uniform monetary policies.

Within this context it is pertinent to note that the following are subject to federal taxation:

1.  The more than 12,000 federal government employees.
2.  The more than 12,000 serving in the National Guard, the Reserves, and on Active Duty in the Armed Forces of the U.S.
3.  Those who earn interest from U.S. Treasury securities.
4.  Those who have income from the sale or rental of property in the 50 states.
5.  Inheritors of estates originating outside of Puerto Rico.
6.  Anyone who receives income from sources outside Puerto Rico. (See *U.S. v Rexach*, 185 FS 465).

Additionally, it is pertinent to note the following facts pertaining to federal taxation[1]:

1. In 2011 the residents of Puerto Rico contributed 3.1 billion dollars to the U.S. Treasury, which is almost as much as the residents of Vermont (3.3 billion dollars), who have a per capita income which is approximately three times the per capita income of the residents of Puerto Rico.

2. In 2011 businesses in Puerto Rico contributed more to the U.S. Treasury than businesses from Montana and New Mexico.

3. In 2011 Employees and Employers in Puerto Rico contributed more to the U.S. Treasury in Social Security (FICA) taxes than Employees and Employers in Vermont and Wyoming.

4. In 2011 Employees and Employers in Puerto Rico contributed more to the U.S. Treasury in Unemployment Insurance than Employees and Employers in Alaska, Delaware, the District of Columbia, Hawai'i, Idaho, Maine, Montana, New Hampshire, New Mexico, North Dakota, Rhode Island, South Dakota, Vermont, West Virginia, and Wyoming.

5. In 2011 residents of Puerto Rico contributed $988,000 in estate (inheritance) taxes to the U.S. Treasury.

These statistics published by the IRS are clear evidence that residents of Puerto Rico do pay federal taxes, and in some categories do contribute more to the U.S. Treasury than the residents of some states. Reviving the rationale of *Harris v. Rosario* in 2013, that Puerto Rico does not pays federal taxes as Plaintiff implicitly pretends, is a false representation of Puerto Rico's contributions to the U.S. Treasury.   Notwithstanding this fact, Congress still discriminates against the American citizens of Puerto Rico by assigning Puerto Rico less in federal funds than it does to any of the individual states.

**D. Military Contributions of the American Citizens Residents of Puerto Rico**

---

[1] SOURCE: Chief Financial Officer
Internal Revenue Service
U.S. Treasury Department
Table 5. Gross Collections, by Type of Tax and State, Fiscal Year 2011.

Thousands of American citizens residents of Puerto Rico have defended democracy and the Nation in military conflicts in which the Nation has been involved since 1917. Hundreds have died in such conflicts (including during service in the most recent wars in Afghanistan & Iraq) (15,000 soldiers of PR origin were activated in the Iraq War; 11% of these were injured; approximately 100 of these died- *10 Años Despúes del Ataque a Irak*, Primera Hora, 15 de marzo 2013).

In summary, all of the policies cited above (Brief Part III) constitute acquired rights and obligations within the American constitutional legal framework. Thus, Puerto Rico is legally and practically an incorporated territory of the United States, and its 3.8 million American Citizens deserve equal treatment on Police Security and Protection Benefits. Taking into account the spirit of the U.S. Constitution, this treatment of incorporation is long overdue for Puerto Rico.

## III.   OPPOSITION TO PLAINTIFFS' ASSERTION THAT PUERTO RICO IS A NON-INCORPORATED TERRITORY

### A)   <u>Opposition to the Insular Cases Criteria</u>

In light of the preceding discussion on Puerto Rico's gradual incorporation to the United States it is pertinent to revisit and oppose the ten previously discussed elements, statements and criteria associated to non-incorporation that serve as a basis to Plaintiffs' express and implied assertion that Puerto Rico is an unincorporated territory.  (See Part II-C pg. 8).

❖ ***Opposition to Criteria #1, #2, #3  #8 and #9***  - To say that Puerto Rico is an unincorporated territory is discriminatory and incorrect as it is evidenced by the elements set forth in Part III of this Brief. Particularly, it is incorrect and discriminatory to propose that American citizens by birth are not part of the American Family (See Part III A (2) of the Brief). It should be noted that Plaintiff never refers in the complaint to the American citizens residents of Puerto Rico but to "the People of Puerto Rico".

