# EXHIBIT A

# Investigation of the
# Puerto Rico Police Department



United States Department of Justice
Civil Rights Division

September 5, 2011

# TABLE OF CONTENTS

ABBREVIATIONS ......................................................................................................... 3

GENERAL METHODOLOGY ...................................................................................... 4

I. EXECUTIVE SUMMARY .................................................................................... 5

II. BACKGROUND ................................................................................................... 12

A.  Puerto Rico Police Department ......................................................................... 12
B.  University College of Criminal Justice (Police Academy) ............................... 13
C.  Public Safety ..................................................................................................... 13
D.  Police Crime and Corruption ............................................................................ 14

III. PATTERN AND PRACTICE OF CONSTITUTIONAL VIOLATIONS ........ 19

A.  PRPD Engages in a Pattern and Practice of Use of Excessive Force .............. 20
    1.  Officers Use Excessive Force in Violation of the Fourth Amendment ............... 20
    2.  Officers Use Unreasonable Force to Suppress the Exercise of Protected
        First Amendment Rights .................................................................................... 25
    3.  Deficiencies Causing and Contributing to the Pattern and Practice of Excessive
        Force ................................................................................................................. 32

B.  PRPD Engages in a Pattern and Practice of Unconstitutional Searches and Seizures ...... 45
    1.  Officers Conduct Searches and Seizures in Violation of the
        Fourth Amendment ............................................................................................ 46
    2.  Systemic Deficiencies Causing and Contributing to the Pattern and Practice of
        Unlawful Searches and Seizures ....................................................................... 50

C.  Additional Areas of Serious Concern ............................................................... 54
    1.  Allegations of Discriminatory Police Practices by PRPD ................................. 54
    2.  PRPD's Failure to Address Domestic Violence and Sexual Assault ................... 57

IV. ADDITIONAL DEFICIENCIES CAUSING THE PATTERN AND PRACTICE OF
CONSTITUTIONAL VIOLATIONS ........................................................................... 59

A.  Inadequate Policies and Procedures .................................................................. 60

B.  Insufficient Training .......................................................................................... 61
    1.  The University College Lacks Accreditation and Independence ......................... 61
    2.  Pre-Service Training Is Insufficient .................................................................. 63
    3.  In-Service Training Is Virtually Non-Existent ................................................... 65

C.  Inadequate Supervision ..................................................................................... 67

D.  Seriously Deficient Civilian Complaint Process ............................................... 68
    1.  The Complaint Intake Process Discourages Civilians from Filing Complaints ... 68

    2.     Complaint Investigations Routinely Take Years To Complete .......................... 70
    3.     Procedures and Protocols Are Insufficient To Ensure Proper Investigations....... 74
    4.     Investigators Lack Training and Resources ........................................................ 75

E.     Ineffective Discipline ......................................................................................... 76
    1.     The Police Personnel Regulation Is Sorely Outdated ........................................ 77
    2.     Supervisors Lack Authority and Training To Correct Even Minor Infractions of
       Their Subordinates ............................................................................................ 78
    3.     Administrative Investigations Take Too Long To Complete .............................. 78
    4.     Disciplinary Action Is Inconsistent and Ineffective in Deterring Misconduct ..... 78
    5.     Protections Against Self-Incrimination Are Offered in Administrative
       Investigations ................................................................................................... 80

F.     Limited Risk Management ................................................................................. 80

G.     Lack of External Oversight and Accountability ................................................. 83
    1.     CIPA .................................................................................................................. 84
    2.     Puerto Rico Civil Rights Commission ............................................................... 84

**V.     RECOMMENDED REMEDIAL MEASURES .................................................. 85**

**VI. CONCLUSION ............................................................................................... 110**

Endnotes.............................................................................................................111

Appendix A:   Additional Illustrative Incident………………………………………..A-1
Appendix B:   Relevant Correspondence…………………………………………..A-10

# ABBREVIATIONS

| | |
|---|---|
| PRPD | Puerto Rico Police Department |
| DOJ | United States Department of Justice |
| CED | Conducted Energy Device |
| CIPA | Commission on Investigations, Processing, and Appeals of Puerto Rico |
| CRC | Civil Rights Commission of Puerto Rico |
| DNVW | Drugs, Narcotics, Vice, and Illegal Weapons Division |
| FBI | Federal Bureau of Investigation |
| FSI | Forensic Sciences Institute of Puerto Rico |
| FY | Fiscal Year (in Puerto Rico, running from July 1 to June 30) |
| GO | General Order of the Puerto Rico Police Department |
| IAD | Internal Affairs Division |
| IACP | International Association of Chiefs of Police |
| LEMAS | Law Enforcement Management and Administrative Statistics |
| PID | Public Integrity Division |
| POST | Peace Officer Standards and Training |
| PRD | Professional Responsibility Division |
| PRDOJ | Puerto Rico Department of Justice |
| SIB | Special Investigations Bureau of the Puerto Rico Department of Justice |
| SO | Special Order of the Puerto Rico Police Department |
| SOU | Special Operations Unit |
| STU | Specialized Tactical Unit |
| TOU | Tactical Operations Unit |
| UPR | University of Puerto Rico |

# GENERAL METHODOLOGY

This report contains the findings of the Civil Rights Division's pattern and practice investigation[1] of the Puerto Rico Police Department ("PRPD"). The investigation was conducted pursuant to the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141, and the Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C. § 3789d. Section 14141 permits the Attorney General, acting on behalf of the United States, to initiate civil actions against state and local governments to remedy a pattern or practice of conduct that deprives persons of rights, privileges, or immunities secured or protected by the Constitution and federal law. The Safe Streets Act, together with Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d to 2000d-7, prohibit discrimination on the basis of race, color, sex, or national origin by state or local criminal justice agencies receiving federal funding.

Attorneys and staff from the Civil Rights Division's Special Litigation Section conducted the investigation alongside law enforcement professionals, whose expertise informed our understanding. These professionals – former police chiefs and supervisors – provided us with in-depth knowledge about how to detect and respond to law enforcement challenges.

We gathered information through many interviews and meetings with PRPD officers, supervisors, and command staff, as well as members of the public, Commonwealth officials, and other community stakeholders. We interviewed officers from all ranks at PRPD headquarters and ten police areas: San Juan, Carolina, Bayamón, Fajardo, Humacao, Caguas, Ponce, Guayama, Mayagüez, and Aguadilla. We also participated in ride-alongs with officers and supervisors. Our investigation included on- and off-site review of documents, including policies and procedures, incident reports, internal investigation files, disciplinary index cards maintained by PRPD's Legal Affairs Office, external audit reports, and legislative materials.

# I.  EXECUTIVE SUMMARY

The Puerto Rico Police Department is Puerto Rico's primary law enforcement agency. Its mission is critical:  To protect and serve the residents of Puerto Rico by designing and implementing policies and practices that control crime, ensure respect for the Constitution and the rule of law, and enable the Department to enjoy the respect and confidence of the public.

Many hard working and dedicated PRPD officers serve the public with distinction under often challenging conditions.  Unfortunately, PRPD is broken in a number of critical and fundamental respects that are clearly actionable under the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141 ("Section 14141").  Based on our extensive investigation, we find reasonable cause to believe that PRPD officers engage in a pattern and practice of:

- excessive force in violation of the Fourth Amendment;
- unreasonable force and other misconduct designed to suppress the exercise of protected First Amendment rights; and
- unlawful searches and seizures in violation of the Fourth Amendment.

In addition to these findings, our investigation uncovered other deficiencies of serious concern.  In particular, there is troubling evidence that PRPD frequently fails to police sex crimes and incidents of domestic violence, and engages in discriminatory policing practices that target individuals of Dominican descent in violation of the Fourteenth Amendment, the Safe Streets Act, and Title VI.  At this time, we do not make a formal finding of a pattern and practice violation in these areas, in part because PRPD does not adequately collect data to evaluate these issues.  However, we are quite concerned that PRPD lacks basic systems of accountability to ensure that all individuals are treated equally by PRPD officers, regardless of race, ethnicity, national origin, or sex as required by federal law.  Furthermore, our investigation raises serious concerns that PRPD policies and practices are woefully inadequate to prevent and address domestic violence committed by PRPD officers.  We find that these deficiencies will lead to constitutional violations unless they are addressed.  PRPD's continued failure to keep necessary data in light of our findings and despite knowledge of these indicators of a very serious problem, may constitute a pattern and practice that violates federal law.

We recognize that PRPD faces significant challenges as Puerto Rico's primary law enforcement agency.  The unconstitutional acts that we have identified arise at a time of crisis in public safety.  Contrary to national trends, violent crime increased overall in Puerto Rico by 17% from 2007 to 2009.  In 2010, Puerto Rico saw the second highest number of murders in its history, a trend that is escalating in 2011.  The clearance rate for murders remains below the national average.  Some Puerto Rico officials maintain that drug trafficking and social deterioration are fueling the wave of violent crime.  However, increasing crime cannot be used to justify continued civil rights violations or the failure to implement meaningful reforms. Constitutional policing and effective law enforcement are inextricably bound.  Public safety depends on the trust and cooperation of the community, which in turn depends on constitutional police practices that respect civil rights.  Our previous efforts in working with large police departments strongly suggest that by addressing the civil rights concerns we raise in this report,

the Commonwealth will not only meet its constitutional duty, but also reduce crime, improve public safety, and increase community confidence.[2]

For many years, victims' families, civic leaders, legislators, and civil rights advocates have voiced concerns over chronic mistreatment by police. For example, over the past decade, various legislative measures have called for comprehensive investigations of police misconduct, greater education and training, and an accounting of public funds spent on civil rights lawsuits against the Commonwealth. Other grass-roots and advocacy organizations have sent letters to Puerto Rico officials denouncing allegations of discrimination against people of Dominican descent, and civic and professional organizations have issued investigative reports detailing numerous civil rights violations at the hands of police. PRPD officers have also called for agency reforms. One police affinity group representing thousands of officers attributed widespread low morale among officers to verbal abuse from supervisors, indifference to officers' personal problems, lack of support and training, absence of motivational and educational activities, deficient equipment and materials, and late payment.

The public's demands for remedial action are fueled in part by the appalling number of officer arrests and convictions for serious misconduct and criminal activity. Among these are: the killing of family members by two police officers in the "Massacre of Las Piedras" in 2007; the videotaped shooting of a civilian by a Tactical Operations Unit ("TOU") officer during a birthday celebration in Humacao in 2007; the shooting death of a PRPD lieutenant by a sergeant at a police station in Yabucoa in 2007; the conviction of multiple officers assigned to the Mayagüez Drug Unit for planting drugs in 2008; the conviction of the director of the Special Arrests and Extraditions Unit and several of his officers on drug-related charges in 2009; the conviction of a lieutenant directing the weapons registry at PRPD headquarters as part of an illegal gun licensing scheme in 2009; the indiscriminate use of batons and chemical irritants against protesters at the Capitol in June 2010; the shooting death of an unarmed young man who was reportedly aiding police following a robbery in September 2010; and the arrest of 61 PRPD officers as part of the largest police corruption operation in the Federal Bureau of Investigation's ("FBI") history in October 2010.

In the report that follows, we discuss the wide range of issues that were the focus of our investigation and the findings that result from our review. In sum, our investigation reveals the following:

- **The constitutional violations we uncovered are pervasive and plague all levels of PRPD.**

Our investigation concluded that a longstanding pattern and practice exists of PRPD officers violating the Constitution by using force, including deadly force, when no force or lesser force was called for. As a result, PRPD officers have unnecessarily injured hundreds of people and killed numerous others. PRPD's overreliance on such tactics is evident in its regular deployment of heavily armed tactical units on routine patrols or "preventive rounds," usually in public housing complexes or low-income neighborhoods. These units, relying almost exclusively on extreme displays of force and actual force, rather than on more contemporary problem-solving approaches, were neither intended nor trained to perform such patrol functions.

Indeed, the marked disconnect between residents and tactical officers, who routinely enter neighborhoods en masse with high-caliber rifles drawn amid children, seniors, and other bystanders, reveals PRPD's reliance on law enforcement strategies that run counter to widely accepted models of community-oriented policing. Distressingly, an officer assigned to one of these units told us openly and without objection from his supervisors that officers *need* to violate civil rights to fight crime and meet the goals set by government officials. This conduct deprives the people of Puerto Rico of their rights guaranteed by the Constitution and federal law.

Officers' use of excessive force also chills speech in violation of the First Amendment. While some individuals may engage in unlawful activity during protests and civil demonstrations, only a fraction of the force used by PRPD is directed at specific threats or criminal behavior, as evidenced by the dearth of arrests supported by probable cause. Instead, PRPD officers regularly rely on the indiscriminate use of force or threat of force well beyond what is necessary to protect public safety when engaging with crowds. Specifically, PRPD indiscriminately used chemical agents, batons, and physical force against demonstrators and other individuals on University Avenue in August 2009, at the Sheraton Hotel in May 2010, and at the Capitol in June 2010. PRPD officers also used choke holds and pressure techniques against protestors who were passively resisting or otherwise not posing any significant threat as recently as December 2010 and January 2011. In February 2011, officers pushed, struck, and sprayed protestors at a university campus, and officers threw rocks and other objects at individuals who likewise posed no significant threat. The use of excessive force by PRPD officers in these instances, along with other tactics aimed at intimidating demonstrators, has garnered significant public attention and discouraged residents of Puerto Rico from engaging in protected First Amendment activities. While we recognize that prolonged strikes and civil demonstrations strain PRPD personnel and resources, Puerto Rico must not waver in its duty to uphold the fundamental rights of all residents, even when their viewpoints or affiliations may be disagreeable.

We also found a pattern and practice of illegal searches and seizures in violation of the Fourth Amendment. Specifically, our investigation revealed a pattern and practice of PRPD officers conducting searches of civilians' homes without a warrant or consent and in the absence of any exigent circumstance or exception that would render such a search constitutional. Too frequently, PRPD officers plant evidence during searches, rely on excessive force and intimidation as search aids or tools, and proceed with searches even when knowing that the address, identity of the individual, or other pertinent information is incorrect. The evidence we uncovered further demonstrates that PRPD officers engage in a regular pattern of detaining, arresting, and searching individuals without reasonable suspicion or probable cause in violation of the Fourth Amendment, and that supervisors and members of specialized units are often involved in these unlawful acts.

- **The staggering level of crime and corruption involving PRPD officers must be addressed in systematic fashion.**

The amount of crime and corruption involving PRPD officers further illustrates that PRPD is an agency in profound disrepair. From January 2005 to November 2010, there were more than 1,709 arrests of PRPD officers. The charges varied widely, from theft and simple

assault to rape, drug trafficking, and murder.  Hundreds of officers have also engaged in domestic violence; many have been arrested multiple times for harming their partners.

- **There are many contributing factors to the constitutional violations.**

PRPD has failed to provide officers with the basic understanding and tools they need to safeguard the rights of the people they serve.  Basic systems of accountability are non-existent or profoundly broken, and have been for years.  Although our report focuses on recent constitutional violations, the systemic deficiencies that underlie the misconduct developed over a much longer period.  These systemic deficiencies include the following:

1. **Policies fail to guide officers on lawful policing practices.**  PRPD's policies and procedures on use of force and searches and seizures are out-dated, disorganized, and omit contemporary legal standards.  Officers are not provided with copies of PRPD's policies, or access to policies through other reliable means, to reference as they carry out their day-to-day duties.  As a result, officers develop their own informal practices, and the operations of similar units or components throughout PRPD vary widely.  Officers also expressed a fundamental misunderstanding of critical aspects of their duties.  For instance, officers in different areas and units routinely defined "force" differently.  Many other officers were unfamiliar with the parameters of temporary investigatory detentions, or *Terry* stops, which may, when performed unreasonably, constitute Fourth Amendment violations.  These and other essential concepts are not communicated effectively and consistently to officers on an ongoing basis through policy.

2. **Pre-service field training is insufficient.**  Cadets review PRPD's policies and procedures while attending pre-service training, but are not provided with post-academy field training to prepare them for real-life policing.  This training is particularly essential in developing the practical skills, judgment, and understanding necessary to lawfully employ force, effect arrests, treat all persons equally, and solve problems effectively as partners with the community.  Instead, new officers are simply armed and released into the streets and neighborhoods of Puerto Rico.  In many cases, they never return to the academy for regular in-service training.

3. **In-service training is virtually non-existent.**  Effective law enforcement agencies reinforce their expectations on use of force and searches and seizures through consistent and sufficient in-service training.  However, many PRPD officers reported that they do not return to the University College of Criminal Justice ("University College") for in-service training for years, or ever, after completing the pre-service program.  In 2010, the Puerto Rico Legislature confirmed these reports and passed legislation requiring PRPD to provide at least 12 hours of annual in-service training.  The Legislature found the training was "necessary and urgent" in light of domestic violence, corruption, and numerous instances in which officers failed to exercise self-control with civilians.  Even with the new legislation, PRPD still requires less than half the average number of annual training hours required by police departments across the country.

4. **No external oversight of officer standards and training.** Unlike every state except Hawaii, Puerto Rico does not have a state-wide authority that establishes minimum law enforcement standards and training requirements, such as Peace Officer Standards and Training ("POST") boards, commissions, or academies. Instead, Puerto Rico vests sole authority for officer recruitment, hiring, training, and development of core competencies on the discretion of the Superintendent. PRPD Superintendents, subject to budget and political pressures, have reduced the length of pre-service training programs, authorized deployment of cadets on patrol duties before cadets completed critical training, and changed the criteria used to identify at-risk officers who engage in repetitive misconduct, without any accountability for outcome.

5. **Tactical units have been allowed to develop violent subcultures.** PRPD has been on notice for years that officers assigned to tactical units routinely employ excessive force when interacting with civilians. These units all too frequently rely on intimidation, fear, and extreme use of force to manage crowds and are often deployed to low-income and minority communities on routine patrols. These units operate with insufficient training and guidance on the lawful exercise of police power.

6. **Supervision is lacking.** PRPD has too few qualified supervisors to effectively supervise. PRPD has not filled many of the 2,100 supervisor vacancies it reported in 2009. In some instances, supervisors must supervise 18 or more officers, nearly double the generally accepted ratio of 1:10. In the field, supervisors are not required to independently review the use of force of their subordinates. As a result, officers engage in multiple incidents of misconduct over prolonged periods, without effective intervention from supervisors.

   Many officers expressed concern that PRPD's promotion practices are driven more by one's affiliations than talents. For instance, although agency regulations indicate that objective examinations should be used to select candidates for promotion, we found that the vast majority of promotions were carried out as excepted "merit" promotions under special authority granted to the Superintendent. Only five percent of officers were promoted by examination from January 2008 to September 2010. Many officers reported that the prevalence of discretionary promotions reinforced their concerns about the quality of supervision.

7. **Internal investigations take years to complete.** Profound deficiencies in the conduct of administrative investigations leave misconduct unaddressed, decimate officer morale, and foster the public's mistrust. We found that administrative investigations routinely take years to complete – in some cases, 10 or more years – well beyond the 180-day timeframe required by existing Puerto Rico regulations.

8. **Discipline is seriously deficient.** In 1989, the First Circuit upheld punitive damages against the Superintendent and other supervisors for federal civil rights violations, relying on evidence that PRPD's disciplinary system was "grossly deficient." As evidence of the dysfunction in PRPD, many aspects of this seriously broken disciplinary system remain unchanged. For example, immediate supervisors are not involved in the disciplinary process, disciplinary sanctions are too limited in scope, and officers are permitted to

refuse to testify or give a statement to internal investigators. Discipline is also ineffective because administrative investigations take years to complete, or are never resolved. In many instances, officers develop pronounced patterns of serious misconduct and face removal only after they are charged with a crime. Other problem officers, sometimes referred to as "parachuters," are simply transferred from one component to another, without any effort to address their underlying problems, because of the extreme delays in completing internal investigations.

9. **Inoperable risk management system.** Effective risk management systems help commanders and supervisors take early corrective action when officers exhibit potential problem behaviors. Interventions typically include targeted training, education, and counseling. These systems are designed to protect the community and support officers who may be experiencing difficulties. PRPD developed a limited program in 1990 following a federal civil rights lawsuit that found PRPD supervisors liable for operating a "grossly deficient" disciplinary system. The program provided a one-size-fits-all intervention, a multiple-day training course, which PRPD stopped offering in 2007. PRPD did not resume the course until October 2010.

It would be an enormous mistake to continue attributing the widespread and ongoing police misconduct that infects PRPD to an isolated group of individual officers or a seemingly intractable crime problem. Doing so not only forestalls the implementation of critical reforms, but also prevents PRPD from regaining the credibility and respect it needs and deserves to fight crime effectively and uphold the rule of law.

- **Prior efforts to reform PRPD have been sporadic and superficial, all too often spawned by public outcry over the latest tragic event.**

The Government of Puerto Rico has recognized the public's diminishing confidence in PRPD following tragic and violent incidents involving police corruption and misconduct. However, the implementation of corrective action has been sporadic and superficial. In 2007, former Superintendent Pedro Toledo Dávila established an external evaluating committee to assess violence, corruption, and misconduct within PRPD. The committee issued reports finding patterns of civil rights violations and corruption, and recommended dozens of remedial measures.[3] In its December 2007 report, the committee urged Puerto Rico to establish a fully resourced commission to develop long-term solutions to PRPD's complex and institutional deficiencies, an endeavor they projected would take up to two years.[4] No such commission was ever created, and many recommendations were not implemented. Governor Luis Fortuño acknowledged the need for reform in September 2010 when he called on the Civil Rights Division to "expand its investigation to incidents of possible use of excessive force or other possible violations of civil rights by the Police of Puerto Rico that may have occurred during [his] administration . . ."[5] Despite longstanding calls for external reviews and investigations, basic reforms have not been implemented and the necessary effort to openly restore the public's trust remains long overdue.

For too long, PRPD has failed to provide its officers with meaningful systems of support and accountability to ensure that officers discharge their duties lawfully and effectively. Policies

do not delineate the limits of lawful exercise of police power; training is insufficient; supervision is too unquestioning and sparse; and civilian complaints languish for years. The lack of meaningful external oversight of PRPD policies and actions exacerbates these issues. The problems outlined in this report are chronic and pervasive. The public lacks confidence in PRPD at a time when Puerto Rico faces significant public safety challenges. While Puerto Rico has taken some initial steps to detect, correct, and deter the problems we highlight in this report, it has failed to adequately address the institutional causes that contribute to both its unconstitutional law enforcement and ineffective policing. It is imperative that Puerto Rico act decisively, openly, and transparently to restore the public's trust and ensure that PRPD becomes an institution that exemplifies the rule of law for all residents in Puerto Rico.

The path toward lasting reform will require nothing less than federal judicial intervention. We believe a court-enforceable agreement will provide the structure, transparency, and accountability that will be necessary to achieve sustainable reform. Accordingly, we look forward to working with Puerto Rico, rather than engage in contested litigation, to craft a meaningful and collaborative reform plan with judicial oversight that will ensure constitutional policing, improve public safety, and restore the public's confidence.

The report that follows is an account of our findings. Section II provides background information concerning PRPD, the University College (which serves as PRPD's training academy), public safety, and crime and corruption within PRPD. Section III discusses the patterns and practices of civil rights violations involving use of excessive force, use of unreasonable force to suppress speech, and unconstitutional searches, detentions, and seizures. We also include illustrative cases demonstrating the deprivation of federal rights and discuss specific deficiencies that cause the pattern and practice for each type of violation. Section IV evaluates additional systemic deficiencies that are common causes and contributing factors for all the violations we uncovered. Finally, Section V provides recommendations for remedying PRPD's systemic deficiencies.

## II. BACKGROUND

### A. Puerto Rico Police Department

PRPD is the primary law enforcement agency in Puerto Rico, providing a wide array of basic and specialized policing services to its 3,726,000 residents. PRPD is the second largest law enforcement agency in the country, with approximately 17,153 sworn officers.[6] There are approximately 4.6 active PRPD officers for every 1,000 residents in Puerto Rico, which represents more than twice the national average for local police departments serving populations of 250,000 or more.[7] PRPD's jurisdiction is divided into 13 police regions: Aguadilla, Aibonito, Arecibo, Bayamón, Caguas, Carolina, Fajardo, Guayama, Humacao, Mayagüez, Ponce, San Juan, and Utuado. Each police region is led by a commander who directly oversees field operations and criminal investigations. Each regional commander reports to the Superintendent. There are six divisions that are administered from PRPD headquarters, including the Professional Responsibility Division ("PRD"), which conducts internal and administrative investigations of PRPD personnel. A Technology and Communications Bureau is responsible for operating PRPD's communication command centers throughout Puerto Rico.

Supreme authority over PRPD is vested in the Governor. The Governor delegates the immediate administration of PRPD to a Superintendent, who is confirmed by the Puerto Rico Senate. The Governor also approves appointments to PRPD's highest ranks, ranging from inspectors to colonels. The Superintendent manages PRPD directly through general and special orders that operate as PRPD's policies and procedures. The Superintendent is charged with the overall administration of PRPD, including recruiting, selecting, training, deploying, and disciplining officers and cadets. There are no accrediting or regulatory agencies in Puerto Rico that promulgate law enforcement standards or training requirements beyond those established by the Superintendent.

On July 6, 2011, the Governor appointed Emilio Díaz Colón, a former Adjutant General of the Puerto Rico National Guard, as Superintendent of PRPD. General Díaz Colón replaced Superintendent José Figueroa Sancha, who resigned on July 2, 2011. Figueroa Sancha, a former Assistant Special-Agent-in-Charge of the FBI's San Juan Division, was preceded by Pedro Toledo Dávila, who also served with the FBI prior to joining PRPD. Former Superintendent Toledo Dávila served as Superintendent from 1993 to 2001, and again from 2005 to 2009. Four separate Superintendents served from 2001 to 2005.

PRPD provides basic law enforcement services through comprehensive enforcement of Puerto Rico's penal code. PRPD also provides specialized security and protective services to airports, highways, coastal boundaries, seats of government, and dignitaries. PRPD's enabling statute, Law Number 53 of June 10, 1996, known as the "Puerto Rico Police Act," sets forth PRPD's duties and responsibilities, including "pursuing and securing the most complete protection of civil rights of civilians." P.R. Laws Ann. tit. 25, § 3102 (2008) *et seq*. PRPD's operating budget for FY 2012 is approximately $766 million, an increase of 3.3% from FY 2011. Puerto Rico's Office of Management and Budget reports that PRPD received approximately $15.1 million in federal funding and an additional $43.6 million in American Recovery and Reinvestment Act funds from 2009 to 2011.[8]

**B.      University College of Criminal Justice (Police Academy)**

The University College, located in Gurabo, serves as the training institution for PRPD and other municipal law enforcement agencies.  The University College was established in 1999 after the Puerto Rico Legislature authorized former Superintendent Toledo Dávila to convert PRPD's police academy into an institution of higher education.  The University College is licensed by the Puerto Rico Council on Higher Education and confers associate's degrees in police sciences to cadets completing a pre-approved curriculum.  PRPD requires its officers to hold at least an associate's degree.

A Board of Directors governs University College.  The Board is composed of nine members, eight of whom are appointed by the Governor.  The Superintendent serves as the President and ex officio member of the Board.  The Superintendent also selects the chancellor and associate deans with the Board's approval.  The current chancellor is Dr. Zulma Méndez Ferrer.

**C.      Public Safety**

Public safety is a significant challenge in Puerto Rico.  As illustrated below, according to the FBI's Violent Crime Index, violent crime increased by 17% in Puerto Rico from 2007 to 2009.[9]  Violent crime is composed of murder and non-negligent manslaughter, forcible rape, robbery, and aggravated assault.  In contrast, over the same period, violent crime decreased across the United States.  Although violent crime decreased slightly in 2010, the number of murders and non-negligent manslaughters in Puerto Rico rose steeply from 901 to 983, almost supplanting 1994 (which registered 995 murders) as the year with the highest murders in Puerto Rico's history.  In 2009, Puerto Rico's murder rate was higher than each of the 50 states, at 22.5 per 100,000 persons, nearly double the next highest state, Louisiana, with 11.8 murders per 100,000 persons.  At the same time, PRPD's self-reported murder clearance rate of 43% – defined in the FBI's Uniform Crime Reporting ("UCR") program as offenses "closed" by arrest or exceptional means – was well below the national average of 66.6% in 2009.[10]  The trend continues to escalate, with 568 murders reported in the first six months of 2011, 98 more than in the same period last year.  The month of June 2011 proved to be among the most violent, with 101 murders reported.

A significant number of murders and violent crimes have involved Puerto Rico's lesbian, gay, bisexual, and transgender ("LGBT") communities.  Information we have obtained indicates that at least 18 LGBT Puerto Ricans have been murdered since 2010.  Three of those murders occurred in the span of 72 hours in early June 2011.  According to recent reports from the Puerto Rico Department of Justice ("PRDOJ"), no one has been convicted of a bias-motivated crime under Puerto Rico law.  PRPD acknowledges a need to improve its handling and investigation of hate crimes, particularly crimes against individuals in the LGBT community.  PRPD should continue to work collaboratively with other law enforcement agencies and the community to thoroughly and timely investigate potential hate crimes.  In this regard, on January 27, 2011, DOJ's Community Relations Service ("CRS") helped facilitate an agreement between PRPD, the University College, and the Puerto Rico Civil Rights Commission ("CRC") to improve officer training and community education on hate crimes.  While we have not completed our

investigation into these matters, available data strongly suggest that PRPD's efforts in addressing these deficiencies should be revisited and appropriately modified to ensure the safety of all Puerto Rico residents.



**Figure 1: Violent Crime, by Type, 2007-2010**

|  | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|
| Forcible Rape | 97 | 95 | 65 | 39 |
| AggravatedAssault | 2983 | 3115 | 3440 | 2757 |
| Robbery | 5134 | 5467 | 6093 | 6590 |
| Murder | 731 | 807 | 894 | 983 |

## D. Police Crime and Corruption

The degree of police corruption and criminal misconduct in Puerto Rico is high and contributes to the public safety and civil rights crisis. More PRPD officers are involved in criminal activity than in any other major law enforcement agency in the country. PRPD officers have been arrested for criminal activity ranging from simple assault and theft to domestic violence, drug trafficking, and murder. From January 2005 to November 2010, there have been more than 1,709 arrests of PRPD officers. These arrest rates are significantly higher than those of comparable jurisdictions. According to the New York Police Department's Internal Affairs Bureau, authorities made approximately 607 arrests of uniformed officers between 2001 and 2006, out of a force roughly twice the size of PRPD.[11]

1. **Officers Arrested for Criminal Conduct**

In October 2010, in the largest police corruption operation in the FBI's history, 89 law enforcement officers and other individuals were arrested for drug and firearm violations. Among the officers arrested, 61 were PRPD officers. As noted below, several of these officers have already pled guilty. PRPD officers, including supervisors and members of specialized units, were also convicted in other cases involving serious criminal activity in breach of the public's trust. The following examples illustrate the breadth and depth of the corruption in PRPD. We provide additional examples in Appendix A.

- In December 2010, Officers Raquel Delgado Marrero and Ángel Rivera Claudio were convicted of three counts each for drug and firearm-related charges for their participation in a July 2009 drug transaction in which they provided armed protection to a drug dealer during the sale of seven kilograms of cocaine.[12]

- On December 16, 2009, Officer Edwin Mercado Irizarry, assigned to the San Juan Stolen Vehicles Division, pled guilty to charges involving aggravated illegal appropriation, fraud, witnesses tampering, preparation and presentation of false documents, and ethics violations. According to the indictment, Mercado Irizarry stole multiple items from an evidence storage room at PRPD Headquarters and tried to cover-up the theft by falsifying documents and attempting to force witnesses to provide false statements.[13]

- On August 3, 2009, Lieutenant Flores Vázquez, Director of the Special Arrest and Extradition Division, pled guilty to conspiring to possess controlled substances with the intent to distribute when he and officers under his command transported cocaine in marked police vehicles and protected shipments of narcotics. Lieutenant Flores Vázquez also conspired to extort money in exchange for illegally obtaining temporary prisoner release orders. He was sentenced to 168 months of imprisonment.[14] Three other officers pled guilty to the conspiracy and other charges.

- In July 2009, Immigration and Custom Enforcement ("ICE") agents intercepted Sergeant Juan Quiñones Rosario in a marine vessel traveling toward the Dominican Republic. ICE agents discovered U.S. currency, totaling more than $1,600,000 hidden inside multiple compartments in the vessel. On August 5, 2010, Sergeant Quiñones Rosario pled guilty to charges that he failed to report the cash as required by federal law and for smuggling the money out of the United States.[15]

- On July 2, 2008, Arecibo Illegal Weapons Division Officer Carlos Ríos González pled guilty to government ethics charges for selling ammunition belonging to PRPD; the court fined him $1000.

- On December 22, 2008, Officer Wilden Semidey Rivera pled guilty to bribery charges for requesting and accepting $200 from a civilian who wanted to avoid DUI charges.[16]

As with much of PRPD's data collection, PRPD data related to police-involved criminal activity are inadequate and inaccurate. Based on our review of press accounts and local and

federal court dockets, we found an additional 21 arrests of officers that were not included in the 1,709 arrests reported by PRPD:

**Table 1:  Arrests of Officers Not Reported by PRPD**

| Approx. Date | Summary of Charges | Status* |
|---|---|---|
| 10/18/2010 | Weapons violation after allegedly shooting a municipal officer | Convicted |
| 7/18/2010 | Illegal appropriation of public funds and related charges for falsely claiming overtime hours | Pending |
| 7/18/2010 | Illegal appropriation of public funds and related charges for falsely claiming overtime hours | Pending |
| 6/13/2008 | Anti-piracy law violation for filming a movie at a theater | Convicted |
| 2/27/2008 | Conspiracy to provide false statements during the purchase of firearms | Convicted |
| 2/19/2008 | Importing narcotics | Convicted |
| 1/26/2008 | Illegal appropriation after stealing canisters of gasoline | Convicted |
| 12/1/2007 | Attempted murder | Convicted |
| 10/19/2007 | Conspiracy to possess with intent to distribute cocaine | Convicted |
| 9/20/2007 | Child abuse | Pending |
| 8/31/2007 | Interfering with commerce by threat or violence | Convicted |
| 7/21/2007 | Carjacking, conspiracy against civil rights, weapons violation, tampering with a witness | Convicted |
| 7/21/2007 | Carjacking, conspiracy against civil rights, weapons violations, and tampering with a witness | Convicted |
| 7/18/2007 | Conspiracy to commit murder, bribery, and government ethics violations | Pending |
| 7/18/2007 | Conspiracy to commit murder, bribery, and government ethics violations | Pending |
| 7/17/2007 | Fraud and aggravated theft | Convicted |
| 5/11/2007 | Controlled substances and government ethics violations | Convicted |
| 5/11/2007 | Controlled substances and government ethics violations | Pending |
| 5/11/2007 | Controlled substances and government ethics violations | Pending |
| 3/14/2007 | Government ethics violation | Convicted |
| 1/5/2007 | Burglary | Convicted |

*As of May 19, 2011.

## 2.    Officers Involved in Domestic Violence

Domestic violence infects the ranks of PRPD and interferes with the ability of PRPD to provide police services in a constitutional manner.  We found that hundreds of officers were also arrested or the subject of administrative complaints for domestic violence.  From 2005 to 2010, PRPD received 1,459 civilian complaints alleging domestic violence by officers.  Of the complaints resolved during this period, administrative investigators recommended disciplinary or corrective action in 1,018 cases in the form of orientation, admonishment, suspension,

separation, or expulsion. We also identified 98 officers who have been arrested more than once on domestic violence charges between 2007 and 2010. Many of these officers, including commanders, remain active on the force. As the Puerto Rico Supreme Court has observed, it is "antagonistic to be a police officer while engaging in acts of domestic violence in all of its many forms: physical or emotional abuse, spousal or child abuse." *San Vicente Frau v. Policía,* 142 D.P.R. 1, 1 (1996).

**Table 2: Officers with Two or More Domestic Violence Arrests (2007-2010)**

|  | Officers | Terminated | Leave | Active |
|---|---|---|---|---|
| Two arrests | 81 | 6 | 2 | 73 |
| Three arrests | 15 | 2* | 3 | 10 |
| Four arrests | 2 | 1 | 0 | 1 |
| **TOTAL** | **98** | **9** | **5** | **84** |

*One officer committed suicide, but was listed by PRPD as terminated.

We also identified several instances in which PRPD officers shot their spouses, including at least three in 2010 alone:

- On June 21, 2010, Officer Heriberto Rivera Hernández shot and killed his ex-wife, Marisel Arocho Soto, with a service firearm before killing himself. At the time of the shooting, Officer Rivera Hernández was under electronic monitoring awaiting trial on domestic violence and weapons charges. Following his March 2010 arrest, PRPD disarmed Officer Rivera Hernández and reportedly placed his service firearm in a safe deposit box at the stationhouse.

- On May 24, 2010, Sergeant José Manuel Rivera Ortiz shot at his wife six times and then turned the firearm on himself, committing suicide. His wife was not struck.

- On March 24, 2010, Officer José Gómez González shot his wife, Verónica Martínez Vélez, hitting her eight times, before killing himself.

- On January 13, 2008, Officer Ramos Santiago killed his wife, Deborah Berrocal Lugo, in front of their then-four-year-old daughter. A jury found him guilty of first-degree murder and a weapons charge.[17]

- On January 26, 2007, Officer López Martínez of the Aibonito Police Athletic League was convicted of first-degree murder when he killed his wife and mother-in-law with his service firearm.[18]

\* \* \*

As these incidents illustrate, an indefensible number of PRPD officers commit a wide range of crimes against the very citizens they are charged with serving. We briefly highlight PRPD's issues with respect to internal crime because the widespread lack of respect for the rule of law affects both public safety and civil rights. Many of the systemic deficiencies we detail in

Sections III and IV below hinder PRPD's efforts to address its internal crime problem just as they limit PRPD's effectiveness in addressing its pattern of civil rights violations and its failure to effectively address sexual assaults, domestic violence, and allegations of discriminatory policing. It is thus our belief that by implementing the remedies we outline below, PRPD will gain tools essential for ridding itself of the crime and corruption that currently infect its ranks.

### III.   PATTERN AND PRACTICE OF CONSTITUTIONAL VIOLATIONS

Our investigation has revealed reasonable cause to find that PRPD engages in a pattern and practice of:

- Use of excessive physical force, including deadly force, in violation of the Fourth Amendment;

- Use of unreasonable force and other misconduct designed to suppress the exercise of protected First Amendment rights; and

- Unlawful searches and seizures in violation of the Fourth Amendment.

Contrary to generally accepted law enforcement practices, PRPD does not maintain reliable reports and data that document encounters with the public to permit supervisors to ensure constitutional law enforcement.  PRPD does not require officers to routinely report uses of force or require supervisors to conduct independent reviews of force.  PRPD records concerning police misconduct cases and incidents of police-involved shootings are inaccurate.  Incident reports describing the reason for an arrest are often incomplete.  Even with these problems, the deficiencies we uncovered are so clear that these additional data sets are unnecessary to conclude that civil rights violations constitute a repeated and routine practice, rather than isolated or sporadic instances of misconduct.  Our determination is based on a review of investigative files and other documents produced by PRPD, criminal and civil cases from local and federal courts, and interviews with officers and residents.

As illustrated below, misconduct within PRPD is not isolated to a particular unit or rank. We found that supervisors and members of specialized tactical and investigation units contribute to the pattern and practice of civil rights violations, including officers assigned to TOU and the Drug, Narcotics, Vice, and Illegal Weapons Division ("DNVW").  The involvement of supervisors is particularly egregious in light of their added responsibility to uphold the agency's values and expectations.  In many instances, rather than correcting or reporting problem behavior, we found supervisors acting in concert with subordinates in cases where individuals were beaten or charged with fabricated evidence.  Supervisors and officers also failed to intervene on behalf of civilians to protect them from excessive force or unlawful searches or seizures by fellow officers.

We focused our review on the four-year period from 2004 to 2008.[19]  However, we found that the pattern of misconduct continued through the course of our investigation, as evidenced by PRPD's actions during protests and other civil demonstrations.  We discuss the legal standards governing our findings below and highlight several cases that illustrate the pattern and practice of use of excessive force, the use of unreasonable force to chill speech, and unconstitutional searches and seizures.  Many cases involve more than one type of violation.  We also discuss specific deficiencies that cause and contribute to each of these violations.

## A. PRPD Engages in a Pattern and Practice of Use of Excessive Force

### 1. Officers Use Excessive Force in Violation of the Fourth Amendment

PRPD officers use force, including deadly force, that is unnecessary and unreasonable in the course of arresting or detaining individuals who pose little, if any, risk of harm, or who offer minimal resistance. The use of excessive force includes punching or taking subjects to the ground, as well as striking and jabbing with batons, deploying chemical agents, using choke holds and other neck restraints, and discharging firearms. Many subjects of excessive force were, at the time of the incident, carrying out ordinary activities or committing minor infractions. Officers also use excessive physical force in response to perceived verbal slights or after an individual stops resisting. These practices are the result of woefully inadequate or non-existent policies and accountability systems on officers' use of force, including PRPD's failure to provide effective training and discipline. We discuss additional deficiencies causing and contributing to the pattern and practice of excessive force in Section IV.

Although complaints of excessive force by PRPD officers have existed for many years, the 2007 videotaped shooting of Miguel Cáceres Cruz exposed many of the deep-rooted deficiencies that continue to plague PRPD. On August 11, 2007, Cáceres Cruz was directing traffic as part of a motorcade that had gathered for a birthday celebration in Humacao. Officers Javier Pagán Cruz, Carlos Sustache Sustache, and Zulma Diaz de León drove by Cáceres Cruz and stopped after they heard him say something they believed was an insult. Officer Pagán Cruz, a member of TOU, exited the vehicle, approached Cáceres Cruz, and engaged in a verbal exchange. The officers then told Cáceres Cruz he was under arrest. Officer Pagán Cruz grabbed Cáceres Cruz and wrestled him to the ground. As they struggled, Officer Pagán Cruz discharged his firearm and shot himself in the leg. Officer Pagán Cruz then unholstered his firearm and shot Cáceres Cruz multiple times at close range in the head and body. Officers Sustache Sustache and Díaz de León left Cáceres Cruz lying on the sidewalk as they drove Officer Pagán Cruz to the hospital without notifying central command that anyone else had been shot. Other officers arrived and found Cáceres Cruz bloodied and gasping for air. With the assistance of bystanders, officers placed Cáceres Cruz in a patrol car and drove him to the hospital where he was pronounced dead.

The officers' initial report indicated that Officer Pagán Cruz acted in self-defense because Cáceres Cruz resisted arrest and tried to gain control of the officer's firearm. The line supervisors' reports were based primarily on statements from the involved officers. A preliminary report prepared by a PRPD homicide investigator consisted only of statements from Officers Sustache Sustache, Díaz de León, and an alleged eyewitness who corroborated the officers' version of the events. The homicide investigator added summarily, "Also, various persons at the scene were interviewed, but they said adverse things about the officers." Critically, a video recording taken by a civilian surfaced shortly after the incident and was distributed widely in the media. The recording showed Officer Pagán Cruz standing over Cáceres Cruz and shooting him several times. On August 14, 2007, local prosecutors filed murder charges against Officer Pagán Cruz. He was found guilty of first-degree murder and weapon violations, and was sentenced to 109 years in prison on April 15, 2008.[20]

Officer Pagán Cruz was the subject of seven civilian and internal complaints at the time of the Cáceres Cruz shooting.  As of November 2008, five of these complaints, dating as far back as 1999, remained unresolved.  They included a 1999 complaint for domestic violence in which Officer Pagán Cruz allegedly beat and threatened his partner with a firearm, a 1999 complaint for insubordination, and a 2002 complaint for immoral conduct.  A separate internal affairs report issued four days after the shooting found that Officer Pagán Cruz had a "bad attitude," "strange behavior," and a "tendency for being an aggressive person."  However, his commanding supervisor indicated as part of yet another administrative investigation that Officer Pagán Cruz did not present a pattern of "repetitive conduct."  Despite his complaint history, he was permitted to join, and remain in, the TOU in Humacao.  The unit, consisting of 44 officers, was supervised by only two sergeants, one of whom had been on leave for weeks at the time of the incident.

The tragic events surrounding the Cáceres Cruz shooting served as a stark reminder of PRPD's institutional dysfunction:  officers engaging in verbal altercations with civilians; officers needlessly arresting civilians; officers using excessive force; officers being deliberately indifferent to the well-being of the community; PRPD supervisors failing to supervise; and internal affairs officers failing to timely and objectively investigate matters, or at all.  According to PRD, civilians filed over 1,500 complaints against officers for unjustified or excessive force and assault from 2004 to 2008.  During the course of our investigation, from January 2009 to August 2010, PRD reported an additional 268 complaints based on similar allegations.  Our review of a sample of these cases, as well as civil and criminal cases filed against officers, demonstrates that officers' use of excessive force constitutes a routine practice within PRPD.  We also found that longstanding deficiencies cause the pattern and practice of excessive force.

Improper and unconstitutional uses of force are rampant throughout PRPD.  Force is frequently used when it is unnecessary and gratuitous, and is often the first and last option considered by PRPD officers.  The use of excessive force by police officers in the course of an arrest, investigatory stop, or other seizure violates the Fourth Amendment.  *Graham v. Connor*, 490 U.S. 386, 394-95 (1989); *see also Jennings v. Jones*, 499 F.3d 2, 11 (1st Cir. 2007).  Courts analyze claims of excessive force, deadly or otherwise, under an objective reasonableness standard.  *Graham*, 490 U.S. at 394.  The analysis requires a balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the governmental interests.  *Id.* at 396.  The criteria courts apply to assess the reasonableness of an officer's use of force include the severity of the crime at issue; whether the subject presents an immediate safety threat to the officers or others; and whether the subject is actively resisting or attempting to evade arrest.  *Id.*; *see also Jennings*, 499 F.3d at 11; *Brenes Laroche v. Toledo Dávila*, 682 F. Supp. 2d 179, 189 (D.P.R. 2010).

Determining the reasonableness of an officer's use of force is a fact-dependent inquiry, based on the "totality of the circumstances."  *Graham*, 490 U.S. at 394-96.

Whether the force used to effect a particular seizure is reasonable 'must be judged from the perspective of the reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'  The reasonableness inquiry is objective, to be determined 'in light of the facts and circumstances confronting [the officers], without regard to their underlying intent or motivation.'

*Brenes Laroche*, 682 F. Supp. 2d at 189.  Our review of hundreds of force incidents revealed frequent violent reactions by officers that serve no public safety or law enforcement purpose.

Force can be excessive even when it results in only minor injury.  *Bastien v. Goddard*, 279 F.3d 10, 14 (1st Cir. 2002); *Alexis v. McDonalds Rests. of Mass., Inc.*, 67 F.3d 341, 353 & n.11 (1st Cir. 1995); *see also Glenn v. City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2001); *Headwaters Forest Def. v. Cnty. of Humboldt*, 240 F.3d 1185, 1199 (9th Cir.), *vacated and remanded on other grounds sub. nom.*, *Cnty. of Humboldt v. Headwaters Forest Def.*, 534 U.S. 801 (2001) ("Whether the use of force poses a risk of permanent or significant injury is a factor to be considered in evaluating the need for the force used in a particular case – but it is certainly not dispositive.").  PRPD's reliance on batons and other less lethal force to suppress demonstrators is no less unconstitutional, despite the fact that demonstrators have not yet experienced life-threatening injury.

The propriety of the use of deadly force is measured by *Graham*'s objective reasonableness test.  *See Scott v. Harris*, 550 U.S. 372, 384 (2007).  Courts generally find that deadly force is unreasonable "unless it is necessary to prevent escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others."  *Tennessee v. Garner*, 471 U.S. 1, 3 (1985); *see also Whitfield v. Meléndez-Rivera*, 431 F.3d 1 (1st Cir. 2005) (citing *Garner*, 471 U.S. at 11; *Jarret v. Town of Yarmouth*, 331 F.3d 140, 149 (1st Cir. 2003)).  Because it constitutes deadly force, the shooting of a suspect with a firearm requires the highest level of justification to be found reasonable.

A police officer may not seize an unarmed, non-dangerous suspect by shooting the subject.  *See Garner*, 471 U.S. at 11.  The Supreme Court indicated that it may, however, be reasonable for a police officer to use deadly force to prevent the escape of a suspect in cases in which there is probable cause to believe the suspect has committed a crime involving the infliction or threatened infliction of serious physical harm.  *Id.* at 11-12; *see also Scott*, 550 U.S. at 382 n.9.  Yet, even in those circumstances, police should provide a warning (if feasible) before using deadly force.  *Garner*, 471 U.S. at 11-12.  Moreover, while the initial shots fired at a suspect may be determined justifiable, continuous shooting at a suspect may not be.  *See Napier v. Town of Windham*, 187 F.3d 177, 185-87 (1st Cir. 1999); *Parker v. Town of Swansea*, 270 F. Supp. 2d 92, 99 (D. Mass. 2003).  As illustrated below, PRPD officers apply deadly force without necessary justification.

While many PRPD officers observe the Constitution while using force, few take steps to prevent other officers from improper conduct.  Officers may not just stand by and watch other officers use excessive force.  *See Calvi v. Knox County*, 470 F.3d 422, 428 (1st Cir. 2006) ("[A] bystander officer who has a realistic opportunity to prevent the use of excessive force by a fellow officer may in certain circumstances be held liable for failure to intervene."); *Davis v. Rennie*, 264 F.3d 86, 98 (1st Cir. 2001); *Hathaway v. Stone*, 687 F. Supp. 708, 712 (D. Mass. 1988).

In the following incidents, officers used unreasonable force to arrest or detain individuals who posed little, if any, threat of harm; used force in response to perceived insults or as retaliation to ensure later silence; or continued using force even after an initial threat or other resistance had dissipated.  In some instances, officers struck handcuffed subjects gratuitously.  We focus primarily on matters in which criminal and civil litigation has concluded so as to not

interfere with ongoing judicial proceedings. Our investigation reveals that the conditions that led to these incidents – lack of adequate training, poor supervision, grossly inadequate policies, and a lack of meaningful accountability – remain significantly unchanged to this day. We provide additional examples in Appendix A.

- On June 21, 2007, Juan Carlos Pérez Liz was at home with his friends and family when he heard multiple gunshots. While on the telephone with a police dispatcher, approximately 12 PRPD officers entered his home with their weapons drawn. Officers handcuffed Pérez Liz and the other individuals while they searched the home. Officers took Pérez Liz to a separate room and questioned him about weapons. As they escorted Pérez Liz through the house, an officer hit Pérez Liz in the head and told him that if they found a weapon, the officers would kill him. During the search, Officer José Sánchez Abraham struck Pérez Liz in the face and allowed other officers to beat him. Officer Sánchez Abraham struck Pérez Liz in the face again as officers escorted him to a police vehicle. The officers took him to the Bayamón TOU station, where they continued to punch and hit him.[21] At all times while being beaten, Pérez Liz was restrained and posed no threat to the officers or other persons. The force used against him served no legitimate law enforcement purpose.

  On March 25, 2010, after the conclusion of a federal civil trial, a jury found Officer Sánchez Abraham and Sergeant Luis Pacheco Albizu liable for using excessive force in violation of Pérez Liz's Fourth Amendment rights.[22]

- On March 17, 2007, Betzaida Cruz Santiago and her daughter, Luz Cecilia Esmuria Cruz, were on their way home when they noticed TOU officers deploying chemical agents in the area. As they approached their home, an officer ordered them to stop and blocked their path. When Cruz Santiago pleaded with the officer to let them go, the officer grabbed Esmuria Cruz and slammed her to the ground. The officer then hit Cruz Santiago in the leg with his baton, breaking her leg. As she tried to get up, the officer hit her again, causing a compound fracture. Other officers observed the incident, but did not intervene to protect Cruz Santiago and Esmuria Cruz. The two women lay on the pavement for over an hour awaiting an ambulance to take them to the hospital. At the hospital, Cruz Santiago was treated for leg fractures and shoulder pain.[23] At no time did Cruz Santiago pose a risk to the officers or others. The force they used was unnecessary.

  On June 10, 2008, the district court entered default judgment against Ponce TOU Director Alvarez Boneta and Supervisor Rosario García. After the default judgment was set aside, Cruz Santiago and Esmuria Cruz settled the case with PRPD.

- On March 3, 2007, Officer Pedro Cruz Sierra arrested Rafael Ortiz Bermúdez without probable cause as he panhandled by the side of a road. Officer Cruz Sierra took Ortiz Bermúdez to the back of a shopping center and beat him until he lost consciousness. The force used against him served no legitimate law enforcement purpose. Instead of taking Ortiz Bermúdez to a police station for booking, Officer Cruz Sierra abandoned him behind the shopping mall with injuries to his face and body. A passerby found Ortiz Bermúdez the next day and transported him to the hospital.

On March 13, 2009, Officer Cruz Sierra pled guilty to aggravated assault and aggravated restraint on liberty, and the court sentenced him to three years of probation.[24]

- On January 8, 2007, Harry Rodríguez Rivero drove his car out of a store parking lot when a group of officers in plainclothes wielding firearms surrounded his car and demanded that he get out. Fearing for his safety, Rodríguez Rivero attempted to drive away, but struck the car behind him. He continued a short way down the road and pulled over when he heard sirens. Police then surrounded him with their weapons drawn. The police pulled him out of the car, threatened to kill him, dropped him on the ground, hit his mouth, grabbed his legs, and dragged him face down on the pavement before handcuffing him. During this time, Rodríguez Rivero was not resisting and posed no threat to the officers or other persons. The show of force and force the officers used against him served no legitimate law enforcement purpose.

  On November 10, 2009, at the conclusion of a federal civil trial, a jury found Officer Ramos Vélez liable for violating Rodríguez Rivero's Fourth Amendment rights and awarded Rodríguez Rivero $100,000 in damages.[25]

- On March 12, 2006, Jorge López Acosta was driving his vehicle with his brother when Officers José Alvarado Almódovar and Juan Meléndez Rivera stopped them. With no legitimate law enforcement purpose, Officer Alvarado Almódovar drew his service weapon and shot López Acosta through the rear of his shoulder, breaking two ribs and injuring his lungs.

  On April 4, 2007, the district court entered default judgment against Officer Alvarado Almódovar on the excessive force claims. López Acosta ultimately settled the case with PRPD.

- On March 2, 2006, Carl Leyva Ramos drove to a gas station he owned after learning that PRPD officers were blocking the station's entrance and searching customers and their cars. Leyva Ramos then began to photograph the officers' actions. Sergeant Antonio Rodríguez Nieves ordered officers to seize Leyva Ramos' camera.[26] Several officers restrained Leyva Ramos and Officer Angel Díaz Casiano hit him in the hand with a flashlight, although Leyva Ramos posed no threat and the force was unnecessary to restrain him.[27]

  On March 3, 2010, the district court entered default judgment against Officer Díaz Casiano and Sergeant Rodríguez Nieves. On March 26, 2010, a jury found that the officers unreasonably injured Leyva Ramos in violation of his federal civil rights and awarded him $4.7 million in damages. On April 8, 2010, Leyva Ramos settled the case against other PRPD supervisors for an unspecified amount.

  Sergeant Rodríguez Nieves has served as a defendant in other federal civil rights cases, including a case involving the 2004 shooting death of Luis Cepeda and the 2004 false arrest of David Rodríguez Román. On June 24, 2011, Luis Cepeda's family members settled the case against Rodríguez Nieves for an unspecified amount. On May 13, 2009,

at the conclusion of a civil trial, a jury found Rodríguez Nieves liable for violating Rodríguez Román's rights and awarded Rodríguez Román $120,000 in damages.

### 2. Officers Use Unreasonable Force to Suppress the Exercise of Protected First Amendment Rights

Demonstrators are frequently the target of PRPD's use of unreasonable force. Specifically, we found that officers use batons, chemical agents, and other physical force indiscriminately against individuals who are either participants or bystanders in protests and who pose little or no threat to officers or others. In many cases, the infliction of harm has no legitimate purpose, such as to effect an arrest or protect public safety. Instead, PRPD's repeated reliance on indiscriminate and unreasonable force instills fear in individuals and discourages future actions protected by the First Amendment. The actions of PRPD officers during demonstrations have been widely reported in the press and have prompted criticism within Puerto Rico and nationally.

The First Amendment prohibits government actors from "abridging the freedom of speech," U.S. Const. amend. I, and prohibits a government official from subjecting an individual to retaliatory actions for speech that falls under the protections of the First Amendment. *Hartman v. Moore*, 547 U.S. 250, 251 (2006) (holding that official reprisal for protected speech offends the Constitution because it threatens to inhibit exercise of the protected right) (internal citations omitted).

The frequency and severity of excessive force by PRPD against individuals engaging in protected speech is designed to chill speech in violation of the First Amendment. For years, individuals engaged in protests and other public demonstrations have been harmed and injured at the hands of PRPD officers. PRPD also has a long history of tolerating officers' clear disregard of Puerto Rican laws requiring officers to visibly display their badge numbers to allow the public to identify officers who may be engaging in misconduct.[28] In the following incidents, officers in TOU and other units used unreasonable force and inflicted pain and injury against civilians who were protesting government action. Many of these individuals were not posing a significant threat or violating the law, as evidenced by the paucity of arrests or findings of probable cause by the courts. PRPD reports following these incidents routinely fail to account for widespread civilian injuries and specific uses of force. In each instance, there is no evidence that officers issued effective dispersal orders, employed alternatives to force, or relied on adequate planning or tactics to prevent pervasive and arbitrary use of force. Many civilians complained that officers concealed their badge numbers to prevent civilians from identifying officers who engaged in misconduct. Supervisors who were on hand also failed to exert sufficient command and control to maintain discipline among the officers.

Government actions that threaten to chill protected activity can occur in a variety of situations. *See, e.g.*, *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 674 (1996) (holding that First Amendment protections apply to government contractors as well as government employees, noting that in either case government efforts "may chill speech on matters of public concern"). Generally, the First Circuit has held that claims alleging violations of the First Amendment by law enforcement officers fall under the analysis used in the employment context. *Willoughby v. Town of Tisbury*, No. Civ. A. 09-11398-JLT, 2010 WL 4502290, at *6 (D. Mass. Nov. 10, 2010)

(quoting *Tatro v. Kervin*, 41 F.3d 9, 18 (1st Cir. 1994)) (applying a "but for" standard of proof used in the employment context to a First Amendment claim against a police officer). The analysis considers whether government actions chill or intimidate speech, and whether such actions are motivated by an "intent or desire to curb . . . expression." *Id.* (quotations omitted). The government action must be such that it would curb the expression of a "reasonably hardy individual." *Agosto de Feliciano v. Aponte Roque,* 889 F.2d 1209, 1217 (1st Cir. 1989) (informal harassment can support a retaliation claim if the "government's actions are sufficiently severe to cause reasonably hardy individuals to compromise their political beliefs and associations"), *abrogated on other grounds by Maldonado*, 568 F.3d 263; *see also Barton v. Clancy*, 632 F.3d 9, 30 (1st Cir. 2011) (even "relatively minor events" can give rise to liability for retaliation). Furthermore, intent to discourage First Amendment rights can be inferred from an aggregation of "parallel or interrelated actions." *Rosario Urdaz v. Velazco*, 433 F.3d 174, 179-180 (1st Cir. 2006) (noting that incidents can take color from, and accumulate with, other incidents to establish sufficient basis for supervisory liability in a First Amendment claim for harassment). The First Circuit has also held that the threat of arrest may constitute a chilling act in the First Amendment context. *McGuire v. Reilly*, 386 F.3d 45, 59 (1st Cir. 2004) (holding that protesters had standing to assert a First Amendment violation when they alleged that their speech rights had been chilled by fear of arrest when protesters had been threatened with arrest).

PRPD routinely deploys TOUs to engage with crowds and protesters without any meaningful effort to control or restrain the use of excessive force by these units. PRPD has been on notice that TOUs frequently use violent force without justification. For instance, in December 2007, an evaluating committee established by former Superintendent Toledo Dávila found numerous complaints against TOUs for abuse of authority. The committee observed, "The indiscriminate use of batons in total disregard of existing regulation . . . has occasioned totally unjustified, multiple, and serious injuries to citizens."[29] A TOU officer interviewed by the committee told members that unit officers "jump into action to resolve, not to dialogue," further evidencing the officers' propensity for using force, regardless of the circumstances.[30]

The committee's observations are consistent with our findings that TOU officers use extreme displays of force, and actual force, to gain respect through intimidation. In this regard, a high-ranking PRPD official acknowledged in September 2010 that TOU officers do not view arrests, regardless of the force they use, as one of their responsibilities. In response to the paucity of arrests during the June 30, 2010, demonstration at the Capitol, TOU officers reportedly explained that "arrests are someone else's job." PRPD made only two arrests on June 30, despite the widespread use of force against hundreds of demonstrators. Strikingly, during our December 2010 tour, another high-ranking PRPD official indicated that residents in Puerto Rico do not fear or respect PRPD officers, but they do fear and respect TOU officers.

### a.     University Avenue – August 21, 2009

On August 21, 2009, municipal officers attempted to arrest a man for drinking an alcoholic beverage on University Avenue in Río Piedras near the University of Puerto Rico ("UPR"). The man reportedly resisted arrest and ran into a nearby business establishment, but was eventually taken into custody. Bystanders, many of whom were college students, criticized the arrest and some reportedly threw bottles and other objects at officers. Officers from PRPD's tactical units arrived promptly on the scene. They began to clear the street and disperse the

crowds using chemical agents, baton strikes, and other physical force.  Many individuals who were not throwing objects or engaging in other criminal activity were caught in the police action.

After the violence was quelled, officers continued to use batons to push and hit unresisting individuals who were attempting to leave the area.  The use of force against individuals who were not posing any immediate threat to the officers or attempting to evade arrest did not serve any valid law enforcement purpose.  Video recordings and statements from witnesses indicate that officers used their batons in a forceful, arbitrary, and unnecessary manner.  For instance, videos show officers striking a civilian wearing a backpack while he was walking by himself on the sidewalk.  Other videos show officers using batons to forcefully shove individuals who were walking in a single file as they left the area.

At approximately 3:00 a.m., after officers cleared University Avenue, college students gathered at a dormitory and began to criticize officers who were staged across the street.  The students were chanting, calling the officers "abusers," and yelling other insults.  The students remained inside the dormitory's fenced courtyard and were not throwing objects or posing any immediate threat to the officers.  Without warning, the officers then pointed a shotgun directly at the students and fired a gas canister, hitting Michelle Padrón Gauthier in the thigh above the knee while she stood peacefully in the courtyard.  Padrón Gauthier, who sustained an open wound, was unable to walk and fell to the ground.  As other students attempted to aid Padrón Gauthier, officers fired a second gas canister at the students, followed by a third canister.  The canisters emitted noxious chemicals, affecting both protesting students and others who were inside the dormitory and not involved in the demonstration.[31]  The intentional discharge of multiple canisters of chemical irritants directly at students who were expressing their criticism of police action on University Avenue served no legitimate purpose.  A special commission convened by the dean of the UPR campus also found that officers' use of force was directed at students' speech, observing that "the use of tear gas is not acceptably justified as a response to an insult."[32]

According to police reports, students injured officers and damaged police vehicles.  However, the reports do not explain or address the extent of civilian injuries.  Officers arrested five civilians in connection with the incident, but dropped most of the cases because of a lack of probable cause.  The man whose arrest precipitated the events was charged with inciting a riot, but the charges were also ultimately dismissed.

b.      Sheraton Hotel – May 20, 2010

On May 20, 2010, approximately 200 students, union leaders, and public employees gathered at the Sheraton Hotel to protest the Governor who was attending a fundraising event.  According to a PRPD report, PRPD deployed TOU and other officers to the area after the crowd began making threats and using obscene language.  However, a commander soon ordered these officers to leave because the police presence at the event appeared excessive.  After the officers left, some of the protesters entered the hotel lobby, chanting and marching, before another group of individuals began pushing security staff to gain access to the hotel's escalators.  As individuals were repelled away from the escalators, a contingency of reinforcing officers arrived and began clearing protesters from the hotel lobby using physical force and baton strikes.  Officers also deployed chemical agents against individuals.[33]

Videos of the incident depict officers using significant force against individuals who already had been dispersed from the hotel lobby. While some of the force was directed at individuals who charged the officers, many were hit and sprayed indiscriminately as they stood by or tried to flee the area. Officers swung batons like baseball bats and used overhead strikes against protesters posing no threat to the officers. Strikes to the head with an impact weapon can cause serious harm or even death and should not be used against individuals who are passively resisting or exiting an area as directed by officers. A union leader was sprayed with chemical irritants when she stepped toward the officers to admonish them, causing her to collapse on the ground.

Inside the lobby, several officers attempted to restrain José Pérez Reisler, who was marching while holding a sign. According to video footage, officers wrestled him to the ground and at least two officers climbed on top of him. One officer pressed his weight on the back of Pérez Reisler's neck, forcing his face to the ground. While Pérez Reisler was face-down – still with officers on top of him – Officer Melvin Rosa Cortés applied a Conducted Energy Device ("CED") three separate times in the stun, or direct contact, mode. We observed from video recordings that Officer Rosa Cortés applied the CED at various points of Pérez Reisler's body while telling him to "cooperate," but not offering other specific commands, such as ordering him to place his hands behind his back. The officer's CED report falsely stated that he gave the proper commands and that the CED was deployed because Pérez Reisler was aggressively fighting. Photographs also depict then-Associate Superintendent José Rosa Carrasquillo kicking Pérez Reisler while Pérez Reisler was restrained on the ground. There was no legitimate law enforcement purpose for this use of force, as Pérez Reisler was not posing a safety threat or attempting to flee. Rosa Carrasquillo resigned in December 2010, reportedly for unrelated reasons.

From our review, Pérez Reisler was not a flight risk or physically combative. Rather, he appeared to be passively resisting the officers when he tucked his hands underneath his body. There were also a sufficient number of officers on hand to control him and even physically lift him, if necessary. The officers thus had no legitimate law enforcement purpose for the force. Despite the officers' claim that Pérez Reisler was non-compliant and aggressively fighting them, the officers released him without any charges. Officers had detained Pérez Reisler just days earlier, on May 14, when he attempted to enter UPR. Officers threw him to the ground, handcuffed him, and sprayed him in the eyes at close range with chemical irritants. Pérez Reisler was not resisting or attempting to evade arrest. PRPD detained him for approximately nine hours but did not charge him with any crime.

Despite the substantial use of force, PRPD detained only four individuals at the Sheraton Hotel. Two individuals were released without charges, and prosecutors declined to prosecute the other two arrestees. Reports provided by PRPD described injuries sustained by officers and property damage, but failed to account for injuries to civilians, such as bruises and lacerations, or specific instances of use of force. In conclusory fashion, a supervisor reported, "The TOU and SOU [Special Operations] units were then activated to contain and control the violent conduct of the students . . . using the necessary physical force."[34]

On December 14, 2010, CRC issued a resolution finding that multiple civilians, journalists, photojournalists, and officers were injured during the incident.[35] CRC also expressed concern over video footage of individuals who were assaulted as they attempted to exercise their rights, finding that the police action may have resulted in "serious violations of constitutional guarantees, democratic processes, and freedom of expression of all people of Puerto Rico."[36] Despite reliable video and the civilian complaints that served as the basis for the CRC resolution, the Superintendent reported during our December 2010 tour that no one had come forward with a sworn statement to complain about officers' actions and that PRPD had not identified any officer misconduct.

### c. Capitol – June 30, 2010

On June 30, 2010, various groups, including labor organizations, journalists, and university students engaged in demonstrations at the Capitol over a series of escalating disputes that included press access to the Capitol. PRPD was aware of the planned demonstrations and prepared an operational plan, dated the same day as the incident, June 30. The incident began unfolding by mid-afternoon with two discrete encounters between protesters and police. First, several individuals and student journalists entered the Capitol, but were denied access to areas traditionally open to the press and public. When officers used physical force to stop them from entering further into the Capitol, they sat in a hallway in protest. Security staff and officers acting together then forcibly removed them by spraying chemical irritants, kicking, pushing, and striking them with batons, and throwing them out onto the Capitol's concrete exterior stairs. At the same time, students and their supporters gathered outside of the Capitol and tried to enter to read a proclamation, but tactical operations officers forcibly repelled them.

The second major encounter occurred approximately two hours later, after the crowd grew and engulfed areas around the Capitol. Because officers used an open central plaza as a staging area, protesters were forced to spill into the adjacent parking lots. At a pivotal moment, videos show a predominantly peaceful, but animated, crowd. After commanders circulated orders among the staged officers, an officer approached the crowd. Using a protester's megaphone, the officer announced that he needed the crowd's cooperation to move cars from the parking lot. The officer did not order the crowd to disperse, nor did he impart instructions on where to move or advise the crowd of the consequences for noncompliance. The announcement caused visible consternation among the protesters who stayed in place and continued chanting. A group of tactical officers then moved toward the crowd. The officers and protesters began pushing and shoving each other and some in the crowd began throwing objects at the officers. Officers charged the crowd, hitting, striking, and pushing anyone in their path, including individuals who were attempting to disperse or had their backs to the officers in a non-threatening manner. Officers also deployed tear gas and chemical irritants. Several witnesses also reported seeing a lieutenant unholster and point his firearm at civilians. One civilian reported that the lieutenant discharged his firearm without justification. In December 2010, former Superintendent Figueroa Sancha indicated that he was unable to determine whether the lieutenant discharged his firearm because the ballistic tests were inconclusive.

As illustrated below, many individuals participating in the protest were not posing any threat to public safety, and none were arrested:

- A student journalist, Rachel Hiskes, entered the Capitol with other individuals and attempted to access the Senate chambers. PRPD officers, who had been dispatched to the Capitol earlier in the day, stopped Hiskes and hit her. She was not resisting or combative. Hiskes then sat in the hallway with other visitors in protest. A Capitol employee then sprayed Hiskes and others with chemical irritants. As Hiskes tried to get up, an officer hit her across the back with a baton, causing her to fall. An officer continued to push and strike her with his baton, driving her toward the doorway. When she reached the door and had her back to the officer, the officer shoved her out onto the concrete stairs using his baton and hitting her in the neck. Hiskes was not arrested or charged with any crime.

- Juan Ángel Gutiérrez also entered the Capitol and was denied entry to the galleries. He then began photographing the officers hitting journalists. Capitol staff tried to take away his camera and sprayed him with chemical irritants. He fell to the ground covering his face and writhing in apparent pain. While on the ground, officers kicked Gutiérrez several times. Gutiérrez was not combative or resisting. He was not arrested or charged with any crime.

- Omar Silva Meléndez reported that he arrived at the demonstration and observed an officer assaulting several female protesters. As he assisted one of the protesters who had been hit by officers, police deployed a gas canister, hitting Silva Meléndez in the forehead. The blow caused a second-degree burn and an injury requiring stitches. Silva Meléndez was not engaged in criminal activity, resisting officers, or attempting to evade arrest.

- A legislator reported that she arrived at the Capitol vestibule and observed an officer kicking a woman as she sat on the ground. The legislator told the officer to stop and showed her identification. An officer then hit the legislator in the arm with a baton, causing significant bruising.

- An attorney who was serving as a legal observer reported that he saw an officer hit a student in the head and officers throwing students down the Capitol's exterior stairs. He was sprayed with chemical irritants. He later observed officers form a perimeter around the central plaza. He reported that officers did not attempt to dialogue with the protesters or answer questions. Many officers were also not wearing their name or identification badges, as required by Puerto Rico law.

- Betty Peña Peña arrived at the protest with her 17-year-old daughter and reported that about an hour and forty-five minutes after arriving, officers began to attack the crowds. An officer hit Peña's daughter in the head with a baton, causing trauma and other injuries. Officers continued kicking and hitting the daughter with batons. Peña tried to cover her daughter to protect her from further injury. Peña's daughter was then dragged away. Both Peña and her daughter sustained injuries to the head. Peña's daughter also sustained abrasions on various parts of her body. Both also had difficulty breathing because of the tear gas and other chemical irritants used by police. Neither Peña nor her daughter was combative or physically resisting. Neither was arrested or detained.

- A university student reported that she arrived after other students were repelled from the Capitol stairs. Officers pushed her, hit her in the chest, and struck her ear with a baton. She fell to the ground. A Capitol employee assisted her to the Capitol health unit where she was given first aid.

- Without provocation, an officer forcefully shoved a photojournalist wearing credentials as he walked past a group of officers in the parking lot. The photojournalist fell to the asphalt, sustained an abrasion, and broke his camera. The photojournalist was not posing a threat to public safety or to the officers.

Following the incident, former Superintendent Figueroa Sancha stated publicly that he was responsible for all decisions involving the removal of individuals. He also publicly justified the officers' use of force. However, it is evident that the use of excessive force against protesters was directed at chilling speech and intimidating protesters, rather than protecting public safety or restoring order. First, Figueroa Sancha's claims of widespread lawlessness by protesters are not supported by the number of arrests. At the conclusion of the barrage, only two individuals were arrested for alleged damage to a police vehicle. They were released after a judge found no probable cause. Second, a PRPD committee evaluating the June 30 incident observed a total lack of control by officers. According to committee minutes dated July 23, 2010, members discussed how to undo the impact of the incident, including whether to make TOUs "disappear." Third, PRPD recognized the potential chilling effect of its tactics on protected First Amendment activities. An October 2010 memorandum issued by the Office of the Superintendent detailed the elimination of the Specialized Tactical Unit, a military-style crowd control unit, to secure First Amendment rights.[37] Finally, CRC has repeatedly warned that the manner in which PRPD engages with crowds who are exercising their First Amendment rights threatens to abridge those rights. For instance:

- On July 1, 2010, CRC publicly expressed its consternation about the government's intervention with protesters, journalists, and citizens who were attempting to exercise their First Amendment right to free speech at the Sheraton Hotel on May 20, 2010.[38]

- On July 2, 2010, CRC issued a resolution calling for an investigation into the actions of PRPD officers, based on images and news reports of injuries to individuals attempting to exercise their right to free expression.[39] CRC again expressed concern that the restrictions on individuals' rights by police may represent serious civil rights violations.[40]

- On February 14, 2011, CRC issued yet another resolution expressing concern over police interventions inside and around UPR.[41] CRC noted that the media continued to depict civil rights violations of civilians exercising their right to protest and that police were undermining these rights through "detentions, discrimination, threats, violence, harassment, persecution, intimidation, including against members of the press."[42] CRC reminded PRPD of its duty to safeguard civil rights and its responsibility to use proportional force when engaging with citizens.

Officers also began employing pressure point techniques on individuals who were passively resisting. We also observed the use of choke holds against individuals, including one instance in which an officer used his baton as a neck restraint. Carotid and choke holds have the

potential of causing death or serious injury and should only be used when subjects pose an immediate risk of death or serious bodily harm. We also learned that PRPD maintained Chloroacetophenone (commonly referred to as "CN gas") in its inventory and that it continued using substantial amounts of chemical agents against crowds. Many law enforcement agencies have replaced CN gas with other less toxic chemical agents for crowd control purposes.

The use of compliance techniques and offensive tactics that pose a significant likelihood of serious bodily harm without an apparent and substantial law enforcement purpose causes protesters, witnesses, and other observers to refrain from opposing PRPD and chills citizens' protected speech. Additionally, we have reasonable cause to believe that the aforementioned instances of PRPD conduct in response to protests and civil demonstrations satisfy both the causal and negative impact requirements necessary for demonstrating a First Amendment violation.

### 3. Deficiencies Causing and Contributing to the Pattern and Practice of Excessive Force

The use of excessive force by PRPD officers is a serious problem that has long been recognized by Puerto Rico officials. For instance, an external evaluating committee convened by former Superintendent Toledo Dávila reported in December 2007 that the use of excessive force by PRPD constituted a "pattern of civil rights violations" that resulted in "nearly a total lack of confidence" in PRPD.[43] Over two years ago, in April 2009, PRPD reported that it was establishing a policy committee to draft updated policies on use of force. However, PRPD has yet to develop or revise all necessary use of force policies. Even with the development of new written policies, without the implementation of effective accountability systems, such as meaningful force reporting and supervisory review processes, Puerto Rico residents will continue to be subjected to preventable harm at the hands of police.

The pattern and practice of excessive force by PRPD is rooted in agency and supervisory deficiencies that have resulted in a culture of indifference to the physical integrity and constitutional rights of Puerto Rico's residents. In addition to other systemic problems discussed in Section IV, these deficiencies include:

> "No accountability in use of force system. I can't be the police, judge, and jury. We can't have that archaic vision."
>
> - PRPD Sergeant

- Non-existent, unclear, and contradictory policies on use of force;
- Lack of reporting requirements and objective supervisory review;
- Inadequate systems to review critical incidents, such as firearm discharges;
- Insufficient training on use of force; and
- Condoned fear and violence by tactical units

### a. Force policies are severely deficient

PRPD deploys officers without sufficient guidance on the lawful use of force.  Contrary to contemporary policing practices, PRPD has not implemented a comprehensive use of force policy that instructs officers on current legal standards.  Although PRPD reports that it issued a written policy on use of force, it has yet to train officers on the new policy.  Other existing policies, as described below, fail to incorporate current legal requirements, do not define force uniformly, use ambiguous or conflicting terms, and do not emphasize appropriate alternatives to physical force.  PRPD has not implemented policies on force options authorized by PRPD, such as chemical irritants, impact weapons, and less lethal munitions.  PRPD policies also do not provide guidance on how officers should respond to individuals experiencing a mental health crisis or to civil disturbances and crowds.  The lack of basic policies points to PRPD's chronic failure to establish any meaningful or reliable system to manage officers' use of force.

More fundamentally, we found significant inconsistencies in officers' understanding of the meaning of "force."  For instance, some officers defined "force" as "lethal force," "excessive force," or "intervening with an individual."  Rarely did officers describe force in functional or operational terms, such as taking a subject to the ground, employing a choke hold, or punching, kicking, or striking with a baton.  In this regard, an officer who does not believe he is using "lethal force" or "excessive force" when he punches, hits, or otherwise injuries a person will simply not feel obligated to report or justify his actions.  Thus, it is not surprising that unjustified slaps, punches, kicks, choke holds, takedowns, baton strikes, chemical use, and more intrusive forms of force routinely go unnoticed by PRPD commanders and supervisors.  Given the magnitude of excessive force we uncovered from a sample of PRPD documents and the public record, it is extremely troubling that PRPD cannot account for the full scope of force its officers use against the people of Puerto Rico.  Simply put, the failure to instruct officers on the specific actions that they will be held accountable for in the course of their interactions with the public reflects a profound indifference to civil rights.

### Batons

General Order 98-6, issued more than 12 years ago, governs PRPD officers' use of the baton, a standard-issue impact weapon.  The policy fails to articulate any legal standard on the use of the baton, including the objective reasonableness standard in *Graham* or the criteria that are to be considered in determining the reasonableness of force.  These criteria include the severity of the crime at issue, the extent to which the suspect poses an immediate threat to the safety of the officer or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight.  *Graham*, 490 U.S. at 396.  Instead, GO 98-6 indicates that the purpose of the policy is to "establish guides for the most effective use of the baton when submitting a civilian to obedience."  The policy does not specify when the government has a legitimate interest to submit an individual into "obedience."

General Order 98-6 also uses terms that are ambiguous and do not describe a subject's level of resistance.  Instead, GO 98-6 instructs officers that the baton *must* be used in eight enumerated circumstances, including to "stop or control riots or crowds," "facilitate movement of a person or persons," and "control individuals."  General Order 98-6, as worded, also does not

provide for any meaningful alternatives to the use of the baton, including using verbal persuasion or calling in reinforcements.

Other sections of GO 98-6 are internally inconsistent and place individuals at serious risk of harm. For instance, Section E instructs officers to avoid striking certain parts of the body because they may be fatal, including areas above the shoulders, genitals, spine, or the *solar/celiac plexus* (the network of nerves situated in the *abdomen* behind the stomach and in front of the aorta and diaphragm).[44] Section D, however, lists areas of the body that may be struck without causing serious injury, including the *chest* and *abdomen*. This conflicting language is of particular concern given PRPD's practice of jabbing and ramming batons into individuals' bodies using the metallic ball on the ends of the batons. Also, Section F merely "suggests" that officers avoid raising the baton above the head when striking an individual, using the baton to provoke a subject, and using the baton against a subject who has been neutralized, rather than clearly prohibiting or restricting these dangerous and unreasonable practices. The improper use of batons by PRPD officers has contributed to serious injuries, specifically during the large demonstrations discussed above.

## Conducted Energy Devices

There are similar deficiencies in GO 2008-2, which governs PRPD's use of CEDs. For instance, GO 2008-2 does not specify any legal standard for the use of CEDs, including the objective reasonableness standard in *Graham*, 490 U.S. at 396. Instead, GO 2008-2 ambiguously references "public safety" as the basis for using CEDs in various sections of the Order. Section C describes CEDs as "non-lethal" weapons that permit officers to "end violent situations, for security reasons" and states that the use of CEDs "shall be carried out in those circumstances where the officer believes the use of [the CED] is appropriate, based on public safety considerations." Although Section G indicates that law enforcement officers are required to act "prudently" and "reasonably," GO 2008-2 does not specify the factors that should be considered when determining the reasonableness of CED deployment, such as the level of resistance of a subject or the severity of the crime at issue.

Most significantly, GO 2008-2 fails to acknowledge that CEDs can be lethal. CEDs have been cited by medical authorities in recent studies as a cause of, or contributing factor in, certain deaths.[45] In addition, GO 2008-2 does not address situational hazards that could result in serious injury or death. These situations include using the device against an individual who is in an elevated location, such as a bridge or rooftop, or against individuals who are restrained or handcuffed. GO 2008-2 also does not:

- require warnings or use of less intrusive alternatives, when feasible;
- require re-assessing the subject's threat or resistance level following each deployment cycle;
- address removal of CED probes that puncture the skin; or
- provide guidance on post-deployment medical attention.

34

## Firearms

PRPD's firearms policy, GO 2004-3, provides a legal standard for use of deadly force, but leaves critical terms undefined. For instance, Section D.1 states that "when using a firearm, only the minimum amount of force that is consistent with achieving the mission shall be used." GO 2004-3 does not define "achieving the mission" and fails to reinforce the actual legal standard, which requires that an officer have probable cause to believe that a subject poses a significant risk of death or serious physical injury to the officer or others. *See Garner*, 471 U.S. at 3. Other critical terms in GO 2004-3 are unclear and may cause confusion about the necessity or reasonableness of force. Section D, "Guides for the Use of the Regulation Firearm," states that the firearm is considered a "defensive weapon and not a tool for arrests." However, the provision does not address whether, and under what circumstances, officers may shoot at fleeing suspects. Other important aspects that are critical to managing officers' use of deadly force are missing from GO 2004-3. For example, GO 2004-3 does not cover the appropriateness of warning shots; the consequences of missing the three annual shooting practices required by GO 2004-3; and the reporting requirements when a firearm is discharged or another form of lethal force is used.

PRPD's firearms policy provides the only discussion of lethal or deadly force. As a result, officers do not receive formal guidance on other types of force that may constitute lethal or deadly force, such as choke holds, carotid holds, and strikes to the head with impact weapons. In addition, PRPD's firearm policy does not address many procedures that should apply to all forms of lethal force, including the use of verbal warnings prior to using force and the supervisor's role in reviewing uses of lethal force. Indeed, the only post-shooting procedure that is mentioned in GO 2004-3 relates to maintenance of the firearm, rather than to any post-shooting review to determine the appropriateness of the shooting. In this regard, GO 2004-3 states, "After shooting a firearm, the principle consideration that should be present is the prevention of rust."

## Other Force

On January 26, 2011, we notified Puerto Rico that we were concerned over news reports depicting PRPD officers using force against individuals who offered minimal or passive resistance during student protests. Specifically, we urged PRPD to restrict the use of choke holds and other carotid pressure techniques to situations warranting lethal force and to require officers to report, at a minimum, when lethal force is used. We also urged PRPD to prohibit the use of CN gas and to decommission any remaining stock in its inventory because most law enforcement agencies had replaced CN gas with other less toxic chemicals. On February 10, 2011, Puerto Rico reported that PRPD had banned the use of CN gas, ordered its decommission, and restricted the use of choke holds, carotid holds, pressure point techniques, and rubber stinger ball cartridges. Puerto Rico also reported that it was completing a new use of force policy, based on model policies and comments we provided. Although these policy developments are encouraging, without effective accountability measures on use of force, discussed further below, the issuance of new policies or directives provides no guarantee that officers will follow them or that officers will be held accountable when violations occur.

In sum, PRPD's existing policies on use of force are inadequate and do not provide officers with necessary guidance to ensure that force is used in accordance with constitutional requirements and contemporary policing practices.

### b.     Reporting and review requirements fail to hold officers accountable

PRPD has not implemented basic reporting and review requirements to ensure officers use lawful and appropriate force during an arrest or detention, or in other interactions with civilians. Use of force reports allow supervisors and commanders to collect and analyze essential information about the factual circumstances surrounding a use of force. At the individual officer level, reliable and accurate information from these reports permits supervisors to formulate objective conclusions about an officer's conduct. More broadly, aggregate information on use of force allows agencies to improve policies, training, tactics, and management. Thus, a properly functioning system provides law enforcement agencies with the tools to hold officers and supervisors accountable when misconduct occurs, provides critical feedback to develop safer and more effective policing methods for officers and the community, and helps strengthen the public's confidence in the agency's ability to regulate itself.

As discussed above, PRPD does not provide a uniform definition of "force" that is commonly understood by officers throughout the agency. This omission prevents officers from consistently distinguishing between reportable uses of force and routine physical contact that does not require formal supervisory review, such as escorting a subject or routine handcuffing. The facts of every use of reportable force must be established and reviewed. For the lowest levels of force, such as "soft" control techniques where there is no complaint of injury, a report fully describing the force used may be sufficient. For intermediate levels of force, such as hand strikes, punches, and use of chemical agents, particularly where there is a complaint of injury or a discrepancy in the description of the force used, some level of investigation and review is required, even in the absence of a formal misconduct complaint.

We found three overarching problems concerning PRPD's policies and practices concerning use of force reporting and review. First, PRPD's general orders regarding use of force reports are wholly inadequate. As an initial matter, PRPD does not require officers to report all significant uses of force. For instance, GO 2004-3 on firearms does not require any notification or report following an intentional or unintentional discharge. There are no policies requiring written reports when officers use physical force, such as punches, kicks, or take downs, or when officers use chemical irritants or less lethal munitions. Even where reporting requirements exist, in the case of batons and CEDs, the procedures are vague and do not require supervisors to conduct independent reviews of officers' use of force. For example, GO 98-6 requires that PRPD officers submit a written report after using a baton that results in serious bodily harm. However, GO 98-6 neither defines "serious bodily harm," nor does it describe the information that should be included in the report. In our interviews, officers were unable to provide a clear and consistent operational definition of the type of injury that would require a use of baton report. For instance, supervisors of specialized units reported that they would not respond to the scene of an incident to review an officer's use of a baton that resulted in a broken arm. Thus, officers are allowed to escape review by their supervisors when they inflict significant injury, such as a broken bone.

In response to our initial document requests for use of force reports, PRPD first indicated that none existed. Several months later, PRPD explained that officers *may* mention the use of force in incident reports that are prepared when an officer arrests an individual. However, PRPD was unable to produce these documents. PRPD explained that production would require already-extended staff to cull through thousands of pages of individual incident reports to glean from handwritten narrative descriptions whether any force was used. We later learned that some supervisors maintain copies of documents with use of force information. Based on our review, these records varied significantly by unit and region. During our March 2009 tours, we requested all documents concerning use of force from the tactical and special operations units for the preceding six months. These documents demonstrated a significant lack of uniformity in the reporting process, even down to officers' interpretations of the term "force." For example:

- The SOU in San Juan produced a one-page memorandum indicating that its officers had not used *force* in the last six months.

- TOU in San Juan produced a one-page memorandum indicating that it had not received any *complaints of use of force*.

- TOU and SOU in Guayama produced memoranda regarding three incidents, prepared by supervisors within days of the incidents, informing higher-level commanders that officers had used *chemical agents, batons, and firearms*. The memoranda were based on officers' accounts of the incidents and did not include any witness statements or information.

- TOU and SOU in Utuado produced memoranda indicating that only SOU had used force in the last six months. Incident reports for three separate incidents were attached where individuals were arrested. However, none of these reports described the type of force used by officers.

- TOU in Mayagüez produced a memorandum that referred specifically to our request (i.e., was not produced in the course of business), describing an incident that had taken place weeks before. The memorandum, whose subject line read, "Interventions Conducted by the Tactical Operations Unit Where *Reasonable Force* Was Used," indicated that the subject "resisted arrest, struggled with the officers, and was injured in the intervention." It did not describe the specific actions taken by officers to subdue the subject, the extent of the subject's injuries, or whether the subject was provided with medical care.

- SOU in Aibonito produced a homicide investigation report concerning a complaint from the son of a PRPD officer who alleged that officers and a sergeant of SOU beat him following a traffic stop on October 25, 2008. Notably, there were no reports, memoranda, or any other written documents prepared by any of the officers involved in the incident describing the traffic stop or the circumstances surrounding the use of force.

- TOU and SOU in Arecibo reported jointly that no member assigned to these units had used *excessive force* in any intervention in the preceding six months.

- SOU in Caguas reported that it had not used *tasers or chemical agents* in the preceding six months.

Second, officers routinely reported that they are only expected to report force when a subject is arrested. This is a serious deficiency because it permits officers to evade supervisory review simply by allowing a subject of force to leave or flee. Officers should be required to report all uses of force, whether or not the subject of force is apprehended. For instance, in April 2011, we observed video of an officer openly spraying two boys with chemical irritants without justification, after former Superintendent Figueroa Sancha prohibited the use of chemical agents twice in January 2011. The boys were playing and were not arrested. The officer did not report the use of force. He was questioned about the incident only after a video taken by a bystander surfaced in the media. Criminal charges have since been filed against the officer for assault.

Third, PRPD supervisors are not required to conduct objective, thorough, and timely reviews of officers' use of force to ensure the force was consistent with constitutional standards and departmental policies. As written and in practice, PRPD's policies only require an officer to notify a supervisor for informational purposes. Once supervisors are notified, supervisors prepare written memoranda to alert higher-level officials about a use of force based on the officers' recitation of the incident. Supervisors simply take dictation. PRPD commanders confirmed this practice during our December 2010 tour.

When supervisors are notified of a use of force resulting in significant injury or complaint of injury, they should canvass the scene to obtain as much information as possible from a variety of sources. For instance, in addition to interviewing the officer involved, supervisors should note all injuries, identify and interview witnesses, and identify other physical evidence. The review should determine whether the use of force was within agency policy and objectively reasonable, and, if not, whether and what discipline should issue. The review should also indicate whether the involved officer needs additional training, counseling, or other assistance. Finally, the review should include an examination of the police tactics and precipitating events that led to the use of force, so that the agency can evaluate whether any revisions to training, policy, practices, or tactics are necessary. Use of force data should be incorporated into the agency's risk management system to detect potential patterns of at-risk conduct and improve performance.

PRPD's failure to uncover the extent of unjustified use of force during the August 2009 incident on University Avenue, the May 2010 incident at the Sheraton Hotel, and the June 2010 incident at the Capitol, *supra,* illustrates the multiple deficiencies plaguing PRPD's system of accountability on use of force. For instance, despite the use of significant force by hundreds of officers, including the use of batons, physical force, and chemical agents, only one written report was completed by an officer who deployed a CED at the Sheraton Hotel. No other officers were required to describe the force they used or the circumstances that led to their use of force. There is also no evidence that PRPD supervisors attempted to obtain information from subjects of force or other witnesses to evaluate officers' actions. Instead, PRPD officials indicated that they relied on civilians coming forward with sworn statements complaining about specific officers. Even if supervisors had attempted to interview subjects or witnesses of force, numerous officers concealed their badge numbers and name plates, preventing individuals from identifying specific officers. Further, post-incident reports prepared by supervisors included only generalized

references to use of force and failed to make any determination on the appropriateness of specific uses of force or account for specific injuries inflicted by officers. Therefore, it is not surprising that PRPD investigators identified only one instance of misconduct among the widespread use of force against non-violent civilians during all three incidents. The incident involved PRPD officers who fired three gas canisters at students who were merely yelling at police outside a dormitory in August 2009. Notably, PRPD's action came after video of the incident, disseminated widely on the Internet, showed a female student being carried by other students after one of the gas projectiles hit her in the leg, causing an open wound.

By failing to implement meaningful reporting and review requirements, PRPD abdicates its responsibility to ensure that officers use force in accordance with constitutional and agency requirements. Further, relying solely on civilian complaints to initiate use of force reviews is insufficient because victims or witnesses of excessive force may be inhibited from coming forward for a variety of reasons, including perceived or actual intimidation by officers or the inability to identify alleged aggressors.

### c. Critical incident reviews are ineffective and improperly completed

While all reportable force should be reviewed and investigated, critical incidents, such as firearm discharges by officers (except those that occur in the regular course of training) and other force that results in serious injury or death, require more comprehensive independent review. To be complete, the critical incident review must be conducted from both the criminal and administrative perspectives. Neither investigation should depend on whether anyone has complained about the use of force. The investigations may be conducted at the same time or sequentially, depending on the circumstances.

PRPD's critical incident reviews are deficient. Specifically, we found that PRPD does not have uniform procedures that require notification and coordination among administrative and criminal investigators, resulting in incomplete tracking of critical incidents. A lack of coordination creates a serious risk of tainting or compromising a criminal prosecution or drawing conflicting conclusions regarding the circumstances surrounding a use of force. PRPD also does not routinely conduct critical incident reviews to identify operational deficiencies and implement corrective action.

Our investigation revealed that PRPD criminal investigators, including those assigned to the homicide units, lack investigative protocols that specifically address officer-involved incidents. In this regard, homicide investigators reported that they employ the same methods and techniques as any other civilian-involved homicide and do not take special precautions when the target or suspect is an officer. Criminal investigators reported that they do not ordinarily receive training on officer-involved shooting investigations and were unaware of any specific procedures. The head of one criminal investigative unit further indicated that existing GOs on criminal investigations were too broad to provide operational guidance and that he typically conducted both the criminal and administrative investigation.

The lack of consistent procedures impedes Puerto Rico's ability to track and analyze critical incidents involving PRPD officers. Currently, Puerto Rico is unable to track even police-involved shooting deaths accurately – a figure that nearly all law enforcement agencies account

for.  Puerto Rico's failure in this regard became evident when we requested information on investigations into officer-involved shootings from 2005 through 2010.  PRDOJ reported 27 incidents involving subjects who were shot and killed by PRPD officers from 2005 to 2010.  *See Table 3*.  However, we identified seven additional incidents from publicly-available sources, such as press releases and news clips, in which officers reportedly shot and killed a subject.  *See Table 4*.  Specifically, PRDOJ's report did not include a 2008 incident in which PRDOJ charged the shooting officer with first-degree murder and weapons violations.  PRDOJ also did not report a 2009 shooting that was the subject of a PRDOJ press release.  It is unclear why PRDOJ failed to include these shooting fatalities in the original report.  Because we did not have access to supplemental sources of information covering dates after the middle of 2009, it is possible that PRPD or PRDOJ failed to identify and track additional shooting fatalities between late 2009 and 2010.

**Table 3:  Subjects Shot and Killed by PRPD, As Reported by SIB, 2005-2010**

| Status* | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | Total |
|---|---|---|---|---|---|---|---|
| Open investigation | 1 | 2 | 2 | 0 | 2 | 7 | **14** |
| Open, charges filed | 0 | 0 | 0 | 0 | 0 | 3 | **3** |
| Closed, no charges | 1 | 0 | 3 | 1 | 1 | 2 | **8** |
| Closed, charges dismissed | 1 | 0 | 0 | 0 | 0 | 0 | **1** |
| Closed, conviction | 0 | 0 | 1 | 0 | 0 | 0 | **1** |
| **Total** | **3** | **2** | **6** | **1** | **3** | **12** | **27** |

* as of December 6, 2010

**Table 4:  Seven Additional Subjects Shot and Killed by PRPD, 2005-2010**

| Date | Alleged Victim | Incident Summary |
|---|---|---|
| 8/4/2007 | Nelson Santiago Rivera | A PRPD officer shot and killed Santiago Rivera, the son of a PRPD officer, following a fight involving several civilians in Las Piedras. |
| 8/15/2007 | Luis Rodriguez Maya | PRPD officers shot and killed Rodriguez Maya during the execution of a search warrant in Cabo Rojo. |
| 4/1/2008 | Carlos Carrasquillo Rodriguez | PRPD officers shot and killed Carrasquillo Rodriguez in San Lorenzo.  Carrasquillo Rodriguez was known to have mental illness and was reportedly holding a knife. |
| 4/28/2008 | Marcos Montes Muñiz | PRPD officers shot and killed Montes Muñiz, who was suspected of committing a robbery and in possession of a weapon. |
| 6/6/2008 | Carlos Santiago Berrios | PRPD officers shot and killed Santiago Berrios, who was suspected of committing a robbery. |
| 8/5/2008 | Victor Sanabria Martinez | PRPD officers assigned to TOU in Humacao shot and killed Sanabria Martinez, who was suspected of committing a robbery.  The shooting officer was charged with first-degree murder and weapons violations. |

| 8/17/2009 | Heriberto Marcial Hernandez | According to a PRDOJ press release, a PRPD officer stopped Marcial Hernandez for a traffic violation. Marcial Hernandez allegedly reached for a weapon as he was being handcuffed and shot at the officer. The officer then shot and killed Marcial Hernandez. |
|---|---|---|

PRPD and PRDOJ recently established protocols to notify various components regarding police-involved deaths and serious injuries. While these are positive steps and should improve the tracking of critical incidents, they do not provide sufficient guidance on parallel criminal and administrative investigations. For instance, the interagency agreement recently entered into by PRPD, PRDOJ, and the Forensic Sciences Institute ("FSI") does not provide for communication or coordination with PRPD administrative investigators. The protocols are also limited to the most basic and immediate steps to be taken on the scene of a critical incident and do not require ongoing coordination.

Further, the "work plans" developed by PRD instruct administrative investigators to interview officers involved in shootings or other critical incidents without exception. While an officer may be ordered (or "compelled") to provide a statement to police department investigators, that statement, and any other evidence that derives from that statement, may not be used against the officer in any subsequent criminal prosecution of the officer. In this regard, officers cannot be forced to choose between losing their jobs because they disobeyed an order to answer questions, and exercising their Fifth Amendment right to avoid self-incrimination. *Garrity v. New Jersey*, 385 U.S. 493 (1967). Thus, a blanket rule requiring compelled statements is problematic because it may prevent prosecutors from using critical evidence in a criminal case involving police misconduct. Similarly, as discussed further below, PRPD's practice of providing blanket protections against self-incrimination in administrative investigations is also problematic because it unnecessarily hinders PRPD's ability to discipline officers. Rather than employing blanket rules, each internal investigation should be considered individually. Where it becomes apparent that an incident may involve criminal conduct, it may be prudent to delay compelling interviews of subject officers, and sometimes other interviews as well, to ensure that prosecutors are able to fully develop evidence that may be critical to a criminal prosecution.

In December 2010, PRPD reported that it was beginning to conduct comprehensive reviews of certain high-profile incidents. PRPD indicated that it was reviewing the August 2009 University Avenue incident, the May 2010 Sheraton Hotel incident, and the June 2010 Capitol incident. While these are positive developments, PRPD should conduct comprehensive reviews of all critical incidents. Without consistent critical incident reviews, PRPD misses crucial opportunities to improve the agency's performance through non-disciplinary, broad-based corrective action. Other agencies have used data collected from critical incident reviews to promote officer and civilian safety. For instance, NYPD adopted procedures in 1969 to collect in-depth information on firearm discharges by officers for the purpose of "[increasing] the safety potential of each member of the force."[46] In 2010, NYPD reported the lowest number of subjects *shot and injured* in 40 years (16 compared to the highest number of subjects shot and injured, 221, in 1971). NYPD also reported the lowest number of subjects *shot and killed*, eight, in 2010. In its 2009 Annual Report, NYPD cited information gleaned from its annual reports as an important tool in its efforts to tailor safer policies and practices.

#### d. Insufficient training on use of force

Insufficient training on use of force further exacerbates PRPD's policy deficiencies. Based on our review of the University College's training reports covering January 1 through November 30, 2010, only a small fraction of active PRPD officers received any training on use of force. For instance, only 415 officers received training on the use of batons during this period, or fewer than 3% of active PRPD officers. Even a smaller number of officers received training on chemical irritants. In the same 11-month period, only 248 officers, or approximately 1.5% of active officers, received training on chemical irritants. PRPD's performance in this regard is deeply troubling and underscores the need for fundamental reform.

All officers should receive in-service training on use of force on an annual basis that covers both current legal requirements and appropriate application of use of force. Officers should also be offered contemporary, scenario-based training that reinforces current legal standards and practices. Ongoing training on use of force should also include:

- use of force reporting requirements;
- examples of scenarios faced by PRPD officers and interactive exercises that illustrate proper use of force decision-making;
- de-escalation techniques that encourage officers to make arrests without using force, and instruction that disengagement, area containment, surveillance, waiting out a subject, summoning reinforcements, calling in specialized units, or delaying arrest may be the appropriate response to a situation, even when the use of force would be legally justified;
- threat assessment;
- crisis intervention and interacting with people with mental illnesses, including instruction by mental health practitioners and an emphasis on de-escalation strategies;
- factors to consider in initiating or continuing a pursuit; and
- training on conflict management.

PRPD also does not consistently train supervisors to independently review officers' use of force. It is crucial that supervisors be taught the skills and judgment necessary to evaluate officers' use of force, not only for compliance with agency policy and appropriate legal standards, but also to identify specific operational, training, or policy needs. In addition, effective law enforcement agencies ensure the lawful use of force by implementing training that reinforces the agency's policies and ongoing auditing that captures and analyzes information to allow for continuous improvement and external accountability.

#### e. Fear and violence by tactical units is condoned

As discussed above, PRPD has been on notice for years that officers assigned to tactical units routinely employ excessive force when interacting with civilians. Members of these units are authorized to use a wide variety of force and special weapons, including chemical sprays, tear gas, CEDs, and less lethal munitions. These units rely on intimidation, fear, and extreme use of force to manage crowds and are often deployed to low-income and minority communities on routine patrols. These units operate with insufficient training and guidance on the lawful exercise of police power.

In 2007, an evaluating committee commissioned by a former Superintendent found that TOU officers use indiscriminate force that is "totally unjustified."[47] Internal affairs investigators also found serious deficiencies in the operation of TOUs following the August 11, 2007 shooting death of Cáceres Cruz by TOU Officer Javier Pagán Cruz. *Supra*. Specifically, an internal affairs investigator found grossly inadequate supervision that contributed to instability and lack of discipline in TOU (two sergeants were assigned to supervise 44 officers in Humacao; one of the sergeants was on leave at the time of the shooting incident). The investigator also found that sergeant-level supervisors were used to supervise TOUs, in violation of PRPD policies requiring, at least, a lieutenant-level supervisor. Officers we interviewed in 2008 and 2009 also expressed serious concerns with the lack of supervision of TOUs.

Rather than take steps to manage the use of force by these units, or provide them with sufficient training and supervision in response to PRPD's own troubling reports, PRPD routinely deployed TOUs to engage with crowds and protesters, despite their propensity for using significant force.[48] Our review of the University Avenue, Sheraton Hotel, and Capitol incidents in 2009 and 2010 confirms that serious deficiencies remain in the deployment of tactical units. For instance:

- PRPD appears to have engaged in little tactical coordination and planning in its responses to major disturbances and demonstrations; instead PRPD relies on physical confrontations by its tactical units.

- PRPD has not sufficiently explored methods that allow civilians to peacefully exercise their constitutional assembly and speech rights.

- Tactical units and other officers displayed a tendency to quickly deploy hand-held or weapon-based chemical agents on civilians without regard for their harmful effects, even upon officers themselves.

- Although the Superintendent (personally in the Capitol incident) and PRPD's high-level commanders claimed responsibility for the tactical decisions made during all three incidents, command and control vanished once tactical officers appeared, leaving the tactical officers unsupervised.

- Supervisors appeared more concerned about public perception than about the actions of their officers. For example, after an officer inappropriately struck a demonstrator being ejected from the Capitol in June 2010, his commander seemed more concerned about warning the officer about video cameras than with reprimanding the officer for his use of force.

- Reports drafted after these incidents show a lack of concern for the basic facts needed to sustain criminal complaints, omissions that led to the dismissal of most charges against individuals due to lack of sufficient probable cause.

- PRPD failed to report its uses of force. A significant number of officers used force indiscriminately, yet the only specific use of force report available was a report from an officer who deployed a CED during the Sheraton Hotel incident.

- Officers used force against civilians who were dispersing, even running away, thus not representing a danger to the officers or others.

Publicly, Puerto Rico officials and PRPD commanders have justified the level of force unleashed on protesters by TOU officers. They have accused protesters of engaging in widespread vandalism and threatening the public safety. Yet, few protesters were arrested and many that were arrested were released for lack of probable cause. Shortly after the June 30, 2010 incident at the Capitol, the Governor requested that PRPD thoroughly review the operation of TOUs. We have not been provided a copy of any final reports, but our review of the committee's minutes revealed that PRPD appeared focused on minimizing public condemnation over PRPD's response to protesters and concealing the committee's findings by assigning attorneys to sub-committees. With respect to PRPD's actions on June 30, the committee observed that TOUs had not developed operational plans to manage the crowds; communication between the incident commander and TOU commanders was inadequate; TOUs failed to use proper formations when confronting crowds; supervisors did not adequately manage officers' stress; and supporting officers intervened without control or coordination.

The committee also found other serious deficiencies that have been known to PRPD for years but were ignored. For instance, the committee found that: there is no selection protocol for officers entering TOUs; five percent of TOU officers are unfit for tactical duty based only on the number and type of civilian complaints lodged against them (as of September 2010, there were 738 officers assigned to TOUs); and training is inadequate and the curricula do not comply with contemporary standards and constitutional protections against the use of excessive force.

In late 2010, PRPD announced that it was disbanding several tactical units and reducing the size of TOUs. As of September 2010, PRPD reported that 53 officers were assigned to Special Operations Units in San Juan, 738 officers were assigned to TOUs, and 35 officers were assigned to the Specialized Tactical Unit. Officers deemed unfit for tactical duties were to be re-deployed to patrol and other units within PRPD. However, PRPD did not provide specific information about steps it would take to re-train, discipline, or remove unfit officers, before re-assigning them to patrol duties. We have not obtained information that these units have, in fact, been disbanded or whether problem officers have been removed or re-trained before being transferred to other units. Based on our review, PRPD continued to deploy tactical officers to engage students and other protesters in January and February 2011, and possibly later. It is critical that PRPD re-structure its tactical units and re-train officers who are transferred from these units to protect civilians from unreasonable risk of harm.

* * * * *

In sum, PRPD's systems of accountability on use of force are profoundly broken and do not ensure the lawful and effective use of force. PRPD continues to demonstrate a deliberate indifference to the public's safety and the civil rights of individuals engaging in protected speech

activities during protests, by failing to control the violence and fear exerted by TOUs. A functioning system of accountability generally includes: (1) clear guidance through written policies that are consistent with legal standards, provide for effective alternatives to force, and are accessible to all personnel authorized to use force; (2) ongoing training by qualified instructors that reinforces the agency's policies and guides officers' discretion on the application of force; (3) clear reporting requirements; (4) supervisory review, including collecting information regarding the circumstances of the use of force and an initial, objective assessment to determine whether the force used was within agency policy and legal standards; (5) thorough and timely force investigations by trained investigators to determine whether the use of force involved criminal or administrative violations; (6) critical incident reviews by commanders to identify and implement corrective action; and (7) ongoing auditing that captures and analyzes information to allow for continuous improvement and external accountability.

In addition, law enforcement agencies should develop external strategies to build and foster trust between the community and its officers. These strategies include external oversight and accountability, public reporting on use of force, and safety surveys to measure the perceptions and needs of the community.[49]

## B.    PRPD Engages in a Pattern and Practice of Unconstitutional Searches and Seizures

PRPD regularly violates the constitutional rights of civilians through illegal searches, detentions, and arrests. In particular, we found a pattern and practice of PRPD officers conducting searches of civilians' homes without warrants or consent and in the absence of any exigent circumstance or exception that would render such a search permissible under the Fourth Amendment. Our findings also indicate that officers plant evidence during searches, rely on excessive force and intimidation as search aids, and proceed with searches even when knowing that the address, identity of the individual, or other pertinent information is incorrect. The evidence we uncovered further demonstrates that PRPD officers engage in a regular pattern of detaining and arresting individuals without reasonable suspicion or probable cause in violation of the Fourth Amendment, and that supervisors and members of specialized units are often involved in these unlawful acts.

The Fourth Amendment's protection against unreasonable searches and seizures "requires that arrests be based on probable cause." *Alexis*, 67 F.3d at 349 (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). Courts analyze the existence of probable cause by "an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time and not [an assessment of] the officer's state of mind at the time the challenged action was taken." *Id.* (citing *Maryland v. Macon*, 472 U.S. 463, 470-71 (1985)). Courts will find probable cause to arrest existed where "the facts and circumstances within [the officer's] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent [person] in believing that the [suspect] had committed or was committing an offense." *Id.* (citing *Rivera v. Murphy,* 979 F.2d 259, 263 (1st Cir. 1992)). The probable cause requirement applies both to arrests and searches made pursuant to, and without, a warrant. *Wilson v. City of Boston*, 421 F.3d 45, 54 (1st Cir. 2005). While "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted," *Michigan v. Summers*, 452 U.S. 692, 705 (1981), this authority does not give law enforcement carte blanche to execute a search warrant in contravention of the

parameters of the Fourth Amendment. *See Muehler v. Mena*, 544 U.S. 93,106 (2005) (Stevens, J. concurring). Regardless of the situation, the ultimate question is whether the facts and circumstances confronting an officer at the time would lead a reasonable person to believe that the arrestee had committed or was committing a crime. *Alexis*, 67 F.3d at 349.

Absent probable cause, the Fourth Amendment permits law enforcement officers to briefly detain individuals for investigative purposes if the officers possess reasonable suspicion that criminal activity is afoot. *Terry v. Ohio*, 392 U.S. 1, 30 (1968). Reasonable suspicion must be supported by specific and articulable facts particular to the detained individual, which, combined with "rational inferences from those facts, reasonably warrant an intrusion." *United States v. Young*, 105 F.3d 1, 7 (1st Cir. 1997) (citing *United States v. Kimball*, 25 F.3d 1, 6 (1st Cir. 1994)). To justify a stop under *Terry*, officers must possess "more than a hunch" that an individual may engage in wrongdoing. *United States v. Romain*, 393 F.3d 63, 71 (1st Cir. 2004).

### 1. Officers Conduct Searches and Seizures in Violation of the Fourth Amendment

We found that unconstitutional searches and seizures are a widespread problem. There is a pattern and practice of searches and seizures without probable cause, for illegal purposes and otherwise in violation of the Constitution. The following are typical, but not exhaustive illustrations; we provide additional examples of unlawful searches and seizures in Appendix A.

As with the videotaped shooting of Cáceres Cruz in Humacao, described above, the arrest of ten officers assigned to the Mayagüez Drug Division reflects serious deficiencies in PRPD's management and oversight of officers' search and seizure practices. On August 23, 2007, Lieutenant Dennis Muñiz Tirado, director of the Mayagüez Drug Division, was indicted for conspiring to deprive citizens of their right to be free from unreasonable searches and seizures; their right not to be detained and arrested based on fabricated evidence; and their right not to be deprived of liberty without due process of law. As part of a three-year conspiracy, Muñiz Tirado and officers under his command stored drugs obtained during the course of ordinary police work in a strong-box in Muñiz Tirado's office and used the drugs to fabricate cases. According to the plea agreement entered on July 15, 2008, Muñiz Tirado was also aware that officers assigned to his unit were swearing out false affidavits to justify arrests.

The other officers involved in the criminal conspiracy are:[50]

- *Pascual Santiago Méndez:* found guilty on December 19, 2008, and sentenced to 108 months of imprisonment.
- *Anthony Domínguez Colón:* found guilty on December 19, 2008, and sentenced to 118 months of imprisonment.
- *Víctor Cortés Pagán:* found guilty on December 19, 2008, and sentenced to 70 months of imprisonment. Officer Cortés Pagán was also found personally liable by a jury on October 28, 2009, in *Cruz Acevedo (see Appendix A)*.
- *Luis Ruperto Torres:* found guilty on December 19, 2008, as to the first count of the indictment and sentenced to 50 months of imprisonment. Sergeant Torres was also found personally liable by a jury on October 28, 2009, in *Cruz Acevedo (see Appendix A)*.

- *Luis Vélez Class*:  pled guilty on November 5, 2008, and sentenced to three years of probation.
- *Michael Monsegur González:*  pled guilty on November 5, 2008, and sentenced to six months of imprisonment.
- *Josué Bosques Muñiz:*  pled guilty on November 7, 2008, and sentenced to three years of probation.
- *Ismael Chaparro Vélez:*  pled guilty on November 10, 2008, and sentenced to twelve months and one day of imprisonment.

PRDOJ reviewed numerous cases involving the arrested officers and dismissed or closed 51 cases.  Tanairí Candelaria Cabán was among those arrested by the Mayagüez officers.  She was falsely imprisoned for 18 months after Officer Cortés Pagán and another officer, both working under the supervision of Sergeant Torres and Lieutenant Muñiz Tirado, planted cocaine and marijuana in her backpack on February 21, 2006.  She was released on October 11, 2007, after the Puerto Rico Justice Secretary found that Candelaria Cabán had been convicted based on fabricated evidence.[51]

Clear indications existed for years that some of these officers were engaging in unconstitutional conduct, yet no evidence exists that PRPD took the steps necessary to prevent their improper and illegal conduct.  For example, many of these officers also had numerous civilian complaints filed against them involving, among other things, illegal searches, assault, and malicious prosecution, including the following officers:

**Table 5:  Civilian Complaint History of a Convicted Mayagüez Officer**

| Type | Year | Disposition |
| --- | --- | --- |
| Negligence | 2000 | Admonishment |
| Illegal search | 2001 | Archived[52] |
| Use of weapon | 2001 | Archived |
| Assault | 2004 | Archived |
| Assault | 2005 | Archived |
| Assault | 2006 | Orientation |
| Illegal search | 2006 | Unknown |
| Assault | 2006 | Archived |
| Disobeying order | 2007 | 30-day suspension |

**Table 6:  Civilian Complaint History of a Convicted Mayagüez Officer**

| Type | Year | Disposition |
| --- | --- | --- |
| Illegal search | 2005 | Archived |
| Negligence, partiality, ineptitude | 2005 | Orientation |
| Assault | 2005 | Archived |
| Illegal search | 2006 | Unknown |
| Illegal search | 2006 | Expulsion |
| Malicious prosecution | 2007 | Archived |

| Illegal search | 2007 | Expulsion |
|---|---|---|
| Illegal search | 2007 | Expulsion |

According to PRD, civilians filed 1,302 complaints against PRPD officers for unreasonable or illegal searches and seizures from 2004 to 2008. During the course of our investigation, from January 2009 to August 2010, PRD reported an additional 221 complaints involving similar allegations. PRPD did not provide the outcome of these complaints. Despite PRPD's difficulties producing information, based on our review, we found that unconstitutional searches and seizures are not isolated or sporadic events, but part of a routine pattern of conduct by PRPD officers. As illustrated below and in Appendix A, PRPD officers conduct searches without probable cause, in violation of the Fourth Amendment. Officers also plant evidence during searches, rely on excessive force and intimidation as search aids, and engage in a regular pattern of detaining and arresting individuals without reasonable suspicion or probable cause in violation of the Fourth Amendment.

- According to the indictment in *United States v. Santos Soto*, No. 07-CR-400 (CCC), Officer José Rodríguez Vázquez arrived at the residence of Juan Carlos Aquino Méndez on July 5, 2007, accompanied by Officers Carlos Plaza Santiago, Bernie González Vélez, and Norma Santos Soto, as part of an undercover operation of the Arecibo Drug Division. The officers planned to arrest Aquino Méndez after the completion of a drug transaction initiated the day before. Aquino Méndez, however, refused to accept any money from Officer Rodríguez Vázquez. Despite Aquino Méndez's refusal, Officer Rodríguez Vázquez signaled to the other officers, who entered Aquino Méndez's home and arrested him.

  After the arrest, Officers Plaza Santiago and González Vélez removed 45 small bags of cocaine from Officer Rodríguez Vázquez's vehicle and planted them inside Aquino Méndez's home. After illegally searching the property and seizing $2,200, the officers charged Aquino Méndez with drug possession and agreed among themselves to provide false testimony during any future court proceedings.

  On April 2, 2009, Officer González Vélez pled guilty to conspiracy against the rights of civilians. Although a judgment of discharge was entered in favor of Officer Rodríguez Vázquez, he pled guilty to withholding information concerning the fabrication of cases on May 28, 2010, in *United States v. Rodríguez Vázquez*, No. 10-CR-202 (CCC). He was sentenced to three years of probation. On October 28, 2010, a jury found Officers Plaza Santiago and Santos Soto guilty.[53]

- On June 21, 2007, Robert González Ramírez was standing in front of a business with a neighbor when four officers detained González Ramírez and seized his car. The officers hit González Ramírez with their service weapons and repeatedly threatened him as they asked him about drugs. The officers took González Ramírez to his home, where they conducted a search but found nothing. González Ramírez's arrest and the search and seizure of his property were not based on probable cause.

Officers Pérez Rosado and Cano Díaz entered guilty pleas to federal criminal charges for carjacking, deprivation of civil rights, conspiracy against the rights of citizens, and use of weapons during the commission of a felony on March 4, 2008.[54]

- On June 12, 2007, officers from the Mayagüez Illegal Weapons Division conducted a search of the home of Corrections Officer Tetelo Vargas and discovered firearms. Although Vargas provided valid licenses for the firearms, Officers Randy Bayrón López and Juan Ortiz continued the search without showing Vargas a search warrant. Vargas' cousin, David Sepúlveda, arrived during the search and the officers asked Sepúlveda about weapons. Sepúlveda took the officers to his home, where he showed them his hunting guns and licenses. The officers took Vargas and Sepúlveda to the home of Jorge Vargas Torres, where they conducted a similar search. The officers then arrested and detained the three men. Although the officers had a search warrant, they lacked probable cause as it was based on false statements. The men sued PRPD and, on April 8, 2010, the court entered judgment after the parties reached a confidential settlement agreement.[55]

- On April 13, 2007, a group of PRPD officers detained Officer Juan Díaz Román and allegedly found drugs in his possession. Díaz Román was charged with drug offenses and summarily suspended from PRPD. An investigation later disclosed that he had been framed by his ex-girlfriend, who reported to PRPD commanders that Díaz Román was corrupt. Officer René Ortiz Correa swore out a false statement indicating that he had conducted surveillance, which served as the basis for the search warrant of Díaz Román's home.[56]

  Officer Ortiz Correa and Sergeant Rivera Padilla were suspended for fabricating the case against Díaz Román. Díaz Román filed a federal civil law suit and default judgments were entered against Officers Ortiz Correa and Sergeant Rivera Padilla. On November 4, 2010, the case was dismissed after Díaz Román settled with PRPD. Díaz Román was reinstated to PRPD. The warrant used to justify Díaz Román's arrest was not predicated on legitimate probable cause.

In addition to the unlawful searches and seizures illustrated above, we found that officers stop or arrest individuals to commit crimes, such as extortion and robbery. Some of the officers involved had significant complaint histories involving similar acts, which should have alerted their supervisors to potential problem behavior. For example:

- On April 11, 2007, Arecibo Transit Officer Héctor Cotto Rivera stopped Jorge Seiglie and two youths riding in a vehicle without cause. He searched the vehicle and showed the youths a marijuana cigarette. Officer Cotto Rivera arrested the driver and passengers and transported them to a precinct where he interviewed them separately, seeking $1,500 to drop the charges and return the vehicle. Each youth paid Officer Cotto Rivera $500.

- On May 8, 2006, Officer Cotto Rivera arrested Marcos Molina Rosario after he reportedly swallowed a bag with drugs during a traffic stop. Officer Cotto Rivera searched Molina Rosario's vehicle, and told him he had found drugs, but refused to show

them to Molina Rosario. Officer Cotto Rivera offered to drop the drug charges and give him back his vehicle for $1,000.

- On June 3, 2009, Officer Cotto Rivera entered a guilty plea for extortion in *People v. Cotto Rivera*, CEG2008G002. He was sentenced to six months and a day of imprisonment.

Officer Cotto Rivera had a lengthy history of civilian complaints, including allegations of illegal arrests and abuse. Administrative investigators were unable to find the final disposition of two complaints, and two cases recommending discipline were closed without further action. Information we obtained also indicates that Cotto Rivera had been terminated from prior employment for reportedly stealing money, information which had been communicated to PRPD investigators conducting his background check, yet he was still permitted to enter PRPD.

Examples of criminal behavior and misconduct by other PRPD officers abound and indicate a serious problem. We provide further examples in Appendix A.

### 2. Systemic Deficiencies Causing and Contributing to the Pattern and Practice of Unlawful Searches and Seizures

The pattern and practice of unlawful searches and seizures described above are primarily the result of widespread institutional deficiencies within PRPD that remain unabated. PRPD lacks adequate controls to ensure lawful searches and seizures. Specifically, PRPD's arrest policies are outdated and fail to provide guidance on conducting brief investigatory or *Terry* stops. PRPD officers also fail to follow investigative protocols and procedures. Until recently, PRPD lacked procedures to review related cases after an officer provided false testimony in support of an arrest warrant. PRPD has not demonstrated that these procedures effectively root out unlawful conduct by officers.

The Fourth Amendment's protection against unreasonable searches and seizures "requires that arrests be based on probable cause." *Alexis*, 67 F.3d at 349. Absent probable cause, the Fourth Amendment permits law enforcement officers to briefly detain individuals for investigative purposes if the officers possess reasonable suspicion that criminal activity is afoot. *Terry*, 392 U.S. at 30. Reasonable suspicion must be supported by specific and articulable facts particular to the detained individual, which, combined with "rational inferences from those facts, reasonably warrant an intrusion." *United States v. Young*, 105 F.3d at 7 (citing *Kimball*, 25 F.3d at 6). Law enforcement agencies should provide clear guidance on the meaning of probable cause, reasonable suspicion, and the legal parameters that govern an officer's authority to carry out searches and seizures. The guidance should include officers' authority to conduct brief investigatory detentions or *Terry* stops. The legal contours of searches and seizures constantly evolve as courts scrutinize various policing methods, tactics, and factual circumstances. As a result, officers should receive continuous education and training on developments in the law. Law enforcement agencies should also collect and analyze data on arrests to provide for ongoing improvement of the agency's policies and practices.

### a. Policies are outdated and inaccessible

PRPD's policies concerning searches and arrests are outdated, inaccessible, and impractical. General Order 98-16, "Internal Policies and Procedures for Handling and Executing Summonses, Arrest Warrants, Searches and Seizures," provides a lengthy, sometimes repetitive, explanation of legal concepts related to searches and seizures. The 63-page policy covers a broad array of topics, including making warrantless arrests, obtaining search warrants, executing search and arrest warrants, transporting arrestees, detaining individuals for investigative purposes, vehicle stops, vehicle pursuits, suppression of illegally obtained evidence, vehicle searches, strip searches, body cavity searches, and a recitation of rules of criminal procedure. The structure of GO 98-16 provides limited operational guidance and is overly broad and impractical, focusing primarily on abstract legal concepts and holdings. GO 98-16 should be written clearly, so as to be comprehensible to the most junior member of the force expected to carry out searches and arrests. Having been issued more than 12 years ago, GO 98-16 is also outdated and does not reflect current developments in the law and policing techniques.

Searches and seizures are core duties of officers and should be reinforced periodically to optimize comprehension and compliance. Although GO 98-16 appears to have been amended and documents we obtained demonstrate that unit heads reviewed recent court decisions at local academies – monthly meetings on new policies, procedures, and directives – local academies do not provide sufficient opportunity to discuss and understand this important material. Supervisors are often required to inform subordinates of dozens of new general and special orders, administrative directives, and general agency announcements at a single meeting. The agenda for one monthly local academy we reviewed contained approximately 190 items, including new general and special orders on monetary incentives for seized property, use of CEDs, and domestic violence investigations. Many of the officers we interviewed indicated that supervisors simply read new policies and procedures to them, and provide little opportunity to discuss and understand the subjects presented. Additionally, as we discuss in Section IV.A *infra*, many officers reported that they are not routinely given copies of new general or special orders for reference.

General Order 98-16 also does not address the consequences of violating laws or agency policies on searches and seizures, beyond explaining that criminal defendants can file motions to suppress evidence. PRPD's policies should clearly advise officers that making false statements to obtain a search warrant, arresting an individual without probable cause, effecting an arrest based on discriminatory criteria such as race or national origin and fabricating evidence, among other search and seizure violations, could subject the officer to criminal prosecution, disciplinary action, and civil liability.

The lack of clear policy guidance and meaningful training and education on legal requirements for searches and seizures is a serious deficiency. Officers we interviewed indicated that PRPD does not have standard operating procedures that describe the legal requirements or processes that are required for lawful searches, detentions, and arrests. As a result, officers routinely improvise and often overlook critical steps, such as not establishing predicate cause for conducting more intrusive searches of an individual's person or property. Significantly, an officer assigned to a specialized unit told us openly and without objection from his colleagues

and supervisors that officers need to violate people's civil rights to achieve the crime-fighting objectives of government officials.

PRPD has been aware of these serious deficiencies for years, but has failed to take corrective action to ensure the lawful exercise of police authority on searches and seizures. For instance, a 2009 report prepared by Total Quality, a consulting firm contracted by PRPD, found that PRPD fails to train and certify investigators in investigative techniques related to seizing illegal weapons; lacks operational plans for the seizure of illegal weapons; lacks uniform investigative protocols for the seizure of illegal weapons; and does not have sufficient resources and equipment to develop investigations. PRPD has failed to substantively address the problems highlighted by the 2009 Total Quality report in a comprehensive and effective manner.

**b.  Training on lawful searches and seizures is inadequate**

PRPD pre-service training related to lawful searches and seizures is inadequate and ill-suited to the needs of PRPD officers. While materials used in University College's course on civil rights cite the United States Constitution as a source of individual rights, they contain no discussion of specific rights, such as the Fourth Amendment's prohibition on searches and seizures without probable cause. The course also lacks any meaningful interaction between instructors and students or engagement using practical examples of lawful and unlawful conduct. Such meager training cannot prepare PRPD officers for the complex situations they will likely face as they carry out their duties.

Available in-service training for PRPD officers is sorely inadequate. A review of the University College's training from January 1 to November 30, 2010 demonstrates how few PRPD officers have received continuing education on searches and seizures and other important police functions.[57] According to the University College, approximately 1,000 officers, or 17%, completed a 16-hour continuing education curriculum during October and November 2010. The curriculum includes a two-hour course titled, "Criminal Procedure" and another four-hour course titled, "Fundamental Civil Rights and Hate Crimes." However, given PRPD's chronic failure to provide officers with legally sufficient policies and training for years and the pattern of pervasive constitutional violations, these general courses do not begin to capacitate PRPD's ranks with the theoretical and practical skills necessary to protect individuals from unlawful searches and seizures. Indeed, the number of officers receiving specific training on searches and seizures for nearly all of 2010 is woefully insufficient. According to the University College, only 60 officers, or less than 1% of active PRPD officers, were trained on arrest and search procedures from January 1 to November 30, 2010. Notably, PRPD trained more officers (197) on vehicle-related topics, such as detailing information on transportation licenses, operating motorcycles, and identifying vehicle parts, than on arrest and search procedures.

Equally troubling is PRPD's failure to implement corrective action, despite reports from its own contractors that officers who lack an understanding of criminal procedure or substantive laws violate individuals' civil rights related to searches and seizures. The 2009 study from Total Quality recommended that the University College provide at least 40 hours of continuous education annually to the Illegal Weapons Bureau on topics such as criminal procedure, civil rights, substantive weapons law, and GO 98-16 concerning searches and seizures. As discussed above, PRPD officers began receiving 16 hours, well below the 40 hours recommended, of in-

service training in October 2010.  Many of Total Quality's other recommendations have not been implemented.

### c.    Guidance on brief investigatory or *Terry* stops is lacking

PRPD provides insufficient guidance on conducting brief investigatory or *Terry* stops and related "pat downs."  Absent probable cause, officers may conduct brief investigatory stops or detentions, typically referred to as *Terry* stops, when they have reasonable suspicion to believe that an individual may be engaging in criminal activity.  Stops and attendant "pat downs" or "frisks" should be limited in focus to officer safety and the grounds giving rise to the officer's suspicion.  While we observed that PRPD officers regularly conduct investigatory stops and "pat downs," we found that PRPD's policies provide insufficient guidance on the legal limits of these temporary stops.  Indeed, many officers we interviewed were unfamiliar with the seminal Supreme Court case authorizing investigatory stops under the Fourth Amendment, *Terry v. Ohio*, *supra*.

General Order 98-16 states that officers do not have free rein to detain an individual without an arrest order or in the absence of probable cause.  Specifically, the Order adds, "[i]n the absence of probable cause to arrest, a person may only be 'detained' for the purpose of obtaining information or dissipating suspicions concerning whether the individual is committing or has committed a crime *when the detention is voluntarily accepted*."  This last clause appears to eviscerate an officer's ability to compel a brief detention to allay a reasonable suspicion that criminal activity is afoot.  However, the Order does not explicitly discuss *Terry v. Ohio* or the limits of temporary detentions and "pat downs."  PRPD officers are also not required to document when they conduct temporary stops or detentions, effectively immunizing such stops from any supervisory review or scrutiny.

Thus, the problems associated with PRPD's failure to address *Terry* stops through formal policy are two-fold.  First, PRPD fails to confer its officers with the full authority permissible under the Fourth Amendment to investigate potential criminal activity.  Second, because officers engage in temporary detentions in practice, PRPD fails to provide officers with sufficient guidance on the constitutional limits of temporary detentions and pat downs to ensure that such interactions do not become unreasonable and overly intrusive.

### d.    Accountability systems related to warrants are insufficient

Until recently, PRPD lacked procedures to review related cases after an officer provided false testimony in support of an arrest warrant.  Despite recent reforms, PRPD policies are still inadequate.  On September 27, 2010, PRPD added procedures that require investigators to review related cases when an officer is suspected of having provided a false statement in support of an arrest or search warrant.  General Order 2010-14 ("GO 2010-14"), which created PRD, requires that the internal affairs bureau conduct a priority investigation of the allegations and search for other warrants issued based on the subject officer's declaration.  The results of the investigation must then be forwarded to the head of PRD and to PRDOJ.  Before the implementation of GO 2010-14, PRPD did not routinely review related cases involving an officer who provided false testimony in support of an arrest or search warrant to identify potential patterns or prior misconduct.  PRPD typically conducted reviews only after high-profile

cases, such as the 2008 arrest of officers in the Mayagüez Drug Division who were convicted of planting drugs and other evidence over the course of several years. Officers were also unaware of any agency protocols to periodically solicit information from prosecutors and other members of the criminal justice system concerning officers who may have engaged in questionable or unlawful searches or seizures.

General Order 2010-14 fails to create an adequate accountability system. To provide for supervisory review and data analysis, law enforcement officers should report all searches and seizures in a thorough, factual, and objective manner. The reports should be completed whether or not property was seized during the course of a search. Searches completed during an arrest should be addressed in the arrest report. Pat downs or "frisks" completed during a traffic stop or temporary detention should be documented in a "search and seizure" report. Supervisors should promptly review and evaluate search and seizure reports to determine whether the search or seizure: was within agency policy, should result in a misconduct investigation, indicates a need for additional training or other remedial non-disciplinary action for the involved officer, and/or indicates the need to revise policies, tactics, or training.

## C.    Additional Areas of Serious Concern

Although we do not make findings at this time, we uncovered troubling evidence that PRPD officers engage in discriminatory policing practices against individuals of Dominican descent in violation of the Fourteenth Amendment, the Safe Streets Act, and Title VI. We also uncovered troubling evidence that PRPD officers fail to adequately police sex assault and domestic violence. While PRPD's failure to adequately collect data regarding these issues makes it difficult to assess PRPD's practices, we believe that PRPD has not implemented sufficient accountability systems to ensure that all residents of Puerto Rico are treated impartially, regardless of race, ethnicity, national origin, sex, sexual orientation, or gender identity. Furthermore, as previously discussed, PRPD has also failed to effectively address domestic violence when committed by PRPD officers.

The institutional deficiencies noted in the previous sections also contribute to the inability of PRPD to address longstanding concerns related to domestic violence and discriminatory policing practices. Deficient policies, inadequate supervision, and dysfunctional accountability systems all hinder the ability of PRPD officers to fulfill their mission in a lawful manner. Without addressing the flaws highlighted throughout this report, PRPD will be unable to effectively ensure that its officers are able to serve all members of the Puerto Rico community.

### 1.    Allegations of Discriminatory Police Practices by PRPD

Evidence suggests that PRPD officers violate the rights of individuals of Dominican descent or appearance through targeted and unjustified police actions, in violation of the Fourteenth Amendment, Title VI, and the Safe Streets Act. PRPD has faced several complaints regarding its targeting of Dominicans for police actions, including allegations that PRPD officers routinely employ excessive force, unlawful searches and seizures, and intimidation. Individual PRPD officers have also been accused of using racially charged and biased language in the course of their policing duties. PRPD's institutional deficiencies, primarily including its failure

to adequately collect and analyze data, make it difficult to assess whether PRPD adequately responds to, and prevents, these incidents.

Discriminatory policing can take many forms, including reliance on bias-based profiling, in which an officer impermissibly decides whom to stop, search, or arrest based upon characteristics such as race, ethnicity, or national origin. It can also include instances in which a law enforcement agency targets certain communities using particular enforcement and crime prevention tactics on the basis of stereotypes or biased decision-making. The Equal Protection Clause of the Fourteenth Amendment prohibits selective or discriminatory enforcement of the law. *Whren v. United States*, 517 U.S. 806, 813 (1996). Discriminatory policing may arise from an explicit classification or a facially neutral law or policy. *Id*. The Equal Protection Clause is violated when the government's administration of a facially neutral law is motivated by a discriminatory purpose and results in a discriminatory effect. *See Washington v. Davis*, 426 U.S. 229-40 (1976). Evidence of discriminatory effect may include evidence of similarly situated individuals who were not subjected to the enforcement actions, statistical evidence, or both. *United States v. Armstrong*, 517 U.S. 456, 467 (1996).

Discriminatory law enforcement activities are likewise prohibited by Title VI and the Safe Streets Act. Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participating in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving [f]ederal financial assistance." 42 U.S.C. § 2000d. PRPD is a program recipient under Title VI. Title VI prohibits intentional discrimination. *See Alexander v. Sandoval*, 532 U.S. 275, 281 (2001), and Title VI implementing regulations proscribe law-enforcement activities that exert a discriminatory effect on the basis of race, color, or national origin. *Id.* at 281-82. The Safe Streets Act, which provides that "[n]o person in any State shall on the ground of race, color, religion, national origin, or sex be excluded from participation in, be denied the benefits of, or be subjected to discrimination under or denied employment in connection with any programs or activity funded in whole or in part with funds made available under this title." 42 U.S.C. § 3789d(c)(1). PRPD is a program recipient under the Safe Streets Act. The Safe Streets Act's statutory text and implementing regulations make clear that it applies both to instances of intentional discrimination and to any law-enforcement practices that disparately impact a group falling under the statute's enumerated factors.

PRPD has recently faced numerous accusations of biased treatment of the Dominican population in Puerto Rico. In 2010, a request was filed with the Inter-American Commission on Human Rights of the Organization of American States calling on it, among other things, to address the treatment of Dominican individuals by PRPD.[58] The complaint alleges that residents of Villas del Sol, a predominantly Dominican community in the municipality of Toa Baja, have been the subject of intense police action resulting in the use of excessive force. Incidents include the alleged use of pepper spray on children and passive individuals, the use of unjustified force on women, and an around-the-clock police presence contributing to intimidation.[59] The Dominican Committee on Human Rights ("DCHR") has also publicly alleged that PRPD officers discriminate against Puerto Ricans of Dominican descent by targeting them in the enforcement of immigration-related laws.[60] Specifically, DCHR alleges that PRPD officers in San Juan

routinely ask individuals who appear to be Dominican for identity documents without reasonable suspicion or legitimate law enforcement purpose.[61]

PRPD has a history of allegations concerning systematic discriminatory treatment of Dominican individuals. In *Herrera v. Davila*, 272 F.Supp.2d 154, (D.Puerto Rico 2003), the plaintiff alleged that PRPD unlawfully arrested individuals in the course of "zero tolerance" operations solely because of their Dominican heritage, in violation of the Equal Protection Clause of the Fourteenth Amendment. The court found that sufficient evidence was presented to establish that PRPD acted in common and mutual concert to deprive the concerned parties of the equal protection of the law based on national origin. The plaintiffs survived a motion for summary judgment in the First Circuit and ultimately settled the case for an award of $600,000.

We have also uncovered anecdotal evidence of discriminatory animus by PRPD officers in regards to the Dominican community of Puerto Rico. Incidents include:

- On December 28, 2006, Félix Escolástico Rodríguez was parking his vehicle at his home when a group of PRPD officers approached him, including Officers Griselle Cuesta Báez and Mario Montesino Rivera. The officers seized Escolástico Rodríguez and, without a legitimate law enforcement purpose, hit him in the head, chest, arms, and legs as they yelled derogatory and xenophobic slurs at him related to his Dominican origin. On March 27, 2010, the district court dismissed Escolástico Rodríguez's civil rights case after the parties entered into a confidential settlement agreement.[62]

- On August 18, 2006, Ignacio Santos Rosario was at a local bar in Río Piedras when PRPD Officer Gregorio Matías Rosario allegedly made derogatory and xenophobic slurs about Dominicans. Santos Rosario asked Officer Matías Rosario to show respect and stop making such comments. Officer Matías Rosario then pointed his service weapon at Santos Rosario and called for back-up. Santos Rosario left the area and, as he walked away, Officer Matías Rosario shot him twice in the leg. Additional PRPD officers arrived on the scene and began kicking and hitting Santos Rosario as he lay on the ground. There was no legitimate law enforcement purpose for Officer Matías Rosario's initial use of lethal force nor for the beating that followed. On March 19, 2009, the district court dismissed Santos Rosario's civil rights case after the parties entered into a confidential settlement agreement.[63]

PRPD's failure to adequately collect data regarding its law enforcement actions frustrates efforts to statistically establish whether or not discriminatory policing is occurring. PRPD's documentation related to arrests does not accurately reflect the racial and ethnic diversity of Puerto Rico. While incident reports allow PRPD officers to record whether an alleged subject or victim is of "Hawaiian" or "Arabic" descent, the forms do not permit PRPD officers to record whether relevant persons are of Dominican descent. Such forms hinder the ability of PRPD to assess whether individual officers are engaged in discriminatory policing practices. They also evince a disregard for the Dominican community in general, since they do not permit the kind of data analysis that allows law enforcement agencies to track crime patterns and determine whether a particular population is the subject of crime. Furthermore, as we discuss throughout this report, the lack of adequate accountability systems and supervision that contribute to the

perpetuation of officer misconduct, including discriminatory policing. PRPD must address these deficiencies.

## 2. PRPD's Failure to Address Domestic Violence and Sexual Assault

Based on our investigation, we have serious concerns that PRPD is failing to adequately address sexual assault in Puerto Rico and to prevent and address domestic violence committed by PRPD officers. While we do not currently have sufficient evidence to find that PRPD systematically denies adequate policing services to women, we believe there are sufficient indicators of a problem to require immediate and sustained remedial efforts.

As an initial matter, we are concerned that PRPD is underreporting sex assaults. Strikingly, Puerto Rico has historically reported fewer forcible rapes than murders. As illustrated below, the number of forcible rapes reported by PRPD has declined sharply over the last 10 years, from 228 to 39, while murders have seen a sharp increase recently. Puerto Rico stands alone in these statistics, with virtually all other jurisdictions reporting far more forcible rapes than murders. At the local level, only a small fraction of cities with populations of 100,000 or more report a significantly higher number of murders than rapes. These cities include New Orleans and Baltimore, whose figures have been questioned or largely discredited.[64] Serious concerns have also been raised publicly regarding the reliability of PRPD's crime reporting practices and the integrity of crime statistics. It is imperative that Puerto Rico take steps to investigate allegations that superiors pressure officers to manipulate crime statistics, and remedy identified problems promptly and transparently. Puerto Rico should also ensure that violent crimes and sexual assaults are reported, reported accurately, and that victims are provided with necessary support and services.



**Figure 2: Forcible Rapes and Murders, 2000-2010**

| | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Forcible Rapes | 228 | 187 | 241 | 204 | 199 | 169 | 118 | 97 | 95 | 65 | 39 |
| Murders | 695 | 747 | 781 | 787 | 797 | 771 | 748 | 731 | 807 | 894 | 983 |

A law enforcement agency that systematically fails to address the needs of discrete, recognized communities violates the Fourteenth Amendment. "[T]he Fourteenth Amendment not only prohibits the making or enforcing of laws which shall abridge the privileges of the citizen, but prohibits the states from denying to all persons within its jurisdiction the equal protection of the laws. Denying includes inaction as well as action, and denying the equal protection of the laws includes the omission to protect." *Bell v. Maryland*, 378 U.S. 226, 311 (1964) (Goldberg, J. concurring); *see also Deschaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 197, n.3 (states may not "selectively deny its protective services" to certain protected groups without violating the Equal Protection Clause). The Safe Streets Act, which explicitly bars discrimination on the basis of sex, similarly protects women from discriminatory treatment.

In order to prevail on an equal protection claim based upon alleged selective denial of protection, "plaintiffs must adduce competent evidence of 'purposeful discrimination.'" *Hayden v. Grayson*, 134 F.3d 449, 453 (1st Cir. 1998) (quoting *Washington v. Davis*, 426 U.S. 229, 243-44 (1976)). A plaintiff must show that "'the decisionmaker . . . selected or reaffirmed a course of action at least in part 'because of,' not merely 'in spite of[,]' its adverse effects upon an identifiable group.'" *Soto v. Flores*, 103 F.3d 1056, 1067 (1st Cir. 1997) (quoting *Pers. Adm'r v. Feeney*, 442 U.S. 256, 279 (1979)) (applying standard in context of allegedly discriminatory treatment of complaints regarding domestic violence against women). In *Soto*, the First Circuit held that the evidence presented was insufficient to establish that discrimination against women was a motivating factor behind PRPD's alleged policy or custom of providing less protection to female victims of domestic abuse, as required to establish an equal protection violation.

PRPD's longstanding failure to effectively address domestic violence and rape in Puerto Rico is clear and, in conjunction with its institutional deficiencies, may rise to the level of a pattern and practice of violations of the Fourteenth Amendment and the Safe Streets Act. Of the women murdered by their partners between 1991 and 1999, only 17 percent had orders of protection, 2 percent had orders of arrest against their aggressors, and 4 percent had expired orders of protection.[65] These statistics strongly suggest that PRPD is not doing enough to ensure that women living under the threat of domestic violence make use of the legal resources available to them. In 2006, PRPD reported 23 murders of women at the hands of their domestic partners, placing Puerto Rico first on an international list comparing the number of women killed in each country/territory by their partners per million women over the age of fourteen.[66] Recent data suggest 2006 was not an aberration – in 2008, 26 women were murdered by their partners.[67]

PRPD's failure to address the commission of domestic violence by law enforcement officers reveals a lack of engagement with Puerto Rico's domestic violence crime crisis and may qualify as evidence of discriminatory intent. As previously discussed, PRPD has repeatedly failed to appropriately discipline officers accused of domestic violence. Because of its inefficient and faulty systems of accountability, PRPD has allowed officers accused of serious crimes to continue on active duty. In tandem with the statistics highlighted above, such an institutional oversight evinces an unwillingness to address a very serious problem in Puerto Rico that may rise to the level of a constitutional violation.

## IV.    ADDITIONAL DEFICIENCIES CAUSING THE PATTERN AND PRACTICE OF CONSTITUTIONAL VIOLATIONS

The constitutional violations we uncovered are evidence of a police department that is in disarray.  These findings are hardly surprising since basic systems related to the hiring, training, supervision, accountability, promotion, and dismissal of PRPD officers are non-existent or broken.  PRPD lacks adequate policies and procedures, and existing operational structures are inconsistent and arbitrary.  Fundamental reforms of the most basic police practices are necessary.

The systemic deficiencies that follow, together with the deficiencies discussed above, cause and contribute to the pattern and practice of use of excessive force, use of unreasonable force to chill speech, and unconstitutional searches and seizures.  Specifically, PRPD's policies and procedures are inadequate and do not align with professional standards.  Beyond formulating new policies, Puerto Rico will need to build and maintain necessary organizational structures to ensure the success of new procedures.  Puerto Rico will also need to invest in building and maintaining effective systems of accountability, promote personnel with demonstrated competency and commitment to lawful policing, and instill organizational values at all levels of PRPD that foster meaningful respect for civil rights.[68]

Accountability is the hallmark of an effective and functional police department.  We found little evidence that sufficient systems of accountability are in place to safeguard the federally-protected rights of individuals in Puerto Rico.  For instance, in addition to deficiencies discussed above, we found that PRPD:

- fails to provide officers with policies consistent with constitutional requirements;
- fails to train cadets through a skills-based field training program;
- does not re-train existing officers on current methods and legal standards;
- provides ineffective field supervision;
- fails to complete timely administrative investigations;
- does not impose consistent or progressive discipline to address misconduct;
- lacks a comprehensive risk management system that identifies patterns of at-risk conduct by officers; and
- is not subject to effective external oversight to ensure constitutional policing and public trust in its law enforcement activities.

> "Police are not trained to handle people with rights.  People are mistreated and the police agency mistreats the officers."
>
> - PRPD Administrative Officer

In the sections that follow, we discuss additional systemic deficiencies that cause and contribute to the pattern and practice of civil rights violations.

## A.    Inadequate Policies and Procedures

PRPD's policies, as set forth in general and special orders, are not comprehensive, comprehensible, up-to-date, or consistent with relevant legal standards and contemporary police practices.  In *Building Trust Between the Police and the Citizens They Serve*, IACP underscored the importance of communicating clear expectations:

> [T]he police executive must ensure that the agency's core "values and principles are expressed, communicated, and reinforced throughout all aspects of the departments' operations, administration, and service." . . . [D]epartmental policies and procedures must support the agency's mission, and must be written, clearly defined, and enforced.  These ethical standards and guiding principles should be set forth in a manual for all personnel and should not only define acceptable standards of conduct, but identify conduct that is unacceptable.  These values and principles must be understood and embraced by all executives, supervisors, officers, and civilian employees within the department.[69]

The Superintendent issues PRPD's general and special orders.  The orders are numbered consecutively by year and are not organized by topic.  The general orders date back to 1967.  The oldest general order in effect, GO 68-14, concerning photographs of officers, was issued in April 1968.  Many general orders have been repealed or revised; however, repeals and amendments are not readily identifiable.

Nearly all officers we interviewed indicated that although they reviewed the orders at the academy, PRPD does not provide them with copies of the orders to retain as guides.  In some cases, supervisors in various command areas were unable to show us a complete set of the orders.  One commander reported during our December 2010 tour that supervisors go over the list of newly issued orders and directives during monthly local academies and that officers may get copies of the orders, if they so request.  Otherwise, the orders are not distributed to each officer.

Several commanders explained that officers must ask for copies of policies, if they want them.  This reliance on officers' discretionary interest is reflected in GO 98-16 on searches and seizures, which states:

> The rules and policies of this Order attempt to incorporate the concepts, doctrine, or procedures that apply by legislative or judicial (jurisprudence) means, without meaning that they represent a catalogue of all of the situations that personnel might face on a daily basis, and should be complemented with court decisions that are produced relatively frequently and with related legal articles, since the officer is a professional of justice and should keep current on this topic.

It is unacceptable to place the onus on each patrol officer to locate, review, comprehend, and institute changes based on his or her interpretation of new case law.  It is apparent that PRPD has not devised an effective means of disseminating orders and other operational directives to ensure that all officers read and understand the orders.  While it may be impractical to provide all officers with multiple sets of binders with GOs in paper format dating back to 1967, PRPD

should ensure that all orders, revised to reflect amendments, are accessible at all times, in either paper or electronic format.

PRPD should also develop standard operating procedures to guide operations and ensure uniformity in procedure among units and geographical areas. Officers currently rely on legalistic regulations and orders that are impractical and offer unclear guidance. As a result, officers improvise critical aspects of the agency's work.

## B. Insufficient Training

The effective recruitment and training of police officers is essential to constitutional policing. PRPD fails in each area. While PRPD mandates pre-service training for officers, it neither screens inappropriate candidates from the force nor offers an adequate foundation for police work. In-service training is nearly non-existent. These failures dramatically reduce public safety and place both residents and police officers at risk.

### 1. The University College Lacks Accreditation and Independence

The University College of Criminal Justice is an institution of higher education charged with providing pre-service and in-service training to PRPD officers, an arrangement similar to nearly half of all state and local law enforcement academies in the United States.[70] The University College was formerly a training unit within PRPD. In 1999, the Puerto Rico Legislature authorized the creation of the University College as an independent entity. This arrangement allowed cadets to earn an associate's degree at the college, a prerequisite for new officers beginning in 2000. That same year, in 2000, the Puerto Rico Legislature granted the University College greater control over its financial, academic, and operational affairs to facilitate accreditation by the Middle States Association of Colleges and Schools. The University College, however, has yet to obtain accreditation, which would make it eligible for federal funding.

The University College also has not yet achieved full independence from PRPD. The Superintendent, as the President of the University College's Board of Directors, continues to direct the school and set its priorities. The Superintendent selects the chancellor and associate deans with the Board's approval. Many of the faculty members are PRPD officers designated by the Superintendent and PRPD. In addition, the Governor, who also appoints the Superintendent, appoints eight of the Board's nine members.

PRPD's leadership changes have thus had a profound impact on the University College's development as an independent, licensed, and fully accredited institution. In 2006, the Puerto Rico Council on Higher Education, which licenses colleges and universities in Puerto Rico, noted that the University College had "suffered frequent administrative changes" and that PRPD had four Superintendents from 2000 to 2004 with separate visions for the development of the University College.[71] During one of those years, the University College lacked a functioning Board and PRPD attempted to transform the University College back to a police academy within PRPD.[72] In 2003, Puerto Rico suspended the associate's degree requirement and permitted a special three-month, pre-service program for new cadets.[73] Three cadet classes went through the abbreviated training and entered PRPD without an associate's degree. Following the return of

former Superintendent Toledo Dávila to PRPD in 2005, the Puerto Rico Legislature reinstated the associate's degree requirement. According to former Superintendent Toledo Dávila, a three-month training period was insufficient to prepare cadets for police work.[74] During our December 2010 tour, former Superintendent Figueroa Sancha indicated that a significant number of officers who completed the three-month special training program were eventually expelled because of criminal activity or other misconduct.

Further, the Superintendent is responsible for recruiting, selecting, hiring, and terminating cadets who enroll in the University College as PRPD employees. PRPD pays cadets and affords them civil service benefits and protections while they train and study at the University College. Although cadets must serve a two-year probationary period, disciplinary actions, including termination, are carried out by PRPD and can only be authorized by the Superintendent. University College officials have little authority over the termination process if they determine a candidate is unsuitable, academically or otherwise. According to the University College chancellor, PRPD's human resources office can only recommend termination to the Superintendent when cadets do not meet training requirements. Cadets who have not met the academic requirements at the University College can therefore potentially remain cadets indefinitely, or at least long enough to gain civil service protections and become permanent PRPD employees by default. Our police consultants believe this process may result in "less than suitable" officer candidates becoming permanent employees before disciplinary proceedings are completed. In its December 2007 report, PRPD's external evaluating committee also expressed concern with PRPD's recruitment and selection process, and recommended that Puerto Rico study the viability of allowing the University College to select and enroll students into its academic program. PRPD would then hire cadets after they successfully complete all academic requirements and graduate from the University College.[75]

We learned that the academic curricula are not tailored to clear and specific learning objectives or to defined policies or standards. Many officers we interviewed indicated that there was a significant disconnect between what they learned in the University College and actual expectations and requirements from supervisors once they were deployed in the field. Critical courses are also taught from a technical legal perspective, more suitable to law students, without practical and real-world application for officers. For instance, the University College's course on civil rights consisted of a lecture and slides on Puerto Rico's rules of criminal procedure, without any discussion on the application of legal concepts to actual encounters with civilians. While the course cited the United States Constitution as a source of individual rights, it did not discuss specific rights, such as the Fourth Amendment's prohibition on searches and seizures without probable cause or unreasonable uses of force. As an example, the course defined "illegitimate" force as "unjustified, deviating from the law and professional practice," but did not discuss relevant factors when considering the reasonableness of force, such as the severity of the crime at issue or the subject's level of resistance, or other standards. The course contained virtually no interaction or engagement with students using practical examples of lawful and unlawful conduct.

Finally, PRPD fails to keep proper records on its instructors. Despite our request, PRPD could not produce specific information about the instructor certification process followed by the University College, other than reports that instructors had been certified by the University

College at some point in time or had been grandfathered-in. Individuals who conduct cadet training, serve as field training officers, or who conduct in-service training should be selected using heightened eligibility criteria that specially apply to these positions. PRPD should ensure that instructors receive periodic re-training and keep current on new developments in their respective fields. Moreover, the disciplinary records of all instructors should be evaluated to ensure that the selected individuals are suitable to instruct new cadets and re-train officers.

### 2. Pre-Service Training Is Insufficient

Cadets review PRPD's policies and procedures while attending pre-service training, but are not provided with post-academy field training to prepare them for real-life policing. This training is particularly essential in developing the practical skills, judgment, and tools necessary to lawfully employ force, effect arrests, and treat all persons equally. Instead, new officers are simply armed and released into the streets and neighborhoods of Puerto Rico. In many cases, they never return to the academy for regular in-service training.

PRPD currently requires that all cadets earn at least an associate's degree to become an officer. All cadets enter the University College as salaried public employees while they attend classes and reside in campus dormitories. The University College currently offers two pre-service programs: a degree track for cadets entering without a degree and a basic training track for cadets with advanced degrees.

The number of training hours required by PRPD is well below the hours required by other large police departments. According to the most recent Law Enforcement Management and Administrative Statistics ("LEMAS") report, the average training requirement for new officers exceeded 1,700 hours of academy and field training.[76] PRPD requires cadets entering without an advanced degree to complete 1,170 hours of training, while cadets entering with advanced degrees must complete 855 hours of training. The lower number of training hours in Puerto Rico is due, in large measure, to the lack of a field training program, or an adequate analogue, offered by the University College. For law enforcement agencies serving 1,000,000 residents or more, the average number of hours required for field training was 667 hours.[77] Even when academies do not offer a mandatory field training program as part of their basic training courses, field training is typically provided by the law enforcement agency employing the new officer. However, PRPD also does not provide a field training program.

> "There is a clear projection of an image of the Police that does not understand the civil rights of citizens in its actions . . . this denotes that the actual [training] curriculum is not tempered to functional and operational reality.
> - Police Affinity Group

A comprehensive field training program incorporates community policing and problem-solving principles, and produces officers who have the necessary knowledge, skills, and attitude to meet contemporary law enforcement challenges. Field training usually consists of several components or phases. Each training phase should be accompanied by a learning exercise

involving real-life problems that have no easy solution and encourage cadets to view problems in a broad community-focused context. A field training program should also include a neighborhood familiarization project to teach cadets how to partner with community residents to effectively deal with crime and neighborhood problems. After successful completion of the field training program, new officers should be assigned to a permanent shift, but continue to be monitored for the remainder of their respective probationary periods – or longer, in the case of officers who became permanent employees prior to the completion of the field training program.

In December 2010, Superintendent Figueroa Sancha reported that PRPD is considering instituting a six-month field training program for all cadets after they complete University College training. He added that PRPD has begun to select mentors for the implementation of the field work program among sergeants and experienced officers who do not have pending administrative investigations. PRPD has not provided information indicating that the new field training program is being implemented. In addition, the most recent class of cadets, which graduated in July 2011, was provided with a shortened pre-service program to allow for prompt deployment to the street. The effectiveness of a field training program depends on many factors, including the quantity and quality of pre-service training. A cursory pre-service program will prevent cadets from learning the policing concepts and skills that are applied in a field training program.

The Superintendent has the authority to deploy cadets – carrying regulation firearms – on policing assignments before the cadets complete their pre-service programs. If this practice continues, PRPD must ensure that cadets complete training in core areas, such as cultural sensitivity and diversity; communication skills (including the importance of courtesy and respect); use of force, including deadly force; verbal disengagement techniques and alternatives to the use of force; and integrity and ethics. Cadets should complete scenario-based training in these subjects to prepare them for the many situations they are likely to encounter involving interaction with civilians, including traffic enforcement and mass event likes *fiestas patronales*. Moreover, PRPD supervisors and University College staff should evaluate the academic performance and disciplinary records of cadets deployed on policing assignments prior to deployment. Finally, the officers supervising cadets on actual policing assignments should provide the University College with an evaluation of the cadets' performance so that the University College can address any academic deficiencies or refer any incident of criminal or unprofessional conduct for investigation, if the cadets' field supervisors have not already done so.

Undercover officers also engage in use of excessive and illegal searches and seizures. During our tours, we learned that PRPD recruits individuals to serve as undercover officers before they enter and complete the pre-service program at the University College. Once the undercover officer completes policing assignments with PRPD, the officer is transferred to the University College to begin the pre-service training program. The quality and quantity of training offered to undercover officers who do not participate in the regular University College training program appears grossly insufficient.

Several officers reported that undercover officers are only "seen" at the University College when they are taken to the shooting range for target training wearing hoods over their

heads.  If undercover officers are going to participate in PRPD interventions, it is critical that PRPD provide them with civil rights and other training offered to PRPD officers, and keep records of this training.

### 3.    In-Service Training Is Virtually Non-Existent

Effective law enforcement agencies reinforce their expectations on use of force and searches and seizures through consistent and sufficient in-service training.  However, many PRPD officers reported that they do not return to the University College for in-service training for years, or ever, after completing the pre-service program.  The dearth of in-service training and pervasive misconduct has recently prompted the Puerto Rico Legislature to set minimum training requirements for PRPD officers.  But these minimums fall significantly short.

Prior to 2008, there were no formal in-service training requirements for PRPD officers. For instance, PRPD reported that out of approximately 12,500 officers assigned to the Field Operations Division, the largest PRPD component, approximately 1,359 – or only about 11% – received some form of in-service training in 2007. The trainings varied widely and were not uniform across regions, ranging from classes on domestic violence to retention of firearms and handling terrorist bombings.  In July 2008, the Puerto Rico Legislature enacted Law 132 finding that an officer who left the University College would not generally receive any additional training.  P.R. Laws Ann. tit.25, § 3102 (2008), *as amended*.  Law 132 required PRPD to provide training to existing officers every two years "limited to the work division to which the [officer] is assigned."  *Id.*  Law 132 did not establish a minimum number of training hours and charged the Superintendent with developing specific requirements.

> "Continuous training and learning is not part of the organizational culture of the Police Department.  There is a real resistance by the Police hierarchy to send police officers to continuous education programs."
>
> - Former PRPD official

Despite the new two-year training requirement, PRPD officers continued to engage in serious misconduct.  In July 2010, the Puerto Rico Legislature enacted Law 103 and observed:

> We have witnessed various dramatic cases in which members of the police have been involved in domestic violence, police corruption, lack of control in the management of their emotions and force at the moment of exercising their duties. This Assembly believes it is necessary and urgent that . . . members of the Puerto Rico Police comply with a minimum requirement of twelve hours of continuing education.

Law 103 of July 2010 required PRPD to provide officers with a minimum of 12 hours of in-training every year.

During our December 2010 tour, we learned that the University College and PRPD had recently developed a 16-hour continuing education program for existing officers to comply with

Law 103. PRPD subsequently produced a 16-hour, two-day training schedule, dated October 2010, listing the following courses: civil rights, hate crimes, police responsibilities, criminal law, human relations, ethics, use of force, and personal defense. PRPD's 16-hour training schedule did not specify whether communication skills (including the importance of courtesy and respect) and verbal disengagement techniques are part of the curriculum, nor whether the hate crimes course covers cultural diversity and sensitivity issues. These topics are vital to any continuing education program. Additionally, the training schedule did not specify whether any courses included scenario-based training to teach practical application of legal and operational concepts.

Although PRPD's 16-hour annual training requirement is an improvement over its prior training practices, the requirement remains insufficient. According to a 2007 LEMAS study, police departments serving a population of one million or more residents provide an average of 27 hours of in-service training for sworn personnel.[78] Across police departments of all sizes, the average is 35 hours. *Id.* Furthermore, PRPD's own consultant, Total Quality, previously recommended a 40-hour in-service training requirement.[79] Given the years that PRPD failed to provide consistent and appropriate in-service training, and the irregular practices that have been allowed to develop across PRPD, a 40-hour annual training requirement, at a minimum, is necessary to reform PRPD.

Even though training is now required by local law, a review of the training statistics provided to the Puerto Rico Senate demonstrates how few PRPD officers have received continuing education. When PRPD has provided training, it has failed to focus on many of the most crucial subjects related to protecting civil rights.[80] According to the University College's report to the Puerto Rico Senate, approximately 1,000 officers completed the continuing education curriculum during October and November 2010. At this pace, continuing education training will be provided to only approximately 6,000 officers by September 2011, or roughly one-third of PRPD officers in a year. Survival training was only provided to 64 officers from January to November 2010. Notably, PRPD began providing training on civil rights in September 2010 – the same month we told the Governor and other Puerto Rico officials that we would be issuing a public report with our investigative findings. The number of officers who received training on the use of expandable baton (415), chemical spray (248), and firearms (287) is very low compared to the number of active PRPD officers (approximately 17,100). All officers should receive continuing education annually and, given the systemic violations we have identified in this report, PRPD should focus its attention on developing and delivering training on core competencies related to civil rights that have been lacking for so long.

PRPD recently identified "local academies" as another new component of PRPD's training program. On January 24, 2011, Puerto Rico reported that "PRPD now requires all units and division supervisors to carry out monthly 'local academies' where supervisors discuss the PRPD's orders and regulations with officers under their command." However, PRPD has required monthly "local academies" since at least 1974 when then-Superintendent Astol Calero Toledo issued GO 74-1. As discussed in Section IV.A, *supra*, many of the officers we interviewed indicated that supervisors simply read new policies and procedures at monthly local academies and provide little opportunity to discuss and understand core material.

## C.      Inadequate Supervision

Many officers we interviewed reported a crisis in supervision. To date, PRPD has not filled many of the 2,100 supervisor vacancies it announced in 2009.[81] A commander in a large metropolitan police area reported that the supervisor-to-officer ratio in the San Juan area is 1:30 and that it should not be more than 1:15. In some specialized units, supervisors are responsible for more than 20 officers. It is generally accepted practice that spans of control for patrol units should be no more than 1:10, and 1:5 is recommended. Any span of control should take into account the level of activity and type of assignment of the unit being supervised. Given the lack of any field training program and the paucity of in-service training for offices and supervisors, a span of control at the lower end of this spectrum for all field units in PRPD is necessary to ensure adequate supervision. The former Superintendent acknowledged that lack of supervision contributes to civil rights abuses during his confirmation hearings in January 2009.[82] Unfortunately, although the Superintendent reported that he has filled approximately 500 sergeant positions, the supervisory ranks remain sparsely filled. Given the high number of supervisor vacancies, it is perplexing that PRPD would promote only four officers in 2009 when PRPD promoted nearly 1,200 officers in 2008. *See Table 7, below.*

PRPD's promotion practices also contribute to poor supervision. PRPD currently promotes officers to sergeant using special "merit" promotions that do not require officers to demonstrate their competency in core areas through objective examination. An adequate examination is designed to reliably measure the officer's proficiency in core areas such as leadership, constitutional law, criminal procedure, agency policies and procedures, risk management, and discipline. When promotions are carried out through examination, candidates typically devote months to learning and preparing for the examination. Once candidates pass the examination and are selected as sergeants, the generally accepted practice is for new sergeants to attend an 80-hour first-line supervisor training that allows them to apply their skills and abilities as supervisors. Because PRPD does not rely on examinations to identify qualified candidates for sergeants, officers are not required to dedicate any time to learning and studying. Once candidates are selected, they are only offered a 40-hour training course. This 40-hour course is inadequate given the lack of attendant preparation and demonstrated proficiency that would be necessary if promotions were carried out by examination. Generally, effective first-line supervision is the cornerstone of constitutional policing and is critical for reform. PRPD simply does not provide first-line supervisors the opportunity to develop the necessary skills to effectively manage officers and ensure lawful policing.

### Table 7:  Number of Promotions by Type

| Year | Merit | Examination | Total |
|------|-------|-------------|-------|
| 2008 | 1,172 | 9 | 1,181 |
| 2009 | 0 | 4 | 4 |
| 2010* | 443 | 79 | 522 |
| **Total** | **1,615** | **92** | **1,707** |

*As of September 10, 2010.

Officers repeatedly complained during our tours that one's political affiliations, rather than skills and competencies, drive promotion decisions. While law enforcement organizations are typically managed by executives who are either directly elected by the people or appointed by elected officials, PRPD is unique in terms of the role that politics plays in internal promotions. Considering political affiliation in promotions to PRPD's command ranks negatively impacts the degree of confidence that line officers have in their superiors, inhibits the cultivation of institutional competence, and contravenes efforts to initiate and secure reforms. Although the agency policy is to promote officers by standardized examination,[83] we found that PRPD promoted the vast majority of officers under special authority granted to the Superintendent as "merit" promotions. As illustrated below, only 5 percent of officers were promoted by examination from January 2008 to September 2010. Generally, these promotions were "merit" in name only, with many awarded based on political affiliation or patronage.

As discussed previously, the Governor of Puerto Rico possesses supreme authority over PRPD. The Governor delegates this authority in several ways, including most clearly by the appointment, with consent of the Puerto Rico Senate, of the Superintendent. However, the Governor also maintains final approval of all promotions to PRPD's highest ranks, from auxiliary superintendents to captains. It is clear from our discussions with PRPD officers that they believe political affiliation plays a significant role in advancement within PRPD, a belief that likely stems, in part, from the Governor's unique role. This belief, in turn, fosters a dysfunctional professional atmosphere and encourages subordinates to question the qualifications and competence of command officers.

The use of political considerations in promotions also threatens reform of PRPD policies and practices. Efforts to instill change in large and complex organizations require a consistent and stable commitment from leadership. Here, however, each time a new Governor is elected there is significant turnover within the command ranks. Such turnover stunts the cultivation of institutional competency and expertise. It also hinders efforts to initiate and maintain reform within PRPD.

## D. Seriously Deficient Civilian Complaint Process

We found pervasive and longstanding deficiencies in PRPD's civilian complaint process. Specifically, we found that:

- The complaint intake process discourages civilians from filing complaints;
- Procedures and protocols are insufficient to ensure complete and timely investigations; and
- Investigators lack training and resources to complete adequate investigations.

### 1. The Complaint Intake Process Discourages Civilians from Filing Complaints

Civilians should have a full and fair opportunity to file complaints alleging officer misconduct. Civilians should be provided with alternative means of filing complaints, including in person, by mail, by telephone, or by email. PRPD should offer citizens a complaint form, but should not require completion of the form to initiate a complaint. Individuals should be able to obtain and file complaint forms at places other than law enforcement agencies. Law

enforcement agencies should prohibit officers and other employees from refusing to accept complaints, or attempting to dissuade civilians from filing complaints. Meeting with or speaking to a supervisory officer should not be a prerequisite for filing a complaint. PRPD should accept complaints from all individuals, including those who request anonymity. PRPD should also accept complaints from third parties to ensure that witnesses of abuse or misconduct can file complaints. PRPD policy should require officers to report misconduct, either witnessed or discovered, by other officers. Officers who fail to report misconduct should be subject to appropriate discipline. PRPD should establish appropriate protections against retaliation for officers who report misconduct.

PRPD's intake practices discourage civilians from filing complaints. Although not required by regulation,[84] PRPD officers explained that in practice, civilians are required to appear before an administrative investigator (or "officer of the day") and provide a sworn statement or declaration to file a complaint against an officer. On some occasions, when the complainant cannot or choses not to appear at a stationhouse, an investigator would travel to the complainant to take the declaration. During our December 2010 tour, the PRD commander confirmed this practice, indicating that an administrative investigator would attempt to take a complainant's declaration once PRD receives a complaint.

The pre-printed form provided by PRPD for civilian complaints also includes a statement admonishing the complainant about the veracity of the complaint. Language warning civilians about potential criminal prosecution for false or untrue complaints may intimidate some would-be complainants into silence.[85] For over 20 years, PRPD has been on notice that its system for receiving civilian complaints was problematic, ineffective, and backward. In *Gutiérrez-Rodríguez*, 882 F.2d at 565-66, the First Circuit upheld a lower court decision imposing liability on PRPD's supervisors based on deficient disciplinary practices, including requiring complainants to appear at a stationhouse to provide a sworn statement. The court summarized the plaintiff's expert's testimony, emphasizing that the policy ultimately served to "'frighten[] most of the average citizen[s], particularly minorities. . . .' By its formality, the system discouraged people from coming forward with information. This hampered [PRPD's] ability to discover the truth surrounding alleged incidents of misconduct. *Id.* at 565-66 (second and third alterations in original).

PRPD's Regulation 6506 on civilian complaints ("Complaint Regulation") does not expressly require that all supervisors and officers accept civilian complaints, including when they are out in the field. Not surprisingly, officers told us that PRPD officers do not accept complaints while out on assignment. The PRD commander reported during our December 2010 tour that a civilian can come to any PRPD unit to make a complaint. A precinct commander during the same tour indicated that civilian complaints against officers can only be made in person and must be made at a local police station. PRPD should clarify that complaints may be made in any form (in person, in writing, by telephone, etc.) and require that all supervisors and officers accept civilian complaints, even while out in the field. All officers should also be required to demonstrate familiarity with the referral process to ensure that complaints are submitted timely to administrative investigators. PRPD should also notify all officers that failing to accept a complaint or discouraging a civilian from filing a complaint may subject the officer to disciplinary action.

Finally, the Complaint Regulation does not specify that PRPD should accept third-party and anonymous complaints. The regulations states simply, "A complaint may be presented by any citizen or agency employee." Although third-party complaints are fairly common, the PRD commander informed us that he had never seen a third-party complaint at PRPD, although they were acceptable. PRPD informed us that it currently accepts anonymous complaints, and transfers them to the Internal Affairs Bureau ("IAB"), a sub-unit within PRD, to determine whether the complaint is credible. If IAB finds the complaint credible, it returns the complaint for a separate administrative investigation. If not, IAB "archives" or closes the investigation. PRPD should specifically instruct officers to accept and investigate third-party and anonymous complaints. In addition, even if complaints are transferred to direct supervisors for investigation, PRD should continue to log and track civilian complaints through their final disposition.

## 2. Complaint Investigations Routinely Take Years To Complete

Officers and civilians consistently reported pervasive and inordinate delays in completing administrative investigations. A former associate superintendent reported in 2008 that the average length of an investigation was nearly four years. Many officers and superintendents reported that investigations could take up to ten years or more to complete. In a May 2010 budget report, PRPD indicated that the accumulation of unresolved complaints – some from the 1990s – was preventing promotions, steps increases, and other benefits. More recently, in February 2011, an officer affinity group observed, "[a]t present, an efficient and diligent process to investigate administrative complaints has not been established. . . . The Agency should improve this process because the current process creates unnecessary delays in the resolution of [administrative complaints].[86] The Complaint Regulation provides that all civilian complaints are to be resolved no more than 180 days from the date of receiving the complaint. Significant delays in the investigation process also impair PRPD's ability to hold officers accountable. For civilians, extraordinary delays breed distrust and a lack of confidence in PRPD. Table 8, below, details the complaint history of a PRPD Lieutenant that reflects several delays.

**Table 8: Civilian Complaint History, PRPD Lieutenant**

| Type | Year | Disposition |
|---|---|---|
| Hiding info on entry application | 1986 | Expulsion; reduced to admonishment |
| Assault | 1989 | 15-day suspension |
| Immoral conduct | 1994 | Archived |
| Accident | 1994 | Archived |
| Misuse of vehicle | 1994 | Archived |
| Misused of donated money | 1994 | Archived |
| Stealing official property | 1995 | Archived |
| Assigned equipment disappeared | 1995 | Archived |
| Assigned equipment disappeared | 1995 | Archived |
| Immoral conduct | 1996 | Archived |
| Disobeyed order | 1997 | No record |
| Incident at ombudsman's office | 2003 | 30-day suspension; reduced to counseling |
| Negligence | 2003 | Archived |
| Negligence | 2003 | Archived |

| | | |
|---|---|---|
| Changed schedule to serve alcoholic beverages | 2004 | 30-day suspension |
| Failure to correct irregularities at precinct | 2005 | Archived |
| Harassment (Dominicans) | 2006 | Archived (two complaints) |

During our December 2010 tour, Superintendent Figueroa Sancha reported that PRPD had made significant progress in resolving the backlog of civilian complaints, and had no remaining cases from 2005 or 2006. He further reported that PRPD had closed approximately 7,000 cases over the past 12 to 13 months. This is remarkable, but inconsistent with statistics published by PRPD. For instance, PRPD reports that administrative investigators resolved 5,067 complaints in 2009 and 2010 by recommending "archive" or a specific disciplinary measure. In the preceding two years, 2007 and 2008, administrative investigators resolved 6,288 complaints. In 2005 and 2006, administrative investigators resolved 7,734 complaints. The data thus demonstrate that administrative investigators are resolving fewer complaints. It is possible that the 7,000 cases reported as "cleared" by the Superintendent were cases backlogged at another PRPD component, such as the Legal Affairs Office, which receives and reviews discipline recommendations before transmitting them to the Superintendent for final approval. Reviewers in the Legal Affairs Office reported significant delays in getting discipline recommendations from administrative investigators, but many other officers reported similar, if not more acute, delays at the Legal Affairs Office. Administrative investigators and staff in the Legal Affairs Office reported needing additional staff, including civil personnel, to resolve the backlog of cases. PRPD has not reported the outcomes of the 7,000 complaints that it "cleared" over the last year.

We also found a significant number of officer complaint histories with missing or unresolved complaints. In the case of missing dispositions, the complaint history would indicate "*no consta*" or "not evidenced." Table 9, below, provides the unresolved complaint history of an officer who was terminated from PRPD in May 2008 after falsely arresting several members of a family during a search in 2006. Had PRPD determined that earlier complaints were sustained, PRPD might have acted to retrain, discipline, or even expel this officer prior to the 2006 incident.

**Table 9:  Civilian Complaint History, Terminated Officer**

| Type | Year | Disposition |
|---|---|---|
| Aggression | 2003 | Pending after investigator recommended admonishment |
| Abandoned service | 2005 | Pending after investigator recommended admonishment |
| Insubordination | 2005 | Archived; investigator recommendation is unknown |
| Negligence; irregularities at the Drug Unit | 2005 | Pending after investigator recommended orientation |
| Immoral conduct; taking $4,700 during search | 2005 | Pending after investigator recommended archive |

| | | |
|---|---|---|
| Domestic violence | 2005 | Pending after investigator recommended 5-day suspension |
| Immoral conduct; $600 taken during search | 2005 | Pending after investigator recommended admonishment |
| Persecution; multiple detentions | 2005 | Pending after investigator recommended archive |
| Lawsuit for illegal search | 2005 | Informational |
| Domestic violence | 2006 | Pending after investigator recommended expulsion |
| Domestic violence | 2006 | Pending after investigator recommended expulsion |
| Domestic violence | 2006 | Pending after investigator recommended expulsion |
| Domestic violence | 2006 | Pending after investigator recommended expulsion |
| Failure to appear in court | 2006 | Pending after investigator recommended expulsion |

*As of Jan 17, 2008.

The civilian complaint history of the following PRPD lieutenant, who is currently on the force, includes numerous missing dispositions for allegations of misconduct. In addition, we found troubling variations between two history profiles taken of the same lieutenant only 18 months apart. The first history, prepared by an administrative investigator in June 2006, consists of nine civilian complaints through the end of 2005. *See Table 10A*. The second history, prepared by a separate investigator in December 2007, consists of 12 civilian complaints for the same period; the disposition of four complaints is also unknown. *See Table 10B*. These discrepancies further illustrate the unreliability of PRPD's recordkeeping. Without reliable internal affairs records, PRPD risks placing unqualified – and even dangerous – officers in the field and promoting them to positions of greater authority within PRPD.

**Table 10A: Civilian Complaint History, Lieutenant Compiled in June 2006**

| Type | Year | Disposition |
|---|---|---|
| Physical abuse | 1989 | **Expulsion** after investigator recommended 30-day suspension |
| Verbal abuse | 1989 | Archived after investigator recommended 30-day suspension |
| Negligence during an intervention where officer was injured | 1991 | Archived after investigator recommended 5-day suspension |
| Extramarital relations | 1993 | Archived |
| Illegal appropriation; taking wallet | 1993 | Archived |
| Negligence during vehicle intervention | 1994 | Archived after investigator recommended 5-day suspension |

| | | |
|---|---|---|
| Vehicle accident | 1994 | Archived after investigator recommended admonishment |
| Immoral conduct | 2002 | Archived after investigator recommended admonishment |
| Vehicle accident | 2004 | Pending after investigator recommended orientation |

*As of June 19, 2006.

**Table 10B:  Civilian Complaint History, Lieutenant Compiled in December 2007**

| Type | Year | Disposition |
|---|---|---|
| Physical and verbal abuse | 1989 | Archived after investigator recommended 30-day suspension |
| Physical abuse | 1990 | Archived after investigator recommended 30-day suspension |
| Negligence during an intervention where officer were injured | 1991 | Archived after investigator recommended 5-day suspension |
| Physical and verbal abuse | 1992 | **Not found** after investigator recommended expulsion |
| Extramarital relations | 1993 | Archived |
| Illegal appropriation; taking wallet | 1993 | Archived |
| Vehicle accident | 1994 | Archived after investigator recommended 5-day suspension |
| Vehicle accident | 1994 | Archived after investigator recommended orientation |
| Lascivious acts | 2002 | Archived after investigator recommended admonishment |
| Vehicle accident | 2004 | **Not found** after investigator recommended admonishment |
| Negligence in investigation | 2005 | **Not found** after investigator recommended archive |
| Vehicle accident | 2005 | **Not found** after investigator recommended 30-day suspension |

On January 9, 2009, administrative investigators confirmed that the following complaints against the lieutenant remained unresolved.  The oldest of these had been open for approximately seven years.  Notably, our investigation concluded that delays of this magnitude are common. Leaving complaints unresolved places the community at risk by impeding PRPD's ability to identify and effectively counsel, retrain, or remove officers, as needed.

**Table 10C: Civilian Complaint History, Unresolved Complaints as of January 2009**

| Type | Year | Disposition |
|------|------|-------------|
| Negligence | 2002 | Pending in Legal Affairs Office |
| Vehicle accident | 2004 | Pending in Legal Affairs Office |
| Vehicle accident | 2005 | Pending in Legal Affairs Office |
| Loss of Government Property | 2005 | Pending in Legal Affairs Office |
| Negligence | 2006 | Pending in Legal Affairs Office |
| Improper searches and seizures | 2007 | Pending investigation by Police Area |
| Loss of official vehicle license plate | 2008 | Pending investigation by Police Area |

### 3. Procedures and Protocols Are Insufficient To Ensure Proper Investigations

PRPD has not established policies and procedures to appropriately guide the efficient disposition of civilian complaints. PRPD's Complaint Regulation provides a broad overview of the complaint adjudication process, including intake, classification (formal vs. chain-of-command investigation), summoning declarants, use of scientific tests, reporting the results of the investigation, confidentiality, summary suspensions, and officers' duty to report criminal misconduct. However, the Complaint Regulation does not provide operational details to ensure consistency between various regional offices, investigators, and supervisors. For instance, the Complaint Regulation does not address assembling case files, maintaining witness logs, obtaining and storing physical evidence, coordinating parallel criminal investigations, ensuring the impartiality of the investigator, or taking statements from target officers. Because PRPD has not established policies and procedures to guide administrative investigations, the process varies significantly. This finding is consistent with a 2009 report from Total Quality, a contractor hired by PRPD to evaluate various administrative processes. The contractor found, among other things, a lack of coordination among PRPD units, duplicate processes, and lack of standardized disciplinary measures. For instance, some investigators created their own electronic spreadsheets to track complaints automatically, while others kept handwritten logs that made identifying patterns and trends more difficult.

In addition, PRPD policies provide little guidance as to which complaints must be referred to administrative investigators for a disciplinary recommendation and which may be handled by the involved officer's supervisor. Article 5, Section C of the Complaint Regulation provides that an administrative investigation director will determine whether a complaint warrants an investigation by an administrative investigator or the officer's supervisor. The Complaint Regulation indicates that administrative investigators must investigate cases in which a "prima facie" allegation exists that an officer engaged in misuse or abuse of authority or corruption. However, these broad categories provide insufficient guidance, particularly as PRPD develops plans to transfer certain "less serious" complaints to supervisors. In *Building Trust Between Police and the Citizens They Serve*, IACP notes, "[i]t is essential to have a written directive that delineates which types of complaints will be investigated by the subject officer's supervisor and which will be referred to Internal Affairs."[87] IACP includes examples of specific complaint categories, such as "verbal abuse, on-duty, shooting incidents, profiling, and drug and alcohol," that provide for more consistent assignment to appropriate investigators.

Further, PRPD's Complaint Regulation does not provide a standard of proof for administrative investigations, such as preponderance of the evidence. This standard should be clearly delineated in policies and procedures accompanied by extensive examples and training to ensure proper application by investigators. During our tours, many investigators were unable to articulate the standard of proof used to adjudicate administrative complaints.

Separately, the Complaint Regulation requires only that investigators prepare investigation reports containing factual conclusions or determinations, the policies allegedly violated, and the recommended sanction or disciplinary measure, if any. The Complaint Regulation does not require that the report address the substance and process of the investigation, nor does it set out the types of final determinations that should be used. Generally accepted practices include the following disposition categories:

- Unfounded: the allegation was false or devoid of fact.
- Exonerated: the act occurred, but was lawful and within policy.
- Not Sustained: the evidence was insufficient to either prove or disprove the allegation.
- Sustained: the evidence was sufficient to prove the allegation.[88]

PRPD generally employs two types of determinations: (1) "archive," and (2) a specific disciplinary action, such as admonishment, reprimand, or suspension, when the allegation is proven. PRPD uses "archive" (or administratively closed) too broadly as a "catch-all" to cover three distinct scenarios, namely, complaints that are unfounded, exonerated, and not sustained. An officer with a history of five "exonerated" complaints is distinct from an officer with five "not sustained" complaints. In this latter case, investigators may find it necessary to conduct a proactive investigation to determine whether the officer is intimidating or threatening witnesses in order to discourage their cooperation during the administrative investigation. For instance, the lieutenant profiled in Table 10B (above) has an extensive history of complaints. However, the numerous "archive" designations in the lieutenant's history fail to explain whether the officer is a frequent target of false complaints (as may be indicated by repeated exonerations) or whether some other factor is contributing to the high number of complaints.

## 4. Investigators Lack Training and Resources

PRPD units designed to promote integrity and compliance with agency standards, while staffed with dedicated individuals, lack the necessary tools to hold officers accountable. Despite their immense responsibility, officers assigned to internal affairs units reported being outcasts in the agency. These officers included individuals who had no other space but the stationhouse restroom to store internal affairs files or who traveled in their own personal vehicles to conduct surveillance because they lacked serviceable equipment. They were charged with rooting out serious misconduct of all types and at all levels within the agency, but PRPD provided them with few resources, virtually no training, and little support.

Administrative investigators tasked with evaluating civilian complaints do not receive formal training. PRPD's 2009 Total Quality study found that administrative investigators lacked training and that the failure to train investigators results in ongoing delays in investigations. In December 2010, the PRD commander indicated that he had not received any formal training on administrative investigations, although he had directed various PRPD units in his 30-year career

at PRPD. The Director of the Administrative Complaint Bureau also indicated that he had not received any training on conducting administrative investigations, though he stated that he had studied the Complaint Regulation before taking charge of the unit. The lack of training they described is consistent with what other investigators reported to us on prior tours.

During our 2008 and 2009 tours, internal affairs and public integrity investigators reported a scarcity of staff to complete timely investigations. They also indicated that staff lacked necessary equipment, such as video cameras, copiers, and unmarked cars. During our December 2010 tour, PRD supervisors reported continued shortages in staff and resources. Although PRPD reports that it recently improved the tracking of civilian complaints by automating a portion of the civilian complaint process, substantial work remains to bring meaningful reforms that will result in greater confidence from the public.

An effective internal investigation and civilian complaint process is essential to preserving public trust. In 2010, the International Association of Chiefs of Police ("IACP"), as part of a project supported by DOJ's Community Oriented Policing Services ("COPS"), highlighted the role of Internal Affairs as the institution best equipped to build and maintain community trust following allegations of unethical conduct by officers.[89] According to IACP, investigation and civilian complaint processes should be comprehensive, accessible, fair, thorough, and transparent to ensure that officers are held responsible when violations occur and to deter misconduct. The process should promote confidence from both civilians and officers. An objective and thorough investigation also serves to protect the community and officers from complaints based on misunderstandings or false information.

In addition, officers should be required to report to their agency any instance in which they are: arrested or criminally charged for any conduct; named as a party in a civil suit regarding on-duty conduct; or named as a party in a civil suit regarding off-duty conduct in which the allegations relate to the officer's ability to perform law enforcement duties (e.g., improper force, fraud, or discrimination). Law enforcement agencies should seek to be notified whenever a court or a prosecutor concludes that an officer engaged in misconduct in the course of criminal investigations or proceedings (e.g., engaged in false testimony or dishonest conduct, or improperly charged an individual with resisting arrest, assault on an officer, or disorderly conduct in an attempt to justify inappropriate use of force).

## E.    Ineffective Discipline

PRPD operates nearly the same "grossly deficient" disciplinary system observed by the First Circuit when it upheld an award of punitive damages against the PRPD Superintendent and other supervisors in 1989. *Gutiérrez-Rodríguez v. Cartagena*, 882 F.2d 553, 581-82 (1st Cir. 1989). The deficiencies included unduly limited sanctions for misconduct and the failure to involve immediate supervisors in the disciplinary process. *Id.* at 565-66. More than two decades later, these deficiencies remain. Specifically:

- PRPD's Personnel Regulation is sorely outdated and does not reflect current types of misconduct and contemporary principles of progressive discipline.
- supervisors lack authority and training to correct even minor infractions of their subordinates;
- disciplinary action is inconsistent, delayed, and ineffective in deterring misconduct; and
- officers are allowed to refuse to provide a statement during administrative investigations.

Law enforcement agencies should appropriately discipline any officer who is the subject of a substantiated misconduct allegation regarding excessive force, false arrest, improper search or seizure, discriminatory law enforcement, or who fails to report misconduct by another officer. The agency should also appropriately discipline any officer who enters a guilty plea or is found guilty in a criminal case regarding on-duty conduct, or who is found in a criminal proceeding to have intentionally committed misconduct.

> "As the expert on police practices and procedures testified, it was a disciplinary system that was going through the procedural motions without any real objective of finding the truth."
>
> - First Circuit in *Gutiérrez-Rodriguez*, 1989

In deciding the appropriate discipline for each officer who is the subject of a substantiated misconduct allegation, the agency should consider the nature and scope of the misconduct, and the involved officer's history of misconduct, investigations, and discipline. Regardless of whether a misconduct allegation is substantiated or discipline is ordered, the agency should also consider whether other remedial non-disciplinary measures, such as training or counseling, are appropriate to correct underlying problems.

### 1. The Police Personnel Regulation Is Sorely Outdated

PRPD's disciplinary system is governed by a Police Personnel Regulation issued thirty years ago, in 1981, that does not reflect current types of officer misconduct and contemporary principles of progressive discipline.[90] The Puerto Rico Legislature recognized this deficiency and passed legislative measures in 1996 and 2004 requiring that the Superintendent update the Regulation to reflect contemporary merit principles. Specifically, Law No. 184 of August 3, 2004, required government agencies, like PRPD, to adopt regulations that uphold critical merit principles concerning selection, training, promotion, retention, and discipline of employees that do not discriminate based on political affiliation, race, color, national origin, gender, or other prohibited category. *See* Law 184 art. 2.1, 5.4. Despite these legislative mandates, PRPD has yet to adopt a new Police Personnel Regulation. A May 2009 audit report from the Puerto Rico Controller's Office found that PRPD's failure to adopt an updated personnel regulation leads to human resource errors and irregularities that are not detected and corrected in a timely manner.[91]

Consistent with the May 2009 Controller's audit report, we found numerous problems with PRPD's outdated disciplinary system that do not promote accountability. For instance, the Police Personnel Regulation contains an antiquated list of rules governing officers' conduct. The

list does not reflect current types of misconduct that should lead to discipline or corrective action. For instance, the Police Personnel Regulation expressly prohibits officers from threatening or using their firearms against any person, except in legitimate defense of self or others. However, the Regulation does not prohibit officers from threatening or using other weapons, such as batons, chemical agents, or CEDs, without justification. The Regulation also prohibits interfering, obstructing, or misusing radio equipment, but does not reference misuse of computers or other electronic communication devices. Separately, the Regulation does not address how much weight prior instances of misconduct should be given when imposing discipline and does not empower supervisors to take early remedial action to correct misconduct or problem behavior of subordinates.

## 2. Supervisors Lack Authority and Training To Correct Even Minor Infractions of Their Subordinates

Numerous supervisors indicated that they do not have authority to correct even minor infractions by officers under their supervision. Instead, supervisors must refer misconduct to administrative investigators before formal discipline or corrective action can be imposed on an officer. Although the regulation governing civilian complaints allows administrative investigators to refer misconduct allegations to supervisors for a chain-of-command investigation, we found few instances of investigative units employing that option. As a result, even minor infractions were channeled through the lengthy and backlogged administrative investigation process. Some officers reported that supervisors simply worked around the cumbersome administrative investigation process by transferring problem officers to other units.

## 3. Administrative Investigations Take Too Long To Complete

Officers from all ranks and divisions reported that administrative investigations can take up to ten years or more to resolve. Officers complained that, in some instances, by the time officers are notified of disciplinary action, it is difficult to gather documents and witnesses to challenge the investigator's findings because the incident occurred so long ago. Officers also told us that they often do not learn about unresolved misconduct allegations against them until they are considered for promotions. In addition, we learned that the length of time that many administrative investigations take makes it difficult for supervisors to manage the officers working for them. For example, an officer could have a dozen pending administrative investigations when he/she is assigned to a new precinct. The supervisor might find out about some of these investigations from PRD, but as discussed below, records on pending and completed investigations are often incomplete. Without these files, a supervisor cannot reliably determine whether the officer poses a risk to civilians or the integrity of the unit.

## 4. Disciplinary Action Is Inconsistent and Ineffective in Deterring Misconduct

We found that administrative investigators' findings and recommendations varied widely for similar types of offenses. PRPD's 30-year-old Police Personnel Regulation classifies misconduct into two categories: minor and major violations. The range of disciplinary action reflects these two types of violations. Discipline for minor violations ranges from a written reprimand to a suspension that cannot exceed ten days. Discipline for major violations can result in suspension lasting up to five months and in termination of employment.[92] This range of

corrective actions is unduly limited.  The rules on discipline do not contemplate training, counseling, or other remedial measures that are focused on correcting problem behavior beyond the imposition of written reprimands and more severe sanctions.  Alternative measures should be added to the rules on discipline that provide for professional improvement and early intervention, rather than strictly to punish.  Furthermore, available penalties involving suspension should be more finely calibrated to address the current gap between a ten-day suspension and a five-month suspension.

The PRD Commander reported that he evaluates each recommendation for discipline that comes across his desk so that discipline is consistent, regardless of the subject officer's assigned region or police unit.  While the Commander's dedication is commendable, PRPD should not rely on the efforts of one individual to standardize the disciplinary recommendation process.  During our December 2010 tour, the Superintendent reported that PRPD was developing a new discipline matrix that would recommend discipline within a pre-determined range that considered the type of violation and the officer's history of misconduct.  We have not been provided with a copy of any updated personnel regulations or a disciplinary matrix.  However, such a matrix – if applied consistently – could greatly assist PRPD in imposing consistent sanctions and/or remedial measures for similar misconduct.

In the case of lawsuits filed against officers, we found little, if any, coordination between PRD, which is responsible for administrative investigations, and the Legal Affairs Office, which reviews all disciplinary action recommended by PRD and usually receives notice first of the suits.  The lack of coordination may be due, in large measure, to PRPD's antiquated and paper-based records management system that relies on a card catalogue to track civil actions and other court proceedings.  We also found that PRPD routinely fails to inform officers about the status of pending administrative investigations and civil court proceedings.  In many cases, both proceedings run simultaneously, often reaching contradictory results.  For instance, it is not uncommon to find a civil action that resulted in a substantial settlement or finding of misconduct where the administrative investigation was completed in a cursory manner without a recommendation for discipline.  In such instances, PRPD should review closed administrative investigations and determine whether any disciplinary or corrective action is necessary to prevent the officer from engaging in similar, or more serious, misconduct in the future.

During our review of civil suits involving PRPD officers, we found cases in which officers currently on the active PRPD roster were found liable for Fourth Amendment violations – or no finding was made because settlement was reached prior to trial – and whose conduct led to awards of money damages paid by Puerto Rico.[93]  Even if PRPD conducted administrative investigations against the involved officers for the incidents giving rise to litigation and no disciplinary action was imposed, following these settlements or verdicts, PRPD should consider whether to require training, counseling, or other remedial non-disciplinary measures to correct problem behavior.

### 5. Protections Against Self-Incrimination Are Offered in Administrative Investigations

In *Gutiérrez-Rodríguez*, 882 F.2d at 565, the First Circuit upheld a lower court decision imposing liability on PRPD's supervisors based on deficient disciplinary practices, including providing officers with Fifth Amendment protections against self-incrimination during administrative investigations. The plaintiff's expert, quoted in the opinion, stated, "[s]uch a rule is 'a really serious handicap' to an investigation of misconduct; it 'cuts off one of your main sources of investigation . . . the officer that was involved.' By invoking such a rule an officer could easily block the department from getting to the bottom of the matter." *Id.* at 565. We found that PRPD still continues this practice. For instance, we found that investigators routinely gave officers the following warning during administrative investigations: "You have the right not to declare if you believe that doing so may be self-incriminating."

As discussed in Section III, above, administrative investigations should be considered individually. Conducting a full administrative investigation short of compelling an interview generally does not compromise either investigation and is often critical to ensuring the later success of the administrative investigation. Regardless of whether or for how long a compelled statement is delayed, a meaningful and timely administrative investigation is particularly important in cases alleging criminal misconduct, given the usually egregious nature of the allegations, the often slow wheels of the criminal justice system, and the very low rate at which these cases are prosecuted (regardless of jurisdiction). Where officers are not guilty of committing the misconduct, they deserve to have the case adjudicated internally and be brought back to work; where an officer is guilty, the community and department have an interest in seeing the officer disciplined or removed from the force without having to wait months or years with the officer on paid or unpaid suspension.

## F. Limited Risk Management

Effective risk management systems help commanders and supervisors take early corrective action when officers exhibit potential problem behaviors. Interventions typically include targeted training, education, and counseling. These systems are designed to protect the community and support officers who may be experiencing difficulties. Information that agencies generally collect in their early intervention systems include: information on shootings, other uses of force, searches and seizures, civilian complaints, civilian commendations, criminal charges against officers, civil suits alleging misconduct, other misconduct allegations, disciplinary actions, non-disciplinary remedial actions, training history, and civilian arrests.

An early intervention system should provide supervisors and managers with both statistical information and descriptive information for individual officers, regions/specialized units, and the entire law enforcement agency. When properly implemented, an early intervention system offers numerous benefits, including: enhancing police integrity; promoting a culture of accountability; emphasizing the department's commitment to ethical policing; decreasing reliance on negative sanctions and punitive actions; providing supportive interventions to sustain, revive, and advance individual careers; supporting and increasing efficiency of first-line supervisors; improving officer morale; and decreasing liability and costs of civil suits associated with misconduct and use of force.[94]

More than 20 years ago, PRPD recognized its responsibility to detect potential patterns of problematic behavior and intervene to avoid and deter serious misconduct. However, PRPD's risk management system remains woefully inadequate. PRPD currently relies on a system referred to as "repetitive conduct," first developed in 1990 by former Superintendent Betancourt Lebrón. In Special Order 90-5, "Repetitive Conduct," Superintendent Betancourt Lebrón observed that PRPD needed to do more to address officers that "have shown signs of emotional maladjustment" and "an inability to control their behavior in tense moments."

Special Order 90-5 highlighted three circumstances that triggered the need for an intervention: (1) a substantial number of citizen complaints filed against a member of PRPD, even when these have not culminated in a disciplinary action; (2) actions of a PRPD officer that evidence any failure to control his/her conduct in stressful situations, thus presenting a potential danger to the citizenry or the officer; and (3) a supervisor's conclusion that a member of the force may be emotionally unbalanced or in need of re-training. The sole intervention consisted of a referral to a course titled, "Professional Improvement."

On June 14, 2007, PRPD published an internal memorandum intended to clarify various items left undefined by SO 90-5. The memorandum defined the term "substantial number of complaints" as three complaints within a five-year period, and required the complaints to be related to a perceived failure by the officer to control his/her conduct in stressful situations. Despite this new definition, PRPD stopped offering the "Professional Improvement" training to PRPD officers for three years, until October 2010.

On September 27, 2010, PRPD modified its repetitive conduct policy with GO 2010-14. The new parameters provide various triggers based on the number of administrative complaints or use of force reports involving an officer. The Order also provides a referral for supervisors whose subordinates are subjects of ongoing complaints. Under the new Order, PRPD requires a referral to the "Professional Improvement" training following three or more civilian complaints within a 12-month period.

General Order 2010-14 is a significant step backward from prior procedures. For one, it shortened the relevant period for consideration of complaints from five years to one year. Thus, under the new system, an officer can continue to receive two civilian complaints every year, without triggering a referral for an intervention. Under the former parameters, a referral would be triggered. The new system also diminishes the role of supervisors in submitting referrals. Under SO 90-5, a supervisor could make a referral when an officer showed any failure to control his conduct in stressful situations, or when the supervisor found that the officer was emotionally unbalanced or in need of re-training. Currently, supervisors have less discretion to make these referrals because referrals are based on the receipt of civilian complaints. Even assuming that GO-2010-14 permits discretionary referrals, it discourages them. A supervisor who makes a referral under GO 2010-14 regarding an incident that happened under his command could see his opportunities for promotion delayed since such a referral would be counted as one of the complaint notifications against him.

Separately, during our tours, we found that information on investigations, citizen complaints (including lawsuits), training histories, supervisory reviews, disciplinary and other corrective actions was not readily available to supervisors. Although supervisors at the precinct level had access to officers' disciplinary files, the information in them is often incomplete. Even

when supervisors request the complaint histories of officers under their command, some complaints were listed as "not found." We further found that PRPD keeps many disciplinary records on note cards, many of which include duplicative or incomplete information, particularly regarding civil suits and criminal prosecutions. While early intervention programs do not require sophisticated technology to succeed, an automated system permits supervisors to access, organize, and search large volumes of data. Additionally, an agency can establish automated alerts, whereby the database, relying on previously selected performance indicators, will automatically inform supervisors when an individual officer exhibits potentially problematic behavior.[95] Such a system is invaluable in an agency the size of PRPD.

Early intervention programs are only a tool, however; they are not a substitute for capable and effective supervisors. For a program to be effective, "[f]irst and second level supervisors [should] familiarize themselves with their subordinates and routinely observe their demeanor, appearance, and conduct. Supervisors [should] remain alert for indications of behavioral changes or stressors that may affect a member's performance. When supervisors perceive or determine that a member has problems or is causing problems, they [should] assess the situation and take appropriate action" in accordance with the agency's policies and procedures, including those on referral to employment assistance programs.[96] To penalize supervisors and make them automatically ineligible for promotion because a certain number of complaints have been filed against officers under their command – as provided by GO 2010-14 – runs counter to the principles of a good risk management system because it shifts the focus away from correcting officers' problem behaviors.

As we discussed earlier, we are concerned about the high percentage of "merit" promotions in PRPD during the past three years, and how those promotions may impact the quality and effectiveness of supervision. We are also concerned about PRPD's apparent lack of supervisory training. Although the University College offers training for new sergeants, more training should be offered to improve the skills of higher-ranking officers so that they can become more effective managers. During our tours, we met auxiliary superintendents, who serve just under the Superintendent and oversee PRPD components, with no prior experience in the areas in which they now lead. We also met captains and higher-ranking commanders with limited management experience because they had spent the bulk of their careers working in specialized units. Sufficiently trained commanders are necessary to make effective decisions on corrective or disciplinary action when an officer requires an early intervention. In this regard, collecting accurate data as part of an early identification program is but one step in the process. Supervisors must still be able to interpret the data and take appropriate corrective action.

We are also concerned about the fixed "Professional Improvement" training curriculum that PRPD began offering in October 2010, beginning with TOU officers. The one-size-fits-all approach, such as the mass training offered to 165 officers on November 22-23, 2010, fails to take into account that referrals for corrective action can be for a wide variety of citizen complaints. "Professional Improvement" training for a TOU officer with complaints of use of excessive force for actions during a mass demonstration may require different corrective measures than for a precinct officer who is verbally abusive to civilians during traffic stops. In this regard, supervisors should be consulted about fashioning an appropriate remedy depending on the particular problem behavior. As one of the University College instructors pointed out,

even experienced traffic officers make mistakes and take short-cuts that can endanger the lives of citizens and the officers themselves. If such an officer is displaying troubling conduct, specific training tailored to the problem can correct the behavior more effectively, and helps the officer refocus his law enforcement commitment and effort.

After choosing and implementing the appropriate type of intervention, the last element of an effective early intervention program is post-intervention monitoring. "For instance, if an officer is indicated because of three use-of-force incidents in a year, any subsequent use-of-force incident should be reviewed thoroughly. Increased supervision, including random roll-bys to observe the officer's performance in the field may also be warranted."[97] Ideally, the effective use of an early intervention program will result in a decreased need for disciplinary measures. However, an early intervention system will not replace the need for appropriate discipline.

## G.    Lack of External Oversight and Accountability

External oversight of PRPD is virtually non-existent. As discussed above, supreme authority over PRPD is vested in the Governor. The Governor appoints, with approval from the Puerto Rico Senate, a Superintendent who manages the day-to-day operations of PRPD. The Superintendent exercises plenary discretion over officer recruitment, selection, training, promotion, and discipline. Unlike all states except Hawaii, Puerto Rico does not have a state-wide authority that promulgates minimum standards and training requirements, such as POST organizations. The Superintendent has, for example, the discretion to reduce the pre-service training program for cadets entering with advanced degrees. The Superintendent could also authorize deployment of cadets with firearms before they complete the pre-service program, modify the firearm training requirements for officers, or set new standards for the use of CEDs. PRPD is also not accredited by any professional organization outside of Puerto Rico, such as the Commission on Accreditation for Law Enforcement Agencies.

In most jurisdictions, law enforcement agencies that adhere to contemporary policing practices are increasingly engaging in constructive dialogue with the public on accountability and oversight issues. "In one recent survey, approximately 80 percent of the American public reports that they favor the use of civilian review."[98] Many individuals see civilian review as a logical outgrowth of community-oriented policing. Civilian review of police misconduct takes many forms. Some civilian review entities are involved in every step of the complaint process, from the receipt of the initial complaint through its review and investigation, to the recommendation for sanctions, if any. Other entities deal exclusively with appeals, leaving the investigation of civilian complaints to the law enforcement agencies they oversee.

In Puerto Rico, there is no effective external oversight of PRPD. Currently, Puerto Rico authorizes two external entities by law to investigate civilian complaints of police misconduct. However, these entities do not have the necessary resources and authority to hold PRPD officers accountable to the public. As a result, they are unable to provide adequate and timely attention to hundreds of civilian complaints stemming from allegations of civil rights violations. We discuss each of these entities below.

1.      **CIPA**

The Commission of Investigation, Processing and Appeals ("CIPA") was created in 1972 to replace Puerto Rico's former Police Commission. Based on its enabling statute, CIPA is an independent, quasi-judicial body charged with investigating civilian complaints against law enforcement officers and adjudicating discipline appeals. *See* Law No. 32 of May 22, 1972, *as amended*. CIPA was intended to provide an alternative to the court system for faster and less costly vindication of individuals' civil rights. Further, the Puerto Rico Legislature designed CIPA to be independent from PRPD in order to "provide maximum protection" to citizens from the "coercive power of the State." *See* Law No. 23 of July 11, 1992.

CIPA is authorized to review and investigate civilian complaints involving: (1) illegal or unreasonable arrests or detentions; (2) illegal or unreasonable searches and seizures; (3) excessive or unjustified threats or aggressions; (4) discriminatory conduct; (5) undue delays in presenting a detainee to a magistrate judge; (6) unjustified use of violence, intimidation, and/or psychological abuse during detention or interrogation; (7) misuse or abuse of surveillance mechanisms; and (8) illegal or unreasonable obstruction to the legal and peaceful exercise of the constitutional rights to free speech, press and/or association. 1 L.P.R.A. § 172(1).

Despite CIPA's critical investigative mandate, it functions solely as an appellate body determining the validity of disciplinary action imposed against officers. In 2008, CIPA reported that budget limitations impaired its ability to hire staff to investigate allegations of police misconduct. Based on our review, CIPA's budget continues to dissipate. In its FY 2010-2011 budget, CIPA reduced its staff to six, down from 13 in 2008. Many residents and even officers interviewed were unaware that CIPA was authorized to investigate police abuse.

2.      **Puerto Rico Civil Rights Commission**

The Puerto Rico Civil Rights Commission is also authorized to receive and investigate civilian complaints. *See* Law No. 102 of June 28, 1965, *as amended.* However, CRC's mission expands well beyond police misconduct. The Puerto Rico Legislature established CRC to: (1) educate the entire population about the significance of citizens' fundamental rights and the means of respecting and protecting them; (2) promote the protection of human rights and the strict enforcement of the laws that protect them; (3) publish an annual report and any other special reports required by the Governor, the Puerto Rico Supreme Court, or the Legislature, containing the recommendations it deems necessary for the continuous and effective protection of civil rights; (4) evaluate the laws, standards, and acts of the Commonwealth and its municipalities for consistency with civil rights, and suggest reforms as needed; and (5) survey citizens as to the effectiveness of protections of fundamental rights and investigate complaints and grievances by any citizen regarding violations of those rights. Again, with significant budget limitations and a broad mandate, CRC cannot provide dedicated oversight of PRPD to ensure public accountability.

# V.    RECOMMENDED REMEDIAL MEASURES

For years, victims' families, civic leaders, legislators, civil rights advocates, and others have called for reforms in response to incidents involving civil rights violations, corruption, criminal activity, and other misconduct by PRPD officers.  Despite the calls for reform, PRPD has yet to build and maintain the necessary systems of accountability to protect individuals against unreasonable searches and seizures, including use of excessive force, and other arbitrary uses of force by officers.  Without fundamental and sustainable changes to the agency's standards, procedures, and practices, the pattern of civil rights violations will continue.

The recommendations we outline below are based on professional and generally-accepted practices in the field of local law enforcement.  As part of our investigation, we solicited feedback from various stakeholders on remedies to reform PRPD.  We received thoughtful and candid assessments from civilians, advocacy organizations, and professional associations.  Notably, many of the officers we interviewed also offered recommendations, demonstrating a genuine commitment to promoting integrity and professionalism within their ranks.  These recommendations also reflect what we heard from various stakeholders, including officers and civilians, who have called for more effective policing to fight crime and uphold civil rights.

At a minimum, Puerto Rico needs to take the steps broadly outlined below to remedy the pattern and practice of constitutional violations and ensure that individuals are not subjected to use of excessive force and unconstitutional searches and seizures.

## A.    Independence and Professionalization

To achieve lasting reform of PRPD that will address the public safety crisis, ensure that constitutional police practices are uniformly applied and sustained, and build public confidence in the police department, PRPD must have stability and protection from politicization.

(1)     Command staff:  Any employees in the command structure who do not report directly to the Superintendent should be career employees not subject to removal or demotion except for cause.

(2)     Promotions:  All promotions should be made by PRPD free from influence by the Governor or the Legislature.  Objective criteria should be developed to ensure promotions based on demonstrated competency in core supervisory and substantive areas.  These criteria should account for experience, civil rights and discipline record, training, and skills.

(3)     The University College should be an independent entity in the government of Puerto Rico with a Board of Trustees consisting of representatives of the Governor, Superintendent, Legislature, and the community.

(4)     Police Officer Standards and Training: PRPD should develop a POST board or commission that establishes minimum professional standards and training requirements for law enforcement officers in Puerto Rico.

**B.** **Evaluate PRPD Staffing and Eliminate Unqualified Officers**

(5)     PRPD should assess the size of the force necessary and appropriate to fulfilling its mission.  PRPD should develop a plan to determine the adequate number of officers needed in each geographic region and in each job category.  The plan should identify each function performed by PRPD, the number of officers required to fulfill the function, and level of training, skill, and experience required for each position.  This assessment should be conducted without regard for the current staffing pattern.

(6)     PRPD should develop a plan to remove corrupt and unqualified officers from PRPD. Within 12 months, PRPD should review the discipline, training, and performance record of each officer against objective criteria to determine which officers should be removed from the force. Upon completion of the review, PRPD should immediately begin proceedings, consistent with the civil service and due process rights of officers, to remove those who are unqualified due to misconduct and to retrain those who are unqualified by lack of training.

**C.** **Reform of Specialized Tactical Units**

In contravention of established and widely accepted policing practices, PRPD employs its specialized tactical units for routine police functions.  The tactics used by the specialized tactical units have negatively impacted the effectiveness and public perception of PRPD.  To restore public confidence, PRPD must assess the character, policies, and practices of its specialized tactical units.  Along with ensuring that specialized tactical units respect general PRPD policies, PRPD shall also assess and modify its practices as they relate to:

(7)     Recruitment: PRPD shall continue to revise and implement standards related to ensuring that members of its specialized tactical units are of the highest caliber.  Initial and reoccurring evaluations of specialized tactical unit officers shall incorporate psychological tests, extensive background investigations, and drug examinations.

(8)     Training: PRPD shall develop training curricula that comply with professional standards related to specialized tactical units.  Specialized training shall emphasize constitutional standards as they relate to the use of force, searches and seizures, and the prohibition of discrimination.

(9)     Policies: PRPD shall develop, revise, and implement comprehensive standard operating procedures for its specialized tactical units that: (a) prohibit deployment solely to conduct crowd management and control; (b) ban deployment for routine patrol duties; (c) prohibit unnecessary displays of force; and (d) establish reporting requirements following deployments.

(10)     Supervision:  PRPD shall ensure that high-level officials who oversee specialized tactical units are familiar with pertinent training curricula and standard operation procedures.

**D.** **Use of Force:  Internal Controls and Accountability**

**1.** **Use of Force Policies**

Puerto Rico should ensure that all force, lethal or otherwise, used by PRPD officers is reasonably necessary and in accordance with individuals' federally-protected rights.  In order to

accomplish this, Puerto Rico should take the following specific steps related to PRPD's use of force policies:

(11)     Develop and implement a comprehensive and agency-wide use of force policy that complies with applicable law and current professional standards. The comprehensive use of force policy shall include all force techniques, technologies, and weapons, both lethal and less lethal that are available to PRPD officers, including officers assigned to specialized tactical units. The comprehensive use of force policy shall clearly define and describe each force option and the circumstances under which use of such force is appropriate.

(12)     Develop, revise, and implement use of force policies, including related policies on each force implement or option available to PRPD officers, that:

     a.     define terms clearly and uniformly;
     b.     incorporate a use of force model that teaches disengagement, area containment, surveillance, waiting out a subject, and summoning reinforcements or calling in specialized units, as appropriate responses to a situation;
     c.     emphasize the goal of de-escalation and the use of advisements, warnings, and verbal persuasion, when appropriate;
     d.     advise that, whenever possible, individuals should be allowed to submit to arrest before force is used;
     e.     reinforce that the use of excessive force will subject officers to discipline, possible criminal prosecution, and/or civil liability;
     f.     ensure that sufficient less lethal alternatives are available to all officers and that officers are provided with appropriate requirements on the proper use of such less lethal alternatives;
     g.     prohibit the use of choke holds and similar carotid holds, except where lethal force is authorized;
     h.     provide that an intentional strike to the head with an instrument constitutes a use of lethal force;
     i.     emphasize that the continued use of force, even if initially justified, may become unreasonable if force is no longer necessary in the course of an arrest, investigatory stop, or other seizure;
     j.     require officers, immediately following a use of force or as soon as practicable, to inspect and observe subjects for injury resulting from the use of force and to obtain any necessary medical care; and
     k.     include canine deployment as a use of force, except in situations involving an on-leash article search or search of a non-fugitive missing person.

(13)     Require that all force implements, such as batons, chemical sprays, CEDs, and firearms be used and maintained in accordance with manufacturer specifications and PRPD policy. PRPD should explicitly prohibit officers and other persons from altering or modifying force implements beyond manufacturer specifications and PRPD policy.

(14)     Revise and implement a use of firearms policy that complies with applicable law and current professional standards. The firearms policy should:

a.    prohibit officers from possessing or using unauthorized firearms or ammunition and shall inform officers that failure to follow any disposition from the policy will result in disciplinary action;

b.    establish a single, uniform reporting system for all critical firearm discharges;

c.    prohibit officers from obtaining service ammunition from any source other than official PRPD channels, and specify the number of rounds that PRPD authorizes its officers to carry;

d.    require that all critical firearm discharges by officers, on- or off-duty, be reported and investigated;

e.    prohibit firing at or from a moving vehicle, unless the use of lethal force is justified, and prohibit officers from intentionally placing themselves in the path of a moving vehicle; and

f.    establish requirements that prohibit unholstering, drawing, or exhibiting a firearm, unless the officer reasonably believes that a situation may escalate to the point where lethal force would be authorized, and that delineate proper techniques when unholstering, drawing, or exhibiting a firearm.

(15)    Specify that officers must successfully qualify with their regulation firearm, including any other firearm they are authorized to use or carry on-duty, on an annual basis.  Officers who fail to re-qualify shall be relieved of police powers and immediately relinquish all firearms, including personal firearms.  Those officers who fail to re-qualify after remedial training within a reasonable time shall be subject to disciplinary action, up to and including, termination of employment.

(16)    Revise and implement PRPD's use of CED policy to ensure that it complies with applicable law and current professional standards.  The use of CED policy should:

a.    limit the use of CEDs to only those cases in which such force is necessary to protect the officer, the subject, or another party from physical harm, or is necessary to effectuate the arrest of an actively resisting subject, or to prevent the escape of that subject, and other less intrusive means are ineffective;

b.    require a verbal warning prior to the deployment of a CED, unless the warning would present a danger to the officer or others, and that, where feasible, the officer will defer deploying a CED a reasonable time to allow the subject to comply with the warning;

c.    require officers to minimize collateral injury to an individual, when feasible, by generally prohibiting CED deployment that may cause serious injury or death from situational hazards, including falling, drowning, losing control of a moving vehicle, or ignition from the presence of a potentially explosive or flammable material or substance;

d.    require that officers assess the need for continued CED deployment following each cycle that is applied against a subject, including whether the use of less intrusive force options are appropriate, and require that officers clearly articulate and justify each and every cycle used against a subject in written reports;

e.    provide protocols on the removal of CED probes, including a protocol requiring medical or specially trained PRPD personnel to remove probes embedded in a

subject's skin (as opposed to the subject's clothing), except for probes embedded in a subject's head, throat, groin, or other sensitive area, which should be removed by medical personnel only;

f.    require that officers report all CED discharges, except for training discharges, to their supervisor and the communications command center, as soon as possible; and

g.    require a supervisor to respond to the scene of a CED deployment and to conduct an initial review to determine the appropriateness of the CED deployment, including canvassing the scene to identify and interview potential witnesses.

(17)    Implement integrity safeguards on the use of CEDs to ensure compliance with PRPD policy, including conducting random audits of CED deployment data. The audits should compare the downloaded data to the officer's report on use of force. Discrepancies within the audits should be addressed and appropriately investigated.

(18)    Develop and implement a chemical spray policy that complies with applicable law and current professional standards. The chemical spray policy should:

a.    limit the use of chemical spray to only those cases in which such force is necessary to protect the officer, the subject, or another party from physical harm, or is necessary to effectuate the arrest of an actively resisting subject, or to prevent the escape of that subject, and other less intrusive means are ineffective;

b.    require that, unless it would present a danger to the officer or others, a verbal warning to the subject that chemical spray will be used be issued prior to use, and that, where feasible, the officer will defer using chemical spray for a reasonable time to allow the subject to comply with the warning;

c.    require officers to target only the subject's face and upper torso when using hand-held chemical spray canisters;

d.    provide officers with guidance regarding the duration of a chemical spray burst and the distance from which it is applied;

e.    require that, absent exigent circumstances, officers decontaminate every subject exposed to chemical spray within 20 minutes of the application of chemical spray, and specify permissible and appropriate means of decontaminating a subject;

f.    require that officers request medical response or assistance for subjects exposed to chemical spray when they complain of continued effects after having been decontaminated, or they indicate that they have a pre-existing medical condition (e.g., asthma, emphysema, bronchitis, heart ailment, etc.) that may be aggravated by chemical spray;

g.    require that officers remove a subject exposed to chemical spray from a face-down position as soon as it is safe to do so;

h.    require that only agency-issued and approved chemical spray is used; and

i.    require that officers report all uses of chemical spray, except when used for training purposes, to their supervisor and the communications command center, as soon as possible.

(19)    Maintain an accounting of the number of chemical spray canisters annually distributed to, and used by, each officer.  Additionally, PRPD should account for all ammunition or other projectiles containing chemical irritants.  PRPD should continue to ban the use of Chloroacetophenone, or CN gas, by officers.

(20)    Develop and implement a crowd control and management policy that complies with applicable law and current professional standards.  The crowd control and management policy should include procedures on responding to civil disturbances and should:

 a. emphasize that all use of force, both lethal and less lethal, must be applied in a manner consistent with applicable law and professional standards;

 b. require that all use of force be reported, reviewed, and investigated;

 c. provide that a ranking officer or other higher-level PRPD official at the scene of a civil disturbance assume command and control of the incident, and:

  (i) assess the immediate situation for seriousness and the potential for escalation;

  (ii) determine the number of personnel and equipment necessary to contain and disperse the disturbance and relay this information to the communications command center; and

  (iii) establish a temporary command post to coordinate and relay information, as necessary;

 d. require that the ranking officer or official assuming control and command of a civil disturbance take reasonable and appropriate steps to ensure the safety of bystanders, including providing for the evacuation of bystanders, when feasible, from the immediate area of a civil disturbance;

 e. require the issuance of a dispersal order, absent exigent circumstances, prior to the deployment of crowd dispersal techniques, including use of force, in a manner reasonably calculated to be heard by the entire crowd under the circumstances and that provides a reasonable period of time for the crowd  to disperse;

 f. provide for a range of command options to bring civil disturbances under control and disperse illegal gatherings, emphasizing, when feasible, area containment, advisements, and dialogue;

 g. prohibit the use of police canines for crowd control and management;

 h. require supervisory approval prior to deploying force as a crowd dispersal technique, including batons and chemical agents, and restrict the use of force beyond that necessary to make lawful arrests, as appropriate;

 i. prohibit the use of batons against members of a crowd who are attempting to disperse or are otherwise posing no imminent threat to officers or other persons, unless the baton is displayed or used in a pushing or leveraging motion as a justified and authorized crowd management technique against individuals who are intentionally disobeying or delaying dispersal subsequent to a lawful order to disperse.

## 2.        Use of Force Reporting and Review

Puerto Rico should require PRPD officers to report all use of force in writing and require supervisors to independently review each use of force to determine whether the use was in accordance with applicable law and agency policy.  The review should also determine whether corrective action, including disciplinary action, is necessary to prevent misconduct.  Specifically, Puerto Rico should:

(21)     Develop and implement a use of force reporting policy and use of force incident report.  The use of force reporting policy should require officers to document all uses of force in writing.  The use of force report form should indicate each and every type of force used and require the evaluation of each use of force.  Use of force reports should include the officer(s)' narrative description of the events preceding the use of force and the circumstances related to the use of force, including the subject(s)' behavior.  The use of force reporting policy should explicitly prohibit the use of boilerplate or conclusory language in all reports documenting use of force.

(22)     Require officers to notify the communications command center and their supervisor following any use of force or upon the receipt of an allegation of excessive force.  Supervisors should respond to the scene, examine the subject for injury, interview the subject for complaints of pain, and ensure that the subject receives medical attention from an appropriate medical provider, as necessary.

(23)     Require supervisors to review, evaluate, and document each use of force and complete the supervisor's narrative description section of the use of force report.  The supervisor's narrative description should include a precise description of the facts and circumstances that either justify or fail to justify the officer's conduct based on the supervisor's independent review of the facts and circumstances of the incident.  As part of the review, the supervisor should evaluate the basis for the use of force, determine whether the officer's actions were within PRPD policy, and assess the incident for tactical and training implications.  The supervisor should provide recommendations for corrective action, including disciplinary and non-disciplinary action, as necessary.  An officer who used force during the incident, whose conduct led to an injury, or who authorized conduct leading to the use of force or allegation of excessive force should not be eligible to review the incident.

(24)     Provide that supervisors reviewing an officer's use of force interview all witnesses to the use of force or injury resulting from the use of force.  Consistent with applicable law, supervisors should ensure that all officer witnesses provide a statement regarding the incident.  Supervisors should ensure that all use of force reports identify all officers who were involved in the incident or were on the scene when it occurred.  Supervisors should not ask officers or other witnesses leading questions that improperly suggest legal justifications for the officers' conduct.

(25)     Require that supervisors reviewing an officer's use of force consider all relevant evidence, including circumstantial, direct, and physical evidence, as appropriate, and make credibility determinations, if feasible.  Supervisors should make all reasonable efforts to resolve material inconsistencies between witness statements.  PRPD should train all of its supervisors on the factors to consider when evaluating credibility.

(26)     Require that supervisors reviewing an officer's use of force ensure that all reports indicate whether an injury occurred, whether medical care was provided, and whether the subject refused medical treatment.  Supervisors should ensure that all reports include contemporaneous photographs or videotapes taken of all injuries at the earliest practicable opportunity, both before and after any treatment, including cleansing of wounds.

(27)     Provide that a copy of the completed use of force report, including the supervisor's written review of each use of force, is forwarded to PRD and the supervisor's Regional Commander or higher ranking PRPD officer within five (5) days.

(28)     Require that a Regional Commander or higher ranking PRPD officer evaluate each supervisory review of an officer's use of force, identify any deficiencies in those reports, and require supervisors to correct any deficiencies.  Supervisors should be held accountable for the quality of their reviews.

### 3.     Critical Incident Review

(29)     Require that PRD respond to the scene of, and investigate, all incidents in which evidence of possible criminal misconduct by an officer exists and all serious uses of force.  PRD should evaluate the written supervisory review of the incident as part of its investigation.  PRD should complete its investigation of possible criminal misconduct and serious uses of force within 60 days of the incident.

(30)     Develop and implement critical firearm discharge and in-custody death review policies that comply with applicable law and current professional standards.  The policies should establish a specialized investigative unit or team composed of investigators from PRPD's Homicide Unit, PRD, and PRDOJ.  The specialized investigative unit or team shall respond to the scene and investigate all critical firearm discharges and in-custody deaths.

(31)     Provide that critical firearm discharge and in-custody death review policies include procedures for conducting investigations of critical firearm discharges and in-custody deaths that require:

   a.     an account of all shots fired, all shell casings, and the locations of all officers at the time the officer(s) discharged the(ir) firearm(s), including an account of all other force used by officers;
   b.     an investigator to conduct and preserve all appropriate ballistic or crime scene analyses, including gunshot residue or bullet trajectory tests, in the investigative file; and
   c.     completion of the investigation within 60 days of the incident.  Compelled statements from officers should be obtained in accordance with applicable law.

(32)     Provide that critical firearm discharge and in-custody death review policies require a command-level review team to evaluate all investigations involving critical firearm discharges and in-custody deaths.  The team should be chaired by the commanding officer or official who directly supervises PRD.  PRPD shall establish criteria for selecting the other members of the team.

(33)     Require that the command-level review team evaluating critical firearm discharge and in-custody death investigations:

     a.     reviews all administrative and internal reports and investigations, including all PRD investigations and supervisory reviews (if applicable), for compliance with PRPD policies, as well as for tactical and training implications;

     b.     interviews principal investigators and/or supervisors, as necessary;

     c.     acts as a quality control mechanism for all critical firearm discharge and in-custody death investigations, with responsibility to return to the investigating unit all incomplete or mishandled investigations and/or supervisory reviews;

     d.     conducts the command-level review contemporaneously with any criminal review, with due regard for compelled statements, and complete the command-level review, absent exceptional circumstances, within 90 days of the end of all criminal reviews;

     e.     prepares a report for the Superintendent, upon completion of the command-level review, that should be made a part of the complete PRPD file regarding the incident and that includes a description of the incident (including all uses of force), a summary and analysis of all relevant evidence, proposed findings, and analysis to support those findings;

     f.     includes specific determinations in the report regarding the following:

          (i)     whether all uses of force during the encounter were consistent with PRPD policy and training;

          (ii)     whether the officer(s) involved employed proper tactics; and

          (iii)     whether lesser force alternatives reasonably were available;

     g.     recommends to the Superintendent the non-disciplinary corrective action that should be taken;

     h.     recommends revisions or amendments to investigative protocols and standards for all internal processes, including administrative investigations and/or supervisory reviews, to the Superintendent; and

     i.     reviews all critical firearm discharges and in-custody deaths annually to detect patterns and/or problems and to report the findings and recommendations to the Superintendent.

## E.     Searches and Seizures

PRPD should ensure that all searches and seizures, including investigatory stops and arrests, are conducted in accordance with the rights, privileges, or immunities secured or protected by the Constitution and/or laws of the United States.  Specifically, PRPD should:

(34)     Revise and implement investigatory stop and detention policies that comply with applicable law and current professional standards.  The policies should:

     a.     define all terms clearly, including the terms "investigatory stop" and "reasonable suspicion;"

     b.     require that all investigatory stops or detentions be based on reasonable suspicion;

     c.      address pedestrian and motor vehicle stops;

     d.     provide guidance on the facts and circumstances that should be considered in initiating, conducting, terminating, and expanding an investigatory stop or detention;

     e.     provide guidance on the nature, scope, and duration of investigatory stops or detentions, including the level of permissible intrusion when conducting related searches, such as "pat downs" or "frisks;"

     f.      explicitly prohibit the use of "canned" or conclusory language in all reports documenting the investigatory stop or detention; and

     g.     explicitly prohibit officers from knowingly using or relying on information known to be materially false or incorrect in effectuating an investigatory stop or detention.

(35)    Require officers to document, in writing, all investigatory stops and detentions, including descriptive details regarding the stop or detention and any related searches that may have been conducted, and to submit the written report to their supervisors by the end of the shift in which the police action occurred.

(36)    Require supervisors to review the report to determine whether the stop and detention:

     a.     was within PRPD policy;

     b.     should result in a misconduct investigation by PRD;

     c.     indicates a need for additional training or counseling, or any other non-disciplinary corrective measure, for the involved officer; and

     d.     suggests the need for revising or reformulating agency policy, strategy, tactics, or training.  The supervisor shall document on an auditable form those investigatory stops and detentions that are unsupported by reasonable suspicion, are in violation of PRPD policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or training.  The quality of these supervisory reviews shall be taken into account in the supervisor's performance evaluations.

(37)    Provide that a command-level officer or official review, in writing, all auditable forms concerning investigatory stops and detentions that are unsupported by reasonable suspicion, are in violation of PRPD policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or training.  The commander should evaluate the corrective action and recommendations in the supervisor's written report and ensure that all appropriate corrective action is taken, including referring the incident for administrative or criminal investigation.

(38)    Revise and implement arrest policies that comply with applicable law and current professional standards.  The policies should:

     a.     define all terms clearly, including the terms "arrest" and "probable cause;"

     b.     prohibit the arrest of an individual with less than probable cause;

     c.     provide guidance on effecting an arrest with and without an arrest warrant;

     d.     provide guidance regarding the nature and scope of searches incident to an arrest;

e.   explicitly prohibit the use of "canned" or conclusory language in all reports documenting an arrest; and

f.   explicitly prohibit officers from knowingly using or relying on information known to be materially false or incorrect in effectuating an arrest.

(39)   Require that officers notify the communications command center and a supervisor immediately after an arrest, or as soon as practicable.  For felony arrests, PRPD should require a field supervisor to respond to the scene of the incident and approve the officer's arrest recommendation, based on the existence of justifiable probable cause and PRPD policy.

(40)   When transporting an arrestee, require that officers notify the communications command center of the starting and ending mileage on the transporting vehicle.  The officer should complete all written arrest forms and booking recommendations at the time an arrestee is presented at any PRPD precinct, station, or other unit for booking.

(41)    Require that the arresting officer take any arrestees with observable injuries or complaints of significant injury for immediate medical attention.

(42)   Require that all booking recommendations be personally reviewed and approved by a supervisor as to appropriateness, legality, and conformance with PRPD policies at the time the arrestee is presented at the precinct, station, or other unit.  The supervisory review should also include examining applicable arrest reports and forms for "canned" or conclusory language, inconsistent information, lack of articulation of the legal basis for the action, or other indicia that the information in the reports or forms is not authentic or correct.

(43)   Provide that, at the time of presentment at a PRPD precinct, station, or other unit, a watch commander or supervisor visually inspect each detainee or arrestee for injury, interview the detainee or arrestee for complaints of pain, and ensure that the detainee or arrestee receives medical attention from an appropriate medical provider, as necessary.

(44)   Require that supervisors evaluate each incident in which a person is detained or arrested for interfering with a police officer, resisting arrest, assault on a police officer, obstruction of justice, or other similar charge, to determine whether the incident raises any issue or concern regarding the basis for the arrest or implications for training, policies, or tactics.

(45)   Require that supervisors memorialize their review of arrests in writing.  As part of the supervisory review, the supervisor should document on an auditable form those arrests that are unsupported by probable cause, are in violation of PRPD policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or training.

(46)   Require that a command-level officer or official review, in writing, all auditable forms related to arrests.  The commander should evaluate the corrective action and recommendations in the supervisor's written report and ensure that all appropriate corrective action is taken, including referring the incident to PRD for investigation.

(47)    Revise and implement policies on searches that comply with applicable law and current professional standards.  The policies should:

    a.    clearly define all terms;

    b.    provide guidance on the legal requirements for conducting searches, with and without a warrant;

    c.    provide guidance on the nature and scope of searches based on the level of permissible intrusion on an individual's privacy interests;

    d.    require that, when seeking a search warrant, an affidavit or sworn declaration supporting the application provides an accurate, complete, and clear description of the offense, the place or thing to be searched, scope of the search, and time and method of the search;

    e.    specify the procedures for executing searches, including handling, recording, and taking custody of seized property or evidence; and

    f.    require written documentation of all searches, including a complete and accurate inventory of all property or evidence seized, by the end of the shift in which the police action occurred.

(48)    Require that a supervisor review each request for a search or arrest warrant, including each affidavit or declaration filed by an officer in support of a warrant application, for appropriateness, legality, and conformance with PRPD policy.  The supervisor should assess the information contained in the warrant application and supporting documents for authenticity, including an examination for "canned" or conclusory language, inconsistent information, and lack of articulation of a legal basis for the warrant.

(49)    Provide that a supervisor review the operational plan for the execution of a search warrant and, when feasible, be present for execution of the search warrant.  Once executed, a supervisor should review the execution of the search warrant and document the review in writing.

(50)    Require that each precinct and specialized unit maintain a log listing each search warrant, the case file where a copy of such warrant is maintained, and the officer who applied for, and each supervisor who reviewed, the application for a search warrant.

(51)    Revise and implement policies to prohibit discriminatory conduct on the basis of race, ethnicity, national origin, sex, sexual orientation, or gender identity in the conduct of its law enforcement activities.  The policies should:

    a.    emphasize that arrests, traffic stops, investigative detentions, searches, and property seizures must be based, to the extent required by federal and Puerto Rico law, on legitimate and articulable reasons consistent with the standards of reasonable suspicion and probable cause;

    b.    restrict the use of race, ethnicity, national origin, sex, sexual orientation, or gender identity in establishing reasonable suspicion or probable cause to appropriate suspect-specific activities involving the identification of a particular person or persons;

c. apply the restrictions in this recommendation to requests for consensual searches of, and non-custodial encounters with, individuals;

d. emphasize that discriminatory policing will subject officers to discipline, possible criminal prosecution, and/or civil liability; and

e. include, as appropriate, provisions related to officer behavior during encounters that can serve to prevent perceptions of biased policing, including:

(i) introducing themselves at the time of the encounter;

(ii) stating the reason for the contact as soon as practicable, even if the individual does not ask; and

(iii) ensuring that the detention or encounter is no longer than necessary to take appropriate action for the known or suspected offense.

## F. Policies and Procedures Generally

Puerto Rico should ensure that all policies are comprehensive, comprehensible, up-to-date, and consistent with relevant legal standards and contemporary police practices. Specifically, PRPD should:

(52) Develop and publish an agency policy and procedure manual governing all administrative and operational aspects of PRPD. The agency policy and procedure manual should be organized by subject-matter area and indexed for reference. PRPD should review and revise the manual at least annually, as necessary, or upon notice of a policy deficiency during agency audits or reviews.

(53) Ensure that all PRPD officers and staff, including supervisors, receive a copy of the agency policy and procedures manual, in hard copy or electronically, and sign a statement indicating that they have read and understood the manual.

(54) Advise all officers that taking police action in violation of PRPD policy shall subject officers to possible discipline, criminal prosecution, and/or civil liability.

(55) Develop and implement standard operating procedures ("SOPs") that guide the function, operation, and administration of at least the following PRPD components:

a. Field Operations, including patrol, special and tactical operations, field support, special weapons and tactics, and canines;

b. PRD, including case and records management, administrative investigations, confidential investigations, critical firearm discharge reviews, in-custody death reviews, parallel criminal and administrative investigations, inspections, and officer drug testing;

c. Criminal Investigations, including sub-units assigned to investigate homicides, narcotics, vice, illegal firearms, and organized crime.

(56) Revise and implement policies regarding off-duty officers who take police action to:

a. provide that off-duty officers shall notify on-duty PRPD or other local law enforcement officers before taking police action, absent exigent circumstances, so

that they may respond with appropriate personnel and resources to handle an incident;

b.     prohibit off-duty officers from carrying or using firearms or taking police action in situations when an officer's performance may be impaired or the officer's ability to take objective action may be compromised; and

c.     provide that, if it appears the officer has consumed alcohol or is otherwise impaired, the officer shall submit to field sobriety, breathalyzer, and/or blood tests.

## G.     Training

(57)     PRPD and the University College should coordinate and review all training to ensure quality, consistency, and compliance with applicable law and PRPD policy.  PRPD and the University College should conduct regular subsequent reviews, at least semi-annually, that are documented in writing.

(58)     PRPD and the University College should develop and implement appropriate training standards to ensure that officers attain and retain necessary knowledge, skills, and competencies, including establishing appropriate passing criteria, attendance and participation requirements, and valid evaluation methods.  PRPD and the University College should conduct regular needs assessments.

(59)     PRPD and the University College should establish appropriate accountability measures to ensure that officers successfully complete all necessary training programs in a timely manner, including taking disciplinary and non-disciplinary corrective action, as necessary.

(60)     PRPD and the University College should select, train, and certify qualified officer and academic instructors and should ensure that instructors teach only mandated objectives and approved lesson plans.  Instructors should engage students in meaningful dialogue regarding particular scenarios, preferably taken from actual incidents involving PRPD officers, with the goal of educating students regarding the legal and tactical issues raised by the scenarios.

(61)     The University College should keep adequate records of lesson plans and other training materials, such that the most current training documents are maintained in a central, commonly accessible file, and are clearly dated.

(62)     PRPD and the University College should continue to maintain training records regarding every PRPD officer that reliably indicate the training each officer has received.  The training records for each officer should, at a minimum, include the course description, duration, curriculum, and instructor.

(63)     PRPD and the University College should establish a curriculum and policy committee that will include core staff from the University College, a broad cross-section of PRPD field personnel, PRPD command staff, and a representative of PRPD's Legal Affairs Office.  The committee should review all training and procedures on at least a monthly basis to ensure compliance with applicable law and PRPD policy.  The committee should report its findings and recommendations in writing to the Superintendent and the University College's Board of Directors on a monthly basis.

(64)    PRPD and the University College should provide all PRPD officers with training on use of force on at least an annual basis and more often as necessary, based on developments in applicable law and PRPD policy.  Such training should include and address the following topics:

      a.      constitutional and other legal requirements regarding use of force;

      b.      PRPD's use of force policies;

      c.      proper use of force decision-making;

      d.      PRPD's use of force reporting requirements;

      e.      examples of scenarios faced by PRPD officers and interactive exercises that illustrate proper use of force decision-making;

      f.      the proper deployment and use of all intermediate weapons or technologies, including batons, chemical spray, canines, and CEDs;

      g.      de-escalation techniques that encourage officers to make arrests without using force, and instruction that disengagement, area containment, surveillance, waiting out a subject, summoning reinforcements, calling in specialized units, or delaying arrest may be the appropriate response to a situation, even when the use of force would be legally justified;

      h.      threat assessment;

      i.      crisis intervention and interactions with people with mental illnesses, including instruction by mental health practitioners and an emphasis on de-escalation strategies;

      j.      factors to consider in initiating or continuing a pursuit; and

      k.      appropriate training on conflict management.

(65)    PRPD and the University College should provide an appropriate firearm training program that:

      a.      requires officers to complete and satisfactorily pass firearm training and qualify for regulation and other service firearms, as necessary, on an annual basis;

      b.      requires cadets, officers in probationary periods, and officers who return from unarmed status to complete and satisfactorily pass firearm training and qualify for regulation and other service firearms, as necessary, before such personnel are permitted to carry and use firearms;

      c.      incorporates professional night training, stress training (i.e., training in using a firearm after undergoing physical exertion) and proper use of force decision-making training, including continuous threat assessment techniques, in the annual in-service training program; and

      d.      ensures that firearm instructors critically observe students and provide corrective instruction regarding deficient firearm techniques and failure to use safe gun handling procedures at all times.

(66)    PRPD and the University College should provide all PRPD officers with training on searches and seizures on at least an annual basis and, as necessary, based on developments in applicable law and PRPD policy.  Such training shall include and address the following topics:

      a.      constitutional and other legal requirements related to searches and seizures;

      b.      PRPD policies regarding searches and seizures; and

c. examples of scenarios faced by PRPD officers and interactive exercises that illustrate proper police practices, methods, and tactics in conducting consensual field interviews, investigatory stops, and arrests. These training scenarios shall address the difference between various police contacts by the scope and level of police intrusion; between probable cause, reasonable suspicion and mere speculation; and between voluntary consent and mere acquiescence to police authority.

(67) PRPD and the University College should provide all PRPD officers with training on biased-free policing on at least an annual basis and, as necessary, based on developments in applicable law and PRPD policy. Such training shall include and address the following topics:

a. police and community perspectives related to discriminatory policing;
b. constitutional and other legal requirements related to equal protection and unlawful discrimination;
c. the protection of civil rights as a central part of the police mission;
d. arbitrary classifications and stereotyping based on race, ethnicity, national origin, sex, sexual orientation, or gender identity;
e. data regarding racial/ethnic/national origin discrimination in policing and the criminal justice system;
f. identification of key decision points in which prohibited discrimination can occur at both the incident and strategic-planning levels; and
g. methods, strategies, and techniques to reduce misunderstanding, conflict, and complaints due to perceived bias or discrimination, including problem-oriented policing strategies.

(68) PRPD and the University College should provide supervisors with training in the appropriate evaluation of written reports, including what constitutes a fact-based description and the identification of catch phrases and/or conclusory language not supported by specific facts (or "canned" or perfunctory language) that so regularly appear in police reports that their inclusion requires further explanation by the reporting officer.

(69) PRPD supervisors should receive leadership and command accountability training and learn techniques designed to promote proper police practices. This training shall be provided to all PRPD supervisors upon assuming supervisory responsibilities and should be made part of annual in-service training.

(70) PRPD and the University College should provide training on risk assessment and risk management to all PRPD supervisors, including the operation of the early identification system database.

(71) PRPD and the University College should provide training to supervisors on fostering positive career development and imposing appropriate disciplinary sanctions and non-disciplinary corrective action, such as counseling.

(72) PRPD and the University College should provide training on appropriate burdens of proof, interview techniques, and the factors to consider when evaluating officer, complainant or

witness credibility to all officers who conduct investigations to ensure that their investigative findings, conclusions, and recommendations are unbiased, uniform, and legally appropriate.

(73)     PRPD should develop and establish a field training program.  PRPD should develop an implementation plan that provides a time table for full implementation and specifies all program requirements, including management and oversight of the program, development of policies and procedures, selection and training of field training officers, program duration, training standards, assessment methods, and ongoing quality improvement.  The implementation plan and field training program should comply with applicable law, PRPD policy, and current professional standards.

## H.     Supervision

(74)     PRPD should develop and implement a plan to ensure that an adequate number of supervisors are deployed in the field to provide supervision consistent with generally accepted professional standards.

(75)     Supervisors of field operation, investigation, and specialized units should provide daily field presence and maintain an active role in unit operations.  Unit supervisors should brief the Regional Commander regularly regarding the activities of their unit, and shall coordinate unit activities with other unit supervisors.

(76)     Regional Commanders should be responsible for ensuring that supervisors exercise proper control and oversight of the units in their command, including units' tactical and investigative operations.

## I.     Discipline

(77)     Puerto Rico and PRPD should ensure that adequate resources are provided to eliminate the backlog of unresolved complaint investigations and disciplinary cases.

(78)     PRPD should establish guidelines, consistent with applicable law, dictating the maximum period of time that should elapse between each stage of the disciplinary process.

(79)     PRPD should create a disciplinary matrix that:

   a.     establishes a presumptive range of discipline and/or corrective action for each type of rule violation;
   b.     increases the presumptive discipline based on both an officer's prior violations of the same rule as well as violations of other rules;
   c.     requires that any departure from the presumptive range of discipline must be justified in writing;
   d.     provides that PRPD will not take only non-disciplinary corrective action in cases in which the disciplinary matrix calls for the imposition of discipline; and
   e.     provides that PRPD will consider whether non-disciplinary corrective action also is appropriate in a case where discipline has been imposed.

**J.    Civilian Complaints and Internal Investigations**

(80)    Puerto Rico should develop and implement a program to inform persons that they may make complaints regarding the performance of any officer.  This program should include distribution of complaint forms, fact sheets, informational posters, and public service announcements that describe the civilian complaint process.

(81)    Puerto Rico and PRPD should ensure that complaint forms and informational materials are easily accessible by making them available at appropriate government locations, including PRPD headquarters, stations, and substations; other government properties; over the Internet; and, upon request, to community groups, community centers, or members of the public.

(82)    At PRPD headquarters and each station and substation, PRPD should permanently post a placard describing the external complaint process that includes relevant contact information, such as telephone numbers and websites.  These placards should be displayed in both English and Spanish.  PRPD should require that all officers carry informational brochures and complaint forms, in English and Spanish, in their vehicles at all times while on duty.  If a civilian objects to an officer's conduct, that officer should inform the civilian of his or her right to make a complaint.

(83)    PRPD should require that all officers and employees report misconduct or potential criminal behavior by PRPD officers or employees to a supervisor and PRD.

(84)    Puerto Rico and PRPD should expressly prohibit all forms of discouragement, intimidation, coercion, or retaliation against any person who makes a complaint.

(85)    PRPD should accept all complaints, including anonymous and third-party complaints, for review and investigation.  Individuals should be able to make complaints in writing or verbally, in person or by mail, telephone (or TDD), facsimile, or email.  PRPD should also require officers and employees to take complaints received in the field.

(86)    All complaints should be forwarded to PRD within 24 hours, absent exceptional circumstances.

(87)    PRD should maintain a centralized numbering and tracking system for all complaints. Upon the receipt of a complaint, PRD should promptly assign a unique numerical identifier to the complaint, which should be provided to the complainant.

(88)    PRD should determine whether the complaint will be assigned to a line supervisor for a chain-of-command investigation, retained by PRD for investigation, or referred to PRDOJ for criminal investigation.  PRPD should develop and implement a complaint classification protocol to guide PRD in determining whether a complaint will be assigned for a command investigation, retained for investigation by PRD, or referred to PRDOJ for criminal investigation.  If PRD refers a complaint for a command investigation, copies of all documents, findings, and recommendations should be forwarded immediately after the investigation is complete to PRD for tracking, monitoring, quality control, and adherence to PRPD policy.

(89)    PRD's centralized numbering and tracking system should maintain accurate and reliable data regarding the status of all complaints, from initial intake to final disposition, including all

instances in which the complainant is notified regarding the status of the investigation. Data from the system should be reviewed periodically to assess compliance with PRPD policies and procedures, including requirements on the timeliness of administrative investigations. The system should facilitate the production of reports and should contain information that includes, but is not limited to, the nature and type of complaint, the incident date, the name(s) of the complainant(s) and target officer(s), and PRPD region, precinct, and unit involved.

(90)    PRPD should investigate and resolve all complaints in writing. PRPD should adopt a single policy concerning the investigation of complaints, regardless of whether the investigation is assigned to PRD, a line supervisor, or any other PRPD officer or employee. Complaints should be evaluated based on a preponderance of the evidence standard.

(91)    PRPD should require that all command investigations be completed within 45 days of the date of referral by PRD, including intake, investigation, adjudication, and command approval. All other administrative investigations conducted by PRD should be completed within 60 days of the date of referral, including intake, investigation, adjudication, and command approval.

(92)    PRPD should explicitly prohibit an officer from investigating a use of force incident if that officer used force during the incident, led to the injury to a person, or authorized the conduct that led to the reported incident.

(93)    PRPD should establish comprehensive procedures and training on administrative and criminal investigations consistent with applicable law and current professional standards. The comprehensive procedures and training should address all aspects of administrative and criminal investigations, including appropriate management and oversight of investigative operations.

(94)    PRPD should establish investigation procedures and train all of its investigators on factors to consider when evaluating complainant or witness credibility; examination and interrogation of accused officers and other witnesses; identifying misconduct, even if it is not specifically named in the complaint; and using the preponderance of the evidence standard as the appropriate burden of proof. Consistent with applicable law, PRPD investigators should ensure that all involved officers on the scene of an incident provide a statement regarding the incident. The policy should require that all interviews that may be essential to the outcome of an investigation be mechanically or digitally recorded using an appropriate recording device, unless the interviewee refuses to allow recording. All recordings should be stored and maintained in a secure location within PRD.

(95)    PRPD should enforce its policy requiring officers to cooperate with administrative investigations, including appearing for an interview when duly summoned by a PRPD investigator. Supervisors should be notified when an officer under their supervision is summoned as part of an administrative investigation and should facilitate the officer's appearance, absent extraordinary and documented circumstances.

(96)    PRPD should provide all investigators with clear guidance regarding the handling of criminal misconduct allegations, including referring such allegations to internal or external agencies for criminal investigation and specifying the entity or individual responsible for determining whether a complaint will be investigated criminally. PRPD should continue to require that an administrative investigation be completed, irrespective of the initiation or

outcome of criminal proceedings, provided that the administrative investigation does not interfere with or jeopardize a criminal investigation or proceeding.

(97)     PRPD should develop and implement a protocol for compelled statements that complies with applicable law and current professional standards.

(98)     In each investigation, PRPD should consider all relevant evidence including circumstantial, direct, and physical evidence, as appropriate, and make credibility determinations, if feasible.  PRPD should not automatically prefer an officer's statement over a non-officer's statement, nor should PRPD completely disregard a witness' statement merely because the witness has some connection to the complainant.  PRPD should make efforts to resolve material inconsistencies between witness statements.

(99)     PRPD should not close an investigation simply because the complaint is withdrawn or the alleged victim is unwilling or unable to provide medical records or proof of injury or the complainant will not provide additional statements; rather, the investigating agency should continue its investigation, as necessary, to determine whether the original allegation(s) can be resolved based on the information, evidence, and investigatory procedures and techniques available.  In each investigation, the fact that a complainant pled guilty or was found guilty of an offense should not be considered as evidence of whether a PRPD officer used or did not use a type of force, nor should it justify discontinuing the investigation.

(100)    PRPD should require that administrative investigations determine, as necessary, whether:

      a.     the police action was in compliance with policy, training, and legal standards, regardless of whether the complainant suffered harm;
      b.     the incident involved misconduct by any officer;
      c.     the use of different tactics should or could have been employed;
      d.     the incident indicates a need for additional training, counseling, or other non-disciplinary corrective measures; and
      e.     the incident suggests that PRPD should revise its policies, strategies, tactics, or training.

(101)    The complainant should be kept informed periodically regarding the status of the investigation.  The complainant should be notified of the outcome of the investigation, including an appropriate statement regarding whether any disciplinary or non-disciplinary action was taken.  PRPD should notify the complainant that he/she may appeal the outcome of the investigation to the CIPA within 30 days of receipt of PRPD's final determination.

(102)    Each allegation in an administrative investigation should be resolved by making one of the following dispositions:

      a.     "Unfounded," when the investigation determines, by a preponderance of the evidence, that no facts support that the incident complained of actually occurred;
      b.     "Sustained," when the investigation determines, by a preponderance of the evidence, that the person's allegation is supported by sufficient evidence to determine that the incident occurred and the actions of the officer were improper;

c. "Not Sustained," when the investigation determines, by a preponderance of the evidence, that insufficient facts exist to decide whether the alleged misconduct occurred; and

d. "Exonerated," when the investigation determines, by a preponderance of the evidence, that the alleged conduct did occur but did not violate PRPD policies, procedures, or training.

(103)   PRPD should require supervisors to review and take appropriate disciplinary or non-disciplinary corrective action, where warranted, when he/she becomes aware of potential misconduct or criminal behavior by an officer under his or her command.  PRPD should also require unit commanders to evaluate each investigation of an incident under their command to identify underlying problems, including potential deficiencies in supervision and training.  Any such deficiencies or other identified needs should be relayed to the appropriate PRPD unit for corrective action at the officer or agency level, where warranted.

(104)   PRPD should develop and implement written requirements for investigator positions in PRD, which include the applicant's complaint and discipline history and investigative experience.  Officers with a sustained complaint of, or who have been disciplined for, excessive use of force, false arrest or charge, unlawful search or seizure, sexual harassment, discrimination, or dishonesty should be disqualified from PRD positions, unless the PRD commanding officer or official recommends and the PRPD Superintendent approves, the selection of the officer despite such complaint or discipline.

(105)   PRPD should establish a term of duty of up to three years for PRD officers and supervisors who conduct investigations, and should reappoint an officer to a new term of duty only if that officer has performed satisfactorily based on an appropriate annual performance evaluation.

(106)   Puerto Rico and PRPD should provide PRPD units and officers with sufficient resources and equipment to conduct adequate criminal and administrative investigations.

## K.   Risk Management

(107)   PRPD should develop and implement an early identification system to include a new computerized relational database for maintaining, integrating, and retrieving information necessary for supervision and management of the entire PRPD.  PRPD should regularly use this data to promote civil rights and professional police practices, manage risk and liability, and evaluate the performance of PRPD officers across all ranks, units, and shifts.

(108)   The early identification system should collect and record a minimum data set to competently develop a risk profile for each officer and identify potential patterns of at-risk behavior, including all uses of force, complaint history, discipline, training history, judicial proceedings involving domestic disputes, and commendations and awards.

(109)   The early identification system should include, for the incidents included in the database, appropriate identifying information for each involved officer (e.g., name, badge number, shift, and supervisor) and civilian (e.g., race, ethnicity, or national origin, if available).

(110)   PRPD should develop and implement a protocol on the use of the early identification system that addresses the following components:  data storage, data retrieval, reporting, data analysis, pattern identification, supervisory assessment, supervisory intervention, documentation and audit, and data retention.

(111)   PRPD should enter information into the early identification system in a timely, accurate, and complete manner, and maintain the data in a secure and confidential manner.

(112)   Prior to implementation of the new early identification system, PRPD should continue to use existing databases and resources, to the fullest extent possible, to identify patterns of conduct by PRPD officers or groups of officers.

(113)   PRPD should incorporate, in a meaningful way, its expectations regarding biased-free policing and equal protection into its hiring, promotion, and performance assessment processes, including appropriately evaluating an individual's character, reputation, and documented history with regard to biased attitudes and behavior through personal interviews, interviews with acquaintances and associates, review of relevant social-networking websites, and review of civilian complaints, as appropriate.

(114)   PRPD should develop a protocol for conducting audits to be used by each officer or supervisor charged with conducting audits.  The protocol should establish a regular and fixed schedule to ensure that such audits occur with sufficient frequency and cover all PRPD units and Regional Commands.  Each audit conducted by PRPD should be documented in a report that provides the methodology, data sources, analyses, conclusions, and recommendations to address any identified deficiencies or areas in need of improvement.

(115)   PRPD should issue a report to the Superintendent on the result of each audit and examine whether there is consistency throughout PRPD.  PRPD should also provide the reports to each precinct or specialized unit commander.  The commander of each precinct or specialized unit should review all audit reports regarding employees under their command and, if appropriate, should take non-disciplinary corrective action or disciplinary action.

(116)   PRPD should develop and implement a plan for organizing and executing regular, targeted, and random integrity audit checks, or "sting" operations (hereinafter "sting audits"), to identify and investigate officers engaging in at-risk behavior, including:  unlawful stops, searches, seizures (including false arrests), excessive uses of force, potential criminal behavior, or other patterns of misconduct.  These operations should also seek to identify officers who discourage the filing of a complaint or fail to report misconduct or complaints.  PRPD should use the relevant early identification system data, and other relevant information, in selecting targets for sting audits.  Sting audits should be conducted each fiscal year.

(117)   PRPD should continue to operate video cameras in all currently equipped vehicles and should repair or replace all non-functioning video cameras, as appropriate.

(118)   PRPD should conduct and document periodic random reviews of police vehicle camera videotapes for training and integrity purposes.  PRPD should require periodic random surveys of police vehicle video recording equipment to confirm proper working order.

(119)   PRPD should develop and implement protocols regarding the supervision and management of specialized units and undercover assignments to ensure compliance with applicable law and PRPD policy regarding use of force, searches and seizures, and discriminatory policing.  Specialized units include TOUs, Special Operations Units, Specialized Tactical Units, Special Weapons and Tactics Units, and the Drug, Vice, and Illegal Firearm Units.

(120)   PRPD should develop and implement appropriate eligibility criteria to select and retain qualified officers and supervisors to serve in specialized units and undercover assignments, and exclude officers and supervisors who may be unprepared or unfit to participate in such units or assignments.  PRPD should disqualify for service on a specialized unit or undercover assignment any officer or supervisor who has generated sustained complaints or adverse judicial findings for use of excessive force, improper search or seizure, false arrest or charge, sexual harassment, discrimination, or dishonesty; is under criminal investigation; or has otherwise engaged in illicit activities, including illegal drug use.

(121)   PRPD should establish pre-screening mechanisms to ensure that all eligibility criteria are met for officers and supervisors selected to participate in specialized units and undercover assignments, including determining whether the officer:

    a.      has completed all probationary requirements;
    b.      is current with all firearm and service weapon certifications, as necessary;
    c.      has demonstrated a proficiency in a variety of law enforcement activities, interpersonal and administrative skills, cultural and community sensitivity, and a commitment to police integrity; and
    d.      has received a positive evaluation based on the officer's relevant and appropriate early identification system record.

(122)   PRPD should screen officers interested in participating in specialized units or undercover assignments on an ongoing basis to develop and maintain a pool of seasoned and competent officers with exemplary records and up-to-date training.

(123)   PRPD should ensure that a sufficient number of trained supervisors exist to ensure appropriate supervision of officers assigned to a specialized unit or undercover assignment. Supervisor training should consist of appropriate pre-service and ongoing training in the operation and management of the specialized unit or undercover assignment to ensure compliance with relevant laws and PRPD policy.

(124)   PRPD should provide adequate pre-service and ongoing training to officers in specialized units and undercover assignments to ensure compliance with relevant laws and PRPD policy, including addressing the desired knowledge, skills, and abilities of the officers participating in the unit or assignment.

(125)   PRPD should track all activities relating to officers participating in a specialized unit or undercover assignment, including enforcement actions, complaints, and misconduct investigations, to enable supervisors to determine whether particular officers should be allowed to continue participating in a specialized unit or undercover assignment.  PRD should inform

commanding officers of specialized units or undercover operations of any complaint received regarding the conduct of an officer in a specialized unit or undercover assignment.

## L.    Oversight and Community Engagement

(126)   PRPD should establish and conduct a Community Outreach and Public Information program in each PRPD Regional Command area.  The Community Outreach and Public Information program should require semi-annual open meetings in each of PRPD's 13 Regional Commands to inform the public about its specific reform efforts and the various methods of filing a complaint against an officer.  Puerto Rico should provide sufficient advance notice and publicity for the meetings in English and Spanish.

(127)   The open public meetings should include presentations and information on PRPD and PRPD operations designed to enhance interaction between officers and community members in daily policing activities.  The presentations shall include the following subject areas, with appropriate safeguards to protect ongoing criminal or administrative investigations, confidential or privileged information, or personal information protected from disclosure by applicable laws:

a.   statistics on arrests, motor vehicle and pedestrians stops, use of force, and geographic deployment of specialized tactical units, broken down by each PRPD Regional Command and precinct, including statistics on race, ethnicity, national origin, and gender;

b.   a summary of all audits completed and any significant action taken as a result of such audits;

c.   a summary of all discipline imposed during the period, reported by type of misconduct and broken down by type of discipline, Regional Command, and rank; and

d.   a summary of all new policies or changes in policies made by PRPD related to civil rights.

(128)   PRPD should continue to use community advisory groups in each Regional Command area and meet periodically with the communities they serve.  PRPD shall establish a liaison, through its community relations units, with members of minority communities to foster dialogue, solicit feedback, increase opportunities for positive interaction, constructively address perceptions and concerns regarding biased policing, and encourage minority group participation in policing activities, including officer recruitment and training.

(129)    PRPD should establish a command-level liaison committee consisting of PRPD command officers who communicate, on at least a monthly basis, with representatives of criminal justice agencies in all regions in Puerto Rico, including judicial courts, prosecutors, and municipal police departments.  The committee should seek feedback and information on performance issues or concerns related to PRPD, its officers, employees, or units.  All PRPD commanders and staff who participate in the command-level liaison committee should ensure that all allegations of misconduct or potential criminal activity are referred to PRD and other pertinent law enforcement agencies.

(130)   Puerto Rico should provide for independent civilian review of PRPD.  The members of the civilian review body should represent a cross-section of the communities in Puerto Rico.  CIPA's enabling statute should be amended to increase the number of commissioners and ensure that half of these commissioners are selected by a panel of non-government civil rights organizations instead of the Governor.  If CIPA is not to assert its civilian review role, a new civilian review body should be established.  The civilian review body should develop a program to inform persons that they may make complaints regarding the performance of any officer.  This program will include distribution of complaint forms, fact sheets, informational posters, and public service announcements that describe the civilian complaint process.

(131)   The civilian review body should develop and implement a protocol for the intake, referral, investigation, and disposition of complaints against PRPD consistent with national guidelines and best practices.  The civilian review body should be empowered to access and review PRPD investigations concerning civilian complaints against PRPD.

(132)   PRPD should provide the civilian review body with intake information regarding all complaints received.  PRPD should keep the civilian review body informed on a monthly basis regarding the status and disposition of all complaint investigations.  The civilian review body should review all civilian complaints alleging retaliation against a complainant for reporting possible misconduct or at-risk behavior by a PRPD officer.  The civilian review body should evaluate PRPD investigations to determine whether they conform to applicable standards and requirements.

(133)   The civilian review body should issue a publicly available, semi-annual report summarizing its review activities.  The report should include recommendations on corrective action to address identified deficiencies and promote civil rights protections within PRPD.

# VI.    CONCLUSION

We value the hard work and dedication of the men and women of PRPD who have sworn to protect and serve the people of Puerto Rico.  We also appreciate the great risk that policing entails and the many public safety challenges confronting Puerto Rico.  To meet these challenges, officers are entrusted with unequaled powers, including the authority to use force and detain individuals, to enforce the law and maintain order.  This authority is not unlimited and carries significant responsibilities.  PRPD's motto, *Proteccion, Integridad* ("Protection, Integrity"), showcases these responsibilities and sets out PRPD's vision for ensuring the safety of the people of Puerto Rico while adhering to the highest professional, ethical, and legal standards.  Unfortunately, far too many PRPD officers have broken their oath to uphold the rule of law, as they have been responsible for acts of crime and corruption and have routinely violated the constitutional rights of the residents of Puerto Rico.  These officers have frequently subjected the very people they swore to protect to unreasonable force and unlawful searches and seizures.  In addition, when faced with public demonstrations, PRPD relies on tactics that violate the free speech rights of demonstrators and the press.

The patterns and practices of civil rights violations we identified are profound.  They are the result of chronic institutional and systemic deficiencies that directly contribute to repeated violations of the Constitution and federal law.  PRPD does not currently provide its officers with sufficient or appropriate training, guidance, discipline, or supervision.  As a result, PRPD both fails to equip its officers with the necessary skills to effectively serve the public and address officer misconduct in a timely or effective manner.  Outdated policies and ineffective external oversight exacerbate PRPD's failure to ensure constitutional policing and contribute to continuing violations that erode the public's confidence in its efforts.

To date, Puerto Rico has failed to adequately address the causes that contribute to both its unconstitutional law enforcement and ineffective policing.  Puerto Rico must act decisively, transparently, and immediately to restore the public's trust and correct PRPD's pattern of unconstitutional policing.  We have outlined the minimum measures necessary to remedy PRPD's pattern of constitutional violations.  Implementing these steps, with the oversight of the federal courts, will place PRPD on the path to lasting reform and permit PRPD to meet its public safety challenges while respecting the constitutional rights of the people of Puerto Rico.  We look forward to working with the Commonwealth, PRPD, and the University College to ensure that these efforts succeed.

# ENDNOTES

[1] Throughout this report, "pattern and practice" refers to conduct of PRPD officers that constitutes a pattern, practice, or both.

[2] Nagourney, Adam, *In Los Angeles, A Police Force Transformed*, New York Times, Aug. 11, 2011, http://www.nytimes.com/2011/08/13/us/13lapd.html?pagewanted=1

[3] Arturo Negrón García et al., *Report of the External Evaluating Committee of the Puerto Rico Police* (Dec. 21, 2007); Arturo Negrón García et al., *Report of the External Evaluating Committee of the Puerto Rico Police: Corruption in the Puerto Rico Police* (May 1, 2008).

[4] Arturo Negrón García et al., *Report of the External Evaluating Committee of the Puerto Rico Police* at 20 (Dec. 21, 2007);

[5] Press Release, La Fortaleza, "Gobernador nombra Monitor Independiente para supervisor a la Policía," Sept. 24, 2010, *available at* http://www.fortaleza.gobierno.pr/2011/news.php?cnt_id=562.

[6] PRPD also has an additional 9,041 inactive officers on its personnel rolls. Puerto Rico Office of the Controller, PRPD Audit Report DA-09-27, Audit No. 12781 at 13 (May 27, 2009).

[7] The national average is 2.2 officers per 1,000 residents for jurisdictions with 250,000 residents or more. U.S. Dep't.of Justice, Office of Justice Programs, Bureau of Justice Statistics, Local Police Departments 2007, Law Enforcement Management and Administrative Statistics at 9 (Dec. 2010). This figure does not include municipal police officers.

[8] P.R. Office of Mgmt. & Budget, Government of Puerto Rico, Proposed Budget for 2011-12, Statistical Table of Federal Funds to Puerto Rico Distributed by Agency, FY 2009-2012; Statistical Table of American Recovery and Reinvestment Act Distributed by Agency, FY 2009-2012, *available at* http://www.presupuesto.gobierno.pr.

[9] Crime statistics for Puerto Rico were obtained from PRPD, *available at* http://www.policia.gobierno.pr. National crime statistics were obtained from the FBI, *available at* http://www.fbi.gov/stats-services/crimestats.

[10] Puerto Rico Police Department, *Crime Clearance Rate Report*, PR S.B. 595 (Aug. 30, 2010).

[11] The reports are available at http://www.nyclu.org/news/nyclu-releases-16-years-of-nypd-corruption-reports. There are approximately 34,500 uniformed officers in NYPD, http://www.nyc.gov/html/nypd/html/faq/faq_police.shtml#1.

[12] Press Release, FBI, San Juan Division, "Two Law Enforcement Officers Convicted for Participation in Drug Transaction," Dec. 9, 2010, *available at* www.sanjuan.fbi.gov.

[13] Judgment, *People v. Mercado Irizarry*, KBD2009G0925-6; KFJ2009G0013-15; KFJ2009M0005-6; and KLE2009G0321 (Dec. 16, 2009).

[14] *U.S. v. Flores Vázquez*, No. 08-CR-0436 (D.P.R. filed on Dec. 18, 2008).

[15] Indictment, *U.S. v. Quiñones Rosario*, No. 09-CR-00246 (D.P.R. July 23, 2009). Plea Agreement filed on August 5, 2010.

[16] Administrative Leave, Legal Affairs Card, SAOC-1-2-334 (Sept. 18, 2008). Judgment, *People v. Semidey Rivera*, JEG2008G0010 (June 15, 2006).

17     *People v. Ramos Santiago*, JLE2008G0490 to 92.

18     *People v. López Martínez*, BVI2007G009.

19     We did not include civil suits filed before 2004, although they may have been resolved within the period of our review. *See, e.g.*, *Carmen Guzmán v. ELA*, DDP2001-0081 (illegal search; $51,496.03 paid on July 10, 2009); *Ortiz Ortiz v. Policía*, IDP2002-0260 (illegal seizure; $76,500.75 paid on July 10, 2009); *Rodríguez Santiago v. ELA*, JDP 2000-0522 (illegal stop; $93,277.81 and $5,783.17 paid on Feb. 1, 2010); *Casanova García v. ELA*, CDP 2001-0322 (illegal arrest; $50,000 paid on Feb. 27, 2009); *Irizarry Irizarry v. ELA*, JDP 20040544, KLCE200501631 (2005 Westlaw 3741500) (illegal search; $30,000 paid on May 11, 2010); *López Méndez v. ELA*, KDP20031248 (503), KLAN200700494 (2008 Westlaw 2885958) (illegal search and detention) ($142,269.86 paid on Nov. 7, 2008).

20     *People v. Pagán Cruz*, HSCR2007-1965-1966.

21     Complaint, *Pérez Liz et al v. Toledo Dávila, et al*, No. 08-CV-1659 (D.P.R. filed on June 17, 2008).

22     *People v. Pérez Liz*, DLA2007G0875, DLA2007G0875 and DVI2007G0081.Verdict, *Pérez Liz v. Toledo Dávila*, entered on Mar. 25, 2010.

23     Complaint, *Cruz Santiago v. Alvarez Boneta, et al.,* No. 08-CV-1311 (D.P.R. filed on Mar. 14, 2008).

24     Press Release, Puerto Rico Dep't. of Justice, "Criminal Charges Filed Against Officer Pedro Cruz Sierra," Mar. 13, 2009; Guilty Plea, *People v. Cruz Sierra*, FIC2009G0009 (Apr. 28, 2009).

25     Order, *Rodríguez Rivero et al v. Commonwealth of Puerto Rico Police Department, et al.,* No. 08-CV-1016 (D.P.R. entered on Nov. 5, 2009). Jury Verdict entered on Nov. 10, 2009.

26     Complaint, *Leyva Ramos et al v. Toledo Dávila, et al*, No. 07-CV-1178 (D.P.R. filed on Mar. 1, 2007).

27     Joint Pretrial Memorandum filed on March 16, 2010.

28     *See, e.g.*, CDC, Annual Report 2009-2010 at 16-17 (discussing the requirements of Law 141 of July 3, 1999 requiring police offices to visibly display an identification number and CDC letters to the Superintendent following protests in June and October 2009 in which a significant number of officers were observed not wearing an identification number).

29     Arturo Negrón García, *et al.*, *Report of the External Evaluating Committee of the Puerto Rico Police* at 12 (Dec. 21, 2007).

30     *Id.*

31     The University Avenue incident was not the only confrontation between PRPD officers and the student community. Numerous clashes between protesting students and officers took place during a 58-day student strike – from April 23 to June 17, 2010 – on various UPR campuses. On May 4, 2010, officers entered the Río Piedras campus after students reportedly blocked access to the campus gates. Students and journalists reported that officers, who had removed their name badges, struck them repeatedly with batons. Confrontations between students and police continue. One of the most violent of these occurred on February 9, 2011, inside the UPR Río Piedras campus.

32     David Helfeld, Carlos Ramos Bellido, William Vázquez Irizarry, *Report of the Commission Investigating the Incidents of August 21, 2009* at 4 (Sept. 25, 2009).

33     Nydia Bauzá& Maritza Díaz Alcaide, *Motín en Actividad de Fortuño por Huelga en la UPR*, Primera Hora, May 21, 2010.

34      Memorandum from Lt. Reinaldo Santiago González to Lt. Col. Miguel A. Mejías Cruz (May 21, 2010).

35      CRC, Resolution 2010-14, "Resolution to Investigate the Events Transpiring on May 20, 2010 at the Hotel Sheraton, San Juan, Puerto Rico," (Dec. 14, 2010).

36      *Id.*

37      PRPD, October 25, 2010, Memorandum.

38      *See* CRC resolution 2010-014 (Dec. 14, 2010).

39      CRC, Resolution 2010-10, "Resolution to Investigate the Events Transpiring on June 30, 2010 at the Capitol, San Juan, Puerto Rico," (July 2, 2010).

40      *Id.*

41      *See* CRC Resolution 2011-01, "Resolution to Investigate the Events Transpiring in the University of Puerto Rico," (Feb. 14, 2011).

42      *Id.*

43      Arturo Negrón García, *et al.*, *Report of the External Evaluating Committee of the Puerto Rico Police* at 12 (Dec. 21, 2007).

44      Merriam-Webster Dictionary, Medical Terms, *available at* http://www.merriam-webster.com/medical/celiac+plexus.

45      Office of Community Oriented Policing Services, Dep't of Justice, *2011 Electronic Control Weapon Guidelines* 13 (2011).

46      NYPD, Office of Management Analysis and Planning, "Annual Firearms Discharge Report, 2009," vii (2009), *available at* http://www.nyc.gov/html/nypd/html/analysis_and_planning/reports.shtml; "NYPD Shooting Restraint," Officer Discharges, Data from 1971-2010, *available at* http://www.nyc.gov/html/nypd/html/analysis_and_planning/reports.shtml.

47      Arturo Negrón García, *et al.*, *Report of the External Evaluating Committee of the Puerto Rico Police* at 12 (Dec. 21, 2007).

48      *Id.*

49      Sample community surveys are published as Appendix C in IACP, *Building Trust Between the Police and the Citizens They Serve: An Internal Affairs Promising Practices Guide for Local Law Enforcement*, (2010).

50      Officer Efraín Bey Arce was acquitted, but separated from PRPD on November 9, 2007.

51      Amended Complaint, *Candelaria Cabán, et al. v. Toledo Davila*, No. 10-1100 (D.P.R. filed on Dec. 17, 2010).

52      As discussed further in Section IV, PRPD uses "archive" to administratively close an internal investigation. The term is used to close cases for a variety of reasons, including when an officer is exonerated, the investigation is inconclusive due to insufficient evidence, or the complainant withdraws the complaint and no longer wishes to cooperate. Critical distinctions between these various circumstances are lost through PRPD's use of this catch-all term.

53      Verdict (Santos Soto and Plaza Santiago), *U.S. v. Santos Soto*, No. 07-CR-400 (D.P.R entered on Oct. 28, 2010).

54      *U.S. v. Pérez Rosado, et al.,* No. 07-392 (sealed plea agreements filed on Mar. 4, 2008).  State criminal charges for robbery, illegal search, kidnapping, and weapons for this same incident had earlier been dismissed because of delays in presenting the charges in court.  *See People v. Gaud Colón*, VP2007-5843 to 5846(608), KLCE200701709 (2008 Westlaw 949659).

55      *Jorge Vargas Torres, et al., v. Toledo Dávila, et al*., No. 08-CV-1527 (D.P.R. filed on May 6, 2008).

56      *See* Facts in Controversy filed on May 25, 2010, at p. 37, in *Diaz Román v. Denis, et al.,* No. 08-CV-1420 (GAG), indicating that Officer Ortiz Correa based his statement exclusively on the information he received from a colonel and inspector.

57      Zulma Méndez Ferrer, *University College of Criminal Justice:  Report on Accomplishments* (Nov. 30, 2010), *available at* www.senadopr.us.

58      ACLU Human Rights Program request to the OAS, *Request by the American Civil Liberties Union, et. al. for Precautionary Measures Under Article 25(2) of the Commission's Rules of Procedure Against the United States of America.*

59      *Id.* at 10-11.

60      Eugenio Hopgood Davila, *Dominicanos Denuncian Persecucion de Parte de la Policia*, El Nuevo Día, May 26, 2011

61      *Id*.

62      *Escolástico Rodríguez v. Acevedo Vila, et al.* No. 07-CV-2227 (D.P.R. filed on Dec. 26, 2007).

63      *Santos Rosario v. Commonwealth of Puerto Rico, et al.,* No. 06-CV-2155 (D.P.R. filed on Nov. 17, 2006).

64      Justin Fenton, *U.S. Senate Committee to Hold Hearings on Rape Investigations*, Baltimore Sun, Sept. 7, 2010, http://articles.baltimoresun.com/2010-09-07/news/bs-md-senate-hearing-rapes-20100907_1_patrol-officers-philadelphia-police-police-departments.

65      Data from United Nations Statistics Division, *Demographics and Social Statistics: Statistics and Indicators on Women and Men*, Table 6.C, Physical Abuse against Women by an Intimate Partner (1991-99), *available at* http://unstats.un.org/unsd/demographic/products/indwm/table6c.html.

66      Esplugues, Jose Sanmartin, et al., *3rd International Report: Partner Violence against Women*, *Statistics and Legislation*, Centro Reina Sofia 90 (2006).

67      Oficina de La Procuradora de Mujeres, *Mujeres Asesinadas Por Sus Parejas o Ex-parejas, 2000-2009*, *available at* http://www.mujer.gobierno.pr.

68      *See e.g.*, U.S. Dep't. of Justice, Community Relations Service, *Principles of Good Policing:  Avoiding Violence Between Police and Citizens*, 1-5 (2003), *available at* http://www.justice.gov/crs/publist.html.

69      *Building Trust Between the Police and the Citizens They Serve* at 7 (internal citations omitted).

70      U.S. Dep't. of Justice, Bureau of Justice Statistics, Special Report, *State and Local Law Enforcement Training Academies*, 2006,  (Apr. 14, 2009).

[71]     Letter from Justo Reyes Torres, Executive Director of the Puerto Rico Council on Higher Education, to Rep. Liza Fernández Rodríguez, President of the House of Representative's Judiciary and Public Safety Committee, of June 27, 2006 at 2-3.

[72]     Letter from Justo Reyes Torres, Executive Director of the Puerto Rico Council on Higher Education, to Rep. Liza Fernández Rodríguez, President of the House of Representative's Judiciary and Public Safety Committee, of June 27, 2006 at 2.

[73]     Letter from Pedro Toledo Dávila, Superintendent, to Sen. Orlando Parga, President of the Senate Special Committee on PRPD, of Mar. 11, 2008 at 9-10.

[74]     *Id.* at 10.

[75]     Arturo Negrón García, *et al.*, *Report of the External Evaluating Committee of the Puerto Rico Police* at 22 (Dec. 21, 2007).

[76]     U.S. Dep't. of Justice, Office of Justice Programs, Bureau of Justice Statistics, *Local Police Departments 2007*, Law Enforcement Management and Administrative Statistics at 12 (Dec. 2010).

[77]     *Id.* at 12.

[78]     *Id*. at 36.

[79]     Carmen M. Acosta Sanchez, Puerto Rico Police Department, *Resumen de Evaluación del Proceso* at 9, 12.

[80]     Zulma Méndez Ferrer, *University College of Criminal Justice:  Report on Accomplishments* (Nov. 30, 2010), *available at* www.senadopr.us.

[81]     Commonwealth of Puerto Rico, Entering Transition Committee, *Final Report on the Transition Process* 8-9 (2009).

[82]     Commonwealth of Puerto Rico, *Report on Nomination of José Figueroa Sancha to Post of Superintendent of PRPD*, S. Rep. (Jan. 21, 2009).

[83]     Puerto Rico Regulation No. 6644, "Regulation for Special Promotions by Merit and/or Heroism through the Rank of Captain," (2003); *see also* Puerto Rico Office of the Controller, PRPD Audit Report DA-09-27, Audit No. 12781 (May 27, 2009).

[84]     Puerto Rico Regulation 6506, "Regulation for the Handling of Administrative Complaints against Members of the Force and Civil Personnel Who Work in the Puerto Rico Police," (2002).

[85]     IACP, *Protecting Civil Rights:  A Leadership Guide for State, Local, and Tribal Law Enforcement*, at 88 (Sept. 2006), *available at* http://www.theiacp.org/  PublicationsGuides/tabid/71/ Default.aspx.

[86]     Memorandum  from José Taboada de Jesus, President of the Police of Puerto Rico Member Association, to Efraín Rivera Pérez, Police Monitor, of Feb. 8, 2011.

[87]     *Building Trust Between the Police and the Citizens They Serve* at 22.

[88]     *Id.* at 26.

[89]     *Id.* at 3.

[90]     Puerto Rico Regulation No. 4216, "Puerto Rico Police Regulation," as amended (1981).

[91]     Puerto Rico Office of the Controller, PRPD Audit Report DA-09-27, Audit No. 12781 at 14 (May 27, 2009).

[92]     Puerto Rico Regulation No. 4216, Art. 14.3.2.a.

[93]     *See, e.g.*, Officer Rafael Ramos Vélez (*Rodríguez Rivero v. Commonwealth*, 08-CV-1016, paid on September 9, 2010); Mayagüez Drug/Vice/Illegal Weapons Sergeant José Figueroa Andújar and officers Camille Ortiz Sepúlveda, Robert Martínez Medina and Maritza Nazario Vega (*Vargas Torres v. Toledo Dávila et al.*, 07-CV-2002, undisclosed amount deposited on August 6, 2010, in satisfaction of judgment after a jury awarded $6.7 million on October 13, 2009); Officer Christian Rodríguez Cruz (*Canals Marcano v. Rodríguez Cruz*, E2CI200601018, KLAN0801565 (2009 Westlaw 2351439), paid on August 11, 2009; Officer Daniel Alvarado Alicea (*Velázquez Ramírez v ELA*, EDP2005-0172, paid on February 22, 2008); Sergeant Hermenegildo Rivera Ruiz and officers José Meléndez Meléndez and David Rodríguez Franqui (*Malavé Colón v. Rivera Ríos* (incorrect last name), 06-CV-1381, settlement reached on August 7, 2009). Sergeant Rivera Ruiz was involved in another incident that resulted in a federal civil suit with officers José Rodríguez Cora and Gerarda Vázquez Quiñones (*Lozano Benítez v. Rivera Ruiz, et al.*, 08-CV-1766, paid on November 13, 2009).

[94]     *Protecting Civil Rights: A Leadership Guide* at 52-53.

[95]     *Id.* at 54

[96]     *Id.* at 55.

[97]     *Id.* at 65.

[98]     *See* Tom O'Connor, *Employee Review Programs*, http://faculty.ncwc.edu/toconner.

**APPENDIX A:** Additional Illustrative Incidents

## I.    Crime and Corruption Involving PRPD Officers

The following incidents further illustrate the widespread criminal activity of PRPD officers:

- On October 14, 2009, Officer Félix Rosa Soto pled guilty to possessing five kilograms of cocaine with intent to distribute and escorting a shipment of 75 kilograms of cocaine. The court sentenced Officer Rosa Soto to 70 months of imprisonment.[1]

- On April 30, 2009, Officer Josué López Rivera pled guilty to attempted murder for shooting the companion of his ex-girlfriend with his service weapon.[2] Officer López Rivera shot the man in the chest, abdomen, right shoulder, and both hands. At the time of the shooting, Officer López Rivera had two pending administrative complaints against him, including one for misuse of his firearm.

- On December 19, 2008, Lieutenant Carlos Cochran Ortiz, who served as the Director of the Weapons Registration Section at PRPD Headquarters, pled guilty to conspiracy charges for participating in a scheme that enabled applicants to obtain firearm permits by providing false information. The district court sentenced him to twelve months imprisonment.[3] Twenty-seven other individuals, including a civilian employee of the PRPD, were also arrested for their participation in the conspiracy.

- On July 29, 2008, Officer Ricardo Rivera Astacio pled guilty to importing narcotics into the United States after conspiring with two individuals to transport 60 to 80 kilograms of cocaine from the Dominican Republic to Puerto Rico.[4]

- On November 15, 2007, Officer Angel Fonseca Guilfú was convicted of sexually assaulting a 13-year-old girl he met through a telephone chat line.[5]

- On June 28, 2007, Officer Meléndez Otero pled guilty to conspiracy to possess illegal substances with the intent to distribute and to a firearm-related charge; he was sentenced to a year and a day of imprisonment.

- On January 20, 2007, in an incident known as "the Massacre of Las Piedras," Officer Javier Santiago Velázquez killed his father-, mother-, and sister-in-law, and wounded his brother-in-law (shooting him nine times) over a property dispute. Officer Santiago Velázquez was convicted of three counts of first-degree murder, one count of attempted murder in the first-degree, and four weapons charges. His wife, Officer Jesly Ann Márquez Arés, was also convicted on three counts of first-degree murder, one count of attempted murder, and four counts of weapons charges, although an appeals court reduced Officer Márquez Arés' weapons convictions from four counts to one.[6]

- On May 26, 2006, Officer William Castro Arocho, who was off duty, fired his service weapon at Carmen Ramírez Irizarry during a dispute with his neighbor. On October 19,

2009, Officer Castro Arocho was found guilty of illegally discharging his service firearm.[7] At least 23 citizen complaints were filed against Officer Castro Arocho prior to his arrest, including verbal abuse, assault, illegal persecution, and domestic violence.

## II. PRPD Engages in a Pattern and Practice of Use of Excessive Force

The following incidents and allegations further support the finding that PRPD has engaged in a pattern and practice of use of excessive force in violation of the Fourth Amendment:

- On February 21, 2008, according to a lawsuit, Officer Rashid Feliciano Vázquez shot Kelmit Oquendo Rivera three times without a valid law enforcement purpose while PRPD officers were conducting surveillance of a home. Oquendo Rivera sued PRPD alleging that he was shot without justification and falsely charged. He also alleged that 10 to 15 officers, including Sergeant Antonio Rodríguez and Officers José Bracero Sepúlveda, David Colón, and Eddie Rivera Nazario, failed to intervene on his behalf. In 2010, the parties agreed to settle under undisclosed terms.[8]

- On July 12, 2007, according to a lawsuit, Sergeant Hermenegildo Rivera Ruiz and Officers José Rodríguez Cora and Gerarda Vázquez Quiñones assaulted Oscar Lozano Benítez following a traffic stop, predicated on Lozano Benítez's alleged use of high-intensity headlights. Without a valid law enforcement purpose, officers twisted Lozano Benítez's arm. Officers then threw Lozano Benítez against a car causing him to fall to the ground, stepped on his face with a boot, and handcuffed him so tight that he could not feel his fingers. Lozano Benítez was then arrested and detained overnight at a PRPD station. Lozano Benítez was not provided medical attention for his injuries. Lozano Benítez filed suit and in 2009, the parties entered into a confidential settlement.[9] At the time of the incident, the Legal Affairs Office had not acted on a 2003 recommendation from administrative investigators to expel Sergeant Rivera Ruiz after he submitted false documents and lied to investigators. Additionally, PRPD closed other investigations into Sergeant Rivera Ruiz's conduct without imposing disciplinary action, even after investigators had sustained misconduct allegations and recommended discipline, as set forth below:

**Table A-1: Civilian Complaint History, Sergeant Rivera Ruiz**

| Type | Year | Disposition |
|---|---|---|
| Illegal search and verbal abuse | 1989 | Archived after investigators recommended a 2-day suspension |
| Physical and verbal abuse | 1989 | Archived after investigators recommended an admonishment |
| Illegal search and arrest | 1992 | Archived |
| Theft of official vehicle | 1992 | Pending in Legal Affairs Office |
| Damage to official vehicle from bullet | 1994 | Archived |
| Illegal arrest | 1995 | Archived |
| Illegal arrest | 1995 | Archived |

| Submitting false document and lying to administrative investigator | 2002 | Pending in Legal Affairs Office; expulsion recommendation in 2003 |

- On June 29, 2007, according to a lawsuit, Alsemmi Martín was driving from the Veterans Administration Hospital with passenger Mario Salazar Cintrón when Officers Orlando Rivera Canaan and Nelson Rodríguez pulled up beside them. Salazar Cintrón made an obscene gesture toward the officers, who proceeded to stop Alsemmi's vehicle. After a verbal exchange, an officer pulled Salazar Cintrón out of the vehicle and, without a legitimate law enforcement purpose, began hitting him in the face and body, causing a rib fracture, bleeding, and bruises on his head. The officer deployed a taser to incapacitate Salazar Cintrón, and handcuffed his hands and feet. The officers dragged Salazar Cintrón on the ground and ordered him to squeal like a pig. Martín and Salazar Cintrón filed a federal civil rights suit alleging that the officers had used excessive force and committed an unreasonable search and seizure.

  On September 30, 2009, the district court entered default judgment against Sergeant Samuel Hernández, the supervising officer on the scene. An amended judgment was entered on April 23, 2010, after the parties reached a confidential settlement agreement.[10]

- On May 10, 2007, Juan Salcedo Collazo and his friend, José Negrón Rivera, pulled over on the side of the road in Utuado when their vehicle malfunctioned. Six PRPD officers arrived on the scene. Without a legitimate law enforcement purpose, Officer Freddie Lucena Pérez pulled out his weapon and handcuffed Salcedo Collazo and Negrón Rivera. Officer Lucena Pérez allegedly told Salcedo Collazo, "if you mess with a policeman, you mess with all of us" (referring to an incident where Salcedo Collazo and his cousin, Miguel Figueroa Collazo, stopped a municipal police officer from abusing his wife). Officer Lucena Pérez then allegedly hit Salcedo Collazo, Negrón Rivera and later Figueroa Collazo and played Russian roulette with Salcedo Collazo. The officers then placed Salcedo Collazo, who was bleeding profusely, in the police vehicle's trunk. Neither Officer Carlos Vélez nor the other four officers intervened to stop Officer Lucena Pérez from hitting the plaintiffs. In 2010, the parties entered into a confidential settlement agreement.[11]

- On April 15, 2007, according to a lawsuit, Misael Medero García was driving his father's car with two friends when PRPD officers Samuel Galloza González, Leonardo Vázquez Martínez, and Javier Avilés Crespo stopped Medero García, allegedly without probable cause. The officers told Medero García and his friends that they were not wearing their seat belts, which Medero García denied. Although neither Medero García nor his passengers posed any threat to the officers or others, Officer Galloza González then pointed his firearm at them, punched Medero García in the back, and cited them for not wearing seatbelts. Officer Vázquez Martínez searched the vehicle without consent and found nothing suspicious. Medero García and his friends left and drove toward the Barceloneta police station to file a complaint against the officers. They were followed by the officers who stopped them a second time and assaulted them, again without a legitimate law enforcement purpose. The officers detained Medero García and his

friends at the station, but filed no charges against them.  In 2009, the parties entered into a confidential settlement agreement.[12]

- On March 19, 2007, according to a lawsuit, approximately 15 PRPD officers arrived at Matthew McLeod López's home to execute a search warrant.  Upon opening the door, seven officers, including Juan Rosa Algarín, jumped on McLeod López, threw him to the ground, and hit him all over his body, including in his groin.  The officers had no legitimate law enforcement purpose for this use of force.  Although the officers did not have a search warrant for a safe deposit box, they ordered McLeod López to open it.  The officers took $3,000 from the box and drove McLeod López to PRPD headquarters, where they detained him for more than fourteen hours.  Once released, McLeod López needed emergency surgery due to injuries he sustained during the officers' beating.  In 2011, the parties entered into a settlement agreement.[13]

- On January 1, 2007, according to a lawsuit, Xavier Muñoz Mejías and his cousin, David Santiago Muñoz, exited a business establishment when an argument ensued outside.  Approximately six officers, including a sergeant, arrived and, without a legitimate law enforcement purpose, began hitting Muñoz Mejías with their batons and boots.  Muñoz Mejías lay on the floor bleeding profusely as the officers continued to hit him.  When Santiago Muñoz attempted to protect his cousin, the officers hit him with batons, causing linear bruising and injuries.  In 2009, the parties entered into a confidential settlement agreement.[14]

- On September 26, 2006, according to a lawsuit, Officer Edwin Félix De Jesús attacked José Cancél Vega without a legitimate law enforcement purpose.  On April 3, 2006, Officer Félix De Jesús pleaded guilty to charges of assault.[15]

- On September 19, 2006, according to a lawsuit, Orvil Cabán Torres was sitting in his parked vehicle when an unmarked vehicle approached him with the lights off.  A man dressed in plainclothes, later determined to be an officer assigned to the Aguadilla Narcotics Division, exited the vehicle, ordered Cabán Torres to "freeze," and pointed a firearm at him.  Cabán Torres then grabbed a canister of chemical agent and sprayed it in the direction of the man.  The man responded by shooting Cabán Torres in the hand and abdomen without adequate justification for using lethal force.  Cabán Torres became aware the man who shot him was an officer when the man addressed another person on the scene as "Sergeant."  In 2009, the parties entered into a confidential settlement agreement.[16]

- On July 25, 2006, according to a lawsuit, during a disturbance related to Constitution Day activities in the Plaza de Recreo in Dorado, Esther López Morales's young son, Agustín, was on his way to a restaurant when PRPD officers repeatedly struck him with batons on his head.  Agustín was not involved in the disturbance, and the officers had no legitimate law enforcement reason to strike him.  Agustín required stitches on his forehead, which left a permanent scar.  In 2009, the parties entered into a confidential settlement.[17]

- On March 3, 2005, according to a lawsuit, five officers followed Andrés García Quiñones and a friend, Edwin Sepúlveda, as they were driving. Without probable cause or justification, the officers got out of their vehicle at a red light and pointed their weapons at García Quiñones and Sepúlveda. Fearful for their lives, they drove away. Although Andrés and Sepúlveda posed no threat to the officers or the community, the officers allegedly fired at least 15 times at García Quiñones's vehicle. On January 13, 2006, four unidentified officers allegedly entered García Quiñones's home without a search warrant or justification, attacked him, and took him to an empty house in Mayagüez while they searched his home. As a result of the officer's' beating, García Quiñones suffered a cervical sprain, trauma, and other injuries. In 2010, García Quiñones and Sepúlveda settled their civil rights action against the PRPD.[18]

## III. UNCONSTITUTIONAL SEARCHES AND SEIZURES

The following incidents and allegations further support the finding that PRPD has engaged in a pattern and practice of unconstitutional searches and seizures in violation of the Fourth and Fourteenth Amendments:

- On May 20, 2008, Elis Manuel Andrades Telleira was pulled over by a marked PRPD vehicle driven by uniformed Officer Osvaldo Hernández Adorno. A group of individuals posing as federal agents joined Hernández Adorno on the scene. The group staged Andrades Telleira's stop in order to steal drugs he was reportedly transporting.[19] Among the individuals posing as a federal agent was Noel Rosario Colón, a sergeant on administrative leave who had engaged in similar activities in 2005 and 2006 where he impersonated a federal agent to detain individuals and seize money from them.

  After Officer Hernández Adorno, Sergeant Rosario Colón, and the other individuals stopped Andrades Telleira, handcuffed him and took him to an auto body repair shop. They seized the narcotics in Andrades Telleira's car and interrogated him. With the information obtained during the interrogation, Sergeant Rosario Colón and two other individuals went to Andrades Telleira' home and stole additional narcotics and other property. They then executed Andrades Telleira.[20]

  On January 8, 2010, Officer Hernández Adorno entered into a plea agreement after being charged with conspiracy to commit carjacking with intent to cause death, motor vehicle theft, and conspiracy against the rights of citizens.[21] According to the plea agreement, for a payment of $700, Officer Hernández Adorno subjected Andrades Telleira to a traffic stop without probable cause. Sergeant Rosario Colón was expelled from the PRPD a month after Andrades Telleira's death. Before the incident, Sergeant Rosario Colón was the subject of multiple civilian complaints.

- On December 5, 2007, Officer David González Pérez of the Arecibo Special Operations Division stopped and searched Ramón Santiago Quiñones' vehicle. Officer González Pérez reportedly found illegal contraband and subsequently offered not to arrest Santiago Quiñones in exchange for a cash payment. Officer González Pérez pleaded guilty to extortion on August 5, 2009 and was fined $200.[22] Officer González Pérez also had an

extensive history of civilian complaints involving illegal searches and seizures, assault, domestic violence, and negligence.  Many of these complaints remained open for years.

- On August 9, 2007, according to a lawsuit, TOU Officer Wendel Delgado Sánchez and a relative were visiting a friend when the Carolina Drug Unit assaulted, arrested, and detained them without probable cause for 12 hours.  Although PRPD alleged in the media that Delgado Sánchez was part of a large drug trafficking organization, no charges were ever filed against Delgado Sánchez or his relative.  Delgado Sánchez was summarily expelled from PRPD.  In 2010, the parties reached a confidential settlement agreement.[23]

- On June 26, 2007, Luis Velázquez González filed a complaint alleging that Officer Osvaldo Acevedo Patiño of the San Juan Narcotics Division stole $606 during a search of his home.  Velázquez González alleged that Officer Acevedo Patiño took the money, did not give him a property receipt, and lied both about returning the money and giving him a receipt.  An investigation later revealed that Officer Acevedo Patiño took the money, but returned it at a later date at the behest of his superior, and that the officer instructed Velázquez González to sign a back-dated receipt.  The investigation also disclosed that Officer Acevedo Patiño was not on duty while he was allegedly conducting surveillance of Velázquez González's home.

  Officer Acevedo Patiño was convicted of making a false statement and violating government ethics laws for theft during an illegal search.  He was sentenced to a year and nine months of imprisonment and fined $1,000.  He was also expelled from PRPD.[24]

- On January 18, 2007, according to a lawsuit, officers from unmarked vehicles stopped Datiz Rodríguez and ordered him to get out of his car at gunpoint and told him they had a search warrant for his vehicle.  The officers then searched his vehicle and home, without a legitimate law enforcement purpose.  They found drugs and detained Datiz Rodríguez without bail on federal drug charges from January 24 to August 28, 2007, when the district court ordered his release.  Datiz Rodríguez alleged malicious prosecution, illegal arrest, seizure, and detention and in 2009, the parties entered into a confidential settlement agreement.[25]

- On December 17, 2006, Officer Diego Santos Pabón arrested Eliseo Pérez Sánchez and another youth for displaying "suspicious attitudes."  Officers subsequently hit the youth , sprayed them with chemical agents, and forced them to kiss.  Officer Emilio Meléndez Santiago and Sergeant José Feliciano Rodríguez did not intervene to protect the youth. Officer Santos Pabón, Officer Meléndez Santiago, and Sergeant Feliciano Rodríguez were separated from PRPD and convicted for unlawfully restraining and assaulting the youth.[26]

- On October 20, 2006, a group of Mayagüez Drug Division officers searched various adjacent homes belonging to the Pietri Vargas family.  Officers Camille Ortiz Sepúlveda, Jorge Vélez Rodríguez, Joel Soto Ramírez, and William Irizarry Cintrón entered the residence of Noel Pietri Figueroa and Marilyn Vargas Vargas without consent or a valid search warrant.  Once inside, they opened the bathroom door while Marilyn was taking a

shower, exposing her naked body to the officers at the scene. The officers asked about the whereabouts of Carlitos Pietri Vargas, Noel and Marilyn's 19-year-old son.

At the same time, a group of approximately 15 officers searched an adjacent house owned by Marilyn's parents, Carlos Vargas Torres and Miriam Vargas Sepúlveda. Among the officers searching the house were José Alago Feliciano, Robert Martínez Medina and Maritza Nazario Vega. At this second residence, the officers conducted an hour-long search and detained five members of the family, including Carlitos Pietri Vargas, who arrived after the search began. The officers also searched a third neighboring residence. During the searches, the officers planted an illegal firearm and seized several legally registered weapons. Four members of the Pietri Vargas family were arrested. Three of them were charged with weapons violations. The charges were later dismissed.

On October 13, 2009, at the conclusion of a federal civil trial, a jury found Officers Martínez Medina, Alago Feliciano, Nazario Vega, and Ortiz Sepúlveda liable for violating the Fourth Amendment rights of various members of the Pietri Vargas family when they conducted an unreasonable search and used excessive force against them. Notably, the jury also found the officers' supervisors – Mayagüez Illegal Weapons Unit Sergeant José Figueroa Andújar, Colonel Francisco Carbo Marty, who oversaw PRPD's Drug Division, and then-Superintendent Toledo Dávila – liable for having failed to adequately train, supervise and discipline the involved officers. The jury awarded $6.7 million to the Pietri Vargas family.[27]

- On September 13, 2006, according to a lawsuit, officers dressed in civilian clothing entered Luis Cruz Acevedo's home. The officers pushed and threatened Cruz Acevedo, identifying themselves as officers of the Mayagüez Drug Division. The officers asked Cruz Acevedo whether he had drugs or weapons and hit him. The officers searched Luis' home for more than two hours. After the incident, Cruz Acevedo went to the Mayagüez Police Station to file a complaint against the officers, but was not permitted to do so.[28]

  Approximately two months later, on November 21, 2006, four officers dressed in civilian clothing came to Cruz Acevedo's home and advised him that they had a search warrant. The officers falsely told Cruz Acevedo that they had a videotape of him taking part in a drug transaction. The officers entered his home without consent and without a legitimate law enforcement purpose and planted ammunition and marijuana there. After the search, the officers arrested Cruz Acevedo and transported him to a police station in Aguadilla. Cruz Acevedo was subsequently released. In 2009, Cruz Acevedo settled his case against some of the officers.[29] On October 28, 2009, a jury found Officers Víctor Cortés Cabán, Luis Ruperto Torres, and Dennis Muñiz Tirado liable for violating Cruz Acevedo's Fourth Amendment rights. The jury awarded him $300,000 in damages.[30]

- On June 6, 2006, Officers Abimelec Sosa Díaz, Edwin Ruiz Vellón, and Elliot Fernández López entered a private residence and searched it without a warrant or consent and also stole private property, including jewelry. On April 19, 2007, Officer Sosa Díaz was found guilty of receiving and transporting stolen items. On May 23, 2007, Officer Ruiz Vellón was found guilty of performing an illegal search and aggravated illegal appropriation. On May 23, 2007, Officer Fernández López was found guilty of

performing an illegal search and aggravated illegal appropriation.  All three officers were expelled from PRPD.[31]On December 24, 2005, plainclothes Officers Fundador González Santos and Luis Ortiz Soto stopped Billy Tavares Bruno.  One of the officers was wearing his badge on a chain and identified himself as a PRPD officer.  The officers then searched Tavares Bruno, and one removed $40 from his pocket.  None of these actions were supported by a legitimate law enforcement purpose.  The officers were found guilty of robbery, weapons violations, and possession of an illegal weapon.  Both officers were expelled on July 13, 2007.

---

[1]        Indictment, *U.S. v. Rosa Soto*, No. 08-CR-0099 (Mar. 18, 2008).

[2]        *People v. López Rivera*, GVI2008G0013 (Apr. 30, 2009).

[3]        Superseding Indictment, *U.S. v. Mojica Hernández*, No. 08-CR-0060 (D.P.R. filed on Mar. 6, 2008).  Amended Judgment entered on May 5, 2009.

[4]        Press Release, FBI, San Juan Division, "Arrest of Police of Puerto Rico Officer" (Feb. 28, 2008), *available at* www.sanjuan.fbi.gov; Indictment, *U.S. v. Rivera Astacio*, No. 08-CR-0071 (D.P.R. filed on Feb. 28, 2008).  Plea Agreement filed under seal on July 29, 2008.

[5]        Judgment, *People v. Fonseca Guilfú*, KIS2007G0012 (Nov. 15, 2007).

[6]        *People v. Santiago Velázquez and Márquez Arés*, HSCR200700589 to 596.  *See also*, *People v. Márquez Arés*, KLAN200800914 (June 30, 2009) (2009 Westlaw 2420009); *Liomar Márquez, et al. v. Toledo Dávila*, No. 07-CV-1340 (D.P.R. filed on Apr. 24, 2007).

[7]        Judgment, *People v. Castro Arocho*, ALA2008G0245 (Oct. 19, 2009).  Castro Arocho was acquitted of attempted murder.  Judgment, *People v. Castro Arocho*, AVI2008G0048 (Aug. 31, 2008).

[8]        *Kelmit Oquendo Rivera v. Toledo Dávila, et al.,* No. 09-CV-1154 (D.P.R. filed on Feb. 18, 2009).

[9]        *Oscar Lozano Benítez v. Rivera Ruiz, et al*., No. 08-CV-1766 (D.P.R. filed on Jul. 11, 2008).

[10]        *Salazar Cintrón, et al. v. Rivera Canaan*, 08-CV-1700 (D.P.R. filed on June 27, 2008).

[11]        *Juan Salcedo Collazo, et al., v. Freddie Lucena, et al*., No. 08-CV-1539 (D.P.R. filed on May 9, 2008).

[12]        *César Medero Ponce, et al., v. Toledo Dávila*, No. 08-CV-1446 (D.P.R. filed on Apr. 15, 2008).

[13]        *McLeod López v. Juan Rosa Algarín, et al.* No. 08-CV-1315 (D.P.R. filed on Mar. 14, 2008).

[14]        *Xavier Muñoz Mejías, et al., v. Toledo Dávila*, No. 07-CV-1845 (D.P.R. filed on Sept. 13, 2007).

[15]        Guilty Plea, *People v. Félix De Jesús*, GIC2006G0077 (Apr. 3, 2007).

[16]        *Cabán Torres v. Toledo Dávila, et al.* No. 07-CV-1864 (D.P.R. filed on Sept. 18, 2007).

[17]        *Esther López Morales, et al., v. Toledo Dávila*, No. 07-CV-1659 (D.P.R. filed on Jul. 23, 2007).

[18]        *García Quiñones, et al., v. González Ramos, et al*., No. 06-CV-1211 (D.P.R. filed on Mar. 2, 2006).

[19]     Press Release, FBI, San Juan Division, "Twelve Individuals Indicted for Conspiracy to Commit Carjacking Resulting in Death and Civil Rights Violations" (July 8, 2009), *available at* www.sanjuan.fbi.gov; Indictment, *U.S. v. Torres Sobrado*, No. 09-CR-0228 (D.P.R. filed on July 7, 2009).

[20]     Conviction, *U.S. v. Torres*, No. 08-CR-0213 (D.P.R. entered on Oct. 13, 2009) (sentenced to 24 months of imprisonment); Judgment, *U.S. v. Torres*, No. 06-CR-0270 (D.P.R. entered under seal on Aug. 4, 2008).

[21]     Plea Agreement, *U.S. v. Hernández Adorno*, No. 09-CR-0228 (entered on Jan. 8, 2010).  He was separated from the PRPD on November 17, 2009.

[23]     *Wendel Delgado Sánchez v. Toledo Dávila, et al.,* No. 07-CV-1709 (D.P.R. filed on Aug. 8, 2007).

[24]     *People v. Acevedo Patiño*, KFJ2008G0011and KLE2008G0198.

[25]     *Ovidio Datiz Rodríguez, et al., v. Toledo Dávila*, No. 08-CV-1000 (D.P.R. filed on Jan. 2, 2008).

[26]     *See People v. Santos Pabón*, KDC2008G0018.  Officer Meléndez Santos was separated on June 16, 2008, after being convicted of felonious restraint and assault.  *See People v. Meléndez Santiago*, KDC2008G0020; KIC2008M0044.  The supervisor at the Puerto Nuevo Precinct, Sergeant Feliciano Rodríguez, was separated on June 16, 2008.  *See People v. Feliciano Rodríguez*, KDC2008G0017 (civil rights violations – restriction of liberty – guilty); KDC2008G0018 (aggravated restriction of liberty – guilty); KIC2008M0043 (crime against corporal integrity – assault – guilty).

[27]     *Vargas Torres v. Toledo Dávila, et al,* No. 07-CV-2002 (D.P.R. filed on Oct. 22, 2007).  Judgment was entered on October 13, 2009.  Verdict was entered on October 13, 2009.

[28]     Complaint, *Cruz Acevedo v. Toledo Dávila, et al.,* No. 07-CV-2104 (D.P.R. filed on Sept. 12, 2007).

[29]     Judgment, *Cruz Acevedo v. Pedro Toledo, et al.,* No. 07-CV-2104 (D.P.R. entered on Dec. 2, 2009).  *See also U.S. v. Muñiz Tirado, et al.,* No. 07-CR-0346, in which multiple Mayagüez officers and supervisors were convicted of civil rights violations.

[30]     Verdict, *Cruz Acevedo v. Pedro Toledo, et al.,* No. 07-CV-1844 (D.P.R. entered on Oct. 28, 2009).

[31]     Judgment, *People v. Sosa Díaz,* FDC2006G0022 (Apr. 19, 2007); Judgment, *People v. Ruiz Vellón*, FDC2006G0023 (May 23, 2007); Judgment, *People v. Ruiz Vellón*, FBD2006G0219 (May 23, 2007); Judgment, *People v. Fernández López*, FDC2006G0021 (June 27, 2007); Judgment, *People v. Fernández López*, FBD2006G0217 (June 27, 2007).

Appendix B: Relevant Correspondence



**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

JUL   1 2008

Pedro Toledo Dávila
Superintendent
Puerto Rico Police Department
601 F.D. Roosevelt Ave.
San Juan, PR 00936

    RE:  <u>Investigation of the Puerto Rico Police Department</u>

Dear Superintendent Toledo Dávila,

    As you discussed with Special Litigation Section Chief, Shanetta Y. Cutlar, this is to inform you that the United States Department of Justice is commencing an investigation concerning allegations of use of excessive force, unconstitutional searches and seizures, and discriminatory policing by members of the Puerto Rico Police Department ("PRPD"), pursuant to the pattern or practice provision of the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141 and the anti-discrimination provisions of the Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C. § 3789d.

    In conducting the investigation, we will seek to determine whether there are systemic violations of the Constitution or laws of the United States in the use of force and police practices by members of the PRPD. We have not reached any conclusions about the subject matter of the investigation. We believe that you and other Commonwealth officials want to operate the PRPD consistent with the requirements of the Constitution and federal law. During the course of our investigation, we will consider all relevant information, particularly the efforts Puerto Rico has undertaken to ensure compliance with federal law. We also will offer to provide recommendations on ways to improve use of force and other police practices, when appropriate. Provided that the PRPD cooperates fully with our investigation, if we conclude that there are not systemic violations of constitutional or other federal rights, we will notify you that we are closing the investigation. In addition, we will identify any financial, technical, or other assistance the United States may be able to provide to assist PRPD in correcting the identified deficiencies.

    Our enforcement of the Violent Crime Control and Law Enforcement Act of 1994 and the Omnibus Crime Control and Safe Streets Act of 1968 has involved a variety of state and local law enforcement agencies, both large and small, in jurisdictions such as New York, California,

Ohio, New Jersey, Georgia, and the District of Columbia. In over ten years of enforcing these statutes, the good faith efforts of state and local jurisdictions working with us have enabled us routinely to resolve our claims without resort to contested litigation. We encourage the PRPD to cooperate with our investigation and can assure you that we will seek to minimize any potential disruption our efforts may have on the operations of the PRPD. Our Special Litigation Section will be handling the investigation and will continue to be in contact with your office as the investigation progresses. Ms. Cutlar may be reached at (202) 514-6255.

Sincerely,

Grace Chung Becker
Acting Assistant Attorney General

cc:    The Honorable Aníbal Acevedo Vilá
       Governor of the Commonwealth of Puerto Rico

       The Honorable Roberto Sánchez Ramos
       Secretary of Justice
       Puerto Rico Department of Justice

       The Honorable Rosa Emilia Rodríguez Velez
       United States Attorney
       District of Puerto Rico



**U.S. Department of Justice**

Civil Rights Division

SYC:DHW:LES:ZIL:SSL:NO
DJ 207-65-3

*Special Litigation Section - PHB*
*950 Pennsylvania Avenue, NW*
*Washington, DC 20530*

December 19, 2008

**VIA ELECTRONIC AND U.S. MAIL**

Pedro Toledo Dávila, Esq.
Superintendent
Puerto Rico Police Department
601 F.D. Roosevelt Avenue
San Juan, PR 00936

    RE:  <u>Investigation of the Puerto Rico Police Department</u>

Dear Superintendent Toledo:

    We write to provide you with a brief summary of the concerns we raised regarding the Puerto Rico Police Department ("PRPD") during our exit conference on December 5, 2008. As you know, the Civil Rights Division is conducting a pattern or practice investigation into alleged police misconduct by members of the PRPD, pursuant to the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141, and the anti-discrimination provisions of the Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C. § 3789d.

    As an initial matter, we wish to express our appreciation to you and your staff for your cooperation and hospitality during our tour. In particular, we would like to thank all of the PRPD officers and staff who took time to meet with us, including Associate Superintendent Ramón Ortega and other auxiliary superintendents, area commanders, unit directors, educators, supervisors, rank-and-file officers, and support staff. We especially would like to thank Legal Director Rosa Seguí for her invaluable assistance in coordinating our tour and facilitating our interviews with PRPD officers and staff. As we indicated during our exit conference, it was apparent from our interviews that the PRPD is staffed with dedicated men and women who are genuinely concerned with providing professional and effective policing services to the citizens and residents of Puerto Rico.

Separately, we recognize that under your leadership, the PRPD has initiated various reform efforts to address allegations of misconduct and improve systems of accountability within the PRPD. For instance, we understand that you have issued policies and procedures concerning periodic training for existing officers and have reorganized the operational structure of the PRPD to provide for more coordinated support services for officers and their families, including psychological treatment and counseling. We also understand that you have launched initiatives to address significant backlogs of administrative investigations and to upgrade the PRPD's communication and information systems to better manage PRPD personnel and resources.

Consistent with our pledge to conduct our investigation as transparently as possible based on the PRPD's cooperation, we met with you, Associate Superintendent Ortega and PRPD Legal Affairs Director Seguí on December 5 at the conclusion of our five-day tour to share our consultants' initial impressions and observations. Our intention was to assist the PRPD in identifying policies, practices, and processes at the outset that may warrant further focused review or corrective action by the PRPD as our investigation progresses.

As we indicated during our meeting, our investigation remains ongoing and we have not formulated any formal opinions or conclusions regarding the PRPD or the conduct of its officers and agents. We also plan to conduct additional interviews and tours, accompanied by our police practices consultants, and plan to review additional documents, including documents that have yet to be provided, such as incident and investigation reports.

At this early juncture, we identified several areas of concern that warrant further attention based on our consultants' preliminary observations. These areas, which we discussed at our December 5 exit conference, are:

- **Inconsistent guidance on the application of force:** We are concerned that there may be inconsistent guidance on the application of force by PRPD officers between geographic areas and operational components within the PRPD.

- **Insufficient reporting on use of force:** We are concerned that PRPD officers may not be required to sufficiently report all uses of force to provide for adequate supervisory review.

- **Inadequate citizen complaint and internal investigation processes:** We are concerned that systemic deficiencies may impede the effective resolution of citizen complaints and internal investigations. For instance, we are concerned that the PRPD: (1) may not accept third party complaints at intake; (2) does not complete timely internal investigations; and (3) issues findings in internal investigations that may not be consistent with generally accepted standards and practices, such as the use of "archive" to close investigations where allegations are found to be unsubstantiated or where an officer is exonerated of misconduct.

- **Lack of an early warning system:** The PRPD does not appear to have a uniform and integrated system that allows supervisors to proactively detect potential patterns of at-risk conduct by officers.

- **Inadequate supervision of field personnel:** We are concerned that field personnel, including officers in specialized units, may be inadequately supervised. We understand that, as of October 2008, there were approximately 2,020 vacancies in sergeant and lieutenant positions reported by the PRPD. We recognize, however, that other factors may contribute to adequate supervision, including deployment patterns and compliance with deployment orders.

- **Fragmented community engagement:** We are concerned that the PRPD may not be fully engaging all of the communities it serves on policing priorities and collaborative approaches to law enforcement, which may contribute to allegations of disparate treatment.

- **Limited training:** We understand that the PRPD does not have a formal field training program for new officers. We are also concerned that the PRPD may be offering limited re-training to existing officers, which could impair the PRPD's ability to provide up-to-date guidance on issues related to use of force, searches and seizures, and equal protection.

- **Ineffective disciplinary system:** We are concerned that the PRPD may have a cumbersome and fragmented disciplinary system that may impair its ability to hold its officers accountable and prevent potential misconduct proactively. For instance, supervisors told us during our interviews that they do not feel

empowered to take action early in the disciplinary process to correct a subordinate's behavior and prevent serious misconduct. A lack of effective communication between PRPD supervisors and components may also frustrate prompt corrective action when officers are transferred between PRPD units and components.

We hope that the foregoing summary of our consultants' preliminary impressions is useful to future reform efforts. We look forward to your continued cooperation in furtherance of our mutual goals of ensuring lawful and effective policing in Puerto Rico. If we can be of any assistance in the future, please do not hesitate to contact us. You may reach me at (202) 514-6255, Luis Saucedo at (202) 353-0299, or Zazy López at (202) 305-8702.

Sincerely,

Shanetta Y. Cutlar
Chief
Special Litigation Section

cc: Rosa M. Seguí Cordero, Esq.
Director
PRPD Legal Affairs Office



**U.S. Department of Justice**

Civil Rights Division

SYC:DHW:LES:ZIL:SSL:NO:db
DJ 207-65-3

*Special Litigation Section - PHB*
*950 Pennsylvania Avenue, NW*
*Washington, DC 20530*

March 5, 2009

**VIA ELECTRONIC AND U.S. MAIL**

José Figueroa Sancha
Superintendent
Puerto Rico Police Department
601 F.D. Roosevelt Avenue
San Juan, PR  00936

    RE:  <u>Investigation of the Puerto Rico Police Department</u>

Dear Superintendent Figueroa:

    Thank you for meeting with us during our tour of the Puerto Rico Police Department ("PRPD") on February 2-6, 2009.  As you know, we conducted our tour as part of the Civil Rights Division's ongoing pattern or practice investigation of the PRPD, pursuant to the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141, and the anti-discrimination provisions of the Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C. § 3789d.  This letter summarizes briefly the concerns we raised during our February 6 exit conference and addresses two related issues regarding document preservation and protections against retaliatory conduct.

    At the outset, we would like to reiterate our appreciation for the cooperation and cordial reception we received from you and your staff during our tour.  We understand that the PRPD is charged with significant responsibilities and that our visits require your staff to share their time and resources.  In this regard, we would like to thank all of the dedicated men and women of the PRPD who facilitated our tour and participated in our interviews, many of whom expressed a genuine commitment to the critical mission and the overall success of the PRPD.  We would especially like to thank Legal Director Mirla Rodríguez for her leadership and Staff Attorney Efrén González for his hard work coordinating our tour and facilitating the PRPD's production of documents.

As we mentioned during our exit conference, we have identified several areas of concern based on our consultants' preliminary observations and impressions. While our investigation remains ongoing, given the serious nature of our concerns, we believe it is appropriate to memorialize these issues to assist the PRPD in identifying policies and practices that may warrant further focused review or corrective action as our investigation progresses. In this regard, we recognize that under your short tenure at the PRPD, you have demonstrated a firm commitment to pursuing necessary reforms by taking steps to address internal processes of mutual concern that warrant immediate attention. We appreciate these efforts and look forward to learning more about the PRPD's initiatives.

As you will see, many of the areas we outline below build upon our earlier letter, dated December 19, 2008, following our first tour and exit conference with former Superintendent Pedro Toledo. Significantly, our preliminary observations indicate strongly that the PRPD appears to lack basic contemporary practices that have been adopted by many law enforcement agencies to safeguard the fundamental constitutional rights of the citizens they serve. These areas of concern are:

- **Insufficient guidance on the application of force:** We are concerned that the PRPD lacks basic policies and other written guidance on the use of force by officers. Significantly, the PRPD does not appear to have an integrated policy that is based on contemporary legal standards and generally-accepted law enforcement practices that incorporates all force options available to, and used by, officers. For instance, the PRPD has developed separate policies for the use of batons, Tasers,[1] and firearms, but has not developed targeted policies on other available force implements, such as chemical irritants and less lethal weapons (e.g., foam projectiles).

- **Lack of formal requirements for reporting and reviewing use of force:** The PRPD does not appear to have a formal policy that requires uniform and thorough reporting of officers' use of force. The lack of such a requirement may impair the PRPD's ability to adequately review and investigate officers' use of force and impedes the PRPD's ability to compile

---

[1] TASER is the brand name of an electro-muscular disruption device that is currently employed by the PRPD.

statistical information on use of force at the agency-
level (to assess policy, training, and supervisory
needs) or the officer-level (to provide for early
detection of potential patterns of at-risk conduct).
The PRPD also does not have a dedicated policy on
conducting internal investigations of police-involved
shootings or uniform administrative reviews of
officers' use of deadly force.

- **Ineffective disciplinary system:** The PRPD's discipline
  process does not appear to effectively promote police
  accountability. In this regard, supervisors reported
  that they are not empowered to take corrective action
  to address minor infractions by subordinates before
  such officers engage in more serious misconduct.
  Supervisors consistently identified inordinate delays
  in completing administrative investigations, many of
  which have remained unresolved for years, as a
  significant barrier to the appropriate discipline of
  officers and as a constant source of low morale among
  officers who are denied promotions or transfers due to
  unresolved administrative investigations. Indeed, the
  failure to adequately resolve citizen complaints
  against officers may perpetuate distrust of the agency
  and may discourage citizens from lodging valid
  complaints when officers engage in misconduct.

- **Lack of basic processes and resources for internal
  investigations:** We are concerned that the PRPD
  components charged with conducting internal
  investigations, particularly the Internal Affairs
  Superintendency, appear to lack basic controls and
  resources to conduct fair and thorough investigations.
  The failure to properly equip, train, and develop these
  units is of particular concern given the fundamental
  role they play in the investigation of serious
  allegations of misconduct, including allegations of
  excessive force, false arrest, improper search and
  seizure, discriminatory policing, and corruption. For
  instance, we understand that Internal Affairs units:
  lack proper equipment, such as video cameras, secure
  photocopiers, and vehicles; have little authority to
  conduct thorough investigations, including
  investigations of higher-ranking officers; lack basic
  internal controls, including systems to preserve
  confidential files and track the disposition of cases;
  and lack processes to follow-up or otherwise provide

appropriate feedback to field investigators on the status or outcome of investigations.

- **Inadequate guidance on conducting searches and seizures:** We are concerned that PRPD officers lack proper guidance and training on conducting lawful searches and seizures. In some cases, officers reported that violations of citizens' civil rights are necessary to meet agency expectations in the seizure of illegal drugs and weapons.

- **Inadequate supervision:** We are concerned that some units may consistently lack adequate supervision. While this may be due to insufficient numbers of adequately trained supervisors, the deployment pattern of supervisors may also be a contributing factor. A manpower allocation study may assist the PRPD in determining staffing needs and appropriate deployment patterns to ensure that officers are properly supervised within generally-accepted supervisor-to-officer ratios.

- **Fragmented community engagement:** Although our consultants observed instances of proactive community engagement, such efforts appear to be inconsistent and fragmented. The lack of consistent community engagement may lead to perceptions of fear and disparate treatment, particularly in communities that may be exposed exclusively to highly-tactical, military-like operations with little, or no, engagement in collaborative or proactive policing efforts.

During our exit conference, our consultants elaborated on each of the areas discussed above and offered preliminary recommendations based on their experience as reform leaders in law enforcement agencies across the United States. Our consultants also identified various professional and research organizations that may assist the PRPD in developing critical policies and processes, such as the International Association of Chiefs of Police ("IACP") (www.theiacp.org), the Police Executive Research Forum (www.policeforum.org), the Major City Chiefs Association (www.majorcitieschiefs.org), and the National Sheriffs' Association (www.sheriffs.org). Our consultant, Charles Gruber, also provided you with a copy of "Protecting Civil Rights: A Leadership Guide for State, Local, and Tribal Law Enforcement," published by the IACP.

Separately, we take this opportunity to remind you that the PRPD should take all necessary steps to preserve relevant documents and information and to protect PRPD officers and staff from any unlawful or otherwise improper retaliatory action regarding our investigation. It also is imperative that the Commonwealth take these steps, including protecting all PRPD officers and staff who participate in our investigation from retaliation, as part of the Commonwealth's pledge of cooperation and consistent with applicable laws and regulations. While we trust that the Commonwealth will take appropriate steps in this regard, we must emphasize that the Department of Justice takes allegations of destruction or spoliation of evidence and improper retaliation of cooperating individuals seriously, and that we will consider all available remedies under federal law should such conduct occur. We appreciate your assistance in this regard and look forward to your continued cooperation.

Thank you again for taking the time to meet with us and for the PRPD's hospitality during out tour. Should you have any questions regarding the foregoing, do not hesitate to contact us. You may reach me at (202) 514-6255, Deputy Chief Daniel Weiss at (202) 616-6594, Attorney Luis Saucedo at (202) 353-0299, or Attorney Zazy López at (202) 305-8702.

Sincerely,

Shanetta Y. Cutlar
Chief
Special Litigation Section

cc: Mirla Rodríguez Marín, Esq.
Efrén González González, Esq.
PRPD Legal Affairs Office



**U.S. Department of Justice**

Civil Rights Division

SYC:DHW:LES:ZIL:SSL:NO:mb
DJ 207-65-3

*Special Litigation Section - PHB*
*950 Pennsylvania Avenue, NW*
*Washington, DC 20530*

April 10, 2009

<u>**VIA ELECTRONIC AND U.S. MAIL**</u>

José Figueroa Sancha
Superintendent
Puerto Rico Police Department
601 F.D. Roosevelt Avenue
San Juan, PR  00936

    RE:   <u>Investigation of the Puerto Rico Police Department</u>

Dear Superintendent Figueroa:

    We write to memorialize the issues and concerns that we discussed at our March 20, 2009 exit conference, following our third investigative tour of the Puerto Rico Police Department ("PRPD"). As you know, the Civil Rights Division is conducting a pattern or practice investigation of the PRPD, pursuant to the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141, and the anti-discrimination provisions of the Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C. § 3789d. During our March 17-27 tour, we met with PRPD officers from the Ponce, Mayaguez, and Aguadilla regions; conducted follow-up interviews at PRPD headquarters; observed PRPD training at the University College of Criminal Justice; and reproduced documents as part of an outstanding request for documents. We were accompanied by our police practices consultants Rachel Burgess, Charles Gruber, and Arturo Venegas.

    As an initial matter, we would like to express our continued appreciation to the PRPD officers and staff who participated in our tour for their cooperation, professionalism, and hospitality. We would especially like to thank the commanders in Ponce, Mayaguez, and Aguadilla for facilitating our visits to each of their respective regions; the officers and staff of the Legal Affairs Office and the Public Integrity Superintendency for their assistance during our inspection and reproduction of documents; and the staff at the University College of Criminal Justice for coordinating our visits to the various classes and training sessions that we observed.

We would also like to thank you for providing us with an update on the organizational changes that have taken place at the PRPD. In this regard, we understand that the PRPD has undergone significant restructuring through the development of police regions that are intended to provide for greater localized control over operational planning. Similarly, we understand that several central-level superintendencies and offices have been reorganized or eliminated to realign functions and responsibilities within the PRPD. For instance, we understand that the Superintendency for Criminal Investigations was eliminated and its responsibilities transferred to directors in each of the PRPD's thirteen regions. We also understand that the Superintendencies for Public Integrity and Internal Affairs were consolidated into a newly-created Superintendency for Professional Responsibility.

You also reported that the PRPD has taken steps to address concerns that we raised in prior exit conferences, including: (1) establishing a use of force committee composed of various disciplines to develop related policies and procedures; (2) meeting with Dominican leaders and identifying a liaison officer to work with the Dominican community; (3) re-training officers in the Tactical Operations units; (4) drafting new policies and procedures for internal affairs and administrative investigations, including creating a conciliation or mediation committee to address less serious policy infractions by officers; and (5) discussing civil rights issues at all levels of the agency, including bringing speakers to weekly staff meetings to address related issues. Finally, we would like to thank you for inviting us to the National Congress of Community Leaders event on March 21 in Aibonito. We were able to attend near the conclusion of the event and were appreciative to see the many residents and families who attended in support of the PRPD's efforts.

As we noted during our exit conference, our investigation remains ongoing and we have not reached any conclusions on the existence of a pattern or practice of unconstitutional or unlawful conduct by PRPD officers. However, consistent with our prior tours and our letters of December 19, 2008 and March 5, 2009, we continue to identify areas of concern based on our consultants' preliminary observations and impressions. At this juncture, our preliminary observations indicate strongly that systemic deficiencies may be impairing the PRPD's ability to ensure the full enjoyment of federal constitutional rights and protections afforded to individuals in Puerto Rico. These deficiencies appear to be departures of basic contemporary practices that have been implemented by law enforcement agencies

across the country to secure the fundamental constitutional
rights of the citizens they serve, and consist of the following
areas of concern:

- **Insufficient guidance on the application of force:** We
  continue to be concerned that the PRPD lacks policies
  and other written guidance on the application of force
  used by officers. For instance, we understand that the
  PRPD lacks policies on the use of chemical irritants
  and less-lethal projectiles, although such weapons are
  available to officers in the field. Similarly, clear
  written instructions for decontaminating individuals
  who have been subjected to chemical irritants also do
  not appear to exist. Such decontamination procedures,
  as well as procedures related to all types of force
  authorized by the PRPD, should be clearly addressed
  through written policy that is provided to all
  officers.

- **Lack of formal requirements for reporting and reviewing
  use of force:** We remain concerned that the PRPD lacks
  formal reporting and review requirements regarding
  officers' use of force and that the lack of such
  requirements has allowed ad hoc practices to develop
  within the PRPD. For instance, we found that officers
  in the Superintendency for Drugs, Narcotics, Vice, and
  Illegal Firearms ("Drug Superintendency") have
  developed their own use-of-force forms and review
  boards that do not appear to be governed by agency-wide
  policy. Given the apparent unofficial nature of the
  process, it is unclear whether any reports or other
  information regarding the outcome of force reviews are
  distributed to other agency components, such as
  internal affairs or public integrity, or whether any
  use-of-force data is tracked systemically to identify
  patterns or trends. We also obtained information that
  officers are instructed informally in the field not to
  report their use of force in reports that are required
  by agency policy, such as PRPD Incident Reports, unless
  an individual is injured seriously. As we discussed
  during our exit conference, the lack of formal written
  policies – and internal mechanisms to ensure adherence
  to such policies – allows for informal practices to
  inure among officers and within units that may be
  inconsistent with agency expectations.

- **Ineffective disciplinary system:** We continue to be concerned that the PRPD's discipline process does not appear to promote police accountability effectively. For instance, the PRPD's current system appears to be based almost entirely on referrals to the Public Integrity Superintendency and the Legal Affairs Office, which has resulted in inordinate delays – more than five years, in some cases – in imposing discipline against officers who violate agency policy. We understand that procedures are currently being developed that would allow for minor policy infractions to be handled at the regional-level through mediation or conciliatory committees. However, we understand that substantial training will still be necessary to ensure that fair and consistent discipline is imposed by supervisors who have not had such responsibilities in the past. Separately, we obtained information that the PRPD's procedures for identifying officers who demonstrate "repetitive conduct" in administrative complaints (see Special Order 90-5) are not being implemented. For instance, we learned that the intervention that the agency offers to all such officers – a week-long course entitled, "Human Relations" – has not been provided since August 2007, despite evidence of continuing referrals by supervisors. We also learned that the PRPD's "repetitive conduct" policy was recently changed to require identification of only those officers who engage in "aggression." As we noted at the exit conference, limiting the triggering event to acts of "aggression" may result in patterns of other types of significant misconduct – such as unlawful searches and seizures – to be missed that may, nonetheless, warrant early agency intervention.

- **Lack of basic processes and resources for internal investigations:** We remain concerned that the PRPD components charged with conducting internal investigations appear to lack basic controls and resources to conduct fair, thorough, and timely investigations. We also understand that the PRPD lacks written standard operating procedures to ensure uniformity in the daily operation of internal investigation units. As a result, there appears to be significant inconsistency in the forms, methods, and processes employed by members of the same units. There also appear to be inconsistencies in the warnings that are provided to officers who are interviewed as targets

of internal investigations. For instance, we learned that some officers are warned that they must disclose all relevant information that is known to them, but also instructed that they may remain silent. In this regard, it appears that administrative investigators have adopted protections against self-incrimination in the criminal context without fully understanding the legal parameters of compelled statements in the administrative context. (See, Garrity v. New Jersey, 385 U.S. 493 (1967)). Separately, we discovered the existence of an internal affairs unit within the Drug Superintendency that does not appear in the PRPD's organizational chart or the current PRPD general order governing the structure of that superintendency. Several individuals who handle administrative investigations at PRPD headquarters also told us that they were unaware of the existence of the Drug Superintendency's internal affairs unit. Unlike investigators in the Superintendency for Internal Affairs, we understand that internal affairs investigators in the Drug Superintendency have increased access to necessary investigative equipment, such as video cameras and unmarked vehicles, and were allowed to be promoted in the last year. As we mentioned during our tour, we are concerned that the existence of multiple internal affairs units within the same agency may lead to conflict, confusion, and duplicity in the agency's efforts to adequately address allegations of officer misconduct.

- **Limited training:** We recognize that the PRPD has made significant efforts to re-train officers in its Tactical Operations units in anticipation of labor demonstrations or civil unrest that may ensue in the coming months. However, we remain concerned that the PRPD's overall training may be too limited to ensure compliance with agency policies and constitutional requirements. For instance, the PRPD does not offer a field training program to new officers who are assigned to patrol duties. Officers also appear to lack training on essential problem-solving techniques that may be necessary in implementing community policing models and approaches. We also understand that field supervisors will require training on supervision and discipline as they assume greater responsibilities in the disciplinary process. Separately, criminal and administrative investigators expressed a significant need for additional training on investigative methods

and techniques, particularly in cases involving allegations of officer misconduct.

Thank you again for your continued cooperation. Should you have any questions regarding the foregoing, do not hesitate to contact us. You may reach me at (202) 514-6255, Deputy Chief Daniel Weiss at (202) 616-6594, Attorney Luis Saucedo at (202) 353-0299, or Attorney Zazy López at (202) 305-8702.

Sincerely,

Shanetta Y. Cutlar
Chief
Special Litigation Section

cc: Mirla Rodríguez Marín, Esq.
Efrén González González, Esq.
PRPD Legal Affairs Office

Col. Jose Luis Rivera
Special Assistant to the Superintendent

# EXHIBIT B

# Island of Impunity

## PUERTO RICO'S OUTLAW POLICE FORCE





# Island of Impunity

PUERTO RICO'S OUTLAW POLICE FORCE

JUNE 2012



**Island of Impunity:**

Puerto Rico's Outlaw Police Force

June 2012



**American Civil Liberties Union**
125 Broad Street, 18th Floor
New York, NY 10004
www.aclu.org

Cover Image:
Betty Peña Peña and her 17-year-old daughter Eliza Ramos Peña were attacked by
Riot Squad officers while they peacefully protested outside the Capitol Building.
Police beat the mother and daughter with batons and pepper-sprayed them.
Photo Credit: Ricardo Arduengo / AP (2010)

# Table of Contents

**Glossary of Abbreviations** .............................................................................. 7

**I. Executive Summary** ..................................................................................... 11

**II. Background: The Puerto Rico Police Department** ................................... 25

**III. Shooting to Kill: Unjustified Use of Lethal Force** ................................... 31

    a. Reported Killings of Civilians by the PRPD between 2007 and 2011 ...................... 33

    b. Case Study: Miguel Cáceres Cruz ........................................................ 43

    c. Case Study: Jorge Luis Polaco Jiménez .................................................. 45

**IV. Police Brutality against Low-Income, Black, and Dominican Communities** ........... 49

    a. Excessive Force against Low-Income Communities ............................................. 50

    b. Excessive Force against Afro-Puerto Rican Communities ..................................... 52

    c. Excessive Force and Other Police Abuse against Dominican Immigrants and Puerto Ricans of Dominican Descent .................................................... 54

**V. Billy Clubs versus Speech: Excessive Force against Protesters to Suppress Speech and Expression** ................................................................... 59

    a. Chilling Effect on Constitutionally Protected Speech and Expression .................... 61

    b. Indiscriminate Use of Toxic CN Tear Gas .............................................. 62

    c. Indiscriminate Use of Pepper Spray ...................................................... 63

    d. Indiscriminate Use of Batons ................................................................ 64

    e. Uncontrolled and Unregulated Use of Carotid Holds and Pressure Point Techniques ................................................................................ 64

    f. Inadequately Regulated Use of "Less-Lethal" Ammunition: Rubber Bullets, Sting Ball Grenades, and Bean Bag Bullets ........................... 65

    g. Inadequately Regulated Use of Tasers ................................................... 66

    h. Groping and Sexual Harassment of Female Protesters ........................... 67

    i. Psychological Trauma Caused by Police Abuse against Protesters ........................ 68

**VI. Documented Cases of Police Abuse against Protesters** ......................... 71

    a. Background Causes that Prompted the Wave of Protests ....................................... 71

    b. Documented Incidents of Police Abuse against Protesters at the Capitol Building ...................................................................................... 73

        i. First Protest at the Capitol ................................................................ 73

  ii. Second Protest at the Capitol ........................................................................... 80

c. Police Abuse against Protesting Students and Union Leaders and Members

at the Sheraton Hotel..................................................................................................... 83

d. Documented Incidents of Police Abuse against Protesting Union Leaders

and Members at Other Locations ................................................................................. 86

  i. The Governor's Mansion ..................................................................................... 86

  ii. Government Development Bank for Puerto Rico ............................................... 88

  iii. The Supreme Court of Puerto Rico.................................................................... 88

e. Documented Incidents of Police Abuse against Protesting Students at the

University of Puerto Rico .............................................................................................. 89

  i. Avenida Universitaria ........................................................................................... 89

  ii. April to June 2010 Student Strike ...................................................................... 90

  iii. December 2010 to February 2011 Student Strike ............................................ 91

**VII. Failure to Police Crimes of Domestic Violence and Sexual Assault.................... 103**

a. Failure to Prevent Intimate Partner Homicides .................................................... 103

b. Failure to Address Domestic Violence.................................................................... 113

c. Failure to Address Rape........................................................................................... 116

d. Domestic Violence by PRPD Officers ..................................................................... 116

**VIII. Total Impunity: Failure to Investigate or Punish Police Brutality...................... 119**

a. Seriously Flawed Investigation Process: Failure to Register Civilian

Complaints and Investigate Reported Police Abuses ............................................... 121

b. Breakdown of the Police Disciplinary System: Failure to Hold Officers

 Accountable.................................................................................................................. 125

c. Failure to Adequately Record, Report and Review Use of Force,

Officer-Involved Shootings and Other Critical Incidents............................................ 130

d. Failure to Prosecute Incidents of Excessive Use of Force..................................... 130

e. Anonymous Abusers: Failure to Ensure Abusive Officers Can be Identified

by Victims ..................................................................................................................... 131

**IX. A Lawless Police Force: Lack of Guidance Governing the Use of Force,**

**and Lack of Oversight, Training and Transparency ...................................................... 133**

a. Lack of Guidance Governing the Use of Force ...................................................... 134

b. Failure to Fully Implement a Standard Trigger Weight......................................... 136

c. Lack of Independent Oversight................................................................................ 137

  d.  Lack of Training and Supervision ........................................................ 138

  e.  Lack of Transparency:  Failure to Maintain and Make Public Statistics on

  Police Brutality .................................................................................... 139

**X.  Relevant Constitutional and Human Rights Law** ................................ **141**

  a.  Constitutional Standards on the Use of Force ..................................... 141

  b.  Human Rights Standards on the Use of Force ..................................... 142

  c.  Constitutional Standards on Freedom of Speech, Expression, and Assembly ..... 144

  d.  Human Rights Standards on Freedom of Speech, Expression, and Assembly..... 147

**XI.  Recommendations** .......................................................................... **151**

**XII.  Methodology and Acknowledgements** ............................................... **162**

# Glossary of Abbreviations

| | |
|---|---|
| **ACLU** | American Civil Liberties Union |
| **AFL-CIO** | American Federation of Labor and Congress of Industrial Organizations |
| **APPU** | *Asociación de Profesores Universitarios de Puerto Rico* / Puerto Rico University Professors' Association |
| **ASPRO** | *Asociación de Periodistas de Puerto Rico* / Puerto Rico Association of Journalists |
| **ATF** | United States Bureau of Alcohol, Tobacco, Firearms and Explosives |
| **CAT** | Convention against Torture and Cruel, Inhuman or Degrading Treatment |
| **CED** | Conducted-Energy Device |
| **CERD** | International Convention on the Elimination of All Forms of Racial Discrimination |
| **CIC** | *Cuerpo de Investigaciones Criminales* / Criminal Investigation Corps |
| **CIPA** | *Comisión de Investigación, Procesamiento y Apelación* / Commission on Investigations, Processing, and Appeals |
| **DOE** | *División de Operaciones Especiales* / Special Operations Division |
| **DOJ** | United States Department of Justice |
| **DOT** | *División de Operaciones Tácticas* / Tactical Operations Division |
| **DTE** | *División de Tácticas Especializadas* / Specialized Tactical Division |
| **FBI** | Federal Bureau of Investigations |
| **FCT** | *Federación Central de Trabajadores* / Central Workers Federation |
| **FTPR** | *Federación de Trabajadores de Puerto Rico* / Puerto Rican Labor Federation |
| **FURA** | *División de Fuerzas Unidas de Rápida Acción* / Joint Rapid Action Force Unit |
| **ICCPR** | International Covenant on Civil and Political Rights |
| **LAPD** | Los Angeles Police Department |
| **MOU** | Memorandum of Understanding |

**NIE**       *Negociado de Investigationes Especiales* /
Special Investigations Bureau of the Puerto Rico Department of Justice

**NDNV**       *Negociado de Drogas, Narcóticos y Control de Vicios y Armas Ilegales* /
Drug, Narcotics, Vice, and Illegal Weapons Bureau

**NYPD**       New York City Police Department

**OPEIU**       Office and Professional Employees International Union

**PNP**       *Partido Nuevo Progresista* / New Progressive Party

**PPD**       *Partido Popular Democrático* / Popular Democratic Party

**PRPD**       Puerto Rico Police Department

**PRDOJ**       Puerto Rico Department of Justice

**SARP**       *Superintendencia Auxiliar de Responsabilidad Profesional* /
Auxiliary Superintendency for Professional Responsibility

**SEIU**       Service Employees International Union

**UDHR**       Universal Declaration of Human Rights

**UFCW**       United Food and Commercial Workers International Union

**UGT**       *Unión General de Trabajadores de Puerto Rico* /
General Union of Workers

**UOE**       *Unidad de Operaciones Especiales* / Special Operations Unit

**UOT**       *Unidad de Operaciones Tácticas* / Tactical Operations Unit

**UTE**       *Unidad de Tácticas Especializadas* / Specialized Tactical Unit

**UPR**       *Universidad de Puerto Rico* / University of Puerto Rico

The Puerto Rico Police Department is a dysfunctional and recalcitrant police force that has run amok for years. Use of excessive or lethal force is routine, and civil and human rights violations are rampant. Years of unchecked abuses have resulted in the avoidable and unjustifiable loss of civilians' lives, and severe and lasting injury to countless others.



Betty Peña Peña and her 17-year-old daughter Eliza Ramos Peña were attacked by Riot Squad officers while they peacefully protested outside the Capitol Building. Police beat the mother and daughter with batons and pepper-sprayed them. Photo Credit: Ricardo Arduengo / AP (2010)

# I. Executive Summary

The Puerto Rico Police Department (PRPD), charged with policing the Commonwealth of Puerto Rico, is the second-largest police department in the United States, second only to the New York City Police Department. The PRPD's over 17,000 police officers police the island's approximately 3.7 million residents. With about 4.6 PRPD officers for every 1,000 residents, the ratio of active PRPD officers to residents in Puerto Rico is more than twice the U.S. national average.

The PRPD performs an essential public safety function, yet the police force is plagued by a culture of violence and corruption. It is a dysfunctional and recalcitrant police department that has run amok for years. Use of excessive or lethal force is routine, and civil and human rights violations are rampant. Years of unchecked abuses have resulted in the avoidable and unjustifiable loss of civilians' lives, and severe and lasting injury to countless others. While police abuse historically has primarily affected low-income Puerto Ricans, Puerto Ricans of African descent, and Dominican immigrants, in the past three years nonviolent political protesters have also been targeted.

Puerto Rico, and its police force, currently confronts a public safety crisis of skyrocketing crime and a record-breaking murder rate. With 1,130 murders in 2011—nearly three violent deaths per day—the number of murders in 2011 was the highest in Puerto Rico's history, while the previous year saw the second-highest number of murders in Puerto Rico's history. Puerto Rico ranks 19th in the world based on its per capita murder rate, and in 2009, Puerto Rico's murder rate was higher than each of the 50 states, and nearly double the rate of the next highest, the state of Louisiana.

Reducing violent crime represents a daunting and at times dangerous challenge for the PRPD. Too often, rather than curbing the violence, the PRPD instead contributes to it through the unwarranted use of lethal and excessive force.

After a comprehensive six-month investigation of policing practices in Puerto Rico, building on eight years of work by the ACLU of Puerto Rico documenting cases of police brutality, the ACLU has concluded that the PRPD commits serious and rampant abuses in violation of the United States Constitution, the Puerto Rico Constitution, and the United States' human rights commitments. The PRPD routinely commits abuses including the unjustified use of lethal force against unresisting, restrained, or unarmed civilians; beatings and other violence against unarmed Black, poor, and Dominican men that left some near death and others paralyzed or with traumatic brain injury; and excessive force against peaceful protesters including the indiscriminate use of tear gas, pepper spray, batons, rubber bullets and sting ball grenades, bean bag bullets, Tasers, carotid holds, and pressure point techniques. The PRPD also fails to police crimes of domestic violence and rape and to protect women from violence by their intimate partners.

These abuses do not represent isolated incidents or aberrant behavior by a few rogue officers. Such police brutality is pervasive and systemic, island-wide and ongoing. The PRPD is steeped in a culture of unrestrained abuse and near-total impunity. The issues plaguing the PRPD predate the administration of the current Governor, Luis Fortuño, and without far-reaching reforms, the abuses will continue.

Evidence drawn from interviews conducted by the ACLU between March and September 2011 in Puerto Rico, as well as careful review of case documents and publicly reported case information from incidents that took place as recently as May 2012, and government quantitative data, form the basis of the following findings.

## Background: Pervasive Corruption, Domestic Violence, and other Crime by PRPD Officers

There is pervasive corruption and other crime within the police force, including domestic violence committed by PRPD officers. The PRPD's failure to address criminal conduct among its ranks is symptomatic of a larger institutional dysfunction of the police department's policing and disciplinary systems.

Over a five-year period from 2005 to 2010, over 1,700 police officers were arrested for criminal activity including assault, theft, domestic violence, drug trafficking, and murder. This figure amounts to 10 percent of the police force, and is nearly three times the number of New York City Police Department (NYPD) officers arrested in a comparable five-year period, although the NYPD is about twice the size of the PRPD. In October 2010, the Federal Bureau of Investigation (FBI) arrested 61 PRPD officers as part of the largest police corruption operation in FBI history, and additional PRPD officers have since been arrested by the FBI. Officers have been convicted of planting drugs and fabricating drug-related charges against residents of a housing project, as well as other drug and firearm violations.

Moreover, the PRPD has recorded an appalling number of complaints of domestic violence by PRPD officers. The PRPD recorded nearly 1,500 domestic violence complaints against police officers from 2005 to 2010. At least 84 still-active officers have been arrested two or more times for domestic violence. There have been multiple highly publicized cases in which PRPD officers shot their wives with their service firearms, in some cases killing their spouses.

## Shooting to Kill: Unjustified Use of Lethal Force

Since 2007, PRPD officers have fatally shot, beaten, or Tasered unarmed men, the mentally ill, individuals who posed no threat to officers or bystanders, and individuals who could have been restrained with less force. A series of widely reported police killings over a nine-month period in 2007, one of which was captured on film, brought to light an ongoing problem

of PRPD officers' use of deadly force, but did not result in reforms that would curb these abuses.

According to statistics provided by the Puerto Rico Department of Justice (PRDOJ), PRPD officers killed 21 people in 2010 and 2011. The ACLU documented 28 cases in which PRPD officers are reported to have killed civilians from 2007 and 2011. In most of these cases, the deaths were unjustified, avoidable, and/or not necessary to protect the life of an officer or civilian. We know of at least eight additional cases in which PRPD officers shot and killed civilians within that timeframe, but the ACLU was unable to document the circumstances of those killings.

The ACLU documented recent cases in which police shot and killed an unarmed boy as young as 14, and a man as old as 77, who was shot when police entered his home to serve and execute a search warrant. Because it is difficult to obtain case information except where there was a public scandal or related litigation, the ACLU's research on use of lethal force relies heavily on cases that have been exposed by local news media. For each of these cases that emerged in newspaper headlines, there are doubtless many others.

## Excessive Force against Low-Income, Black, and Dominican Communities

PRPD officers assigned to tactical units regularly use excessive force while on routine patrols and checkpoints in low-income, Black, and Dominican communities. During encounters with civilians in these communities, officers routinely use excessive force or resort to force unnecessarily and inappropriately, and they disproportionately target racial minorities and the poor. The PRPD is using excessive force as a substitute for community policing.

Police use excessive force including beating with batons, kicking, punching, throwing on the ground or against walls and objects, chokeholds, and shooting with firearms. In the cases documented by the ACLU, police inflicted injuries including: a broken jaw, cracked or lost teeth, bone fractures, internal bleeding, severe contusions, abrasions, lacerations, organ damage, organ failure, traumatic brain injury, paralysis, brain death, and death. In the cases documented by the ACLU, victims were not resisting arrest or were already restrained, unarmed, and posed little or no risk to officers or bystanders at the time of officers' use of force. The ACLU documented cases in which police severely beat individuals already restrained in handcuffs, and in some cases police did not arrest victims after injuring them, merely leaving them broken and bleeding on the street or in their homes.

Excessive use of force is rampant. According to data provided by the PRPD's Auxiliary Superintendency for Professional Responsibility (*Superintendencia Auxiliar de Responsabilidad Profesional*, or SARP), which oversees the internal administrative investigations of PRPD officers, civilians filed at least 1,768 complaints against officers for excessive or unjustified force and assault from 2004 to August 2010. These numbers

are most surely low and do not accurately represent the extent of the problem: the ACLU's research shows that civilians regularly elect not to report police abuse because of a lack of faith in the investigatory and disciplinary system; because of widely-known impunity for police abuse; and because of fear of retribution for filing complaints of civil rights and human rights violations.

Excessive force is routine among police officers in multiple tactical units of the PRPD. We have determined that particularly problematic units include the Tactical Operations Unit (*Unidad de Operaciones Tácticas*, or UOT), whose work is carried out by a Tactical Operations Division in each of the 13 police regions (*División de Operaciones Tácticas*, or DOT), colloquially known as the Riot Squad (*Fuerza de Choque*); and the Drug, Narcotics, Vice, and Illegal Weapons Bureau (*Negociado de Drogas, Narcóticos y Control de Vicios y Armas Ilegales*, or NDNV), which is represented in each of the 13 police regions across the island by a Division of Drug, Narcotics, and Vice (*División de Drogas, Narcóticos y Control de Vicios*), commonly known as the Drug Division (*División de Drogas*). Also problematic is the Specialized Tactical Unit (*Unidad de Tácticas Especializadas*, or UTE), commonly known as the Group of 100 (*Grupo de Cien*), an elite unit of officers grouped into multidisciplinary teams drawn from several different police units including drug, traffic, stolen vehicles and the UOT, to combat the drug trade. In addition to its anti-drug operations, the UTE has worked closely with the UOT in responding to protests.

## Billy Clubs versus Speech:  Excessive Force against Protesters to Suppress Speech and Expression

Since 2009, the PRPD also has used excessive force against nonviolent protesters. Even as police crackdowns on the Occupy movement have brought attention to the problem of police abuse against protesters in the United States, the PRPD has failed to address its frequent and systematic use of force against protesters. Officers use excessive force to suppress constitutionally protected speech and expression, indiscriminately using chemical agents including a toxic form of tear gas and pepper spray, batons, rubber bullets and rubber stinger rounds, sting ball grenades, bean bag bullets, Tasers, carotid holds, and pressure point techniques on protesters.  Police have regularly used excessive force in violation of protesters' First Amendment right to freedom of speech, expression, and assembly, as well as their Fourth Amendment right to be free from unreasonable searches and seizures.

The ACLU documented numerous instances of police abuse against protesters at locations that are traditionally the site of public demonstrations in Puerto Rico, including outside the Capitol Building, the Supreme Court of Puerto Rico, the Governor's mansion, and the Government Development Bank for Puerto Rico, and on the campus of the University of Puerto Rico (UPR). The PRPD has regularly responded to peaceful protests by deploying scores of Riot Squad officers in full riot gear, including padded body armor, helmets with visors, combat boots, and plastic shields. They are customarily armed with long crowd-control batons; aerosol pepper spray canisters; tear gas riot guns, rubber bullet guns, and/or pepper-ball guns; and firearms with live ammunition.

In responding to entirely peaceful or largely peaceful political demonstrations, police routinely fired aluminum tear gas canisters at protesters from riot guns or "less-lethal launchers," a firearm that physically resembles a rifle grenade launcher. Police also launched tear gas from helicopters, and video footage and photographs show thick clouds of tear gas engulfing protesters. Police doused protesters with pepper spray at point-blank range just inches from protesters' faces, directly into protesters' eyes, noses, and mouths. Protesters told the ACLU that police sprayed them so thickly with pepper spray that they were covered in the orange liquid, which poured down their faces and bodies, temporarily blinding them and causing excruciating pain that in some cases lasted for days.

Police have also routinely struck, jabbed, and beat protesters with 36" straight-stick batons, used as blunt impact weapons specifically for riot control. Riot squad officers struck protesters with two-handed jabs and single-handed strikes in which officers raised the batons over their heads to hit protesters with maximum impact. In numerous cases riot squad officers even chased after fleeing protesters and struck them in the head, back and shoulders from behind. Officers also used painful carotid holds and pressure point techniques intended to cause passively resisting protesters pain by targeting pressure points under protesters' jaws, near their necks, or directly on their eyes and eye sockets. Pressure point tactics not only cause excruciating pain, but they also block normal blood flow to the brain and can be potentially fatal if misapplied. In some cases these pressure point techniques have caused student protesters to lose consciousness.

In the cases documented by the ACLU, as a result of the PRPD's excessive use of force numerous protesters required and received medical treatment for blunt and penetrating trauma, contusions, head injuries, torn ligaments and sprains, respiratory distress, and second-degree burns from chemical agents.

Despite the PRPD's widespread use of violence on protesters during several of the incidents documented by the ACLU, including a protest at the Capitol on June 30, 2010 and a demonstration outside a political fundraiser at the Sheraton Hotel on May 20, 2010, few protesters were arrested during these incidents. The dearth of arrests following these incidents indicates that protesters were not threatening public safety and the use of force was neither necessary nor justified.

In other instances involving UPR student protesters, particularly during the April to June 2010 and December 2010 to February 2011 student strikes, we documented baseless mass arrests of UPR students to put an end to their protests, thereby suppressing their speech and expression. A very small fraction of these arrests of student protesters were supported by probable cause. Of approximately 200 UPR student protesters who have been arrested, some of whom have been arrested multiple times, prosecutors have pursued charges against only approximately 17 students. In case after case, student protesters were arrested and held for hours in a police cell, only to have a court find no probable cause to support the arrest.

These abuses have had a chilling effect on First Amendment-protected protest, and numerous university students and labor union leaders and members reported to the ACLU that they have ceased protesting, or significantly scaled back their protest activity, because of fear that they will again be subjected to police violence and baseless arrest. A number of these self-described activists, who have participated in past protests on numerous occasions, told the ACLU they no longer feel safe participating in demonstrations. They said they fear that the PRPD will again use excessive and unnecessary force to suppress their demonstrations, and they are reluctant to express their political beliefs in public and risk retaliation by the PRPD.

All of the protesters interviewed by the ACLU told us that they believe the PRPD's use of force against them is designed to suppress their speech and expression, and is specifically directed at those with viewpoints that are critical of the current administration and its policies. Without exception, all of the concerned citizens, community leaders, university student activists, and labor union leaders and members we interviewed told us that they feel the police have targeted them because of the viewpoints they have sought to express.

## Failure to Police Crimes of Domestic Violence and Sexual Assault

The PRPD systematically fails to protect victims of domestic violence and to investigate reported crimes of domestic violence, sexual assault, and even murders of women and girls by their partners or spouses. The PRPD is failing to protect women and girls from abusive intimate partners and ex-partners, and the PRPD is not policing those crimes when they are committed.

Puerto Rico has the highest per capita rate in the world of women over 14 killed by their partners. The numbers are disturbing, and climbing: 107 women were killed by their intimate partners in a five-year period from 2007 to 2011. The number of women killed by their intimate partners jumped significantly in 2011, to 30 women killed, up from 19 in 2010. In 2006, the PRPD reported 23 murders of women at the hands of their partners or spouses, placing Puerto Rico first on an international list comparing the number of women killed in each country/territory by their partners per million women over the age of 14.

Of the women killed by their intimate partners from 1991 to 1999, only 17 percent had orders of protection, a scant 2 percent had orders of arrest against their murderer, and 4 percent had expired orders of protection. In 2007, 25 percent of the women killed by their partners had previously reported incidents of domestic violence to the PRPD. Few women are seeking protection from their abusive partners, in part because they lack faith in a system that is failing to provide adequate protection to victims.

In addition, the PRPD is failing to ensure that women confronting domestic violence utilize the legal options available to them, and it is failing to enforce existing protective orders by arresting abusers who violate orders that are in place.

In July 2011, during his confirmation hearing before the committee on Public Safety and Judicial Affairs, the recently-replaced Superintendent of Police, Díaz Colón, was asked about deaths from domestic violence that have occurred on the island, and he replied that domestic violence is a private matter and is outside the purview of the PRPD.

Moreover, the PRPD is not adequately responding to or investigating rape crimes, and it is significantly underreporting these crimes. The PRPD reported that only 39 forcible rapes were committed in 2010, while the department also reported 1,000 homicides during the same year. Based on data from police departments around the U.S., we would expect the rape statistics to be 100 times the figure reported by the PRPD, as other jurisdictions in the U.S. report about four times as many rapes than homicides.

The number of reported forcible rapes has declined exponentially; from 426 in 1990 to 39 in 2010. While the reported rape rate has declined sharply in the last ten years, from 228 forcible rapes in 2000 to 39 in 2010, the murder rate has seen a sharp increase during the same time period, indicating that reduced crime is not the cause of the recent suspiciously low rape statistics.

The remarkable data spread between reported forcible rape and murder is the result of the PRPD's failure to follow protocols to respond to, record, or investigate crimes of rape. Official sources estimate that, in the case of sexual violence, only about 16 percent of rapes are reported. In their latest study, issued in 2007, the Puerto Rico Department of Health's Center for Assistance to Rape Victims estimated that 18,000 people in Puerto Rico, mostly women and girls, are victims of sexual violence each year.

## Total Impunity: Failure to Investigate or Punish Police Brutality

There are numerous contributing factors that are responsible for these deeply-rooted, wide-ranging, and long-standing human rights abuses—abuses which are both preventable and predictable. Our research has found that the investigatory, disciplinary, and reporting systems in place utterly fail to address, and therefore prevent, police abuses. In particular, we have documented the failure of the following systems:  the disciplinary and other accountability systems, which fail to meaningfully punish officers for misconduct; the investigatory system, which fails to effectively examine use of force and allegations of police misconduct; and the reporting system, which fails to collect and track data that could be used to correct these grave issues.

These systems virtually guarantee impunity: instead of deterring abuses by holding abusive officers accountable, the PRPD allows officers to escape punishment or any other consequences, rearming them and returning them to active duty, often to repeat their offenses.  Citizen complaints of brutality, lethal force, and excessive force languish for years without resolution. Abusive officers rarely are administratively punished or criminally prosecuted. The PRPD fails to track repetitive conduct by officers who violate the law or have significant records of complaints from the public. The failure to implement effective

early warning systems to identify abusive officers and flag high-risk officers likely to commit abuses has resulted in the avoidable loss of numerous lives.

The investigatory, disciplinary, and reporting systems of the PRPD rubber-stamp the use of force, cover up abuse by its officers, and encourage a code of silence. We documented a disciplinary system that retains, protects, and even promotes officers who use lethal and excessive force. It is a disciplinary system that retained an abusive officer even after he was labeled a "ticking time bomb" by a police psychologist, to see him later execute an unarmed man in the street; awards medals of valor to officers involved in a deadly shooting of a mentally ill man even while the official investigation into their use of force was ongoing; and reinstated an officer who held the local police chief hostage at gunpoint, rearmed him after he was arrested eight times, and returned him to foot patrol in a housing project where he shot and killed an unarmed 18-year-old boy.

We also documented an investigatory system that fails to interview witnesses and ignores eyewitness accounts that contradict the officers', as in one case in which an investigation of the fatal shooting of an unarmed man reported only the involved officers' account of events and summarily stated that bystanders were interviewed at the scene, "but they said adverse things about the officers."

## A Lawless Police Force: Lack of Guidance Governing the Use of Force and Lack of Oversight, Training and Transparency

The ACLU has identified a number of additional problematic PRPD policies and practices that contribute to the pattern of police abuse, including lack of guidance governing the use of force; lack of effective oversight, supervision, and training; failure to collect and track data that could be used to correct these grave issues; and failure to fully implement a standard trigger weight that meets U.S. national standards.

PRPD officers perform an essential public safety function, and the ACLU recognizes the important work performed every day by the department's officers. However, the PRPD fails to provide even basic guidance to its personnel on how to discharge their duties in compliance with constitutional and human rights standards. Until January 31, 2012, the PRPD had no comprehensive policy on the use of force. Such a policy is standard for police departments across the United States, and is standard policing practice around the world. To date, the PRPD has not fully implemented the new policy, and it has not yet trained all of its personnel in the policy.

The PRPD continues to lack standard protocols governing the use of force that officers are authorized to use, including guidance on the use of chemical agents, impact weapons, and "less-lethal" ammunition such as rubber bullets or sting ball grenades. The PRPD also lacks any protocols on policing protests and large-scale demonstrations, interactions with people with mental illness, and handling complaints of domestic and sexual violence.

Existing PRPD policies fall short of constitutional legal standards and U.S. police practices. For example, PRPD policies on the use of firearms, Tasers, and batons do not incorporate current legal requirements governing officers' use of force, do not emphasize alternatives to physical force, and do not require the use of measures to avoid or minimize the use of force. The existing policies fail to establish a clear protocol on the levels of force that are permitted in response to different levels of resistance from suspects. The existing policies also fail to provide any guidance on types of force other than firearms that may constitute lethal or deadly force, such as chokeholds, carotid holds, and strikes to the head with batons or other impact weapons. The existing policies do not even acknowledge that such types of force can be lethal, a serious omission. In addition, the PRPD's orders regulating police practices are not easily comprehensible or accessible to officers, who are not provided with copies of the policies.

Officers also receive patently inadequate training, insufficient supervision, and minimal guidance on the legal boundaries of their use of force and other conduct. The PRPD fails to enforce even the protocols and laws in place to regulate officers' conduct. Moreover, there is minimal public oversight and transparency of the PRPD's policies and practices, including no effective independent review.

Until February 2011, the PRPD lacked any standard trigger weight, instead leaving all service weapons at their factory settings of 5.5 and 6.5 pounds, which are substantially lighter than the standard trigger weights of U.S. metropolitan police departments such as the NYPD, which requires a trigger weight of 12 pounds on all service weapons. The PRPD had not paid any attention to the trigger weights of its service weapons until the September 2010 fatal shooting of an unarmed 22-year-old witness to a robbery who had remained at the scene to provide police with a statement. In that case, after the gun of one of five officers at the scene accidentally discharged, another officer began shooting and fired 10 bullets, one of which fatally struck the young man in the back of his head.

In February 2011, the Superintendent of the PRPD issued an order setting the standard trigger weight of all PRPD service weapons at 8.5 pounds. However, the Superintendent ordered that trigger weight springs on service weapons would be changed gradually, and as of June 2011, the PRPD still had over 9,000 service weapons in use that had not been altered to the higher standard trigger weight. Sensitive triggers lead to unintentional shootings during police interactions with civilians and overfiring in which officers shoot more rounds than they would with firearms with heavier trigger weights. In the mid-1990s the NYPD increased the mandatory trigger weight for service weapons from 8 pounds to 12 pounds in order to minimize unintentional shootings. It is essential that the PRPD modify all of its service firearms to the 8.5-pound trigger weight at a minimum, and ideally increase its standard trigger weight to bring it in line with police department policy in cities such as New York and Los Angeles.

## The Path Ahead

The United States Department of Justice (DOJ) opened an investigation into the PRPD in July 2008, and in September 2011 issued its findings in a scathing report, technically termed a "findings letter." The DOJ's investigation focused on the four-year period from 2004 to 2008, and was expanded to include police response to protests in 2009 and 2010. The DOJ found a pattern and practice of constitutional violations by the PRPD, including excessive force in violation of the Fourth Amendment and unreasonable force and other misconduct designed to suppress the exercise of First Amendment rights, concluding that the PRPD "is broken in a number of critical and fundamental respects."[1] The superintendent at the time, Emilio Díaz Colón, who had been in the post for only three months when the DOJ published its report, responded by rejecting the DOJ's findings and denying any constitutional violations by the PRPD. In a court filing, Puerto Rico's Justice Department subsequently denounced the DOJ report as unreliable, flawed, and biased.[2] On March 29, 2012 Governor Luis Fortuño named Héctor Pesquera as Superintendent of the PRPD following Díaz Colón's resignation. Pesquera, who is the PRPD's eighth superintendent in 11 years, told journalists in April 2012 that the PRPD does not violate human rights; when pressed he acknowledged that some individual officers may do so.[3]

The PRPD has demonstrated it is both unwilling and unable to police itself, and the political leadership in Puerto Rico has failed to step into the breach. The PRPD has long promised reforms and publicly stated its commitment to reforming some of its policies, but for the most part it has not delivered on these promises. Immediately following the publication of the DOJ's investigation findings, Governor Fortuño issued a plan outlining a series of planned reforms, which are superficial at best, and most of which have not yet been enacted in the nine months since. To its credit, the PRPD has retained a qualified team of experts to assist them with formulating new policies, which resulted in the issuance of a new general use of force policy at the end of January 2012. However, Puerto Rico's new use of force policy falls short of constitutional and U.S. national standards and is vague and lacks objective criteria on the use of lethal force by PRPD officers. In addition, most of Governor Fortuño's and the PRPD's promised reforms have not materialized. Moreover, while the issuance of the new use of force protocol is a necessary first step, the new policy is meaningless without effective accountability measures on the use of force and adequate training and enforcement.

Since the new use of force policy went into effect, there have been at least five recent incidents in April and May 2012 of potentially excessive force by PRPD officers that left one 19-year-old dead, four young men seriously injured with gunshot wounds inflicted by officers, and one young man with injuries from a beating he sustained from an officer. These incidents include a police shooting on April 27, 2012 in the parking lot of a shopping center in Manatí, in which PRPD officer Alfredo Delgado shot two brothers, killing 19-year-old Saúl Medina Figueroa and critically wounding 21-year-old Adrián Medina Figueroa. The officer allegedly stopped the young men's sister for running a red light outside the taco restaurant where the siblings worked, after which her unarmed brothers and mother became involved in a verbal altercation with the officer. The officer reported that he tried to use his nightstick

on the family, but one of the brothers took his nightstick and hit him with it and the other brother struck him with a pipe from his car. The officer shot 14 times, fatally shooting Saúl in the abdomen and leg and critically wounding Adrián with three gunshots, including a shot to his chest. In another recent incident, on May 7, 2012 in Puerta de Tierra, PRPD officer Juan Nieves Martínez shot unarmed 21-year-old Jovanny Héctor Núñez Morla, allegedly after the young man punched him in the face. The officer reportedly had stopped the young man for a suspected traffic violation and shot the young man twice, in his arm and his right side. Both incidents raise serious questions about the reasonableness of the force used by the officers. Following these recent incidents, Superintendent Pesquera made troubling remarks to the press, seemingly justifying the use of deadly force against unarmed assailants who assault police officers, in which he stated that, "'Any attack against a police officer has to be repelled with force, and whatever consequence that occurs is going to be the attacker's responsibility.'"[4]

The PRPD requires an overhaul, not merely reform, and certainly not the empty promises of reform that the PRPD has offered to date. The PRPD needs to address the structural issues identified in the ACLU's and DOJ's reports, and these wide-ranging reforms should be supervised by a federal court. While the DOJ's findings are a critical first step, with no enforcement mechanism to ensure the PRPD adopts the essential reforms recommended by the DOJ and the ACLU, there will not be change on the ground and lives will continue to be lost and destroyed by abusive police officers. In order to stop the ongoing police abuse and translate planned reforms into real change, a court-enforceable and monitored agreement between the DOJ and the government of Puerto Rico that includes a comprehensive reform plan is necessary.

Since 2004, the ACLU of Puerto Rico has been documenting numerous cases of police brutality in Puerto Rico. Between March and September 2011, the national office of the ACLU conducted fact-finding human rights research in Puerto Rico to further document allegations of police brutality. This report is based on a comprehensive six-month investigation, during which the ACLU conducted interviews in Puerto Rico with government officials and victims of police brutality or their surviving family members or lawyers in March, April, May, and September 2011. We focused on incidents over a five-year period from 2007 through 2011, and have continued monitoring incidents, policies, and practices. We issued a preliminary report of our research findings in June 2011;[5] this expanded report contains our complete findings based on additional field research and documentation of ongoing police abuse in Puerto Rico, including excessive force incidents that took place as recently as May 2012.

The scope of this report does not include several additional categories of police misconduct that are pervasive within the PRPD and raise serious concern, including unlawful searches and seizures, racial profiling, and unconstitutional stop-and-frisks. In its report, the DOJ found that the PRPD engages in a pattern and practice of unconstitutional searches and seizures, an issue that has long been raised by community activists in Puerto Rico. Additional categories of police abuse that are not documented here, but that warrant further

research based on cases documented by the ACLU of Puerto Rico and the news media, include police abuse against the homeless in urban areas (particularly in Aguadilla, San Juan, and Bayamón) and police abuse against the LGBT community.

Based on our research, including our findings identifying a number of problematic policies and practices that contribute to the pattern of police abuse, we have formulated clear recommendations for much-needed reforms. These reforms will not only help to bring the PRPD into compliance with the constitutions of the United States and Puerto Rico and human rights laws, but will also help it to combat the public safety crisis it currently confronts. Constitutional policing is a central component of public safety. Policing practices that respect Puerto Ricans' civil and human rights are critical to achieve public confidence in the police department, an essential element to improving public safety.

The ACLU makes the following key recommendations. A complete list of recommendations is set forth at the end of this report.

- Develop, revise, and implement comprehensive policies on the use of lethal and less-lethal force and encounters with civilians that meet national, constitutional, and human rights standards. This should include policies on the discharge of firearms, chemical irritants, carotid holds and chokeholds, pressure point techniques, stinger or other "less-lethal" rounds, bean bag guns, canines, batons, use of Tasers and other conducted electronic devices, physical restraints, and the unholstering and brandishing of firearms. This also should include policies on the treatment of protesters and the handling of public demonstrations, as well as the treatment of persons with medical conditions, persons with mental illness, and juveniles.

- Develop and fully implement comprehensive procedures for investigating allegations of police abuse and other civilian complaints. This should include procedures requiring that investigators identify, interview, and record statements from all involved officers and eyewitnesses. This should also include protocols on the intake of civilian complaints to ensure that all civilians wishing to report instances of abusive conduct by officers are able to do so.

- Create and fully implement reporting systems adequate to document *all* uses of force by the PRPD, as is standard in mainland U.S. metropolitan police departments. Develop and fully implement a use of force reporting policy that includes detailed protocols for officer-involved shooting reporting and the preparing and filing of field incident reports. Develop and fully implement a policy for reviewing use of force and critical incident reports.

- Create and implement fair and expeditious disciplinary procedures to impose effective disciplinary sanctions on officers when they fail to follow protocols, including disarming officers, removing police officers from duty, and permanently suspending them when called for. Reform the internal disciplinary system to periodically review officers' disciplinary files to flag repetitive conduct and assess risk of future unlawful conduct.

- Effectively implement policies by training PRPD officers to follow all applicable policies and laws on the use of force, and provide adequate supervision to be sure that use of force policies are followed.

- Take measures to address the grave problems with policing of domestic and sexual violence. Such measures should include adoption of clear and improved policies on law enforcement response, investigation and evidence collection, classification of offenses and charging decisions, training of officers, oversight and accountability for police misconduct relating to domestic or sexual violence, and response to officer-committed domestic or sexual violence.

- Gather and publicly report statistics on the use of force by the PRPD, internal investigations initiated and completed, and disciplinary measures taken against police officers.

- The legislature of Puerto Rico should create an effective and independent oversight body to monitor the PRPD's compliance with all applicable laws. The oversight body should be fully empowered and adequately funded to discharge its mandate, and it should be fully independent of the PRPD and the office of the Governor of Puerto Rico.

- The DOJ should enter into a court-enforceable and court-monitored agreement with the PRPD. The agreement should include a detailed and court-enforceable plan for comprehensive reforms that addresses all of the findings and the recommendations contained in the DOJ findings letter and this report.

The Puerto Rico Police Department is the second-largest police department in the United States.  It has been plagued by pervasive corruption, domestic violence, and other crime within the police force.  The high incidence of criminal conduct among the PRPD's ranks is symptomatic of a larger institutional dysfunction of the police department's policing and disciplinary systems.



Riot Squad officers in formation while protesting students march on the University of Puerto Rico campus during the December 2010 student strike. Photo Credit: Andre Kang / Primera Hora (2010)

## II. Background: The Puerto Rico Police Department

The PRPD is the second-largest police department in the country, second only to the New York City Police Department (NYPD). The PRPD's over 17,000 police officers police the island's approximately 3.7 million residents. With about 4.6 PRPD officers for every 1,000 residents, the ratio of active PRPD officers to residents in Puerto Rico is more than twice the U.S. national average for police departments policing populations of 250,000 or more.[6] The PRPD is divided into 13 police regions: Aguadilla, Aibonito, Arecibo, Bayamón, Caguas, Carolina, Fajardo, Guayama, Humacao, Mayagüez, Ponce, San Juan, and Utuado.[7] Various tactical units are represented in each region by a division of the unit. There are 80 precincts island-wide.[8]

The Governor of Puerto Rico has ultimate authority over the PRPD; he appoints a Superintendent to administer the PRPD, subject to confirmation by the Puerto Rico Senate. The Governor approves appointments to senior positions in the PRPD, from inspectors to colonels.

The PRPD has seen a rotating roster of superintendents over the past decade, with the police force led by eight different superintendents in 11 years. On March 29, 2012 Governor Luis Fortuño named Héctor Pesquera as Superintendent of the PRPD following the resignation of Emilio Díaz Colón. Superintendent Pesquera, who was confirmed to the post on April 9, 2012, is on extended temporary leave from his position as Assistant Director of Security for the Port of Miami, and previously worked for the FBI for 27 years, including as chief of the FBI Miami field office and Special-Agent-in-Charge of the FBI office in Puerto Rico. Díaz Colón, former Adjutant General of the Puerto Rico National Guard, served as Superintendent for less than nine months following his appointment on July 6, 2011. Díaz Colón replaced Superintendent José Figueroa Sancha, a former Assistant Special-Agent-in-Charge of the FBI's San Juan Division, who resigned on July 2, 2011. Figueroa Sancha was preceded by Pedro Toledo Dávila, who served as Superintendent from 1993 to 2001, and again from 2005 to 2009 following four different Superintendents who served from 2001 to 2005.

The PRPD, originally known as the Insular Police, was created less than a year after the United States invaded Puerto Rico and took possession of the island as a U.S. territory at the conclusion of the Spanish-American War in 1898. The Insular Police was officially created on February 21, 1899, under the command of Colonel Frank Thacher, a U.S. Marine officer during the Spanish-American War. The police department served as a tool to assert U.S. colonial power, and during the first decades after its creation, its police chiefs were Americans appointed by the colonial governors.

Historically, the police department has been implicated in violence and other actions to suppress dissent. In 1935, the Insular Police killed nearly two dozen nationalists in two

incidents known as the Ponce Massacre and the Río Piedras Massacre.[9] In 1978, the police intelligence division ambushed and killed two young pro-independence activists on a hilltop in Cerro Maravilla. In 1987, it was confirmed that for three decades, the police intelligence division had kept dossiers on at least 135,000 independence supporters; these files, known as *carpetas*, revealed a systematic pattern of surveillance and harassment of pro-independence groups and suspected supporters of Puerto Rican independence from U.S. rule.

The PRPD has long been known for its abusive tactics against independence supporters, labor unions, university students, anti-military and environmental activists, and residents of housing projects. The Civil Rights Commission of the Commonwealth of Puerto Rico issued a special report in 1967 regarding civil rights violations by the PRPD, in which it concluded that police violence was common in Puerto Rico.[10]

**More Puerto Rico Police Department officers are involved in criminal activity than in any other major law enforcement agency in the United States.**

In recent years, the PRPD has been plagued by pervasive corruption, domestic violence, and other crime within the police force. According to the DOJ, more PRPD officers are involved in criminal activity than in any other major law enforcement agency in the United States.[11] The high incidence of criminal conduct among the PRPD's ranks is symptomatic of a larger institutional dysfunction of the police department's policing and disciplinary systems. Over a five-year period from 2005 to 2010, over 1,700 police officers were arrested for criminal activity including assault, theft, domestic violence, drug trafficking, and murder.[12] This figure amounts to 10 percent of the police force, or one arrest of a police officer every 30 hours. According to the DOJ, these arrest rates are significantly higher than comparable jurisdictions in the United States.[13] For example, the number of PRPD officers arrested between 2005 and 2010 is nearly three times the number of NYPD officers arrested in a comparable five-year period (the NYPD reported arrests of only 607 officers between 2001 and 2006), of a police force about twice the size of the PRPD.[14]

In October 2010, the FBI arrested 61 PRPD officers as part of the largest police corruption operation in FBI history, and additional PRPD officers have since been arrested by the FBI. Officers have been convicted of numerous drug and firearm violations. For example, nearly a dozen officers of the Mayagüez Drug Division were convicted of planting drugs and fabricating drug-related charges against residents of a housing project in 2008. The convictions have prompted the review of hundreds of convictions, and it is believed that over 100 people are still incarcerated and serving sentences as a result of these fabricated cases.

Moreover, the PRPD has recorded an appalling number of complaints of domestic violence by PRPD officers. The PRPD recorded nearly 1,500 domestic violence complaints against police officers from 2005 to 2010.[15] The actual number of crimes of domestic violence committed by officers is likely significantly higher due to underreporting, because survivors

are unlikely to file and pursue complaints with the same police department that employs their abusive partner or ex-partner. At least 84 still-active officers have been arrested two or more times for domestic violence.[16] Recently there have been multiple highly publicized cases in which PRPD officers shot their wives with their service firearms, in some cases killing their spouses.

The PRPD currently confronts a public safety crisis that includes skyrocketing crime and a record-breaking murder rate.[17] With 1,130 murders in 2011—nearly three violent deaths per day—the number of murders in 2011 was the highest in Puerto Rico's history, while the previous year saw the second-highest number of murders in Puerto Rico's history. With 22.5 murders per 100,000 people in 2009, Puerto Rico's murder rate was higher than each of the 50 states, and nearly double the rate of the next highest, the state of Louisiana.[18] Based on the 2010 statistics, Puerto Rico ranks 19th in the world based on the number of murders per 100,000 inhabitants.[19]

Reducing violent crime represents a daunting and at times dangerous challenge for the PRPD. Too often, rather than curbing the violence, the PRPD instead contributes to it through the unwarranted and unjustified use of lethal and excessive force.

Following a series of widely reported police killings over a period of months in 2007 and sustained public outcry from affected communities and advocates, including the ACLU of Puerto Rico, condemning the pervasive police violence in Puerto Rico, the Civil Rights Division of the United States DOJ opened an investigation into the PRPD in July 2008. In September 2011, the DOJ issued its findings in a scathing report, technically termed a "findings letter." The DOJ found a pattern and practice of constitutional violations by the PRPD, including excessive force in violation of the Fourth Amendment and unreasonable force and other misconduct designed to suppress the exercise of protected First Amendment rights, concluding that the PRPD "is broken in a number of critical and fundamental respects."[20]

The superintendent at the time, Díaz Colón, who had been in the post for only three months when the DOJ published its report, responded by rejecting the DOJ's findings and denying any constitutional violations by the PRPD. In a court filing, Puerto Rico's Justice Department subsequently denounced the DOJ report as unreliable, flawed, and biased.[21] Superintendent Pesquera told journalists in April 2012 that the PRPD does not violate human rights; when pressed he acknowledged that some individual officers may do so.[22]

Immediately following the publication of the DOJ's investigation findings, Governor Fortuño issued a plan outlining a series of planned reforms, which are superficial at best, and most of which have not yet been enacted in the nine months since. To its credit, the PRPD has retained a qualified team of experts to assist them with formulating new policies, which resulted in the issuance of a new general use of force policy at the end of January 2012. However, Puerto Rico's new use of force policy falls short of constitutional and U.S. national standards and has been criticized by civil rights and human rights advocates and policing experts as vague and lacking objective criteria on the use of lethal force by PRPD

officers. In addition, most of Governor Fortuño's and the PRPD's promised reforms have not materialized. Moreover, while the issuance of the new use of force protocol is a positive first step, without effective accountability measures on the use of force, the issuance of the new policy does not guarantee that officers will follow it or that officers will be held accountable when constitutional and human rights violations occur.

If the PRPD is serious about instituting reforms, it faces a significant budgetary challenge, as the PRPD currently devotes the lion's share of its resources to the salaries of officers rather than to the systems required to ensure those officers obey the law. Former Superintendent José Figueroa Sancha told the ACLU that 93 percent of the PRPD's $700 million annual budget is dedicated to wages and salary, with only seven percent of its budget allocated for all other operations including equipment, technology, and training.[23] This budget allocation leaves a small fraction of the force's annual budget available to fund much-needed reforms such as training on protocols governing the use of force and computer technology to record civilian complaints and track repetitive conduct by abusive officers. The ratio of active PRPD officers to residents in Puerto Rico is more than twice the U.S. national average, suggesting that the department may be devoting a disproportionate amount of its resources to hiring and maintaining a too-large police force rather than putting money into much-needed reforms. One policing expert who analyzed the PRPD suggested that the department could effectively function with 13,000 officers instead of the 17,000 officers they currently employ.[24]

Recent years have seen the increasing federalization of the PRPD. Shortly after the publication of the DOJ's report, on September 20, 2011 Governor Fortuño announced a cooperation agreement between the PRPD, Puerto Rico Department of Justice (PRDOJ), and federal law enforcement agencies including the FBI and Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) expanding the categories of crimes over which federal law enforcement has jurisdiction. The agreement also included the creation of a joint state and federal Illegal Firearms and Violent Crimes Strike Force. The cooperation agreement was widely viewed in Puerto Rico to be part of a recent trend of federalization of the PRPD. One aspect of the federalization of the PRPD has been the appointment of former FBI officials to the position of Superintendent; in 14 of the last 18 years, the PRPD has been run by a former FBI official.

The September agreement implemented a February 2010 Memorandum of Understanding (MOU) between the PRPD, PRDOJ, and DOJ granting federal law enforcement agencies and the U.S. Attorney's Office primary prosecutorial and investigatory jurisdiction over certain categories of cases of possession or trafficking of controlled substances at points of entry to the island, carjacking theft of motor vehicles, bank robberies utilizing a firearm or resulting in death or serious bodily harm, and interference with interstate commerce by robbery or extortion of over $50,000.[25] The MOU also significantly expanded federal jurisdiction over firearms and weapons cases, granting federal authorities primary jurisdiction over cases involving any drug trafficking crime or drive-by shooting resulting in death, as well as any cases when the defendant is a convicted felon or known member of a gang or terrorist group; when the offense involved an illegally obtained firearm, semiautomatic assault

weapon, or firearm modified to operate differently than designed (i.e., machine guns or silencers); and when the offense involved the transporting or receiving of seven or more firearms.[26] The MOU updated and superseded a previous agreement signed in 1993.

Many in Puerto Rico have objected to the recent federalization of the PRPD, pointing to abuses committed by the FBI in Puerto Rico, including the 2005 extrajudicial killing of Filiberto Ojeda Ríos, leader of the militant pro-independence group *Los Macheteros*; and the February 2006 pepper-spraying and beating of more than 20 journalists trying to cover a high-profile FBI raid on the home of Liliana Laboy, a prominent political activist associated with the movement for Puerto Rican independence.[27] Prior to becoming Superintendent of the PRPD, during his career with the FBI José Figueroa Sancha participated in the Filiberto Ojeda Ríos operation and directed the operation outside Liliana Laboy's apartment building (because of the use of pepper spray on the journalists, the operation, known in Puerto Rico as *444 De Diego*, earned him the nickname "Pepper").

Puerto Rico Police Department officers have fatally shot, beaten, or Tasered unarmed men, teenagers, the mentally ill, individuals who posed no threat to officers or bystanders, and individuals who could have been restrained with less force. Police killed at least 21 people in 2010 and 2011, including an unarmed boy as young as 14 and a man as old as 77.



The funeral of Luis Alberto Santos Figueroa, a 14-year-old fatally shot in the back of the head by Drug Division officers about two blocks from his home. Photo Credit: Nelson Reyes Faría / Primera Hora (2011)

## III. Shooting to Kill: Unjustified Use of Lethal Force

A series of widely reported police killings over a nine-month period in 2007, one of which was captured on film, brought to light the ongoing but partially hidden problem of PRPD officers' unjustified use of lethal force. Unfortunately, PRPD officers continue to use lethal force against unarmed civilians[28] or civilians who do not pose a risk to the life of an officer or other civilian, and against civilians who could have been restrained through non-lethal means.

According to statistics provided by the Puerto Rico Department of Justice (PRDOJ), PRPD officers killed 21 people in 2010 and 2011. The PRDOJ reported that PRPD officers killed 27 people from 2009 to 2011; more than double the number the PRDOJ recorded in the four previous years, from 2005 to 2008.[29] According to statistics provided by the Special Investigations Bureau of the PRDOJ, officers shot and killed 12 people in 2010 alone.[30]

> **Puerto Rico Police Department officers killed 21 people in 2010 and 2011.**

The ACLU documented 28 cases in which PRPD officers are reported to have killed civilians between 2007 and 2011 (this figure includes shooting deaths, as well as deaths from beatings, Tasers, and other force). Based on statistics provided by the PRPD, and on additional cases documented by the ACLU and the DOJ, we have deduced that at a minimum, PRPD officers killed at least 36 people between 2007 and 2011. Community activists have pegged the number of civilians killed by police even higher. UPR student researchers identified 50 people killed by the police between 2006 and 2010, including 17 cases in 2010 alone.[31]

In a significant number of the cases documented by the ACLU, the facts as reported in the press or in related criminal or civil litigation suggest that the PRPD's use of force was unjustified, avoidable, and/or not necessary to protect the life of an officer or civilian. In some of the cases, journalists located eyewitnesses who disputed the involved PRPD officers' account of events, suggesting that the victims in these cases were actually unarmed, or had not fired a weapon.

Three of the cases we documented involved the use of lethal force against individuals with mental illness who perhaps could have been restrained through the use of non-lethal force. Four of the cases we documented involved the killing of teenagers ranging in age from 14 to 19. Several of the cases include killings by off-duty officers using their service weapons, in which the off-duty officers were reportedly attempting to effectuate an arrest for presumed criminal activity. These statistics do not include murders by off-duty officers of their partners and spouses, an issue that is addressed briefly in section VII of this report, which addresses the PRPD's failure to address domestic violence crimes by PRPD officers.

The most recent police killing documented by the ACLU took place on April 27, 2012 in the parking lot of a shopping center in Manatí. In that case, PRPD officer Alfredo Delgado shot two brothers, killing 19-year-old Saúl Medina Figueroa and critically wounding 21-year-old Adrián Medina Figueroa. The officer allegedly stopped the young men's sister for running a red light outside the taco restaurant where the siblings worked, after which her unarmed brothers and mother became involved in a verbal altercation with the officer.[32] The officer reported that he tried to use his nightstick on the family, but one of the brothers took his nightstick and hit him with it and the other brother struck him with a pipe from his car.[33] The officer shot 14 times, fatally shooting Saúl in the abdomen and leg and critically wounding Adrián with three gunshots, including a shot to his chest.[34] The brothers' sister has disputed the officer's account that he acted in self-defense.[35] The incident raises serious questions about the reasonableness of the force used by the officer, and the circumstances as reported in the press suggest that the officer's use of deadly force could have been avoided.

**Table 1:  Civilians Killed by the PRPD, Cases Documented by the ACLU, 2007–2011**

|  | 2007 | 2008 | 2009 | 2010 | 2011 | Total |
|---|---|---|---|---|---|---|
| Cases documented by the ACLU | 5 | 7 | 4 | 7 | 5 | **28** |

**Table 2:  Civilians Killed by the PRPD, 2005–2011**

| Category of Cases | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | Total |
|---|---|---|---|---|---|---|---|---|
| Cases of civilians shot and killed by the PRPD, as reported by the PRDOJ Special Investigations Bureau[36] | 3 | 2 | 6 | 1 | 3 | 12 | N/A | **27** |
| Additional cases of civilians shot and killed by the PRPD, documented by the DOJ[37] | 0 | 0 | 2 | 4 | 1 | 0 | N/A | **7** |
| Additional cases of civilians killed by the PRPD, documented by the ACLU[38] | N/A | N/A | 0 | 2 | 0 | 0 | 5 | **7** |
| **Total** | **3** | **2** | **8** | **7** | **4** | **12** | **5** | **41** |



*The mother of José Alberto Vega Jorge (inset), the unarmed 22-year-old witness to a robbery at a Burger King who was fatally shot by police. He had remained at the scene to provide police with a statement and after the gun of one of five officers at the scene accidentally discharged, another officer began shooting and fired 10 bullets, one of which fatally struck the young man in the back of his head. Photo Credit: Teresa Canino Rivera / Primera Hora (2010)*

### a. Reported Killings of Civilians by the PRPD between 2007 and 2011

The following chart details the circumstances of 28 police killings of civilians between 2007 and 2011. Information in some of the following cases is based on publically available information and news media reports; there are not yet final adjudications of guilt or innocence in a number of these cases, and in some of these cases criminal and/or civil litigation is pending. The ACLU is presenting these cases not to accuse or assign guilt to particular officers, but rather to describe the types of abuses reported by civilians and the barriers to fully investigate these allegations and hold officers accountable for unjustified killings. These cases raise serious questions about the lack of transparent, independent, and accountable mechanisms to investigate police officers who use deadly force.

Because it is difficult to obtain case information except where there was a public scandal or related litigation, this research relies heavily on cases that have been exposed by local news media. For each of these cases that emerged in newspaper headlines, there are doubtless many others. In cases that have not attracted public attention or become scandals in the media, disciplinary action and criminal prosecution is even less common.

This chart includes two cases of killings by municipal police officers. While these officers are not officially a part of the PRPD, they are trained with PRPD officers at the University College of Criminal Justice of Puerto Rico (Puerto Rico's police academy), and their alleged crimes are subject to the same investigatory procedure. These two cases are included here because the municipal police departments of Puerto Rico are plagued by the same problems of inadequate guidance on their officers' use of force, impunity for abuses, and inadequate training that are systemic in the PRPD.

**Table 3:  Reported Killings of Civilians by Police, 2007–2011**

| Reported Victim | Age | Date | Description of Incident |
|---|---|---|---|
| Luis Alberto "Beto" Santos Figueroa | 14 | December 9, 2011 | An officer assigned to the Drug Division of Vega Baja shot 14-year-old Santos Figueroa in the back of the head about two blocks from his home. According to the PRPD's account of the incident, approximately seven police agents were conducting an operation at a suspected drug point in the Brisas de Tortuguero neighborhood when the boy began to run away and pointed a gun at them. Drug Division agent Iván Robles Varela shot the ninth-grade student in the back of the head. Police reported that they recovered a firearm and drugs on or near Santos Figueroa's body. The boy's family disputed the agents' account of the incident, alleging that officer Robles Varela emerged from an unmarked car dressed in civilian clothing and carrying a gun, and shot the boy while he ran away in fear as neighbors shouted at the agent not to shoot. They also maintain that the boy did not possess a firearm and was not involved with drugs. Santos Figueroa was pronounced brain dead before dying of his injuries. Following the opening of an investigation by the Criminal Investigation Corps (CIC) of the PRPD, the Special Investigations Bureau (NIE) of the Puerto Rico Department of Justice assumed jurisdiction over the investigation into the incident. The ACLU was unable to obtain any further information about the status of the investigation.[39] |
| John Doe | 30s | December 4, 2011 | Off-duty PRPD officer Orlando Abreu Flores shot and killed a man whom he said tried to rob the sandwich truck he operated on Avenida Luis Muñoz Marín in Caguas. Officer Abreu Flores used his service weapon, shooting the alleged assailant multiple times on various parts of his body. Officer Abreu Flores reported that the presumed assailant was armed and shot at him after he identified himself as a police officer. Five bullet casings were reportedly found at the scene, all belonging to a .40-caliber firearm consistent with the officer's service weapon.[40] Press reports have not disclosed the victim's name. |

| Jaime Amell Ilaraza Ruíz[41] | 24 | November 13, 2011 | Municipal police officer Roberto Rodríguez Rodríguez shot the 24-year-old motorcyclist in the back, killing him, after pursuing him when he failed to comply with an order to stop. Rodríguez Rodríguez and another Guaynabo municipal police officer had attempted to stop Ilaraza Ruíz for speeding, and based on bullet casings recovered from the scene, it appears that Officer Rodríguez Rodríguez fired three bullets at Ilaraza Ruíz. The officers claimed Ilaraza Ruíz was armed and shot at them three times while driving away on his motorcycle, but the victim's girlfriend, Jamelyn González, who was on the motorcycle with him and witnessed the shooting, reported that he was unarmed and did nothing to provoke the officers. González told journalists that she had dropped her helmet on the road and after they stopped and dismounted, police suddenly started shooting without provocation. She said they did not hear any order to stop and did not realize they were being pursued by the police. According to press reports, no evidence the young man was armed ever came to light, and all of the weapons and bullet casings recovered at the scene belonged to the police officers. Police later publicly claimed that the reason they did not recover Ilaraza Ruíz's gun is because it was stolen from the scene. The municipal police of Guaynabo declined to investigate the killing. The NIE reportedly opened an investigation into the incident. The ACLU was unable to obtain any further information about the status of the investigation.[42] |
|---|---|---|---|
| Alexander Roja Rivera | 27 | September 13, 2011 | Off-duty PRPD officer Oscar Cortés Santiago, assigned to the Domestic Violence Division of Caguas, shot and killed a young man, presumed to be one of two men who attempted to rob a Pepe Gangas store in Caguas. According to the officer, he ordered the young men to stop, and pursued Roja Rivera when he did not obey his order. According to news reports, Officer Cortés Santiago, who pursued Roja Rivera on foot, alleges that he shot Roja Rivera with his service weapon after the hammer of Roja Rivera's gun jammed.  Roja Rivera reportedly died instantly.[43] |
| Rafael Estrada Berrios | 42 | March 9, 2011 | An off-duty PRPD officer shot Estrada Berrios three times with his service revolver after Estrada Berrios reportedly tried to rob a pharmacy in Guaynabo with a toy gun.[44] |

| George Edil Vega Mangual | 32 | September 30, 2010 | Vega Mangual, a FURA officer assigned to the Maritime Unit in Fajardo, was shot by a fellow police officer. The officer fatally shot Vega Mangual in the back with his Glock service revolver. The officer claimed afterwards that the incident was an accident, and that he had pulled out his gun when Vega Mangual asked him to hand over a tool known as a *pistola de tiempo* while the two were doing mechanic work together on a car outside a residence in Luquillo. Eyewitness accounts reportedly contradicted the shooting officer's account. News reports indicate that the officer had repeatedly been disarmed in the past because of multiple violations, but had been rearmed with a service firearm following a psychiatric evaluation. The officer was subsequently charged with second-degree murder, and convicted of fourth-degree negligent homicide.[45] |
|---|---|---|---|
| William Malaret Pagán | 77 | September 29, 2010 | The elderly Malaret Pagán was shot when Drug Division officers entered his house in Ponce to serve and execute a search warrant to look for drugs. When a knock on the family's door at 6:15 a.m. was not answered, police entered the home with force and Malaret Pagán reportedly shot at them once. Police then shot back at the elderly man four times, hitting him in the face and chest. After searching the home, no drugs were found. Neighbors suggested that the police confused Malaret Pagán's house with the house next door, where neighbors believed a drug dealer lived. Local press reported that the confidential information that led to the issuing of the warrant indicates a "large" man, in his late 30s, was using the residence to sell illegal narcotics, a description that does not match the 77-year-old elderly man. The police had executed a search at a neighboring home before entering Malaret Pagán's. According to that neighbor, the police had not presented him with a search warrant prior to searching his home, and when questioned about Malaret Pagán's house, he had explained that an elderly man lived there and it was not a drug point.[46] |
| José Alberto Vega Jorge | 22 | September 25, 2010 | PRPD officer Abimalet Natal Rosado shot the unarmed 22-year-old bystander in the back of his head. As the witness to a robbery at a Burger King in Altamira, Vega Jorge had remained at the scene to provide police with information and was not a suspect. Natal Rosado, one of five officers at the scene, reportedly began shooting after hearing another officer's gun accidentally fire. According to a forensic ballistics expert, Officer Natal Rosado fired 10 bullets, one of which struck Vega Jorge in the head. Police at the scene did not call an ambulance to provide emergency medical services. Vega Jorge was brought to a hospital over an hour after the shooting; ambulance response time in the area would have been under 10 minutes. Natal Rosado, a rookie officer who reportedly had been on active duty for only a month following 8-10 months of training in the police academy according to the then-Superintendent, was subsequently charged with second-degree murder.[47] |

| Jirón Suero Pinales | 19 | August 21, 2010 | Three agents of the Special Operations Division of San Juan shot and killed the teenage Dominican immigrant. The agents were responding to an early-morning shooting during a party at El Coquí, a cafetería/bar in Río Piedras. Suero Pinales was leaving the establishment and heading towards a bus stop when police arrived and ordered him to stop. According to the police officers, the teenager pointed a gun at them, and they fired at him. Four civilians were wounded from the gunfire inside El Coquí, one of whom suffered a punctured lung and was in critical condition after the incident. Over 20 bullet casings were recovered inside the cafetería/bar, and a revolver and a pistol were reportedly recovered on the street outside.[48] |
|---|---|---|---|
| Luis Mártir Chévere[49] | 36 | July 30, 2010 | Two Carolina municipal police officers responded to a call from Mártir Chévere's daughter, who requested their assistance with her mentally ill father, who she said was threatening her and her mother. When police arrived at the family's home, the schizophrenic man wielded two machetes, demanding that they leave. The family reportedly told the officers that Mártir Chévere was schizophrenic and begged them not to hurt him. According to press reports, when Mártir Chévere hit the officers' patrol car with a machete, the officers exited their vehicle and he then cut one of the officers on her arm and head. Both officers responded by firing their firearms simultaneously, fatally striking Mártir Chévere seven times in front of his family. Martír Chévere's sister, Wanda Mártir, criticized the police's actions in a letter to the newspaper *Primera Hora*, challenging why the officers did not seek reinforcement when they learned that they would have to intervene with a person with mental illness. She pointed out that the officers shot her brother in the chest and jaw, but not in the legs, and asked why they shot to kill rather than to immobilize him. She also questioned why the Carolina municipal police department did not provide its officers with Tasers for use in situations when officers have to immobilize people without killing them. Charges were not brought against the officers.[50] |
| Michael Martínez Travieso | 24 | May 8, 2010 | Martínez Travieso was shot in the back by an officer assigned to the Drug Division of Humacao. The officer, who was off-duty at the time, reportedly chased the victim in his pick-up truck and shot him with his service weapon.[51] |

| Luis L. Pérez Feliciano | 56 | March 26, 2010 | Pérez Feliciano, a Vietnam Veteran with schizophrenia and paranoia, was shot multiple times by one of three police officers responding to a call from his wife, who reportedly sought assistance getting her husband committed to a psychiatric institution because she believed he was experiencing a psychotic break. According to the officers' account of events, Pérez Feliciano was armed when they arrived, and a struggle over his gun ensued, during which Pérez Feliciano discharged his gun, hitting agent José Romero Quiñones in the forearm. The officer's partner, Sergeant Heriberto Acevedo Olavarría, shot at the victim four times in various parts of his body, killing him. Pérez Feliciano's wife and two daughters disputed the police officers' version of events, which they said was false. According to his wife, there was no struggle over the gun and both policemen drew and fired their guns before her husband fired a shot; she also reported that police disallowed her to approach her husband and try to calm him. One year after the killing, Romero Quiñones and Acevedo Olavarría were awarded the Gold Medal of Valor by Governor Fortuño and then-Superintendent Figueroa Sancha, although the NIE investigation into their use of lethal force had not yet concluded.[52] |
|---|---|---|---|
| Franklin Cáceres Osorio | 31 | October 2009 | Cáceres Osorio, an undocumented immigrant from the Dominican Republic and father of three, was reported to have fallen from a second story window to the ground after police entered his home in Santurce. His family alleges that the police threw him to the ground after beating him. Police reportedly delayed calling for emergency medical assistance, and as a result an ambulance did not arrive until after he had died.  Police also reportedly neglected to call the Homicide Division or the department of forensics, as is the police practice when dealing with a dead body. Instead, his family reported that they had to call a funeral home to have the body removed. No forensic investigation ever took place at the crime scene. While the autopsy report provided by Puerto Rican authorities to Cáceres Osorio's widow claimed his death was caused by cocaine, an autopsy performed upon repatriation of his body to the Dominican Republic concluded that the cause of his death was beating and blunt force trauma. The Dominican Committee of Civil Rights (*Comité Dominicano de Derechos Civiles*) has labeled his death a hate crime. According to the Dominican Committee of Civil Rights, which conducted an investigation into the case and worked closely with Cáceres Osorio's widow, the organization located a witness not interviewed by police who says he saw police beat Cáceres Osorio. According to the Dominican Committee of Civil Rights, there are no records of the incident in police department files.[53] |
| Alvin Delgado Camacho | 27 | December 27, 2009 | Delgado Camacho reportedly was killed by Tactical Operations Division officer Rigollot Colón. Colón shot the 27-year-old 15 times in the billiards hall El Terrible. Colón reportedly continued to fire at Delgado Camacho after he was already on the floor. Witnesses reported that the officer did not like something that the victim said while playing pool. |

| Heriberto Marcial Hernández | 44 | August 17, 2009 | A PRPD transit officer shot and killed Marcial Hernández after stopping him for a traffic violation in Mayagüez. According to a Puerto Rico Department of Justice press release, Marcial Hernández reached for a weapon as he was being handcuffed and shot at the officer, who shot and killed him. According to press reports, Marcial Hernández had shot and killed a man in front of a bakery earlier in the day, but the transit officer who subsequently shot Marcial Hernández did not know of the earlier incident at the time he stopped the man for speeding.[54] |
|---|---|---|---|
| Ramón Luis Martínez Rodríguez | 23 | July 25, 2009 | According to the officers involved, two armed and masked men entered a sports bar in Villalba and announced a robbery. Three armed PRPD officers assigned to various police divisions, including the Tactical Operations Division (DOT) of San Juan and the Homicide Division of San Juan, happened to be in the café at the time. According to the officers, they identified themselves as police and unholstered their service weapons. The officers say that Martínez Rodríguez then pointed a gun at one of the officers, who shot him in his head, chest, and hand. Martínez Rodríguez did not discharge his weapon, which reportedly was found at the scene. The other presumed assailant fled, and one of the officers reportedly shot at him as he was fleeing but did not strike him.[55] |
| José Luis "Goldo" Irizarry Pérez | 19 | November 4, 2008 | On election night, in response to noise complaints from neighbors in the Colinas neighborhood of Yauco, five PRPD officers arrived at a party where revelers were celebrating the election results. Irizarry Pérez attempted to intervene when the police officers harassed and clubbed his father. According to Irizarry Pérez's relatives who witnessed the attack, some of the officers, including Ángel Torres Quiñones, clubbed the unarmed teenager to death with a nightstick, beating him repeatedly in his head, face, and thorax. Also according to Irizarry Pérez's family, at least one of the officers allegedly stood by and watched. The teenager was pronounced dead on arrival at the hospital. The police officers reportedly claimed that the family was throwing bottles or rocks, but witnesses present at the party dispute this. According to Irizarry Pérez's family, the PRPD refused to identify the officers involved in the teenager's killing, and the family only learned the names of the officers when the NIE and FBI subsequently initiated an investigation. Also according to the family, the PRPD failed to provide them with information about the disciplinary status of the officers involved. Only one of the officers, Ángel Torres Quiñones, was charged for his role in the killing; he was subsequently acquitted of second-degree murder. A judge found cause to arrest another of the officers for presentation of false documents, because of redactions he allegedly made to the complaints filed concerning the incident, and the other officers involved were not charged. Irizarry Pérez's family filed a civil suit against the officers in April 2011.[56] |

| Diego Alberto Delgado Ferré | 35 | August 31, 2008 | Delgado Ferré was shot and killed by police at a gas station in Saint Just, where he was washing his wife's car. Two officers assigned to the Drug Division of Carolina reportedly were preparing for an anti-drug operation in the area when, according to them, they saw two suspicious-looking men. According to the officers, when they approached Delgado Ferré he pulled out a gun, and they shot and killed him.[57] |
| --- | --- | --- | --- |
| Víctor Manuel Sanabria Martínez | 29 | August 5, 2008 | In Las Piedras, a PRPD officer assigned to the DOT of Humacao shot and killed Sanabria Martínez, who was suspected of committing a robbery. PRPD officers reportedly ordered Sanabria Martínez to stop, but the 29-year-old man fled on foot. One of the officers reportedly shot him in the back of his head as he ran away. A senior PRPD officer publicly defended the officers' actions, telling the press that "'A person that is going to assault is going to kill and is going to do whatever. The policeman did his job.'" The shooting officer was subsequently charged with first-degree murder.[58] |
| Antonio Rodríguez Bonet | 31 | June 29, 2008 | PRPD officers in Río Piedras Tasered Rodríguez Bonet, a homeless man, who died as a result of the Tasering. Officers assigned to the Special Operations Division (DOE) had arrested Rodríguez Bonet for a suspected robbery, and applied a Taser to him while taking him into custody. Rodríguez Bonet was transferred to a jail cell, where he began convulsing and died an hour-and-a-half later. |
| Carlos Alberto Santiago Berríos | 41 | June 6, 2008 | In Bayamón, PRPD officers shot and killed Santiago Berrios, who was suspected of committing a robbery. |
| Marcos Montes Muñiz | 38 | April 28, 2008 | Officers shot and killed Montes Muñiz, who was suspected of committing a robbery and reportedly had a blade or similar knife-like weapon. The officers were responding to a call from a homeowner in Mayagüez who believed an intruder was trying to gain access to his home. The officers shot Montes Muñiz in the heart, killing him.[59] |
| Carlos William Carrasquillo Rodríguez | 55 | April 1, 2008 | In San Lorenzo, a PRPD officer shot and killed Carrasquillo Rodríguez, who was known to have mental illness. He was reportedly holding a knife. Carrasquillo Rodríguez's family had called the authorities, seeking assistance controlling the schizophrenic man. According to his family, when police arrived they approached him in the outdoor gated area where he was sitting, and instead of attempting to calm him, they beat him with a baton. The family also stated that Carrasquillo Rodríguez did not pose a threat to public safety when police arrived, as he was in an enclosed area. Carrasquillo Rodríguez reportedly pulled out a knife after the beating, and one of the officers shot him 13 times. According to the family, the PRPD never informed them of the results of the investigation into Carrasquillo Rodríguez's killing. Ten months after the killing, a municipal judge in Caguas found there was no cause to charge the shooting officer with second-degree murder.[60] |

| Jorge Luis Polaco Jiménez | 28 | October 4, 2007 | PRPD officers shot the unarmed 28-year-old eight times, seven in the back while he was in police custody. Polaco had smashed his car against the building where his ex-girlfriend worked in Carolina when Drug Division police officers reportedly shot him once in his front left shoulder and took him into custody. Polaco was taken away by PRPD officers, ostensibly to get the young man immediate medical assistance at a hospital located 10 minutes away. He arrived at the hospital dead-on-arrival one-and-a-half hours later, with seven bullet wounds to the back in addition to the single gunshot wound to his front shoulder. Police later claimed they acted in self-defense, but a private investigator hired by Polaco's mother found that he was unarmed and only had a dollar and his house keys in his pocket. As described in more detail in the case study below, the police investigation of Polaco's killing was perfunctory and wholly inadequate: police did not interview eyewitnesses to the incident and did not provide a report of their investigation to Polaco's mother, who filed multiple complaints with the PRPD but received no response other than to be told that the investigation was closed. To date, the officers have not been charged with a crime or subject to disciplinary measures for their role in the shooting.[61] |
|---|---|---|---|
| Luis Andrés Rodríguez Maya | 25 | August 15, 2007 | PRPD officer Adrián Cardoza Cardoza shot and killed Rodríguez Maya during the execution of a search warrant in Cabo Rojo. Police were conducting a raid related to the search for illegal arms when Rodríguez Maya reportedly resisted the entry of four PRPD officers who sought to search his home. According to the officers, Rodríguez Maya fired a shot that hit the ceiling of his home, and one of the officers responded by shooting Rodríguez Maya twice, killing him. Witnesses reported that upon their arrival, the police officers did not identify themselves and did not knock on the door. An investigation by the NIE found that Rodríguez Maya fired the first shot, and that he did so under the influence of cocaine.[62] |
| Miguel Cáceres Cruz | 43 | August 11, 2007 | On August 11, 2007, Cáceres Cruz, a 43-year-old father of three, was helping to direct traffic in Humacao as part of a scooter club that was providing vehicular escort for a party. Tactical Operations officer Javier Pagán Cruz shot the unarmed man four times, the fourth to his head when he was face down on the ground, bleeding from the shots to his arms and chest. The three involved PRPD officers, their superiors, and the PRPD homicide investigator attempted to cover-up the murder and claimed that the officers had acted in self-defense, alleging that Cáceres Cruz had attempted to grab officer Pagán Cruz's gun. A video filmed by a bystander clearly showing the murder was subsequently released. The case, described in more detail in the case study below, prompted a massive public outcry and exposed a number of the long-term problems that have plagued the PRPD. |

| Nelson Santiago Rivera | 21 | August 4, 2007 | A PRPD officer shot and killed 21-year-old Santiago Rivera, the son of a PRPD officer, following a fight involving several civilians at a youth festival in Las Piedras. After supposedly becoming involved in a scuffle with police, a PRPD officer reportedly shot him six times when he was lying on the ground. When Santiago's father arrived at the scene, police originally refused to allow him to approach his son, on the grounds that the area was closed for investigation. Santiago's father eventually gained access and found his son bleeding from multiple bullet wounds, and discovered officers had closed the area without providing Santiago with medical assistance. Another officer present, Javier Pagán, who would go on to shoot and kill Miguel Cáceres Cruz a week later, reportedly told Santiago's father not to bother assisting the boy, as there was "'one less criminal on the streets.'" The shooting was witnessed by Javier Pagán and another PRPD officer, neither of whom informed their supervisor or any other government officials of what they had seen.[63] |
|---|---|---|---|
| Christopher Rojas Miranda | N/A | April 10, 2007 | Police stopped Rojas Miranda for speeding in Toa Baja. He reportedly appeared to be disoriented and hallucinating, and the officers allegedly beat him before arresting and detaining him. Rojas Miranda subsequently died in a jail cell. According to news reports, an independently performed autopsy found that his death was caused by the beating, not a cocaine overdose as the officers had alleged.[64] |

Not included in the figures and chart above are cases of lethal force by law enforcement agents assigned to the Special Investigations Bureau (NIE) of the Puerto Rico Department of Justice. Like PRPD officers, NIE agents are trained at the University College of Criminal Justice of Puerto Rico (Puerto Rico's police academy), and their alleged crimes, including allegations of unjustified use of lethal force, are subject to investigation by the PRPD. The July 2011 killing of three young men by a NIE agent raises concerns about the training provided to NIE agents concerning the boundaries of lawful use of force and the PRPD's handling of cases of use of lethal force by agents assigned to the NIE.

On July 17, 2011, Ángel Fontánez Torres, a NIE agent and bodyguard for the Attorney General of Puerto Rico, shot and killed 24-year-old Jesús Emanuel González Cardona and brothers Jean Carlos Palomares and Víctor Manuel Palomares, age 25 and 28 respectively.[65] Fontánez Torres reportedly shot at the young men 14 times with his service weapon while he was off-duty; a ballistics examination reportedly determined that the young men's guns had not been fired.[66] One of the men died of bullet wounds to the head and chest, another of six bullet wounds on different parts of his body, and the third of four bullet wounds to his pelvis, back, chest, and shoulder.[67] According to the agent's account of the incident, he was outside a business in Santurce with his wife when the three armed young men attempted

to rob them at gunpoint; the agent reported that the young men had taken some of their possessions when he unholstered and fired his service weapon. According to a neighbor who told reporters he witnessed the incident, Fontánez Torres shot one of the men in the head after he was already shot in the chest and lying on the ground, and dragged another of the men on the ground before shooting him in the neck.[68] Family members reported that the young men had injuries consistent with blows to the face.[69] The mother of González Cardona, who did not die at the scene, told press that she was not notified of the incident until the next day, and that her son had a black eye, injuries on his nose, and lacerations on his arms and elbows, consistent with the dragging account.[70] The Homicide Division of the CIC conducted an investigation, which included a reenactment of the shootings but no interviews with eyewitnesses, and concluded that the agent acted in legitimate self-defense.[71] The San Juan prosecutor's office declined to bring criminal charges against the agent.[72]

**b. Case Study:  Miguel Cáceres Cruz**

The police shooting of Miguel Cáceres Cruz exposed a number of the many problems that have plagued the PRPD for years, and which continue to plague the police department. Because the shooting was caught on video by a bystander, the involved officers' cover-up of the execution-style killing was exposed and the incident provoked a public outcry against police abuse in Puerto Rico. The tragic killing of Miguel Cáceres clearly demonstrates several of the institutional failings of the PRPD that contribute to the systemic abuses committed by its officers. These failings include the failure to effectively investigate incidents including officers' lethal use of force, the failure to track repetitive conduct and flag officers at high risk of committing abuses, the failure to discipline officers who commit abuses, and the general culture of impunity that pervades the police force.

On August 11, 2007, Cáceres, a 43-year-old father of three, was helping to direct traffic in Humacao as part of a scooter club that was providing vehicular escort for a *quinceañera* party, a Latino rite of passage similar to a sweet sixteen.[73] PRPD officers Javier Pagán Cruz, Carlos Sustache Sustache, and Zulma Díaz de León were driving by, stopped, and ordered Cáceres to move his motorbike because he was allegedly obstructing traffic. Tactical Operations officer Pagán exited the police vehicle, put on his bulletproof vest, and approached Cáceres.[74] The two had a verbal exchange, and officer Díaz told Cáceres he was under arrest. Cáceres walked backwards, with his hands up, and officer Pagán grabbed him, punched him, and wrestled him to the ground.[75] Officer Pagán continued to punch Cáceres, who was on the ground and tried to protect himself by grabbing onto Pagán's leg.[76] Cáceres accidentally touched Pagán's holster as he was trying unsuccessfully to get up, and Pagán continued to punch him.[77] As they struggled, Pagán accidentally shot himself in the leg; he then unholstered his gun and shot Cáceres at close range.[78] A crowd had formed and was yelling and screaming at the police agents, but officers Sustache and Díaz prevented them from coming to Cáceres's aid.[79]

After the first shot, Cáceres's body fell to the side. Officer Pagán then fired at Cáceres three or four more times while the man was lying on the ground, shooting him in the back and the

head at very close range.[80] The last shot was fired execution-style in the back of his head, when Cáceres was lying motionless face-down on the ground and bleeding from the shots to his arms and chest.[81] The officers left Cáceres bleeding on the sidewalk and drove away without notifying central command that a civilian had been shot.[82]

Another set of officers later arrived at the scene and found Cáceres dying on the sidewalk; they transported him to the hospital, where he was pronounced dead.[83] Two eyewitnesses to the shooting told one of these officers, Lieutenant Luis Rodríguez, what had happened. Lieutenant Rodríguez subsequently prepared a report of what he had been told.[84]

> **At the time he shot and killed Miguel Cáceres, officer Pagán was the subject of seven disciplinary complaints, five of which remained unresolved at the time of the killing and dated back as far as nine years earlier.**

The three involved PRPD officers, their superiors, and the PRPD homicide investigator attempted to cover-up the murder.[85] The three involved officers' initial report claimed that the officers had acted in self-defense, and that Cáceres had resisted arrest and attempted to grab officer Pagán's gun.[86] In their reports, the line supervisors relied on the account of events provided by the involved officers.[87] A PRPD homicide investigator appointed to investigate the killing did not record the names of witnesses present at the killing who related a version of events different than the version told by the involved officers.[88] The PRPD homicide investigator's preliminary report consisted only of statements from officer Sustache, officer Díaz, and the single witness who corroborated the involved officers' account of the incident.[89] The homicide investigator wrote, "Also, various persons at the scene were interviewed, but they said adverse things about the officers."[90]

However, unbeknownst to the officers, a bystander had surreptitiously filmed the incident and released the video, which exposed the PRPD officers' and supervisors' cover-up.[91] The video clearly showed officer Pagán standing over Cáceres and shooting him in the head while he was lying face-down, and it was widely disseminated by the media, provoking massive public outrage. If there had not been a video, there most likely would have been no accountability for Cáceres's murder.

On August 14, 2007, Pagán was charged with murder. Pagán was convicted of first-degree murder and weapons violations, and was sentenced to 109 years in prison; Sustache and Díaz were acquitted on all charges.[92] A civil suit filed by Cáceres's widow, Evelyn Ramírez Lluveras, and their three children against the PRPD Superintendent and supervisors was dismissed in December 2011 on the ground that their negligent actions did not rise to the level of deliberate indifference, while the family's suit against Pagán was allowed to proceed.[93] They intend to appeal the decision.

At the time he shot and killed Cáceres, officer Pagán was the subject of seven disciplinary complaints, five of which remained unresolved at the time of the killing and dated back

as far as nine years earlier.[94] These complaints included multiple complaints of assaults against civilians, a 1999 complaint filed by a supervisor for insubordination, a complaint for falsifying a police report, and a complaint for refusing to attend to a citizen attempting to file a complaint.[95] Also among the complaints against him was a 1999 complaint for domestic violence in which Pagán allegedly physically attacked and threatened his intimate partner with a firearm.[96]

Pagán's disciplinary file revealed that he had been assessed by police psychologists as a "ticking time bomb," and he had two recommendations of expulsion from two different police superintendents.[97] Notwithstanding his disciplinary history, when the second recommended expulsion was pending, Pagán was promoted to the Tactical Operations Division of Humacao, to work in a specialized and elite group within the division, called the Special Response Team.[98] The two expulsion recommendations were lowered to suspensions as a result of an internal disciplinary hearing by the Commission on Investigations, Processing, and Appeals (*Comisión de Investigación, Procesamiento y Apelación*, or CIPA).[99] Pagán served his suspension from the PRPD from August 23, 2006 to October 22, 2006, returning to work about nine-and-a-half months before killing Cáceres.[100] Pagán's 44-officer unit was supervised by only two sergeants, one of whom had been on leave for weeks at the time of Cáceres's murder.[101] When Pagán was finally expelled he had two civilian complaints against him pending, both of which had been filed eight years earlier.[102]

Moreover, both officers Pagán and Sustache had witnessed the police killing of a young man, Nelson Santiago, one week earlier and had not been interviewed about the killing they witnessed.[103] They also were aware that the officers involved in that unjustified killing had enjoyed complete impunity, and in fact had not even had their service weapons taken after the killing. In that case, Nelson Santiago, son of a PRPD officer, was shot and killed during a youth festival in Las Piedras. When Santiago's father arrived at the scene, police officers originally refused to allow him to approach his son, on the grounds that the area was closed for investigation. Santiago's father eventually gained access and found his son bleeding from multiple bullet wounds, and discovered officers had closed the area without providing Santiago with medical assistance. Officer Pagán, who would go on to shoot Cáceres one week later, reportedly told Santiago's father not to bother assisting the boy, as there was "'one less criminal on the streets.'"[104] Niether Pagán nor Sustache informed their supervisor or any other government officials of what they had witnessed.[105]

### c. Case Study:  Jorge Luis Polaco Jiménez

The police killing of **Jorge Luis Polaco Jiménez**, a 28-year-old Black man extrajudicially executed by police assigned to the Carolina Division of Drug, Narcotics, and Vice on October 4, 2007, similarly exposes several systemic problems that plague the PRPD: the failure to adequately investigate police shootings of civilians, the failure to hold responsible officers accountable for unlawful use of lethal force even in cases where force was obviously unjustified, and the failure of the PRPD's internal disciplinary system to flag officers at risk for abusive conduct.



A hospital record of Jorge Luis Polaco Jiménez showing the location of his gunshot wounds. PRPD officers shot the unarmed 28-year-old eight times, seven in the back while he was in police custody. The investigation into his killing was closed without interviewing witnesses or examining forensic evidence, and the responsible police officers were never brought to justice. Photo Credit: Courtesy of Ruth Jiménez de Jesús

Polaco had smashed his car against the building where his ex-girlfriend worked on Avenida Campo Rico in Carolina when Drug Division police shot him once in his front left shoulder and took him into custody.[106] Polaco was taken away by PRPD officers, ostensibly to get the young man immediate assistance at a hospital located a 10-minute drive away. He arrived at the hospital dead-on-arrival one-and-a-half hours later, with seven bullet wounds to the back in addition to the single gunshot wound in his front shoulder.[107]

Since that day, Polaco's mother, Ruth Jiménez de Jesús, has been tirelessly seeking both justice and the truth of what happened to her son. The police investigation of Polaco's killing was perfunctory and wholly inadequate: police did not interview eyewitnesses to the incident and did not provide a report of their investigation to Polaco's mother.[108] Jiménez de Jesús filed multiple complaints with the PRPD, but received no response other than to be told that the investigation was closed.[109] After perseverance she eventually obtained autopsy documents, including a drawing indicating the locations of the gunshot wounds on her son's body.

Polaco's mother continued to seek out the details of her son's killing, and returned to the scene where her son was initially shot and taken into custody in the hope of finding

a witness. She told the ACLU, "I went every day, every afternoon, so I could shed some light on what happened because the investigation was closed."[110] She hired a private investigator, who found that her son was first shot in his front left shoulder at about 7:00 p.m., shortly after which Jiménez de Jesús received a call from police stating that her son had been brought to the local police station.[111] The investigator located an eyewitness never interviewed by the PRPD who saw officers shoot her son in the shoulder and subsequently load him into a patrol car.[112]

According to the private investigator's findings, the other seven gunshot wounds to Polaco's back were later inflicted after he had been loaded onto the agents' patrol car. Although the Carolina hospital was located only a 10-minute drive from the location where police took Polaco into custody, police agents delivered Polaco to the hospital one to one-and-a-half hours later, at 8:35 p.m., dead on arrival.[113] Police had claimed they acted in self-defense, but the private investigator found that Polaco was unarmed and only had a dollar and his house keys in his pocket; the officers were wearing bulletproof vests and carried firearms.[114]

> **"If my son broke the law he belongs in a jail cell, not a cemetery."**

The police officers involved in Polaco's arrest and killing were never subjected to any disciplinary measures, and the ACLU has documented the involvement of one of the two involved officers in a recent police beating of 62-year-old Julio Cirino in his home that left him unconscious and hospitalized for a blood clot in his brain and other injuries. The officer, Isaac Joel Pizarro Pizarro, was later shot and killed in an unrelated incident in December 2011. The other officer is now reportedly working for U.S. Border Patrol.

Moreover, the ACLU of Puerto Rico recently obtained a memo on PRPD letterhead by a police psychologist, dated one year before the officer shot Polaco, stating that one of the officers implicated in Polaco's shooting should not be rearmed. This suggests that the PRPD failed to disarm the high-risk officer, a pervasive problem that we documented in other cases, as detailed in Section VIII of this report.

Jorge Polaco's mother Ruth told the ACLU, "My wish is that the guilty pay, that those responsible pay their due, that they end up in jail. If I killed someone, I would be in jail," adding, "If my son broke the law he belongs in a jail cell, not a cemetery."[115] She says she is still seeking justice, and cannot rest until she knows the truth of what happened to her son. She told the ACLU,

> "I have never had any peace or tranquility. I have continued searching and searching to learn what happened to my son that day.... This pain that I have, it is so enormous. And my pain and misery is worse because the police never did an investigation.... I've always wondered where they took him and what they did to him during that hour-and-a-half. What I need to know is: what happened?"[116]

Puerto Rico Police Department officers assigned to tactical units regularly use excessive force while on routine patrols and at checkpoints in predominantly low-income, Black, and Dominican communities.  During encounters with civilians in these communities, officers routinely use excessive force or resort to force unnecessarily and inappropriately.




Dominican immigrant Joel Félix was brutally beaten by police while he was walking home alone one night. The officers left him dying on the sidewalk. He required emergency life-saving surgery because of internal bleeding and organ damage to his spleen and liver caused by the police beating. Photo Credit: ACLU (2011)

## IV. Police Brutality against Low-Income, Black, and Dominican Communities

PRPD officers assigned to tactical units regularly use excessive force while on routine patrols and checkpoints in predominantly low-income, Black, and Dominican communities. During encounters with civilians in these communities, officers routinely use excessive force or resort to force when it is unnecessary and inappropriate. PRPD officers routinely use aggressive tactics that disproportionately target racial minorities and the poor. Young men who live in predominantly low-income, Black or Dominican communities reported to the ACLU that PRPD officers subject them to constant harassment and intimidation. Instead of using de-escalation techniques, officers use force as a substitute for community policing.

Police use excessive force including beating with batons, kicking, punching, throwing on the ground or against walls and objects, chokeholds, and shooting with firearms. In the cases documented by the ACLU, police inflicted injuries including: a broken jaw, cracked or lost teeth, bone fractures, internal bleeding, severe contusions, abrasions, lacerations, organ damage, organ failure, traumatic brain injury, paralysis, brain death, and death. At the time of officers' use of force in the cases documented by the ACLU, victims were not resisting arrest or were already restrained, unarmed, and posed little or no risk of harm to officers or bystanders. The ACLU documented cases in which police severely beat individuals already restrained in handcuffs, and in some cases police did not arrest victims after injuring them, merely leaving  them broken and bleeding on the street or in their homes.

Excessive use of force is rampant. According to data provided by the PRPD's Auxiliary Superintendency for Professional Responsibility (*Superintendencia Auxiliar de Responsabilidad Profesional*, or SARP), which oversees the internal administrative investigations of PRPD officers, civilians filed at least 1,768 complaints against officers for excessive or unjustified force and assault from 2004 to August 2010.[117] These numbers are most surely low and do not accurately represent the extent of the problem: as detailed in Section VIII of this report, the ACLU's research shows that civilians regularly elect not to report police abuse because of a lack of faith in the investigatory and disciplinary system; because of widely-known impunity for police abuse; and because of fear of retribution for filing complaints of civil rights and human rights violations.

Excessive force is routine among police officers in multiple tactical units of the PRPD. Based on the ACLU's research, we have determined that particularly problematic units include the Tactical Operations Unit (*Unidad de Operaciones Tácticas*, or UOT), whose work is carried out by a Tactical Operations Division in each of the 13 police regions (*División de Operaciones Tácticas*, or DOT), colloquially known as the Riot Squad (*Fuerza de Choque*); and the Drug, Narcotics, Vice, and Illegal Weapons Bureau (*Negociado de Drogas, Narcóticos y Control de Vicios y Armas Ilegales*, or NDNV), which is represented in each of the 13 police regions across the island by a Division of Drug, Narcotics, and Vice (*División de Drogas,*

*Narcóticos y Control de Vicios*), commonly known as the Drug Division (*División de Drogas*). Also problematic is the Specialized Tactical Unit (*Unidad de Tácticas Especializadas*, or UTE), commonly known as the Group of 100 (*Grupo de Cien*), an elite unit of officers grouped into multidisciplinary teams drawn from several different police units including drug, traffic, stolen vehicles and the UOT, to combat the drug trade in Puerto Rico. Other specialized tactical units also routinely use extreme force.

### a. Excessive Force against Low-Income Communities

PRPD officers assigned to tactical units frequently commit abuses during raids in public housing projects (*caseríos* or *residenciales públicos*) in urban neighborhoods and other low-income communities. For years low-income community leaders and members have decried the PRPD's frequent harassment and intimidation of residents at check-points set up by PRPD officers in their communities, as well as raids in which PRPD officers ostensibly searching for weapons and drugs conduct warrantless searches of multiple homes and verbally threaten residents, in some cases physically attacking residents, destroying their belongings, or arresting them without cause.

For example, on October 25, 2010, PRPD officers, including officers assigned to the Joint Rapid Action Force Unit (*División de Fuerzas Unidas de Rápida Acción*, or FURA), raided the Villa Esperanza public housing complex in San Juan with police cruisers and helicopters.[118] Residents of the public housing complex later reported that PRPD officers verbally threatened and harassed residents, and arrested some residents without cause. On April 18, 2009, according to residents of the Candelaria public housing project in San Juan, PRPD officers entered the public housing complex and pushed, hit, and insulted residents indiscriminately.[119] Similarly, residents of the Las Gladiolas public housing complex in San Juan reported that PRPD officers conducted an abusive drug raid on the complex that did not yield any arrests, after which they carried out what residents called a police occupation of the area.[120]

PRPD officers assigned to the Division of Drug, Narcotics, and Vice frequently commit abuses during so-called anti-drug operations. In one case documented by the ACLU, Drug Division officers savagely beat unarmed 28-year-old Mauricio Alejandro Castillo Shaw. On April 29, 2010, PRPD Drug Division officers pounded on the door of Castillo Shaw's home, and when he opened the door, approximately 20 Drug Division officers entered and informed him they had an order to enter, although they did not show him a warrant at any time.[121] The officers immediately handcuffed him before searching his house. According to Castillo Shaw, after he was handcuffed with his arms behind his back, four of the officers pushed him against the wall, threw him against the ground, and hit his face against the ground, breaking his two front teeth and breaking his jawbone.[122] The officers then lifted him by his handcuffed wrists and began punching him and striking him with batons while he was still handcuffed.[123] Castillo Shaw told the ACLU, "They lifted my head, and I could feel that my mouth was full, and I realized it was full of blood.  Blood was running down my face and pouring out of my mouth."[124]

 

"They lifted my head, and I could feel that my mouth was full, and I realized it was full of blood. Blood was running down my face and pouring out of my mouth."

Drug Division officers savagely beat unarmed Mauricio Castillo Shaw in his home. After handcuffing him, they smashed his face against the ground, breaking his jawbone and shattering his two front teeth. They then punched him and struck him with batons while he was still handcuffed. Photo Credit: ACLU (2011)

The officers then searched the house. Castillo Shaw says that he was subsequently released without charge or citation, and police did not find any drugs or weapons, but he reports that police did find a firearm, marijuana, and drug paraphernalia at a home located five houses away from his.[125] That day Drug Division officers arrested 18 people from different residences in the community. As part of the same operation, Drug Division officers reportedly beat at least two other young men in their homes in a manner similar to the attack on Castillo Shaw. Castillo Shaw required emergency medical treatment for his injuries, and he saw these two men at the hospital being treated for their injuries.[126]

Castillo Shaw filed a complaint with the PRPD that same day, in which he verbally provided detailed information about the incident and provided photos taken of his substantial injuries while he was in the hospital. He did not know the name of the officer who had beaten him, who had not identified himself. He says that the written complaint prepared by the officer who attended him did not contain any of the detailed information that he had provided, and failed to mention that the officers had broken his jawbone. He told the ACLU, "The complaint didn't include anything that I said. It just said 'Report of Incident,' but it didn't say how they broke my face. It simply wasn't the version of events that I told them."[127] One week later, on May 7, 2010, PRPD officers entered Castillo Shaw's home and told him he was under arrest. He was retroactively charged with two counts of possessing controlled substances and one count of possessing illegal weapons, based on the operation conducted one week earlier. He told the ACLU, "I think personally that they brought charges against me because I made the complaint. The only other people who had charges brought against them were the other two men who were beaten. They were charged on the same day as me."[128] Castillo Shaw has heard nothing about the status of his complaint.

Castillo Shaw believes the criminal case against him may not proceed because the PRPD officers involved in the operation claim that all videos and photos taken by police during the operation have been erased. Castillo Shaw told the ACLU, "All the photos of that operation taken by police have been erased because they prove the police are lying. I am sure there must be photos of the police beating me."[129]

In another incident, on February 23, 2011, police officers conducted an operation in the community of Sector Miñi-Miñi in Loíza, during which 10 armed PRPD officers entered the home of 62-year-old Julio Cirino and brutally battered and kicked him in the head and ribs in front of his daughter, rendering him unconscious.[130] The officers claimed to be looking for weapons and drugs but never presented a warrant to search their home.[131] Cirino, who was unarmed and had merely been talking with a neighbor when police arrived, lost consciousness as a result of the beating and had to be transported from the scene by ambulance.[132] According to his daughter, he subsequently had to be hospitalized for a blood clot in his brain and other injuries inflicted by the police officers.[133] The ACLU of Puerto Rico interviewed Cirino's daughter, who witnessed the incident and says her father did not resist or struggle with the police in any way.[134] Cirino's daughter initially filed a civilian complaint with the PRPD denouncing the attack on her father, but the family subsequently decided not to continue with the complaint.[135]

More recently, the ACLU of Puerto Rico has documented numerous cases of police abuse in La Perla, one of Puerto Rico's oldest and largest low-income communities, built in the World War II-era in San Juan. In June 2011, PRPD officers conducted an abusive and violent raid on residents of La Perla. In August 2011, the ACLU of Puerto Rico conducted public hearings in which community residents denounced assaults, illegal searches, baseless arrests, and harassment by PRPD officers. La Perla resident Rafael Ortíz told the ACLU, "Nowadays [the police] break down doors and windows and conduct illegal searches, claiming they are looking for a suspect."[136] Ortíz reported that after the June 2011 raid, police officers inspected baby carriages and students' book bags without warrants or legal authority.[137] Tania Amigón, another resident, told the ACLU that on June 24, 2011, several officers entered the community and clubbed people on the street. She said, "At least five women and two children were injured then."[138] Amigón added, "I don't feel any safer when [the police] are around. As a matter of fact, I feel safer when they are not."[139]

### b. Excessive Force against Afro-Puerto Rican Communities

The ACLU documented multiple cases of unjustified police violence against residents of Loíza, a predominantly Afro-Puerto Rican municipality. According to Census statistics from 2010, the municipality is predominantly Afro-Puerto Rican, with nearly 65 percent of residents identifying as Black. The municipality also is predominantly low-income, with 67 percent of the population living below the poverty line and a median household income of $8,962, according to 2006 Census statistics.

The ACLU interviewed 20-year-old Luis Ayala Rivera, a young Black man living in Villa Cañona, an Afro-Puerto Rican community in the municipality of Loíza. He witnessed police assigned to the Tactical Operations Division shoot his unarmed 22-year-old brother, José Amaury Ayala Rivera, in the head on a Saturday night in September 2010 while the two were returning home from a party.[140] Ayala told the ACLU, "I saw it all. They told him to stop and he began to run, and they shot at him. The officer fired two shots. The first missed its mark and the second struck my brother in the head. Then the officers made a barrier and would not let anyone pass to get to my brother and help him. They said he was dead and wouldn't let me approach him, but I could see he was moving and still alive."[141] The brain injuries Ayala's brother sustained from the gunshot wound have left him paraplegic and confined to a wheelchair for the rest of his life.[142]

According to Ayala, his family filed an administrative complaint with the PRPD but received no response.[143] The family later filed a civil lawsuit against the PRPD for monetary damages, and accepted a $90,000 settlement offer. He said, "We didn't have any other witnesses. They offered $90,000 and we accepted it because we are poor. They took advantage of the fact that we didn't have witnesses. It's just too sad."[144] Ayala says no criminal charges were brought against the officer, who is still on active duty with the PRPD. Ayala told the ACLU, "The abuse will repeat itself—in nine months, one year, the police will do it again, and our tears will be someone else's tears."[145]

> "The abuse will repeat itself—in nine months, one year, the police will do it again, and our tears will be someone else's tears."

Ayala told the ACLU that PRPD officers are a near-constant presence in his community, and they frequently harass young men. He said, "You can't walk around on the streets in peace; almost no one dares to go around. Some of my friends have been victimized by the police recently. No one can be at peace in my neighborhood."[146] He added,

> "The [police's] racism is very, very, very bad against our community. It's terrible what is happening to us. The police do their work, but they don't do their job as they should. If people are gathered at a business or a party in our neighborhood, everyone minding their own business and not breaking the law, the police will come and injure people without any reason. It's police brutality without any reason or justification. Where I live, the police think everyone is a drug trafficker, but that's not how it is. The police come in with violence, guns drawn, shooting and beating everyone. The police need to think differently, not to just assume that everyone in my community is bad."[147]

Other Black residents of Villa Cañona reported ongoing police aggression, harassment, and intimidation. Evelyn Rivera, a single parent of two, one of whom is afflicted with severe cognitive deficiency, told the ACLU that PRPD officers have repeatedly beaten and pepper-sprayed her severely developmentally disabled 27-year-old son, Edgar Pizarro Rivera.[148]

According to Evelyn Rivera, police have seized and beaten her son with nightsticks while he rides around the neighborhood on his bicycle on numerous occasions between 2007 and 2008, and again in 2011. He suffered bruising from these attacks, including bruising around his genitals, and is now terrified to play outside. During the attacks on her son, who has a mental capacity of a five-year-old, police have repeatedly used racist language that suggests that the attacks are at least partially racially motivated.[149] Evelyn Rivera witnessed one police attack on her son during which PRPD officers called her son "a dirty negro," and she has witnessed officers use the same language against other residents of her community.[150] Rivera filed three complaints concerning police abuse against her son, and received no response to her first two complaints, and merely received a letter stating that the complaint had been "archived" without any explanation.[151] Rivera told the ACLU, "I don't believe in the police complaint system. They wouldn't take any of my complaints seriously. I have never had confidence in the police, and every day I trust them even less."[152]

### c. Excessive Force and Other Police Abuse against Dominican Immigrants and Puerto Ricans of Dominican Descent

Dominican community leaders, the ACLU of Puerto Rico, and other civil rights advocates have for many years denounced discriminatory policing practices including incidents of extreme police abuse motivated by national origin in several communities known to be predominantly inhabited by Dominican immigrants and people of Dominican descent, including the Santurce sector of San Juan, Puerto Rico. According to Dominican community leaders, PRPD officers target communities that are known to be predominantly Dominican, and officers also target individuals who physically appear to be Dominican or who are identifiable by their accent when they speak. In these cases, officers often use racial epithets and xenophobic slurs relating to their Dominican origin, indicating that these PRPD officers are motivated by racial or ethnic bias.

The spokesperson of the Dominican Committee of Civil Rights (*Comité Dominicano de Derechos Civiles*), José Rodríguez, told the ACLU that he has been documenting cases of police brutality against Dominican immigrants and Puerto Ricans of Dominican descent over the past 15 years.[153] According to Rodríguez, the Dominican Committee of Civil Rights has documented 26 police killings of Dominican immigrants between 2000 and 2011.[154] He also reported that PRPD officers routinely search the homes of Dominican immigrants without warrant or permission, and ask individuals who appear to be Dominican for identity documents and proof of immigration status without reasonable suspicion or legitimate law enforcement purpose.[155]

Puerto Rico press reports have similarly reported that the PRPD discriminatorily targets Dominican immigrants and routinely subjects them to warrantless searches of their homes without permission.[156] According to these press reports, PRPD officers routinely demand identity documents and proof of immigration status from Dominican immigrants, and when these civilians refuse to provide evidence of citizenship or lawful permanent residency, PRPD officers arrest them without cause or issue baseless citations that carry heavy fines.[157]

One of the cases documented by the Dominican Committee of Civil Rights is the October 2009 police killing of Franklin Cáceres Osorio, an undocumented immigrant from the Dominican Republic and father of three.[158] Cáceres Osorio was reported to have fallen from a second story window to the ground after police entered his home in a predominantly Dominican community of Santurce.[159] His family alleges that the police threw him to the ground, and that he did not fall by accident. Police delayed calling for emergency medical assistance, and as a result an ambulance did not arrive until after he had died. Police neglected to call the department of homicides or the department of forensics, as is the custom when dealing with a dead body. Instead, his family had to call a funeral home to have the body removed. No forensic investigation ever took place at the crime scene. While the autopsy report provided by Puerto Rican authorities to Cáceres Osorio's widow claimed his death was caused by cocaine, an autopsy performed upon repatriation of his body to the Dominican Republic concluded that the cause of his death was beating.[160] The Dominican Committee of Civil Rights has labeled his death a hate crime. According to the Dominican Committee of Civil Rights, which conducted an investigation into the case and worked closely with Cáceres Osorio's widow, located a witness not interviewed by police who says he saw police beat Cáceres Osorio.[161] According to Rodríguez, there are no records of the incident in police department files.[162]

Another incident documented by the Dominican Committee of Civil Rights is the September 12, 2010 assault and mass arrest of about 75 Dominican immigrants who were participating in or watching a cockfight in Río Piedras.[163] According to the Dominican Committee of Civil Rights, a group of about 10 police officers assigned to the Drug Division entered the building without a warrant and began shooting in the air "like cowboys."[164] The officers reportedly demanded to see the spectators' immigration documents and arrested all of the young Dominican men present at the cockfight.[165] According to Rodríguez, when family members came to the police station to look for the men who had been arrested, PRPD officers demanded as much as $300 from each family in exchange for releasing and not deporting them.[166] According to the Dominican Committee of Civil Rights, PRPD officers beat and handcuffed one young woman named Stefany Bello, and told her, "Shut up, you damned Dominican."[167] Bello later told journalists that police slapped her and claimed her immigration documents were false when she asserted that she is a documented immigrant.[168]

The ACLU documented numerous cases of police brutality committed by PRPD officers in the course of an August 2009 government attempt to forcefully evict the residents of Villas del Sol, a squatter community comprised mostly of indigent families of Dominican origin. Police officers violently attacked members of the community, which mainly consisted of female heads of households and children, by beating, pepper-spraying, and Tasering them, and in some cases tossing women over concrete barriers. One former resident of the community, Laura Mota, told the ACLU that during the first attempted forced eviction on August 4, 2009, Riot Squad officers doused her face with pepper spray, then pulled her by her hair, threw her over a chest-high cement barrier, punched her, dragged her, and kicked her with their boots.[169] Mota says that she had merely shouted at police that they should



**Riot Squad officers doused Laura Mota's face with pepper spray, pulled her by her hair, threw her over a chest-high cement barrier, punched her, dragged her, and kicked her.**

During the attempted forceful eviction of a predominantly Dominican squatter community, police violently attacked residents, including Laura Mota. Photo Credit: ACLU (2011)

leave and denounced them for the violence they were using against other members of the predominantly Dominican community, and that she was not resisting or threatening police in any way, and indeed was so weakened by the initial pepper spraying that she was incapable of taking any action against the police.[170]

Mota also witnessed police drag, kick, punch, and pepper-spray her eight-months-pregnant friend Maritza de la Cruz, rendering her unconscious, and she saw police pepper-spray and beat Maritza's five-year-old son with nightsticks.[171] Mota also witnessed police kick a man in the back and Taser him eight times while he screamed, "They're going to kill me!"[172] Mota says, "That screaming still haunts me to this day. He had foaming coming out of his mouth and blood all over his face."[173]

Mota told the ACLU that the police used racial and ethnic epithets throughout the violent attempted eviction operation and during the subsequent police occupation of the community over the next year-and-a-half, until the final eviction of the community in December 2010.[174] According to Mota, police repeatedly told residents, "Goddamned Dominicans," "Go back to your country," "We should have killed you," and when a 20-year-old Dominican woman required medical treatment for an epileptic seizure, an officer who refused to call an ambulance said, "One Dominican less."[175] Mota told the ACLU, "It was hard listening to those racist remarks all the time."[176] Between August 4, 2009 and December 31, 2010, PRPD officers also frequently pulled people out as they were driving out of the community and demanded to see their green cards, not their licenses, as a form of baseless harassment targeting Dominican immigrants living in Villas del Sol.[177]

The ACLU also documented the cases of two young Dominican men brutally beaten by police in separate incidents in Santurce. In both cases the young men were unarmed and required lifesaving surgery for their injuries. In late May 2009, when Dominican immigrant Joel

Félix was 24 years old, he was walking home alone just after midnight following a Saturday evening out with friends.[178] As he walked under a bridge he saw about six to eight PRPD officers, who exited their patrol car and shined flashlights in his eyes. One of the officers immediately told him to put his arms around his back, and they handcuffed him without telling him the reason for stopping and handcuffing him. The officers then savagely beat him with their fists and gloves and kicked him with their boots. He fell to the ground and lost consciousness. Félix says that the officers surely knew that he is a Dominican immigrant, as he has an identifiable Dominican accent.[179]

Félix woke up in a hospital bed, flat on his back and in extreme pain. The police officers had apparently abandoned him on the side of the road, and had used his cell phone to call his sister and tell her that he was lying on the ground. It took his sister an hour to find him, and he initially did not want to seek treatment at the hospital because he was terrified that the police officers would come looking for him.[180] However, he was in such severe pain he could not sleep or eat, and he allowed his mother to take him back to the hospital.[181] There, a doctor told him that he needed emergency surgery immediately because of internal bleeding and organ damage to his spleen and liver caused by the police beating.[182] The doctor told him that he would die without surgery, and would have died if he had delayed seeking medical assistance any longer. Félix was hospitalized for a full month, and had to pay for all of his medical expenses.[183]

Félix filed a complaint with the PRPD while in the hospital, but he was so terrified of police retribution if he proceeded with the complaint that he dropped it after PRPD officers stopped by his home. Because the officers had not identified themselves during the attack, had not filed an incident or arrest report, and had shone their flashlights directly into his eyes, making it impossible for him to see their faces, Félix was unable to identify any of the responsible officers.[184] Félix wanted to file a civil lawsuit against the PRPD for monetary damages, but he says that he was unable to afford to pay a lawyer for the legal fees, which cost a minimum of $5,000 to commence work on the case.[185]

Félix told the ACLU, "Now, when I see a group of police I feel nervous and leave the area. When one police officer comes while you're alone on a corner and he hears that you're a Dominican, they use brutal force, thinking that we can't do anything against them. When they're in a group, that's when they are even more abusive."[186] He added, "There is substantial racism against Dominicans, because there have been many cases of police abuse against Dominicans. Many times the police stop Dominicans for something simple, like not wearing a seatbelt, and they intimidate and harass us."[187]

The Puerto Rico Police Department frequently and systematically uses excessive force against protesters. Officers indiscriminately used a toxic form of tear gas, pepper spray, batons, rubber bullets, sting ball grenades, Tasers, carotid holds, and painful pressure point techniques on protesters.



Riot Squad officers in formation on the University of Puerto Rico campus while students march in protest. An officer in the foreground holds a riot gun that fires aluminum canisters of tear gas. Photo Credit: Gerald López-Cepero / Primera Hora (2010)

# V. Billy Clubs versus Speech: Excessive Force against Protesters to Suppress Speech and Expression

Since 2009, the PRPD also has regularly used excessive force against protesters. Even as police crackdowns on the Occupy movement have brought attention to the problem of police abuse against protesters elsewhere in the United States, the PRPD has failed to address its systematic use of force against protesters. Officers have routinely used excessive force to suppress First Amendment-protected activity, indiscriminately using chemical agents such as pepper spray and a toxic form of tear gas, batons, rubber bullets and rubber stinger rounds, sting ball grenades, bean bag bullets, Tasers, carotid holds, and pressure point techniques on protesters. Police have regularly used excessive force in violation of protesters' First Amendment right to freedom of speech, expression, and assembly, as well as their Fourth Amendment right to be free from unreasonable searches and seizures. These police practices also violate protesters' human rights to free speech, expression, and peaceful assembly, and the strict prohibition on torture and cruel, inhuman, or degrading treatment under international law.

The PRPD has regularly responded to largely peaceful protests by deploying scores of officers assigned to Tactical Operations Units (*Unidad de Operaciones Tácticas*, or UOT), colloquially known as the *Fuerza de Choque* (literally translated as Strike Force) or Riot Squad. When responding to protests, Riot Squad officers typically wear full riot gear, including padded body armor, helmets with visors, combat boots, and plastic shields. They are customarily armed with long crowd-control batons; aerosol pepper spray canisters; tear gas riot guns, rubber bullet guns, and/or pepper-ball guns; and firearms with live ammunition. Riot Squad officers are visually threatening and imposing; tall and muscled, Riot Squad officers are a minimum height of 5'10" according to PRPD regulations. The Riot Squad frequently works closely with the Specialized Tactical Unit (*Unidad de Tácticas Especializadas*, or UTE), commonly known as the Group of 100 (*Grupo de Cien*), an elite unit of officers grouped into multidisciplinary teams drawn from several different police units including drug, traffic, stolen vehicles, and the UOT. Officers assigned to the Criminal Investigation Corps (*Cuerpo de Investigaciones Criminales*, or CIC) also were frequently deployed to protests.

The ACLU documented numerous instances of police abuse against protesters at locations that are traditionally the site of public protest in Puerto Rico, including outside the Capitol Building, the Supreme Court of Puerto Rico, the Governor's mansion, and the Government Development Bank for Puerto Rico, and on the campus of the University of Puerto Rico (UPR). Many of these incidents were captured on video and camera. In the cases documented by the ACLU, as a result of the PRPD's excessive use of force, numerous protesters required and received medical treatment for blunt and penetrating trauma, contusions, head injuries, torn ligaments and sprains, respiratory distress, and second-degree burns from chemical agents.

In remarks on the House floor in February 2011, Representative Luis V. Gutierrez addressed the U.S. House of Representatives to draw attention to the PRPD's attacks on peaceful protesters:

> "I want to talk to you today about a part of the world where the rights of citizens of all walks of life to protest and speak their minds is being denied, with clubs and pepper spray. A part of the world where a student strike led the university to ban student protests anywhere, anytime on campus, and where, when the students protested the crackdown on free speech, they were violently attacked by heavily armed riot police.... What faraway land has seen student protests banned, union protesters beaten, and free speech advocates jailed? The United States of America's colony of Puerto Rico."[188]

Despite the widespread use of violence on protesters during several of the incidents documented by the ACLU, including the June 30, 2010 incident at the Capitol and the May 20, 2010 incident at the Sheraton Hotel fundraiser, few protesters were arrested during these incidents. The dearth of arrests following these incidents, and the scant number of arrests during other incidents that were supported by probable cause, indicates that protesters were not threatening public safety and the **use of force was excessive and neither necessary nor justified**.

In other instances involving UPR student protesters, particularly during the April to June 2010 and December 2010 to February 2011 student strikes, the ACLU documented **baseless mass arrests** of UPR students to put an end to their protests, thereby suppressing their speech and expression. A very small fraction of these arrests of student protesters was supported by probable cause. Student activists report that about 200 UPR student protesters have been arrested, some of whom have been arrested multiple times, but prosecutors have pursued charges in only approximately 17 of these cases. In case after case, student protesters were arrested and held for hours in a police cell, only to have a court find no probable cause to support the arrest. Ironically, in some of the isolated instances in which students did apparently break the law by breaking windows of cars on campus, the students were not arrested despite police presence at the scene.

The ACLU has identified several categories of excessive force that were utilized by police in the incidents we documented: indiscriminate use of chemical agents including tear gas and pepper spray; indiscriminate use of batons; uncontrolled and unregulated use of carotid holds and pressure point techniques; inadequately regulated use of "less-lethal" ammunition such as rubber bullets, plastic bullets, rubber stinger rounds, sting ball grenades, and bean bag bullets; and inadequately regulated use of conducted-energy devices such as Tasers. These tactics were unnecessary, unreasonable, and unconstitutional. In addition, the ACLU documented several instances in which police groped and sexually harassed female student protesters.

### a. Chilling Effect on Constitutionally Protected Speech and Expression

PRPD's excessive use of force and baseless mass arrests of protesters has had a **chilling effect on First Amendment-protected protest**. Numerous university students and labor union leaders and members reported to the ACLU that they have ceased protesting, or significantly reduced their protesting, because of fear that they will again be subjected to police violence and baseless arrest. A number of these self-described activists, who have participated in past protests on numerous occasions, told the ACLU they no longer feel safe participating in demonstrations. They said they fear that the PRPD will again use excessive and unnecessary force to suppress their demonstrations, and they are reluctant to express their political beliefs in public and risk retaliation by the PRPD. The PRPD has also openly recorded student protesters with video cameras, and PRPD officers have made clear to students that their activities are personally being tracked by the PRPD. Indeed, PRPD officers often will address student activists by name, instilling in the students a fear of retribution. Students reported that these tactics intimidate them, and have led some to abandon or significantly scale back their attempts to engage in protected First Amendment activities.

> **"If we bring our posters outside the Capitol and they pepper-spray and beat us, then what can we do? We don't have a freedom of expression. What do I do with the papers that say we have a right to freedom of expression?"**

All of the protesters interviewed by the ACLU told us that they believe the PRPD's use of force against them is **designed to suppress their speech and expression**, and is specifically directed at those with viewpoints that are critical of the current administration and its policies. Without exception, all of the concerned citizens, community leaders, university student activists, and labor union leaders and members we interviewed told us that they feel the police have targeted them because of the viewpoints they have sought to express, suggesting that the police are **unconstitutionally discriminating against protesters based on their viewpoints**. Labor union leader Luisa Acevedo Zambrano, who was subjected to excessive force by police on numerous occasions when she was lawfully protesting, told the ACLU that she views the police crackdown on protesters as a "strategic violence against those who confront the government." She explained,

> "In our opinion, the reality is that the civil rights for the men and women workers in Puerto Rico have declined tremendously in the recent years. They don't actually allow public expression, and not just of the men and women workers, but students, women, journalists—in general terms, all sectors that could present some kind of dissent. This has eroded our rights and we have been pressured into not talking or to make public statements saying the reality of what's happening in Puerto Rico."[189]

UPR student Shariana Ferrer Nuñez told the ACLU, "The message of the beatings and repression is that you can't talk to the press and you can't demonstrate, because you are critical of us, because you will criticize the government. Where is the real space for us? If we bring our posters outside the Capitol and they pepper-spray and beat us, then what can we do? We don't have a freedom of expression. What do I do with the papers that say we have a right to freedom of expression?"[190]

In the DOJ's report of the findings of its investigation into the PRPD, the DOJ found that the force and other misconduct used against protesters was explicitly "designed to suppress the exercise of protected First Amendment rights."[191] The DOJ concluded, "The frequency and severity of excessive force by PRPD against individuals engaging in protected speech is designed to chill speech in violation of the First Amendment."[192]

### b. Indiscriminate Use of Toxic CN Tear Gas

In responding to entirely peaceful or largely peaceful protests, police routinely and indiscriminately fired aluminum tear gas canisters at protesters from riot guns or "less-lethal launchers," a type of firearm that physically resembles a rifle grenade launcher and is used to fire less-lethal ammunition. Police also launched tear gas from helicopters, and video footage and photographs show thick clouds of tear gas engulfing protesters. Tear gas causes intense pain, burning and irritation to the eyes, mouth, throat, lungs and skin. Protesters reported experiencing temporary blindness, difficulty breathing, chest tightness, shortness of breath, wheezing, coughing, and/or a choking sensation from tear gas exposure. Some protesters told the ACLU that they suffered eye, nose and throat pain for days; others reported suffering wheezing, throat irritation and coughing for weeks after they were tear gassed.

UPR student protester Roberto Morales described the effects of tear gas: "You can't get a full breath of air, you can't fill your lungs completely. And at the same time your lungs hurt a lot…Your skin is on fire, and you're coughing, mucus flows everywhere and tears are all over your face. You can't open your eyes because of the pain."[193]

The ACLU learned that the PRPD used substantial amounts of Chloroacetophenone, or CN tear gas, on protesters.[194] CN tear gas is a toxic form of tear gas that is not used by most law enforcement agencies because of its toxicity.  Law enforcement agencies in the United States generally stopped using CN tear gas in the late 1950s and early 1960s, and replaced it with other less toxic chemical agents. A former PRPD Auxiliary Superintendent reported to the ACLU that the PRPD prohibited the use of CN tear gas as of January 31, 2011, and the department intended to destroy the 1,000 cans of CN tear gas still in its inventory.[195] The PRPD now uses Chlorophenyl-methylenepropanedinitrile, or CS tear gas, a more potent but less toxic form of tear gas.

Exposure to large doses of tear gas or exposure for periods of over an hour can cause blindness, glaucoma, long-term breathing problems, serious chemical burns to the throat

and lungs that can lead to death, and respiratory failure that can result in death. Individuals with asthma or other lung conditions are at higher risk of death from tear gas exposure. Tear gas can be fatal to healthy individuals who inhale higher doses, particularly in enclosed spaces. Many cities in the United Kingdom and continental Europe no longer use tear gas in protests because of the risk they pose.

CN tear gas can be lethal, and the primary cause of death following CN inhalation is from pulmonary damage. U.S. Army medical research reported multiple deaths from CN inhalation, including the death of a prison inmate exposed to CN gas in his cell; the death of a man who locked himself in a room of his house during an altercation with police, who launched a CN grenade in his room; and three other cases in which CN inhalation—in one case exposure for only 10 minutes—was found to be the cause of death.[196] Medical studies conducted on rats, guinea pigs, and dogs have discovered that the animals that died from CN inhalation suffered pulmonary congestion, edema, emphysema, tracheitis, bronchitis, and bronchopneumonia.[197] The animals that died because of CN inhalation suffered congestion of alveolar capillaries, alveolar hemorrhage, excessive secretions in the bronchi and bronchioles, and acute inflammatory cell infiltration of the trachea, bronchi, and bronchioles.

According to U.S. Army medical research, CS tear gas can cause prolonged airway dysfunction and is associated with the development of reactive airways disease syndrome in some individuals. Although no deaths attributed to CS gas have been reported, medical researchers have concluded that exposure to the agent could result in death by inflicting pulmonary damage leading to pulmonary edema.[198]

### c. Indiscriminate Use of Pepper Spray

Police have also routinely and indiscriminately doused protesters with pepper spray from aerosol canisters, at point-blank range just inches from protesters' faces, directly into protesters' eyes, noses, and mouths. Protesters told the ACLU that police sprayed them so thickly with pepper spray that they were covered in the orange liquid, which poured down their faces and bodies, temporarily blinding them and causing excruciating pain that in some cases lasted for days.

Pepper spray is a potent inflammatory agent, and it causes temporary blindness and an excruciating burning sensation in the eyes, face, and skin that can persist for days; irritates and damages eyes, membranes, bronchial airways, and the stomach lining; amplifies allergic sensitivities; and inflames the airways, causing swelling and restriction.[199] Pepper spray is banned for military use overseas by the Chemical Weapons Convention, which prohibits the use of "any chemical which through its chemical action on life processes can cause death, temporary incapacitation or permanent harm to humans or animals."[200]

Pepper spray also can cause death. A 1995 ACLU of Southern California report found that pepper spray was associated with multiple deaths in California, finding that about one in every 600 people sprayed with pepper spray by California police officers died.[201] Most who

died had pre-existing conditions like asthma, but "these findings suggest that pepper spray may be a serious complicating factor when it is used on people with cardiovascular or cardiorespiratory disease—individuals police might not be able to recognize readily in an emergency situation."[202] Pepper spray use has been suspected of contributing to a number of deaths that occurred in police custody, and in the mid-1990s, the DOJ cited nearly 70 fatalities linked to pepper-spray use.[203]

Pepper spray poses a risk to people with asthma and other respiratory conditions, and can cause respiratory failure.[204] With repeated exposures, studies have also found there can be permanent damage to the cornea.[205] A 1993 U.S. Army study found that pepper spray's active ingredient "is capable of producing mutagenic and carcinogenic effects, sensitization, cardiovascular and pulmonary toxicity, neurotoxicity, as well as possible human fatalities."[206] A 2004 paper on the health hazards of pepper spray, written by health researchers at the University of North Carolina and Duke University, reported that pepper spray could "produce adverse cardiac, respiratory, and neurologic effects, including arrhythmias and sudden death."[207]

### d. Indiscriminate Use of Batons

Police have also routinely struck, jabbed, and beat protesters with 36" straight-stick metal-tipped batons, used as a blunt impact weapon specifically for riot control. Riot squad officers struck protesters with two-handed jabs and single-handed strikes in which officers raised the batons over their heads to hit protesters with maximum impact. In numerous cases riot squad officers even chased after fleeing protesters and struck them in the head, back, and shoulders from behind. These baton jabs and strikes caused head injuries and multiple contusions to countless protesters, many of whom bore clear marks of the size and shape of batons on their backs and chests.

In September 2007, the then-Superintendent of the PRPD created a committee to conduct an external evaluation of the problems of police violence and corruption in Puerto Rico. Called the External Evaluating Committee on the Police of Puerto Rico (*Comité Evaluador Externo de la Policía de Puerto Rico*), it released reports of its findings in December 2007 and May 2008. The External Evaluating Committee found that "[t]he indiscriminate use of batons in total disregard of existing regulation...has occasioned totally unjustified, multiple, and serious injuries to citizens."[208]

### e. Uncontrolled and Unregulated Use of Carotid Holds and Pressure Point Techniques

Officers have also used painful carotid holds and pressure point techniques intended to cause pain to passively resisting protesters by targeting pressure points on protesters' carotid arteries, under their jaws, near their necks, their ears, or directly on their eyeballs and eye sockets. Officers also dug their fingers deep underneath students' ears and above their jaws, forcibly lifting and dragging them by exerting extreme pressure on these sensitive

 

Left, police pepper-spray student protesters on the University of Puerto Rico campus during the April 2010 student strike.  Right, a PRPD officer shoots rubber bullets at student protesters. Photo Credit: Cubadebate (2010)

points. Pressure point tactics not only cause excruciating pain, but they also block normal blood flow to the brain and can be potentially fatal if misapplied. In some cases these pressure point techniques have caused student protesters to lose consciousness.

The PRPD used these techniques on students passively resisting arrest. In the cases documented by the ACLU, police used these tactics on students engaged in sit-ins who did nothing more to resist arrest than to link arms and cross their legs. Police officers also used these cruel, painful techniques on some students even after they had already been securely handcuffed or otherwise restrained by the PRPD. In the cases documented by the ACLU these pressure point techniques were utilized exclusively by PRPD officers assigned to the CIC.

### f. Inadequately Regulated Use of "Less-Lethal" Ammunition: Rubber Bullets, Sting Ball Grenades, and Bean Bag Bullets

On multiple occasions the PRPD has fired rubber bullets and other "less-lethal" ammunition such as sting ball grenades and rubber stinger rounds at protesters. Rubber bullets typically consist of a metal bullet shell coated in rubber; other variations that have been used by the PRPD include plastic bullets, rubber buckshot rounds commonly known as sting ball grenades or stinger rounds, and bean bag bullets that consist of a cloth pouch containing about 40 grams of lead shot. These projectiles are designed to deliver a painful blow that incapacitates; they are launched from guns at high velocity to induce severe pain by blunt trauma.

Rubber bullets and related types of "less-lethal" ammunition can cause severe blunt and penetrating injuries, and can be lethal if shot in the head or at close range.[209] In October 2004, a 21-year-old college student was killed when Boston Police shot a plastic bullet loaded with pepper spray in her eye while attempting to disperse a crowd after the Red Sox World Series victory. Rubber bullets have been linked to numerous deaths and serious injuries of protesters in Northern Ireland and Israel and the Occupied Palestinian Territories.[210]

In a seminal 2002 study of the Israeli military's use of rubber bullets published by *The Lancet*, medical researchers concluded, "Inaccuracy of rubber bullets and improper aiming and range of use resulted in severe injury and death in a substantial number of people. This ammunition should therefore not be considered a safe method of crowd control."[211] Because of documented deaths and severe injuries, the South African police banned the use of rubber bullets on protesters in January 2012, and the European Commission issued a directive banning the use of rubber bullets in all European Union countries by the end of 2012.[212]

### g. Inadequately Regulated Use of Tasers

In at least one incident involving a peacefully protesting and unarmed UPR student who was already restrained and face-down on the ground, the PRPD gratuitously and unnecessarily used a conducted-energy device (CED) on a protester. CEDs, also known as electronic control devices or Tasers, discharge a high-voltage, low-amperage jolt of electricity. They work by firing twin metal barbs that emit a 50,000-volt charge into an individual, causing the individual to collapse from loss of muscular control. Tasers can inflict serious, and even fatal, injury. Risks of CED use to the human body include cardiac arrhythmia, changes to blood chemistry, impaired respiration, disruption of the central nervous system, burns and increased risk of accidental injury.[213]

In the case documented by the ACLU, detailed below in the subsection covering police abuse against protesters at the political fundraiser at the Sheraton Hotel, a PRPD officer applied the Taser to the protesting student, José "Osito" Pérez Reisler, multiple times. According to Pérez Reisler's lawyer, Enrique G. Juliá Ramos, the officer shocked Pérez Reisler six or seven times with the Taser, on the young man's hips and back. Juliá Ramos told the ACLU that Pérez Reisler had to be hospitalized for days, during which he was evaluated by a doctor who concluded that he could have died as a result of the Taser, because he suffers from a medical condition that could be exacerbated by the Taser.[214]

The PRPD does not provide adequate guidance to its officers on the use of CEDs.  According to the DOJ's report of its investigation findings, the PRPD's order governing use of CEDs, GO 2008-2, is seriously deficient.[215]  The order does not specify any legal standard for the use of CEDs, and it does not specify any factors that should be considered when determining when it is appropriate to use CEDs, such as the subject's level of resistance or the severity of their suspected crime.

Most problematic, the PRPD's order governing use of CEDs does not acknowledge that CEDs can be lethal, instead mischaracterizing them as "non-lethal" weapons. According to Amnesty International, 334 people in the United States died after being shocked by a CED in 2001-2008.[216] Medical examiners and coroners in the United States cited CED exposure as the cause or contributing factor in over 50 of these deaths.[217] The two most likely predictors of whether a subject will die after CED shock are if the person is shocked multiple times or for an extended duration, and if the person's heart is unusually stressed, either by recreational drug use, a preexisting heart condition, or the placement of the CED barbs across or near the heart. In Amnesty International's review of autopsy reports from post-CED deaths, they found that 43 percent of decedents were shocked in the chest, and 52 percent had cardiovascular disease.[218]

Tasers can cause a fatal heart arrhythmia, especially in vulnerable populations, such as those with preexisting heart conditions, those whose hearts are already compromised by drug use, and thinner people who have a lower skin-to-heart distance. Likewise, situational factors such as dart placement near or across the heart, and multiple Taser exposures, can increase the risk of arrhythmia. Further, at least one study, in a peer-reviewed forensic engineering journal, found that CEDs actually discharged far more powerful current than Taser International has acknowledged, and that a Taser shock is powerful enough to cause fatal heart disrhythmias.[219]

### h. Groping and Sexual Harassment of Female Protesters

Several female university students reported to the ACLU that police officers had groped their breasts and genitals while arresting them. At least two of these incidents have been caught on camera. UPR student Victoria Carro Robledo told the ACLU that when she was arrested outside the Capitol Building on January 27, 2011, after she was handcuffed with her arms pinned behind her back in plastic straps, a PRPD officer grabbed her by her breasts as he moved her from one police van to another.[220] Another UPR student told the ACLU that a police officer groped her around her breasts, thighs, and pubic area while he arrested her.[221]

UPR Master's student Adriana Mulero publicly denounced the PRPD officer who grabbed her breasts and thighs while arresting her on campus on January 19, 2011. Eyewitnesses reported that although it was apparent that the PRPD officer could have easily carried her by her waist, he carried her with one hand on her breast and one hand on her crotch. Mulero told *The Nation* magazine that when she was arrested on a subsequent occasion, "[S]everal of them attacked me by squeezing my neck, saying, 'This is the one who complained about grabbing her breast!' and they called me a whore. That hurt even more than when they hit me."[222] Another UPR student, Yaritza Figueroa, told the ACLU that on February 9, 2011, she witnessed 10 to 12 Riot Squad officers surround a female student, throw her on the ground, and call her "whore."[223] When Figueroa tried to assist the young woman, an officer said, "'She's just a bitch, a whore, arrest her,'" after which the officers arrested Figueroa.[224] The officers beat Figueroa and threatened her that she "would have to suffer the

consequences because I was going to be in their territory," meaning a jail cell.[225] Figueroa was subsequently released without charge.

Several female UPR students also told the ACLU that PRPD officers sexually harassed them while they were going about their daily lives on campus, including while walking to and from classes, during the period when police occupied the campus from December 2010 to February 2011. Yaritza Figueroa reported that police blew a kiss at her and other female students in early February 2011.[226] Other students reported that PRPD officers made flirtatious remarks and sexual comments (*piropos*) to female students, who found those remarks to be intimidating. At least one student reportedly was followed by a PRPD officer into a women's bathroom in a school building.

Carro Robledo told the ACLU that she and two other students filed a complaint with the Women's Advocate Office (*Oficina de la Procuradora de las Mujeres*), and returned to follow up on the complaint a month later, but never heard another word from the office. In Carro Robledo's case, she was able to identify the officer who grabbed her breasts, but to her knowledge no action was taken to discipline the officer. She said, "There is no repercussion for them, no change" in their behavior.[227] Carro Robledo says that the PRPD must take action to ensure PRPD officers handle female arrestees appropriately, explaining, "If the police know that they are intervening with female students, then they need a protocol on how to arrest women. There are ways to prevent certain situations, with proper training and protocols."[228]

### i. Psychological Trauma Caused by Police Abuse against Protesters

Numerous UPR students told the ACLU that they are suffering psychological trauma caused by police abuse against them. Students described experiencing recurring nightmares of police abuse, intrusive thoughts, uncontrolled crying, fear of police and other men in uniform, general distrust of men, and other signs of significant psychological trauma. Several students also reported that they required and received psychological counseling, therapy, or psychiatric treatment for trauma caused by police abuse they suffered while protesting.

For example, UPR student Rachel Hiskes, who was pepper-sprayed and beaten by police at the Capitol Building on June 30, 2010, said that what happened to her changed her life and robbed her of her piece of mind. She added,

> "What are my damages? Nothing that wears a visible pricetag. How does one quantify how gender and institutional violence by government officials and political repression by the intelligence community affect the psyche? How can I explain how seeing big men in uniform makes me afraid? How getting pulled over by the cops in a state and continent far away from Puerto Rico almost makes me break down? How can it be that I relate to men differently

now, because one has laid his hands on me in a way that had never happened before. Now I have a hard time trusting the good intentions of those in government and uniform, because I know from first-hand experience the violence and criminal behavior they are capable of, I don't want to even be around them…. To this day I can't think or talk about the 30th of June without getting choked up."[229]

UPR law student Gamelyn Oduardo, who was beaten and arrested by police on January 13, 2011 while he peacefully marched said, "At times when I go to sleep, I see a mob of about 300 police officers, running towards me and on top of me."[230] UPR student Mariana López Rosado described suffering "nightmares of torture" and "nightsticks in my dreams," adding, "There is no way to forget what has happened to us."[231]

During a public town hall meeting convened by the ACLU at the UPR School of Law, the ACLU heard testimony from numerous students who came forward to describe the police abuse they had suffered. Throughout the event, many of the students who were gathered in the lecture hall, which was packed to capacity, cried or otherwise were visibly upset by the events being recounted by their classmates, and some students told the ACLU that there is a need for further study into the psychological trauma caused by the systematic police violence on their campus.

Other protesters abused by police at locations other than the UPR campus also described suffering psychological effects of the police violence they suffered. High school student Elisa Ramos, a 17-year-old protester attacked by police when she peacefully protested outside the Capitol Building with her mother on June 30, 2010, told the ACLU, "I have had many nightmares of the police beating my mom. Sadly, I will live my whole life with the memory of this horrible experience."[232]

> "Now I have a hard time trusting the good intentions of those in government and uniform, because I know from first-hand experience the violence and criminal behavior they are capable of."

In responding to entirely peaceful or largely peaceful political demonstrations at locations that are traditionally the site of public protest in Puerto Rico, police have systematically used excessive force to suppress constitutionally protected speech and expression. The PRPD has regularly responded to protests by deploying scores of Riot Squad officers in full riot gear, who routinely struck protesters with batons, sprayed protesters with pepper spray at close range, fired tear gas indiscriminately, and used painful pressure point techniques on passively resisting students.



Riot Squad officers on the steps of the Capitol Building pepper-spray protesters during the June 30, 2010 mass public protest. Photo Credit: Andre Kang / Primera Hora (2010)

# VI. Documented Cases of Police Abuse against Protesters

The following is a detailed description of the incidents of police abuse against protesters documented by the ACLU, including documented incidents of police violence against protesters at the Capitol Building on June 30, 2010 and January 27, 2011; against protesting students and union leaders and members outside a political fundraiser at the Sheraton Hotel; against protesting union leaders and members at other locations, including outside the Governor's Mansion, the Supreme Court of Puerto Rico, and the Government Development Bank for Puerto Rico; and against protesting students at the UPR, including an incident on Avenida Universitaria, and numerous incidents during the April to June 2010 and December 2010 to February 2011 student strikes.

To document the following incidents, the ACLU interviewed victims of police violence, eyewitnesses, and lawyers representing victims; and reviewed complaints and other legal documents filed by victims, television and print news reports of the incidents, and video footage and photographs that captured these events as they occurred.

Immediately following is a brief explanation of the background causes of the wave of protests that engulfed the island, including recently imposed fiscal austerity measures and the closure of legislative sessions to the press and public while bills concerning those controversial measures were under debate by Puerto Rico's legislature.

### a. Background Causes that Prompted the Wave of Protests

In a nationally televised address, on March 3, 2009 Governor Fortuño unveiled his Fiscal and Economic Recovery Plan, the centerpiece of which was the Governor's promise to reduce Puerto Rico's annual public expenditures by more than two-billion dollars in fiscal year 2010. In order to do so, the government of Puerto Rico decided to fire roughly 30,000 government employees at a time when Puerto Rico was already battling a surging unemployment rate that until then had hovered around 15 percent. More conservative estimates pegged the number of layoffs at almost 19,000—roughly 14 percent of Puerto Rico's public workforce.

To cut expenditures, the Declaration of Fiscal Emergency and Omnibus Plan for Economic Stabilization and Restoration of the Puerto Rican Credit Act, which in Puerto Rico is more popularly known as *La Ley Pública 7* or Law 7, relied on a series of proposals that allowed the government to suspend collective bargaining and other labor laws that had previously barred the unjustified firing of public employees.[233] Another important measure of Law 7 included legalizing public-private alliances, which authorized the government to outsource public services to private corporations. In addition, Law 7 stipulated a redirection of tax revenues that previously contributed to the General Fund, 9.6 percent of which are earmarked for the UPR's annual budget, in effect resulting in a budget cut for the university.

Just days after the Governor appeared on television, the Puerto Rican Congress approved the Fiscal and Economic Recovery Plan, paving the way for Governor Fortuño to sign it into law on March 9, 2009. From the time of its first announcement, Law 7 engendered considerable opposition, especially from union leaders and members, and ultimately also from university students, setting off a series of protests across the island that lasted more than two years.

In April 2010, after the University of Puerto Rico (UPR) announced that it planned to impose an $800 "stabilization fee," popularly known as the *cuota* (quota), to make up for Law 7-related budget cuts, opposition to Law 7 intensified on UPR campuses. The fee increase, which was in effect a tuition increase, came on the heels of Certification 98, a Board of Trustee's resolution limiting the university's tuition waiver program to students who did not benefit from government funded programs such as Pell Grants.

Because the so-called "stabilization fee" represented a 50 percent increase in tuition for the public university over the previous school year, it meant that a significant portion of the student body could no longer afford to go to college. The tuition increase and Certification 98 were both wildly unpopular among students, a significant portion of whom immediately rallied against these and other measures enacted by the administration. Students' opposition to these policies and the university administration's ongoing refusal to meet with the Negotiating Committee elected to represent the students before the UPR's administration prompted students to launch a series of protests on the Río Piedras campus. The Río Piedras campus is UPR's main campus, and serves about 20,000 of the public university's 65,000 students.

UPR students' protests included a 48-hour walk-out in April 2010, a 62-day student strike from April to June 2010, a student strike from December 2010 to January 2011, and protests outside the Capitol Building in June 2010 and January 2011. These protests included peaceful sit-ins, actions of civil disobedience in which students sat with their arms linked, chanting and holding placards, marching through the campus, distributing leaflets outlining the students' grievances and demands, and painting political messages on campus sidewalks and streets.

On June 21, 2010, an accord reached between students and the UPR administration to end the students' April to June 2010 strike was ratified by all campuses of the UPR. Immediately after, Puerto Rico's legislature approved a number of measures that were unpopular with many students, including an increase in the number of members of the Board of Trustees of the UPR, which many student activists opposed because they perceived it as a move to pack the Board of Trustees for politically-motivated reasons. Students viewed this and other measures as being contrary to the accord.

On June 24, 2010, a photojournalist was expelled from the legislative chambers, and the following day, the President of Puerto Rico's Senate, Thomas Rivera Schatz, ordered the complete closure of legislative sessions to the press corps and the public. The closure of the legislative sessions provoked a massive public outcry, and prompted a series of lawsuits, including one brought by members of the press and another brought by a Senator from

an opposition party.[234] The closure of the legislative session was particularly unpopular because at the time the Puerto Rico legislature was debating controversial budget changes of intense interest to public workers and UPR students who would be affected by the bills under discussion. Because of the public outcry, on June 29, 2010, the day before the end of the legislative session, Senator Schatz issued a notification permitting access to the Senate chambers, but limiting press access to the Senate to only press who had secured advance permission to interview members of the Puerto Rico legislature and possessed verified credentials. The Capitol Building itself remained open to the public.

### b. Documented Incidents of Police Abuse against Protesters at the Capitol Building

*i. First Protest at the Capitol*

Various concerned citizens and groups, including UPR students and labor union leaders and members, planned protests at the Capitol Building (*Capitolio*) on June 30, 2010 to protest the final day of the controversial legislative session, during which Puerto Rico's legislature was to conduct final arguments on legislation to carry out the proposed budget cuts. Protesters planned to gather outside the Capitol Building to protest the legislation under debate, the public's and press's expulsion from the legislative session in the previous days, the mass lay-offs of public workers under Law 7, the decision to expand the UPR Board of Trustees, and UPR policies that would threaten the ability of many students to financially afford and attend the public university. A group of UPR students also planned to read a proclamation inside the Capitol Building outlining their grievances, which included police abuse against student protesters at the university.

Officers assigned to the UOT (Riot Squad) and UOE (Group of 100) gathered inside the Capitol Building before any citizens had attempted to protest. Colonel Leovigildo Vázquez, Auxiliary Superintendent for Field Operations for the PRPD, was also observed inside the Capitol Building before protesters gathered. The Superintendent of the PRPD at the time, José Figueroa Sancha, was also present inside the Capitol throughout the operation, but negotiators and legal observers of the Puerto Rico Bar Association report that the Superintendent remained inaccessible to them.[235]

Student and independent journalists from alternative media, including IndyMedia, Rumbo Alterno, Onda Alterna, and Radio Huelga arrived at the Capitol Building at approximately 3:00 p.m. These journalists intended to observe the final day of the controversial legislative session, and planned to report on the session afterwards by preparing print and radio media reports.

As the student and independent journalists attempted to enter the Capitol Building, they were able to enter only as far as the portico before they were stopped by an un-uniformed guard who denied them entry. The student and independent journalists identified themselves as members of the press, but they did not have the opportunity to show their press credentials, which some of the journalists carried with them. At that time, there was no

PRPD perimeter or other indication that access to the Capitol was prohibited or restricted in any way. The student and independent journalists observed members of the traditional press inside the Capitol, and perceived that they were being denied entry because of their viewpoints as members of the alternative media.

Their efforts thwarted, four of the student and independent journalists improvised a peaceful sit-in at the interior entryway vestibule of the Capitol Building. Riot Squad officers who were already in formation in the rotunda of the Capitol then swarmed the student and independent journalists. Without warning, and without giving the student and independent journalists an opportunity to leave on their own volition, Riot Squad officers began to pummel, strike, and push the journalists with batons.

The Riot Squad officers pepper-sprayed the student journalists at close range, and kicked, pushed, and beat them with batons before throwing them out onto the Capitol's concrete exterior stairs. Among these journalists was **Rachel Hiskes**, then a UPR graduate student in social work who also worked as a journalist for Rumbo Alterno, a digital newspaper. Riot Squad officers pepper-sprayed Hiskes in her eyes, ears, neck, face and on her back, burning her skin, eyes and throat. As Hiskes attempted to get up off the floor, a Riot Squad officer struck her back with the full length of a baton, striking her so forcefully that she was propelled across the room. The Riot Squad officer then struck her across her side and arm, striking her so violently that she lost both of her shoes.

> **"I was in shock, and couldn't believe what I was witnessing and experiencing in such violence."**

The officer continued to strike Hiskes with a baton, striking her across her neck and throwing her down the marble steps at the entrance to the Capitol, even as she was still blinded and unable to breathe because of the pepper spray. She told the ACLU, "I was hurled down the stairs of the Capital building at a literal breakneck speed. I was barefoot, blinded by pepper spray, and my feet splayed out in front of me, barely able to keep up with the tumbling force of my body as it lurched precariously forward. I knew if I fell, these marble stairs would crack my bones or head.... I was in shock, and couldn't believe what I was witnessing and experiencing in such violence."[236] Hiskes suffered extreme pain and bruising on several parts of her body. She experienced a persistent stinging and burning from the pepper spray, and her attempts to wash off the pepper spray only intensified the burning. Hiskes was never arrested or charged with any crime.

Also among the student journalists was **Shariana Ferrer Nuñez**, also a correspondent for Rumbo Alterno who was present to document the legislative session.[237] As she was sitting with her hands in the air, Riot Squad officers approached her from behind and began kneeing her in the back and pepper-sprayed her directly in her face. She told the ACLU, "I couldn't breathe. I couldn't stand it. I wanted to leave, but they had surrounded us."[238]

Riot Squad officers also pepper-sprayed **Reverend Juan Ángel Gutiérrez Rodríguez**, an observer for Amnesty International, directly into his eyes and on other parts of his body, causing him to curl up in a fetal position, roll around on the floor, and cry out in excruciating pain. As Reverend Gutiérrez Rodríguez lay on the ground wailing in pain, covering his face with his hands and jacket, Riot Squad officers proceeded to kick him and brutally beat him with batons.

**Representative Carmen Yulín Cruz Soto**, a legislator in the House of Representatives belonging to the minority Popular Democratic Party (*Partido Popular Democrático*, or PPD), attempted to intervene and was also attacked by a Riot Squad officer, who hit her so hard with his baton that he tore a ligament in her arm. Representative Yulín told the ACLU that she witnessed two Riot Squad officers hitting and pepper spraying the student journalists, hitting one woman so hard "that her chest was bouncing up and down." Appalled, she tried to intervene: "I said 'don't touch her,' I pulled my ID card out and said, 'I am an elected member of Congress.'"[239] She remembers that one of the Riot Squad officers then turned to her and said, "'Carmen Yulín, this is for you.'"[240] At that, one group of Riot Squad officers circled Representative Yulín and the independent and student journalists from behind, and another group of Riot Squad officers circled them from the front, leaving them surrounded by a circle of officers inside the vestibule.

Two members of the security of the House of Representatives tried to assist Representative Yulín by dragging her away from the Riot Squad officers as they struck her with batons across her arms and back. The Riot Squad officers then sprayed Representative Yulín and the student and independent journalists with pepper spray, spraying the students directly in the face mere inches from their eyes, nose, and mouth. Because most of the doors of the vestibule were closed at that point, the clouds of noxious pepper spray filled the air.  Representative Yulín, who suffers from severe asthma, felt her throat close and had difficulty breathing because of the pepper spray, and notes that if the PRPD officers had pepper-sprayed her as heavily as they did the students, "I could have died."[241] Representative Yulín recalls that throughout the attack on her and the journalists, the Riot Squad officers kept shouting, "Formation! Formation!"[242] She received emergency medical treatment at the Capitol infirmary, including injectable cortisone and oxygen because the pepper spray had caused her trachea to close. Doctors also concluded that the baton blows had torn a ligament in her left arm and caused multiple bruises on her legs, right ankle, and right ribcage. While she was in the Capitol Building infirmary, she witnessed bloodied students and journalists receiving emergency medical treatment.

Outside the Capitol, the group of students who planned to deliver the proclamation to the legislature also tried to peacefully enter the Capitol Building, and the students were forcibly repelled by the Riot Squad. Riot Squad officers hit several of these students with batons on their faces, heads, arms, backs, and other parts of their bodies. Several of the students tumbled down the marble stairs as a result of the Riot Squad using their batons to push, strike, and jab them indiscriminately. Several of the students required medical treatment as a result of the assault.

As news spread about the protest at the Capitol Building and the media began to broadcast images of police beating demonstrators as well as images of bloodied protesters being assisted by paramedics, the size of the protest swelled. Thousands of citizens gathered near the Capitol Building to join in the protest. Many of these protesters gathered in the public plaza (*plazoleta*) across from the steps of the Capitol and other areas adjacent to the Capitol Building.

After kicking and shoving the protesters off the Capitol Building's steps, the Riot Squad created a perimeter around the public plaza that leads to the front steps of the Capitol, blocking off the only clear area for demonstrators to gather, and forcing demonstrators to spill over into the side parking lots. The public plaza is a traditional public forum where demonstrations take place frequently without incident, and has been used for years by people seeking to exercise their First Amendment rights.

Once in the parking lots, the demonstrators continued their peaceful protest, holding placards and chanting. After approximately two hours of peaceful protest, a police officer approached the crowd and, using a megaphone, asked them to cooperate in moving cars out of one of the parking lots. The police officer did not order the crowd to disperse, nor give them instructions about where to move, or even give them warning about the consequences of not "cooperating." At this point, the PRPD had also mobilized the mounted police units and the Group of 100.

Protesters remained in place and continued peacefully chanting, at which point the Riot Squad began to move towards them. After a small number of protesters threw small objects, such as water bottles, the Riot Squad and Group of 100 charged the crowd, striking, pushing, pepper-spraying and jabbing students, union members, and other citizens indiscriminately. Officers fired tear gas canisters from riot guns, in some cases aiming the aluminum projectiles at protesters. A low-flying police helicopter sprayed tear gas from above, blanketing protesters in noxious fumes. The majority of students, union members, journalists, and other citizens were attempting to disperse and did not pose a threat to the police or the public. Student **Shariana Ferrer Nuñez** described the tear gas that engulfed her and other protesters: "It began with a really big, toxic cloud. It entered my lungs and I felt that I was going to die—it's grabbing your lungs and you can't breathe. That is the most horrible sensation I've ever felt. I started spitting, including spitting blood, and my eyes were watering. I had a panic attack, freaking out that I couldn't breathe."[243]

Among those attacked by police were **Betty Peña Peña**, a ninth-grade schoolteacher and community activist, and her 17-year-old daughter **Elisa Ramos Peña**, a high school student. Betty had brought her daughter to the protest as a lesson in democracy; she explained, "As a mother, I feel this responsibility to teach my children that when something is wrong in our country, we must raise our voice."[244] Elisa explained, "It is an honor for us, the value of standing up and using our voices to defend our Puerto Rico, and the feeling of saying, 'No, I will not let you destroy my Puerto Rico; I will not allow anyone to walk all over me, walk all over my neighbor, walk all over my colleagues.'"[245]



"I never, I never thought I'd live through such an experience, and that my daughter would live through an experience like this—so, so horrible."

Betty Peña Peña and her 17-year-old daughter Eliza Ramos Peña were attacked by Riot Squad officers while they peacefully protested outside the Capitol Building. Police beat the mother and daughter with batons and pepper-sprayed them.

Betty and Elisa arrived at about 4:45 p.m. and joined protesting professors from the University Professors' Association (*Asociación de Profesores Universitarios de Puerto Rico*, or APPU).  The crowd around them was singing and chanting slogans.  They saw a number of UPR students bleeding from injuries inflicted by police earlier, and witnessed a line of Riot Squad officers push the students from the public plaza and into an adjacent parking lot. Betty and Elisa had been protesting for about one hour and 45 minutes when they saw a low-flying helicopter approach and douse them with tear gas. Betty, who has a respiratory condition, could not breathe and looked for a place not choked with tear gas, but was blocked by the line of Riot Squad officers.

They heard an officer with a megaphone order the crowd to move, but he gave no orders about where they should stand instead and he did not order them to disperse. Within seconds, without giving the crowd time to respond, a wall of Riot Squad officers began to attack the protesters with batons and pepper spray. Betty explained what happened next:

> "Without waiting for an answer or nothing, they started. We were all surprised because then came the pushing, the batons, and Elisa received a blow, and she falls under a car, and then I receive another blow... I was trying to lift her up and they continued their onslaught, beatings, trampling, pulling... when all of a sudden, they drag Elisa. They were saying, 'Grab her, grab her, you're going to jail.' I lose my flip flops, I drop everything, I try to go to her, to throw myself on top of her to prevent the police from harming her. Then I see that the police keep hitting, giving blows, raising the batons at her, and then at that moment, they come and they spray me with pepper spray on my face. For a few minutes, I fainted, because I couldn't breathe. I felt my whole being was burning and it was a feeling like everything, everywhere inside me was burning... I had lost sight of Elisa...it may have been 20, 25 minutes,

> when I later found her. I really couldn't breathe; it was something that was
> truly unbearable. I never, I never thought I'd live through such an experience,
> and that my daughter would live through an experience like this—so, so
> horrible."[246]

They fell below a vehicle, and police continued to beat them even while they were lying on the
ground. Betty threw herself on top of Elisa in an attempt to protect her from the Riot Squad's
blows, and police continued to strike the mother and daughter with batons. Elisa explained,
"I wasn't feeling well, I was dizzy, suffocating, and...I felt so bad and I thought I was going
to die. At that moment, I thought...that she was already dead, and all I could think of was
getting out of there to go and get my mom. All I could think of was getting away, and I said,
'Oh my God, Lord, help me.'"[247]

Betty and Elisa were badly affected by the tear gas and pepper spray. Elisa suffered a
hematoma on the right side of her head, and Betty suffered a contusion from one of the
blows. Betty was unable to speak for a week because of the chemical agents police used on
her, and experienced difficulty speaking for a full year afterwards.

Betty told the ACLU, "Living in the United States with the right to free expression, I never
thought this would happen when we try to protest. The Capitol Building is the house of the
people. It is an open house, and to close it is a blow to democracy."[248] Elisa said, "At no point
in my life did I think that this would happen. In years of going to marches and strikes with my
mom nothing like this has ever happened. The government wants people to stay quiet, and
to stop protesting. I was raised by someone who knows her rights, so I know my rights, and
I will continue to express myself because this is my country, and it is important to do so for
the next generation, to carry Puerto Rico into the future."[249]

Police also pepper-sprayed and pushed a legal observer for the Puerto Rico Bar Association,
lawyer and Bar Association president **Osvaldo Toledo**.[250] Toledo was one of nine legal
observers, identified by yellow jackets. Toledo witnessed Riot Squad officers throwing
students down the stairs of the Capitol and pushing protesters across the public square.  He
subsequently observed police beating protesters with batons, and witnessed one officer hit
a student directly in the head with a baton. When Toledo went to assist an injured student,
officers sprayed pepper spray in his face and pushed him. According to Toledo, the Riot
Squad's actions seemed planned, and despite his and other legal observers' efforts to speak
with the police, PRPD officers refused to talk or negotiate with the legal observers and
protesters. Although police later claimed students were throwing rocks at police, Toledo
reports that he did not see a single rock.[251]

Lieutenant Juan D. Vargas unholstered his firearm and pointed it at protesters; a photograph
captured the lieutenant with his gun unholstered. Some protesters reported that they heard
gunfire and believed the lieutenant had fired his gun; then-Superintendent Figueroa Sancha
later stated that the PRPD was unable to determine whether the gun had been fired because
ballistics tests were inconclusive. Lieutenant Vargas had recently been promoted to the rank
of Lieutenant despite a proven history of past violence against citizens, and his disciplinary

file reportedly revealed he had more than two dozen complaints filed against him during his career with the PRPD.

At this point, the Riot Squad, Group of 100, and mounted police split the crowd into three groups and began to herd one group toward the ocean, while chasing another group on horseback into Old San Juan, and forcing a third group of protesters to flee toward the El Condado area of San Juan. Meanwhile, helicopters were shooting tear gas at the terrified protesters who were attempting to escape. The terrified citizens, many of whom were blinded by pepper spray and tear gas, were forced to run into oncoming traffic and pell-mell through the streets in an attempt to escape the police violence. Many of the incidents that day were captured on video and camera.[252]

Lawyer Hans Perl-Matanzo, who was present because some of the student activists had asked for attorneys to be on hand, told the ACLU, "There were points where I seriously considered that I might die. And I am not exaggerating. The Riot Squad police pushed me back so hard that I fell 10 to 15 feet back. I lost my shoe. They imposed a perimeter and pushed us away. The Riot Squad risk more lives than they are supposed to be protecting."[253]

The protesters were so scared that they would be subjected to further police violence that many contacted friends or relatives who lived within walking distance and took refuge in their homes. Even several hours after they had been forcefully expelled from the Capitol complex, many of them were still afraid to go home. One student, **Xiomara Caro**, hid at a friend's home in Old San Juan, terrified to be caught by the Riot Squad. She remained there late into the night, unable to leave out of fear that the Riot Squad or other PRPD officers, who were still roaming the streets, would target her for her role as a student leader and beat her or arrest her for no reason.

Dozens of citizens were injured by police that day, a number of whom required treatment for injuries at local hospitals. Those injured included university and high school students, journalists, attorneys, legal observers, professors, and tourists. According to Rachel Hiskes, who sought medical attention for injuries caused by the PRPD, "Burned in my brain is the image of one of the students from the National Students Negotiating Committee with his shirt bloodied from a head wound that was still spouting blood. It felt like we were walking through a battleground with all the wounded there, people with black eyes, everyone coughing, bloodied faces and limbs that seemed unreal. We went looking for an ambulance, and there really was none."[254]

> "It felt like we were walking through a battleground with all the wounded there, people with black eyes, everyone coughing, bloodied faces and limbs that seemed unreal."

Afterwards, then-Superintendent Figueroa Sancha, who had been present at the Capitol Building during the incident, publicly defended and justified the officers' use of force. Figueroa Sancha stated that he was directly responsible and "assumed full responsibility"

for the use of chemical agents against protesters, stated that he "gave all of the instructions personally today," and he warned citizens that if faced with similar protests, his response would be the same, "today, tomorrow...and next month."[255] Lieutenant Vargas, the officer who unholstered and brandished his service firearm, was temporarily suspended with pay following the June 30, 2010 incident; it is believed he is the only PRPD officer to have been suspended as a result of the events of that day.

Student Rachel Hiskes told the ACLU that the police attack on her at the Capitol changed her life and robbed her of her piece of mind, and she found the Superintendent's public statements particularly disturbing:

> "I was so affected I could not resume my normal activities..... And long after the burn from the pepper that lasted several days was the anguish of being a victim. I went to a psychiatrist, went to the doctor, took steps that made me feel better. But seeing the Police Superintendent on TV saying that he was responsible for all the orders, and that his response would be the same today, tomorrow, next month and next year shook me. His pointing finger and piercing eyes seemed to burrow under my skin, and I felt like he was after me, or people like me, the political dissidents and civil protesters as well as the alternative media that covered them."[256]

Despite the widespread use of force, only two individuals were arrested for alleged damage to a police vehicle; they were released after a judge found no probable cause.[257] A Special Commission of the Puerto Rico Bar Association (*Comisión Especial Sobre Fiscalización del Estado Actual de los Derechos Constitutionales*) was created to investigate the events at the Capitol. On July 8-9, 2010, the Special Commission conducted public hearings, during which it recorded declarations from 48 people involved in the incident. The Special Commission issued a preliminary report on July 12, 2010, concluding that the PRPD committed numerous civil rights violations.[258] The DOJ concluded in its report on the PRPD, "[I]t is evident that the use of excessive force against protesters was directed at chilling speech and intimidating protesters, rather than protecting public safety or restoring order."[259]

*ii. Second Protest at the Capitol*

On January 27, 2011, UPR students organized a second demonstration outside the Capitol Building. The Riot Squad was already in formation, blocking the steps to the Capitol, when the student protesters arrived. The peaceful demonstration began with student leaders reading a proposed bill that would create a scholarship fund for students unable to afford the $800 tuition increase. After reading the bill, the students conducted a protest in the public plaza adjacent to the north steps of the Capitol, where students chanted and held placards. Notwithstanding the fact that the protest was peaceful and taking place in a location that is traditionally a site of public protest in Puerto Rico, PRPD officers forcibly removed the students after allowing them to protest for some period of time.



PRPD officers used painful pressure point techniques on passively resisting student protesters, in which officers targeted protesters' carotid arteries, under their jaws, near their necks, their ears, or directly on their eyeballs.
Photo Credit: left, El Nuevo Día (2011); right, Desde Adentro (2011)

The students then moved onto Avenida Constitución, directly behind the Capitol complex, and some students began a sit-in on the public street, partially blocking traffic, while others continued to chant and hold placards. As soon as the smaller group of students began their sit-in at the Avenida Constitución, police officers began arresting those engaging in the sit-in one by one. The police never advised the students where they should move, and never told them they could protest in another location, but rather merely ordered them to "get out."[260]

PRPD officers assigned to the CIC used painful pressure point techniques to carry out the arrests on the passively resisting students, who were merely peacefully resisting by linking arms and crossing their legs. As police officers disbanded one group of students, other students would start a new peaceful sit-in a different part of the street. Using the same harsh pressure point techniques as they had employed in earlier protests, the PRPD painfully targeted the students' most sensitive body parts—their eyes and eye sockets, their necks including the area beneath their jaw and their carotid arteries, and their ears—to move the students and then arrest them. In some cases, the police continued to apply the pressure point techniques after students were handcuffed. Police officers used these pressure point techniques on dozens of students that day, many of whom were severely injured as a result. Some of the students experienced such a significant loss of blood flow to the brain that they lost consciousness. Police arrested 36 students.

Among the student subjected to the pressure point techniques was UPR student **Zulee Aguilar**, who was passively resisting arrest. CIC officers pressed on her neck, jaw, and eyeballs, causing an "indescribable pain."[261] She briefly lost consciousness. She explained, "It was a torture tactic. They would put pressure on our neck and our jaws,

> "**It was a torture tactic. They would put pressure on our neck and our jaws, stopping the blood flow to our heads... It is a pain that is so terrible— I couldn't stand it.**"

stopping the blood flow to our heads... It is a pain that is so terrible—I couldn't stand it. He kept pressing farther and farther up my face, then he started pressing against my eyes. I started to lose conscience. He was huge, and he never even tried to put on the handcuffs, but it would have been easy. I felt both a tremendous pain and a terrible fear, and indignation that they are doing all this because I am defending education in my country."[262] She felt pain for days after she was removed from the civil disobedience line.[263] Student **Shariana Ferrer Nuñez** said, "I heard the screams of pain and torture of my comrades and I knew I was next. The two CIC agents had their hands on my neck and their fingers behind my ears. I started screaming because I couldn't breathe—it is an asphyxiation technique. One officer was on my back, then he twisted my arms and cuffed me, but backwards so my wrist was bent back painfully."[264]

Police officers also used batons on the students participating in the sit-in and stepped on their ankles while arresting the students. One student was not only arrested using painful pressure point techniques that cut off his circulation, but he was also choked and dragged several feet with a baton used by a police officer as a neck restraint. A PRPD officer grabbed UPR student **Victoria Carro Robledo**'s breasts while moving her from one police van to another after her arrest; her arms were handcuffed behind her back with plastic straps when the officer grabbed her by her breasts.[265]

After the police had arrested and removed the students participating in the sit-in, the Riot Squad then formed long chains and advanced on the larger group of students who were peacefully chanting, waving flags, and holding up placards in support of their cause. Police pushed these students with large plastic body shields, indiscriminately sprayed them with pepper spray, indiscriminately launched tear gas canisters from tear gas guns, fired rubber bullets and sting ball grenades at them, and beat them with batons. Some students reported that PRPD officers fired rubber bullets directly at them, in some cases shooting students in the back as they ran away. Some students suffered identifiable blunt impact wounds on their chests and backs from the rubber bullets. UPR law student **Ricardo Olivero** said, "There was a huge chain of Riot Squad officers in a line, barricading the area by shooting rubber bullets and tear gas."[266]

UPR student **Amada Garcia** told the ACLU, "They wouldn't let us go. We were looking for a way to leave, but they kept pushing us, and shooting, shooting, shooting tear gas...We were 20 students, with 40 Riot Squad officers behind us and 20 Riot Squad officers in front of us. We kept running, all the way to the park, and they pursued us. We continued running because we didn't feel safe."[267] She added, "I felt that if they saw me they could kill me."[268] Garcia fled with some students to a public park, and about 10 mounted police on horses and 40 to 60 Riot Squad officers chased the students away, even though they had long abandoned their protest and were merely sitting in the park.[269]

Police indiscriminately fired so many tear gas canisters that a nun exited a nearby parochial school and chastised the officers for firing tear gas "with no warning or precaution" near the school's classrooms and basketball court, where children were playing.[270] Multiple students required medical treatment for tear gas inhalation and other injuries. Riot Squad officers chased students as far as Puerta de Tierra, a substantial distance from the Capitol Building.

### c. Police Abuse against Protesting Students and Union Leaders and Members at the Sheraton Hotel

On May 20, 2010, as the student strike at the UPR approached its fourth week, about 200 UPR students and labor union leaders and members gathered at the Sheraton Hotel to protest a fundraising event at which Governor Fortuño was a guest. As the demonstrators peacefully formed a picket line and chanted slogans on the other side of the street from the side entrance of the hotel, the UOT (Riot Squad) and UOE (Group of 100) arrived but later unexpectedly dispersed.

Soon thereafter, and as PRPD officers stood by and watched, a group of students entered the hotel lobby, which was open to the public. The officers did not attempt to prevent the students from entering the hotel lobby or tell the students that they were not allowed to do so. The students entered the lobby because they wanted the Governor to see their picket line. Inside the lobby the students again peacefully formed a picket line, held signs, and began to chant. Suddenly, and with no advance warning, the Riot Squad burst into the lobby and indiscriminately began to beat, push, kick, and pepper-spray students and other protesters. Outside, standing near each of the hotel's doors, PRPD officers blocked the exits and struck students with their batons as they attempted to exit the lobby, in some cases using their baton as bats to strike the students.

Police pepper-sprayed and clubbed a leader of the Office and Professional Employees International Union, AFL-CIO, CLC of Puerto Rico (OPEIU), **Iram Ramírez**, who had entered the hotel lobby in order to help students escape safely. An officer struck him in the back with a baton. He witnessed police drag students by their feet, back into the lobby when they attempted to leave.

Several police officers tackled UPR student **José "Osito" Pérez Reisler**, forcing him to the floor, and at least two officers climbed on top of him and forced his face to the ground. One of the officers then repeatedly Tasered him after he was restrained and incapacitated. According to Pérez Reisler's lawyer, Enrique G. Juliá Ramos, the officer shocked Pérez Reisler six or seven times with the Taser, on the young man's hips and back. When police tackled him, Pérez Reisler was unarmed and had merely been peacefully holding a poster stating "I am a graduate student and I support the strike." Video footage capturing the incident clearly shows that Pérez Reisler posed no threat and was already lying on the floor face-down when he was Tasered.[271] Juliá Ramos told the ACLU that Pérez Reisler required hospitalization for days, during which he was evaluated by a doctor who concluded that he could have died as a result of the Taser, because he suffers from a medical condition that could be exacerbated by Tasering.[272] Pérez Reisler was not charged with a crime.

Col. José A. Rosa-Carrasquillo, then Associate Superintendent of the PRPD and second-in-command of the police department, kicked Pérez Reisler in the genitals while he was incapacitated on the ground and being held down by at least two PRPD officers. Photographs published by news media captured this unwarranted assault.







Left, injuries inflicted by police on student protesters at the Sheraton Hotel political fundraiser, including a student with a bloody wound caused by a beating with a baton and a student with bruising from baton blows on his back. Right, the police Tasering of student José Pérez Reisler, who was unarmed and had merely been peacefully holding a poster. Source: Indymedia (2010)

Outside the hotel, other protesters, including many labor union leaders and members, were still picketing on the public street. Suddenly, PRPD officers corralled these protesters and started to forcefully push them away from the hotel. As they did so, the police indiscriminately pepper-sprayed, jabbed, hit, and shoved protesters with their batons even as the demonstrators were trying to peacefully and quickly leave the area.

Video footage captured the officers using excessive force against numerous protesters who had already been dispersed from the lobby and posed no threat or danger to the PRPD or bystanders. The video footage clearly shows Riot Squad officers striking fleeing students in the back with long riot-control batons, raising the batons over their heads and bringing them down on students' shoulders and backs, and in some cases chasing the dispersing students and striking them repeatedly.[273] Riot Squad officers also pushed the student protesters, threw them to the ground, kicked them, punched them, and pepper-sprayed them at close range. Officers also indiscriminately fired aluminum canisters of tear gas from riot guns at the crowd of protesters, and video footage captures the canisters arcing through the air and exploding around the protesters.

The Riot Squad officers then attacked the union leaders and members who were peacefully picketing outside the hotel, on a little-trafficked side street and on the sidewalk across the street from the hotel. A Riot Squad officer pepper-sprayed and used a baton to hit **Luisa Acevedo Zambrano**, President of the Central Workers Federation (*Federación Central de Trabajadores*, or FCT), Local 481 of the United Food and Commercial Workers International Union (UFCW). Acevedo Zambrano had been peacefully picketing with other union leaders and members outside the Sheraton Hotel when she witnessed the Riot Squad attack the student protesters inside the hotel. The Riot Squad officers then exited the hotel and started beating, pepper-spraying, and tear-gassing the peacefully protesting union leaders and members. Acevedo Zambrano explained, "When the police and the strike force came out...we were on the street, and the strike force simply jumped on us...This entire force went towards those who were participating in the picket line."[274]

Acevedo Zambrano tried to ask the officers what was happening and why they were being attacked, and Riot Squad officers sprayed pepper spray directly into her eyes and face and struck her with a baton on the neck. The blow caused Acevedo to fall on the street, smacking her skull on the ground. While she was on the ground a PRPD officer kicked her in the shoulder. Other labor union leaders and members tried to rush to her aid, to prevent police from trampling and pepper-spraying her as she lay helplessly on the ground. She explained,

> "Immediately, the police Riot Squad sprayed pepper spray on my face, directly into my face and eyes, just steps away from me. My face was completely bathed in pepper spray—I was completely blind, it is such a horrible thing. When I turned around they hit me on the neck with a baton on the neck, and I fell to the ground. They did not allow any of my comrades, who were with me at the time, to help me up or give me first aid, and anyone who approached would get sprayed with in their face so they could not do it. I was being kicked while on the ground... They threw blows indiscriminately, used their batons, tear gas and pepper spray to all of the participants who were on the street, and we didn't have anything to do with what was happening inside the lobby of the hotel."[275]

Acevedo's throat swelled and she had trouble breathing because of the pepper spray, and required emergency medical treatment at a hospital. She had a swollen bump on her head, a bruise on her arm and elsewhere on her body, and cuts to her knees and elbows. Her glasses were cracked. At the hospital doctors removed her clothes and cleaned off the pepper spray, provided first aid to assist her to breathe, and took x-rays. Because the baton blows were so severe, she had to remain hospitalized until nearly midnight. Acevedo continued to have trouble speaking for some time as a result of being pepper-sprayed at such close range. One year later, she required an MRI and a CT scan of her neck and cervical vertebrae because she had ongoing problems caused by the baton blows.[276]

**José Rodríguez Báez**, President of the Puerto Rican Labor Federation (*Federación de Trabajadores de Puerto Rico*, or FTPR) of the AFL-CIO, was pepper-sprayed and injured so badly that he required emergency medical treatment at a hospital. Rodríguez Báez told

the ACLU, "When we tried to help our fallen comrades, we were pepper sprayed at short distance."[277] Likewise, **Manuel Perfecto**, President of the General Union of Workers (*Unión General de Trabajadores de Puerto Rico*, or UGT), Local 1199 of the Service Employees International Union (SEIU); **Eric Sevilla**, another leader of the UGT Local 1199; and **John Vigueras**, a leader of the the of the FTPR, also were beaten and pepper-sprayed by police.

The PRPD detained only four individuals at the Sheraton Hotel; two were released without charge and prosecutors declined to prosecute the other two.[278] One student, for example, was held for at least nine hours, but was never charged. Although video footage and photographs of the incident were widely reported in the Puerto Rico press and clearly depicted PRPD officers using excessive force, then-Superintendent of police Figueroa Sancha called the police officers "heroes" in subsequent public remarks.

### d. Documented Incidents of Police Abuse against Protesting Union Leaders and Members at Other Locations

Law 7 was so unpopular among labor unions that on May 1, 2009, an estimated 20,000 protesters joined the *Frente Amplio de Solidaridad y Lucha*'s call for a work stoppage and marched outside Puerto Rico's Labor Department to protest the law's passage. Subsequently, labor union leaders and members participated in multiple protests advocating Law 7's repeal.

According to Luisa Acevedo, President of the FCT Local 481, the PRPD's forcible suppression of labor unionists' protests began in earnest in September 2009. She explained, "From around the month of September, which is when the largest layoffs began, the police deployed the Riot Squad against the workers, and there were many activities where we were assaulted by the Riot Squad...The police practice was to always be present and try to intimidate and punish all of those on the picket lines or protesting...At all of the activities, the Riot Squad was there trying to intimidate us and to try to prevent us from making public announcements about the injustices that were being committed. The police were very consistently doing this at all of our activities."[279]

*i. The Governor's Mansion*

On September 29, 2009, four days after Carlos Garcia, the chairman of the Reorganization and Fiscal Stabilization Board, announced that the government planned to fire 16,970 government employees, in addition to the over 8,000 workers who had been fired earlier in the year, labor union leaders and members participated in a public demonstration outside the Governor's Mansion, known as *La Fortaleza*. Labor union leaders and other groups have conducted demonstrations and acts of civil disobedience at the same location in the past, without incident.

At approximately 8:00 a.m. that morning, about 30 labor union leaders and members gathered near one of *La Fortaleza*'s side entrances and set up a "protest camp" on pedestrian-only Calle Fortaleza, a small side street located outside the Governor's Mansion. The protesters chanted and held placards. At no point did the protesters block car traffic or interfere with pedestrian traffic; in fact, early morning commuters were able to use the sidewalk to walk around the protesters. In a show of resolve, a group of four demonstrators chained themselves to two small posts flanking the cobblestoned street, while the remaining union members continued to hold placards and chant. When the PRPD arrived, a group of union leaders explained to the officers that the four protesters who had chained themselves together would not resist if the police tried to arrest them.

Within minutes the PRPD mobilized the Riot Squad. As was customary when responding to public protests, the Riot Squad officers wore full riot gear, including padded body armor, helmets with visors, crowd-control batons, and plastic shields. Upon their arrival, without adequately giving the protesters an opportunity to move out of the way, the Riot Squad immediately began to shove, strike, and jab the protesters with their batons, aiming for the chest, head, stomach, arms, and legs, until they wedged the protesters up against a concrete barrier that separates *La Fortaleza* from the main street. Those who fell back against the barrier were unable to move and were trampled on by the Riot Squad.

Even as the protesters tried to move back, they were pushed and beaten by the Riot Squad wielding their batons. Although the officers had been notified that four protesters were chained to each other and to the posts were thus unable to move, the Riot Squad officers hit these protesters repeatedly with their batons and kicked them with their boots.

Several protesters sustained serious injuries, including bruises and contusions, as a result of the Riot Squad's use of force. One police officer, for example, hit **Iram Ramirez**, a leader of the OPEIU of Puerto Rico, over the head with his baton as Ramirez tried in vain to plead with police officers to let a reporter who had fallen to the ground regain her footing and avoid being trampled by the Riot Squad. Another police officer struck **Luisa Acevedo Zambrano**, President of the FCT Local 481, in the breast with a baton.

None of the protesters was arrested. **José Rodríguez Báez**, President of the FTPR, told the ACLU, "There was no reason to send in the Riot Squad," adding, "[Our protest] was completely nonviolent and our plan was to offer no resistance. We wanted to call attention [to our demands] without committing any illegal act...We tried to find a place where we wouldn't impede the flow of traffic and we could show ourselves in front of the government, to express ourselves to the seat of government, and for those reasons we chose that place."[280] He explained, "The Riot Squad was very aggressive.... They kept pushing and hitting us with their batons, cleaning the area of us."



**"There hasn't been any bridge of communication with the government in the last two years. No communication of any kind; not in the streets, not in the courts, and not in the legislature."**

Union leaders Luisa Acevedo and José Rodríguez Báez, who suffered baton blows and pepper-spraying at close range while peacefully protesting outside the Governor's Mansion and a political fundraiser at the Sheraton Hotel. Photo Credit: ACLU (2011)

*ii. Government Development Bank for Puerto Rico*

On September 25, 2009, union leaders organized a lunchtime protest attended by hundreds of union members and government employees on the day that the second round of Law 7-related layoffs of public workers was expected to be announced. The protest took place outside the Government Development Bank for Puerto Rico (*Banco Gubernamental de Fomento para Puerto Rico*) in Minillas, at a time when the Board of Economic and Fiscal Reconstruction (*Junta de Reconstrucción Económica y Fiscal*) was meeting to approve the layoffs of 16,970 public workers. The group peacefully protested and chanted slogans including "Workers united will never be defeated" and "Struggle yes, surrender no." A smaller group of union leaders also sought an interview with the president of the Government Development Bank.

PRPD officers, including members of the Riot Squad, surrounded the protesting unionists and pushed them with batons. Police formed a barricade around the public building, and forcibly prevented the protesters from entering the government complex. No protesters were arrested.

*iii. The Supreme Court of Puerto Rico*

On February 12, 2010, approximately 100 labor union leaders and members protested outside the Supreme Court of Puerto Rico, which had declared Law 7 constitutional. The labor union leaders and members were demonstrating against the ruling, as well as the recent packing of the Supreme Court with three additional justices appointed by Governor Fortuño. The unionists and workers picketed and marched in front of the entrance to the Supreme Court complex, about 50 or 60 meters from the building itself. They did not approach the stairs or the lobby of the courthouse.

Police intercepted the picket line, refused to allow them to enter the exterior gates of the Supreme Court complex, and ordered them to leave and "get out of here."[281] Police pushed the protesters with batons and forcibly prevented the protesters from approaching the exterior gates.[282] Union leader Federico Torres Montalvo later told the press, "The only path that remains to us is this one, the street, and we had advised the police not to provoke us, to allow us to do our peaceful protests, because we were going to reach the doors to the Capitol Building, to the Governor's Mansion, and wherever necessary."[283] Luisa FCT Local 481 leader Acevedo Zambrano told the ACLU that after the police forced them to abandon their protest outside the Supreme Court, "More than indignation, I felt frustration. The police, they don't let us express ourselves. You feel impotence that you can't even express yourself about what is happening, because they won't let you. There hasn't been any bridge of communication with the government in the last two years. No communication of any kind; not in the streets, not in the courts, and not in the legislature."[284]

### e.  Documented Incidents of Police Abuse against Protesting Students at the University of Puerto Rico

*i.  Avenida Universitaria*

In the early morning hours of August 21, 2009, the first weekend after the semester began, police attempted to arrest a man, reportedly for drinking an alcoholic beverage on Avenida Universitaria, a street near the UPR campus where university students frequent bars, cafes and restaurants. When students gathered to verbally protest the police's actions, more than 100 UOT agents belonging to the Division of San Juan arrived at the scene. They were armed with batons, pepper spray, and tear gas, and indiscriminately attacked the students. Police beat the students with nightsticks, fired tear gas canisters at them, and pepper-sprayed them. Officers arrested five people, but dropped most of the cases because there was no probable cause to support the arrests.[285]

Later, students gathered inside the fenced courtyard of a UPR college dormitory, Torre Norte, and began to chant, "Abusers!" ("¡Abusadores!") at the police nearby. The students were not throwing objects or posing any threat. Suddenly and without warning, the officers pointed a riot gun directly at the protesting students and fired a tear gas canister, striking student bystander **Michelle Padrón Gauthier**, who was peacefully standing in the courtyard of the residence hall where she lived. The canister severely injured her leg, slicing through her pants and inflicting a deep wound in her thigh. She was wounded so severely that she fell to the ground and was unable to walk. Officers continued to shoot tear gas canisters at the group of protesting students, preventing other students from assisting her. Police also blocked emergency vehicles from approaching the area, including an ambulance that was called to assist her. Padrón Gauthier, a college athlete who had a sports scholarship to attend the UPR, was confined to a wheelchair for about a month because of the injury, after which she required a cane to walk, and was unable to complete the semester and graduate as planned. She required emergency medical treatment and ongoing physical and psychological therapy, and she has a four-centimeter-deep hole in her thigh. Padrón

Gauthier filed a lawsuit against the PRPD for damages, and her lawyer said, "She is trying to continue on with her life, but it is not easy."[286]


*ii. April to June 2010 Student Strike*

On April 13, 2010, as a response to students' call for action, the UPR General Student Council held a General Assembly of Students at the UPR's Río Piedras campus. The student General Assembly approved a motion to create a Negotiating Committee to represent the students before the UPR's administration and also resolved to enact a 48-hour walk-out if the administration did not heed their concerns. After numerous attempts to negotiate with administration officials, on April 21, 2010 the General Student Council announced the beginning of the 48-hour walk-out.

UPR administrators and officials continued to refuse to meet with the Negotiating Committee. As a result, on April 23, 2010, the General Student Council announced the beginning of an indefinite student strike. The strike grew in size and support, and by early May, 10 of the 11 UPR campuses had joined the strike. Almost three weeks later, the student General Assembly rejected a proposal introduced by university administrators, voting instead to continue the strike.

Students set up a temporary camp at the center of the Río Piedras campus. Students gathered to chant and hold placards against Law 7, the tuition increases, and various UPR administration policies. Almost immediately after the second vote extended the strike, the Riot Squad seized control of the main campus gates, limiting any means of ingress or egress to the UPR campus. The Riot Squad blocked parents, professors, students, and other supporters gathered outside the campus from passing anything—even food and water—to students who the police had barricaded inside.

The strike lasted 62 days on the Río Piedras campus. Throughout the strike, police surrounded and guarded the gates at the Rio Piedras campus. During that period, on multiple occasions the Riot Squad used force and chemical irritants against student demonstrators, student bystanders, and supporters including parents of students. PRPD officers repeatedly struck with batons, hit, shoved, and pepper-sprayed students protesting near the university gates and students who tried to enter the Río Piedras campus via campus gates.

On **April 23, 2010**, recent law school graduate **Hans Perl-Matanzo** was beaten by Riot Squad officers at the principal gate leading to the campus museum and library. The Riot Squad officers were blocking the gate and not permitting students to enter the campus. Perl-Matanzo, who was acting as a legal representative for the students, approached the officers to say that a group of law students wished to enter the campus to protest and exercise their right to speech and assembly.[287] Perl-Matanzo told the Riot Squad officers that he would enter the campus, and they could arrest him if they thought he was breaking a law. He took only a single step toward the university gate, and two Riot Squad officers threw

him to the ground and hit him with batons with six or eight strong dagger-type blows to his chest and ribs.[288] They kicked him once or twice once he was on the ground, and a third Riot Squad officer pushed him with his baton. The blows caused Perl-Matanzo's lung to partially collapse and left him with painful bruises and inflammation on his chest and ribs; he subsequently lost consciousness and required emergency medical treatment.[289]

On **May 14, 2010**, when student **José "Osito" Pérez Reisler** attempted to enter the UPR gates, officers grabbed him, threw him to the ground, kicked him, beat him with fists and nightsticks, handcuffed him, and pepper-sprayed his face at close range. At no time did Pérez Reisler resist arrest. Officers held him for around nine hours but did not charge him with a crime. At the time the police stopped and detained him, Pérez Reisler was carrying a laptop containing the electronic version of his draft Master's thesis; police confiscated his bag and laptop upon taking him into custody and claimed no knowledge of the laptop when Pérez Reisler was released. Pérez Reisler never recovered his laptop or his thesis from police.

Also on May 14, 2010, one or more PRPD officers beat one student's father, parole officer **Luis Torrez**, in the face with a nightstick when he attempted to bring food to his son and other students to show his support for the strike. Torrez customarily brought food to the students while on his way to work, and although he saw police officers during each visit to the perimeter of the Río Piedras campus, no officer ever informed him he could not bring food to the protesting students. When he arrived to the campus gates on the morning of May 14 at about 7:30 a.m., he saw approximately 30 PRPD officers, led by a Sergeant of the UOT. The Sergeant grabbed Torrez by his sweater and threw him to the ground, and while he was on the ground he felt the officer or officers hit him in the face twice, breaking his glasses. Officers then lifted Torrez and threw him to the ground before handcuffing and arresting him. Torrez sustained a head wound that bled down his face, scratches on his wrist, and a foot-long contusion of the shape and size of a police baton. He was detained in a cell for an hour-and-a-half before police transported him to the emergency room of the Río Piedras hospital, where he received emergency medical care, including a cranial X-ray. Police returned Torrez to a cell until 6:00 p.m., when they permitted him to leave. He was never charged with any crime, nor did police inform him of the reason for his arrest and detention. Torrez missed 15 days of work because of his injuries.[290]

Incidents such as these were common throughout the student strike. Indeed, UPR students reported that they read postings by several self-identified PRPD officers on Facebook stating that they were excited to have an opportunity to beat students and put an end to the student demonstrations.

*iii. December 2010 to February 2011 Student Strike*

In December 2010, just as the second semester was getting underway at UPR, students continued their campaign against the $800 fee increase, which was due to come into effect in January 2011. That same month, Governor Fortuño declared in a televised appearance that



Police arrest a student on the University of Puerto Rico campus. The ACLU has documented baseless mass arrests of UPR student to put an end to their protests. A very small fraction of these arrests of student protesters was supported by probable cause. Photo Credit: Andre Kang / Primera Hora (2011)

protests by extreme leftists would no longer be tolerated on the campus. His Chief of Staff, Marcos Rodríguez Ema, declared in a televised interview that students and professors who dare protest will be removed and get their asses kicked ("*vamos a sacarlos a patadas*").

On December 13, 2010, the Chancellor of the UPR Río Piedras campus, Ana Guadalupe, issued a 30-day ban on all First Amendment activity, including protests and group activities anywhere on the university campus and asked Commonwealth government for assistance in enforcing the ban. Chancellor Guadalupe extended the resolution banning protests on the university campus, set to expire on January 13, 2010, for an additional 30-day period, ending on February 13, 2010.  After the second protest ban expired, Chancellor Guadalupe reactivated the resolution on February 25, 2010 for a third 30-day period. The university administration also limited any protest to small designated areas located outside the campus, called "free speech zones" (áreas de libre e*xpresión*). A group of four students filed suit for injunctive relief, challenging the ban on protest and other expressive activities as an unconstitutional restriction on freedom of speech and expression, but both the lower court (*Tribunal de Primera Instancia*) and the Court of Appeals (*Tribunal de Apelaciones*) denied injunctive relief.[291]

Students told the ACLU that the designated "free speech zones" outside the campus made it impossible for them to communicate their message. Students said that the "free speech zones" were too small and completely surrounded by police. Until the Chancellor's protest ban and the recent police crackdowns, protesting UPR students have customarily marched through the campus, within earshot of fellow students, alerting students to their message and thereby gathering supporters along the way. Student Zulee Agular explained, "That area

is not near the students who would hear us and would participate with us. We can't raise the consciousness of students inside the campus if you are outside. Also, no professors or university administration officials—the people we wanted to direct our message to—could hear or see us from that area."[292]

Student protesters planned and executed a peaceful two-day walkout on **December 7 and 8, 2010**, during which private security contractors used violence against students. Guards recruited by Capitol Security, a private security firm contracted by the university, patrolled the campus, some bearing knives, sticks, pieces of wood, pipes and other objects they had picked up around the campus. These hired guards had little or no training and bore no identification badges. One student told the ACLU he witnessed about five of the security officers savagely beat one student with sticks and kick him, injuring him so badly he had to be hospitalized.[293] A line of police outside the perimeter of the campus reportedly witnessed the security officers savagely beat the student, but did not intervene.[294] A video purportedly of students breaking the windows of a security van was aired by local television news channels.

Prior to the student walk-out, during the early morning hours of December 6, 2010, the UPR administration had the various gates to the Río Piedras campus dismantled, removed, or welded open, in an attempt to prevent student strikers from blocking other students' access to the campus. After the student walk-out, the PRPD took over the campus, actually occupying the inside of the campus itself. Some students estimated the number of police officers who entered the campus that day at more than 300. This marked the first time in over 31 years that the PRPD had entered and occupied the UPR Río Piedras campus, which has been a traditional forum for student protest. The police presence on the campus ended a longstanding Non-Confrontation Policy promulgated by the Academic Senate, which banned PRPD police presence inside the campus, and was enacted following incidents of police abuse against protesters including the fatal shooting of a UPR student by police over three decades earlier.

On December 14, 2010, student leaders announced the beginning of another indefinite student strike, passed by a majority of students at a General Assembly of Students held by the General Student Council. Police were constantly present on the campus during the strike: officers patrolled all around the university on foot, in police cars and SUVs, on police motorcycles, and in golf cart-type vehicles; multiple mobile police units were stationed in each of the parking lots on campus; and approximately twenty PRPD officers were stationed at each gate to the campus. Some students estimated that there were 200 to 400 police on the campus at any given time during the strike. Students told the ACLU that they felt constantly threatened by the officers, who often harassed them. Student **Gabriela Camacho** reported that one officer warned, "'The streets are dark and one day the press won't be there.'"[295]

Throughout the strike, the students organized peaceful marches and demonstrations both on and off the campus. The locations of students' protests included the gates of the UPR Río Piedras campus, on side roads inside the campus, inside and outside the buildings of the

**"In effect, it was a prohibition of expression anywhere, by students specifically. There was nowhere we could express ourselves. If we were inside the campus, we couldn't protest. And once they chased us outside they would prevent us from protesting. So we couldn't."**

various schools (*facultades*) and administrative buildings of the campus, and on the streets and sidewalks outside the campus. On some occasions the students would enter the buildings of the various departments to peacefully march and chant, as student protesters have historically done for years on the campus. Starting on January 19, 2011 they also began to stage sit-ins, in addition to their usual marches. Despite the fact that the vast majority of these marches and demonstrations were entirely peaceful and lawful, Riot Squad officers would attack the student demonstrators almost daily with tear gas, pepper spray, batons, sting ball grenades, and rubber bullets. Furthermore, during the second student strike, the PRPD used mass arrests without cause to intimidate students and prevent them from engaging in protected speech.

The student protesters started the strike with a march on **December 14, 2010**, during which they sang and chanted slogans, and carried posters with messages such as "No to the quota!" ("*¡No a la cuota!*") and "Get out police!" ("*¡Fuera policía!*"). While the students peacefully marched, Riot Squad officers would form a solid wall, advance on the students, and use batons, plastic riot shields, tear gas guns, and pepper spray to forcibly drive the students out of the university campus and into the "free speech zone" outside the campus. Student leader **Xiomara Caro Díaz** explained, "We would march through the university, and the police would say we can't protest—they had a megaphone with an amplifier and would say you can't protest in the university. Then the lines of Riot Squad officers would physically push us out of the campus, but then when we got out they would continue to prevent us from protesting, even outside the gates."[296] She added, "In effect, it was a prohibition of expression anywhere, by students specifically. There was nowhere we could express ourselves. If we were inside the campus, we couldn't protest. And once they chased us outside they would prevent us from protesting. So we couldn't."[297]

Thereafter, throughout the strike, whenever the students tried to protest on the campus, the Riot Squad would forcibly drive them off campus. The Riot Squad officers would fire aluminum tear gas canisters from tear gas guns that looked like grenade launchers, firing indiscriminately at the crowd of protesting students, and they would jab and strike at students with batons and spray them with aerosol cans of pepper spray. UPR student Roberto Morales explained, "It was really, really frustrating. You are in your university and you're not doing anything illegal at all, and the police are threateningly and violently forcing you out of your university…Every single time we marched, they would form their lines and drive us out of the university. We never were able to continue protesting."[298]

Students organized a large, peaceful march on **December 15, 2010**, from the university campus to the *Jardín Botánico*, a building where the UPR President's office and other central

administration for the university is located, and which commonly has been the site of student protests in the past. Outside the *Jardín Botánico*, the students organized a picket on the Carretera Número Uno street, which blocked traffic. More than 100 Riot Squad officers arrived and less than five minutes later, the students abandoned their picket and marched back toward the campus to avoid being attacked by the police. As the student protesters approached the campus, they turned onto the Avenida Universidad street, where they saw a huge wall of hundreds of Riot Squad officers advancing toward them. Terrified, the students started walking backwards toward the university gates with their arms linked, and a group of UPR professors ran out and formed a human chain to protect the students from harm.

On **December 20, 2010**, the sixth day of the strike, students began a peaceful march at the Natural Sciences building, where they chanted, sang, and held posters. Riot Squad officers again attacked the student protesters, jabbing and striking them with long metal-tipped batons, fired tear gas canisters at the students, and arrested students who were peacefully marching and chanting slogans. One Riot Squad officer threw student **Amada Garcia** against a wall, breaking her camera and causing a bloody wound on her finger, and told her, "If you're not quiet, I'll throw you outside [of the university]."[299] Garcia was unable to bend two of her fingers for two months and has a scar on her finger from the injury she sustained that day.[300]

PRPD officers told the students they had to leave because they were violating the regulation banning protests on campus, and then violently forced the student protesters off campus. Students trying to flee the police violence ran into the *Plaza Universitaria* building located across from the entrance to the campus. There, Riot Squad officers corralled the student protesters, beat them with batons, violently grabbed them and threw them to the ground, and launched tear gas canisters that created a dense cloud of tear gas that engulfed them.[301] A number of students suffered injuries. Seventeen students were arrested during the incident, and a judge found cause for arrest in only eight of these cases.

On the morning of **January 12, 2011**, a group of 15 students entered the Humanities building to hand out flyers stating "There is no reason to maintain the quota; we demand real dialogue" ("*No hay razones para mantener la cuota; exigimos diálogo real*"). The students knocked on the door of classrooms and asked professors for permission to address their classes for three minutes and distribute the flyers. Approximately 30 PRPD officers, including CIC officers, arrived. The CIC officers gave the students a one-minute warning to leave the building. The students immediately started to walk downstairs to exit the building, and 30 seconds after the warning, the officers violently arrested the students. Student **Roberto Morales** told the ACLU that while he was walking down the stairs to exit, two officers grabbed him, one grabbing his back and the other grabbing his shirt, violently threw him to the floor face-down, and handcuffed him tightly and painfully with plastic restraining straps.[302] The officers then pulled him to his feet by yanking him by his arms, which were pinned behind his back. Student **Manuel Ortiz** told the ACLU that the officers arrested him in a similarly violent manner, and PRPD officers continued hitting him even after he raised his hands to show he was not resisting.[303] Officers jabbed one student with the metal tip of his baton, and beat another with a baton.

The officers arrested nine of the student leafleters and one student who was merely going to the bathroom during class and sobbed while the officers arrested her. At the Hato Rey Oeste police station, officers did not know the names of the arresting officers nor the basis for the arrest. The students were held in a cell for eight hours before being released without explanation. The students were not given any food while in the cell, and when one of the female students complained she was hungry, an officer grabbed his crotch and told her, "'You can eat this.'" One of the students required treatment at a hospital and had to wear a sling on his arm because of the baton blows he received. None of the students received any citation, and none was charged with any crime.

On **January 13, 2011**, the date the university began to process the $800 fee increase, a large group of students protested outside *Plaza Universitaria*, the administrative building housing the offices to process payments. The students held banners stating "No to the quota!" (*"¡No a la cuota!"*), posters with slogans such as "Get out police" (*"Fuera policía"*), and homemade



Injuries inflicted by police on UPR students during the February 9, 2011 student paint-in.  Below left, police use excessive force to arrest a student during the peaceful protest. Photo Credit: Lower left, Indymedia (2011); right and upper left, ACLU (2011)

shields of wood and plastic, some stenciled with "To defend the UPR" ("*A defender la UPR*"). Riot Squad police violently dislodged the students with tear gas, pepper spray, and batons. Students suffered injuries, including one female student who suffered a split brow from a baton blow.

The students then tried to peacefully march through the Río Piedras campus while chanting slogans. Riot Squad officers continued to pursue them, and one officer announced through a megaphone that their protest was illegal and ordered the students to move their protest off campus. Riot Squad officers then forced the students off the campus, onto the Avenida Barbosa, one of the streets that borders the campus. There, the police violently arrested students. PRPD officers grabbed students in chokeholds, used their batons to choke students around their neck, and threw students to the ground.

That day, the police arrested six students, five of whom were later released without charges. Among those arrested was law student **Gamelyn Oduardo**, who was peacefully marching on a sidewalk when police beat him with batons and arrested him. Oduardo said, "I still see it in my sleep. I saw hundreds of members of the Riot Squad running towards us. Our exit was blocked. A Riot Squad officer attacked me with a baton, and other officers screamed, 'Catch him! Catch him!'"[304] He said, "Instead of putting me under arrest, they repeatedly beat me...They weren't arresting me, they were beating me. I didn't see the handcuffs; what I saw were the batons. It wasn't until after they had me in a wrestling headlock (*me hicieron una llave*) that they arrested me."[305] Oduardo added, "Instead of police officers they seemed like a gang of delinquents."[306] During his arrest, officers painfully tightened plastic handcuffs on his wrists and repeatedly told him his protest was worthless; he experienced pain from the baton blows for three weeks afterwards. Oduardo also witnessed PRPD officers throw another student "like a sack of potatoes" who began convulsing upon crashing to the ground. Nonetheless, PRPD officers arrested the convulsing student, who began to vomit in the police bus; the officers asked Oduardo and other arrested students whether any of them were paramedics.[307] A judge found no probable cause to support Oduardo's arrest.

> "I still see it in my sleep. I saw hundreds of members of the Riot Squad running towards us. Our exit was blocked. A Riot Squad officer attacked me with a baton, and other officers screamed, 'Catch him! Catch him!'"

On **January 19, 2011**, the students staged the first sit-in of the strike. The students sat linking arms and sitting cross-legged side-by-side at the gates of the university while other students stood nearby chanting and holding placards. As students sat and chanted along with fellow supporters, the Riot Squad surrounded them on all sides, forming a wall between them and their supporters. CIC officers then used harsh and violent pressure point compliance techniques on the students engaged in the sit-in. These painful techniques included the PRPD digging their fingers deep underneath the students' ears and above their jaws, and forcibly lifting and dragging them by exerting extreme pressure on these points.

Other pressure point techniques involved causing the students pain by targeting pressure points under the students' jaws, near their necks or ears, or directly on their eyes and eye sockets. The students were merely passively resisting arrest, doing nothing more to resist arrest than to link arms and cross their legs. In some cases, police used these techniques on the students even after they had already been securely handcuffed or otherwise restrained by the PRPD. For example, students witnessed police continue pressing on **Ian Camilo Cintrón**'s jugular and neck after he already was handcuffed with his arms behind his back and restrained by four officers.

Among the students involved in the sit-in was **Rafael Ojeda**, who told the ACLU that PRPD officers applied pressure to his neck and on his carotid artery, then threw him to the ground and kneed him in his back and neck while he was face-down with his arms behind his back. An officer twisted his wrist back, causing wrist pain that persisted for two weeks, and his knees hurt for months.

Forty-nine students were arrested at the sit-in. The arrested students received citations for obstruction of a public thoroughfare, but judges reportedly found no probable cause to support the arrests and none of the arrestees was charged with a crime.

On **January 20, 2011**, the students staged the second sit-in of the strike. About 20 to 25 students protested at each gate to the campus. PRPD officers, including Riot Squad, applied press point techniques on the peacefully resisting students, who were sitting with their arms linked. UPR student **Zulee Aguilar** explained, "It was really easy to put my hands behind my back [and handcuff me], but instead they treated me as if I was a criminal," adding, "The torture techniques—because in reality that's what they are—caused an indescribable pain, and they affected my circulation and left a mark on my neck."[308]

On **January 25, 2011**, students carried out another sit-in at the university gates. PRPD officers, including Riot Squad officers, arrested the students one-by-one, again applying pressure point techniques to each passively resisting student. Among those arrested was law student and founder of the Radio Huelga student radio station **Ricardo Olivero**, who was transmitting live from the event and not participating in the sit-in. PRPD officers grabbed him and after they had immobilized him with his arms behind his back, they began to apply the pressure point techniques, pressing on his carotid artery. Olivero explained, "It hurt a ton—there's a nerve at the spot where they press—and it made me dizzy and completely lose balance."[309] According to Olivero, when he tried to speak to journalists while the PRPD officers dragged him away, an officer forcefully grabbed him by his waist and told him "Shut up, don't talk to the press."[310]

Also on January 25, 2011, students tried to carry out a picket outside the university gates, in the street, and mounted police officers pursued them. UPR student **Zulee Aguilar** told the ACLU, "We were running; we ran to protect ourselves, and they kept pursuing us. There were many [police] horses. We were protesting without any violence, and we weren't even paralyzing traffic or interfering with anything."[311]

On the first and second day of classes for the semester, **February 7 and 8, 2011**, Riot Squad officers forcibly prevented students from protesting at various locations, breaking up peaceful marches and a protest that involved reading poetry.[312]

On **February 9, 2011**, police violently attacked students participating in peaceful paint-in (*pintada*) in front of the library, *Biblioteca Lázaro*. Paint-ins, in which students paint the sidewalk and road in front of the campus's main library with political messages of all types, are a tradition on the UPR campus. The road is named Consciousness Street (*Calle Consiencia*) in honor of this tradition. Students gathered to peacefully paint messages such as "No police," "No quota," and "Defend your freedom, express what you feel." CIC officers arrived and began filming the students, and more police arrived. The students began chanting "Get out, get out, get out police." The Riot Squad then arrived and heavily sprayed the students with pepper spray. Riot Squad officers began to strike the students with nightsticks, chasing them down. Students ran into the library in an attempt to escape the beatings; Riot Squad officers tried to chase them inside, but library employees assisted the students to hold the doors shut. Students estimate that around 100 police officers, including Riot Squad and CIC officers, were involved in the incident.

Student Shariana Ferrer Nuñez said that the PRPD were so violent that she thought that a student may be killed by police. She said, "The police pepper-sprayed us as we were leaving, with our backs turned. From there we ran and ran throughout the campus. But we were on the campus—a bubble—so there's nowhere to run. The police were at every gate, every department building. You could try to run to a classroom, but there would be police there. There was nowhere to hide. This is the incident that most marked me. You could be crying on the floor and bleeding from your head, and the police wouldn't stop."[313] Student **Roberto Morales** told the ACLU, "We were quietly painting and talking amongst ourselves, but the police were savage that day. They were hitting and pushing people for no reason. It was really bad, really unfair, and totally unjustified. Obviously they don't agree with us, and they have the physical power to stop us. Since it's political, it's personal. The Superintendent of Police, the Chancellor, and the Governor are against what we believe and what we do to express our beliefs."[314]

Twenty-eight students were arrested, including some who were merely on their way to class. All of the students arrested were subsequently released without being charged. **Zulee Aguilar** reported that she was arrested after Riot Squad officers swarmed one of the departmental buildings where she happened to be walking, threatened students with nightsticks, and ordered them to exit the lobby even though many students were in class or studying inside the building at the time.[315] **Guillermo Torres Grajales**, an accounting student who was not a part of the protest but merely had come in early to make a change to his class schedule, was beaten and arrested.[316] About four Riot Squad officers beat Torres Grajales with nightsticks so severely that he bled from his head and arm. He explained that because of the PRPD's actions, he feels less able to participate in protests: "You have to stay quiet or else they will arrest you."[317]



**Guillermo Torres Grajales, an accounting student who was not a part of the protest but merely had come in early to make a change to his class schedule, was beaten and arrested.**

Guillermo Torres Grajales, a University of Puerto Rico accounting student. About four Riot Squad officers beat him with nightsticks so severely that he bled from his head and arm. Photo Credit: ACLU (2011)

Many students, parents and other relatives of students, professors, and other non-teaching university employees were furious about the police violence, and they marched together with students toward the Chancellor's office. The large crowd peacefully chanted inside the vestibule of the clock tower building housing Chancellor Guadalupe's office.

UPR president José Ramón de la Torre resigned on February 11, 2011. In a letter dated February 10, President de la Torre requested that the Superintendent at the time, José Figueroa Sancha, remove the police. On February 14, 2011, the majority of the police were ordered off campus, but some remained.

On some isolated occasions, some students did engage in unlawful activity. However, these incidents do not justify the PRPD's consistent use of excessive force on protesters who posed no threat on other occasions. On **January 11, 2011**, people who were alleged to be members of a small militant wing of the student movement, called "*encapuchados*" for the masks they wear, set off smoke bombs to disrupt classes being held despite the strike, and smashed windows and overturned tables in the Student Center's fast food court. No arrests were made, although police were present throughout the incident. The coordinating committees of the student movement issued statements repudiating the vandalism. On **March 7, 2011,** students surrounded the department of Architecture building, where Chancellor Guadalupe attended a meeting, and some of the students attacked her as she tried to leave the building. These students pulled her hair and sprayed her with water, despite the cordon of security guards surrounding her. Students also smashed the windows of her car.

The Puerto Rico Police Department systematically fails to protect women and girls from abusive partners and ex-partners, and it is not policing crimes of domestic violence and sexual assault. Puerto Rico has the highest per capita rate in the world of women over 14 killed by their partners.



Family members cry at the crime scene where Sandra Villafañe Silva's estranged husband of 20 years fatally stabbed her 50 times before taking his own life. Source: Andre Kang / Primera Hora (2011)

# VII. Failure to Police Crimes of Domestic Violence and Sexual Assault

The PRPD systematically fails to protect victims of domestic violence and to investigate reported crimes of domestic violence, sexual assault, and even murders of women and girls by their partners or spouses. The PRPD is failing to protect women from abusive partners and spouses, and the PRPD is not policing those crimes when they are committed. The PRPD is not doing enough to ensure that women confronting domestic violence utilize the legal options available to them, and it is not adequately enforcing existing protective orders by arresting abusers who violate orders that are in place. The PRPD also is not adequately responding to or investigating rape crimes, and it is significantly underreporting these crimes. Moreover, the PRPD has recorded an appalling number of complaints of domestic violence by PRPD officers, and the PRPD's failure to address domestic violence among its ranks is symptomatic of a larger institutional dysfunction of the police department's policing of domestic violence and other sexual and gender-based crimes.

## a. Failure to Prevent Intimate Partner Homicides

The PRPD is failing to prevent murders of women and girls by their spouse, partners, and ex-partners. Puerto Rico has the highest per capita rate in the world of women over 14 killed by their partners. The numbers are disturbing, and climbing: 107 women were killed by their intimate partners in the five-year period from 2007 to 2011. The number of women killed by their intimate partners jumped significantly in 2011, to 30 women killed, up from 19 in 2010. According to news reports, 21 women were murdered by intimate partners in the first six months of 2011 alone.[318] In 2006, the PRPD reported 23 murders of women at the hands of their partners or spouses, placing Puerto Rico first on an international list comparing the number of women killed in each country/territory by their partners per million women over the age of 14.[319]

To put the incredibly high rates of domestic violence homicides in Puerto Rico into perspective, the ACLU examined the number of women killed by intimate partners in Los Angeles, which has a population close to that of Puerto Rico (according to the 2010 Census, Puerto Rico's population was 3.726 million, while Los Angeles's was 3.793 million). Thirty women were killed by their intimate partner in Puerto Rico in 2011; in Los Angeles, five women were killed by their partners that year.[320] While 107 women were killed by their intimate partners over the five-year period from 2007 to 2011, 42 women were killed over the same period in Los Angeles.[321]

Thirty women killed by their partners in a single year, 2011, not only is a huge increase in Puerto Rico, but is significantly higher than the rate that would be expected based on U.S. national numbers. The DOJ estimates that the rate of intimate partner homicides with

female victims is 1.07 per 100,000 female residents in a year (this is a 2007 figure, the most recent statistics available).[322] Census figures show that there were 2,063,918 women in Puerto Rico in 2009. Based on the U.S. national intimate partner homicide rate and Puerto Rico's population, one would expect the number of women killed by their intimate partners over the course of a year to be about 27 percent lower (22 women).

**Table 4: Intimate Partner Homicides of Women in Puerto Rico versus Los Angeles, 2006-2011**[323]

|  | 2011 | 2010 | 2009 | 2008 | 2007 | 2006 |
|---|---|---|---|---|---|---|
| Women killed by intimate partners in Puerto Rico | 30[324] | 19 | 16 | 26 | 16 | 23 |
| Women killed by intimate partners in Los Angeles[325] | 5 | 8 | 5 | 10 | 14 | N/A |

Unfortunately, appropriate PRPD response and intervention could have prevented some of these tragic killings. The recent killing of 44-year-old nurse Wanda I. Camacho Meléndez is emblematic of the PRPD's systematic failure to protect women from violent partners and ex-partners. Camacho Meléndez was stabbed to death, allegedly by her ex-partner, Alexander Rodríguez Vélez, on February 14, 2012.[326] Camacho Meléndez had repeatedly gone to the police seeking protection from her partner, who had threatened her with death and beat her on multiple occasions.[327] On November 12, 2011 she sought assistance from the PRPD domestic violence division in Fajardo, and reported that her ex-partner had stabbed her one week earlier, on November 5, 2011.[328] The police did not initiate any investigation into her allegations, and did not process the attack as an assault or a domestic violence crime.[329] Instead, the police processed the case as a stalking case and a request for a protective order, which was granted to Camacho Meléndez.[330]

On November 16, 2011, Camacho Meléndez returned to the police to report that Rodríguez Vélez had violated the protective order.[331] According to press reports, she reported that he had vandalized a gas line and called her at the hospital where she worked, telling her that he was going to "see her dead."[332] A PRPD officer says he consulted with the district attorney's office, which did not find probable cause to charge Rodríguez Vélez with violating the order of protection, because a call log at the hospital did not document the call.[333] The district attorney's office has since told journalists that the PRPD never informed them of the previous stabbing incident.[334]

On December 14, 2011, Rodríguez Vélez again violated the protective order by going to Camacho Meléndez's house; a neighbor was there at the time. Charges were brought against him for violating the order, but he was not taken into custody.[335]

On February 14, 2012, Rodríguez Vélez again violated the protective order by approaching Camacho Meléndez.[336] He was wearing an electronic GPS-tracking device, which alerted



Nurse Wanda Camacho, in a family photo with her brothers and father (left), was stabbed to death, allegedly by her ex-partner. She had repeatedly gone to the police seeking protection from her partner, but police did not investigate her allegations and failed to enforce a protective order. Photo Credit: Angel Luis García / El Nuevo Día (2012)

police that he had violated the protective order. Police did not follow protocols, which require them to immediately contact the domestic violence victim to alert her that her abuser had violated the order and was nearby.[337] Rodríguez Vélez stabbed Camacho Meléndez in her back, face, and abdomen, and she died of her injuries.[338] Rodríguez Vélez has been charged with murder, attempted murder, and weapons violations, and is currently being held on $6.5 million bail.[339]

In other cases the PRPD's failures have not been as starkly revealed, but the following cases raise serious concern that the PRPD is failing to protect women from their abusers. Information on the following cases of women reportedly killed by their partners and spouses in 2011 is based on public reports and news media reports. There are not final adjudications of guilt or innocence in a number of these cases, and in some of these cases criminal litigation is pending. Because it is difficult to obtain case information except where the case emerged in newspaper headlines, this research relies heavily on cases that have been exposed by local news media.

**Table 5: Women Killed by their Partners and Spouses in Puerto Rico in 2011**

| Name | Age | Date | Description |
|------|-----|------|-------------|
| María Margarita Ramos García | 56 | January 8, 2011 | María Margarita Ramos García, 56, was the first victim of an intimate partner homicide in 2011. According to press reports, she was killed by her husband of over 30 years, José Cruz Martínez, 58, while she slept. After shooting his wife in the head he took his own life. Both bodies were found in their bed after police responded to a call from their daughter, Yaska Cruz Ramos, who reportedly became concerned after her mother was not answering her phone.[340] |

| Elisa Rosa ("Elirosa") Figueroa Pagán | 29 | January 9, 2011 | Elirosa Figueroa Pagán, a 29-year-old mother of a seven-year-old daughter, was allegedly fatally stabbed 15 times with a machete by her ex-partner, Víctor Amaro Texidor, in the town of Patillas. Amaro also allegedly wounded Figueroa Pagán's ex-husband in the attack. According to press reports, Figueroa Pagán had left Amaro days earlier to reconcile with her ex-husband, who was also the father of her daughter. Amaro reportedly had been criminally charged in 2007 for violation of the Domestic Violence Prevention and Intervention Law (Law 54), stemming from complaints of domestic violence filed against him by a previous girlfriend. Amaro also reportedly had an outstanding warrant for his arrest issued one month before the attack, for failing to appear at a hearing for charges of aggression against Figueroa Pagán's ex-husband. Amaro was charged with first degree murder, two counts of attempted murder, and weapons violations.[341] |
|---|---|---|---|
| Moraima Muñiz Muñiz | 39 | January 15, 2011 | Moraima Muñiz Muñiz, a 39-year-old mother of four and nursing student, was allegedly stabbed to death by her ex-boyfriend, Modesto Tosado Nieves, 56, in the Túnel de Guajataca, a beachside railroad tunnel. Muñiz was killed shortly after she ended their three-year relationship. Tosado Nieves reportedly killed her in front of her 18-year-old son, who called for emergency assistance. When police later took Tosado Nieves into custody he reportedly had wounds consistent with a suicide attempt. According to Muñiz's sister, María, prior to her murder Tosado Nieves had threatened her sister with harm if she did not return to him. Tosado Nieves was charged with first degree murder and weapons violations.[342] |

| Sasha Hernández Alemar | 30 | January 22, 2011 | Sasha Hernández Alemar, 30, was allegedly killed by her ex-boyfriend, Abed Nego González Vélez, 35. According to press reports, he stabbed her 26 times in the ballpark of the housing complex Río Cristal in the urban center of Mayagüez, where she lived with her grandmother and her 6-year-old and 12-year-old daughters. Hernández Alemar reportedly had previously lived for some time in a shelter for abused women in Ponce, where González Vélez had found her and resumed their relationship. According to press reports, she had moved in with her grandmother after they split a second time. González Vélez reportedly confessed to Puerto Rico newspaper *Primera Hora* that he killed Hernández Alemar when she told him she had a new boyfriend. González Vélez was charged with first degree murder and weapons violations.[343] |
| --- | --- | --- | --- |
| Iris Nidia Lugo Garcia | 23 | January 28, 2011 | Iris Nidia Lugo Garcia, 23, was killed by her ex-partner, 45-year-old Francisco Mercedes, who shot her twice in the face while she sat in her car. They had separated several months earlier.  Mercedes then took his own life in the same vehicle.[344] |
| Wilmary Vázquez Hernández | 24 | February 4, 2011 | Wilmary Vázquez Hernández, 24, was allegedly stabbed to death by her ex-husband, José Ramón Maldonado Bones, 34, in Villa Kennedy, in the town of Loíza. Maldonado Bones allegedly beat her and stabbed her in the abdomen, back, arms, and hands with two knives because of a dispute over child support payments. Their three-year-old son reportedly witnessed part of the murder; a friend who was with her fled with the child during the attack. Maldonado Bones's stepmother told a Wapa television broadcast journalist that he had a history of domestic violence against other women. Maldonado Bones was charged with first degree murder, attempted third degree murder, and weapons charges.[345] |

| | | | |
|---|---|---|---|
| Claribel Rivera Wilson | 38 | March 9, 2011 | Claribel Rivera Wilson, a 38-year-old mother of four, died on March 9, 2011 at the Medical Center in Río Piedras, seven days after her partner, Reinaldo Díaz Alvarado, 40, shot her in the head. Rivera Wilson's 15-year-old son reportedly witnessed the killing. Díaz later committed suicide, reportedly with the same weapon he used to kill Rivera Wilson.[346] |
| Marina Guiador Díaz | 37 | March 5, 2011 | Marina Guiador Díaz, 37, was beaten to death by her partner. Alongside her body, her partner José Manuel Ventura, 38, was also found dead by hanging.[347] |
| Sandra Villafañe Silva | 39 | March 16, 2011 | Sandra Villafañe Silva, a mother of two, was stabbed 50 times by her husband of 20 years, Alberto Bracero Morales, at the gas station that they operated together. They had been separated for three months at the time of the killing. Bracero Morales reportedly committed suicide after killing his wife.[348] |
| Helen Pérez Darnet | 32 | March 27, 2011 | Helen Pérez Darnet, 32, was fatally shot by her partner in her apartment in the Puerto Nuevo sector of San Juan, where they had lived together for 10 months prior to the murder. The murder took place in the presence of at least six witnesses, including her three children ages 5, 14, and 16.[349] |
| María de Lourdes Cortés Rosado | 45 | March 29, 2011 | María de Lourdes Cortés Rosado, 45, and a friend were allegedly shot and killed by her ex-husband of 15 years, Héctor Manuel Rivera Cruz, 39, in the town of Añasco. Cortés Rosado's husband reportedly fired five shots at her male friend and three shots at her after he saw them kissing. Rivera Cruz, who reportedly confessed to the killings, was charged with two counts of first degree murder.[350] |
| Gloria Hernández Orsini | 47 | March 30, 2011 | Gloria Hernández Orsini, a 47-year-old mother of four, was found by her daughter stabbed to death in a parked car in a parking lot of a shopping center in Ponce. Her intimate partner of five years, Madeline Gonzáles Torres, allegedly stabbed her 10 times. Gonzáles Torres was charged with murder.[351] |

| | | | |
|---|---|---|---|
| Frances Feliciano Cappas | 17 | April 7, 2011 | 17-year-old high school student Frances Feliciano Cappas was allegedly shot in the head by her 17-year-old boyfriend, Kevin William Díaz Olán, in Yauco. The teenage girl's friend reportedly witnessed the shooting.  Olán drove his already brain-dead girlfriend to the hospital, where he reportedly provided conflicting stories. The girl's parents ultimately made the decision to remove life support and donate her organs. Díaz Olán was subsequently charged with first-degree murder.[352] |
| Aida Cruz Ivette Ortiz | 47 | April 23, 2011 | Aida Cruz Ivette Ortiz, 47, a mother of two who worked as a secretary at a hospital clinic for children and adolescents, reportedly was stabbed to death by her partner Hipólito Sevilla Sevilla, 63, in the town of Gurabo. According to relatives of Ivette Ortiz, she had filed complaints with the PRPD against Sevilla for domestic violence in the past. Sevilla, who worked as a security guard, reportedly had previously threatened her on multiple occasions, and had chased her with a gun during an earlier incident. Sevilla was charged with first degree murder, weapons violations, and domestic violence.[353] |
| Rosaura Sánchez Cruz | 28 | May 6, 2011 | According to press reports, Eduardo Feliciano Alvarez, 32, scaled eight stories of his ex-partner's condominium building, climbing up the balconies, to break into the Aguadilla apartment where his ex-partner Sánchez Cruz, 28, slept with their two children, ages two and six. They reportedly had been partners since she was 12 years old. He reportedly shot and killed Sánchez Cruz in front of their children as she tried to flee down a hallway, injuring their two-year-old son, who was in her arms. Feliciano Alvarez subsequently committed suicide with the same gun he used to kill his ex-partner. Feliciano Alvarez reportedly had been charged with domestic violence in 2010, stemming from a complaint filed by a previous partner.[354] |



The funeral of María Margarita Ramos García, who was fatally shot in the head by her husband of over 30 years. Photo Credit: El Nuevo Día (2011)

| Linda Rivera Cruz | 44 | June 8, 2011 | Linda Rivera Cruz, a 44-year-old mother of four, was found dead by her 12-year-old daughter in the apartment of her boyfriend of approximately one year, Rocaford Carrero Morales, 56. She had reportedly been stabbed eight times. Neighbors told journalists that they had witnessed Carrero Morales threaten to kill Rivera Cruz on previous occasions. Carrero Morales reportedly had been convicted of domestic violence as a result of a complaint filed by his ex-wife in 2007.[355] |
|---|---|---|---|
| Josmarie Serrano Fonseca | 20 | June 18, 2011 | 20-year-old Yosmarie Serrano Fonseca was shot to death by her estranged husband and father of her three children, Alvin Hermina Vélez. The couple, whose three children ranged in age from eight months to five years, had reportedly separated several weeks before the murder. Hermina Vélez was charged with first degree murder and weapons violations. As part of a plea deal, Hermina Vélez pled guilty to second-degree murder and weapons violations, and was sentenced to 65 years in prison.[356] |

| Brunilda Torres Sánchez | 62 | July 11, 2011 | Brunilda Torres Sánchez, 62, was killed with a machete by her partner of 10 years, Modesto Pérez Román, who subsequently buried her in the backyard of the home they shared in Lajas. Pérez Román, who confessed to police, was charged with first degree murder, weapons violations, and destruction of evidence. In December 2011, Pérez Román pled guilty to first degree murder and destruction of evidence.[357] |
|---|---|---|---|
| Eulalia Texidor Ortiz | 54 | July 17, 2011 | Eulalia Texidor Ortiz, a mother of three and an English teacher who was on the verge of retiring, was killed by her estranged husband of 30 years, Teddy Lugo Almodóvar, 55, from whom she had been separated for two years. Lugo Almodóvar shot her 10 times while their four-year-old grandchild watched television in the next room, then took his own life. Lugo Almodóvar had reportedly threatened and physically abused Texidor Ortiz on previous occasions, and their daughter had reportedly filed a complaint with the PRPD against him for abuse of their mother, but later withdrew the complaint.[358] |
| Marta Iris Marrero Estrada | 44 | August 15, 2011 | Marta Iris Marrero Estrada was slayed with a machete by her husband, José Mélendez Marrero, who reportedly had been suffering paranoia in the days leading up to the killing. The couple had four children, ranging in age from six to 24. According to their children, Mélendez Marrero locked himself in a bedroom with his wife of 25 years, Marrero Estrada. The couple's 18-year-old daughter tried to open the door when she heard her mother screaming; she reported that her father walked out of the room with a machete in hand while her mother lay on the floor holding a bleeding neck wound. Méndez Marrero subsequently hanged himself on the terrace as their daughter tried to help her mother, who died of her wounds. The couple's 20-year-old daughter reportedly left the house the night before and tried to convince her mother to leave with her.[359] |

| Jennifer Toro Hurtado | 26 | November 11, 2011 | Jennifer Toro Hurtado, a 26-year-old mother of three, was shot in the head by her estranged husband, Nelson Crespo Feliciano, in front of her three daughters at a grocery store in Aguadilla. Crespo Feliciano subsequently shot himself in the head and died days later. Toro Hurtado had obtained a temporary order of protection against Crespo Feliciano in July 2011. On September 22, 2011, Judge Rafael Ramos charged Crespo Feliciano with violating the protective order on account of his continued stalking of his estranged wife, released him on $5,000 bail, and ordered him to be placed under electronic surveillance by means of an ankle monitor. However, Crespo Feliciano failed to comply with the order and he was not outfitted with the ankle monitoring system. Six days later, Toro Hurtado sought an extension of the protective order, which was set to expire that day, testifying that her husband had violated the previous order and continued to threaten to kill her. Judge Diomedes González delayed the case to October 20, and again to November 8, to allow Crespo Feliciano time to find a lawyer. Wanda Vázquez Garced, the Women's Advocate of the Commonwealth of Puerto Rico, has called Judge Gonzalez' ruling "negligent" for failing to take into account Toro Hurtado's credible testimony, corroborated by Crespo Feliciano's previous history of domestic violence and recent death threats. According to the Women's Advocate, the day before the November 8, 2011 hearing concerning Toro Hurtado's requested extension of the protective order, Crespo Feliciano was arrested for failure to comply with the order to submit to electronic monitoring, but on November 10 Judge Rafael Ramos again released him on an additional $5,000 bond. Toro Hurtado was not notified of her husband's release, and he shot her the day after his release.[360] |
|---|---|---|---|

In addition to the cases detailed above, there are eight additional cases under investigation, in which the victims' partner is suspected of her murder: Julia García Cruz, age 21; Raisa González González, 28; Lorenis Karen Mejías Contreras, 30; Tayra Linnette Torres, 22; Tatiana Delgado Flores, 23; Marisol Rivera Rivera, 49; Lizyeisha Reyes Marrero, 25; and Eneida Montañez Beltrán, 25.[361] Women's rights advocates in Puerto Rico have called for

a full investigation into these and other cases, citing evidence uncovered by journalists suggesting that the murdered women's partner or ex-partner committed the homicide.

### b. Failure to Address Domestic Violence

The PRPD is not doing enough to ensure that women confronting domestic violence utilize the legal options available to them, and it is failing to enforce existing protective orders by arresting abusers who violate orders that are in place. Women's rights advocates have described domestic violence in Puerto Rico as "a state of national emergency," and the police are failing to effectively address crimes of domestic violence.[362] According to the DOJ, the "PRPD's longstanding failure to effectively address domestic violence and rape in Puerto Rico is clear and, in conjunction with its institutional deficiencies, may rise to the level of a pattern and practice of violations of the Fourteenth Amendment and the Safe Streets Act."[363]

In July 2011, during his confirmation hearing before the committee on Public Safety and Judicial Affairs, the recently-replaced PRPD Superintendent, Díaz Colón, was asked about deaths from domestic violence and child abuse that have occurred on the island, and he replied that domestic violence is a private matter and outside the purview of the PRPD. He told reporters, "Well, those two issues you pointed out to me are activities that are not directly part of the functions of the police of Puerto Rico. Possibly they may be directed at other agencies that can work on them."[364]

Of the women killed by their intimate partners from 1991 to 1999, only 17 percent had orders of protection, a scant 2 percent had orders of arrest against their murderer, and 4 percent had expired orders of protection.[365] In 2007, 25 percent of the women killed by their partners had previously reported incidents of domestic violence to the PRPD.[366] Few women are seeking protection from their abusive partners, in part because they distrust or lack faith in a system that is failing to provide adequate protection to victims.

Advocates in Puerto Rico report that arrests are not occurring and that police are not carrying out other statutory responsibilities. Police are failing to enforce the Domestic Violence Prevention and Intervention Law, known as Law 54 (*Ley 54*), enacted in 1989. Law 54 is a comprehensive domestic violence law that outlines criminal, civil, and preventive measures. With respect to criminal penalties, the law restricts police discretion and requires arrest when a domestic abuse offense has occurred.[367] It also provides a right to immediate medical care as necessary; the right to file a report with law enforcement; and the right to a restraining order, among other provisions.

A 2006 study of Puerto Rico's practices in handling domestic violence cases identified significant gaps in the response of both the civil and criminal justice system, including the PRPD, to domestic violence. The report found that there are significant delays in the adjudication of protection orders, due in part to confusion over the PRPD's responsibility for service of ex parte orders and summons to appear at the hearings on final orders of

protection, which result in delays in service; dramatic under-enforcement of violations of protection orders; inadequate staffing of both specialized domestic violence PRPD units and specialized domestic violence prosecution units, making it impossible to provide coverage of all domestic violence cases; lack of adeqate evidence collection and case investigation by the PRPD; and lack of consistent coordination between police and prosecutors in domestic violence case development.[368] Moreover, arrests are usually not made for violations of protective orders issued by the courts.

A significantly high percentage of domestic violence incidents reported to the PRPD do not result in convictions, in part because of lack of sufficient cooperation between police and prosecutors in case development.[369] According to data provided by the Women's Advocate Office (*Oficina de la Procuradora de las Mujeres*), around 20,000 protective orders are issued annually and a comparable number of domestic violence incidents are reported to the police, while fewer than 500 convictions for domestic violence are made annually.[370] According to a study commissioned by the PRDOJ and conducted by UPR researchers, domestic violence is the highest volume crime in Puerto Rico, but it has the lowest conviction rate, measured by the percent of incidents reported to police which result in convictions.[371] The study found that of approximately 20,000 domestic violence incidents reported to the police each year, only 17 percent resulted in convictions.[372] PRDOJ statistics for Fiscal Year 2003 to 2004 (in Puerto Rico, running from July 1 to June 30) indicate that of the approximately 21,000 domestic violence incidents reported by the PRPD that year, 19 percent (4,072) resulted in criminal complaints filed by the PRDOJ, and only 12.3 percent (2,586) resulted in convictions.[373]

These figures for domestic violence-related convictions are lower than U.S. national averages. A report by the National Institute of Justice examining intimate partner prosecutions between 1973 and 2006 in 120 mostly urban jurisdictions in 44 states and the District of Columbia of found the average arrest prosecution rate was 63.8 percent, and the average offense prosecution rate was 27.4 percent.[374]

The 2006 study of response to domestic violence in Puerto Rico found that to address the dearth of domestic violence arrests and convictions, police and prosecutors need to better collaborate in the processing of cases and develop consistent procedures in the development of cases. This includes creating and implementing consistent procedures for comprehensive incident report-writing, crime scene photos and photos of all injuries, body diagrams indicating location of injuries, and medical documentation, in order to collect adequate evidence to sustain criminal charges and successfully prosecute a case.[375]

In addition, victim reporting rates of domestic violence incidents are low, given Puerto Rico's population and U.S. national rates of domestic violence. As a performance measure of police departments' response to domestic violence, the National Institute of Justice has found that on the basis of actual rates of domestic violence as determined by victim surveys, law enforcement officers should be responding annually to 8 to 9 incidents per 1,000 females, and 2 to 3 per 1,000 males.[376] Based on this figure, and 2010 census statistics pegging the population of Puerto Rico at 1,785,171 men and 1,940,618 women, the PRPD should be

receiving about 15,525-17,466 complaints from women and 3,570-5,356 complaints from men, or a total of 19,095-22,822 complaints, which is higher than the 16,952 complaints the PRPD reported receiving in 2010. The National Institute of Justice noted that "if the incidence of domestic violence reported in victim surveys is significantly above the level that victims actually report to law enforcement, greater community outreach and barriers to reporting must be addressed. Law enforcement officers must encourage the rest of the community to do its part, and prosecutors must work with law enforcement if incidents are not making it into the courts."[377]

**Table 6: Domestic Violence Incidents Reported by the Puerto Rico Police Department**[378]



**Table 7: Orders of Protection Requested and Issued by the Court of First Instance (Tribunal de Primera Instancia) versus Domestic Violence Incidents Reported by the Puerto Rico Police Department**[379]

|  | **2011** | **2010** | **2009** | **2008** | **2007** |
|---|---|---|---|---|---|
| Number of orders of protection requested | 27,934 | 29,089 | 28,971 | 30,552 | 30,620 |
| Number of orders of protection issued | 18,391 | 19,260 | 19,504 | 20,293 | 20,258 |
| Domestic violence incidents reported by the PRPD | N/A | 16,952 | 19,124 | 20,389 | 19,222 |

### c. Failure to Address Rape

The PRPD is not adequately responding to or investigating rape crimes, and it is significantly underreporting these crimes. The PRPD reported that only 39 forcible rapes were committed in 2010, while the department also reported 1,000 homicides during the same year. Based on data from police departments around the U.S., we would expect the rape statistics to be 100 times the figure reported by the PRPD, as other jurisdictions in the U.S. report about four times as many rapes than homicides.

The number of reported forcible rapes has declined exponentially; from 426 in 1990 to 39—less than one-tenth that number—in 2010. In the last ten years the reported rape rate has declined sharply, declining from 228 to 39 forcible rapes from 2000 to 2010, while murders have seen a sharp increase during the same time period, indicating that reduced crime is not the cause of the recent shockingly low rape statistics.

The unprecedented data spread between reported forcible rape and murder is most likely the result of the PRPD's failure to follow protocols to respond to, record, or investigate crimes of rape. Official sources estimate that, in the case of sexual violence, only about 16 percent of rapes are reported.[380] In their latest study, issued in 2007, the Puerto Rico Department of Health's Center for Assistance to Rape Victims estimated that 18,000 people in Puerto Rico, mostly women and girls, are victims of sexual violence each year.[381]

**Table 8: Forcible Rapes Reported by the Puerto Rico Police Department**[382]

|  | 2010 | 2009 | 2008 | 2007 | 2006 | 2005 | 2004 | 2003 | 2002 | 2001 | 2000 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Forcible Rapes | 39 | 65 | 95 | 97 | 118 | 169 | 199 | 204 | 241 | 187 | 228 |

|  | 1999 | 1998 | 1997 | 1996 | 1995 | 1994 | 1993 | 1992 | 1991 | 1990 | 1989 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Forcible Rapes | 223 | 243 | 178 | 316 | 324 | 396 | 401 | 433 | 424 | 426 | 509 |

### d. Domestic Violence by PRPD Officers

The PRPD has recorded an appalling number of complaints of domestic violence by PRPD officers, and the PRPD's failure to address domestic violence among its ranks is symptomatic of a larger institutional dysfunction of the police department's policing of domestic violence and other sexual and gender-based crimes. The PRPD recorded nearly 1,500 domestic violence complaints against police officers from 2005 to 2010.[383] The actual number of crimes of domestic violence committed by officers is likely significantly higher due to underreporting, because survivors are unlikely to file and pursue complaints with

the same police department that employs their abusive partner or ex-partner. The DOJ has identified 84 still-active officers who have been arrested two or more times for domestic violence.[384] Recently there have been multiple highly publicized cases in which PRPD officers shot their wives with their service firearms, in some cases killing their spouses.

In the DOJ's report of its findings concerning the PRPD, the DOJ concluded that, "PRPD policies and practices are woefully inadequate to prevent and address domestic violence committed by PRPD officers. We find that these deficiencies will lead to constitutional violations unless they are addressed."[385] According to the DOJ, the PRPD's failure to address the commission of domestic violence by police officers "may qualify as evidence of discriminatory intent."[386]

Domestic violence by an officer at home often is a useful predictor of violence by the officer while on duty outside the home. Police officers' civilian complaint records, which have been disclosed through pre-trial discovery in a number of civil lawsuits seeking compensation for deaths and injuries caused by excessive police force, have revealed in numerous cases that there were previous complaints of domestic violence by the officer. Judith Berkan, a civil rights lawyer who has represented numerous victims of police brutality, told the ACLU that in most of the cases of excessive use of police force she has handled, there were previous domestic violence complaints against the officer; in one case, she says there were 24 civilian complaints of aggression against a single officer recorded in his disciplinary file.[387]

The investigatory, disciplinary, and reporting systems of the Puerto Rico Police Department rubber-stamp the use of force, cover up abuse by its officers, and encourage a code of silence. Instead of deterring abuses by holding abusive officers accountable, the PRPD allows officers to escape punishment or any other consequences, rearming them and returning them to active duty, often to repeat their offenses. Citizen complaints of police brutality languish for years without resolution. The disciplinary system retains, protects, and even promotes officers who use lethal and excessive force. The PRPD utterly fails to comprehensively investigate complaints of excessive force and other police abuses, often failing to interview witnesses or ignoring eyewitness accounts that contradict the officers'.



Ruth Jiménez de Jesús holding a photo of her 28-year-old son, Jorge Luis Polaco Jiménez, who was fatally shot by police eight times, seven in the back while he was in police custody. The investigation into his killing was closed without interviewing witnesses or examining forensic evidence, and the responsible police officers were never brought to justice. Photo Credit: Indymedia (2009)

# VIII.  Total Impunity:  Failure to Investigate or Punish Police Brutality

There are numerous contributing factors that are responsible for the deeply-rooted, wide-ranging, and long-standing human rights abuses the ACLU has documented. Our research has found that the systems in place utterly fail to address, and therefore prevent, abuses. In particular, we have documented the failure of the following systems:  the investigatory system, which fails to effectively examine use of force and allegations of police misconduct; the disciplinary and other accountability systems, which fail to meaningfully punish officers for misconduct; and the reporting system, which fails to require officers to report uses of force or critical incidents such as officer-involved shootings.

These systems virtually guarantee impunity:  instead of deterring abuses by holding abusive officers accountable, the PRPD allows officers to escape punishment or any other consequences, rearming them and returning them to active duty, often to repeat their offenses. Citizen complaints of brutality, lethal force, and excessive force languish for years without resolution. Abusive officers rarely are administratively punished or criminally prosecuted. The PRPD fails to track repetitive conduct by officers who violate the law or have significant records of complaints from the public. The failure to implement effective early warning systems to identify abusive officers and flag high-risk officers likely to commit abuses has resulted in the avoidable loss of numerous lives.

The investigatory, disciplinary, and reporting systems of the PRPD rubber-stamp the use of force, cover up abuse by its officers, and encourage a code of silence. We documented a disciplinary system that retains, protects, and even promotes officers who use lethal, disproportionate, and excessive force. It is a disciplinary system that retained an abusive officer even after he was labeled a "ticking time bomb" by a police psychologist, to see him later execute an unarmed man in the street; awards medals of valor to officers involved in a deadly shooting of a mentally ill man even while the official investigation into their use of force was still ongoing; and reinstated an officer who held the local police chief hostage at gunpoint, rearmed him after he was arrested eight times, and returned him to foot patrol in a housing project where he shot and killed an unarmed 18-year-old teen.

We also documented an investigatory system that fails to interview witnesses or ignores eyewitness accounts that contradict the officers'. We documented a systemic failure to comprehensively investigate and punish excessive use of police force, including lethal force. The PRPD fails to investigate or punish even cases in which unarmed and nonthreatening individuals were killed by police officers. Citizen complaints of brutality, lethal force, and excessive force languish for years without resolution. Administrative complaints filed by victims of police brutality often yield no results, the officers involved in the cases the ACLU documented generally were not sanctioned administratively, and criminal charges rarely are initiated against offending officers.

In 2007, in response to numerous outrageous instances of police violence including executions and other police misconduct, numerous organizations including the ACLU of Puerto Rico, Puerto Rico Bar Association, and other non-governmental groups demanded government action to address the crisis. In September 2007, the then-Superintendent of the PRPD created a committee to conduct an external evaluation of the problems of violence and corruption in Puerto Rico and render recommendations. The committee, called the External Evaluating Committee on the Police of Puerto Rico (*Comité Evaluador Externo de la Policía de Puerto Rico*), conducted a five-month investigation into PRPD's organization, structure, training, recruitment, supervision, discipline, and other policies. The committee released two reports of its findings in December 2007 and May 2008, concluding that there was a pattern of civil rights violations by members of the PRPD and recommending a number of reforms to prevent police violence and improve the investigatory and disciplinary systems.[388] To date, the PRPD has taken no actions to implement the External Evaluating Committee's recommendations to improve the investigatory and disciplinary mechanisms in place.

There are human consequences to impunity in the police department, including the avoidable loss of life. The ACLU documented the involvement of PRPD officers in multiple instances of lethal or excessive force. For example, one of the police officers involved in the shooting death of 28-year-old Jorge Luis Polaco Jiménez in October 2007, in which the unarmed Polaco was shot seven times in the back while he was in police custody, was also involved in the February 23, 2011 police beating of unarmed 62-year-old Julio Cirino in his home that left him unconscious and hospitalized for a blood clot in his brain and other injuries. The police investigation of Polaco's killing had been perfunctory and wholly inadequate, and to date, the officers have not been charged with a crime or subject to disciplinary measures for their role in the shooting.[389]

In another instance of an officer implicated in two instances of lethal use of force, the same officer (Efraín Burgos Montes) was allegedly implicated in the shooting death of Erick Sánchez Vargas on September 4, 2003 and the beating death of 19-year-old José Luis "Goldo" Irizarry Pérez on November 4, 2008, both in Yauco.[390] In the August 2007 case of Miguel Cáceres Cruz, the 43-year-old unarmed father of three shot four times when he was face down on the ground, two of the three police officers involved had witnessed the police killing of 21-year-old Nelson Santiago at a youth festival one week earlier and had not been interviewed about the killing they witnessed. The two officers also were aware that the officers involved in that unjustified killing had enjoyed complete impunity, and in fact had not even had their service weapons taken after the killing.

**a. Seriously Flawed Investigation Process: Failure to Register Civilian Complaints and Investigate Reported Police Abuses**

The ACLU documented numerous problems with the PRPD's complaint intake and investigatory process that lead to impunity for excessive use of force and other police abuse, including excessive delays, the systematic failure to comprehensively investigate cases, and the failure to accept and register complaints from citizens wishing to report abuses by PRPD officers.

PRPD administrative **complaints often take years to resolve**, due in part to the many steps required to complete the investigatory process and the tremendous backlogs among investigators and review officers assigned to the Auxiliary Superintendency for Professional Responsibility and the Legal Division (the lengthy process and multiple steps are detailed in subsection C below). A former Auxiliary Superintendent told the ACLU that when he began a review of PRPD policies following his appointment to the PRPD in November 2010, the PRPD had pending investigations from the 1990s, including investigations that had been pending for over eight years without resolution.[391] According to the DOJ's investigation findings, "Many officers and superintendents reported that investigations could take up to ten years or more to complete."[392] In its December 2007 report, the External Evaluating Committee on the Police of Puerto Rico found about there is a backlog of about 5,000 complaints at any given time, while about 3,000 to 4,000 complaints are filed a year.[393]

There also are excessive delays after complaints are referred for criminal investigation of alleged crimes by police officers. Where there is evidence of criminal conduct, the NIE of the Puerto Rico Department of Justice assumes jurisdiction over the investigation. According to a former Auxiliary Superintendent of the PRPD, the NIE is responsible for tremendous backlogs and its investigations drag on "forever."[394] The External Evaluating Committee on the Police of Puerto Rico similarly found that investigations conducted by the NIE can take years.[395]

The PRPD also **utterly fails to comprehensively investigate complaints** of excessive use of force and other police abuses. The ACLU documented numerous serious shortcomings of PRPD investigations of alleged misconduct and abuse, including failure to perform even basic investigatory tasks such as taking photos of civilian complainants' injuries inflicted by officers or interviewing witnesses to incidents of excessive use of force. The shortcomings documented by the ACLU include:

- Failure to interview all police officers involved in or witness to a killing or other incident of abuse, and failure to do so promptly or thoroughly;

- Failure to obtain detailed, non-conclusory written statements from all officers involved in or witness to a killing or other incident of abuse;

- Failure to consult non-police eyewitnesses or failure to record their statements;

- Failure to collect and preserve forensic evidence such as bullet shell casings and gunshot residue and blood from the victim's and officers' clothing;

- Failure to conduct forensic examinations on relevant evidence from the crime scene, involved officers, and the victim;

- Failure to document alleged injuries to the victim, and failure to obtain and evaluate evidence such as medical documentation of injuries caused by the use of force;

- Failure obtain and review photographic or video evidence;

- Failure to promptly conduct investigations; and

- Failure to ensure that police officers under investigation are taken off field duties or disarmed while investigations of serious abuse are pending.

The police killing of Jorge Luis Polaco Jiménez, a 28-year-old Black man extrajudicially executed by police on October 4, 2007, clearly demonstrates the PRPD's complete failure to conduct a competent investigation of a civilian complaint. Polaco was shot seven times in the back while in police custody, and the police investigation into his killing was perfunctory and wholly inadequate: police did not interview eyewitnesses to the incident and did not provide a report of their investigation to Polaco's mother.[396] Polaco's mother, Ruth Jiménez de Jesús, filed multiple complaints with the PRPD, but received no response other than to be told that the investigation was closed.[397] She hired a private investigator, who located an eyewitness to her son's arrest who had not been interviewed by police but reported witnessing the police shoot her son once in the front shoulder before taking him into custody one-and-a-half hours before they delivered him to the hospital dead-on-arrival with seven bullet wounds in his back.[398] Police later claimed they acted in self-defense, but the private investigator found that Polaco was unarmed and only had a dollar and his house keys in his pocket.[399] According to Polaco's mother, PRPD investigators failed to conduct any forensic testing on her son's or the officers' clothing.[400] Given the police officers' claim that they had acted in self-defense, Polaco's mother questions why the PRPD conducted no tests for gunpowder residue on the police uniforms, and failed to examine the officers for evidence of defensive injuries that would suggest that her son resisted the officers.[401]

The External Evaluating Committee on the Police of Puerto Rico evaluated the PRPD's complaint, investigatory, and disciplinary policies and practices, and issued two reports of its findings plus recommendations.[402] The committee identified serious flaws in the PRPD's complaint and investigatory processes. According to attorney Nora Vargas, a member of the External Evaluating Committee,

> "As a member of the Comité Evaluador I participated in reviewing the complaint process. We looked at statistics and other data provided by the Police Dept., and interviewed the head of the Division. It was apparent the number of complaints that either go unresolved, are never investigated, are poorly investigated, lack of training of those who are charged with the investigation, the lengthy process and time it takes to investigate and resolve

the complaint, the lack of notice and participation of the complainant. We are also aware of how citizens are discouraged by police officers from presenting a complaint against police officers."[403]

The ACLU also identified numerous problems with the intake of complaints and follow-up with complainants, including:

- Intimidation of would-be complainants and attempts to dissuade them from filing or proceeding with a complaint;

- Focusing on undermining complainants' case instead of documenting the reported officer misconduct;

- Refusing to process a complaint or conduct an investigation because the victim could not identify the name and badge number of the officer who abused them;

- Failure to inform complainants of the status of their complaint, the status or findings of the ensuing investigation, or any disciplinary action taken; and

- Refusal to accept or process complaints.

Victims, their family members, and their lawyers reported to the ACLU that when they sought to file a complaint of police misconduct, officers were intimidating and hostile, and plainly did not wish to receive a complaint about a colleague. In some cases, **officers threatened or attempted to dissuade would-be complainants**, or expressed disbelief about their allegations.

Lawyer Enrique G. Juliá Ramos, who represents at least 40 UPR students, has practiced both criminal defense and civil law for many years, and has represented numerous victims of police abuse in civil lawsuits against the PRPD and its officers, described the numerous obstacles he and his clients have faced when they have attempted to file complaints reporting police abuse. He told the ACLU, "First, [the police] derail the process. When you file a complaint, someone from the Legal Division takes a sworn statement, and in their questions they derail the process. For example, in a case of police abuse at a gas station, their first question is, 'How much alcohol did you drink that day?' The focus of the officer's investigation is undermining the complainant rather than finding out what actually happened."[404] Juliá Ramos added, "Second, the complaint doesn't go anywhere. The officer who shot at the Capitol Building [protest] had seven or eight complaints against him at the time; he was upgraded to a Lieutenant from Sergeant even after all those complaints. In all these cases of police brutality, those officers have multiple complaints against them."[405] He continued, "Third, if you get the complaint to pass the initial hearing, all the officers are members of a police union, and they start mobilizing the community."[406] Juliá Ramos reported that he is now hesitant to even bother filing complaints because of these obstacles.

In numerous cases documented by the ACLU, victims of police abuse reported that PRPD officers told them they were **unable to proceed with a complaint or an investigation**

**because they could not identify the name and badge number of the abusive officer**. Juliá Ramos described the case of one client of his, UPR student José "Osito" Pérez Reisler, who was Tasered multiple times by police while protesting at the Sheraton Hotel on May 20, 2010, and had been beaten and had his laptop taken by police days earlier on campus.[407] Juliá Ramos said that he and his client received no response after filing a complaint with the PRPD on May 14, 2010 and sending a follow-up letter on August 4, 2010 detailing both incidents. [408] He and his client returned to the police precinct on November 24, 2010 to follow-up on the complaint in person.

According to Juliá Ramos, the PRPD officer they met with at the station was "very negative" and "she said it was difficult because there are a lot of police from all over the island and you have to know who the arresting officer is" in order to launch an investigation.[409] Although the Tasering incident was captured on film, part of the officer's face was concealed in the vido footage and Pérez Reisler's booking sheet did not include the name of the arresting officer. Juliá Ramos says that when he asked about his client's laptop, the officer's response was to ask whether Pérez Reisler had gone to the pawn shops to check if his computer had been pawned.[410] In December 2010, Juliá Ramos sent a DVD of the Tasering video to the PRPD, and on April 5, 2011 he had his final communication with the PRPD concerning the complaint, during which a PRPD officer said they could not do anything about the complaint because "it was so hard to identify the officer" who Tasered Pérez Reisler.[411]

Several victims of police misconduct who did file complaints told the ACLU that they had traveled to the police station to file a complaint, which required them to provide their home address, and were terrified when police later arrived at their house. These men and women told the ACLU that they were unsure why officers visited them or attempted to visit them in their homes. In several of these cases, the complainant told the ACLU that they subsequently **dropped their complaint because they feared police retribution**, and they perceived the officers' visit as an intentional message that they were being watched or would be subject to retribution if they continued with their complaint.

We also documented numerous instances in which **officers refused to initiate and process complaints** by civilians who approached officers about filing a complaint (*presenter una querella* or *queja*) in the field or at a police station regarding excessive use of force or other police abuse. For example, as a result of the events at the Capitol Building on June 30, 2010, numerous protesters who had been subject to police abuse attempted to file complaints with the police, but police officials refused to accept or record the complaints. In its report of the incidents that took place at the Capitol on June 30, 2010, the Special Commission of the Puerto Rico Bar Association also found that "On various occasions the police refused to accept criminal complaints that citizens wished to file to denounce the criminal conduct of other law enforcement agents."[412] The Special Commission documented several specific cases from individuals who sought to file complaints and were denied, or who witnessed police officers turn away other would-be complainants empty-handed.[413]

Lawyer Hans Perl-Matanzo, who has represented several victims of police brutality, told the ACLU that he has witnessed PRPD officers refuse to accept complaints on three occasions. He explained, "There are countless people, including attorneys, who have been outright denied, by police officers with no legitimate reason to do so, of their right to file a complaint or press charges…This outright refusal to receive complaints has occurred in a systematic and wide-ranging manner, and occurs even after attempting to ask supervising officers, including high-ranking officials, to accept the complaints or order their subordinates to comply with their legal duty."[414]

Moreover, a significant number of victims of police abuse told the ACLU that they **did not file a complaint because they have no faith in the PRPD's investigatory or disciplinary systems**. One victim of police abuse told the ACLU, "A complaint wouldn't be worth the value of the paper it was written on." Another told the ACLU, "I did not file a complaint with the police because I felt it wouldn't do anything—I have no confidence in the police."[415] They correctly perceive that the officers who abused them are highly unlikely to be held accountable for their actions.

Numerous victims of police abuse told the ACLU that they **decided not to file a complaint because of fear of retribution** from the officers involved. UPR student Amada Garcia told the ACLU, "First, I couldn't file a complaint because I didn't have the number of the police officer, because he wasn't wearing his badge. Second, I would have had to put my contact information in the complaint, and I don't feel safe if the police have my name, address, and telephone numbers…We all have fear about what will happen if we file a complaint. Really it is a collective fear, that we will be put under surveillance and persecuted, and what will happen to us in our professional future."[416] Others were concerned that filing a complaint would affect charges that may be pending as a result of the arrest that gave rise to the abusive incident.

Lastly, the PRPD **places the onus on victims to file a complaint**, and in practice generally has not launched investigations even when credible evidence of abuse has been exposed by the media, on the grounds that the victims did not come forward and initiate a complaint. Government officials repeatedly told the ACLU that they could not investigate alleged abuses, even well-known incidents in which the responsible police officers could be easily identified, because victims were not filing complaints. The PRPD is authorized to initiate an internal investigation into alleged police brutality without a formal complaint, and it ought to do so.

### b. Breakdown of the Police Disciplinary System: Failure to Hold Officers Accountable

The ACLU documented numerous problems with the PRPD's internal disciplinary sanction process that lead to impunity for excessive use of force and other police abuse. The serious deficiencies of the disciplinary system we identified include:

- Nonexistent or inappropriately minor or temporary sanctions for misconduct and abuse;

- The systematic overruling or downgrading of recommended disciplinary sanctions including temporary suspension or permanent dismissal, by the bodies that evaluate and institute potential disciplinary measures;

- Lack of attention to repetitive conduct by officers who repeatedly use excessive force or have multiple complaints filed against them indicating they are at high risk of committing abuse;

- Failure to disarm officers involved in excessive use of force, even lethal force, against unarmed suspects;

- Swift re-arming of officers following incidents;

- Excessive delays in the administrative disciplinary process, generally during which officers under investigation remain armed and are permitted to continue working in the field;

- *Pro forma* evaluations;

- Failure to follow policies regarding officers who return from suspensions for disciplinary reasons; and

- Officers are permitted to refuse to provide a statement during administrative disciplinary investigations.

Officers **rarely are held accountable for abuses**. According to PRPD records, from 2004 to 2010, 27,395 complaints were filed by civilians alleging misconduct by PRPD officers. During that period, only 884 officers received expulsion recommendations, a figure amounting to just over three percent of complaints filed; the number of officers actually expelled from the force is likely significantly lower because expulsion orders are frequently overturned.[417] During that period of time, no administrative complaints were referred to the final appellate body that reviews disciplinary measures, the Commission on Investigations, Processing, and Appeals (*Comisión de Investigación, Procesamiento y Apelación*, or CIPA).[418]

The PRPD's disciplinary system is virtually identical to the system that was in place in 1989, when in the leading case *Gutiérrez-Rodríguez v. Cartagena*, the United States Court of Appeals for the First Circuit found the PRPD's disciplinary system to be "grossly deficient" and upheld an award of punitive damages against the PRPD Superintendent and other supervisors.[419] In that case, the First Circuit concluded, "As the expert on police practices and procedures testified, it was a disciplinary system that was going through the procedural motions without any real objective of finding the truth."[420]

The police practices expert in that case, Lou Reiter, is the former Deputy Chief of Police of the Los Angeles Police Department and served as an active police officer for 20 years. He has served as a police practices expert witness in about 40 civil cases in Puerto Rico

and was appointed as the Federal Court Monitor for a consent decree in California. Most recently, as an expert in a civil suit brought by the widow and children of Miguel Cáceres Cruz (the unarmed father of three shot by a police officer on video), Reiter found in 2010 that the PRPD's disciplinary system continues to promote impunity and fails to hold officers accountable for abuses. Reiter concluded that the PRPD "has historically chosen to create a system and agency environment which is designed to not hold officers accountable for misconduct and abuse of citizens," and one which "can result in unreasonable uses of force and deadly force."[421] He found that supervisors were "deliberately indifferent in their supervision, control and monitoring of field officers' use of force, including use of deadly force."[422] He also found that officers would be aware of the general impunity for unreasonable uses of force and deadly force "and the failure to hold officers accountable for misconduct or improper, unreasonable and excessive uses of force."[423] Lastly, he found that systems to follow reasonable practices for administrative disciplinary investigations would be essential to establish "the environment within the…agency for field officers to know that they will be held accountable for their actions in the field."[424]

The ACLU also found that there is **no process for monitoring officers' disciplinary files to flag repetitive abusive conduct**, identify patterns of misconduct, or take action to remove repeat offenders from the police force. The PRPD does not automatically review or track the records of individual police officers in order to flag officers with multiple complaints filed against them or other indications they are at high risk of committing abuse so that supervisors can take appropriate measures to prevent further misconduct. In fact, the PRPD fails to conduct any periodic review of personnel disciplinary files, which include information on the number of complaints against an officer, the nature of the complaints, and their resolution. The PRPD has no automated, computerized database to identify officers with multiple complaints filed against them, and the PRPD keeps many disciplinary records on paper rather than in computerized files. The PRPD lacks such an early warning system despite its Special Order 90-5 on "repetitive conduct" requiring supervisors who observe conduct from which problems requiring retraining can be inferred to bring such conduct to the attention of the Superintendent.[425]

The administrative disciplinary process is plagued by **excessive delays**, generally during which officers under investigation remain armed and are permitted to continue working in the field. The investigatory process is delayed in part because after the Auxiliary Superintendency for Professional Responsibility completes its investigation into a complaint, it does not impose a disciplinary measure; instead, the file is then forwarded to the Legal Division, which decides on whether to recommend a disciplinary action.[426] There are **backlogs** at both of these levels.[427] From there, the file goes to the Superintendent, who has full discretion to decide whether to agree or disagree with the Legal Division regarding the recommended disciplinary action.[428] Because all complaints of misconduct are processed by the Auxiliary Superintendency for Professional Responsibility in the order in which they were received—including complaints of minor violations such as disobeying orders and ineptitude, as well as serious abuses such as illegal arrest and unjustified aggression—there is a backlog that fails to prioritize cases based on the severity of the alleged offense.[429] The PRPD has stated that it plans to change the investigatory process, which will include the creation

of an investigatory matrix that will create different investigatory procedures depending on the level of force used, but it has not introduced or implemented the new procedure.[430]

The administrative investigative process, which involves 14 discrete steps, provides officers with **many opportunities to contest proposed punishments** and in many cases officers accused of misconduct prevail. When the PRPD seeks to dismiss an officer, he or she may appeal the dismissal order to multiple bodies. Because the supervisors and bodies that evaluate and institute potential disciplinary measures heavily favor the officers, many abusive officers avoid temporary suspension, permanent dismissal, or other disciplinary sanctions. Even when a Superintendent proposes the suspension of an officer on the basis of a substantiated civilian complaint (called a Proposed Suspension on Sustained Complaint, or a *Me Propongo*), these expulsion proposals often are not acted upon or are overruled.

The 14 steps of the disciplinary process are:

- A citizen fills out an administrative complaint.

- The complaint is endorsed by the Auxiliary Superintendency for Professional Responsibility (*Superintendencia Auxiliar de Responsabilidad Profesional*, formerly the Superintendency of Public Integrity).

- The complaint goes to the Administrative Investigations Division (*División de Investigaciones Administrativas*, formerly the Office of Public Integrity) at the regional/ area level, where it can be taken up at that office or referred to another region/area.

- Complaints are first investigated at the regional/area level. The investigator provides a report to the head of the Administrative Investigations Division at the regional/area level.

- The director of the Administrative Investigations Division at the regional/area level approves a report including findings concerning any violations, and may include a recommendation of an administrative sanction such as a warning, admonition, suspension, or expulsion.

- The report goes to the island-wide Auxiliary Superintendency for Professional Responsibility, which can accept or reject the recommendation.

- The determination by the Auxiliary Superintendency for Professional Responsibility is sent to the Legal Division, which has the power to modify the recommendation.

- The recommendation then goes to the Superintendent of the PRPD, who has full discretion to decide what punishment, if any, to impose.

- The Superintendent of the PRPD then drafts a letter (typically known as a *Me Propongo*) proposing a disciplinary sanction. The proposed sanction is not a final decision, even in the case of a proposed expulsion.

- The officer may file an internal appeal of any proposed sanction. The officer may appeal for an administrative hearing before hearing officers assigned to the Legal Division.

- The Legal Division hearing officer then issues a report, including a recommendation for disciplinary sanction, if any, to the Director of the Legal Division.

- The case then returns to the Legal Division, which then reviews the evidence and may make additional recommendations.

- The case then returns to the Superintendent of the PRPD or his Associate Superintendent, who can either accept or reject the recommendation of the hearing officer and/or the Legal Division.

- The decision by the Superintendent or Associate Superintendent is a final agency decision, which the officer can then appeal to the CIPA.

Any disciplinary measures that survive the 13 previous steps may be appealed to the final appellate body, the CIPA, where many suspension or expulsion orders are overturned and either downgraded or extinguished entirely. This body, which offers a process for officers wishing to appeal a disciplinary sanction imposed by the Police Superintendent or his Associate Superintendent, **usually overrules disciplinary sanctions**. In numerous cases, the CIPA has ordered the reinstatement of officers who have been ordered discharged from the police force due to unlawful use of force.

Illustrative of the unresolved problems that plague the PRPD disciplinary system still in place is the September 1993 case of PRPD Criminal Investigation Corps officer Miguel Díaz Martínez. Officer Díaz Martínez took the Acting Police Superintendent and another officer hostage with a shotgun at a police station after assaulting and threatening to kill his wife.[431] He had been arrested eight times in his first five years of service in the police force, and at the time of the hostage incident had nearly two dozen prior complaints of violent and/or threatening behavior filed against him. Díaz Martínez was initially suspended and ordered expelled from the police force following the hostage incident, but the CIPA reinstated him to the police force a short time later and his service revolver was returned.[432] On the day after his full return to active duty, while Díaz Martínez was on guard duty at a housing project in Bayamón, he shot and killed unarmed 18-year-old José Rivera and shot the teen's unarmed sister María Rosario Díaz in the leg.[433] Rivera had failed to stop quickly when the officer asked the teen for identification at the entrance to the housing project where he lived. Amazingly, Díaz Martínez remained on the force for several months, and received a psychiatric certification declaring him fit for active duty with no restrictions, until he assaulted, arrested and imprisoned Grancid Camilo, a court security guard who insisted the police officer was not permitted to park in a judge's parking area.[434]

The case of the officer who shot Miguel Cáceres Cruz in 2007, Javier Pagán, similarly illustrates the PRPD's utter failure to hold officers accountable for misconduct, flag high-risk officers, and take action to ensure they do not commit even more grave abuses. At the

time he shot the unarmed father of three, officer Pagán had many disciplinary complaints lodged against him, had been assessed by a police psychologist as a "ticking time bomb," and had two recommendations of expulsion from two different police superintendents on account of his past misconduct.[435] Officer Pagán had been promoted to a Tactical Operations Unit when the second recommended expulsion was pending.[436] Ultimately, the two expulsions were lowered to suspensions before he killed Cáceres.[437] When Pagán was finally expelled from the force, he had two civilian complaints against him pending, both of which had been filed eight years earlier.[438]

### c. Failure to Adequately Record, Report and Review Use of Force, Officer-Involved Shootings and Other Critical Incidents

The PRPD fails to record, report, review, and analyze incidents including officers' use of force, officer-involved shootings, and other critical incidents such as discharge of a firearm. According to Max Pérez Bouret, former Auxiliary Superintendent of Administrative Services, there are no protocols requiring any specialized reporting of officers' use of force, officer-involved shootings, or other critical incidents. Instead, PRPD officers are only required to file ordinary incident reports following any use of force, even the use of lethal force against a civilian. He explained, "We have no way of knowing whether use of force was used, or how much force was used, because the report contains no line for reporting use of force, so officers are not obligated to report use of force."[439] He added, "We know that not everyone will report use of force, and we recognize this is a problem."[440] He said that the PRPD plans to issue a new order on the reporting of use of force, but the order has not gone into effect to date.

In his review of the PRPD as a police practices expert for the prosecution in a civil suit seeking damages for the killing of Miguel Cáceres, Lou Reiter found the "lack of any… protocol or administrative review" of officer-involved shootings "is most disturbing."[441] Reiter added, "[T]his is a vital issue for any police department and to control officers' uses of deadly force. These are essential agency protocols which have to be in place."[442] According to Reiter, "[T]he Department has elected to overlook any ability to learn from these tragic critical incidents and analyze its policies, training, tactics, equipment and supervision."[443] In his opinion, the lack of protocols and systems for monitoring officers involved in shootings is a "conscious choice to ignore this vital and necessary control" and as a result, the PRPD "have continued to place the public at serious risk."[444]

### d. Failure to Prosecute Incidents of Excessive Use of Force

Criminal prosecutions of abusive officers are rare, and arise only in cases where the abuse has received substantial media attention and there is significant public outcry. As of December 6, 2010, of the 34 shooting deaths of civilians at the hands of PRPD officers between 2005 and 2010, only one PRPD officer was convicted for his involvement in the killing, in the Miguel Cáceres Cruz case.[445] (In that case, there was a video of the shooting

taken by a bystander; the involved officers and supervisors attempted to cover up the clearly unjustified killing, and the PRPD took no action against the three officers involved in the shooting until the video surfaced.) Of these 34 cases in which PRPD officers shot and killed civilians, charges were brought in only three cases.[446]

By means of their prosecutorial powers to hold officers accountable for violations of the law, prosecutors can and should play a critical role to remedy the problem of police killings and excessive use of force. Unfortunately, prosecutors often choose not to pursue cases against allegedly brutal officers. The lack of criminal indictments results in part because of the close relationship between district attorneys and police officers, who usually work together to prosecute alleged criminals.

There are additional significant obstacles to criminal accountability for civil rights violations and use of excessive or lethal force by police. Prosecutors often rely on investigations conducted by the NIE of the Puerto Rico Department of Justice, which assumes jurisdiction over the investigation where there are allegations of criminal conduct by the police. However, the NIE is not trained to conduct homicide investigations, and the PRPD Homicide Division currently does not conduct concurrent investigations of use of lethal force because the NIE has exclusive jurisdiction.

### e.  Anonymous Abusers:  Failure to Ensure Abusive Officers Can be Identified by Victims

We documented a systematic failure to ensure officers can be identified by civilians who wish to report complaints of excessive use of force. According to numerous protesters and legal observers, police dispatched to protests are purposefully not wearing identifying badges (*placas*), which are removable with Velcro, or are concealing identifying badges with the pocket flap of their uniform. These identification tags bearing each officer's name and badge number on the uniforms and caps used by the UOT are easily removed or hidden. The ACLU has also received reports that officers are exchanging badges with other officers to avoid identification and escape responsibility for their actions.

Moreover, in the majority of the cases the ACLU documented of protesters arrested by PRPD officers who used excessive force in the course of the arrest or prior to the arrest, the booking papers do not indicate name of arresting officer. As detailed in subsection A above, numerous victims of police abuse reported to the ACLU that they were told by officers at PRPD stations that they could not proceed with a complaint or an investigation because the victim could not identify the name and badge number of the abusive officer, or the name of the arresting officer was not included on the booking papers.

The Puerto Rico Police Department fails to provide even basic guidance to its personnel on how to discharge their duties in compliance with the Constitution.  The PRPD lacks standard protocols on the use of force and officers receive patently inadequate training, insufficient supervision, and minimal guidance on the legal boundaries of their use of force and other conduct.  There is minimal transparency and no effective independent review of the PRPD's policies and practices.



Riot Squad officers indiscriminately fire tear gas and rubber bullets at peacefully protesting students on the University of Puerto Rico campus in February 2011. Photo Credit: Andre Kang / Primera Hora (2011)

# IX. A Lawless Police Force: Lack of Guidance Governing the Use of Force, and Lack of Oversight, Training and Transparency

The ACLU has identified a number of additional problematic PRPD policies and practices that contribute to the pattern of police abuse, including lack of adequate guidance governing the use of force; failure to fully implement a standard trigger weight that meets U.S. national standards; lack of effective oversight, supervision, and training; and failure to collect and track data that could be used to correct these grave issues. The departure of former Superintendents Díaz Colón and Figueroa Sancha from their positions does not fix these ongoing structural issues that need to be addressed in order to bring an end to the ongoing police abuse.

PRPD officers perform an essential public safety function, and the ACLU recognizes the important work performed every day by the department's officers. However, the PRPD fails to provide even basic guidance to its personnel on how to discharge their duties in compliance with the Constitution and applicable human rights standards. Until January 31, 2012, the PRPD had no general protocol on the use of force, and the police department continues to lack standard specialized protocols governing the use of force, including guidance on the use of chemical agents, impact weapons, policing protests and large-scale demonstrations, and how to handle complaints of domestic and sexual violence.

Officers receive patently inadequate training, insufficient supervision, and minimal guidance on the legal boundaries of their use of force and other conduct. The PRPD fails to enforce even the protocols and laws in place to regulate officers' conduct. Moreover, there is minimal public oversight and transparency of the PRPD's policies and practices, including no effective independent review.

To its credit, the Puerto Rico Police Department (PRPD) has acknowledged that there is need for reform of police policies and practice, and it has initiated a process of reform that included the issuance of a new general use of force policy in January 2012 and is expected to include the issuance of additional new policies, training of cadets and officers on these new policies, and other much-needed reforms. However, most of Governor Fortuño's and the PRPD's promised reforms have not yet materialized. Moreover, while the issuance of the new use of force protocol is a positive first step, without effective accountability measures on the use of force, the issuance of the new policy does not guarantee that officers will follow it or that officers will be held accountable when constitutional and human rights violations occur.

### a. Lack of Guidance Governing the Use of Force

Until January 31, 2012, the PRPD did not have any comprehensive use of force policy. Such a policy is standard for police departments across the United States, and is standard policing practice around the world. The PRPD continues to lack basic protocols governing the use of force that officers are authorized to use. For instance, the PRPD lacks any protocol on the use of impact weapons or "less-lethal" ammunition such as stinger rounds, sting ball grenades, rubber or plastic bullets, and bean bag bullets. It also lacks any protocol on the use of chemical agents, despite the PRPD's extensive use of tear gas and pepper spray against protesters and other civilians. The PRPD lacks any protocol on interactions with people with mental illness, despite numerous documented police killings of men with mental illness who could have been restrained through non-lethal means. It also lacks any protocol governing the treatment of protesters and the handling of public demonstrations, and in particular the use of force against demonstrators.

The PRPD also lacks a comprehensive policy for responding to and investigating reported crimes of domestic and sexual violence. The PRPD lacks any protocols that address 911 operators' receipt of domestic and sexual violence calls; initial and follow-up victim interviews, including how to safely communicate with victims; identification and documentation of victim injuries; forensic examination of victims; suspect interviews and forensic examinations; evidence preservation and crime scene management; enforcement of protective orders; follow-up investigations, including cases in which the suspect has left the scene; collaboration with victim advocates; and services and assistance to be offered to victims.

Existing PRPD policies fall short of constitutional legal standards and U.S. police practices. For example, PRPD policies do not incorporate current legal requirements governing officers' use of force, do not emphasize alternatives to physical force, and do not require the use of measures to avoid the use of force or minimize the use of force required. The existing policies fail to establish a clear protocol on the levels of force that are permitted in response to different levels of resistance from suspects. The existing policies also fail to provide any guidance on types of force other than firearms that may constitute lethal or deadly force, such as chokeholds, carotid holds, and strikes to the head with batons or other impact weapons. The existing policies do not even acknowledge that such types of force can be lethal, a serious omission.

The PRPD's firearms policy, OG 2004-3, is completely inconsistent with the relevant legal standard, which requires that an officer have probable cause to believe that a suspect poses a significant risk of death or serious physical injury to the officer or others. The policy is vague and fails to define critical terms. For example, it allows the amount of force "that is consistent with achieving the mission," without actually defining what is meant by "achieving the mission."[447] The policy also does not define the circumstances under which officers may or may not shoot at fleeing suspects, nor does it address the lawfulness of firing warning shots.

The PRPD's order governing the use of Tasers and other electronic control devices, OG 2008-2, is seriously deficient and also fails to meet constitutional standards.[448] The order does not provide adequate guidance to its officers on the use of CEDs: it does not specify any legal standard for the use of CEDs, and it does not specify any factors that should be considered when determining when it is appropriate to use CEDs, such as the subject's level of resistance or the severity of their suspected crime. Most problematic, the PRPD's order governing use of CEDs does not acknowledge that CEDs can be lethal, instead mischaracterizing them as "non-lethal" weapons. As detailed in section V above, Tasers and other CEDs can cause fatal injury.

To its credit, the PRPD has retained a qualified team of experts to assist them with formulating new policies, which resulted in the issuance of a new general use of force policy at the end of January 2012. However, Puerto Rico's new use of force policy falls short of constitutional and U.S. national standards and has been criticized by civil rights and human rights advocates and policing experts as vague and lacking objective criteria on the use of lethal force by PRPD officers. An early draft of the use of force policy included the constitutionally mandated objective reasonableness standard, which was removed from the final version. Instead, the use of force policy currently in effect uses a simple reasonableness standard that allows officers' subjective judgment to determine the level of force that is



Riot Squad officers in formation outside the Capitol Building during a university student protest on January 27, 2011. Photo Credit: Indymedia (2011)

lawfully permissible, and empowers officers to use deadly force based on their "perception" of danger, not on objective standards.

Moreover, the issuance of new policies does not mean that officers will follow them. Without adequate training and enforcement to hold officers accountable when violations occur, these new policies will remain meaningless. While the issuance of a general use of force policy is encouraging, the PRPD has not fully implemented the policy, and it has not yet trained all of its personnel in the new policy.

In addition, the PRPD's general and special orders regulating police practices are not easily comprehensible or accessible to officers, who are not provided with copies of the policies. The orders, which date back to 1969, are numbered consecutively by year and are not organized by topic or indexed in any way. The DOJ found that the PRPD does not provide officers with copies of the orders, and some supervisors were even unable to show the DOJ a complete set of these orders.[449] A former Auxiliary Superintendent told the ACLU that orders are a "mess," "dispersed and not collected in a single binder."[450] He said, "Now it is a hassle for agents to even find out what orders are in place," and he told the ACLU that the PRPD intends to create a new catalogue of orders that is organized and easier for agents to locate policies.[451] At this time, the PRPD's website contains links to policies issued through 2011, but merely lists them in the order that they were issued, starting back in 1969. The new use of force policy is not even on the PRPD's website for the public to access.

### b. Failure to Fully Implement a Standard Trigger Weight

Until February 2011, the PRPD lacked any standard trigger weight, instead leaving all service weapons at their factory settings of 5.5 and 6.5 pounds, which are substantially lighter than the standard trigger weights of U.S. metropolitan police departments such as the New York City Police Department (NYPD), which requires a trigger weight of 12 pounds on all service weapons. It was the September 2010 fatal shooting of 22-year-old José Alberto Vega Jorge by a PRPD officer that prompted the PRPD to evaluate the trigger weight of its weapons.[452] In that case, PRPD officer Abimalet Natal Rosado shot the unarmed 22-year-old bystander in the back of his head. As the witness to a robbery at a Burger King in Altamira, Vega Jorge had remained at the scene to provide police with a statement and was not a suspect. After the gun of one of five officers at the scene accidentally discharged, officer Natal Rosado began shooting and fired 10 bullets, one of which fatally struck the young man in the back of his head.[453]

On February 22, 2011, the Superintendent of the PRPD issued an order setting the standard trigger weight of all PRPD service weapons at 8.5 pounds. PRPD Glock service weapons (the .40-caliber Glock model) were previously set at their factory-set trigger weight of 5.5 pounds, while PRPD Smith & Wesson service weapons (the Smith & Wesson M&P40 model) were previously set at 6.5 pounds. The Superintendent ordered that trigger weight springs on service weapons would be changed slowly and gradually "so as not to affect the rendering

of services by members of the Police."[454] As of June 2011, the PRPD still had over 9,000 service weapons in use that had not been altered to the higher standard trigger weight.[455]

Sensitive triggers lead to unintentional shootings during police interactions with civilians, accidental firings, and overfiring in which officers shoot more rounds than they would with revolvers or pistols with heavier trigger weights. In fact, in 1988, the FBI predicted that the Glock's standard-issue sensitive trigger would "inevitably...lead to an unintentional shot at the worst moment."[456] It is essential that the PRPD modify all of its service firearms to the 8.5-pound trigger weight at a minimum, and ideally increase its standard trigger weight to bring it in line with police department practice in cities such as New York and Los Angeles. For example, all standard-issue pistols that are authorized for on-duty use by NYPD officers are required to have a 12-pound trigger pull; the triggers of the NYPD's Glock, Sig Sauer, and Smith & Wesson pistols are modified to this weight.[457] In the mid-1990s the NYPD increased the mandatory trigger weight for service weapons from 8 pounds (known as the NY-1 trigger) to 12 pounds (known as the NY-2 trigger) in order to minimize unintentional shootings.[458]

### c. Lack of Independent Oversight

There is no effective independent, external oversight of the PRPD. The Governor of Puerto Rico has ultimate authority over the PRPD; he appoints a Superintendent to administer the PRPD, subject to confirmation by the Puerto Rico Senate. The Governor approves appointments to senior positions in the PRPD, from inspectors to colonels. Unlike 49 of the 50 U.S. states, Puerto Rico does not have a state-wide authority that sets minimum standards and training requirements.[459] The Superintendent has wide discretion to promulgate and change policies without any external review. For instance, the Superintendent has full discretion to reduce or modify the pre-service training program, set new standards for the use of force or specific weapons without any public comment or external legal review, or reject proposed disciplinary action against PRPD personnel.

The PRPD lacks any civilian review board, independent auditor to review the PRPD's operations and make public its findings, or other independent auditing mechanism. There are no oversight bodies that currently conduct any oversight role over the PRPD in practice. Only two bodies are authorized to investigate civilian complaints of police misconduct, but they do not do so in practice. These bodies are the Puerto Rico Civil Rights Commission, which in practice does not provide any external oversight over the PRPD, and the CIPA, which in practice only reviews the validity of disciplinary actions imposed against PRPD officers.

A third body was created by executive order to operate for a temporary period, but in practice failed to provide any meaningful oversight over the PRPD. The Governor of Puerto Rico created the Office of the Independent Monitor of the Police of Puerto Rico by Executive Order on October 19, 2010. In June 2011, nine months after the creation of the office, the Independent Police Monitor resigned, concluding that the objectives of his office had been met. The Monitor announced that the PRPD had announced a comprehensive plan

of reform to ensure civil rights are guaranteed in Puerto Rico, and optimistically reported that the PRPD was already implementing all of his recommendations. On June 30, 2011, the Independent Police Monitor, Efrain Rivera Pérez, concluded his mandate by issuing a superficial 21-page report that whitewashed the serious issues plaguing the PRPD and included no statistical data or information about specific cases.

The Independent Police Monitor lacked any authority to enforce recommendations for policy reforms or even existing policies. The Independent Monitor had a narrow and limited mandate that did not include the authority to accept complaints, forward complaints to the PRPD for further investigation, or the tracking of any statistics on excessive use of force or lethal use of force by the PRPD, investigations initiated or concluded, or any disciplinary actions taken. Indeed, in response to ACLU questions about the number of civilian complaints filed alleging excessive use of force, the Independent Police Monitor dismissively answered that while he did not know the precise statistics, he estimated that at most only 1 to 2 percent of the police have had complaints filed against them.[460] The Monitor's staff subsequently contacted the ACLU to clarify that in fact, the number is probably closer to 0.2 percent of the police force,[461] an absurdly low figure belied by the statistics reported by the PRPD to the DOJ and by the External Evaluating Committee that evaluated the PRPD in 2007.

### d. Lack of Training and Supervision

We documented significant gaps in the training and supervision of officers. The PRPD provides inadequate pre-service training to cadets at the University College of Criminal Justice of Puerto Rico (Puerto Rico's police academy). For example, the PRDP provides no specialized training on the use of chemical agents such as tear gas and pepper spray.[462] In addition, the PRPD provides virtually no in-service follow-up training for field officers and supervisors after their pre-service training. A former Auxiliary Superintendent admitted, "We have a lack of training—once in service, some agents didn't go back the police academy after their initial training."[463]

There are serious gaps in the supervision of PRPD officers, and this lack of supervision contributes to the rampant constitutional and human rights violations documented in this report. According to the DOJ, there is a crisis in supervision in the PRPD. The supervisor-to-officer ration in the San Juan area is 1:30; it is generally accepted practice that the ratio for patrol units should not be more than 1:10, and 1:5 is recommended.[464] We also found that high-level supervisors fail to establish protocols to provide for adequate supervision of officers who have offended.

**e.  Lack of Transparency:  Failure to Maintain and Make Public Statistics on Police Brutality**

The PRPD fails to make public any data on the number of complaints of excessive or lethal use of force filed, investigations initiated or concluded, or disciplinary actions taken.[465] The PRPD also fails to collect and maintain comprehensive data on policing practices such as the number of domestic violence-related complaints filed or orders of protection issued. Puerto Rico lacks a public records law such as a freedom of information law that grants Puerto Ricans the right to obtain government records. As a result, data on police brutality, complaints filed against individual officers, and other information is rarely made public, and often can be obtained only by means of the discovery process attendant to litigation.

After a comprehensive six-month investigation of policing practices in Puerto Rico, building on eight years of work by the ACLU of Puerto Rico documenting cases of police brutality, the ACLU has concluded that the Puerto Rico Police Department commits serious and rampant abuses in violation of the United States Constitution, the Puerto Rico Constitution, and the United States' human rights commitments.



Riot Squad officers violently attacked protesters and independent and student journalists with pepper spray and batons on the steps of Capitol Building on June 30, 2010. Photo Credit: Andre Kang / Primera Hora (2010)

# X.  Relevant Constitutional and Human Rights Law

## a.  Constitutional Standards on the Use of Force

Excessive force is force that exceeds what is objectively reasonable and necessary to subdue a person, in the circumstances confronting the officer. The use of excessive force by police officers in the course of an arrest, investigatory stop, or other seizure violates the Fourth Amendment of the United States Constitution.[466] Force can be excessive in violation of the Fourth Amendment even when it causes only minor injury.[467]

The U.S. Supreme Court has established guidance on the use of force by police. In *Tennessee v. Garner* (1985), the U.S. Supreme Court held that police can use deadly force when pursuing a fleeing suspect only if the suspect poses a significant threat of death or serious physical injury to others.[468] The Court defined deadly force as "any use of force which creates a substantial likelihood of causing death or serious bodily injury."[469] In *Garner*, the Court also held that police may not seize an unarmed, non-dangerous suspect by shooting them, and in circumstances where deadly force against a fleeing suspect is justified, police should provide a warning before using deadly force.[470]

In *Graham v. Connor* (1989), the U.S. Supreme Court ruled that any use of force must be objectively reasonable; the "calculus of reasonableness" should take into account factors such as the severity of the crime, whether the suspect poses an immediate safety threat, and whether the suspect is actively resisting arrest or attempting to evade arrest.[471] The analysis of use of force requires a balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the governmental interest.[472] Determining the objective reasonableness of police officers' use of force is based on the totality of the circumstances.[473] In *Graham*, the Court also held that the Fourth Amendment's requirement of reasonableness on the part of the police applies to "all claims that law enforcement officials have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other seizure of a free person."[474]

Courts generally evaluate the constitutionality of the use of force by applying the objective reasonableness test established in *Graham*. For example, in *Scott v. Harris* (2004), the U.S. Supreme Court evaluated a claim of excessive force in violation of the Fourth Amendment (a police offer's ramming of a police cruiser into the vehicle of a fleeing suspect, rendering him quadriplegic) by using *Graham*'s objective reasonableness test.[475] In *Scott*, to determine the reasonableness of the force used by police, the U.S. Supreme Court evaluated the imminence of the actual threat the suspect posed to the lives of others.  The Court found that for the force to be justified, the suspect had to pose an actual, substantial, and imminent threat to the lives of others.

The shooting of a suspect with a firearm constitutes deadly force and requires the highest level of justification to be found reasonable. Courts find that deadly force is unreasonable

"unless it is necessary to prevent escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others."[476] In addition, courts have found that while the initial shots fired at a suspect may be determined to be justified, subsequent shooting at a suspect may not be justifiable.[477]

The Constitution of the Commonwealth of Puerto Rico protects the right to life, liberty, and human dignity as fundamental rights. Section seven of the Bill of Rights (Article II) provides that "The right to life, liberty and the enjoyment of property is recognized as a fundamental right of man," and section one declares that "The dignity of the human being is inviolable." Moreover, section 10 protects "the right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures.

## b. Human Rights Standards on the Use of Force

International legal standards regulating the use of force by law enforcement officers are based on the "inherent dignity of the human person,"[478] "inherent right to life"[479] and "right to liberty and security of person,"[480] as elucidated in the International Covenant on Civil and Political Rights (ICCPR), which the United States ratified in 1992. These principles are also found in the Universal Declaration of Human Rights (UDHR), which deems that "All human beings are born free and equal in dignity and rights" and "Everyone has the right to life, liberty and security of person."[481] The American Declaration of the Rights and Duties of Man likewise holds that "Every human being has the right to life, liberty and security of his person."[482] The right to life is non-derogable, and applies to all persons under the authority or control of a country; the ICCPR specifically dictates that "no person under the authority or control of a State, regardless of his or her circumstances, is devoid of legal protection for fundamental non-derogable human rights."[483]

The ICCPR and Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT), also ratified by the United States, strictly prohibit the use of torture,[484] cruel, inhuman or degrading treatment under all circumstances.[485] The U.N. Body of Principles for the Protection of All Persons under Any Form of Detention (Detention Principles) explicitly state that "no circumstance whatever may be invoked as a justification" for such acts.[486]

Moreover, international treaties ratified by the United States ensure that all persons are afforded equal protection under the law as well as protection from discrimination.[487] According to the ICCPR, "In this respect, the law shall prohibit any discrimination and guarantee to all persons equal and effective protection against discrimination on any ground such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status."[488] The International Convention on the Elimination of All Forms of Racial Discrimination (CERD) likewise prohibits any such "distinction, exclusion, restriction or preference," and mandates that governments undertake to prohibit and eliminate such discrimination as well as ensure all persons have access to effective

protection and remedies.[489] These protections are also enshrined in the Detention Principles and the American Declaration on the Rights and Duties of Man.[490]

In light of the importance international law places on the liberty and security of the person, international standards dictate that law enforcement officers may use force only under limited circumstances. Internationally agreed-upon standards regulate the use of force and firearms by police officers. These international standards include the U.N. Basic Principles on the Use of Force and Firearms by Law Enforcement Officials and the U.N. Code of Conduct for Law Enforcement Officials.

International standards are clear on the threshold required to legitimate the use of force. The U.N. Code of Conduct for Law Enforcement Officials provides that "law enforcement officials should use force only when strictly necessary and to the extent required for the performance of their duty."[491] The use of force and firearms is only allowed "if other means remain ineffective or without any promise of achieving the intended result."[492] In such situations, "law enforcement officials shall exercise restraint in such use and act in proportion to the seriousness of the offence and the legitimate objective to be achieved."[493]

The U.N. Basic Principles on the Use of Force and Firearms by Law Enforcement Officials sets minimum standards for the use of force, as well as recruitment and training. It calls for proportionality in the force used by officers when it is required and the adoption of reporting requirements when force or firearms are used. It stipulates that, "Whenever the use of force and firearms is unavoidable, law enforcement officials shall exercise restraint in such use and act in proportion to the seriousness of the offence and the legitimate objective to be achieved."[494] So as to minimize to the greatest extent possible "the application of means capable of causing death or injury to persons," the U.N. Basic Principles on the Use of Force also provide that law enforcement officers must "as far as possible, apply non-violent means before resorting to the use of force and firearms" and "may use force and firearms only if other means remain ineffective or without any promise of achieving the intended result."[495] Moreover, law enforcement officers must be armed with non-lethal as well as lethal weapons.[496]

Restrictions on the use of force remain in effect when persons are in custody.  Under the ICCPR and Detention Principles, persons in any form of detention "shall be treated with humanity and with respect for the inherent dignity of the human person."[497] Moreover, "There shall be no restriction upon or derogation from any of the human rights of persons under any form of detention or imprisonment recognized or existing in any State pursuant to law, conventions, regulations or custom."[498] Specifically, according to the U.N. Basic Principles on the Use of Force and Firearms by Law Enforcement Officials, when persons are in custody or detention, law enforcement officials "shall not use force, except when strictly necessary for the maintenance of security and order within the institution, or when personal safety is threatened" and "shall not use firearms, except in self-defense or in the defense of others against the immediate threat of death or serious injury, or when strictly necessary to prevent the escape of a person in custody or detention" who presents a serious danger.[499]

Victims are entitled to redress for use of excessive or lethal force by law enforcement. Under the CAT, governments must promptly and impartially investigate situations where torture, cruel, inhuman or degrading treatment may have occurred, and ensure victims have access to redress through its legal system.[500] Likewise, injuries or deaths resulting from the use of force and firearms by law enforcement officials must be promptly reported, and the U.N. Basic Principles on the Use of Force and Firearms by Law Enforcement Officials stipulates that governments must ensure that "arbitrary or abusive use of force and firearms by law enforcement officials is punished as a criminal offence under their law."[501]

International bodies tasked with monitoring compliance with human rights treaties have continually faulted the U.S. for its failure to comply with international standards regarding the use of force by law enforcement officers. In its 1995 report, the Human Rights Committee urged the United States to "take all necessary measures to prevent any excessive use of force by the police," and to ensure "that rules and regulations governing the use of weapons by the police and security forces be in full conformity with the United Nations Basic Principles on the Use of Force and Firearms by Law Enforcement Officials; that any violations of these rules be systematically investigated in order to bring those found to have committed such acts before the courts; and that those found guilty be punished and the victims be compensated." [502] The Committee reiterated these recommendations in its 2006 report.[503] Similar criticisms and recommendations were lodged by the Special Rapporteur on extrajudicial, summary or arbitrary executions[504] and the CAT Committee.[505] The CERD Committee expressed particular concern with the use of excessive and lethal force against minority groups and foreigners in both its 2001 and 2008 reports, and recommended the U.S. provide appropriate training for law enforcement to combat prejudices.[506] The volume of reports from different international bodies throughout a period of more than a decade highlights the continued failure of the U.S. to live up to international standards regarding the use of force.

### c. Constitutional Standards on Freedom of Speech, Expression, and Assembly

The First Amendment of the Constitution of the United States creates a fundamental right to protest. The First Amendment protects freedom of speech and expression, the right of peaceful assembly, and the right to petition government for a redress of grievances, all of which are manifestly part of a right to protest. The right to protest in public places includes large gatherings (such as parades in the streets and rallies in parks), small gatherings (such as pickets on sidewalks and vigils on government plazas), and solitary expression (such as one person holding a sign or distributing leaflets). The "freedom of the press" clause of the First Amendment protects the right of all people, professional journalists and others alike, to gather and publish information about protests. The U.S. Constitution also protects actions that symbolically express a viewpoint. Examples of these symbolic forms of speech include music, theater, film, dance, wearing masks and costumes, or holding a candlelight vigil.

Further, implicit in the First Amendment is a well-protected right to expressive association; that is, a right to join together with likeminded persons to collectively express a shared

message, by means of protest or otherwise.[507] According to the U.S. Supreme Court, "the practice of persons sharing common views banding together to achieve a common end is deeply embedded in the American political process."[508]

The First Amendment is based in part upon the recognized importance of protecting protest concerning the performance of government officials and other matters of public concern,[509] and of protecting protest in public forums.[510] Generally, all types of speech and expression are constitutionally protected in "traditional public forums" such as streets, sidewalks and parks.[511] The steps of city hall and public plazas also constitute traditional public forums.[512] In addition, speech activity is permitted to take place at other locations that the government has opened up to be used for speech activities. Once the government treats a venue as available to some non-commercial speech, it must be made available to all.

Governments cannot limit protest because of the protest's viewpoint. Rather, governments must be neutral among messages and messengers.[513] Protests can be controversial, unpopular, offensive, or even hateful. Protesters can speak in support of illegal activity, violence, or even the overthrow of our government. The government cannot discriminate based on viewpoint even in a non-public forum.[514]

Governments can regulate the time, place, and manner of protest; for example, various government regulations of protest address disrupting vehicle and pedestrian traffic, blocking building entrances, harassment, and sound amplification and other loud noise. However, the governments may regulate the time, place, and manner of protest only if the regulations are reasonably related to an important government interest, narrowly tailored such that they do not prevent substantially more expression than is necessary to achieve the government's goals, and do not discriminate on the basis of the viewpoints protesters wish to express.[515] An ordinance regulating protest is invalid if it is unreasonably or unnecessarily burdensome, if it prevents protesters from communicating their message, if it has vague or no standards, or if it is selectively enforced.[516] The restrictions must also leave open ample alternative channels of communication and allow protesters a reasonable opportunity to effectively communicate their message to their intended audience.[517] Moreover, a protest should be allowed to take place within "sight and sound" of its intended audience.[518] If protesters are observing reasonable time, place, and manner restrictions, police may not break up a protest or demonstration unless there is a "clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety."[519]

The First Amendment also prohibits government officials from subjecting an individual to retaliatory actions for constitutionally protected speech. In *Hartman v. Moore*, the U.S. Supreme Court held that official reprisal for protected speech offends the U.S. Constitution because it threatens to inhibit exercise of the protected right to free speech.[520] In addition, police officers may not use their powers in a way that has a "chilling effect" on people who wish to express their views.[521] In analyzing whether government actions violate the First Amendment, the United States Court of Appeals for the First Circuit considers whether the actions chill or intimidate speech, and whether the actions are motivated by an "intent or

desire to curb...expression."[522] Moreover, the First Circuit has held that the threat of arrest of protesters may constitute a chilling act in violation of the First Amendment.[523]

Only a few narrow categories of speech and expression are outside the scope of the protections of the First Amendment. The First Amendment does not protect "incitement," meaning speech intended and likely to cause imminent violence or law-breaking.[524] For example, the First Amendment does not protect a speaker who urges an angry crowd to immediately attack someone or destroy their property. In addition, the First Amendment does not protect "true threats" directed against a particular person who would reasonably perceive in the message a danger of violence.[525] The U.S. Supreme Court held in *Whitney v. California*, "Fear of serious injury cannot alone justify suppression of free speech and assembly.... To justify suppression of free speech there must be reasonable ground to fear that serious evil will result if free speech is practiced...that the danger apprehended is imminent...the evil to be prevented is a serious one."[526]

"Fighting words" are also unprotected. These are words directed at a particular person, face-to-face, which might provoke an ordinary reasonable person to violence.[527] This narrow category of unprotected speech and expression does not include political messages directed at a general audience, even if especially inflammatory, such as flag burning, or displaying a swastika at a neo-Nazi rally in a Jewish community, or wearing a jacket bearing the words "fuck the draft" in a courthouse, all of which courts have deemed to be constitutionally protected speech and expression.[528] Abusive words are less likely to be unprotected "fighting words" if they are directed at police officers, who are expected to exercise greater self-restraint, due to their office and training.[529] All three exceptions to the First Amendment— incitement, true threats, and fighting words—are very narrow and rarely upheld by courts when invoked as a basis for suppressing speech.

Civil disobedience is the active refusal to comply with certain laws as a form of protest. The First Amendment generally does not protect such acts when they involve illegal conduct. Police officers may arrest those engaged in civil disobedience, but may not arrest protesters who are in compliance with the law, bystanders, observers, or others in the vicinity. The best police practice is to give those engaged in civil disobedience the realistic opportunity to comply with the law, and to distinguish between those who are in violation of the law and bystanders and protesters engaged in protected First Amendment activity who are not disobeying the law. Moreover, civil disobedience never justifies the excessive use of force by police.

The Constitution of the Commonwealth of Puerto Rico also guarantees freedom of speech and assembly. Section four of the Bill of Rights (Article II) provides that "No law shall be made abridging the freedom of speech or of the press, or the right of the people peaceably to assemble and to petition the government for a redress of grievances."

### d. Human Rights Standards on Freedom of Speech, Expression, and Assembly

The human rights to free speech, expression, and peaceful assembly are universally recognized and enshrined in numerous treaties including the ICCPR,[530] which the United States has ratified, and the UDHR.[531] As expressed in the ICCPR and the CERD, these freedoms apply to *all persons* regardless of race, color, descent, national or ethnic origin or other such characteristics.[532] Freedom of speech and assembly are fundamental: indeed, the Human Rights Committee characterized them as "the foundation for every free and democratic society," providing "a basis for the full enjoyment of a wide range of other human rights."[533]

Considering the fundamental nature of these rights, they may only be curtailed in a strictly limited set of circumstances. Under the ICCPR, any restrictions on the right to freedom of speech and assembly must be in accordance with the law and strictly necessary to preserve national security or public safety, public order, public health or morals or protect the rights and freedoms of others.[534] Any such restrictions must be proportionate to a legitimate purpose and non-discriminatory, including on basis of political opinion.

In its General Comment 34 elucidating the right to freedom of speech and expression, the Human Rights Committee, the U.N. body empowered to interpret the ICCPR, specified that laws limiting free expression and assembly must be "formulated with sufficient precision to enable an individual to regulate his or her conduct accordingly"[535] and "accessible to the public."[536] Further, "A law may not confer unfettered discretion for the restriction of freedom of expression on those charged with its execution."[537] In addition, laws restricting these fundamental freedoms must comport with universal human rights norms. They must be "compatible with the provisions, aims and objectives of the [ICCPR]"[538] and may not "violate the non-discrimination provisions of the Covenant."[539] Any limitations based on morals must be "understood in the light of universality of human rights and the principle of non-discrimination."[540] Even where an aforementioned interest is at stake, limitations "may never be invoked as a justification for the muzzling of any advocacy of multi-party democracy, democratic tenets and human rights,"[541] as restrictions on free expression "may not put in jeopardy the right itself."[542]

In its General Comment 34, the Human Rights Committee also held that restrictions on the freedom of expression and assembly must be "proportional to the interest to be protected."[543] The principle of proportionality "has to be respected not only in the law that frames the restrictions but also by the administrative and judicial authorities in applying the law."[544] Restrictions must further be narrowly tailored and serve as "the least intrusive instrument amongst those which might achieve their protective function."[545] Indeed, a state party must "demonstrate in a specific and individualized fashion the precise nature of the threat, and the necessity and proportionality of the specific action taken, in particular by establishing a direct and immediate connection between the expression and the threat" when invoking a ground for restricting free expression.[546]

In those instances where restrictions on the right to assemble are justifiable under international law, the policing of demonstrations must be carried out in accordance with international standards. These standards prohibit the use of force by law enforcement officials unless strictly necessary and to the extent required for the performance of their duty, and permit the use of firearms only when strictly unavoidable in order to protect life.[547] The U.N. Basic Principles on the Use of Force and Firearms by Law Enforcement Officials expressly recognize that "everyone is allowed to participate in lawful and peaceful assemblies."[548] Accordingly, force is only permitted in the dispersal of *unlawful* and *violent* assemblies "when less dangerous means are not practicable and only to the minimum extent necessary."[549] During unlawful but non-violent assemblies, "law enforcement officials shall avoid the use of force or, where that is not practicable, shall restrict such force to the minimum extent necessary."[550]

As international treaty bodies have emphasized, the freedoms to speak one's mind and assemble peacefully are fundamental components of a democratic society. Any restrictions on these rights, and the implementation thereof, must comport with international law.

Based on our research, including our findings identifying a number of problematic policies and practices that contribute to the pattern of police abuse in Puerto Rico, we have formulated clear recommendations for much-needed reforms. These reforms will not only help to bring the Puerto Rico Police Department into compliance with the constitutions of the United States and Puerto Rico and human rights laws, but will also help it to combat the public safety crisis it currently confronts.



A protesting University of Puerto Rico student demanding the removal of police from the university campus. The tape on his mouth reads, "UPR Without Police." Photo Credit: Andre Kang / Primera Hora (2011)

# XI. Recommendations

Based on the ACLU's research findings, including our findings identifying a number of problematic policies and practices that contribute to the pattern of police abuse, the ACLU has formulated clear recommendations for much-needed reforms. These reforms are essential to bring the PRPD into compliance with the constitutions of the United States and Puerto Rico and human rights laws. Moreover, these recommended reforms will assist the PRPD to combat the public safety crisis it currently confronts. Policing practices that respect and protect Puerto Ricans' constitutional and human rights are critical to achieve public confidence in the police department, an essential element to improving public safety.

**To the Puerto Rico Police Department:**

- Use of force policies:

    □ Develop, revise, and implement clear and comprehensive policies on the use of lethal and less-lethal force and encounters with civilians that meet national, constitutional, and human rights standards. In the case of force implements, ensure these policies also are in accordance with manufacturer specifications. These use of force policies should include detailed policies on the discharge, unholstering, and brandishing of firearms; the use of chemical agents such as pepper spray and tear gas; carotid holds and chokeholds; pressure point techniques; "less-lethal" ammunition such as stinger rounds, sting ball grenades, rubber or plastic bullets, and bean bag bullets; canines; batons; Tasers and other conducted electronic devices; and physical restraints.

    □ Revise the current use of force policy to authorize only *objectively* reasonable force (instead of the current language authorizing merely reasonable force), and ensure the revised policy clarifies precisely what objective reasonable force means. Revise the current use of force policy to clarify that officers may use deadly force only when there is an objectively reasonable and apparent imminent danger of death or grave bodily harm, instead of the current language allowing officers to act on their perception and belief of impending danger.

    □ Develop, revise, and implement policies that require the use of measures to avoid the use of force or minimize the use of force required. These measures should include dialogue, de-escalation of low-level encounters, disengagement, waiting out a subject, area containment, dialogue, warnings, verbal persuasion, advising suspects to halt and/or submit to arrest, dispersal orders, and calling for reinforcement, mental health experts, or other specialized personnel.

☐ Develop and implement policies on interactions with persons with mental illness, how to avoid the use of force in interactions with persons with mental illness, and other special considerations when using force against persons with mental illness.

☐ Use of force policies should make clear that even when force is initially justified, the continued use of force may become excessive and unreasonable in the course of an arrest, investigatory stop, or other seizure if the initial level of force is no longer necessary.

☐ Use of force policies also should make clear the level of force permitted when pursuing a fleeing suspect, and should provide detailed guidance on how to handle post-chase apprehensions. Policies should prohibit officers from firing at or from a moving vehicle unless the use of lethal force is justified.

☐ Use of force policies also should require officers to immediately secure any necessary medical care for civilians injured by officers' use of force.

☐ Develop and implement policies requiring off-duty officers to notify on-duty officers or supervisors before using force or taking any other police action, so that on-duty personnel may be dispatched to the scene to handle the incident, unless exigent circumstances require immediate action by the off-duty officer. Ensure policies make clear that when exigent circumstances require immediate action, off-duty officers may only use the level of force that is legally authorized and should use the minimum amount of force necessary, if any at all. Prohibit off-duty officers from using force or taking any other police action when their judgment is impaired such as by alcohol.

☐ Fully enforce the use of force policies throughout the PRPD.

■ Protest and demonstration policies, and other guidance for officers:

☐ Develop and implement an official policy governing the treatment of protesters and the handling of public demonstrations, and in particular the use of force against demonstrators, that meets national, constitutional, and human rights standards and which (i) allows demonstrations to take place safely; (ii) permits only reasonable time, place, and manner restrictions on demonstrations; (iii) prohibits the use of Tactical Operations Units, including the Riot Squad, to coerce people into not exercising their First Amendment rights; (iv) requires the PRPD to give clear warnings and directions to demonstrators if the police believe that the clearly-delineated time, place, and manner restrictions are being violated, and requires the PRPD to issue such warnings and provide a reasonable opportunity to comply before permitting officers to arrest any people; (v) permits arrests of demonstrators only where probable cause exists to believe that a crime is being or has been committed; and (vi) requires PRPD officers to use no more force than that which is necessary under the circumstances in the event that probable cause does exist that a crime is being or has been committed.

- Develop and implement clear and comprehensive policies on encounters with and the treatment of persons with medical conditions, persons with mental illness, and juveniles that meet national, constitutional, and human rights standards.

- Create a system to enable all current policies to be easily located and comprehended by the police and public. This should include a policy manual that is organized by subject matter and importance, and it should be indexed for ease of use. Ensure that all members of the PRPD receive a copy of the policy manual.

- Policies for investigating domestic and sexual violence:

  - Adopt and implement clear, evidence-based policies for investigating domestic and sexual violence, including policies on violence perpetrated by officers. They should include protocols that address the following: 911 operators' receipt of domestic and sexual violence calls; initial and follow-up victim interviews, including how to safely communicate with victims; identification and documentation of victim injuries; forensic examination of victims; suspect interviews and forensic examinations; evidence preservation and crime scene management; enforcement of protective orders; follow-up investigations, including cases in which the suspect has left the scene; collaboration with victim advocates; and services and assistance to be offered to victims.

  - Ensure that police protocols accommodate barriers to responding to domestic and sexual violence in rural areas.

- Civilian complaint procedure:

  - Eliminate barriers to the filing of civilian complaints by reforming the intake of civilian complaints. This should include protocols on the intake of civilian complaints to ensure that all civilians wishing to report instances of abusive conduct by officers are able to do so, and disciplinary procedures to punish officers when they fail to follow intake protocols such as attempting to dissuade or intimidate a complainant. Provide civilians wishing to report instances of police misconduct with clear instructions, forms that are easy to procure and complete, detailed information about the complaint and investigations process, and a telephone contact to follow up on the status of the investigation.

  - Accept anonymous and third-party complaints for the purpose of triggering further investigation.

  - Provide complainants with written and regular updates of the status of their complaints and the progress of the resulting investigation. This should include information about any hearings or disciplinary action taken, any final determination regarding the complaint and related investigation, and detailed explanations of the basis for the outcome.

▫ Create a process for civilians to appeal the decision to close an investigation of an officer's use of force, and create a procedure for civilians to obtain access to the investigation file in their case.

▫ Conduct outreach efforts with communities to provide information about filing complaints and to encourage civilians to file and pursue complaints when they have suffered police abuse or misconduct.

■ Investigations of alleged misconduct and abuse:

▫ Develop and fully implement comprehensive procedures for investigating allegations of police abuse and other civilian complaints promptly, thoroughly, and impartially. This should include procedures requiring that investigators identify, interview, and record statements from all involved officers and eyewitnesses; account for all shots fired and all shell casings; preserve, and conduct forensic testing on all relevant evidence from the crime scene, involved officers, and the victim, including gunshot residue and bullet trajectory tests.

▫ Ensure that officers who are witness to, or responsible for, the shooting of a civilian or use of deadly force against a civilian are required to provide statements immediately to investigators, in compliance with appropriate due process guarantees.

▫ Initiate investigations even when complainants have not come forward, in instances where information has come to light—whether through media reports, civil lawsuits filed concerning police abuse, anonymous complaints, or other means—to suggest that abuse or other misconduct has been committed by an officer, both on- and off-duty.

▫ Internal investigations should involve concurrent administrative and criminal processes, where possible, with due consideration of the rights of the accused officer.

▫ In the case of use of lethal force or in-custody death, a concurrent investigation should be conducted by investigators from the PRPD Homicide Unit, PRPD Superintendency for Professional Responsibility, and PRDOJ.

▫ When a civilian complaint filed with the PRPD or any independent oversight or fact-finding body alleges possibly criminal behavior, it should be forwarded to prosecutors for review.

■ Use of force and critical incident reporting and review:

▫ Create and fully implement a use of force reporting system adequate to document *all* uses of force by the PRPD. The reporting system should include detailed protocols for reporting officer-involved shootings and firearm discharges both on- and off-duty, and the preparing and filing of critical incident reports in writing. The use of force reports should require officers to document all uses of

force and provide a detailed description of the events leading to the use of force and the circumstances of the use of force. The use of force reports also should require officers to document any injuries that were inflicted and whether medical care was provided.

☐ Develop and fully implement a policy for reviewing all use of force and critical incident reports in a timely manner. Require uninvolved supervisors or a command-level review team to review each use of force to determine whether the use of force was in compliance with constitutional and other applicable law, PRPD policies, and manufacturer specifications (in the case of the use of force implements). The reviewing supervisor or review team should interview witnesses to the use of force and the victim of the use of force, and should obtain and evaluate any relevant evidence including ballistics, medical evidence, photographic or video evidence, and other evidence of injuries caused by the use of force.

☐ The reviewing supervisor or review team should prepare a report that includes a description of the incident and all relevant evidence, findings, and determinations of (i) whether all uses of force were in compliance with applicable law and PRPD policy, (ii) whether the officers employed proper tactics, (iii) whether lesser force alternatives were reasonably available, (iv) whether the use of different tactics could or should have been employed, and (v) whether force could have been avoided entirely. Where the use of force is not in accordance with applicable law and PRPD policies, the reviewing supervisor or review team should recommend disciplinary action. The report and recommended disciplinary action should be sent up the chain of command, to the Superintendent, for review and action.

☐ Require that the identity of the arresting officer, shooting officer, all of the officers who were involved in the incident or who witnessed the incident, and any other witnesses are documented in the use of force report, arresting report, and other relevant documents, without exception.

■ Disciplinary procedures and sanctions:

☐ Create, implement, and enforce fair and expeditious disciplinary procedures to impose effective disciplinary sanctions on officers when they fail to follow protocols, including disarming officers, removing police officers from field duty, temporarily suspending officers, and permanently suspending them when called for. These disciplinary procedures should also ensure that disarmed officers are not rearmed before an investigatory or disciplinary body reviewing the predicate use of force incident has determined that rearming is appropriate.

☐ Disciplinary procedures should also clearly lay out when and how officers should be relieved of duty and of their weapons, as prescribed by agency policy and federal and state law. These procedures should be implemented and systematically enforced.

☐ Disciplinary procedures should clearly lay out protocols for officers who return from suspensions for disciplinary reasons. These procedures should be implemented and systematically enforced.

☐ Reform the internal disciplinary system to allow superintendents to dismiss officers who have committed serious abuses and have been deemed unsuitable for police work. Ensure that expulsions of abusive officers are upheld, with due consideration of the rights of the accused officer, and are not routinely overturned.

☐ Reform the internal disciplinary system to periodically review officers' disciplinary record to flag repetitive conduct by officers who repeatedly use excessive force or commit other abuses both on- and off-duty, and assess risk of future unlawful conduct. This early warning system should include flagging officers who are repeatedly the subject of complaints and/or civil lawsuits and taking appropriate remedial or disciplinary measures (such as requiring further training, disarming, suspending, or expelling them).

☐ Conduct a comprehensive review of the disciplinary record of all PRPD officers to determine which officers should be removed from the force due to misconduct. The review should be based on objective criteria, including recurrence of misconduct and severity of past abuse.

☐ Ensure supervisors are reporting and not tolerating persistent abusive behavior on the part of subordinate officers. Appropriately discipline superior officers who fail to act to curtail abuses on the part of any of the officers he or she supervises.

☐ Ensure supervisors conduct regular performance evaluations of subordinate officers under their command. Ensure these performance evaluations are meaningful and thorough rather than *pro forma*, and result in a written evaluation entered into the officers' disciplinary file.

☐ Ensure that officers are held fully accountable when they are alleged to have perpetrated domestic or sexual violence. Systems of recruiting, training, supervision, review of use of force, internal investigations, and disciplinary procedures should incorporate standards for evaluating officers who have been accused of sexual or domestic violence and for making criminal referrals where appropriate.

☐ Ensure that officers wear their name tags and badges while on duty, particularly during mass demonstrations. Consistently hold officers accountable when they fail to comply with this requirement.

- Data collection and transparency:

    □ Track and publicly report statistics on the use of force by the PRPD, investigations initiated and completed, and disciplinary measures taken.

- Training and supervision:

    □ Ensure all PRPD officers receive ongoing, periodic training on the use of force. Effectively implement use of force policies by training PRPD officers to follow all applicable policies and laws on the use of force. This should include training on the use of pepper spray, tear gas, and other chemical agents; batons; "less-lethal" ammunition such as rubber or plastic bullets, sting ball grenades, and bean bag bullets; carotid holds and pressure point techniques; physical restraints; Tasers and other conducted electronic devices; the discharge, unholstering, and brandishing of firearms; and how to handle post-chase apprehensions.

    □ Ensure trainings emphasize that the use of excessive force will subject officers to discipline, criminal prosecution, and/or civil liability.

    □ Develop and implement training curricula that stress constitutional and human rights standards, including relating to the use of force, searches and seizures, and responding to protests.

    □ Ensure that all officers receive ongoing, periodic training on civilian complaint protocols, investigatory protocols, reporting protocols, and the disciplinary system.

    □ Ensure that all officers receive ongoing, periodic training on responding to domestic and sexual violence. Training should include risk and lethality assessment and guidance to officers so that their actions (or inaction) do not increase the risk of exposing the complainant to further danger. Officers assigned to work on domestic and sexual violence cases should receive specialized training in such critical areas as interviewing victims, suspects, and child witnesses or victims; investigating non-stranger and drug and alcohol facilitated sexual assault; documenting sexual and domestic violence, including strangulation; and determining the primary aggressor.

    □ Ensure that all officers receive ongoing, periodic training on the treatment of persons with medical conditions, persons with mental illness, and juveniles.

    □ Ensure that all officers receive ongoing, periodic training on the treatment of protesters and the handling of public demonstrations, and in particular the use of force against demonstrators and determining probable cause for arrest of protesters.

    □ Ensure that all officers receive ongoing, periodic training on the prohibition of discrimination and constitutional requirements related to equal protection. This

should include training on combating racial and ethnic bias, stereotyping, and racial, ethnic, and national origin discrimination.

□ Ensure supervisors receive ongoing, periodic training on promoting accountability, flagging repetitive conduct, identifying high-risk or abusive officers, and appropriate disciplinary measures to address abuse by subordinate officers or colleagues.

□ Provide adequate supervision to be sure that use of force and other policies are followed.

■ Policing domestic and sexual violence:

□ Ensure that officers accept and record all complaints and properly classify offenses. Sexual and domestic violence incidents should not be classified as miscellaneous or non-crimes or otherwise summarily disposed of at the outset where the elements of a crime appear to exist, or because the officer deems the victim uncooperative or unsure of what occurred or concludes that the evidence refutes the allegation.

□ Ensure that officers investigate domestic and sexual violence with the same care and attention given to other similar offenses and that law enforcement responses are not based on stereotypes about victims or how violence is perpetrated. Staffing should be sufficient to allow for full and complete on-scene and follow-up investigations. Complaints should be recorded, preserving detailed statements from victims and witnesses and describing the appearance of the scene, victim injuries and need for medical assistance, and results of forensic exams or laboratory analysis. Evidence should be collected in accordance with standard guidelines, such as by interrogating suspects, interviewing witnesses, ascertaining history of violence, taking photographs and gathering other physical and forensic evidence. Collection should be performed to the fullest extent possible, even if time has passed since the crime. Investigative reports should include any reports prepared by patrol officers or other first responders.

□ Ensure that the immigration status or sexual orientation of a victim does not impact law enforcement responses to domestic or sexual violence.

□ Implement monitoring mechanisms to ensure that domestic or sexual violence investigations are being conducted in compliance with the law. Supervisors should be charged with reviewing whether domestic or sexual violence complaints are being classified, investigated, and charged or cleared appropriately. Supervisors should communicate early and effectively with prosecutors, and should promptly respond to concerns from complainants, advocates, prosecutors, and others that may be raised with respect to particular cases. The internal investigative process should identify clear avenues for adjudication, discipline, and criminal prosecution if necessary.

- Organizational culture and attitudes towards policing:

  □ Institutionalize reform by addressing the culture among supervisors and the rank-and-file, including by confronting police officers' behaviors, attitudes, and beliefs regarding policing. Adopt clear goals and effective communication with officers about reforms, revise training on reforms and transformation of the force's culture, revise promotion standards and performance evaluations that take into account officers' behaviors and attitudes toward reform and constitutional policing, and incorporate all levels of the PRPD into reform efforts.

  □ PRPD leadership must send a strong and clear message to officers through words and actions that constitutional and human rights violations will not be tolerated and that the law and PRPD policies will be strictly enforced.

**To the Governor of Puerto Rico:**

- Work with the United States Department of Justice to implement all reforms recommended in their findings letter by entering into a court-enforceable and court-monitored agreement to implement a detailed plan of reform.

**To the Legislature of Puerto Rico:**

- Create effective and independent oversight mechanisms that are fully empowered and adequately funded to discharge their mandate. These mechanisms should be transparent and fully independent of the PRPD and the office of the Governor of Puerto Rico:

  □ Create an effective and independent oversight body to monitor the PRPD's compliance with all applicable laws. The oversight body should identify problematic PRPD policies and practices, including those problematic policies and practices identified by the DOJ and ACLU as contributing to the pattern of police abuse. The oversight body also should review internal PRPD investigations, have the authority to order additional investigations into allegations of police misconduct where needed, recommend reforms, monitor the implementation of its recommendations, track civil lawsuits relating to police misconduct and identify patterns in abuse allegations and officers named in the lawsuits, and participate in disciplinary hearings and other disciplinary review procedures. The body should meet international standards of independence, competence, and effectiveness.

  □ The independent oversight body should work closely with relevant stakeholders, and it should provide periodic public reports on its activities and findings.

  □ The independent oversight body should ensure that domestic or sexual violence investigations are being conducted in compliance with the law. The oversight body should review whether domestic or sexual violence complaints are being

classified, investigated, and charged or cleared appropriately.

☐ Create an independent fact-finding body to receive and investigate civilian complaints of police misconduct. The independent fact-finding body should be granted sufficient and specific supporting investigatory powers to enable it to conduct full and effective investigations. For instance, the body should be entitled to issue summonses to witnesses, including the officials allegedly involved, and should have the power to subpoena documents, obtain search warrants, seize documents and other evidence, protect witnesses, and compel police cooperation. The body should have at its disposal all of the necessary technical resources to conduct effective investigations, including resources for evidence collection and forensic analysis.

☐ The independent fact-finding body should be granted the authority to ensure that the PRPD and prosecutors act on its findings. It should be empowered to recommend disciplinary measures for officers who commit abuses, and it should be granted the authority to enforce its disciplinary recommendations.

☐ The independent fact-finding body should conduct outreach efforts with communities to provide information about filing complaints with the PRPD and the independent fact-finding body, and to encourage civilians to file and pursue complaints when they have suffered police abuse or misconduct.

☐ Provide the independent oversight body and independent fact-finding body with adequate resources to effectively execute their mandates.

■ Enact freedom of information legislation that guarantees public access to government records.

### To the Puerto Rico Department of Justice:

■ Ensure that where there is evidence of criminal conduct by PRPD officers, including excessive use of force, the Special Investigations Bureau (NIE) promptly conducts a thorough and impartial investigation.

■ Initiate prosecutions where there is probable cause to indict a PRPD officer for a crime relating to excessive use of force.

### To the United States Department of Justice:

■ Enter into a court-enforceable and court-monitored agreement with the PRPD. The agreement should include a detailed and court-enforceable plan for comprehensive reforms that addresses all of the findings and the recommendations contained in the DOJ findings letter, and to the extent possible, this report.

- Ensure that any consent decree or other agreement with the PRPD includes measures that address the grave problems with current policing of domestic and sexual violence. Such measures should include adoption of clear and improved policies on law enforcement response, investigation and evidence collection, classification of offenses and charging decisions, training of officers, oversight and accountability for police misconduct relating to domestic or sexual violence, and response to officer-committed domestic or sexual violence.

- Ensure that any consent decree or other agreement with the PRPD includes measures that address the treatment of protesters and the handling of public demonstrations, and in particular the use of force against demonstrators. Such measures should include the adoption of a specialized policy that (i) allows demonstrations to take place safely; (ii) permits only reasonable time, place, and manner restrictions on demonstrations; (iii) prohibits the use of Tactical Operations Units, including the Riot Squad, to coerce people into not exercising their First Amendment rights; (iv) requires the PRPD to give clear warnings and directions to demonstrators if the police believe that the clearly-delineated time, place, and manner restrictions are being violated, and requiring the PRPD to issue such warnings and providing a reasonable opportunity to comply before permitting officers to arrest any people; (v) permits arrests of demonstrators only where probable cause exists to believe that a crime is being or has been committed; and (vi) requires PRPD officers to use no more force than that which is necessary under the circumstances in the event that probable cause does exist that a crime is being or has been committed.

- Ensure that any grantees and sub-grantees receiving federal funding comply with prohibitions on discrimination based on sex, race, and national origin and protections guaranteed under federal law.

This report is based on a comprehensive six-month investigation, during which the ACLU conducted interviews in Puerto Rico with government officials and victims of police brutality or their surviving family members or lawyers.



The ACLU convened a town hall meeting at the UPR School of Law, at which numerous UPR students provided testimony of the police abuse they have suffered. Photo Credit: ACLU (2011)

# XII. Methodology and Acknowledgements

Since 2004, the ACLU of Puerto Rico has been documenting numerous cases of police brutality in Puerto Rico, and has been documenting PRPD suppression of First Amendment rights since 2009. Between March and September 2011, the national office of the ACLU conducted fact-finding human rights research in Puerto Rico to further document allegations of police brutality. In addition, in May 2011, an ACLU-led high-level delegation conducted a mission in Puerto Rico to draw attention to police abuse against protesters. The delegation included the actress Rosie Perez; baseball legend Carlos Delgado; Juan Cartagena, President of LatinoJustice PRLDF; Angelo Falcón, President of the National Institute for Latino Policy; and Anthony Romero, the Executive Director of the ACLU.

This report is based on a comprehensive six-month investigation, during which the ACLU conducted interviews in Puerto Rico with government officials and victims of police brutality or their surviving family members or lawyers in March, April, May, and September 2011. We focused on incidents over a five-year period from 2007 to 2011, and have continued monitoring incidents, policies, and practices. The ACLU issued a preliminary report of our research findings in June 2011;[551] this expanded report contains our complete findings based on additional field research and documentation of ongoing police abuse in Puerto Rico.

This report is based on 76 interviews conducted by the ACLU in Puerto Rico and 14 testimonies collected from students at a town hall meeting at the University of Puerto Rico. In most cases these interviews were conducted in Spanish; in the case of interviewees fluent in English, the interviews were conducted in English.

The ACLU interviewed university students, union leaders, and other citizens who experienced excessive force and police violence when they participated in peaceful protests over the past three years. The ACLU also interviewed professional journalists and student journalists who faced police violence and other restrictions when reporting on these incidents. The ACLU also interviewed people who had been victims of extreme police brutality since 2007, and lawyers who have represented victims of severe police brutality.  In the cases in which the police killed or caused serious brain damage to the victim, the ACLU interviewed the parents, widow, children or lawyer of the victim.

In addition, the ACLU met with and obtained information from eight representatives of the governor's office, including the governor's chief of staff, the Attorney General, and the Secretary of State; five representatives of the University of Puerto Rico, including the president and chancellor of the Río Piedras campus; five representatives of the Puerto Rico Police Department, including the superintendent of Police at the time and several auxiliary or deputy superintendents; and four senators and representatives of the majority and minority parties.

Jennifer Turner, ACLU Human Rights Researcher, researched and wrote this report. William Ramírez, Executive Director of the ACLU of Puerto Rico; Jamil Dakwar, Director of the Human Rights Program; and Chris Hansen, Senior Staff Attorney of the Speech, Privacy, and Technology Program, reviewed and edited drafts of this report. Legal Assistant Allison Frankel and intern Jonathan Sands provided research assistance.

For their invaluable assistance in providing endless information, assistance, and for making this project possible, the ACLU thanks William Ramírez, Josué González Ortiz, Milagros Benezario-Fuentes, and Virgenmina Rivera of the ACLU of Puerto Rico. We also thank the many community leaders, advocates, lawyers, union leaders, and student leaders who assisted us to identify people to interview and generally facilitated this research. In particular, we thank student leader Xiomara Caro Díaz for her tireless help in facilitating this research. The ACLU extends its deepest gratitude to the many individuals who agreed to be interviewed for this report.

# Endnotes

1   U.S. Dep't of Justice, Civil Rights Division, *Investigation of the Puerto Rico Police Department* (Sept. 5, 2011), *available at* http://www.justice.gov/crt/about/spl/documents/prpd_letter.pdf (hereinafter DOJ report).

2   *Rachel Hiskes and Omar Silva-Meléndez v. José Figueroa Sancha, José A. Rosa Carrasquillo et al.*, D.P.R., Case No. 10-2246-JAG, Opposition to Motion Requesting Leave to Amend; *see also* Danica Coto, *Puerto Rico Justice Departent Denounces Federal Report Criticizing Police Force*, Associated Press, Oct. 8, 2011.

3   Ricardo Cortés Chico, *Cuesta arriba para Chief Pesquera*, El Nuevo Día, April 22, 2012.

4   Javier Colón and Limarys Suárez, *Repelerán ataques con fuerza*, El Nuevo Día, May 8, 2012.

5   ACLU, *Preliminary Findings of the ACLU Human Rights Documentation Research in Puerto Rico* (June 13, 2011), *available at* http://www.aclu.org/human-rights/aclu-investigation-reveals-systematic-pattern-police-brutality-and-abuse-puerto-rico and http://www.aclu.org/files/assets/puerto_rico_preliminary_findings_6_13_11_final.pdf.

6   U.S. Dep't of Justice, Office of Justice Programs, Bureau of Justice Statistics, *Local Police Departments 2007*, Law Enforcement Management and Administrative Statistics at 9 (Dec. 2010); DOJ report at 12.

7   ACLU interview with Max Pérez Bouret, then Auxiliary Superintendent of Administrative Services of the PRPD, May 6, 2011, San Juan, Puerto Rico.

8   *Id.*

9   Arthur Garfield Hayes, a founder and general counsel of the ACLU, chaired an independent commission to investigate the incidents. *See* Arthur Garfield Hays et al., *Report on the Commission of Inquiry on Civil Rights in Puerto Rico*, May 22, 1937.

10  Comisión de Derechos Civiles del Estado Libre Asociado de Puerto Rico, *Informe especial sobre los Derechos Civiles y las intervenciones de los policías con los ciudadanos* at 31-50 (San Juan:  1967).

11  DOJ report at 14.

12  According to data provided by the PRPD to the DOJ, 1,709 PRPD officers were arrested between January 2005 to November 2010.  Based on a review of press accounts and local and federal court dockets, the DOJ was able to document an additional 21 arrests of officers that were not included in the arrest data provided by the PRPD.  *See* DOJ report at 14-16.

13  DOJ report at 14.

14  NYPD Internal Affairs Bureau reports, including data on arrests of officers, were obtained by the New York Civil Liberties Union (NYCLU) through a Freedom of Information Law request, *available at* http://www.nyclu.org/news/nyclu-releases-16-years-of-nypd-corruption-reports.

15  DOJ report at 16.

16  *Id.* at 17.

17  Lizette Alvarez, *Murder Rate and Fear Rise in Puerto Rico*, N.Y. Times, June 20, 2011.

18  DOJ report at 13.

19  Lisa Evans, *Mapping Murder throughout the World*, Guardian (United Kingdom), Oct. 10, 2011; *PR Murder Rate Among Highest in World*, Puerto Rico Daily Sun, Oct. 14, 2011.

20  U.S. Dep't of Justice, Civil Rights Division, *Investigation of the Puerto Rico Police Department* (Sept. 5, 2011), *available at* http://www.justice.gov/crt/about/spl/documents/prpd_letter.pdf (hereinafter DOJ report).

21  *Rachel Hiskes and Omar Silva-Meléndez v. José Figueroa Sancha, José A. Rosa Carrasquillo et al.*, D.P.R., Case No. 10-2246-JAG, Opposition to Motion Requesting Leave to Amend; *see also* Danica Coto, *Puerto Rico Justice Departent Denounces Federal Report Criticizing Police Force*, Associated Press, Oct. 8, 2011.

22  Ricardo Cortés Chico, *Cuesta arriba para Chief Pesquera*, El Nuevo Día, April 22, 2012.

23  ACLU interview with José Figueroa Sancha, then Superintendent of the PRPD (now retired), May 3, 2011, San Juan, Puerto Rico.

24  ACLU interview with [name withheld at the request of interviewee], San Juan, Puerto Rico.

25  Memorandum of Understanding between the Department of Justice for the Commonwealth of Puerto Rico, the Puerto

Rico Police Department, and the United States Attorney's Office for the District of Puerto Rico for the Referral and Handling of Cases where there is Concurrent and State Federal Jurisdiction, Feb. 2, 2010.

26    *Id.*

27    *See, e.g.*, the lawsuit brought by the ACLU on behalf of the Puerto Rico Association of Journalists, *Asociación de Periodistas de Puerto Rico, Overseas Press Club of Puerto Rico, et al., v. Robert Mueller and Ten Unknown Agents of the Federal Bureau of Investigation, et al.*, all legal documents *available at* http://www.aclu.org/free-speech/puerto-rico-journalists-association-v-mueller. A federal judge ruled against the reporters in June 2007, but a federal appeals court partially reversed that decision in 2008, holding that the lower court erred in dismissing the journalists' Fourth Amendment excessive-force claims. In August 2009, the U.S. District Court again threw out the journalists' lawsuit. While acknowledging the FBI agents may have violated the reporters' rights, the judge still ruled the journalists could neither collect damages nor obtain a court order barring the FBI from attacking them again. The ACLU appealed the ruling to the U.S. Court of Appeals for the First Circuit, which issued a decision on May 16, 2012 affirming the district court's grant of summary judgment.

28    This report uses the term "civilian" to refer to citizens and residents of Puerto Rico who are not part of the PRPD.

29    Eugenio Hopgood Dávila, *Peligrosa arma en la policía*, El Nuevo Día, Jan. 30, 2012.

30    DOJ report at 40. Figure cited is as of December 6, 2010.

31    Colegio de Abogados, *Vista Pública Sobre la Situación de Derechos Civiles en Puerto Rico*, March 30, 2011.

32    Javier Colón and Limarys Suárez, *Agente Delgado: "No deseaba que esas personas murieran"*, El Nuevo Día, May 4, 2012; *Muere un joven baleado por un agente en Manatí*, El Nuevo Día, April 30, 2012; *Dan de alta a policía golpeado ayer en Manatí*, Primera Hora, Aril 2, 2012.

33    *Id.*

34    *Id.*; Javier Colón Dávila, *Alegan que muerte de joven a manos de agente fue un abuso*, El Nuevo Día, May 1, 2012.

35    Javier Colón Dávila, *Alegan que muerte de joven a manos de agente fue un abuso*, El Nuevo Día, May 1, 2012.

36    DOJ report at 40-41.

37    *Id.*

38    The data on cases documented by the ACLU include non-shooting deaths caused by the PRPD.

39    Javier Colón Dávila, Con *muerte cerebral menor baleado por la Policía, El Nuevo Día, Dec. 9, 2011; Maribel Hernández Pérez, Vecinos clamoran por la vida de niño que recibió disparo en la cabeza, Primera Hora, Dec. 10, 2011; Javier Colón Dávila, Con muerte cerebral al adolescente, El Nuevo Día, Dec. 10, 2011; Joel Ortiz Rivera, Ante el NIE el caso del menor baleado, El Nuevo Día, Dec. 11, 2011; Eugenio Hopgood Dávila, Sepultan al joven baleado por la Policía en Vega Baja, El Nuevo Día, Dec. 14, 2011; Wilma Maldonado Arrigoitía, Familia despide a Beto exigiendo investigación por abuso policiaco, Primera Hora, Dec. 14, 2011.*

40    Daniel Rivera Vargas, *Policía le dispara a asaltante en Caguas, El Nuevo Día, Dec. 5, 2011; Ariel Rivera Vázquez, Asaltante muere en medio de robo en Caguas, WAPA.TV, Dec. 4, 2011.*

41    This case is an instance of use of lethal force by municipal police officers. As noted above, this case is included here because municipal police officers are trained with PRPD officers at the University College of Criminal Justice of Puerto Rico (Puerto Rico's police academy), and their alleged crimes are subject to the same investigatory procedure as suspected crimes by PRPD officers. This case is included as a related and instructive case example because the municipal police departments of Puerto Rico are plagued by the same problems of inadequate guidance on their officers' use of force, impunity for abuses, and inadequate training that plague the PRPD.

42    Javier Colón Dávila, *Evidencia apunta a que motociclista no disparó: Policías lo balearon durante persecución, El Nuevo Día, Nov. 15, 2011; Eugenio Hopgood Dávila, Testigo desmiente versión oficial: La novia del joven muerto niega que apuntara con arma, El Nuevo Día, Nov. 17, 2011; Eugenio Hopgood Dávila, Policías alegan que el joven les apuntó con arma, El Nuevo Día, Nov. 13, 2011; Velorio de joven muerto a manos de guardias municipales de Guaynabo, El Nuevo Día, Nov. 16, 2011.*

43    *Agente franco de servicio mata asaltante en Caguas, Primera Hora, Sept. 13, 2011.*

44    *Presunto asaltante muere a manos de policía en farmacia de Guaynabo, El Nuevo Día, March 9, 2011; Muere al intentar un asalto con arma falsa, El Nuevo Día, March 10, 2011.*

45    Maribel Hernández Pérez and Bárbara Figueroa, Muere *policía a manos de compañero policía en Luquillo, Primera Hora, Sept. 30, 2010; Eugenio Hopgood Dávila, Sacudida la fuerza, El Nuevo Día, Oct. 1, 2010; Miguel Díaz Román, "Él sabe lo que es una pistola de verdad", El Nuevo Día, Oct. 2, 2010; Bárbara J. Figueroa Rosa, Continúa pesquisa sobre la muerte del policía George Edill Vega, Primera Hora, Oct. 4, 2010; Javier Colón Dávila, Acusarán a agente que mató a colega en Luquillo, El Nuevo Día, Oct. 25, 2010; Pedro Rosa Nales, Jurado encuentra culpable a policía, WAPA, Jul. 29, 2011.*

46    Raúl Colón, A*nother Citizen Killed by Police Officers, Puerto Rico Daily Sun, Sept. 30, 2010; Danica Coto, Puerto Rican Police*

*Under Intense Scrutiny After Second Killing in 1 Week; Feds Investigating, Associated Press,* Sept. 29, 2010; *Crímenes en PR Causan Polémica: Ponen en duda la preparación policiaca, Univisión, Oct.* 1, 2010.

47    Jorge Molina et al v. Natal Rivera et al, Compl., D.P.R., Case *No. 3:2011cv01882, filed Sept. 7, 2011; Superintendente confirma se radicarán cargos por asesinato en segundo grado a policía que mató a joven deportista, El Nuevo Día,* Sept. 28, 2010; Frances Rosario and Javier Colón, *Súper pide espacio para pesquisa de incidente de joven baleado, El Nuevo Día,* Sept. 23, 2010; *Causa para juicio contra ex policía Abimalet Natal Rivera, Primera Hora,* Mar. 17, 2011; Maribel Hernández Pérez, *Joven baleado por la Policía pierde la batalla, Primera Hora,* Sept. 25, 2010.

48    Juan Nadal Nolasco, *Policías matan a tiros dominicano en Río Piedras Puerto Rico, El Nuevo Diario* (Dominican Republic), Aug. 22, 2010; Sara M. Justicia Doll, *Identifican hombre que murió en Río Piedras, Primera Hora,* Aug. 22, 2010; Sara M. Justicia Doll, *Agentes de la DOE dan muerte a un hombre en medio de incidente de violencia, Primera Hora,* Aug. 22, 2010; Leysa Caro González, *Velan a joven muerto en medio de incidente con agentes policiacos, Primera Hora,* Aug. 26, 2010.

49    This case is an instance of use of lethal force by municipal police officers. As noted above, this case is included here because municipal police officers are trained with PRPD officers at the University College of Criminal Justice of Puerto Rico (Puerto Rico's police academy), and their alleged crimes are subject to the same investigatory procedure as suspected crimes by PRPD officers. This case is included as a related and instructive case example because the municipal police departments of Puerto Rico are plagued by the same problems of inadequate guidance on their officers' use of force, impunity for abuses, and inadequate training that plague the PRPD.

50    Sara M. Justicia Doll, *Hermana de paciente mental que murió en manos de agentes municipales cuestiona la intervención, Primera Hora,* Aug. 11, 2010; *Respuesta mortal a ataque a machetazos, El Nuevo Día, July 31, 2010; Eugenio Hopgood Dávila, Sin protocolo para pacientes mentales, El Nuevo Día, Jan.* 30, 212.

51    Osman Pérez Méndez, *Sargento es acusado port res cargos y le imponen fianza de $70 mil, El Nuevo Día, Oct.* 5, 2010; Mike Melia, *Another Puerto Rico Police Charged with Murder, Associated Press, Oct.* 6, 2010.

52    Maribel Hernández Pérez, *Muerto a tiros paciente mental, Primera Hora, March* 27, 2010; Miguel Díaz Román, *Prematuro honor a dos agentes: Son reconocidos sin que termine pesquisa sobre incidente mortal, El Nuevo Día, March* 1, 2011.

53    ACLU interview with José Rodríguez, April 7, 2011, Santurce, Puerto Rico; Rosita Marrero, *Denuncian abusos y persecución de la Policía contra dominicanos, Primera Hora, Oct. 4, 2010; Estado Libre Asociado de Puerto Rico, Instituto de Ciencias Forenses de* Puerto Rico, Informe Médco – Forense, Autopsia Núm. 4402-9, Franklin Cáceres Ozorio, July 6, 2010 (autopsy report on file with the ACLU); Instituto Nacional de Ciencias Forenses, Procuraduría General de la República, Expediente #A-011-10, Franklin Cáceres Ozorio, Feb. 15, 2010 (autopsy report on file with the ACLU).

54    Puerto Rico Dep't of Justice, NIE asume jurisdicción en incidente *en Mayaguez, Press Release, July 17, 2009; Muere sujeto a manos de la Policía, Associated Pre*ss, July 17, 2009; Maelo Vargas Saavedra, *Dos muertos en complicada secuencia de hechos en el oeste, Primera Hora,* July 17, 2009.

55    Aixa Vázquez, *Asaltante muere a manos de policías, WAPA.TV, July 26, 2009; Da*risabel Texidor Guadalupe, *Policías matan asaltante durante robo en Villalba, Primera Hor*a, July 26, 2009; *Justicia y el NIE investigan caso de muerte de asaltante en Villalba, Primera Hora,* July 26, 2009.

56    José Luis Irizarry Muñiz, *Betsy Jeannette Pérez Rivera et al. v. Eric Rivera Nazario, Jaime Rodriguez Vega et al., Compl, 11-01337 (April 13, 2011); Oscar J.* Serrano y Melissa Solórzano García, *Demanda por policías que mataron al joven en Yauco, NotiC*el, April 19, 2011; *Podrían demandar al agente, El Nuevo Día, Oct. 18, 2010; Objetan desaparición de vídeo en caso de brutalidad policiaca, El Nuevo Día, July 2, 2010; Keila López Alicea, Justicia no se rinde, El Nuevo Día, Feb. 4, 2009; Causa para juicio contra policía estatal, El Nuevo Día, June 26, 2009.*

57    Sara M. Justicia Doll, *Policía mata hombre armado, Primera Hor*a, Sept. 1, 2008; Muere hombre en medio de intervención policíaca, El Nuevo Día, Aug. 31, 2008.

58    Maribel Hernández Pérez, *Un tiro en la espalda, Pr*imera Hora, Aug. 7, 2008.

59    Jalibeth Rodríguez, *Policía mata a escalador en Mayagüez, WAPA.TV, April 28, 2008.*

60    Maribel Hernández Pérez, *Reclamo de nueva investigación en caso de paciente mental asesinado por un policía, Primera Hor*a, April 4, 2011.

61    ACLU interview with Ruth Jiménez de Jesús, San Juan, Puerto Rico, March 28, 2011.

62    Maribel Hernández Pérez, *Policía mata a un sospechoso, Primera Hora, March* 16, 2007.

63    Carmen Enid Acevedo, *Testigo del abusado y victimario de un ciudadano, Centro de Periodi*smo Investigativo, April 6, 2011; Evelyn Ramírez Lluveras et al. v. Javier Pagán Cruz et al., D.P.R., Case No. 3:08-cv-01486-FAB, Plaintiff's Statement of Facts in Opposition to Motion for Summary Judgment on Liability, Filed March 15, 2011.

64    Bárbara J. Figueroa Rosa, *Ju*lio Voltio *y Residente desahogan su sufrimiento, Primera Hora, Aug.* 20, 2007.

65    Rosita Marrero, *Ponen en duda versión del NIE sobre muerte de tres jóvenes, Primera Hora, July 28, 2011; Rosita Marrero, Recrean escena del crimen en la Placita Bolívar en Santurce, Primera Hora, Aug. 16, 2011; Limarys Suárez Torres, Reviven*

*incidente en detalle*, El Nuevo Día, Aug. 17, 2011; Rosita Marrero, *A madre le cuesta aceptar que no le notificaron muerte de su hijo a manos del NIE*, Primera Hora, Aug. 3, 2011; Rosita Marrero, *Vieron cuando arrastraron a joven por el pavimento y lo remataron*, Primera Hora, Aug. 5, 2011; Eugenio Hopgood Dávila, *Justicia exonora a agente del NIE que mató a tres*, El Nuevo Día, Dec. 28, 2011; *Culmina investigación sobre asesinato de tres jóvenes*, Primera Hora, Dec. 28, 2011; Eugenio Hopgood Dávila, *Espaldarazo de Justicia al agente que mató a tres*, El Nuevo Día, Dec. 29, 2011.

66    *Id.*

67    *Id.*

68    Rosita Marrero, *Vieron cuando arrastraron a joven por el pavimento y lo remataron*, Primera Hora, Aug. 5, 2011.

69    Rosita Marrero, *Ponen en duda versión del NIE sobre muerte de tres jóvenes*, Primera Hora, July 28, 2011; Rosita Marrero, *A madre le cuesta aceptar que no le notificaron muerte de su hijo a manos del NIE*, Primera Hora, Aug. 3, 2011.

70    *Id.*; Rosita Marrero, *Vieron cuando arrastraron a joven por el pavimento y lo remataron*, Primera Hora, Aug. 5, 2011.

71    Rosita Marrero, *Recrean escena del crimen en la Placita Bolívar en Santurce*, Primera Hora, Aug. 16, 2011; Limarys Suárez Torres, *Reviven incidente en detalle*, El Nuevo Día, Aug. 17, 2011; Eugenio Hopgood Dávila, *Justicia exonora a agente del NIE que mató a tres*, El Nuevo Día, Dec. 28, 2011; *Culmina investigación sobre asesinato de tres jóvenes*, Primera Hora, Dec. 28, 2011; Eugenio Hopgood Dávila, *Espaldarazo de Justicia al agente que mató a tres*, El Nuevo Día, Dec. 29, 2011.

72    Eugenio Hopgood Dávila, *Justicia exonora a agente del NIE que mató a tres*, El Nuevo Día, Dec. 28, 2011; *Culmina investigación sobre asesinato de tres jóvenes*, Primera Hora, Dec. 28, 2011; Eugenio Hopgood Dávila, *Espaldarazo de Justicia al agente que mató a tres*, El Nuevo Día, Dec. 29, 2011.

73    *Evelyn Ramírez Lluveras et al. v. Javier Pagán Cruz et al.*, D.P.R., Case No. 3:08-cv-01486-FAB, Plaintiff's Statement of Facts in Motion for Summary Judgment on Liability, Filed March 15, 2011; *Pueblo v. Pagán Cruz*, P.R., HSCR2007-1965-1966; DOJ report at 20-21; ACLU interview with Judith Berkan, April 5, 2011, San Juan, Puerto Rico.

74    *Id.*

75    *Id.*

76    *Id.*

77    *Evelyn Ramírez Lluveras et al. v. Javier Pagán Cruz et al.*, D.P.R., Case No. 3:08-cv-01486-FAB, Plaintiff's Statement of Facts in Opposition to Motion for Summary Judgment on Liability, Filed March 15, 2011.

78    *Evelyn Ramírez Lluveras et al. v. Javier Pagán Cruz et al.*, D.P.R., Case No. 3:08-cv-01486-FAB, Plaintiff's Statement of Facts in Opposition to Motion for Summary Judgment on Liability, Filed March 15, 2011; *Pueblo v. Pagán Cruz*, P.R., HSCR2007-1965-1966; DOJ report at 20-21; ACLU interview with Judith Berkan, April 5, 2011, San Juan, Puerto Rico.

79    *Id.*

80    *Id.*

81    *Id.*

82    *Id.*

83    *Id.*

84    *Id.*

85    *Evelyn Ramírez Lluveras et al. v. Javier Pagán Cruz et al.*, D.P.R., Case No. 3:08-cv-01486-FAB, Plaintiff's Statement of Facts in Opposition to Motion for Summary Judgment on Liability, Filed March 15, 2011; DOJ report at 20-21; ACLU interview with Judith Berkan, April 5, 2011, San Juan, Puerto Rico.

86    *Id.*

87    *Id.*

88    *Id.*

89    *Id.*

90    *Id.*

91    Video footage available at http://www.youtube.com/watch?v=0dTXUavJ_0A.

92    *Pueblo v. Pagán Cruz*, P.R., HSCR2007-1965-1966.

93    *Evelyn Ramírez Lluveras et al. v. Javier Pagán Cruz et al.*, D.P.R., Case No. 3:08-cv-01486-FAB, Opinion and Order, J. Besosa, Dec. 22, 2011.

94    *Evelyn Ramírez Lluveras et al. v. Javier Pagán Cruz et al.*, D.P.R., Case No. 3:08-cv-01486-FAB, Plaintiff's Statement of Facts in Opposition to Motion for Summary Judgment on Liability, Filed March 15, 2011; ACLU interview with Judith Berkan, April 5, 2011, San Juan, Puerto Rico.

95    *Id.*

96    *Id.*

97    *Id.*

98    *Id.*

99    *Id.*

100   *Id.*

101   *Id.*

102   *Id.*

103   *Id.*; Carmen Enid Acevedo, *Testigo del abusado y victimario de un ciudadano*, Centro de Periodismo Investigativo, April 6, 2011

104   *Evelyn Ramírez Lluveras et al. v. Javier Pagán Cruz et al.*, D.P.R., Case No. 3:08-cv-01486-FAB, Plaintiff's Statement of Facts in Opposition to Motion for Summary Judgment on Liability, Filed March 15, 2011.

105   *Id.*

106   ACLU interview with Ruth Jiménez de Jesús, San Juan, Puerto Rico, March 28, 2011.

107   *Id.*

108   *Id.*

109   *Id.*

110   ACLU interview with Ruth Jiménez de Jesús, San Juan, Puerto Rico, March 28, 2011.

111   *Id.*

112   *Id.*

113   *Id.*

114   *Id.*

115   *Id.*

116   *Id.*

117   DOJ report at 21.

118   *Puerto Rico: Más abuso en residencial Villa Esperanza*, Indymedia, Oct. 26, 2010.

119   Colectivo Candelaria Pa'lante, *Mayagüez: Denuncian Operativo Policial de Represión Contra Activista*, Indymedia, April 18, 2009.

120   Gabriel Rodríguez and Laura Moscoso Candelas, *Peligro de desalojo de La Perla se repite en otras comunidades pobres*, Prensa Comunitaria, July 13, 2011.

121   ACLU interview with Mauricio Alejandro Castillo Shaw, April 5, 2011, San Juan, Puerto Rico.

122   *Id.*

123   *Id.*

124   *Id.*

125   *Id.*

126   *Id.*

127   *Id.*

128   *Id.*

129   *Id.*

130   ACLU of Puerto Rico interview with Rossmaly Cirino, March 16, 2011, San Juan, Puerto Rico.

131   *Id.*

132   *Id.*

133   *Id.*

134   *Id.*

135   *Id.*

136   ACLU of Puerto Rico, *Vista Pública de la Unión Americana de Libertas Civiles sobre Incidentes de Abuso Policiaco en La Perla, Viejo San Juan, Puerto Rico*, Testimony of Rafael Ortíz, Aug. 4, 2011.

137   *Id.*

138   ACLU of Puerto Rico, *Vista Pública de la Unión Americana de Libertas Civiles sobre Incidentes de Abuso Policiaco en La Perla, Viejo San Juan, Puerto Rico*, Testimony of Tania Amigón, Aug. 4, 2011.

139   *Id.*

140   ACLU interview with Luis Ayala, March 31, 2011, San Juan, Puerto Rico.

141   *Id.*

142   *Id.*

143   *Id.*

144   *Id.*

145   *Id.*

146   *Id.*

147   *Id.*

148   ACLU interview with Evelyn M. Rivera, April 6, 2011, San Juan, Puerto Rico.

149   *Id.*

150   *Id.*

151   *Id.*

152   *Id.*

153   ACLU interview with José Rodríguez, April 7, 2011, Santurce, Puerto Rico.

154   *Id.*

155   *Id.*

156   *See, e.g.*, Rosita Marrero, *Discrimen y persecución bochornosa contra dominicanos*, Primera Hora, May 26, 2011; Eugenio Hopgood Dávila, *Dominicanos denuncian persecución de parte de la Policía*, El Nuevo Día, May 26, 2011; Claudio Matos, *Denuncian constante violación de los derechos de los inmigrantes dominicanos*, Primera Hora, April 27, 2011.

157   *Id.*

158   ACLU interview with José Rodríguez, April 7, 2011, Santurce, Puerto Rico.

159   *Id.*

160   *Id.*; Estado Libre Asociado de Puerto Rico, Instituto de Ciencias Forenses de Puerto Rico, *Informe Médco – Forense, Autopsia Núm. 4402-9, Franklin Cáceres Ozorio*, July 6, 2010 (autopsy report on file with the ACLU); Instituto Nacional de Ciencias Forenses, *Procuraduria General de la República, Expediente #A-011-10, Franklin Cáceres Ozorio*, Feb. 15, 2010 (autopsy report on file with the ACLU).

161   ACLU interview with José Rodríguez, April 7, 2011, Santurce, Puerto Rico

162   *Id.*

163   ACLU interview with José Rodríguez, April 7, 2011, Santurce, Puerto Rico; Rosita Marrero, *Denuncian abusos y persecución de la Policía contra dominicanos*, Primera Hora, Oct. 4, 2010.

164   *Id.*

165   *Id.*

166  ACLU interview with José Rodríguez, April 7, 2011, Santurce, Puerto Rico.

167  *Id.*

168  Rosita Marrero, *Denuncian abusos y persecución de la Policía contra dominicanos*, Primera Hora, Oct. 4, 2010.

169  ACLU interview with Laura Mota, April 6, 2011, San Juan, Puerto Rico.

170  *Id.*

171  *Id.*

172  *Id.*

173  *Id.*

174  *Id.*

175  *Id.*

176  *Id.*

177  *Id.*

178  ACLU interview with Joel Félix, April 7, 2011, Santurce, Puerto Rico.

179  *Id.*

180  *Id.*

181  *Id.*

182  *Id.*

183  *Id.*

184  *Id.*

185  *Id.*

186  *Id.*

187  *Id.*

188  Rep. Luis V. Gutierrez, U.S. House of Representatives, Remarks on House Floor, Feb. 16, 2011, *available at* http://www.gutierrez.house.gov/index.php?option=com_content&view=article&id=642%3Aremarks-by-rep-luis-v-gutierrez&catid=48&Itemid=72 and  http://www.youtube.com/watch?v=QJhmoV01xQI&feature=youtu.be (video).

189  ACLU interview with Luisa Acevedo Zambrano, May 2, 2011 and April 6, 2011, San Juan, Puerto Rico.

190  ACLU interview with Shariana Ferrer Nuñez, May 6, 2011, San Juan, Puerto Rico.

191  DOJ report at 19.

192  *Id.* at 25.

193  ACLU interview with Roberto Morales, April 1, 2011, San Juan, Puerto Rico.

194  ACLU interview with Max Pérez Bouret, then Auxiliary Superintendent of Administrative Services of the PRPD, May 6, 2011, San Juan, Puerto Rico.

195  *Id.*

196  Office of the Surgeon General, U.S. Army and Borden Institute, Walter Reed Army Medical Center, ed. by Shirley D. Tuorinsky, *Riot Control Agents*, Medical Aspects of Chemical Warfare at 462 (2008), *available at* http://www.bordeninstitute.army.mil/published_volumes/chemwarfare/Ch13_Pg441_484.pdf.

197  *Id.* at 460.

198  *Id.* at 452.

199  Deborah Blum, *About Pepper Spray*, Scientific American Blog, Nov. 11, 2011, *available at* http://blogs.scientificamerican.com/guest-blog/2011/11/21/about-pepper-spray/.

200  Convention on the Prohibition of the Development, Production, Stockpiling and Use of Chemical Weapons and on their Destruction, opened for signature January 13, 1993, 32 I.L.M. 800, entered into force April 29, 1997.

201  ACLU of Southern California, *Pepper Spray Update: More Fatalities, More Questions* (1995), *available* at http://www.aclu-sc.org/attach/p/Pepper_Spray_New_Questions.pdf.

202   *Id.*

203   Deborah Blum, *About Pepper Spray*, Scientific American Blog, Nov. 11, 2011.

204   Deborah F. Bilmire et al., *Pepper-Spray-induced Respiratory Failure Treated With Extracorporeal Membrane Oxygenation*, Pediatrics Vol. 98 No. 5 at 961-63 (Nov. 1, 1996), *available at* http://pediatrics.aappublications.org/content/98/5/961.short.

205   Minna Vesaluoma et al., *Effects of Oleoresin Capsicum Pepper Spray on Human Corneal Morphology and Sensitivity*, Invest. Ophthalmol. Vis. Sci. July 2000 vol. 41 no. 8 2138-2147, *available at* http://www.iovs.org/content/41/8/2138.full.

206   Harry Salem, E.J. Olajos et al., *Capsaicin Toxicology Review*, U.S. Army ERDEC, Life Sciences Department (1993).

207   C. Gregory Smith and Woodhall Stopford, *Health Hazards of Pepper Spray* (2004), *available at* http://web.archive.org/web/20000817004624/http://www.ncmedicaljournal.com/Smith-OK.htm.

208   Comité Evaluador Externo de la Policía de Puerto Rico, *Informe del Comité Evaluador Externo de la Policía de Puerto Rico* (Dec. 21, 2007), *available at* http://www.claridadpuertorico.com/documents/articles/02%20Informe%20Polic%C3%ADa%2021%20Dic%202007.pdf.

209   Khonsari RM, Fleuridas G, Arzul L, et al, *Severe Facial Rubber Bullet Injuries: Less Lethal but Extremely Harmful Weapons*, Injury Int'l J. of the Care of the Injured 41 at 73-76 (2010).  Charlier P, Alvarez J.D., Durigon M, et al., *Unusual Death by Rubber Bullet:  Should these Guns be Reclassified as Lethal Weapons?*, Am. J. Forens. Med. Pathol. 33(1) e4 (March 2012).

210   Cristen Conger, *Can Rubber Bullets Kill You?*, Discovery News (Aug. 15, 2011).

211   Ahmad Mahajna et al., *Blunt and Penetrating Injuries Caused by Rubber Bullets during the Israeli-Arab Conflict in October, 2000:  A Retrospective Study*, The Lancet Vol. 359, Issue 9320 at 1795-1800 (May 25, 2002) *available at* http://www.thelancet.com/journals/lancet/article/PIIS0140-6736(02)08708-1/fulltext.  *See also The Official Summation of the OR Commission Report*, Ha'retz (Israel), Sept. 2, 2003 (concluding that "The committee determined that rubber-coated bullets are not appropriate for use due to their risk. It was determined that the police should remove them from use.  It was emphasized that this does not prevent the police from deploying other kinetic means, including rubber ones.  Nonetheless, the guiding principle must be that a means with lethal potential can be used only in situations of real and immediate life-threatening danger, and only if its accuracy level enables it to hit the source of this life-threatening danger and no one else.  In other situations, the police must use non-lethal means.").

212   *Police Ban Use of Rubber Bullets on Protesters*, Mail & Guardian (South Africa), Jan. 14, 2012.

213   ACLU of Minnesota, *Shocking:  The Lack of Responsible Taser Policy in Minnesota* (Dec. 9, 2011), available at http://www.aclu.org/files/assets/aclu_report_on_taser_policy_12_2011.pdf.

214   ACLU interview with Enrique G. Juliá Ramos, May 5, 2011, Río Piedras, Puerto Rico.

215   DOJ report at 34.

216   Amnesty International, *"Less than Lethal"?  The Use of Stun Weapons in U.S. Law Enforcement* (2008), *available at* http://www.amnesty.org/en/library/asset/AMR51/010/2008/en/530be6d6-437e-4c77-851b-9e581197ccf6/amr510102008en.pdf; Amnesty International, *List of Deaths Following Use of Stun Weapons in U.S. Law Enforcement, June 2001 to 31 August 2008*, *available at* http://amnesty.org/en/library/asset/AMR51/146/2008/en/a4e3aa10-cb62-11dd-9ec2-e57da9519f8c/amr511462008en.pdf.

217   Amnesty International, *"Less than Lethal"?  The Use of Stun Weapons in U.S. Law Enforcement* (2008).

218   *Id.*

219   ACLU of Minnesota, *Shocking:  The Lack of Responsible Taser Policy in Minnesota* (Dec. 9, 2011).

220   ACLU interview with Victoria Carro Robledo, May 5, 2011, Río Piedras, Puerto Rico.

221   Testimony of [name withheld], May 2, 2011, Río Piedras, Puerto Rico.

222   Ed Morales, *Puerto Rico's Policing Crisis*, The Nation, Dec. 6, 2011.

223   Testimony of Yaritza Figueroa, May 2, 2011, Río Piedras, Puerto Rico.

224   *Id.*

225   *Id.*

226   *Id.*

227   ACLU interview with Victoria Carro Robledo, May 5, 2011, Río Piedras, Puerto Rico.

228   *Id.*

229   E-mail communication from Rachel Hiskes, May 4, 2011.

230   Testimony of Gamelyn Oduardo, May 2, 2011, Río Piedras, Puerto Rico.

231   Testimony of Mariana López Rosado, May 2, 2011, Río Piedras, Puerto Rico.

232   ACLU interview with Elisa Ramos, April 4, 2011, San Juan, Puerto Rico.

233   Declaration of Fiscal Emergency and Omnibus Plan for Economic Stabilization and Restoration of the Puerto Rican Credit Act (also known as the Special Act Declaring a State of Fiscal Emergency and Establishing a Comprehensive Fiscal Stabilization Plan to Salvage the Credit of Puerto Rico), Law No. 7, H.B. 13, approved January 8, 2010.

234   *See Asociación de Fotoperiodismo v. Rivera Schatz*, Compl., P.R. (2011); *Eduardo Bhatia Gautier et al. v. Rivera Schatz*, Comp., P.R. (2011).  Puerto Rico's Constitution mandates that all legislative sessions must be open to the public.

235   Colegio de Abogados de Puerto Rico, Comisión Especial Sobre Fiscalización del Estado Actual de los Derechos Constitucionales, *Informe Preliminar* at 16 (July 12, 2010), *available at* http://www.capr.org/dmdocuments/Informe_Comi_Fiscalizacion.pdf; Sara Justicia and Nydia Bauzá, *Macanazos y gases lacrimógenos a los estudiantes en el Capitolio*, Primera Hora, June 30, 2010.

236   E-mail communication from Rachel Hiskes, May 4, 2011.

237   ACLU interview with Shariana Ferrer Nuñez, May 6, 2011, San Juan, Puerto Rico.

238   *Id.*

239   ACLU telephone interview with Carmen Yulín Cruz Soto, April 26, 2011.

240   *Id.*

241   *Id.*

242   *Id.*

243   ACLU interview with Shariana Ferrer Nuñez, May 6, 2011, San Juan, Puerto Rico.

244   ACLU interview with Betty Peña Peña, April 4, 2011 and May 2, 2011, San Juan, Puerto Rico.

245   ACLU interview with Elisa Ramos Peña, April 4, 2011 and May 2, 2011, San Juan, Puerto Rico.

246   ACLU interview with Betty Peña Peña, April 4, 2011 and May 2, 2011, San Juan, Puerto Rico.

247   ACLU interview with Elisa Ramos Peña, April 4, 2011 and May 2, 2011, San Juan, Puerto Rico.

248   ACLU interview with Betty Peña Peña, April 4, 2011 and May 2, 2011, San Juan, Puerto Rico.

249   ACLU interview with Elisa Ramos Peña, April 4, 2011 and May 2, 2011, San Juan, Puerto Rico.

250   ACLU interview with Osvaldo Toledo, March 30, 2011, San Juan, Puerto Rico.

251   *Id.*

252   For video footage of the incident, *see, e.g.*, http://www.youtube.com/watch?v=AJoWElVF8vo ; http://www.youtube.com/watch?v=wkR14_xSM1I.

253   ACLU interview with Hans Perl-Matanzo, May 4, 2011, San Juan, Puerto Rico.

254   E-mail communication from Rachel Hiskes, May 4, 2011.

255   Sara Justicia and Nydia Bauzá, *Macanazos y gases lacrimógenos a los estudiantes en el Capitolio*, Primera Hora, June 30, 2010; *Figueroa Sancha defiende Violencia Policiaca y Advierte que lo hara de Nuevo*, Univisión, available at http://www.youtube.com/watch?v=67LyuNF7NCc (video); *Reacciona el superintendente*, WAPA.TV, June 30, 2010, *available at* http://www.wapa.tv/noticias/locales/reacciona-el-superintendente_20100630191454.html.

256   E-mail communication from Rachel Hiskes, May 4, 2011.

257   DOJ report at 31.

258   Comisión Especial Sobre Fiscalización del Estado Actual de los Derechos Constitutionales, Colegio de Abogados de Puerto Rico, *Informe Preliminar* (July 12, 2010).

259   DOJ report at 31.

260   ACLU interview with Roberto Morales, April 1, 2011, San Juan, Puerto Rico.

261   ACLU interview with Zulee Aguilar, April 5, 2011, San Juan, Puerto Rico.

262   *Id.*

263   *Id.*

264   ACLU interview with Shariana Ferrer Nuñez, May 6, 2011, San Juan, Puerto Rico.

265   ACLU interview with Victoria Carro Robledo, May 5, 2011, Río Piedras, Puerto Rico.

266   ACLU interview with Ricardo Olivero, April 7, 2011, San Juan, Puerto Rico.

267   ACLU interview with Amada Garcia, May 5, 2011, Río Piedras, Puerto Rico.

268   *Id.*

269   *Id.*

270   *See* video footage, *available at* http://www.youtube.com/watch?v=77xibyogluY.

271   Video footage available at http://www.youtube.com/watch?v=04TlgF6Cj_U&feature=related.

272   ACLU interview with Enrique G. Juliá Ramos, May 5, 2011, Río Piedras, Puerto Rico.

273   For video footage, *see, e.g.* http://www.youtube.com/watch?v=1RV8nzlyOFA and http://www.primerahora.com/vevideosdeestudiantesysindicatossacadosapalosdehotelsheraton-388880.html.

274   ACLU interview with Luisa Acevedo Zambrano, May 2, 2011 and April 6, 2011, San Juan, Puerto Rico.

275   *Id.*

276   *Id.*

277   ACLU interview with José Rodríguez Báez, April 6, 2011, San Juan, Puerto Rico.

278   DOJ report at 28.

279   ACLU interview with Luisa Acevedo Zambrano, May 2, 2011 and April 6, 2011, San Juan, Puerto Rico.

280   ACLU interview with José Rodríguez Báez, April 6, 2011, San Juan, Puerto Rico.

281   *Id.*

282   ACLU interview with Luisa Acevedo Zambrano, May 2, 2011 and April 6, 2011, San Juan, Puerto Rico.

283   Nydia Bauzá, *Obreros elevan protestas al Supremo*, Primera Hora, Feb. 12, 2010.

284   ACLU interview with Luisa Acevedo Zambrano, April 6, 2011, San Juan, Puerto Rico.

285   DOJ report at 27.

286   Testimony of attorney Linda Backiel, speaking on behalf of her client, Michelle Padrón Gaulthier, May 2, 2011, Río Piedras, Puerto Rico.

287   ACLU interview with Hans Perl-Matanzo, May 4, 2011, San Juan, Puerto Rico.

288   *Id.*

289   *Id.*

290   ACLU interview with Luis Torrez, March 29, 2011, San Juan, Puerto Rico; ACLU interview with Rocio Villela, March 29, 2011, San Juan, Puerto Rico.

291   E-mail communication from Aníbal J. Núñez González, May 2, 2011; *Luis M. Pellot Juliá, Aníbal J. Núñez González, et al. v. Ana R. Guadalupe, José de la Torre, et al.*, Tribunal de Apelaciones, Sentencia, Case No. K PE2010-4829 (904) (Jan. 11, 2011).

292   ACLU interview with Zulee Aguilar, April 5, 2011, San Juan, Puerto Rico.

293   ACLU interview with Roberto Morales, April 1, 2011, San Juan, Puerto Rico.

294   *Id.*

295   Testimony of Gabriela Camacho, May 2, 2011, Río Piedras, Puerto Rico.

296   ACLU interview with Xiomara Caro Díaz, April 6, 2011, San Juan, Puerto Rico.

297   *Id.*

298   ACLU interview with Roberto Morales, April 1, 2011, San Juan, Puerto Rico.

299   ACLU interview with Amada Garcia, May 5, 2011, Río Piedras, Puerto Rico.

300   *Id.*

301   For video footage of the first part of the incident, at the Natural Sciences building, *see* http://www.youtube.com/watch?v=GtUxFD9eoEI&list=UUqXGwsxX5S9Dw8YGgSX8Kvg&index=149&feature=plcp.  For video footage of the second part of the incident, at the *Plaza Universitaria*, *see* http://www.youtube.com/watch?v=pp_CNqAWcXI.

302   ACLU interview with Roberto Morales, April 1, 2011, San Juan, Puerto Rico.

303   Testimony of Manuel Ortiz, May 2, 2011, Río Piedras, Puerto Rico.

304   Testimony of Gamelyn Oduardo, May 2, 2011, Río Piedras, Puerto Rico.

305   *Id.*

306   *Id.*

307   *Id.*

308   ACLU interview with Zulee Aguilar, April 5, 2011, San Juan, Puerto Rico.

309   ACLU interview with Ricardo Olivero, April 7, 2011, San Juan, Puerto Rico.

310   *Id.*

311   ACLU interview with Zulee Aguilar, April 5, 2011, San Juan, Puerto Rico.

312   ACLU interview with Shariana Ferrer Nuñez, May 6, 2011, San Juan, Puerto Rico; ACLU interview with Zulee Aguilar, April 5, 2011, San Juan, Puerto Rico.

313   ACLU interview with Shariana Ferrer Nuñez, May 6, 2011, San Juan, Puerto Rico.

314   ACLU interview with Roberto Morales, April 4, 2011, San Juan, Puerto Rico.

315   ACLU interview with Zulee Aguilar, April 5, 2011, San Juan, Puerto Rico.

316   ACLU interview with Guillermo Torres Grajales, April 4, 2011, San Juan, Puerto Rico.

317   *Id.*

318   Maria Miranda, *21 Women Killed This Year by Partners*, Puerto Rico Daily Sun, July 14, 2011.

319   Centro Reina Sofía, *Tercer Informe internacional:  Violencia contra la mujer en las relaciones de pareja, estadísticas y legeslación* at 89, 92 (2010).

320   *The Homicide Report, Circumstances – Domestic Violence*, Los Angeles Times.

321   *Id.*

322   U.S. Dep't of Justice Bureau of Justice Statistics, Shannan M. Catalano, Michael R. Rand, et al., *Female Victims of Violence* (Sept. 30, 2009).

323   Tendencias PR, *Compendio de Estadísticas: Violencia en Puerto Rico, 2009* (2010); El Nuevo Día, *Mujeres en Puerto Rico*; Oficina de la Procuradora de las Mujeres, *Cuando solo una es demasiado:  Informe de asesinatos de mujeres por el motivo de violencia doméstica, Puerto Rico 2007* (2008, revised 2009); Oficina de la Procuradora de las Mujeres, *Ni una más: Informe de asesinatos de mujeres por el motivo de violencia doméstica, Puerto Rico 2006* (2007, revised 2009); University of Puerto Rico, *De cara hacia el futuro*.

324   Official government statistics identified 26 intimate partner homicides for 2011, but civil society organizations reported five additional cases of women murdered by their partners during the final days of December 2011, bringing the figure up to 30 cases of women murdered by their partners.  See, e.g., Tania *Polanco, El 2011 tuvo alarmantes niveles de violencia en RD y Puerto Rico, Diario Libre*, Jan. 2, 2011.

325   The *Homicide Report, Circumstances – Domestic Violence, Los* Angeles Times.

326   Bárbara Figueroa Rosa, *Clamor de justicia en sepelio de enfermera de Ceiba*, Primera Hora, Feb. 17, 2012; Eugenio Hopgood Dávila, *Llamado a evitar que otra mujer sea asesinada*, El Nuevo Día, Feb. 17, 2012; Eugenio Hopgood Dávila, *Familiares de mujer asesinada en Ceiba piden justicia*, El Nuevo Día, Feb. 16, 2012; Bárbara J. Figueroa Rosa, *Clamor de justicia en el entierro de Wandy Camacho*, Primera Hora, Feb. 18, 2012; *Procuradora de la Mujer exije investigación para fijar responsabilidades*, Telemundo, Feb. 15, 2012; *Procuradora investiga instalación de grillete a presunto asesino de mujer en Ceiba*, Primera Hora, Feb. 14, 2012; Eugenio Hopgood Dávila, *Fracasaron en proteger a mujer asesinada por su expareja*, El Nuevo Día, Feb. 15, 2012.

327   *Procuradora investiga instalación de grillete a presunto asesino de mujer en Ceiba*, Primera Hora, Feb. 14, 2012; Eugenio Hopgood Dávila, *Fracasaron en proteger a mujer asesinada por su expareja*, El Nuevo Día, Feb. 15, 2012.

328   *Id.*

329   *Id.*

330   *Id.*

331   *Id.*

332   *Id.*

333   *Id.*

334   *Id.*

335   *Id.*

336   *Id.*

337   *Id.*

338   Bárbara Figueroa Rosa, *Clamor de justicia en sepelio de enfermera de Ceiba*, Primera Hora, Feb. 17, 2012; Eugenio Hopgood Dávila, *Llamado a evitar que otra mujer sea asesinada*, El Nuevo Día, Feb. 17, 2012; Eugenio Hopgood Dávila, *Familiares de mujer asesinada en Ceiba piden justicia*, El Nuevo Día, Feb. 16, 2012; Bárbara J. Figueroa Rosa, *Clamor de justicia en el entierro de Wandy Camacho*, Primera Hora, Feb. 18, 2012.

339   *Preso el hombre imputado de matar ex pareja en Ceiba*, Primera Hora, Feb. 14, 2012.

340   Wilma Maldonado Arrigoitía and Sara M. Justicia Doll, *Juntos hasta la tumba, Primera Hora, Jan.* 12, 2011.

341   Barbara J. Figueroa Rosa, *Padre presintió que su hija moriría, Primera Hor*a, Jan. 11, 2011; Barbara J. Figueroa Rosa, Arrestan a hombre acusado de matar a compañera en Patillas, Primera Hora, Jan. 10, 2011; Darisabel Texidor Guadalupe, Despiden entre llantos y aplausos a mujer asesinada en Patillas, Primera Hora, Jan. 12, 2011; Darisabel Texidor Guadalupe, Declaran no procesable a hombre que asesinó a ex companera en Patillas, Primera Hora, Feb. 24, 2011; Acusan hombre por asesinato de ex pareja, El Nuevo Día, Jan. 11, 2011.

342   Javier Colón Dávila, De*gollada por ex pareja, El Nuevo Día, Jan. 27, 2011;* Wilma Maldonado Arrigoitía, Asesinada frente al hijo, Primera Hora, Jan. 27, 2011; Transportan al hospital al hombre que asesinó a su ex pareja en Túnel Guajataca, Primera Hora, Jan. 26, 2011.

343   Maelo Vargas Saavedra, *Víctima fatal por violencia doméstica en Mayagüez, Primera Hor*a, Jan. 23, 2011; Maelo Vargas Saavedra, Ingresan a prisión imputado por la muerte de su ex pareja, Sacha Hernández Alemar, Primera Hora, Jan. 24, 2011.

344   Luis Dalmau D., *Dominicano mata en PR a su ex mujer y se suicida, El Nacional (Dominican Republic), Jan.* 29, 2011.

345   Ivelisse Rivera Quiñones, A *la cárcel con fianza millonaria asesino de mujer en Loíza, Primera Hor*a, Feb. 5, 2011; Alberto Rullán, La asesinan frente a su hijo, WAPA.TV, Feb. 5, 2011;  Darisabel Texidor Guadalupe, Dan último adiós a mujer asesinada, Primera Hora, Feb. 9, 2011; Asesina a su ex pareja en disputa por pensión, El Nuevo Día, Feb. 5, 2011.

346   Frances Rosario, *Muere mujer que fue baleada en la cabeza por su esposo, El Nuevo Día,* March 10, 2011; Darisabel Texidor Guadalupe and Arys Rodríguez Andino, Asombrados por tragedia, Primera Hora, March 5, 201; Darisabel Texidor Guadalupe, Conmoción por la muerte de mujer, Primera Hora, March 5, 2011.

347   *Víctimas de violencia machista, El Vocero, July 13*, 2011.

348   Javier Colón Dávila, De*spiadado asesinato, El Nuevo Día,* March 17, 2011; Maribel Hernández Pérez and  Pedro Menéndez, No salen de su asombro familiares de pareja muerta en hecho de violencia doméstica, Primera Hora, March 17, 2011.

349   Daniel Rivera Vargas, O*tra mujer asesinada por su pareja, El Nuevo Dí*a, March 28, 2011.

350   Ricardo Cortés Chico, *Hombre confiesa que asesinó por celos a su pareja y a un acompañante, El Nuevo Día, Marc*h 30, 2011; Maelo Vargas Saavedra, Posponen vista contra hombre que confesó asesinato de su exposa y acompañante, Primera Hora, April 13, 2011.

351   Darisabel Texidor Guadalupe, *Duerme en la cárcel mujer acusada de asesinar a su novia, Primera Hora,* April 7, 2011; Javier Colón Dávila, Policía inspecciona auto y su posible relación con muerte de mujer, El Nuevo Día, April 4, 2011.

352   Darisabel Texidor Guadalupe, *El novio asesinó a Frances, Primera Hora,* April 9, 2011; Darisabel Texidor Guadalupe, Un duro golpe la muerte de Frances, Primera Hora, April 12, 2011.

353   Istra Pacheco, *Claman por castigo para el asesino de Aida, Primera Hora, April 27, 2011; Sara M. Justicia Doll, Sujeto cumplió amenaza al degollar a su pareja, Primera Hora, April 24, 2011; Alberto Rullán, Sexagenario asesina a su pareja, WAPA.TV, April 24, 2011.*

354   Javier Colón Dávila, *Trágico fin de convulsa relación, El Nuevo Día,* May 7, 2011; Ivelisse Rivera Quiñones, Escala ocho pisos y mata a su ex pareja frente a sus hijos en Aguadilla, Primera Hora, May 6, 2011; Maelo Vargas Saavedra, Reclaman cese la violencia doméstica durante sepelio de mujer en Aguadilla, Primera Hora, May 10, 2011.

355    Yainary López Quintana, Sospechan del novio en brutal crimen de mujer, El Nuevo Día, June 9, 2011; Osman Pérez Méndez, Matan a cuchilladas a una madre de cuatro, El Nuevo Día, June 9, 2011; Maelo Vargas, Le roban la vida a puñaladas, Primera Hora, June 10, 2011; Yainary López Quintana, "Varias veces él dijo que la iba a matar", El Nuevo Día, June 10, 2011.

356    Wilma Maldonado Arrigoitía, Sentencian a 65 años de cárcel sujeto que mató a su esposa en Arecibo, Primera Hora, Sept. 29, 2011; Wilma Maldonado Arrigoitía, Preso en Guerrero esposo de Josmarie Serrano Fonseca, Primera Hora, June 21, 2011;

357    Maelo Vargas, Hombre que asesinó a su compañera se declara culpable, Primera Hora, Dec. 7, 2011; Ivelisse Rivera Quiñones, Hombre mata a su pareja de un machetazo en Lajas, Primera Hora, Jul. 12, 2011; Ivelisse Rivera Quiñones, Degüella a pareja con machete, Primera Hora, Jul. 13, 2011.

358    Maribel Hernández Pérez, Acribilla a pareja y se suicida, Primera Hora, Jul. 19, 2011.

359    Alex Figueroa Cancel, Hombre asesina a su pareja y luego se suicida en Toa Alta, Primera Hora, Aug. 25, 2011; Javier Colón Dávila, Familiares y vecinos lamentan caso de violencia doméstica en Toa Alta, El Nuevo Día, Aug. 25, 2011; Francisco Rodríguez-Burns, Macabro crimen en comunidad remota de Toa Alta, Primera Hora, Aug. 25, 2011.

360    Eugenio Hopgood Dávila, Grave denuncia a dos jueces, El Nuevo Día, Nov. 26, 2011; Procuradora de las Mujeres acusa a juez de negligente, El Nuevo Día, Nov. 25, 2011; Procuradora de las Mujeres pide investigar posible violación a la ley en caso de ataque en Aguadilla, El Nuevo Día, Nov. 12, 2011.

361    Ivelisse Cortes Kercado, Exigen esclarecer ocho asesinatos por violencia doméstica, Telemundo, Dec. 30, 2011; Comisión de la Mujer del Colegio de Abogados y Abogadas de Puerto Rico and Coalición Coordinadora Paz para la Mujer, Press Release, Organizaciones pro mujeres exigen esclarecer 8 asesinatos por violencia doméstica del 2011, Dec. 29, 2011.

362    Maria Miranda, 21 Women Killed This Year by Partners, Puerto Rico Daily Sun, July 14, 2011.

363    DOJ report at 58.

364    Díaz Colón saca la Policía de diferentes asuntos, WAPA.TV, Sept. 7, 2011.

365    World Health Organization, World Report on Violence and Health at 25 (2002).

366    Cuando solo una es demasiado:  Informe de asesinatos de mujeres por el motivo de violencia doméstica, Puerto Rico 2007 at 7 (2008, revised 2009).

367    "[E]very law enforcement officer shall make an arrest, even though there is no order to such effect, if he has grounds to believe that the person to be arrested has committed, even though not in his/her presence, or that is committing in his/her presence, a violation to the criminal provisions of this chapter."  PR ST T. 8 § 638.

368    Emily J. Sack, Report on Domestic Violence Practices and Services of the Puerto Rico Court System and its Partners: Assessment, Evaluation and Recommendations at 6 (May 17, 2006).

369    Id. at 23, 27.

370    Jodie G. Roure, Gender Justice in Puerto Rico:  Domestic Violence, Legal Reform, and the Use of International Human Rights Principles, 33 Human Rights Quarterly 790, 798-99 (2011).

371    Emily J. Sack, Report on Domestic Violence Practices and Services of the Puerto Rico Court System and its Partners: Assessment, Evaluation and Recommendations at 23 (May 17, 2006).

372    Id.

373    Id.

374    U.S. Dep't of Justice, National Institute of Justice, Practical Implications of Current Domestic Violence Research:  For Law Enforcement, Prosecutors and Judges at 36 (June 2009).

375    Id. at 27.

376    Id. at 6.

377    Id.

378    Oficina de la Procuradora de las Mujeres, Estadísticas de violencia doméstica, Incidentes de violencia doméstica; Tendencias PR, Compendio de Estadísticas: Violencia en Puerto Rico, 2009 (2010); Puerto Rico Police Department, División de Estadísticas, Incidentes de violencia doméstica por área; Entreparedes.org, Datos que se harán actuar.

379    Maricarmen Rivera, Víctimas con las manos vacías:  Procuradora de la Mujer denuncia inacción en muchas salas de justicia ante la violencia doméstica, Vocero, April 8, 2012; Tendencias PR, Compendio de Estadísticas: Violencia en Puerto Rico, 2009 (2010); Oficina de la Procuradora de las Mujeres, Estadísticas de violencia doméstica, Incidentes de violencia doméstica; Puerto Rico Police Department, División de Estadísticas, Incidentes de violencia doméstica por área.

380    Departamento de Salud, Centro de Ayuda a Víctimas de Violación, Violencia Sexual en Puerto Rico at 3 (2007).

381   *Id.*

382   Tendencias PR, *Compendio de Estadísticas: Violencia en Puerto Rico, 2009* at 106 (2010); DOJ report at 57.

383   DOJ report at 16.

384   *Id.* at 17.

385   *Id.* at 5.

386   *Id.* at 58.

387   ACLU interview with Judith Berkan, April 5, 2011, San Juan, Puerto Rico.

388   Comité Evaluador Externo de la Policía de Puerto Rico, *Informe del Comité Evaluador Externo de la Policía de Puerto Rico* (Dec. 21, 2007), *available at* http://www.claridadpuertorico.com/documents/articles/02%20Informe%20 Polic%C3%ADa%2021%20Dic%202007.pdf; Comité Evaluador Externo de la Policía de Puerto Rico, *Informe del Comité Evaluador Externo de la Policía de Puerto Rico:  La Corrupción en la Policía de Puerto Rico* (May 1, 2008), *available at* http:// pr.microjuris.com/ConnectorPanel/ImagenServlet?reference=/images/file/Informe%202008.pdf.

389   ACLU interview with Ruth Jiménez de Jesús, San Juan, Puerto Rico, March 28, 2011.  The officer implicated in both the Polaco and Cirino cases, Isaac Joel Pizarro Pizarro, was later shot and killed in an unrelated incident in December 2011.

390   *José Luis Irizarry Muñiz, Betsy Jeannette Pérez Rivera et al. v. Eric Rivera Nazario, Jaime Rodriguez Vega et al.*, Compl, 11-01337 (April 13, 2011); Oscar J. Serrano and Melissa Solórzano García, *Demanda por policías que mataron al joven en Yauco*, NotiCel, April 19, 2011; *Podrían demandar al agente*, El Nuevo Día, Oct. 18, 2010; *Objetan desaparición de vídeo en caso de brutalidad policiaca*, El Nuevo Día, July 2, 2010; Keila López Alicea, *Justicia no se rinde*, El Nuevo Día, Feb. 4, 2009; *Causa para juicio contra policía estatal*, El Nuevo Día, June 26, 2009.

391   ACLU interview with Max Pérez Bouret, then Auxiliary Superintendent of Administrative Services of the PRPD, May 6, 2011, San Juan, Puerto Rico.

392   DOJ report at 70.

393   Comité Evaluador Externo de la Policía de Puerto Rico, *Informe del Comité Evaluador Externo de la Policía de Puerto Rico* (Dec. 21, 2007); Comité Evaluador Externo de la Policía de Puerto Rico, *Informe del Comité Evaluador Externo de la Policía de Puerto Rico:  La Corrupción en la Policía de Puerto Rico* (May 1, 2008).

394   ACLU interview with Max Pérez Bouret, then Auxiliary Superintendent of Administrative Services of the PRPD, May 6, 2011, San Juan, Puerto Rico.

395   Comité Evaluador Externo de la Policía de Puerto Rico, *Informe del Comité Evaluador Externo de la Policía de Puerto Rico* (Dec. 21, 2007).

396   ACLU interview with Ruth Jiménez de Jesús, San Juan, Puerto Rico, March 28, 2011.

397   *Id.*

398   *Id.*

399   *Id.*

400   *Id.*

401   *Id.*

402   Comité Evaluador Externo de la Policía de Puerto Rico, *Informe del Comité Evaluador Externo de la Policía de Puerto Rico* (Dec. 21, 2007); Comité Evaluador Externo de la Policía de Puerto Rico, *Informe del Comité Evaluador Externo de la Policía de Puerto Rico:  La Corrupción en la Policía de Puerto Rico* (May 1, 2008).

403   E-mail communication from Nora Vargas to the ACLU, May 5, 2011.

404   ACLU interview with Enrique G. Juliá Ramos, May 5, 2011, Río Piedras, Puerto Rico.

405   *Id.*

406   *Id.*

407   *Id.*

408   *Id.*

409   *Id.*

410   *Id.*

411   *Id.*

412    Colegio de Abogados de Puerto Rico, Comisión Especial Sobre Fiscalización del Estado Actual de los Derechos Constitucionales, *Informe Preliminar* at 20-21 (July 12, 2010), *available at* http://www.capr.org/dmdocuments/Informe_Comi_Fiscalizacion.pdf.

413    *E.g.*, *id.* at 76.

414    ACLU interview with Hans Perl-Matanzo, May 4, 2011, San Juan, Puerto Rico; e-mail communication from Hans Perl-Matanzo, May 3, 2011.

415    ACLU interview with Luis Torrez, March 29, 2011, San Juan, Puerto Rico.

416    ACLU interview with Amada Garcia, May 5, 2011, Río Piedras, Puerto Rico.

417    Policía de Puerto Rico, Superintendencia Auxiliar en Responsabilidad Profesional, *Relación Annual de Querellas Administrativas por Acciones Disciplinarias Recomendadas y Referidas a la Oficina de Asuntos Legales*.

418    *Id.*

419    *Gutiérrez-Rodríguez v. Cartagena*, 882 F.2nd 553, 581-82, 565-66 (1st Cir., 1989).

420    *Gutiérrez-Rodríguez*, 882 F.2nd at 582.

421    *Evelyn Ramírez Lluveras et al. v. Javier Pagán Cruz et al.*, D.P.R., Case No. 3:08-cv-01486-FAB, Plaintiff's Statement of Facts in Opposition to Motion for Summary Judgment on Liability, Exhibit JJJ, Lou Reiter Report under penalty of perjury, Filed March 15, 2011.

422    *Id.*

423    *Id.*

424    *Id.*

425    PRPD, *Orden Especial 90-5.*

426    ACLU interview with Max Pérez Bouret, then Auxiliary Superintendent of Administrative Services of the PRPD, May 6, 2011, San Juan, Puerto Rico.

427    *Id.*

428    *Id.*

429    *Id.*

430    *Id.*

431    ACLU interview with Judith Berkan, April 5, 2011, San Juan, Puerto Rico; *see, Camilo-Robles v. Zapata*, 175 F.3d 141 (1st Cir., 1999); *Camilo-Roblez v. Hoyos*, 151 F.3s 1 (1st Cir., 1998); *Rosario Díaz v. González*, 140 F.3d 312 (1st Cir., 1998); *Díaz v. Martínez*, 112 F.3d (1st Cir., 1998).

# ISLAND OF IMPUNITY: Puerto Rico's Outlaw Police Force

The Puerto Rico Police Department (PRPD), charged with policing the Commonwealth of Puerto Rico, is the second-largest police department in the United States. The PRPD performs an essential public safety function, yet the police force is plagued by a culture of unrestrained abuse and impunity. After a comprehensive six-month investigation of policing practices in Puerto Rico, building on eight years of work by the ACLU of Puerto Rico documenting cases of police brutality, the ACLU has concluded that the PRPD commits serious and rampant abuses in violation of the United States Constitution, the Puerto Rico Constitution, and the United States' human rights commitments.

The PRPD routinely commits abuses including the unjustified use of lethal force against unresisting, restrained, and unarmed civilians; beatings and other violence against unarmed low-income Puerto Ricans, Puerto Ricans of African descent, and Dominican immigrants that left some near-death and others paralyzed or with traumatic brain injury; and excessive force against peaceful protesters including the indiscriminate use of tear gas, pepper spray, batons, rubber bullets and sting ball grenades, Tasers, carotid holds, and pressure point techniques. The PRPD also systematically fails to police crimes of domestic violence and rape, and utterly fails to protect women from violence by their intimate partners.

These abuses do not represent isolated incidents or aberrant behavior by a few rogue officers. Such police brutality is pervasive and systemic, island-wide and ongoing. The ACLU's research shows that there are numerous contributing factors that are responsible for this pattern of police abuse. Our research has found that the PRPD's disciplinary, investigatory, and reporting systems in place utterly fail to address, and therefore prevent, police abuses. These systems virtually guarantee impunity: instead of deterring abuses by holding abusive officers accountable, the PRPD allows officers to escape punishment or any other consequences, rearming and returning them to active duty, often to repeat their offenses. Citizen complaints of brutality languish for years without resolution, and the PRPD fails to adequately investigate allegations of police misconduct. The PRPD rubber-stamps the use of force, covers up abuse by its officers, and encourages a code of silence. Officers also receive patently inadequate training, insufficient supervision, and minimal guidance on the legal boundaries of their use of force and other conduct. The PRPD fails to provide critical guidance to its personnel on how to discharge their duties in compliance with constitutional and human rights standards. Moreover, there is no effective independent review of the PRPD's policies and practices.

The PRPD has demonstrated it is both unwilling and unable to police itself, and the political leadership in Puerto Rico has failed to step into the breach. The PRPD has long promised reforms and publicly stated its commitment to reforming some of its policies, but for the most part it has not delivered on these promises. Based on our research, the ACLU has formulated clear recommendations for much-needed reforms. These reforms will not only help to bring the PRPD into compliance with the Constitutions of the United States and Puerto Rico and human rights laws, but will also help it to combat the public safety crisis it currently confronts.

