UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                  PLAINTIFF,<br><br>    - against -<br><br>COMMONWEALTH OF PUERTO RICO AND<br>PUERTO RICO POLICE DEPARTMENT.<br><br>               DEFENDANTS. | CIV. NO.: 12-2039 (GAG) |

## AMICI BRIEF OF THE AMERICAN CIVIL LIBERTIES UNION, AMERICAN CIVIL LIBERTIES UNION OF PUERTO RICO, MOVIMIENTO AMPLIO DE MUJERES DE PUERTO RICO, COORDINADORA PAZ PARA LA MUJER, THE LATIN AMERICAN AND THE CARIBBEAN COMMITTEE FOR THE DEFENSE OF WOMEN'S RIGHTS (CLADEM) PASOS DE LAS MUJERES, FEMINISTAS EN MARCHA, OPMT, TALLER SALUD, ET AL

## TABLE OF CONTENTS

Table of Authorities…………………………………………………………………………… iv
Interest of Amici Curiae…………………………………………………………………………... viii

I.  THE PUERTO RICO POLICE DEPARTMENT HAS FAILED TO EFFECTIVELY
    POLICE DOMESTIC AND SEXUAL
    VIOLENCE…………………………………………………………………………........... 1
    A.  THE PRPD SYSTEMATICALLY FAILS TO ADDRESS AND POLICE
        DOMESTIC VIOLENCE
        CRIMES…………………………………………………………………........................ 2
    B.  THE PRPD SYSTEMATICALLY FAILTS ADEQUATELY POLICE AND
        REPORT SEXUAL ASSAULT
        CRIMES………………………………………………………………………………… 4
    C.  DOMESTIC VIOLENCE BY PRPD OFFICERS ILLUSTRATES THE
        INSTITUTUIONAL DYSFUNCTION OF THE PRPD IN POLICING
        DOMESTIC VIOLENCE AND SEXUAL
        ASSAULT……………………………………………………………………….. 5
II.  THE PROPOSED AGREEMENT IS ESSENTIAL TO ACHIEVE SUSTAINABLE
     REFORM OF THE PUERTO RICO POLICE DEPARTMENT AND ITS
     RESPONSE TO GENDER-BASED
     VIOLENCE………………………………………………………………………….. 6
     A.  INVESTIGATION AND
         POLICING…………………………………………………………………… 6
         1.  PRPD Must Ensure Appropriate Classification of Crimes and Investigation
             Reports of Sexual Assault and Domestic Violence
             Cases………………………………………………………………………… 7
         2.  The PRPD Should Collaborate Closely with Community
             Stakeholders………………………………………………………………… 8
         3.  Police Procedures and Policies Must be Revised to Comply With Applicable
             Law and Best Practices and Then Implemented Through Effective Training
             and Monitoring……………………………………………………………… 9
         4.  The PRPD Should Promote a Victim-Centered Approach to Policing
             Domestic and Sexual Violence……………………………………………… 12
         5.  The PRPD Must Address Officer-Committed Domestic and Sexual
             Violence……………………………………………………………………... 13
     B.  THE NEED FOR ONGOING TRAINING ON GENDER BIAS-FREE
         POLICING…………………………………………………………………… 14
     C.  OVERSIGHT AND TRANSPARENCY…………………………………………... 19
         1.  Oversight mechanisms……………………………………………………… 19
         2.  Interagency coordinated response to domestic and sexual violence
             cases………………………………………………………………………… 20
         3.  Data collection and public reporting……………………………………….. 22
     D.  FUNDING FOR THE PROPOSED REFORM……………………………………. 24
III. UNLESS PRPD POLICING OF DOMESTIC AND SEXUAL VIOLENCE IS
     SERIOUSLY REFORMED, THE PRPD WILL BE IN VIOLATION OF DOMESTIC
     AND INTERNATIONAL HUMAN RIGHTS LAW…………………………………... 25
     A.  THE FAILURES OF THE PRPD IN POLICING DOMESTIC AND SEXUAL
         VIOLENCE VIOLATE OR ARE LIKELY TO VIOLATE FEDERAL AND
         PUERTO RICO LAW…………………………………………………………... 25
         1.  PRPD Practices Resulting in Discriminatory Enforcement of the Law Conflict

with Their Obligations under the Constitution.................................... 25

    a. The Equal Protection Clause of the 14th Amendment Prohibits Discriminatory Enforcement of the Law....................................... 26

    b. Discriminatory PRPD Practices Implicate Substance Due Process Concerns Under the 14th Amendment............................................. 27

2. PRPD Practices Resulting in Discriminatory Enforcement of the Law Conflict with Their Obligations under Federal and Local Law.............................. 29

    a. Federal Law: The Safe Streets Act, the Violent Crime Control and Law Enforcement Act, and Title VI................................................ 29

    b. Puerto Rico Local Law: the Domestic Abuse Prevention and Intervention Act of 1989 (Act 54) and the Constitution of the Commonwealth of Puerto Rico.................................................................... 30

B. PRPD PRACTICES IMPLICATE CONCERNS UNDER INTERNATIONAL HUMAN RIGHTS LAW................................................................... 32

1. Applicability of International Human rights Law to Domestic Violence and Sexual Assault.......................................................... 32

2. Protection from Gender-Based Violence is a Fundamental Human right under International Law......................................................... 34

    a. The right to be free from gender-based violence is an established norm of customary international law.............................................. 34

    b. International Law Imposes an Obligation on States to Exercise "Due Diligence" in Policing Domestic Violence and Sexual Assault Cases....... 35

3. The Inter-American Commission on Human Rights has condemned the U.S. Government Accountable for its Failure to Exercise Due Diligence in Policing Domestic Violence Cases................................................ 37

4. PRPD Practices Need Reform to Ensure Compliance with the Fundamental Human Right to be Protected from Gender-Based Violence..................... 38

Conclusion.......................................................................... 39

Appendix I. – List of Amici Curiae................................................. 40

## <u>TABLE OF AUTHORITIES</u>

**Cases**

Agreement, *United States v. Puerto Rico*, No. 3:12-cv-2039 (Dec. 21, 2012) .......... 6, 7, 11, 19, 22

*Arteaga v. Town of Waterford*, No. HHDX07CV5014477S, 2010 WL 1611377 (Conn. Super. Ct. Mar. 16, 2010) ................................................................................................................. 28

*Atkins v. Virginia*, 536 U.S. 304 (2002) ............................................................................... 33

*Balistreri v. Pacifica Police Dep't*, 901 F.2d 696 (9th Cir. 1988) ............................... 26, 28

*Beltran v. City of El Paso*, 367 F.3d 299 (5th Cir. 2004) ................................................... 26

*Carlton v. Cleburne Cty.*, 93 F.3d 505 (8th Cir. 1996) ....................................................... 28

Consent Decree, *United States v. New Orleans*, No. 2:12-cv-01924-SM-JCW (July 24, 2012).. 12

*Estate of Macias v. Ihde*, 219 F.3d 1018 (9th Cir. 2000) .................................................... 26

*Freeman v. Ferguson*, 911 F.2d 52 (8th Cir. 1990) ........................................................... 28

*Gonzales v. United States*, Case 12.626, Inter-Am Comm'n H.R., OEA/Ser./L/V/II.128 Doc. 19, n. 150, para. 160 (2007). ............................................................................................. 38

*Gonzales v. United States*, Case 12.626, Inter-Am. Comm'n H.R., Report No. 80/11 (2011) ..... 36

*González et al. ("Cotton Field") v. Mexico*, 2009 Inter-Am. Ct. H.R. (ser. C) No. 205 (Nov. 16, 2009) ................................................................................................................................. 37

*Graham v. Florida*, 130 S. Ct. 2011 (2010) ....................................................................... 33

*Grutter v. Bollinger*, 539 U.S. 306 (2003) (Ginsburg, J., concurring) ............................. 33

*Haberthur v. City of Raymore*, 119 F.3d 720 (8th Cir. 1997) ........................................... 28

*Hynson v. City of Chester*, 864 F.2d 1026 (3d Cir. 1988), *remanded to* 731 F. Supp. 1236 (E.D. Pa. 1990) ......................................................................................................................... 26

*Jones v. Wellham*, 104 F.3d 620 (4th Cir. 1997) ............................................................... 28

*Kneipp v. Tedder*, 95 F.3d 1199 (3d Cir. 1996) .................................................................. 29

*Lawrence v. Texas*, 539 U.S. 558 (2003) ............................................................................ 33

*M.C. v. Bulgaria*, App. No. 39272/98, Eur. Ct. H.R. (2004) ............................................. 35

*Maria da Penha Maia Fernandes v Brazil*, Case No. 12.051, Inter-Am Comm'n H.R., No. 54/01 (2001) ................................................................................................................................. 35

*Navarro v. Block*, 72 F.3d 712 (9th Cir. 1995) .................................................................. 26

*Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415 (2d Cir. 2009) ............. 28

*Opuz v. Turkey*, App. No. 33401/02, Eur. Ct. H.R. (2009) ...................................... 34, 36, 37

*Pearce v. Longo*, 766 F. Supp. 2d 367 (N.D.N.Y. 2011) ............................................... 28, 29

*Phillips v. County of Allegheny*, 515 F.3d 224 (3d Cir. 2008) .......................................... 28

*Rogers v. City of Little Rock*, 152 F.3d 790 (8th Cir. 1998) .............................................. 28

*Roper v. Simmons*, 543 U.S. 551 (2005) ............................................................................ 33

*Smith v. City of Elyria*, 857 F. Supp. 1203 (N.D. Ohio 1994) ........................................... 26

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) ................................................................. 32

*The Paquete Habana*, 175 U.S. 677 (1900) ...................................................................... 32

*Thompson v. Oklahoma*, 487 U.S. 815 (1988) (Stevens, J.) .............................................. 33

*Thurman v. City of Torrington*, 595 F. Supp. 1521 (D. Conn. 1984) ................................ 26

*Watson v. City of Kansas City*, 857 F.2d 690 (10th Cir. 1988) ......................................... 26

*Whren v. United States*, 517 U.S. 806 (1996) ................................................................... 26

*Wood v. Ostrander*, 879 F.2d 583 (9th Cir. 1989) ....................................................... 28, 29

*Zachry Int'l v. Tribunal Superior*, 104 D.P.R. 267 (P.R.) .............................................. 31

## Statutes

28 C.F.R. §42.104(b)(2)...................................................................................... 29

42 U.S.C. § 14141 (2012)................................................................................... 30

42 U.S.C. § 2000d (2012)................................................................................... 30

42 U.S.C. § 3789d(c)(1) (2012)........................................................................... 29

42 U.S.C. §§ 3796gg(1)-3796hh (2010). ............................................................ 24

American Declaration of the Rights and Duties of Man, May 2, 1948, O.A.S. Official Rec., OEA/Ser. L./V./II.23, doc. 21 rev. 6 ..................................................... 32

Human Rights Watch, *Improving Police Response to Sexual Assaults* 2 (Jan. 2013)............. 13, 20

*Id.* .................................................................................................................... 31

International Association of Chiefs of Police (IACP) National Law Enforcement Policy Center, *Investigating Sexual Assaults:  Model Policy* 2 (July 2005)...................................... 13

International Covenant on Civil and Political Rights, *opened for signature* Dec. 16, 1966, G.A. Res 2200A (XXI), 999 U.N.T.S 171 (entered into force Mar. 23, 1976)............... 34, 36

P.R. Const. art. II .............................................................................................. 31

Puerto Rico Law 284 of 21 August 1999 Against Stalking and Sexual Assault crimes................... 5

Puerto Rico Law 54 of 15 August 1989 to Prevent and Intervene with Domestic Violence....5, 30, 31

Restatement (Third) of the Foreign Relations Law of the United States § 102 (2) (1987).....34, 35

Universal Declaration of Human Rights, G.A. Res. 217(A)(III), U.N. Doc A/810 (Dec. 12, 1948) ............................................................................................................... 32

Women's Affairs Commission, Office of Governor, *First Report on the Establishment of the Intervention and Prevention of Domestic Abuse Act in Puerto Rico* 130-133 (1991) ................ 31

## Other Authorities

Ana Irma Rivera Lassén, *Afro Descendant women: our gaze fixed on the intersections of race and gender-based organizing. Concept Document Challenges and Opportunities of the Economic Empowerment of Afro Descendant Women ECLAC.* Brasilia, 13-16 July, 2010, Network of Afro-Latin American, Afro-Caribbean and Diaspora Women. http://www.cepal.org/mujer/noticias/paginas/9/39909/EnglishRedAfro.pdf .............................. 18

Andrew R. Klein, U.S. Dep't of Justice, Nat'l Institute of Justice, *Practical Implications of Current Domestic Violence Research:  For Law Enforcement, Prosecutors and Judges* 36 (June 2009)...................................................................................................... 3

Área de Estadística Oficina de la Procuradora de las Mujeres, *Cuando Solo Una Es Demasiado: Informe de Asesinatos de Mujeres por el Motivo de Violencia Doméstica*, Puerto Rico 2007 8 (2009) ................................................................................................................ 3

Centro Reina Sofia, *Tercer Informe Internacional:  Violencia Contra la Mujer en las Relaciones de Pareja, Estadísticas y Legislación* 89 (2010)............................................................ 1

Comisión para los Asuntos de la Mujer, Oficina del Gobernador, *Primer Informe de Progreso Sobre la Implantación en Puerto Rico de la Ley para la Prevención en Intervención con la Violencia Doméstica* 168 (June 1991). ............................................................. 15

Comité de América Latina y el Caribe para la Defensa de los Derechos de las Mujer, *Deudas Pendientes del Gobierno de Puerto Rico con las Mujeres* (September 2012). http://cladempr.com/deudas-pendientes-del-gobierno-de-puerto-rico-con-las-mujeres/ ............. 5

