1            IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF PUERTO RICO
2

3    :_____:

4    UNITED STATES OF AMERICA,          :

5                     Plaintiff,         :

6            vs.                         :   NO: 12-CV-2039 GAG

7    COMMONWEALTH OF PUERTO RICO,        :
     PUERTO RICO POLICE DEPARTMENT,
8                                        :

9                     Defendants.        :
     :_____:
10
               TRANSCRIPT OF SETTLEMENT/STATUS CONFERENCE
11          HELD BEFORE THE HONORABLE GUSTAVO A. GELPÍ
       JOSÉ V. TOLEDO U.S. COURTHOUSE, OLD SAN JUAN, PUERTO RICO
12          THURSDAY, APRIL 11, 2013, BEGINNING AT 2:30 P.M.
     :_____:
13

14   A P P E A R A N C E S:

15          US DEPARTMENT OF JUSTICE
            Civil Rights Division, Special Litigation Section
16          300 N. Los Angeles Street
            Federal Building, Suite 7516
17          Los Angeles, California 90012
            BY LUIS E. SAUCEDO, ESQUIRE
18          For the Plaintiffs

19
            LAW OFFICE OF CARLOS DEL-VALLE-CRUZ
20          P.O. Box 90022473
            San Juan Puerto Rico 00902-24743
21          For Defendant Commonwealth of Puerto Rico and
            Puerto Rico Police Department
22
            LAW OFFICE OF GREGORIO IGARTÚA-DE-LA-ROSA
23          Box 3911
            Aguadilla, Puerto Rico 00605
24          Amicus

25

```
 1    A P P E A R A N C E S   C O N T I N U E D:

 2

 3         AMERICAN CIVIL LIBERTIES UNION OF PR
           Union Plaza, Suite 205
 4         416 Ponce de Leon Ave.
           San Juan, Puerto Rico 00918
 5         Josue González-Ortíz, Esquire

 6         Jorge Díaz-Castro, Esquire
           Cesar González 400, Suite 189
 7         San Juan, Puerto Rico 00918
           Amicus
 8

 9

10    ALSO PRESENT:

11         Sulma López-Defilló, Courtroom Deputy Clerk

12         Eva Prado, ACLU

13

14

15

16                         ---

17

18

19

20

21

22

23

24

25
```

```
 1              THE BAILIFF:  All rise.

 2              (The Court enters the room.)

 3              THE COURT:  Please be seated.

 4              Okay, good afternoon.  Let's call the case,

 5       the matter.

 6              THE COURTROOM DEPUTY:  12-2039.  United

 7       States of America versus the Commonwealth of Puerto

 8       Rico, and the Puerto Rico Police Department.  Case

 9       called for status conference.

10              Appearing on behalf of government, Attorney

11       Luis Saucedo.

12              Appearing on behalf of the Commonwealth of

13       Puerto Rico and the Puerto Rico Police Department,

14       Carlos Del-Valle-Cruz and Attorney Gilberto Marxuach;

15       amicus curiae, Attorney Gregorio Igartúa.

16              And on behalf of amicus curiae, ACLU, Josue

17       González.

18              THE COURT:  Okay.  Good afternoon, Counsel,

19       everybody present, Amicus.

20              What we are going to do is the status

21       conference is a status/settlement conference.  And

22       because the case is in negotiations obviously that is

23       going to be done in chambers.  So what we will have

24       first for the next half hour or so are the -- I'm

25       going to allow amicus curiae ACLU and Gregorio
```

1    Igartúa De-La Rosa to argue briefly under amicus

2    briefs, which have been presented.

3           Now, the first matter I want to note is,

4    first of all, I do want to thank greatly both of ACLU

5    and Mr. Igartúa -- or Attorney Igartúa-De-La-Rosa for

6    filing these amicus briefs.  And as a matter of fact,

7    they were filed in a very timely manner in compliance

8    with the Court's requirements.  Some other attempts

9    at amicus briefings were rejected by the Court; they

10   obviously did not comply.  And obviously from what I

11   saw was going to be filed, they were not really

12   amicus briefs.  So, I do want to thank both amicus.

13          The other thing that's very important and I

14   want to clarify, I'm allowing you to appear as amicus

15   and make these arguments.  At this time, before I

16   accept or reject -- the probability is that I will be

17   accepting the proposed consent decree, subject to any

18   modifications that we may have, because what we have

19   is a draft for a proposed consent decree.  But you're

20   allowed to argue as amicus or amici, for purposes of

21   the Court accepting or rejecting the consent decree.

22          Once that is accepted, judgment will be

23   entered, the Court retains jurisdiction; but the only

24   parties would be the United States Government and the

25   Government of Puerto Rico, because that consent

1    decree obviously does not create rights as to third

2    parties or any other individuals.  And that is why I

3    understood it's important to allow you at this point;

4    but once the judgment is entered, obviously the only

5    appearing counsel in the case, unless something

6    extraordinary happens at some future point, would be

7    the United States Department of Justice and the

8    Commonwealth of Puerto Rico and its police

9    department.

10            So, having said that, the order we're going

11   to take is, the ACLU has 20 minutes to argue any

12   matters that it may deem important.  I will be asking

13   some questions, interrupting a bit, but you have

14   20 minutes -- use it as you can.  I know the ACLU has

15   filed two amicus briefs:  One is filed on behalf of

16   ACLU itself and the other is filed on behalf of

17   several groups of women's interests groups as

18   *Movimiento Amplio De Mujeres de Puerto Rico,*

19   *Coordinadora Paz para la Mujer,* Latin American and

20   Caribbean Committee for the Defense of Women's

21   Rights -- that acronym is CLADEM -- *Pasos De Las*

22   *Mujeres Feministas en Marcha, OPMT,* and Taller Salud

23   are some of these feminist or women's groups.

24            So, I would ask counsel for the ACLU please

25   go ahead.

1    MR. GONZÁLEZ-ORTÍZ:  Yes, Your Honor.

2    THE COURT:  And obviously the ACLU, it need

3 not make any introduction.  We all know about the

4 ACLU, the importance of the ACLU in national

5 litigation and federal issues, judicial issues,

6 throughout the nation.  I think it's

7 self-introductory what the ACLU does.

8    So thank you, Counsel.

9    MR. GONZÁLEZ-ORTÍZ:  Thank you, Your Honor.

10 Just to mention for the record, Attorney Josue

11 González-Ortíz representing the ACLU, who appears as

12 amicus in this case.  Just to mention that also for

13 the ACLU present is the director, Attorney William

14 Ramírez-Hernández, and also another attorney that has

15 been providing assistance for the ACLU, Eva Prado.

16    Well, Your Honor, thank you for allowing --

17 first of all, thank you for allowing the ACLU to

18 appear and to -- and for this opportunity to express

19 its position and its concern regarding this

20 important -- this important matter.

21    As thoroughly discussed in our briefs and

22 the investigative report that we published last

23 summer the ACLU Puerto Rico has been working on the

24 issue of police brutality and police misconduct for

25 many years and from many fronts.  Over the years the

1    ACLU, among other things, has conducted profound

2    investigations on individual police abuses.

3    Documented dozens of incidents of police unlawful

4    practices, conducted litigation representing

5    individual, organized educational and outreach

6    activities with the community, and presented the

7    issue -- and even presented the issue before

8    international forums as an issue of human rights

9    violations.

10          As a result of those efforts, we came to the

11   conclusion that the nature of the problem goes way

12   beyond individual and insulated cases and incidents

13   of police misconduct, and it has been tried to be

14   halted by all governmental administrations in the

15   past years.

16          The same measure of police misconduct could

17   be traced in all municipalities and radios along and

18   across the island.  Just from Humacao, Carolina, San

19   Juan, Aguadilla, Ponce -- you name it.  The nature of

20   the problem within the police department certainly is

21   systemic.  It has been developing for years, and it

22   has been ignored and neglected by all governmental

23   administrations, Your Honor.

24          Hence, we agree with the Department of

25   Justice of the United States that within the police

1   department prevails a practice of misconduct in

2   violation of the constitution, specifically the First

3   Amendment, the Fourth Amendment, and the Fourteenth

4   Amendment; and also this conduct, certainly

5   constitutes violation of human rights.  In that sense

6   we believe that this case represents an historical

7   opportunity to effectively address the culture of

8   violence that prevails within the police department.

