Appendix E

**Implementing §14141 "Pattern or Practice" Reform:**
**Evidence from Four Police Departments**

Joshua M. Chanin
American University

Prepared for the Public Management Research Conference
Columbus, OH

October 1-3, 2009

E-1

## Introduction

The paradox of bureaucratic discretion is well known. The authority and expertise to make discretionary decisions is fundamental to the operation of a government like the one that exists in the United States, where its administrative responsibilities stretch the breadth and depth of the public policy spectrum. Discretionary administration necessarily produces an uneven application of the law, a reality that conflicts directly with perhaps the central precept of the American democratic-constitutional arrangement: the rule of law shall supersede all else.

The tension between adherence to the rule of law and the pursuit of efficient administration is especially pronounced when observed in the context of street-level bureaucratic behavior. No public servant exemplifies this more clearly than the police officer. Of course, cops fit perfectly the definition of street-level bureaucrats: they interact directly with members of the public on a regular basis, performing tasks that demand considerable reliance on intuition and discretion, all in an environment largely devoid of direct supervision or quantifiable performance measures. What is more, police officers rely on the use of force (or threat thereof) to maintain their positions of authority, and are sanctioned by law to apply force – lethal force, in the most extreme cases – in the necessary course of the job. As with all street-level bureaucrats, with this power comes the potential for great costs, particularly in light of the high-stress, low-visibility environment in which most these discretionary decisions are made. All of which begs the question, How best to maximize the benefits of low-level administrative discretion while minimizing the potential for costly abuse?

E-2

For decades, the pursuit of answers has challenged scholars from several academic disciplines, including public administration (e.g., Lipsky 1980; Rosenbloom and O'Leary 1997), law (Davis 1969), and criminal justice (e.g., Skolnick 1966; Wilson 1968). The Supreme Court has a long history with these questions (e.g., *Miranda v. Arizona* 1966; *Terry v. Ohio* 1968; *Tennessee v. Garner* 1985), and will no doubt face new iterations every term, in one form or another. Not only do new facts beget new law, but often lead to fresh administrative efforts to control discretionary behavior.

This paper takes as its subject a relatively new, but promising initiative to control police behavior through department-wide reform: a provision in the Violent Crime Control and Law Enforcement Act of 1994, which that grants to the Department of Justice (DOJ) jurisdiction to sue local police departments found in systematic violation of constitutional or statutory law. This provision – §14141 – has been instrumental in identifying illegal behavior in many of the country's most prominent police departments, and has generated settlement agreements that articulate deep reforms to the offending police department's organizational model and accountability systems.

More specifically, I examine the implementation of settlement agreements between the DOJ and police departments in four jurisdictions -- Pittsburgh, Cincinnati, Washington, D.C., and Prince George's County, Maryland. Two key questions motivate this research: (1) How do §14141 reform efforts fit into the broader historical drive to regulate administrative discretion broadly, and police behavior in particular? and (2) Is existing theory able to explain the implementation of these reform efforts, or does the unique nature of §14141 reform implicate a new set of influences?

E-3

To those ends, the paper begins with a short history of past efforts to control police officer discretion, largely in order to put §14141 of the Violent Crime Control Act in context. Next, I describe in some detail the settlement agreements reached in the four jurisdictions under review, paying particular attention to the three common elements upon which each agreement is built. In this section I discuss the implication these reforms have for street-level bureaucratic behavior and administrative reform. In the paper's third section, I present a model used to examine the implementation of §14141 settlement agreements. Based on a diverse collection of policy implementation scholarship, ranging from Pressman and Wildavsky (1984) to Canon and Johnson (1999), the model includes variables for the affected departments' organizational design, institutional competency, and employees' attitudes toward reform, among several others. After discussing my data and chosen analytical method, I then go on to describe settlement implementation in the four jurisdictions under review, using the model to compare and contrast the experiences of each. I close the paper by revisiting my research questions and offering early observations on the implementation processes generally.

**A Brief History of Efforts to Control Police Discretion**

The history of police management and reform follows very closely that of American public administration more generally. Much like his orthodox administrative brethren, August Vollmer, widely recognized as the father of modern law enforcement and as the first to formally study the business of policing, pursued administrative efficiency through centralized Weberian accountability structures, expertise and professionalism generated by educational requirements and advanced officer training protocols, and a culture built around a military-style respect for the chain of command

E-4

(Walker 1977). Technological advancements like patrol cars and walkie-talkies were introduced to improve communication and minimize physical interaction between officer and citizen, and contributed to the appearance of successful police department self-regulation.

Just as Waldo and Simon were challenging the politics-administration dichotomy myth, a group of sociologists and academic lawyers began documenting the incredible discretionary authority exercised by street-level police officers (see Ohlin and Remington 1993 for a review). These discoveries scrambled the conventional wisdom, and set the stage for unrest, both among scholars and underserved urban residents. In the late 1960s, academic work (e.g., Walker 1977; Skolnick and Fyfe 1993) and blue ribbon commission reports (e.g., Kerner Commission Report 1968) confirmed what the race riots and police corruption scandals of the 1960s made clear to even the most casual observer: top-down, self regulation was simply not enough to control street-level police discretion in the volatile 1960s. The cultural and organizational means favored by the police professionalization movement had run their course.

Central to the rights revolution that reoriented the relationship between citizen and government was the Warren Court's Fourth, Fifth, and Sixth Amendment jurisprudence, which aimed to bring discretionary police behavior within the framework constitutional law (e.g., *Mapp v. Ohio* 1961; *Gideon v. Wainwright* 1963; *Miranda v. Arizona* 1966). These early cases expanded citizen protections in several critical areas, and paved the way for future Courts to reduce an officer's legitimate use of force to a small set of circumstances (*Tennessee v. Garner* 1985; *Graham v. Connor* 1989).

E-5

5

These legal controls created the possibility for both civil and criminal recourse for those who suffered at the hand of illegal police behavior, with the clear expectation that punishment would deter future misconduct.  Unfortunately, that hasn't happened.  Civil suits alleging police misconduct are common, as are large financial settlements (Kappelar, et al 1993; Hughes 2003), but the prospect of liability does not seem to affect police officer behavior.  Even the most conscientious and rule-bound cops see liability as a reality of the job, and thus tend not to alter their approach to policing in so as to avoid litigation (Garrison 1995).  Further, police officers rarely, if ever, pay civil damages out of pocket; most municipalities have funds in place to cover the costs of litigation, from legal fees to damage award and settlement costs, in effect indemnifying their police staff (Cheh 1996; Emery and Maazel 2000-2001).

It is notoriously difficult to convict police officers in criminal court (Mastrofsky 2004), even those accused of the most high-profile and egregious misconduct, as in the cases of Amadou Diallo (Fritsch 2000) and Rodney King (Mydans 1992).  The line between criminal behavior and the necessary use of force, for example, is difficult to draw clearly and even harder to explain to a jury of citizens who tend to sympathize with the police officer the public deems responsible for shielding them from the unseemly and criminal segments of society.

In the 1990s, as Al Gore was advocating a reinvention, police departments across were moving away from purely top-down organizational and operational strategies as well.  The community policing movement took patrol officers out of their cars and in to situations where they could more easily interact with the public.  Though more of a crime-control strategy than a specific means of controlling street-level discretion,



community policing fostered a more democratic approach to order maintenance and promoted accountability through police legitimacy. Despite mixed empirical reviews (National Research Council 2004, Chap. 6), community policing is noteworthy for the shift to decentralized policy-making it represents, and for the 'customer-first' ethos it has come to stand for in policing. Today, police departments tend to supplement the community policing approach with enhanced screening techniques (Grant and Grant 1996) and advanced training programs (Skolnick and Fyfe 1993; Fyfe 1996) to minimize abusive behavior, particularly those related to the use of excessive force (White 2001). In the same vein, citizen oversight boards designed to hold the police accountable to their constituents have also been moderately successful at enhancing police legitimacy and reducing rates of police misconduct (Walker 2001).

