U.S. Department of Justice

Appendix G



# Taking Stock: Report from the 2010 Roundtable on the State and Local Law Enforcement Police Pattern or Practice Program (42 USC § 14141)

September 2011

NCJ 234458

G-1

# Contents

Introduction............................................................................................................. 1

The History of § 14141........................................................................................... 1

The Efficacy of Pattern or Practice Litigation........................................................ 2

Improving the Process............................................................................................ 4

Outcome Evaluation Research............................................................................... 6

    Pittsburgh, PA................................................................................................ 6

    Cincinnati, OH............................................................................................... 7

    Los Angeles, CA............................................................................................ 8

The Need for Prevention........................................................................................10

Notes......................................................................................................................11

Appendix A: Roundtable Participants...................................................................13

Appendix B: Program Settlements & Investigations, 1994–2010.........................19

Questions regarding this report should be forwarded to Patrick Clark at the National Institute of Justice. Points of view or opinions contained in this document are those of the author and do not necessarily represent the official position or policies of the U.S. Department of Justice. Please direct inquiries to Patrick.Clark@usdoj.gov.


G-2

PUBLICATION OF THE U.S. DEPARTMENT OF JUSTICE

# Taking Stock: Report from the 2010 Roundtable on the State and Local Law Enforcement Police Pattern or Practice Program (42 USC § 14141)

## Introduction

On June 21, 2010, the Civil Rights Division (CRT) of the Department of Justice (DOJ) and the Office of Justice Programs (OJP) convened a roundtable of invited law enforcement officials, researchers and consultants to review and discuss DOJ's Police Pattern or Practice Program and authority under 42 USC § 14141. Fifteen years ago, the police misconduct provision was enacted with the Violent Crime Control and Law Enforcement Act of 1994 (the Crime Act).[1] This provision granted authority to DOJ to intervene in local jurisdictions where police agencies engaged in patterns or practices of violating constitutional rights or federal law. Since that time and to date, the Special Litigation Section (SPL) of CRT has initiated more than 125 preliminary inquiries, pursued investigations of over more than 56 state and local law enforcement agencies, provided technical assistance, and entered into a number of settlement agreements (including memorandums of agreement and consent decrees) in which law enforcement agencies agreed to implement changes to remedy alleged patterns or practices of police misconduct.

CRT and OJP convened this one-day roundtable to take stock of the last 15 years of § 14141 litigation and to discuss ideas and suggestions for future directions. The meeting brought together a representative group of individuals including police chiefs and other law enforcement executives, attorneys, case monitors, advocates and other federal staff to consider what might be learned from past experiences and suggestions related to the future of § 14141 litigation (See Appendix A). Assistant Attorney General Thomas Perez (CRT) and Laurie O. Robinson (Assistant Attorney General, OJP) hosted the roundtable. They provided opening comments along with Ellen Scrivner, Deputy Director of the National Institute of Justice (NIJ), and Bernard Melekian, Director of the Office of Community Oriented Policing Services. Attorney General Eric Holder and Associate Attorney General Thomas Perrelli also joined the discussion for a brief time. Professor Chris Stone from the Kennedy School of Government at Harvard University facilitated the day-long roundtable. In general and breakout sessions, the group discussed jurisdiction selection, police policies and procedures, the development of agreements, monitoring compliance, and the sustainability of changes implemented in the § 14141 process.

## The History of § 14141

A number of events preceded enactment of 42 USC § 14141 as part of the 1994 Crime Act. The Kerner Commission report in 1968 highlighted the need for change in police practice involving citizens.[2] A number of other commissions and reports focused on police practices, culminating in the 1981 publication of *Who is Guarding the Guardians? A Report on Police Practices* by the Civil Rights Commission.[3] The Commission put forward recommendations to improve law enforcement in the United States and suggested the need for federal law to facilitate change in police agencies similar to the federal laws and litigation that had changed other social institutions such as education and corrections.

This sentiment gained momentum subsequent to the 1991 Rodney King incident and the riots that followed in Los Angeles. A series of congressional hearings regarding police misconduct



TAKING STOCK: 2010 ROUNDTABLE REPORT ON POLICE PATTERN OR PRACTICE PROGRAM      1

PUBLICATION OF THE U.S. DEPARTMENT OF JUSTICE

garnered testimony from around the country, and it became apparent that the federal government had limited capability to address civil rights violations by police agencies. In *United States v. City of Philadelphia* (644 F.2d 187 (3d Cir. 1980)), on appeal the Third Circuit ruled that the government had no standing to litigate allegedly unconstitutional police practices.[4] In *Los Angeles v. Lyons* (461 U.S. 95 (1983)), the U.S. Supreme Court ruled that an individual was not entitled to prospective injunctive relief because it was not possible to demonstrate that he or she would be the subject of excessive force again.[5] These and other events led to the introduction of federal legislation referred to as the Police Accountability Act of 1991 (H.R. 2972). Some provisions of the bill were incorporated in the Crime Act of 1994 in an effort to fill the gap in existing law and require DOJ to hold law enforcement agencies responsible when individual officer actions formed a "pattern of misconduct" or were part of "systematic practices underlying the misconduct."

Since enactment, 42 USC § 14141, along with other federal laws, has resulted in federal investigations involving all sizes of police agencies within the United States, Puerto Rico and the Virgin Islands. DOJ convened the 2010 roundtable to begin assessing the effects and impacts of this litigation authority with agency representatives and other individuals involved in these cases.

