## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA

        Plaintiffs;

    v.

COMMONWEALTH OF PUERTO RICO, ET AL.

        Defendant.

No. 12-cv-2039 (GAG)

## MOTION TO FILE FIRST SIX MONTH REPORT

**TO THE HONORABLE COURT,**

Comes here, the Technical Compliance Advisor, and respectfully informs:

1.  Pursuant to Requirement 250 of the Agreement for the Sustainable Reform of the Puerto Rico Police Department (hereinafter "the Agreement"), the Technical Compliance Advisor (hereinafter 'the TCA"), prepared the first Six Month Report covering the period from the date of appointment to December 6th, 2014.

2. In compliance with Requirement 252 of the Agreement, the TCA submitted to the parties a copy of the first six months report in a draft form on December 17, 2014.

3. Both parties requested an extension to submit comments, to which the TCA agreed. The Puerto Rico Department of Justice (PRDOJ) submitted their comments on January 16, 2015; the United States Department of Justice (USDOJ) submitted their comments on January 18, 2015, as stipulated by the parties.

4. Having considered the parties' comments, the TCA is ready to file the final Six Month Report with this Court, pursuant to Requirements 250 and 252 of the Agreement.

FOR ALL OF WHICH, the TCA respectfully requests that this Honorable Court affirms compliance with Requirements 250 and 252 of the Agreement, approving and

authorizing the filing of the first Six Month Report, covering the period from the date of appointment to December 6th, 2014.

In San Juan, Puerto Rico, this day February 9, 2015.

**RESPECTFULLY SUBMITTED.**

**Arnaldo Claudio -TCA**

**CERTIFICATE OF SERVICE:** I here by certify that an electronic copy of this document has been sent to all parties of record.

# SIX-MONTH REPORT OF THE TECHNICAL COMPLIANCE ADVISOR JUNE 6 – DECEMBER 6, 2014

*Office of the Technical Compliance Advisor to the Agreement for the Sustainable Reform of the Puerto Rico Police Department*

# A Message from the
# Technical Compliance Advisor

This Report, submitted pursuant to Paragraphs 250 and 252 of the Agreement for the Sustainable Reform of the Puerto Rico Police Department (hereinafter the "Agreement") summarizes the activities of the Technical Compliance Advisor, hereinafter the "TCA," of the Puerto Rico Police Department (hereinafter "PRPD"), for the six-month period that ended December 6, 2014.

The role of the TCA is to assess and report the challenges and obstacles facing the PRPD in the implementation of the Agreement. The TCA approaches this challenging task with the understanding that this is a project that requires expertise, experience, the application of rigorous scientific methodologies, integrity and high ethical standards. In advancing the above objectives, one month after my appointment, the undersigned, jointly with the Parties, put together a team of highly qualified professionals and seasoned subject matter experts ("SMEs") in all eleven areas of the Agreement. As the present report will affirm, the above team has begun to make immediate contributions, as recognized by PRPD in its latest Status Report; "[T]here is an environment of collaboration and assistance between the Parties, the TCA and his team that is strengthening the goal of the intended Reform."

Objectivity, thoroughness and professionalism are just some of the elements which are needed to further advance the Agreement. Notwithstanding, we are also committed to other values which are just as important. Those are an unconditional commitment to accomplish the requirements of the Agreement and a devoted dedication to the needs of the people of Puerto Rico, who will become the ultimate beneficiaries of the full implementation of the intended Reform.

The principles ingrained in the Agreement are exactly the principles that the TCA is committed to uphold and defend: the adoption by PRPD of constitutional effective policing, the professionalization of PRPD, and the restoration of community trust in the PRPD. Of course, the reforms will not be implemented in the course of one reporting cycle, in particular the restoration of community trust, but our commitment is to see the successful implementation of the Agreement to its fruition.

TCA Semi-Annual Report | 2014

During this initial six-month period, the TCA met with numerous community stakeholders and numerous public and governmental officials.  The primary goal of these meetings was to listen to each individual's perceptions and perspectives on citizen-police interactions.   The above meetings and civic engagements have re-affirmed my conviction that understanding the link between constitutional policing, police professionalism, and community trust is one of the primary keys to the success in the implementation of the Agreement.   It is through active listening and personal engagement that the I have acquired essential information which has proven very valuable in the early progress being made in the fulfillment of the Agreement.   By "taking the pulse" of the community, the TCA and his team  have been placed in a better position to directly hear from the people that are possibly the most affected; by the PRPD itself, to make meaningful recommendations to our office for the desired expeditious changes in the way they operate and interact with members of the community.

Finally, I would like to express my deepest appreciation to all those that placed their trust in my capacity to undertake this important project.

Colonel (ret.) Arnaldo Claudio
Technical Compliance Advisor

# Table of Contents

A Message from the TCA                                                    1

Table of Contents                                                        3

Introduction

    Public Reporting under the Agreement                             4

    The Unique Character of PRPD's Agreement for Reform              6

The United States Investigation: Background to the Agreement              9

The Content and Terms of the Agreement                                  11

The Role of PRPD's Reform Unit                                          12

The Role of the TCA                                                     13

PRPD's Action Plans and TCA Comments                                    13

TCA Activities and Community Engagements                                20

Identified Challenges to Implementation and Compliance                  21

Projected Activities: The Next Six Months                               26

Closing Remarks                                                        29

Appendix 1: List of TCA Activities and Community Engagements            31

Appendix 2: Biographical Notes                                         39

# Introduction

## Public Reporting under the Agreement

Paragraph 250 of the Agreement for the Sustainable Reform of the Puerto Rico Police Department ("Agreement") defines the scope and structure of Technical Compliance Advisor's ("TCA") report.  The Agreement requires that a semi-annual public report be filed with the Court after the Parties have had an opportunity to review and submit comments.  The report must address five areas: a) work performed by the TCA; b) assessment of the steps taken in the implementation of the Puerto Rico Police Department's ("PRPD") Action Plans; c) Action Plans' review methodology; d) TCA's recommendations on the steps to achieve compliance; and e) projection of the work to be completed by the TCA in the next reporting period.  The report must be submitted in draft form to the Parties for comments before final filing.

This report describes the work performed by the TCA (requirement (a)) and anticipates the work to be completed during the next six month period (requirement (e)).  As to requirements (b) and (d), the report documents why the TCA and the Parties agreed that PRPD's Action Plans initially submitted in September 4, 2014 should be resubmitted with a different template and with additional information by May 7, 2015. Where appropriate, the methodology and specific findings for each review conducted is documented in compliance with requirement (c).  Requirements b, c, d are further discussed in the section entitled "PRPD's Action Plans and TCA Comments." Requirement (e) is discussed in the section entitled "Projected Activities: The Next Six Months."

The TCA also wants to recognize the efforts made by PRPD during the six-month reporting period to meet the reporting requirements under the Agreement.  In particular, in compliance with Paragraph 261 of the Agreement, PRPD submitted two status reports detailing the compliance work of the PRPD: the preliminary status report ("Preliminary PRPD Report"), covering PRPD's pre-TCA reform progress ending in July 31, 2014, and the first status report ("First PRPD Report"), which covered the

Agreement compliance from August 1, 2014 through November 30, 2014.[1]  The First PRPD Report showed, in more tangible and effective ways than the Preliminary PRPD Report did, the specific steps being taken by the PRPD towards achieving reforms.  In particular, the First PRPD Report highlighted the environment of collaboration that has emerged between PRPD, the United States Department of Justice ("USDOJ"), the Commonwealth of Puerto Rico's Department of Justice ("PRDOJ"), and the TCA.[2]

The purpose of these reports was to describe the PRPD's self-purported progress and current conditions.  They reported on PRPD's compliance initiatives that were resulting in improvements related to the Agreement as well as challenges and obstacles.  These reports highlighted significant implementation activities.  For instance, the First PRPD Report described the critical incident reporting process that was developed jointly with the Parties and the TCA to communicate critical incidents, such as officer-involved shootings and in-custody deaths.  As a result of this process, the PRPD has provided the TCA with numerous reports of critical incidents.  These reports also highlighted the challenges in terms of time, logistics and resources that the PRPD identified in various compliance areas, in particular, training in use of force and search and seizure policies.

In addition to looking at these status reports, the TCA and his Core Team had the opportunity to visit a myriad of police units and facilities during the reporting period and create a documented record of these visits.  The TCA was able to compare and contrast the data available in the reports with the conditions on the ground.  For example, the PRPD reported that Force Investigation Units have been assembled and Force Review Boards were performing critical force reviews.  During one of our scheduled visits, the TCA and his team asked for the number of people on these units and boards and their respective ranks.  It also asked to see some of the findings stemming from these reviews.  The TCA was informed that this information was not available yet, raising concerns on how operational these units and boards actually are.  We commend the PRPD for its strategic vision in this endeavor; however, the facts show that the tactical implementation will be laborious to achieve.

---

[1] See: USA v. Commonwealth of Puerto Rico, No. 3:12-CV-2039 (GAG) *Puerto Rico Police Department's First Status Report Pursuant to Requirement 261 of the Agreement for the Sustainable Reform.*

[2] In the Comments on TCA's First Draft Monitoring Report, USDOJ noted that it was unclear whether the TCA utilized PRPD's preliminary status report in August 2014 as a starting point to understand and evaluate PRPD's focus and model for implementation of the Agreement.  As noted here, the First report was more effective in discussing current conditions than the preliminary report.  The TCA appreciates the efforts made by PRPD in improving the content of the status report.

## The Unique Character of PRPD's Agreement for Reform

The endeavor of reforming the PRPD departs significantly from prior reforms of police departments in the United States as defined by both the scope of the task and the sheer number of affected officers, which are well over 14,000 members. Although there have been over twenty Agreements or Consent Decrees affecting U.S. police departments only two others, New Jersey and the United States Virgin Islands, involved what could be described as a state police department. Following examples and measures that might work for a municipal or urban police department might not be an adequate strategy for a state police agency. In this context, the TCA and his Core Team understand that there is a dearth of models for the PRPD to mirror as it attempts to assimilate and effectively implement the terms of the Agreement.

The TCA believes that the current priority for the PRPD should be to develop its own model and path for reform, one which is particularly consistent with three major fundamental principles of the Agreement: constitutional and effective policing, police professionalism, and community trust in the police. The Commonwealth of Puerto Rico and PRPD agree with the TCA.[3] In the coming months, the TCA and his Core Team will continue to work with the Parties on how PRPD can more specifically tailor its approach to meet the agreed-upon goals of the Agreement.

PRPD had an opportunity to start developing such a novel model during the process of drafting the Action Plans as required under the Agreement. However, a clear vision and a clear path towards meeting the requirements and objectives of the Agreement were not adequately articulated in these plans. Being cognizant that developing this unique reform model is not an easy task, the TCA met with the Parties and recommended a restructured strategy resulting in a different way of approaching the required Action Plans. The TCA recommendations are made part of and discussed in the "Action Plans" section of this report.

---

[3] In the Comments on the TCA's First Draft Monitoring Report, the Commonwealth of Puerto Rico agreed with the TCA that PRPD must develop its own model and path to reform as this will be the only way to make the reform sustainable. In this response, Puerto Rico also referenced three years of intense labor on the part of PRPD's Reform Office and a group of external experts on reform (Warshaw and Associates) while earning the collaboration among all levels of PRPD's ranking system.

