

**U.S. Department of Justice**

Civil Rights Division

---

JMS:LES:ZIL:BDB:SSL:MJC
DJ 207-65-3

*Special Litigation Section - PHB*
*950 Pennsylvania Ave, NW*
*Washington DC 20530*

January 18, 2015

**VIA ELECTRONIC MAIL**

Arnaldo Claudio
Technical Compliance Advisor
World Plaza Building
268 Munoz Rivera Avenue, Suite 1001
San Juan, PR 00918

      RE:    <u>USA v. Commonwealth of Puerto Rico</u>, No. 3:12-cv-2039 (GAG)
             *Comments on TCA's First Draft Monitoring Report*

Dear Mr. Claudio:

      We write to provide our comments on your draft "Six-Month Report of the Technical Compliance Advisor, June 6 – December 6, 2014" (Draft Report), pursuant to Paragraph 252 of the Agreement for the Sustainable Reform of the Puerto Rico Police Department (Agreement). We recognize that overseeing the implementation of comprehensive reforms at a major law enforcement agency presents significant demands and appreciate the considerable effort that is reflected in the Draft Report. We also commend you for working with the parties to assemble a team of dedicated and experienced subject-matter experts to assist you in this task and the Commonwealth for its continuing commitment to providing you with the resources and support you need to carry out your duties under the Agreement.

      The Draft Report comes following significant coverage of the Department of Justice's investigation and negotiations with the Commonwealth that culminated in final entry of the Agreement in July 2013 and your appointment as TCA in June 2014. As we discussed at the outset, given the time that has passed between these events, the first monitoring report provides an opportunity for the TCA to update the Parties, the Court, and the public about current conditions, operations, and capabilities of the Puerto Rico Police Department (PRPD) based on your own independent review. To assist you, and pursuant to the Agreement, the Commonwealth submitted two progress reports on the status of implementation in August and December 2014. The Agreement also provides the TCA with broad access to documents, staff, and information that are related to the Agreement. An independent assessment of current conditions is of great importance to the parties and other stakeholders as we launch the formal implementation process. It allows the parties to reach consensus on upcoming priorities, identifies areas needing focused attention to ensure continued progress, and assists the public in

understanding the initiatives that the Commonwealth has undertaken since entering into the Agreement. We expect that with the development of action plans that are required under the Agreement in the next review period, the monitoring reports will be more closely aligned to Paragraph 250, which requires that the TCA assess the implementation of specific measures that are designed build PRPD's capacity to comply with the Agreement.[1]

The first monitoring report also provides an opportunity for the TCA to introduce and describe the monitoring structure and approach that have been developed to conduct the independent assessments and other activities that are required by the Agreement. This information sets a foundation for understanding the TCA's compliance findings, conclusions, and recommendations that will be the focus of subsequent monitoring reports. Among the areas that would assist the parties in this regard are a description of the monitoring capabilities that have been developed within the TCA's Office to conduct quantitative and qualitative reviews, the methodology that will be utilized to assess compliance, and the outcomes that will be measured to determine whether the goals of the Agreement are being met. Paragraphs 245, 246, and 248 require that the TCA address these issues, which facilitates the development of a transparent, objective, and reliable monitoring approach and methodology that can be shared with the parties and the public.

Finally, the monitoring report provides an opportunity to discuss upcoming goals and objectives, priority areas for the TCA, and recommendations to overcome or address challenges to implementation. The TCA is uniquely situated to provide thoughtful analysis and perspective on these issues as an independent entity with access to a wide array of sources and information.

