INTAKE DROP BOX
RECEIVED & FILED

2015 APR -8 PM 2:49

CLERK'S OFFICE
U.S. DISTRICT COURT
SAN JUAN, PR

# Appendix F

U.S. Department of Justice
Civil Rights Division
&
Office of Justice Programs

Roundtable on
State and Local Law Enforcement
Police Pattern or Practice Program
42 USC §14141

### Background Briefing Paper
(June 3, 2010)

The Department of Justice (DOJ), Civil Rights Division (CRT) and the Office of Justice Programs (OJP) are convening a Roundtable of invited law enforcement officials, researchers and consultants to review and discuss Pattern or Practice authority under 42 USC §14141. Fifteen years ago, police misconduct provisions were enacted with the Violent Crime Control and Law Enforcement Act of 1994 (Crime Act). These provisions expanded the authority of DOJ to intervene in local jurisdictions where police agencies engaged in patterns or practices of violating constitutional rights or federal law. Since that time, the Special Litigation Section (SPL) of CRT has pursued investigations, provided technical assistance, and developed memoranda of understanding or consent decrees concerning police misconduct with over fifty local police departments and jurisdictions.

DOJ and OJP convened a similar meeting in 1999 to discuss *"Strengthening Police-Community Relationships."* In 2001, results from that meeting were incorporated in the DOJ publication, *"Principles for Promoting Police Integrity,"* to serve as a guide in promoting ways of building trust, enhancing police accountability, and reducing police misconduct (See included computer disk for this and other referenced documents).

Now, CRT and OJP are convening a one-day roundtable to take stock of the last fifteen years of §14141 litigation. The meeting will bring together a representative group of individuals to consider past experiences and future directions for §14141 litigation. Specifically, the group will discuss jurisdiction selection, police policies and procedures suitable for review, the development of agreements, monitoring, compliance, and the sustainability of changes implemented in the §14141 process.

**History.** A number of events preceded the enactment of §14141 as part of the 1994 Crime Act. The Kerner Commission report in 1968 highlighted the need for change in police practice involving citizens. A number of other commissions and reports focused on police practices leading to *"Guarding the Guardians"* issued by the Civil Rights Commission in 1981. The Commission forwarded recommendations to improve law enforcement in the United States suggesting that existing federal laws were inadequate to create change in police agencies in the way that other social institutions such as education and corrections had been changed through federal law and litigation.

Following the 1991 Rodney King incident and the riots that followed, a series of Congressional hearings heard testimony from people around the country regarding police misconduct. It became apparent that the federal government had limited capability to address civil rights violations by police agencies. In *Los Angeles v. Lyons* (461 U.S. 95 (1983)), the U.S. Supreme Court ruled that an individual was not entitled to prospective injunctive relief because it could not be demonstrated that they would be the subject of excessive force again. These events led to the introduction of legislation referred to as the Police Accountability Act of 1991. Some provisions of this bill were incorporated in the Crime Act of

1994 to fill the gap that existed in the law and require DOJ to hold law enforcement agencies responsible when individual actions formed a "pattern of misconduct" or were part of "systematic practices underlying the misconduct."

Since enactment, §14141 along with other regulations have resulted in federal intervention involving all sizes of police agencies within the United States, Puerto Rico, and the Virgin Islands. The DOJ would like to now assess effect and impact of this litigation authority with agency representatives and other individuals that have been involved in these cases.

**Process.** Section 14141 cases typically include findings that describe problem areas and needed changes in policy, procedures or training. Historically, these areas have included use of force, citizen complaints and misconduct investigations, accountability and management, non-discriminatory policing, data collection, recruitment, hiring, and retention. Allegations of §14141 violations come to the attention of SPL in a variety of ways. SPL may be apprised of police misconduct allegations through complaints by individuals, advocacy groups, police personnel, local prosecutors, political officials, through the media, or through other civil or criminal suits filed in local or federal courts. SPL staff also proactively seek out information regarding possible pattern or practice violations by, for example, reviewing §1983 cases, conducting outreach with advocacy groups, by reviewing internal information about various officers and agencies available from other CRT components and related Federal agencies.

