

22 de octubre de 2015.

**Ponencia de la Comisión de Derechos Civiles de Puerto Rico sobre la Reforma de la Policía de Puerto Rico**

I  Introducción

   a) Creación de la Comisión de Derechos Civiles
   b) Informes de la Comisión sobre labor de la Policía
   c) Comienzo de la labor de la Comisión con la Policía en la Reforma

II La Comisión y la Academia

  a) Reuniones
  b) Currículo y Recursos
  c) Conflictos Organizativos
    1) Tardanzas en pagos a recursos
    2) Problemas con los contratos-Se firmaron los contratos en varias ocasiones por problemas con el número de las cuentas
  d) Problemas con la metodología de evaluación de la Academia
    1) Exámenes y evaluaciones sin participación de los(as) profesores(as) a cargo de los cursos
    2) Ausencia de evaluación y validación del currículo
    3) Ausencia de reuniones entre la Comisión y la Facultad de la Academia para reflexionar y discutir el currículo ,la implantación y los cambios necesarios para lograr las metas de la Academia a la luz de la Reforma y la importancia de los derechos civiles
    4) Necesidad de integrar el aspecto de los derechos civiles en todo el currículo
    5) Ausencia de planes, estrategias y metas para preparar al policía comunitario

IV Informe de la Comunidad Dominicana sobre las violaciones a sus derechos civiles- la necesidad de atender con prioridad, llevar a cabo adiestramientos y otras medidas para atender un problema urgente

1

ESTADO LIBRE ASOCIADO DE PUERTO RICO
**COMISIÓN DE DERECHOS CIVILES**



Apartado 192338
San Juan, Puerto Rico 00919-2338
(787) 764-8686 / 1-800-981-4144
Fax: (787) 250-1756
TTY/TDD: (787) 765-9360 / 1-800-981-9366
http://www.cdc.gobierno.pr

5 de agosto de 2015

Coronel José A. Caldero
Superintendente
Policía de Puerto Rico

Estimado Superintendente Caldero López:

Por este medio le remito el informe sobre las denuncias presentadas por la comunidad LGBTT ante la Comisión de Derechos Civiles. El informe es producto de las querellas presentadas ante la Comisión de Derechos Civiles, testimonios recopilados en audiencias de la Comisión y en investigaciones llevadas a cabo por la Comisión de Derechos Civiles fundadas en las querellas presentadas.

Como le indiqué en la última reunión que se llevó a cabo en julio de 2015 a la Comandante Alba Díaz, Directora Auxiliar de la Reforma, la Comisión de Derechos Civiles interesa llevar a cabo una reunión con la División de Control del Vicio y examinar los videos de las redadas que se han llevado a cabo en el área de Ocean Park y en la avenida Muñoz Rivera con el propósito de atender los reclamos presentados.

Atentamente,

Lcda. Georgina Candal Segurola
Presidenta

**Intervenciones ilegales de la Policía con la comunidad LGBTT**



Introducción

La Comisión de Derechos Civiles tiene entre sus responsabilidades atender querellas y quejas presentadas por ciudadanas y ciudadanos en las que se reclaman violaciones de derechos humanos. Como resultado de múltiples querellas presentadas por miembros de la comunidad LGBTT la Comisión de Derechos Civiles llevo a cabo en junio de 2015 dos audiencias a la que comparecieron representantes de AARP, miembros de la comunidad salubrista, mujeres transgénero y hombres homosexuales que presentaron testimonios sobre acciones injustificadas de la Policía por motivos discriminatorios.

La Comisión de Derechos Civiles presenta este informe que hace un resumen de los hallazgos recopilados de querellas testimonios e investigaciones de intervenciones que lleva a cabo la unidad de control del Vicio contra mujeres transexuales y transgénero y contra hombres homosexuales. Incluimos un resumen de quince testimonios presentados ante la Comisión de Derechos Civiles en las cuales hemos protegido los nombres de los querellantes además acompañamos unas recomendaciones sobre la situación presentada.

Por los pasados cuatro (4) años la Comisión de derechos Civiles ha documentado las intervenciones de la Policía de Puerto Rico, su recurrencia y la estructura de las mismas hacia las comunidades LGBTT, debido a múltiples querellas y testimonios de mujeres transexuales y transgénero que reclaman sus derechos constitucionales. Las intervenciones y operativos se focalizan en las zonas donde ubican los espacios y lugares de entretenimiento de las comunidades LGBTT. Las zonas identificadas son: la calle Condado en Santurce, donde se concentran las discotecas y clubes nocturnos, la avenida Fernandez Juncos y en la avenida Simón Madera, ambas en Rio Piedras. También se han documentado intervenciones de la Policía en áreas de encuentro y socialización gay. Las zonas identificadas son: el Parque del Indio en Ocean Park, la avenida

**Intervenciones ilegales de la Policía con la comunidad LGBTT**



65 de Infantería en Rio Piedras, la avenida Betances en Bayamón, la Playa de Luquillo y el Monumento al Jíbaro en Cayey.

Las intervenciones injustificadas de la policía las podemos dividir en dos: las intervenciones con mujeres transexuales y transgénero, y las intervenciones con hombre homosexuales.

### Mujeres transexuales y transgénero

**Intervenciones recurrentes de la Unidad de Control del Vicio de la Policía de Puerto Rico en contra de Mujeres Transexuales/Transgéneros:**

**Trasfondo:**

Desde el año 2002 las comunidades compuestas por mujeres transexuales y/o transgéneros han estado reportando consistentemente operativos policíacos, cuyo objetivo es intervenir con personas que alegadamente realizan trabajo sexual en diversas zonas del área de San Juan. En la zona de Santurce, específicamente el bloque que comienza en la parada 15 e incluye la Ave Ponce de León, calle Ernesto Cerra y Ave. Fernández Juncos hasta la parada18 entre las calles Condado, San Juan, Ave Ponce de León y Ave. Fernández Juncos, así como otras calles circundantes en dicha área. Cabe destacar que es en dichos lugares se encuentran la mayoría de los clubes nocturnos, pubs y discotecas cuya clientela es exclusivamente LGBTT.   Otra área donde se dan frecuentemente este tipo de operativos lo es la calle Simón Madera en Rio Piedras. Por décadas tanto la zona identificada en Santurce, como el área en la calle Simón Madera han sido lugares de socialización para mujeres transexuales y/o transgéneros.

**Intervenciones ilegales de la Policía con la comunidad LGBTT** 

Durante la década de los 80, principios de los 90 a las mujeres transexuales y/o transgéneros no se les permitía la entrada a bares gay a menos que fueran a ser parte del espectáculo de la noche y tan pronto culminaban su presentación debían abandonar el bar o la discoteca. Por esto se convirtió en costumbre el que se aglutinaran transexuales y transgéneros cerca de dichos bares como única alternativa de recreación y esparcimiento para estas mujeres. Aunque la apertura de las barras gays hacia las mujeres transexuales y/o transgéneros, fue un proceso arduo y extenso la costumbre de estas de aglutinarse en los alrededores de los actuales clubes, bares y/o discotecas se mantiene por diversas razones.

Un sector significativo de mujeres transexuales y/o transgéneros que han sido intervenidas en estos operativos, plantean que el prejuicio social es una de las motivaciones de estos operativos, considerados como selectivos por muchas de ellas. Al principio de los operativos de la policía se limitaba al uso de la intimidación bajo la amenaza de que serían arrestadas si no abandonaban el área. Estas intervenciones eran motivadas por un número considerable de llamadas por parte de los residentes del área. En otras instancias se amparaban en una supuesta ordenanza municipal y/o ley que prohibían la presencia de hombres vestidos de mujer en las vías y/o áreas públicas de esas mismas áreas. Con el paso del tiempo estas intervenciones se convirtieron en un acoso y trajo serias repercusiones en perjuicio de las mujeres transexuales y/o transgéneros que acostumbraban visitar esas áreas.

Desde principios del 2014 hubo una oleada de operativos semanales (jueves) por parte de agentes de la Unidad de Control del Vicio de la Policía de PR en las zonas ya mencionadas.

Según las querellas y testimonios de mujeres transexuales y/o transgéneros intervenidas:

**Intervenciones ilegales de la Policía con la comunidad LGBTT** 

 Eran abordadas por un individuo en un vehículo de motor, logrando llamar su atención utilizando piropos, halagos e inclusive acercamientos abiertamente de índole sexual, invitándolas a montarse en el vehículo. Una vez se lograba que abordaran el auto estas eran llevadas a un área cercana, otras testificaron que eran forzadas a abordar algunos de los vehículos. Las intervenidas en Santurce eran llevadas a un solar baldío detrás del Walmart de la Parada 18, donde eran transferidas a una guagua blanca sin ningún tipo de identificación y luego de atar sus manos con una banda de plástico. Otro grupo arrestado en la 65 Infantería en Rio Piedras las llevaban al estacionamiento de Pep Boys.

- Nunca se les informó que estaban siendo arrestadas, ni los motivos del arresto.

- Los agentes nunca se identificaron, aunque algunas de las mujeres intervenidas les requirieron ser informadas sobre las motivaciones del arresto y solicitaban que se identificaran. Lo único que recibieron en respuesta a sus preguntas fueron insultos utilizando epítetos despectivos como: maricones con tetas, pato, loca.

- Luego de mantenerlas detenidas por varias horas en la guagua se les llevaba al cuartel que se encuentra ubicado en la 65th Infantería. Allí las mantenían a todas en una misma celda, que en ocasiones resultaba ser demasiado pequeñas para el número de personas intervenidas y eran unas celdas insalubres con pobre ventilación. Tampoco se les permitía el uso del servicio sanitario y nunca se les orientó sobre sus derechos, ni se les permitió realizar una llamada.

- Luego de mantenerlas bajo ésas condiciones por periodos prolongados se les entregaba una citación al tribunal, en la mayoría de los casos, sin pasar por la Sala de Investigaciones, sino que son citadas directamente a una sala generalmente del piso 11 del mismo Tribunal de San Juan. Al

**Intervenciones ilegales de la Policía con la comunidad LGBTT**



momento de la entrega de la citación aquellas mujeres transexuales y/o transgéneros que ya han oficializado su cambio de nombre son nuevamente sometidas a vejámenes al cuestionárseles sobre la veracidad de los documentos que constatan la veracidad de la información que las identifica.

**Recomendaciones:**

- Es necesario educar a la comunidad sobre la importancia de documentar estas incidencias y la forma adecuada de llevar a cabo dicho proceso de documentación, tal como el tipo de información pertinente. Por ejemplo, números de placas de los agentes que realizan la intervención, nombre y número de placa del agente a cargo del operativo etc.
- Desarrollar estrategias para motivar la radicación de querellas en las agencias pertinentes.
- Apoyar a estas comunidades en el proceso de visibilizar y denunciar públicamente y/o ante los organismos pertinentes, ya sean estatales, nacionales y/o internacionales procurando la vindicación de sus derechos y dignidad.
- Coordinar una reunión con la División del Vicio para auscultar la forma, motivación y procedimientos que se utilizan en las redadas, incluyendo las grabaciones de estas intervenciones para determinar si hay violaciones de derechos.

**Hombres homosexuales**

En los casos de hombre homosexuales, las intervenciones se centran en áreas de encuentro gay, áreas comúnmente conocidas como de "gay cruise". Hemos documentado arrestos en lugares de encuentro gay y lugares identificados donde los hombres homosexuales tienen sexo casual

**Intervenciones ilegales de la Policía con la comunidad LGBTT**



y anónimo. En ninguno de los casos que hemos documentado hay intercambio de dinero. Por lo que no se configura el delito de prostitución. En la mayoría de los casos, se imputa a los arrestados el delito de prostitución. En ocasiones los hombres acusados de delito, acceden a que se reclasifiquen los delitos y hacen alegaciones de culpabilidad por no enfrentarse al efecto mediático que puede acarrear un juicio en su fondo y las consecuencias que implica en términos de sus antecedentes penales.

Las zonas donde con más frecuencia se dan estos casos son: el Parque del Indio en Ocean Park, la Playa de Luquillo y el Monumento al Jíbaro en Cayey. En todos los casos se identifican patrones de intervenciones donde agentes de la policía con cuerpos físicos muy desarrollados, hacen acercamientos de índole sexual a otros hombres para luego arrestarlos por prostitución.  En la mayoría de los casos documentados en las querellas prestadas ante la CDC los querellantes, reclamaban que al ser arrestados no se les indican sus derechos y se les mantiene encerrados en una celda por muchas horas, antes de brindarle las correspondientes citaciones. En la mayoría de las ocasiones la citación se completa cuando los medios periodísticos llegan hasta el cuartel o al lugar de detención, con el propósito de dar un despliegue publicitario y provocar humillación a los arrestados.

Tanto en las intervenciones con mujeres transexuales y transgénero como las intervenciones con hombre homosexuales, los casos, en la mayoría de las veces no prosperan,  en algunas instancias porque los agentes del orden público no comparecen a las citaciones y en otras porque el tribunal, ante los hechos presentados, no encuentra causa.

Todas estas acciones requieren estrategias educativas que sensibilicen y capaciten a los agentes del orden público sobre las intervenciones, las

· 6

**Intervenciones ilegales de la Policía con la comunidad LGBTT**



diferencias entre prostitución y exposiciones deshonestas; el alcance de las exposiciones deshonestas, además es necesario la educación sobre los derechos que tiene la comunidad LGBTT.

**Relación de querellas:**

**1.** Nombre: Y.A.

Fecha: febrero de 2015

Breve resumen: Y.A. estaba en el área de Santurce un club llamado Scandalo Vip. Sale del mismo y se dirige a otro club en Rio Piedras con una amiga (Soriana). Manejaban por la Avenida Fernández Juncos y se dan cuenta que había un auto siguiéndolas. Las detiene por que alega el agente que se le ofreció a un policía en el área de Scandalo. Luego la llevaron detenida al cuartel de la Avenida 65 de Infantería. Agente José Medina #placa 34469.

**2.** Nombre: J.S.P.

Fecha: 5 de febrero de 2015

Breve resumen: El 5 de febrero del 2015 a las 11:06 este se encontraba en la calle Víctor Figueroa intersección con la Avenida Fernández Juncos, en Santurce. Jonathan se encontraba hablando con un amigo cuando hubo un acercamiento de un hombre el cual dijo "que inventas cuanto cobras" y este le contestó "treinta". Rápidamente se procedió a un arresto a pesar de que J.S.P. nunca accedió al vehículo o hubo intercambio de dinero. Fue citado para el Tribunal de San Juan. Este relata que hay guardias que explotan sexualmente a las chicas trans por medio del sexo oral, las golpean y luego las envían para sus casas. Cuenta que hace dos fines de semana había varios en VIP. Una de las chicas le practicó sexo oral a uno de los guardias. Alega que van a la barra a carpetear a las chicas.

**Intervenciones ilegales de la Policía con la comunidad LGBTT**



**3.** Nombre: K.J.M.

Fecha: 22 de enero de 2015

Breve resumen: El jueves 22 de enero del 2015 salió de su residencia para comer. Una vez esta se dispone a volver a su residencia cae un fuerte aguacero la cual la obliga esperar en el lugar a que escampe. En ese momento se le acerca un vehículo en el cual se encontraba un hombre blanco de ojos azules. Kenia no acede al principio pero luego al ser seducida por el mismo acepta entrar al vehículo. Una vez adentro instantáneamente ambos se tocan mutuamente, el hombre el área abdominal y K.J.M. el área genital. En eso momento el hombre le dice "espera un momento" y sale corriendo del vehículo. Corrió y unos minutos más tardes llega otro vehículo contra el tránsito el cual procede a arrestarla utilizado brutalidad policíaca. Durante el proceso de traslado este estuvo lleno de insultos por su orientación sexual. En el cuartel de Control de Vicio en la avenida 65 de Infantería no le permitieron comer, ni hacer ningún tipo de llamada pues se le prohibió el celular. Luego en el complejo correccional 705 de Bayamón le raparon su cabeza y OSAJ no le brindó ninguna asistencia.

**4.** Nombre: J.R.M.

Fecha: 10 de noviembre de 2014

Breve resumen: Alega que fue arrestado por prostitución masculina en Ocean Park. En la intervención alega que una agente le hizo acercamientos indebidos, le pidió dinero, así como favores de índole sexual. Por lo cual lo arrestaron y le asignaron una vista el 10 de noviembre de 2014, a la cual su abogado no asistió. El juez determinó causa para juicio.

**5.** Nombre: J.R.V.S.

Fecha: 16 de agosto de 2014

**Intervenciones ilegales de la Policía con la comunidad LGBTT**



Breve resumen: Fue arrestado durante una redada en una zona de encuentro gay en Aguadilla. Se alega que le solicitó sexo oral a cambio de dinero a un agente encubierto, lo que él niega.

**6.** Nombre: J.C.D.R.

Fecha: 7 de agosto de 2014

Breve resumen: Fue arrestado ilegalmente, el policía no le leyó sus derechos y no supo la razón de su arresto hasta después de 12 horas cuando lo llevaron ante el juez. El caballero tiene 36 años. Todo esto ocurrió el 7 de agosto de 2014 en una redada que hubo mientras estaban en la calle Yardley en Ocean Park (playa) a más de 80 personas. Conoce a varias personas de las arrestadas.

**7.** Nombre: T.S.

Fecha: 7 de agosto de 2014

Breve resumen: El siete de agosto cerca de la querellante se detuvo un auto color gris con dos hombres que la saludan y acto seguido le dijeron que estaba arrestada y que ella sabía por qué. En ese mismo lugar le entregaron una citación y le dijeron "ahora sigue trabajando". Informó que "uno de los guardias le dijo al otro ya hicimos la cuota".

**8.** Nombre: J.M.

Fecha: 7 de agosto de 2014

Breve resumen: el 7 de agosto del 2014 en la 65 de Infantería hubo una intervención con la comunidad transexual la cual se encontraban en el garaje de Gas Victory en la calle Simón Madera. Su compañero J.M.B.T. estaba sentado y escuchando música y ella estaba parada a su lado. El agente Alex Candelario subió con otro agente y se le quedaron mirando, les dicen "párense" y no se identifican y le dijeron que ellos no tenían por qué identificarse. J.M.B.T iba

 · 9

**Intervenciones ilegales de la Policía con la comunidad LGBTT** 

fumando y lo hicieron ver como si fuese marihuana. Alega que hubo brutalidad policiaca.

**9.** Nombre: L.O.G.M.

Fecha: marzo de 2014

Breve resumen: Las divisiones de "Control del Vicio", específicamente la División de San Juan mantienen un patrón de hostigamiento y "fabricación" de casos en lugares de encuentro de hombres que se relacionan con otros hombres. Esto incluye, pero no se limita a, agresiones físicas, vejaciones y humillaciones y arrestos bajo cargos de "prostitución".

**10.** Nombre: X.R.

Fecha: julio de 2013

Breve resumen: Mujer lesbiana, fue intervenida por la Policía en la Avenida Eleonor Roosevelt en Hato Rey P.R, en un área frecuentada por la comunidad LGBTT por una mujer policía del Municipio de San Juan. Fue detenida por un supuesto viraje indebido y luego fue arrestada por supuestamente arrojar .12% en la prueba de alcohol. En el arresto fue hostigada sexualmente por una mujer policía que la detuvo. La querellante alega que no estaba bajo efectos de alcohol. Durante el proceso de ratificación de prueba de sangre fue maltratada y humillada por la policía. Alega que la detuvieron por discrimen y por persecución sistemática en contra de la comunidad LGBTT. Alega que la Policía detiene sistemáticamente a los miembros de la comunidad LGBTT en esa área.

**11.** Nombre: L.N.R.

Fecha: febrero de 2012

Breve resumen: Alega haber sido objeto de discrimen por la policía en todas las ocasiones que han intervenido con ella. En 4 ocasiones la han arrestado

**Intervenciones ilegales de la Policía con la comunidad LGBTT**



simplemente por estar en la parada o en ciertas áreas aledañas a su residencia en Santurce. Alega que la han arrestado y la han tenido hasta 14 horas sin radicarle cargos. Denuncia patrón discriminatorio contra la comunidad trans en las intervenciones llamada control de vicios o prostitución. Denuncia en que la manera en que intervienen no es adecuada y que solamente intervienen con ella por ser una mujer transexual. Alega que la persuaden para declararse culpable y pagar multa. Alega que en una ocasión un policía le mostro su miembro y le dijo que se lo tocara, luego regresa y la arresta por prostitución.

**12.** Nombre: J.A.R.P.

Fecha: enero de 2011

Breve resumen: Hombre alega discrimen y hostigamiento por orientación sexual. Indica que es dueño de una compañía de actividades que estaba con su cliente en el vehículo, contando y dividiendo el dinero para pagar. Se le acercan unas patrullas de la policía, el compañero se baja del vehículo y se monta en el carro propio. En el camino detienen a J.A.R.P. por alegada infracción en los tintes del vehículo. Él les informa que por una condición los debe tener y que son legales, al bajarse a buscar los papeles, la oficial, sin su consentimiento abre la puerta. Ella de mala manera le dice que ella puede hacer lo que quiera. Le indica que suerte tuvo que no lo detuvo en Cantón Mall porque estaba teniendo relaciones sexuales con el otro sujeto. El compañero oficial le grita palabras soeces como "homosexual acaba y móntate en el carro".

**13.** Nombre: E.P.M.

Fecha: 17 de septiembre de 2010

Breve resumen: El 17 de septiembre de 2010, se encontraba en el Bar Circo, lugar en el que alegadamente intervinieron para realizar un registro administrativo por diferentes agencias, cuando fue objeto de una intervención ilegal de la policía.

11

**Intervenciones ilegales de la Policía con la comunidad LGBTT**



Este lugar es un bar de la comunidad LGBTT. Alega que un policía le dio un fuerte golpe en el pecho indicándole que tenía que moverse sin estar identificado como policía, él le respondió el ataque. La policía en el forcejeo le bajó los pantalones y lo tuvieron en la calle frente a la prensa, cámaras de televisión y todos los presentes sin pantalones por media hora aproximadamente. La intervención tuvo lugar en un bar de la comunidad LGBTT. Se le radicaron cargos por obstrucción a la justicia.

**14.** Nombre: A.M.D

Fecha: 10 de septiembre de 2010

Breve resumen: El pasado viernes 10 de septiembre de 2010, se encontraba camino a Guayama y se detuvo en el área de descanso en el Monumento al Jíbaro. Al detenerse allí, dos personas se le acercaron, lo detuvieron, registraron su vehículo y su persona. Lo arrestaron por llevar consigo tres (3) condones, ya que los guardias alegaron que los tres (3) condones eran evidencia de prostitución masculina y solicitud de favores sexuales en el área.

**15.** Nombre: F.S.

Fecha: 18 de marzo de 2010

Breve resumen: Orientación Sexual. Alega que hace trabajo comunitario en Río Piedras, además es miembro de la comunidad riopedrense. El 18 de marzo de 2010, estaba en la calle José de Diego frente a la tienda Rainbow en unos bancos color verde esperando a un amigo que le daría transportación a él y a un amigo que lo acompañaba, Iván. De momento pasa una guagua Mitsubishi Nativa color roja. Este auto lo manejaba un hombre quien lo saluda y le pregunta ¿Cómo estás? ¿Qué haces? ¿Te inventas algo? Este acercamiento inicial se lo hacen a Iván, su acompañante. En esos momentos el querellante se encontraba en una tienda cercana comprando algo. Cuando el hombre de la Nativa le hace el

12

**Intervenciones ilegales de la Policía con la comunidad LGBTT**



acercamiento a Iván, este le indica que se mueva que tiene una patrulla atrás. El hombre se movió. Fernando llega al banco donde estaba Iván y vuelve a pasar el hombre en la guagua Nativa y Fernando decide coger pon con él y cuando se monta el hombre le toca el muslo y le dice que a él lo cambiaron de Caguas para Río Piedras desde la muerte de Jorge Steven, que tenía un cuartito alquilado que si quería ir allá. Fernando accedió pero el hombre se dirigió al estacionamiento del Banco First Bank de la De Diego. Alega que en ningún momento hubo ningún tipo de ofrecimiento. Alega que había como 30 agentes (civiles). Había como 50 hombres en el First Bank. Luego alega que los movilizaron a todos al cuartel de la 65 de infantería. Alega que los metieron en una patrulla e iban rápido sin detenerse en los muertos para que se dieran cantazos en la cabeza con el techo del vehículo en que los transportaban. Alega que no le leyeron sus derechos. No le permitieron hacer una llamada, hubo un trato cruel y hostil, malas palabras, uso de pepper spray arbitrariamente, no tenían placa y estaban todos los policías de civil y se negaron a darle las placas e información de identificación. En el cuartel le dieron una citación. El define el operativo como un recogido o una limpieza de Río Piedras alega que había deambulantes, drogadictos, travestis, transexuales, migrantes, etc., los cuales fueron vejados, maltratados y le echaron pepper spray.

ESTADO LIBRE ASOCIADO DE PUERTO RICO
**COMISIÓN DE DERECHOS CIVILES**



Apartado 192338
San Juan, Puerto Rico 00919-2338
(787) 764-8686 / 1-800-981-4144
Fax: (787) 250-1756
TTY TDD. (787) 765-9360 / 1-800-981-9366
http://www.cdc.gobierno.pr

1 de agosto de 2014

Dra. Michelle M. Hernández de Fraley
Rectora
Academia de la Policía
Gurabo, Puerto Rico

Estimada doctora Hernández de Fraley:

El 14 de julio de 2014 tuvimos la grata visita suya a la Comisión y en la misma intercambiamos impresiones sobre la colaboración que haría la Comisión de Derechos Civiles con la Academia de la Policía en el aspecto de la reforma de la Policía, particularmente en la etapa de la preparación de los nuevos cadetes que comenzarían en agosto de 2014. Los acuerdos de dicha reunión fueron los siguientes: 1. que la Comisión le sometería a usted una lista de recursos recomendados, con sus currículum vitae para enseñar el curso sobre  derechos civiles; 2. que la Comisión de Derechos Civiles prepararía un prontuario para el curso de derechos civiles de la Academia; 3. que la Comisión consideraba necesario la revisión de todo el currículo para que este respondiera a los cambios necesarios para la Reforma.



