# EXHIBIT A

Arnaldo Claudio
Technical Compliance Advisor
TCAPR Corp.
268 Muñoz Rivera
World Plaza, Suite 1001
San Juan, PR 00918

May 14, 2015

**VIA ELECTRONIC MAIL**

Lt. Col. Clementina Vega Rosario
Reform Unit Director
Puerto Rico Police Department
P.O. Box 70166
San Juan, PR 00936

Beatriz Annexy
Special Assistant to the Secretary
Puerto Rico Department of Justice
P.O. Box 9020192
San Juan, PR 00902

      Re: USA v. Commonwealth of Puerto Rico, No. 3:12-cv-2039 (GAG)
      *Review of the Puerto Rico Police Department's Action Plans on Use of Force, Search*
      *and Seizure, Equal Protection and Non-Discrimination, and Civilian Complaints,*
      *Internal Investigations and Discipline.*

Dear Lt. Col. Vega Rosario and Ms. Annexy:

      I write to provide the Technical Compliance Advisor's (TCA) comments on the four Action Plans (Plans) developed by the Puerto Rico Police Department (PRPD) concerning Use of Force, Search and Seizure, Equal Protection and Non-Discrimination, and Civilian Complaints, Internal Investigations and Discipline.   These comments are pursuant to Paragraph 236 of the Agreement for the Sustainable Reform of the Puerto Rico Police Department (Agreement).  These Plans were submitted to the TCA on May 7, 2015.

      Paragraph 233 of the Agreement requires the PRPD to draft Plans that set forth the detailed steps the PRPD will take to implement and achieve compliance with each of the Agreement's provisions in Sections III through XIII.

      Paragraph 235 states that, at minimum, the Plans should include the following:

a)   Identify each policy and procedure and the type of change required;

b) Date by which these changes will be drafted;
c) Date of preparation of training curricula;
d) Schedule for implementation of training by precinct, zone, rank;
e) Schedule for implementation of new policies and procedures in the field;
f) The budgetary allocations; and,
g) Date by which data collection for compliance (assessment and evaluation) will be commenced to be gathered

Paragraph 237 also adds that the Plans shall address resources, funding, staffing, technology, capacity, and other infrastructure and budgetary needs to place the PRPD in a position to implement the Agreement's provisions.

In addition, Paragraph 237 requires the PRPD to submit these Plans to the TCA and the USDOJ for review and approval.  This Paragraph sets the criteria for evaluation.  In order to evaluate these Plans, the TCA should determine whether the Plans for implementation are:

a) Reasonable;
b) Achievable; and,
c) Prioritized to promote efficiency.

Finally, Paragraph 236 sets forth that within 15 days of submission by PRPD, the TCA and the USDOJ will review the Plans.  The US DOJ has 15 days to complete its review. The TCA has 45 days to complete its review and approval.

Following the requirements set forth in the Agreement, the TCA has now completed its review of the aforementioned Plans.  The TCA finds that all four Plans are reasonable, achievable and prioritized to promote efficiency and they meet the requirements set forth in Paragraphs 235 and 237.  After the TCA receives and reviews the USDOJ's comments, the TCA will notify the PRPD concerning approval.

The TCA makes three recommendations to the PRPD applicable to all future Plan submissions.   First, the PRPD, the USDOJ, and the TCA should continue to work collaboratively in the drafting of the remaining seven Plans.  It is clear that the various meetings, discussions, and interim reviews between USDOJ, the PRPD and the TCA prior to the submission of these four Plans have created a better work product.  It is imperative that, in the weeks ahead, we developed a workable schedule for the prompt delivery of the remaining Plans.

Second, the TCA strongly encourages the PRPD to address in the remaining seven Plans issues regarding resources, funding, staffing, and technology that the USDOJ and the TCA identified during the elaboration of these four plans.  In particular, the Action Plan on

2

Supervision and Management must address the new demands that the Agreement brings upon supervisors and upon the PRPD to effectively train and evaluate supervisory staff.  It is also important to address these issues in the Plan on Professionalization.

In addition, the PRPD must effectively and expeditiously expand its technological capacity and infrastructure and began work on this key integrating Action Plan.  The TCA submits that this is an area where the PRPD need considerable improvement.  New TCA team member Scott Cragg will provide technical assistance and support concerning the area of Information Technology (IT).

Although the submitted Plans have outlined with great clarity the expected developments in the area of policy and training, concrete references to technology, infrastructure, administrative and operational needs require more specificity in order to strengthen the PRPD's capacity-building efforts in the next four years.  Similarly, the subsequent Plans must continue to identify further obstacles to compliance, how the PRPD expect to address these roadblocks, and the role that experts may have in developing innovative solutions to overcome barriers and operational problems.  Also, the remaining Plans must continue to address how they will help the PRPD to create a healthy and positive command climate which is essential for their implementation.

Third, the TCA recommends that, although the current four Plans under review should be approved after reviewing USDOJ comments, they must be reviewed one more time once all eleven Plans are completed.  At that point, the PRPD, the USDOJ and the TCA shall meet to make sure that all Plans read as a consistent, coherent and synchronized document identifying potential conflicts or inconsistencies and making substantial edits when needed.

In conclusion, the TCA appreciates the considerable effort made by PRPD, in particular the Reform Unit, in completing the first four Plans within the May 7, 2015 deadline set by during the 20 November 2014 meeting among the Parties and the TCA.  The TCA looks forward to meeting with you and scheduling new working sessions for the purpose of completing the remaining Plans as soon as feasible.  If you have any questions or concerns regarding my comments, please do not hesitate to contact me.

Sincerely,


Arnaldo Claudio
Technical Compliance Advisor

cc:     Luis E. Saucedo
        U.S. DOJ
        Special Litigation Section

3

# EXHIBIT B

Arnaldo Claudio
Technical Compliance Advisor
TCAPR Corp.
268 Muñoz Rivera
World Plaza, Suite 1001
San Juan, PR 00918

June 16, 2015

**VIA ELECTRONIC MAIL**

Lt. Col. Clementina Vega Rosario
Reform Unit Director
Puerto Rico Police Department
P.O. Box 70166
San Juan, PR 00936

Beatriz Annexy
Special Assistant to the Secretary
Puerto Rico Department of Justice
P.O. Box 9020192
San Juan, PR 00902

Re: USA v. Commonwealth of Puerto Rico, No. 3:12-cv-2039 (GAG)
*Review of the Puerto Rico Police Department's Action Plans on Use of Force, Search and Seizure, Equal Protection and Non-Discrimination, and Civilian Complaints, Internal Investigations and Discipline.*

Dear Lt. Col. Vega Rosario and Ms. Annexy:

I write to provide the Technical Compliance Advisor's (TCA) additional comments on the four Action Plans (Plans) developed by the Puerto Rico Police Department (PRPD) concerning Use of Force, Search and Seizure, Equal Protection and Non-Discrimination, and Civilian Complaints, Internal Investigations and Discipline. I already provided initial comments on May 13, 2015, and these comments supplement those originally made. These additional comments are pursuant to Paragraph 236 of the Agreement for the Sustainable Reform of the Puerto Rico Police Department (Agreement). These Plans were submitted to the TCA on May 7, 2015.

Paragraph 233 of the Agreement requires the PRPD to draft Plans that set forth the detailed steps the PRPD will take to implement and achieve compliance with each of the Agreement's provisions in Sections III through XIII. Here I provide comments for each specific Plan.

My comments on the Plan on Use of force is that these changes are consistent with the comments and edits that both the USDOJ and the TCA made concerning the Plans. Page

1 identifies that the PRPD will revise policies as needed.  The TCA agrees with this change. However, the TCA submits that the term "tan pronto se notifique una deficiencia," is too vague because it does not identify who will be the subject of the notification. I recommend that it is changed to "tan pronto se identifique una deficiencia sobre esta."  All other changes are relevant.

My comments on the Plan on Search and Seizure is that these changes are consistent with the comments and edits that both the USDOJ and the TCA made concerning the Plans. Again, page 1 identifies that the PRPD will revise policies as needed.  The TCA agrees with this change but recommends the change suggested in language for the use of force Plan.  All other changes are relevant, including the reference to the non-discrimination Plan.

My comments on the Plan on Non-discrmination is that these changes are consistent with the comments and edits that both the USDOJ and the TCA made concerning the Plans. I recommend that the PRPD adopts the change already noted for the prior plans.  Table 23has improved and the TCA finds this change relevant.

My comments on the Plan on Civilian Complaints is that these changes are consistent with the comments and edits that both the USDOJ and the TCA made concerning the Plans. I recommend that the PRPD adopts the change already noted for the prior plans.  The tables in page 74 and 75 have improved in content and the TCA finds this change relevant.

Following the requirements set forth in the Agreement, the TCA has now completed its review of the aforementioned Plans.  The TCA finds that all four Plans are reasonable, achievable and prioritized to promote efficiency and they meet the requirements set forth in Paragraphs 235 and 237.

In conclusion, the TCA appreciates the considerable effort made by PRPD, in particular the Reform Unit, in completing the first four Plans within the May 7, 2015 deadline set by during the November 20 Agreement among the Parties and the TCA.  The TCA looks forward to meeting with you and scheduling new working sessions for the purpose of completing the remaining Plans as soon as feasible.  If you have any questions or concerns regarding my comments, please do not hesitate to contact me.

Sincerely,

Arnaldo Claudio
Technical Compliance Advisor

cc:    Luis E. Saucedo
       U.S. DOJ
       Special Litigation Section

2

# EXHIBIT C



**U.S. Department of Justice**

Civil Rights Division

JCP:CEL:LES:ZIL:BB:SSL:MC
DJ 207-65-3

*Special Litigation Section - PHB*
*950 Pennsylvania Ave, NW*
*Washington DC 20530*

July 6, 2015

**<u>VIA ELECTRONIC MAIL</u>**

Arnaldo Claudio
Technical Compliance Advisor
World Plaza Building
268 Munoz Rivera Avenue, Suite 1001
San Juan, PR  00918

   RE: <u>USA v. Commonwealth of Puerto Rico</u>, No. 3:12-cv-2039 (GAG)
     *Comments on TCA's Second Draft Monitoring Report*

Dear Mr. Claudio:

  We write to provide our comments on the draft "Six-Month Report of the Technical Compliance Advisor, December 7, 2014 – June 7, 2015" (Draft Report), pursuant to Paragraph 252 of the Agreement for the Sustainable Reform of the Puerto Rico Police Department (Agreement). We appreciate the considerable effort reflected in the Draft Report. We recognize that the Draft Report is the culmination of a dedicated effort by your entire team over the course of many months, and we appreciate their valuable input. We highlight below several areas that we found particularly useful in addressing the structural and organizational needs of the Puerto Rico Police Department (PRPD) during the current capacity-building period of the Agreement, which provides the Commonwealth with an opportunity to make much-needed investments to modernize and professionalize PRPD. At the same time, we have serious concerns with other areas of the Draft Report, which we address in detail below. All references to "Paragraphs" are to the Agreement.

