| Requirement | To appoint the members of the Board for the selection of candidates for the appointment to the Committee of Citizen Interaction. |
|---|---|
| Due Date | October 2015 |
| Progress | Initial appointment was done in October 2016. The subsequent appointment will take place every two years (2). |
| Finding | Full Compliance |

| Requirement | Select and appoint the new members of the fourteen (14) Committees of Citizen Interaction. |
|---|---|
| Due Date | October 2015 |
| Progress | This process will take place every two (2) years. |
| Finding | Full Compliance |

# Section III

# Anticipated Challenges and Projected Activities: Paragraph 205(e)

## Promotions

Paragraph 17 of the Agreement provides as follows:

"PRPD shall utilize competitive written examinations as a component of the selection process to award promotions through the rank of Captain. Written promotion examinations shall conform to generally-accepted professional standards for test validity and security and be designed to evaluate qualifications that are job-related and consistent

with business necessity. PRPD shall develop these examinations in consultation with the TCA based on generally accepted policing practices and in compliance with anti-discrimination laws."

Within the prior reporting period, covering from June through December 2015, the Superintendent appointed a Board of Examinations for Promotions ("Board"), which met weekly to prepare and administer competitive written examinations for the ranks of Sergeant, Second Lieutenant, First Lieutenant, and Captain as well as to address other administrative matters important to the promotional process.

The Human Resources Division then identified vacancies and made determinations about the proper supervisor to officer span of control as required by the Agreement. This ratio is subject to change once the PRPD completes a staffing study as required under Paragraph 13.

As part of the promotional process, the PRPD published a profile of responsibilities and qualifications for all ranks and identified the subject matter and laws that would be covered in each examination. In addition to passing a written examination, applicants are required to approve special courses at the PRPD Police Academy. A clean record, rid of sustained disqualifying administrative complaints, is also required.

In November 2015, the Board administered examinations for the ranks of Sergeant, First Lieutenant, and Captain under very strict security measures to guarantee the confidentiality of each exam. Of the 1,431 members of the PRPD who took the Sergeant's exam, 196 passed (13.7%); for First Lieutenant 68, out of 206 passed (33%); and for the rank of Captain, 81 of a total of 153 were successful (53%). Thereafter, an examination for the rank of Second Lieutenant was administered on December 5, 2015 and of out of a total of 978 applicants, 517 (53%) approved the test.

During the month of February 2016, the PRPD held its first promotion ceremony under the Agreement. It was the first promotional process where the PRPD selected police officers through a truly competitive process of examinations using "best police practices" as a frame of reference. Although the ceremony was a success, there are underlying questions about the fairness of the selection process that emerged in the days after the event.

Given the importance of this issue under the Agreement, the USDOJ, and the TCA concurred to assess the validity of the promotional process following Paragraphs 14 through 21. This assessment was to be conducted in two phases: the ranks from Sergeant to Captain and the higher echelons comprising the ranks of Inspector to Colonel. This task is now completed.

Within the realm of the subject of promotions from Sargent to Captain, the TCA continues to encourage the PRPD to prioritize the preparation of its staffing study, so the PRPD may be better positioned to determine the necessary number of supervisors that the PRPD should promote.   Additionally, the current process of determining who will be the candidates for promotion, from a list of eligible candidates, appears fraught with issues. The most important issue is that the list of candidates passing the exam is published early before all required criteria for eligibility can be verified.  Additionally, certain candidates who have a justified reason for not timely taking the written exam, because of military, medical, religious, or maternity leave, are then added to the list after completing the exam.

The TCA recommends that at the point in time a list is published, the same must have all the necessary warnings informing all the candidates that the numerical order appearing in the list may be subject to changes because of regulatory requirements, including the examples mentioned above. It is critical for the candidates and the public to understand that modifications to an eligibility list are permitted within the law and the applicable regulations.

The TCA also recommends increasing the staff in charge of promotions so the PRPD can properly update the vast amount of paperwork and data that come before the Board. There is limited technology (including computerized data) used by the Board, and the TCA believes the PRPD has been lax in addressing this deficiency. There should be dedicated staff and IT resources for this important process. Moreover, the TCA recommends that the PRPD portal/web-site should be the only mechanism used to officially announce the list of eligible personnel (or updates) to the public to avoid any confusion or dissemination or use of the information for other unintended purposes. Other internal means of communications are acceptable, but the following disclaimer should be clearly stated in the document: "For official use only, not final; as of date/time."

Under Law Number 53 of June 10, 1996, 25 Laws of Puerto Rico Annotated, 1001 and 1005(e), the Superintendent of the PRPD shall have the authority to promote personnel to the ranks of Inspector, Commander, Lieutenant Colonel, and Colonel. There are few limitations with regards to this power. However, this same statute requires that the process has to be "objective and scientific" and that the criteria to be employed must be part of the agency's rules and regulations (25 L.P.R.A. 1005). Specifically, the criteria must be based on the applicant's prior conduct, leadership skills, initiative, attitudes, academic qualifications, years of service and physical condition. That section ends with a mandatory legal disposition; that is, the Superintendent must take into consideration the above-recited requirements to give his recommendation to the Governor. The Superintendent must prepare a "concise report" about the candidate, containing all

information pertinent and necessary to demonstrate that the candidate meets the requirements.

During this reporting period, the TCA met with the Associate Superintendent, PRPD Office of Legal Affairs, members of the Board, members of the Reform Office and Human Resources, and the USDOJ. During the meeting with the Associate Superintendent he briefed the TCA that all matters related to the promotions from Inspector to Colonel followed the rules and regulations imposed by the Law, the process to include briefing the Governor on the promotions to get his approval. The TCA found later that this was not the case.

It was originally planned that, during the review, the TCA and the USDOJ would select various files at random, following the same process used in the first stage of the assessment of the promotional process for the ranks of Sergeant to Captain. However, we were told that the custodian of the records, a Sergeant, was absent, and therefore, the records were unavailable. Nevertheless, the TCA disclosed the evaluation criteria to be employed, which was drafted in accordance with the best police practices. The intended evaluations were postponed for a later date. The TCA and the USDOJ went to the office of the Superintendent's legal counsel on the scheduled date and upon arrival, the TCA noticed an assortment of portfolios and binders separated into three stacks, by rank. It was determined that the TCA was going to choose three files per rank.

