IN THE UNITED STATES COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| USA,<br><br>    Plaintiff,<br><br>    v.<br><br>COMMONWEALTH OF<br>PUERTO RICO, ET AL.,<br><br>    Defendants. | CIV. NO.: 12-2039 (GAG) |

**ORDER**

The Court has very carefully reviewed the tendered agreement submitted by the United States and the Commonwealth of Puerto Rico (Docket No. 2-1). The same is extremely comprehensive, insofar as it proposes reform initiatives to modernize and professionalize the Puerto Rico

| | |
|---|---|
| Civil No. 12-2039 (GAG) | Page 2 |

police force, as well as monitoring compliance with the parties' terms.

The agreement, the consideration of which the Court has stayed until April 15, 2013 (see Docket No. 5), however, does not include a proposed budget for the several measures the Commonwealth must take to implement the directives contained therein. This is a crucial element for the Court as it considers whether to accept the agreement. What is the projected short-term and long-term cost of implementing this agreement? More so, the agreement is silent as to whether the Commonwealth will bear the entire cost of overhauling its police department, or whether the United States will assist in whole or in part, by way of federal executive grants, programs or otherwise. The agreement is clear regarding the

| Civil No. 12-2039 (GAG) | Page 3 |
|---|---:|

compensation for the Technical Compliance Advisor ("TCA"). The agreement at page 21 paragraph 272 provides that the Commonwealth "shall bear all reasonable fees and costs of the TCA." However, the amount and meaning of these fees and costs may become a point of contention.  For example, if the TCA selected resides outside of Puerto Rico, he or she will spend considerable time in Puerto Rico.  How big a staff must the TCA have?  What will the TCA and the staff members' compensation be?  And, how many hours will the TCA and staff devote to work related to the agreement?  The judges in the District of Puerto Rico over the past several decades have employed Court monitors and staff in cases such as the <u>Morales-Feliciano</u> prison litigation, 79-04 (PJB).  Costs can run into several million dollars per year.

Discussion of the above issues is imperative because, ultimately, the Commonwealth's bicameral Legislative Assembly will have to include and earmark such expenses in the government's annual budget. The Court notes the Commonwealth government's fiscal year begins on July 1st of each calendar year.

In another case before the undersigned, United States v. Commonwealth of Puerto Rico, 99-1435 (GAG), both governments have, for the past thirteen years, been signatories to several superseding agreements in a Commonwealth-wide ADA claim initiated by the United States on behalf of mentally disabled citizens. This case has required a minimum annual budget of over thirty million dollars ($30,000,000.00), and, candidly, several million more. These monies are earmarked

each year by the Legislative Assembly. When compared to the instant action, this matter could demand an even greater budget. Hence, if this agreement is approved and effectuated this year, reasonably well-estimated financial projections must be presented to the Legislative Assembly.

It is no secret that the Commonwealth's fiscal capacity has been in a dire crisis for the past decade. The last three Governors, Anibal Acevedo Vila (2005-2008), Luis G. Fortuno (2009-2012), and now Alejandro Garcia-Padilla (2013-present), have all recognized the precarious condition of the Commonwealth's coffers. In Consejo de Salud Playa Ponce v. Rullan, 593 F. Supp. 2d 386, 388 n.3 (D.P.R. 2008), the undersigned noted the Commonwealth's dire financial state and the difficult consequence of having to comply with federal

monetary mandates. At present, the Commonwealth government's retirement system is on the verge of collapse, and in December of last year, its bonds were downgraded to just one notch above junk bond status. With its borrowing power presently in limbo, and a fiscal crisis on its hands, the government may find itself in a Catch-22.

There is no doubt in the Court's mind that Congress intended for 42 U.S.C. § 14141 to apply to Puerto Rico, just as it applies to the States of the Union, and has in fact been applied to New Jersey in <u>United States v. New Jersey, et al.</u>, 99-5970, filed in the United States District Court for said district.

Puerto Rico has been a United States Commonwealth since 1952. "[T]he purpose of Congress in the 1950 and 1952 legislation was to accord to Puerto Rico the degree of

autonomy and independence normally associated with a State of the Union." Examining Bd. v. Flores de Otero, 426 U.S. 572, 594 (1976). "[A]lthough Puerto Rico is not a State in the federal union, it . . . seem[s] to have become a State within a common and accepted meaning of the word." Calero Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 672 (1974).

