# POLICE REFORM AS SEEN THROUGH THE EYES OF A DISTRICT JUDGE

HON. GUSTAVO A. GELPI

During the past two decades, the U.S. Department of Justice (DOJ) has filed in federal courts a plethora of civil rights actions seeking police reform against cities and counties across the nation. The state of New Jersey, the commonwealth of Puerto Rico, and the territory of the Virgin Islands are among those sued. From 1994–2012, only eight such proceedings were commenced in the federal courts.[1] Since then, in only four years, the DOJ has commenced 13 such actions, which has exponentially increased law enforcement reform nationwide.[2]



These civil rights actions are brought under the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141, which makes it unlawful for any governmental authority, any agent thereof, or any person acting on behalf of a governmental authority to engage in a pattern or practice of conduct by law enforcement officers that deprives persons of rights, privileges, or immunities secured by the U.S. Constitution and laws of the United States. The act also authorizes the attorney general of the United States to initiate a civil action to obtain appropriate equitable and declaratory relief to eradicate the pattern or practice of police misconduct. Commonly referred to as the "Rodney King statute," the act was enacted following a series of congressional hearings during the aftermath of the 1991 Rodney King incident with the Los Angeles Police Department. These hearings evidenced that, at that time, the federal government had very limited capacity to address civil rights violations by law enforcement entities.

Section 14141 actions generally result in consent decrees or agreements between the DOJ and the defendant governmental entity. Upon approval, the court appoints a monitor recommended by the parties. Consent decrees provide for reform in multiple areas of police departments as large as that of the commonwealth of Puerto Rico with over 15,000 officers, or much smaller ones such as Ferguson, Mo., with 53 officers. The most common areas reformed are usually use of excessive force, unreasonable searches and seizures, discriminatory policing, illegal detentions, and false arrests. However, the action can also focus on a very narrow issue, as in the Portland case where the reform focuses on the use of excessive force against individuals with mental illness.

### Puerto Rico Police Department Investigation

Following an investigation that commenced in 2008, the DOJ in 2012 filed a § 14141 action in the U.S. District Court for the District of Puerto Rico against the Puerto Rico Police Department. By way of random assignment, the case landed on my docket. This is the largest police force ever subjected to federal reform, given that it is the second-largest police department in the nation, second only to that of New York City. Now, four years later, and given my educated opinion that such actions are necessary and will continue to be filed for



Top Left: A hearing at the U.S. Courthouse in Ponce, Puerto Rico. A former three-term governor of Puerto Rico, Rafael Hernández-Colón, deposes about his views on the necessity for police reform and his experiences with the police during his governorship. Bottom Left: At the March 2016 Puerto Rico Police Promotions Ceremony at the Police Academy. From left to right: Superintendent José Caldero, Attorney General César Miranda, Judge Gustavo A. Gelpi, Col. Clementina Vega, and court monitor Arnaldo Claudio.



years to come, I will share my experiences, challenges, and thoughts on the reform with the hope that it will benefit my colleagues, as well as the DOJ and police department attorneys who in the future will become involved in a case of such magnitude.

When I first took on the case I immediately ordered a conference with the attorneys, as well as the Puerto Rico Police Department superintendent and attorney general. The parties were highly cooperative. As a matter of fact, since the outset of the DOJ investigation, the police welcomed the investigation and worked alongside in negotiating the agreement that would follow the filing of the § 14141 action. This highly cooperative environment set a positive tone for the task we would soon embark upon. The first big challenge was approving a budget and selecting a monitor (known as the technical compliance adviser (TCA)), as well as a team of subject-matter experts. The original proposed annual budget was, in my opinion, unrealistic. I thus ordered the parties to revisit the matter,[3] and it was soon resolved.

### Monitor Selection

Selecting the monitor was an even bigger challenge. Because of the magnitude of the contemplated police reform, I understood, and now can confirm, that the person selected had to be available around the clock. I did not want a monitor who came to Puerto Rico for a week or two every month and then went back to the mainland. I wanted someone full-time. I also required that he or she be fully bilingual since Spanish is the principal spoken language in the commonwealth.

Thus, my monitor had to have the ability to readily and fluently communicate with those who spoke in both the languages of Cervantes and Shakespeare. Most important, I wanted someone who was born and raised in Puerto Rico and, therefore, had knowledge of the island's history and understood its sociocultural nuances. Ideally, this individual's career took place away from the island, preferably working for the federal government. This way, said individual's career would not be immersed in Puerto Rican partisan politics, such as someone who previously held a position of trust in the commonwealth government, for example. The search took longer than expected. Ultimately, the parties recommended retired U.S. Army Col. Arnaldo Claudio, who indeed met all my requirements. After interviewing him, I offered him the position. I would like to praise his many personal qualifications and patriotic achievements in this article, but due to limited word count, I simply refer the reader to the internet for a look into his life experience. There is plenty to read. Suffice it to say that during his career he had vast police experience and was instrumental in the preservation and reestablishment of civil rights across the globe.

