# 2016

**Fifth Progress Report for the Sustainable Reform of the Puerto Rico Police Department**



**José L. Caldero López**

**Superintendent**

11/25/2016

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br>Plaintiff<br><br>**v.**<br><br>**COMMONWEALTH OF PUERTO RICO AND THE PUERTO RICO POLICE DEPARTMENT**<br>Defendants | NO. 12-cv-2039 (GAG) |

### PUERTO RICO POLICE DEPARTMENT 2016 BI-ANNUAL PROGRESS REPORT

**TO THE HONORABLE COURT:**

**COME NOW** the COMMONWEALTH OF PUERTO RICO and the PUERTO RICO POLICE DEPARTMENT, through the undersigned counsel, and respectfully submits the Puerto Rico Police Department's second Bi-Annual Progress Report for the year 2016, in compliance with paragraph 261 of the Agreement for the Sustainable Reform of the Puerto Rico Police Department..

## I.    INTRODUCTION.

The Agreement for the Sustainable Reform of the Puerto Rico Police Department (Agreement) states, in its pertinent part, that beginning with the Technical Compliance Advisor's (TCA) first six-month report, Puerto Rico Police Department (PRPD) shall file with the Court sealed and unsealed versions of a status report. Agreement ¶ 261, Dkt. No. 60. Therein, the PRPD will delineate the steps taken during the review period to implement the Agreement, an assessment

of the status of its progress, and any response to concerns raised in previous TCA's reports. *Id.* at ¶ 261.

In compliance with paragraph 261 of the Agreement, the PRPD hereby submits its second bi-annual progress report for the year 2016. This report encompasses PRPD's progress of the PRPD in its reform efforts for the period comprising from May 26 to November 25 of this year. Any statistical data will be provided as of October 31, 2016, except in particular areas were a different date is therein stated.

## II.   OVERALL PROGRESS.

### A.  Action Plans.

The Action Plans shall set forth the detailed steps that the PRPD will take to implement and achieve compliance with the Agreement's requirements. *Id.* at ¶ 234. These Plans shall include reasonable and achievable timeframes for completing each detailed step. *Id.* at ¶ 235. Each Action Plan will identify policies and procedures required and the dates for them to be submitted to the TCA and DOJ, date for preparation of training curricula, modules or plans, training schedule, implementation schedule, budgetary allocations, funding sources to execute the tasks in the Action Plan, and compliance due date. *Id.* at ¶ 235.

On July 22, 2016, the eleven (11) Action Plans for the PRPD reform process were submitted and were formally approved by the TCA on October 16, 2016 and by the United States Department of Justice (DOJ) on October 20, 2016. This benchmark represents a unique effort that sets us apart from any police department reform process in the United States. This achievement is distinctive because the PRPD is the first law and order agency required to draft such extensive

and detailed plans. These  Action Plans have and will continue to serve as an  essential work tool to guide  the PRPD on the steps that need to be taken during the Agency's capacity building period in order to achieve the goals established in the Agreement.

As stated in the Memorandum of Approval, the TCA found that  the eleven (11) Action Plans "are reasonable, achievable and prioritized to promote efficiency and, as a result, they meet the requirements set forth in Paragraphs 235 and 237[of the Agreement]. We appreciate the TCA's expressions and recognition. Furthermore, we  appreciate the (DOJ's) recognition that this achievement took leadership and cooperation, as well as the significant planning, collaboration and resources.

At present, the Action Plans are being translated into English and, once finalized, will be submitted to Court, where they will be incorporated into the Agreement after the Court's approval.

**B. Transition Orders.**

The Commonwealth of Puerto Rico General Elections were celebrated on November 8, 2016. Due to this significant event and the  prospect of a change  in the administration  of the Commonwealth of Puerto Rico's government, the Honorable Judge Gustavo A. Gelpí issued a Transition Order on August 1, 2016.  The Court issued this Order to mitigate and prevent excessive interruptions in operations or abrupt staff turnover that may delay and affect the efforts of the Commonwealth of Puerto Rico, and specifically PRPD's compliance with the Action Plans and the Agreement. Dkt. No. 388.The Order is necessary because historically the Commonwealth of Puerto Rico terminates professional service contracts before the end of the calendar year, previous

to the inauguration of the new elected Governor, in addition to other reasons such as Puerto Rico's current fiscal situation. *Id.* These reasons create uncertainty in PRPD's ability to cover critical positions, maintain essential contracts and generate results on time. *Id.* For  the aforementioned motives, the Transition  Order establishes guidelines to follow, so that the progress of the PRPD reform effort and the compliance of the Agreement are not affected by the outcome of the election process.

After the celebration of the General Elections, specifically on November 15, 2016, the Court issued an Order "[f]or purposes of the smoothest governmental transition possible".  Dkt. No. 442 at 11.  In sum, the Order attaches six documents that should not be understood as "an exhaustive list of materials, but sufficient to make anyone new to the case familiar with the issues involved."  *Id.* at 19-20.

### C.  Ocular Inspection of the Federal Court to the PRPD Mounted and Canine Division Facilities.

On October 6, 2016, Honorable Judge Gustavo Gelpí conducted an inspection of the Mounted Unit, where its Director explained the different aspects that are addressed in the services they provide to the community. Also, the Honorable Judge visited the Canine Division, where its Director mentioned the amount of canines  currently  in the Division and the functions they perform depending on what they are trained and certified for. In addition, it was indicated to the Honorable Judge that other assignment being performed by PRPD members assigned to the Division  are to provide lectures in different places, so people can   learn more about what their mission is in the PRPD. During the  inspections, the Honorable Judge made several important recommendations and expressed satisfaction with the physical condition of the facilities of both  units. He also commended the PRPD  on the preparation and commitment of the police officers working in these Divisions.

**D.  Reform Office Monitoring Visits (Self-Assessment).**

The Evaluation of Programs, Initiatives and Operational Activities Division of the Reform Office has conducted several monitoring visits to PRPD work units during the period covered by this report. The objective of the visits was to evaluate whether the work units were complying with the requirements of the Agreement, as well as the policies and procedures of the Agency. These visits are carried out with a non-punitive approach. The Reform Office personnel use the visits to review documentation and procedure in order to corroborate that they are taking place in accordance with the above mentioned standards.

If irregularities are found, the Reform Office personnel recommends and advices on the necessary actions to correct the findings and implement the required administrative measures that apply under the rules of the Agency. The monitoring process is carried out as stipulated in paragraphs 133-134 and 232-233 of the Agreement. The ultimate goal is to successfully apply and improve procedures within the capacity building period in order to move to the next phase of the Agency's reform process with a solid foundation.

During the period from May 26 to October 31, 2016, staff assigned to the Evaluation of Programs, Initiatives and Operational Activities Division of the Reform Office, visited each work unit located in the Police Areas of Fajardo, Humacao, and Guayama, irrespective of what Auxiliary Superintendence they responded to. The visits included District and administrative offices responding to the Area Commander, all units responding to the Criminal Investigations Division ("CIC" for its acronym in Spanish), Drug and Narcotics Division Units, FURA Units, Stolen Vehicle Units. When the work plan in each Area is finalized, the police officer from the Reform Office who is in charge of the plan proceeds to outline the results in a report. Subsequently, a personal discussion is done between the area commander and the Director of the Reform Office.

In this meeting, which is held in order to report results, the presence of Zone Commanders and a representative of the Auxiliary Superintendence of Criminal Investigations ("SAIC" for its acronym in Spanish) at the central level  are requested, as is in also the Reform Office police officer that was in charge of reporting the results. The meeting  between the Area Commander of Fajardo and the other mentioned components have already been carried out. During the first and second week of December of 2016, the meetings with the Area Commander of Humacao and Guayama, respectively, are scheduled. This self-assessment will continue with the Police areas of Aibonito, Utuado and Ponce, using the same approach.

In order for the process of evaluation and orientation by the staff of the Reform Office to be complete and with the knowledge of what they evaluate, the PRPD coordinated with their Bureau of Technology Director for all the personnel to receive the training on the Computer Assisted Dispatch System (CAD). Consequently on September 30, 2016, nine (9) PRPD police officers assigned to the  Reform Office  participated in a workshop on the Computer Assisted Dispatch System (CAD). The training was  carried out by a consultant of the CAD system for the PRPD,  in the laboratory that the Police Academy  built for this technical equipment.  Training to the PRPD police officers of the Reform Office is realized in accordance with the  paragraph 231 of the Agreement, which states that PRPD has to assure that all staff assigned to the Reform Office receive  necessary training and  resources for the performance of their duties.

**E.  Sexual Crimes Victims Hotline.**

Paragraph 96 of the Agreement states that PRPD shall ensure that its Sex Crimes Investigation Unit is accessible through a hotline that is staffed twenty-four (24) hours a day with trained responders. On October 4, 2016, the PRPD launched the service of a new confidential

telephone line of counseling for victims of sexual crimes, to channel calls from victims who require special attention. During a press conference in the Division of Sexual Offences and Child Abuse Investigations, the Superintendent inaugurated the line and pointed out that the operators have been trained to use key questions that can channel the aid and the investigation to the corresponding Division of the nearest Police Area.

The "hotline" **(787) 343-0000** that will operate twenty-four (24) hours a day, seven (7) days a week. The creation of the line is part of the development of the Agency's public policy and the approval of the General Order that regulates investigations of sex crimes, including cases occurring within the Agency itself as part of the PRPD Sustainable Reform. It was PRPD's CIO who suggested the number 787-343-0000. A challenge at that moment was to get the telephone company to enable the number. The reasoning behind choosing this number for the hotline was twofold: (1) the PRPD wanted a number that would be easily remembered by a sex crime victim; and (2) the "0's" in the hotline telephone number represent the Agency's policy of zero tolerance against sexual abuse and sex crimes.

Specialized agents who will attend this hotline will give priority, seriousness and confidentiality to calls from victims to provide immediate assistance. They should ensure the physical and emotional safety of victims and refer them to one of the fourteen (14) Sex Crimes Divisions of the nearest Police Area. The creation of this hotline is a step ahead.. The staff selected to perform these functions was carefully investigated and are academically prepared. The formation of this service is covered by the Equal Protection Action Plan.

For the PRPD to properly prepare for this launch a total of fifty (50) PRPD police officers and supervisors received a sixteen (16) hour training on the best police practices on how to

professionally, respectfully and sensibly work sex crime investigations and, most important, how to treat sex crime victims. Included in these fifty (50) PRPD police officers are all the agents and supervisors assigned to work the Sex Crime Victims Hotline.

To advertise and promote the recently launched Sex Crime Victims Hotline, the PRPD has distributed information about the hotline through brochures; by posting information on the PRPD website; press communications; television and radio stations; and the Puerto Rico Department of Corrections and Rehabilitation as well as other governmental agencies that have been notified about this new service in order to channel institution incidents with minors as well as adults.

The staff that serves this hotline is attached to the Division of Sexual Crimes located on the fifth floor of the PRPD General Headquarters, who are also available for guidance to groups or entities, both governmental and private.

**F. TCA's Informative Motion to the United States District Court for the District Of Puerto Rico [No. 12-cv-2039 (GAG)] Due to an Island-Wide Power Failure.**

The TCA through this motion, informed "this Honorable Court that on September 21, 2016, the Island of Puerto Rico suffered an island-wide power failure directly affecting an estimate of 1.5 million homes and businesses and almost one hundred percent (100%) of the entire Island roadway infrastructure." Dkt. No. 425 at ¶ 1

"Within minutes from the major power failure announcement, the PRPD reassigned approximately three thousand (3,000) agents across the Island to begin the arduous task of traffic control, providing security and complying with their law and order mission." *Id.* at ¶ 3.

