# SIX-MONTH REPORT OF THE TECHNICAL COMPLIANCE ADVISOR JUNE 10, 2016 – DECEMBER 9, 2016

*Office of the Technical Compliance Advisor to the Agreement for the Sustainable Reform of the Puerto Rico Police Department*

# Table of Contents

A Message from the TCA                                          3

TCA Reports under the Agreement                                 7

Introduction                                                    8

**Section I**

PRPD Status Report                                              9

The Work of the TCA                                            14

**Sections II**

PRPD Action Plans                                              18

**Section III**

Current and Anticipated Challenges in the Implementation of the Plans and the
Agreement                                                      21

    Paragraph 13: Staffing Allocation and Resource Study       22

    Promotions                                                 26

    Law 53                                                     31

    The Consent Decree about Complaints of Unpaid Overtime     32

    Reorganization of the Drugs, Narcotics, Vice and Illegal Firearm Bureau   34

    Domestic Violence and Mental Health Services               36

    Community Interaction Councils ("CICs")                     41

    Paragraph 241: Community Surveys and Focal Groups          43

    Policies, Public Information, and the Community: GRUCORPO    46

    Information Systems                                         47

    The Fourth Public Hearing                                  49

    Mediation                                                  52

TCA Fifth Semi-Annual Report | 2016

**Section IV**

Projected Activities                                          55


**Appendix**                                                 57

# A Message from the Technical Compliance Advisor

This is the Fifth Semi-Annual report ("Report") of the Technical Compliance Advisor ("TCA") in the Agreement for the Sustainable Reform of the Puerto Rico Police Department ("Agreement"). It assesses and reports on the progress made toward the implementation of the Agreement by the Puerto Rico Police Department ("PRPD"), and summarizes the work conducted by the TCA for the six-month period ending on December 9, 2016.

During this reporting period, the PRPD made excellent progress in the drafting of 48 new policies. The PRPD completed all eleven (11) Plans, and the TCA and the United States Department of Justice ("USDOJ") have approved them.[1]  This is a critical milestone within the capacity-building period of the Agreement. The TCA recognizes the leadership and dedication of the PRPD's Reform Unit in finalizing the required Plans. They set forth the detailed steps the PRPD has agreed to implement within each of the eleven (11) substantive areas of the Agreement. Upon submission to the Court and once translated into English, the Parties will consider these Plans as fully incorporated, enforceable terms of the Agreement.

The PRPD also made important progress in training. The Police Academy has developed very polished training curricula based on a training development model that ensures a seamless transition from policy to training, and eventually to implementation. The TCA has also documented advances in the number of officers trained on impact weapons, use of force, ethics, administrative complaints, searches and seizures, and equal protection in accordance with the requirements of Paragraph 237.

Sadly, the TCA has noticed a deterioration of the physical structure of the facilities at the Police Academy, which in a significant way has caused some of the classrooms to become unsuitable for instruction. The TCA highlighted a similar shortcoming in his first semi-annual report, which prompted repairs. At present, there are new needed repairs to the physical structure of the Academy demanding a prompt and effective correction to preserve this asset. The problem is – and the PRPD acknowledges this in its response to

---

[1] Under the Agreement, Action Plan means a strategic plan developed by PRPD with the approval of the TCA and USDOJ that contains temporal benchmarks and detailed action steps designed to achieve desired outcomes within generally accepted professional standards.

the TCA's draft report - directly related to delays by the office of budget to award contracts for repair. The TCA recommends that the Academy remains sufficiently funded to adequately deal with the required maintenance.

Notwithstanding the progress made in planning, policy development, and training, there are three key areas of the Agreement that represent a tremendous disappointment and a setback toward its implementation. The three areas are: promotions, the human resource staffing study (Paragraph 13 of the Agreement), and the reorganization of the Drugs, Vice, and Illegal Firearms Bureau. The TCA will further address in depth those three critical areas in this Report.

In prior semi-annual reports, the TCA recommended that the PRPD should not make any additional promotions until they had completed the staffing study and ensured that personnel decisions were made on both operational needs and the establishment of a rigorous system of merit-based promotions. The TCA argued against the PRPD promoting personnel without first understanding the strategic demands of the organization and having established a tested and reliable merit-based system of promotions. As it is documented in this Report, the recent round of promotions made by the former Superintendent was plagued with deficiencies, violated the terms of the Agreement, and in the TCA's opinion, caused irreversible damage toward the implementation of a career plan for supervisors by giving an unfair advantage to individuals who lacked the qualifications to be promoted. After reviewing the files used to promote candidates, the TCA presented his findings on the systemic and widespread problems to the PRPD. The TCA had separate meetings on those issues with the Governor of Puerto Rico and his staff, the Secretary of Justice, and the Police Superintendent. They were fully informed of the nature of these findings. The TCA recommended, and the Commonwealth agreed to make, important legislative and policy changes. These changes are underway. However, it is indisputable in the aftermath that the repercussions forewarned by the TCA has already occurred. Further comments and recommendations of the TCA will be addressed in pertinent sections of this Report.

Concerning the staffing study, the Professionalization focus area of the Agreement, has three key components, which are all interrelated. These components are: the development of a staffing plan, the adoption of merit-based promotions (Paragraphs 14 through 20), and the implementation of a developmental career path (Paragraph 21). Paragraph 13 requires the PRPD to conduct a staffing allocation and resource study to assess human resource needs of the PRPD. This study is the cornerstone of the professionalization reforms and the basis for a staffing and resource allocation plan

rooted in community-oriented policing principles. This requirement is part of the Plan on Professionalization, which has been approved by the parties, however, there are still pending translations for final approval and submission to the Court. The initial deadline to develop this study was June 2016. As of the date of this report, the PRPD has not complied with this deadline and it is unlikely to be met within the first part of 2017. The sole responsibility for this lack of progress lies in PRPD's leadership.

The TCA continues to document problems with the structure and operation of the Drugs, Vice, and Illegal Firearms Bureau. During the preparation of the new General Order for the Bureau, there was a lack of openness and transparency by PRPD's leadership in rejecting the cooperation of the TCA and his technical assistance. During this reporting period, the public has continued to read news reports about incidents of alleged corruption and civil rights violations by members of the Bureau. These incidents reflect a pattern of conduct of an organization still in disarray and lacking leadership and direction. Once again, the TCA strongly recommends a full operational reorganization be implemented at once. The TCA has reported problems with this Bureau almost since the beginning of his tenure, and has included recommendations for improvement and reform in previous semi-annual reports. There have been limited or no significant improvements to date.

The TCA is greatly concerned about the persistent refusal by the PRPD to abide by the Agreement and provide the TCA with the records that the TCA has requested regarding the Drugs, Vice, and Illegal Firearms Bureau. Under the provisions of the Agreement, the TCA is to have unfettered access to PRPD records affecting the Agreement. The TCA has requested, and the Former Superintendent refused to provide the TCA with the results of polygraph examinations of members of the Drugs Bureau. As such, the Bureau remains under a shroud of suspicion because of the numerous reported incidents of misconduct, arrests, and even convictions of some of its members. Despite the TCA technical assistance and recommendations for change, most of the important suggestions for improvement seem to have been neglected. The PRPD must commit itself to make substantial changes and implement remedies, or the public will continue to view this very important part of PRPD operations with distrust and apprehension. I encourage the new Superintendent to take this task of reorganization head on.

The TCA is cognizant that Puerto Rico faces unprecedented fiscal problems that affect police reform efforts, particularly relating to the Agreement requirements for Information Technology. The TCA continues to encourage the PRPD to search for new funding and grant opportunities. This, among many others, is the main reason why the decision of allocating budget funds to promote members of the PRPD without conducting a staffing

study determining the real current needs of the agency was fundamentally wrong.  The irrefutable fact is that PRPD must make hard decisions about the implementation of the reforms by setting priorities consistent with, not outside of, the Agreement.

The United States District Court, mindful that 2016 was an election year, issued a "Transition Order" to prevent a transfer of critical personnel that would jeopardize the Reform process. The Court provided directives to enable the PRPD to continue in the process by maintaining key personnel in the Reform Unit and the Police Academy, unless there is just cause for a transfer. Additionally, PRPD is to retain current professional services contracts, and to ensure there is sufficient funding to continue the reform process.  The District Court held public hearings in the Mayaguez Judicial Center in September, and again the community had the opportunity to present their concerns and to be informed of the progress of the PRPD in implementing the Agreement.

The TCA and his team want to take this opportunity to welcome the new Superintendent COL (ret) Michelle Fraley, and wish her success in such an important responsibility to Puerto Rico and its citizens.

Finally, TCA continues its open-door policy to serve as a constant conduit to the PRPD to raise community issues and concerns, as they relate to the Agreement, while at the same time overseeing that PRPD addresses those issues and concerns timely and appropriately.

Arnaldo Claudio, US Army, Col. (ret)
Technical Compliance Advisor

TCA Fifth Semi-Annual Report | 2016

# TCA Reports under the Agreement

*Paragraph 250 of the Agreement:*

"During the first four years, from the Appointment Date, the TCA shall file with the Court, written public reports every six months that shall include:

a) a description of the work conducted by the TCA;

b) a listing of each detailed step in the Action Plans and its timeframe indicating whether the timeframe has been met, and whether the Commonwealth of Puerto Rico is making satisfactory progress toward implementation of the Agreement by rating PRPD in full, partial, or non-compliance steps in the Action Plan;

c) the methodology and specific findings for each review conducted, where appropriate, and redacted as necessary for privacy concerns. An un-redacted version shall be filed under seal with the Court and provided to the Parties. The underlying data for each audit or review shall not be publicly available, but shall be retained by the TCA and provided to either or both Parties upon request;

d) for any detailed steps that were reviewed and found not to have been fully implemented in practice, the TCA's recommendations regarding necessary steps to achieve compliance; and

e) a projection of the work to be completed during the upcoming reporting period and any anticipated challenges or concerns related to implementation of the Agreement."

*Paragraph 252 of the Agreement:*

"The TCA shall provide a copy of the six-month reports to the Parties in draft form within 15 days after the end of the reporting period. The Parties shall have fifteen calendar days upon receipt of the draft report to allow the Parties to informally comment on the draft report. The TCA shall consider the Parties' responses and make appropriate changes, if any, and shall file the final report with the Court within 45 days of the end of the review period.  DOJ and PRPD may file responses to the TCA's final report within 30 days."

# Introduction

This is the fifth six-month report ("Report") of the Technical Compliance Advisor ("TCA"). The Report measures the progress made by the Puerto Rico Police Department ("PRPD") in meeting the requirements outlined in the Agreement for the Sustainable Reform of the Puerto Rico Police Department ("Agreement") for the period from June 10, 2016, through December 9, 2016.  Pursuant to the terms of the Agreement, it is the responsibility of the TCA to provide technical assistance and systematically review Action Plans ("Plans"), policies, procedures, programs, protocols, training, and systems of the PRPD.  It is also his task to measure the nature and the extent of the PRPD's compliance with the terms set forth in the Plans and the Agreement.

The Report consists of four major sections and one appendix.  In the first section, the Report comments on the PRPD's Fifth Status Report documenting the PRPD's accomplishments and progress made from May 16, 2016, through November 15, 2016. Consistent with Paragraph 250(a), this section also discusses the work conducted by the TCA in the last six months, from June 10, 2016, through December 9, 2016.  It focuses on the work of the TCA in providing technical assistance to the PRPD, including work in the development and review of Plans, policies and procedures, and training materials.

In its second section, the Report focuses on work of the Puerto Rico Police in developing Plans for the eleven substantive areas of the Agreement and complying with Paragraphs 234 through 238.  This is consistent with Paragraphs 250(b) and 250(c).

In the third section, as required by Paragraph 250(d), for any detailed steps that were reviewed and found not to have been fully or partly implemented in practice, the TCA makes recommendations regarding necessary steps to achieve compliance. The purpose of this section is to identify issues that require further attention and may have a negative impact in the implementation of the Agreement.  The list is detailed in the table of contents.

The final and fourth section, as required by Paragraph 250(e), includes a projection of the work to be completed during the upcoming reporting period and reflects the TCA's vision of intended reviews of PRPD operations.  These estimates highlight the priorities that require further attention.

# Section I

## The Fifth Status Report

On November 25, 2016, the PRPD submitted its fifth Status Report ("Status Report") assessing progress for each of the eleven (11) focus areas, steps towards implementation of the Agreement, and a response to prior concerns raised by the TCA. The Status Report documents the overall progress made by the PRPD for the period covering May 16, 2016, through November 15, 2016. Paragraph 261 requires that the Commonwealth "file with the Court sealed and unsealed versions of the Status Report, with a copy to the TCA and USDOJ, no later than 15 days before the end of the period under review."

The Status Report continues to have the same problems the TCA highlighted in his previous reports: it falls short of documenting obstacles to progress. Except for the progress made by the Reform Unit and the Police Academy in the drafting of very polished policies and training modules, the Status Report fails to document the steps taken by the PRPD in building capacity during the last six months. The Status Report describes steps taken and statistics, but neglects to provide an explanation of how these actions and/or numbers have enhanced PRPD's capacity or how these statistics assist to measure the progress made. For example, there is a bare-bones discussion of Paragraph 13 and the relevance of the staffing study. During various organized site visits and "ride-alongs", the TCA and his team observed the need for a clear strategy in using personnel resources. However, nowhere in the Status Report is there any information on the capacity of the PRPD to operate more efficiently based on its current staffing.

The Status Report documents the excellent success of the PRPD, led by the Reform Unit, in producing very detailed Plans and timelines. The TCA acknowledges the importance and relevance of reaching this milestone in the Agreement; however, the TCA would have appreciated a more constructive self-assessment of this reality grounded in the important obstacles and challenges that the PRPD faces regarding the implementation of these Plans. The development of policies and training manuals is important, but there are considerable concerns about their actual implementation in practice and how expeditious this implementation can be.

