# SIX-MONTH REPORT OF THE TECHNICAL COMPLIANCE ADVISOR DECEMBER 10, 2016 – JUNE 9, 2017

### *Office of the Technical Compliance Advisor to the Agreement for the Sustainable Reform of the Puerto Rico Police Department*

TCA Sixth Semi-Annual Report                                    2017

# Table of Contents

Table of Contents                                                    1

A Message from the TCA                                               3

TCA Reports under the Agreement                                      9

Introduction                                                        10

**Section I**
PRPD Status Report                                                  13

The Work of the TCA                                                 19

**Sections II**
PRPD Action Plans                                                   22

**Section III**
Current and Anticipated Challenges in the Implementation
of the Plans and the Agreement                                     30

    Paragraph 13: Staffing Allocation and Resource Study          31

    Development of Career Path, Promotions, and the Need to
    Amend the Current Legal Framework                             35

    The Impact of Act 20/2017                                     39

Reorganization of the Narcotics Bureau and Findings
From Polygraph Review                                              55

The Consent Decree and Complaints of Unpaid Overtime              63

Current Issues Regarding Recruitment                              65

Paragraph 241: Community Surveys and Focus Groups                68

Information Systems                                               72

Assessment of PRPD Personnel Transfers                           74

**Section IV**

Projected Activities                                             86

**Appendixes**

Appendix 1: List of Approved Policies                            88

Appendix 2: TCA Activities and Community Engagements             92

Appendix 3: Technical Compliance Advisor Team: Updates           96

Appendix 4: Paragraph 250(b) Compliance Tables                  100

# A Message from the Technical Compliance Advisor

This is the Sixth Semi-Annual Report ("Report") of the Technical Compliance Advisor ("TCA") under the Agreement for the Sustainable Reform of the Puerto Rico Police Department ("Agreement"). It assesses and reports on the progress made toward implementing the Agreement by the Puerto Rico Police Department ("PRPD"), and summarizes the work conducted by the TCA for the six-month period ending on June 9, 2017.

The PRPD has made significant progress over the last six months in building capacity and implementing the eleven (11) Action Plans ("Plans") for the eleven (11) compliance areas required by the Agreement. The Plans, which are now finalized and translated into the English language, have been submitted to the Court. As per Paragraph 238 of the Agreement, "[o]nce the Action Plans are approved, the Parties will submit them to the Court as addendums to this Agreement. Upon submission to the Court, the Parties shall treat the Action Plans as fully incorporated, enforceable terms in this Agreement, unless the Court instructs otherwise." In the body of this Report and Appendix 4, the TCA provides a detailed assessment and compliance rating for each detailed step of the Plans.

Before enumerating PRPD's efforts, accomplishments, and remaining challenges, the TCA would like to acknowledge the historical milestone the Commonwealth of Puerto Rico reached by appointing its first female Police Superintendent, Dr. Michelle M. Hernández de Fraley. Dr. Fraley is no stranger to the PRPD. Superintendent Fraley was previously the Special Assistant to the Superintendent of the Puerto Rico Police, leading the Strategic Initiative Group. Under this initiative, Dr. Fraley was charged with analyzing the entire PRPD organization. Subsequently, she was the Auxiliary Superintendent for Education and Training. As the Director of the PRPD's Police Academy, she interacted and worked with all members of the PRPD, from their new recruits to their accomplished Colonels and Lieutenant Colonels. She also oversaw the first-ever pre-service training program and the training for the first Field Training Officer ("FTO") program in the history of the PRPD. The FTO program trained and evaluated new officers as they worked with the community they served and engaged in all practical aspects of policing. Dr. Fraley helped to usher in the new reform through an

academic and practical perspective.   Superintendent Fraley assumed her new responsibility to lead the PRPD in January 2017, demonstrating early on her sharp focus on implementing the terms of the Agreement.  The TCA and his team look forward to a continued meaningful professional relationship with Superintendent Fraley and the PRPD's Reform Office.

As the new Superintendent and her team have made the reform of the PRPD their top priority, the TCA has identified an increased enthusiasm by the PRPD leadership to address some of the thorny issues that previously plagued the police department and seemed to have lingered under the previous administration.   Specifically, Superintendent Hernández de Fraley has become directly involved with addressing past questionable promotions, unexplained personnel transfers, and failed officer polygraph examinations.   In addition to immediately addressing these issues, she has also directed that policies be developed to ensure that these deficiencies do not repeat in the future.

Superintendent Fraley's leadership and her efforts to develop new processes and mechanisms promoting the professionalization of the PRPD in compliance with the Agreement have been met with an extraordinary challenge, the enacting of Act 20 of 2017.  In April 2017, Act 20-2017 consolidated several government agencies, including the Puerto Rico Police Department, establishing the Department of Public Safety ("DPS").  Governor Ricardo Rosselló Nevares appointed Former Police Superintendent Héctor Pesquera as Secretary of the newly created Department.  Pursuant to the terms of the Act, Secretary Pesquera is the head of all the agencies consolidated under the new law and Superintendent Fraley reports to him under the title of Police Commissioner.   The same hierarchical structure applies to all the other incumbent heads managing the government agencies consolidated under this law.

In the past month of February 2017, while Act 20-2017 was pending approval, the TCA prepared a twenty-two page confidential report with his team of constitutional advisors. The confidential report was shared with the Parties.  The document examined how Act 20-2017 (creating DPS) could impact the implementation of the Agreement.   In the referenced confidential document, the TCA identified potential problems that could follow the enactment of that law.   The main concern was the proposed hierarchical structure and the imminent possibility of unnecessary power struggles.   The then-confidential report also pointed out foreseeable problems with the Police Academy, should the training of cadets and retraining of policemen be relented to private institutions where assessment of teaching materials and instruction methods would

become unavailable.  The TCA made these concerns known to the Court and the Parties.  It is of utmost importance in this process that any changes that are made in the organization of the PRPD, as it is integrated into the newly created Department, should be promptly disclosed to the Court.  The confidential report is now shared in the body of this Report after a decision to make the aforesaid document public.

Although in the Public Hearing held by the United States District Court on May 22, 2017, the Governor's representatives reported to the Court that under the new law "the Superintendent is fully in charge of the day-to-day operations and decisions of the PRPD," recent events, some of them which may still be in progress, confirm many of the TCA's concerns regarding the hierarchical issues and power struggles at the PRPD. For example, extensive changes were made to the security and operational plans for the Plebiscite of June 2017 as designed originally by Superintendent Fraley.

The TCA has continued to conduct all permissible assessments under the Agreement regarding the developments of the aforesaid issues and concerns, which may affect the reform process or in any way are contrary to the letter of the Agreement.

In keeping with the responsibility of the TCA consistent with Paragraph 241, the TCA completed his second survey of the community.  This second community survey is to yield a better understanding of the police through the lenses of the community.  The survey was completed during this reporting period and included in-depth discussions with diverse representatives of community groups.  The methodology was a typical focus group study.  These groups included representatives of traditionally underserved and underrepresented communities in Puerto Rico, such as blacks, LGBT, Dominican, Homeless, and public housing residents among others.  Documenting greater community cooperation and trust, the TCA wants to acknowledge that many community leaders have assumed an active role in supporting the survey and providing input on the questions.  They have sought greater inclusion by identifying affected groups, and working with the Puerto Rico and United States Departments of Justice in establishing a workable format to ensure the success of the survey.  The survey's findings will be presented to the Parties and members of the community.  They will be published in a special report to the Court, sometime in late July. The TCA always welcomes community advocacy groups into this ever-expanding umbrella of community cooperation with the police, and encourages better and more productive communication between the PRPD and the TCA.

These focus groups were conducted under the direction of renowned sociologist Dr. Richard Blanco Peck, where he and his team provided guided discussions to gauge community sentiments and experience with the PRPD.  Dr. Blanco Peck conducted the first set of surveys.   The findings of these focus groups will assist the PRPD in determining why the community retains certain beliefs, how change can come about, and which policies and community strategies need reassessment and revision.

Three years of cooperation have created a strong professional interaction between the PRPD and the TCA.  The PRPD recognizing the subject matter expertise of the Core Team has asked the TCA under Paragraph 255 of the Agreement for technical assistance in addressing traditional challenges affecting the operations of the Traffic Bureau. The TCA will assist the PRPD in examining road and pedestrian safety, traffic enforcement and investigations, highway patrol, fleet management, and other areas of general traffic administration.

As the TCA last reported in his previous six-month report, the staffing study (Paragraph 13) that the PRPD must complete is an integral part to ensure that the PRPD can continue to sustain their progress made to reform.  On May 16, 2017, the TCA attended the first convening between the PRPD and the selected consultant, V2A (Vision to Action), which has been contracted to complete the study.  The timeline has been set to start immediately and to produce results in one year.  The TCA will provide oversight and will report more extensively on the progress made on the staffing study in the next report.  The TCA believes once PRPD is informed by the study, it will make the most judicious use of its human resources in this important time of fiscal constraint for the Commonwealth.

Until the staffing study is completed, the TCA recommends – based on his responsibility under Paragraph 137- that no additional promotions and supervisory decisions take place unless they are needed to address legislative and policy actions having substantial impact on officers near retirement.  The PRPD will have limited information on the correct workload ratios and, consequently, for the PRPD to continue to make promotions throughout all ranks would be only based on historical precedent or guesswork of operational needs and in non-compliance with Paragraph 137.  Similarly, promotions without a merit based framework and a carefully structured career path will always raise questions of the qualifications of those promoted.   The TCA expects concrete changes both in law and policy as well as practice. The staffing study touches on all phases of police administration: command, control, promotion, communication and training to identify a few.  Proper staffing is the thread that brings together police

organizations, and as such is critical to its success.  The TCA acknowledges the crucial role the Reform's Unit has played in complying with the demands of Paragraph 13.

The TCA is compelled to comment on PRPD'S continued need to devote significant resources to the restoration of the infrastructure at the Police Academy.  The Commonwealth should ensure that the PRPD is sufficiently funded to meet the challenges, particularly with respect to its infrastructure to support a meaningful reform.

The TCA has past reported on PRPD's use and failure to act on questionable polygraph results of certain members of the PRPD's Drugs, Narcotics, Vice, and Illegal Firearms Bureau ("Narcotics Bureau").  Police departments typically use polygraph examinations to verify information on application forms or to confirm or refute information the police discovered during a background investigation. For officers in specialty assignments, such examinations may ensure that officers have not compromised their position or otherwise engaged in any serious undetected criminal activity.  For officers investigating narcotics, firearms, or other vices, polygraph examination can point to whether officers engaged in the use or sale of illegal narcotics or weapons.  Though failing a polygraph test may not necessarily entail a finding of misconduct, it may sufficient reason to initiate an internal affairs investigation or transfer the officer pending the outcome of an investigation.

Under the past administration, the PRPD did not provide the TCA with any justifiable explanation on why certain members of its Narcotics Bureau have remained in the Bureau or at a minimum have not been investigated.  The community the PRPD serves and the officers under the cloud of having failed the test deserve to have this specter of suspicion removed. Though there are a myriad of laws and regulations to ensure due process to the officers, to which the TCA agrees, keeping these officers investigating drug-related and gun-related offenses is akin to "putting the fox in the hen house."  The TCA expects the PRPD to address and rectify this situation immediately and has informed the Superintendent that this matter will continue to receive his direct attention and the TCA will continue to mention the Superintendent's progress in fighting corruption in future reports.  The TCA acknowledges the effort of Superintendent Fraley who took ownership of the issue and has transferred all personnel who has previously failed the polygraph test.  The TCA feels encouraged that the PRPD will also follow-up with internal investigations where appropriate. This is the type of administrative action expected of leadership at the highest level to have a meaningful impact on reform.

The TCA is pleased to report on the continued cooperation and efforts of Colonel Clementina Vega and the PRPD Reform Unit. The political transition that occurred in January has not affected the collaborative efforts of the Reform Unit and the TCA.

The TCA has slightly changed the format of the report when measuring compliance with the Action Plans.  Now the TCA's Report will contain detailed tables that describe what steps and activities the PRPD committed to undertake and the TCA's reviews and observations assessing whether the PRPD made progress toward the implementation of these activities and steps. This tabular design is more transparent and will make it easier for the public to gauge PRPD's accomplishments and challenges, while simultaneously viewing the TCA assessment process.

The TCA welcomes the newest member of its "Core Team," Dr. Alex del Carmen who previously was a subject matter expert with the Consent Decree Monitoring team for the New Orleans Police Department.  Dr. del Carmen's Vita is appended to this report.  The Report also updates the biographical note for Core Team member Dr. Marcos Soler, who was appointed to the position of Deputy Technical Compliance Advisor.

Finally, the TCA continues its open-door policy to serve as a constant conduit to the PRPD to raise community issues and concerns, as they relate to the Agreement, while ensuring that PRPD addresses those issues and concerns timely and appropriately.

Arnaldo Claudio, US Army, Col. (ret)
Technical Compliance Advisor

# TCA Reports under the Agreement

*Paragraph 250 of the Agreement:*

"During the <u>first four years</u>, from the Appointment Date, the TCA shall file with the Court, written public reports every six months that shall include:

a) a description of the work conducted by the TCA;

b) a listing of each detailed step in the Action Plans and its timeframe indicating whether the timeframe has been met, and whether the Commonwealth of Puerto Rico is making satisfactory progress toward implementation of the Agreement by rating PRPD in full, partial, or non-compliance steps in the Action Plan;

c) the methodology and specific findings for each review conducted, where appropriate, and redacted as necessary for privacy concerns. An un-redacted version shall be filed under seal with the Court and provided to the Parties. The underlying data for each audit or review shall not be publicly available, but shall be retained by the TCA and provided to either or both Parties upon request;

d) for any detailed steps that were reviewed and found not to have been fully implemented in practice, the TCA's recommendations regarding necessary steps to achieve compliance; and

e) a projection of the work to be completed during the upcoming reporting period and any anticipated challenges or concerns related to implementation of the Agreement."

*Paragraph 252 of the Agreement:*

"The TCA shall provide a copy of the six-month reports to the Parties in <u>draft form within 15 days after the end of the reporting period</u>. The Parties shall have fifteen calendar days upon receipt of the draft report to allow the Parties to informally comment on the draft report. The TCA shall consider the Parties' responses and make appropriate changes, if any, and shall file the final report with the Court within 45 days of the end of the review period.  DOJ and PRPD may file responses to the TCA's final report within 30 days."

# Introduction

This is the Sixth Semi-Annual Report ("Report") of the Technical Compliance Advisor ("TCA").   The Report measures the progress made by the Puerto Rico Police Department ("PRPD") in meeting the requirements set forth in the Agreement for the Sustainable Reform of the Puerto Rico Police Department ("Agreement") for the period from December 10, 2016, through June 9, 2017.  In particular, the Report focuses on the progress made in the implementation of the eleven Action Plans ("Plans") for the eleven compliance areas.

The TCA has the duties, responsibilities, and authority conferred by the Agreement under the supervision and order of the Court.  He performs his duties without replacing or assuming the role and duties of the PRPD and its leadership.  Pursuant to the terms of the Agreement, TCA provides technical assistance during the capacity building period while monitoring during the compliance period.  He reviews and approves Plans , policies, procedures, programs, protocols, training, and programs of the PRPD; and conducts audits and assessments as the Parties, or the Court, deem appropriate.  The TCA is also to report on the PRPD's implementation of this Agreement, their Plans, and their intended impact.  It is the task of the TCA to measure the nature and the extent of the PRPD's compliance with the terms set forth in the Agreement and the Plans (which are deemed incorporated into the Agreement upon submission to and approval by the Court).

During this reporting period, the PRPD has made significant progress in building capacity and implementing detailed steps and activities set forth in the Plans and the Agreement.  With diligence and hard work, the PRPD has reached substantial milestones in the areas of planning, policy making, training, use of force, and community engagement.  This Report enumerates the most significant achievements, as well as short- and long-term obstacles towards implementation.  In this introduction, the focus is on two examples where one finds both well-documented progress and current and anticipated challenges.

With only nine remaining policies on the schedule to be developed, it is a fact that in as little as sixteen months from now (October 2018) in many, if not all, eleven compliance areas, the PRPD should have in place both comprehensive policies and coherent training modules consistent with the requirements set forth by the Agreement and

TCA Sixth Semi-Annual Report                                             2017

nationally accepted standards of policing.  From the perspective of building capacity, the distance traveled by the PRPD in issuing policies and conducting first-class training for the entire workforce far exceeds the distance that remains.  However, the short- and long-term impact that the newly enacted Department of Public Safety ("DPS") will have in delaying the full implementation of policies and training remains unclear.  For now, the TCA has agreed to the Commonwealth's request for a four-month extension of the capacity building period to accommodate the new institutional reality in Puerto Rico.  As discussed in Section III of this Report, it is hard to predict next steps with so little is known about the actual implementation of DPS.

Another key example of the progress made by the PRPD under the Agreement is the steps taken towards de-escalation in the use of force.  In addition to the successful enactment of well-established use of force policies and training for the past three years, the PRPD recently reported a 10% decrease on the use of force in three out of the four categories of force, including force greater than low-level Type I force.  In total, there were 1,257 incidents of force in 2016 versus 1,403 cases of use of force in 2015. (This information about progress made in the use of force is also consistent with information documented in the second survey of the Community)

By categories, there was a 17% decrease in the highest-level Type IV force.  Type IV incidents are the most serious forms of force (i.e., force which is likely to produce death or serious bodily injury such as use of firearm or use of baton in deadly force areas).  There have also been significant decreases in the number of low- and moderate- level force incidents, 19% and 37% respectively.  However, not all trends point downwards.  During the same period, there was a substantial increase of 132 cases—a 36% increase—in the number of Type III force incidents. Type III incidents include use of a conducted electrical weapon (CEW, often referred to as taser), gun pointing, canine bites, or use of baton in non-deadly force areas.

The TCA recommends that the PRPD closely examine these statistics for additional information on emerging trends.  The TCA will analyze use of force trends in the coming months to determine whether these statistics document sustained progress.  During this phase of capacity building, these numbers require scrutiny to assess opportunities for greater improvement prior to the period of compliance.  For example, the fact that Type III use of force incidents increased from 39 to 167--a 320% increase--in Carolina deserve close attention by the PRPD.  To the extent that these numbers were to signal that officers, on the whole, were deescalating more incidents and reserving force for only those instances where it was necessary, proportional, and reasonable under the

circumstances in all Police Areas but Carolina, it would be helpful to understand what has gone differently with the implementation of policies and training in this geographic area.   However, the TCA wants to be absolutely clear that these statistics do not indicate that there is a problem in Carolina; rather than the trends in Carolina differed from the other areas and this fact deserves further analysis without predetermining the findings of such analysis.

This Report consists of four major sections and four appendixes.  In the first section, the Report comments on the PRPD's Status Report documenting the PRPD's self-reported accomplishments and progress made from November 26, 2016, through May 25, 2016. Consistent with Paragraph 250(a), this section also discusses the main highlights of the work conducted by the TCA in the last six months, from December 10, 2016, through June 9, 2017.  It focuses on the work of the TCA in providing technical assistance to the PRPD, including work in the development of Plans, policies and procedures, and training materials.  During this reporting period, this technical assistance has included assistance in the translation of these Plans.   This section has three corresponding appendixes.

In its second section, the Report focuses on work of the Puerto Rico Police in developing Plans for the eleven substantive areas of the Agreement and complying with Paragraphs 234 through 238 of the Agreement.  This part of the Report complies with Paragraphs 250(b) and 250(c).  This section and its corresponding appendix include tables detailing activities and steps taken by the PRPD in accordance with the submitted Plans and rating the progress made towards their implementation.

In the third section, as required by Paragraph 250(d), the TCA recommends necessary steps to achieve compliance for any detailed activities or steps that were reviewed and found not to have been fully or partly implemented in practice.  The purpose of this section is to identify issues that require further attention and/or may have a negative impact in the implementation of the Agreement.  The list of topics is detailed in the table of contents.

The fourth section, as required by Paragraph 250(e), includes a projection of the work to be completed during the upcoming reporting period and reflects the TCA's vision of intended reviews of PRPD operations, including steps and activities taken towards building capacity.   These plans highlight the areas of the Agreement that the TCA and/or the Court has identified as current top priorities.

The purpose of this report is to describe where the PRPD is in the capacity building process and, under the framework of the Agreement, how the PRPD achieves full and effective compliance with the Plans submitted to the Court.  Pursuant to the Agreement, the PRPD had four years to build capacity through the structure agreed upon in the Plans.  The role of the TCA is to assess the progress made by the PRPD towards building that capacity, and the PRPD's compliance with its own Plans.  After three years of work and with less than eighteen months left, this Report seeks to provide with an overall summary of the status of compliance with the Plans and the assessment of the progress made.

# Section I

## The PRPD Status Report

On May 25, 2017, in compliance with the terms and deadlines set forth in Paragraph 261, the PRPD submitted its Sixth Status Report ("Status Report") assessing progress for each of the eleven (11) focus areas, steps towards implementation of the Agreement, and a response to prior concerns raised by the TCA.  The Status Report documented the overall progress made by the PRPD for the period covering November 26, 2016, through May 25, 2017.  Paragraph 261 requires that the Commonwealth "file with the Court sealed and unsealed versions of the Status Report, with a copy to the TCA and USDOJ, no later than 15 days before the end of the period under review."

The Status Report identifies both areas of progress and persistent obstacles.  The purpose of this review is not to generate a particularized rebuttal of the PRPD of the Status Report on a particular area of compliance.  The goal is to raise questions or concerns about PRPD self-assessment of the progress made towards implementation of the Plans and the Agreement where appropriate.

In pages 6 through 8, the Status Report documents the very important work the Reform Unit of the PRPD conducts in terms of self-assessment through monitoring field visits. The Status Report highlights some of the most significant findings made during the evaluation of certain Police Areas, such as the absence of training certification in

personnel records or vast deficiencies in the use of police forms.  In this sense, the PRPD has adopted the recommendation of the TCA in prior reports that the PRPD uses the Status Report to identify what are the lessons learned from those self-assessment visits.   In this Report, the TCA further recommends that these visits are used to document more than findings: which initiatives are working and which ones are not working, what obstacles have been encountered towards implementation, and what are the solutions and lessons learned from those visits.  Also, the TCA recommends that the next Status Report details how these visits are bringing about changes in the areas visited.  Specifically, the TCA recommends a follow-up report for the identified areas in the next report.

