# ASSESSMENT REPORT

**Police of Puerto Rico's Response to the demonstrations and incidents involving the Capitol building, the "Centro Para Puerto Rico," and the Worker's Day**

## *Office of the Technical Compliance Advisor to the Agreement for the Sustainable Reform of the Puerto Rico Police Department*

2018 JAN 26  PM 2:09

TCA Assessment Report | 2018

# Table of Contents

Table of Contents                                                    1

Executive Summary                                                    3

TCA Reports under the Agreement                                     14

Introduction                                                        15

**Section I** Crowd Control Policies

History                                                             18

Under the Agreement                                                 20

**Section II** Training on Crowd Control

Training of PRPB Personnel                                          25

Training of Personnel Deployed                                      26

People and Units Trained under New Policy                           30

**Section III** Implementation of Policies and Training

Analysis of Operational Plans                                       33

Analysis of Strategy and Tactics                                    42

**Section IV** Related/Relevant Policy Issues

Policy and Training                                                 47

Analysis of Events                                                  50

Interview Data                                                     104

Analysis of Interview Data                                         148

**Section V** Review of PRPB's Self-Assessment

Review of After-Action Reports                                     155

Review of Complaints                                               162

Review of Operational and Personnel Decisions                      163

| TCA Assessment Report | 2018 |
|---|---|

**Section V** Analysis of Best Practices and Models

Models and Best Practices                                                   165

TCA Assessment Report | 2018

# Executive Summary

This is the Technical Compliance Advisor's ("TCA") Report ("Report") for the Court and the Parties in the Agreement for the Sustainable Reform of the Puerto Rico Police Bureau ("Agreement") on the demonstrations and incidents in April and May of 2017. The Report assesses the Puerto Rico Police Bureau's ("PRPB") response to these events.[1]

Pursuant to instructions of the Court, Docket 511; ***"ORDER CLARIFYING MAY 22, 2017 SECOND PUBLIC HEARING AGENDA AND SCOPE OF HEARING ON APRIL 19, 2017,"*** the Court issued an order setting the agenda for the May 22, 2017, public hearing, to be held in Ponce, Puerto Rico. (See Docket No. 509.) The Court took judicial notice that, since this order, several incidents had occurred during mass demonstrations and protests involving the police and protesters. They included the April 18, 2017 events at the capitol building, as well as the April 25, 2017 events at the foundation of former Governor Sila M. Calderón. The Court also noted that the TCA had indeed observed and received information regarding said incidents.

During the public hearing, the Court ordered the TCA to conduct an **assessment** of the demonstrations and incidents that occurred at the Capitol building on April 18, 2017, and April 27, 2017, the incident that occurred in "Centro Para Puerto Rico" on April 25, 2017, and the events and incidents that took place throughout May 1, 2017 (Worker's Day). In the Report, the TCA were to submit the corresponding assessment and the necessary recommendations to the Court and the parties.

Given the Court's instructions to assess events and report on findings, the focus of this Report is the PRPB's compliance with the Agreement and the laws protecting the citizens of Puerto Rico and their civil rights and liberties pursuant to the Constitutions of the United States and the Commonwealth of Puerto Rico. The Report pays special attention to the PRPB's policies and trainings on policing of mass demonstrations, command and control, as well as communications and the use of Information Technology ("IT").

The assessment was conducted from May 15, 2017 through January 2018.

---

[1] With the implementation of Act 20 of 2017, the former Puerto Rico Police Department (PRPD) is now known as the Puerto Rico Police Bureau (PRPB).

| TCA Assessment Report | 2018 |

The Methodology used in this Report consists of the following:

- Interviewing members of the Puerto Rico Police Bureau (PRPB), members of organizations that participated during some of the events as observers, and individuals having pertinent information in relation with the previously mentioned events.
- Reviewing and analyzing all available video recordings and photographs to verify the accuracy of the information provided by the interviewed individuals.
- Reviewing and analyzing all available documents, reports and forms prepared by the PRPB.
- Reviewing and analyzing the PRPB Self-Assessment reports.
- Reviewing best practices and standard at National level.

The TCA instructed Investigations Consultant (IC) Jose L. Pujol to conduct the Court ordered assessment and to report on his findings. IC Jose Pujol based his work on:

- His law enforcement training and experience as a federal Special Agent for approximately twenty-one (21) years.
- His knowledge as Federal Defensive Tactics Instructor (certified in 1997 by the Federal Law Enforcement Training Center located in Glynco, Brunswick, Georgia).
- The Agreement for the Sustainable Reform of the Puerto Rico Police Department (Item # 73)
- The Puerto Rico Police Bureau's General Orders (Items #10 through 19).

During the Assessment:

- IC Jose Pujol dedicated more than 400 hours of work to the investigation and report-writing
- Large numbers of interviews were conducted involving members of the PRPB, members of Organizations that participated during some of the events as observers, and individuals having pertinent knowledge related to the four events covered by the Assessment.
- A significant number of video-recordings were reviewed and analyzed. These video recordings were obtained from the internet and publicly aired local TV stations. IC Jose Pujol also reviewed videos received from the PRPB. Finally, IC Jose Pujol reviewed video recordings made by a local TV station, who allowed IC Jose Pujol to review and analyze their video recordings.

| TCA Assessment Report | 2018 |

- Hundreds of PR Police Bureau's reports were reviewed and analyzed.

IC Jose Pujol based on law enforcement experience, training, knowledge of the Agreement for the Sustainable Reform of the Puerto Rico Police Department and the Puerto Rico Police Bureau's General Orders, all the evidence and facts collected during the Assessment, all the work performed (as described above), the support and advice received from all the TCA team, formulated findings and recommendations that are fully described in this Assessment Report and hereby submitted.

In order to prepare this report, generic identifiers were used in place of the actual names of witnesses, Police Officers/Agents and other individuals for the public version of this report that will be filed with the Court. A report containing the key of all the assigned identifiers identifying the names of the persons to whom they were assigned, will be filed with the Court as a Sealed document, to be accessible only to the Court, the TCA and to the involved parties (USDOJ and PRDOJ).

## EVIDENCE AND ANALYSIS' RESULTS

## USE OF FORCE:

It is common knowledge that before the Agreement was signed, demonstrations and protests (often of lesser magnitude than the demonstrations of April and May) ended in violent responses by the PRPB against the protesters. The United States Department of Justice ("USDOJ) investigation of 2011 uncovered excessive force and pervasive civil rights and liberties violations during these past demonstrations.

To date, the analyzed evidence reflects that the Reform, even at this capacitation stage, has brought very positive changes in the way the PRPB responds to these situations and events. The police avoided physical confrontations with the protesters at all cost, by changing to the use of lesser aggressive techniques like the use of Pepper Spray and CS gas. The PRPB seems to have learned to use more restrain, more discipline, and having a better perspective of the mission's goal. Also, the police have learned to prioritize the control of the situation, maintaining group discipline and using well trained tactics and strategies, rather than chasing and hitting the protesters like they did in the past. They have accomplished all this, without affecting or violating the right of speech and protest that the citizens have. The PRPB personnel present at the events used some levels of less-than-lethal force against the protesters to ensure the safety of individuals, properties and their own safety.

| TCA Assessment Report | 2018 |
|---|---|

The review of available video recordings showed that the Use of Force employed by the PRPB during the events seen in these video recordings was appropriate, with some incidental individual exceptions that will be fully and properly documented in the Report. This determination was made independent of the available Use of Force reports.

Despite these very positive changes that the Reform has brought to this day, work remains to be done in several areas, as the report will fully and properly explain.

## REPORTING USE OF FORCE:

The evidence reflected that the reporting and documenting of this use of force by PRPB was grossly inadequate. The review of available video recordings and PRPB reports revealed that in many instances in which Use of Force was employed, this was not reported or was not properly reported as the General Order requires, which will be fully addressed during the report.  Despite the importance of properly documenting the use of force by its personnel, the evidence showed that the PRPB did not properly address this factor, hence making it impossible by those means to determine if the force used was within department guidelines. These determinations were made by independent means, that is, video evidence, interviews, and available documentation.  Given the discrepancies in the reporting of the number of use of force incidents, it is clear there was incomplete documentation by the PRPB of these incidents, particularly when force was used. Therefore, General Order Chapter 600, Section 605, "Reporting and Investigating Use of Force by Members of the PRPB," was not adhered to.

## PRPB's FAILURE TO COMPLY WITH TCA's REQUESTS DURING THIS ASSESSMENT:

The TCA submitted a written request to the PRPB on July 17, 2017, requesting copies of all the video recordings in possession of the PR Police Bureau in relation to the four events covered by this Report. A PRPB officer acknowledged receipt by signing the request.  When the undersigned delivered the request, the PRPB officer verbally informed that the PRPB had "montones de videos."[2]  In several occasions after such day, the TCA office spoke to the same police officer and reminded him of the request for the video recordings, including any video in possession of CRADIC, and his responses were always evasive.  The TCA was so persistent with this request, that on 08/16/2017, the police officer provided to IC Jose Pujol only one computer disk (DVD) containing a few video recordings (Item # 80)[3], not "montones" (Spanish for "mounts") of recordings as verbally stated.  It is important and relevant to remark that the delivered DVD was

---

[2] Spanish for a vast number of videos.
[3] It should be noted those videos were determined not to be CRADIC videos

| TCA Assessment Report | 2018 |
|---|---|

labeled in part as "CRADIC" ("Centro de Recopilacion, Analisis y Diseminacion de Inteligencia Criminal", Spanish for "Center for the Collection, Analysis and Dissemination Criminal Intelligence"). The officer stated that these were the video recordings pursuant to the TCA's request, a request that included any and all video recordings taken pursuant to Section 610 of the General Order "Normas a seguir para la grabacion de eventos publicos" (Spanish for "Rules to be followed for the recording of public events"), which implicitly includes all CRADIC video recordings.

When the TCA reviewed the video recordings, it was rapidly noticed that all the TCA was provided with were video recordings made by reporters of local TV stations, and video recordings downloaded from the internet (Pulso Estudiantil, Dialogo UPR). The PRPB Officer did not deliver videos recorded by CRADIC or the PRPB. The TCA finds this fact as a deceitful response to the official request. The TCA submits that having been provided in a timely fashion with all videos recorded by the PRPB would have helped to present a more complete and accurate Report.

On 12/01/2017 the PRPB provided copies of nine DVDs to the TCA (Item # 88), all related to this event. These recordings show and corroborate most of the information already provided in this Report. However, one of the DVDs, contains one single file that has recordings made from multiple different locations, and it contains several clearly visible transitions, and in other instances has images' even overlapping each other. Additionally, the other remaining eight DVDs provide multiple video segments which are identified with the sequence number that the video recorder device has assigned to each of them. Two of these eight DVDs are missing several video segments according to the sequence number that the video recorder device assigned to all the segments. These facts cast doubts on the video recordings that were received, and it could be questioned if they represent only part of the incidents recorded that day by CRADIC.

On December 7, 2017, pursuant to a request of the TCA, the PRPB agreed to offer for interview agents assigned to the CRADIC unit that had been working on the May 1st events providing crowd control at the "Milla de Oro" location. The TCA interviewed Agent # 1 and Officer # 1, both assigned to CRADIC. Present at the time of the interviews for the TCA office were TCA Arnaldo Claudio (via telephone line), IC Jose Pujol, as well as Counsels Federico Hernandez Denton and Antonio R. Bazan. Representing PRPB was Counsel Joel Torres of the Commonwealth Department of Justice and 1st Lt. Nelson Castro.

The first interview commenced at approximately 9:11 am with PRPB Agent # 1, who introduced himself and further explained that he has been assigned to the CRADIC unit for the last thirteen years working in an assortment of both federal and local cases and further added he had never been the object of any complaints.   Upon questioning,

| TCA Assessment Report | 2018 |

among the evidence provided by this agent, he explained that on May 1st of 2017, he was assigned a hand-held video recorder to record on tape. This agent was informed by IC Jose Pujol that his name was not on the Operational Plan for that day.   He explained he was originally assigned to a post in Muñoz Rivera Avenue, at the Fire Station, in the vicinity of the Commonwealth Department of Labor and the urban train station across the street.   His mission, as stated, was to video record all crimes happening there, and suspicious individuals carrying shields and/or blunt instruments that could be used as weapons during the demonstrations. It should be noted that at no time the agent informed that part of his duty was to video record uses of force or intelligence gathering information.

The salient features of his statement were the following:   1) that he video recorded images with the use of a hand-held analogue camera using tapes; 2) that on May 2, 2017 he downloaded the recorded images in a computer and he burned a DVD, of which we received a copy; 3) shown over imposed images in his own recording he explained the same could have been the result of a computer generated error (transitions that depict different overlapping images); 4) he denied using any editing equipment and having edited the images; 5) he claimed that the tapes used to video record images were erased after content was downloaded at the computer and further added that erased tapes were again reused on subsequent investigations and were not preserved as evidence; 6) that everything that he recorded  in his equipment is what appears in the video provided by the PRPB to the TCA; 7) that images do not overlaps but that there can be transitional images; 8) that he had to put the images together when he transferred them to digital, and  9) that he had to make transitions in order to project a complete video. This interview ended at approximately 10:25 am.

The second interview commenced at approximately 10:26 am with PRPB Officer # 1, who introduced himself as being CRADIC's Assistant Director.   Officer # 1 informed he participated in the May 1st, 2017 events supervising at the field, and specifically recalled that agents PRPB Agent # 49 and PRPB Agent # 50,[4] from his own unit, were assigned for duty in that event.   He expressed that to the best of his knowledge the use of all hand-held cameras recording on tapes was discontinued.   That the only cameras utilizing tapes were the older model big cameras used with tripods for the recording of official events although he could not dispute equipment using tapes had been used (his best recollection is that video recorders with tape were not used).   He recalled that upon arriving back at the office, downloading of the disks was done and the equipment was handed over to PRPB Officer # 14.

---

[4] PRPB did not provide any video recording made by PRPB Agent # 50 to the TCA

| TCA Assessment Report | 2018 |
|---|---|

He explained that in the equipment using tapes, the tapes are not erased to prepare a disk and the original tape is secured as evidence by PRPB Officer # 14.

He stated that although he is not an expert, digital cameras create sequential files. He made a specific statement that anyone that could have been issued a tape operated camera would be issued a new tape. He further informed that tapes are not erased for reuse. Additionally, he mentioned that on that same day no videos were recorded at La Fortaleza because no one expected a protest to be held there early in the morning. He also stated that they did not keep a log of the materials to be used with equipment assigned to each agent for his mission.

During the Interview of PRPB Agent # 1, he either did not know that Section 610 of the General Order "Normas a seguir para la grabacion de eventos publicos" (Spanish for "Rules to be followed for the recording of public events") does not include the use of video recordings and/or video recorder devices that use video tapes, or PRPB Agent # 1 failed by not providing/volunteering this information. On the contraire, PRPB Officer # 1 informed during his interview that to the best of his knowledge the use of all hand-held cameras recording on tapes was discontinued. That the only cameras utilizing tapes were the older model big cameras used with tripods for the recording of official events although he could not dispute equipment using tapes had been used (his best recollection is that video recorders with tape were not used). With his statement, PRPB Officer # 1 implicitly demonstrated that he knew that the use of video recordings and/or video recorder devices that use video tapes was discontinued or had to be discontinued (not covered in Section 610 of the General order). Furthermore, PRPB Agent # 1 stated, at least twice, that the recordings made by way of video tapes was subject to the following procedure: He would download the contents of the videotape to prepare a DVD disk which would be considered as the original and then would precede to erase the video tape for reuse in another assignment. This procedure is totally aberrant to established procedures for preservation of video evidence in federal practice because the method in unreliable in that images of previous recordings may remain in the same video tape.

During the two interviews the TCA encountered discomforting contradictions and discrepancies between both interviewees on issues of upmost importance to the credibility of this visual evidence. These interviews continue to cast a doubt on the video recordings that were received by the TCA office, and it could be questioned if they represent only part of the total video footage recorded that day by CRADIC.

The interviews also revealed the lack of proper equipment in the hands of the CRADIC Division because the equipment they have at this time has not any uniformity at all, and some of it is even obsolete. The interviews also showed that CRADIC personnel does

TCA Assessment Report | 2018

not have the proper training, and they lack a clear uniform methodology to be applied by all CRADIC personnel assigned to video record events of crowd control.   This methodology should include at least the requirement of: 1) a written chain of custody of all equipment, materials and recordings at all times; 2) methodology on how the recordings will be preserved as evidence; 3) written certification by anyone who makes a copy of these original recordings.   The interviewed PRPB members complained that there is continuing request for modern equipment that was initiated long time ago, that is, a request for 4K cameras, bodycams, and other equipment that so far has been fruitless.

Section 610 of the General Order states that the DVDs that do not contain criminal activity, will be preserved for two (2) years, counting since the day that the recording was made, unless they are part of an administrative, judicial or legislative investigation. Any possible claim alleging that the missing video segments not provided to the TCA were deleted because they did not contain any criminal activity, would be a claim completely opposed to the mandates of Section 610 of the General Order.

Any possible claim alleging that the members of CRADIC did comply with the mandates of Section 610 is totally incorrect if, as alleged, members of CRADIC used video recording equipment that uses video tapes, equipment not covered by Section 610. Section 610 of the General Order was created in consideration of the fact that the current technology consists of digital cameras and digital recording, which have been in use for many years.  Again, Section 610 exclusively refers to "tarjeta de almacenaje" (Spanish for "recording memory card") which relates only to digital recorders.

**USE OF CHEMICAL AGENTS:**

The evidence showed that the PRPB completely failed to adhere to its policies, prior to using chemical agents and less than lethal ammunition against the protesters, by not providing repetitive information to the protesters via loud speakers about:   1) the violations they were committing; 2) informing them of the dispersal order; 3) and informing them about the routs to be taken to leave the area.   The evidence also showed that the PRPB failed by not placing a police officer in civilian clothes in the back of the protesters to listen to the required communications/orders from the police to the protestors.  In sum, the PRPB should have followed the foresaid mandated procedures to also comply with preparing a video recording of the required compliance, with General Order Chapter 600 Section 625 "Manejo y Control de Multitudes" (Crowd Management and Control).   Such recordings also require the video documentation of the protesters' response to police orders and warnings.

| TCA Assessment Report | 2018 |

## INCONSISTENCIES IN REPORTS:

The evidence reflected that the inconsistencies found in the various PRPB reports are enormous.   There are inconsistencies in (1) the number of police officers injured, (2) the number of use of force incidents reported, and (3) the weapons used by officers. In addition, the evidence showed, after reviewing PRPB's own reporting of the incidents, that the uses of force incidents by members of the PRPB were underreported.   By properly reporting use of force during demonstrations resulting in civil unrest, the PRPB has the ability to specifically identify and document the use of force utilized and the event that warranted its use. This required action is meant to reduce the potential of persons or groups coming forward, after the fact, with videos of the event that contradict the levels of force reported by the police, that may cast a dark shadow over the entire police response to the demonstration/protest. The use of force by police against the public,   notwithstanding the need or justification, usually portrays a disturbing appearance, especially at demonstrations of civil unrest where, more often than not, the police response is highly publicized.  In other instances, the PRPB could face litigation from groups and/or individuals claiming excess use of force during the demonstration.

## "PLANES DE TRABAJO" (OPERATIONAL PLANS):

All Operational Plans (OP) received and analyzed by the TCA failed to provide some of the information required by the Section 625 of Chapter 600 of the General Order.  A detailed analysis of the OPs provided reflected varying degrees of deficiencies.

For example, an interview with the Incident Commander of the April 27, 2017 event, revealed the following:  the Incident Commander informed IC Jose Pujol that security for the door where the violent incident between Representative Jose Luis Rivera Guerra and some protesters took place, did not fall under his responsibility because he was responsible only for the North entry of the Capitol building.  The OP unequivocally reflected that this Incident Commander was responsible for having two (2) Police Agents in that specific door, thus, in complete contradiction to his statement.  This is an example of how lightly the OP was taken or disregarded.   The evidence shows a scenario where the Incident Commander's contradiction reflects that he did not know his own Operational Plan at all.

## ESTABLISHING CONTACT WITH THE EVENTS' ORGANIZERS:

The evidence showed that the PRPB failed, prior to the occurrence of two of the events (April 17 and 18, 2017), by not making any efforts to establish contact and

| TCA Assessment Report | 2018 |
|---|---|

communication with the activities' organizers to gather necessary information about the event and ensure the appropriate human resources allocation, in accordance with General Order Chapter 600 Section 625 "Manejo y Control de Multitudes" (Crowd Management and Control).

Regarding the event of April 25, 2017, the evidence demonstrated that it was impossible to comply with an attempt to establish contact, because the event was not planned and the PRPB had to react to evolving situations.

In the event of May 1st, 2017, the PRPB complied by making previous contact with the organizers of the event.

## PRPB FOILED CHAIN OF COMMAND:

The evidence showed that the PRPB Chain of Command was broken during the May 1st event.  On May 1st, 2017, Secretary Hector Pesquera - at present, Secretary of the Department of Public Safety ("DPS") - was not part of the Chain of Command in charge of handling the PRPB activities related to the Workers' Day event, and he gave an Operational Order to a PRPB Colonel related to the day's operation.

When Mr. Hector Pesquera gave an Operational Order to a PRPB Colonel related to the day's operation, he had not been confirmed by the Senate, his appointment did not qualify as a "recess appointment" because the Senate was in session and Law 20 of 2017, creating the Public Security Agency would not come into effect until October 10, 2017, that is, there was not an Agency of Public Security.

Mr. Pesquera had been appointed/nominated by the Governor as Secretary of Public Security on 04/29/2017, but was not confirmed by the PR Senate until May 8, 2017, thus he was not yet confirmed by the Senate on May 1st, 2017.

The Law of the Department of the Public Security of Puerto Rico, Law Number 20 of April 10, 2017 (Item # 73), in its Article number 1.04 (Department of Public Security; Authority) established the creation of the position of Secretary of the Department of the Public Security of Puerto Rico.  Article 9.07.-Vigencia (Spanish for "Validity") of this Law, establishes that "this Law shall take effect one hundred and eighty (180) days after its approval. However, Articles 1.03, 1.04, 1.13, 1.14 and 9.02 will begin to apply immediately".

A reading of the Law establishes that the remaining Articles will take effect 180 days after the Law's approval (April 10, 2017), including Article 1.05. Titled "Deberes y Facultades del Secretario" (Spanish for "Duties and faculties of the Secretary").  The

aforesaid Article establishes that the Secretary shall have, without limitation, the following duties and powers:

> (a) Shall have the hierarchical authority, administration and immediate supervision of the Department of Public Security.
>
> (h) Will plan, organize, supervise, coordinate, manage, direct and control all the activities that are developed in the "Negociados" (Spanish for "Bureaus") that are created under this Law.

An article of the Legal Review of the Law School of the University of Puerto Rico (Revista Juridica), entitled "Successive Recess Appointments: Stripping of the Senate's Faculty of Advice and Consent? (Item # 74), explains that the Constitution of Puerto Rico establishes that the Governor may make "appointments" when the Legislature is not in session. Calendar of Activities of the PR Senate for the month of April 2017 (Item # 75) and Calendar of Activities of the PR Senate for the month of May 2017 (Item # 76), show that the PR Senate was in session during the months of April and May of 2107.

The same article of the Legal Review of the University of Puerto Rico, (Item # 74), explains that the Governor has the power to make Interim Appointments. But in this scenario, the person assuming the position will acquire all the obligations, responsibilities and faculties of the person that he substitutes. In our scenario, there was no prior Secretary of Public Security, therefore no Interim Appointment could have been made.

In view of the above and after consulting legal counsel on this issue, it is submitted that when Mr. Hector Pesquera gave an Operational Order to a PRPB Colonel related to the day's operation, he broke the Puerto Rico Police Bureau's Chain of Command on this day's Police Operation.

On August 16, 2017, IC Jose Pujol interviewed Officer # 2. During this interview, PRPB Officer # 2 noted that, on May 1st, he was located at the PRPB Fusion Center. He further informed that on that same date, Mr. Hector Pesquera and Mr. Alfonso Orona arrived at the Fusion Center. When they arrived, the following individuals were present at that time: Commissioner Michele Hernandez de Fraley, PRPB Officer # 2, PRPB Officer # 3, PRPB Officer # 28, PRPB Officer # 29, PRPB Officer # 30, and other personnel that he could not recall. According to his statement, Mr. Pesquera ordered PRPB Officer # 3 to go to the airport and take charge of the operation at that location. He stated that Counsel Alfonso Orona asked questions, but he never gave orders. Officer # 2 disclosed that when Mr. Pesquera ordered PRPB Officer # 3 to go to the

| TCA Assessment Report | 2018 |
|---|---|

airport, he instructed PRPB Officer # 3 stating the phrase "Destranca esto,"[5] which he understood that the order consisted on going to the airport to remove the protesters. He further stated that Mr. Pesquera asked him why did not they place a locking device on the buses' tires, and that he replied to Mr. Pesquera that these devices weren't legal in the island and that the Police did not have these devices.

During the August 16, 2017, interview of PRPB Officer # 3, he stated that when Mr. Hector Pesquera arrived at the Fusion Center he was not there because he was at the SAIC Office, at the Police Headquarters. He was called and instructed to report to the Fusion Center. Upon arrival, he met with Mr. Pesquera, Commissioner Michele Hernandez de Fraley, PRPB Officer # 2 and PRPB Officer # 28 who were talking about the day's events. He stated that Mr. Pesquera instructed him to go to the airport, after which he looked at the Commissioner and upon not receiving any counter instructions from her, he followed Mr. Pesquera's instructions. Mr. Pesquera's instructions to him were: "destranquen eso."

During the interview with the Police Commissioner, she stated that that on May 1st, 2017, when Counsel Alfonso Orona arrived at the Fusion Center, it was not a surprise to her because they had coordinated his visit in advance. She did not expect the visit of Mr. Hector Pesquera, despite that she had met with him a few days earlier and she informed him about the preparations for the May 1st, 2017 event. She advised that, in her presence, Mr. Pesquera ordered PRPB Officer # 3 to go to the airport and solve a problem there with the protesters. She explained that she did not confront Mr. Pesquera because she knew that the problem at the airport was already under control, and she did not want to create unnecessary tension. She explained the situation to IC Jose Pujol by saying "Why fight if the problem was already solved?" She further added that she did not oppose to Mr. Pesquera's order because this was going to unnecessarily heat up the situation. She stated that later on, PRPB Officer # 3 spoke to her because he did not feel comfortable with what happened, that is, him obeying Mr. Pesquera's order. She confirmed that while at the Fusion Center, Counsel Alfonso Orona had made some comments but he did not give any order at all.

---

[5] "Desatrancar" has two meanings in Spanish: remove from a door the object that prevents opening the door and unclog a pipe or drain.

TCA Assessment Report | 2018

# TCA Reports under the Agreement

*Paragraph 227 of the Agreement:*

"In order to assess and report on PRPD's implementation of this Agreement and whether implementation is having the intended beneficial impact on policing and community trust in Puerto Rico, the TCA shall conduct the reviews specified in this Agreement; shall review PRPD policies, training material, protocols, and programs developed and implemented pursuant to this Agreement; and conduct such additional audits, reviews, and assessments as the TCA or the Parties deem appropriate, or the Court, consistent with this Agreement and the dismissal order."

*Paragraph 250 of the Agreement:*

"During the <u>first four years</u>, from the Appointment Date, the TCA shall file with the Court, written public reports every six months that shall include:

a) a description of the work conducted by the TCA;

b) a listing of each detailed step in the Action Plans and its timeframe indicating whether the timeframe has been met, and whether the Commonwealth of Puerto Rico is making satisfactory progress toward implementation of the Agreement by rating PRPD in full, partial, or non-compliance steps in the Action Plan;

c) the methodology and specific findings for each review conducted, where appropriate, and redacted as necessary for privacy concerns. An un-redacted version shall be filed under seal with the Court and provided to the Parties. The underlying data for each audit or review shall not be publicly available, but shall be retained by the TCA and provided to either or both Parties upon request;

d) for any detailed steps that were reviewed and found not to have been fully implemented in practice, the TCA's recommendations regarding necessary steps to achieve compliance; and

| TCA Assessment Report | 2018 |

e) a projection of the work to be completed during the upcoming reporting period and any anticipated challenges or concerns related to implementation of the Agreement."

# Introduction

Pursuant to instructions of the Honorable Court, Docket 511; "ORDER CLARIFYING MAY 22, 2017 SECOND PUBLIC HEARING AGENDA AND SCOPE OF HEARING" on April 19, 2017, the Court issued the order setting the agenda for the May 22, 2017 public hearing, to be held in Ponce, Puerto Rico. (See Docket No. 509.) The Court took judicial notice that, since then, several incidents have occurred involving the Puerto Rico Police and protesters. The Court noted two examples: the April 18, 2017 events at the capitol building and the April 25, 2017 events at the foundation of former Governor Sila M. Calderón. Because of said incidents, civil rights groups such as the American Civil Liberties Union ("ACLU") have denounced police practices. On the other hand, the Puerto Rico Government has justified the police presence.

Given the Court's instructions to assess events and report on findings the TCA has conducted an **assessment** of the Police of Puerto Rico's response to the demonstrations and incidents involving the Puerto Rico Police and protesters that occurred at the Capitol building on April 18, 2017, and April 27, 2017, the incident that occurred in "Centro Para Puerto Rico" on April 25, 2017, and the event and incidents occurring throughout May 1, 2017 (Worker's Day).  The focus of the **assessment** is the PRPB's compliance with the "Agreement for the Sustainable Reform of the PRPB" ("Agreement") and the Civil Rights of citizens pursuant to the Constitutions of the United States and the Commonwealth of Puerto Rico with special attention to policies and trainings on policing of mass demonstrations, command and control, as well as communications and the use of Information Technology ("IT").

Under the Agreement, the TCA has the authority to assess and report on whether the provisions of this has Agreement have been implemented resulting in constitutional and effective policing, increased professionalism, and increased community trust. Under the supervision and orders of the Court, the TCA conducts its duties includes the duty to report and assess, review policies and trainings, and conduct such additional audits, reviews, and assessments as the TCA or the Parties deem appropriate, or the Court, consistent with the Agreement.

This assessment report covers and evaluates actions taken before, during and after the events above described, regarding the following areas of the Agreement: Supervision

| TCA Assessment Report | 2018 |
|---|---|

and Management; Equal Protection and Non-discrimination; Use of Force; Crowd Control; Search and Seizures; Arrests and Citations; Training and its implementation; Community Engagement and Internal Investigations, Civil Complaints and Discipline section.

This report has been prepared by Investigative Consultant (IC) Jose L Pujol using:

- His Law Enforcement training and experience as a federal Special Agent for approximately twenty-one years.
- His knowledge as Defensive Tactics Instructor (certified in 1997 by the Federal Law Enforcement Training Center located in Glynco, Brunswick, Georgia).
- The Agreement for the Sustainable Reform of the Puerto Rico Police Department.
- The Puerto Rico Police Department's General Orders.

IC Jose Pujol based on law enforcement experience, training, knowledge of the Agreement for the Sustainable Reform of the Puerto Rico Police Department and the Puerto Rico Police Bureau's General Orders, all the evidence and facts collected during the Assessment, all the work performed (as described above), the support and advice received from all the TCA team, formulated findings and recommendations that are fully described in this Assessment Report and hereby submitted.

TCA Assessment Report | 2018

# Section I: Crowd Control Policies

## I.A Historical Reference: Crowd Control Policies Prior to the Agreement

Under the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141 and the anti-discrimination provisions of the Omnibus Crime Control and Safe Streets Act, 42 U.S.C. § 3789d, in 2008, the United States Department of Justice (USDOJ) initiated an investigation of an alleged pattern or practice of use of excessive force, unconstitutional searches, and discriminatory policing by the PRPD.  In September 2011, USDOJ issued a written report finding – findings disputed by the Commonwealth - that the PRPB engaged in a pattern of using force to suppress the exercise of First Amendment rights.[6]  Here this Report summarizes the two main findings of the USDOJ investigation of 2011:

> "Officers' use of excessive force also chills speech in violation of the First Amendment.  While some individuals may engage in unlawful activity during protests and civil demonstrations, only a fraction of the force used by PRPD is directed at specific threats or criminal behavior, as evidenced by the dearth of arrests supported by probable cause.  Instead, PRPD officers regularly rely on the indiscriminate use of force or threat of force well beyond what is necessary to protect public safety when engaging with crowds.  Specifically, PRPD indiscriminately used chemical agents, batons, and physical force against demonstrators and other individuals on University Avenue in August 2009, at the Sheraton Hotel in May 2010, and at the Capitol in June 2010.  PRPD officers also used choke holds and pressure techniques against protestors who were passively resisting or otherwise not posing any significant threat as recently as December 2010 and January 2011.  In February 2011, officers pushed, struck, and sprayed protestors at a university campus, and officers threw rocks and other objects at individuals who likewise posed no significant threat.  The use of excessive force by PRPD officers in these instances, along with other tactics aimed at intimidating demonstrators, has garnered significant public attention and discouraged residents of Puerto Rico from engaging in protected First Amendment activities.  While we recognize that prolonged strikes and civil demonstrations strain PRPD personnel and resources, Puerto Rico must not

---

[6] Paragraphs 5 and 8 of the Agreement.

TCA Assessment Report | 2018

waver in its duty to uphold the fundamental rights of all residents, even when their viewpoints or affiliations may be disagreeable."[7]

And

"PRPD has been on notice for years that officers assigned to tactical units routinely employ excessive force when interacting with civilians.  These units all too frequently rely on intimidation, fear, and extreme use of force to manage crowds and are often deployed to low-income and minority communities on routine patrols.  These units operate with insufficient training and guidance on the lawful exercise of police power."[8]

As a result of the negotiated agreement between the United States and the Commonwealth of Puerto Rico, the Agreement for the Sustainable Reform of the Puerto Rico Police was drafted.

During the interviews made to Officers of the Puerto Rico Police Department, IC Jose Pujol asked two officers of the PRPB about the PRPB's rules and/or guides they followed during crowd control operations before General Order Chapter 600 Section 625 "Manejo y Control de Multitudes" entered into effect (Item # 10).  The two officers answered as follows:

- PRPB Officer # 4, the San Juan Area Commander since 01/24/2017, who during his approximately twenty three (23) years in the PR Police Department (PRPB) had worked in dozens of manifestations similar to the ones covered by this Assessment, explained the following:  before the General Order Chapter 600 Section 625 "Manejo y Control de Multitudes" entered into effect, there wasn't any established official protocol; they worked based on their experience, which was obtained by years of working in the streets, and working in similar scenarios. (Item # 57)

- PRPB Officer # 2, who is the Superintendente Auxiliar de Operaciones de Campo (PR Police Bureau Chief of Field Operations), stated that in the past he was part of the DOT (Tactical Operations Division) and that during his long career with the PRPB he participated in multiple, large number, of manifestations/protests/scenarios like the ones covered by this assessment.   PRPB Officer # 2 explained that before the General Order Chapter 600 Section 625 "Manejo y Control de Multitudes" entered into

---

[7] USDOJ, Investigation of the PRPD: Executive Summary, 2011, page 4.
[8] USDOJ, Investigation of the PRPD: Executive Summary, 2011, page 6.

| TCA Assessment Report | 2018 |
|---|---|

effect, there was great disorganization.  Before any event, similar to the ones covered by this assessment, they planned for any possible scenario. He further added that back then, the guidelines (in the General Order) weren't clear for this type of events. (Item # 62)

# I.B Analysis of the Current Policy on Crowd Control Under the Agreement

Under the Agreement, the PRPB is to develop crowd control and incident management policies that comply with applicable law and comport with generally accepted policing practices (Paragraph 32).  Paragraphs 33, 34 and 35 of the Agreement expand on this requirement.

"33. The incident management policy shall provide that a ranking officer or other higher-level PRPD official at the scene of a mass demonstration, civil disturbance, or other crowd situation assume command and control and provide approval prior to deploying force as a crowd dispersal technique.
34. The crowd control policy shall require the use of crowd control techniques and

tactics that respect protected speech and the right to lawful assembly.
35. PRPD policy shall require the assessment of law enforcement activities following each response to a mass demonstration, civil disturbance, or other crowd situation to ensure compliance with applicable laws and PRPD policies and procedures."

The Action Plan on the Use of Force further expanded on the requirements set forth by the Agreement. In particular, the Action Plan required the PRPB to develop a General Order on Crowd Control and Incident Management (OG. 600-625) by September 2015.

On January 28, 2016, the PRPB's Reform Unit met with the TCA and the USDOJ to discuss written recommendations and comments on the PRPB's "Final Draft" of the Management and Crowd Control Policy. These comments and recommendations were subsequently adopted and incorporated into the Policy. The Order was approved on April of 2016.  On April 30, 2017, an Annual Review was conducted on this Policy.

In preparation for this Report, the following areas of the policy were extensively reviewed:

- Purpose Section

| TCA Assessment Report | 2018 |
|---|---|

- Definition Section
- Policy and Procedure Section
- General Disposition Section

This Management and Crowd Control Policy has been instrumental in providing established guidelines to PRPB personnel in managing crowds and preserving the peace during demonstrations, constitutional activities and spontaneous disturbances. Police, the most visible form of government, must continue to ensure that the First Amendment rights of the public they serve are protected and guaranteed. However, it should be understood, that in part, the effectiveness of this Policy will be based on the training component implemented by the PRPB, as well as strict compliance to the Policy.

This General Order establishes policy and procedures in managing and controlling of crowds. Because physical force by PRPB may be necessary in some of these instances, the Order references the following related General Orders:

- Chapter 600, Section 601, Rules of Use of Force
- Chapter 600, Section 602, Use and Management of Electronic Control Devices
- Chapter 600, Section 603, Use and Management of Impact Weapons
- Chapter 600, Section 604, Use and Management of Chemical Agents
- Chapter 600, Section 605, Reporting and Investigating Use of Force by PRPB Members
- Chapter 600, Section 620, Use of Intermediate and Specialized Weapons (less-than-lethal)

In Puerto Rico, all people have the right to free speech and assembly guaranteed by the First Amendment of the Constitution of the United States and the Constitution of Puerto Rico. A fundamental role of law enforcement is the protection of the rights all people must peacefully assemble, demonstrate, protest or rally. In turn, law enforcement also has the responsibility to ensure public safety and to protect the lives and property of all people. The often-competing goals of maintaining order while protecting the freedoms of speech and assembly stand as one of law enforcement's greatest challenges.

Demonstrations throughout the United States, especially in 2017, have clearly put law enforcement agencies on notice that they have an obligation to prepare their departments for a proper response to these events. Preparation to address crowd control is best achieved through policy and training on how to manage crowds while protecting First and Fourth Amendment rights.

As in all high-liability areas the following is needed:

- Knowledge of the legal standards applicable to First Amendment conduct
- Effective Information Gathering
- Proper Policy Guidance
- Detailed Planning
- Effective Training
- Effective Leadership
- Proper Use of Force

The Policy and Procedures Section A. 1., states that all organizations or groups interested in having a constitutional activity or demonstration shall notify the PRPB thirty-six (36) hours in advance of the event. Although this rarely occurs, it is strongly suggested that the PRPB keep this timeline in place and require organizations, if possible, to obtain a written permit.

Subsection D. 1., states: "The use of force is limited to circumstances permitted by General Order 600, Section 601, entitled 'Rules for the Use of Force by Members of the Puerto Rico Police' (hereinafter, OG-601) and to a reasonable extent necessary in light of the circumstances faced by the PRPB. However, during a civil disturbance, the PRPB will act according to the legal instructions given by the Squad Leader, Platoon Leader or the Incident Commander, as applicable."

Subsection D. 2., 3., 4. and 5., are strong parts of the Policy and should continue to be enforced:

- "2. Except in extreme circumstances that warrant immediate action, PRPBs may not make arrests or use force without making the warnings and commands as set forth in OG-601 and General Order 615, entitled 'Puerto Rico Police Authority to carry out Arrests and Citations' (hereinafter, OG-615.)"
- "3. In any individual incident where force has been used, an arrested person has been injured or allegations of excessive force being used, the PRPB shall follow the procedure established in General Order 600, Section 605, entitled 'Report and Investigation of Incidents of Use of Force of Members of the Police of Puerto Rico' (hereinafter, OG-605.)"
- "4. Each use of weapons authorized by the PRPB against a person, animal or crowd constitutes one (1) independent use of force. Therefore, each use requires detailed justification and explanation on Form PPR-854, entitled 'Use of Force Report' and as set forth in OG-605. Officials authorizing the use of force to control or manage a disturbance of crowds shall complete a Report."

- "5. The injured will be treated in accordance with the provisions of OG-605."

PRPB should embrace collaboration with community stakeholders when planning for and responding to public assemblies and gatherings.

Community stakeholders may include:

- Business associations
- Civil right organizations
- Labor organizations
- Advocacy groups
- Leaders of local/state government
- Elected officials
- Special interest groups
- Neighborhood associations
- Religious groups/clergy
- Schools/colleges/universities

The following training information is available to the PRPB. These following resources are currently being utilized in the United States for training in management and crowd control:

- IACP National Law Enforcement Policy Center-Civil Disturbances—12/2005
- Law Enforcement Guidelines for First Amendment-Protected Events—10/2011
- Privacy, Civil Rights and Civil Liberties Policy Development Guide—4/2012
- Independent Investigation Occupy Oakland Response—10/2012
- The Reynoso Task Force Report-UC Davis November 18, 2012
- CA POST Guidelines Crowd Management, Intervention and Control
- Ferguson Review—2015

Currently there does not appear to be legal sanctions, fines or penalties against organizers who fail to notify the PRPB they will be conducting a march, parade, protest, demonstration or other major event. As a result, lives and property of police, participants and uninvolved citizens are placed at risk. The TCA Core Team has recommended affirmative legislative action to enforce compliance with the requirement of prior notification to the PRPB.

The PRPB Reform Unit has developed a comprehensive policy that provides PRPB with established guidelines for managing crowds and preserving the peace during demonstrations and civil disturbances. The development of this in-depth policy has

| TCA Assessment Report | 2018 |
|---|---|

been essential to providing detailed protocols and clear guidelines to members of the PRPB. It should be noted that this is a new Policy and the only prior reference to anything resembling crowd control was in repealed General Order 2006-6 entitled "Rules and Procedures to Intervene in Labor Conflicts" (Oden General 2006-6 Normas y Procedimientos Para la Intervencion en Conflictos Obrero-Patronales.)

# Section II: Training

TCA Assessment Report | 2018

# II.A Training Received by All PRPD Personnel Regarding Crowd Control and Related Policies

According to the information received from the <u>PRPB, nobody in</u> the PRPB had been trained on the General Order, Chapter 600, Section 625, titled "Manejo y Control de Multitudes" (Spanish for "Crowd Management and Control") when the April 18, 25, 27, and May 1, 2017 events occurred.

The PRPB informed that by the Month of May 2017, the general statistics of training in the following Use of Force Policies, for the complete Puerto Rico Police Bureau, were as shown below:

General Order, Chapter 600, Section 601:  85% of the Police agents were trained in this General Order.
General Order, Chapter 600, Section 602:  89% of the Police agents were trained in this General Order.
General Order, Chapter 600, Section 603:  92% of the Police agents were trained in this General Order.
General Order, Chapter 600, Section 604:  91% of the Police agents were trained in this General Order.
(Item # 2)

The PRPB reported that the OG Chapter 600 Section 620 "Normas y Procedimientos para la Utilización de Armas Especializadas por Miembros de las Divisiones de Tacticas Especializadas (DTE)" (Spanish for "Rules and Procedures for the Use of Specialized Weapons by Members of the Specialized Tactical Divisions (DTE)" entered into effect on February 11, 2016.  The PRPB is responsible for training the members of their Specialized Tactical Division.

- The PRPB reported that when the April 18, 25, 27, and May 1 2017 events occurred, **all** members of the Specialized Tactics Division of the PRPB (DOT and SWAT) had been trained on the OG Chapter 600 Section 620 "Normas y Procedimientos para la Utilización de Armas Especializadas por Miembros de las Divisiones de Tacticas Especializadas (DTE)" (Spanish for "Rules and Procedures for the Use of Specialized Weapons by Members of the Specialized Tactical Divisions (DTE)".  They also informed that 100% of the SWAT personnel had been trained in the use of the specialized weapons.  (Item # 1)

TCA Assessment Report | 2018

In 2016, the PRPB developed four new courses related to the Use of Force. The courses were REA 601, DOT 601, DOT 112, DOT 603 and DOT 604:

- REA 601: Its purpose is the training of the Police agents on the use of the basic techniques of soft hands and hard hands. These techniques were designed so the Police officer/agent could minimize causing a physical injury.
- DOT 601: This training was directed to the members of the PRPB agents assigned to the Tactical Operations Division (Division de Operaciones Tacticas), hereinafter referred to as the "DOT". This training prepared the Police agents on the use of the basic techniques of soft hands and hard hands, so they could be used to control a situation, avoiding an intensification of the confrontation.
- DOT 112: This training was directed to the members of the PRPB assigned to the DOT. This training is a basic training in tactical formations.
- DOT 603: This training was directed to the members of the PRPB assigned to the DOT. This training focuses in the use of the rigid baton.
- DOT 604: This training was directed to the members of the PRPB assigned to the SWAT units. This training focuses in the use of tear gas (CS).

## II.B Personnel Deployed and Their Crowd Control and Related Training

### April 18, 2017

- PRPB informed that they deployed to this event a total of ninety-four (94) agents. PRPB agents deployed for this event belonged to the San Juan Area, Traffic Division and Tactical Operations Division (DOT).

By the month of May 2017, the PRPB agents assigned to the above Area and Divisions were trained on the following General Orders:

General Order, Chapter 600, Section 601, titled "Reglas para el uso de la Fuerza por Miembros de la Policia de Puerto Rico" (Spanish for "Rules for the Use of Force by Members of the Police of Puerto Rico"). The following percentages reflect the number of trained agents on General Order, Chapter 600, Section 601:

1. **73% agents of the San Juan Area**
2. **88% of agents of the Traffic Division**
3. **96% of agents of the DOT**.

TCA Assessment Report | 2018

General Order, Chapter 600, Section 602, titled "Uso y Manejo del Dispositivo de Control Electrico" (Spanish for "Use and Operation of the Electric Control Device"). The following percentages reflect the number of trained agents on General Order, Chapter 600, Section 602:

1   **87% agents of the San Juan Area**
2   **65% agents of the Traffic Division**
3   **98% agents of the DOT**

General Order, Chapter 600, Section 603, titled "Uso y Manejo de Armas de Impacto" (Spanish for "Use and Operation of Impact Weapons"). The following percentages reflect the number of trained agents on General Order, Chapter 600, Section 603:

1.   **92% agents of the San Juan Area**
2.   **75% agents of the Traffic Division**
3.   **99% agents of the DOT**

General Order, Chapter 600, Section 604, titled "Uso y Manejo de Agentes Quimicos" (Spanish for "Use and Operation of Chemical Agents). The following percentages reflect the number of trained agents on General Order, Chapter 600, Section 604:

1.   **84% agents of the San Juan Area**
2.   **95% agents of the Traffic Division**
3.   **99% agents of the DOT**

General Order, Chapter 600, Section 612, titled "Autoridad de la Policía de Puerto Rico para llevar a cabo Registros y Allanamientos" (Spanish for "Puerto Rico Authority to Carry Out Searches and Search Warrants"). The following percentages reflect the number of trained agents on General Order, Chapter 600, Section 612:

1.   **5% agents of the San Juan Area**
2.   **33% agents of the Traffic Division**
3.   **65% agents of the DOT**.

General Order, Chapter 600, Section 615, titled "Autoridad de la Policía de Puerto Rico para llevar a cabo Arrestos y Citaciones" (Spanish for "Puerto Rico Police Authority to Conduct Arrests and Citations"). The following percentages

| TCA Assessment Report | 2018 |
|---|---|

reflect the number of trained agents on General Order, Chapter 600, Section 615:

1. **82% agents of the San Juan Area**
2. **79% agents of the Traffic Division**
3. **99% agents of the DOT**

General Order, Chapter 600, Section 620, titled "Normas y Procedimientos para la Utilización de Armas Especializadas por Miembros de las Divisiones de Tacticas Especializadas (DTE)" (Spanish for "Rules and Procedures for the Use of Specialized Weapons by Members of the Specialized Tactical Divisions (DTE)". The following percentages reflect the number of trained agents on General Order, Chapter 600, Section 620:

All members of the Specialized Tactics Division of the PRPB (DOT and SWAT) had been trained on this General Order. (Item # 2)


**April 25, 2017**
- PRPB informed that they deployed to this event a total of seventy-three (73) agents. PRPB agents deployed for this event belonged to the San Juan Area and Tactical Operations Division (DOT).

By the month of May 2017, the PRPB agents assigned to the San Juan Area and Tactical Operations Division (DOT) were trained as it has been described in the previous section related to the April 18, 2017 event. (Item # 2)


**April 27, 2017**

- PRPB informed that they deployed to this event a total of two hundred twenty (220) agents. PRPB agents deployed for this event belonged to the San Juan Area, Traffic Division, Tactical Operations Division (DOT) and SWAT.

By the month of May 2017, the PRPB agents assigned to the San Juan Area, Traffic Division and Tactical Operations Division (DOT) were trained as described above, in the April 18, 2017 event.

By the month of May 2017, the FURA Division (SWAT belongs to the FURA Division) were trained on the following General Orders as follows:

| TCA Assessment Report | 2018 |

General Order, Chapter 600, Section 601:  96% of the Police agents of the FURA Division were trained in this General Order.
General Order, Chapter 600, Section 602:  90% of the Police agents of the FURA Division were trained in this General Order.
General Order, Chapter 600, Section 603:  93% of the Police agents of the FURA Division were trained in this General Order.
General Order, Chapter 600, Section 604:  98% of the Police agents of the FURA Division were trained in this General Order.
General Order, Chapter 600, Section 612:  22% of the Police agents of the FURA Division were trained in this General Order.
General Order, Chapter 600, Section 615:  94% of the Police agents of the FURA Division were trained in this General Order.
General Order, Chapter 600, Section 620:  100% of the Police agents of the FURA Division were trained in this General Order.  100% of the SWAT personnel have been trained in the use of the specialized weapons.
(Item # 2)


**May 1, 2017**

- PRPB informed that they deployed to this event a total of seven hundred eighty-eight (788) agents.  PRPB agents deployed for this event belonged to the San Juan Area, Carolina Area, Traffic Division, Tactical Operations Division (DOT), SWAT and Aerial Units (FURA).
- By the month of May 2017, the PRPB agents assigned to the San Juan Area, Traffic Division and Tactical Operations Division (DOT) were trained as described above, in the April 18, 2017 event.
- By the month of May 2017, the FURA Division (SWAT and Aerial units belong to the FURA Division) were trained as described above, in the April 27, 2017.
- By the month of May 2017, the Carolina Area Police agents were trained on the following General Orders as follows:

General Order, Chapter 600, Section 601:  100% of the Police agents of the Carolina Area were trained in this General Order.
General Order, Chapter 600, Section 602:  100% of the Police agents of the Carolina Area were trained in this General Order.
General Order, Chapter 600, Section 603:  93% of the Police agents of the Carolina Area were trained in this General Order.

| TCA Assessment Report | 2018 |
| --- | --- |

General Order, Chapter 600, Section 604:  100% of the Police agents of the Carolina Area were trained in this General Order.
General Order, Chapter 600, Section 612:  32% of the Police agents of the Carolina Area were trained in this General Order.
General Order, Chapter 600, Section 615:  100% of the Police agents of the Carolina Area were trained in this General Order.

The TCA took a small, but a relevant, sample of five (5) Police agents who participated in the events covered by this Assessment.  These five Police agents were reported as having made Use of Force during the April 25, 2017 event. These are the following four Police agents and one Police officer:

- PRPB Officer # 8
- PRPB Agent # 3
- PRPB Agent # 4
- PRPB Agent # 5
- PRPB Agent # 6

On July 17, 2017, a written request was made to the PRPB requesting all trainings in which these five agents participated during the last three years.

In spite of numerous verbal reminders to the PRPB, at the closure of this report this information has not been provided to the TCA.

## II.C Number of People and Units Trained Under the New Policy

According to the information received from the PRPB, nobody in the PRPB had been trained on the General Order, Chapter 600, Section 625, titled "Manejo y Control de Multitudes" (Spanish for "Crowd Management and Control") when the April 18, 25, 27, and May 1, 2017 events occurred.  (Item # 1)

The PRPB reported that training on the General Order, Chapter 600, Section 625, titled "Manejo y Control de Multitudes" (Spanish for "Crowd Management and Control") was scheduled to start on July of 2017.  This training was to be based on the concepts trained by personnel of Homeland Security. This training would be provided to the OT Divisions, who are mainly responsible for the line contention in mass demonstrations.

TCA Assessment Report | 2018

On August 3, 2017, IC Jose Pujol met with PRPB Officer # 5, PRPB Officer # 6, PRPB Officer # 7 and PRPB Agent # 2, who is the Training Coordinator for the Specialized Units at the PR Police Academy in Gurabo. PRPB Agent # 2 explained that when Section 625 of the General Order Chapter 600 was approved, they adapted the following trainings as the required and necessary trainings for a Police officer/agent to be certified as trained on the 625 Section:

DOT-112 Basic Formations Course
DOT-603 Use and Handling of the rigid baton
DOT-604 Use and Handling of Tear Gas (CS)

Additionally, the officer/agent must approve and Advanced Course before being certified as trained in the 625 Section.

Training in the three above described adapted courses started only to realize that they did not have any certified instructor to provide the Advanced Course. On July 26, 2017 Clayton Calkins, an Instructor from the Homeland Security (HS), FEMA Center for Domestic Preparedness, visited the PRPB Academy to provide training to the PRPB Instructors. He trained a total of 17 instructors: four (4) from SWAT, six (6) from DOT, two (2) from the Special Arrests Unit and five (5) from the SAEA (PRPB Academy). He trained them in a Basic Course and in a Validation Class. The HS instructor could not train the PRPB instructors on Impact Ammunitions or Chemical Agents. The SWAT unit is expected to train these instructors in this area. To be certified in Section 625, each of these PRPB instructors still will have to provide three sessions of training to other agents under the supervision of the HS instructor. After that, these instructors will have to be trained in the Advanced Course. The Advance Course has not been prepared yet, but they expect to have it soon.

While the HS instructor was training the PRPB instructors, they were training PRPB agents in the three adapted modules described above. At that time, two hundred-and-one (201) agents (including the seventeen PRPB instructors) had been trained in the three modules explained above and waiting for the Advance Course, to complete the required training in Section 625.

IC Jose Pujol was informed that the PRPB expects to have all DOT, SWAT and Special Arrest agents/agents properly trained in Section 625, before July 2018. It is expected they will be trained on the three modules described above plus on Impact Ammunitions training, Chemical Agents training and the Advanced Course.

HS is expected to prepare and provide training for the PRPB instructors, so these can train the PRPB Incident Commanders. These high ranking PRPB Officers will have to

| TCA Assessment Report | 2018 |

be trained on the three modules described above, on the Impact Ammunitions training, the Chemical Agents training and the Advanced Course.  Training is also expected on knowledge of their specific functions and limitations during crowd control operations.

Before ending the meeting, IC Jose Pujol asked PRPB Officer # 5, PRPB Officer # 6, PRPB Officer # 7 and PRPB Agent # 2, how they understood Section 625.  They all agreed that Section 625 is a Section created to regulate how the PRPB will handle the Crowd Control situations.  They stated that they understood that Section 625 was adopting other Sections of the Chapter 600, like Sections 601, 602, 603, 604, 605, 610, 612, 615 and 620.  They used an example, if during a crowd control operation, a PRPB agent uses a chemical agent, the PRPB agent will have to comply with Sections 601, 604, 605 and 625, and the PRPB agent will have to fill all the forms that each of these sections mandates.  The reply made by these Officers from the PRPB Academy and PRPB Reform Unit to the rhetoric question, indicates they are fully acquainted with the aforesaid orders.

| TCA Assessment Report | 2018 |

# Section III: Implementation of Crowd Control Policies and Training Under the Agreement

PRPB General Order Chapter 600 Section 625 (effective since April 19, 2016) establishes the rules, procedures and guidelines that the members of the PRPB shall follow to establish crowd control and preserve the peace during demonstrations, programmed events, protests, strikes, or to recover the order during and spontaneous disturbance. It also covers the use of force (including chemical agents like tear gas), training, arrests and reporting requirements.   This section also covers the circumstances under which the PRPB will activate the specialized units like Operaciones Tacticas (DOT), SWAT units, the Mounted Police units and the Motorcycle units.

## III.A Analysis of specific Operational Plans (OPs) developed by PRPB for crowd control and mass demonstrations that are the focus of this study. Findings and Recommendations.

PRPB's Order Chapter 600 Section 625, III Rules and Procedures, A. Programmed Constitutional Activities and Crowd Control, paragraph number 6, establishes how the PRPB Area Commander will prepare the Operational Plan ("Plan de Trabajo").

In response to a request by the T.C.A.'s Office, the PRPB provided to the TCA a copy of an Operational Plan (OP) prepared on April 17, 2017, for a protest scheduled to take place on 04/18/2017 at the Capitol Building, related to a "Request for an Audit of the Puerto Rico's Debt".  This OP was prepared by the PRPB and signed by PRPB Officer # 9.  The approved plan failed to comply with several of the requirements established in General Order Chapter 600 Section 625, III Rules and Procedures, A. Programmed Constitutional Activities and Crowd Control, paragraph number 6 (Item # 3):

**FINDINGS (April 17, 2017: Capitol Building):**

TCA Assessment Report | 2018

- The OP did not provide any information related to any attempt made by the Area Commander or his/her representative to establish contact and communication with the event/protest's organizers.
- The OP failed to inform about the expected number of participants or convoked individuals (paragraph # 6 section d).
- The OP failed to inform if copies of the required permits had been delivered (paragraph # 6 section e).
- The OP failed to inform if the event coincides with other large activities/events like for example, sports events, religious or labor events (paragraph # 6 section f).
- The OP failed to inform about a designated zone to provide first aid in case of being necessary, and to coordinate the assistance of the "Cuerpo de Emergencia Medicas" (Emergency Medical Corps) (paragraph # 6 section p ii).   Despite that the OP has a paragraph identified as "Situacion de Emergencia Medica" (Spanish for Medical Emergency Situation, this) explains that in case of a medical emergency, a motorized police officer will escort the ambulance to a specific medical facility, the OP fails to explain where the ambulance, if any, will be located during the event (designated zone).
- The OP failed to identify the places where they would place legible and visible signs informing about the event's entry and exit, and the places assigned for the participants (paragraph #6 section r).
- The OP failed to identify the official vehicles to be utilized to transport the arrestees, if any (paragraph # 6 section s).

No OP was provided for the event that took place on 04/25/2017 at the "Centro Para Puerto Rico-Fundación Sila M. Calderon", a non-profit organization founded by former Governor Sila Maria Calderon.  The PRPB explained that no OP was prepared because this event was never scheduled.  On such date, the Honorable Thomas Rivera Schatz, President of the Puerto Rico Senate, visited the "Centro Para Puerto Rico-Fundación Sila M. Calderon" location.  Such Foundation is located near to the University of Puerto Rico, which at that time was locked and controlled by the students, who were in the middle of a general strike.

**FINDINGS (Centro Para Puerto Rico):**

- It is completely understandable that no Operational Plan was prepared for the visit of the President of the Senate to the Foundation, because this visit was not scheduled.  Nevertheless, some recommendations are later made in this

| TCA Assessment Report | 2018 |
|---|---|

report for situations similar to this one, in order to avoid a violent situation like the one that happened this day at such location.

In response to a request by the TCA's Office, the PRPB provided to IC Jose Pujol a copy of an Operational Plan (OP) prepared on April 26, 2017, as a work plan to handle a protest scheduled to take place on 04/27/2017, at the Capitol Building, by various syndicated groups.  The OP was prepared by the PRPB and signed by PRPB Officer # 9.  The approved plan failed in comply with several of the requirements established in PRPB Order Chapter 600 Section 625, III Rules and Procedures, A. Programmed Constitutional Activities and Crowd Control, paragraph number 6

(Item # 4):

**FINDINGS (Capitol Building 4/27/2017):**

- The OP did not provide any information related to any attempt made by the Area Commander or his/her representative to establish contact and communication with the event/protest's organizers.
- The OP failed to inform about the expected number of participants or convoked individuals (paragraph # 6 section d).
- The OP failed to inform if copies of the required permits had been delivered (paragraph # 6 section e).
- The OP failed to inform if the event coincides with other large activities/events like for example, sports events, religious or labor events (paragraph # 6 section f).
- The OP failed to inform about a designated zone to provide first aid in case of being necessary, and to coordinate the assistance of the "Cuerpo de Emergencia Medicas" (Emergency Medical Corps) (paragraph # 6 section p ii).  Despite that a paragraph identified as "Situacion de Emergencia Medica" (Spanish for Medical Emergency Situation) explains that in case of a medical emergency a motorized police officer will escort the ambulance to a specific medical facility, the OP fails to explain where the ambulance, if any, will be located during the event (designated zone).
- The OP failed to identify the places where they would place legible and visible signs informing about the event's entry and exit, and the places assigned for the participants (paragraph #6 section r).
- The OP failed to identify the official vehicles to be utilized to transport the arrestees (paragraph # 6 section s).

| TCA Assessment Report | 2018 |
|---|---|

On April 26, 2017, an Operational Plan (OP) for the May 1st event, the National Strike ("Paro Nacional"), was prepared by the PRPB and signed by PRPB Officer # 4.  The approved plan failed in comply with several of the requirements established in PRPB Order Chapter 600 Section 625, III Rules and Procedures, A. Programmed Constitutional Activities and Crowd Control, paragraph number 6 (Item # 5):

**FINDINGS (May 1st events, PRPB Officer # 4 OP):**

- The OP did not provide any information related to any attempt made by the Area Commander or his/her representative to establish contact and communication with the event/protest's organizers.
- The OP failed to inform the previous experiences with this type of Constitutional activity or manifestation and with the leaders of the groups and the result of the auto-evaluations made by the PRPB (paragraph # 6 section c).
- The OP failed to inform about the expected number of participants or convoked individuals (paragraph # 6 section d).
- The OP failed to inform if copies of the required permits had been delivered (paragraph # 6 section e).
- The OP failed to inform if the event coincides with other large activities/events like for example, sports events, religious or labor events (paragraph # 6 section f).
- The OP failed to inform about a designated zone to provide first aid in case of being necessary, and to coordinate the assistance of the "Cuerpo de Emergencias Medicas" (Emergency Medical Corps) (paragraph # 6 section p ii).
- The OP failed to identify the places where they would place legible and visible signs informing about the event's entry and exit, and the places assigned for the participants (paragraph #6 section r).
- The OP failed to identify the official vehicles to be utilized to transport the arrestees (paragraph # 6 section s).
- The OP informs that DOT and SWAT units had been requested, but does not provide any information about how many SWAT personnel had been requested.  The OP did not inform if the request had been granted, and who would be directing and supervising these DOT and SWAT Units, if activated and utilized in the main event location.

On April 26, 2017, an Operational Plan (OP) for the May 1st event, the National Strike ("Paro Nacional"), was prepared by the PRPB and signed by PRPB Officer # 10, Director of Patrulla de Carreteras (Road Patrols) of San Juan.  The objective of this OP

| TCA Assessment Report | 2018 |
|---|---|

was more focused in traffic control rather than the event itself.  Nevertheless, the OP is failing to comply with the following requirements (Item # 6):

**FINDINGS (May 1st events, Officer # 10 OP)**

- The OP did not provide any information related to any attempt made by the Area Commander or his/her representative to establish contact and communication with the event/protest's organizers.
- The OP failed to inform the previous experiences with this type of Constitutional activity or manifestation and with the leaders of the groups and the result of the auto-evaluations made by the PRPB (paragraph # 6 section c).
- The OP failed to inform about the expected number of participants or convoked individuals (paragraph # 6 section d).
- The OP failed to inform if the event coincides with other large activities/events like for example, sports events, religious or labor events (paragraph # 6 section f).

On April 28, 2017, an Operational Plan (OP) for the May 1st event, the National Strike ("Paro Nacional"), was prepared by the PRPB, by PRPB Officer # 11, Commander Carolina Area.  This OP is mainly focused in traffic control and in the protection of very important sites (like electric power stations, water system sites, etc.) in the Carolina Precinct area, rather than the site of the main event itself.  Taking this fact into consideration, this OP provided most of the basic necessary information for the assigned mission.  Nevertheless, the OP is failing to comply with the following requirements (Item # 7):

**FINDINGS (May 1st events, Officer # 11 OP)**

- The OP did not provide any information related to any attempt made by the Area Commander or his/her representative to establish contact and communication with the event/protest's organizers.
- The OP did not provide information on how to handle the arrestees, if any, and did not identify the official vehicles to be utilized to transport the arrestees, if any.

On April 29, 2017, an Operational Plan (OP) for the May 1st event, the National Strike ("Paro Nacional"), was prepared by the Drugs, Narcotics, Vice Control and Illegal Weapons Division of the PRPB and signed by PRPB Officer # 12, Director of the Drugs,

| TCA Assessment Report | 2018 |
|---|---|

Narcotics, Vice Control and Illegal Weapons Division of the PRPB.  This OP was more focused in providing support to other units by conducting surveillance, arrest and investigations during the event, rather than the event itself.   Nevertheless, the OP is failing to comply with the following requirements (Item # 8):

## FINDINGS (May 1st events, Officer # 12 OP):

- The OP did not provide any information related to any attempt made by the Area Commander or his/her representative to establish contact and communication with the event/protest's organizers.
- The OP failed to inform the previous experiences with this type of Constitutional activity or manifestation and with the leaders of the groups and the result of the auto-evaluations made by the PRPB (paragraph # 6 section c).
- The OP failed to inform about the expected number of participants or convoked individuals (paragraph # 6 section d), it only states that a large number of people are expected.
- The OP failed to inform if copies of the required permits had been delivered (paragraph # 6 section e).
- The OP failed to inform if the event coincides with other large activities/events like for example, sports events, religious or labor events (paragraph # 6 section f).

On April 30, 2017, an Operational Plan (OP) for the May 1st event, the National Strike ("Paro Nacional"), was prepared by the PRPB and signed by PRPB Officer # 13, Maritime General Coordinator, FURA.  This OP is more focused in the naval and air transport of Police units and in providing the necessary naval protection to government properties and commercial maritime routes, rather than the event itself.  Taking this fact into consideration, some of the requirements established in PRPB "General Order Chapter 600 Section 625, III Rules and Procedures, A. Programmed Constitutional Activities and Crowd Control, paragraph number 6", may not apply.  Nevertheless, very important deficiencies in this OP were found:
(Item # 9)

## FINDINGS (May 1st events, Officer # 13 OP):
- The OP did not provide any information related to any attempt made by the Area Commander or his/her representative to establish contact and communication with the event/protest's organizers.
- This OP was prepared by FURA.  Since SWAT units are part of FURA, the OP failed to inform about how many SWAT units, and how many of their

TCA Assessment Report | 2018

members were in standby, ready to be activated and moved for this event. The OP also failed in informing who would be directing and supervising these SWAT Units when activated and utilized in the main event site.

- The OP is not identifying the official vehicles to be utilized to transport the arrestees, if any.


**OTHER FINDINGS AND RECOMMENDATIONS SUBMITTED:**

The above referenced Operational Plans lacked important information and details that, despite not being required by the General Order, should be considered for incorporation to the General Order:

- The OPs provide information about an existent chain of command system, but they could be improved by providing additional information about the supervisory structure and chain of command. In the presented OPs there is no clear-cut information of how each unit or working group responds within the chain of command. This may be easily depicted with the use of a diagram showing how the different units respond in the chain of command of the operation.

- The OPs for the April 18 and April 27 do not provide information of how many, if any, and which SWAT and/or DOT units would be available and ready to participate in the event. These OPs state that in the past, in previous events, the Capitol building has suffered physical damages. Despite knowing that fact, the OP only makes a short reference stating that: should it be necessary the activation of the DOT, the Area Commander will be notified to coordinate it. It is recommended that in events like this one, in which there is knowledge of past events that became violent and resulted in damages to the Capitol building, the OP includes a more specific coordination with the Tactical Operations Division. The OP should include: the identification of the Tactical Operations units in standby; the location of these units while the event is currently ongoing; the name and complete information of the contact person in case they are urgently needed in the event's site; how and by whom these units will be directed/supervised at the event's site; and how these units will interact with the PRPB units already at the site.

- The OP for the May 1 event signed by PRPB Officer # 4, is the one related to the place where all the marches would end at and meet with each other. This OP states at page 24, that it is requested to the F.U.R.A. Director, personnel

from SWAT, but does not provide detail about the number of requested units and/or agents, and does not provide information of the finally assigned ones, if any. This same OP for the May 1 event, states at page 25 that four squads from the DOT of San Juan were requested, but it does not provide any information about which squads, the names of their members and the names of their supervisors were finally assigned, if any. This OP should also explain how and by whom the DOT and the SWAT units would be supervised, if activated, during the performance of their specific duties at the event's site. It should also explain how these tactical units would interact with the other PRPB Units assigned to this main event's location.

The Operational Plan (OP) for the May 1st event signed by PRPB Officer # 13, Maritime General Coordinator, FURA, explained that a SWAT team would be ready since 6:00 am at the PRPB Headquarters; ready to react and be mobilized where it may be needed. The OP doesn't provide any other information about the names of SWAT team members, immediate supervisors or its composition. The OP provides a general FURA chain of command, but it does not provide any information about how, and by whom, this SWAT team will be supervised in case of being mobilized to an area where there is many PRPB agents working with their own leadership. It is submitted that the FURA's OP must inform how the SWAT units will interact with the PRPB agents and supervisory chain of command located already at the site area.

- Summarizing the above paragraphs, it is evident there was not an integrated OP where the role of each specialized unit was determined in order to avoid overlapping and misunderstanding of functions to be executed. After examining the details of all these OPs, it is evident there was never an identification of how many and which DOT and SWAT units were ready to act during the event. The OPs also lacked information on how, and by whom, these units were going to be supervised at the main location. The absence of this information is a disquieting deficiency, because it deals with to the PRPB's units trained to utilize the highest levels of Use of Force and conduct strategic planning.

- The OPs lacked detailed explanation of the arrest procedures to be undertaken in mass arrests situations. It is submitted that such OPs must foresee a situation where large number of arrestees will be separated from the crowd and controlled in extraordinary circumstances. Notwithstanding the aforesaid it should be noted that such procedures were in place although not contemplated in the OPs.

| TCA Assessment Report | 2018 |
|---|---|

- The OPs don't have any description of the equipment to be used during crowd control events. They only make reference to the vehicles and to the personnel assigned equipment. It is summited that the PRPB should go into detail about which is the personnel assigned equipment that every officer will have with him. These OPs should also provide detailed information of all equipment that the SWAT and DOT units will have available for use: the agents' personal assigned equipment, the equipment to be used with chemical agents, the identification and inventory of all available chemical agents, the amount and identification of all other available less than lethal weapons and ammunitions. It is submitted that the OPs should have a certification that chemical agents distributed to the SWAT units are not expired.

- The majority of the OPs do not provide "anticipated scenarios" and how to react in the event of any of them becoming a threatening event. It is advised that the PRPB should provide information about some possible expected scenarios that can occur, and provide an explanation on how to react to these scenarios.

- The OPs contain a General Dispositions (DISPOSICIONES GENERALES) paragraph which details the Chapters and Sections (Capitulos y Secciones) that apply to the operation. This notice assumes any participant in the operation knows and remembers every enumerated disposition therein. It is submitted that the OPs should provide more and detailed information explaining the Use of Force in Major Crowd Situations rules and regulations that could apply to the specific operation, especially about the deployment of chemical agents and impact ammunitions, and how to document and report the use of them.

- The OPs don't cover Contingent Situations. Example: Explaining in detail how to react if individuals invade and/or damage public properties or set fires, or take hold of public roadways not included in the original planned marches, etc. It is submitted that the OPs should cover contingency plans for viable scenarios in the event that they become a threat.

- The OPs don't go into detail as to how the communications within the PRPB organization will be conducted during the event. Reference is made in some of them to radio communications. It is further submitted that the OPs should provide additional ways of communication, should the radio communications fail to meet the expected communication objective.

| TCA Assessment Report | 2018 |
|---|---|

- The OPs don't go into detail as to how the Media representatives will be treated and allowed to conduct their right to cover the events.  It is submitted that the OPs should direct the Incident Commanders to remind the PRPB agents the following: the Media has a right to cover demonstrations/protests, including the right to record the event on video, film or in photographs.  The Media should be permitted to observe and should be permitted close enough access to the event. Even after a dispersal order has been given, clearly identified Media should be permitted to carry out their professional duties in any area, unless their presence would unduly interfere with the enforcement action.  The Media should be permitted to observe and shall be permitted close enough access to the arrestees, if any, to record their names. The Media and Legal Observers should never be targeted for dispersal or enforcement action because of their status unless their lives are threatened.

# III.B Analysis of Strategy and Tactics During the Event

This analysis is made event by event:

- **April 18, 2017 at Capitol Building:**

On the above captioned date, the "Citizen Front for the Audit of Public Debt" (Frente Ciudadano Para la Auditoria de la Deuda) and students from the University of Puerto Rico protested in front of the North part on the Capitol building, where the Legislative Assembly was in session debating economic measures related to Puerto Rico's public debt.

The Police of Puerto Rico placed a no access zone barrier in front of the stairs of the North part of the Capitol building.  This barrier consisted of a series of individual plastic water filled barriers, placed one next to the other completing a barricade establishing the no access zone restricting access to protesters.  Behind de barrier, the PRPB placed a line formation of Police agents.  The mission of the line of Police agents was to ensure that the barriers weren't moved and that protesters would not access the stairs that lead to the entrance of the Capitol building.

Video images depicting actual footage of the event reflect the following: 1) some protesters moved individual water filled barriers and the PRPB agents had to confront the protesters in order to return the barriers to their place.  In order to control this situation, the PRPB agents made the use of pepper spray.  2) When this situation

| TCA Assessment Report | 2018 |
|---|---|

turned critical, the DOT units located inside the Capitol building were moved to the stairs in front of the Capitol building to ensure that no protester could have access to the building. The line formation of PRPB agents located behind the barrier facing the protesters controlled the situation and the DOT was removed from the area without having to intervene.

The evidence reflects that the strategy planned and executed by the PRPB was consistent with the scenario and it appeared to be well planned and performed.

- **April 25, 2017 - Visit of Senate President Thomas Rivera Schatz to the "Centro Para Puerto Rico-Fundación Sila M. Calderon":**

This foundation is physically located at a short distance of the University of Puerto Rico, which at that time was locked and controlled by the students which were in the middle of a general strike. Senator Schatz had to be extracted from this location under the protection of many Police agents (mainly DOT), on account of many violent protestors gathering in the area. The protesters threw rocks and water bottles against the vehicle when the Senator was leaving and also against the Police agents. Several Police agents were injured.

When the Senator was about to leave the site in his official vehicle accompanied by other official vehicles, the gates of the site's parking were opened, and the DOT personnel made a wedge formation and a left diagonal formation to allow the vehicles to leave the site and to gain access into the street. This formation rapidly evolved into two single lateral formations, and to a double line formation in front of the first vehicle and a double line formation behind the last vehicle. The two single line formations protected the lateral parts of the convoy of vehicles. The vehicles advanced with many difficulties due to the large number of protesters that tried to impede a safe departure. After a very long and violent ordeal, the vehicles were able to leave the area.

Once the vehicles left the area, the DOT personnel had to return to the origin point to board their vehicles. This was a highly complicated operation due to the number and the hostility of the protesters. In some occasions, the DOT personnel had to regroup and make circular formations to create a safe pause, and be able to reorganize and plan a new movement back to their vehicles. In one instance, a Police agent in civilian clothes (from the Senator's escort) made use of pepper spray against one protester that triggered an increased protesters' hostility. The DOT personnel had to make a circular formation to protect that Police agent in civilian clothes to control the situation. After a long struggle, they were able to leave the area in their vehicles. The remaining group of DOT personnel was able to retreat on foot to the Muñoz Rivera Avenue. During their retreat they were followed by a large number of agitated protesters who insulted them

| TCA Assessment Report | 2018 |
|---|---|

and threw objects at them.  The DOT personnel were using a line formation while moving backwards towards the Muñoz Rivera Avenue.  In one instance, the reviewed recording reflected some protesters undergoing the effects of pepper spray although the recording fails to show the moment it took place.  Once they arrived at the Muñoz Rivera Avenue they made a double line formation, secured the area, and moved backwards to board their vehicles.

The evidence reflects that the strategy used by the PRPB DOT was consistent with the given scenario and it appeared to be properly performed, taking into consideration that they did not have the necessary time to properly plan the extraction of the Senator. The performance of a member of the Senator's escort team remains questionable as will be explained later on.


- **April 27, 2017 at Capitol Building:**

Members of approximately 25 (twenty-five) labor unions protested in the North part of the Capitol building against Law Project 938-2017, which they alleged could endanger the amount and quality of the benefits that government employees are enjoying now.  A physical confrontation between some protesters and a member of the House of Representatives took place during the event.

The Police of Puerto Rico made a line formation in front of the stairs of the North part of the Capitol building.  Behind this first line of PRPB agents they placed a second line formation consisting of DOT personnel.  These two lines of PRPB personnel made a human barrier establishing the no access zone for protesters.

The evidence reflects that the strategy used by the PRPB was consistent with the given scenario and it appeared to have been properly performed.


- **May 1, 2017:**

Dozens of organizations, labor unions and students from the University of Puerto Rico (UPR) organized and mapped out the national strike route for May 1, 2017 considered to be the International Workers' Day.  The protesters would concentrate on five marches that would leave from different points of the metropolitan area arriving at the building where the Offices of the Fiscal Control Board are located. The demonstrations would focus on the "Milla de Oro" (Spanish for the "Golden Mile") in Hato Rey, San Juan, PR. According to leaders of the movement, the demonstrations would be carried out against the austerity measures taken by the government of Puerto Rico. By the same token,

they would request the audit of the PR public debt and they would enforce their claims against the cuts to workers' benefits.

The PRPB strategy and plan for this day's events was:

- They assigned and placed PRPB agents protecting the key buildings at the Muñoz Rivera Avenue (Milla de Oro area), the Capitol building, the airport, electric power and water distribution stations, and seaports. At the same time, they assigned several vehicles to patrol the main streets of the Metropolitan area.
- They assigned and placed PRPB agents to the marches to ensure their safety and to ensure that they could exercise their civil rights without incidents.
- They assigned DOT and SWAT units to be standby to act if necessary.

The five marches developed and ended at the "Milla de Oro" in a very organized and peaceful way. No incidents were reported at the Capitol building. A minor incident was reported at the airport but the PRPB controlled the situation in a very fast and peacefully way. No incidents were reported at electric power and water distribution stations, or the seaports.

During the event, some individuals broke glass windows at the Banco Popular building. A group of PRPB Officers attempted to advance in formation to arrest these individuals but they ended being surrounded by protesters in the Muñoz Rivera Avenue. The PRPB undertook negotiations with the protesters and were able to slowly retreat to the intersection at the Muñoz Rivera and Chardon avenues.

During the course of the events at the Milla de Oro, protesters vandalized many properties. Such incidents will be further addressed in detail later on in this report.

<u>Strategies followed by PRPB for this event:</u>

The standby DOT and SWAT units were activated to the Ponce de Leon and Muñoz Rivera Avenues. They placed a front-line formation of DOT personnel and positioned the SWAT units behind them. They advanced southbound in both avenues moving the violent protesters away from the center of the Milla de Oro. When directly confronted by the protesters, the SWAT units made use of tear gas to disperse them. In some occasions the SWAT teams made use of non-lethal ammunition (rubber balls) against some protesters. Once they arrived at Roosevelt Avenue, some protesters moved to this avenue in direction of Plaza Las Americas and finally dispersed. Other protesters, who were still vandalizing many properties, were moved South by the DOT and SWAT units until near the location of Hipopotamo Restaurant, where they dispersed.

| TCA Assessment Report | 2018 |
|---|---|

The strategy used by the PRPB was consistent with the scenario and appeared to be properly performed.  The video recordings reviewed by the undersigned depict that the PRPB personnel acted with discipline and dispersed the violent protesters by using the minimal necessary use of force.  They avoided a physical confrontation with the violent protesters by dispersing them with the use of pepper spray, CS gas and less than lethal ammunition preventing in this way an escalated scenario of violence.  The evidence shows that the PRPB knew their priorities and focused on their main goal, instead of wasting time and efforts in chasing a specific subject that damaged property at a given point, as they did in the past.  They arrested individuals engaged in these types of violations when performing the arrests did not jeopardize their group formation and tactical discipline.

The TCA had no access to complete video recordings of the event happening this day at the protest at Plaza de la Democracia, Ave. Luis Muñoz Rivera, San Juan; or to the march departing from Plaza de la Democracia towards the "Fortaleza" (the Governor's residence) that could help the undersigned to analyze the PRPB strategy.  It should be noted that a video was provided by an independent source, "Witness A", which depicts a use of force by policemen in civilian clothes.  Comments on the video images will be provided later in this report.

# Section IV: Analysis of Related and Relevant Policy Issues       Stemming       from       Policing       these

| TCA Assessment Report | 2018 |

# Demonstrations: Use of Force, Search and Seizure, Supervision, Administrative Complaints, Detention

## IV.A Policies and Training Involving these Related and Relevant Issues

The policies involving these related and relevant issues are the following:

- The PRPB General Order, Chapter 600, Section 625, titled "Manejo y Control de Multitudes" (Spanish for "Crowd Management and Control") is effective since April 19, 2016. It establishes the rules, procedures and guides to be utilized by the PRPB members for crowd control events, covering use of force (including chemical agents like tear gas), training, arrests and reporting requirements. This section also covers the circumstances under which the PRPB will activate the Operaciones Tácticas (DOT) and SWAT units, the Mounted Police units and the Motorcycle units.

This Section 625 of the Chapter 600 of the General Order, refers and incorporates/adopts other sections of the Chapter 600 as follows:

- The PRPB General Order, Chapter 600, Section 620, titled "Normas y Procedimientos para la Utilización de Armas Especializadas por Miembros de las Divisiones de Tacticas Especializadas (DTE)" (Spanish for "Rules and Procedures for the Use of Specialized Weapons by Members of the Specialized Tactical Divisions (DTE)" (Item # 19), establishes the rules, procedures and guidelines to be utilized by the PRPB members when utilizing specialized and intermediate weapons. It establishes that only properly trained and certified members of the DTE will be allowed the use of the specialized weapons. It also establishes the authorized use of less than lethal weapons and ammunitions and when will they be authorized to be used and when its use is prohibited. It establishes, as well, the obligations and responsibilities of the members of the PRPB forces when using the less than lethal weapons and ammunitions. It covers also the trainings needed to use these weapons and ammunitions and how these weapons and ammunitions will be stored and transported.

- The PRPB General Order, Chapter 600, Section 601, titled "Reglas para el uso de la Fuerza por Miembros de la Policia de Puerto Rico" (Spanish

for "Rules for the Use of Force by Members of the Police of Puerto Rico") (Item # 11) establishes the rules and limits that will rule the use of force by the members of the PRPB.  It establishes: the rules for the use of force, the escalated use of force, the immediate medical attention needed after force has been used, the duty to intervene to avoid excessive use of force, the use of lethal force in order to protect human life, the restrictions of the use of lethal force, the rules for the use of less than lethal force, reports related to the use of force, monitoring of the use of force and training in the policies of use of force.

- The PRPB General Order, Chapter 600, Section 602, titled "Uso y Manejo del Dispositivo de Control Electrico" (Spanish for "Use and Operation of the Electric Control Device") (Item # 12) establishes the rules and procedures for the use, operation and maintenance of the Electric Control Device (ECD), according to the policies and practices of the PRPB relating to use of force.  It establishes: the rules for the use of force related to the ECD, the procedure for the use of the ECD, permitted use of the ECD, prohibited use of the ECD, people in crisis or with mental and/or behavioral problems and the use of the ECD, medical treatment after the use of the ECD, procedures after the use of the ECD, responsibilities of the supervisors, trainings and certifications in the use and operation of the ECD, rules for the use operation and maintenance of the ECD, assigning and change of the ECD, procedure to repair the ECD, duties of the technician at central level , duties of the technicians in the Police areas, unloading of information of the data port.

- The PRPB General Order, Chapter 600, Section 603, titled "Uso y Manejo de Armas de Impacto" (Spanish for "Use and Operation of Impact Weapons") (Item # 13) establishes the rules and procedures for the use and operation of the impact weapons used as less than lethal force by the PRPB.  It establishes: the carrying of the impact weapon, the use and operation of the impact weapon, the use of the equipment, description of the body areas that should be avoided when using impact weapons, warnings or verbal commands to be used, referral/transportation for medical treatment, required training, notifications, required reports and the responsibilities of supervisors.

- The PRPB General Order, Chapter 600, Section 604, titled "Uso y Manejo de Agentes Quimicos" (Spanish for "Use and Operation of Chemical Agents) (Item # 14) establishes the guides and procedures that will rule

| TCA Assessment Report | 2018 |
|---|---|

the use and operation of chemical agents by the members of the PRPB.  It establishes: the rules for use of chemical agents, acts not considered as use of force, the carrying and allowed uses of pepper spray, the forbidden use of pepper spray, the verbal warnings, the techniques for the use of pepper spray, the training and certification in the use and operation of pepper spray, the use of tear gas, the procedures for the decontamination and treatment, the required notifications and reports, the storage, the coordinator of chemical agents, the assigning and replacement.

- The PRPB General Order, Chapter 600, Section 605, titled "Informe e Investigacion de Incidentes de Uso de Fuerza de Miembros de la Policia de Puerto Rico" (Spanish for "Report and Investigation of Incidents of Use of Force by Members of the Police of Puerto Rico") (Item # 15) establishes the rules and procedures to report and investigate the use of force made by members of the PRPB in the line of duty.  It establishes: the reportable use of force (levels 1 to 4), the responsibility to inform of the use of force, referrals/transfers for medical treatment, the responsibilities of the immediate supervisor and upper rank supervisors, operations and search warrants and the required training.

- The PRPB General Order, Chapter 600, Section 610, titled "Normas a seguir para la grabacion de eventos publicos" (Spanish for "Rules for the recording of public events") (Item # 16) establishes the rules and rules for the recording by the PRPB of public events.

- The PRPB General Order, Chapter 600, Section 612, titled "Autoridad de la Policia de Puerto Rico para llevar a cabo registros y allanamientos", (Spanish for "Puerto Rico Police authority to carry out searches and seizures".) (Item # 17).  This Section's purpose is to regulate the policy and rules that members of the Puerto Rico Police must follow in the exercise of their legal authority to carry out searches and seizures, and execution of search warrants.

- The PRPB General Order, Chapter 600, Section 615, titled "Autoridad de la Policía de Puerto Rico para llevar a cabo Arrestos y Citaciones" (Spanish for "Puerto Rico Police authority to carry out Arrests and Summons") (Item # 18).    The purpose of this section is to regulate the policy and the rules that members of the Police of Puerto Rico have to

follow in the exercise of its legal authority to carry out arrests and summons.

The trainings involving these related and relevant issues are the following:

- Persuasion, Mediation and Conflict Resolution
- Techniques and Verbal Commands
- Soft Hands Techniques
- Hard hands Techniques
- Techniques for crowd control
- Emotional Health and Stress Management for the Police
- Basic Formations Course
- Use and Handling of the rigid baton
- Use and Handling of the less than lethal weapons and ammunition
- Use and Handling of Tear Gas (CS)

# IV.B Analysis of the Events: Findings and Recommendations

- **April 18, 2017**:

  April 18, 2017 at Capitol Building:  On this day, the "Frente Ciudadano Para la Auditoria de la Deuda" (Spanish for "Citizen Front for the Debt Audit") and students from the University of Puerto Rico protested in front of the North part on the Capitol building where the House of Representatives was debating measures related to the Puerto Rico's public debt.

  On 06/27/2017, in response to a request by the T.C.A.'s Office, the PRPB provided to IC Jose Pujol several documents related to such day's events, that is copy of the Operational Plan (OP); copies of seven Incident Reports: four related to physical damages, one related to a civilian that felt sick, another one related to a civilian that suffered injuries and one prepared by the PRPB with a short general description of the event.

  The PRPB provided a signed document which informed the TCA that no Use of Force Reports were prepared because "NO HUBO USO DE FUERZA" (Spanish for "There was no use of force") (Item # 20).

  The PRPB also provided copy of a PPR-174 form, "Informe sobre Actividades Constitucionales o Disturbios Civiles" (Spanish for "Report on Constitutional Activities or Civil Disturbances") (Item # 21).   This form

contained the following information: That during the event there were no arrests; that there were eight (8) instances of **Use of Force**; that twenty-one (21) Police agents were injured along with one photo reporter; that the event lasted 7 hours; that initially twenty (20) PRPB agents were present but they ended with the participation of ninety-four (94) agents; that they did not use SWAT or K-9 Units; that they used Motorized and DOT units. The report provided a summary of the event by stating that it started at 10:00 AM. Approximately three hundred (300) people were protesting including UPR students, Comision Ciudadana para la Auditoria de la Deuda Publica (Spanish for "Public Commission for the Audit of the Public Debt") and other unidentified individuals. The protest took place at the North part of Capitol building. Twelve people were allowed to enter the building but the first one refused to be searched, and he/she threw him/her self on the floor. Security personnel decided to deny entry to the twelve (12) individuals. Participants of protest threw rocks, used sticks, used spray paint, and threw type C and D batteries and used pepper spray against Police agents. Twenty-one (21) Police agents were injured in addition to one (1) photo reporter from Telemundo. During several incidents, the protesters violently moved the plastic barriers trying to enter into the Capitol building. Ten (10) PRPB agents used pepper spray against protesters to avoid their entry into the established perimeter (the report does not provide the names or badge number of these agents). Protesters caused damages to a vehicle of a member of the House of Representatives, and they broke glass windows of the Capitol bldg. At one point in time, the protesters removed the security barriers and two squads of DOT were activated to protect the Capitol building's doors. In five minutes, order was established, and DOT was moved back inside de building. Objects thrown to the Police agents were seized.

The PRPB provided a report titled "Notificacion de Incidentes Criticos" (Spanish for "Critical Incident Report"), which basically provides the same information as the PPR-174 (Item # 22).

The PRPB provided the list of the names of the PRPB personnel that participated in the event.

The PRPB provided the list of injured PRPB personnel (Item # 23).

The PRPB provided copy of the PPR-920 form, "Registro de Movilizaciones de las Divisiones de Tacticas Especializadas" (Spanish for "Registration of

Mobilizations of the Specialized Tactical Divisions"). The form shows that three Squads with five (5) Supervisors and one (1) Inspector of DOT were mobilized. That they did not make Use of Force, and they made no arrests, because they did not have to act.

The PRPB also provided copies of seven (7) forms titled "Informe de Incidente" (Spanish for "Incident Reports"), some with supplemental reports. One of them refers to a person that felt sick during the event, the others reference the following incidents, a person claiming that someone threw a rock at him, the damages suffered by a government vehicle, a very brief synopsis of the event, the damages suffered by another government vehicle, the damages suffered by another government vehicle and the damages caused to the plastic barriers during the incident.

On 08/29/2017, the PRPB allowed IC Jose Pujol to review ten (10) PPR-854 forms, Use of Force forms. The PRPB refused to provide copies of these reports despite the fact that several requests were made. These reports were all related to the use of pepper spray on April 18, 2017, while they were protecting the established perimeter to prevent the protesters accessing the stairs that led to the entry into the Capitol building:

- PPR-854. PRPB Agent # 7. He used the pepper spray.
- PPR-854. PRPB Agent # 8. He used the pepper spray.
- PPR-854. PRPB Agent # 9. He used the pepper spray.
- PPR-854. PRPB Agent # 10. He used the pepper spray.
- PPR-854. PRPB Agent # 11. He used the pepper spray.
- PPR-854. PRPB Agent # 12. He used the pepper spray.
- PPR-854. PRPB Agent # 13. He used the pepper spray.
- PPR-854. PRPB Agent # 14. He used the pepper spray.
- PPR-854. PRPB Agent # 15. He used the pepper spray.
- PPR-854. PRPB Agent # 16. He used the pepper spray.

The Certification provided is signed by the PRPB Director of Administrative Investigations, PRPB Officer # 15. In this document there is information of a continuing investigation of an incident that took place on April 18, 2017 at the Capitol building related to a complaint that was filled to her office on 06/12/2017. This complaint is identified as "Querella N.I.A. 2017-01-03-00087." A female individual complained that during the April 18, 2017 event, she received a physical aggression made by a Police Agent. According to a

PRPB internal document, they are investigating, and the case is still pending, while they search for video recordings that could show the alleged aggression (Item # 79).

IC Jose Pujol had the opportunity to review video recordings of the event and corroborated that several PRPB agents used the pepper spray in one occasion, when the protesters moved a large part of the plastic barrier and the PRPB had to mobilize several agents to return the barrier to its original location and secure again the established perimeter.  They also used the pepper spray in another occasion in which several protesters were trying to break the perimeter by attempting to remove individual water filled barriers, while other protesters were throwing all kind of objects to the PRPB agents protecting the perimeter.  In general, the reviewed images showed that protesters were throwing assorted objects against the Police agents that were standing behind the barriers.  In one instance it is possible to see protesters spraying an unknown substance against the Police agents standing behind the barrier.

**FINDINGS:**
- The Incident Commander (IC) did not make any possible effort to establish contact and communicate with the organizers of the event or leaders of the demonstration, as required by Section 625 of the General Order Chapter 600.  When the Incident Commander, PRPB Officer # 4 was interviewed; he stated that during the April 18, 2017 event, the students did not deliver prior information about the events to the PRPB. PRPB Officer # 4 accepted that the PRPB did not make any contact with the organizers of the events, prior to the events, as Section 625 of Chapter 600 of the General Order requires.  They talked to the protesters on the same day of the event at the site of the event.

- The reviewed evidence reflected that the above described uses of the pepper spray by the Police appeared to be completely justified and needed to maintain the control of the marked perimeter.  There was one instance where a Policeman sprayed one protester that approached the perimeter holding a camera and trying to take a picture.  The video recordings reflect this action did not represent any harm or risk for the security of the perimeter or the Police agents.  This single use of the

| TCA Assessment Report | 2018 |

pepper spray by one specific Police agent against one unidentified protester appears to be not justifiable under any circumstance. (Item # 85 which is the video showing this use of force). Note: This single occasion of clear inappropriate use of pepper spray was informed to the PRPB on November 14, 2017.

IC Jose Pujol was verbally informed by PRPB Officer # 36 (from the PRPB Reform Unit) that the PRPB decided that the Police Agent that made the clear inappropriate use of pepper spray was going to be retrained in the use of pepper spray.

- On 06/27/2017, when the PRPB provided the requested documents to IC Jose Pujol (pursuant to a request related to this Assessment), the PRPB informed in a signed document by a high-ranking officer that **NO** PPR-854 "Report of Incident of Use of Force" was prepared reporting the Use of Force during the event because **no Use of Force was used**, despite the fact that reports provided by the PRPB show that ten (10) Police agents used pepper spray against protesters. The document is Titled "Solicitud Formal Para Produccion de Documentos, 18 de abril de 2017 Capitolio" (Item # 20). The PRPB ended preparing ten (10) PPR-854 "Informe de Uso de Fuerza" (Spanish for "Report of Incident of Use of Force") forms for the use of pepper spray. Copies of them were allowed to be reviewed by IC Jose Pujol but not provided. The PRPB's written statement informing that NO PPR-854 "Report of Incident of Use of Force" was prepared reporting the Use of Force because **no Use of Force was used**, is **in complete contradiction** with the provided copy of a PPR-174 form, "Informe sobre Actividades Constitucionales o Disturbios Civiles" (Spanish for "Report on Constitutional Activities or Civil Disturbances") where the PRPB informed that there were **eight instances of Use of Force**, and the ten **(10) PPR-854 "Use of Force" forms prepared by them**. This triple contradiction (No Use of Force - Ten PPR-854 Use of Force forms- Eight instances of Use of Force in PPR-174) is troublesome. This is a clear example of the problems that were encountered during this Assessment, regarding the PRPB's documenting and reporting the incidents of Use of Force.

- The reports and documents provided by the PRPB informed that twenty-one (21) members of the PRPB and a photo reporter from a local television station suffered injuries during the event and a citizen felt dizzy.

| TCA Assessment Report | 2018 |
|---|---|

The reports documented that the citizen was treated by Paramedics present at the event and that she was later transported to the Presbyterian Hospital.   The reports also documented that the photo reporter was treated at the Capitol building's first aid center by Dr. Rodriguez (no first name provided).   The reports also documented that the PRPB personnel used pepper spray on some protesters but that they were not decontaminated by the PRPB because other protesters took them inside the crowd.   The report informed that there were Paramedics at the event's site.   The reports **failed** to inform where and how the twenty-one (21) members of the PRPB were treated.

- The PRPB **failed** by not providing to the T.C.A. copies of the videos of the civil disturbance that they were required to take in accordance with General Order Chapter 600 Section 625; III Normas y Procedimientos (Spanish for "Rules and Procedures") C. Respuestas ante un Disturbio Civil Espontaneo y Control de Multitudes (Spanish for "Responses to a Spontaneous Civil Disturbance and Crowd Management"); 3. Responsabilidad de Comandante del Incidente CI (Spanish for "Responsibility of the Incident Commander (CI)"; g. El CI se asegurara tambien de: (Spanish for "The CI also will make sure of:"), ix. Tomar videograbaciones del disturbio civil y de la respuesta del la PPR, conforme a lo establecido en la Orden General 610, titulada "Normas a Seguir para la Grabacion de Eventos Publicos (Spanish for "Take videotape recordings of the civil disturbance and the response of the PRPB, in accordance with the General Order 610, titled "Rules to Follow for the Recording of Public Events").

- IC Jose Pujol submitted a written request to the PRPB on July 17, 2017, requesting copies of all the video recordings in possession of the PR Police Bureau in relation to the four events covered by the Assessment. In relation to this event, the PRPB provided to the TCA copies of videos televised by local TV stations and copies of videos obtained from the internet.   The PRPB did not provide any video recording made by their CRADIC Divison regarding this event.

- The videos reviewed by IC Jose Pujol did not reveal any evidence that could support or refute the allegations made in the civilian complaint identified as "Querella N.I.A. 2017-01-03-00087", in which a female individual complained that during the April 18, 2017 event, she received a

physical aggression made by a Police Agent.  On November 27, 2017 IC Jose Pujol interviewed "Witness A", who provided a photograph alleging it shows the point in time when the Police Officer made the alleged aggression by assaulting the female individual with a rolled banner/poster with what appears to be a pole inside (Item # 81). "Witness A" informed the following: "the young woman had to be taken to a hospital and that she also filed a complaint at a Police Station (2017-1-166-2104) against the aggressor agent.  A complaint was also presented at the FBI on April 28th, 2017. They were not afforded a complaint number or provided the name of the duty agent."   IC Jose Pujol noticed that although the complaint numbers do not match, the information received from the PRPB and "Witness A" refers to the same facts.  The provided photograph depicts a Police Office having a rolled banner/poster on his right shoulder, in a batting position, appearing to be ready to strike someone with it.   The alleged victim appears to be right in front of him. If the Police Officer struck "Individual Q" with the banner, as the photograph suggests, it would have constituted an unreported illegal use of force using a tool/weapon not authorized by the PRPB.  On November 28, 2017 IC Jose Pujol sent copy of the photograph to the PRPB to be referred to the investigative agent.

- **April 25, 2017:**

  On April 25, 2017, the Senate President Thomas Rivera Schatz visited the "Centro Para Puerto Rico-Fundación Sila M. Calderon".  This foundation is physically located at a short distance from the University of Puerto Rico, which at that time was locked and controlled by the students which were in the middle of a general strike.  Senator Rivera Schatz had to be extracted from this location under the protection of many Police agents (mainly DOT), on account many protesters gathered in the area.  The protesters threw rocks and water bottles against the vehicle where the Senator was leaving and against the Police agents.  Several Police agents resulted injured.

  On 06/27/2017, in response to a request by the T.C.A.'s Office, the PRPB provided a document informing that no Operational Plan was prepared because this was not a programmed event (Item # 24).  The PRPB provided copy of an Incident Report PPR-468 (including two supplements) (Item # 25).  In this Incident Report and Supplements, they informed the following: A manifestation composed mainly by students of the University of Puerto Rico protested the visit of Senator Thomas Rivera Schatz at the "Centro Para Puerto Rico-Fundación Sila M. Calderon."   The protestors became violent causing injuries to twelve (12) PRPB agents and causing damages to

TCA Assessment Report | 2018

government vehicles. Some of the PRPB agents were sprayed with unknown chemical products and some agents were injured. Some PRPB agents lost government issue property, one baton and one Taser. In one of the Supplements it was informed that no charges were pressed against any protester but that the case was referred to the Cuerpo de Investigaciones Criminales (CIC) (Spanish for "Criminal Investigations Corps") for investigation.

The PRPB provided copy of a PPR-93 Form, "Informe de Accidente de Trafico" (Spanish for "Traffic accident report"), which informs that a government vehicle that was escorting Senator Thomas Rivera Schatz, while he was leaving the premises of "Centro Para Puerto Rico-Fundacion Sila M. Calderon", was attacked by the protesters with rocks, sticks and bottles. During this situation this vehicle ran over the foot of a PRPB agent, who could not identify which vehicle was involved, because of the pain he suffered and the complicated and chaotic situation they were experimenting.

The PRPB provided copy of a PPR-928 Form, "Notificacion Diaria de Incidentes de Uso de Fuerza" (Spanish for "Daily Notice of Use of Force Incidents") (Item # 26). This report informs that on 04/25/2017, personnel from the DOT of Arecibo was mobilized to the area of "Centro Para Puerto Rico-Fundación Sila M. Calderon". At approximately 5:00 pm, when Senator Thomas Rivera Schatz was leaving the premises of "Centro Para Puerto Rico-Fundación Sila M. Calderon", they moved the protesters to the sides of the street, to allow the departure of the vehicle transporting the Senator and the other protection vehicles. The protesters started throwing objects to the Senator's vehicle attempting to commit an aggression against him. The DOT personnel protected the Senator's vehicle. The protesters confronted the DOT personnel and they had to use pepper spray to disperse the crowd that confronted them obstructing their official function of bringing order and security. The pepper spray affected individuals could not be arrested because they were removed from the area by other protesters. Later, the situation was under control and order was reestablished in the area.

The PRPB provided copy of a PPR-174 form, "Informe sobre Actividades Constitucionales o Disturbios Civiles" (Spanish for "Report on Constitutional Activities or Civil Disturbances") (Item # 27). The report informs the following: No arrests were made; no seizure was made; Use of Force was used in five (5) instances; fifteen (15) individuals were injured; batons and

gas were used; the incident lasted for 3 hours and 45 minutes; initially twelve (12) PRPB personnel were involved in the event but they ended with a total of seventy-three (73) agents; no SWAT, no K-9, no Mounted Division and no Motorized Division personnel were deployed there; DOT personnel were present in the event.  The report explains that protesters obstructed the exit of Senator Thomas Rivera Schatz from the premises of "Centro Para Puerto Rico-Fundación Sila M. Calderon", provoking a civil disturbance, throwing hard objects to the vehicles that transported the Senator and the PRPB vehicles escorting him.  A complaint number was assigned and referred to the CIC.

The PRPB provided a report titled "Notificacion de Incidentes Criticos" (Spanish for "Critical Incident Report") (Item # 28), which basically provides the same information as the PPR-174.  It adds that the number of protesters that were impacted with pepper spray and the batons is unknown because they left the area.  A PRPB baton and a Taser were lost during the incident. At least three government vehicles were damaged.

The PRPB provided a list of the names of the PRPB personnel that participated in the event.

The PRPB provided seven (7) copies of the PPR-920 form, "Registro de Movilizaciones de las Divisiones de Tacticas Especializadas" (Spanish for "Registry of Mobilizations of the Specialized Tactical Divisions") (Item # 29). The reports informed the following:

- Operaciones Tacticas Metropolitana (hereinafter referred to as DOT) was mobilized and used during the event at "Centro Para Puerto Rico-Fundación Sila M. Calderon".  No arrests.  They used Gas (OC-Tear gas).  Use of Force in two (2) instances. Three agents were injured.  Three (3) Use of Force reports were prepared.
- DOT from Aibonito was deployed during the event at "Centro Para Puerto Rico-Fundación Sila M. Calderon".  No arrests. No Use of Force.  One officer/agent was injured.
- DOT from Humacao was mobilized because of a manifestation that moved from the UPR-Humacao to the center of the town of Humacao. They were not used.  No arrests were made.  No Use of Force was made.

TCA Assessment Report | 2018

- DOT Metropolitana was mobilized to the Capitol building.  They were never in contact with the protesters.   No arrests were made.  No Use of Force was made.
- DOT from Arecibo was mobilized and used during the event at "Centro Para Puerto Rico-Fundación Sila M. Calderon".   No arrests were made.  Use of Force was made in two occasions, using Gas OC (tear gas).
- DOT from Fajardo was mobilized because of a manifestation that moved from the UPR-Humacao to the center of the town of Humacao.  They were not used.  No arrests were made.  No Use of Force was made.

The PRPB provided copy of a report signed by PRPB Agent # 17 dated May 2, 2017.  The report is titled "ACTOS DE MOTIN" (Spanish for "Acts of Civil Disturbance") (Item # 30), and is related to the event when Senator Thomas Rivera Schatz was leaving the premises of "Centro Para Puerto Rico-Fundación Sila M. Calderon".  The report explains that the protesters were composed mainly of students and employees of the University of Puerto Rico (UPR).   The report goes into detail of how the protesters used a megaphone to send insulting messages in the Spanish language to the Senator in the way of: "traitor", "corrupt", "you sold the Homeland", "Police of PR, instrument of the rich people", "arrest this son of a bitch", "you are scared, motherfucker", "this is the people's revolution", "yes to fight, no to surrender".  The report explains that they had to mobilize DOT squads due to the dangerous situation in order to protect the exit of the Senator.  The report explains with very good detail how they protected the exit of the Senator, and how the DOT and other PRPB agents acted during the chaotic situation while they were being attacked by a very hostile crowd.  The report provides details about the twelve injured agents and where they were treated of their injuries.  It also explains the damages caused to vehicles and the theft of an extendable baton and a Taser.  The report also explains that while some members of the Senator's escort were on the ground after being pushed, and while Police agents were receiving physical aggressions from the protesters, these agents had the need to use different levels of force, using the Taser, pepper spray and baton to defend themselves.   To this date, no complaints have been filed by civilians claiming injuries or violations of rights.

The PRPB provided copy of a report signed by PRPB Officer # 16 dated April 25, 2017.  The report is titled "DISTURBIO CIVIL" (Spanish for "Civil Disturbance") (Item # 31), and is related to the event when Senator Thomas Rivera Schatz was leaving the premises of "Centro Para Puerto Rico-Fundación Sila M. Calderon".  This report provides and explanation of the events that happened there when the Senator left the area, but with less detail than the report in paragraph above.  The report provides the names of fifteen (15) injured PRPB agents and information related to two damaged vehicles.

The PRPB provided copy of a report signed by PRPB Officer # 17 dated May 5, 2017.  The report is titled "ACTOS DE MOTIN FUNDACION SILA MARIA CALDERON" (Spanish for "Acts of Civil Disturbance at the Sila Maria Calderon Foundation") (Item # 32), and is related to the event when Senator Thomas Rivera Schatz was leaving the premises of "Centro Para Puerto Rico-Fundación Sila M. Calderon".  The report is a brief summary of the events that happened there.  It provides a complaint number which will be referred to the CIC (Criminal Investigation Corps) for investigation.

On 08/29/2017, the PRPB allowed IC Jose Pujol to review two (2) PPR-854 Use of Force forms, and three (3) PPR-877 Continuation Page forms related to the Use of Force during this event.  The PRPB refused to provide copies of these reports despite various requests were made.   These reports informed that:

- One PPR-854 informed that PRPB Officer # 18 gave instructions to use the pepper spray to repeal the aggressions made by the protesters.
- Another PPR-854 informed that PRPB Agent # 18 used pepper spray to repeal aggressions made by the protesters.
- One PPR-877 informed that PRPB Officer # 19 authorized the use of pepper spray to disperse the crowd that was trying to steal their batons and that were throwing bottles and other objects to them.  PRPB Agent # 19 made use of pepper spray.
- Another PPR-877 informed that PRPB Agent # 20 was a witness of the use of pepper spray.
- Another PPR-877 informed that PRPB Agent # 21 was a witness of the use of pepper spray.  She witnessed the use of pepper spray by PRPB Officer # 18, PRPB Agent # 19 and PRPB Agent # 22.

| TCA Assessment Report | 2018 |

A review of video images of the incident shows that protesters blocked the street where "Centro Para Puerto Rico-Fundación Sila M. Calderon" is located. Lines of Police agents were made in the street, to protect the Senator's exit. DOT personnel stablished two (2) lines protecting the exit of the vehicles that carried the Senator and his escort. DOT personnel established the Senator's exit with the use of minimal force, just by pushing the protesters that blocked the way with the extended batons. Protesters were throwing objects against the vehicles and Police. No excessive or unnecessary use of force was detected from the video images of the incident. After the Senator left the area the DOT personnel regrouped and returned to the area of the foundation building, where they have left their vehicles. The protesters did not cease to insult the Police and attempt to block their way back. DOT personnel were forced again to push their way back. A member of the Senator's escort (in civilian clothes) was physically confronted by several protesters and he used pepper spray against them. DOT personnel controlled the situation again by making a human barrier circling the member of the Senator's escort team, isolating him from the very aggressive protesters. Later on, police agents were cornered at one spot where protesters chanting slogans surrounded them. Eventually, police agents were allowed to leave the area, going away in one single line. Again, they were confronted by other protesters who continued insulting the agents. Finally, some DOT personnel left the area in their vehicles, but the last ones, which were on foot, were followed until the Muñoz Rivera Avenue while protesters were throwing rocks at them. As an unknown camera man walked with the protesters, he passed by people that had been previously sprayed with pepper spray. At the Muñoz Rivera Avenue, the remaining DOT personnel made a line formation until they finally were able to make a complete retreat. While retreating, protesters kept throwing rocks at them.

**FINDINGS:**

- The data gathered reflects this event was not previously planned; it was an evolvement of an ongoing situation. In spite of this fact, no excessive use of force by the Police agents (DOT) was observed in the video recordings. The videos showed the Police agents (DOT) having great level of restrain, control and tactical discipline, despite the toxic, aggressive and provocative environment existing around them. They resisted the constant verbal

| TCA Assessment Report | 2018 |
|---|---|

provocations and physical attacks by the protesters with remarkable control, which allowed them to accomplish their mission: to ensure the safe extraction of the President of the Senate, and their safe exit from the area, exercising minimal use of force. The evidence shows that during the course of this event the behavior shown by the PRPB agents (DOT) demonstrates that the changes and instruction received as a result of the Agreement has already positively influenced the performance of the Police of Puerto Rico, and the General Orders and regulations also resulting from the Agreement are already ingrained in the deportment of specialized units.

- The reviewed videos showed the great level of training and experience that the DOT personnel had, however, it was noticeable that the agents assigned to the escort team of the President of the Senate lacked these resources. The careful observation of the video recordings of this event showed that sometimes some of the agents assigned to the protection of the President of the Senate became a liability to the DOT personnel. In one specific instance, when they were returning to the vehicles after the President of the Senate had left the area, the DOT had to protect one of the agents assigned to the escort team of the President of the Senate who was on the floor being attacked by many protesters, after he had used pepper spray against some of them. The evidence showed that this use of the pepper spray could have been avoided had the Senator's escort agent been properly trained for scenarios of crowd control. At that moment the Senator's escort personnel were acting very disorganized and disconnected from, and not using the protection of the DOT personnel. Hadn't been by the quick and professional assistance of the DOT personnel, who circled and isolated him from his attackers, this agent assigned to the protection team could have received severe physical injuries. The reports inform that during the event, one member of the Senator escort team lost his baton and another member lost his Taser. It is submitted that the Police personnel assigned to the escort teams of Politicians and other dignitaries, should receive more training on events of crowd control, and should take this training along with DOT personnel. Through this training, they could learn how DOT operates, and they could learn some of their main techniques and how to adapt to their tactics in future events like this one.

- It is a given fact that the visit by the President of the Senate to the Foundation was not announced to PRPB headquarters with enough anticipation, so no Operational Plan was prepared.

TCA Assessment Report | 2018

- The evidence showed that it was appropriate for the PRPB personnel present at the scene to use some levels of less-than-lethal force against the protesters in order to assure the safety of the Senator and police personnel. However, the reporting and documenting of this use of force by PRPB is **grossly inadequate**. Despite the importance of properly documenting the use of force by its personnel, the PRPB did not properly address this factor, therefore making it impossible to determine if the force used was within department guidelines. Given the discrepancies in the reporting of the number of use of force incidents, it is clear that confusion during periods of aggressive behavior by protesters resulted in incomplete documentation by PRPB of the incidents when force was used. Therefore, General Order Chapter 600, Section 605 "Reporting and Investigating Use of Force by Members of the PRPB" was not adhered to.

- On 08/29/2017, the PRPB allowed IC Jose Pujol to review two (2) Use of Force Reports (PPR-854), and three (3) PRPB Supplemental Report (PPR-877). The PRPB refused to provide copies of these reports in spite of the several requests made. The reports informed as follows:
    - One PPR-854 informed that PRPB Officer # 18 gave instructions to use the pepper spray to repeal the aggressions made by the protesters.
    - Another PPR-854 informed that PRPB Agent # 18 gave used pepper spray to repeal aggressions made by the protesters.
    - One PPR-877 informed that PRPB Officer # 19 authorized the use of pepper spray to disperse the crowd that was trying to steal their batons and that were throwing bottles and other objects to them. PRPB Agent # 19 made use of pepper spray.
    - Another PPR-877 informed that PRPB Agent # 20 was a witness of the use of pepper spray.
    - Another PPR-877 informed that PRPB Agent # 21 was a witness of the use of pepper spray. She witnessed the use of pepper spray by PRPB Officer # 18, PRPB Agent # 19 and PRPB Agent # 22.

Again, this is another example that demonstrates the lack of proper reporting and training on reporting the use of force. **A use of force by a member of the PRPB cannot be reported on a Supplemental Report**. A supplemental report is only to be prepared to provide additional information.

- The incident appeared to be well reported in a specific report, titled "ACTOS DE MOTIN" Spanish for "Acts of Civil Disturbance", report signed by PRPB Agent # 17 dated May 2, 2017.

- IC Jose Pujol found some **contradictions** in the number of Police agents injured during the event.  One report (Incident Report # 2017-1-162-4040) provides the names of 12 (twelve) injured agents.  Another report (Report titled Registry of Mobilization of the Specialized Tactical Divisions signed by PRPB Agent # 23) provided the additional name of one more injured Agent. Another report (Civil Disturbance signed by PRPB Officer # 16) reported that fifteen (15) members of the PRPB were injured during the event but the report added the names of four (4) agents that were not named in the other reports.   **So, IC Jose Pujol accounted the names of seventeen (17) injured members of the PRPB during the event.** The reports were correctly compliant by properly informing where the PRPB personnel were treated.
The report informed that there were protesters that were hit with the batons and some were contaminated with pepper spray, but the PRPB could not treat them because they fled the area.
The report explained that there was a PRPB Paramedic onsite.

- The PPR-928 Form, "Notificacion Diaria Incidentes de Uso de Fuerza" (Spanish for "Daily Notification of Use of Force Incidents") by the DOT Arecibo, informed that the protesters confronted the DOT personnel and they had to use pepper spray to disperse the crowd that confronted them, obstructing their official function to bring order and security.  The report provided the names of the three PRPB agents that made the Use of Force: PRPB Officer # 18, PRPB Agent # 3, and PRPB Agent # 4.  The report lacked details about the Use of Force.  The report should have provided more detail about: 1) How many instances was the pepper spray used.  2) Against how many protesters was the pepper spray used.

- The report titled "Notificacion de Incidentes Criticos" (Spanish for "Notification of Critical Incidents") identified as Complaint # 2017-1-162-04040, informed that the number of the protesters hit with a baton or controlled with pepper spray was unknown because they fled the area.  The report informed about the loss of a baton and the loss of one Taser by members of the Senator's escort team.  The report also informed of the damages inflicted to Police vehicles.

- The report titled "Registro de Movilizaciones de las Divisiones de Tacticas Especializadas" (Spanish for "Registration of Mobilizations of the Specialized Tactical Divisions") from the DOT Metropolitana informed that during the event they made Use of Force, levels 2 and 3, and reported that the Agents making the use of Force were: PRPB Agent # 22, PRPB Agent # 19 and PRPB Officer # 18.  Despite reference was made regarding the Use of Force by agents PRPB Agent # 5 and PRPB Agent # 6, they failed to file the required PPR-854 forms.

- The report titled "Registro de Movilizaciones de las Divisiones de Tacticas Especializadas" (Spanish for "Registration of Mobilizations of the Specialized Tactical Divisions") from the DOT Arecibo informed that they made Use of Force in two (2) occasions and that PRPB Officer # 18 made the report of the squad's Use of Force.  Despite the fact that the Use of Force by some Agents was "somehow" reported, the report had a complete lack of detail about:  1) On how many instances was the pepper spray used.  2) Against how many protesters was the pepper spray used.  No reference was made to the names of those policemen who allegedly made use of force, hence the proper procedure should have been for those two unknown policemen to file independent PPR-854 forms.

- No PPR-854 forms, Use of Force reports, by the escort team personnel of the President of the Senate regarding information about the use of the Taser and the use of the batons by them were afforded to IC Jose Pujol (report titled "ACTOS DE MOTIN" Spanish for "Acts of Civil Disturbance", explains that the pepper spray, Tasers and batons were used by the escort team of the President of the Senate.   The reviewed video recording, showed the use of the pepper spray by one the member of the protection team).

- The information provided in the above paragraphs showed the following:
  A number of PRPB reports were generated in connection with the above incident, however, the inconsistencies in the various reports are disturbing. There are inconsistencies in the number of police officers injured, the number of use of force incidents that occurred, and the weapons used by officers. It is clear, after reviewing PRPB's own reporting of the incident, that the use of force incidents by members of the PRPB at this event have been underreported.

| TCA Assessment Report | 2018 |
|---|---|

The PRPB <u>Failed</u> to fill many PPR-854 Forms according to the mandates of PRPB General Order Chapter 600 Sections 604, 605 and 625. The failure to comply by not filing all required PPR-854 "Use of Force" forms prevented supervisors from determining whether corrective action, including disciplinary action, was necessary.

- The PRPB again failed by not providing copies of the videos of the civil disturbance that they prepared pursuant to General Order Chapter 600 Section 625.

### April 27, 2017:

Members of approximately twenty-five (25) different labor unions protested in the North part of the Capitol building against a project of law, specifically Project 938, alleging the same could endanger the amount and quality of the benefits that government employees are now enjoying.   Confrontations of protesters with Police agents and other incidents involving a member of the House of Representatives occurred during the protest.

On 06/27/2017, in response to a request by the T.C.A.'s Office, the PRPB provided to IC Jose Pujol a copy of the OP, copies of four Incident Reports PPR-468 (including supplements): 1) one prepared by the PRPB with an explanation of the protest at Plaza de la Democracia, Ave. Luis Muñoz Rivera, San Juan; 2) related to a march that departing from Plaza de la Democracia, Ave. Luis Muñoz Rivera, San Juan, towards the "Fortaleza", the Governor's residence; 3) related to a complaint of a civilian that claimed to be a victim of an aggression and had suffered injuries, and informing of physical damages caused to the House of Representatives, specifically a wooden door and a glass;  4) related to a complaint of a civilian that claimed was victim of an aggression and was inflicted injuries.

The PRPB provided copies of four (4) PPR-468 forms "Informe de Incidente" ("Incident Report) (Item # 33), providing general information about the event, and the violent incident that happened between a member of the House of Representatives and some protesters.

The PRPB provided copy of a PPR-174 form, "Informe sobre Actividades Constitucionales o Disturbios Civiles" (Spanish for "Report on Constitutional

| TCA Assessment Report | 2018 |

Activities or Civil Disturbances") (Item # 34).   This report informed the following: 1) during the event there were no arrests, 2) no use of force was used, 3) no persons were injured, 4) the event lasted 8 hours, 5) the initial number of PRPB personnel was one-hundred-eighty (180) but additional reinforcements arrived, for a total ending balance of two-hundred-twenty (220) agents.   This form also informed that: 1) during the event no SWAT, no K-9, no Mounted Division units were used., 2) the Motorized Division, DOT-CRADIC and Special Arrest personnel were used, 3) the report provides a summary of the event which started at 9:00 AM., 4) approximately nine hundred (900) individuals, who represented mainly Labor Unions, were protesting, 5) the protesters sometimes obstructed the access to the building of some Representatives, 6) at one point in time, an incident happened between Representative Jose Luis Rivera Guerra and some protesters (a complaint related to an aggression was presented related to this incident and it was assigned the Complaint number 2017-1-166-02264 which is investigated by PRPB Agent # 51), 7) during the incident some physical damages were caused to the glass door that gives access the West side of the Capitol building known as "Puesto 4", 8) the protest ended at 5:00 pm.

The PRPB provided another copy of a PPR-174 form, "Informe sobre Actividades Constitucionales o Disturbios Civiles" (Spanish for "Report on Constitutional Activities or Civil Disturbances") (Item # 35).  This form provided the same information as the above described form and thus no further relevant information will be repeated.

The PRPB provided a list with the names of the PRPB personnel that participated in the event.

The PRPB provided seven copies of the PPR-920 form, "Registro de Movilizaciones de las Divisiones de Tacticas Especializadas" (Spanish for "Registration of Mobilizations of the Specialized Tactical Divisions").  The form reports the following:

- DOT Metropolitana was mobilized but did not participate in the event.
- DOT from Mayaguez was mobilized but did not participate in the event.
- DOT from a not identified city was mobilized was mobilized but did not participate in the event.

| TCA Assessment Report | 2018 |
|---|---|

- DOT from Humacao was mobilized but did not participate in the event.
- DOT from Ponce was mobilized but only used to create a formation with shields to protect some access doors in order to limit the access of the protesters. They were never in contact with the protesters. No arrests were made. No Use of Force was needed nor reported.
- DOT from Aibonito was mobilized but only used, along with DOT from Ponce, to create a formation with shields to protect some access doors in order to limit the access of the protesters who had a hostile attitude trying to force their entry. They were never in contact with the protesters. No arrests were made. No Use of Force was needed nor reported.
- DOT from Fajardo was mobilized but did not participate in the event.
- SWAT was mobilized as a part of the protection team of the Governor of Puerto Rico, on his visit to the Universidad del Turabo. Another team of SWAT agents was mobilized to provide support at the Capitol building. Everything developed in an orderly manner. No arrests were made. No Use of Force was needed or reported.

The PRPB provided a report titled "Notificacion de Incidentes Criticos" (Spanish for "Critical Incident Report") (Item # 36), which basically provided the same information as the PPR-174. It added that in the violent incident between the protester and Representative Jose L. Rivera Guerra, a complaint was generated by the protestor and a separate complaint by the Representative. The CIC took over the investigation. It was also informed the door was damaged, that no arrests were made and that no use of force was used.

## **FINDINGS:**

- The Operational Plan states at page 2 that the PRPB's mission is to: "Protect life and properties; Ensuring the exercise of the free expression and other constitutional rights; Comply and enforce the actual laws of

| TCA Assessment Report | 2018 |
|---|---|

Puerto Rico; **Protect the life and physical integrity, as well as protect the properties of citizens, employees and the Capitol itself**; To establish the necessary controls in the traffic for the fulfillment of the Vehicles and Transit Law of Puerto Rico".

- IC Jose Pujol takes no issue with the violent event involving protestors and Representative Jose L. Rivera Guerra since it is irrelevant to this Assessment as it relates to the aggression incident itself. Notwithstanding, the Representative had a constitutional right to enter the capitol building to perform the job for which he was elected. It should be noted that IC Jose Pujol had not been afforded a single police report containing an explanation of where the Police units were located at the time of the incident. Video recordings show that the entry door to the Capitol building where the incident happened had no Police protection at all. The Police made its presence known after the incident took place.

- When IC Jose Pujol interviewed the Incident Commander PRPB Officer # 4, he explained that this incident took place in front of an entry door located in a lateral part of the building, which was under the control and responsibility of the Capitol building's security personnel. PRPB Officer # 4 insisted that his PRPB personnel were only responsible for protecting the building's entrance located at the North part of the building, where the protest was scheduled to happen and where it actually occurred. He stated having recently learned that the Capitol building's security personnel lacked police experience, and he added knowing that now Capitol security is going to create a protocol for similar situations. The evidence, the OP (Item # 4), demonstrates that PRPB Officer # 4's statement during the interview is IN COMPLETE CONTRADICTION WITH HIS WORKPLAN (PLAN DE TRABAJO), as evidenced by the document itself. The OP reflects that forty-seven (47) PRPB personnel were assigned to the North part of the building, twenty-three (23) PRPB personnel to the South part of the building, two (2) PRPB agents to the East lateral door of the building and two (2) agents to the West lateral door of the building. According to the OP, two (2) PRPB agents had to be present securing the door where the incident between the Representative with the protesters took place. This evidence shows that the explanation for the contradiction between PRPB Officer # 4's statement and the Operational Plan is, at the very least, PRPB Officer #

| TCA Assessment Report | 2018 |

4 DID NOT KNOW THE OPERATIONAL PLAN AT ALL.   This is an example of the total disregard of the Operational Plan's importance by PRPB Officer # 4.

See the relevant Items below:

TCA Assessment Report | 2018



SACC-CSJ-1-PSJ-0-171
26 de abril de 2017



Comandante de Area
Área San Juan

Comandante Zona San Juan
Área San Juan

**PLAN DE TRABAJO PARA ATENDER MANIFESTACIÓN EN CAPITOLIO
GRUPOS SINDICALES CONTRA PROYECTO 938**

**I. SITUACION**

El próximo jueves 27 de abril de 2017, los diferentes representantes sindicales han convocado una manifestación desde las 8:00 a.m. en el Capitolio. Los manifestantes estarán realizando una protesta por el Proyecto 938 de la Cámara de Representantes. Uniones de la Autoridad de Energía Eléctrica, la Autoridad de Acueductos y Alcantarillados, de Edificios Públicos, de Transportación y Obras Públicas y de la Corporación del Fondo del Seguro del Estado son algunas de las que se han expresado participarán de la manifestación.

En pasadas manifestaciones ha sido necesario establecer unos perímetros para establecer controles en el acceso de los manifestantes al interior del Capitolio, para proteger la propiedad de Capitolio y la integridad física de os empleados y visitantes del mismo. Estas precauciones se toman debido a que en eventos anteriores se ha causado daños a la estructura del Capitolio y algunos de los manifestantes han intentado penetrar el mismo de manera violenta. El derecho constitucional a la libre expresión es uno de los más fundamentales de nuestra sociedad, no obstante, no es absoluto. A través de jurisprudencias se ha establecido que el referido derecho puede ser regulado en el tiempo, modo y lugar de la expresión. La Policía de Puerto Rico tiene entre sus responsabilidades el garantizar y proteger los derechos constitucionales de todas las personas en nuestro país. De igual manera es nuestro deber el proteger la vida y las propiedades tanto de los ciudadanos como del propio Estado y evitar la comisión de actos delictivos.



TCA Assessment Report | 2018

---

SAOC-CSJ-1-PSJ-9-171
26 de abril de 2017

**Avenida Constitución Bajada Hacia Paseo Covandonga (Hacienda)**

Dos (2) Agentes Patrullas de Carreteras San Juan

**Actividad en el Capitolio**

**Establecimiento de Perímetro Exterior**

**Lado Norte Capitolio**

Un (1) Oficial de Alto Rango
Dos (2) Oficial
Cuatro (4) Sargentos
Cuarenta (40) Agentes

**Lado Sur Capitolio**

Un (1) Oficial
Dos (2) Sargentos
Veinte (20) Agentes

**Puerta lado Este Capitolio**

Dos (2) Agentes

**Puerta lado Oeste Capitolio**

Dos (2) Agentes

**Área Designada para Expresión Pública**

Se asignará el Lado Norte del Capitolio como área para realizar el ejercicio de la libre expresión.

**Unidades de Apoyo**

Se asignará un (1) Oficial y un (1) Sargento para atender cualquier incidente de uso de fuerza.



TCA-OR-140-22-06-17

---

OFFICE OF THE

| TCA Assessment Report | 2018 |
|---|---|

- During the event, no PRPB personnel were reported injured. Representative Jose L. Rivera Guerra presented a complaint stating that he was hit in several parts of his body. A citizen, "Individual A", filed a complaint against Representative Rivera Guerra alleging the representative hit him in his face.

- The Capitol building had a first aid center, and the OP provided for the contingency that an ambulance would be needed to transport any injured individual to Centro Medico (Medical Center), if necessary.

**May 1, 2017:**

Dozens of organizations, union leaders and students from the University of Puerto Rico (UPR) organized and mapped out the national strike route scheduled for May 1, considered to be the International Workers' Day. The protesters would concentrate on five marches that would leave from different points of the metropolitan area arriving at the building where the Office of the Fiscal Control Board is located. The demonstrations would have their main site on the "Milla de Oro" (Spanish for the "Golden Mile") in Hato Rey, San Juan, PR. According to leaders of the movement, the demonstrations would be carried out against the austerity measures suggested by the Fiscal Control Board. In the same token, they would request the audit of the debt and they would make vigorous claims against the cuts of benefits to the workers. The five marches developed in a very organized and peaceful way and ended at the "Golden Mile". Around 12:15 to12:30 PM, individuals stormed the Banco Popular building, near the location where the official demonstrations were taking place. These individuals broke several glass panels of the Banco Popular building. PRPB's units were mobilized and ordered to march, in pursuit of the persons vandalizing Banco Popular. Unfortunately, this police march was also in the same direction where the stage of the protest was located. At the Muñoz Rivera Avenue, almost half way towards the Seaborne building from the Chardon Avenue, the group of PRPB agents were stopped by the protesters that mistakenly interpreted the police was marching towards them. The PRPB negotiated for a long period of time with some legal observers that were present at the event. These PRPB agents finally left the area. After 2:07 PM protesters threw rocks to the UBS and Banco Popular buildings causing considerable damages. PRPB used force to prevent further damages. After 2:27 PM vandalism

continued at the Milla de Oro area evolving into a violent riot. The PRPB launched an operation to control the situation. PRPB agents, along with DOT and SWAT units made line formations and began to sweep the Ponce de Leon and Muñoz Rivera avenues making use of CS gas and other less than lethal weapons. Approximately 17 persons were arrested. Those involved in the riots acts burned assorted objects and vandalized many properties. Union leaders and multisector organizations claimed that it was a peaceful demonstration that acts of violence that were reported later on were not related to the activity.

On 06/27/2017, in response to a request by the T.C.A.'s Office, the PRPB provided documents related to this event. The PRPB provided copies of six (6) Operational Plans (OP) "related" to this event. One of the OPs was not related to this event (it was related to a different event scheduled to take place on April 23, 2017), so only four (5) OPs related to this event were received, which were already discussed in section 3-A of this report.

The PRPB provided a document containing a timeline of the events took place on May 1, 2017, at the Airport, Old San Juan and "Milla de Oro" in Hato Rey, Puerto Rico. The report summarizes that seventeen 17 arrests were made at the "Milla de Oro" incident and two (2) individuals were injured (Item # 37).

The PRPB provided a signed written document in which informed the TCA in the Spanish language that NO Use of Force Reports were prepared because there was no use of force. The document specifically states "NO HUBO USO DE FUERZA SEGUN COMUNICADOS: SAOC-CSJ1-PRP-8-081, SAOC-CSJ1-PRP-8-082, SAOC-NFURA-DSWAT-1-228, SAOC-CAI-13-DC-1-620" (Spanish for "There was no use of force according to communications: SAOC-CSJ1-PRP-8-081, SAOC-CSJ1-PRP-8-082, SAOC-NFURA-DSWAT-1-228, SAOC-CAI-13-DC-1-620" (Item # 38).

The PRPB provided copy of a report titled "NOTIFICACION DE INCIDENTES CRITICOS" (Spanish for "Notification of Critical Incidents") that belonged to the April 27, 2017 event.

The PRPB provided copies of four (4) "INFORMES DE INCIDENTE" (Spanish for "Incident Reports"), one of them had three (3) supplements: one report (2017-1-382-3463) to inform about a protest on 05/01/2017 related to different labor units which consisted of approximately 12,000 people; another one (2017-1-382-3428) informed of the arrest of "Individual B" for

causing damages to property (building 654Plaza, Ave. Luis Muñoz Rivera, Hato Rey) with the use of spray paint; another one (2017-1-166-2347) related to a protest march at Fortaleza Street, Old San Juan, consisting of approximately ninety (90) persons belonging to the "Feminist Collective" and students of the UPR in relation to the national strike of 05/01/2017; the fourth one (2017-1-166-2348) is related to a report related prepared by PRPB Agent # 24, informing that while he was intervening with some protesters, one of them took from him a bottle of pepper spray; a supplement of report # 2017-1-166-2348 is related to a citizen complaint informing of the injuries suffered when attacked by a female individual; another supplement of report # 2017-1-166-2348 is related to another citizen complaint informing of the injuries received when attacked by another female individual as well; a supplement to report # 2017-1-166-2348 is related to another citizen complaint informing of the injuries suffered when attacked by various females (Item # 39).

The PRPB provided copies of five (5) "INFORMES DE INCIDENTE" (Spanish for "Incident Reports") by the Fuerzas Unidas de Rapida Acción (FURA). One referred to an event occurred at 7:00 AM at Ave. Muñoz Rivera when DOT and SWAT agents dispersed a group of protesters; another one timed at 8:30 AM informing that they set a tent for medical assistance at a Puerta de Tierra site in San Juan to provide support to the day expected events. The report informs that they received injured Police agents for treatment and that they relocated their place of operation; another one timed at 3:25 PM informed that a photo reporter for the Nuevo Día newspaper requested their services because he was injured by a rock thrown by a protester; another one posted a 4:00 PM informed that when they were at the Ave. Roosevelt, nearby the Tren Urbano (train station) they had to assist to a Police officer that felt sick; another one posted at 4:35 pm reported that when they were at the Muñoz Rivera avenue, in front of the Hipopotamo Restaurant, when they provided treatment a policeman that felt to the ground and hurt his knees (Item # 40).

The San Juan FURA Aerial Division of the PRPB, provided copies of nine (9) "INFORME INDIVIDUAL DE VUELO" (Spanish for "Individual Flight Report"). In these reports they informed of the aerial surveillance they made of the protest areas, providing this way support to the ground units of the PRPB (Item # 41).

| TCA Assessment Report | 2018 |
|---|---|

The PRPB provided copies of two (2) documents titled "CERTIFICO DE USO DE FUERZA" (Spanish for "Certification of Use of Force"), dated 06/16/2017, addressed to PRPB Officer # 4, and signed by PRPB Officer # 20, Commander of the 162th Precinct of Rio Piedras. These reports certify that on April 18 and 27, and on May 1, 2017, there were no incidents of use of force.  It reports that the only incidents of use of force were on April 25, 2017 and provided the complaint number and informed that the three (3) PPR-854 forms related to the incident were sent to SARP (Item # 42).

The PRPB provided copy of a report titled 'INFORME MENSUAL OF USE OF FORCE" (Spanish for "Monthly Report of Use of Force".  In this report they informed of two Police agents using Chemical Agents, level force of 2, at Ave. Ponce de Leon, Zona Bancaria, Hato Rey, and at Ave. Muñoz Rivera, Zona Bancaria, Hato Rey, on May 1, 2017 at 2:20 PM.  The report provided the complaint numbers (Item # 43).

The PRPB provided copy of a report titled 'SOLICITUD FORMAL DE DOCUMENTOS" (Spanish for "Formal Request of Documents") by DOT, Aibonito informing that they made no arrests, they did not engage in use of force and that they did not incarcerate any person (Item # 44).

The PRPB provided copy of a PPR-468, report titled "DECLARATION NARRATIVA DEL MIEMBRO DE LA PPR SOBRE INFORME DE INCIDENTE" (Spanish for "NARRATIVE DECLARATION BY MEMBER OF THE PRPB ON INCIDENT REPORT").  In this report, PRPB Agent # 25, informed about the arrest of "Individual B" for the use of spray paint on private property and by fleeing the area when he was intervened by the agents (Item # 45).

The PRPB provided copy of a PPR-174 report titled "INFORME SOBRE ACTIVIDADES CONSTITUCIONALES O DISTURBIOS CIVILES" (Spanish for "REPORT ON CONSTITUTIONAL ACTIVITIES OR CIVIL DISTURBANCES") dated 05/01/2017 at 9:30PM.  The report referred to the protest march involving approximately 80 people, mostly women that arrived at the gates of La Fortaleza (the Governor's Mansion).    The report informed of thirteen (13) incidents of use of force and three (3) injured persons. Initially there were only ten (10) agents but support was requested from the Motorized Unit and there were fifty (50) agents at the end of the incident. The narrative of the report informed that to reestablish order and regain the perimeter, eleven (11) Police agents used the batons, and one (1) Police

| TCA Assessment Report | 2018 |
|---|---|

officer used the "Dispositivo de Control Electrico" (Spanish for "Electric Control Device") against a protester that became aggressive against the agents.    Three (3) Police agents were injured.    No arrests were made because the protesters that used force against the agents fled the area (Item # 46).

The PRPB provided copy of a PPR-174 report titled "INFORME SOBRE ACTIVIDADES CONSTITUCIONALES O DISTURBIOS CIVILES" (Spanish for "REPORT ON CONSTITUTIONAL ACTIVITIES OR CIVIL DISTURBANCES") dated 05/01/2017 at 1:00 pm.  The same informed that some protesters demonstrated at the area of the airport but that after a dialogue with PRPB officers, they voluntarily and orderly left the area. Neither arrests were made nor use of force was required.  The incident lasted approximately 2 hours.  Twenty (20) police agents were initially at the scene and forty (40) at the conclusion of the event.  They received support from K-9 and motorized units (Item # 47).

The PRPB provided copy of a PPR-174 report titled "INFORME SOBRE ACTIVIDADES CONSTITUCIONALES O DISTURBIOS CIVILES" (Spanish for "REPORT ON CONSTITUTIONAL ACTIVITIES OR CIVIL DISTURBANCES") dated 05/01/2017 at 7:30 PM.  This report informed about the event that started at 12:15 pm at the Luis Muñoz Rivera Avenue in Hato Rey, San Juan, PR.  It reported thirteen (13) arrests; the use of gas, baton and wood clubs ("roten", another type of baton device); five (5) instances of use of force; five (5) injured individuals; that the activity lasted six (6) hours and thirty (30) minutes; that they started with six hundred forty eight (648) PRPB agents and they ended using seven hundred eighty eight (788) policemen; that SWAT, Motorized Units, Tactical Operations units, CRADIC and the CIC were deployed.  The narrative of the report informed that they attended the protest known or identified as "Día Internacional del Trabajo" (Spanish for "International Workers Days").  They arrived in front of the Sea Borne building at the Milla de Oro in Hato Rey, San Juan, PR, where Labor Unions and students from the UPR met after marching from different locations. It was reported that during the incident a group of students provoked a civil disturbance by throwing hard objects to the PRPB agents, injuring five (5) agents, causing damages to two (2) official vehicles and vandalizing some buildings at Plaza 654, Multinational 510, UBS, Subway restaurant, Walgreens drugstore (located at Ave Luis Muñoz Rivera), San Juan Judicial Center, ABC Medical, old Walgreens, Notary Inspections Offices, the Labor Department, the Milla de Oro Pharmacy, the

Union Plaza building, property at an attorney's office at Padre de las Casas street, the Oriental Bank at Ponce de Leon # 374, McDonalds restaurant, the CVS Pharmacy, the building of old PNP Headquarters, the Liberty Cable office at Ave. Ponce de Leon #304, 273 and 252, the MCS Plaza building, and the Popular Center building, and the Edificio Group, Building # 268 at Ponce de Leon Ave. (Item # 48).

The PRPB provided copies of three (3) PPR-82 forms "CONDICION DE PERSONA INGRESADA/EGRESADA A CELDA" (Spanish for "CONDITION OF PERSON INCARCERATD/EXCARCERATED IN HOLDING CELL". They refer to the detentions of "Individual B", "Individual C" and "Individual D" (Item # 49).

The PRPB provided copies of a certification of the Commander of Precinct # 162 of Rio Piedras and the Director of the DOT Division of Aibonito, informing that they did not imprison any arrestee in a holding cell during the incidents of April 18, 25 and 27, and May 1, 2017 (Items # 50 and 51).

The PRPB provided copies of multiple documents documenting the PRPB agents that participated in the May 1st, 2017 event.

The PRPB provided three documents recording the PRPB agents that were injured in the May 1st, 2017 event (Item # 52).

The PRPB provided documents related to the May 1, 2017 event prepared by the Drugs, Narcotics, Vice Control and Illegal Weapons Division of the PRPB (Item # 53). Among them were the following:
- Copy of the OP.
- Copy of a complaint providing information related to the arrest of "Individual E" and "Individual F" at Isabel Andreu Street, Urb El Vedado, Hato Rey, PR. The report provided a list of the items seized from the two individuals.
- Copy of summons to "Individual E" and "Individual F".
- Copy of the document related to the Warning and Waiver of Rights document (Miranda Rights) to "Individual E".
- A list of the personnel engaged in the mission.

The PRPB provided nine (9) copies of the PPR-920 form, "Registro de Movilizaciones de las Divisiones de Tacticas Especializadas" (Spanish for

TCA Assessment Report | 2018

"Registry of Mobilizations by the Specialized Tactical Divisions") and supplements (Item # 54). The form reflects the following:

- A PPR-920 form informing that DOT from Fajardo participated in providing support in the arrest of individuals during the event of May 1st, 2017 in Hato Rey, PR.
- A PPR-920 form informing that DOT from Aibonito participated in providing support in the control of the event of May 1st 20171 in Hato Rey, PR.
- A PPR-920 form providing general information of the location of the DOT units before the event started.
- A PPR-920 form identified as Complaint # 2017-1-182-03185, signed by PRPB Agent # 26, provides general information of the group of DOT agents that provided support and intervened with the protesters at the Luis Muñoz Marin International Airport, where protesters were obstructing vehicular traffic from entering the airport facilities. The report further narrates that later on they moved to the Minillas Tunnel where they intervened with other protesters that were about to obstruct said road. Later on, at approximately 1:15 PM, they were mobilized to area known as the Milla de Oro in Hato Rey to continue to provide support. At that point in time they were located at the intersection of Ponce de Leon Avenue with Quisqueya Street. After a while, they saw masked protesters gather at the intersection of Ponce de Leon Avenue with Bolivia Street, in front of the Popular Center building. A few minutes later they heard four explosions of what appeared to be the sound generated by home-made bombs. Some of the protesters were observed throwing rocks to the glass windows of the Banco Popular building, breaking some of them. PRPB Officer # 19 from the DOT Division mobilized his squads. Once they were in formation, the protesters gathered there and were informed to leave the area. The protesters attacked the DOT personnel by throwing rocks and sticks to them. The DOT provided support to the Special Arrests Unit in the arrests of individuals. It was also reported that on account of the continuing damages inflicted to private property and aggressions to policeman by throwing rocks and sticks at them, SWAT personnel used tear gas on several occasions to disperse the crowd. The protesters moved through the Ponce de Leon Avenue until they reached the Roosevelt Avenue. The Police units moved there and waited for the protesters to dispersion but other protesters

TCA Assessment Report | 2018

coming from Luis Muñoz Rivera Avenue joined the ones there and to cause damages to properties.  A part of the group was disbanded to Roosevelt Avenue, but the majority continued through Muñoz Rivera Avenue causing damages to business, vehicles and setting on fire trash containers.  They continued their trajectory passing by the intersection of Domenech Avenue where they continued to destroy property until they arrived at the San Juan Judicial Center where they vandalized part of the building's structure and burning the flag of the United States.  From there they continued to the vicinity of the Jesus T. Pinero Avenue where a group of protestors were arrested for causing damages to the Office of the US Armed Forces and the Monte Mall building.  Their intervention ended near the Universidad Avenue, where they arrested other individuals.  The rest of protesters left the area without any additional incidents.  Two (2) Police Agents resulted with injuries in the course of these events.

- A supplement of Complaint # 2017-1-182-03185, signed by PRPB Officer # 21, provided general information of other group of DOT agents.  This supplemental reported more details about the events that took place at La Milla de Oro but did not provide a clear time line of the events. It was reported that he, PRPB Officer # 22 and another agent got into the crowd, because PRPB Officer # 4 was located with two groups of agents within the crowd, exactly at the intersection of the Muñoz Rivera with Domenech Street.  PRPB Officer # 22 remained with PRPB Officer # 4 to observe the situation and to maintain communication with PRPB Officer # 21 who returned to his platoon that was located at the Domenech Street, near the Oriental Bank building.  On that location his platoon was encircled by the protesters and coordination with SWAT personnel was used to return to the back of the Oriental Bank building where they remained at the building's basement.  At approximately 1:45 pm, PRPB Officer # 21 received instructions on his radio to activate his platoon because PRPB Officer # 4 had authorized the deployment of the second platoon because the protesters were causing damages to the area's properties and were throwing objects to the police agents located at the Muñoz Rivera Avenue.   They moved through the Domenech Avenue towards the Muñoz Rivera Avenue and later to the Roosevelt Avenue, witnessing that the crowd still kept throwing objects at the police and continued to destroy property.  It was decided that the

TCA Assessment Report | 2018

SWAT would make the use of tear gas to disperse the crowd. The situation in front of the Oriental Bank building was momently controlled. PRPB Officer # 21 dialogued with one of the protesters about the incidents that took place during the previous hours but after this dialogue was over, the protesters started again to move towards the Roosevelt Avenue. Individuals that had covered their faces to hide their identity started throwing objects again to the police agents, which provoked that they again had to use tear gas against the protesters. DOT personnel were moved to Roosevelt Avenue and from there in the direction of Las Americas Expressway. Protesters continued throwing objects to the Police squads that were posted in front of the Roosevelt station of the Tren Urbano. At approximately 4:00 pm, the policemen were mobilized to the building of the San Juan Judicial Center to attempt to control a disturbance that protesters had initiated there. Once this situation was under control, they returned to the DOT's installations.

- A PPR-920 form informing that DOT from Ponce participated in providing support during the event of May 1st, 2017 in Hato Rey, PR.
- A PPR-920 form informing that DOT from Aibonito participated in providing support during the event of May 1st, 2017 in Hato Rey, PR.
- A PPR-920 form in which SWAT informed of two (2) Use of Force events. They informed of the use of chemical agents (OC, CS) and less than lethal ammunitions during the May 1st, 2017 events in Hato Rey, when they were activated at approximately 2:20 pm. They provided support to DOT units in controlling of a violent crowd that was causing damages to private properties and attacking the police agents.
- A PPR-920 form informing that DOT Metropolitana participated in providing support during the event of May 1st, 2017 at the Governor's mansion area of San Juan, PR.
- A PPR-920 form informing that part of the DOT from Ponce participated in providing support during the event of May 1st, 2017 in Hato Rey, PR.

- On 08/29/2017, the PRPB allowed IC Jose Pujol to review thirteen (13) PPR-854 Use of Force forms related to the events that took place on May 1st, 2017 at the La Fortaleza site. The PRPB refused to provide copies of

| TCA Assessment Report | 2018 |

these reports despite various requests were made.  The reports informed that:

- One (1) PPR-854 form by PRPB Agent # 27, informed that three (3) agents physically removed a female individual that arrived at the entry gate of La Fortaleza.
- Another PPR-854 form informed that PRPB Agent # 28 was physically hit by a protester that was throwing punches at him, and he made use of his extendable baton.  He could not arrest the subject who fled the area.
- Another PPR-854 form informed that PRPB Agent # 29 was pushed by a female individual who became aggressive and the agent made use of his baton to push her. She also fled the area.
- Another PPR-854 form disclosed that PRPB Agent # 30 used his extendable baton to push protesters that were ignoring the established perimeter.  One of the protesters threw a punch to him and he responded by hitting the protester in his right arm with his baton.  He could not arrest the individual because she fled the area.
- Another PPR-854 form revealed that PRPB Agent # 31 used his baton to push some protesters that became aggressive against him. He could not arrest the individuals because they fled the area.
- Another PPR-854 form reported that PRPB Agent # 32 used his Taser against a female individual to repeal an aggression.  She hit the agent with a kitchen utensil.  After that, the agent received additional aggressions. He could not arrest the individual because she fled the area.
- Another PPR-854 form divulged that PRPB Agent # 33 used his baton to escort protesters out of the premises, but he did not hit anyone.
- Another PPR-854 form referred that PRPB Agent # 34 used pepper spray against protesters that were pushing the barriers and the police agents.
- Another PPR-854 form informed that PRPB Agent # 35 informed that they pushed protesters that crossed the established perimeter, but that they did not complain.
- Another PPR-854 form disclosed that PRPB Agent # 36 used his baton to push some individuals that crossed the perimeter and arrived at the Fortaleza's gate.
- Another PPR-854 form indicated that PRPB Agent # 37 used his baton to hit protesters that were accosting him.

| TCA Assessment Report | 2018 |
|---|---|

- Another PPR-854 form reported that PRPB Agent # 38 was attacked by a female individual. The agent used his baton in a defensive way to block the hits of the protester. He could not arrest the individual because she fled the area.
- Another PPR-854 form described how PRPB Agent # 39 used his baton to push an individual that was hitting and pushing him. He could not arrest the individual because he also fled the area.

On 08/29/2017, the PRPB allowed the undersigned to review six (6) PPR-854 Use of Force forms related to the events that happened on May 1st, 2017 at the Milla de Oro locations. The PRPB refused to provide copies of these reports regardless of the fact that various requests were made. The reports informed that:

- One (1) PPR-854 form was filled by PRPB Officer # 4 (the Incident Commander). He provided a general report of the Police activity, and the use of force used, on May 1st, 2017 at the Milla de Oro.
- Another PPR-854 form prepared by PRPB Agent # 40 from SWAT. The report informed about the use of the OC chemical agent (MK-9), the Gas Gun Cal. 37 mm, and the use of a 12-mm shotgun with ammunition consisting in rubber balls on May 1st, 2017 at the Milla de Oro.
- Another PPR-854 form prepared by PRPB Agent # 41. The report informed about the use of the OC chemical agent (MK-9), OC grenades, the 37 mm and 12 mm shotguns with ammunition consisting in rubber balls, and the Gas Gun with CS gas.
- Another PPR-854 form prepared by PRPB Agent # 42, informed of the arrest of "Individual G" who resisted arrest. The agents moved the female individual to the ground in order to arrest her. She was arrested for allegedly having participated in the vandalizing of a building.
- Another PPR-854 form prepared by PRPB Agent # 43, informed of the arrest of "Individual H" who resisted the agents. The agents moved the individual to the ground in order to arrest him. He was arrested for allegedly having participated in the vandalizing of a building.
- Another PPR-854 form prepared by PRPB Agent # 44, informing that "Individual I" was sitting on the ground obstructing Police work. He was ordered to move, and he verbalized that he was not going to do it. The Police informed to him that he was under arrest, and he started kicking the agent during his arrest.

TCA Assessment Report | 2018

On 08/29/2017, the PRPB allowed IC Jose Pujol to review three (3) PPR-468 Incident Report forms related to the events that happened on May 1st, 2017 at the Milla de Oro site. The PRPB refused to provide copies of these reports despite various requests were made. The reports informed that:

- One (1) PPR-468 form informing of the arrest "Individual H" who was breaking glass windows at the building located on Muñoz Rivera Avenue # 654. They arrested him but informed that he resisted the arrest and they were forced to throw him to the ground.
- Another PPR-468 form by PRPB Agent # 44 informed that they arrested "Individual I" for aggression and rioting.
- Another PPR-468 form informed of the arrest of "Individual G", who was breaking glass windows at the building located on Muñoz Rivera Avenue # 654. She resisted her arrest and they had to be thrown on the ground to be handcuffed.

- On August 29, 2017 IC Jose Pujol received from the PRPB two requested Certifications related to civilian complaints filled by citizens in relation to the four events covered by this Assessment (Item # 55):
    - One Certification is signed by the PRPB Director of Administrative Investigations, PRPB Officer # 15. In this Certification it is informed that they are conducting an investigation of an incident that happened on April 18, 2017 at the Capitol building related to a complaint that was filled to his office on 06/12/2017. They inform that this is the only investigation that they are working on. This complaint is identified as "Querella N.I.A. 2017-01-03-00087". A female individual complained that during the April 18, 2017 event, she received a physical aggression from a Police agent. According to a PRPB internal document, they conducted an investigation, but the case is still pending determination because they are searching for video recordings that could show the alleged aggression (Item # 79).
    - The other Certification is signed by PRPB Officer # 23, Director of the Internal Affairs Office, in which he informed that they are not investigating any complaint related to the four events covered by this Assessment because they did not receive any complaint related to them.

- A Report titled "Personal Miembros de la Policia de Puerto Rico Lesionados En Manifestacion del 1 de Mayo de 2017 En Fortaleza" (Spanish for "Personnel of the Puerto Rico Police Injured in Demonstration on May 1, 2017 at La Fortaleza) was signed by PRPB Officer # 9 on 06/26/2017, and

| TCA Assessment Report | 2018 |
|---|---|

it was addressed to PRPB Officer # 4.  The report informed that eleven (11) reports of Use of Force Level 1, one (1) report of Use of Force Level 2 for gas, and one (1) report of Use of Force Level 3 for Taser were prepared. The report totaled thirteen (13) reports of Use of Force.

A review of video recordings of the events of May 1st, 2017 shown on television by one of the main local stations and other video recording found on the internet showed the following:

- At approximately 12:26 PM, a line of Police agents was formed at the Muñoz Rivera Avenue, almost half way from the intersection of Chardon Avenue to the Seaborne Plaza Building where the stage of the event was located. The protesters started throwing objects at the Police agents causing that this line of Police agents had to be reinforced with more Police agents.  This action took place around 12:29 PM.  The line made a short retreat and protesters threw water bottles and other undetermined objects at them.  One protester used a fire extinguisher against the line of Police agents, momentarily breaking in this way the line formation of Police agents, but the agents rapidly regrouped and again formed the line formation.  The line and group of Police agents were surrounded by the protesters (12:34 PM).  The Police agents backed up a little bit creating a two-line formation, leaving some space between the two lines.  They backed up a little bit more and formed a thick line formation.  They retreated to the intersection of Muñoz Rivera and Chardon Avenues (12:48 PM).   The television images showed some broken glass windows at the Banco Popular building, what appeared to be the cause for the presence of the Police agents there.  PRPB Officer # 4 was filmed by the television images at the time when he was negotiating with some observers/mediators.  I this video it can be heard when PRPB Officer # 4 states that the Police already backed up but that the protesters did not, that he was not going to retreat up to the "Cuartel General" (Police HQ) (12:59 PM).  Images showed how the surrounded Police force was slowly retreating, but the protesters were advancing to maintain the same level of distance with the Police, confirming the statements made on camera by PRPB Officer # 4.

| TCA Assessment Report | 2018 |
|---|---|

- The television images at Bolivia Street show the moment when the Police force was retreating from there. The reporter explained that the Police used tear gas in there.
- The television images showed when an individual was vandalizing the buildings in the area while walking and using a can of spray paint. The images show when Police agents ran after him and arrested him.
- The television reporter commented that the protesters never retreated the ten meters asked by the Police, corroborating what PRPB Officer # 4 was heard saying before. The reporter informed that finally the Police retreated from there. (This refers to the group of Police agents surrounded at the Muñoz Rivera Avenue).
- The reporter informed that protesters had thrown rocks and objects to the UBS building's windows and that the private security of said building had used pepper spray against the protesters. Images corroborated the statements made (2:08 PM).
- One of the protesters recommended to the other protesters to calm down, not to provoke.
- The images showed several glass windows were already broken at the Banco Popular building. A protester was shown having a pole in his hands with a hanging burned US flag. Another protester was making graffiti (all at Muñoz Rivera Avenue).
- The reporter explained that the official event had already finished (it was approximately 2:15 PM). Despite this, many protesters remained near to the Banco Popular building and continued breaking glass windows and becoming more and more aggressive and agitated. It was heard when comments were made to the effect that they also used pyrotechnics. Many of them had their faces covered with clothing or were wearing masks. The images depicted in the videos reflect a chaotic and violent tantamount to a full fledge riot.
- At 02:16/17 pm the images showed the line of Police agents coming back to the area of the Ponce de Leon Avenue. DOT and SWAT continued to advance.
- At 2:21 pm pepper spray and CS gas canisters were thrown to the protesters at the Ponce de Leon Avenue.
- Protesters were seen retreating along Muñoz Rivera Avenue because the Police also made way into that Avenue.

TCA Assessment Report | 2018

- A protester was seen speaking to a Police officer and the Police officer was heard advising to him that the protesters had to stay away from the Police, that only the press could stay there.
- Protesters were observed using metal barriers to close the Muñoz Rivera and Ponce de Leon Avenues.
- A fire truck appeared at Muñoz Rivera Avenue in its way to the old PNP headquarters where apparently there was a fire (2:58 PM).
- Protesters from Ponce de Leon Avenue moved to the Muñoz Rivera Avenue and were observed vandalizing the area. They continued to throw assorted objects to the Police. The Police was observed advancing through the Ponce De Leon and Muñoz Rivera Avenues. Protesters moved to the intersection with Roosevelt Avenue, blocking said intersection.
- Protesters were observed braking glass windows and spraying paint at a CVS pharmacy, and also vandalizing a vehicle from Noticentro (local TV station).
- At Muñoz Rivera Avenue, going towards Rio Piedras, it could be observed that a large trash container had been set on fire. Police advanced in this direction.
- Many protesters were seeing moving West along Roosevelt Avenue in the direction to Plaza Las Americas. Reporter spoke to "Scott Barbes" who informed that they were retreating, concluding the protest. This individual made a long ideological speech pointing out alleged violent behavior of the Police against the protesters.
- Police continued moving along Muñoz Rivera Avenue towards Rio Piedras.
- TV images showed three arrested individuals.
- The Honorable Governor Ricardo Rosello provided a Press Conference. Amongst many things, the Governor explained that "...en un momento, recordaran que ... nuestros Policías, incluso, estaban atrapados. Los visuales están ahí. Y yo, como Comandante en Jefe di la dirección, de que removieran los Policías hacia los lados..." (Spanish for "... in a moment, you will remember that ... our Police agents were even trapped in. The visuals are there. And I, as Commander-in-Chief, gave the instructions, that the Police agents be removed to the sides ..." The Governor was referring to the group of Police agents surrounded by protesters at Muñoz Rivera Avenue. In

| TCA Assessment Report | 2018 |
|---|---|

another moment, the Governor stated that the Police acted according to what they had planned.

**FINDINGS:**

- On 06/27/2017, when the PRPB provided documents to the TCA Office (pursuant to a request related to this Assessment), the PRPB informed in a written document signed by a high-ranking Officer that **NO** PPR-854 "Report of Incident of Use of Force" was prepared reporting the Use of Force during the event because no Use of Force was used, despite the several times that the Police agents used pepper spray and tear gas against protesters. (General Order Chapter 600 Section 604 "Uso y Manejo de Agentes Quimicos" (Spanish for "Use and handling of Chemical Agents"), under the part: III. Normas y Procedimientos, A. Normas para el uso de Agentes Químicos" (Spanish for: III. Rules and Procedures, A. Rules for the use of Chemical Agents'), paragraph number 7 states that "Each pattern of application of pepper gas or use of tear gas against a person or a crowd constitutes one independent use of force.  Therefore, each use requires justification and detailed explanation".).  For PRPD to inform the TCA that no Use of Force forms (PPR-854) were prepared related to the May 1 event because NO Use of Force was made, was completely incorrect.

- The PRPB only allowed to review six (6) PPR-854 Forms, "Informe de Uso de Fuerza" (Spanish for "Use of Force Report") in relation to the events that took place on May 1, 2017 at the Milla de Oro, in Puerto Rico.  The PRPB refused to provide copies of the prepared PPR-854 reports, despite the fact that various requests were made.

From a perusal of the above named PPR-854 reviewed by IC Jose Pujol the following information was obtained:
  - One (1) PPR-854 form was filled by PRPB Officer # 4 (the Incident Commander).  He provided a general report of the use of force used on May 1st, 2017 at the Milla de Oro.
  - Another PPR-854 form prepared by PRPB Agent # 40 from SWAT. The report informed about the use of the OC chemical agent (MK-9), the Gas Gun Cal. 37 mm, and the use of a 12-mm shotgun with ammunition consisting in rubber balls.

| TCA Assessment Report | 2018 |
|---|---|

- Another PPR-854 form prepared by PRPB Agent # 41.  The report informed about the use of the OC chemical agent (MK-9), OC grenades, the 37 mm and 12 mm shotguns with ammunition consisting in rubber balls.
- Another PPR-854 form prepared by PRPB Agent # 42, informing of the arrest of "Individual G" who resisted the agents.  The agents threw the female individual to the ground in order to be able to arrest her.
- Another PPR-854 form prepared by PRPB Agent # 43, informing of the arrest of "Individual J" who resisted arrest.
- Another PPR-854 form prepared by PRPB Agent # 44, informing the arrest of "Individual I", who started kicking the agents and resisted the arrest.

Interviews to PRPB Officer # 2, PRPB Officer # 3, PRPB Officer # 4, PRPB Officer # 24, PRPB Officer # 19, and the review of video recordings of the events at the Milla de Oro, revealed that during the event at Ponce de Leon Avenue and Muñoz Rivera Avenue, CS gas and ammunition with rubber balls were used in **MANY** occasions against the protesters.  Each single use of any of the chemical agents, and any single use of the CS gas and/or ammunition with rubber balls, HAD TO BE REPORTED by preparing a PPR-854 form for each of the uses.

As previously stated, the TCA Office was provided a copy of a PPR-174 report titled "INFORME SOBRE ACTIVIDADES CONSTITUCIONALES O DISTURBIOS CIVILES" dated 05/01/2017 at 7:30 PM.  This report informed about the event that started at 12:15 PM at Ave. Luis Muñoz Rivera, Hato Rey, San Juan, PR.  It reported thirteen (13) arrests; the use of gas, baton and wooden club ("Roten" another type of baton device); **five (5) instances of Use of Force**; five (5) injured individuals.

The PRPB also provided a document containing a time line of the events occurred on May 1, 2017, at the Airport, Old San Juan and "Milla de Oro" in Hato Rey, Puerto Rico, summarizing that seventeen 17 arrests were made at the "Milla de Oro" incident and two (2) individuals were injured.

The PRPB also provided a report by SWAT Division titled "INFORME MENSUAL USO DE LA FUERZA" (Spanish for "Monthly Report of use of Force"), in which they reported the use of Chemical Agents in two occasions at 2:20 PM.

TCA Assessment Report | 2018

The reviewed video recordings showed that the PRPB made Use of Force in a very large number of occasions during the Milla de Oro event.

In accordance to General Orders Chapter 600 Sections 604, 605 and 625, MANY (very large number of) PPR-854 forms had to be prepared by the PRPB, and copies had to be provided to the TCA Office pursuant to its request. The PRPB Failed again to fill the required number of PPR-854 Forms according to the mandates of PRPB General Order Chapter 600 Sections 604, 605 and 625. The failure in complying with the filing of all the needed PPR-854 "Use of Force" forms prevented supervisors to determine whether corrective action, including disciplinary action, was necessary to detect and prevent misconduct.

- Thirteen (13) PPR-854 Forms, "Informe de Uso de Fuerza" (Spanish for "Use of Force Report") were allowed to be reviewed in relation to the events that took place at the Old San Juan, near the Fortaleza. The PRPB refused to provide copies of these reports despite various requests made. Six (6) of them informed of the use of the baton for only pushing protesters. A check with major Police Departments, including the New York City, Denver and the Los Angeles Police Departments, showed a pushing motion with a baton, is not considered a use of force and does not require a report. If there is an injury, a use of force report is then required. An account of this type of incident would be written in an After-Action Report by a supervisor. There is also case law to support this believe: in **Zavala v. Parks, 124 Fed. Appx. 527 (9th Cir. 2005)**, Officer's use of baton against individual in the course of attempting to clear an intersection following receipt of an anonymous bomb threat was reasonable when individual failed to comply with orders to leave, **and the baton was only used to push him** away from the officer and in the direction of the leaving crowd. Section 603 of the General Order states that *"Any PPR member who uses an impact weapon to detain, control, restrain or escort a person shall notify his supervisor in accordance with the provisions of OG-605. In addition, he/she will fill in form PPR-854 ..."*. If pushing a noncompliant individual with a baton in a crowd control situation would constitute a Use of Force, then the requirement would be to complete a Use of Force form per incident as defined by Policy. Of course, pushing a noncompliant individual is not defined as a use of force and such requirement would result in an unnecessary burden by having to report every push with a baton made in a riot situation.

| TCA Assessment Report | 2018 |
|---|---|

The TCA's recommendation is that that Sections 601, 603, 605 and 625 should be amended to clarify the following: The act of using the baton just for pushing or moving individuals who do not respond to verbal direction by the police, during the control of a mass demonstration, does not constitute a Use of Force reportable via PPR-854 unless a physical damage is inflicted on the individual.  In controlling a mass demonstration, it is very difficult, if not impossible, to keep track of all the instances in which this use of the baton is made to push non-compliant individuals not to mention later on filling hundreds of forms.

- The TCA submitted a written request to the PRPB on July 17, 2017, requesting for copies of all the video recordings in possession of the PR Police Department in relation to the events covered here.  On 12/01/2017 the PRPB provided copies of 9 (nine) DVDs to the TCA, all related to this event.   These recordings show and corroborate most of the information already provided in this report.  They aid in clarifying the following facts:

  - When PRPB Officer # 4 was surrounded by the protesters, the Police was attacked with rocks, water bottles and even with a fire extinguisher.
  - The violent protesters were well organized in groups formed by several people, and there were several of these groups strategically located in different points of the Milla de Oro.  These groups moved from one point to another, depending how the police was acting.  The video images clearly show that these groups came well prepared and with clear intentions and/or objectives, which include violence.
  - At Ponce de Leon and Muñoz Rivera Avenues, DOT and SWAT acted as they were supposed to, due to the way that the events were developing: the damages that protesters were making to properties and the attacks that the Police was suffering.

However, there is a strong cautionary note here.   One of the DVDs, identified by the PRPB as "Tecnico: PRPB Agent # 1, UTG, S.J., Paro Nacional Estacion de Bomberos", contains one single file that has recordings made from multiple different locations, and it contains several clearly visible transitions, and in other instances has images' even overlapping each other.  Eight (8) DVDs provide multiple video segments which are identified with the sequence number that the video recorder

device has assigned to each of them.  Two (2) of these eight (8) DVDs are missing several video segments according to the sequence number that the video recorder device assigned to all the segments. These facts cast strong doubts on the video recordings that were received, and it could be questioned if they represent only part of the video footage recorded that day by CRADIC.

The two (2) DVDs containing a broken sequence of video segment numbers, and missing several video segments, are titled as follows:
- "Tecnico PRPB Agent # 45, Paro Nacional Frente Tribunal Superior"
- "Tecnico PRPB Agent # 46, Paro Nacional, Ave. Luis Muñoz Marin"

- The PRPB failed not providing copies of the videos announcing a dispersal order, in accordance with General Order Chapter 600 Section 625.

- The provided PRPB reports lacked the information providing the times in which each use of force (use of tear gas, pepper spray, batons…) was used, the names of the Police agents that made the use of force, the circumstances that caused or required each specific use of force.  All these information failures could have been avoided by preparing one PPR-854 form for each instance of use of force by the agent responsible for such use of force, as several of the Sections of Chapter 600 of the PRPB General Order require.

- The reviewed television images corroborated that glass windows were broken at the Banco Popular building; that a line formation of Police was formed near to the corner of the Chardon and Muñoz Rivera Avenues, almost half way towards the Seaborne Building; that protesters threw water bottles and other assorted objects at them; that a protester used/discharged a fire extinguisher against the Police; that the Police line formation was surrounded by protesters for a very prolonged period of time; that there were long negotiations between the Police (PRPB Officer # 4) and the protesters; the Police retreated to the intersection of the Chardon and Muñoz Rivera Avenues; and that finally the Police left the area.  The provided reports don't explain why the PRPB moved towards the Seaborne Building from the intersection of Avenues Muñoz Rivera and Chardon Street.  The PRPB reports afforded to the undersigned do not provide an explanation for the prolonged amount of time by which a large number of PRPB agents remained surrounded by protesters near the intersection of Muñoz Rivera

| TCA Assessment Report | 2018 |
|---|---|

Avenue with Chardon street, at which time PRPB Officer # 4 negotiated with authorized observers and representatives of the protesters for a long period of time. The reports only mention the existence of this situation without providing details. It is important to note that it has been claimed that the previous move of policemen needlessly moving against the demonstrators instead of using other methods to capture the individuals vandalizing the buildings caused the resentment of many of the protesters, a fact that is evident and can be clearly seen in the video recordings of the events. This is the main reason why this Assessment is focusing on this controversial specific event with much concern.

- The document provided by the PRPB to the T.C.A. Office titled "ANALISIS DE EVENTOS RELACIONADOS A LAS MANIFESTACIONES DEL DIA DEL PARO NACIONAL" (Spanish for "Analysis of the events related to the national Strike Day protests") provided a synopsis of the events very similar to the images shown by a local TV station, but there was no mention whatsoever of the event in which this large number of Police agents were surrounded at the Muñoz Rivera Avenue by many protesters nor about the negotiations they had with them. The other reports provided by the PRPB to the T.C.A. Office failed to explain this specific event as well, which is very important in the analysis of the complete day's event and causes concerns about the strategy followed.

- The PRPB reports provided informed about the names of fourteen (14) arrestees: "Individual B", "Individual C", "Individual D", "Individual E", "Individual F", "Individual G", "Individual H", "Individual J", "Individual K", "Individual L", "Individual M", "Individual N", "Individual O", "Individual P". The reports did not provide details about the reason and the circumstances that lead to the arrest of several of these individuals. The "ANALISIS DE EVENTOS RELACIONADOS A LAS MANIFESTACIONES DEL DIA DEL PARO NACIONAL" (Spanish for "Analysis of the events related to the national Strike Day protests") report provided by the PRPB, summarized that a total of seventeen (17) individuals were arrested.

The reports provided lack very important and detailed information regarding some of the reported fourteen (14) arrests. There was complete lack of information regarding the three (3) other arrestees (no names, no specific reason for each arrest and no information about what finally happened with each of these three (3) arrestees).

TCA Assessment Report | 2018

- Video recordings provided by "Witness A" showed that on the event of May 1st, 2017, at the Governor's mansion (La Fortaleza), some protesters had crossed the perimeter marked with metal barriers. The Police removed two female individuals from inside the perimeter by pushing one of them very hard and by dragging another one of them on the ground for a considerable period of time by not less than four (4) policemen in civilian clothing. Some of these Police officers wearing civilian clothes could have been mistaken for members of La Fortaleza's escort team.   The images showed that the Police agents in plain clothes (four of them) dragging the protester, could have removed the protester in a less violent way, and with minimal use of force.   The undersigned was able to notice that these agents didn't bear any visible identification that could indicate that they were law enforcement officers.   One PPR-854 was shown to the undersigned that could relate to this event, but it failed in describing the unnecessary use of force (dragging the female on the ground), it only explains that they removed protesters that crossed the perimeter.

- The images shown by the local TV station regarding the May 1, 2017 events at The Milla de oro, specifically at various intersections of Munoz Rivera Avenue portrayed a Police Department attempting to control a chaotic and violent situation, in which vandalism was a reality and the Police was confronted and attacked by many of the protesters who threatened and threw all kind of objects against them.   Based on the images shown by a local TV station, it appears that the PRPB worked hard to control the chaotic situation using reasonable and justified force, and showing a great level of tactical discipline.   The focus was in the dispersion of the violent protesters and avoiding a physical confrontation with them, which could have resulted in a worse and unwanted ending. However, before using force in the form of pepper spray and tear gas, even if it was justified, the PRPB failed by not providing repetitive information to the protesters, via loud speakers, about: 1) the violations they were committing; 2) informing them of the dispersal order; 3) and informing them about the routes to be taken to leave the area. The PRPB failed, as well, by not placing a Police officer in civilian clothes in the back of the protesters to make sure the previous stated communications/orders from the Police to the protesters were audible.   The Police failed too by not video recording when these orders, in the event they were given and the response of the protesters, all in accordance with General Order Chapter 600 Section 625.

| TCA Assessment Report | 2018 |
|---|---|

- It appears that in the May 1, 2017 event, violence erupted from some small groups of extremist or radical individuals. The statement of the PRPB in the report titled "ANALISIS DE EVENTOS RELACIONADOS A LAS MANIFESTACIONES DEL DIA DEL PARO NACIONAL" (Spanish for "Analysis of the events related to the national Strike Day protests") when it states that lest than 1% of the protesters became violent (the report states in red ink: "Less 1% turned violent"), appears to be a correct statement in agreement with the evidence analyzed. The analyzed evidence referenced by the undersigned is the video recordings he collected from TV stations, the internet, and the one provided by the PRPB on 12/01/2017 (the previous video recordings provided by the PRPB were recordings that the undersigned had already collected/watched from TV stations and the internet).

- When the Incident Commander, PRPB Officer # 4, was interviewed by the TCA, he explained that when the protesters started for the first-time breaking glass windows at Banco Popular, the PRPB agents assigned to protect the building had to find cover to protect themselves from the attack because they were completely outnumbered by the aggressive protesters, which were throwing rocks at them. PRPB Officer # 4 decided to move with a group of Police agents to arrest these individuals. The protesters mistakenly understood the Police was after them and started running southbound at the Muñoz Rivera Avenue, towards the stage area. PRPB Officer # 4 and his agents advanced in formation towards them. Some people, from the stage area, started screaming and a group of protesters faced PRPB Officer # 4 and his agents. PRPB Officer # 4 realized that the people he was chasing were gone and that he and his agents were outnumbered by the protester facing them. PRPB Officer # 4 and his agents ended being surrounded by protesters. They were then attacked by protesters who were throwing things at them. Representatives of the ACLU and an attorney started negotiating with him. PRPB Officer # 4 agreed to back up his agents, but the protesters had to stay put where they were. He and his agents backed up, but the protesters continued walking towards them. They backed up to the Chardon Avenue where they decided to stay until the end of the event, in agreement with the Field Operations Commander.

It appears that the actions taken by PRPB Officer # 4 trying to follow the individuals that broke the glass windows by making a formation and marching towards the stage area, caused a clear and reasonable resentment in the protesters located in the area. The protesters apparently understood that the Police was advancing towards the stage area. PRPB Officer # 4 tried to amend the situation by negotiating with the individuals that spoke in representation of the protesters, and after a very long period of time, he complied with the requests made by the protesters by backing up little by little, until they arrived at the Chardon Avenue (visuals confirm these facts). Despite the Police retreat, protesters didn't comply with their part of the bargain when they didn't stay put where they were, and continued advancing towards the retreating Police forces. The complicated situation was finally resolved, but it should be a matter of discussion within the PRPB in the preparation of future events like this one and learn about this experience. It is apparent from the video recordings that PRPB Officer # 4's decision to advance to arrest the individuals vandalizing a building was made in the heat of the violent situation and contributed to a reasonable expectation from the part of the protesters that the police was going after them. Notwithstanding the aforesaid, it is evident in the recordings that PRPB Officer # 4 corrected the situation in a very peaceful and proper manner, that is, PRPB Officer # 4 negotiated with the protesters' representatives and, after a very long period of time, he complied with their request of retreating. As previously informed, the protesters didn't comply with their part of the bargain and they kept advancing towards the retreating Police.

- When the general event had finished, and a group of protesters caused a violent riot situation by engaging in the braking of glass windows in several buildings and damaging other properties, the PRPB decided to assign DOT, SWAT and Special Arrests personnel at Ponce de Leon Avenue and Muñoz Rivera Avenues. The PRPB made simultaneous movements in both avenues, with the support of the DOT, SWAT and Special Arrests personnel in both places, to disperse this riot without engaging in a physical contact with them. They advanced in formation, and made use of the CS each time they needed to disperse the protesters without having to engage in physical contact with them. After the CS gas was used, they were able to advance a little further down the avenue. They used the shotguns with ammunition consisting of rubber balls only when they understood it was necessary to use them. The evidence shows that the use of the CS gas

| TCA Assessment Report | 2018 |
|---|---|

and in some instances the shotguns with rubber balls was the safest way to disperse and move the violent crowd away from the area, without having to engage in personal contact with the protesters which, would eventually have caused more and worse physical damages to both parties (Police and protesters).

- Prior to the signing of The Agreement, less complicated events of crowd control in Puerto Rico ended in violent responses by the PRPB against the protesters.  The evidence shows that the Reform, even at this capacity building stage, has brought very positive changes in the way the PRPB responds to these situations/events. The Police avoided a physical confrontation with the protesters at all cost, by changing to the use of lesser aggressive techniques like the use of Pepper Spray and CS gas.  They learned to use more restrain, more discipline and having a better perspective of the mission's goal.  They learned to prioritize the control of the situation, maintaining group discipline and using well trained tactics and strategies, rather than chasing and hitting the protesters like it was done in the past.  All the aforesaid has been accomplished without affecting or violating the right to free speech and to protest that the citizens have.

- Within the documents provided by the PRPB, injuries to PRPB personnel related to the Fortaleza and Milla de Oro sites were reported, but, in some instances, they failed to provide relevant information:

  - Complaint # 2017-1-166-2348 (Incident Report) informed about two (2) injured PRPB members at the Fortaleza site, which were treated by Paramedics of the EMM of San Juan.
  - A Report titled "Personal Miembros de la Policia de Puerto Rico Lesionados En Manifestacion del 1 de Mayo de 2017 En Fortaleza" (Spanish for "Personnel Members of the Puerto Rico Police Injured in Demonstration on May 1, 2017 at La Fortaleza) informed the names of three (3) members of the PRPB were injured.  The report **did not provide** information about where they were treated or information about who treated them.
  - A PPR-174 "Informe sobre Actividades Constitucionales o Disturbios Civiles" (Spanish for "Report on Constitutional Activities or Civil Disturbances") prepared by PRPB Officer # 25 informed of three injured at the Fortaleza site, **but did not provide** any names or where they were they treated.

TCA Assessment Report | 2018

- A FURA's Incident Report informed that they installed a field tent to treat injured personnel (Dra. Calderon of the medical Services of the PRPB). The report informed that they treated two members of the PRPB.
- A FURA's Incident Report informed that an injured photo reporter from El Nuevo Día (local newspaper) was treated of wounds received by the impact of a rock thrown at him.
- A PPR-174 "Informe sobre Actividades Constitucionales o Disturbios Civiles" prepared by PRPB Officer # 26 reported five (5) injured agents at the Milla De Oro site, **but did not provide** their names or information about when and where they received treatment. The report also informed that protesters that were hit with batons and had been sprayed with gas had left the area.
- A report titled "Certificacion de Lesionados y Daños a Equipo" (Spanish for "Certification of Injured Personnel and Damages to Equipment") dated 06/16/2016 and prepared by PRPB Officer # 20, provided the name of two (2) injured Agents. The report **did not provide** information about the nature of the injuries and where or when were they treated.
- A PPR-920 report titled "Registro de Movilizaciones de las Divisiones de Tacticas Especializadas" (Spanish for "Registration of Mobilizations of the Specialized Tactical Divisions"), prepared by PRPB Agent # 26 informed of two injured PRPB Agents who were treated at the State Insurance Fund (Fondo del Seguro del Estado), a government building that has a medical facility for injured government employees.
- A Memorandum prepared by PRPB Agent # 47 on 06/19/2017 informed of one injured PRPB Agent that was treated at the Centro Medico (Medical Center) of Rio Piedras, PR.

- Based on the violent actions of the protesters after the conclusion of the protest, it appeared appropriate for the PRPB personnel present at the two scenarios to use some levels of less-than-lethal force against the protesters in order to insure the control of the riots. However, the reporting and documenting of this use of force by PRPB was again grossly inadequate. Despite the importance of properly documenting the use of force by its personnel, the PRPB did not properly address this factor, therefore making it almost impossible to determine if the force used was within department guidelines or excessive. Given the discrepancies in the reporting of the number of use of force incidents, it is clear that confusion during the riots and periods of aggressive behavior by protesters resulted in incomplete documentation by

| TCA Assessment Report | 2018 |
|---|---|

PRPB of the incidents when force was used. Therefore, General Order Chapter 600, Section 605 "Reporting and Investigating Use of Force by Members of the PRPB" was not adhered to.

- Training on Section 625 of the General Order Chapter 600, is just beginning for the PRPB's instructors.  It will take some time until every member of the DOT and SWAT units are properly and completely trained.  No agents or officers in the PRPB, at the time of the protests/demonstrations, had been trained on the Management and Crowd Control policy, and while some may attempt to make the argument that this contributed to the possible improper use of force or the failure to properly report use of force, this argument is not supported by facts. Since the inception of the Agreement for the Sustainable Reform of the Puerto Rico Police Department, officers of the PRPB have been properly trained in the Use of Force and the requirements of Reporting and Investigating in the Use of Force policies which control when officers can use force, how to report the use of force and how it will be investigated.

**RECOMMENDATIONS:**

1. A problematic pattern found during this Assessment is that form PPR-854 "Informe de Uso de Fuerza" was not prepared in many instances when it ought to be prepared.  These forms are required for each single Use of Force made by a PRPB officer/agent.  The General Order Chapter 600, Sections 603, 604, 605, 620 and 625 clearly establish such fact.  The PRPB, from the Commissioner down to the line agents, must understand the importance of complying with the preparation of such forms.  Use of force reports allow supervisors and commanders to collect and analyze essential information about the factual circumstances surrounding a use of force. At the individual officer level, reliable and accurate information from these reports permits supervisors to formulate objective conclusions about an officer's conduct. More broadly, aggregate information on use of force allows agencies to improve policies, training, tactics, and management.

2. As explained before, it is recommended that Sections 601, 603, 605 and 625 of the General Order should be amended to clarify that the act of using the baton just for pushing an individual during the control of a mass demonstration, does not constitute a Use of Force reportable via PPR-854, unless it causes an injury or any physical damage (the act of pushing a

TCA Assessment Report | 2018

person with the baton rarely causes any physical damage to the pushed individual.) If this is not clarified, then it could mistakenly be interpreted that the PRPB is bound by regulation to fill a PPR-854 for each single use of the baton. In the control of a mass demonstration it is very difficult to keep track of any and all the instances in which this use of the baton is made.

3. The PRPB must ensure that all arrests are fully documented.   All circumstances about the arrest must be documented: where it happened, when it happened, reason for the arrest, possible violations, name and complete information of the arrestee, information about the arrestee's release or his/her transfer to a cell, inventory of seized items from the arrestee, etc....

4. Most of the Operational Plans were deficient by failing to provide all the information required by the General Order.  During the event of the May 1st, 2017 the SWAT units appeared only in the way of a notation that the SWAT units had been requested.   These units are very specialized units that normally are used in situations where Use of Force is needed.  The gathered evidence revealed that in this specific event, these units were main players in controlling the group of protesters that turned violent.  It is unconceivable how these units were not included in the Operational Plans for this event. These Units must be included in the Operation Plan, identifying and explaining: 1) the amount of assigned SWAT units and personnel; 2) the weapons and ammunition they will have available for the operation; and 3) their mission in the general scheme of the operation.

In the Section of Operational Plans, other general recommendations were provided.

5. Written reports recording the events that took place during crowd control events must improve, mainly by establishing a clear-cut timeline of the events that are reported and providing all possible details about any incident that transpired during the operation.  Not all reviewed reports failed in this area but some of them failed badly.  More emphasis should be given to the importance of properly reporting all incidents and events, and with a timeline that accompanies the incident.

TCA Assessment Report | 2018

6. A suggestion for complex field scenarios similar to the May 1st event, is that the Incident Commander could assign an agent to be responsible for keeping written track of the developing events and the times in which they are occurring. This individual could be located near the Incident Commander, so he/she has complete awareness of the developing events and firsthand knowledge of them. This individual should be assigned also to ensure that all participating units in the event make their own reports, and he/she should collect them and create an event's final report. This final report would be based on the notes and knowledge acquired by the individual during the event, and the information obtained through the individual reports from the participating units. Proper documentation of the events protects the PRPB from later claims made by individuals or organizations claiming Police wrongdoings.

7. When the PRPB prepares Operational Plans for future crowd control events, like the May 1st, 2017 event, they must talk and discuss the strategy followed in the event that occurred on the Muñoz Marin Avenue on May 1st, 2017, where a group of Police agents attempting to follow some individuals to arrest them, ended being surrounded by protesters. The question to be addressed by the PRPB before the preparation of future similar events should be: was it worth following the individuals that broke the glass windows when they fled towards the stage area where the generally calmed protesters were arriving and gathering? Did this action cause the escalation of events and created a more complicated situation? Is it foreseeable where acts of vandalism are likely to occur so that proper action is taken before they actually happen?

8. On December 7, 2017 the TCA interviewed Agent # 1 and Officer # 1, both assigned to CRADIC. Present at the time of the interviews for the TCA office were TCA Arnaldo Claudio (via telephone line), IC Jose Pujol, as well as Counsels Federico Hernandez Denton and Antonio R. Bazan. During the two interviews the TCA encountered discomforting contradictions and discrepancies between both interviewees on issues of upmost importance to the credibility of this visual evidence.
The General Order Chapter 600 Section 610 "Normas a seguir para la grabacion de eventos publicos" (Spanish for "Rules to be followed for the recording of public events") establishes that once the recording has been done, the recording equipment and the "tarjeta de almacenaje" (Spanish

| TCA Assessment Report | 2018 |
|---|---|

for "recording memory card") will be taken to the Technical Recordings Unit for its unloading. The member of the Police making the recording will be responsible for preparing a report regarding the recording. A member of the Technical Recordings Unit will unload the recordings and will burn a DVD which will be stored in the offices of the Technical Recordings Unit. The Unit's supervisor will be responsible to verify that the images were correctly recorded before allowing the erasing of the recorded images (from the memory card or digital equipment). Once the recordings are unloaded, a member of the Technical Recordings Unit will mark (identify) the DVD, with the name and badge ID of the Agent that made the recordings, the recording's date, the name and badge number of the Supervisor at the scene and the identification number for such DVD. The DVD will be registered in the "bitacora de grabaciones" (Spanish for "recordings' registry book" and will be safeguarded in the vault assigned by the "Superintendencia Auxliar de Operaciones Estrategicas" (Spanish for "Deputy Superintendence for Strategic Operations"). The General Order also informs that it is totally prohibited to record, reproduce, place in the internet, transfer to digital equipment, review the contents of the recordings without the authorization of the Commissioner or a designated person.

By reading this Section of the General Order it is clear that the Order only makes reference to digital equipment and digital recording ("tarjeta de alacenaje"), at no moment it makes any reference to any type of video tapes or video recording devices that use video tapes. Interview of PRPB Agent # 1 revealed that on May 1st, 2017 he video recorded images with the use of a hand-held camera allegedly using tapes, and that on May 2, 2017 he downloaded the recorded images in a computer and he burned a DVD. It is also clear that PRPB Agent # 1 was allegedly assigned a type of recording equipment that Section 610 does not cover (obsolete equipment) and that PRPB Agent # 1 was the person unloading the recordings from the video tape to a computer and burning the DVD. This analysis, added to the one reported in the Executive Summary part of this Assessment Report, prompts the necessity of providing a recommendation:

- In the event that PRPB Agent # 1 utilized a handheld camera using tapes, the PRPB would be using equipment not covered by Section 610, that is, PRPB should stop using obsolete equipment, which are not mentioned in Section 610. This Section was prepared having in mind the current technology, digital cameras and digital recording, which are available and in use since many years ago.

The reading of Section 610 creates more doubts about the recordings that were provided by the PRPB to the TCA regarding the events covered by this assessment, which appear to have been selectively chosen and not being the totality of the recordings made by CRADIC on May 1st 2017.

9. In the PRPB's After Action Reports provided to the TCA, they inform that they did not give the dispersal orders via loudspeakers before deploying chemical agents, as Section 625 mandates, because of the large number of people in the crowd, which would have impeded them from hearing the dispersal orders and additionally, this would have posed an imminent risk for the PRPB agent placed within the crowd.

The intent of a dispersal order is to permanently disperse a crowd, not to merely relocate the problem.  It should be made clear in the dispersal order that the crowd is expected to immediately leave the area, and include a warning that force may be used which may inflict significant pain or result in serious injury. In case *Deorle v. Rutherford*, 272 F.3d 1272, 1284 (9th Cir. 2001), it was stablished that warnings should be given, when feasible, if the use of force may inflict significant pain or result in serious injury.  Deploying the chemical agents without proper dispersal orders is denying the crowd the choice of whether to disperse in order to avoid pain or even an injury or remain in place to face the consequences. Stating that because the crowd was too large would have impeded them from hearing the orders appears to be a plain excuse for not complying with the mandate of Section 625.

.

The PRPB also raises the concern that placing a PRPB agent within the crowd to hear and record the dispersal orders represents an imminent risk to the agent's safety.  IC Jose Pujol understands the PRPB's concern and recommends to the PRPB to properly submit this issue to the Reform Unit, the TCA, USDOJ and PRDOJ for further discussion and analysis.   A recommendation for the PRPB would be to find and submit an alternative method by which to record the dispersal orders without placing an Agent in a risky position.

| TCA Assessment Report | 2018 |
|---|---|

# IV.C Interview Data: Officers and Civilians

1. On May 19, 2017, several members of the American Civil Liberties Union ("ACLU"), and members of the Bar Association met with personnel from the TCA's Office. They made, in essence, the following claims:

   - Many Police agents were not properly identified.  When agents were asked for the reason for that, ACLU personnel were told that some ranks of the PRPB didn't have to be identified.
   - At approximately 12:30 pm, individuals that hid their identities with the use of masks or covering their faces with the use of pieces of clothing vandalized the Popular Center building breaking glass fixtures.  These individuals ran away and mixed with the protesters.   The PRPB failed to intervene with the attackers.   Instead, what the PRPB did was moving towards the stage area where protesters were peacefully acting.
   - At the intersection of the Muñoz Rivera Ave. with the Chardon Street, near to the Oriental building, people were throwing objects.  There was a good presence of Police agents there.  People from the stage area started moving towards this intersection and the PRPB agents made a formation in the middle of the intersection.  This group of Police agents were encircled by people of the manifestation and remained in there for a while.  The PRPB agents were not trapped by the individuals, as it was later claimed: Official Observers, properly identified, provided in many occasions, a way out for the Police agents so they could leave the area by clearing spaces, removing protesters and providing a clear clean path for the Police agents to leave. The Police agreed each time to leave the area, but ended not using any of the provided opportunities.  At one point, one of the individuals in charge of these PRPB agents informed to one of the Identified Observers that they were calling via telephone to ask for authorization to leave the area, because they couldn't leave it without authorization.   The Observer saw them using a telephone and, apparently, they were talking to someone. One of the Police agents in charge was identified as "PRPB Officer # 4", and another individual with authority there was identified as "Tanco".

TCA Assessment Report | 2018

- At some point, later on, individuals that hid their identities (faces) with the use of masks and pieces of clothing started to heavily attack the Popular Center with rocks, sticks and other devices. The PRPB failed to intervene with them for a very long period of time. The students started to talk to these aggressive individuals trying to pacify the situation, because the Police didn't act.
- At approximately 2:00 or 3:00 pm, Tactical Units from the PRPB entered the area coming from the Muñoz Rivera Avenue.
- The PRPB used rubber projectiles, rubber balls and CS gas against protesters. The use of these dispersal methods was never justified by the actions of the protesters. The PRPB never informed the protesters that they were going to shoot the CS gas canisters against the protesters, as the PRPB General Order mandates. That Order is part of the PRPB Reform.
- The use of SWAT and Tactical Operations (DOT) units was never justified.
- Some participants of the manifestation fled and entered the Roosevelt Train Station, and the PRPB threw CS gas against them while they were entering the station and then the Police agents closed the doors of the station. Identified Observers informed to various Police agents what happened, and they didn't take any action towards helping the individuals trapped inside the station with the gas.
- They all agreed that the PRPB could have intervened against the individuals attacking the Popular center without the need, at any time, to intervene with the participants of the manifestation.

2. On November 27, 2017 IC Jose Pujol interviewed "Witness A" as a part of the Assessment ordered by the Honorable Gustavo A. Gelpi, U.S.D.J., in relation to the demonstrations and incidents, involving the Puerto Rico Police and protesters, that occurred in Puerto Rico during the days of April 18, 25, and 27, 2017 and May 1, 2017; all as part of the assessment of the Puerto Rico Police Department's implementation of the "AGREEMENT FOR THE SUSTAINABLE REFORM OF THE PUERTO RICO POLICE DEPARTMENT" during its capacity building period. "Witness A" stated, in essence, the following:

She explained that she participated in some of the events covered by this Assessment and that she had spoken to several individuals that had participated in them. "Witness A" also collected evidence, such as photographs and video recordings, from individuals that had participated in these events.
"Witness A" stated that during the April 18, 2017 event in front of the Capitol building, the Puerto Rico Police Department (PRPB) never informed the

105

protesters that they were planning to use chemical agents (pepper spray) against them.  In her opinion, the PRPB made an excessive use of the pepper spray. Mari provided a written document that in part reads as follows:

> "On April 18, 2017, "Individual Q" was at the demonstration in front of the Capitol building. There, she received a blow from a policeman, who attacked her with a rolled banner/poster. The girl had to be taken to the hospital and was also taken to a Police Station, where a complaint was filed (2017-1-166-2104) against the aggressor officer. The next day, "Individual Q" went on a short trip and when she returned on Saturday, April 22, 2017 at night, she found her apartment all messed up, the locks intact and nothing stolen ... A complaint was filed with the FBI on April 28, 2017. They were not offered a complaint number and nor provided the name of the agent. They were told that "he was the Duty Agent and that, with the day and time they would know who he was".  "Witness A" provided a photograph that allegedly shows the moment when the police Officer was about to strike "Individual Q" with a rolled banner/poster (Item # 81).

"Witness A" explained that on the event of April 25, 2017 the PRPB made an excessive use of the pepper spray again.  She stated that the escort personnel of the President of the Senate were provoking the protesters, stirring the environment, showing a defiant attitude and not accepting any type of dialog with the protesters.

"Witness A" explained that on the event of May 1st, 2017 at the Fortaleza scenario, some protesters crossed the perimeter that was established with metal barriers.  The Police removed two female individuals from inside the perimeter by pushing one of them very hard, and by dragging one of them on the ground for a considerable period of time.  Some of these Police officers were in civilian clothes, which made her think that they could be part of the escort team of La Fortaleza. She provided two short video recordings documenting what is explained in this paragraph (Item # 83).

"Witness A" explained that on the event of May 1st, 2017 at the Milla de Oro scenario, the PRPB made an excessive use of force, even using CS gas that had expired before the day of the event.  She informed that the PRPRD made random arrests, without a founded motive.  She stated that the PRPB used undercover agents (she showed images of PRPB members in plain clothes. Note: IC Jose Pujol was able to see that they had their PRPB Id's on them, which were easily visible).

"Witness A" provided an article written by Elliot Castro Tirado that was published by the "Claridad" newspaper in which Castro Tirado explained that he was present at the Roosevelt train station when the PRPB threw chemical agents (CS gas) in various occasions to the protesters that were inside the station (Item # 82). "Witness A" showed a video recording of many of the protesters at the train station once they arrived at the top level of the station (the evidence, a video recording, demonstrated to IC Jose Pujol that the protesters were under the effects of chemical agents).

3. "Witness B", a manager of the "Tren Urbano" (Urban Train) of Puerto Rico, was interviewed by IC Jose Pujol in relation to his personal knowledge about the incidents that happened on May 1, 2017, at the Roosevelt train station of the Tren Urbano.  These incidents were related to the "Paro Nacional" (National Strike) activities. The manager stated in essence the following:

He stated that the Roosevelt Station had video cameras, but they lacked a recording system.   Only a few stations have this capacity due to budgetary reasons. They decided that it was a priority to begin equipping with recording equipment the stations that had higher criminal activity.

He explained that on May $1^{st.}$ 2017 he was present at the Roosevelt station because he knew that this was the station that was closer to the center of all "Paro Nacional" activities.   Between 2:45 and 3:00PM, but closer to 3:00 PM, many people were rapidly entering the station.  He physically went to the entry location to the station and saw a well-organized line of Police agents advancing southbound through the Muñoz Rivera Avenue towards a group of protesters. Among those protesters, there were a considerable number of young masked individuals that engaged in throwing objects at the Police.   The Police was responding to them by throwing large amounts of CS gas in their direction.  He stated that when he saw that a very large number of people had entered the station, they decided to close the station's entry by blocking the entry with its security grilled doors.   The reason behind this decision was safety: to avoid having too many individuals inside of the station, which could have forced them to go down to the electrified rails, which could have caused several casualties. He stated that when they closed the entry, the wind blew a large amount of CS gas into their direction, which affected him and many other persons.  He assured that the Police never tossed the CS gas towards the station and that the Police agents never broke their formation.  He explained that the Police never touched the security grilled doors and that the Police lacked the capacity to close them, because the process of closing these doors is mechanical, not manual, and the

Police did not have the access to operate the system. He added that the Police never approached the station's entry, not even the sidewalk, and that they never tried to intervene with the train station.

He explained that when some of the station's security guards saw people going down to the area where the electrified rails are located, they rapidly communicated with the Tren Urbano Central Control, who immediately cut the electricity of the train's system to avoid having any fatality.

He stated that approximately two or two and a half hours after this event happened, and after they had checked that everything was under control outside the station, they allowed the people inside the station to leave.

He stated that he worked for fourteen years as a Police officer before becoming the Chief of Security of the Tren Urbano (twelve years ago), but that he is not biased at all, and that he provided a truthful statement of all which he personally witnessed.  He stated that the information he provided "es la verdad, lo que paso" (Spanish for "is the truth, what happened").

4.  "Witness C", a legal observer from the Bar Association, provided a statement that has been translated into the English language and which is provided, almost in its entirety, below.  This legal observer provided two photographs as well (Item # 56):

"Summary of my participation as a negotiator in the activities related to May 1. (The written times are approximate).

- **09:00 AM**. The police stopped controlling the traffic at the intersection of Ave Gandara and Ponce de León Avenue and at the exit of the Tren Urbano in Robles street, in Ponce de León, contrary to what was established in the agreement with the Organizers. Demonstrators and people assigned to the safety of the activity took over.
- **10:30 AM**.  The march that started from the Río Piedras campus began. The police were escorting with motorized personnel and vehicles.
- **10:45 AM**.  The march changes its route, as announced, rather than continue walking along Ave. Ponce de Leon, turned by the marginal Piñero Ave. until arriving at Ave. Muñoz Rivera, where it continued. The police who were escorting it were already in front of the Auxilio Mutuo when the route was changed. They continued their march and the march continued without escort.

TCA Assessment Report | 2018

- **11:15 AM**.  When the march passed in front of the Department of Labor, I noticed a group of young people who had their faces covered - most of them covered their faces with shirts or cloths, but I noticed a few who also had glasses that did not reveal anything on their faces and gloves. The one who was most covered had a tube. They wore backpacks, and I noticed that some of them had on their hands and backpacks (hooked in their side pockets) bottles with a yellow-green phosphorescent liquid. They were not marching. They were on the side, watching the march coming from the UPR. They were not identified with shirts allusive to the UPR or to some organization - They had clothes mainly black or of dark colors. Nor did I see any of them with the wooden shields that carried the flag painted in black and white (which I later saw during the negotiation with the police, of a group that made a barrier to collaborate with creating the open space requested by the police)

- **11:30 AM**. The march from the UPR arrived at the meeting point for Muñoz Rivera and was confused with the march that came by the Roosevelt. I am informed by the other negotiators that the other marches were arriving at the meeting point. I did not see any cops on the whole trip. Neither there. I continued walking through the Ponce de León, away from the concentration of people to explore the area and identify where the police were located.

- **11:50 AM**.  I arrived walking to the corner of Ponce de León and Chardón (Banco Popular) - Police were located there. A group of policemen stood in line in front of the Banco Santander building, another stood in the same way against the windows of the Banco Popular. All in formation, standing on the sidewalks of the front of the buildings (there would be between 20 and 25 people in each group). I passed in front of them on the way to Muñoz Rivera. A third group stood in the same way on the sidewalk, bordering the USB building (Muñoz Rivera and Chardón). I stopped between Muñoz Rivera and Chardón. There were almost no protesters in that area (from Ponce de Leon Avenue to Ave. Muñoz Rivera, in the area of Chardón Street).

- **Between 12:15 and 12:25 PM**.  A small group of people stops in front of the glass windows of Banco Popular and starts throwing stones at them. The group arrived there entering Ponce de Leon Ave., not through Ave. Muñoz Rivera, where the protesters walked. The policemen who were standing in front of the glass windows sheltered behind the bus stop. They did not throw stones to the policemen, only to the glass windows.  I approach them to try to

TCA Assessment Report | 2018

persuade them to (not) continue throwing the objects: I shouted: Stop! Stop!  One of them, the one closest to me, says to me, "Jump or you'll get tangled up, too," and the next conversation is given.

Me-There are children here.
Him – Why they brought them? They knew what could happen.
Me - It was not about this.
Him - Jump or you go you are entangled too.

He moves to show something behind him. It was a wheeled trash can with stones that had been dragging along.

They keep throwing. The glass windows of the Banco Popular sounded, some trembled, but none broke. Then I hear when one of them shouts: "Throw to the fountain". One of them stands in front of that glass window throwing a stone and the glass collapses. It came down in bits.

The police that was there in front, run to the center of Ave. Muñoz Rivera (away from the Banco Popular), to where the demonstrators were watching the activities on the activities' stage.

- **12:30 PM**.  I start walking from the Muñoz Rivera Ave. intersection with Chardón Street (Banco Popular) to the opposite corner of the same junction (Oriental). At that intersection, objects are being thrown. I could not know where they came from. That's where the police are. A stone hits me. Many of the people who were at the event's stage area run to this intersection, which until that moment had been almost empty, and they start to stop with their hands raised in front of the policemen. The police are making a formation in the middle of the intersection. They stop throwing objects.

I approach the person who tells me that he is in charge, I identify myself as a member of the Bar Association's negotiating group, he does not identify himself back, I begin to talk to her.

Demonstrators have formed a wall in front of each side of the DOT personnel and we begin to negotiate.

Initially they tell me they will stay there. Subsequently, a person arrives who identifies himself as the person who will continue to be in charge,

| TCA Assessment Report | 2018 |
|---|---|

he neither formally identified himself, and I continue the negotiation with him. He tells me that he agrees to move if the demonstrators back off to a place where there was a large speaker (of the circular ones that are mounted in vehicles). It was not a real proposal. The space was about 20 feet, the number of people who had already occupied the space between the stage and the formation was too much. It was impossible to achieve something like that because people did not fit.

I return to the Colonel to evaluate other alternatives. He tells me that they will "withdraw" if the demonstrators open the space that divides them (they were facing each other, very close), because they have to withdraw without losing the formation. However, he questioned my capacity to negotiate on behalf of the protesters and to get them to agree to move. From his words, I understood that he was aware of the costliness of his request. And I confirmed, "If I make them move, will you leave?" He answered yes.

I begin communicating the agreement to the demonstrators. I ask for the commitment of each and every one of the people in the first and second row to keep the line firm and prevent the pushing closes the space between demonstrators and police. All the people agreed to collaborate and began to pass the information about the agreement and to request collaboration to move back to open the requested space.

(Those who were nearby were giving information to those behind, and so on.)   The space is opened.   The formation begins to move, but shortly after it stops. I ask the reason and he tells me that they are not going to move anymore, that's it is there that where they're going to arrive. I question him not having complied with the agreement to withdraw. It keeps on that this is withdrawing.

A person who identified himself as a police lawyer added to the negotiation and I continued to negotiate with him.

They say again that they will retire. He indicates to me that they want to be located in the street in front of the Popular Bank. They make their way in that direction. When the way is ready, they tell me that it is not on this street, that it is in front the sidewalk, where they were originally. He tells me that he has to place the agents in the same place they were initially: a group on the sidewalk in front of the Banco Popular and another on the

| TCA Assessment Report | 2018 |
|---|---|

sidewalk in front of the UBS building. Both ways are opened so that they can exit.

When the paths were open, I went to notify the Colonel and the Attorney again. They were slow to arrive. They would not show up. When they arrived, I notified them, they see the corridor and the Colonel tells me that I must also remove the people who are touching the building. So, they could stand in front of the building wall without people behind. He tells me to move the people to the street. We again asked people to move, this time to the street. There was always a lot of cooperation from people, but they were annoyed by so much change with no sign that they would move, which was why they had agreed to cooperate.)

Once again, we managed to dislodge all the space we were asked for. I went back to notify him that the area was empty. Then they tell me that this was not the agreed place that it was another one. I questioned him because I did not agree with what he said. I asked him to tell me specifically where they want to move. He tells me that they will not stop in front of the Bank (Calle Chardón), but on the side (Ave. Muñoz Rivera). And that, in addition, I must remove all the people who are near the building in this area. There were so many people, even people who were unaware to the situation that was developing with the police. They had approached the sidewalks and the buildings looking for shade and a place to sit or lie down. The cement that borders the building allows sitting and was under shade.

An effort is again made to move the people who were there. Each time they requested more space and longer or wider corridors. I went back to notify them. I go back and look for them. I see them in the distance. They were in the center of the space created by the two rows of agents. The Colonel was on the phone. I try to make eye contact with them, and it gives me the impression that they are avoiding it. When I finally achieve it, without approaching, they indicate that they are calling to request authorization to move, that they need authorization from above. That they do not answer them and until they do not get an answer they cannot move. I question that they had been telling me from the beginning that they had the authority to reach agreements with me and now they said they did not have it.

The time keeps ticking. The people are extremely annoyed and claiming that the police were not fulfilling their part of the agreement. At that time, it

TCA Assessment Report | 2018

has been about an hour and a half since the negotiation began and the agents have not moved, as they said they would. The situation was very fragile. I felt that violence could be unleashed at any moment. It was necessary, in order to avoid it, that they begin to withdraw immediately. I comment to several of the policemen how fragile the situation was and the importance of this happening immediately.

A few minutes passed, I cannot remember how many ... One of the agents I have in front of me tells me that they will retreat. Neither the Colonel nor the lawyer spoke to me again.

I make a gesture to verify that the spaces were still open, and the officer answers me that it is not necessary, that they will exit towards Chardón Street. I comment aloud: "now we have to open for the Chardón". The officer answers, "The Chardon has always been open."

- **Between 1:40 and 1:50 PM**.

They began to leave. They left quite quickly. They reached Chardon Street. They kept going. The last of them had almost passed the end of the UBS building, when the Colonel called them and told them where they were going, that they were going back.  He orders them to form again. At that moment, I realized that in that street, besides the agents who have just left the middle of the avenue, there were many more agents. When forming, they again block the passage of people. Many protesters returned to stand in front of them (the Police) to prevent them from returning to the place from which they had withdrawn. The tension is created again. We again ask people to step back and keep a space in front of them. The activity on the stage was over and that street was being used by people to go out. We led people away from the sidewalk, so they did not approach them. An officer approached me to ask for my information. He tells me that he is doing a report of what happened, and he needs to know the name of the person with whom he negotiated. I did not see the Colonel again, nor the lawyer. I say goodbye to the people who had been collaborating. I'm starting to retire. I'm walking towards Ave. Muñoz Rivera again. I stop when I get there. It seemed like it was over. There were far fewer people left.

| TCA Assessment Report | 2018 |
|---|---|

- **2:15 PM**.  I begin to hear again the blows of objects against the windows of the Banco Popular building. I find myself in the middle, between the Banco Popular building and the DOT forces. I imagine that they will run in front of me but the time begins to pass and there is no movement. I was there for a few minutes. The police did not intervene. It was very strange to me. I started to walk away in the direction of Santurce. While on the way I still expect to see the DOT forces to cross the street, and time continues to pass, the noise is still heard, and the police do not intervene.

- **2:30 PM**. I was very far away when I noticed that they crossed the avenue. I know it because I saw a lot of people running to where I was, like moving away from the place. I was so far away that I could not see clearly.

  A few minutes later, I noticed another movement of people running towards where I was.

- **Near 04:00 PM**. I left there to receive medical attention on my arm. In the place where I was, I saw the live press conference offered by the Governor. In it he said that he was the person who had made all the decisions about the police action. He mentioned that the force used was justified because the protesters had cornered the agents during the demonstration, as the people had already seen in the visuals.

  "If he was the "upstairs" people who took the determinations on the police, he knew that those DOT agents to which he referred, had at all times all the space to withdraw that they themselves had requested."

"Witness C" also provided a copy of a photograph which is an aerial view of the PRPB agents that were at the intersection of Muñoz Rivera and Chardon Avenues.  According to "Witness C", this photograph corroborates that the PRPB units surrounded by protesters had the opportunity to leave the area, or to move away from the encirclement made by the protesters.

5. As previously informed, the PRPB provided a document titled "ANALISIS DE EVENTOS RELACIONADOS A LAS MANIFESTACIONES DEL DIA DEL PARO NACIONAL" (Spanish for "Analysis of the events related to the national Strike Day protests") containing a timeline of the events that took place on May 1, 2017, at the Airport, Old San Juan and "Milla de Oro" in Hato Rey, Puerto Rico.  The timeline reads as follows:

**Overview May Day Protest**

| TCA Assessment Report | 2018 |
|---|---|

- On May 1st demonstration began peacefully
- Thousands of protesters blocked public roads
- Access to main Airport (4 Flights Delayed)
- Largest Public Hospital affected
- Bus System paralyzed
- Many Businesses closed
- Puerto Rico Police Department (PRPB) reports indicated a small group of protesters became violent
- Committed several acts of vandalism
- Aggression attempts against Law Enforcement Officers (LEOs)
- PRPB responded without using excessive force
- Ensure safety and security of protesters
- Prevent further damage
- Safeguard the Constitutional right to protest
 Approx. 50,000 protesters, less than 1% turned violent

**4:45 AM (Ended Approx. 5:50 AM)**
At Fortaleza area:
"Colectivo Feminista en Construcción" (Spanish for "Feminist Collective in construction). Approx. 80 individuals. Two Groups. Front Gate. Fortaleza Int. Cristo Street. PRPB increased presence. • First group relocated
**6:00 AM (Ended Approx. 8:40 AM)**
At Luis Muñoz Marin Airport/Baldorioty de Castro Avenue:
UPR Rio Piedras Students. Approx. 200 protesters. Two School Busses. 13358TE (identified). Blocked entrance/exit to airport. Traffic affected. One (1) lane available. Flight Passengers walked to their destination gate (4 flights delayed)
**7:12 AM (Ended Approx. 7:50 AM)**
At Piñeiro Avenue:
UPR Rio Piedras Students. Approx. 50 individuals. Blocked Piñeiro Avenue. Traffic affected.
**7:50 AM (Ended Approx. 8:20 AM)**
At Caguas Expressway to San Juan:
UPR Rio Piedras Students. Approx. 20 individuals. Blocked Piñeiro Avenue. Traffic affected. Piñeiro Group Joined. Approx. 50 protesters
**10:00 AM (Ended Approx. 12:00 PM)**
**Main Protest began (5 rally points)**
- Dept. of Labor (12:00 PM)
- UPR Rio Piedras (9:56 AM)
- Puerto Rico Coliseum (11:00 AM)
- Hiram Bithorn Stadium (10:47 AM)

| TCA Assessment Report | 2018 |
|---|---|

- "Plaza Las Americas" (10:30 AM)
- Headed to Seaborne Building ("Milla de Oro")

**12:00 PM**
Main Protest Arrived to "Milla de Oro". Official messages from protesters (stage). PRPB deployed agents to strategic places to ensure public safety (no specialized units). On stage speaker warned protesters not to engage police chanting "no se dejen provocar" (Spanish for "don't let them provoke you").

**12:30 PM**
1st Incident:
Fire Extinguisher Discharged/Throwing Things against LEOs. Protesters used a fire extinguisher and threw things against LEOs. A small group of Protesters (Approx. 50 individuals) approach LEOs with shields; with intention to provoke, cause damage to private/public property and engage LEOs. • LEOs retreated

**12:40 PM**
2nd Incident – Banco Popular/MCS-Plaza/McDonalds:
Protesters break Banco Popular, MCS Plaza and McDonalds' glass windows. PRPB's specialized units deployed. Protesters and PRPB agents face-off. PRPB arrests one individual for committing vandalism: **"Individual K"**

**2:07 PM**
3rd Incident – UBS/Banco Popular:
Protesters throw rocks at UBS building. Using slingshots. Protesters continue to throw rocks, bottles causing damage to private property. Protesters throw smoke bombs and pyrotechnics. PRPB used necessary force to prevent further damage and ensure protesters safety. Another Protester arrested: **"Individual B"**

**2:27 PM**
4th Incident – PRPB Response:
PRPB began operation to guarantee public safety in the riot zone. Vandalism continues throughout "Milla de Oro". Another PRPB agents line at the end of the Ponce de Leon Avenue. Another Protester arrested: **"Individual L"**. Protesters approach approx. 50 ft. away from LEOs with a combative attitude

**3:00 PM**
5th Incident – PRPB/Protesters Confrontation:
Protester began to throw rocks to LEOs. SWAT agents responded. Damages to former New Progressive Party HQ reported. 3 more Protesters arrested: **"Individual M"**, **"Individual N" and "Individual D"**. Walgreens/CVS vandalized

**3:40 PM**
6th Incident – Protesters Relocate:
Protester headed towards Muñoz Rivera Ave. to Roosevelt Ave. Protesters used trash containers as barricade. Protesters set fire to an object in the middle of the Muñoz Rivera Ave.

TCA Assessment Report                                    | 2018

**3:55 PM**
7th Incident – Protesters Retreat:
Protester blocked Roosevelt Ave. with Cayo Caribe restaurants decorative rocks. PRPB restricts access to the other end of Roosevelt Ave. Protesters continued to march to Cesar Gonzalez street on route to Rio Piedras. PRPB presence remains and follows closely the march (Motorcycle Unit). 4 PRPB agents wounded. Governor's Message

**4:30 PM**
8th Incident – Muñoz Rivera Ave. to Rio Piedras:
Another group of Protesters continues on Muñoz Rivera Ave. moving towards Rio Piedras. Vandalism continues on San Juan Court (Judicial Center). Vandalism reported at "Hipopotamo" Restaurant. 3 protesters arrested. 1 unknown observer arrested. "El Nuevo Día" newspaper receives a phone threat by an unknown individual threatening to "cause damages in retaliation for their coverage"

6. "Witness D", an elder individual (approximately 80 years) old that was present during the May 1 event explained that he/she was trying to leave the event's area along with other non-aggressive individuals through the Chardon Avenue. He/she stated that they were not allowed by the Police that blocked that avenue. He/she explained that, all of a sudden, a Police officer/agent shot something with a rifle that was releasing smoke that fell on his/her foot. He/she affirmed that the group of individuals that he/she was with consisted of aged individuals that had a non-aggressive attitude, and that the general public's attitude at that moment was not agitated at all.

7. On August 15, 2016 **PRPB Officer # 4** was interviewed as a part of the Assessment ordered by the Honorable U.S. District Court Judge Gustavo A. Gelpi, in relation to the demonstrations and incidents, involving the Puerto Rico Police and protesters, that occurred in Puerto Rico during the days of April 18, 25, and 27, 2017 and May 1, 2017; all as part of the assessment of PRPB's implementation of the "AGREEMENT FOR THE SUSTAINABLE REFORM OF THE PUERTO RICO POLICE DEPARTMENT" during its capacity building period (Item # 57). PRPB Officer # 4 stated, in essence, the following:

   • PRPB Officer # 4 is the San Juan Area Commander since 01/24/2017, being responsible for thirteen (13) Precincts and two (2) Specialized Units. He supervises approximately one thousand eighty (1,080) agents.
   • PRPB Officer # 4 stated that during his approximately twenty-three (23) years in the PR Police Department (PRPB) he has worked in

| TCA Assessment Report | 2018 |
|---|---|

    dozens of manifestations similar to the ones covered by this Assessment.

- PRPB Officer # 4 explained that before the General Order Chapter 600 Section 625 "Manejo y Control de Multitudes" entered into effect, there wasn't any stablished official protocol; they worked based on their experience, which was obtained by years of working in the streets, and working in similar scenarios. He stated knowing Sections 604, 620 and 625 of the Chapter 600 of the General Order.

**APRIL 18, 2017**

- PRPB Officer # 4 explained that they found out about the protest that was going to happen at the Capitol building through "social media", and that they never had the opportunity to meet with the students before the protest started. He prepared the Operational Plan (OP), and prior to the event, they discussed Sections 604, 620 and 625 of the Chapter 600 of the General Order with the participant units, mainly the specialized units.
- The Mission was that the protest could not interfere with the regular legislative work at the Capitol building. To accomplish this goal, they had to prevent the students from gaining access to inside the building. As a part of the mission, they had to also prevent the protesters from causing damages to the building and to any other properties.
- As a preparation for the event, PRPB Officer # 9 monitored the social media. They were informing to the Field Operations, to whom PRPB Officer # 4 reported, of all the events. The communication with Field Operations was by telephone.
- During the event, the orders established in the OP and the Chains of Command were never altered.
- They established a perimeter on the North part of the Capitol building by placing plastic barriers filled with water, which are heavy and not easy to remove. They placed a line of Police officers behind this physical barrier. PRPB Officer # 4 had Tactical Operations (DOT) agents and Special Arrests agents inside the building, standby in case they were needed.
- The protesters were throwing many objects against the Police Officers. At one point, the Police Officers were forced to make the use of force when the protesters removed some of the plastic barriers, trying to gain access to the building. In order to remove them, the protesters punctured some of the plastic barriers emptying the water that was inside them. When they removed the plastic barriers, the Police Officers were forced to use pepper spray to regain

TCA Assessment Report | 2018

control of the barriers and secure the perimeter again. They placed the barriers again, where they belonged, all under the heavy attack of the protesters who were throwing all kind on objects, event paint, at them. Some of the protesters were armed with sticks.

- During the event, some university professors entered into the Capitol building because they had previously negotiated it with personnel of the Capitol building, not with him.
- PRPB Officer # 4 stated that the PPR-854 forms (Use of Force forms) were properly filled and submitted.
- PRPB Officer # 4 considered that they accomplished their mission because they impeded that the students could interrupt the work at the Capitol building. He added, that despite the violence of the protesters they only needed to use the minimal necessary use of force (pepper spray in some instances) to control the situation.

**APRIL 27, 2017**

- PRPB Officer # 4 explained that they knew of the protest that was going to happen before the Capitol building through "social media", and that they never had the opportunity to meet with the protesters before the event. He prepared the Operational Plan (OP), and he informed that that prior to the event, they discussed Sections 604, 620 and 625 of the Chapter 600 of the General Order with the participant units, mainly the specialized units.
- The Mission was that the protest could not interfere with the regular legislative work at the Capitol building. To accomplish this goal, they had to prevent the protesters from gaining access to inside the building. As a part of the mission, they had to also prevent the protesters from causing damages to the building and to any other properties.
- As a preparation of the event, they monitored the social media. They were informing to the Field Operations, to whom reported, of all the events. The communication with Field Operations was by telephone.
- During the event, the orders established in the OP and the Chains of Command were never altered.
- PRPB Officer # 4 stated that the OP was prepared by PRPB Officer # 27 along with PRPB Officer # 9.
- PRPB Officer # 4 explained that they never met with the Unions before the event, but that they know the Unions' leaders who are known to have more control of their represented individuals, and are better organized than the students normally are.
- When asked about the violent incident that happened between a Legislator and some protesters, PRPB Officer # 4 explained that this situation happened in front

TCA Assessment Report | 2018

of an entry door located in a lateral part of the building, which was under the control and responsibility of the Capitol building's security personnel. PRPB Officer # 4 and his PRPB personnel were only responsible for protecting the building's entrance located at the north part of the building. He has recently learned that the Capitol building's security personnel lacked police experience, and he knows that now they are going to create a protocol for similar situations.

- PRPB Officer # 4 stated that, as on the 18th, there weren't any unidentified members of the PR Police Department and that they did not use undercover agents. There were individuals in civilian clothes, but they were part of the Capitol building's security.

## MAY 1st, 2017

- PRPB Officer # 4 stated that he prepared the OP (a preventive one) in his office with PRPB Officer # 9, and that prior to the event he had several meetings with his personnel. He was responsible for the whole operation at the metropolitan area of San Juan.
- The mission was to ensure that the protesters could exercise their right to march to, and meet at the Milla de Oro, without any incident. Part of the mission was also to control the traffic in the area.
- Prior to the event, he met with "Individual R" (representative of part of the protesters), and they agreed that all groups of protesters would discipline their own members.
- They started to work at 4AM when the PRPB personnel met at the Navy Frontier. From there they moved to their assigned locations.
- They knew where the marches started from. Once they started to march, at some point the UTIER (Union of the employees of the Electric Energy Authority) and the students changed the plans by moving through different streets than the ones they had agreed to. He explained that the PRPB peacefully corrected the situation.
- PRPB Officer # 4 maintained communication at all time with the Field Operations by telephone.
- PRPB Officer # 4 explained that when the protesters started, for the first time, breaking glass windows at Banco Popular, the PRPB agents assigned to protect the building had to find cover to protect themselves because they were completely outnumbered by the aggressive protesters, which were throwing rocks at them. PRPB Officer # 4 decided to move with a group of Police agents to arrest these individuals. The protesters realized the Police were after them and started running southbound at the Muñoz Rivera Avenue, towards the stage area. PRPB Officer # 4 and his agents advanced in formation behind them.

| TCA Assessment Report | 2018 |

Some people, from the stage area, started screaming and a group of protesters faced PRPB Officer # 4 and his agents. PRPB Officer # 4 realized that the people he was chasing were gone and that he and his agents were outnumbered by the protester facing them. PRPB Officer # 4 and his agents ended being surrounded by protesters. They were attacked by protesters who were throwing things at them. Representatives of the ACLU and an attorney started negotiating with him. He agreed to back up his agents, but the protesters had to stay put where they were. He and his agents backed up, but the protesters continued walking towards them. They backed up to the Chardon Avenue where they decided to stay until the end of the event, in agreement with the Field Operations Commander.

- PRPB Officer # 4 stated that later on, protesters started throwing rocks and breaking glass windows at the Banco Popular and UBS buildings. He tried to move his agents towards these locations, but he could not get there because he was faced by dozens of protesters who were carrying sticks, and some were protected with shields, making a line of protection for the protesters that were vandalizing the buildings. PRPB Officer # 2, the Field Operations Commander, moved to the Ponce de Leon Avenue and activated the Tactical Operation units (DOT) and SWAT teams. Some DOT and SWAT were assigned to support PRPB Officer # 4 and some to support PRPB Officer # 2. PRPB Officer # 4 explained that, at the Ponce de Leon Avenue scenario, two more Colonels arrived, PRPB Officer # 28 and PRPB Officer # 3. Knowing that these two Colonels were not part of the OP, PRPB Officer # 4 was asked who sent these Colonels to the field. He answered that they came from the PRPB Headquarters but elegantly refused to say who sent them there. He added that these two Colonels stayed all the time with PRPB Officer # 2 at the Ponce de Leon Avenue scenario.

- PRPB Officer # 4 was asked if they gave a dispersal order with speakers to the protesters before DOT and SWAT started using CS gas and less than lethal ammunition to disperse the violent protesters, as Section 625 requires. He answered negatively explaining that they did not do it because it was a chaotic situation, it was a violent riot, and it would not have been reasonable or prudent, because the risk was too high. He explained that they decided to disperse this violent multitude using these types of weapons, to avoid a direct confrontation which could have resulted in much worse consequences. He justified that they did not follow the procedures established in Section 625 of giving a dispersal order, placing an agent in civilian clothes among the protesters and recording the dispersal order, because the situation was not the ideal to do it. The amounts of damages made to the properties by the protesters were of great proportions.

- PRPB Officer # 4 was asked why the SWAT units did not appear in his OP or the FURA's OP, and he answered he did not know the reason. He explained that

| TCA Assessment Report | 2018 |
|---|---|

they requested the DOT and SWAT units, as appears in his OP, but he doesn't know why no more information is provided in his OP or the FURA's OP.

- PRPB Officer # 4 was asked if the PPR-854 forms (Use of Force forms were filled) and he answered that they were.  SWAT filled theirs and DOT filled their own, and he affirmed having seen them.
- PRPB Officer # 4 was asked about how many people were arrested, and he stated that between 14 and 20 people, mainly by the Special Arrests units that accompany the DOT and SWAT units during the operations.
- PRPB Officer # 4's opinion is that they accomplished the mission, because once a violent riot started the mission changed.  The new objective was stopping the violent riot, which they did in the safest possible way, preventing worse situations.

8. On August 15, 2017, **PRPB Officer # 19**  was interviewed as a part of the Assessment ordered by the Honorable U.S. District Court Judge Gustavo A. Gelpi, in relation to the demonstrations and incidents, involving the Puerto Rico Police and protesters, that occurred in Puerto Rico during the days of April 18, 25, and 27, 2017 and May 1, 2017; all as part of the assessment of PRPB's implementation of the "AGREEMENT FOR THE SUSTAINABLE REFORM OF THE PUERTO RICO POLICE DEPARTMENT" during its capacity building period (Item # 58).  PRPB Officer # 19 stated, in essence, the following:

- PRPB Officer # 19 informed being the Director of the Tactical Operations Division (DOT) of San Juan, Puerto Rico.  His responsibility is to supervise the DOT of San Juan.  He further explained that when an event happens in which the DOT of the entire island is activated, he becomes the supervisor of all of them.
- PRPB Officer # 19 stated that during his career with the PRPB he had worked in dozens of manifestations/protests similar to the ones covered by this Assessment.
- PRPB Officer # 19 stated knowing Sections 620 and 625 of the Chapter 600 of the General Order, and that they (he and his units) discussed these Sections before each of the events with the exception of the April 25, 2017 event, which was an emergency situation of which they had no prior knowledge.

**April 18, 2017**

- PRPB Officer # 19 was present at the event with four (4) squads and two Officers, as PRPB Officer # 4 established in his Operational Plan (OP).  They were located in a room inside the capitol building in stand-by, ready in case they were needed.  They were requested to be part of this event by PRPB Officer # 4 through PRPB Officer # 2.  At the event, they reported to PRPB Officer # 4 with whom they were in contact via telephone or verbally speaking in person.  He

OFFICE OF THE TECHNICAL COMPLIANCE ADVISOR
122

| TCA Assessment Report | 2018 |
|---|---|

doesn't remember if agents of the Special Arrests Division were present in the area.

- In one occasion, he received the order from PRPB Officer # 4 to come out of the building and stablish a perimeter in the stairs that lead to the entrance of the Capitol building. This happened when the protesters broke the perimeter for a short period of time by moving some of the plastic barriers. Once the Police agents in the first line reestablished the perimeter, they moved back inside the building without having to act in any manner.

**April 25, 2017**

- PRPB Officer # 19 was present at the event supervising the entire DOT personnel mobilized there, consisting of three (3) squads. He was called by PRPB Officer # 2 thirty (30) minutes before they had to move. He was instructed to ensure the safe extraction of the President of the Senate from the location (former PR Governor Sila Maria Calderon's foundation). This became his main mission, and also to attempt to accomplish the extraction of the President of the Senate in the safest possible way for his commanded Police officers, and for the protesters.
- He explained that during the event they were attacked by the protesters who were throwing rocks, bottles and all kind of objects at them. They were forced to use pepper spray in some instances in order to protect themselves from these attacks, and this way they avoided a more direct confrontation with the protesters. They did not use the batons as weapons or the Tasers.
- He stated that they filled the PPR-854 forms (Use of Force forms) as Section 625 requires.
- He believed that they accomplished the mission by safely extracting the President of the Senate from there, using the minimal necessary force to accomplish this mission.

**April 27, 2017**

- PRPB Officer # 19 was present at the event with six (6) squads of DOT, as PRPB Officer # 4 requested and established in his OP. They were located in a room inside the capitol building in stand-by, ready in case they were needed. They were never requested to act by PRPB Officer # 4, or any other person, during this event.

**May 1, 2017**

| TCA Assessment Report | 2018 |
|---|---|

- PRPB Officer # 19 was present at the event with twelve (12) squads of DOT which he supervised. His mission was to have his units in standby in case the PRPB Officers in charge of the event would need them. He was briefed by PRPB Officer # 4 and they were under PRPB Officer # 4's OP.

- Once the event started to develop, they received direct instructions and orders from PRPB Officer # 2, the Chief of Field Operations, to whom they reported to, and from PRPB Officer # 29. They communicated by telephone and sometimes, when possible, verbally (talking in person).

- Once the situation at the event transformed into a riot, they were contacted and were activated by PRPB Officer # 2. They were instructed to divide into two groups, one to provide support to PRPB Officer # 4 at the Muñoz Rivera Avenue and the other one to provide support to PRPB Officer # 2 at the Ponce de Leon Avenue. He personally was in the group at the Ponce de Leon Avenue. Once they were ordered to start moving at the Ponce de Leon Avenue, they started moving in a line formation, accompanied by the SWAT units. When protesters were near them, SWAT used the CS to disperse them, so DOT and SWAT were advancing, and the protesters were retreating. With this strategy they avoided physical contact and confrontation with the protesters, avoiding much worse situations. The protesters continued making damages to properties while retreating.

- PRPB Officer # 19 explained that: the situation was chaotic, with protesters causing great damages to properties; the protesters were attacking the Police with rocks and other objects, causing injuries to some Police agents; the use of the CS and less than lethal ammunitions by the SWAT personnel was completely necessary and it was the safest way to accomplish the mission having the minimal number of injured persons (protesters and Police). He added that the DOT did not make use of pepper spray or batons.

- PRPB Officer # 19 admitted that they did not give a dispersal order with speakers to the protesters before SWAT started using CS gas and less than lethal ammunition to disperse the violent protesters, as Section 625 requires. He also stated that they did not place an agent in civilian clothes among the protesters and recorded the dispersal order, because the situation did not allow it.

- PRPB Officer # 19 stated knowing that arrests were made but not knowing how many because they were mainly made by the Special Arrests units, and he was completely concentrated in his own responsibilities.

- PRPB Officer # 19 stated that he did not see any Police agent who was not properly identified, and that he has no knowledge of any undercover agent/vehicle being used during the operation.

- Once, he was asked about who controlled the CS canisters during the event. He answered that SWAT controlled them at the event, and that all the CS in the island is under the control of the SWAT.

TCA Assessment Report | 2018

- When asked about the mission's results, he stated that they accomplished the mission reestablishing the order by making use of the minimal possible force. He added that if they would not have acted in the way they did, it would have ended in a much worse scenario.

9. On August 15, 2017 **PRPB Officer # 31** was interviewed as a part of the Assessment ordered by the Honorable U.S. District Court Judge Gustavo A. Gelpi, in relation to the demonstrations and incidents, involving the Puerto Rico Police and protesters, that occurred in Puerto Rico during the days of April 18, 25, and 27, 2017 and May 1, 2017; all as part of the assessment of PRPB's implementation of the "AGREEMENT FOR THE SUSTAINABLE REFORM OF THE PUERTO RICO POLICE DEPARTMENT" during its capacity building period (Item # 59). PRPB Officer # 31 stated, in essence, the following:

- PRPB Officer # 31 explained that he is the Director of the Negociado of FURA ("Fuerzas Unidas de Rapida Accion", Spanish for "Forces United for Rapid Action").
- PRPB Officer # 31 stated that before the "AGREEMENT FOR THE SUSTAINABLE REFORM OF THE PUERTO RICO POLICE DEPARTMENT" was implemented, he had worked in many manifestations/protests similar to the ones covered by this Assessment. He also added that the May 1st, 2017 event was the first one in which he participated after the "AGREEMENT FOR THE SUSTAINABLE REFORM OF THE PUERTO RICO POLICE DEPARTMENT" was implemented.
- PRPB Officer # 31 explained knowing and being familiar with the General Order Chapter 600 Section 625 "Manejo y Control de Multitudes" (Spanish for "Crowd Management and Control"), and with Section 620 "Normas y Procedimientos para la Utilizacion de Armas Especializadas por Miembros de las Divisiones de Tacticas Especializadas (DTE)" (Spanish for "Rules and Procedures for the Use of Specialized Weapons by Members of Specialized Tactical Divisions").

**April 18, 2017**
- PRPB Officer # 31 stated not remembering this event and that FURA did not participate in this event.

**April 25, 2017**
- PRPB Officer # 31 stated not remembering this event and that FURA did not participate in this event. FURA was not included in the "Plan de Trabajo" (Spanish for "Operational Plan", hereinafter referred to as OP).

**April 27, 2017**

TCA Assessment Report | 2018

- PRPB Officer # 31 stated not remembering this event and that FURA did not participate in this event.  FURA was not included in the OP.

**May 1st, 2017**
- PRPB Officer # 31 explained that in the PRPB's process of preparation for this event, PRPB Officer # 2 contacted him and requested the assistance of the SWAT Division during the event.
- PRPB Officer # 31 contacted PRPB Officer # 24 and instructed him to contact and to coordinate with PRPB Officer # 2, to whom PRPB Officer # 24 would report for the event's operation.
- PRPB Officer # 31 stated that this was his only participation.


10. On August 15, 2017 **PRPB Officer # 32** was interviewed as a part of the Assessment ordered by the Honorable U.S. District Court Judge Gustavo A. Gelpi, in relation to the demonstrations and incidents, involving the Puerto Rico Police and protesters, that occurred in Puerto Rico during the days of April 18, 25, and 27, 2017 and May 1, 2017; all as part of the assessment of PRPB's implementation of the "AGREEMENT FOR THE SUSTAINABLE REFORM OF THE PUERTO RICO POLICE DEPARTMENT" during its capacity building period (Item # 60).  PRPB Officer # 32 stated, in essence, the following:
- PRPB Officer # 32 informed being the Director of the Division of "Arrestos Especiales" (Spanish for "Special Arrests").
- PRPB Officer # 32 stated he had worked in several manifestations/protests similar to the ones covered by this Assessment, approximately five (5) to ten (10).
- PRPB Officer # 32 explained knowing and being familiar with the General Order Chapter 600 Section 625 "Manejo y Control de Multitudes" (Spanish for "Crowd Management and Control").


**April 18, 2017**
- PRPB Officer # 32 stated that he did not participate in this event.


**April 25, 2017**
- PRPB Officer # 32 stated that he did not participate in this event.


**April 27, 2017**
- PRPB Officer # 32 stated that he participated in this event.  He explained that the Unit that he commands was assigned to provide support to the Division de Operaciones Tacticas (Spanish for Tactical Operations Division), hereinafter

TCA Assessment Report | 2018

referred to as the DOT.  He stated that he spoke about the operation with PRPB Officer # 3.

- He was provided the mission and he selected his team, composed of approximately fifteen (15) agents, one (1) supervisor and himself.
- He did not prepare any Operational Plan because he understood that he fell under the OP prepared by PRPB Officer # 12.
- He informed that the Incident Commander was PRPB Officer # 4.
- He informed that he was, at all time, inside the Capitol building with PRPB Officer # 12 in standby in case they were needed.
- He stated that in total they made two (2) arrests.  The Special Arrests unit arrested an individual that the Drugs Division identified as the person that caused damages to a physical structure by using paint.  The Drugs Division arrested another individual for using spray paint on a property.

**May 1st, 2017**

- PRPB Officer # 32 explained that he participated in this event.  His mission was to provide support to the DOT with a team of approximately twenty-four or twenty-five (24-25) of his Special Arrests agents.  He spoke about the mission with PRPB Officer # 3 who informed him that he had to follow the orders given by PRPB Officer # 2 through PRPB Officer # 19.
- He stated that the Central Commander was PRPB Officer # 2.
- He explained that he made two (2) teams.  In one team he assigned PRPB Agent # 52 with ten (10) agents, to provide support at the Ponce de Leon Avenue (he was part of this team as well).  In the other team, he assigned PRPB Agent # 53 with ten (10) agents to provide support at the Muñoz Rivera Avenue.
- He stated that at the Ponce de Leon Avenue, where he was with his team, he saw PRPB Officer # 3 and PRPB Officer # 19.
- He explained that at approximately 2:15 PM, they heard some explosions and the DOT personnel were ordered to make a formation, and consequently Arrestos Especiales (Special Arrests Unit) joined the DOT formation.
- He explained that the riot that he saw was of great magnitude, consisting of aggressive protesters that were throwing objects at the Police, and that they were causing damages to the properties around them.  He believed that the use of CS gas was completely justified and necessary to disperse and control this crowd.
- He stated that his Unit at the Ponce de Leon Avenue arrested eight (8) individuals, but that the Motorized and Drugs Units made some arrests as well. He knows that they processed twelve (12) arrestees at the Bayamon Precinct, where a determination was made about them.  If charges were to be presented,

TCA Assessment Report | 2018

CIC (Criminal Investigations Center) would be responsible for it. He stated knowing that the CIC made some arrests after the event based on developed investigation.

- When asked, he answered that he never heard anyone ordering the protesters to disperse or warning them that the CS gas was going to be used, via the use of speakers or in any other way. He stated not having knowledge if a PRPB agent in civilian clothes was placed in the back of the protesters to hear such orders, and he did not have any knowledge if there was anyone video recording the moment the orders were given. He stated knowing that CRADIC was video recording the event in general.
- When asked, he explained that he did not see any unidentified Police agent/officer, and that he did not know if undercover individuals/vehicles were used.
- He explained that he considered that his team of Special Arrests accomplished their mission in a very satisfactory way.

11. On August 15, 2017 **PRPB Officer # 24** was interviewed as a part of the Assessment ordered by the Honorable U.S. District Court Judge Gustavo A. Gelpi, in relation to the demonstrations and incidents, involving the Puerto Rico Police and protesters, that occurred in Puerto Rico during the days of April 18, 25, and 27, 2017 and May 1, 2017; all as part of the assessment of PRPB's implementation of the "AGREEMENT FOR THE SUSTAINABLE REFORM OF THE PUERTO RICO POLICE DEPARTMENT" during its capacity building period (Item # 61). PRPB Officer # 24 stated, in essence, the following:

- PRPB Officer # 24 informed being the Director of the SWAT Division since 2012, but that he has been part of the SWAT for the last twenty (20) years.
- PRPB Officer # 24 stated that before the "AGREEMENT FOR THE SUSTAINABLE REFORM OF THE PUERTO RICO POLICE DEPARTMENT" was implemented, he had worked in dozens of manifestations/protests similar to the ones covered by this Assessment. He also added that the May 1st, 2017 event was the first one in which he participated after the "AGREEMENT FOR THE SUSTAINABLE REFORM OF THE PUERTO RICO POLICE DEPARTMENT" was implemented.
- PRPB Officer # 24 explained knowing and being familiar with the General Order Chapter 600 Section 625 "Manejo y Control de Multitudes" (Spanish for "Crowd Management and Control"), and with Section 620 "Normas y Procedimientos para la Utilizacion de Armas Especializadas por Miembros de las Divisiones de Tacticas Especializadas (DTE)" (Spanish for "Rules and Procedures for the Use of Specialized Weapons by Members of Specialized Tactical Divisions"). He also informed that in the briefing before the May 1st event, they went over and reviewed these Sections of the General Order.

| TCA Assessment Report | 2018 |
|---|---|

**April 18, 2017**
- He stated that SWAT did not participate in this event.

**April 25, 2017**
- He stated that SWAT did not participate in this event.

**April 27, 2017**
- He stated that SWAT did not participate in this event.

**May 1st, 2017**
- PRPB Officer # 24 participated in this event as the SWAT Commander. Previous to it, he was instructed by PRPB Officer # 31 (Director of FURA) to contact and coordinate with PRPB Officer # 2 to whom he would report to for this event. The day before the event, he talked to PRPB Officer # 4 over the telephone about the event, and the SWAT's mission.
- He explained that SWAT did not prepare an Operational Plan (OP) because they fell into PRPB Officer # 4's OP.
- He stated that on the day of the event they met at the Federal building's parking lot located at the Chardon Avenue. SWAT was located at this location along with the Tactical Operation Division (DOT).
- He explained that his mission, the SWAT's mission, was providing support to the PRPB and DOT during the event.
- He explained that he prepared two (2) teams consisting of ten (10) SWAT agents in each. In each of the two (2) teams, two (2) agents were responsible for the CS gas and for shooting it when ordered. He stated that on this day, each assigned agent carried approximately forty (40) shots of CS. During the event, the CS was kept by the two (2) agents of each team who were assigned to shoot it when ordered to. The place where the CS is normally kept is at a vault located at the FURA's central offices.
- He stated that PRPB Officer # 4 was the person in charge of the event's operation and that he reported to him by telephone. When PRPB Officer # 4 was surrounded by the protesters, they were preventively activated but they never went there.
- He explained that the two (2) SWAT units were activated by PRPB Officer # 4 when there was a big riot at the Banco Popular's building, at approximately 2:15 PM, when the protesters were causing major damages to the building. One of the SWAT teams was assigned to be with the DOT at Muñoz Rivera Ave., with PRPB Officer # 4. The other team was assigned to be with the DOT at the Ponce de Leon Avenue. Some members of SWAT stayed near the Banco

Popular building securing the perimeter.   The teams at Muñoz Rivera and Chardon Avenues advanced with the DOT southbound in the two avenues.  They advanced in a wedge formation, and then changing to a line formation (they made the use of the CS when they were in the line formation).  They made use of the CS each time that PRPB Officer # 4 (Muñoz Rivera Avenue) and PRPB Officer # 3 (Ponce de Leon Avenue) ordered the use of it.  They used the shotguns with ammunition consisting of rubber balls only when they believed it was necessary to use them, as the General Order stablishes it.  He explained that they used the CS and the shotguns with rubber balls because this is the safest way to disperse and move a violent crowd, without having to have personal contact with the protesters which would cause more and worse physical damages.

- He stated learning that Coronels PRPB Officer # 2 and PRPB Officer # 28 were also at the Ponce de Leon Avenue because he heard them in the radio communications.
- When asked, he answered that the PPR-854 forms (Use of Force forms) were filled along with the PPR-877 (Continuation page).
- When asked, he answered that he never heard anyone informing the protesters to disperse or that the CS gas was going to be used, via the use of speakers or in any other way.  He stated not having knowledge if a PRPB agent in civilian clothes was placed in the back of the protesters to hear such orders, and he did not have any knowledge if there was anyone video recording the moment the orders were given.
- When asked, he explained that he did not see any arrest, that he did not see any unidentified Police agent/officer, and that he did not know if undercover individuals/vehicles were used.
- He explained that the SWAT accomplished its mission in a satisfactory way

12. On August 16, 2017 **PRPB Officer # 2**  was interviewed as a part of the Assessment ordered by the Honorable U.S. District Court Judge Gustavo A. Gelpi, in relation to the demonstrations and incidents, involving the Puerto Rico Police and protesters, that occurred in Puerto Rico during the days of April 18, 25, and 27, 2017 and May 1, 2017; all as part of the assessment of PRPB's implementation of the "AGREEMENT FOR THE SUSTAINABLE REFORM OF THE PUERTO RICO POLICE DEPARTMENT" during its capacity building period (Item # 62).  PRPB Officer # 2 stated, in essence, the following:
- PRPB Officer # 2 explained that he is the Superintendente Auxiliar de Operaciones the Campo (PR Police Department Chief of Field Operations), and he directly supervises the administrative and operational parts of the operation of the thirteen (13) Police areas that Puerto Rico Police Department has in the island.

| TCA Assessment Report | 2018 |
|---|---|

- PRPB Officer # 2 stated that in the past he was part of the DOT (Tactical Operations Division) and that during his long career he participated in a large number of manifestations/protests/scenarios like the ones covered by this assessment.
- PRPB Officer # 2 stated that he has never been pointed out for violations of civil rights against citizens during protests/manifestations.
- PRPB Officer # 2 explained knowing and being familiar with the General Order Chapter 600 Section 625 "Manejo y Control de Multitudes" (Spanish for "Crowd Management and Control"), Section 604 "Uso y Manejo de Agentes Quimicos" (Spanish for "Use and Handling of Chemical Agents"), and with Section 620 "Normas y Procedimientos para la Utilizacion de Armas Especializadas por Miembros de las Divisiones de Tacticas Especializadas (DTE)" (Spanish for "Rules and Procedures for the Use of Specialized Weapons by Members of Specialized Tactical Divisions").
- PRPB Officer # 2 explained that before the General Order Chapter 600 Section 625 "Manejo y Control de Multitudes" entered into effect, there was a great disorganization.   Before any operation, similar to the ones covered by this assessment, they planned for any possible scenario.  He further added that back then, the guides (in the General Order) weren't clear for this type of events.

## APRIL 18, 2017

- PRPB Officer # 2 explained that he participated in this event.  PRPB Officer # 4 prepared the Operational Plan (OP) under his supervision.  He cooperated with PRPB Officer # 4 during the event from his office, as a supervisor.  He knows that they established a perimeter on the North part of the Capitol building by placing plastic barriers filled with water and they closed the South access to the building.  With these actions, they allowed the protesters to use the North part of the building to exercise their right to protest, and at the same time allowing the Legislature to perform their duties inside the capitol building.
- He stated that they did not meet with the students (protesters) before the event because, in the past, they had talked to them just before the event started.  They expected the same behavior from the protesters during this event, but it did not happen.
- He stated that the DOT personnel were placed in standby inside the building and responsible to prevent the entry of the protesters into the building.  To his best knowledge, personnel from the Special Arrest Division were there in standby as well.
- He explained that PRPB Officer # 4 was in charge of the situation and that PRPB Officer # 4 would only contact him by phone when something abnormal occurred.

For example, PRPB Officer # 4 contacted him when the perimeter was broken by the protesters and PRPB Officer # 4 decided to move the DOT from inside the building to the stairs that lead to the entrance of the capitol building.   He instructed PRPB Officer # 4 to place the DOT there, and not allow them to go to the perimeter unless a very serious situation occurred (which did not happen).

- He justified the use of force (pepper spray) because the protesters were attacking the Police by throwing objects at them, and the protesters removed some of the plastic barriers that established the perimeter (by puncturing them so the water could come out), breaking the perimeter in an attempt to enter into the Capitol building.
- He stated that to his best knowledge, the PPR-854 forms (Use of Force forms) were filled, along with the PPR-468 forms (Incident Reports) and the Critical Incident Reports.  He gave instructions for these forms to be filled.
- He stated that they did not use undercover agents/vehicles.
- Is his opinion the mission was completely accomplished because the work at the Legislature wasn't interrupted; the situation was controlled with the minimal possible use of force; there weren't major confrontations with the protesters who were allowed to exercise their right of free expression.


**April 25, 2017**
- PRPB Officer # 2 explained that he participated in this event.  At about 1PM, he was called by PRPB Officer # 33, the Officer in charge of the protection team assigned to Honorable Thomas Rivera Schatz, President of the Senate.  PRPB Officer # 33 informed him of the intention that the President of the Senate had of visiting (at 3PM) the Foundation that Sila Maria Calderon, former Governor of PR, has in Rio Piedras, PR.  He warned PRPB Officer # 33 that they would have problems because such location was very close to the University of Puerto Rico-UPR (University that at that time was locked and controlled by the students which were in a general strike), and that the location did not offer any security.  PRPB Officer # 33 informed him that the President of the senate was going there.
- PRPB Officer # 2 stated that at approximately 2:30PM he was called by a Sergeant (member of the President of the Senate's protection team) who informed him that there were already twelve (12) or thirteen (13) protesters there. PRPB Officer # 2 warned the Sergeant that at 3PM they would possibly have two hundred (200) protesters. The Sergeant informed PRPB Officer # 2 that the President of the Senate was going there anyway.  PRPB Officer # 2 instructed the Sergeant on how to approach the place, how to enter there in the safest possible way, and where to leave the vehicles to facilitate an easier exit.
- He explained that at approximately 3:30PM he was called and informed that there were approximately one hundred fifty (150) aggressive protesters and that

TCA Assessment Report | 2018

the President of the Senate was inside. He decided to send DOT personnel and Police agents in motorcycles, which were placed near the Foundation. He sent PRPB Officer # 16 to negotiate with the protesters.

- At some point, PRPB Agent # 48 contacted him and informed that the President of the Senate was about to come out. He was informed that outside everything was out of control. He told PRPB Agent # 48 that the President of the Senate should stay there, but the President of the Senate decided otherwise.
- He gave the instructions about how the DOT personnel should operate, to ensure a safe exit of the President of the Senate.
- He stated being sure that the force used by the DOT and Police agents there was completely justified.
- He informed that the mission was accomplished: the President of the Senate was safely extracted by using the minimal possible force.

**04/27/2017**
- PRPB Officer # 2 stated that he wasn't there and did not participate in it, but that he was informed of the events via telephone.

**05/01/2017**
- PRPB Officer # 2 explained that he participated in this event as the PR Police Department Chief of Field Operations. He stated that the Incident and Area Commander was PRPB Officer # 4.
- He explained that the week prior to this event, he went to a meeting held at the Hiram Bithorn stadium were Unions' leaders met to organize the event. He stated that the meeting was led by Carmen Yulin Cruz, Mayor of San Juan. They tried to enter the meeting, but they weren't allowed. They waited for approximately ten (10) minutes and they were being denied the access to the meeting, so they decided to leave.
- He stated that on May 1st, at 4AM, he was at the PR Police Headquarters Fusion Center with PRPB Officer # 29 observing the situation through the monitors they have there. They were mainly observing the situation in Bayamon where the Police was working to avoid that trucks could block the highway.
- He stated that at around 6AM they saw movement towards the airport. They rapidly informed PRPB Officer # 11 of the situation, who was already prepared for this possible event having his personnel properly and strategically placed. A bus arrived with approximately 50 individuals who left the vehicle at the Baldioroty Avenue and started walking towards the airport. These individuals arrived at the main avenue which is the entry to the airport and blocked the traffic. PRPB Officer # 11 intervened by talking and negotiating with them. The

| TCA Assessment Report | 2018 |
|---|---|

result was positive, and the protesters opened some lanes, so the traffic could pass.

- He stated that at approximately 6:45AM, Hector Pesquera (who on 04/29/2017 was designated/nominated by the Governor as the Public Security Secretary but he wasn't confirmed yet by the Senate until May 8, 2017) entered into the PRPB Headquarters Fusion Center and led a meeting in which the following individuals were present: PRPB Officer # 2, the PRPB's Commissioner, the Associated Commissioner, PRPB Officer # 28, PRPB Officer # 3 and other individuals. Pesquera ordered PRPB Officer # 3 to go to the airport and take charge of the situation there. When PRPB Officer # 3 arrived at the airport, the situation was under control.

- He stated that at approximately 7:30AM, some protesters were located near the Minillas Tunnel.

- He explained that they had agreements with some of the marches' leaders but that some of them violated the agreements and blocked the traffic in some places.

- He explained that attorney Alfonso Orona Amilivia, the main legal assessor of Governor Ricardo Rosello, arrived at the PRPB's Fusion Center and started to take control of the situation along with Pesquera. William Villafane, Secretary of the Government, also entered the Fusion Center but he only observed and did not make any comments. The PRPB's Commissioner maintained a good communication with PRPB Officer # 2. During the process, the Commissioner made decisions, so the situation could flow properly, despite having Pesquera and Orona giving instructions there.

- He explained that PRPB Officer # 4 called him when PRPB Officer # 4 was surrounded by protesters at the Muñoz Rivera Avenue. He told PRPB Officer # 4 to maintain his perimeter, regroup his agents and start moving them towards a wall that was near them, making a one-line formation. PRPB Officer # 28, PRPB Officer # 3 and PRPB Officer # 30 (from Security and Protection Division) left the Fusion Center and went to the Milla de Oro.

- He decided to leave the Fusion Center and went to the Milla de Oro as well because the situation was out of control there. He went with PRPB Officer # 29 and PRPB Officer # 34. They went to the Ponce de Leon Avenue. He talked to PRPB Officer # 3 there who told him that the situation was out of control. PRPB Officer # 3 did not know about PRPB Officer # 4's situation at the Muñoz Rivera Avenue. PRPB Officer # 4 called PRPB Officer # 2 and informed that the situation where he was located at was completely out of control, it was a riot. PRPB Officer # 28 was scared and wasn't making any decision about it so PRPB Officer # 28 asked PRPB Officer # 2, "What are we going to do?". PRPB Officer # 2 called PRPB Officer # 4 and informed him that he was sending DOT and SWAT personnel to him. PRPB Officer # 2 prepared a team of DOT, SWAT and

Special Arrests agents at Ponce de Leon Avenue. He contacted PRPB Officer # 4 again and told him that they both were going to make a simultaneous movement in both avenues, with the support of the DOT, SWAT and Special Arrests personnel in both places. At some point "Individual S", ACLU's Executive Director, and other individuals appeared there and asked if they could join them there, to what he agreed.

- At the Ponce de Leon Avenue, PRPB Officer # 2 assumed the control/leadership of the situation. PRPB Officer # 3 stayed with him. PRPB Officer # 28 limited himself to make some recommendations but never gave any instructions. PRPB Officer # 3 and PRPB Officer # 30 were under control and advanced with the group.
- PRPB Officer # 2 stated that at the CVS located at the Muñoz Rivera Avenue, some protesters attempted to get some gas containers from the pharmacy, but they were unsuccessful. Nevertheless, the protesters then started a fire, burning things in the middle of the Muñoz Rivera Avenue.
- When asked, PRPB Officer # 2 informed that DOT/SWAT never threw gas canisters towards the urban train station located at the intersection of Muñoz Rivera and Roosevelt Avenue. He had a good visual from his position and he can attest to that. He stated that SWAT only threw gas canister to the protesters that were in open spaces.
- PRPB Officer # 2 informed that there wasn't any person reported injured by the use of force they made.


13. On August 16, 2017 **PRPB Officer # 3** was interviewed as a part of the Assessment ordered by the Honorable U.S. District Court Judge Gustavo A. Gelpi, in relation to the demonstrations and incidents, involving the Puerto Rico Police and protesters, that occurred in Puerto Rico during the days of April 18, 25, and 27, 2017 and May 1, 2017; all as part of the assessment of PRPB's implementation of the "AGREEMENT FOR THE SUSTAINABLE REFORM OF THE PUERTO RICO POLICE DEPARTMENT" during its capacity building period (Item # 63). PRPB Officer # 3 stated, in essence, the following:
- PRPB Officer # 3 is the Assistant Commissioner on Criminal Investigations. His duties in this position are: the responsibility for the administration and operation of the Criminal Investigation Division of the PR Police Department (PRPB), resolving all crimes referred to his Division and the assistance to other Divisions of the PRPB when requested.
- PRPB Officer # 3 stated that during his career with the PRPB, he has worked in multiple manifestations/protests like the ones covered by this Assessment.
- PRPB Officer # 3 explained knowing and being familiar with the General Order Chapter 600 Section 625 "Manejo y Control de Multitudes" (Spanish for "Crowd

| TCA Assessment Report | 2018 |
|---|---|

Management and Control"), and with Section 620 "Normas y Procedimientos para la Utilizacion de Armas Especializadas por Miembros de las Divisiones de Tacticas Especializadas (DTE)" (Spanish for "Rules and Procedures for the Use of Specialized Weapons by Members of Specialized Tactical Divisions").

**April 18, 2017**
- PRPB Officer # 3 provided support to the PRPB units and leaders in charge of this event, by providing personnel from the CRADI (video recording section), personnel from the Explosives section and personnel of the Canine section of his Division.

**April 25, 2017**
- PRPB Officer # 3 stated he did not have any type of participation in this event.

**April 27, 2017**
- PRPB Officer # 3 stated that he had a conversation with the PRPB Commissioner a few days before this event, who ordered him to instruct his personnel to look for possible violations/crimes occurring during this event/protest.
- He provided support to the PRPB units and leaders in charge of this event, by providing personnel from the CRADIC (video recording section), personnel from the Explosives section and personnel of the Canine section of his Division.
- He established a work plan to work with specific personnel of the Drugs Division. This plan consisted in the coordination of the CRADIC personnel (video recordings), who would identify the individuals involved in the commission of crimes/violations, with the Drugs Division personnel, who would locate these individuals outside the event's area.  The CRADIC personnel, after identifying and recording the individuals committing the crimes, would pass the information to the Drugs Division personnel, who would arrest these individuals.  This coordination resulted in the arrest of two individuals for causing damages to properties.
- He stated that they did not use undercover agents.  Some of the PRPB agents were not using uniform but were properly identified.  Personnel from the Drugs Division only identified themselves at the moment of the arrests.
- He further explained that later, the review of recorded videos by the CRADIC personnel led to other arrests.

**May 1, 2017**
- PRPB Officer # 3 stated knowing of this event several days before because there was plenty of information outside and inside the PRPB.

| TCA Assessment Report | 2018 |
|---|---|

- He explained that they started preparing for this event several days before, working on the "Planes de Trabajo" (Spanish for "Operation Plans") (hereinafter referred to as "OP") and gathering intelligence. His Division was added to the OPs of the Area Commander (PRPB Officer # 4) and Carolina Area Commander (PRPB Officer # 11).
- On the day of the event, May 1st, at approximately 4:00 AM, he was at the PRPB's Fusion Center from where they were going to control all the possible events (airport, the individual marches, the Milla de Oro area …). He was there with the PRPB's Commissioner, with PRPB Officer # 2, PRPB Officer # 28 and other support personnel. From there, he went to the PRPB SAIC office, his office at the PRPB headquarters, located not far from the Fusion Center. He explained that when Mr. Hector Pesquera arrived at the Fusion Center he was not there because he was at the SAIC. He was called and instructed to go to the Fusion Center. When he arrived there, he met with Mr. Pesquera, the PRPB Commissioner, PRPB Officer # 2 and PRPB Officer # 28 who were talking about the day's events. He stated that Mr. Pesquera ordered him to go to the airport, after which he (PRPB Officer # 3) looked at the PRPB Commissioner and when not receiving any countermand from the PRPB Commissioner, he followed Mr. Pesquera's instructions. Mr. Pesquera's orders were: "destapen eso" (Spanish for "unblock that"). He selected PRPB Officer # 30 and they went to the airport with the instructions of checking the situation. Once there, he presented himself to PRPB Officer # 11 (Carolina Area Commander) and informed to him that he was there to provide support to him. PRPB Officer # 11 explained to him that they were already moving the protesters, clearing the Baldioroty Avenue. When asked, PRPB Officer # 3 explained that he did not find it unusual to be sent to the airport with the mission of providing support to PRPB Officer # 11 with anything this could need. He stated that from the airport area he maintained contact with Mr. Pesquera and with the PRPB Commissioner, who validated Mr. Pesquera's orders.
- He explained the he was the "taparrotos" (Spanish for "jack of all trades") there.
- After the events at the airport he went to have some quick breakfast. While having breakfast, he was informed of some incidents happening at the Minillas tunnel, where some protesters were and two (2) squads of the PRPB Tactical Operations Division (DOT) were trying to prevent the protesters from blocking the tunnel. He saw that there was an excess of resources there. He contacted the Commissioner at the Fusion Center and requested permission to remove the two (2) squads of DOT from there, and only leaving one (1) patrol car and some motorcyclists there. His request was granted, and the DOT personnel were relocated to their base, to stay there in standby in case they were needed anywhere else. Once they finished that, he informed the PRPB Commissioner that he was moving to the Milla de Oro area.

| TCA Assessment Report | 2018 |
|---|---|

- He said that being at the Isla Verde area; they heard from the radio that the first violent incidents had already happened at the Banco Popular. They received an order by radio from the Fusion Center instructing them to rapidly go to the Milla de Oro area.
- He explained that when they arrived at the Milla de Oro area he called PRPB Officer # 4, the Area Commander there, informing him that he was in the area. At that moment PRPB Officer # 4 and his men were still surrounded by protesters. PRPB Officer # 3 was with PRPB Officer # 30, and later PRPB Officer # 28 arrived. He explained not knowing who sent PRPB Officer # 28 there and that he never questioned him about it. He explained that since the Banco Popular was already vandalized, he ordered to protect the Banco Santander's building which hadn't been attacked yet by the protesters. When the protesters tried to attack the Banco Santander building, they made approximately three (3) arrests.
- He explained that when he was already at the Milla de Oro area, he was called by Mr. Pesquera who thought that he was with the group of Police agents that were surrounded by protesters. He immediately clarified to Mr. Pesquera that he was not with them and he informed Mr. Pesquera that PRPB Officer # 4 was the officer in charge of the surrounded group.
- He stated that, at some point, they heard some explosions caused by the protesters at the Ponce de Leon Avenue, whom were also throwing rocks and were in a very violent estate. They decided to take action, and they activated the DOT, the SWAT and the Special Arrests units. He was advancing southbound at the Ponce de Leon Avenue with these activated units, while the protesters were retreating and destroying properties. He decided to request some PRPB agents with motorcycles to try to surround the protesters from the south, but he said that when these agents arrived the operation was almost over. He affirmed that he was the lead PRPB Officer at the Ponce de Leon in coordination with PRPB Officer # 19 from the DOT.
- He explained that when they arrived at the Roosevelt Avenue, they were attacked by the protesters who were throwing all kind of objects at them. He stated that there was a specific protester, dressed in all black but wearing red shoes, that was one of the main attackers, but they could not arrest him. He said that PRPB Officer # 4 was suffering the same situation at the Muñoz Rivera Avenue. He explained that at a specific time, one rock was going to hit him, but he was saved by a PRPB agent who covered him, and was hit by the rock on his helmet.
- He stated that the protesters tried to get the gas containers from the CVS pharmacy located at the Muñoz Rivera Avenue but were unsuccessful.
- He explained that they arrived up to the Hipopotamo restaurant and they stopped there. The situation calmed there. They waited a while and then they decided to move back.

TCA Assessment Report | 2018

- He stated that they did not use undercover agents during this day's operation, or unidentified Police agents/officers.  He further explained that they use Police unidentified vehicles when they are going to make an arrest, but that the Police agents in the vehicles are properly identified.
- He explained that the way the PRPB worked during this event, demonstrated that the PRPB was prepared in a different way than during similar events that happened in the past, and that the protesters were not prepared for this change of preparation of the PRPB and they did not know how to act facing this different situation.
- PRPB Officer # 3 explained that right now, the PRPB Commissioner knows that he is working with Mr. Pesquera.  He explained that Mr. Pesquera made some requests to the Commissioner.  The Commissioner informed Mr. Pesquera that who works with what he requested was PRPB Officer # 3.  Mr. Pesquera asked the Commissioner if there was any problem in that Mr. Pesquera would communicate directly with PRPB Officer # 3, and that the Commissioner said no. He further explained that when Mr. Pesquera summons him for something, he properly informs the Commissioner about it.

14. On August 16, 2017 **PRPB Officer # 11** was interviewed as a part of the Assessment ordered by the Honorable U.S. District Court Judge Gustavo A. Gelpi, in relation to the demonstrations and incidents, involving the Puerto Rico Police and protesters, that occurred in Puerto Rico during the days of April 18, 25, and 27, 2017 and May 1, 2017; all as part of the assessment of PRPB's implementation of the "AGREEMENT FOR THE SUSTAINABLE REFORM OF THE PUERTO RICO POLICE DEPARTMENT" during its capacity building period (Item # 64).  PRPB Officer # 11 stated, in essence, the following:

- PRPB Officer # 11 explained that he is the PRPB's Carolina Area Commander. In this position, he is responsible for all the administrative and operational operations in the Carolina Police Area.  He supervises ten (10) Police stations and the investigative branch as well.
- PRPB Officer # 11 stated that he had worked in approximately twenty (20) to twenty-five (25) manifestations/protests like the ones covered by this Assessment.
- PRPB Officer # 11 explained knowing and being familiar with the General Order Chapter 600 Section 625 "Manejo y Control de Multitudes" (Spanish for "Crowd Management and Control"), and with Section 620 "Normas y Procedimientos para la Utilizacion de Armas Especializadas por Miembros de las Divisiones de Tacticas Especializadas (DTE)" (Spanish for "Rules and Procedures for the Use of Specialized Weapons by Members of Specialized Tactical Divisions").

**April 18, 2017**

| TCA Assessment Report | 2018 |

- PRPB Officer # 11 stated not having participated in this event.

**April 25, 2017**
- PRPB Officer # 11 stated not having participated in this event.

**April 27, 2017**
- PRPB Officer # 11 stated not having participated in this event.

**May 1st, 2017**
- PRPB Officer # 11 stated that he was contacted by PRPB Officer # 2 weeks before the event, and he was instructed to prepare the Operational Plan (OP) and to prepare for the May 1st event.
- He explained that he prepared the OP for his area, which was a preventive plan. He covered possible scenarios like preventing the airport's access from being blocked, like it happened in 2013.  His OP covered the surveillance and protection of the Electric Power and Water System sites located in his assigned area.
- He explained that on May 1st, he placed his personnel in the previously assigned locations.  At approximately 5:45 AM, three school buses arrived at the airport area via the Moscoso Bridge, up to the place where the letters identifying the Luis Muñoz Marin airport are located.  He was informed by a PRPB Sergeant that several individuals came out from the buses. He decided to go there.  When he arrived at the area, he explained finding a group of sixty (60) to one-hundred (100) individuals blocking the entry/exit of the airport.  At that moment, a PRPB Sergeant had already spoken to the protesters.  He had agreed with one of the leaders of the protesters that in approximately ten (10) minutes they were going to open one lane for the traffic to pass.  He respected the agreement made by the Sergeant with the protesters' leader and he spoke to this person.  He gave the legal advices to him, and he told him that they had the remaining five (5) until they had to open the lane.  After the five (5) minutes passed, the protesters opened an entry lane to the airport. After that, he made a formation with the PRPB personnel that came from Fajardo (leaded by Sergeant Perez).   He returned to talk to the protesters' leader to whom he informed that they had to open the exit way as well.  The protester's leader made a telephone call.  When PRPB Officer # 11 noticed that there was no more cooperation from the protesters, he sent the Motorized Unit to open the airport's exit way and they completed the task without any remarkable opposition.   The protesters left towards their vehicles located at the Baldioroty de Castro Avenue, specifically at the Laguna Gardens Shopping Center.  They escorted the protesters until they arrived at their vehicles and left the area.

| TCA Assessment Report | 2018 |

- He explained that they did not have to use force at any moment during the complete operation.
- He stated that from the PRPB Headquarters they sent PRPB Officer # 3 and PRPB Officer # 30. When these two Officers arrived there, he explained to them that the situation was totally under control. They stayed there with him for a while, but the situation was already resolved.

15. On August 16, 2017 **PRPB Officer # 35** was interviewed as a part of the Assessment ordered by the Honorable U.S. District Court Judge Gustavo A. Gelpi, in relation to the demonstrations and incidents, involving the Puerto Rico Police and protesters, that occurred in Puerto Rico during the days of April 18, 25, and 27, 2017 and May 1, 2017; all as part of the assessment of PRPB's implementation of the "AGREEMENT FOR THE SUSTAINABLE REFORM OF THE PUERTO RICO POLICE DEPARTMENT" during its capacity building period (Item # 65). PRPB Officer # 35 stated, in essence, the following:

- PRPB Officer # 35 explained that she is the Director of the "Negociado de Drogas, Narcoticos, Control del Vicio y Armas Ilegales' (Spanish for "Drugs, Narcotics, Vice Control and Illegal Weapons Division").
- PRPB Officer # 35 stated that she had worked in approximately ten (10) manifestations/protests similar to the ones covered by this Assessment.
- PRPB Officer # 35 stated knowing and being familiar with the General Order Chapter 600 Section 625 "Manejo y Control de Multitudes" (Spanish for "Crowd Management and Control"), and with Section 620 "Normas y Procedimientos para la Utilizacion de Armas Especializadas por Miembros de las Divisiones de Tacticas Especializadas (DTE)" (Spanish for "Rules and Procedures for the Use of Specialized Weapons by Members of Specialized Tactical Divisions").

## April 18, 2017
- PRPB Officer # 35 stated not having participated in this event.


## April 25, 2017
- PRPB Officer # 35 stated not having participated in this event.

## April 27, 2017
- PRPB Officer # 35 stated not having participated in this event.

## May 1st, 2017
- PRPB Officer # 35 stated that PRPB Officer # 3 asked her to prepare an Operational Plan for her Division related to the May 1st, 2017 event, day of the National Strike.

| TCA Assessment Report | 2018 |
|---|---|

- She explained that the mission of the personnel that she assigned to the event was to observe individuals committing crimes, and to provide the information to the Special Arrests agents so they could execute the arrests.
- She stated that the agents that she assigned from her Division were wearing civilian clothing, but they were properly identified. She assigned PRPB Officer # 12 to supervise her personnel during the operation. PRPB Officer # 12 reported to PRPB Officer # 3 during the event.
- She affirmed that none of her assigned agents had to use force during this day's operation.

16. On August 29, 2017 **PRPB Agent # 40** was interviewed as a part of the Assessment ordered by the Honorable U.S. District Court Judge Gustavo A. Gelpi, in relation to the demonstrations and incidents, involving the Puerto Rico Police and protesters, that occurred in Puerto Rico during the days of April 18, 25, and 27, 2017 and May 1, 2017; all as part of the assessment of PRPB's implementation of the "AGREEMENT FOR THE SUSTAINABLE REFORM OF THE PUERTO RICO POLICE DEPARTMENT" during its capacity building period (Item # 66). PRPB Agent # 40 stated, in essence, the following:

- PRPB Agent # 40 informed being the supervisor of the SWAT squad that was assigned to provide support to PRPB Officer # 4 on May 1st, 2017 at the Muñoz Rivera Avenue, Milla de Oro, San Juan, PR. He stated that on such day, between 2:00 PM and 2:20 PM, he was assigned, with the members of his squad, to move with DOT personnel at such avenue, to be part of the team led by PRPB Officer # 4
- PRPB Agent # 40 informed that at that time the protesters were vandalizing several locations in the area and they were also attacking the Police. PRPB Officer # 4 authorized the SWAT to use chemical agents. He stated that PRPB Officer # 24 was present there at that moment, and he authorized PRPB Agent # 40 to use chemical agents. This happened in front of the Popular Center (in direction of the 65th Infantry Avenue).
- PRPB Agent # 40 explained that the chemical agents, weapons and less than lethal ammunition that they used that day were the following:
- MK-9 aerosol (large pepper spray container)
- CS canisters. They are thrown by hand, under the arm, like in the softball game.
- 37 mm shotgun (known as the Gas Gun). Uses cylindrical ammunition that stays in the gun and it releases the gas. They used it when they wanted to disperse protesters located at approximately 75 meters.
- 12 mm shotgun. They used it to shoot rubber pellets, but not directly to the protesters.

| TCA Assessment Report | 2018 |
|---|---|

- PRPB Agent # 40 provided copy of an internal memorandum dated May 3, 2017, which lists the less than lethal weapons that they had that day. PRPB Agent # 40 asked that this Memorandum be treated with confidentiality because it discloses all the weapons' serial numbers (Item # 67).
- PRPB Agent # 40 explained that when the protesters were located very close to the DOT, they used the MK-9 spray to disperse them. When they wanted to disperse the protesters that were not that close but that were attacking the Police by throwing objects to them, they used smoke grenades (to psychologically affect them because they do not contain irritant gas) and at the same time, the smoke produced by these grenades informed them of the wind's direction at the moment. If these protesters would not disperse after the smoke grenades, they used the CS canisters to disperse them. After each use of chemical agents, they waited to verify the crowd reaction and advance some distance (if it was deemed safe) rescuing, in this way, the location that was being vandalized by the protesters before the use of the chemical agents. They proceeded with this course of action for several times. In some specific instances, they had to use the Gas guns and the 12-mm shotgun.
- PRPB Agent # 40 explained that when they arrived at the Muñoz Rivera Avenue, intersection with Roosevelt Avenue, part of the crowd moved to the Roosevelt Avenue in direction to Plaza las Americas, and other protesters continued Muñoz Rivera Avenue (southbound to 65th Infantry Division). DOT made its formation in the same exact intersection and they (SWAT) formed behind them. He stated that they did not use any chemical agents at the intersection; it was before getting to the intersection that they used them. After being attacked by protesters at the Roosevelt Avenue, DOT moved to the Roosevelt Avenue (direction to Plaza las Americas) and stopped in the middle of the avenue under a bridge that connects the two parts of the Tren Urbano entries. From this location, under the bridge, SWAT used CS gas against the protesters to repeal their aggressions. He perfectly remembered that the wind was blowing towards Plaza las Americas, and it could not go back to where they were located.
- When asked, PRPB Agent # 40 explained that neither SWAT nor DOT personnel moved towards the Tren Urbano entries of the Roosevelt train station, and that they never broke the formation they had. He added that he never saw any Police Officer near the entries to the Tren Urbano station and that no chemical agents were thrown in direction to the station.
- When asked, PRPB Agent # 40 stated having no clue on how the Tren Urbano station's doors work.

17. On September 14, 2017 Puerto Rico Police Commissioner Colonel Michelle Hernández de Fraley was interviewed as a part of the Assessment ordered by the Honorable U.S. District Court Judge Gustavo A. Gelpi, in relation to the

TCA Assessment Report | 2018

demonstrations and incidents, involving the Puerto Rico Police and protesters, that occurred in Puerto Rico during the days of April 18, 25, and 27, 2017 and May 1, 2017; all as part of the assessment of PRPB's implementation of the "AGREEMENT FOR THE SUSTAINABLE REFORM OF THE PUERTO RICO POLICE DEPARTMENT" during its capacity building period (Item # 68). Puerto Rico Police Commissioner Colonel Michelle Hernández de Fraley (hereinafter referred to as the Commissioner) stated, in essence, the following:

- The Commissioner was asked about what models or structures the PRPB has created to contact and communicate with the organizers of events or constitutional activities, as soon as the PRPB has knowledge of them, to comply with Section 625 of Chapter 600 of the General Order. She stated that the PRPB hasn't created any specific model, but she had instructed the Area Commanders to approach these organizations as soon as they have knowledge, so they can coordinate with them. She further explained that when this contact is not possible before the event, they establish contact and dialogue at the moment in which the event happens.

- The Commissioner explained that she learned about the April 18 and 27, 2017 events a few days before through the Area Commanders. She learned about the May 25, 2017 event at the last moment, when she received a panic call informing of the imminent event. She explained that she learned about the May 1st, 2017 event a few days before. She met with the Unions' leaders and coordinated with them. They asked permission to place a stage at the Milla de Oro and she agreed to it. They informed that they would march from different points to the Milla de Oro, and she agreed to it.

- The Commissioner informed that on May 1st, when Alfonso Orona, Esq. arrived at the Fusion Center, it was not a surprise because they coordinated this visit before. She did not expect the visit of Mr. Hector Pesquera, despite that she met with him a few days before and informed him about the May 1st event. She explained that in front of her, Mr. Pesquera ordered PRPB Officer # 3 to go to the airport and solve a problem there with some protesters. She explained that she did not confront Mr. Pesquera because she knew that the problem at the airport was already under control, and she did not want to create unnecessary tension, "Why fight if the problem was already solved?" She further added that she did not oppose to Mr. Pesquera's order because this was going to unnecessarily heat the situation. She stated that, later, PRPB Officer # 3 spoke to her because he did not feel comfortable with what happened, him obeying Mr. Pesquera's order. She stated that while at the Fusion Center, Orona Esq. made comments but he did not give any order at all.

- The Commissioner explained that if Colonels PRPB Officer # 28 and PRPB Officer # 3 would have gone to the Ponce de Leon Avenue sent by Mr. Pesquera, this would have been an intrusion in the Chain of Command (See footnote in the last paragraph).  She added that PRPB Officer # 3 could have gone to the Ponce de Leon Avenue, because he had part of his assigned personnel there.
- The Commissioner admitted that Mr. Pesquera tried to break the Chain of Command, but that he failed because Colonels PRPB Officer # 4 and PRPB Officer # 2 followed her orders.
- Note: With this explanation, the Commissioner was admitting that following an order made by Mr. Pesquera constituted an intrusion, a break, in the Chain of Command, which exactly happened when Mr. Pesquera ordered PRPB Officer # 3 to go to the airport to fix the situation there.

18. PRPB Officer # 4 was interviewed again as a part of the Assessment ordered by the Honorable U.S. District Court Judge Gustavo A. Gelpi, in relation to the demonstrations and incidents, involving the Puerto Rico Police and protesters, that occurred in Puerto Rico during the days of April 18, 25, and 27, 2017 and May 1, 2017; all as part of the assessment of PRPB's implementation of the "AGREEMENT FOR THE SUSTAINABLE REFORM OF THE PUERTO RICO POLICE DEPARTMENT" during its capacity building period (Item # 69).  PRPB Officer # 4 stated, in essence, the following:

- PRPB Officer # 4 explained being the Incident Commander for the April 18 and 27, 2017 and the May 1st, 2017 events.  He stated that during the April 18 and 27, 2017 events, neither the students nor the Unions delivered any information about the events, prior to them, to the PRPB.  He accepted that the PRPB did not make any contact with the organizers of the events, prior to the events, as Section 625 of Chapter 600 of the General order requires. They talked to the protesters on the same day of the event, at the event's site.
- PRPB Officer # 4 stated that, prior to the May 1st, 2017 event, he met with "Individual R" (a representative of some of the protesters) and coordinated with him.  He also explained that the Commissioner met with representatives of the Unions in her office, and they talked about the stage area and the marches they were planning to do.
- PRPB Officer # 4 stated that in the three events, he informed PRPB Officer # 2 as soon as he learned about them.  PRPB Officer # 2 then informed the Commissioner.
- PRPB Officer # 4 explained that on May 1st, 2017, at the Milla de Oro, PRPB Officer # 2 activated the DOT and SWAT Units.  He informed that at the Muñoz Rivera Avenue, where he was the Incident Commander, SWAT used

| TCA Assessment Report | 2018 |
|---|---|

the CS gas and rubber balls' ammunition in several occasions against the protesters.

19. PRPB Officer # 3 was interviewed again as a part of the Assessment ordered by the Honorable U.S. District Court Judge Gustavo A. Gelpi, in relation to the demonstrations and incidents, involving the Puerto Rico Police and protesters, that occurred in Puerto Rico during the days of April 18, 25, and 27, 2017 and May 1, 2017; all as part of the assessment of PRPB's implementation of the "AGREEMENT FOR THE SUSTAINABLE REFORM OF THE PUERTO RICO POLICE DEPARTMENT" during its capacity building period (Item # 70).  PRPB Officer # 3 stated, in essence, the following:

- PRPB Officer # 3 explained that when they received information that the above four events would happen, the information rapidly flew through the Chain of Command up to the Commissioner.
- PRPB Officer # 3 informed that when on May 1st, 2017 Mr. Hector Pesquera ordered him to go to the airport and told him "Destranca Eso", he understood that the order was to go to the airport and ensure that the traffic would flow.
- When asked about who gave him the order to go to the Ponce de Leon Avenue, he stated that on the way back from the airport they were listening through the Police radio about the evolving events, and he decided to go there.  He explained that his position as Assistant Commissioner allowed making such decisions.  He stated that he maintained communication with the Commissioner and with Mr. Pesquera, who told him to help PRPB Officer # 4.  He explained that the operation at the Ponce de Leon Avenue was led by PRPB Officer # 2.
- PRPB Officer # 3 informed that PRPB Officer # 2 and PRPB Officer # 4 activated the DOT and SWAT at the Ponce de Leon and Muñoz Rivera Avenues.  He explained that at the Ponce de Leon Avenue, SWAT used the CS gas and the rubber balls' ammunition in several occasions against the protesters.

20. PRPB Officer # 2 was interviewed again as a part of the Assessment ordered by the Honorable U.S. District Court Judge Gustavo A. Gelpi, in relation to the demonstrations and incidents, involving the Puerto Rico Police and protesters, that occurred in Puerto Rico during the days of April 18, 25, and 27, 2017 and May 1, 2017; all as part of the assessment of PRPB's implementation of the "AGREEMENT FOR THE SUSTAINABLE REFORM OF THE PUERTO RICO POLICE DEPARTMENT" during its capacity building period (Item # 71).  PRPB Officer # 2 stated, in essence, the following:

- PRPB Officer # 2 explained that on the events of April 18 and 27, 2017, PRPB Officer # 4 was the Incident Commander and that on the April 25, 2017 event there wasn't one because it was a reaction to an emergency.  He stated that for the May 1st event, PRPB Officer # 4 was the Incident Commander, but later

| TCA Assessment Report | 2018 |
|---|---|

Colonels PRPB Officer # 28, PRPB Officer # 30 and PRPB Officer # 3 were sent there.

- PRPB Officer # 2 explained that on May 1st, when Mr. Hector Pesquera and Alfonso Orona, Esq. arrived at the Fusion Center, the following individuals were present there: the Commissioner, PRPB Officer # 3, PRPB Officer # 28, PRPB Officer # 29, PRPB Officer # 30, and other individuals that he doesn't remember. Mr. Pesquera ordered PRPB Officer # 3 to go to the airport and take charge of the operation there. He stated that Orona Esq. asked questions but never gave orders.

- PRPB Officer # 2 explained that when Mr. Pesquera ordered PRPB Officer # 3 to go to the airport and told him "Destranca esto", he understood that the order consisted on going to the airport to move the protesters. He stated that Mr. Pesquera asked him why they did not place a locking device on the tires' of the buses used by the protesters, and that he answered to Mr. Pesquera that these devices weren't legal in the island, and that they did not have them.

- PRPB Officer # 2 explained that prior to the May 1st, 2017 event, he went with PRPB Officer # 4 to the Hiram Birthon stadium, where the organizers where having a meeting, to participate on it but they were denied the entry. He stated knowing that the Commissioner had communications with the Labor Unions' leaders about the event.

- PRPB Officer # 2 stated that when they found out about the events, the information rapidly flew through the Chain of Command up to the Commissioner.

- PRPB Officer # 2 explained that he activated the DOT and SWAT at the Ponce de Leon Avenues and PRPB Officer # 4 did it at the Muñoz Rivera Avenue. He explained that at the Ponce de Leon Avenue, SWAT used the CS gas (grenades and gas gun) and the rubber balls' ammunition in several occasions (between 5 and 10 times).

# IV.D Analysis of Interview Data

1. The statement provided during the meeting with personnel of the ACLU was the following: *"Some participants of the manifestation fled and entered the Roosevelt Train Station, and the PRPB threw CS gas against them while they were entering the station, and then the Police Agents closed the doors of the station. Identified Observers informed to various Police agents what happened, and they didn't take any action towards helping the individuals trapped inside the station with the gas."*, and the

article written by Elliot Castro Tirado appear to be in complete contradiction with the statement of "Witness B", the Tren Urbano's manager that was present there during the event and who informed the following: "no gas was thrown into the train station by the Police and the Police did not close the doors of the station. The Tren Urbano personnel closed the station's doors as a security measure, following their management's decision." The ACLU and the Castro Tirado statements are also in contradiction with the statements made by the SWAT personnel responsible for the tactical/defensive use of the CS gas in the area, who affirmed that they never tossed/propelled any chemical agent inside the station. Castro Tirado stated in his article that the gates of the station were suddenly closed, a fact that matches with the statement of "Witness B", the manager of the Tren Urbano, who informed that his personnel closed the stations doors. "Witness B" stated that "when they closed the entry doors to the station, the wind blew a large amount of CS gas into their direction, which affected him and many other people" (already inside the station). Unfortunately, IC Jose Pujol hasn't found any clear and proving video recording showing what exactly happened there, which could have helped clarifying if the protesters were affected by the gas as explained by the Tren Urbano's manager, or as explained by the ACLU and "Witness A". Nevertheless, video recordings provided by the PRPB on 12/01/2017 show SWAT personnel deploying CS gas in several occasions at the Muñoz Rivera and Chardon Avenues intersection, and at the Chardon Avenue just below the train station's bridge that crosses over the avenue. The images also show that the wind was moving the gas from East to West, which could corroborate the statements of the "Witness B", in regards that the wind was bringing gas from outside the station to inside the station.

2. Personnel from the TCA Office asked to the ACLU, in several occasions, for copies of the video recordings made by them on the day of the event. The reason behind this request was to see video recordings taken from the field by individuals that participated as observers, which could enormously help to provide a complete picture of the events, and to corroborate or deny statements made by all parties related to this event. The ACLU's never changing response to this request was that they would not provide copies of the videos because the Assessment was only for the parties, and it would not be available to the public. On September 13, 2017 IC Jose Pujol sent a new email communication to the ACLU's Director (with copy to another ACLU member) informing that the Assessment Report would be made public, and requesting again the

chance to review any video recording in their possession. IC Jose Pujol never received a response to his e-mail communication. On November 16, 2017 IC Jose Pujol sent a reminder e-mail communication to the ACLU. This e-mail was answered on the same day by "Individual S" from the ACLU, who informed the following: "I am entrusting this request to "Individual T", who is in charge of follow-up on matters of the police reform". Copies of both e-mail communications identified as Item# 78. At the closure of this report, IC Jose Pujol has not been contacted by "Individual T". IC Jose Pujol wants to emphasize that he tried in many occasions to meet with the ACLU to review the video recording evidence in their possession, but all attempts failed because lack of cooperation by the ACLU.

3. A photograph was provided by "Witness C", the representative of the Bar Association casting a doubt to the statements made by several sources stating that some PRPB units located near the intersection of Muñoz Rivera and Chardon Avenues (almost half way towards the Seaborne Plaza), were unable to leave the area, or to leave the encirclement made by the protesters around them. Looking at the photograph, it appears that this photograph was taken of the PRPB units when they were at the exact intersection of Muñoz Rivera and Chardon Avenues, not when the PRPB units were surrounded by protesters half way towards the Seaborne Plaza. The reviewed television images corroborated that for a long period of time, the group of Police Officers located half way towards the Seaborne Plaza, at Muñoz Rivera Avenue, was surrounded completely by protesters. The photograph provided by "Witness C" could have been taken at the later stages of this episode, before these Police Units finally left the area. With this conclusion, IC Jose Pujol does not attempt at all to infer nor conclude that the incursion of the PRPB personnel towards the stage are was an appropriate tactical movement. It is intended only to explain that the photograph provided is not proof that the PRPB personnel could easily leave the area when they were encircled by the protesters.

4. Interviews to PRPB personnel revealed a few situations worth analyzing:
   • The PR Police Department has not created any models or structures to comply with Section 625 of Chapter 600 of the General Order where it states: "The Area Commander or his representative will make every possible effort to establish contact and communication with the organizers of the event or the leaders of constitutional activity or manifestation so necessary information on the event it can be collected and to ensure appropriate human resources allocation". The Commissioner was asked

| TCA Assessment Report | 2018 |
|---|---|

about it, and she stated that the PRPB hasn't created any specific model, but she had instructed the Area Commanders to approach these organizations as soon as they had knowledge, so they could coordinate with them. She further explained that when contact is not possible prior to the event, they establish contact and dialogue the moment in which the event takes place. Interviews with PRPB Officer # 4, the Incident Commander on the April 17 and 18, 2017 events admitted not having made any effort to contact the organizers of the events prior to them. Only on the May 1st, 2017 event there was a contact with the organizers and the PRPB complied with Section 625. It should be noted that the April 25, 2017 incident qualified as an emergency, and there was no time to proceed with this attempt to establish contact with organizers, a contact that could also had been worse for the PRPB's operation.

- The evidence showed that the PRPB Chain of Command was broken during the May 1st event. Mr. Hector Pesquera, who was designated/nominated by the Governor as the Public Security Secretary but had not been confirmed by the Senate as of May 1st 2017, when this event happened, gave operational orders to high ranking officers of the PRPB during the course of the event.

During the interview of PRPB Officer # 2, who was located at the PRPB Fusion Center, he stated that on May 1st, 2017, when Mr. Hector Pesquera and counsel Alfonso Orona arrived at the Fusion Center, the following individuals were present there: the PRPB Commissioner Michelle Hernandez de Fraley, PRPB Officer # 2, PRPB Officer # 3, Col. PRPB Officer # 28, PRPB Officer # 29, PRPB Officer # 30, and other individuals that he doesn't remember. Mr. Pesquera ordered PRPB Officer # 3 to go to the airport and take charge of the operation there. He stated that counsel Orona asked questions but never gave orders. PRPB Officer # 2 explained that when Mr. Pesquera ordered PRPB Officer # 3 to go to the airport and told him "Destranca esto", he understood that the order consisted on going to the airport to move the protesters. He stated that Mr. Pesquera asked him why they didn't place a locking device on the tires of the buses used by the protesters, and that he replied to Mr. Pesquera that these devices weren't legal in the island, and that they didn't have them.

During the interview of PRPB Officer # 3, he stated that when Mr. Hector Pesquera arrived at the Fusion Center he was not there because he was at the SAIC. He was called and instructed to go to the Fusion Center.

When he arrived there, he met with Mr. Pesquera, the PRPB Commissioner, PRPB Officer # 2 and PRPB Officer # 28 who were talking about the day's events. He stated that Mr. Pesquera ordered him to go to the airport, at which time he (PRPB Officer # 3) looked at the Commissioner and not receiving any countermand from the Commissioner, he followed Mr. Pesquera's instructions. Mr. Pesquera's orders were: "destapen eso" (Spanish for "unblock that")". (Note: In one interview PRPB Officer # 3 used the Spanish word "Destapen" and in another one he used the Spanish word "Destranquen", which both have a similar meaning in this situation, which is "unblock or unlock").

During the interview with PRPB Commissioner, she stated that on May 1st. 2017, when Alfonso Orona, Esq. arrived at the Fusion Center, it was not a surprise for her because they had coordinated this visit before. She didn't expect the visit of Mr. Hector Pesquera, even though she met with him a few days before and informed him about the May 1st. event. She explained that in front of her, Mr. Pesquera ordered PRPB Officer # 3 to go to the airport and solve a problem there with some protesters. She explained that she didn't confront Mr. Pesquera because she already knew that the problem at the airport was already under control, and she didn't want to create unnecessary tension. She further commented, "Why fight if the problem was already solved?". She added that she didn't oppose Mr. Pesquera's order because this was going to unnecessarily heat the situation. She stated that, later, PRPB Officer # 3 spoke to her because he didn't feel comfortable with what had happened, that is, him obeying Mr. Pesquera's order. She stated that while at the Fusion Center, counsel Orona made comments but he didn't give any order at all.

The TCA has no information on whether Mr. Pesquera had any working knowledge of the "Agreement for the Sustainable Reform of the Puerto Rico Police Department" or the mandates of General Order, Chapter 600, Section 625, titled "Manejo y Control de Multitudes" (Spanish for "Crowd Management and Control" when he arrived at the Fusion Center and gave a direct operational Order to a PRPB Colonel. However, IC Jose Pujol knows the following:

- When Mr. Hector Pesquera gave an Operational Order to a PRPB Colonel related to the day's operation, he had not been confirmed by the Senate, his appointment did not qualify as a "recess appointment" because the Senate was in session and Law 20 of 2017, creating the Public Security Agency would not come into effect until October 10, 2017, that is, there

was not an Agency of Public Security. Furthermore, and most important, he was not part of the Chain of Command on this day's Police Operation. Mr. Pesquera had been appointed/nominated by the Governor as Secretary of Public Security on 04/29/2017, but was not confirmed by the PR Senate until May 8, 2017, thus he was not yet confirmed by the Senate on May 1st, 2017

- The Law of the Department of the Public Security of Puerto Rico, Law Number 20 of April 10, 2017 (Item # 73), in its Article number 1.04 (Department of Public Security; Authority) established the creation of the position of Secretary of the Department of the Public Security of Puerto Rico.   Article 9.07.-Vigencia (Spanish for "Validity") of this Law, establishes that "this Law shall take effect one hundred and eighty (180) days after its approval. However, Articles 1.03, 1.04, 1.13, 1.14 and 9.02 will begin to apply immediately".

  A reading of the Law establishes that the remaining Articles will take effect 180 days after the Law's approval (April 10, 2017), including Article 1.05. Titled "Deberes y Facultades del Secretario" (Spanish for "Duties and faculties of the Secretary").   The aforesaid Article establishes that the Secretary shall have, without limitation, the following duties and powers:

  > (b) Shall have the hierarchical authority, administration and immediate supervision of the Department of Public Security.
  > (h) Will plan, organize, supervise, coordinate, manage, direct and control all the activities that are developed in the "Negociados" (Spanish for "Bureaus") that are created under this Law.

- An article of the Legal Review of the Law School of the University of Puerto Rico (Revista Juridica), entitled "Successive Recess Appointments: Stripping of the Senate's Faculty of Advice and Consent? (Item # 74), explains that the Constitution of Puerto Rico establishes that the Governor may make "appointments" when the Legislature is not in session. Calendar of Activities of the PR Senate for the month of April 2017 (Item # 75) and Calendar of Activities of the PR Senate for the month of May 2017 (Item # 76), show that the PR Senate was in session during the months of April and May of 2107.

- The same article of the Legal Review of the University of Puerto Rico, (Item # 74), explains that the Governor has the power to make Interim Appointments. But in this scenario, the person assuming the position will acquire all the obligations, responsibilities and faculties of the person that he substitutes.  In our

| TCA Assessment Report | 2018 |
|---|---|

scenario, there was no prior Secretary of Public Security, therefore no Interim Appointment could have been made.

In view of the above and after consulting legal counsel on this issue, it is submitted that when Mr. Hector Pesquera gave an Operational Order to a PRPB Colonel related to the day's operation, he broke the Puerto Rico Police Bureau's Chain of Command on this day's Police Operation.

- The PRPB personnel interviewed stated knowing that the PPR-854 Use of Force forms were to be filled out and submitted to the system. The requests for copies of PPR-854 forms made by the TCA to the PRPB were answered in witting (and signed by a high-ranking officer) that they were not prepared because no Use of Force was made during those events. IC Jose Pujol met with "Individual U" who was recently appointed as the "Superintendente Auxiliar de Responsabilidad Profesional (SARP)" (Spanish for "Deputy Commissioner for Professional Responsibility (SARP)"). IC Jose Pujol requested from "Individual U" to check for all Use of Force forms related to these events submitted to the SARP. "Individual U" agreed to make the search and to meet with IC Jose Pujol on 08/29/2017. On that date, the Use of Force forms were reviewed by IC Jose Pujol. On September 14, 2017 PRPB Officer # 36 informed IC Jose Pujol that the PRPB refused to provide copies of the Use of Force forms to the T.C.A., but that IC Jose Pujol could check the forms again if he believed it necessary. A second review took place on November 20, 2017.

- The analysis of the interviews to the PRPB personnel revealed that the Operational Plans for the May 1, 2017 event did not consider nor foresaw how complicated this event could be. The Incident Commander, PRPB Officer # 4, who was trapped among protesters during a long period of time, was supposed to run the complete operation, something that proved to be, in the best scenario, inadequate operational strategy. Despite the lack of foreseeability in the Operational Plan, the evidence showed that the PRPB was able to react and displayed the ability to rapidly correct the situation when PRPB Officer # 2 (in agreement with the Commissioner) decided to leave the PRPB Headquarters and he went to the Ponce de Leon Avenue and took charge of this scenario, while PRPB Officer # 4 regrouped to control the situation at Muñoz Rivera Avenue. Notwithstanding the aforesaid, this reflected a strategically compromised Operational Plan. It was previously pointed out and reiterated that the OPs should provide instruction for possible foreseeable evolving scenarios.

- PRPB Officers interviewed conceded that the PRPB failed by not providing repetitive information to the protesters, via loud speakers, about: 1) the violations they were committing; 2) informing them of the dispersal order; 3) and informing them about the routes to be taken to leave the area. In the event they would have complied with the

| TCA Assessment Report | 2018 |
|---|---|

aforesaid requisites, the also failed, by not having placed a Police officer in civilian clothes in the back of the protesters to listen to the previous stated communications/orders from the Police to the protesters. They also failed by recording when these orders were given and the response of the protesters, pursuant to General Order Chapter 600 Section 625. It should be noted that the officers interviewed argued that this part of the General Order is difficult to follow in some scenarios, but they were honest and never tried to hide the fact that they failed by not doing it.

The TCA submits that if the PRPB would have complied with the above described General Order, mainly by providing the repetitive information to the protesters via loud speakers, it might have deterred the resistance of some of the protesters and their involvement in aggressive behavior, thus diminishing having the need to employ justified Use of Force in some instances.

- While interviewing PRPB personnel it appeared that they do not understand the importance of filling one (1) PPR-854 form for each single Use of Force. It is submitted that some of the interviewed personnel, including high ranking Officers, understand they must report Use of Force in a general way, instead of reporting each single Use of Force in a separate PPR-854, as the General Order mandates. This critical issue must be seriously addressed by the PRPB immediately.

# Section V: Review of the Self-Assessment Conducted by the PRPB

## V.A Review of After-Action Reports (AARs)

The PRPB verbally informed that the four AARs of the four events covered by this assessment were not prepared immediately after the events.

| TCA Assessment Report | 2018 |
|---|---|

On November 14, 2017 the TCA gave a presentation of the main findings related to this assessment to personnel of USDOJ, PR Department of Justice, PR Police Department and the TCA's core team.  At the end of the presentation, a PRPB officer from the Reform Unit informed the TCA that they were planning to deliver their self-assessment reports (AARs) to him on November 20, 2017.  By November 28, 2017 those AARs had not been delivered by the PRPB.

On December 1st, 2017, at approximately 3:30 pm, the PRPB's AARs were delivered to the TCA's Office.  The four AARs, one for each of the four events covered by this Assessment, were compiled in one single 26-page report.  Each AAR is individually analyzed herein as follows:

1. **April 18, 2017 event:**

   - The AAR states that PRPB Officer # 37 acted as the Incident Commander for the event without being properly assigned.
   - The AAR states that they could not tell from looking at the PRPB documents if there was a scheduled meeting with the event's organizers before the event.
   - The AAR contains several findings ("Conclusiones") and provides numerous Recommendations.  This AAR document is included as "Item # 84" and contains the referred to "Findings and Recommendations."

**FINDINGS on the AAR - April 18, 2017 event:**

   - The AAR fails to inform that the PRPB reported to the TCA that no PPR-854 forms were prepared informing the Use of Force during this event "because no use of force was used (sic)".  The evidence shows this is an incorrect statement.
   - The Operational Plan for the event, at page 6, section VI. "Control y Mando" (Spanish for "Command and Control"), reports PRPB Officer # 4 was the highest Officer assigned to the Command and Control of the event.  In the interview of PRPB Officer # 4, on 08/15/2017, he stated that during the event, the orders established in the OP and the Chain of Command were never altered.  In the second interview of PRPB Officer # 4 on 09/14/2017, he explained he was the IC for the April 18 and 27, 2017 and the May 1st, 2017 events.  A review of the video recordings of the event reflects PRPB Officer # 4 was in charge of the field decisions.  Notwithstanding the aforesaid PPR-174 ("Report on Constitutional Activities and Civil Disturbances") states PRPB Officer # 37 was the

| TCA Assessment Report | 2018 |

Incident Commander (IC), the evidence shows that the "de facto" Incident Commander was PRPB Officer # 4.

- The PRPB states that they could not observe in the PRPB documents proof of the existence of a scheduled meeting with the event's organizers before the event.   The AAR fails to reveal a fact that is well known to them: In the interview of PRPB Officer # 4 on 09/14/2017, where other PRPB personnel was present, he stated that during the April 18 and 27, 2017 events, neither the students nor the Unions provided prior information about the events. Likewise, he admitted that the PRPB did not make any prior effort to contact the organizers of the events as required by Section 625 of Chapter 600 of the General order.  They met with the protestors on the same day of the event, at the event's site.  The AAR also failed to inform this important fact.

- The PRPB's After Action Report failed to include/report all pertinent facts that qualify as findings. Reference is made to details found by IC Jose Pujol, which are pointed out in this report.

- The PRPB's AAR is limited in that it failed to provide appropriate recommendations pursuant to the referenced General Order. There is a specific PRPB recommendation that challenges the mandates of Section 625 of the General Order. Pursuant to that section the IC shall place one or several members of the PPRB in the rear part of the crowd to hear any dispersal order and to be able to inform the IC that the order was heard by the protesters. Contrary to the letter of the Order, concerns are expressed regarding the safety of the PRPB personnel placed "within" the crowd. IC Jose Pujol suggests these concerns should be properly presented to the TCA Office and US DOJ for the next revision of the policy.

## 2. **The April 25, 2017 event:**

- The AAR provides a very brief description of the event with three (3) reported uses of force. It fails to clearly identify who was the IC coupled with the nonexistence of an OP and a brief explanation of the events reporting that there were fifteen (15) members of the PRPB which resulted injured. There is some information about training but information that no arrests were made in a violent event where fifteen agents were injured borders on the incredible.   There is no follow up information on the possibility of arresting anyone for the alleged aggressions.   Conclusions and recommendations regarding this occurrence are limited.

| TCA Assessment Report | 2018 |
|---|---|

## FINDINGS for the AAR - April 25, 2017 event:

- The evidence reflects the event/occurrence as unplanned. The event developed from an unscheduled incident. The evidence available is diffuse to the point it's difficult to establish who fared as the event's IC. The reason for the nonexistence of an OP responds to the fact that the protesters suddenly turned aggressive.

- The evidence showed the undersigned that despite this being an unplanned event, no excessive use of force by Police agents (DOT) was observed in the video recordings, a fact in concurrence with the PRPB's AAR.

- IC Jose Pujol must emphasize the fact that the documents provided by the PRPB reflected that there were seventeen (17) injured members of the PRPB during the event in open contradiction to the fifteen (15) injured as per the AAR reports.

- The AAR reports that that there were three (3) reported uses of force. The evidence examined showed that it was appropriate for the PRPB personnel present at the scene to use some levels of less-than-lethal force against the protesters to assure the safety of the Senator and police personnel. However, the reporting and documenting of this use of force by PRPB is inadequate.

  - The evidence showed that the PRPB prepared two (2) Use of Force Reports (PPR-854), and three (3) PRPB Supplemental Reports (PPR-877). One use of force was reported on a PPR-854. Information regarding the two (2) additional uses of force was reported on PPR-877 forms. The AAR failed to inform that this is another instance that reflects lack of proper reporting and training on reporting use of force. A use of force by a member of the PRPB cannot be reported on a Supplemental Report. A supplemental report is only to be prepared to provide additional information.

  - The AAR failed to report that no PPR-854 forms, Use of Force reports, were prepared regarding the use of the Taser and the use of the batons by escort team personnel assigned to escort the Senate President.

| TCA Assessment Report | 2018 |
|---|---|

- The AAR failed to report/comment the lack of training and preparation of the Senator's escort personnel for events requiring crowd control.

- The AAR failed to report that the review of the video recordings and PRPB's own reporting of the incident, reveal that additional use of force incidents by members of the PRPB at this event went unreported.  In view of the aforesaid the PRPB also failed to fill a considerable number of PPR-854 Forms according to the mandates of PRPB General Order Chapter 600 Sections 604, 605 and 625.

### 3. April 27, 2017 event:

- The AAR states that the PRPB documents do not establish who the IC was.
- The AAR informs that they could not determine from the PRPB documents if there was a previous scheduled meeting with the event's organizers.
- Accordingly, the AAR discusses several of its Findings, Conclusions and provides numerous Recommendations.

### FINDINGS on the AAR - April 27, 2017 event:

- The Operational Plan for the event, at page number 6, section VI titled "Control y Mando" (Spanish for "Command and Control"), places PRPB Officer # 4 as the highest Officer assigned to the Command and Control of the event.   In the interview of PRPB Officer # 4 on 08/15/2017, he stated that, during the event, the orders established in the OP and the Chains of Command were never altered.  In the interview of PRPB Officer # 4 on 09/14/2017, he informed he was the IC for the April 18, 27, and the May 1st, 2017 events.  In spite of a PPR-174 form that stated that PRPB Officer # 9 was the Incident Commander, the AAR failed to inform that the "de facto" IC was PRPB Officer # 4, who acted as such during the event.
- When PRPB Officer # 4 was interviewed, he explained that the violent incident involving protestors and Representative Jose L. Rivera Guerra took place in front of an entry door located in a lateral part of the building, which was under the control and responsibility of the Capitol building's security personnel.  PRPB Officer # 4 insisted that his PRPB personnel were only responsible for protecting the building's entrance located at the North part of the building, where the protest was scheduled to take place and where it occurred.  The evidence, the OP (Item # 4), demonstrates that PRPB Officer # 4's statement during the interview is IN COMPLETE CONTRADICTION

WITH THIS EVENT'S WORKPLAN (PLAN DE TRABAJO), as evidenced by the document itself. Reference is made to the facts covering this particular incident of April 27, 2017 which are discussed in this Report.

- The AAR failed to inform about the violent event involving House Representative Rivera Guerra. Reference is made to the facts covering this particular incident of April 27, 2017 which are discussed on this Report.
- The AAR provided some useful recommendations but failed to provide constructive recommendations for future events/demonstrations in the area of the Capitol building. It should emphasize that the IC should know the totality of the OP and his own responsibilities in detail and assure he has the capability to execute them.

4. **May 1st, 2017 event**:

- The AAR provides a brief summary of the event.
- The AAR states that PRPB Officer # 4 was the IC, a job description for which he has not been properly trained.
- The AAR explains that the IC, PRPB Officer # 4 informed that they did not use any type of loud speaker to alert the protesters about the use of chemical agents due to the large number of protesters, who would not be able to hear it and that placing a member of the PRPB among the crowd represented an imminent risk to the safety of said agent.
- The AAR states that meetings were conducted with the organizers of the event.
- The AAR provided a more detailed narrative of the events, including that an unidentified high rank Police Officer, who was not the IC, instructed other police members to disperse some protesters that were causing damages to government property, and he/she also authorized the use of chemical agents by the SWAT members present there. According to the AAR, SWAT personnel waited to receive the instructions made by the IC before proceeding to execute said order.
- The AAR informs that CRADIC personnel was assigned to make video recordings. It also states that the video recordings available were the ones provided by CRADIC, which were recorded from the local television news reports. The AAR attempts to justify the unavailability of the recordings made by CRADIC alleging these are "evidence under the custody of the Court." The AAR reports that the reviewed documents revealed that the Special Arrests Unit informed making eight (8) arrests.

| TCA Assessment Report | 2018 |
|---|---|

- The AAR provides several conclusions and recommendations.

**FINDINGS on the AAR – May 1st, 2017 event:**

- The AAR's brief summary of the event provided at the beginning of the report matches the evidence reviewed by the undersigned.
- The AAR fails to inform that the PRPB provided a report to the TCA, informing that no PPR-854 forms were prepared reporting the Use of Force during this event because no use of force was used. The evidence clearly shows this is an incorrect statement.
- The AAR failed to report that only six (6) PPR-854 Forms, "Informe de Uso de Fuerza" in relation to the events that took place on May 1, 2017 at the Milla de Oro, in Puerto Rico, were prepared. After reviewing all evidence related to this event, it is evident the PRPB failed again to fill out many PPR-854 Forms on account of under reporting.
- The AAR grossly fails by not informing about the event that took place this same day, near the premises of La Fortaleza. Thirteen (13) PPR-854 Forms, "Informe de Uso de Fuerza" (Spanish for "Use of Force Report") were allowed to be reviewed in relation to the events that took place at the Old San Juan, near the Fortaleza.
- The PRPB failed by not providing copies of all the videos of the civil disturbance that took place there, in accordance with General Order Chapter 600 Section 625.
- The ARR does not address the failure to provide a timeline for the use of force (use of tear gas, pepper spray, batons…) incidents nor the names of the Police agents involved the use of force and the circumstances that caused each specific use of force. All these information failures could have been avoided by preparing one PPR-854 form for each instance of use of force, as several of the Sections of Chapter 600 of the PRPB General Order require.
- The AAR does not make any mention of the event in which a large number of Police agents were surrounded at the Muñoz Rivera Avenue by considerable number of protesters nor about the negotiations they had with said protestors. Other reports provided by the PRPB to the T.C.A. Office also failed to mention/discuss this specific event which is very important in the analysis of the complete event as it relates to flawed strategic planning and maneuvering that endangered the safety of police agents.
- The AAR only informed about eight (8) arrests made by the Special Arrests Unit, failing to explain the discrepancies in their own reports about the number of arrests made that day, and the failure to

provide full details related to many of those arrests:  The PRPB reports provided informed the names of fourteen (14) arrestees. The reports did not provide details about the reasons and circumstances that led to the arrest of several of these individuals. The "ANALISIS DE EVENTOS RELACIONADOS A LAS MANIFESTACIONES DEL DIA DEL PARO NACIONAL" report also provided by the PRPB, in contradiction to the previous one, summarized that a total of seventeen (17) individuals were arrested.  These reports lacked <u>any information about the additional three (3) arrestees</u> (no names, no specific reason for each arrest and no information about what finally happened with each of these additional three (3) arrestees).

- The AAR does not provide any information about an event of May 1st, 2017, at the premises of La Fortaleza where some protesters crossed the perimeter marked with metal barriers.  The Police removed two female individuals from inside the perimeter by pushing one of them very hard and by dragging the other over a sidewalk for a considerable period of time.  Some of these Police officers were wearing civilian clothes, which may indicate that they could be part of the Fortaleza's escort team.   The evidence shows that those four Police agents in plain clothes dragging a female protester could have removed the protester in a less violent way. The two video recording clips of this event, identified as Item # 83, show that these agents did not have any visible identification that indicated that they were law enforcement officers.  One PPR-854 was shown to the undersigned that could relate to this event, but it failed in describing the unnecessary use of force (dragging the female on the ground), it only explains that they removed protesters that crossed the perimeter.

- The AAR repeats recommendations which need to be carefully examined in the next revision of this Policy.  The PRPB insists in a specific recommendation that challenges Section 625 of the General Order when it argues the concerns they have for the safety of the PRPB personnel placed within the crowd to assure orders given are heard by the crowd.

- The AAR fails to provide information about when the PRPB Chain of Command was broken during the May 1st. 2017 event. Reference is made to the findings that appear in this Assessment Report.

| TCA Assessment Report | 2018 |

The AAR report finishes by providing in a section titled "Tendencias Generales" (Spanish for General Tendencies), areas in which they could improve their performance in crowd control events.

The Self-Assessment reports presented by the PRPB, in general terms, provide a very light self-assessment.  They consist mostly of short, limited and selective auto critiques that appear to be concocted just to comply with the requirement, rather than being crafted with rigorous discipline intended for meaningful improvement. The PRPB uses the report as a mouthpiece to improperly express their dissatisfaction with and suggest changes to Section 625 of the General Order as it relates to the requirement that the IC shall place one or several members of the PPRB in the rear part of the crowd in order to hear any dispersal order, and to be able to inform the IC that the order was heard by the protesters.

## V.B Review of Complaints

The PRPB informed that they only received one civilian complaint which is related to the April 18, 2017 but that at this time, the same still is under investigation.  Review of the Complaint has not been allowed by PRPB.  This was made known on November 14, 2017, to personnel of the USDOJ, the PR Justice Department, the PRPB, and to the TCA and his core team and Constitutional Attorneys.

On November 17, 2017, the PRPB e-mailed a report titled "INVESTIGACION ADMINISTRATIVA, RE: QUERELLA N.I.A. 2017-01-03-00087" in which they informed that "Individual Q" complained that during the April 18, 2017 event, she received a physical aggression made by a Police Agent.  According to a PRPB internal document, they conducted an investigation, but the case is still pending, while they search for video recordings that could show the alleged aggression (Item # 79).

On November 27, 2017 IC Jose Pujol interviewed "Witness A", who provided a photograph alleging it shows when the Police Officer made the aggression, assaulting her with a banner/poster rolled over a pole (Item # 81). The young woman had to be taken the hospital emergency ward and she was also taken to the Police Station, where a complaint was filed (2017-1-166-2104) against the aggressor/officer.  A complaint was presented at the FBI on April 28th, 2017. They were not provided with a complaint number or the name of the agent that took the complaint. They were told that he was the Agent on Duty."

The evidence examined reflects that the complaint numbers do not match, but the information received from the PRPB and "Witness A" refers to the same incident.  The

| TCA Assessment Report | 2018 |

photograph provided depicts a Police Officer with a rolled banner/poster over a pole or stick on his hands, placed over his right shoulder on a batting position and appearing to be ready to strike someone with it.  If the Police Officer struck "Individual Q" with the banner, as the photograph suggests it is about to happen, it would have been a non-reported use of force using a tool/weapon not authorized by the PRPB.  On November 28, 2017 IC Jose Pujol sent copy of the photograph to the PRPB for referral to the investigative agent.

# V.C Review of Operational and Personnel Decisions

Most of these operational and personnel decisions have been covered in detail previously in this report, but they will be summarized here:

1. The analysis of the interviews to the PRPB personnel revealed that the OP for the May 1, 2017 event did not foresee how complicated this event could be.  The Incident Commander, PRPB Officer # 4, who along with his group of policemen was encircled by protesters during a long period of time, was supposed to run the complete operation, a strategic mistake when he encountered a long and extremely complicated situation.

   On the same event, and related to the PRPB personnel encircled by the protesters, the evidence reflected that PRPB Officer # 4's flawed decision to advance in order to arrest individuals vandalizing property was made in the heat of the violent situation but clearly instilled resentment of the protesters.  The evidence also showed that he managed to slowly correct his action, by backing up to a reasonable and proper distance avoiding acts of violence against/from the protesters, even when some of them had clearly turned violent against the Police.

2. An interview with the PRPB Officer # 4, Incident Commander (IC) of the April 27, 2017 event revealed the following:  PRPB Officer # 4 informed to IC Jose Pujol that Security at the door where the violent incident between House Representative Jose Luis Rivera Guerra and some protesters took place did not fall under his responsibility, because his responsibility was only the North entry of the Capitol building.  The OP revealed that this Incident Commander (IC) was responsible for having two (2) Police Agents in that specific door, that is, in complete contradiction to his verbal statement.  This is an example of how lightly the OP was taken.  The evidence shows in this case, that the best possible explanation for this

Incident Commander's contradiction is that he did not know his Operational Plan at all.

3. The evidence showed that the PRPB Chain of Command was broken during the May 1st 2017 event.  The evidence presented in this report shows that by May 1st, 2017, Mr. Hector Pesquera was not part of the Chain of Command in charge of handling the PRPB activities related to that event, in the way that when he gave direct operational orders to PRPB officers involved in the event, the Chain of Command was broken, as it has been previously informed in this report.

# Section VI: Analysis of Best Practices and Models on Policing of Mass Demonstrations

The main recommendation to the PRPB in managing mass demonstrations is that the PRPB must abide by all the Sections of Chapter 600 of their General Order, mainly on Section 625 "Manejo y Control de Multitudes".  This Section provides the established guidelines to manage mass demonstrations. Full compliance with these Sections should suffice for a successful management of crowd control events.  This Assessment Report has pointed out an area in which the Police has improved their performance but at the

| TCA Assessment Report | 2018 |
|---|---|

same time found many serious deficiencies in important areas which require expedited adjustments to efficiently manage future mass demonstrations. The PRPB must continue to be committed to protecting free speech and facilitating protests regardless of the message being conveyed. The Bureau of Police must also continue to be committed to protecting the community from civil unrest and disorder. Going forward, the competing goals of maintaining order while protecting the freedoms of speech and assembly stands as one of the PRPB's greatest challenges.  This challenge MUST be addressed by completely adhering to departmental policy in the form of General Orders crafted pursuant to the Agreement for the Sustainable Reform of the Police of Puerto Rico.

**Signed at San Juan, PR on January 25, 2018.**

José L. Pujol

**Investigations Consultant**

**OFFICE OF THE TECHNICAL COMPLIANCE ADVISOR**

**268 Muñoz Rivera, Suite 1001**

**San Juan, PR 00918**