# SEVENTH (INTERIM) SIX-MONTH REPORT OF THE TECHNICAL COMPLIANCE ADVISOR JUNE 10, 2017 - DECEMBER 9, 2017

## *Office of the Technical Compliance Advisor to the Agreement for the Sustainable Reform of the Puerto Rico Police Department*

| TCA Seventh (Interim) Semi-Annual Report | 2017 |
|---|---|

# Table of Contents

Table of Contents                                                                          1

A Message from the TCA                                                           3

TCA Reports under the Agreement                                          9

Introduction                                                                               10

**Section I**
PRPB Status Report                                                                  14

The Work of the TCA                                                                15
-   Work Prior to Hurricanes Irma and Maria                    15
-   Work in the Aftermath of Irma and Maria                     20
-   The Role of Constitutional Attorneys in the TCA's Office    25

**Section II**
PRPB Action Plans                                                                   27

**Section III**
Current and Anticipated Challenges in the Implementation of the Plans and the Agreement                29
-   Building IT capacity                                                          31
-   Building HR capacity (Paragraph 13)                          34

- Building Recovery and Continuity of Operations Capacity     36
- Building Leadership Capacity: The Current Leadership Crisis, Act 20 of 2017, Promotions, Overtime, and Police Absenteeism     43
- Building Community Trust Capacity: Findings from the Second Community Survey (Paragraph 241)     46
- Building Civil Rights Capacity: Findings from the Court-Ordered Report on Policing of Mass Demonstrations in April and May     48

**Section IV**

Projected Activities     55

**Appendixes**     57

# A Message from the Technical Compliance Advisor

This is the Seventh Semi-Annual Report ("Report") of the Technical Compliance Advisor ("TCA") in the Agreement for the Sustainable Reform of the Puerto Rico Police Bureau ("Agreement"). It is an interim report during this period of national crisis in Puerto Rico, the unfortunate loss of life and the devastating destruction left behind by Hurricanes Irma and Maria. The Report preliminary assesses the progress made toward implementing the Agreement by the Puerto Rico Police Bureau ("PRPB") prior to Hurricanes Irma and Maria. It also reports on the current challenges to the sustainability of the Reform, and summarizes the work conducted by the TCA for the six-month period ending on December 9, 2017.

First and foremost, I want to acknowledge the outstanding work of the women and men of the PRPB who have provided safety, public order, assistance, and strength to Puerto Rico when it was most needed after the brutal devastations of the Hurricanes. I want to recognize specifically the sacrifice of the two officers who died responding to Hurricane-related incidents and the bravery of the more than 150 police officers who lost their homes and continued to work while they were forced to relocate themselves and their families. It is worth praising the sense of determination, sacrifice and duty of the members of the PRPB. The progress made in the last three and half years has only been possible because of their outstanding work and dedication under very difficult and extraordinary circumstances.

Prior to September 2017, the PRPB continued to make progress - with some deficiencies which I discuss below - in building capacity, drafting and updating policies, conducting required trainings, and implementing the eleven Action Plans for the eleven compliance areas required by the Agreement. However, the devastation left by these natural disasters has redefined the very idea of "capacity building" under the Agreement. There are new and significant challenges that the Parties must attend to and prioritize. In this endeavor, the TCA (with his Core Team and Constitutional

| TCA Seventh (Interim) Semi-Annual Report | 2017 |
| --- | --- |

Lawyers) is ready to support the Parties' efforts regardless of how significant and daunting a task it may be.

Immediately after the passing of Hurricane Irma and subsequently after the landing of Hurricane Maria, my office conducted a preliminary assessment of the situation on the ground. Members of my team and I visited many police installations; convened with and conferred with Area Commanders, police officers, staff personnel; inspected equipment and infrastructure; and conducted operational and administrative assessments to fully understand the gravity of the situation. The United States Department of Justice ("USDOJ") joined us in several field visits. These visits included a thorough evaluation of the PRPB's Information Technology ("IT") infrastructure and operational capabilities.

In the first week of October, I provided the Court with a preliminary assessment. On October 4, 2017, the Court "ordered the Parties, with the assistance of the TCA, and ultimate court approval, to adopt a new framework" for the Agreement best fitting the new reality on the ground.[1] During the months of October and November, my team and I reinitiated our regular monthly site visits and fieldwork conducting extensive assessments and baseline analyses of the PRPB's operational capacity after the Hurricanes. These evaluations have been shared with the Parties. The message of these reports is clear: after three and half years of capacity-building, there is much more that is needed from the PRPB to achieve real, effective capacity. For example, the tactical radio communications system is at best mediocre with many officers still without a hand-held radio which could easily lead to unsafe police practices. This item was presented to the PRPB more than two years ago. As described in sections of this Report, issues remain about the standardization and interoperability of radio systems and their operationality under situations where there is no electric power.

During these post-storm visits, my team and I identified three specific areas where the PRPB's strategic and operational plans as drafted in the Action Plans must quickly adapt to the new prevailing conditions. In prior communications with the Parties and six-month reports, I highlighted the lack of significant progress in two of these three areas.

---

[1] See: Docket No. 624.

TCA Seventh (Interim) Semi-Annual Report | **2017**

In the aftermath of Irma and Maria, the first challenge is to undertake real, effective capacity-building in the compliance area of Information Systems and Technology. It is apparent that the modest progress made in the last three and half years in terms of creating a reliable IT infrastructure for the PRPB has affected the operational and tactical response of the PRPB during and in the aftermath of these natural disasters. From a strategic vantage point, however, the PRPB should consider situation as an opportunity for a major "step function" modernization of the entire IT infrastructure.

The second area where the PRPB faces a significant strategic and operational challenge is the lack of development and progress in creating a robust and solid strategic staffing plan as required under Paragraph 13 of the Agreement. During the aftermath of Irma and Maria, it is also apparent that the lack of a consistent staffing approach has limited the PRPB operationally and strategically. These staffing limitations can be seen on post-storm developments involving police overtime and the ongoing police slowdown and/or absenteeism. They are sadly developments that are likely to have a substantial effect on the PRPB's overall ability to deter crime. Since the first six-month report, I have raised concerns that these matters (e.g., compensation, overtime, increased sick leave, impermissible protest by officers) will ultimately end up impacting on the reform process if left unattended.[2]

The third challenge for real and effective capacity building is the lack of well-thought out Continuity of Operations ("COOP) and Recovery and Resilience plans. These are components of a capacity building strategy that I have recommended the Parties must add to the Action Plans and the Agreement. Members of my staff have diligently worked with the Parties to recommend concrete steps towards the prompt implementation of these initiatives.

In the middle of this national disaster, I must unfortunately return to one of the themes that I mentioned in my prior reports. The most persistent challenge to the Reform and the implementation of the Agreement today is the current crisis of leadership and management affecting the PRPB and the lack of direction in the implementation of Act 20 of 2017. This crisis has created tremendous uncertainty in all ranks of the PRPB. News coverage and social media debates continue to document the inner struggles of a Police Department in crisis and how this mayhem at the top is affecting the rank-and-file and the public safety of Puerto Rico in very concrete ways such as the

---

[2] See: TCA Six Month Report (December 2014), 7.

| TCA Seventh (Interim) Semi-Annual Report | 2017 |
| --- | --- |

lack of enough available police officers during the holiday season. This crisis is further accentuated when the TCA is regularly excluded from any discussion pertaining to the implementation of Act 20 in relation to the PRPB.

The old themes associated with this leadership in turmoil are still recurrent in the aftermath of this national crisis. The TCA continues to see problems associated with promotions, unexplained personnel transfers, questionable overtime practices, and failure to take actions against officers with dubious disciplinary records. Similarly, it is no longer open to discussion that the Police Commissioner does not have the direct authority and total command and control of the PRPB operations which is required under the Agreement. Consequently, there are no longer doubts that this crisis on the top of command chain is clearly affecting the Reform by creating an environment of uncertainty, mistrust, and polarization of the ranks. That the current management structure is not working well has been clearly established during this reporting period, the result must be an intervention that restores clear lines of leadership and management within the PRPB.

In February 2017, with my team of legal advisors and law enforcement experts, I prepared thorough and detailed report which was shared with the Parties and the Court on how Act 20-2017 (creating the Department of Public Safety) could impact and delay the implementation of the Agreement. In the referenced document, drafted after a meticulous study of the law, the TCA found obstacles and challenges that could affect the Reform and its implementation. Those concerns have been further accentuated by the events on the field. To date, the TCA is yet to be invited to a meeting of the Act 20 Implementation Task Force and the information that is often reported publicly, such as the changes to the Police Academy, just emphasize the concerns raised in prior documents and during public hearings.

In keeping with the responsibility of the TCA consistent with Paragraph 241, the TCA submitted to the Court his second survey of the community. This survey provides a better understanding of the police through the lenses of the community. This survey is based on in-depth discussions with diverse community "focus" groups. The methodology was a typical focus group study. These groups included representatives of traditionally underserved and underrepresented communities in Puerto Rico, such as blacks, LGBT, Dominican, Homeless, and public housing residents among others.

| TCA Seventh (Interim) Semi-Annual Report | 2017 |
|---|---|

The TCA also submitted to the Parties and the Court his preliminary assessment of how the PRPB policed the mass demonstrations of April and May. The overall assessment is that the PRPB managed these incidents in a more professional manner than in the days prior to the Reform. Although the specific findings will be made public soon, there are two concerns which are worth discussing. The first finding is the disruption of the chain of command which exemplifies the concerns I mentioned earlier regarding the implementation of Act 20. The second finding is that there are still significant challenges in the ability of the PRPB to document police-civilian interactions and police-involved incidents. It is also worth mentioning that the lack of cooperation of the PRPB with certain requests for information from the TCA reveals that the PRPB has not adopted fully the principles of trust and transparency.

Once again, the TCA must address the situation and infrastructure of the Police Academy. If the Commonwealth's position is that the financial commitment needed is beyond their control, then the financial bureaucracy of the Commonwealth should step in and ensure the PRPB is sufficiently funded to meet this challenge. Until the TCA sees meaningful effort to correct the Academy's situation, the Police Academy will remain outdated in its infrastructure to support meaningful reform.

There is a matter that is of great concern to the TCA. Although I have previously reported that the political transition that occurred in January 2017 did not affect the collaborative efforts of the Reform Unit and the TCA and that there were no significant personnel changes in the Reform Unit, this has been no longer the case during this reporting period. During this time, the PRPB removed Colonel Clementina Vega of her role as head of the Reform Unit. The TCA was never officially notified of this change. Neither the original monthly reports that the PRPB submits to the TCA of personnel transfers within the PRPB notified the TCA of this action. Under Paragraph 233 of the Agreement, the obligations of the PRPB are crystal-clear: "PRPB shall inform the TCA and USDOJ of any changes to Reform Unit staff, including suspensions, reassignments, and dismissals of personnel." Without entering to evaluate the merits of the transfer, the TCA is highly concerned with the apparent violation of the Agreement and the lack of transparency and information sharing stemming from the PRPB. To date, the PRPB has not provided the TCA with any justifiable explanation as to why the reports contained incorrect information and the TCA was not properly provided with a justification for the transfer. (Although the TCA was informed that Colonel Vega has

| TCA Seventh (Interim) Semi-Annual Report | **2017** |
|---|---|

been re-instated in her leadership role on December 22, 2017, the fact remains that the opacity of the PRPB and the alleged violation of the Agreement are disconcerting).

Given the preliminary nature of this Report and the absence of the PRPB's Status Report, the TCA has changed the format of the report when measuring compliance with the Action Plans. This Report will not contain tables that describe what the PRPB said they would accomplish and the TCA's reviews and observations assessing whether the PRPB achieved what they claimed. The TCA will return to this tabular design in subsequent reports as mandated by the Agreement.

Finally, the TCA continues its open-door policy and raises with the PRPB community concerns that are often brought to the TCA's attention, while ensuring that the PRPB addresses those issues and concerns timely and appropriately.

Arnaldo Claudio, US Army, Col. (ret)
Technical Compliance Advisor

# TCA Reports under the Agreement

*Paragraph 250 of the Agreement:*

"During the <u>first four years</u>, from the Appointment Date, the TCA shall file with the Court, written public reports every six months that shall include:

  a) a description of the work conducted by the TCA;

  b) a listing of each detailed step in the Action Plans and its timeframe indicating whether the timeframe has been met, and whether the Commonwealth of Puerto Rico is making satisfactory progress toward implementation of the Agreement by rating PRPB in full, partial, or non-compliance steps in the Action Plan;

  c) the methodology and specific findings for each review conducted, where appropriate, and redacted as necessary for privacy concerns. An un-redacted version shall be filed under seal with the Court and provided to the Parties. The underlying data for each audit or review shall not be publicly available, but shall be retained by the TCA and provided to either or both Parties upon request;

d) for any detailed steps that were reviewed and found not to have been fully implemented in practice, the TCA's recommendations regarding necessary steps to achieve compliance; and

e) a projection of the work to be completed during the upcoming reporting period and any anticipated challenges or concerns related to implementation of the Agreement."

*Paragraph 252 of the Agreement:*

"The TCA shall provide a copy of the six-month report to the Parties in <u>draft form within 15 days after the end of the reporting period</u>. The Parties shall have fifteen calendar days upon receipt of the draft report to allow the Parties to informally comment on the draft report. The TCA shall consider the Parties' responses and make appropriate changes, if any, and shall file the final report with the Court within 45 days of the end of the review period.  DOJ and PRPB may file responses to the TCA's final report within 30 days."

# Introduction

This is the Seventh Semi-Annual Report ("Report") of the Technical Compliance Advisor ("TCA") in the Agreement for the Sustainable Reform of the Puerto Rico Police Bureau ("Agreement").[3]  It is an interim report and is issued during a period of national crisis stemming from the massive loss of life and destruction caused by Hurricanes Irma and Maria.  The Report preliminary assesses the progress made toward implementing the Agreement by the Puerto Rico Police Bureau ("PRPB") before these two storms devastated Puerto Rico.  It also reports on the current challenges to the sustainability of the Reform, and summarizes the work conducted by the TCA for the six-month period ending on December 9, 2017.

---

[3] Prior to the implementation of Act 20 of 2017 creating the umbrella agency known as the Department of Public Safety ("DPS"), the Puerto Rico Police Bureau ("PRPB") was a separate government agency known as the Police Department of Puerto Rico ("PRPB").  The Agreement uses the term PRPB.

