# Puerto Rico Police Bureau

## Status Report
Implementation of the Agreement for the Sustainable Reform

**March 1, 2018**

**Henry  Escalera Rivera**
**Interim Commissioner of the Puerto Rico Police Bureau**
**3-1-2018**

# TABLE OF CONTENTS

I.   Introduction ........................................................................ 2

ii.  Progress Report .................................................................. 3

III.  Zones of Excellence .......................................................... 10

IV.  Compliance Areas .............................................................. 13

   A.  Professionalization ......................................................... 13

   B.  Use of Force ................................................................... 16

   C.  Searches and Seizures ..................................................... 21

   D.  Equal Protection and Non
       Discrimination ............................................................... 22

   E.  Policies and Procedures .................................................. 27

   F.  Training .......................................................................... 32

   G.  Civilian Complaints, Internal Investigations and Discipline ........ 43

   H.  Community Engagement and Public Information .................. 47

   I.   Information Systems and
        Technology ................................................................... 49

V.   Puerto Rico Police Bureau Response to Concerns Raised in the Technical
     Compliance Advisor's (TCA) Previous Six Month-
     Report ............................................................................... 50

VI.  Conclusion ........................................................................ 64

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| Plaintiffs | CIVIL NO.: 12-2039 (GAG) |
| V. | |
| COMMONWEALTH OF PUERTO RICO, et al. | |
| Defendants | |

**STATUS REPORT AS OF DECEMBER 31, 2017, OF THE PUERTO RICO POLICE BUREAU UNDER PARAGRAPH 261 OF THE AGREEMENT FOR THE SUSTAINABLE REFORM**

TO THE HONORABLE COURT:

COMES NOW, the Commonwealth of Puerto Rico and the Puerto Rico Police Bureau, through the undersigned counsel, and respectfully submits its Status Report for the period of May 26, 2017 to December 31, 2017, in compliance with paragraph 261 of the Agreement for the Sustainable Reform of the Puerto Rico Police Bureau, Docket. #60:

## I. INTRODUCTION.

1. The Agreement for the Sustainable Reform of the Puerto Rico Police Bureau (hereinafter referred to as the "Agreement") states in its pertinent part that, beginning with the Technical Compliance Advisor's (hereinafter referred to as the "TCA") first six-month report, Puerto Rico Police Bureau (hereinafter referred to as "PRPB") shall file with the Court sealed and unsealed versions of a status report. Therein, PRPB will delineate the steps taken during the review period to implement the Agreement, an assessment of the status of its progress, and any response to concerns raised in prior TCA's reports (paragraph 261 of the Agreement).

2. Pursuant to paragraph 261 of the Agreement, the PRPB hereby submits its bi-annual status report. This report encompasses progress of the PRPB in its reform efforts for the period

comprising from May 26, 2017 to December 31, 2017. Any statistical data will be provided as of December 31, 2017, except areas were a different date is therein stated.

## II.  PROGRESS REPORT.

### A.  Generals Aspects.

3.  *Passage of Hurricanes Irma and Maria through Puerto Rico in September, 2017 (Executive Orders OE-2017-045 and OE-2017-047 issued by the Governor of Puerto Rico, Honorable Ricardo Roselló Nevares for the passage of Hurricanes Irma and Maria).*

The passage of the hurricanes through Puerto Rico not only totally affected the economic infrastructure, essential services and communications, among others, but also affected the services provided by both private and public entities in Puerto Rico. The PRPB was affected by having to adjust its primary mission of protecting lives and property, to one of immediate response to the emergency created by these atmospheric events. This situation affected the PRPB, both in operational and administrative aspects, especially in the police reform process, one of the most catastrophic in American nation history. The results of these atmospheric phenomena forced the PRPB to adjust all its operations to take the necessary steps to take and maintain control after the disaster resulting from these events. The reform process was affected, to the point that there was a need to request extensions for the delivery of policies, extend the capacity building period, and change compliance dates for the development and implementation of training.

4.  *Status of PRPB Structures after Hurricanes Irma and Maria.*

PRPB structures were considerably damaged, affecting the daily operations, as well as the training phase undergoing to comply with the reform process. Several structures used as training centers were partially or completely destroyed. A committee was created consisting of PRPB personnel and structural engineers from the United States Corps of Engineers. This committee evaluated the state of the totality of one hundred and sixty-eight (168) structures used by the PRPB. Work is still in progress. This evaluation effort will complement the one carried out by the Public Buildings Authority of the Government of Puerto Rico of dependencies housing PRPB units. The following is a partial summary of the conditions of the PRPB structures evaluated by the committee:

| PRPB Structures Evaluated | Structures in Good Condition | Structures in Need of Temporary Improvements | Buildings with Structural Danger |
|---|---|---|---|
| 168 | 120 | 35 | 13 |

5. *Request for Extension of the Capacity Building Period.*

The PRPB, through its legal representation, requested the TCA an extension of four (4) months to extent the capacity building period (until October 7, 2018), based on the need to modify the timeframes set forth in the Action Plans (see paragraph 239 of the Agreement). The proffered justifications for the extension request are the following:

   a. Unexpected challenges have delayed the policy approval process; and
   b. Additional time is required to draft policies and regulations capturing amendments to Act 53-1996, which has been superseded by Act Law 20-2017, known as the Department of Public Safety of Puerto Rico Act (hereinafter referred to as Law 20-2017). (Law of Department of Public Safety of Puerto Rico).

Although the TCA maintains that the PRPB has made steady progress in the implementation of its action plans during the capacity building period, and that progress has been observed mainly in the areas of policy development and training, this extension is necessary to be able to adjust the timelines in the action plans in response to the challenges presented.

6. *Request for Extension on Policies Submission Deadline.*

On September 27, 2017, the former Commissioner of the PRPB, requested the TCA an extension under paragraphs 229 and 230 of the Agreement, so that policies that were scheduled to be submitted on September 30, 2017, be postponed until October 30, 2017. This petition was made due to the passage of Hurricanes Irma and Maria through Puerto Rico during the month of September, 2017. The state of emergency and the challenges raised by this situation, such as the lack of essential services and human resources, specifically during the month of September, 2017, affected the completion of these policies, reason why this request was made. In response to the emergency created by these weather events, the Governor of Puerto Rico, Dr. Ricardo Rosselló Nevares, issued the Executive Orders OE-2017-045 and OE-2017-047.

7. *PRPB Self-Assessments.*

In the self-assessment visits, the procedures performed in the daily operations of police officers and the documentation generated by them are evaluated, pertinent to the performance of the work units versus what is established in the Action Plans according to the Agreement (paragraphs 232-233).

The process of self-assessment is initiated with a meeting with the high ranking police officers of the areas to be evaluated, then visits are made to verify the units. The results of the evaluations are consolidated in a global report that details the places visited, which high ranking officer was present with the Reform Office personnel, what items were reviewed and the recommendations on the findings. Subsequently, the Director of the Reform Office meets with the Area Commander and zone commanders of their respective Police Area to inform the findings and provide the opportunity to make the necessary adjustments to achieve the sustainability of the process. For those units not responding to the Area Commander in the chain of command, a separate report is prepared and presented to the corresponding Auxiliary Commissioner or Bureau Director.

For the period covered in this report, the areas assessed were Mayagüez and Carolina. The Police Area of Mayagüez was visited during the period of May 23 to July 7, 2017. The challenges identified in this area are related to the following topics: monthly meetings, service weapons, use of force, evidence rooms, and electrical control weapons, among others. The Police Area of Carolina was visited for evaluation on August 1, 2017. The challenges identified in this area are similar to the ones found in the Mayagüez Area, although later are mentioned in more detail.

From September 20, 2017, to February 9, 2018, the self-assessment visits were interrupted to allow the staff to focus on the emergency tasks. Although there are still police areas that have circumstances to overcome, the Director of the Reform Office requested authorization from the Interim Commissioner to restart the self-assessment visits to the police areas that remain to be visited. Starting on February 12, 2018, the areas of San Juan, Bayamón, Caguas, Arecibo and Aguadilla will be on schedule to be visited. This will allow that in October, 2018, when the capacity building period ends and the TCA initiates the compliance evaluations in the agency according to paragraph 242, all the work units of the PRPB have benefited of the orientations based on the result of the self-assessments.

The following are the findings of the self-assessments:

a. Records of Local Academies[1] (Monthly Meetings) that took place and the police officers' attendance to these, as established in the Special Order 2010-7, titled, "Monthly Local Academies":

   i. The records show that civil employees are not included in the topics that are discussed about the Reform process and others of interest to them.

   ii. The need for follow-up in cases where police officers fail to attend the Monthly Meetings, according to the scheduled dates.

   iii. Number of certifications did not match the number of people present (attendance sheet).

   iv. The signatures of the police officers present in the attendance lists of the Monthly Meetings are collected, but the reasons for those who are absent are not indicated, leaving blank spaces instead of writing the reason why they did not attend.

   v. In some cases, the evidence of compliance with the Monthly Meetings were not immediately available. This occurs mostly when the Meeting is held in a centralized way (outside the unit).

b. Service Weapons:

   i. Assessment revealed that in some units supervisors do not perform and/or do not document the random inspections of the police officers' service weapons, ammunition, and ammunition clips during the work shift, as part of duties that each shift supervisor must perform at least once a month, certifying the completion thereof, as established in the General Order Chapter 600, Section 618, titled, "Use and Management of Service Weapons", Section III, B, 5 (d).

   ii. Substitutions of the ammunition of rifles and shotguns were not made in accordance with General Order 600, Section 618, titled "Use and Management of Service Weapons", Section III, B, 5 (b).

---

[1] The current policy at the time of the self-assessment visits was Special Order 2007-10, titled, "Monthly Local Academies", repealed by the current policy, Administrative Order OA-2017-2, titled, "Monthly Meetings" effective on August 31, 2017".

     iii.  Issues in the completion of Form PPR-924, "Registration of Entry and Exit of Long Arms", in the instruction box a brief explanation of the supervisor or instructions is missing.

c.  Deficiencies in the Use of Forms:

     i.  PPR-928 "Daily Force Incident Notification".

     ii.  PPR -854 "Use Force Report".

     iii.  PPR-82 "Condition of Persons Entered/Released in the Holding Cell".

     iv.  PPR-128 "Vehicle Inventory".

d.  Failure to perform and/or document weekly arc tests on Electronic Control Weapon (ECW), as established in General Order Chapter 600, Section 602, titled "Use and Handling of the Electronic Control Weapon".

e.  There are some blocked email accounts.

f.  Deficiencies in the evidence rooms or temporary custody evidence deposits, as well as the handling of the evidence according to the General Order Chapter 600, Section 636, titled "Rules and Procedures for the Handing, Custody and Disposition of Evidence", the temporary evidence deposit room was not under the care of the duty officer, and they did not have a control book for the inventory breakdown of the pieces of evidence deposited per shift, which makes it difficult to verify the status of the evidence or to which case they belong.

g.  Signal problems in some places with the Computer Aided Dispatch System (CAD).

h.  Lack of documents in criminal investigation files (General Order Chapter 600, Section 615, titled "Authority of the Puerto Rico Police to Carry out Arrests and Citations").

i.  Possible lack of representation of community groups in several of the Citizen Interaction Committees, since some representatives are in the process of resigning the Committee.

j.  The quantity of police officers trained in topics such as Searches and Seizures, Domestic Violence and Police Pursuits are not as expected in respect to the dates outlined in the Action Plans for training implementation.

    k.  Documents that must be displayed on all PRPB facilities' bulletin boards:

        i.  The following policies were found not to be posted in some bulletin boards: Regulation No. 8728, "Regulation for the Establishment of Police Practices Free of Discrimination, Improper Sexual Conduct and Retaliation of the Puerto Rico Police", and/or the "Addendum" to the Internal Regulations, approved on March 13, 2017.

        ii.  The Searches and Seizures posters (Spanish and English) were not displayed in some units.

8. *Law 20-2017.*

On October 10, 2017, Law 20-2017 came into effect, consequently repealing the previous Puerto Rico Police Act 53-1986. As of the effectiveness of this Act, the Puerto Rico Police Department and the Superintendent is now known as the Puerto Rico Police Bureau (PRPB) and the Commissioner of the Puerto Rico Police, respectively.

The law of the Department of Public Security of Puerto Rico; established a new system composed of all the components that administer public security in Puerto Rico, allowing to share personnel and administrative expenses y, as pertinent, create the Puerto Rico Police Bureau.

9. *Self-Evaluation of the Multitudinous Events of April and May of 2017.*

Paragraphs 32, 34 and 35 of the Agreement establishes that the PRPB will develop crowd control and incident management policies that guarantee the following: compliance with applicable laws that are in accordance with generally accepted police practices; respect for freedom of expression and the right to meet legally; and that after each response to a mass demonstration, civil disturbance, or other crowd control situation, an assessment of the activities is conducted, to ensure compliance with applicable laws and PRPB policies and procedures.

During the months of April and May of 2017, four (4) demonstrations took place in the San Juan Police Area. These occurred on the dates of April 18, 25, 27 and May 1, 2017. According to the documents evaluated, the reasons that triggered them were related to the economic and fiscal situation of Puerto Rico, such as: Project 785 (Commission for the Audit of Public Debt); Fiscal Oversight Board; visit of the Senate President Thomas Rivera Schatz to the Sila María Calderón

Status Report

Foundation; Project 938 of the House of Representatives; and the Government Fiscal Plan approved by the Fiscal Oversight Board.

Prior to the enforcement of Law 20-2017, the then Commissioner Michelle Hernandez de Fraley appointed an internal committee in the Agency composed of the Auxiliary Commissioner of Field Operations, the San Juan Area Commander, the Director of Tactical Operations, the Director of SWAT, an officer of the Auxiliary Superintendence of Criminal Investigations, and two (2) officers of the Reform Office  to evaluate the actions of the police officers in each event; and analyze if the actions of the police were in accordance with the policies, procedures and training created for these purposes, using as a frame of reference the documents provided, the General Orders; Chapter 600, Section 625, titled "Crowd Control"; Section 601, titled "Rules for the Use of Force by Members of the Puerto Rico Police"; and Section 605, titled "Report and Investigation of Use of Force Incidents by Members of the Puerto Rico Police" and, last but not least, their own experience of most of the members of the committee, who participated in the police actions in different capacities and supervision levels, in one or more of these events.

Once the work of the committee was completed, in the results presented, they concluded that several general tendencies common to the four (4) events occurred, that can be improved to achieve greater efficiency in handling future events, if the following needs are met:

a.  Need to design a comprehensive work plan that complies with the provisions of General Order 625, that allows to anticipate possible events that may occur to develop specific strategies to take the necessary and effective actions; guaranteeing compliance with applicable laws and respecting freedom of expression and the right to meet legally, and police actions that are in accordance with generally accepted police practices. The Committee recommended that the work plan should be drafted by the Police Area Commander where demonstrations are organized or take place.

b.  Need to train high ranking officers in strategies, tactics, negotiations and distribution of resources for the handling of incidents, crowd control and constitutional activities, knowledge needed to be able to act as an Incident Commander. It is also recommended to provide training on the National Incident Management System best known by its acronym NIMS offered by Homeland Security.

c.  Need to train all police officers in the updates of the General Order Chapter 600, Section 625, titled "Crow Control" and perform practical exercises in simulated scenarios that allow them to apply the knowledge acquired and clarify doubts.

d.  Review General Order 625, to re-evaluate several aspects necessary to achieve greater effectiveness in the handling of critical incidents and establish uniformity in the documents that must be completed to demonstrate and justify the procedures used in each event. Among these we can mention the following:

   i.  Informative Page - This form is very useful to obtain necessary and accurate information from the organizers of the events that will later help to develop an effective work plan to handle any incident that may occur.

   ii.  Authorize high ranking officers, other than the Incident Commander, to disperse a crowd in cases of emergency or under the instructions of the Area Commander.

   iii.  Establish the criteria to designate the Incident Commander and assign a single person to this function.

   iv.  Establish support high ranking officers for the operation in addition to the Incident Commander and the Area Commander, which allow a more efficient and effective work in the handling of incidents or critical events.

