# SEVENTH SIX-MONTH REPORT OF THE TECHNICAL COMPLIANCE ADVISOR JUNE 10, 2017 – MARCH 31, 2018

*Office of the Technical Compliance Advisor to the Agreement for the Sustainable Reform of the Puerto Rico Police Department*

TCA Seventh Semi-Annual Report                                    2018

# Table of Contents

Table of Contents                                                1

A Message from the TCA                                           3

TCA Reports under the Agreement                                 18

Introduction                                                    19

**Section I**
PRPB Status Report                                              24

The Work of the TCA
-   Work Prior to Hurricanes Irma and Maria                    29
-   Work in the Aftermath of Irma and Maria                    34

**Section II**
PRPB Action Plans                                              40

**Section III**
Current and Anticipated Challenges in the Implementation of the Plans and the
Agreement                                                      45

-   Building IT capacity                                       49
-   Building HR capacity (Paragraph 13)                        55
-   Building Recovery and Continuity of Operations Capacity    59
-   Building Leadership Capacity: The Current Leadership Crisis, Act 20 of

TCA Seventh Semi-Annual Report                                              2018

2017, Promotions, Overtime, and Police Absenteeism                          65

- Building Community Trust Capacity: Findings from the Second Community
  Survey (Paragraph 241)                                                    68

- Building Civil Rights Capacity (I): Findings from the Court-Ordered Report on
  Policing of Mass Demonstrations in April and May                          71

- Building Civil Rights Capacity (II): Findings from SARP Evaluation        77


**Section IV**

Projected Activities                                                        85


**Appendixes**                                                              87


- Message from the TCA: Interim Seventh Six-Month Report                    87
- Activities                                                                93
- List of Policies                                                          96
- Action Plan Tables                                                        110

| 2018

# A Message from the Technical Compliance Advisor

This is the Seventh Report ("Report") of the Technical Compliance Advisor ("TCA") in the Agreement for the Sustainable Reform of the Puerto Rico Police Bureau ("Agreement").[1]  It builds upon the Interim Seventh Six-Month Report ("Interim Report") transmitted to the Parties on December 26, 2017 and submitted to the Court on January 26, 2018.[2]  As required under the Agreement, this Report assesses whether the timeframes set forth by the Agreement and the Action Plans have been met, and whether the Commonwealth of Puerto Rico is making satisfactory progress toward implementation of the Agreement.[3]

In the June 10, 2017 through March 31, 2018 reporting period addressed here, the PRPB has continued to reach specific milestones in compliance with steps in the Action Plans under the steadfast guidance and leadership of the Reform Unit Director Colonel Clementina Vega, the Deputy Director Lieutenant Colonel Alba Diaz, and the newly incorporated Lieutenant Colonel Jazmin Perez Mauraz.[4]  Annual revisions of policies created or revised pursuant to the Agreement have provided pertinent updates based on the feedback received during their implementation.[5]  In-depth, scenario-based training for all relevant PRPB officers on selected use of force, search and seizure, equal protection, and ethics policies is well underway and in partial compliance with Paragraph 237.[6]  Crisis intervention training is scheduled to start this April after months of delays and domestic violence training has already begun.   The significant collaboration between the Reform Unit and the Police Academy staff (which was

---

[1] Case 3-12-cv-02039-GAG. Docket No. 57 (Filed 07/07/2013)

[2] See: Docket No. 723.  The Seventh Interim Six-Month Report assessed the progress made by the PRPB in the implementation of the Agreement from June 10, 2017 through December 9, 2017.  The message from the TCA in the Interim Report is now Appendix 1 of this Report.

[3] See Paragraph 250 for reports the TCA must file, their content and format, during the first four years from the Appointment Date [June 6, 2014].

[4] The role of the Reform Unit is defined in Paragraphs 60, 215, 231, 232, 233, 234, and 253.

[5] Paragraph 113. "PRPB shall review each policy or procedure created or revised pursuant to this Agreement on an annual basis for the first three years from the Appointment Date or upon notice of a policy deficiency, and biannually thereafter.

[6] See Paragraph 237 for interim milestones during the first three years of the Agreement. This overall finding of partial compliance should not mask deficiencies and more nuanced findings regarding the status of trainings that the TCA has identified in the body of this Report.

established in the days that Colonel Michelle Fraley led the Police Academy and has continued under the supervision of Lieutenant Colonel Orlando Rivera have resulted in dynamic, high-quality training in key compliance areas.  At the same time, valuable outreach work (although not sufficient on their own account) has been conducted by the Reform Unit across Puerto Rico's communities on the first phase of constructing a new community and problem-oriented policing plan for Puerto Rico.[7]  In all these areas, the PRPB must be commended for their commitment to adopting new approaches consistent with the Agreement and best practices.

Once again, I want to commend the outstanding work of the women and men of the PRPB who provide safety and public order for all communities of Puerto Rico, particularly during the aftermath of hurricanes Irma and Maria.  My team and I also want to take this opportunity to give our deepest condolences for those officers who lost their lives during the execution of their duties while trying to safeguard life and property.  To them, their families, and friends our utmost respect for their sacrifices.

I strongly believe that the progress made in the last forty-six (46) months in terms of training and policy implementation has only been possible because of the dedication of PRPB officers and employees and their outstanding work under very difficult and extraordinary work conditions.  For that reason, I see with great unease the gradual but relentless loss of officers leaving the PRPB each month for other positions in law enforcement, resigning, or opting for retirement; therefore, as I stated time and time again in all my previous public reports, investments in the PRPB's human capital should be the Commonwealth's top public safety priority under the guidance provided by the Agreement.[8]   I am particularly concerned about the fate of the 310 officers who graduated from the Police Academy in March 2015, class 223, the first and only PRPB class to graduate under the Agreement.

As in past reports and consistent with Paragraph 250(d), this Report also details ongoing, persistent challenges and recommendations regarding necessary steps to achieve compliance.[9]

---

[7] See Paragraphs 215 and 231 for the role of the Reform Unit in community outreach and public information.

[8] For the previous TCA six-month reports, see docket numbers 203, 245, 306, 382, 464, 609, and 723. Also, please visit the website (https://www.policia.pr.gov/documentos-de-reforma-en-linea/) of the PRPB for Police Reform and its documents ("Reforma Policiaca").

[9] See Paragraph 250 (d): "[f]or any detailed steps that were reviewed and found not to have been fully implemented in practice, the TCA's recommendations regarding necessary steps to achieve compliance; and."

As the Agreement is now headed towards its fifth year of existence and its fourth official year of capacity building, this Report is <u>to assess whether the timeframes set forth by the Agreement and the Action Plans have been met</u>.[10]   **To date, my assessment is that the PRPB will not meet the original four-year capacity-building timeframe (including the TCA-granted four-month extension) set forth in the Agreement and the Action Plans.**

To make this determination, I have reviewed and have assessed whether the PRPB has met the timeline for each detailed step specified in the Agreement and the Action Plans. Although the timeline has been met in certain detailed steps, particularly steps concerning the production of policies and training materials, there are important detailed steps - including policy drafting and training steps - for which the Commonwealth has requested additional time extensions because it has not been or will not be able to meet the agreed upon milestones.  In reviewing the reasons for these delays, my assessment shows that Hurricanes Irma and Maria are neither the sole nor the main explanation for the Commonwealth not meeting the agreed upon timeframes.  Other reasons account for these delays.

Consequently, let me put these failures to meet the agreed upon deadlines set forth by the Agreement and the Action Plans in its proper context.  In September of 2011, under the tenure of Police Superintendent, Major General (ret) Emilio Diaz Colon, the United States Department of Justice ("USDOJ") found a pattern or practice of misconduct by the PRPB.   On December 21, 2012, a year later, under the tenure of then-Police Superintendent and now current Secretary of the Department of Public Safety ("DPS") Mr. Hector Pesquera, the USDOJ filed a civil action under *the Violent Crime Control and Law Enforcement Act of 1994*.[11]   That same day, the United States entered into a sweeping agreement with the Commonwealth of Puerto Rico and Governor Luis Fortuño to resolve its civil investigation of the PRPB.[12] The complaint and the Agreement were filed along with a joint motion requesting a temporary stay of the proceedings until April 15, 2013 to provide the incoming administration of Governor-elect Alejandro García Padilla sufficient time to review the Agreement. In July 2013, after additional negotiations among the Commonwealth and the United States, U.S.

---

[10] Paragraph 240 requires that, for the first four years from the appointment date [June 6, 2014] of the TCA, the TCA evaluates "PRPB's compliance with this Agreement by assessing PRPB's progress against its Action Plans."
[11] Docket No. 1 (Filed 12/21/2012). https://www.justice.gov/iso/opa/resources/647201212211524505748.pdf.
[12] Docket No. 2.1 (Filed 12/21/2012).

|

District Court Judge Gelpí entered the final Agreement among the Parties as an order to remedy the USDOJ identified violations.[13]

On October 31, 2013, Superintendent Pesquera submitted his resignation a day after federal and local officials announced the designation of U.S. Marshal Juan Mattos as Technical Compliance Advisor (TCA) and the clock started counting on the PRPB's obligation to submit the first Action Plans for the first four years of the Agreement.[14]   In February 2014, TCA Mattos resigned and, two months later, Police Superintendent Tuller also resigned.   On June 6, 2014, when Jose Caldero was the new Police Superintendent, the Parties recommended (and the Court approved) my appointment to serve as TCA, overseeing the implementation of sweeping organizational and civil rights reforms under the Agreement.[15]   With my appointment, the clock on the four-year capacity building started to run again.   Although the Commonwealth had at least one year prior to my appointment to start meeting targets and make progress in the drafting of the Action Plans and implement meaningful reforms consistent with Paragraph 235, that competitive advantage quickly faded away mainly due to the profound disruptions and instability affecting the PRPB's top leadership detailed above.[16]   It was an erratic time for the PRPB that closely resembles today's upheaval within the Bureau.

For three years, from June 2014 through May 2017, the PRPB worked closely with my team of subject-matter experts and the USDOJ team drafted eleven (11) achievable and

---

[13] On December 21, 2012, the agreement was announced, to settle this federal civil rights lawsuit.   Its implementation was delayed giving the then-new governor, Alejandro García Padilla, time to review it. See original announcement:         https://www.justice.gov/opa/pr/justice-department-enters-agreement-reform-puerto-rico-police-department

[14] Docket No. 86.   Paragraph 237 mandates that the "PRPD shall submit its Action Plans to the TCA and DOJ for review and approval on a rolling basis and shall cover, at a minimum, the four years of the Agreement from the Appointment Date [Appointment of the TCA]. PRPD shall submit the first set of Action Plans no later than 90 days from the Appointment Date or 60 days after the Commonwealth's FY2013-14 budget is enacted, whichever occurs later."

[15] Under Paragraph 224, "[T]he Parties shall select a Technical Compliance Advisor ("TCA") to assess and report whether the provisions of this Agreement have been implemented, and whether this implementation is resulting in constitutional and effective policing, professional treatment of individuals, and increased community trust of PRPB."   Under the Agreement, Paragraph 11, the "TCA" means "Technical Compliance Advisor," a person or team of people, including any employee, agent, or independent contractor of the TCA, who shall be selected to review, assess, and report on the Commonwealth of Puerto Rico's implementation of this Agreement."

[16] This is the timeline for changes in PRPB leadership: Police Superintendent Hector Pesquera served from April 2012 to November 2013; Police Superintendent James Tuller served from December 2013 to April 2014; and, Police Superintendent Jose Caldero began to served April 2014 to December 2016.   TCA Mattos served from October 2013 to February 2014.

strategic Action Plans for each of the eleven (11) compliance areas of the Agreement. As reported in prior six-month reports, there was overall notable progress in meeting the agreed upon timeframes. The PRPB drafted more than a hundred policies and developed a similar number of training materials. Alongside these achievements, the Action Plans were completed by May 2017 and submitted to the Court for approval in June 2017. However, in May 2017, coinciding with the implementation of Act 20-2017, the PRPB started to give signs of having hit a wall and submitted a request for an extension of four months to the capacity building period.

In June 2017, I granted the requested four-month extension based on the TCA's authority under Paragraph 239.[17] After carefully reviewing the PRPB proposal, I agreed that the request was in good cause. However, I cautioned the Commonwealth that the implementation of Act 20-2017 was likely to create unintended disruption and additional delays which should be quickly identified to prevent further delays. I never received confirmation that the PRPB adopted my recommendation and that potential obstacles for compliance related to the implementation of Act 20-2017 were promptly acknowledged. If the Reform lost a year between July 2013 and June 2014, it is my assessment that the Reform has again lost very valuable time with the chaotic implementation of Act 20 from May 2017 to March 2018.

In the Interim Report of January 2018, I identified the most significant current PRPB failures in meeting the timelines set forth in the Information Systems and Technology, Supervision and Management, Community Engagement and Public Information, and the Professionalization Action Plans. With regards to the interruptions in the implementation of the Professionalization Action Plan, I emphasized delays affecting Paragraph 13 (the Staffing Allocation and Resource Study ["The Staffing Study"]). I also identified how the leadership crisis caused by the implementation of Act 20-2017 and leading to the January 2018 separation of Police Commissioner Dr. Michelle Fraley (the

---

[17] Under Paragraph 239, "[S]hould PRPB need to modify any of the timeframes set forth in the Action Plans, PRPB shall explain to the TCA, in writing, why such modification is necessary. For good cause, which may include budgetary or funding limitations, the TCA may extend any timeframe by up to four months. However, the TCA shall not extend the initial timeframe by more than four months without the approval of DOJ. DOJ shall not unreasonably withhold approval. Any modification to an Action Plan, including extensions approved by the TCA and DOJ, shall be filed with the Court for approval. Extensions submitted to the court shall be effective, absent further action from the Court, 30 days after submission to the court. Disputes on approval for extensions may be submitted to the Court for resolution. The Parties agree that should PRPB need to extend the time for completing an Action Plan beyond the time frame originally contemplated in the approved Action Plan for operational or budgetary reasons, such an extension shall be permitted upon agreement of the Parties and the TCA or upon leave of Court."

first female Police Superintendent and a person completely committed to the Reform of the PRPB) along with the subsequent re-organization of the PRPB's top leadership, resulted in additional delays.   The Interim Report also highlighted how the power struggle within the PRPB reached and impacted the Reform Unit with the subsequent impact on the timely implementation of the Agreement and the Action Plans.

It is my assessment that, except for the steps identified in the second paragraph of this message, there has been very limited progress in meeting required deadlines from the submission of the Interim Report (December 2017) to the end of this reporting period (March 2018).  In March, the Court noted for the record the extension of the timeframe for twenty-five (25) detailed steps in the Action Plans agreed by the Parties and approved by the Court.[18]  On or before April 6, 2018, the Commonwealth is to submit additional requests for extension in the timeframes for a yet to be defined number of steps in the Action Plans.  The Parties will have to negotiate this extra time as these additional time extensions "will be permitted upon agreement of the Parties and the TCA or upon leave of Court."[19]

Beyond meeting deadlines, the Report is to assess from a substantive point of view whether the Commonwealth of Puerto Rico is making satisfactory progress towards the implementation of the Agreement.  **My overall assessment is one of partial compliance with unsatisfactory progress made in key compliance areas.**  The PRPB is for the most part in full or partial compliance in meeting policy and procedure development as well training development steps in the Action Plans.  However, it is in non-compliance in key data collecting and reporting objectives as well as implementation objectives defined in the Action Plans.  Furthermore, there are areas such as Professionalization, Supervision and Management, Administrative Complaints, and Information Systems and Technology where the PRPB is non-compliant in key steps and is far from making satisfactory progress towards the implementation of the Agreement.

To make this determination, I have assessed whether the PRPB has made satisfactory progress in each detailed step specified in the Action Plans.  While the PRPB has either fully complied or partly complied with many policy and training development steps that were crucial in the first three years of the Agreement, there are very important, significant detailed steps scheduled for the third and four years of the Agreement for

---

[18] Docket No. 624.
[19] Paragraph 239.  Update:  In May, the Parties agreed-upon new timelines.

which the Commonwealth has not made satisfactory progress and has been rated non-compliant.

Although a detailed analysis of each step is to be found on the body of the Report and the appendix with the specific tables, I would like to address in greater detail here my overall assessment of partial compliance with unsatisfactory progress made in certain key compliance areas.  In the Interim Report, in response to an October court order, I identified specific areas where the PRPB's strategic and operational plans as drafted in the Action Plans needed to be seriously revamped because the PRPB was not making satisfactory progress in implementation and analytical reporting.  This situation was less the result of the impact of Hurricanes Irene and Maria and more the effect of a spur-of-the-moment implementation of Act 20-2017 and other systemic deficiencies affecting PRPB's organizational performance.[20]

In the Interim Report, I highlighted that the first challenge to the successful implementation of the Agreement was to undertake real, effective capacity-building in the compliance area of Information Systems and Technology and in the PRPB's analytical and reporting capacity.  It is now quite apparent that the modest progress made in the last 46 months in terms of creating a reliable data gathering/reporting and IT infrastructure for the PRPB has affected the operational and tactical response of the PRPB to both the Hurricanes as well as the subsequent crime wave.

The second documented challenge was the modest progress in creating a robust and solid strategic staffing plan as required under Paragraph 13 of the Agreement.[21]  This is still the case today, even as there are solid signs of positive progress in the first three months of 2018 and evidence that the study will be completed in April 2018.[22]  During this reporting period from June 2017 through March 2018, as in the past, my assessment is that it is blatantly apparent that the lack of a consistent staffing approach for more than two years has continued to limit the PRPB operationally and

---

[20] See: Docket No. 624.

[21] See Paragraph 13.  "PRPB shall assess the appropriate number of sworn and civilian personnel to perform the different department functions necessary to fulfill its mission.  To do so, PRPB shall conduct a staffing allocation and resource study.  The study shall form the basis for a staffing and resource allocation plan that is consistent with community-oriented policing principles and supports the systematic use of partnerships and problem-solving techniques.  To foster community-oriented policing, the plan shall consider deployment practices that offer officers opportunities to serve the communities in which they reside."

[22] The study was completed in April 2018.  The findings of the study were presented before the Court during a public hearing scheduled for May 16, 2018.

strategically.  These staffing limitations manifested fully in the rank-and-file frustration about overtime and other personnel issues contributing to the damaging police slowdown and/or absenteeism of December 2017 and January 2018.  In addition, since my first six-month report, I warned the Parties and the Court that staffing matters not directly covered under the Agreement (e.g., compensation, overtime, increased sick leave, impermissible protest by officers) would ultimately end up impacting on the reform process if left unattended.[23]

These days I have additional concerns about the implementation of Paragraph 13.  Contrary to what it has been publicly reported, the Staffing Allocation and Resource Study is an agreed-upon requirement of the 2013 Agreement and the Professionalization Action Plan, not a recent request of the DPS or a particularly DPS administrator even if that administrator is the DPS Secretary.[24]  The study is one of the key components of the Agreement and the public record is clear.  First, the Request for Proposals ("RFP") for the study was issued in October 2016 and the selection of a consulting firm was made in December 2016 with the approval of former Police Commissioner Fraley in January 2017 months before the appointment of Secretary Pesquera.  Second, it is well documented that I have been publicly cautioning the Court and the Parties of the PRPB's lack of compliance with this requirement since 2015 and my team and I have had a significant role in pushing the PRPB towards compliance with the three Paragraph 13 related steps outlined in the Action Plans since March 2016.[25]

My main concern is that the study now appears to be an instrument to address an expedient public policy issue, not seen as one of the cornerstones of the Agreement and a sustainable reform agenda.  In this sense, the current public statements of the DPS Secretary on the allocation staffing study seem to bring confusion to the path of the Commonwealth toward the implementation of Paragraph 13.  First, it is important

---

[23] See: Docket No. 203. TCA, First Six-Month Report (June 6, 2014 – December 6, 2016. Submitted to the Court: February 9, 2015. Page 7).

[24] See: Miguel Rivera Puig, El Vocero, "En La Mira La Plantilla Policiaca." Monday, March 26, 2018. pp. 1, 3-4.  "Tras el marcado exodo de boricuas que decidieron probar fortuna en Estados Unidos, incluida una cantidad indeterminada de agentes, Pesquera encomendo un estudio para analizar si hay suficientes policias para velar por el bien public y espera tener el informe en sus manos en abril."

[25] See Docket No. 306 (02/01/2016), Docket No. 382 (07/11/2016), and Docket No. 464 (01/13/2017).  For instance, this is what the TCA wrote in his Fourth Report: "Paragraph 13 requires the PRPB to conduct a personnel-staffing study to assess human resource needs by the PRPB. This requirement is highlighted under the approved Action Plan on Professionalization.  The set deadline is June 2016. However, the PRPB will not comply with this deadline. Upon the insistence of the TCA, the PRPB has assembled a working group to complete the staffing study. The PRPB has submitted an application for a federal grant to defray expenses." (TCA, Fourth Six-Month Report: December 9,2015 – June 9, 2016. Submitted to the Court: July 11, 2016.  Pages 4-5)

not to confuse the staffing allocation study (Activity IV.1.2 of the Professionalization Plan, table 11) with the development of a community-oriented staffing plan (Activity IV.1.3 of the Plan, table 12). The plan is due in June 2018. The study is a tool, a means to an end; but, the ultimate goal is the development and implementation of a reliable community-oriented staffing plan. To be perfectly clear, there will be no compliance with the Agreement without a real staffing plan that is "consistent with community-oriented principles and supports the systematic use of partnerships and problem-solving techniques."[26] Second, the Action Plan clearly outlines the responsibilities of the Police Commissioner and his/her working team (Activities IV.1.1 and IV 1.3) in developing the allocation study and staffing plan and of the Police Commissioner in making decisions on the basis of the Plan. However, the current public statements of the DPS Secretary appear to suggest that he is the one in charge, not the Commissioner, and these statements demand further clarification on issues of decision making as well as of command and control.[27]

The Interim Report also identified that a third challenge towards making satisfactory progress at this stage of the capacity building period was the lack of a well-thought out Continuity of Operations ("COOP) and Recovery and Resilience plans. These two components must be key elements of the PRB's capacity building strategy moving forward. I recommended to the Parties that they should add these items to the Action Plans and the Agreement when discussing extensions or modifications to the Agreement and the Plans.

There were also other challenges and recommendations, such as the need to reinvigorate community outreach or the demands for an immediate strengthening of civil

---

[26] The TCA must review, assess, and report on compliance with Paragraphs of the Agreement and the steps in the Action Plans. This is also the case for Paragraph 13 where the actions of the Commonwealth are subject to the compliance assessment and rating of the TCA. Consequently, for both the staffing study and the staffing plan, the TCA must determine whether the timeframe has been met and whether the Commonwealth of Puerto Rico has made satisfactory progress toward implementation of the Agreement by rating the study and the plan as being in full compliance, partial compliance, or non-compliance with the terms of the Agreement and the Action Plans. Furthermore, for any activities and detailed steps (study and/or plan) that were reviewed and found not to have been fully implemented in practice, the TCA must issue recommendations regarding necessary steps to achieve compliance. See also Paragraph 137.

[27] Puerto Rico Police Bureau's Action Plans. "1.3. El Superintendente tomará decisiones sobre la reasignación de recursos humanos, apertura de nuevas convocatorias a ascensos y/o reclutamiento de personal que sea consistente con los Principios de Policía Comunitaria de equidad, anti-discrimen y conforme a las prácticas policiacas generalmente aceptadas según las necesidades del servicio para que la PPR pueda cumplir con su misión. Este Plan tendrá como base la evaluación realizada. (Tabla 12)" (page 21). https://www.policia.pr.gov/planes-de-accion/

rights and civil liberties protections when conducting police operations, that I also identified as areas for urgent action.

Since the Interim Report, my team and I have continued to conduct comprehensive, extensive field visits and assessments.  I have identified other challenges that are limiting compliance with the Agreement and the terms set forth in the Actions Plans.

