**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CIVIL NO. 12-2039 (GAG)(PG)** |
| **Plaintiff,** | |
| **v.** | |
| **COMMONWEALTH OF PUERTO RICO, et. al.** | |
| **Defendants.** | |

**COMMONWEALTH OF PUERTO RICO RESPONSE TO THE SEVENTH SIX-MONTH REPORT OF THE TECHNICAL COMPLIANCE ADVISOR, JUNE 10, 2017 - MARCH 31, 2018**

**TO THE HONORABLE COURT:**

**COME NOW** the Commonwealth of Puerto Rico and the Puerto Rico Police Bureau, through the undersigned counsel, and respectfully submits the following response to the "Seventh Six-Month Report of the Technical Compliance Advisor, June 10, 2017 - March 31, 2018" ("Seventh Six-Month Report") filed on June 6, 2018. Dkt. No. 871-1:

## I.    BACKGROUND

The Agreement for the Sustainable Reform of the Puerto Rico Police Department, Dkt. #60 ("Agreement"), calls for the Puerto Rico Police Department ("PRPD") to implement among the most sweeping reforms a law enforcement agency has undertaken pursuant to the Violent Crime Control and Law Enforcement Act of1994, 42 U.S.C. § 14141. The PRPD will adopt dozens of new policies, provide training for new recruits and thousands of current officers, and implement reporting and

accountability systems that will reinforce constitutional policing practices, equal protection for all, and public safety.

The Agreement requires a unique four-year capacity-building period that permits the Commonwealth of Puerto Rico and PRPD to build a solid foundation of policies, regulations, training, staffing measures, technology, and accountability mechanisms to place PRPD in a position to successfully implement the terms of the Agreement in all police areas. Pursuant to the Agreement, the Commonwealth and PRPD draft "action plans" setting forth the steps that PRPD will take to lay this foundation. Agreement ¶234. PRPD begins implementing the Action Plans upon their approval by the TCA. *Id.* ¶236.

The TCA is tasked with assessing PRPD's implementation of the Agreement and providing technical assistance, where appropriate. *See id.* ¶¶ 225, 255. The TCA files semiannual reports that serve as the primary means of communicating his assessments to the Court, the Parties and the public. *See id.* ¶ 250. For the first four (4) years of the Agreement, the TCA's reports must include (a) a description of the TCA's work; (b) a listing of each detailed step and timeframe in the Commonwealth's Action Plans and an assessment of the Commonwealth's progress; (c) the methodology and specific findings of each review conducted; (d) recommendations to achieve compliance; and (e) a projection of the work to be completed during the upcoming reporting period and any anticipated challenges or concerns related to the implementation of the Agreement. *Id.* ¶ 250.

On June 6, 2018, the TCA submitted a restricted version of his Seventh Six-Month Report. (*See* Docket No. 871-1) Therefore, pursuant to Paragraph 252 of the

Agreement, the Commonwealth of Puerto Rico presents its Response to the Seventh Six-Month Report.

## II.    DISCUSSION

The Commonwealth is aware that the TCA's findings in his reports are independent and that the Parties in this case cannot change the outcome of his Reports. However, the Commonwealth understands that the Seventh Six-Month Report has serious flaws and omission of facts that affect negatively the reform process that need to be clarified in this response.

A. "Commonwealth had one year before the TCA appointment to start action plans." (See docket 871-1, p.6)

The TCA states on its Report that the Commonwealth had at least one year prior to his appointment to start meeting targets and make progress in the drafting of the Action Plans and implement meaningful reform consistent with Paragraph 235, and that it was due to the profound disruptions and instability affecting the PRPB's top leadership. The main concern with the TCA's statement is that it does not take into account the policies and work that was made prior the current TCA was appointed to its position. It is inaccurate to state that no progress was made in that timeframe. Moreover, the TCA does not substantiate the correlation between the changes in leadership with the allege lack of progress in that timeframe.

B. "In May 2017, coinciding with the implementation of Act 20-2017, the PRPB started to give signs of having hit a wall and submitted a request for an extension of four months to the capacity building period." (See docket 871-1, p.7)

The TCA's statement omits that there were other reasons besides the implementation of Law 20 that were expounded in the Commonwealth's request letter to extend the capacity building period. Specifically, the letter mentioned that policies have been drafted by the PRPB and submitted to USDOJ and the TCA on a rolling basis for review as per Requirement 229 but that the exchanges of these drafts for several iterations of reviews have resulted in many unexpected challenges that have surfaced in the process of getting these policies approved. Therefore, attributing law 20-2017 as the only reason to request the extension of time is incorrect and misleading.

