From:        Arnaldo Claudio, US Army, Col. (ret), Monitor

To:          Honorable Gustavo Gelpi, U.S. District Court of Puerto Rico

Re:          <u>USA v. Commonwealth of Puerto Rico, et al.</u>, No. 3:12-cv-2039 (GAG) Plan **and Methodology for Compliance Review and Outcome Assessment (Paragraph 245 of the Agreement)**

Date:        October 5, 2018


Beginning in October 8, 2018, the Agreement for the Sustainable Reform of the Puerto Rico Police ("Agreement") will enter a new phase. The period of capacity-building will end, except for the areas where the Parties may agree to Paragraph 239 time-bound extensions, and the phase of compliance will commence.

During the last 52 months, the original four-year period of capacity-building plus the Paragraph 239 four-month Technical Compliance Advisor ("TCA") granted extension, the Agreement required technical assistance and compliance with the Action Plans. During this period, the TCA has assessed through his six-months reports and other assessments whether the Puerto Rico Police Bureau ("PRPB") has met "the timeline for each detailed step specified in the Action Plans," and whether the PRPB has been "in full, partial, or noncompliance with the detailed steps." (Agreement ¶ 240) These reports have identified areas of substantial progress, particularly in policy creation and training, and have also outlined Agreement provisions and Action Plan steps where significant improvement was needed. However, starting in October, the TCA will no longer measure "the progress" made towards the implementation of the Action Plans. (Agreement ¶ 240) Although the Parties and the TCA may agree to further extend the timeline for 33 steps specified in the Action Plans with the Court's approval, the final assessment under Paragraph 240 will be completed when the TCA issues his Eighth Six-Month Report to the Court and the Parties this Autumn. The draft to the Parties will be submitted on or before October 24, 2018. The issue of the partial extensions has not been resolved as of today.[1]

Fifty-two months after my effective appointment date [June 6, 2014], we start a different phase of the Agreement.[2] The Agreement requires that in accordance with the provisions of the approved Action Plans the Monitor begins "to regularly conduct compliance reviews to assess PRPB's compliance with each of the Agreement

_____

[1] As of October 4, 2018, the 33 extensions have not been granted. The Parties have not yet submitted them for the Court's approval. However, the Parties have reached agreement in principle and are preparing the filing which is likely to take place on or before the beginning of the compliance period.

[2] "Appointment Date" means the date when the Court enters an order approving the Parties' selection of the TCA or when the Court enters an order appointing a TCA among candidates submitted by the Parties, consistent with Paragraphs 271-272. (Agreement ¶ 11 (f)). This language, as set forth in the Agreement, was intended to capture all agreed-upon and approved extensions of the Action Plans, pursuant to Paragraph 239.

provisions in Sections III through XIII." (Agreement ¶ 242).[3]   The Monitor will also conduct outcome assessments, pursuant to Paragraph 243.  That time is now upon us.

To carry out the compliance reviews and outcome assessments under Paragraphs 242 and 243, the Monitor must develop a monitoring plan and methodology in accordance with Paragraphs 245 through 248.  Specifically, the Agreement requires the Monitor to "develop a plan for conducting the above compliance reviews and outcome assessments" (Agreement ¶ 245) and "submit a proposed methodology" that will be used to monitor compliance.    (Agreement ¶ 248).  These actions must occur prior to starting the required compliance reviews and outcome assessments.

In 2014, the TCA submitted his first plan and methodology in compliance with Paragraph 245 of the Agreement.  Paragraph 245 required for the TCA to develop a monitoring plan for conducting compliance reviews and outcome assessments submitting this plan to the Parties within 90 days of assuming his duties.[4]

In 2015 and in 2016, in accordance with Paragraph 250, the TCA also submitted the plans and methodology to assess progress against the Action Plans.   That methodology has made possible for the TCA to assess whether the PRPB has met the timeline for each detailed step specified in the Action Plans, and whether the PRPB has been in full, partial, or noncompliance with the detailed steps, as required by Paragraph 240.  The Parties also approved those plans and the proposed methodology.

At present, Paragraph 248 requires that, "at least 90 days prior to the initiation of any outcome assessment or compliance review, the TCA shall submit a proposed methodology for the review or assessment to the Parties."  Pursuant to Paragraph 248, the Monitor submits the Monitor's, not the PRPB's, first-year Monitoring Plan ("Monitoring Plan" or "Plan") and the proposed methodology for the review or assessment to the Parties.  The document is based on best national monitoring and auditing practices and adopts concepts and ideas used in other jurisdictions, such as Newark, New York, Cincinnati, Detroit, New Orleans, Baltimore, Alburquerque, and Seattle.

This document is critical for three reasons.

First, an agreement between the Parties and the Monitor on the methodology and Monitoring Plan (in plain English, a roadmap for how to interpret the specific

---

3 The Agreement uses the term TCA. TCA means "Technical Compliance Advisor, a person or team of people, including any employee, agent, or independent contractor of the TCA, who shall be selected to review, assess, and report on the Commonwealth of Puerto Rico's implementation of this Agreement." (Agreement ¶ 11 (jjj)). However, in the public hearing of August 20, 2018, the Court announced that, starting the period of compliance in October 2018, the TCA will be referred to as the Federal Monitor. In this report, the term TCA is used for the capacity-building period and Monitor is used for the period of compliance monitoring.

4 "Within 90 days of assuming duties as the TCA, the TCA shall develop a plan for conducting the above compliance reviews and outcome assessments, and shall submit this plan to the Parties for review and approval." (Agreement ¶ 245)

requirements of this Agreement) is critical to setting clear and predictable expectations for the Parties on the basis how the Monitor will assess and report compliance moving forward.  This should result in consensus among the Parties and the Monitor on what metrics and outcomes matter in determining compliance.

There is another reason as to why an agreement between the Parties and the Monitor on this roadmap, both on the methodology and the Monitoring Plan, is so vital at this stage.  Before reaching the Agreement's endpoint of sustained compliance, there is a very important midpoint in this journey.  Paragraph 249 determines that, on June 7, 2020, six years after the Appointment Date, "the TCA shall conduct a comprehensive outcome assessment and review of requirements to determine whether (and to what extent) the outcomes intended by this Agreement have been achieved, and whether any modifications to the Agreement are necessary for continued achievement in light of changed circumstances or unanticipated impact (or lack of impact) of a requirement. (…) Based upon this comprehensive assessment, the TCA shall recommend modifications to the Agreement that are necessary to achieve and sustain intended outcomes." (Agreement ¶ 249) It is evident that this methodology and Monitoring Plan will lay out the concrete foundations for that comprehensive assessment.  In particular, this proposed methodology and Monitoring Plan will set the baseline that will be the backbone of the Paragraph 249 report.

There is a third reason why this roadmap and consensus around methodology and metrics is so crucial.  As the Court has noted in the August 2018 status hearing, with the expiration of the capacity building, the Court is to more closely follow the progress made on the implementation to date now that the technical assistance element is fading.  During that hearing, the Court made it abundantly clear that it has broad authority to issue additional remedies for noncompliance, including supplemental orders, fines, and receivership, whenever outcomes are not achieved and requirements are not met.

In sum, the Monitor presents this memorandum to the Court and the Parties seeking to create an ambitious, but realistic, consensus-based framework for assessing compliance with the Agreement's requirements.  As an initial step, the Monitor and the Parties will attempt to reach consensus on a preliminary monitoring plan and methodology by the start of the compliance phase on October 8, 2018.  Thereafter, the Monitor and the Parties will work together to validate and test the preliminary methodology through field visits and other assessments during the first monitoring period.  Before the start of the second monitoring period on April 9, 2019, the Monitor and the Parties will develop an updated monitoring methodology that incorporates the results of the baseline assessment and gap analysis and will begin the baseline analysis for outcome assessments.

**I. Introduction**

The United States and the Commonwealth ("The Parties") entered into the Agreement to ensure that the PRPB "delivers policing services in a manner that upholds civil rights guaranteed by the Constitution and laws of the United States and the Commonwealth of Puerto Rico." (Agreement ¶ 1) This is what the Agreement refers as compliance with "constitutional policing."

By signing the Agreement, the Parties recognize that "public safety, constitutional policing, and the community's trust in its police force are interdependent." (Agreement ¶ 1) It is because of this interdependence that the Parties agreed that "the full and sustained implementation of this Agreement will protect public safety, guarantee individual civil rights, and increase public confidence in the police." (Agreement ¶ 1) Only when the Commonwealth achieves compliance with these three interrelated goals as manifested in the implementation of the paragraphs in Section III through XIII or the outcomes agreed upon is that this Monitor will make the determination and recommend to the Court that the Commonwealth has reached full and effective compliance.  Much work remains ahead to reach this target.

Creating a Strategic Plan for Full and Effective Compliance

To advance the Agreement's interdependent goal of constitutional policing, this Monitor recommends for the PRPB to implement a multi-pronged strategic and implementation plan to public safety and police reform in a similar fashion to the development of the Action Plans that guided PRPB's efforts through the end of the capacity-building period. This plan should demonstrate how the Commonwealth intends to phase in and implement changes to agency culture and leadership, technology, human capital, and contingency/disaster planning.  The premise of this request is that there is a current gap between the end of the capacity building period and the demands for compliance outlined in the Agreement.   This gap is exacerbated by the facts on the ground, including the effects of Hurricane Maria and changes in crime dynamics.