❖ *Opposition to Criterion #4* - As to criterion #4, it is by its very nature contradictory to suggest that Puerto Rico is an unincorporated territory where the full U. S. Constitution does not apply while at the same time filing the instant complaint to demand and secure applicability of the U.S. Constitution to the American citizens of Puerto Rico.

❖ *Opposition to Criterion #5* – Reviving and supporting the rationale that served as a basis for the U.S. Supreme Court's decisions in *Harris vs. Rosario* and in *Califano vs. Torres* declaring that: "Puerto Rican residents do not contribute to the federal treasury" is wholly inconsistent with the fiscal reality of the island and incognizant of its role and contributions within the national economic system. Within this context, it is pertinent to note that the data is readily available in the form of IRS Statistics of Income Tables published annually. (See Part III – C iii).

❖ *Opposition to Criterion #6* -"The cost of treating Puerto Rico as a State under the statute would he high". Since when is it the function of the U.S. Dept. of Justice to tell Congress not to implement a program which will affect 3.8 million American citizens because of its cost?

❖ *Opposition to Criterion #7* – "greater benefits could disrupt the Puerto Rican economy". The Puerto Rican economy, like that of the fifty states, is part of the greater U.S. economy. The health and/or condition of the Puerto Rican economy directly impacts the national economy. If we follow their perverse logic, then the poorer counties of some states, and severely depressed cities like Detroit, Michigan and Elkhart, Indiana, should receive less federal aid from Congress.

❖ *Opposition to Criterion #10* - That Congress enjoys authority to treat Puerto Rico differently from states, as long as there is a "rational basis for its actions", is by its very nature an argument in support of discrimination. This is the same logic that was used by the U.S. Supreme Court in various far reaching decisions, including:

1. *Dred Scott v. Sandford*, 60 U.S. 393 (1857): Dred Scott, a runaway slave, was returned to his owner, because constitutionally speaking he was "property" and not a person. It took a Civil War, the death of one half million Americans, and three constitutional amendments (XIII, XIV, XV) to undo the Dred Scott decision.

2. *Plessy v. Ferguson* 163 U.S. 537 (1896): Mr. Plessy, a man of European and African ancestry was denied service in an all white train. The Supreme Court ruled that it was compatible with the U.S. Constitution as long as "separate and equal" services were provided. This decision institutionalized segregation (Apartheid) in the U.S. for more than sixty years until it was nullified by *Brown vs. Board of Education* in 1954.

3. 1902-1922: In the Insular Cases the U.S. Supreme Court ruled that Puerto Rico, and other newly acquired territories "belonged to" but were not part of the U.S., thus subjecting the American citizens who live in Puerto Rico to a geographical discrimination on the part of the Federal Government for more than one hundred years. (Previously cited and discussed in Part II-B).

25

As evidenced by the preceding discussion, the criteria and/or characteristics adopted by the US Supreme Court to describe unincorporated territories are currently inapplicable to Puerto Rico both in practical and philosophical terms. Nonetheless, as in the instant case, the federal government's policies towards Puerto Rico have been highly inconsistent qualifying and/or treating Puerto Rico as unincorporated in some instances and incorporated in others. (See *for example, U.S. v Laboy, 553 F3d 715,* Opinion by Supreme Court Judge Sandra O' Connor). (The following must also be considered in support of incorporation: "…This statement that Puerto Rico is an unincorporated territory is at odds with that of our President's Task Force Report on Puerto Rico's status of March 11, 2011 which at page 19 reads: 'The Supreme Court's Insular Cases interpreted the U.S. Constitution and Federal law on a number of questions related to Puerto Rico. Those decisions...in any event, do not address the development of the relationship of Puerto Rico with the United States…..'." (See note #1 of the January 3rd, 2013 Order in the instant case).