Comm. on the Elimination of Violence Against Women, General  Recommendation No.19: Violence Against Women (11th Sess. 1992) .......................................................34, 35, 36

Convention on the Elimination of All Forms of Discrimination Against Women, *opened for signature* Dec. 18, 1979, G.A. Res. 34/180, 34 U.N. GAOR, 34th Sess., Supp. No. 46, U.N Doc. A/34/46 (1979) (entered into force Sept. 3, 1981) ....................................................................... 34

Council of Europe, Comm'n. of Ministers Recommendation Rec(2002)5 to Member States on the Protection of Women Against Violence, 794th mtg. of the Ministers' Deputies (Apr. 30, 2002) ........................................................................................................................................ 34

Declaration on the Elimination of Violence Against Women, arts. 1, 2, G.A. Res. 48/104, U.N. GAOR, 48th Sess., Supp. No. 49, U.N. Doc A/48/49 (Dec. 20, 1993) ................................... 34, 36

Declaration on the Elimination of Violence against Women, G.A. Res. 48/104, 48th Sess., U.N. Doc. A/RES/48/104 (Feb. 23, 1994) ....................................................................................... 35

Departamento de Salud, Centro de Ayuda a Víctimas de Violación, *Violencia Sexual en Puerto Rico* 3 (2007) ......................................................................................................................... 5

*Domestic violence deaths reported in 2011.* Pesquisa Boricua (January, 8 2012), ........................... 1

Elimination of Domestic Violence Against Women, G.A. Res. 58/147, U.N. GAOR, 58th Sess., U.N. Doc. A/Res/58/147 (Feb. 19, 2004) ........................................................................... 36

Emily J. Sack, *Report on Domestic Violence Practices and Services of the Puerto Rico Court System and its Partners: Assessment, Evaluation and Recommendations* 23 (2006) ....... 3, 4, 27

Firuzeh Shokooh Valle, *Puerto Rican Women Face Rising Tide of Violence*, Womensnews (Aug. 24, 2010), http://womensnews.org/print/8264 ...................................................................... 1

Human Rights Comm'n., *The Equality of Rights Between Men and Women*, 68th Sess., U.N. Doc CCPR/C/21/Rev.1/Add.10 (2000) ........................................................................................ 34

Human Rights Council Res., *Accelerating efforts to eliminate all forms of violence against women: ensuring due diligence in prevention,* 14th Sess., U.N. Doc. A/HRC/RES/14/12 (Jun. 25, 2010) ............................................................................................................................ 35, 37

Inter-American Convention on the Prevention, Punishment and Eradication of Violence Against Women, *opened for signature* Jun. 9, 1994, 33 ILM 1534 (entered into force Mar. 5, 1995) . 34

Jenny Rivera, *Puerto Rico's Domestic Violence Prevention and Intervention Law: The Limitations of Legislative Responses, in* Global Critical Race Feminism: AN International Reader 34 (Adrien Katherine Wing ed., 2000) ...................................................................... 14

Maria Miranda, *21 Women Killed This Year by Partners*, PUERTO RICO DAILY SUN, July 14, 2011 ...................................................................................................................................... 1

*Mujeres Asesinadas a Manos de Sus Parejas o Ex Parejas en lo Que Va del 2011- Puerto Rico,* Mujeres en Puerto Rico (July 26, 2011), http://www.mujeresenpr.com/2011/07/22-mujeres-asesinadas-manos-de-sus.html ........................................................................................... 1

*Mujeres en "Estado de Emergencia Nacional*", Periódico Diálogo, (July 13, 2011), http://www.dialogodigital.com/index.php/Mujeres-en-estado-de-emergencia-nacional.html .... 1

Oficina de Estadísticas de la Criminalidad, *Policía de Puerto Rico: Total de Mujeres Asesinadas por Violencia Doméstica 1990-2012* (2012). ..................................................................... 1

Oficina de la Procuradora de las Mujeres, *La Respuesta Institucional del Sistema de Justicia Criminal en el Manejo de los Casos de Violencia Doméstica: Evaluación e Identificación de Necesidades para Promover la Seguridad de la Víctima y la Intervención con la Persona Agresora* (June 2005) .............................................................................................. 10, 16, 17

Orden General Núm. 2006-4 (Rev. 1): *Normas y Procedimientos para las Investigaciones Criminales de Incidentes de Incidentes de Violencia Doméstica*, Policía de Puerto Rico .......... 9

Orden General Núm. 2007-1: *Funciones y Responsabilidades de las Divisiones de Delitos Sexuales y Maltrato de Menores,* Policía de Puerto Rico (Jan. 18, 2007) ................................ 10

*Organizaciones Sociales Puertorriqueñas: Hay un Estado de Emergencia Nacional por Violencia de Género*, Periodico Claridad, (July 18, 2011, 8:47 PM), http://www.aporrea.org/internacionales/n184998.html ........................................................... 1

*Policía que asesinó a expareja y a su acompañante había sido desarmado*, El Nuevo Día, March 25, 2013 ................................................................................................................... 13

Press Release, United States Dep't of Justice, Vice President Biden and Attorney General Holder Announce Grants to Help Reduce Domestic Violence Homicides (Mar. 13, 2013) ........... 20, 24

Rahim Kanani, *DOJ Director on Violence Against Women in the United States*, Forbes (Mar. 8, 2012, 5:25 PM) ........................................................................................................... 33

Ruth Silva Bonilla, Milagros Miranda, & Jannette Rodríguez, Centro de Investigaciones Sociales, Facultad de Ciencias Sociales, Universidad de Puerto Rico Recinto de Río Piedras, *Proyecto de Investigación*: *Dificultades del Estado en la Implantación de la Ley 54 de 15 de Agosto de 1989, Informe Preliminar* 5 ................................................................. 16

Special Rapporteur on Violence Against Women, *Report of the Special Rapporteur on Violence Against Women, Its Causes and Consequences - Mission to the U.S.*, U.N. Doc. A/HRC/17/26/Add.5 (June 6, 2011) (by Rashida Manjoo) ................................................. 37

Special Rapporteur on Violence Against Women, *The Due Diligence Standard as a Tool for the Elimination of Violence Against Women*, ¶ 35, U.N. Doc. E/CN.4/2006/61 (Jan. 20, 2006) (by Yakin Ertürk) ............................................................................................................ 36

U.N. Secretary General, *Violence Against Women*, U.N. GAOR, 59th Sess., U.N. Doc. A/59/281 (2004) ........................................................................................................................ 35

U.S. Dep't of Justice Civil Rights Division, *Investigation of the Puerto Rico Police Department* 57 (Sept. 2011) .......................................................................... 2, 3, 4, 5, 12, 14, 19, 27

U.S. Dep't of State, United States Strategy to Prevent and Respond to Gender-Based Violence Globally (Aug. 10, 2012) ................................................................................................ 33

United Nations, *Progress of the World's Women: In Pursuit of Justice*, United Nations Women (2011), http://progress.unwomen.org/pdfs/EN-ReportProgress.pdf ..................................... 12

Universal Declaration of Human Rights, G.A. Res. 217A (III), U.N. Doc. A/810 (Dec. 10, 1948) ........................................................................................................................ 34, 36

Violence Against Women Reauthorization Act of 2013, Pub. L. No. 113-4 .................................. 11

World Conference on Human Rights, June 14-25, 1993, *Vienna Declaration and Programme of Action*, U.N. Doc. A/CONF.157/24 (Part I) (Oct. 13, 1993) ............................................. 34

World Conference on Women, Sept. 4-15, 1995, *Beijing Declaration and Platform for Action*, U.N. Doc. A/CONF.177/20 (1995) and A/CONF.177/20/Add.1 (1995) ............................ 35, 36

## **INTEREST OF AMICI CURIAE**

This brief *amici curiae* is submitted on behalf of the above listed non-governmental organizations, scholars and another experts dedicated to the protection of human rights and specifically to the protection of women from domestic and sexual violence. *Amici curiae* respectfully submit this memorandum to highlight the severe problem of domestic violence and sexual assault in Puerto Rico. In endorsing the terms of the proposed consent decree that reforms the Puerto Rico Police Department's ("PRPD") practices in domestic violence and sexual assault cases, *amici* offer guidance on how to implement the reforms effectively. *Amici* respectfully submit that PRPD policies and practices in domestic violence and sexual assault cases must be transformed as outlined in the agreement and described herein in order to avoid violations of domestic and international human rights law. Description of the signatory organizations and experts can be found in the attached Appendix.

I.      **THE PUERTO RICO POLICE DEPARTMENT HAS FAILED TO EFFECTIVELY POLICE DOMESTIC AND SEXUAL VIOLENCE.**

Domestic violence is a critical problem in Puerto Rico, leading advocates here to describe domestic violence as at a "state of national emergency."[1] In 2006, PRPD reported 23 murders of women at the hands of their domestic partners, placing Puerto Rico first on an international list comparing the number of women killed by their partners in each country/territory per million women over the age of fourteen.[2] Puerto Rico reports an intimate partner homicide rate of 1.4 per 100,000 women per year, as compared to 0.78 in United States and 0.33 in Spain.[3]

Since 2006, the situation has steadily worsened:[4] 27 women were murdered in 2007;[5] 19 women were killed by their intimate partners in 2010; 30 women were killed in 2011; and 27 women were killed in 2012.[6] From 2007 to 2012, no less than 130 women were the victims of intimate partner homicide.[7] It should be noted that, because statistics issued by the PRPD are outdated and unreliable, women's advocates groups collect data and research domestic violence related deaths. As an example, in 2011, 42 women were killed by their partners instead of the 30 cases reported by the PRPD.[8]

---

[1] *See, e.g.,* Maria Miranda, *21 Women Killed This Year by Partners,* PUERTO RICO DAILY SUN, July 14, 2011.

[2] Centro Reina Sofia, *Tercer Informe Internacional:  Violencia Contra la Mujer en las Relaciones de Pareja, Estadísticas y Legislación* 89, 92 (2010).

[3] *Id.*

[4] Firuzeh Shokooh Valle, *Puerto Rican Women Face Rising Tide of Violence,* Womensenews (Aug. 24, 2010), http://womensenews.org/print/8264; *Mujeres Asesinadas a Manos de Sus Parejas o Ex Parejas en lo Que Va del 2011- Puerto Rico,* Mujeres en Puerto Rico (July 26, 2011), http://www.mujeresenpr.com/2011/07/22-mujeres-asesinadas-manos-de-sus.html; *Organizaciones Sociales Puertorriqueñas: Hay un Estado de Emergencia Nacional por Violencia de Género,* Periodico Claridad, (July 18, 2011, 8:47 PM), http://www.aporrea.org/internacionales/n184998.html; *Mujeres en "Estado de Emergencia Nacional",* Periódico Diálogo, (July 13, 2011), http://www.dialogodigital.com/index.php/Mujeres-en-estado-de-emergencia-nacional.html.

[5] *See* sources cited *supra,* note 4.

[6] Oficina de Estadísticas de la Criminalidad, *Policía de Puerto Rico: Total de Mujeres Asesinadas por Violencia Doméstica 1990-2012* (2012)

[7] *Id.*

[8] *See, e.g., Domestic violence deaths reported in 2011.* Pesquisa Boricua (January, 8 2012), http://pesquisaboricua.files.wordpress.com/2012/01/estadisticasvd2011.jpg.

The domestic violence crisis in Puerto Rico is even more alarming when Puerto Rico's intimate partner homicide rate is compared against the intimate partner homicide rate in other parts of the United States. To illustrate, Puerto Rico's intimate partner homicide rate is disproportionately higher than that of Los Angeles, despite the fact that Puerto Rico and Los Angeles have similar population sizes. In Puerto Rico, 30 women were killed by their intimate partners in 2011; in Los Angeles, five women were killed by their intimate partners in 2011.

A. THE PRPD SYSTEMATICALLY FAILS TO ADDRESS AND POLICE DOMESTIC VIOLENCE CRIMES.

Not only do the above statistics illustrate the depth of the domestic violence crisis in Puerto Rico, but they also highlight the failure of the Puerto Rico Police Department (PRPD) to combat the crisis. The systematic failure of the PRPD to effectively prevent, protect, and police against domestic violence and sexual assault has led the U.S. Department of Justice ("DOJ") to conclude that "immediate and sustained remedial efforts" are required.[9] According to the DOJ, the "PRPD's longstanding failure to effectively address domestic violence and rape in Puerto Rico is clear and, in conjunction with its institutional deficiencies, may rise to the level of a pattern and practice of violations of the Fourteenth Amendment and the Safe Streets Act."[10] This report also identified victims of Dominican descent as particularly vulnerable to such discriminatory policing practices.[11]

The PRPD does not adequately ensure that women confronting domestic violence access the legal options available to them. Of the women murdered by their partners between 1991 and 1999, only 17% had orders of protection, 2% had orders of arrest against their aggressors, and

---

[9] U.S. Dep't of Justice Civil Rights Division, *Investigation of the Puerto Rico Police Department* 57 (Sept. 2011) [hereinafter *Investigation*].
[10] *Investigation*, *supra* note 9, at 58.
[11] *Id.* at 56.

4% had expired orders of protection.[12] In the limited instances in which there are protective orders, the PRPD—in violation of its duty to enforce the order—often fails to arrest the offender in violation of the protective order. In 2007, for example, 25% of the women killed by their partners had previously reported incidents of domestic violence to the PRPD.[13] In part because the system fails to provide adequate protection to its victims, few women seek the PRPD's protection—they distrust and lack faith in the broken system of the PRPD.