9           We believe that the consent decree, as it is

10  proposed, includes the essential commissions

11  ordinarily needed to reform the police department and

12  to carry out the comprehensive reform and hence fully

13  supports -- hence ACLU fully supports the entry of

14  the consent decree, subjected to the following

15  observations.

16          THE COURT:  And let me note something before

17  I listen to your observations.  This consent decree,

18  and I've read it very carefully, but the way it's

19  presented, it's presented in a very broad language

20  and it encompasses a lot.  There may not be some

21  details, particular details, but that I understand is

22  done on purpose because what -- a problem we may have

23  today may be resolved this way today but three years

24  from now there's another way to resolve it, other

25  issues can come up.

1          And that is something that obviously your

2     input is very valuable in that respect, but the fact

3     that the consent decree may not have more

4     specifically tailored language to a specific problem

5     does not mean that it cannot address those problems.

6     So, that's why again I understood it's important to

7     hear from you -- and, again, your input may be

8     subject to some modifications.

9          The same way, I'm going to keep jurisdiction

10    whenever and if ever I approve, which seems to be

11    what is going to happen, the consent decree; but that

12    doesn't mean -- at any point should matters change or

13    circumstances change that it could be modified,

14    because that's the beauty about keeping jurisdiction

15    about that.

16          So, let me hear your recommendations then.

17    And I understand what you're arguing right now is not

18    on behalf of the women's groups, it's the ACLU as

19    itself.

20          MR. GONZÁLEZ-ORTÍZ:  Well, at large and also

21    I would like to point out some of the points that

22    were brought out by the brief that was filed by the

23    women's rights organizations.

24          But our observations basically are three:

25    The first one is that the proposed decree lacks

1   provision for independent civilian oversight of the

2   PRPD such as the one that we have been proposing for

3   years, such as the civilian review board.  Such

4   civilian oversight is essential to hold the PRPD

5   accountable for abuses and provides an independent

6   forum for community involvement and review of PRPD

7   policies and practices.

8           So what we are talking about here is about

9   accountability from an independent body represented

10  by individuals in society, independent from the

11  government and independent from the police

12  department.

13          We recommend that the final consent decree

14  include the provisions creating an independent

15  civilian oversight mechanism.

16          Number two --

17          THE COURT:  Okay, let me first just address

18  number one and we'll go one by one.

19          MR. GONZÁLEZ-ORTÍZ:  Okay.

20          THE COURT:  The consent decree, and as I

21  read it and everybody can read it, it creates the

22  figure of the technical compliance advisory, the TCA.

23  The role of the TCA is detailed in the consent decree

24  but there is no impediment, as I read the consent

25  decree, that that TCA will meet with community

1    groups, with the ACLU, with whatever representative

2    the ACLU may have.

3            Also, any time anything is adopted or

4    there's orders in this case eventually those do

5    become public, and there's -- you know, obviously

6    this case, this is not a case that's going to be

7    sealed and nobody is going to find out what's going

8    on; it's a very public case.  So ACLU is going to be

9    knowing what is going on.

10           And there's no impediment, the way I read

11   it, that members from the ACLU or any other community

12   group who meets periodically with the TCA, technical

13   compliance advisor, and any time -- and again, I

14   understand will be valued, will be considered along

15   with the input of anybody else because the advisor

16   and whatever group of staff he has, they need to go

17   out in the community also -- that's not only meeting

18   with the police and the government, they're going to

19   be out there getting input from the community.

20           So, I understand that in respect -- and,

21   again, I understand what you suggest.  I understand

22   again that the consent decree does not preclude that

23   in any way, and it's a matter of, you know, obviously

24   getting this implemented.

25           So point number two.

1           MR. GONZÁLEZ-ORTÍZ:  Well, Your Honor, as to

2     that point, the only thing that I would -- as I

3     understand it, the civilian review board, as we are

4     proposing it, is mostly a mechanism of accountability

5     to take a civilians' complaints from the community as

6     a way to take complaints from the community which is

7     one of the problems that we have been able to

8     identify throughout all these years of

9     investigations.  And it is -- what we try to

10    establish is as a permanent institution that is going

11    to be -- that is going to be directed to deal with

12    the problem of civilians complaints with regard to

13    the police misconduct, et cetera.

14          THE COURT:  And what you're suggesting is --

15    because obviously what I take it is that not that you

16    necessarily -- obviously you're taking about

17    long-term after the TCA is gone, after the consent

18    decree is complied with, after the police reform

19    takes place, you want to have a longstanding figure

20    out there or a body or something to that effect.

21          MR. GONZÁLEZ-ORTÍZ:  Exactly.

22          THE COURT:  Let me say this:  And, again,

23    I'm not saying one thing or another.  Obviously the

24    parties are the ones what are ultimately going to

25    decide and propose to the Court.  But let me ask you,

1    isn't that something also at some point during or,

2    you know, even after the reform?  And I don't it

3    would be inconsistent.  The legislative assembly

4    could create such a group by law or, you know, the

5    governor could by executive order also create some

6    group.  Those would also be alternatives; right?

7           MR. GONZÁLEZ-ORTÍZ:  Well, as a matter of

8    fact, there are a few proposals to that effect right

9    now, but I think that it could be already discussed

10   in the process of negotiation during this consent

11   decree.  And that is something that for our point of

12   view deserves discussions from the parties in the

13   process of --

14          THE COURT:  Obviously I asked them to take

15   note.  I'm sure they've read your brief.

16          Please continue.

17          MR. GONZÁLEZ-ORTÍZ:  Yes.  As to the second

18   point, although the proposed agreement addresses

19   crowd control, it fails to include a provision that

20   addressing the training of police officers on the new

21   crowd control policies -- interaction with

22   protesters, the handling of public demonstration, and

23   constitutional rights to speech and assembly.

24          In addition, the proposed consent decree

25   does not require the PRPD to devise policies that

1    address when it is appropriate for the commander on

2    scene to approve crowd dispersal techniques or what

3    technique should be allowed under what circumstances.

4    These provisions are necessary in order to prevent

5    the use of excessive force against protestors and to

6    ensure the PRPD officers respect Puerto Ricans' First

7    Amendment rights to freedom of speech and expression

8    in the future.

9              And our third --

10             THE COURT:  And before we go into the third,

11   let me ask you, from your reading of the proposed

12   consent decree I understand what you would like us to

13   have is a specific provision there regarding this; am

14   I correct?

15             MR. GONZÁLEZ-ORTÍZ:  Yeah.

16             THE COURT:  Okay, but there is -- let me

17   also say, there is nothing in the consent decree that

18   precludes -- and I understand when all this training

19   and all this reform goes, this is going to be part --

20   this would be my understanding, that this would

21   obviously go hand in hand because if you read the DOJ

22   report, obviously crowd control and a lot of these

23   issues that have taken place we can all -- we've all

24   read from the press and the news that have happened.

25             And I know the incidents are well-cited,

1    some of these incidents, but I understand that --

2    obviously that is something that I will have the

3    parties discuss that.  But obviously the -- at least

4    from my reading of the proposes consent decree, that

5    would be covered by everything.

6              That's obviously -- and, again, that's a

7    point that is very well taken, at least from

8    perspective, but there may be many other points that

9    could also go in.  And I think they're all

10   encompassing, and that is why the consent decree

11   language is so broad because if it starts saying

12   train the police officers or X, Y, Z, and it doesn't

13   have A, B, C, as attorneys then is going to say,

14   Well, that wasn't included, that's not part of the

15   consent decree.  And I understand that is why the

16   consent decree is so broad, because the more

17   technical and nitty-gritty the parties get, then the

18   less space for, you know, implementing different

19   options.  But I take notice of that.

20             And obviously -- and let me say from the

21   Court's perspective, and I've had some these cases

22   not the later ones that we had some pretty bad riots

23   here on the island, but obviously the training

24   obviously I agree with you.  It's very essential when

25   to use it or not, and there's times when, you know,

1    it has to be used because sometimes these protestors

2    are here, it gets too wild and they all start

3    claiming First Amendment, First Amendment, but at the

4    same time we've had other incidents where policemen

5    are attacked -- and, again, it's a two-way street,

6    and I recognize it.