As is true with most other street-level agencies, police departments have tested several different strategies to control the discretion of street-level officers. Organizational mechanisms have ranged from purely top-down, centralized models to more customer-driven, community based approaches. Civil and criminal laws have for decades existed as a means for delineating good police work from illegal activity, but for several reasons have failed to control officer abuse. It is worth noting that until recently the legal mechanisms underlying civil and criminal liability were based entirely on efforts to identify and sanction *individual* bad actors. Until recently there has been little effort and no available means to regulate malfeasant police *departments*,[1] whose permissive

---

[1] In 1983, the Supreme Court rejected for lack of standing an individual's request for an injunction against a type of choke hold used by the Los Angeles Police Department. The Court reasoned that because the plaintiff did not show "a real and immediate threat that he would again be stopped. . .by an officer who would illegally choke him into unconsciousness," Article III's "case or controversy" requirement was not satisfied (*Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983)). Until passage of the Violent Crime Control Act and the institution of §14141, *Lyons* was interpreted as foreclosing the use of litigation to address illegal police department policy or practice.

view toward street-level legal compliance may undermine managerial strategies like training and screening, in place to curb abuse, or tacitly promote many of the problems individual liability is in place to deter.  Perhaps the ability to identify and correct systematic illegal behavior at the department level would prove a more efficient and effective way to control street-level discretion and reconcile our society's simultaneous need for security and liberty.

That was the hope of those members of Congress, frustrated by an inability to hold accountable Los Angeles Police Department (LAPD) officers involved in the taped beating of Rodney King, who by including §14141 in the Violent Crime Control and Law Enforcement Act of 1994, created a provision that allowed the Department of Justice to sue local police departments shown to engage in systematic illegal behavior.

Despite the high profile nature of the reform process generated by §14141 settlements, and its importance to legal, public administration, and criminal justice scholarship, there has been very little published research on the subject to date.[2] What does exist includes an ongoing debate among academic lawyers regarding the merits of structural reform litigation generally (Jeffries and Rutherglen 2007; Sabel and Simon 2004; Zaring 2004), with much of the work focused on the ability of federal judges to manage successfully the reform of school districts, public prison systems, and mental facilities.  There are several public administration studies that examine institutional reform litigation generally, but few, if any works that focus on §14141.  Scholars like

---

[2] There are various potential explanations for this gap in knowledge. The statutory mechanism is a relatively new development, and the issue's technical legal aspect may create some barrier to entry, particularly among social scientists. The issue also straddles several academic disciplines, which may discourage those scholars focused narrowly on one field of study. The insularity of the §14141 enforcement process and the proprietary nature of police department outcomes also make research in this area time consuming and potentially quite difficult.



Rosenbloom and O'Leary (1997, Chap. 8), Wise and Christensen (2005), Wise and O'Leary (2004), Bertelli (2004), Bertelli and Lynn (2003), among others, have examined from a management perspective several issues related to judicially-managed institutional reform litigation.  Again, though these studies raise many compelling avenues for empirical and analytical work, they do not address the specific issues presented by §14141 reform.  Further, as far as I can tell, there is no existing scholarship that uses either institutional reform or policy implementation literature to examine §14141 initiatives.

The most robust analysis of §14141 reform is found in the existing policing literature. There are a handful of general studies available, each of which provide a worthwhile view of the issue from several different normative positions (Human Rights Watch 1998; Markovic 2006; Walker 2005). Case studies have also been written about the experiences in both Pittsburgh (Davis, et al. 2002; Davis, et al. 2005) and Cincinnati (Riley, et al. 2005; Ridgeway, et al. 2006). Each analysis uses quantitative and qualitative techniques to describe the process of reform, and does well to illuminate the several issues unique to each jurisdiction. To date, however, no systematic, cross-jurisdictional analysis is available.

### §14141 "Pattern or Practice" Reform

§14141 of the Violent Crime Control and Law Enforcement Act of 1994 makes unlawful any "pattern or practice of conduct by law enforcement officers…that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States" and establishes that the Attorney General "may in a civil

E-9

action obtain appropriate equitable and declaratory relief to eliminate the pattern or practice" (42 U.S.C §14141). Since the law's inception, the Special Litigation Section (SPL) of the Justice Department's Civil Rights Division has completed investigation of alleged systematic misconduct in at least 24 police departments,[3] and initiated formal action against twelve departments found to exhibit a pattern or practice of illegal conduct.[4]

The DOJ has negotiated settlement agreements to remedy several categories of systematic police department misconduct, including illegal use of chemical agent propellants (Buffalo), racial profiling (Mt. Prospect, IL; State of New Jersey), illegal canine control and management policy (Prince George's County, MD), improper search and seizure practices (Steubenville, OH; Villa Rica, GA), and unconstitutional holding cell conditions (Cleveland; Detroit). Of the several categories of alleged misconduct, police use of excessive force is the most common. Investigations of excessive force claims have resulted in formal agreements between the DOJ and police departments in at least seven major U.S. jurisdictions:[5] Cincinnati, OH; Detroit; Pittsburgh, PA; Prince George's County, MD; Los Angeles; and Washington, DC.[6]

---

[3] The Special Litigation Section lists on its website (http://www.usdoj.gov/crt/split/) investigations into police departments in the following jurisdictions: Alabaster, AL; Austin, TX; Bakersfield, CA; Beacon, NY; Buffalo, NY; Cincinnati, OH; Cleveland, OH; Columbus, OH; Detroit, MI; Easton, Pennsylvania; Los Angeles, CA; Orange County, FL; Miami, FL; Mt. Prospect, IL; Pittsburgh, PA; Portland, ME; Prince George's County, MD; Schenectady, NY; State of New Jersey; Steubenville, OH; U.S. Virgin Islands; Villa Rica, GA; Warren, OH; and Washington, DC. The DOJ does not release information regarding ongoing investigations.

[4] Buffalo, NY; Cincinnati, OH; Cleveland, OH; Detroit, MI; Los Angeles, CA; Mt. Prospect, IL; Pittsburgh, PA; Prince George's County, MD; State of New Jersey; Steubenville, OH; Villa Rica, GA; and Washington, DC. The Special Litigation Section maintains a database of all materials related to Department investigations, formal complaints filed, settlements, and other court documents. The database is found here: http://www.usdoj.gov/crt/split/ (last visited on March 15, 2009).

[5] In each case, police departments facing suit chose to avoid formal litigation by signing negotiated settlements in the form of a Consent Decree (CD) or Memorandum of Agreement (MOA).

[6] Several of the police departments found to exhibit a pattern or practice of misconduct were in violation of more than one law/right/principle.



Broadly, the goal of these settlement agreements is to "provide for the expeditious implementation of remedial measures, to promote the use of the best available practices and procedures for police management, and to resolve the United States' claims without resorting to adversarial litigation" (United States of America v. City of Los Angeles, Consent Decree 2001). Though the content of each agreement is tailored to the specific pattern or practice of abuse, the DOJ relies on a core set of reform mechanisms to affect department-wide change. In each case, the settlement agreement uses aggressive timelines and a court appointed independent monitor to implement changes to police department organizational structures, operational policy and oversight mechanisms, training protocols, and accountability systems in order to combat what the Department of Justice termed a 'pattern or practice' of abuse of force.

More specifically, settlement agreements instituted in the four jurisdictions under review here structure reforms around three key concepts. First, each department is required to adjust their use of force policies, though the specifics of that mandate vary. In the case of Pittsburgh, for example, the language of the settlement agreement is limited strictly to legal compliance: "[t]he City…[must] develop and implement a use of force policy that is in compliance with applicable law and current professional standards" (U.S. v. City of Pittsburgh, Consent Decree 1997, at ¶ 13 [Pittsburgh Consent Decree]). In Washington D.C., in addition to a reconciling their use of force policy with prevailing legal standards, the terms of the settlement add further that the Department's use of force policy "shall emphasize the goal of de-escalation and shall encourage officers to use advisements, warnings, and verbal persuasion when appropriate (Memorandum of



Agreement, U.S. Department of Justice and the District of Columbia and the D.C. Metropolitan Police Department 2001, at ¶ 37 [DC Memorandum of Agreement]).

In both Cincinnati and Prince George's County, the settlement agreements mandated almost entirely policy-based changes. Each department is required to revise its use of force policy to "incorporate a use of force model that teaches disengagement, area containment, surveillance, waiting out a subject, summoning reinforcements or calling in specialized units as appropriate responses to a situation" (Memorandum of Agreement between the United States Department of Justice and Prince George's County, Maryland and The Prince George's County Police Department [PG County MOA] 2004, at ¶ 34(c); see also, Memorandum of Agreement between the United States Department of Justice and the City of Cincinnati, Ohio and The Cincinnati Police Department [Cincinnati MOA] 2002)[7]."

The second key set of reforms stipulates that each department develop and implement a database designed for

> maintaining, integrating, and retrieving data necessary for supervision and management of [the police department] and its personnel. The computerized data shall be used regularly and affirmatively…to promote civil rights integrity and best professional police practices; to manage the risk of police misconduct, and potential liability thereof; and to evaluate and audit the performance of…officers of all ranks, and…units, sub-units, and shifts. It shall be used to promote accountability and proactive management and to identify, manage, and control at-risk officers, conduct, and situations. (DC Memorandum of Agreement, ¶ 106).[8]

---

[7] The specific language from the Cincinnati MOA requires the Cincinnati Police Department to "incorporate a use of force model that relates the force options available to officers to the types of conduct by individuals that would justify the use of such force and teaches that disengagement, area containment, surveillance, waiting out a subject, summoning reinforcements or calling in specialized units may be an appropriate response to a situation" (See ¶12(c)).