The CRT/OJP roundtable focused on jurisdictions where § 14141 litigation resulted in consent decrees and looked to participants for information, ideas and suggestions as to how to ensure that § 14141 is effective as possible in making communities safer, protecting the rule of law, and increasing public trust and confidence in law enforcement agencies. As summarized later, there were a number of recurring themes, questions and apparent recommendations coming from the Roundtable discussion and break-out sessions. The observations of roundtable participants regarding the effectiveness of pattern or practice litigation are presented below, followed by a brief description of the case process. Ideas for improving the process, provided throughout the meeting, are presented along with some results from a few jurisdictions with outcome studies. The goal of prevention, as introduced by roundtable participants, is then discussed as a conclusion to this report.

## The Efficacy of Pattern or Practice Litigation

Without exception, everyone providing comments during the roundtable meeting acknowledged the efficacy of pattern or practice litigation to reforming policies and practices in local police organizations. Comments made by police chiefs acquainted with formal consent decrees were generally positive in relating their experiences with § 14141 litigation, although many also voiced some negative aspect or event, or noted something that could have improved the process and experience for them. Overall, chiefs reported that § 14141 litigation was "tremendously" helpful in making reforms in police agencies by providing resources and concentrating on making needed changes to police policy and practice. As one police chief offered, "A tremendous amount of good came out of the process, generating tremendous confidence in the police department by the community." One official suggested that "having a consent decree was the best thing ever to happen" to their police department. "We saw enormous progress" as a result of the memorandum of agreement. A community activist commented that § 14141 litigation gave "politics no place to hide in making necessary reforms, in increasing the credibility of police agencies with the community." And another chief said, "This litigation forces people to the table and reduces our civil liabilities." Another commenter suggested that § 14141 litigation established "the floor for constitutional policing" in their community.


G-4

PUBLICATION OF THE U.S. DEPARTMENT OF JUSTICE

As further discussed below, there were some criticisms of this approach to creating change in police departments, including the negative effects of litigation on a police department. Some police officials reported that this litigation creates a negative stigma for a police department, which takes a long time to overcome in a community. Law enforcement participants also felt that they should be apprised of an investigation and become involved earlier rather than later in the process. Some also suggested that labor issues prevent them from directly addressing misconduct by dismissing responsible police officers. Some also suggested that § 14141 litigation is needlessly complex and takes too long to resolve.

Section 14141 cases typically include findings that describe problem areas and needed changes in policy, procedures or training. Historically, these areas have included concerns regarding Fourth Amendment concerns (use of excessive force, in particular), the Fourteenth Amendment (racial profiling/bias in policing), inadequate systems for civilian complaints and misconduct investigations, lack of accountability and supervision, data collection, training, recruitment and hiring. Allegations of § 14141 violations come to the attention of the Special Litigation Section (SPL) in a variety of ways before initiation of a formal investigation. SPL may be apprised of police misconduct allegations through complaints by individuals, advocacy groups, police personnel, local prosecutors, political officials, through the media, or through other civil or criminal suits filed in local or federal courts. SPL staff also proactively seek out information regarding possible pattern or practice violations by, for example, reviewing § 1983 cases, conducting outreach with advocacy groups, or by reviewing internal and public information about various officers and agencies which is available from other CRT components and related federal agencies.

Following an initial assessment, SPL determines whether the allegations appear to indicate a pattern or practice of misconduct and determines the scope, nature and severity of the apparent misconduct. SPL then makes a recommendation seeking authority to initiate an investigation to determine whether there is reasonable cause to believe that a pattern or practice of misconduct exists. If this recommendation is approved by the Assistant Attorney General or his designee, SPL begins a formal investigation by notifying the chief executive and legal officer of the jurisdiction, in writing, that certain subject matter areas are being examined and requesting a meeting to discuss information and the access necessary to complete the investigation. At the time of the roundtable meeting, there had been only one example of a police agency completely refusing to cooperate with an investigation, resulting in contested litigation (and the jurisdiction providing full access). During an investigation, technical assistance may be provided, along with letters memorializing advice and suggestions, to enable the jurisdiction to make needed changes as soon as practicable. Investigations include an exhaustive review of policies, procedures, incident reports and other relevant departmental data. Investigative staff meet with all relevant stakeholders, including agency command staff, line officers, bargaining unit representatives, and members of community and advocacy groups. Investigators also observe trainings and participate in police patrol ride-alongs.

Since § 14141's enactment, SPL has officially initiated more than 50 investigations resulting in nine memorandums of agreement (MOA), two letter agreements, and eight consent decrees. Of the total, eight investigations were closed after providing the jurisdiction with technical assistance; 15 were closed after investigations concluded that the allegations could not be sustained, and 16 investigations were ongoing at the time of this meeting (see Appendix B).

In cases that advance to the MOA or consent decree stage, the process of change and compliance is monitored and documented by an independent entity in most cases, although DOJ maintains oversight. The choice and role of the independent monitor is part of negotiations


G-5

and usually includes access to all relevant personnel, documentation, records, data and reporting systems. In most cases, the independent monitor submits regular publicly available reports regarding progress in complying with conditions of the agreement. Section 14141 cases have been formally initiated and closed in less than two years, although one has lasted as long as 10 years.

These agreements require a number of changes to policies, procedures and practices within a police agency. Generally, police agencies must develop, update or modify current policies regarding use of force. They are often required to update or modify the citizen complaint process and the reporting of misconduct. In addition, many agreements call for the development and implementation of policies for monitoring misconduct — including internal affairs, use-of-force review boards, performance-monitoring information systems, and systems and procedures for officer oversight, supervision, discipline and training — and the improvement of community relations and outreach.[6]

## Improving the Process

A number of suggestions were offered during the roundtable meeting related to processes that could be improved and problems that could be prevented. Some police chiefs who had experience with consent decrees agreed that they had become involved in the process too late and that, initially, the DOJ investigation had a negative impact on their respective departments. As one chief said, "It puts a cloud over the police department when DOJ announces an investigation." Another suggested, "The stigma associated with DOJ intervention lasts a long time." Some also commented that the process was too adversarial, that it too often involved lawyers talking with lawyers, that the agreements are too complex and too long, that it takes too much time to negotiate and to close a case, that case monitors can become problematic, and that labor unions can serve to undermine agreed-upon changes.