TCA Semi-Annual Report | 2014

In the multiple meetings held with the Parties, the TCA and his Core Team met with PRPD's team of private consultants that have been in Puerto Rico for several years working on some of the issues central to the Agreement. In the spirit of collaboration, the TCA recommended to the Parties, and the Parties embraced the idea, that the PRPD's Reform Unit, the PRPD's consultants, and the TCA's Core Team work together in better defining the contours of PRPD's unique path to reform. As noted in Page 43 of the First PRPD Report, pursuant to Paragraph 261 of the Agreement, the Parties and PRPD have embraced in great measure this collaboration environment.[4]

The lack of a well-defined reform model for the PRPD is one of the existing limitations but there are other challenges to confront and overcome. Adding to this complex scenario is the fact that throughout Puerto Rico, almost every municipality has its own municipal police department interacting with the PRPD. These municipal departments are not covered by this Agreement. Adding to the myriad of laws, regulations and procedures distinctive to Puerto Rico, one can envision a formula for reform that could be protracted with complex obstacles. The TCA recommends that all relevant Parties continue to pay close attention to municipal police departments as the interaction between the PRPD, the municipal police departments, and the communities that they serve, could ultimately and predictably have an important impact on the Agreement. The implementation of the Agreement on the PRPD creates an unusual situation where law enforcement personnel from different municipalities interact with them while performing the same tasks, but under a different, albeit more liberal, set of rules. Municipal policemen train at the PRPD's Police Academy ("Academy") and receive the exact instruction from the same Academy faculty as PRPD. The possibility of legislation to standardize this situation ought to be explored to avoid future problems in the execution of police action. Historically the PRPD was the only law enforcement agency dealing with the citizens of Puerto Rico. The municipal police departments, of a more recent creation, tend to follow the model institutionalized by the PRPD. To the extent that PRPD will adopt the principles of constitutional policing and best policing practices, these principles and practices should extend to local departments through the training that the PRPD will offer to these municipalities. It is reasonable to assume that PRPD's training experts will not have a training manual for PRPD officers and a different training manual for local departments trained by PRPD.

---

[4] In the Comments on the TCA's First Draft Monitoring Report, USDOJ noted that the Parties discussed ways to strengthen the draft Actions Plans, from both a practical and compliance standpoint that included greater collaboration in the development of policies. USDOJ also thanked the TCA for having agreed to this approach and committed to working with PRPD through the subject-matter experts on the development of policies.

One of the salient attributes of the Agreement is the opportunity to actively engage the members of the community.  In the six months after the TCA's appointment, there were many substantial and significant community engagements providing the opportunity for the TCA and his Core Team to quickly realize the operational environment that the TCA would have to interact with in order to implement the Agreement.  The TCA and the Core Team held meetings and had communications with representatives of the community of the LGBTTQ, organizations that protect the homeless, representatives of handicapped citizen groups, leaders of the Dominican community[5], representatives of taxicab unions, ACLU, university organizations, private organizations, government officials, particularly the PRPD, the Puerto Rico and U.S. Departments of Justice, the current Superintendent of the Police Department and former police superintendents, commissioners of public safety and chiefs of municipal police departments, legislative leaders, all former governors, the current Governor of the Commonwealth of Puerto Rico as well as many other community institutions.

The above meetings and communications efforts have fostered multiple layers of cross encounters that have been established as a result of these engagements and meetings. For example, a visit to "*La Fondita de Jesús,*" a shelter for the homeless, initiated a direct link with PRPD and the Police Academy in matters related to the PRPD dealing with the homeless.   This newly established relationship opens the door for the organization to provide important viewpoints for the instruction and training of new cadets at the Police Academy in the unique area of community policing.

The TCA has observed an overall commitment to implementing the Agreement conducing to the reform by all Parties involved, which will not only enhance the legitimacy of PRPD with the public, but it has also ensured that the dynamics and environment that necessitated the Agreement will not recur.  The magnitude of the intended Reform was emphasized by the Puerto Rico Secretary of Justice, Honorable Cesar R. Miranda, who commented that the Reform was the most significant transformation that would reverberate throughout Puerto Rico's society, culture, and its people.  He also stated that the Reform has the full support of the government of Puerto Rico.

Notwithstanding this overall level of commitment, the TCA has identified an important area of concern that could be considered a particularly local one, and separate from the Agreement, which could assume a much larger role in the intended reform process. The TCA feels compelled to address matters that pertain to the compensation of police

---

[5] The Dominican community has the largest group of foreign nationals residing in Puerto Rico.

officers, including overtime and sick leave, which have been fraught with delays, and have created a mood of cynicism among the police rank and file, whose acceptance and effective cooperation with the Agreement is crucial to the success of the Reform. The TCA fully understands that these matters are not part of the Agreement but they deserve attention for their broader implications. They are having a negative effect on morale, and the TCA has at times observed work slowdowns and increased sick leave to highlight the predicament in a form of possibly impermissible protest. The PRPD is well aware of these challenges and is working with the Office of Management and Budget ("OMB") attempting to solve these issues. The TCA is of the opinion that, although these controversies are being proactively addressed by the PRPD, if the above salary related matters are not resolved in the near future, the situation in all likelihood will have an adverse effect on the Agreement and intended Reform.

# The United States Investigation: Background to the Agreement

The Agreement resulted from an exhaustive investigation by the Special Litigation Section of the United States Department of Justice's Civil Rights Division. This meticulous examination of the policies and procedures of PRPD pursuant to 42 U.S.C. § 14141, among others, which permits the Attorney General to remediate a pattern or practice of abuses protected by the United States Constitution, culminated in an extensive and comprehensive report that was issued on September 5, 2011. The report identified a pattern and practice of excessive force and unlawful searches and seizures in violation of the Fourth Amendment; as well as, misconduct in suppressing protected rights under the First Amendment.

Although the USDOJ did not specifically identify other indications of meeting the pattern and practice criteria of police misconduct, they did make it patently clear that there were serious deficiencies in how the PRPD exercised its law enforcement duties. Specifically, the PRPD's policing of sex crimes and domestic violence, even when the offenders were their own officers, seriously concerned the USDOJ regarding the potential of those abuses eventually becoming constitutional violations. The only reason the USDOJ did not raise this specter at the time was because of the lack of

concrete data and accountability mechanisms maintained by the PRPD. The USDOJ report also noted that, in contrast to a national decline in violent crime, Puerto Rico had seen its violent crime increase by 17% from 2007 to 2009, while experiencing an escalating trend in murders. Coupled with this criminal activity was the insidious conduct of PRPD officers that resulted in the arrest and conviction of numerous officers for criminal misconduct, including narcotics trafficking and murder. Perhaps the most damning claim highlighted by the USDOJ was the nature and extent of constitutional violations that they felt was widespread.

The investigation uncovered specific examples on how the PRPD used improper excessive force, at times deadly force, when less invasive, dangerous and less confrontational methods were an option. For example, when an officer assigned to a tactical unit feels comfortable telling a USDOJ investigator that "officers need to violate civil rights to fight crime," this statement sheds light into how the PRPD's law enforcement procedures have deteriorated. The USDOJ also identified the dynamics and influences that nurtured and sustained this culture. Principally, the USDOJ identified a lack of guiding policies, insufficient or non-existent training at the initial stages of an officer's career and continuing thereafter, and a lack of specific ongoing training standards. Certain enforcement units had inculcated violence into their operations and an absence of adequate supervisory control and accountability permitted policing violations to occur unabatedly.

Against this backdrop was the dismal record of administrative internal investigations that were often very protracted. Even the United States Court of Appeals for the First Circuit characterized PRPD's disciplinary system as "grossly deficient" when it upheld punitive damages against a former Superintendent. Such an operational indictment can regularly be assuaged and corrected by a well-designed and functional risk management system, which often portends of festering problems that can be addressed through training, education, and counseling, before they erupt into full-blown scandals. In fact, USDOJ commented that even this remedy for reform had been used in a "sporadic and superficial" way by PRPD, resulting in a lack of legitimacy and confidence in PRPD by the very people they were sworn to serve. In certain communities, this sense of mistrust persists. For example, two separate incidents were brought to the attention of the TCA, one of which the TCA received firsthand information, which was quite pertinent to the implementation of the Agreement. One involved alleged acts of discrimination by PRPD officers against a member of the LGBTTQ community and the other is a lingering investigation of alleged misconduct by high ranking officers that remain in command of their post. These two issues reflect lingering patterns of conduct

TCA Semi-Annual Report                                              2014

that the reform will address.  The PRPD is well aware of these incidents and acted on both them.

The TCA remains attentive to the processing and outcome of the aforementioned investigations and believes that the results may be a measure to evaluate how well the PRPD is progressing in its attempt to comply with the Agreement.  It is vitally important, during this critical stage of transition, for the PRPD to establish a fair and equitable system in terms of discipline for dealing with sworn and civilian employees, regardless of rank or title within the organization.   A just and expeditious resolution of all disciplinary matters is essential for all members of the PRPD to embrace the implementation of the Agreement and the intended Reform.  The PRPD has already committed to improve its disciplinary system, see paragraphs 198-200 of the Agreement,

# The Content and Terms of the Agreement

The Agreement consists of eleven focus areas describing a blueprint for a systematic and complete reform on the following issues: Professionalization; Use of Force; Searches and Seizures; Equal Protection and Non-Discrimination; Recruitment, Selection and Hiring; Policies and Procedures; Training; Supervision and Management; Civilian Complaints, Internal Investigations and Discipline; Community Engagement and Public Information; and Information Systems and Technology. Realizing the enormity of this endeavor, additional time was placed into the Agreement, that is, four years of capacity building, to afford the PRPD to receive technical advice and develop the policies and metrics that would enable them to meet the individualized tasks of the Agreement.  This "capacity building" allotment of time, which has not been included in any other known negotiated agreement or consent decree, with any other police department in the United States, is an acknowledgement of the uniqueness of the situation in Puerto Rico, and also a recognition of the magnitude of the transformational challenge that lies ahead in the areas of human resources, Information Technology (IT), professionalization, and other specific content areas within the Agreement. To ensure progress, the Agreement requires the PRPD to demonstrate specific and incremental phases on their accomplishments in the form of Action Plans.  The PRPD must develop

these Action Plans, with the approval of the TCA and the USDOJ, as an integral step in collaborative reform.    Action Plans should establish timely benchmarks and a descriptive process on achieving specific requirements under the Agreement.    The PRPD is required to submit Action Plans in all eleven focus areas on a continued "rolling basis."

The Agreement also directs PRPD to submit scheduled reports on the status of its progress in meeting the terms within the corresponding schedules of the Agreement. Similarly, the TCA shall submit semiannual reports detailing the PRPD's progress as well as any recommendations based upon the TCA's reviews.  Provisions were also included in the Agreement for a mutual exchange of ideas and comments, with the U.S. District Court as the final arbiter for any issue that could not be resolved among the Parties.  Finally, the Agreement requires the TCA not only report on its findings to the Court for the past six months, but also provide a projection of what the TCA intends to accomplish in the next six (6) months period.

# The Role of PRPD's Reform Unit

Embedded in the Agreement is the establishment of the PRPD's Reform Unit, which consists of civilian and sworn members varying in rank and skills.  This unit is to provide instruction, guidance, and supervision to assist the PRPD in the implementation of the Agreement's requirements.    Furthermore they shall also serve as intermediaries between the Parties in implementing the terms of the Agreement and provide data and documents upon request.  The TCA is charged with providing the PRPD with technical assistance to promote compliance, in accordance with Paragraphs 231 and 255.

The Reform Unit is currently under the direction of Lieutenant Colonel Clementina Vega, who reports directly to the Superintendent.  Lieutenant Colonel Vega supervises forty one (41) employees who are police officers, attorneys, and administrative staff.  This unit currently performs the integral role of assisting in the drafting of policy and related Action Plans.  The Reform Unit compiles information and has provided two reports on the status of the PRPD's Agreement implementation efforts.  They submitted the last status report on December 5, 2014.