The Draft Report addresses the three main areas discussed above in varying degrees. We believe that the biographical notes at the conclusion of the Draft Report provide useful information about the expertise that the TCA has marshaled to oversee the Agreement, based on the parties' recommendations and analyses. We also appreciate the extensive list of meetings

---

[1] Paragraph 250 reads:

During the first four years from the Appointment Date, the TCA shall file with the Court, every six months, written, public reports that shall include:
  a) a description of the work conducted by the TCA;
  b) a listing of each detailed step in the Action Plans and its timeframe indicating whether the timeframe has been met, and whether the Commonwealth of Puerto Rico is making satisfactory progress toward implementation of the Agreement by rating PRPD in full, partial or noncompliance with steps in the Action Plan;
  c) the methodology and specific findings for each review conducted, where appropriate, and redacted as necessary for privacy concerns. An unredacted version shall be filed under seal with the Court and provided to the Parties. The underlying data for each audit or review shall [] not be publicly available, but shall be retained by the TCA and provided to either or both Parties upon request;
  d) for any detailed steps that were reviewed and found not to have been fully implemented in practice, the TCA's recommendations regarding necessary steps to achieve compliance; and
  e) a projection of the work to be completed during the upcoming reporting period and any anticipated challenges or concerns related to implementation of the Agreement.

that are outlined in the Draft Report. It is evident that stakeholder outreach has been a main focus of the TCA's activities during the evaluation period.

We believe that the Draft Report can be strengthened to more fully obtain the benefit of the TCA Office's expertise and the monitoring activities that took place during the last six months. Accordingly, we encourage you to revisit certain components of the Draft Report to emphasize current conditions, including whether PRPD's compliance initiatives, as described in the two self-reports, are resulting in improvements related to the Agreement. We noted few references to PRPD's self-reports and it is unclear whether the TCA utilized PRPD's first status report in August 2014 as a starting point to understand and evaluate PRPD's focus and model for implementation. For instance, the Agreement and PRPD's self-reports discuss the Zones of Excellence, which are PRPD precincts that PRPD has selected to initiate reforms and pilot-test compliance initiatives. In the self-reports, PRPD discusses the implementation of computer-aided dispatch systems, personnel allocations, training, and force implements available in the Zones of Excellence. PRPD has described the utility of this approach by emphasizing that the Zones of Excellence represent the various environments and conditions in which PRPD officers must operate. They also allow PRPD to implement reform in a more manageable scale. Your recommendation that PRPD develop its own unique implementation model appears to miss this significant initiative on the part of the Commonwealth.

PRPD reports other significant implementation activities that are not addressed in the Draft Report. For instance, PRPD reports that force instructors have been certified and that many officers have been trained on revised use of force policies. PRPD also reports that Force Investigation Units have been assembled and that Force Review Boards are performing critical force reviews. PRPD also reports that it has initiated the Staffing and Resource Allocation Study, a critical requirement that touches virtually every area of the Agreement. The Draft Report does not address the critical incident reporting process that was developed jointly with the parties and the TCA to communicate critical incidents, such as officer-involved shootings and in-custody deaths. PRPD has provided numerous reports of critical incidents, and it would be useful to understand how the TCA intends to utilize the information as part of his monitoring activities. The Draft Report also does not discuss the monthly personnel transfer reports that PRPD submits to the TCA and the events that took place to obtain them. Specifically, the Draft Report omits any reference to the first enforcement order issued in this case at the TCA's urging concerning the transfer of personnel.

We believe that the Draft Report's description of work conducted by the TCA should bear on PRPD's progress. For instance, the Draft Report presents an exhaustive list of meetings that the TCA has held during the past six months. The public may appreciate this information in an addendum to the report, and we encourage you to include it there. However, it is important to emphasize the *value* of meeting with community stakeholders in assessing PRPD's compliance in the body of the report. We encourage you to describe why you selected the meeting participants you did, what information they have revealed, and what role these meetings will play in the larger plan to improve practices at PRPD. There should be a clearer connection between the TCA's activities and the compliance issues that are being addressed.

The Draft Report draws numerous conclusions about PRPD's operations; in very few instances do you disclose your methodology or the information used to reach the conclusions. In one case, your conclusions were internally inconsistent: you used the word "eyesore" to describe an investigation PRPD is conducting, but immediately thereafter conceded that the investigation "may be a measure to evaluate ... PRPD." Drawing conclusions about PRPD without adhering to a strict methodology or describing the factual basis is inconsistent with the Agreement and has the potential of leading to compliance disputes between the parties. We strongly encourage you to review the information in your possession regarding PRPD's operations and revisit the conclusions you have drawn.