Following an initial assessment, SPL determines whether there is reasonable cause to believe that (if the facts alleged are true) a pattern or practice violation exists. Once that assessment is made, SPL makes a recommendation seeking authority to initiate an investigation. Once this determination is approved by a Deputy Assistant Attorney General (or the Assistant Attorney General), SPL begins a formal investigation by notifying the jurisdiction, in writing, of the subject matter areas being examined. There is only one known example of a police agency refusing to cooperate with an investigation, resulting in contested litigation. Throughout an investigation, technical assistance is provided along with letters memorializing advice and suggestions to enable the jurisdiction to make needed changes as soon as practicable. Notably, investigations include an exhaustive review of policies, procedures, incident reports and other relevant departmental data. Investigative staff meet with all relevant stakeholders including agency command staff, line officers, community members/groups, advocacy groups, and participate in police patrol ride-alongs.

Since §14141's enactment, SPL has initiated over fifty investigations resulting in nine Memorandums of Agreement, two letter agreements, and eight Consent Decrees. Of the total, eight investigations were closed after providing the jurisdiction with technical assistance; eleven were closed after the investigation concluded that the allegations could not be sustained; and, sixteen investigations are on-going (See attachment).

The process of change and compliance is monitored and documented by an independent entity in most cases although the Department maintains oversight in a small number of cases. The role of the independent monitor is part of negotiations and often includes access to all relevant personnel, documentation, records, data and reporting systems. The independent monitor submits regular publicly available reports regarding progress in complying with conditions of the agreement. Section 14141 cases have been initiated and closed in as little as two years, although one has lasted as long as ten years.

Agreements usually require a number of changes to policy, procedure and practice within a police agency. Generally, police agencies must develop, update or modify current policies regarding use of force; the complaint process and reporting of misconduct; for monitoring misconduct including policy involving internal affairs, use of force review boards, performance monitoring information systems;

systems and procedures for officer oversight, supervision, discipline and training; and, to improve community relations and outreach.

**Outcomes**. Local reports from evaluation studies in jurisdictions like Pittsburgh, Cincinnati and Los Angeles indicate that very positive structural and organizational changes have resulted from §14141 intervention. There have been over eighty articles about §14141 litigation published in legal and other academic journals. A few selected cases are reviewed below where evaluation research has been part of the process of demonstrating compliance.

**Pittsburgh, PA.** Although CRT initiated and was continuing other cases at the time, the City of Pittsburgh was the first to enter into a Consent Decree. After a number of years of tension between citizens and police, the American Civil Liberties Union filed a lawsuit against the City of Pittsburgh in 1996 for violation of civil rights by the Pittsburgh Bureau of Police. In April 1996, SPL sent a notice letter to the city solicitor. The scope of the investigation included excessive use of force, false arrests, improper searches and seizures, failure to discipline officers adequately, and failure to supervise officers.

The City of Pittsburgh signed a CD with DOJ in April 1997 which stipulated a number of organizational reforms and changes to policy and practice including oversight, training, and supervision of officers. Two years later, in August 1999 the Pittsburgh Police Bureau was in compliance with the vast majority of the prescribed changes and the CD was terminated (with the exception of ongoing oversight of one aspect of the agreement).