La Academia nos sometió solamente cuatro prontuarios, los cuales hemos examinados a la luz de las recomendaciones hechas por la Comisión en el 2011. Es importante destacar que prevalecen las recomendaciones hechas y que estas no han sido acogidas en los siguientes puntos:

1- la acreditación de la Middle State Commission on Higher Education;
2- el desarrollo de un currículo (en formación) de derechos humanos;
3- el desarrollo de un currículo para distintas etapas de formación: policía en sus funciones, ascensos y policías supervisores, así como un programa de educación continua;
4- el desarrollo de metodologías de investigación;
5- la formación y desarrollo de una facultad académica y profesional cualificada con bagaje interdisciplinario y diverso;

6- el desarrollo de instrumentos de evaluación para medir cambios en el conocimiento;

7- la elaboración de un cuestionario que incluya crímenes de odio, de género, raza y xenofobia;

8- el desarrollo de instrumentos de medición de conocimiento, destrezas actitudes y comportamiento;

9- el análisis de los oficiales sobre los efectos de sus acciones;

10- el desarrollo de espacios para diálogos difíciles y manejo de conflictos;

11- las películas y documentales que enfocan en derechos humanos como:
    a. The accused (Jody Foster)
    b. Aquel Rebaño Azul (CDC)
    c. La Historia Oficial

12. el desarrollo de una serie de cursos y temas, entre los que destacan:
    a. Introducción a los derechos Humanos
    b. Introducción al Derecho Constitucional
    c. Crímenes por prejuicio
    d. Relaciones Humanas y la policía comunitaria
    e. Temas sobre el manejo de protestas y personas
    f. Policía ante situaciones de crisis
    g. Responsabilidad personal en la intervención en crisis sociales como huelgas, protestas, piquetes, marchas



Específicamente, hemos analizado los prontuarios: **CISO 103 – Introducción a los Derechos Civiles; POLI 101 – Ética Policial, y ADMI 105 - La Conducta Organizacional en el Contexto Policial**. Recomendamos que el prontuario de derecho penal sea revisado en su totalidad, ya que el mismo discute las disposiciones del año 2004 y no está al día. Adjunto los prontuarios revisados con nuestras recomendaciones.

En relación con el compromiso de la Comisión de someter una lista de profesionales competentes para ofrecer los cursos sobre derechos civiles y derecho penal se acompañan los currículos de los siguientes recursos que tenemos a bien recomendar:

    1. Lcdo. Francis Daniel Nina
    2. Lcda. Wanda Valéntín (Pontificia Universidad Católica)
    3. Lcdo. Luis Rivera Román (Universidad Interamericana)
    4. Lcda. Carmencita Burgos Pabón
    5. Lcda. Ana Rosa Biascoechea Rodríguez
    6. Lcda. María Consuelo Sáez Burgos (UPR)
    7. Lcda. Annette Martínez Orabona (Universidad Interamericana)
    8. Lcdo. Carlos A. Torres Jiménez

3

9. Lcdo. Carlos Ramos (Universidad Interamericana)
10. Lcdo. Carlos Del Valle Cruz - Comisionado (Ad Honorem)

Además se acompañan tres curriculum vitae sometidos por:
1. Lcdo. Jorge Alexis Torres Montes
2. Lcda. Idalis Torres Orengo
3. Lcdo. Israel Santiago Lugo

Se acompaña el prontuario del curso que fuera aprobado por la Comisión. Aprovecho la ocasión para reiterarle que nos interesa sostener unas reuniones periódicas con la facultad que tendrá a cargo los cursos de la Academia para intercambiar ideas con ellos. Queremos señalar que estas recomendaciones han sido unas preliminares, debido a la premura en cumplir con los términos, debido al comienzo del curso de la Academia el 11 de agosto de 2014.

Confió en que los puentes de asistencia y colaboración que hemos iniciado se fortalezcan y redunden en una empresa conjunta que sea de ayuda a la Policía de Puerto Rico y a nuestra ciudadanía.

Atentamente,

Lcda. Georgina Candal Segurola
Presidenta

Anejos

Prontuarios:
CISO 103 – Introducción a los Derechos Civiles
POLI 101 – Ética Policial
ADMI 105 - La Conducta Organizacional en el Contexto Policial
10 *Curriculum vitae*

c Hon. José M. Caldero
*Superintendente Policía de Puerto Rico*

**Carlos A. Del Valle Cruz**
**Comisionado**
**Comisión de Derechos Civiles**
**San Juan, Puerto Rico**

A:   **Col. Michelle Hernández Farley;  Col. José Calero (via Teniente Coronel Clementina Vega Rosario)**

cc:   **Comisión de Derechos Civiles; TCA Arnaldo Claudio**

Re:   **Informe de Experiencias del Primer Semestre de Clase en la Academia de la Policía bajo Acuerdo de Reforma de 17 de julio de 2013**

---

Estimada Rectora:

Reciba mi más afectuoso y solidario saludo. En conformidad con el Memorando de Entendimiento entre el Departamento de Justicia federal y el Estado Libre Asociado de Puerto Rico, de 27 de 2011, según enmendado en la práctica, y el Acuerdo de Reforma de 17 de julio de 2013, la Comisión de Derechos Civiles se comprometió a someterle una lista de profesores de avalada excelencia en el área de derechos civiles y penal para dar comienzo a la Academia de la Policía bajo la Reforma. Así se hizo, y este grupo de profesionales ya han prestado clases durante el primer semestre de agosto a octubre.

Como ha sido mi costumbre, y habiendo sido delegado por la Comisión en esta área, he entrevistado a estos profesores al comienzo, durante y al terminar su periodo de impartir clases este primer semestre. Debido a que el proceso de la Reforma es uno de constante retro-alimentación y evolución, le someto, para su conocimiento y acción, un resumen de las fortalezas y ajustes necesarios en la Academia identificada por este personal docente.

## FORTALEZAS

En primer lugar, todos los recursos le reconocen sus grandes dotes en apoyarlos, facilitar recursos, trato personal y administrativo, y deferencia pedagógica. Entiende que en este momento, el mayor recurso con que cuenta la Academia es su dirección y su apertura a dialogar con ello y efectuar ajuste y cambios. Los recursos también agradecen el apoyo técnico que se le ha prestado; y ven que se han ampliado las alternativas pedagógicas, como computadoras, tecnología de clase, flexibilidad de tiempo. Aunque su experiencia como administradora académica no es amplia, entienden que su capacidad de oír, delegar, implantar y acomodar es excelente. Todas la admiran mucho. Quisieran muchas de usted.

## AJUSTES

Por otro lado, los recursos han expresado insatisfacción con ciertas cuestiones administrativas, como la ausencia de pago por servicios prestados, malentendidos con

1

relación a la relación contractual, y desilusión de tal manera que han conllevado la renuncia de al menos uno de ellos, y la renuencia de volver a contratar de otros. De igual manera, uno de los recursos lamentó la interrupción de su clase por agentes para propositivos disciplinarios (cotejar contenido de mochilas) que a su entender gravemente desenfocó la función educativa de ahí en adelante. En particular, las medidas disciplinarias tomada por el hecho que cierto número de cadetes tenían celulares no autorizados, y se les expulsó de la residencia y tuvieron que recurrir a dormir adentro en los vehículos a los costados del cementerio por una o varias noches, causó mucho malestar entre estudiantes y profesores, y lastimó el ambiente educativo.

Otra observación común es que los estudiantes apenas tienen tiempo para estudiar con profundidad. El conocimiento es producto del tiempo para aprender. Pero el horario de clase es tan estricto y apretado, que reduce mucho el crecimiento cognitivo y el rendimiento en clase. En su totalidad, los profesores aunque reconocen que hay diferentes niveles de preparación previa, alaban la actitud y disposición de los estudiantes. En su mayoría, los educando han obtenido notas satisfactorias. Pero por otro lado, lamentan, por ejemplo, que los educando no se la ha dado un entrenamiento en destrezas de recursos bibliotecarios para que puedan no solo leer caso, sino desarrollar destrezas de identificar áreas de "law enforcement" y conducir investigaciones legales. El prontuario tiene que mejorar a adaptarse la realidad de los cadetes. No hay una clase o seminario de investigación policiaca electrónica.

Quizás la observación más penetrante concierne la identidad de la Academia: si es una academia militar o un centro de estudios. La Academia al momento parece operar como una institución militar para cadetes de poca preparación a los cuales se les aplica en pleno rigor las disciplinas y practicas militares: ejercicios, formaciones, marchas, push-ups. Esto puede operar bien para personas recién graduadas de escuela superior, sin mucha otra educación formal, carga familiar y experiencia de vida. Sin embargo, con el cambio en el perfil del cadente entrante, que ahora tiene un grado asociado, es mayor, casado y con hij@s, la disciplina militar enfocada en el aspecto físico esta enajenada del perfil promedio del estudiante y resulta contra productiva. Los recursos, en su mayoría, entienden que el policía soldado no es tan responsivo a los derechos civiles como el policía ciudadano y promueven que se puede llegar a un mejor balance a favor del último.

Por último, y relacionado con lo anterior, hay observaciones sobre la ausencia de un campus de ideas. En particular, la falta de comunicación con los educandos, los docentes y los administradores para discutir colectivamente el programa de preparación. Una de las observaciones más chocantes es que algunos recursos han escuchados con sus propios oídos a representantes de la Academia referirse a la Reforma como como un truco político para obtener dinero legislativos y denigran el contenido normativo de las clases y los profesores. Alguno expresan a los cadetes cinismo de que los curso de la Academia en el área de derechos civiles pueden cambiar la cultura interna de silencio y brutalidad que se entiende rigen las operaciones especializadas y otras. Desde ya, hay temor de hacer estas denuncias personalmente por temor a represalias. En otras palabras, hay cierto personal de la Academia

que reproduce o permite que se reproduzca el mismo tipo de  lenguaje y conducta que la Reforma busca eliminar. Esta situación, sobre decir, es anatema a nuestros objetivos.

Afecta mucho que no hay en lugar procesos formales de ventilar problemas y sugerencias. Para dar los ejemplos más evidentes: (a) los docentes no se han reunido entre sí para comparar experiencia, enmendar el prontuario, ajustar las clases a las realidad de vida de los cadetes: (b) los docentes no han tenido una reunión de grupo con la administración para discutir situaciones en comunes y ajustes institucionales; y (c) ni administradores ni docentes no se han reunido con los estudiantes para en conjunto examinar el programa de estudio en su totalidad y tratar de mejorarlo. Según ellos, existe una falta de dialogo y dirección conjunta entre estudiantes, profesoras y administración que le brinde mayor coherencia al proyecto pedagógico.  El resultado es que no hay ventilación cruzada de experiencias, ideas, ajustes  y propuestas. O sea, la polinación de ideas es deficiente y consume la vitalidad del proyecto. Necesitamos más abejas.

Dicho esto, le ruego que no me malinterprete. Los recursos docentes están completamente comprometidos con los objetivos de la Reforma y la labor de la Academia. Como todo proceso de anchas aspiraciones que comienza desde el suelo raso, este es el principio de una transformación no solo en la policía sino en la cultura del país.  Los recursos creen que la Reforma en la Academia es necesaria, posible y real.  Pero sugieren que se establezcan los procesos dialógicos necesarios que permitan hacer los ajustes y cambios que la experiencias y metas dictan.

Con mucho respeto.

Carlos A. Del Valle Cruz

'Comisión De Derechos Civiles     

**Informe de la Comisión de Derechos Civiles sobre Reunión con Comunidad Dominicana**

La Comisión de Derechos Civiles sostuvo una interesante y concurrida reunión el 8 de mayo de 2015 convocada por líderes de organizaciones dominicanas en la sede de la Alianza Dominicana para recibir los reclamos de esta comunidad sobre las violaciones a sus derechos civiles. A la reunión acudieron el cónsul Honorable Franklin Grullón, el Vice cónsul el Dr. Carlos Pérez, el Ingeniero Pachín Ramírez, el Sr. José Rodríguez Báez, representante sindical, los afamados periodistas Gheidy de la Cruz y la Lcda. Rochy Torrens, entre otros representantes de organizaciones como Diáspora Dominicana, Fundación Misión de Amor, Alianza Dominicana al igual que otros miembros de la comunidad.

Entre los planteamientos que fueron acogidos por la Comisión de Derechos Civiles representados por la presidenta Lcda. Georgina Candal y el Director Ejecutivo el Lcdo. Ever Padilla fue la detención injustificada de parte de la Policía Estatal y Municipal a ciudadanos dominicanos, la ausencia de reclutamiento de personas de origen dominicano en la Policía de Puerto Rico, la ausencia de una política pública que arrope a todos las agencias del ejecutivo estableciendo una prohibición de discrimen por nacionalidad, la falta de protección a las mujeres dominicanas que son víctimas de violencia doméstica, la necesidad de educación para superar el discrimen, entre otros.

La Comisión de Derechos Civiles se comprometió a trabajar en los asuntos presentados por la comunidad dominicana, particularmente en los asuntos que se refieren a la Reforma de la Policía que se llevarán ante el Superintendente, Coronel José A. Caldero López.

Entre otros planteamientos que hicieron en la reunión fueron:

1. La falta de preparación de la Policía de Puerto Rico  en relación a la normas y leyes aprobados tales como la de los licencias para inmigrantes ya que relató que a un Policía le mostraron e indicó que esa no valía "esa es la licencia de Agapito".
2. El desconocimiento de la Policía sobre los derechos humanos al hacer comentarios y dar un trato discriminatorio a las personas de origen dominicano.
3. Las querellas o denuncias que someten personas dominicanas son ignorados o peor aún se utilizan para denunciar a las personas ante inmigración.
4. La Policía no atiende las querellas por violencia doméstica de mujeres dominicanas, a quienes siempre les pregunta sobre su estatus migratorio, sin atender su reclamo de la violencia de que ha sido objeto.

5. Aquellas personas que trabajan en las agencias sufren discrimen en la evaluación de su desempeño laboral.
6. Se sugirió integrar a personas de la comunidad dominicana como policías auxiliares que puedan formar parte de la Policía, en carácter ad honorem.
7. La necesidad de orientar y adiestrar al Policía sobre cómo reaccionan o se comportan los ciudadanos dominicanos a quien la Policía detiene, siempre se bajan del vehículo pues están acostumbrados a hacerlo así en su país, el policía interpreta este gesto como amenazador y saca el revólver.

En San Juan, Puerto Rico, hoy 1 de junio de 2015.

Lcda. Georgina Candal Segurola
Presidenta

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br>*Demandante*<br><br>**v.**<br><br>**ESTADO LIBRE ASOCIADO DE**<br>**PUERTO RICO, et al.**<br>*Demandados* | **CASE NO. 12-2039 (GAG)** |

**PONENCIA DE LA ALCALDESA DE PONCE, DRA. MARÍA MELÉNDEZ ALTIERI,**
**ANTE EL TRIBUNAL FEDERAL PARA EL DISTRITO DE PUERTO RICO EN VISTA**
**PÚBLICA SOBRE LA REFORMA DE LA POLICÍA DE PUERTO RICO**

Buenos días Honorable Juez Gelpí. Bienvenido nuevamente a nuestra Ciudad Señorial.

Igualmente extiendo mis saludos al exgobernador Rafael Hernández Colón, al monitor federal sobre Reforma de la Policía, coronel Arnaldo Claudio, y a los distinguidos deponentes e invitados a esta sesión judicial de incalculable valor histórico.

Desde mi perspectiva, esta sesión sienta precedente sobre el diálogo franco y abierto que como pueblo estamos llamados a sostener para aspirar a una mayor seguridad colectiva apoyada firmemente sobre bases de respeto a los derechos civiles.

Recibí muy gratamente la invitación que me ha sido formulada para examinar, entre varios asuntos, el efecto de onda expansiva que la Reforma de la Policía de Puerto Rico puede, y debe tener, sobre los cuerpos policíacos municipales, ya sea para fortalecer aquellas áreas y servicios que se ha comprobado funcionan eficientemente dentro del marco de la ley o para realizar un ejercicio honesto de introspección que nos ayude a identificar los puntos que requieren acción correctiva inmediata.

El deber de garantizar mayor seguridad para nuestros habitantes es una tarea que exige coordinación de esfuerzos a todos los niveles gubernamental, desde las esferas federales y estatales hasta los gobiernos municipales.

Entre mis funciones como Alcaldesa de Ponce, tengo la responsabilidad de buscar que nuestra Policía Municipal se conduzca bajo los más firmes principios de servicio y protección a la ciudadanía ya que en nuestra ciudad, como en todo Puerto Rico, el asunto de seguridad pública es una de la mayores preocupaciones.

Al amparo de la Ley 19 de 1977, conocida como Ley de la Policía Municipal, el Municipio de Ponce tiene un cuerpo policíaco que cuenta al presente con 350 miembros entre Policías y Supervisores. Como cuerpo de seguridad colectiva, nuestra Policía Municipal tiene una visión dirigida a la prestación de servicios policíacos con agentes del orden público destacados en las comunidades, accesibles a los residentes, con metas y responsabilidades claras enfocadas en prevenir el crimen, mantener la ley y el orden, y mejorar la calidad de vida de todos los ciudadanos. La Policía Municipal de Ponce tiene 12 unidades que incluyen la Unidad

Marítima, Ciclista, Comisión de Estorbos Públicos, Tránsito, Policía de la Comunidad, Unidad Motorizada, Unidad de Rápida Acción, Comunicaciones, Policía Turística, Servicios Especiales, Liga Atlética Policíaca y Unidad Escolar. Cada Unidad dentro de la Policía Municipal está regida por una Orden General u Orden Especial que recoge sus prioridades y valores fundamentales.

Durante los pasados siete años, he promovido que la Policía Municipal de nuestra ciudad tenga un proceso de transformación abarcadora con iniciativas de diversa naturaleza. Este proceso de cambios ha ido desde aspectos tan básicos como el cambio del uniforme, hasta asuntos más sustantivos como el adiestramiento de todo nuestro cuerpo policíaco con talleres sobre Derechos Civiles ofrecidos por la *American Civil Liberties Union (ACLU)*.

Con el objetivo de imprimirle a nuestra Policía Municipal un carácter nuevo que reflejara autoridad, disciplina y accesibilidad, en el 2010 cambiamos los uniformes para todos sus miembros y las distintas unidades. Desde el principio fue mi determinación que la Policía Municipal de Ponce se viera a sí misma de un modo distinto, y el punto de partida fue la adopción de un nuevo uniforme que fue escogido mediante votación entre los mismos policías.

Conjuntamente con ese cambio de imagen, también hemos implementado exitosamente varios proyectos para acercar a los miembros de la Policía Municipal a nuestros ciudadanos. Así desarrollamos el proyecto Policía de la Comunidad, bajo el cual vehículos de la Policía Municipal están asignados a cubrir ocho demarcaciones geográficas específicas en la ciudad para brindar patrullaje preventivo a cerca de 25

3

urbanizaciones y comunidades rurales bajo este programa. En estas unidades de patrullaje, los policías cuentan con un teléfono celular cuyo número fue difundido en una hoja informativa distribuida a los residentes del sector. De este modo, los residentes tienen accesible el número telefónico de la patrulla en su comunidad, para poder llamar directamente a los policías en situaciones de emergencia o comisión de delitos.

La experiencia nos ha demostrado que mediante el programa de Policía en Tu Comunidad, existe mayor interacción y cooperación entre los policías y los residentes, lo que nos ha permitido utilizar los recursos policíacos de forma más eficiente con un tiempo de respuesta más corto, y a la vez promover más confianza en la relación policía-ciudadano. Con este programa, los residentes de las comunidades mantienen comunicación directa con los policías, que se convierten también en facilitadores para canalizar otras situaciones presentes en las comunidades que afectan la seguridad general, tales como casas abandonadas, estorbos públicos, vertederos clandestinos, postes de alumbrado averiados.

Debo subrayar que este programa tiene un elemento adicional de valor añadido que beneficia a la Policía de Puerto Rico, ya que al contar con el patrullaje municipal preventivo en ocho demarcaciones municipales, los recursos de la policía estatal pueden ser destinados a cubrir otras áreas de la ciudad.

Otro programa que nos brinda presencia directa y nos acerca a la comunidad, es la ampliamente reconocida Liga Atlética de la Policía Municipal. Con el tema "Educar a nuestros jóvenes hoy para que no sean castigados mañana", nuestra Liga

4

Atlética ofrece charlas en escuelas y comunidades sobre temas que afectan a la juventud. Recientemente hemos iniciado por primera vez como patrulleros escolares, a 25 jóvenes especiales de una escuela pública intermedia, con los mismos deberes y responsabilidades de todos los patrulleros.  Gracias a estas iniciaciones y charlas educativas la Policía Municipal ha llevado un mensaje preventivo que ha impactado a 7,174 niños y 740 adultos en las escuelas.

Como parte de las iniciativas recientes dentro de la Policía Municipal, implementamos un programa de Supervisión de Órdenes de Protección, en colaboración con la Oficina de la Procuradora de la Mujer. Con este programa realizamos esfuerzos que reduzcan la incidencia de violaciones a las órdenes de protección emitidas a favor de las víctimas y sobrevivientes de violencia doméstica.

Aprovecho la discusión sobre este punto, para subrayar igualmente la colaboración que la Policía Municipal de Ponce ha establecido con agencias del gobierno federal y el estatal, dentro un plan de seguridad integrada. A esos fines tenemos acuerdos con agencias federales y estatales para destacar policías municipales en los denominados "Task Force"  o grupos de trabajo conjunto, o delinear estrategias conjuntas. Por ejemplo, con asignaciones federales del programa *Stonegarden* cubrimos el pasado año fiscal los costos de mantenimiento de la lancha de nuestra Unidad Marítima, el combustible y el pago de horas extras de nuestro personal en dicha unidad. Con la Unidad Marítima de la Policía Municipal de Ponce ha colaborado directamente con agencias federales y estatales en operativos, rescate de náufragos, vigilancia en las costas, entre otras tareas.

Consistentemente hemos procurado brindarle a la Policía Municipal nuevos equipos tecnológicos y vehículos adicionales para sus gestiones de patrullaje en la ciudad. Por ejemplo, en los pasados seis años hemos recibido bajo el programa 1033 del *National Defense Authorization Act*, hemos recibido cerca de 50 vehículos especializados para seguridad pública que incluyen ocho unidades tipo Hummer, cinco camiones, cuatro SUV, entre otros.

Dentro del esfuerzo que hemos realizado en los pasados años para transformar a nuestra Policía Municipal, el capital humano tiene la más alta prioridad, por lo que se han tomado medidas permanentes para mejorar las condiciones de trabajo y la capacitación de nuestros policías y supervisores en materias fundamentales para la seguridad pública. Por ejemplo, paulatinamente hemos otorgado aumentos salariales a los miembros de la Policía municipal que suma la cuantía de $450 mensuales al presente. Y en el año 2013 graduamos a 20 nuevos policías municipales.

Somos conscientes de que cualquier plan para mejorar nuestro cuerpo policíaco municipal quedaría trunco si no está acompañado de medidas específicas para mantener a nuestros policías en adiestramiento continuo sobre las mejoras prácticas y tácticas policíacas, así como el respeto a los derechos civiles. A esos fines creamos la Oficina de Educación y Adiestramiento de la Policía Municipal, para asegurarnos de establecer y cumplir con un programa de adiestramientos continuos para que nuestros policías puedan realizar sus tareas de acuerdo a las leyes aplicables.  Los adiestramientos ofrecidos a la Policía Municipal cubren diversidad

de temas para el mejoramiento en sus ejecutorias como policías, tales como Manejo de casos de Agresión Sexual, Ley de Menores, Derechos Civiles, Manejo de la escena de un crimen.

Hemos cubierto también seminarios que están enfocados en proveer a nuestros policías, herramientas para su mejoramiento personal, tales como Manejo de Emociones de Forma Saludable y Manejo de Estrés. Algunos de los seminarios en este renglón fueron posibles gracias a acuerdos alcanzados con el programa académico de Psicología de una institución universitaria que proveyó los especialistas en campos de la salud mental.

En nuestra agenda está ampliar los adiestramientos a los supervisores y oficiales de la Policía Municipal para que tengan mayores y mejores herramientas en la dirección de sus respectivas áreas de trabajo. Queremos que toda nuestra estructura policiaca tenga exposición completa por medio de seminarios teóricos y prácticos, a las medidas de reforma de la Policía de Puerto Rico, y sobre todo, a las razones que han motivado la necesidad de una reforma.

Dentro de este contexto, la Policía Municipal de Ponce también ha promovido la profesionalización de 115 policías y oficiales que han logrado grados universitarios en materias sobre Justicia Criminal. Mientras están cursando sus estudios universitarios, se ha procurado conceder a estos policías y supervisores tiempo para que completen sus grados.