  One of the hallmarks of sustainable institutional reform is an organizational culture that values continuous improvement and instills a shared responsibility in advancing the agency's mission among all members. Many of the Agreement's requirements are designed to accomplish these objectives. For example, the force review boards enable PRPD to examine uses of force individually and in aggregate to identify patterns or trends that may require changes in policy or training; new officers are offered the opportunity to provide confidential feedback on the quality of their field training and are encouraged to make recommendations for improvement; and first-line supervisors are held accountable for the quality of their initial review of arrests and uses of force. While it is important to assist PRPD in building its operational capacity through the

development of policies and procedures, the Agreement's capacity building period provides a unique opportunity for the Technical Compliance Advisor (TCA), through his subject-matter experts, to guide PRPD in promoting a culture of meaningful self-evaluation through performance measurement, consumer-oriented feedback, and public accountability. The monitoring approach that the Agreement requires of the TCA also holds the potential to serve as a model for PRPD's own evaluation efforts. While the Reform Unit serves as the nucleus of PRPD's self-monitoring at the present time, teaching and encouraging all members of PRPD to take responsibility for improving PRPD's performance – in addition to meaningful public accountability and community engagement – will ultimately bring about the kind of reform that will outlive the case. These principles provide the backdrop for our evaluation of the TCA's priorities and activities, as set forth in the Draft Report.

As an initial matter, we commend the TCA's team of subject-matter experts, which includes constitutional law experts, for their collaboration during the review period. We have had the opportunity to observe their interactions with PRPD first-hand and appreciate their professionalism and candor in conveying feedback and offering recommendations and technical assistance. It is evident that, collectively, their experience with other local law enforcement agencies, expertise in various subject-matter areas, and familiarity with the needs of Puerto Rico have been of great benefit to the development of critical policies, programs, and plans during the review period. Their effort to guide and assist PRPD in a manner that allows PRPD to take ownership of its own transformation is very much appreciated and consistent with the lasting reforms that the Agreement is intended to achieve.

We also appreciate the Draft Report's discussion on information technology. This is an area that can benefit PRPD greatly during the capacity building period. As you know, we agreed to this initial four-year period, in large part, because chronic infrastructure and technology needs throughout PRPD and the Commonwealth presented significant barriers to sustainable reform. We also recognized that overcoming these barriers would require concerted and sustained effort, together with proper oversight, to ensure that the Commonwealth's investments facilitated full and timely implementation of the Agreement following the capacity building period. Accordingly, we agreed to the development of action plans that serve as roadmaps during this initial phase of implementation and are overseen by the Court as enforceable terms of the Agreement. *See* Paragraphs 235, 238. The four years allotted to this initial phase include the strategic planning, resource allocation, implementation, and program evaluation necessary to place PRPD on a path toward greater modernization and professionalization. Information technology in particular will require every minute of the capacity building period given the pervasive needs throughout PRPD, which are discussed briefly in the Draft Report on page 27. We understand that much-needed discussions on staffing, budgeting, resource availability, leadership, and other topics related to information technology are now taking place. The TCA team's assessments in this area should prove useful in developing a comprehensive action plan on information technology that supports all areas of the Agreement before the end of the year.

We have serious concerns with the Draft Report's emphasis on the TCA's activities over an independent assessment of PRPD's compliance initiatives; lack of a consistent connection between the TCA's recommendations and PRPD's action plans; and inclusion of sensitive information that should not be disseminated publicly at this stage. We expressed similar

2

concerns regarding the emphasis on the TCA's activities in response to your first monitoring report. *See* Letter from DOJ to TCA of 1/18/15; Supplement on the First Six-Month Report of the Technical Compliance Advisor, June 6 – December, 2014, Dkt. #212. In response to our concerns on the first TCA report, on March 14, 2015, the TCA submitted a draft work plan and indicated that future reports would provide greater focus on, and independent assessment of, the status of PRPD's implementation of required reforms. Based on our review, there is an inconsistent correlation between the TCA's March 14 work plan and the content and focus of the Draft Report.

The Draft Report places an atypical and counterproductive emphasis on the TCA, rather than on PRPD's compliance initiatives and performance. This inappropriate focus is evident from the outset of the Draft Report, which opens with a Message from the Technical Compliance Advisor stating that the Draft Report "summarizes" the TCA's activities. Draft Rep. at 2. This emphasis on the TCA rather than the status of Agreement implementation continues throughout the Draft Report. In many cases a description of the TCA's activities and instructions take prominence over an assessment of PRPD's efforts to address the TCA's concerns or an evaluation of the actions taken by the Commonwealth. With few exceptions, such as the preliminary assessment by the new information technology expert, the TCA's activities do not appear to be connected to a consistent monitoring methodology that describes the underlying information reviewed or the data relied upon. This undertaking is particularly useful at this early stage of implementation in order to determine whether any gaps in documentation or data exist that may impede drawing reliable conclusions about PRPD's compliance. This focus lends the impression that the TCA's activities are not tied to the Agreement, when, of course, for reform to be successful, the TCA must remain focused on determining the status of PRPD's implementation of the Agreement's agreed-upon requirements.

The section of the Draft Report discussing PRPD's semi-annual self report, which is required under Paragraph 261, provides another example of the disproportionate emphasis on the TCA, to the detriment of much-needed focus on what PRPD has (and has not) done to implement the required reforms. Each of the issues discussed in this section are evaluated in the context of the TCA's performance and access, rather than on determining whether PRPD's actions furthered the goals and objectives of the Agreement. For example, the TCA indicates that he received conflicting information from PRPD on use of force statistics. Draft Rep. at 8. There is no discussion of the adequacy of PRPD's force reporting methods or analyses, steps that PRPD should take to improve the gathering of these important data, or an acknowledgement that PRPD only recently began gathering this data as a result of the Agreement. Separately, the Draft Report indicates that the TCA did not review, comment, or approve training provided or attended by PRPD. *Id.* However, the Draft Report does not acknowledge that a schedule has been developed as part of the action planning process that sets time frames for submitting relevant training programs to the TCA and the United States for review and comment. Nor does the Draft Report discuss the TCA's plans to evaluate the training to determine whether it advanced the objectives of the Agreement. The third issue discussed in this section is incorrect – the Parties have not agreed that PRPD should submit its next semi-annual report in draft form to the TCA prior to its submission to the Court. The remaining issues discussed in this section focus on the TCA not approving certain policies or receiving copies of other documents. It is easy to determine from this report what the TCA has (and has not) done; it is far more difficult to

determine the status of PRPD's efforts implementing the Agreement, or even whether the TCA has assessed that status. Given the primary purpose of the TCA's assessments and reports, pursuant to Paragraphs 225, 227, 240 and 250, this is troubling.

Significantly, the TCA's assessment of one of the few, major requirements during the review period – the training of an initial group of PRPD officers in four core areas of the Agreement, pursuant to Paragraph 237(a) – was given only a passing reference. The Draft Report states summarily that the "PRPD Report does not address the PRPD's failure to comply with Paragraph 237(a)." *Id.* There is no discussion of the efforts undertaken by PRPD to comply with this requirement, nor does the Draft Report evaluate the reasons for the reported failure. Similarly, the Draft Report does not provide an objective assessment of the academy training program and its contents, which make the commentary congratulating the recruit class and describing the graduation ceremony seem superfluous. Further, an objective assessment of the training to determine whether it was or was not consistent with the Agreement would provide greater significance and meaning to the TCA's observation that the recent recruit class was the first to graduate "under the reform Agreement." The TCA also does not discuss the resolution, if any, of concerns identified previously at the Academy regarding continuity of instructors, testing, and misconduct allegations to determine the efficacy of PRPD's remedial efforts.

Paragraph 240 requires that the TCA evaluate PRPD's compliance with the Agreement by assessing PRPD's progress against its action plans. Agreement ¶ 240. We recognize that PRPD's action plans were under development during the review period. However, the focus of the TCA's reports should remain on PRPD and its performance. In our March 2015 Supplement, we urged that the TCA's next reports focus on PRPD's progress toward reform. Supplement at 4-6. We explained that the failure to identify and evaluate the Commonwealth's compliance actions deprives the Parties and the Court of the opportunity to address any challenges being faced by PRPD in the implementation of the Agreement. *Id.* at 6. In addition, it undermines the transparency that the Agreement promises to the people of Puerto Rico. *Id.* We reiterate the concerns raised in our Supplement and urge the TCA to provide a more complete discussion of the Commonwealth's implementation efforts.

The TCA's observations and recommendations related to the Agreement should be addressed in the context of PRPD's action plans in order to ensure proper follow up and remedial action during the capacity building period. The action plans embody the Commonwealth's commitments through June 2018, and each of the TCA reports during this period must focus on PRPD's implementation of the plans. *See* Paragraphs 240, 250. The Draft Report currently lists recommendations from the TCA in response to specific incidents and concerns regarding the Drug Units, the Canine Units, and the Maritime Units.[1] Draft Rep. at 18-24. While serious, not all of these issues implicate PRPD's compliance with the Agreement. Further, the issues that are related to compliance are not reflected fully in the current set of PRPD action plans. The TCA must remain focused on implementation of the Agreement and PRPD's action plans if this reform effort is to be successful.

---

[1]     We understand that the TCA has decided to redact sensitive information about these units and raise his concerns in separate memoranda. Letter from TCA to PRDOJ of 7/2/15.

Contrary to the statement in the Draft Report, the capacity-building period of this Agreement was in no way intended to confer on the TCA the authority or role of a "comptroller" that allows the TCA to examine "virtually every aspect of how the PRPD police the people of Puerto Rico." Draft Rep. at 4. The Agreement defines the limited authority of the TCA and requires that the TCA not interfere with the Superintendent's operational control and authority over PRPD. During the capacity-building period, the action plans provide the scope and breadth of remedial action that will be taken by PRPD under the Agreement, and, correspondingly, the scope and breadth of the TCA's monitoring activities and reports. Limiting the TCA's focus in this manner is not only required by the terms of the Agreement, it is necessary to ensure that the TCA's efforts do not become overly diffuse and thus ineffective, and that the TCA's legitimacy with the PRPD and the public—legitimacy critical to the TCA's success—is not compromised.

We do not mean to say that the TCA cannot raise ancillary issues or bring serious operational deficiencies to the attention of the Parties. When an issue is not related directly to the Agreement, it would be appropriate for the TCA to notify the Parties of the issue for action that may be warranted. The discussion in the Draft Report regarding the ███████████ is a good example. The TCA reports that he learned from the commanding officer that ██████████████████████████████████████████████████████████████████ There is no discussion regarding any compliance issues that are implicated. Even if there were compliance issues discussed, the TCA has not recommended that PRPD take remedial action in this area in the action plans. It appears that the emphasis on ancillary operational and tactical issues in the Draft Report is based on the TCA's misapprehension of his role as a "comptroller."