A common trait was that none of the personnel files followed a uniform record keeping method. The paperwork was loosely contained; there was no criteria worksheet nor documentation reflecting any ranking among the competing candidates. Some files lacked supervisory evaluation documents while others lacked essential training information related to completion of Ethics, Use of Force, and Weapons qualification. None had physical fitness evaluations. None of the files had a letter addressed to the Governor containing the Superintendent's endorsement and, coincidentally, none of the files had the Governor's certification. Equally distressing, none had an original or even a copy of a verification of academic accomplishments.

It became apparent to the TCA that those files could not support promotions based on the criteria of the law requiring "an objective and scientific method" to determine the qualifications of each candidate for promotion. The bottom line is that it was clear to the TCA that no standard criteria for evaluation had been established for such an important process in the PRPD. Therefore, the TCA recommends adhering to the best police practices with regards to promotion procedures. This practice includes standardized packages, the creation of a table that satisfies all legal requirements regarding the skills identified and required by Law Number 53 of June 10, 1996, a concise glossary of terms of standard evaluation criteria, an interview process of candidates, peer evaluation, a

strict list of training requirements (particularly dealing with supervisory roles, such as ethics), a clearly established profile of the rank to be promoted (need to meet requirements of published job description), an exhaustive examination of past complaints, the use of a merit-based career track model, examination of past leadership roles and accomplishments in the organizations they led, and the establishment of clear physical fitness requirements. All the requirements above, which are consistent with Paragraphs 14-21, will assure and provide a process in which the PRPD will ultimately have officers that meet the demands of the position to which they are promoted. The implementation of these requirements needs to be consistent with best police practices, creating the desired effect of having a credible and accountable promotion system. Based on the issues above, the TCA urges the PRPD to fully examine its promotion criteria, specifically from the ranks of Inspector to Colonel, make changes to the process, and refrain from executing further promotions until a process strictly following the Law and the Agreement is in place.

Finally, the TCA commends those who approved their examinations for their forthcoming promotions within the exigencies of the law and the applicable regulations. Notwithstanding those above, the TCA will continue to bring attention to those challenges that are worth addressing in the next reporting period. The most significant are that, to date, the PRPD has not completed the staffing allocation and resource study required by Paragraph 13. The Agreement requires the PRPD to assess the appropriate number of sworn personnel to perform the different departmental functions, and the lack of a completed study provides uncertainty on the allocation and distribution of these new supervisors. The second challenge is the need to fully comply with mandatory documentation requirements to achieve accurate promotional decisions. Lastly, the PRPD intends to continue with promotions in the month of August, which in the TCA's view will continue to exacerbate the problem and will lead to more mismanagement of money and resources.

# Paragraph 13: Staffing Allocation and Resource Study

Paragraph 13 of the Agreement reads as follows:

*"Staffing and Community Policing*

*13.      PRPD shall assess the appropriate number of sworn and civilian personnel to perform the different department functions necessary to fulfill its mission. To do so, PRPD*

TCA Fourth Semi-Annual Report | 2016

*shall conduct a staffing allocation and resource study. The study shall form the basis for a staffing and resource allocation plan that is consistent with community-oriented policing principles and supports the systematic use of partnerships and problem-solving techniques. To foster community-oriented policing, the plan shall consider deployment practices that offer officers opportunities to serve the communities in which they reside."*

As part of the Professionalization action plan, the PRPD is to establish a working group made up of representatives from the Office of the Superintendent and from each of the Auxiliary offices. The group is led by the Auxiliary Superintendent for General Services, who will be responsible for the development of the work plan for conducting an evaluation for the Staffing Allocation and Resource Study. It is fair to say that this working group has not made much progress.

From the group's inception, the TCA has held monthly meetings in order to follow up on the plan's progress and provide technical assistance. These meetings began in March of 2016. In his initial presentation, the TCA was able to provide guidance to the PRPD Working Group on the scope and features of this project. Additionally, he made a recommendation for obtaining federal funds to supplement the PRR's budget for this activity. Although the deadline is June 2016, the PRPD is likely to miss this deadline.

The TCA wants to stress here by the information provided by the study will be useful for the PRPD. Among other benefits, the study will do the following: (a) provide the public and governmental officials with informative data on crime and agency performance, (b) measure the effectiveness of preventive efforts including community-based and police-based programs, (c) uncover patterns and trends in performance that can serve as best practices and facilitate bench-marking exercises, (d) measure overall agency workload, efficiency, and effectiveness including the performance of specific divisions, (d) analyze the factors associated with success or failure of various police initiatives, (e) provide comparative norms of performance across divisions and other police agencies, (e) furnish baseline data for research, budget, and performance issues, (f) assess budget expenditures directly related to crime control and service delivery, (g) forecast future events for better police planning, and (h) assess what worked when, where, why, and how as the PRPD moves toward becoming a more effective and efficient organization, among others. This study is not an academic exercise; it is a cost-saving initiative that the PRPD must complete sooner rather than later.

Finally, it is the recommendation of the TCA to the Court and the Parties that no additional promotions – except when absolutely needed - are made until the study is completed and a complete overhaul of the merit system is in place.

# Training and the PRPD Police Academy

The PRPD Police Academy's primary role is to provide the foundational piece of training at all levels. Therefore, the Academy must have a firmly built foundation with proper materials, i.e., policy, procedures and directives, standards, assessment tools, centralized training records, core curricula, appropriate equipment, use of technology, and quality instructors. All of these enhancements directly affect the structural integrity and success of the entire PRPD. The TCA has provided extensive resources for model samples of curricula, lesson plans, codes of conduct, performance forms, and course and instructor evaluations. The TCA has verified instructor credentials for the required training of the currently approved Action Plans. Additionally, some community stakeholders, such as GRUCORPO, the Civil Rights Commission, ACLU's Puerto Rico Chapter, and La Fondita de Jesus, have reviewed proposed curricula and offered suggestions, which resulted in some modifications.

The PRPD also benefitted from external instruction from the Puerto Rico Reserves and National Guard, who spent two weeks at the Police Academy in 2015 teaching, coaching, and mentoring selected members of the Police Academy.

The PRPD has also assisted in the resolution of a previous issue concerning the contracts of PRPD Academy instructors by approving year-long teaching contracts, which will ensure continuity of operations and reduce the administrative overhead of preparing contracts every semester.

A change in the intent of Paragraph 118 reflected that PRPD Academy graduates could no longer receive academic credit toward an Associate Degree for courses of instruction provided by the Academy. Under the new requirement, the Academy will focus on the practical instruction of policing.  The TCA recommends the PRPD to encourage all colleges and universities to offer courses or programs awarding an Associate Degree, which is the new requirement for entry into the PRPD, and to inform students of career opportunities as law enforcement agents.