As a United States Commonwealth with a republican form of government, an Article III United States District Court, and nearly 3,726,000 residents (the vast majority being natural-born United States citizens), the government of Puerto Rico – just as any state of the union – must zealously guard the sacrosanct guarantees contained in the First and Fourteenth Amendments to the United States Constitution. See Posadas de Puerto Rico v. Tourism Co., 478 U.S. 328, 336 n.1 (1986); Torres v. Puerto

Rico, 442 U.S. 456, 469 (1979). Accordingly, the Commonwealth must act as any State of the Union. However, the Commonwealth, which has a larger population than 22 States of the Union, and has approximately one-third (1/3) the per capita income of the United States, does not come even close to having the economic capacity of Mississippi, the poorest State in the Union. This is why a projected budget is imperative in this case. Otherwise, the Commonwealth stands *ab initio* to violate any agreement for lack of funds. This, in turn, will force this Court to micro-manage the day-to-day affairs of the Commonwealth's police force – an obscene proposition from a federalist perspective.

A serious and ongoing problem in the Commonwealth's police department must be remedied. Both the United States

and the Commonwealth have recognized this in the tendered agreement. This is not to say the Commonwealth police force is composed entirely of dishonest and unprofessional officers. To the contrary, the vast majority of police officers are honest, law abiding men and women who, day after day, put their lives at risk making the Commonwealth's streets and communities safe. More so, the many federal task forces on the Island, such as the FBI, DEA, ICE and ATF, depend on the work of many such officers. By implementing the measures contained in the proposed agreement, the Commonwealth realistically will have a well-functioning 21st century police force.[1]

---

**1.** The Federal Government, since the 1990's, has designated Puerto Rico a High Intensity Drug Trafficking Area ("HIDTA"). The Island is a bridge to the Mainland for drug traffickers, in large part because it falls within the federal customs and immigration zone. A modern and sophisticated Commonwealth police force will provide a mutual

The Court would like to be mistaken, but based on its experiences, it is of the impression that compliance with the proposed agreement seems too daunting a task within the time and economic constraints set forth. The current Commonwealth structure does not generate enough economic resources and capital to put its own house in order in a relatively short time. And, unfortunately, the Commonwealth receives but a fraction of the federal monies States receive. The problem, thus, is one which both the United States and Commonwealth must work together to resolve for the benefit of its people. The Court sees the same story played out over and over: in cases involving compliance with federal mandates, the Commonwealth must act like any State of the Union; it

---

benefit to the United States, in deterring the flow of narcotics from South and Central America to the States.

must comply with the Federal Constitution and laws enacted by Congress; but, it does not have the fiscal resources in place to do so. And, historically, time after time, the Commonwealth is readily incapable of coming into full compliance with federal law.

In light of the preceding, the Court instructs the parties to discuss and address the matters highlighted in this order immediately. The Court wants to help both the United States and the Commonwealth resolve these issues, over which the parties have devoted considerable time. But without a realistic budget, not much can be done.[2]

---

2. The Court highly encourages the parties to promptly provide copies of this order to the Presidents of the Commonwealth Senate and House of Representatives, so that they also may prepare accordingly before finalizing the fiscal year 2013-2014 budget.

The instant order is not intended to suggest in any way how the Court will ultimately rule on the merits of the case and agreement before it. It is only intended to alert and highlight the potential institutional and implementation problems that will likely arise, so as to allow the parties to seek possible solutions now, not later.

THIS IS A CASE WHERE THERE SHOULD BE NO LOSERS. EVERYONE, PARTICULARLY THE CITIZENRY, SHOULD COME OUT AS A WINNER.

The parties shall file a joint motion outlining the proposed budget for the implementation of the consent decree **on or before March 15, 2013.**

| Civil No. 12-2039 (GAG) | Page 13 |
|---|---:|

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 6th day of February, 2013.

<u>S/ Gustavo A. Gelpí</u>
GUSTAVO A. GELPI
UNITED STATES DISTRICT JUDGE