The next main issue to tackle was deciding how the monitor and his staff would be compensated. The commonwealth wanted him to be under contract with its justice department. This presented a conflict of interest, given that as an officer of the court he would report directly to me. Also, any such contractual relationship would hamper his ability to render impartial advice to the court, since he would be required to respond to the local legislature, comptroller, and ethics board. Having recently rejected a similar request for a monitor in another matter,[4] I proceeded to deny the proposal and ordered that the operating budget for his office, including his staff of experts and counsel, be deposited every fiscal year with the court, which then issued monthly payments.

### Subject-Matter and Constitutional Experts

Appointing the several subject-matter experts for the monitor's team was not a difficult task. The parties and the monitor readily selected and recommended an excellent team, which included experienced members from the mainland and one from the island. These individuals each focused on a particular subject-matter contained in the

police reform agreement, to wit: (1) investigation of civilian administrative complaints and discipline; (2) recruitment, selection, and hiring; (3) supervision and management; (4) information systems and technology; (5) police professionalization, training, and education; (6) police protocols; and (7) civil rights, community outreach and engagement, and civilian oversight. I felt, additionally, that the monitor's team would not be complete without the addition of a team of highly qualified constitutional lawyers. At first, the parties were adamant about this. Ultimately, I selected three attorneys to work as a team, one recommended by the DOJ, one by the commonwealth attorney general, and another one of my selection. Their professional experiences varied from former chief justice of the Puerto Rico Supreme Court to retired federal prosecutor and civil rights litigant, respectively. This kind of talent combined to give the monitor the best team of constitutional and legal advisers possible. Since their inclusion, the number of matters that I've had to resolve is minimal. The team advises the TCA and, at the same time, brings the parties to consensus on important and debated matters. Ultimately, my hunch was right. Both sides now greatly appreciate their work.



Police Superintendent Jose Caldero (in passenger's seat) in car with court monitor Arnaldo Claudio.

### Capacity Building

The police reform agreement before me consists of a four-year capacity-building period in the several subject-matter areas outlined in the preceding paragraph. Therefore, the actual monitoring of the reform has not yet begun. We are currently halfway through this initial capacity-building stage. Every six months, the monitor presents a report discussing the police's progress. I am proud to say all has been positive, and slowly but surely I have seen great improvement in several areas. Once the capacity-building stage concludes, a six-year monitoring period will ensue, also containing periodic reports.

The monitor and his team are extremely active. On a very frequent basis he meets and confers with the police superintendent and commonwealth attorney general, as well as counsel for the parties. He regularly conducts visits of the various police divisions and offices (for example, the canine and maritime units, the police academy, and different precincts) and speaks to officers of all ranks. He also meets with civilians, American Civil Liberties Union staff (who are closely following the progress of the consent decree), and various other stakeholders. His experts and counsel also meet with the police department staff and others who are implementing the reform. They provide advice and guidance in drafting protocols, administrative regulations, and implementing improved systems and procedures. On an almost daily basis, the monitor updates me on all matters, and we both discuss the positive occurrences, areas that need improvement, and any other issues that require follow-up.

### Judge's Role

My role as a judge in the reform process is as unique as can be. Originally, I understood that I would hold a status conference every six months merely to follow up on the progress being made. Quickly, however, I realized that although I need not micromanage the monitor's work, I had to become more proactive. Because the case before me is not being litigated, I see myself more as a facilitator. Thus, I always say to the parties, "Help me help you."[5] As a busy district judge, on a daily basis, I attend criminal matters and preside over sentencing hearings and trials, as well as manage complex civil litigation.[6] I nonetheless try to be as visible as possible within the police reform process. For example, I recently attended and spoke at police graduations and promotion ceremonies. I have also visited the police academy. During the next month, I intend to travel along with the monitor and other parties to visit the police maritime units at work. I believe these appearances highlight the court's support and commitment to the police, DOJ, and monitor, as well as to the citizenry who look up to the reform process.

In my opinion, the most important decision I made in the police reform process is to hold periodic and open public hearings. This is an idea I took from my esteemed colleague from the Eastern District of Louisiana, Judge Susie Morgan, who presides over the New Orleans police reform case. Judge Morgan, who commenced her case a year before I became involved in mine, invited me and my monitor to spend several days with her and her monitor. This experience was illuminating. We visited the various New Orleans

*continued on page 82*



*Hon. Gustave Gelpi has been a U.S. District Judge since 2006. He is a past national president of the FBA.*

Case 3:12-cv-02039-FAB   Document 442-4   Filed 11/15/16   Page 5 of 5

**Police Reform** *continued from page 61*

police department dependencies and met with many of those involved in both sides of the reform process. Witnessing that reform at work really widened my vision of what police reform must truly be. Any judge with a new case should certainly confer with an experienced colleague. Likewise, counsel for the police in any jurisdiction should consult with colleagues from police departments undergoing reform.