"Regular operations ceased in order to reserve staff members for activities associated with the restoration of power, which lasted in some cases more than ninety-six (96) hours." *Id.* The

PRPD also systematically assisted with the evacuation and movement of emergency vehicles and personnel providing a visible and necessary presence in the hours of darkness to guarantee public safety and security. *Id.* Overall, this was a major strategic, operational and tactical success on the part of PRPD in the handling of the aforesaid emergency. *Id.*

"As the above referred information relates to the Reform process, the actions of the PRPD during this major crisis emphasized the absolute need of Community Policing, a major objective of the Reform, where the "range of potential partners is large and these partnerships can be used to accomplish the two interrelated goals of developing solutions to problems through collaborative problem solving and improving public trust". *Id.* at ¶ 4. "The accomplishments by the PRPD, […], were not tasks done in isolation as many other agencies, organizations and individuals also supported the operation. However, the TCA found it essential to provide the Court an opportunity to learn about PRPD's important accomplishments while still in the Capacity Building Period since these actions relate to their handling of special events, crisis management and PRPD's ability to mitigate the effects of an event of this nature. *Id.* at ¶ 5.

The TCA's motion, which recognized the commendable work of the PRPD during a national emergency, while still in a Reform process,. It is important to note that the TCA's motion was reinforced by the appreciation and recognition, by the community in general through the media and social networks of the work performed by PRPD. Finally, the PRPD is proud of its handling of operations during an unprecedented and difficult situation.

### G. Ride Alongs.

On October 4 and 8 of 2016, the Reform Office personnel, with members of the TCA Core Team and DOJ performed "ride alongs" in the Areas of Excellence in the western part of Bayamón,

Caguas, Quebradillas and Utuado. The purpose of this activity was for all Parties to observe the PRPD police officers as they carry out their daily routines in the Precincts and patrol rounds.

In these "ride alongs" the Parties had the opportunity to see, in real time, as PRPD police officers handled complaints presented by the public, the procedure in investigations from start to finish and the reaction of citizens during said interventions. This, with the purpose of making sure that all PRPD police officers' actions are in compliance with the Agreement.

In regards to the "ride along" performed in the Area of Excellence of Quebradillas, Mr. Ruiz issued the following recommendations: PRPD police officers need training in vehicular intervention techniques; there is also a need for training in the CAD System; and radio communications, both portable and patrol, need to improve in the majority of the sectors served in the District.

Regarding the visit to the Area of Excellence in Caguas, Mr. Arnaldo Claudio, TCA, recognized the excellent work in terms of information provided during the shift change. However, he recommended that more comprehensive information should have been offered in relation to the information provided to PRPD personnel, specifically, a murder incident that had occurred during the previous shift. Mr. Marcos Soler said that the interventions performed in this Area by the PRPD police officers were done with professionalism and respect toward the citizens. Nonetheless, he made the following recommendations: use the PRPD police officer assigned to the PRPD facility entrance gate to control traffic; that PRPD police officers that work vehicular interventions should always check with Radio Command Center the driver's license number, vehicle registration, and license plates; PRPD police officers should have access to "crime map"; and that the front security post ("retén" in Spanish) and vehicle entrance control positions should be filled by duly trained civilian personnel.

These activities provided valuable information to the Agency and will be used to improve the PRPD's reform efforts in conjunction with the evaluation and compliance visits carried out by the Reform Office.

**H. Staffing Allocation and Resource Study.**

Paragraph 13 of the Agreement establishes that the PRPD shall assess the appropriate number of sworn and civilian personnel to perform the different department functions necessary to fulfill its mission. To do so, the PRPD shall conduct a staffing allocation and resource study. The study shall form the basis for a staffing and resource allocation use of partnerships and problem-solving techniques. To foster community-oriented policing, the plan shall consider deployment practices that present PRPD police officers with opportunities to serve the communities in which they reside.

To comply with it paragraph 13 of the Agreement, the PRPD has continued to hold monthly meetings with the TCA and the DOJ teams. In these meetings, the PRPD has been able to report the advances carried out by the Agency in order to successfully achieve this requirement. Due to the comprehensive nature of this study, the Reform Office has also held several meetings with personnel from the Auxiliary Superintendency of Management Services ("SASG" for its acronym in Spanish). In these meetings the PRPD recommended dividing the study in four (4) phases. This recommendation was endorsed by all Parties and the PRPD is targeting its efforts to develop them.

Phase one (1) is the most comprehensive, as it entails the development of the CAD System; the identification of economic resources that will allow the hiring of external resources, field experts that will allow the study development in a more agile and accurate manner, a human

resources module, and data collection in order to provide the necessary information needed that the selected field expert contractor will use to elaborate the staffing allocation and resource study.

Phase two (2) shall include the analysis and evaluation of relevant data obtained through programs developed in phase one (1). This will be performed by the external resource to be contracted for the elaboration of said study.

In phase three (3) the field expert contractor will present to the PRPD the preliminary results of the study and phase four (4) shall include the preparation and presentation of a final report of the study containing the objectives of the Agreement.

## 1.  Human Resources Module.

The compilation of data necessary in order to develop the analysis required for the study will come from, among other sources, a Human Resources Module (HRM) and reports form the CAD System. The HRM is in the process of being developed by the Interboro Systems Corporation. The HRM includes tools for the selection and recruitment of personnel; personnel transactions; personnel information; the administration of benefits; employee's career development; performance evaluation and safety; and health.

## 2.  Computer Aid Dispatch System.

Regarding the Computer Aid Dispatch (CAD), the Agency is already using this system and has been able to present its functionalities to the TCA and DOJ in various occasions.  In summary, the CAD System has features that allow PRPD personnel to know the complaints filed daily and by shift; identify available PRPD police officers to receive and investigate the complaints; and calculate the time average taken by PRPD police officers to attend complaints.

### 3.  Study Development Contracting.

In order to identify economic resources to hire a contractor for the study development services, the Federal Proposals and External Resources Office of the PRPD filed a formal proposal under the COPS program on June 1, 2016. This proposal was supported by Mr. Alan Young of the TCA Core Team, who presented recommendations that were incorporated. This proposal was evaluated by the COPS Office, which in its discretion would submit a single grant nationwide. The notices of approval were made during the month of August, 2016, but unfortunately the PRPD was not awarded the grant.

In order for the project not to stall while the Agency was waiting for the results of the proposal submitted to COPS, the PRPD, in collaboration with the TCA Core Team, began working on drafting a Request for Proposal (RFP) to identify suitable professional services for the personnel study. On October 17, 2016, the RFP was distributed to several suppliers. The deadline for its submission was November 4, 2016. On November 11, 2016, the Evaluation and Selection Committee was selected. The Committee is comprised of a Reform Office representative, an Auxiliary Superintendence of Field Operations (SAOC) representative, a Bureau of Technology and Communications representative, the Director of the Federal Proposals and External Resources Office, and an Appointments and Transfers Division representative. The proposals have been received, and the Committee  will be meeting soon in order to evaluate the proposals and select the company or person who will be the best capable to carry out the study.

## III.   ZONES OF EXCELLENCE.

On May 18, 2016, the Superintendent inaugurated the Precinct of Caguas Norte.  This new Precinct has been constituted as the fifth (5th) Zone of Excellence (ZOE) in the PRPD.  The ZOE's

are PRPD  units that serve as implementation laboratories of policies and police practices developed under the Agreement. This new Precinct was created and implemented through the coordination and collaboration between the PRPD and the Municipality of Caguas. This effort, besides  contributing with the Agreement, it also has as its essential purpose to bring closer police services to the public and strengthen the preventive surveillance in the downtown and north zone of this Municipality.

### A.  Training Progress in the ZOE's.

The table and graphic chart shown below summarize the training progress in the five (5) ZOE's Precincts/Districts until October 31, 2016. Compliance percentage is based on two hundred and seventy seven (277) police officers assigned to the ZOE's.

| ZOE's Training Progress From January 1 to October 31, 2016 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| District/Precinct | Total PRPD Police Officers | Impact Weapons | Service Weapon | Email | Use of Force | ECW | Arrests and Citations | Chemical Agents | Transgender | Pursuit | Searches and Seizures |
| **Bayamón Oeste** | 99 | 98 | 98 | 98 | 93 | 98 | 76 | 96 | 45 | 47 | 9 |
| **Utuado** | 35 | 34 | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 8 |
| **Quebradillas** | 44 | 42 | 41 | 43 | 43 | 42 | 42 | 42 | 6 | 15 | 5 |
| **Las Piedras** | 42 | 42 | 41 | 42 | 27 | 42 | 42 | 42 | 37 | 27 | 29 |
| **Caguas Norte** | 57 | 57 | 57 | 57 | 57 | 56 | 20 | 56 | 10 | 30 | 10 |
| **Total** | 277 | 273 | 272 | 275 | 255 | 273 | 215 | 271 | 133 | 154 | 61 |
| **Percent** | ------- | 99% | 98% | 99% | 92% | 99% | 78% | 98% | 48% | 56% | 22% |



The information provided in the table/graphic chart above shows that the ZOE's Precincts/Districts have complied with the training required in the policies developed in compliance with the Agreement and following the guidelines and timeframes detailed in the Action Plans.

**B. Use of Force Incidents in the ZOE's.**

The table and graphic chart below summarize the Use of Force Incidents reported in the ZOE's detailed by use of force levels varying from Level I thru IV, as established in General Order Chapter 600, Section 601, titled "Rules for the Use of Force for the Members of the Puerto Rico Police Department", during the period of January 1 to October 31, 2016.

| USE OF FORCE INCIDENTS REPORTED IN THE ZOE'S FROM JANUARY 1 TO OCTOBER 31, 2016 | | | | | |
|---|---|---|---|---|---|
| District/Precinct | Level I | Level II | Level III | Level IV | Total |
| Bayamón Oeste | 6 | 1 | 3 | 0 | 10 |
| Utuado | 0 | 1 | 0 | 0 | 1 |
| Quebradillas | 2 | 0 | 3 | 1 | 6 |
| Las Piedras | 1 | 2 | 2 | 1 | 6 |
| Caguas Norte | 0 | 1 | 6 | 0 | 7 |
| Totals | 9 | 5 | 14 | 2 | 30 |



## C.  Statistics on the Devolution of Use of Force Incidents Reports from the ZOE's Versus the Rest of the PRPD Police Areas.