Similarly, the Status Report recognizes the importance of the Transition Order. The United States District Judge, Gustave A. Gelpi, presiding over the Agreement and the TCA wanted to ensure that the electoral transition had limited or no effect on the progress

the PRPD has achieved in the past two and half years. To that end, it is important to emphasize that immediately after the new administration is in place, the Court will conduct a hearing to confirm that the new administration has been properly briefed on the challenges and obstacles ahead. The TCA would have preferred the Status Report had more information so that it could have been used as a briefing document for the new administration. The Status Report has failed to meet these expectations.

The Status Report also documents as progress the on-site inspections personally conducted by the judge on the Canine and the Mounted units. It is important to note that the PRPD made significant recommendations in past reports about how to overcome the challenges and shortcomings that the TCA and his team found in both units. Although these recommendations were initially met with extraordinary resistance, the TCA acknowledges that these two units have become great exemplars of the progress made to date. These units are two excellent examples to showcase the changes that have taken place in within the Reform process where the ultimate beneficiaries are the people of Puerto Rico.

The Status Report does obviate the fact that the presiding judge, Honorable District judge Gustavo A. Gelpi, and the TCA made additional recommendations during the onsite inspection. For instance, the TCA noted that the Mounted Unit had not yet received the training recommended by the TCA in prior visits. The training, which was intended to commence more than a year ago, would have provided for basic and advanced mounted police training to 36 police officers at a reduced price of approximately less than $36,000.00 instead of the $200,000.00 regular price offer.

Judge Gelpi recommended that in any search and seizure case involving probable cause based on a "dog sniff," the PRPD must document in the case that the canine has been previously certified. He also suggested that in cases involving seizures of narcotics, when the PRPD testify, they must explain how the canines train, detect narcotics and explosives, and how they interact with other units, such as the SWAT team. Judge Gelpi also proposed that the PRPD implement a protocol, that once horses are no longer able to perform police functions they should be placed for adoption instead of euthanasia, like the procedure PRPD follows with K-9s. It was also recommended that the PRPD should invest more time training horses to address civil disorders. Finally, the presiding judge and the TCA noted that several horses and canines in service are aging fast and the PRPD must incorporate a contingent strategy to renovate these units.

In its response to the draft TCA Report, the PRPD acknowledges and appreciates the training recommendations recommended by the TCA for the PRPD members of the Mounted Unit. To that end, the Police Academy has initiated conversations with the resource identified here and has learned that there are physical fitness requirements in

order to be able to participate in the training. In consideration of the expenditure of public funds implied by this initiative, the Police Academy developed a diagnostic test of physical fitness. This is in order to establish the minimum standards with which the personnel assigned to this training must comply. This initiative will be complemented by the drafting of a General Order that will regulate the composition and processes of the Mounted Unit.

One other area of the Status Report that the TCA found particularly challenging was the section on "Reform Office self-assessment visits." The Status Report notes that these visits are non-punitive. However, the issue is not whether these visits are punitive or non-punitive. The critical issue is what are the lessons learned from those self-assessment visits. The status Report has no information that sheds light into what the PRPD is doing regarding the implementation of the Plans and the Agreement. The Report needs to document findings, what initiatives are not working, what obstacles were encountered and what are the solutions and lessons learned from those visits. It is not enough to highlight that these visits are taking place without detailing how these visits are causing any type of changes. For example, there is no mention of the problems affecting the Drugs Bureau, the evidence rooms, or the slow pace in implementing Information Technology.

In response to the recommendation of the TCA, the PRPD has committed to assign senior officers to participate in the evaluation visits for compliance regarding initiatives, programs and operational activities. The purpose of this new proposal is to receive their input regarding the identification of both progress being made and obstacles. These findings should contribute to the implementation of positive steps resulting in the incorporation of significant changes in the PRPD.

The Status Report also highlights the recent island-wide power failure and the response of the PRPD. Again, the tone of the Status Report is of a congratulatory nature and hardly critical about evident and persistent problems. The TCA congratulates the PRPD for the excellent job during the power failure; however, the TCA realizes that there are many lessons to be learned from an event of this magnitude. For example, the Status Report does not mention that the PRPD needs tighter supervision of its inventory of tools (e.g., raincoats, security triangles, flashlights, night flares, or illumination sticks to name a few) available during these events. There was a significant number of officers who were deployed without sufficient equipment. In some instances, this lack of equipment placed some officers at risk. The TCA is not aware of any after-action performance report from the PRPD examining what went well, which were a lot of things, and what went wrong.

The TCA is particularly concerned about the production and reporting of statistics in the Status Report. The statistics reported lacked context and purpose. Once again, the PRPD publicizes and discusses troubling statistics without producing a framework or an internal audit. This deficiency is an issue that the TCA has mentioned in prior reviews of

the PRPD's Status Reports. There is no clear indication of what the PRPD seeks to achieve by presenting these statistics. The TCA recommends the PRPD should devote more attention to this issue. For instance, the Status Report brings attention to the facts on page 14 regarding the training progress in the Zones of Excellence. There is no reference to standards, yardsticks, or targets. What does it mean that 22% of the force in these areas has been trained in searches and seizures? Is this within the target? What is the target? What is the timeline and how does this implementation compare to the deadline set in the Plans?

A similar analysis can be done regarding the table on the "use of force incidents" in the Zones of Excellence and force incidents in general. What does the fact that Bayamon Oeste has ten (10) incidents compared to one (1) in Utuado mean? Similarly, what does it mean that that Bayamon Oeste has ten (10) incidents compared to Bayamon that has a total of 126 incidents? Without providing an analysis and a proper explanation these figures are totally meaningless.

There is another area where the information is quite sparse and insufficient. Reference is made to the reorganization of the Drugs, Narcotics, Vice and Illegal Firearm Bureau. The section reads more like a cut and paste from the recent policy directive on the reorganization of the Bureau than a discussion of the multiple challenges facing the Bureau. For example, there is no reference to the polygraph testing issue and how many members of that Bureau have taken a polygraph test. There is no reference to the various recommendations made by the TCA and the USDOJ that have been rejected by the Police Superintendent and have not been adopted. Similarly, there is no mention of the findings of the TCA regarding evidence rooms. Finally, there is no discussion of the steps taken toward training and implementation of the reforms available for this Bureau.

Another deficiency is the lack of self-assessment in the section regarding information systems and online training. There is no clear institutional response to the problem. The fact that the PRPD is solely dependent on a "contractor" begs the question of how is it that the PRPD finds itself in this predicament. The level of response and the confidence the public may have that a solution will be in place sooner rather than later is quite uncertain. Similarly, the description of online training fails to inform when this tool will be operational.

The table on pre-service training (the Academy) contains erroneous information. It also highlights the failure of the PRPD to train their cadets after Class 223. The fact that this table lacks context or analysis cannot obliterate the reality that the PRPD has not trained a relevant number of PRPD cadets, not municipal police officers, since 2014. It also obviates important issues such as the fact that there were some undercover agents that were grandfathered into the system without meeting certain academic criteria. The Status

Report highlights the number of personnel with Master's or Bachelor's degrees but remains mute about those with Associate's degrees or less education.

This issue on pre-training service, while important on its own merits, affects another program, which is part of the Agreement.  There is no Field Training Officer ("FTO") program, not because the PRPD has made the choice of not recruiting cadets. Furthermore, there are more than 350 FTO officers in the program at risk of being decertified because there are no recruits to mentor.  The anticipated collapse of this program is highly relevant in this Status Report because it reveals the lack of a consistent strategy across areas and programs.

Another issue that the Status Report fails to adequately document is the problematic issue of promotions.  A good example is the explanation on page 32 of the Status Report regarding the physical fitness tests for candidates from Captain to Lieutenant Colonel. The central issue here is the fact that the candidates "participate" rather than "take and pass" the test.  On July 23, 2016, the Police Superintendent abolished the requirement of "taking" the physical fitness test.  The test was no longer a real test.  It evolved into some sort of training that the candidates just needed to attend and participate.  This change allowed 12 of the 22 people who were promoted to participate, rather than take, the physical fitness test and be promoted outside the protocols that were in place for years. Therefore, the public had no real way to know whether these candidates were fit for service.  The deed is done, but the Status Report should have documented accurately and precisely, what occurred.

Finally, it is certainly of great concern that the table depicting cases of domestic violence (as in the prior report) shows limited information about the resolution of these cases.  The TCA had previously recommended that the PRPD provide both, information about complaints as well as information about outcomes of domestic violence investigations and disciplinary action taken.  More importantly, the Status Report does not address the persistent and frequent problem of domestic violence and its relationship, as applicable, to issues of mental health in light of the numerous recent cases.

| TCA Fifth Semi-Annual Report | 2016 |
| --- | --- |

# A Description of the Work Conducted by the TCA: Paragraph 250(a)

## *Policies*

During this reporting period, one of the central tasks of the TCA has been to provide technical assistance while at the same time reviewing a considerable number of policies and training documents drafted and implemented by the PRPD. The process of reviewing policies and training materials follows the schedule agreed by the Parties and set by the Plans presented by the PRPD in compliance with Paragraphs 234 and 237. For this reporting period, the Parties and the TCA successfully reviewed over 48 General Orders, Special Orders, Administrative Orders, regulations, and complementary forms. The TCA also reviewed more than 25 training documents. On average, each policy has been discussed three times among the PRPD, the TCA, and the USDOJ.

During this reporting period, the PRPD, the USDOJ, and the TCA agreed to have monthly meetings to closely follow-up the development of policies. In these meetings, the TCA meets with the Director of the Reform Unit and the head of policy development for the Reform Unit to attend to matters about the status of General Orders, Administrative Orders, internal and external regulations, manuals, protocols, agreements, and other issues. The goal of these meetings is to jointly work on issues that may have an impact on the development and implementation of policies during the capacity building period.

One of the primary issues is the development of a new protocol for policy review. The protocol sheds a different light into Paragraph 229 of the Agreement. The purpose of this protocol is to agree upon and set up realistic processes and achievable timelines involved in the review of the policies that PRPD creates as part of the activities of the Action Plans.

The experience acquired during the past thirty months shows that the review of policies, both new and old, is being conducted in accordance with the terms outlined in Paragraph 229. However, this does not mean that the Parties and the TCA should not consider additional approaches to improve the process.

The Reform Office has estimated that each policy is taking an average of four months from development to approval, and not the forty-five (45) days outlined in Paragraph 229 of the Agreement. This substantial difference in policy production and review must be addressed. Thus, the development of the protocol has the effect of amending Paragraph

229 by tempering the Agreement to the reality, to the processes of development and review of policies as they are taking place at present.

On December 30, 2016, and outside the time frame of this Report, the PRPD presented the latest draft of the Policy Development Protocol. The TCA Team has offered as an option to include the Protocol as part of the Action Plan on Policies and submit it in this way to the Court for approval. According to the PRPD December request, this recommendation of the TCA has been accepted by the PRPD.  The PRPD will continue the discussion about the protocol between the Parties and the TCA in order to implement this Protocol as soon as possible.  The PRPD agrees that it is important to amend paragraph 229 so it can be more closely reflect the experience and the lessons learned of the last two and a half years.

Also, during this reporting period, the TCA conducted work between the PRPD and the USDOJ regarding DOJ objections to the Internal Regulation for the Prevention of Discrimination, Harassment, and Retaliation objections by the DOJ.  In the second half of 2016, the TCA was asked to resolve the objections to the "Regulation for the Prevention of Discrimination, Harassment and Reprisals of the Police of Puerto Rico" ("Reglamento para la Prevencion de Discrimen, Hostigamiento y Represalias de la Policia de Puerto Rico") presented by the USDOJ representing the United States and the response provided by the PRPD on behalf of the Commonwealth of Puerto Rico.  Hence, at the request of the Parties, the TCA submitted his determination following the guidelines provided by the Agreement.

The origin of the controversy presented to the TCA dates back to April 1, 2015, when the PRPD submitted the initial draft of the above referred regulation covering both, prohibited employment practices and prohibited policing practices against the general public. On May 7, 2015, PRPD submitted a revised draft of four Plans where the Plan on Equal Protection and Non-Discrimination split the initial draft regulation into the Internal Regulation and the Police Practices Regulation. Both new regulations needed to be published for public comment in accordance with the Commonwealth's Uniform Administrative Procedures Act (LPAU).

After an extensive series of sessions, on June 16, 2015, TCA recommended the PRPD to broaden the applicability of the Internal Regulation and offered the following language: "[E]veryone who works for the PRPD or its workplaces, or who seeks employment within the PRPD, is covered by federal and local employment laws, and this Policy. This includes all members of the service, civilian employees, managers (including executives and senior level staff members), supervisors, co-workers, paid and unpaid interns and job applicants."

In November 2015, the United States objected to PRPD's changes to the regulation that omitted coverage for all necessary personnel.  Discrepancies continued to cause further delays to the approval of the Internal Regulation. On December 14, 2015, the Commonwealth submitted a final "revised version" of the Internal Regulation to the TCA and the USDOJ for review and comment which included "applicants, contractors, and former employees."

On January 7, 2016, pursuant to a request for approval submitted by the PRPD, the TCA approved the "Reglamento Interno para la Prevención de Discrimen, Hostigamiento y Represalias de la Policía de Puerto Rico" and the "Reglamento para el Establecimiento de Practicas Policiacas Libres de Discrimen, Conducta Sexual Impropia y Represalias de la Policía de Puerto Rico."

On February 29, 2016, the Superintendent signed the Internal Regulation, but it did not include "applicants, contractors, and former employees." Ten (10) days later, on March 10, 2016, the PRPD informed of the signing of the Internal Regulation and further informed that it did not have to be published and undergo the public's comment period as required by the Uniform Administrative Procedures Act ("Ley de Procedimientos Administrativos Uniformes" 3 L.P.R.A. § 2101 et. sec.). As informed by the USDOJ in their letter to the TCA, this version did not include the groups explicitly recommended by the TCA, nor did it highlight the existence of any changes.  On April 29, 2016, counsel for the PRPD argued for the first time that the Internal Regulation did not confer jurisdiction on the PRPD to "discipline job applicants, contractors, and former employees." Additionally, they further stated that these groups were covered by the Police Practices Regulation.