In the Status Report, there is also an extensive analysis of the progress made by the Reform Unit and the Police Academy in the drafting of policies and training modules. The Status Report continues to document a fact that the TCA has noted in prior reports: the evident progress made by the PRPD, led by the Reform Unit, in producing very detailed Plans and policies in accordance with agreed upon timeframes.  In fact, the Reform Unit has become the center of policy development for the PRPD based on the Directive OS 1-1-378 of November 2016.  The implementation of this directive has been a success and the transition has been seemingly smooth.

Notwithstanding these positive developments, the TCA has expressed serious concerns about the actual implementation in practice of these policies and how expeditious this implementation can be in the field.  For example, just recently, in May 2017, the PRPD requested an extension of four months to the capacity building period to further develop additional policies and training manuals which are falling behind schedule or are impacted by the implementation of the new Department of Public Security ("DPS"). Measuring the effect and implementation of these policies and trainings is difficult when there are relevant delays in terms of the adoption of certain key policies.

The Status Report does not fully address the request for an extension of the capacity building period by the PRPD.  The TCA submits that this issue is important and deserves a detailed explanation.  Paragraph 239 of the Agreement requires the PRPD to explain in writing to the TCA if there is a need to modify any of the timeframes set forth in the Plans submitted to the Court.  Pursuant to Paragraph 239, the PRPD considered that there was good cause for a modification to the timeframes set forth in the Plans, and submitted its request for timeframe extension.

TCA Sixth Semi-Annual Report                                    2017

Based on the correspondence submitted to the TCA by the Commonwealth of Puerto Rico, the argument for an extension is articulated as follows.  The PRPD states that, since June 2014, the PRPD has been diligently drafting policies required by the Agreement to incorporate the Plans into the Agreement.  Likewise, the PRPD claims that these policies have been drafted by the PRPD and submitted timely to the United States Department of Justice ("USDOJ"), and the TCA on a rolling basis for review as required by Paragraph 229.  The TCA find these two statements to be factually accurate. The PRPD then argues that the exchanges of these drafts between the PRPD, USDOJ, and the TCA for several iterations of deliberation and review have resulted in the identification of many unanticipated, unexpected challenges.  For the most part, the PRPD argues, "these challenges have been overcome after in-depth and fruitful discussions."  Although these deliberations have been fruitful, they often have resulted in unavoidable delays even as the result was to finish with a better policy work product.  The consequence of these extended deliberations is that some policies have been approved behind schedule impacting both production of training materials and training schedules.   The TCA agrees with these statements by the PRPD and recognizes that the process of policy deliberation that is in place in Puerto Rico is quite time consuming.  The TCA also acknowledges that these deliberations have produced excellent and lasting policies.


It is undisputed that the capacity building has benefited from a close cooperation between the PRPD's Reform Unit, the USDOJ, and the TCA's Core Team in producing policies and training materials.  Although the PRPD has drafted all policies, the TCA have assisted through technical assistance, editing, and deliberation to the production of high quality policies and training manuals while performing many other tasks.  Specifically, the TCA's Core Team has conducted extensive policy review while continuing to provide real-time feedback on the implementation of the Plans, conducting extensive field visits, ride-alongs, and a vast array of activities measuring the implementation of the Plans.  In a recent report, the Seattle Police Monitor called this active approach "collaborative monitoring," which the Police Monitor compared to the old-fashioned model of passive monitoring.[1]  In Puerto Rico, "collaborative monitoring" has been the norm since the appointment of the TCA in 2014.

---

[1] "The Monitor would be remiss if he did not thank the whole of the Monitoring Team that has contributed, to date, for its extraordinary, hard work provided to a significant degree on a pro bono and reduced fee basis. Over the years and currently, the Monitoring Team will have produced and is producing a slate of high-quality, methodologically-rigorous evaluations of SPD performance along a host of dimensions. The Team will have done so while continuing to provide real-time feedback on policies, procedures, and progress to SPD. This model of collaborative monitoring—in which a Monitoring Team works closely with the Parties and the wider community to address issues in real-time and critically analyzes departmental performance and compliance across time and incidents—necessarily requires substantially more time and resources than a passive model in which the Monitor might set artificial benchmarks for the Department to

Additionally, in their correspondence to the TCA, the PRPD argues that the approval of Act 20-2017 creating the Department of Public Safety "has shifted PRPD's efforts with the changes that had already been drafted to Act 53 of 1996 (Act 53-1996, as amended)." The Commonwealth also argues that, "with the creation of the Department of Public Safety, Act 53-1996 will be abolished; therefore, its content must be captured as separate efforts under General Orders and Regulations. Although the content exists, drafting new General Orders and Regulations to undergo the process of Requirement 229 will require additional time." The TCA agrees that this is one of the many areas of the police reform in place that will be impacted by the adoption and implementation of Act 20-2017.

The conclusion of the request submitted by the Commonwealth is that, for these two reasons (the deliberative nature of the policy-making process and the adoption of a new organizational structure by the Commonwealth), "the PRPD understands that an extension of four months is necessary to fully comply with the timeframes set forth in the Plans." The requested extension would extend the terms until October 8th, 2017.

After carefully reviewing the request, the TCA agreed that the request was in good cause and approved it. However, it also cautioned the Commonwealth that the implementation of Act 20-2017 is likely to create additional delays which must quickly be identified.

Regardless of the areas of progress reported above, the Status Report fails to document in greater detail the steps taken by the PRPD in addressing resources, funding, staffing, technology, capacity, and other infrastructure needs to place the PRPD in a position to implement each of the provisions and detailed steps of the Action Plans during the last six months. This analysis is sparse.

For example, there is a bare-bones discussion of Paragraph 13 and the relevance of the staffing study on page 10 of the report. The discussion about the TCA concerns

---

reach and merely assesses, across short periods of time, whether the Department has technically "checked the box." Because such collaborative monitoring is capable of producing more rapid, comprehensive, and lasting progress, the Monitor thanks the Monitoring Team for its dedication to balancing the demands of both real-time monitoring and technical assistance with concurrent work on several assessments and other projects." Seattle Police Monitor, Compliance Status & Seventh Semiannual Report (September 2016), p.2. As it is the case in Seattle, the TCA Core Ream has provided this form of collaborative monitoring to a significant degree on a pro bono and reduced fee basis.

regarding the lack of implementation of Paragraph 13 and the lack of compliance with the original deadline is more extensive (pages 44 and 45), but still does not address the most pressing issue: does the PRPD have the funds, infrastructure, resources and capacity to complete the study in the next six months?  As the Status Reports notes, the contract for the Staffing Allocation and Resource Study was executed on April 24, 2017. A meeting was also convened in May 2017 between PRPD leadership, the TCA, and the hired consultants.  However, there is no reference to the budgetary situation and the fact that funds are not currently available for the study.

Similarly, the Status Report publishes statistics, but neglects to provide an explanation of how these numbers document the progress made, enhance PRPD's capacity, and how they assist to measure meeting objectives and outcomes.  For example, on page 9 of the Status Report, the statistics on the implementation of training in the Zones of Excellence highlight that *Bayamon Oeste* has substantially fewer people trained in April 2017 than in October 2016.  The Status Report provides no explanation for this retrogressive change and the basis for the reduction in the percentage of officers trained in this particular Zone of Excellence.  Similarly, the Status Report does not address the fact that the numbers reported regarding the use of force cases in 2016 appear to be drastically different from the data reported in the previous Status Report: 605 cases from January through October 2016 versus 1,257 in Calendar Year 2016.

The TCA continues to recommend that the PRPD improves the production and reporting of statistics in the Status Report.  The statistics reported lacked context and purpose.  The PRPD continues to report on troubling statistics without offering a methodological response, an analytical framework, or an internal audit.  There is no clear indication of what exactly the PRPD seeks to achieve by presenting these statistics.  The TCA once again recommends that the PRPD should devote more attention to this issue.  Similarly, in the Status Report, there is no substantial reference to the standards, yardsticks, timelines, or targets that are required under the Agreement.  Without providing an analysis and a proper explanation for these figures in the Status Report, their production and reporting is totally de-contextualized and meaningless.

There is another area where the information provided by the PRPD is quite sparse and insufficient.  The Status Report makes reference to the reorganization of the Bureau of Drugs, Narcotics, Vice and Illegal Weapons ("Narcotics Bureau") and the implementation of the polygraph tests.  The section makes specific reference to the criteria adopted to be assigned to the Narcotics Bureau, including the fact that passing a

polygraph test is required.  The Status Report also documents how many members of that Bureau failed these tests.  However, the Status Report does not address the significance and relevance of these statistics.  There is no reference to the various recommendations made by the TCA and the USDOJ that were rejected by the former Police Superintendent.  Similarly, in that section of the Status Report, there is no mention of the findings made by the TCA regarding evidence rooms.  Finally, there is no discussion of the steps taken by the PRPD's current leadership toward training and implementation of the reforms available for this Bureau.

Another deficiency is the lack of self-assessment in the section regarding information systems and online training.  The Status Report only addresses the Information Technology ("IT") policies developed during this time period, and the fact that the PRPD has signed a contract with the National College of Business and Technology for the implementation of online training which will start in September 2017.  Although the section informs when online training will be operational, it does not really explain how this tool will advance training schedules and the timeframe set forth in the Plans.

The table on administrative complaints received and investigated contains incomplete information.  This table lacks context and analysis neglecting to discuss the issue of how many complaints are investigated within the timeliness set forth in the Agreement and the Plans.  It also obviates important issues such as the type of findings made.  For example, the Status Report highlights that almost a third of the complaints filed in 2017 have been investigated, but there is no reporting on the findings for these complaints.  Similarly, it is noted that there are 161 complaints pending investigation from prior years but there is no reference to the age of these cases.  Furthermore, in pages 31 and 32, the tables evaluating the disposition of complaints reveal interesting statistics that are not fully analyzed here.  For example, 44% of complaints filed by the Office of Legal Affairs (OLA) are sustained versus 25% of those filed by the Superintendence in Professional Responsibility (SARP).  Their exoneration rates are also vastly different: 8% for OLA versus 25% for SARP.  There is no explanation of the reasons behind these vast differences, and their relevance (if any).  The TCA does not suggest that the rates should be identical; rather than the PRPD should explain the reasons behind such different rates.

Another topic that the Status Report fails to document adequately is the problematic issue of promotions.  There is not a single reference to this matter in the section addressing the Plan for Professionalization.

Finally, the TCA recommended in prior reports that the tables reporting on the number of cases of domestic violence needed to include complete information about the resolution of these cases. The TCA had previously recommended that the PRPD provide both, information about complaints as well as information about outcomes of domestic violence investigations and disciplinary action taken. The issue of domestic violence is neglected in this Status Report, period. More importantly, the Status Report does not address the persistent and frequent problem of domestic violence and its relationship, as applicable, to issues of mental health in light of the numerous cases experienced by the PRPD in past years.

# A Description of the Work Conducted by the TCA: Paragraph 250(a)

During this reporting period, the TCA continued to provide technical assistance (for example, the TCA was involved in assisting the PRPD in the restructuring of the Traffic Division) while at the same time reviewing a considerable number of policies and training documents drafted and implemented by the PRPD. This process of reviewing policies and training materials followed the schedule agreed by the Parties and set by the Plans presented by the PRPD in compliance with Paragraphs 234 and 237.

To comply with the Action Plans, the PRPD had the obligation to draft a total of 99 policies. To date, 60 policies are completed, 31 are in progress, and eight (8) are in development. In addition, there are 75 policies not included in the Action Plans which must be drafted for operational reasons, of which 28 have been drafted or are in the process of development.

From December 2016 through May 2017, the Parties and the TCA successfully reviewed and revisited over 111 General Orders, Special Orders, Administrative Orders, regulations, and complementary forms. The TCA also reviewed more than 25 training documents. The TCA approved 39 policies, and they are listed in Appendix 1. On average, each policy has been discussed three times among the PRPD, the TCA, and the USDOJ.

Continuing with a practice agreed upon during the previous reporting period, the PRPD, the USDOJ, and the TCA continued to have monthly meetings to closely follow-up the development of policies and training materials.  In these meetings, the TCA meets with the Director of the Reform Unit and the head of policy development for the Reform Unit to attend to matters about the status of General Orders, Administrative Orders, internal and external regulations, manuals, protocols, agreements, and other issues.  These meetings have proven to be an effective way to identify obstacles.  The goal is to jointly work on issues that may have an impact on the timely development and implementation of policies during the capacity building period.

In the Fifth Semi-Annual Report, the TCA noted that the Parties and the TCA were working in the development of a new protocol for policy review.  The protocol sought to shed a different light into Paragraph 229 of the Agreement.  The purpose of this protocol was to agree upon and set up realistic processes and achievable timelines involved in the review of the policies that PRPD creates as part of the activities of the Action Plans.  The experience showed that the review of policies, both new and annual revisions, was being conducted in accordance with the terms outlined in Paragraph 229.  However, there were practical issues regarding turn-around-times.

The Reform Office and the TCA estimated that each policy was taking an average of four months from development to approval, and not the forty-five (45) days outlined in Paragraph 229 of the Agreement.  This substantial difference in policy production and review had to be addressed.  Thus, the development and approval of the new protocol was likely to have the effect of amending Paragraph 229 by tempering the Agreement to the reality, to the processes of development and review of policies as they are taking place at present.

The Parties discussed various options to amend Paragraph 229.  One option was for a new protocol to be submitted for consideration of the Federal District Court of Puerto Rico (case No. 3:12-cv-2039 [GAG]) through a joint stipulation by the Parties.  This approach was consistent with Paragraph 296.  The other option was to include this revised policy protocol as part of the Plans to be submitted to the Court for review and approval.  To date, this matter is still under deliberation by the Parties.

During this reporting period, the TCA visited most of the PRPD command areas to review the nature and extent of use of force incidents as well as the use of force

reporting procedures.  Based on the limited review of files during these visits and without a overstating the extent of the TCA's review and PRPD's compliance, the TCA determined the PRPD was generally complying with recording requirements in accordance with the Agreement and training procedures. It should be noted that the USDOJ conducted its own limited review of use of force files at the Force Investigations Unit, and it found "several [reporting] errors."  These preliminary findings suggest further work is needed to more properly assess the extent of the PRPD's compliance until all records are electronically available.

The TCA and members of the Core Team have also participated in ride-alongs with the PRPD, which have enabled the technical compliance team to develop a hands-on approach, as well as one-on-one communication with officers on some of their concerns and the Agreement.  For example, the Deputy TCA participated in a ride-along where the lack of appropriate equipment, in particular radios, became an issue.  In response to the after-action memoranda, the PRPD acted promptly and diligently and a large number of radios were disseminated to officers in the field.

During the TCA monthly visits, a member of the TCA team always visited the Police Academy and reviewed curriculum development ensuring the entire pedagogical approach is consistent with best practices of police training. Similarly, a TCA member conducted five field visits to determine the implementation of the IT Action Plan.

During this period, the TCA continued to meet with many community stakeholders to persistently encourage their participation in the Reform process.  This interaction between the community and the TCA was crucial in facilitating the implementation of a stratified selection of community and civic groups to serve as focus groups in the second round of community surveys.  The list of activities and community engagements is included in Appendix 2.

Finally, to further drive the work of his office, the TCA nominated (and the Court approved with the support of the parties) the newest member of its "Core Team," Dr. Alex del Carmen who previously was a subject matter expert with the Consent Decree Monitoring Team for the New Orleans Police Department.  Dr. del Carmen's Vita is appended to this report as Appendix 3.  He is the national expert on policing and racial profiling, and the head of one of the most vibrant University Department in criminology in the United States.

# Section II

## PRPD's Action Plans ("Plans"): Paragraph 250(b) and 250(c)

During this reporting period, all eleven Plans were in full effect.  In June, the PRPD submitted the Plans to the Court for final approval and incorporation into the Agreement.

Since June 2014, as set forth in the Agreement, the Parties and the TCA have worked together and identified appropriate activities and steps to be taken to build capacity and enhance each of the following substantive areas of compliance: (1) Professionalization; (2) Use of Force; (3) Searches and Seizures; (4) Equal Protection and Non-Discrimination; (5) Recruitment, Selection, and Hiring; (6) Policies and Procedures; (7) Training; (8) Supervision and Management; (9) Civilian Complaints, Internal Investigations, and Discipline; (10) Community Engagement and Public Information; and (11) Information Systems and Technology.

To carry out these capacity building reforms, the PRPD began to develop specific, tailored made Action Plans for each of these substantive areas.  These Plans contain temporal benchmarks and set forth in detail the steps agreed upon to execute and implement the reforms and achieve the desired outcomes in each area within generally accepted professional standards.  These steps and reforms required the implementation of policies, practices, training, data gathering and reporting, documentation, internal review, technological improvements, and oversight.  The Plans describe temporal benchmarks and detailed activities and steps agreed upon to execute and implement the required reforms and to achieve the desired outcomes in each substantive area. Paragraphs 231 through 240 discussed in detail their development, implementation, and assessment.  The Plans put forth policies and any required revisions, mandatory training, resources, staffing, budgetary requirements, and a schedule for when specific policies are to become field operational.

Consistent with Paragraph 234, for the past 30 months, the PRPD, with assistance from the Reform Unit, drafted the Plans that set forth the detailed steps the PRPD is to take

to implement and achieve compliance with each of the Agreement's provisions in Sections III through XIII of the Agreement. Under Paragraph 236, the TCA and USDOJ reviewed these Plans to ensure that they specified actions necessary to comply with all applicable substantive provisions of the Agreement and that timelines, implementation strategies, budgetary allocations and funding sources are reasonable, achievable, and prioritized to promote efficiency. In November 2016, the TCA and the USDOJ completed their review of all these Plans.  The eleven Plans were approved as drafted in Spanish.

Pursuant to Paragraph 238, the Plans had to be translated into English and be submitted to the Court.  After months of additional review by the Parties and the TCA, the PRPD completed the translation of the Action Plans on May 31, 2017.   In June, the PRPD submitted these Plans to the Court as addenda to the Agreement.   Upon submission to the Court, the Parties are to treat the Plans as fully incorporated, enforceable terms of this Agreement, unless the Court instructs otherwise.

Once the submitted Plans are approved by the Court, the Plans are deemed incorporated into the Agreement.  The final step will be for the PRPD to make these Plans publicly available.

Given that it has taken more than 30 months of cooperative work between the Parties and the TCA to complete these eleven Plans for all compliance areas and there were unanticipated delays in some areas of the Agreement, in the last Semi-Annual Report the TCA recommended that the Parties renegotiate an extension of the capacity building period of, at least, one additional year.  In May 2017, as discussed in Section I, five months after the recommendation of the TCA, the PRPD submitted a request for a four-month extension of the capacity building period based on Paragraph 239 of the Agreement.

In this section, the task of the TCA is to assess whether the PRPD is meeting the timeframe outlined in the Plans, and making satisfactory progress toward implementation of the Agreement by rating the PRPD in full, partial, or non-compliance with steps in the Action Plans.  The TCA must also discuss the specific findings and methodology for each review, when appropriate.   Finally, the TCA must include recommendations detailing the necessary steps to achieve compliance with any detailed steps that were found not to have been fully implemented.

In this past six months, consistent with Paragraph 250, the TCA continued to assess the progress made by conducting interviews, reviewing documents, analyzing statistical tables, and conducting ride-alongs and site visits to determine the nature and extent of the PRPD's progress with the activities and steps detailed in specific Plans.   The detailed findings and ratings of the TCA regarding compliance with the timeframes and the progress being made in the implementation of the Plans are documented in Appendix 3.    Here the Report summarizes and highlights some of the most relevant parts of the TCA's assessment and findings.

As noted in previous reports, the PRPD continued to make excellent progress in the drafting of new policies.  The detailed tables show that the PRPD has met the deadlines for the development of policies in the overwhelming majority of instances.  The delays are often attributed to the inherent complexity of making legislative reforms.

The PRPD also made important progress in training.  The Police Academy continues to develop very polished training curricula based on a training development model that ensures a seamless transition from policy to training and eventually to implementation. In the rare instances when the development of training materials or the implementation of training were delayed, the delayed was often attributed to budgetary and contractual factors that the TCA already identified in prior reports.