TCA Seventh (Interim) Semi-Annual Report | 2017

As Paragraph 226 sets forth, the TCA has the duties, responsibilities, and authority conferred by the Agreement under the supervision and order of the Court without replacing or assuming the role and duties of the PRPB and its leadership.[4] Pursuant to the terms of the Agreement, it is the responsibility of the TCA to provide technical assistance during the capacity building period.[5] The TCA also systematically reviews and approves Action Plans, policies, procedures, programs, protocols, training, and systems of the PRPB.[6] Furthermore, the TCA reports on PRPB's implementation of this Agreement, their Plans, and their intended impact.[7]

It is ultimately the task of the TCA to measure the nature and the extent of the PRPB's compliance with the terms set forth in the Agreement and the Action Plans (which are deemed incorporated into the Agreement upon submission to and approval by the Court). The findings and recommendations made on this Report are based on his authority to asses and report on the Agreement's implementation and whether this implementation is "resulting in constitutional and effective policing, professional treatment of individuals, and increased community trust of PRPB."[8]

Prior to September 2017, the PRPB continued to make satisfactory progress in building capacity, drafting and updating policies, conducting required trainings, and implementing the eleven Action Plans for the eleven compliance areas required by the Agreement. With diligence and hard work, the PRPB reached substantial milestones in the areas of planning, policy making, training, and community engagement. In prior reports, we have enumerated the most significant achievements. There were, nonetheless, specific steps where progress was limited, partial, or non-existent such as the implementation of Paragraph 13 (staffing study) or the timely upgrading of IT required infrastructure.

With less than five remaining policies on the schedule to be developed, the fact is that for the last three and half years the PRPB has put in place both comprehensive and coherent policies and training modules consistent with nationally accepted best standards of policing. From this limited perspective of capacity building, the distance

---

[4] See Paragraphs 225-228.
[5] See Paragraphs 236, 255.
[6] See Paragraphs 229 (Review of Policies and Programs) and 235-240 (Development of Action Plans)
[7] See Paragraphs 250, 252
[8] Paragraph 225.

TCA Seventh (Interim) Semi-Annual Report | 2017

traveled by the PRPB in issuing policies and conducting well-structured training for the entire workforce has satisfactorily met the demands of the Agreement.

However, the new challenges on the ground in the aftermath of Maria have redefined the very idea of capacity building under the Agreement.[9]   The new reality has unfortunately brought to light some of the deficiencies and concerns that the TCA highlighted in past reports, such as the need to build a strong and robust information systems and technology infrastructure or the urgency of developing a solid and coherent staffing plan.  In addition, there are new and significant on the ground challenges that the Parties must attend to and prioritize.  These challenges are discussed at length in Section III of this Report.

Following the structure set forth in Paragraph 250, this Report consists of four major sections (and two appendixes).  In the first section, the Report briefly discusses the request of the PRPB not to submit a PRPB's Status Report until March 2018.  The extension request is based on the operational and administrative delays stemming from the impact of Irma and Maria.  At present, there is not any reliable manner to document the PRPB's self-reported accomplishments and progress made from May 26, 2017 to date.

Consistent with Paragraph 250(a), Section I also discusses the main highlights of the work conducted by the TCA in the last six months, from June 10, 2017 through December 9, 2017.  This Report distinguishes between two periods: the work prior to the destruction of Hurricanes Irma and Maria (from June through September) and in the aftermath of Irma and Maria (from October through December).  This section focuses on

---

[9] The term "capacity building" is not defined in the Agreement.  However, it is a crucial mechanism with the Agreement.  "Capacity building" refers to both (a) a period of time (four years after the appointment of the TCA) and (b) the concrete steps and actions to be taken by the PRPB in terms of resources, funding, staffing, technology to build capacity.  During this period, these actions and steps should place the PRPB in a position of implementing each of the Agreement's provision.

There is a third element in the idea of "capacity building."  Capacity building also refers to the first four years from the Appointment Date [of the TCA] during which "the TCA shall evaluate PRPD's compliance with this Agreement by assessing PRPD's progress against its Action Plans." (Paragraph 240, See also 242).  To evaluate compliance, the TCA must determine that the Action Plans "address resources, funding, staffing, technology, capacity, and other infrastructure and budgetary needs to place PRPD in a position to implement each of the Agreement's provisions in Sections III through XIII within four years from the Appointment Date and in accordance with the implementation schedules set forth in the Action Plans." (Paragraph 237)

OFFICE OF THE TECHNICAL COMPLIANCE ADVISOR | 11

| TCA Seventh (Interim) Semi-Annual Report | 2017 |
|---|---|

the work of the TCA in providing assessment and technical assistance to the PRPB, including the work of reviewing policies and trainings as well as the assessment reports in the aftermath of Hurricane Maria.  This section has two corresponding appendixes: meetings of the TCA with the PRPB, the community, and public officials (Appendix 1) and the review and approval of policies (Appendix 2).

In its second section, the Report focuses on the work of the PRPB in implementing Action Plans for the eleven substantive areas of the Agreement and complying with Paragraphs 234 through 238 of the Agreement from June through September.  This part of the Report complies with Paragraphs 250(b) and 250(c).  For this preliminary Report, tables detailing activities and steps taken by the PRPB in accordance with the submitted Action Plans and rating the progress made towards their implementation are not included.  They will be included in the regular report upon the submission of the PRPB's Status Report.

In the third section, as required by Paragraph 250(d), the TCA continues to assess and make recommendations regarding necessary steps to achieve compliance for any detailed activities or steps that were preliminary reviewed and found not to have been fully or partly implemented in practice.  The purpose of this section is to identify issues that require further attention and/or may have a negative impact on the implementation of the Agreement.  The list of topics is detailed in the table of contents.

The final and fourth section, as required by Paragraph 250(e), includes a projection of the work to be completed during the upcoming reporting period.  This section reflects the TCA's vision of intended reviews of the PRPB operations, including steps and activities taken towards building capacity.   These plans highlight the areas of the Agreement that the TCA and/or the Court has identified as current top priorities.
The purpose of this interim Report is to describe where the PRPB is in the capacity building process and, under the framework of the Agreement, how the PRPB is set to achieve full and effective compliance with the Action Plans and their implementation.[10] Pursuant to the Agreement, the PRPB had four years to build capacity through the mechanisms, steps, and timelines set forth in the Action Plans.  With less than one year left in terms of capacity building, as mandated by the Court, this preliminary Report recommends that the Parties, in consultation with the TCA, work to develop a "new

---

[10] See Paragraph 242.

| TCA Seventh (Interim) Semi-Annual Report | 2017 |
|---|---|

framework" for the Agreement and the Action Plans consistent with the magnitude of the national crisis in the aftermath of the massive storms that hit Puerto Rico.

# Section I

# The PRPB Status Report

In November 2017, the PRPB asked for an extension to submit its Status Report in March of 2018.   The extension was justified in terms of the disruption created by Hurricanes Irma and Maria.   The goal of the requested extension is for the PRPB to comply with the terms and deadlines set forth in Paragraph 261.[11]   Under the Agreement, the PRPB will submit to the TCA and to the United States Department of Justice ("USDOJ") a Status Report assessing progress for each of the eleven (11) focus areas, steps towards implementation of the Agreement, and a response to prior concerns raised by the TCA.   The Status Report should document the overall progress made by the PRPB for the period covering May 26, 2017 through November 26, 2017. However, the Commonwealth has indicated that the next status report is likely to cover activities through February 2018.

In consultation with the Court, the TCA and the USDOJ agreed with the extension request of the PRPB.   The Parties and the TCA also agreed that the TCA will issue a preliminary six-month Report and a full report upon submission by the PRPB of the Status Report.

# A Description of the Work Conducted by the TCA: Paragraph 250(a)

---

[11] Paragraph 261 requires that the Commonwealth "file with the Court sealed and unsealed versions of the Status Report, with a copy to the TCA and USDOJ, no later than 15 days before the end of the period under review."

| TCA Seventh (Interim) Semi-Annual Report | **2017** |
|---|---|

## Work Prior to Hurricanes Irma and Maria

During the first months of this reporting period, the TCA continued to provide technical assistance, conducted site visits and observations on the field, and reviewed a considerable number of policies and training documents drafted and implemented by the PRPB.  Continuing with a practice agreed upon during the previous reporting period, the PRPB, the USDOJ, and the TCA continued to have monthly meetings to closely follow-up the development of policies and training materials.

The process of reviewing policies and training materials followed the schedule agreed by the Parties and set forth by the Plans drafted and submitted by the PRPB in compliance with Paragraphs 234 and 237 of the Agreement.  To comply with the Action Plans, the PRPB was scheduled to draft a total of 99 policies. To date, more than 90 policies have been completed or are in progress, with less than five policies in development.  In addition, there are 75 policies not included in the Court-submitted Action Plans which must be drafted for operational reasons, of which more than 30 have been drafted or are in the process of development.

From June through September 2017, the Parties and the TCA successfully reviewed and revisited over 60 General Orders, Special Orders, Administrative Orders, regulations, and complementary forms.  The TCA also reviewed more than 40 training documents.  During this period, the TCA also approved 38 policies (plus one policy in October).  Appendix 1 has a list of all policies reviewed and/or approved.

From June through August, the TCA visited several PRPB command areas to review the nature and extent of use of force incidents as well as the reporting procedures.  The TCA visited the Area Commands of Bayamón, San Juan, Mayagüez, Carolina, Fajardo and the Police Academy.   The TCA determined that in most of these areas and precincts the PRPB was complying with recording requirements in accordance with the Agreement and training procedures.  The purpose of the visits was to observe the implementation of training requirements, obtaining information reference to the Force Review Board ("FRB") for each area and Use of Force reports.  The TCA met with the Area Commanders and other supervisors to discuss the Implementation of the Agreement, the Action Plans.  The goal was to obtain their insights with respect to the aforementioned and the impact on their daily duties.  To measure compliance with the

| TCA Seventh (Interim) Semi-Annual Report | 2017 |
| --- | --- |

Training Action Plan, it was important to interview training coordinators. They assisted in verifying training records and certifications. Also, the TCA had the opportunity to discuss with the Coronels and commanders in charge of each area and their staff the implementation of the Action Plans. The TCA also attended Domestic Violence Training that was being taught in these areas.

For example, the TCA conducted a site visit of the Fajardo Area Command. The purpose of the visit was to review progress and compliance of the Area Command relating to the PRPB's Use of Force Action Plan. During the visit the TCA Core team had the opportunity to meet with the president of the FRB for the area.

The TCA found that all designated members of the Board have received training related to Use of Force including training on weapons utilized by PRPB officers. Minutes of all meeting are kept by the Board and are available for review. As per the PRPB policy, all FRBs are required have a legal advisor assigned to the Board (non-voting member) who receives the same training as Board members and is certified as a member. The legal advisor is to be available to the Board for meeting, if necessary, as well as for providing guidance on legal matters arising during evaluation of use of force incidents. However, the Fajardo's FRB currently does not have legal advisor as required by the policy. The Area Command of Carolina has made their legal advisor available to Fajardo when needed.

The TCA also found that neither the Board or the Area Command maintained a detailed database on the use of force incidents occurring in their geographical area of responsibility. However, some information such as number, level, and type of force used was available via the data base. It was established that there was computerized data base, but the database has limited information. The conclusion is that, with incomplete information, is difficult for the Board and Area Commanders to make specific decisions to address concrete problems. More detailed information is vital.

The president of the FRB reported that the problem of incomplete or incorrect reports arriving at the Board for evaluation continue to be problematic. He stated that most of the reports had to be returned to the precinct/district for incomplete information. In an effort to reduce the number of cases returned, the President of the Board met with commanders of precincts/districts. As a result, the Board now has a protocol in place

that after use of force incidents are evaluated the commander of the precinct/district where the incident took place receives written notification of the decision.

Similarly, in July 2017, the TCA Core Team conducted a follow-up site visit to the Utuado Area Command and the Utuado Police Precinct.   This is a Zone of Excellence. The purpose for the visit was to review the progress and compliance of the Area Command relating to the Use of Force Action Plan. In addition, the TCA was looking for an update on the CAD Mobile Pilot Project that was in place since April 2017. The pilot project entailed Utuado Zone of Excellence officers to digitally prepare and submit Incident Reports (PPR-468) in the CAD System via vehicle and precinct computers.

The TCA met with representatives of the precinct to discuss, among other things, if the proposed CAD training that was to be provided to ZOE personnel by PRPB CAD mobile vendor "Intellution" had in fact been supplied.   This training was essential for the precinct to commence the pilot project described above. The discussion revolved around how the vehicle's computerized terminal access to the upgraded CAD System known as CAD Mobile is progressing.

The Area Command staff, as well as the precinct representative, provided little in the way of information.  It was their belief that the orientation had taken place, however, they could not confirm. The lieutenant of the precinct, who is second in command, reported that officers are in fact digitally preparing and submitting Incident Reports (PPR-468) via the vehicle computer terminals, but could not say when the pilot project began, or if it is still ongoing.   The concern here is that, although CAD has been gradually implemented throughout the commands since August, the materials providing CAD training have not been completed.  The training materials were going to be ready in August, but there were substantial delays in its implementation.  As a result, CAD training has not taken place and it is questionable how functional CAD is on the field without this training.

It was initially reported, by the PRPB's IT Bureau in March 2017, that upon completion of this project the results would be analyzed and a determination as to whether the program can be expanded to the other Zones of Excellence would be made. In the event technical and/or issues were uncovered the pilot program could be extended.  If the pilot program was successful, it was expected that August would be the target date

| TCA Seventh (Interim) Semi-Annual Report | 2017 |
| --- | --- |

to expand the program to the other Zones of Excellence. During this visit. it was evident that no determination regarding the pilot project has been made. In addition to preparing the reports digitally, officers of Utuado precinct were continuing to prepare written reports, so it may be concluded that the expansion to other zones of excellence was not imminent.

During the visit, the TCA Core Team had the opportunity to meet with president of the Force Review Board, as well as the Area Training Coordinator by the Commander of the Utuado Area Command. The TCA found that all designated members of the Force Review Board have received training related to Use of Force, including training on weapons utilized by PRPB officers. Minutes of all meeting are kept by the Board and are available for review.

During the visit, the TCA found that president of the FRB had developed a comprehensive use of force database that provides a plethora of information on the use of force incidents occurring in their geographical area of responsibility. This information allowed the Area Commanders to identify potential problem officers and possible training deficiencies. The TCA recommended to the PRPB's IT Bureau that this database be adopted by the other twelve Area Commands and serve as the departments database pending the implementation of "Early Warning System".

From June through August, the TCA visited several PRPB command areas to review the nature and extent of search and seizure policies are implemented and reporting procedures are in place. The TCA determined that, in most of these precincts, the PRPB was complying with most reporting and record-keeping requirements in accordance with the Agreement and training procedures. This is not to suggest that all reporting and record-keeping requirements of the Agreement have been satisfied in all these precincts.

For example, in July, the TCA Core Team visited Quebradillas Zone of Excellence and other commands in San Juan and Carolina to inquire about issues addressed by the Search and Seizures Action Plan, and GO's 600-612 Search and Seizure, and 600-615, Arrests and Summons. In Quebradillas, the TCA CT met with the District Director and other supervisors. There were 42 members of the PRPB assigned to his district: 9 supervisors and 33 Agents.

| TCA Seventh (Interim) Semi-Annual Report | 2017 |
|---|---|

During the visit to Quebradillas, The TCA reviewed several PPR-880 and PPR-468 (Incident/Booking Sheets) during visits to Quebradillas and Arecibo Drug Unit and found them to be properly completed and signed by supervisors.   A PPR-47 Citation was inspected at the Arecibo Drug Unit and it was properly completed.