## III.  ZONES OF EXCELLENCE.

1.  *Consolidation of the Caguas Norte and Caguas Sur Precinct.*

The Zones of Excellences (hereinafter referred to as "ZOE") were established by provision of paragraph 7 of the Agreement for the Sustainable Reform of the Puerto Rico Police, in response to the concerns raised by the United States Department of Justice (hereinafter referred to as "USDOJ") and in view of the need of the PRPB to modernize and professionalize its operations. The main purpose of these, is to be the place where the new and revised policies are implemented and trainings adopted by the PRPB, aimed at compliance with the Agreement, to prove the effectiveness of the same to achieve greater efficiency in the services that are offered to our citizens and communities in general. It emerges as a critical component within the Excellence Plan (March 2011). The ZOE are precincts where policies and generally accepted police practices are applied first to measure compliance with the Reform, and later extend them to the rest of the police units.

At present, five (5) ZOE have been established in the following jurisdictions: Bayamón Oeste Precinct, Quebradillas District, Utuado District, Las Piedras District and Caguas Norte Precinct. The latter was inaugurated on May 18, 2016.

In the month of September of 2017, after the Island was hit by Hurricane Maria; the structure of the Caguas Norte Precinct, was destroyed, receiving substantial damages, making its use impossible because it presented a risk to the safety of employees and visitors. This was certified by personnel from the Public Buildings Corporation of the Government of Puerto Rico, Federal Emergency Management Agency, and the US Corps of Engineers. Given this situation, the precinct and its personnel were relocated in the facilities of the Caguas Area Command. The US Corps of Engineers, after an evaluation of the structure, determined that 1.5 million dollars was needed to fix the structure.

In view of this information, as part of the process of making administrative decisions, the following aspects were analyzed:

a.  The recommendation of the study of personnel and resources allocation that is being carried out by the company Vision to Action (hereinafter referred to as "V2A")[2], in which the consolidation of the Caguas Norte and Caguas Norte Precincts was suggested, as a measure to achieve greater efficiency in the use of available resources to provide services more effectively and efficiently, by integrating the administrative and operational phases of both precincts. Achieving a planned reduction of the personnel used in administrative tasks to be used in operational tasks.

b.  The current need to achieve a reduction in the operational expenses of government agencies due to the existing fiscal crisis, maintaining the services offered to the communities. After an analysis conducted by the Caguas Area Commander, endorsed by the then Auxiliary Commissioner in Field Operations, recommended the consolidation of the Caguas Norte and Caguas Sur Precincts, aimed at maximizing the operational and administrative resources of the PRPB, resulting in more effective police operations given the current situation of the physical facilities that housed the Precinct of Caguas Norte.

---

[2] The company Vision to Action (V2A) is the company hired by the PRPB to carry out the assignment study of personnel and resources established in paragraph 13 of the Agreement.

c. The creation of the ZOE, proved to be very effective in establishing processes initiated by the reform. To the extent that policies, procedures and training were added, the PRPB realized in the process of evaluating the implementation, that in order to meet the timelines the policies and trainings had to be fully implemented in all police areas and not only in the ZOE.

The then Commissioner, with the objective of offering greater efficiency in the services that the PRPB offers to the public, immediately accepted the recommendations made by the Caguas Area Commander and the company V2A, on the administrative and operational integration of the Precincts of Caguas Norte and Caguas Sur, establishing again the District of Caguas, as established by the current policy, the Special Order 2007-5 titled "Reorganization of the Caguas Area". This action was informed to the TCA and USDOJ in a letter dated December 28, 2017.

2. *ZOE Training Progress.*

The table shown below summarizes the training progress in the five (5) ZOE Districts/Precincts as of December 31, 2017. The compliance percentage is based on the quantity of two hundred and fifty (250) PRPB police officers assigned to de ZOE.

| ZONES OF EXCELLENCE TRAINING PROGRESS | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **District/Precinct** | **Precinct 311 Bayamon Oeste** | | **District 173 Utuado** | | **District 059 Quebradillas** | | **District 044 Las Piedras** | | **Precinct 113 Caguas Norte** | | **Totals** | |
| **Amount of Personnel per ZOE** | **86** | | **34** | | **41** | | **35** | | **54** | | **250** | |
| **Trainings** | **#** | **%** | **#** | **%** | **#** | **%** | **#** | **%** | **#** | **%** | **#** | **%** |
| General Order 600-603 Baton | 83 | 97% | 34 | 100% | 40 | 98% | 35 | 100% | 51 | 94% | 243 | 97% |
| General Order 600-622 Sexual Offenses | 85 | 99% | 34 | 100% | 40 | 98% | 35 | 100% | 48 | 89% | 242 | 97% |
| Police Officers with Email Account | 85 | 99% | 34 | 100% | 41 | 100% | 35 | 100% | 54 | 100% | 249 | 100% |
| General Order 600-605 Use of Force | 85 | 99% | 34 | 100% | 41 | 100% | 35 | 100% | 54 | 100% | 249 | 100% |
| General Order 600-602 Electronic Control Weapon | 79 | 92% | 31 | 91% | 41 | 100% | 34 | 97% | 52 | 96% | 237 | 95% |
| General Order 600-615 Arrests and Citations | 84 | 98% | 25 | 74% | 41 | 100% | 35 | 100% | 50 | 93% | 235 | 94% |
| General Order 600-604 Pepper Spray | 85 | 99% | 10 | 29% | 40 | 98% | 35 | 100% | 53 | 98% | 223 | 89% |
| General Order 600-624 Transgender | 84 | 98% | 34 | 100% | 41 | 100% | 35 | 100% | 52 | 96% | 246 | 98% |
| General Order 600-618 Daytime Shooting | 78 | 91% | 32 | 94% | 39 | 95% | 28 | 80% | 41 | 76% | 218 | 98% |
| OG 600-618 Nighttime Shooting | 77 | 90% | 32 | 94% | 39 | 95% | 27 | 77% | 50 | 93% | 225 | 90% |
| OG 600-623 Pursuits | 84 | 98% | 34 | 100% | 37 | 90% | 35 | 100% | 54 | 100% | 244 | 98% |
| OG 600-612 Searches and Seizures | 83 | 97% | 34 | 100% | 40 | 98% | 34 | 97% | 27 | 50% | 218 | 87% |
| OG 600-627 Domestic Violence | 82 | 95% | 34 | 100% | 40 | 98% | 31 | 89% | 51 | 94% | 238 | 95% |
| Police Ethics (Code of Ethics) | 85 | 99% | 34 | 100% | 41 | 100% | 35 | 100% | 52 | 96% | 247 | 99% |

The information is presented by work units and the training provided. Included, is the total number of police officers assigned, the amount and percentage of personnel trained in each topic are

observed from each unit of work. The information shows that the ZOE have complied with the training required in the policies developed, in compliance with the Agreement and following the guidelines and timeframes detailed in the Action Plans, except for justified cases for several reasons, including as the principal factor the hurricanes occurred during the month of September 2017[3].

## IV.  COMPLIANCES AREAS.

**The policies and procedures carried out under the Action Plans and the Agreement, mentioned in this report, have been reviewed and approved by the TCA and the USDOJ, prior to being put in effect in the PRPB. As well, the training materials mentioned below have been reviewed and approved by the TCA, prior to its implementation.**

### A.  Professionalization.

1.  *Policies Developed or Reviewed.*

   a.   General Order Chapter 300, Section 305, titled, "**Rules and Procedures for Transfer Transactions of the Rank System Personnel**".

On May 15, 2017, the former Commissioner signed this policy. The General Order has the purpose of establishing the guidelines, conditions and procedures that will govern the rank system personnel transfer transactions. This, in support of the change of the PRPB towards the concept of community policing, maintaining the efficiency and effectiveness of the organization, as well as providing the police officers with the opportunity to promote the continuous improvement of their work performance. It is established in this General Order, that any transfer transaction will be made in a fair, equitable, impartial manner, safeguarding the best interests of the PRPB and maintaining an environment of respect, free from discrimination and reprisals.

---

[3] The justifications for police officers pending trainings are as follows: the District of Quebradillas has one (1) case per medical condition; the District of Las Piedras has two (2) cases in military leave, one case in mandatory retirement (in leave); Bayamón Oeste Precinct has two (2) cases for military license, two (2) temporarily assigned to other units and two (2) more in the replacement center (administrative unit in the PRPB for absences cases due to the concepts of natural illness, work accidents, among others, for a period greater than thirty [30] working days); the Utuado District has one (1) unarmed police and another temporarily assigned to another unit. In Addition, the Utuado District during the period after the hurricanes, the pepper spray training of twenty-four (24) policemen expired, due to the pause in the trainings during the emergency. These Utuado police officers has already begun to be trained.

The revision of this policy was carried out as established in the Professionalization Action Plan; Policies and Procedures Development Objectives; Activity 1.3.

2.  *Summary of Work Conducted on Paragraph 13: Study of Personnel Allocation and Resources.*

Paragraph 13 is part of the Puerto Rico Police Reform Professionalization Compliance Area, requiring the PRPB to carry out an assignment study of personnel and resources to ensure that the PRPB counts with the correct number of personnel to fulfill its mission. The company contracted to develop the project is the Puerto Rican consulting firm in strategic management, Vision to Action (V2A); with the active participation of consultant Dr. Alexander Weiss, expert in capacity studies of Police Departments in the United States.

The purpose of the staffing study is to determine the appropriate number of civilian and rank personnel to carry out the functions within all the units of each Auxiliary Superintendence and Central Office. As part of the study, information has been collected on the activities carried out by each function per shift, including the frequency with which they are performed and the time each activity takes. The information on activities and times has been compiled through interviews and focus groups, complemented by frequency data collected by the CAD (Computer Aided Dispatch), and other methods of data collection.

The one-year project to carry out the study began in May, 2017, taking the first month to understand the organization and prepare the plan to carry out the analysis. In June, 2017, visits and interviews to the different areas of the PRPB began, starting with the Auxiliary Superintendence of Field Operations. From the beginning of the project until December, 2017, all the locations of the following work units were visited:

a.  Auxiliary Superintendence in Field Operations.

b.  Superintendence in Professional Responsibility.

c.  Legal Affairs Office.

d.  Security and Protection Office.

e.  Press Office.

f.  Auxiliary Superintendence in the "Fortaleza" Police.

g.  Auxiliary Superintendence in Criminal Investigations (these visits are programmed to be completed in January, 2018).

In these units, 100% of the locations were visited, including the one hundred (110) precincts and districts belonging to the Auxiliary Superintendence in Field Operations. In the seven (7) months that the study has been carried out, there have been three hundred and sixteen (316) interviews with four hundred and fifty-nine (459) participants. The visits analyze the procedures and activities carried out by the various functions contained in each work unit. In addition, the Service Lists (PPR-850) are validated to understand how many resources are allocated per function and documents of statistical results, list of equipment and vehicles, among others, are requested.

Hurricane Maria caused most of the staff of the Auxiliary Superintendence in Field Operations and the Auxiliary Superintendence in Criminal Investigations to be temporarily re-assigned to the field in order to support traffic control task, and other operational tasks different from their usual duties. This situation did not significantly impact the project, since the visits and analyses of other work units were prioritized to provide time for the units of the Auxiliary Superintendence in Field Operations and the Auxiliary Superintendence in Criminal Investigations to return to their usual tasks, being available to receive the V2A personnel to continue the study.

In addition, interviews have been conducted with some Auxiliary Commissioners or Office Directors to understand the structure of their units, in order to be able to plan future visits and interviews to be carried out in 2018. These meetings include the directors of the following units:

a.  Auxiliary Superintendence in Management Services.

b.  Auxiliary Superintendence in Education and Training.

c.  Reform Office.

In addition to the visits and interviews, twenty-eight (28) group sessions (focus groups) have been conducted with Sergeants or Division Directors, to understand in more detail the complaint investigation process of the Auxiliary Superintendence in Field Operations, the steps and time involved in the investigations of the Auxiliary Superintendence in Professional Responsibility and the Auxiliary Superintendence in Criminal Investigation by Bureau and Division.

To complement the analysis, V2A facilitated two (2) working sessions with the management personnel of the Auxiliary Commissioner of Field Operations, the Auxiliary Commissioner of

Criminal Investigations and the Reform Office to determine which statistical and administrative reports are the ones that should be performed per work unit of the Auxiliary Superintendence in Field Operations. This to establish the real need for administrative personnel per unit. Also, three (3) work sessions have been conducted with the PRPB Appointments and Changes Division personnel to determine how to transfer the information of personnel functions raised by the study and to integrate it into the systems used by the PRPB to manage the roster. This would support the sustainability of the study and allow the analysis of the calculation of the necessary personnel to be continued once V2A completes the project. Likewise, since December, 2017, a lieutenant assigned as project coordinator began receiving training in order to manage the databases developed by V2A to calculate the need for personnel.

As part of the project, monthly meetings have been held with NPPR senior management to show the models to be used to calculate the need for resources, receive feedback on calculated results and plan the next steps to be followed. The V2A findings will be presented in formal documents during the months of February to April, 2018, beginning with the Auxiliary Superintendence in Field Operations final report. However, V2A calculations, have already been used to support administrative decisions regarding the consolidation of precincts such as Caguas Norte with Caguas Sur, after Hurricane Maria and the situation to be considered of the possibility of consolidating the Hayales Detachment with other stations.

**B. Use of Force.**

1. *Policies Developed or Reviewed.*

   a. General Order Chapter 100, Section 117, titled, **"Division of Special Tactics and Weapons"**.

On August 31, 2017, the then Commissioner signed the new version of this General Order. The purpose of this policy is to review the organizational structure, methods of selection, recruitment, and mobilizations of the Special Weapons and Tactics Division (SWAT), considering that the main objective of the team is to handle high-risk incidents, which endanger public safety, as safely as possible. This is achieved through the selection and proper recruitment of personnel, training and tactical teams to deal with such situations, and the assignment of specialized functions, focused on tactics to protect human life, property, civil rights of people, and the fight against crime.

The revision of this order meets, for the second time, the provisions of the Use of Force Action Plan; Policies and Procedures Development Objectives; Activity 1.10. This action demonstrates the PRPB's commitment to implementing the provisions of the Action Plans to comply with the Agreement, and provide sustainability to the reform process.

b.  General Order Chapter 600, Section 620, titled, **"Specialized Weapons of the Specialized Tactical Units (STU)"**.

On August 31, 2017, the then Commissioner signed the new version of this General Order. The purpose of this General Order is to establish the rules and procedures to be followed during the use of specialized weapons by police officers that belong to the Specialized Tactical Divisions of the PRPB. Also, regulate that the necessary training and certifications are provided, which will allow them to attend dangerous high-risk situations, minimizing the chances of injuries to police officers, suspects or third parties.

The revision of this order complies, for the second time, with what is established in the Use of Force Action Plan; Policies and Procedures Development Objectives; Activity 1.11. This action is an indication of the PRPB's commitment to implement the provisions of the Action Plans to comply with the Agreement and provide sustainability to the reform process.

c.  General Order Chapter 100, Section 112, titled **"Tactical Operations Division"**.

On August 31, 2017, the then Commissioner signed this policy of the Tactical Operations Division (DOT for its acronym in Spanish). The purpose of this General Order is to provide mechanisms for the selection, recruitment or permanence of the personnel of the DOT. In addition, to include the requirement to document and report the activities concerning the activations and/or mobilizations, emphasizing the capacity to carry out the DOT's mission in a constitutional manner. DOT is the PRPB operational unit mainly responsible for controlling crowds and/or riots, as well as acting in interventions where life and property are at risk of being damaged; where there is destruction of public or private property, threat of explosives, or any other particular circumstance that threatens public safety. To fulfill their responsibility, the police officers assigned to the DOT will have specialized training in strategies, tactics and techniques that will enable them to carry out their functions without the need for excessive use of force, or to impede the constitutional right to free expression, as dictated by the Bureau's use of force policies.

This is the first revision of this policy, which in its previous version was tempered for the first time to the Agreement, at the same time the General Order 73-4, titled, "Rules and Procedures for the Tactical Operations Unit" was repealed. This action is carried out in compliance with the Use of Force Action Plan, Policy and Procedure Development Objectives; Activity 1.9. PRPB with this action demonstrates its commitment and effort in implementing the provisions of the Agreement, providing sustainability to the reform process, reviewing policies previously developed according to the Action Plans, maintaining constitutional policies and keeping up to date with the generally accepted police practices.