First, in the first three months of 2018, my team has evaluated compliance with both the equal protection Action Plan and the internal disciplinary process.  The main finding is that a system for investigating and addressing administrative complaints, in particular complaints of equal protection and non-discrimination, continues to lag far behind where it must be.   The PRPB's capture and use of officer performance data in order to build an effective Early Intervention System ("EIS") to guide it in the delivery of services, supervision and professional development of officers, and risk management also requires significant attention from the top leadership over the coming months.   This involves compliance with Paragraphs 147 through 153 which are an essential part of the Supervision and Management Action Plan.  Similarly, even as the PRPB made limited strides in implementing necessary technological platforms, the Agreement-required Information Technology and Systems Action Plan demands that the PRPB puts in place promptly systems and processes that ensure that the PRPB does not fall behind again in the future as it did during the Hurricanes.  Similarly, much work remains on bringing about significant operational and technological changes to the performance evaluation systems as well as the investigative and disciplinary processes affecting the PRPB personnel.  The PRPB must improve immediately their processes for investigating and reviewing use of force, investigating officer misconduct, supervising problem-prone officers, managing personnel resources, and imposing discipline if they want to have credibility both before the public and their employees. Finally, there is an increasing backlog of cases that raises concerns about the expediency of the progress made in past years.

In this area, there is a matter that is of great concern to the implementation and sustainability of the Reform.  During this reporting period, the PRPB removed Colonel Clementina Vega of her role as head of the Reform Unit as she was the subject of an internal misconduct complaint.  The matter was referred to the Bureau of Special Investigations (known as NIE) rather than being investigated by the PRPB's Superintendency of Professional Responsibility (known as SARP).  This was important because NIE investigates criminal conduct and SARP investigates administrative complaints.  This was not just a matter of the type of complaint and the nature of the

referral, but also an issue of jurisdiction and of who has the authority to adjudicate this matter.  NIE was part of the Department of Public Safety and reported to Secretary Hector Pesquera while SARP was part of the PRPB and reported to the then-Police Commissioner Michelle Fraley.

Neither was I officially notified of this change in the leadership of the Reform Unit when it first occurred nor the original monthly reports that the PRPB submitted to the TCA on personnel transfers notified my office of the PRPB's action.  Under Paragraph 233 of the Agreement, the obligations of the PRPB are crystal-clear: "PRPB shall inform the TCA and USDOJ of any changes to Reform Unit staff, including suspensions, reassignments, and dismissals of personnel."[28]  This requirement is even more obvious when talking about the removal of the "one supervisor who reports directly" to the Police Commissioner (Paragraph 233).   Furthermore, this notification is crucial because Paragraph 253 requires that the "TCA shall maintain regular contact with the Parties" and "shall conduct a monthly conference" with the Reform Unit and USDOJ and the lack of notification created considerable disruptions.

From the point of view of substance, this matter is also important in connection with the TCA's assessment of the complaint system, subsection XI of the Agreement ("Civilian Complaints, Internal Investigations, and Discipline.").   Paragraph 173 states that, "[W]ithin five business days of the receipt of a misconduct complaint, SPR will determine whether the complaint will be assigned to a supervisor for a Supervisory Investigation, retained by SPR for investigation, or whether it will be investigated criminally by PRPB, PRDOJ, or both."  Under my authority to review, asses and report on compliance with the Agreement and the Action Plans, I have an obligation to assess whether the PRPB was acting in compliance with Paragraph 173 and the simple fact was that the handling of a misconduct complaint as if it were a criminal complaint made the PRPB's compliance with the Agreement dubious.

Without entering to evaluate the merits of the complaint against and the removal of Colonel Vega, the TCA raised concerns to the Parties and the Court regarding the

---

[28] Paragraph 233. "The Reform Unit shall include at least one PRPB supervisor who reports directly to the Superintendent.  PRPB shall inform the TCA and DOJ of any changes to Reform Unit staff, including suspensions, reassignments, and dismissals of personnel.  The Superintendent may designate PRPB personnel, including members of the Reform Unit, and external resources, which are in his professional judgment critical to the successful implementation of this Agreement and the comprehensive reform of PRPB.  The Commonwealth and PRPB shall make their best efforts to retain such personnel and resources to ensure continuity of effort and successful implementation."  See also Docket No. 646.

apparent violation of the Agreement and the lack of transparency and information sharing stemming from the PRPB.  After the Parties filed separate motions and the matter was addressed by the Court, I was informed that the Parties agreed that the misconduct complaint should be investigated by SARP.  By mid-December, I was also informed that Colonel Vega was to be re-instated in her leadership role on December 22, 2017.  However, upon her re-instatement, the PRPB took additional actions against Colonel Vega, including the physical transfer of Colonel Vega to the Police Academy and away from the Reform Unit, the disarming of Colonel Vega, and the assignation of guards monitoring her whereabouts within the PRPB.  These actions added additional confusion to the PRPB handling of the complaint.

More recently, in the course of a routinely scheduled evaluation of equal protection and non-discrimination case files investigated by SARP and the Legal Bureau, the Deputy TCA identified significant irregularities in the handling and processing of this misconduct complaint resulting in apparent inconsistencies with the application of Paragraph 176 and applicable policies.[29]  These issues will be identified in a separate report once the TCA has an opportunity to review all relevant materials pertaining to this investigation. It should be noted that the TCA filed a motion with the Court based on the fact that once the PRPB was alerted to the findings of the Deputy TCA, the PRPB denied him access to the case file in apparent violation of Paragraphs 262, 264, and 268 pertaining access to documents and data.[30]  After the Court granted access to the United States and three court-appointed members of the TCA team, the United States and this appointed group had the opportunity to review the file in camera.  The review of this file is still ongoing.

There is a second issue that has emerged in my assessment of the PRPB activities from December 2017 through March 2018.  In recent months, I have conducted a thorough assessment of the infrastructure and budgetary needs required "to place the

[29] Paragraph 176: "PRPB's centralized numbering and tracking system shall maintain accurate and reliable data regarding the number, nature, and status of all misconduct complaints, from initial intake to final disposition, including investigation timeliness and notification to the complainant of the interim status and final disposition of the investigation.  This system shall be used for periodic assessment of compliance with PRPB policies and procedures and this Agreement."

[30] Paragraph 264: "PRPB and UCCJ shall ensure that the TCA <u>has full and direct access to all PRPB and UCCJ's documents and data that the TCA reasonably deems necessary to carry out the duties assigned to the TCA by this Agreement, except any documents or data protected by the attorney-client privilege</u>."

Paragraph 262: "To facilitate its work, the TCA may conduct on-site visits and assessments without prior notice to PRPB and UCCJ.  <u>The TCA shall have access to all necessary individuals, facilities, and documents, which shall include access to Agreement-related meetings and reviews such as critical incident reviews, use of force review board meetings, and disciplinary hearings</u>."

PRPB in a position to implement" each of the Agreement's provisions within four years from my appointment date and in accordance with the implementation schedules set forth in the Action Plans.[31]   These monthly evaluations have been shared with the Parties.  The message of these reports is clear: after 46 months of capacity-building, there is much more that is needed from the PRPB to achieve real, effective capacity in terms of operational capacity, infrastructure, and budget.

Based on the information available, the PRPB has only used $8 million of the $20 million assigned to the Reform in this Fiscal Year.  Taking into consideration that $1.5 million is assigned to the Office of the TCA, the simple fact remains that the PRPB has only used $6.5 million to advance the Agreement and the Action Plans.  Furthermore, in February 2018, the USDOJ and the TCA were alerted that the PRPB had not used any of the approximate $2.8 million available in federal asset forfeiture funds that were assigned for police reform purposes for fiscal year 2018.[32]   The situation was so dire that the federal administrators threatened to take these forfeiture funds away.  After several meetings with the federal authorities administering the equitable sharing program, the Commonwealth seemed to have resolved some of the access problems but issues about the use of these funds and their prioritization persist.  My assessment is straightforward on this issue: the administrative hurdles created by the implementation of Act 20-2017 have just accentuated structural deficiencies identified in the past regarding the budgetary autonomy of the PRPB.   In my assessment, these budgetary obstacles are preventing the PRPB from making satisfactory progress toward implementation of the Agreement and the Action Plans.

Thirdly, I must unfortunately return to one of the themes that I have most persistently identified in my last two reports.  The most importante challenge to the Reform and the implementation of the Agreement and the Action Plans continues to be the crisis of leadership and management affecting the PRPB and the lack of direction in the implementation of Act 20 of 2017.  This crisis has created tremendous uncertainty in all ranks of the PRPB and this lack of confidence has persisted in the aftermath of Irma and Maria.  The problems associated with promotions, unexplained personnel transfers,

---

[31] See Paragraph 237.

[32] In December 2013, the United States Department of Justice reinstated the PRPB into the Equitable Sharing Program.  The reinstatement was conditioned upon PRPB's use of equitable sharing funds to implement and fulfill the Agreement.  Since December 2013, the Commonwealth received $16.7 million in equitable sharing funds.  PRPB used most of these funds from FY 2014 to FY 2017.  The United Stated made equitable sharing payments of cash and sale proceeds to the PRPB for an amount of $5,496,710 in FY 2014, $5,969,617 in FY 2015, $1,206,941 in FY 2016, and $987,032 in FY 2017. (see: https://www.justice.gov/afp/reports-0).  In February 2018, there was a carry over of $2.2 million plus $652,092 at hand.

questionable overtime practices, and failure to take actions against officers with dubious disciplinary records have fueled the sense of crisis.  That the current management structure is not working well has been clearly established during this reporting period when the progress made toward the implementation of the Action Plans came close to a standstill.   The solution is for the Commonwealth to comply with an Agreement that clearly outlines the lines of leadership, management, and responsibility within the PRPB.  If this cannot happen under the current circumstances, I will not hesitate to recommend to the Court actions that restore satisfactory progress toward implementation.

A good example of the current dysfunctionality is the very limited communication and information sharing that takes place between the Commonwealth and the TCA on the works of the Act 20 Implementation Task Force.  At present, when the information is public, such as possible changes to the Police Academy, the follow up is non-existent. It is for that reason that I must address on the record issues such as the future of the Police Academy.  If the Commonwealth's position is that the financial commitment to maintain the Academy open is not available at present, then the Commonwealth should develop a plan to ensure that the PRPB staff is effectively trained and the investments and gains made in past years are not lost.  Similarly, in discussing ideas about the privatization of police training, the Commonwealth must bear in mind the requirements set forth in Paragraph 117 regarding "effective and comprehensive training" and the demands of other paragraphs of the Training subsection of the Agreement and the Training Action Plans.

Another example of the current confusion is that, almost a year after its creation, the DSP has failed to produce a manual providing uniformity to the operational structure of the PRPB and streamlining its administration and the use of their resources.  In the past, Act No. 53 of June 10, 1996 (Law of the Puerto Rico Police of 1996) provided such guidance. This situation has created a vacuum of authority when it comes to transfers, police review, and other administration core structure and command and control. I am fully aware of the importance of Article 9.04 of Act 20-2017; however, when regulations adopted under previous laws are used for the daily administration of the PRPB, they create confusion. For example, I have received misinformation from PRPB officials when dealing with policies, transfers, or conducting investigations. As of today, investigations announced by the Commonwealth and led by the DSP regarding overpayment of police escorts, transfers, police absenteeism, or payments of accrued overtime have not yet been completed and when I ask for an update or status report nobody seems to have an adequate response.  In each instance, I have provided independent studies to help the PRPB in its decision making and policy changes

(transfers, promotions, polygraphs, Traffic Bureau, absenteeism, and payment of overtime). All of studies have resulted in changes in policy; however, the implementation of real changes in each of these areas have been modest at best.

Finally, this Report returns to the tabular format when measuring compliance with the Agreement and Action Plans. The Report consists of tables that describe what the PRPB said they would accomplish and the TCA's reviews and observations assessing whether the PRPB achieved or failed to achieve what they claimed in the Action Plans. We have also introduced a short methodological note to define with precision findings, assessment, and ratings. After more than four and half years since the signing of the Agreement, it is certainly useful to present a paragraph-by-paragraph accounting of the general state of the PRPB's compliance with the specific requirements of the Agreement. Although this approach runs the risk of being an over-simplification, there is a solid qualitative assessment regarding compliance in the body of the Report.

The TCA takes this opportunity to thank all involved in the Reform process for their continued support and cooperation.

ARNALDO CLAUDIO, US ARMY, COL. (RET)

Technical Compliance Advisor

|

# TCA Reports under the Agreement

*Paragraph 250 of the Agreement:*

"During the <u>first four years</u>, from the Appointment Date, the TCA shall file with the Court, written public reports every six months that shall include:

a)  a description of the work conducted by the TCA;

b)  a listing of each detailed step in the Action Plans and its timeframe indicating whether the timeframe has been met, and whether the Commonwealth of Puerto Rico is making satisfactory progress toward implementation of the Agreement by rating PRPB in full, partial, or non-compliance steps in the Action Plan;

c)  the methodology and specific findings for each review conducted, where appropriate, and redacted as necessary for privacy concerns. An un-redacted version shall be filed under seal with the Court and provided to the Parties. The underlying data for each audit or review shall not be publicly available, but shall be retained by the TCA and provided to either or both Parties upon request;

d)  for any detailed steps that were reviewed and found not to have been fully implemented in practice, the TCA's recommendations regarding necessary steps to achieve compliance; and

e)  a projection of the work to be completed during the upcoming reporting period and any anticipated challenges or concerns related to implementation of the Agreement."

*Paragraph 252 of the Agreement:*

"The TCA shall provide a copy of the six-month reports to the Parties in <u>draft form within 15 days after the end of the reporting period</u>. The Parties shall have fifteen calendar days upon receipt of the draft report to allow the Parties to informally comment on the draft report. The TCA shall consider the Parties' responses and make appropriate changes, if any, and shall file the final report with the Court within 45 days of the end of the review period.  DOJ and PRPB may file responses to the TCA's final report within 30 days."

# Introduction

This is the Seventh Semi-Annual Report ("Report") of the Technical Compliance Advisor ("TCA") in the Agreement for the Sustainable Reform of the Puerto Rico Police Bureau ("Agreement").[33]  It builds upon the Interim Seventh Six-Month Report ("Interim Report") transmitted to the Parties on December 26, 2017 and submitted to the Court on January 26, 2018.[34]  This Report is issued during a period of national crisis stemming from the massive loss of life and destruction caused by Hurricanes Irma and Maria.  The Report assesses the progress made toward implementing the Agreement by the Puerto Rico Police Bureau ("PRPB") before these two storms devastated Puerto Rico.  It also reports on the current challenges to the sustainability of the Reform, and summarizes the work conducted by the TCA for the nine-month period ending on March 31, 2018.[35]

As Paragraph 226 sets forth, the TCA has the duties, responsibilities, and authority conferred by the Agreement under the supervision and order of the Court without replacing or assuming the role and duties of the PRPB and its leadership.[36]  Pursuant to the terms of the Agreement, it is the responsibility of the TCA to provide technical assistance during the capacity building period.[37]  The TCA also systematically reviews and approves Action Plans, policies, procedures, programs, protocols, training, and systems of the PRPB.[38]  Furthermore, the TCA reports on PRPB's implementation of this Agreement, their Action Plans, and their intended impact.[39]

---

[33] Prior to the implementation of Act 20 of 2017 creating the umbrella agency known as the Department of Public Safety ("DPS"), the Puerto Rico Police Bureau ("PRPB") was a separate government agency known as the Police Department of Puerto Rico ("PRPB").  The Agreement uses the term PRPB.

[34] See: Docket No. 723.  The Seventh Interim Six-Month Report assessed the progress made by the PRPB in the implementation of the Agreement from June 10, 2017 through December 9, 2017.  The message from the TCA in the Interim Report is now Appendix 1 of this Report.

[35] The Agreement refers to six-month reports.  However, in the aftermath of Irma and Maria, the Parties and the TCA agreed to issue an interim six-month report and then a subsequent a ninth-month report.  This Report covers the period from June 6, 2017 to March 31, 2018.  The next report will be issued in October 2018 coinciding with the end of the four years since the appointment of the TCA plus the four-month extension granted by the TCA.

[36] See Paragraph 11, jjj: "TCA means 'Technical Compliance Advisor,' a person or team of people, including any employee, agent, or independent contractor of the TCA, who shall be selected to review, assess, and report on the Commonwealth of Puerto Rico's implementation of this Agreement." The TCA's role and duties are defined in Paragraphs 15, 17, 60, 137, 220, 225-279, 288, 289, 293, 295, 296, 300.

[37] See Paragraphs 236, 255.

[38] See Paragraphs 229 (Review of Policies and Programs) and 235-240 (Development of Action Plans)

[39] See Paragraphs 250, 252

It is ultimately the task of the TCA to measure the nature and the extent of the PRPB's compliance with the terms set forth in the Agreement and the Action Plans (which were deemed incorporated into the Agreement upon submission to and approval by the Court). The findings and recommendations made on this Report are based on his authority to asses and report on the Agreement's implementation and whether this implementation is "resulting in constitutional and effective policing, professional treatment of individuals, and increased community trust of PRPB."[40]

Prior to September 2017, the PRPB made satisfactory progress in building capacity, drafting and updating policies, conducting required trainings, and implementing the eleven Action Plans for the eleven compliance areas required by the Agreement. With diligence and hard work, the PRPB reached specific milestones in the areas of planning, policy making, training, and community engagement. In prior reports, we have enumerated the most significant achievements. In this matter, the PRPB and the TCA are in full agreement.[41]

During this reporting period, annual revisions of policies created or revised pursuant to the Agreement provided pertinent updates based on the feedback received during their implementation.[42] In-depth, scenario-based training for all relevant PRPB officers on selected use of force, search and seizure, equal protection, and ethics policies were well underway and in partial compliance with Paragraph 237.[43] Crisis intervention training was scheduled to start this April after months of delay and domestic violence training had already begun. The significant collaboration between the Reform Unit and the Police Academy staff resulted in dynamic, high-quality training in key compliance areas. At the same time, valuable outreach work (although not sufficient on their own account) was conducted by the Reform Unit across Puerto Rico's communities on the first phase of constructing a new community and problem-oriented policing plan for

---

[40] Paragraph 225.

[41] In discussing the request for extension of the capacity building period in its Seventh Status Report, the PRPB states the following: "Although the TCA maintains that the PRPB has made steady progress in the implementation of its action plans during the capacity building period, and that progress has been observed mainly in the areas of policy development and training, this extension is necessary to be able to adjust the timelines in the action plans in response to the challenges presented." We agree that this characterization of the TCA assessment is accurate.

[42] Paragraph 113. "PRPB shall review each policy or procedure created or revised pursuant to this Agreement on an annual basis for the first three years from the Appointment Date or upon notice of a policy deficiency, and biannually thereafter.

[43] See Paragraph 237 for interim milestones during the first three years of the Agreement. This overall finding of partial compliance should not mask deficiencies and more nuanced findings regarding the status of training that the TCA identifies in the body of this Report.

Puerto Rico.[44]   In all these areas, the PRPB satisfactorily met the agreed-upon requirements of the Agreement.

With very few policies remaining on the schedule to be developed, the most important being the policy on Early Intervention Systems ("EIS"), the fact is that for the last 46 months the PRPB has put in place both comprehensive and coherent policies and training modules consistent with nationally accepted best standards of policing.  From this limited understanding of capacity building (capacity building as policy development and training development), the distance traveled by the PRPB in issuing policies and conducting well-structured trainings for the entire workforce has for the most part satisfactorily met the demands of the Agreement.

During this reporting period, there were nonetheless specific steps where progress was limited, partial, or non-existent such as the implementation of Paragraph 13 (staffing study), the implementation of the EIS, or the timely upgrading of much required IT infrastructure.  The PRPB is for the most part non-compliant with a broader definition of the idea of capacity building, implementation in practice.   Besides policy and training, capacity building includes key data collecting and reporting objectives as well as implementation objectives defined in the Action Plans.   There are areas such as Professionalization, Supervision and Management, Administrative Complaints, and Information Systems and Technology where the PRPB is non-compliant in key steps and is far from making satisfactory progress towards the implementation of the Agreement.

Furthermore, the new challenges on the ground in the aftermath of Maria have redefined the very idea of capacity building under the Agreement.[45]  The new reality has

[44] See Paragraphs 215 and 231 for the role of the Reform Unit in community outreach and public information.
[45] The term "capacity building" is not defined in the Agreement.  However, it is a crucial mechanism with the Agreement.  "Capacity building" refers to both (a) a period of time (four years after the appointment of the TCA) and (b) the concrete steps and actions to be taken by the PRPB in terms of resources, funding, staffing, technology to build capacity.  During this period, these actions and steps should place the PRPB in a position of implementing each of the Agreement's provision.
There is a third element in the idea of "capacity building."   Capacity building also refers to the first four years from the Appointment Date [of the TCA] during which "the TCA shall evaluate PRPB's compliance with this Agreement by assessing PRPB's progress against its Action Plans." (Paragraph 240; see also 242).  To evaluate compliance, the TCA must determine that the Action Plans "address resources, funding, staffing, technology, capacity, and other infrastructure and budgetary needs to place PRPB in a position to implement each of the Agreement's provisions in Sections III through XIII within four years from the Appointment Date and in accordance with the implementation schedules set forth in the Action Plans." (Paragraph 237)

unfortunately brought to light some of the deficiencies and concerns that the TCA highlighted in past reports, such as the need to build a strong and robust information systems and technology infrastructure or the urgency of developing a solid and coherent staffing plan.   In addition, there are new and significant on the ground challenges that the Parties must attend to and prioritize.   In accordance with Paragraphs 250 (b) and 250 (d), these challenges and the TCA recommendations are discussed at length in Section III of this Report.

Following the structure set forth in Paragraph 250, this Report consists of four major sections (and four appendixes).   In the first section, the Report briefly discusses the PRPB's Status Report.   Initially, the PRPB requested an extension.   The extension request was justified on the operational and administrative delays stemming from the impact of Irma and Maria.   With the submission of a Status Report ending in February 28, 2018, there is now a reliable manner to document the PRPB's self-reported accomplishments and progress made from May 2017 to February 2018.

Consistent with Paragraph 250(a), Section I also discusses the main highlights of the work conducted by the TCA in the last six months, from June 10, 2017 through March 31, 2018.   This Report distinguishes between two periods: the work prior to the destruction of Hurricanes Irma and Maria (from June through September) and in the aftermath of Irma and Maria (from October through March).   This section focuses on the work of the TCA in providing assessment and technical assistance to the PRPB, including the work of reviewing policies and trainings as well as the assessment reports in the aftermath of Hurricane Maria.   This section has two corresponding appendixes: meetings of the TCA with the PRPB, the community, and public officials (Appendix 2) and the review and approval of policies (Appendix 3).

In its second section, Section II, the Report focuses on the work of the PRPB in implementing Action Plans for the eleven (11) substantive areas of the Agreement and in complying with Paragraphs 234 through 238 of the Agreement from June through March.   This part of the Report complies with Paragraphs 250(b) and 250(c).   For this Report, tables detailing activities and steps taken by the PRPB in accordance with the submitted Action Plans along with ratings on the progress made towards implementation are included in Appendix 4.

In the third section, Section III, as required by Paragraph 250(d), the TCA continues to assess and make recommendations regarding necessary steps to achieve compliance

for any detailed activities or steps that were preliminary reviewed and found not to have been fully or partly implemented in practice.  The purpose of this section is to identify issues that require further attention and/or may have a negative impact on the implementation of the Agreement.  The list of topics is detailed in the table of contents.

The final section, Section IV, as required by Paragraph 250(e), includes a projection of the work to be completed during the upcoming reporting period.  This section reflects the TCA's vision of intended reviews of the PRPB operations, including steps and activities taken towards building capacity.  These plans highlight the areas of the Agreement that the TCA and/or the Court has identified as current top priorities.

The purpose of this Report is to describe the progress made by the PRPB in the first 46 months of the implementation of the Agreement.  It seeks to asses and report where the PRPB is in the capacity building phase and, under the framework of the Agreement, how the PRPB is set to achieve effective compliance with the Action Plans and their implementation.[46]  To assess effective compliance, the TCA shall assess and report whether the PRPB has, for each Agreement requirement:  (a) incorporated the requirement into an implemented policy; (b) trained all relevant personnel in the requirement and policy; and (c) fully implemented in practice.  Pursuant to the Agreement, the PRPB had four years to build capacity through the mechanisms, steps, and timelines set forth in the Action Plans.  To these four years, one must add the four-month extension that the TCA granted in 2017 upon the PRPB request.  With less than six months left in terms of capacity building, the TCA is cognizant that the Parties are likely to request additional time extension for selected steps in the Action Plan.   In addition, as mandated by the Court, the Parties should work together in consultation with the TCA to develop a "new framework" for the Agreement and the Action Plans consistent with the magnitude of the national crisis in the aftermath of the massive storms that hit Puerto Rico.