C. "If the Reform lost a year between July 2013 and June 2014, it is my assessment that the Reform has again lost very valuable time with the chaotic implementation of Act 20 from May 2017 to March 2018." (See docket 871-1, p.7)

As mentioned above, it is not a fair statement that the reform lost a year between July 2013 and June 2014 because in that timeframe the Reform Office worked on policies and other areas of the reform process. It is unclear the facts and data that the TCA has used to conclude that the implementation of Law 20-2017 has been chaotic. To the contrary, much progress has been made in the difficult task that is the consolidation of several agencies that are related to public safety. The Commonwealth, in the implementation of Law 20-2017 has taken all the necessary precautions to avoid any interruption in the Police Reform process. However, it is important to note that Hurricanes Irma and Maria have affected the implementation of Law 20. In the aftermath of the hurricanes, the Commonwealth had to redirect all its resources to the recovery efforts, and understandably this has affected the implementation of Law 20-2017. The Commonwealth regrets that the TCA did not take into account the devastation that happen in the island when asserting in its report that from May 2017 –

March 2018 the implementation of Law 20-2017 has been chaotic. Hopefully, the TCA will retract that statement in the future.

D. <u>However, the current public statements of the DPS Secretary appear to suggest that he is the one in charge, not the Commissioner, and these statements demand further clarification on issues of decision making as well as of command and control</u>. (See docket 871-1, p.11)

The Police Commissioner is in charge of implementing the Agreement and developing the community-oriented staffing plan. However, articles 1.04 and 1.05 of the Law 20 give the authority to the Secretary of Public Safety to make all the necessary decisions to establish safety without affecting the implementation of the Agreement.

Section 1.04.-  Department of Public Safety; Authority.  The office of Secretary of the Department of Public Safety is hereby created to be appointed by the Governor with the advice and consent of the Senate of Puerto Rico. The Secretary shall hold office at the discretion of the Governor.

The Governor of Puerto Rico shall have supreme authority with respect to the direction of the Department of Public Safety, but the administration and immediate supervision of the organization shall be delegated to the Secretary of Public Health.

Section 1.05.-  Duties and Powers of the Secretary.
The powers and duties of Secretary shall include, but shall not be limited to: (a) Have authority over the hierarchy, administration, and immediate supervision of the Department of Public Safety. (b) Establish bylaws for the functional organization of the Department and its components. (c) Establish the chain of command in the event of the Secretary's absence, disability, or death.   (d) Designate an Assistant Secretary of Administration who shall guarantee effective communication between the Department and the bureaus, as well as assign functions as appropriate. (e) Designate personnel as necessary to effectively achieve the purposes of this Act. (f) Act as the direct liaison between the Governor and the Department of Public Safety. (g) Develop public safety and emergency management policies as well as recommend actions, programs, and strategies to the Governor in order to develop such policies. (h) Plan, organize, supervise, coordinate, administer, direct, and control all activities developed in the Bureaus created by virtue of this Act.  (i) Ensure that the personnel

of the Department and its bureaus is highly trained in the fields of investigation, public safety, and citizen protection. (j) Manage and supervise managerial and fiscal services of each Bureau, among others. (k) Apply the laws, rules, regulations, memoranda of understanding, and directives germane to the services rendered by each of the Bureaus.  (l) Administer the budget allocated to the Bureaus to render their services and the projections thereof.  (m) Adopt rules and regulations as are necessary to carry out his duties and achieve the highest quality in the services offered to the citizenry. (n) Adopt internal bylaws as are necessary to guarantee the operations of the Department and to integrate and offer all of its services effectively.      (o) Adopt rules and regulations as are necessary to establish the recruit requirements, as well as the obligations, responsibilities, and conduct of the Department's personnel. (p) Establish through bylaws all that pertains to the hiring the members of the Medical Evaluation Board and the procedures thereof.  (q) Establish the public policy on state and national safety, emergencies, disasters, and criminal investigation in conjunction with the Governor. (r) Implement the public policy established by the Governor on state and national safety, emergencies, disasters, and criminal investigation. (s) Integrate the local security system with national security system of the United States. (t) Develop and implement State Plans including: Anti-crime Plan, Natural Disasters Plan, Catastrophe Plan, Continuity of Operations Plan, Mitigation Plan, and any other plan required by state or federal regulations.      (u) Advise the Governor on the Department's regulations, processes, and actions. (v) Coordinate with federal agencies to guarantee the public safety of the People of Puerto Rico.  (w) Award medals for valor as provided by Regulations. (x) Establish the Band of the Department of Public Safety. (y) Establish the Chaplain Corps of the Department of Public Safety. (z) Exercise any other powers as are necessary for the adequate operations.