Mapping out investments and initiatives over a multi-year period, the Monitor proposes to lay out some of the foundations of such strategy.  This proposal takes to heart the primary lesson on law enforcement in the United States over the past two decades: that we can control crime without relying exclusively on enforcement and mass incarceration and without compromising civil rights and trust in government.  It recognizes that 21st century crime reduction and prevention must move well beyond traditional law enforcement actors in order to continue to drive down crime, reduce unnecessary enforcement and incarceration, and establish practices that enhance accountability, trust, efficiency, and fairness.

In the Monitor's opinion, reducing and preventing crime under a constitutional policing paradigm must rely on three interconnected strategies: controlling police

behavior and deterring criminal behavior, managing risk, and enhancing trust and legitimacy.

In the 1990s and early 2000s, cities in the United States relied upon police – boots on the ground – to do all these things.  Using targeted, data-driven strategies several cities in the United States drove this approach with extraordinary crime control results.  For example, in New York City, murders and shootings were down more than 85% since the mid-1990s. By 2010, some crimes were virtually extinct, like grand larceny auto, which went down by 95%.

This approach of relying solely on boots on the ground, however, came with some big economic and social costs.  Litigation costs escalated.  Heavily-policed communities challenged the legitimacy and fairness of police action.  This distrust between police and communities had a pernicious effect, interrupting an organic relationship between neighborhoods and police that is critical for enduring and sustained crime reduction and respect for due process.  When a neighborhood and their residents trust the police, they cooperate with the police and other government institutions.  In this environment of trust, they will report crime and give the police information that permits the police to arrest perpetrators and further boost the neighborhood's confidence in law enforcement.  When this circle breaks down, however, a culture of non-cooperation with law enforcement and prosecutors emerges and a vicious cycle of "us versus them" is put into motion.

Today the most successful cities in the United States are reducing crime using a less police-centered approach to crime control.  New York, Seattle, and Los Angeles are a good example.  In the last four years, for example, in New York City, since the end of unconstitutional stop and frisk practices that led to the setting of a Consent Decree, murders are down more than 15% and shootings are down by more than 35%.   The clearance rate for murders, in the upper sixties, is well above the low-levels of the 1990s when the clearance rate was below 30%.  In this environment, the percentage of felony firearm arrests prosecuted as felonies has increased by ten percentage points, from 56% to 66%, indicating greater cooperation between the police and prosecutors, better evidence collection strategies, and better civilian cooperation.  During this time, misdemeanor arrests have been down more than 50% in New York City while felony arrests have remained flat.  Gun arrests, however, have been up more than 20% since the end of stop and frisk era because the City has persistently focused on new innovations to fight gun violence.

A 21st century police reform strategy must take these lessons to heart: we can manage risk and control behavior when we realize legitimacy as a crime-fighting strategy.  When legitimacy, fairness, trust and accountability drive a strategic plan for reform this is perfectly compatible with pro-active, data-drive policing and crime control.  To do that, the Commonwealth must enlist more entities than just the police, move the intervention points well before arrest, and use methods beyond street patrols and hotspot policing.   Cost-effective legitimacy-building interventions can more often interrupt a cycle of offending than regular arrests and/or stays in jail.

This array of method requires: 1) an integrated strategy that stretches across agencies inside and outside government and outside the Commonwealth; 2) development of legitimacy building, technology, and data-sharing initiatives as the backbone of operations; and 3) investment in assessment and analytics. All of this should culminate in effective crime reductions, real respect of rights and citizen involvement in matters of policing, and effectual trust building between the police and the people of Puerto Rico.

The following proposal maps out where investments should be made over the next years.

A common experience to most cities in the United States is that a few neighborhoods and a few individuals within those neighborhoods drive the crime rate. Each of these individuals touches multiple local, city and federal agencies. Each touch is an opportunity to intervene and prevent crime. To do so, the PRPB strategic plan should:

1. Build an integrated criminal justice data system that can identify – from court, corrections, probation, state databases, among others – who the high fliers are and where the opportunities are for strategies to reduce crime; and
2. Conduct inventory and assess the effectiveness of services and build the matching instruments, such as risk assessment tools to enhance the PRPB's ability to pair people with the right services and interventions at the right time, intervening before a person ends up arrested and behind bars and supporting them so they do not return to criminal activity after release.

In particular, the Monitor recommends for the Commonwealth to implement three immediate steps. They are as follows:

*A. Enhance PRPB's technology infrastructure*

Upgrading PRPB's technological infrastructure to be able to accurately assess risk in real-time is a priority. From my preliminary assessment based on four years of observations and data collection, the PRPB must prioritize and take four concrete steps:

1. Create a new functional Data Center to replace the current obsolete Real-Time Crime Center designed for a smaller enterprise, which lacks sufficient resources for true disaster recovery and response
2. Invest in fiber optic technology and consolidate the PRPB Platform to replace the current mainframe that is not capable of supporting a fully integrated, mobile data system
3. Establish a world-class security posture to create a robust and sustainable approach to data security
4. Equip officers with 21st century policing technology like mobile investigation software

*B.  Create data-driven ways to assess the risks and needs of various populations*

Implementing a risk-based system to ensure that high risk individuals are incarcerated and low risk individuals are offered alternatives to detention and incarceration.   Individuals should be paired with appropriate programming where necessary.  This would bring greater accountability and trust.  From my preliminary assessment, the PRPB must prioritize and take two concrete steps:

1. Create data-driven, standardized ways of assessing risk when making decisions around arraignment, disposing of a case, placement into correctional custody, how to process a domestic violence case, and when issuing a summons or arresting someone;
2. After inventorying what exists and what works, create targeted interventions for key populations including high risk individuals, as well as officer training in recognizing behavioral health issues and the creation of drop-off centers in community-based settings and offer crisis beds for short-term stays.

*C. Assess available supports and interventions and create a cross agency vehicle to match the right people in contact with the criminal justice system to the right prevention and deterrence programs*

Integrating people and databases across agencies will transform the way the PRPB does business and interacts with the public to more efficiently and benignly transform the way the PRPB thinks about rights.  From our preliminary assessment, the PRPB must prioritize and take three concrete steps:

1. Create a data sharing and communications infrastructure
2. Integrate data sharing Commonwealth-wide
3. Ensure easy access to real time information

This proposal is a very first, rough draft of the strategic and implementation plan that, consistent with the goals of the Agreement, the Commonwealth and the PRPB should develop in conjunction with local, state, and federal agencies, along with community organizations.  To be clear, this is not an obligation of the Commonwealth under the Agreement, but it is a recommendation of the Monitor based on best practices, past experiences with the Action Plans, and his assessment of the current conditions on the ground.

<u>Defining the Target: Full and Effective Compliance</u>

A methodology is needed when we need to measure "something."   Here this "something" is measuring compliance with the terms of the Agreement and the impact of the Agreement's reforms.  The target of the proposed methodology and Monitoring Plan

is then to determine how we measure compliance, in particular what the Agreement defines as full and effective compliance.

Paragraph 294 provides that the Court shall retain jurisdiction to enforce this Agreement until "the Commonwealth of Puerto Rico and PRPB have achieved full and effective compliance with this Agreement." This means that the Agreement will not be terminated until that level of sustained compliance is attained.  The role of the Monitor is to assess and report to the Court on the progress made to meet that target.  Under the Agreement, three key elements define "full and effective compliance."[5]

First, the burden of demonstrating full and effective compliance is with the PRPB (Agreement ¶ 294, 300).  As Paragraph 294 states, "at all times, PRPB shall bear the burden of demonstrating full and effective compliance with this Agreement." The Agreement is crystal-clear that the PRPB must demonstrate to the Court and, hence to the Monitor and the United States that is in full and effective compliance.  This must be understood both as an obligation to comply with the requirements agreed upon, and as opportunity to demonstrate tangible and impactful internal reforms and outcomes.

Second, to meet the burden, the Commonwealth of Puerto Rico and the PRPB must achieve full and effective compliance with this Agreement over time and maintain "such compliance for no less than two consecutive years." (Agreement ¶ 294) Full and effective compliance is anticipated not to take place before "ten years after the Effective Date [July 13, 2013]." (Agreement ¶ 300).[6]  In other words, this is a time-based assessment and there are specific techniques and methodological strategies designed to measure the effect of program interventions and change over time.

Third, there are two parallel paths for the Commonwealth to demonstrate full and effective compliance with the Agreement.  As Paragraph 294 highlights, full and effective compliance requires "either sustained compliance with all requirements of this Agreement, or sustained and continuing improvement in constitutional policing, as demonstrated pursuant to the Agreement's outcome measures."  However, we should not think narrowly of Paragraph 294 as an "either/or" proposition.  On the contrary, they coproduce compliance.[7]   The Monitor submits that meeting the requirements of the Agreement will likely produce the desired outcomes and, vice versa, achieving certain outcomes is likely to be associated with compliance with certain requirements.