The discriminatory treatment resulting from said inconsistent treatment has caused grave legal, social, political, and economic problems for the island and its residents; including the following:

a) <u>Legal Problems</u>- the uncertainty caused by the application of the U.S. Constitution on a case by case basis allows and leads to an arbitrary, capricious, unequal and discriminatory treatment by each of the three Branches of the Federal Government against its own American Citizens residing in Puerto Rico.  The same American citizens that ironically and contradictorily it pretends to protect in this complaint. The American citizens residents of Puerto Rico do not have government by consent. The Government requires the American Citizens residing in Puerto Rico to comply with the US Constitution, but selectively and capriciously denies its applicability.

b) <u>Social Problems</u>- Puerto Rico has one of the highest indexes of criminal activity in the Nation. Puerto Rico is under the custody and "parens patriae" of the United States, and most of the criminal activity is related to interstate or international activities, which are under the jurisdiction and responsibility of Plaintiff.

On the other hand, social mobility has reversed in the case of the American citizens of Puerto Rico due to the economic crisis, labor conditions, increase in unemployment and increase for social needs. (A. Álvarez, *En Picada la Movilidad Economíca y Social*, El Vocero page 20, March 25, 2013).

c)   Political Problems- It has the American citizens residents of Puerto Rico divided between those who support American citizenship with full rights under statehood, (62%), and those supporting American citizenship with privileges of a sovereign nation. Moreover, these cannot vote for the President or elect Senators (2) and Representatives to Congress (5). Notwithstanding, these have to defend the democratic rights of citizens of other Nations.

d)   Economic problems- Puerto Rico has the lowest income per capita in the Nation; 50% lower than that of the poorest state.   Puerto Rico's unemployment rate of 14.4 % is almost double the National average of 7.7 %. Puerto Rico does not receive federal funds in parity with the states. As a result, Puerto Rico is at a competitive disadvantage against the states that impairs its ability to retain its skilled and professional workforce. Many of its professionals and skilled workforce has moved residence to the states for better salaries and benefits. (See *Exilio Económico vacía el ELA*; R.C. Torres; El Vocero page 4; March 18, 2013).  Moreover, the U.S. has signed treaties with various Latin American Nations which have affected Puerto Rico's economic competitiveness. Many manufacturing plants have moved operations to the signatory countries with adverse economic consequences.  Puerto Rico does not participate in the ratification of these treaties.

On the other hand, Puerto Rico is covered by the Jones Act for purposes of shipping laws, which impose higher costs for all merchandise exported or imported to Puerto Rico. The U.S. Government opposes exempting P.R. from the Jones Act in order to protect the U.S. merchant marine fleet (at our expense). (Caribbean Business, March 21, 2013*; "GAO, Lifting Jones Act in P.R. a Mixed Bag, could sink US Shipping Industry…"*).

B)   **Opposition to Unincorporated Treatment  in this Complaint**

As repeatedly stated in this Brief, the incorporation issue is not a mere philosophical concern but a comprehensive legal policy with far-reaching practical consequences. For purposes of the instant complaint, Plaintiff's discriminatory policies towards Puerto Rico are particularly evidenced by the limited amount of resources assigned to comply with the constitutional requirements set forth in the complaint.  Plaintiff seeks to impose the same constitutional requirements and responsibilities it imposes to states while simultaneously

assigning Defendant a substantially inferior amount of funds.  This discriminatory treatment capriciously imposes upon Defendant the burden of funding all or most of the cost associated to the implementation of the remedies sought.  Implementation costs have been estimated at $300 million. (See *Carísima La Reforma de la Policía*, El Nuevo Día page 20; March 1, 2013).  This amount is substantial and burdensome if we consider the current recommended budget of the Puerto Rico Police Department ($766 million for fiscal year 2012-13) and the island's dire fiscal and economic outlook. (Puerto Rico is at risk of a degrading of its bonds by credit rating agencies "A un Paso de Chatarra Crédito del ELA, El Vocero, page 21, March 14,2013). This situation is particularly onerous if we consider that the American citizens residing in Puerto Rico do not have the political power in Congress to oversee the actions of the U.S. Dept. of Justice as residents of states do.   Evidently, Plaintiff is claiming the full application of the U.S. Constitution for the purpose of supporting the allegations contained in the complaint, while simultaneously requiring the implementation of remedies under unequal and discriminatory conditions.   Unmistakably, that is a policy based on the notion of Puerto Rico as an unincorporated territory, since it is clearly contrary to incorporation.