The significant inverse relationship between domestic violence's rate of occurrence and its rate of conviction further highlights the inadequacies of the PRPD's policies and practices: domestic violence is the highest volume crime in Puerto Rico, and yet it has the lowest conviction rate.[14] A study commissioned by the PRDOJ found that of approximately 20,000 domestic violence incidents reported to the police each year, only 17% resulted in convictions.[15] These figures for domestic violence-related convictions are lower than U.S. national averages, where the average arrest prosecution rate is 63.8%, and the average offense prosecution rate is 27.4%.[16] The under-conviction rate is perpetuated mainly due to a failed collaboration between police and prosecutors as cases are processed and developed.

As we discuss later, PRPD practices in addressing domestic violence cases are in significant need of reform. A 2006 study of PRPD practices in domestic violence cases found, among other things: (1) significant delays in the adjudication of protection orders, due in part to delays in service when PRPD fails to appear at the hearings on the final orders of protection; (2)

---

[12] *Id. at* 58 (citing Data from United Nations Statistics Division, Demographics and Social Statistics: Statistics and Indicators on Women and Men, Table 6.C, Physical Abuse against Women by an Intimate Partner (1991-99), available at http://unstats.un.org/unsd/demographic/products/indwm/table6c.html).

[13] Área de Estadística Oficina de la Procuradora de las Mujeres, *Cuando Solo Una Es Demasiado:  Informe de Asesinatos de Mujeres por el Motivo de Violencia Doméstica*, Puerto Rico 2007 8 (2009).

[14] Emily J. Sack, *Report on Domestic Violence Practices and Services of the Puerto Rico Court System and its Partners:  Assessment, Evaluation and Recommendations* 23 (2006).

[15] *Id.*

[16] Andrew R. Klein, U.S. Dep't of Justice, Nat'l Institute of Justice, *Practical Implications of Current Domestic Violence Research:  For Law Enforcement, Prosecutors and Judges* 36 (June 2009).

dramatic under-enforcement of violations of protection orders; (3) inadequate staffing of both specialized domestic violence PRPD units and specialized domestic violence prosecution units, making it impossible to provide coverage to all domestic violence cases; (4) lack of adequate evidence collection and case investigation by the PRPD; and (5) lack of consistent coordination between police and prosecutors in domestic violence case development.[17]

    B.  <u>THE PRPD SYSTEMATICALLY FAILS TO ADEQUATELY POLICE AND REPORT SEXUAL ASSAULT CRIMES.</u>

The PRPD is not adequately responding to or investigating sexual assault crimes, and it is significantly underreporting these crimes.  The PRPD reported that only 39 forcible rapes were committed in 2010, and yet also reported 1,000 homicides during the same year. In the last ten years the reported rape rate has declined sharply, declining from 228 to 39 forcible rapes from 2000 to 2010, while murders have seen a sharp increase during the same time period, indicating that reduced crime is not the cause of the recent low rape statistics. As noted by the DOJ, Puerto Rico stands alone in the statistic of far fewer reported forcible rapes than murders.[18]

The unprecedented data spread between reported forcible rape and murder is most likely the result of the PRPD's failure to follow protocols to respond to, record, or investigate sexual violence crimes. It is crucial that PRPD accurately documents and responds effectively to reports of sexual assault in order to encourage victims to come forward to law enforcement and to achieve justice. To ensure effective response, it is also critical that PRPD tracks and documents its domestic violence and sexual assault investigations to avoid misclassifying offenses. In stark contrast to the numbers that PRPD publishes, the Puerto Rico Department of Health's Center for Assistance to Rape Victims estimated that 18,000 people in Puerto Rico, mostly women and

---

[17] Sack, *supra* note 14, at 6.
[18] *Investigation*, *supra* note 9, at 57.

girls, are victims of sexual violence each year.[19] Official sources estimate that, in the case of sexual violence, only about 16% of rapes are reported.[20]

In spite of existing laws, Puerto Rico Law 54 of 15 August 1989 to Prevent and Intervene with Domestic Violence and Law 284 of 21 August 1999 Against Stalking and Sexual Assault crimes, the PRPD has shown a lack of commitment to comply fully and in coordination with the public policies set forth in these laws. Groups mostly ignored are afrodescendant women, migrant women, sexual workers, young women, students, elderly women, persons with disabilities and lesbian, gay, bisexual, transsexual, transgender and intersex (LGBTTI) persons.[21]

   C. DOMESTIC VIOLENCE BY PRPD OFFICERS ILLUSTRATES THE INSTITUTIONAL DYSFUNCTION OF THE PRPD IN POLICING DOMESTIC VIOLENCE AND SEXUAL ASSAULT.

The PRPD has recorded an appalling number of complaints of domestic violence by PRPD officers. The PRPD's failure to address domestic violence among its ranks is symptomatic of a larger institutional dysfunction of the police department's policing of domestic violence and other sexual and gender-based crimes.

According to the DOJ Findings Letter, hundreds of officers have engaged in domestic violence and many others have been arrested multiple times for harming their partners.[22] While the fact that *hundreds* of PRPD officers have been arrested on domestic violence charges is shocking, what is even more shocking is that many of those officers are still on active duty. The PRPD's failure to hold its officers accountable illustrates the broader dysfunction of the PRPD; allowing PRPD officers to remain on active duty despite their domestic violence charges

---

[19] *Id.*
[20] Departamento de Salud, Centro de Ayuda a Víctimas de Violación, *Violencia Sexual en Puerto Rico* 3 (2007).
[21] Comité de América Latina y el Caribe para la Defensa de los Derechos de las Mujer, *Deudas Pendientes del Gobierno de Puerto Rico con las Mujeres* (September 2012). http://cladempr.com/deudas-pendientes-del-gobierno-de-puerto-rico-con-las-mujeres/
[22] *Investigation*, *supra* note 9, at 16-17.

is illustrative of the PRPD's problematic attitude towards the policing of domestic violence and sexual assault crimes. As we discuss below, the PRPD is in need of significant reform if its policies and practices are to be in compliance with domestic and international law.

II.    **THE PROPOSED AGREEMENT IS ESSENTIAL TO ACHIEVE SUSTAINABLE REFORM OF THE PUERTO RICO POLICE DEPARTMENT AND ITS RESPONSE TO GENDER-BASED VIOLENCE.**

The PRPD requires an overhaul, not merely incremental reform, and certainly not the empty promises of reform that the PRPD has offered to date. The PRPD needs to address the structural issues identified, and these wide-ranging reforms should be supervised by a federal court. While the DOJ's findings are a critical first step, change within the PRPD´s system will not occur and women's lives will continue to be lost and destroyed as a consequence of discriminatory acts and omissions of the police force unless the PRPD adopts the essential reforms recommended by the DOJ and the *amici*. Therefore, *amici* support the provisions of the settlement agreement that reform policing of domestic and sexual violence, and advocate for effective implementation of these reforms.

A.    INVESTIGATION AND POLICING

The PRPD needs reform that focuses on increasing community safety, victim protection, enhancing law enforcement investigations, facilitating successful prosecution, and promoting a coordinated criminal justice system response to violence against women in Puerto Rico. The Agreement for the Sustainable Reform of the Puerto Rico Police Department commits the PRPD to address reports of sexual assault and domestic violence "professionally, effectively, and in a manner free of gender-based bias."[23] According to the agreement, this is to be achieved through: (i) ensuring appropriate classification of crimes and investigation reports, (ii) collaborating

---

[23] Agreement, *United States v. Puerto Rico*, No. 3:12-cv-2039 at 39 (Dec. 21, 2012).

6

closely with community stakeholders, (iii) creating policies and procedures that comply with applicable law and generally accepted policing practices on how to respond to sexual assaults and domestic violence, including incidents involving PRPD officers; and (iv) applying a victim-focused approach at every stage of its response.[24]

Accordingly, we submit the following recommendations concerning reforms in these areas addressed by the proposed agreement.

**1.  PRPD Must Ensure Appropriate Classification of Crimes and Investigation Reports of Sexual Assault and Domestic Violence Cases.**

As this agreement proposes, the PRPD needs to adopt, re-assess or improve its mechanisms to ensure that officers accept and record all complaints and adequately classify sexual and domestic violence offenses.[25] For instance, sexual and domestic violence incidents should not be classified as miscellaneous, non-crimes or otherwise summarily disposed where the elements of a crime appear to exist, because an officer deems the victim uncooperative or unsure of what occurred, or concludes that the evidence refutes the allegation.

Adequate scene investigation procedures for sexual assault and domestic violence cases , including evidence and supporting data collection need to be in place to ensure proper case prosecution. Complaints should be recorded, preserving detailed statements from victims and witnesses, and police reports should describe the appearance of the scene, victim injuries, need for medical assistance, and results of forensic exams or laboratory analysis.  Evidence should be collected in accordance with standard guidelines: interrogating suspects, interviewing witnesses, ascertaining history of violence, taking photographs and gathering other physical and forensic evidence. Collection should be performed to the fullest extent possible, even if time has passed

---

[24] *Id.*
[25] *Id.* at 40.

since the crime was committed. Investigative reports should include any reports prepared by patrol officers or other first responders.

In making law enforcement decisions with respect to domestic or sexual violence, law enforcement officers may not rely on generalized stereotypes about how victims of domestic violence or sexual violence should or will behave, or how domestic or sexual violence is perpetrated.    In addition, the PRPD must ensure that immigration status, sexual orientation, gender identity or marital status of a victim does not impact law enforcement responses to domestic or sexual violence. Policing that downplays, ignores, or exacerbates domestic or sexual violence against lesbian, gay, bisexual, transgender and queer people is also unlawful.

Finally, the PRPD must implement and improve its monitoring mechanisms to ensure that domestic or sexual violence investigations are being conducted in compliance with the law. For example, supervisors should be responsible for reviewing whether domestic or sexual violence complaints are being classified, investigated, and charged or cleared appropriately. Also, supervisors should communicate early and effectively with prosecutors, and promptly respond to concerns from complainants, advocates, prosecutors, and others that might be raised with respect to particular cases.

### 2.  **The PRPD Should Collaborate Closely with Community Stakeholders.**

Close collaboration with women's rights organizations and community providers ensures that policies and protocols remain victim-centered and effective. To facilitate this collaboration, other jurisdictions have agreed that a high ranking police officer, such as the Superintendent or a Commander, will meet with state coalitions against domestic violence or other coalitions of women's rights organizations on at least a quarterly basis to discuss and coordinate policy, training, and other aspects of police response to domestic and sexual violence. The PRPD should do the same.

In addition, PRPD should implement outreach initiatives in its 13 regions to guarantee the integration of domestic and sexual violence service providers into collaborative problem-solving partnerships. Forming the *Community Interaction Councils (CICs)*, proposed by the Agreement, will foster frequent, effective communication and cooperation between PRPD and representatives of victim's needs and interests. A proactive approach to domestic violence and gender-centered issues is critical to adequately managing and reducing the occurrence of cases committed and reported, which may potentially result in implementing successful prevention initiatives. In regions where there is a domestic violence NGO-administered shelter, these organizations will be integrated into the CIC´s coordinating efforts and policing approaches to enable the identification and implementation of strategies at each region.

Finally, increased police interaction with academic institutions will promote effective policing approach by providing relevant information on proper protocols, technology and specialized skills. Researchers can learn what needs to be studied and practitioners (police and victim services) need best practices. This will maintain updated police practices.  An alliance between all can contribute to more effective responses to violence.

3. **Police Procedures And Policies Must be Revised to Comply With Applicable Law and Best Practices and Then Implemented Through Effective Training and Monitoring.**

Regarding policies and procedures on domestic violence and sexual assault crimes, the PRPD has adopted two different protocols: General Order 2006-4 (Rev-1), "Policies and Procedures for the Criminal Investigations of Domestic Violence Incidents," and General Order 2007-1, "Functions and Responsibilities of Sex Crimes and Child Abuse Investigation Units."[26]

---

[26] Orden General Núm. 2006-4 (Rev. 1): *Normas y Procedimientos para las Investigaciones Criminales de Incidentes de Incidentes de Violencia Doméstica*, Policía de Puerto Rico, *available at* http://www2.pr.gov/agencias/policiapr/OrdenesGenerales/Documents/Ordenes%20Generales/Orden%20General%2 02006-4%20(Rev.%201).pdf; Orden General Núm. 2007-1:  *Funciones y Responsabilidades de las Divisiones de*

The General Order 2006-4 (Rev-1), last revised in 2008, governs every stage of PRPD's response to a report of domestic violence.[27] This protocol delineates the duties of all PRPD officers and staff, and also provides guidelines to respond to reports of domestic violence involving PRPD officers. However, these protocols need to be revised and updated with evidence-based policies on law enforcement response to gender-based violence. For example, they need more concrete provisions regarding domestic violence investigations, including on-scene and follow-up investigations, the taking and preserving of witness statements, and collection of evidence. This general order also needs concrete provisions regarding cooperation with prosecutors in case development.

Additionally, the Women's Advocate Office found that the General Order 2006-4 lacks specific provisions regarding PRPD's responsibility for service of orders of protection and summons to appear at orders of protection hearings, though Act 54 expressly imposes these obligations.[28] The General Order should be revised to clarify PRPD's responsibility for service of orders of protection and summons to appear at hearings on orders of protection.