7           So go to your third point.  Thank you.

8           MR. GONZÁLEZ-ORTÍZ:  Well, Your Honor, as to

9    the third point regarding the police response to

10   gender violence, which is an important element of our

11   discussions --

12          THE COURT:  And let me note something about

13   that because in your brief I brief a made a note

14   about the gender situation.  Normally when you say

15   gender violence -- and I know women's advocates

16   groups are advocating a lot for this.  Most of the

17   time, the way we see it, it's the woman who is the

18   victim, but we've had cases where the women is

19   actually the aggressor.  We've had women who are

20   police officers who have shot their significant

21   others.  And so I've seen it both ways.

22          So, obviously it is mostly a gender issue,

23   but the issue, I think, goes to some extent beyond

24   gender sometimes.

25          MR. GONZÁLEZ-ORTÍZ:  Yes.  We recognize

1    that.  But from our point of view, what has been

2    prevailing as a social problem is the women as

3    victims.

4             THE COURT:  No, the women are victims, yes.

5             MR. GONZÁLEZ-ORTÍZ:  And I believe that --

6    and part, you know, what you just said, it is --

7             THE COURT:  But you cannot leave the men

8    victims behind because there are a few.  And

9    obviously -- and I've also had case which -- I belive

10   it was a case I've settled, but it wasn't a domestic

11   violence dispute but it was a policewoman -- and

12   actually this is probably five, six years ago but the

13   policewoman did not receive Law 9 benefits from the

14   Puerto Rico Justice Department.  The Justice

15   Department had actually determined that she was

16   actually the aggressor, she had just gone to get a

17   gun and shot I don't know who, there was a dispute in

18   her neighborhood.

19            So, it has happened both ways.  Obviously a

20   big percentage of police force are men, so obviously

21   you're going to see that.  But obviously I take all

22   your recommendations, and it's a two-way street.

23   And, again, it could be a same-sex couple that is --

24   you know, we've had victims like that as well -- and,

25   again, sometimes I have the perspective which you

1    don't and sometimes --

2         MR. GONZÁLEZ-ORTÍZ:  Well, Your Honor, just

3    to let you know that our approach in the amicus brief

4    filed by the bit women's advocate organizations, it

5    is not only about the police officers involved in

6    incidents of domestic violence --

7         THE COURT:  I'm aware of that.  And that's

8    also -- I understand that that's an issue.

9         MR. GONZÁLEZ-ORTÍZ:  I have here -- sorry,

10   Sir.

11        THE COURT:  No, no.  That's okay.

12        MR. GONZÁLEZ-ORTÍZ:  Yes.  I have here

13   Attorney Eva Prado who would like to add about that.

14        THE COURT:  Whenever you're done, I'll

15   listen to Ms. Prado.  And if you extend your

16   20 minutes, I will listen to Ms. Prado.

17        MR. GONZÁLEZ-ORTÍZ:  Well, in any case, Your

18   Honor, with regard to our position about how the

19   police officers or how the police department responds

20   to gender issues -- and as explained in detail in our

21   brief filed by the ACLU, the consent decree certainly

22   contains critical provisions that reform policy of

23   domestic and sexual violence.  The ACLU and the

24   amicus support of these provisions, and our brief

25   offers guidance on how to implement these reforms

1    effectively.

2           Our brief offers detailed guidance on

3    implementation reform of PRPD's investigation and

4    policy on sexual and domestic violence.  Including

5    the classification of crimes and investigation of

6    reports of sexual assault and domestic violence

7    cases.  PRPD collaboration with community

8    stakeholders, revision of policies and implementation

9    of those policies through effective training and

10   monitoring, the promotion of a victim's center

11   approach to policy and domestic and sexual violence.

12          Our brief also offers guidance on the

13   provision of ongoing training on gender violence

14   brief policy.  The creation and implementation of

15   oversight mechanism, the use of interagency

16   coordinated response to domestic and sexual assault

17   cases and data collection and public reporting.

18          What we are talking about here, Your Honor,

19   is about due diligence in the intake of those cases

20   of domestic violence or sexual assault, in the

21   investigation of those incidents of domestic violence

22   in which usually women are the victims and in the

23   prosecution of those cases.

24          In fact, Your Honor, right now at this very

25   moment the Inter-American Court of Human Rights has

1    already found that the government of the United

2    States has failed to -- has violated human rights

3    because of its failure to prosecute protection

4    orders -- something that happens here in Puerto Rico

5    every day about -- according to the information that

6    we have had access to.

7           So, I believe that this is an important

8    matter that it is needed to be considered during the

9    discussions of the final consent decree.  And

10   obviously it's something that it should be included

11   in any -- in any plan for implementation of this

12   consent decree.

13          So, that's our position with regard to --

14          THE COURT:  Yes.  Before I hear from

15   co-counsel, let me just mention this as to this

16   problem.  And again, I'm very glad you raised and I'm

17   very glad you raise it this stage before the actual

18   consent decree is approved.  And again, the consent

19   decree will have very broad language but obviously

20   this is a point where, if the language is not in the

21   agreement in the implementation or when the technical

22   compliance advisor is appointed, these are issues

23   that will certainly have to be looked upon by

24   everything.

25          Let me just make another comment and then

```
1    I'll hear from co-counsel.  Obviously what you're
2    addressing is a very serious problem.  And obviously
3    it involves the Puerto Rico Police Department to one
4    extent.  But that's not the only participant in
5    resolving all of this.  And I see from your brief,
6    and obviously I know that from my experience, that's
7    not the only component in solving this problem.  We
8    have the PRPD to -- and obviously I have to address
9    this to the PRPD.
10           The Puerto Rico Justice Department also
11   plays a very important role.  When I worked there
12   from '97 to 2000, that's when they started having the
13   specialized units in domestic violence.  And that was
14   a big change at the time.  It was very, very
15   important that there be prosecutors who were very
16   sensitive to victims.  They were trained in the --
17   you know, this is -- in the past, the mentality was a
18   women would be abused and the prosecutor, or
19   sometimes the judge, would say, Well, you deserve it
20   or go home, you know, for whatever reasons.  And that
21   was wrong.
22           And the policy, you know, at least for the
23   last almost 15 years, the DOJ, the Puerto Rico DOJ,
24   has had -- these cases get prosecuted.  Once there's
25   probably cause, they get charged.
```

1          And I remember when I was solicitor general

2     of Puerto Rico we had two important cases involving

3     women's domestic violence issues.  And one was that

4     lack of interest would not cause a case to be

5     dismissed.  And that was a very important case.  I

6     believe it was *The People of Puerto Rico versus*

7     *Osvaldo Ríos*.  And that was a landmark case.  So, the

8     DOJ I know has always been very big into resolving

9     this problem.  The prosecutors are well-trained; of

10    course, they can always be trained -- you know,

11    there's never a limit to how well you can get

12    trained.  But it's not only the PRPD and the DOJ,

13    it's also the Court system in Puerto Rico.

14          And those are -- this is part of a bigger

15    component, when we look at the three.  Obviously I do

16    realize your point, and the police always have to do

17    their part of their role.  The DOJ has to do its part

18    of the role, and the Courts also have to do the part

19    of their role.  And obviously this case is not a

20    reform for the Puerto Rico court system or the

21    domestic violence courts, how they handle it in

22    Puerto Rico, nor is it of the DOJ.

23          I think the DOJ is very advanced, you know,

24    compared to some other jurisdictions; it had its own

25    internal reform.  But I want to note that, because

1    obviously you may have the best trained policeman out

2    there, but without the good prosecutors and without

3    the judges who are sensitive to these issues, and

4    many, many are -- and I think, you know, lack of

5    interest or go-home-to-your-husband mentality, that

6    has changed over the last 15 years.  And it's been a

7    matter of educating all the parties.  But obviously

8    at least for the PRPD your points are well-taken.

9              So I'll hear then from co-counsel.

10             MS. PRADO:  Thank you, Your Honor.  For the

11   record Eva Prado from the ACLU.