[8] Compare PG County MOA, ¶ 75; Cincinnati MOA, ¶ 57; MPD MOA, ¶¶ 126-133; and Pittsburgh CD, ¶ 12(a-e).



The development of this 'Early Warning System' (also referred to as a Misconduct Management System; an Early Indication System; a Risk Management System and a Performance and Personnel Management System), includes both technological and management components. Each department is required to develop the system itself (all four used a private contractor) to institute protocols requiring that street-level officers write the incident reports that comprise the systems' data,[9] and to ensure that managerial officers review system performance reports. Consider as an example the requirement that "commanders, managers, and supervisors will review, on a regular basis, but not less than quarterly system reports, and will evaluate individual officers, supervisor, and unit activity" and "require that commanders, managers, and supervisors initiate intervention for individual officers, supervisors, and units based on appropriate activity and pattern assessment of the information contained in the database" (Prince George's County MOA, ¶ 80 (a-b)).

Third, settlement agreements signed with the DOJ require each jurisdiction to establish model citizen complaint processes. The first tenet of this stipulation is the development of policy that facilitates the complaint process while broadening the scope of those citizens eligible to make a complaint against police. For example, in Washington D.C., complaints may be filed "in writing or verbally, in person, by mail, telephone,...or by electronic mail." Further, "MPD shall accept and investigate anonymous complaints and complaints filed by persons other than the alleged victim" (DC Memorandum of Agreement, ¶ 92). Next, the four settlement agreements require

---

[9] Consider, for example, data points required by Cincinnati's MOA, including, among others: "(a) all uses of force; (b) canine bite ratios; (c) the number of canisters of chemical spray used by officers;...(f) all critical firearm discharges, both on-duty and off-duty; (g) all complaints (and their dispositions)...(i) all vehicle pursuits...(k) all disciplinary action taken against officers."

E-13

that each department establish an independent complaint review office, and a well-defined protocol for investigating and settling every complaint filed.  In Prince George's County, for instance, "[c]omplaints will be evaluated based on a preponderance of the evidence standard," (¶ 66) and investigators will "consider all relevant evidence including circumstantial, direct and physical evidence" (¶ 68).  What's more, the complaint review office "will not close an investigation simply because the alleged victim is unwilling or unable to provide medical records or proof of injury" (¶ 69).

Settlement agreements in each of the four affected jurisdictions include aggressive timelines for reform implementation, and put a fixed term of years on the overall process.  Deadlines are given for each individual task and range from 30 to 180 days, depending on the nature of the issue and vary only slightly from department to department.  Affected departments may move to terminate the settlement agreement "[a]t any time after five (5) years from the date of entry…and after substantial compliance has been maintained for no less than two years" (Pittsburgh CD, ¶ 79), and maintain the burden of "demonstrate[ing] that it has fully and faithfully implemented all provisions" of the settlement agreement (Ibid).[10]  The tenets of each agreement are backed by the threat of either judicial sanction or instigation of formal litigation, are thus legally binding.

To facilitate implementation of settlement terms, each agreement mandates the appointment of an independent monitor, selected by the DOJ and the affected department to "review and report on the [department's] implementation of, and assist with the [department's] compliance" with the settlement agreement (Cincinnati MOA, ¶ 92).

---

[10] The settlement agreement between the DOJ and Prince George's County set a three year termination date: "The Agreement will terminate three years after the effective date of the Agreement or earlier if the parties agree that the PGPD and the County are in substantial compliance with each of the provisions of this Agreement, and have maintained substantial compliance for at least two years" (Prince George's County Memorandum of Agreement, ¶ 113).

E-14

14

Each agreement mandates that the affected department provides the DOJ and the monitor "full and unrestricted access to any City and [department] documents (including database), staff and facilities that are relevant to evaluate compliance...include[ing], but not limited to, all documents regarding use of force data, protocols, analyses, and actions taken pursuant to analyses" (DC Memorandum of Agreement, ¶ 177).

The depth of these reforms, the aggressive pace at which they are pursued, and the high profile nature of the departments' alleged malfeasance highlight the practical importance of this issue and implicate many of the fundamental theoretical questions that underlie the study street-level bureaucratic behavior in a democratic society. Not only do §14141 reforms have the ability to change the process and focus of policing, but provide a unique approach to reconciling the tension between legal protections guaranteed under the U.S. Constitution and the unyielding drive for more efficient, effective service so evident in the day-to-day operation of all street-level bureaucracies. Of course, as with any policy that disrupts the status quo by forcing hard managerial and organizational choices, these reforms present significant implementation challenges, and ones that not only affect street-level actors, but rely on their compliance.

### The Implementation of §14141 Reform

In this section I present the model used to describe and evaluate the implementation of §14141 settlement agreements in Pittsburgh, Washington, DC, Cincinnati, and Prince George's County, Maryland. Though I rely on relevant theoretical and empirical literature from across the policy implementation field to develop individual variables, the broad framework of the model is derived from three volumes that analyze

E-15

the implementation of case law: Robert Wood's <u>Remedial Law</u> (1990), Canon and Johnson's <u>Judicial Policies</u> (1999), and Cooper's <u>Hard Judicial Choices</u> (1988).

I operationalize 'implementation' by tracking the extent to which the four police departments were able to implement the settlements' three key components – changes to use of force policy, development of Early Warning systems, and the revision of citizen complaint systems – pursuant to the terms of the agreement.

The model's independent variables are drawn from relevant policy implementation literature, beginning with Wood's (1990) volume, in which the author describes an empirical framework that includes four categories of variables thought to affect a public institution's implementation of a judge's remedial order: (1) an agency's organizational design; (2) its institutional competency; (3) employees' attitude toward reform; and (4) the nature of the political arena.[11]

To operationalize the organization design construct, I will include measures for the agency's size (e.g., Chun and Rainey 2005) and centralization (Thompson 1982), as well as the complexity of joint action (Pressman and Wildavsky 1984). I will use measures for the attitudes of police leadership and patrol officers toward the settlement agreement (Berman and McLaughlin 1976; Pressman and Wildavsky 1984), resource availability (Rein and Rabinowitz 1978), department professionalization,[12] and the communication structure in place between management and street-level officers (Lipsky 1980; Van Meter and Van Horn 1975) to operationalize institutional competency. The measure of employee attitudes will be straight forward, in that it will reflect the opinions

---

[11] This framework reflects the thinking of many policy implementation scholars and represents a mainstream understanding of those factors thought to affect policy implementation, as O'Toole's 1986 review of the field makes clear.

[12] "Department professionalization" will incorporate measures for the department's recruit education and screening requirements.



16

of both management and street-level officers toward the reforms mandated by §14141 settlement documents (Canon and Johnson 1998). Finally, the model will include variables that reflect public support for the reforms among members of the jurisdiction's political and administrative infrastructure.

To complete the model, I will add to Wood's empirical framework two sets of independent variables. First, I will evaluate the affects of certain settlement agreement characteristics (Mazmanian and Sabatier 1981, 1989; Ingram and Schneider 1990), including the number and complexity of required reforms, and the timeframe required for compliance. Second, building off Bardach's (1978) work on political fixers and on Cooper's (1988) description of the importance of special masters to case law implementation, I will evaluate the impact of each independent monitor on the settlement agreement implementation. This analysis will include measures for the relationship between the Monitor and police leadership, and the relative involvement of the Monitor in overcoming disruption to the implementation process.

The proposed model is as follows:


[Figure 1 Here]


To review, this model will allow me to both describe and evaluate the structures developed by the four affected police departments to implement those reforms stipulated by the §14141 settlement agreements. This analysis will evaluate the applicability of current policy implementation literature to a relatively new and understudied policy type, and will provide a solid initial step toward understanding what factors explain differences



17

in the experiences of four major police departments in implementing §14141 settlement agreements.  Because this policy type is so understudied, much of this research is exploratory; as a result, I resist the urge to offer specific hypotheses regarding causal impact of the independent variables included.

**Data and Methods**

The project's data will come from one primary source: quarterly reports filed by the independent monitor hired to management settlement reform implementation.