Overall, there was recognition that police organizational reform and change is not something that happens easily; however, § 14141 litigation is an effective mechanism for bringing these changes to local police departments. From experience of the last 15 years, many lessons were learned that may serve to improve the process at the local level.

From the outset, there seemed to be consensus among participants that in addition to legal representatives, the process should involve police officials, subject-matter experts, labor unions and community representatives as well as all other relevant parties. One chief suggested that required changes should be basic and narrow in scope and that negotiated agreements must be understandable to everyone involved with the case, not just the lawyers. Another police official expressed the need to involve the community in the process, and another suggested that information and statistics relevant to patterns or practices of misconduct be made available to the public during and after a case has been officially resolved.

Expressed throughout the day was the desire on the part of police officials to be informed and made aware of an investigation as early as possible in the process. Another recurring suggestion was developing some sort of diversion mechanism whereby police agencies can avoid litigation if they make necessary changes and reforms. Similarly, some participants suggested the development of some sort of "continuum of litigation," wherein SPL would "dial down" in cases of cooperative, voluntary compliance and "dial up" intervention in cases where


G-6

PUBLICATION OF THE U.S. DEPARTMENT OF JUSTICE

an agency is resistant or noncompliant. "It may be a better tack to provide technical assistance and experts up front, and then bring the litigation if that doesn't work," suggested one law enforcement official.

There were also a number of comments regarding court monitors appointed in the MOA and consent decree stages. There seemed to be agreement that the "right" monitor can make a significant difference and that some monitors do a disservice in prolonging the process. One person suggested the development of a procedure to "monitor the monitors." Another suggested that there be some way to limit the power of the monitor, with some consideration given to the role and authority of monitors in § 14141 consent decrees during negotiations.

One police chief suggested that change in most agencies involves getting rid of bad officers and that labor unions can serve to thwart necessary dismissals or block changes necessary for reform. Discussion included ways to bring the unions or union issues into the process. Some suggested ways to effectively work with unions in making changes. Suggestions included inviting labor unions to be part of the process as it is initiated. Another participant from a major department reported that the establishment of a legal unit within their police agency has served to resolve many issues with labor unions related to arbitration and dismissal.

Along with every negative experience regarding the intrusiveness, complexity or length of DOJ involvement in local police agencies, additional comments and suggestions regarded the need for more performance monitoring, oversight, follow-up, and some effective means of measuring and sustaining changes. Despite comments regarding cases lasting too long, there was recognition that organizational change and reform does not happen overnight and that concerted efforts and resources have to be directed over time for reform to take place; there can be "back-sliding" if the change process is not monitored. Some suggested that DOJ develop and provide some way of monitoring changes over time to assure that they are sustained. Others recommended that DOJ be involved to ensure that changes are codified and remain in place. Still others remarked that sustaining change is a local matter, and the local Inspector General or other entity should have that responsibility, not the federal government.

By and large, comments regarding the need for early notice, diversion, negotiations, monitoring and follow-up may reflect a lack of appreciation for the role of, and process used by, SPL in § 14141 cases. For instance, technical assistance, often documented in writing, is provided to the executive of the jurisdiction under investigation in most if not all cases. In this regard, it may be the role of the local executive — not the federal government — to make the police department aware of the situation and to involve other parties in the negotiation process. Most comments voiced at the meeting seemed to reflect a lack of understanding of the SPL process related to diversionary or informal options in § 14141 cases. It is clear from the information provided by SPL that most investigations have been resolved without a court-enforceable agreement (Appendix B). Moreover, technical assistance is offered, if not provided, in many of these instances. How counsel chooses to proceed in handling a case when representing the local executive has more to do with the outcome than anything SPL could provide by way of information or guidance to the local police department under investigation. The lack of understanding of the SPL process points to the need for broadly disseminated information on the pattern or practice litigation process, a topic discussed more in the following sections.



G-7

PUBLICATION OF THE U.S. DEPARTMENT OF JUSTICE

**Outcome Evaluation Research**

Roundtable participants repeatedly suggested some sort of outcome evaluation to document changes at the local level and to identify evidence-based policies and practices that police agencies can implement to prevent litigation. Some suggested that formal outcome evaluations should be mandated in each case and that evaluation research should include community reports of police misconduct as well as reports regarding citizen perceptions of trust and confidence. Related comments called for the development of standard performance criteria, output and outcome measurement, including standard, reliable and valid measures of racial profiling and discrimination, use of force and other misconduct. To be sure, SPL uses a number of benchmarks to document compliance and close a case. However, these benchmarks are often limited to the immediate action and seldom extend to outcomes and impacts beyond those normally considered in litigation. Many commented during the roundtable that follow-up studies to § 14141 litigation are needed. A recurring theme of the meeting was the need for evidence-based policies, procedures and practices in law enforcement to reduce misconduct.

Although more than 80 articles about § 14141 litigation have been published in legal and other academic journals, little evaluation research has actually been conducted or published. Reports from evaluation studies in Pittsburgh, Cincinnati and Los Angeles provide measurable examples of positive structural, organizational and community changes resulting from § 14141 intervention in these jurisdictions.