TCA Semi-Annual Report | 2014

# The Role of the TCA

The Agreement provides for a TCA to ensure that the particular provisions of the Agreement are implemented and are successful in achieving their ultimate goals of constitutional policing and enhanced community trust through professionalism.  To achieve this end, the TCA reviews and approves all policy, protocol, and training related to the eleven focus areas contained in the Agreement.  The TCA in coordination with the USDOJ and the PRDOJ jointly chose six individual SMEs in the eleven focus areas of the Reform.  These individuals have particularized experience in monitoring and making recommendations on other judicially mandated agreements affecting policing operations.  This group of experts is known as the "Core Team." The TCA and the Core Team will, during the capacity building period, assess and report whether the provisions of this Agreement have been implemented, and whether this implementation is resulting in constitutional and effective policing, professional treatment of individuals, and increased community trust of the PRPD.  Through direct contact with the PRPD, their specialized entities, and the Reform Unit, the Core Team shall examine the benchmarks designed by the PRPD in their policies and Action Plans and determine if they are achievable, considering the totality of the provisions of the entire Agreement. (See Appendix Two for the biographies of each member of the TCA Core Team)

In addition to the Core Team, the TCA has a Counsel and an Executive Assistant on permanent staff.  The TCA has attorneys with expertise in Constitutional Law, on temporary staff.  They are used on an as-needed basis.  They are residents of Puerto Rico.  The TCA office is located at #268 Muñoz Rivera Avenue, World Plaza Bldg., Suite 1001, San Juan, Puerto Rico 00918, telephone 787-765-3209.  On June 6, 2014, Honorable Gustavo A. Gelpi, United States District Judge for the District of Puerto Rico, appointed retired U.S. Army Colonel, Arnaldo Claudio as the Technical Compliance Advisor.

# PRPD's Action Plans and TCA Comments

In compliance with Paragraph 250 (b), (c), and (d) of the Agreement, the TCA six-month report is to address whether the Commonwealth of Puerto Rico is making satisfactory progress towards the implementation of the Agreement based on the findings made in

reviewing the Action Plans.  The report should also discuss the specific findings and methodology for each review.

The TCA's reporting responsibilities for the first four years under the Agreement are specified reviews of the Action Plans submitted by the PRPD. The Agreement delineates specific timelines on when the Action Plans, for each of the eleven focus areas, were to be submitted for approval, as well as the requirement for a stepped approach on how and when the PRPD would comply with the goals of the Agreement. These Action Plans should set forth temporal benchmarks and detailed steps agreed upon to execute and implement the required reforms and achieve the desired outcomes in each substantive area. Paragraphs 231 through 240 discuss in detail the development, implementation, and assessment of these Action Plans.

Additionally, the Action Plans are to examine policy and any required revisions, required training, budgetary requirements, and a schedule for when policy is to become field operational.  In compliance with the requirements of Paragraph 237, the PRPD submitted to the TCA and the UDSDOJ the first four Action Plans on September 4, 2014.  The timely submission met the deadline set by the Agreement, and focused on four key substantive reform areas: Professionalization, Use of Force, Searches and Seizures, Equal Protection and Non-Discrimination.

Based on the Agreement, the USDOJ had 15 days to respond to the submitted Action Plans.  The TCA had 45 days to submit its review and submit comments.  The USDOJ submitted its comments on Searches and Seizures on October 2, 2014; on Use of Force and Equal Protection on October 5, 2014; and on Professionalization on October 7, 2014.[6]

On October 14, 2014, five days prior to the deadline, the TCA submitted his comments and recommendations for all four Action Plans to the Parties.  The Parties timely received the TCA's comments to the Action Plans as the TCA met the deadlines set by the Agreement.

---

[6] In the Comments on TCA's First Draft Monitoring Report, the USDOJ noted that they made significant oral contributions on the draft Action Plans prior to the submission of our written comments on October 2, 2014. They noted that the in-person meetings were instrumental in tracing the purpose of the Action Plans and the way that they can be improved to meet the goals of the Agreement.  They also noted that the TCA solicited USDOJ views in commencing the discussion on Action Plans during the November 20, 2014 convening at PRPD headquarters. Finally, the TCA agrees that, in many ways, the comments and recommendations of the TCA and USDOJ regarding PRPD's draft Action Plans often overlapped.

In his submission to the Parties, based on the authority set forth in Paragraphs 236 and 255, the TCA found that the Action Plans needed to be strategically re-structured to be approved.  The TCA also made the main recommendation that the Parties and the TCA should meet on November 20, 2014, to coordinate the process of re-engineering the Action Plans.  The re-engineering process was intended to focus on two agenda items: strategic prioritization and the key role of policies in the Action Plan process.

In the process of review and approval of the Action Plans, the TCA plays two complementary and interrelated roles.  The first role of the TCA is to assess, determine and report whether the Action Plans set forth in detail the steps agreed upon to execute and implement the Agreement, and achieve the desired outcomes in each area.  The second role of the TCA is to provide feedback and technical support in the development, implementation, and assessment of the Action Plans.  Paragraph 236 requires the TCA to provide technical assistance as necessary to achieve the desired outcomes.  As the USDOJ recommended in its response, PRPD should draw upon the considerable expertise of the TCA and his Core Team "to anticipate implementation problems and recommend proven and innovative solutions."

When the TCA and his team began reviewing the submitted plans it became patently clear, in light of the Agreement, that to parse out success for one Action Plan without the benefit of examining the policies and protocols of all the other Action Plans would be problematic. The Agreement is specific on what needs were to be addressed in the Action Plans, and the TCA team unanimously felt those needs could not be properly assessed until the TCA reviewed policies and Action Plans for all the eleven compliance areas.   Whether it was designing projections for human and capital resources, or establishing the connectivity for training and technology, for the TCA to comment and approve one Action Plan without knowing how subsequent Action Plans may be impacted, would be short-sighted and misplaced. In other words, the set of Action Plans must be tailored to be harmonious and congruent among them.

The TCA submits the idea that the best policing practices are linked to best policies and, hence, there must be a global view of how a particular Action Plan impacts on other policies.  For example, it is clear that information systems and technology is a required component under the Agreement.   A viable information technology system would incorporate all police/public interactions as well as provide management with a tool to review officer behavior and recommend intervention where appropriate. The reliability and validity of the data is of paramount importance if the TCA is to conduct

trend analyses, so it is imperative that the system be in place for such endeavors. It is equally difficult to conjure up the design of such a system when the TCA has only seen four of the eleven Action Plans. It would certainly facilitate a system design if the TCA had all eleven Action Plans and their relating policy.  To this effect, in order to support the PRPD, the TCA will incorporate a SME in Information Technology to his team to integrate all technology and policy in the development and reviewing of Action Plans. Moreover, the TCA has already met with the Director of Information Technology for the Government of Puerto Rico and the PRPD to start assessing the IT needs of the PRPD. In meeting with the government representative, it was underscored that there was a basic need to restructure the information technology enterprise of the PRPD.


After reviewing the submitted Action Plans, the TCA also determined that, although many of the actions proposed were necessary, these actions were not sufficiently prioritized making implementation less attainable.  The TCA recommended that the Action Plans incorporate a strategic, vision statement and set clear priorities.  In his response, the TCA noted that the Action Plans outlined benchmarks and action steps, but lacked concrete and precise references to resources, funding, staffing, information technology, capacities, and infrastructure.  Similarly, they did not sufficiently identify concrete operational and administrative obstacles to compliance, nor identify how PRPD expects to address these issues.  There was no mention on the role that the subject matter experts may have in developing innovative solutions to overcome barriers and operational problems. The Action Plans often read as a series of deadlines rather than depicting a strategic vision.  As a result, the TCA made the determination to address how the TCA and his team would help the PRPD to create a healthy and positive command climate and called for the meeting mentioned above.  The TCA is cognizant that the development of policies is taking place during the capacity-building phase and this context is critical to understanding the role and purpose of policies at this stage of implementation.  The USDOJ has expressed that PRPD's capacity for developing policies had greatly improved and commended PRPD and its consultants for their efforts.  Based on the discussions held at the November meeting, the PRPD agreed to issue several provisional policies as final General Orders.  The USDOJ understands that this process can be described as "collaborative" in determining that the PRPD could benefit from finalizing policies that were originally intended to remain provisional for the first year of the Agreement.  Again, it should be noted that the final set of policies should bring about a synchronized effort permitting all Action Plans to harmonize with each other.


The TCA also made the recommendation that, to sooner begin the implementation process, PRPD should consider developing policies for the entire PRPD consistent with

the Agreement.  In most other decrees initial compliance is usually achieved after all required policies have been drafted.  The TCA believed the PRPD should be on the way to begin compliance after all relevant policies have been drafted.  The view of the TCA is that the development of adequate policies is a necessary component to achieving compliance with reform agreements.  Furthermore, the TCA will continue to provide the PRPD with technical assistance in the process of prioritizing the development of policies through the compliance review plan required under Paragraph 245. In a recent meeting with the PRPD, after the reporting period, the Parties and the TCA agreed to a basic schedule based on agreed priorities.

The TCA also recommended that the notion of drafting and adopting "provisional" policies should be eliminated from the Agreement.  The Parties have recently agreed with the TCA's recommendation of eliminating provisional policies.  This was the position supported by the Parties.  Both the Parties and the TCA determined that PRPD's capacity for developing policies had greatly improved since the Agreement went into effect.  The PRPD also expressed its own desire to issue several provisional policies as final General Orders. The process was completely collaborative.

The TCA recommended that PRPD provide additional information for the Action Plans on Professionalization in terms of budget, human resources, materials and information technology and equipment necessary for the implementation of the proposed activities. The TCA recommended the PRPD to add a section describing the most recent departmental developments on Professionalization and summarize the most relevant studies, documents, and reports already conducted or collected.  In particular, the TCA recommended the following two actions: (a) a ranked summary of the most relevant information gathered by the PRPD in the area of Professionalization; and, (b) an analysis of information that reports on barriers and informational gaps that may limit PRPD's ability to collect quantitative and qualitative information.

The TCA also recommended that, as soon as possible, the PRPD develop a career path for officers aspiring to the command ranks.  There should be a structured training and mentoring program and career path for officers and all levels of command staff. Best practices would suggest the following: (a) promotable officers should be identified and properly trained and mentored; (b) all personnel need to know what the job requirements are for every level within the department; (c) if the PRPD increases and enhances training and mentoring, it should encourage more people to apply for promotion; (d) without increasing the amount of training, the PRPD is at risk of increased liability for failure to train; and, (e) if a comprehensive field training program

TCA Semi-Annual Report | 2014

for potential and current supervisors is developed and implemented, the confidence and competence of newly promoted supervisors will increase. The two PRPD status reports evidenced that increasing supervision levels and promoting officers in a more equitable and consistent manner through the development of promotional examinations has been a priority of the PRPD.  Furthermore, it appears that until recently fiscal shortfalls limited the actual promotion of supervisors.  This recommendation promotes the retention of qualified personnel.

As a result of the TCA's concerns, and in accordance with paragraph 255 of the Agreement, there was a meeting on November 20, 2014 to resolve these issues.  The consensus among the Parties was to modify the Agreement through a letter or memorandum of understanding that would hold in abeyance the TCA's approval of any Action Plan until he has had the opportunity to review and approve all policy for the eleven compliance areas.  The TCA favors the theoretical premise of the Action Plan requirement and feels reviewing policies before the Action Plans will hasten the reform process.

In the November meeting, the TCA and the Parties agreed that the Action Plans submitted on September 4, 2014, will be resubmitted with a different template (which has already been approved by both Parties and the TCA) and with additional information by May 7, 2015 in order to conform to the TCA's proposal.  The PRPD will also focus on developing at least one-hundred twenty-seven (127) policies, identified by the Parties and the TCA, to be created in furtherance of the Agreement.  (This number was identified after the reporting period during a subsequent meeting between the Parties and the TCA)

It is important to note that, as a result of these developments regarding the Action Plans, the Commonwealth's Office of Management and Budget assigned a project manager to PRPD to update and revise the Action Plans, in response to feedback from the Parties and the TCA. The TCA and the Parties agree that this additional resource has been invaluable to the process, including the reformulation of the template.