We appreciate the recommendations and projections you have provided for the next six months. Nevertheless, this section offers no vision for the most pressing concerns facing PRPD. You note that no law enforcement agency has undertaken a restructuring of this scope, and all parties are learning how to collaboratively build the capacity for a department to achieve compliance under a settlement agreement. You describe those as "limitations"; we are hopeful that your final report can offer a clearer vision for addressing the challenges inherent in the endeavor that is underway at PRPD.

Below are additional specific comments on the Draft Report. References to page numbers are to the Draft Report submitted for the parties' review on December 17, 2014. All references to "Paragraphs" are to the Agreement. We do not address purely typographical errors.

| Page, Section | Comment |
| --- | --- |
| 1 | Please consider incorporating your "Message from the TCA" as a substantive section of the Draft Report. The entire report should reflect the TCA's views and message to the parties and the Court. We also recommend that you utilize "Agreement" and "Reform" as two separate terms to avoid confusion between the set of measures agreed upon by the parties (Agreement) and the institutional change that is intended to occur through the implementation of these measures (Reform). The first sentence of the second paragraph illustrates the conflation of these concepts. Please refer to Paragraphs 225 and 227 for a further elaboration of this distinction. |
| 1 | The Draft Report states that the role of the TCA is to assess and report on, among other things, the obstacles confronted by the TCA in the discharge of his duties. While it is useful to know the obstacles confronting the TCA, one of the TCA's primary responsibilities is to assess the challenges and obstacles facing PRPD in the implementation of the Agreement. See Paragraph 250(d). |
| 2 | The use of the slogan in the closing of the "Message" may have connotations that outweigh its utility and seems inappropriate for a neutral monitoring report. Please consider deleting it. |
| Throughout the document, e.g., 11 | The Draft Report features issues of word choice that should be addressed before it is filed. For example:<br>• On page 11, you state that the Core Team experts have experience "monitoring or investigating other judicially mandated agreements." Agreements are not 'investigated.' |

4

| | |
|---|---|
| 5 | While it is accurate that the Department of Justice has entered into two other reform agreements with law enforcement agencies that operate at the state-level, PRPD and the TCA are not entirely in unchartered water. The Los Angeles Police Department, with approximately 10,000 active officers, successfully implemented the terms of a comprehensive consent decree in 2012. The New Orleans Police Department is implementing a consent decree that covers a wide array of remedial measures. Private settlements and judgments have also addressed police reform on a broad scale. For instance, Rodriguez v. California Highway Patrol, involving claims of racial profiling by a state law enforcement agency and Floyd v. City of New York, involving the New York Police Department, with 34,000 active officers.<br><br>In addition, although PRPD's jurisdiction covers the entire Island, much of PRPD's work involves street-level encounters with individuals and responding to localized instances of crime, such as burglaries, robberies, and theft. We view PRPD as a hybrid law enforcement agency, with responsibilities that have been traditionally performed by municipal, county, and state law enforcement agencies. We believe that PRPD could benefit from the experience of prior reform efforts and from research, demonstrations, and model practices from around the country to tailor an implementation strategy that meets the needs of the Commonwealth and the specific terms of the Agreement. |
| 5 | We appreciate your recommendation that PRPD should develop an implementation model that is consistent with the three fundamental principles or goals of the Agreement – constitutional and effective policing, professionalism, and community trust. As you now, PRPD negotiated the Agreement and agreed to implement specific measures to meet these goals. We would appreciate if you would elaborate on your recommendation to more specifically describe your views on how PRPD can tailor its approach to meet the agreed-upon goals of the Agreement. |
| 6 | The Draft Report occasionally raises vague concerns that, left unrefined, are unlikely to foster positive interactions between the parties and stakeholders. For example, you state that "the TCA strongly recommended to the Parties that PRPD"s [sic] Reform Unit, PRPD's consultants, and the TCA Core Team work together in better defining the contours of PRPD's unique path to reform." It is unclear what is meant by the phrase. The parties, with the help of the TCA Office, have worked on numerous endeavors, to positive ends. To the extent you have specific concerns, you should state them.<br><br>In addition, we note that the parties discussed ways to strengthen the draft action plans, from both a practical and compliance standpoint, that included greater collaboration in the development of policies. We appreciate that the TCA agreed to this approach and committed to working with PRPD through the subject-matter experts on the development of policies. |