The media and other observers recognized the resulting positive changes to policing in Pittsburgh. According to the Vera Institute: *"Among both police officials and civil rights groups, the Pittsburgh consent decree is generally viewed as a success in terms of increasing police accountability and improving officer training."* Vera also conducted a survey of citizens and found:

*One of the most important measures of change in Pittsburgh is community opinion. Only slightly more than half of Pittsburgh residents had heard of the consent decree. But among persons who had, those who believed policing had improved since the decree outnumbered those who believed that it had gotten worse by a 4-1 margin. We found similarly large margins between those who thought things had improved and those who felt things had worsened in response to questions about fair and courteous treatment of citizens by police officers and thoroughness of investigation of citizen complaints. Whites were much more likely to believe that police use of excessive force had decreased rather than increased since the decree, while more African-Americans believed that use of force had increased than believed that it had decreased.*

The Vera report also noted a number of important factors related to the success of the Pittsburgh CD including the importance of the prompt response to the decree by the City of Pittsburgh committing to the reforms; determination to make the decree part of the reform agenda of the Police Chief; the critical role of the court-appointed monitor; the development of a comprehensive "early warning" performance management information system; and, implementation of command staff meetings to review and act on information from the early warning system (See disk).

**Cincinnati, OH**. Ironically, Cincinnati was one of the cities first studied by the Kerner Commission in 1968. During 2001, some of the same conditions cited in the Kerner study were included in the filing of a lawsuit by the Ohio Chapter of the American Civil Liberties Union, the Cincinnati Black United Front, and the class of African American citizens in Cincinnati. The filing alleged that African Americans had been treated differently than other racial groups for more than 30 years. It was alleged

that recent deaths of fourteen African American men and disproportionate stop and search rates illustrated a pattern or practice of discrimination by the Cincinnati Police Department (CPD). Hearing the case, the court and both parties agreed to a method and process of dispute resolution, and a special master was appointed to facilitate the process.

Another shooting and death of an unarmed African American man propelled the process forward in a Collaborative Agreement (CA). However, still another citizen death and the civil unrest that followed prompted the Mayor of Cincinnati to request an investigation by the DOJ under §14141 in May 2001. Following a comprehensive investigation, the DOJ concluded that constitutional violations had occurred and negotiated a settlement agreement (MOA) with Cincinnati in April 2002.

As of 2002, the City of Cincinnati had separately entered into a CA with the Plaintiff class, the Fraternal Order of Police, and Cincinnati Police Department; while DOJ and Cincinnati entered into a MOA. The Court combined efforts in appointing one monitor and monitoring team for the MOA and CA. This arrangement provided a uniquely comprehensive and complex situation in implementation and progression of both agreements over time.

The MOA specifically targeted police department policies on accountability and use of force. It required the development of new policies on use of force, reporting and investigating use of force incidents and citizen complaints, new training requirements, as well as the development of early intervention and risk management systems. The CA focused on the practice of policing by CPD to build mutual respect and accountability through adoption of Community Problem Oriented Policing; in addressing bias-free policing through policy, training, and data collection; by requiring independent evaluation research to determine if the measures implemented were working (a review that focused on outcomes, not just processes); and, in the creation of the Citizen Complaint Authority to conduct independent reviews of citizen complaints.

On behalf of the parties of the CA, the City of Cincinnati hired the RAND Corporation to conduct research over the course of five years which would assist the parties in measuring progress toward the goals of the CA. RAND collected data regarding all aspects of the CA including citizen surveys and issued a report in 2009 that concluded, *"CPD is not the same as the department that policed Cincinnati in 2001. Policy changes, oversight, and a variety of reforms have produced a department that polices differently than it had in 2001"* (See disk).

Having successfully worked through many disruptive events, obstacles, and hurdles involved in this unique arrangement, DOJ and Cincinnati successfully terminated the MOA in April 2007. On August 26, 2008, the Court held a hearing and accepted a Collaborative Agreement Plan that continued and affirmed the commitment of all parties to remain engaged in ongoing efforts to improve police-community relations throughout the City of Cincinnati. The Court accepted and approved the plan and terminated the case after receiving the Monitor's Final Report in December 2008. The report concludes:

> *The Collaborative has been successful in laying a strong foundation for police reform.... In the five years of the MOA and the six years of the CA, the City made significant changes in the way it polices Cincinnati.... In addition, efforts to improve relations between the police department and the community, particularly the African American community, are continuing.... The Parties' performances under the Agreements were initially halting and defensive. With time and the emergence of impressive leadership throughout the Cincinnati Community, significant compliance with the Agreements were achieved resulting in the Cincinnati Collaborative being one of the most successful police reform efforts ever undertaken in this Country.*

**Los Angeles, CA.** Los Angeles had a number of law suits and consent decrees involving the police department and the issue of racial discrimination prior to and after the beating of Rodney King in 1991. With the acquittal of the three officers and their sergeant in April 1992, the City of Los Angeles erupted in several days of rioting that resulted in over fifty deaths. President Bush addressed the nation on the third night of the riots and directed the U.S. Attorney General to investigate. Under existing law, CRT filed criminal indictments against the individual police officers for violating Rodney King's civil rights. Two of four officers, and the supervising sergeant were convicted in April 1993.

Section 14141 became law the following year and DOJ began investigating LAPD for violations in August 1996. DOJ entered into a CD with the City of Los Angeles in June 2001. Among stipulated items, the consent decree required development, implementation and use of a computer information system containing relevant information about officers, supervisors, and managers to promote professionalism and best policing practices, and to identify and modify at-risk behavior among officers. This included an incredibly detailed protocol for implementation of policies for management and coordination of risk assessment including training of supervisory and management staff in the use of this information to address "at-risk" behavior in a performance monitoring and evaluation system.

Other provisions of the CD included development and upgrading of policies regarding use of force; search and arrest procedures; initiation, receipt and processing of citizen complaints; use of force and complaint investigations and adjudications including disciplinary actions; providing internal affairs with responsibility for investigations; making improvements to non-discrimination policy and motor vehicle and pedestrian stops data; improving policy regarding management of gang units and management of confidential informants; development of policy and a program responding to people with mental illness; officer training; audits by the Inspector General and the Police Commission; community outreach and public information.

In June 2006, five years after the City began implementation, the Court concluded that the City was not yet in substantial compliance with the decree and extended the decree for another three years. On July 17, 2009, the Court terminated the CD and entered into a transition agreement with Los Angeles and DOJ which is ongoing.

The final report of the independent monitor asserts: *"We believe the changes institutionalized during the past eight years have made the LAPD better at fighting crime, at reaching out to the community, in training its officers, in its use of force, in internal and external oversight, and in effectively and objectively evaluating each of the sworn members of LAPD."*

Professor Christopher Stone of Harvard's Kennedy School conducted an evaluation study on behalf of Los Angeles Police Foundation in preparation for termination of the CD (See disk). Researchers gathered data from multiple sources to find, *"public satisfaction is up, with 83 percent of residents saying the LAPD is doing a good or excellent job; the frequency of the use of serious force has fallen each year since 2004. Despite the views of some officers that the consent decree inhibits them, there is no objective sign of so-called "de-policing" since 2002."* The report concludes:

> *The evidence here shows that with both strong police leadership and strong police oversight, cities can enjoy both respectful and effective policing. The LAPD remains aggressive and is again proud, but community engagement and partnership is now part of the mainstream culture of the Department. The Department responds to crime and disorder with substantial force, but it is scrutinizing that force closely and it is accountable through many devices for its proper use. Will the management and oversight improvements persist if the consent decree ends? Better yet, will management and oversight*

*become still stronger? While we cannot answer those questions in advance, the LAPD appears ready for that test.*

**What is needed in the future?** A number of other reports and commentaries have been published on §14141 intervention. Some suggest that the effectiveness of pattern or practice litigation is limited due to the small number of investigations that have been initiated over the last fifteen years. Others suggest that even with a limited number of cases, effects have prompted proactive and professional changes in the way police organizations achieve their mission in local jurisdictions across the United States. Some have commented that §14141 litigation has been only marginally successful in bringing about changes in the police agencies that have been the subject of litigation, and in inspiring change in other police organizations. Some argue that federal intervention is too intrusive, or is not effective in bringing about lasting changes within police organizations because police misconduct still remains a local problem unaffected by federal intervention. But, reports from the sites that have been involved in §14141 litigation consistently suggest that federal intervention has lead to fundamental changes to improve the structure and organization of involved police agencies.