Aprovecho esta coyuntura para hacer una observación sobre las limitaciones que enfrentan los gobiernos municipales para poder graduar nuevos policías ya que

solo puede realizarse por medio de las academias que ofrece la Policía de Puerto Rico. Igual sucede con los adiestramientos de educación continuada que los integrantes de las policías municipales, ya en funciones, están obligados a tomar bajo la Ley de la Policía Municipal y que solo provee la academia de la Policía de Puerto Rico.  Significa esto que los gobiernos municipales estamos sujetos a los costos que la Academia de la Policía de Puerto Rico determine tanto para graduar nuevos policías como para los cursos de adiestramientos posteriores una vez ya están en la fuerza policíaca. Sobre este particular, es recomendable que el Grupo Asesor de Cumplimiento Técnico evalúe posibles alternativas educativas que permitan graduar nuevos miembros de policías municipales, sin el impacto fiscal que al presente tienen estos programas.

Más aún, dentro de la implementación de la Reforma de la Policía de Puerto Rico, debe contemplarse que los seminarios que son mandatorios para los policías estatales sean extensivos a los policías municipales, sin que suponga un costo adicional para los gobiernos municipales.

Como saben, Ponce ha sido sede de eventos multitudinarios que concentran cientos de miles de personas en zonas de espacios limitados, como son el casco urbano de la ciudad y el Complejo Recreativo La Guancha. Para estos eventos se han diseñado planes de trabajo integrados entre la Policía Municipal y la Policía de Puerto Rico, que han permitido la organización exitosa de eventos como las Justas de la LAI, juegos de campeonatos de Baloncesto Superior, carnaval Ponceño, entre otros.

8

Puedo decir con gran honestidad que una de mis mayores satisfacciones en el proceso de transformar a la Policía Municipal de Ponce estos años, es la estrecha colaboración que el Municipio Autónomo de Ponce ha establecido con la *American Civil Liberties Union (ACLU) –Capítulo de Puerto Rico*. Con un diálogo franco y respetuoso, en el año 2014 hicimos un acercamiento al director ejecutivo de la *ACLU Puerto Rico*, Lcdo. William Ramírez, para recibir sus recomendaciones sobre las medidas de seguridad adoptadas por nuestra Policía Municipal en los puntos de entrada al casco urbano durante las actividades de las Justas. Lo que comenzó con la discusión de unos temas específicos, eventualmente se amplió para atender otras preocupaciones compartidas por ambas partes. Y así, previo a la celebración de las Justas de la LAI, ese año todos nuestros policías municipales recibieron adiestramiento provisto por abogados de la *ACLU* en materias sobre Derechos Civiles, registro y allanamientos y el derecho de libertad de asociación.

Aún más, gracias a esa voluntad de colaboración entre el gobierno municipal y la *ACLU*, los policías municipales también recibieron capacitación sobre el manejo de casos de agresiones sexuales y por primera vez ese año se estableció como parte del Plan de Seguridad para las Justas, un área privada dentro de la Casa Alcaldía donde pudieran atenderse exclusivamente casos de esta naturaleza. Gracias a la disciplina y el orden respetuoso que la Policía Municipal ha alcanzado con sus planes de seguridad pública, en colaboración con la Policía de Puerto Rico, esto eventos han tenido lugar sin incidentes que lamentar.

En la exposición que he realizado en los párrafos anteriores, he detallado

acciones concretas y políticas públicas que se han implementado para llevar a la Policía Municipal de Ponce a un nivel más alto de excelencia en sus ejecutorias, en su visión propia como cuerpo policíaco, en la disponibilidad de equipo moderno, y en su capacitación general sobre prácticas policíacas con respeto a los derechos civiles.

Resulta necesario entonces ahora, evaluar resultados y examinar donde queda posicionada la Policía Municipal de Ponce en áreas que resultan críticas para este análisis, como serían por ejemplo, las reclamaciones y acciones judiciales por violación de derechos o uso de fuerza excesiva, y querellas de conducta policiaca discriminatoria o inadecuada. Para estos propósitos, nuestra Policía Municipal cuenta con una Oficina de Investigaciones y Asuntos Disciplinarios que tiene la responsabilidad de atender todos los asuntos relacionados a investigaciones administrativas sobre conducta de los policías municipales y querellas sometidas por ciudadanos contra algún integrante del cuerpo policíaco. A los fines de promover que los ciudadanos denuncien acciones incorrectas por parte de cualquier miembro de la Policía Municipal, en todos nuestros precintos policíacos hemos colocado un anuncio para informar a los ciudadanos sobre su derecho a presentar querellas relacionadas a un desempeño inadecuado. Aunque dicho anuncio era originalmente de la Policía de Puerto Rico, lo atemperamos para usarlo en la Policía Municipal.

Contamos en nuestra Policía Municipal con protocolos para que en los incidentes que involucran uso de fuerza, se someta un informe que detalle las circunstancias en que se produjo ese uso de fuerza y permita evaluar la corrección

de la actuación.  Y a tenor con el ánimo de la Reforma de la Policía de Puerto Rico, vamos a revisar nuestras órdenes administrativas y generales sobre Uso de Fuerza y Registros y Allanamientos.

En el análisis sobre los resultados netos que refleja nuestra Policía Municipal, comparto con ustedes que el historial de demandas por violaciones de derechos o incidentes de uso de fuerza excesiva contra nuestro cuerpo policíaco, es mínimo, con apenas tres casos pendientes, ninguno de los cuales implicó uso de fuerza letal.

Igualmente, es necesario establecer que la incidencia de delitos Tipo I en la zona de Ponce durante los pasados cinco años ha mostrado descenso. Al cierre del año fiscal 2015, y en comparación con el año 2014, se reflejaron 101 delitos menos para una reducción de 6.2%. Ciertamente esto ha sido el resultado del esfuerzo conjunto con la Policía de Puerto Rico.

Al evaluar el saldo de la Policía Municipal de Ponce, considero que hoy tenemos en nuestra ciudad, un cuerpo policíaco mejor adiestrado para cumplir con su deber, con más presencia en la comunidad y con equipos modernos.

Las medidas que hemos implementado en nuestra Policía Municipal por los pasados años no estaban en principio contextualizadas dentro del acuerdo que el Estado Libre Asociado de Puerto Rico firmó con el Departamento de Justicia federal sobre reforma de la Policía estatal. No obstante resulta evidente que muchas de nuestras acciones llevadas a cabo proactivamente en este periodo de tiempo, ya estaban alineadas con las 11 áreas a reformarse en la policía estatal. Es decir, aún cuando no se había adoptado aún la Reforma de la Policía por el gobierno central, en

cada una de esas áreas el gobierno municipal de Ponce ya había tomado acciones concretas en su Policía Municipal para cumplir con los estándares policíacos constitucionales más elevados.

Esto nos confirma que en muchos aspectos, estamos bien enfocados en cuanto a las acciones que hemos tomado para transformar a la Policía Municipal de Ponce y que vamos por buen camino. Pero la realidad es que no nos conformamos con lo que hemos alcanzado al presente. Por eso, junto con el Comisionado de la Policía Municipal de Ponce y mi grupo de trabajo, hemos examinado en detalle los principios contenidos en el Acuerdo para la Reforma Sostenible de la Policía de Puerto Rico, para progresivamente ir adoptando como política pública a nivel municipal diversas medidas y órdenes administrativas que sean implementadas como parte de esta reforma.

En cada una de las áreas, la Policía Municipal de Ponce ha estado trabajando para estar a la par con la reforma. De esta manera, tal y como señalé al principio de mi exposición, los objetivos que persigue la Reforma de la Policía de Puerto Rico tendrán un efecto multiplicador, como una onda expansiva, que trasciende la policía estatal y llega hasta las policías municipales de nuestro país.

Tengo la firme convicción de que aquellos de nosotros que hemos sido elegidos por el pueblo para dirigir la administración gubernamental, sea en el gobierno estatal o municipal, cargamos la responsabilidad primaria de buscar mayor seguridad para nuestros ciudadanos. Todos los alcaldes de Puerto Rico debemos compartir la responsabilidad de mover nuestros cuerpos policíacos a un

mayor grado de excelencia, y con el mapa que ha trazado el acuerdo de reforma de la Policía de Puerto Rico, ya está definido el camino a seguir. Sobre este particular, me permito hacer una recomendación adicional a este Honorable Tribunal y al Comité Técnico a los fines de que entre la Policía de Puerto Rico y las policías municipales se establezcan oficiales de enlace por medio de los cuales se pueda canalizar hacia los municipios información sobre los procesos de reforma de la Policía y así puedan ser implementados de forma paralela en el cuerpo policiaco municipal.

En este proyecto de país encaminado para reformar la Policía de Puerto Rico, también es indispensable incorporar todos los sectores que integran nuestra comunidad, en un ejercicio de respeto y democracia. La reforma de un cuerpo policíaco de las proporciones de la Policía de Puerto Rico, exige indiscutiblemente la participación y el insumo de todos, especialmente de aquellos sectores que podrían ser más susceptibles a aquellas prácticas policíacas fuera del marco de la ley, no éticas, discriminatorias o inapropiadas que se persigue erradicar.

Como Alcaldesa de Ponce, agradezco la oportunidad brindada para participar en este intercambio de experiencias e ideas que nos permitan identificar con mayor precisión aquellas iniciativas que han sido exitosas en su implementación y que han logrado los resultados que aspiramos obtener en la protección de nuestros ciudadanos.

Buenos días.



1
2
3
4

**APUNTES DE:**

**PROF. ROBERTO "PAPO CHRISTIAN" PÉREZ SANTONI**

**LÍDER COMUNITARIO CASERÍO PÚBLICO MANUEL A. PÉREZ**

**EDIF. B – 4 , APTO. B – 43**

**SAN JUAN, CIUDAD CAPITAL DE PUERTO RICO.**

**FUNDADOR DE LA CRUZADA CONTRA LOS DISPAROS**

**AL AIRE EN PUERTO RICO. 2004 – 2015**

8  **PARA: VISTAS PÚBLICAS SOBRE EL ACUERDO PARA LA REFORMA DE**
9  **LA POLICÍA DE PUERTO RICO. A CELEBRARSE EN EL TRIBUNAL DE**
10 **DISTRITO DE LOS ESTADOS UNIDOS DE NORTEAMERICA PARA EL**
11 **DISTRITO DE PUERTO RICO, EN LA CIUDAD DE PONCE, P.R.**

12  **EL VIERNES 23 DE OCTUBRE DE 2015**

13 **ESTAS VISTAS SON CONVOCADAS POR EL SR. GUSTAVO GELPÍ, JUEZ**
14 **DEL TRIBUNAL DE  DISTRITO DE LOS ESTADOS UNIDOS DE**
15 **NORTEAMÉRICA, PARA EL DISTRITO DE PUERTO RICO.**

16

17 **¡BUENAS TARDES SR. JUEZ GUSTAVO GELPÍ¡ ¡GRACIAS POR**
18 **PERMITIRME PARTICIPAR DE ESTAS VISTAS QUE SON TAN**
19 **IMPORTANTES PARA EL PUEBLO DE PUERTO RICO.**

20 **MI NOMBRE ES ROBERTO "PAPO CHRISTIAN" PÉREZ SANTONI,**
21 **SOY PUERTORRIQUEÑO Y CIUDADANO DE LOS ESTADOS UNIDOS DE**
22 **NORTEAMÉRICA. TENGO 64 AÑOS DE EDAD. SOY MAESTRO DE**
23 **PROFESIÓN, Y  LÍDER  COMUNITARIO DEL CASERÍO PÚBLICO**
24 **MANUEL A. PÉREZ EN SAN JUAN, CIUDAD CAPITAL DE PUERTO RICO.**
25 **EL CASERÍO PÚBLICO MANUEL A. PÉREZ, ES EL SEGUNDO CASERÍO**
26 **PÚBLICO MÁS GRANDE, DE LOS CERCA DE 320 CASERÍOS PÚBLICOS**
27 **QUE HAY EN PUERTO RICO.**

28 **NUESTRO TRABAJO COMUNITARIO, ES UNO PURO VOLUNTARIO**
29 **PUES NUNCA, HEMOS RECIBIDO NI PEDIDO NADA A NADIE...**
30 **MI TRABAJO COMUNITARIO LO HAGO LIBREMENTE, PORQUE QUIERO,**
31 **Y PORQUE TENGO UN COMPROMISO MORAL CON TODOS LOS**
32 **HOMBRES, MUJERES, NIÑ@S Y ANCIANOS QUE ME PRECEDIERON,**
33 **Y TRABAJARON, LUCHARON, SE SACRIFICARON Y DIERÓN SUS VIDAS**
34 **PARA QUE TODOS NOSOTROS PUDIERAMOS VIVIR EN UNA SOCIEDAD**
35 **LIBERAL DEMOCRÁTICA COMO LA NUESTRA.**

36 **ES DE COBARDES, PUSILÁNIMES Y MALAGRADECIDOS,**
37 **NO CONSERVAR, MANTENER, CUIDAR Y AMPLIAR LOS DERECHOS**
38 **CONSTITUCIONALES , CIVILES Y HUMANOS. PRODUCTO DEL SUDOR,**
39 **LAS LUCHAS, SACRIFICIOS Y LA SANGRE DE NUESTROS ANCESTROS,**
40 **EN TODAS LAS PARTES DEL MUNDO...**

41 **POR QUE, APARTE DE SER PUERTORRIQUEÑO Y CIUDADANO DE LOS**
42 **ESTADOS UNIDOS DE NORTEAMÉRICA, YO ME SIENTO PARTE DE**
43 **TODA LA HUMANIDAD. Y SOY PARTE COMO TODOS USTEDES, DE**
44 **ESTA CASA GRANDE QUE ES EL PLANETA MADRE TIERRA...**

45 **LO QUE AFECTE A UN SER HUMANO EN CUALQUIER PARTE**
46 **DEL PLANETA MADRE TIERRA, ME AFECTA A MI, Y LOS AFECTA**
47 **A TODOS USTEDES, PORQUE TODOS, SOMOS MIEMBROS DE UNA**
48 **SOLA RAZA...LA RAZA HUMANA... TODOS NOSOTROS SOMOS**
49 **LA HUMANIDAD.**

50 **CUANDO EL  AMIGO Y HERMANO, PRESIDENTE DEL COMITÉ**
51 **DOMINICANO DE LOS DERECHOS HUMANOS, SECCIÓN DE PUERTO**
52 **RICO. EL SR. JOSÉ RODRÍGUEZ, NOS INVITO EL JUEVES 19 DE JUNIO**
53 **DE 2014 A LAS 3:00 P.M. AL COLEGIO DE ABOGADOS DE PUERTO**
54 **RICO EN SAN JUAN. PARA UNA REUNIÓN CON LÍDERES**
55 **COMUNITARIOS, OBREROS, DE DERECHOS, GAYS Y DE MUCHAS**
56 **OTRAS ORGANIZACIONES,  CON EL SR. ARNALDO CLAUDIO,**
57 **EL MONITOR FEDERAL DE LA POLICÍA DE PUERTO RICO.**

58  PENSÉ QUE SERÍA UNA REUNIÓN MÁS, EN DONDE UN BURÓCRATA,
59  REPRESENTANTE DE LA CORTE DE DISTRITO FEDERAL DE PUERTO
60  RICO. SE PRESENTARÍA, NOS DARÍA SUS TÍTULOS PROFESIONALES.
61  NOS EXPLICARÍA SOBRE EL ACUERDO DE LA REFORMA DE LA
62  POLICÍA DE PUERTO RICO. NOSOTROS LAEPRESENTARÍAMOS
63  NUESTRAS INQUIETUDES, ÉL TOMARA NOTAS Y TODO QUEDARÍA AHÍ.
64  COMO PASA SIEMPRE.

65  ¡ME EQUIVOQUÉ¡ EL SR. ARNALDO CLAUDIO, HABLÓ CLARO Y SIN
66  TAPUJOS. NOS DIJO TODOS SU TÍTULOS Y EXPERIENCIAS
67  SIN FANFARRONEAR, NI ALARDEAR, Y ESO ME GUSTO.

68   NOS HABLÓ DEL ACUERDO DE LA REFORMA DE LA POLICÍA DE
69  PUERTO RICO.

70  EL SR. ARNALDO CLAUDIO, ESCUCHÓ A TODOS LOS LÍDERES DE LAS
71  ORGANIZACIONES PRESENTES Y SUS EXPERIENCIAS CON LA
72  POLICÍA DE PUERTO RICO.

73  RECUERDO QUE AL TERMINAR MIS PLANTEAMIENTOS,
74  LE DIJE AL SR. ANARDO CLAUDIO, QUE PODÍA CONTAR
75  CONMIGO, PUES EL ACUERDO PARA LA REFORMA DE LA
76  POLICÍA DE PUERTO RICO ERA UN PROYECTO DE PAÍS,
77  UN PROYECTO DE VIDA QUE DE LOGRARSE EN TODOS SUS
78  OBJETIVOS SERÍA DE GRAN BENEFICIO PARA TODOS
79  LOS PUERTORRIQUEÑOS Y RESIDENTES DE LA ISLA.

80  YO SR. JUEZ GUSTAVO GELPÍ, QUE NO SOY UN ALZA COLA, NI UN
81  EÑANGOTA'O, NI UN LAMBÓN, NI ME CASO CON NADIE... SALÍ DE LA
82  REUNIÓN, CONTENTO Y LLENO DE ESPERANZAS, PENSANDO QUE
83  ESTE PROYECTO DE PAÍS Y DE VIDA, QUE ES EL ACUERDO PARA LA
84  REFORMA DE LA POLICÍA, SI SE DABA, SERÍA ALGO
85  EXTRAORDINARIO Y BUENO PARA TODOS.

86  POR OTRA PARTE COMO YO NO SOY ABOGADO, NI LO QUIERO SER...
87  CUANDO LEÍ EN LOS PERIÓDICOS Y EN LOS DOCUMENTOS  DEL
88  TRIBUNAL FEDERAL, QUE CONVOCAN A ESTAS VISTAS PÚBLICAS LO
89  SIGUIENTE:

90  "LA CORTE ACLARA QUE LAS VISTAS NO SON ADVERSATIVAS. EL
91  ESPÍRITU DE COLABORACIÓN GENUINA Y ASISTENCIA MUTUA DEBE
92  GUIAR LOS PROCESOS DE LA REFORMA..."

93  CORRÍ A BUSCAR EN MI VIEJO DICCIONARIO LA DEFINICIÓN DE LA
94  PALABRA "ADVERSATIVAS". Y PENSÉ, YO SIEMPRE SERÉ
95  ADVERSARIO DE LAS INJUSTICIAS Y DE LAS COSAS QUE ENTIENDA
96  SEGÚN MI CONCIENCIA  QUE NO SON JUSTAS Y HONRADAS...

97  Y HOY, AQUÍ, SR. JUEZ GUSTAVO GELPÍ, LE DIGO CON MUCHO
98  RESPETO QUE CON ESTE PROYECTO DE PAÍS Y DE VIDA QUE ES EL
99  ACUERDO PARA LA REFORMA DE LA POLICÍA DE PUERTO RICO.
100  NO PODEMOS SER ADVERSARIOS, NI ENEMIGOS...

101  LAS COSAS BUENAS QUE HACE LA POLICÍA DE PUERTO RICO, QUE
102  SON MUCHAS. HAY QUE DECIRLAS Y RESPARDARLAS. PERO LAS
103  COSAS MALAS QUE HACE LA POLICÍA, QUE SON MUCHAS TAMBIÉN
104  HAY QUE DECIRLAS Y DENUNCIARLAS PARA CORREGIRLAS Y
105  ENMENDARLAS.

106  CON  EL ACUERDO PARA LA REFORMA DE LA POLICÍA. CORRIENDO
107  DESDE EL 17 DE JUNIO DE 2013. MIRE USTED SR. JUEZ GUSTAVO
108  GELPÍ, COMO SALIÓ A LA LUZ, LA PODREDUMBRE QUE HABÍA EN LA
109  POLICÍA DE PUERTO RICO. CON ESOS AGENTES Y POLICÍAS
110  PANDILLEROS Y CORRUPTOS DE LA BANDA DE "LOS SURICATOS"...

111  YO SIEMPRE SERÉ ADVERSARIO Y ADVERSATIVO, EN CONTRA DE
112  LAS ACCIONES DE  ESTAS PERSONAS... SEAN POLICÍAS, O NO LO
113  SEAN. POR ESO EL DESARROLLAR Y IMPLEMENTAR ESTE ACUERDO,
114  PARA LA REFORMA DE LA POLICÍA DE PUERTO RICO, ES TAN
115  IMPORTANTE. PARA EVITAR QUE ESTAS COSAS PASEN.

116  A NOSOTROS, EN VERDAD, QUE EL ARRESTO DE ESTOS POLICÍAS
117  CORRUPTOS, Y "DELINCUENTOSOS" NO NOS SORPRENDE.

118  YO, QUE VIVO EN EL CASERÍO DESDE LOS DOS AÑOS.
119  NO TENGO NINGÚN COMPLEJO EN DECIR QUE A LOS RESIDENTES
120  DE LA VIVIENDA PÚBLICA DE PUERTO RICO SE NOS ESTIGMATIZA,
121  SE NOS MARGINA, SE NOS DISCRIMINA Y SE NOS ACUSA DE SER LOS
122  CAUSANTES DE TODOS LOS MALES SOCIALES DE PAÍS... MUCHOS
123  POLICÍAS VEN EN CADA RESIDENTE DE VIVIENDA PÚBLICA UN
124  CRIMINAL...  Y TODOS SABEMOS QUE ESO NO ES CORRECTO.

125  LA GRAN MAYORÍA DE LOS RESIDENTES DE LA VIVIENDA PÚBLICA
126  SON PERSONAS DECENTES Y TRABAJADORAS . IGUAL QUE LA GRAN
127  MAYORÍA DE LOS MIEMBROS DE LA POLICÍA DE PUERTO RICO, NO
128  SON MIEMBROS DE LA PANDILLA "DELINCUENTOSA" DE LOS
129  SURICATOS. Y SON PERSONAS DECENTES Y TRABAJADORAS...

130  DESDE EL CASERÍO  EN MIS EXPERIENCIAS DE VIDA, HE VISTO COMO
131  MIEMBROS DE LA POLICÍA DE PUERTO RICO HAN ABUSADO, HAN
132  PISOTEADO Y HAN ASESINADO RESIDENTES...

133  AQUÍ Y DELANTE DE TODOS USTEDES, CONFIESO Y DIGO
134  PÚBLICAMENTE, QUE DE NIÑO PARA MI, VER UN POLICÍA ERA
135  ENTRAR EN UNA GRAN CRISIS EMOCIONAL. YO NO VEÍA EN UN
136  POLICÍA, UNA PERSONA AMIGA. YO VEÍA UNA PERSONA ABUSÍVA,
137  QUE ROMPÍA PUERTAS,  QUE GOLPEABA Y EMPUJABA A ADULTOS,
138  MUJERES, NIÑ@S Y ANCIANOS. YO LES TENÍA MIEDO. MUCHO
139  TRABAJO ME DIO EL PODER ENTENDER YA DE ADULTO, QUE NO
140  TODOS LOS POLICÍAS ERAN UNOS ABUSADORES...