Finally, we appreciate that you plan to revise the Draft Report to redact sensitive information and preliminary observations. Letter from TCA to PRDOJ at 1. In several areas of the current Draft Report, the TCA discussed ongoing administrative and criminal investigations and other law enforcement vulnerabilities that could be exploited by others. The TCA also offered preliminary observations that are more appropriately raised outside of the context of the public report to avoid prejudicing or interfering with ongoing investigations. For example, the Draft Report discussed ██████████████████████, which could be exploited by █████████ ██████ Draft Rep. at 23-24. The Draft Report also identified ████████ vulnerabilities at the ████████████. *Id.* at 26.

The problem with sharing preliminary observations is that the assessment is based on incomplete information. From our understanding, there has been no compilation and assessment of relevant evidence, nor any finding or conclusion of "inequities" against the public or officers related to the incident. *See* Draft Rep. at 18 (discussing the intent of the section). Because fact-finding and other investigative activities are reportedly underway, the public dissemination of preliminary comments based on incomplete information may improperly prejudice or interfere with the investigative process. That is not to say that the TCA cannot follow up on the status of the investigation or review the investigation report and corrective actions taken once PRPD's investigation is complete; it would be appropriate for the TCA to do so. However, the TCA's activities or advocacy on behalf of alleged victims cannot serve as a substitute for the investigative process carried out by PRPD and may compromise the TCA's independence and objectivity.

We are also concerned that the TCA's observations concerning the ▮▮▮▮▮ incident in ▮▮▮▮▮ involve sweeping claims that do not have adequate support and have the potential of undermining ongoing criminal investigations and prosecutions.  For instance, the Draft Report indicates that "▮▮▮▮▮▮▮▮▮▮▮▮▮▮ are always conducted without any legal advice and they rely upon immediate observations rather than on an ongoing investigation."  Draft Rep. at 20.  The Draft Report also states, ▮▮▮▮▮▮▮▮▮▮ *Id.*  As an initial matter, the Draft Report makes these claims in the context of one incident without elaborating on the factual support or explaining how these observations apply to other cases.  Separately, it is imperative that the TCA recommend that PRPD address systemic concerns raised by this incident in its action plans.  To be clear, we are not disputing the TCA's claims, which may be accurate.  However, without further information supporting the TCA's conclusions, the discussion in the Draft Report is incomplete and may improperly interfere with ongoing cases.  These discussions within the Draft Report underscore the need for the TCA to focus on conducting reliable assessments, based on transparent and sound methodologies, to make findings regarding PRPD police activities, rather than matters not even covered by the Agreement.

Below are additional specific comments on the Draft Report that further illustrate our concerns above, as well as discuss other specific issues.  We do not address purely typographical errors.

| Section, Page | Comment |
|---|---|
| Message, 2 | The Draft Report includes "rules" among the documents reviewed by the TCA. We are not aware of rules governing PRPD operations and do not recall receiving them from PRPD for review and comment.  We recommend that the TCA use terms that are consistent with PRPD's operations. |
| Message, 2 | The Message does not highlight any major accomplishments or challenges facing PRPD.  The section focuses almost entirely on the actions of the TCA, rather than an assessment of PRPD's implementation efforts.  We recommend that the TCA include an assessment of major accomplishments and significant challenges facing PRPD. |
| Introduction, 4 | The first paragraph makes reference to the "TCA and his staff  ("Core Team"). Please clarify the reference to "staff" and whether it includes administrative staff.<br><br>We agree that the TCA should conduct systematic reviews of policies, procedures, and practices.  The Draft Report generally should discuss the methodology employed in reaching conclusions and present data or other metrics that support its conclusions. |
| Introduction, 4 | The TCA should consider organizing the Draft Report according to the eleven substantive areas of the Agreement to ensure that contents are tied to the Agreement. |

| Introduction, 4 | In the third paragraph, the TCA indicates that the TCA is required to devote his efforts toward developing policies, procedures, and action plans. A more complete statement of the capacity building period, which runs through June 2018, would also include the creation and strengthening of organizational systems to modernize and professionalize PRPD, including addressing chronic infrastructure, personnel, and technology needs.<br><br>We do not agree with your view that the TCA's role is that of a "comptroller." It is unclear whether the TCA chose this term as a substitute for "receiver," which is also not the TCA's role. The Agreement defines the scope of the TCA's duties and authority. We recommend deleting this statement and that we have a discussion at your earliest convenience to ensure we have a common understanding about the limits of the TCA's role. |
|---|---|
| Introduction, 4-5 | Please clarify your statement regarding PRPD's "willingness and enthusiasm to accept insightful recommendations that will eventually facilitate the monitoring process." The statement implies that there are problems in the areas discussed, which, if true, should be discussed more fully in the Draft Report. Even if PRPD does not follow the TCA's recommendations and chooses to employ alternate measures, an assessment of underlying conditions remains necessary to determine whether PRPD is, nonetheless, making progress toward compliance. This is an important function of the TCA as a neutral, external entity that distinguishes it from the Superintendent or other Commonwealth official who is authorized to issue orders and direct the operations of PRPD. |
| Introduction, 5 | The statement that the TCA "departs from his assistance role whenever he understands that the PRPD displays egregious conduct toward the community by violating their civil or constitutional rights…" is unclear. The TCA should always search for ways to improve PRPD's systems of accountability, even when addressing individual instances of misconduct. With respect to individual allegations of misconduct, the TCA describes a process for referring allegations to PRPD and following up on the status of investigations. These are appropriate actions that fall within the scope of the TCA's duties. Please clarify whether the TCA views other actions as falling within the scope of his duties concerning individual allegations of misconduct. We caution that it would be inappropriate for the TCA to advocate on behalf of alleged victims or litigants in specific cases, or to prejudge or interfere with ongoing criminal and administrative investigations conducted by PRPD or other investigative authority.<br><br>The TCA should also treat allegations as such, until a determination is made by investigative authorities concerning a violation of policy, law, or regulation. The first full paragraph in this section refers to allegations, and the language used to describe them is conclusory and may be unnecessarily inflammatory. |

| | |
|---|---|
| Introduction, 5 | One of the goals of the Agreement is to ensure that PRPD builds constructive relationships with the communities it serves. While it is understandable that some community groups remain distrustful of PRPD given prior interactions, it is critical that PRPD work to restore that trust. We recommend that the TCA assist PRPD in building constructive relationships by facilitating constructive dialogue and joint effort, rather than serving as a conduit or spokesperson for a community or advocacy group, which may interfere with the TCA's role as a neutral, impartial entity.<br><br>The Draft Report states that the TCA and his staff "personally visit community stakeholders who raise their concerns about PRPD." To ensure a balanced assessment, please indicate whether community stakeholders also convey any positive feedback regarding PRPD, including any strengths or areas of improvement that are relevant to the Agreement.<br><br>The statement that there is a "dearth of community interaction between the people and the police" is unclear and should be clarified. |
| Agreement, 6 | This section provides a good summary of the Agreement and the capacity building period. Specifically, we agree that the capacity building period is intended to "afford the PRPD to receive technical advice and develop the policies and metrics that would enable them to meet the individualized tasks of the Agreement." We request that the Draft Report and upcoming monitoring reports provide a fuller discussion of work undertaken by PRPD and the TCA on these tasks. |
| PRPD Status Report, 8 | The Draft Report indicates that there was a discrepancy between force statistics offered by PRPD. Please discuss any steps undertaken by the TCA to address the discrepancy, including any evaluations on PRPD's data gathering methods on use of force. We also request that you specify the period that is covered by the force statistics presented in the Draft Report. For example, what is the period covered by the 512 incidents that were reported by PRPD?<br><br>The Draft Report indicates that PRPD reported zero uses of force in Guayama in 2014 and six investigations on use of force in Guayama in 2015. The Draft Report describes these figures as statistical anomalies or errors. Please explain. |

| | |
|---|---|
| PRPD Status Report, 8 | The Draft Report indicates that the TCA did not review, comment, or approve training that was reported by PRPD in its Second Status Report.  Draft Rep. at 8.  The Draft Report does not to recognize that PRPD has provided a schedule on the development of new and revised training programs during the capacity building period as part of its first four action plans on Use of Force, Searches and Seizures, Equal Protection, and Civilian Complaints/Internal Investigations.  It is also unclear whether the TCA requested any training calendars or made attempts to audit or attend any of the training sessions at issue.  This section would benefit from a more complete discussion of whether any training provided during the review period was adequate, beyond the TCA's observation that he did not approve training.  We note that the Draft Report indicates at page 14 that one member of the TCA's expert team was "fully assigned to training and Academy matters" for the review period.  The Draft Report states further that the "TCA team member was involved in every aspect of curriculum development, training planning, and resource assessment."  Draft Rep. at 14.  Please address the apparent discrepancy between your discussion of PRPD's Second Status Report at page 8 and your discussion of training on pages 14-16. |
| PRPD Status Report, 8 | The Parties have not agreed that the next PRPD status report should be sent to the TCA in draft form for comment 30 days prior to submission to the Court.  The Agreement does not provide for this procedure.  Accordingly, the TCA should delete the third paragraph. |
| PRPD Status Report, 8 | The Draft Report indicates that the TCA does not have sufficient information to determine the appropriateness of training provided on police ethics in April 2015.  Among the reforms in the Agreement are requirements that PRPD maintain complete and accurate records of current curricula, lesson plans, and other training materials in a central, commonly-accessible, and organized file system.  *See* Paragraph 133.  Please indicate whether the TCA is able to conduct an assessment of police ethics training based on existing training records.  If such a review is impossible because records are incomplete or another reason, please provide your assessment.  Your assessment of the record management system at the Academy would be useful to the Parties in developing action plans on training during the next review period. |
| PRPD Status Report, 9 | We agree that there may be qualitative differences between general government ethics and policing ethics.  The Draft Report indicates that the TCA is unaware of the content of the collaborative agreement between the Office of Government Ethics and PRPD.  We recommend that the TCA request a copy of the agreement and discuss whether the actual arrangement allays the TCA's concerns regarding potential qualitative differences. |

| | |
|---|---|
| PRPD Status Report, 9 | The observation that PRPD's Second Status Report did not address PRPD's failure to comply with Paragraph 237(a) requires further elaboration. Specifically, the Draft Report should provide context for the requirement, which has been a matter of multiple discussions with the Parties; an assessment of PRPD's performance; and support for the TCA's conclusions.  As we have indicated, the time frames in Paragraph 237 serve as performance indicators for PRPD's progress under the Agreement, and the training in subsection (a) is the first compliance milestone in the Agreement's ten-year life span.  We also note that on June 4, 2015, the PRPD Superintendent provided a certification and supporting documents on training provided to officers assigned to federal task forces, pursuant to Paragraph 237(a). |
| Action Plans, 9-10 | We recommend that the TCA re-assess the organization of this section.  For example, the TCA may want to begin with the Parties' agreement on the development of action plans to explain why action plans were not in place during the review period.<br><br>The Draft Report states incorrectly that the Parties agreed to modify the Agreement to hold the TCA's approval of "any Action Plan until he has had the opportunity to review and approve all policies for the eleven compliance areas."  This statement is not accurate and should be modified or deleted. |
| Action Plans, 10 | The Draft Report indicates that a "working group" was created to develop PRPD's action plans.  We do not recall that such a working group was formed.  Nonetheless, we recognize that DOJ met on several occasions with members of the TCA team and PRPD to discuss PRPD's draft action plans.  In one of the meetings, we recommended that other TCA members assigned to specific areas of the Agreement participate in the planning meetings to provide their perspective on substantive issues, such as specific infrastructure, personnel, or technology needs that might be required to facilitate compliance. |
| Action Plans, 11 | The Draft Report discusses the TCA's recommendations on the pending action plan for professionalization in detail.  Please clarify the reasons for selecting this area and whether the recommendations regarding budget, human resources, materials and information technology equipment also apply to other action plans. |
| Action Plans, 11 | The Draft Report indicates that the four action plans that were submitted during the review period are "only pending USDOJ approval."  During our June 24, 2015 conference call, PRPD reported that the revised action plans are pending review and approval by the Superintendent, which is expected on July 13.<br><br>The Draft Report includes a discussion of various concerns that are related to the four action plans that were approved by the TCA, such as improved guidance to Drug Units to ensure that arrests are justified.  Several of the TCA's recommendations are not included in the relevant action plans, which embody the Commonwealth's commitments during the four-year capacity building period.  We urge the TCA to re-evaluate his concerns in the context of the action plans to ensure that PRPD is taking appropriate steps during the capacity building period. |