The TCA's responsibility under Paragraph 250 is to assess progress made in accomplishing the activities in the Action Plans. Concerning the Police Academy, the TCA has seen progress in the number of officers trained on impact weapons, use of force, ethics and administrative complaints, searches and seizures, and equal protection and non-discrimination, all of which are subjects of approved Action Plans. The TCA is also pleased to learn that PRPD purchased horses and equestrian equipment to enter into

Phase Two of the reorganization of the Mounted Police, with the relating General Oder currently in the review process.

To satisfy the need for range requirements for the PRPD, the Academy synchronized and integrated an execution plan for assigned weapons qualification that incorporated the four PPRD ranges (Isla de Cabra, Gurabo, Cabo Rojo, and Arecibo).  Additionally, the PRPD executed a rental contract for two private ranges in Moca and Guayama to decrease the travel distance previously required for police officers to get to a PRPD range to qualify. The TCA further encourages the PRPD to secure "virtual integrated weapons training." This training is cost effective and is a very practical way to enhance the use of force training and escalation and de-escalation techniques consistent with Paragraphs 22 through 57.

During several TCA visits, the Core Team noticed there was no presence of any trained Emergency Management Personnel ("EMP"), an ambulance, or other emergency equipment for any mishap that could occur at the Police Academy. The closest hospital has a 30-minute-response time. As a result, the PRPD is planning on having all range instructors trained as Certified Life Support (CLS) personnel and, furthermore, is looking at other alternatives, such as the opening and closing of the firing ranges with a phone alert call to the nearest hospital. According to the Director, one of the major problems facing the PRPD is that most ambulance services are privatized in Puerto Rico and the cost of having an ambulance every day at six different police ranges for 10 hours will be financially prohibitive. Notwithstanding the aforesaid, the Director will continue to maintain open communications with local hospitals to resolve this problem and focus on internal training.  The TCA recommends for the PRPD to consider using personnel from the Fire Department, whose certified paramedics may be available for off-duty services.

On a visit to the canine training center, the TCA realized that the PRPD trainers were unaware of a newly approved policy on canine training. Once this issue was brought to the attention of the supervisors, the new policy was distributed and is currently in use. It is strongly suggested that a process is in place to ensure that new policies are immediately distributed as they will directly influence training, especially those areas covering searches and seizures and use of force.

One of the most important fundamentals in Academy instruction is to have a process in place that delineates a General Order or directive into its teachable parts. An Academy in effect "brings life" to the written word because each policy or directive entails an implementation process. In conjunction with the Academy Director, the TCA has agreed on a training development model that ensures a seamless transition from policy to training, and eventually to implementation. This method is called the "training development process."

Some of the most important elements are:

- Receive policy to evaluate if there are internal subject-matter experts to design training materials.
- Forward training material for the approval and recommendations of the TCA and incorporate those approved in the training material.
- Train Instructors on the precise subject-matter.
- Inform Instructors of the delivery of the training material and schedule training sessions for instructors.
- Prepare a Training Plan to provide instructions about on how to conduct the training.
- Summon Training Coordinators of police areas and Offices of Assistant Superintendents to coordinate Training Calendars.
- Evaluate, approve and effectively manage Training Calendars of each police area and the Office of the Assistant Superintendent.

This process shall also incorporate a strict timeline on dates to undergo training and the percentages of personnel that the PRPD is required to train. Deviations from scheduled proceedings could affect implementation of Paragraph 237(c).


# The Women's Advocate Office (OPM in Spanish)


The TCA's third semi-annual report reported that, at the request of Wanda Vazquez Garced, Director of the Women's Advocate Office (WAO), the TCA attended several Executive Hearings.  During these hearings, the TCA learned of the nature and extent of discrimination faced by several female police officers of the PRPD. Additionally, the TCA had the opportunity to examine the complaint filing process and protocols regarding allegations of sexual harassment and discrimination, especially when women were the complainants. Subsequently, counsel Vazquez Garced testified at the Public Hearings held by Judge Gelpí in Fajardo on March 2016 and also conducted several meetings with the PRPD, the USDOJ, and the TCA's office.

The recurring theme in both hearings described in detail the acts of discrimination and sexual harassment encountered by female officers of the PRPD. The TCA recommended the PRPD to prioritize this issue, collaborate with the WAO, and develop protocols to address this recurring problem in a timely fashion. On May 25, 2016, the PRPD and the

WAO signed a "Memorandum of Understanding ("MOU") in an attempt to succeed in controlling problems of this nature.

In addition to establishing complaint procedures, the central substance of this MOU was to ensure that anyone subjected to harassment could bring their concerns and complaints directly to PRPD's Auxiliary Superintendence for Professional Responsibility ("SARP"). Paragraph 163 of the Agreement permits officers to report misconduct by another PRPD officer or employee, "to a supervisor or directly to SPR (SARP) for review and investigation." Hence, any female police officer can currently report sexual harassment, discrimination, or other workplace harassment directly to SARP. The TCA praises this joint effort and commends both, the WAO and the PRPD for responding to and revising a deficiency in PRPD's policy and protocols affecting the health, morale, welfare, and safety of members of the force.

The TCA will continue to pay close attention to the implementation of this meaningful and vital agreement between WAO and the PRPD

# Domestic Violence and Mental Health Services

The empirical literature on acts of domestic violence reflects a higher prevalence among police officers when compared to the general population. Additionally, enlisted officers tend to respond to domestic violence more informally by failing to report such events even though they are legally, and by their police regulations, required to do so.  Similarly, policing as a profession may subject officers to stress conditions, either directly or indirectly on account of their response to crime scenes and crime victims, where the nature of the situation experienced is well beyond the realistic expectations of their profession. Stress can manifest itself either in the form of domestic violence incidents or general incidents of violence committed by officers. Often, police refrain from seeking psychological intervention to ameliorate this stress for fear of occupational repercussion (loss of weapon) or because of an unwarranted belief that seeking such assistance will be a stigma to their career. Police departments have attempted to address these concerns by mandating dialog with police psychologists after a critical incident, or by protecting disclosure when seeking such help.  Paragraphs 201 through 204 on officer assistance and support address these issues.

The PRPD has recently experienced an increase in incidents of police-perpetrated violence, either in cases of domestic abuse or "blue-on-blue" violence.  Each year a

substantial number of cases of domestic violence are reported where police members are either victims or perpetrators. In a well-publicized incident, an officer recently shot and killed three other officers at one precinct. Often there are precursor behaviors that foretell such tragedies. The question always asked is, if this could have been prevented through some psychological intervention.