The public hearing that I attended before Judge Morgan was an eye-opening experience. Giving the chief of police and other officers involved in the areas of the reform the opportunity to engage in a colloquy with the court, rather than simply have attorneys summarize the status of matters, makes a whole world of difference. I cannot emphasize this enough! Having those involved in the process communicate with the court directly makes the police accountable for its progress and shortcomings. It also allows the court to publicly recognize compliance with the consent decree, as well as address areas that need improvement. More importantly, the hearing is accessible to the interested public, stakeholders, and the media. It guarantees transparency in the reform process, while at the same time the transcribed proceedings become a matter of historical record.

### Public Hearings

Since my return to Puerto Rico from New Orleans, I have held three public hearings. A fourth one is scheduled for September 2016. The first hearing was held at the federal courthouse in Old San Juan. Following that, I have literally ridden circuit, holding the second hearing at the federal courthouse in Ponce, a municipality in the southern part of the island. The third hearing took place at the commonwealth courthouse building in Fajardo, located on the east coast. The next public hearing will take place at the commonwealth courthouse in Mayaguez, which is on the west coast.[7]

My motive behind these regional hearings is to best allow the police officers, stakeholders, and interested parties from the area to attend and be involved in the process. From my perspective, and given that this is a commonwealth-wide reform, it is important to get a feel of how the process is being carried out across the entire jurisdiction of the District of Puerto Rico. I must commend the perennial presence of the police superintendent and the colonel assigned to oversee the reform process throughout the entire two days of each hearing. This is a practice I sincerely hope will be carried on by their successors.

Community leaders, individuals, and stakeholders also attend these public hearings. They coordinate in advance with counsel for the monitor to testify before the court in their areas of personal and technical knowledge. I have also invited the deans of Puerto Rico's three American Bar Association-accredited law schools, as well as law professors who teach criminal law and civil rights, to give their academic perspective on the police reform. As a result of this interaction, law students have interned with the monitor and the police department. In the near future I would like to see a police reform clinic at the Puerto Rico law schools. Other deponents have included associate justices of the Puerto Rico Supreme Court, the president of the Puerto Rico Civil Rights Commission, the commonwealth women's advocate, representatives of the written media, as well as representatives of the Dominican, handicapped, and lesbian, gay, bisexual, and transgender communities, just to mention a few. At the close of each day, the police superintendent, counsel for the parties, and monitor also address the court, commenting on the day's proceedings.

In my humble opinion, much has been achieved thus far in this unique collaborative effort. Because the public hearings are non-adversarial, and deponents speak directly and freely with the judge who himself engages in a colloquy with them (rather than the typical judicial testimony involving direct and cross examination), the process becomes one of collaboration and constructive criticism, rather than one of presenting mere grievances. As an example, at the October 2015 hearing held in Ponce, the women's advocate informed the hearing that the police had not resolved several outstanding sexual harassment complaints within the police force. The superintendent took note and during the next hearing informed the court that the matter had been promptly addressed and action had been taken. Additionally, most deponents, including the police superintendent and a former governor, have agreed with the court that beyond the reform process itself, the commonwealth legislature needs to enact the equivalent of the Hatch Act, which prohibits federal employees from participating in partisan political activity, other than voting-related activity.[8]

### Concluding Remarks

The path to complete police reform in any jurisdiction within our nation is long. However, it is one of the most satisfying and rewarding functions in which a federal judge can engage in. I am honored and privileged to preside over such a matter in the District of Puerto Rico. More so, I commend the hardworking and zealous individuals from the Puerto Rico and United States governments who along with me have embarked on this noble task. ⊙

### Endnotes

[1] These actions were filed against the city of Pittsburgh; the cities of Steubenville and Columbus, Ohio; the state of New Jersey; the city of Los Angeles, the city of Detroit; Prince George's County, Md.; and the territory of the U.S. Virgin Islands.

[2] These actions were filed against the city of Warren, Ohio; Maricopa County and the town of Colorado City, Ariz.; the city of New Orleans; the city of Seattle; the Almanance County Sheriff's Office in North Carolina; the Commonwealth of Puerto Rico; the city of Portland; the city of Albuquerque, N.M.; Los Angeles County, Calif.; the city of Cleveland; and the city of Ferguson, Mo.

[3] *United States v. Commonwealth of Puerto Rico,* 922 F. Supp. 2d 185 (D.P.R. 2013).

[4] *United States v. Commonwealth of Puerto Rico,* 26 F. Supp. 3d 139 (D.P.R. 2014).

[5] I take no credit in this phrase, which comes from the movie "Jerry McGuire."

[6] The District Court for the District of Puerto Rico is one of the busiest district courts in the nation.

[7] I personally recognize the chief justice of the Puerto Rico Supreme Court, Hon. Maite D. Oronoz-Rodriguez, for her camaraderie in facilitating these excellent facilities, as well as for so promoting state-federal court comity.

[8] 5 U.S.C. §§ 7321-7326.