The table below summarizes the comparison rate of returned ZOE's Use of Force Incidents versus the rest of the PRPD Police Areas:

| STATISTICS ON USE OF FORCE REPORTS INCIDENTS (FILED VS. RETURNED) From January 1 to October 31, 2016 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **AREA** | **FILED** | | **RETURNED** | | **TOTAL** | **PRPD** | | |
| | | | | | | FILED | 348 | 58% |
| **San Juan** | 46 | 13% | 45 | 17% | 91 | RETURNED | 257 | 42% |
| **Arecibo** | 29 | 8% | 26 | 10% | 55 | TOTAL 605[1] | | |
| **Ponce** | 27 | 7% | 14 | 5% | 41 | | | |
| **Humacao** | 15 | 4% | 4 | 2% | 19 | | | |
| **Mayaguez** | 38 | 10% | 26 | 10% | 64 | | | |
| **Caguas** | 16 | 4% | 10 | 4% | 26 | | | |
| **Bayamón** | 71 | 19% | 55 | 21% | 126 | | | |
| **Carolina** | 33 | 9% | 12 | 5% | 45 | **ZONES OF EXCELLENCE** | | |
| **Guayama** | 17 | 5% | 13 | 5% | 30 | | | |
| **Aguadilla** | 10 | 3% | 3 | 1% | 13 | FILED | 13 | 76% |
| **Utuado** | 10 | 3% | 15 | 6% | 25 | RETURNED | 4 | 24% |
| **Fajardo** | 26 | 7% | 25 | 10% | 51 | TOTAL 17[2] | | |
| **Aibonito** | 10 | 3% | 9 | 3% | 19 | | | |
| **TOTAL** | 348 | | 257 | | 605 | | | |

According to the information provided above by the Force Investigation Unit (FIU) for the period of January 1 to October 31, 2016, on Use of Force Incident Reports drawn up and processed (Form PPR-854, "Use of Force Report"), statistics show that of the total of reports completed by the PRPD police officers from the ZOE's work units, seventy-six percent (76%) were correctly

---

[1] This figure only represents the reports that have been received and processed by the Force Investigation Unit (FIU), reason why if the figures vary with others on the same subject in this report, it is due to the fact that a number of reports are still on their way to be received by the FIU.
[2] Ibid.

filled out and only twenty-four percent (24%) of the total amount of reports were returned for corrections. This can be compare with the figures of the rest of the PRPD work force, who showed fifty-eight percent (58%) of reports completed according to established standards, versus forty-two percent (42%) referred back to their work unit to be corrected. The difference to the positive side of correctly completed reports from ZOE's PRPD police officers can be attributed to the greater amount of police officers trained in the use of force policies and their respective forms, compared to the rest of the Agency.

### D.  Community Engagement in the Zones of Excellence.

The Zone of Excellence in Quebradillas has recently started an outreach program in public schools named "Tu Amigo el Policía". The goal of these talks is to allow the students to learn more about the career of being a police officer, the meaning of uniform components and proper use of their equipment. In addition, an orientation on the PRPD reform effort is given to parents and teachers. The PRPD plans to expand this program to other Zones of Excellence and eventually to the rest of the Police Areas around the Island. This community engagement program allows young individuals to gain knowledge on uniform and use of equipment of a PRPD official, consider a police career in the future and, change their views about police officers, thus engaging positively with the community that the PRPD serves and protects.

## IV.    POLICIES AND PROCEDURES.

During the period covered by this Progress Report, and in compliance with the requirements of the Agreement, and according to the projections stipulated in the Action Plans, the Policies and Procedures Section of the Reform Office presented to the TCA and DOJ for review and commentary, thirty-four (34) new policies, as well as seven (7) previously approved annual

policy reviews. A total of fifteen (15) policies were approved by the TCA and signed by the Superintendent.

### A. General Order of the Drugs Bureau.

On September 13, 2016, the Superintendent signed the General Order Chapter 100 Section 122 titled "**Restructuration of the Bureau of Drugs and Narcotics, Vice Control and Illegal Arms**". The purpose of this policy is to reorganize the Bureau, redefine its organizational structure, procedures, member's selection criteria, training, and policy in terms of its operation. Furthermore, the General Order looks to ensure efficient supervision that promotes a respectful police service, free of bias and that tends to protect the civil rights of individuals.

This order was developed as established in the Policies and Procedures Action Plan. Amongst the standards set out in the same the following are essential to discuss:

### 1.     Organizational and Functional Structure.

The Bureau will respond to the Auxiliary Superintendence in Criminal Investigation ("SAIC" for its acronym in Spanish), and it will have (16) divisions distributed in the thirteen (13) Police Areas. The Order also establishes the duties and responsibilities of the different positions of the chain of command, both at the Bureau and Divisions located in the Areas, as well as their respective Sections. Moreover, the Order indicates the amount of resources allocated to the different Sections in which the Divisions are divided up and most important yet, the respective functions of personnel comprising the same. In addition, the Order sets the official forms to be used by PRPD police officers in the performance of their duties assigned to these work units. This is extremely important for obtaining historical data either to be used as evidence in different

forums, to demonstrate transparency in the processes, compliance evaluation, training needs and service to the public.

**2.      Selection, Evaluation, and Permanence Criteria for the Members of the Drugs Divisions.**

The Order establishes minimum criteria of selection, which can be expanded by announcement promulgated by the Superintendent as a result of vacancies, and the assignation to these is voluntary. The staff who aspires to belong to Drug Divisions will be rigorously evaluated and selected based on  police experience, problem-solving and verbal skills, and psychological suitability for the responsibility associated with the functions inherent to his position.

**3.      Professional Profile.**

To take on responsibilities of the functions and tasks of the Drug Divisions, those interested have to meet a specific profile. As part of the selection criteria, the professional profile of agents assigned to the Drug Divisions must have a minimum of five years of experience in the Agency. As well as having knowledge in civil rights issues, laws and regulations and other norms inherent to their functions as members of the PRPD among other considerations.

**4.      Selection and Evaluation Process will be composed of three (3) phases.**

Compliance requisites, analysis and interview process and selection process.

**5.      Criteria of Permanence in the Drug Divisions.**

The PRPD police officers that are assigned to the Drugs Divisions will be assessed by the Board established by this General Order every three (3) years for the selection, evaluation and

permanence. Therefore, all PRPD officers assigned to the Drugs Division will be subject to transferred every three (3) years, pending reevaluation.

The Board, when determining permanence, will perform an interview as part of the evaluation process of the PRPD police officers assigned to the Drug Divisions and will take into account different criteria including but not limited to work performance, physical and mental health, and results of polygraphs taken.

The Board will be able to reevaluate the permanence of PRPD police officers assigned to the Drug Divisions in a term of less than three (3) years , if special circumstances occur such as: no-shows at Court, mendacious witness, among others.

**B. Use of Force.**

**1.     Reviewed Policies.**

On August 24, 2016, the Superintendent approved and signed the revision of five (5) use of force policies, as follows:

  a.  General Order, Chapter 600, Section 601, "Rules on the Use of Force for PRPD Members";

  b.  General Order, Chapter 600, Section 602, "Use and Handling of the Electronic Control Device";

  c.  General Order, Chapter 600, Section 603, "Use and Handling of Impact Weapons";

  d.  General Order, Chapter 600, Section 604, "Use and Handling of Chemical Weapons"; and

     **e.**  General Order, Chapter 600, Section 605, "Report and Investigation on Use of Force Incidents by PRPD Members".

**2.**    **Use of Force Basic Concepts Glossary.**

On August 24, 2016, the Superintendent approved and signed the Use of Force Basic Concepts Glossary. This Glossary will serve as a useful tool when used in conjunction with all use of force policies.

The purpose of this Glossary is to compile the definitions of concepts related to the PRPD use of force policies in order keep them updated and in a single document. This will allow  for a better understanding of them and serve as a quick reference to PRPD police officers and the general public. All terms related to these issues will be included in this Glossary and not in the General Orders, except in the case of a policy containing a concept that has a specific and/or different meaning set forth in said policy.

The Glossary, although it is not an activity established in the Use of Force Action Plan, it is applicable to the policies relating to the matter of use of force, its creation is of utmost importance, to standardize the definitions in a comprehensive manner and according to policies, laws and generally accepted police practice, and the Agreement.

These aforementioned actions complement the establishment and continuous improvement of just and respectful policies, of civil and constitutional rights of people, and also contributes to the formation of standards and guidelines that meet one of the main goals of the Reform process: sustainability beyond the term of the Agreement.

## C. Administrative Complaints.

### 1.      Policy on Administrative Complaints Procedures.

On May 23, 2016, the TCA in accordance with paragraph 229 of the Agreement approved the "**Regulation for the Receipt, Processing, Investigation and Adjudication of Administrative Complaints**" This policy was developed according with paragraphs 159, 163, 166 through 169, 171 through 176, and 178 through 180 of the Agreement and the Administrative Complaints Action Plan.  This policy establishes the rules and procedures to be followed by the PRPD regarding the receipt, processing, investigation, and adjudication of any received administrative complaint of misconduct. Those processes are established to develop a work environment in accordance with the principles of the police ethics and protection of human and civil rights.

### 2.      SARP Investigator's Manual.

On May 23, 2016, the TCA in accordance with paragraph 229 of the Agreement approved the "**SARP Investigator's Manual**". This Manual was created according to paragraphs 159, 160, 162, 168, 170 through 174, 176, 177 through 180, and 186 through 187 of the Agreement and the Administrative Complaints Action Plan.

This Manual is a working guide that promotes the uniformity of the administrative investigative processes through the establishment of practical guidelines that should be observed when conducting such investigations. It promotes uniformity by instructing staff at all stages of

the process, such as creating a dossier up to the use of interview techniques aimed at obtaining information relevant to the research.

**D.  Searches and Seizures.**

**1.  Protocol to Receive Comments of the Components of the Commonwealth of Puerto Rico Criminal Justice System.**

On May 10, 2016, in accordance with  paragraph 73 of the Agreement, PRPD sent a request to the Puerto Rico Department of Justice (PRDOJ) requesting the allocation of resources to carry out the functions of liaisons between their Agency and the PRPD. This was done in order to achieve compliance with the above mentioned paragraph and the Searches and Seizures Action Plan., The aforementioned protocol was referred to the TCA for review and approval on May 30, 2016..

**V.  TRAINING.**

The significance of training provided under the Reform effort, highlighted under paragraphs 117, 121-122, 129, 132 and 137 of the Agreement, and captured in each of the eleven (11) areas of compliance throughout the Action Plans is pivotal to the building capacity period and compliance of the Agreement.  As a result of the Election Process, the PRPD had to request a dispensation to continue training to the Central Office of Labor Advisory and Administration of Human Reosources ("OCALARH" for its acronym in Spanish), which was approved on September 24, 2016.  The importance of the approval by the Director of OCALARH is that it allowed the PRPD to continue training without interruption in order to be fully compliant. The Agreement requires that fifty percent (50%) of PRPD police officers are trained in six (6) of the published policies, not including training at the firing ranges.

**A. Community Outreach.**

The Auxiliary Superintendence on Education and Training (Police Academy) coordinated for the Superintendent to sign a Collaborative Agreement with the Society of Human Resource Management (SHRM) in August, 2016. As a result of this Agreement, SHRM has been providing workshops on emotional intelligence to PRPD police officers of the Class of 223, which was targeted for the pilot program.  Prior to the commencement of the workshops, the Police Academy reviewed the material and recommended changes to incorporate scenarios germane to police officers. This is a great example of how the Police Academy has leveraged external expertise and resources to address training shortfalls in the PRPD.

**B. Information Systems and Technology.**

The Police Academy continues to improve its posture with the computer laboratory.  The thirty (30) computers had the CAD application recently installed to develop the training program required in a sustainable process.  Right now, the PRPD is solely dependent on a contractor.  The Police Academy's strategy is to take over the basic training at the operator level and let the contractor work at the application level.

**C. Online Training.**

The Superintendent approved to award a contract for online training for ten (10) courses in 2017.  The PRPD CIO is working with the Office of Legal Affairs, Contracting Division, on the contract while the Puerto Rico Police Academy is working the list of ten (10) courses by priority.