On June 16, 2016, counsel for the USDOJ wrote seeking a resolution to their prior objection to the aforesaid Internal Regulation. On June 30, 2016, counsel for PRPD wrote its opposition to the USDOJ request claiming as its main argument that the three groups excluded from the Internal Regulation would still be protected by the "Reglamento de Practicas Policiacas" and further argued that the USDOJ should raise these issues at the annual review "to be held on February 2017."

Given the above, the TCA followed the methodology described in Paragraph 295 of the Agreement for the resolution of conflicts prior to the Parties requesting judicial resolution of the disputed issue.  Additionally, a linear representation of pertinent events in the order in which they occurred was prepared to analyze the evolution of the problem area.  The TCA constitutional attorneys were asked to analyze the merits of all the allegations, as well as the jurisprudence applicable to the issues presented.  On Saturday, July 20, 2016, the TCA notified the Parties of his determination that the PRPD was not in compliance and requested a Regulation to be prepared for immediate approval with the inclusion of

TCA Fifth Semi-Annual Report | 2016

"applicants, contractors, and former employees" in compliance with the Uniform Administrative Procedures Act ("Ley de Procedimientos Administrativos Uniformes" 3 L.P.R.A. § 2101 et. sec.).

On July 15, 2016, the PRPD and the legal representative for the Commonwealth's Department of Justice agreed to the inclusion of the three categories of employees in the Regulation and to expeditiously submit the amended regulation to the exigencies of the Uniform Administrative Procedures Act, *supra*.

During this reporting period, the TCA visited all thirteen (13) PRPD command areas to review the nature and extent of use of force incidents as well as the reporting procedures. The TCA determined the PRPD was complying with recording requirements in accordance with the Agreement and training procedures.

The TCA Core Team has also participated in "ride-alongs" with the PRPD, which has enabled the Core Team to develop a hands-on approach, as well as one-on-one communication with officers on some of their concerns and the Agreement.

On all site visits, a TCA member always visited the Police Academy and reviewed curriculum development ensuring the entire pedagogical approach is consistent with best practices of police training.

A staple for the TCA is meeting with community stakeholders to encourage their participation in the Reform process. This interaction between the community and the TCA facilitated a stratified selection of community and civic groups to serve as focus groups for the impending community surveys.

In the month of November, the TCA joined other federal monitors and judges, as well as government officials in the first-ever U.S. conference where federal judges had an active participation overseeing on-going consent decrees and participating in the discussions. The conference provided an exchange of ideas and methods that have been implemented in other police departments under a consent decree and afforded the opportunity for all to hear from different jurisdictions about lessons learned.

TCA Fifth Semi-Annual Report | 2016

# Section II

## PRPD's Action Plans ("Plans"): Paragraph 250(b) and 250(c)

As set forth in the Agreement, the Parties worked together and identified appropriate measures to enhance each of the following areas: (1) Professionalization; (2) Use of Force; (3) Searches and Seizures; (4) Equal Protection and Non-Discrimination; (5) Recruitment, Selection, and Hiring; (6) Policies and Procedures; (7) Training; (8) Supervision and Management; (9) Civilian Complaints, Internal Investigations, and Discipline; (10) Community Engagement and Public Information; and (11) Information Systems and Technology.

To carry out these reforms, the PRPD has developed Plans in each of these substantive areas. These Plans contain temporal benchmarks and set forth in detail the steps agreed upon to execute and implement the reforms and achieve the desired outcomes in each area within generally accepted professional standards. These steps and reforms require the implementation of policies, practices, training, documentation, internal review, technological improvements, and oversight.

Consistent with Paragraph 234, the PRPD, with assistance from the Reform Unit, has drafted the Plans that set forth the detailed steps the PRPD is to take to implement and achieve compliance with each of the Agreement's provisions in Sections III through XIII of the Agreement. Under Paragraph 236, the TCA and USDOJ have reviewed these Plans to ensure that they specify actions necessary to comply with all applicable substantive provisions of the Agreement and that timelines, implementation strategies, budgetary allocations and funding sources are reasonable, achievable, and prioritized to promote efficiency. The TCA and the USDOJ staff have completed their review. The eleven Plans are now approved by USDOJ and the TCA. Consistent with Paragraph 238, once the Plans are translated into English, the Parties will submit them to the Court as addenda to the Agreement. Upon submission to the Court, the Parties will treat the Plans as fully incorporated, enforceable terms of this Agreement, unless the Court instructs otherwise. Once approved by the Court, the Plans will be deemed incorporated into the Agreement. The PRPD will make the Plans publicly available.

The Plans describe temporal benchmarks and detailed steps agreed upon to execute and implement the required reforms and to achieve the desired outcomes in each substantive

area.  Paragraphs 231 through 240 discuss in detail their development, implementation, and assessment. The Plans are to examine policies and any required revisions, mandatory training, resources, staffing, budgetary requirements, and a schedule for when specific policies are to become field operational.

In this Report, the task of the TCA is to assess whether the PRPD is meeting the timeframe outlined in the Plans, and making satisfactory progress toward implementation of the Agreement by rating the PRPD in full, partial, or non-compliance with steps in the Action Plans.  The TCA must also discuss the specific findings and methodology for each review, when appropriate.  Finally, the TCA must include recommendations detailing the necessary steps to achieve compliance with any detailed steps that were found not to have been fully implemented.  In this past six months, the TCA has continued to conduct interviews, review documents, and conduct "ride-alongs" and site visits to determine the nature and extent of the PRPD's progress with the steps detailed in specific Plans.  These findings are documented in the Appendix.

During this reporting period, there were eight (8) Plans in full effect: *Use of Force; Searches and Seizures; Equal Protection and Non-Discrimination; Civilian Complaints, Internal Investigations, and Discipline; Professionalization; Recruitment, Selection, and Hiring; Supervision and Management; and Community Engagement and Public Information*.  Also, there were three (3) Plans that went into effect during the reporting period: *Policies and Procedures; Training; and Information Systems and Technology*.

In April 2016, the PRPD submitted these three remaining Plans. These three Plans have been reviewed by the USDOJ and the TCA resulting in a set of specific changes and recommendations.  In May 25, 2016, the PRPD re-submitted these Plans, and they were approved by the TCA in September 2016 and by the USDOJ in October 2016.

With the approval of all eleven (11) Plans by the USDOJ and the TCA and once the Plans are submitted to the Court, the Parties will treat these Plans as fully incorporated, enforceable terms of the Agreement.  During the first four years from the appointment date of the TCA, the Agreement requires the TCA to evaluate and assess the PRPD's progress against these eleven (11) Plans.  Given that it has taken more than two years of cooperative work between the Parties and the TCA to complete these eleven Plans for all compliance areas and there are significant delays in some areas, the TCA recommends that the Parties renegotiate an extension of the capacity building period of at least one additional year based on the following:

1. There are substantial delays – which we discuss at length in Section III of this Report - in the implementation of Paragraph 13.  Paragraph 13 requires a

staffing and resource allocation plan and it is hard to assess the real capacity of the PRPD without the analysis and the development of a plan.

2. There are significant delays in the implementation of a strong and robust analytical and reporting structure within the PRPD.  It is difficult to assess capacity when the PRPD leadership and the TCA do not have access to solid data.  The TCA has discussed this deficiency in this and prior reports.

3. One of the lessons of the last two and half years is that there are many more policies and General Orders that needed to be created, approved and implemented than were initially thought of.  This is due to adoption by the PRPD of new standards of policing.

4. The TCA estimates that the aforesaid new policies once created and fully implemented for training will take to be implemented.  It takes no less than six months to prepare curriculum, train the trainers, allocate resources and identified instructors at the Academy to start training the force.

5. The Information Technology systems are slowly being implemented. However, it is a known fact that it will take much longer than the remaining of the capacity building period to get to full implementation.  This is in part because the Information Technology Action Plan was the last one to be developed.  The TCA submits that it will take time for IT personnel to develop programs addressing the training needs of the PRPD, such as, "online distance learning" and the actual capacity to train the full force on new technologies.

6. There are lags in providing timely review of policy by USDOJ, which usually results in delays in training

7. The final reason for recommending an extension of the capacity building period is related to and responds to the current fiscal situation which has an impact on PRPD systems building capacity.

The PRPD supports the recommendation of the TCA.  Given that the development of the Action Plans has taken a period of more than two years of work in cooperation between the Parties and there are significant delays in some policy areas, the PRPD has discussed with the TCA that the Parties renegotiate an extension of the Capacity Building period for at least one year consistent with the proposal of the TCA.  In its response to the TCA draft Report, the PRPD appreciated the support of the TCA and agreed with his findings. The PRPD will also be requesting in due time the extension of the capacity building period.

TCA Fifth Semi-Annual Report | 2016

# Section III

## Current and Anticipated Challenges in the Implementation of the Agreement and the Plans: Paragraph 205(d)

In this part of the Report, the TCA examines all relevant detailed steps that were reviewed and found not to have been, fully or, partially implemented in practice. It also discusses the TCA's recommendations regarding necessary steps to achieve compliance with the timelines and steps in the Plans.

At present, one of the most significant challenges in the implementation of the Plans is the implementation of sustainable reforms under the Plan on Professionalization. Under the Agreement, the substantive area of Professionalization has three key objectives and three main interrelated activities: the development of a staffing plan (Paragraph 13), the adoption of merit-based promotions (Paragraphs 14 through 20), and the implementation of a developmental career path (Paragraph 21). The goal of these three interconnected activities is for the PRPD to develop processes and mechanisms that promote professional, ethical, and respectful policing services to effectively address Puerto Rico's public safety challenges. These processes and mechanisms must consistently and uniformly apply constitutional police practices. They must also build public confidence, including the confidence of the PRPD personnel, and must strengthen PRPD's institutional structures.

To attain these goals in Professionalization, the PRPD must take reasonable measures to achieve performance expectations in this area of the Agreement. However, it is difficult to see how any of the recent actions taken by the PRPD could be construed as reasonable measures. In the past six months, the criminal actions of several police officers have caused a tremendous disappointment and a setback toward the implementation of constitutional and effective policing, professional treatment of individuals, and affected community trust of the PRPD.

TCA Fifth Semi-Annual Report | 2016

# Paragraph 13: Staffing Allocation and Resource Study

Paragraph 13 requires the PRPD to conduct a staffing allocation and resource study to assess human resource needs for the entire organization. The study is the cornerstone of the professionalization reforms and the basis for a staffing and resource allocation master plan rooted in community-oriented policing principles. This requirement is part of the approved Plan on Professionalization, which detailed steps and timelines are now fully incorporated, enforceable terms of this Agreement.

Paragraph 13 of the Agreement, entitled "Staffing and Community Policing," reads as follows:

> *"PRPD shall assess the appropriate number of sworn and civilian personnel to perform the different department functions necessary to fulfill its mission. To do so, PRPD shall conduct a staffing allocation and resource study. The study shall form the basis for a staffing and resource allocation plan that is consistent with community-oriented policing principles and supports the systematic use of partnerships and problem-solving techniques. To foster community-oriented policing, the plan shall consider deployment practices that offer officers opportunities to serve the communities in which they reside." (The underline is mine)*

Based on the Action Plan, the deadline to develop this study was June 2016. The PRPD has not met with the Plan's timeline, and it is unlikely to comply with it in the first part of 2017. In addition, the PRPD is in noncompliance with these detailed steps of the Plan for this requirement. Upon the insistence of the TCA, in March 2016, the PRPD began to assemble a working group to complete the staffing study. To date, progress has been slow even as the group has met monthly. The project lacked a strategic vision.

The working group is a team of representatives from the Office of the Superintendent and each of the Auxiliary offices. The group is led by the Auxiliary Superintendent for General Services. He has been ultimately responsible for the development of the work plan for conducting an evaluation of the Staffing Allocation and Resource Study.

Traditionally, there have been four basic approaches to determining workforce levels: per capita, minimum staffing, authorized level, and workload-based. Each differs in its assumptions, ease of calculation, usefulness, validity, and efficiency. The TCA has recommended an evidence-based approach to police staffing that addresses the needs of the PRPD based on consistent, long-term workload demands.

During these meetings, the TCA has recommended that the study focus on the following elements of an evidence-driven workload approach: (a) providing the PRPD, governmental officials, and the public with informative data on crime and agency performance; (b) measuring the effectiveness of preventive efforts including community-based and police-based programs which specifically targets crime prevention ; (c) uncovering patterns and trends in performance that can serve as best practices and facilitate bench-marking exercises; (d) measuring overall agency workload; efficiency; and effectiveness including the performance of specific divisions; (d) analyzing the factors associated with success or failure of various police initiatives; (e) providing comparative norms of performance across divisions and other police agencies; (e) furnishing baseline data for research, budget, and performance issues; (f) assessing budget expenditures directly related to crime control and service delivery; (g) forecasting future events for better police planning; and (h) assessing what worked when, where, why, and how as the PRPD moves toward becoming a more effective and efficient organization, among others.

From a data perspective, an evidence and step-by-step approach for conducting a workload-based assessment should include, at least, the following items:

(1) Examining the distribution of calls for service by the hour, day, and month. Calls for service can differ by the hour of the day, the day of the week, and the month of the year. Peak call times can also differ by agency. Knowing when peak call times occur can help agencies determine when they must have their highest levels of staff on duty.

(2) Examining the nature of calls for service. Reviewing the nature of calls can help better understand the work that an agency's officers are doing. Types of police work required can vary by area within a single jurisdiction and require agencies to staff differing areas accordingly.