Based on the information provided monthly by the PRPD, the TCA has documented significant advances in the number of officers trained on impact weapons, use of force, ethics, administrative complaints, pursuant to the requirements of Paragraph 237.  In these areas, 80% of officers have been trained.   In the areas of search and seizures and equal protection, the numbers also indicate progress but this progress is more uneven.  The following tables from the PRPD document the progress in training made as of April 2017:

TCA Sixth Semi-Annual Report  2017



**GOBIERNO DE PUERTO RICO**
**POLICÍA**
SUPERINTENDENCIA AUXILIAR EN EDUCACIÓN Y ADIESTRAMIENTOS
Estadísticas de Adiestramiento PPR

MES: **ABRIL**  AÑO: **2017**

| Área / Superintendencia | M.P.P.R. Asignados | O.G. 601 | | O.G. 602 | | | | | O.G. 603 | | | | | O.G. 604 | | | | O.G. 612 | | O.G. 615 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | U.F. | % U.F. | 1EH DCE | EH DCE | 2-3H DCE | Cant. Personal DCE | % DCE | 1EH BATÓN | EH BATÓN | 2-3H BATÓN | Cant. Personal BATÓN | % BATÓN | OC | Read. OC-EH | Cant. Personal O.C. | % O.C. | R.A. | % R.A. | A.C. | Read A.C. | Cant. Personal O.C. | % A.C. |
| AGUADILLA | 459 | 368 | 74% | 108 | 243 | 0 | 441 | 83% | 80 | 365 | 0 | 445 | 85% | 459 | 0 | 459 | 84% | 137 | 27% | 325 | 0 | 325 | 77% |
| ARECIBO | 326 | 290 | 89% | 1 | 290 | 0 | 291 | 96% | 2 | 235 | 0 | 237 | 54% | 297 | 0 | 297 | 97% | 290 | 55% | 294 | 0 | 294 | 59% |
| ARECIBO | 555 | 502 | 89% | 152 | 337 | 63 | 552 | 95% | 63 | 435 | 9 | 563 | 56% | 555 | 0 | 555 | 95% | 263 | 86% | 553 | 0 | 553 | 59% |
| BAYAMÓN | 1090 | 822 | 75% | 472 | 350 | 50 | 908 | 83% | 238 | 665 | 0 | 893 | 82% | 243 | 62 | 905 | 83% | 338 | 31% | 903 | 0 | 903 | 83% |
| CAGUAS | 420 | 323 | 77% | 242 | 133 | 0 | 385 | 90% | 191 | 207 | 0 | 338 | 59% | 371 | 0 | 371 | 83% | 34 | 6% | 295 | 0 | 295 | 65% |
| CAROLINA | 605 | 605 | 100% | 376 | 229 | 0 | 605 | 100% | 459 | 83 | 9 | 583 | 93% | 573 | 10 | 583 | 97% | 127 | 21% | 603 | 0 | 605 | 100% |
| FAJARDO | 317 | 216 | 69% | 152 | 158 | 0 | 308 | 97% | 110 | 167 | 23 | 300 | 56% | 289 | 4 | 290 | 51% | 15 | 5% | 130 | 0 | 130 | 52% |
| GUAYAMA | 329 | 262 | 85% | 73 | 171 | 0 | 249 | 81% | 43 | 201 | 0 | 249 | 81% | 237 | 0 | 237 | 77% | 170 | 55% | 232 | 0 | 232 | 73% |
| HUMACAO | 275 | 210 | 56% | 54 | 218 | 0 | 272 | 56% | 57 | 217 | 0 | 274 | 100% | 273 | 0 | 273 | 55% | 206 | 75% | 282 | 0 | 282 | 82% |
| MAYAGÜEZ | 555 | 552 | 93% | 353 | 131 | 82 | 576 | 97% | 334 | 164 | 52 | 550 | 97% | 532 | 0 | 532 | 89% | 105 | 18% | 458 | 0 | 455 | 82% |
| PONCE | 817 | 612 | 75% | 507 | 166 | 0 | 673 | 82% | 549 | 216 | 0 | 765 | 94% | 709 | 2 | 711 | 87% | 117 | 14% | 550 | 0 | 559 | 68% |
| SAN JUAN | 1222 | 976 | 89% | 745 | 593 | 23 | 1047 | 86% | 206 | 552 | 61 | 1019 | 83% | 1042 | 20 | 1062 | 87% | 37 | 3% | 538 | 3 | 544 | 77% |
| UTUADO | 274 | 211 | 99% | 13 | 257 | 0 | 270 | 99% | 63 | 207 | 3 | 273 | 100% | 269 | 4 | 273 | 100% | 270 | 99% | 272 | 0 | 272 | 99% |
| SAOC | 66 | 53 | 89% | 30 | 23 | 0 | 53 | 88% | 41 | 19 | 0 | 60 | 94% | 60 | 0 | 60 | 91% | 9 | 14% | 53 | 0 | 53 | 80% |
| NEG. DE TRÁNSITO | 913 | 733 | 80% | 63 | 387 | 118 | 548 | 60% | 211 | 422 | 45 | 678 | 74% | 556 | 0 | 556 | 94% | 270 | 36% | 721 | 0 | 721 | 79% |
| FURA | 548 | 523 | 95% | 125 | 319 | 0 | 444 | 81% | 143 | 347 | 0 | 490 | 89% | 533 | 0 | 533 | 97% | 60 | 11% | 509 | 0 | 509 | 93% |
| DOTM | 65 | 64 | 98% | 33 | 31 | 0 | 64 | 98% | 28 | 38 | 0 | 64 | 99% | 65 | 0 | 65 | 100% | 1 | 2% | 65 | 0 | 65 | 100% |
| NEG. REL. COMUNIDAD | 21 | 17 | 81% | 10 | 0 | 0 | 10 | 47% | 10 | 1 | 0 | 20 | 95% | 21 | 0 | 21 | 100% | 3 | 14% | 17 | 0 | 17 | 81% |
| SAIC (GLOBAL) | 3832 | 2913 | 76% | 1434 | 1690 | 311 | 3331 | 86% | 1312 | 2080 | 217 | 3809 | 84% | 3029 | 282 | 3303 | 86% | 2013 | 53% | 2873 | 456 | 3329 | 87% |
| SARP | 173 | 173 | 100% | 9 | 150 | 0 | 159 | 90% | 33 | 133 | 0 | 166 | 96% | 171 | 0 | 171 | 99% | 85 | 49% | 191 | 0 | 191 | 89% |
| SAEA | 209 | 209 | 99% | 134 | 65 | 0 | 199 | 95% | 101 | 93 | 0 | 197 | 94% | 199 | 0 | 199 | 95% | 118 | 55% | 200 | 0 | 200 | 96% |
| SASG | 55 | 45 | 89% | 34 | 11 | 0 | 45 | 83% | 9 | 33 | 4 | 45 | 82% | 45 | 0 | 45 | 82% | 3 | 5% | 37 | 0 | 37 | 66% |
| Superintendencia Reforma, Policía Segura | 61 | 53 | 85% | 15 | 24 | 16 | 55 | 90% | 25 | 25 | 3 | 54 | 89% | 53 | 0 | 53 | 79% | 58 | 0 | 58 | 92% | | |
| FORTALEZA | 134 | 121 | 90% | 13 | 114 | 0 | 132 | 95% | 21 | 113 | 0 | 134 | 100% | 9 | 123 | 132 | 55% | 9 | 7% | 74 | 0 | 74 | 55% |
| **Total** | **13373** | **11135** | **83%** | **5023** | **5074** | **627** | **11654** | **82%** | **4476** | **7254** | **417** | **12127** | **81%** | **11502** | **507** | **12009** | **93%** | **4792** | **36%** | **10727** | **459** | **11193** | **84%** |

Page 1 of 2



GOBIERNO DE PUERTO RICO
POLICIA
SUPERINTENDENCIA AUXILIAR EN EDUCACION Y ADIESTRAMIENTOS
Estadísticas de Adiestramiento PPR

MES: ABRIL                                                AÑO: 2017

| Áreas/ Superintendencias | O.G. 617 Etica | % Etica | O.G. 622 O.S. | % O.S. | O.G. 623 Persec. | % Persec | O.G. 624 Trans | % Trans | O.G. 627 V.D | % V.D | | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AGUADILLA | 455 | 91% | 29 | 6% | 415 | 83% | 366 | 73% | 44 | 9% | | 0% |
| ARECIBO | 292 | 55% | 354 | 86% | 295 | 83% | 295 | 56% | 92 | 22% | | 0% |
| ARECIBO | 524 | 100% | 247 | 46% | 253 | 45% | 407 | 72% | 153 | 27% | | 0% |
| BAYAMON | 833 | 81% | 243 | 23% | 524 | 54% | 512 | 47% | 24 | 2% | | 0% |
| CAGUAS | 312 | 74% | 150 | 36% | 273 | 65% | 300 | 71% | 109 | 25% | | 0% |
| CAROLINA | 605 | 100% | 229 | 35% | 425 | 70% | 334 | 55% | 112 | 19% | | 0% |
| FAJARDO | 275 | 87% | 43 | 15% | 235 | 74% | 72 | 23% | 84 | 28% | | 0% |
| GUAYAMA | 280 | 91% | 83 | 22% | 214 | 69% | 189 | 60% | 54 | 17% | | 0% |
| HUMACAO | 273 | 99% | 227 | 83% | 247 | 91% | 237 | 86% | 84 | 31% | | 0% |
| MAYAGUEZ | 583 | 58% | 253 | 44% | 115 | 19% | 500 | 84% | 94 | 16% | | 0% |
| PONCE | 651 | 60% | 297 | 28% | 452 | 57% | 523 | 68% | 122 | 15% | | 0% |
| SAN JUAN | 921 | 75% | 115 | 9% | 614 | 50% | 618 | 51% | 31 | 3% | | 0% |
| UTUADO | 273 | 100% | 188 | 69% | 273 | 100% | 272 | 99% | 53 | 19% | | 0% |
| S.A.O.C. | 63 | 55% | 21 | 32% | 52 | 73% | 63 | 55% | 1 | 2% | | 0% |
| NEG. DE TRANSITO | 762 | 86% | 243 | 27% | 831 | 95% | 435 | 54% | 97 | 11% | | 0% |
| FURA | 450 | 84% | 71 | 13% | 313 | 57% | 443 | 82% | 20 | 4% | | 0% |
| DOTM | 57 | 83% | 21 | 32% | 63 | 91% | 64 | 98% | 5 | 0% | | 0% |
| NEG. REL. COMUNIDAD | 50 | 55% | 10 | 45% | 17 | 81% | 20 | 55% | 0 | 0% | | 0% |
| S.A.I.C. (GLOBAL) | 3237 | 84% | 1353 | 35% | 2937 | 68% | 3001 | 76% | 899 | 23% | | 0% |
| S.A.R.P. | 172 | 93% | 89 | 51% | 170 | 98% | 172 | 99% | 93 | 54% | | 0% |
| S.A.E.A. | 204 | 98% | 199 | 95% | 205 | 98% | 205 | 98% | 195 | 93% | | 0% |
| S.A.S.G. | 43 | 77% | 0 | 0% | 38 | 64% | 23 | 41% | 7 | 13% | | 0% |
| Superintendencia, Reforma, Unidad y Familiar | 56 | 92% | 31 | 51% | 53 | 87% | 52 | 82% | 4 | 7% | | 0% |
| FORTALEZA | 125 | 95% | 68 | 45% | 103 | 77% | 110 | 82% | 53 | 40% | | 0% |
| **Total** | **11590** | **87%** | **4498** | **34%** | **8502** | **64%** | **9307** | **70%** | **2380** | **18%** | **0** | **0%** |

Page 2 of 2

In the introduction, the Report documented the apparent progress made in the use of force based on the statistics provided by the PRPD. Here these statistics from the PRPD documents the progress in training, including training in search and seizure. The TCA found that the PRPD is properly prioritizing training on search and seizures and arrests and summons for investigative units such as CIC's and Drug Units, as these are the units most likely to request and receive search warrants and arrest warrants. The Academy reported that as of the end of April 2017, 53% of all investigators assigned to

SAIC have been trained in Search and Seizure and 87% have been trained in Arrests and Summons.

There are, however, areas of concern in which the TCA recommends for the PRPD to make notable adjustments. While most CIC's and Drug Units are up to date in these trainings, the TCA found that only 5 officers (6%) out of 81 at the Fajardo CIC were trained on GO 600-612 (Search and Seizure) and 52 officers (64%) were trained on GO 600-615 (Arrests and Summons). The TCA recommends that the PRPD Academy keeps track of and rectifies this situation.

Similarly, the Director of San Juan Grand Larceny Auto (GLA) Unit reported to the TCA that only 11 officers (32%) out of 34 have been trained in 600-615 (Arrests and Summons) and that only 3 officers (9%) out of 34 are trained in 600-612 (Search and Seizure). The GLA Division is a unit expected to be involved in many arrests and possibly many searches of vehicles per year. The TCA believes that training rate for Arrests and Summons is too low when compared to San Juan Police Area-wide which is at 50%, and the Department-wide numbers, which are well above the 50% percent mark—at 84%--that the Agreement requires. Training on Search and Seizure for stolen vehicles is ahead of schedule in general terms but it is also low in the San Juan Police Area. The TCA recommends that this type of investigative units should be given priority. The Reform Unit was notified to take corrective action.

The TCA has also identified other training issues involving searches and seizures. The TCA has made specific recommendations for additional training of personnel in the Narcotics Division given the fact that Puerto Rico has been subjected to the importation of previously unavailable and little known controlled substances which require additional training to ensure the safety of the community and law enforcement personnel.

The TCA also recommends that the PRPD provides basic tactical entry training to investigators, so they are trained at making an emergency entry in the absence of SWAT personnel. A familiarization course on K-9 procedures should also be provided for investigators. In addition, the PRPD should provide investigators with off-duty type of holsters that properly secure the weapon. The TCA recommends that the PRPD trains officers on it. Also, bullet-proof vests that are worn under civilian clothes would be more proper for investigators while performing their duties rather than vests worn over clothing. Vests worn outside of clothing are more proper for visibility when making an entry to serve an arrest or search warrant.

During their field visits, the TCA noted that data gathering is not automated and is presently being done manually.  However, there are units within the PRPD that have taken it upon themselves to create methods for uploading PRPD forms into the system and make them fillable on computer screens.  For example, San Juan Drug Unit personnel converted the PRPD Forms from PDF to MS-Word or Excel so they could fill them out on the computer, print them, and sign them.  The TCA learned that other units do the same. This is a good practice that works until the proper systems are put in place.  However, the problem is that there is no consistency on how this is done or to what format each form is converted. The TCA recommends that the Reform Unit provides specific instructions to all units on how to convert these forms using a consistent format to make them writeable on computers.  This will save officers time and save the PRPD money by using less paper and providing standardized procedures for conversion.

There are other achievements that the TCA highlights, because of their real impact in the implementation of the Plans and in the development of capacity. First, the PRPD revamped the Polygraph Examiner's Unit testing the Narcotics Bureau as part of the reorganization of that unit. This task resulted in the transfer and administrative investigation of a considerable number of members of the Bureau for failure to pass the administered test.  In the past, the TCA reported on the PRPD's failure to act on questionable polygraph results of certain members of the PRPD's Narcotics Bureau. Police departments typically use polygraph examinations to verify information on application forms or to confirm or refute information the police discovered during a background investigation.  For journey officers in specialty assignments, these tests may ensure that officers have not compromised their position or otherwise engaged in any serious undetected criminal activity. For officers investigating narcotics, firearms, or other vices, polygraph examinations can point to whether officers engaged in the use or sale of illegal narcotics or weapons.  Though failing such a polygraph examination containing pinpointed questions relating to narcotics and weapons may not sustain disciplinary action, it may initiate an internal affairs investigation or transfer the officer pending its outcome.  Under the previous administration, the PRPD did not provide the TCA with any justifiable explanation on why certain members of its Narcotics Bureau remained in the Bureau after failing the tests, or, at a minimum, were investigated.

The community and the officers deserve to have this specter of suspicion removed. Though there are a myriad of laws and regulations to ensure due process to the officers, all of which the TCA agrees with, keeping these officers in a unit investigating offenses dealing with drugs and guns, and having officers display deception on a test

directed toward their illegal use or possession, is akin to "putting the fox in the hen house."

In 2016, the TCA expected the PRPD to address and rectify this situation immediately. When the new administration took control of the PRPD, the TCA informed the Superintendent that this issue continued to be a top priority for the reform and that the TCA planned to report on the PRPD's progress in subsequent reports. Here the TCA acknowledges the effort of Superintendent Fraley. She took ownership of the issue and transferred all officers who previously failed the polygraph examinations. The Superintendent also informed the TCA that the PRPD was to conduct internal investigations of officers where appropriate. This is the type of administrative action expected of leadership at the highest level to have a meaningful impact on the reform.

Another area of progress is the drafting of a General Order for the much-contested issue of Transfers and Promotions for the benefit of the Members of the Police of Puerto Rico (MPPR). Similarly, the PRPD made substantial progress by drafting a General Order to address the deplorable conditions of the Evidence Rooms with a vision toward the prosecution of cases with a methodology designed to preserve the evidence and account for every step in the chain of custody.

In general terms, the work of the PRPD in the implementation of the Community Interaction Councils (General Order 801) is a major achievement, and it is a decisive step toward improving community relations.

The TCA commends the PRPD for looking into the challenges of the Traffic Bureau and for requesting the technical assistance of the TCA and his team. The PRPD and the TCA are working together in examining road and pedestrian safety, traffic enforcement, traffic investigations, highway patrol tactics, fleet management, and other areas of general traffic administration. The TCA is currently drafting a report of its findings and recommendations to the Superintendent.

Finally, the TCA wants to thank the PRPD for supporting the TCA's efforts related to the design and implementation of the surveys under Paragraph 241. In order to complete this task in a timely fashion, the TCA has worked with community leaders, who have assisted in identifying areas of concerns and were instrumental in supporting the operations and coordination of the project.

# Section III

## Current and Anticipated Challenges in the Implementation of the Agreement and the Plans: Paragraph 205(d)

In this section of the Report, the TCA examines the main activities and steps that were reviewed and found not to have been fully, or partially, implemented.  It also discusses the TCA's recommendations regarding necessary steps to achieve compliance with the timelines and activities identified in the Plans.

During this reporting period, the two most significant challenges towards the implementation of the Plans continued to be the implementation of sustainable reforms identified under the Professionalization Plan and the practical steps to be taken towards a timely and efficient implementation of the technological innovations required under Information and Technology Plan.

In the previous Semi-Annual Report, the TCA identified actions taken by the PRPD leadership in the areas of staffing, promotions, and career development that were inconsistent with the Agreement.  However, in the last six months, the TCA has identified an increased commitment by the PRPD, led by Superintendent Fraley, to address some of the thorny issues that previously plagued the professionalization of the PRPD and seemed to have lingered under the previous administration. Specifically, the Superintendent has addressed head-on past illegitimate promotions, unexplained personnel transfers, and failed officer polygraph examinations.  In addition to immediately rectifying these issues, she has directed that policies and procedures are put in place to ensure that they do not happen again.

Under the Agreement, the substantive area of Professionalization has three key objectives and three main interrelated activities: the development of a staffing plan (Paragraph 13), the adoption of merit-based promotions (Paragraphs 14 through 20), and the implementation of a developmental career path (Paragraph 21).  The goal of these three interconnected activities is for the PRPD to develop processes and

TCA Sixth Semi-Annual Report                                    2017

mechanisms that promote professional, ethical, and respectful policing services to effectively address Puerto Rico's public safety challenges. These processes and mechanisms must consistently and uniformly apply constitutional police practices. They must also build public confidence, including the confidence of the PRPD personnel, and must strengthen PRPD's institutional structures.

To attain these goals in Professionalization, the PRPD must take reasonable measures to achieve performance expectations in this area of the Agreement. The TCA examines these issues and make specific recommendations for improvement.

# Paragraph 13: Staffing Allocation and Resource Study

In the previous Semi-Annual Report, the TCA identified significant delays in the originally planned implementation of Paragraph 13 and documented the collateral negative effect this form of inaction was having in other areas of the Agreement. This Report provides an update of the progress made in the last six months and identifies current obstacles for a timely and complete implementation. The TCA acknowledges the key leadership role the Reform's Unit has played in driving the PRPD to comply with the demands of Paragraph 13.

Paragraph 13 requires the PRPD to conduct a staffing allocation and resource study to assess human resource needs for the entire organization. This task is extraordinarily complex. For most police department, the completion of a task of this magnitude often requires contracting external expertise. The case of the PRPD is no exception. The study is important because it is the cornerstone of the professionalization reforms and the basis for a staffing and resource allocation master plan rooted in community-oriented policing principles. This requirement is part of the approved Plan on Professionalization, which detailed steps and timelines have been updated to account for these delays.

Paragraph 13 of the Agreement, entitled "Staffing and Community Policing," reads as follows:

> "PRPD shall assess the appropriate number of sworn and civilian personnel to perform the different department functions necessary to fulfill its mission. To do

TCA Sixth Semi-Annual Report | 2017

> *so, PRPD shall conduct <u>a staffing allocation and resource study</u>. The study shall form the basis for a staffing and resource allocation plan that is consistent with community-oriented policing principles and supports the systematic use of partnerships and problem-solving techniques. To foster community-oriented policing, the plan shall consider deployment practices that offer officers opportunities to serve the communities in which they reside."*

Based on the original proposal in the Action Plans, the deadline to develop this study was June 2016. The PRPD did not meet with the Plan's timeline and was found in non-compliance. The Plan was modified and the Parties and the TCA agreed to three new activities and deadlines. At present, section IV of the Plan on professionalization (implementation objectives) includes three activities toward the implementation of Paragraph 13: activity 1.1 (establishing a working group to develop a work plan toward the implementation of Paragraph 13 on or before December 2016), activity 1.2 (conduct a study on or before December 2017), and activity 1.3 (develop a plan based on the findings of the study on or before December 2017).

When the PRPD failed to meet the June 2016 deadline, the TCA urged the PRPD to prioritize compliance with Paragraph 13. In response to the TCA calls for action, the PRPD created a working group and this is where the role of dedicated PRPD leaders played a key role in driving compliance with this requirement further. The working group consisted of a team of representatives from the Office of the Superintendent and each of the Auxiliary offices. The group was headed by the Auxiliary Superintendent for General Services. The Auxiliary Superintendent was ultimately responsible for the development of the work plan for conducting an evaluation of the Staffing Allocation and Resource Study.

As part of the work plan, in October 2016, the PRPD informed the TCA that the PRPD was issuing a Request for Proposals ("RFP") to conduct the study. The deadline for submission of proposals was November 4th, 2016.

The PRPD created an evaluation committee to review the submitted proposals. The committee consisted of representative of the Reform Office, Human Resources, Information Systems and Technology, Grants, and Field Operations. The committee developed an evaluation rubric with the following criteria: experience, subject matter expertise, expertise, professional references, evaluation of the proposal and its content, services, and available resources. The committee selected one of the companies that

submitted the application.  However, the committee gave the new administration the opportunity to evaluate the recommendation of the committee.  The new administration confirmed the decision of the working group.

The selected consultant was V2A (Vision-to-Action).  V2A is to work closely with Dr. Alexander Weiss.  Dr. Weiss is one of the top national experts on police staffing.  He has conducted multiple staffing analyses for a number of small, medium, and large police departments in the United States.  He is the co-author of *A Performance-Based Approach to Police Staffing and Allocation*, the reference handbook for studies of this kind.   The handbook was published by the COPS Office of the United States Department of Justice and is used frequently as the master guide by many police department undertaking this type of task.  In addition, the PRPD needs to accomplish a number of prerequisite tasks before a successful study can be launched and completed.  The two most important such prerequisite tasks are (a) gathering necessary data and (b) compiling and maintain the data in a form that the consultants can access and use it.

V2A plans to conduct a workload-based analysis, which requires significant data collection and reporting.  Traditionally, there have been four basic approaches to determining workforce levels: per capita, minimum staffing, authorized level, and workload-based.  Each differs in its assumptions, ease of calculation, usefulness, validity, and efficiency.  In his prior semi-annual report, prior to the selection of the consulting firm, the TCA recommended an evidence-based approach to police staffing, addressing the needs of the PRPD based on consistent, long-term workload demands.  The TCA was familiar with the best practices and academic literature, and was quite familiar with the workload-based methodology approach led by Dr. Weiss.  The TCA had no objections to the selection of V2A and Dr. Weiss.

The TCA is aware that the sole responsibility for the lack of progress and delays of the past lies in the PRPD's former leadership.  However, the TCA remains concerned about the current speed of the project.  On April 24, 2017, four months after the consultant was identified, the PRPD and the selected consultant executed the contract.