The TCA inspected about fourteen arrest and incident reports (PPR-468 and PPR-880) at both site visits for proper usage and completion. Forms indicate that Supervisors responded to the scene in every case there was an arrest. Forms PPR-468 and PPR-880 were reviewed and signed by supervisors.

In Quebradillas, the TCA noted that radio communications were not stored digitally as required by the Agreement and the Action Plans.   The PRPB stated that they only record all radio communications in the following areas: San Juan, Carolina, Bayamon, and Caguas. The PRPB is expecting a grant from U.S. to buy and implement a system (P-25) that will record all communications Island-wide by the end of 2017. The present recording equipment has the capability to store recordings for up to 3 years, after that it overwrites, erasing the oldest data one month at a time. PRPB GO 400-402 mandates that the Communication Technician back up the recording to another storage because it requires that recordings be kept for five years.   To date, the TCA is not aware of alternative plans made by the PRPB if they do not receive the grant.   The TCA will provide an update to this section in the final six-month report due on April.

The TCA asked these Unit Directors if they had enough Mobile radios for their personnel. Quebradillas reported they have only seven radios of which only five are working properly and two of those are assigned to motorcycle officers. That leaves only enough radios to be assigned to supervisors. Most times patrol officers do not carry mobile radios and must rely on their car radios to communicate.  In the final six-month report, the TCA will update the Court on the PRPB's radio stock inventory.  The TCA will ask the PRPB to conduct an inventory of its radio stock and demonstrate the accuracy of that inventory.  The TCA will also extend the sampling of the total radio stock and number available at other precincts.

The TCA also interviewed the Directors at San Juan and Carolina Command Centers and Radio Control. Both Directors stated they receive no formal training on how to use the equipment when assigned to their posts, nor do their officers assigned to dispatch

and 911 Operations. Usually, they all receive a brief orientation on the equipment and must learn mostly on their own. When they receive new equipment or an update to software, the directors stated that they received limited instructions on its use. They both reported a shortage of personnel with access to the David Plus System (M/V Registry), RCI (Firearms Registry), and, to some extent, NCIC access. This was a great concern to them.

Through these visits, the TCA regularly conducts its compliance reviews to assess the PRPB's compliance with each of the Agreement provisions in Sections III through XIII. In these reports, the TCA assesses whether PRPB has, for each Agreement requirement: (a) incorporated the requirement into an implemented policy at the command and precinct level; (b) trained all relevant personnel in a command and precinct in the requirement and policy; and (c) fully implemented these policies in practice. These compliance reviews are - consistent with Paragraph 242 - based on both quantitative elements as necessary for reliability and comprehensiveness.

## Work in the Aftermath of Hurricanes Irma and Maria

Immediately after Hurricane Irma and subsequently after Hurricane Maria, the TCA conducted a preliminary assessment of the situation on the ground. The TCA visited police installations; communicated with Area Commanders, police officers, staff personnel; inspected equipment and infrastructure; and conducted operational and administrative assessments to fully understand the gravity of the situation. The TCA visited several municipalities, including Fajardo, Naguabo, Gurabo, Las Piedras, Juncos, Humacao, Caguas, Ceiba, San Lorenzo, Cidra, Yabucoa, North Caguas, and other areas to assess the conditions of their police stations. The USDOJ joined the TCA in several of these visits. These visits included an evaluation to PRPB's Information Technology infrastructure. The TCA also convened meetings with the Police Superintendent and the Director of the Reform Office to coordinate the continuity of the work in the Reform Office.

After the TCA provided the Court with a preliminary assessment, the Court "ordered the Parties, with the assistance of the TCA, and ultimate court approval, to adopt a new framework" for the Agreement best fitting the new reality on the ground. The Court issued the order on October 4, 2017.

TCA Seventh (Interim) Semi-Annual Report | 2017

In October and November, the TCA fully reinitiated site visits and fieldwork conducting extensive assessments and baseline analyses of the PRPB's capacity in the aftermath of the storms.  These work products were shared with the Parties.  In these reports, it is clear the message that after three and half years of capacity-building, there is much more that is needed from the PRPB to achieve real, effective capacity. For example, as documented in the prior section, the tactical radio communications system is at best mediocre with many officers still without a hand-held radio which could easily lead to unsafe police practices. This item was presented to PRPB more than two years ago.

During the October visit to Puerto Rico, the TCA and his team met with Commissioner Michelle Hernandez de Fraley.   The purpose of the meeting was to discuss the devastation of the island of Puerto Rico by Hurricane Maria, as well as its impact on the Puerto Rico Police Bureau, specifically on the department's ability to provide police services to the public.

The Commissioner noted that many police facilities suffered considerable damages all throughout Puerto Rico.  However, only one facility was destroyed completely: Caguas North.  Personnel from Caguas North was relocated to the Area Command that had ample space to accommodate precinct personnel. Twenty-one (21) police vehicles were lost due to the hurricane.   The Commissioner noted that PRPB officers were assigned around the clock to all shelters throughout the Island.

Most Area Commands throughout the Island were operating on generators; however, there was a severe shortage of generators.  The Commissioner looked for donations from the mainland. She indicated that CSA groups were assisting the PRPB in identifying locations in need of generators. FEMA engineers visited Area Commands to determine the conditions of the PRPB's buildings.

Commissioner Fraley reported that departments firearms had been secured, with the exception of the firearm of an officer killed during the hurricane which had not been recovered.

After the storm, people detained by the police were transferred to commands with generator power. The majority of arrests were related to violations of curfew law. Arrestees in federal cases were transferred to the US mainland. The PRPB reported there were no issues with prisoners. Those in custody were moved to a secure area. Booking was also expedited so that when possible prisoners had minimum time in police custody.

Central Command was functional (24/7) and continued to provide complaint numbers, as well as use of force numbers for all incidents occurring on the island. The Commissioner was notified of all use of force incidents.

The Commissioner reported that department headquarters had full internet access and Bureau's applications were fully functional.

As required by the PRPB's policy, all commands (precincts/districts) throughout the PRPB continued to prepare use of force reports (PPR-854) for incidents involving force. Supervisors were investigating all use of force incidents. However, the Area Command Force Review Boards as well as the SARP's Force Review Board were suspended temporarily.

One hundred to one hundred-fifty officers were displaced department-wide by the hurricane (loss of homes and vehicles) and were given "Exceptional Circumstances" status and provided the opportunity to work in locations near their current residence for up to six months.

Due to the personnel losses relating to uniforms, officers have been permitted to substitute some clothing for parts of uniform; however, officers while on duty were to be recognizable by the public as PRPB officers.

Due to the needs of the public relating to police services the Commissioner extended to June of 2018 the time allotted for officers to use 2017 sick and vacation time. The Commissioner indicated that the PRPB was to receive more than $3 million from FEMA. The Commissioner intended to utilize $500,00 for overtime and the remainder for comp

| TCA Seventh (Interim) Semi-Annual Report | 2017 |
| --- | --- |

time.  However, recently, she was advised she could not spend any of this money for overtime. This has caused morale issues within the PRPB and significant problems for Commissioner Fraley.

Police from across the United States, including Boston, New York and Houston, have been assisting PRPB officers to patrol the island. The arriving officers were paired with PRPB officers. In the event the officers were required to take police action, the PRPB officer would be the officer of record relating to any arrest situation.

During this time, the TCA visited several precincts and Area Commands.  Thus, for example, during the November visit, the TCA Core Team conducted a site visit of the Fajardo Area Command.  The purpose of the visit was to evaluate the impact of Hurricane Maria on the precincts and districts of the Fajardo Area Command.  The Team first met with several supervisors and offices.

- PRPB personnel mentioned that during and after Hurricane Maria the PRPB had lost telephone, cell phone, internet, and radio communications.

- In October, The Fajardo Area Command used generator power.  The Municipality of Fajardo provided a generator for the Command Center use.

- In November, power was restored for more than two weeks but there were three blackouts during this time.

- The Fajardo Area Command did not use the air conditioning when generator power was being used.

- Communications were poor when using phones including dropped phone calls.

- The main antenna was damaged during Hurricane Maria and had affected communications.

- When the power went out, the Area Command continued to enter data by hand. Cards were being written and filed in lieu of calls for service.

- When communications and technology were restored, information and complaint numbers were assigned from Central Command.

- The Fajardo Area Command distributed food and water to members of the community, which has improved relations between the community and the PRPB. Police and community relations appear to be at an all-time high.

- During this period, the Fajardo Area Command met with members of the community three times a day.

- There were numerous meetings between the Municipal Police and the PRPB.

- Members of the Fajardo Area Command indicated there was no contamination, destruction or loss of evidence, no loss of firearms and ammunition.

- Police officers told the TCA Core Team that the Area Command had received on-site assistance from police departments across the United States.  These officers have been assigned to traffic posts that provides relief for the PRPB officers who have been working 12-hour shifts.

- Supervisors mentioned that after Hurricane Maria passed, Patrol could not resume its efforts because of downed electrical poles and trees that obstructed the streets.

- Supervisors told the TCA that 50 members of his staff were affected by the hurricane and were given time off to deal with their family problems.

- Supervisors mentioned that the officers were on 12-hour shifts, which has been challenging for the officers, the supervisors, and their families.

- Supervisors mentioned that the islands of Culebra and Vieques had sufficient staffing.  The police boat sunk during Hurricane Maria.

- There is no indication that the Fajardo Area Command had a written Contingency Plan to deal with disasters.  This problem needs to be addressed as soon as possible.  Many police departments in the States have a book available that states what protocols and procedures are to be followed in the event of disasters such as earthquakes, plane crashes, and hurricanes.  It is recommended that a

manual be created for these kinds of emergencies.  The TCA and his team can assist the PRPB with this project.

During the November visit, the TCA also conducted a site visit of the Carolina Area Command.  The purpose of the visit was to evaluate the impact of Hurricane Maria on the Precincts and Districts of the Carolina Area Command.   The team met with supervisors and officers.  The Colonel in charge was on vacation.  The following is a synopsis of the meeting.

- FEMA was providing a generator and paid for gas and repairs of the generator.

- There was currently no air conditioning in the building.

- The lights in the building have been affected by power surges.

- There have been leaks from the roof in the building.

- The radios had not been working so agents have been forced to use mobile phones.

- 30 to 40 officers were affected by the hurricane and were given time off to deal with their family problems.

- Supervisors mentioned that their officers were on 12-hour shifts but since November 11th they have returned to an 8-hour shift.

- Several vehicles were damaged but were repairable.

- Members of the Carolina Area Command indicated there was no contamination, destruction or loss of evidence, and no loss of firearms and ammunition.

- Members of the Carolina Area Command indicated that traffic accidents were a recurrent problem during and after Hurricane Maria.

- Members of the Carolina Area Command have been part of monthly meetings with the community and the Municipal Police.  They stated that there was a very positive relationship with both and cooperation is at an all-time high.

# The Work of the Constitutional Attorneys in the TCA's Office[12]

The business of the TCA in attempting to achieve a sustainable reform for the PRPB is most of the time a complex and demanding commitment.   In many instances the requirements extend to foresee the consequences of improvised actions and even of legislative oversights that clearly affect the balance intended by the Agreement submitted by the parties and approved by the District Court for the District of Puerto Rico.   Sometimes there are subtle and barely noticeable actions which, if left unattended, will affect the foundations of the reform process.  These are the instances where the support of the TCA's Constitutional Attorneys is required to turn the tide of instability and assure a just and legal process.

Other essential work performed by the Constitutional Attorneys relates to the review of General Orders, Rules, Regulations and Manuals, of the Bureau of Police to ensure they are in accordance with the laws of Puerto Rico, that "due process" is followed and that they constitute legal and best policing practices.  They also remain attentive that the constitutional rights of the citizens and residents are respected and that the members of the PRPB are able to work in an environment where there are just and reasonable working conditions that guarantee employment security, transparency in the prosecution of administrative and criminal complaints against enlisted personnel and of their right to aspire to higher ranks by way of merit based promotions (Paragraph 14 thru 20) within the staff of the organization through the implementation of a developmental career path (Paragraph 21).

On the instructional side of their duties, the TCA's Constitutional Attorneys also review and make recommendations on the syllabus of the different courses taught at the Police Academy.

In 2017, the TCA and the team of Constitutional Attorneys have consistently pointed out and prepared memoranda on the operational and constitutional flaws of Act 20 of 2017

---

[12] "Lawyers are the foot soldiers of our Constitution," Rennard Strickland and Frank T. Read, The Lawyer Myth.

| TCA Seventh (Interim) Semi-Annual Report | 2017 |

and how the same affects the reform process.  In April 2017, the TCA shared with the parties a Memorandum prepared by the Constitutional Attorneys pointing out the diverse sections of Act 20 that affect the reform and separates the process from the mandates of the Agreement.   Unfortunately, such recommendations were not followed.   The observations made were right on target and those regarding chain of command and the Police Academy have now evolved into problematic issues and awkward situations that constitute great challenges to the implementation of the Agreement even before the end of the capacity building period. Most recently the Court was briefed about recurring problems of this nature.

Throughout this year, the Constitutional Lawyers have confronted those challenges and have prepared diverse memoranda on behalf of the TCA to alert the Court and the Parties of violations to the Agreement that involve unauthorized transfers and promotions, violations of rights and due process, infringement of Court Orders, breach of procedures established pursuant to the mandates of the Agreement and *ultra vires* interventions with the established chain of command.[13]

The role of the Constitutional Lawyers of the TCA, in short, is one of eternal vigilance while the Sustainable Reform of the Police of Puerto Rico is ongoing.  A former Chief Judge of the Supreme Court of Puerto Rico, a former Federal Prosecutor, and a practicing attorney are entrusted with this responsibility.

# Section II

## PRPB's Action Plans ("Plans"): Paragraph 250(b) and 250(c)

---

[13] Ultra vires. Ultra vires is a Latin phrase meaning "beyond the powers". If an act requires legal authority and it is done with such authority, it is characterized in law as intra vires ("within the powers"). If it is done without such authority, it is ultra vires.

| TCA Seventh (Interim) Semi-Annual Report | 2017 |
| --- | --- |

During this reporting period, the Parties submitted these Plans to the Court as addenda to the Agreement. All eleven Plans were in full effect. With the submission to the Court, the Parties now treat the Plans as fully incorporated, enforceable terms of this Agreement. The final step is for the PRPB to make these Plans publicly available, which has not occurred yet.