2. *Designation of Legal Advisors for the Force Use of Force Investigations Boards.*

   a. On August 7, 2017, PRPB appointed the legal advisors of the Force Review Boards (FRB) in the thirteen (13) Police Areas and the Commissioner's Force Review Board (CFRB). The appointment of these members is made in accordance with General Chapter 500, Section 502, titled, "Puerto Rico Police Use of Force Incidents Review Board", which was developed in arrangement of Use of Force Action Plan; Policies and Procedures Development Objectives; Activity 1.3.

3. *Statistics of Use Force Cases in Police Areas[4]:*

   a. Use of Force Incidents in 2017, as reported by the Superintendence of Professional Responsibility:

| Police Areas | Level I | Level II | Level III | Level IV | Totals | % of Cases per Area |
|---|---|---|---|---|---|---|
| San Juan | 6 | 16 | 15 | 11 | **48** | **8%** |
| Arecibo | 34 | 7 | 2 | 8 | **51** | **8%** |
| Ponce | 51 | 6 | 14 | 5 | **76** | **13%** |
| Humacao | **0** | 7 | 7 | 3 | **17** | **3%** |
| Mayaguez | 29 | 12 | 7 | 3 | **51** | **8%** |
| Caguas | 8 | 7 | 16 | 3 | **34** | **6%** |
| Bayamón | 37 | 27 | 32 | 17 | **113** | **19%** |

[4] The statistical information on the incidents of use of force occurred was provided by the Superintendence of Professional Responsibility (Division of Investigations of Incidents of Use of Force [FIU], unit responsible for the custody of these documents). It is based on the quantity of use of force reports (Forms PPR-854 "Force Use Incident Reports") received by this unit, and does not represent the total amount of incidents occurred, due to those in transit.

| | | | | | | |
|---|---|---|---|---|---|---|
| Carolina | 7 | 11 | 39 | 4 | 61 | 10% |
| Guayama | 4 | 7 | 8 | 1 | 20 | 3% |
| Aguadilla | 40 | 18 | 12 | 2 | 72 | 12% |
| Utuado | 14 | 3 | 6 | 2 | 25 | 4% |
| Fajardo | 6 | 2 | 4 | 1 | 13 | 2% |
| Aibonito | 9 | 2 | 2 | 7 | 20 | 3% |
| **Sub Totals** | **245** | **125** | **164** | **67** | **601** | |
| *Average* | *19* | *6* | *13* | *5* | *46* | |

The table above shows the cases of use of force occurred in the thirteen (13) Police Areas during 2017, according to the reports received by the Auxiliary Superintendence in Professional Responsibility. In 2017, according to this information, the police officers made use of force in six hundred one (601) times, in the different levels from 1 to 4. The level of greatest trend was Level 1, followed by Level 3. The table also shows a column with the percentage of cases that occurred by area with respect to the total, with the Bayamón Area having the highest incidence of events with a total from one hundred and thirteen (113) for a 19%, although this must be considered within the framework that the Bayamón Area is the one with the most police officers assigned, in comparison with the other police areas. At the end of the table, the averages of cases occurred by levels of force use, where the highest occurrence average per police area is Level 1 are shown[5].

4. *Incidents of Use of Force during the period from September 20 to December 31, 2017 (Post Hurricane Maria).*

During the passage of the recent hurricanes, incidents of use of force continued to be investigated and documented, although with certain limitations caused by the emergency that the PRPB went through, due to the weather events of September, 2017. There were a total of one hundred and five (105) registered cases of use of force incidents. The following is shown the information related to the investigation of these incidents during September 20 to December 31, 2017:

**Investigations Status of Incidents of Use of Force**
**During the Period of September 20 to December 31, 2017**

---

[5] Use of force of Level 1 is according to Annex 1 of the General Order Chapter 600, Section 601 "Rules for the Use of Force by Members of the Puerto Rico Police" are the Techniques of defense and control (escort when physical contact is used, includes techniques with the Baton, immobilization, grip and twist of wrists); control techniques in vulnerable areas (hair grip, restriction in pressure points and shoulder muscle grip); and to give a shot of grace to an animal seriously injured under the provisions of Act 154-2008, known as the "Act for the Welfare and Protection of Animals" as amended.

| Police Area | Use of Force Incidents Investigations | Comments |
|---|---|---|
| (Source Auxiliary Superintendence in Field Operations) |||
| San Juan | 6 | 3 cases pending of evaluation and 3 cases referred to the Superintendence of Professional Responsibility |
| Arecibo | 12 | 5 cases dismissed, and 7 cases referred to the Superintendence of Professional Responsibility |
| Ponce | 18 | 9 cases referred to the Superintendence of Professional Responsibility and 9 cases pending to be delivered |
| Humacao | 2 | 1 case pending evaluation and 1 referred to the Superintendence of Professional Responsibility |
| Mayagüez | 14 | 8 cases referred to the Superintendence in Professional Responsibility, 4 cases pending investigation by the Board for the Evaluation of Incidents of Use of Force (FRB) and 2 cases investigated by the Use of Force Incident Investigation Division (FIU) |
| Caguas | 6 | 4 cases referred to the Superintendence in Professional Responsibility, 1 case pending investigation by the Force Review Board (FRB) and 1 case sent for investigation to the Use of Force Incident Investigation Division (FIU) |
| Bayamón | 5 | 3 cases sent directly to the Auxiliary Superintendence in Professional Responsibility by the Commanders of the Work Unit, 2 cases pending evaluation |
| Carolina | 5 | 3 cases evaluated by the Force Review Board (FRB), 2 cases referred to the Superintendence of Professional Responsibility |
| Guayama | 6 | 4 cases investigated by the Force Review Board (FRB) and 2 cases pending investigation |
| Aguadilla | 16 | 10 cases referred to the Superintendence of Professional Responsibility, 5 cases returned for correction, and 1 was case referred to the Force Review Board (FRB) |
| Utuado | 4 | 1 case for evaluation, 1 case according to the Law No. 154 of 2008 (Law for the Welfare and Protection of Animals), 1 negative case and 1 justified case sent to the Superintendence of Professional Responsibility. |
| Fajardo | 3 | 1 case pending to complete the document file, 1 case pending the evaluation by the Board for the Assessment of Incidents of Use of Force (FRB) and 1 case was sent to the Auxiliary Superintendence of Field Operations on January 3, 2018 |
| Aibonito | 8 | 8 cases of use of the force referred by the different districts of the Area were investigated |
| TOTAL | 105 | |

5.  Commissioner *Force Review Board (CFRB)*

The Commissioner's Force Review Board was forced to suspend temporarily its role of reviewing use of force incidents due to the hurricanes of September, 2017, since the priority was to work in the related services to meet the needs of the communities during the emergency. Other factors that affected the work of the CFRB, were that one of its members applied for retirement and the military activation of a second member. Notwithstanding the above, the procedures established to handle use of force incidents continued in use during the emergency according to the policies of the Bureau, and the Force Investigation Unit (FIU) continued the investigation of these incidents.

Once the situation began to normalize, the president of the CFRB requested the necessary appointments to replace the missing members and thus continue their work. On February 6, 2018, the Acting Commissioner appointed the remaining members with the necessary training to belong to the CFRB, pursuant to the General Order Chapter 500, Section 502, titled, "Creation of the Force Use Incident Evaluation Board" that regulates their functions.

The next working session of the CFRB was scheduled for February 22, 2018, to begin evaluating fifty (50) cases occurred during the hurricane emergency period.

**C. Searches and Seizures.**

1. *Policies Developed or Reviewed.*

   a. General Order Chapter 600, Section 612, titled, **"Authority to Carry out Searches and Seizures"**.

On September 18, 2017, the then Commissioner signed this order. The purpose of this General Order is to regulate the policy and standards that police officers have to follow in exercising their legal authority to carry out searches and seizures. In this way, it will be ensured that all searches and seizures are carried out in accordance with the civil rights of the people, avoiding the suppression of evidence by reason of an illegal seizure or search and limiting the unnecessary exposure of the police officers to criminal charges, civil actions and/or administrative complaints (disciplinary measures) for violation of these rules.

   b. Glossary of Definitions, titled, "**Basic Legal Concepts of the Puerto Rico Police**".

On August 31, 2017, the then Commissioner signed this Glossary. The purpose of this document is to compile the definitions of legal concepts related to the policies that police officers have to follow in the exercise of their legal authority to carry out arrests, citations, searches and/or seizures; in order to keep these terms updated in a single document for better understanding. This policy serves as a quick reference for police officers and the public in general.

This Glossary is applicable to the following General Orders:

   i. Chapter 600, Section 612, titled, "Puerto Rico Police Authority to Carry Out Searches and Seizures";

    ii.   Chapter 600, Section 615, titled "Authority of the Puerto Rico Police to carry out Arrests and Citations".

This action is carried out in support of what is established in the Searches and Seizures Action Plan; Policies and Procedures Development Objectives; Activities 1.2 and 1.3.

## D.  Equal Protection and Non-Discrimination.

1.  *Policies Developed or Reviewed.*

    a.   General Order Chapter 100, Section 115, titled, "**Reorganization and Structuring of the Division of Sexual of Sexual Crimes and Child Abuse**".

On October 2, 2017, the then Commissioner signed this Order. The purpose of this policy is to establish the organizational and functional structure, duties and responsibilities of the personnel assigned to the Sexual Crimes and Child Abuse Division, including the Coordinator, directors, supervisors and special agents, as well as the control and management of the Victims of Sexual Crimes Orientation Line.

The PRPB, through this policy, reiterates its public policy of zero tolerance towards sexual crimes. Safeguarding always the rights and privileges protected by the Constitutions and Laws of the United States of America and of the Puerto Rico Government. This Order was written according to the Equal Protection and Non-Discrimination Action Plan; Policies and Procedures Development Objectives; Activity 1.9.

    b.   Revision of Administrative Order 2016-3, titled "**Intervention in Incidents of Sexual Crimes Perpetrated by Puerto Rico Police Employees**".

On August 8, 2017, the then Commissioner signed the first revision of this policy. The purpose of this Administrative Order is to reiterate the public policy of the PRPB of zero tolerance towards sexual crimes. In addition to establishing that in circumstances where a PRPB employee appears to be suspected of committing such a crime or any other crime, the criminal and administrative proceedings concerned shall be followed. This, with the fundamental intention of maintaining the confidence of the community in the work done by the PRPB in the strict application of the law.

To comply with this, the duties and responsibilities of police officers, specifically those assigned to the Sexual Crimes and Child Abuse Division and all its components, in the handling of both

criminal and administrative investigation of a complaint on sexual offenses where a PRPB employee is a victim or a perpetrator are established in a detailed, precise and clear manner. Likewise, the obligation of all police officers to refer the suspected employee of committing a sexual crime, to the Puerto Rico Department of Justice (hereinafter referred to as "PRDOJ") and the Auxiliary Superintendence in Professional Responsibility for the respective criminal and administrative investigations.

The revision of this policy, demonstrates the strong commitment of the PRPB, not only with the implementation of the Agreement, but the sustainability of the reform process further than its terms. This action was carried out as set out in the Equal Protection and Non-Discrimination Action Plan; Policies and Procedures Development Objectives; Activity 1.10.

c.  General Order Chapter 600, Section 622, titled, **"Investigation of Incidents of Sexual Crimes"**.

On August 31, 2017, the then Superintendent signed this policy.  The purpose of this policy is to provide operational and specialized agents guidelines addressing the reports of sexual crimes in all their forms. In addition, set inter-agency collaboration processes to provide support services to victims and families. Thus, incorporating protocols of initial response to the report of a sexual crime, investigation mechanisms; including the interaction with victims, interviews and the collection of evidence. The PRPB has the paramount interest of assisting and protecting the victim, as well as achieving the identification of the perpetrator, for the later processing in the Puerto Rico justice system. This policy establishes, since its previous version, the "Orientation Line for Victims of Sexual Violence", as well as the rules and procedures for its implementation.

The review of this policy, shows the solid commitment of the PRPB, not only with the implementation of the Agreement, but the sustainability of the process of reform further than its terms. This activity was carried out as set out in the Equal Protection and Non-Discrimination Action Plan; Policies and Procedures Development Objectives; Activity 1.9.

The following table shows the calls received by the Sexual Violence Victims Orientation Line during the year 2017:

| Statistics of Calls Received by the Sexual Violence Victims Orientation Line (787-343-0000) 2017 | |
|---|---|
| **Classification of Received Calls** | **Amount** |
| Confidences Received | 5 |
| Orientations[6] | 128 |
| Abuse | 86 |
| Institutional abuse | 21 |
| Sodomies | 33 |
| Human trafficking | 2 |
| Sexual aggressions[7] | 273 |
| Conjugal Sexual Aggression - Article 3.5 (Act No. 54 of August 15, 1989, "Law for the Prevention and Intervention of Domestic Violence") | 35 |
| Other Crimes[8] | 15 |
| Indecent Exposure | 17 |
| Pornography | 25 |
| Lewd Acts | 325 |
| **Total Received Calls** | **965** |

d. **Human Trafficking Protocol**.

On May 17, 2017, the then Commissioner signed this policy. The purpose of this Protocol is to provide the tools to police officers, in order to identify the indicators of human trafficking cases and how to investigate these. Human trafficking is the capture and conservation of the work or services of a person by force, threat, coercion, fraud, deception, abuse of power, or other situations of vulnerability that constitute a violation of human rights. Police officers, as first responders, play a very important role in the discovery of incidents of human trafficking, which can usually be manifested in the form of domestic violence, labor disputes or prostitution, among others.

This protocol goes hand in hand with the General Order Chapter 600, Section 622, titled "Investigation of Incidents of Sexual Offenses", since both policies assign primary responsibility for investigating cases of human trafficking to the Sexual Crimes Division. The General Order 622 was revised according to the Equal Protection and Non-Discrimination Action Plan; Policy and Procedure Development Objectives, Activity 1.9.

1. *Statistics Related to Paragraph 97.*

---

[6] The calls to the line classified as orientations in addition to including the individuals who call to request information and help, include the agents of districts and precincts who call to request help from the specialized unit to work their cases.

[7] Calls to the line classified as a case of sexual assault include rape, statutory violations, incest, incidents that occurred in the prison system (Prison Rape Elimination Act of 2003 or PREA), and digital sexual assault.

[8] Calls to the line classified as other crimes include simple assaults, threats, and unfortunate incidents, among others.