---

[46] See Paragraph 242.

# Section I

## The PRPB Status Report

In November 2017, the PRPB asked for an extension to submit its Status Report on or before March 1, 2018.  The extension was justified in terms of the disruption created by Hurricanes Irma and Maria.  The goal of the requested extension was for the PRPB to comply with the terms and deadlines set forth in Paragraph 261.[47]   Under the Agreement, the PRPB will submit to the TCA and to the United States Department of Justice ("USDOJ") a Status Report assessing progress for each of the eleven (11) focus areas, steps towards implementation of the Agreement, and a response to prior concerns raised by the TCA.  The Status Report should have originally documented the overall progress made by the PRPB for the period covering May 26, 2017 through November 26, 2017.

On March 1, 2018, in compliance with the terms and deadlines set forth in Paragraph 261 and the agreement between the Parties and the TCA, the PRPB submitted its Seventh Status Report ("Status Report") assessing progress for each of the eleven (11) focus areas, steps towards implementation of the Agreement, and a response to prior concerns raised by the TCA.  The Status Report documented the overall progress made by the PRPB for the period covering May 25, 2017 through February 28, 2018. Paragraph 261 requires for the Commonwealth to "file with the Court sealed and unsealed versions of the Status Report, with a copy to the TCA and USDOJ, no later than 15 days before the end of the period under review."

The Status Report generally identifies both areas of progress and persistent obstacles.  This Status Report also discusses the impact of Hurricanes Irma and Maria.   The purpose of this review by the TCA is not to generate a particularized rebuttal of the PRPB of the Status Report on a concrete or specific area of compliance.  The goal is to raise questions or concerns about the PRPB self-assessment of the progress made towards implementation of the Plans and the Agreement where appropriate.

---

[47] Paragraph 261 requires that the Commonwealth "file with the Court sealed and unsealed versions of the Status Report, with a copy to the TCA and USDOJ, no later than 15 days before the end of the period under review."

TCA Seventh Semi-Annual Report | 2018

In pages 5 through 8, the Status Report documents the very important work the Reform Unit of the PRPB conducts in terms of self-assessment through monitoring field visits. The Status Report highlights some of the most significant findings made during the evaluation of certain Police Areas, such as the deficiencies in record keeping by local training academies, lack of random inspections of the police officers' service weapons, deficiencies in the use of forms (from use of force reports to condition of persons entered in holding cells, failures to perform tests on electronic control weapons, deficiencies in the evidence rooms, signal problems in CAD, deficiencies in criminal investigation files, lack of representation in Citizen Interaction Committees, and low training numbers for certain policies.

In this sense, the PRPB has adopted the recommendation of the TCA in prior reports that the PRPB uses the Status Report to identify what are the lessons learned from those self-assessment visits.  The list is very important.  In this Report, the TCA further recommends that these visits are used to document findings as well as remedies: which initiatives are working, which ones are not working, what obstacles have been encountered towards implementation, and what are the solutions and lessons learned from those visits.

The TCA continues to recommend that the Status Report details how these self-assessment visits are bringing about changes in the areas visited.  Specifically, the TCA recommends a follow-up report to be filed for the identified areas.

In the Status Report, there is also an extensive analysis of the progress made by the Reform Unit and the Police Academy in the drafting of policies and training modules. The Status Report continues to document a fact that the TCA has noted in prior reports: the evident progress made by the PRPB, led by the Reform Unit, in producing very detailed Plans and policies in accordance with agreed upon timeframes.  This is consistent with the TCA assessment that the PRPB has made progress in the implementation of its Action Plans during the capacity building period, and that progress has been observed mainly in the areas of policy development and training.  There is little or no doubt that the Reform Unit has become the center of policy development for the PRPB based on the Directive OS 1-1-378 of November 2016.  The implementation of this directive has been a success.

Notwithstanding these positive developments, the TCA has expressed serious concerns about the actual implementation in practice of these policies and trainings, and how

expeditious this implementation can be in the field.  For example, just recently, in March 2018, the PRPB requested an extension for more than 50 steps in the Action Plans. This extension to the capacity building period will be used to develop additional policies and training manuals which are falling behind schedule or are impacted by the implementation of the new Department of Public Security ("DPS").   In this sense, measuring overall implementation of these policies and trainings is difficult when there are relevant delays in terms of the adoption of certain key policies and measuring effect is so hard without relevant quantitative data.

The Status Report fully addresses the request for an extension of four months of the capacity building period by the PRPB.  The TCA agrees that this issue was important and deserved a detailed explanation.  Paragraph 239 of the Agreement requires the PRPB to explain in writing to the TCA if there is a need to modify any of the timeframes set forth in the Plans submitted to the Court.  Pursuant to Paragraph 239, the PRPB considered that there was good cause for a modification to the timeframes set forth in the Action Plans and submitted its request for timeframe extension. The TCA expects the PRPB to provide a similar detailed extension for any additional extension request.

The Status Report also provides a detailed account of what changes are expected in the way the PRPB polices mass demonstrations.  This issue is discussed further in the subsection of this Report entitled Building Capacity in Civil Rights.

Regardless of the areas of progress reported above, the Status Report fails to document in greater detail the steps taken by the PRPB in addressing resources, funding, staffing, technology, capacity, and other infrastructure needs which are required to place the PRPB in a position to implement each of the provisions and detailed steps of the Action Plans during the last six months.  This analysis is sparse. The TCA is particularly concerned about the fact that the word "budget" is absence from the Status Report when we have identified serious obstacles in this area since the implementation of Act 20 of 2017.

The Status Report continues to publish basic statistical information.   However, it neglects to provide an explanation of how these numbers document the progress made, enhance PRPB's capacity, and how they assist to measure meeting objectives and outcomes.   For example, on page 12 of the Status Report, the statistics on the implementation of training in the Zones of Excellence highlight the high level of compliance in terms of training across the five areas, but it does not explain situations

where compliance is out of the ordinary.  For example, the Status Report provides no explanation for the low training rate (29%) in Utuado for Pepper Spray or the modest rate for Search and Seizure training (50%) in Caguas Norte.

Similarly, the Status Report does not address the fact that the numbers reported regarding the use of force cases in 2017 appear to be drastically lower than the data reported in 2016 and 2015.  Further, it raises concerns that in the Sixth Status Report there was a comparison between years to which the TCA brought attention, and this comparison is no longer included here.  More importantly, there is no comprehensive analysis or assessment of the key findings stemming from these statistics if the data can be verified.  The main finding is that, when compared to 2015, Level I, III and IV Use of Force is down by 50% and Level II is down by 75%.  These numbers are so remarkable that they need a more detailed analysis.

The TCA continues to recommend that the PRPB improves the production and reporting of statistics in the Status Report.  The statistics reported continue to lack context and purpose.   The PRPB continues to report on troubling statistics without offering a methodological response, an analytical framework, or an internal audit.  There is no clear indication of what exactly the PRPB seeks to achieve by presenting these statistics.   The TCA once again recommends that the PRPB should devote more attention to this issue.  Similarly, in the Status Report, there is no substantial reference to the standards, yardsticks, timelines, or targets that are required under the Agreement.  Without providing an analysis and a proper explanation for these figures in the Status Report, their production and reporting is totally de-contextualized and almost meaningless.

In page 44, the table on administrative complaints received and investigated contains incomplete information.  This table lacks context and analysis neglecting to discuss the issue of how many complaints are investigated within the timeliness set forth in the Agreement and the Plans. For example, the Status Report highlights that about 50% of the complaints filed in 2017 have been investigated, but there is no reporting on the findings for these complaints.  Similarly, it is noted that there are 51 complaints pending investigation from prior years but there is no reference to the age of these cases.  This is important because, as this Report highlights, the backlog for SARP has increased significantly.

Furthermore, in page 47, the tables evaluating the disposition of complaints in 2017 reveal interesting statistics that are not analyzed here.  For example, 43% of complaints filed by the Office of Legal Affairs (OLA) are sustained versus 31% of those filed by the Superintendence in Professional Responsibility (SARP).  Their exoneration rates are also vastly different.   There is no explanation of the reasons behind these vast differences, and their relevance (if any).  The TCA does not suggest that the rates should be identical; rather than the PRPB should explain the reasons behind such different rates.

Another topic that the Status Report fails to document adequately is the problematic issue of transfer and promotions.  There is not a single reference to this matter in the section addressing the Plan for Professionalization except for references to policies enacted during this reporting period pertaining these issues.

Finally, we appreciate the work of the PRPB in addressing the concerns of the TCA in past reports.  The TCA recommended in prior reports that the tables reporting on the number of cases of domestic violence needed to include complete information about the resolution of these cases.  The TCA had previously recommended that the PRPB provide both, information about complaints as well as information about outcomes of domestic violence investigations and disciplinary action taken.  The issue of domestic violence is no longer neglected in this Status Report.  However, the statistics present a finding that should have been discussed at length.  While 14% of domestic violence complaints in the general population result in convictions, no single officer (of the 99 that received complaints) was convicted.  Furthermore, the arrest rate (63% vs 53%) and the rate at which charges are filed by a prosecutor (37% vs 24%) also show significant differences.  The TCA will not speculate on the reasons for these differences, but the PRPB should do a better job of analyzing and explaining the differences.

# A Description of the Work Conducted by the TCA: Paragraph 250(a)

## Work Prior to Hurricanes Irma and Maria

During the first months of this reporting period, the TCA continued to provide technical assistance, conducted site visits and observations on the field, and reviewed a considerable number of policies and training documents drafted and implemented by the PRPB.  Continuing with a practice agreed upon during the previous reporting period, the PRPB, the USDOJ, and the TCA continued to have monthly meetings to closely follow-up the development of policies and training materials.

The process of reviewing policies and training materials followed the schedule agreed by the Parties and set forth by the Plans drafted and submitted by the PRPB in compliance with Paragraphs 234 and 237 of the Agreement.  To comply with the Action Plans, the PRPB was scheduled to draft a total of 99 policies. To date, more than 90 policies have been completed or are in progress, with less than five policies in development.  In addition, there are 75 policies not included in the Court-submitted Action Plans which must be drafted for operational reasons, of which more than 30 have been drafted or are in the process of development.

From June through September 2017, the Parties and the TCA successfully reviewed and revisited over 60 General Orders, Special Orders, Administrative Orders, regulations, and complementary forms.  The TCA also reviewed more than 40 training documents.  During this period, the TCA also approved 38 policies (plus one policy in October).  Appendix 1 has a list of all policies reviewed and/or approved.

From June through August, the TCA visited several PRPB command areas to review the nature and extent of use of force incidents as well as the reporting procedures.  The TCA visited the Area Commands of Bayamón, San Juan, Mayagüez, Carolina, Fajardo and the Police Academy.  The TCA determined that in most of these areas and precincts the PRPB was complying with recording requirements in accordance with the Agreement and training procedures.  The purpose of the visits was to observe the implementation of training requirements, obtaining information reference to the Force Review Board ("FRB") for each area and Use of Force reports.  The TCA met with the

TCA Seventh Semi-Annual Report | 2018

Area Commanders and other supervisors to discuss the Implementation of the Agreement, the Action Plans.  The goal was to obtain their insights with respect to the aforementioned and the impact on their daily duties.  To measure compliance with the Training Action Plan, it was important to interview training coordinators.  They assisted in verifying training records and certifications.  Also, the TCA had the opportunity to discuss with the Coronels and commanders in charge of each area and their staff the implementation of the Action Plans. The TCA also attended Domestic Violence Training that was being taught in these areas.

For example, the TCA conducted a site visit of the Fajardo Area Command.  The purpose of the visit was to review progress and compliance of the Area Command relating to the PRPB's Use of Force Action Plan.  During the visit the TCA Core team had the opportunity to meet with the president of the FRB for the area.

The TCA found that all designated members of the Board have received training related to Use of Force including training on weapons utilized by PRPB officers.  Minutes of all meeting are kept by the Board and are available for review.  As per the PRPB policy, all FRBs are required have a legal advisor assigned to the Board (non-voting member) who receives the same training as Board members and is certified as a member. The legal advisor is to be available to the Board for meeting, if necessary, as well as for providing guidance on legal matters arising during evaluation of use of force incidents. However, the Fajardo's FRB currently does not have legal advisor as required by the policy.  The Area Command of Carolina has made their legal advisor available to Fajardo when needed.

The TCA also found that neither the Board or the Area Command maintained a detailed database on the use of force incidents occurring in their geographical area of responsibility.  However, some information such as number, level, and type of force used was available via the data base. It was established that there was computerized data base, but the database has limited information.  The conclusion was that, with incomplete information, is difficult for the Board and Area Commanders to make specific decisions to address concrete problems.  More detailed information is vital.

The president of the FRB reported that the problem of incomplete or incorrect reports arriving at the Board for evaluation continue to be problematic. He stated that most of the reports had to be returned to the precinct/district for incomplete information. In an effort to reduce the number of cases returned, the President of the Board met with

commanders of precincts/districts.   As a result, the Board now has a protocol in place that after use of force incidents are evaluated the commander of the precinct/district where the incident took place receives written notification of the decision.

Similarly, in July 2017, the TCA Core Team conducted a follow-up site visit to the Utuado Area Command and the Utuado Police Precinct.   This is a Zone of Excellence. The purpose for the visit was to review the progress and compliance of the Area Command relating to the Use of Force Action Plan. In addition, the TCA was looking for an update on the CAD Mobile Pilot Project that was in place since April 2017. The pilot project entailed Utuado Zone of Excellence officers to digitally prepare and submit Incident Reports (PPR-468) in the CAD System via vehicle and precinct computers.

The TCA met with representatives of the precinct to discuss, among other things, if the proposed CAD training that was to be provided to ZOE personnel by PRPB CAD mobile vendor "Intellution" had in fact been supplied.   This training was essential for the precinct to commence the pilot project described above. The discussion revolved around how the vehicle's computerized terminal access to the upgraded CAD System known as CAD Mobile is progressing.

The Area Command staff, as well as the precinct representative, provided little in the way of information.  It was their belief that the orientation had taken place, however, they could not confirm. The lieutenant of the precinct, who is second in command, reported that officers are in fact digitally preparing and submitting Incident Reports (PPR-468) via the vehicle computer terminals, but could not say when the pilot project began, or if it is still ongoing.   The concern here is that, although CAD has been gradually implemented throughout the commands since August, the materials providing CAD training have not been completed.  The training materials were going to be ready in August, but there were substantial delays in its implementation.  As a result, CAD training has not taken place and it is questionable how functional CAD is on the field without this training.

It was initially reported, by the PRPB's IT Bureau in March 2017, that upon completion of this project the results would be analyzed and a determination as to whether the program can be expanded to the other Zones of Excellence would be made. In the event technical and/or issues were uncovered the pilot program could be extended.  If the pilot program was successful, it was expected that August would be the target date to expand the program to the other Zones of Excellence.   During this visit.  it was

evident that no determination regarding the pilot project has been made. In addition to preparing the reports digitally, officers of Utuado precinct were continuing to prepare written reports, so it may be concluded that the expansion to other zones of excellence was not imminent.

During the visit, the TCA Core Team had the opportunity to meet with president of the Force Review Board, as well as the Area Training Coordinator by the Commander of the Utuado Area Command.  The TCA found that all designated members of the Force Review Board have received training related to Use of Force, including training on weapons utilized by PRPB officers.  Minutes of all meeting are kept by the Board and are available for review.

During the visit, the TCA found that president of the FRB had developed a comprehensive use of force database that provides a plethora of information on the use of force incidents occurring in their geographical area of responsibility. This information allowed the Area Commanders to identify potential problem officers and possible training deficiencies.  The TCA recommended to the PRPB's IT Bureau that this database be adopted by the other twelve Area Commands and serve as the departments database pending the implementation of "Early Warning System".

From June through August, the TCA visited several PRPB command areas to review the nature and extent of search and seizure policies are implemented and reporting procedures are in place.  The TCA determined that, in most of these precincts, the PRPB was complying with most reporting and record-keeping requirements in accordance with the Agreement and training procedures. This is not to suggest that all reporting and record-keeping requirements of the Agreement have been satisfied in all these precincts.

For example, in July, the TCA Core Team visited Quebradillas Zone of Excellence and other commands in San Juan and Carolina to inquire about issues addressed by the Search and Seizures Action Plan, and GO's 600-612 Search and Seizure, and 600-615, Arrests and Summons. In Quebradillas, the TCA CT met with the District Director and other supervisors. There were 42 members of the PRPB assigned to his district: 9 supervisors and 33 Agents.

During the visit to Quebradillas, The TCA reviewed several PPR-880 and PPR-468 (Incident/Booking Sheets) during visits to Quebradillas and Arecibo Drug Unit and found them to be properly completed and signed by supervisors.  A PPR-47 Citation was inspected at the Arecibo Drug Unit and it was properly completed.

The TCA inspected about fourteen arrest and incident reports (PPR-468 and PPR-880) at both site visits for proper usage and completion. Forms indicate that Supervisors responded to the scene in every case there was an arrest. Forms PPR-468 and PPR-880 were reviewed and signed by supervisors.


In Quebradillas, the TCA noted that radio communications were not stored digitally as required by the Agreement and the Action Plans.  The PRPB stated that they only record all radio communications in the following areas: San Juan, Carolina, Bayamon, and Caguas. The PRPB is expecting a grant from U.S. to buy and implement a system (P-25) that will record all communications Island-wide by the end of 2017. The present recording equipment has the capability to store recordings for up to 3 years, after that it overwrites, erasing the oldest data one month at a time. PRPB GO 400-402 mandates that the Communication Technician back up the recording to another storage because it requires that recordings be kept for five years.  To date, the TCA is not aware of alternative plans made by the PRPB if they do not receive the grant.  The TCA will provide an update in April.


The TCA asked these Unit Directors if they had enough Mobile radios for their personnel. Quebradillas reported they have only seven radios of which only five are working properly and two of those are assigned to motorcycle officers. That leaves only enough radios to be assigned to supervisors. Most times patrol officers do not carry mobile radios and must rely on their car radios to communicate.  In the coming months and reports, the TCA will update the Court on the PRPB's radio stock inventory.  The TCA will ask the PRPB to conduct an inventory of its radio stock and demonstrate the accuracy of that inventory.  The TCA will also extend the sampling of the total radio stock and number available at other precincts.


The TCA also interviewed the Directors at San Juan and Carolina Command Centers and Radio Control. Both Directors stated they receive no formal training on how to use the equipment when assigned to their posts, nor do their officers assigned to dispatch and 911 Operations. Usually, they all receive a brief orientation on the equipment and must learn mostly on their own. When they receive new equipment or an update to software, the directors stated that they received limited instructions on its use.  They both reported a shortage of personnel with access to the David Plus System (M/V

Registry), RCI (Firearms Registry), and, to some extent, NCIC access.  This was a great concern to them.

Through these visits, the TCA regularly conducts its compliance reviews to assess the PRPB's compliance with each of the Agreement provisions in Sections III through XIII. In these reports, the TCA assesses whether PRPB has, for each Agreement requirement: (a) incorporated the requirement into an implemented policy at the command and precinct level; (b) trained all relevant personnel in a command and precinct in the requirement and policy; and (c) fully implemented these policies in practice.  These compliance reviews are - consistent with Paragraph 242 - based on both quantitative elements as necessary for reliability and comprehensiveness.

## Work in the Aftermath of Hurricanes Irma and Maria

Immediately after Hurricane Irma and subsequently after Hurricane Maria, the TCA conducted a preliminary assessment of the situation on the ground. The TCA visited police installations; communicated with Area Commanders, police officers, staff personnel; inspected equipment and infrastructure; and conducted operational and administrative assessments to fully understand the gravity of the situation. The TCA visited several municipalities, including Fajardo, Naguabo, Gurabo, Las Piedras, Juncos, Humacao, Caguas, Ceiba, San Lorenzo, Cidra, Yabucoa, North Caguas, and other areas to assess the conditions of their police stations.  The USDOJ joined the TCA in several of these visits.   These visits included an evaluation to PRPB's Information Technology infrastructure. The TCA also convened meetings with the Police Superintendent and the Director of the Reform Office to coordinate the continuity of the work in the Reform Office.

After the TCA provided the Court with a preliminary assessment, the Court "ordered the Parties, with the assistance of the TCA, and ultimate court approval, to adopt a new framework" for the Agreement best fitting the new reality on the ground.  The Court issued the order on October 4, 2017.

In October and November, the TCA fully reinitiated site visits and fieldwork conducting extensive assessments and baseline analyses of the PRPB's capacity in the aftermath of the storms.  These work products were shared with the Parties.  In these reports, it is clear the message that after three and half years of capacity-building, there is much

more that is needed from the PRPB to achieve real, effective capacity. For example, as documented in the prior section, the tactical radio communications system is at best mediocre with many officers still without a hand-held radio which could easily lead to unsafe police practices. This item was presented to PRPB more than two years ago.

During the October visit to Puerto Rico, the TCA and his team met with former Police Commissioner Michelle Hernandez de Fraley.   The purpose of the meeting was to discuss the devastation of the island of Puerto Rico by Hurricane Maria, as well as its impact on the Puerto Rico Police Bureau, specifically on the department's ability to provide police services to the public.

The Commissioner noted that many police facilities suffered considerable damages all throughout Puerto Rico.  However, only one facility was destroyed completely: Caguas North.  Personnel from Caguas North was relocated to the Area Command that had ample space to accommodate precinct personnel. Twenty-one (21) police vehicles were lost due to the hurricane.   The Commissioner noted that PRPB officers were assigned around the clock to all shelters throughout the Island.

Most Area Commands throughout the Island were operating on generators; however, there was a severe shortage of generators.  The Commissioner looked for donations from the mainland. She indicated that emergency response and disaster recovery teams were assisting the PRPB in identifying locations in need of generators. FEMA engineers visited Area Commands to determine the conditions of the PRPB's buildings.

Former Police Commissioner Fraley reported that departments firearms had been secured, with the exception of the firearm of an officer killed during the hurricane which had not been recovered.

After the storm, people detained by the police were transferred to commands with generator power.  The vast majority of arrests were related to violations of curfew law. Arrestees in federal cases were transferred to the US mainland.  The PRPB reported there were no issues with prisoners.  Those in custody were moved to a secure area. Booking was also expedited so that when possible prisoners had minimum time in police custody.

Central Command was functional (24/7) and continued to provide complaint numbers, as well as use of force numbers for all incidents occurring on the island. The Commissioner was notified of all use of force incidents.

The Commissioner reported that department headquarters had full internet access and Bureau's applications were fully functional.

As required by the PRPB's policy, all commands (precincts/districts) throughout the PRPB continued to prepare use of force reports (PPR-854) for incidents involving force. Supervisors were investigating all use of force incidents. However, the Area Command Force Review Boards as well as the SARP's Force Review Board were suspended temporarily.

One hundred to one hundred-fifty officers were displaced department-wide by the hurricane (loss of homes and vehicles) and were given "Exceptional Circumstances" status and provided the opportunity to work in locations near their current residence for up to six months.

Due to the personnel losses relating to uniforms, officers have been permitted to substitute some clothing for parts of uniform; however, officers while on duty were to be recognizable by the public as PRPB officers.

Due to the needs of the public relating to police services the Commissioner extended to June of 2018 the time allotted for officers to use 2017 sick and vacation time.   The Commissioner indicated that the PRPB was to receive more than $3 million from FEMA. The Commissioner intended to utilize $500,00 for overtime and the remainder for comp time.  However, recently, she was advised she could not spend any of this money for overtime. This has caused morale issues within the PRPB and significant problems for Commissioner Fraley.

Police from across the United States, including Boston, New York and Houston, have been assisting PRPB officers to patrol the island. The arriving officers were paired with PRPB officers. In the event the officers were required to take police action, the PRPB officer would be the officer of record relating to any arrest situation.

During this time, the TCA visited several precincts and Area Commands. Thus, for example, during the November visit, the TCA Core Team conducted a site visit of the Fajardo Area Command. The purpose of the visit was to evaluate the impact of Hurricane Maria on the precincts and districts of the Fajardo Area Command. The Team first met with several supervisors and offices.

- PRPB personnel mentioned that during and after Hurricane Maria the PRPB had lost telephone, cell phone, internet, and radio communications.