The statements made by the Secretary of Public Safety have been consistent with the responsibilities of the Police Commissioner and the authority given to the Secretary of Public Safety by Law 20.

E. "During this reporting period, the PRPB removed Colonel Clementina Vega of her role as head of the Reform Unit as she was the subject of an internal misconduct complaint." (See docket 871-1, p.12)

The PRPB has not removed Colonel Clementina Vega of her position as Director of the Reform Office. The word "removed" is misleading because Colonel Vega has held her position as Director of the Reform Office uninterrupted during the tenure of Police Commissioners Fraley and Escalera. During the time that Col. Vega was the subject of an internal misconduct complaint, she was on leave from work using her vacation and sick days up to mid-December when she rejoined in her position as Director of the Reform Office.

F. "NIE was part of the Department of Public Safety and reported to Secretary Hector Pesquera while SARP was part of the PRPB and reported to the then-Police Commissioner Michelle Fraley." (See docket 871-1, p.13)

It is important to clarify that the Bureau of investigation and the Puerto Rico Police Bureau report to their respective commissioners and in turn both them report directly to the Secretary of Public Safety.

G. It should be noted that the TCA filed a motion with the Court based on the fact that once the PRPB was alerted to the findings of the Deputy TCA, the PRPB denied him access to the case file in apparent violation of Paragraphs 262, 264, and 268 pertaining access to documents and data. After the Court granted access to the United States and three court-appointed members of the TCA team, the United States and this appointed group had the opportunity to review the file in camera. (See docket 871-1, p.14)

This statement by the TCA needs clarification because it is inaccurate to state that PRPB denied access to the TCA in respect to the access of a specific case file in SARP. When the request was made by the TCA, the Commonwealth requested time to consult with its principles rather than deny access of the case file outright.

The Commonwealth of Puerto Rico recognizes that pursuant to paragraph 264 the PRPB must ensure that the TCA has direct and full access to all PRPB documents that the TCA considers necessary to carry out his duties. However, pursuant to

paragraph 267 of the Agreement the TCA must give reasonable notice to the PRPB when requesting access to documents. However, in this request the TCA did not give enough time for the Commonwealth to consult with its principles. The TCA gave the Commonwealth only one business day to deliberate before filing an informative motion with the Court. As stated to the Court in restricted docket No. 794, the Commonwealth demonstrated that it had good cause to deny access at the time that the document was requested.

H. "The most importunate challenge to the Reform and the implementation of the Agreement and the Action Plans continues to be the crisis of leadership and management affecting the PRPB and the lack of direction in the implementation of Act 20 of 2017." (See docket 871-1, p.15)

The Commonwealth posits that the above statement lacks sufficient evidence to support its claim. The supreme authority as to the direction of the Police is exercised by the Governor of Puerto Rico, but the administration and immediate direction of the organization is delegated to the Commissioner. The Governor in the full exercise of the prerogatives conferred by the Constitution constitutes an executive work cabinet to lead the daily operations of agencies and the PRPB is no exception. There is no lack of leadership in the PRPB. Together with the Secretary of Public Safety, we continue to work with equal commitment in our daily administrative and operational operations. The TCA's statements based on the allege lack of leadership is more of subjective opinion of the TCA rather than objective statement based on evidence. The Commonwealth believes that this report is not the forum to discuss interpretations and allegations that are not part of the assessment of progress and compliance that ultimately is the guiding principle of this Report.