At any rate, the Commonwealth must show that is meeting the demands of compliance based on the methodology agreed upon.  These demands are set forth in the requirements specified in the Agreement.  They are also rooted in the two tangible

---

5 Under the Agreement, "Full and Effective Compliance" means sustained compliance with all substantive provisions of this Agreement and sustained and continuing improvement in PRPB policing. The substantive provisions of this Agreement are all provisions contained in Sections III through XIII." (Agreement ¶ 11 (bb)).

6 Paragraph 300 is only an estimate of the Parties.  It is not a bright-line termination date.  Separately, the "effective date" is date that the Court approved the Agreement – July 17, 2013.  The Commonwealth may file a motion to terminate by July 2023 under Paragraph 300.

7 Although these two requirements are related, they remain independent grounds for reaching full and effective compliance.

ways that the PRPB has to demonstrate that they have made sustained measurable gains "in constitutional policing." (Agreement ¶ 301) By constitutional policing, the Agreement refers to the three interrelated goals of protecting the public, guaranteeing individual civil rights, and increasing public confidence in the police which I discussed as the foundations of the strategic plan recommended above.

This document - both the Monitoring Plan and the methodology - provide the framework for how the Monitor will collaborate with the Parties to regularly conduct compliance reviews during the years of the monitorship, with a particular emphasis on the first year.  The document details how the Monitor will assess the PRPB and the Commonwealth for compliance with the terms of the Agreement.

<u>Roadmap for a Consensus-based, Validated Methodology to Assess Compliance (Agreement ¶ 241-249).</u>

On or before October 4, 2018, the Parties and the Monitor agreed on the following:

1.     The meaning of policy, training, and practice compliance, pursuant to Paragraph 242;

2.     A rating scale that measures change for each of the Paragraph 242 requirements (policy, training, practice);

3.     A preliminary methodology that describes data sources, evaluation methods, and related outcome measures; and

4.     A calendar for completing compliance reviews and outcome assessments, pursuant to Paragraph 245.

- From October 8, 2018 through January 8, 2019, the Monitor and the Parties will jointly conduct a baseline assessment and gap analysis to assess current conditions and validate the preliminary methodology through field visits. Specifically, the Monitor and the Parties will:  determine whether predicted data sources are existent and viable; identify gaps in data sources and concerns with data integrity; validate proper evaluation methods, including appropriate sampling; develop appropriate compliance thresholds; and update outcome measures.

- From January 9 – March 8, 2019, the Monitor will design logical models and specific audits and compliance reviews based on the validated methodology. The Monitor will develop standard document and data requests, which will be supplemented on an ongoing basis with non-standard requests in accordance with the Agreement.

- From March 9 – April 8, 2019, the Monitor and the Parties will agree upon an updated and complete methodology to be applied beginning on April 9 for the Tenth Semi-Annual Report ("SMR-10").  The complete methodology will include data sources, evaluation methods, compliance thresholds, and related outcome measures.  The Ninth Semi-Annual Report ("SMR-9"), covering October 8, 2018 to April 8, 2019, will report on the results of the baseline assessment and gap analysis, including identifying which paragraphs are measurable using the agreed-upon methodology.  For those paragraphs that are not measurable, the Commonwealth will develop a corrective action plan.

-  From March 9, 2019 – October 8, 2019, the Monitor will design complete outcome assessment logical models and data collection based on the validated methodology.  The Monitor will develop standard document and data requests, which will be supplemented on an ongoing basis with non-standard requests in accordance with the Agreement.

- The TCA and the Parties will review the updated and complete methodology on an ongoing basis, as needed, to consider whether modifications are necessary as additional data management systems are implemented and additional data sources become available, and based on the TCA's and the Parties' experience implementing the monitoring methodology.  At least one review of the monitoring methodology shall occur six years after the Appointment Date as part of the Comprehensive Reassessment under Paragraph 249.


**II. OVERVIEW OF THE MONITORING PLAN**


The Agreement requires the PRPB to undertake wholesale reforms, including creating new policies and procedures, implementing numerous trainings, reallocating staff, and generating reports to create a twenty-first century police force.  The court-approved Action Plans served as the manifestation of all the policies, training, data reporting, operational, and self-assessment and analytic detailed steps that were intended to place PRPB in the best possible position to comply with the Agreement following the capacity-building period.  The Parties agreed to a capacity-building period during the first four years from the Appointment Date of the TCA for the PRPB to implement and make progress against its Action Plans. (Agreement ¶ 240) The goals and purposes of the Action Plans are described in Paragraphs 234-236.

Further, upon completion of the capacity-building period, the Parties anticipated that it would likely require six years for the Commonwealth to achieve full and effective compliance with the Agreement, which includes the two-year period of sustained compliance.   The Monitor appreciates that the PRPB cannot accomplish these

comprehensive, extensive, and substantial changes at once.  Rather, it will take years to implement some of them. Thus, this Monitoring Plan lays out those goals to be pursued during the first year of the monitorship along with the methodology to be used in the compliance assessment and audits.   The Monitoring Plan refers to the monitoring obligations of the Monitor, not of the PRPB and the Commonwealth.


## A. Purpose of the Monitoring Plan

At its core, the Monitoring Plan is a roadmap or chart for how to implement the monitoring requirements of the Agreement and achieve the priorities regarding monitoring for the first year that begins in October 2018. Importantly, the Monitoring Plan does not expand, restrict, or alter the Agreement in any way. Instead, the Plan clearly sets forth how the Monitor will measure compliance with the Agreement's goals and requirements. To properly measure the implementation of the Agreement, the Monitoring Plan will follow the guidelines set forth in Paragraph 245.  The Plan is the incarnation of Paragraph 245.

Paragraph 245 demands that "the Plan" shall:

a) clearly <u>delineate the requirements of the Agreement to be assessed for compliance</u>, indicating which requirements will be assessed together;
b) set out a <u>schedule for conducting a compliance review</u> of each requirement of this Agreement, beginning after the fourth year from the Appointment Date in accordance with the approved Action Plans for each requirement, and annually after the first compliance review for each requirement; and
c) set out <u>a schedule for conducting outcome assessments</u> for each outcome measure at least annually, with the first assessment occurring no later than five years from the Appointment Date. (Agreement ¶ 245)

In addition to these three requirements, the Monitoring Plan must detail the methods by which the Monitor will assess and report on compliance, as well as the methods by which the Monitor will communicate with the Parties and the public and receive public input during the monitorship.

The Plan also outlines the Monitor's priorities for the first year, discussed in Section III below.  These priorities reflect those set forth in the Agreement itself, and are informed by the Monitor's meetings with the Parties, police officers and their representatives, and community groups.

The Plan envisions that the Monitor and the United States will continue to provide technical assistance and collaborate with the Commonwealth, as appropriate, to help the PRPB achieve compliance with certain Agreement requirements simultaneously rather than working to achieve full compliance one Agreement requirement at a time. Moreover, while the Plan sets forth a timeline for accomplishing the Agreement's requirements during the first year, in certain circumstances, implementing the

requirements will be an iterative and cyclical process—as the Parties and Monitor discover information during the monitorship it may become apparent that further refining the PRPB's current practices, policies, trainings, and/or systems is necessary. Implementing and monitoring the Agreement will therefore be a dynamic and evolving process, and the Monitor anticipates that the Plan will need to be supplemented and/or amended periodically to reflect the current priorities of the Monitor and the Parties, and other implementation challenges.  This is consistent with Paragraphs 246 and 247.


## I. OVERVIEW OF THE MONITORING PLAN

### A. Objective & Format of the Monitoring Plan

The First-Year Monitoring Plan is intended to provide a clear, unified structure and framework for the day-to-day and week-to-week efforts that the Monitor needs to undertake to measure and report whether the Agreement is implemented in a manner aimed at ensuring police services that are constitutional, effective, and consistent with community values, while preserving officer and public safety.

The Plan details a formalized process for the Monitoring Team's assessment of the PRPB's progress implementing the Agreement. In the Monitoring Team's experience over the last four years, it is clear that if well-intentioned police officials continue to address parts of the Agreement at different junctures as if they were distinct elements, it is less likely that major changes will be implemented  effectively, efficiently, and with the involvement of all important stakeholders – including PRPB officers, community members, leadership of police officer affinity groups and organizations, and others.  The Commonwealth needs to understand how interconnected these requirements are and how the system is best understood as a hydraulic system where the force that is applied at one point and is transmitted to another point of the system.

This Monitoring Plan is partially a project or program management plan and partially an agenda. It is divided into eleven major areas. Those areas address the core parts of the Agreement (Sections III through XIII) on which the Monitor will focus during the first year of monitoring.  It is our expectation that the Parties will also focus on those areas.

Primary objectives are the broader achievements or accomplishments that the Agreement requires. Below those objectives are the key requirements or milestones that must be met during the year in service of each objective. In some instances, notes explain or clarify details about the key requirement or milestone delineated immediately above it.  Each key result or milestone is associated with at least one unit of the PRPB. That unit is responsible for providing the access and information indicated. Accomplishing the result or milestone is achieved by providing the "deliverable" identified in each row by the deadline provided in the "deadline" column.