This reality cannot be avoided or overlooked by an amendment of the pleadings. Furthermore, the discriminatory nature of the instant complaint is evidenced by Plaintiffs' own policies towards Puerto Rico. The Department of Justice assigns Puerto Rico less funds per capita than to all states and territories.

The Department of Justice Program Awards as compared to the 50 states and the territories is shown below:

i.    ***U.S. Department of Justice Office of Justice Programs (as of September 30, 2011) Awards as of September 30, 2011.***

| STATE | GRANT[2] | POPULATION[3] | AWARD PER CAPITA |
|---|---|---|---|
| Alabama | $25,239,360 | 4,802,740 | $5.26 |
| Alaska | 17,408,626 | 722,718 | 24.09 |
| Arizona | 57,760,706 | 6,482,505 | 8.91 |
| Arkansas | 14,703,050 | 2,937,979 | 5.00 |
| California | 319,507,553 | 37,691,912 | 8.48 |
| Colorado | 41,636,517 | 5,116,796 | 8.14 |
| Connecticut | 24,131,350 | 3,580,709 | 6.74 |
| Delaware | 7,756,743 | 907,135 | 8.55 |
| Florida | 133,307,812 | 19,057,542 | 7.00 |
| Georgia | 101,732,141 | 9,815,210 | 10.36 |
| Hawaii | 8,206,072 | 1,374,810 | 5.97 |
| Idaho | 12,079,920 | 1,584,985 | 7.62 |
| Illinois | 76,064,126 | 12,869,257 | 5.91 |
| Indiana | 28,089,491 | 6,516,922 | 4.31 |
| Iowa | 15,509,808 | 3,062,309 | 5.06 |
| Kansas | 16,962,375 | 2,871,238 | 5.91 |
| Kentucky | 39,244,966 | 4,369,356 | 8.98 |
| Louisiana | 25,027,498 | 4,574,836 | 5.47 |
| Maine | 9,651,213 | 1,328,188 | 7.27 |
| Maryland | 87,852,236 | 5,828,289 | 15.07 |
| Massachusetts | 53,667,119 | 6,587,536 | 8.15 |
| Michigan | 49,186,078 | 9,876,187 | 4.98 |
| Minnesota | 33,290,771 | 5,344,861 | 6.23 |
| Mississippi | 14,221,679 | 2,978,512 | 4.77 |
| Missouri | 28,586,196 | 6,010,688 | 4.76 |
| Montana | 11,867,102 | 998,199 | 11.89 |
| Nebraska | 10,166,884 | 1,842,641 | 5.52 |
| Nevada | 38,531,972 | 2,723,322 | 14.15 |
| New Hampshire | 9,603,594 | 1,318,194 | 7.29 |
| New Jersey | 55,515,874 | 8,821,155 | 6.29 |
| New Mexico | 18,434,486 | 2,082,224 | 8.85 |
| New York | 147,070,966 | 19,465,197 | 7.56 |
| North Carolina | 59,599,168 | 9,656,401 | 6.17 |
| North Dakota | 7,316,348 | 683,932 | 10.70 |

---

[2] U.S.  Dept Of Justice web site: http://www.justice.gov.
[3] The World Almanac and Book of Facts. 2013.