Finally, this General Order must be revised in order to comply with the federal Violence Against Women Reauthorization Act of 2013 to include specific provisions providing protection to victims of domestic violence in populations who face barriers in accessing and using victim services. It also must be changed to include populations that are underserved because of

---

*Delitos Sexuales y Maltrato de Menores,* Policía de Puerto Rico (Jan. 18, 2007), *available at* http://www2.pr.gov/agencias/policiapr/OrdenesGenerales/Documents/Ordenes%20Generales/Orden%20General%202007-1.pdf.
[27]*Id.*
[28] For a detailed analysis of this General Order with Law 54, *see generally* Oficina de la Procuradora de las Mujeres, *La Respuesta Institucional del Sistema de Justicia Criminal en el Manejo de los Casos de Violencia Doméstica: Evaluación e Identificación de Necesidades para Promover la Seguridad de la Víctima y la Intervención con la Persona Agresora* (June 2005), *available at* http://www2.pr.gov/agencias/mujer/InvestigacionesEstudios/Documents/Respuesta%20Institucional%20del%20sistema%20de%20justicia%20criminal%20en%20el%20manejo%20de%20los%20casos%20de%20violencia%20dom%C3%A9stica/Ver%20Informe.pdf.

geographic location, religion, sexual orientation, gender identity, race, ethnic origin, and special needs (such as language barriers, disabilities or age).[29] For instance, the PRPD must ensure that police protocols consider and adequately manage barriers when responding to domestic and sexual violence cases in rural areas, severely impoverished communities, and public housing projects.

As for sexual violence cases, PRPD has General Order 2007-1, which governs every stage of PRPD's response to a report of sexual assault. This protocol, as well as General Order 2006-4, should be revised and updated with evidence-based policies on law enforcement response to sexual violence. As this agreement proposes, this protocol must provide specific guidelines on the role of dispatch and initial officers, on-scene and follow up investigations, and conducting interviews in sexual assault cases.[30]

Additionally, these policies should be consistent with the National Protocol for Sexual Assault Medical Forensic Examinations from the DOJ Office of Violence Against Women[31] and the Puerto Rico Department of Health Protocol for the Intervention in Cases of Sexual Assault. The PRPD should re-assess and revise, where needed, its classification protocols for crimes involving sexual assaults, and track all reports of felony sexual assaults based on the FBI Uniform Crime Reporting definitions.

Staffing should be sufficient to allow for full and complete on-scene and follow-up investigations of both domestic and sexual violence. PRPD should be committed to increase the staffing at the Sex Crimes and Domestic Violence Investigation Unit and in the regional Domestic Violence Divisions. Additionally, data from 39 countries show that the presence of

---

[29] Violence Against Women Reauthorization Act of 2013, Pub. L. No. 113-4, sec. 3(a)(18), § 39, 127 Stat. 54, 59 (amending the Violence Against Women Act to expand the provision on underserved populations).
[30] Agreement, *United States v. Puerto Rico*, No. 3:12-cv-2039 at 40 (Dec. 21, 2012).
[31] *Id.*

well trained women police officers correlates positively with reporting of sexual assault, which confirms that recruiting women is an important component of a gender-responsive justice system.[32]

To explore current approaches for responding to and investigating crimes of violence against women, specifically domestic violence, sexual assault, stalking, and human trafficking, other jurisdictions, such as New Orleans, have agreed to incorporate the International Association of Chiefs of Police's ("IACP") recommendations for Violence Against Women Law Enforcement Best Practices into their training of the police force, and to update procedural requirements annually to reflect changes in policy, law and developments in research and best practices.[33]  The PRPD should do the same.

Finally, the PRPD must implement or improve its monitoring mechanisms to ensure that all officers are properly trained on domestic and sexual violence policies and procedures. According to the DOJ's findings letter, "many of the officers indicated that supervisors simply read new policies and procedures to them, and provide little opportunity to discuss and understand the subjects presented."[34]

### 4.   The PRPD Should Promote a Victim-Centered Approach to Policing Domestic and Sexual Violence.

Experts in the United States agree that a victim-centered approach is vital to effective policing of domestic and sexual violence, as opposed to one that emphasizes quickly closing

---

[32] United Nations, *Progress of the World's Women: In Pursuit of Justice*, United Nations Women (2011), http://progress.unwomen.org/pdfs/EN-ReportProgress.pdf at p.59.  [UN Women analysis based on police representation data from UNODC 2009 and reporting of sexual assault calculated from ICVS (latest available)].
[33] Consent Decree, *United States v. New Orleans*, No. 2:12-cv-01924-SM-JCW ¶ 203 (July 24, 2012), *available at* http://www.laed.uscourts.gov/Consent/12cv01924_Doc2-1.pdf.
[34] *Investigation*, *supra* note 9, at 51.

cases.[35] Accordingly, if the victim is treated well, they are more likely to cooperate with the investigation, increasing the likelihood of justice.[36] In sexual assault cases, a Model Policy published by the IACP emphasizes the importance of officers' and investigators' attitudes towards victims in ensuring victims' cooperation and ability to deal with the aftermath of a crime.[37]

Moreover, prosecutors in other jurisdictions have stressed the importance of law enforcement officers' understanding the impact they have on victims and promoted performance evaluation of officers based on how thoroughly they investigate reported assaults and how well they interact with victims.[38] The police officer must be well trained on victimology and how to use this knowledge in the process of interview and investigation to enhance victim collaboration in the process.

Finally, integration of interdisciplinary teams is critical when handling sexual and domestic violence cases. A team of behavioral specialists such as psychologists, social workers, nurses, doctors, among others, should provide more in-depth analysis for gender specific occurrences.

### 5.   The PRPD Must Address Officer-Committed Domestic and Sexual Violence.

PRPD must ensure that officers are held fully accountable when they have allegedly perpetrated domestic or sexual violence. As recently as last week, a PRPD officer killed his former wife and her companion, committing suicide afterwards.[39] In this case, the officer had

---

[35] *See, e.g.,* International Association of Chiefs of Police (IACP) National Law Enforcement Policy Center, *Investigating Sexual Assaults:  Model Policy* 2, 6 (July 2005); Human Rights Watch, *Improving Police Response to Sexual Assaults* 2 (Jan. 2013).
[36] Human Rights Watch, *Improving Police Response to Sexual Assaults* 3 (Jan. 2013).
[37] International Association of Chiefs of Police (IACP) National Law Enforcement Policy Center, *Investigating Sexual Assaults:  Model Policy* 1 (July 2005).
[38] *See,* Human Rights Watch *Improving Police Response to Sexual Assaults* 3-4 (Jan. 2013).
[39] *Policía que asesinó a expareja y a su acompañante había sido desarmado*, El Nuevo Día, March 25, 2013.

been previously disarmed as a precaution after committing a violent act against his wife, but because the protection order was not issued, he was later reinstalled to his duties.[40]

The Agreement commits the PRPD to implement measures to respond to domestic violence reports involving PRPD officers, including disarmament and evaluation of duties. Among other measures, we recommend that systems of recruiting, training, supervising, reviewing the use of force, conducting internal investigations, and enforcing disciplinary procedures incorporate standards for evaluating officers who have been accused of sexual or domestic violence, and in addition to implementing a mechanism for making criminal referrals when appropriate.

B. THE NEED FOR ONGOING TRAINING ON GENDER BIAS-FREE
   POLICING

The DOJ Report identified the lack of training for officers as a key contributor to incidents of domestic violence and to police officers' subsequent misconduct.[41] When training was available, the discussion of gender-based violence was generally brief, giving officers little opportunity to truly understand the policies and procedures that relate to domestic violence investigations.  At times, officers were not given copies of the new orders for later refence.[42]

Even after the inception of the Domestic Violence Act of Puerto Rico, known as Act 54, in 1989, the tendency to privatize domestic violence as a family issue and not a criminal justice matter has been a pervasive problem within the criminal justice system and particularly in the PRPD.[43]  In its report covering the implementation of the Domestic Violence Act during the law's first year of existence, the Women's Affairs Commission - the Puerto Rico governmental

---

[40] *Id.*
[41] *Investigation, supra* note 9, at 8.
[42] *Id.* at 51.
[43] Jenny Rivera, *Puerto Rico's Domestic Violence Prevention and Intervention Law: The Limitations of Legislative Responses, in* Global Critical Race Feminism: AN International Reader 349, 353-58 (Adrien Katherine Wing ed., 2000).

agency in charge of monitoring this process - concluded that the main obstacle to the Act's implementation had been the resistance from high-level public officials to assume responsibilities assigned to them and to their agencies by Act 54.[44]  The Commission stated that this practice weakened the public policy enacted in the Act, created confusion among the community and lower level staff, and demonstrated the state's lack of seriousness and commitment to deal with intimate partner violence.[45]  The Commission also criticized the lack of support from the heads of the agencies of the criminal justice system to its efforts in the evaluation of the implementation process of Act 54.[46]  At an individual level, women who tried to use the remedies created by the Act also faced the same lack of support from public officials. This, in turn, caused many women to drop their cases once reported, after facing uncooperative and biased attitudes from public officials who were tasked to help them process their claims.[47]

More than twenty years later, the response of the PRPD to violence against women and in particular to domestic violence continues to be fragmented, confusing, biased, and uncoordinated.  These attitudes have created severe and additional risks for women and the appearance of a justice system allied with the abusers.

Thus, advocates, researchers and practitioners have constantly called for, and continue to call for, training of the PRPD on the needs of survivors of domestic and sexual violence, how to identify victims of domestic and sexual violence, the gendered aspects of the violence, the cycle of violence, and the importance of an adequate response from all components of the criminal justice system, and the police in particular.

---

[44] Comisión para los Asuntos de la Mujer, Oficina del Gobernador, *Primer Informe de Progreso Sobre la Implantación en Puerto Rico de la Ley para la Prevención en Intervención con la Violencia Doméstica* 168 (June 1991).
[45] *Id.* at 169.
[46] *Id.*
[47] *Id.* at 170-71.

In 1992, CERES, a women's studies and research project ascribed to the University of Puerto Rico, initiated a pilot research project regarding the implementation of the Domestic Violence Act of Puerto Rico, Act 54.  Its preliminary report provided information based on a series of interviews with judges from municipal, district and superior courts. [48] Judges interviewed stated that some difficulties were caused by the PRPD's methods for dealing with claims filed under Act 54. They indicated that PRPD officers tended to view intimate partner violence incidents as typical occurrences within marital relationships and as private affairs. In many cases their intervention was tainted by these sexist and traditional attitudes and beliefs. Judges recommended that education and training activities be offered to members of the Puerto Rico Police.  Otherwise, they said, Act 54 would be eventually inoperative. [49]

Several other inquiries have been conducted by the Puerto Rico Legislative Assembly and the Supreme Court Special Commission to Investigate Gender Bias in the Courts. [50] The Women's Advocate Office conducted a thorough inquiry on the implementation of public policies regarding violence against women and published a report on June 2005. [51] In all these instances, the findings have been similar as those mentioned above. Indeed, the Women's Advocate Office 2005 Report found that officers' attitudes and values were similar to those

---

[48] Ruth Silva Bonilla, Milagros Miranda, & Jannette Rodríguez, Centro de Investigaciones Sociales, Facultad de Ciencias Sociales, Universidad de Puerto Rico Recinto de Río Piedras, *Proyecto de Investigación*: *Dificultades del Estado en la Implantación de la Ley 54 de 15 de Agosto de 1989, Informe Preliminar*  5 (on file with author).
[49] *Id.* at 11-15.
[50] From 1993 to 1995, investigative reports were published by two different entities, a joint report by two Commissions of the House of Representatives and a report by the Supreme Court Special Commission to Investigate Gender Bias in the Courts.
[51] Oficina de la Procuradora de las Mujeres, *La Respuesta Institucional del Sistema de Justicia Criminal en el Manejo de los Casos de Violencia Doméstica: Evaluación e Identificación de Necesidades para Promover la Seguridad de la Víctima y la Intervención con la Persona Agresora* (June 2005), *available at* http://www2.pr.gov/agencias/mujer/InvestigacionesEstudios/Documents/Respuesta%20Institucional%20del%20sistema%20de%20justicia%20criminal%20en%20el%20manejo%20de%20los%20casos%20de%20violencia%20dom%C3%A9stica/Ver%20Informe.pdf.

shown by aggressors, suggesting an urgent and critical need for intensive and extensive gender bias free training.[52]

As a result of its inquiry, the Women's Advocate Office developed a training curriculum to train police officers. The training curriculum was designed as an interactive workshop to be offered during a five-day session. It incorporated the use of film, simulations, practical exercises and PowerPoint presentations. Topics covered included: gender sensitivity, identification of the diverse manifestations of domestic violence, sexual violence and stalking, the study and understanding of psychological and economic violence, legal norms and jurisprudence, gathering of evidence, dealing with victims and perpetrators, internal policies and protocols to deal with domestic violence, and internal proceedings for investigating and dealing with police officers engaged in domestic violence incidents.

From 2006 to 2008 the Women's Advocate Office conducted a series of trainings for police officers, supervisors and high ranking PRPD officers using the curriculum or parts thereof. A plan was established to train police officers assigned to the Special Units dealing with violence against women and children, so that they could in turn train other police officers. It was also recommended that the Police Academy include a course on domestic violence, sexual violence and stalking within its curriculum. Such a course should not only train cadets on the legal aspects of these problems, but also on the gendered social, economic and psychological causes and effects related to them.

As the DOJ findings letter has demonstrated, these efforts have not been sufficient or properly implemented over time. The need for training remains unfulfilled. Fulfillment of the PRPD's responsibility to redress violence against women requires a commitment to provide pre-

---

[52] *Id.*

service and ongoing in-service training throughout the police force, including high ranking officers, so that the following issues are addressed:

1. Eradicating gender stereotyping and the attitude that domestic and sexual violence should be treated as a private matter, undeserving of police, governmental, or public attention. This attitude frequently results in law enforcement's refusal to accept complaints, conduct investigations, or make arrests, even when the abuse clearly rises to the level of criminal activity.

2. Eliminating police intervention and practices that downplay, ignore, or exacerbate domestic or sexual violence against lesbian, gay, bisexual, transgender and queer people – this will require offering training programs on biased-free policing on an ongoing basis.