12             Yeah, Your Honor, I agree with you that we

13   have made some advances in fighting with domestic

14   violence situations here in Puerto Rico.  We have a

15   special unit.  We have not in the PRPD but also in

16   the Department of Justice.  But what's the problem

17   that we have?  Is that sometimes we have the special

18   units that most of them are well-prepared.  The first

19   instance of response of the police department is not

20   the special units; sometimes it's the person that is

21   working on the 9-1-1 line, it's the person -- it's

22   the first police that is --

23             THE COURT:  Sorry to interrupt.  You're

24   talking about the people that control what -- because

25   eventually without these people -- you know, if the

1   Puerto Rico Justice Department doesn't hear from it,

2   it's over, and they never intervene.  You're talking

3   about, again, the 9-1-1 --

4          MS. PRADO:  Yeah, the first stance.

5          THE COURT:  The police person who takes the

6   complaint or the policeman out on the street who's

7   driving around and sees a fight between husband and

8   wife, sees the guy with the machete and doesn't

9   report.  That's the one you're talking about; right?

10          MS. PRADO:  Yes.  That's one of the

11   classification of crimes.  What we have is that

12   sometimes the police department do not responds

13   adequately because they do not report an incident as

14   domestic violence crime.  And if you do not classify

15   an incident as a domestic violence crime, you will

16   not start all the process.  Even you will not call to

17   the special unit and you will have some victim

18   without neither response.

19          For that is that we think, and I agree with

20   you, that the domestic violence problem is not just

21   about gender, we have men that are victims of

22   domestic violence; but the problem, as you already

23   said, is that we have a big problem with domestic

24   violence and sexual violence against woman.

25          But also what we propose in the amicus is

1    that ongoing training on gender bias free policy, it

2    do not only impact the response for women -- for

3    violence against women; that also will be -- have a

4    good impact in every case of domestic violence

5    response.  That has been proved.

6             This is not only regarding violence against

7    women, even though it's a really big problem; it's

8    about how the police department responds to every

9    case of domestic violence.  How the police department

10   responds has to be reevaluated.  They have to be

11   well-trained, they need to collaborate in this

12   process with community organization.  They have the

13   specialty, they understand what the victim is going

14   through.

15            For that, we really for -- our

16   recommendation is very important that even if the

17   police department reviews the protocols, do not do

18   that alone.  They need to be involved -- they need to

19   include the women's rights organization and the

20   centers that are giving to the victims -- the service

21   to victims.  They need to collaborate with them,

22   because they are those that knows what is the needs

23   for the victims and what are the failings of the

24   police department.

25            And on the end, one of the big situations

1    that women's rights organization brought to us is

2    that -- the oversight process.  It's very important

3    that we have a specific system to monitoring the

4    domestic violence and sexual violence cases.  We have

5    a really big problem that we don't have any

6    oversight, any monitoring process oversight

7    mechanism, to ensure that they are doing this case in

8    the better way with taking into account the bad

9    practices not in Puerto Rico but in United States but

10    in the world.

11          So just as my fellow said, United States

12    have to comply with our international human rights

13    standards, and it's that we need to reenforce, we

14    need to improve the way that we respond to domestic

15    violence and sexual violence cases.  Due diligence is

16    the general point, but it's the best way that we have

17    to respond.  With due diligence, with sensitive, and

18    with the needed training and procedures to adequately

19    take these cases to the court.

20          THE COURT:  Okay.  Thank you very much.

21          Anything else, Counsel?

22          MR. GONZÁLEZ-ORTÍZ:  Yes.  Just a few final

23    notes.  As it is reported and discussed in both of

24    our amicus briefs, in view of the systemic nature of

25    the part and practice that unlawful police conduct

1    within the police force, and since this problem

2    encompasses all level of administration within the

3    PRPD, we believe that this Honorable Court should

4    have direct and constant supervision during the

5    implementation process of the proposed consent

6    decree.

7            First, as I already stated, before the

8    filing of the U.S. DOJ complaint, several police

9    chiefs in the past have refused to adopt effective

10   measures to deal with the problem, even though they

11   were well aware of the situation that has been

12   developing over many years.

13           One of our past chief of police, talking

14   about the domestic violence problem in the police

15   department, he publicly stated that domestic

16   violence -- this is just an example -- that domestic

17   violence is not a police problem.  You know, we need

18   a profound change of mind and a true commitment from

19   the government officials that these problems exist.

20   And that's why we deem necessary the constant

21   presence of the Court over this matter.

22           Second --

23           THE COURT:  And let me -- before you go into

24   the second, let me say, the Court's intention, if it

25   approves, or when it approves I think is the better

1    question, the consent decree obviously the Court is

2    retaining jurisdiction.  And I am not going to

3    micromanage day-to-day affairs of the police.  I

4    don't see this case as, you know, it's -- but on a

5    specific -- every specific matter the police has to

6    do on a day-to-day basis.  But on the broader

7    picture, my intention is quarterly or every couple of

8    months to meet with counsel, to see -- as well as the

9    TCA, to see what issues are arising.

10         Obviously if I have some input or at least

11   from my perspective, I've been here in this court

12   12 years and I've had prior experience with the

13   Puerto Rico state government, but based on that

14   experience, if I see anything that can be improved or

15   should continue, I'm going to be providing input and

16   I'm going to be providing reports.  The Court is not

17   going to simply be hands-off for ten years and then

18   say, Nothing happened, consent decree over.

19         This is one of these cases where the Court's

20   vision is that I'm here -- this is more of a team

21   approach.  On one side I hold the Commonwealth' hand,

22   on the other side I hold the United States' hand; and

23   we all try to work this together.  Obviously I'm not

24   a participant, but I try to bring the parties

25   together.  That's my philosophy for this type of

1    case.

2            And I also have to apologize because we have

3    another case, *United States versus Commonwealth of*

4    *Puerto Rico*, which deals with the mentally impaired

5    population of Puerto Rico.  That's the approach we've

6    been taking.  It has not been the typical litigation

7    approach, but it's a more policy, result-driven

8    approach.

9            And again, the Court's not going to be

10   hands-off.  And of course, if there's any issues that

11   arise obviously the Court, and depending on those

12   issues, may involve itself a bit more or involve

13   itself a little bit less, depending on the issues.

14   But that's the Court's position as to that.

15           So, you may rest assured simply that I'm not

16   simply going to sign off and forget about it.

17           MR. GONZÁLEZ-ORTÍZ:  That's good to know,

18   Your Honor.

19           Another reason why we believe that the

20   constant presence of the Court is necessary is

21   because this reform, the proposes reform, necessarily

22   involves profound changes at many levels of

23   administration from enrollment process, training,

24   accountability, supervision, access to information,

25   transparency, public involvement, et cetera.

1          Your Honor, we certainly recognize that the

2     adoption of the consent decree represents a

3     challenge.  However, it is -- at this moment it is

4     the proper instrument to attain that the PRPD

5     operates under the rule of law under the constitution

6     and under human rights standards.

7          Also, as long as individual police officers

8     be given the proper tools for dealing with the

9     public, it is less likely that the police brutality

10     litigation be filed, relieving the State of its

11     usually costs.

12          And, well, Your Honor, basically that's the

13     points that we would like to add, apart from what has

14     been already discussed in both our briefs.

15          THE COURT:  No, and they're very

16     comprehensive.  They're long ones, especially the one

17     at Docket 28, but obviously they're very easy to

18     read, they're comprehensive, they have statistics.

19     And they're very, very helpful.  And I really thank

20     the ACLU.  I think the input is going to be well

21     taken by both parties and their counsel.

22          I told the parties when I met with them --

23     obviously what we discussed in camera is

24     negotiation-wise, that's not public, but I did tell

25     them, and it's in my order that I issue at some

1    point -- or my orders, that I have no doubt that if

2    this reform goes through -- and a similar reform was

3    done in the State of New Jersey.  Obviously the

4    difference between New Jersey and Puerto Rico is New

5    Jersey has its central police but then it has

6    counties.  You know, here we have a central police

7    and the central government has to handle it all.

8          But I told the parties there is -- and I've

9    been public in that in my order also -- I have no

10   doubt that if we're able, with the Court's

11   supervision, the parties are able to complete this

12   reform, obviously with the input that they have

13   received from you and other sources of input, there's

14   no doubt -- there's no reason why the Commonwealth

15   police force couldn't be tops in the nation.

16         We're not looking -- this reform is not

17   looking to simply put the Police of Puerto Rico up

18   there with, you know, the 50 states and territories

19   at a minimum; it's trying to put it -- and, again,

20   this has not been done at a statewide level except

21   the State of New Jersey before.  But this is

22   something that would probably place the Puerto Rico

23   Police at tops in the nation and a model to be

24   followed by many other jurisdictions, whether by

25   consent decree or not by consent decree.