Independent monitors have been hired to manage the implementation of every §14141 settlement reform process.  As described above, these monitors, who have been academics (Pittsburgh), former police chiefs (Prince George's County), and other high-level government administrators (Washington, DC; Cincinnati), are expected to serve as intermediaries between the DOJ and the police department leadership.  They attend every important planning meeting, communicate regularly with all critical staff, and follow closely progress toward the goals outlined in each clause of the settlement document. Ultimately, the monitor is responsible for managing the process and helping each side overcome obstacles that threaten successful implementation.  A key feature of this job is the quarterly reports each monitor is required to file in order to document the implementation process.

These reports use both quantitative and qualitative data to develop a detailed, analytical review of the implementation process.  In each of the four cases, the departments undergoing §14141 reform issued their own internal quarterly reports. These reports are similar to the monitor reports in that they describe the implementation



process step-by-step, but do so from the department's perspective.  This second set of reports offer an interesting counter-point to the monitor reports and will be used as a supplement with the hope of injecting into the analysis a diverse perspective.  Both the monitor and department reports are publicly available.[13]

Owing to the lack of systematic research evaluating the implementation of §14141 reform, much of this analysis is exploratory.  It is my intention to describe and evaluate each variable systematically, and use those descriptions as a vehicle for assessing the causal relationships that exist between the implementation of each clause of the settlement agreement and those independent variables selected for analysis.

**Preliminary Results and Analysis**

In this section I describe the implementation of reforms to use of force policies, early warning systems, and citizen complaint protocols enacted in Pittsburgh, Washington, DC, Cincinnati, and Prince George's County,[14] and offer an early analytical look at those variables that significantly affected the process in each.

<u>Use of Force Policy</u>

I examine here the implementation of reforms to use of force policies in the four affected jurisdictions, discussing where relevant three separate components of the

---

[13] In addition to the monitor and department reports, I intend to conduct structured interviews with key participants, including Department of Justice's Special Litigation Section (SPL) staff, independent monitors, police department leadership, and relevant political and community leaders in each of the four jurisdictions under review.  Unfortunately, the process of securing these interviews has been much slower than I originally anticipated.  Thus, no interview data is included in the current analysis.  Future work will certainly reflect the views of key participants.  Further, as needed in the future, I will rely on publicly available data to supplement implementation reports and participant interviews.  These data will allow me to track metrics like budgetary figures, crime statistics, and police department staffing, among others.

[14] I have yet to conduct interviews, and have only just begun evaluating organizational structures in each jurisdiction.  My failure to discuss several independent variables, including organizational size, centralization, communication structure, public and political support, and professionalism, is not a coincidence.



process: (1) department policy reform; (2) street-level officer compliance (in the form of written use of force incident reports); and (3) supervisor compliance (in the form of command level reports). Results are presented comprehensively in Table 1.

Implementation of the required use of force policy change presented a low level challenge for the Pittsburgh Bureau of Police (PBP). In Pittsburgh, the independent monitor determined that within four months of signing the Consent Decree, PPD had drafted a use of force policy that allowed PPD "to control effectively" police use of force (Auditor's Third Quarterly Report 1998, at 10). Further, the monitor determined that the requisite use of force reporting protocol, which required street-level officers to "complete a written report each time a PBP officer…exercises a use of force," (Pittsburgh Consent Decree, ¶ 15) has been "developed, disseminated, and implemented" properly (Auditor's Third Quarterly Report, at 10). The relative absence of few if any noteworthy impediments to implementation, either among street-level officers or with their supervisors, is perhaps most directly owed to the fact that the emphasis of the DOJ's investigation and subsequent settlement with PBP focused on the department's citizen complaint protocol rather than its pattern or practice of excessive force (Davis 2002).

In Cincinnati, the independent monitor formally approved the Cincinnati Police Department (CPD) use of force policy in the second reporting period, six months after the monitor's initial policy review (Cincinnati Independent Monitor's Second Quarterly Report, July 2003, at 15). Though there was some initial disagreement between the DOJ and CPD leadership regarding policy language, those issues were overcome very quickly. The same cannot be said for disputes between the CPD and the DOJ regarding use of force reporting, however. A dispute developed over the comparative length and level of

E-20

detail required by an officer's report following incidents that involved a 'take-down without injury' versus that required following take-down incidents causing injury. Though seemingly minor, CPD insisted that requiring officers to expend the same time and energy filing reports for non-injury takedowns, which are much more common than injury-producing incidents, would force officers to spend inordinate amounts of time on paperwork and ultimately detract from the CPD's ability to do its job properly. After nearly two years of negotiation, the DOJ relented, albeit on a trial basis, and CPD instituted a new policy permitting fewer reporting requirements for non-injury incidents (Cincinnati Independent Monitor's Tenth Quarterly Report, July 2005).

In Washington and in Prince George's County, agreement between the DOJ and department leadership took much longer than it did in either Cincinnati or Pittsburgh. In each case, the actual terms of the policy were not of issue as much as was the Departments' implementation of those policy changes. In DC, for example, the monitor concludes that "MPD's roll-out of the Use of Force General Order was not as effective as it could have been primarily because MPD's initial efforts to train its officers were poorly coordinated and executed (Third Quarterly Report of the Independent Monitor for the Metropolitan Police Department, Jan. 2003, at 5). MPD was never really able to overcome the initial implementation problems. Consider, for example, that five years into the implementation of settlement reforms, only 36 % of necessary use of force reports were filed by MPD street-level officers. Further, 45% of completed use of force reports reviewed by MPD's quality assurance team were missing required supervisor signatures (17th Metropolitan Police Department, Jan. 2003, at 15). It was only in the final months of the settlement agreement, some seven years after the agreement's

E-21

inception, that the independent monitor approved the quality of MPD use of force reporting (Final Report of the Independent Monitor for the Metropolitan Police Department, June 2008, at 25-31).

The Prince George's Police Department (PGPD) struggled in similar ways to develop and implement a use of force policy consistent with the terms of their settlement agreement. After two and one half years of negotiation with the Department of Justice and the independent monitor, PGPD promulgated use of force regulations that met the conditions of the agreement (Report of the Independent Monitor, Seventh Quarterly Report, March 2006, at 14). As this negotiation was ongoing, PGPD was struggling to find consistency and quality in the use of force reports filed by street-level officers and supervisors. In their 3rd quarterly report, for example, the Prince George's County monitors found that

> adherence to the current directive on use of force is not uniform, especially with respect to the deployment of OC spray. Supervisors preparing the [review reports] are neither commenting on the adherence or lack of adherence to the directive, nor evaluating the appropriateness of the use of force. There is currently no mechanism in place to evaluate whether or not the unit commander has evaluated the performance of the supervisor who prepared the [review report]. The coding of the [review reports] frequently does not reflect the type of force utilized (March 2005, at 5).

A few themes are apparent when comparing use of force policy change across the four jurisdictions. First, the nature of the specific change required by the settlement agreement is important. The Pittsburgh Consent Decree used simple language in asking the PBP to bring their policies in line with current law. In each of the other three jurisdictions, mandated reforms were largely policy-driven, requiring affected departments to emphasize de-escalation, disengagement, and non-violent submission, for

E-22

example.  Though long-term results from each type of reform – including officer respect for civil rights and reduction in use of force incidents, citizen complaints, and litigation – remain to be seen, the more complex reform requirements proved harder to develop and to implement.

The second interesting theme here is the importance of department leadership and reliance on bureaucratic accountability structures to rectify problems with use of force policy implementation.  Independent monitors in both Washington and in Prince George's County described police departments that struggled initially to find consistency and quality in their use of force reporting.  In the District, throughout the first ten quarters reviewed, the monitor observed consistently low use of force report completion percentages and among the completed reports, high rates of missing information or insufficient descriptions of key events.  Though there is no explanation given as to why these deficiencies persisted for as long as they did, in his 11th quarterly report, the DC monitor acknowledges dramatic improvement in terms of both quality and consistency, and suggests that MPD leadership's newfound commitment to the issue made a difference: "MPD has initiated internal controls with respect to [use of force reporting], and we recommend that MPD continue to devote significant attention, in terms of training and supervision, to sustaining the high completion rates reported this quarter and to improving the information recorded" (MPD 11th Quarterly Monitor Report, at 32).