### *Pittsburgh, PA*

Although CRT had initiated and was continuing other cases at the time, the city of Pittsburgh was the first to advance to a § 14141 consent decree. After years of tension between citizens and police, the American Civil Liberties Union filed a lawsuit against the city of Pittsburgh in 1996 for violation of civil rights by the Pittsburgh Bureau of Police. In April 1996, SPL sent letter of notice to the city solicitor. The scope of the investigation included excessive use of force, false arrests, improper searches and seizures, failure to adequately discipline officers, and failure to supervise officers.

The city of Pittsburgh entered into a consent decree with DOJ in April 1997 that stipulated a number of organizational reforms and changes to policies and practice including oversight, training and supervision of officers. Two years later, in August 1999, the Pittsburgh Police Bureau was in compliance with the majority of the prescribed changes, and the consent decree was terminated (with the exception of ongoing oversight of one aspect of the agreement).

The media, other observers and an evaluation study recognized the resulting positive changes to policing in Pittsburgh. According to Vera Institute, "Among both police officials and civil rights groups, the Pittsburgh consent decree is generally viewed as a success in terms of increasing police accountability and improving officer training." Vera also conducted a survey of citizens and found:

> One of the most important measures of change in Pittsburgh is community opinion. Only slightly more than half of Pittsburgh residents had heard of the consent decree. But among persons who had, those who believed policing had improved since the decree outnumbered those who believed that it had gotten worse by a 4-1 margin.



PUBLICATION OF THE U.S. DEPARTMENT OF JUSTICE

> We found similarly large margins between those who thought things had improved and those who felt things had worsened in response to questions about fair and courteous treatment of citizens by police officers and thoroughness of investigation of citizen complaints. Whites were much more likely to believe that police use of excessive force had decreased rather than increased since the decree, while more African-Americans believed that use of force had increased than believed that it had decreased.

The Vera report also noted a number of important factors related to the termination of the city of Pittsburgh consent decree:[7]

- A prompt response to the decree and a commitment to the reforms.
- Determination to make the decree part of the police chief's reform agenda.
- Recognition of the critical role of the court-appointed monitor.
- Development of a comprehensive "early warning" performance management information system.
- Implementation of command staff meetings to review and act on information from the early warning system.

## *Cincinnati, OH*

In 1968, Cincinnati was one of the first cities studied by the Kerner Commission. During 2001, some of the same conditions cited in the Kerner report were included in the filing of a lawsuit by the Ohio chapter of the American Civil Liberties Union, the Cincinnati Black United Front, and the class of African American citizens in Cincinnati. The filing alleged that African Americans had been treated differently than other racial groups for more than 30 years. It was alleged that recent deaths of 14 African American men and the disproportionate stop-and-search rates illustrated discrimination by the Cincinnati Police Department (CPD). Hearing the case, the court and both parties agreed to a method and process of dispute resolution, and a monitor was appointed to facilitate the process.

Another shooting and death of an unarmed African American man propelled the process forward in a collaborative agreement (CA). Still another citizen death, and the civil unrest that followed, prompted the mayor of Cincinnati to request an investigation by DOJ under § 14141 in May 2001. Following a comprehensive investigation, DOJ concluded that pattern or practice violations had occurred and negotiated a settlement agreement with Cincinnati in April 2002.

As of 2002, the city of Cincinnati had separately entered into a CA with the plaintiff class, the Fraternal Order of Police and the Cincinnati Police Department; DOJ and Cincinnati had entered into an MOA. The court combined the cases by appointing one monitor and monitoring team for both the MOA and CA. This arrangement provided a uniquely comprehensive and complex mechanism for implementing both agreements and documenting their progress over time.

The MOA specifically targeted police department policies on accountability and the use of force. It required the development of new policies on the use of force, reporting and investigating use-of-force incidents and citizen complaints and new training requirements as well as development of early intervention and risk management systems. The CA focused on the practice of policing by the CPD, in an effort to build mutual respect and accountability, by:

- Adopting Community Problem-Oriented Policing.
- Addressing bias-free policing through policy, training and data collection.



PUBLICATION OF THE U.S. DEPARTMENT OF JUSTICE

- Requiring independent evaluation research to determine whether the implemented measures were working (and focusing on outcomes, not just processes).
- Creating the Citizen Complaint Authority to conduct independent reviews of citizen complaints.

On behalf of the parties of the CA, the city of Cincinnati hired the RAND Corporation to conduct research over the course of five years to measure progress toward the goals of the CA. RAND Corporation collected data regarding all aspects of the CA, conducted citizen surveys, and issued a report in 2009 that concluded, "CPD is not the same as the department that policed Cincinnati in 2001. Policy changes, oversight, and a variety of reforms have produced a department that polices differently than it had in 2001."[8]

Having successfully worked through many disruptions and obstacles in this unique arrangement, DOJ and Cincinnati successfully terminated the MOA in April 2007. On August 26, 2008, the Court heard and accepted a collaborative agreement plan that affirmed and continued the commitment of all parties to remain engaged in ongoing efforts to improve police-community relations throughout the city of Cincinnati. The Court terminated the case after receiving the Monitor's Final Report in December 2008. The report concludes:

> The Collaborative has been successful in laying a strong foundation for police reform. ... In the five years of the MOA and the six years of the CA, the City made significant changes in the way it polices Cincinnati. ... In addition, efforts to improve relations between the police department and the community, particularly the African American community, are continuing. ... The Parties' performances under the Agreements were initially halting and defensive. With time and the emergence of impressive leadership throughout the Cincinnati Community, significant compliance with the Agreements were achieved[,] resulting in the Cincinnati Collaborative being one of the most successful police reform efforts ever undertaken in this Country.[9]

### *Los Angeles, CA*

Los Angeles had a number of law suits and consent decrees involving the police department and the issue of racial discrimination before the beating of Rodney King in 1991 occurred, and afterwards. With the acquittal of the three officers and their sergeant in April 1992, the city of Los Angeles erupted in several days of rioting that resulted in more than 50 deaths. President Bush addressed the nation on the third night of the riots and requested that the U.S. Attorney General conduct an investigation. Under existing law, CRT's Criminal Section, along with the U.S. Attorney for the Central District of California, filed criminal indictments against the individual police officers for violation of Rodney King's civil rights. Two of the four officers and the supervising sergeant were convicted in April 1993.