Although there are no Action Plans in place yet, PRPD has requested that the TCA and the Parties meet to discuss the TCA's review methodology to measure compliance of the Action Plans with the Agreement.  This methodology will be in place while PRPD is in the process of developing all new policies in order to comply with the Agreement. In accordance with Paragraph 245 of the Agreement, within 90 Days of assuming duties as TCA, on September 4, 2014, the TCA submitted for review and approval a

compliance, assessment and methodology report documenting how the TCA will conduct the compliance reviews and outcome assessments.  Upon request from the Parties, the TCA re-submitted the methodology report on November 26, 2014. Methodology for each compliance area will be presented by the office of the TCA prior to assessing each area.

Furthermore, the TCA looks forward to working with PRPD and the Parties in discussing the specifics of an audit plan, including methodologies, which is tailored to the concrete requirements of the Action Plans.  The TCA and his Core Team can efficiently identify and quantify compliance with the data to be provided by the PRPD.  Members of the TCA Core Team have an understanding and experience in managing high-risk areas of law enforcement combined with a thorough and professional application of US Government Accountability Office's Generally Accepted Government Auditing Standards (GAGAS/Yellow Book Standards).  In particular, two Core Team members have substantial experience in the principles, methods, and strategies useful in the planning, design, and evaluation of organizational diagnoses and compliance reviews. The research methodology or approach will focus on quantitative and qualitative analyses as well as surveys where independent, dependent, and classificatory variables will be formulated to set the stage for an appropriate research design permitting statistically reliable findings.

This new arrangement does not curtail the PRPD from continuing to work and submit Action Plans. Therefore, the Action Plans that were submitted to the TCA on September 4, 2014, and were not approved, will be resubmitted by the PRPD to the TCA no later than 120 days after the new template format for the Action Plans is approved by the Parties and the TCA, at which time the TCA will fulfill the requirements listed in Paragraph 250 (b), (c), and (d).  It was the intent of the TCA to fully comply with Paragraph 250 of the Agreement, however, because of the shortcomings highlighted with the Action Plans and the agreed change among the Parties to review policies before plans, the TCA will comment on the Action Plans once they are completed and approved after submission by PRPD in the next reporting period.  The TCA's Core Team will continue to provide technical assistance to PRPD to satisfy this requirement. It is important to mention at this juncture that the Commonwealth assigned an OMB budget manager to the PRPD to update and revise the Action Plans in response to feedback from the Parties and the TCA.  It should be noted that the current template for the Action Plans was developed as a result of these efforts and recently agreed to by the Parties and the TCA.

# TCA Activities and Community Engagements

In compliance with Paragraph 250 (a) of the Agreement, the TCA six-month report must provide a description of the work conducted by the TCA.   In addition to the review of Action Plans that was described in the prior section, one of the central functions of the TCA is to meet with members of the community as well as members of the Police Department, which are also stakeholders of the Reform.

Paragraph 254 of the Agreement requires the TCA, as he deems necessary, to meet with community stakeholders.  The goal is to inform civic and community leaders about the Agreement and its implementation; to update them on the progress being made; and to listen to their perspectives on citizen/police interactions.

Paragraph 254 is not just a mandate but one of the essential tools for the success of the Reform.  Active listening and engagement is a central function of the TCA.  It is through this rigorous methodology of actively engaging community stakeholders constructively that the TCA and his team of SMEs hear from those affected and can make meaningful recommendations for change.  In the spirit of cooperation, many of these meetings were conducted with the presence of PRPD and the Parties to ensure full cooperation and complete transparency.   Regardless of whether the PRPD or other Parties were present, all meeting have been properly documented and catalogued.

The benefit of these activities has been two-fold.  First, outreach to community groups and stakeholders had to be done not just to gather useful information but rather to create a relationship of trust among the community stakeholders and the TCA and his team.  The TCA and his Core Team needed to participate and establish an environment of understanding in order to effectively operate in Puerto Rico and will continue to do so to better understand community and stakeholders' concerns.  Also, in order to increase community understanding of the reform process, it was absolutely essential to meet community stakeholders and discuss the process of the Reform and the Agreement.

Second, in evaluating the impact that these outreach initiatives had on the Agreement, one of the main beneficiaries of these meetings has been PRPD.  In fact, the First PRPD Report highlighted how these meetings with community stakeholders had been positive steps towards establishing better bonds with community organizations.  In its report, the PRPD also recognized that these meetings will ultimately lead to providing

| TCA Semi-Annual Report | 2014 |

better police services while protecting the civil rights and liberties of citizens. The PRPD cited specific examples of how meetings with groups had an immediate impact. These examples are detailed in the First PRPD Report. The TCA encourages the PRPD to continue to attend these meetings with the TCA.

Finally, as an example of how the TCA benefited, the meetings with the former Governors of Puerto Rico provided the TCA with the historic evolution of the PRPD during the past thirty (30) years and great deference was afforded to their opinions. These meetings provided the TCA with a thorough and comprehensive understanding of the strategic decisions made and the operational environment affecting the PRPD in its history.

These meetings are further described and specifically delineated in Appendix 1.

# Identified Challenges to Implementation and Compliance

Consistent with Paragraph 250 (d) and (e), the TCA discusses challenges and concerns related to the implementation of the Agreement as well as any necessary steps that the TCA found not to have been fully implemented in practice.

Since 2011, there have been several different superintendents of the PRPD. Inherently, each superintendent had his expectations as well as his own management and leadership style. Each superintendent made new appointments, and such changes often resulted in periods of adjustment. For example, a turnover in the superintendent position resulted in a change in the leadership of PRPD's Reform Unit, which is important to the success of the reform. Coupled with that, there was a long delay in selecting a permanent TCA.

The TCA submits that these events created significant instability in the beginning of the reform process and clearly interrupted commencement of what was originally envisioned under the Agreement. The TCA further submits that, as the most recent

PRPD December Status Report shows, the process of reform and accountability has finally begun.   However, there are significant hurdles ahead as exemplified below.

The Agreement was designed to permit the PRPD to build infrastructure, acquire equipment, provide training, and to modify the promotional process.   All of these initiatives require funding and Puerto Rico's OMB has issued directives curtailing spending.  Hence, what was envisioned, and what is required under the Agreement, is lagging because of the fiscal situation in Puerto Rico.   Even the Reform Unit, as significant as it is to the Reform, remains without OMB final approval.   The TCA respectfully submits that the actual fiscal situation of the Commonwealth of Puerto Rico is an impediment to the Reform.   The TCA strongly recommends for some type of amelioration to the fiscal regulations imposed by OMB on the PRPD.

The Agreement also requires the PRPD to create "provisional policies and procedures" on Use of Force, Searches and Seizures, Equal Protection, and Ethics, and to train officers assigned to or engaged in joint operations with federal law enforcement agencies.  What is often difficult in such joint operations, especially when agencies are at different government levels and agencies, is to determine who is in charge and to which policy must all Parties involved adhere to.  Without being explicitly clear on which standard is to be followed, officers may find themselves in a policy or legal violation making them the possible subjects of a misconduct investigation.   In its policies and Action Plans, the PRPD should delineate to what extent a PRPD officer can get involved.

For example, the TCA and members of the Core Team recently attended a meeting with a federal law enforcement agency.  During preliminary discussions, it was pointed out that members of the PRPD are given a cross-jurisdictional authority in joint operations; therefore, they are held accountable to the standards of conduct, rules, policies, procedures, directives, and laws of the federal agency. This distinction in status raises the bar of responsibility and accountability in Use of Force involved operations to the Federal level.  The result is that officers in the joint task forces should not be placed in a position to be the subjects of provisional policies and procedures.   The TCA understands that provisional policies will be eliminated but more critical is to understand that, whether permanent or provisional, the PRPD police officers assigned to federal task forces will have to abide by the guidelines and policies set forth by federal authorities.  The TCA recommends that the Parties and the TCA meet to amend the Agreement to meet the reality outlined above.

TCA Semi-Annual Report | 2014

Since his appointment, the TCA has taken particular emphasis in the situation and condition at PRPD's training academy. The Academy has been in and out of crisis, with many of these crises reported in the local media. A constellation of negative events has caused the Director to assume a reactive posture just to ensure the basic needs of the Academy are met and it can continue to operate. As the Agreement unfolds, the TCA understands that all managers attempt to anticipate challenges that implementation may create, but when these unforeseen events include the basics of running and maintaining an academy, the TCA recommends that once these problems emerge they are addressed promptly so the PRPD can provide the best training environment for its cadets.

It has come to the attention of the TCA that the Academy has been recently affected by salary issues affecting personnel that rose to the level of some professors permanently abandoning the workplace. Other occurrences prompted a formal investigation by the Reform Unit and culminated in a reprimand of the subject by the Superintendent.

The Parties have agreed that there is a specific unit within the PRPD, the Superintendence for Professional Responsibility, which will handle future similar cases. Also, the TCA has taken notice of these disruptions and will provide the Academy and the PRPD the opportunity to continue to self-assess and self-remediate while utilizing the Agreement to bring remedies to these issues when necessary in a timely fashion. The TCA will review the situation stressing that the fairness of the disciplinary process should be met. Regardless of rank and civil service status in the Department, the TCA will assess and review that discipline is fair and equitable.

A physical examination of the Academy by TCA staff reflected a structure in need of repair, often lacking the most current instructional equipment. The TCA and Core Team members shared concern over some of the current environmental situations of students and instructors. The physical facilities are neither adequate nor conducive to adult learning. For example, the auditorium has water leakages that make it unusable. This condition forces the Academy to hold meetings at the dining facility which disrupts learning and creates a negative learning environment. The library is not conditioned to adapt to the needs of modern information technology. The hold system is antiquated and needs to rapidly be modernized. If current facilities cannot be upgraded or fixed, PRPD should consider alternate methods or facilities to substitute for the library.

The TCA submits the Police Academy and its training programs are the center of gravity of the Reform. Academy training for all law enforcement agencies is an important

responsibility. It carries with it a huge legal and moral obligation to provide initial, remedial, ongoing, and specialized training. This obligation also carries legal consequences. Courts now hold academies and departments legally accountable. With this in mind, the PRPD should consider establishing an appropriate, dedicated budget and permanent positions to provide consistency and stability in the Academy's staff, in particular, the Director's position. Without proper financial funding to provide reliable essential training, departments may find themselves spending more money through expensive litigation over recurring court rulings that departments can be held liable for failing to train officers. The TCA recommends that the Academy should be provided with its own budget and the overall financial support needed to carry out the activities of the Academy. It is further recommended that the budget should be under the direct control and supervision of the Academy Director.

The TCA further submits that pursuant to Paragraph 289 of the Agreement the Commonwealth of Puerto Rico is responsible for providing or obtaining necessary support and resources to enable the PRPD and its Academy to fulfill their obligations under this Agreement. If the Commonwealth of Puerto Rico is unable to secure adequate funding sources, whether state or federal, to comply with its obligations under this Agreement within the compliance timeframes stipulated in this Agreement, including extensions of Action Plans approved by the TCA pursuant to Paragraph 239, Puerto Rico may submit to the court proper documentation of its fiscal situation and request that the court modify any applicable compliance time frame.

It is essential not only to have the financial backing, but also the support and commitment of the upper management. The TCA has assigned two Core Team members who are experts on training and police academies to work with the Director and her staff to ensure the Academy gets intense supervision as it continues to establish new curricula and policy in accordance with the Agreement and the best practices in law enforcement. The TCA believes expertly trained recruits/officers are able to perform their constitutional and professional duties while exhibiting a positive reputation with the public. Over time they will be the future trainers, supervisors, commanders and leaders. They will shape and impact the reputation and face of the PRPD as well as its effectiveness and respect within the community. The TCA recommends a continued exchange between the Academy staff and the Core Team in terms of developing curriculum, lesson plans, external training and other associated activities. The expert advisors for the PRPD should also be part of this effort.

TCA Semi-Annual Report | 2014

The TCA believes the PRPD Police Academy's primary role is to provide the foundational piece of training. A firmly built foundation with proper materials -- i.e. policy, procedures and directives; standards; assessment tools; centralized training records; core curriculum; appropriate equipment, use of technology; and quality instructors. All of these enhancements will directly affect the structural integrity and success of the entire department. Core Team members are ready to provide resources for model samples of curricula, lesson plans, code of conduct, performance forms, and evaluation samples.