| | |
|---|---|
| 6 | Law enforcement agencies often share overlapping jurisdictions; this feature is not unique to Puerto Rico. In addition, local laws and regulations are often complex. We are confident that PRPD can achieve compliance with the Agreement despite whatever complexities may arise from these circumstances. Many of the Core Team members have navigated these issues before. We encourage you to ensure that you have the benefit of their expertise on these issues generally, and to revisit this section of the Draft Report, particularly.<br><br>In addition, your statement concerning the impact of municipal police departments on the implementation of the Agreement is unclear and would benefit from further clarification. For instance, is PRPD relying on municipal police to fulfill its own duties or compliance obligations, or are they working together on law enforcement operations pursuant to formal or informal inter-governmental agreements? We note that municipal police departments operate within their own command structure and as independent entities. |
| 6 | Please clarify your statement concerning "standardiz[ing] the actions of the law enforcement community of Puerto Rico," including agencies other than PRPD. This statement is inconsistent with your observation that PRPD is a large, complex organization that should develop its own unique reform model. You seem to imply that much smaller and more limited municipal police departments should adopt the comprehensive measures that the Commonwealth has agreed to implement following the Department of Justice's investigation of PRPD. |
| 7 | While it is useful for the TCA to report on factors that impact the implementation of the Agreement, including external factors that are not part of the Agreement, such as sick and overtime pay for officers, the discussion does not indicate that these controversies are being addressed as part of ongoing investigations and litigation. |
| 9 | The Draft Report states that a meeting between ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ demonstrates that "discrimination is still present by members of PRPD" because ▓▓▓▓ raised concerns. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ please specify whether the conclusions you draw are from completed investigations into the allegations ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. It is critical that the TCA accurately report the factual basis of his conclusions, and allegations that have not been substantiated or investigated should be characterized as allegations to avoid prejudicing or improperly influencing ongoing investigations.<br><br>Your observation at the end of the principal paragraph that it is vitally important for PRPD to establish a fair and equitable disciplinary system at this stage requires further elaboration. PRPD has already committed to improving its disciplinary system under the Agreement. See Paragraphs 198-200. We urge the TCA to provide greater specificity on the changes that are necessary and to expand on the factual basis for the recommendations. |
| 10 | This section claims that the four-year, capacity-building period permits PRPD to develop "policies and metrics" that will enable PRPD to achieve compliance with the Agreement. This statement neglects other elements required by the Agreement and indispensible to PRPD's transformation, such as resources and personnel. We encourage you to modify this claim appropriately. |