**How can §14141 litigation be improved?** There remain a number of questions about SPL's enforcement of §14141. Is the process of case selection fair and how might it be improved? What, if any role should local labor organizations, local advocacy organizations and community groups have in determining where and how §14141 litigation is initiated? Are there instances where federal intervention has hindered local change concerning these problems? Just as prison litigation has contributed to improvement of unstable and volatile corrections systems in the United States through the development of professional policy standards and accreditation, can the same be accomplished for pattern or practice litigation with local law enforcement agencies?

Suggestions for improvement come from numerous sources and involve a variety of recommendations. Some argue that SPL staffing levels should be increased to enable SPL to investigate a greater number of police agencies. Some suggest that the lack of data regarding police misconduct at the local level continues to be a problem and that the creation of a national data collection system is the solution. Others have suggested that local police misconduct will remain a problem as long as individual citizens are without status in §14141 litigation. Novel ideas have been forwarded to further facilitate change such as providing local police agencies with "safe harbor" to promote reform while avoiding the costs associated with litigation. Legislation has been introduced to provide support and incentives for accreditation of police agencies (See Law Enforcement Trust and Integrity Act on disk).

**What do we know without valid and reliable data?** Anecdotes, testimonials, monitor reports and limited research continue to serve as the primary evidence regarding the effectiveness of §14141. Limited data suggests that police-citizen encounters remain problematic in many jurisdictions. The Bureau of Justice Statistics periodically includes items regarding police-public contacts as part of the National Crime Victimization Survey (See disk). The last survey estimated that 43.5 million persons had some sort of contact with the police in 2005. It is estimated that force had been used or threatened during the most recent contact involving 707,520 citizens. Of these persons, 83% reported that they felt the force used was excessive.

Over and above data provided by the BJS periodic survey, are other data gathering systems needed to measure and provide national data on pattern or practice problems in local law enforcement agencies and with their interaction with citizens? Is more research needed to establish evidence-based policy, procedures and practices in law enforcement to reduce misconduct? Can the policy and procedural interventions included in §14141 cases be validated as effective through systematic research and evaluation? For instance, are the performance management systems required under §14141 effective in

identifying and curbing aberrant behavior of police officers and promoting productive public relations, and can the effectiveness of these systems be demonstrated? Can use of force policies be improved, and with training be shown to be effective in reducing incidents resulting in complaints and litigation settlements?

**Is federally instigated litigation the best route to change?** Is the approach used by DOJ in §14141 litigation more cost effective than full litigation used to bring about institutional and structural changes in education, housing, the work place, and corrections in the United States? Has pattern or practice intervention by the federal government helped local jurisdictions in addressing problems through organizational and structural changes that could not be brought about through other means (local appropriations, §1983, criminal prosecution or exclusionary rule court actions and local settlements)?

Does §14141 litigation actually reduce the liability and costs to local jurisdictions of misconduct cases? An independent internet group called the National Police Misconduct Statistics and Reporting Project collects real time news feeds and published media reports regarding police misconduct from across the nation. In a summary of reports during six months in 2009, they found $128,306,406 in reported costs in police misconduct related civil litigation, not counting legal fees or court costs. Recently they reported that over $50 million was spent on police misconduct lawsuit settlements and judgments during the first three months of 2010 involving over 1,500 law enforcement officers and over 80 law enforcement leaders.

It is not known how many local cases are filed and settled, or the amount of local funds and resources necessarily allocated to these cases in comparison to costs associated with pattern or practice intervention by the federal government. Does federal intervention actually reduce ongoing and increasing costs to local governments associated with continued local litigation and settlements through the federal provision of expert technical assistance, training, and monitoring? Questions remain as to whether or not §14141 litigation is any more effective than other mechanisms of modernization and change such as the establishment and growth in organizations like the Commission on Accreditation for Law Enforcement Agencies, other associated trade associations, and professional training academies.