141  TODAVÍA RECUERDO UNAS ESCENAS  DE MI NIÑEZ,RELACIONADAS
142  CON LA POLICÍA, QUE ME MARCARON PARA SIEMPRE.

143  SE ESCUCHABAN GRITOS Y ALGARABÍA...  CON EL ABUELO,
144  SALIMOS AL BALCÓN PARA VER QUE OCURRÍA. LOS POLICÍAS
145  SACABAN A PALOS A LOS VIEJOS QUE ERAN MIS VECINOS

146  **DEL COLMADO CAFETÍN DEL VIEJO DON ANASTACIO. PERO LO QUE**
147  **LES QUEDO BIEN CRUEL Y ABUSIVO FUE CUANDO DETUBIERON A**
148  **UN JOVEN QUE  PASABA TODOS LOS DÍAS FRENTE A MI CASA PARA**
149  **LA IGLESIA. LLEVABA UN REFRESCO Y LA BIBLIA EN LAS MANOS...**
150  **LO EMPUJARON, LO GOLPEARON Y EL REFRESCO, SE LO HECHARON**
151  **POR LA CABEZA Y SE BURLARÓN DE ÉL... DOÑA BENITA ( QUE EN**
152  **PAZ DESCANSE) NUESTRA VECINA, LES GRITO: ¡COBARDES¡**
153  **¡ABUSADORES¡ ¡DEJEN A ESE MUCHACHO TRANQUILO! ¡ÉL NO SE**
154  **METE CON NADIE!**

155  **¡JAMÁS NI NUNCA, VOLVIMOS A VER AL POBRE MUCHACHO**
156  **CAMINANDO PARA LA IGLESIA...!**

157  **ESA ESCENA DE ABUSO DE PODER, DE VIOLACIÓN DE DERECHOS,**
158  **DE ARROGANCIA Y DE HUMILLACIÓN, A ESE JOVEN MUCHACHO.**
159  **DESDE NIÑO, LA CARGO EN MI CONCIENCIA Y EN MI CORAZÓN...**

160  **EN LA ESCUELA ELEMENTAL MANUEL A. PÉREZ, LOS MAESTROS NOS**
161  **HABLABAN DEL POLICÍA "AMIGO"... PERO ESTOS POLICÍAS NO ERAN**
162  **AMIGOS, ERAN UNOS COBARDES ABUSADORES Y YO LES TEMÍA...**

163  **TAMBIÉN RECUERDO A OTRO VECINO, UN HOMBRE JOVEN QUE FUE**
164  **TIROTEADO Y ASESINADO POR LA ESPALDA, POR OTROS POLICÍAS**
165  **AL LADO DE MI CASA. SU MADRE PRESENTO UN QUERELLA...**
166  **Y COMO LA POLICÍA SE INVESTIGA A ELLA MISMA, COMO PASA**
167  **AHORA... ESA MUERTE QUEDO IMPUNE, Y EN EL OLVIDO... PERO**
168  **TODAVÍA SIGUE PRESENTE EN MIS RECUERDOS... Y EN MI**
169  **CONCIENCIA.**

170  **PENSANDO EN ESTOS RECUERDOS, Y EN EL ACUERDO PARA LA**
171  **REFORMA DE LA POLICÍA DE PUERTO RICO. CREO QUE LA POLICÍA DE**
172  **PUERTO RICO TIENE QUE CAMBIAR SU ACTITUD DE HACER CUMPLIR**
173  **LAS LEYES A LAS BUENAS O A LAS MALAS. PORQUE ELLOS SON LA**
174  **AUTORIDAD, PORQUE SON LOS QUE TIENEN EL PODER,  PORQUE**
175  **ELLO SON LOS QUE MANDAN...**

176 **ALGÚNOS POLICÍAS SON TAN ATREVIDOS, QUE SE TOMAN LA LEY**
177 **EN LAS MANOS Y CREEN SER; JUEZ, FISCAL, ABOGADO, JURADO Y**
178 **VERDUGOS. Y HACEN LO QUE LES DA LA GANA CON LOS**
179 **CIUDADANOS QUE DETIENEN... LOS GOLPEAN, LOS DENIGRAN, LOS**
180 **HUMILLAN Y LOS MATAN...**

181 **¡ Y ESO NO ES SER POLICÍA! ¡ESO ES SER UN COBARDE, UN**
182 **ABUSADOR Y UN CRIMINAL!**

183 **Y DEJO CLARO QUE SEÑALO A LOS AGENTES Y POLICÍAS QUE**
184 **INCUMPLEN CON SU DEBER Y VIOLAN LAS LEYES... PORQUE LA**
185 **MAYORÍA DE LOS POLICÍAS NO SON COMO "LOS SURICATOS".**

186 **MÁS DE LA MITAD DE ELLOS SON BUENOS POLICÍAS.**

187 **A MI ME PREOCUPA Y ME LLAMA LA ATENCIÓN EN RELACIÓN**
188 **AL ACUERDO PARA LA REFORMA DE LA POLICÍA DE PUERTO RICO.**

189 **LA SECCIÓN V- REGISTROS Y ALLANAMIENTOS: CONTROLES**
190 **INTERNOS Y RESPONSABILIDAD PÚBLICA.( PÁG.36 – VERSIÓN EN**
191 **ESPAÑOL)**

192 **EN LOS REGISTROS Y ALLANAMIENTOS SE REQUIERE QUE EL**
193 **POLICÍA**

194 **SE LO INFORME A SU SUPERVISOR. ¿COMÓ SE HACE ESO?**

195 **¿POR FE? ¿Y SI EL POLICÍA NO QUIERE INFORMAR A SU**
196 **SUPERVISOR? EN LOS CASOS QUE LES QUITAN A LOS ARRESTADOS,**
197 **DROGAS, ARMAS Y DINERO... ¿A QUIÉN SE INFORMA?**

198 **EL PROBLEMA DEL USO, ABUSO Y DISTRIBUCIÓN DE DROGAS ES UNO**
199 **BIEN SERIO EN LA ISLA Y EN EL TERRITORIO CONTINENTAL.**

200 **¡ Y ME PREOCUPA MUCHO, QUE EN TODOS LOS DOCUMENTOS**
201 **Y PAPELES QUE HE LEÍDO PARA PREPARAME  PARA ESTAS VISTAS,**
202 **EN NINGÚN LUGAR HE VISTO QUE A LA POLICÍA DE PUERTO RICO, NI**

203  **AL PERSONAL CIVIL QUE TRABAJA CON ELLOS SE LES DEBEN HACER**
204  **PRUEBAS DE DROGAS CON CIERTA REGULARIDAD.**

205  **LAS PRUEBAS DE USO Y ABUSO DE DROGAS EN LA POLICÍA DE**
206  **PUERTO RICO DEBEN COMENZAR DESDE EL SUPERINTENDENTE ,**
207  **LOS OFICIALES DE ALTO RANGO, AGENTES, POLICÍAS, HASTA EL**
208  **EMPLEADO CIVIL, QUE HAGA LAS COSAS MÁS SIMPLES.**

209  **POR AHÍ HAY UN REFRÁN QUE DICE:**
210  **"LA MUJER DEL CÉSAR, NO SOLO DEBE SER PURA,**
211  **CASTA, SANTA Y BEATA... SINO QUE LO DEBE APARENTAR**
212  **TAMBIÉN".**

213  **EDUCAR, HUMANIZAR, SENSIBILIZAR**

214  **(LA ACADEMIA DE LA POLICÍA DE PUERTO RICO)**

215  **HAY PERSONAS EN LA VIDA QUE SON UNA EMINENCIA.**
216  **DOCTOS, SABIOS, BRILLANTES Y TIENEN TANTOS TÍTULOS Y**
217  **DIPLOMAS "QUE NI BOTANDOLOS SE ACABAN"...**

218  **A MUCHAS DE ESTAS PERSONAS UNO NUNCA LES PUEDE VER LA**
219  **CARA NI CONOCERLOS BIEN. PORQUE SIEMPRE ESTAN DETRÁS DE**
220  **SUS DIPLOMAS Y SUS TÍTULOS DOCTORALES DE MAESTRO, DE**
221  **ABOGADOS, DE LÍDERES COMUNITARIOS, DE POLICÍAS, DE**
222  **PASTORES, ETC.**

223  **HAY QUE RECONOCER QUE ESAS PERSONAS SABEN MUCHAS**
224  **COSAS... PERO ESTAN DESHUMANIZADAS Y INSENSIBILIZADAS...**

225  **VIVEN, DETRÁS DE SUS PUESTOS Y TÍTULOS. SON COMO LOS**
226  **FARISEOS. ¡UNOS HIPÓCRITAS! ¡TIENEN APARIENCIA DE VIRTUOSOS**
227  **Y POR DENTRO ESTAN PODRIDOS!**

228  **¡ QUE BUENO QUE EN EL ACUERDO PARA LA REFORMA DE LA**
229  **POLICÍA DE PUERTO RICO SE INCLUYE EL COLEGIO UNIVERSITARIO**

230  DE JUSTICIA CRIMINAL. HOY CON EL NOMBRE DE LA ACADEMIA DE
231  LA POLICÍA DE P.R. LA ACADEMIA DE LA POLICÍA DE PUERTO RICO
232  EN DONDE SE EDUCAN A LOS CIVILES, OFICIALES Y A LA POLICÍA. ES
233  UN CENTRO EDUCATIVO PROPIEDAD DEL PUEBLO DE PUERTO RICO.

234  EN LA SECCIÓN IX- ADIESTRAMIENTO, EL ARTÍCULO  117. DEL
235  ACUERDO PARA LA REFORMA DE LA POLICÍA DE PUERTO RICO DICE:

236   " LA POLICÍA DE PUERTO RICO ASEGURARÁ QUE TODO EL
237  PERSONAL CIVIL Y DEL SISTEMA DE RANGO DE LA POLICÍA DE
238  PUERTO RICO RECIBA UNA FORMACIÓN EFECTIVA Y COMPLETA
239  PARA ASEGURAR QUE CONOZCAN SUS RESPONSABILIDADES, EL
240  ALCANZE DE SU AUTORIDAD, Y QUE LOS MISMOS PUEDAN
241  DESEMPEÑAR ESTAS RESPONSABILIDADES Y TRABAJAR
242  EFECTIVAMENTE."

243  EN LA ACADEMIA DE LA POLICÍA ME IMAGINO SE LES ENSEÑARÁ,
244   Y  ADIESTRARÁ, EN EL USO CORRECTO, DE PISTOLAS, RIFLES,
245  PISTOLAS ELÉCTRICAS, MACANAS, GASES LACRIMÓGENOS, EL GAS
246  PIMIENTA Y DE COMO USAR LA FUERZA FÍSICA... SIN ATROPELLAR,
247  DAÑAR Y MATAR A NADIE...

248  ME IMAGINO TAMBIÉN, QUE APARTE DE TODAS ESAS TÉCNICAS
249  "CUASI MILITARES". SE LES ESEÑARÁ LA CONSTITUCIÓN  Y LA
250  CARTA DE DERECHOS DE PUERTO RICO, LA CONSTITUCIÓN DE LOS
251  ESTADO UNIDOS DE NORTEAMÉRICA, LA CARTA DE DERECHOS DE
252  LAS NACIONES UNIDAS, LA CARTA DE DERECHOS DE LA
253  ORGANIZACIÓN DE LOS ESTADOS AMERICANOS, ETC. ESTOY
254  SEGURO QUE LES ENSEÑARÁN CUAN RESPETUOSOS, SIN EXPONER
255  SUS VIDAS. DEBEN SER, CON LAS PERSONAS QUE DETIENEN. CON
256  LAS PERSONAS QUE VISITAN LOS CUARTELES DE LA POLICÍA
257  ESPECIALMENTE EL CUARTEL GENERAL DE HATO REY. Y CUAN
258  RESPETUOSOS DEBEN SER CON LAS PERSONAS DE LA CALLE...

259  LA ACADEMIA DE LA POLICÍA DE PUERTO RICO, ESTOY SEGURO, QUE
260  PUEDE, Y ES SU RESPONSABILIDAD TRANSMITIR TODOS LOS
261  CONOCIMIENTOS EN RELACIÓN AL USO CORRECTO DEL EQUIPO QUE
262  DEBEN USAR LOS POLICÍAS.

263  TAMBIÉN ESTOY SEGURO QUE LES EDUCARÁN EN RELACIÓN A LOS
264  DERECHOS  HUMANOS, CIVILES Y CONSTITUCIONALES DE TODOS
265  LOS SERES HUMANOS. Y DEL RESPETO QUE LE DEBEMOS A
266  NUESTROS HERMANOS LOS ANIMALES. QUE LO ÚNICO QUE NOS
267  DIFERENCIA DE ELLOS ES, QUE NOSOTROS NOS LLAMAMOS
268  RACIONALES. Y DECIMOS QUE ELLOS SON UNOS IRRACIONALES.

269  PERO HUMANOS, Y ANIMALES, PERTENECEMOS AL MISMO REINO.
270  ¡AL REINO ANIMAL!

271  Y COMO ESTA EL CAMBIO CLIMÁTICO, ESPERO QUE LES ENSEÑEN
272  A RESPETAR Y DAR A RESPETAR EL MEDIO AMBIENTE.

273  REFLEXIONO, QUE DE NADA SIRVE EDUCAR Y ADIESTRAR

274   A LOS POLICÍAS EN LA ACADEMIA. DE NADA SIRVE AUMENTARLES
275  EL SUELDO. DE NADA SIRVE EQUIPARLOS CON LAS MEJORES
276  ARMAS, TÉCNOLOGIAS, CARROS, ROTENES Y OTRAS COSAS...

277  SI EN EL PROCESO EDUCATIVO SE PIERDEN Y SE TRANSFORMAN EN
278  SERES INSENSIBLES Y ROBÓTICOS. ¿NO SE COMO? PERO HAY QUE
279  SEMBRAR SEMILLAS DE HUMANIDAD Y SENSIBILIDAD EN SUS
280  MENTES Y EN SUS CORAZONES, PARA QUE SIN BAJAR LA "GUARDIA"

281  NO VEAN UN ENEMIGO Y UN CRIMINAL EN CADA RESIDENTE DE
282  CASERÍO PÚBLICO Y BARRIADAS POBRES. PARA QUE NO VEAN UN
283  CRIMINAL Y UN ASESINO EN LOS DEAMBULANTES, EN LOS NEGROS,
284  EN LOS GAYS, EN LOS ESTUDIANTES, EN LOS OBREROS Y EN LOS
285  EXTRANJEROS. ESPECIALMENTE EN CONTRA DE NUESTROS
286  HERMANOS DOMINICANOS A QUIENES LOS POLICÍAS ESTATALES Y

287  **MUNICIPALES NO LES SACAN EL GUANTE DE LA CARA POR SER**
288  **EXTRANJEROS...**

289  **EN LA ACADEMIA DE LA POLICÍA DE PUERTO RICO, LOS**
290  **INSTRUCTORES DE TODAS LAS MATERIAS DEBEN Y TIENEN QUE**
291  **EDUCAR Y FOMENTAR QUE HAY QUE RESPETAR A LOS CIUDADANOS**
292  **PARA QUE ESTOS LOS RESPETEN A ELLOS...**

293  **SE LES DEBE EDUCAR QUE EL SER REPRESENTANTES DE LA LEY Y**
294  **EL ÓRDEN NO LES DA NINGÚN DERECHO A SER CANALLAS Y**
295  **ABUSADORES.**

296  **TODOS SABEMOS QUE LA GRAN MAYORÍA DE LOS HOMBRES Y**
297  **MUJERES DE LA POLICÍA DE PUERTO RICO SON PERSONAS**
298  **COMPROMETIDAS CON LA JUSTICIA, LA PAZ Y EL BIEN. PERO TODOS**
299  **SABEMOS TAMBIÉN QUE HAY OTRA GRAN MAYORÍ QUE LES GUSTA**
300  **ABUSAR DEL PODER Y LA CONFIANZA QUE EL PUEBLO PONE EN SUS**
301  **MANOS.**

302  **POR ESO YO INSISTO, Y LO COMENTO DONDEQUIERA QUE VOY.**

303  **QUE EL ACUERDO PARA LA REFORMA DE LA POLICÍA DE PUERTO**
304  **RICO, ES UN PROYECTO DE PAÍS, ES UN PROYECTO DE VIDA...**

305  **ES UN PROYECTO PARA DESARROLLAR LAZOS DE COMUNICACIÓN,**
306  **COLABORACIÓN Y RESPETO ENTRE LA POLICÍA Y TODOS LOS**
307  **COMPONENTES SOCIALES DEL PAÍS.**

308  **TODOS LOS PUERTORRIQUEÑOS Y HERMANOS EXTRANJEROS QUE**
309  **VIVEN EN LA ISLA TENEMOS QUE APORTAR Y TRABAJAR PARA**
310  **LOGRAR Y MEJORAR LOS OBJETIVOS Y LAS METAS DEL ACUERDO**
311  **PARA LA REFORMA DE LA POLICÍA DE PUERTO RICO.**

312  **CREO TAMBIÉN QUE LO ESCRITO EN EL ACUERDO, NO DEBE**
313  **LIMITARNOS PARA ABRIR PUERTAS Y FRONTERAS A PROYECTOS,**
314  **IDEAS Y ACCIONES ENCAMINADAS A ESTABLECER LAZOS**
315  **RESPETUOSOS DE COMUNICACIÓN Y TRABAJO PARA EL BIEN DE**

316   **TODO EL PAÍS Y EL RESPETO A LOS DERECHOS CONSTITUCIONALES**
317   **DE TODOS LOS COMPONENTES SOCIALES DE PUERTO RICO.**

318   **TENGO QUE DESTACAR EN ESTE MOMENTO EL TRABAJO DEL SR.**
319   **ARNALDO CLAUDIO MONITOR FEDERAL DE LA POLÍCIA DE PUERTO**
320   **RICO Y REPRESENTANTE DEL TRIBUNAL DE DISTRITO DE LOS**
321   **ESTADOS UNIDOS DE NORTEAMÉRICA, DISTRITO DE PUERTO RICO.**

322   **EL SR. ARNALDO CLAUDIO A RESULTADO SER UN FUNCIONARIO CON**
323   **LOS OÍDOS ABIERTOS Y LOS PIES EN LA TIERRA. A ESTE SEÑOR LE**
324   **GUSTA ESCUCHAR, VISITAR LAS COMUNIDADES SIN MIEDO,**
325   **Y EXPLICA SIN PALABRAS RIMBONBANTES Y SIN PALABRAS**
326   **REBUSCADAS LO QUE ES EL ACUERDO PARA LA REFORMA DE LA**
327   **POLICÍA DE PUERTO RICO.**

328    **EL SR. ARNALDO CLAUDIO A DIFERENCIA DE OTROS FUNCIONARIOS**
329   **BURÓCRATAS GUBERNAMENTALES ARISTOCRÁTICOS TANTO**
330   **ESTATALES COMO FEDERALES A QUIENES LES GUSTA**
331   **APANTALLARNOS CON SUS TÍTULOS Y VOCABULARIO FINO Y**
332   **SOFISTICADO  QUE SOLO ELLOS ENTIENDEN. EL SR. CLAUDIO NOS**
333   **HABLA EN ESPAÑOL Y EN BLANCO Y NEGRO. COMO DECIMOS EN LA**
334   **CALLE , "HABLA EN ARROZ Y EN HABICHUELAS", COMO LE GUSTA AL**
335   **PUEBLO. Y PARA IMPLEMENTAR EL ACUERDO  PARA LA REFORMA DE**
336   **LA POLICÍA DE PUERTO RICO, HAY QUE HABLAR BIEN CLARO.**
337   **SIN ESTABLECER  BARRERAS CLASISTAS, EDUCATIVAS,SOCIALES**

338   **Y PREJUICIADAS. PIENSO QUE EL SR. CLAUDIO ES UN HOMBRE DE**
339   **PUEBLO Y LE APLAUDO QUE SE META EN LOS CASERÍOS , EN LAS**
340   **BARRIADAS, EN LOS CUARTELES DE LA POLICÍA, EN LAS**
341   **UNIVERSIDADES Y HABLE CON LA GENTE DEL PUEBLO Y  CON**
342   **LOS OTROS... PUES TODOS TENEMOS ALGO QUE APORTAR PARA EL**
343   **ÉXITO DE ESTE PROYECTO DE VIDA Y DE PAÍS. Y SENTADO EN UNA**
344   **OFICINA CON AIRE ACONDICIONADO SIN VER LA REALIDAD DE LA**
345   **CALLE NO SE PUEDE TRABAJAR.**

346 **AUNQUE SIEMPRE POR AHÍ HAY PERSONAS "VELA GUIRA" QUE LES**
347 **GUSTA EL PODER POR EL PODER Y LES GUSTA ESTAR TIRANDO**
348 **CÁSCARAS DE GUINEOS PARA QUE LOS QUE TRABAJAN POR EL BIEN**
349 **DEL PAÍS, RESBALEN Y SE CAIGAN, PARA ELL@S ACOMODARSE,**
350 **SENTARSE Y NO HACER NADA.**

351 **ESTO LO DECIMOS CON RESPETO Y CON BASE EN LOS AÑOS QUE**
352 **LLEVAMOS HACIENDO TRABAJO COMUNITARIO VOLUNTARIO.**
353 **HEMOS VISTO COMO A VECES CUANDO ALGUIEN HACE UN TRABAJO**
354 **PARA EL PUEBLO...HAY UN MONTÓN DE BUITRES, Y ALIMAÑAS**
355 **TRATANDO DE DESTRUIR LAS COSAS BUENAS.**

356 **Y QUE CONSTE SR. JUEZ GUSTAVO GELPÍ QUE EL DÍA QUE YO  VEA**
357 **ALGO Y ENTIENDA QUE EL SR. ARNALDO CLAUDIO HACE ALGO QUE**
358 **NO SEA PARA ADELARTAR ESTE PROYECTO DE VIDA Y DE PAÍS.**
359 **PRIMERO SE LO DIRÉ A ÉL Y DESPUES SALDRE CORRIENDO A**
360 **DECIRCELO A USTED.**

361 **Y QUE CONSTE PARA RECORD, QUE YO NO SOY UN "LAMBÓN', NI UN**
362 **ADULADOR, NI UN "EÑANGOTAO". AQUÍ CON EL ACUERDO PARA LA**
363 **REFORMA DE LA POLICÍA DE PUERTO RICO HAY MUCHO TRABAJO**
364 **QUE HACER Y CADA QUIEN TIENE QUE CUMPLIR CON SUS**
365 **RESPONSABILIDADES CIUDADANAS POR EL BIEN DEL PAÍS.**

366 **LA PANDILLA DE POLICÍAS CORRUPTOS**
367 **DE LA BANDA DE LOS SURICATOS.**

368 **SR. JUEZ GUSTAVO GELPÍ. EL ACUERDO PARA LA REFORMA DE LA**
369 **POLICÍA DE PUERTO RICO ES TAN IMPORTANTE Y ESTA TAN**
370 **VIGENTE QUE NO PODEMOS DEJAR DE SEÑALAR A LA GANGA DE LOS**
371 **AGENTES NARCOTRAFICANTES LLAMADOS  "LOS SURICATOS"**

372 **QUE FUERÓN ARRESTADOS POR EL F.B.I. EL PASADO MARTES 29 DE**
373 **SEPTIEMBRE DE 2015**

374   **ESTA PANDILLA Y ESTOS POLICÍAS SON LOS HEREDEROS Y**
375   **CONTINUADORES DE ESA MALA COSTUMBRE DE ALGUNOS POLICÍAS**
376   **DE TRANSFORMARSE DE PERSONAS DE BIEN, EN DELINCUENTES Y**
377   **EN CRIMINALES... Y ESA COSTUMBRE HAY QUE SACARLA DE RAÍZ,**
378   **DEL CUERPO DE LA POLICÍA DE PUERTO RICO.**

379   **TAMBIÉN YA DE ADULTOS DESDE EL BALCÓN DE NUESTRO HOGAR**
380   **EN EL CASERÍO. OBSERVAMOS MUCHAS VECES COMO LLEGABAN**
381   **MUCHAS PATRULLAS DE LA POLICÍA CON PERSONAL ARMADO CON**
382   **RIFLES... SE METÍAN EN LOS PUNTOS DE DROGAS, LES QUITABAN A**
383   **LOS DELINCUENTES LA DROGA , EL DINERO Y LAS ARMAS Y NO LOS**
384   **ARRETABAN.**

385   **AL OTRO DÍA ERA EL TEMA EN LA COMUNIDAD QUE DURANTE ESOS**
386   **OPERATIVOS FANTASMAS SE HABÍAN LLEVADO LA DROGA, EL**
387   **DINERO Y LOS AGENTES CORRUPTOS NEGOSIABAN CON LOS**
388   **"DELINCUENTOSOS" DEL CASERÍO PARA QUE LES DIERAN ARMAS,**
389   **DROGAS Y DINERO...**

390   **UNO NO PUEDE SER TAN ESTÚPIDAMENTE, IDIOTA, INGENUO Y**
391   **BOBO. PARA PENSAR QUE LOS SUPERVISORES Y SUPERIORES DE**
392   **ESTOS AGENTES NO SABÍAN LO QUE ESTABA PASANDO... COMO**
393   **PASA AHORA MISMO. ¡ESO NO SE LO CREEN NI ELL@S MISMOS!**
394   **DELINCUENTES CON UNIFORMES DE LA POLICÍA DE PUERTO RICO**
395   **ASALTANDO DELINCUENTES DE LA CALLE PARA ELLOS VENDER LA**
396   **DROGA Y LAS ARMAS QUE LES QUITABAN.**

397   **SR. JUEZ GUSTAVO GELPÍ YO LE ESTOY HABLANDO DE MÁS DE**
398   **VEINTE AÑOS ATRÁS. ESTAMOS EN EL SIGLO XXI Y EL PROBLEMA DE**
399   **POLICÍAS "DELINCUENTOSOS"  CONTINUA.**

400   **¿Y LOS SUPERVISORES DE ESTOS AGENTES... MIRANDO PARA EL**
401   **LADO Y HACIENDOSE LOS CIEGOS,  LOS SORDOS Y LOS MUDOS?**

402   **¿O ES QUE ESTOS SUPERVISORES COBARDES LE TIENEN MIEDO A**
403   **ESTOS COMPAÑER@S CORRUPTOS? ¿NO DICEN POR AHÍ QUE LA**
404   **DISCIPLINA COMIENZA EN EL HOGAR?**

405   **LOS "SURICATOS NOS RECUERDAN EL CASO DEL CERRO MARAVILLA**
406   **Y LA PLANIFICACIÓN PARA ASESINAR AUNOS JOVENES**
407   **PUERTORRIQUEÑOS QUE CREÍAN EN LA INDEPENDENCIA PARA**
408   **PUERTO RICO.**

409   **FUE NAUSEABUNDO Y ASQUEANTE EL VER A AGENTES DE LA**
410   **POLICÍA MINTIENDO DURANTE LAS VISTAS DEL CERRO MARAVILLA.**

411   **POR AHÍ TENEMOS AL SR. ALEJO MALDONADO, A JULIO CÉSAR**
412   **ANDRADES Y A OTROS AGENTES DELINCUENTES QUE VIOLARON LA**
413   **CONFIANZA DEL PUEBLO.**

414   **CRIMINALES VELANDO CRIMINALES. EN UN PERIODO DE CINCO AÑOS**
415   **(2005 – 2010) SEGÚN A.C.L.U. EN UNO DE SUS INFORMES DE JUNIO**
416   **DE 2012. EN ESE PERÍODO DE TIEMPO EN PUERTO RICO SE**
417   **ARRESTARON 1,700 POLICÍAS CORRUPTOS. ¿Y LOS SUPERVISORES Y**
418   **LA ALTA OFICIALIDAD? ¡BIEN , GRACIAS!**

419   **ME ALEGRO MUCHO QUE EL DEPARTAMENTO DE JUSTICIA FEDERAL**
420   **ALLÁ INTREVENIDO EN ESTE ASUNTO PAR PONER FIN A TANTO**
421   **ABUSO, CRIMEN Y MALDAD DE ALGÚN@S DE LOS MIEMBROS DE LA**
422   **POLICÍA DE PUERTO RICO.**

423   **EL ACUERDO PARA LA REFORMA DE LA POLICÍA DE PUERTO RICO**
424   **ESTA ACTIVO DESDE JUNIO DE 2013. Y MIRE USTED SR. JUEZ**
425   **GUSTAVO GELPÍ, COMO A PESAR DE ESTO SIGUEN ARRESTANDO**
426   **"DELINCUENTOSOS" EN LA POLICÍA DE PUERTO RICO.**

427   **POR ESO ESTE PROYECTO DE VIDA Y DE PAÍS, QUE ES EL ACUERDO**
428   **PARA LA REFORMA DE LA POLICÍA DE PUERTO RICO, TENEMOS QUE**
429   **SEGUIR TRABAJANDO BIEN FUERTE PARA IMPLEMENTARLO.**

430  **SR. JUEZ GUSTAVO GELPÍ, ME GUSTARÍA RECOMENDARLE QUE EN**
431  **ESTOS PLANES DE LA REFORMA DE LA POLICÍA DE PUERTO RICO SE**
432  **PUDIERAN INCLUIR A LOS POLICÍAS MUNICIPALES.**

433

434  **Y TERMINO MI PONENCIA DICIENDO:**

435  **"AQUÍ ESTAMOS TODOS UNIDOS BREGANDO CON UN PROBLEMA**
436  **SOCIAL QUE NOS AFECTA A TODOS...**

437  **LA POLICÍA DE PUERTO RICO ES PARTE DE LOS COMPONENTES**
438  **SOCIALES DE NUESTRO PAÍS. Y SOBRE SUS HOMBROS RECAÉ LA**
439  **GRAN RESPONSABILIDAD DE VELAR PORQUE SE RESPETEN LAS**
440  **LEYES DEL PAÍS Y LOS DERECHOS HUMANOS Y CONSTITUCIONALES**
441  **DE TODOS LOS QUE VIVIMOS EN EL ARCHIPIÉLAGO DE PUERTO RICO.**

442  **PERO ESTAN FALLANDO Y TENEMO QUE CON RESPETO PERO SIN**
443  **MIEDO SEÑALARLES ESA FALLAS PARA QUE LAS CORRIJAN.**

444  **EL ACUERDO PARA LA REFORMA DE LA POLICÍA DE PUERTO RICO ES**
445  **UN PROYECTO DE VIDA, ES UN PROYECTO DE PAÍS.**

446  **NO SOMOS ADVERSARIOS, NI ENEMIGOS. SOMOS CIUDADANOS**
447  **UNIDOS BUSCANDO EL RESPETO, LA PAZ, LA EQUIDAD Y EL TRATO**
448  **IGUAL DE LA JUSTICIA PARA TODOS.**

449  **¡GRACIAS POR ESCUCHARME SR. JUEZ**
450  **GUSTAVO GELPÍ!**

451  **"PAPO CHRISTIAN"**

452  **VIERNES 23 DE OCTUBRE DE 2015**

453  **PONCE, PUERTO RICO**







*Consulado General de la República Dominicana*
*San Juan, Puerto Rico, Islas Vírgenes y Turcas y Caicos*

"Año de la Atención Integral a la Primera Infancia"

**Honorable Juez**

**Gustavo A. Gelpí**

**Tribunal de Distrito de Los Estados Unidos para el Distrito de Puerto Rico**

**Ponce, Puerto Rico**

**REF: Ponencia sobre la Implementación del Acuerdo de la Reforma Sostenible de la Policía de Puerto Rico.**

**SU SEÑORÍA:**

Gran espectativa generó en la Comunidad Dominicana residente en Puerto Rico y en el gobierno Nacional, la presentación del informe sobre **la Investigación de la Policía de Puerto Rico** que hiciera el Departamento de Justicia de los Estados Unidos a través de la División de Derechos Civiles, el 05 de Septiembre de 2011, luego de tres años de investigación al cuerpo policial; ello así por que fue una denuncia sobre violaciones de derechos civiles a nuestra comunidad, uno de los elementos que motivaron dicha investigación.