| | |
|---|---|
| Action Plans, 12 | The third paragraph of this section should be revised to reflect the Parties' discussion on June 24, 2015 regarding the timing on filing the action plans. Specifically, the Parties discussed filing the action plans as they are approved. We also discussed that amendments to filed action plans should only occur when necessary to ensure consistency with other action plans and compliance with the Agreement, as additional action plans are approved. |
| Action Plans, 12 | We understand that the TCA has approved PRPD's four initial action plans on Use of Force, Searches and Seizures, Equal Protection, and Civilian Complaints/Internal Investigations.  However, we note that many of the TCA's recommendations for future action plans apply to the plans he approved.  These comments are consistent, in large measure, with our comments on the four revised action plans.  In addition, as discussed above, the TCA has raised concerns regarding the Drug Units and other PRPD components that are relevant to the four initial action plans, which do not include corresponding action steps. |
| Policies/ Procedures, 13 | Based on the description of the TCA's activities, a significant amount of the TCA's efforts were directed at reviewing policies and procedures.  This section should provide a fuller description of the work undertaken by PRPD and its reform unit to develop and revise policies.  As currently written, the Draft Report emphasizes the work of the TCA in reviewing policies over PRPD's efforts to produce policies, in some cases new policies, for review.

Please confirm that the example in the second paragraph concerning "prohibiting Terry stops" is accurate.  As written, the Draft Report indicates that Puerto Rico's rules of criminal procedure prohibit Terry stops. |
| Training, 14 | The opening sentence is unclear and confusing.  Rather than focusing on the TCA's beliefs, the Draft Report should evaluate the role ascribed to the Academy by PRPD and whether it is consistent with the Agreement.

The issues raised in the opening paragraph concerning the needs of the Police Academy should be included in PRPD's action plan on training, which is under development. |
| Training, 15 | We recommend that the TCA re-evaluate the Field Training Officer (FTO) manual in light of its observations concerning the role of the FTO program in community policing to ensure that appropriate guidance is being provided to FTOs in this area.  It is unclear whether the TCA has independently assessed PRPD's reports on the rotation of recruits and the prompt correction of identified deficiencies.  The Draft Report should specify the basis for the TCA's conclusions. |
| Training, 15 | We appreciate the comment that each recruit assigned to Canovanas was given a copy of the Agreement.  We recommend that the TCA also address any messages that were conveyed to the recruit class regarding the Agreement by FTOs or other commanders, beyond providing a copy of the Agreement, and what the take-away message was for recruits concerning the Agreement. |

| Training, 15 | The paragraph concerning the discrepancies discovered in Bayamon Sur and San Juan omits that PRPD's Reform Unit was also present and participated in the visit.  We understand that the Reform Unit audited the program and raised concerns directly with the FTO program commander.  If available, please provide your assessment of PRPD's remedial actions.  We also recommend that the Draft Report provide brief context on the meaning of the FTO recruit ratings to make this observation accessible to the public. |
|---|---|
| Training, 16 | Please clarify your recommendation that PRPD should develop a strong professional cadre of "new" officers for the FTO program.  PRPD should be identifying experienced veteran officers to work with new officers in order to, among other things, develop situational awareness during calls for service and other field work.  The "89 months" in the first paragraph appears to be a typographical error. |
| Training, 16 | While it is appropriate for the TCA to make recommendations concerning PRPD's programs and operations, it is critical that the TCA not attempt to manage them in order to preserve his independent role under the Agreement.  For example, it is appropriate to guide PRPD by offering resources that are available to assist in the development of the FTO program, but PRPD must ultimately take ownership for developing its program in accordance with the Agreement.  The TCA's assistance should also be directed at promoting PRPD's ability to successfully manage its program.<br><br>The list of recommendations does not specify what actions PRPD has already taken and whether the actions are meeting the goals of the Agreement. |
| TCA Activities and Community Engagements 17 | We recommend that the Draft Report provide additional details regarding the two-hour public hearing in which PRPD provided answers to important questions posed by the Court.  Specifically, we recommend that the Draft Report summarize the most salient points raised during the hearing regarding the topics covered, as well as address concerns raised by the public and the Parties.  The Draft Report should also clarify the expectation regarding translation of the proceedings.<br><br>The dates of the next hearing should be updated. |
| Significant Events, 17 | Please clarify the statement that "[t]here is an expectation that the TCA will have the competency to address real problems" in the opening paragraph of the section.  It is unclear what competency the TCA is referring to, beyond referring misconduct allegations to the Parties for investigation.  The statement that members of PRPD have "increasingly provided the TCA with honest commentary on certain conditions within PRPD" also warrants clarification.  The current language implies that initial commentary by officers was dishonest, or that comments provided by others that have not contacted the TCA were dishonest.  Interviews with PRPD personnel, whether they result in positive or adverse commentary, should be part of the TCA's independent assessments of conditions within PRPD. |

| | |
|---|---|
| Significant Events, 18 | This section describes the TCA's interest in demonstrating that the "TCA is ever vigilant that inequities perpetrated against the public or police officers are exposed and properly investigated." However, this section does not appear to consider the implications of publicizing factual details of specific incidents that are under active administrative and/or criminal investigation. Indeed, the TCA may be undermining his stated goal of ensuring proper investigations by offering observations and recommendations that are based on incomplete information. While it is appropriate for the TCA to monitor the status and outcome of investigations, it would be inappropriate for the TCA to offer premature commentary that has the potential of inflaming the public or prejudicing ongoing investigations. In addition, the TCA does not mention what efforts he has undertaken, if any, to guide PRPD in becoming more transparent concerning misconduct investigations and their outcomes. We understand that the TCA will be revising this section to redact sensitive information.<br><br>If necessary, we recommend that the Draft Report provide only a general description of allegations he has referred for investigation. Other factual details, including preliminary observations and recommendations, should be deleted and transmitted separately to PRPD while investigations are pending. We recommend further that the Draft Report focus on offering observations and recommendations that would guide PRPD in building its capacity to complete timely, thorough, and objective internal investigations, such as assessments on the investigative process, staffing levels for investigators, and training programs for investigators.<br><br>███████████████████████ lease use the following description of the FBI's review of the allegations: "The FBI opened a case to allow the FBI to monitor and coordinate the investigation with NIE pursuant to DOJ and FBI policy. |
| Significant Events, 19-20 | The Draft Report draws conclusions regarding ███████████████ ██████████████████ by PRPD while administrative and criminal investigations are ongoing. To avoid prejudicing or interfering with pending investigations, we recommend that the TCA provide his preliminary recommendations to PRPD directly as technical assistance, rather than through a public report. The TCA should also share the information he has obtained regarding the alleged misconduct with investigators. We understand that this is one of the areas that the TCA intends to redact, pursuant to his July 2, 2015 letter to the Commonwealth. |

| Significant Events, 20 | The Draft Report indicates that this section is intended to address compliance challenges related to the implementation of the Agreement and steps that were found not to have been fully implemented in practice by the TCA, pursuant to Paragraph 250 (d) and (e).  Paragraph 250 refers to the TCA's assessment of PRPD's action plans.  The action plans outline specific steps that PRPD has committed to undertake to build its capacity to comply with the Agreement.  The time frame for the completion of action plans was extended by mutual agreement of the Parties and, therefore, there were no approved action plans during the review period.  We recommend that the TCA work to incorporate appropriate observations and assessments that are contained in the Draft Report into the action plans to ensure that PRPD takes specific action to address the TCA's concerns during the capacity building period.  For example, the TCA's recommendations regarding canine training facilities and licensure of canine instructors should be incorporated into PRPD's action plan on Use of Force to ensure that appropriate measures are taken during the capacity building period.

We also recommend that the TCA re-organize this section to focus on actual challenges to the implementation of PRPD's capacity building efforts.  We believe that information technology is an appropriate topic in this section.  The subsections on canines, the Zones of Excellence, body-worn cameras, and the maritime unit should be discussed in the context of the eleven substantive areas of the Agreement in other sections of the Draft Report. |
|---|---|
| Identified Challenges, 20-22 | The TCA's observations and recommendations should be discussed in the context of the Agreement and PRPD's four initial action plans on Use of Force, Searches and Seizures, Equal Protection, and Civilian Complaints/Internal Investigations.  Concerns in areas covered by other sections of the Agreement should be identified for follow-up by PRPD in the formulation of pending action plans.

For example, the TCA should discuss whether the proper storage of chemical substances and chain-of-custody issues concerning the Canine Unit are addressed adequately by PRPD's action plan on Searches and Seizures.  We note that the only reference to canines in the four initial action plans, which the TCA approved, requires that PRPD develop a policy and training for patrol canines.