Law 53 of June 10, 1996, permits the Superintendent to establish agreements with mental health professionals to address specific needs of the police department. Paragraph 201 of the Agreement states that "PRPD shall provide officers and employees with a range of non-punitive supports and services to address and correct problem behavior, as part of PRPD's disciplinary and performance improvement systems. These supports and services shall include a comprehensive range of mental health services that include, but are not limited to: readily accessible confidential counseling services; critical incident debriefings and crisis counseling; mental health evaluations; and stress management training that comport with generally accepted practices", however, the TCA has learned that there are only sixteen (16) mental health professionals currently assigned to assist a police force close to 15,000 employees.  This is clearly a challenging ratio for PRPD to execute proper mental health support to its work force. In the coming months, the TCA will assist the PRPD to explore all available alternatives to address the requirements of the Agreement.  Finally, the TCA recommends and offers assistance in ensuring that existing policies and regulations reflect voluntary requests for psychological interventions that shall not adversely affect an officer's career.

# Reorganization of the Drug, Vice, and Illegal Firearms Division

In prior TCA reports, the TCA has been critical of the operational readiness and protocols of the Drug, Vice, and Illegal Firearms Bureau, perceiving the unfortunate reality of very shocking public scandals. To decrease these occurrences, the TCA provided literature, written suggestions, and recommendations to enhance the reorganization of this Bureau. The TCA also attended meetings and discussions with the PRPD and other stakeholders to provide input.

The history of the narcotics, vice, and firearms investigations by the PRPD is replete with allegations of corruption, misconduct, and civil rights violations. It has been publicly reported on various occasions that members of the Drug, Narcotics, Vice & Illegal Firearms Bureau of the PRPD have been arrested and convicted by federal and local

authorities. This pattern of behavior has not changed significantly. As recently as September 29, 2015, the United States Attorney's Office for the District of Puerto Rico indicted ten (10) police officers for running a criminal enterprise whose crimes included robbery, extortion, narcotics, illegal firearms, and violations of civil and constitutional rights. In another instance currently under investigation, a pregnant female was assaulted, received physical injuries and was ultimately threatened by members of this Unit.

It should be noted, perhaps as a reminder that the USDOJ while conducting their investigation that led to the Agreement made findings to the effect that the Drugs, Narcotics, Vice and Illegal Weapons Bureau, "contributed to a pattern and practice of civil rights violations." More recently, the USDOJ expressed that they were "also concerned with the number of recent allegations of misconduct involving the Drug and Narcotics Unit and were also interested in following up on any corrective or preventive action that is being taken while the internal investigations are pending." The TCA has also learned of several similar violations, which were promptly reported to the PRPD and on, at least two occasions, to the FBI.

These immoderate occurrences prompted the Superintendent to determine the need for reorganization and requested the assistance and recommendations of the TCA. On May 2016, the PRPD created a new General Order to reorganize and restructure this Unit and to correct deficiencies that have plagued this Division, which it appears has nurtured an environment and sustained a culture where officers believe they are impervious to detection and punishment. The purpose of this General Order is to reorganize the Bureau of Drugs, Narcotics, Vice Control and Illegal Arms, redefine its organizational structure and procedures, set selection criteria of personnel, and improve training. New areas in the reorganization are guidelines for recruitment, transfer of personnel, increased supervision, polygraph examinations, training, specific duties, and responsibilities, and the internal restructuring of the unit for better quality control, evidence control, and data collection.

These specific areas for improvement perhaps will fall short as the TCA sees the need that these initiatives and restructuring must be sufficiently funded to fight internal corruption, reorganize internal controls and create a basic baseline from which to measure progress moving forward. The TCA provided a list of recommendations to the Superintendent to help address issues with the reorganization and to provide a clearer vision. Indications are that there is a desire to reorganize; however, results will not be visible for some time.

The TCA is astonished to learn the Commander of this particular Division, a Lieutenant Colonel, has received a third promotion in less than two years while in charge of a group

in an environment plagued with the arrest of many of his officers, personnel charged with serious violations of civil and human rights, general misconduct, and reprisals. This is totally inconsistent with the good order and discipline expected of law enforcement organization.  The TCA strongly suggests the promotion above fails to satisfy the letter of the law (Law 53 of June 10, 1996), and clearly defeats the purpose of Paragraph 16 of the Agreement which mandates the following:

"16. PRPD shall ensure that its supervisor selection process is lawful, fair, and consistent with generally accepted policing practices and anti-discrimination laws. PRPD shall develop objective selection criteria to ensure promotions are based on knowledge, skills, and abilities that are required to perform supervisory and management duties successfully in core substantive areas. PRPD shall provide clear guidance on promotional criteria, and prioritize effective, ethical, and community-oriented policing as criteria for promotion. These criteria should account for experience, civil rights and discipline record, training, and skills."

Given the flagrant failure to comply with the above directive, it is evident that said promotion adversely indicates that the PRPD contravened the reform process and the TCA urges the Superintendent to reconsider this promotion.


# Policies and the Community: GRUCORPO


GRUCORPO ("Grupo Comunitario de Trabajo de la Reforma de la Policía") is an amalgam of civic and community organizations created to represent the community throughout the Reform Process. By becoming a conduit between the community and the PRPD, GRUCORPO can effectively represent their members, voice their concerns, offer suggestions, and discuss policies and procedures from the perspective of the community. Ultimately, they seek to assist the PRPD by informing the agency and the Reform of the needs of the community they serve.

Initially, there was no working relationship between the PRPD and GRUCORPO. Some mediation efforts were conducted with fraught success. However, after the publication of an editorial piece entitled "¿Reforma policiaca genuina o de cartón?" ("Genuine or Cardboard Police Reform?") by the Project Manager of *Espacios Abiertos* (Open Spaces) an organization within GRUCORPO a door was opened for dialogue. Despite the content and context of the editorial, the opinion piece ended by expressing high hopes the PRPD could become a law enforcement agency that afforded citizens a high sense of security

and solidarity while at the same time respecting diversity and human rights. That month, the PRPD gave GRUCORPO the opportunity to review several Use of Force General Orders. Despite not being entirely satisfied with the length of the time given for their input, GRUCORPO provided significant contributions.