### E.  Infrastructure Concerns.

Although the Superintendent approved both maintenance contracts for facility/grounds up keeping and air conditioning, neither contract has been completed after months of coordination with the Auxiliary Superintendence of General Services ("SASG" for its acronym in Spanish). The ramifications in the lack of maintenance contracts are twofold: (1) the Police Academy cannot maximize training space because classrooms lack air conditioning or air conditioners stop functioning shortly after a class starts, and (2) higher level maintenance supervisors are consumed by routine manual labor.

### F.  Pre-Service Training.

The Police Academy continues to comply with paragraphs 119 through 122 of the Agreement.  The Superintendent approved the third iteration of the pre-service training curriculum. The table below summarizes the pre-service training, which includes both state and municipality cadets:

| CLASS | COMPOSITION STATE/MUNICIPALITY | ACADEMIC PREPARATION | GRADUATES | DROP-OUTS |
|---|---|---|---|---|
| 223 | 321/6 | 4 Master's Degree<br>154 Bachelor's Degree | 327 | 11 |
| 224 | 101/4 | 4 Master's Degree<br>60 Bachelor's Degree | 105 | 12 |
| 225 | 44/1 | 0 Master's Degree<br>15 Bachelor's Degree | 45 | 5 |
| 226 | 9/1 | 0 Master's Degree<br>3 Bachelor's Degree | | 2 |
| TOTAL | | | 477 | 30 (6.29%) |

**G. Visit from the University of Puerto Rico (UPR) Law School Legal Assistance Clinic to the Training of Interventions with Transgender and Transsexual Persons.**

On August 24, 2016, staff from the Legal Assistance Clinic, Discrimination Based on Sexual Orientation Division, of the UPR Law School, attended the aforementioned training at the Police Academy. As a result of the visit, valuable recommendations were provided to improve the delivery of training on General Order Chapter 600, Section 624, titled "Interaction with Transgender and Transsexual Persons".  This visit, among others, demonstrates the transparency that the Police Academy has created for interest groups with expertise in any subject to partake. The Academy Director extended an invitation to observe other training sessions of interest, such as Searches and Seizures or Civil Rights, among others.

**H. Field Training Officer (FTO's) Program.**

At the beginning of the period covered by this report, four (4) apprentices are yet to finalize the FTO's Program. Their mentoring period began on March 16, 2016 and the projected ending date was August 2, 2016. By September 27, 2016, the Central Coordinator for the FTO's Program, from the Auxiliary Superintendence of Field Operations ("SAOC" for its acronym in Spanish) informed the Reform Office that they are still waiting for three (3) apprentices to finish the Program. The  reasons as to why they have not completed this stage, are as follows: military leave, natural illness, among other reasons. All absences are documented as reported by the FTO Central Coordinator. The remaining apprentices are on the fourth (4th) and last phase of the Program.

Likewise, the SAOC informed the PRPD Reform Office that, as of July 7 of 2016, there are three hundred forty and five (345) Field Training Officers certified.  However, the Police Academy has raised a concern that, due to the lack of recruitment of cadets, most Field Training

Officers will be decertified by the time another pre-service training class graduates. The Academy's Director suggested to use the Field Training Officers to mentor and coach police officers, who have been identified with training shortfalls. This suggestion was accepted by the Superintendent and the latest version of General Order Chapter 700, Section 701, reflects this change.  The Police Academy has developed a strategy to renew FTO training in 2017 and has determined to implement this strategy initially in San Juan, Bayamon, and Carolina, and eventually Island-wide.

I.  **Trainings provided to PRPD Police Officers.**

From January 1 to October 31, 2016, the Police Academy has trained and certified PRPD police officers[3] in different topics as shown in the following table and graphic chart:

| Training Courses | PRPD Members Trained | % of PRPD Members Trained |
|---|---|---|
| General Order 603 (Baton) 16 hours | 3,076 | |
| General Order 603 (Baton) 8 hours | 5,916 | 82% |
| General Order 603 (Baton) 2-3 hours | 2,164 | |
| Use of Force | 8,678 | 64% |
| Electronic Control Weapon (ECW) 16 hours | 1,916 | |
| Recertification of ECW 8 hours | 2,449 | 63% |
| Refresher Course for ECW Operators 2-3 hours | 4,308 | |
| Pepper Spray | 10,395 | 77% |
| Arrest and Citations | 8,534 | 63% |
| Code of Ethics | 9,156 | 68% |
| Transgender | 5,330 | 39% |
| Police Pursuits | 2,481 | 18% |
| Searches and Seizures | 991 | 7% |

---

[3] The percentage has been calculated by ASET using as reference an estimated total number of thirteen thousand five hundred and sixty three (13,563) PRPDM's, according to data that have been supplied by the training coordinators from their lists of personnel of the work units.



This table and graphic chart show the amount of PRPD police officers trained in each one of the named policies. In the case of the General Order Chapter 600, Section 603, titled "*Use and Handling of Impact Weapons*", the amount combines the three (3) phases in which the baton training is arranged for a total of eleven thousand one hundred and fifty six (11,156) PRPD police officers trained. On the subject of Electronic Control Weapon (ECW) it also combines three (3) phases in which the training is divided, reaching a sixty three percent (63%), and the rest of the courses shown in the table are self-explanatory. The percentage is based on the thirteen thousand five hundred and sixty three (13,563) PRPD police officers reported by the Training Coordinators to the Police Academy. This information reflects the effort made by the Agency, not only in the development of policies, but also in conducting the trainings necessary for the policies, and meeting the planned goals for both the Actions Plans and the Agreement.

**J.  Fire Arms Training.**

As of 30 September, 2016, the Police Academy has trained and certified twelve thousand two hundred and forty nine (12,249) PRPD police officers in the Daylight Qualification Shooting Course; this represents two-hundred and forty (240) more PRPD police officers than in 2015. Likewise, the Police Academy has trained eight thousand one hundred and eighty (8,180) PRPD police officers in the Reduced Light (Night) Qualification Shooting Course with two (2) months remaining to complete the cycle.  The Police Academy is working with the PRPD Medical Team to examine over thirty (30) PRPD police officers identified by Firearms Instructors as needing medical screening before returning to the range.  The Police Academy is expected to receive the list of the PRPD police officers cleared for Firearms Training by the first week of December, 2016, to possibly conduct a Daylight Qualification Shooting Course during the third week of December, 2016.  The accomplishments of these trainings were carried out in accordance with the Use of Force Action Plan and the Agreement.

During the year 2016, the Police Academy has conducted two (2) Rearming Courses to certify one-hundred and twenty-five (125) PRPD police officers in order to return to service with their assigned weapon. Each course lasts two (2) days.  Additionally, over one thousand (1,000) PRPD police officers have been trained on the Safariland holster.  The Police Academy also conducted Weapon Transition Training for one-hundred and twenty-two (122) PRPD police officers to MP40 or Glock in order to standardize the use of force equipment throughout the Agency.

One simulator was installed, and a second simulator will be installed no later than February, 2017.  The simulator has been used to train cadets as well as to certify instructors on Use of Force.

In addition to the simulator, we have certified at least two (2) faculty members on the use of munitions.

The Police Academy has certified two (2) faculty members as Active Shooter Instructors with the Federal Law Enforcement Training Centers (FLETC).  Late this summer, we hosted the FLETC for an Active Shooter Course for operators. Our strategy for 2017 is to prepare an orientation for PRPD civilians and possibly two (2) different courses for PRPD police officers, based on their duties and likelihood of an active shooter scenario.

**K. Training Designs Associated with the Use of Force Action Plan.**

The PRPD Reform Office referred to the Technical Compliance Advisor (TCA) for review and approval nine (9) syllabi related to the Use of Force Action Plan, developed by the Police Academy. These courses were updated to reflect the new changes made to these policies during the last revision made by the Reform Office this year.

**L. Physical Performance Tests for the Tactical Operations Divisions.**

Since the publication of the Tactical Operations Division General Order, the Police Academy has worked several training requirements concurrently, such as physical fitness, civil rights, tactical formations and special weapons. The PRPD standard physical fitness test was administered, and those who failed were referred to the Board established by the General Order. The Board agreed to give those who failed a second opportunity to take the physical fitness test. Those who failed a second time have been removed from the Tactical Operations Division ("DOT" for its acronym in Spanish).  Everyone who passed the standard physical fitness test were offered the specialized fitness test.  This test was designed exclusively for PRPD police officers assigned

to the DOT, as established in General Order Chapter 100, Section 112, titled "Reorganization of the Tactical Operations Divisions" contemplated in the Use of Force Action Plan. Two hundred and one (201) PRPD police officers took the Test PTF-112 with the following results: one hundred and thirty-one (131) approved; forty four (44) did not approve; and twenty-six (26) were not able to take the test for reasons of illness, injury or court appearance. The Board has not notified a decision on those who failed or did not take the test due to the Puerto Rico General Election event, where focus was shifted to prepare the DOT police officers to address possible contingencies.

### M. Physical Fitness Tests for Promotion Candidates to the Ranks of Captain to Lieutenant Colonel:

On July 22, 2016, the Superintendent, by the power conferred to him by Article 5 (e) of Law No. 53-1996, as amended, known as the Puerto Rico Police Law, establishes that officers in the ranks of Captain to Lieutenant Colonel, or are interested to be considered as candidates for promotion, would have to participate in a physical fitness test. This test was administered by the Police Academy. The participation in the test was one of the factors to be considered for determining the promotion eligibility.

### N. Searches and Seizures Training for Supervisors.

Training for high ranking police officers of the Agency on the subject of Searches and Seizures was conducted on September 22 and 23, 2016, at the Police Academy.  This training was offered in accordance with the Searches and Seizures Action Plan.

The following community leaders were invited to this training: Attorney Georgina Candal (Puerto Rico Civil Rights Commission), Attorney Ever Padilla (Puerto Rico Civil Rights Commission), Mari Narvaez (Open Spaces Group/ GRUCORPO), Josué González Ortiz (ACLU/

GRUCORPO), Virgenmina Rivera (ACLU), William Ramírez (ACLU), and Myra Rivera Torres (Alianza para la Paz Social [Alapás]/GRUCORPO).  The intent of the invitation was for these leaders to observe and provide feedback to the Academy Director on the two (2) day training session.  Myra Rivera Torres, Alianza para la Paz Social (Alapás), could not make it on the above mentioned date, but participated in a later session on September 29, 2016.  We are still awaiting her feedback in writing which she stated she would submit at a later date.

### O. Supervision and Management.

During the month of May 2016, the PRPD requested to the components of the of federal and state criminal justice system; the Police Academy; and municipal police departments assigning liaison staff to work on feedback by the Executive Coordination Committee, which has already been previously established. The above steps are necessary to comply with paragraph 158 of the Agreement.

During the month of July of 2016, the PRPD signed the contract for the development of the Early Identification System (EIS). This System, once developed and implemented, will provide the PRPD with the opportunity to detect and respond to problematic behaviors at an early stage. This will help the PRPD during the capacity building period to promote ethical and professional practices, manage risks and responsibilities, and evaluate the performance of the employees in all ranks and work units. This will lay a solid foundation for the implementation of the reform effort during this process, providing sustainability beyond the term of the Agreement.

## VI.   INFORMATION AND TECHNOLOGY.

### A.  Protocol for the Digital Record and Storage of Radio Communications between the PRPD Police Officers and their Supervisor.

On May 30, 2016, the Digital Recordings Protocol was sent to the TCA for review and approval in compliance with paragraph 66 of the Agreement, the Policies and Procedures Action Plan; and the Searches and Seizures Action Plan. The implementation of this Protocol is contemplated in the Information Systems and Technology Action Plan.