(3) Estimating time consumed on calls for service. Determining how long a call takes, from the initial response to completed paperwork, is key to determining the minimum number of officers needed for a shift. This calculation is most straightforward when a single officer handles the call and completes resulting administrative demands (e.g., reports, arrests) before clearing it.

(4) Calculating the agency shift-relief factor. The shift-relief factor shows the relationship between the maximum number of days that an officer can work and works. Knowing the relief factor is necessary to estimate the number of officers that should be assigned to a shift to ensure that the appropriate number of officers is working each day.

TCA Fifth Semi-Annual Report | 2016

(5) Establishing performance objectives. This encompasses determining what fraction of an officer's shift should be devoted to calls for service and what portion to other activities. For example, an agency might build a staffing model in which officers spend 50 percent of their shift on citizen-generated calls and 50 percent on discretionary activities.

(6) Providing staffing estimates. Staffing needs will, as noted earlier, vary by time of day, day of week, and month of year, among other variables. Any police agency should distribute their officers accordingly. For example, a shift with only half the number of calls than another shift will require half the number of officers. These numbers may also vary by the type of calls, and the time and officers they require, in each shift. For example, one large urban precinct assigns two officers to each unit in its evening shift, affecting the number of officers needed for units to respond to calls. Another non-urban precinct responds to the same type of calls in different ways in different shifts (for example, sending a unit in some shifts, but requesting citizens file a report in person at a station during others)

Following these and other metrics, it is the assessment and the recommendation of the TCA that the PRPD's top priority in the next three to six months should be to develop an interim but comprehensive assessment in coordination with the TCA and the USDOJ. The TCA has enough expertise in his team of subject matter experts selected by the Parties to support the work of the PRPD in this area.

While this interim work is done, the PRPD should continue to work toward the implementation of a complete and thorough study. In the October meeting, the PRPD informed the TCA that the Department was issuing a Request for Proposals ("RFP"). The deadline for submission of proposals was November 4th, 2016.

The PRPD created an evaluation committee to review the submitted proposals. The committee consists of representative of the Reform Office, Human Resources, Information Systems and Technology, Grants, and Field Operations. The committee developed an evaluation rubric with the following criteria: experience, subject matter expertise, expertise, professional references, evaluation of the proposal and its content, services, and available resources. The committee has selected one of the companies that submitted the application. However, the committee will give the new administration the opportunity to evaluate the recommendation of the committee. The expected starting time of the project will be February 2017.

In conclusion, the fact that the PRPD is two and half years into the capacity building period and there is no objective way to measure and assess its staffing and resource capacities is nothing short of an inexcusable failure. One person is primarily responsible for this failure: the Police Superintendent. This assessment is the basis of the recommendation

of the TCA to the Court and the Parties that no additional promotions and transfer--except when absolutely needed--should be made until the study is completed and a complete overhaul of the merit system is in place. The Police Superintendent has ignored this recommendation on two prior occasions. As the TCA documents in this Report, the cost of these decisions to the implementation of the Agreement has been extraordinarily high in terms of public safety and the trust in the commitment of the PRPD to sustainable reform. The damage is done and cannot be undone easily.

With respect to compliance with paragraph 13 of the Agreement, the PRPD has acknowledged in its response to the draft Report that there have been delays in carrying out the study for the reasons mentioned in the Report. The PRPD agrees that this study should determine what the PRPD's personnel and resources needs should look like. The PRPD recognized that after two and a half years, they have not advanced enough to get the results they needed so that they can start adjusting the PRPD based on this needs study.

The PRPD acknowledges that this study will determine, among other things, how many police officers will be needed, in what areas they should be deployed, and the resources and technology with which they should be trained.

The PRPD has noted that soon the new appointed Superintendent will hold meetings for the hiring of an external audit company that performs this type of analysis.

Regarding the sign of non-compliance with the date of June 2016, PRPD notes that it is important to clarify that by recognition of the Parties, that deadline had been extended to December 2016 and is reflected in the approved version of the Action Plan on Professionalization. There has been recognition from the Parties that the ambitious nature of this study is an obstacle and the scope of the study is quite different from the scope of other jurisdictions. PRPD has also pointed out that, given the fiscal problem and the fact that this study is going to require the outsourcing of a company outside Puerto Rico that has the specialized knowledge to carry out this type of study, it was going to be done gradually. The PRPD has submitted a Work Plan detailing how this study will be carried out and this submission complies with the December deadline.

The PRPD also agrees with the TCA that Puerto Rico is facing an unprecedented fiscal crisis and this crisis affects the reform efforts of the PRPD. The PRPD wants to highlight the current fiscal crisis affects all areas of the Reform including, among other things, the maintenance of the structures and resources necessary to carry out the study required by Paragraph 13.

TCA Fifth Semi-Annual Report | 2016

# Promotions

Under the Agreement, the development of a staffing plan (Paragraph 13) and the adoption of merit-based promotions (Paragraphs 14 through 20) are intrinsically connected. Although they are two unequivocal directives, the PRPD has neglected compliance with the same time after time in the last two reporting periods.  This neglect is one the greatest obstacles, if not the most significant one, for the PRPD's to make progress toward the implementation of the Agreement.

Paragraphs 17 and 18 of the Agreement provide as follows:

> *"PRPD shall utilize competitive written examinations as a component of the selection process to award promotions through the rank of Captain. Written promotion examinations shall conform to generally-accepted professional standards for test validity and security and be designed to evaluate qualifications that are job-related and consistent with business necessity.  PRPD shall develop these examinations in consultation with the TCA based on generally accepted policing practices and in compliance with anti-discrimination laws."*

> *"All appointments to ranks above Captain shall be based on objective criteria that account for the knowledge, skills, and abilities to perform core management, supervisory, and leadership duties."*

As part of its promotional process, the PRPD is to publish a profile of responsibilities and qualifications for all ranks and identify the subject matter and laws that would be covered in each examination.  In addition to passing a written examination for all appointments through the rank of Captain, applicants are required to pass special courses at the PRPD's Police Academy.  A clean record, rid of sustained disqualifying administrative complaints, is also required.  Consistent with Paragraph 20, the PRPD shall establish specific criteria for the promotion of officers in direct supervisory roles.  In addition, Paragraph 20 states the following:

> *"Officers in supervisory roles shall not be rendered ineligible for promotion based solely on the number of civilian complaints filed against officers under their supervision. The nature and type of civilian complaints, particularly those complaints that are investigated and substantiated by evidence, shall also be weighed when considering an officer for promotion. Promotions of officers with pending investigations or disciplinary action in a matter alleging serious misconduct shall be held in abeyance until the investigation or disciplinary action is resolved."*

TCA Fifth Semi-Annual Report | 2016

In the TCA's Fourth Semi-Annual Report, he documented systemic shortcomings for the promotional process conducted in 2015. The promotional ceremony for these promotions took place in February 2016. At that time, given the problems identified by the TCA and the fact that the staffing study was not completed, the TCA recommended that the PRPD hold no additional promotions until both these issues were addressed.

In the post-promotion evaluation of the 2015 promotions, the USDOJ and the TCA agreed to assess together the validity of the promotional process given the importance of Paragraphs 14 through 21 of the implementation of a Professionalization plan. This assessment was conducted in two phases: the ranks from Sergeant to Captain and the higher echelons comprising the ranks of Inspector to Colonel. With regards to the promotions above the rank of Captain, it became apparent to the TCA that the files and documentation presented by the PRPD could not support promotions based on the criteria of the law requiring "an objective and scientific method" to determine the qualifications of each candidate for promotion. It was clear to the TCA that no standard criteria for evaluation had been established for such an important process in the PRPD. It was also apparent that the TCA has been misled by the PRPD leadership.

Based on these findings, the TCA recommended adhering to several commonly accepted police practices regarding promotion procedures. These practices include standardized packages, the creation of a table that satisfies all legal requirements regarding the skills identified and required by Law Number 53 of June 10, 1996, a concise glossary of terms of standard evaluation criteria, an interview process of candidates, peer evaluations, a strict list of training requirements (particularly dealing with supervisory roles, such as ethics), a clearly established profile of the rank to be promoted (need to meet requirements of published job description), an exhaustive examination of past complaints, the use of a merit-based career track model, examination of past leadership roles and accomplishments in the organizations they led, and the establishment of clear physical fitness requirements. All these requirements were consistent with Paragraphs 14-21 and were missing in one way or another in the PRPD promotional process.

In July 2016, the Police Superintendent announced to the press that the Office of Management and Budget had authorized another round of promotions even if the number of promotions and the timing could not be confirmed at that time.

In response to this decision, on July 20, 2016, the TCA submitted a letter to the Police Superintendent recommending that these promotions should not take place based on the following three arguments. First, the TCA noted that the PRPD was still in the very preliminary first stage of the Staffing and Resource Study and that these promotions were to be implemented without objective reference to the staffing needs of the PRPD as required by the approved Plan and the Agreement. The TCA also noted that there was

no connection between these promotions and any strategic goals or ongoing crime fighting plan. Finally, these promotions were not considering the problems highlighted by the TCA in his prior review of the 2015 promotional process. Specifically, the TCA was concerned that the PRPD was neglecting the standards outlined in Law 53 of 1996 and the need for the PRPD to develop "objective criteria" for promotions to high ranking positions.

In response to the concerns of the TCA, the Police Superintendent responded in a letter dated August 12, 2016. The Superintendent made reference to his authority under Law 53, article 5, to recommend promotions for high ranking officers. This was an odd argument because the TCA's letter never questioned the Superintendent's authority but rather brought to his attention the requirements under the Agreement and the current legislation. The issue was never the Superintendent's authority but rather noting the constraints under which such authority operates. Furthermore, the TCA was not addressing the issue of authority but rather whether decisions under such legitimate authority were good or bad, proper or improper, consistent or inconsistent with the Agreement.

In an even more surprising statement, the Superintendent then proceeded to claim that the implementation of Paragraph 13 was not connected to the promotional process. He maintained that his authority under Law 53 should not be limited by the completion of a "study." As the Police Superintendent stated in his letter to the TCA, "Nótese que dicho Artículo no supedita la realización de ascensos a estudios de campo alguno."[2] The Police Superintendent further argued that a meeting with his cabinet was all that was needed to make a determination of the PRPD's staffing and promotional needs. These arguments highlight the PRPD's complete misunderstanding of the demands of the Agreement regarding professionalization. First, Paragraph 13 is not a study for the sake of a study; it is a legal and policy requirement under the Agreement signed by the Parties. It is not optional; it is a mandate to which the PRPD is committed to. It is not a book on the library shelf; Paragraph 13 is a binding operational guideline to which the Parties have agreed to.

It also appeared that Police Superintendent was unconcerned of the obligations and commitment he had signed off under the Plan on Professionalization that he approved months earlier. Furthermore, the suggestion that a cabinet meeting is sufficient to make determinations of needs is absurd in the face of the PRPD's current commitment to undertake the study as described in the prior Paragraph. It seems that the Superintendent

---

[2] "Take notice that said article of the law does not subject the implementation of promotions to the completion of any kind of field studies."

could not differentiate between short-term which can be addressed through a meeting and long-term needs of the Department that require a comprehensive evaluation.

The Police Superintendent provided a similar response to the TCA's proposal regarding the need to link promotions to operational needs and crime fighting plans. The Superintendent claimed that criminal incidents are an ever-changing phenomenon and that promotions should not be tied to such phenomena. He reiterated that the PRPD's primary task is to fight crime and restore order. The TCA submits there is not a more relevant indicator to make determinations about personnel than the development of a long-term strategy against crime and disorder.

Finally, the letter from the Superintendent addressed the critical issue of standards for high ranking promotions. The Superintendent pointed out that, under the Plan for Professionalization, the timeline for the development of such standards was December 2016. However, he contended that he could not wait and that there was no indication that the PRPD was not operating under any standards in the meantime (sic). At that point in time, the Superintendent provided a very generic list enumerating seven standards, which were going to be used for the evaluation of the new set of promotions. In doing so, the Police Superintendent missed the point once again. His letter offered no explanation as to the need to rush these promotions when the Department was in the process of drafting concrete, relevant criteria consistent with the Agreement and, by the PRPD's own contention, this task would be completed in less than six months. The only logical explanation is that the Police Superintendent was less concerned with the setting of proper criteria consistent with the spirit and the letter of the Agreement than with his desire to exercise his authority prior to the expiration of his term. The position of the TCA is crystal clear: the terms of the Agreement are binding commitments, not general guidelines.

On August 25, 2016, the TCA delivered a letter to the Police Superintendent reminding the Police Superintendent that the capacity building period could not be used as a delay tactic and/or justification for the Police Superintendent to continue to operate as if the Agreement was not in place and under the same troubling past pattern of behavior. The fact that the PRPD is still under the capacity building period, rather than the period of compliance, should not be used to violate the terms of the Agreement. The Police Superintendent replied to this letter with a letter dated August 26, 2016, claiming that the response and arguments of the TCA were not proportional to the situation.

On August 30, 2016, the USDOJ submitted a letter to the Police Superintendent and the TCA. The USDOJ emphasized that it was imperative that the PRPD refrain from engaging in activities that would undermine present and future compliance with the Agreement. The USDOJ noted that, although strict compliance is not required during the

capacity-building period, this period cannot be used to implement policies, practices, or action that will have a detrimental impact on the implementation of the Agreement. The PRPD cannot revert to operating in pre-Agreement terms. Furthermore, the USDOJ highlighted that actual or perceived impropriety in the promotion process should be avoided, including promoting individuals based on political considerations. The USDOJ further recommended that the PRPD promotions should be open for review by the TCA before the promotions were finalized and were submitted to the Governor's Office.

On August 31, 2016, the TCA met with Governor Garcia Padilla and his team. During that meeting, the TCA presented the Governor his concerns regarding the promotions within the context of the Agreement. The TCA spoke about the requirements within the Reform and the need for external oversight of the process. The Governor agreed to promote more transparency and to initiate a fast track revision of Law 53 immediately.