On May 16, 2017, the TCA attended the first entry briefing between the PRPD and the consultant.   PRPD provided a more recent update in July.  The current proposed timeline is to start immediately and to produce results within in a year, which would not meet the timeframes set forth in activities 1.2 and 1.3 discussed above.  The expected submission date for the study is April 2017 and there is no date for the work plan.  This

will entail that the PRPD would continue to be in non-compliance with these two steps detailed in the Action Plan. Additionally, the TCA is aware that, although the contract has been executed, the funding for this project - as of the time of this Report - is currently on hold.

It is the assessment and the recommendation of the TCA that the PRPD's top priority in the next six to twelve months should be to totally focus on this project so it can turn into an instrument to measure organizational progress. The goal is to conduct a significant and important reorganization of the PRPD structure to better serve Puerto Rico and its citizens. The TCA will continue to provide support to the work of the PRPD in this area. Until the staffing study is completed, the position of the TCA is that the PRPD will continue to be ill-informed on the correct supervisor-to-officer ratio and, consequently, promotional and staffing decisions are likely to be based only on guesswork of operational needs.

For the TCA, the staffing study is to address all phases of police administration: command, control, promotions, communications, and training. Proper staffing is the thread structuring police organizations and as such is critical to its success. The TCA is concerned that the implementation of the new DPS will bring additional changes to the structure and administration of the PRPD that will further impact the production of the study. The TCA cautions that, before any changes to organizational structure are implemented, they should be put on hold until the study is completed.

The fact that the PRPD is three years into the capacity building period and there is no objective way to measure and assess its staffing and resource capacities is nothing short of an inexcusable failure. One person is primarily responsible for this failure, the past Police Superintendent, but the current leadership must be responsive and take charge. This assessment is the basis of the recommendation of the TCA to the Court and the Parties that no additional promotions and transfer--except when absolutely needed--should be made until the study is completed and a complete overhaul of the merit system is in place. The TCA is concerned that the current administration will continue to ignore these recommendations just as the past Police Superintendent ignored them on two prior occasions. As the TCA has documented this lack of compliance with Paragraph 13, the cost of these decisions to the implementation of the Agreement has been extraordinarily high in terms of public safety and the trust in the commitment of the PRPD to sustainable reform.

# Developmental Career Path, Promotions, and The Need to Amend the Current Legal Framework

In past reports, the TCA found that promotions without an objective, scientific merit-based framework and a carefully structured career path raised questions of the qualifications of those promoted. The TCA recommended the PRPD and the Commonwealth to initiate legislative and policy changes to make sure progress was made toward the implementation of competitive merit-based promotions (Paragraphs 14 through 20), and the adoption of a developmental career path (Paragraph 21).

In 2016, the Commonwealth agreed in principle to implement comprehensive legal and policy changes, but they never took place.  Under the new administration, the PRPD has taken very positive steps toward compliance but the much-needed structural changes must be implemented in the coming months.  For example, in a recent public hearing before the House of Representatives, the Superintendent acknowledged the failures of the past and indicated that the promotions of more than 30 members of the PRPD have been or are currently under investigation. This is a very positive step, but long-term reforms require additional legal and policy steps.  This Report points to the most significant steps: the adoption of a new competitive method for promoting high ranking officers, those who aspire to the rank of Captain and above, and amendments to Act 53 or its current equivalent.

Under the Agreement, the development of a staffing plan (Paragraph 13) and the adoption of competitive merit-based promotions (Paragraphs 14 through 20) are intrinsically connected.  Although they are two distinct directives, they are closely linked.  In the past, the PRPD failed to comply with the demands of these requirements.  In fact, the persistent failure to see the interconnection between these Paragraphs was one the greatest obstacles for the PRPD's to make progress toward the implementation of the Agreement in the compliance area of Professionalization.  The TCA understands that the current leadership of the PRPD is fully committed to making progress, but there are persistent concerns about the speed of these changes.

Previously, the TCA documented systemic shortcomings for the promotional process conducted in 2015.  In the post-promotion evaluation of the 2015 promotions, the USDOJ and the TCA agreed to assess together the validity of the promotional process given the importance of Paragraphs 14 through 21 of the implementation of a

Professionalization plan.   The audit found that no standard, objective criteria for evaluation of candidates had been established for such an important process in the PRPD. Based on these findings, the TCA recommended adhering to several commonly accepted police practices regarding promotion procedures. All these recommendations were consistent with Paragraphs 14-21 and were missing in one way or another in PRPD's past promotional processes.

In July 2016, the Police Superintendent announced that the Office of Management and Budget had authorized another round of promotions, and the PRPD implemented more than 200 promotions that summer.  These promotions involved officers who had taken written examinations in 2015 who were on a waiting list, and officers aspiring to the ranks above Captain (which were not subject to written examinations).   Some of these promotions, in particular, for high raking positions, were highly questionable.

After several meetings with the former Governor of Puerto Rico and the Superintendent, the Commonwealth agreed to promote more transparency and to initiate a fast track revision of Act 53 of 1996.  The Commonwealth also agreed to an audit of the files and documents pertaining to the promotion of more than 200 members of the PRPD.

As noted in the Fifth Semi-Annual Report, the audit found significant systemic problems with the promotions.  This review documented the worst fears, including the fact that promotions to ranks above Captain were not based on objective criteria even if they were defined as "merit-based" promotions.   It was undisputed that certain officers (in particular, several high-ranking officers) should not have been promoted.

The USDOJ and the TCA agreed to assess together the validity of the promotional process given the importance of Paragraphs 14 through 21 to the implementation of a professionalization plan.  This assessment was conducted in two phases: the ranks from Sergeant to Captain and the higher echelons comprising the ranks of Inspector to Colonel.  With regards to the promotions above Captain, it became apparent to the TCA that the files and documentation presented by the PRPD could not support promotions based on the criteria of the law requiring "an objective and scientific method" to determine the qualifications of each candidate for promotion.  It was also clear to the TCA that no standard criteria for evaluation had been established for such an important process.   Part of the failure was with the former Superintendent, part was attributable to the limitations of Act 53.

In accordance with Act 53 of June 10, 1996, 25 Laws of Puerto Rico Annotated, 1001 and 1005(e), the Superintendent of the PRPD had the authority to promote personnel to the ranks of Inspector, Commander, Lieutenant Colonel, and Colonel. There were some supposed limitations to this power.  The statute required that the process be "objective and scientific" and the criteria employed be part of the agency's rules and regulations (25 L.P.R.A. 1005).  The criteria included the following elements: (a) evaluation of the applicant's prior conduct, (b) leadership skills, (c) initiative and attitude, (d) academic qualifications, (e) years of service and (f) physical condition.  The Agreement also requires objective criteria, but does not define it.

Section 1001 and 1005(e) of Act 53 ended with the following mandatory legal disposition:

> "[T]he Superintendent must take into consideration the above-recited requirements to give his recommendation to the Governor. The Superintendent must prepare a "concise report" about the candidate, containing all information pertinent and necessary to demonstrate that the candidate meets the requirements."

Based on the findings of the audit, amending Act 53 of 1996 became a priority.  As noted, the Commonwealth agreed to fast track these amendments with the recommendations of the TCA, but this commitment soon proved to be a travesty.

In November 2016, when the TCA received the proposed amendments to Act 53-1996, the proposed amendment did not include the terms agreed upon in August regarding the promotion of high ranking officers.  The TCA responded to the proposal of the Commonwealth.  The TCA noted that the Commonwealth had committed to his recommendation of creating a multi-faceted, competitive form of testing for the ranks from Inspector to Lieutenant Colonel and to discard the highly problematic, highly partisan method of the past.  (The PRPD uses to define these promotions as "merit-based" promotions but there was no indication that they were based on the basis of a competitive method to determine outstanding professional performance).  This was one of the most critical reforms that were agreed to by the Commonwealth in order to comply with the requirements of professionalization set forth by the Agreement and the Plans.

In response to the TCA, the then-Superintendent noted that promotions in the ranks from Inspector to Lieutenant Colonel were to remain unchanged and based on what the PRPD defined as the "merit" system.  During the first week of December 2016, the PRPD notified the TCA that the fast track amendment to Act 53 will not proceed.  This was obviously in direct contradiction to the August commitment of the Commonwealth.  The PRPD also informed the TCA that the proposed amendment will be submitted to the new Superintendent for review and consideration.

In January, the TCA agreed to give the new administration and the new Superintendent the time to evaluate his current proposal and make appropriate revisions and amendments to Act 53, if needed.  The current Superintendent agreed to amend the promotional process to the requirements of the Agreement and to adopt the recommendations of the TCA, but the process of implementation has proven complex and time-consuming, particularly after the implementation of Act 20 of 2017.

The implementation of Act 20 and the derogation of Act 53 have added an unanticipated level of complexity to the needed reforms in this area.  In mid- February, with his team of legal and policy advisors, the TCA prepared a twenty-two page confidential report to the Court, which was shared with the Parties, on how Act 20-2017 (creating the Department of Public Safety) impacted the implementation of the Agreement.  In the referenced confidential document, prepared after a meticulous study of the law as drafted, the TCA found specific challenges that were to affect the implementation of the Agreement and made them known to the Parties.  One of the most poignant examples of the immediate impact that Act 20-2017 would have on the Agreement was the need to incorporate in a timely fashion the legislative changes regulating the PRPD to the reality of the Agreement and its requirements.  Under the old framework, these changes required to amending Act 53; under the new framework, these changes needed to be incorporated in amendments to the current legal order.

In the previous Semi-Annual Report, the TCA noted delays in the implementation of policies associated with the need to amend Act 53 of 1996.  These delays persist today and, as a result, the Commonwealth is found in non-compliance with the terms of the Agreement and the Action Plans in all activities and detailed steps requiring amendment of Act 53 or its current equivalent.  Until recently, Act 53 was the main legislative document governing the structure and operations of the PRPD.  The recent enactment of Act 20 of 2017 has replaced Act 53, but has not replaced the need to adjust the legislative reality to the terms of the Agreement, the Action Plans, and the commitments

TCA Sixth Semi-Annual Report                                    2017

to professionalization made by the Commonwealth. The Commonwealth must find a way to move forward without further delays

As noted earlier, the purpose of the four-month extension request made by the Commonwealth and approved by the TCA is to adjust the production of policies and training materials to the new organizational structure stemming from the implementation of Act 20 replacing Act 53. The recommendation of the TCA is that this extension is first used to address reforms to the promotion of high ranking officials to which the Commonwealth has committed.

In this Report, the TCA continues to stand by the recommendation that the most objective method of promotion of high ranking official is to adhere to a multi-faceted form of testing rather than merit based promotional system. The TCA submits that the history of promotions in the PRPD has been highly partisan and no matter how much effort is placed in trying to define merit or enumerating attributes that may be considered meritorious, when it comes to deciding who deserves the promotion among those with "merit," the current system seems subjective and suspicion becomes prevalent among the candidates. The position of the TCA is based on two arguments. First, competitive testing only recognizes merit in the highest grade. A system based on recognizing who has the highest grade will never be called partisan. Second, the current PRPD's definition of merit is discriminatory. If the so-called non-competitive "merit" system is applicable only to higher ranked officers, then such application unduly discriminates against those in the ranks from Sergeant to Captain. Due process of law, a paramount requirement of the Agreement, entails equal application and equal protection under the law.

# The Impact of Act 20 of 2017

In the early months of 2017, the Puerto Rico House of Representatives approved Bill 741 to create the Department of Public Security ("DPS") within the government of the Commonwealth of Puerto Rico. The purpose of this legislation submitted by the Governor was to reorganize and consolidate seven agencies of the government in charge of public safety into one Department. Specifically, the proposed legislation integrated the Puerto Rico Police Department, the Fire Department, the Emergency Management Agency, the Medical Emergencies Management Agency, the Bureau of

Special Investigations, and the Institute of Forensic Sciences into the proposed new DPS.   Each of the then-separate agencies were to become a bureau of the new department and were to be headed by a commissioner appointed by the Governor.

At that point, the TCA actively engaged with the Parties, in particular USDOJ, and researched the Bill to make sure it complied with the requirements of the Agreement. The authority of the TCA to review the impact of this legislation stems from the Agreement.  Paragraph 286 specifically reads as follows:

> "This Agreement is binding on all Parties hereto, by and through their officials, agents, employees, and successors. If the Commonwealth of Puerto Rico establishes or reorganizes a government agency or entity whose function includes overseeing, regulating, accrediting, investigating, training, or reviewing the operations of PRPD, any aspect thereof, or of its officers, the Commonwealth of Puerto Rico agrees to ensure that these functions and entities are consistent with the terms of this Agreement and shall incorporate, to the extent possible under applicable law, the terms of this Agreement into the oversight, regulatory, accreditation, investigation, training, or review functions of the government agency or entity as necessary to ensure full implementation of this Agreement".

It is undisputed that this new legislation had to be evaluated through the lenses of Paragraph 286 as it integrated the Puerto Rico Police Department into a new government agency or entity.  Also, it is undisputed that the legislation had the potential of directly affecting important aspects of the Action Plans submitted by the PRPD in accordance with Paragraph 237 of the Agreement, all of which have been approved by the TCA and the USDOJ.   Given this situation, the TCA began to carefully monitor developments in the legislative process.

In February, the TCA was invited by the Commonwealth House of Representatives to participate in a Public Hearing to present his assessment of the proposed legislation. On February 16, 2017, the TCA brought to the attention of the USDOJ the ongoing efforts of the Commonwealth regarding the draft of the aforesaid project, pursuant to instructions of the District Court.   After the TCA's conversation with USDOJ representatives, the attorney in charge indicated he was going to brief his superiors. After conversing with his superiors, the attorneys representing USDOJ and the TCA again discussed the pending issues and the following was agreed to:

1. The PRPD should manage this issue by itself in coordination with PRDOJ and provide to both, USDOJ and TCA information on how does this bill affects the reform process;

2. Neither the TCA nor the USDOJ should testify before the House of Representatives as they may, in an unintended way, give the appearance of intervening in the local legislative process either in favor or against the bill;

3. The PRDOJ was to identify the potential problems and risks the bill represents to the implementation of the Action Plans and Policies approved by the TCA and the USDOJ during the capacity building period;

4. Because the Commonwealth was the defendant in the case before the United States District Court, the USDOJ should not provide advice directly to the Government of Puerto Rico about this specific Bill;

5. USDOJ concurred with briefing on the Reform Process and its effects to a small group of members of the House and the Senate in closed meetings;

6. PRDOJ did not provide advanced notice concerning this Bill to the USDOJ and the TCA.

7. PRDOJ was expected to discern the incongruities between the bill and the mandates of the Reform Process to be able to advice on any issues before the Governor signs the Bill into law.

8. USDOJ and the TCA agreed that once the new law was in effect, it could potentially challenge some aspects in the implementation of the Reform.


On February 17, 2017, the Court issued an order (Docket 494) taking judicial notice of the fact that at that time the Legislative Assembly of the Commonwealth of Puerto Rico was entertaining a Bill which intended to consolidate, among other administrative bodies, law enforcement agencies in the local jurisdiction, including the PRPD. Moreover, the Court also took judicial notice of the fact that the Legislative Assembly had been considerate enough to extend an invitation to the Technical Compliance Adviser ("TCA"), Colonel Arnaldo Claudio, to address matters related to the possible enactment of the above-mentioned legislative initiative. Due to the above, the Court was compelled by constitutional mandate to articulate about any potential participation of the TCA in the above-mentioned legislative process. The Court found it was imperative to clarify that the TCA acts and exercises his authority pursuant to the Consent Agreement

(Docket No. 60) as an arm of the Federal Judiciary. Hence, in his official capacity, all opinions that the TCA renders must be limited to the confines of the Consent Agreement and the jurisdictional limitations of the Court.

In that same Order, the Court extended an official invitation to all members of the Legislative Assembly to the Public Hearing to be held on Friday, February 24, 2017 at the José V. Toledo U.S. Courthouse in Old San Juan, Puerto Rico.  Lastly, the Court informed the Legislative Assembly that the TCA and his team were authorized to offer additional information regarding the Agreement in a non-public, educational type forum. It should be further noticed that these forums were not requested by either the House of Representatives or the Senate.

On February 22, 2017, the TCA met with the Governor's advisors and the Parties to discuss the Bill. Information and concerns were exchanged and the TCA was advised that he would again be consulted and not to be concerned because the Bill would not affect the ongoing Reform process. A second meeting never took place.

On February 24, 2017, the Governor's representatives testified at the February Public Hearing and informed that the Commonwealth would comply with the Judge's request of consulting with USDOJ and the TCA prior to the signing of the Bill.  That consultation never took place.  Neither the proposed meeting took place nor was there any effort to convene it.

On March 27, 2017, the Bill was approved by the House of Representatives and referred to the Senate (PS 306) where it was approved without any amendments.   It was subsequently sent to the Governor of Puerto Rico for his approval and signing into law.

This Report identified the areas of concerns that the implementation of the new Act could have upon the Reform Process which is being implemented according to the Agreement signed by the Department of Justice of the United States and the Commonwealth of Puerto Rico and approved by the U. S, District Court for the District of Puerto Rico.

A detailed analysis of the Act strongly suggests the following areas of the Agreement and the Action Plans that could be directly affected by the new law unless proper measures are taken by the new department (DSP) to continue implementing the Reform without undue delay.

*Primary Areas of Concern:*

A detailed analysis of the Act strongly suggests the following areas of the Agreement and the Action Plans that could be directly affected by the new law:

1.    Policies
2.    Command and Control (Supervision and Management)
3.    Budget
4.    Human Resources
5.    Self-sustained IT system for data analysis and reporting
6.    Capacity Building and Evaluation Process
7.    Police Academy, Training and Evaluation

At the top of the TCA list of concerns was the need to complete the Staffing Study (Paragraph 13 of the Agreement) and the impact of derogating Act 53, as it takes away the ability to promote, transfer, provide disciplinary actions and train the Police force. In other words, all drafted and approved policies of the last three years needed to be revised and changed into internal orders and again run the process of approval by the USDOJ and the TCA. This process also called for additional expenses.  These two concerns have been addressed in prior portions of this section.

The main concern for the TCA was, under the aegis of this Bill, for the creation of an external PRPD training base different from the Police Academy.  Among other problems, the creation of a new training facility could turn into significant expenses to a government already facing a very severe fiscal crisis.

The TCA is aware that on Article 9.02 (Disposiciones transitorias) of the Act, there was specific language that affirmed that the restructuring of PRPD would be subject to the implementation of the Agreement which reads as follows:

"El proceso de consolidación del Negociado de la Policía estará sujeto al cumplimiento con lo establecido en el acuerdo entre el Departamento de Justicia de los Estados Unidos, el Gobierno de Puerto Rico y la Comisionada de la Policía (Agreement for Sustainable Reform of Puerto Rico Police Department). **La fusión dispuesta en esta Ley se realizará en coordinación con las autoridades federales que forman parte y/o supervisan el acuerdo de Reforma de la Policía de Puerto Rico. (**emboldened for emphasis)**"**

The TCA acknowledged the meaning of the paragraph cited above but there were open questions about the role and participation of the USDOJ and the TCA in some sort of transitional team to oversee compliance with the Police Reform singling out the Bureau of Police among the other agencies comprising the Security Agency.

The TCA's analysis of the new legislation was based on the premise that Paragraph 286 of the Agreement for the Sustainable Reform of the Police of Puerto Rico makes the Agreement binding on all Parties by and through their officials, agents, employees, and successors. Said paragraph further states that "If the Commonwealth of Puerto Rico establishes or reorganizes a government agency or entity whose function includes overseeing, regulating, accrediting, investigating, training, or reviewing the operations of PRPD, any aspect thereof, or of its officers, the Commonwealth of Puerto Rico **agrees to ensure that these functions and entities are consistent with the terms of this Agreement and shall incorporate, to the extent possible under applicable law, the terms of this Agreement into the oversight, regulatory, accreditation, investigation, training, or review functions of the government agency or entity as necessary to ensure full implementation of this Agreement.** (Emboldened for emphasis).

Pursuant to the Agreement for the Sustainable Reform of the Puerto Rico Police Department and to ensure the reform process is carried out, the PRPD developed Action Plans in each of the eleven Areas set by the Agreement; (1) Professionalization; (2) Use of Force; (3) Searches and Seizures; (4) Equal Protection and Non-Discrimination; (5) Recruitment, Selection, and Hiring; (6) Policies and Procedures; (7) Training; (8) Supervision and Management; (9) Civilian Complaints, Internal Investigations, and Discipline; (10) Community Engagement and Public Information; and (11) Information Systems and Technology. These Action Plans set forth in detail the steps agreed upon to execute and implement the Reform process and achieve the desired outcomes in each area. Any deviation from these Action Plans in time, space, effort and allocated resources would jeopardize the on-going process and set back the

TCA Sixth Semi-Annual Report                                    2017

progress already obtained. The creation of new policies, practices, training, documentation, internal review, continuous improvement, and oversight by leaders and subordinates provide a platform for success that should not be detained.

On the Statement of Motives of the Bill (Exposicion de Motivos), it stated in its pertinent part as follows:

> "Disponer para la ordenada transición hacia la integración de las entidades que formarán parte del Departamento de Seguridad Pública en aras de lograr ahorros y eficiencias, mejorar los servicios que recibe la ciudadanía, cumplir con los requerimientos de la reforma de la Policía y salvaguardar los fondos federales; y para otros fines relacionados."

Although these objectives were well intentioned, the concern was that the text of the Act did not include specific language about the Action Plans consistent with Paragraph 293 of the Agreement, that is, "Except where otherwise specifically indicated, PRPD shall implement the provisions of this Agreement in accordance with the Action Plans developed in consultation with the TCA and incorporated into this Agreement by reference.

In other words, the concern is that the Act did not recognize the obligations of the Commonwealth under the Action Plans, which are enforceable terms of the Agreement. This could have been addressed by including a more suitable language expressing the following: "cumplir con los requerimientos de la reforma de la Policía como estipulado en los Planes de Acción."

The fact that there was no reference to the Action Plans in the body of the Act was highly problematic.  Neither there was a reference to the capacity building period, a feature unique to this Agreement, which was requested by the government in consideration to the needs of the PRPD.  The Act merely mentioned in Article 2.04, that the Commissioner of the Bureau of Police, among his powers and duties, will assure compliance with the Agreement.  More specificity in the text of the Bill would have assured all the parties that compliance will be met pursuant to the requirements of the Agreement and will advance the reform process ridding it of unnecessary litigation. Needless to mention, had this been done, it would avoid unnecessary additional expenses on matters that have long been resolved.