As set forth in the Agreement, since June 2014, the Parties and the TCA have worked together and identified appropriate activities and steps to be taken to build capacity and enhance each of the following substantive areas of compliance: (1) Professionalization; (2) Use of Force; (3) Searches and Seizures; (4) Equal Protection and Non-Discrimination; (5) Recruitment, Selection, and Hiring; (6) Policies and Procedures; (7) Training; (8) Supervision and Management; (9) Civilian Complaints, Internal Investigations, and Discipline; (10) Community Engagement and Public Information; and (11) Information Systems and Technology.

To carry out these capacity building reforms, the PRPB began to develop specific, tailored made Action Plans for each of these substantive areas. These Plans contained temporal benchmarks and set forth in detail the steps agreed upon to execute and implement the reforms and achieve the desired outcomes in each area within generally accepted professional standards. These steps and reforms required the implementation of policies, practices, training, documentation, internal review, technological improvements, and oversight. The Plans described temporal benchmarks and detailed activities and steps agreed upon to execute and implement the required reforms and to achieve the desired outcomes in each substantive area. Paragraphs 231 through 240 discussed in detail their development, implementation, and assessment. The Plans were to examine policies and any required revisions, mandatory training, resources, staffing, budgetary requirements, and a schedule for when specific policies are to become field operational.

Consistent with Paragraph 234, the PRPB, with assistance from the Reform Unit, drafted the Plans that set forth the detailed steps the PRPB is to take to implement and achieve compliance with each of the Agreement's provisions in Sections III through XIII of the Agreement. Under Paragraph 236, the TCA and USDOJ reviewed these Plans to ensure that they specified actions necessary to comply with all applicable substantive provisions of the Agreement and that timelines, implementation strategies, budgetary allocations and funding sources are reasonable, achievable, and prioritized to promote

efficiency. In November 2016, the TCA and the USDOJ staff completed their review of all these Plans.  The eleven Plans were approved as drafted.  They were drafted in Spanish.

Pursuant to Paragraph 238, the Plans were translated into English and were submitted to the Court.  After months of additional review by the Parties and the TCA, the PRPB completed the translation of the Action Plans on May 31, 2017.

In the last six-month report, the TCA recommended that the Parties renegotiate an extension of the capacity building period of, at least, one additional year.  This recommendation was rooted on the fact that it took more than three years of cooperative work between the Parties and the TCA to complete the eleven Action Plans for all compliance areas and that there were unanticipated delays in some areas of the Agreement.  In May 2017, the PRPB submitted a request for an extension of four months of the capacity building period based on Paragraph 239 of the Agreement. Pursuant to his authority the TCA extended the capacity-building period by four months. The TCA still recommends to the Parties, in light of the current circumstances in the aftermath of Irma and Maria, that the PRPB applies for one additional year.

In this preliminary report, there is nothing further to report on regarding the implementation of the Action Plans and its detailed tables.

# Section III

## Current and Anticipated Challenges in the Implementation of the Agreement and the Plans: Paragraph 205(d)

| TCA Seventh (Interim) Semi-Annual Report | **2017** |

In this part of the Report, the TCA examines all relevant detailed issues involving capacity building that were reviewed and found not to have been, fully or, partially implemented in practice.   It also discusses the TCA's recommendations regarding necessary steps to achieve compliance with the timelines and steps in the Plans.

After Hurricane Maria devastated Puerto Rico, the TCA conducted a preliminary assessment of the situation on the ground by visiting many police installations, convening meeting with PRPB personnel, inspecting equipment and infrastructure, and conducting operational and administrative assessments.   In the first week of October, the TCA provided his report to the Court.

Considering the TCA report, on October 4, 2017, the Court "ordered the Parties, with the assistance of the TCA, and ultimate court approval, to adopt <u>a new framework</u>" for the Agreement best fitting the new reality on the ground.[14]  After three and half years of capacity-building, a new framework is needed because there is much more that is needed from the PRPB to achieve real, effective capacity.

During these post-storm visits, my team and I identified three specific areas where the PRPB's strategic and operational plans as drafted in the Action Plans must quickly adapt to the new prevailing conditions. They are the pillars of the new framework ordered by the Court.  The first challenge is to undertake real, effective capacity-building in the compliance area of Information Systems and Technology.  The second strategic and operational challenge is to complete a robust and solid strategic staffing plan as required under Paragraph 13 of the Agreement. The third challenge for real and effective capacity building is to develop a well-thought out Continuity of Operations ("COOP) and Recovery and Resilience plans intertwined with the current Actions Plans.

In addition, there is a challenge that precedes the Hurricanes that devastated Puerto Rico, but the Hurricanes have accentuated its most pervasive effects.  It is a recurring challenge in the PRPB.   The most persistent challenge to the Reform and the implementation of the Agreement today is the current crisis of leadership and management affecting the PRPB and the lack of direction in the implementation of Act 20 of 2017.  This crisis has created tremendous uncertainty in all ranks of the PRPB.  News coverage and social media debates continue to document the inner

---

[14] See: Docket 624.

TCA Seventh (Interim) Semi-Annual Report | **2017**

struggles of a Police Department in crisis and how this mayhem at the top is affecting the rank-and-file and the public safety of Puerto Rico in very concrete ways such as the lack of enough available police officers during the holiday season. This crisis is further accentuated when the TCA is regularly excluded from any discussion pertaining to the implementation of Act 20 in relation to the PRPB.

The TCA has discussed these issues of leadership in prior reports. The problems are more accentuated in the aftermath of this national crisis. The TCA continues to see problems associated with promotions, unexplained personnel transfers, questionable overtime practices, and failure to take actions against officers with dubious disciplinary records. Similarly, it is no longer open to discussion that the Police Commissioner does not have the direct authority and total command and control of the PRPB operations which is required under the Agreement.

In February 2017, with my team of legal advisors and law enforcement experts, I prepared thorough and detailed report which was shared with the Parties and the Court on how Act 20-2017 (creating the Department of Public Safety) could impact and delay the implementation of the Agreement. Those concerns have been further accentuated by the events on the field. To date, the TCA is yet to be invited to a meeting of the Act 20 Implementation Task Force.

In keeping with the responsibility of the TCA consistent with Paragraph 241, the TCA submitted to the Court his second survey of the community. This survey provides a more detailed understanding of the police through the lenses of the community. This survey is based on in-depth discussions with diverse community "focus" groups. The methodology was a typical focus group study. The picture that emerges is still highly problematic: there is a persistent gap between the community and the PRPB.

There is another area of concern. The TCA submitted to the Parties and the Court his preliminary assessment of how the PRPB policed the mass demonstrations of April and May. The overall assessment is that the PRPB managed these incidents in a more professional manner than in the days prior to the Reform. However, there are at least two concerns which are worth discussing. The first finding is the disruption of the chain of command which amplifies the crisis of leadership. The second finding is that there are still significant challenges in the ability of the PRPB to document police-civilian

interactions and police-involved incidents. It is also worth mentioning that the lack of cooperation of the PRPB with certain requests for information from the TCA reveals that the PRPB has not adopted fully the principles of trust and transparency.


# Building Information Systems and Technology ("IT") Capacity in the aftermath of Irma and Maria


In the aftermath of Irma and Maria, one of the most significant capacity-building challenges for the PRPB is to undertake real, effective capacity-building in the compliance area of Information Systems and Technology. These days it is apparent that the modest progress made in the last three and half years in terms of creating a reliable IT infrastructure for the PRPB has affected the operational and tactical response of the PRPB during and in the aftermath of these natural disasters. From a strategic vantage point, however, the PRPB should consider situation as an opportunity for a major "step function" modernization of the entire IT infrastructure.


During this reporting period, four on-site visits were conducted: two in July and August before the hurricanes and two in October and November. Of note, leading into July and August, PRPB's Bureau of Technology (BT) continued to make progress, albeit limited, in accordance with the Agreement. However, with the hurricanes and the ensuing devastation to Puerto Rico, progress against the IT Action Plan slowed considerably as BT attempted to restore the capacity lost from the storms.


From June through September, procedurally speaking, the BT achieved an important management stage by finalizing the Action Plans in combination with the IT Tables thereby enabling a more stabilized ongoing assessment of BT actions and progress. In policy terms, general orders, policies and manuals continued to be developed. However, resources remained insufficient to fully impact efforts beyond basic maintenance and development. As such, at this stage, innovative and strategic re-architecting and solutioning is essentially limited if not non-existent. In this regard the BT still has much to do to not only support the other ten compliance areas of the Agreement but also implement necessary long-term IT and infrastructure improvements.

TCA Seventh (Interim) Semi-Annual Report | **2017**

Additional observations for this period included:

- Given the shortage of resources, it was not adequately clear that BT was able to adequately implement oversight and management mechanisms such as Life Cycle program reviews and cataloging of systems and infrastructure requirements, both of which are fundamental to effective technology stewardship.

- Beyond capacity building, the CIO and his BT team must not only maintain focus on completing this phase but also identifying ways to leverage partnerships to share its workload with credible partners through collaborations or outsourcing.  BT should consider the possibility of outsourcing selected BT functions.  By doing so, they will be able to focus internally on critical functions and innovative options.

- Training was not yet complete and lagging on CAD Mobile as of July and August.

- The Reform Unit and BT acknowledged that oversight could be better enabled through four key documents that form a baseline for managing and monitoring.  They are; 1) The Agreement, 2) the Action Plans, 3) Task Tables, 4) Policy Chronology.

From the perspective of staffing and resources:

- The staffing study implementation is critical to the probability of success and the delay in implementation is affecting IT;

- BT organizational structure must be staffed and implemented in accordance with the General Order;

- The PMO contract needs to be approved and implemented;

- It is essential that management and supervisory personnel have the skills to manage internal IT operations and to execute oversight methods. especially if DSP outsources or consolidates PRPB IT services under DSP.

TCA Seventh (Interim) Semi-Annual Report | **2017**

From September through December, following the hurricanes, the TCA conducted two on-site assessments, one in October and one in November. They revealed the magnitude of damage. Clearly, the damage sustained by the PRPB required that their fullest energy be focused on restoration of capabilities and away from the tasks at hand prior to the Hurricane. As examples, the following was observed:

- Radio Communications (Johnson Radio Sets) were functioning in degraded mode because microwave tower transceivers/repeaters (18 of 30 nodes) were damaged and so communications back to Headquarters were down.

- PRPB HQ's computer room was functioning near full operational capability. However, because the Early Intervention System ("EIS") and CIW ("Crime Information Warehouse") sustained a hard stop due to battery expiration during the storm, CIW files were at risk of being corrupted.

- The Fusion Center, which is the information sharing center, sustained substantial water damage with no repair scheduled more than 8 weeks after hurricane Maria.

In addition, first-hand inspection in October showed that Caguas Norte was uninhabitable. Fajardo, Mayaguez, Utuado, Carolina and Ponce were on battery power and were inconsistently being returned to commercial power.

"Shot Spotter" was functioning because it is a web service with a reach back solution to the application provider. This is a powerful "lesson learned" of significance that points to the potential benefits that can be achieved by leveraging a cloud service provider.

EIS was reviewed noting that the credibility of its data is essential and that information from CAD field operations needs to be applicable, credible, reliable and searchable. It was also observed and shared with the Reform unit that the TCA analysis of the Data dictionary, Entity Relationship Diagram and functional requirements documents is necessary in order to assess analytical utility of the field data. An example of this can be demonstrated with hierarchical capture of date against the most serious crimes that could also unintentionally exclude other important data elements important to analysis and research.

TCA Seventh (Interim) Semi-Annual Report | 2017

Clearly there is much more work to be done with regards to the architecture of data in order to ensure usefulness of the data collected beyond strictly crime statistics. It is strongly recommended that the PRPB recognize the importance of academic and scientific analysis of data (such as use of force data) to transformation of behavioral characteristics and the subject matter expertise needed to perform the analysis and change.

In these very difficult times, the resiliency of Puerto Rico is commendable. And although much of the IT work on the Agreement's compliance has been suspended, BT has had reasonable success restoring and maintaining IT service capacity. IT systems hosted at Headquarters are in functioning condition as is the computer center and radio equipment center. At this juncture, the PRPB should remain vigilant in their efforts to respond to the hurricanes and, also, be comfortable knowing that the work towards the implementation of the Agreement in the area of technology should begin in earnest as soon as possible.

From a strategic vantage point, the PRPB should consider the potential opportunity of a major "step function" modernization of the IT infrastructure. The potential success of wholesale change and re-architecting may never be more opportune than at the present when much of the infrastructure is a candidate for replacement rather than repair.

# Building HR/Staffing Capacity: The Staffing Allocation and Resource Study (Paragraph 13)

The second area where the PRPB faces a significant strategic and operational challenge in terms of capacity building is the lack of development and progress in creating a robust and solid strategic staffing plan as required under Paragraph 13 of the Agreement. In the aftermath of Irma and Maria, it is apparent that the lack of a consistent staffing approach has limited the PRPB operationally and strategically. The effects of an inconsistent staffing approach can be seen on the post-storm developments involving police overtime and the ongoing police slowdown and/or absenteeism.

TCA Seventh (Interim) Semi-Annual Report | **2017**

Under the Agreement, the substantive area of Professionalization has three key objectives and three main interrelated activities: the development of a staffing plan (Paragraph 13), the adoption of merit-based promotions (Paragraphs 14 through 20), and the implementation of a developmental career path (Paragraph 21).   The goal of these three interconnected activities is for the PRPB to develop processes and mechanisms that promote professional, ethical, and respectful policing services to effectively address Puerto Rico's public safety challenges.   To attain these goals in Professionalization, the PRPB were take reasonable measures to achieve performance expectations in this area of the Agreement.   However, delays have dominated the PRPB's response.

Paragraph 13 requires the PRPB to conduct a staffing allocation and resource study to assess human resource needs for the entire organization.  The study is the cornerstone of the professionalization reforms and the basis for a staffing and resource allocation master plan rooted in community-oriented policing principles.  This requirement is part of the approved Plan on Professionalization, which detailed steps and timelines are now fully incorporated, enforceable terms of this Agreement.

Paragraph 13 of the Agreement, entitled "Staffing and Community Policing," reads as follows:

> *"PRPB shall assess the appropriate number of sworn and civilian personnel to perform the different department functions necessary to fulfill its mission. To do so, PRPB shall conduct <u>a staffing allocation and resource study</u>. The study shall form the basis for a staffing and resource allocation plan that is consistent with community-oriented policing principles and supports the systematic use of partnerships and problem-solving techniques.  To foster community-oriented policing, the plan shall consider deployment practices that offer officers opportunities to serve the communities in which they reside." (The underline is mine)*

Upon the insistence of the TCA, in March 2016, the PRPB began to assemble a working group to complete the staffing study.  In October 2016, the PRPB informed the TCA that the Bureau had issued a Request for Proposals ("RFP").  The deadline for submission

of proposals was November 4th, 2016.  In 2017, the PRPB selected a firm, V2A, and the project gradually started.