The table below contains the information of the year 2017, related to paragraph 97 of the Agreement, regarding the monitoring that PRPB must perform on the results of investigations of sexual assault cases, including: whether the investigation produced arrests, if the prosecutor submitted charges to the suspect, and if the accused was convicted. PRPD will also monitor sexual assaults by gender, as well as incidents in which more than one person is arrested. These data will be published on the PRPB website, as required by paragraph 97 of the Agreement.

| Areas | Complaints Received | Complaints Solved | Amount of Arrests | More than one Arrest | Criminal Cases Filed | Intervention with Minor | More than one Intervened Minor | Filing of Minors' Faults | Convictions |
|-------|------|------|-----|---|-----|-----|---|---|-----|
| San Juan | 122 | 34 | 28 | 0 | 15 | 1 | 0 | 1 | 15 |
| Arecibo | 78 | 74 | 6 | 0 | 5 | 18 | 0 | 1 | 1 |
| Ponce | 290 | 157 | 30 | 1 | 18 | 27 | 0 | 3 | 17 |
| Humacao | 41 | 25 | 7 | 0 | 5 | 12 | 0 | 0 | 0 |
| Mayaguez | 60 | 10 | 9 | 0 | 6 | 4 | 0 | 0 | 0 |
| Caguas | 81 | 12 | 0 | 0 | 3 | 5 | 0 | 0 | 0 |
| Bayamon | 145 | 81 | 10 | 0 | 9 | 19 | 0 | 5 | 14 |
| Carolina | 148 | 112 | 8 | 0 | 6 | 14 | 0 | 1 | 0 |
| Guayama | 79 | 14 | 22 | 0 | 10 | 7 | 0 | 1 | 4 |
| Aguadilla | 71 | 15 | 9 | 0 | 8 | 6 | 0 | 3 | 5 |
| Utuado | 60 | 60 | 8 | 1 | 6 | 2 | 0 | 2 | 2 |
| Fajardo | 49 | 39 | 2 | 0 | 2 | 5 | 0 | 0 | 0 |
| Aibonito | 39 | 23 | 8 | 0 | 7 | 3 | 0 | 0 | 0 |
| Vega Baja | 131 | 23 | 8 | 0 | 8 | 5 | 0 | 3 | 3 |
| Total | 1,394 | 679 | 155 | 2 | 108 | 128 | 0 | 20 | 61 |

2. *Statistics Related to Paragraph 100.*

The following table shows the results of the monitoring of the investigations of the cases of domestic violence for the year 2017, including: whether the investigation produced arrests; if the prosecutor submitted charges to the suspect and if the accused was convicted. In addition, arrests for domestic violence by gender are shown, as well as incidents in which more than one (1) person is arrested. These data will be published on the PRPB website, as required by paragraph 100 of the Agreement.

| *Area* | Domestic Violence Incidents by Gender | | | | | Convictions [9] |
|--------|------|---|---|---|---|------|

---

[9] The data on the convictions are provided by the Specialized Divisions of Domestic Violence. These are preliminary and are subject to change because part of the information about the convictions of domestic violence cases comes from the Department of

| | Women | Men | Unfounded Cases | Cases with Complaints | Investigations with Arrest | Prosecutor Ordered to File Charges | |
|---|---|---|---|---|---|---|---|
| San Juan | 689 | 119 | 3 | 329 | 479 | 364 | 325 |
| Arecibo | 848 | 191 | 297 | 771 | 268 | 245 | 112 |
| Ponce | 486 | 87 | 0 | 43 | 515 | 240 | 39 |
| Humacao | 372 | 56 | 0 | 97 | 332 | 274 | 44 |
| Mayaguez | 548 | 88 | 64 | 26 | 629 | 170 | 10 |
| Caguas | 645 | 94 | 13 | 512 | 127 | 247 | 6 |
| Bayamón | 981 | 205 | 179 | 314 | 925 | 510 | 214 |
| Carolina | 392 | 67 | 3 | 139 | 321 | 184 | 22 |
| Guayama | 429 | 67 | 0 | 210 | 286 | 237 | 167 |
| Aguadilla | 513 | 124 | 189 | 114 | 523 | 288 | 18 |
| Utuado | 347 | 96 | 105 | 160 | 189 | 71 | 65 |
| Fajardo | 369 | 64 | 6 | 235 | 193 | 133 | 15 |
| Aibonito | 495 | 101 | 28 | 83 | 535 | 203 | 126 |
| TOTAL | 7,114 | 1,359 | 887 | 3,033 | 5,322 | 3,166 | 1,163 |

The table shown below shows the number of complaints received for cases of domestic violence against police officers in 2017. In addition, the number of arrests made for these complaints, the cases where the prosecutor filed criminal charges against the arrested police officer, how many were convicted, and other persons arrested in the events. This information is presented as part of the information to be disclosed according to paragraph 100 of the Equal Protection and Non-Discrimination Compliance Area of the Agreement.

| PARAGRAPH 100 Domestic Violence complaints received by gender, number of arrests, Determination Attorney, Police Convicts and Others Arrested (2017) | | | | | |
|---|---|---|---|---|---|
| GENDER | COMPLAINTS RECEIVED | POLICEMEN ARRESTED | PROSECUTOR | CONVICTED POLICEMEN | OTHER PERSONS ARRESTED |
| Male Aggressors | 93 | 49 | 21 | 0 | 0 |
| Female Aggressors | 6 | 4 | 3 | 0 | 0 |
| Total | 99 | 53 | 24 | 0 | 0 |

Justice (Prosecutor's Office) and the Judicial Branch (Courts), and due to the past atmospheric events, these governmental entities have had confronted difficulties to provide information. Once the information is obtained, it will be updated on the PRPB website.

**E.  Policies and Procedures.**

During the period covered by this report, the PRPB has developed or reviewed twenty-two (22) policies in the different compliances areas of the Agreement, eleven (11) of these policies, although not part of the activities included in the Action Plans, are intrinsically related with others that enclosed in the same, have an impact on the operational and administrative matters of the Agency included in the Agreement.

1.  *Policies Developed or Reviewed.*

a.  General Order Chapter 600, Section 637, titled, "**Center of Escheated Goods**".

On May 10, 2017, the then Superintendent signed the General Order Chapter 600, Section 637. This Order has the purpose of establishing the rules and procedures for administering the Centers of Escheated Goods located in Area Commands facilities. It is the policy of the PRPB to establish adequate controls for the delivery, custody and disposition of the goods received in the PRPB, as a result of its official duties.

The revision of this policy, although not contemplated in the Action Plans, turn out to be necessary as a result of the revision of General Order Chapter 600, Section 636, titled "Rules and Procedures for the Delivery, Custody, and Disposition of Evidence", among others. General Order 636, was revised as established in the Searches and Seizures Action Plan; Policies and Procedures Development Objectives; Activity 1.2.

b.  General Order Chapter 100, Section 107, titled, "**Reorganization of the Auxiliary Superintendence in Criminal Investigation**".

On June 30, 2017, the then Commissioner signed this General Order. The purpose of this policy is to establish the organizational and functional structure of the Auxiliary Superintendence in Criminal Investigations, which will be the unit responsible for directing, planning, organizing, managing and coordinating all activities related to the criminal investigation process.

This policy is reviewed in accordance with the Policies and Procedures Action Plan; Policies and Procedures Development Objectives; Activity 1.5.

c.  General Order Chapter 100, Section 130, titled, "**Criminal Investigations Corps**".

On June 30, 2017, the then Commissioner signed this General Order. The purpose of this policy is to review the organizational and functional structure of the Criminal Investigation Corps, as well as to establish the duties and responsibilities of the personnel assigned to it. The main responsibility will be the criminal investigation of felonies and other crimes that, due to their complexity, require special attention.

This policy, although not contemplated in the Action Plans, is reviewed to temper it to the revision of General Order Chapter 100, Section 107, titled, "Reorganization of the Auxiliary Superintendence in Criminal Investigations"; and the development of the policy titled, "Criminal Investigation Corps Investigator's Manual" in accordance with the Policy and Procedure Action Plan; Policy and Procedure Development Objectives; Activities 1.5; and 4.3.

    d.   General Order Chapter 100, Section 132, titled, **"Major Crimes Division"**.

On June 30, 2017, the then Superintendent signed this policy. This General Order is intended to establish the organizational and functional structure of the Major Crimes Division, as well as to outline the duties and responsibilities of the personnel assigned to it. The Division will be attached to the Auxiliary Superintendence in Criminal Investigations, to which it will respond administratively and operationally. Its responsibility will be to investigate and clarify "crimes of high public interest or of difficult solution", in addition to investigating or solving crimes that have not been solved over time, and will investigate any other crime designated by the Commissioner.

This policy, although not established in the Policy and Procedure Action Plan, is revised to temper it in accordance with the Policy and Procedure Development Objectives; Activity 1.5 (revision of General Order Chapter 100, Section 107, titled "Reorganization of the Auxiliary Superintendence in Criminal Investigations).

    e.   General Order Chapter 100, Section 131, titled, **"Joint Operations Division"**.

On June 30, 2017, the then Superintendent signed this policy. This General Order is intended to establish the organizational and functional structure of the Joint Operations Division, as well as outlining the duties and responsibilities of the personnel assigned to it. This Division will be responsible for planning, organizing, directing and controlling the interagency work plans on drug trafficking, money-laundering, trafficking in persons and arms, postal service fraud, witness

protection, without exclusion of any other case that merits joint strategies with state, federal, or municipal agencies for the benefit of the security of the community in general.

The Division is comprised of the Task Forces, which are divided into the different specialized groups formed to work in collaboration with federal and state agencies, necessary to fulfill its responsibility of preventing, investigating and minimizing, criminal activity in Puerto Rico. Also included in the Joint Operations Division are the island-level groups known as "Strikes Forces" created through an agreement with the Federal Prosecutor's Office and the PRPB.

This policy, although is not included as an activity in the Policy and Procedure Action Plan, is revised to temper it in accordance with the Policy and Procedure Development Objectives; Activity 1.5 (revision of General Order Chapter 100, Section 107, titled, "Reorganization of the Auxiliary Superintendence in Criminal Investigations").

    f.  Administrative Order Num. OA-2017-2, titled, **"Monthly Meetings"**.

On August 31, 2017, the then Superintendent signed this policy. The purpose of this Administrative Order is to establish the rules and procedures that will be followed in the PRPB during the celebration of Monthly Meetings in all police units. The objective of these monthly meetings is to provide a frequent, continuous and flexible mechanism to train, guide and impart new instructions from the Commissioner to police officers regarding new policies and procedures and/or revisions promulgated by the PRPB and any other pertinent and relevant matters under its jurisdiction.

The Monthly Meetings will supplement the forty (40) hours of annual training offered by the PRPB. The purpose of these Meetings is to provide managers at all hierarchical levels with the means to train their peers and subordinates by considering and analyzing police officers' safety factors, concerns and feedback from the communities of interest, use of force statistics and internal affairs, court decisions and the latest trends in law enforcement.

    g.  General Order Chapter 500, Section 503, titled, **"Specialized Divisions Evaluation Board"**.

On August 31, 2017, the then Superintendent signed this policy. The purpose of this policy is to create the Specialized Divisions Evaluation Board to establish a quality control mechanism in the

recruitment, selection and permanence processes of all police officers that aspire either to become part of these divisions, or to remain in the various specialized divisions of the PRPB.

The PRPB, with its main role of maintaining order and security of people, has the inherent responsibility of requiring potentially qualified candidates willing to serve with determination, efficacy and professionalism in eradicating crime and the welfare of the security of our people, always safeguarding their civil rights.

This policy, although not included as an activity in the Policy and Procedure Action Plan, complements what is established in the Policy and Procedure Development Objectives; Activity 1.5 (revision of General Order Chapter 100, Section 107, titled, "Reorganization of the Auxiliary Superintendence of Criminal Investigations"), and Activity 1.7 (Development of General Order Chapter 100, Section 122, titled "Restructuring of the Bureau of Drugs, Narcotics, Vice Control and Illegal Weapons"), in terms of the allocation of personnel to any specialized unit, as established in this policy.

h.  General Order Chapter 100, Section 129, **titled "Division of Special Arrests and Extraditions"**.

On August 31, 2017, the then Superintendent signed this Order. Its purpose is to establish the organizational structure of the Special Arrests and Extraditions Division, attached to the Auxiliary Superintendence of Criminal Investigations. The Bureau shall, in its policy, establish and ensure that all arrests are made in accordance with the rights, privileges and immunities guaranteed and protected by the Constitutions and the laws of the United States and the Government of Puerto Rico. In addition, it will clearly define all terms and provide guidance on the facts and circumstances to be considered in the enforcement of an arrest.

This policy, although is not included as an activity in the Policy and Procedure Action Plan, was written to temper it in accordance with the Policy and Procedure Development Objectives; Activities 1.5 (revision of General Order Chapter 100, Section 107, titled, "Reorganization of the Auxiliary Superintendence of Criminal Investigations"), which is the policy that governs the Superintendence to which the Division of Special Arrests and Extraditions belongs, therefore it is necessary to temper the Division's policy to the Agreement.

i. General Order Chapter 100, Section 128, titled, **"Division of Special Arrests and Seizures"**.

On August 31, 2017, the then Superintendent signed this policy. The purpose of this General Order is to establish the organizational structure of the Divisions of Arrests and Seizures, attached to the Criminal Investigations Corps, in the Police Areas. The PRPB will ensure compliance with the law and the generally accepted police practices on arrests and searches, ensure consistent oversight and hold police officers accountable for the compliance with applicable laws and policies.

This policy, although not included as an activity in the Policy and Procedure Action Plan, was written to temper it in accordance with the Policy and Procedure Development Objectives; Activity 1.5 (revision of General Order Chapter 100, Section 107, titled, "Reorganization of the Auxiliary Superintendence of Criminal Investigations"), which is the policy that governs the Division of Special Arrests and Seizures, therefore it was necessary to temper the Division's policy to the Agreement.

j. General Order Chapter 600, Section 614, titled, "**Rules and Procedures to Address Cases of Missing Persons**".

On August 31, 2017, the then Superintendent signed this policy. This General Order has the purpose of establishing the investigation process that police officers have to follow in missing persons cases reported, as well as the publication of the photograph of these persons through the PRPB website and the National Crime Information Center (NCIC).

Although this policy was not contemplated as an activity in the Policy and Procedure Action Plan, it is closely related to what is established in the Policy and Procedure Development Objectives; Activity 1.5 (revision of General Order Chapter 100, Section 107, titled, "Reorganization of the Auxiliary Superintendence in Criminal Investigations"); and Activity 4.3 (development of the policy "Criminal Investigations Corps Investigator Manual"). Policies governing the Auxiliary Superintendence to which the Criminal Investigation Corps is attached, which is the unit responsible to continue the in-depth investigation of the cases of missing persons. It was therefore necessary to temper this policy to the Agreement and to the policies mentioned above.

k. General Order Chapter 600, Section 606, titled, "**Criminal Photography**".

On October 3, 2017, the then Superintendent signed this policy. The purpose of this Order is to establish a uniform procedure for taking photographs and sending the compact discs to the PRPB Criminal Photography Laboratory. It also establishes the procedures regarding the archiving, custody and disposal of CD-R, DVD-R, as well as the negatives of photographs.

Although this policy was not part of the activities of the Policies and Procedure Action Plan, it related to what is established in the Policy and Procedure Development Objectives; Activity 1.5 (revision of General Order Chapter 100, Section 107, titled, "Reorganization of the Auxiliary Superintendence in Criminal Investigations"); and Activity 4.3 (development of the policy titled "Manual of the Investigator of the Criminal Investigations Corps"), which are the policies of the work unit to which the Criminal Photography Laboratory is responding in the chain of command. Therefore, it was appropriate to update this policy to the Agreement and to the aforementioned policies. The work done by this work unit is vital for the clarification and prosecution of criminal cases, where all investigation in the preliminary stage, or the cases assigned to the investigative branch, need a process of compilation of photographic evidence that complies with the current laws and generally accepted police practices.

**F. Training.**

1. *Collaborative Agreement with the Ports Authority.*

After the hurricanes passed thru Puerto Rico in September of 2017, several training centers were partially or totally destroyed, and alternatives have been sought out to continue the training that has continued on January, 2018, especially collaborative alternatives that help to save money in times of economic crisis. On January 31, 2018, a Collaborative Agreement between the PRPB and the Port Authority was formalized. This collaborative agreement establishes that the training personnel of the Aguadilla Police Area will use the facilities of the Rafael Hernández Airport, located at the Ramey Base in Aguadilla, to train the police officers. In exchange, the PRPB will assign personnel to attend certain aspects of security in the place.