- In October, The Fajardo Area Command used generator power. The Municipality of Fajardo provided a generator for the Command Center use.

- In November, power was restored for more than two weeks but there were three blackouts during this time.

- The Fajardo Area Command did not use the air conditioning when generator power was being used.

- Communications were poor when using phones including dropped phone calls.

- The main antenna was damaged during Hurricane Maria and had affected communications.

- When the power went out, the Area Command continued to enter data by hand. Cards were being written and filed in lieu of calls for service.

- When communications and technology were restored, information and complaint numbers were assigned from Central Command.

- The Fajardo Area Command distributed food and water to members of the community, which has improved relations between the community and the PRPB. Police and community relations appear to be at an all-time high.

- During this period, the Fajardo Area Command met with members of the community three times a day.

- There were numerous meetings between the Municipal Police and the PRPB.

- Members of the Fajardo Area Command indicated there was no contamination, destruction or loss of evidence, no loss of firearms and ammunition.

- Police officers told the TCA Core Team that the Area Command had received on-site assistance from police departments across the United States.  These officers have been assigned to traffic posts that provides relief for the PRPB officers who have been working 12-hour shifts.

- Supervisors mentioned that after Hurricane Maria passed, Patrol could not resume its efforts because of downed electrical poles and trees that obstructed the streets.

- Supervisors told the TCA that 50 members of his staff were affected by the hurricane and were given time off to deal with their family problems.

- Supervisors mentioned that the officers were on 12-hour shifts, which has been challenging for the officers, the supervisors, and their families.

- Supervisors mentioned that the islands of Culebra and Vieques had sufficient staffing.  The police boat sunk during Hurricane Maria.

- There is no indication that the Fajardo Area Command had a written Contingency Plan to deal with disasters.  This problem needs to be addressed as soon as possible.  Many police departments in the States have a book available that states what protocols and procedures are to be followed in the event of disasters such as earthquakes, plane crashes, and hurricanes.  It is recommended that a manual be created for these kinds of emergencies.  The TCA and his team can assist the PRPB with this project.

During the November visit, the TCA also conducted a site visit of the Carolina Area Command.  The purpose of the visit was to evaluate the impact of Hurricane Maria on the Precincts and Districts of the Carolina Area Command.   The team met with supervisors and officers.  The Colonel in charge was on vacation.  The following is a synopsis of the meeting.

- FEMA was providing a generator and paid for gas and repairs of the generator.

- There was currently no air conditioning in the building.

- The lights in the building have been affected by power surges.

- There have been leaks from the roof in the building.

- The radios had not been working so agents have been forced to use mobile phones.

- 30 to 40 officers were affected by the hurricane and were given time off to deal with their family problems.

- Supervisors mentioned that their officers were on 12-hour shifts but since November 11th they have returned to an 8-hour shift.

- Several vehicles were damaged but were repairable.

- Members of the Carolina Area Command indicated there was no contamination, destruction or loss of evidence, and no loss of firearms and ammunition.

- Members of the Carolina Area Command indicated that traffic accidents were a recurrent problem during and after Hurricane Maria.

- Members of the Carolina Area Command have been part of monthly meetings with the community and the Municipal Police.  They stated that there was a very positive relationship with both and cooperation is at an all-time high.

# Section II

## PRPB's Action Plans ("Plans"): Paragraph 250(b) and 250(c)

During this reporting period, the Parties submitted these Plans to the Court as addenda to the Agreement.  All eleven Plans were in full effect since June 2017.  With the submission to the Court, the Parties now treat the Plans as fully incorporated, enforceable terms of this Agreement.  The final step is for the PRPB to make these Plans publicly available, which has not occurred yet.

As set forth in the Agreement, since June 2014, the Parties and the TCA have worked together and identified appropriate activities and steps to be taken to build capacity and enhance each of the following substantive areas of compliance: (1) Professionalization; (2) Use of Force; (3) Searches and Seizures; (4) Equal Protection and Non-Discrimination; (5) Recruitment, Selection, and Hiring; (6) Policies and Procedures; (7) Training; (8) Supervision and Management; (9) Civilian Complaints, Internal Investigations, and Discipline; (10) Community Engagement and Public Information; and (11) Information Systems and Technology.

To carry out these capacity building reforms, the PRPB began to develop specific, tailored made Action Plans for each of these substantive areas.  These Plans contained temporal benchmarks and set forth in detail the steps agreed upon to execute and implement the reforms and achieve the desired outcomes in each area within generally accepted professional standards.  These steps and reforms required the implementation of policies, practices, training, documentation, internal review, technological improvements, and oversight.  The Plans described temporal benchmarks and detailed activities and steps agreed upon to execute and implement the required reforms and to achieve the desired outcomes in each substantive area.  Paragraphs 231 through 240 discussed in detail their development, implementation, and assessment. The Plans were to examine policies and any required revisions, mandatory training, resources, staffing, budgetary requirements, and a schedule for when specific policies are to become field operational.

Consistent with Paragraph 234, the PRPB, with assistance from the Reform Unit, drafted the Plans that set forth the detailed steps the PRPB is to take to implement and achieve compliance with each of the Agreement's provisions in Sections III through XIII of the Agreement.  Under Paragraph 236, the TCA and USDOJ reviewed these Plans to ensure that they specified actions necessary to comply with all applicable substantive provisions of the Agreement and that timelines, implementation strategies, budgetary allocations and funding sources are reasonable, achievable, and prioritized to promote efficiency. In November 2016, the TCA and the USDOJ staff completed their review of all these Plans.  The eleven Plans were approved as drafted.  They were drafted in Spanish.

Pursuant to Paragraph 238, the Plans were translated into English and were submitted to the Court.  After months of additional review by the Parties and the TCA, the PRPB completed the translation of the Action Plans on May 31, 2017.

In the last six-month report, the TCA recommended that the Parties renegotiate an extension of the capacity building period of, at least, one additional year.  This recommendation was rooted on the fact that it took more than three years of cooperative work between the Parties and the TCA to complete the eleven Action Plans for all compliance areas and that there were unanticipated delays in some areas of the Agreement.  In May 2017, the PRPB submitted a request for an extension of four months of the capacity building period based on Paragraph 239 of the Agreement. Pursuant to his authority the TCA extended the capacity-building period by four months. The TCA still recommends to the Parties, in light of the current circumstances in the aftermath of Irma and Maria, that the PRPB applies for one additional year.

Generally, the report must describe the work conducted by the TCA during the period covered by the report and outline which requirements from the Agreement and Action Plans have been incorporated into policy, trained for, and carried out in actual practice.

In the first two years since the TCA's appointment date, my team and I avoided the use of tables, report cards, ratings, and similar devices to measure compliance.  It was the opinion of the team and their lengthy professional experience that the over-simplification of measuring progress or compliance through a table sidetracked the discussion about the substance of the PRPB's compliance.  The tables limited the TCA from his ability to openly discuss the work that the PRPB engaged in to achieve compliance.

However, the TCA and his team agree with the position of the USDOJ that, almost five years into the Agreement and approximately four years into the capacity building period, it is useful to present a paragraph-by-paragraph accounting of the state of the PRPB's compliance with the specific requirements of the Agreement and the steps of the Action Plans.  Although the risk over-simplification persists, the Team and I conclude that this approach of measuring compliance through tables is beneficial to the Parties and the Court.

Consequently, each of the following sections of this appendix displays with a table – activity by activity, step by step – the state of the PRPB's compliance with the requirements of the Action Plans.

The Report use the following rating structure and color code:

**Non-Compliance. [RED]** The PRPB has not yet complied with the relevant provision of the Action Plan.  This includes instances in which the PRPB's work or efforts have begun but cannot yet be certified by the TCA Team as compliant with a material component of the Action Plan requirement.

**Partial Compliance. [YELLOW]** The PRPB has made sufficient initial strides or sufficient partial progress toward compliance toward a material number of key components of the step of the Action Plan – but has not achieved real, effective operational compliance.  This includes instances where policies, processes, protocols, trainings, systems, or the like exist on paper but do not exist or function in day to-day practice.  It may capture a wide range of compliance states or performance, from the PRPB having taken only very limited steps toward operational compliance to being nearly in full compliance.  It also includes situations where the PRPB has made notable progress to technically comply with the requirement and/or policy, process, procedure, protocol, training, system, or other mechanism of the Action Plan such that it is in existence or practice operationally – but has not yet demonstrated, or not yet been able to demonstrate, meaningful adherence to or effective implementation, including across time, cases, and/or incidents.

**Full Compliance. [GREEN]** The PRPB has complied fully with the requirement and the requirement has been demonstrated to be meaningfully adhered to and/or effectively implemented across time, cases, and/or incidents.  This includes instances where it can

be shown that the PRPB has effectively complied with a requirement fully and systemically.

**Evaluation Deferred. [BLUE]** This category reflects those limited instances where work in a given area has been intentionally and affirmatively deferred in order to work on other, necessary prerequisites.  In these areas, the PRPB could have made more progress in a given area but, for project management, budgetary, or operational reasons, have appropriately focused attention on other areas.

In considering this classification scheme, readers of this report should keep some important things in mind.  First, a designation of "Partial Compliance" does not necessarily or in itself mean that the lack of progress is something that the TCA finds problematic under the circumstances.  In some instances, it does.  But, there are many instances where partial compliance includes situations where the PRPB has made notable progress to technically comply with the requirement of the Action Plan such that it is in existence or practice operationally – but has not yet demonstrated, or not yet been able to demonstrate, meaningful adherence to or effective implementation, including across time, cases, and/or incidents.

Second, the Monitoring Team's conception of "partial compliance" requires more than the PRPB simply taking some limited or initial steps toward adhering to a specific step of an Action Plan or an Agreement requirement.  That is, a "partial compliance" determination is not used simply because some small amount of work has been conducted.  Instead, "non-compliance" becomes "partial compliance" when the PRPB has made sufficient, material progress toward compliance – suggesting that the PRPB has graduated from the stages of initial work to more well-developed and advanced refinement or various reforms.

Third, the compliance that this report discusses is with respect to compliance with the various, specific provisions of the Action Plans – and not with respect to the "Full and Effective Compliance" with the whole of the Agreement which is defined in Paragraphs 10 (bb), 294 and 301.[48]  Such "Full and Effective Compliance" will be reached when the PRPB has reached "sustained compliance with all requirements of this Agreement, or

---

[48] Paragraph 11, bb, defines Full and Effective Compliance.  "Full and Effective Compliance means sustained compliance with all substantive provisions of this Agreement and sustained and continuing improvement in PRPB policing.  The substantive provisions of this Agreement are all provisions contained in Sections III through XIII."

sustained and continuing improvement in constitutional policing, as demonstrated pursuant to the Agreement's outcome measure."

During this period of capacity building, the PRPB still has a substantial distance to travel to either comply with all of the Action Plans' steps and Agreement's requirements and/or to demonstrate "sustained and continuing improvement" across outcome measures. There is no way for the PRPB to meet the preponderance of the evidence standard to reach Full and Effective compliance with the Agreement until we enter the phase of compliance.

Next, the various tables in Appendix 4 involve intentionally condensed summaries of the requirements in each paragraph.  For the sake of space and clarity, we do not reprint the entire Action Plans and/or Agreement in the document.  Any imprecision detected by these condensed or summarized requirements is unintended and, in any event, can be cured with reference to the original Agreement and Action Plans language themselves.  This is the reason why we have added the Paragraphs and activities in the tables.

Further, the TCA Team bases its assessments on its current understandings, knowledge, and information gained through ongoing field work document reviewing, data gathering, and discussing with PRPB, the Parties, and other stakeholders. During this capacity building phase, the assessments are often less formal to the extent that not all of them are necessarily informed by the type of exhaustive quantitative compliance and outcome measurements that are a critical component of the Agreement under Paragraphs 242 and 243.  In this sense, it is important to understand that the summary determinations here do not take the place of these more structured, systemic analyses.    Ongoing, rigorous quantitative assessments will provide a more comprehensive picture during the compliance phase as work under the Agreement proceeds.  However, this task is just impossible at present given the data gathering limitations of the PRPB.

The terms adopted here – including Non-Compliance, Partial, and Full Compliance – are terms that appear in the Agreement.  Categorizing the state of compliance with the steps of the Action Plans and the Agreement requirements by using these terms is a method that the TCA has internalized to explain and discuss the substantive work and progress that the PRPB has made in a systematic, straightforward way.  This is not unique.  The rating approach is similar to the methodological approach used by police

monitors in Cleveland, Albuquerque, Cincinnati, Detroit, East Haven, Los Angeles, New Orleans, and others, as well as consent decrees in non-police contexts.

In the next report, the Report will also include additional differentiation between six crucial categories of compliance: policy compliance, staffing compliance, resource compliance, training compliance, documentation compliance, and outcome compliance. For example, policy compliance means (a) that there are sufficient written policies and procedures in place so that, if they were implemented, compliance would be achieved; and (b) that there are no policies and procedures in place that are inconsistent with the requirement.

# Section III

## Current and Anticipated Challenges in the Implementation of the Agreement and the Plans: Paragraph 205(d)

In this part of the Report, the TCA examines all relevant detailed issues involving capacity building that were reviewed and found not to have been, fully or, partially implemented in practice.   It also discusses the TCA's recommendations regarding necessary steps to achieve compliance with the timelines and steps in the Plans.

After Hurricane Maria devastated Puerto Rico, the TCA conducted a preliminary assessment of the situation on the ground by visiting many police installations, convening meeting with PRPB personnel, inspecting equipment and infrastructure, and conducting operational and administrative assessments.   In the first week of October, the TCA provided his report to the Court.

Considering the TCA report, on October 4, 2017, the Court "ordered the Parties, with the assistance of the TCA, and ultimate court approval, to adopt a new framework" for

the Agreement best fitting the new reality on the ground.[49]  After 48 months of capacity-building, a new framework is needed because there is much more that is needed from the PRPB to achieve real, effective capacity.

During these post-storm visits, my team and I identified three specific areas where the PRPB's strategic and operational plans as drafted in the Action Plans must quickly adapt to the new prevailing conditions. They are the pillars of the new framework ordered by the Court.  The first challenge is to undertake real, effective capacity-building in the compliance area of Information Systems and Technology.  The second strategic and operational challenge is to complete a robust and solid strategic staffing plan as required under Paragraph 13 of the Agreement. The third challenge for real and effective capacity building is to develop a well-thought out Continuity of Operations ("COOP) and Recovery and Resilience plans intertwined with the current Actions Plans.

Since the Interim Report, the TCA has continued to conduct comprehensive, extensive field visits and assessments.  The TCA has identified other challenges that are limiting compliance with the Agreement and the terms set forth in the Actions Plans.

First, in the first three months of 2018, The TCA has evaluated compliance with both the equal protection Action Plan and the internal disciplinary process.  The main finding is that a system for investigating and addressing administrative complaints, in particular complaints of equal protection and non-discrimination, continues to lag far behind where it must be.   The PRPB's capture and use of officer performance data in order to build an effective Early Intervention System ("EIS") to guide it in the delivery of services, supervision and professional development of officers, and risk management also requires significant attention from the top leadership over the coming months.[50]   This involves compliance with Paragraphs 147 through 153 which are an essential part of the Supervision and Management Action Plan.  Similarly, even as the PRPB made limited strides in implementing necessary technological platforms, the Agreement-required Information Technology and Systems Action Plan requires that the PRPB puts in place promptly systems and processes that ensure that the PRPB does not fall behind again in the future as it did during the Hurricanes.  Similarly, much work remains on bringing about significant operational and technological changes to the performance evaluation

---

[49] See: Docket 624.

[50] An Early Intervention System is not the same and should not be confused with an electronic database or record management system for administrative complaints.  They are two distinct, although related systems.

systems as well as the investigative and disciplinary processes affecting the PRPB personnel.  The PRPB must improve immediately their processes for investigating and reviewing use of force, investigating officer misconduct, supervising problem-prone officers, managing personnel resources, and imposing discipline if they want to have credibility both before the public and their employees. Finally, there is an increasing backlog of cases that raises concerns about the expediency of the progress made in past years.

There is a second issue that has emerged in my assessment of the PRPB activities from December 2017 through March 2018.  In recent months, I have conducted a thorough assessment of the infrastructure and budgetary needs required "to place the PRPB in a position to implement" each of the Agreement's provisions within four years from my appointment date and in accordance with the implementation schedules set forth in the Action Plans.[51]   These monthly evaluations have been shared with the Parties.  The message of these reports is clear: after 46 months of capacity-building, there is much more that is needed from the PRPB to achieve real, effective capacity in terms of operational capacity, infrastructure, and budget.

Based on the information available, the PRPB has only used $8 million of the $20 million assigned to the Reform in this Fiscal Year.  Taking into consideration that $1.5 million is assigned to the Office of the TCA, the simple fact remains that the PRPB has only used $6.5 million to advance the Agreement and the Action Plans.  Furthermore, in February 2018, the USDOJ and the TCA were alerted that the PRPB had not used any of the approximate $2.8 million available in federal asset forfeiture funds that were assigned for police reform purposes for fiscal year 2018.[52]   The situation was so dire that the federal administrators threatened to take these forfeiture funds away.  After several meetings with the federal authorities administering the equitable sharing program, the Commonwealth seemed to have resolved some of the access problems but issues about the use of these funds and their prioritization persist.  My assessment is straightforward on this issue: the administrative hurdles created by the implementation of Act 20-2017 have just accentuated structural deficiencies identified in the past regarding the budgetary autonomy of the PRPB.  In my assessment, these budgetary obstacles are preventing the PRPB from making satisfactory progress toward implementation of the Agreement and the Action Plans.

---

[51] See Paragraph 237.
[52] See Page 15 of this Report.

Thirdly, there is a challenge that precedes the Hurricanes that devastated Puerto Rico, but the Hurricanes have accentuated its most pervasive effects.  It is a recurring challenge in the PRPB.   The most persistent challenge to the Reform and the implementation of the Agreement today is the current crisis of leadership and management affecting the PRPB and the lack of direction in the implementation of Act 20 of 2017.  This crisis has created tremendous uncertainty in all ranks of the PRPB. The problems associated with promotions, unexplained personnel transfers, questionable overtime practices, and failure to take actions against officers with dubious disciplinary records have fueled the sense of crisis.  That the current management structure is not working well has been clearly established during this reporting period when the progress made toward the implementation of the Action Plans came close to a standstill.   The solution is for the Commonwealth to comply with an Agreement that clearly outlines the lines of leadership, management, and responsibility within the PRPB.  If this cannot happen under the current circumstances, I will not hesitate to recommend to the Court actions that restore satisfactory progress toward implementation.

In keeping with the responsibility of the TCA consistent with Paragraph 241, the TCA submitted to the Court his second survey of the community.  This survey provides a more detailed understanding of the police through the lenses of the community.  This survey is based on in-depth discussions with diverse community "focus" groups.  The methodology was a typical focus group study.  The picture that emerges is still highly problematic: there is a persistent gap between the community and the PRPB.

There is one final area of concern.  The TCA submitted to the Parties and the Court his preliminary assessment of how the PRPB policed the mass demonstrations of April and May.  The overall assessment is that the PRPB managed these incidents in a more professional manner than in the days prior to the Reform.  However, there are at least two concerns which are worth discussing.  The first finding is the disruption of the chain of command which amplifies the crisis of leadership.  The second finding is that there are still significant challenges in the ability of the PRPB to document police-civilian interactions and police-involved incidents.  It is also worth mentioning that the lack of cooperation of the PRPB with certain requests for information from the TCA reveals that the PRPB has not adopted fully the principles of trust and transparency.  In the Status Report, from pages 8-10 and 51-60, the PRPB has responded in great detail to the TCA's preliminary assessment of the 2017 demonstrations.

# Building Information Systems and Technology ("IT") Capacity in the aftermath of Irma and Maria

In the aftermath of Irma and Maria, one of the most significant capacity-building challenges for the PRPB is to undertake real, effective capacity-building in the compliance area of Information Systems and Technology.  These days it is apparent that the modest progress made in the last 48 months years in terms of creating a reliable IT infrastructure for the PRPB has affected the operational and tactical response of the PRPB during and in the aftermath of these natural disasters.  From a strategic vantage point, however, the PRPB should consider situation as an opportunity for a major "step function" modernization of the entire IT infrastructure.

During this reporting period, several on-site visits were conducted: two in July and August before the hurricanes and five after the Hurricanes.  Of note, leading into July and August, PRPB's Bureau of Technology (BT) continued to make progress, albeit limited, in accordance with the Agreement.  However, with the hurricanes and the ensuing devastation to Puerto Rico, progress against the IT Action Plan slowed considerably as BT attempted to restore the capacity lost from the storms.

From June through September, procedurally speaking, the BT achieved an important management stage by finalizing the Action Plans in combination with the IT Tables thereby enabling a more stabilized ongoing assessment of BT actions and progress. In policy terms, general orders, policies and manuals continued to be developed. However, resources remained insufficient to fully impact efforts beyond basic maintenance and development.  As such, at this stage, innovative and strategic re-architecting and solutioning is essentially limited if not non-existent.  In this regard the BT still has much to do to not only support the other ten compliance areas of the Agreement but also implement necessary long-term IT and infrastructure improvements.

Additional observations for this period included:

- Given the shortage of resources, it was not adequately clear that BT was able to adequately implement oversight and management mechanisms such as Life Cycle program reviews and cataloging of systems and infrastructure

requirements, both of which are fundamental to effective technology stewardship.[53]

- Beyond capacity building, the CIO and his BT team must not only maintain focus on completing this phase but also identifying ways to leverage partnerships to share its workload with credible partners through collaborations or outsourcing. BT should consider the possibility of outsourcing selected BT functions. By doing so, they will be able to focus internally on critical functions and innovative options.

- Training was not yet complete and lagging on CAD Mobile as of July and August.

- The Reform Unit and BT acknowledged that oversight could be better enabled through four key documents that form a baseline for managing and monitoring. They are; 1) The Agreement, 2) the Action Plans, 3) Task Tables, 4) Policy Chronology.

From the perspective of staffing and resources:

- The staffing study implementation is critical to the probability of success and the delay in implementation is affecting IT;

- BT organizational structure must be staffed and implemented in accordance with the General Order;

- The PMO (Project Management Office) contract needs to be approved and implemented;

- It is essential that management and supervisory personnel have the skills to manage internal IT operations and to execute oversight methods. especially if DSP outsources or consolidates PRPB IT services under DSP.

---

[53] The systems development **life cycle** (SDLC), also referred to as the application development **life-cycle**, is a term used in systems engineering, information systems and software engineering to describe a process for planning, creating, testing, and deploying an information system

From September through March, following the hurricanes, the TCA conducted five on-site assessments. They revealed the magnitude of damage. Clearly, the damage sustained by the PRPB required that their fullest energy be focused on restoration of capabilities and away from the tasks at hand prior to the Hurricane. As examples, the following was observed:

- Radio Communications (Johnson Radio Sets) were functioning in degraded mode because microwave tower transceivers/repeaters (18 of 30 nodes) were damaged and so communications back to Headquarters were down.

- PRPB HQ's computer room was functioning near full operational capability. However, because the Early Intervention System ("EIS") and CIW ("Crime Information Warehouse") sustained a hard stop due to battery expiration during the storm, CIW files were at risk of being corrupted.

- The Fusion Center, which is the information sharing center, sustained substantial water damage with no repair scheduled more than 8 weeks after hurricane Maria.[54]

In addition, first-hand inspection in October showed that Caguas Norte was uninhabitable. Fajardo, Mayaguez, Utuado, Carolina and Ponce were on battery power and were inconsistently being returned to commercial power.

"Shot Spotter" was functioning <u>because it is a web service with a reach back solution</u> to the application provider. This is a powerful "lesson learned" of significance that points to the potential benefits that can be achieved by leveraging a cloud service provider.

EIS was reviewed noting that the credibility of its data is essential and that information from CAD field operations needs to be applicable, credible, reliable and searchable. It was also observed and shared with the Reform unit that the TCA analysis of the Data dictionary, Entity Relationship Diagram and functional requirements documents is necessary in order to assess analytical utility of the field data. An example of this can be demonstrated with hierarchical capture of date against the most serious crimes that

---

[54] The ultimate goal of a **fusion center** is to provide a mechanism where law enforcement, public safety, and private partners can come together with a common purpose and improve the ability to safeguard our homeland and prevent criminal activity. Fusion centers operate as state and major urban area focal points for the receipt, analysis, gathering, and sharing of threat-related information between federal; state, local, tribal, territorial (SLTT); and private sector partners. See: https://www.dhs.gov/state-and-major-urban-area-fusion-centers

could also unintentionally exclude other important data elements important to analysis and research.