I.  <u>Videos Taken By CRADIC on May 1, 2017</u>

Respectfully, the Commonwealth posits that the claim of the TCA in that the videos of the events of May 1, 2017 demonstrations were edited is incorrect and misrepresentation of the truth. The Commonwealth takes issue with the TCA in the choosing the word "edit" because that word implies that the videos were altered. Moreover, the TCA elected to use the word "edit" when his own expert who prepared the report on the demonstration of May 1, 2017, did not used the word "edit" in his report. The PRPB reiterates that the recordings that were given to the TCA are all the recordings that we showed and that they were not altered. This information could be confirmed by the TCA and its team as a result of the interviews it held with personnel assigned to CRADIC. Therefore, if there are still doubts regarding the integrity of the videos, the original videos are available to the TCA for an expert in editing videos to evaluate them. The recordings according to the statement of one of the CRADIC interviewees are not erased, but are kept as evidence, being delivered to the CRADIC Director to be insured. Under no circumstances does the PRPB edit the images, except if the exceptions established in the General Order of CRADIC are met. The only circumstances that lead to a recording being edited are: (a) protect the identity of minors captured in the recordings; (b) protect the identity of witnesses; (c) protect the exposure of details of a scene that may be harmful or cruel to victims, relatives and communities of interest and / or images of no educational, investigative or illustrative value and that only appeal to the morbid; (d) protect the privacy of the interior of a private property; and (e) that the details of the same can compromise the investigation and the result of the

same. In any case, the PRPB keeps the originals of the recordings if any of them need to be edited according to the mentioned circumstances.

The PRPB does not keep recordings that do not contain criminal material. Specifically, if a public event is recorded and in said public event no crime arises, there is no reason for the PRPB to keep this recording. These norms have been established in the revision of the drafts of the general order of CRADIC and the recording of public events, whose documents have already been sent to the TCA and DOJ.

The confusion may be based on the technological limitations currently facing the Bureau. It is acknowledged that the PRPB faces the challenge that the equipment does not have enough battery to record the entire event, so the recordings are limited to fragments where the person in charge of recording or the Incident Commander reasonably understands or has a well-founded reason to determine what will happen to an event that should be recorded. The multitudinous events are not recorded in its entirety; many times it will depend on how the event happens. We reiterate the regulations in that the NPPR does not pursue in any way the creation of records of unnecessary recordings, if those recordings do not contain any criminal material. None of the MNPPR assigned to the CRADIC failed to comply with the provisions of the General Order Chapter 600, Section 610 Recordings of Public Events in force.

J.   Chain of Command During The May 1, 2017 Demonstrations

The PRPB strongly denies that its chain of command has been violated. In light of the TCA's allegations, it is necessary to clarify that its interpretation that Secretary Pesquera was not in the chain of command on May 1, 2017, is erroneous. Law 20-2017, establishes that the Governor may appoint the Secretary of Public Security from

the moment the law is signed. Article 9.07 provides that Articles 1.03 and 1.04 will also be valid from the moment of signing the law. The latter are precisely those that give the Secretary the responsibility and authority to be there at that moment and ensure that any event that might affect the public safety is controlled.

### III.     CONCLUSION

The Government of Puerto Rico and the PRPB submits this response with the purpose to clarify the TCA's reporting during this important capacity building period. As mentioned before by the United States Department of Justice, these reports describe the Government of Puerto Rico's efforts to lay a solid foundation of policies, training, infrastructure, technology, and staffing in order to successfully implement the extensive reforms required by the Agreement in all police areas in Puerto Rico. By addressing the Government of Puerto Rico's concerns, the TCA will provide a more complete and reliable assessment of the Government of Puerto Rico and PRPB's compliance and will assist the Court, the Parties, and the public in understanding the Government of Puerto Rico's use of this unique capacity-building period offered by the Agreement.

**WHEREFORE**, it is respectfully requested from this Honorable Court to take notice of the above stated.

**I HEREBY CERTIFY** that on this same date, I electronically filed the foregoing with the Clerk of the Court using CM/ECF system which will send notification of such filing to all attorneys of record.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, on July 13, 2018.

**WANDA VÁZQUEZ GARCED**
Secretary of Justice

**WANDYMAR BURGOS VARGAS**
Deputy Secretary in Charge of
Litigation
Department of Justice

**SUSANA PEÑAGARÍCANO BROWN**
Director of Federal Litigation
and Bankruptcy Division

**S/JOEL TORRES ORTIZ**
**Joel Torres Ortiz**
U.S.D.C. NO. 302311
Federal Litigation Division
Department of Justice

P.O. Box 9020192
San Juan, P.R., 00902-0192
Tel. (787) 721-2900, ext. 2647,2650,2624,2606
Fax (787) 723-9188
joeltorres@justicia.pr.gov