The Plan covers the period of October 1, 2018 through September 30, 2019, with a limited number of deadlines falling beyond September 2019.

**B. Major Milestones Anticipated Under the Plan**

The emphasis of the First-Year Monitoring Plan is on providing the PRPB with clear rules with respect to the measuring of compliance in the performance of police services, from using force, searching and seizing individuals, policing without bias to acting always in a professional way in every citizen –police encounter. This must be done by establishing within the PRPB the basic policies, trainings, and procedures necessary to ensure that all uses of force, all searches, all encounters are uniformly reported, fairly investigated, and rigorously reviewed if applicable. To this end, all policies related to the Agreement must be in place, and all officers should be trained on them, by no later than December 31, 2019, in order to measure operational compliance.  Policy compliance is a condition of training compliance, and policy and training compliance are a condition of operational compliance.

Throughout the year, the PRPB should be revamping trainings, protocols, procedures, and processes for reviewing internal investigations of alleged officer misconduct and the investigation and review of use of force incidents specifically. This means that, as of October 1, 2018, except for the areas where an extension may be granted, PRPB officers will be operating under policies and trainings that must immediately meet the requirements of the Agreement.

Relatedly, PRPB, in partnership with the other Commonwealth agencies, should also be developing new Crisis Intervention Team (CIT) policies and training for responding to individuals experiencing a behavioral health crisis.

Another primary area of focus should be non-discrimination and bias-free policing. A major task of the Monitor will be to conduct assessments of the PRPB's non-discrimination and bias-free policing policies, practices, and training and make recommendations for improvements or changes. After receiving input from police officers, officer organizations, and community members and organizations, the PRPB should strengthen non-discrimination policing policy and training to incorporate the principles of procedural justice.  The goal is to make sure that all policies and training implemented in practice are designed to ensure that police services are delivered free from bias and discrimination.

More generally, the PRPB should submit the Staffing Plan by the end of September and begin implementing it by December 2018. That Plan must communicate the PRPB's commitment to community-oriented policing, should reflect the input of community groups and officers.  Consistent with the revised plan, the PRPB must develop a new, comprehensive strategy for implementing a community and problem-oriented policing model.

In 2018, PRPB must implement a new recruitment policy and strategic recruitment plan that includes clear goals, objectives, and action steps for attracting qualified applicants from a broad cross-section of the community.  In 2018, supervisors should continue to receive training that will be consistent with their new and enhanced responsibilities with respect to the central compliance areas of the Agreement.

In the early part of 2019, the Monitor's consultant will complete the comprehensive surveys set forth by Paragraph 241. The early findings reveal lack of progress and, in some instances, retrogression.  The PRPB should evaluate these findings carefully as community trust is - as discussed above - one of the three pillars of constitutional policing.  The monitoring team will also complete comprehensive equipment and resource studies that assess PRPB's current needs and priorities with respect to its officers being able to fulfill PRPB's mission and satisfy the requirements of the Agreement. This analysis will not replace PRPB's own needs assessment.

The Monitor will work closely with officers, community members, stakeholders, and the PRPB to measure whether officers have the tools and resources that they need to effectuate the priorities associated with problem-solving and community-oriented policing strategies.  The Plan calls for the PRPB to complete the Staffing Plan and ensure that they deploy the appropriate number of personnel to perform the functions necessary for the PRPB to fulfill its mission and satisfy the requirements of the Agreement.

Part of this analysis will necessarily consider implications of PRPB's implementation of a new department-wide computer system enabling it to collect, maintain, integrate, and retrieve data for each officer about officer performance. Efforts should also be underway in 2019 to ensure that SARP receives and investigates civilian complaints of officer misconduct and performs high-quality, objective investigations.  For this to happen, SARP officer must have the training, expertise, and composition to ensure fair, objective, and rigorous assessment of misconduct investigations. Finally, the PRPB must make significant progress in the implementation of the Early Intervention System.

These milestones detailed above are expected milestones.  They are not mandatory targets, but they reflect the TCA's expectations on the progress that PRPB should be making to implement the Agreement based on the Agreement and the Actions Plans.


## C. What the Plan Is and Is Not

This Plan does not take the place of the Agreement. This Plan does not impose any responsibility on the Commonwealth.  This is the Monitor's monitoring plan and proposed methodology, not the Commonwealth's strategic and/or implementation plan that the Commonwealth has agreed to draft under certain conditions that we discuss below in this document.

The Agreement sets forth a number of objective, goals, and major commitments that the Commonwealth and the PRPB have made for changing the way that a number of things are done within PRPB. Nothing in this Plan alters the PRPB's fundamental obligations, changes timelines, adds new requirements, or eliminates commitments. Instead, the Plan provides a framework for the Commonwealth and the PRPB to understand how the Monitor will measure whether they are meeting the objectives and are fulfilling the major commitments of the Agreement.

This Plan covers only the first year of monitoring. It is not a multi-year, comprehensive plan that details each and every step that the Monitor must take to assess the Commonwealth's compliance with the Agreement.  This Plan is not a new set of Action Plans. Instead, it covers the first year of compliance monitoring under Paragraph 242, beginning on October 8, 2018 until October 8, 2019, when the TCA and the Parties expect to agree on an updated and validated monitoring methodology. In October 2019, the Monitor will present a plan for the second year of monitoring compliance.

Not all requirements and reforms of the Agreement are addressed by this Plan due to the extensions submitted by the PRPB.  All other requirements are addressed by this Plan.  Ultimately, all requirements will be captured in the methodology.  The Agreement requires that these issues be addressed during the process, and subsequent Monitoring Plans will outline a unified process for addressing them in the same way that issues related to the issues outlined above are addressed in this First-Year Monitoring Plan.

This Monitoring Plan proposes deadlines for specific deliverables or milestones on the part of the Monitor. If the PRPB fails to meet a deadline or is out of compliance with the Agreement, not this Monitoring Plan, the Monitor will use the structure set by this plan and proposed methodology to inform the Court of his findings in his bi-annual reports and will seek its assistance on addressing the identified deficiency.

The Monitoring Plan set deadlines on the Monitor.  The deadlines might, in some instances, need to be extended by a brief interval to allow or accommodate unforeseen circumstances or unexpected, minor delays. Accordingly, if and only if all of the Monitor, the United States, and the Commonwealth agree that an extension for any of the deadlines outlined in this Plan is warranted and acceptable, the deadline may be extended by submitting a modification to the Court submission after input from the Parties.

**D. Format of the Monitoring Plan**

This Monitoring Plan consists of three key components: (1) the First-Year Monitoring Plan tables ("Tables"); (2) the Critical Path for Tasks Implementation ("Critical Path") based on Paragraph 242 and the proposed Roadmap discussed above; and (3) the Compliance Methodology ("Methodology").

The Tables set forth steps and deadlines that the Monitor will aim at meeting during the first year in measuring the progress made by the PRPB. *See Appendix A*. Many of these tasks will require completion in a timeframe that extends beyond the first year and into the second and third year of the monitoring period.

The Roadmap agreed upon by the Parties and the Monitor and Critical Path set forth by Paragraph 242 lays out a detailed methodology for how the Monitor, the Parties, the PRPB, police representatives, and community members will collaborate to accomplish the task of measuring outlined in the Tables.

The Compliance Methodology categorizes the various identified steps that the Commonwealth and PRPB must take to accomplish the Agreement's requirements into compliance levels, which the Monitor will use to assess the Commonwealth and PRPB's compliance with the Agreement in the Monitor's semi-annual reports. These three components should be read together to fully understand the Plan.

## 1. The First-Year Monitoring Tables

The Tables (See Appendix A) are divided into the eleven major areas of compliance, which reflect the core topics of the Agreement from Section III through XIII.   The Tables include all paragraphs of the Agreement and pursuant to Paragraph 245(a), an indication of the requirements that will be assessed together:

As stated earlier, the Monitoring Plan's primary objectives detail the broad requirements established in the Agreement. Below the primary objectives and the Paragraph of the Agreement, the Tables will provide six categories of information: (1) Paragraph; (2) Requirements for compliance review and compliance threshold; (3) Outcomes for outcome assessment; (4) Methodology Notes (including data sources and quantitative and qualitative methods to be used); (5) Origination Responsibility; and (6) Calendar and First-Year Monitoring Plan Deadline for Achievement.   Consistent with the Roadmap (see above), the Table will also include the data source, the specific evaluation method, the compliance threshold, and the related outcome measures.  See Appendix A for examples.

The Requirements and Outcomes columns describe specific demands, accomplishments, and outcomes that must be met to achieve a primary objective or meet certain requirements. The Methodology Notes column gives further information about how an achievement and/or outcome will be accomplished, when necessary. The detailed steps required to implement the methodology are set forth in the Critical Path required by Paragraph 242. The Origination Responsibility column indicates the unit (or units) responsible for doing the primary work for an achievement, such as drafting

policies, conducting trainings, or setting up entities required by the Agreement. The entities with origination and review responsibility are responsible for accomplishing the achievement by the deadline in the fifth column.