| | | | |
|---|---|---|---|
| Ohio | 53,718,216 | 11,544,951 | 4.65 |
| Oklahoma | 28,255,027 | 3,791,508 | 7.45 |
| Oregon | 32,389,815 | 3,871,859 | 8.37 |
| Pennsylvania | 73,753,104 | 12,742,866 | 5.79 |
| Rhode Island | 7,898,687 | 1,051,302 | 7.51 |
| South Carolina | 29,617,639 | 4,679,230 | 6.33 |
| South Dakota | 12,962,826 | 824,082 | 15.73 |
| Tennessee | 36,592,793 | 6,403,353 | 5.71 |
| Texas | 155,407,360 | 25,674,681 | 6.05 |
| Utah | 17,753,158 | 2,817,222 | 6.30 |
| Vermont | 5,213,078 | 626,431 | 8.32 |
| Virginia | 141,570,406 | 8,096,604 | 17.49 |
| Washington | 47,437,209 | 6,830,038 | 6.95 |
| West Virginia | 10,450,110 | 1,855,361 | 5.63 |
| Wisconsin | 37,018,695 | 5,711,767 | 6.48 |
| Wyoming | 4,718,988 | 568,158 | 8.31 |
| Puerto Rico | 13,620,791 | 3,690,923 | 3.69 |
| Guam | 3,438,819 | 154,805 | 22.21 |
| American Samoa | 1,890,392 | 54,947 | 34.40 |
| US Virgin Islands | 2,183,043 | 105,275 | 20.74 |
| District of Columbia | 48,169,164 | 617,996 | 77.94 |
| Northern Marianas | 1,857,474 | 51,395 | 36.14 |

ii.     *US Department of Justice Office of Justice Programs awards to Puerto Rico as compared to awards to the fifty states and territories.*

1.     Puerto Rico's per capita award of $3.69 was less than the per capita award to each individual state. Indiana was the state which received the smallest per capita award:  $4.31. Alaska received the highest per capita award: $24.09.

2.     Puerto Rico's per capita award of $3.69 was smaller than the per capita award to the District of Columbia ($77.94) .

3.      Puerto Rico's per capita award of $3.69 was smaller than the per  capita award to:

Guam....................................$22.21
American Samoa.....................34.40
US Virgin Islands....................20.74
Northern Marianas...................36.14

5.      Puerto Rico's per capita award was the smallest of every single U.S. political jurisdiction.

As shown, Puerto Rico is being asked to bear most of the burden for protecting the rights guaranteed in the Constitution of the U.S. to the 3.8 million American citizens who live in Puerto Rico, even though Plaintiff claims that Puerto Rico is unincorporated and therefore the entire U.S. Constitution does not apply.

### V. FINAL COMMENTS

The instant complaint seeks a noble and just cause for the American Citizens of Puerto Rico.  However, the end does not justify the means, and the means implied or proposed in this case are discriminatory, arbitrary, and unequal.

The Puerto Rico of the present is, thus, one which Congress, pursuant to Article IX of the Treaty of Paris, in 1898 and pursuant to the territorial clause (U.S. Constitution Article IV), has assimilated in the very image and likeness of the United States system of government and laws, and in which an Article III Federal Court sits. Moreover, for over ninety six (96) years Puerto Ricans have been loyal United States Citizens; today fourth and fifth generation American citizens by birth. The People of Puerto Rico are the People of the United States since 1898.

In *Martin v. Hunter*, I Wheat. 304,324, 326,331, 4 L ed. 97. 102,104, the Supreme Court stated: "The Government of the United States was ordained and established, not by the states in their sovereign capacities but emphatically, as the preamble of the Constitution declares, by the People of the United States".

Furthermore, and as espoused by Justice Harlan in *Downes v. Bidwell*, supra at 376, citing *McCulloch v. Maryland*. 4 Wheat. 316, 403-406,4 L. ed. 579, 600, 601: "The government

proceeds directly from the people; is ordained and established in the name of the people; and is declared to be ordained in order to form a more perfect union, establish justice, insure domestic tranquility, and secure the blessings of liberty to themselves and to their posterity. The assent of the states, in their sovereign capacity, is implied in calling a convention, and thus submitting that instrument to the people. But the people were at perfect liberty to accept or reject it; and their act was final. It required not the affirmance, and could not be negative, by the state governments. The Constitution, when thus adopted, was of complete obligation, and bound the state sovereignties. .. . The government of the union, then (whatever may be the influence of this fact on the case) is emphatically and truly a government of the people. In form and in substance it emanates from them. Its powers are granted by them, and are to be exercised directly on them and for their benefit. This government is acknowledged by all to be one of enumerated powers…"

"It is the government of all; its powers are delegated by all; it represents all, and acts for all.' If the national government is in any sense a compact, it is a compact between the People of the United States among themselves as established. The constitution speaks, not simply to the states in their organized capacities, but to all peoples whether of states or territories, who are subject to the authority of the United States". *Martin v. Hunter.* 1 Wheat. 327. 4L. ed. 103".