3. Offering training programs to identify and avoid arbitrary classification and stereotyping based on age, race, color, ethnicity, national origin, religion, gender, disability, sexual orientation, gender identity and immigration status. Trainings on culturally sensitive populations are also needed.

4. Ensuring that all police officers receive ongoing, periodic training on responding to domestic and sexual violence.

5. Providing consistent and current specialized training to all police officers in such critical areas as interviewing victims, suspects, and child witnesses or victims; investigating non-stranger and drug and alcohol facilitated sexual assault; documenting sexual and domestic violence, including strangulation; and determining the primary aggressor.

6. Requiring periodic and continuous educational activities on legal norms, jurisprudence and administrative rules related to domestic violence, sexual violence and stalking.

7. Training on adequate record keeping and statistical data collection as an important and integral duty in the process of responding to incidents of violence against women and other populations subject to discrimination. Training on the collection and systematization of information on gender and ethno-racial categories.[53]

8. Educating police officers on Immigration Law benefits and avenues of relief for victims of domestic and sexual violence available under VAWA and VTVPA.

---

[53]This is of particular importance because of the systematic denial of racism in Puerto Rican culture. *Cf.*, Ana Irma Rivera Lassén*, Afro Descendant women: our gaze fixed on the intersections of race and gender-based organizing. Concept Document Challenges and Opportunities of the Economic Empowerment of Afro Descendant Women ECLAC.* Brasilia, 13-16 July, 2010, Network of Afro-Latin American, Afro-Caribbean and Diaspora Women. http://www.cepal.org/mujer/noticias/paginas/9/39909/EnglishRedAfro.pdf

C.     OVERSIGHT AND TRANSPARENCY

1.  **Oversight mechanisms**

The PRPD systematically fails to enforce the protocols and laws in place to regulate officers' conduct and to investigate complaints of domestic violence and sexual assaults.[54] The PRPD also fails to collect and maintain comprehensive data on policing practices such as the number of domestic violence-related complaints filed.[55] Moreover, there is minimal public oversight and transparency of the PRPD's policies and practices, including no effective independent review.[56]

To ensure comprehensive, effective, and transparent oversight of PRPD, the Agreement provides for the development of systems to monitor sustained implementation of reforms. To ensure public accountability, the Agreement requires the collection and public dissemination of information regarding the reform efforts and their results.[57] In addition, the PRPD should engage the public in the reform process through the dissemination of public information on a regular basis.[58]

To facilitate effective and constitutional policing and increase trust between PRPD and the Puerto Rico community, these oversight systems should ensure that improper incidents, practices, or trends are identified and corrected in an equitable and timely manner. For instance, the DOJ found that the current civilian complaint process, to lodge complaints about individual police officers, included pervasive deficiencies that resulted in underreporting of domestic and sexual assaults by PRPD officers.[59]

---

[54] *Investigation*, *supra* note 9, at 67.
[55] *Id.* at 57.
[56] *Id.* at 83.
[57] Agreement, *United States v. Puerto Rico*, No. 3:12-cv-2039 at 70 (Dec. 21, 2012).
[58] *Id.* at 67.
[59] *Investigation*, *supra* note 9, at 68-72.

Moreover, there is no effective independent, external oversight of the PRPD. Unlike 49 of the 50 U.S. states, Puerto Rico does not have a state-wide authority that sets minimum standards and training requirements. The Superintendent has wide discretion to promulgate and change policies without any external review. For instance, the Superintendent has full discretion to reduce or modify the pre-service training program, set new standards for the use of force or specific weapons, or reject proposed disciplinary action against PRPD personnel without any public comment or external legal review.

An independent oversight body can ensure that domestic or sexual violence investigations are conducted in compliance with the law. The oversight body should review whether domestic or sexual violence complaints are being classified, investigated, charged or cleared appropriately. The independent oversight body should work closely with relevant stakeholders, and provide periodic public reports on its activities and findings. Without effective external oversight, it is clear that this Court needs to maintain jurisdiction over the matter and monitor the PRPD's compliance with the proposed reforms.

### 2.   Interagency coordinated response to domestic and sexual violence cases

In other jurisdictions, the use of coordinated teams of law enforcement, prosecutors, health professionals and victims' services significantly reduced the domestic violence homicide rate.[60] Moreover, effective collaboration between police and the various agencies and community groups that work with sexual assault survivors was viewed as an essential component of a victim-centered approach.[61]

---

[60] Press Release, United States Dep't of Justice, Vice President Biden and Attorney General Holder Announce Grants to Help Reduce Domestic Violence Homicides (Mar. 13, 2013), *available at* http://www.justice.gov/opa/pr/2013/March/13-ag-302.html.

[61] Human Rights Watch, Improving Police Response to Sexual Assaults 16 (Jan. 2013).

These interagency teams have promoted a significant reduction of obstacles encountered by victims and service providers seeking protection from the justice system. As such, it is an indispensable mechanism to improve the PRPD´s response to violence against women. Experience has shown that, by reducing obstacles, there is a marked increase in the victim's confidence of the protection the system can provide and willingness to participate. Strengthening the victim's willingness to proceed with the case reduces impunity, a significant problem in domestic and sexual violence situations.

Interagency teams must integrate law enforcement, prosecutors, health professionals, and victim's public service providers as well as grassroots organizations and NGOs. These teams serve a two-fold strategy. They show the justice system´s commitment to victim protection and her perception that her other significant needs will be addressed and not dismissed as irrelevant despite the outcome of a case. Interagency team's intervention resulted in a most effective mechanism to identify specific gaps and failures in execution: personnel negligence, lack of training, failure to comply with established protocols, among other factors. These evaluations should be performed after each domestic and sexual violence incident to improve institutional responses, and even the victim's own (and her surrounding family and friends) protection strategies. This is where domestic violence and gender-based free bias educational strategies are a much needed tool.

The continuous monitoring, evaluation and sharing of relevant information is not to be undervalued as it also provides on-the-job training experiences to personnel involved, whether inter- or intra-agency. Each component gets to understand the value of his or her work and the work of others, developing a team spirit that resonates on single actions.

Interagency teams should work to share their efforts with the public to increase transparency, thus increasing public confidence in their work.

Finally, there should be total compliance with Law 329 of 2000 that established an Interagency Commission where the heads of relevant departments (police, justice, family affairs, education, public television), together with the Women's Advocate Office, representatives from NGOs, and service providers, assessed significant gaps between already established protocols and incidents, developing public policies to correct inconsistencies in compliance and/or deviations from proper procedures.

### 3.   Data collection and public reporting

PRPD should collect and maintain all data and records needed to enable and ensure transparency and wide public access to information related to PRPD decision-making and activities, as permitted by law. For example, this Agreement, if approved, will require PRPD to track dispositions of sexual assault and domestic violence investigations and cases, broken down by gender and multiple arrests, which will be included in the PRPD annual report.[62]

Accurate data collection and public dissemination is critical to increase public confidence in police reform related to domestic and sexual violence.

Data collection should also include a victim´s age, educational level, income, race, ethnicity, nationality, civil status (married, divorced, single, cohabiting), children in common, previous or existing protective orders or criminal complaints to police, weapon of use, employment status, desegregated by gender and by victim and aggressor.  This data  should  be updated daily through the use of technology that is readily available and available for public examination.  Public dissemination of the efforts by the PRPD to provide information is essential

---

[62] Agreement, *United States v. Puerto Rico*, No. 3:12-cv-2039 at 40-41 (Dec. 21, 2012).

so that can there be a strengthening of the community's trust in their police force. Data collected from the PRPD must include:

- Domestic and sexual violence incidents reported TO police;

- Domestic and sexual violence incident reports prepared BY police;

- Arrests made by police in domestic and sexual violence;

- Summons issued by police to police stations in domestic violence and sexual incidents;

- Summons to court issued by police in domestic violence and sexual incidents;

- Cases closed after summons to police stations;

- Incidents consulted with prosecutors;

- Preliminary cause hearings for arrest.

Data needed relating to deaths resulting from partner violence is particularly significant. PRPD must guarantee that these statistics are current, accurate, and published daily for examination by the general public, social science researchers, and news media. Transparency is critical to develop public´s trust in its institutions, particularly in the police force.

Technological tools available and shared among the justice system support general availability of domestic violence–related current data. Therefore, lack of accurate, timely data cannot be justified with the technological advances generally available. Thus, PRPD should develop and implement a modern system of formal coordination and information sharing between the different components of the Criminal Justice System.

D.      FUNDING FOR THE PROPOSED REFORM

The Violence Against Women Act and other federal laws and programs have, among other things, built criminal justice capacity and expertise, trained thousands of officers, and resulted in more effective law enforcement. For example, funds from STOP Violence Against Women Formula Grant Program ("STOP grants"), assist states in strengthening the criminal justice system's response to violence against women. In addition, the Grants to Encourage Arrest Policies and Enforcement of Protection Orders Program, which funds state and local governments to implement pro  arrest programs and policies.[63]

Additionally, Vice President Joe Biden and Attorney General Eric Holder recently announced grants to 12 programs across the country to target the urgent need to reduce domestic violence homicides.[64] In total, the Department of Justice will award $2.3 million to 12 sites across the country as part of the new Domestic Violence Homicide Prevention Demonstration Initiative (DVHP Initiative).  The DVHP Initiative, created by the Justice Department's Office on Violence Against Women, (OVW) helps state and local jurisdictions reduce domestic violence homicides by effectively identifying potential victims and monitoring high-risk offenders.

Finally, there is a need for independent monitoring of the PRPD and the statistical data collection process and this can be done via foundations and federal funds, with academic institutions. Partnering with academic institutions on research study grants would also provide more funding.

---

[63] 42 U.S.C. §§ 3796gg(1)-3796hh (2010).
[64] Press Release, United States Dep't of Justice, Vice President Biden and Attorney General Holder Announce Grants to Help Reduce Domestic Violence Homicides (Mar. 13, 2013), *available at* http://www.justice.gov/opa/pr/2013/March/13-ag-302.html.

III.   **UNLESS PRPD POLICING OF DOMESTIC AND SEXUAL VIOLENCE IS SERIOUSLY REFORMED, THE PRPD WILL BE IN VIOLATION OF DOMESTIC AND INTERNATIONAL HUMAN RIGHTS LAW.**

For Puerto Rico to combat its ongoing crisis in domestic violence and sexual assault, the suggested reforms in the preceding section should be implemented. Because domestic violence and sexual assault crimes are predominantly committed against women and often involve gender-based stereotypes, the failure of the police to respond to crimes of domestic violence and sexual assault can constitute gender-based discrimination in violation of federal and state constitutions and civil rights laws.[65] PRPD policies and practices in domestic violence and sexual assault cases must accordingly be reformed as described in the preceding section in order to avoid violations of domestic and international human rights law.

A. THE FAILURES OF THE PRPD IN POLICING DOMESTIC AND SEXUAL VIOLENCE VIOLATE OR ARE LIKELY TO VIOLATE FEDERAL AND PUERTO RICO LAW.

The policies and practices of the PRPD in responding to domestic and sexual violence are subject to the U.S. Constitution, the Safe Streets Act, the Violent Crime Control and Law Enforcement Act, Title VI, as well as Puerto Rico's Domestic Violence Prevention and Intervention Act of 1989 (Act 54) and the Constitution of the Commonwealth of Puerto Rico . The systematic failures of the PRPD to adequately address domestic and sexual violence are likely to result in discrimination prohibited under federal and Puerto Rico law.

1.   **PRPD Practices Resulting in Discriminatory Enforcement of the Law Conflict with Their Obligations under the Constitution.**

PRPD practices implicate both equal protection and substantive due process concerns under the 14th Amendment.

---

[65] Because victims of Dominican descent are particularly vulnerable to the PRPD's policing practices, PRPD practices may also result in discrimination on the basis of race or national origin.

### a. The Equal Protection Clause of the 14th Amendment Prohibits Discriminatory Enforcement of the Law.

The Equal Protection Clause of the 14th Amendment prohibits selective or discriminatory enforcement of the law.[66] In the context of domestic violence and sexual assault cases, many courts have held that police practices can result in an equal protection violation when domestic violence or sexual assault is treated less seriously than other crimes, or when under-enforcement of domestic violence or sexual assault laws result in an adverse impact on women.[67]

The PRPD's systematic failures to prevent and police domestic violence and sexual assault cases—as illustrated through the statistical evidence in Part I —strongly suggest discriminatory practices have occurred or are likely to occur unless the suggested reforms are

---

[66] *Wren v. United States*, 517 U.S. 806, 813 (1996).