1          So, I also -- something that, I think, is

2     very important and I have not done in this case, but

3     this is a case which is very unique because I know

4     the Commonwealth government started meeting with U.S.

5     DOJ officials before the report came out; so we're

6     talking this is really about a four-, five-year

7     period that this -- even though the case was filed in

8     2012, this has been going on.

9          And I do have to commend the former governor

10    of Puerto Rico, Governor Fortuño, because I know the

11    proposed consent decree was reached under his

12    administration.  But I also, at the other hand

13    equally have to commend Governor García-Padilla

14    because this is not one of these cases, you know,

15    where you hear, Oh, it's the new government

16    administration comes in and let's figure everything

17    or find a new way to do so.  Governor García-Padilla

18    has focused on everything that was accomplished

19    during the past administration; and from there he has

20    taken off.  This has saved time and effort from

21    everybody.

22          And again, both governors, I think, this is

23    something that they're not doing this reform because

24    of politics; it is something that has to be done and

25    their effort and their support is essential, as well

1    as any other governor.  Because this is -- it could

2    be 10, 12, 15 years; we're going to see probably more

3    than two governors involved in this reform.  So

4    obviously I would hope that any future governor,

5    whatever it may be, that also participates first

6    executive is going to give the same dedication and

7    effort in moving this case.  Thank you very much.

8            MR. GONZÁLEZ-ORTÍZ:  Thank you, Your Honor.

9            THE COURT:  Okay.  Then the next amicus that

10   we have -- and before I recognize him, let me note

11   that we have Professor José Garrilla-Picó from the

12   University of Puerto Rico.  He teaches undergrads,

13   political sciences, and has been doing so for over

14   30 years, maybe a little bit more; and he was also a

15   state senator for a four-year term here.  He's here

16   with several of his students; I believe there's maybe

17   20 of his students or more.

18           I want to commend Professor Garrilla because

19   it's important that -- obviously this case raises

20   public matters, it's a matter of public interest.

21   And I know you teach political science, but it's very

22   important that students come to court, listen to

23   these cases, find out what's going on not only

24   through the press but also participating going here,

25   going to the capital building, seeing what

1    legislature is passed, seeing trials.  So I want to

2    thank the professor and I welcome his students.

3            Those of you who are interested in what goes

4    on here, talk to the ACLU attorneys after the

5    hearing, talk to Mr. Igartúa, talk to the other

6    attorneys.  And at some point I believe the ACLU may

7    have internships at one point.  Some of you are from

8    Aguadilla like Mr. Igartúa; he might need an intern

9    at some point also.  And, you know, the DOJ also, if

10   any of you go to law school, does have internship

11   programs.  So it's very important, and I thank all of

12   you for being here.

13           Now, Mr. Igartúa is -- I want to note that I

14   have allowed him to participate as amicus.  His

15   experience of many years dating back to the early

16   nineties.  Mr. Igartúa has championed civil rights.

17   Particularly he has always brought to the Court --

18   and let me say, I do have to commend him from that

19   respect because he always uses the Court.  Other

20   people prefer other ways to bring issues of social

21   change, but he has always chosen the courts and the

22   law.

23           Mr. Igartúa has on four occasions, in his

24   own behalf and on behalf of Puerto Rico, sued the

25   United States seeking presidential vote.  The last

1    time was seeking congressional representation.  In

2    two of those occasions the Government of Puerto Rico

3    joined as a party to those proceedings; so that is --

4    it also shows the seriousness of his arguments.  This

5    is not just some pro se attorney for Plaintiff who is

6    raising these arguments for the sake of it.

7         You know, in one of those, in 2000, I worked

8    as the solicitor general of Puerto Rico.  And I,

9    along with Mr. Igartúa, argued one of those cases in

10   Boston, which we did not prevail, but I do note also

11   Mr. Igartúa as appeared as amicus in other cases.

12   His brief is very well presented and it's what the

13   Court would expect from an amicus brief, and it's

14   also going to be there for the record.

15        So what I would ask Mr. Igartúa, obviously

16   the issue -- I note part of the issue in your brief

17   has to deal with incorporation/nonincorporation of

18   the U.S. territory of the Commonwealth of Puerto

19   Rico, but I believe that right now is a moot issue,

20   at least in this case, because the Court asked the

21   United States to respond to that position, if it

22   wanted to sustain it or if it wanted to withdraw it.

23        And I mentioned in doing so in my order that

24   the presidential task force report, signed by our

25   nation's president, had put into question the

1    continued validity of the insular case.  And that is

2    in one of my orders, that's very clear; it's after my

3    order.  The United States withdrew that allegation.

4              And this is one of these cases that I know

5    you're always arguing for equal treatment of the

6    Commonwealth of Puerto Rico and the nearly 4 million

7    U.S. citizens, as I've heard you many times argue

8    that, but this is a case where the DOJ, on behalf of

9    the citizens of Puerto Rico -- and this is called --

10   for the students who are here, this is called the

11   Rodney King Statute.

12             I don't know if -- you're probably too young

13   to remember that, but I believe in the late eighties

14   or early nineties Rodney King was beat up by L.A.

15   police.  He was acquitted at the state level, there

16   were all these riots, there was a pattern and

17   practice of police misconduct, not defending civil

18   rights, and that's why this statute, the law that

19   this case was brought under, was enacted.

20             And Mr. Igartúa, I just want to mention that

21   obviously the Rodney King Statute, the statute in

22   question, which is 14.141 -- and correct me if I mix

23   up the numbers -- 14.141 -- Section 14.141, it is

24   treating Puerto Rico exactly as any state.  It's the

25   same way it treated New Jersey, it's treated counties

1    of territories, or other particular parts of the

2    nation.

3            So, what I would like you to argue -- and,

4    again, you may want to briefly mention your argument

5    about the incorporation and incorporation, but I

6    think that argument is really moot.  I think you have

7    some other arguments about how this case puts Puerto

8    Rico and compares it to other jurisdictions in

9    dealing with these sort of issues.  I think the focus

10   of your argument would be appreciated if you'd

11   respond to that.  But go ahead, you have ten minutes,

12   and if you need a little bit more time, that's no

13   problem.  And I may have some questions.

14           So go ahead, Mr. Igartúa.  Thank you.

15           MR. IGARTÚA:  May it please the Court.

16           THE COURT:  Please proceed.

17           MR. IGARTÚA:  Your Honor, thank you for

18   allowing me to participate as amicus curiae in this

19   case and thanks, Your Honor, by your comments.

20           THE COURT:  And let me say this just on a

21   funny note.  But when Mr. Igartúa and I argued in

22   2000 the First Circuit, for about ten minutes before

23   we were going to argue he said he couldn't do it, he

24   was afraid to argue.  And we all said No, you brought

25   us all here, it's your fault, so you are responsible.

1    And after that he's never been afraid to argue a cas.

2    So go ahead.

3            MR. IGARTÚA:  Well, for many years, as you

4    said, I have been advocating for the civil rights for

5    human rights of the 3.8 American citizens of Puerto

6    Rico.  I support the interests of the U.S. Department

7    of Justice to protect the constitutional rights of

8    the American citizens of Puerto Rico.  But I oppose

9    that discriminatory practices of the U.S. Department

10   of Justice to further those interests as in this

11   case.

12           As you said, they filed the original

13   complaint, and they in the pleading said that Puerto

14   Rico was an unincorporated territory; and because of

15   an order of the Court, they amended and eliminated

16   that pleading.  Now we have to ask, if they

17   eliminated, is it because they considered them, as it

18   is, and as this Court said, Consejo De Salud versus

19   Ruyán, that Puerto Rico is incorporated and that it

20   is not appropriate to say that Puerto Rico is not

21   incorporated.

22           But the problem is that the pleadings of

23   this case continue without that argument -- continue

24   the assertion, the discriminatory assertions.  And

25   pleadings are pleadings on the assumption that Puerto

1    Rico is a nonincorporated territory, which is

2    incorrect and discriminatory and has serious

3    political and economical and social consequences; and

4    that's because -- and that is why this case is so

5    important for the 3.8 American million citizens of

6    Puerto Rico.  They have an interest in the solution

7    of this case.