A similar situation occurred in Prince George's County.  The first report filed by the PG County monitor described a use of force reporting system that was rife with inconsistencies and lacked even the most basic quality assurance and accountability measures (PG County 1st Monitor Report, at 4).  It was not until the Chief himself began

E-23

reviewing specific use of force data reports did the existing discrepancies begin to clear up (PG County 3rd Quarterly Report, at 5). A directive signed by the Chief to "ensure…that all…[use of force reports] are accounted for and transmitted to the appropriate locations" proved instrumental (PG County 4th Quarterly Report, at 5), as did the Chief's establishment of a Use of Force Reporting Committee to assist in addressing use of force reporting system inconsistencies (PG County 5th Quarterly Report, at 16). These managerial and organizational changes aided in the development of a use of force checklist and a recommitment to training (PG County 6th Quarterly Report, at 4), and helped to steadily improve the quality of use of force reporting.

As late as June 2007, however, some two years after PG County's Chief issued the directive related to street-level officer use of force reporting, the monitor determined that 26% of *supervisor* reports (which summarize use of force trends in the supervisor's command area) reviewed lacked "sufficient detail to determine compliance" with the settlement (PG County 12th Monitor Report, at 3). It is interesting to note that in both DC and Prince George's County many of the problems with use of force reporting occurred at the mid-level managerial level, rather than at the street-level. Given the strict hierarchical accountability structures in place, the acute attention paid to the issue by the monitor, and the direct involvement of the Chief, one wonders if the recalcitrant middle managers were simply overwhelmed by the increases in responsibility the settlement agreement placed on them or were responding to what they believed was an unclear or inefficient policy (see, for example, PG County 5th Monitor Report at 5).


[Table 1 Here]

E-24

<u>Early Warning System</u>

In this section I describe and analyze the implementation of department early warning systems, emphasizing (1) system development; and (2) system utilization. Table 2 documents the findings.

Early warning systems are a critical component of the DOJ's §14141 reform template, in that they (at least in theory) provide each affected jurisdiction a sophisticated database to track officer compliance with existing law and department regulations. When fully operational, these early warning systems afford department leadership the ability to identify officers who have violated the law at a rate statistically significantly higher than relevant peers, and to intervene with extensive training, counseling, or a more punitive sanction, depending on the nature and persistence of the problem. As these systems are complicated and expensive to develop, and require a substantial change in department culture and individual officer behavior, they present a sizable implementation challenge.

In three of the four jurisdictions under review, implementation of an early warning system proved to be the most significant challenge presented by the reform settlement. Again, Pittsburgh was anomalous. By the 9th quarter of reform, some two years after the agreement had been signed, PBP had developed, tested, and fully implemented an electronic database that satisfied the terms of the agreement. Though not without problems along the way, the speed with which PBP implemented this section of its Consent Decree was nothing short of remarkable. Pittsburgh did have a significant head start on the road to the EW system, as the PBP had committed to such a system prior to signing the consent decree.



Significant delays hindered the implementation of EW systems in each of the other three jurisdictions.  Prince George's County PD spent over four years implementing their version of the system, while in Cincinnati it took CPD just short of four years to give their system the minimum level of capability it needed to satisfy the terms of the settlement agreement.  The DC Metropolitan Police Department was unable to fully implement their EW system within the 5-year term required by the settlement agreement, and even with the significant time and resources invested in this system, several (albeit minor) problems remained almost seven years after the agreement's inception (DC Monitor Final Report, at 84-86).

Diagnosing the problems experienced in each jurisdiction begins with a discussion of resources.  In Washington, DC, for example, budgetary shortfalls completely halted all work on MPD's EW system for 18 months (MPD 16th Quarterly Monitor Report, at 94), despite then-Chief Ramsey's personal attention to the matter.  Prince George's County's system was complicated by the demands of "acquiring the total $1.4 million dollars required to fully fund" their EW system (PG County 9th Monitor Report, at 3).

Second, cities' budgetary shortfalls were often complicated by challenges presented by the use of private contractors to develop the systems' technological capability.  Shortly after the budget crisis in DC was averted, a dispute over labor costs with the contractor hired to develop the system delayed progress an additional four months (MPD 16th Quarterly Monitor Report, at 94).  In PG County, development of the EW system was delayed from the start by lengthy contract bidding process and negotiations between PGPD and the Department of Justice over the terms of the Request

E-26

for Proposal (PG County 1st Monitor Report, at 31). Implementation of Prince George's County's EW system was also complicated by negotiations related to "costs of customizing" the system (PG County 7th Monitor Report, at 38), and by incongruities between priorities of Department staff and private contractor employees (PG County 10th Quarterly Report, at 39). Cincinnati PD experienced some delay due to their chosen contractor's failure to deliver on time critical components of the EW system (e.g., Cincinnati 4th Monitor Report, at 40).

The third theme that emerged from the analysis of implementation of early warning system implementation was the importance of the commitment of mid- and upper-level management to the full use of the system, particularly as a disciplinary mechanism. In Cincinnati, for example, the monitor documented in two straight quarterly reports several cases where officers who met the threshold for misconduct (typically, a combination of three use of force incidents, illegal search and seizures, citizen complaints, etc.), failed to receive the intervention mandated by the terms of the settlement (e.g., Cincinnati 5th Monitor Report, at 38). The monitor attributed directly to management level staff's refusal to take seriously the disciplinary function of the EW system (Cincinnati 13th Monitor Report, at 44). Monitors in Washington, D.C., and Prince George's County observed similar patterns of supervisorial noncompliance. Monitors in Washington, D.C. and Prince George's County observed similar patterns of supervisory noncompliance. Clearly, without the resources necessary to implement the system, and the commitment from critical mid-level supervisory staff to use the systems as designed, even the most advanced bureaucratic accountability tools can be rendered ineffective.

E-27

[Table 2 Here]

<u>Citizen Complaint Review Systems</u>

The third – and most complex – tenet of DOJ settlement agreements with Pittsburgh, Washington, DC, Cincinnati, and Prince George's County, is the stipulated reform of each department's system for receiving and investigating citizen complaints. Though there are marginal distinctions between the systems mandated by each agreement, several fundamental characteristics were required in all four jurisdictions: (1) facilitate the complaint process by expanding the means by which citizens may file complaints; (2) set parameters for ensuring quality investigation, including witness identification, interview protocols, and review of evidence; (3) staff an independent agency responsible for investigating and adjudicating complaints; (4) complete investigation of all submitted complaints within the mandated 90 days; (5) develop an accountability system (including the use of an auditor and a supervisory review of final adjudication) designed to ensure the legitimacy and independence of the process.

Each of the four departments faced significant problems in developing and implementing citizen complaint systems to comply with settlement terms. Some of the components presented more of a challenge than others. In most cases, those reforms requiring just a change in policy – i.e., (1) redefining eligibility and means of filing complaints and (2) re-establishing investigative parameters – were met with little resistance in any of the four departments. These changes demanded little in terms of



E-28

28

resources and required minimal levels of behavioral change or organizational movement. Low hanging fruit, as it were.

Implementation of these policy changes was also quite smooth, though there were instances where departments struggled for brief periods to get investigators to adhere strictly to the revised protocols. Consider, for example, that the monitor in Cincinnati found periodically failure among investigators to reconcile evidentiary inconsistencies between officer statements and those given by witnesses (e.g., Cincinnati 14th Monitor Report, at 32-33). Though potentially serious enough to undermine the quality of the investigation process and the legitimacy of the outcomes generated, these types of setbacks tended to be temporary. More data is needed to determine whether such issues were nothing more than anomalies in a broader general pattern of compliance, or if quarterly scrutiny by independent monitors and substantial department accountability structures were able to nip noncompliance in the bud before it grew into a bigger problem.

Perhaps the area that presented the most substantial challenge was stipulation that no citizen complaint investigation last longer than 90 days. As the four monitors described in detail, no jurisdiction proved consistently able to meet this requirement. In Pittsburgh, this problem was clearly a manifestation of the City's inability to fully staff the Office of Municipal Investigations (OMI). Finding money in the budget for officers and civilians willing and able to perform the job capably remained an issue throughout the term of the settlement. Consider, as a result, that almost three years into the settlement implementation, Pittsburgh's Office of Municipal Investigations (OMI) "completed and forwarded…for review 26 cases this quarter, the office received 99

E-29

complaints [during the same quarter], adding an additional 73 cases to the backlog of 559 cases currently pending.  OMI cases currently pending total 632 cases" (Pittsburgh Monitor 10th Quarterly Report, at 59).  Though the link between staffing and adjudication speed was not as direct in the other three jurisdictions as it was in Pittsburgh (in Pittsburgh the issue was existing positions remaining unfilled for extended periods of time), one cannot interpret the following snapshot without considering resources and staffing:

- Prince George's County: "None of the 20 cases reviewed were completed in less than 90 days" (PG County Monitor 14th Quarterly Report, at 35).

- Cincinnati: Of the "total of 67 cases [that] were cleared [in Q1 of 2005]…42 exceeded the 90-day investigative requirement" (Cincinnati Monitor 10th Quarterly Report, at 27).