Section 14141 became law the following year, and DOJ began investigating LAPD for pattern or practice violations in August 1996. DOJ entered into a consent decree with the city of Los Angeles in November 2000. Among items stipulated, the consent decree required development, implementation and use of a computer information system containing relevant information about officers, supervisors and managers to promote professionalism and best policing practices, and to identify and modify problem behavior among officers. This included a detailed protocol for implementation of policies for management and coordination of risk assessment, including training of supervisory and management staff in the use of this information to address at-risk behavior in an officer performance monitoring and evaluation system.


G-10

Other provisions of the consent decree included the development and upgrade of policies regarding:

- The use of force.
- Search and arrest procedures.
- Initiation, receipt and processing of citizen complaints.
- Investigations and adjudications of complaints regarding the use of force, including disciplinary actions.
- Assignment of the responsibility for investigations to internal affairs.
- Nondiscrimination policy, and data on motor vehicle and pedestrian stops.
- Management of gang units and confidential informants.
- Design of a program that responds to people with mental illness.
- Officer training.
- Audits by the Inspector General and the Police Commission.
- Community outreach and public information.

In June 2006, five years after the city began implementation, the Court concluded that the city was not yet in substantial compliance with the decree and extended the decree for another three years. On July 17, 2009, the Court terminated the consent decree and entered into a transition agreement with Los Angeles and DOJ, which is ongoing.

The final report of the independent monitor asserts, "We believe the changes institutionalized during the past eight years have made the LAPD better at fighting crime, at reaching out to the community, in training its officers, in its use of force, in internal and external oversight, and in effectively and objectively evaluating each of the sworn members of LAPD."

Professor Christopher Stone of Harvard's Kennedy School conducted an evaluation study on behalf of the Los Angeles Police Foundation in preparation for termination of the consent decree. Researchers gathered data from multiple sources to find that "public satisfaction is up, with 83 percent of residents saying the LAPD is doing a good or excellent job; the frequency of the use of serious force has fallen each year since 2004. Despite the views of some officers that the consent decree inhibits them, there is no objective sign of so-called 'de-policing' since 2002." The report concludes:

> The evidence here shows that with both strong police leadership and strong police oversight, cities can enjoy both respectful and effective policing. The LAPD remains aggressive and is again proud, but community engagement and partnership is now part of the mainstream culture of the Department. The Department responds to crime and disorder with substantial force, but it is scrutinizing that force closely and it is accountable through many devices for its proper use. Will the management and oversight improvements persist if the consent decree ends? Better yet, will management and oversight become still stronger? While we cannot answer those questions in advance, the LAPD appears ready for that test.[10]

G-11

PUBLICATION OF THE U.S. DEPARTMENT OF JUSTICE

### The Need for Prevention

A recurring theme in the roundtable discussions was the need for DOJ to provide a proactive program of education for law enforcement officials and others involved in local criminal justice systems on issues related to § 14141 litigation, evidence-based policies and practices, and other technical assistance to prevent police misconduct. As one chief suggested, "DOJ needs to educate us as to what is the right thing to do!" A comment offered by another police chief seemed to further suggest that "the development and dissemination of guidelines for constitutional policing would be of great assistance to local law enforcement." Various targets for education were suggested, including chiefs, legal counsel, judges, labor unions and police officers (e.g., development of police academy curricula on "constitutional policing"). It was noted that SPL has developed guidance in the document, "Principles for Promoting Police Integrity: Examples of Promising Police Practices and Policies," which may serve as the basis of a prevention education program for law enforcement and others.[11]

The related idea of a "Centers of Excellence" approach was also mentioned a number of times during the one-day meeting. The suggestion was to have § 14141 police agencies provide guidance and education to other local police agencies, especially to those under investigation or facing litigation. "We've fallen short in the area of not making use and examples of the departments that have been involved in these matters," suggested one proponent of this approach for disseminating information from 42 USC § 14141 on police pattern or practice of misconduct litigation.

The roundtable meeting closed with general recognition that the forum provided a beginning to discussions on the effectiveness of pattern or practice litigation. Participants in the meeting also recognized that many more questions and issues remain to be explored.



G-12

PUBLICATION OF THE U.S. DEPARTMENT OF JUSTICE

## Notes

1. Violent Crime Control and Law Enforcement Act of 1994, http://thomas.loc.gov/cgi-bin/query/z?c103:H.R.3355.ENR:

2. Report of the National Advisory Commission on Civil Disorders, www.eisenhowerfoundation.org/docs/kerner.pdf

3. *Who Is Guarding the Guardians? A Report on Police Practices,* No. 005-901-00029-4, http://www.usccr.gov/pubs/guard/

4. *United States* v. *City of Philadelphia* (644 F.2d 187 (3d Cir. 1980)), http://ftp.resource.org/courts.gov/c/F2/644/644.F2d.187.80-1348.html.