The TCA recommends the strengthening of the Field Training Officer (FTO) Program. The basis for the TCA's recommendation to strengthen the FTO Program is that they provide the foundation and example for good community policing in the communities that they will perform their duties after completion of the Academy. The FTO is an assurance for the success of the intended Reform.

The PRPD's FTO program should develop a strong professional cadre of new officers who successfully and appropriately apply their knowledge and skills to the intricacies and complexities of their new job demands, while maintaining officer safety. Preliminary proposals regarding the FTO program to discuss further with the Academy's Director and her staff entail:

- PRPD to develop a formal criterion for selecting FTO's.
- Design PRPD FTO program to require recruits to work with multiple FTO's during the FTO phases.
- PRPD should create a formal route by which FTOs provide curriculum feedback.
- Frequent tests and recruit/instructor feedback are evaluated. Early identification of recruits who are not keeping pace for remedial intervention is critical.
- Develop plan to jointly manage the FTO program by the academy staff and managers in the patrol function to allow for feedback and input during this transitional phase of the recruits training.
- Identify pay incentives for being a FTO.
- Develop a philosophy and a Manual for the FTO program. The Manual should include the measure instruments (instrumentos de medición), under which both the recruits and the FTOs will be evaluated. The Manual should define the phases of the FTO Program. The FTO Program should respond to the Academy. The graduation of the

recruits should be after they complete the FTO program, which should include reinforcement training after they complete the program. The program should also include a Feedback process after the recruits receive their reinforcement training.

- The FTOs should be part of the Recruitment process of the cadets.
- Define Geographical areas for the FTO program.

As new sciences, information and practices emerge, the Academy will be pushed to provide proper training to maintain and hone officers' skills. Proficiently trained and competent officers whose deportment and professionalism is exhibited in all facets of their responsibilities are a strong asset; allowing a department to effectively and efficiently serve and build partnerships with the community, protect the public, and maintain peace. A department reflecting high ethical standards lessens legal liabilities, lawsuit entanglements and financial drains. The Academy has the potential to directly affect the new life brought about by reform and help ensure the outstanding future of its leaders and the department. Therefore, the TCA will continue to support that direction.

Further dialogue and recommendations will be forthcoming after additional information can be obtained by the Core Team members and through an ongoing collaborative effort with the Director and her staff. Core Team members look forward to continued involvement and offer their expertise in expediting the necessary reform to assist the PRPD and its members transition through the necessary positive changes.

# Projected Activities: The Next Six Months

Consistent with Paragraph 250 (e), the TCA provides a projection of the work to be completed during the upcoming six-month reporting period from December 7, 2014 to June 5, 2015.

- Core Team members responsible for Civilian Complaints, Internal Investigations, and Discipline, and Use of Force will meet with the Director of the Puerto Rico Department of Justice ("PRDOJ") Special Investigations Bureau (N.I.E.) responsible for investigation of egregious use of force by the PRPD. The meeting will discuss the current Memorandum of Understanding regarding these investigations and determine how the PRPD Force Investigation Unit will interact

with PRDOJ. Additionally, the meeting will establish distinct contours on how PRPD will be monitored in this area when the capacity building period concludes. Core members will consider at all times the "Letter of Understanding" between the United States Attorney for the District of Puerto Rico and the Department of Justice for the Commonwealth of Puerto Rico, in providing advice on jurisdictional matters related to the prosecution of criminal cases involving firearms, violations of Civil Rights or any other investigation where there is concurrent jurisdiction."

- Continue direct communication with the Reform Unit and the administrative and criminal internal affairs commanders suggesting "best practice" in this area. This is a complete policy review and where appropriate, suggestions for revision. There will also be a review of a draft copy of the General Order on the citizen's complaint policy.
- Visit various precincts and review the equipment on hand to safeguard internal investigations material, ensure informational materials are visible to the public in Spanish and English, and review the protocols used at the precinct level in investigating allegations of misconduct. Examine vehicles to ensure they contain complaint forms.  The purpose of these visits is to ascertain the needs of the precincts, as well as speak to the relevant commanders concerning the challenges they face in implementing the Agreement for this focus area.   As noted earlier in the report (page 6), these visits facilitate the process of analyzing how information flows from headquarters to the command level.
- Review all the auditable forms to ensure they contain all the necessary fields and variables that will be used to measure compliance
- Confirm that the complaint Hotline number and Website are fully operational and contain clear information on the procedure for filing a complaint.
- Examine training records to determine which officers have been trained on complaint intake.
- Meet with representatives of the prosecutor, public defender, and other court offices, to review the protocol for reporting allegations of misconduct as well as cases where evidence has been suppressed, or there were questions of candor in PRPD testimony, or Notices of Claim that have been lodged.
- Review the current numbering system used to track complaints and inform complainants.
- Review all Memoranda of Understanding with other agencies to determine their effect on the Agreement.
- Continue working with Academy Director and staff to review curriculum, instructor qualifications and selection process, and review Academy procedures for mandated training, testing, and retention qualification.

TCA Semi-Annual Report | 2014

- Conduct infrastructure and equipment survey of Academy to ensure these resources are the most current to facilitate the learning process. For example, ammunition, safety gear; Virtual Reality Training simulators or Interactive Judgment simulators – i.e. MILO - Multiple Interactive Learning Objectives Range Pro, FACE-LE 1000, L-3DPA, Virtual Driving Simulators such as EVOKE – Emergency Vehicle Operations Computers, VIDA – Virtual Drive Interactive.
- Review Field Training Officer (FTO) program process and practices to blend transition between academy and field, i.e. - selection of FTO's, FTO Train the Trainers program, compensation and evaluation and documentation process of recruits and Veto's.
- Review PRPD in-service training policy, requirements and documentation.
- Review Use of Force (UOF) documents and files to ensure proper procedures are being followed and that given resources are being utilized properly. Follow-up on the work of review force units and force review boards.
- Review Searches and Seizures policy and relating completed forms to ensure proper procedures were followed.
- Review policy and training on Community Policing and identify those officers trained, their current assignments, and interview them on their individual perspectives of success of this initiative.
- Review policy and training on bias-free policing, recruitment, promotions and testing.
- Review auditable forms relating to civilian complaints alleging discriminatory policing and how officers accurately record the demographic information in officer and civilian interactions that may have an effect on biased policing, including arrest data, vehicle stops, street encounters, and property entries.
- Review policy and procedure on how equal protection and non-discrimination policies are incorporated into hiring, promotion, and performance assessment processes.
- Review Ethics curriculum and observe classes to conform to the Agreement.
- Establish a Memorandum of Understanding with the Graduate School of Public Administration of the University of Puerto Rico, to conduct a survey of the members of the community regarding the experiences with and the perception of PRPD.

# Closing Remarks

During the first six months the TCA and his Core Team have observed a police department in transition. Beleaguered by the transition of top leadership, besieged by fiscal constraints that hampered overtime payments, lack of equipment, promotions, training, and selection, the Police Department of Puerto Rico was trying to accomplish much with very scarce resources. Notwithstanding this hurdle, the TCA observed an organization with a commitment to change. The creation of a dedicated Reform Unit, the search for quality and distinction within their police areas, and the interaction of PRPD with the TCA and his Core Team, have fashioned an organization that seeks recognition as a "partner in reform."

A transformation of this magnitude is often replete with challenges that could short circuit success anywhere along the path. The TCA is well aware that a "buy in" from all commanders and rank and file is not an easy accomplishment. The TCA and Core Team members were somewhat disconcerted during some visits to police facilities offices to have encountered members of the PRPD, including some senior members, who were unaware of the totality of the Agreement and its contents. Some members of the PRPD had not read the Agreement and portrayed a lack of understanding. Such contemptuous attitude jeopardizes the active change necessary to meet the progressive reforms. There is a natural trepidation anytime external oversight appears on the scene. It is essential and an obligation that all personnel of the PRPD are familiar with the principles and basic elements of the Reform. The TCA recommends that the Department develops a method, whether a survey or other method, to quantify and monitor officers' familiarity with the Agreement and its terms. The TCA praises PRPD's efforts to post the Agreement for easy access on its website.

Fortunately, entrenched in the Agreement is time, time to garner resources, time to think through effective policies, time to design measurable goals and objectives, time to build police infrastructure, and time to envision a model police department. The challenge for the TCA, as he monitors the Agreement, is to assure the people of Puerto Rico through his reports and community engagements that the PRPD uses this time wisely.

To accomplish this, the TCA has directed his Core Team to engage the PRPD directly and through the Reform Unit. By having this direct contact with personnel long before the monitoring period begins, not only facilitates communication, but enhances

sustained dialogue, which is critical to success.  Conversely, the TCA recognizes that more deeds than verbal platitudes are needed for true sustainable reform.  The TCA will be attentive and observant that claims of commitment by the PRPD are not just rhetorical.  The TCA expects well designed policy, forms that accommodate a wide array of data fields, analytic designs that perpetuate trend analyses, and a public/police interaction that fosters constitutional policing.  Finally, the TCA recognizes that from a technical standpoint his authorization is to assess and report on the Commonwealth's compliance and offer technical assistance to promote the compliance, as appropriate, since enforcement of the Agreement lies in the Parties and the Court.

# Appendix 1: List of TCA Activities and Community Engagements

<u>Meetings with Current Government Officials</u>:

- Hon. Alejandro García Padilla, Governor, Commonwealth of Puerto Rico (June 2014)
- Hon. Pedro R. Pierlusi Urrutia, Puerto Rico's Resident Commissioner in Washington, DC (July 2014)
- Hon. David E. Bernier Rivera, Secretary of State and Mr. Javier González, Deputy Assistant Secretary of State (June, December 2014)
- Hon. César R. Miranda Rodríguez, Secretary of Justice, Commonwealth of Puerto Rico (June 2014); and various follow up meetings
- Superintendent José Caldero López, PRPD (June 2014); and various follow up meetings
- Meeting with various representatives of the Puerto Rico National Guard (June and July 2014)

<u>Meetings with Former Governors of Puerto Rico</u>:

- Former Governor Luis Fortuño Burset (July 2014)
- Former Governor Anibal Acevedo Vilá (July 2014)
- Former Governor Sila María Calderón Serra (September 2014)
- Former Governor Pedro Roselló González (September 2014)
- Former Governor Carlos Romero Barceló (June 2014)
- Former Governor Rafael Hernández Colón (June 2014)

<u>Meetings with Former Police Superintendents</u>:

- Superintendent Pierre Vivoni Del Valle, former Superintendent of PRPD (July 2014)
- Superintendent Emilio Díaz Colón, former Superintendent of PRPD (July 2014)

Meetings with Federal Government Officials:

- Mr. Reinaldo Rivera, Regional Director for the Community Relations Service of the U.S. Department of Justice (July 2014)
- Mr. José R. Vázquez, Director of the Wage and Hour Division, District Office of U.S. Department of Labor (July 2014)
- Brigadier General José R. Burgos, U.S. Army Reserve-Puerto Rico (August 2014)
- Ms. Rosa Emilia Rodríguez, U.S. Attorney for the District of Puerto Rico (September 2014)
- Mr. Carlos Cases, Special Agent In Charge, Federal Bureau of Investigation, San Juan Division (September 2014)

Meetings with Senators and Representatives of the Legislative Assembly of Puerto Rico and related offices:

- Hon. Eduardo Bhatia Gautier, President of the Senate of Puerto Rico
- Hon. Jaime R. Perelló Borrás, Speaker of the House of Representatives of Puerto Rico
- Hon. María de Lourdes Santiago Negrón, Senator of the Senate of Puerto Rico (July 2014)
- Hon. Ángel Matos García, Legislator of the House of Representatives of Puerto Rico (September 2014)
- Commissioner Carlos A. Del Valle Cruz and members of Puerto Rico's Comisión de Derechos Civiles [Civil Rights Commission] (July 2014); various follow up meetings and communications with Commissioner Del Valle.