| | |
|---|---|
| 10-11 | The role of PRPD's Reform Unit is memorialized in the Agreement. Insofar as you find it necessary to describe the role of the Reform Unit, your Draft Report should also take care to accurately describe the requirements of the Agreement. For example, you state that the Reform Unit must "support the TCA and his team in ensuring compliance with the Agreement." While the parties enjoy a spirit of collaboration, this language does not feature in the Agreement. Rather, the Reform Unit is charged with assisting PRPD in the implementation of the Agreement, and the TCA is charged with providing PRPD with technical assistance to promote compliance. See Paragraphs 231 and 255. |
| 11 | We recommend that you review the section concerning the role of the TCA to ensure that it is consistent with the Agreement. For instance, the Agreement does not include "best practices" as a standard for the TCA's review. We recommend that the TCA utilize the language in Paragraph 225 to more clearly describe the role of the TCA. |
| 12 | We note that we contributed significant comments on the draft action plans prior to the submission of our written comments on October 2, 2014. Our in-person meetings were instrumental in tracing the purpose of the action plans and the way that they can be improved to meet the goals of the Agreement. In many ways, the TCA reflected the views of the Department of Justice in his written comments on the draft action plans. We also note that the TCA solicited our views in commencing the discussion on action plans during the November 2014 convening at PRPD headquarters. |
| 13-14 | In the discussion concerning the need to review all action plans simultaneously, the Draft Report states that the TCA will add an information technology expert to the TCA team. Please clarify whether this resource is necessary to the development of PRPD's information technology system, the development of action plans, the review of the implementation of action plans, or some combination of some or all of these. |
| 14 | While it is accurate to state that the development of adequate policies is a necessary component to achieving compliance with reform agreements, each case is different. In some cases, all policies may be necessary. In others, compliance can be attained in stages by subject-matter area. We believe that the TCA could provide PRPD with assistance in this regard through the compliance review plan required under Paragraph 245, which requires that the TCA indicate the requirements under the Agreement that will be assessed together. We also encourage the TCA to consider that the development of policies is taking place during the capacity-building phase – context that is critical to understanding the role and purpose of policies at this stage of implementation. |
| 14 | We appreciate the TCA's input on the need for provisional policies. As part of our review of PRPD's draft policies, we determined that PRPD's capacity for developing policies had greatly improved, and we commended PRPD and its consultants for these efforts. PRPD also expressed its own desire to issue several provisional policies as final general orders. In this context, we would describe the process as collaborative in determining that PRPD could benefit from finalizing policies that were originally intended to remain provisional for the first year of the Agreement. |
| 15 | It is evident from the self-reports that increasing supervision levels and promoting officers in a more equitable and consistent manner through the development of promotional examinations has been a priority area for PRPD. It is also clear that, until recently, fiscal shortfalls have limited the actual promotion of supervisors. The Draft Report does not discuss or even recognize these efforts. It would be useful to understand the basis for the TCA's recommendation that PRPD should create a career path as soon as possible, including any independent assessments of supervisory shortages or other information that would explain the urgency of the recommendation. |

| | |
|---|---|
| 15 | The Draft Report does not mention that the Commonwealth's Office of Management and Budget assigned a project manager to PRPD to update and revise the action plans, in response to feedback from the parties and the TCA. In our assessment, this additional resource has been invaluable to the process. Indeed, the current template for the action plans was developed as a result of these efforts. |
| 16 | The Draft Report describes the TCA's community engagement and active listening as a "rigorous methodology." We would appreciate greater clarity of this statement. |
| 16-24 | We appreciate the specificity in the individuals and organizations listed as having met with the TCA during the course of the review period. Please consider whether any names need to be redacted for the final report. We also recommend that you place this information in an appendix to the report. |
| 25 | We appreciate that the Draft Report covers a period when there are no approved action plans in effect. Therefore, the TCA is unable to assess PRPD's compliance with action plans. We also appreciate that the TCA addresses general obstacles to implementation without the benefit of action plans, which are required to describe barriers to compliance and steps to overcome them. We agree that the Commonwealth's fiscal situation is an important factor in PRPD's ability to implement action plans and the Agreement. However, very little information is discussed to provide a full assessment of the problem. For example, this section could benefit from a discussion of PRPD's actual budget, access to federal funding and assistance, and other sources of funding. PRPD was allocated special funding for reforms – how has that funding been utilized? Is it sufficient? Are restrictions placed on the use of that funding that are onerous or burdensome? What implementation activities are limited by the funding issue? Has PRPD been able to successfully utilize funding for reform-related equipment and other expenses? A fuller discussion of this issue would provide the parties with greater insights on remedies that might be needed. |
| 25 | PRPD participates in numerous federal task forces with various federal law enforcement agencies. We urge the TCA to consider these differences in making recommendations concerning policy development. Many task forces are governed by memoranda of understanding that provide the standards by which the conduct of individual task force members will be assessed. Please specify whether you have reviewed these memoranda. We also urge the TCA to consider the Commonwealth's interests in holding its officers accountable to agency expectations and the Agreement, particularly in areas that fall outside of MOUs. We look forward to continued discussion of issues related to task force officers and whether the TCA's recommendation for a modification of the Agreement is appropriate. |