**Are improvements created by §14141 intervention sustainable?** A large question remains as to whether or not pattern or practice litigation has served to create permanent structural and organizational improvements in law enforcement agencies and promote positive change in the profession of policing. After pattern or practice action has been terminated, do local agencies institutionalize proactive organizational approaches to the development of policies and practices? Are there ways that continued monitoring can be an effective way to ensure sustainability of structural and organizational changes?

Are amendments to §14141 necessary to increase the effectiveness of this approach to changing police organizations? For instance, should private citizens be included as proposed in the original legislation? Should local police departments be compelled to collect and report misconduct data? Are there ways to promote change in local police departments without threatening or initiating federal law suits? Efforts to promote the proactive adoption of principles, policies and procedures related to these issues include the publication of a guide by the DOJ, and the development and publication of a guide by the International Association of Police Chiefs (See disk). Should a program of dissemination and training be developed to promote and improve the profession of policing in the United States?

The upcoming DOJ/OJP Roundtable will highlight these aspects of §14141 litigation and look to participants for information, ideas and suggestions as to how to ensure that §14141 is being as effective as possible in making our communities safer, protecting the rule of law and increasing public confidence in its law enforcement agencies.

Special Litigation Division, Department of Justice Pattern or Practice of Police Misconduct Litigation (May, 2010)

| Defendant | Investigation Initiated | Settlements Allegation Type | TAL/MOA/CD* | Agreement Initiated | Status |
|---|---|---|---|---|---|
| State Police of NJ | December, 1994 | Discriminatory Policing, Search & Seizure | CD | 12/30/1999 | Terminated - 9/21/2009 |
| Steubenville PD, OH | July, 1995 | Use of Force, False Arrest, Search & Seizure | CD | 9/3/1997 | Terminated - 3/4/2005 |
| Pittsburgh PD, PA | April, 1996 | Use of Force, False Arrest, Search & Seizure | CD | 4/16/1997 | Terminated - 4/7/2005 |
| Montgomery Co.PD, MD | June, 1996 | Discriminatory Policing | MOA | 2/1/2000 | Terminated - 02/2005 |
| Los Angeles PD, CA | August, 1996 | Use of Force, False Arrest, Search & Seizure | CD | 6/15/2001 | Transition - 7/17/2009 |
| Buffalo PD, NY | December, 1997 | Use of Force | MOA | 9/19/2002 | Terminated - 07/2008 |
| Columbus PD, OH | March, 1998 | Use of Force, False Arrest, Search & Seizure | Exchange Ltrs | 9/1/2002 | Terminated - 05/12/2004 |
| Metro PD, DC | January, 1999 | Use of Force | TAL & MOA | 6/13/2001 | Terminated - 6/13/2008 |
| PG County PD, MD | July, 1999 | Use of Force (Canine) | TAL & CD | 3/1/2004 | Terminated - 03/2007 |
| Mt. ProspectPD, IL | January, 2000 | Discriminatory Policing | MOA | 1/22/2003 | Terminated - 01/2007 |
| Highland Park PD, IL | May, 2000 | Discriminatory Policing | MOA | 7/1/2001 | Terminated - 07/2004 |
| Cleveland PD, OH | August, 2000 | Use of Force, Discriminatory Policing | TAL, Ltr Agree | 2/1/2004 | Terminated - 3/2005 |
| PG County PD #2, MD | October, 2000 | Use of Force | MOA | 1/22/2004 | Terminated - 1/15/2009 |
| Detroit PD, MI | December, 2000 | Use of Force | TAL & CD | 6/12/2003 | Ongoing |
| Cincinnati PD, OH | May, 2001 | Use of Force | TAL & MOA | 4/12/2002 | Terminated - 04/2007 |
| Detroit PD #2, MI | May, 2001 | Holding Cells, Arrest & Witness Detention | CD | 6/12/2003 | Ongoing |
| Cleveland PD, OH | July, 2002 | Holding Cells | MOA | 7/1/2002 | Terminated - 03/2008 |
| Villa Rica PD, GA | January, 2003 | Discriminatory Policing | TAL & MOA | 12/23/2003 | Terminated - 12/2006 |
| Virgin Islands PD | Feburary, 2004 | Use of Force, Search & Seizure, Oth Misc | TAL & CD | 3/23/2009 | Ongoing |