El 17 de julio de 2013, el Secretario de Justicia de Estados Unidos Eric Holder Jr. y el gobernador del Estado Libre Asociado de Puerto Rico, Alejandro García Padilla acuden ante **Su Señoría** y firmaron en San Juan, Puerto Rico el **Acuerdo para la Reforma Sostenible de la Policía de Puerto Rico,** que en el primer párrafo lee y citamos :

**"Las Partes comparecen en este Acuerdo para asegurar que la Policía de Puerto Rico (PPR) ofrezca servicios policiacos que respeten los derechos civiles garantizados por la Constitución y las leyes de los Estados Unidos y del ELA. Este Acuerdo también tiene el objetivo de promover la seguridad pública al proveerle al personal de rango las herramientas, la orientación y los recursos**

Edificio Cobian's Plaza Piso I, Oficina-101-Ponce De León 1607, Pda. 23, S.J. P.R. 00909.-Apt. 8540-0540, San Juan, P.R. 00910-. Tel. (787)725/9550/9554, 721-2700. Fax (787)-721-7820. Email: consuladodominicanopr@gmail.com
**www.consudompr.com**



*Consulado General de la República Dominicana*
*San Juan, Puerto Rico, Islas Vírgenes y Turcas y Caicos*

*"Año de la Atención Integral a la Primera Infancia"*

que necesitan para combatir efectivamente el crimen. Las Partes reconocen que la seguridad pública, las actuaciones policiacas constitucionales y la confianza de la comunidad en su cuerpo de policía son interdependientes. La implementación plena y sostenida de este Acuerdo protegerá la seguridad pública, garantizará los derechos civiles de los individuos y aumentará la confianza del público en la policía." Termina la cita.

Como puede apreciarse las partes asumen un compromiso de reforma completo de una institución que está llamada a brindar un servicio al pueblo de Puerto Rico y a todos los habitantes y residentes en la isla, salvaguardando los derechos que les confieren la Constitución y las leyes tanto de Puerto Rico como de Los Estados Unidos de América.

Los principios sobre los que descansa este acuerdo son fundamentales en toda sociedad democrática y garantizan un régimen de convivencia basado en la igualdad, el respeto y el no discrimen

Es mucho el trabajo y largo el camino, pero toda empresa humana que cuente con la voluntad, el trabajo y compromiso de gobierno y sociedad, más temprano que tarde rendirá los frutos, que en beneficio de todos se cosecharán.

A lo largo de la historia, el pueblo dominicano ha recibido del pueblo puertorriqueño cariño y solidaridad.

Uno de nuestros héroes indenpendentista, el General Antonio Duvergé, sin cuya espada hubiese sido más difícil la independecia nacional, nació en Hormigueros, Puerto Rico en 1807, donde encontraron refugio sus padres, huyendo de la persecución haitiana. Es conocida la contribución del insigne Puertorriqueño Eugenio María de Hostos al sistema educativo dominicano y más reciente aún, el cobijo libertario de Puerto Rico para con los dominicanos que perseguía la tiranía de Rafael Leonidas Trujillo.

Edificio Cobian's Plaza Piso I, Oficina-101-Ponce De León 1607, Pda. 23, S.J. P.R. 00909.-Apt. 8540-0540, San Juan, P.R. 00910-. Tel. (787)725/9550/9554, 721-2700. Fax (787)-721-7820. Email: consuladodominicanopr@gmail.com
www.consudompr.com



*Consulado General de la República Dominicana*
*San Juan, Puerto Rico, Islas Vírgenes y Turcas y Caicos*

*"Año de la Atención Integral a la Primera Infancia"*

No obstante, minorías enquistadas en algunas instituciones- de la que no escapa la Policía de Puerto Rico- discrimina y maltrata a la humilde y laboriosa comunidad dominicana residente en la Isla del Encanto, o nos presentan en chistes sociales como paradigma de "bruto", "negro" y "pobre" y nuestras mujeres, según esa injusta distorsión, solo estan capacitadas para trabajar detrás de una barra en un bar. En definitiva, para pocos en muchas instituciones, el dominicano o la dominicana es el esteriotipo con el perfil de "culpable", "sospechoso" o "responsable", "a la soltá", para usar un término coloquial boricua.

Por suerte, **Su Señoría**, eso ha ido cambiando en toda la sociedad puertorriqueña y nuestra gente se ha ido abriendo paso y ganado el respeto y aprecio de cada vez más personas e instituciones en esta bella tierra, entre la que se cuenta la Policía de Puerto Rico.

El Consulado General de Republica Dominicana en San Juan Puerto Rico, ha podido constatar una mejoría sustancial del trato recibido para nuestra comunidad por parte de la Policía de Puerto Rico, luego de implantada **La Reforma** de dicho cuerpo policial y firmado el Acuerdo para la Reforma Sostenible de la que hemos hecho referencia anteriormente. Para esa mejoría podemos mencionar algunas medidas específicas implantadas por ese cuerpo de orden público como son:

- Directriz prohibiendo a los miembros de la policía actuar como brazo operativo del Servicio de Inmigración de Los Estados Unidos de América y procesar al acusado de delito o falta de conformidad con las leyes del Estado Libre Asociado de Puerto Rico.
- Atención oportuna de querella y sin discrimen por orígen nacional a las víctimas de violencia doméstica, sin importar el estatus migratorio.

Edificio Cobian's Plaza Piso I, Oficina-101-Ponce De León 1607, Pda. 23, S.J. P.R. 00909.-Apt. 8540-0540, San Juan, P.R.
00910-. Tel. (787)725/9550/9554, 721-2700. Fax (787)-721-7820. Email: consuladodominicanopr@gmail.com
**www.consudompr.com**



*Consulado General de la República Dominicana*
*San Juan, Puerto Rico, Islas Vírgenes y Turcas y Caicos*

*"Año de la Atención Integral a la Primera Infancia"*

- Resolución de querellas administrativas contra un agente de la policía en un plazo razonable y facilidad para radicarla.
- Mejora en la comunicación con las diferentes áreas policiales para canalizar quejas o dudas sobre una situación en particular.
- Acercamiento de la Policía de Puerto Rico  con las instituciones comunitarias dominicanas radicadas en Puerto Rico.
- Intercambio profesional y deportivo de la Policia de Puerto Rico con la Policía Nacional Dominicana.

Recientemente la opinión pública pudo observar y esta Sede Consular siguió de cerca, como se apresaron, procesaron y se logró convicción a tres agentes policiales-uno de la Polica Municipal de San Juan y dos de la Policía de Puerto Rico- por cargos de secuestro, robo y allanamiento ilegal contra un ciudadano dominicano. Acciones de ese tipo reviven la esperanza y la confianza en la policía y en las demás instituciones encargadas de velar por la justicia.

**Honorable juez**, esta Sede Consular valora en justicia los cambios de conducta y de acción por parte de la policía de Puerto Rico para con nuestra comunidad, no obstante, nos mantendremos vigilantes y cooperadores para que estos pasos de avances se consoliden y se amplien.

Tenga la seguridad, este Tribunal, que denunciaremos con firmeza, por los canales correspondientes y dentro de los parámetros que nos concede la Convención de Viena, cualquier acto o acción que viole los derechos que le confieren la Constitución y las leyes de Estados Unidos y Puerto Rico a nuestros compatriotas. Con la misma voz y responsabilidad que reconocemos los cambios que favorecen a nuestra comunidad, denuciaremos los abusos y atropellos, de ocurrir.

Edificio Cobian's Plaza Piso I, Oficina-101-Ponce De León 1607, Pda. 23, S.J. P.R. 00909.-Apt. 8540-0540, San Juan, P.R. 00910-. Tel. (787)725/9550/9554, 721-2700. Fax (787)-721-7820. Email: consuladodominicanopr@gmail.com
www.consudompr.com



*Consulado General de la República Dominicana*
*San Juan, Puerto Rico, Islas Vírgenes y Turcas y Caicos*

*"Año de la Atención Integral a la Primera Infancia"*

Sabemos que la **Reforma de la Policía de Puerto Rico** conlleva un proceso largo y complejo que debe culminar, según lo planteado por las partes, en un **Nuevo Modelo Policial Comunitario.** En el camino debemos todos, gobiernos, Policía y comunidad aunar esfuerzos para lograr dicho objetivo.

Todos queremos una Policía de Puerto Rico moderna, eficiente, profesional, honesta y amiga del ciudadano; que ejecute prácticas policiales constitucionales, no basadas en caprichos o conductas discriminatorias. En esa genuina aspiración se puede contar con nuestro humilde aporte.

**Su Señoría**

El Gobierno de la República Dominicana, através de esta Sede Consular, reconoce el esfuerzo, la voluntad y la cooperación que han hecho los gobiernos de Estados Unidos y de Puerto Rico para reformar una institución que como la Policía debe ofrecer una labor de primer orden en cualquier sociedad moderna, como lo es proteger vidas y propiedades en un clima de paz dentro de un marco de legalidad, todo lo cual permite el pleno desarrollo individual y colectivo.

**Honorable Juez**, este servidor queda a las órdenes de la Corte para cualquier pregunta que su Señoría considere pertinente en relación a lo expuesto.

Muchas gracias.

En Ponce Puerto Rico, hoy viernes 23 de octubre de 2015

**Sr. Franklin Grullon**
Cónsul General de la República
Dominicana, en San Juan, Puerto Rico e Islas Vírgenes

Edificio Cobian's Plaza Piso I, Oficina-101-Ponce De León 1607, Pda. 23, S.J. P.R. 00909.-Apt. 8540-0540, San Juan, P.R. 00910-. Tel. (787)725/9550/9554, 721-2700. Fax (787)-721-7820. Email: consuladodominicanopr@gmail.com
**www.consudompr.com**

## Ponencia Facultad de Derecho de la Pontificia Universidad Católica de Puerto Rico
## Vista Publica sobre la Reforma de la Policía de Puerto Rico
## 22 de octubre de 2015

El pasado 10 de septiembre de 2015, luego de una reunión en la cual estuvieron presentes, el Lcdo. Javier René Oronoz, Decano Asociado de la Escuela de Derecho de la Pontificia Universidad Católica de Puerto Rico, el Profesor Fernando Torres Ramírez, el Profesor Octavio J. Capó Pérez, Lcdo. Alfredo Castellanos y el Sr. Erick Guzmán, ( Personal del TCA), se nos invitó a una audiencia a llevarse a cabo el 22 de octubre de 2015, en el caso de United Sates of America v. Commonwealth of PR and The Puerto Rico Police Department, caso número 3:12-cv-2039 (GAG). Posteriormente y mediante comunicación escrita del 7 de octubre de 2015, se nos solicitó hacer recomendaciones con énfasis en que nuestra participación contribuya al cumplimiento de las estipulaciones número 73 y 158 del Agreement for the Sutainable Reform of the Puerto Rico Police Department y las cuales citamos a continuación:

> "73. PRPD shall develop a protocol to seek formal feedback from the prosecutor's office, the public defender's office, and Commonwealth judges on a regular basis regarding the quality of PRPD investigations, arrests, court testimony, and indicia of misconduct and to make operational and policy changes based upon this feedback. In addition, PRPD shall refer to SPR for investigation any information regarding specific incidents of possible officer misconduct received through this protocol."

> "158. PRPD shall establish an executive-level liaison committee consisting of high-level command officers of the PRPD who communicate, on at least a quarterly basis, with representatives of federal and local criminal justice components in all regions in Puerto Rico, including judicial courts, prosecutors, the University College, and municipal police departments. The committee shall seek mutual feedback and information on improving Puerto Rico's criminal justice system, including performance issues or concerns related to PRPD, its officers, employees, or units. All PRPD high-level commanders who participate in the executive-level liaison committee shall ensure that all allegations of misconduct or potential

1

criminal activity are referred to SPR and/or PRDOJ for investigation, as appropriate."

En primera instancia creo conveniente, tomar como ejemplos tres (3) casos resueltos por nuestro Honorable Tribunal Supremo de Puerto Rico, de los cuales entiendo se relatan hechos que en mi opinión demostraron violaciones a los derechos civiles o conducta impropia de algunos miembros de la Policía de Puerto Rico y que exigen a raíz de esas nefastas experiencias la necesidad de que los Agentes de la Policía sean adiestrados para evitar errores cometidos por sus pares en la investigación de un crimen. A saber:

1. En <u>Pueblo vs. Vélez Bonilla</u>, 2013 TSPR 121, allá para agosto del 2010, ocurrió un robo en una estación de gasolina en el Municipio de Yauco. Ese establecimiento comercial contaba con un sistema de cámaras de seguridad. Según el cajero de dicha estación de gasolina, en un momento dado, él observó a través de las cámaras de seguridad cuando el individuo que cometió el robo se marchaba en un vehículo de motor. En un momento dado, la Policía de Puerto Rico observó las imágenes que había grabado el sistema de cámaras de seguridad de la estación de gasolina. El agente Ricardo Pontón Cruz, declaró en el Tribunal que él hizo una regrabación del video en un dispositivo removible (USB), pero que no había podido reproducirlo en su oficina, por lo que no estaba disponible para ser entregado en el Tribunal. Curiosamente el Ministerio Público anunció que no iba a utilizar ese video durante la vista preliminar. Luego de que se presentaron acusaciones, el 18 de octubre de 2010, se llevó a cabo una vista para discutir las mociones presentadas por las partes, entiéndase, por la defensa del acusado sobre descubrimiento de prueba y las del Ministerio Público. El Ministerio Público informó que tenía el video y que haría las gestiones necesarias para traer el equipo y poder verlo, ya que no lo habían podido reproducir en la oficina. El 12 de noviembre de 2010, la defensa del acusado, radicó una moción en la cual hizo constar que le entregaron dos (2) discos compactos (CD's) por parte del Ministerio Público y las gestiones infructuosas para poder ver su contenido. En otra vista llevada a cabo el 23 de noviembre de 2010, la defensa del acusado indicó que no podía ver el video que había entregado el Ministerio Público. El Fiscal se comprometió a ver el contenido en su oficina de los CD'S entregados a la defensa. El 10 de diciembre de 2010, en otra vista se informó que ni siquiera el técnico de computadoras del Tribunal pudo reproducir el video. El 28 de enero de 2011, se llevó a cabo otra vista, en la cual se acordó acudir con el Agente Pontón a la gasolinera para intentar ver el video desde el dispositivo USB del agente. El Agente indicó que la cinta del establecimiento se había borrado, por lo que tenía que verificar si se podía ver desde la copia que había realizado. El 2 de marzo de 2011, se llevó a cabo otra vista judicial, en la cual el dueño de la gasolinera manifestó que no podían ver el video en el equipo del local porque había

2

ocurrido otro asalto y entendía que se podía borrar el video de este último incidente. El Honorable Tribunal citó al agente Ricardo Pontón para que acudiera con su USB a la gasolinera para ver si se podía reproducir el video desde el dispositivo. El 23 de marzo de 2011, las partes acudieron al Honorable Tribunal junto al agente Ricardo Pontón y allí se les ordenó acudir a la gasolinera ese mismo día para ver el video desde el equipo del local. Al otro día se informó que no podían ver el video en la gasolinera y se acordó con el Fiscal, para que éste se llevara el USB al instituto de Ciencias Forenses para que un especialista intentara extraer el video. El 27 de abril de 2011, todavía no se había podido ver el video y se informó que se estaba esperando por los resultados del Instituto de Ciencias Forenses. El 13 de mayo de 2011, la defensa del acusado informó que había entregado los dos (2) CD que había entregado el Fiscal para que fuera examinado por el perito del Instituto de Ciencias Forenses. El 18 de mayo de 2011, se llevó a cabo otra vista para dilucidar el asunto del video. El Ministerio Público informó que no tenía el video solicitado, toda vez que el sistema de seguridad de la gasolinera tiene una duración de treinta (30) días y pasado ese tiempo lo grabado en el video no se retiene. Además, informó que la sección de evidencia digital y multimedios del Instituto de Ciencias Forense indicaba que no se podía recuperar el video del CD; que había un video captado en el "pen drive" del Agente Pontón, pero que, **después de haberle hecho una foto secuencia, dicho video correspondía a los hechos de otro caso. (Énfasis nuestro)** Luego de otros incidentes procesales, el Honorable Tribunal de Primera Instancia desestimó las acusaciones, ya que la no disponibilidad del video, impidió a la defensa presentar su caso de una manera adecuada. El Honorable Tribunal de Apelaciones denegó la expedición del recurso de certiorari. El Honorable Tribunal Supremo luego de hacer un análisis desde el punto de vista de evidencia potencialmente exculpatoria, devolvió el caso al TPI para que evaluara si se trataba de una actuación de mala fe o por negligencia por parte del Estado, en cuanto al video solicitado por la defensa del acusado. Cabe mencionar que el Honorable Tribunal Supremo de Puerto Rico, expresó y citamos y citamos en lo pertinente que:

> "La justicia demanda la verdad porque precisa de ella para manifestarse. 'Basta recordar que el propósito del juicio no es obtener una convicción, sino la depuración de hechos en búsqueda de la verdad'; de ahí, que el debido proceso de ley constitucional exija que el acusado tenga la oportunidad de examinar con tiempo suficiente, no solo la prueba que obra en su contra-en vías de impugnarla-, sino aquella que obra a su favor, sea sustantiva o para impugnación."

2. Pueblo vs. Millán Pacheco, 2011 TSPR 118. En este caso el Agente Fernando Tarafa, asignado a la Región Policiaca de Ponce, el 7 de marzo de 2009, se presentó junto a tres (3) agentes policiacos más y en dos vehículos oficiales, al apartamento del entonces sospechoso Ramón Millán Pacheco, ubicado en el Residencial Perla del Caribe en Ponce.

3

Estando allí, el agente Tarafa le pidió a Millán Pacheco que lo acompañara (sin previa orden judicial de arresto), lo transportaron en el asiento trasero de uno de los vehículos oficiales hasta la Comandancia de la Policía. Una vez en la Comandancia, Millán Pacheco es conducido a un cuarto en el segundo piso, donde el Agente Tarafa comienza a interrogarlo **sin advertirle primero de sus derechos**, conocidas como las advertencias de Miranda. Despúes de aproximadamente una hora de interrogatorios, el Agente Tarafa confronta en un momento dado a Millán Pacheco con un conflicto entre lo que éste estaba narrando y lo que otras personas ya entrevistadas habían narrado al agente. En ese momento y como producto de esa confrontación, Millán Pacheco comienza a llorar y admite haber dado muerte al Sr. Luis A. León Ramírez, quien fuera un guardia de seguridad en una finca en la que Millán Pacheco trabajaba. Admitido ese hecho, el agente Tarafa inmediatamente lo detiene para que éste no declarara más **y procede a leerle las advertencias de Miranda**, las cuales Millán Pacheco firmó. Entonces el Agente Tarafa instó a Millán Pacheco a narrar lo ocurrido quien confiesa todos los detalles de lo acontecido el día de los hechos.

Posteriormente, el Honorable Tribunal de Primera Instancia ordenó la supresión de la confesión. El Estado radicó un recurso certiorari ante el Honorable Tribunal de Apelaciones y dicho Tribunal revocó al Juez del Tribunal de Primera Instancia. El Sr. Millán Pacheco presentó recurso certiorari ante el Honorable Tribunal Supremo de Puerto Rico.

Cabe señalar que el Honorable Tribunal Supremo al comienzo de la opinión expresó y citamos:

> "Cierto que al mantener los postulados de una democracia a veces… [alguno] logra escapar de su justo castigo, pero ese es el precio que, aunque doloroso, hemos escogido pagar, porque si abandonamos estos principios algún día terminaremos pagando el precio de nuestra propia libertad."

El Honorable Tribunal Supremo revocó el dictámen del Honorable Tribunal de Apelaciones, determinando que procedía la supresión de la confesión ante la estrategia del Agente Investigador de esperar hacerle las advertencias Miranda luego de que obtuviera a través de la misma la evidencia que incriminaba al sospechoso de la comisión del delito y citamos en lo pertinente de dicha opinión:

> "Ante una estrategia como esa, las Advertencias de Miranda provistas a mitad del interrogatorio con el propósito de conseguir una posterior confesión son, conforme a lo resuelto en Missouri v. Seibert, supra, inadecuadas, y, por lo tanto, la renuncia al derecho a no auto incriminarse que asiste al ciudadano no es inteligente o bien informada. En casos como este y conforme al discutido

4

precedente federal, la única manera en que las Advertencias de Miranda pueden constituirse en unas adecuadas y la renuncia del ciudadano una informada en cumplimiento con Miranda v. Arizona, supra, en que **al momento de la admisión se incluya, de manera clara y expresa en las Advertencias, el que nada de lo que la persona ha dicho hasta ese momento puede ni será utilizado en su contra, incluyendo la declaración incriminatoria que acaba de hacer; o que ocurra una interrupción substancial de tiempo y circunstancias entre las dos partes del interrogatorio que permitan objetivamente concluir que hubo una renuncia inteligente y voluntaria a los derechos bajo la Quinta Enmienda."** (énfasis nuestro)

3. En <u>Pueblo vs. Velázquez Colón</u>, 2088 TSPR 124, de entrada nuestro Honorable Tribunal Supremo hizo las siguientes expresiones y citamos:

"La capacidad de defensa social y represión del crimen en los países democráticos radica en la sabiduría de sus leyes y en la idoneidad de sus funcionarios; jamás en un procedimiento criminal mutilado y opresivo. No es... el momento de ofrecer la justicia como cordero de sacrificio en aras de la paz y de la seguridad del pueblo. La gran fuerza de la Ley y de las cortes como espada protectora de la ciudadanía será más respetable cuanto más diáfanos y esclarecidos sean sus métodos de enjuiciamiento."