The TCA's legal conclusions regarding the suppression of evidence and potential civil litigation in other cases, as written, are inappropriate for the Draft Report and beyond the scope of the TCA's responsibilities.  The TCA may consider modifying the language to recommend that the Commonwealth consider the consequences of the training and certification issues raised by the TCA. |
| Identified Challenges, 22 | We appreciate the brief mention of the Zones of Excellence in the Draft Report, which were not addressed in the first TCA report.  Please elaborate on the information that not all officers in the Zones of Excellence have been trained on the basic principles of community policing and whether the training is consistent with the Agreement. |

| | |
|---|---|
| Identified Challenges, 22 | The Draft Report indicates that USDOJ reported to a Bayamon commander that there is a large Asian community in Bayamon that is targeted by criminals.  We recommend that the Draft Report indicate that we received allegations or concerns from a community advocate concerning this issue.  We note that members of the TCA team have also been present in several meetings in which an advocate for the Chinese community raised public safety concerns.  Please clarify whether your reference to a "specific situation" in the second paragraph is to alleged targeting of members of the Asian community in Bayamon. |
| Identified Challenges, 23 | The Draft Report describes PRPD's decision not to apply for a federal grant on body worn cameras as "imprudent."  The Draft Report fails to mention that PRPD explained that its decision was based, at least in part, on the critical need for other basic equipment, such as radios, which the TCA acknowledges in other sections of the Draft Report.   As written, the Draft Report implies that PRPD is not committed to civil rights reform because it did not accept a recommendation by the TCA.  A more constructive approach by the TCA would offer to guide PRPD on the development of a long-term plan that would lead to the eventual testing of body worn cameras in PRPD. |
| Identified Challenges, 23 | The discussion regarding ███████████ raises sensitive security issues.  We are extremely concerned that this discussion in a public document may be exploited by others who ███████ ████████████████████████  The TCA should delete this section or provide a general description of the work undertaken, and provide details of the unit's ██████████████████████ in separate correspondence to the Parties.  The TCA should also specify the compliance issues that are implicated.  Where compliance issues exist, the TCA should recommend action steps that should be undertaken by PRPD as part of its action plans.  We understand that this is one of the areas that the TCA intends to redact, pursuant to his July 2, 2015 letter to the Commonwealth. |
| Identified Challenges, 24 | Please clarify your statement in the Draft Report on information technology that begins "[w]hile at Bayamon it was obvious…" and ends with "the sharing of tactics and IT experience is unlikely given resource challenges."  We recommend using a description that is more accessible to the public. |
| Identified Challenges, 25 | The discussion of computer-aided dispatch systems is a good example of the need for a capacity building period.  As noted earlier, we appreciate the thoughtful analysis presented in this section.<br><br>Please consider whether the information concerning ████████ ████████████████████████ is subject to exploitation and, consequently, whether a more general description or deletion is appropriate. |

| Projected Activities, 27 | We recommend that the TCA connect the description of projected activities to PRPD's action plans.  For example, the section on Searches and Seizures on page 28 does not include the TCA's concerns regarding the Drug and Canine Units that are related to compliance with the Agreement.  We note that many of these activities were described as part of the TCA's draft work plan for March-May 2015, which the TCA shared with the Parties in March 2015.<br><br>The TCA should review the phrase "actual UOF crime scenes" to avoid suggesting prematurely that a use of force involves apparent criminal conduct.  We are also concerned that the TCA's presence on the scene of a use of force incident may interfere with investigations conducted by PRPD or other investigative authority.  We would like to discuss this proposed activity further with the TCA and the Commonwealth. |
|---|---|
| Methodology 32-34 | We appreciate the TCA's note on methodology in the Draft Report.  We recommend that the TCA discuss the methodology utilized to formulate findings and conclusions throughout the body of the Draft Report.  In addition, the broad claims made concerning ██████████ based on a review of one incident appear inconsistent with the methods that are described in the Draft Report. |
| Appendix 1, 36 | Please provide further details regarding the purpose of your meetings with legislators. |
| Appendix 1, 36 | Please consider whether to move the section on meetings with the PRPD Reform Unit to the beginning of the section; it appears that the bulk of the TCA's meetings have been with this unit. |
| Appendix 1, 39 | Please provide further details regarding the purpose of your meetings with union leaders or organizers. |
| Appendix 1, 40 | Unless specific allegations of police abuse or misconduct have been substantiated, it is inappropriate to refer to "citizens who have been victims of civil rights violations by the Police of Puerto Rico."  This may incorrectly convey or imply that the allegations have been adjudicated.  Similarly, in other instances, the Draft Report refers to "victims of police brutality" when the matters are still under investigation. |
| Appendix 1 | Throughout Appendix 1, the TCA should ensure that individuals who are named in the Draft Report have consented or agreed to be identified. |

\*       \*       \*       \*       \*

We look forward to working with you and the Commonwealth to address the Parties' comments on the Draft Report. If you have any questions or concerns regarding our comments, please do not hesitate to contact me at (202) 598-0482, Zazy López at (202) 305-8702, or Brian Buehler at (202) 353-1100.

Sincerely,

Luis E. Saucedo
Counselor to the Chief
Special Litigation Section

cc:     Beatriz Annexy
        Special Assistant to the Secretary
        Puerto Rico Department of Justice

17

# EXHIBIT D



Estado Libre Asociado de Puerto Rico
DEPARTAMENTO DE JUSTICIA
Apartado 9020192, San Juan, PR  00902-0192

BEATRIZ ANNEXY-GUEVARA, ESQ.

TEL. (787)  721-7700
FAX (787) 724-4770

**CONFIDENTIAL AND PRIVILEDGED**

June 25, 2015

**VIA FIRST CLASS AND ELECTRONIC MAIL**

Coronel (ret) Arnaldo Claudio
Technical Compliance Advisor
World Plaza
268 Muñoz Rivera Ave.
Floor 10, Office 1001
San Juan, PR 00918

Dear Mr. Claudio:

**United States of America v. Commonwealth of Puerto Rico et al., Civil No. 12-2039(GAG) at the United States District Court for the District of Puerto Rico**

Pursuant to Paragraph 252 of the Agreement, we write to provide our comments on the Six Month Report Draft for the period covering December 7, 2014-June 7, 2015. We thank the TCA Office for providing a report even when we do not yet have a set of approved Action Plans in order to assess PRPD's compliance.  We would like to extend our gratitude to the TCA Office, the Core Team and the DOJ for their collaboration with the Reform Office during this period.

The end of this reporting period, marked the first year of the reform process at PRPD as well as the benchmark for compliance regarding policies and procedures on the use of force, searches and seizures, equal protection and ethics. Considering the great efforts made by PRPD to achieve this milestone, we were expecting a comprehensive report on the part of the TCA Office that would significantly cover PRPD's accomplishments.  On February 2015, PRPD celebrated Police Week with a solid campaign regarding the reform process and the efforts made by the agency in furtherance of the Agreement.  On March 2015, PRPD graduated cadet class 223, the first class within the reform process who will become a force for positive change within PRPD.  The Deputy Superintendence of Education and Training undertook the colossal task of creating and administering a reform curriculum that included education on civil rights, ethics and community policing.  Upon their graduation, class 223 commenced training through the newly created Field Training Officers Program, a pilot program to allow for PRPD's new agents to be overseen by more experienced trained officers on the street; a well-established practice amongst the ranks of American law enforcement agencies and a program in which we can take great pride. By far, the most significant achievement of PRPD during this reporting period has been in community engagement.  On April 29, 2015, for the first time in the history of PRPD, the ACLU Director

June 25, 2015
Page 2

visited the Headquarters of PRPD to provide a seminar on *Constitutional and Community Perspective in Law Enforcement* to over two-hundred high ranking PRPD officers. PRPD and the ACLU have participated in a number of meetings to discuss how to improve communications and service to the many communities the agency serves. PRPD has also met with a number of community groups including the Civil Rights Commission, the Dominican Civil Rights Coalition, as well as with the components of the Community Work Group for the Reform of PRPD, also known as GRUCORPO" which is composed of the following community groups:  Laura Aponte Alliance for Social Peace (ALAPÁS), American Civil Liberties Union (ACLU), Amnesty International Puerto Rico (AIPR),  Asian Community and Youth Association, Corp (ACYA), Ample Committe for the Search of Equity, (CABE), Center of Help for Dominican Women, Puertorrican Coalition for the Reduction of Damages (CoPuReDa), Commission for the Rights of Immigrants of the Puerto Rico Attorney Bar (Colegio de Abogados),  UPR Legal Assistance Clinic, Section on discrimination for sexual orientation and gender identity, Coordinator for Peace for Women (CPM), Open Spaces (EA), Institute for the Investigation and Promotion of Civil rights (INIPRODEH), Judith Berkan, Esq.,  Julie Cruz, Esq., Osvaldo Toledo, Esq., Osvaldo Burgos, Esq., Legal Services of Puerto Rico (SLPR) and  Creative Lesbic Workshop.   Additionally, March 21, 2015, marked the convention of the Community Security Council which grouped a total of over two thousand members who serve the communities. Although we are cognizant that events may continue to occur that could impair the relationship between PRPD and the community, PRPD is working towards rapidly and effectively addressing these through investigations and the application of a robust disciplinary process.   PRPD recognizes that gaining and keeping the trust of the community is at the heart of the reform process and will continue to foster its relationship with community groups.

The Draft Report fails to assess any of PRPD's accomplishments aforementioned. Instead it dedicates a mere two pages to PRPD's most recent Progress Report. There was no substantive feedback provided. Efforts made by PRPD in furtherance of the Agreement were critiqued without any basis.  The TCA concluded that PRPD failed to comply with Paragraph 237a without providing any methodology or assessment to reach that conclusion.  We encourage the TCA Office to revisit the Draft Report in order to emphasize the work achieved by PRPD.  In addition, based on the data provided to the TCA regarding compliance with Paragraph 237a, the TCA Office should find that PRPD has complied.   In the alternative, the TCA Office should provide the basis in which it concludes that PRPD failed to achieve this objective.

The focus of the Draft Report is the work performed by the TCA Office rather than PRPD's progress. We find this to be antithetical to what the roles and duties are of a TCA.  For the most part, the TCA's findings are incongruous with the advances PRPD has realized during the reporting period as per its Progress Reports.  The work agenda of the TCA Office seems ad hoc.  We would like the agenda to bear some significance to the areas of concern that are being developed at PRPD consistent with the Action Plans that are being drafted and with the chronology in the Agreement.  While the TCA is called to include a description of the work conducted, we ask you to note our concern with your acting on matters that fall beyond the scope of the TCA Office and which are within the discretion of the PRPD's administration.  We must remember that the Agreement delineates the scope of the TCA's duties: the TCA "shall only have the duties, responsibilities, and authority conferred by the Agreement" and that he "shall not, and is not intended to replace or assume the role and duties of PRPD, including the Superintendent, UCCJ, or any other agency official of the Commonwealth of Puerto Rico". The Agreement at ¶226. See also, ¶284. We strongly urge the TCA Office to review Section XIV A. of the Agreement for the role of the TCA.

June 25, 2015
Page 3

Of greater concern to us in the Draft Report, is the apparent interpretation of portions of the Agreement that are entirely inconsistent with both the clear language of the Agreement as well as the mutual understanding of the Parties that was reached during its negotiation. The TCA is not a "party to this agreement" and we are troubled that the TCA Office does not understand this most basic of facts. Startlingly, the TCA Office believes that the capacity building period affords the TCA "a comptroller's role in examining virtually every aspect of how the PRPD police the people of Puerto Rico". We are unfamiliar with any other consent decree where the TCA (Monitor) sees himself in such a role. The capacity building period is unique to our Agreement because the parties recognized that immediate compliance could not be reached until the infrastructure was built for PRPD to be able to develop the reform. We must insist that the TCA Office consult with its own attorneys to better clarify the rightful and legal role of the Office in order to avoid conflicting language in the Draft Report.

In addition, the TCA Office includes information regarding PRPD operatives which are confidential in nature and which are not meant to be made public by the TCA Office. We strongly urge the intervention of the TCA Office attorneys to avoid any violation of the Agreement on the part of the TCA which prohibits the publication of confidential non-public information. We encourage a review of Paragraph 269 of the Agreement and the elimination of such information in the Draft Report.