This relationship plateaued at a very high point between June and November 2015. GRUCORPO continued to receive PRPD's drafted policies, and in turn, they provided their comments, as well as reviewing the curriculum for future PRPD Police Academy instruction.  GRUCORPO became an effective partner in the reform process and had a good relationship with the PRPD Reform Office, offering their "expertise," which helped the PRPD shape the policy regarding interaction with the community.  The relationship between both organizations can be exemplified by the PRPD's comments on the TCA's Second Semiannual Report (June 2015): "PRPD recognizes that gaining and keeping the trust of the community (including GRUCORPO) is at the heart of the reform process and will continue to foster its relationship with community groups."

All efforts leading to a continued cooperation came to a halt by the month of December 2015. GRUCORPO reported that the PRPD stopped sharing the drafted policies for their input. PRPD's position was that they would resume sending the policies only if GRUCORPO agreed not to put the draft policies on the GRUCORPO website. The PRPD argued that placing these policies on the GRUCORPO website without PRPD's permission was a confidentiality violation that would cause confusion within the Police and the Community. In the dialogue with PRPD, GRUCORPO suggested that to enhance transparency and accountability the PRPD should make the proposed policies available for comment before these regulations are finalized and signed by the Superintendent.

The TCA strongly supports a durable partnership between the PRPD and the community in the process of drafting sustainable policies.  This position is consistent with Paragraph 212 that requires the PRPD to work closely with Community Interaction Councils (CICs) to address crime and safety issues. Ideally, these groups can provide feedback concerning the effectiveness of the PRPD policy. (See 212 (a) through (e)). In fact, the Agreement requires CICs to prepare an annual report on their recommendations to PRPD, and the PRPD to place these recommendations on the PRPD website. It is the TCA's position that the reform is better served if the PRPD would be willing to take the initiative and place the drafted policies on the PRPD's website designating a specified period for public comment. The procedure recommended herein will address the concerns of GRUCORPO, CICs, and the public at large who clamor for transparency and accountability.

In the Commonwealth of Puerto Rico, any agency pressing to adopt, amend or approve rules and regulations, must abide by the Uniform Administrative Procedures Act of Puerto

Rico (3 L.P.R.A. Section 2101 et seq.). A specific requirement of this law (Section 2122) is to afford the public the opportunity to voice their views with regards to the proposed rule or regulation. To that effect, asking the police to make proposed policies available to the public, places the police in a position to receive comments and data (both anecdotal and empirical) that may help clear the threshold of public opinion in the approval procedure.

This hesitant attitude towards the community is not reassuring of a commitment directed to attain a Sustainable Reform. Lack of communication can only tarnish a potential partnership, something that will be proving detrimental to the efforts of attaining stable community relations. The PRPD should divest itself from any prior conflict and seize the opportunity by taking advantage of the willingness of organizations like GRUCORPO to meet with them, not only for policy discussions but also to discuss common challenges, share information, and learn about new ideas and tactics, to serve the community. Fostering communication and cooperation with the community is a centerpiece of the Reform because it is essential to strengthen the community's trust in the PRPD. Such strength can only come from timely and reliable information about PRPD's progress and accomplishments under the Reform.

# Information Systems

TCA firmly advises that the gap from critical to successful implementation of the Agreement lies in the ability to plan and execute specific tasks and to muster the resources needed to implement them in the compliance area of Information Systems and Technology.  A plan that details scope, tasks, resources and focuses on required outcomes is essential to monitor PRPD's Information Technology Operational and Transformational performance.  The IT Action Plan is one of the most significant documents to lead, change and monitor performance. The IT Action Plan must be comprehensive and provide support to the other ten Action Plans that rely on IT support.

During the current six-month reporting period, the TCA's IT subject matter expert conducted on-site visits with PRPD's Chief Information Officer ("CIO"), and his team. These visits were conducted exclusively to review the capacity, approach, and ability of PRPD to plan, manage and execute IT initiatives that satisfy the requirements of the Agreement, the Action Plans and/or support other reforms that depend on IT.

The TCA conducted visits on December 2015, March 2016, and May 2016.  Materials exchanged included drafts of the PRPD IT Action Plan, Strategic Plan, Buy Process, EIS Schedule, Policies and Procedures Timelines, Notional Architectural Drawings, List of Contractors and emails.

*Observations regarding the IT Action Plan:*

Several iterations of the IT Action Pan ("ITAP") were provided culminating in a draft version provided for analysis on 26 May 2016. In its current version, the "ITAP" is comprehensive concerning the Agreement in that it refers to collaborations needed to enable the other ten Action Plans. It also indicates current technologies needed by the PRPD to meet or satisfy the terms of the Agreement. Although comprehensive, it does not expressly identify specific institutional IT management practices or governance necessary to ensure that oversight rigor is in place to ensure alignment of IT initiatives with the Agreement. In in short, the ITAP does not make reference to or contain an IT governance board.

In view of the above observations, to be approved, the ITAP must be revised to include the below indicated institutional practices, policies or procedures, their incorporation and acquisition thereof.

Regarding infrastructure, the ITAP does identify that necessary IT infrastructure work needs to be performed to support enablement of the Agreement.  In section 1.12, Table 1 and throughout the document, the essential need for infrastructure upgrades to execute projects is detailed. These notations are enlightening in that PRPD/CIO, and the Reform has documented this as a precursor to success. In short, without an infrastructure that is capable and updated, the probability of specified technology needs, as stated thus far throughout all of the Action Plans is to be considered a high risk. In addition to this risk is the proposition that the ITAP and its deliverables are the decisive paths to the success of the other Action Plans and that ITAP PRPD/CIO suggests that extensions of ITAP projects may be necessary. Given these conditions, the sequencing of the ITAP as an essential supporter to the establishment of the other Action Plans is tantamount to a reverse engineering process.

The TCA strongly requests the PRPD to make a genuine and exhaustive effort regarding the timing concerns identified within the ITAP and to prioritize the need to conduct a master sequencing exercise through which resources, timing and dependencies are identified as well as the associated risks due to the pacing of the ITAP.

Regarding IT human capital, the ITAP references in paragraph 1.12 on page 3 and Table 2 the staffing and resources needed. This means that the PRPD leadership must put

together the investment in human capital (organic to the PRPD or outsourced) necessary to accomplish the tasks required of the Action Plan and the Agreement. In light of the sheer volume of activity, the Office of the PRPD/CIO risks not having adequate numbers of subject matter experts to plan and manage the Action Plan, its dependencies, and overall coordination with other action plans nor to effectively acquire and oversee contractor services and their work product. An example of this dilemma can be seen in the assistance of Mr. Diaz from the Reform Office. His significant contributions notably extend to IT planning and strategy, something which would normally fall under the responsibilities of a Deputy CIO or the first level of management in PRPD. This currently is not the case. And so, the administrative burdens of orchestrating needed coordination with the Agreement's elements and expectations are being assumed by Mr. Diaz and CIO Rivera whose attention and activities might be better dedicated to managing strategy, expectations and satisfaction of deliverables.