### B.  Central Repository for the Capture of Data Related to Crime (CIW/Crime Information Warehouse).

At the end of April, 2016, the PRPD renewed the support and maintenance contract of the CIW for the 2017 Fiscal Year. The renewal of this contract is very important for the implementation of the Early Intervention System (EIS), which will include a database that will be used to collect, maintain, integrate and retrieve detailed data from each division as a whole and for each PRPD police officer in compliance with paragraph 148 of the Agreement. These support and maintenance services for the CIW will provide the necessary continuity for the future development of the EIS, which is of vital importance for the whole PRPD reform process.

The renewal of this contract has a significant role in achieving the goals set in the Information Systems and Technology Action Plan. Nonetheless, and more importantly, this support and maintenance service is fundamental to the overall achievement of all of the Action Plans established objectives. Therefore, this action is an achievement that gives character for sustainability of the PRPD reform process.

**C. Maintenance Contract Renovation for the Main Storage System of the Crime Information Warehouse (CIW).**

During the month of April, 2016, the PRPD renewed the maintenance contract for the central system storage of the CIW for the 2017 Fiscal Year. This action benefits the development and future implementation of the Early Identification System (EIS).

This contributes to the development and implementation of the processes required in the different Compliance Areas of the Agreement that depend on information and technology systems to achieve comprehensive development for the accomplishment of the objectives in the Action Plans.

**D. Maintenance Contract for the Assistance System for the Employees Performance Evaluation (KRONOS).**

The PRPD acquired for the 2017 fiscal year a maintenance service contract for the Agency's Employees Performance Evaluations Assistance System.

The above contributes to the development and implementation of the reform process required in different compliance areas of the Agreement dependent on Information Systems and Technology in order to achieve comprehensive development to fulfill the objectives in all related Action Plans.

**E. Renovation of Computer Software Licenses.**

In January of 2016, PRPD renewed the annual licenses of the computer software needed to maintain the Crime Information Warehouse (CIW) and to continue with the development of the Early Identification System (EIS) until February, 2017. As a result of the renewal of these licenses, the Agency is demonstrating the commitment to obtain the necessary continuity for the sustainable

development of the CIW and EIS. These are vital tools for the early detection of staff behavioral abnormalities, need for trainings or retraining among others. This, in order to take proactive actions to achieve the provision of fair, constitutional, police services, free of discrimination and in accordance with the policies, laws, regulations of the Agency and the Agreement.

**F. Acquisition of Data Service (SIM Cards) for the Information System for Data Collection on the Incidence of Crime (Computer Aid Dispatch [CAD] Mobile).**

During the month of March, 2016, the PRPD acquired seven hundred (700) renovations of the Data Service (SIM Cards) that have been utilized in five hundred (500) computers to be installed in patrols cars and two hundred (200) laptops for the connectivity of the CAD Mobile. This acquisition is part of the necessary steps for the development and implementation of the CAD Mobile, in which the incidents reported are collected by PRPD police officers of all units of the Agency. For these purposes will be used different forms digitally integrated into this system to utilize by PRPD police officers. Through the CAD and the digitalized forms available on it, the PRPD will be able to collect the pertinent information necessary for the collection of statistical data required to comply with the procedures set forth in the Agreement and the Action Plans. This step was taken as part of what is established in the Information Systems and Technology Action Plan.

The development and implementation of the CAD System, with the acquisition of this data service, is part of the efforts that are being made by the PRPD to meet and provide sustainability to the processes outlined in the different Areas of Compliance of the Agreement, which are intertwined with the Information Systems and Technology Compliance Area.

### G. Equipment and Accessories for the Continuity of the CAD System.

During the month of April, 2016, the PRPD acquired two hundred (200) patrol car stations, arms, and the installation service of this equipment in compliance with the Information Systems and Technology Action Plan. The acquisition and installation of these accessories complement the equipment needed to implement the Mobile CAD System and thus make this useful tool available for the PRPD police officers as part of the path to compliance with the provisions of the Agreement.

### H. Digitalization of the PRPD Forms.

The digitalization of documents was developed for the following PRPD forms: 468, 47, 126, 46, 175, 264, 879, 853, 82 and 854. This was created so that PRPD police officers can use them from computers in the squad cars, workplaces and Technology Centers, facilitating and streamlining the filling out process for the benefit of the Agency and the community we serve. The digitalization of these forms was conducted as set out in the Information Systems and Technology Action Plan.

### I. Formalization of the Contract for the Development of the Digital Version of the Form PRPD-93, "Traffic Accident Report".

The contract for the development of the digital version of the PRPD-93 Form, "Traffic Accident Report" was formalized during the period covered by this Progress Report. This will enable PRPD police officers to complete the traffic accident report in the squad car computer, workplace or anywhere else within the Agency with access to computers. This action was conducted in accordance with the Information Systems and Technology Action Plan.

**J. Development of the Interface between the CAD System, the Integral Criminal Record ("RCI" for its acronym in Spanish) and the NCIC (National Crime Information Center).**

The interface between the CAD System, the RCI and the NCIC was developed with the objective that PRPD police officers can search criminal records from the patrol car laptops and their workplace computers. This was achieved in accordance with the Information Systems and Technology Action Plan.

**K. Acquisition of Additional Vehicles with the LPH (License Plate Reader) System.**

The PRPD acquired fifteen (15) patrol cars that read car license plates in order to compare them against a database to determine if the vehicle is stolen. The acquisition was conducted according to the Information Systems and Technology Action Plan.

**L. Migration to the Encrypted Network P-25.**

The following Police Areas migrated to the P-25 Encryption Network radio system communications: Humacao, Las Piedras, Maunabo, Yabucoa, Mayagüez, Cabo Rojo, Lajas, Las Marías, Maricao, Añasco, Hormigueros, San German, among others. The migration was performed in compliance of the Information Systems and Technology Action Plan.

**M. Workshop on the CAD System in the District of Vieques.**

On September 20 and 21, 2016, twenty-five (25) PRPD police officers of the Vieques District were trained on the CAD System. The training was taught by a consultant and to facilitate the logistics process the consultant relocated to the Municipality of Vieques. Training the PRPD police officers assigned to the Municipality of Vieques in the CAD System is a very positive achievement for the Reform process and for the goals of the capacity-building period, bringing

training to the personnel in more distant places. This training relates to the provisions of the Information Systems and Technology Action Plan.

### N.  Training for Supervisors on the Digital Incident Report, Form PPR-468.

On September 21, 2016, in the Police Area of Utuado, twenty-four (24) supervisors of multiple police areas were trained in the digital version of the Incident Report, Form PPR-468, using the CAD System. This training is an important step for the development and implementation of the provisions of the General Order Chapter 600, Section 621, titled "Controls on the Use, Distribution, File and Final Disposition of the Crime Incidents Reports (NIBRS) in the Puerto Rico Police" through the appropriate use of the CAD System, and by this mean collect the demographic data from the documentation on arrests, traffics stops, investigative stops, detentions, searches, property seizures, and civilian complaints of all involved persons including alleged suspects and victims, according to paragraphs 83 and 85 of the Agreement.

The  main goal  of training supervisors and Reform Office personnel in this matter, is to provide the right tools to the persons in charge of the reform efforts, to properly guide the PRPD police officers under their command, giving a strong foundation to achieve the goals of the capacity building period and the Agreement.

## VI.  EQUAL PROTECTION AND BIAS FREE POLICING.

### A.  Collaborative Agreement between the Woman Advocate Office ("OPM" for its acronym in Spanish) and the PRPD.

On May 25, 2016, the OPM and the PRPD formalized a Collaborative Agreement with the purpose of establishing a transparent, flexible and confidential public Agency policy, in the

complaints filing process on sexual harassment, workplace harassment and domestic violence incidents. This collaboration complements the effort towards the implementation of the Agreement and the benefits of sustainability, developing an atmosphere of interagency cooperation and planting roots for a solid relationship towards the Reform process beyond the terms established. This Collaborative Agreement states that OPM will cooperate with the PRPD Sustainable Reform in cases related to sexual harassment, workplace harassment, sex discrimination and domestic violence. OPM will also provide assistance in the resolution of administrative complaints related to the above matters.

The most significant and tangible result from the above mentioned Collaborative Agreement is the partnership between OPM and the Police Academy to develop the training associated with the policies signed and published on the subject of domestic violence. In an unprecedented effort, and upon the request of the Police Academy, OPM developed the psychosocial portion of the sixteen (16) hour training venue, which will consist of a six (6) hour instruction period that will be given by a certified psychologist. The Police Academy took the Collaborative Agreement, which was written for OPM to provide training free of charge to the PRPD police officers on laws and protective regulations for women related to sexual harassment, workplace harassment, sex discrimination, domestic violence, employment, gender equality and psychosocial aspects of violence to the next level, by helping the Police Academy develop a sustainable train-the-trainer program.

**B. Separation of Church and State.**

On September 12, 2016, the Superintendent issued the Directive (OS-2-OAL-OAN-116) reaffirming that PRPD institutional policy is based on the equal and fair treatment for all persons

in accordance with the Bill of Rights of the Constitution of the Commonwealth of Puerto Rico. This, to ensure a dignified work environment free of discrimination. Therefore, it is part of the PRPD's institutional policy to guarantee the constitutional right of complete separation of church and state, protected by the Bill of Rights of the Constitution of the Commonwealth of Puerto Rico and the First Amendment of the Constitution of the United States of America, in which freedom of religion and the complete separation of church and state is provided. This Directive details both rights, as well as the permitted actions within the aforementioned constitutional legal framework, in addition to federal provisions outlined in Title VII of the Civil Rights Act of 1964; Act 184-2004, as amended, entitled "Law for the Administration of Human Resources in the Public Service", reaffirming the responsibility of the PRPD to meet the commitment of the Reform process and to establish policies that allow sustainable, durable and permanent process in terms of respect for the rights of individuals to be in an environment free of discrimination.

### C. Hate Crime Policy.

For the first time in the history of the PRPD, a hate crime policy and procedure manual were put into effect as listed below:

On October 13, 2016, the Superintendent signed the Hate Crimes Procedures Manual. The purpose of this Manual is to assist the various administrative and operational components of the PRPD to identify and investigate crimes on which there is suspicion that the motivation for the commission of these crimes was prejudice of (hate crime), as identified in the "NIBRS" System from the FBI. This manual was developed in conjunction with General Order Chapter 600, Section 621, titled "Controls on the Use, Distribution, Archiving and Disposal of Crime Incident Reports (NIBRS)" in the PRPD; the Information Manual for the PRPD Uniform Crime Data and General

Order Chapter 600, Section 630, titled "Identification and Investigation of Hate Crimes". These policies detail the administrative and operational practices and policies for research, documentation and submission of statistical data related to offenses, including those motivated by a prejudice. The provisions contained herein are consonant with the "*Hate Crime Data Collection Guidelines and Training Manual*" version 2.0, which was a review on February 27, 2015 and the "*Student Manual, National Hate Crimes Training Curricula*, *United States Department of Justice*". This to safeguard the uniformity required for the proper management and standardization of the information collected on hate crimes.

## VII.  USE OF FORCE.

### A.  Use of Force Incidents Statistics.

Shown below are tables with the Use of Force Incidents reported during the year 2016 (until October 31, 2016) as provided by the SARP.