After meeting with the Governor, the TCA and the Parties agreed to a review of the files and documents pertaining to the promotion of more than 200 members of the PRPD. The TCA and members of his team began to examine these records by reviewing six randomly selected files. The review of these files documented significant systemic problems with the promotions. The problem was particularly acute after the review of files from Internal Affairs (known as SARP, Auxiliary Superintendence for Professional Responsibility) and the Legal Division. This review documented the worst fears. Certain officers should not have been promoted.

In the post-promotion evaluation of the 2015 promotions, the USDOJ and the TCA agreed to assess together the validity of the promotional process given the importance of Paragraphs 14 through 21 to the implementation of a professionalization plan. This assessment was conducted in two phases: the ranks from Sergeant to Captain and the higher echelons comprising the ranks of Inspector to Colonel. With regards to the promotions above Captain, it became apparent to the TCA that the files and documentation presented by the PRPD could not support promotions based on the criteria of the law requiring "an objective and scientific method" to determine the qualifications of each candidate for promotion. It was also clear to the TCA that no standard criteria for evaluation had been established for such an important process in the PRPD. It was quite apparent that the TCA has been misled by the PRPD leadership.

Based on these findings, the TCA recommended adhering to various commonly accepted police practices with regards to promotion procedures. These practices include the following: standardized packages; the creation of a table that satisfies all legal requirements regarding the skills identified and required by Law Number 53 of June 10, 1996; a concise glossary of terms; standardize evaluation criteria; an interview process of candidates; peer evaluations; a strict list of training requirements (particularly dealing

with supervisory roles, such as ethics); a clearly established profile of the rank to be promoted (need to meet requirements of published job description); an exhaustive examination of past complaints; the use of a merit-based career track model; examination of past leadership roles and accomplishments in the organizations they led; and the establishment of clear physical fitness requirements. All these requirements are consistent with Paragraphs 14-21 and were missing in one way or another in the PRPD promotional process.


# Law 53


In accordance with Law Number 53 of June 10, 1996, 25 Laws of Puerto Rico Annotated, 1001 and 1005(e), the Superintendent of the PRPD has the authority to promote personnel to the ranks of Inspector, Commander, Lieutenant Colonel, and Colonel. However, there are some limitations to this power.  The statute requires that the process be "objective and scientific" and that the criteria employed must be part of the agency's rules and regulations (25 L.P.R.A. 1005).  The criteria include the following elements: (a) evaluation of the applicant's prior conduct, (b) leadership skills, (c) initiative and attitude, (d) academic qualifications, (e) years of service and (f) physical condition.  That section ends with the following mandatory legal disposition: "[T]he Superintendent must take into consideration the above-recited requirements to give his recommendation to the Governor. The Superintendent must prepare a "concise report" about the candidate, containing all information pertinent and necessary to demonstrate that the candidate meets the requirements."

As noted in the prior section, the Governor agreed to fast track an amendment to Law 53. On November 3, 2016, the TCA received the projected amendments to Law 53-1996. The TCA responded on November 8, 2016.  In his letter to the Police Superintendent, the TCA congratulated the PRPD on the proposed amendments which mostly responded to the agreements reached with the Honorable Governor of Puerto Rico, Alejandro Garcia Padilla, in the August meeting.  Creating a multi-faceted form of testing for the ranks from Inspector to Lieutenant Colonel, rather than following a merit system and a Board of Examiners recommendation, was among the most critical matters that were agreed to by the Governor in the meeting.

The letter from the Superintendent reiterated the current PRPD's position that promotions in the ranks from Inspector to Lieutenant Colonel be based on the "merit" system.  The TCA stands by the recommendation that the most objective method responds to a multi-

faceted form of testing rather than merit.  The TCA submits that the history of promotions in the PRPD has been highly partisan and no matter how much effort is placed in trying to define merit or enumerating attributes that may be considered meritorious, when it comes to deciding who deserves the promotion among those with "merit," the system turns subjective and suspicion becomes prevalent among the candidates.  This happens because gradations of merit are mainly in the eye of the beholder and there is no opportunity for a second opinion or external review.  Allegations of unfairness usually follow this scheme.  On the contrary, testing only recognizes merit in the highest grade.  A system based on recognizing who has the highest grade will never be called a meritocracy.  The next argument in favor of testing is that if the merit system is applicable only to higher ranked officers, then such application unduly discriminates against those in the ranks from Sergeant to Captain.  Due process of law, a paramount requirement of the Agreement, entails equal application and equal protection under the law.

During the first week of December 2016 the PRPD notified the TCA that the fast track amendment to Law 53 will not be proceed.  This is obviously in direct contradiction to the August commitment of the Governor.  The PRPD also informed the TCA that the proposed amendment will be submitted to the new Superintendent for review and consideration.  The TCA agreed to give the new administration and Police Superintendent the time to evaluate the current proposal and make appropriate revisions, if needed.

In response to the comments and recommendation of the TCA, the PRPD has noted that the development of a Bill to amend Act 53 was an activity contained Action Plan for Policies.  The deadline for this activity was March 2017.  However, the PRPD submitted a first draft of the amendments that addressed the issue of promotion by merit.  This document was discussed on several occasions with the TCA and the USDOJ.  At all times, the PRPD noted that the submission of these amendments to the legislature was an issue that was not within the jurisdiction of the PRPD and was a prerogative that the Executive held.  The PRPD understands that the prior Administration convened an extraordinary session but the role of the PRPD was minimal.  Through its communications with the TCA, the PRPD has sought to reiterate its total commitment to continue working on the draft while considering the recommendations of the new Legislature.

# The Consent Decree and Complaints of Unpaid Overtime

In his first semi-annual report, the TCA identified an important area of concern that was however not included in the Agreement.  This issue had the potential to project itself into

a prominent and sensitive issue in the intended reform process.  The TCA felt compelled to address matters about the compensation of police officers, including overtime and sick leave which were fraught with delays.  Those issues had created a mood of cynicism among the police rank and file, whose acceptance and effective cooperation with the Agreement is crucial to the success of the Reform.  The TCA noted that, although he was cognizant these important matters were not explicitly addressed in the Agreement, they deserved attention for broader implications.  Thus, for example, the lack of proper overtime compensation was having a negative effect on morale.  The TCA had observed first-hand and had received reports of work slowdowns and increased sick leave.  The TCA concluded that, although these controversies were being partly addressed by the PRPD, the situation was reaching a breaking point that could hurt the implementation of the reforms associated with the Agreement.

In October, these matters reached the courts.  The case regarding the unpaid overtime compensation of PRPD members was before the consideration of the United States District Court (Thomas E. Perez v. Puerto Rico Police Department and Commonwealth of Puerto Rico, et al., USDC-PR, Case No. 16-2849 (GAG)).

The matter began with a complaint by the Federal Department of Labor against the PRPD for unfair labor practices filed in the United States District Court for the District of Puerto Rico.  The matter addresses the claims of 2,642 enlisted and retired members of the PRPD asking for a total of $8.7 million in payments in arrears of overtime hours during the period between June 2010 and August 2014.

The Fair Labor Standards Act (FLSA) provides that an employee may accrue a maximum of 480 hours in compensatory time.  For any number of hours over said limit, the federal statutes prescribe that employees should receive monetary compensation.

The complaint argues that the PRPD failed to pay overtime compensation for all hours worked in excess of the maximum of 480 hours to thousands of employees.  It is further alleged that the PRPD did not pay for compensatory hours accrued at the time some of the complainants retired or filed their resignation.  Additional allegations in the complaint charge that the PRPD did not pay the cadets for hours of overtime worked and did not pay members of the Canine Unit compensation for the care of K-9 units.  There are also claims to the effect that the PRPD also failed to pay certain bonds or payments to approximately 100 officers who worked in the Federal "Task Forces."

As it relates to the situation of cadets, the claims against the PRPD indicate that Police Academy cadets were paid 40 hours per week, but the PRPD failed to meet payments for additional hours of participation in mandatory activities such as physical training, academic training, and study time (approximately eight hours of overtime each week).

Furthermore, for the years 2003, 2007 and 2009, the Federal Department of Labor identified violations of law for lack of overtime compensation.  These prior violations resulted in payments of $1.7 million to 340 employees in 2003, $3 million to 654 employees in 2007, and $1.5 million to 93 employees in 2009.

In October 2016, the Court designated the TCA as the federal monitor on this matter.  The presiding judge in the Police Reform Agreement Case, 12-2039 (GAG), commended the Parties for the resolution of the overtime matter.  The Court also noted that the TCA had cautioned about this matter in his first semi-annual report. (Docket No. 203 at page 7).  The Court told the Parties that the TCA was assigned to the case at no cost to the Commonwealth.  The Court felt compelled to designate him and put him at the Parties' disposal to ensure that this important matter of overtime compensation did not become a recurrent issue and interfere in the long-term with the Reform efforts.  Finally, the Court noted that an adequately compensated police force is essential to the overall morale of the PRPD during this critical time of Reform.

In response to the TCA draft Report, the PRPD requested that this issue be not part of the Report. The argument of the PRPD is that a discussion of this matter would have the potential to create confusion as it could be interpreted as part of the Reform Agreement. The TCA submits that, although there are connections between the two agreements, the Report makes it clear that the agreement on unfair labor practices is a separate and distinct agreement.


# Reorganization of the Drugs, Narcotics, Vice, and Illegal Firearms Bureau ("Drugs Division")


In prior semi-annual reports, the TCA has been critical of the operational readiness and protocols of the Drugs Division driven by the unfortunate reality of very shocking public scandals.  In his commitment to decrease these occurrences, the TCA provided literature, written suggestions, and recommendations to the PRPD to enhance the reorganization of this Division. The TCA also attended meetings and discussions with the PRPD and other stakeholders to provide input.

The history of the narcotics, vice, and firearms investigations by the PRPD is replete with allegations of corruption, misconduct, and civil rights violations.  Episodes of this history

TCA Fifth Semi-Annual Report | 2016

have been recurrent in past years with highly publicized stories of corruption. It has been publicly reported on various occasions that members of the Drugs Division of the PRPD have been arrested and convicted by federal and local authorities. This pattern of behavior has not changed significantly during this reporting period. The United States Attorney's Office for the District of Puerto Rico continues to indict police officers for running criminal enterprises whose crimes included robbery, extortion, and sales of narcotics, illegal firearms, and violations of civil and constitutional rights.

The USDOJ while conducting their investigation that led to the Agreement found that the Drugs Division "contributed to a pattern and practice of civil rights violations." More recently, the USDOJ expressed that they were "also concerned with the number of recent allegations of misconduct involving the Drug and Narcotics Unit and were also interested in following up on any corrective or preventive action that is being taken while the internal investigations are pending." The TCA has also learned of several similar violations, which were promptly reported to the PRPD and, on at least two occasions, to the FBI.

These immoderate occurrences prompted the Superintendent to determine the need for a reorganization and requested the assistance and recommendations of the TCA. On May 2016, the PRPD created a new General Order to reorganize and restructure this Unit and to correct deficiencies that have plagued this Division, which it appears has nurtured an environment and sustained a culture where officers believe they were impervious to detection and punishment. The purpose of this General Order is to reorganize the Division, redefine its organizational structure and procedures, set selection criteria of personnel, and improve training. New areas in the reorganization are guidelines for recruitment, transfer of personnel, increased supervision, polygraph examinations, training, specific duties, and responsibilities, and the internal restructuring of the unit for better quality control, evidence control, and data collection.

The TCA reviewed, commented, and provided recommendations to the PRPD on the reorganization and improvement of the Drugs Division, which the Superintendent approved on September 13, 2016. The TCA recommended and the PRPD adopted the following provisions in their General Order:

1: Specificity in the Evaluation Board regarding (a) maximum and minimum number of members, (b) the number of members that constitutes a quorum in order to conduct an evaluation and furthermore that (c) the quorum requirement should not be a small number of participants that could be unduly influenced or even overwhelmed, by the participation of the designated members, that is, the President and the Training Coordinator.

2. A separate Bureau to deal with illegal firearms. The Drugs Division has too many separate and diversified assignments. A Bureau for the Control of Illegal Firearms could

benefit from special training in the control of firearms and ammunition, something in dire need of consideration with the rising number of violent gun crimes and deaths.

3. Increased and diversified basic training and continuing education requirements to work for the Drugs Division, however, as mentioned above, the Division has many and diversified investigative and policing functions that necessarily will entail diversified training and the continued education of its members to the extent that it could ultimately affect or even impede to focus on investigations other than narcotics trafficking.

4. Development of a standard method of storing evidence and appropriate equipment for this purpose to avoid confusion and the possibility of contamination in evidence rooms. A perpetual inventory of stored evidence along with adequate forms to reflect a chain of custody to include a central computerized system to monitor daily the acquisition, movement, and disposition of evidence, will be the appropriate tool to bring transparency to a process subject to legal attacks and suppressions of evidence.

5. A confidential archive of paid informants reflecting payments kept at every unit and a monthly report submitted to the Division's Director to maintain accountability of active informants and disbursements made to each them. The eventual creation of a Manual for the handling of paid informants and tipsters should be made available for review.

Nevertheless, the current policy changes may fall short as the TCA sees the need that these initiatives and restructuring must be more closely linked to fighting internal corruption, reorganizing internal controls, and creating a basic baseline from which to measure progress. The TCA provided a list of recommendations to the Superintendent to help address these issues with the reorganization of the Division and to provide a clearer strategy.

# Domestic Violence and Mental Health Services

In the Fourth Semi-Annual report, the TCA noted that the PRPD was experiencing an increase in incidents of police-perpetrated violence, either in cases of domestic abuse or "blue-on-blue" violence. As statistics from the PRPD documented, each year a substantial number of cases of domestic violence were reported where police members were either victims or perpetrators.

In consideration of a well-publicized incident where an officer shot and killed three other officers at a police precinct, the TCA offered technical assistance to the PRPD. The goal

was to explore with the PRPD all available alternatives to address the requirements of the Agreement.  Also, the TCA recommended changes in policy to ensure that existing policies and regulations reflect voluntary requests for psychological interventions that shall not adversely affect an officer's career.