In the Statement of Motives of the Bill, the following was expressed:

> "Antes del Acuerdo para la Reforma Sostenible de la Policía de Puerto Rico, agencias como la Policía de Puerto Rico, adiestraban recursos humanos para realizar funciones específicas y luego estos eran trasladados a otras unidades y áreas para ejercer funciones en las cuales no habían sido adiestrados y donde no se aprovechaban los conocimientos de ese recurso . Es preciso que utilicemos nuestros recursos de forma más efectiva y eficiente para el mejoramiento de nuestro recurso humano y los servicios de seguridad que se presentan a la ciudadanía".

The TCA was very concerned with the fact that before any changes in personnel were to be contemplated, the study required by Paragraph 13 of the Agreement must be completed. Said study was scheduled to commence no later than 1 August 2017, and should bear results on or about April 2018 with a work plan to be developed thereafter. Paragraph 13 mandates that PRPD shall assess the appropriate number of sworn and civilian personnel to perform the different departmental functions necessary to fulfill its mission. To do so, PRPD shall conduct an allocation and resource study. The study shall form the basis for a staffing and resource allocation plan that is consistent with community-oriented policing principles and supports the systematic use of partnerships and problem-solving techniques.  To foster community-oriented policing, the plan shall consider deployment practices that provide officers opportunities to serve the communities in which they reside. Such essential language is not included in the body of the law nor there is a reference to the same.  For example, the Act could have specifically mentioned this pending matter by including the following language:

> "Antes del Acuerdo para la Reforma Sostenible de la Policía de Puerto Rico, agencias como la Policía de Puerto Rico, adiestraban recursos humanos para realizar funciones específicas y luego estos eran trasladados a otras unidades y áreas para ejercer funciones en las cuales no habían sido adiestrados y donde no se aprovechaban los conocimientos de ese recurso  . Es preciso que utilicemos nuestros recursos de forma más efectiva y eficiente para el mejoramiento de nuestro recurso humano y los servicios de seguridad que se presentan a la ciudadanía. <u>En cuanto al Negociado de Policía de Puerto Rico, estaremos en espera de los resultados del estudio del Párrafo 13 del Acuerdo para establecer las necesidades de esta agencia</u>".

The Statement of Motives of the Bill and the body of the law noted that compliance with the Agreement would be observed, however, specificity was necessary to assure no variances or departures taking place in its implementation.  The TCA assumes the responsibility of informing any disparities or deviations.

In Page 7 of the Statement of Motives of the Bill, the following was expressed:

> "Esta iniciativa está cimentada en el firme compromiso de desarrollar una estrategia que funcione y que se oriente a la seguridad en sus diversas vertientes y que trabaje de forma integrada con otras agencias del Gobierno de Puerto Rico.  Hay el firme compromiso de poder desarrollar una Iniciativa que: sea abarcadora y que vaya a la raíz del problema; atienda los pilares de la seguridad de forma coherente y en cumplimiento con lo requerido por la Reforma de la Policía"

However, the TCA was concerned that this text made no mention of the importance of the effective implementation of the Action Plans previously approved. Had it included the following language, we would not be so concerned:

> "Atienda los pilares de la seguridad de forma coherente y en cumplimiento con lo requerido por la Reforma de la Policía según enmarcado en sus Planes de Acción'

The TCA was particularly concerned with the restructuring of the Police Academy and its integration to a new Center for Training and Development of Public Safety. (Centro de Capacitacion y Seguridad Publica).  The language in Page 8 of the Bill, and its counterpart, as it appeared on Article 1.11 of the Bill was of special concern to the TCA. It stated the Police Academy would be replaced by a "Centro de Capacitación y Desarrollo de Seguridad Pública." The text cited is the following:

> "Instrucción adecuada y centralizada para la profesionalización y capacitación de todo el personal de DSP.  En el nuevo Centro de Capacitación y Desarrollo de Seguridad Pública, contaremos con instructores certificados para cada área de conocimiento relevante a los trabajos de cada Negociado incluyendo instructores certificados bajo los parámetros de la Reforma de la Policía y  otros recursos del

más alto calibre incluyendo la posibilidad de allegar y/o ampliar los recursos pedagógicos mediante acuerdos con instituciones federales de ley y orden así como instituciones educativas públicas o privadas".

The TCA cautioned of any deviation from providing new and active PRPD members with the opportunity to attain training at the Police Academy.   The Academy, as an agent of change, serves as a point of entry and exit of all the changes that are being carried out through the Reform.

As a recent survey of the TCA revealed (Paragraph 214 of the Agreement), the Police of Puerto Rico is a very experienced institution, but with a high number of members of the Department that are closer to the age of retirement and separation. It is for this reason, among others, that the TCA recommended in several reports to the Court and the Parties, and in conversations with the police, that the Academy is vital for the progress of the reform and that the Police Department should consider the implementation of at least two annual classes of new cadets. This measure would be highly beneficial for the rejuvenation and the transformation of the police. In addition, the Police Academy has developed very polished training curricula based on a training development model that ensures a seamless transition from policy to training, and eventually to implementation. The TCA has also documented advances in the number of officers trained on impact weapons, use of force, ethics, administrative complaints, searches and seizures, and equal protection in accordance with the requirements of Paragraph 237.   The TCA has persistently recommended that the Academy must remain sufficiently funded to adequately deal with the required maintenance and that no changes be made by this law until full implementation of the training requirements in the Agreement, as set forth by the Action Plans, are completed; including the Field Training Officer program.   The TCA further submits that training and the recruitment of new cadets is fundamental to the success of the Agreement. Finally, to provide guidance by way of example, the United States District Court, in order to ensure strict compliance with the Agreement, issued a "Transition Order" to prevent a transfer of critical personnel that would jeopardize the Reform process. The Court provided those directives to enable the PRPD to continue the process by maintaining key personnel in the Reform Unit and the Police Academy, unless there is just cause for a transfer.

In page 9 of the Statement of Motives of the Bill there was the following language:

"Para poder enfrentar los retos de criminalidad, violencia y emergencias de Puerto Rico hay que reorganizar, reformar, modernizar y fortalecer nuestros

instrumentos de seguridad pública a nivel estatal para incrementar su capacidad, eficiencia y efectividad. Reformar y modernizar las agencias de seguridad pública es una necesidad imperativa".

As it is clearly stated in paragraph 1 of the Agreement, the commitment of both Parties is for "vigorous and constitutional law enforcement. The Parties jointly entered this Agreement to ensure that the Puerto Rico Police Department ("PRPD") delivers policing services in a manner that upholds civil rights guaranteed by the Constitution and laws of the United States and the Commonwealth of Puerto Rico. This Agreement is also intended to promote public safety by providing PRPD officers with the tools, guidance, and resources that they need to fight crime effectively. The Parties recognize that public safety, constitutional policing, and the community's trust in its police force are interdependent. The full and sustained implementation of this Agreement, will protect public safety, guarantee individual civil rights, and increase public confidence in the police". Furthermore, the Action Plan for Professionalism states, "the goal of developing processes and mechanisms that will contribute to promoting professional, ethical, and respectful police services to address the public security challenges Puerto Rico is facing in an effective manner; applying constitutional police practices in a consistent and uniform manner to restore the community's trust in the Puerto Rico Police Department (PRPD); and promoting ongoing improvement in the work performance of all its personnel. Decisions made by PRPD supervisors and officers can have a direct impact on the services provided to communities". We suggested that no changes be made in the process of providing an adequate training resource to the Police; i.e. the Academy should not be modified or changed until such activities in the Action Plan for Professionalism and Training are completed. It should be noted that a considerable amount of expenses had already been incurred in refining the curricula and training manuals of the Academy to meet the standard of "best practices." Any changes would amount to a substantial waste of taxpayers' monies.

In page 11 of the Statement of Motives of the Bill, the definition of the "reform" was incomplete and inconsistent with Paragraph 2 of the Agreement.  The text is included below for comparison purposes:

"Reforma" o "Reforma de la Policía– Significa el Acuerdo para la Reforma Sostenible del Departamento de la Policía de Puerto Rico suscrito entre los Estados Unidos, el Gobierno de Puerto Rico y la Policía de Puerto Rico. Esta definición incluye cualquier enmienda futura u orden relacionada emitida por el Tribunal Federal para el Distrito de Puerto Rico.

TCA Sixth Semi-Annual Report | 2017

This was an incorrect definition of the Reform. The "Reform" (per paragraph 2 of the Agreement) consists of the initiatives negotiated after an extensive period of cooperation and consultation between PRPD and the Department of Justice ("DOJ"). "The Parties recognize that the modernization and professionalization of PRPD are important priorities and have agreed on comprehensive reforms to accomplish these objectives".

The Agreement was definitely the main part of the decision issued by the Hon. Gustavo Gelpí, United States District Judge, in case number, No. 12-cv-2039 (GAG), that the defendant, the Commonwealth of Puerto Rico, must fully comply with. The "Reform, "is not something that may be obviated or complied with in any other way or form other than what is established in the Agreement. Its mandatory terms cannot be diverted from strict compliance by the creation of a local law or the inclusion of the PRPD in a Security Agency. The decision of the United States District Court, specifically the decision regarding the implementation of the Agreement, is an exacting mandate to the Commonwealth of Puerto Rico.

Paragraph 1 of the Agreement reads as follows:

> "The Commonwealth of Puerto Rico and the United States are committed to vigorous and constitutional law enforcement. The Parties jointly enter this Agreement to ensure that the Puerto Rico Police Department ("PRPD") delivers policing services in a manner that upholds civil rights guaranteed by the Constitution and laws of the United States and the Commonwealth of Puerto Rico. This Agreement is also intended to promote public safety by providing PRPD officers with the tools, guidance, and resources that they need to fight crime effectively. The Parties recognize that public safety, constitutional policing, and the community's trust in its police force is interdependent. The full and sustained implementation of this Agreement, will protect public safety, guarantee individual civil rights, and increase public confidence in the police."

Another issue of concern was found in page 11 of the Exposition of Motives, which read as follows:

> "Determinará, mediante reglamento, con el consentimiento del Secretario y en cumplimiento con el Acuerdo para la Reforma de la Policía de Puerto Rico, el sistema de rango a ser utilizado".

The above assertion we read in conjunction with the same issue on the text of the Bill at Article 2.11:

> "Los rangos de los miembros de Negociado de la Policía serán los que se establezcan administrativamente conforme a las mejores prácticas policíacas y lo requerido por el Acuerdo para la Reforma de la Policía".

The TCA submitted that concerning promotions in the PRPD, the new Law needed to take into serious consideration the present state of affairs that led to questionable and possible illegal promotions and acts of favoritism. The Action Plan on Professionalization had three key components, which are all interrelated, as discussed in prior portions of this Report.

In prior semi-annual reports, the TCA recommended that the PRPD should not make any additional promotions until they had completed the staffing study and ensured that personnel decisions were made on both, operational needs and the establishment of a rigorous system of merit-based promotions. the TCA argued against the PRPD promoting personnel without first understanding the strategic demands of the organization and having established a tested and reliable merit-based system of promotions. As it is documented in the TCA's Fifth Semi-Annual Report, the recent round of promotions was plagued with deficiencies, violated the terms of the Agreement, and in our opinion, caused irreversible damage toward the implementation of a career plan for supervisors by giving an unfair advantage to individuals who lacked the qualifications to be promoted. After reviewing the files used to promote candidates, the TCA presented his findings on the systemic and widespread problems to the PRPD. The TCA had separate meetings on those issues with the former Governor of Puerto Rico and his staff, the Secretary of Justice, and the Police Superintendent. They were fully informed of the nature of these findings. We recommended, and the Commonwealth agreed to make, important legislative and policy changes.

On Article 2.14 of the Bill creating the Department of Public Security, the TCA encountered yet another issue which was of great concern:

> "El Secretario y el Comisionado deberán tomar todas las medidas administrativas necesarias para garantizar la seguridad y la secretividad de la identidad de los encubiertos, y en cumplimiento al Acuerdo para la Reforma de la Policía de Puerto Rico".

This measure could simply take away from the Police Superintendent the power to manage undercover agents and leave that program without a policy to manage such an important asset.   It should be noted that the creation of a new plan to manage undercover agents, when there is one already in place, will result in an additional waste of taxpayers' monies and resources to a government already confronting a fiscal crisis.

Another important issue was the fact that there were some undercover agents that were grandfathered into the system without meeting certain academic criteria.  The new legal framework could not let this important program and its personnel be untouched by the Reform process as it would continue to gather unqualified people for police services.

On Article 2.21 of the Bill we found yet another conflicting difference with the intent of the Agreement:

> "El Comisionado determinará mediante reglamentación interna todo lo relativo a los Consejos Comunitarios de Seguridad conforme a las mejores prácticas policíacas y lo dispuesto en el Acuerdo para la Reforma de la Policía".

The TCA submitted that the "Consejos Comunitarios de Seguridad" was not a part of the Agreement. However, Paragraphs 209 through 213 do require the PRPD to maintain Community Interaction Councils ("CICs") jointly with community representatives to facilitate regular communication and cooperation between the PRPD and community leaders at the local level.  In other words, the establishment of the CIC"s is not a discretionary matter determined by internal regulations.

*Additional Areas of Concern:*

**Reporting and Data Collection**:

The TCA was also concerned that the Act did not include a specific commitment to develop policies and procedures to continue with professionalization of the police force; provide services in an equitable, respectful, and unbiased manner; strengthen the community's trust; and comply with constitutional guarantees and generally accepted police practices. All members of the PRPDs will be required to inform their supervisor of any arrest for a felony, obstruction of justice, or resisting arrest. Arrests will also be

documented in an electronic form, using as reference the automatic mechanized dispatch system adopted by the Agency to write up arrests, interventions, and searches electronically. Also, the adding of an Early Identification System (EIS) will be paramount in identifying recurrent offenders. Again, improvising on issues already settled and approved will also unnecessarily affect the taxpayers pocket.

**Recruitment:**

The Act provided no guidance for the recruitment of police services. The TCA was cognizant that the absence of this language jeopardized the efficiency that must be obtained to conduct a reliable Recruitment program.

Pursuant to the Agreement for the Sustainable Reform of the Puerto Rico Police Department, the Recruitment, Selection, and Hiring Compliance Area has the goal of developing and establishing an effective Recruitment Program to select and hire candidates who are qualified to perform the role of a Member of the PRPD (MPRPD) to maintain or increase the personnel's efficiency and performance, as well as the efficiency of the PRPD, and in turn, help earn the community's trust. It also has the goal of establishing alliances with historically underrepresented groups in the PRPD to successfully attract candidates from different cultures and to have a better understanding, to address the needs of the community and the factors that contribute to crime". The absence of this language in the Bill, reiterating the importance of an effective and merit basis recruitment jeopardizes the efficiency that must be obtained to conduct a reliable Recruitment Program.

**Policy and Procedure Development**:

With the derogation of Law 53, many of the existing new policies must be changed and substituted by internal regulations. The policies and procedures developed by the PRPD are to establish the specific rules and processes that will direct supervisors to fulfill their duties, and to prevent, identify, and correct misconduct. These policies and procedures will serve as guidelines for the professional development of the personnel in charge of directly supervising MPRPDs, and will enable close and effective supervision that is effective and consistent with generally accepted police practices. Based on the Agreement, these policies will be reviewed annually during the first three (3) years following the appointment of the Technical Compliance Advisor (TCA), and every two

years thereafter. A change in that ongoing process or a change provoked by the Law will bring significantly delays in the creation and implementation of these important policies.

**Information and Technology Systems Requirements**:

Pursuant to the Agreement for the Sustainable Reform of the Puerto Rico Police Department, the Information Systems and Technology Compliance Area has the goal of updating its technological information systems infrastructure to improve the police processes and procedures in the administrative and operational areas. The Puerto Rico Police Department (PRPD) will efficiently and effectively establish data communication and information systems infrastructures to support the daily activities of its employees. In that sense, the PRPD will collect and maintain all the necessary information, including records, required reports, and statistical data, to document the implementation of and compliance with the Agreement in each compliance area. Additionally, it will facilitate public access to all information required by the compliance areas and related to the Agreement. In the technological aspect, it will promote the safety of individuals and members of the Puerto Rico Police Department (MPRPD). Because of the budget constraints due to the pervasive fiscal crisis, the PRPD is way behind the mandated requisites for compliance. Imposing such additional burden of funding multiple Bureaus within the Security agency would totally disrupt progress in this area, which is critical for safety concerns and needs immediate implementation.

**Budget:**

The Act did not present a logical and sequential budget for the PRPD. Furthermore, it had no language that supported the Reform funding requirements, which have been estimated in not less than $20 million. As committed in the Action Plans, at a minimum, each action plan will: identify each policy and procedure change required; the dates by which these changes will be drafted for submission to the TCA and USDOJ; the date for preparation of training curricula, modules, or plans; a schedule for training (by precinct, zone, rank, or another appropriate categorization); a schedule for the implementation of policies and procedures in the field; the budgetary allocations and funding sources to execute the tasks in the Action Plan; and the date(s) by which compliance data will begin to be collected and the requirement shall be ready for compliance review by the TCA. The budget committed under the Plans is now part of the Agreement.

In closing, the TCA was fully aware of the importance of government plans regarding this legislation. However, lack of precision in understanding the complexities of the Agreements and the Action Plans, and the legal commitment made already by the Commonwealth might slow down the progress achieved by the reform so far under the guise of progress and reorganization.   This was clear when members of the Administration made public statements about complying with the terms of the Agreement in a shorter than committed timeframe.  The TCA further acknowledged that the TCA acts and exercises his authority pursuant to the Consent Agreement (Docket No. 60) as an arm of the Federal Judiciary but is not a party to this case.  Furthermore, the above concerns were made in an overabundance of caution and were shared with the parties for the sole purpose of advancing the progress of the reform.

# Reorganization of the Drugs, Narcotics, Vice, and Illegal Firearms Bureau ("Narcotics Bureau") and Findings from Polygraph Review

In prior semi-annual reports, the TCA has been critical of the operational readiness and protocols of the Drugs Division driven by the unfortunate reality of very shocking public scandals.   In his commitment to decrease these occurrences, the TCA provided literature, written suggestions, and recommendations to the PRPD to enhance the reorganization of this Division. The TCA also attended meetings and discussions with the PRPD and other stakeholders to provide input.

These immoderate occurrences prompted the former police Superintendent to determine the need for reorganization and requested the assistance and recommendations of the TCA.  On May 2016, the PRPD created a new General Order to reorganize and restructure this Unit and to correct deficiencies that have plagued this Division, which it appears has nurtured an environment and sustained a culture where officers believe they were impervious to detection and punishment.  The purpose of this General Order was to reorganize the Division, redefine its organizational structure and procedures, set selection criteria of personnel, and improve training.  New areas in the reorganization are guidelines for recruitment, transfer of personnel, increased supervision, polygraph examinations, training, specific duties, and responsibilities, and the internal restructuring of the unit for better quality control, evidence control, and data collection.

2017

The TCA reviewed, commented, and provided recommendations to the PRPD on the reorganization and improvement of the Drugs Division, which the Superintendent approved on September 13, 2016.  The TCA made several recommendations and the PRPD adopted some but not all of the recommendations.

If there was an area where the TCA found policy changes fell short of the requirements of the Agreement, this area was the PRPD initiatives addressing internal corruption, reorganizing internal controls, and creating a basic baseline from which to measure progress.  Furthermore, if there was an area where the former Superintendent failed to share relevant information with the TCA, that was the results of polygraph testing. Under the current Superintendent, that situation has been remedied and the TCA had the opportunity to evaluate the progress made.

**Background**

On September 29, 2015, the former Superintendent, Jose L. Caldero, reacting to a rash of recent arrests and allegations of police corruption in the Bureau of Narcotics, Vice and illegal Firearms ("Narcotics Bureau") ordered that all members of the Narcotics Bureau submit to a polygraph test.  The initiative was made known to the public through a press release on the same date. Notwithstanding the aforesaid initiative, allegations of misconduct persisted and further arrests of members of this Unit by the FBI continued to make headlines in local newspapers.

The TCA and the Reform Unit of the PRPD have continued to work on Action Plans, Regulations, General Orders and new policies in an effort to improve all directives within the province of the Agreement, including policies affecting the Narcotics Bureau.  The goal was to develop and improve the capacity of police officers, their relations with the community, and to restore the image and confidence of the citizens in the Police of Puerto Rico.

In early September 2016, the former Superintendent informed the TCA that a considerable number of the personnel working for the Narcotics Bureau had failed the polygraph tests; however, these individuals continued to work for said Bureau.  This information was relayed to the former Secretary of Justice, Cesar Miranda.  The PRPD failed to provide additional information to the TCA and share concrete statistics and documents.

When the new administration took over the reins of the PRPD and the former Director of the Narcotics Bureau and his assistant were removed from their positions, the number of officers who had failed the polygraph test was still unknown and they had remained in their positions.   During this reporting period, the TCA asked Police Superintendent Fraley for a meeting with the former Director of the Narcotics Bureau and the former director of the Deputy Superintendence of Criminal Investigations, S.A.I.C., and the members of the Polygraph Unit of the PRPD, in an effort to determine the current status of polygraph testing and the measures, if any, taken against those that failed said test. The Superintendent agreed to the meeting.

**Puerto Rico Police Department's Policy on Polygraph Examinations**

Currently, the PRPD's policy on polygraph testing is regulated by Regulation No. 65-07; "*Rules, Regulation and Governing Guidelines Regarding the Use of Polygraph Testing in the PRPD.*" This regulation was signed into law on August 20, 2002. These governing guidelines are applicable to any proceeding where the agency carries out a polygraph examination, whether to job applicants, by request of another agency, to witnesses, and the like.

Under this regulation, the data obtained from the polygraph examination must not be considered the "result" of the test.