During this reporting period, the TCA received two updates on the progress made to date towards the implementation of Paragraph 13:

- On October 5th and November 16th, 2017, V2A submitted to the TCA and USDOJ relevant status reports;

- In these reports, the consultant updated the Parties and the TCA on the work plan to carry out the study, the analysis of operational and staffing resources, the analysis of the areas where the study will focus on, and the findings obtained to date;

- The TCA was very satisfied with the results delivered to date by the consultants as well as of the quality of the data and information gathered through this activity;

- The TCA understands that this study is to provide valuable information that will lead the PRPB to make informed decisions based on scientific evidence;

- The TCA urges the PPR to continue working hand in hand with V2A, as has been done so far.

The fact that the PRPB is three and half years into the capacity building period and there is no objective way to measure and assess its staffing and resource capacities is nothing short of an inexcusable failure of management and leadership.   PRPB leadership is responsible for this failure.   As the TCA has documented time and time again, the cost of this failure has been extraordinarily high in terms of public safety and the trust in the commitment of the PRPB to sustainable reform and Hurricanes Irma and Maria have further accentuated the administrative and operational failures of the PRPB in the area of staffing.   The damage is done and cannot be undone easily if left unattended.   From a strategic vantage point, the PRPB should consider the potential opportunity of a major modernization of the staffing structure.   The potential success of wholesale change and re-architecting may never be more opportune than at the present when much of the staffing issues are dominating the debate about policing in Puerto Rico.

TCA Seventh (Interim) Semi-Annual Report | **2017**

# Building Capacity by Incorporating Recovery and Continuity of Operations Plans into the Agreement and Actions Plans

The third challenge for real and effective capacity building is the lack of well-thought out Recovery and Resilience and Continuity of Operations ("COOP") plans.  These are components of a capacity building strategy that the TCA has recommended the Parties must add to the Action Plans and the Agreement.  To date. The TCA has diligently worked with the Parties to recommend concrete steps towards the prompt implementation of these initiatives.

The PRPB can learn from many communities of the United States that have gone to "great lengths to develop disaster response plans and routinely conduct drills to prepare for natural or man-made calamities."[15] The goal is to prepare first responders and other government entities to know with precision what they need to do in those critical hours, days, and weeks that immediately follow a devastating event.   In this regard, first responders have two missions: lead and protect the communities they serve.

Based on an analysis by Deloitte of critical long-term recovery issues encountered by communities that recently undertook a disaster recovery program, typical challenges that government leaders are likely to face include: (1) Insufficient specific long-term recovery experience; (2) Capacity constraints; (3) Governance, monitoring, and ongoing oversight; (4) Fraud, waste, and misuse.

There is no question that the PRPB faces significant challenges in all these areas, but the one challenge which is the most problematic is the current limited capacity. Deploying infrastructure, resources, funding, and staffing in a coordinated and strategic way requires expertise and knowledge on many levels, starting with strong leadership and a solid cadre of management staff.  All of this demands a comprehensive planning procedure where risk management policies and procedures as well as controls are

---

[15] See; Deloitte, Rebuilding after disaster: the first steps on the road to recovery (October 2015).

developed.  It also requires strong project management oversight, data management, technology implementation, and persistent communication and training between the leadership, the first responders, and the communities they serve.  The PRPB must confront these constraints head on.

Similarly, it is important to understand that the development of a Recovery and Resilience Plan requires understating the proper implementation of the recovery timeline efforts.  Recovery is really the combination of three intertwined moments: the period of restoration of the critical infrastructure, the stage of organization and controls, and the phase of assessment and rebuilding.

In October, the TCA recommended the PRPB to examine the experience of the City of New York as an example for the development of the PRPB's own Recovery and Resilience Plan.  There are many reasons for the PRPB to look into the New York example, including the fact that, in late October 2012, Hurricane Sandy roared into the New York Harbor with unprecedented force, causing record-breaking water levels over much of the city.  There are, of course, other jurisdictions that have experienced similar situations, but New York is a great reference due to the size of the police department and the coastal nature of New York's geography.

After the storm had passed and the water had receded, a new reality emerged: New Yorkers and their government officials had to think differently about our relationship with a changing climate in a city so much defined by water. Sandy also laid bare many pre-existing challenges in NYC communities and vividly highlighted the physical and social vulnerabilities to coastal storms and rising seas.

As the City infrastructure and housing stock suffered significant damage, it was clear that the City of New York could not just plan to "recover" from Sandy. The City needed to find a way to emerge from Sandy a stronger and more resilient city - one that did not just plan for 'the next Sandy,' but one that invested with an eye toward future risks and guided in its decision making by the best available science.  This is the "new approach" that the TCA submits should define the work of the PRPB in coming months.

Hurricane Sandy brought a realization that the City of New York needed a new approach to engaging with its 520 miles of waterfront, and that the City needed to look beyond Sandy to build its physical, economic, and social resiliency against a range of risks, enhancing the city's capacity to withstand and emerge stronger from the impacts of climate change in all of its neighborhoods and public facilities.

In response, the City proposed a $20 billion resiliency program to address not only the risks of 'another Sandy', but to broaden the City's approach to the risks of climate change and other threats. In April 2015, Mayor de Blasio released the ground-breaking "OneNYC" plan which expanded this multilayered resiliency program and accelerated its implementation.  The TCA proposes that the PRPB adopts this strategy: one that embraces the reality of a Caribbean island but plans for new risks through a multilayered strategy of coastal protection, upgrades to buildings, protections for infrastructure, and investments to make police facilities and the neighborhoods they patrol safer and more vibrant - tailored to local risks and solutions.

In addition to the development of a Recovery and Resiliency Plan, the TCA has also recommended to the Parties the development of a solid Continuity of Operations ("COOP") Plan.   Many states and cities in the United States have adopted this approach.  The plans are grounded on the fact that unexpected disruptions of normal operations are plausible and that these disruptions are to dramatically alter the ability of a law enforcement agency to effectively deliver its services to the community.

Before delving into this issue, it is important to distinguish continuity plans from standard Emergency Operations Plans (EOPs). While the two necessarily can link to one another, the purposes are distinct.  EOPs provide guiding principles for an agency's response to a disaster, crisis, or emergency situation.  On the other hand, a COOP should focus on what a police department should do if that disaster or emergency were to render the agency unable to accomplish its own mission.  For a COOP plan to be effective, these plans must be implemented, exercised in practice, and maintained up to date.

Again, the TCA recommended for the PRPB to look after the experience of New York City.   In 2006, the New York City Office of Emergency Management ("OEM") established the first-ever formalized City of New York Continuity of Operations Program (COOP).  In this area, New York leads the nation.  The mission of this initiative was to

enhance the ability of City agencies to provide vital services to the public during emergencies, while maintaining internal resiliency.

With the success of a pilot program consisting of three agencies, Mayor Bloomberg signed Executive Order 107 in 2007 requiring City agencies to develop standardized COOP plans by December 2009.   OEM, in partnership with the Department of Information Technology & Telecommunications (DOITT) worked with the participating City agencies in achieving this goal.

The NYC COOP Program has grown over time to include 40 additional agencies, the establishment of agency COOP planning teams, customization of continuity software for agencies to design plans, and an intranet portal for agency COOP administrators to gather resources, ask questions, and download planning materials. As the managers of the NYC COOP Program, OEM continues to provide guidance to agencies in developing continuity planning strategies and exercising plans. While each agency team has its own plan to maintain essential services, COOP standards, formatting, and language is uniform.   The development of the NYC COOP program involved key five elements that should serve as guide for the work of the PRPB:

- The pilot program assessed the critical functions and operational requirements of selected agencies. OEM and DOITT studied three agencies and collaboratively developed COOP plans for each agency.

- OEM and its COOP partners used knowledge of industry practices and City specifications to develop a COOP planning methodology to address City agencies' needs.

- OEM and partner organizations configured commercial software for the City's intranet. The software provides electronic tools for creating COOP plans. To accompany the software, COOP planners at OEM generated a guide to lead City agencies through the COOP methodology and the commercial software.

- Software administrators continue to run a series of training programs to demonstrate how to use the software to tailor the methodology to each agency's specific needs.

| TCA Seventh (Interim) Semi-Annual Report | 2017 |
|---|---|

- Agencies maintain their own continuity plans, but OEM continues to provide support for continuity planning strategies, trainings, and exercises.

Dr. Owen and Burke further recommend that there are specific Law Enforcement related concerns in drafting a COOP plan. The TCA highlights these concerns because they are extraordinarily important in the case of the PRPB based on some of the recommendations for immediate departmental change that the TCA made in past reports.[16]

Following are some specific considerations which, according to Owen and Burke's guidelines, should be discussed in the PRPB's continuity planning sessions:

- Weapons: How will the arsenal be protected or transported? While arsenals are generally highly secured and protected areas within a facility, a disaster could lead to a breach or the requirement of abandoning the facility as a whole. Is there a protocol for determining when to relocate the arsenal, to what space, and how? Within the alternate facility, is there a suitable area for weaponry?

- Evidence: Similar concerns emerge for evidence in pending cases. When does it need to be moved and what priority should it receive? Following Hurricane Katrina, some evidence was lost and cleanup was continuing as recently as 2011. Certainly, questions about chain of custody could also emerge if the security of evidence storage was breached.

- Laboratories: Related to evidence, agencies and those who depend upon them (e.g., prosecutors' offices) should be prepared to handle temporary inaccessibility of crime laboratories. COOPs should take into account how the work of the crime lab relates to mission essential functions, the impact of disrupted crime lab operations on ongoing analyses, and any concerns related to hazardous materials which might stem from damage to, or movement of, lab equipment and supplies

---

[16] Stephen Own, and Tod Burk, "Continuity of Operations Planning," Blue Sheepdog August 1, 2013. http://www.bluesheepdog.com/2013/08/01/continuity-of-operations-planning/

- K-9 Partners: How will a department's K-9 partners be cared for in a continuity situation? What if a K-9 officer's home kennel is rendered unavailable or if supply chains for dog food are interrupted?

- Inmates: Planning for the evacuation of a detention facility, even one with few inmates, is no small task. Likewise, problems related to long-term power outages or lack of availability of supplies or running water in an otherwise structurally sound facility are challenging issues. If continuity needs include responding to a personnel shortage, how will appropriate supervision of inmates be ensured? One consideration may be relocation of inmates in advance, if there are indications of a pending emergency. Of course, any relocation presumes that space is available and that the alternate detention facility is not similarly impacted by the crisis situation.

- Transportation: Even if the facility is intact and officers are available for duty, plan for scenarios in which transportation lines are unavailable. If roads are closed or vehicles are unavailable, officers may not be able to get to work. Likewise, consider the possibility of gasoline

- Shortages, or an unavailability of fuel, which would be detrimental to patrol and other operations. While this could stem from a variety of circumstances, the unavailability of necessities due to slowdowns in production and transportation is a common theme of discussion in pandemic preparedness.

- Communication: Depending on the type of disaster, communication lines may be partially or completely inaccessible. Likewise, communication operations (e.g., 911 center and dispatch) may have to be relocated. NIMS standards specify that communications should be interoperable and portable, a key lesson learned from past events.

- Cross-Training: Delegation of authority is a key component of COOPs. But, in planning delegation of authority, particularly when focusing on mission essential functions, it is important to consider cross-training – both in the context of who currently has it and who should get it, particularly when necessary to ensure continuity of specialized operations. For instance, there may be only a small number of persons in an agency prepared to assume the role of emergency response team commander, crime lab supervisor, digital forensics examiner,

budget director, etc. As a result, COOPs should be informed by a realistic, rather than idealized, assessment of the feasibility of delegating authority in mission essential areas and how to proceed if personnel are unavailable or unable to come to work.

- Families: Evidence suggests that role abandonment, in which public service employees abandon their assigned posts in crisis situations, is rare. When it does occur, caretaking for family members is a significant reason and, even without role abandonment, it is natural for first responders to be concerned about their families. Advanced planning can help to address these concerns. For instance, the Fraternal Order of Police has developed the Law Enforcement Families Readiness Initiative, including recommendations for officer family readiness and a model policy.

- Stress: Any emergency situation has the potential to induce stress, but this can certainly be magnified if agency personnel have to deal with two crises at the same time – one as the precipitating event for which an emergency response is required and the other as a disruption of normal operations, services, facilities, and so on, requiring implementation of the continuity plan. While COOP training and exercising can increase familiarity with procedures and reduce uncertainty, it remains important to be aware of the impacts of stress. Particularly in the aftermath of the incident, it is important to be aware of the possibility of critical incident or post-traumatic stress and to have resources available for personnel experiencing stress-related symptoms.

# Building Leadership Capacity: The Current Crisis of Leadership, Overtime, Promotions, and Police Absenteeism

The most persistent challenge to the Reform and the implementation of the Agreement today is the current crisis of leadership and management affecting the PRPB and the lack of direction in the implementation of Act 20 of 2017. This crisis has created tremendous uncertainty in all ranks of the PRPB. News coverage and social media debates continue to document the inner struggles of a police department in crisis and

| TCA Seventh (Interim) Semi-Annual Report | 2017 |
|---|---|

how this mayhem at the top is affecting the rank-and-file and the public safety of Puerto Rico in very concrete ways such as the lack of enough available police officers during the holiday season. This crisis is further accentuated when the TCA is regularly excluded from any discussion pertaining to the implementation of Act 20 in relation to the PRPB. In past reports, the TCA has documented the inherent problems with the implementation of Act 20.

The old themes associated with this leadership in turmoil are still recurrent in the aftermath of this national crisis. The TCA continues to see problems associated with promotions, unexplained personnel transfers, questionable overtime practices, and failure to take actions against officers with dubious disciplinary records.

When the TCA refers to an old theme, a pervasive crisis that does not go away, the facts are there. This is what the TCA wrote in his first six-month report of December 2014 regarding these matters:

> "Notwithstanding this overall level of commitment [of the PRBP to the Reform], the TCA has identified an important area of concern that could be considered a particularly local one, and separate from the Reform, which could assume a much larger role in the reform process. The TCA feels compelled to address matters pertaining to the compensation of police officers, including overtime and sick leave which have been fraught with delays, and have created a mood of cynicism among the police rank and file, whose acceptance and effective cooperation with the Agreement is crucial to the success of the Reform, even though the above important matters are not expressly addressed in the Agreement. The above situation is having a negative effect on morale, and the TCA has at times observed work slowdowns and increased sick leave to call out the predicament in a form of possibly impermissible protest. PRPB is well aware of these challenges and is working with the Office of Management and Budget (OMB) attempting to solve said issues. The TCA is of the opinion that if the above salary related matters are not resolved in the near future, the addressed situation in all likelihood will have an adverse effect on the Reform.[17]

---

[17] SIX-MONTH REPORT OF THE TECHNICAL COMPLIANCE ADVISOR, JUNE 6 – DECEMBER 6, 2014, p.7

TCA Seventh (Interim) Semi-Annual Report | **2017**

In subsequent reports, the TCA noted that, although he was cognizant these important matters were not explicitly addressed in the Agreement, they deserved attention for their broader implications. Thus, for example, the lack of proper overtime compensation was having a negative effect on morale. The TCA observed first-hand and received reports of work slowdowns and increased sick leave in the past, although they did not reach the levels that we have seen during the recent holiday season where there were precincts that were not in operation. The TCA has also observed the inability of the leadership in all its ranks, from the Secretary of the Department of Public Safety to the Area Commanders, to address this crisis. In his capacity also as monitor of the federal consent decree on overtime disputes, the TCA has concluded that, although these controversies were for a while being partly addressed by the PRPB, the situation has reached a breaking point that is hurting the implementation of the reforms associated with the Agreement.