2. *Condition Verification Visits to the Training Centers after the Hurricanes of September, 2017.*

During the days of November 28 to December 7, 2017, the Reform Office Implementation and Compliance Section made visits to several Training Centers to verify the state and conditions of

the Training Centers in order to begin providing the training in the designated date of January 15, 2018.

| Ubication/Unit | Centers Quantity of Classrooms and Condition of the | Commentaries |
|---|---|---|
| **CONDITIONS OF TRAINING CENTERS** | | |
| **Caguas Area** | Two (2) training rooms, one (1) disabled and one (1) in good condition. | Of two (2) training rooms available, the one (1) used for the theoretical part of the trainings is in good condition, although with a limited space for fifteen (15) people, and the one used for the practical part was destroyed. As an alternate solution, they are temporarily using a classroom in the PRPB Academy in Gurabo. |
| **Auxiliary Superintendence of the Fortress** | Two (2) training rooms, one (1) disabled and one (1) in good condition. | Two (2) rooms available, one is in good condition, although with limited space for twenty (20) people and the other is not in use due to damages to the air conditioning caused by the Hurricane Maria. |
| **Utuado Area** | Two (2) training rooms in good condition. | The facility used for the operational part of the training belongs to the Municipality of Utuado and the PRPB uses it and provides it with the necessary maintenance to keep it in good condition. |
| **Arecibo Area** | Two (2) training rooms, both disabled. | The training coordinator informed that it is committed to comply, by the assigned date to begin the training. |
| **Aguadilla Area** | One (1) training room in limited conditions. | It suffered minimal damage to the structure and equipment. No water or electricity services. |
| **Aibonito Area** | One (1) training room in limited conditions. | It suffered minimal damage to the structure and equipment and although they lack air conditioning, they continue to provide training in it. |
| **Carolina Area** | Two (2) training rooms in limited conditions. | It suffered minimal structural damage and continues to be used to provide training. |
| **Bayamón Area** | Three (3) training rooms in good condition | |
| **Mayagüez Area** | One (1) training room in good condition and two (2) in limited conditions. | Limitation of use due to lack of air conditioning and ventilation in two (2) of the training rooms. |
| **San Juan Area** | One (1) training room in good conditions. | |
| **Auxiliary Superintendency in Field Operations** | One (1) training room in good conditions. | |
| **"Fuerzas Unidas de Rápida" Acción" ("FURA" for its acronym in spanish)** | Two (2) training rooms in San Juan in good condition. One (1) training room in Bayamón in good condition. One (1) training room in Ponce in good condition. | The rooms in San Juan are energized with an electric plant. |
| **Fajardo Area** | One (1) training room in good conditions. | |
| **Humacao Area** | One (1) training room in good conditions. | The facility operates with a generator. |

| Guayama Area | One (1) training room in good conditions. | In addition, the firearms shooting range for the training of service weapons was ready for January 2018. |
|---|---|---|
| Auxiliary Superintendence in Education and Training/Gurabo Academy | Thirty (30) training rooms in good condition. | |
| Moca Firearms Shooting Range | Training room and firearms range in good condition. | |
| Gurabo Firearms Shooting Range | Training room and firearms range in good condition. | |
| Islas de Cabras Firearms Shooting Range | Training room in good conditions; the firearm range is disabled. | The training room operates with a generator and the instructors are using the fire arms shooting range in use by the federal agencies in an alternating method until the one used by the PRPB is repaired. |
| Arecibo Firearms Shooting Range | Training room and firearm range are in good conditions. | There is a need to remodel the structure, the original structure has a roof, but does not have walls. |
| Cabo Rojo Firearms Shooting Range | It is not in conditions of use. | Inoperative since a strong swell in Hurricane Maria, impacted the area of the firearms range and detached the area of impact of the ammunition. The cleaning and reconstruction work was started in order for it to become a viable facility for training. |

3. *Training materials developed or revised.*

   a. On July 11, 2017, PRPB forwarded to the TCA for review and approval the syllabus titled "Retraining for Canines Handler" (REA-116R). It was approved by the TCA on July 31, 2017. PRPB began to train the first group of police officers on August 7, 2017. This syllabus and its corresponding training are carried out in accordance with the:

      i. Use of Force Action Plan; Policies and Procedures Development Objectives; Activity 1.15 (General Order Chapter 100 Section 116, titled "Reorganization of the Canine Division"; and Training Development Objectives; Activity 1.14 (Develop Training for Patrol Canines).

      ii. Training Action Plan; Development and Implementation of Training and Retraining in the Service Objectives, Activity B (1.1.14).

   b. On July 17, 2017, PRPB submitted to the TCA for review and approval the syllabus titled "Training of Norms for Intervention with People in Crisis and Negotiation of Hostage-Taking" (REA-628). This syllabus and its corresponding training are carried out as established in the:

    i.  Use of Force Action Plan; Training Development Objectives to Police Officers in Crisis Interventions (CIT), Activity 1.3; and Objective on Responding to Behavioral or Mental Health Crises, and Activity 1.1 (development of the General Order Chapter 600, Section 628 titled "Rules for Intervention with People in Crisis and Negotiation in Hostage Taking".

c.  On July 17, 2017, PRPB sent to the TCA for review and approval the syllabus titled "Rules for the Intervention with Minors in the Commissions of Offenses" (REA-633). This syllabus and its corresponding training are carried out in accordance with the:

    i.  General Order Chapter 600, Section 633, titled "Intervention with Minors in the Commission of Offenses". Although this order is not part of the objectives and activities in the Action Plans, it was revised to temper it to the Bureau current public policy (General Order Chapter 100, Section 107, titled, Reorganization of the Auxiliary Superintendence in Criminal Investigations and the Manual of Procedures of the Criminal Investigation Corp Investigator, according with the Policies and Procedures Action Plan; Policies and Procedures Development Objectives; and Activities 1.5 and 4.4 respectively) as part of efforts to comply with the PRPB Agreement for the Sustainable Reform.

d.  On July 17, 2017, PRPB forwarded to the TCA for review and approval the syllabus for the training titled "Rules and Procedures for the Delivery, Custody and Disposition of Evidence" (REA-636). This syllabus and its corresponding training are carried out in accordance with the:

    i.  Searches and Seizures Action Plan; Training Development Objectives, Activity 1.1.2; and Training Implementation Objectives, Activity 1.1 (b).

e.  On July 17, 2017, PRPB submitted to the TCA for review and approval the syllabus titled "Training for the Investigation on Maltreatment and/or Negligence in Juvenile Institutions" (REA-635). This syllabus and its corresponding training are carried out as established in:

    i.  Equal Protection and Non-Discrimination Action Plan; Training Development Objectives, Activity 1.1.10; and Policy and Procedure Development Objectives, Activity 1.17 (revision of the now General Order Chapter 600, Section 635 titled

"Standards and Procedures for the Criminal Investigation of Complaints about Maltreatment and/or Negligence in Juvenile Institutions").

f.  On July 17, 2017, PRPB submitted with the recommended amendments to the TCA the syllabus for the training titled "Police Corruption" (REA-CPOL). This syllabus and its corresponding training are developed as established in the:

    i.  Policies and Procedures Action Plan; Training Development Objectives, Activity 1.2; Training Implementation Objectives, Activity 1.2; Policies and Procedures Development Objectives, Activities 1.6 and 4.2 (General Order and Operational Manual of the Drugs Bureau, respectively).

g.  On July 20, 2017, PRPB forwarded to the TCA for review and approval the syllabus for the training titled "Developing Effective Supervisors" (REA-171). This syllabus and its correspondent training are related to the policy created as established in accordance with the:

    i.  Administrative Complaints Action Plan; Policies and Procedures Objectives; Activity 2.3, development of the Administrative Order to Create de Employee Assistance Program (OA-2017-1 [PAE for its acronym in English]).  In addition, this action complements Activity 4.1 of the Training Development Objectives of the same Plan, where an orientation workshop is developed for those who exercise supervision and management functions on stress management and prevention of critical incidents. Also, to **inform the personnel about the support and mental health services available for them and their families (responsible Division of psychology of the PPR).**

h.  On July 24, 2017, PRPB referred to the TCA for review and approval the syllabus for the First Bimester of the pre-service training as established in the Training Action Plan; Pre-Service Training Development Objectives, Activity 2.1. The training material consists of the following syllabus in accordance with the Activity 2.1 aforementioned:

    i.  Criminology (POL-2028);

    ii.  Fundamental Elements in the Writing of Communications, Reports, and Forms (POL-1002);

iii. Basic Techniques in the Use and Handling of Force (POL-2008);

iv. Psychological Foundations and Human Relations in the Social Context (POL-105);

v. Ethical Police Principles (POL-1003);

vi. Criminal Law (POL-1005);

vii. Introduction to Human and Civil Rights (POL-1010);

viii. Basic Use and Handling of Firearms (POL-2016);

ix. Physical Training /PT (POL-302/303/304);

x. Special Laws (POL-2020);

xi. Criminal Procedure (POL-2021);

xii. Searches and Seizures (POL-1004);

xiii. Operational Foundations in Traffic Control and Direction (POL-2010);

xiv. Biopsychosocial and Investigative Aspects of Domestic Violence (POL-2019);

xv. Discrimination, Sexual Harassment, Retaliation and Sexual Misconduct (POL2060);

xvi. Police Management in Conflict Handling (POL-2053);

xvii. Intermediate Use and Handling of Firearms (POL-2018);

xviii. Intermediate Techniques in the Use and Handling of Force (POL-2011);

xix. Certification in the Use and Handling of Pepper Spray (POL-2040);

xx. Introduction to Juvenile Justice (POL-2024);

xxi. Rules of Evidence and Testimony in Court (POL-2022);

xxii. Organizational Behavior in the Police Context (POL-3004);

xxiii. Criminal Investigation (POL-2003);

xxiv. Handling and Protocol in Crisis Situations (POL-3389);

    xxv.  Operational Skills in Simulated Situations (POL-2013);

   xxvi.  Community Police (POL-3087);

  xxvii.  Cybernetics in the Criminal Investigation and the Psychology of the Cyber Culture (POL-2031);

 xxviii.  Bloodborne Pathogens (POL-2062);

  xxix.  Response in Cases of Emergency (POL-2038;

   xxx.  Basic First Aid Skills (POL-2064);

  xxxi.  Interview and Interrogation (POL-2054);

  xxxii.  Equal Protection and Non-Discrimination to Homeless People (POL-2057);

 xxxiii.  Human Trafficking (POL-2058);

 xxxiv.  Introduction to the Victimology (POL-2056); and

  xxxv.  Police Basic English (POL-2055).

i.  On July 31, 2017, the TCA returned to the PRPB the revised syllabus, titled "Police Professional Development", with comments to be considered in the content of same. This syllabus and its corresponding training are developed as established in the Recruitment Action Plan; Training Development Objectives; Activity 1.2 (development of a training of field investigations).

j.  On September 1, 2017, PRPB submitted to the TCA for review and approval the syllabus, titled "Course on the Prevention of Discrimination and Retaliation" (VEI-8728). This course will be offered in online mode and includes the topics of the Internal Regulations for the Prevention of Discrimination, Harassment and Retaliation in the Puerto Rico Police; Regulation No. 8728, of April 13, 2016, "Regulations for the Establishment of Police Practices Free of Discrimination, Improper Sexual Conduct and Retaliations of the Puerto Rico Police," and General Order Chapter 600, Section 626, titled "Intervention with Foreign Persons".

The development of this training material is done according to the established in the Training Action Plan; Development and Implementation of Training and Retraining in

Service Objectives (V); Area of Equal Protection and Non-Discrimination Compliance/Training Development Activities (D); Activity 1.1; Sub activities 1.1.1 and 1.1.2; and the Equal Protection and Non-Discrimination Action Plan; Training Development Objectives (II); Activity 1.1; Sub activities 1.1.1 and 1.1.2.

k.  On January 19, 2018, the PRPB sent to the TCA for review and approval the syllabus titled "Effective Practices Course for Controlled Substances and Vice Control Interventions" (REA-122S) for the rank system supervisors of the Bureau of Drugs, Narcotics, Vice Control and Illegal Weapons.

The development of this training material is carried out as established in the Supervision and Administration Action Plan; Training Development Objectives; Activity 1.3 and the Training Action Plan; Development and Implementation of Training and Retraining in the Service Objectives (V); Supervision and Management Compliance Area/Training Development Activities (G); Activity 1.3.

4.  *Trainings provided to PRPB Police Officers.*

Here are shown the amount of police officers trained in each policy mentioned below and the compliance dates provided by the PRPB Academy, to achieve 50% and 100% goals. PRPB has complied with the percentages of the training mentioned in the table following the provisions of the Action Plans and the Agreement.

a.  As of December 31, 2017, PRPB has trained and certified police officers [10] in different topics as shown in the following table:

| Training Courses | Police Trained | | % of Police Trained | Date to meet 50% of Training Implementation | Date to meet 100% of Training Implementation[11] |
|---|---|---|---|---|---|
| General Orders 601 and 605 Use of Force | | 12,011 | 91% | January 30, 2017 | June 1, 2018 |
| General Order 602 Electronic Control Weapon 16 hours | 4,897 | | | | |
| General Order 602 *Electronic Control Weapon 8 hours* | 7,197 | 12,312 | 93% | December 5, 2016 | April 16, 2018 |
| General Order 602 *Electronic Control Weapon 2 hours* | 218 | | | | |
| Gene*ral Order 603 Baton 16 hours* | 5,201 | | | | |
| General Order 603 Baton 8 hours | 7,292 | 12,711 | 96% | September 27, 2016 | February 6, 2018 |
| General Order 603 Baton 2 hours | 218 | | | | |

[10] The percentage has been calculated by Auxiliary Superintendence on Education and Training using as reference an estimated total number of thirteen thousand one hundred and sixty-seven (13,167) police officers, according to the information provided by the training coordinators.

[11] The dates of compliance are indicated as agreed in the Federal Court and established in document 656 of the case of the Sustainable Reform of the Puerto Rico Police.

| General Order 604 Pepper Spray | 10,875 | 12,277 | 93% | November 21, 2016 | March 23, 2018 |
|---|---|---|---|---|---|
| General *Order 604 Pepper Spray 4 hours* | 1,423 | | | | |
| General Order 612 *Searches and Seizures* | | 9,079 | 69% | August 12, 2017 | December 21, 2018 |
| General Order 615 Arrest and Citations | 11,344 | 12,285 | 93% | October 24, 2016 | March 5, 2018 |
| General Order 615 Arrest and Citations *Recertification* | 941 | | | | |
| General Order 617 Code of Ethics | | 12,308 | 93% | October 24, 2016 | March 5, 2018 |
| General Order 622 *Sexual Offences* | | 8,344 | 63% | October 24, 2017 | March 7, 2019 |
| General Order 623 Police Pursuits | | 10,488 | 80% | September 17, 2017 | February 1, 2019 |
| General Order 624 Transgender | | 10,921 | 83% | June 10, 2017 | October 26, 2018 |
| General Order 627 Domestic Violence | | 5,009 | 38% | October 21, 2017 | October 16, 2019 |

5. *Annual Fire Arm Training.*

During 2017, of the total of thirteen thousand sixty-seven (13,167) police officers reported by the training coordinators, the Auxiliary Superintendence in Education and Training, trained the police officers in firearms according to the amounts shown below:

a. Daytime Shooting Training (this training included stress shooting; shotgun; pistol caliber .40; and transition from shotgun to handgun):

i. 11,306 police officers for a total of 90%.

b. Nighttime Shooting (this training included caliber .40 pistol with reduced light):

i. 10,328 police officers for a total of 82%.

The training of daytime firearms reached 90% and the nighttime (reduced light) has 82% of trained police officers. These trainings are carried out according to the Use of Force Action Plan; Training Implementation Objectives; Activity 1.1 (d). The passage of hurricanes Irma and Maria, affected the implementation of training, especially the firearms training, due to the damage to the training facilities and the necessary response of the PRPB, diverting staff resources to address the emergency due to the havoc caused by these atmospheric events, hence training had to be paused to tend the field operations during the emergency.

6. *Canine Division Training.*

As reported in the semi-annual status report of May 25, 2017, the Canine Division police officers assigned as dog handlers were trained according to the Use of Force Action Plan. As of the date of this report, all dog handlers are trained in the REA-116 Course, titled "Handler of Dogs", except for two (2) medical cases that are being processed according to the policies and rules that rule police officers in this regard. On October 7, 2017, the weekly training of four (4) hours for dog

handlers of the Canine Division resumed. The annual recertification began to be offered from January 22 to 26, 2018, and will continue progressively to keep the dog handlers duly certified. Likewise, personnel newly arrived at the Canine Division, recruited according to the internal call process for the Specialized Divisions established in the General Order Chapter 300, Section 305, titled "Rules and Procedures for Transactions of Transfer of Personnel of the Rank System", in terms of the minimum requirements, types of exams and all aspects that are necessary or convenient to disclose in order to announce the admission opportunities to a specialized unit.

This activity has been carried out in accordance with the Use of Force Action Plan, Policies and Procedures Development Objectives, Activity 1.15; Training Development Objectives, 1.14; and Training Implementation Objectives, Activity 1.1 (m).