After December, the primary objectives of the IT site visits were to:

- Demonstrate EIS, CIW, Kronos, CAD, Reform Unit Project Management Tool (AKA; "MAPA")
- Review the status of the IT recovery following the hurricanes
- Refine the Punch List as an action tracking tool and commit to the method
- Review IT Tables
- Coordinate program management and administrative follow through

Emphasized during these visits was the criticality of conducting a unified demonstration of EIS, CIW, CAD, Kronos, and the Reforma Project & Policy Tracking Tool (AKA; Policy Mapa) to a combined audience of TCA and USDOJ personnel.  And that it be completed at the next possible opportunity, optimally in April 2018.  There is consistent agreement that at this time in capacity building the compliance advisors and the USDOJ must hear and see the same explanations of the functionality of systems being built. Only then can effective and collaborative judgment be passed that the systems being delivered has adequate functionality. Experience is showing that not doing so will lead to inconsistencies in the understanding of system status, training and functionality thereby increasing risk to the success of these topics.

For planning purposes, this engagement should be conducted for a period of at least 6 hours preferably on a single day to achieve a high level of awareness amongst non-IT personnel regarding how well the IT systems will support policing. This format is critical to ensure that each person of the monitoring teams is able to see firsthand the utility of these systems and also jointly ask questions and receive single answers.

The TCA shared with PRPB a Punch List details and status of the IT topics addressed during this visit.  This list is chronologically sequenced by on-site visit and if logical prior tasks have been migrated forward to the most recent visit.  Doing so condenses the information and minimizes redundant entries. Regarding format, because this is a "living" document and the methodology has now been employed, details have been tracked back to May of 2017.  The TCA IT expert is confident that topics have been revisited or updated sufficiently since May 2018 that reaching back further is not necessary.

Significant observations during these visits:

- Agreement reached that the Decree, Action Plans & Tables, Project Management Tool and Punch List are fundamental to overseeing the Decree.
- USDOJ emphasized that data attributing of EIS is critical. During an attempt to demonstrate EIS to USDOJ it was evident that USDOJ has noticeable reservations that PRPB is developing EIS correctly. (The TCA shares those reservations) This concern highlights the need for a comprehensive and joint review. There is risk to functional success in this area
- All IT SME's agreed that demonstrations need to be done for the CT members so that they can link policing practices with the tools as they are currently designed.
- Reforma agreed to commit to a PMR schedule and will submit a recommendation in April 2018
- The CIO noted that he has received $6.9M for recovery efforts but a detailed plan for its use was not provided.
- CIO provided copies of CAD/Mobile status in Mayaguez and Arecibo and will continue collecting post Maria inventory of all installed computers followed with a projected completion date.
- CIO provided a copy of a partial radio inventory for Aguadilla and Bayamon, this effort needs to continue island wide.
- Noted that BT backup power is provided by the same generator that supplies HQ. CIO recommends that BT have a redundant stand-alone backup generator in the event that the primary generator fails.

The main finding is that the PRPB IT personnel continues to work towards satisfying the Agreement. However, the shortage of staff and budget allocation hampers necessary progress and increases risk. To understand the ultimate risk to IT system delivery, Program Reviews must commence. Finally, the PRPB's CIO remarked that he did not receive approval to hire project management staff. This adds significant risk to efforts under the Bureau of Technology.

Clearly there is much more work to be done with regards to the architecture of data in order to ensure usefulness of the data collected beyond strictly crime statistics. It is strongly recommended that the PRPB recognize the importance of academic and scientific analysis of data (such as use of force data) to transformation of behavioral characteristics and the subject matter expertise needed to perform the analysis and change.

In these very difficult times, the resiliency of Puerto Rico is commendable. And although much of the IT work on the Agreement's compliance has been suspended, BT has had reasonable success restoring and maintaining IT service capacity.  IT systems hosted at Headquarters are in functioning condition as is the computer center and radio equipment center.

At this juncture, the PRPB should remain vigilant in their efforts to respond to the hurricanes and, also, be comfortable knowing that the work towards the implementation of the Agreement in the area of technology should begin in earnest as soon as possible.

As PRPB nears the end of capacity building, the risks to successful completion of IT systems delivery needed to support the Agreement goes up.  PRPB, USDOJ and TCA scrutiny of the dependent nature of IT and policing workflows and practices must be highly focused on the integration of remaining efforts/actions.  It is clear that resources have been expended to develop technology solutions.  At this point although systems are being developed, the lack of available institutional training in a repeatable way is hindering effective deployment of systems such as CAD.

Therefore, it is a best practice at this point for the Parties to jointly review transformed policing practices and how they are to be represented by the IT systems built.  Management and leadership measurement of progress to date versus the intended outcomes and schedule is the best method for estimating the probability of success.  The IT monitor strongly advocates for dedicated joint reviews of CAD, RMS, EIS and Kronos systems.  They should occur at a rate of two reviews per month recurrently.

From a strategic vantage point, the PRPB should consider the potential opportunity of a major "step function" or phased modernization of the IT infrastructure.  The potential success of wholesale change and re-architecting may never be more opportune than at the present when much of the infrastructure is a candidate for replacement rather than repair.

# Building HR/Staffing Capacity: The Staffing Allocation and Resource Study (Paragraph 13)

The second area where the PRPB faces a significant strategic and operational challenge in terms of capacity building is the lack of development and progress in creating a robust and solid strategic staffing plan as required under Paragraph 13 of the Agreement.  In the aftermath of Irma and Maria, it is apparent that the lack of a consistent staffing approach has limited the PRPB operationally and strategically.  The effects of an inconsistent staffing approach can be seen on the post-storm developments involving police overtime and the ongoing police slowdown and/or absenteeism.

Under the Agreement, the substantive area of Professionalization has three key objectives and three main interrelated activities: the development of a staffing plan (Paragraph 13), the adoption of merit-based promotions (Paragraphs 14 through 20), and the implementation of a developmental career path (Paragraph 21).  The goal of these three interconnected activities is for the PRPB to develop processes and mechanisms that promote professional, ethical, and respectful policing services to effectively address Puerto Rico's public safety challenges.   To attain these goals in Professionalization, the PRPB were take reasonable measures to achieve performance expectations in this area of the Agreement.   However, delays have dominated the PRPB's response.

Paragraph 13 requires the PRPB to conduct a staffing allocation and resource study to assess human resource needs for the entire organization.  The study is the cornerstone of the professionalization reforms and the basis for a staffing and resource allocation master plan rooted in community-oriented policing principles.  This requirement is part of the approved Plan on Professionalization, which detailed steps and timelines are now fully incorporated, enforceable terms of this Agreement.

Paragraph 13 of the Agreement, entitled "Staffing and Community Policing," reads as follows:

> "PRPB shall assess the appropriate number of sworn and civilian personnel to perform the different department functions necessary to fulfill its mission. To do so, PRPB shall conduct <u>a staffing allocation and resource study</u>.  The study shall

*form the basis for a staffing and resource allocation plan that is consistent with community-oriented policing principles and supports the systematic use of partnerships and problem-solving techniques. To foster community-oriented policing, the plan shall consider deployment practices that offer officers opportunities to serve the communities in which they reside." (The underline is mine)*

Upon the insistence of the TCA, in March 2016, the PRPB began to assemble a working group to complete the staffing study.  In October 2016, the PRPB informed the TCA that the Bureau had issued a Request for Proposals ("RFP").  The deadline for submission of proposals was November 4th, 2016.  In 2017, the PRPB selected a firm, V2A, and the project gradually started.

During this reporting period, the TCA received several updates on the progress made to date towards the implementation of Paragraph 13:

- From October through March 2018, V2A submitted to the TCA and USDOJ relevant status reports;

- In these reports, the consultant updated the Parties and the TCA on the work plan to carry out the study, the analysis of operational and staffing resources, the analysis of the areas where the study will focus on, and the findings obtained to date;

- The TCA was very satisfied with the results delivered to date by the consultants as well as of the quality of the data and information gathered through this activity;

- The TCA understands that this study is to provide valuable information that will lead the PRPB to make informed decisions based on scientific evidence;

- The TCA urges the PPR to continue working hand in hand with V2A, as has been done so far.

Even as there are signs of positive progress in recent months and the expectation is that the study will be completed in April 2018, the TCA still have concerns about the implementation of Paragraph 13.  The first concern is that the damage is done and will take months if not years to fix it.  During this reporting period from June 2017 through March 2018, as in the past, my assessment was that it was blatantly apparent that the

lack of a consistent staffing approach continued to limit the PRPB operationally and strategically.  These staffing limitations manifested fully in the rank-and-file frustration about overtime and other personnel issues contributing to the damaging police slowdown and/or absenteeism of December 2017 and January 2018.

I have another concern about the implementation of Paragraph 13.  Contrary to what it has been publicly reported, the Staffing Allocation and Resource Study is an agreed-upon requirement of the 2013 Agreement and the Professionalization Action Plan, not a recent request of the DPS or a particularly DPS administrator even if that administrator is the DPS Secretary.[55]  The study is one of the key components of the Agreement and the public record is clear.  First, the Request for Proposals ("RFP") for the study was issued in October 2016 and the selection of a consulting firm was made in December 2016 with the approval of former Police Commissioner Fraley in January 2017 months before the appointment of Secretary Pesquera.  Second, it is well documented that I have been publicly cautioning the Court and the Parties of the PRPB's lack of compliance with this requirement since 2015 and my team and I have had a significant role in pushing the PRPB towards compliance with the three Paragraph 13 related steps outlined in the Action Plans since March 2016.[56]

My main concern is that the study now appears to be an instrument to address an expedient public policy issue, not seen as one of the cornerstones of the Agreement and a sustainable reform agenda.  In this sense, the current public statements of the DPS Secretary on the allocation staffing study seem to bring confusion to the path of the Commonwealth toward the implementation of Paragraph 13.  First, it is important not to confuse the staffing allocation study (Activity IV.1.2 of the Professionalization Plan, table 11) with the development of a community-oriented staffing plan (Activity IV.1.3 of the Plan, table 12).  The study is a tool, a means to an end; but, the ultimate goal is the development and implementation of a reliable community-oriented staffing

---

[55] See: Miguel Rivera Puig, El Vocero, "En La Mira La Plantilla Policiaca." Monday, March 26, 2018. pp. 1, 3-4.  "Tras el marcado exodo de boricuas que decidieron probar fortuna en Estados Unidos, incluida una cantidad indeterminada de agentes, Pesquera encomendo un estudio para analizar si hay suficientes policias para velar por el bien public y espera tener el informe en sus manos en abril."

[56] See Docket No. 306 (02/01/2016), Docket No. 382 (07/11/2016), and Docket No. 464 (01/13/2017).  For instance, this is what the TCA wrote in his Fourth Report: "Paragraph 13 requires the PRPB to conduct a personnel-staffing study to assess human resource needs by the PRPB. This requirement is highlighted under the approved Action Plan on Professionalization.  The set deadline is June 2016. However, the PRPB will not comply with this deadline. Upon the insistence of the TCA, the PRPB has assembled a working group to complete the staffing study. The PRPB has submitted an application for a federal grant to defray expenses." (TCA, Fourth Six-Month Report: December 9,2015 – June 9, 2016. Submitted to the Court: July 11, 2016.  Pages 4-5)

plan.  To be perfectly clear, there will be no compliance with the Agreement without a real staffing plan that is "consistent with community-oriented principles and supports the systematic use of partnerships and problem-solving techniques."[57]  Second, the Action Plan clearly outlines the responsibilities of the Police Commissioner and his/her working team (Activities IV.1.1 and IV 1.3) in developing the allocation study and staffing plan and of the Police Commissioner in making decisions on the basis of the Plan.  However, the current public statements of the DPS Secretary appear to suggest that he is the one in charge, not the Commissioner, and these statements demand further clarification on issues of decision making as well as of command and control.[58]

The statements from the Secretary appear to overlook the obvious: this work requires the cooperation of the Parties and the TCA.  Under the Agreement, the TCA must review, assess, and report on compliance with Paragraphs of the Agreement and the steps in the Action Plans.  This is also the case for Paragraph 13 where the actions of the Commonwealth are subject to the compliance assessment and rating of the TCA. Consequently, for both the staffing study and the staffing plan, the TCA must determine whether the timeframe has been met and whether the Commonwealth of Puerto Rico has made satisfactory progress toward implementation of the Agreement by rating the study and the plan as being in full compliance, partial compliance, or non-compliance with the terms of the Agreement and the Action Plans.  Furthermore, for any activities and detailed steps (study and/or plan) that were reviewed and found not to have been fully implemented in practice, the TCA must issue recommendations regarding necessary steps to achieve compliance.  Paragraph 137 is clear regarding the cooperative nature of this enterprise.  As it reads:

> "After considering the results of the staffing study required by Paragraph 13 and whether the first-line supervisors are meeting all of the supervisory requirements of this Agreement at the current officer to supervisor ratios, the TCA and the Parties shall determine whether to lower the number of officers supervised by each first-line field supervisor."

---

[57] Paragraph 13.

[58] Puerto Rico Police Bureau's Action Plans. "1.3. El Superintendente tomará decisiones sobre la reasignación de recursos humanos, apertura de nuevas convocatorias a ascensos y/o reclutamiento de personal que sea consistente con los Principios de Policía Comunitaria de equidad, anti-discrimen y conforme a las prácticas policiacas generalmente aceptadas según las necesidades del servicio para que la PPR pueda cumplir con su misión. Este Plan tendrá como base la evaluación realizada. (Tabla 12)" (page 21). https://www.policia.pr.gov/planes-de-accion/

The fact that the PRPB is 46 months into the capacity building period and there is no objective way to measure and assess its staffing and resource capacities is nothing short of an inexcusable failure of management and leadership.   PRPB leadership is responsible for this failure.   As the TCA has documented time and time again, the cost of this failure has been extraordinarily high in terms of public safety and the trust in the commitment of the PRPB to sustainable reform and Hurricanes Irma and Maria have further accentuated the administrative and operational failures of the PRPB in the area of staffing.  The damage is done and cannot be undone easily if left unattended.  From a strategic vantage point, the PRPB should consider the potential opportunity of a major modernization of the staffing structure.  The potential success of wholesale change and re-architecting may never be more opportune than at the present when much of the staffing issues are dominating the debate about policing in Puerto Rico.

# Building Capacity by Incorporating Recovery and Continuity of Operations Plans into the Agreement and Actions Plans

The third challenge for real and effective capacity building is the lack of well-thought out Recovery and Resilience and Continuity of Operations ("COOP") plans.  These are components of a capacity building strategy that the TCA has recommended the Parties must add to the Action Plans and the Agreement.  To date. The TCA has diligently worked with the Parties to recommend concrete steps towards the prompt implementation of these initiatives.

The PRPB can learn from many communities of the United States that have gone to "great lengths to develop disaster response plans and routinely conduct drills to prepare for natural or man-made calamities."[59] The goal is to prepare first responders and other government entities to know with precision what they need to do in those critical hours, days, and weeks that immediately follow a devastating event.   In this regard, first responders have two missions: lead and protect the communities they serve.

---

[59] See; Deloitte, Rebuilding after disaster: the first steps on the road to recovery (October 2015).

Based on an analysis by Deloitte of critical long-term recovery issues encountered by communities that recently undertook a disaster recovery program, typical challenges that government leaders are likely to face include: (1) Insufficient specific long-term recovery experience; (2) Capacity constraints; (3) Governance, monitoring, and ongoing oversight; (4) Fraud, waste, and misuse.

There is no question that the PRPB faces significant challenges in all these areas, but the one challenge which is the most problematic is the current limited capacity. Deploying infrastructure, resources, funding, and staffing in a coordinated and strategic way requires expertise and knowledge on many levels, starting with strong leadership and a solid cadre of management staff.  All of this demands a comprehensive planning procedure where risk management policies and procedures as well as controls are developed.  It also requires strong project management oversight, data management, technology implementation, and persistent communication and training between the leadership, the first responders, and the communities they serve.  The PRPB must confront these constraints head on.

Similarly, it is important to understand that the development of a Recovery and Resilience Plan requires understating the proper implementation of the recovery timeline efforts.  Recovery is really the combination of three intertwined moments: the period of restoration of the critical infrastructure, the stage of organization and controls, and the phase of assessment and rebuilding.

In October, the TCA recommended the PRPB to examine the experience of the City of New York as an example for the development of the PRPB's own Recovery and Resilience Plan.  There are many reasons for the PRPB to look into the New York example, including the fact that, in late October 2012, Hurricane Sandy roared into the New York Harbor with unprecedented force, causing record-breaking water levels over much of the city.  There are, of course, other jurisdictions that have experienced similar situations, but New York is a great reference due to the size of the police department and the coastal nature of New York's geography.

After the storm had passed and the water had receded, a new reality emerged: New Yorkers and their government officials had to think differently about our relationship with a changing climate in a city so much defined by water. Sandy also laid bare many pre-existing challenges in NYC communities and vividly highlighted the physical and social vulnerabilities to coastal storms and rising seas.

As the City infrastructure and housing stock suffered significant damage, it was clear that the City of New York could not just plan to "recover" from Sandy. The City needed to find a way to emerge from Sandy a stronger and more resilient city - one that did not just plan for 'the next Sandy,' but one that invested with an eye toward future risks and guided in its decision making by the best available science.  This is the "new approach" that the TCA submits should define the work of the PRPB in coming months.

Hurricane Sandy brought a realization that the City of New York needed a new approach to engaging with its 520 miles of waterfront, and that the City needed to look beyond Sandy to build its physical, economic, and social resiliency against a range of risks, enhancing the city's capacity to withstand and emerge stronger from the impacts of climate change in all of its neighborhoods and public facilities.

In response, the City proposed a $20 billion resiliency program to address not only the risks of 'another Sandy', but to broaden the City's approach to the risks of climate change and other threats.  In April 2015, Mayor de Blasio released the ground-breaking "OneNYC" plan which expanded this multilayered resiliency program and accelerated its implementation.   The TCA proposes that the PRPB adopts this strategy: one that embraces the reality of a Caribbean island but plans for new risks through a multilayered strategy of coastal protection, upgrades to buildings, protections for infrastructure, and investments to make police facilities and the neighborhoods they patrol safer and more vibrant - tailored to local risks and solutions.

In addition to the development of a Recovery and Resiliency Plan, the TCA has also recommended to the Parties the development of a solid Continuity of Operations ("COOP") Plan.   Many states and cities in the United States have adopted this approach.  The plans are grounded on the fact that unexpected disruptions of normal operations are plausible and that these disruptions are to dramatically alter the ability of a law enforcement agency to effectively deliver its services to the community.

Before delving into this issue, it is important to distinguish continuity plans from standard Emergency Operations Plans (EOPs). While the two necessarily can link to one another, the purposes are distinct.  EOPs provide guiding principles for an agency's response to a disaster, crisis, or emergency situation.  On the other hand, a COOP should focus on what a police department should do if that disaster or emergency were to render the agency unable to accomplish its own mission.  For a COOP plan to be effective, these plans must be implemented, exercised in practice, and maintained up to date.

Again, the TCA recommended for the PRPB to look after the experience of New York City.   In 2006, the New York City Office of Emergency Management ("OEM") established the first-ever formalized City of New York Continuity of Operations Program (COOP).  In this area, New York leads the nation.  The mission of this initiative was to enhance the ability of City agencies to provide vital services to the public during emergencies, while maintaining internal resiliency.

With the success of a pilot program consisting of three agencies, Mayor Bloomberg signed Executive Order 107 in 2007 requiring City agencies to develop standardized COOP plans by December 2009.   OEM, in partnership with the Department of Information Technology & Telecommunications (DOITT) worked with the participating City agencies in achieving this goal.

The NYC COOP Program has grown over time to include 40 additional agencies, the establishment of agency COOP planning teams, customization of continuity software for agencies to design plans, and an intranet portal for agency COOP administrators to gather resources, ask questions, and download planning materials. As the managers of the NYC COOP Program, OEM continues to provide guidance to agencies in developing continuity planning strategies and exercising plans. While each agency team has its own plan to maintain essential services, COOP standards, formatting, and language is uniform.   The development of the NYC COOP program involved key five elements that should serve as guide for the work of the PRPB:

- The pilot program assessed the critical functions and operational requirements of selected agencies. OEM and DOITT studied three agencies and collaboratively developed COOP plans for each agency.

- OEM and its COOP partners used knowledge of industry practices and City specifications to develop a COOP planning methodology to address City agencies' needs.

- OEM and partner organizations configured commercial software for the City's intranet. The software provides electronic tools for creating COOP plans. To accompany the software, COOP planners at OEM generated a guide to lead City agencies through the COOP methodology and the commercial software.

- Software administrators continue to run a series of training programs to demonstrate how to use the software to tailor the methodology to each agency's specific needs.

- Agencies maintain their own continuity plans, but OEM continues to provide support for continuity planning strategies, trainings, and exercises.

Dr. Owen and Burke further recommend that there are specific Law Enforcement related concerns in drafting a COOP plan. The TCA highlights these concerns because they are extraordinarily important in the case of the PRPB based on some of the recommendations for immediate departmental change that the TCA made in past reports.[60]

Following are some specific considerations which, according to Owen and Burke's guidelines, should be discussed in the PRPB's continuity planning sessions:

- Weapons: How will the arsenal be protected or transported? While arsenals are generally highly secured and protected areas within a facility, a disaster could lead to a breach or the requirement of abandoning the facility as a whole. Is there a protocol for determining when to relocate the arsenal, to what space, and how? Within the alternate facility, is there a suitable area for weaponry?

- Evidence: Similar concerns emerge for evidence in pending cases. When does it need to be moved and what priority should it receive? Following Hurricane Katrina, some evidence was lost and cleanup was continuing as recently as 2011. Certainly, questions about chain of custody could also emerge if the security of evidence storage was breached.

- Laboratories: Related to evidence, agencies and those who depend upon them (e.g., prosecutors' offices) should be prepared to handle temporary inaccessibility of crime laboratories. COOPs should take into account how the work of the crime lab relates to mission essential functions, the impact of disrupted crime lab operations on ongoing analyses, and any concerns related to hazardous materials which might stem from damage to, or movement of, lab equipment and supplies

---

[60] Stephen Own, and Tod Burk, "Continuity of Operations Planning," Blue Sheepdog August 1, 2013. http://www.bluesheepdog.com/2013/08/01/continuity-of-operations-planning/

- K-9 Partners: How will a department's K-9 partners be cared for in a continuity situation? What if a K-9 officer's home kennel is rendered unavailable or if supply chains for dog food are interrupted?

- Inmates: Planning for the evacuation of a detention facility, even one with few inmates, is no small task. Likewise, problems related to long-term power outages or lack of availability of supplies or running water in an otherwise structurally sound facility are challenging issues. If continuity needs include responding to a personnel shortage, how will appropriate supervision of inmates be ensured? One consideration may be relocation of inmates in advance, if there are indications of a pending emergency. Of course, any relocation presumes that space is available and that the alternate detention facility is not similarly impacted by the crisis situation.

- Transportation: Even if the facility is intact and officers are available for duty, plan for scenarios in which transportation lines are unavailable. If roads are closed or vehicles are unavailable, officers may not be able to get to work. Likewise, consider the possibility of gasoline

- Shortages, or an unavailability of fuel, which would be detrimental to patrol and other operations. While this could stem from a variety of circumstances, the unavailability of necessities due to slowdowns in production and transportation is a common theme of discussion in pandemic preparedness.

- Communication: Depending on the type of disaster, communication lines may be partially or completely inaccessible. Likewise, communication operations (e.g., 911 center and dispatch) may have to be relocated. NIMS standards specify that communications should be interoperable and portable, a key lesson learned from past events.

- Cross-Training: Delegation of authority is a key component of COOPs. But, in planning delegation of authority, particularly when focusing on mission essential functions, it is important to consider cross-training – both in the context of who currently has it and who should get it, particularly when necessary to ensure continuity of specialized operations. For instance, there may be only a small number of persons in an agency prepared to assume the role of emergency response team commander, crime lab supervisor, digital forensics examiner, budget director, etc. As a result, COOPs should be informed by a realistic, rather than idealized, assessment of the feasibility of delegating authority in mission essential areas and how to proceed if personnel are unavailable or unable to come to work.