Compliance with specific achievements will be measured pursuant to the Compliance Methodology. As explained further below, interim deadlines for the review and revision process are generally laid out in the Critical Path Set Forth by Paragraph 242.

## 2. The Roadmap and the Critical Path Set Forth by Paragraphs 242 and 251

Meeting the goals and requirements of the Agreement requires a comprehensive review of the PRPB's current policies, practices and systems; performing both a "baseline" and a "gap analysis" to understand how those current policies, trainings, practices and systems differ from the Agreement's requirements and best practices; revising policies, practices and systems to incorporate the Agreement's requirements and best practices; training PRPB personnel so they can fulfill their responsibilities under the Agreement's requirements; and implementing the Agreement's requirements into practice.   The specific Roadmap for consensus has been discussed in page 9.

The Roadmap is based on Paragraph 242.  Paragraph 242 sets forth as follows:

"Four years after the Appointment Date and in accordance with the provisions of the approved Action Plans, the TCA shall begin to regularly conduct compliance reviews to assess PRPB's compliance with each of the <u>Agreement provisions in Sections III through XIII.</u>  The TCA shall assess and report whether PRPB has, for each Agreement requirement: <u>(a) incorporated the requirement into an implemented policy; (b) trained all relevant personnel in the requirement and policy; and (c) fully implemented in practice</u>.  These compliance reviews shall contain both quantitative and qualitative elements as necessary for reliability and comprehensiveness.

For purposes of assessing and reporting on each of the three compliance levels of Paragraph 242, the Monitor shall use the following definitions for each paragraph of the Agreement:

(a) "incorporated the requirement into an implemented policy" shall mean that PRPB has in place operational and effective policies and procedures that are designed to guide officers, supervisors, commanders, and other relevant personnel in the performance of the tasks that are set forth in the Agreement and generally-accepted policing practice.   This will be referred to as Primary or Policy Compliance.

(b) "trained all relevant personnel in the requirement and policy" shall mean that PRPB has developed all necessary training materials and sufficiently trained to competency all pertinent personnel in the performance of the tasks that are set

forth in the Agreement and applicable policies and procedures.  This will be referred to as Secondary or Training Compliance.

(c) "fully implemented in practice" shall mean consistent and verified adherence to the requirements of the Agreement and applicable policies and procedures in the day-to-day operation of PRPB where personnel are held accountable for performing the requirements of applicable policies and procedures as written by their superiors.  This will be referred to as Operational Compliance.

(d) The Monitor has recommended to the Parties and the Parties have agreed in principle that the idea of "full implementation in practice" must take into consideration and is operationalized through the assessment of resources, human resources and staffing, data collection and data analysis protocols, and operational implementation.  These variables are discussed as an example in Appendix B.

This three-step Critical Path (policy, training, and operational or implementation in practice compliance) lays out the steps the Commonwealth and the PRPB must take to successfully achieve full and effective compliance with the Agreement, and how the Monitor will assess the compliance. This process will take place for the duration of the compliance phase and will began its implementation during the first six month of the compliance period and prior to the Monitor's issuance of the first Six-Month Compliance Report pursuant to Paragraph 251.  These tasks are divided into four broad phases:

(1) conducting a "current baseline assessment" and "gap analysis" of the PRPB and Commonwealth's current state of affairs;
(2) revising or creating policies;
(3) training and implementation; and
(4) the Monitor's issues audits and reports assessing change and progress made.

During the baseline assessment and gap analysis phase, the Monitor with his consultants collaborate with the Parties to assess the PRPB's current practices and procedures that relate to a particular Agreement requirement and determine how the practice and/or procedure needs to be revised and implemented in order to comply with the Agreement.  This will be the focus of our work from October 2018 through January 2019.

During the policy revision (or creation) steps, the Monitor, the PRPB, the USDOJ, and Commonwealth will continue to work together with community members and police representatives in reviewing and revising the policies envisioned by the Agreement. The PRPB will continue to be responsible for preparing a first draft of new or revised policies after obtaining input from police representatives and community members. The draft then goes through an extensive review and revision process that culminates with the

Monitor and DOJ approving the policy.   This is consistent with the work the Monitor has performed since 2014 and already performs.

During the training and implementation steps, the PRPB is responsible for developing a training curriculum and schedule for its personnel on the new/revised policy or Agreement requirement. The Monitor and DOJ will be responsible for reviewing and revising training curricula and lesson plans, and the Monitor will continue to observe training sessions.   This is consistent with the work the Monitor has performed since 2014 and already performs.

During the audit phase, the Monitor will audit the implementation in practice of policies and trainings to see whether the Commonwealth is complying with the Agreement requirement.  This will take form January 2019 through March 2019.

The "Critical Path" sets forth the general phases and activities that must be completed for the PRPB to achieve full compliance with the Agreement for any given subject matter area.  These phases and activities detail the specific steps underlying the "achievements" and/or outcomes set forth in the First-Year Monitoring Plan. Therefore, the "Critical Path" serves as a guide for understanding the First-Year Monitoring Plan as well as a checklist for PRPB compliance. Any tasks deemed necessary, but not included in the First-Year Monitoring Plan, will be deferred until subsequent years. Note that not all tasks need to be started within the first year of compliance, as some tasks will require funding for the acquisition of technology or equipment.

**Phase 1: Perform a "Current Baseline Assessment" of the PRPB state of affairs and a "Gap Analysis" on any specific provision of the Agreement.**

This process includes the following steps:

1. Identify what the Agreement specifically requires of the PRPB.

2. The Monitor to conduct an "as is" assessment in collaboration with the Parties. This analysis will include:

a. Review of all existing Standard Operating Procedures (SOPs), General Orders, administrative codes, policy statements, relevant departmental communications, memoranda, system/solutions/supporting documentation, etc. for all functional areas;
b. Review of pre-service and in-service training for each topic area;
c. Review of training records for each topic area;
d. Interviews of informed sworn and non-sworn personnel in the PRPB for operational understanding, identification of gaps, areas requiring clarification, etc.;
e. Review of all reports, data collection processes, CompStat or other operational priority areas, and any other pertinent sources for relevance to topic;
f. Conduct additional "ride alongs" when relevant;
g. Review past complaints from the public, SARP files, newspaper coverage and other media;

h. Collect quantitative data, including both administrative and survey data, and,
i. Collect community input.

3. Identify approved policies and existing best practices in the topic area. Potential sources include:

a. DOJ-approved plans from other police and law enforcement agencies under consent decrees, collaborative reform efforts, and other DOJ sources;
b. Academic guidance; and,
c. Highly regarded and successfully implemented practices from other agencies.

4. After factoring in items 1-3, the Monitor will develop recommendations to address the results of the Gap Analysis and necessary changes for compliance.

**Phase 2: PRPB Creates New or Revised SOPs**

This process will consist of the protocol adopted by the Parties for the periodical review of policies that were created during the capacity building period.

**Phase 3: Training and Adoption Procedure for SOP**

This process will consist of the following steps:

1. Using newly adopted SOPs, PRPB will identify training approaches and will continue to draft training module and materials.

2. PRPB to develop updated training curriculum and materials (including PowerPoint, speaker notes, etc.).

3. PRPB to provide internally vetted training curriculum and materials to Monitor and USDOJ for evaluation.

4. PRPB to "train-the-trainers." Train-the-trainer sessions will provide instructors with (1) the opportunity to complete the relevant in-service and/or electronic-based training from start to finish, and (2) specific instructional content to guide the trainers in teaching the course.

5. PRPB will continue to conduct Pilot ("test") training to be observed by Monitoring Team. Instructional adjustments to be made, if needed.

6. PRPB to provide regular updates of training schedule and train all PRPB officers within the timelines established by the Agreement.

**Phase 4: Monitor's Compliance Assessment Reports**

See next section, compliance methodology.

## 3. The Monitoring Methodology

The Agreement requires the Commonwealth and the PRPB to achieve full and effective compliance as determined by the Court. For the Commonwealth and the PRPB to be in compliance with an Agreement requirement, Paragraphs 242 and 251 demand that the requirement[8] must be:

> (1) incorporated into implemented policy;
> (2) the subject of sufficient training provided to all relevant PRPB officers and employees;
> (3) reviewed or audited by the Monitor and the PRPB's own self-assessment to determine whether the requirement has been fully implemented in actual practice; and
> (4) found by the Monitor to have been fully implemented in practice. (Agreement ¶ 242, 251)

Reporting and Rating Methodology: From Paragraphs 240 and 250 to Paragraph 242 and 251

Until recently, during the capacity-building period and in accordance with Paragraphs 240 and 250, the TCA filed with the Court, every six months, written, public reports with a very straightforward methodology defined by the requirements of Paragraph 240.  The purpose of these reports was for the TCA to determine whether PRPB was "making satisfactory progress toward implementation of the Agreement" (Paragraph 250) and "to evaluate PRPB's compliance with this Agreement by assessing PRPB's progress against its Action Plans." (Agreement ¶ 240)

To determine compliance with the Action Plans, among other things, the TCA was to perform two distinct tasks under Paragraph 240. They were defined as follows:

> "The TCA shall assess whether PRPB has met the timeline for each detailed step specified in the Action Plans, and whether PRPB is in full, partial, or noncompliance with the detailed steps." (Agreement ¶ 240)

Consequently, past reports used the following rating structure:

**Timeline met.** The PRPB has met the timeline set forth in the Action Plan and/or Agreement

---

8  Paragraph 251 does not add a new requirement to the three compliance levels in Paragraph 242.  Paragraph 251(b)(3) requires that the TCA indicate in his reports whether a particular paragraph was reviewed or audited by the TCA during the monitoring period.