As previously denoted, the People of Puerto Rico are the People of the United States, all to whom the U.S. Constitution speaks.

As this Honorable Court has so eloquently stated: "Congress today, thus must afford Puerto Rico and the 4 millions U.S. citizens residing therein all [U.S.] constitutional guarantees. To hold otherwise, would amount to the court blindfolding itself to continue permitting

Congress…" to switch on and off the Constitution, like it was done by the Court in the Insular Cases…." (*Consejo de Salud de Playa de Ponce v Rullan* 586 FS 2nd 22 (2008).

In 2013, the ties between the United States and Puerto Rico have strengthened in such a way, and in such constitutional significance, that the island must be definitely considered incorporated territory. (see *Boumediene*, supra). The evidence cited in this brief should move this Honorable Court, in justice to the 3.8 million American Citizens residents of Puerto Rico, to reaffirm its opinion in *Consejo de Salud de Playa de Ponce v Rullan*, supra, and declare Puerto Rico as an incorporated territory of the United States. This Declaratory Judgment would eliminate, once and for all, the discriminatory and arbitrary treatment in federal programs afforded to the good American citizens of Puerto Rico. It would recognize their right to the equal protection of the law.  As applicable to the instant case, it would provide equal treatment in federal funds for anticrime policies.

The Honorable Court cannot allow Plaintiff to claim the full application of the Constitution for the purpose of establishing obligations while advocating its selective application for the purpose of recognizing rights. (See generally: Hon. Judge Torruella dissenting opinion in *Igartua v. U.S.* 654 F3d 99 (2011)).

Economists Armen Albert Alchian and Reuben Kessel published an article years ago about the economic costs and burdens of discrimination.  Amongst others, they concluded that

> "….discrimination is costly, not just to those discriminated against, but also to those who discriminate. The discriminators give up the chance to deal with someone with whom they could engage in mutually beneficial exchange…" (The Wall Street Journal, February 20, 2013   pg   15A).(See also, *U.S. v Carolene Products Co.* 304 US 144, 152 n.4 1938).

In October 28, 1898 all laws in effect in Puerto Rico that were contrary to the Constitution of U. S. were declared null and void. In 1952 a majority of the American Citizens

residents of Puerto Rico voted in favor of accepting the supremacy of the Constitution of the U. S. over the Constitution of Puerto Rico and over all local laws. In neither case was that allegiance and supremacy confined to Article IV, paragraph 3, clause 2 of the U.S. Constitution. The 3.8 million Americans who live in P. R. owe allegiance to, and accept the Supremacy of the Constitution of the U.S. (1 LPRA – PR Contitution Art. VII – 3) ( See also, U.S. Const. Art VI). For the Department of Justice of the United States to claim in 2013 that Puerto Rico is a non-incorporated territory of the United States is to make a mockery of that allegiance and supremacy.

## VI. CONCLUSION

This Honorable Court should not decide this case without a Declaratory Judgment reaffirming Puerto Rico's status as an incorporated territory of the United States. Furthermore, it is within that legal reality and perspective that the allegations and remedies sought in the Complaint should be disposed of. The 3.8 million American Citizens residents of Puerto Rico, including the undersigned, have a substantial interest in this complaint.

**RESPECTFULLY SUBMITTED.**


s/ Gregorio Igartua

**GREGORIO IGARTUA**
**ATTORNEY AS AMICUS CURIAE**
**COMERCIO ST. #52, AGUADILLA, PR**
**BOX 3911, AGUADILLA, PR 00605**
**TEL (787) 891-9040, FAX (787) 882-3011**
**USDC ATTY. NO. 130712**
**bufeteigartua@yahoo.com**