[67] *See Beltran v. City of El Paso*, 367 F.3d 299, 304 (5th Cir. 2004) (citing *Shipp v. McMahon*, 234 F.3d 907, 914 (5th Cir. 2000) ("More recently, this court acknowledged that certain intentionally discriminatory policies, practices, and customs of law enforcement with regard to domestic assault and abuse cases may violate the Equal Protection Clause under the *DeShaney* footnote.")); *Estate of Macias v. Ihde*, 219 F.3d 1018, 1028 (9th Cir. 2000) (holding that a longtime domestic violence victim who held a valid restraining order against her murderer may prevail on a § 1983 claim if she can prove the police violated her right to equal protection, regardless of whether Defendants themselves directly caused any harm); *Navarro v. Block*, 72 F.3d 712, 714 (9th Cir. 1995) (acknowledging that a municipality may be sued for "constitutional deprivations visited pursuant to governmental 'custom' even though such custom has not received formal approval through the [governmental] body's official decision making channels," and that failure to classify 911 requests for assistance relating to domestic violence as "emergency" calls could amount to discriminatory custom) (internal citations omitted); *Watson v. City of Kansas City*, 857 F.2d 690, 696 (10th Cir. 1988) (holding that police officers' training that encouraged officers to "defuse" the situation and to use arrest as a last resort amounts to discriminatory policy or custom when applied to Plaintiff, who was raped, beaten, and stabbed by ex-husband after previous police refusal to arrest); *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 701 (9th Cir. 1988) (finding that where police were rude, insulting, and unsympathetic to a domestic violence victim, and one officer even claiming that the victim deserved the beating, are "facts which, if true, may be a proper subject of relief."); *Thurman v. City of Torrington*, 595 F. Supp. 1521, 1527 (D. Conn. 1984) (holding that a persistent failure of police to aid a domestic violence victim was "pursuant to a pattern or practice of affording inadequate protection, or no protection at all, to women who have complained of having been abused by their husbands or others with whom they have had close relations," and that "[p]olice action is subject to the equal protection clause and section 1983 whether in the form of commission of violative acts or omission to perform required acts pursuant to the police officer's duty to protect."); *Smith v. City of Elyria*, 857 F. Supp. 1203, 1210 (N.D. Ohio 1994) (concluding that police increased danger to battered woman whose former husband subsequently killed her when, notwithstanding history of violence and abuse, they told her they could not remove him from her house, and told him he did not have to leave); *Hynson v. City of Chester*, 864 F.2d 1026, 1032 (3d Cir. 1988), *remanded to* 731 F. Supp. 1236 (E.D. Pa. 1990) (holding that a police officer loses qualified immunity defense to a claim that a facially neutral policy is executed in a discriminatory manner if a reasonable police officer would know that the policy has a discriminatory impact on women, that bias against women was motivating factor behind policy, and that there is no important public interest served by adoption of policy).

implemented. First, the fact that domestic violence is the highest volume crime in Puerto Rico and yet has the lowest conviction rate[68] indicates a discriminatory and disparate impact against the protected class of gender. Second, statistics of intimate partner homicides in Puerto Rico provide strong evidence that the PRPD does not sufficiently encourage the use of protective legal services and fails to enforce existing protective orders.[69] These statistics strongly suggest that domestic violence and sexual assault crimes are ineffectively policed, and domestic violence and sexual assault laws are under-enforced by the PRPD; such under-enforcement, as noted above, may give rise to discriminatory conduct in the policies and practices of the PRPD.

The systematic failures of the PRPD to address domestic violence by PRPD officers may additionally evidence discriminatory intent that is prohibited under the Equal Protection Clause. As discussed in the Background Statement, a significant number of officers arrested on domestic violence charges remain on active duty. The complaints of domestic violence by PRPD officers were so dramatic that in July 2010, the Puerto Rico legislature cited the fact that PRPD officers "have been involved in domestic violence […] at the moment of exercising their duties" in enacting a law that instituted a 12 hour training requirement.[70] The failure of the PRPD to discipline, supervise, and hold its officers accountable for their domestic violence charges strongly suggests an unwillingness to address domestic violence and may qualify as discriminatory intent.

### b.   Discriminatory PRPD Practices Implicate Substantive Due Process Concerns Under the 14th Amendment.

Numerous courts have also recognized a duty on the police in situations where the police affirmatively increased the victim's risk of danger under the substantive due process guarantees

---

[68] Sack, *supra* note 14, at 23.
[69] *See infra* p. 7.
[70] *Investigation*, *supra* note 9, at 65 (discussing Law 103 of July 2010).

of the 14th amendment.[71] To the extent that PRPD practices affirmatively raise the level of risk for domestic or sexual violence victims, those practices additionally give rise to substantive due process concerns under the 14th amendment.

The practices of the police department may give rise to substantive due process violations in at least three situations: (1) where police officers committed domestic violence or sexual assault themselves while acting in the course of their official duties;[72] or (2) where police officers implicitly but affirmatively encouraged the commission of domestic violence or sexual assault;[73] or (3) where police conduct resulted in subjecting a victim to heightened risk for domestic violence or sexual assault.[74]

---

[71] *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 430 (2d Cir. 2009) (citing *Pena v. DePrisco*, 432 F.3d 98, 111 (2d Cir. 2005)) (holding that a reasonable fact finder could infer that several incidents of police conduct, such as discussing football with a perpetrator or laughing at a victim for filing a report "plainly transmitted the message that what [the perpetrator] did was permissible," which in turn rises to the level of affirmative conduct that created or increased the risk of violence to the victim); *Phillips v. County of Allegheny*, 515 F.3d 224, 237 (3d Cir. 2008) (finding affirmative act when employee provided confidential 911 computer information about ex-wife to perpetrator who went on to kill the ex-wife, her boyfriend, and her sister); *Carlton v. Cleburne Cty.*, 93 F.3d 505, 508 (8th Cir. 1996) ("In [the state-created danger] cases the courts have uniformly held that state actors may be liable if they affirmatively created the plaintiffs' peril or acted to render them more vulnerable to danger. In other words, the individuals would not have been in harm's way but for the government's affirmative actions.") (internal citation omitted); *Freeman v. Ferguson*, 911 F.2d 52, 55 (8th Cir. 1990) (remanding for repleading on the theory that the officers affirmatively increased the danger to decedent); *Wood v. Ostrander*, 879 F.2d 583, 586 (9th Cir. 1989) (finding liability where police officers abandoned a passenger on the side of a road in a high crime area in the early morning hours after impounding her vehicle, and she was raped); *Pearce v. Longo*, 766 F. Supp. 2d 367, 372, 374-75 (N.D.N.Y. 2011) (finding sufficient facts for due process claim where former officer killed wife and committed suicide even though police officers were well-aware of ongoing abuse by police officer of his wife; assured her they were "all over this" in response to wife's complaints; and failed to discipline the officer, suspend him, confiscate his guns, or have his mental condition evaluated), *aff'd in part, rev'd in part*, 473 Fed. Appx. 16 (2d Cir. 2012); *Arteaga v. Town of Waterford*, No. HHDX07CV5014477S, 2010 WL 1611377, at *8 (Conn. Super. Ct. Mar. 16, 2010) (holding that several interactions between a domestic violence victim and police with no arrest, interview, or investigation into occurrences constituted state action by police, which may have affirmatively increased the risk of danger at the hands of a private actor).

[72] *See, e.g.*, *Rogers v. City of Little Rock*, 152 F.3d 790, 793-94, 797 (8th Cir. 1998) (holding that officer violated substantive due process when he stopped driver who had a broken tail light, called for a tow truck, then cancelled the tow, followed her home, went into her house, and raped her); *Jones v. Wellham*, 104 F.3d 620, 628 (4th Cir. 1997) (holding that officer violated victim's due process right to bodily integrity where after giving the victim a warning for an alleged traffic offense, the officer raped her before he drove her home); *Haberthur v. City of Raymore*, 119 F.3d 720, 724 (8th Cir. 1997) (holding that sexual assault by police officer violated plaintiff's substantive due process rights).

[73] *Balistreri*, 901 F.2d at 701 (including where police dispatched to a domestic violence call stated that the victim deserved the abuse she received, creating an atmosphere wherein domestic violence was acceptable); *Okin*, 577 F.3d at 430 (including where police laughed at a victim for filing a report, repeatedly refused to file reports, and where there was evidence that victim's husband was friends with police officers); *Arteaga*, 2010 WL 1611377, at *6

As discussed in Part I, the PRPD systematically fails to supervise its officers and hold them accountable when charges of domestic violence are brought against PRPD officers.[75] Because inadequate training, supervision, and accountability procedures are likely to affirmatively raise the victim's risk of danger of domestic violence, PRPD practices additionally implicate substantive due process concerns protected under the 14th amendment.

### 2. **PRPD Practices Resulting in Discriminatory Enforcement of the Law Conflict with Their Obligations under Federal and Local Law.**

#### a. **Federal Law: The Safe Streets Act, the Violent Crime Control and Law Enforcement Act, and Title VI**

Discriminatory police practices are also prohibited by a series of federal statutes: the Safe Streets Act, the Violent Crime Control and Law Enforcement Act, and Title VI all prohibit discriminatory conduct. As a program recipient under these statutes, the PRPD is subject to the applicable anti-discrimination provisions of each statute.

The Safe Streets Act (42 U.S.C. § 3789d) explicitly prohibits gender-based discrimination in programs funded under the Safe Streets Act.[76] While § 3789d is similar to the 14th Amendment in that it also prohibits gender-based discrimination, § 3789d focuses on the effect of a program's policies on members of a protected class,[77] and prohibits those policies as

---

(including failure of police to handle several calls and repeated violations of a protective order could reasonably constitute discriminatory treatment violative of due process requirements).

[74] *Wood*, 879 F.2d at 586 (finding liability where police officers abandoned a passenger on the side of a road in a high crime area in the early morning hours after impounding her vehicle, and she was raped); *Kneipp v. Tedder*, 95 F.3d 1199, 1211 (3d Cir. 1996) (finding facts, if proven, that officers left intoxicated pedestrian to walk home alone on a cold night after which she fell down an embankment and suffered brain damage increased harm to pedestrian in violation of her due process right). *See also, e.g., Pearce*, 766 F. Supp. 2d at 374-75 (pertaining to where former officer killed wife and committed suicide even though police officers were well-aware of ongoing abuse by police officer of his wife; assured her they were "all over this" in response to wife's complaints; and failed to discipline the officer, suspend him, confiscate his guns, or have his mental condition evaluated).

[75] *See infra* pp. 9-10.

[76] 42 U.S.C. § 3789d(c)(1) (2012).

[77] The regulation that implements § 3789d prohibits program recipients from "utiliz[ing] which have the effect of subjecting individuals to discrimination under [§ 3789d(c)], or have the effect of substantially impairing accomplishment of the objectives of the program as respects individuals of a particular race, color, sex, national origin, or origin." 28 C.F.R. § 42.104(b)(2).

unlawful discrimination to the extent they result in disparate impact on the protected class. Accordingly, just as the statistical evidence of PRPD practices discussed in the preceding section implicate discriminatory equal protection concerns under the 14th amendment, those same statistics, too, implicate concerns of gender discrimination under 42 U.S.C. § 3789d.

Likewise, failures of the PRPD to police domestic and sexual violence cases can violate the Violent Crime Control and Law Enforcement Act of 1994 (42 U.S.C. § 14141) and Title VI. Because § 14141 prohibits law enforcement officers from depriving persons of their rights under constitutional and federal law.[78] PRPD police practices that violate the equal protection clause of the 14th amendment or the anti-discrimination provisions of § 3789d will also give rise to violations under § 14141. Similarly, Title VI (42 U.S.C. § 2000d) prohibits discriminatory practices by public officials on the basis of race, color, or national origin,[79] so PRPD practices in policing domestic violence and sexual assault may also result in a Title VI violation when the victims are racial minorities, immigrants, and/or limited English proficient individuals.

### b. Puerto Rico Local Law: the Domestic Abuse Prevention and Intervention Act of 1989 (Act 54) and the Constitution of the Commonwealth of Puerto Rico

Enacted by the Puerto Rico legislature to combat the pervasive problem of domestic violence in Puerto Rico, the Domestic Abuse Prevention and Intervention Act of 1989 (Act 54) explicitly acknowledges that domestic violence is inextricably tied to gender-based stereotypes and impermissible gender discrimination.[80] Act 54 also recognizes that the structural gender

---

[78] 42 U.S.C. § 14141 (2012).
[79] 42 U.S.C. § 2000d (2012).
[80] Act 54, *supra* note 4,§§ 601-664.

discrimination that influences state authorities' response to this kind of violence is a core problem to address.[81]

Several provisions of Act 54 are concerned with the PRPD, establishing a list of responsibilities in relation to the civil and criminal remedies it offers to domestic violence victims. Act 54 calls for the mandatory arrest of domestic violence offenders if there is reason to believe that a protective order issued under Act 54 has been violated, even if there is no warrant for the arrest.[82] Act 54 also requires police officers to keep records of all domestic violence incidents brought to its attention and to provide assistance to survivors of domestic violence.

Due to resistance from high-level public officials who would be held accountable under Act 54, Act 54 has been insufficiently implemented and enforced.[83] Nevertheless, evidence that the PRPD often fails to arrest domestic violence offenders in violation of protective order—as discussed in the Background Statement—strongly suggests that PRPD practices may also result in violations of Act 54.

PRPD practices additionally implicate potential violations of the Constitution of the Commonwealth of Puerto Rico ("Puerto Rico Constitution"). Not only does the Puerto Rico Constitution guarantee the equal protection of the laws,[84] but it also expressly prohibits discrimination on the basis of gender.[85] Moreover, in the Preamble and article II, the Puerto Rico Constitution expressly commits the government to the protection of human rights and incorporates core principles under international human rights law, such as the rights to dignity

---

[81] *Id.* § 601 ("The discriminatory ideas, attitudes and conduct also permeate those social institutions called upon to resolve and prevent the problem of domestic abuse and its consequences.").

[82] *Id.* § 628 establishes that any police officers shall "proceed to make an arrest, even if there were no warrant to such effect" if there is reason to believe that a Protective Order issued under Act 54 has been violated.

[83] Women's Affairs Commission, Office of Governor, *First Report on the Establishment of the Intervention and Prevention of Domestic Abuse Act in Puerto Rico* 130-133 (1991).

[84] P.R. Const. art. II, § 7.

[85] *Id.* at § 1; *see also Zachry Int'l v. Tribunal Superior*, 104 D.P.R. 267, 270 (P.R.).

and equality.[86] The inclusion of these general commitments to the protection of human rights and to dignity and equality within the Puerto Rico Constitution echoes the language of the Universal Declaration of Human Rights[87] and the American Declaration of the Rights and Duties of Man.[88]

Accordingly, not only do current PRPD practices potentially violate Act 54, but those practices are also unfaithful to the Puerto Rico Constitution's commitments to equal protection, non-discrimination, dignity, and equality. And as we discuss next, PRPD practices raise concerns under international human rights law, in addition to the concerns they raise under federal and domestic law.