8            And, also, we understand that the U.S.

9    government is confronting the court, this court,

10   which already established that Puerto Rico was an

11   incorporated territory with their stance on the

12   pleadings.  Now --

13           THE COURT:  Before you continue, let me note

14   that in the *Consejo de salud* case, I ruled that,

15   based on -- particularly on the case of *Boumediene*

16   *versus Bush* and other jurisprudence and matters that

17   have taken place that Puerto Rico should be treated

18   as an incorporated territory of the United States,

19   and that all federal laws and civil rights would

20   apply, et cetera, et cetera.

21           And that was the case that was brought --

22   that argument was made to me by the Government of

23   Puerto Rico in probably July or August of 2008 under

24   Gobernador Acevedo Villá's administration, and it was

25   a challenge to the spending clause, and it was one of

1    these issues.

2         And as I mentioned in some my orders, the

3    problem that we have in Puerto Rico sometimes is that

4    we, the Commonwealth, the citizens of Puerto Rico, we

5    have to comply with federal law but at the same time

6    there's no funding.

7         And that case involved wraparound payments

8    to medical institutions on the island.  And the

9    Commonwealth, for example, the analogy in that case

10   was that the states get a matching fund of 92 percent

11   or 88 percent, I think, something like that, and then

12   they have to put 12 percent in state funds; Puerto

13   Rico has to put 88 percent in state funds and only

14   gets 12 percent matching.  And that was some, you

15   know, inequality that I had mentioned in that case.

16        Since I decided that case, that issue, the

17   government of the United States I asked them to

18   respond; they never responded particularly to that

19   point.  At some point that case was still alive, but

20   under the administration that came under Gobernador

21   Acevedo Villá some additional funding came in and

22   that allegation was -- or that ruling the government

23   did not wish to pursue that ruling any further;

24   that's why the United States did not have to

25   intervene at some point defending the

1    constitutionality of that statute at issue versus the

2    incorporation/unincorporation doctrine.

3           And since then I note that I have not had

4    any other case or any other matter to convince me

5    that I should reaffirm my ruling or I should modify

6    to some respect.  There is the opinion by Former

7    Justice O'Connor in the -- the name of the case

8    escapes me right now --

9           MR. IGARTÚA:  Samuel -- U.S. versus Laboy.

10           THE COURT:  -- Laboy from The Third Circuit.

11    There is that opinion which seems to be somewhat

12    consistent to what I have stated, but it doesn't talk

13    about incorporation or not; and then we obviously

14    have the presidential task force report which says

15    the insular cases no longer -- or put into question

16    the applicability into Puerto Rico Law.

17           So, that's how things stand at this point; I

18    have no higher guidance at this time.  And, again, I

19    don't think the issue is before me any longer.  I

20    think even if -- and let me ask you this question.

21    Even if -- regardless if Puerto Rico were

22    incorporated, I understand, unless they were a state

23    of the union, the government are still --

24    incorporated and unincorporated are still

25    territories.  So, even if Puerto Rico were to be

1    considered incorporated, which again I'm not going to

2    decide in this case, but the United would still

3    discriminate as to funding to Puerto Rico.

4              MR. IGARTÚA:  Well, the thing is, Your

5    Honor, and that's what I'm going to explain right

6    now.  What I said before was to try to put the case

7    within its proper perspective on our position.  But

8    we have -- I have been talking about the

9    nonincorporated territory treatment.  And what is an

10   unincorporated territory treatment?  Why it is

11   important in case? because of this complaint.

12   Because this complaint is typical of the legal and

13   discriminatory contradictions exposed in the insular

14   cases in the United States.

15             Why?  Let's take this case, this complaint.

16   Here the U.S. Department of Justice requires the

17   applicability of the U.S. constitution:  Amendment 1,

18   4, and 14.  Now, on the other hand, they have said,

19   and we understand from the body of the pleadings --

20             THE COURT:  But that's not discriminatory

21   because it did the same with New Jersey and it does

22   the same with the Virgin Islands.

23             MR. IGARTÚA:  No.  Okay.  But why?  Why?

24   Why?  Why?  Within what context?  Well, they want

25   applicability of the U.S. constitution, they filed

1    the complaint; but then there is no parity in federal

2    aids.  And what happens?  First, without parity in

3    federal aids, Puerto Rico is assigned less per capita

4    in awards for disbursements.  And I refer to the

5    brief -- the tables that we submitted.

6         THE COURT:  You have a table of every state

7    and territory.  And I will note obviously Guam per

8    capita receives much more than other places even

9    though it's a fraction of federal funds because the

10   population is so small.

11        MR. IGARTÚA:  We are the least that receives

12   federal funds for those purposes.  So what happens?

13   That then, there is no equal treatment.  So, you want

14   the constitutional to apply, Amendment 14, equal

15   protection of the law, but you don't have equal

16   protection of the law in the assigning of funds to

17   the American citizens of Puerto Rico.  And that's

18   discriminatory.  And that's why it is important this

19   case within that language, within that issue, that

20   argument.

21        Then, the non parity, the non parity of

22   federal funds within the context of Harris.  What

23   happens?  In the case of *Harris versus Rosario,* the

24   Court said that parity of course would disrupt the

25   Puerto Rico economy.  And that's ridiculous to say

1     that.  And it is shown in this case, and they

2     accepted it in the complaint, because that's why they

3     are -- that's what they are arguing.

4            THE COURT:  And I would humbly say it's

5     different *Harris versus Rosario* or *Califano versus*

6     *Torres;* because it's not an entitlement or it's not

7     like Social Security benefits of Medicare or aid to

8     women with children, whatever, you know, that they

9     would receive federal funds; or like with Medicare,

10    Medicaid.  No citizen would be receiving moneys in

11    this case.  If there's any parity, it would come from

12    DOJ programs to the Puerto Rico Police; and obviously

13    it would be the Commonwealth of Puerto Rico would

14    receive those funds.

15           MR. IGARTÚA:  Yes, Your Honor, but in the

16    *Harris* case the Court said that equal parity in

17    federal funds would disrupt the economy.  And what

18    happened?  What we're seeing, we don't have parity.

19    And what do we have?  Social problems, particularly

20    in the criminal area.  And that's why they are

21    accepting -- that's what they are arguing that there

22    are social problems, that there is a custom here of

23    the police.  And why?  We don't have parity.

24           So, what the *Harris* case said and you should

25    consider for purposes of adjudicating this case, is

1    the issue of the parity; because what's going on is

2    that the non-parity is disrupting the social problems

3    of Puerto Rico.

4           And then, thirdly, and furthermore, without

5    funding parity, Your Honor, the implementation of the

6    remedies sought will further disrupt the economy of

7    Puerto Rico, which is already in recession.  Since it

8    would require the reallocation of limited resources

9    unequal to the states for the purposes claimed in

10   this complaint.

11          On the other hand, and not dealing with

12   parity, just to finish my argument, I would

13   respectfully suggest that the fact that Puerto Rico

14   is under the parens patriae of the United States,

15   most of the criminal activity in Puerto Rico is

16   related to interstate activity and international

17   criminal activity.  And this came on Tuesday in the

18   *El Nuevo Dia* explaining all of that very clearly; and

19   from here the drug goes to the states.  And, I mean,

20   we are being asked to participate in the payment

21   of -- to train the Puerto Rico Police so that it

22   meets constitutional qualifications, but then the

23   constitutional does not apply equally to Puerto Rico

24   because of the federal treatment.

25          Also, for me important, we are never

```
1    referred in this complaint as American citizens,

2    residents of Puerto Rico; it never addresses us like

3    that.  Always "the residents of Puerto Rico," "the

4    affected people."  In fact --

5         THE COURT:  Well, I'll take judicial notice

6    that the residents of Puerto Rico are American U.S.

7    citizens and that's -- throughout the case we'll take

8    notice of that.

9         MR. IGARTÚA:  Please do so.  And I would

10   really like the Department of Justice --

11        THE COURT:  Even if the language is not

12   there, the Court will take notice; so, that's a

13   non-issue.

14        MR. IGARTÚA:  Okay.

15        THE COURT:  But let me say that I did

16   mention in my order about the funding, that that

17   obviously is a challenge because this case will cost

18   the Commonwealth a lot of money.  I have asked the

19   government and parties to see where federal funds are

20   possible to the extent that that can be done.  And

21   obviously we do have a problem in implementing -- or

22   the Court has a problem -- well, not that the Court

23   has a problem, but the Court understands that the

24   Commonwealth may face a problem.  We cannot -- this

25   would not be implemented the same way in, let's say,
```

1    Vermont, for example, which probably has good money,

2    it's a small state, and they could probably do this

3    easily.  Here the funds are lacking, there are fiscal

4    problems, and it's different.  And, again, what I

5    would probably expect Vermont to do in two weeks

6    perhaps Puerto Rico has to do in six months.