- Washington, DC: "This quarter, only 55.1% of the investigations reviewed either were completed within the 90 days or contained special circumstances justifying the delay, which is approximately the same level of compliance we reported last quarter (56.1%)" (MPD 12th Monitor Report, at 40).

Three years into the settlement implementation, none of the four jurisdictions could consistently adjudicate citizen complaints within the requisite 90-day period more than 56% of the time.  Of the several possible explanations that exist, one of the most plausible might be that investigator training was inadequate, rendering investigators incapable of adjudicating complaints as efficiently as necessary.  In all four jurisdictions, however, monitors determined that the investigator training programs in place each met the standards set by the DOJ.  Alternatively, perhaps the 90-day window was just too



aggressive, and more time was actually needed to do the job properly. Only Washington, DC actively pursued and succeeded in garnering an extension of the 90-day window. In July, 2005, the DOJ agreed to allow MPD investigators an additional 45 days to adjudicate citizen complaints (MPD 13th Monitor Report, at 72, n.150).

One might also hypothesize that the delays and subsequent case backlogs were due to investigators who were either bad at their jobs or simply dragging their feet, unwilling to meeting necessary deadlines. Some of the evidence pointing to problems with the quality of investigations might support this theory. As described above, in each of the four jurisdictions, particularly early on in the implementation process, monitors highlighted areas where investigators were not meeting the minimum quality threshold. That these inconsistencies tended to subside as time went on makes the 'feet dragging' and 'incompetent' hypotheses seem less likely.

Finally, the explanation that resonates most is that there simply were not enough investigators in place, and that each individual investigator's caseload was too much to handle. Though there is no direct evidence supporting this theory (no Department brought on significant additional staff, and none was able to eliminate their backlog or reduce dramatically the adjudication time), the view of PG County's monitor is instructive:

> [The monitor] believes that achievement of the 90 day turn around on these cases could only have been accomplished through an infusion of a large number of investigators into the Internal Review unit or by reducing the extensive review process for internal affairs cases utilized by Prince George's County [and mandated by the settlement agreement].



Perhaps in subsequent agreements, the Department of Justice will be more concrete when requiring cities to "provide [citizen complaint review offices] sufficient qualified staff, funds, and resources to perform the functions required" (Memorandum of Agreement, U.S. Department of Justice and the District of Columbia and the D.C. Metropolitan Police Department, 2001, at ¶ 37).

The fifth and final component of the citizen complaint system implementation was the requirement that each jurisdiction institute an accountability regime to ensure the quality and independence of the citizen complaint process. None of the affected departments faced much difficulty in developing and implementing the necessary accountability processes. All four jurisdictions created an independent office charged with receiving and adjudicating citizen complaints, and all four jurisdictions established a citizen board to review the findings and certify their legitimacy. That this framework was instituted without complication comes as little surprise. The citizen complaint review component of the four settlement agreements is arguably the most visible, and the easiest to evaluate. The independent monitors made it a point in each case to review carefully citizen complaint adjudication, and in the process focused on the role played by the review body. If cases were not making their way from police departments to the citizen complaint review offices (many citizen complaints are filed at with the police directly), or from citizen complaint offices to review boards, the monitor, the DOJ, and leadership from the affected jurisdictions would be prompted to act quickly and decisively to correct things. This component of the settlement reform implementation process exemplifies most clearly the benefits of the independent monitor's close observational oversight.

E-32

[Table 3 Here]

**Early Observations and Implications for Theory and Practice**

This research offered early results from the first systematic analysis of the implementation of police department reforms mandated by settlement agreements with the Department of Justice. By evaluating implementation in four jurisdictions found to exhibit a "pattern or practice" of abuse of force, this research aimed to apply to a unique policy type several theoretical principles well-established in the policy implementation literature. Further, I hoped to place these reform efforts – which are being hailed by the Department of Justice ("Principles for Promoting Police Integrity" 2001) and several prominent policing scholars (Walker 2003; 2005; Stone, et al. 2009) as producing a model for all American departments to emulate – in context with the history public administration and recent efforts at police reform.

Several important findings merit discussion. First, it is very clear that the development and implementation of settlement agreements between the Department of Justice and affected police departments occur is a decisively top-down, highly centralized manner. Each of the four settlement agreements discussed here were developed by members of the DOJ, political leadership from the affected jurisdictions, and that city's top-level police staff. In no case were members of the rank and file, union representatives, community groups, or other members of the public included in the initial decision making. The product of these negotiations (which, incidentally, involve nothing beyond issues of marginal importance, i.e., the frequency with which a mid-level



33

supervisor must review early warning reports; that the city agrees to the central terms of

the settlement – the reformation of department use of force policy, establishment of an

early warning system, etc. – are a prerequisite to avoiding formal litigation) is a highly

centralized operational environment where essential information, policy, oversight flows

unilaterally from the chief down.

      This observation is of interest to public administrationists and policing scholar for

several reasons.  To begin with, at the very least, the reform process described herein is

inconsistent with the drive for decentralization (not to mention devolution, but that

discussion is for another day) undergirding both the New Public Management and

Community Policing movements.  Under the terms of the agreement, for example, top-

level management are necessarily involved in several fundamental aspects of the

department's operation and are less capable of granting broad discretion to street-level

and even mid-level supervisors over when to use of force, how to discipline an officer,

and how to train new recruits, among several other areas.  Though this may be justified --

each department was shown to have violated systematically constitutional law -- it clearly

runs counter to community policing movement's goal of bringing officer and citizen

closer together through neighborhood-based initiatives and expanded street-level

discretion.

      There is some evidence, however, that the organizational and operational model

effectuated by §14141 settlements may be a harbinger of "back to the future" shift toward

centralized administration reform, at least among police departments.  Consider that the

DOJ is pushing the "Policy Change – Early Warning System – Citizen Complain

System" template as a model for democratic policing in the United States, and urging



departments to preempt investigation and litigation by making changes along these lines. Several of the country's biggest departments – from Los Angeles and Cincinnati to Washington, DC and the State of New Jersey – have already emerged from settlement agreements, with several more on the horizon.  What little evidence exists suggests that in most cases the implementation process has been relatively smooth, the abusive behavior motivating DOJ involvement has subsided without statistically significant increases in crime (Davis, et al. 2005; Stone, et al. 2009), and public support for the police has increased following the reforms (Davis, et al. 2005). To my knowledge, no one has suggested applying this model to other administrative contexts, but given the early results, the idea seems far from crazy, particularly given the long running battle to reconcile administrative efficiency with constitutional values.

In terms of both policy implementation theory and practice (as well as theory related to street-level bureaucracy), a second finding that bears some mention is the absence of any significant pattern of street-level officer recalcitrance.  For the most part, the terms of the settlement agreements and the internal directives used to implement them were adhered to at the lowest levels.  Beat cops dutifully filed use of force reports and submitted to interviews by citizen complaint investigators, and, perhaps most importantly, use of force incidence fell steadily in each jurisdiction.  Citizen complaint investigators followed carefully the stipulated protocols, and did so despite overwhelming case loads.  The abuse of discretion that concerned Lipsky and has preoccupied police leadership and scholars from several academic fields did not materialize.  Perhaps even more interesting than that even is how frequently mid-level management was found responsible for delays or non-compliance.  In several instances,

E-35

supervisors neglected to consistently review use of force reports as required, and in some cases failed to perform the necessary intervention or take the appropriate disciplinary measures against those officers identified by department early warning systems. Future interviews with police leadership and mid-level managers will certainly address this issue and should prove very insightful.

The importance of resources to the reform implementation was readily apparent. City budget shortfalls and lengthy disputes with private contractors significantly delayed development and implementation of early warning systems in Washington DC, Cincinnati, and Prince George's County. An inability to staff properly citizen complaint offices led directly to substantial delays in adjudicating complaints in all four jurisdictions, and produced case backlogs that, at least according to one monitor "threaten[ed] the overall success of the consent decree" (Pittsburgh Monitor 10th Quarterly Report, at 59-60). This is not a surprising finding. Since the field's inception, policy implementation literature has consistently highlighted the necessity of both labor and capital resources. The clarity and decisiveness with which the absence of resources detrimentally affected the implementation of several aspects of the settlement is noteworthy.

Another resource worth mentioning is that of street-level officers' time. Pursuant to the terms of the settlement agreements, street-level officers are required to spend substantially more time responding to interview requests, attending training sessions, and especially, filling out reports. The monitors in each of the four jurisdictions under review found no evidence of "under policing," or the active choice by officers to minimize or avoid altogether citizen interaction so as to reduce the amount of paperwork required.