5. *Los Angeles* v. *Lyons* (461 U.S. 95 (1983)), http://supreme.justia.com/us/461/95/.

6. The Special Litigation Section website provides many related documents: http://www.justice.gov/crt/split/.

7. Davis, R.C., Ortiz, C.W., Henderson, N.J., and Massie, M.K. (2002). *Turning Necessity Into Virtue: Pittsburgh's Experience With a Federal Consent Decree.* Vera Institute of Justice, http://www.vera.org/download?file=239/Pittsburgh%2Bconsent%2Bdecree.pdf.

8. Ridgeway, G., Schell, T.L., Gifford, B., Saunders, J., Turner, S., Riley, K.J., and Dixon, T.L. (2009), *Police-Community Relations in Cincinnati,* http://www.rand.org/pubs/monographs/MG853/.

9. City of Cincinnati Police Department, Consent Decree, Monitor Reports, Final Report of the Independent Monitor, http://www.cincinnati-oh.gov/police/downloads/police_pdf35491.pdf.

10. Stone, C., Fogelsong, T., and Cole, C.M. (2009). *Policing Los Angeles Under a Consent Decree: The Dynamics of Change at the LAPD.* Program in Criminal Justice Policy and Management. http://www.hks.harvard.edu/var/ezp_site/storage/fckeditor/file/pdfs/centers-programs/programs/criminal-justice/Harvard_LAPD_Report.pdf.

11. Special Litigation Section, Civil Rights Division, U.S. Department of Justice, "Principles for Promoting Police Integrity: Examples of Promising Police Practices and Policies," January 2001, http://www.ncjrs.gov/pdffiles1/ojp/186189.pdf.


G-13

## Appendix A: Police Pattern or Practice Program Roundtable Participants

Richard Aborn
CAAS LLC
Manhattan, NY

Roy L. Austin, Jr.
Office of the Assistant Attorney General
Civil Rights Division, U.S. DOJ
Washington, DC

Anthony Batts
Chief of Police
Oakland, CA

Tommy Beaudreau
Fried Frank
Washington, DC

Andre Birotte
U.S. Attorney
Central District, California
Los Angeles, CA

Merrick Bobb
Police Assessment Resource Center
Los Angeles, CA

Theron Bowman
Chief of Police
Arlington, TX

William Bratton
Altegrity Security Consulting
New York, NY

Michael Bromwich
Fried Frank LLP
Washington, DC

Ella Bully-Cummings
Chief of Police (ret.)
Detroit, MI

Jim Burch
Bureau of Justice Assistance
Washington, DC

Rachel Burgess
Los Angeles Police Department
Los Angeles, CA

Michael Caroll
International Association of
Chiefs of Police
West Goshen, PA

Andrew Celli
Assistant Attorney General
New York, NY

Gerald Chaleff
Los Angeles Police Department
Los Angeles, CA

Patrick Clark
National Institute of Justice
Washington, DC

Matthew Colangelo
Office of the Assistant Attorney General
Civil Rights Division, U.S. DOJ
Washington, DC

Christine Cole
Harvard University
Boston, MA

Laura Coon
Special Litigation Section
Civil Rights Division, U.S. DOJ
Washington, DC

Sylvester Daughtry
Commission on Accreditation for Law
Enforcement Agencies, Inc.
Fairfax, VA

Robert Davis
Chief of Police
San Jose, CA

Edward Davis
Police Commissioner
Boston, MA

Ronald Davis
Chief of Police
East Palo Alto, CA

G-14

PUBLICATION OF THE U.S. DEPARTMENT OF JUSTICE

Louis Dekmar
Chief of Police
LaGrange, GA

Gary Edwards
National Native American Law Enforcement Association
Washington, DC

Dean Esserman
Chief of Police
Providence, RI

Warren Evans
Chief of Police
Detroit, MI

Kelli Evans
ACLU of Northern California
San Francisco, CA

Julie Fernandes
Office of the Assistant Attorney General
Civil Rights Division, U.S. DOJ
Washington, DC

Tom Frazier
Major Cities Chiefs Association
Columbia, MD

Lorie Fridell
University of South Florida
Tampa, FL

Joye Frost
Office for Victims of Crime
Office of Justice Programs, U.S. DOJ
Washington, DC

Col. Rick Fuentes
Superintendent
New Jersey State Police

Joel Garner
Bureau of Justice Statistics
Office of Justice Programs, U.S. DOJ
Washington, DC

Jonas Geissler
Special Litigation Section
Civil Rights Division, U.S. DOJ
Washington, DC

Peter Gray
Federal Coordination and Compliance Section, Civil Rights Division, U.S. DOJ
Washington, DC

Dennis Greenhouse
Community Capacity Development Office
Office of Justice Programs, U.S. DOJ
Washington, DC

Tammie Gregg
Special Litigation Section
Civil Rights Division, U.S. DOJ
Washington, DC

Chuck Gruber
Consultant
St. Charles, IL

Rachel Harmon
University of Virginia
Charlottesville, VA

Hector Hernandez
Hispanic American Police Command Officers Association
Cibolo, TX

Eric Holder
Attorney General, U.S. DOJ
Washington, DC

Susan Hutson
Office of the Inspector General
New Orleans, LA

Roberto Hylton
Chief of Police
Prince Georges County, MD

Dan Isom
Chief of Police
St. Louis, MO

G-15

PUBLICATION OF THE U.S. DEPARTMENT OF JUSTICE

Regina Jansen
Special Litigation Section
Civil Rights Division, U.S. DOJ
Washington, DC

Richard Jerome
Pew Foundation
Washington, DC

Je Yon Jung
Special Litigation Section
Civil Rights Division, U.S. DOJ
Washington, DC