Meetings with Representatives of Executive Agencies:

- Meeting with "*Comunidades Especiales*" [Special Communities] (September 2014)
- Ms. Marisol Blanco of the "*Oficina de Asuntos de la Mujer*" [Office of Women's Affairs] (October 2014)
- Ms. Cynthia González, Ombudsman Office [ (October 2014)
- Ms. Sandra Jimenez, of the "*Departamento de la Familia*" [Department of Family Affairs] and Ms. Yesenia Mojica of "*Administración de Servicios de Salud y Contra la Adicción*"[Administration of Health Services] (November 2014)
- Mr. Heriberto Luna, Criminal Justice Information System (November 2014)

- Ms. Iris Miriam Ruiz Class, "Procuradora del Ciudadano" [Office of the Ombudsman] (November 2014)
- Ombudsman Agustin Montañez, "*Oficina del Procurador del Veterano de Puerto Rico*" [Office of the Ombudsman for Veteran Affairs], Governor's Office (November 2014)
- Ms. María Nieves, "*Oficina del Procurador de las Personas con Impedimento*" [Office of the Ombudsman for People with Disabilities], Ponce Regional Office (OPPI) (November 2014)
- Assistance to "*XXV Conferencia Anual del Ministerio Público, Abogados y Registradores de la Propiedad*" of the Puerto Rico Department of Justice (October 2014)

Meetings with Mayors and/or Commissioners of Public Safety:

- Hon. María Eloisa "Mayita" Meléndez Altieri, Mayor of Ponce, and Commissioner Norberto Rodriguez Alicea (July 2014)
- Commissioner , Juncos (July 2014)
- Hon. William E. Miranda Torres, Mayor of Caguas (August 2014)
- Hon. Carmen Yulin Cruz, Mayor of San Juan (September 2014)
- Hon. José Carlos Aponte Dalmau, Mayor of Carolina (September 2014)
- Hon. Javier Jiménez Pérez, Mayor of San Sebastián (October 2014)
- *Hon. José Ramón Román Abreu, Mayor of San Lorenzo (November 2014)*
- Hon. Victor M. Emeric, Mayor of Vieques (December 2014)

Meetings with Puerto Rico Police Department Reform Unit:

- Ongoing meetings and communications with LTC Clementina Vega, Director of the Puerto Rico Police Department Reform Unit
- Several meetings with Robert Warshaw of Warshaw and Associates, Inc., consultants for Puerto Rico Police Department (June 2014)
- Several meetings for the discussion of the Critical Incident Use of Force Report (July 2014)
- Meeting for the presentation of the Puerto Rico Police Reform Unit to the TCA Core Team
- Several meetings and communications with the Reform Unit's professionals for the review, analysis, discussions and technical support to the final drafts of the following Generals Orders:
  - General Order 600-601: Use of Force
  - General Order 600-603: Use of Weapons

TCA Semi-Annual Report | 2014

- o  General Order 600-605: Investigations on Use of Force
- o  General Order 600-614: Arrests and Citations/Summons
- o  General Order 800-801: Community Interactions Councils
- Review, analyses and comments on the Action Plans presented by the PRPD (October 2014)
- Session of work with all the Parties for the discussion of the TCA Response to the Puerto Rico Police Action Plans. (November 2014)

Meetings with Puerto Rico Police Department representatives:

- Several visits to the Police Academy, and meetings with Col. Michelle Hernández Fraley and her staff.
- Meeting with Police Explosive Ordinance Team (September 2014)
- Meeting with various representatives of the "*Cuerpo de Capellanes de la Policía de Puerto Rico*" (Corps of Chaplains of the Puerto Rico Police). (November 2014)
- Meeting with a member of the Administrative Division. (November 2014)
- Meeting with Antonio Cruz Domenech, Administrative Division. (November 2014)
- Visit Police Academy Firing Range-meeting with Cadets (November 2014)
- During this period of time, the TCA has conducted a considerable amount of informal interviews with the agents of the Puerto Rico Police through casual street conversations.
- Since July 2014, several police officers have requested confidential meetings with the TCA. All the requested actions have been met by the TCA.

Visits and meetings to Police Regional Headquarters and Police Stations:

- Visit Utuado Police Headquarters (July 2014)
- Visit to Quebradillas' Police Station (July 214)
- Visit to Camuy's Police Station (July 2014)
- Visit to Las Piedras Police Station with Core Team (August 2014)
- Visit to Caguas Regional Headquarters (September 2014)
- Visit to Ponce Regional Headquarters (September 2014)
- Visit to Juncos' Highway Patrol (September 2014)
- Meeting with SWAT Team (September 2014)
- Meeting with Tactical Operation (September 2014)
- Visit to Manuela Pérez Public Residential Project Police Station (September 2014)
- Meeting in Aguadilla Police Station (October 2014)

TCA Semi-Annual Report | 2014

- Meeting in Mayaguez Police Station (October 2014)
- Visit to San Lorenzo Police Station (October 2014)
- Highway 52 Police Station night visit (October 2014)
- Meeting Isabela Police Headquarters (November 2014)
- Attended the Sexual Harassment Conference at Caguas Police Headquarters (November 2014)
- Visit to Bayamón Oeste's Zone of Excellence ("*Zona de Excelencia*") (November 2014)
- Ponce Headquarters' Community Open Meeting in Barrio Indio in Guayanilla (November 2014)

Meetings and communications with representatives of the following groups and associations within the Puerto Rico Police Department:

- "*Sindicato de Policías Puertorriqueños, Inc.*"
- "*Asociación de Miembros de la Policía de Puerto Rico*"
- "*Corporación Organizada de Policías y Seguridad*" (COPS)
- "*Concilio Nacional de Policías*" (CONAPOL)
- "*Cuerpo Organizado de la Policía, Inc.*"

Meetings and activities with the Community Councils for Public Safety ("*Consejos Comunitarios de Seguridad*") and other community groups:

- Meeting with Mr. Ricardo Porrata-Doria, Los Maestros' *Consejos Comunitarios de Seguridad*, and follow up meetings (July, August, October 2014)
- Participation in "Night Out Activity" (August 2014)
- Meeting with Ms. Cecilia de la Luz, LGBTTQ representative, and follow up meeting (August, September 2014)
- Meeting with representatives of the Dominican community at San Mateo's Church Neighborhood Security Committee (September 2014)
- Meeting with administration of the University of Puerto Rico (September 2014)
- Meeting with Ms. Tere Cánovas, Hato Rey Oeste's *Consejos Comunitarios de Seguridad*, (October 2014)
- Participation in the San Juan's monthly meeting of the *Consejos Comunitarios de Seguridad* at Manuel A. Pérez's Public Housing development (October 2014)
- Meeting with representatives of Mayagüez's *Consejos Comunitarios de Seguridad* (October 2014)

TCA Semi-Annual Report | 2014

- Participation in the activity "*Feria de Seguridad y Recursos Comunitarios*" in Bayamón (November 2014)
- Participation in the activity "*Policía y Comunidad Unidos por una Sola Causa*" in Francisco Figueroa's public housing development in Añasco (November 2014)
- Participation in the acts of installation of the *Consejos Comunitarios de Seguridad* in the public housing development of El Caribe in La Playa of Ponce (November 2014)
- Participation in the activity "*Feria de Seguridad y Recursos Comunitarios*" in Hermanas Dávila in Bayamón with the active participation of the following Community Councils for Public Safetyy: Rexville, Santa Monica, Forest Hills, La Milagrosa, Valencia, Parque de Flamingo, Sierra Linda, and Reparto Flamingo (November 2014)


**Meetings with the "*Grupo Comunitario de Trabajo*" [Community Working Group] gathered through the joint efforts of the TCA and the American Civil Liberties Union (ACLU):**

- Participation in several meetings with the members of this group for the discussion of different aspects of the Reform.
- This group includes the following organizations and different community leaders, among others:

  o Mr. William Ramírez, ACLU
  o Mr. Josué González, ACLU
  o Ms. Vilma Gonzalez, "*Paz para la Mujer*"
  o Ms. Nora Vargas Acosta, University of Puerto Rico School of Law, LGBTTQ Legal Clinic
  o Mr. Osvaldo Toledo, "*Colegio de Abogados de Puerto Rico*"
  o Mr. Esteban Reyes, Dominican Community
  o Ms. Romelinda Grullón, "*Centro de la Mujer Dominicana*"
  o Ms. María Colón, Mr. Héctor Berdecía, and Mr. Juan Miranda, University of Puerto Rico's Student Council Representatives
  o Ms. Carmen Milagros Vélez, LGBTTQ Community
  o Mr. Andrés Lloret Gutiérrez, President of "*Federación Central de Trabajadores*" (FCT)
  o Ms..Carmen Tirado  and Ms. María G. Rosado, "*Asociación Puertorriqueña de Profesores Universitarios*" (APPU)
  o Mr. Rafael Rivera, Villa Cañona Community
  o Ms. Amarilis Pagán and Ms. Yesenia Méndez, Proyecto Matria
  o Commissioner Carlos Del Valle, "*Comision de Derechos Civiles*"

- o Ms. Julie Cruz, Ms. Jeannette García Alonso, and Mr. Robert Millán, Immigrants Community
- o Ms. Esther Vicente and Mr. Julio Fontanet, Interamerican Law School
- o Mr. Efren Rivera Ramos, University of Puerto Rico Law School
- o Mr. Stephen Leung, Representative of the Asian Community
- o Mr. Joey Pons, "*Comité Amplio para la Búsqueda de Equidad*" (CABE)
- o Mr. Osvaldo Burgos, Amnesty International
- o Mr. Miguel Soto and Ms. Mari Mari, Center for a New Economy
- o Ms. Judith Berkan
- o Mr. José Rodriguez, Dominican Community
- o Ms. Olga Orraca, "*Taller Lésbico Creativo*"
- o Ms. Lina Torres, Universidad del Sagrado Corazón
- o Mr. José Vargas Vidot, "*Iniciativa Comunitaria*"
- o Ms. Gloria Ruíz, "*Fondita de Jesús*"
- o Ms. Adrana Godreau, ACLU Women's Project
- o Mr. Alfredo Font, "*Concilio Multisectorial*"

**Meetings with Community Leaders and other community's activities**:

- Meeting with different civil rights and minorities groups (July, 2014)
- Meeting with Ms. Ada Conde, LGBTTQ Community Leader (July, August 2014)
- Meetings with Ms. Cecilia La Luz from "*Centro Comunitario LGBTTQ*" (August 2014)
- Meetings with Mr. Roberto Pérez Santoni, known as "Papo Christian," Community Leader (August, October, November 2014)
- Meetings with Mr. Pedro Julio Serrano, LGBTTQ Community Leader (November 2014)
- Meeting with Mr. José Rodríguez, immigrant rights advocate (August 2014)
- Meeting with Mr. Esteban Reyes Manzano, immigrant rights advocate (August 2014)
- Meeting with community leaders and groups advocates at ACLU's facilities with the Core Team (August 2014)
- Meeting with Ms. Yesenia Méndez Sierra and others representatives of "*Proyecto Matria*", and various follow up meetings (August, September 2014)
- Visit to Manuel A. Pérez Public Housing development to participate in a community forum (September 2014)
- Meeting with representative of "*La Playita*" community group with TCA Core Team (September 2014)
- Meeting with Special Communities and Loiza Community with TCA Core Team (September 2014)