| 26-27 | The paragraph concerning staffing controversies at the Academy is difficult to follow. You discuss a salary dispute with instructors, allegations of ▮▮▮ and concerns regarding the investigative process by the Reform Unit. Each of these issues could benefit from greater elaboration of the compliance issue raised, the facts uncovered, and any concerns with the resolution of the issue, if any. <br><br> For instance, we are aware that the allegations of misconduct by ▮▮▮ went beyond inappropriate ▮▮▮ and that he has since ▮▮▮. The TCA's intervention in the allegations involving harassment on the basis of sexual orientation involved directing the Reform Unit to ascertain the identity of the complainant, ▮▮▮ Our main concern, as discussed with the Commonwealth and the TCA, is that the TCA should be promoting compliance with the Agreement, which calls for the investigation of misconduct allegations by the Superintendency for Professional Responsibility, rather than carving out exceptions (e.g., suggesting that the Reform Unit conduct the investigation). Suggesting different investigative processes ▮▮▮ not only conflicts with the Agreement, but also sends a message that different disciplinary systems exist depending on the officers' rank. We also learned that the reprimand received by the ▮▮▮ as a result of the Reform Unit's investigation did not constitute discipline because discipline is only permissible when the allegation is investigated by the Superintendency for Professional Responsibility. The discussion of these important issues is vague and cursory. |
|---|---|
| 27 | The Draft Report includes a series of recommendations regarding the Academy. During the evaluation period, the Academy transitioned from a quasi-independent educational institution to a component of PRPD. Please discuss any review you may have conducted regarding the transition, including whether any of the problems you identified were anticipated and whether any steps were taken to prevent or mitigate them. <br><br> We are troubled by your observations of the Academy. We are interested in your assessment of any corrective steps PRPD or the Commonwealth may have taken once they became aware of the problems. PRPD and the Academy are scheduled to graduate their first cadet class since entering into the Agreement in the coming weeks. As we have discussed, these cadets can have a transformative effect on PRPD once they become members of the rank-and-file, and the quality of their experience at the Academy will likely determine whether they become a force for positive change from within the agency. A poor or even traumatic experience could send a message that conditions may never change or that reform takes place in name only. There is a significant opportunity to improve the quality of cadets' experience to ensure they become agents for positive change. |
| 29 | Please specify the basis for your recommendations for the field training officer program. |
| 33 | We appreciate the TCA's vigilance in overseeing the implementation of meaningful reforms as expressed in the closing remarks. While the TCA's intent may have been figurative in stating, "Finally, the TCA recognizes his responsibility to enforce the Agreement," from a technical standpoint, the TCA is not empowered to enforce the Agreement. The TCA is authorized to assess and report on the Commonwealth's compliance and offer technical assistance to promote compliance, as appropriate. Enforcement of the Agreement lies in the parties and the Court. Please refer to Paragraphs 265, 287, and 295 of the Agreement for a discussion of this issue. |

We look forward to working with you, the TCA's Office, and the Commonwealth to address the parties' comments on the Draft Report. If you have any questions or concerns regarding our comments, please do not hesitate to contact me at (202) 598-0482, Zazy López at (202) 305-8702, or Brian Buehler at (202) 353-1100.

Sincerely,

*/s/ Luis E. Saucedo*
Luis E. Saucedo
Counselor to the Chief
Special Litigation Section

cc: Beatriz Annexy
Special Assistant to the Secretary
Puerto Rico Department of Justice