* TAL - Technical Assistance Letter
MOA - Memorandum of Agreement
CD - Consent Decree



## Investigations

| Defendant | Initiated | Allegation Type | Assistance | Status |
|---|---|---|---|---|
| New Orleans PD, LA | July, 1996 | Use of Force, False Arrest | TAL | Closed |
| NYPD (EDNY), NY | August, 1997 | Use of Force | | Closed |
| Orange Co. PD, FL | November, 1997 | Use of Force | | Ongoing |
| Orange Co.Sheriff, CA | November, 1997 | Use of Force (CED) | TAL | Closed |
| Eastpointe PD, MI | March, 1998 | Discriminatory Policing | TAL | Closed |
| Charleston PD, WV | March, 1999 | Use of Force | | Closed |
| NYPD (SDNY), NY | March, 1999 | Discriminatory Policing | | Closed |
| Riverside PD, CA | July, 1999 | Use of Force, Discriminatory Policing | | Closed |
| Tulsa PD, OK | February, 2001 | Use of Force, Discriminatory Policing | | Closed |
| Schenectady PD, NY | April, 2002 | Use of Force, Discriminatory Policing | TAL | Ongoing |
| Miami PD, FL | May, 2002 | Use of Force, Planting Evidence | TAL | Closed |
| Portland PD, ME | May, 2002 | Use of Force | TAL | Closed |
| Providence PD, RI | December, 2002 | Use of Force, Discriminatory Policing | Technical Assist. | Closed |
| Bakersfield PD, CA | June, 2003 | Use of Force | Technical Assist. | Closed |
| Alabaster PD, AL | March, 2003 | Use of Force, Discriminatory Policing | TAL | Closed |
| Virgin Islands PD (Narc) | February, 2004 | Corruption | | Closed |
| Beacon PD, NY | August, 2004 | Use of Force, Unlawful Arrests | TAL | Ongoing |
| Easton PD, PA | October, 2005 | Use of Force | TAL | Ongoing |
| Warren PD, OH | December, 2005 | Use of Force, Search & Seizure (Strip & Body) | TAL | Ongoing |
| Austin PD, TX | May, 2007 | Use of Force | | Ongoing |
| Yonkers PD, NY | August, 2007 | Use of Force | TAL | Ongoing |
| Puerto Rico PD | July, 2008 | Use of Force | | Ongoing |
| Harvey PD, IL | November, 2008 | Use of Force | | Ongoing |
| Lorain PD, OH | December, 2008 | Use of Force, Search & Seizure, Sexual Misc. | | Ongoing |
| Escambia Co Sheriff, FL | January, 2009 | Use of Force | | Ongoing |
| Maricopa Co Sheriff, AZ | March, 2009 | Discriminatory Policing, Search & Seizure | | Ongoing |
| Inglewood PD, CA | March, 2009 | Use of Force | | Ongoing |
| Inglewood PD, CA | March, 2009 | Use of Force | TAL | Ongoing |
| Sufflok County PD, | September, 2009 | Discriminatory Policing | | Ongoing |
| East Haven PD, | September, 2009 | Use of Force, Discriminatory Policing, S & S | | Ongoing |
| New Orleans PD, LA | April, 2010 | Use of Force, False Arrest, Search & Seizure | | Ongoing |