En dicho caso, la testigo de cargo, Zoe Díaz Colón, era una confidente participante retribuída por el Estado. Antes del Juicio la defensa del acusado solicitó descubrimiento de prueba, incluyendo examinar todo acuerdo, ofrecimiento, convenio o información sobre inmunidad, pagos y etc., que se hubiese hecho por el Estado o sus funcionarios a testigos y/o a personas relacionadas con los testigos incluyendo al confidente. En primera instancia, el Fiscal se limitó a negar que a la testigo Zoe Díaz Colón se le hubiese ofrecido inmunidad. Luego de varios incidentes procesales en los cuales la defensa reiteraba sus solicitudes de que no se había cumplido con el descubrimiento de prueba, finalmente el día del juicio, Fiscalía entregó parte de la prueba solicitada al abogado del acusado. Entre los documentos entregados el día del juicio, se desprendían datos de los nombres de los testigos que fueron entrevistados por el Ministerio Publico y cuyas declaraciones contradecían la declaración jurada y el testimonio de la testigo principal de la Fiscalía Sra. Zoe Díaz Colón. Tribunal no accedió a la solicitud de suspensión de la defensa que alegaba que ante la entrega tardía de esa prueba no estaba preparada. Se celebró el juicio en su fondo por tribunal de dereco, encontrándose culpables y convictos a los tres acusados. Antes de que se dictara sentencia, se presentó una moción de nuevo juicio bajo el fundamento de que no fue hasta el primer día de juicio que la Fiscalía le entregó al

5

abogado de la defensa gran parte del descubrimiento de prueba, incluyendo evidencia que no pudo ser investigada por la falta de tiempo suficiente. Tribunal declaró no ha lugar la solicitud de nuevo juicio. Tribunal de Apelaciones confirmó la decisión del Tribunal de Primera Instancia. Tribunal Supremo declaró no ha lugar la solicitud de certiorari hecha por el Sr. Carmelo Velázquez Colón. Posteriormente, éste presentó una solicitud de nuevo juicio acompañada de una declaración jurada de la testigo principal del Ministerio Publico, Zoe Díaz Colon y de la cual se desprendía en lo pertinente, que ella no tenía conocimiento personal de cómo ocurrieron las muertes, que testificó durante el juicio porque le ofrecieron una casa, dinero en efectivo y la custodia de los hijos que había procreado con uno de los co-acusados. Mencionó que se había enterado recientemente del suicidio en prisión de una de las personas convictas en uno de los casos que ella testificó, cosa que le hizo sentirse sumamente culpable, al punto de que ella intentó suicidarse en el albergue de testigos y victimas. Expresó además, que la madre de su compadre asesinado **y el Agente Francisco Báez la habían presionado. Explicó que luego de diez (10) sesiones, en las que los agentes le enseñaban fotos de los acusados y la llevaban al lugar de los hechos, se aprendió las declaraciones que debía dar y finalmente ofreció en fiscalía.** (Énfasis nuestro) Surgió de la prueba sometida con la solicitud de nuevo juicio, que Zoe Díaz Colon había firmado un contrato para prestar servicios como cooperadora retribuida el 2 de agosto de 1995, o sea, un día antes en que se alega que ocurrió el asesinato por el cual fue juzgado y convicto el Sr. Carmelo Velázquez Colon. Sin embargo, la declaración jurada que ella prestó relacionado a dicho asesinato fue hecha casi tres años después de la muerte. Además, surgió que en la tarde del día en que prestó la declaración jurada le entregaron $200.00 como remuneración por información prestada en el caso de muerte de otra persona. Nuevamente el Tribunal de Primera Instancia, denegó la solicitud de nuevo juicio, luego de que se celebrara una vista en la cual declaró el Agente Francisco Báez, quien expresó que los expedientes policiacos siempre estuvieron disponibles en el CIC y que contrario a lo que le informaron a la defensa y al Tribunal el primer día de juicio, nunca estuvieron perdidos. Todo ello, a pesar de que Fiscalía había dicho el primer día de juicio que dicho expediente estaba perdido pero que había aparecido. Surgió además durante dicha vista que el contrato con Zoe Díaz Colon, fue entregado a la Fiscalía en otro caso donde Zoe Díaz Colon fue testigo. El Tribunal de Apelaciones denegó revocar la decisión del Tribunal de Primera Instancia. Se radicó recurso de certiorari ante el Tribunal Supremo de Puerto Rico y fue denegado. **Sin embargo, mediante moción de reconsideración se expidió el auto de certiorari y luego se emitió la opinión en la cual se ordenó la celebración de un nuevo juicio. (Énfasis nuestro)**

Reiteramos que estos casos son solo una muestra reciente de nuestra jurisprudencia, en la cual se demostró conducta impropia por parte de algunos

6

funcionarios del Estado en el manejo y encausamiento de casos de naturaleza penal contra esos ciudadanos.

El Honorable Tribunal Supremo Federal, se ha expresado mediante opinión en casos sobre alegadas violaciones de derechos civiles relacionados con intervenciones de agentes del orden público, inclusive sobre el aspecto de falta de entrenamiento por parte de los gobiernos a sus empleados para evitar reclamos por alegadas violaciones a los derechos civiles. Véase: Connick, District Attorney, Et Al v. Thompson 131 S. CT. 1350 (2011); Monell v. New York City Dept. of Social Servs., 436 US 658; Canton vs. Harris, 489 US 378 (1989). En limitadas circunstancias, la decisión de un gobierno local de no entrenar ciertos empleados acerca de su deber legal de evitar la violación de los derechos de los ciudadanos, podría constituir base para responsabilizarlos bajo 42 U.S.C. 1983. (42 U.S.C.A. 1983) (Civil Rights Act); Board of Comm'rs of Bryan City. v. Brown, 520 US 397, 410 (Deliberate indifference in this context requires proof that city policymakers disregarded the "known or obvious consequence" that a particular omission in their training program would cause city employees to violate citizens' constitutional rights.)

Por otra parte, el deber de revelar evidencia exculpatoria también aplica a la Policía y no solo a la Fiscalía. Véase:  Drumgold v. Callahan, (1st Cir. Jan. 31, 2013); Tennison v. City and County of San Francisco, 570 F.3d 1078 (9th Cir. 2009).

El Profesor Octavio J. Capó Pérez fungió como Fiscal del Departamento de Justicia de Puerto Rico durante varios años y como parte de sus experiencias advino en conocimiento de varias actuaciones por parte de agentes del orden público sobre posibles violaciones a los derechos civiles de ciudadanos. En su opinión, algunas de esas actuaciones fueron el producto de la falta de entrenamiento adecuado a dichos agentes del orden público para manejar adecuadamente arrestos, registros y otras tareas. Sin embargo, en otros casos, de nada hubiese servido entrenamiento previo, puesto que se demostró actuaciones ilícitas intencionales de algunos funcionarios del orden público. En atención a ello, el fiscal debe ser el primer cedazo para detectar actuaciones impropias de algunos miembros de la fuerza policiaca. No podemos perder de vista que el fiscal es el que autoriza o no la radicación de cargos contra ciudadanos que se alega infringieron la ley o puede percatarse durante otras etapas del proceso criminal sobre posibles violaciones de derechos civiles.

Además de la fase de entrenamiento continuo, también es importante contar con mecanismos en la Policía de Puerto Rico para detectar aptitudes negativas que muy probablemente desembocarán en situaciones en las cuales algunos policías incurran en actos ilegales y tomar medidas correctivas a tiempo.

La Escuela de Derecho de la Pontificia Universidad Católica de Puerto Rico, cuenta con una facultad de profesores que pueden aportar al entrenamiento y la enseñanza en particular sobre aspectos que muy bien van a contribuir a la profesionalización de los miembros de la Policía de Puerto Rico. Definitivamente los miembros de la Policía de Puerto Rico se envuelven diariamente en situaciones que tienen repercusiones legales, por ello es de suma importancia el entrenamiento a éstos sobre aspectos de Derecho. Además, podemos enseñar sobre aspectos éticos y reforzar la necesidad de que cuando un policía actúa teniendo en mente buenos principios éticos y morales, nada lo hará actuar incorrectamente.

Somos de la opinión de que parte del entrenamiento que podemos ofrecer como Institución Educativa, debe ser ofrecido en un ambiente fuera de las facilidades de la Policía de Puerto Rico. Es importante que los miembros de la Policía de Puerto Rico, se percaten acudiendo a nuestras facilidades de los actos estándares de enseñanza y de valores éticos o morales que se viven y respiran a diario en nuestra Institución. Sugerimos además, que el entrenamiento debe comenzar por aquellos miembros de la Policía pertenecientes a divisiones que están presentando más problemas en su desempeño o que han sido objeto de crítica directa por parte de la ciudadanía en general.

Los componentes de nuestra Institución universitaria pueden además, servir de mediadores o árbitros en controversias que surjan entre la ciudadanía y la Policía de Puerto Rico. También, podrían participar como observadores en situaciones que requieran la intervención policiaca con la ciudadanía, con el propósito de tratar de garantizar que se cumplan con la protección de derechos civiles a los ciudadanos.

Recomendamos que a todos los policías, se les debe brindar seminarios en las siguientes áreas:

1. Arrestos;

2. Registros y allanamientos;

3. Métodos de identificación de sospechosos;

4. Advertencias de Miranda;

5. Manejo de evidencia;

6. Detección y protección de evidencia exculpatoria;

7. Etapas judiciales en un proceso de naturaleza penal;

8. Derecho Penal con énfasis en aspectos tales como:

    a. Causas de exclusión de responsabilidad penal;

    b. Prescripción de los delitos;

    c. Delitos contra la integridad corporal;

    d. Delitos contra la propiedad;

    e. Delitos contra la Indemnidad Sexual;

    f. Delitos contra la Función Pública;

    g. Ley de Sustancias Controladas;

    h. Ley para la prevención y protección contra la violencia domestica;

    i. Ley de Armas de 2000;

    j. Ley de tránsito;

9. Derecho probatorio con énfasis en las siguientes áreas:

    a. Privilegios evidenciaros;

    b. Autenticación e identificación;

    c. Prueba de referencia;

    d. Contenido de escritos o documentos;

    e. Derecho de confrontación;

10. Asuntos relacionados a menores;

11. Derechos Civiles de los ciudadanos y su protección;

12. Ética;

13. Manejo de estrés y emociones;

El listado anterior podría ser ampliado con otros seminarios dependiendo de las recomendaciones que surjan según se vayan adiestrando y evaluando a los miembros de la Policía de Puerto Rico.

Los grupos sujetos a adiestramiento y evaluación no deben estar compuestos por más de cincuenta (50) miembros de la Policía a la vez y es necesario que se acredite mediante técnicas de avalúo, si lo instruido fue comprendido y recopilado adecuadamente

por cada miembro de la Policía participante. El material educativo que se debe entregar a los miembros de la Policía, debe ser redactado de una forma que pueda entenderse fácilmente por éstos y que les sirva como un manual de repaso y cotejo ante las diferentes situaciones que le puedan surgir en su desempeño.

Basado en la muestra de las tres opiniones emitidas por el Honorable Tribunal Supremo de Puerto Rico, anteriormente reseñadas, está más que claro que de la experiencia de los errores pasados se puede aprender mucho para evitarlos. Por eso es de suma importancia de que las personas que adiestren a los miembros de la Policía de Puerto Rico, tengan un gran acervo de conocimientos y experiencias.

Por último, sugerimos que todos los adiestramientos a los miembros de la Policía de Puerto Rico, se vuelvan a repetir sobre las áreas anteriormente recomendadas, según vayan actualizándose sobre la marcha a través de opiniones judiciales, leyes o reglas.

Respetuosamente sometido,

Profesor Octavio J. Capó Pérez

10



**PONTIFICIA UNIVERSIDAD CATÓLICA DE PUERTO RICO**
**ESCUELA DE DERECHO**
**PONCE, PUERTO RICO**



# Reflexiones y Recomendaciones en Torno al Acuerdo Para la Reforma Sostenible de la Policía de Puerto Rico

Profesor Fernando L. Torres Ramírez[1], J.D.; LL.M.

## I.

Hon. Gustavo A. Gelpí, Juez de Distrito Federal

**[Saludo Protocolar]**

[Con la venia del Honorable Tribunal.]

En la Introducción del "Acuerdo Para la Reforma Sostenible de la Policía de Puerto Rico" suscrito el 17 de julio de 2013 por el Departamento de Justicia de los Estados Unidos de América [EE.UU.] (DOJ) y el Estado Libre Asociado de Puerto Rico en el Caso No. 3:12-cv-2039 (GAG) se dice: *"en el año 2008 el DOJ inició una investigación de la PPR [Policía de Puerto Rico] acerca de un presunto patrón o práctica de uso de fuerza excesiv[a], registros y allanamientos inconstitucionales y <u>prácticas policiacas discriminatorias</u>"*[2].

Luego de la publicación de un informe del DOJ del 5 de septiembre de 2011, y que la PPR acogiera la investigación y se comprometieran a apoyar los esfuerzos para establecer reformas frente a los hallazgos contenidos en ese informe, durante el año 2012 el DOJ y funcionarios de la PPR se reunieron en múltiples ocasiones.

---

[1] Catedrático Asociado.

[2] El DOJ realizó la investigación conforme a lo dispuesto en la "Ley Para el Control de Crímenes Violentos y Orden Público de 1994" (*Violent Crime Control and Law Enforcement Act*) 42 USC §1441 y las disposiciones de la "Ley de Control del Crimen General y Seguridad en las Calles" (*Omnibus Crime Control and Safe Streets Act*), 42 USC §3789d. Véase el acápite 5 de la introducción, páginas 3 y 4 del Acuerdo.

Reflexiones y Recomendaciones en Torno al Acuerdo Para la Reforma Sostenible de la Policía de P.R.
Profesor Fernando L. Torres Ramírez
Página 2

El 21 de diciembre de 2012, el DOJ presentó una demanda contra el Estado Libre Asociado de Puerto Rico y la PPR para asegurar el desarrollo y la implantación de nuevas políticas que atendieran los señalamientos contenidos en el informe del 5 de septiembre de 2011 del DOJ[3].

Los esfuerzos de los funcionarios de DOJ y del gobierno del Estado Libre Asociado (y por supuesto de la PPR) provocaron que las partes firmaran el 17 de julio de 2013 un documento intitulado *"Agreement for the Sustainable Reform of the Puerto Rico Police Department"* que utilizando una frase del Honorable Gustavo A. Gelpí[4] -ha sido traducido en el idioma de Cervantes- como "Acuerdo para la Reforma Sostenible de la Policía de Puerto Rico" (en adelante el "Acuerdo").

Como parte de las estipulaciones que fueron acogidas por la Corte el mismo 17 de julio de 2013, y que por tanto, no solo es un contrato transaccional si no una "Sentencia Parcial" de este Ilustre Foro, las partes seleccionaron un "Asesor de Cumplimiento Técnico" (TCA por sus siglas en inglés, o ACT si se alude a las siglas en español) cuyos deberes y responsabilidades se desglosan en la Parte XIV A del Acuerdo[5]. En el párrafo 275 de éste se establece que el TCA *"reclutará, empleará o contratará personas o entidades adicionales para realizar las tareas asignadas en virtud del presente acuerdo"*. Por invitación de uno de los miembros de ese equipo, el licenciado Alfredo Castellanos, avalada eventualmente por el señor Juez Gelpí, hemos comparecido a estas vistas en representación de la Escuela de Derecho de la PUCPR, de igual forma lo ha hecho el compañero Octavio Capó Pérez, quien se ha dirigido ante este Ilustre Foro. Debo aclarar que mis expresiones, algunas de las cuales he compartido informalmente con el Decano, Profesor José A. Frontera Agenjo, y con el Decano Asociado, Profesor René A. Javier Oronoz, no necesariamente constituyen una expresión formal de nuestros profesores.

---

[3] Véase el acápite 8 de la Introducción, páginas 4 y 5 del Acuerdo.

[4] Véase la Orden de Calendarización sobre esta vista pública ("Scheduling Order: Ponce Public Hearing on the Puerto Rico Police Reform") suscrita por el Honorable Gustavo A. Gelpí el 4 de octubre de 2015. Asesor de Cumplimiento Técnico, case 3:12-cv-02039 – GAG Document 266.

[5] Parte XVI A, acápites 225-228, páginas 90 y 91 del Acuerdo.

Reflexiones y Recomendaciones en Torno al Acuerdo Para la Reforma Sostenible de la Policia de P.R.
Profesor Fernando L. Torres Ramírez
Página 3

En gran medida las mismas están matizadas y esculpidas por mi experiencia docente y mis vivencias como abogado, Juez Municipal, Juez de Distrito Designado y Juez Superior.

De entrada debemos recordar que: "*el problema de corrupción y uso indebido de la fuerza por nuestra policía aparece documentado desde [los] inicios [de la soberanía estadounidense]*". Véase, Pedro Malavet Vega, El Sistema de Justicia Criminal en Puerto Rico, Ponce, P.R.; Ediciones Lorena, 2007, páginas 155, *et seq.*

Las manifestaciones de la corrupción policíaca pueden ir desde incidentes muy comunes, como funcionarios de orden público que por falta de capacitación o intereses variados so pretexto de combatir la criminalidad violan los derechos de los seres humanos, hasta episodios de nuestra historia en que se les ha imputado actos delictivos a miembros de la PPR del más alto rango. En el Informe del Comité Evaluador Externo de la Policía de Puerto Rico: La Corrupción en la Policía de Puerto Rico[6], publicado el 1 de mayo de 2008, se menciona el caso del Coronel George Shanton que ocupó el cargo de Jefe de la Policía de 1909 al 1922. El historiador Guillermo A. Baralt narra cómo, unos meses después de su nombramiento, el Juez Federal Arthur F. Odlin se reunió con el Gobernador Reily y le mostró documentos que comprobaban que el Jefe de la Policía, miembros de la policía, detectives y funcionarios del Gobierno incurrieron en una flagrante violación a la "Ley de la Prohibición". Un gran jurado determinó que en la mayoría de estos casos se habían

---

[6] Bajo la administración del ex gobernador Aníbal Acevedo Vilá, el entonces superintendente de la Policía, Pedro Toledo (QEPD), designó un Comité Evaluador Externo de la Policía de Puerto Rico compuesto por diversos profesionales. Ese comité tuvo ante sí la responsabilidad de examinar los protocolos, reglamentos y procedimientos que rigen los trabajos de la Policía de Puerto Rico, para luego rendir el informe con recomendaciones. Uno de los miembros del comité el jurista ponceño Pedro Malavet Vega, se encargó de que el informe incluyera diez páginas de reseñas de prensa sobre la problemática social–gubernamental que nos sigue aquejando.

Reflexiones y Recomendaciones en Torno al Acuerdo Para la Reforma Sostenible de la Policía de P.R.
Profesor Fernando L. Torres Ramírez
Página 4

apropiado de licor indebidamente los miembros de la policía, los detectives y en algunos casos el mismo Jefe de la Policía[7].

En Pueblo v. Adorno, 81 D.P.R. 518 (1959) se reseña como un agente del Escuadrón Contra el Vicio fue arrestado por un soborno, saliendo a relucir una práctica "generalizada" dirigida por el propio Director de dicho Escuadrón, José Padilla.

En la despedida del año 1992, agentes del Negociado de Investigaciones Especiales (NIE) del Departamento de Justicia arrestaron al Superintendente Auxiliar de Tránsito de la Policía de Puerto Rico y a varios oficiales policíacos. Los vergonzosos hechos de esa intervención contra un esquema de crimen organizado aparecen reseñados en Pueblo v. Meliá León, 143 D.P.R. 708 (1997).

Los casos de corrupción policíaca y violación de derechos civiles aparecen en los niveles más disímiles, en intervenciones rutinarias y en situaciones que –aunque excepcionales- nos defraudan. Tan reciente como el 29 de septiembre de 2015, agentes del Buró Federal de Investigaciones (FBI, por sus siglas en inglés) arrestaron a nueve de diez policías que enfrentan cargos por violación a la "Ley Contra el Crimen Organizado", conocida como "RICO Act"[8], violación a derechos civiles, extorsión, conspiración para distribuir sustancias controladas y algunos por mentir ante las autoridades federales.

El 22 de diciembre de 1999, el Tribunal Supremo de Puerto Rico resolvió en una Opinión *Per Curiam* el caso de Pueblo v. Jorge Rodríguez Marcial Mattei, 149 D.P.R. 832 (1999). Los apelantes–convictos se desempeñaban como policías adscritos a la Estación E de la División de Transito de Patrullas de Carreteras. A base de declaraciones y

---

[7] Guillermo A. Baralt, Historia del Tribunal Federal en Puerto Rico: 1899-1999, Publicaciones Puertorriqueñas, Inc. y Tribunal Federal, 2004, páginas 242-244, citado en el Informe del Comité Evaluador Externo de la Policía de Puerto Rico: La Corrupción en la Policía de Puerto Rico, *supra*, páginas 10-11.

[8] Federal Racketeer Influenced and Corrupt Organization Act; 18 U.S.C. sec. 1961 et seq.

Reflexiones y Recomendaciones en Torno al Acuerdo Para la Reforma Sostenible de la Policía de P.R.
Profesor Fernando L. Torres Ramírez
Página 5

testimonios de dos agentes encubiertos los policías fueron acusados de dos (2) alegadas violaciones al Artículo 401 de la "Ley de Sustancias Controladas"[9].

Tras la correspondiente Vista Preliminar, los juicios fueron señalados para la Sala del antiguo Tribunal Superior de Ponce. Debido a que estuve presente –como abogado– en el momento en que los acusados fueron arrestados, los casos fueron atendidos en otra sala del mismo piso en que trabajaba como Juez Superior. El Jurado que intervino rindió veredicto de culpabilidad y los acusados fueron sentenciados a cumplir una pena de quince años de cárcel e ingresados el 21 de diciembre de 1994.

Luego de varios trámites procesales los apelantes informaron que tenían información de que el Estado estaba conduciendo una investigación por supuesta fabricación de casos contra varios miembros de la División de Drogas entre los que se encontraban los agentes Rivera Nazario y Guigliotty Ramos.  Dando cumplimiento a una Orden del Tribunal Supremo, el entonces Procurador General, un joven de apellido Gelpí, compareció por escrito.  En su comparecencia informó que como resultado de una investigación confidencial "*que llevara a cabo el Estado*" el Ministerio Público tiene serias dudas en torno a la veracidad de los hechos en el presente caso, tal y como fueron expuestos por los agentes Rivera Nazario y Guigliotty, razón por la cual el Procurador General estimó que "las convicciones de epígrafe no deben prevalecer"[10] (*sic*).

Durante varios años, en una serie de artículos periodísticos el periódico El Vocero de Puerto Rico atribuyó a la División de Drogas de San Germán, y específicamente a Rivera Nazario, fabricar casos a distintas personas en el suroeste del país.  A los agentes se les identificaba como "los fabricantes" y al policía Rivera Nazario como "Kiko el protegido".  Ese

---

[9] 24 L.P.R.A. § 2401.

[10] Pueblo v. Jorge Rodríguez, Marcial Mattei, supra, pág. 835, citando *Escrito en Cumplimiento de Orden* de 9 de diciembre de 1999, págs. 2-3.

Reflexiones y Recomendaciones en Torno al Acuerdo Para la Reforma Sostenible de la Policía de P.R.
Profesor Fernando L. Torres Ramírez
Página 6

apodo tenía mucho sentido.   A pesar de múltiples querellas contra éste ascendió a Sargento y eventualmente a Teniente.

El 5 de noviembre de 2008, unos policías del Precinto de Yauco dieron una golpiza a un joven causándole la muerte[11].  Una magistrada de la Región de Ponce, basándose en un informe forense y en los testimonios de los policías (incluyendo a Rivera Nazario), determinó que no había causa probable para encausarlos.   En el foro estatal solamente uno de los policías fue acusado.

El 16 de octubre de 2012, el entonces Teniente Rivera Nazario fue arrestado.  Un gran jurado determinó causa probable en su contra en un pliego acusatorio en que se le imputó violación de los derechos civiles del joven occiso y de su padre[12].

El 6 de marzo de 2015, Rivera Nazario fue sentenciado en el Tribunal Federal a cumplir ocho años de prisión y tres años de libertad supervisada por su participación y eventual encubrimiento en la letal agresión del joven antes mencionado.

La gran pregunta es: ¿cómo el agente Rivera Nazario permaneció 29 años en la PPR y logró ascender hasta el rango de Teniente a pesar de las querellas contra "los fabricantes", los artículos periodísticos y las investigaciones confidenciales?

A pesar de los episodios bochornosos aludidos en esos casos que son más frecuentes de lo que quisiéramos, la Policía de Puerto Rico está compuesta por cientos de hombres y mujeres que ponen en riesgo su vida diariamente para proteger nuestra sociedad y brindar seguridad pública.

---

[11] Primera Hora; Ocho años de cárcel a exteniente que participó en mortal ataque a joven yaucano, http//:www.primerahora.com/noticias/policiatribunales/nota/ochoañosdecarcelextenientequepaticipoemortalataqueajovenyaucano-1069565/

[12] El Nuevo Día, Acusados por propinar una paliza mortal, http//: www.elnuevodia.com/noticias/locales/nota/acusadosporpropinarunapalizamortal

Reflexiones y Recomendaciones en Torno al Acuerdo Para la Reforma Sostenible de la Policia de P.R.
Profesor Fernando L. Torres Ramirez
Página 7

Procedo a mencionar un par de ejemplos gráficos: El Superintendente de la Policía, Coronel José Caldero López, luego de una fructífera y ejemplar carrera policiaca abandonó el retiro para dirigir el cuerpo policíaco a partir del 4 de abril del 2014. Si estuviéramos en un juicio plenario solicitaría del Honorable Tribunal que tome conocimiento judicial[13] de la carrera de más de treinta y cinco años como funcionario del orden público del Superintendente Caldero López y de su probidad.