We hereby submit comments to substantive issues brought forth in the Draft Report. We will address our comments per pages of the Draft Report. We provide no feedback on grammatical or typographical errors. Any reference to Agreement is the Agreement for the Sustainable Reform of the Puerto Rico Police Department. Any reference to Paragraph is to those numbered in the Agreement.

| p.2 | If the report is submitted in accordance with Paragraph 250, we would like to see the analysis of the methodology during the four year capacity period which seems to be lacking. PRPD was submitted a Compliance Assessment and Methodology as per Paragraph 245 to begin after the fourth year from the Appointment date. However, during the capacity building period, the TCA should be assessing compliance by assessing progress with the Action Plans that have yet to be approved. PRPD would like to discuss whether the methodology for the capacity building period will be similar to that submitted or if a new methodology will be created. PRPD could benefit from knowing what methodology is being put in use in light of the Agreement during this period where there are no Action Plans approved and in place. |
|---|---|
| p.2 | For a clear description of the TCA's role please review section XIV A. of the Agreement. Compliance outcomes at this stage should be done through the Action Plans once they are approved. |
| p.2 | PRPD acknowledges that the TCA has been working closely with the community groups. However, the TCA Office should recognize that PRPD has made a breakthrough with the communities and that it has joined in "active listening and personal engagement with the community". Rather than channeling concerns from community stakeholders, the TCA should if anything, encourage direct contact between PRPD and the community. The TCA should not be a liaison between the agency and the community. |
| p.4 | The TCA does not have a comptrollers' role in this Agreement as he does not audit government accounts or certifies expenditures. The consent decree is not akin to a receivership. We find the use of such terminology as both contrary to the |

June 25, 2015
Page 4

| | |
|---|---|
| | provisions of the Agreement and offensive to the standing of the executively appointed Superintendent of Police; a position that is confirmed by the Senate of Puerto Rico. See, Section XIV A. for the duties of the TCA and Paragraph 284 on PRPD's administrative and operational control of the agency. We urge that the TCA Office review the duties of the TCA so that the Draft Report properly depicts the work he has to perform. |
| p.4-5 | Any technical assistance by the TCA should bear on the Action Plans that are being developed. Any recommendations by the TCA on operational issues of the PRPD will be treated as such. The TCA comments that his recommendations will "eventually facilitate the monitoring process" is tantamount to stating that if PRPD accepts his recommendation, monitoring and eventually compliance, will be swift. We reiterate, the TCA's duties are clearly limited to those enumerated in the Agreement and he must cease portraying himself as either a member of the "chain of command," or a party to the Agreement. The TCA Office must respect the Agreement which clearly states on Paragraph 284 that PRPD maintains the operational control of PRPD. PRPD will exercise its legal prerogatives to accept, reject, or otherwise consider, any recommendations put forth by the TCA. |
| p.5 | The TCA has made a determination in his Draft Report that PRPD has displayed "egregious conduct towards the community by violating its civil or constitutional rights". We urge the TCA Office to review Paragraphs 256-257 which state that the TCA cannot issue findings with regard to any act or omission of the Commonwealth of Puerto Rico, its agencies, departments, officials or employees. These comments should not be part of the Draft Report. We urge the TCA Office to limit its role to notifying the Reform Unit of any misconduct by a PRPD member in order to properly channel the complaint. The TCA Office should take no part in the investigation and adjudication of any complaints. |
| p.5 | In the event that the TCA learns of any complaint by a citizen regarding a PRPD officer, he should encourage the citizen to file a complaint at PRPD. If the citizen refuses, he should notify the Reform Office for PRPD to make the proper channeling of the allegations through the administrative process and disciplinary measures in place at PRPD. The Draft Report should recognize that there is currently in place a process to address these complaints. |
| p.5 | Although PRPD is appreciative of the TCA Office's work to engage PRPD in reaching the community, the TCA Office should not boast of outreach efforts. Neither the TCA nor his staff are members of the PRPD. As this report is concurrent with the first year of the reform process, the TCA Office should be transitioning from being the conduit of complaints or concerns of the community, to assuming more of an educational role to the community, so the public directly reaches PRPD. PRPD has made great advancements in the area of community outreach as included in its Progress Report, which should be recognized in the Draft Report. |
| p.5 | While PRPD welcomes the idea of a TCA website, we would like additional information on what it will encompass and how the confidentiality of the information will be preserved. Of great concern is the content of the information that will be posted which should always be submitted to the parties in compliance with Paragraph 256. |

June 25, 2015
Page 5

| | |
|---|---|
| p.6 | Rather than making a summary of the Agreement, we believe the reader would better benefit if the Agreement were put in its proper setting. We encourage a more detailed discussion of Paragraphs 237-242 so that the role of the TCA Office is put in context with the timeframes set up in the Agreement. |
| p.7 | We recommend that the section that describes the Reform Unit conform to the Agreement requirements as stated in Paragraphs 231-234. The Reform Unit does more that assisting in drafting of policies and Action Plans. To limit a description of its role to the drafting of policies undermines the comprehensive work accomplished under the leadership of Lt. Col. Vega. |
| p.8 | The alleged discrepancy in use of force data stems from the facts that the data previously provided to the TCA was up to a certain date. The data was updated for purposes of the Progress Report. |
| p.8 | The TCA alerts that the PRPD status report makes reference to training that was not approved by the TCA. As the TCA is aware, the parties are working toward the development of policies and procedures in order to conform them to the requirements of the Agreement. PRPD has four years to build capacity within the agency in order to commence, accelerate and sustain the reform process. While PRPD is developing new policies and procedures, it must also continue delivering police services and the full array of operational mandates consistent with its statutory duties. Consequently, it must also rely on current policies and procedures in place at PRPD. Please note that Paragraph 229 states that PRPD will submit all new and revised policies and procedures for comment. The trainings that were included were those regarding the use of the baton and the use of electric devices (TASER) which are not new or revised policies, rather, existing ones at PRPD until new ones are adopted. |
| p.8 | The TCA made a suggestion that PRPD provide its status report in draft format prior to submitting it to Court. On June 1, 2015, the Legal Director of the Reform relayed to the TCA that PRPD would not be submitting the draft for review prior to filing. The Draft Report includes the opposite of what was stated to the TCA Office. We encourage a review of Paragraph 261 for further information on PRPD's reports and self-assessment. We expect the Draft Report to be amended to state that PRPD does not agree to send its Progress Report to the TCA prior to submitting it to Court. |
| p.8 | An internal seminar on Police Motivation was offered free of charge to PRPD by Honorary Lt. Cl. Hiram Morales, former Director of the Government Ethics Office of the Commonwealth. This is an initiative of PRPD's administration. See, Paragraph 284. |
| p.8 | The TCA states that he does not have the sufficient criteria "to determine the appropriateness of [an] activity" in which PRPD engaged. The role of the TCA is not to determine whether PRPD is acting "appropriately" but rather to assess and report whether the provisions of the Agreement are being implemented. Please review the paragraphs pertinent to the role of the TCA at Section XIVA. |
| p.9 | The Agreement calls for the establishment of collaborative agreements at Paragraph 207 and 208. It is of great concern that the TCA Office is questioning the "appropriateness" of the establishment of a Collaborative Agreement between the Office of Government Ethics and PRPD. If anything, the Draft Report should |

June 25, 2015
Page 6

| | |
|---|---|
| | recognize this effort.  Aside from Government Ethics as required by local law individually to each public servant, PRPD members also receive police ethics.  We encourage the review of Paragraph 226 on the TCA duties and Paragraph 284 regarding the Superintendent's administrative and operational control of PRPD.  The Draft Report should clearly state that although the TCA Office may have recommendations on operational practices of the PRPD, these are matters that are ultimately decided by PRPD's Superintendent. |
| p.9 | The outcome of administrative investigations is a confidential matter within PRPD until such time as the determination is notified to the complainant.  This matter is not for public dissemination. |
| p.9 | At the outset we must stress that the period covered on PRPD's Progress Report covered the period between December 1, 2014 and May 31, 2015.  Nonetheless, the TCA states that PRPD failed to comply with Paragraph 237a, something that was not reported in the report.  On June 5, 2015, PRPD provided the evidence to the TCA that it had complied with Paragraph 237a.  We request the data and the methodology in which the TCA Office sustains the conclusion that PRPD failed to meet compliance with Paragraph 237a. |
| p.9-12 | PRPD was able to submit the first four of eleven Action Plans with the help of their group of experts, the TCA Core team and the DOJ.  We believe that collaboration of further Action Plans should be done by PRPD and their experts, Warshaw & Associates, prior to the matter being opened for discussion.   It is important to remember that this is a sustainable reform. |
| p.12 | PRPD believes that the Action Plans should be submitted to the Court once approved by the DOJ and the TCA.  Paragraph 236 and 237 are consistent with this posture: "Upon approval by the TCA, the Action Plan shall be implemented immediate according to the schedule set forth in the Action Plan" (Paragraph 236) and "PRPD shall submit its Action Plans to the TCA and DOJ for review and approval on a rolling basis" (Paragraph 237).  To withhold the filing of the Action Plans until the eleven Action Plans are drafted and approved would unnecessarily hinder the reform process.  The Action Plans need to be submitted so that the TCA can have the proper basis on which to apply the methodology for monitoring. See Paragraph 240.  The Draft Report mentions this but does not address the essential component that the TCA's evaluation during the capacity building period will be made through the Action Plans.  Consequently, the Action Plans need to be filed once approved. |
| p.12 | The development of operational and tactical competencies of PRPD is not for the TCA to determine.   It is exclusively in the legal domain of the appointed Superintendent of Police.  We are not sure what the TCA means with "contingent competencies" and therefore request a clarification on the term.  We cannot stress enough, and therefore insist that the Draft Report make clear that PRPD's operation and administration are the prerogatives of PRPD's Superintendent. |
| p.13 | PRPD has been drafting its policies and procedures in accordance with Paragraph 109 according to best police practices with the help of its external experts Warshaw & Associates.  Up to date PRPD has developed over 13 policies. |
| p.14 | We concur with the TCA Office that the Academy is at the heart of the reform process. We encourage the TCA to include in the Draft Report additional |