A second example of the limitations in human capital is referred to in paragraph 2.2 and Table 3, whereby effort must also be given to interagency agreements with other organizations external to PRPD needing oversight. The observations above strongly suggest that the PRPD must hire or acquire IT subject matter experts and experienced management analysts or project managers either through PRPD staffing or contractor augmentation to perform oversight functions. Ultimately, the risk associated with being understaffed will increase with time as actions, issues and needed coordination or correction mounts. Access to staff and experts is the most critical need and highest risk area for meeting the IT expectations under the Agreement. It is the recommendation of the TCA that the PRPD should make a clear and stated commitment to increase resources through the hiring of certified IT experts and/or certified project leads to manage and oversee the workload required to satisfy the decree.

On the subject of planning, an Integrated Master Plan (IMP) is an essential element in planning and tracking to schedule. Currently, the schedule and plan artifacts are not yet mature enough for management tracking and critical decision making, setting aside the shortage of skilled support staff noted above. Although the intentions of current PRPD staff are the best of intentions, intuitive decision making, and oversight can carry the PRPD and CIO management only so far. Without established and transparent scheduling and goal setting, program review for adherence to program and project intentions, performance targets and metrics, to include the delegation of task management, is impossible. The recommendation of the TCA is that PRPD establishes as a foundational management artifact, an IMP (or Schedule) or individual projects in sufficient granularity to define satisfaction of the requirements of the Agreement about IT solutions. The key elements in this recommendation include the CIO's ability to track cost, performance and schedule of every activity required of IT to satisfy the Agreement. This stated, the IMS must also reconcile cost per project.

Regarding funding, the IT budget associated with the ITAP lacks clear details to substantiate what appears to be an extremely conservative estimate of the cost that should be associated with implementing the IT Action Plan irrespective of the source of funds. It is the recommendation of the TCA that a fully scrutinized, reviewed and detailed program budget, endorsed by leadership, be detailed for each line item identified above and be posted and formalized for transparency. Not doing so leaves a question of how resources will be applied and whether or not projects are within cost parameters. PRPD should consider with reverence the option of additional staff to monitor this fundamental management practice.

The following are general observations that apply throughout the draft upon which action should be taken:

1. The ITAP is responsive to the demands of the Agreement, but there is little evidence of the also needed, long-term systemic improvement required to sustain the transformation and prevent the reverting of technology.

2. The availability of a quantified and documented IT Technical Architecture is in question. This type of management tool is essential for planning and strategizing as it forms the basis for technology decision-making, prioritization, and investment. Not having a structured framework is tantamount to not tying technology to a stated vision.

3. The volume of documents, manuals, policies and training materials cannot be taken lightly. Communicating purpose is essential to effective deployment of all IT deliverables and their effective use. Staffing of this activity is essential to the agents who will use IT deliverables.

*Observations regarding IT management practices:*

1. To effectively execute IT projects there should be at least three elements available for a successful implementation: a) specificity of requirements and business process reengineering, b) project planning of cost and schedule, and c) governance and oversight needed to monitor execution.

2. Governance and the policy that invokes oversight is essential. It is therefore recommended that PRPD, Reform, and the CIO establish these practices, if not already in place, and publish their intent to ensure that all participants performing IT work understand the accountability that comes with the assignment and the compliance monitoring that will be enforced. Stewardship of people and resources cannot be underestimated.

3. Commensurate with the Integrated Master Schedule cited above, it is recommended that the CIO establish; a) a strategy and/or a plan for contracting technology expertise required for successful implementation of the Decree, b) a plan for Risk Mitigation (technical and resourcing), c) a plan and schedule for adding professional capacity organically with PRPD staff or through outsourcing to contractors, d) formalize a plan for current Accounting of Policies and Procedures for IT and e) enforce that the PRPD/CIO and Reform investigate business intelligence tools for the management and tracking of IT transformation activities.

Undoubtedly, PRPD/CIO and the Reform Unit are working diligently to meet the demands of the required transformation. Additionally, the CIO has stated that he feels that he has the full support of the Superintendent to comply with the Agreement.  These are positive signs.  However, the inability to fully apply rigor and discipline imperils achieving the intended goals.  As stated previously, intuition and the best of intents alone will not guarantee IT success.  Attention to detail, third party and peer review, independent validation and verification are well proven best practices that must be incorporated. Unfortunately, these values also require resources and investment in people and practices.  Not having access to subject matter experts and experienced management talent is the highest hazard to PRPD/CIO's success.

With regard to factors of timing and sequencing, the ITAP delivery of the last of the Action Plans is actually a risk factor because of the fundamental dependency of the other ten Action Plans.  In retrospect, ITAP should have been done first and the PRPD should evaluate and possibly bear the potential aftereffects of not doing so.

Collaborations for delivery of technology capabilities can be highly effective.   It is recommended that PRPD Leadership and the CIO give dedicated consideration to leveraging of the Academy and private sector capacity to complete the transformation. The CIO currently depends on outsourcing and industry, and it has proved to be beneficial.  Exploiting external opportunities may be the most effective and fastest way to expand the number of subject matter experts required for success.

Special dispensation or waivers on the subject of policy or statute may be required for the CIO to be successful. Legislation (Law No. 66-2014, of June 17, 2014) that restricts adding infrastructure or hiring people given the current fiscal situation in Puerto Rico limits response.

The CIO has stated that his budget is "need based." As long as this is so, the "on demand" nature of planning will make difficult the sustained transformation rendering it risky and improbable. Earmarked multi-year budgeting is essential to planning and scheduling.

Professional continuity is a highly stabilizing factor to an IT environment.  With the impending elections and the potential impact that it will have on leadership, PRPD should give strong consideration to providing continuity to present IT leadership.  They characterize the analogy of the "connective tissue" keeping the transformation together. The loss of any of those human assets will substantially set back the Office of the CIO.
It is the position of the TCA that critical to successful implementation of the Agreement is the ability to plan and execute specific tasks and to scope the resources needed to implement it in the compliance area of information Systems and Technology.  A plan that details scope, tasks, resources and required outcomes is essential to being able to monitor PRPD's Information Technology Operational and Transformational performance. The IT Action Plan is the one of the most significant documents to being able to lead, change and monitor performance.   The IT Action Plan must be comprehensive and provide support to the other ten Action Plans that rely on IT support.