The Table below summarizes the amount of Use of Force Incidents by Level reported from **January 1 to October 31, 2016,** for each of the thirteen (13) Police Areas, which are classified into four (4) levels of use of force as follows:

| AREA | LEVEL I | | | | LEVEL II | | | | | LEVEL III | | | | | LEVEL IV | | | | | | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | SH | Baton | SW | SubTotal | MD | ECW | Baton | QW | SubTotal | HH | ECW | Baton | SW | SubTotal | HH | ECW | Baton | CDSW | DP | SubTotal | |
| San Juan | 31 | 0 | 0 | 31 | 17 | 2 | 0 | 2 | 21 | 0 | 7 | 0 | 31 | 38 | 0 | 0 | 0 | 1 | 0 | 1 | 91 |
| Arecibo | 8 | 0 | 2 | 10 | 9 | 0 | 0 | 0 | 9 | 0 | 7 | 0 | 14 | 21 | 0 | 1 | 0 | 14 | 0 | 15 | 55 |
| Ponce | 8 | 0 | 22 | 30 | 0 | 1 | 0 | 0 | 1 | 0 | 6 | 1 | 0 | 7 | 0 | 0 | 0 | 3 | 0 | 3 | 41 |
| Humacao | 6 | 0 | 1 | 7 | 4 | 2 | 0 | 0 | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 0 | 6 | 19 |
| Mayagüez | 19 | 0 | 3 | 22 | 12 | 1 | 4 | 0 | 17 | 0 | 7 | 0 | 7 | 14 | 2 | 0 | 0 | 9 | 0 | 11 | 64 |
| Caguas | 5 | 0 | 0 | 5 | 6 | 1 | 0 | 0 | 7 | 3 | 6 | 0 | 1 | 10 | 2 | 0 | 0 | 2 | 0 | 4 | 26 |
| Bayamón | 39 | 0 | 2 | 41 | 13 | 2 | 1 | 1 | 17 | 4 | 15 | 0 | 22 | 41 | 2 | 0 | 0 | 25 | 0 | 27 | 126 |
| Carolina | 13 | 0 | 3 | 16 | 8 | 1 | 0 | 0 | 9 | 0 | 2 | 0 | 17 | 19 | 1 | 0 | 0 | 0 | 0 | 1 | 45 |
| Guayama | 0 | 0 | 0 | 0 | 6 | 0 | 0 | 0 | 6 | 1 | 5 | 0 | 10 | 16 | 0 | 0 | 0 | 8 | 0 | 8 | 30 |
| Aguadilla | 2 | 0 | 3 | 5 | 2 | 3 | 0 | 0 | 5 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 2 | 13 |
| Utuado | 5 | 0 | 2 | 7 | 13 | 0 | 0 | 0 | 13 | 1 | 3 | 0 | 0 | 4 | 0 | 0 | 0 | 1 | 0 | 1 | 25 |
| Fajardo | 4 | 0 | 0 | 4 | 12 | 3 | 0 | 0 | 15 | 0 | 5 | 0 | 12 | 17 | 0 | 0 | 0 | 15 | 0 | 15 | 51 |
| Aibonito | 7 | 0 | 0 | 7 | 5 | 0 | 0 | 0 | 5 | 2 | 0 | 0 | 1 | 3 | 0 | 1 | 0 | 3 | 0 | 4 | 19 |
| TOTAL | 147 | 0 | 38 | 185 | 107 | 16 | 5 | 3 | 131 | 11 | 64 | 1 | 115 | 191 | 7 | 3 | 0 | 88 | 0 | 98 | 605 |

**REPORTED INCIDENTS OF USE OF FORCE** — January 1 to October 31, 2016

Legend: Soft Hands, HH- Hard Hands, Baton, ECW- Eletronic Control Weapon, QW- Pepper Spray/ Tear Gas, SW-Service Weapon, DP- Deceased Persona, CDSW- Critical Discharge of Service Weapon

# VIII. CIVILIAN COMPLAINTS AND INTERNAL INVESTIGATIONS.

## A. SARP Administrative Complaints Statistics.

The Table shown below summarizes the amount of Administrative Complaints received and investigated by SARP, as well as complaints pending investigation until October 31, 2016:

| Police Areas | Complaints Received in 2016 | Investigated Complaints of 2016 | Investigated Complaints from Previous Years[4] | Complaints of 2016 Pending Investigation | Complaints of Previous Years Pending Investigation[5] |
|---|---|---|---|---|---|
| Aguadilla | 203 | 122 | 44 | 81 | 1 |
| Aibonito | 144 | 95 | 25 | 49 | 0 |
| Arecibo | 151 | 110 | 34 | 41 | 15 |
| Bayamón | 83 | 48 | 29 | 35 | 1 |
| Caguas | 104 | 70 | 41 | 34 | 2 |
| Carolina | 126 | 91 | 30 | 35 | 0 |
| Fajardo | 258 | 171 | 42 | 87 | 3 |
| Guayama | 126 | 99 | 10 | 27 | 0 |
| Humacao | 77 | 54 | 12 | 23 | 0 |
| Mayagüez | 113 | 68 | 22 | 45 | 1 |
| Ponce | 37 | 37 | 14 | 0 | 0 |
| San Juan | 79 | 54 | 19 | 25 | 0 |
| Utuado | 68 | 51 | 16 | 17 | 0 |
| Domestic Violence | 97 | 44 | 33 | 53 | 0 |
| Gender Discrimination | 44 | 27 | 9 | 17 | 0 |
| Sexual Harassment | 20 | 11 | 8 | 9 | 0 |
| Labor harassment | 60 | 19 | 12 | 41 | 0 |
| IAB[6] | 106 | 44 | 116 | 62 | 51 |
| Total | 1,896 | 1,215 | 516 | 681 | 61 |

## B. Controlled Substances Detection Test.

In compliance with paragraph 200 of the Agreement, for the period of January 1 to October 31, 2016, the PRPD has performed two thousand one hundred and fifty-nine (2,159) tests to detect the use of controlled substances in PRPD police officers in a continuous manner.  In order to ensure

---

[4] This total includes administrative complaints investigated in the years 2012 to 2015.

[5] Complaints pending investigation from previous years include 2014 through 2015.

[6] Internal Affairs Bureau (IAB) is responsible for investigating any complaint of apparent or alleged conduct of a criminal nature made or in which it is involved an employee of the PRPD, except complaints of aggravated assaults, violent death, suspicious death, suicide, missing persons, sexual assault, domestic violence and sexual harassment, which will be investigated by the Auxiliary Superintendence for Criminal Investigations (SAIC, for its Spanish acronym).

the reliability and validity of tests performed prior to service for cadets and to PRPD police officers, the tests are conducted randomly.

The Table below shows the quantity of controlled substance tests given to PRPD police officers during the period of January 1 to October 31, 2016. The information is shown on a monthly basis divided by the thirteen (13) Police Areas, pre-employment and cadets. During the covered period, two thousand one hundred and fifty-nine (2,159) tests were performed out of approximately thirteen thousand five hundred and sixty-three (13,563) PRPD police officers, which represents sixteen percent (16%) of the sworn members. Of the total tests performed, three (3) PRPD police officers tested positive for controlled substances. One (1) of the PRPD police officers was expelled, and the remaining two PRPD police officers are suspended from employment and salary until the administrative process ends.

| Police Areas | Jan | Feb | Mar | April | May | Jun | Jul | Aug | Sept | Oct | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Aguadilla | 0 | 0 | 0 | 0 | 21 | 28 | 0 | 0 | 27 | 16 | 92 |
| Aibonito | 0 | 0 | 0 | 41 | 13 | 0 | 0 | 0 | 0 | 0 | 54 |
| Arecibo | 249 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 249 |
| Bayamón | 0 | 0 | 0 | 0 | 58 | 0 | 0 | 0 | 0 | 0 | 58 |
| Caguas | 0 | 0 | 0 | 0 | 0 | 22 | 0 | 0 | 119 | 0 | 141 |
| Carolina | 0 | 0 | 0 | 0 | 0 | 199 | 0 | 0 | 0 | 0 | 199 |
| Fajardo | 0 | 0 | 19 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 19 |
| Guayama | 0 | 243 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 243 |
| Humacao | 0 | 0 | 0 | 28 | 0 | 0 | 0 | 0 | 0 | 0 | 28 |
| Ponce | 25 | 0 | 38 | 0 | 54 | 0 | 0 | 0 | 0 | 31 | 148 |
| Mayagüez | 0 | 0 | 43 | 0 | 11 | 0 | 0 | 0 | 0 | 0 | 54 |
| Utuado | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 17 | 17 |
| San Juan | 0 | 16 | 231 | 115 | 0 | 74 | 0 | 0 | 39 | 0 | 475 |
| Pre-Employment | 5 | 22 | 1 | 0 | 0 | 1 | 0 | 191 | 161 | 1 | 382 |
| Cadets | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Totals[7] | 279 | 281 | 332 | 184 | 157 | 324 | 0 | 191 | 346 | 65 | 2,159 |
| Positives | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 1 | | 3 |

[7] None of the employees, Cadets, or applicants refused to take the tests.

**C. Status of Administrative Complaints in the PRPD Legal Affairs Office ("OAL" for its acronym in Spanish).**

Legal advisors ascribed to the Legal Affairs Office are responsible for evaluating and analyzing administrative complaints that are referred to them by the Auxiliary Superintendence on Professional Responsibility ("SARP" for its acronym in Spanish), and recommend the appropriate disciplinary actions or dismissal of the complaint according with the proved facts and applicable law.

The Table summarizes all pending administrative complaints in the Office of Legal Affairs, including both pending for evaluation and those evaluated pending notification:

**Pending Administrative Complaints[8]**

| 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|------|------|------|------|------|------|------|
| 1 | 0 | 1 | 0 | 3 | 12 | 3 |
| **2010** | **2011** | **2012** | **2013** | **2014** | **2015** | **2016** |
| 2 | 8 | 18 | 19 | 58 | 299 | 205 |
| **TOTAL 629** | | | | | | |

The Table below summarizes all administrative complaints resolved in the Office of Legal Affairs from the period of January 1 to October 31, 2016, by month and by final disposition:

---

[8] These statistics include administrative complaints assigned to OAL attorneys pending evaluation and evaluated administrative complaints pending notification of results.

| Final Dispositions of Administrative Complaints Resolved in the Office of Legal Affairs During the Year 2016 | | | | | | |
|---|---|---|---|---|---|---|
| Month | Sustained | Not Sustained | Unfounded | Exonerated | Orientation | Total |
| January | 4 | 3 | 4 | 1 | 35 | 47 |
| February | 14 | 103 | 26 | 37 | 57 | 237 |
| March | 2 | 0 | 0 | 0 | 1 | 3 |
| April | 11 | 49 | 1 | 16 | 96 | 173 |
| May | 13 | 51 | 15 | 17 | 53 | 149 |
| June | 9 | 40 | 5 | 13 | 74 | 141 |
| July | 8 | 59 | 3 | 36 | 16 | 122 |
| August | 14 | 108 | 9 | 30 | 29 | 190 |
| September | 1 | 62 | 0 | 4 | 5 | 72 |
| October | 33 | 54 | 5 | 8 | 21 | 121 |
| Subtotal | 109 | 529 | 68 | 162 | 387 | 1255 |

### D.  Monitoring of Domestic Violence Cases against PRPD Police Officers.

The statistic is presented pursuant to **paragraph 100** of the Agreement. For the period covered by this report there has been one (1) expulsion of a police officer from the Agency for domestic violence. The Table below summarizes investigation results on domestic violence cases against PRPD Police Officers from January 1 to October 31, 2016.

| Investigation Results of Domestic Violence Cases Filed Against PRPD Police Officers | | | | | |
|---|---|---|---|---|---|
| Gender | Complaints Received | PRPD Police Officers Arrested | Cases Filed | Convicted PRPD Police Officers | Other Persons Arrested |
| Male | 89 | 47 | 20 | 0 | 0 |
| Females | 8 | 4 | 2 | 0 | 1 |
| Total | 97 | 51 | 22 | 0 | 1 |

## IX. COMMUNITY ENGAGEMENT AND PUBLIC INFORMATION.

### A. Community Policing Policy.

On October 13, 2016, the Superintendent signed the General Order Chapter 800 Section 803 titled "Community Policing" prior the approval of the TCA. The purpose of this Order is to extend and strengthen existing PRPD initiatives with communities of interest. The development and implementation of activities leading to organizational transformation, where PRPD will incorporate the principles of community policing, involves a thorough evaluation of how we provide our police services. Organizational transformation is everyone's responsibility, including contract workers, classified and sworn personnel, from top management to the cadet or newly appointed employee. By incorporating the principles of community policing in the administration, management, policies, protocols, recruitment, training and development, personnel evaluation, tactics, distribution of staff, systems accountability and public information, among others, will encouraged public safety, civil rights and ensure our most important goal, which is to increase the confidence of communities in the PRPD. The development of this policy was carried out as set out in the Community Interaction Action Plan.