The current situation is one of utmost concern.  One way to visualize and learn about the problem is to conduct an analysis of the administrative complaints filed during this period.  The TCA downloaded information from the PRPD website where only one report was available.  The only available report was the monthly report for the month of September 2016.  The reports for the months of July and August were not found.  There was no report for the month of October.

The statistics for the month of September 2016 were as follows:

A total of 197 complaints were received.

Of these 197 filed complaints:

- 9 complaints of employment harassment
- 4 complaints of sexual harassment
- 8 complaints of domestic violence
- 10 disobedience and flouted orders
- 30 immoral conduct or conduct unbecoming of an officer
- 10 wrong use or loss of the weapon of regulation
- 5 discrimination

The largest number of complaints was received under the heading of "neglect, bias, incompetence," with a total of 83.

The report also highlights that there were 165 complaints investigated in September.  There were 287 additional complaints pending investigation.

During this reporting period, the TCA began his analysis of the services and/or the support that the PRPD provides to the members of service through the information obtained in the presentation of the PRPD in the public hearing held in September 2016.  The TCA also obtained additional information during the process of review of the Administrative Order of the Program of Assistance and Support to the Employee of the PRPD ("PAAE").

The following is the analysis of the data and services examined by the TCA:

The Division of Psychology and Social Work is the Unit with the responsibility of addressing aspects related to the mental health of the members of the PRPD.  This Unit works under the parameters of law No. 167 of 11 August 2002, as amended.  It is known as the Act to create programs in agencies of the Government, municipal governments and private company employees. ("PAE").

During the past years, the PRPD has been in non-compliance with the PAE Act by not providing preventive services. These services have been neglected or limited by the lack of human and fiscal resources.

With the review of PAAE, the PRPD begins to address these deficiencies and shortcomings.  The PRPD must provide training, and the implementation of this training is part of the Action Plans and subject to review by the TCA.  The implementation of training and new guidelines will be done by the social work staff.

The PRPD is also developing new guidance through a series of posters.  These posters will address services that it offers in compliance with PAAE.  The posters are an excellent way, in terms of cost and effectiveness, to begin to change the organizational culture of the PRPD.  They address the fact that there are people in the PRPD "that need help."

The TCA wants to note that the PRPD appears to be in non-compliance with Article 4 of PAE because the PRPD does not extend these programs and assistance services to the employee's family, as required by law. These services have been unattended by the lack of human and fiscal resources.

In prior reports, the TCA has noted that the PRPD is working with a minimum number of mental health professionals considering the total number of employees that the PRPD has (more than 13,000). Law 53 of June 10, 1996, permits the Superintendent to establish agreements with mental health professionals to address specific needs of the police department. These supports and services shall include a comprehensive range of mental health services that include, but are not limited to: readily accessible, confidential counseling services, critical incident debriefings and crisis counseling; mental health evaluations; and stress management training that comport with generally accepted practices.  However, the TCA has learned that there are only sixteen (16) mental health professionals currently assigned to assist a police force close to 14,000 employees.  This is a deficiency that PRPD must correct to execute proper mental health support to its workforce.

During the public hearing held in the Judicial Center of Mayagüez in September 2016, the PRPD reported that the current 'ratio' or relationship between the number of mental and

behavioral health professionals and the number of employees varies between 1: 1,200 to 1: 1,300.

Regarding insufficient personnel, there is the issue of the distance between the professional services and the members of services.  This low ratio represents the lack of specialized staff near the employees to provide consistent and adequate services.

These factors mentioned above come into play and they should be taken into consideration.  Policing is a profession where stress is an inherent part of police activities. For police officers, stress is part of the performance of their duties, and it negatively affects the motivation and disposition of the police officers to carry out their work. It is important for the PRPD to recognize and address this situation because it will allow the PRPD to optimize police officer skills and enhance performance as well preserve able personnel in service.

At present, the Division has a Central Office at the General Headquarters in San Juan. There are also "satellite offices" in the following command areas, each area with only one psychologist (who, from time to time, is to provide services to several police areas):

- Bayamón (Aibonito receives services in Bayamón)
- Carolina (Fajardo, Vieques, and Culebra receive services in Carolina)
- Humacao
- Caguas-Academy of the PPR
- Guayama,
- Ponce
- Mayaguez
- Aguadilla
- Arecibo
- Utuado

Based on these facts, it is not hard to imagine how difficult it is for an officer in places such as Vieques or Culebra to seek help in Carolina.

Every psychologist has a service contract of 100 hours per month. Out of these 100 hours, they need to allocate time to document their interaction with the officers.  The need to record these interactions and prepare paperwork means that they have fewer than 100 hours of direct service.  They are also supposed to perform functions of psychological evaluation of all staff, but presently they are only conducting these assessments for special divisions (e.g. drugs and narcotics).

The TCA concluded that the PRPD is in non-compliance with their own Special Order 2007-16, which provides that all members of the mid-range system, without distinction, must undergo a psychological evaluation process every three (3) years or whenever deemed appropriate. The TCA recommended the inclusion of the contents of such an order in the PAAE, but this recommendation was not implemented.

The TCA offered other recommendations. For example, the TCA recommended giving a "debriefing" session when a police officer uses his or her gun.  The TCA also recommended that the PRPD should develop a system for early identification of behavioral problems or situations at risk whereby supervisors can address problems with their subordinates.

Moreover, the TCA recommended the need to move to the development of a program that seeks to serve the well-being and quality of life of the members of the PRPD from a holistic perspective.  It is important to implement preventive efforts, including the development of comprehensive health and wellness programs and a prevention strategy. The TCA also recommended to the PRPD the strengthening and development of the services included in PAAE.  The TCA believes that extending the scope of support services to the PRPD employees should be a continual priority of the Department.

Through the study of staff and resources that will be carried out in accordance with Paragraph 13, the PRPD must identify the "staff" that is necessary and proper to offer these services.  This analysis should include best practices for this type of organization. and provide the necessary number of employees who must shape this program.

While the study is underway, the TCA recommends that all the efforts that are being conducted for arrangements with third party providers (institutions or professionals) be strengthened in response to the needs of the PRPD employees.  They must be able to receive the attention necessary when identified or required by the situation.

In response to this section of the Report, the PRPD noted that there is some concern about the cases of domestic violence by members of the PRPD.  The TCA Report has highlighted that, although the cases of agents that incurred in this crime are reported publicly, the PRPD public reports do not indicate the sentences officers receive stemming from these referrals. The PRPD submits that it is necessary to clarify that the Bureau of Anti-Discrimination Affairs of the PRPD conducts administrative investigations to recommend sanctions, but they do not collect specific data regarding the convictions of this type of crime. Since these are separate proceedings and convictions are handed down by the criminal courts following the filing of criminal charges, the PRPD argues that they have no jurisdiction over the results of particular cases.

# Community Interaction Councils ("CICs")

Paragraphs 209 through 213 require that the PRPD maintains Community Interaction Councils ("CICs") jointly with community representatives to facilitate regular communication and cooperation between the PRPD and community leaders at the local level.  In conjunction with these community representatives, the PRPD must select the members of CICs, which shall include a representative cross-section of community members and PRPD officers.   The PRPD must also allocate sufficient resources and authority to ensure that CICs possess the means, staffing, access, training, and directives necessary to fulfill their mission and the requirements of this Agreement.  Finally, the CICs must memorialize their recommendations to the PRPD in an annual public report that shall be available in PRPD facilities and on the official web pages of the Commonwealth of Puerto Rico and PRPD.

During this reporting period, the PRPD reviewed General Order 800-801 regarding CICs. This General Order establishes procedures for the Organization and functioning of the CICs. In September 2014, the TCA and the USDOJ approved this General Order under the parameters and requirements of the Agreement.   During this annual review, the Parties and the TCA agreed to incorporate the process of policy to the Central Committee as well as to the thirteen (13) area committees. This activity will be added to the workload of the committees moving forward.  This activity is consistent with Paragraph 212.

The TCA also attended the scheduled training for all CICs.  The TCA made several recommendations to the PRPD to make the training more practical and adequate to the concerns and priorities of the committee members.

Although the CICs have been in operation since 2011 (prior to the Agreement), the CIC's current members have gone through the selection process that establishes the Agreement and the General Order.

During this period, one of the recommendations of the TCA was that the PRPD should receive from the central CIC quarterly reports rather than the annual report required under the Agreement.  The goal of this recommendation is that, by the CIC submitting quarterly reports, the PRPD can respond promptly to situations brought for their consideration by the Superintendent without having to wait a year for the receipt of such valuable information and recommendations. The TCA also recommended that the annual and quarterly reports must be submitted through a formal meeting between the Superintendent and the members of the Committee.

Regarding the annual public report, TCA recommended that the PRPD should generate a report on the follow-up of the recommendations made and presented in the quarterly reports and the annual report, indicating how the issues were resolved and the results obtained.  These reports should be available in the facilities of the PRPD and the web pages of the PRPD and the Commonwealth.

The TCA notes that the current General Order meets the requirements of the Agreement and, in general terms, provides the necessary tools to operationalize the CICs properly. However, the implementation of the CICs under the Agreement has had its setbacks.

Among the concerns that have been raised in this process, is that the TCA has identified inadequate interactions by some representatives of the PRPD with the CICs. When there is poor communication between the PRPD and the members of the committees, it limits the work of the CICs.  The CICs have brought this matter to the attention of the TCA and the USDOJ.  These issues were discussed both in the public hearing of September as well as in a meeting with the TCA and the USDOJ held in October 2016.

The main objective of the October meeting was to allow the members of the CICs to voice their concerns without intermediaries and allow the participants in the meeting to have a greater understanding of the role they should play under the Agreement and the PRPD guidelines.  It was also important to discuss the role they play in the context of the Agreement and the reforms associated with it.

During the October meeting, the TCA indicated that the primary responsibility of the CICs was to serve as a liaison between the communities that they represent and the PRPD. The TCA emphasized that the members of the CICs do not represent the PRPD.  The TCA also highlighted that the meetings of the CICs must be open to the public.

As a result of this meeting, the TCA gathered information about the need to further attend to the following components in the implementation of the CICs: (a) the organization of the PRPD and the committees by command area; (b) the responsibilities of the facilitator of the PRPD; (c) the relationship between the Central Committees and local committees serving the different areas; (d) how to continue the efforts of conducting outreach and providing guidance on new general orders for a better understanding of their consequences, (e) the participation of the CICs in the revision of the policies; (f) the need to receive guidance on the implementation of the action plans; (g) participation in the preparation of the budget assigned to the committees and transparency about the obligations that are generated regarding how the money must be spent), and (h) the need for the PRPD to provide input on implementation of the recommendations made by the CICs'.

TCA Fifth Semi-Annual Report | 2016

In response to this situation, the TCA has been emphatic in recommending the CICs to proceed with the elaboration of a Strategic Plan and the drafting of their "By-Laws" so everything is clearly outlined.

During this reporting period, the TCA observed and participated in the training of the CIC members for the thirteen areas and Central Committee. There was a certain delay in the implementation of the training.  The failure to provide timely training resulted in: (1) confusion between the members of the CICs on the scope of the management of their activities, (2) difficulty to establish working groups under the correct parameters, and (3) the extension of the term of the existing committees for one additional year from the date on which the training was performed.

The TCA and his team had the opportunity to participate in some of the training sessions and provided the PRPD with specific recommendations about how to improve the training.

Finally, the TCA has recommended the participation of the members of the CICs in the elaboration of their annual operating budget. Regarding the budget of the current fiscal year (2016-2017), this activity was not conducted as required by Paragraph 211.  The TCA will monitor this issue and will participate in meetings with each of the CICs.

In response to the draft TCA Report, the PRPD acknowledged that the TCA has identified inappropriate interactions between members of the PRPD and members of the CICs. The PRPD does not know the full extent of these interactions and what specifically the TCA refers to. The PRPD has requested a meeting in order to put the PRPD in a position to resolve this matter.


# Paragraph 241: Community Surveys and Focus Groups


Paragraph 241 of the Agreement establishes that in assessing the PRPD's overall compliance with and the effectiveness of this Agreement, the TCA shall conduct a reliable, comprehensive survey of members of the Puerto Rico community regarding their experiences with and perceptions of PRPD once during the first three years of this Agreement and annually thereafter. The community survey should be statistically valid, based on a sound methodology, and conducted by an independent entity.  This community survey shall include measures to ensure input from individuals of each demographic category. The survey shall also assess the number and variety of

community partnerships with PRPD and the depth and effectiveness of those partnerships. Specifically, the survey shall:

a) include interviews with a random sample of residents of Puerto Rico, PRPD officers, and detainees arrested by PRPD within the past week;
b) ensure the anonymity of all interview participants; and
c) survey participants regarding community-police relations; PRPD's integrity, effectiveness, and service; and how it treats members of different demographic groups.

The Agreement required that the TCA conduct a survey of these three populations by an independent entity measuring and reporting on the experiences and perceptions of these groups on police-community relations. The persons and groups surveyed consisted of residents, detainees, and PRPD members. The first survey began on Aug 14, 2015 (resident survey), and the last survey was completed on April 12, 2016 (detainees).

It was important that these surveys included a representative sample of each demographic category of the population. Residents of Puerto Rico, PRPD officers, and detainees arrested by PRPD were surveyed anonymously and were asked about the state of community-police relations, PRPD's integrity, effectiveness, and service; and how the PRPD treats members of different demographic groups. Because of these three separate surveys and their findings, the TCA made specific recommendations to the PRPD.

The police officer survey, which was conducted from November 8, 2015, to December 19, 2015, is a historical precedent for the PRPD. This survey is to serve as a foundation for future surveys against which real internal change can be measured, and how well the Agreement is meeting its purpose of sustained constitutional policing. This survey addressed the work-related behavior of officers and supervisors, as well as improvements promoted by the Agreement.