Article 5. j. states that:

> "No test will be considered valid until it passes quality control checks. Results have to be signed and validated by the Director of the Psychological Services Unit."[2]

Once the process reaches its resolution, the results are not published automatically. The publications of the results are heavily regulated by the guidelines, and, depending

---

[2] Rough translation. Original Article 5. J. "Ninguna prueba se considerará válida hasta que haya sido sometida al programa de control de calidad y el informe haya sido firmado por el Director de la Unidad de Psicología Forense." Reglamento 6507 de la Policía de Puerto Rico.

on the subject being examined, different standards are applied.  Regarding the results of the test, Article 5. I Subsection (8) ("Final Report on Results") reads:

> "The (final) results of the polygraph exam are confidential and will not be published **outside the agency** without the Superintendent's consent."[3]

Another relevant section of the regulation pertains to examining members of the Police Department. Article M. 5 reads:

> "Polygraph testing will be employed when an investigative agent or official deems it necessary, consistent with established parameters (   )."[4]

The General Order on the Reorganization of the Narcotics Bureau (G.O. No. 100-122) also includes certain disposition regarding polygraph testing within the Division.  The G.O. incorporates a Board of Evaluation that is tasked to review the qualifications of the candidates who applied to the Narcotics Bureau, and to reevaluate their performance to determine if they have met expectations and have not deviated from the standard expected of them.

The Board will conduct a performance review every three years. One of the areas subjected to this survey will be polygraph testing. However, the purpose of this Board is not to act upon the result of the exam, but to consider it when it carries out its review every three years.

**Fact Finding Meeting:**

Given the TCA focus on the patterns and practices related to the design, implementation and analysis of findings relevant to the polygraph testing practices of the PRPD, a meeting took place on March 23, 2017. The meeting was portioned in two segments or components—the first segment took place with the former commander of

---

[3] Rough translation: Original Article 5. I Subsection (8) "Los resultados de dichas pruebas serán mantenidos dentro de la más estricta confidencialidad y no serán divulgados a terceras personas sin autorización del Superintendente Auxiliar en Integridad Pública."
[4] Rough translation. Full text of original Article M.6: "Las pruebas de polígrafo a empleado de la Policía de Puerto Rico serán administradas en casos en que el agente u oficial investigador estime pertinentes, conforme a los parámetros aquí establecidos para dudar del testimonio de la misma o que sean ordenadas por previa autorización del Superintendente o Superintendente Auxiliar en Integridad Pública."

the Division and with the former director of the Auxiliary Superintendent of Criminal Investigations, S.A.I.C.. Both officers acknowledged that their presence at the meeting was on a voluntary basis. The second segment took place with the PRPD's certified polygraph examiners. Interviews with both groups were based on questions previously drafted by the TCA's staff which focused on the patterns and practices of polygraph examinations with the intent of identifying the number of individuals tested, passing and failure rates, and specifically on the action taken, if any, on the individuals that had failed the polygraph test in the Drugs Unit.

Meeting with Command Staff Members

The first meeting with both former command staff members revealed that, according to both interviewees, they only had a general idea of the manner in which the polygraphs were being implemented and, more specifically, did not really have exact knowledge on the numbers and/or names of individuals that had passed or failed the polygraphs; or any follow up to those that failed. When pressed for an answer as to the number of officers that were subjected to the polygraph test in addition to those that failed, they acknowledged that a significant number of officers failed the test.

They emphasized that they did not have an exact number. The former director of the Auxiliary Deputy Superintendence of Criminal Investigations, S.A.I.C., specifically mentioned that he had no prior knowledge on the outcomes of the polygraph tests (this was later contested by a member of the Polygraph Unit who indicated, during the meeting with the TCA, that at least twice, the former director had requested and obtained an outcome report on those officers that had failed the polygraph).

Moreover, they both pointed out that the information that they had received on polygraph examinations was "general" in nature and not "specific" on individual performance. The sense provided to the TCA during the course of the meeting was that they had a "passive" role at receiving information and depended largely from the direction of the Office of the previous Superintendent.

They emphasized the notion that if a police officer failed the polygraph test, it did not imply that the officer was guilty. In short, they seemed to be more concerned about the due process of individual officers and less concerned about following up on the outcome of those officers that were assigned to the Drug Unit and had failed the polygraph test.

They both added, during the meeting, that there were no specific guidelines provided on polygraph administration prior to the implementation of the most recent policy on polygraphs (Chapter 100, Sec. 122, effective September 13, 2016). They were also unsure if a "Junta" or disciplinary board had been created as required by the most recent policy. They suggested that the lack of follow up to the number of members of the Narcotics Bureau that had failed the polygraph along with the staleness in the creation of the Board, was not intentional.

Meeting with Polygraph Examiners:

The second meeting took place with the members of the Polygraph Unit of the PRPD along with their corresponding Supervisor. The TCA noted the level of competence and professionalism of the examiners during the course of the meeting.

The first item of discussion related to a detailed explanation on the polygraph testing method. The polygraph examiners said they draft a total of 9 questions; 4 of which are considered to be "relevant;" however, all of them, for the purpose of the examination, must be answered "no." That is, questions that relate to the specific issue leading to the polygraph test. Further, 5 of the 9 questions are considered to be "control" based which allow the examiner to create a behavioral baseline for the individual being tested.

The outcome of a question being asked, during the course of the polygraph test, can be either "favorable" or "unfavorable", according to the polygraph examiners. A testing outcome deemed as unfavorable is based on the notion that the individual being tested failed at least 1 of the 4 relevant questions. It must be emphasized that the aforesaid polygraph design, administration and testing of individuals is consistent with best practices and professional standards in the United States. This, added to the fact that all members of the PRPD Polygraph Unit are trained and certified according to U.S. standards, leads the TCA to conclude that there are no major issues of concern related to the actual testing or professionalism of the polygraph unit.

It became apparent during the interview that the examiners did not have knowledge of each other's work per se. That is, each individual examiner is responsible for his/her own work and they submit the outcome of their tests to the corresponding supervisor at a central location at PRPD headquarters.

When asked about specific data regarding testing trends, the examiners provided the following information:

    a) Their goal is to complete a total of 600-650 polygraphs.
    b) Approximately 465 polygraphs had been rendered.
    c) A significant number of officers failed the polygraph (*It was possible that several officers that failed the polygraph were still assigned to the Narcotics Bureau*).
    d) They were requested to re-test an officer.
    e) None of the test outcomes were asked to be reviewed beyond initial assessment.  If this would ever take place, a panel of 3 examiners would come together and review the test.
    f) No one refused to undergo the polygraph testing.  Only in one instance did an officer request to re-schedule testing date (which was granted).
    g) Individuals tested varied in rank and assignment (highest rank to had been tested was a captain).

During the course of the meeting, the examiners indicated that the Board had not been convened.

The TCA was informed by the staff of the Polygraph Unit that in two occasions, **the former director had requested and obtained an outcome report on those officers that had failed the polygraph.**  This was in direct contradiction of the Colonel's statement during the meeting with the TCA where he indicated that he had no prior knowledge on the data relevant to the individuals that had failed the polygraph test.

**Findings:**

The TCA found that the critical issue has to do with the fact that despite the professional implementation of polygraphs and the implementation of the new policy on polygraphs since September 13, 2016, there seems to be no action taken by the previous Superintendent on individuals that are assigned to the Narcotics Bureau and fail the polygraph test.  The TCA feels that this is a critical and urgent matter that must be addressed immediately.

## TCA Recommendations:

Based on the findings previously discussed in this report, the TCA recommends the following action items to be implemented immediately:

1. Implement the appropriate administrative process (including removal) to all members of the Drugs Unit who failed the polygraph test. The PRPD should also instruct SARP to initiate a comprehensive investigation regarding past performances by those officers in conducting criminal investigations, searches and seizures, problems in the chain of evidence and/or disappearance of evidence, allegations of fabrication.

2. Modify the current polygraph policy and rules (based on best practices in the U.S.) so that the appropriate polygraph testing is conducted on all drug and specialized (undercover) units, on an on-going basis. Further, establish the same polygraph testing requirements in place for drug unit officers, to all officers currently assigned to undercover work or on specialized assignments.

3. Establish a "real time" and automatic communication process in order to ensure that the information relevant to the individuals that pass or fail the polygraph test is immediately relayed to the Superintendent, through the chain of command. This process needs to be in place immediately and this information, in the form of a report, needs to be relayed on a daily basis (automated) regardless of whether or not a request is made for this information.

4. Complete all pending polygraph tests on drug unit personnel, within 30 to 60 days.

5. Refer all individuals that failed the polygraph tests to SARP in order to initiate the appropriate investigative protocols.

6. Re-examine the process by which information is shared among decision makers relevant to cases involving officers that failed in order to improve the speed, communication, and disciplinary action, if any, initiated by the PRPD.

7. Work with the Reform Unit in order to monitor the progress of all polygraph tests administered.

8. Commence to restructure the current PRPD unit immediately. Initially, re assign all drug unit officers, who pass the polygraph to support federal law enforcement agencies who specialize in drug, narcotics and firearms intervention. This will initiate a new branding of the unit until such time that PRPD can ensure a highly professional unit is form and then revert back to internal command and control of the forces purely by PRPD.

9. The Polygraph Unit should focus on which of the pertinent questions the subjects of the examination failed the most in order to, considering the percentages obtained in the statistical study, determine if a common trait exists among those that failed the test in that specific question, as it may relate either to a behavioral pattern or a flaw in investigative directives.

10. Immediately, and in accordance with Chapter 100, Sec. 122, effective September 13, 2016, create the "junta" or disciplinary board as required by policy. The purpose of the board is not to conduct quality control of the work of the examiners, who are the only ones trained and certified to conduct such task, but to determine next steps and best practices for this program.

On June 15, 2017, during a public hearing before the House of Representatives, the Superintendent acknowledged the failures of the past and indicated that the changes had been made to the Narcotics Bureau, and officers that did not pass the polygraph test had been transferred.

# The Consent Decree and Complaints of Unpaid Overtime

In his first semi-annual report, the TCA identified an important area of concern that was however not included in the Agreement. This issue had the potential to project itself into a prominent and sensitive issue in the intended reform process. The TCA felt compelled to address matters about the compensation of police officers, including overtime and sick leave which were fraught with delays. Those issues had created a mood of cynicism among the police rank and file, whose acceptance and effective cooperation with the Agreement is crucial to the success of the Reform. The TCA noted that, although he was cognizant these important matters were not explicitly addressed

in the Agreement, they deserved attention for broader implications.  Thus, for example, the lack of proper overtime compensation was having a negative effect on morale.  The TCA had observed first-hand and had received reports of work slowdowns and increased sick leave.  The TCA concluded that, although these controversies were being partly addressed by the PRPD, the situation was reaching a breaking point that could hurt the implementation of the reforms associated with the Agreement.

In October, these matters reached the courts.  The case regarding the unpaid overtime compensation of PRPD members was before the consideration of the United States District Court (Thomas E. Perez v. Puerto Rico Police Department and Commonwealth of Puerto Rico, et al., USDC-PR, Case No. 16-2849 (GAG)).

The matter began with a complaint by the Federal Department of Labor against the PRPD for unfair labor practices filed in the United States District Court for the District of Puerto Rico. The matter addresses the claims of 2,642 enlisted and retired members of the PRPD asking for a total of $8.7 million in payments in arrears of overtime hours during the period between June 2010 and August 2014.

In October 2016, the Court designated the TCA as the federal monitor on this matter. The presiding judge in the Police Reform Agreement Case, 12-2039 (GAG), commended the Parties for the resolution of the overtime matter.  The Court also noted that the TCA had cautioned about this matter in his first semi-annual report. (Docket No. 203 at page 7).  The Court told the Parties that the TCA was assigned to the case at no cost to the Commonwealth.  The Court felt compelled to designate him and put him at the Parties' disposal to ensure that this important matter of overtime compensation did not become a recurrent issue and interfere in the long-term with the Reform efforts.   Finally, the Court noted that an adequately compensated police force is essential to the overall morale of the PRPD during this critical time of Reform.

During this reporting period, as noted in the PRPD Status Report, the PRPD has agreed to this Consent Judgment in good faith and to avoid further expenses. The PRPD agreed to pay its current and former employees the amount of $8,732,386.52 in compensation for overtime hours worked during the period from June 13, 2010 through August 31, 2014, plus interest from November 30, 2016 through October 31, 2023.  Funds for the payment of October 31, 2017, are in the hands of the Office of Management and Budget (OMB).

Also, on January 12, 2017, the Superintendent issued a directive (OS-01/01-15) ordering the publication of a poster containing the rights of PRPD's employees on overtime pay.

# Current Issues regarding Recruitment

In the compliance area of Recruitment, Selection, and Appointment, there are outstanding issues that require further attention.  In 2016, a full recruit class was not possible for PRPD. As of June 2017, no decision has been made by the Superintendent concerning a 2017 PRPD recruit class and how many cadets will attend, but there is indication that will be no class by year end.   The PRPD is an aging force and it is anticipated many agents will retire in the near future.  As a result, the PRPD must be in a position to implement and fast-track a new recruiting plan as soon as possible.  There are two problems: the lack of a clear recruitment work plan and strategy, and the uncertainty about the future of the Police Academy.

The PRPD has many outstanding agents who would be excellent as recruiters.  The task of recruiting qualified candidates for police departments across the country has become increasingly difficult, and Puerto Rico is no exception. The Dallas and Las Vegas Police Departments each have shortages in excess of 500 personnel. PRPD recruiters are additionally stymied by the job's lower pay, increasingly tougher standards for new recruits, and limited job flexibility. In the case of the PRPD, there have been scandals involving the Narcotics Bureau, as well as negative publicity, affecting the Department. But despite the various obstacles, there are still qualified people in Puerto Rico who want to become police officers.
It is incumbent on PRPD to develop a strategy to find these qualified individuals. In addition, as per the Agreement, PRPD must develop a specific strategy for attracting a diverse pool of applicants, including members of groups that have been historically underrepresented in the PRPD, such as Dominicans. They must also ensure that this diversity is represented and respected within their own organizational structure and culture.

In the Recruitment Action Plan, Objectives of the Development of Policies and Procedure Section: (Activities) 1.1, it states that PRPD will continue to require two years of college or an associate degree from a university or educational institution recognized

by the CEPR. This is important to continue, since it is a national trend among police department and recognized best practice.

In the Recruitment Action Plan, Implementation Objectives Section: 1.4, it discusses how PRPD will develop a publicity campaign attractive to the various sectors of the community to promote the recruitment of candidates for the PRPD. In many instances, individuals who have served in the armed forces seek a police career. Therefore, it would be advantageous for the PRPD to seek out these individuals. Many States allow those that are currently in the military to take the police exam, expediting the process to become a police officer.

As part of the recruiting campaign, the PRPD should make presentations to high school seniors to get them thinking about a police career as they enter college. The TCA Core Team is aware of several police departments in the States that offer a high school training corps, primarily in California. Members of the corps are given special training (physical fitness) and incentives to continue their interest in pursuing a police career. Some universities will allow the courses to be applied as college credits.

Many police departments in the States, including the Denver Police Department and the NYPD, allow college students to work part time in the police department as police cadets. As an incentive for working part time, the student's college tuition is paid for by the police department, with the stipulation that the student will enter the police academy upon becoming 21 and/or graduating from college.

In the Recruitment Action Plan, Implementation Objectives Section: 1.5, the PRPD intends to analyze the best recruiting practices used by police departments in the United States and Latin America. The TCA Core Team recommends that the PRPD utilize a Best Practices approach for police recruiting.

The following ten strategies come from the International Association of Chiefs of Police (IACP) which is recognized as the premier organization of law enforcement. The PRPD could utilize these strategies to improve their police recruitment:

- Develop a Recruitment Plan

- Conduct Research

- Personalize the Recruitment Process

- Select and Train the Right People as Recruiters

- Build Strong Partnerships

- Develop an Employee Referral Program

- Improve the Selection Process

- Develop an Advertising Plan

- Develop an Internet Presence

- Use Effective Recruitment Strategies

For example, the PRPD should allow candidates to participate in a ride-along with members of PRPD. Many police agencies currently use this technique in the States. The IACP has developed an English language ride-along program and explain the responsibilities of a police officer: The PRPD should consider developing a Spanish language, virtual ride-along, similar to the IACP ride-along. Similarly, the PRPD could hire temporary employees in other capacities as a way to bring potential recruits into the agency. The PRPD could also develop an ad campaign asking employees to tell their story (on camera or in writing) about what attracted and keeps them working for the agency, and put those stories on the agency website. This is currently being done by the commanders of the Denver, Colorado Police Department where commanders have a web page and they talk about why they love working in the police department and what attracted them to the profession.

The TCA also recommends that the PRPD implement an Oral Board for prospective candidates. This Oral Board should include scenario-based questions involving ethics, use of force, and knowledge of the PRPD. Members of the community or other federal and State employees could also be involved in the Oral Board process.

Also, the TCA recommends that the PRPD continue institutionalizing mentoring into all structures of the department. One of the most beneficial aspects of mentoring is how it appeals to police recruits who represent new generational needs and attitudes. In the

past five years, the PRPD has experienced a reduction in veteran officers due to retirement. In many areas of the States, mentoring is having a significant impact on lowering employee turnover and helping provide a better leadership development process.

The PRPD should be prepared by July of this year, to implement a full recruitment plan for 2017–2018. Time is of the essence and lack of recruiting efforts, could result in major problems for the PRPD.

The uncertainty about the future of the Academy is also affecting the development of a recruitment strategy.  The PRPD Police Academy's role is to provide the foundational piece of training. A firmly built foundation with proper materials (i.e., policy, procedures and directives; standards; assessment tools; centralized training records; core curriculum; appropriate equipment, use of technology; quality instructors, and the like) will directly affect the structural integrity and success of the entire PRPD.  In the prior Section, the Report has discussed how the implementation of the DPS is likely to affect the progress made to date.

# Paragraph 241: Community Surveys and Focus Groups

During this reporting period, the TCA completed his second round of surveys using the methodology of focus groups.  The findings of this second, more qualitative study confirm those of the first quantitative report.  For this reason, the Report summarizes the goals and findings of the prior surveys and introduces the main findings of the current survey.

Paragraph 241 of the Agreement establishes that in assessing the PRPD's overall compliance with and the effectiveness of this Agreement, the TCA shall conduct a reliable, comprehensive survey of members of the Puerto Rico community regarding their experiences with and perceptions of PRPD once during the first three years of this Agreement and annually thereafter. The community survey should be statistically valid, based on a sound methodology, and conducted by an independent entity.  This community survey shall include measures to ensure input from individuals of each

demographic category. The survey shall also assess the number and variety of community partnerships with PRPD and the depth and effectiveness of those partnerships. Specifically, the survey shall:

a) include interviews with a random sample of residents of Puerto Rico, PRPD officers, and detainees arrested by PRPD within the past week;
b) ensure the anonymity of all interview participants; and
c) survey participants regarding community-police relations; PRPD's integrity, effectiveness, and service; and how it treats members of different demographic groups.

The Agreement required that the TCA conduct a survey of these three populations by an independent entity measuring and reporting on the experiences and perceptions of these groups on police-community relations. The people and groups surveyed consisted of residents, detainees, and PRPD members. The first survey began on Aug 14, 2015 (resident survey), and the last survey was completed on April 12, 2016 (detainees).

It was important that these surveys included a representative sample of each demographic category of the population. Residents of Puerto Rico, PRPD officers, and detainees arrested by PRPD were surveyed anonymously and were asked about the state of community-police relations, PRPD's integrity, effectiveness, and service; and how the PRPD treats members of different demographic groups. Because of these three separate surveys and their findings, the TCA made specific recommendations to the PRPD.

The police officer survey, which was conducted from November 8, 2015, to December 19, 2015, is a historical precedent for the PRPD.  This survey is to serve as a foundation for future surveys against which real internal change can be measured, and how well the Agreement is meeting its purpose of sustained constitutional policing.  This survey addressed the work-related behavior of officers and supervisors, as well as improvements promoted by the Agreement.

The detainee survey, which was conducted from February 29, 2016, to April 12, 2016, examined those who were being held at PRPD precincts and inquired on their treatment, cell conditions, and officer behavior.

Though the TCA recognizes that this was the first set of surveys, the findings that he found most informative and disappointing at the same time were those that indicated that 20% of PRPD officers had little or no knowledge of the reform process. With a cadre of approximately 15,000 officers, to have 3000 officers without a clear understanding of the Agreement and its specific reporting requirements, portrays a dim view of the professionalism of the PRPD. Fortunately, this shortcoming is being rectified through increased training and continued discussion at all command levels to the rank and file members.  Nevertheless, once this deficiency was made known to the Police Superintendent, he immediately addressed all thirteen (13) area commanders to institute immediate training.

Similarly striking to the TCA was the finding that 80% of the residents of Puerto Rico were unfamiliar with the Agreement and the reform process.  Once this was made known to the Superintendent, there was an immediate response through increased social media and advertising to raise public awareness so that the continuing efforts by the PRPD to reform its organization do not go unnoticed or unappreciated by the residents they serve.  The second survey suggests that this social media campaign did not increase awareness.

During this reporting period, the TCA noted a commitment to expanding the survey to all sectors of the community by using focus groups.  This methodology provides an in-depth analysis of people's concerns, fosters continued dialogue with the PRPD, and facilitates the design and implementation of remedies to address concerns.  The TCA completed its second survey of the community generating a better understanding of the police through its community survey, which was completed this period and included in-depth discussions with diverse community groups. These groups included women who were victims of crime, homeless people in rehabilitation, homeless people suffering addicting, college students, blacks, LGBT, Dominican, and public housing residents.

The vast majority of people who participated in the focus groups had a very negative view of the police and they were very dissatisfied with the members of the PPR.  They indicated lack of professionalism when intervening with their communities.  The PRPD has significantly improved its relationship with community leaders in the last two years.  However, it seems that this is not the case with the community as a whole.

In the use of force, the participants mentioned that the factors determining the use of force depends on the situation in which the officer is. However, they believe that there

has been an improvement in the use of force by the police.  In their entirety, the participants express the need for greater supervisors and police oversight in their daily duties.  In addition to supervision, during the searches and seizures carried out by the police, there is a greater prevalence of force. In the use of force, the perceived disproportionate use of force by police officers with marginalized communities and the homeless is mentioned again and again.

In the area of search and seizure, many participants believe that members of the uniform are abusers.  They indicate that not only physical force is used, but is also exercised verbally.  The community believes that officers use the fact that they are policemen to intimidate the citizenry with arrogant and violent attitudes.  In addition, they use excessive force to handle simple interactions. Communities expressed great concern for children and the elderly during the raids and searches. They also express discomfort with the destruction of private property during these proceedings.