In the past, these matters reached the courts. The case regarding the unpaid overtime compensation of PRPB members was before the consideration of the United States District Court (Thomas E. Perez v. Puerto Rico Police Department and Commonwealth of Puerto Rico, et al., USDC-PR, Case No. 16-2849 (GAG)). These days these matters have also reached the public opinion, the streets of Puerto Rico, and the empty halls of the police precincts.

When the Police Commissioner informs the TCA in his dual capacity as TCA and federal monitor of the overtime consent decree that the PRPB was to receive more than $3 million from FEMA, the question is what happened to that money. During the meeting with the Commissioner, she communicated to the TCA that she intended to utilize $500,00 for overtime and the remainder for compensatory time until she was instructed that she could not spend any of this money for overtime. Therefore, the relevant question remains of who told the Police Commissioner that she could not spend that money that she has received from FEMA for that purpose.

There is no question that issues of compensation and overtime have caused morale issues within the PRPB and are the drivers of the current police slowdown and police absenteeism. This has also created significant problems for Commissioner Fraley that does not have the tools to both address personnel issues and the fight against crime. She cannot pay her police officers and without police officers performing their work she cannot prevent and fight crime. This is happening while the records show that police officers providing protection to the Secretary of the Department of Public Safety are

TCA Seventh (Interim) Semi-Annual Report | **2017**

receiving significant overtime payments. This is a fact that is well known to police officers and the public because it has received extensive media coverage.

Another example of a broken chain of command was during the demonstrations of May 1st, 2017. The evidence here is based on extensive testimony the TCA received from the Police Commissioner, Colonel Salva, and other high-ranking officials coordinating the police response to the demonstrations. On May 1st, 2017, Mr. Hector Pesquera - at present, Secretary of the Department of Public Safety ("DPS") but then a civilian - was not part of the Chain of Command in charge of handling the PRPB activities related to the Workers' Day event. By May 1st, 2017, Mr. Hector Pesquera had been appointed by the Governor as the Public Safety Secretary, but had not been confirmed by the Senate. However, the evidence shows Mr. Pesquera was in police headquarters giving orders to personnel under the supervision of the Police Commissioner, including Colonel Salva and others, in the presence of the Police Commissioner.

One of the officers who received instructions from Secretary Pesquera and questioned his authority was Colonel Roberto Salvá. Colonel Salva was promoted by the current Police Commissioner and his appointment was signed by the Governor. However, the Governor has since voided and nullified that appointment. The matter is now being litigated in court.

The TCA submits that it is no longer open to discussion that the Police Commissioner does not have the direct authority and total command and control of the PRPB operations which is required under the Agreement. Consequently, there are no longer doubts that this crisis on the top of command chain is clearly affecting the implementation of the Agreement by creating an environment of uncertainty, mistrust, and polarization of the ranks. That the current management structure is not working well has been clearly established during this reporting period, the result must be an intervention that restores clear lines of leadership and management within the PRPB.

# Building Community Trust Capacity: Findings from the Second Community Survey (Paragraph 241)

TCA Seventh (Interim) Semi-Annual Report | **2017**

In keeping with the responsibility of the TCA consistent with Paragraph 241, the TCA submitted to the Court and the Parties his second survey of the community during this reporting period. This survey provides a better understanding of the police through the lenses of the community. This survey is based on in-depth discussions with diverse community groups. The methodology was a typical focus group study. These groups included representatives of traditionally underserved and underrepresented communities in Puerto Rico, such as blacks, LGBT, Dominican, Homeless, and public housing residents among others.

Paragraph 241 of the Agreement establishes that in assessing the PRPB's overall compliance with and the effectiveness of this Agreement, the TCA shall conduct a reliable, comprehensive survey of members of the Puerto Rico community regarding their experiences with and perceptions of PRPB once during the first three years of this Agreement and annually thereafter. The community survey should be statistically valid, based on a sound methodology, and conducted by an independent entity. This community survey shall include measures to ensure input from individuals of each demographic category. The survey shall also assess the number and variety of community partnerships with PRPB and the depth and effectiveness of those partnerships. Specifically, the survey shall:

   a) include interviews with a random sample of residents of Puerto Rico, PRPB officers, and detainees arrested by PRPB within the past week;
   b) ensure the anonymity of all interview participants; and
   c) survey participants regarding community-police relations; PRPB's integrity, effectiveness, and service; and how it treats members of different demographic groups.

The Agreement required that the TCA conduct a survey of these three populations by an independent entity measuring and reporting on the experiences and perceptions of these groups on police-community relations. The persons and groups surveyed consisted of residents, detainees, and PRPB members. The first survey began on Aug 14, 2015 (resident survey), and the last survey was completed on April 12, 2016 (detainees).

The TCA expanded the survey to all sectors of the community by using focus groups. This methodology provides an in-depth analysis of people's concerns, fosters continued dialogue with the PRPB, and facilitates the design and implementation of remedies to

address concerns.  Specifically, the survey and focus group experts will speak with members of the LGBTQ, Dominican, Chinese, and homeless communities, and CIC representatives to aid the PRPB to use all survey findings to increase their interaction with all communities, consistent with Paragraph 205 of the Agreement.  The TCA will incorporate new groups into the dialogue as they are identified.

These surveys provide the baseline that the TCA will use to determine PRPB's ability to effective engage with the community and increase the public's trust on the work of the police.  These surveys are used to determine strengths and weakness in the area of fairness and legitimacy that structure the Agreement.

The survey undertook a study based on the collection of qualitative data of eight (8) communities in Puerto Rico from homogeneous focus groups.  Through the study, the focus groups were involved in a qualitative research designed to study the opinions or attitudes of the eight groups.  They met in small groups of 6 to 12 people assisted by a moderator and researcher or analyst.  The moderator will provide questions and lead the discussion on the Agreement and the intended reform of the PRPB. These activities related to the focus groups gave continuity to the first surveys in accordance with Paragraph 205, as well as measuring progress as defined in the Action Plans.

Dr. Richard Blanco Peck, the consultant of the TCA, was responsible for the activities related to the focus groups which includes the writing of the final report.  The focus groups had the opportunity to review and make recommendations to the moderator about the questionnaires used to survey the community and other relevant matters.  In these focus groups, the participants were asked about the following areas of the Agreement: use of force, searches and seizures, equal protection and non-discrimination, interaction with the community and public information, administrative complaints, internal affairs, and discipline.  The survey will soon be made available to the public.

The International Consortium of Political and Social Research of the University of Michigan has ranked the summary and findings report about the three surveys.  Of 548 studies, the report is ranked number 10 for Puerto Rican issues.  Of 1,640 studies on policing, the report is ranked number 64.  Finally, of 3,744 surveys, the report is ranked number 103.

# Building Civil Rights' Protection Capacity: Report on the Police Response to the Mass Demonstrations of April and May 2017

Under Paragraph 227, the TCA "shall conduct the reviews specified in this Agreement; shall review PRPB policies, training material, protocols, and programs developed and implemented pursuant to this Agreement; and conduct such additional audits, reviews, and assessments as the TCA or the Parties deem appropriate, or the Court, consistent with this Agreement and the dismissal order."

Pursuant to instructions of the Court, Docket 511; **"ORDER CLARIFYING MAY 22, 2017 SECOND PUBLIC HEARING AGENDA AND SCOPE OF HEARING ON APRIL 19, 2017,"** the Court issued an order setting the agenda for the May 22, 2017, public hearing, to be held in Ponce, Puerto Rico. (See Docket No. 509) During the public hearing, the Court took judicial notice that, since this order, several incidents had occurred during mass demonstrations and protests involving the police and protesters. They included the April 18, 2017 events at the capitol building, as well as the April 25, 2017 events at the foundation of former Governor Sila M. Calderón. The Court also noted that the TCA had indeed observed and received information regarding said incidents.

At the public hearing, the Court ordered the TCA to conduct an assessment of the demonstrations and incidents that occurred at the Capitol building on April 18, 2017, and April 27, 2017, the incident that occurred in "Centro Para Puerto Rico" on April 25, 2017, and the events and incidents that took place throughout May 1, 2017 (Worker's Day).   In the report to the Court, the Court instructed, the TCA were to submit the corresponding assessment and the necessary recommendations to the Court and the Parties.

As per Court instructions, the focus of the assessment should be on the PRPB's compliance with the Agreement and the laws protecting the citizens of Puerto Rico and their civil rights and liberties pursuant to the Constitutions of the United States and the Commonwealth of Puerto Rico.  This assessment was to pay special attention to the

TCA Seventh (Interim) Semi-Annual Report | **2017**

PRPB's policies and trainings on policing of mass demonstrations, command and control, as well as communications and the use of Information Technology ("IT").

In December of 2017, following Court's instructions, the TCA submitted to the Court and the Parties a draft assessment report on the demonstrations and incidents in April and May of 2017. Given that the assessment draft report is under review by the Parties, this Report identifies the methodology used, the timeline, the main themes of the draft report, and an issue – the cooperation of the PRPB with the requests for information made by the TCA - which is separate from the assessment report.

The Methodology used in this assessment report consists of the following:

- Interviewing members of the Puerto Rico Police Bureau (PRPB), members of organizations that participated during some of the events as observers, and individuals having pertinent information in relation with the previously mentioned events.
- Reviewing and analyzing all available video recordings and photographs to verify the accuracy of the information provided by the interviewed individuals.
- Reviewing and analyzing all available documents, reports and forms prepared by the PRPB.
- Reviewing and analyzing the PRPB Self-Assessment reports.
- Reviewing best practices and standard at National level.

The TCA instructed Investigations Consultant (IC) Jose L. Pujol to conduct the Court ordered assessment and to report on his findings. IC Pujol based his work on:

- His law enforcement training and experience as a federal Special Agent for approximately twenty-one (21) years.
- His knowledge as Federal Defensive Tactics Instructor (certified in 1997 by the Federal Law Enforcement Training Center located in Glynco, Brunswick, Georgia).
- The Agreement for the Sustainable Reform of the Puerto Rico Police Department (See Enclosure # 73)
- The Puerto Rico Police Bureau's General Orders (See Enclosures #10 through 19).

The assessment was conducted from May 15, 2017 through December 2017. As of the time of filing of this Interim Report, the Parties have completed their review of the draft assessment. The Report will be filed on January 31, 2018, with the Court.

During the Assessment:

- More than 300 hours of work were dedicated to the investigation and report-writing
- Large numbers of interviews were conducted involving members of the PRPB, members of Organizations that participated during some of the events as observers, and individuals having pertinent knowledge related to the four events covered by the Assessment.
- A significant number of video-recordings were reviewed and analyzed. These video recordings were obtained from the internet from the internet and publicly aired local TV stations. IC Pujol also reviewed edited videos received from the PRPB. Finally, IC Pujol reviewed video recordings made by a local TV station, who allowed IC Pujol to review and analyze their video recordings.
- Hundreds of PR Police Bureau's reports were reviewed and analyzed.

To the extent possible, the draft report and its assessment on findings has not reflected the opinion of the TCA, the TCA's Office, or IC Jose L Pujol. It has reflected the evidence obtained (whether oral, by video, or by accessing documents) by IC Pujol, and the results of the analysis made of the totality of the evidence.

In terms of main themes, the draft assessment report focused on the use of force and its reporting (in particular, use of chemical agents), arrests, the use of operational plans, coordination with the event's organizers, and issues regarding the chain of command. The draft report also documented inconsistencies in reporting and the PRPB"s failure to comply with the TCA's requests during this assessment.

In this six-month report, it is appropriate to discuss PRPB's lack of cooperation with the TCA and the PRPB"s failure to comply with the TCA requests for documents and information. Matters of access to records and personnel by the TCA are regulated by

| TCA Seventh (Interim) Semi-Annual Report | 2017 |
|---|---|

the Agreement.[18]   Two Paragraphs are particularly poignant.   First, Paragraph 263 states that "PRPB shall ensure that the TCA shall have full and direct access to all PRPB and UCCJ staff, employees, and facilities that the TCA reasonably deems necessary to carry out the duties assigned to the TCA by this Agreement."   Similarly, under Paragraph 264, "PRPB and UCCJ shall ensure that the TCA has full and direct access to all PRPB and UCCJ's documents and data that the TCA reasonably deems necessary to carry out the duties assigned to the TCA by this Agreement, except any documents or data protected by the
attorney-client privilege."


Here this Report highlights four examples of the PRPB's failure to comply with the TCA requests:


1.  On June 1, 2017 and August 19, 2017, IC Jose Pujol requested in writing to the PRPB for copies of the PPR-854 (Use of Force) forms related to the four events covered by the Assessment (April 18, 25 and 27, 2017 and May 1st, 2017).   The PRPB refused to provide copies of these forms but allowed the forms to be reviewed by IC Pujol.

2.  The TCA submitted a written request to the PRPB on July 17, 2017, requesting copies of all the video recordings in possession of the PRPB in relation to the four events covered by this Report.  A PRPB officer acknowledged receipt by signing the request.  When IC Pujol delivered the request, the PRPB officer verbally informed that the PRPB had "lots of videos" ("montones de videos").  In several occasions after such day, the TCA office spoke to the same police officer and reminded him of the request for the video recordings, and his responses were always evasive.  IC Pujol was so persistent with this request, that on 08/16/2017, the police officer provided to IC Pujol a computer disk (DVD) containing several video recordings.  The officer stated that they were the video recordings pursuant to the TCA's request.


When IC Pujol reviewed the video recordings, it was rapidly noticed that all the TCA was provided with were video recordings made by reporters of local TV stations, and video

---

[18] See Paragraphs 262 to 270: Access and Confidentiality.

recordings downloaded from the internet (Pulso Estudiantil, Dialogo UPR).  The PRPB officer did not deliver videos recorded by CRADIC or the PRPB.

The TCA finds this fact as a deceitful response to the official request.  The TCA submits that having been provided in a timely fashion with all videos recorded by the PRPB would have helped to present a more complete and accurate draft report.