7. *Training for Specialized Tactical Units (STU's).*

In the month of July, 2017, PRPB trained two hundred and one (201) police officers in the subject of Specialized Tactical Units (STU's). The training was provided by Homeland Security-Center of Domestic Preparedness personnel, in the PRPB Academy in Gurabo. Trained personnel are detailed below:

a. Seventeen (17) police officers were trained as instructors (were also trained in flexicuffs) of the following units:

  i. Six (6) of the Tactical Operations Division (DOT for its acronym in Spanish);

  ii. Four (4) of the Special Weapons and Tactics Division (SWAT) (they were also certified in chemical agents and impact weapons by the supplying company);

  iii. Two (2) of Special Arrests Division (from the Auxiliary Superintendence in Criminals Investigations)

  iv. Five (5) of the Auxiliary Superintendence in Education and Training.

b. One hundred and eighty-four (184) police officers attached to the DOT were trained in the basic course of STU's.

These actions are carried out in compliance with Activities 1.9 to 1.12 of the Policies and Procedures Development Objectives; Activities 1.8 and 1.9 of the Training Development

Objectives; and Activities 1.1 (h) (i) of the Training Implementation Objectives of the Use Force Action Plan.

8. *Formalization of the Contract for Virtual Trainings.*

As stated in the previous PRPB report of May 25, 2017, the efforts towards the implementation of these virtual training is an ongoing process. The PRPB Academy, and the educational institution hired for this purpose, have been working and communicating with each other, and a test was expected before September 18, 2017. The completion of this test was affected due to the passage through Puerto Rico of the Hurricanes Irma and Maria during the month of September, 2017. This activity is carried out in accordance with the Training Action Plan; Implementation Objectives; Activity 1.3; and the Information and Technology Systems Action Plan; Objectives of Development of Implementation of Information Systems and Technology; Activity 1.5.

9. *Electronic Control Weapon (ECW) Master Instructors.*

From April 24 to 28, 2017, two (2) police officers, one assigned to the Auxiliary Superintendence in Field Operations and other from the Auxiliary Superintendence in Education and Training, were trained as master instructors in the courses of the Electronic Control Weapon, in Reno Nevada by the supplier of the Electronic Control Weapon. These are the first police officers to be certified at this level in the subject. This action will benefit the implementation of the training in this less lethal weapon, overcoming the challenge of the lack of master instructors, certifying additional instructors locally by our personnel, resulting in savings of time and funds. Streamlining the process of implementing training to benefit compliance within the terms of the Action Plans developed under the Agreement.

This action is parallel to that established in General Order Chapter 100, Section 108 entitled "Creation of the Auxiliary Superintendence in Education and Training", according to Activity 1.3; Policies and Procedures Development Objectives of the Training Action Plan. In the purpose of the policy mentioned above, it is mentioned the responsibility of the PRPB to develop training programs; prior to the service, field and during the service according to its mission of a law enforcement agency.

In addition, the acquisition of master instructors complements the effort to achieve compliance with the Activities 1.5 of the Training Development Objectives; and 1.1e of the Training

Implementation Objectives of the Action Plan for Force Use, which addresses the development, updating and implementation of training on the Electronic Control Weapon subject.

10. *Extension in Training.*

On September 27, 2017, the then Superintendent requested the TCA under paragraph 239 of the Agreement, to grant the PRPB an extension until January 15, 2018, for the fulfillment of each of the trainings required by each signed policy, as established in the Action Plans to implement the Agreement. This request was due to the state of emergency caused by hurricanes Irma and Maria during the month of September, 2017, a situation that required the PRPB to be fully occupied in effort related to the emergency. Hence, the training schedules have been affected. The extension of time was requested for the training mentioned below:

    a.  Use and Management of Impact Weapons;

    b.  Making Arrests;

    c.  Police Ethics;

    d.  Use and Management of Chemical Agents;

    e.  Use of the Electrical Control Weapon.

On September 28, 2017, the TCA approved the request to extend the training compliance dates.

## G. Civilians Complaints, Internal Investigations, and Discipline.

1. *Policies Developed or Reviewed.*

    a.  On August 29, 2017, the Regulation No. 9001, titled "**Regulation to Amend Article 14 of the Regulation of the Puerto Rico Police Personnel**" was approved.

The purpose of this Regulation is to amend Article 14 of the Regulation of the Puerto Rico Police Personnel, Regulation No. 4216 of May 4, 1981, as amended, to establish a disciplinary scaffolding tempered by Act No. 53-1996, as amended, known as the Puerto Rico Police Act, to Act No. 8-2017, as amended, known as the "Law for the Administration and Transformation of Human Resources of the Government of Puerto Rico" and the Agreement.

The purpose of this policy was to temper Regulation No. 4216, which was based on laws repealed hereto, current laws applicable to the same and the Agreement. The time elapsed of its approval in

the State Department of the Government of Puerto Rico, subject to Act No. 38-2017, "Uniform Administrative Procedures Act of the Government of Puerto Rico" after being filed for approval in 2016. Its approval process was subsequently affected by Hurricanes Irma and Maria, leading to the first effective enactment of Law 20-2017, and subsequently this Regulation No. 9001. In view of the foregoing, it is necessary to amend the legal basis of the Regulations and verify whether there is a need to make additional amendments to temper it to this new statute. This Regulation is carried out as established in the Action Plan for Administrative Complaints; Development of Policies and Procedures Objectives; Activity 2.1.

2. *Auxiliary Superintendence in Professional Responsibility (ASPR) Statistics.*

   a. Administrative Complaints received and investigated.

The following table shows the amount of administrative complaints received and investigated, as well as complaints pending investigation from January 1 until December 31, 2017:

| AREAS | RECEIVED | INVESTIGATED | PENDING INVESTIGATION | PENDING COMPLAINTS FROM PREVIOUS YEARS | | | TOTAL | INVESTIGATED COMPLAINTS FROM PREVIOUS YEARS | | | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2017 | | | 2016 | 2015 | 2014 | | 2016 | 2015 | 2014 | |
| San Juan | 168 | 81 | 87 | 1 | 1 | 0 | 2 | 55 | 0 | 0 | 55 |
| Arecibo | 134 | 101 | 33 | 0 | 0 | 0 | 0 | 27 | 0 | 0 | 27 |
| Ponce | 145 | 85 | 60 | 0 | 0 | 0 | 0 | 48 | 0 | 0 | 48 |
| Humacao | 93 | 52 | 41 | 1 | 1 | 0 | 2 | 30 | 0 | 0 | 30 |
| Mayagüez | 139 | 51 | 88 | 1 | 0 | 0 | 1 | 44 | 0 | 0 | 44 |
| Caguas | 137 | 90 | 47 | 1 | 0 | 0 | 1 | 35 | 0 | 0 | 35 |
| Bayamón | 228 | 115 | 113 | 2 | 0 | 0 | 2 | 73 | 1 | 0 | 74 |
| Carolina | 123 | 99 | 24 | 0 | 0 | 0 | 0 | 19 | 0 | 0 | 19 |
| Guayama | 72 | 35 | 37 | 0 | 0 | 0 | 0 | 18 | 0 | 0 | 18 |
| Aguadilla | 124 | 50 | 74 | 0 | 0 | 0 | 0 | 32 | 0 | 0 | 32 |
| Utuado | 42 | 21 | 21 | 0 | 0 | 0 | 0 | 6 | 0 | 0 | 6 |
| Fajardo | 87 | 54 | 33 | 0 | 0 | 0 | 0 | 14 | 0 | 0 | 14 |
| Aibonito | 71 | 43 | 28 | 0 | 0 | 0 | 0 | 18 | 0 | 0 | 18 |
| Domestic Violence | 99 | 63 | 36 | 0 | 0 | 0 | 0 | 38 | 0 | 0 | 38 |
| Gender Discrimination | 36 | 22 | 14 | 0 | 0 | 0 | 0 | 13 | 0 | 0 | 13 |
| Sexual Harrasment | 20 | 10 | 10 | 0 | 0 | 0 | 0 | 8 | 0 | 0 | 8 |
| Labor Harrasment | 144 | 85 | 59 | 0 | 0 | 0 | 0 | 48 | 0 | 0 | 48 |
| Bureau of Anti-Discriminatory Affairs | 125 | 31 | 94 | 28 | 12 | 3 | 43 | 41 | 19 | 1 | 61 |
| **TOTAL** | **1987** | **1088** | **899** | **34** | **14** | **3** | **51** | **567** | **20** | **1** | **588** |

SUPERINTENDENCY OF PROFESSIONAL RESPONSIBILITY
ADMINISTRATIVE COMPLAINTS INVESTIGATED IN 2017

1,088 ADMINISTRATIVE COMPLAINTS OF 2017 INVESTIGATED IN 2017

+588 ADMINISTRATIVE COMPLAINTS INVESTIGATED IN 2017 FROM PREVIOUS YEARS (2014/2015/2016)

=1,676 TOTAL ADMINISTRATIVE COMPLAINTS INVESTIGATED IN 2017

899 ADMINISTRATIVE COMPLAINTS PENDING INVESTIGATION OF 2017

+51 ADMINISTRATIVE COMPLAINTS PENDING INVESTIGATION OF PREVIOUS YEARS (2014/2015/2016)

= 950 TOTAL OF ADMINISTRATIVE COMPLAINTS PENDING INVESTIGATION

b. *Controlled Substances Detection Test.*

In compliance with Paragraph number 200 of the Agreement, for the period of January 1 to December 31, 2017, PRPB has continued performing tests to detect the use of controlled substances in police officers.  To ensure the reliability and validity of tests performed prior to service for cadets and to police officers, the tests are conducted randomly.

The table below shows the number of controlled substance tests performed on police officers during the period. The information is shown monthly divided by the thirteen (13) police areas, and cadets. During the period covered, eight hundred and forty-six (846) tests of thirteen thousand one hundred and sixty-seven (13,167[12]) police officers were held, representing six percent (6%) of the total workforce. Of the total number of tests performed, one tested positive for controlled substances and another case was recorded as negative (police officer refused to submit to the test). Both cases are under the procedures of the Regulation No. 6403, titled, "Regulation of the Program for the Detection of Controlled Substances in Officials and Employees of the Puerto Rico Police" that govern the PRPB in these cases.

The following table summarizes in a monthly basis the tests performed:

| Controlled Substances Screening Tests (2017) | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Police Areas** | Jan | Feb | Mar | April | May | June | July | Aug | Sept | Oct | Nov | Dec | Total |
| Aguadilla | 0 | 0 | 0 | 0 | 0 | 149 | 0 | 0 | 0 | 0 | 0 | 0 | 149 |
| Aibonito | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 147 | 0 | 0 | 0 | 0 | 147 |
| Arecibo | 0 | 0 | 0 | 0 | 0 | 17 | 0 | 67 | 0 | 0 | 0 | 0 | 84 |
| Bayamon | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 28 | 0 |
| Caguas | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 15 | 0 | 0 | 0 | 0 | 15 |
| Carolina | 0 | 0 | 0 | 0 | 0 | 13 | 0 | 0 | 0 | 0 | 0 | 0 | 13 |
| Fajardo | 0 | 0 | 0 | 0 | 79 | 22 | 0 | 0 | 0 | 0 | 0 | 0 | 101 |
| Guayama | 0 | 0 | 0 | 0 | 21 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 21 |
| Humacao | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ponce | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 24 | 0 | 0 | 0 | 0 | 24 |
| Mayaguez | 0 | 0 | 0 | 13 | 0 | 0 | 0 | 26 | 0 | 0 | 0 | 0 | 39 |
| Utuado | 0 | 0 | 0 | 11 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 11 |
| San Juan | 0 | 0 | 0 | 70 | 34 | 51 | 0 | 4 | 0 | 2 | 0 | 45 | 159 |
| Pre-Employment | 4 | 1 | 0 | 1 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 8 |
| Cadets | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Totals** | **4** | **1** | **0** | **95** | **134** | **252** | **1** | **284** | **0** | **2** | **0** | **73** | **846** |

---

[12]For the purposes of calculating percentages, this figure was used as the basis on the amount of police officers reported in the training compliance area of this report. It comes from the figures reported by the training coordinators according to personnel lists of their respective units. This is for maintaining numerical uniformity throughout the progress report, until it is finished the personnel study of Paragraph 13 of the Agreement.

| Positives[13] | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Negatives[14] | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |

As mentioned in the PPRB progress report of May 25, 2017 the total of tests conducted during this period was limited during the first three (3) months of 2017, due to the transition of government during the change of administration after the elections of 2016. Likewise, the passage of Hurricanes Irma and Maria through the Caribbean affected temporarily the continuity of the testing program of controlled substances, given the state of emergency provoked by these two (2) natural disasters, and the need to use all resources and efforts of the PRPB into the emergency work and maintain public safety as a priority.

c.  The following table summarizes all administrative complaints filed by the Office of Legal Affairs and the Superintendence in Professional Responsibility signed by the appointing authority, during the period from January 1 to December 31, 2017. These are classified by final dispositions as established in Paragraph 188 of the Agreement:

| Office of Legal Affairs (OAL) 2017 | | | | | |
|---|---|---|---|---|---|
| Month | Sustained | No Sustained | Unfounded | Exonerated | Total |
| January | 37 | 14 | 4 | 2 | 57 |
| February | 10 | 2 | 0 | 0 | 12 |
| March | 9 | 7 | 6 | 1 | 23 |
| April | 12 | 6 | 1 | 8 | 27 |
| May | 5 | 4 | 1 | 1 | 11 |
| June | 10 | 20 | 0 | 12 | 42 |
| July | 26 | 25 | 5 | 5 | 61 |
| August | 10 | 5 | 3 | 6 | 24 |
| September | 13 | 9 | 6 | 2 | 30 |
| October | 0 | 0 | 0 | 0 | 0 |
| November | 7 | 18 | 6 | 4 | 35 |
| December | 8 | 12 | 2 | 2 | 24 |
| Total | 147 | 122 | 34 | 43 | 346 |

| Superintendence in Professional Responsibility (SPR) |
|---|

[13] See Articles 13 "Test Procedure"; 14 "Duties of the Medical Review Officer"; 15 "Rights of Employees or Officials"; and 16 "Disciplinary Measures" of the Regulation No. 6403 "Regulation of the Program for the Detection of Controlled Substances in Officials and Employees of the Police of Puerto Rico", which are not included in this document.

[14] This classification refers to the cases described in the definitions of Regulation No. 6403 "Regulation of the Program for the Detection of Controlled Substances in Officials and Employees of the Puerto Rico Police" in its Article 8 (U): "*Unjustified Negative: Constitute the refusal to submit to the tests of controlled substances or to cooperate so that they are carried out, as it is, without excluding others, the non-presentation to the place where the sample is taken without justification; leave the place where the sample is taken; the refusal of the person clearly expressed that he refuses to submit to the procedure; not following orders or following instructions from the laboratory or the Officer in charge so that the appropriate sample can be produced or when the sample is altered.*"

| 2017 | | | | | |
|---|---|---|---|---|---|
| Month | Sustained | No Sustained | Unfounded | Exonerated | Total |
| January 2017 | 12 | 107 | 17 | 73 | 209 |
| February 2017 | 5 | 87 | 14 | 71 | 177 |
| March 2017 | 97 | 41 | 3 | 11 | 152 |
| April 2017 | 32 | 48 | 4 | 17 | 101 |
| May 2017 | 51 | 20 | 4 | 4 | 79 |
| June 2017 | 35 | 51 | 6 | 4 | 96 |
| July 2017 | 9 | 15 | 8 | 15 | 47 |
| August 2017 | 47 | 36 | 12 | 9 | 104 |
| September 2017 | 49 | 7 | 5 | 2 | 63 |
| October 2017 | 12 | 74 | 32 | 25 | 143 |
| November 2017 | 37 | 32 | 21 | 12 | 102 |
| December 2017 | 52 | 42 | 0 | 39 | 133 |
| Total | 438 | 560 | 126 | 282 | 1,406 |

## H. Community Engagement and Public Information.

1. *Policies Developed or Reviewed.*

   a. General Order Chapter 100, Section 125 titled "**Organizational and Functional Structure of the Press Office**".