- Families: Evidence suggests that role abandonment, in which public service employees abandon their assigned posts in crisis situations, is rare. When it does occur, caretaking for family members is a significant reason and, even without role abandonment, it is natural for first responders to be concerned about their families. Advanced planning can help to address these concerns. For instance, the Fraternal Order of Police has developed the Law Enforcement Families Readiness Initiative, including recommendations for officer family readiness and a model policy.

- Stress: Any emergency situation has the potential to induce stress, but this can certainly be magnified if agency personnel have to deal with two crises at the same time – one as the precipitating event for which an emergency response is required and the other as a disruption of normal operations, services, facilities, and so on, requiring implementation of the continuity plan. While COOP training and exercising can increase familiarity with procedures and reduce uncertainty, it remains important to be aware of the impacts of stress. Particularly in the aftermath of the incident, it is important to be aware of the possibility of critical incident or post-traumatic stress and to have resources available for personnel experiencing stress-related symptoms.

# Building Leadership Capacity: The Current Crisis of Leadership, Overtime, Promotions, and Police Absenteeism

The most persistent challenge to the Reform and the implementation of the Agreement today is the current crisis of leadership and management affecting the PRPB and the lack of direction in the implementation of Act 20 of 2017.  This crisis has created tremendous uncertainty in all ranks of the PRPB.  News coverage and social media debates continue to document the inner struggles of a police department in crisis and how this mayhem at the top is affecting the rank-and-file and the public safety of Puerto Rico in very concrete ways such as the lack of enough available police officers during the holiday season.  This crisis is further accentuated when the TCA is regularly excluded from any discussion pertaining to the implementation of Act 20 in relation to

the PRPB.  In past reports, the TCA has documented the inherent problems with the implementation of Act 20.

The old themes associated with this leadership in turmoil are still recurrent in the aftermath of this national crisis.  The TCA continues to see problems associated with promotions, unexplained personnel transfers, questionable overtime practices, and failure to take actions against officers with dubious disciplinary records.

When the TCA refers to an old theme, a pervasive crisis that does not go away, the facts are there.  This is what the TCA wrote in his first six-month report of December 2014 regarding these matters:

> "Notwithstanding this overall level of commitment [of the PRBP to the Reform], the TCA has identified an important area of concern that could be considered a particularly local one, and separate from the Reform, which could assume a much larger role in the reform process.  The TCA feels compelled to address matters pertaining to the compensation of police officers, including overtime and sick leave which have been fraught with delays, and have created a mood of cynicism among the police rank and file, whose acceptance and effective cooperation with the Agreement is crucial to the success of the Reform, even though the above important matters are not expressly addressed in the Agreement.  The above situation is having a negative effect on morale, and the TCA has at times observed work slowdowns and increased sick leave to call out the predicament in a form of possibly impermissible protest.  PRPB is well aware of these challenges and is working with the Office of Management and Budget (OMB) attempting to solve said issues.  The TCA is of the opinion that if the above salary related matters are not resolved in the near future, the addressed situation in all likelihood will have an adverse effect on the Reform.[61]

In subsequent reports, the TCA noted that, although he was cognizant these important matters were not explicitly addressed in the Agreement, they deserved attention for their broader implications.  Thus, for example, the lack of proper overtime compensation was having a negative effect on morale.  The TCA observed first-hand and received reports of work slowdowns and increased sick leave in the past, although they did not reach the levels that we have seen during the recent holiday season where there were precincts

---

[61] SIX-MONTH REPORT OF THE TECHNICAL COMPLIANCE ADVISOR, JUNE 6 – DECEMBER 6, 2014, p.7

that were not in operation.  The TCA has also observed the inability of the leadership in all its ranks, from the Secretary of the Department of Public Safety to the Area Commanders, to address this crisis.  In his capacity also as monitor of the federal consent decree on overtime disputes, the TCA has concluded that, although these controversies were for a while being partly addressed by the PRPB, the situation has reached a breaking point that is hurting the implementation of the reforms associated with the Agreement.

In the past, these matters reached the courts.  The case regarding the unpaid overtime compensation of PRPB members was before the consideration of the United States District Court (Thomas E. Perez v. Puerto Rico Police Department and Commonwealth of Puerto Rico, et al., USDC-PR, Case No. 16-2849 (GAG)).  These days these matters have also reached the public opinion, the streets of Puerto Rico, and the empty halls of the police precincts.

When the Police Commissioner informs the TCA in his dual capacity as TCA and federal monitor of the overtime consent decree that the PRPB was to receive more than $3 million from FEMA, the question is what happened to that money.  During the meeting with the Commissioner, she communicated to the TCA that she intended to utilize $500,00 for overtime and the remainder for compensatory time until she was instructed that she could not spend any of this money for overtime.  Therefore, the relevant question remains of who told the Police Commissioner that she could not spend that money that she has received from FEMA for that purpose.

There is no question that issues of compensation and overtime have caused morale issues within the PRPB and are the drivers of the current police slowdown and police absenteeism.   This has also created significant problems for former Commissioner Fraley that did not have the tools to both address personnel issues and the fight against crime.  She could not pay her police officers and without police officers performing their work she cannot prevent and fight crime.  This is happening while the records show that police officers providing protection to the Secretary of the Department of Public Safety are receiving significant overtime payments.  This is a fact that is well known to police officers and the public because it has received extensive media coverage.

Another example of a broken chain of command was during the demonstrations of May 1st, 2017.  The evidence here is based on extensive testimony the TCA received from the Police Commissioner, Colonel Salva, and other high-ranking officials coordinating

the police response to the demonstrations.  On May 1st, 2017, Mr. Hector Pesquera - at present, Secretary of the Department of Public Safety ("DPS") but then a civilian - was not part of the Chain of Command in charge of handling the PRPB activities related to the Workers' Day event.  By May 1st, 2017, Mr. Hector Pesquera had been appointed by the Governor as the Public Safety Secretary, but had not been confirmed by the Senate.  However, the evidence shows Mr. Pesquera was in police headquarters giving orders to personnel under the supervision of the Police Commissioner, including Colonel Salva and others, in the presence of the Police Commissioner.

One of the officers who received instructions from Secretary Pesquera and questioned his authority was Colonel Roberto Salvá.  Colonel Salva was promoted by the current Police Commissioner and his appointment was signed by the Governor.  However, the Governor has since voided and nullified that appointment.  The matter is now being litigated in court.

The TCA submits that it is no longer open to discussion that the Police Commissioner does not have the direct authority and total command and control of the PRPB operations which is required under the Agreement.  Consequently, there are no longer doubts that this crisis on the top of command chain is clearly affecting the implementation of the Agreement by creating an environment of uncertainty, mistrust, and polarization of the ranks. That the current management structure is not working well has been clearly established during this reporting period, <u>the result must be an intervention that restores clear lines of leadership and management within the PRPB</u>.

# Building Community Trust Capacity: Findings from the Second Community Survey (Paragraph 241)

In keeping with the responsibility of the TCA consistent with Paragraph 241, the TCA submitted to the Court and the Parties his second survey of the community during this reporting period.  This survey provides a better understanding of the police through the lenses of the community.  This survey is based on in-depth discussions with diverse community groups.  The methodology was a typical focus group study.  These groups included   representatives   of   traditionally   underserved   and   underrepresented

communities in Puerto Rico, such as blacks, LGBT, Dominican, Homeless, and public housing residents among others.

Paragraph 241 of the Agreement establishes that in assessing the PRPB's overall compliance with and the effectiveness of this Agreement, the TCA shall conduct a reliable, comprehensive survey of members of the Puerto Rico community regarding their experiences with and perceptions of PRPB once during the first three years of this Agreement and annually thereafter. The community survey should be statistically valid, based on a sound methodology, and conducted by an independent entity.  This community survey shall include measures to ensure input from individuals of each demographic category.  The survey shall also assess the number and variety of community partnerships with PRPB and the depth and effectiveness of those partnerships. Specifically, the survey shall:

a) include interviews with a random sample of residents of Puerto Rico, PRPB officers, and detainees arrested by PRPB within the past week;
b) ensure the anonymity of all interview participants; and
c) survey participants regarding community-police relations; PRPB's integrity, effectiveness, and service; and how it treats members of different demographic groups.

The Agreement required that the TCA conduct a survey of these three populations by an independent entity measuring and reporting on the experiences and perceptions of these groups on police-community relations. The persons and groups surveyed consisted of residents, detainees, and PRPB members. The first survey began on Aug 14, 2015 (resident survey), and the last survey was completed on April 12, 2016 (detainees).

The TCA expanded the survey to all sectors of the community by using focus groups. This methodology provides an in-depth analysis of people's concerns, fosters continued dialogue with the PRPB, and facilitates the design and implementation of remedies to address concerns.  Specifically, the survey and focus group experts will speak with members of the LGBTQ, Dominican, Chinese, and homeless communities, and CIC representatives to aid the PRPB to use all survey findings to increase their interaction with all communities, consistent with Paragraph 205 of the Agreement.  The TCA will incorporate new groups into the dialogue as they are identified.

These surveys provide the baseline that the TCA will use to determine PRPB's ability to effective engage with the community and increase the public's trust on the work of the police.  These surveys are used to determine strengths and weakness in the area of fairness and legitimacy that structure the Agreement.

The survey undertook a study based on the collection of qualitative data of eight (8) communities in Puerto Rico from homogeneous focus groups.  Through the study, the focus groups were involved in a qualitative research designed to study the opinions or attitudes of the eight groups.  They met in small groups of 6 to 12 people assisted by a moderator and researcher or analyst.  The moderator will provide questions and lead the discussion on the Agreement and the intended reform of the PRPB. These activities related to the focus groups gave continuity to the first surveys in accordance with Paragraph 205, as well as measuring progress as defined in the Action Plans.

Dr. Richard Blanco Peck, the consultant of the TCA, was responsible for the activities related to the focus groups which includes the writing of the final report.  The focus groups had the opportunity to review and make recommendations to the moderator about the questionnaires used to survey the community and other relevant matters.  In these focus groups, the participants were asked about the following areas of the Agreement: use of force, searches and seizures, equal protection and non-discrimination, interaction with the community and public information, administrative complaints, internal affairs, and discipline.  The survey will soon be made available to the public.

The International Consortium of Political and Social Research of the University of Michigan has ranked the summary and findings report about the three surveys.  Of 548 studies, the report is ranked number 10 for Puerto Rican issues.  Of 1,640 studies on policing, the report is ranked number 64.  Finally, of 3,744 surveys, the report is ranked number 103.

# Building Civil Rights' Protection Capacity (I): Report on the Police Response to the Mass Demonstrations of April and May 2017

Under Paragraph 227, the TCA "<u>shall conduct</u> the reviews specified in this Agreement; shall review PRPB policies, training material, protocols, and programs developed and implemented pursuant to this Agreement; <u>and conduct such additional audits, reviews, and assessments as the TCA or the Parties deem appropriate, or the Court, consistent with this Agreement and the dismissal order.</u>"

Pursuant to instructions of the Court, Docket 511; ***"ORDER CLARIFYING MAY 22, 2017 SECOND PUBLIC HEARING AGENDA AND SCOPE OF HEARING ON APRIL 19, 2017,"*** the Court issued an order setting the agenda for the May 22, 2017, public hearing, to be held in Ponce, Puerto Rico. (See Docket No. 509) During the public hearing, the Court took judicial notice that, since this order, several incidents had occurred during mass demonstrations and protests involving the police and protesters. They included the April 18, 2017 events at the capitol building, as well as the April 25, 2017 events at the foundation of former Governor Sila M. Calderón. The Court also noted that the TCA had indeed observed and received information regarding said incidents.

At the public hearing, the Court ordered the TCA to <u>conduct an assessment</u> of the demonstrations and incidents that occurred at the Capitol building on April 18, 2017, and April 27, 2017, the incident that occurred in "Centro Para Puerto Rico" on April 25, 2017, and the events and incidents that took place throughout May 1, 2017 (Worker's Day).  In the report to the Court, the Court instructed, the TCA were to submit the corresponding assessment and the necessary recommendations to the Court and the Parties.

As per Court instructions, the focus of the assessment should be on the PRPB's compliance with the Agreement and the laws protecting the citizens of Puerto Rico and their civil rights and liberties pursuant to the Constitutions of the United States and the Commonwealth of Puerto Rico.  This assessment was to pay special attention to the PRPB's policies and trainings on policing of mass demonstrations, command and control, as well as communications and the use of Information Technology ("IT").

In December of 2017, following Court's instructions, the TCA submitted to the Court and the Parties a draft assessment report on the demonstrations and incidents in April and May of 2017.  Given that the assessment draft report is under review by the Parties, this Report identifies the methodology used, the timeline, the main themes of the draft report, and an issue – the cooperation of the PRPB with the requests for information made by the TCA - which is separate from the assessment report.

The Methodology used in this assessment report consists of the following:

- Interviewing members of the Puerto Rico Police Bureau (PRPB), members of organizations that participated during some of the events as observers, and individuals having pertinent information in relation with the previously mentioned events.
- Reviewing and analyzing all available video recordings and photographs to verify the accuracy of the information provided by the interviewed individuals.
- Reviewing and analyzing all available documents, reports and forms prepared by the PRPB.
- Reviewing and analyzing the PRPB Self-Assessment reports.
- Reviewing best practices and standard at National level.

The TCA instructed Investigations Consultant (IC) Jose L. Pujol to conduct the Court ordered assessment and to report on his findings.  IC Pujol based his work on:

- His law enforcement training and experience as a federal Special Agent for approximately twenty-one (21) years.
- His knowledge as Federal Defensive Tactics Instructor (certified in 1997 by the Federal Law Enforcement Training Center located in Glynco, Brunswick, Georgia).
- The Agreement for the Sustainable Reform of the Puerto Rico Police Department (See Enclosure # 73)
- The Puerto Rico Police Bureau's General Orders (See Enclosures #10 through 19).

| TCA Seventh Semi-Annual Report | 2018 |
|---|---|

The assessment was conducted from May 15, 2017 through December 2017.  As of the time of filing of this Interim Report, the Parties have completed their review of the draft assessment.  The Report will be filed on January 31, 2018, with the Court.
During the Assessment:

- More than 300 hours of work were dedicated to the investigation and report-writing
- Large numbers of interviews were conducted involving members of the PRPB, members of Organizations that participated during some of the events as observers, and individuals having pertinent knowledge related to the four events covered by the Assessment.
- A significant number of video-recordings were reviewed and analyzed.  These video recordings were obtained from the internet from the internet and publicly aired local TV stations.  IC Pujol also reviewed edited videos received from the PRPB.  Finally, IC Pujol reviewed video recordings made by a local TV station, who allowed IC Pujol to review and analyze their video recordings.
- Hundreds of PR Police Bureau's reports were reviewed and analyzed.

To the extent possible, the draft report and its assessment on findings has not reflected the opinion of the TCA, the TCA's Office, or IC Jose L Pujol.  It has reflected the evidence obtained (whether oral, by video, or by accessing documents) by IC Pujol, and the results of the analysis made of the totality of the evidence.

In terms of main themes, the draft assessment report focused on the use of force and its reporting (in particular, use of chemical agents), arrests, the use of operational plans, coordination with the event's organizers, and issues regarding the chain of command. The draft report also documented inconsistencies in reporting and the PRPB's failure to comply with the TCA's requests during this assessment.

In this Report, it is appropriate to discuss PRPB's lack of cooperation with the TCA and the PRPB''s failure to comply with the TCA requests for documents and information. Matters of access to records and personnel by the TCA are regulated by the Agreement.[62]  Two Paragraphs are particularly poignant.  First, Paragraph 263 states that "PRPB shall ensure that the TCA shall have full and direct access to all PRPB and UCCJ staff, employees, and facilities that the TCA reasonably deems necessary to carry out the duties assigned to the TCA by this Agreement."  Similarly, under

---

[62] See Paragraphs 262 to 270: Access and Confidentiality.

Paragraph 264, "PRPB and UCCJ shall ensure that the TCA has full and direct access to all PRPB and UCCJ's documents and data that the TCA reasonably deems necessary to carry out the duties assigned to the TCA by this Agreement, except any documents or data protected by the attorney-client privilege."

Here this Report highlights four examples of the PRPB's failure to comply with the TCA requests:

1. On June 1, 2017 and August 19, 2017, IC Jose Pujol requested in writing to the PRPB for copies of the PPR-854 (Use of Force) forms related to the four events covered by the Assessment (April 18, 25 and 27, 2017 and May 1st, 2017).  The PRPB refused to provide copies of these forms but allowed the forms to be reviewed by IC Pujol.

2. The TCA submitted a written request to the PRPB on July 17, 2017, requesting copies of all the video recordings in possession of the PRPB in relation to the four events covered by this Report.  A PRPB officer acknowledged receipt by signing the request.  When IC Pujol delivered the request, the PRPB officer verbally informed that the PRPB had "lots of videos" ("montones de videos").  In several occasions after such day, the TCA office spoke to the same police officer and reminded him of the request for the video recordings, and his responses were always evasive.  IC Pujol was so persistent with this request, that on 08/16/2017, the police officer provided to IC Pujol a computer disk (DVD) containing several video recordings.  The officer stated that they were the video recordings pursuant to the TCA's request.

When IC Pujol reviewed the video recordings, it was rapidly noticed that all the TCA was provided with were video recordings made by reporters of local TV stations, and video recordings downloaded from the internet (Pulso Estudiantil, Dialogo UPR).  The PRPB officer did not deliver videos recorded by CRADIC or the PRPB.

The TCA finds this fact as a deceitful response to the official request.  The TCA submits that having been provided in a timely fashion with all videos recorded by the PRPB would have helped to present a more complete and accurate draft report.

On 12/01/2017 the PRPB provided copies of nine DVDs to the TCA, all related to the mentioned above events.  These recordings show and corroborate most of the information already provided in other recordings.  However, one of the DVDs, appears to have been edited.  This DVD contains one single file that has recordings made from multiple different locations, and it contains several clearly visible transitions, and in other instances has images' even overlapping each other.  All these facts clearly suggest that this file may have been created with a video editor software. Additionally, two of the other remaining eight DVDs provide multiple video segments which are identified with the sequence number that the video recorder device has assigned to each of them.  These two DVDs are missing several video segments according to the sequence number that the video recorder device assigned to all the segments.

These facts cast doubts on the video recordings that the TCA received, and it could be questioned if they represent only part of the incidents recorded that day by CRADIC.

On December 7, 2017, pursuant to a request of the TCA, the PRPB agreed to offer for interview agents assigned to the CRADIC unit that had been working on the May 1st events providing crowd control at the "Milla de Oro" location.  The TCA interviewed an agent and his supervisor, both assigned to CRADIC.  Present at the time of the interviews for the TCA office were TCA Arnaldo Claudio (via telephone line), IC Pujol, as well as Counsels Federico Hernandez Denton and Antonio R. Bazan.  Representing PRPB was Counsel Joel Torres of the Commonwealth Department of Justice and a police supervisor of the Reform Unit.

During the two interviews, the TCA encountered discomforting contradictions and discrepancies between both interviewees on issues of upmost importance to the credibility of this visual evidence.  This presents a very serious concern about the possible inability of CRADIC to present their recordings as evidence during any legal process related to these events.  These interviews continue to cast a doubt on the video recordings that were received by the TCA office, and it could be questioned if they represent only part of the total video footage recorded that day by CRADIC.

3.  IC Pujol took a small, but a relevant, sample of five (5) Police agents who participated in the events covered by this Assessment.  These five Police agents were reported as having made Use of Force during the April 25, 2017 event.

On July 17, 2017, a written request was made to the PRPB requesting all trainings in which these five agents participated during the last three years.

Despite numerous communications and reminders, this information has not been provided to the TCA as of the writing of this Report.

4. On June 1, 2017, July 17, 2017, and September 5, 2017, IC Pujol requested to the PRPB for copies of the complaints submitted against PRPB agents in relation to the four events covered by the assessment draft report. The PRPB informed that they only received one civilian complaint which is related to the April 18, 2017 but that at this time, the same still is under investigation. At present, the review of these complaint has not been allowed by the PRPB. This fact was made known on November 14, 2017, to personnel of the USDOJ, the Puerto Rico Justice Department, the PRPB, and to the TCA and his Constitutional Attorneys.

On November 17, 2017, the PRPB e-mailed a report titled "INVESTIGACION ADMINISTRATIVA, RE: QUERELLA N.I.A. 2017-01-03-00087" in which they informed that a person complained that, during the April 18, 2017 event, a police officer use force. According to a PRPB internal document, the complaint is still under investigation pending photographic and video evidence. On 11/28/2017, IC Pujol e-mailed to the PRPB a copy of a photograph which very likely depicts the police agent just before he used force.

In the draft assessment report, the evidence gathered to date identifies significant gaps and inconsistencies between the statements and the documents provided by the PRPB. For example, there are inconsistencies in the number of police officers injured, the number of use of force incidents reported, and the weapons used by officers. In addition, the evidence shows, after reviewing PRPB's own reporting of the incidents, that the uses of force incidents by members of the PRPB were allegedly underreported.

In response to the TCA report and their own self-assessment, the PRPB concluded – and the TCA agrees - that four changes must be implemented immediately:

a. Need to design a comprehensive work plan that complies with the provisions of General Order 625, that allows to anticipate possible events that may occur to develop specific strategies to take the necessary and effective actions.

b. Need to train high ranking officers in strategies, tactics, negotiations and distribution of resources for the handling of incidents, crowd control and constitutional activities, knowledge needed to be able to act as an Incident Commander.

c. Need to train all police officers in the updates of the General Order Chapter 600, Section 625, titled "Crow Control" and perform practical exercises in simulated scenarios that allow them to apply the knowledge acquired and clarify doubts.

d. Review General Order 625, to re-evaluate several aspects necessary to achieve greater effectiveness in the handling of critical incidents and establish uniformity in the documents that must be completed to demonstrate and justify the procedures used in each event.

# Building Civil Rights' Protection Capacity (II): Findings on SARP Evaluation

The TCA interviewed the SARP (Superintendency for Professional Responsibility) leadership on January 23, 2018 in order to gain a better understanding of the effects of Hurricanes Irma and Maria on the operations, organizational management, and the process related to the investigations and assessment of complaints filed on police personnel.   The following document illustrates some of the highlights and findings related to this assessment.

Preparing for Hurricane IRMA:

When Hurricane Irma formed and Puerto Rico was placed on notice that it would likely make landfall or affect the Island, the PRPB and in particular SARP, were activated following the emergency plan.  They were given approximately 2 or 3-day notice. This affected the manner in which SARP operated as most of the personnel was deployed to

support patrol and related functions.  That is, SARP investigators were asked to conduct patrol and engage in the preparation effort.  It should be noted that the administrative component of SARP continued to function during the emergency deployment as critical and essential management personnel remained in place.

SARP reports that during the days leading to Hurricane Irma, the intake process of all complaints continued.  That is, regional offices where SARP personnel is deployed continued to receive complaints from the public on police personnel.  The Puerto Rico Police Department SARP headquarters in San Juan was no exception. That is, they also continued to receive complaints.  Notwithstanding, the actual "processing" or "investigation" of these complaints was paralyzed as the designated personnel usually assigned to these tasks were supporting patrol and emergency preparedness.

During the interview, SARP acknowledged that the 5-day deadline to process complaints was in fact negatively affected by the lack of personnel in place in order to process cases.  Although the TCA found it encouraging that SARP leadership communicated with all SARP personnel during this stage of the emergency preparedness process, it is unfortunate (and perhaps a lesson to be learned and implement in future events), that SARP failed to draft and implement a "readiness policy" which would allow for all SARP personnel throughout the island to have in place (and follow) a particular protocol as to what to do with regards to the intake, investigation, and filing of cases before, during and after a hurricane or related natural event.  This would likely provide SARP personnel throughout the island, in the event of failure of communication devices, to follow a protocol in an effort that such behavior becomes an institutional "muscle reflex" type of response to natural disasters.

The SARP leadership reported that it has no knowledge of any complaints or files lost before, during or after Hurricane Irma among all SARP personnel deployed throughout the island.

It should be noted that SARP reports as having 173 employees with 29 assigned to internal affairs type investigations, 19 to discriminatory claims, 8 inspectors, 15 to administrative tasks, 88 to administrative investigations and 23 to FIU. Some of these individuals have multiple assignments; hence, the reason why the total of assigned personnel may constitute beyond the number of total employees.