**Timeline not met**. The PRPB has not met the timeline set forth in the Action Plan and/or Agreement

**Full Compliance**. The PRPB has complied fully with the requirement and the requirement has been demonstrated to be meaningfully adhered to and/or effectively implemented across time, cases, and/or incidents. This includes instances where it can be shown that the PRPB has effectively complied with a requirement fully and systemically.

**Partial Compliance**. The PRPB has made sufficient initial strides or sufficient partial progress toward compliance toward a material number of key components of the step of the Action Plan – but has not achieved real, effective operational compliance. This includes instances where policies, processes, protocols, trainings, systems, or the like exist on paper but do not exist or function in day to-day practice. It may capture a wide range of compliance states or performance, from the PRPB having taken only very limited steps toward operational compliance to being nearly in full compliance. It also includes situations where the PRPB has made notable progress to technically comply with the requirement and/or policy, process, procedure, protocol, training, system, or other mechanism of the Action Plan such that it is in existence or practice operationally – but has not yet demonstrated, or not yet been able to demonstrate, meaningful adherence to or effective implementation, including across time, cases, and/or incidents.

**Non-Compliance.** The PRPB has not yet complied with the relevant provision of the Action Plan. This includes instances in which the PRPB's work or efforts have begun but cannot yet be certified by the TCA Team as compliant with a material component of the Action Plan requirement.

**Evaluation Deferred**. This category reflects those limited instances where work in a given area has been intentionally and affirmatively deferred in order to work on other, necessary prerequisites. In these areas, the PRPB could have made more progress in a given area but, for project management, budgetary, or operational reasons, have appropriately focused attention on other areas.

In considering this classification scheme, the TCA noted three key points. First, a designation of "Partial Compliance" did not necessarily or in itself meant that the lack of progress with the Action Plan target was something that the TCA found problematic under the circumstances. In some instances, it did. But, there were many instances where partial compliance includes situations where the PRPB made notable progress to technically comply with the requirement of the Action Plan such that it is in existence or practice operationally – but has not yet demonstrated, or not yet been able to demonstrate, meaningful adherence to or effective implementation, including across time, cases, and/or incidents.

Second, the TCA's conception of "partial compliance" required more than the PRPB simply taking some limited or initial steps toward adhering to a specific step of an Action Plan or an Agreement requirement.  That is, a "partial compliance" determination was not used simply because some small amount of work was conducted.  Instead, "non-compliance" became "partial compliance" when the PRPB made sufficient, material progress toward compliance – suggesting that the PRPB graduated from the stages of initial work to more well-developed and advanced refinement or various reforms.

Third, the compliance that Paragraph 250 reports discussed was with respect to compliance with the various, specific provisions of the Action Plans – and not with respect to the "Full and Effective Compliance" with the whole of the Agreement which is defined in Paragraphs 10 (bb), 294 and 301.

During this period of capacity building, the TCA found that the PRPB still had a substantial distance to travel to either comply with all of the Action Plans' steps and Agreement's requirements and/or to demonstrate "sustained and continuing improvement" across outcome measures.  There was no way for the PRPB to meet the preponderance of the evidence standard to reach Full and Effective compliance with the Agreement until they finally entered the phase of compliance.

The terms previously used – including Non-Compliance, Partial, and Full Compliance – were terms that appeared explicitly in the Agreement when referring to the Action Plans.  There are no such terms for the compliance period. Paragraph 240 definitions do not necessarily apply to the period of compliance where a more nuanced approach is needed.

Each of the three compliance levels in Paragraph 242 related to polices, training, and implementation in practice shall be evaluated using the following ratings:

1. Non-Compliance
2. Partial Compliance
3. Substantial Compliance
4. Full Compliance

The Monitoring Methodology will provide specific compliance thresholds to be met for each paragraph for each compliance level in Paragraph 242, as agreed-upon by the Parties and approved by the Court.  The compliance thresholds shall be agreed upon after the baseline assessment and gap analysis is performed by the TCA and the Parties to validate the preliminary methodology.

Preliminarily, the Monitor will use these categories when assessing the PRPB and the Commonwealth's compliance in its bi-annual reports.  However, on October 4, 2018, the Monitor and the Parties agreed that the Monitor and the Parties will adopt an alternative rating structure provided that the Commonwealth drafts and implements the recommended strategic and implementation plan.

With the adoption of an implementation and strategic plan as a condition, the Monitor recognizes that the Commonwealth and the PRPB may therefore take significant steps to comply with an Agreement requirement without achieving "compliance" with the requirement, as the Agreement defines that term. Therefore, to better track the Commonwealth and PRPB's progress on the Agreement requirements, the original compliance Methodology proposed above would be replaced with a structure that provides five separate categories or forms of compliance provided that the Commonwealth adheres to the terms of the agreement reached on October 4, 2018. This alternative rating structure would be as follows:

(1) non-compliance
(2) initial development,
(3) administrative compliance,
(4) operational compliance,
(5) full and effective compliance

Here I describe the categories of PRPB compliance with the Agreement. It is intended for use in the Monitor's Reports. Compliance will be assessed according to compliance with annual Monitoring Plans, which will break down into tasks the requirements set forth in the Agreement. The compliance categories are as follows: (1) non-compliance, (2) initial development, (3) administrative compliance, (4) operational compliance, (5) full compliance, and (6) full and effective compliance. These categories are defined below.

**1. Non-Compliance**
"Non-Compliance" means that PRPB has either made no progress towards accomplishing compliance or has not progressed beyond Initial Development at the point in time when PRPB is expected to have at least achieved Preliminary Compliance for that monitoring period.

**2. Initial Development**
"Initial Development" means that during the auditing period, PRPB has taken substantive steps (e.g., retaining a vendor/consultant) toward achieving compliance with an Agreement requirement this is not yet scheduled for completion. Initial Development will only be noted if PRPB's efforts are consistent with established timeframes in the Monitoring Plan or Agreement. If PRPB is expected to have achieved at least Initial Compliance during the auditing period, and has not, the Monitor will note "Non-Compliance."

**3. Administrative Compliance**
"Administrative Compliance" means that during the auditing period PRPB has completed all necessary actions to implement an Agreement requirement, but General

Compliance has not yet been demonstrated in PRPB's day-to-day operations.

**4. Operational Compliance**

"Operational Compliance" means that PRPB has satisfied an Agreement requirement by demonstrating routine adherence to the requirement in its day-to-day operations or by meeting the established deadline for a task or deliverable that is specifically required by the Agreement. PRPB's compliance efforts must be verified by reviews of data systems, observations from Monitor, etc.

**5. Full and Effective Compliance**

"Full and Effective Compliance" means that all Monitor reviews have determined that RPB has maintained Operational Compliance for the two-year.

The Monitor will use these categories when assessing the PRPB and the Commonwealth's compliance in its bi-annual reports.

In addition, the Monitor's reports will also include additional differentiation between crucial types of compliance: **policy compliance, training compliance, data gathering/reporting/documentation compliance, staffing compliance, resource compliance, and outcome compliance.** For example, policy compliance means (a) that there are sufficient written policies and procedures in place so that, if they were implemented, compliance would be achieved; and (b) that there are no policies and procedures in place that are inconsistent with the requirement. See Appendix B for sample of Reporting and Rating document.

Methods and Instruments

To measure compliance, the Monitor has tailored the methodology that he developed for the capacity-building period to achieve the following two objectives during the compliance period: (a) continue to assist the Commonwealth and the PRPB in building operational and management systems and structures that will facilitate compliance with the Agreement following the capacity-building period for the 33 steps for which extensions are likely to be granted once the agreement in principle between the Parties is filed with the Court for approval as noted in footnote 1 of this document (see Agreement ¶ 236 concerning feedback and technical assistance to develop and implement Action Plans[9]); and (b) to evaluate PRPB's progress by assessing the implementation of the Agreement (see Agreement ¶ 242 and 245). These steps will permit the Monitor to meet its reporting obligations under Paragraph 251.

In general terms, the basic methodological steps to be taken are as follows:

1) The Monitor will continue to develop onsite tour schedules jointly with the PRPB while informing the Parties;

---

9 Paragraph 236 will no longer be operative following the capacity-building period.  Deficiencies will be captured as either policy, training, or operational non-compliance.