B. PRPD PRACTICES IMPLICATE CONCERNS UNDER INTERNATIONAL HUMAN RIGHTS LAW.

International human rights law recognizes a fundamental right to be protected from gender-based violence. Because international law imposes an affirmative obligation on states to take effective action to respond to and prevent domestic violence, PRPD policies and practices in policing domestic violence cases additionally implicate concerns under international human rights law.

1. Applicability of International Human Rights Law to Domestic Violence and Sexual Assault

Though not binding precedent, international law has long formed part of the common law of the United States and thus serves as persuasive authority for this Court. Acknowledging the relevance of international law to domestic adjudication, the U.S. Supreme Court has repeatedly cited to and relied on international and foreign materials in the course of interpreting U.S. law.[89]

---

[86] *See* P.R. Const. art. II, § 1 ("The dignity of the human being is inviolable. All men are equal before the law.").
[87] Universal Declaration of Human Rights, G.A. Res. 217(A)(III), U.N. Doc A/810, at pmbl. (Dec. 12, 1948).
[88] American Declaration of the Rights and Duties of Man, May 2, 1948, O.A.S. Official Rec., OEA/Ser. L./V./II.23, doc. 21 rev. 6.
[89] *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 734 (2004) ("For two centuries we have affirmed that the domestic law of the United States recognizes the law of nations."); *The Paquete Habana*, 175 U.S. 677, 700 (1900) ("International law is part of our law, and must be ascertained and administered by the courts of justice of

Most recently in *Graham v Florida*, the Court reaffirmed its "longstanding practice" of "look[ing] beyond our Nation's borders for support for its independent conclusion that a particular sentence is cruel and unusual" for purposes of the Eighth Amendment.[90]

Moreover, the applicability of international human rights law in discussing domestic violence issues is well-established within the United States. In a March 2012 interview, for example, Susan B. Carbon, Director of the United States Department of Justice's Office on Violence Against Women said that she "view[ed] violence against women, in all its forms, as a fundamental human rights issue… [that] usurps victims of their rights to sovereignty over their own persons."[91] The U.S. government's global strategy to prevent and address gender-based violence, released in August 2012, consistently refers to gender-based violence as a human rights issue "that undermines not only the safety, dignity, overall health status, and human rights of the millions of individuals who experiences it, but also the public health, economic stability, and security of nations."[92]

Because the United States regards gender-based violence as an international human rights issue, and courts have consistently looked to international law in interpreting domestic law, the government's obligations under international human rights law should inform this Court's consideration of the terms of the consent decree that relate to domestic and sexual violence.

---

appropriate jurisdiction, as often as questions of right depending upon it are duly presented for their determination.").

[90] *Graham v. Florida*, 130 S. Ct. 2011, 2033 (2010); *see also Roper v. Simmons*, 543 U.S. 551 (2005); *Grutter v. Bollinger*, 539 U.S. 306, 344 (2003) (Ginsburg, J., concurring); *Lawrence v. Texas*, 539 U.S. 558, 576-78 (2003); *Atkins v. Virginia*, 536 U.S. 304, 316 n. 21 (2002); *Thompson v. Oklahoma*, 487 U.S. 815, 830-31 (1988) (Stevens, J.).

[91] Rahim Kanani, *DOJ Director on Violence Against Women in the United States*, Forbes (Mar. 8, 2012, 5:25 PM), at 4, *available at* http://www.forbes.com/sites/rahimkanani/2012/03/08/doj-director-on-violence-against-women-in-the-united-states/.

[92] U.S. Dep't of State, United States Strategy to Prevent and Respond to Gender-Based Violence Globally, at 7 (Aug. 10, 2012) *available at* http://www.state.gov/documents/organization/196468.pdf  (discussing gender-violence generally as a human rights issue).

### 2. Protection from Gender-Based Violence is a Fundamental Human Right under International Law.

International law recognizes a fundamental human right to be protected from gender-based violence and to effective remedies when such protection fails. This norm, as reflected in ratified treaties and other international instruments, now constitutes customary international law.[93]

#### a. The right to be free from gender-based violence is an established norm of customary international law.

The right to be protected from gender-based violence is recognized in widely-ratified international and regional human rights treaties,[94] including those ratified by the United States, numerous resolutions by the United Nations and other inter-governmental organizations,[95] decisions of international tribunals,[96] and the laws and practices of other nations.[97]

---

[93] Customary international law, historically referred to as part of the "law of nations," is the law of the international community that "results from a general and consistent practice of states followed by them from a sense of legal obligation." Restatement (Third) of the Foreign Relations Law of the United States § 102 (2) (1987) [hereinafter Restatement].

[94] *See, e.g.,* International Covenant on Civil and Political Rights, *opened for signature* Dec. 16, 1966, G.A. Res 2200A (XXI), 999 U.N.T.S 171, at 52 (entered into force Mar. 23, 1976) [hereinafter ICCPR; Human Rights Comm'n., *The Equality of Rights Between Men and Women*, 68th Sess., U.N. Doc CCPR/C/21/Rev.1/Add.10, paras. 10,11,14, 16, 21 (2000) (identifying protection from various forms of violence and subordination in the family as implicit under articles 6, 7, 12, 18 and 24 of the ICCPR); Convention on the Elimination of All Forms of Discrimination Against Women, *opened for signature* Dec. 18, 1979, G.A. Res. 34/180, 34 U.N. GAOR, 34th Sess., Supp. No. 46, U.N Doc A/34/46, at 193 (1979) (entered into force Sept. 3, 1981) [hereinafter CEDAW]; Comm. on the Elimination of Violence Against Women, General Recommendation No.19: Violence Against Women (11th Sess. 1992) [hereinafter Gen. Rec. No. 19], paras. 1, 24(b) (recognizing "gender-based violence is a form of discrimination that seriously inhibits women's ability to enjoy rights and freedoms" and recommending that States Parties "ensure that laws against family violence and abuse . . . give adequate protection to women"); Inter-American Convention on the Prevention, Punishment and Eradication of Violence Against Women, *opened for signature* Jun. 9, 1994, 33 ILM 1534 (entered into force Mar. 5, 1995).

[95] *See, e.g.,.* Universal Declaration of Human Rights, G.A. Res. 217A (III), U.N. Doc. A/810, at 71 (Dec. 10, 1948); World Conference on Human Rights, June 14-25, 1993, *Vienna Declaration and Programme of Action*, U.N. Doc. A/CONF.157/24 (Part I), para. 18 (Oct. 13, 1993) [hereinafter *Vienna Declaration*]; Declaration on the Elimination of Violence Against Women, arts. 1, 2, G.A. Res. 48/104, U.N. GAOR, 48th Sess., Supp. No. 49, U.N. Doc A/48/49, at 217 (Dec. 20, 1993); Council of Europe, Comm'n. of Ministers Recommendation Rec(2002)5 to Member States on the Protection of Women Against Violence, 794th mtg. of the Ministers' Deputies, at 3,5 (Apr. 30, 2002).

[96] *See, e.g,. Opuz v. Turkey*, App. No. 33401/02, Eur. Ct. H.R. (2009) (holding that states have an obligation to protect women, in particular, from domestic violence and that domestic violence is a form of gender discrimination that states are required to eliminate and remedy); *M.C. v. Bulgaria*, App. No. 39272/98, Eur. Ct. H.R., paras. 185-87

According to international and regional bodies, gender-based violence is one of the most extreme and pervasive forms of discrimination, severely "impairing and nullifying the exercise of women's rights."[98] The United Nations Committee on the Elimination of Discrimination against Women reported that gender-based violence impairs or nullifies the enjoyment of rights such as: (i) the right to life; (ii) the right not to be subject to torture or to cruel, inhuman or degrading treatment or punishment; (iii) equal protection according to humanitarian norms in times of international or internal armed conflict; (iv) personal liberty and security; (v) equal protection under the law; (vi) equality in the family; (vii) the right to the highest standard attainable of physical and mental health; and (viii) the right to just and favorable conditions of work.[99] The right to be free from gender-based violence is now so well established under international law that it has attained the status of customary international law.[100]

### b. International Law Imposes an Obligation on States to Exercise "Due Diligence" in Policing Domestic Violence and Sexual Assault Cases.

Inherent to the fundamental right to be protected from gender violence is the state's concomitant obligation to undertake reasonable measures to protect women from acts of violence, such as domestic and sexual violence, where there is a real and immediate risk of harm to a particular individual or family.

---

(2004); *Maria da Penha Maia Fernandes v Brazil*, Case No. 12.051, Inter-Am Comm'n H.R., No. 54/01, at 704 (2001).

[97] *See generally* U.N. Secretary General, *Violence Against Women*, U.N. GAOR, 59th Sess., U.N. Doc. A/59/281 (2004).

[98] *See, e.g.* Human Rights Council Res., *Accelerating efforts to eliminate all forms of violence against women: ensuring due diligence in prevention,* 14th Sess., U.N. Doc. A/HRC/RES/14/12 (Jun. 23, 2010); Declaration on the Elimination of Violence against Women, G.A. Res. 48/104, 48th Sess., U.N. Doc. A/RES/48/104 (Feb. 23, 1994); World Conference on Women, Sept. 4-15, 1995, *Beijing Declaration and Platform for Action*, U.N. Doc. A/CONF.177/20 (1995) and A/CONF.177/20/Add.1 (1995) [hereinafter *Beijing Declaration*]; Gen. Rec. No. 19, U.N. Doc. A/47/38, at 1 (1993).

[99] Gen. Rec. No. 19, *supra*, n. 54.

[100] Customary international law, historically referred to as part of the "law of nations," is the law of the international community that "results from a general and consistent practice of states followed by them from a sense of legal obligation." Restatement, *supra* note 93 § 102 (2) (1987).

This "due diligence" obligation requires that states adopt measures aimed at preventing such violence from occurring in the first place, investigating it when it does, and punishing perpetrators—an obligation that applies equally whether the perpetrator is a state or private actor.[101] The due diligence obligation also requires that states provide compensation and redress for victims and survivors of such violence.[102] Under the principle of non-discrimination,[103] states are required to use the same level of commitment in preventing and policing domestic violence cases as they employ with other forms of violence.[104]

Because international law imposes an obligation of due diligence, states may be held responsible for failure to prevent, investigate, and punish acts of gender violence,[105] and for failing to provide compensation for victims.[106] The UN Human Rights Council has recently

---

[101] *See, e.g.,* Elimination of Domestic Violence Against Women, G.A. Res. 58/147, para. 5, U.N. GAOR, 58th Sess., U.N. Doc. A/Res/58/147 (Feb. 19, 2004) ("States have an obligation to exercise due diligence to prevent, investigate and punish the perpetrators of domestic violence against women and to provide protection to the victims."); *Vienna Declaration*, *supra* note (recognizing gender violence as a human rights violation requiring system-wide as well as national reforms designed to eliminate such violence); Gen. Rec. No. 19, *supra*, para. 9; *see also Opuz v. Turkey*.

[102] Generally, international law requires that when a government violates its human rights obligations, it must provide those harmed with an adequate and effective remedy.  *See* Universal Declaration of Human Rights, *supra*, art. 8 ("Everyone has the right to an effective remedy by the competent national tribunals for acts violating . . . fundamental rights . . . ."); ICCPR, *supra* note art. 2(3) (requiring that states provide "an effective remedy" including "judicial remedy" for victims of violations of the ICCPR and that states "ensure that the competent authorities shall enforce such remedies when granted.")  These general principles on the right to a remedy apply equally to remedies for victims of acts of gender-based violence. *See e.g. Beijing Declaration*, *supra*, at Annex I, ch. IV, U.N. Doc. A/CONF.177/20 and A/CONF.177/20/Add.1, paras. 125-30 (1995) (recognizing the right of women to be free from violence by affording "women who are subjected to violence with access to mechanism of justice and . . . to just and effective remedies for the harm they have suffered."); *see also Opuz v. Turkey*.

[103] Special Rapporteur on Violence Against Women, *The Due Diligence Standard as a Tool for the Elimination of Violence Against Women*, ¶ 35, U.N. Doc. E/CN.4/2006/61 (Jan. 20, 2006) (by Yakin Ertürk).

[104] *Id*.

[105] *Gonzales v. United States*, Case 12.626, Inter-Am. Comm'n H.R., Report No. 80/11, paras. 125-128 (2011); *See e.g.* Elimination of Domestic Violence Against Women, *supra*, at para. 5 ("States have an obligation to exercise due diligence to prevent, investigate and punish the perpetrators of domestic violence against women and to provide protection to the victims."); *Vienna Declaration*, *supra*, at para. 18; Gen. Rec. No. 19, *supra*, para. 9; *see also Opuz v. Turkey*.