7            So, obviously the Court is aware of that,

8    and that is obviously something I have brought to the

9    parties' attention.  And obviously, although this

10   reform has to take place -- because it's not a

11   question of when and how or why, it's a question

12   of -- actually, it's a matter of When do we start? or

13   when does to the Court approve this so we can start?

14   But the Court is very, very aware of that.

15           The other thing, and I did mention it in

16   that same order, obviously the Court is also aware

17   and that's why I have suggested that the government

18   consider its view, revisit its view, to see if

19   federal funding can be added to subsidize this

20   reform; because, as I noted in my order, Puerto Rico

21   is a HIDTA -- a high intensity drug trafficking area.

22   It's classified as HIDTA by the United States

23   Government in the mid nineties.

24           The Congress has recognized, and the DOJ,

25   that Puerto Rico is a transshipment international

1    drug zone.  So, drugs come from Puerto Rico to the

2    United States.  As a matter of fact, they even go to

3    some parts in Europe, as you well read in the Nuevo

4    Dia article.

5          But the issue is obviously, as I mentioned,

6    that is why this is such an important case because if

7    Puerto Rico has one, if not the best, police forces

8    in the United States, that would ultimately benefit

9    the entire American nation because it's going to

10   help, perhaps not all the drug trafficking, but it's

11   going to stop a lot of that drug trafficking.  If we

12   cut it in half what goes to the mainland or we cut it

13   in two-thirds, you know -- and when I say "we," I'm

14   talking about the United States and Puerto Rico

15   because obviously a lot of these cases come through

16   the Court so that's why I use the "we."  But I do

17   note they're important issues, they've been brought

18   to the parties' attention.

19         Anything else, Mr. Igartúa?

20         MR. IGARTÚA:  Two brief things.  First,

21   Pleading 65 to 70, just to make the Court refer to

22   the treatment given to Dominicans that have been

23   nationalized.  The stance of the U.S. Department of

24   Justice in this case is complete, but for Dominicans

25   the pleading 65 to 70, which I respect, are different

1    from the status of the U.S. Department of Justice in

2    the case of *Arizona versus U.S.*

3            And lastly, respectfully, I request from

4    Your Honor to consider at least affirming your

5    position in the case of Ponce -- *Playa de Ponce*

6    *versus* --

7            THE COURT:  Okay.  And that ruling in that

8    case is not appealed, it's there in the books.  It

9    hasn't been overruled by me.  So, unless somebody, at

10   the appropriate case and at the appropriate time,

11   would, with standing, bring that issue where I can

12   revisit it.  Again, that is still, you know, my last

13   expression in the books.  There's nothing at this

14   time that would make me change my mind one way or

15   another; but, again, the particular case issue is not

16   before me.  And, again, the government has removed

17   that allegation from the complaint, but I note that.

18   And, again, if at some point this or in another case

19   it comes up, I will gladly revisit that issue in my

20   duties.

21           So, thank you very much, Mr. Igartúa.

22           MR. IGARTÚA:  Thank you very much, Judge.

23           THE COURT:  Now, court is adjourned.  I'm

24   going to meet within the next 15 minutes with counsel

25   for the parties in my conference room downstairs.

1          What I'm going to ask is -- I'm going to

2    excuse everybody in else in the courtroom.  I know

3    Professor Garrilla, the students are here; so, if

4    they have time, I would like to meet with them ten,

5    15 minutes while the parties get ready downstairs.

6    So, I'll excuse everybody else in the courtroom and

7    then I'll -- Professor, you have some time, right?

8          PROFESSOR GARRILLA-PICÓ:  Sure.

9          THE COURT:  Okay.  So I'll stay here a few

10   minutes with the students.  Obviously, I can't

11   discuss the merits of how this case will be resolved,

12   but you can talk about anything else that you want

13   about the settlement.

14          And, as I said, if counsel for any of the

15   parties wish to say anything pertaining to the amicus

16   for the record or to ask any questions -- obviously

17   this is not a cross-examination -- please do so.

18   Mr. Del-Valle on behalf of the Commonwealth.

19          MR. DEL-VALLE-CRUZ:  Your Honor, first of

20   all, in the same manner that you recognize

21   contributions of Governor Fortuño and Governor

22   García-Padilla, I would like to publically recognize

23   the contributions of the superintendent of the police

24   Hector Pesquera --

25          THE COURT:  Who happens to be back there.

 1    And I will obviously recognize his contributions not

 2    only as part of the Puerto Rico Police in his latest

 3    roles but also for many years with the FBI here.

 4              MR. DEL-VALLE-CRUZ:  Mr. Pesquera has taken

 5    this initiative by the United States Government not

 6    only -- not as an adversarial proceeding, but he has

 7    embraced it as an opportunity to implement a

 8    much-needed reform with respect to the statutory

 9    admission and the public service that he's doing in

10    this case.

11              And I think he deserves that recognition

12    together with the secretary of justice who has also

13    embraced this action in the same manner as

14    Mr. Pesquera.

15              THE COURT:  I agree with you.  And, again,

16    both governors in this case have been working very

17    hard in this case.  And I note that after the

18    elections I think it was the first -- before swearing

19    in one of the first actions that now Governor

20    García-Padilla took.  I do know he went with the now

21    attorney general and with the team to Washington,

22    D.C. to continue discussing this case.  And it was

23    one of his top priorities.

24              And I know the outgoing administration also

25    made its best efforts to make -- particularly in this

1    case a very smooth transition.  So, again, both

2    administrations are commended.  And, again, by

3    commending both administrations -- you know, it's not

4    easy for a judge to commend one governor or the

5    other, but when I can commend both then -- and they

6    happen to be from different administrations -- I

7    think that's appropriate in this case.  It's probably

8    one of the few times I'll be able to do that.

9            MR. DEL-VALLE-CRUZ:  Everybody wins.

10            Your Honor, I also cannot leave without

11   recognizing the amicus that have participated in this

12   case:  The American civil liberties union, Puerto

13   Rico has been very instrumental particularly to the

14   leadership of Mr. William Ramírez in bringing to the

15   public attention many issues that have to do with

16   civil rights in Puerto Rico; and it's not surprising

17   that he's here in this case as one of the leading

18   participants in the amicus curiae.

19            In the same manner, the *Movimiento Amplio de*

20   *Mujeres, La Coordinadora de Paz para las Mujeres, El*

21   *Comité de Defensa de Derechos de las Mujeres,* and the

22   other women's groups that have participated to the

23   amicus have been traditional and historic

24   spokespersons who are respected with Puerto Rican

25   society.  And the fact that they're speaking on

1    behalf of the persons they represent means a lot to

2    us as the participants -- as the plaintiff and

3    defendant of this case, but also in terms of the

4    recognition of their role in Puerto Rican society and

5    bringing civil rights issues to the court.  So, in

6    that way I would also like to make the recognition.

7            This -- I would like to point out that this

8    case it's a very historic accomplishment what is

9    trying to be done between the United States

10   Department of Justice and the Commonwealth of Puerto

11   Rico because we're trying to reform a system that has

12   traditionally been faulted with certain civil rights

13   deficiencies in a manner that takes -- that does not

14   do away with the compelling state interest in crime

15   fighting in Puerto Rico but that takes that

16   compelling state interest and activates it in a

17   manner that is the most protectful [ph] of the civil

18   rights of the persons in Puerto Rico.

19           What the amici are very right insofar as the

20   consent decree does not directly address gender

21   violence or gender bias or violence in Puerto Rico.

22   The agreement, nonetheless, establishes the framework

23   for community and citizen input so that the matters

24   that they're raising can be the subject subsequently

25   of new police policies and procedures that directly

1    address the concerns that they're bringing up today.