Though the absence of under policing is consistent with earlier case studies of "pattern or practice" reform in Pittsburgh (Davis, et al. 2002; Davis, et al. 2005) and in Los Angeles (Stone, et al. 2009), it conflicts with expectations of both rational behavior and street-level bureaucratic theory. This is another issue that bears watching as more data becomes available.

No further data is needed to support the conclusion that independent monitors are central to the implementation of "pattern or practice" reform. In each case, the monitors alone set the parameters for compliance and thus dictate the pace, emphasis, and effect of the settlement reform process. The monitor's quarterly reports are the singular independent source of data on reform progress and provide for both the DOJ and the department itself a definitive account of the process. This finding seems to square with the emphasis Bardach (1978) placed on political fixers, and is entirely consistent with previous accounts of special masters facilitating institutional litigation reform. This does beg the questions, however, whether the independent monitors have too much power.

Beyond the quarterly report filing requirement, there is no accountability structure in place to ensure that the monitors themselves are performing as expected. The recent experience in Detroit, where the independent monitor was caught having an extramarital affair with the mayor and has been accused of lying about her fees and expense reports to the tune of millions of dollars (Elrick et al, 2009), illustrates the extent of damage a monitor may cause. Further, there are no mechanisms in place under the current arrangement to prevent a rogue monitor intent on padding his or her pockets from setting an unattainable standard and forcing an extension of the original settlement termination date.



## Resources

Bardach, Eugene, The Implementation Game, Cambridge, MA: MIT Press (1978).

Berman, Paul and Milbrey McLaughlin, "Implementation of Educational Innovation," Educational Forum, Vol. 40, No. 3 (1976), pp. 347-370.

Bertelli, Anthony M., "Strategy and Accountability: Structural Reform Litigation and Public Management," Public Administration Review, Vol. 64 (2004), pp. 28-42.

Bertelli, Anthony M. and Laurence E. Lynn, Jr., Laurence E., "Managerial Responsibility," Public Administration Review, Vol. 63, No. 3 (2003), 259-269.

Bittner, Egon, Functions of the Police in Modern Society, Washington, D.C.: National Institute of Mental Health (1970).

Canon, Bradley and Charles Johnson, Judicial Policies: Implementation and Impact, 2nd ed., Washington, DC: CQ Press (1999).

Cheh, Mary M., "Are Lawsuits an Answer to Police Brutality?," in Police Violence, William A. Geller and Hans Toch, eds., (New Haven: Yale University Press, 1996).

Chun Young Han and Hal G. Rainey, "Goal Ambiguity in U.S. Federal Agencies," Journal of Public Administration Research and Theory, Vol. 15, No. 1 (2005), pp. 1-30.

Cooper, Philip J., Hard Judicial Choices, New York: Oxford University Press (1988).

Davis, Robert C., Christopher W. Ortiz, Nicole J. Henderson, Joel Miller, and Michelle K. Massie, "Turning Necessity into Virtue: Pittsburgh's Experience with a Federal Consent Decree," Vera Institute of Justice (2002).

Davis, Robert C., Nicole J. Henderson, and Christopher W. Ortiz, "Can Federal Intervention Bring Lasting Improvement in Local Policing? The Pittsburgh Consent Decree," Vera Institute of Justice (2005).

Davis, Kenneth C., Discretionary Justice: A Preliminary Inquiry, Baton Rouge, LA: Louisiana State University Press (1969).

Elrick, M.L., Joe Swichard, Ben Schmitt, and Naomi R. Patton, "FBI uncovered texts from Kilpatrick, monitor: They show meetings in various cities with cops' watchdog," The Detroit Free Press, July 28, 2009. Available here: http://www.freep.com/article/20090728/NEWS01/907280318.

Emery, Richard and Ilann M. Maazel, "Why Civil Rights Lawsuits do not Deter Police Misconduct: The Conundrum of Indemnification and a Proposed Solution," Fordham Urban Law Journal, Vol. 28 (2000-2001), pp. 587-600.



E-38

Fritsch, Jane, "The Diallo Verdict: The Overview; 4 Officers in Diallo Shooting are Acquitted of All Charges," The New York Times, February 26, 2000.

Fyfe, James, "Training to Reduce Police-Civilian Violence," in *Police Violence*, William A. Geller and Hans Toch, eds., (New Haven: Yale University Press, 1996).

Garrison, Arthur H., "Law Enforcement Civil Liability under Federal Law and Attitudes on Civil Liability: A Survey of University, Municipal and State Police Officers," Police Studies, Vol. 18, No. 3/4 (1995), pp. 19-37.

Grant, J. Douglas, and Joan Grant, "Officer Selection and the Prevention of Abuse of Force," in *Police Violence*, William A. Geller and Hans Toch, eds., New Haven: Yale University Press (1996).

Hughes, Tom, "Police Officers and Civil Liability: The Ties that Bind," Policing: An International Journal of Police Strategies & Management, Vol. 24, No. 2, 2003, pp. 240-262.

Human Rights Watch, Shielded From Justice: Police Brutality and Accountability in the United States, 103-05 (1998).

Ingram, Helen and Anne Schneider, "Improving Implementation Through Framing Smarter Statutes," Journal of Public Policy, Vol. 10, No. 1 (1990), pp. 67-88.

Jeffries, Jr., John C. and George A. Rutherglen, "Structural Reform Revisited," University of California Law Review, Vol. 95 (2007).

Kappeler, Victor E., Kappeler, Stephen F., & del Carmen, Rolando V. (1993). "A Content Analysis of Police Civil Liability Cases: Decisions of the Federal District Courts, 1978-1990," Journal of Criminal Justice, 21, 325-337.

Lipsky, Michael, Street-Level Bureaucracy, New York: Russell Sage Foundation (1980).

Markovic, John, Protecting Civil Rights: A Leadership Guide for State, Local, and Tribal Law Enforcement, Washington, D.C.: International Association of Chiefs of Police (2006).

Mastrofski Stephen D., "Controlling Street-Level Police Discretion," The Annals of the American Academy, May 2004, pp. 100-118.

Mazmanian, Daniel A. and Paul A. Sabatier, eds., Effective Policy Implementation, Lexington, MA: Lexington Books (1981).

_____, Implementation and Public Policy, Lanham, MD: University Press of America (1989).

E-39

Mydans, Seth, "The Police Verdict: Los Angeles Policemen Acquitted in Taped Verdict," New York Times, April 30, 1992.

National Research Council, Fairness and Effectiveness in Policing: The Evidence, Washington, D.C.: The National Academies Press (2004).

Pressman, Jeffrey and Aaron Wildavsky, Implementation, 3rd ed., Berkeley: University of California Press (1984).

O'Toole, Jr., Lawrence J., "Recommendations for Multi-Actor Implementation: An Assessment of the Field," Journal of Public Policy, Vol. 6, No. 2 (Apr. - Jun., 1986), pp. 181-210.

Ohlin, Lloyd E. and Frank J. Remington (eds), Discretion in Criminal Justice: The Tension Between Individualization and Uniformity, Albany: State University of New York Press (1993).

"Principles for Promoting Police Integrity: Examples of Promising Police Practices and Policies," U.S. Department of Justice, January 2001. Available here: http://www.ncjrs.gov/pdffiles1/ojp/186189.pdf.

Rein, Martin and Francine Rabinowitz, "Implementation: A Theoretical Perspective," in Walter Dean Burnham and Martha W. Weinberg, eds., American Politics and Public Policy, Cambridge: MIT Press (1978), pp. 307-335.

"Report of the National Advisory Commission on Civil Disorders (Kerner Commission)," Washington: Government Printing Office, (1968).

Riley, K. Jack, Susan Turner, John MacDonald, Greg Ridgeway, Terry Schell, Jeremy Wilson, Travis L. Dixon, Terry Fain, and Dionne Barnes-Proby, "Police-Community Relations in Cincinnati," Santa Monica, CA: RAND Corporation (2005).

Ridgeway, Greg, Terry Schell, K. Jack Riley, Susan Turner, and Travis L. Dixon, "Police-Community Relations in Cincinnati: Year Two Evaluation Report," Santa Monica, CA: RAND Corporation (2006).

Rosenbloom, David H., "Public Administration Theory and the Separation of Powers," Public Administration Review, Vol. 45, No. 5 (1983), pp. 555–562.

Rosenbloom, David H. and Rosemary O'Leary, Public Administration and Law, 2nd Ed., New York: Marcel Dekker, Inc. (1997).