Mark Kappelhoff
Federal Coordination and Compliance
Section, Civil Rights Division, U.S. DOJ
Washington, DC

Joseph LaPorte
Chief of Police
Little River Band of Ottawa Indians, MI

Mary Lou Leary
Office of Justice Programs, U.S. DOJ
Washington, DC

Judith Levy
Assistant U.S. Attorney
Detroit, MI

Zazy Lopez
Special Litigation Section
Civil Rights Division, U.S. DOJ
Washington, DC

Christy Lopez
Consultant
Takoma Park, MD

Candace McCoy
John Jay College of Criminal Justice
New York, NY

Cathy McNeilly
Pittsburgh Police Department
Pittsburgh, PA

Bob McNeilly
Consultant
Pittsburgh, PA

Bernard Melekian
Community Oriented Policing Services
U.S. DOJ
Washington, DC

Jeff Murray
Special Litigation Section
Civil Rights Division, U.S. DOJ
Washington, DC

Carrie Nguyen
Special Litigation Section
Civil Rights Division, U.S. DOJ
Washington, DC

Bill Nolan
Special Litigation Section
Civil Rights Division, U.S. DOJ
Washington, DC

Matt Nosanchuk
Office of the Assistant Attorney General
Civil Rights Division, U.S. DOJ
Washington, DC

Lynn Overmann
Access to Justice Initiative
U.S. DOJ
Washington, DC

Tom Perez
Assistant Attorney General
Civil Rights Division, U.S. DOJ
Washington, DC

Thomas Perrelli
Associate Attorney General, U.S. DOJ
Washington, DC

Judy Preston
Special Litigation Section
Civil Rights Division, U.S. DOJ
Washington, DC

Monica Ramirez
Office of the Assistant Attorney General
Civil Rights Division, U.S. DOJ
Washington, DC


G-16

PUBLICATION OF THE U.S. DEPARTMENT OF JUSTICE

Charles Ramsey
Police Commissioner
Philadelphia, PA

Charles Reynolds
Consultant
Dover, NH

Constance Rice
Advancement Project
Los Angeles, CA

Gregory Ridgeway
RAND Corporation
Los Angeles, CA

Laurie O. Robinson
Assistant Attorney General
Office of Justice Programs, U.S. DOJ
Washington, DC

Leon Rodriguez
Office of the Assistant Attorney General
Civil Rights Division, U.S. DOJ
Washington, DC

Kristina Rose
National Institute of Justice
Office of Justice Programs, U.S. DOJ
Washington, DC

Dan Rosenblatt
International Association of
Chiefs of Police
Alexandria, VA

Luis Saucedo
Special Litigation Section
Civil Rights Division, U.S. DOJ
Washington, DC

S. Andrew Schaffer
Deputy Commissioner, N.Y.P.D.
New York, NY

Ellen Scrivner
National Institute of Justice
Office of Justice Programs, U.S. DOJ
Washington, DC

Ronal Serpas
Chief of Police
New Orleans, LA

Jiles Ship
National Organization of Black
Law Enforcement Executives
Alexandria, VA

John Shofi
Department of Homeland Security
Washington, DC

Shaheena Simons
Special Litigation Section
Civil Rights Division, U.S. DOJ
Washington, DC

Michael Sinclair
Bureau of Justice Statistics
Office of Justice Programs, U.S. DOJ
Washington, DC

Brooks Singer
Federal Coordination and
Compliance Section
Civil Rights Division, U.S. DOJ
Washington, DC

Jeff Slowikowski
Office of Juvenile Justice and
Delinquency Prevention
Office of Justice Programs, U.S. DOJ
Washington, DC

Chris Stone
Harvard University
Boston, MA

Christine Stoneman
Federal Coordination and
Compliance Section
Civil Rights Division, U.S. DOJ
Washington, DC

Tom Streicher
Chief of Police
Cincinnati, OH

G-17

PUBLICATION OF THE U.S. DEPARTMENT OF JUSTICE

John Timoney
Chief of Police (ret.)
Miami, FL

Catherine Trainor
Special Litigation Section
Civil Rights Division, U.S. DOJ
Washington, DC

Samantha Trepel
Special Litigation Section
Civil Rights Division, U.S. DOJ
Washington, DC