- Meeting with representatives of the Dominican Community (October 2014)
- Meetings with members of the "*Fondita de Jesús*" (Homeless Shelter) (September, October 2014)
- Meeting with Mr. José Rodríguez and Mr. Esteban Reyes Manzano, Dominican Human Rights' Committee (October 2014)
- Visit to the funeral home for the memorial service of Don Pedro Aguayo, member of the Floral Park's "*Consejos Comunitarios de Seguridad*" (November 2014)
- Meeting with Mr. Papo Christian for the discussion of the campaign "*No más Balas al Aire*" (November 2014)
- Meeting with Ms. Carmen Villanueva, La Playita Community (November 2014)
- Meeting Homeless Shelter personnel Caguas (November 2014)
- Meeting in Yauco with Ms. Tati Escobar, an advocate for persons with disabilities. (November 2014)
- Participation in activity held in Añasco, "*La Policía y la Comunidad Unidos en una Sola Causa*" (November 2014)
- Participation in the annual activity "*Ni una Bala más al Aire*" (December 2014)


**Meetings with citizens who have been victims of civil rights violations by the Police of Puerto Rico:**

- Meeting with victims of police civil rights abuses (July 2014)
- Meeting with the parents of a victim who was killed by a municipality policeman in Guaynabo (September 2014)
- Meeting regarding civil rights violation case, presented to the Police Reform Unit (July 2014)
- Meeting with a handicap child in Luquillo  Municipality (October 2014)
- Meeting with LGBTTQ community victims of police brutality (November 2014)


**Others Groups of Interest:**

- Mr. José R. Nin, on the behalf of the "*Asociación de Taxistas*" (August 2014)
- Mr. Miguel Méndez. "*Mi Opinion PR.com*" (August 2014)
- Radial interview in "580 Radio AM" special program: "*Foro por Puerto Rico: Reforma de la Policía y Seguridad*", conducted by Rubén Sánchez (August 2014)
- Dr. Carlos Collado Shwarz, President of Carlos Albizu University, (September 2014)
- Prof. Ricardo Blanco, professor of the Graduate School of Public Administration of the University of Puerto Rico (October 2014)

- PRPD reform's presentation to directors and members of the Chamber of Marketing Industry and Food Distribution (MIDA) (October 2014)
- Members of the Advanced Security International Safety Association (November 2014)

# Appendix 2: Biographical Notes

## TCA

**Colonel (ret.) Arnaldo "Arnie" Claudio** is the Technical Compliance Advisor of the Agreement for the Sustainable Reform of the Puerto Rico Police Department.  He was selected by the Parties and appointed by Judge Gustavo Gelpi on June 6, 2014.

TCA Claudio is a retired Army Colonel and a native of Santurce, Puerto Rico.  He attended the University of Puerto Rico and was commissioned a Second Lieutenant on January 5, 1979, in the U.S. Army Military Police Corps.  During his 30 years of military service, he held numerous highly sensitive positions culminating as Chief of Staff and Chief of Police for the Joint Force Headquarters - National Capital Region (JFHQ-NCR) and the U.S. Army Military District of Washington (MDW).  Some of his most prominent assignments included: Chief Security Operations for Pope John Paul II; Special Forces/Police Advisor for Presidential Hostage Rescue Forces, Colombian Armed Forces; Military Group Advisor for counter-narcotics and Counterterrorism, Peru, El Salvador and Bolivia; Assistant to the Special Advisor for Central and Eastern European Affairs of the Office of the Secretary General of NATO for counter-narcotics; White House Senior Drug Control Analyst for Central America and the Caribbean, Office of the National Drug Control Policy (ONDCP); Police Advisor for the Cuban and Haitian Refugees Operations in Guantanamo Bay, Cuba;  Joint Staff Interagency representative in the development of the Government of Panama National Security Strategy; Department of Defense Security Coordinator and Interagency Coordinator for President Ronald Reagan and President Gerald R. Ford's State Funerals and President George W. Bush and President Barack Obama's Presidential Inauguration;  Brigade Commander, Military Police Brigade, 25th Infantry Division; and Provost Marshal/Chief of Police of the Multinational Coalition Forces and XVIII Airborne Corps in Iraq.

Upon Retirement from the U.S. Army, TCA Claudio served as the Executive Director for the Office of Information Technology, Oversight and Compliance at the Department of Veterans Affairs.  In March 2009, he joined the Peace Corps as the Chief of Staff for

Operations, Volunteer Recruitment, and Selection. Since February 2010 until his appointment as TCA, he served as the JFHQ-NCR's Interagency Program Director and Advisor to the Commanding General.  In this position, TCA Claudio was the direct representative for the Commanding General in matters related to the integration and synchronization of Homeland Defense and Defense Support to Civilian Authorities within the JFHQ-NCR.  He coordinated directly with local, state and federal partners concerning National Security Special Events within the NCR Interagency (FBI, Secret Service, US Capitol Police, FEMA, HLS, Metro Police Department, Fire and Rescue, others) and led the critical relationships that JFHQ-NCR sustains with governmental and non-governmental agencies on a daily basis, which play a critical role in the ability to execute operational plans for the safety and security of the Nation's Capital.

TCA Claudio's significant military and civilian awards include the Distinguished Service Medal, Defense Superior Service Medal, Legion of Merit (2 OLC), Bronze Star Medal, Meritorious Service Medal (7 OLC), Joint Service Commendation Medal, Army Commendation Medal (3 OLC), Joint Service Achievement Medal (1 OLC), Army Achievement Medal (4 OLC), National Defense Service Medal (with Star), Armed Forces Expeditionary Medal (2 OLC), Iraq Campaign Medal, Global War on Terrorism Medal, Humanitarian Service Medal (1 OLC), Armed Forces Reserve Medal, Army Service Ribbon, Overseas Service Ribbon (7th), Inter-American Defense Board Ribbon, U.S. Army Combat Action Badge, U.S. Army Airborne Badge, U.S. Army Air Assault Badge, United States Air Force Senior Security Police Badge, Republic of Colombia - Military Order of Merit Award (Jose Maria de Cordova), Colombian Airborne Badge, Colombian Urban Counterterrorist Badge, German Spotabzeichen, German Airborne Badge, Joint Chiefs of Staff Identification Badge, Inter-American Defense Board Identification Badge, Order of the Marchaussee (Military Police in Bronze), Order of Saint Barbara (Field Artillery), Order of Saint Maurice (Legionnaire, Infantry), United States Capitol Police Distinguished Service Medal and the Civilian Joint Service Achievement Medal.

TCA Claudio is a Doctoral candidate in Management, with a concentration in Homeland Security, at the Colorado Technical University.  He has previously earned a Master of Science Degree in Education from Jacksonville State University.  He is also a graduate of the Inter-American Defense College, where he completed a thesis titled, "The *United Sates National Drug Control Strategy and its Impact on Latin America*", based on his experiences working with White House US Drug Czar, General Barry McCaffrey.  Other significant publications include: "Peru, Sendero Luminoso and the Narco Trafficking Alliance," "Bolivian Armed Forces and the War on Drugs," "Training Foreign Police Forces: Assisting El Salvador in its Transitions to Peace."  His most recent publication, "Communications Gaps in the Interagency: Let's Chatter Better," was published in the

Revista Juridica Universidad Interamericana de Puerto Rico – Facultad de Derecho in August 2012 – May 2013.

TCA Claudio is a graduate of the FBI's Citizen's Academy, the Marine Corps Command and Staff College, and the Joint Staff Senior level Counterterrorism School. During his tenure at White House's ONDCP, he assisted in the development and implementation of U.S. Government counter-drug policies, strategies, and programs governing counter-narcotics activities of all defense and federal agencies; assessed the effectiveness of counter-drug programs in Central America and the Caribbean and made recommendations to the Director of the ONDCP, a senior US cabinet official.

TCA Claudio possesses a top secret/SCI clearance adjudicated by the Department of Defense.  He is fluent in Spanish.


## TCA Core Team


**Dr. Gerard LaSalle** is currently an Assistant Professor and the Coordinator of the criminal justice internship program at East Stroudsburg University in Pennsylvania.   He has over 40 years of professional law enforcement experience and over 20 years as an academic having received his Ph.D. in 2004 in criminal justice from the City University of New York Graduate Center, John Jay College of Criminal Justice.  His federal law enforcement career began in 1972, and until his retirement in 2000, Dr. LaSalle was a Special Agent for the United States Department of Justice ("DOJ") initially with the Immigration & Naturalization Service and their Office of Professional Responsibility, and after an organizational change in 1989, with the DOJ Office of the Inspector General. Upon retirement, Dr. LaSalle became the Chief State Investigator for the New Jersey Attorney General's Office of State Police Affairs.

Except for the first four years of his federal career, Dr. LaSalle's professional expertise has been devoted to investigating allegations of criminal and administrative misconduct against DOJ personnel, as well as private contractors conducting business with DOJ. In addition to managing investigations with the Attorney General's Office, Dr. LaSalle's primary duty was to serve as the "compliance coordinator" between the New Jersey State Police ("NJSP") and the court appointed New Jersey Independent Monitoring Team ("IMT") ensuring compliance with a federal Consent Decree.  The Decree focused on  four main elements: traffic stop protocols, training, citizen complaint tracking, and a computerized management awareness system.

**Linda V. Navedo Cortés, J.D.,** was born in San Juan, Puerto Rico, and obtained a Bachelor's Degree in Education from the University of Puerto Rico, and a Juris Doctor from the Inter-American University.  She has studies leading to a Master's Degree in Public Administration from the UPR Graduate School of Public Administration.

Ms. Navedo has a vast experience in processes related to the administration of the government resources and institutional reforms, obtained through the positions of leadership that has occupied in various government agencies. She has also worked for more than one decade as a consultant in the institutional reform's cases that have been brought against the Commonwealth of Puerto Rico, in the Puerto Rico Department of Justice's "*Civil Rights Legal Task Force*", and in similar efforts in the Department of Health.  She was the consultant in charge of cases against the Puerto Rico Psychiatric Hospital, Dr. Ramón Fernández Marina of the Mental Health and Anti Addiction Agency, and in the case against the Division of Services for Persons with Intellectual Disability of the Department of Health.

Ms. Navedo stands out as a professional with a great commitment for human and civil rights.  She is a fierce advocate of participatory democracy and of the processes of community inclusion of disadvantaged and vulnerable groups in our society.   She participated in one of the first studies on human trafficking in the country, entitled "Human Trafficking in Puerto: An Invisible Challenge" with Dr. Cesar Rey.  She has been a partner of the Puerto Rico Alliance against Human Trafficking.

**Chief (ret.) John Romero** is an experienced police executive.  His police career spans over 43 years in New York City and the City of Lawrence Massachusetts with almost 30 years of executive management experience.   He joined the New York City Police (Transit) in 1970 as a Police Trainee and rose to the rank of Deputy Inspector in the New York Police Department (NYPD). During his career in the NYPD, he held the positions of Police Officer, Sergeant, Lieutenant, Special Assignment (commander), Captain and Deputy Inspector. As a Lieutenant and Special Assignment Commander he was designated Commanding officer of the Citywide Homeless Outreach Unit and the Citywide Anti-Graffiti Unit of the NYPD, two units formed in the 1980's to address quality of life issues. He was involved in the formation of these units creating policy and procedures governing how the units would operate, both units where highly successful. In the case of the Homeless Outreach Unit, the number of homeless living in the subway and under bridges in the city was drastically reduced and the number of homeless transported to city shelters increased dramatically.  The Anti-Graffiti Unit was successful in eradicating graffiti from the NYC subway system, specifically from subway trains. In 1995, he was promoted to rank of Captain where he was assigned to Manhattan North 34th Precinct, designated Executive Officer.  He was also designated

Manhattan North Shooting Team Leader whereby he headed teams of investigators that responded and investigated firearms discharges by members of the department. As a result of his overall performance in 1996 he was designated the Commanding Officer of the 34th precinct. The precinct was located in the Washington Heights Section of Manhattan, a multi-cultural community where in the past violent crime ran rampant. Working with the community and its leaders he was able to significantly reduce crime and improve quality of life for its residents. During his tenure, the 34th Precinct experienced one the largest crime reductions of any precinct in the city, as a result of these effort he was promoted to the rank of Deputy Inspector.