Otro digno ejemplo de un policía de carrera que ha ido ascendiendo por sus méritos y compromiso con el servicio público es el Coronel Héctor Agosto Rodríguez, quien estuvo fungiendo como Superintendente Interino de la Policía de Puerto Rico tras la renuncia de Héctor Pesquera. El Coronel Agosto, a quien me honro en conocer desde que él era sargento y yo Juez Superior, lleva más de treinta años de servicio en la uniformada, trabajó en varias áreas policiacas y ocupó el cargo de Jefe de la Región Sur[14].

Otro ejemplo, y el cual considero es uno de los grandes aciertos de la Policía de Puerto Rico en la implantación de las estipulaciones del "Acuerdo", fue designar como Directora Ejecutiva de la Oficina de Reforma de la Policía de Puerto Rico[15] a la Teniente Coronel Clementina Vega Rosario. Su designación no solo es un reconocimiento a una mujer destacada dentro de la PPR, sino que es un paso adelante y envía un

---

[13] Regla Federal de Evidencia 201: "The court may judicially notice a fact that is not subject to reasonable dispute because it": "Is generally known within the trial court's territorial jurisdiction...".

[14] Véase, entre otros, Coronel Héctor Agosto Rodríguez no anticipa cambios durante su periodo como jefe de la policía, Primera Hora, 18 de noviembre de 2013; http//:www.primerahora.com/noticias/policia;

Policías reciben con agrado regreso del Coronel Héctor Agosto, 4 de mayo de 2012; http//: www.lacallerevista.com/postada.

[15] La Oficina de Reforma es el organismo creado por el Superintendente responsable de asegurar la implementación y cumplimiento del Acuerdo de la Reforma Sostenible de la Policía de Puerto Rico establecido por el Departamento de Justicia de Estados Unidos de América y el Gobierno del Estado Libre Asociado de Puerto Rico.

a Negarse a un Registro y Allanamiento Involuntario Cuando No Exista Orden Judicial", y al final se advierte que si la persona considera que un miembro de la policía ha violentado sus derechos puede presentar una querella a través de determinados medios. Al lado, había otra pancarta que explicaba los procedimientos para presentar "querellas administrativas y elogios" (sic).

## III.

Más importante que lo anterior, en la Parte V E del "Acuerdo", acápite 78, se dispuso que: "La PPR adiestrará a sus miembros en las políticas de detenciones, arrestos, registros y allanamientos".  Allí se acordó además que la PPR proveerá adiestramiento de forma periódica, en forma escalonada y "según sea necesario" basándose en el desarrollo de las leyes aplicables y de la política de la PPR.  A mi juicio, tomando en cuenta el contexto histórico en que se produjo el pleito ante el Honorable Tribunal Federal, y los valores en que se enmarca, ello se refiere a cambios en el ordenamiento jurídico y no únicamente en las "leyes".

No hay duda de que esta cláusula del "Acuerdo" es una que puede contribuir a una verdadera reforma sostenible de la PPR.  Pero ello, únicamente, si los recursos que utiliza la PPR son idóneos.  Entiendo que en el área de la capacitación de los nuevos cadetes ya ha habido cambios dirigidos a cumplir con la estipulación que nos ocupa.  El semestre anterior recibí una llamada de uno de los Comisionados de la Comisión de Derechos Civiles, el distinguido profesor Carlos Del Valle (quien fue uno de los abogados que suscribió el "Acuerdo" ante la "Corte"), invitándome a brindar algún curso en la Academia de la Policía.  El profesor Del Valle me explicó que había un convenio de colaboración entre la Comisión de Derechos Civiles y la PPR para proveer recursos docentes en la capacitación de los cadetes en la Academia de la Policía sobre los derechos de ciudadanos y protecciones garantizadas en la Constitución del Estado Libre Asociado frente a las intervenciones del Estado.  Por una situación muy personal no pude aceptar la invitación, pero sugerí que

consideraran al Ex–Juez Luis Rivera Román, cuyo bagaje y conocimiento de estos temas es incuestionable[17]. La contratación de Rivera Román en ese momento (para adiestrar a los cadetes) debe replicarse en la contratación de los recursos que la Policía de Puerto Rico utilice para brindar adiestramientos a tenor con la cláusula que nos ocupa. De muy poco servirán los mismos si las personas que contraten para estos adiestramientos no conocen los valores en que están cimentados los derechos fundamentales consignados en nuestra Ley Suprema, como el derecho del Pueblo a la protección contra registros, incautaciones y allanamientos irrazonables[18], y por decir otro, el derecho constitucional a la no autoincriminación, que están íntimamente relacionados a la dignidad y al derecho a la intimidad. Sobre el vínculo de estos derechos de la más alta jerarquía, véase entre otros, Pueblo v. Lebrón, 108 D.P.R. 324 (1979); E.L.A. v. Coca Cola, 115 D.P.R. 197, 207 (1984); Pueblo v. Bonilla Bonilla, 146 D.P.R. 318 (1999) y Pueblo v. Rolón Rodríguez, 2015 T.S.P.R. 73, Op. del 9 de junio de 2015. Véase además, Pueblo v. Sánchez Torres, 168 D.P.R. 350, 354 (2000); Pueblo v. Nieves Vives, 188 D.P.R. 1 (2013)[19].

---

[17] El licenciado Rivera Román fue Asesor de Seguridad del Gobernador Rafael Hernández Colón; Asesor del Superintendente de la Policía; Juez Superior; Juez de Apelaciones; ha sido miembro del Comité Asesor Permanente de Reglas de Procedimiento Criminal y del Comité Asesor Permanente de Reglas de Evidencia del Tribunal Supremo, actualmente es Conferenciante de la Escuela de Derecho de la Universidad Interamericana de Puerto Rico, y fue conferenciante de nuestra Facultad de Derecho.

[18] El Artículo II, Sección 10, de la Constitución del E.L.A. de Puerto Rico literalmente dispone:

"No se violará el derecho del pueblo a la protección de sus personas, casas, papeles y efectos contra registros, incautaciones y allanamientos irrazonables.
No se interceptará la comunicación telefónica.
Sólo se expedirán mandamientos autorizando registros, allanamientos o arrestos por autoridad judicial, y ello únicamente cuando exista causa probable apoyada en juramento o afirmación, describiendo particularmente el lugar a registrarse, y las personas a detenerse o las cosas a ocuparse.
Evidencia obtenida en violación de esta sección será inadmisible en los tribunales."

[19] En este caso el Tribunal Supremo de Puerto Rico discute qué factores deben tenerse en cuenta para determinar si una confesión realizada luego de un arresto ilegal debe ser admitida en evidencia, adoptando la doctrina señalada por la Corte Suprema de EE.UU. en Brown v. Illinois, 422 U.S. 590 (1975).

Este asunto va más allá de la capacitación por sí misma.  Si los funcionarios del orden público conocen las normas aprenderán no solamente los valores en que están empotradas (las cuales una vez las entiendan —como cuestión de principios— las deben respetar) sí que además deben aprender cuáles son las consecuencias de infringir o violar los preceptos constitucionales.  De entrada, recordemos que nuestro texto constitucional contiene en el Artículo II §10 una protección más amplia que Cuarta Enmienda Federal.  Pueblo v. Rolón Rodríguez, supra, pág. 10. Deben entender además cuáles son los costos y consecuencias de una intervención ilegal.  Primero: El cuarto párrafo del Artículo II §10 contiene con rango constitucional el mecanismo de exclusión de evidencia obtenida en contravención de los primeros tres párrafos. A nivel federal, como sabemos, ese remedio es jurisprudencial y su cubierta (o factura) reconoce excepciones que no están vigentes en nuestro ordenamiento jurídico.  La cláusula de exclusión de nuestra Constitución promueve que los tribunales excluyan evidencia aún en circunstancias que estarían cobijadas por doctrinas de excepción en la casuística estadounidense.  Ejemplo: la doctrina de la "buena fe" desarrollada por la Corte Suprema en U.S. v. Leon, 487 U.S. 897 (1984)[20].

En el caso de Toll y Sucn. Rivera Rojas v. Adorno Medina, 130 D.P.R. 352, 358-359 (1992) el Tribunal Supremo de Puerto Rico reseñó los propósitos de incluir esta regla de exclusión al Art. II, Sec. 10 de nuestra Constitución. En lo pertinente, expuso que: *[L]a regla de exclusión encarna tres (3) propósitos ínsitos en el Art. II, Sec. 10, supra. Primero, disuadir y desalentar a los funcionarios del orden público de que violen la protección constitucional (deterrence). Se reconoce que este elemento disuasivo realmente es el más fundamental. Segundo, integridad judicial. Los tribunales no deben ser cómplices de actos de desobediencia a la Constitución y admitir evidencia ilegalmente obtenida. Y tercero, impedir*

---

[20] En más de una ocasión el Procurador General ha intentado convencer al Tribunal Supremo de Puerto Rico de que determinada intervención debe sostenerse al amparo de esa excepción.  Su último intento fallido fue precisamente en el caso de Rolón Rodríguez.  Un primer intento aparece en Pueblo v. Pacheco Báez, 130 D.P.R. 664 (1992).

Reflexiones y Recomendaciones en Torno al Acuerdo Para la Reforma Sostenible de la Policía de P.R.
Profesor Fernando L. Torres Ramírez
Página 12

*que el Gobierno se beneficie de sus propios actos ilícitos; de otra manera la ciudadanía **perdería la confianza en el Gobierno**. 1 La Fave and Israel, Criminal Procedure (Sec. 3.1 (b), pág. 135 (1984)"*.   En el caso de <u>Toll y Sucn. Rivera Rojas v. Adorno Medina</u>, *supra*, pág. 356  se dice que: *"Las referencias durante los incidentes de la Convención Constituyente tienden a demostrar que su inclusión en el documento pretendía cristalizar el estado de derecho vigente en 1952"*[21].   En conclusión, y en esencia, la doctrina del *"fruto del árbol ponzoñoso"* se estableció con el propósito de evitar que los agentes del gobierno obtengan evidencia de forma reñida con la protección constitucional.   Cfr. <u>Pueblo v. Fernández Rodríguez II</u>, 188 D.P.R. 165 (2013).

Un famoso escritor francés, Anatole Francois Thibault conocido como Anatole France, quien recibió el Premio Nobel de Literatura en 1921, escribió en 1901 *"El Asunto de Crainquebille*[22]*"*.   En esta novela corta se narra como un humilde vendedor de verduras, de 70 años, iba arrastrando su carro por las calles hasta que el guardia No. 64 le dijo que no podía quedarse detenido en la vía pública.   Tras una conversación en la que Crainquebille trató de explicar que espera el regreso de una cliente, el policía sacó un "cuadernito mugriento" para denunciarlo.   El verdulero hizo varias expresiones y el policía entendió que lo estaba insultando.   Se trata de una crónica de cómo por el capricho de un agente de orden público el anciano fue convicto.   El resto es la secuela de la injusticia... el costo y la estigma de la condena provocan que aquel hombre, al salir de la cárcel sea objeto de discrimen, pierda los clientes y la confianza.   Cuando esto ocurre se erosiona la fe en la Justicia y en las instituciones sociales que fueron creadas –como la Policía– con el propósito de proteger el bien común.

---

[21]  42 4 Diario de Sesiones de la Convención Constituyente 2568 (1952); J. Trías Monge, *Historia Constitucional de Puerto Rico*, San Juan, Ed. Universidad de Puerto Rico 1982, Vol. III, pág. 192.

[22]  También conocido como *"El caso de Crainquebille"*.

El país necesita de lo que en algún momento se llamaba el "benemérito cuerpo de la Policía de Puerto Rico", de una Policía que cumpla su propósito social.   El país necesita que la reforma de la Policía, que pretende encaminar esta "Corte" al aprobar el "Acuerdo" y celebrar esta vista, sea sostenible.  Más bien debe ser "sustentable", o sea, "que se pueda sustentar o defender con razones"[23], que sea aceptable porque corresponde a los valores que la mayoría de los puertorriqueños y puertorriqueñas y los hermanos extranjeros con quienes convivimos en este archipiélago compartimos. Incluyendo, pero sin limitarse, al deseo de la promoción del bienestar general y el aseguramiento del goce cabal de los derechos humanos y la lealtad a los postulados de la Constitución Federal (mencionados en el Preámbulo de la Constitución del E.L.A. de Puerto Rico), el respeto a la dignidad del ser humano y el reconocimiento del derecho fundamental a la vida (en toda su expresión) y a la libertad (en su sentido más amplio -solo limitada por el respeto al derecho ajeno-) encapsulados en la Carta de Derechos .

El Capítulo XI del "Acuerdo" trata de "*Querellas Administrativas, Investigaciones Internas y Disciplina*". No hay duda de que en éste, que comienza con el acápite 159, se pretende contribuir al saneamiento de la PPR. Se dispone que la PPR "*desarrollará políticas y prácticas para el recibo, investigación y adjudicación de querellas por conducta impropia contra los miembros*" de la uniformada. A mi juicio, este esquema solo será efectivo si la PPR abre sus procesos internos para que en ellos haya participación de personas y/o entidades externas, como lo podrían ser la Unión Americana de Libertades Civiles (ACLU) y el Ilustre Colegio de Abogados y Abogadas de Puerto Rico, que sirvan como garantía de transparencia para lograr los objetivos del "Acuerdo". Los procesos de investigación y adjudicación de querellas, en los que los querellantes son como -regla general- la gente de carne y hueso, los comunes, los desaventajados, y los grupos minoritarios, no deben estar en manos únicamente de los miembros de la PPR. El Tribunal Federal tiene una amalgama de ejemplos  en los que lamentablemente los crisoles internos

---

[23] Real Academia Española, Asociación de Academias de la Lengua Española, <u>Diccionario de la Lengua Española</u>, 23 ª ed., Ed. Del Tricentenario [en línea].  Madrid: España, 2014.

fallaron y puede tomar las medidas profilácticas para evitar que se repitan casos en que la institución (la PPR) no pudo, a través de sus foros internos, identificar, sancionar o separar ni a los "fabricantes" ni a los "suricatos".

En consecuencia, no es justo para los miles de hombres y mujeres honestos y sacrificados que trabajan en la PPR, ni para la sociedad puertorriqueña, que el esfuerzo de quienes han laborado para la consecución de los objetivos del "Acuerdo", desde mucho antes de su firma por las partes, quede en entredicho porque no haya la capacidad y generosidad institucional de reconocer que la participación de personas o representantes de la sociedad civil fortalecerá lo que yo llamo el proceso de "saneamiento".

En la Escuela de Derecho de la PUCPR ("La Católica"), y en otras entidades no gubernamentales, hay muchos recursos que pueden contribuir al éxito de una verdadera reforma sustentable de la PPR y pueden servir para garantizar la transparencia que el Honorable Tribunal le ha impregnado a este proceso judicial.

En la Ciudad de Ponce, Puerto Rico, a 22 de octubre de 2015.

Respetuosamente sometida.

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

    Plaintiff,

    v.                              CASE NO. 12-2039 (GAG)

COMMONWEALTH OF PUERTO RICO, et al.,

    Defendants.

## SCHEDULING ORDER: PONCE PUBLIC HEARING ON THE PUERTO RICO POLICE REFORM

The Second Public Court Hearing and status conference in the captioned case is set for Thursday, October 22, 2015, and Friday, October 23, 2015 at 9:00 a.m. at the Luis A. Ferre United States Courthouse in Ponce, Puerto Rico. The Court will first meet in camera at 8:30 a.m. with the Technical Compliance Advisor ("TCA") and his team, including his legal and constitutional advisors, as well as counsel for the United States and Commonwealth of Puerto Rico. The purpose of this and all forthcoming public hearings is to inform the Court and public of the progress on the work being conducted in implementing the Police Reform thus far as well as to hear in an open judicial forum all upcoming plans and ensuing steps that are required to be taken to assure that the reform of the Puerto Rico Police Department ("PRPD") is proceeding as per the Agreement for the Sustainable Reform of the Puerto Rico Police Department (hereinafter referred to as the "Agreement" and at other times "Police Reform"). The Court is committed to transparency and seeks to ensure that the structural police reform lives up to its potential, meeting its goal of holistic

1

# Cuenta su horror la niña violada en casa alcaldía

**MAELO VARGAS SAAVEDRA**
*PRIMERA HORA*

MAYAGÜEZ.- "Yo sé que no an al cielo los niños que no di- en la verdad".

Con esas palabras comenzó a stificar por circuito cerrado na niña de 9 años que fue viola- a en octubre pasado en un baño e la alcaldía de Añasco, caso por l que se acusa al ex convicto de- empleado Roberto Ramos Lugo.

A preguntas del fiscal Gerardo lartínez, la niña narró con lujo e detalles al jurado mientras or tres mujeres y nueve hom- res cómo su atacante le colocó n revólver en la frente y le dijo



que si no se dejaba violar la ma- taría a ella y a su madre, que es- taba en la recepción de la alcal- día en espera de una entrevista de empleo.

La nena dijo que tuvo necesi- dad de ir al baño y que la recep- cionista de la oficina del alcalde Pablo Crespo Torres le indicó que la llevaría, pero la dejó allí sola para regresar a su área de trabajo, lo que aprovechó el vio- lador para entrar al lugar que utilizan hombres y mujeres.

La niña narró todo el encuen- tro con su agresor y dijo que cuando salió del baño, después que el hombre se había marcha- do, lo vio parado al lado de su ma-

má, en la recepción, y le dio mie- do, por lo que permaneció en si- lencio desde las 3:00 de la tarde hasta horas de la noche, cuando relató lo ocurrido.

Describió a su atacante como una persona alta de poco pelo en la cara, que tenía una gorra que leía "Suiza Dairy".

El acusado fue identificado ori- ginalmente por la niña durante una tercera rueda de confron- tación que realizó personal de la Unidad de Delitos Sexuales de Mayagüez.

En una primera rueda de con- frontación, la niña descartó al primer sospechoso detenido, un empleado de mantenimiento del municipio, y en la segunda, no se atrevió a identificar a Ramos Lu- go, según dijo en su testimonio al jurado.

Ramos Lugo está siendo juzga- do por los delitos de violación, ac- tos lascivos, amenaza y violación a la ley de armas. Está sumaria- do en la cárcel Las Cucharas de Ponce desde octubre pasado.

Ayer, la niña volvió a identifi- car a Ramos Lugo durante una breve comparecencia a sala acompañada de alguaciles.

# Resentían juicio cómplices Meliá

**Por Julio Víctor Ramírez**
**Redactor — EL VOCERO**

MAYAGÜEZ — Tras declarar con lugar el pedido de la defensa, el juez superior Fernando Luis Torres Ramírez señaló para el 1 de febrero del '94 el inicio del juicio contra los ex empleados municipales de Guánica, Noel León Rodríguez y Obed Elena Orengo, encausados por crimen organizado y Artículo 406 de la Ley de Drogas.

León Rodríguez y Elena Orengo son los únicos acusados pendientes de ser juzgados en conexión con hechos presuntamente ocurridos en el '91. A la pareja se le imputa vinculación con la organización mafiosa que dirigía el convicto ex coronel policíaco Enrique Meliá León, que cumple condena de 15 años.

Aunque los imputados sostienen que han sido víctimas de la fabricación de casos por parte del encubierto Edgar Candelaria Soto, también conocido como el "Agente 913", el Departamento de Justicia ha seguido adelante con los cargos. León Rodríguez,

ex director de relaciones públicas del municipio de Guánica y Elena Orengo, ex jefe local de la Defensa Civil, fueron arrestados el 31 de diciembre del '91. En aquella ocasión también se detuvo al ex coronel Meliá León, al entonces patrullero Jaime Torres Vargas, al gruero Ernesto (Nesty) Figueroa y a la hija de "Nesty", Evelyn Figueroa Rodríguez, quienes cumplen condenas en prisiones locales y federales.

A pesar de que León Rodríguez y Elena Orengo habían sido exonerados durante vista ante el juez superior especial Hiram Torres Rigual, los fiscales Andrés Rodríguez Elías y Michael Corona Muñoz volvieron a radicarles acusaciones. Se alega que el dúo conspiró con Meliá y demás acusados para introducir un cargamento de cocaína al país y que violaron la Ley Sobre Crimen Organizado. Ambos acudieron el martes al Centro Judicial de Mayagüez, para el comienzo del proceso que fue reseñalado para febrero del año próximo. Los ex funcionarios son representados por los Lcdos. José Fernando Irizarry y Nicanor Laguillo.

© 1999 PUBLICACIONES JTS® ™ - LUIGGI ABRAHAM - EDITOR

# 99 JTS 186

El Pueblo de Puerto Rico
Recurrido

v.

Miguel Jorge Rodríguez
Reinaldo Marcial Mattei
Acusados-Apelantes

Núm. CR-94-85

Tribunal de Primera Instancia, Sala Superior de Ponce
Hon. Frank Rodríguez García

San Juan, Puerto Rico, a 22 de diciembre de 1999

CITESE 99 JTS 186

*PER CURIAM*

Oficina del Procurador General: Hon. Gustavo A. Gelpí.
Abogado de Miguel Jorge Rodríguez: Héctor Zayas Puig.
Abogado de Reinaldo Marcial Mattei: Manuel B. Caballer.

**Procedimiento Criminal**: Fabricación de Casos.

A base de las declaraciones o testimonios de dos agentes encubiertos, los policías apelantes fueron acusados y hallados culpables por infracciones al Artículo 401 de la Ley de Sustancias Controladas. Sometido un recurso de apelación ante el Tribunal Supremo, los apelantes presentaron moción ante ese tribunal para informar que los testigos de cargo (los dos agentes encubiertos) eran objeto de investigación criminal por fabricación de casos. A requerimiento del Tribunal Supremo, el Procurador General compareció e informó que era cierto lo de la investigación y que el ministerio público tenía dudas serias y fundadas en cuanto a la veracidad de las declaraciones de los agentes encubiertos, por lo cual *"las convicciones no deben prevalecer"*. Mediante Opinión *Per Curiam*, el Tribunal Supremo revoca la sentencia apelada por razón de lo informado por el Procurador General.

## RESUMEN NORMATIVO *

1. *Procedimiento Criminal, Fabricación de Casos, Duda Razonable.*
No puede prevalecer una sentencia de convicción basada en declaraciones de agentes encubiertos de la Policía, quienes luego han sido objeto de investigación por la fabricación de casos, admitiendo el Procurador General y el ministerio público que la investigación arroja serias y fundadas dudas sobre el testimonio y declaraciones de los agentes, allanándose a la revocación de las sentencias condenatorias.

**JTS... LAS DECISIONES QUE USTED NECESITA... AL MOMENTO QUE LAS NECESITA**

**JURISPRUDENCIA DEL TRIBUNAL SUPREMO DE PUERTO RICO®™**

### TEXTO COMPLETO DE LA OPINION

Los apelantes Miguel Jorge Rodríguez y Reinaldo Marcial Mattei se desempeñaban, para los años de 1989 y 1990, como miembros de la Policía de Puerto Rico, adscritos a la Estación E de la División de Patrullas de Carreteras, Cuartel de Sabana Grande, Puerto Rico. Con motivo de unas alegadas confidencias, suministradas las mismas a un oficial de la Policía de Puerto Rico, a los efectos de que varios agentes pertenecientes al mencionado Cuartel de Patrullas de Carreteras se dedican al narcotráfico, la Policía de Puerto Rico le encomendó a dos agentes encubiertos la investigación de dicha confidencia.

Como resultado de la labor realizada por dichos agentes encubiertos --los cuales responden a los nombres de Eric Rivera Nazario y Luis A. Guigliotty Ramos-- los policías Jorge Rodríguez y Marcial Mattei fueron acusados por dos alegadas infracciones al Artículo 401 de la Ley de Sustancias Controladas, alegadamente cometidas las mismas el día 17 de febrero de 1990 en Guánica, Puerto Rico.

Celebrado que fuera el juicio ante el antiguo Tribunal Superior de Puerto Rico, Sala de Ponce, el jurado que intervino en el mismo rindió veredicto de culpabilidad contra ambos acusados en los dos cargos que le fueran imputados a éstos. Jorge Rodríguez y Marcial Mattei fueron sentenciados por el mencionado tribunal de instancia a cumplir una pena de quince (15) años de reclusión en cada cargo, a ser cumplidas las mismas en forma concurrente, el día 19 de diciembre de 1994. Ese día fueron ingresados en una institución penal.

Inconformes con lo acontecido ante el tribunal de instancia, Jorge Rodríguez y Marcial Mattei radicaron el correspondiente recurso de apelación ante este Tribunal, el día 21 de diciembre de 1994, en revisión de las convicciones decretadas y las sentencias que le fueron impuestas; al así hacerlo, le imputaron al tribunal de instancia la supuesta comisión de diez (10) errores. **[1]**

Luego de los trámites usuales y corrientes, referentes los mismos a la tramitación de un recurso de apelación, **[2]** y habiendo quedado el caso sometido ante este Tribunal el 19 de marzo de 1997, luego de que el Procurador General radicara su alegato, el 18 de abril de 1997, los apelantes radicaron un escrito intitulado "*moción informativa y en solicitud de paralización de los procedimientos*", en el cual le informaron al Tribunal que habían recibido información a los efectos de que el Estado estaba conduciendo una investigación por la supuesta fabricación de casos por varios agentes de la Policía de Puerto Rico, entre los cuales se encontraban los Agentes Rivera Nazario y Guigliotty Ramos.