June 25, 2015
Page 7

| | |
|---|---|
| | information regarding the work that has been performed in the Academy during this reporting period as stated in section G. Training of PRPD's Progress Report. |
| p.15 | The FTO program is a pilot program that will improve as it continues to develop. We request the data that support the TCA's contention that "there is a need for additionally trained FTO's to ensure a one-to-one ratio" since there is currently a one-to-one ratio. |
| p.16 | The TCA provided several recommendations regarding the FTO Program which were implemented by PRPD. Other recommendations were discussed with the TCA Group and they were not adopted. This was previously discussed in our January 16, 2015 comments to the TCA's first Six Month Report Draft. Nonetheless, the TCA restates in the Draft Report that there are proposals which "are yet to be implemented". The implementation of the recommendations of the TCA is a decision of the administration of PRPD. We encourage that the TCA review our previous comments in regards to the FTO Program which are equally applicable to this report. |
| p.16-17 | Community engagement has been one of most meaningful advancements for PRPD during this reporting period. We believe the Draft Report should reflect this as stated in our introduction to this letter. In addition, the TCA should consider adopting a different role in the process considering this is a sustainable reform. Rather than stating a list of community stakeholders which met with the TCA we believe that PRPD would benefit if the TCA expressed the outcomes of these meetings in his Draft Report. |
| p.17 | As party to this litigation, PRPD would benefit to be part of the process in developing the plan for the next public hearing. |
| p.17-18 | Part of the TCA's duties is to educate the public regarding his roles and duties in light of the Agreement. We strongly encourage the TCA Office to review the Agreement for the role of the TCA at Section XIV A, vis a vis the role of the Superintendent at Paragraphs 226 and 284. Other important documents that should be reviewed by the TCA Office so he can better perform his duties are the Code of Judicial Conduct for Judicial Employees, which binds the TCA Office, as well as the PARC National Guidelines for Police Monitors which was incorporated as part of the TCA Compliance Assessment and Methodology. Any information that is received by the TCA should be channeled to PRPD for it to run its course through the internal processes at PRPD. The TCA Office should in no way interfere with any internal processes at PRPD. Moreover, the TCA has a duty to maintain confidential all non-public information, which includes the receipt of complaints against PRPD members and operational plans of PRPD. See Paragraph 269. We are very troubled by the statement included in the Draft Report where the TCA admits that he purposely wants to make public, nonpublic information so that it is known that he is "ever vigilant that inequities perpetrated against the public or police officers are exposed". We find this statement both inappropriate and offensive. We call your attention to Paragraph 256-257 which prohibits the TCA from issuing findings against PRPD. We urge that the Draft Report be amended accordingly. |
| p.18 | We strongly urge that the TCA remove any reference to ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ in the Draft Report. Paragraph 250 of the Agreement states that any data |

June 25, 2015
Page 8

| | |
|---|---|
| | used for audits or review shall not be made publicly available.  See, also Paragraph 269 regarding confidential non-public information. In addition, PRPD officially provided the TCA with one operational plan, however the TCA states that he received "three different versions of the same operational plan".  We request that the additional documents provided to the TCA be disclosed to PRPD.  PRPD has consistently requested that any request for information be submitted to the Reform Office in order to avoid conflicting information from being disclosed. |
| p.18 | In spite of any personal concern that the TCA Office may have regarding any issues regarding a possible civil rights violation, it must allow PRPD to perform its duties, which include putting in motion internal investigations, disciplinary measures and administrative processes. The TCA Office should review the PARC National Guidelines for Police Monitors regarding the objectivity of monitors. |
| p.18-20 | We recommend that any negative feedback and recommendations regarding the operational aspects of PRPD be eliminated from the Draft Report because they constitute public findings by a purported objective judicial officer against the PRPD which are untimely as per the Agreement.  PRPD and the DOJ reached a consent decree because they agreed that a reform process had to ensue at PRPD.  PRPD has a four year capacity building period in which to improve all aspects of the agency.  Qualifying a PRPD operational plan as deficient is beyond the scope of the TCA duties at a time when the TCA Office should be monitoring Action Plans.  Part of the reform process is the creation of standard operating procedures for the different divisions within PRPD.  PRPD is currently in the process of developing these for the Drug and Narcotics Division in order to ascertain their duties, oversight and accountability measures.  PRPD's expert, Robert Warshaw is the former Deputy Drug Czar of the United States, and he and members of his team have overseen drug enforcement units in a host of law enforcement agencies.  Accordingly, Chief Robert Warshaw and members of his team have been assigned to assist the PRPD with this requirement. |
| p.20-21 | A review of Draft Report calls for a need by the TCA Office to place the Agreement in its proper context in light of Paragraph 109, 237-242. The TCA Office must monitor in accordance with the Action Plans.  Until such time as we have approved Action Plans the TCA Office should focus on systemic changes at PRPD rather than doing individual ad hoc investigations into internal and operational aspects at PRPD.  An investigation into ▆▆▆ does not provide any aid to PRPD in this process.  Insisting in this piecemeal approach encroaches on operational and administrative aspects of the agency.  Additionally, it diverts the work efforts at PRPD in order to address these issues due to the insistence of the TCA Office for immediate response.  The Draft Report should consider that the investigation of PRPD concluded with the determination that a reform was warranted, hence the Agreement.  The role of the TCA is not to investigate PRPD units but to monitor organizational compliance with the Agreement, and when appropriate provide assistance. The Draft Report should focus on establishing a methodology for monitoring during the four year capacity building period.  In the alternative, we encourage a review of the Compliance Assessment and Methodology submitted in compliance with Paragraph 245 to identify whether it |

June 25, 2015
Page 9

|  | will also be used for this period.  We recommend a thorough discussion of the relevant methodology for the capacity building period in the Draft Report. |
|---|---|
| p.22 | We request that data that supports the contention stated in the Draft Report that "…one commander said not all officers were trained in the basic principles of community policing". Moreover, we call to the TCA Office's attention that this policy is not yet final, therefore no training can be given in a draft policy. |
| p.22 | The Zones of Excellence were developed as a laboratory in which to measure the reform process.  The focus is for reform efforts to first reach the ZOEs in order for them to serve as a compliance indicator. The TCA should focus on the ZOEs rather than on other internal units at PRPD. |
| p.22-23 | To catalogue the administrative decision by PRPD to not apply for body worn camera grants as "an imprudent choice decided without discussing with the TCA" is a wholly inappropriate statement.  Nothing in the Agreement requires that administrative determinations at the agency be first consulted with the TCA Office, See Paragraphs 279 and 284.  PRPD opted to not apply for this grant for a number of reasons: there is other more basic equipment that is lacking at PRPD such as portable radios; the grant required collaborative agreements with different agencies as well as compliance with the Law of Uniform Administrative Procedure for regulations that would affect third parties, which could not be achieved in the short period of time (one month) prior to due date of the grant.  Moreover, the grant required technical components that PRPD currently lacks.  PRPD aspires to this type of technology in the future, and may address it as a pilot program at a future time, but when PRPD understands it is so warranted.  Moreover, as of now, little is known of the evidence regarding the benefits of this type of technology. See, Michael D. White's article, "Police Officer Body-Worn Cameras/Assessing the Evidence" at DOJ's Office of Justice Program. |
| p.23 | As it regards the ▮▮▮▮▮ Unit, please see our comments provided regarding the ▮▮▮▮▮▮▮ and ▮. See, Comments to pages 18 and 20-21. We urge the elimination of this part of the Draft Report for the same reasons. |
| p.23-24 | We are concerned with the conclusions reached by the TCA regarding the safety of ▮▮▮▮▮ as it pertains to PRPD's police intelligence.  Additionally, the Draft Report includes comments that are clearly misplaced as it regards his duties: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ We request this information be deleted from the report. |
| p.25 | The first order for the CAD base mounting units was received and their installation on existing vehicles commences on June 2, 2015.  There are currently over 80 installed base mounting units that are completely functional. |
| p.25 | PRPD is expecting to receive 262 additional vehicles on August 2015, and each one will be equipped for the implementation of CAD Mobile. |
| p.26 | Actually, over 75% of PRPD employees have access to the ▮▮▮▮▮ email platform; a total of 9,767 new email accounts.  In addition, there were already 3,420 existing email accounts at PRPD at the time, for a total of 13,187.  At the Bayamón ZOE 99.9% of the personnel have access to ▮▮▮▮▮. |
| p.26 | There are a number of computers which have been acquired in order to be installed in the Bayamón training room |

June 25, 2015
Page 10

| | |
|---|---|
| p.26 | PRPD's Bureau of Technology and Communications Strategic Plan 2014-2018, establishes the integration of the NCIC data base to the information systems of the agency. |
| p.26 | Currently, Academy IT services are divided between the administration and the academic area. The academic area has a data communications infrastructure of 10 MB while the academic area while have independent access to the Internet of 25MB with adequate security to protect the integrity of the data communications net. |
| p.26 | On June 24, 2015, fifteen new laptop computers were acquired for the Academy instructors. The computers are equipped with the proper security measures to protect the integrity of the data communications net. |
| p.27 | PRPD's Bureau of Technology and Communications Strategic Plan 2014-2018 includes a number of areas which present challenges to the IT implementation and which PRPD must improve. |
| p.28 | We encourage a review of the Agreement in order to put into perspective the duties of the TCA, which are separate from those of PRPD. In this respect, we expect that "random ride- a-longs" and "request to respond and observe actual UOF crime scenes" be edited out of the Draft Report as the Agreement does not support these interventions on the part of the TCA. In addition, General Order No. 83-10, establishes that PRPD official vehicles are for official use only. |
| p.28 | We urge the TCA Office to review the timetables submitted by PRPD on the drafting of policies as well as the timeframes for the Action Plans as the work to be performed does not take into consideration either of them. |
| p.29 | Any policies and procedures that are required as per Paragraph 109 of the Agreement are to be drafted by PRPD with the assistance of the Reform Unit and their group of experts, Warshaw & Associates. |
| p.29 | The compensation of FTOs is an administrative matter that pertains to PRPD, not to the TCA Office. We recommend that the Draft Report reflect this. |
| p.32 | We respectfully request that the TCA provide additional input on the section identified as "Note on Methodology". There seems to be uncertainty as to how PRPD will be monitored during the four year capacity building period. The Compliance Assessment and Methodology created in compliance with Paragraph 245 could be helpful in determining how PRPD will be monitored through the Action Plans. We are unsure as to what the TCA means with the Draft Report comment "when determining the scale and scope of an organizational assessment, decisions are made about the capacities, core issues and points of entry to be included in the assessment". We request a clarification of this statement. |
| p.35 | The Draft Report identifies that the TCA has conducted over 20 meetings with police officers for alleged violations of their administrative due process. The TCA Office should bear in mind the following issues. First, administrative processes at PRPD are confidential in nature as per Law 53-1996, and internal regulations in place at PRPD. Second, the Agreement does not intend for the arrogation by the TCA of PRPD internal procedures. Third, any conversations, notes or memos on the meetings with these police officers, if any, constitute discoverable evidence as part of a discovery process in either administrative or legal proceedings. The |

June 25, 2015
Page 11

| | |
|---|---|
| | duties of the TCA require that any allegations of this sort be submitted to PRPD for review rather than handling them at the TCA Office. |
| p.35 | Any meetings conducted in accordance with Paragraph 254 imply an affirmative duty towards the TCA to inform the public and to receive input relevant to the reform.  Aside from the meetings with the PRPD Reform Unit, the list in the Draft Report does not provide any description regarding the reason for the meeting, or the use or value gained from it.  We encourage that this information be included in the Draft Report. |

We are available to discuss our comments to the Draft Report and any concerns you may have.

Cordially,

S/Beatriz Annexy-Guevara
Beatriz Annexy-Guevara, Esq.

c. Secretary of Justice César R. Miranda
    Superintendent José Caldero
    Lieutenant Coronel Clementina Vega
    Luis Saucedo, Esq.
    Maritere Rivera, Esq.