# Third Public Hearing

During the present reporting period, the Hon. Gustavo A. Gelpí, United States District Judge, on the dates of March 17 thru 18, 2016, held the third Public Hearing about the Sustainable Agreement for the Reform of the Police of Puerto Rico.  The Hearing was held at the Commonwealth's Courthouse in Fajardo, and focused on updating and informing the Court and the public of the advances achieved in complying with the stipulations in the Agreement.  A permanent component of the Agreement is the inclusion of the community in this reform process. In view that the setting for the Hearing was the township of Fajardo, particular attention was placed on the Eastern side of the island, including the island municipalities of Vieques and Culebra. Just like in the other two previous hearings, participation came from a varied group of participants that included police officers, community groups, community leaders and influential personalities.  The synopses of testimonies offered in this Report do not purport to be the official minutes of the hearing but rather a summary of those challenges and concerns that were perceived through the lens of the TCA and are deemed to have an impact in the reform process.  It should further be noticed that the TCA has endeavored to withhold personal opinions in the summary of the aforesaid presentations.

On the first day of the Hearing, the Court heard presentations from diverse components of the community directly affected by the reform process that had not previously appeared

before the court nor had the opportunity to meet with the TCA to address any pertinent issue. The Honorable Rafael Martínez, Associate Justice of the Commonwealth's Supreme Court, opened the proceedings by reading a brief statement on behalf of the newly appointed Chief Justice, the Hon. Maite Oronoz, who was unable to attend. Representatives from the major townships in the Eastern part of the island, the municipalities of Fajardo and Humacao, also welcomed those present on behalf of their respective city mayors, the Hon. Anibal Meléndez from Fajardo and the Hon. Marcelo Trujillo from Humacao.

The Dean of the University of Puerto Law School, Mrs. Vivian Neptune, Esq. promoted the inclusion of the law schools of Puerto Rico into the Reform process, as an additional resource to achieve the sought after goals. Mr. Oscar Serrano, Mr. Miguel Rivera Puig, and Mr. Juan Hernández, spoke on behalf of the media in Puerto Rico and their past and present relationship with the Police Department.  They all voiced a request for greater transparency on behalf of the Commonwealth. Mrs. Ineabelle Álvarez spoke on behalf of Ceiba's Proyecto Escudo, an office focused on assistance to victims of sexual crimes committed in the eastern part of the island and contributed valuable statistics on victims and police response. Counsel Wanda Vázquez, the Commonwealth's Women's Advocate, also briefly addressed the Court.

The Honorable Anabelle Rodríguez, Associate Justice of the Supreme Court of Puerto Rico, presented her statement to the Court, promoting collaboration between the federal and state judicial systems in attaining a sustainable Reform for the Police Department for the benefit of the Puerto Rican community. Mr. Carlos Iván Pérez, a community leader from the township of Naguabo, called for a broadening of the courts' monitoring duties and powers as the only efficient way to properly attain the reform of the Police Department. Mr. José A. Ruiz García, Esq., Executive Director of the Maritime Transport Authority, and Inspector Wilson Lebrón, Director of Security for the Ports Authority, also briefly addressed the Court. Dr. Keren Riquelme, Director of the Central Committee of Community Interaction, and Mrs. Elitzia de Jesús, Spokesperson for the Fajardo Community Interaction Council, closed out the first day's proceedings, followed by brief comments by Mr. José Caldero López, the Police Department's Superintendent.

On the second day of proceedings, Mr. Víctor Emeric Caterineau, mayor of the island of Vieques, addressed the Court regarding the island's relationship with the Puerto Rico Police Department. He was followed by Mr. José Vega, Esq. from the Fajardo Community Interaction Council, and Mrs. Sonia Rodríguez, Spokesperson of the Humacao Community Interaction Council. Antonio Maldonado, president of the Palmas del Mar Homeowners Association, gave a brief statement to the Court, followed by the presidents of the main private security companies in Puerto Rico: Mr. Luis Pagán, Mr. Juan Bravo III, Mr. Miguel Portilla, and Mr. Pedro Morales.  Mr. Johanis Salcedo spoke on behalf of

the University of Puerto Rico Legal Assistance Clinic regarding the LGBTT community's rights, followed by Mr. Josué González on behalf of GRUCORPO, and Mrs. Georgina Candal, Esq., the Executive Director of the Civil Rights Commission.

Col. Luis Colón Ortiz, commander of the Puerto Rico Joint Forces of Rapid Action ("FURA"), gave a presentation on the current operations of FURA, followed by Mr. Jaime Vega, Security Director of Marina Puerto del Rey. Col. Clementina Vega, the Director of the Puerto Rico Police Department's Reform Office, addressed the Court regarding the current efforts by the Police Department in complying with the Reform, followed by closing statements by Police Superintendent.

The Court has scheduled the Fourth Public Hearing for the month of September 2016 in the city of Mayagüez, in the Western part of the island.  As a follow-up measure regarding some issues addressed during the last Hearing, the Court expressed its desire to have the participation of the Director of the Tourism Company during the next public hearing. The Court also restated its belief that hearings, such as this one, are a unique and effective way of properly engaging the different sectors affected and responsible for the success of the reform process.

Overall, as evidenced by the different presentations throughout the course of the two days, the Hearing demonstrated how the sustainable reform of the Puerto Rico Police Department can only be achieved if the Puerto Rican community is fully included in the process.  Protection of civil rights can only be attained if the voices of those who are meant to be protected can be heard. This past Hearing opened the doors, not only for full awareness and integration of the Reform within the community but also for members of the community to become valuable resources in the process.  The goal is to achieve a Police Department that fully serves and defends the constitutional rights of the People of Puerto Rico.  (Transcripts of the Hearing are available to the public)

Next, on behalf of GRUCORPO, Mr. Josué González of the American Civil Liberties Union (ACLU) addressed the Court. The Communitarian Work Group in Regards to the Police Reform (GRUCORPO) is a group whose workforce is composed of individuals and organizations based in the community that provide services to interested parties (stakeholders) and have become part of this effort to promote effective and independent community participation, transparency, and the rendering of accounts during the implementation stage of the Agreement. These particular groups of stakeholders are persons from the community that have directly suffered some abuse from police officers or endured their neglect or their negligence in conducting investigations or have provided services to victims of police abuse. From their point of view, and based on their experience in the field, they are capable of providing a unique perspective on important aspects of police practices at operative level.