### B. Activities of Dissemination of Public Information.

#### 1. Conferences.

On September 29, 2016, the PRPD Reform Office Director, Colonel Clementina Vega Rosario, gave a lecture at the Catholic University of Puerto Rico, Mayaguez Campus, to graduate programs students on the subject of the PRPD Reform. This conference is a tool of public broadcasting on the Reform process which is currently taking place in our Agency, by integrating the public to the same by providing public information regularly. The action of sharing information

with the public and obtaining feedback could result in future alliances focused on  the solution of problems.  This conference drew the attendance of forty (40) students from the graduates programs of the aforementioned University.

On September 9, 2016, the PRPD  held a Conference  with the Border Patrol on the PRPD Reform. The specific issues discussed were the following:

    a.   Implications of the PRPD Agreement;

    b.   Information on the creation and revision of policies and trainings;

    c.   Actions Plans;

    d.   PRPD Web Portal; and

    e.   General Order Chapter 600 Section 626 titled "Intervention with Foreign Persons".

**2.   Meetings with Stakeholders.**

PRPD, in their interest to have transparency and integration  of community groups, has continued the process of rapprochement with the GRUCORPO organization. As a result of these efforts, a meeting was held on August 23, 2016.  In this meeting, GRUCORPO was presented with several alternatives to help PRPD in the Reform process. Among the alternatives are the following:

    a.   Contribute to the analysis of policies through which they are published in the electronic portal police;

    b.   Collaborate in the design process and review training curricula;

    c.   They were invited to observe training sessions offered to its employees by the Agency. What made during the day Aug. 24, 2016, attending the training of intervention transgender people. As part of this activity it was provided

the syllabus, instructor manual and presentation so they can evaluate the training and also it was done with the training on the subject of searches and seizures provided to supervisors on 29 and 30 September of 2016 in the Police Academy;

d.  Be spokespeople on issues affecting communities;

e.  Be links between the police and communities bringing information and guidance to these, such as processes and file administrative complaints;

f.  Report public order problems;

g.  Report praise positive acts of law enforcement;

h.  Visit and evaluate community meetings between police and the community;

i.  Accompany members of the Office Reform to the Zones of Excellence to assess compliance among them; and

j.  Participate in the development of a training aimed at interaction with victims. The creation of it was recommended by GRUCORPO.

As a result of the meeting, they were provided with the option to evaluate these alternatives and determine how they wish to contribute to the process. An agreement was achieved, and they accepted the integration of the Reform Office staff to the workshops they offer. These are related to the subject of records and searches "Officer I have Right" which in turn is an area of implementation of the Agreement. We intend to participate in these workshops is to receive first-hand input from the community so that we can incorporate their concerns and get ideas to improve our community approaches, informational posters aimed at people and trainings.

On August 29, 2016, we were visited by the "*Open Society Foundation*". During this visit, ideas  were exchange  between the organization and staff attached to the Office Reform. They were

also clarified on some concerns they had regarding issues related to the community, technology and the PRPD Academy.

In regards to the Citizen Interaction Committees (CIC's) and in compliance with requirement 211of the Agreement, trainings were offered in four (4) sessions of sixteen (16) contact hours comprising of nineteen (19) different subjects. A participation of eighty three percent (83%) of the active members of the fourteen (14) Citizen Interaction Committees was achieved. The trainings were offered in four (4) Police Areas:

    a.  San Juan, June 25 and 26, 2016

    b.  Ponce, June 9 and 10, 2016

    c.  Arecibo, July 16 and 17, 2016

    d.  Humacao, August 6 and 7, 2016

In order to facilitate the participation of the members of the Committees, who could not attend the trainings on the weekends, they are also giving trainings overnight on weekdays. These began in the San Juan Area on the dates of 17, 18, 25 and 31 of August 2016, and additional sessions were programmed for October 12, 13, 19, 20, 29 and 30, 2016.

### 3.  Open House Activity "Tú y Yo Somos Comunidad"

On October 13, 2016, PRPD held in its Headquarters facilities an open house educational activity under the slogan "Tú y Yo Somos Comunidad". In this activity , different PRPD work units, which at that time have been restructured during the Reform process, offered orientations on the services they provide to communities. Also known persons within our communities provided conferences guiding people on community policing and hate crimes.

To the activity were invited community members of the university as well as members of the community in general such as: Atty. Nora Vargas from the LGBTT Legal Clinic School of Law of the University of Puerto Rico; Joselyn Gomez from the Educational System Ana G. Mendez; Benelyz González Baez also from the Educational System Ana G. Mendez; Lina Torres Rivera, PhD. From the Sacred Heart University; Gloria Ruiz from "La Fondita of Jesus"; Sara I. Delgado Benitez Municipality of San Juan; Pedro Julio Serrano of Puerto Rico Tod @ s from the LGBTT Community; Modesta Irizarry from the Loiza Community; Carmen Villanueva from the Hill Brothers Community; Ivana Fred from the Transgender Community; and Cecilia la Luz from the LGBTT Community Center of Puerto Rico. The invitation to the university sector to this activity obeys to one of the results obtained on the survey conducted by the TCA, directed to residents, PRPD police officers and detainees in police quarters, during the period from August 14 to October 3, 2015, as required by paragraph 241 of the Agreement. One of the survey results showed that the persons from the sector of young and/or college people do not know about the PRPD Reform. This open house activity was realized to address this situation first hand and make known to this sector what the Reform process is, and in the same way we will continue to do activities like this, among others.

In addition, during this activity the first versions of the following policies were signed:

    a.   General Order of Community Policing

    b.   General Order of Hate Crime Investigations

    c.   Procedures Manual of Hate Crimes Investigation

**4. Public Hearings held by District Court of the United States for the District of Puerto Rico.**

On September 1 and 2, 2016, Public Hearings presided by the Honorable Judge Gustavo Gelpí were held at the facilities of the State Courthouse in Mayagüez. This is the fourth (4th) Public Hearing on the PRPD Sustainable Reform Process. The public hearing helps the Reform process, by obtaining feedback from various government and private agencies, as well as the community regarding the goals and objectives and its progress, which is very important for the capacity building period. A total of thirty-eight (38) members of the community, from both the private and public sector, offered testimony giving their opinion on the PRPD reform process:

a.      Attorney Gerogina Candal, from the Puerto Rico Civil Rights Commission ("CDC" for its acronym in Spanish), for the most part, echoed the TCA's previous bi-annual report. Attorney Candal brought to the Court's attention an administrative complaint number 2016-01-17-00172, filed by Ivana Fred for discrimination and persecution of a transsexual woman, where a parking ticket was given to her for obstructing a handicap ramp, where the PRPD police officer who gave her the parking ticket allegedly made a discriminatory comment. The current status this administrative complaint is as follows: the complainant Ivana Fred did not testify in the citation served for September 9, 2016. Nonetheless, she did attend and testify in the second (2nd) citation date. The PRPD police officer on this complaint was summoned for October 4, 2016, to testify. Results are pending.

As to the administrative complaint number 2016-00-04-137, filed by Charlotte Velilla for derogatory comments allegedly made by a PRPD police officer to a sexual assault victim on July 5, 2016, this complaint was investigated by the Bureau of Antidiscrimination Affairs of the SARP. The investigation was completed and sent to the PRPD Office of Legal Affairs for the corresponding legal procedures.

The Puerto Rico Civil Rights Commission also reported the receipt of a complaint in their headquarters by a person alleging that the PRPD police officers removed him from a business establishment due to ignorance of regulations regarding service animals. They provided number of the complaint filed with the PRPD. The Agency had the opportunity to investigate the facts alleged by the complainant and it was the latter who presented himself to a PRPD Precinct to file a complaint for the incident. According to facts stated by the complainant, it was an employee who removed him from the business establishment and not PRPD police officers, as stated by Attorney Candal in her testimony.

Attorney Candal also alleged in her deposition, that PRPD lacked training in LGBTT Communities' interventions and that these claims had not been attended. Contrary to her statement in this matter, in May, 2016, Attorney Ever Padilla from the Puerto Rico Civil Rights Commission attended a training on Interventions with Transgender and Transsexual Persons. These trainings are still being given to PRPD police officers and the Agency has demonstrated commitment to fully comply with the Agreement, not only in the drafting of the policy, but also in all the efforts that have been taken to develop training on this subject that will surely help PRPD police officers acquire the tools to professionally and respectfully interact with transgender and transsexual persons.

b.      Judge Edgardo Rivera García, of the Puerto Rico Supreme Court, testified on the importance of an initial curriculum and robust continuing education of all PRPD personnel. He also indicated that training related to the dynamics developed in the courts was needed. Judge Rivera Garcia was invited to visit the Police Academy, but he has not responded to the invitation, which was endorsed by Judge Gelpí.

c.      The Mayor of Mayagüez, Jose Guillermo Rodríguez, testified to the amount of PRPD police officers from the west part of the Island versus the resources allocated. Regarding this matter, he spoke about the adverse effects to the PRPD police officers when traveling to the metropolitan area to work.

d.      Colonel Orlando Meléndez Serrano, Auxiliary Superintendent in Field Operations, testified about the reorganization of the Tactical Operations Division.

e.      Colonel Francisco Rodríguez Ortiz, Auxiliary Superintendent on Professional Responsibility testified about the progress of the Auxiliary Superintendence which he leads.

f.      Michelle Hernández Fraley, Ph.D, Auxiliary Superintendent in Education and Training, recognized the valuable contributions of different community leaders and government organizations in the training development. She stressed the need for academic preparation of cadets coming to the pre-service training, but also highlighted that as standards-based organization, the Academy has had a 6% failure among cadets from three classes which includes both state and municipal police candidates. She informed that PRPD is in compliance with the fifty percent (50%) of required training as articulated in the Agreement and Action Plans. Hernández Fraley testified that the implications of having two (2) training sessions of shooting practice for more than thirteen thousand (13,000) PRPD police officers has resulted in the renting of two additional ranges in Moca, to serve Aguadilla, and Guayama, to serve Guayama and Ponce.