The detainee survey, which was conducted from February 29, 2016, to April 12, 2016, examined those who were being held at PRPD precincts and inquired on their treatment, cell conditions, and officer behavior.

Though the TCA recognizes that this was the first set of surveys, the findings that he found most informative and disappointing at the same time were those that indicated that 20% of PRPD officers had little or no knowledge of the reform process. With a cadre of approximately 15,000 officers, to have 3000 officers without a clear understanding of the Agreement and its specific reporting requirements, it portrays a dim view of the professionalism of the PRPD. Fortunately, this shortcoming is being rectified through

increased training and continued discussion at all command levels to the rank and file members.  Nevertheless, once this deficiency was made known to the Police Superintendent, he immediately addressed all thirteen (13) area commanders to institute immediate training.

Similarly striking to the TCA was the finding that 80% of the residents of Puerto Rico were unfamiliar with the Agreement and the reform process.   Once this was made known to the Superintendent, there was an immediate response through increased social media and advertising to raise public awareness so that the continuing efforts by the PRPD to reform its organization do not go unnoticed or unappreciated by the residents they serve.

The TCA continues to collaborate with the PRPD and the contracted social scientists to fine tune each survey, so that it captures the sentiment, knowledge, and concerns of the community and enhances the community policing paradigm.

In the Fourth Semi-Annual report, the TCA noted a commitment to expanding the survey to all sectors of the community by using focus groups.  This methodology provides an in-depth analysis of people's concerns, fosters continued dialogue with the PRPD, and facilitates the design and implementation of remedies to address concerns.  Specifically, the survey and focus group experts will speak with members of the LGBTQ, Dominican, Chinese, and homeless communities, and CIC representatives to aid the PRPD to use all survey findings to increase their interaction with all communities, consistent with Paragraph 205 of the Agreement.  The TCA will incorporate new groups into the dialogue as they are identified.

During this reporting period, the TCA has conducted conference calls and meetings and has made all necessary administrative arrangements to carry out the work of the focus groups.

The TCA will undertake a study based on the collection of qualitative data of eight (8) communities in Puerto Rico from homogeneous focus groups.  Through the study, the focus groups will be involved in a qualitative research designed to study the opinions or attitudes of the eight groups.  They will meet in small groups of 6 to 12 people assisted by a moderator and researcher or analyst.  The moderator will provide questions and lead the discussion on the Agreement and the intended reform of the PRPD. These activities related to the focus groups will give continuity to the first surveys in accordance with Paragraph 205, as well as measuring progress as defined in the Action Plans.

Dr. Richard Blanco Peck, the consultant of the TCA, will be responsible for the activities related to the focus groups which includes the writing of the final report.  The focus groups will have the opportunity to review and make recommendations to the moderator about

the questionnaires used to survey the community and other relevant matters.  In these focus groups, the participants will be asked about the following areas of the Agreement: use of force, searches and seizures, equal protection and non-discrimination, interaction with the community and public information, administrative complaints, internal affairs, and discipline.

The International Consortium of Political and Social Research of the University of Michigan has ranked the summary and findings report about the three surveys.  Of 548 studies, the report is ranked number 10 for Puerto Rican issues.  Of 1,640 studies on policing, the report is ranked number 64.  Finally, of 3,744 surveys, the report is ranked number 103.

# Policies, Public Information, and the Community: GRUCORPO

The "community working group for the reform of the police" (GRUCORPO) is intended to ensure the participation of communities and independent organizations in the reform process of the PRPD.

In November 2015, the PRPD objected to the participation of GRUCORPO in the discussion of policies because GRUCORPO had posted on the internet drafts of the various policies under review to receive comments from the public in general.  At that time, the Police Superintendent gave orders that policies not be shared with GRUCORPO until GRUCORPO signed a confidentiality agreement.

The position of GRUCORPO was that these actions by the Police Superintendent were incompatible with the principle of transparency and community involvement required by the Agreement.  They argued that the PRPD should not restrict access to information to a limited number of members of the community.  They contended that it was important information and that this information should be available to the community in general so they could provide meaningful comments.

The position of the PRPD was that publishing drafts of policies could induce error into both, community members as well as members of the PRPD.  The PRPD also argued that these drafts are "confidential" or are protected by the privilege of "attorney's work product."  Rule 505 of the Rules of Evidence of Puerto Rico defines the "work product privilege" as follows: "the protection provided to information that is the product of the work

of a party or of the person who is a lawyer, consultant, surety, insurance company or agent of that party, prepared or obtained in advance, or as part of an administrative or criminal investigation or civil procedure". They further argued that exposing drafts of policies to the scrutiny of the community, in general, can damage the image of the PRPD when exposed to an unfinished product.

The position of the TCA has been clear since the onset of the controversy. It is very positive indication, as it relates to the Agreement, that the public gets engaged in the reform efforts. The PRPD should think of this process as a public hearing which is normally carried out under the "law of administrative procedures" (LPAU) for the adoption of a regulation affecting the public.

The TCA submits that this category of requests, such as the one made by GRUCORPO, raises the level of trust and engagement between the PRPD and the community in general. Secrecy in public affairs should be the exception, not the norm. Furthermore, in this case, there is no question that the community plays a key, integral part in the successful implementation of the Agreement. They cannot and should not be excluded from participating in policies that will affect their lives.

Although the TCA has made public his position, the TCA has engaged in an active process of mediation between the Parties, the PRPD and the GRUCORPO. The objective of the TCA has been to reach consensus and restore confidence between the Parties. The TCA strongly believes that a collaborative environment is beneficial to all.

To date, the situation is still pending. During a meeting at the ACLU in August 2016, the Parties sought to reach a consensus on the most appropriate process for the review of policies and the need to make them accessible to the community in general. The USDOJ and the TCA also participated. After an extensive discussion, where both Parties exposed their respective positions, the PRPD requested from GRUCORPO time to find a way to install a series of electronic safeguards so the draft document would be protected electronically from editing or manipulation. By the end of this reporting period, the PRPD has agreed to develop a regulation to set forth a strategy of public access to information and public disclosure. We expect additional information from the new administration to determine the appropriate timeline.

# Information Systems

During the reporting period, the TCA and members of his team conducted various site visits and held meetings with members of the PRPD's information System team. The

primary objective of these meetings and site visits was to coordinate closure and finalization of the General Order for Information Systems and Technology ("IT"), the IT Action Plan, and to monitor the overall progress being made in IT.  Other topics reviewed in depth during these visits included;

1. The Office of Technology Reorganization proposal
2. The highly significant context of the Office of Technology's and CIO's relationships with leadership and customers for the effective implementation of IT Governance and oversight
3. Conceptual overarching assessment and monitoring methodology which must include the definitive alignment of guidance (leading to actions required) such as the decree, policies, General Orders, Action Plans, and tasks.

The TCA proposed broad array of topics for review such as contract review, Zones of Excellence visits, and review of the CAD Lab at the Academy.  However, the PRPD also narrowly scoped their focus for discussion limiting the ability of the TCA's team to conduct a systematic and systemic analysis. While the Reform Office has provided extensive support to the Chief Information Officer ("CIO") in this area moving forward will require continuing explicit examination of topics relevant to the Decree during subsequent on-site visits.  This can be accomplished with availability of the translated IT Action Plan and publishing of the IT Action Plan "spreadsheet," which as of the end of this reporting period was near completion. This spreadsheet orders, aligns and reconciles the specific actions required of the PRPD CIO and IT Action Plan in direct support of tasks required of the other ten (10) Plans necessary for compliance.

Finally, it is important to also note that IT efforts in the Zone of Excellence of Utuado are proceeding effectively.  The Sergeant leading IT in the Utuado precinct is engaged and appears to be supported by local supervision and by the PRPD management, the CIO, and the Academy.  The accomplishments at Utuado in the development of forms, CAD, or activation of embedded GPS should set a baseline expectation with regards to what is achievable across the PRPD, both in the Zones of Excellence and the command areas. This is an area of demonstrated progress.

The assessment of the TCA is that progress continues to be made by the Office of Technology and Reform regarding transformation and capacity building in IT.  However, it is becoming more noticeable that clear, undeniable support from the Superintendent is a must.  Finally, there are persistent concerns that the imminent governmental transition may likely have detrimental impact on continuity of the IT reform efforts and that appropriately planned staffing is critical to the PRPD CIO in order to maintain the pace of the transformation formalized in the other Action Plans.

# The Fourth Public Hearing

On September 1-2, 2016, the Hon. Gustavo A. Gelpí, United States District Judge, held the fourth Public Hearing of the Agreement for the Sustainable Reform of the Police of Puerto Rico. The Hearing was held at the Commonwealth's Judicial Center in Mayaguez. The focus of the hearing was on updating and informing the Court and the public of the advances achieved by the Police of Puerto Rico in complying with the stipulations in the Agreement and affording various community groups the opportunity to be heard on issues related to police practices and their views on what needs to be done in regards to their rights and security measures needed for public wellbeing.   A permanent component of the Agreement is the inclusion of the community in this reform process. In view that the setting for the hearing was the township of Mayaguez, particular attention was placed on the Western side of the Island. Just like in the other two previous hearings, participation came from a varied group of participants that included police officers, community groups, community leaders, and influential personalities.

Official minutes of the Hearing are available to the public.  The TCA's comments to the Court at the hearing were as follows:

"Honorable Judge Gustavo A. Gelpi, Police Superintendent José Caldero, Ms. Maritere Rivera Corujo, Mr. Luis Saucedo of the USDOJ.  All present.

As the Technical Compliance Advisor ("TCA"), my team and I were chosen by the Parties and approved by this Court to assess and report the progress and compliance in the implementation of the Agreement for the Sustainable Reform of the Puerto Rico Police Department.  Our mission is to ensure that such implementation is in compliance with principles and values of constitutional policing, professionalism, and effective enforcement that has the confidence of the community.  Central to the role of TCA in evaluating compliance with the implementation of the Agreement is producing reports for public consumption. Equally important is our work in providing technical assistance and making recommendations to the Parties to ensure an effective implementation of the Agreement.  This role in making recommendations to the Parties and providing technical advice to the police is especially relevant during the first years of the Agreement, and noted as the process of "capacity building."  The TCA has focused and stressed that role of assistance and cooperation with the police and the Parties since inception of the Agreement.

In the month of June 2016, the PRPD presented its Fourth Progress Report and, in July, I presented to the Court and the Parties the fourth semi-annual report.  In my report, I

documented the enormous progress, (and I would like to emphasize this term, "enormous progress") that the police carried out over these past two years, but particularly in the last few months, in the implementation of various requirements of the Agreement. The report documented the work of the police in completing the plans of action in the eleven areas of compliance, along with the production of an innumerable number of policies and training manuals; as well as, the work of the police in approaching the community, in particular the implementation of the new CICs.

In the report, I also documented that my office had complied with the requirement 241 of the Agreement of conducting surveys of the public, the police, and detainees. These surveys will be used to make informed decisions that will enable us to better understand perceptions of the Puerto Rico police and community members on the reform and its progresses.

There are other elements of progress which, although referred to directly or indirectly in my report, I would like to highlight here today. First, I would like to recognize the active work of the police in the implementation of Paragraph 13 of the Agreement, which requires the Police Department to carry out a complete study of its needs in human and technical resources. Although the police have not complied with this requirement, the collaboration between the police, the TCA, and of the U.S. Department of Justice are consistent. This project shows the importance of having a strategic vision that structures all the initiatives in the fight against crime and the implementation of the sustainable changes of this Department within a paradigm of community police.

Also, I would like to acknowledge the striking transformation by the Police Academy. The Academy is the center of the reform not only because of its training responsibility but the future of the success of the reform depends upon its members understanding the new protocols for constitutional policing outlined in the Agreement and delivered to the entire Department through training. The Academy, as an agent of change, serves as a point of entry and exit of all the changes that are being carried out through the reform. As the surveys revealed, the Police of Puerto Rico is an institution very experienced, but with a high number of members of the Department that are closer to the age of retirement and separation. It is for this reason, among others, that we have recommended in the report, and in other conversations with the police, which is vital for the progress of the reform, for the Police Department to consider the implementation of at least two annual classes of cadets. This measure would be highly beneficial for the rejuvenation and the transformation of the police.

[In response to this recommendation by the TCA, including the recommendation identifying funds in fiscal year 2017 for a new class from the Police Academy, the PRPD agrees with the principle but has a different recommendation. The PRPD proposes that

the recruitment and launch of a new class Academy must await the results of the Personnel and Resources Study to ensure that personnel decisions are made in accordance with the Agency's operational needs. As the TCA rightly states in his letter – the PRPD argues - this study is the cornerstone of the reform of the area of professionalization and the basis for the plan for identifying the need for personnel and resources rooted in the principles of community policing].

Another area that I would like to highlight is the area of the promotions and professionalization and the compliance with requirements of Paragraphs 14 to 21 of the Agreement. This week I have met with the Governor of Puerto Rico, Honorable Alejandro Garcia Padilla. In this meeting, I had the opportunity of discussing the need of introducing greater transparency to the process of promotions. The Governor has suggested an immediate review of Law 53 of 1996. Also, we have determined that it is important that there is a process in place through which current promotions can be verified so that they do not adversely affect the Reform. In all of this, I will work with my team, the police, and the Parties to ensure that there is strict compliance with the requirements of the Agreement.

The TCA, recognizes the interdependence of the compliance with the requirements of Paragraph 13 of the Agreement, the role of change instituted by the Police Academy, the need to graduate new cadets, and the rigor in the promotional process. We will work together, in cooperation with the police, and will advise and provide useful recommendations to ensure compliance with the terms of the Agreement.

In the next months, there are many substantive areas that will require our attention to advance the reform. One of the areas that we will pay a special attention is the well-being and mental health of police officers. Along with the revision of the General Order of employee assistance, the TCA will be ensuring that the PRPD provides a suitable selection of services to its personnel. At present, there are a limited number of professionals and resources available to meet the needs of the PRPD.