About the issue of equal protection and non-discrimination, participants exhibit divided opinions. On the one hand, some argue that they do not perceive police discrimination towards certain sectors, but recognize that this perception may vary depending on the sector, social class or group to which the individual belongs. However, the poorer communities and the LGBTQ group interviewed for this qualitative study indicated a lot of discrimination and lack of protection.

Regarding the topic of Supervision and Administration, the participants interestingly found difficult to identify the ranks of the police and, therefore, they cannot identify when they are approached by a supervisor or a senior officer. They suggest renewing the hierarchy of the PRPD, by a new group of officers and civilians with a new vision for the Department. They supported a total restructuring of the department with a new institutional culture.

Lastly, with regards to the topic of Interaction with the Community and Public Information, students from Mayagüez mention that the Puerto Rican Police has improved in terms of interaction or communication with the community compared to previous years. All other eight groups indicated that the PRPD had not been integrated into the communities (residential, poor neighborhoods and marginalized groups) and lacks an extensive path to interweaved dialogue and understanding.   These communities are extremely resentful of the past behavior of the PRPD.

Overall, all the focus groups point out that the purpose of the Agreement has hardly been publicized. There is much uncertainty about the Reform because it lacks disclosure and information. These groups suggest that information be disseminated systematically in the community and not just in meetings with community leaders.

About 73% of the people who participated in this qualitative study indicated that they did not read or know or read or know very little about the Reform. Therefore, almost three-quarters were unaware of the ongoing Reform of the Puerto Rico Police Department. The findings of this qualitative study confirm those of the quantitative report.

# Information Systems

During the reporting period, the TCA and members of his team conducted various site visits and held meetings with members of the PRPD's information System team. The primary objective of these meetings and site visits was to coordinate closure and finalization of the General Order for Information Systems and Technology ("IT"), the IT Action Plan, and to monitor the overall progress being made in IT. Other topics reviewed in depth during these filed visits include:

1. The Office of Technology Reorganization proposal
2. The highly significant context of the Office of Technology's and CIO's relationships with leadership and customers for the effective implementation of IT Governance and oversight
3. Conceptual overarching assessment and monitoring methodology which must include the definitive alignment of guidance (leading to actions required) such as the decree, policies, General Orders, Action Plans, and tasks.

Consistent with the terms set forth in the Agreement and the Plans, the PRPD's Bureau of Technology ("BT") continues to make "routine" progress during this reporting period in relative compliance with the Capacity Building phase. General Orders, policies and manuals continue to be developed with varying degrees of quality and success. For example, in the last six months BT has successfully prepared CAD, systems administration and CIW GO, Policy and manual documents. But substantial or "reach" transformational change eludes the PRPD's technology delivery team due to deficits in

2017

areas of experienced and skilled staff, budgetary resources, and comprehensive management, budget, and procedural baselines. Given that the TCA interprets the intent or "spirit" of the Agreement to include aspirational transformation of culture beyond the specific and discreet improvements identified in the Agreement and the Plans, it is reasonable to submit that the PRPD and its Bureau of Technology have far to go in order to not only comply with the Agreement but also self-actualize. That being said, the pace of IT actions and outcomes may require a reconsideration of the length of Capacity Building for IT.

Complicating BT's effort to comply and operationalize its actions and initiatives are suboptimal collaborations with other PRPD offices due to priorities and resource allocations. As well, accountability for task accomplishment where there is more than one organizational element responsible is often in question. Examples include training syllabi and curricula due from the Training Academy that trail behind IT Systems operationalization and deployment. This disconnect can therefore jeopardize data collection and analysis regarding improvements in policing doctrine and culture. And, finally, the volume of workload, both to satisfy operational demands as well as transformational initiatives required by the Agreement, is significant.

Noting the above overall, skepticism of BT's current state and efforts is prudent as to whether or not BT can be successful beyond merely answering and meeting the demands of the capacity building categories while also transforming in concert with the spirit of the Agreement. Concerning risk, technology risk is not uncommon to systems development and operational improvement in addition, effective application of management principals is essential to mitigating risk and transforming organizations. Unfortunately, at this stage of capacity building, it is not fully clear that BT is effectively implementing oversight and management mechanisms such as; Life Cycle program reviews, cataloging systems and infrastructure requirements which are fundamental to effective technology stewardship.

In summary, given the short time remaining for capacity building the CIO and his BT team must not only maintain its focus on capacity building but also find valid ways to share its workload with credible partners. The following should be acted on or taken under advisement in order to build technological capacity in addition to meeting the demands of the Agreement:

TCA Sixth Semi-Annual Report | 2017

1) Completion of Capacity Building tasks

2) Effective partnering with other PRPD organizations to jointly impact operationalization of systems such as CAD and its training syllabus.

3) Populate CIW and EIS with credible data

4) Develop an analytical strategy for exploiting collected data from systems

5) Identify and evaluate valid outsourcing partnerships for BT services in lieu of securing adequate internal staff and infrastructure.

6) Focus on improving organic BT management, oversight and review practices that would be necessary to oversee collaborative IT service providers

# Transfers

Pursuant to Paragraph 227 of the Agreement, the TCA has authority to review and report on activities related to the Agreement and issue ad hoc reports. During this reporting period, the TCA informed the Parties that he reviewed personnel transactions from September 2016 to January 2017. The assessment pays special attention to Paragraph 197 of the Agreement and to General Order No. 2010-12 (entitled "Standards and Procedures for Transactions of Range System Personnel").

Paragraph 197 expressly prohibit any form of retaliation, whether subtle or direct, including deterrence, intimidation, coercion, reassignment of employment, or adverse action against any person, civilian or PRPD employee, who reports improper conduct, files a complaint for misconduct, or cooperates with an investigation of this nature. The General Order details procedures for transfers.

The first task of the TCA was to review transfer transaction reports for rank and classified system personnel of the PRPD. The term "transfer transactions" within the Puerto Rico Police refers to the "change of place or job of a MPPR from one unit to another within the same Police Area, Superintendency, Bureau or Office."

TCA Sixth Semi-Annual Report                                    201 /

Findings:                                                                    1

In the transfer reports submitted by the PRPD for the period comprising the months mentioned in the first paragraph, the following information was found:

1. During the period covered by this report (5 months), some 1,016 transactions were reported in the PRPD for the rank system, namely:

• September / 2016: 354 transfers
• October / 2016: 128 transfers
• November / 2016: 69 transfers
•December / 2016: 249 transfers
• January / 2017: 216 transfers

2. It is noted that not all transactions reported for the month in question correspond to it. Transactions of previous months were identified in all monthly reports. This results in monthly reports that do not necessarily reflect the actual information of the transactions made in the reporting month.

Observation with regards to finding #2:

In relation to the latter, the month of January 2017 stands out. In this month, of a total of 216 reported transfers transactions, approximately 96 were reported for other months, namely:

• 69 transfers for the month of December / 2016
• 17 transfers for the month of November / 2016
• 1 corresponding transfers October / 2016
• 3 transfers for the month of September / 2016
• 5 transfers for the month of August / 2016
• 1 transfer corresponding to the month of April / 2016.

That is, 45% of the transfer transactions reported during the month of January 2017 correspond to previous months.

3. The TCA observed that the information related to the name, plaque, rank / position,

date of transfer and characteristics of the transfer, was provided in almost all instances.

Observation with regards to finding #3:

The report said "in almost all instances", because in some cases the workplace was not provided (particularly in September / 2016). This information is essential for this report.

4. As for the information related to the name of the transferred member of the PRPD, sometimes the first name is first thing provided, and at other times the family or last name is given. This makes it difficult to find a particular case, when necessary.

5.The dates that the information is given is poorly collected. Occasionally the date follows the American sequence (month / day / year) and in others with the Latin sequence (day / month / year). We also note that the month may be mentioned by its name and in others by its number. This situation may be misleading in trying to determine the date of the transfer.

6. Regarding the information related to the workplace (where the member of the PRPD was working prior to the transfer) and where it was transferred, the TCA made the following observations:

• In a few cases this information was not provided. Particularly, in the column of place of work, as mentioned in the observation of subsection 3.

• In some cases, the physical location (area, district, seal) of the workplace where the officer was transferred is unclear. As an example, for the "workplace" it is indicated that it was SARP and, for "place where it was transferred", it indicates that it is SAIC. The report fails to identify where that function will physically take place. This information is essential in this type of report.

• On other occasions, the report only mentions the municipality (eg Bayamón, Ponce, Aguadilla), but it does not indicate in which operational area it yields or will perform its functions (SAIC, SAOC, SARP, Command Center, Patrol Bureau, among others).

7. The columns on the "type of transfer" (exceptional, temporary, or barter) and on "reconcentrations" (pregnancy, breastfeeding and others) are being underused. They provide valuable information that can help contextualize the circumstances of the

transfer.

Observation regarding finding #7:

Inconsistencies in providing information or failing to provide essential information make it difficult to obtain a clear, complete and reliable view of the transfer. Not by the content itself; rather by the way it is expressed.

8. From the reports of transfers provided, it was observed that for the months of December 2016 and January 2017, about 150 transfer transactions were related to the Auxiliary Superintendent of the Police in Fortaleza (SAPF and / or Fortaleza). These transactions represent 32% of all transactions reported in those two (2) months.

About 75 members of the PRPD were transferred from La Fortaleza to other service areas, with transfer characteristics as "external" and "voluntary".  About 60 members were transferred from other areas to La Fortaleza, with characteristics of the transfer as "internal" and "due to service requirements".  Transfer transactions related to La Fortaleza during the month of December 2016 were 54% of total reported transactions.

In January 2017, there were 15 transfer transactions related to La Fortaleza.  All transfers were with "external" and "voluntary" characteristics. All were transferred from Fortaleza to other areas of service. Transfer transactions related to La Fortaleza during January 2017 were 7% of total reported transactions.

Observations for finding #8:

It is important to highlight the number of transfers made in La Fortaleza after the electoral process. This caught the TCA's attention, and it seems inconsistent with the professionalization reforms.

In this respect, it is not clear why all the MPPR transfers that came to SAPF / Fortaleza were classified as "internal" and "due to service requirements". It is also unclear to the TCA why all the transfers from members that left their SAPF functions were classified as "external" and "voluntary". Prima facie, it appears that the justification or reason for

the movements of transfers mentioned in this subsection were the result of the electoral process celebrated last November rather than professional police service reasons. Also, these transfers give the impression that the police personnel working woking in SAPF or La Fortaleza must have the "trust" of the Governor of Puerto Rico.

This is important because the Revised General Order 100-104: Creation of the Auxiliary Superintendent of the Police Force of La Fortaleza (February 13, 2013) does not address this issue. The TCA found that the order does not express anything about this respect, trust from the current governor, nor does it indicate that this criterion ("being an employee of trust") is relevant to the provision of police services.

It should be pointed out that, for the only posts that General Order 100-104 expressly states that it is a post of trust, it is for the post of Assistant Superintendent of the Police of La Fortaleza. The General Order requires that the Assistant Superintendent and his second in command must be appointed through consultation and recommendation and/or authorization of the Governor.

In sum, this situation suggests in a preliminary manner that these transfers have been given by partisan political considerations, and not by a real need for the police service these officers provide. It is also possible that the Assistant Superintendent is playing favorites within the Department.

In order to achieve a better understanding of this process and to leave aside speculation, the TCA requested the following information from the PRPD:

-In order to establish the legal basis governing transfer transactions, TCA asked for the Commonwealth to provide any legal or political provision regarding these transfers that were not considered by the TCA in this report.

-The TCA requested that the necessary information be provided to show the rationale or justification why the transfers that occurred during the months of December 2016 and January 2017 related to the SAPF were classified as: (a) "internal" and "By service requirements" when MPPRs come to work for SAPF and, (b) "external" and "volunteers" when MPPRs leave SAPF

- In order to have a clear idea of this process, the TCA requested to examine at least five (5) files and / or documents of transfers to the SAPF and five (5) files and / or documents of MPPR transfers that left the SAPF to render functions of the SAPF to other areas of the agency.

-In relation to the 135 transfers made and reported for the month of December / 2016, it is not clear to us by whom they were authorized. The TCA requested that this information be provided.

-The TCA requested copies of the communications used to inform the transactions of transfers to the MPPR.

-The TCA requested the report (s) that have been generated corresponding to "Activities 1.2.1, 1.2.2 and 1.2.3" of the Professionalization Plan: Part V. Self-Assessment Objectives, related to the collection of data and periodic monitoring for the updating of the information of transfers and assignment of new functions, among others.

Finally, the TCA requested a number cases.  They are not included here for confidential reasons.

The TCA also conducted a number of telephone interviews with members of the PRPD that were transferred during this period of time.  The methodology is described as follows:

The TCA has carried out a study for the review of the processes related to the transfers in the PPR, through "telephone interviews" of members of the PRPD.  This activity was carried out in order to obtain information about their experience with the process. It was carried out in accordance with what is required in Paragraph 197 of the Agreement, above, and with Activities 1.1, 1.2 and 1.3 of the Professionalization Plan.

Under the methodology used by the TCA for the development of this study, the following steps were performed:

1. The PRPD randomly selected the names of the members of the PRPD who would be invited to participate in the study from the Transfer Transactions reports provided by the PRPD for the five (5) months covered by this report (September / 2016 to January / 2017).

2. An invitation was sent in writing and via email, requesting to communicate with the TCA Office. Emails were provided thanks to the collaboration of the PRPD.

3. Telephone interviews were conducted personally by the TCA on Wednesday, February 22, 2017. During the interviews, a representative of the PRPD assisted in the setting of the communications.

4. The questions asked were three (3): a. When was your last transfer? B. What was the reason for it? C. What has been the impact that the transfer has had on its personal character; As well as, in the performance of its role as Police of Puerto Rico?

5. The entire process was conducted under strict confidentiality.

6. A commitment was made to the members of the PRPD contacted that their name will not be disclosed.

Findings:

1. The TCA observed that in the 100% of the cases examined through the interviews, the Human Resources representatives did not take part in the process.

2. In several of the cases, the officer indicated that two (2) transfer transactions were carried out within a period of less than 30 days.

3. In several of the cases, the officer indicated that when they presented themselves to the person who was to supervise them, the latter was unaware of the transfer.

4. In a number of cases, the TCA noted that the officer that was the subject of the transfer did not meet the requirements to adequately perform the new functions to which he or she was assigned.

5. The TCA noted that in some cases, transfers classified as "internal" did not carry out the formal procedure and were not reported. For administrative purposes, the position occupied in the internal transfer remained vacant.

6. In one case, the officer indicated that when s/he arrived at the place where s/he was transferred, there were several officers with the same rank (they were "high ranking"), and they did not know what to do with the person transferred. The option was to assign the new person to the night shift, to resolve the situation. There was no analysis of any need.

The above is indicative that transfers are occurring that do not address the excess of personnel of the same rank in the area in question and as a consequence, functions are assigned that do not necessarily correspond to their rank and / or the capacity of the MMPR in question.

7. The TCA observed that in 100% of the cases examined through the interviews, it did not receive training prior to be assigned to new functions.

8. The TCA noted that in 100% of the cases examined through the interviews, there was no transition process that would have facilitated the early incorporation of the officer to perform his/her functions at full capacity from day one. A mentor supervisor was not assigned or present to provide the necessary support.  There was no identification of the necessary equipment (in an orderly and official way) to be assigned to the officer, among other aspects.

9. The TCA noted that, as a result of the telephone interviews, actual transfers did not reflect    the    context    that    was    recorded    in    official    documents of the agency (such as the transfer transaction report).  That is, one thing is what the report indicates and another is what reflects the reality of the transfer.

On this issue, in response to the type of transfer requested by the officers, one must identify the real reason for the transfer. While the agency records indicate that the transfer was requested through the voluntary transfer process, the reality is that none of officers interviewed received their transfer following such a request. Their transfer resulted as the consequence of unofficial efforts made by them. Although registered as a voluntary transfer, the true cause of most of the transfers, according to what the police officer interviewed said, was that they were transfers for alleged service requirements.

For example, when a police officer who was on the list of volunteers to be moved on a duty-for-service basis appears to be "hanging out" (which means that the transfer is not honored), it should also be considered that, since the actual transfer is of service requirement, and it is pointed out as a voluntary one, it is not evidenced that the process of service requirement has been carried out. Consequently, it is not known what is the criterion by which the transfer was approved or denied by requirement of service that was carried out unofficially.

This shows that the process is fractured and divided, and nothing prevents the police from being able to use simultaneous procedures. In the telephone interview, several police officers admitted that they had come directly to negotiate their transfers with the auxiliary superintendent, the area command, or the officer with the legal authority to assign a transfer for service requirements, and have used this type of process. Human Resources was not involved. To get the transfer they wanted to get, they circumvented the process. Although the voluntary transfer was not achieved in an ordinary way, the police officer was astute and sought the means of obtaining his transfer through unofficial channels.

Observation:

-There are several types of transfers contained in General Order 2010-12, supra. The interviews focused on the following: (a) those that were "Transfers to the Specialized Divisions" or, (b) "Voluntary Transfers." We observed that the transfers made to the Specialized Divisions were those transfers categorized by "of service." While the transfers categorized as "volunteers" are those where the same MPPR can request their relocation.

TCA Sixth Semi-Annual Report | 201/

## Specific Recommendations:

To this end, the TCA recommends that all transfer arrangements be handled through the Office of Human Resources. This means that the HR officers will be responsible for administering all transfers, and they will be able to ensure that all the requirements to grant the transfer are satisfied according to the requirements established in the order.

Accordingly, it may be appropriate to recommend that HR makes sure that the officer who is transferred may discharge his duties competently and efficiently, and that the officer can receive training in preparation to the transfer.

Likewise, Human Resources staff will have to ensure that everyone complies with the requirement established in the order, including that the officer requesting a transfer for service requirement provides adequate justification so that the HR office can grant and dispose of the human resource to attend the real needs of the PRPD.

It should be arranged that the place where the officers is to be transferred know all the details of the transfer.  Thus, for example, they will know that the transfer will be made and that person will come to do a specific function. This guarantees equal treatment of all persons who are subject to transfer.

Finally, conditioned transfers must be supervised by the HR office in order to comply with the restrictive condition (i.e. not more than 5 years in a supervisor position).

In short, the Human Resources Office must become the central administrative authority in all matters relating to transfers, regardless of the type of transfer.

Under this system, the PRPD should accept the transfer as a uniform process where there is only one reason for the transfer, although the process can be started for different reasons.  By subjecting all those transferred to the same rigor, it is guaranteed to comply with the due process of law to which the personnel to be transferred is entitled, just as it puts the agency in a better position to make informed decisions regarding its human resource, respecting that the police officer is a person with family obligations and in need of closeness to his/her family should be taken into account. The

result is likely to be that the police officer will be able to devote his/her energies to their profession, because they will not have to carry the weight of the distance from their home.

**General Recommendations to the Transfer Process:**

1. The TCA recommends that the Transactions Reporting of the Rank System and Classified System be standardized in light of the findings presented in Part I of this document.

2. The TCA recommends that the entire transfer process (from start to finish) be generated and worked by the Office of Human Resources. The objective is to centralize this management to maintain the necessary administrative controls, as mentioned in detail in Part II, Specific Recommendations.

3. The TCA recommends that no officer in the hierarchy of the PRPD be able to carry out a transfer process. It is highly necessary that the transfers be consulted and managed through the Office of Human Resources. Likewise, it is necessary to verify that there is a need for the transfer because the place is available in the requested area and have informed the new command about its transfer, that the officer is trained and checked, that the officer is able to perform optimally.  All of the above must be coordinated by Human Resources.

4. From the examples observed, it appears that the shift system established by the PPR is not being respected. In keeping with this situation, the TCA recommends that the list be updated and published so that the PRPD has reliable information. Also, that this process of reporting is carried out strictly, under the jurisdiction of Human Resources.

5. The Transactions Report of Personnel Transfer of the Rank System and Classified System, presents serious deficiencies, as presented in Part I of this report. The TCA recommends that the information provided in this document be presented in a uniform and standardized manner. In this way, the reader will not enter into speculations by interpreting the information related to the transfer in question.

6. The TCA recommends that the PRPD gives up the practice of informing transfers at or after the date of the transfer. If for extraordinary reasons, a transfer is not reported in the month that corresponds to it, the TCA recommends that a supplementary report be made, so as to be able to make an easy reference of all the transfers of the month in question. This report could be considered as an "addendum" of the month report to which it corresponds.

7. The TCA recommends rigorously following the processes of informing and training the members of the PRPD about the consequences of a transfer.

8. The TCA recommends that the officers being transferred be received by a liaison officer to carry out an appropriate transition to enable the MPPR to perform its functions in an optimal manner.

9. The TCA requests that the recommendations contained in this report be incorporated (if they have not been presented previously) in the General Transfer Order that is currently being revised. Likewise, considering the provisions related to transfers contained in Act No. 8 of 2017, better known as the Administration and Transformation of Human Resources in the Government of Puerto Rico.  The TCA requests an analysis of the scope of this legislation in the processes related to the transfers and their impact with the requirements of the Agreement and that a copy of the requested analysis be provided. This application is extended to P. de S. 306 of 2017.

To conclude, the TCA understands that this process (as well as the process of promotions) is covered by considerations of a political-partisan nature, which do not fully comply with the principles and requirements of the Agreement and the Action Plans developed for Compliance.  They must end if the PRPD is serious about complying with the demands of the Professionalization Plan and the Agreement.

# Section IV
# Projected Activities: Paragraph 205(e)

Consistent with Paragraph 250 (e), the TCA will continue to work in the upcoming six months providing technical assistance and review for the policies that the PRPD will submit in subsequent months.  The TCA will continue to provide support to the Police Academy while emphasizing on more comprehensive IT technical assistance.  The TCA will also work with the PRPD in the review of the pending and outstanding training modules.

There are two reports that will be completed during the next reporting period.

First, the TCA will complete the analysis of the Traffic Bureau. The TCA will provide a report assisting the PRPD in examining road and pedestrian safety, traffic enforcement and investigations, highway patrol, fleet management, and other areas of general traffic administration.

Second, pursuant to instructions of the Court, as directed in Court Docket 509, the TCA is to conduct an assessment of the demonstrations and incidents that occurred at the Capitol building on April 18, 2017, and those that took place on May 1, 2017 (Worker's Day).  On May 11, 2017, the TCA began the administrative portion of this investigation. Upon completion, the TCA will submit a report to the Court and brief the Parties.  The main focus of this assessment is the PRPD's compliance with policies, procedures, protocols, General Orders and training on policing of mass demonstrations, its command and control, as well as communications and the use of force and arrest conducted during and after the demonstrations.