On 12/01/2017 the PRPB provided copies of nine DVDs to the TCA, all related to the mentioned above events.   These recordings show and corroborate most of the information already provided in other recordings.  However, one of the DVDs, appears to have been edited.  This DVD contains one single file that has recordings made from multiple different locations, and it contains several clearly visible transitions, and in other instances has images' even overlapping each other.  All these facts clearly suggest that this file may have been created with a video editor software. Additionally, two of the other remaining eight DVDs provide multiple video segments which are identified with the sequence number that the video recorder device has assigned to each of them.  These two DVDs are missing several video segments according to the sequence number that the video recorder device assigned to all the segments.

These facts cast doubts on the video recordings that the TCA received, and it could be questioned if they represent only part of the incidents recorded that day by CRADIC.

On December 7, 2017, pursuant to a request of the TCA, the PRPB agreed to offer for interview agents assigned to the CRADIC unit that had been working on the May 1st events providing crowd control at the "Milla de Oro" location.  The TCA interviewed an agent and his supervisor, both assigned to CRADIC.   Present at the time of the interviews for the TCA office were TCA Arnaldo Claudio (via telephone line), IC Pujol, as well as Counsels Federico Hernandez Denton and Antonio R. Bazan.  Representing PRPB was Counsel Joel Torres of the Commonwealth Department of Justice and a police supervisor of the Reform Unit.

During the two interviews, the TCA encountered discomforting contradictions and discrepancies between both interviewees on issues of upmost importance to the credibility of this visual evidence.   This presents a very serious concern about the

possible inability of CRADIC to present their recordings as evidence during any legal process related to these events.  These interviews continue to cast a doubt on the video recordings that were received by the TCA office, and it could be questioned if they represent only part of the total video footage recorded that day by CRADIC.

3. IC Pujol took a small, but a relevant, sample of five (5) Police agents who participated in the events covered by this Assessment.  These five Police agents were reported as having made Use of Force during the April 25, 2017 event.

On July 17, 2017, a written request was made to the PRPB requesting all trainings in which these five agents participated during the last three years.

Despite numerous communications and reminders, this information has not been provided to the TCA as of the writing of this Report.

4. On June 1, 2017, July 17, 2017, and September 5, 2017, IC Pujol requested to the PRPB for copies of the complaints submitted against PRPB agents in relation to the four events covered by the assessment draft report.  The PRPB informed that they only received one civilian complaint which is related to the April 18, 2017 but that at this time, the same still is under investigation.  At present, the review of these complaint has not been allowed by the PRPB.  This fact was made known on November 14, 2017, to personnel of the USDOJ, the Puerto Rico Justice Department, the PRPB, and to the TCA and his Constitutional Attorneys.

On November 17, 2017, the PRPB e-mailed a report titled "INVESTIGACION ADMINISTRATIVA, RE: QUERELLA N.I.A. 2017-01-03-00087" in which they informed that a person complained that, during the April 18, 2017 event, a police officer use force.  According to a PRPB internal document, the complaint is still under investigation pending photographic and video evidence.  On 11/28/2017, IC Pujol e-mailed to the PRPB a copy of a photograph which very likely depicts the police agent just before he used force.

In the draft assessment report, the evidence gathered to date identifies significant gaps and inconsistencies between the statements and the documents provided by the PRPB.

| TCA Seventh (Interim) Semi-Annual Report | 2017 |
|---|---|

For example, there are inconsistencies in the number of police officers injured, the number of use of force incidents reported, and the weapons used by officers.   In addition, the evidence shows, after reviewing PRPB's own reporting of the incidents, that the uses of force incidents by members of the PRPB were allegedly underreported.

# Section IV

## Projected Activities: Paragraph 205(e)

Consistent with Paragraph 250 (e), the TCA will continue to work in the upcoming six months providing technical assistance and review for the policies that the PRPB will submit in subsequent months.  The TCA will continue to provide support to the Police Academy while emphasizing on more comprehensive IT technical assistance.  The TCA will also work with the PRPB in the review of the pending and outstanding training modules.

Some areas of attention during the next six months are as follows:

TCA Seventh (Interim) Semi-Annual Report | 2017

1. Consistent with Paragraph 250 (e), the TCA will continue to work in the upcoming six months providing technical assistance and review for the policies that the PRPB will submit in subsequent months.

2. Will assess and report on the effect the police slowdown and police absenteeism has on compliance with the Agreement

3. Will work with the Parties on the implementation of a new framework for the Agreement in the aftermath of Hurricanes Irma and Maria, including technical assistance in the development of a recovery and resiliency plan as well as a Continuity of Operations ("COOP") plan

4. Will continue to provide support to the Police Academy while emphasizing more comprehensive IT technical assistance.

5. Will continue to conduct random visits to districts, precincts and units to determine that records relating to incidents of use-of-force have been prepared and completed.

6. Will conduct random visits to districts, precincts and units to determine whether the Supervisors of the PPR have conducted reviews and investigations on use-of force.

7. Will continue to monitor the implementation of the NIBRS policy. The TCA will review the production schedule and will interview IT staff to monitor it.

8. Will continue to support the implementation of Paragraph 13.

9. Provide support to the Court in the implementation and execution of Public Hearings.

10. Continue to provide technical assistance related to evidence rooms inspections.

11. Continue to implement next steps in the implementation of Paragraph 241

12. Continue to meet with stakeholders to ensure Reform information is properly disseminated and relations are developed.

13. Continue with the visits to the Zones of Excellence to assess progress.

14. Conduct ride-alongs to verify compliance with new established policies.

15. Continue to monitor the progress of the PRPB Information Technology Infrastructure development.

16. Continue to assess the progress of the Drug, Vice, and Illegal Firearms Division.

# Appendix 1

# TCA Activities and Community Engagements

*Monthly meetings with the Parties*

- In accordance with Paragraph 253 of the Agreement, the TCA has conducted monthly meetings with all Parties during this period, for the considerations of the pending matters. Also, continuous written and telephone communications have been made on a regular basis to ensure the effectiveness and timely response to the situations regarding the status of implementation of the Agreement.

| TCA Seventh (Interim) Semi-Annual Report | 2017 |
| --- | --- |

- During the past six months, the TCA has maintained constant communication with the Hon. Gustavo Gelpí, Judge for the United States District Court of Puerto Rico, for issues or situations that have required his intervention.

- Throughout this period, the TCA has conducted more than 25 meetings with different police agents *of the Puerto Rico Police Department (PRPB)*, for the attention of specific claims and/or complaints that have against the agency because of alleged violations to their administrative due process.

### *Meetings and activities in accordance with Paragraph 254 of the Agreement*

Meetings with Puerto Rico Police Reform Unit:

- Meetings with Police Department Commissioner (August, September, October & November 2017)
- Meetings and communications with Col. Clementina Vega, Director of the Puerto Rico Police Reform Office, and other personnel of the PRPB.
- Monthly meetings with the Police Reform Unit designated personnel for the review, analysis and comments on the Action Plans presented by the PRPB.
- Meetings, conference calls and documents' presentation with review of the politics of the PRPB with the Reform Unit's professionals and/or with the USDOJ and PRDOJ for the analysis, discussions and technical support to the final drafts of following Generals Orders, Policies, Actions Plans and PRPB Forms. Please see Table
- TCA Core Team meetings with Police Reform Unit and other PRPB units (August, October and November 2017)

Meetings with Puerto Rico Police Bureau representatives:

- Several visits to the Police Academy, and meeting with Col. Orlando Rivera and his staff (July, August, October and November 2017).
- Meetings with the head of SARP (August 2017)

Visits and meetings to Police Regional Headquarters and Police Stations and Specialized Units:

- TCA and Core Team visit to Aguadilla Police Headquarters (August 2017).

| TCA Seventh (Interim) Semi-Annual Report | 2017 |
|---|---|

- TCA and Core Team visit to Mayagüez Headquarters (August 2017).
- TCA and Core Team visit to Aibonito Headquarters (July 2017).
- TCA and Core Team visit to Ponce Headquarters (August 2017).
- Visit to police Fire Range at Gurabo (August, October & November 2017).
- Core Team visit to Zone of Excellence Quebradillas (October 2017)
- Core Team visit to Zone of Excellence Utuado (July2017)
- Core Team visit to Zone of Excellence Bayamón (July 2017)

Visits and Meetings to Police Specialized Units:
- CIC, Drugs and Narcotics Arecibo, Aibonito, Mayaguez and Aguadilla Units (July and August 2017)
- San Juan SARP Unit (July 2017)
- TCA Core Team Visit Command and Radio Control Center of Carolina and San Juan (July 2017)

Meeting and communications with representatives of the following Puerto Rico Police's associations and others worker's union:
- Ismael Rivera, Police Association (July 2017).
- Gregorio Matías, Police Organize Associations (July 2017).
- Diego Figueroa, Federación Unida Policias Organizados, (July and October 2017)
- Jaime Morales COPS (July 2017)

Meetings with Community Leaders and other interaction community's activities:
- Meeting with Tati Escobar Office of Advocate for Individuals with Disabilities (July 2017)
- Meeting with Cecilia La Luz from "*Centro Comunitario LGBTT*", Transgender Group (August, September & October 2017)
- Meeting with Modesta Irizarry, Loiza community leader. (Julu 2017)
- Meeting with Carmen Villanueva Community Leader (July 2017)

Meetings with Reform Stakeholders:

- Esq. William Ramírez, ACLU (August and September 2017)
- Dr. Richard Blanco Peck, University of Puerto Rico Public Administration Graduate School for the discussion and analysis and presentation of Paragraph 241 of the Agreement. (July 2017)

- Mari Mari Narvaez Espacios Abiertos (July 2017)
- Jose Rodríguez, Dominican Community Leader (July and August 2017)
- Roberto "Papo" Christian Community Leader (July 2017)
- Pedro Julio Serrano, LGBTT. (July 2017)
- TCA meeting with Honorable Judge Sigfredo Steidel Figueroa (July 2017)

# Appendix 2

## List of Revised Policies

**June/2017**

Orden General 600-612: Autoridad para Llevar a Cabo Registros y Allanamientos
General Order 600-612: PRPB Policy on Searches and Seizures

Orden General 600-620: Armas Especializadas de las Divisiones de Tácticas
Especializadas (DTE)

TCA Seventh (Interim) Semi-Annual Report | **2017**

General Order 600-620: Specialized Weapons of the Division of Specialized Tactics (DTE)

Orden General 600-623: Persecuciones Policiacas
General Order 600-623: Police Pursuits

Orden General 600-625: Manejo y Control de Multitudes
General Order 600-625: Management and Crowds Control

Manual Administración Sistemas Computadorizados
Manual for the Administration of Computerized Systems

Manual Uso y Manejo Sistemas Computadorizados
Manual for the Use and Management of Computerized Systems

Manual Operacional del Cuerpo de Investigaciones Criminales (CIC)
Operational Manual of the CIC

Orden General 500-503: Junta de Evaluación de las Divisiones Especializadas
General Order 500-503: Specialized Divisions Evaluation Board

OA-2015-IV: Orden Administrativa de Intervenciones Vehiculares
OA-2015-IV: Administrative Order on Motor Vehicle Interventions

Orden General 600-618: Uso y Manejo de Armas de Reglamento
General Order 600-618: Use and Management of Regulation Firearm
- Receipt for Regulation Firearm, Magazine, and Ammunition (PPR-121)
- Registration Checking In/Out of Rifles (PPR-924)
- Evidence of Payment for Depreciation of Firearm Lost or Stolen of a Member of the PRPB (PPR-925)
- Request for Service of Firearm (PPR-846)
- Receipt for Regulation Firearm (PPR-279)
- Additional Firearms Assigned to Members of the PRPB (PPR-444)
- Quarterly Inventory of Long Guns, Magazines and Ammunition (PPR-119)
- Repercussion for Non-Approval with Regulation Firearm (PPR-990)
- Certifications of Receipt of Firearm and/or Ammunition (PPR-384)
- Certification of Proof of Functioning Chemical Gas (pepper spray) (PPR-1009)

TCA Seventh (Interim) Semi-Annual Report | **2017**

Orden General: Evaluación de Desempeño de los Miembros de la Policía de Puerto Rico
General Order: Performance Evaluation of Members of the Puerto Rico Police Department
- PRPB Form: Performance Evaluation
- PRPB Form: Performance Self-Assessment

Orden General 600-615: Autoridad para Llevar a Cabo Arrestos y Citaciones
General Order 600-615: Authority to Conduct Arrests and Issue Summons

Manual de Procedimientos Operacionales Estandarizados para las Divisiones de Drogas, Narcóticos, Control del Vicio y Armas Ilegales
Manual of Standardized Operational Procedures for the Divisions of Drugs, Narcotics, Addiction Control and Illegal Weapons

Orden General 600-626: Intervención con Personas Extranjeras
General Order 600-626: Intervention with Foreign Persons

Orden General: Cámara Corporal
General Order: Body Cameras

Glosario de Definiciones: Conceptos Básicos Legales de la Policía de Puerto Rico
Glossary of Definitions: Basic Legal Concepts of the Puerto Rico Police

**July/2017**

Orden General: Creación de la Unidad Motorizada en la Policía de Puerto Rico
General Order: Creation of the Motorized Unit in the Puerto Rico Police

Orden General 600-623: Persecuciones Policiacas
General Order 600-623: Police Pursuits

Orden General 600-625: Manejo y Control de Multitudes
General Order 600-625: Management and Crowds Control

Orden General 600-627: Investigación de Incidentes de Violencia Doméstica
General Order 600-627: Investigation of Incidents of Domestic Violence

Orden General 100-118: Funciones y Responsabilidades de la División de Violencia Doméstica
General Order 100-118: Functions and Responsibilities of the Division of Domestic Violence

OA-2016-4: Orden Administrativa Investigación de Incidentes de Violencia Doméstica Empleados de la PPR
OA-2016-4: Administrative Order for the Investigation of Incidents of Domestic Violence Employees of the PRPB

Orden General 100-113: División de Investigación de Incidentes de Uso de Fuerza (FIU)
General Order 100-113: Division of Incident Investigation of Use of Force (FIU)

Orden General 100-115: División de Delitos Sexuales y Maltrato de Menores
General Order 100-115: Division of Sexual Offenses and Child Mistreatment

Orden General 600-622: Investigación de Incidentes de Delitos Sexuales
General Order 600-622: Investigation of Incidents of Sexual Offenses

OA-2016-3: Orden Administrativa de Delitos Sexuales Cometidos por Empleados de la PPR
OA-2016-3: Administrative Order of Sexual Offenses Committed by Employees of the PPR
- PRPB Forms-849 (849.1 to 849.7): Report of Incidents of Investigation of Sex Crimes
- Brochure for the Confidential Line 343-0000: Rights of Victims of Sex Crimes

Orden General 500-503: Junta de Evaluación de las Unidades Especializadas
General Order 500-503: Evaluation Board of Specialized Units

Orden General 600-612: Autoridad para Llevar a Cabo Registros y Allanamientos
General Order 600-612: PRPB Policy on Searches and Seizures

Orden General 600-620: Armas Especializadas de las Divisiones de Tácticas Especiales
General Order 600-620: Specialized Weapons of the Special Tactical Divisions