The purpose of this policy is to establish the organizational and functional structure of the PRPB Central Press Office and those located in the Police Areas, with the intention of institutionalizing the generally accepted police practices, which are aimed at achieving efficiency between duties to communicate to the community and to carry out the police work aimed at preventing, investigating and prosecuting crime.

This policy was developed according to the Community Engagement Interaction and Public Information Action Plan; Development of Policies and Procedures Objectives; Activity 3.2.

2. *Status of the Central Citizen Interaction Committee (CIC).*

The last meeting of the CIC was on August 21, 2017, in which the restructuring of the Central Citizen Interaction Committee was discussed, this after the meeting held on August 17, 2017, with the then Commissioner Michelle Hernández de Fraley, also were present Colonel Clementina Vega, Director of the PRPB Reform Office, and Commander Iris Colón, Executive Director of the Central Committee.

At this meeting, the Commissioner held a conversation with the TCA to explain the problem of the resignations received from members of the Central Committee. In this conversation, the TCA

was asked to approve a restructuring of the Central Committee. He informed that, for the well-being of the CIC that they proceed with the restructuring that the Commissioner asked.

In the agreements of this meeting, the following was established:

    a. The three (3) remaining members of the committee will continue in office until the end of the oath.

    b. The thirteen (13) spokespersons of the CIC of the areas will be integrated into the work of the Central Committee.

    c. To amend the General Order Chapter 800, Section 801, titled, "Citizen Interaction Committees" related to its composition.

    d. The meetings will be bimonthly on the second (2nd) Saturday of the month corresponding to the meeting.

At the meeting of August 21, 2017, the Area Committees Spokespersons were fully updated, and in agreement elected Dr. Carlos Pérez Fernandez, Representative of the Foreign Community, to continue in his role of Spokesperson and Dr. Jorge A. Rodríguez Romero by vote was elected as Alternate Speaker.

The date for the first meeting of the restructured committee was scheduled for October 16, 2017. This meeting could not be carried out due to the Hurricanes Irma and Maria. A working date for this year's meeting has not been established, but communication with the Alternate Speaker Dr. Jorge A. Rodríguez has been maintained and the Reports for 2017 were requested, recognizing that many Facilitators[15] are in special services and they have not been able to complete them.

## I. Information System and Technology.

1. *Policies Developed or Reviewed.*

    a. General Order Chapter 100 Section 126 titled "**Radio Control Operations Center and Command Centers**".

On October 2, 2017, the then Superintendent signed this policy. The purpose of this policy is to establish the duties and responsibilities of PRPB employees assigned to the Radio Control

---

[15] The Facilitator is a police officer with the agent rank that will assist in the coordination of meetings, logistics and administrative matters of the Central Citizen Interaction Committee.

Operations Center and Areas Command Centers and the requirements they must possess to belong to, or remain in them. This will ensure an effective and uniform channeling of requests for police services through the Line (787) 343-2020 and the Emergency System 9-1-1. In addition, encourage the classification, identification and archiving of messages in electronic form.

This policy was written under the provisions of the Information and Technology Systems Action Plan; Policies and Procedures Development Objectives; Activity 2.3.

2. *Status of Telephone Services, Data and Biometric Timekeepers in the Police Areas.*

The Bureau of Technology and Communications undertook the task of verifying the state of the PRPB Data and Telephone Systems, after the hurricanes on September, 2017. The results were presented as of January 31, 2018, and are presented in the following table:

| Unit | SUMMARY OF THE STATUS OF DATA AND TELEPHONE SERVICES IN THE HEADQUARTERS AND POLICES AREAS BUREAU OF TECHNOLOGY As of January 31, 2018 | | | |
|---|---|---|---|---|
| | Number of Units per Police Area and Data Service Status | | Number of Units per Police Area and Telephone Service Status | |
| | Yes | No | Yes | No |
| Headquarters | 1 | 0 | 1 | 0 |
| Aguadilla Area | 5 | 2 | 5 | 2 |
| Aibonito Area | 4 | 3 | 1 | 6 |
| Arecibo Area | 8 | 2 | 1 | 9 |
| Bayamón Area | 11 | 6 | 12 | 5 |
| Caguas Area | 6 | 4 | 5 | 5 |
| Carolina Area | 6 | 4 | 6 | 4 |
| Fajardo Area | 4 | 3 | 5 | 2 |
| Guayama Area | 5 | 0 | 5 | 0 |
| Humacao Area | 4 | 2 | 5 | 1 |
| Mayagüez Area | 10 | 0 | 10 | 0 |
| Ponce Area | 12 | 0 | 12 | 0 |
| San Juan Area | 9 | 4 | 9 | 4 |
| Utuado Area | 2 | 5 | 2 | 5 |

## V.  PRPB RESPONSE TO CONCERNS RAISED BY THE TECHNICAL COMPLIANCE ADVISOR (TCA) IN THE PREVIOUS SIX-MONTH REPORT.

1. *Concern expressed by the TCA in its Sixth Half-Year Report on Personal Transaction Information related to the Agreement.*

On December 17, 2017, the then Commissioner issued guidelines related to the notifications of personnel transactions for compliance with the Order of the Federal Court for the District of Puerto Rico, of July 2, 2014, Case No. 12- 2039 (GAG) Document 143 and its respective amendments.

The PRPB and the USDOJ signed on July 17, 2013, an Agreement for the Sustainable Reform of the Puerto Rico Police. Said Agreement is under the supervision of the Honorable Judge Gustavo A. Gelpí of the Federal Court in Puerto Rico. Pursuant to Paragraph 232 of the Agreement, it is established that the PRPB will inform the TCA and the DOJ of any change in the personnel of the ranking system.

According to Amended Order and issued by Judge Gelpí, the PRPB will have to inform the TCA and the local and federal Departments of Justice, monthly, in the first five days of the following month, of all transactions carried out, in accordance with the provisions of Paragraph 264 of the same.

For these purposes they were instructed in the communication OS-1-1-587; "*Fulfillment of the Order of the Federal Court*" regarding the reporting of staff transactions of the rank system, which not later than the second (2nd) day after the end of each month, must notify the Division of Appointments and Changes of the Human Resources Bureau, all transfers transactions made during the month that ended. Likewise, and to comply with another Order by the Federal Court in Case No. 12-2039 (GAG) Document 646, to amend the Order in Document 143, the Appointments and Changes Division of the Human Resources Bureau was established, it must inform every Friday morning, to the Reform Office, the transfers of the following personnel: Colonels, Lieutenant Colonels, Area Commanders and staff of the Reform Office.

2. *TCA Concerns about the Multitudinous Events of April and May 2017.*

The information on this subject included in this report is extracted from the response of the Puerto Rico Police Bureau to the Evaluation made by the TCA of the Response of the Puerto Rico Police in the Manifestations and Related Events of the months of April and May 2017, and the TCA Seventh (Interim) Semi-Annual Report.

   a. **PRPB's Failure to comply with TCA's requests during this assessment:**

### TCA's 7th Report

*"The TCA submitted a written request to the PRPB on July 17, 2017, requesting copies of all the video recordings in possession of the PRPB in relation to the four events covered by this Report. A PRPB police officer acknowledged receipt by signing the request. When the undersigned delivered the request, the PRPB officer verbally informed that the PRPB had "montones de videos." In several occasions after such day, the TCA office spoke to the same police officer and reminded him of the request for the video recordings, and his responses were always evasive. The TCA was so persistent with this request, that on 08/16/2017, the police officer provided to IC Pujol a computer disk (DVD) containing some video recordings (see Enclosure # 80). The officer stated that these were the video recordings pursuant to the TCA's request.*

*When the TCA reviewed the video recordings, it was rapidly noticed that all the TCA was provided with were video recordings made by reporters of local TV stations, and video recordings downloaded from the internet (Pulso Estudiantil, Dialogo UPR). The PRPB Officer did not deliver videos recorded by CRADIC or the PRPB. The TCA finds this fact as a deceitful response to the official request. The TCA submits that having been provided in a timely fashion with all videos recorded by the PRPB would have helped to present a more complete and accurate Report."*

### PRPB Response

*"It should be clarified that in an exchange of views produced by the initial request of the TCA, the PRPB official who coordinated the matter in effect expressed that there were videos, but referred to the videos collected and disseminated by the different social and news media, among others, not to videos taken specifically by police officers assigned to this specific task. This, since at that time the coordinating officer, had not been informed that there were such videos. It must be underscored that once the videos were delivered to this officer, the immediate delivery to the TCA staff was completed.*

*The PRPB disagrees that it is mentioned in the Report that it acted in a deceptive manner in response to the TCA request and reiterates that, in effect, what was configured was a misinterpretation of the information."*

b. **Alteration of Videos:**

### TCA's 7th Report.

*"On 12/01/2017 the PRPB provided copies of nine DVDs to the TCA, all related to this event. These recordings show and corroborate most of the information already provided in this Report. However, one of the DVDs, appears  to have been edited. This DVD contains one single file that has recordings made from multiple different locations, and it contains several clearly visible transitions, and in other instances has images' even overlapping each other. All these facts clearly suggest that this file may have been created  with  a video editor software. Additionally, six of the other remaining eight DVDs provide multiple video segments which   are identified with the sequence number that the video recorder device has assigned to each of them. These six DVDs are missing several video segments according to the sequence number that the video recorder device assigned to all the segments. These facts cast doubts on the video recordings that were received, and it could be questioned if they represent only part of the incidents recorded that day by CRADIC.*

*On December 7, 2017, pursuant to a request of the TCA, the PRPB agreed to offer for interview agents assigned to the CRADIC unit that had been working on the May 1st events providing crowd control at the "Milla de Oro" location. The TCA interviewed agent Leonel Albino Rios and 2nd lt. Jose Javier Bocanegra Ortiz, both assigned to CRADIC. Present at the time of the interviews for the TCA office were TCA Arnaldo Claudio (via telephone line), IC Pujol, as well as Counsels Federico Hernandez Denton and Antonio R. Bazan. Representing PRPB was Counsel Joel Torres of the PRDOJ and 1st Lt. Nelson Castro."*

### PRPB Response.

*"It is a matter of procedural law that mere allegations do not constitute sufficient proof. Demonstrative evidence is required to sustain them. Respectfully, we establish that the accusations of the TCA inasmuch as it asserted that the videos of the demonstrations that were delivered were edited have totally no justification. This imputation, beyond being a mere impression, was not sustained. At no time was the PRPB shown evidence to support such allegations. The PRPB reiterates that the recordings that were given to the TCA are all the recordings that we showed and that they were not altered.*

*This information could be confirmed by the TCA and its team as a result of the interviews it held with personnel assigned to CRADIC. Therefore, if there are still doubts regarding the integrity of the videos, the original videos are available to the TCA for an expert in editing videos to evaluate*

*them. The recordings according to the statement of one of the CRADIC interviewees are not erased, but are kept as evidence, being delivered to the CRADIC Director to be insured. Under no circumstances does the PRPB edit the images, unless the exceptions established in the General Order of CRADIC are met. The only circumstances that lead to a recording being edited are: (a) protect the identity of minors captured in the recordings; (b) protect the identity of witnesses; (c) protect the exposure of details of a scene that may be harmful or cruel to victims, relatives and communities of interest and/or images without educational, investigative or illustrative value and that only appeal to the morbid; (d) protect the privacy of the interior of a private property; and (e) that the details of the same can compromise the investigation and the result of the same. In any case, the PRPB keeps the originals of the recordings if any of them need to be edited according to the mentioned circumstances.*

*The PRPB does not keep recordings that do not contain criminal material. That is to say, if a public event is recorded and in said public event no crime arises, there is no reason for the NPPR to keep this recording. These norms have been established in the draft of the revision of the general orders of the CRADIC and the recording of public events, whose documents have already been sent to the TCA and DOJ.*

*The confusion may be based on the technological limitations currently facing the Bureau. We have acknowledged that we face the challenge that the equipment does not have enough battery to record the entire event, so the recordings are limited to fragments where the person in charge of recording or the Incident Commander reasonably understands or has a well-founded reason to determine what will happen to an event that should be recorded. The multitudinous events are not recorded complete, many times it will depend on how the event happens. We reiterate the norm in that the PRPB does not in any way pursue the creation of unnecessary recordings, if those recordings do not contain any criminal material. None of the police officers assigned to the CRADIC failed to comply with the provisions of the General Order Chapter 600, Section 610 Recordings of Public Events in force.*

*However, the PRPB recognizes that this policy has to be improved, that is why it is in the revision stage. It was amended, sent to the TCA and the DOJ and they already issued their recommendations, which were mostly welcomed, so it is in the process of approval for the signature of the Commissioner.*

*It must be remembered that the General Order of the CRADIC was also sent to the TCA and the DOJ for review on November 30, 2017, and most of the recommendations made by both parties were accepted, all this was done despite the fact that these policies you are not directly mentioned in the Agreement and in the Action Plans."*

c. **Disparity in testimonies of Lieutenant Bocanegra and Agent Albino Rios**

**TCA's 7th Report**

*"On December 7, 2017, pursuant to a request of the TCA, the PRPB agreed to offer for interview agents assigned to the CRADIC unit that had been working on the May 1st events providing crowd control at the "Milla de Oro" location. The TCA interviewed agent Leonel Albino Rios and 2nd lt. Jose Javier Bocanegra Ortiz, both assigned to CRADIC. Present at the time of the interviews for the TCA office were TCA Arnaldo Claudio (via telephone line), IC Pujol, as well as Counsels Federico Hernandez Denton and Antonio R. Bazan. Representing PRPB was Counsel Joel Torres of the PRDOJ and 1st Lt. Nelson Castro.*

*The first interview commenced at approximately 9:11 am with Agent Leonel Albino Rios, who introduced himself and further explained that he has been assigned to the CRADIC unit for the last thirteen years working in an assortment of both federal and local cases and further added he had never been the object of any complaints. Upon questioning, among the evidence provided by this agent, he explained that on May 1st of 2017, he was assigned a hand-held video recorder to record on tape. This agent was informed by IC Pujol that his name was not on the Operational Plan for that day. He explained he was originally assigned to a post in Muñoz Rivera Avenue, at the Fire Station, in the vicinity of the Commonwealth Department of Labor and the urban train station across the street. His mission, as stated, was to video record all crimes happening there, and suspicious individuals carrying shields and/or blunt instruments that could be used as weapons during the demonstrations. It should be noted that at no time the agent informed that part of his duty was to video record uses of force or intelligence gathering information.*

*The salient features of his statement were the following: 1) that he video recorded images with the use of a hand-held analogue camera using tapes; 2) that on May 2, 2017 he downloaded the recorded images in a computer and he burned a DVD, of which we received a copy; 3) shown over*

54

imposed images in his own recording he explained the same could have been the result of a computer generated error (transitions that depict different overlapping images); 4) he denied using any editing equipment and having edited the images; 5) he claimed that the tapes used to video record images were erased after content was downloaded at the computer and further added that erased tapes were again reused on subsequent investigations and were not preserved as evidence; 6) that everything that he recorded in his equipment is what appears in the video provided by the PRPB to the TCA; 7) that images do not overlaps but that there can be transitional images; 8) that he had to put the images together when he transferred them to digital, and 9) that he had to make transitions in order to project a complete video. This interview ended at approximately 10:25 am.

The second interview commenced at approximately 10:26 am with Second Lieutenant Jose Javier Bocanegra Ortiz, who introduced himself as being CRADIC's Assistant Director. Second Lieutenant Bocanegra Ortiz informed he participated in the May 1st, 2017 events supervising at the field, and specifically recalled that agents Gaston and Marrero, from his own unit, were assigned for duty in that event. He expressed that to the best of his knowledge the use of all hand-held cameras recording on tapes was discontinued. That the only cameras utilizing tapes were the older model big cameras used with tripods for the recording of official events although he could not dispute equipment using tapes had been used (his best recollection is that video recorders with tape were not used). He recalled that upon arriving back at the office, downloading of the disks was done and the equipment was handed over to Lieutenant Guadalupe.

He explained that in the equipment using tapes, the tapes are not erased to prepare a disk and the original tape is secured as evidence by Lieutenant Guadalupe.