Hurricane IRMA:

During the hurricane period, SARP indicates the filing of complaints continued.  In fact, they estimate that approximately 20 to 25 percent of all complaints were filed during the period leading up to and during Hurricane Irma.  The SARP leadership explained in terms of an investigator who left on his/her desk 10 complaint files on the days leading up to the Hurricane, and when they returned a few days later, this individual found an additional 10 to 15 complaint files; totaling 20 to 25 files to investigate.  The reason why the complaint filing process continued despite hurricane preparedness and its effect on SARP personnel, is that the complaints, when filed regionally, do not require for an initial sit down or interview of the complainant by a SARP investigator.  That is, the complaint can be filed by anyone through the completion of an initial form readily available.  In addition, most regional SARP personnel was still able to submit these forms electronically to the SARP headquarters office, within 2 or 3 days from the original day of submission. This process was largely not interrupted by Hurricane Irma.

Post-Hurricane Irma and Pre-Hurricane Maria:

The period ending the threat and effects of Hurricane Irma was short lived in light of the fact that Hurricane Maria was announced to likely impact Puerto Rico only a few days after Hurricane Irma's threat had diminished.  Given this, similar protocols to the ones leading up to Hurricane Irma, were followed by SARP personnel.  That is, administrative personnel remained at headquarters, and all SARP investigators and remaining personnel were deployed to support the hurricane preparedness efforts, following the directives of the police commissioner.

Hurricane Maria:

On September 20, 2017, Hurricane Maria's impact was felt throughout the island.  The devastation and impact on the island was of epic proportions.  Although historians will likely one day designate Hurricane Maria as a historical event that changed the lives of all Puerto Ricans living inside and outside the island, it is clear that the hurricane had a dramatic impact on the daily operations of the Puerto Rico Police Department and SARP specifically.

| TCA Seventh Semi-Annual Report | 2018 |
|---|---|

Post-Hurricane Maria:

Although all SARP personnel were asked to support the general police efforts during the hurricane, the key administrative SARP personnel returned soon after the hurricane winds ceased, to the police headquarters to assess the damage and determine their ability to function.   The local SARP personnel were given instructions by SARP administration (prior to the hurricane) to report to their local town's police commanders and districts in order to support local police efforts.  The SARP commander engaged in the task of identifying the location of his regional personnel as well as assess the health and damage affecting regional and local SARP personnel. Following the commissioner's directives, SARP began to provide assistance, where needed, to those members of SARP who were financially or physically affected by the Hurricane.

It should be noted that all communication devices were not functioning.  Satellite phone services were not working as well as internet, electricity or running water in local and regional buildings.  In the words of a SARP administrator, "*it was as if an atomic bomb had landed in the middle of the island*".

In terms of the ability that SARP had to function, it was simply very limited.  However, following the commissioner's directives, the SARP administration began to prioritize investigations that were deemed as "critical".  That is, those investigations that involved high ranking members of the police force and those whose claims were deemed as "very serious".   Given the shortage of personnel, some of the regional SARP investigators were asked to report to headquarters in San Juan in order to provide assistance on the processing of these "critical" cases.  That is, a total of 20 regional SARP investigators reported to headquarters to follow up on approximately 5 to 10 "critical" cases.

When asked if the "nature" of the complaints filed during and after Hurricane Maria, changed, the SARP administration holds that the nature of the cases filed did not seem to be affected by the Hurricane.   However, there seems to be an apparent increase of cases filed by police officers, after the hurricane, on fellow officers or supervisors.  The type of complaints filed after the hurricane on police officers by fellow officers included abandonment of service, insubordination, and similar behaviors.   Although one can speculate as to why this is the case, the SARP administration seems to adhere to the theory that it must be due to the "stressors" caused by the hurricane on police officers, who were asked to ignore their personal sufferings for the sake of providing security and rendering aid to their fellow citizens.

When asked, SARP indicated that it did not deploy its personnel in conjunction with outside police agencies that came to the island in order to render assistance.  When questioned on whether or not any complaints had been filed on a police officer or agency that came from the United States to provide assistance, the SARP administration indicated that it was aware of only one complaint filed against a state trooper from police agency outside of Puerto Rico (not specified) and the Puerto police officer that accompanied him. The nature of the complaint had to do with the state trooper's alleged rude behavior towards a citizen.  Due to jurisdictional issues, SARP submitted the complaint and its investigation to the commissioner who in turn, contacted the police agency administration and reported the incident.  SARP also made it clear that the accusation made against the PRPB officer was based on the fact that he was next to the state trooper; therefore, no disciplinary action was taken against him.

As a matter of protocol, all SARP regional personnel were given instructions that given the communication challenges in the island, post Hurricane Maria, if a complaint was filed at a regional police station, and if SARP personnel was not in place, such complaint should be sent immediately to the closest regional police station that had a SARP investigator in place.  Once the SARP investigator receives the complaint, it is sent to headquarters. However, given the absence of internet, the electronic submission was not possible.  However, the files submitted regionally, were reported as having made their way to headquarters eventually.

Current Status of SARP Operations:

Currently, SARP reports to being in working almost at its full capacity. The regional officers of Fajardo, Aguadilla, and Humacao are still affected in terms of electricity and the ability of its SARP personnel from being able to electronically submit the complaints to headquarters.  Absent those three regional offices, SARP is operating at its capacity. However, during the interview, it became clear that the SARP administration is very concerned about its ability to continue to operate in an effective manner (i.e., observing the reform related timelines on investigations), considering the additional cases that were filed during the time of the hurricanes, which simply accumulated at a time when SARP personnel were assisting general recovery efforts.   This has the tendency of placing SARP personnel in direct contact with people that may have a dispute against them or simply may file a complaint against a member of SARP; therefore, presenting the possibility of being forced to remove such personnel from SARP while the investigation is being conducted.  In short, this practice unnecessarily exposes SARP personnel while potentially affecting the ability for them to continue their duties.

| TCA Seventh Semi-Annual Report | 2018 |
| --- | --- |

There have been efforts to assist the workload such as the issuance of a memorandum by the SARP commander, where he indicated to SARP personnel suspending deadlines and timelines in place prior to the hurricane, until January 8, 2018.  However, currently there seems to not be a relief in sight as SARP personnel continue to be asked to provide assistance in crime prevention and related efforts. Therefore, causing for cases involving complaints to continue to add volume to an existing strained workload.  This will likely have an impact on the quality of investigations being conducted in the near future.

**The TCA recommends that the current practice of assigning SARP personnel to assist in any police related effort that falls outside of its scope of duties ends immediately.**   If the current practice continues, it will likely affect the attrition rate of SARP personnel.  In fact, SARP reports that currently, there are:

a)  Eight (8) transfer requests in place
b)  Two (2) SARP personnel who have left to other units within PRPB
c)  Five (5) SARP investigators in the process of retiring + one that recently resigned

This, according to the SARP commander, is an unusual trend for this particular unit. Thus, he expects that the effect of the current situation is that the workload will increase, and that additional strain will be placed on its personnel; causing for this trend to continue, if relief is not in place immediately.  Restated, the current transfers or departures noted earlier constitute 9% of the total number of employees currently assigned to SARP.

The current inventory and trend of cases filed and investigated by SARP is as follows:

Cases Filed:

a) Total number of cases filed from January 2017 to September 2017 is: 1,592
b) Total number of cases filed from January 2017 to December 2017 is: 1,987
c) Total number of cases filed AFTER Hurricane Maria (from September 20, 2017 to December 31, 2017) is: 395

| TCA Seventh Semi-Annual Report | 2018 |
|---|---|

This constitutes an average of 132 cases <u>filed per month since</u> Hurricane Maria; when compared to an average of 177 cases <u>filed per month before</u> Hurricane Maria

<u>Cases Investigated:</u>

a) Total number of cases investigated from January 2017 to September 2017 is: 869
b) Total number of cases investigated from January 2017 to December 2017 is: 1,088
c) Total number of cases investigated AFTER Hurricane Maria (from October 2017 to December 2017) is: 219.  Of these, 28 cases did not exist until after Maria.
d) Of the cases investigated since Hurricane Maria, 8 of them relate to discrimination and domestic violence.

<u>Current Inventory of Cases:</u>

a) Total number of cases assigned (January 2017 to September 2017) that are pending investigations: 648
b) Total number of cases assigned (January 2017 to December 2017) that are pending investigations: 899
*There was an apparent increase on the number of cases pending investigation (251 cases) from October to December 2017 (post Hurricane Maria)

<u>Training:</u>

On training, SARP reports that it had to make significant adjustments to the training schedule of all of its personnel throughout the island. Deadlines were extended and priority on the training schedule is being given to personnel who are pass their training deadlines.  The administration of SARP affirm that the training on all of its personnel started in early January and is expected to be continued throughout the year.  This includes shooting training at night, whose deadline was also extended given the personnel shortage caused by Hurricane Maria.  The TCA requested the training schedule and confirmation was given that this document would be given to the TCA at a later date, once completed.

| TCA Seventh Semi-Annual Report | 2018 |
| --- | --- |

Policies:

With regards to policies, SARP stated that general order 114 was already reviewed by SARP personnel and comments were provided to the Reform division of the PRPB. Further, SARP is pending final approval of the investigations manual in order to move forward with their training and directives, which will stem from this document.   In addition, SARP indicated that Reglamento 9001 (article 14 of the Police Manual), was ratified on August 29, 2017.   The SARP administration also confirmed that all of SARP personnel have been made aware of the new rules and regulations as soon as these are being confirmed and ratified.

Summary:

The TCA characterizes the meeting with SARP as being generally positive and is grateful for their continued cooperation. The highlights of this report relate to the notion that SARP is currently under a great deal of strain as it relates to the investigation and processing of cases given personnel shortage, personnel assignment to duties outside of SARP, and an increase of cases being filed which have accumulated during the months after Hurricanes Irma and Maria. The TCA acknowledges that SARP is experiencing challenges at this time and encourages for relief to be provided to this unit immediately in the form of no longer assigning SARP personnel to activities that fall outside of its duty; thus, giving them time to devote to catching up on the current case load.  The TCA also encourages SARP to develop a policy which relates to the form of operation of all field SARP personnel in the event of future natural disasters. This should involve the manner in which they will operate, communicate and file cases in case of power failure.  Finally, the TCA encourages SARP to develop a quantitative approach to keep record on the "typology" of cases filed. That is, keep record on the nature of cases specifically noting who filed the case (civilian vs. police), what offenses were claimed to have been violated, and how case was classified and assigned to a particular investigator.

# Section IV

## Projected Activities: Paragraph 205(e)

Consistent with Paragraph 250 (e), the TCA will continue to work in the upcoming six months providing technical assistance and review for the policies that the PRPB will submit in subsequent months.  The TCA will continue to provide support to the Police Academy while emphasizing on more comprehensive IT technical assistance.  The TCA will also work with the PRPB in the review of the pending and outstanding training modules.

Some areas of attention during the next six months are as follows:

1. Consistent with Paragraph 250 (e), the TCA will continue to work in the upcoming six months providing technical assistance and review for the policies that the PRPB will submit in subsequent months.

2. Will assess and report on the effect the police slowdown and police absenteeism has on compliance with the Agreement

3. Will work with the Parties on the implementation of a new framework for the Agreement in the aftermath of Hurricanes Irma and Maria, including technical assistance in the development of a recovery and resiliency plan as well as a Continuity of Operations ("COOP") plan

4. Will continue to provide support to the Police Academy while emphasizing more comprehensive IT technical assistance.

5. Will continue to conduct random visits to districts, precincts and units to determine that records relating to incidents of use-of-force have been prepared and completed.

6. Will conduct random visits to districts, precincts and units to determine whether the Supervisors of the PPR have conducted reviews and investigations on use-of force.

|

7. Will continue to monitor the implementation of the NIBRS policy. The TCA will review the production schedule and will interview IT staff to monitor it.

8. Will continue to support the implementation of Paragraph 13.

9. Provide support to the Court in the implementation and execution of Public Hearings.

10. Continue to provide technical assistance related to evidence rooms inspections.

11. Continue to implement next steps in the implementation of Paragraph 241

12. Continue to meet with stakeholders to ensure Reform information is properly disseminated and relations are developed.

13. Continue with the visits to the Zones of Excellence to assess progress.

14. Conduct ride-alongs to verify compliance with new established policies.

15. Continue to monitor the progress of the PRPB Information Technology Infrastructure development.

16. Continue to assess the progress of the Drug, Vice, and Illegal Firearms Division.

# Appendix 1

## A Message from the TCA
### [Interim Seventh Report: Docket No. 723 (01/26/2018)]

This is the Seventh Semi-Annual Report ("Report") of the Technical Compliance Advisor ("TCA") in the Agreement for the Sustainable Reform of the Puerto Rico Police Bureau ("Agreement").  It is an interim report during this period of national crisis in Puerto Rico, the unfortunate loss of life and the devastating destruction left behind by Hurricanes Irma and Maria.  The Report preliminary assesses the progress made toward implementing the Agreement by the Puerto Rico Police Bureau ("PRPB") prior to Hurricanes Irma and Maria.  It also reports on the current challenges to the sustainability of the Reform, and summarizes the work conducted by the TCA for the six-month period ending on December 9, 2017.

First and foremost, I want to acknowledge the outstanding work of the women and men of the PRPB who have provided safety, public order, assistance, and strength to Puerto Rico when it was most needed after the brutal devastations of the Hurricanes.  I want to recognize specifically the sacrifice of the two officers who died responding to Hurricane-related incidents and the bravery of the more than 150 police officers who lost their homes and continued to work while they were forced to relocate themselves and their families.  It is worth praising the sense of determination, sacrifice and duty of the members of the PRPB.  The progress made in the last three and half years has only been possible because of their outstanding work and dedication under very difficult and extraordinary circumstances.

Prior to September 2017, the PRPB continued to make progress - with some deficiencies which I discuss below - in building capacity, drafting and updating policies, conducting required trainings, and implementing the eleven Action Plans for the eleven compliance areas required by the Agreement.  However, the devastation left by these natural disasters has redefined the very idea of "capacity building" under the Agreement.  There are new and significant challenges that the Parties must attend to and prioritize.  In this endeavor, the TCA (with his Core Team and Constitutional Lawyers) is ready to support the Parties' efforts regardless of how significant and daunting a task it may be.

Immediately after the passing of Hurricane Irma and subsequently after the landing of Hurricane Maria, my office conducted a preliminary assessment of the situation on the ground. Members of my team and I visited many police installations; convened with and conferred with Area Commanders, police officers, staff personnel; inspected equipment and infrastructure; and conducted operational and administrative assessments to fully understand the gravity of the situation. The USDOJ joined us in several field visits. These visits included a thorough evaluation of the PRPB's Information Technology ("IT") infrastructure and operational capabilities.

In the first week of October, I provided the Court with a preliminary assessment. On October 4, 2017, the Court "ordered the Parties, with the assistance of the TCA, and ultimate court approval, to adopt a new framework" for the Agreement best fitting the new reality on the ground.[63]  During the months of October and November, my team and I reinitiated our regular monthly site visits and fieldwork conducting extensive assessments and baseline analyses of the PRPB's operational capacity after the Hurricanes.  These evaluations have been shared with the Parties.  The message of these reports is clear: after three and half years of capacity-building, there is much more that is needed from the PRPB to achieve real, effective capacity.  For example, the tactical radio communications system is at best mediocre with many officers still without a hand-held radio which could easily lead to unsafe police practices.  This item was presented to the PRPB more than two years ago.  As described in sections of this Report, issues remain about the standardization and interoperability of radio systems and their operationality under situations where there is no electric power.

During these post-storm visits, my team and I identified three specific areas where the PRPB's strategic and operational plans as drafted in the Action Plans must quickly adapt to the new prevailing conditions.  In prior communications with the Parties and six-month reports, I highlighted the lack of significant progress in two of these three areas.

In the aftermath of Irma and Maria, the first challenge is to undertake real, effective capacity-building in the compliance area of Information Systems and Technology.  It is apparent that the modest progress made in the last three and half years in terms of creating a reliable IT infrastructure for the PRPB has affected the operational and tactical response of the PRPB during and in the aftermath of these natural

---

[63] See: Docket No. 624.

disasters.  From a strategic vantage point, however, the PRPB should consider situation as an opportunity for a major "step function" modernization of the entire IT infrastructure.

The second area where the PRPB faces a significant strategic and operational challenge is the lack of development and progress in creating a robust and solid strategic staffing plan as required under Paragraph 13 of the Agreement.  During the aftermath of Irma and Maria, it is also apparent that the lack of a consistent staffing approach has limited the PRPB operationally and strategically.  These staffing limitations can be seen on post-storm developments involving police overtime and the ongoing police slowdown and/or absenteeism.  They are sadly developments that are likely to have a substantial effect on the PRPB's overall ability to deter crime.  Since the first six-month report, I have raised concerns that these matters (e.g., compensation, overtime, increased sick leave, impermissible protest by officers) will ultimately end up impacting on the reform process if left unattended.[64]

The third challenge for real and effective capacity building is the lack of well-thought out Continuity of Operations ("COOP) and Recovery and Resilience plans.  These are components of a capacity building strategy that I have recommended the Parties must add to the Action Plans and the Agreement.  Members of my staff have diligently worked with the Parties to recommend concrete steps towards the prompt implementation of these initiatives.

In the middle of this national disaster, I must unfortunately return to one of the themes that I mentioned in my prior reports.  The most persistent challenge to the Reform and the implementation of the Agreement today is the current crisis of leadership and management affecting the PRPB and the lack of direction in the implementation of Act 20 of 2017.  This crisis has created tremendous uncertainty in all ranks of the PRPB.  News coverage and social media debates continue to document the inner struggles of a Police Department in crisis and how this mayhem at the top is affecting the rank-and-file and the public safety of Puerto Rico in very concrete ways such as the lack of enough available police officers during the holiday season.  This crisis is further accentuated when the TCA is regularly excluded from any discussion pertaining to the implementation of Act 20 in relation to the PRPB.

---

[64] See: TCA Six Month Report (December 2014), 7.

The old themes associated with this leadership in turmoil are still recurrent in the aftermath of this national crisis. The TCA continues to see problems associated with promotions, unexplained personnel transfers, questionable overtime practices, and failure to take actions against officers with dubious disciplinary records. Similarly, it is no longer open to discussion that the Police Commissioner does not have the direct authority and total command and control of the PRPB operations which is required under the Agreement. Consequently, there are no longer doubts that this crisis on the top of command chain is clearly affecting the Reform by creating an environment of uncertainty, mistrust, and polarization of the ranks. That the current management structure is not working well has been clearly established during this reporting period, the result must be an intervention that restores clear lines of leadership and management within the PRPB.

In February 2017, with my team of legal advisors and law enforcement experts, I prepared a thorough and detailed report which was shared with the Parties and the Court on how Act 20-2017 (creating the Department of Public Safety) could impact and delay the implementation of the Agreement. In the referenced document, drafted after a meticulous study of the law, the TCA found obstacles and challenges that could affect the Reform and its implementation. Those concerns have been further accentuated by the events on the field. To date, the TCA is yet to be invited to a meeting of the Act 20 Implementation Task Force and the information that is often reported publicly, such as the changes to the Police Academy, just emphasize the concerns raised in prior documents and during public hearings.

In keeping with the responsibility of the TCA consistent with Paragraph 241, the TCA submitted to the Court his second survey of the community. This survey provides a better understanding of the police through the lenses of the community. This survey is based on in-depth discussions with diverse community "focus" groups. The methodology was a typical focus group study. These groups included representatives of traditionally underserved and underrepresented communities in Puerto Rico, such as blacks, LGBT, Dominican, Homeless, and public housing residents among others.

The TCA also submitted to the Parties and the Court his preliminary assessment of how the PRPB policed the mass demonstrations of April and May. The overall assessment is that the PRPB managed these incidents in a more professional manner than in the days prior to the Reform. Although the specific findings will be made public soon, there are two concerns which are worth discussing. The first finding is the disruption of the chain of command which exemplifies the concerns I mentioned earlier regarding the

implementation of Act 20. The second finding is that there are still significant challenges in the ability of the PRPB to document police-civilian interactions and police-involved incidents. It is also worth mentioning that the lack of cooperation of the PRPB with certain requests for information from the TCA reveals that the PRPB has not adopted fully the principles of trust and transparency.

Once again, the TCA must address the situation and infrastructure of the Police Academy. If the Commonwealth's position is that the financial commitment needed is beyond their control, then the financial bureaucracy of the Commonwealth should step in and ensure the PRPB is sufficiently funded to meet this challenge. Until the TCA sees meaningful effort to correct the Academy's situation, the Police Academy will remain outdated in its infrastructure to support meaningful reform.

There is a matter that is of great concern to the TCA. Although I have previously reported that the political transition that occurred in January 2017 did not affect the collaborative efforts of the Reform Unit and the TCA and that there were no significant personnel changes in the Reform Unit, this has been no longer the case during this reporting period. During this time, the PRPB removed Colonel Clementina Vega of her role as head of the Reform Unit. The TCA was never officially notified of this change. Neither the original monthly reports that the PRPB submits to the TCA of personnel transfers within the PRPB notified the TCA of this action. Under Paragraph 233 of the Agreement, the obligations of the PRPB are crystal-clear: "PRPB shall inform the TCA and USDOJ of any changes to Reform Unit staff, including suspensions, reassignments, and dismissals of personnel." Without entering to evaluate the merits of the transfer, the TCA is highly concerned with the apparent violation of the Agreement and the lack of transparency and information sharing stemming from the PRPB. To date, the PRPB has not provided the TCA with any justifiable explanation as to why the reports contained incorrect information and the TCA was not properly provided with a justification for the transfer. (Although the TCA was informed that Colonel Vega has been re-instated in her leadership role on December 22, 2017, the fact remains that the opacity of the PRPB and the alleged violation of the Agreement are disconcerting).

Given the preliminary nature of this Report and the absence of the PRPB's Status Report, the TCA has changed the format of the report when measuring compliance with the Action Plans. This Report will not contain tables that describe what the PRPB said they would accomplish and the TCA's reviews and observations assessing whether the PRPB achieved what they claimed. The TCA will return to this tabular design in subsequent reports as mandated by the Agreement.

TCA Seventh Semi-Annual Report | 2018

Finally, the TCA continues its open-door policy and raises with the PRPB community concerns that are often brought to the TCA's attention, while ensuring that the PRPB addresses those issues and concerns timely and appropriately.

# Appendix 2

## TCA Activities and Community Engagements

***Monthly meetings with the Parties***

- In accordance with Paragraph 253 of the Agreement, the TCA has conducted monthly meetings with all Parties during this period, for the considerations of the pending matters. Also, continuous written and telephone communications have been made on a regular basis to ensure the effectiveness and timely response to the situations regarding the status of implementation of the Agreement.

- During the past six months, the TCA has maintained constant communication with the Hon. Gustavo Gelpí, Judge for the United States District Court of Puerto Rico, for issues or situations that have required his intervention.

- Throughout this period, the TCA has conducted more than 25 meetings with different police agents *of the Puerto Rico Police Department (PRPB)*, for the attention of specific claims and/or complaints that have against the agency because of alleged violations to their administrative due process.