2) The Monitor will continue to meet with the PRPB leadership at the beginning of monitoring visits to review the Commonwealth's implementation plans, compliance objectives, and monitoring activities;

3) The Monitor will conduct exit briefings following monitoring visits;

4) The Monitor will continue to share recommendations and soliciting feedback on implementation priorities;

5) The Monitor will continue to prepare written memoranda describing recommendations and areas of concern following specific audits or assessments;

6) The Monitor will continue to identify sources and provide materials on best practices; and

7) The Monitor will assess the Commonwealth's engagement with community groups and other stakeholders to promote collaborative partnerships and broad participation in the reform process, as required by the Agreement.

With respect to the second objective under paragraphs 242 and 251, the Monitor will begin to assess and measure the PRPB's progress against the Agreement.  The Monitor will continue to develop specific measurements of progress for each initiative to report the level of compliance achieved.  These are the four ratings that are designed to depict change – noncompliance, partial compliance, substantial compliance, and full compliance.   In conducting his organizational assessment of PRPB's compliance initiatives, the Monitor will use a combination of qualitative and quantitative data collection methods.   The emphasis will be on quantitative data collection methods because, as noted in several reports and communications, the PRPB needs to build robust quantitative data gathering and data reporting capabilities.

The methodology sets forth the Monitor's steps and plans to assess PRPB's quantitative data gathering and data reporting capabilities.  These data systems will be essential to the PRPB in order to manage its operations, demonstrate compliance, and share information with the public.   The Monitor continues to offer the expertise of members of the Core Team - two PhDs with expertise in advanced quantitative methods and one Chief Information Officer - that will be available to assist the PRPB in building this quantitative capacity.  The Monitor will also hire the services of a consultant with extensive expertise in data analysis.

When determining the scale and scope of a report on organizational assessment, decisions must be made about the capacities, core issues, and points of entry to be included in the assessment. What also needs to be established is how these capacities will actually be assessed. The Monitor's assessment is to be conducted through a variety of qualitative and quantitative data gathering methods.

**Qualitative data gathering methods**:

1. <u>Documentary Research and Desk Review</u>.

The Monitor will review documentary evidence. This documentation will include internal and external institutional reports, correspondence, organizational and staffing charts, personnel records, administrative reports, MOUs and other agreements, planning documents, needs assessments, monitoring and evaluation reports, and financial records as needed.  Access to privileged and confidential documents will be determined on a case-by-case basis.

2. <u>Organizational self-assessment or internal questionnaire</u>.

The Monitor will provide, if needed, a structured questionnaire for the PRPB self-assessment in the areas identified in the process. The Monitor will also review PRPB's self-assessment reports.

3. <u>Interviewing Key Personnel</u>.

The Monitor will interview key individuals who will be able to provide information about the PRPB's programs and initiatives. The best method to collect primary source data is the interviewing of key decision-makers. Unlike an organizational self-assessment report or questionnaire, organizational capacity assessment generates its basic assumptions based on face-to-face, one-on-one targeted interviews. Instead of using a structured questionnaire framework, where interviewers read the questions exactly as they appear on the survey questionnaire and the choice of answers to the questions is often fixed in advance, the Monitor will put special emphasis on semi-structured questions.

This method offers flexibility to probe for details, allowing new questions to be brought up during the interview as a result of what the interviewee says. It is a conversation with a purpose. To obtain a balanced view, different perspectives should be gathered. This may imply collecting input from people at various levels of an organization, e.g., managerial, supervisory, and technical personnel at central level and field, persons in charge of personnel planning, recruitment, and training. It may also imply collecting information from an organization's partners. The ability to identify and gain access to key people with access to information and to extract accurate information from them is intuitive process that requires skills and sensitivity.

4. <u>Focus Group Discussions</u>.

Aside from in-depth interviews other qualitative method that the Monitor will use as needed are focus group discussions. Focus group process can take advantage of interactions within the group to stimulate participants to exchange of information and generate new material. Talking to staff or other stakeholders of an institution in group provides an opportunity to elicit information or check impressions gained by face-to-face interviews

5.  <u>Site visits and observation</u>.

The Monitor will use site visits and observation to gain additional information. Observations can expose information not otherwise obtained or validate information gained by other means. Observation of physical assets of an institution is a way to assess an institution's stock (for example, inventory, equipment, facilities, and so forth). Observation of the behavior of staff is much more difficult, especially if the time available is short, but can provide important insight.

**Quantitative data collection methods**:

The Monitor will use the expertise of a consultant as well as of the members of the Core Team familiar with statistical techniques and data analysis to develop complex analysis where statistical significance is emphasized. Although simple descriptive analysis procedures are usually sufficient, results must be generalizable. The Monitor will focus on measures or central tendency, variability, comparison of groups, and relationships between variables.

For the readers who are acquainted not just with descriptive methods, but also with Pearson's chi-square test, Fisher's exact test, and Student's t test, the Monitor will be also able to produce, if the data is available, a large proportion of quantitative-based assessments.  In these assessments, criteria will be presented as to the decision for choosing the proper statistical test. An algorithm and a table will be provided to facilitate the selection of the appropriate test.

Compliance monitoring is increasingly based on empirical studies and the results of these are usually presented and analyzed with statistical methods. It is therefore an advantage for the Parties if they have staff who are familiar with the most frequently used statistical tests, as this is the only way they will be evaluate the statistical methods used in the Monitor's report and thus correctly interpreting the Monitor's findings.

The Monitor anticipated that readers who are familiar with descriptive statistics, Pearson's chi-square test, Fisher's exact test and the t-test, should be capable of correctly interpreting the statistics in the vast majority of the assessments the Monitor plans to conduct. When possible, the Monitor will conduct more complex test procedures.

In past communications, the PRPB asked for clarification on the evaluation methodology.   In particular, the PRPB asked for additional information on data

collection, selection of focus groups, structured interviews, and organizational assessment.  The Monitor and his consultants will prepare detailed handouts for the PRPB and the Parties on how data will be collected, focus groups selected, and questionnaires are prepared once this information is put together.  This will be in the methodology for each requirement and described in each monitoring report.  In this process, the Monitor continues to use two main references: Stephen Isaac and William B. Michael, Handbook in Research and Evaluation (EDITS:1995) and Paul Brewerton and Lynne Millward, Organizational Research Methods (SAGE: 2001).

**Outcome Assessments**:

In addition to the qualitative and quantitative compliance reviews discussed above, the Monitor will conduct qualitative and quantitative outcome assessments to measure whether the implementation of this Agreement has resulted in constitutional policing, pursuant to Paragraph 243.

These outcome assessments shall include collection and analysis of the following outcome data trends and patterns: a.) Rates of Use of Force Reforms; b.) Rates of Stop, Search, and Seizure Reforms; c.) Rates of Equal Protection, Non Discrimination and Community Engagement; c. 4) a satisfaction survey of representatives from the community, including rape crisis advocates, service providers, and/or legal providers, regarding PRPB services related to equal protection, sexual assault, and domestic violence, that is drafted by PRPB and the Monitor and is statistically valid, based on a sound methodology, and conducted by an independent entity; d.) Rates of Civilian Complaints, Internal Investigations, and Discipline; d. 3) number of misconduct complaints, with a qualitative assessment of whether any increase or decrease appears related to access to the complaint process, and assessment of where and when complaints are coming from, by geographic area and shift.

In accordance with Paragraph 244, these outcome assessments shall include collection of data relevant to and analysis of the outcome measures set out in the above sections, including an analysis of patterns and trends, as well as any additional assessments the Monitor deems necessary for measuring the Commonwealth of Puerto Rico's implementation of this Agreement. This part of the compliance work will be done in cooperation with impartial outside consultants.

A scientific research methodology will be applied for the accomplishment of the Paragraph 243.  This methodology will consist in a research design that will measure:

1) includes collection and analysis of the following outcome data trends and patterns: a.) Rates of Use of Force Reforms; b.) Rates of Stop, Search, and Seizure Reforms; c.) Rates of Equal Protection, Non-Discrimination and Community Engagement; d.) Rates of Civilian Complaints, Internal Investigations, and Discipline;

2.) a satisfaction survey of representatives from the community, including rape crisis advocates, service providers, and/or legal providers, regarding PRPB services related to equal protection, sexual assault, and domestic violence, that is drafted by PRPB and the Monitor and is statistically valid, based on a sound methodology, randomly selected and stratified by the 13 Police Districts of P.R. in proportion of every municipality established in the census.   Selection of the proportion of the adults (18 years or more) will be made as in the 2012 (or more recent census).

3.) The self-perception of members of the PRPB and others through a focal group study where members of the police will discuss (Rates of Civilian Complaints, Internal Investigations, and Discipline) about the number of misconduct complaints, and whether any increase or decrease appears related to access to the complaint process, and assessment of where and when complaints are coming from, by geographic area and shift.

These three procedures are going to take place during the first year of monitoring creating a baseline.  The elaboration of reports after collecting the baseline data of the three research studies will take place during the second half of the first year of monitoring.  These baseline reports will include the presentation of the tables, graphics, crosstabs, and their explanations.