[106] Generally, international law requires that when a government violates its human rights obligations, it must provide those harmed with an adequate and effective remedy.  *See* Universal Declaration of Human Rights, *supra*, art. 8 ("Everyone has the right to an effective remedy by the competent national tribunals for acts violating . . . fundamental rights . . . ."); ICCPR, art. 2(3) (requiring that states provide "an effective remedy" including "judicial remedy" for victims of violations of the ICCPR and that states "ensure that the competent authorities shall enforce such remedies when granted.")  These general principles on the right to a remedy apply equally to remedies for victims of acts of gender-based violence. *See e.g. Beijing Declaration*, *supra*, at Annex I, ch. IV, paras. 125-30 (recognizing the right of women to be free from violence by affording "women who are subjected to violence with

36

emphasized that the failure of states to exercise due diligence in policing gender violence cases "violates and impairs or nullifies the enjoyment of [the] human rights and fundamental freedoms [of victims of domestic violence and sexual assault]."[107] The due diligence obligation has been recently interpreted to require, at a minimum, "the organization of the entire state structure—including the state's legislative framework, public policies, law enforcement machinery, and judicial system—to adequately and effectively prevent and respond to violence against women."[108]

3.     **The Inter-American Commission on Human Rights has condemned the U.S. Government Accountable for its Failure to Exercise Due Diligence in Policing Domestic Violence Cases.**

International tribunals and bodies have on several occasions held U.S. governments accountable for its failure to respond with due diligence to act of gender based violence.[109] In 2011, in *Jessica Lenahan (Gonzales) v. United States*, the Inter-American Commission on Human Rights ("IACHR") held that the U.S. Government's failure to exercise due diligence to protect  a domestic violence victim and her children violated the fundamental right to life, due

---

access to mechanism of justice and . . . to just and effective remedies for the harm they have suffered."); *see also Opuz v Turkey*

[107] Human Rights Council Res., *Accelerating efforts to eliminate all forms of violence against women: ensuring due diligence in prevention*, *supra*.

[108] *See González et al. ("Cotton Field") v. Mexico*, 2009 Inter-Am. Ct. H.R. (ser. C) No. 205 (Nov. 16, 2009).

[109] The Committee on the Elimination of Racial Discrimination (CERD) in its concluding observations on the US compliance with CERD (2008). Last year, the United Nations Special Rapporteur on Violence Against Women, Rashida Manjoo, issued a report documenting her findings from her mission to the United States. Clearly referring to Castle Rock and its predecessors, Manjoo observed "a lack of legally binding federal provisions providing substantive protection against or prevention of acts of violence against women," which, "combined with inadequate implementation of some laws, policies and programmes, has resulted in the continued prevalence of violence against women and the discriminatory treatment of victims, with a particularly detrimental impact on poor, minority and immigrant women." Special Rapporteur on Violence Against Women, *Report of the Special Rapporteur on Violence Against Women, Its Causes and Consequences - Mission to the U.S.*, U.N. Doc. A/HRC/17/26/Add.5 (June 6, 2011) (by Rashida Manjoo).

process and non-discrimination contained in the American Declaration of Human Rights, a treaty-based source of legal obligation for the United States. [110]

The first case brought by a domestic violence survivor against the United States before an international human rights body, *Gonzales* held the U.S. government responsible for human rights violations resulting from the police's failure to protect victims of domestic violence. Discussing the U.S.'s affirmative duty under international law to prevent gender-based crimes,[111] the IACHR concluded that even though the U.S. recognized the necessity to protect victims of domestic violence in its legislation, the U.S. had failed to meet its duty of due diligence:[112]

> "The state apparatus was not duly organized, coordinated, and ready to protect these victims from domestic violence by adequately and effectively implementing the restraining order at issue; failures to protect which constituted a form of discrimination in violation of Article II of the American Declaration."[113]

The IACHR recommended that the United States implement federal and state legislation that would ensure the mandatory enforcement of protection orders and other precautionary measures.[114]

### 4. PRPD Practices Need Reform to Ensure Compliance with the Fundamental Human Right to be Protected from Gender-Based Violence.

The significant delays in the adjudication of protective orders, dramatic under-enforcement of those protective orders, inadequate training of PRPD officers in policing domestic violence, among other things, strongly suggest that PRPD practices would violate the fundamental human right to be protected from gender-based violence. For the U.S. to meet its

---

[110] *Gonzales v. United States*, Case 12.626, Inter-Am Comm'n H.R., OEA/Ser./L/V/II.128 Doc. 19, n. 150, para. 160 (2007).
[111] *Id.* ¶ 126.
[112] *Id.* ¶ 160.
[113] *Id.* ¶ 160.
[114] *Id.* ¶ 201.

due diligence obligation under international human rights law, the suggested reforms to PRPD practices in the context of domestic violence and sexual assault are needed.

## **<u>CONCLUSION</u>**

For the reasons above, *Amici Curiae* respectfully submit that justice would be better served if the Court ordered the parties to include language in the Consent Decree addressing the concerns identified above in order to better ensure the reform of the PRPD.

Dated:    **April 1, 2013**


    /s/   Nora Vargas-Acosta
**Nora Vargas-Acosta**
USDC-PR#201206
First Federal, Suite 1004
1056 Ave. Muñoz Rivera
San Juan, Puerto Rico  00927
Telephone: 787-7517485
nvargasacosta@onelinkpr.net


    */s/   Josué González-Ortiz*
**Josué González-Ortiz, USDC-PR No. 221808**
**Eva Prados Rodríguez***
American Civil Liberties Union Puerto Rico
Union Plaza, Suite 1105
416 Avenida Ponce de Léon
San Juan, Puerto Rico 00918
Telephone: (787) 753-8493
E-mail:  jgonzalez-ortiz@aclu.org


**Sandra S. Park***
**Lenora M. Lapidus***
American Civil Liberties Union
Women's Rights Project
125 Broad St. 18th Fl.
New York, NY 10004
Telephone: (212) 519-7871
E-mail:  spark@aclu.org


**Esther Vicente**
Law Professor
Apartado 70351
San Juan, Puerto Rico 00936-8351
Telephone: 787-751-1912 (2106)
E-mail: evicente@juris.inter.edu


*not admitted in this district

*Attorneys for Amici Curiae*[115]

---

[115] *Amici* gratefully acknowledge Wendy Liu, J.D. Candidate, New York University School of Law, for her

Appendix I. – List of Amici Curiae

**American Civil Liberties Union**

The American Civil Liberties Union ("ACLU") is a nationwide, nonprofit, nonpartisan organization with more than 500,000 members dedicated to the principles of liberty and equality embodied in the Constitution and this nation's civil-rights laws. The American Civil Liberties Union of Puerto Rico was founded in 2001, and is the ACLU's affiliate in Puerto Rico. Since its founding in 1920, the ACLU and its affiliates have been involved in numerous cases around the country challenging the use of excessive force by law enforcement officers. Since 2004, the ACLU of Puerto Rico has documented and litigated numerous cases of police abuse in Puerto Rico, including excessive use of force, discriminatory policing, and unlawful arrests, and has been documenting PRPD suppression of First Amendment rights since 2009. Between March and September 2011, the ACLU conducted fact-finding research in Puerto Rico to further document allegations of police brutality and other police abuse over a five-year period from 2007 to 2011. The ACLU and the ACLU of Puerto Rico have continued monitoring incidents, policies, and practices to date.

**Coordinadora Paz para la Mujer, Inc**

Coordinadora Paz para la Mujer, Inc. is the Puerto Rico Coalition Against Domestic Violence and Sexual Assault. Founded in 1989, and incorporated in 1997, it is a 37-member organization of shelters, non residential programs, service providers, legal advocates, researchers, feminists and human rights activists dealing with issues of violence against women, especially with intimate partner violence and sexual assault. In the main island of Puerto Rico and the municipal islands of Vieques and Culebra, CPM provides community education, technical assistance, and support to intimate partner violence survivors, victim services programs and other related organizations serving battered women and their children's, as well as sexual assault survivors.

**Proyecto de Ayuda a Sobrevivientes de Violencia Sexual y Doméstica Orientado a la Salud (PASOS) de las Mujeres**

PASOS de las Mujeres is a comprehensive transdisciplinary clinical forensic service, from a public health and justice perspective, for victims and survivors of sexual and domestic violence. It has provided services to over 800 victim survivors and their support system, with a satisfaction service rate of over 95% and has over a 40% conviction rate among interventions provided. PASOS is co-sponsored by the University of Puerto Rico Medical Sciences Campus, Puerto Rico Institute of Forensic Sciences, Women's Advocate Office of Puerto Rico.

**Professor María Dolores Fernós, Inter American University of Puerto Rico, School of Law**

María Dolores Fernós is an Associate Professor of law at Inter American University of Puerto Rico School of Law, where she teaches Constitutional and Administrative Law, and specialized seminars on vulnerable populations. Professor Fernós was the first person to be named Women's Advocate for the Government of Puerto Rico when this national mechanism for women was

substantial contributions to this brief.

created in 2001 and served until 2007. Professor Fernós directly participated in the lobbying efforts for the adoption of Puerto Rico's domestic violence statute in 1989, Law for the Prevention and Eradication of Domestic Violence (Act 54), defended in court an attack to Law 54's constitutionality, and has been a constant presence in the continued struggle to establish and defend public policies regarding adequate regulations, protocols, and processes to safeguard the rights of victims of gender violence. Fernós has authored scholarly articles on sexual and reproductive rights, particularly on the reproductive rights of adolescents and comparative analysis on good practices to combat domestic violence. She has been an advisor to the United Nation's Economic Commission for Latin America and the Caribbean (ECLAC) and is the author of a comparative analysis on the various state mechanisms in the Latin American and Caribbean region.

## Professor Esther Vicente, Inter American University of Puerto Rico, School of Law

Esther Vicente is a Professor of Law at the Inter American University of Puerto Rico, School of Law, where she teaches International Protection of Human Rights, Feminist Jurisprudence, Family Law, Property Law and Administrative Law. She has been a full time member of the Inter American University Law Faculty since 1999. During the spring semester of academic year 2008, she was Visiting Researcher and Fellow at the Orville H. Schell, Jr. Center for International Human Rights, Yale Law School in New Haven, Connecticut. Professor Vicente obtained a Ph. D. in Law from the University of London, U.K. in 2002 and in 1991 was granted an LLM by the London School of Economics and Political Science. Through her work with governmental and nongovernmental organizations Professor Vicente has been closely involved in the development and defense of women's rights using litigation, the promotion of legislation and legal education, both in Puerto Rico and internationally. She has collaborated as consultant with governmental agencies such as the Office of the Women's Advocate of the Government of Puerto Rico. Professor Vicente participates in national, regional and international non-governmental organization and is also a member of RED ALAS-Latin American Women Law Professors Network and of SELA-Latin American Seminar of Constitutional and Political Theory.

## Professor Jodie G. Roure, John Jay College of Criminal Justice, CUNY, New York

Jodie G. Roure is Associate Professor in the Latin American and Latina/o Studies Department at John Jay College of Criminal Justice, CUNY. She has conducted extensive research in the area of human rights including violence against women and domestic violence in Brasil, Puerto Rico, Dominican Republic, Cuba, and the United States. She has also presented on this topic before the United Nations, is an expert witness and government consultant in this area, and also conducts research on pipeline education, race, class ethnicity and gender in the United States.  She teaches in the areas of domestic violence/gender rights, criminal justice, international human rights, international criminal justice, race, class and ethnicity in the United States, and Latina/o studies. Her doctoral dissertation is entitled International Human Rights Law as a Resource in Combating Domestic Violence: Transcending Legal, Social and Cultural Obstacles in Brasil and the United States. Her publications include: Gender Justice in Puerto Rico: Domestic Violence, Legal Reform and International Human Rights. Human Rights Quarterly Law Journal, August 2011; Roure, J. Domestic Violence in Brazil: Examining Obstacles and Approaches to Promote

Legislative Reform. Columbia Human Rights Law Review (Fall 2009).; Roure, J.G. Domestic Violence in Latin America: Implementing International Human Rights Law and Principles. (University of Pennsylvania Press Human Rights Series under advanced book contract).

## Movimiento Amplio de Mujeres de Puerto Rico (MAMPR)

Movimiento Amplio de Mujeres de Puerto Rico (MAMPR) is a network of grassroots feminist organizations, NGOs and feminist advocates with the primary mission to promote a gender perspective and human rights approach across national issues with the purpose of advancing women's rights and welfare. MAMPR works in solidarity and collaboration with other social justice movements that oppose oppression and promote human rights. MAMPR support the reform of policing of domestic and sexual violence and its effective implementation.

## The Latin American And The Caribbean Committee For The Defense Of Women's Rights (Cladem)

CLADEM, the Latin America and Caribbean Committee for the Defense of Women's Rights, is a regional organization that includes persons and groups in Latin America and the Caribbean for the promotion and defense of interdependent and integral women's human rights. With consultative status at the United Nations and its equivalent at the Organization of American States, CLADEM's network is represented in 17 countries of the region and developsdifferent strategies and activities for strengthening women's rights, such as international monitoring and litigation, legislative proposals, research, training, educational publication, information dissemination, communication and solidarity actions.

## Feministas en Marcha

Feministas en Marcha is a feminist organization in Puerto Rico, which proposes a feminist political praxis that inserts gender into the social agenda and public policies. The organization produces and disseminates information about women's human rights and intersectional analyses of all forms of discrimination. It participates in national and international networks of feminist activists.

## Organización Puertorriqueña de la Mujer Trabajadora (OPMT)

Organización Puertorriqueña de la Mujer Trabajadora (OPMT) is a feminist, non-partisan, grassroots organization that advocates for the protection of women's rights in Puerto Rico since 1982. OPMT works in pursuit of gender equality, in particular, with issues regarding gender violence, including domestic violence and sexual assault. Their advocacy strategies include education and community outreach on the subject. It is member of the Puerto Rico Coalition Against Domestic Violence and Sexual Assault, MAMPR and CLADEM.

## Taller Salud

Taller Salud is a feminist community based organization that for more than 33 years has been working on comprehensive health and human rights for low income women, girls and youth in Puerto Rico. Our main objective is to promote empowerment in this population so they can claim

and exercise their human rights and citizenship. We support strong reforms of the Puerto Rico Police on their basic training and operations.  Such reforms are needed to end the violation of citizens' human rights, ensure comprehensive response, and also, not to lose the humanity within the officers themselves.