2           So, in that manner, the concern -- the

3    agreement that is being approved -- that will be

4    approved by the Court is not -- does not foreclose

5    the concerns that these civil voices have brought

6    before the Court.  And I think we should take note of

7    that because it does not mean that these concerns

8    could not be addressed --

9           THE COURT:  And let me say, as you mention,

10   I think you hit the nail on the coffin.  You said --

11   you used the word "framework," and with this

12   framework these issues can be addressed.  This is a

13   floor, it's not a ceiling; and it doesn't bind the

14   United States nor the Commonwealth in addressing any

15   of these issues.

16          And there're going to be public measures,

17   public policy.  Regulations will be issued or

18   internal operating procedures by the police of Puerto

19   Rico, regulations made in the legislature.  At some

20   point there could be an executive order or

21   regulations, that's going to ensue at some point.  At

22   that is something the technical compliance advisor

23   will be working with very carefully.

24          And obviously at some point when the parties

25   recommend that the Court appoint that person

1   obviously you're going to be able to have

2   face-to-face meetings with that person and address

3   many of these concerns probably at a very early on

4   stage.

5          MR. DEL-VALLE-CRUZ:  The degree addresses

6   particularly excessive use of force, unreasonable

7   search and seizures, and community expression to

8   demonstrations because those were the main objectives

9   that were behind the investigation and the

10  recommendations issued by the U.S. DOJ; but the

11  report -- the decree in itself is not foreclosed only

12  to those issues.  It censors them, but it opens the

13  process so that other issues can be attended.

14          Finally, Your Honor, I wish to emphasize

15  this is not an adversary proceeding.  The

16  Commonwealth of Puerto Rico has taken this as a

17  commitment that it has under both the past and

18  present administration to attend to crimefighting but

19  within the context of a healthy Democratic society.

20  This is not a case that is brought against the

21  Government of Puerto Rico and we're fighting it as an

22  adversary.  We have joined as participants,

23  co-participants, in an effort to reform the Police

24  Department of Puerto Rico.  And, therefore, it should

25  not be seen as one part as against another but as a

1    team of players who are pooling resources to work

2    together.

3            Our recognition must go out to the U.S.

4    Department of Justice because they are helping in

5    terms of the budget of this case.  You know we're

6    going through a very tight budgetary proceeding in

7    Puerto Rico; and, nonetheless, the U.S. DOJ is

8    participating and helping funding the many reforms

9    that are needed.

10            I would like to make -- recognize my

11    expression of gratitude to the American Civil

12    Liberties Union because, even though they discharged

13    their duties in signaling what our potential

14    deficiencies -- according to them, and I agree -- in

15    the end they endorse the agreement.  They say that

16    the agreement endorses a majority of the reforms that

17    are needed to comply with the requirements of the

18    United States constitution.  And I think that when an

19    organization like the American Civil Liberties Union

20    is capable of recognizing that, it means that this

21    represents the best interests of many, if not all,

22    aspects of the Puerto Rican community.

23            Thank you.

24            THE COURT:  Thank you.  And let me note that

25    when you mentioned the government of Puerto Rico and

1   the United States who are acting in a partnership

2   manner or on equal footing on this matter, obviously

3   the complaint has to be filed; we need a plaintiff

4   and we need a defendant.  And obviously -- but this

5   is not the type of adversarial proceeding that in the

6   past was brought.

7          Many years ago what would happen, maybe the

8   DOJ or it could be, for example, the Environmental

9   Protection Agency would file a complaint against

10   Aqueduct Sewer, and Electric Power against agencies

11   of the government and it would be an adversarial

12   proceeding.  It would cost the Commonwealth millions,

13   it would cost the United States not as many millions

14   but a lot of manpower; and then judges were resolving

15   motions issues, a lot of infighting.

16          And I've seen this not only in this case,

17   but I know Mr. Valle you're also an attorney in that

18   case for the Commonwealth -- the *U.S. versus*

19   *Commonwealth of Puerto Rico Health Department* when

20   the mentally impaired population here.  And in that

21   case also it's this sort of approach.  And it saves a

22   lot of money for the parties; the money that can be

23   used litigating the cases and appealing the cases is

24   used internally in Puerto Rico to benefit the

25   Commonwealth.

1          So, obviously it's -- I would say this is a

2     21st century approach that we're getting in

3     litigation between federal and state governments.

4     And it has been this way -- the State of New Jersey

5     is also a consent decree.  The United States Virgin

6     Islands obviously it's a much smaller jurisdiction

7     but also a consent decree; and a lot of these

8     jurisdictions have been consent decreed.

9          And, again, I think this is, you know, a

10    very important statute the Congress has enacted.  And

11    I think also with what we learn -- and when I say

12    "we," I say the Court, the United States, the

13    Commonwealth; but obviously this would not be the

14    first or last time the statute is invoked by the

15    United States.  And obviously with all of us working

16    together and putting our little grain of salt,

17    obviously we're going to set a framework for the

18    United States and other states and jurisdictions to

19    follow in the future.  And, again, Puerto Rico can be

20    the model for that at some point.

21          So, having said that, Counsel for the United

22    States, is there anything you wish to add at this

23    time?

24          MR. SAUCEDO:  Yes, Your Honor.  I will be

25    very brief.  I do want to thank the amicus curiae

1  that participated today; we do value and welcome the

2  input and insights that they bring.  I want to

3  recognize the long advocacy of the ACLU in this

4  matter and in other police matters across the country

5  and all of the groups that they represent in their

6  briefs.

7          The United States understands that this case

8  is of great interest to all of the individuals who

9  live, work, and visit the island.  It's important for

10 us to hear from as many people as possible so that we

11 ensure that the agreement that we reach leads to

12 sustainable reform.  And the reform we're looking for

13 is one that is going to guarantee fundamental civil

14 rights, ensure public safety on the island, and

15 restores the confidence in the men and women who work

16 and put their lives on the line to protect the

17 individuals who live here on the island.

18          THE COURT:  And the motto of the police

19 department is "Honesty and Integrity," and this is

20 what this case is all about -- putting that back

21 there.

22          MR. SAUCEDO:  We're going to continue to

23 work with the government and with all state holders

24 to reach an agreement that achieves those goals.  The

25 agreement itself contemplates ongoing engagement with

1   community members advocacy groups, all stakeholders.

2   And, Your Honor, indeed the very success of the

3   agreement is going to depend on that active

4   involvement and engagement by all stakeholders.

5          So, we appreciate the views that have been

6   expressed today.  We will continue to work hard to

7   finalize the agreement, present a plan, an

8   implementation plan that is achievable, that is

9   practical, that considers the financial realities

10  everyone is living under but that also ensures and

11  guarantees the civil rights that we all enjoy.

12          So thank you very much.

13          THE COURT:  Okay.  Thank you.  And I know

14  Mr. Del-Valle would love to argue, discuss for the

15  next five hours or sit with Mr. Igartúa and discuss

16  the insular case and all these matters; but obviously

17  from what I've stated, and I've heard Mr. Igartúa,

18  and I think the issues are really -- the financial

19  are a consequence, but that will be a matter for

20  another day.  But I know that Mr. Del-Valle looks

21  very forward seeing Mr. Igartúa on another day in

22  another matter as well.

23          So, thank you very much.  And you're all

24  excused.  And I will remain with the students here so

25  I'll give everybody two or three minutes to exit and

1    I'll stay here with the students.

2              (Settlement/Status Conference concluded at

3    3:45 p.m.)

4                             ---

```
 1    UNITED STATES DISTRICT COURT    )

 2                 OF                  )ss.

 3         PUERTO RICO                 )

 4

 5

 6

 7                        CERTIFICATE

 8

 9

10         I, EVILYS E. BRATHWAITE, hereby certify that

11    the proceedings and evidence are contained fully and

12    accurately, to the best of my ability, in the notes

13    recorded stenographically by me, at the

14    settlement/Status conference in the above matter; and

15    that the foregoing is a true and accurate transcript

16    of the same.

17

18                        /s/ Evilys E. Brathwaite

19                        EVILYS E. BRATHWAITE, RPR
                          Official Court Reporter
20                        United States District Court
                          Federal Building, Room 200
21                        San Juan, Puerto Rico 00918
                          787-772-3377
22

23

24

25
```