Simmons, Kami Chavis, "The Politics of Policing: Ensuring Stakeholder Collaboration in the Federal Reform of Local Law Enforcement Agencies," Journal of Criminal Law and Criminology, Vol. 98 (2008).

E-40

Skolnick, Jerome H., <u>Justice Without Trial: Law Enforcement in Democratic Society</u>, New York: Wiley (1966).

Skolnick, Jerome H. and James J. Fyfe, <u>Above the Law</u>, New York: The Free Press (1993).

Stone, Christopher, Todd Foglesong, and Christine M. Cole, "Policing Los Angeles Under a Consent Decree: The Dynamics of Change at the LAPD," Harvard Kennedy School Program in Criminal Justice Policy and Management, May 18, 2009.  Available here: http://www.hks.harvard.edu/criminaljustice/publications/Harvard_LAPD_Report.pdf.

Thompson, Joel A., "Implementing Workmen's Compensation Programs in the States," <u>Administration and Society</u>, Vol. 14, No. 2 (August 1982), 237-60.

United States Department of Justice, "Principles for Promoting Police Integrity: Examples of Promising Police Practices and Policies," January 2001. Available here: <u>http://www.ncjrs.gov/pdffiles1/ojp/186189.pdf</u>.

Van Meter, Donald S., and Carl E. Van Horn, "The Policy Implementation Process: A Conceptual Framework," <u>Administration and Society</u>, Vol. 6, No. 4 (1975), pp. 445-488.

Walker, Samuel, <u>A Critical History of Policy Reform</u>, Lexington, MA: Lexington Books (1977).

_____, <u>Police Accountability: The Role of Citizen Oversight</u>, Belmont: Wadsworth, (2001).

_____, "The New Paradigm of Police Accountability: The U.S. Justice Department 'Pattern or Practice' Suits in Context," <u>St. Louis University Public Law Review</u>, Vol. 22 (2003), pp. 3-52

_____, <u>The New World of Police Accountability</u>, Thousand Oaks, CA: Sage Publications (2005).

White, Michael D., "Controlling Police Decisions to Use Deadly Force: Reexamining the Importance of Administrative Policy," <u>Crime & Delinquency</u>, Vol. 41, No. 1 (2001), pp. 131-151.

Wilson, James Q., <u>Varieties of Police Behavior: The Management of Law and Order in Eight Communities</u>, Cambridge, MA: Harvard University Press (1968).

Wise, Charles R. and Rosemary O'Leary, "Breaking Up is Hard to Do: The Dissolution of Judicial Supervision of Public Services," <u>Public Administration Review</u>, Vol. 63, No. 2 (2003), 177-92.

E-41

Wise, Charles R. and Robert K. Christensen, "A Full and Fair Capacity: Federal Courts Managing State Programs," <u>Administration & Society</u>, Vol. 37, No. 5 (2005), 576-610.

Wood, Robert C., ed., <u>Remedial Law</u>, Amherst, MA: The University of Massachusetts Press (1990).

Zaring, David, "National Rulemaking Through Trial Courts: The Big Case and Institutional Reform," <u>UCLA Law Review</u>, Vol. 51 (2004).


**Cases Cited**

*Gideon v. Wainwright*, 372 U.S. 335 (1963).
*Graham v. Connor*, 490 U.S. 386 (1989).
*Los Angeles v. Lyons*, 461 U.S. 95 (1983).
*Mapp v. Ohio*, 367 U.S. 643 (1961).
*Miranda v. Arizona*, 384 U.S. 436 (1966).
*Tennessee v. Garner*, 471 U.S. 1 (1985).
*Terry v. Ohio*, 392 U.S. 1 (1968).


**Settlement Agreements**

United States of America v. City of Los Angeles, California, Board of Police Commissioners of the City of Los Angeles, and the Los Angeles Police Department, Civil No. 00-11769 GAF Consent Decree (2001).

United States of American v. City of Pittsburgh, Pittsburgh Bureau of Police, and Department of Public Safety, Consent Decree, April 5, 1997.

Memorandum of Agreement between the United States Department of Justice and the City of Cincinnati, Ohio and the Cincinnati Police Department, April 12, 2002.

Memorandum of Agreement between the United States Department of Justice and the District of Columbia and the D.C. Metropolitan Police Department, June 13, 2001.

Memorandum of Agreement between the United States Department of Justice and Prince George's County, Maryland and The Prince George's County Police Department, January 22, 2004.


**Monitor Reports**

"City of Cincinnati Independent Monitor Quarterly Reports," April 1, 2003 – December 30, 2008.  Available here: http://gabsnet.com/cincinnatimonitor/.

E-42

"Auditor's Quarterly Reports, Public Management Resources," San Antonio, Texas, December 15, 1997 – May 16, 2002.  Available here: http://www.parc.info/consent_decrees_-_memoranda_of_agreement_-_monitor_reports.chtml.

"Quarterly Reports of the Independent Monitor for the Metropolitan Police Department," Michael Bromwich, Independent Monitor, Office of the Independent Monitor, Fried, Frank, Harris, Shriver & Jacobson, Washington, DC, August 1, 2002 – June 13, 2008. Available here: http://www.policemonitor.org/reports.html.

"Reports of the Independent Monitor, Memorandum of Agreement between the United States Department of Justice and Prince George's County, Maryland and The Prince George's County Police Department," Alexandria Group of MPRI, September 10, 2004 – January 15, 2009.  Available here: http://www.co.pg.md.us/Government/PublicSafety/Police/progress.asp

E-43

Figure 1: Proposed Model of §14141 Settlement Agreement Implementation



E - 44

**Table 1: Implementation of Use of Force Policy**

| | | Use of Force Policy Change | Use of Force Street-Level Reporting | Supervisor Review of Reports |
|---|---|---|---|---|
| Pittsburgh, PA | Level of Difficulty | Low | Low | Low |
| | Relevant Variables | Policy Simplicity (Settlement Terms) | Nature of Problem (Settlement Terms) | Nature of Problem (Settlement Terms) |
| Washington, DC | Level of Difficulty | Moderate | High | High |
| | Relevant Variables | Leadership (Institutional Competency) | Leadership (Institutional Competency) | Leadership (Institutional Competency) |
| Cincinnati, OH | Level of Difficulty | Low | High | Low |
| | Relevant Variables | TBD | DOJ Flexibility | TBD |
| Prince George's County, MD | Level of Difficulty | Moderate | High | High |
| | Relevant Variables | TBD | Leadership (Institutional Competency) Hierarchical Policy Communication (Organizational Structure) | Leadership (Institutional Competency) |

E-45

**Table 2: Implementation of Early Warning Systems**

| | | System Development | System Utilization |
|---|---|---|---|
| **Pittsburgh, PA** | Level of Difficulty | Low | Low |
| | Relevant Variables | Existing System (Institutional Competency) | Existing System (Institutional Competency) |
| **Washington, DC** | Level of Difficulty | High | High |
| | Relevant Variables | Lack of Resources (Political Context)<br><br>Contractors (Institutional Competency) | Lack of Staff Commitment (Institutional Competency) |
| **Cincinnati, OH** | Level of Difficulty | High | High |
| | Relevant Variables | Contractor Delays (Institutional Competency) | Lack of Staff Commitment (Institutional Competency) |
| **Prince George's County, MD** | Level of Difficulty | High | High |
| | Relevant Variables | Lack of Resources (Political Context)<br><br>Contractors (Institutional Competency) | Lack of Staff Commitment (Institutional Competency) |

E-46

**Table 3: Implementation of Citizen Complaint Protocols**

| | | Expand Means | Change Parameters | Staff | 90-Day Limit | Accountability |
|---|---|---|---|---|---|---|
| **Pittsburgh, PA** | Level of Difficulty | Low | Low | High | High | Low |
| | Relevant Variables | Institutional Competency | TBD | Lack of Resources (Political Context) | Lack of Resources (Political Context) | Independent Monitor |
| **Washington, DC** | Level of Difficulty | Low | Moderate | High | High | Low |
| | Relevant Variables | Institutional Competency | TBD | Lack of Resources (Political Context) | Settlement Terms / Lack of Resources (Political Context) | Independent Monitor |
| **Cincinnati, OH** | Level of Difficulty | Low | Moderate | High | High | Low |
| | Relevant Variables | Institutional Competency | TBD | Lack of Resources (Political Context) | Lack of Resources (Political Context) | Independent Monitor |
| **Prince George's County, MD** | Level of Difficulty | Low | Low | High | High | Low |
| | Relevant Variables | Institutional Competency | TBD | Lack of Resources (Political Context) | Lack of Resources (Political Context) | Independent Monitor |



E-47