George Turner
Chief of Police
Atlanta, GA

Tom Tyler
New York University
New York, NY

Arturo Venegas
Chief of Police
Sacramento, CA

Robert Warshaw
Consultant
Sacramento, CA

Chuck Wexler
Police Executive Research Forum
Washington, DC

Hubert Williams
Police Foundation
Washington, DC

Joseph Wolfinger
Major County Sheriffs' Association
Tappahannock, VA

Tim Woods
National Sheriffs' Association
Alexandria, VA

Ann Yom
Department of Homeland Security
Washington, DC


G-18

**Appendix B**

| Department of Justice<br>Civil Rights Division – Special Litigation Section<br>Pattern or Practice of Police Misconduct Program<br>( As of July 2010) |||||| 
|---|---|---|---|---|---|
| **Settlements** ||||||
| **Defendant** | **Investigation Initiated** | **Allegation Type*** | **Settlement Type*** | **Settlement Date** | **Status** |
| State Police of NJ | Dec. 1994 | DP, S&S | CD | 12/30/1999 | Term – 9/21/2009 |
| Steubenville PD, OH | July 1995 | UOF, FA, S&S | CD | 9/3/1997 | Term – 3/4/2005 |
| Pittsburgh PD, PA | April 1996 | UOF, FA, S&S | CD | 4/16/1997 | Term – 4/7/2005 |
| Montg Co. PD, MD | June 1996 | DP | MOA | 2/1/2000 | Term – 2/2005 |
| Los Angeles PD, CA | Aug. 1996 | UOF, FA, S&S | CD | 6/15/2001 | Trans – 7/17/2009 |
| Buffalo PD, NY | Dec. 1997 | UOF | MOA | 9/19/2002 | Term – 7/2008 |
| Columbus PD, OH | March 1998 | UOF, FA, S&S | Exchange Ltrs | 9/1/2002 | Term – 5/12/2004 |
| Metro PD, DC | Jan. 1999 | UOF | TAL & MOA | 6/13/2001 | Term – 6/13/2008 |
| PG County PD, MD | July 1999 | UOF (Canine) | TAL & CD | 3/1/2004 | Term – 03/2007 |
| Mt. Prospect PD, IL | Jan. 2000 | DP | MOA | 1/22/2003 | Term – 1/2007 |
| Highland Park PD, IL | May 2000 | DP | MOA | 7/1/2001 | Term – 7/2004 |
| Cleveland PD, OH | Aug. 2000 | UOF, DP | TAL, Ltr Agree | 2/1/2004 | Term – 3/2005 |
| PG County PD, MD #2 | Oct. 2000 | UOF | MOA | 1/22/2004 | Term – 1/15/2009 |
| Detroit PD, MI | Dec. 2000 | UOF | TAL & CD | 6/12/2003 | Ongoing |
| Cincinnati PD, OH | May 2001 | UOF | TAL & MOA | 4/12/2002 | Term – 4/2007 |
| Detroit PD, MI #2 | May 2001 | Holding Cells, Detention | CD | 6/12/2003 | Ongoing |
| Cleveland PD, OH | July 2002 | Holding Cells | MOA | 7/1/2002 | Term – 3/2008 |
| Villa Rica PD, GA | Jan. 2003 | DP | TAL & MOA | 12/23/2003 | Term – 12/2006 |
| Virgin Islands PD | Feb. 2004 | UOF, S&S | TAL & CD | 3/23/2009 | Ongoing |

* DP = Discriminatory Policing
  FA = False Arrest
  PD = Police Department
  S&S = Search & Seizure
  UOF = Use of Force

** CD = Consent Decree
  MOA = Memorandum of Agreement
  TA = Technical Assistance
  TAL = Technical Assistance Letter



G-19

| Investigations | | | | |
|---|---|---|---|---|
| Defendant | Investigation Initiated | Allegation Type | Assistance Type | Status |
| New Orleans PD, LA | July 1996 | UOF, FA | TAL | Closed |
| NYPD (EDNY), NY | Aug. 1997 | UOF | | Closed |
| Orange Co. PD, FL | Nov. 1997 | UOF | | Ongoing |
| Orange Co. Sheriff, CA | Nov. 1997 | UOF (CED) | TAL | Closed |
| Eastpointe PD, MI | March 1998 | DP | TAL | Closed |
| Charleston PD, WV | March 1999 | UOF | | Closed |
| NYPD (SDNY), NY | March 1999 | DP | | Closed |
| Riverside PD, CA | July 1999 | UOF, DP | | Closed |
| Tulsa PD, OK | Feb. 2001 | UOF, DP | | Closed |
| Schenectady PD, NY | April 2002 | UOF, DP | TAL | Ongoing |
| Miami PD, FL | May 2002 | UOF, Planting Evidence | TAL | Closed |
| Portland PD, ME | May 2002 | UOF | TAL | Closed |
| Providence PD, RI | Dec. 2002 | UOF, DP | TA | Closed |
| Bakersfield PD, CA | June 2003 | UOF | TA | Closed |
| Alabaster PD, AL | March 2003 | UOF, DP | TAL | Closed |
| Virgin Islands PD | Feb. 2004 | Corruption | | Closed |
| Beacon PD, NY | Aug. 2004 | UOF, Unlawful Arrests | TAL | Ongoing |
| Easton PD, PA | Oct. 2005 | Use of Force | TAL | Ongoing |
| Warren PD, OH | Dec. 2005 | UOF, S&S (Strip & Body) | TAL | Ongoing |
| Orange Co Sheriff, FL | Jan. 2007 | UOF | TAL | Ongoing |
| Austin PD, TX | May 2007 | UOF | | Ongoing |
| Yonkers PD, NY | Aug. 2007 | UOF | TAL | Ongoing |
| Puerto Rico PD | July 2008 | UOF, S&S, DP | | Ongoing |
| Harvey PD, IL | Nov. 2008 | UOF | | Ongoing |
| Lorain PD, OH | Dec. 2008 | UOF, S&S, Sexual Misc | | Ongoing |
| Escambia Co Sheriff, FL | Jan. 2009 | UOF | | Ongoing |
| Maricopa Co Sheriff, AZ | March 2009 | DP, S&S | | Ongoing |
| Inglewood PD, CA | March 2009 | UOF | TAL | Ongoing |
| Suffolk County PD, NY | Sept. 2009 | DP | | Ongoing |
| East Haven PD, CT | Sept. 2009 | UOF, DP, S&S | | Ongoing |
| New Orleans PD, LA | April 2010 | UOF, FA, S&S, DP | | Ongoing |
| Alamance Co. Sheriff, NC | June 2010 | DP, S&S | | Ongoing |

* DP = Discriminatory Policing
  FA = False Arrest
  PD = Police Department
  S&S = Search & Seizure
  UOF = Use of Force

** CD = Consent Decree
   MOA = Memorandum of Agreement
   TA = Technical Assistance
   TAL = Technical Assistance Letter