In 1999, Chief Romero was recruited by the City of Lawrence, Massachusetts to be its Police Chief. The city was facing the daunting task of having to reverse over twenty years of high crime and deteriorating quality of life for its residents. He was taking charge of the department on the heels of a management study commissioned by the mayor of the city which essentially said that department was out of control and needed to be completely reorganized. To add to the problem, the members of the department were demoralized, having had six chiefs in five years. His first order of business was to establish the Internal Affairs Unit in the department. He then went about completely reorganizing the department emphasizing the need to work closely with the community in order to reestablish the community trust in the police department. He also emphasized the importance of building relationships with outside law enforcement agencies on the county, state, and federal levels and working with social agencies in the Commonwealth of Massachusetts. As a result he was able, in a few short years, to reduce crime by almost 60%, a forty year low. He was also credited with establishing the first Insurance Fraud Task Force in Massachusetts which resulted in over four hundred arrest of individuals for fraud related crimes. As a result of his efforts, the Lawrence Police Department received national recognition and the model was copied in thirteen cities throughout the commonwealth resulting in $500 million in insurance savings to Massachusetts residents. During his tenure as Chief in Lawrence, he also worked with the Department of Justice, Special Litigation Section, Civil Rights Division, conducting investigations of police departments for possible civil rights violations.

**Superintendent (ret.) Rafael E. Ruiz Canton** came to Boston from the Dominican Republic in 1971, at age 15. Superintendent Ruiz joined the Boston Police Department in 1979 and rose through the ranks, joining the command staff first as a Deputy Superintendent in 1997, and then as a Superintendent-Citywide Night Commander in 2008. During his over three-decade career, he worked in the Recruit Investigation Unit, the Drug Control Unit, Internal Affairs, and Anti-Corruption Unit. He worked in most BPD districts either as a patrolman or patrol supervisor.

Superintendent Ruiz is a consultant and Joint Compliance Expert for the U.S. Department of Justice Consent Decree with the town of East Haven, Connecticut, to reform its police department since mid-2012.   Since 2010, he has worked as a consultant with MBG-Catalyst providing training, development, and mentoring services in justice and public safety to foreign governments in Latin America.   As a police commander, he was very much involved (and remain involved) in the Latino and African American communities by serving on several community- based boards and participating in fund raising events and serving as mentor for Latino and African-American youths.   He served in the boards of the Hispanic Office of Planning and Evaluation in Jamaica Plain and the Centro El Cardenal in South End of Boston, where he mentored Latino youth.  He was also a Vice-president of Roxbury Youthworks, Inc. This organization for the last 30 years has served at-risk minority youths in greater Boston area.  He served as Co-Chair of the Grove Hall Safe Neighborhood Initiative from January 2000 until May 2008. He was Vice President and President of the Board for South Boston En Accion. He is the President of Dominicans Inc. Membership in community-based organizations: Boston Connects, Inc. (now defunct) this agency provides and manages funding for business and job development in mostly minority sections of Boston. I participated in Oiste?'s Despierta program- A civic education program for Latinos, where I taught a class Police Internal Affairs procedures, and assisted in other civic projects. Member, Latino Professional Network (LPN); Member, League of United Latino American Citizens (LULAC); Member, Dominican American National Roundtable (Washington DC). I also assisted Latino Festival Committees in Boston to coordinate Puerto Rican and Dominican festivals. I served as mentor to a group of kids at the Emerson Elementary School in Boston by meeting with them several times a year in school and discussing matters of interest to them. I was a "Promising Pal" for a Latino youth at the James Timilty Middle School in Boston for two consecutive years.

Superintendent Ruiz has lived in the Boston area since he came to the US.  He is a father of two, a son and daughter, both in their 30's.  He also has a step-son, and has five grandchildren, three boys and two girls.  He attended Boston public and private schools.   He graduated from U-Mass Boston in 1989, with a Bachelor's degree in Criminal Justice.   He received a Master's Degree in Criminal Justice in 1998 from Boston University.

**Marcos Soler** is the Deputy Executive Director for Policy and Strategic Initiatives at the Civilian Complaint Review Board (CCRB) of the City of New York and an Adjunct Professor of Politics and Public Management with the City University of New York (CUNY).

Marcos joined the CCRB in 2001.  The CCRB is the largest civilian oversight agency in the United States.  He oversees the preparation of qualitative and quantitative analyses, policy memoranda, monthly and semi-annual reports, and public testimony.  He designs and monitors the implementation of organizational strategies and policy initiatives for the Board.  He has presented his research on civilian oversight of law enforcement to domestic and international audiences.  Marcos is a graduate of the New York City Leadership Institute, which is the main organizational and executive development program for executives and senior managers working for the City of New York.  As part of this program, he conceptualized and developed policy initiatives concerning behavioral assessment and recidivism for the New York City Department of Juvenile Justice.

Marcos is a faculty member at John Jay College of Criminal Justice (CUNY).  He has a dual appointment, serving in the Political Science and Public Management Departments.  Since 2005, he has taught senior seminars on judicial policies and processes, civil rights and liberties, and constitutional politics.  He also teaches a graduate course on public oversight of law enforcement.  He has been a visiting professor of Constitutionalism and Politics at the Technical University of Dresden (Germany).  He has also served on the Board of Directors of the National Association of Civilian Oversight of Law Enforcement (NACOLE) from 2009 to 2012.  He was NACOLE's treasurer and chair of the Membership Development and Outreach Committee and served on the Finance and Strategic Planning Committees.

Marcos began his undergraduate education in Europe studying philosophy and law and continued his education earning four graduate degrees: a LLM in Legal Theory, a MA in Constitutional Law and Politics, a MA in Law and Society, and a Ph.D. in Jurisprudence. He holds a MS in Management and Policy Analysis from The New School.  He is a Ph.D. candidate in Political Science at The New School, New York.  He was a Member of the Department and a Research Fellow in Jurisprudence at the University of Valencia Law School (Spain).  He was also a Research Fellow at the Spanish Center for Constitutional and Political Studies (Madrid, Spain).


**Chief (ret.) Alan Youngs, Esq.,** is an experienced police executive.  After 33 years, he retired after 33 years with the Lakewood Colorado Police Department, a suburb of Denver.  He is also an Attorney at Law and a licensed member of the Washington D.C. Bar, the Nebraska and Colorado United States District Courts, International Trade Court, Court of Appeals for the District, and U.S. Supreme Court.  He is a member of the American Bar Association Rule of Law Committee and a member of the American Immigration Lawyers Association Federal Litigation Committee.

Chief Youngs is an American for Effective Law Enforcement (AELE) certified Litigation Specialist and a member of the Board of Directors. He is a Certified Fraud Specialist. He is a member of the International Association of Chiefs of Police (IACP) Investigative Operations Committee, the IACP Professional Standards Committee, the Steering Committee for the U.S. Bureau of Justice Law Enforcement Leadership Initiative, the FBI's Futures Working Group, the American Society Industrial Security Law Enforcement Liaison Committee, and Chair of the ASIS Interpol Committee. He was a member of the 2011 FBI Task Force on Gangs, Terrorism, and Weapons of Mass Destruction. He is a Colorado Police Officer Standards and Training Instructor, a Facilitator for Enlightened Leadership International, an Adjunct Professor of Criminal Justice at Rio Salado College, and was the Interim Director at Red Rocks Community College P.O.S.T. Certified Police Academy.

Chief Youngs is a graduate of the 166th session of the FBI National Academy. He brings a high level of specialized experience that includes: Advising 30 law enforcement agencies in both the United States, Middle East, South and Central America as a consultant for the U.S. Department of Justice, the U.S. State Department, Police Executive Research Forum, DynCorp International, Maximus, Inc. and Engility Inc. He was an Instructor, facilitator and role player involving the training of U.S. Military Human Terrain Teams in democratic policing for Iraq and Afghanistan. He has published numerous articles on law enforcement topics.

## TCA Constitutional Law Counsel

**Antonio R. Bazán, Esq.,** is a retired federal prosecutor (Senior Litigation Counsel) that during his tenure at the United States Attorney's Office, District of Puerto Rico, prosecuted mostly violent crime cases involving murders although prosecution of other federal crimes included Federal Firearms, Narcotics, Immigration and White Collar Crimes. As a Senior Litigation Counsel the job related responsibilities, in addition to the regular caseload, included accompanying recently acquired (new) prosecutors to the various pre-trial hearings of their assigned cases, including Grand Jury presentations and trials. The "Continuing Legal Education" program consisted of offering lectures and "on the job training" to regular and new assistants. Regular case load included complex prosecutions involving narcotics and firearms conspiracies and the prosecution of death penalty eligible and death penalty certified cases. Other job related activities included providing legal advice and recommendations to the United States Attorney and Federal Agencies. Additionally, he has lectured to students at diverse universities and law

schools and provided training to agents at several federal law enforcement agencies and to the Puerto Rico Police Department. Mr. Bazan holds a Bachelor's Degree in Business Administration from the University of Puerto Rico and a Juris Doctor degree from the Inter-American University. He is admitted to practice in the Supreme Court of the Commonwealth of Puerto Rico, the U.S. District Court, District of Puerto Rico, the U.S. Court of Appeals for the First Circuit, the U.S. Court of International Trade, and the U.S. Court of Federal Claims.

**Alfredo Castellanos Bayouth, Esq.,** is the Senior and Founding Partner at Castellanos Group Law Firm, P.S.C., with almost 25 years of experience in the legal profession. His extensive list of achievements includes successful fraud litigation against Don King Productions in the Federal District Court for the Southern District of New York and against the King of Pop, singer Michael Jackson in California. He has been involved in numerous multimillion dollar transactions on behalf of his clients. Mr. Castellanos has also participated as Counsel in the famous Morales–Feliciano case, being awarded by special recognition by the then-Secretary of the Department of Correction and Rehabilitation of Puerto Rico, for his assistance closing various chapters in said litigation. Moreover, Mr. Castellanos has litigated as both as party and counsel in several important constitutional cases in Puerto Rico, among them his efforts in ending Compulsory Membership to the Bar of the Commonwealth of Puerto Rico and having the Seventh Amendment of the Constitution of the United States incorporated in Puerto Rico, among other mayor constitutional cases. Mr. Castellanos knowledge of constitutional law has been acknowledged by Ex-Governors and various Secretaries of State. Said accomplishment, and de facto expertise, caused Mr. Castellanos to be invited by then Governor Hon. Luis G. Fortuño and the then Secretary of State Hon. Kenneth McClintock, to the be the keynote Speaker in the 60th Anniversary of the Enactment of Puerto Rico's Constitution. Mr. Castellanos' work and personal projects have allowed him to travel in excess of ten million miles which have taken him to over 150 countries and 500 cities in all corners of the world. Mr. Castellanos is admitted to practice law in numerous jurisdictions, including the United States Supreme Court, First Circuit Court of Appeals, United States Circuit Court of Appeals for the Armed Forces, United States District Court -- District of Puerto Rico, and Supreme Court for the Commonwealth of Puerto Rico, among others. Mr. Castellanos is a past president of the Federal Bar Association (FBA), Puerto Rico Chapter, and a current Life Fellow of the

Federal Bar Association (which is highest honor bestowed by the FBA), and former Chair of the FBA Council of Past Presidents.  He is also the author of numerous articles that have been published in the FBA newsletter. Mr. Castellanos holds a Bachelor's Degree from the Smith Business School, University of Maryland and has a Juris Doctor from the University of Puerto Rico Law School in Rio Piedras. Mr. Castellanos is an active three term member of the Examination Committee for the Federal District Court in the District of Puerto Rico. He has been bestowed countless awards and recognitions by the FBA, the Foundation of the FBA, L.U.L.A.C., and the Puerto Rico Legislation, among others. Mr. Castellanos has had  the honor of been invited to participate in the Thurgood Marshall Moot Court Competition as a Final Round Judge for nearly a decade, and most recently,  he was bestowed a Life Time Achievement Award  by the Young Lawyers Division of the FBA, for an active participation the above mentioned Moot Court Competition held in Washington, DC.