En atención a ello, mediante Resolución del 2 de mayo de 1997, le concedimos término al Procurador General para que se expresara respecto a la mencionada moción. En la comparecencia del Procurador General, en cumplimiento de la referida Resolución, éste admitió el hecho de la existencia de la investigación y que los agentes que participaron en el caso de autos efectivamente estaban siendo investigados; expresó dicho funcionario, por último, que aun cuando entendía que no era necesario paralizar el trámite apelativo del caso, no se oponía a ello.

Este Tribunal, mediante Resolución de fecha 18 de junio de 1997, entendió procedente fijarle, *motu proprio*, fianza en apelación a los apelantes Jorge Rodríguez y Marcial Mattei, **la cual éstos prestaron**. Le ordenamos, además, al Procurador General mantener informado al Tribunal sobre el resultado de la antes mencionada investigación.

Habiendo transcurrido un término de tiempo considerable sin que el Procurador General nos informara al respecto, el 8 de octubre de 1999 le concedimos un breve término a dicho funcionario para que compareciera e

**JTS... LAS DECISIONES QUE USTED NECESITA... AL MOMENTO QUE LAS NECESITA**

  * RESUMEN NORMATIVO © 1999 POR PUBLICACIONES JTS®™

informara. Este compareció y solicitó prórroga para someter su posición definitiva al respecto; la concedimos.

El pasado 9 de diciembre del presente año, el Procurador General finalmente compareció. En su escrito nos informa, en lo pertinente, que, como resultado de la investigación confidencial que llevara a cabo el Estado, "... *el Ministerio Público tiene dudas serias y fundadas en torno a la veracidad de los hechos en el presente caso, tal y como éstos fueron expuestos por los agentes Rivera Nazario y Guigliotty Ramos en sus respectivas declaraciones durante el proceso*"; razón por la cual, estima el Procurador General, que "...*las convicciones de epígrafe no deben prevalecer*".

Resulta lamentable que situaciones como la presente sucedan. Ello no obstante, la ocurrencia de las mismas debe servir de estímulo a la Policía de Puerto Rico para mejorar no sólo la calidad del reclutamiento de su personal sino los procesos de entrenamiento y supervisión de sus agentes; en específico, la labor que llevan a cabo los agentes encubiertos.

Naturalmente, coincidimos totalmente con el Procurador General en que, en vista de los resultados arrojados por la investigación realizada por el Estado, relacionada con la fabricación de casos de drogas por miembros de la fuerza policíaca del País, **las convicciones apeladas no deben, ni pueden, prevalecer**; razón por la cual procede dictar Sentencia revocatoria de las emitidas por el antiguo Tribunal Superior de Puerto Rico, Sala de Ponce, decretándose la absolución de los apelantes Miguel Jorge Rodríguez y Reinaldo Marcial Mattei.

Se dictará Sentencia de conformidad.

## SENTENCIA

Por los fundamentos expuestos en la Opinión *Per Curiam* que antecede, la cual se hace formar parte íntegra de la presente, se dicta Sentencia revocatoria de las emitidas por el antiguo Tribunal Superior de Puerto Rico, Sala de Ponce, decretándose la absolución de los apelantes Miguel Jorge Rodríguez y Reinaldo Marcial Mattei.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo.

Isabel Llompart Zeno
Secretaria del Tribunal Supremo

### ESCOLIOS 99 JTS 186

1. Mediante el **sexto (6to.)** señalamiento de error, los apelantes le imputaron al tribunal de instancia haber errado:

"....*al no permitir que testigos de defensa declararan ante el jurado sobre hechos que probaban la teoría de defensa sobre fabricación de casos y la mendacidad de los testigos de cargo, por entender o que no impugnaban credibilidad alguna o por entender que no constituían prueba de mendacidad, abrogándose de esa manera las funciones del jurado.*"

2. La preparación y certificación de una exposición narrativa de la prueba, la radicación de los alegatos de las partes, etc.

Acusados por propinar una paliza mortal | El Nuevo Día

# Acusados por propinar una paliza mortal

Les radican múltiples cargos por violación de los derechos civiles

martes, 16 de octubre de 2012 - 11:31 PM

Erick Rivera Nazario, un teniente con 28 años en la fuerza, aún vestía el pantalón azul del uniforme de la Policía cuando escuchó ayer en la corte federal que dormiría en la cárcel por presuntamente violar los derechos civiles de un joven y su padre en medio de una paliza propinada el día de las elecciones generales de 2008.

Ayer también fue arrestado en Guánica por el mismo caso el agente Jimmy Rodríguez Vega.

De ser hallados culpables, ambos agentes policiales encaran penas de diez o más años de cárcel.

El joven agredido por los policías moriría después como consecuencia de los golpes recibidos, en un caso que, a nivel estatal, involucró a otros agentes policiacos y desató una intensa polémica pública cuando en su momento una corte estatal ni siquiera halló causa para juicio.

De 50 años de edad y con estudios graduados en la Universidad Interamericana, en San Germán, Rivera Nazario fue arrestado en la mañana de ayer por sus colegas del Negociado Federal de Investigaciones (FBI, en inglés) justo cuando se aprestaba a tomar servicio en la Comandancia de Ponce.

En corte, la magistrada federal Camille Vélez Rivé le informó que el pasado viernes un gran jurado federal emitió en su contra un pliego acusatorio de cinco cargos por violarle los derechos constitucionales a José Luis Irizarry Pérez y a su padre, José Luis Irizarry Muñiz, al utilizar un batón y emplear fuerza excesiva contra ambos el 4 de noviembre de 2008.

La acusación también le imputa al agente Rodríguez Vega actuar en concierto y común acuerdo con el teniente Rivera Nazario para utilizar el batón con brutalidad en un acto que culminó con daño corporal en padre e hijo.

Irizarry Pérez, de 19 años, falleció la madrugada del 5 de noviembre de 2008 a causa de los golpes que recibió en medio de una intervención policiaca contra un grupo de simpatizantes del Partido Nuevo Progresista (PNP) que celebraba la victoria electoral frente a la urbanización Colinas, en Yauco.

De acuerdo con la investigación, los agentes llegaron al lugar y tuvieron una discusión con el padre del joven y su hermana.

El joven Irizarry Pérez intercedió por sus familiares y, acto seguido, fue golpeado hasta quedar inconsciente. Murió de camino al hospital.

"El 5 de noviembre de 2008, cuando usted era un sargento de la Policía y actuando so color de autoridad, intencionalmente falló en intervenir y alejar de daños a José Luis Irizarry Pérez y a José Luis Irizarry Muñiz cuando el agente de la Policía Jimmy Rodríguez Vega, bajo su supervisión, asaltó con su batón y los privó de los derechos constitucionales", resumió Vélez Rivé los cargos tres y cuatro.

Esposado, el teniente Rivera Nazario entonces escuchó que se expone, por los primeros cuatro cargos que pesan en su contra, a una condena máxima de diez años.

## DECLARACIONES FALSAS

"Contra usted también pesa un cargo por emitir, el 11 de enero de 2012, declaraciones falsas al gran jurado y por eso se expone a una condena no mayor de cinco años de cárcel", añadió la magistrada federal.

El acusado, quien se mostró tranquilo ante el proceso y estuvo representado por el defensor público federal Héctor Ramos, estuvo acompañado en sala por dos hombres que se identificaron como familiares, pero rehusaron dar declaraciones a la prensa.

Por otra parte, Vélez Rivé le explicó al agente Rodríguez Vega que pesan dos cargos en su contra por privar de los derechos civiles a padre e hijo cuando utilizó su batón y les propinó una golpiza el 5 de noviembre de 2008.

De resultar culpable, Rodríguez Vega, representado por Joseph Boucher, se

expone a una condena máxima de diez años de cárcel.

La magistrada federal ordenó el ingreso de forma temporera al Centro Metropolitano de Detención a ambos oficiales y pautó la vista de fianza para mañana a las 4:00 p.m.

En 2009, la jueza Lourdes Robles, del Tribunal de Ponce, no encontró causa contra Rivera Nazario y Rodríguez Vega por estos mismos hechos durante la vista de Regla 6 o causa para arresto.

La jueza se basó en el informe de un patólogo forense, quien determinó que la participación de ambos agentes en la reyerta no estuvo asociada con los golpes que le causaron la muerte al joven José Luis Irizarry Pérez.

Contra ambos miembros de la Uniformada pesaban entonces cargos por agresión simple, agresión agravada y violación a la Ley de Armas.

En el foro estatal solamente fue acusado por el asesinato de Irizarry Pérez el policía Ángel Torres Quiñones. Ningún otro oficial acusado a nivel estatal por estos hechos fue imputado en el foro federal.

Sin embargo, por estos mismos hechos Irizarry Muñiz y sus hijas radicaron una demanda civil en el Tribunal Federal el 13 de abril de 2011 contra de los agentes Rivera Nazario, Rodríguez Vega, Ángel Torres Quiñones, Efraín Burgos Montes y David Colón Martínez en la que reclamaron una compensación de $5 millones.

El juez Juan M. Pérez Giménez desestimó el pasado 3 de agosto la demanda contra todos los policías, excepto contra Torres Quiñones.

# Ocho años de cárcel a exteniente que participó en mortal ataque a joven yaucano

**Por Francisco Rodríguez-Burns /** frodriguez@primerahora.com
03/06/2015 |02:41 p.m.

Tweet                                                                                    A-   A ɕ



(Archivo)

## El oficial pidió disculpas y aseguró estar dispuesto a trabajar para que no se repitan incidentes similares.

El exteniente de la Policía, Erick Rivera Nazario, fue sentenciado a ocho años de prisión y tres años de libertad supervisada por su participación en la letal agresión a un joven de 19 años que fue interceptado por agentes estatales en Yauco, el 5 de noviembre de 2008.

La hermana menor de la víctima fatal, José Luis Irizarry Pérez, ofreció una emotiva declaración antes que el juez federal Juan Pérez Giménez emitiera la pena.

"La partida de un hermano no se puede explicar", indicó Kiara J. Irizarry Pérez, de 22 años. "El dolor es demasiado de intenso, desconocido, pareciera que la vida se detiene y que el tiempo no fluye porque nos detenemos en un punto de total incredulidad e irrealidad", agregó la joven con voz quebrada y sin poder contener el llanto.

Rivera Nazario, al igual que otros cinco expolicías involucrados en el caso, alcanzaron acuerdos de culpabilidad con la Fiscalía Federal, luego que un Gran Jurado emitiera un pliego acusatorio contra los funcionarios por obstrucción a la justicia, perjurio y violación a los derechos civiles.

Rivera Nazario aparentemente fue uno de los policías que peor actuó durante la agresión al joven de 19 años, según se desprende de la investigación de las autoridades. La pesquisa reflejó que los policías violentaron los derechos civiles del Irizarry Pérez cuando el joven intentó defender a su padre, José Luis Irizarry Muñiz, de unas primeras agresiones de los uniformados.

El grupo de uniformados comenzó a agredir al progenitor del muchacho, luego de preguntarle "si era guapo" y sin que mediara ninguna provocación por parte del yaucano, durante un evento de celebración eleccionaria, de acuerdo con la investigación de los hechos.

"El acusado (Rivera Nazario) asestó un golpe con su macana en la parte superior del cuerpo de José cuando éste estaba herido y controlado, sin que representara un peligro para nadie", sostuvo el fiscal José Contreras, al subrayar los agravantes de las actuaciones del exteniente.

## A PRISIÓN EXTENIENTE DE LA POLICÍA

Pinterest    0

Erick Rivera Nazario fue sentenciado a ocho años de prisión y a tres años de libertad supervisada por su participación en la letal agresión a un joven de 19 años.

Poco después, Rivera Nazario, quien ingresó en la Policía de Puerto Rico en 1984, pidió clemencia.

"Esta es la primera vez que puedo dirigirme a la familia del joven. Estoy muy arrepentido de la situación que ocurrió y estoy dispuesto a ayudar en todo lo que pueda para que esto se pueda erradicar de las agencias de ley y orden", el exteniente al dirigirse al tribunal.

El juez Pérez Giménez pidió el ingreso inmediato a prisión de Rivera Nazario, aunque el abogado de defensa, Richard Dansoh, pidió que se pudiera entregar voluntariamente, luego de cumplir con varias obligaciones personales que involucran a su madre y a una hija de cinco años.

## Una familia devastada

La familia de la víctima lució visiblemente afectada durante el procedimiento judicial y agradecieron la labor de las autoridades federales en el caso.

"Hoy nuestra familia siente, alivio, tranquilidad y agradecimiento de saber que los que hoy cometieron el error y el abuso de arrebatarle la vida a mi hermano están cumpliendo por esta injusticia", sostuvo la joven Kiara J. Irizarry Pérez.

La víctima procreó una niña que hoy tiene de siete años, así como un niño, que ya cumplió seis. Ambos menores preguntan regularmente por su padre, dijeron los parientes del joven ultimado a golpes. La madre de los pequeños se mostró complacida por la labor del Negociado Federal de Investigaciones (FBI), aunque favoreció penas más severas por la muerte de su marido.

"No pagaron por la muerte, pero van para dentro", indicó Diana Pacheco, de 26 años de edad.

Por su parte, José Irizarry Muñiz, abuelo de los niños y sobreviviente de la violenta intervención policiaca, no pudo contener las lágrimas cuando habló sobre sus nietos, al salir del tribunal.

"El nene pregunta cuándo su papá vendrá a verlo… Hay que explicarle las cosas. No todos los policías son malos", señaló.

# Coronel Héctor Agosto Rodríguez no anticipa cambios durante su periodo como jefe policiaco

**Por Javier Colón Dávila** / javier.colon@gfrmedia.com
11/18/2013 |05:17 p.m.

Tweet

A-  A+



Coronel Héctor Agosto Rodríguez (Archivo)

## Sostuvo una reunión en horas de la mañana con la plana mayor de la agencia en el Cuartel General, en Hato Rey.

El coronel Héctor Agosto Rodríguez, quien estará a cargo de la Policía como superintendente interino hasta que el nuevo jefe policiaco, James Tuller Cintrón, ocupe el cargo en propiedad, indicó este lunes que en su breve mandato se concentrará en darle seguimiento a los planes de trabajo y en la vigilancia preventiva de cara al inicio de la época navideña.

Agosto Rodríguez sostuvo una reunión en horas de la mañana con la plana mayor de la agencia en el Cuartel General, en Hato Rey. Casi finalizado el encuentro, el oficial, con 29 años de servicio en cuatro áreas policiacas y actual jefe de la región Sur, atendió brevemente a la prensa y afirmó que no hará cambios en jefaturas y no vislumbra suspender días libres o de vacaciones a los uniformados.

"Sabemos que coincide el que se me haya designado como interino con la época navideña, cuando hay

un gran movimiento de actividad comercial. Debemos ser cuidadosos en vigilar el comportamiento de la actividad criminal y debemos maximizar el uso de los recursos", dijo.

Agosto recalcó en que se estarán revisando los planes de trabajo de cada área policiaca y reconoció que le dará un especial énfasis el área metropolitana, donde existe una gran población flotante. De hecho, dio la instrucción de adelantar los días libres durante las próximas semanas para contar con todo los agentes y personal de alto rango disponible para los fines de semana.

Agosto rechazó que vaya alterar alguna directriz de las implantadas por el pasado jefe policiaco, Héctor Pesquera.

"Vamos a seguir en esa línea. En ese sentido no hay cambio radicales", dijo Agosto. "El periodo es tan corto... el enfoque va a estar dirigido a la parte operacional".

Pesquera presentó su renuncia el pasado 30 de octubre, un día después del nombramiento de Juan Mattos, hijo, como asesor de cumplimiento técnico, una especie de síndico nombrado para supervisar el cumplimiento de la Uniformada con el acuerdo alcanzado en los tribunales con el Departamento de Justicia de Estados Unidos para poner en marcha la reforma de la Policía. Su renuncia no fue efectiva hasta el pasado 15 de noviembre.

En la reunión de dos horas de duración, Agosto hizo llamado a su equipo a esforzarse con el objetivo de tratar de terminar del año lo más lejos posible de a cifra de 985 asesinatos con que cerró el 2012. A esta fecha la cifra de muertes violentas se ubica en 789, aunque faltan por sumar varios casos de muertes sospechosas.

Durante el encuentro, en que también participaron jefes de las ramas investigativa y jefes de área, tomaron la palabra el coronel Leovigildo Vázquez, quien hizo un análisis de la incidencia criminal, el coronel Reymaldo Bermúdez, quien habló sobre el plan de arrestos y el coronel José Luis Ramírez.

Tuller Cintrón tomará las riendas de la Policía el 2 de diciembre. Actualmente, se encuentra en Estados Unidos, pero Agosto Rodríguez sostuvo que mantiene comunicación continua con el que será su jefe.

# Policías reciben con agrado regreso del Coronel Héctor Agosto

4 mayo, 2012 5:24 am by Julio Víctor Ramírez-Torres

MAYAGUEZ: Al describirlo como un oficial de carrera identificado con los problemas de la Uniformada, miembros de la Policía en el Area Oeste, recibieron jubilosos la designación del Teniente coronel Héctor Agosto, como el nuevo jefe regional en sustitución de Francisco Carbó Marty, quien se acoge a la jubilación. El Superintendente de la Policía, señor Héctor Pesquera, hizo el anuncio durante una visita reciente a los diferentes cuarteles del litoral Oeste.

El teniente coronel Agosto  ha ocupado varias puestos de importancia dentro de la Policía estatal, habiendo dirigido las Divisiones de Homicidios y Delitos Contra la Persona, en la otrora Area de Mayagüez, para la década del 90. Persona jovial y muy accesible a los medios de comunicación el alto oficial le devuelve a ese Cuerpo de Seguridad Pública, un mayor acercamiento con la ciudadanía.

Se espera que el teniente coronel Agosto, efectúe una serie de cambios en los diferentes distritos de la Región de Mayagüez, especialmente, en aquellos de mayor incidencia de delitos.  A su llegada a la Sultana del Oeste, Agosto tendrá que lidiar con 17 casos de homicidio reportados hasta mayo 2012, lo que representan 3 asesinatos más que para la misma fecha de 2011.

## ¿QUÉ ES LA OFICINA DE REFORMA?

Es una división integrada por diversos profesionales y miembros de la PPR de distintos rangos con destrezas y habilidades necesarias para planificar y facilitar la implementación de este Acuerdo.

### ¿CUÁNDO ESTA OPERANDO LA OFICINA DE REFORMA?

La misma esta operando desde mayo de 2012.

### ¿QUIÉN ESTA A CARGO DE LA OFICINA DE REFORMA?

La Oficina de Reforma pertenece a la Oficina del Superintendente de la PPR. Actualmente es dirigida por la única mujer que ostenta el rango más alto dentro de la PPR, Tnte. Cor. Clementina Vega Rosario 2-13603.



## ¿CUÁNDO FUE NOMBRADO EL TCA?

El TCA fue designado el 6 de junio de 2014.

### ¿QUIÉN NOMBRÓ AL TCA?

El TCA fue nombrado por el juez federal Gustavo Gelpí del Tribunal Federal, Distrito de Puerto Rico.

### ¿A QUIÉN DESIGNARON COMO TCA?

Designaron al Sr. Arnaldo Claudio como TCA de la PPR.



SR. ARNALDO CLAUDIO

### ¿A QUIÉN LE RESPONDE?

Le responde al Tribunal Federal y se asegura de que el proceso de la Reforma se lleve a cabo.

## ¿QUÉ ES UN ASESOR DE CUMPLIMIENTO TÉCNICO Y CUÁLES SON SUS FUNCIONES?

El TCA (según sus siglas en inglés) es una persona nombrada para revisar, evaluar, monitorear e informar sobre la implementación y cumplimiento del Acuerdo para la Reforma Sostenible de la Policía de Puerto Rico (PPR).

1. Revisará las políticas, protocolos, procedimientos, planes de trabajo, formularios y sistemas de la PPR y emitirá sus recomendaciones.

2. Evaluará si la PPR ha cumplido en el tiempo establecido en el Acuerdo e informará al DJEU cualquier incumplimiento.

3. Podrá reunirse con distintos grupos comunitarios para informarles sobre el proceso de la reforma y recibir un insumo acerca de la interacción por parte de la PPR hacia la comunidad.

 

ESTADO LIBRE ASOCIADO DE PUERTO RICO

# DERECHO DE LAS PERSONAS A NEGARSE A UN REGISTRO Y ALLANAMIENTO INVOLUNTARIO CUANDO NO EXISTA ORDEN JUDICIAL

a persona tiene un derecho constitucional a negarse a un Registro y Allanamiento de un miembro de la Policía si este iene una Orden Judicial. Sin esta orden, el miembro de la Policía no puede registrar su persona, residencia, vehículo, ocio u oficina sin su consentimiento.

ué es una Orden Judicial?

n documento oficial firmado por un Juez en el cual se autoriza a los agentes de ley y orden a entrar en una residencia cal para hacer un registro (Orden de Registro) o realizar un arresto (Orden de Arresto). Una Orden de Registro permite los agentes de ley y orden entren al lugar descrito en la Orden y puedan registrar y ocupar los artículos identificados a orden. También podrán incautarse de cualquier objeto ilegal y/o delictivo que este a plena vista.

n miembro de la Policía presenta una Orden Judicial debidamente firmada por un Juez, la persona debe acceder al gistro y Allanamiento y tiene derecho a verificar que la Orden Judicial sea válida.

a que una Orden de Registro sea válida, esta debe contener lo siguiente:

Debe ser un documento oficial expedido con el sello del Tribunal y contendrá el nombre y firma del Juez que la emite;
Nombre y dirección del (la) dueño(a), residente o parte interesada en el lugar que va a ser objeto del registro;
Fecha y lugar en que se efectuará;
Descripción general de los artículos objeto de ese registro;
Nombre de la agencia que lleva a cabo el registro.

a Orden de Registro que no tenga el nombre de la persona se considera válida si contiene la dirección y descripción rrecta del lugar.

no se ha expedido una Orden de Registro, el miembro de la Policía puede registrar su residencia si usted, otro residente una persona que la Policía razonablemente crea que tiene la autoridad para consentir, le manifiesta al miembro de la olicía que consiente al registro. En cuanto al registro de su oficina o lugar de trabajo usted puede consentir al registro del smo pero de usted negarse a ello, un miembro de la Policía sólo puede llevar a cabo un registro de su oficina si tiene a Orden de Registro o el consentimiento de su patrono. Si su patrono consiente, el miembro de la Policía puede buscar su espacio de trabajo con o sin su consentimiento.

a Orden de Registro por sí sola no da el derecho a un miembro de la Policía a arrestarlo. Sin embargo, lo pueden arrestar encuentran evidencia relacionada con un delito o que por sí sola constituya un delito. En caso de que un miembro de la olicía lo arreste, éste puede llevar a cabo un registro de su persona y del área a su alcance inmediato para proteger su a, la de usted y la de terceras personas sin mediar una Orden de Registro.

un miembro de la Policía intenta hacer un registro de su residencia, usted tiene el derecho a:

1. Preguntar si tienen una Orden de Registro y a no dejarle entrar hasta que obtenga la misma.
2. Solicitar que se le muestre la Orden de Registro antes de permitir el registro.
3. Asegurar que la información en la Orden de Registro es correcta y que no existen errores en la dirección. De existir errores, debe informárselo al miembro de la Policía.
4. No permitir la entrada a su residencia ni contestar preguntas de un miembro de la Policía, si no tiene una Orden de Registro.
5. Manifestar que no consiente al registro y que necesitan obtener una Orden de Registro.

u consentimiento al Registro y Allanamiento sin una Orden judicial debe cumplir con lo siguiente:

1. Ser voluntario, sin mediar violencia, coacción o intimidación directa o indirecta del miembro de la Policía.
2. No constituye coacción la advertencia de un miembro de la Policía a una persona de que solicitará una Orden de Registro si no consiente al mismo.
3. Si un miembro de la Policía le solicita el consentimiento para registrar su persona, residencia o vehículo, le pedirá que exprese su contestación en el documento titulado *Formulario de Consentimiento a un Registro y/o Allanamiento* (PPR-879).



Lcdo. Fernando Torres Ramírez <licftorres@gmail.com>

## Re: Ponencia Vistas Reforma de la Policía - Profesor Fernando L. Torres Ramírez

**Lcdo. Fernando Torres Ramírez** <licftorres@gmail.com>                    21 de octubre de 2015, 19:35
Para: "Lcdo. Fernando Torres Ramírez" <licftorres@gmail.com>, "Cruz Pagan, Lizaida" <lizaida_cruz@pucpr.edu>,
"fernando_torres@pucpr.edu" <fernando_torres@pucpr.edu>, "Javier Oronoz, Rene" <rene_javier@pucpr.edu>, José
<jose_frontera@pucpr.edu>, Alfredo Castellanos <alfredo@cglawpr.com>

Saludos Lcdo. Castellanos,

Incluyo en formato PDF mi ponencia y sus anejos sobre la vista pública de mañana. Para facilitar cualquier
trámite he incluido mi ponencia en formato word también.

No dude en contactarme para cualquier trámite o asunto adicional que sea necesario.

He copiado en este correo al señor Decano, al Decano Asociado y a la Secretaria (de apoyo a la Facultad) de la
PUCPR.

Buenas noches.

--
Lcdo. Fernando L. Torres Ramírez

Porta Coeli Legal Services, PSC

Bufete Torres Ramírez
20 Calle Cruz
San Germán, P.R. 00683-4070
Tel: (787) 892-7829
Fax: (787) 892-7830

**2 archivos adjuntos**

**PONENCIA-Reflexiones y Recomendaciones en Torno al Acuerdo para la Reforma de la PPR.PDF**
6155K

**PONENCIA - REFORMA DE LA PPR -.docx**
150K