# EXHIBIT E

# OFFICE OF THE TECHNICAL COMPLIANCE ADVISOR
TCAPR Corp.
268 Muñoz Rivera Avenue
World Plaza Bldg., Suite 1001
San Juan, Puerto Rico 00918

**CONFIDENTIAL AND PRIVILEDGED**

**July 2, 2015**

**<u>VIA ELECTRONIC MAIL</u>**

**Beatriz Annexy-Guevara, Esq.**
**Commonwealth of Puerto Rico**
**Department of Justice**
**Box 9020192**
**San Juan, Puerto Rico 00918.**

**Re:**  United States of America v.
Commonwealth of Puerto Rico,
et al, Civil No. 12-2039 (GAG)

Dear Counsel Annexy-Guevara:

We thank you for your letter dated June 25, 2015, with your recommendations.

Bottom line up front, the following three areas of the Six Months Report will be redacted; ███████

Changes to the language will reflect in essence the following information: Visits were conducted jointly with PRPD in all three areas. During our visits, several operational and administrative issues were found and reported to the Reform Unit, some of which are considered by the TCA and his team as high-level security and safety issues. The TCA will ask PRPD to incorporate these observations as part of the on-going efforts in the development of the relevant Action Plans and memorialize this important data and have it readily available for future assessments by the TCA, in accordance with Paragraph 229 of the Agreement.

Also, based on the recommendations of USDOJ, these assessments will be further presented to the Superintendent through the Reform Office, in the form of a TCA memorandum in order to ensure there is no loss of sensitive information that is brought to the attention of the TCA. Notwithstanding redaction, please bear in mind that failure to expeditiously deal with the notable deficiencies pointed out in those three areas could well result in serious civil and criminal liability against the Police of Puerto Rico and its officers. ███████



Hopefully, this information will result in action from the Commonwealth's Department of Justice to resolve this issue.

In regards to the issues related to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ We respectfully dissent from your comments that "an investigation into ▮▮▮▮ does not provide any aid to PRPD in this process" or "that the insistence of the TCA for immediate response diverts the efforts of the PRPD." The efforts of PRPD are not diverted when lack of improvement will inexorably lead to legal responsibility and senseless losses. Furthermore, it should not go unmentioned that after the TCA's visit to the ▮▮▮▮▮▮ that Unit finally received the attention necessary to start remediating its organizational issues, which the TCA was very pleased to hear. Just yesterday the TCA received a call from the ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ asking to be inspected in order to benefit from the TCA's technical advice in the same manner as the ▮▮▮▮▮ did. We gladly accepted this request to provide the technical advice requested.

I respectfully submit that not every item included in your letter is considered because some of them merit no further discussion and/or are treading on common ground. However, there are certain matters that we need to clarify so that there is a pellucid understanding of the legal framework in place in this case and the extent of the mission undertaken by the TCA pursuant to the Agreement for the Sustainable Reform of the Puerto Rico Police Department.

It has been consistently alleged by counsel that "[T]he TCA Office must monitor in accordance with the Action Plans." You further added in your last letter "[U]ntil such time as we have approved the Action Plans the TCA Office should focus on systemic changes at PRPD rather than doing individual ad hoc investigations into internal and operational aspects at PRPD." It is very pertinent to remind you, at this juncture, the "Action Plans" served to the TCA on September 4 of 2014, were disapproved. In coordination with the parties, on November 20 of 2014, a one hundred twenty (120) day extension for the Action Plans was submitted for approval. On May 7 of 2015, the Action Plans were once again disapproved pending the incorporation of recommendations, mostly from USDOJ. A new date was established for re-submission on July 13, 2015. Also, the lack of full compliance by PRPD as to Paragraph 237(a) (training of Task Forces; see Superintendent's report to TCA dated June 4 of 2015) and the need for an additional extension until June of 2016 for completion of Action Plans and Policies, constitutes an actual impediment for the TCA to carry out the necessary assessment in accordance with Paragraphs 240 and 250 of the Agreement. While awaiting for the completion of the Action Plans, the TCA in accordance with Paragraph 262, through on-site visits and

assessments, continues to build an understanding of PRPD's organizational structure and operations. The latter will support in a more effective way the evaluation of PRPD's compliance required by Paragraph 240 of the Agreement.

In your letter you suggest that "[T]he TCA Office should review the PARC National Guidelines for Police Monitors regarding the objectivity of the monitors."  We are familiar with the Police Assessment Resource Center (PARC) guidelines, which is a guide that can be utilized to build a framework for independent monitoring for the purpose of effectuating a Consent Decree. We also understand the leadership of PARC has been contracted to monitor Consent Decrees in several cities in the United States, to include the city of Seattle. In the latter, the Consent Decree addressed what the DOJ found was a pattern and practice of unconstitutionally excessive force and deep concerns with respect to issues relating to discriminatory policing in the city's Police Department. A study of the PARC document will clearly validate its usefulness when creating a framework for police monitoring execution. However, it would be perilous to just abide by these "guidelines," especially when there is no precedent and no explanation for a "Capacity Building Period" and the elaboration of Action Plans in the history of police monitoring. This exceptional situation in police monitoring history created a necessary and important opportunity for the TCA to establish the need for a baseline approach to provide the TCA, Core Team and Constitutional lawyers the opportunity to learn about PRPD's organizational structures, budgetary issues, Information Technology Systems, Command and Control structures, Human and Administrative Resources, and many of the other key and essential systems within PRPD to responsibly attend to the duties and responsibilities of the TCA when conducting its mission.

During our baseline studies, in many instances jointly with PRPD, we have found serious issues in several PRPD organizational structures and mission readiness. Those issues have been brought to the attention of PRPD leadership. We strongly feel the practice followed by the TCA is sound, that is, we encourage PRPD to embrace this approach as it facilitates and supports the Reform in every possible angle covered by the 11 areas in the Agreement.

You also appear to suggest in your comments to page 28, that "random ride-a-longs" and "requests to respond and observe actual UOF crime scenes" are not supported by the Agreement. One specific item in the PARC document, which was published in the year 2009, says monitors should do ride-a-longs, attend roll calls, and go to crime scenes. Specifically the PARC document states:

> "By the same token, the monitor and a monitoring team will benefit from attendance at precinct briefings and going on "ride-alongs" to familiarize themselves with the police personnel and their issues and to make the monitoring process understandable to them. Likewise, monitors should consider meeting with officers of different ranks, attending briefings and roll calls, meeting with union leadership, and reading historical accounts,

previous reports, and newspaper articles about the agency. Roll call appearances introduce the monitoring team to officers and provide opportunities to explain the monitor's role."

It seems that the use of the PARC document by you to question the method by which the TCA attempts to conduct its business is being used only when convenient to attempt to curtail the TCA's work. It is disquieting to us that you neglect to reference it when it does not underscore your assertions. It is even more disquieting that General Order 83-10 was unearthed in an attempt to curtail the TCA from observing procedures that are very pertinent to this reform, such as use of force (UOF) and observing and assessing the FTO program. Perhaps, it should be noted that the Superintendent himself has previously invited the TCA to observe the previously mentioned interventions and we were pleased to accept.

In your response letter, you state that, "[B]y far, the most significant achievement of PRPD during this reporting period has been in community engagement." The response cites as the most representative example the fact that, "for the first time in the history of PRPD, the ACLU Director visited the Headquarters of PRPD to provide a seminar on Constitutional and Community Perspective in Law Enforcement to over two-hundred high ranking PRPD officers." The response further states that, although PRPD is appreciative of the TCA Office's work to engage PRPD in reaching the community, the TCA Office should not boast of outreach efforts." It is paradoxical that you highlighted this event since you are fully aware of the comments made by the ACLU Director before Judge Gelpi stating the condition upon which he would meet with PRPD was only through the TCA. The TCA made this event possible by arranging the meeting with the ACLU director and the Reform Unit. We are very pleased with this new relationship and encourage PRPD to continue to confer with the ACLU in future matters.

Furthermore, in your response letter, you state that "community engagement has been one of most meaningful advancements for PRPD during this reporting period. (…) Rather than stating a list of community stakeholders which met with the TCA we believe that PRPD would benefit if the TCA expressed the outcomes of these meetings in his Draft Report." Consistent with Paragraph 254, the TCA meets independently with community stakeholders to inform, hear stakeholders' perspectives and seek input relevant to the reform. In many instances; however, these engagements have been jointly attended with PRPD.

In regards to Methodology, Paragraph 245 of the Agreement, establishes that the TCA is responsible for providing a Methodology, "Within 90 days of assuming duties as the TCA, the TCA shall develop a plan for conducting the above compliance reviews and outcome assessments, and shall submit this plan to the Parties for review and approval." On September 5, 2014 the TCA responsibly submitted this document to the Parties. Regarding Paragraph 250 (c) it would be totally irresponsible of the TCA to provide a Methodology without any completed

Action Plans of the PRPD.   The issuance of the compliance methodology cannot precede the issuance of the Action Plans. We are prepared to comply with this requirement not later than 15 days after the approval of any Action Plan and share with PRPD our assessment Methodology as previously discussed in our May 2015 Paragraph 253 meeting.

The prevalent overzealous tone of the letter referenced herein can be best described as a headstrong effort to keep the TCA away from participating, observing and informing deficiencies during the four (4) year capacity building period.   This is reflected by your comments to pages 9 to 12 of the Report where it is stated that **"[W]e believe that collaboration on further Action Plans should be done by PRPD and their experts Warshaw & Associates, prior to the matter being opened for discussion. It is important to remember that this is a sustainable reform (emboldened for emphasis)."**  This request is contrary to the clear letter of the Agreement and reflects an undeviating step aimed at isolation and rejection of recommendations from the TCA and its Core Team, when precisely the working protocol established by the PRPD Reform Unit and the TCA is to provide technical assistance during the drafting of the Action Plans, Policies and Training. It is in this spirit that the TCA has provided assistance to PRPD in the absence of PRPD consultants that have failed to attend all working group meetings for the past several months. It is quite difficult to understand how, this being a "sustainable reform," in any way provides support, legal or otherwise, to such request.

Paragraph 227 indicates the TCA will review training, while Paragraph 229 says PRPD shall submit new and revised polices to the TCA for review and comment. Since policy requires training before practice, by implication the TCA should review and comment on all training. Additionally, Paragraph 235 concerns the creation of training curricula, modules, and plans relating to Action Plans, which as you know must be approved by the TCA. Since Action Plans eventually will impact on every aspect of policing and Action Plans require training and TCA approval, the TCA submits that all training should be submitted to him for review and comment.

The TCA respectfully submits that the four (4) year capacity building period was not intended to be a shield to protect the Police of Puerto Rico, an agency under the jurisdiction of the District Court during the Reform Process precisely for unmanageable deportment, from all unethical and unprofessional conduct until the four year capacity building term expires.  The TCA is the working arm and eyes of the Court throughout the Reform Process and is not expected to ignore civil rights and constitutional violations.  The latter would be a disservice to the citizens of Puerto Rico and a breach of my responsibility and duty as the TCA.

Cordially,

Arnaldo Claudio, TCA