Bearing in mind the culture of violence that is still prevalent among some individuals or groups within the PRPD, this workgroup firmly advocates that effective community participation is necessary to achieve positive and permanent transformations within the PRPD. As the Department of Justice of the United States recently stated, "[T] he stipulations in the Agreement aspire to establish solid relationships with the community and therefore to promote collaboration in the resolution of problems, police practices free from discrimination, and the effective prevention of crime."  Those measures include: community integration and the adoption of police practices directed towards the resolution of problems in regards to supervision, procedures, recruitment, training, personnel evaluation, police tactics, and the distribution of resources; the development of programs that promote community involvement and programs to convey information to residents on the progress the PRPD has made in the Reform and to address community concerns and publicize precise and actualized crime statistics.

Counsel Gonzalez continued to say that each organization and individual that participates in this effort hopes that the PRPD is transformed into a Department that upholds law and order for the people, is institutionally founded on the principles of community police and works under strict principles of human and civil rights. This workgroup initially was organized through the American Civil Liberties Union (ACLU) of Puerto Rico, who on their own, involved stakeholders, individuals, leaders and different community organizations and invited them to collaborate independently in the Reform process.

Between the months of August and December of 2014, the ACLU of Puerto Rico organized various meetings with the community and various key functionaries of the Reform, including the TCA, attorneys from the United States Department of Justice, the Superintendent of the PRPD, the Director of the Police Academy, Dr. Michelle Hernández and the Office of the Police Reform, led by Colonel Clementina Vega Rosario. This effort, with the assistance of the TCA, led to long discussions with representatives of the Reform Unit and important channels of communication were established. Even though there still are profound disagreements about certain aspects of the Reform, the dialogue is still in place and has promoted an ambience of collaboration with the Office of the Reform and the Academy.

GRUCORPO has made suggestions and comments on general orders relating to arrest, searches and seizures, domestic violence, use of force, and other areas of concern in police operations. They have also participated in various meetings with the TCA, the U.S. Department of Justice, the Superintendent, and the Reform Unit. Mr. Gonzalez is most concerned with the issue of "use of force" and believes the PRPD has not yet achieved solid policies that could guide the discretion of the police officers in the use of force. He explained that they believed that any proposed protocol should strictly guide and limit the

discretion of the police officers. For example, he pointed out that the neck restraint technique used by PRPD was unnecessary and dangerous. He perceived that despite the fact this technique is mentioned in the Agreement, its adoption is not required. He added that the proposed "General Order" that regulates the Tactical Operations Unit should clearly establish that this division should not be activated to suppress protected activities under the First Amendment.

Mr. Gonzalez went on to establish that the only detentions that should be permitted under the laws of Puerto Rico should be those based on probable cause of for the commission of a crime. He asserted that "experience dictates that investigatory detentions in other jurisdictions have been used for racial discrimination and have provoked incidents of police abuse." Additionally, the use of appropriate terms should be adjusted to the advice of constitutional rights of a suspect. He argued that certain key definitions should be more clearly and articulately explained in the policies refer to clearly established constitutional principles.

The protocols in place for gender violence were also discussed. It was suggested that these policies should establish clear criteria to adequately classify the crimes of domestic violence and sexual aggression. It was also suggested that the collaboration and coordination of support groups for gender violence victims should be sought, and protocols should be adjusted to comply with the federal statutes and regulations, and special attention should be emphasized on incidents of gender violence committed by police officers.

# Partnerships with National Organizations: The NACOLE-ACLU Regional Conference on Oversight of Law Enforcement

As part of the process for the Reform of the PRDP, the American Civil Liberties Union (ACLU-PR) is working to create awareness of the concept of citizen oversight of law enforcement. These oversight committees are officially recognized groups composed of community members, which may include non-sworn civilians, who review complaints filed against the police on behalf of the citizenry.

In connection with this effort, during the month of May ACLU coordinated the Regional Conference of the National Association Civilian Oversight of Law Enforcement (NACOLE) that took place in Puerto Rico. NACOLE is a non-profit organization that brings together individuals and agencies working to establish or to improve oversight of police officers in the United States. The TCA and members of his team participated in activities related to the visit to Puerto Rico of NACOLE's representatives and presenters.

The TCA participated in a meeting held at the ACLU-PR office on May 12, 2016. Among the participants were Liana Perez, Director of Operations of NACOLE; Susan Hutson, New Orleans Police Monitor; Cameron McEllhiney, NACOLE Director of Training and Education; Christina Beaumud, Civilian Investigative Panel, City of Miami; and Prof. Jodie Roure, John Jay College of Criminal Justice. The purpose of the meeting was to share experiences on the implementation of mechanisms of independent civil monitoring and discuss their relevance in the PRPD reform process and access to public information.

TCA representatives participated the next day in the Conference on "Independence, Transparency & Accountability in Policing" sponsored by NACOLE, which took place in the Amphitheatre of the Interamerican University School of Law. Topics discussed in the conference included building public confidence, mechanisms related to the implementation and functioning of civilian oversight committees, access to information and transparency in the state's processes, among others.

The TCA is available to continue the dialogue and exchange of information on this matter.

# Projected Activities: The Next Six Months

Consistent with Paragraph 250 (e), the TCA will continue to work in the upcoming six months providing technical assistance and review for the policies that the PRPD will submit in subsequent months. The TCA will continue to provide support to the Police Academy while emphasizing on more comprehensive IT technical assistance. The TCA will also work with the PRPD in the review of the pending and outstanding Action Plans. Concerning the Action Plans in effect, the TCA has attached the compliance methodology to measure the progress made in the second group of Action Plans. (See Appendix 6) This methodology includes all relevant timeframes and steps to be taken in measuring the PRPD progress towards implementation.

Consistent with past practices, the TCA will continue to provide the PRPD and the USDOJ a monthly agenda of activities. The TCA acknowledges that more than two years have

elapsed since he and his Core Team have been in Puerto Rico assisting the PRPD in the transformation process. As with any such endeavor, there are challenges, learning curves, personality adjustments and competing visions that need to be addressed to create a seamless process toward reform. The TCA understands that significant strides have been achieved on how he and his team now collaborate with the Reform Unit, the PRPD, the command staff, and the community stakeholders. There is now a more open line of communication among all those who want to ensure the success of the Reform and the PRPD. The TCA realizes that acceptance of the Reform by the public and the police will increase as the image of reliability and transparency of the process sets in.  As the PRPD can extricate a host of issues affecting policies, programs, and systems, and as the public is better informed about issues affecting the police, the TCA is confident that new important associations will be formed to assist the Parties, while at the same time existing, affiliations will be strengthened.