g.      Colonel Miguel Rosado Carrero, Mayagüez Area Commander gave an administrative and operational overview of the Command Area he leads.

h.      Lieutenant Colonel Agustín Marrero Marrero, Aguadilla Area Commander gave an administrative and operational overview of the Command Area he leads and testified to the alliances developed in his Area.

i.     Colonel Luis Colón Ortiz, PRPD United Rapid Action Forces ("FURA" for its acronym in Spanish) testified to the status of the maritime facilities in the west coast of the Island.

j.     Lieutenant Colonel Jose J. García Díaz, Drug Bureau Director, testified about the progress of the bureau that he leads.

k.     Lieutenant Jaime Cosme Oliver, Force Investigation Unit's Director, testified about the progress of the unit he leads.

l.     Lieutenant Alberto Rivera Ortiz, Canine Division Director, testified about the progress of the unit he leads.

m.     Sgt. Lourdes Rivera, Community Relations for the District of Aguadilla, spoke about five (5) detachments served by the community and spoke about orientations that are being given through local stations.

n.     Sgt. Gamalier Dumen, Police Athletic League ("LAP" for its acronym in Spanish) testified on the integration of children with disabilities in the LAP. He also spoke of an alliance with Kedriel Hodge 4 Autism Foundation Sake and detailed sport events tailored for children with Down Syndrome in LAP sport competitions.

o.     Dr. Juan Centeno López, PRPD Psychology Office Director, spoke about his role in the office he leads.

p.     Member of the Police Athletic League ("LAP" for its acronym in Spanish) with Down Syndrome, spoke about his experience and expressed his appreciation for being a part of the LAP.

q.     Mr. Juan Girad, member of the Security Community Council for the Borough of Plana, testified about his prevention work plans with the PRPD. He also expressed his satisfaction with the changes that have been observed in the PRPD.

r.      Mr. Ariel Negrón, member of the Security Community Council of the Borough of Sonadora testified about orientations given to the community, and the inauguration of the Police Athletic League ("LAP" for its acronym in Spanish) in his area. He also testified that, after the inauguration, crime rate has dropped.

s.      Mr. Eduardo Muñoz Ramos, member of the Security Community Councils testified to his participation in PRPD prevention campaigns such as "Ojo al Pillo" and "Tu amigo el Policía".

t.      Mr. José Vega, a member of Fajardo Area Citizen Interaction Committee (CIC's), testified about his concerns for the CIC's operations.

u.      Ms. "Tati" Escobar, member of Ponce Area CIC's, recommended training for PRPD officers that will result in assertive interventions with populations with disabilities.

v.      Mr. Euclides Feliciano, member of CIC's Area Aguadilla, testified about his experiences with the PRPD and activities attended.

w.      Mr. Walter Santiago Rodriguez, CIC's Mayagüez, testified that steps should be taken in order for PRPD police officer's morale to rise. He also spoke about preventive programs that exist in the PRPD such as "¿Sabes dónde está tu hijo?" and "Tu Amigo el Policía".

x.      Mr. Dennys Villanueva, Community CIC member and LGBTTIQ representative, testified that the greatest fear of trans community is the use of force against them by PRPD police officers. He recommended identifying links, raising statistics of the interventions and develop discussion groups on use of force incidents.

y.      Dr. Juan Aviles, EDP College, testified about workshops being given fo CCS and spoke about his participation in PRPD prevention campaigns as "No Más Balas al Aire" and elderly programs.

z.      Ms. Lissette Morales Garcia, Interamerican University of Puerto Rico, testified about their offers on workshops for PRPD police officers and communities. She also spoke about their willingness to collaborate in the Reform process.

aa.     Student of the University of Puerto Rico, Mayagüez Campus, testified about coordination with PRPD before a demonstration and communications between students and the PRPD during demonstrations in the last two (2) years.

bb.     Dr. Nicholas Linares, FILIUS Institution - University of Puerto Rico, testified about the Institute's coordination in multidisciplinary and multi-campus research. This Institute develops public policy related to people with special needs.

cc.     Mr. José Díaz, Tallaboa Encarnation Civic Group, testified about security incidents where protesters have been at stake.

dd.     Mr. Luis García Mercado, LGBTTIQ Community, testified about incidents of physical abuse against the community (cruising), exposure to the press during arrest raids and asked to PRPD to investigate the appropriateness of the arrests performed.

ee.     Mr. Juan Carlos Mejías, American Cancer Society, testified to the contribution of PPR in the event Relay for Life and spoke about visits made to patients in cancer hospitals by PRPD police officers.

ff.     Dr. Javier Aceves, Federal Mental Health Monitor, testified about modern treatment of people with mental disabilities and their integration into the communities. He stressed the necessity for sensitivity and assertiveness training for police officers in order to be prepared to assertively work police interventions with this community.

gg.     Ms. María Hernández Jiménez, PAEC Director, testified about the Support Program and Community Liaison. She also spoke about prevention in children and youth in vulnerable communities.

hh.     Ms. Ingrid Rivera Rocafort, PRTC, testified that the Reform process must create a safe environment and a professional police workforce that will benefit the tourism industry.

ii.     Mr. José M. Reyes, Chamber of Commerce, testified to the importance of training PRPD police officers who work in tourist areas on courtesy, friendliness, professionalism, stress management, emotions and the English language.

jj.     Mr. Felipe Morales, Western Development Movement, testified about his concerns for the crime increase and said that organizations do not know about the PRPD Reform process.

kk.     Ms. Mari Mari Narváez, GRUCORPO Spokesperson, established the difference between the events occurred in El Nuevo Día newspaper facilities and the one in the Condado sector. She also explained the difference of a demonstration and civil disobedience.

ll.     Attorney Josué González, American Civil Liberties Union, asked the PRPD Reform Office effort to provide different opportunities to contribute.

mm.     Mr. Arnaldo Claudio, TCA, spoke about his meeting the Governor and Superintendent to amend the Law 53-1996, as amended, titled "Ley de la Policía de Puerto Rico". He also recognized the work of the Office Reform.

nn.     Judge Gustavo Gelpí took this opportunity to speak about the role of the TCA as an observer and how he should not interfere with the demonstrations, and the need to create a protocol for these situations. He recognized that the PRPD has shown progress in their reform process but expresses that there are still areas that need work, discussed issues presented in previous hearings that have improved and announced the next hearing to be held in his chambers on October 7, 2016.

## X. PROMOTIONS.

On October 19, 2016, a meeting was held between the TCA and the Superintendent in which they discuss issues related to Promotions at the PRPD. As a result of the meeting, an understanding was reached on the need to amend Law 53-1996, as amended, known as the "Puerto Rico Police Act" (Law 53). These new changes arise in order to adjust the provisions of this Law to the Agreement. Likewise, it was agreed to draft internal regulations that would cover the matters discussed at that meeting, related to the topic of Promotions from the ranks of Inspector to Colonel.

In order to ascend to the ranks of Inspector to Colonel, the following must be considered: the personnel history file of the candidates; work evaluations; a physical fitness test and a weight proportional to the tables that regulate said topic; all shooting training approved by the PRPD Reform. The binders for promotion candidates for the ranks of inspector to colonel will be uniform.

Taking into account that Law 53 does not confer the power to regulate the requirements to the mentioned ranks, and as dialogued with the TCA, the Superintendent imparted instructions to work an internal regulation with such requirements.

### A. Creation of a Promotions Evaluation Board.

The creation of a Promotions Evaluation Board (Board) was included as a new provision for such purposes in the draft of the Bill. The Superintendent has the power conferred by Law 53 to create this Board. Therefore, the creation of a Board can be created by internal regulation. When the internal regulation is drafted, the duties and responsibilities of the Board will, in turn, be established.

The Board will send the candidates to the Superintendent that meet all the requirements established in the reform process and the internal regulation, in addition to those covered by law.. These are the candidates that the Superintendent will recommend to the Governor.

The administrative complaints and discipline history against the candidates for promotion to these ranks, will be issued by the SARP and by the Office of Legal Affairs, respectively.

As a result of this meeting, a draft of the bill was prepared. In the same way, several matters may be handled in the meantime by the drafting of internal regulation. As soon as the internal regulation is drawn up, it will be sent to the TCA and DOJ, in order to continue collaborating in this challenge of adjusting Law 53 and internal regulation, to the Agreement.

As discussed at the meeting, the only change that cannot be established by internal regulation is the one referring to the requirement of an academic degree prior to 1994, since it is an issue expressly established in Article 30 of Law 53. The rest of the issues discussed will be carried out through internal regulations, which will be beneficial at the institutional level.

**XI.** PRPD'S RESPONSE TO CONCERNS RAISED BY THE TCA IN HIS PREVIOUS BI-ANNUAL REPORT**.**

Please refer to the Motion filed before this Honorable Court on August 9, 2016, *Commonwealth of Puerto Rico's Response to the Six-Month Report of the Technical Compliance Advisor, December 9, 2015 – June 9, 2016.* Docket #397.

## XII.    CONCLUSION.

The PRPD is in the process of consolidating the bases to meet the goals of the capacity building period, where the fruits achieved have been many and arduous.. In the period covered by this report, the eleven (11) Sustainable Reform Action Plans were submitted and approved by the TCA, a unique effort in any process of Police Reform.

Among the most important achievements is the development of one hundred and one (101) policies to date, the approval of thirty nine (39) policies to date, not counting the sixteen (16) policies pending approval, which are the result of the guide outlined by the aforementioned Action Plans. This achievement shows, without a doubt, the high level commitment of the PRPD in accomplishing the goals and objectives towards the fulfillment of its responsibility during the reform process and compliance with the Agreement.

Parallel to the Action Plans and the development of policies and procedures, the respective training documents have been made within the terms established in the Agreement, taking into account the best quality of services and respect for human rights and their communities. The achievement of the training has been demonstrated by complying with paragraph 237(b), by training in the policies required by the Agreement at this stage, fifty percent (50%) of the relevant members of the PRPD within the required term. It is only thanks to the staff who have worked in all this effort, for the benefit of the Agency and especially the communities that compose it, as well as the TCA and DOJ for their commitment and collaboration with the PRPD in their reform effort.

**CERTIFY**

**I HEREBY CERTIFY** under penalty of perjury under 28 U.S.C. § 1746 and any other applicable law of United States of America, that the foregoing report and information is true and correct. Executed on San Juan, Puerto Rico, on this 25th day of November, 2016.

JOSÉ L. CALDERO-LOPEZ
Superintendent
Puerto Rico Police Department

**WHEREFORE**, it is respectfully requested from this Honorable Court to take notice of the above stated.

**I HEREBY CERTIFY** that on this same date, I electronically filed the foregoing with the Clerk of the Court using CM/ECF system which will send notification of such filing to all attorneys of record.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, on November 25, 2016.

**CÉSAR MIRANDA RODRÍGUEZ**
Secretary
Puerto Rico Department of Justice

**MARTA ELISA GONZÁLEZ.**
Deputy Secretary for Litigations
Puerto Rico Department of Justice

**WANDYMAR BURGOS VARGAS**
Director
Federal Litigation Division
Department of Justice

**/s/ JOEL TORRES ORTIZ**
**JOEL TORRES ORTIZ**
U.S.D.C. NO. 302311
Attorney for the Defendants
Puerto Rico Department of Justice
P.O. Box 9020192
San Juan, P.R. 00902-0192
Tel. (787) 721-2900 ext. 2647/2606
Fax. (787) 722-1595
Email: joeltorres@justicia.pr.gov