[In response to this issue, the PRPD noted that it was meritorious to clarify that an Employee Assistance and Assistance Program has existed in the PRPD for several years, and has continued to offer services to employees and their families in an uninterrupted manner. Compliance with this Program is monitored by AMMSSCA through the issuance of compliance certifications (which the PRPD is to share with the TCA). The PRPD pointed out that what did not exist was an Administrative Order that regulated the program. The PRPD has committed to develop this Order in collaboration with the TCA and the USDOJ. One of the objectives of the program is the implementation of prevention initiatives. These initiatives have been redesigned and extended through the proposed regionalization of services contained in the new order].

The TCA will also review disarmament protocols.  In conversations with several commanders, it is clear there is an urgent need for a well-designed process to disarm officers under appropriate circumstances.

The TCA will continue working with the police to identify obstacles to the implementation of the requirements of the Agreement and the Action Plans.  The TCA will document and share the PRPD "lessons learned" from its Core Team on-site visits.  As part of such visits, the TCA will continue to use "ride-alongs" and other tools to evaluate situations related to the use of force, searches, non-discrimination, and other police activities recognized in the Agreement.

Finally, I would like to recognize the budgetary discipline of the Police Department in the implementation of the budget dedicated to reform.  In this time of such severe budget limitations, the Police Department has done a commendable job in the last two years and has about $28 million dedicated to the implementation of various aspects of the reform.  My office will continue to provide technical assistance working with the police to ensure funds allocated to the reform are used to advance the objectives of the Agreement."

# Mediation

Currently, the PRPD has only one way to handle and resolve citizen complaints, that is, by investigating them and setting discipline in those cases in which it finds misconduct.  The TCA recommends that an effective system for resolving citizen complaints against police officers needs to incorporate meaningful informal, alternative dispute resolution tools if the PRPD wants to have a valid alternative to the current system.  To that end, during this reporting period, the TCA has met with national experts in mediation to explore what steps must be taken toward the implementation of a mediation program.

In supporting the implementation of mediation programs to resolve civilian complaints, mediation advocates argue that alternative, non-traditional complaint handling procedures offer greater satisfaction with the complaint process for both complainants and officers.  Empirical research validates this argument.  Advocates also indicate that efficiency arguments support the growth of mediation and other alternative dispute resolution programs.  Cost-analysis studies indicate that mediation programs are, on average, less costly than investigation procedures.  Finally, many scholars and mediators argue that police officers *may* learn from the mediation process and that this learning experience *may* affect their future interactions with citizens.

The once highly controversial notion of publicly resolving citizen complaints through mediation against the police has recently received increased public acceptance, which has also resulted in greater policy and academic attention. No matter what the reasons are for this change in perception, the setting of strong and robust mediation programs is generally assumed to add value to the communities it serves. In this sense, a strong system to resolve citizen complaints through mediation is one of the most common policy options which are now available to public officials and policy decision-makers in response to public demands for greater levels of police accountability.

As already indicated above, there is ample evidence in the literature about the limitations of the investigation or "rule enforcement" model. The disparity between the goals of the complainant and the rigidity of the process, the certitude that many abuses are underreported, the inability to treat different cases differently, the absence of case triage (priorization), or the fact that even the most comprehensive and fair investigations often fail to resolve complaints (i.e., un-sustained findings) are often noted as signs of these limitations. Experts argue that the narrow focus of the adversarial approach prevents the development of any comprehensive strategy aimed at improving policing and minimizing abuse. A comprehensive strategy should include a variety of tactics and tools – the development of data gathering and data analysis task forces identifying patterns and problems; peer-review procedures emulating legal and medical professional boards, increased line supervision mechanisms, systematic auditing, case triage, and the broad implementation of informal alternative dispute resolution procedures - particularly mediation.

In short, the TCA recommends that the PRPD should strongly consider the implementation of a mediation program in the near future. National experts argue that mediation programs offer two potentially significant contributions to civilian oversight systems. The first benefit is a contribution to the complaint process itself as mediation brings to the table all parties with an interest in the process - complainants, officers, the police department, the review boards, and the community. The second benefit is a contribution to the type of individual, specific, face-to-face form of accountability that mediation represents, i.e., mediation benefits to the concrete parties that meet to resolve the specific conflict that originated the complaint.

Other experts have further elaborated upon their original idea of contributing factors and have identified twenty potential benefits of mediation as it affects police officers, complainants, the complaint process, police accountability, community policing, and the criminal justice system at large. Four of these potential benefits are very concrete. For instance, we can argue that mediation benefits the complaint process in three major ways – mediation is cost beneficial, has higher success rates, and it is a more efficient

complaint processing method.  The fourth contribution is the benefit of bringing greater satisfaction to the participants in the complaint process.

Finally, mediation experts point to the fact that there are many other potential benefits, such as the notion that mediation will bring potential changes to police culture, a sense of empowerment, or that it will lower crime rates.  University of Nevada at Las Vegas Law Professor Raymond Patterson agrees with this assessment of the potential benefits associated with setting up a mediation program – he was the first director of the NYC mediation program established in 1997.  Consistent with the literature, he advances from his personal experience in the real world of mediation the notions that (i) mediation is a better way of resolving many citizen complaints due to the high success rate of cases that make it to the (mediation) table, and (ii) both officers and civilians may learn from the experience.

TCA Fifth Semi-Annual Report | 2016

# Section IV

## Projected Activities: Paragraph 205(e)

Consistent with Paragraph 250 (e), the TCA will continue to work in the upcoming six months providing technical assistance and review for the policies that the PRPD will submit in subsequent months. The TCA will continue to provide support to the Police Academy while emphasizing on more comprehensive IT technical assistance. The TCA will also work with the PRPD in the review of the pending and outstanding training modules.

Some areas of attention during the next six months are as follows:

1. Consistent with Paragraph 250 (e), the TCA will continue to work in the upcoming six months providing technical assistance and review for the policies that the PRPD will submit in subsequent months.

2. Will continue to provide support to the Police Academy while emphasizing more comprehensive IT technical assistance.

3. Will continue to conduct random visits to districts, precincts and units to determine that records relating to incidents of use-of-force have been prepared and completed.

4. Will conduct random visits to districts, precincts and units to determine whether the Supervisors of the PPR have conducted reviews and investigations on use-of force.

5. Will continue to monitor the implementation of the NIBRS policy. The TCA will review the production schedule and will interview IT staff to monitor it.

6. Will continue to support the implementation of Paragraph 13.

TCA Fifth Semi-Annual Report | 2016

7. Provide support to the Court in the implementation and execution of Public Hearings.

8. Continue to provide technical assistance related to evidence rooms inspections.

9. Continue the execution of Paragraph 241 (Focus Groups Survey)

10. Continue to meet with stakeholders to ensure Reform information is properly disseminated and relations are developed.

11. Continue with the visits to the Zones of Excellence to assess progress.

12. Conduct "ride-alongs" to verify compliance with new established policies.

13. Continue to monitor the progress of the PRPD Information Technology Infrastructure development.

14. Closely Assess the progress of the Drug, Vice, and Illegal Firearms Division.

TCA Fifth Semi-Annual Report | 2016

# Appendix

## TCA Activities and Community Engagements

### *Monthly meetings with the Parties*

- In accordance with Paragraph 253 of the Agreement, the TCA has conducted monthly meetings with all Parties during this period, for the considerations of the pending matters. Also, continuous written and telephone communications have been made on a regular basis to ensure the effectiveness and timely response to the situations regarding the status of implementation of the Agreement.

- Assistance and participation in Fourth Public Hearing (Case No. 12-20139) held on September 1-2, 2016.

- During the past six months, the TCA has maintained constant communication with the Hon. Gustavo A. Gelpí, Judge for the United States District Court of Puerto Rico, for issues or situations that have required his intervention.

- Throughout this period the TCA has conducted more than 15 meetings with different police agents *of the PRPD*, for the attention of specific claims and/or complaints that have against the agency because of alleged violations to their administrative due process.

### *Meetings and activities in accordance with Paragraph 254 of the Agreement*

Meetings with Puerto Rico Government's Office

- Hon. Pedro Pierluisi, Esq., Puerto Rico Resident Commissioner (July 2016)
- Maria Teresa Rivera Corujo, Esq., Governor's Representative in the Agreement for The Sustainable Reform of The Puerto Rico Police Department (August 2016)
- Hon. Cesar Miranda, Esq., Secretary of Justice of Puerto Rico (August & December 2016)

TCA Fifth Semi-Annual Report | 2016

Meetings with Federal Government Officers:

- TCA meet with Douglas Leff of Federal Bureau of Investigation (FBI) Agency (August & October 2016)
- TCA meet with Antonio Cordova of Housing Urban Development (HUD) (September 2016)

Meetings with Representatives of Executive Agencies:

- Wanda Vázquez, Esq., Office of the Women Rights' Advocate (August 2016)
- Iris Miriam Ruiz Office of the Ombudsman (September 2016)
- Georgina Candal, Esq., Puerto Rico Civil Right Commissions (August & September 2016)

Meetings with Mayors and/or Municipal Security Commissioners:

- Ángel Martínez, Bayamón Municipality Security Commissioner (October 2016)

Meetings with Puerto Rico Police Reform Unit:

- Frequently meetings with Police Superintendent (August, September, & October 2016)
- Frequently meetings and communications with Colonel Clementina Vega, Director of the Puerto Rico Police Reform Office, and other personnel of the PRPD.
- Monthly meetings with the Police Reform Unit designated personnel for the review, analysis and comments on the Action Plans presented by the PRPD.
- Numerous meetings, conference calls and documents' presentation with review of the politics of the PRPD with the Reform Unit's professionals and/or with the USDOJ and PRDOJ for the analysis, discussions and technical support to the final drafts of following Generals Orders, Policies, Actions Plans and PRPD Forms. Please see Table
- TCA Core Team meeting with Police Reform Unit and other divisions (August, September, October and December 2016)

Meetings with Puerto Rico Police Department representatives:

- Several visits to the Police Academy, and meeting with Col. Hernandez de Fraley and her staff (July, August, October and December 2016)

TCA Fifth Semi-Annual Report | 2016

- Meetings with Superintendence of Professional Responsibility known by its Spanish initials as SARP (August, 2016)
- TCA and TCA Constitutional Lawyers active participation during this period with PRPD's Board of Examinations for Promotions (July and August 2016)
- Meeting with Col. Ramírez from Caguas area Headquarters (August 2016)
- Meeting with Col. Rosado from Mayagüez area Headquarters (August 2016)

Visits and meetings to Police Regional Headquarters and Police Stations and Specialized Units:

- TCA and Core Team visit to Aguadilla Police Headquarters (August 2016)
- TCA and Core Team visit to Mayagüez Headquarters (August 2016)
- TCA and Core Team visit to Aibonito Headquarters (July 2016)
- TCA and Core Team visit to Canine Unit in Bayamón (October 2016)
- TCA and Core Team visit to Ponce Headquarters (July 2016)
- Visit to police Fire Range at Gurabo (August and September 2016)
- Core Team visit to Zone of Excellence Quebradillas (October 2016)
- Core Team visit to Zone of Excellence Utuado (October 2016)
- Core Team visit to Zone of Excellence Bayamón (October 2016)

Visits and Meetings to Police Specialized Units:

- CIC, Drugs and Narcotics Arecibo, Aibonito, Mayaguez and Aguadilla Units (July and August 2016)
- CIC, Use of Force Unit in Mayaguez, Aibonito and Aguadilla (July and August 2016)
- San Juan SARP Unit (July 2016)

Meeting and communications with representatives of the following Puerto Rico Police's associations and others worker's union:

- Ismael Rivera, Police Association (August 2016).
- Gregorio Matías, Police Organize Associations (September 2016).
- Diego Figueroa, Federación Unida Policias Organizados (August 2016)

TCA Fifth Semi-Annual Report | 2016

Meetings and activities of the Community Interaction Council ("*Consejo de Interacción Ciudadana*")

- Open Meeting for Yauco Area "Agreement for the Sustainable Reform of the PRPD presentation in Yauco (June 2016)
- Open Meeting for Caguas Area "Agreement for the Sustainable Reform of the PRPD" presentation in Caguas (June, 2016)
- Open Meeting for Vieques Area "Agreement for the Sustainable Reform of the PRPD" presentation in Vieques (November 2016)

Meetings and activities of the Community Safety Council ("*Consejos Comunitarios de Seguridad*"):

- Meeting with Milagros Catala in Naranjito Cedro Arriba Community Safety Council (September 2016)


Meetings with Community Leaders and other interaction community's activities:
- Meeting with Tati Escobar Office of Advocate for Individuals with Disabilities (September 2016)
- Meeting with Cecilia La Luz from "*Centro Comunitario LGBTT*", Transgender Group (August, September & October 2016)
- Meeting with Modesta Irizarry, Loiza community leader. (June 2016)

Others Groups of Interest Meetings (Stakeholders):

- William Ramírez, Esq., ACLU (June, August & October 2016)
- Professor Richard Blanco Peck, PhD., University of Puerto Rico Public Administration Graduate School for the discussion and analysis of Paragraph 241 of the Agreement (August, September, October & November 2016)
- Mari Mari Narvaez Espacios Abiertos (July 2016)
- Jose Rodríguez, Dominican Community Leader (September and October 2016)
- Roberto "Papo" Christian Community Leader (September, October, November & December 2016)
- Pedro Julio Serrano, LGBTT. (September, October, November and December 2016)
- TCA meeting with former judge Ariel Belen, Mediator and Arbitrator of New York. (June 2016)
- TCA and Staff participation in Night Out Activity (August 2016)
- Participation in the Forth Worth, Texas, National Conference of Police Monitors

|

(November 2016)
- Meeting with Carmen Villa Nueva, community leader (September, October and November 2016)