The areas of attention during the next six months are as follows:

1. Consistent with Paragraph 250 (e), the TCA will continue to work in the upcoming six months providing technical assistance and review for the policies that the PRPD will submit in subsequent months.

2. Will continue to support the implementation of Paragraph 13.

3. Will continue to provide support to the Police Academy while emphasizing more comprehensive IT technical assistance.

4. Will analyze use of force trends to document whether there is sustained progress

5. Will continue to conduct random visits to districts, precincts and units to determine that records relating to incidents of use-of-force have been prepared and completed.

6. Will conduct random visits to districts, precincts and units to determine whether the Supervisors of the PRPD have conducted reviews and investigations on use-of force.

7. Will continue to monitor the implementation of the NIBRS policy. The TCA will review the production schedule and will interview IT staff to monitor it.

8. Provide support to the Court in the implementation and execution of Public Hearings.

9. Continue the execution of Paragraph 241

10. Continue to meet with stakeholders to ensure Reform information is properly disseminated and relations are developed.

11. Continue with the visits to the Zones of Excellence to assess progress.

12. Conduct ride-alongs to verify compliance with new established policies.

13. Continue to monitor the progress of the PRPD Information Technology Infrastructure development.

14. Closely Assess the progress of the Drug, Vice, and Illegal Firearms Division.

# Appendix 1

## List of Approved Policies

DECEMBER 2016

Orden General: Normas y Procedimientos para las Transacciones de Traslado del Personal del Sistema de Rango
General Order: Rules and Procedures for Transfer of the Rank System Personnel.

Orden General: PREA ("Prison Rape Elimination Act")
General Order: PREA ("Prison Rape Elimination Act")

Orden General: Ingresos y Egresos de Celdas
General Order: Cell Admission and Discharges

Orden General: Negociado de Tecnología
General Order: Bureau of Technology

Orden General: Normas para el Uso de los Sistemas Computadorizados
General Order: Rules for the Use of Computerized Systems

Orden General: Normas y Controles para el Uso de Sistemas Computadorizados
General Order:  Rules and Controls for the Use of Computerized Systems

Acuerdo Colaborativo Interagencial (Departamento de Corrección, Departamento de la Familia, Departamento de Justicia y Policía de Puerto Rico
Interagency Collaborative Agreement (Department of Correction, Department of the Family, Department of Justice and PRPD)

Orden General: Estructura y Funcionamiento Organizacional de la Oficina de Prensa
General Order:  Structure and Functional Organization of the Press Office

Orden General: Divulgación de Información de Incidentes
General Order:  Dissemination of Incident Information

Orden General: Investigación sobre el Maltrato y/o Negligencia en Instituciones Juveniles

General Order:  Investigation on Maltreatment and/or Neglect in Juvenile Institutions

Orden Administrativa: Programa de Ayuda al Empleado
Administrative Order: Employee Assistance Program

Orden General: Reorganización de la Superintendencia Auxiliar en Educación y Adiestramiento
General Order: Reorganization of the Auxiliary Superintendence in Education and Training

Protocolo de Intercambio de Información: Retroalimentación de Componentes del Sistema de Justicia Criminal de Puerto Rico (Requerimientos 73 & 158)
Protocol of Exchange of Information: Feedback of Components of the Puerto Rico Criminal Justice System (Requirements 73 & 158)

Orden General: Restructuración de la Oficina de la Reforma
General Order: Restructuration of the Reform Office

JANUARY 2017

Orden General: Investigación sobre Maltrato y o Negligencia en Instituciones Juveniles
General Order: Investigation on Maltreatment and Neglect in Juvenile Institutions

MARCH 2017

Orden General: Intervención con Menores en la Comisión de Faltas Orden
General Order: Intervention with Youth Offenders

General 600-635: Investigación sobre Maltrato y/o Negligencia en Instituciones Juveniles
General Order 600-635: Investigation on Maltreatment and/or Neglect in Juvenile Institutions

Orden General: Cuartos de Evidencia
General Order: Evidence Room

Orden Administrativa: Programa de Información Pública y Querellas Administrativas
Administrative Order: Public Information Program and Administrative Complaints

Orden General: Reuniones Mensuales
General Order: Monthly Meetings

Orden General: Fotografía Criminal
General Order: Criminal Photography

Orden General: Personas Desaparecidas
General Order: Missing Persons

Orden General: Programa Previo al Servicio
General Order: Pre-Service Training

Orden General: Bienes Advenidos
General Order: Assets

Orden General: Comités de Interacción Ciudadana
General Order: Community Interaction Councils

Manual "Copy Rights"
Copyrights Handbook

Orden General: Reorganización de la Unidad Montada de la PPR
General Order: Reorganization of the PRPD Mounted Division

Orden General: Unidad Canina
General Order: Canine Unit

MAY 2017

Orden General 300-305: Normas y Procedimientos para las Transacciones de Traslado del Personal de Sistema de Rango
General Order 300-305: Rules and Proceedings for the Transfer of Personnel of the Rank System

Orden General 100-117: Reorganización de la División de Armas y Tácticas
General Order 100-117: Reorganization of the Division of Special Weapons and Tactics (SWAT)

Manual Operacional de Violencia Doméstica
Operational Handbook on Domestic Violence

Manual del NIBRS
NIBRS Handbook

TCA Sixth Semi-Annual Report | 2017

Orden General 600-621: NIBRS
General Order 600-621: NIBRS

Orden General 600-624: Interacción con Personas Transgénero y Transexuales
General Order 600-624: Interaction with Transgender and Transsexual People

Orden General: Reclutamiento de Aspirantes a Cadetes de la PPR
General Order: Recruitment of Prospective Cadets of the PRPD

Orden General 100-126: Reorganización del Centro de Operaciones de Radio Control y Centro de Mando
General Order 100-126: Reorganization of the Center of Operations of Radio Control and Command Center

Orden General: Reorganización de la Superintendencia Auxiliar en Investigaciones Criminales
General Order: Reorganization of the Auxiliary Superintendence in Criminal Investigations

Manual de Explosivos
Handbook on explosives

Reglamento para el Establecimiento de Prácticas Policiacas Libres de Discrimen, Hostigamiento, Conducta Sexual Impropia y Represalias de la PPR
Regulations for the Establishment of Police Practices Free of Discrimination, Harassment, Sexual Misconduct and Retaliation of the PPR

# Appendix 2

## TCA Activities and Community Engagements

### Monthly meetings with the Parties

- In accordance with Paragraph 253 of the Agreement, the TCA has conducted monthly meetings with all Parties during this period, for the considerations of the pending matters. Also, continuous written and telephone communications have been made on a regular basis to ensure the effectiveness and timely response to the situations regarding the status of implementation of the Agreement.

- Assistance and participation in Fourth Public Hearing (Case No. 12-20139) held on February 24th, 2017 and May 22nd, 2017.

- During the past six months, the TCA has maintained constant communication with the Hon. Gustavo Gelpí, Judge for the United States District Court of Puerto Rico, for issues or situations that have required his intervention.

- Throughout this period, the TCA has conducted more than 25 meetings with different police agents *of the Puerto Rico Police Department (PRPD)*, for the attention of specific claims and/or complaints that have against the agency because of alleged violations to their administrative due process.

### Meetings and activities in accordance with Paragraph 254 of the Agreement

Meetings with Commonwealth Officials

- Hon. Luis Rivera Marín, Secretary of the State of PR. (February 2017)
- Ramón Rosario, Senior Legal Advisor for Governor Ricardo Roselló (February 2017)
- Hon. Tomás Rivera Shatz, President of the Puerto Rico Senate (January 2017)
- Alfonso Orona, Esq., Governor's Representative in the Agreement For The Sustainable Reform of the Puerto Rico Police Department (April 2017)
- Hon. Wanda Vázquez, Secretary of Justice of Puerto Rico (January & March

2017)

Meetings with Federal Government Officials:

- TCA meet with Douglas Leff of Federal Bureau of Investigation (FBI) Agency (February 2017)
- TCA meet with Antonio Cordova of Housing Urban Development (HUD) (March 2017)

Meetings with Representatives of Executive Agencies:

- Leo Torres, Esq., Sub-director of Infrastructure Financing Authority (Known for its initials in Spanish as AFI) (April 2017)
- Iris Miriam Ruiz, Office of the Ombudsman (January & March 2017)
- Georgina Candal, Esq., Puerto Rico Civil Right Commissions (March 2017)

Meetings with Mayors and/or Municipal Security Commissioners:

- Ángel Martínez, Bayamón Municipality Security Commissioner (February 2017)
- Hon. Carmen Yulín Cruz, Major of San Juan Municipality (February & May 2017)
- Hon. Rosa Rivera Santana, Major of Gurabo Municipality (May 2017)

Meetings with Puerto Rico Police Reform Unit:

- Regular ongoing communication and meetings with Police Superintendent (January, February, March, April & May 2017)
- Regular ongoing communication and meetings with Col. Clementina Vega, Director of the Puerto Rico Police Reform Office, and other personnel of the PRPD.
- Monthly meetings with the Police Reform Unit designated personnel for the review, analysis and comments on the Action Plans presented by the PRPD.
- Numerous meetings, conference calls and documents' presentation with review of the politics of the PRPD with the Reform Unit's professionals and/or with the USDOJ and PRDOJ for the analysis, discussions and technical support to the final drafts of following Generals Orders, Policies, Actions Plans and PRPD Forms. Please see Table
- TCA Core Team meeting with Police Reform Unit and other divisions (January, February, March, April & May 2017)

TCA Sixth Semi-Annual Report | 2017

Meetings with Puerto Rico Police Department representatives:

- Meeting with Col. Wilfredo Melendez, Guayama Area Headquarters (January 2017)
- Several visits to the Police Academy, and meeting with Col. Orlando Rivera and his staff (February, March & April 2017)
- Meetings with Superintendence of Professional Responsibility known by its Spanish initials as SARP (February 2017)
- TCA and TCA Constitutional Lawyers active participation during this period with PRPD's Board of Examinations for Promotions (February 2017)
- TCA & TCA Constitutional Lawyers active participation for Public Hearing Preparation and Act 20 analysis (March, April and May 2017)
- Meeting with Col. Luyando Pérez from Caguas Area Headquarters (March 2017)

Visits and meetings to Police Regional Headquarters and Police Stations and Specialized Units:

- TCA and Core Team visit to Aibonito Police Station (January 2017)
- TCA and Core Team visit to Ponce Headquarters (March 2017)
- TCA and Core Team visit to Quebradillas Police Station (March 2017)
- TCA and Core Team visit to Caguas Police Headquarters (March 2017)
- Visit to Police Fire Range at Gurabo (March 2017)
- TCA and Core Team visit to Fajardo Police Station (January 2017)
- TCA and Core Team visit to Utuado Headquarters (March 2017)
- TCA and Core Team visit to Bayamon Area Headquarters (April 2017)
- TCA and Core Team visit to Guayama Police Station (January 2017)
- TCA and Core Team visit to Arecibo Area Headquarters (April 2017)
- TCA and Core Team visit to Police Academy (January, February & March 2017)

Visits and Meetings to Police Specialized Units:
- CIC, Drugs and Narcotics Arecibo, Aibonito, Mayaguez and Aguadilla Units
- CIC, Use of Force Unit in Mayaguez, Aibonito and Aguadilla
- San Juan SARP Unit

Meeting and communications with representatives of the following Puerto Rico Police's associations and others worker's union:

TCA Sixth Semi-Annual Report | 2017

- Ismael Rivera, Police Association (February 2017).
- Gregorio Matías, Police Organize Associations (January & February 2017).
- Diego Figueroa, Federación Unida Policias Organizados, (February 2017)

Meetings and activities of the Community Interaction Council ("*Consejo de Interacción Ciudadana*")

- Open Meeting for Yauco Area "Agreement for the Sustainable Reform of the PRPD presentation in Yauco. (March 2017)
- Open Meeting for Caguas Area "Agreement for the Sustainable Reform of the PRPD" presentation in University of El Turabo (April 2017)
- Open Meeting for Loiza Area "Agreement for the Sustainable Reform of the PRPD" presentation in Loiza. (March 2017)
- Open Meeting for San Juan Area "Agreement for the Sustainable Reform of the PRPD" presentation in San Juan. (March 2017)

Meetings with Community Leaders and other interaction community's activities:
- Meeting with Tati Escobar Office of Advocate for Individuals with Disabilities (March & April 2017)
- Meeting with Cecilia La Luz from "*Centro Comunitario LGBTT*", Transgender Group (January 2017)
- Meeting with Modesta Irizarry, Loiza community leader (February 2017)
- Meeting with Pedro Julio Serrano, LGBTT Community and Civil Rights Activist (March 2017)

Meetings with Stakeholders:

- Esq. William Ramírez, ACLU (January, April & May 2017)
- Dr. Richard Blanco Peck, University of Puerto Rico Public Administration Graduate School for the discussion and analysis of Paragraph 241 of the Agreement (January, February, March, April & May 2017)
- Mari Mari Narvaez Espacios Abiertos (April & May 2017)
- Jose Rodríguez, Dominican Community Leader (January & February 2017)
- Roberto "Papo" Christian Community Leader (January 2017)
- Fondita de Jesus Board of Directors (January 2017)
- TCA and Core Team attendance to Plaza Las Americas for the PRPD presentation of "The Agreement for the Sustainable Reform of the pRPD" (February 2017)
- Zenia Galán – Director of Asociación de Padre de Niños con Impedimentos" (January 2017)

# Appendix 3

## Biographical Notes (Updates)

### Technical Compliance Advisor

**Colonel (ret.) Arnaldo "Arnie" Claudio** is the Technical Compliance Advisor ("TCA") of the Agreement for the Sustainable Reform of the Puerto Rico Police Department. He was selected by the Parties and appointed by Judge Gustavo Gelpi on June 6, 2014.

TCA Claudio is a retired Army Colonel and a native of Santurce, Puerto Rico. He attended the University of Puerto Rico and was commissioned a Second Lieutenant on January 5, 1979, in the U.S. Army Military Police Corps. During his 30 years of military service, he held numerous highly sensitive positions culminating as Chief of Staff and Chief of Police for the Joint Force Headquarters - National Capital Region (JFHQ-NCR) and the U.S. Army Military District of Washington (MDW). Some of his most prominent assignments included: Chief Security Operations for Pope John Paul II; Special Forces/Police Advisor for Presidential Hostage Rescue Forces, Colombian Armed Forces; Military Group Advisor for counter-narcotics and Counterterrorism, Peru, El Salvador and Bolivia; Assistant to the Special Advisor for Central and Eastern European Affairs of the Office of the Secretary General of NATO for counter-narcotics; White House Senior Drug Control Analyst for Central America and the Caribbean, Office of the National Drug Control Policy (ONDCP); Police Advisor for the Cuban and Haitian Refugees Operations in Guantanamo Bay, Cuba; Joint Staff Interagency representative in the development of the Government of Panama National Security Strategy; Department of Defense Security Coordinator and Interagency Coordinator for President Ronald Reagan and President Gerald R. Ford's State Funerals and President George W. Bush and President Barack Obama's Presidential Inauguration; Brigade Commander, Military Police Brigade, 25th Infantry Division; and Provost Marshal/Chief of Police of the Multinational Coalition Forces and XVIII Airborne Corps in Iraq.

Upon Retirement from the U.S. Army, TCA Claudio served as the Executive Director for the Office of Information Technology, Oversight and Compliance at the Department of Veterans Affairs. In March 2009, he joined the Peace Corps as the Chief of Staff for Operations, Volunteer Recruitment, and Selection. Since February 2010 until his

appointment as TCA, he served as the JFHQ-NCR's Interagency Program Director and Advisor to the Commanding General. In this position, TCA Claudio was the direct representative for the Commanding General in matters related to the integration and synchronization of Homeland Defense and Defense Support to Civilian Authorities within the JFHQ-NCR. He coordinated directly with local, state and federal partners concerning National Security Special Events within the NCR Interagency (FBI, Secret Service, US Capitol Police, FEMA, HLS, Metro Police Department, Fire and Rescue, others) and led the critical relationships that JFHQ-NCR sustains with governmental and non-governmental agencies on a daily basis, which play a critical role in the ability to execute operational plans for the safety and security of the Nation's Capital.

TCA Claudio's significant military and civilian awards include the Distinguished Service Medal, Defense Superior Service Medal, Legion of Merit (2 OLC), Bronze Star Medal, Meritorious Service Medal (7 OLC), Joint Service Commendation Medal, Army Commendation Medal (3 OLC), Joint Service Achievement Medal (1 OLC), Army Achievement Medal (4 OLC), National Defense Service Medal (with Star), Armed Forces Expeditionary Medal (2 OLC), Iraq Campaign Medal, Global War on Terrorism Medal, Humanitarian Service Medal (1 OLC), Armed Forces Reserve Medal, Army Service Ribbon, Overseas Service Ribbon (7th), Inter-American Defense Board Ribbon, U.S. Army Combat Action Badge, U.S. Army Airborne Badge, U.S. Army Air Assault Badge, United States Air Force Senior Security Police Badge, Republic of Colombia - Military Order of Merit Award (Jose Maria de Cordova), Colombian Airborne Badge, Colombian Urban Counterterrorist Badge, German Spotabzeichen, German Airborne Badge, Joint Chiefs of Staff Identification Badge, Inter-American Defense Board Identification Badge, Order of the Marchaussee (Military Police in Bronze), Order of Saint Barbara (Field Artillery), Order of Saint Maurice (Legionnaire, Infantry), United States Capitol Police Distinguished Service Medal and the Civilian Joint Service Achievement Medal.

TCA Claudio is a graduate of the FBI's Citizen's Academy, the Marine Corps Command and Staff College, and the Joint Staff Senior Level Counterterrorism School. During his tenure at White House's ONDCP, he assisted in the development and implementation of U.S. Government counter-drug policies, strategies, and programs governing counter-narcotics activities of all defense and federal agencies; assessed the effectiveness of counter-drug programs in Central America and the Caribbean and made recommendations to the Director of the ONDCP, a senior US cabinet official.

TCA Claudio is a Ph.D. candidate in Management, with a concentration in Homeland Security, at the Colorado Technical University.  He has previously earned a Master of Science in Education from Jacksonville State University.  He is also a graduate of the Inter-American Defense College, where he completed a thesis titled, "The *United Sates National Drug Control Strategy and its Impact on Latin America*", based on his experiences working with White House US Drug Czar, General Barry McCaffrey.  Other significant publications include: "Peru, Sendero Luminoso and the Narco Trafficking Alliance," "Bolivian Armed Forces and the War on Drugs," "Training Foreign Police Forces: Assisting El Salvador in its Transitions to Peace."


TCA Claudio possesses a top secret/SCI clearance adjudicated by the Department of Defense.  He is fluent in Spanish.


## Deputy Technical Compliance Advisor


**Marcos Soler** is the Deputy Technical Compliance Advisor.  He was nominated by the TCA, approved by the Parties, and appointed by Judge Gustavo Gelpi in January 2017.  Since July 2014, Marcos has been a member of the TCA Core Team.


Marcos the Chief of Staff at the Mayor's Office of Criminal Justice (MOCJ) in New York City.  MOCJ advises the Mayor of the City of New York on criminal justice policy, developing and implementing strategies to reduce crime and incarceration and to promote fairness and legitimacy.  As the Mayor's chief advisor on public safety strategy, MOCJ shapes and funds strategies at every stage of the criminal justice system – from interactions with police officers and first responders on the street, to how cases are processed through the criminal justice system, to connecting individuals leaving City jails with programs and services to help them build productive and healthy futures.


Marcos is an Adjunct Assistant Professor at John Jay College of Criminal Justice of the City University of New York (CUNY).  Since 2005, Marcos has taught undergraduate and graduate courses in three different departments: Political Science, Public Management, and Criminal Justice.  He teaches courses and senior seminars on judicial policies and processes, civil rights and liberties, constitutional powers, and constitutional politics.  He also teaches a graduate course in public oversight of law enforcement, and co-teaches a graduate seminar in criminal justice which is part of the New York Police Department (NYPD) Graduate Leadership Program.  From 2012 to

2013, Marcos was a Visiting Professor of Constitutionalism and Politics at the Technical University of Dresden (Germany).

Marcos holds a PhD in Politics from the New School for Social Research (New York). He is the recipient of the Hannah Arendt Award to the Best Dissertation in Politics. He also holds a MS in Management and Policy Analysis from The New School. Marcos began his undergraduate education in Europe studying philosophy and law and continued his education earning four graduate degrees: a LLM in Legal Theory, a MA in Constitutional Law and Politics, a MA in Law and Society, and a Ph.D. in Jurisprudence. He was a Member of the Department and a Research Fellow in Jurisprudence at the University of Valencia Law School (Spain). He was also a Research Fellow at the Spanish Center for Constitutional and Political Studies (Madrid, Spain).

## TCA's Core Team (New Appointment in 2017)

**Dr. Alejandro (Alex) del Carmen** is the newest member of the TCA's Core Team. He was nominated by the TCA, approved by the Parties, and appointed by Judge Gustavo Gelpi in January 2017.

Dr. del Carmen is currently Professor and Executive Director of the School of Criminology, Criminal Justice and Strategic Studies at Tarleton State University (Texas). The School was formed in 2014 and houses the Departments of Criminal Justice and Military Science along with several institutes, including the Institute for Homeland Security, Cybercrime and International Criminal Justice Studies, and the Institute for Predictive and Analytical Policing Science. Dr. del Carmen was a member of the federal monitoring team in New Orleans.

Dr. del Carmen received a Ph.D. in Criminology from the College of Criminology at the Florida State University. He is considered an authority on the topics of terrorism and race and crime, with particular emphasis on racial profiling in law enforcement. Dr. del Carmen has written over 40 academic manuscripts in internationally recognized journals and has authored numerous books. Among these is the nationally recognized book titled "Racial Profiling in America," which he published with Prentice Hall. Dr. del Carmen has presented his research findings throughout the world (Scotland, Belgium, Slovenia, Spain, United Arab Emirates, and Italy). He often appears in interviews in newspapers and television stations throughout the United States and Canada.

# Appendix 4

# Paragraph 250(b): Compliance Tables

# SIX-MONTH REPORT OF THE TECHNICAL COMPLIANCE ADVISOR DECEMBER 10, 2016 – JUNE 9, 2017

*Office of the Technical Compliance Advisor to the Agreement for the Sustainable Reform of the Puerto Rico Police Department*