Orden General 600-618: Uso y Manejo de Armas de Reglamento
General Order 600-618: Use and Management of Regulation Firearm

| TCA Seventh (Interim) Semi-Annual Report | 2017 |
|---|---|

## August/2017

Orden General 600-615: Autoridad para llevar a cabo Arrestos y Citaciones
General Order 600-615: Authority to carry on Arrests and Citations

Orden General 600-627: Investigación de Incidentes de Violencia Doméstica
General Order 600-627: Investigation of Incidents of Domestic Violence

Orden General 100-118: Funciones y Responsabilidades de la División Especializada de Violencia Doméstica de la Policía de Puerto Rico
General Order 100-118: Functions and Responsibilities of the Puerto Rico Police Domestic Violence Specialized Division

Orden Administrativa OA-2016-4: Investigación de Incidentes de Violencia Doméstica Involucrando Empleados de la Policía de Puerto Rico
Administrative Order 2016-4: Investigation of Domestic Violence Incidents Involving Puerto Rico Police Employees

Manual SAIC: Capitulo 7 - División de Investigaciones de Robos y Fraudes a Instituciones Financieras y Cooperativas
SAIC Manual: Chapter 7 - Investigation Division of Robberies and Frauds to Financial Institutions and Cooperatives

Reglamento de Estudiantes de la Superintendencia Auxiliar en Educación y Adiestramiento
Student Regulations of the Auxiliary Superintendence in Education and Training

Orden General: División Asuntos Confidenciales
General Order: Confidential Affairs Division

Orden General: Acceso y Manejo de los Sistemas de Justicia Criminal
General Order: Access and Management of Criminal Justice Systems

Orden General: División de Crímenes Cibernéticos y Normas para Solicitar, Intervenir y Procesar las Actividades y Equipos Electrónicos Relacionados con la Comisión de Delitos
General Order: Division of Cybercrime and Standards to Request, Intervene and Process Electronic Activities and Equipment Related to the Crime Commission

**September/2017**

Orden General: Comparecencia a los Foros Judiciales y/o Administrativos
General Order: Appearance to the Judicial and / or Administrative Forums

Orden General: Centro de Recopilación, Administración y Diseminación de Inteligencia Criminal
General Order: Center for Collection, Administration and Dissemination of Criminal Intelligence

Orden General 600-610: Grabación de Eventos Públicos
General Order 600-610: Public Events Recording

Acuerdo Colaborativo entre el Departamento de Justicia y la Policía de Puerto Rico en cuanto a las Advertencias Garrity
Collaborative agreement between the Department of Justice and the Police of Puerto Rico regarding the Garrity Warnings

Orden General: Normas y Procedimientos para la Implantación de Adiestramientos y Readiestramientos
General Order: Norms and Procedures for the Implementation of Training and Re-Training
• PRPB Form: Corrective Action Plan

Protocolo: Evaluación Sobre el Cumplimiento de las Mejores Prácticas de Programas Operacionales
Protocol: Evaluation of Compliance with Best Practices of Operational Programs

Orden General 600-601: Reglas de Uso de Fuerza
General Order 600-601: Rules of Use of Force

Orden General 600-602: Uso y Manejo del Dispositivo de Control Eléctrico
General Order 600-602: Use and Operation of the Electric Control Device

Orden General 600-603: Uso y Manejo de las Armas de Impacto
General Order 600-603: Use and Management of Impact Weapons

Orden General 600-604: Uso y Manejo de Agentes Químicos

| TCA Seventh (Interim) Semi-Annual Report | 2017 |

General Order 600-604: Use and Management of Chemical Agents

Orden General 600-605: Informe e Investigación de Incidente de Uso de Fuerza
General Order 600-605: Report and Investigation of Use of Force Incident

Orden General Código de Ética
General Order Code of Ethics

Glosario de Términos de Uso de Fuerza
Glossary of Terms of Use of Force

**October/2017**

Orden General de Comparecencias a los Tribunales y Foros Administrativos
General Order of Court Appearances and Administrative Forums

Orden General de CRADIC
General Order of CRADIC

Orden General de Grabación de Eventos Públicos
General Order for the Recording of Public Events

Acuerdo Colaborativo con el Departamento de Justicia de Puerto Rico en cuanto a las Advertencias Garrity
Collaborative Agreement with the Department of Justice of Puerto Rico regarding the Garrity Warnings

Orden General 600-601:  Reglas de Uso de Fuerza
General Order 600-601: Rules of Use of Force

Orden General 600-602: Dispositivo de Control Eléctrico
General Order 600-602: Electric Control Device

Orden General 600-603: Uso y Manejo de las Armas de Impacto
General Order 600-603: Use and Management of Impact Weapons

Orden General 600-604: Uso y Manejo de Agentes Químicos
General Order 600-604: Use and Management of Chemical Agents

| TCA Seventh (Interim) Semi-Annual Report | 2017 |
|---|---|

<u>Orden General 600-605: Informe e Investigación de Incidente de Uso de Fuerza</u>
General Order 600-605: Report and Investigation of Use of Force Incident
- PRPB Form 854: Use of Force Incident Report
- PRPB Form 204: Use of Force Report
- PRPB Form 892: Daily Use Electrical Control Device.
- PRPB Form 900: Receipt Occupation Less Lethal Weapons
- PRPB Form 928: Daily Report of Incidents of Use of Force

<u>Orden General 600-605: Informe e Investigación de Incidentes de Uso de Fuerza</u>
General Order 600- 605: Report and Investigation of Use of Force Incident

<u>Orden General Código de Ética</u>
General Order Code of Ethics

<u>Glosario de Términos de Uso de Fuerza</u>
Glossary of Terms of Use of Force

<u>Orden General: Evaluación de Desempeño de los Miembros de la Policía de Puerto Rico</u>
General Order: Performance Evaluation of Members of the Puerto Rico Police Department
- PRPB Form: Evaluation Instrument

<u>Orden General: Armas Especializadas de las Unidades Tácticas Especializadas</u>.
General Order: Specialized Weapons of the Specialized Tactical Units.

**November/2017**

<u>Orden General 600-617: Código de Ética de los Miembros del Negociado de la Policía de Puerto Rico</u>
General Order 600-617: Code of Ethics of the Members of the Bureau of the Puerto Rico Police

<u>Manual Operacional del Cuerpo de Investigaciones Criminales</u>
Operational Manual of the Criminal Investigation Unit

<u>Orden General: Citaciones y Comparecencias y Citaciones a los Foros Judiciales y/o Administrativos</u>

TCA Seventh (Interim) Semi-Annual Report | 2017

General Order: Citations and Appearances and Citations to the Judicial and / or Administrative Forums

Reglamento Estudiantes de la Comisión Auxiliar de Educación y Adiestramiento
Students Regulation of the Auxiliary Commission of Education and Training

Orden General: Evaluaciones de Desempeño de los Miembros del Negociado de la Policía de la Policía de Puerto Rico
General Order: Performance Evaluation of Members of the Bureau of the Police of the Puerto Rico Police

Orden General 600-626: Intervención con Personas Extranjeras
General Order 600-626: Intervention with Foreign Persons

Orden General: Comisaria Auxiliar de Responsabilidad Profesional (CARP)
Order General: Assistant Commissioner for Professional Responsibility (CARP)

Orden General: Reorganización de Asuntos Confidenciales
General Order: Reorganization of Confidential Affairs

Manual del Investigador de la Comisaría Auxiliar en Responsabilidad Profesional
Investigator's Manual of the Auxiliary Commissariat in Professional Responsibility

Orden General 100-118: Funciones y Responsabilidades de la División de Violencia Doméstica
General Order 100-118: Functions and Responsibilities of the Division of Domestic Violence

OA-2016: Investigación de Incidentes de Violencia Doméstica Involucrando Empleados
OA-2016: Investigation of Incidents of Domestic Violence Involving Employees

Manual de Procedimientos Estándar (SOP) Violencia Doméstica
Standard Procedures Manual (SOP) Domestic Violence

Orden General 600-627: Investigación de Incidentes de Violencia Doméstica
General Order 600-627: Investigation of Incidents of Domestic Violence

Reglamento para el Recibo, Trámite, Investigación y Adjudicación de Querellas Administrativas Contra Empleados del Negociado de la Policía de Puerto Rico

Regulation for the Receipt, Processing, Investigation and Adjudication of Administrative Complaints Against Employees of the Bureau of the Police of Puerto

Orden General 100-122: Negociado de Drogas, Narcóticos, Control del Vicio y Armas Ilegales
General Order 100-122: Bureau of Drugs, Narcotics, Control of Vice and Illegal Weapons

Orden General 400-402: Procedimiento para el Manejo y Divulgación de las Grabaciones del Sistema de Radio Comunicación del Negociado de la Policía de Puerto Rico
General Order 400-402: Procedure for the Handling and Dissemination of Recordings of the Radio Communication System of the Bureau of the Police of Puerto Rico

Orden General 100-113: Organización de la División de Incidentes de Uso de Fuerza (FIU)
General Order 100-113: Organization of the Force Use Incident Division (FIU)

Orden General: Uso y Manejo de la Aplicación del Mapa de Incidentes Criminales
General Order: Use and Management of the Application of the Criminal Incidents Map (Crime Mapping)

Orden General del Sistema de Intervención Temprana (EIS)
General Order of the Early Intervention System (EIS)

Manual de Procedimientos para el Uso del Sistema de Intervención Temprana (EIS)
Manual of Procedures for the Use of the Early Intervention System (EIS)

# List of Approved Policies

**June/2017**[19]

---

[19] The list of policies of June/2017, belongs to the previous TCA Six Month Report (were approved on June 1, 2017). They are part of this report given that, they were not included in the past report.

TCA Seventh (Interim) Semi-Annual Report | **2017**

Orden General 100-117: Reorganización de la División de Armas y Tácticas Especiales
General Order 100-117: Reorganization of the Division of Special Weapons and Tactics

Orden General 600-621: NIBRS
General Order 600-621: NIBRS

Orden General 600-624: Interacción con Personas Transgénero y Transexuales
General Order 600-624: Interaction with Transgender and Transsexual Persons

Reglamento para el Establecimiento de Prácticas Policiacas Libres de Discrimen,
Hostigamiento, Conducta Sexual Impropia y Represalias de la PPR
Regulations for the Establishment of Police Practices Free of Discrimination, Harassment,
Sexual Misconduct and Retaliation of the PRPB

Orden General: Reclutamiento Aspirantes a Cadetes
General Order: Recruitment Aspirants to Cadets

Orden General 100-126: Reorganización del Centro de Operaciones de Radio Control y Centro
de Mando
General Order 100-126: Reorganization of the Command Center Operational Center for Radio
Control and Command Center

Orden General: Reorganización de la Superintendencia Auxiliar en Investigaciones Criminales
General Order: Reorganization of the Auxiliary Superintendent in Criminal Investigations

Orden General: Repositorio Central para la Captura de Datos Relacionada al Crimen
General Order: Central Repository for Data Capture Related to Crime

Orden General: Reorganización de la Superintendencia Auxiliar en Cuerpo de Investigaciones
Criminales
General Order: Reorganization of the Auxiliary Superintendent in Criminal Investigations Corps

Manual Operacional de Violencia Doméstica
Operational Manual of Domestic Violence

Manual NIBRS
NIBRS Manual

Manual de Explosivos
Explosive Manuals

**July/2017**

TCA Seventh (Interim) Semi-Annual Report | **2017**

Manual de Procedimientos Operaciones Estandarizadas para las Divisiones de Drogas, Narcóticos, Control del Vicio y Armas Ilegales
Manual of Procedures Standardized Operations for Divisions of Drugs, Narcotics, Vice Control and Illegal Weapons

Orden General 600-620: Armas Especializadas de las Divisiones Tácticas Especializadas
General Order 600-620: Specialized Weapons of Specialized Tactical Divisions

Orden General 500-503: Junta de Evaluación de las Unidades Especializadas
General Order 500-503: Evaluation Board of Specialized Units General

Orden General 600-612: Autoridad para Llevar a Cabo Registros y Allanamientos
Order 600-612: Authorization to Carry Out Search & Seizures

Glosario de Definiciones: Conceptos Básicos Legales de la Policía de Puerto Rico
Glossary of Definitions: Basic Legal Concepts of the Puerto Rico Police Department

Manual para el Uso de los Sistemas Computadorizados
Manual for the Use of Computerized Systems

Orden General 100-115: División de Delitos Sexuales y Maltrato de Menores
General Order 100-115:  Division of Sexual Crimes and Child Abuse

Orden General 600-622: Investigación de Incidentes de Delitos Sexuales
General Order 600-622: Investigation of Incidents of Sexual Offenses

OA-2016-3: Orden Administrativa de Delitos Sexuales Cometidos por Empleados de la PPR
AO-2016-3: Administrative Order of Sexual Crimes Committed by Puerto Rico Police Employees

Orden General 100-113: División de Investigación de Incidentes de Uso de Fuerza
General Order 100-113: Use of Force Investigation Division

OA-2015-IV: Orden Administrativa de Intervenciones Vehiculares
AO-2015-IV: Administrative Order of Vehicular Interventions

OA-2017-2: Reuniones Mensuales
AO-2017-2: Administrative Order Monthly Meetings

**August/2017**

Orden General 600-615: Autoridad para llevar a cabo Arrestos y Citaciones General Order 600-615: Authority to carry on Arrests and Citations

Orden General 600-627 Investigación de Incidentes de Violencia Doméstica General Order 600-627: Investigation of Domestic Violence Incidents

Orden General 100-118: Funciones y Responsabilidades de la División Especializada de Violencia Domestica de la Policía de puerto Rico
General Order 100-118: Functions and Responsibilities of the Puerto Rico Police Domestic Violence Specialized Division

Orden Administrativa 2016-4: Investigación de Incidentes de Violencia Domestica Involucrando Empleados de la Policía de Puerto Rico
Administrative Order 2016-4: Investigation of Domestic Violence Incidents Involving Puerto Rico Police Employees

Orden General 100-115: Estructura Organizacional y Funcional de la Oficina de Prensa
General Order 100-115: Organizational and functional Structure of the Press Office

Orden General Centro de Mando y Radio Control
General Order Command Center and Radio Control

Orden General Crímenes Cibernéticos
General Order Cyber Crimes

**September/2017**

Orden General 600-612: Autoridad para llevar a cabo Registros y Allanamientos
General Order 600-612: Authority to conduct Search and Seizures

Orden General 600-615: Autoridad para llevar a cabo Arrestos y Citaciones
General Order 600-615: Authority to carry on Arrests and Citations

Manual Operacional de la Oficina de Explosivos y Seguridad Publica
Operational Manual of the Office of Explosives and Public Safety

**October/2017**

Orden General 600-618: Uso y Manejo de Armas de Reglamento
General Order 600-618: Use and Management of Regulation Weapons