He stated that although he is not an expert, digital cameras create sequential files. He made a specific statement that anyone that could have been issued a tape operated camera would be issued a new tape. He further informed that tapes are not erased for reuse. Additionally, he mentioned that on that same day no videos were recorded at La Fortaleza because no one expected a protest to be held there early in the morning. He also stated that they did not keep a log of the materials to be used with equipment assigned to each agent for his mission.

During the two interviews the TCA encountered discomforting contradictions and discrepancies between both interviewees on issues of upmost importance to the credibility of this visual evidence.

*This presents a very serious concern about the possible inability of CRADIC to present their recordings as evidence during any legal process related to these events. These interviews continue to cast a doubt on the video recordings that were received by the TCA office, and it could be questioned if they represent only part of the total video footage recorded that day by CRADIC.*

*The interviews also revealed the lack of proper equipment in the hands of the CRADIC Division because the equipment they have at this time has not any uniformity at all, and some of it is even obsolete. The interviews also showed that CRADIC personnel does not have the proper training, and they lack a clear uniform methodology to be applied by all CRADIC personnel assigned to video record events of crowd control. This methodology should include at least the requirement of: 1) a written chain of custody of all equipment, materials and recordings at all times; 2) methodology on how the recordings will be preserved as evidence; 3) written certification by anyone who makes a copy of these original recordings. The interviewed PRPB members complained that there is continuing request for modern equipment that was initiated long time ago, that is, a request for 4K cameras, bodycams, and other equipment that so far has been fruitless."*

**<u>PRPB Response.</u>**

*"The truth is that there is an apparent disparity in the testimony of both police officers on the procedure to be followed regarding the tapes once they are used to record images. However, from the same testimony it appears that Lieutenant Bocanegra answered and so he expressed it based on his general knowledge of the processes. However, we cannot lose sight of the fact that he himself is not a technician with specialized knowledge, and that he did not have the correct knowledge to answer the question that was asked.*

*The reality is that the only one with technical knowledge to answer these questions is the Agent Albino Ríos, who explained correctly what the process to follow with the tapes used is. The procedure that is carried out is that once the tapes are used to record, the recording is transferred to a DVD disc for it to be guarded by the CRADIC director. The tape is erased and reused in future occasions. It follows from the foregoing that the testimonies were not intentionally contradictory, but that each police officer answered according to their best knowledge."*

    d.  **Chain of Command**

**TCA's 7th Report.**

*"The evidence showed that the PRPB Chain of Command was broken during the May 1st event. On May 1st 2017, Secretary Hector Pesquera-at present, Secretary of the Department of Public Safety ("DPS") - was not part of the Chain of Command in charge of handling the PRPB activities related to the Workers' Day event.*

*By May 1st, 2017, Mr. Hector Pesquera had been appointed by the Governor as the Public Safety Secretary, but had not been confirmed by the Senate. On August 16, 2017, the TCA interviewed Col. Roberto Salva. During this interview, Colonel Salva noted that, on May 1st, he was located at the PRPB Fusion Center. He further informed that. On that same date, Mr. Hector Pesquera and Mr. Alfonso Orona arrived at the Fusion Center. When they arrived, the following individuals were present at that time: Commissioner Michele Hernandez de Fraley, Col. Roberto Salva, Col. Francisco Rodriguez, Col. Reinaldo Bermudez, Commander Reinaldo Santiago, Col. Rosario Polanco, and other personnel that he could not recall. According to his statement, Mr. Pesquera ordered Col. Rodriguez to go to the airport and take charge of the operation at that location. He stated that Counsel Alfonso Orona asked questions, but he never gave orders. Col. Roberto Salva disclosed that when Mr. Pesquera ordered Col. Rodriguez to go to the airport, he instructed Col. Rodriguez stating the phrase "Destranca esto," which he understood that the order consisted on going to the airport to remove the protesters. He further stated that Mr. Pesquera asked him why did not they place a locking device on the buses' tires, and that he replied to Mr. Pesquera that these devices weren't legal in the island and that the Police did not have these devices.*

*During the August 16, 2017, interview of Colonel Francisco Rodriguez, Colonel Rodriguez stated that when Mr. Hector Pesquera arrived at the Fusion Center he was not there because he was at the SAIC Office, at the Police Headquarters. He was called and instructed to report to the Fusion Center. Upon arrival, he met with Mr. Pesquera, Commissioner Michelle Hernandez de Fraley, Col. Salva Lopez and Col. Bermudez who were talking about the day's events. He stated that Mr. Pesquera instructed him to go to the airport, after which he looked at the Commissioner and upon not receiving any counter instructions from her, he followed Mr. Pesquera instructions. Mr. Pesquera instructions to him were: "destranquen eso".*

*During the interview with the Police Commissioner, she stated that that on May 1st, 2017, when Counsel Alfonso Orona arrived at the Fusion Center, it was not a surprise to her because they had*

*coordinated his visit in advance. She did not expect the visit of Mr. Hector Pesquera, despite that she had met with him a few days earlier and she informed him about the preparations for the May 1st, 2017 event. She advised that, in her presence, Mr. Pesquera ordered Colonel Francisco Rodriguez to go to the airport and solve a problem there with the protesters. She explained that she did not confront Mr. Pesquera because she knew that the problem at the airport was already under control, and she did not want to create unnecessary tension. She explained the situation to IC Pujol by saying "Why fight if the problem was already solved?" She further added that she did not oppose to Mr. Pesquera order because this was going to unnecessarily heat up the situation. She stated that later on, Col. Rodriguez spoke to her because he did not feel comfortable with what happened, that is, him obeying Mr. Pesquera order. She confirmed that while at the Fusion Center, Counsel Alfonso Orona had made some comments but he did not give any order at all."*

**PRPB Response.**

*The PRPB vehemently denies that its chain of command has been violated. In light of the TCA's allegations, it is necessary to clarify that its interpretation is incorrect on what the Secretary Pesquera was not part of the chain of command on May 1, 2017, is erroneous. Law 20-2017, Law for the Creation of the Department of Public Safety, establishes that the Governor may appoint the Secretary of Public Safety from the moment the law is signed. Article 9.07 provides that Articles 1.03 and 1.04 will also be valid from the moment of signing the law. The latter are precisely those that give the Secretary the responsibility and authority to be there at that moment and ensure that any event that affects public safety is attended to and controlled.*

e. **Trainings sample**

**PRPB Response**

*"Regarding the sample of training of five PRPDM requested by the TCA on July 17, 2017, the staff of the TCA indicates that it was not provided at the close of the evaluation report, it is necessary to point out the following: it was requested to the Auxiliary Commissioner in Education and Training (SAEA) on August 3, 2017 (document with communication number OS-4-OR-1-477). The information requested could not be provided due to the migration of personnel training data to a new system. Then, the emergency of the hurricanes Irma and Maria occurred. The facilities and equipment of the Academy were not exempt from the ravages of both atmospheric phenomena. This affected the delivery of the information to the TCA. Currently the Academy continues to have*

*limitations in its facilities and information systems and technology because it is still in the process of recovery. For the foregoing, we request that the Report clarify the justified reasons to which the non-delivery of the requirement is due."*

f. **Discrepancies in the amount of Reports of Use Force Incidents**

**PRPB Response**

*"The PRPB recognizes that there was an initial disparity in the number of reported incidents of use of force and the number of Reports of Use Force Incidents submitted. This disparity was communicated and clarified by personnel of the Reform Office to Mr. José Pujols, member of the TCA team and responsible for the evaluation of the multitudinous events. Later, he was informed of the existence of ten (10) Force Use Reports (PPR-854), which he had the opportunity to examine. We were kind enough to indicate that he could return as many times as necessary to achieve his goal.*

*The disparity referred to was one of an administrative nature. That is, there were some deficiencies in the processing of the documents, but it is important to note that no police officer failed to notify the uses of force used that day at the demonstration on April 18, 2017, completed on time the PPR-854. The PRPB recognizes that in this period of capacity must continue to improve concerning the documentation of the uses of force and related information. We reiterate that we have the inalienable commitment to continue standardizing our procedures and we are directed to this. In this period of capacity. The mere fact that the Specialized Tactical Divisions and the personnel of other units will work the events of April and May with the professionalism, ethics and respect for human and civil rights that made it is a monumental progress and conclusive evidence of the achievements made by all PRPB Members in compliance with the Reform process."*

g. **Deficiency in the Work Plans for Multitudinous Events**

**PRPB Response**

*"The PRPB recognizes that the Work Plans were deficient, as it did not contain all the necessary information that a Work Plan must have that adopts the generally accepted police practices to attend multitudinous events.*

*The PRPB as an immediate measure has proactively started a process of creation and revision of the Work Plans that will be used in the multitudinous events, that comply with the best police practices and that meet the needs that have arisen in the past multitudinous events.*"

3. ***Building Information Systems and Technology ("IT") Capacity in the aftermath of Irma and Maria (TCA's Comments on its Seventh Report [Interim] and PRPB response)***

**TCA's 7th Report (pages 31-34)**

"*From June through September, procedurally speaking, the Bureau of Technology (BT) achieved an important management stage by finalizing the Action Plans in combination with the IT Tables thereby enabling a more stabilized ongoing assessment of BT actions and progress. In policy terms, general orders, policies and manuals continued to be developed.*

*However, resources remained insufficient to fully impact efforts beyond basic maintenance and development. As such, at this stage, innovative and strategic re-architecting and solutioning is essentially limited if not non-existent. In this regard the BT still has much to do to not only support the other ten compliance areas of the Agreement but also implement necessary long-term IT and infrastructure improvements.*

*Additional observations for this period included:*

- *Given the shortage of resources, it was not adequately clear that BT was able to adequately implement oversight and management mechanisms such as Life Cycle program reviews and cataloging of systems and infrastructure requirements, both of which are fundamental to effective technology stewardship.*

- *Beyond capacity building, the CIO and his BT team must not only maintain focus on completing this phase but also identifying ways to leverage partnerships to share its workload with credible partners through collaborations or outsourcing. BT should consider the possibility of outsourcing selected BT functions. By doing so, they will be able to focus internally on critical functions and innovative options.*

- *Training was not yet complete and lagging on CAD Mobile as of July and August.*

- *The Reform Unit and BT acknowledged that oversight could be better enabled through four key documents that form a baseline for managing and monitoring. They are; 1) The Agreement, 2) the Action Plans, 3) Task Tables, 4) Policy Chronology.*

*From the perspective of staffing and resources:*

- *The staffing study implementation is critical to the probability of success and the delay in implementation is affecting IT;*

- *BT organizational structure must be staffed and implemented in accordance with the General Order;*

- *The PMO contract needs to be approved and implemented;*

- *It is essential that management and supervisory personnel have the skills to manage internal IT operations and to execute oversight methods. Especially if DSP outsources or consolidates PRPB IT services under DSP.*

*From September through December, following the hurricanes, the TCA conducted two on-site assessments, one in October and one in November. They revealed the magnitude of damage. Clearly, the damage sustained by the PRPB required that their fullest energy be focused on restoration of capabilities and away from the tasks at hand prior to the Hurricane. As examples, the following was observed:*

- *Radio Communications (Johnson Radio Sets) were functioning in degraded mode because microwave tower transceivers/repeaters (18 of 30 nodes) were damaged and so communications back to Headquarters were down.*

- *PRPB HQ's computer room was functioning near full operational capability. However, because the Early Intervention System ("EIS") and CIW ("Crime Information Warehouse") sustained a hard stop due to battery expiration during the storm, CIW files were at risk of being corrupted.*

- *The Fusion Center, which is the information sharing center, sustained substantial water damage with no repair scheduled more than 8 weeks after hurricane Maria.*

*In addition, first-hand inspection in October showed that Caguas Norte was uninhabitable. Fajardo, Mayaguez, Utuado, Carolina and Ponce were on battery power and were inconsistently being returned to commercial power.*

*"Shot Spotter" was functioning because it is a web service with a reach back solution to the application provider. This is a powerful "lesson learned" of significance that points to the potential benefits that can be achieved by leveraging a cloud service provider.*

*EIS was reviewed noting that the credibility of its data is essential and that information from CAD field operations needs to be applicable, credible, reliable and searchable. It was also observed and shared with the Reform unit that the TCA analysis of the Data dictionary, Entity Relationship Diagram and functional requirements documents is necessary in order to assess analytical utility of the field data. An example of this can be demonstrated with hierarchical capture of date against the most serious crimes that could also unintentionally exclude other important data elements important to analysis and research.*

*Clearly there is much more work to be done with regards to the architecture of data in order to ensure usefulness of the data collected beyond strictly crime statistics. It is strongly recommended that the PRPB recognize the importance of academic and scientific analysis of data (such as use of force data) to transformation of behavioral characteristics and the subject matter expertise needed to perform the analysis and change."*

### **PRPB comments on Information and Technology Systems after Hurricanes Irma and Maria**

*"Due to the damages caused by hurricanes Irma and Maria, the Radio Communications infrastructure of the Puerto Rico Police Bureau (PRPB) was severely affected. Given the magnitude of the damage the PRP submitted to the Federal Emergency Management Agency (FEMA) a request for replacement, repair and reconstruction of the infrastructure of Radio Communications (PW) which was approved. The Agency is currently waiting for the next steps with FEMA. This achievement will impact not only the Reform Agreement, but also update the technology infrastructure of the Agency.*

*In addition, the PRPB is evaluating increasing capacity in terms of redundancy of data communications (Internet), to ensure the functioning of information systems and services such as, the Payroll System, CAD, Shot Spotter, E-mail, etc. For these purposes, the PRPB has requested a satellite solution from the PRPB communications service provider.*

*The Project Management service was recently approved. It is in the Office of Legal Affairs to formalize the contract. This contract will provide the necessary assistance in the implementation*

*of the portfolio of projects that are currently under development and those that will be developed in the future. On the other hand, specialized technology services in the area of communications networks, applications related to criminal investigations, dispatching and handling of criminal incidents, criminal activities map and software development of the Bureau of Technologies and Communications are being carried out with outsourced services. In the future, the PRPB will be reinforcing the Technology and Communications Bureau with specialized resources in the aforementioned areas with the purpose of strengthening the IT services of the Agency.*

*Regarding the risk mitigation phase, the PRPB will request from FEMA the necessary equipment for the computer center, in order to maintain the availability of information systems and mission critical services (24 hours/7 days). In addition, a battery bank will be acquired for the computer and communications center respectively, with the purpose of replacing those affected by the hurricanes due to faults in the electric power.*

## VI.   CONCLUSION

During the period of this Progress Report, the PRPB encountered many challenges that could have derailed the progress of the Police Reform. However, as can be appreciated in this Report, the resilience and commitment of the Puerto Rico Police Members excelled during this time of hardships. Although, the PRPB is still recuperating from the aftermath of Hurricane Maria, the Commonwealth and the United States Department of Justice will work together to maintain continuity of the Police Reform, and request any modification that is needed on the timeframes set forth in the Action Plans pursuant to paragraph 239 of the Agreement.

CERTIFY

I hereby certify under penalty of perjury under 28 U.S.C. § 1746 and any other applicable law of United States of America, that the foregoing report and information is true and correct. Executed on San Juan, Puerto Rico, on this 1st day of March, 2018.

**Henry Escalera Rivera**
Acting Commissioner of the Puerto Rico Police

RESPECTFULLY SUBMITTED.

I HEREBY CERTIFY that on this same date, I electronically filed the foregoing with the Clerk of the Court using CM/ECF system which will send notification of such filing to all attorneys of record.

**WANDA VÁZQUEZ GARCED**
Secretary of Justice

**WANDYMAR BURGOS VARGAS**
Deputy Secretary in Charge of
Litigation
Department of Justice

**SUSANA PEÑAGARÍCANO BROWN**
Director of Federal Litigation
and Bankruptcy Division

**S/JOEL TORRES ORTIZ**
**Joel Torres Ortiz**
U.S.D.C. NO. 302311
Federal Litigation Division
Department of Justice

P.O. Box 9020192
San Juan, P.R., 00902-0192
Tel. (787) 721-2900, ext. 2647,2650,2624,2606
Fax (787) 723-9188
joeltorres@justicia.pr.gov