***Meetings and activities in accordance with Paragraph 254 of the Agreement***

Meetings with Puerto Rico Police Reform Unit:

- Meetings with Police Department Commissioner (August, September, October & November 2017)
- Meetings and communications with Col. Clementina Vega, Director of the Puerto Rico Police Reform Office, and other personnel of the PRPB.
- Monthly meetings with the Police Reform Unit designated personnel for the review, analysis and comments on the Action Plans presented by the PRPB.
- Meetings, conference calls and documents' presentation with review of the politics of the PRPB with the Reform Unit's professionals and/or with the USDOJ and PRDOJ for the analysis, discussions and technical support to the final drafts

of following Generals Orders, Policies, Actions Plans and PRPB Forms. Please see Table

- TCA Core Team meetings with Police Reform Unit and other PRPB units (August, October and November 2017)

Meetings with Puerto Rico Police Bureau representatives:

- Several visits to the Police Academy, and meeting with Col. Orlando Rivera and his staff (July, August, October and November 2017).
- Meetings with the head of SARP (August 2017)

Visits and meetings to Police Regional Headquarters and Police Stations and Specialized Units:

- TCA and Core Team visit to Aguadilla Police Headquarters (August 2017).
- TCA and Core Team visit to Mayagüez Headquarters (August 2017).
- TCA and Core Team visit to Aibonito Headquarters (July 2017).
- TCA and Core Team visit to Ponce Headquarters (August 2017).
- Visit to police Fire Range at Gurabo (August, October & November 2017).
- Core Team visit to Zone of Excellence Quebradillas (October 2017)
- Core Team visit to Zone of Excellence Utuado (July 2017)
- Core Team visit to Zone of Excellence Bayamón (July 2017)

Visits and Meetings to Police Specialized Units:
- CIC, Drugs and Narcotics Arecibo, Aibonito, Mayaguez and Aguadilla Units (July and August 2017)
- San Juan SARP Unit (July 2017)
- TCA Core Team Visit Command and Radio Control Center of Carolina and San Juan (July 2017)

Meeting and communications with representatives of the following Puerto Rico Police's associations and others worker's union:
- Ismael Rivera, Police Association (July 2017).
- Gregorio Matías, Police Organize Associations (July 2017).
- Diego Figueroa, Federación Unida Policias Organizados, (July and October 2017)
- Jaime Morales COPS (July 2017)

| TCA Seventh Semi-Annual Report | 2018 |
|---|---|

<u>Meetings with Community Leaders and other interaction community's activities</u>:
- Meeting with Tati Escobar Office of Advocate for Individuals with Disabilities (July 2017)
- Meeting with Cecilia La Luz from "*Centro Comunitario LGBTT*", Transgender Group (August, September & October 2017)
- Meeting with Modesta Irizarry, Loiza community leader. (Julu 2017)
- Meeting with Carmen Villanueva Community Leader (July 2017)

<u>Meetings with Reform Stakeholders</u>:

- Esq. William Ramírez, ACLU (August and September 2017)
- Dr. Richard Blanco Peck, University of Puerto Rico Public Administration Graduate School for the discussion and analysis and presentation of Paragraph 241 of the Agreement. (July 2017)
- Mari Mari Narvaez Espacios Abiertos (July 2017)
- Jose Rodríguez, Dominican Community Leader (July and August 2017)
- Roberto "Papo" Christian Community Leader (July 2017)
- Pedro Julio Serrano, LGBTT. (July 2017)
- TCA meeting with Honorable Judge Sigfredo Steidel Figueroa (July 2017)

TCA Seventh Semi-Annual Report | 2018

# Appendix 3

## List of Revised Policies

### June/2017

Orden General 600-612: Autoridad para Llevar a Cabo Registros y Allanamientos
General Order 600-612: PRPB Policy on Searches and Seizures

Orden General 600-620: Armas Especializadas de las Divisiones de Tácticas Especializadas (DTE)
General Order 600-620: Specialized Weapons of the Division of Specialized Tactics (DTE)

Orden General 600-623: Persecuciones Policiacas
General Order 600-623: Police Pursuits

Orden General 600-625: Manejo y Control de Multitudes
General Order 600-625: Management and Crowds Control

Manual Administración Sistemas Computadorizados
Manual for the Administration of Computerized Systems

Manual Uso y Manejo Sistemas Computadorizados
Manual for the Use and Management of Computerized Systems

Manual Operacional del Cuerpo de Investigaciones Criminales (CIC)
Operational Manual of the CIC

Orden General 500-503: Junta de Evaluación de las Divisiones Especializadas
General Order 500-503: Specialized Divisions Evaluation Board

OA-2015-IV: Orden Administrativa de Intervenciones Vehiculares
OA-2015-IV: Administrative Order on Motor Vehicle Interventions

Orden General 600-618: Uso y Manejo de Armas de Reglamento
General Order 600-618: Use and Management of Regulation Firearm
- Receipt for Regulation Firearm, Magazine, and Ammunition (PPR-121)
- Registration Checking In/Out of Rifles (PPR-924)

- Evidence of Payment for Depreciation of Firearm Lost or Stolen of a Member of the PRPB (PPR-925)
- Request for Service of Firearm (PPR-846)
- Receipt for Regulation Firearm (PPR-279)
- Additional Firearms Assigned to Members of the PRPB (PPR-444)
- Quarterly Inventory of Long Guns, Magazines and Ammunition (PPR-119)
- Repercussion for Non-Approval with Regulation Firearm (PPR-990)
- Certifications of Receipt of Firearm and/or Ammunition (PPR-384)
- Certification of Proof of Functioning Chemical Gas (pepper spray) (PPR-1009)

Orden General: Evaluación de Desempeño de los Miembros de la Policía de Puerto Rico
General Order: Performance Evaluation of Members of the Puerto Rico Police Department
- PRPB Form: Performance Evaluation
- PRPB Form: Performance Self-Assessment

Orden General 600-615: Autoridad para Llevar a Cabo Arrestos y Citaciones
General Order 600-615: Authority to Conduct Arrests and Issue Summons

Manual de Procedimientos Operacionales Estandarizados para las Divisiones de Drogas, Narcóticos, Control del Vicio y Armas Ilegales
Manual of Standardized Operational Procedures for the Divisions of Drugs, Narcotics, Addiction Control and Illegal Weapons

Orden General 600-626: Intervención con Personas Extranjeras
General Order 600-626: Intervention with Foreign Persons

Orden General: Cámara Corporal
General Order: Body Cameras

Glosario de Definiciones: Conceptos Básicos Legales de la Policía de Puerto Rico
Glossary of Definitions: Basic Legal Concepts of the Puerto Rico Police

**July/2017**

Orden General: Creación de la Unidad Motorizada en la Policía de Puerto Rico
General Order: Creation of the Motorized Unit in the Puerto Rico Police

Orden General 600-623: Persecuciones Policiacas

General Order 600-623: Police Pursuits

Orden General 600-625: Manejo y Control de Multitudes
General Order 600-625: Management and Crowds Control

Orden General 600-627: Investigación de Incidentes de Violencia Doméstica
General Order 600-627: Investigation of Incidents of Domestic Violence

Orden General 100-118: Funciones y Responsabilidades de la División de Violencia Doméstica
General Order 100-118: Functions and Responsibilities of the Division of Domestic Violence

OA-2016-4: Orden Administrativa Investigación de Incidentes de Violencia Doméstica Empleados de la PPR
OA-2016-4: Administrative Order for the Investigation of Incidents of Domestic Violence Employees of the PRPB

Orden General 100-113: División de Investigación de Incidentes de Uso de Fuerza (FIU)
General Order 100-113: Division of Incident Investigation of Use of Force (FIU)

Orden General 100-115: División de Delitos Sexuales y Maltrato de Menores
General Order 100-115: Division of Sexual Offenses and Child Mistreatment

Orden General 600-622: Investigación de Incidentes de Delitos Sexuales
General Order 600-622: Investigation of Incidents of Sexual Offenses

OA-2016-3: Orden Administrativa de Delitos Sexuales Cometidos por Empleados de la PPR
OA-2016-3: Administrative Order of Sexual Offenses Committed by Employees of the PPR
  • PRPB Forms-849 (849.1 to 849.7): Report of Incidents of Investigation of Sex Crimes
  • Brochure for the Confidential Line 343-0000: Rights of Victims of Sex Crimes

Orden General 500-503: Junta de Evaluación de las Unidades Especializadas
General Order 500-503: Evaluation Board of Specialized Units

Orden General 600-612: Autoridad para Llevar a Cabo Registros y Allanamientos
General Order 600-612: PRPB Policy on Searches and Seizures

| TCA Seventh Semi-Annual Report | 2018 |
|---|---|

Orden General 600-620: Armas Especializadas de las Divisiones de Tácticas Especiales
General Order 600-620: Specialized Weapons of the Special Tactical Divisions

Orden General 600-618: Uso y Manejo de Armas de Reglamento
General Order 600-618: Use and Management of Regulation Firearm

**August/2017**

Orden General 600-615: Autoridad para llevar a cabo Arrestos y Citaciones
General Order 600-615: Authority to carry on Arrests and Citations

Orden General 600-627: Investigación de Incidentes de Violencia Doméstica
General Order 600-627: Investigation of Incidents of Domestic Violence

Orden General 100-118: Funciones y Responsabilidades de la División Especializada de Violencia Doméstica de la Policía de Puerto Rico
General Order 100-118: Functions and Responsibilities of the Puerto Rico Police Domestic Violence Specialized Division

Orden Administrativa OA-2016-4: Investigación de Incidentes de Violencia Doméstica Involucrando Empleados de la Policía de Puerto Rico
Administrative Order 2016-4: Investigation of Domestic Violence Incidents Involving Puerto Rico Police Employees

Manual SAIC: Capitulo 7 - División de Investigaciones de Robos y Fraudes a Instituciones Financieras y Cooperativas
SAIC Manual: Chapter 7 - Investigation Division of Robberies and Frauds to Financial Institutions and Cooperatives

Reglamento de Estudiantes de la Superintendencia Auxiliar en Educación y Adiestramiento
Student Regulations of the Auxiliary Superintendence in Education and Training

Orden General: División Asuntos Confidenciales
General Order: Confidential Affairs Division

Orden General: Acceso y Manejo de los Sistemas de Justicia Criminal
General Order: Access and Management of Criminal Justice Systems

| TCA Seventh Semi-Annual Report | 2018 |
|---|---|

Orden General: División de Crímenes Cibernéticos y Normas para Solicitar, Intervenir y Procesar las Actividades y Equipos Electrónicos Relacionados con la Comisión de Delitos
General Order: Division of Cybercrime and Standards to Request, Intervene and Process Electronic Activities and Equipment Related to the Crime Commission

**September/2017**

Orden General: Comparecencia a los Foros Judiciales y/o Administrativos
General Order: Appearance to the Judicial and / or Administrative Forums

Orden General: Centro de Recopilación, Administración y Diseminación de Inteligencia Criminal
General Order: Center for Collection, Administration and Dissemination of Criminal Intelligence

Orden General 600-610: Grabación de Eventos Públicos
General Order 600-610: Public Events Recording

Acuerdo Colaborativo entre el Departamento de Justicia y la Policía de Puerto Rico en cuanto a las Advertencias Garrity
Collaborative agreement between the Department of Justice and the Police of Puerto Rico regarding the Garrity Warnings

Orden General: Normas y Procedimientos para la Implantación de Adiestramientos y Readiestramientos
General Order: Norms and Procedures for the Implementation of Training and Re-Training
  • PRPB Form: Corrective Action Plan

Protocolo: Evaluación Sobre el Cumplimiento de las Mejores Prácticas de Programas Operacionales
Protocol: Evaluation of Compliance with Best Practices of Operational Programs

Orden General 600-601: Reglas de Uso de Fuerza
General Order 600-601: Rules of Use of Force

Orden General 600-602: Uso y Manejo del Dispositivo de Control Eléctrico
General Order 600-602: Use and Operation of the Electric Control Device

Orden General 600-603: Uso y Manejo de las Armas de Impacto

General Order 600-603: Use and Management of Impact Weapons

<u>Orden General 600-604: Uso y Manejo de Agentes Químicos</u>
General Order 600-604: Use and Management of Chemical Agents

<u>Orden General 600-605: Informe e Investigación de Incidente de Uso de Fuerza</u>
General Order 600-605: Report and Investigation of Use of Force Incident

<u>Orden General Código de Ética</u>
General Order Code of Ethics

<u>Glosario de Términos de Uso de Fuerza</u>
Glossary of Terms of Use of Force

**October/2017**

<u>Orden General de Comparecencias a los Tribunales y Foros Administrativos</u>
General Order of Court Appearances and Administrative Forums

<u>Orden General de CRADIC</u>
General Order of CRADIC

<u>Orden General de Grabación de Eventos Públicos</u>
General Order for the Recording of Public Events

<u>Acuerdo Colaborativo con el Departamento de Justicia de Puerto Rico en cuanto a las Advertencias Garrity</u>
Collaborative Agreement with the Department of Justice of Puerto Rico regarding the Garrity Warnings

<u>Orden General 600-601:  Reglas de Uso de Fuerza</u>
General Order 600-601: Rules of Use of Force

<u>Orden General 600-602: Dispositivo de Control Eléctrico</u>
General Order 600-602: Electric Control Device

<u>Orden General 600-603: Uso y Manejo de las Armas de Impacto</u>
General Order 600-603: Use and Management of Impact Weapons

<u>Orden General 600-604: Uso y Manejo de Agentes Químicos</u>
General Order 600-604: Use and Management of Chemical Agents

Orden General 600-605: Informe e Investigación de Incidente de Uso de Fuerza
General Order 600-605: Report and Investigation of Use of Force Incident
- PRPB Form 854: Use of Force Incident Report
- PRPB Form 204: Use of Force Report
- PRPB Form 892: Daily Use Electrical Control Device.
- PRPB Form 900: Receipt Occupation Less Lethal Weapons
- PRPB Form 928: Daily Report of Incidents of Use of Force

Orden General 600-605: Informe e Investigación de Incidentes de Uso de Fuerza
General Order 600- 605: Report and Investigation of Use of Force Incident

Orden General Código de Ética
General Order Code of Ethics

Glosario de Términos de Uso de Fuerza
Glossary of Terms of Use of Force

Orden General: Evaluación de Desempeño de los Miembros de la Policía de Puerto Rico
General Order: Performance Evaluation of Members of the Puerto Rico Police Department
- PRPB Form: Evaluation Instrument

Orden General: Armas Especializadas de las Unidades Tácticas Especializadas.
General Order: Specialized Weapons of the Specialized Tactical Units.

**November/2017**

Orden General 600-617: Código de Ética de los Miembros del Negociado de la Policía de Puerto Rico
General Order 600-617: Code of Ethics of the Members of the Bureau of the Puerto Rico Police

Manual Operacional del Cuerpo de Investigaciones Criminales
Operational Manual of the Criminal Investigation Unit

Orden General: Citaciones y Comparecencias y Citaciones a los Foros Judiciales y/o Administrativos
General Order: Citations and Appearances and Citations to the Judicial and / or Administrative Forums

Reglamento Estudiantes de la Comisión Auxiliar de Educación y Adiestramiento
Students Regulation of the Auxiliary Commission of Education and Training

Orden General: Evaluaciones de Desempeño de los Miembros del Negociado de la
Policía de la Policía de Puerto Rico
General Order: Performance Evaluation of Members of the Bureau of the Police of the
Puerto Rico Police

Orden General 600-626: Intervención con Personas Extranjeras
General Order 600-626: Intervention with Foreign Persons

Orden General: Comisaria Auxiliar de Responsabilidad Profesional (CARP)
Order General: Assistant Commissioner for Professional Responsibility (CARP)

Orden General: Reorganización de Asuntos Confidenciales
General Order: Reorganization of Confidential Affairs

Manual del Investigador de la Comisaría Auxiliar en Responsabilidad Profesional
Investigator's Manual of the Auxiliary Commissariat in Professional Responsibility

Orden General 100-118: Funciones y Responsabilidades de la División de Violencia
Doméstica
General Order 100-118: Functions and Responsibilities of the Division of Domestic
Violence

OA-2016: Investigación de Incidentes de Violencia Doméstica Involucrando Empleados
OA-2016: Investigation of Incidents of Domestic Violence Involving Employees

Manual de Procedimientos Estándar (SOP) Violencia Doméstica
Standard Procedures Manual (SOP) Domestic Violence

Orden General 600-627: Investigación de Incidentes de Violencia Doméstica
General Order 600-627: Investigation of Incidents of Domestic Violence

Reglamento para el Recibo, Trámite, Investigación y Adjudicación de Querellas
Administrativas Contra Empleados del Negociado de la Policía de Puerto Rico
Regulation for the Receipt, Processing, Investigation and Adjudication of Administrative
Complaints Against Employees of the Bureau of the Police of Puerto

Orden General 100-122: Negociado de Drogas, Narcóticos, Control del Vicio y Armas Ilegales
General Order 100-122: Bureau of Drugs, Narcotics, Control of Vice and Illegal Weapons

Orden General 400-402: Procedimiento para el Manejo y Divulgación de las Grabaciones del Sistema de Radio Comunicación del Negociado de la Policía de Puerto Rico
General Order 400-402: Procedure for the Handling and Dissemination of Recordings of the Radio Communication System of the Bureau of the Police of Puerto Rico

Orden General 100-113: Organización de la División de Incidentes de Uso de Fuerza (FIU)
General Order 100-113: Organization of the Force Use Incident Division (FIU)

Orden General: Uso y Manejo de la Aplicación del Mapa de Incidentes Criminales
General Order: Use and Management of the Application of the Criminal Incidents Map (Crime Mapping)

Orden General del Sistema de Intervención Temprana (EIS)
General Order of the Early Intervention System (EIS)

Manual de Procedimientos para el Uso del Sistema de Intervención Temprana (EIS)
Manual of Procedures for the Use of the Early Intervention System (EIS)

**December/2017**


Revision Orden General SAEA
General Order SAEA Annual Review

Orden General SARP
General Order SARP

Manual de Investigacion SARP
Handbook SARP

Orden General Crime Mapping

Revision Orden General 403 Uso de Sistemas Computarizados
General Order Computer Use Annual Review

| TCA Seventh Semi-Annual Report | 2018 |
|---|---|

## January/2018

<u>Revision de Orden General Policía Comunitaria</u>
General Order Community Policing Annual Review

<u>Revision Orden General Encuentros Comunitarios</u>
General Order Meetings with the Community Annual Review

<u>Revision Orden General Superintendencia Auxiliar de Servicios Gerenciales</u>
General Order Management Division Annual Review

<u>Orden General Medidas Correctivas No Punitivas</u>
General Order non-Punitive Actions

<u>SOP de Violencia Doméstica</u>
Domestic Violence SOP

<u>Reglamento para el Recibo , Trámite, Investigación y Adjudicación de Querellas Administrativas</u>
Regulation for Processing of Administrative Complaints

<u>Orden General Programa de Información Pública y Querellas Administrativas</u>
General Order for Public Outreach on Administrative Complaints

<u>Orden General de CRADIC</u>
CRADIC General Order

<u>Orden General de Comparecencias a los Foros Judiciales y Administrativos</u>
General Order for Participation in Judicial Hearings

<u>Orden General de Crímenes Cibernéticos</u>
General Order Cyber Crimes

## February/2018

<u>Revision Orden Administrativa Programa de Ayuda al Empleado</u>
Review Administrative Order for Employee Assistance Program

<u>Orden General 601 Reglas para el Uso de Fuerza</u>

| TCA Seventh Semi-Annual Report | 2018 |
|---|---|

General Order 601 Use of Force

Orden General 605 Informe e Investigación Uso de Fuerza
General order 605 Use of Force Investigation

Informe de Uso de Fuerza PPR 854
PPR 854 Use of Force Report

Informe de Notificación de Incidentes de Usos de Fuerza
Use of Force Notification Report

Informe de Notificación Diaria de Incidentes de Usos de Fuerza
Use of Force Notification Report (Daily)

Notificación de Incidentes Críticos
Reporting of Critical Incidents

# List of Approved Policies

**June/2017**[65]

Orden General 100-117: Reorganización de la División de Armas y Tácticas Especiales
General Order 100-117: Reorganization of the Division of Special Weapons and Tactics

Orden General 600-621: NIBRS
General Order 600-621: NIBRS

Orden General 600-624: Interacción con Personas Transgénero y Transexuales
General Order 600-624: Interaction with Transgender and Transsexual Persons

Reglamento para el Establecimiento de Prácticas Policiacas Libres de Discrimen,
Hostigamiento, Conducta Sexual Impropia y Represalias de la PPR

---

[65] The list of policies of June/2017, belongs to the previous TCA Six Month Report (were approved on June 1, 2017). They are part of this report given that, they were not included in the past report.

| TCA Seventh Semi-Annual Report | 2018 |
|---|---|

Regulations for the Establishment of Police Practices Free of Discrimination, Harassment, Sexual Misconduct and Retaliation of the PRPB

Orden General: Reclutamiento Aspirantes a Cadetes
General Order: Recruitment Aspirants to Cadets

Orden General 100-126: Reorganización del Centro de Operaciones de Radio Control y Centro de Mando
General Order 100-126: Reorganization of the Command Center Operational Center for Radio Control and Command Center

Orden General: Reorganización de la Superintendencia Auxiliar en Investigaciones Criminales
General Order: Reorganization of the Auxiliary Superintendent in Criminal Investigations

Orden General: Repositorio Central para la Captura de Datos Relacionada al Crimen
General Order: Central Repository for Data Capture Related to Crime

Orden General: Reorganización de la Superintendencia Auxiliar en Cuerpo de Investigaciones Criminales
General Order: Reorganization of the Auxiliary Superintendent in Criminal Investigations Corps

Manual Operacional de Violencia Doméstica
Operational Manual of Domestic Violence

Manual NIBRS
NIBRS Manual

Manual de Explosivos
Explosive Manuals

**July/2017**

Manual de Procedimientos Operaciones Estandarizadas para las Divisiones de Drogas, Narcóticos, Control del Vicio y Armas Ilegales
Manual of Procedures Standardized Operations for Divisions of Drugs, Narcotics, Vice Control and Illegal Weapons

Orden General 600-620: Armas Especializadas de las Divisiones Tácticas Especializadas
General Order 600-620: Specialized Weapons of Specialized Tactical Divisions

Orden General 500-503: Junta de Evaluación de las Unidades Especializadas
General Order 500-503: Evaluation Board of Specialized Units General

Orden General 600-612: Autoridad para Llevar a Cabo Registros y Allanamientos
Order 600-612: Authorization to Carry Out Search & Seizures

TCA Seventh Semi-Annual Report | 2018

Glosario de Definiciones: Conceptos Básicos Legales de la Policía de Puerto Rico
Glossary of Definitions: Basic Legal Concepts of the Puerto Rico Police Department

Manual para el Uso de los Sistemas Computadorizados
Manual for the Use of Computerized Systems

Orden General 100-115: División de Delitos Sexuales y Maltrato de Menores
General Order 100-115:  Division of Sexual Crimes and Child Abuse

Orden General 600-622: Investigación de Incidentes de Delitos Sexuales
General Order 600-622: Investigation of Incidents of Sexual Offenses

OA-2016-3: Orden Administrativa de Delitos Sexuales Cometidos por Empleados de la PPR
AO-2016-3: Administrative Order of Sexual Crimes Committed by Puerto Rico Police Employees

Orden General 100-113: División de Investigación de Incidentes de Uso de Fuerza
General Order 100-113: Use of Force Investigation Division

OA-2015-IV: Orden Administrativa de Intervenciones Vehiculares
AO-2015-IV: Administrative Order of Vehicular Interventions

OA-2017-2: Reuniones Mensuales
AO-2017-2: Administrative Order Monthly Meetings

**August/2017**

Orden General 600-615: Autoridad para llevar a cabo Arrestos y Citaciones General Order 600-615: Authority to carry on Arrests and Citations

Orden General 600-627 Investigación de Incidentes de Violencia Doméstica General Order 600-627: Investigation of Domestic Violence Incidents

Orden General 100-118: Funciones y Responsabilidades de la División Especializada de Violencia Domestica de la Policía de puerto Rico
General Order 100-118: Functions and Responsibilities of the Puerto Rico Police Domestic Violence Specialized Division

Orden Administrativa 2016-4: Investigación de Incidentes de Violencia Domestica Involucrando Empleados de la Policía de Puerto Rico
Administrative Order 2016-4: Investigation of Domestic Violence Incidents Involving Puerto Rico Police Employees

Orden General 100-115: Estructura Organizacional y Funcional de la Oficina de Prensa
General Order 100-115: Organizational and functional Structure of the Press Office

Orden General Centro de Mando y Radio Control
General Order Command Center and Radio Control

Orden General Crímenes Cibernéticos
General Order Cyber Crimes

**September/2017**

Orden General 600-612: Autoridad para llevar a cabo Registros y Allanamientos
General Order 600-612: Authority to conduct Search and Seizures

Orden General 600-615: Autoridad para llevar a cabo Arrestos y Citaciones
General Order 600-615: Authority to carry on Arrests and Citations

Manual Operacional de la Oficina de Explosivos y Seguridad Publica
Operational Manual of the Office of Explosives and Public Safety

**October/2017**

Orden General 600-618: Uso y Manejo de Armas de Reglamento
General Order 600-618: Use and Management of Regulation Weapons