## III. MONITORING PLAN'S FIRST-YEAR PRIORITIES[10]

### A. Review and Revision of Policies

The Agreement provides that the PRPB will continue develop and implement comprehensive and agency-wide policies and procedures that are consistent with and incorporate all substantive requirements of this Agreement during the monitoring period. The Monitor's primary goal for the first year of the monitorship will be to continue to work with the PRPB, the Commonwealth, and community members to continue to produce pending policies so that they can be incorporated into the Agreement's requirements and begin training PRPB personnel on these new policies.

To that end, the Monitor anticipates that the PRPB will continue to review and revise its current policies and General Orders starting in October 2018 and the Monitor will have the opportunity to assess compliance no longer with the timelines and goals of the Actions Plans but the timelines and targets set forth by the Agreement.

### B. Use of Force

---

10 Although a monitoring plan may not be required under the Agreement, Paragraph 245 calls for a plan and a plan is useful to highlight the focus of the Monitor during this period.

The Agreement provisions regarding Use of Force contain some of the most important requirements of the Agreement and touch upon issues most pressing to Commonwealth community members, as well as the nation. Therefore, the Monitor has prioritized the PRPB's review and revision of its Use of Force policies, and anticipates that the PRPB will have revised in accordance with the timelines set for by the Agreement all relevant use of force policies in place during the last quarter of 2018 and 2019. Moreover, the Monitor will carefully review the PRPB the likely adoption of a new use of force reporting system by the PRPB in 2019, which will include officers' individual accounts of any use of force incident. The applicable deadlines are set forth in the Plan (see Appendix).

Additionally, the PRPB will assess that the PRPB has established an Effective Force Investigation Team to review Serious Force Incidents in all areas and has established Use of Force Review Boards starting in October 2018.

## C. Stops, Searches, and Arrests

Another priority during the first year will be to put systems in place that ensure the PRPB conducts all investigatory stops, searches, and arrests in accordance with the rights secured or protected by the Constitution and local law. To that end, beginning in October 2018, the Monitor will assess that the PRPB has completed its comprehensive training on the requirements for make constitutional stops, searches, and arrests that are in keeping with best practices. In order to ensure compliance and adequate reporting, the Monitor will assess whether the PRPB has modified its procedures to collect and preserve stop, search, and arrest data sufficient to determine the nature and scope of demographic disparities in stop and search practices, as well as which stop and arrest practices are most effective and efficient.

The Monitor will evaluate whether the PRPB continues to update its current forms after October 2018 and trains officers on how to fill them out properly in 2019. The Monitor will also issue a report summarizing the available data on its stops, searches, arrests, and uses of force. The report will set forth the steps taken by the PRPB to correct problems, and build on successes that the data shows.

## D. SARP: Complaint Intake and Investigation

The Monitor will prioritize working with the Parties to review and revise the PRPB's internal affairs for complaint intake and investigation. As a first step, the PRPB will revise SARP staffing and ensure that SARP staff have appropriate training for their positions.

The Monitor will assess whether the PRPB is trained on how to properly handle complaint intake on or before early 2019. Beginning in October 2018, the Monitor will assess whether the PRPB continues to collaborate with the community and publicizes a program regarding how to make police misconduct complaints.

As part of that effort, the Monitor will assess whether the PRPB makes materials outlining the police complaint process easily accessible to Commonwealth community members, including posting the materials on its websites and appropriate government properties. The Monitor will also revise PRPB policies to make clear that all complaints must be accepted from community members, regardless of whether they are made in writing, verbally, in person, by mail, or telephone.

## E. Community Engagement and Civilian Oversight

Another priority in the first year of the monitorship is for the PRPB to revitalize its community policing efforts. In order to provide a strong foundation for accomplishing this important task, in 2019, the Monitor will evaluate whether the PRPB will assess and revise its staffing allocation and personnel deployment to support community policing and problem-solving initiatives and modify any deployment strategy that is incompatible with effective community-oriented policing. This Staffing Plan is crucial to creating a successful community policing program and will encompass both the PRPB's general patrol operations, as well as the various specialized units in the PRPB.

The PRPB will provide training to its personnel on best practices regarding community-oriented policing and problem-oriented policing methods and skills.

The Monitor's primary task in this area for the first year is to continue to conduct comprehensive surveys to assess Commonwealth community members' experiences with and perceptions of the PRPB and public safety. The Monitor has already conducted a survey of PRPB personnel and residents and is currently conducting another survey. Once those surveys are completed, the Monitor will conduct a survey of custodial arrestees.

## F. Non-Discrimination and Bias-Free Policing

During the compliance period starting October 2018, the PRPB's work on non-discrimination and bias-free policing is likely to have substantial overlap with its efforts in the stops, searches, and arrests, and community engagement and civilian oversight areas. In addition to the objectives detailed in those sections, in 2019, the Monitor will evaluate whether the PRPB will provide officer training on bias-free policing and the Monitor will begin to conduct demographic analyses of PRPB's enforcement activities.

## G. Data Systems Improvements: Early Warning and Records Management Systems

The Agreement requires the PRPB to enhance its Early Intervention System in 2019, and to revise its use of its current Record Management System so it can make effective use of the data it contains. During the first year of the monitorship, the PRPB will monitor closely the implementation of the Early Warning System and Record Management System to accomplish these tasks.

**H. Officer Training**

In addition to the training PRPB personnel will receive for the specific areas of the Agreement outlined above, in accordance with the Agreement, the PRPB must complete its first wave of training on the requirements of this Agreement in 2019. Accordingly, the Monitor will assess whether all PRPB officers are aware of and understand the Agreement before the PRPB begins fully implementing its requirements.

In addition, the Monitor will evaluate whether the PRPB will provide officers with at least significant hours of in-service training each year, and will provide additional training as necessary to address changes in the law, or issues identified through its review of use of force incidents, arrest reports, misconduct complaints, or other means.

**I. Agreement Implementation and Enforcement**

The Agreement details the Monitor's requirements for assessing compliance with the Agreement and issuing reports on its efforts. In particular, the Monitor is responsible for conducting compliance reviews and audits to determine whether the PRPB are implementing and complying with the Agreement's requirements; conducting "outcome assessments" to determine if implementing the Agreement is resulting in policing that is consistent with the Constitution and engenders effective cooperation and trust between the PRPB and community it serves; and issuing public reports that set forth the Monitor's findings.

During the first year of monitoring, the Monitor (with the Parties) will conduct baseline assessments for each area required by the Agreement following the Roadmap agreed upon the Monitor and the Parties. The Monitor is currently working with the PRPB to determine which data it has available in its current systems, and the order in which the Monitor will conduct the outcome assessments will depend on the availability of data.

The Monitor will continue to prepare semi-annual reports that inform the Court, Parties, PRPB, community members, and the general public about the work the Monitor has conducted during the reporting period; the status of the PRPB's implementation of the Agreement requirements; the methodology and findings for any audit or compliance that the Monitor conducted during the reporting period; recommendations for necessary next steps to achieve compliance with the Agreement; and a projection of the Monitor's work during the following period.

The first Monitoring Report will begin in 2019 *after* the Monitoring Plan is approved by the Court. The Monitor, therefore, will conduct its first compliance review/audit in March 2019. As with the outcome assessments, the subject matter(s) of the audits and reviews will depend upon the data that is available for collection at that time.

The PRPB will be evaluated based upon its performance in the six months after approval of the Monitoring Plan. Accordingly, the Monitor's first bi-annual report will be published on or about March 2019, will focus on the Monitor and Parties' activities since the compliance period went into effect.

## IV. FINDINGS AND PUBLIC COMMUNICATION

The overarching aim of the Agreement is that police services delivered to the people of Commonwealth fully comply with the Constitution and laws of the United States, promote public and officer safety, and increase public confidence in the PRPB and its officers. To achieve this goal, community members must have a role in how the Agreement is implemented and a venue through which to voice their experiences, concerns, and ideas.

In 2018, the Court and the Monitor introduced the Town Halls Community Meetings hosted by the Monitor, the Parties and the PRPB. At these meetings, the Monitor provides an overview of his role in the Agreement and addresses questions that community members have about the Agreement and monitorship. These meetings will continue during the compliance period starting in October 2018.

In the past, the Monitor has implemented multiple methods of communicating with the public and receiving public input on the Agreement's implementation throughout the duration of the monitorship. In 2019, the Monitor will work on additional ways to meet and communicate with community members and stakeholders.

## V. CONCLUSION/RECOMMENDATION TO THE COURT

Once approved the current draft, including the Roadmap and its timeline, the Monitor proposes the following recommendation to the Court:

The Monitor and Parties have collaborated to create this Monitoring Plan and Methodology, which establish the framework for measuring the Agreement's requirements for the first year of the monitorship with a high degree of flexibility. The Monitoring Plan sets forth aggressive but achievable monitoring goals for the first year and lays the foundation for complete compliance with the Agreement within six years. Therefore, the Monitor and Parties respectfully request that the Court approve the First-Year Monitoring Plan which the Monitor has discussed extensively with the Parties receiving and incorporating very valuable input.

The Monitor looks forward to working with the Court and the Parties in the implementation of this methodology.