```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF PUERTO RICO
 2    :_____:

 3     UNITED STATES OF AMERICA,          :
                                          :
 4                    Plaintiff,          :
                  vs.                     : No. 12-CV-2039 GAG
 5                                        :
       COMMONWEALTH OF PUERTO RICO, et al., :
 6                                        :
                      Defendants.         :
 7    :_____:

 8                TRANSCRIPT OF PUBLIC HEARING
       HELD BEFORE THE HONORABLE CHIEF JUDGE GUSTAVO A. GELPÍ
 9    JOSÉ V. TOLEDO U.S. COURTHOUSE, OLD SAN JUAN, PUERTO RICO
           MONDAY, AUGUST 20, 2018, BEGINNING AT 2:17 P.M.
10    :_____:

11    A P P E A R A N C E S :

12         U.S. DEPARTMENT OF JUSTICE
           Civil Rights Division
13         By Luis E. Saucedo, Esquire
           300 N. Los Angeles Street
14         Federal Building, Suite 7516
           Los Angeles, California 90012
15         For the United States of America

16         P.R. DEPARTMENT OF JUSTICE
           Federal Litigation Division
17         By Joel Torres Ortíz, Esquire
           P.O. Box 9020192
18         San Juan, Puerto Rico 00902-0192
           For the Commonwealth of Puerto Rico
19
      ALSO PRESENT:
20
           Courtroom Deputy Clerk Sonia C. Cardona
21         Spanish Interpreter Manuel Horta
           Monitor Arnaldo Claudio
22         TCA Alfredo A. Castellanos-Bayouth, Esquire
           TCA Antonio R. Bazán-González, Esquire
23         Police Commissioner Henry Escalera
           Gov. Chief Legal Advisor Alfonso Orona-Amilivia
24         Susana Peñagarícano, Esquire

25
```

1          THE COURTROOM DEPUTY:  All rise.

2          (The Court enters the room.)

3          THE COURTROOM DEPUTY:  The United States

4  District Court for the District of Puerto Rico is now

5  in session.  All those having business before this

6  Court shall draw near, give your attention and you

7  shall be heard.  God save the United States of

8  America and this Honorable Court.  Honorable Chief

9  Judge Gustavo A. Gelpí presiding.

10          THE COURT:  Please be seated.  Call the

11  case.

12          THE COURTROOM DEPUTY:  United States of

13  America versus the Commonwealth of Puerto Rico set

14  for public hearing.  Will the parties please present

15  themselves for the record.

16          MR. SAUCEDO:  Good afternoon, Your Honor.

17  Luis Saucedo for the United States.

18          MR. TORRES-ORTÍZ:  Joel Torres-Ortíz for the

19  Commonwealth.  I would like also to acknowledge the

20  presence of several individuals from the

21  Commonwealth.

22          THE COURT:  Please.

23          MR. TORRES-ORTÍZ:  Police Commissioner Henry

24  Escalera is present.  The Governor's personal

25  representative Alfonso Orona.  Director of federal

1    litigation Susana Peñagarícano from the Puerto Rico

2    Department of Justice.  Also we have the interim

3    budget director, Ms. Mildred Reyes Pérez.  Also, we

4    have auxiliary superintendant for professional

5    responsibility, Colonel José Ramírez-Ramos.  And we

6    have the director of the canine division, Alberto

7    Rivera -- Lieutenant Alberto Rivera.

8           THE COURT:  Good morning.  And I know the

9    monitor and his attorneys are here, as well as

10   members of his team, Arnaldo Claudio.  And also I see

11   Attorney Castellanos, Attorney Bazán, Ms. Navedo.

12   And I know the deputy monitor, Marcos Soler and also

13   the investigator José Pujol are here.  So we're all

14   set.

15          So, let me begin by making some general

16   comments and observation as to matters.  We have

17   about ten items for the agenda.  First of all, again,

18   as I had mentioned, I'm trying to hold -- due to my

19   duties as chief judge, it becomes extremely hard for

20   me to go to Ponce or elsewhere to have a public

21   hearing for two days as I wish I could and could hear

22   from everybody.  In that respect, and we'll hear from

23   that later on in the agenda, we've been having the

24   town hall meetings where I know Mr. Torres from DOJ,

25   members of the police, and Mr. Saucedo, as well as

1    members from the monitor's office have been

2    participating.  And in a sense it doesn't substitute

3    it a hundred percent, I wish I were everywhere, but

4    it's the Court reaching out to the public, the police

5    in different areas.  So we will hear from that.

6            The other points -- and, again, I just going

7    to mention general points.  We will be discussing

8    this throughout the whole process.  But what I will

9    be doing is again periodically -- and it's been

10   usually like a month, month and half I've been

11   holding periodic status conferences.  Sometimes we

12   have discussed matters in camera, but I'm -- given

13   that we're about to approach the monitoring phase of

14   the case, I understand that these hearings should be

15   held public.

16           First of all, the capacity-building period

17   ends October of this year, October 7th.  There's a

18   total of 237 areas.  There's been requests for

19   extension of 34 areas.  And the United States

20   Department of Justice was discussing those with the

21   Commonwealth -- I will hear from you in a bit as to

22   that -- but about at least approximately 90 percent

23   of the areas in the Reform agreement, by October 8th

24   monitoring will begin in those areas.

25           Now, the monitor will be presenting by

1    August 30th the methodology for monitoring, as soon

2    as the parties receive it they should provide

3    comments and provide feedback to the Monitor because

4    obviously by mid to late September we need to have

5    that methodology set in place.

6              Now, because this was a capacity-building

7    period of four years, and now we're going to have a

8    monitoring period, the Monitor's office in the next

9    month and a half or two months will undergo a

10   reorganization.  It doesn't -- what that means is

11   that the Monitor I've instructed him to meet with the

12   staff and assess what areas each of the staff members

13   will be covering.  It is -- I mentioned this in

14   probably two or three of the prior hearings.  In

15   addition to the current staff, assistant monitoring

16   staff will be -- in the months to come will be hired

17   because obviously this is going to take a lot of

18   time, a lot of effort, and it's important that the

19   Monitor have all the staff under his office.

20             Now, as I mentioned, not for this fiscal

21   year but for the next fiscal year everybody is

22   informed, expect an increase in budget.  I -- for the

23   last -- since the reform process began, the budget

24   recommended originally by U.S. DOJ -- and Mr. Saucedo

25   can correct me if I'm wrong -- I think it was about

1    4.5 million for the Monitor's office.  I was able to

2    bring that down in order to save the Commonwealth

3    money to approximately $1.4 million a year.  But the

4    time has come -- and, again, I'm not talking about

5    going up to that number, but there has to be a 20,

6    25 percent increase which I think -- the Commonwealth

7    at least has saved probably about $3 million for the

8    last five years.  So I guess we saved $15 million but

9    at this point it becomes necessary for the Monitor to

10   have in the next fiscal year some additional budget.

11          Now, once monitoring starts, everybody in

12   his staff will be performing, again, monitoring

13   functions.  So, at some point, you know, the badges

14   that the monitors have they all say "Monitor."  And

15   that is important because in the past -- and, again,

16   not only in this case, in other case I have another

17   monitoring.  It's difficult that if they won't

18   identify themselves as monitors and with the chief

19   monitor, people who don't know about what's going on

20   will not give them the respect or provided

21   information they were required.  So everybody will be

22   referred, once the monitoring starts, as a monitor.

23   And, again, Mr. Claudio will be the chief deputy

24   monitor and then obviously you have seven, eight,

25   nine ten monitors who are working under him,

1   providing monitoring work.

2           Now, something that's important, and I just

3   say this in general terms and will be more specific

4   when we touch other points, it's important once that

5   monitoring begins that, according to the methodology,

6   there's a methodology and there's orders of the

7   Court, there's the Agreement, the data that is

8   requested by the Monitor's office, this is not

9   received by the Monitor, and the Monitor doesn't --

10  it's not shared, it's confidential information but it

11  has to be provided on a day-to-day basis when

12  requested.

13          So one of the things that's going to be

14  happening when there's monitoring, and this is just

15  an example, but assume the Monitor on a given week

16  says, for example, On Tuesday, next Tuesday at

17  8:00 a.m., members of my office -- and obviously this

18  can be unannounced because that's what monitoring is

19  about.  But members of the Monitor's office can show

20  up individually at the 13 police regions or at

21  different police stations throughout the island and

22  request the same exact information.  And when that

23  occurs that has to be provided on the spot along with

24  all the orders of the Court, the directives of the

25  Court, because that's how monitoring goes.

1           So obviously there's going to be time for

2     that, to prepare for that, but I'm just giving

3     everybody a heads-up, that's what the monitoring

4     phase is.  And if the monitoring phase is complied

5     with it will terminate a schedule which I would

6     definitely like that to happen.

7           Now, I don't want to sound too drastic but

8     once monitoring starts if there's noncompliance,

9     there's remedies; and remedies can range anywhere

10    from sanctions, economic or noneconomic sanctions,

11    contempt, and receivership.  And, again, that is the

12    most drastic -- one of the most drastic sanctions.

13    And a receivership -- I'm not saying the entire

14    police force has to be on receivership, but let's

15    assume there's an office within the reform -- let's

16    assume that, for example, the canine office.  Let's

17    assume the information provided by the monitoring is

18    that it's not operating the way it is, there could be

19    a receiver for that office; there could be a receiver

20    for one or more offices.  And, again, the Monitor is

21    not the receiver.  If there's a receiver, the Monitor

22    monitors the receiver.

23          But, again, I hope -- and just because I'm

24    forewarning this doesn't mean it's going to happen, I

25    hope it does not happen; but I ask obviously for full

1    cooperation so we don't have to reach this extent.

2    And obviously the most drastic sanction would be a

3    receivership over the entire police bureau -- which,

4    again, don't put me in that position, and I hope it's

5    not going to happen.  But I need to alert everybody

6    because of the importance of this issue.

7           Now, those are some general comments that I

8    have.  We're going to begin with -- I know there's a

9    canine out there somewhere so perhaps if we can begin

10   with the canine division.

11          Yes?

12          (The Court confers with the Monitor.)

13          THE COURT:  Let me go to budget first and

14   then we'll talk about the canine division.  So, let

15   me make some general comments.  What the procedure is

16   going to be throughout the afternoon, I'll hear first

17   from Mr. Saucedo then I'll hear from the

18   Commonwealth.  If the Monitor has any comments also I

19   will hear from him as to that item.  And then at the

20   end of the day I know the Commissioner's here,

21   Mr. Orona is here, so I will allow him to make other

22   general comments in the bigger framework.

23          So as to -- let me begin as to the budget

24   and I'll make a general observation -- I'll make two

25   general observations and then I'll hear from

1    everybody.  Now, I do note that, again, this is -- I

2    have information that's been provided for the budget

3    for the years 2014, 2015, 2016, -17, and -18, for the

4    years this case has been ongoing.  Now, what is

5    concerning to the Court is the fact that

6    approximately there's $20 million a year that are

7    provided for the Reform aside from -- again, this has

8    nothing to do with the Monitor's office, but from the

9    Reform for the Police of Puerto Rico.  And looking

10   longitudinally at all those years, there are years

11   when most of the budget has been used but, for

12   example, in 2017 there's almost like $15 million that

13   were not used throughout that year.  And right now

14   we're in -- that's fiscal year 2017/18.  We're in the

15   new fiscal year 2018/19 so that's not startling.

16           There's another item I'd like to ask also.

17   In 2014 I see there's almost $7 million in travel.

18   Again, I know there was a different administration

19   but I'd like to ask if anybody has an idea why was so

20   much spent in travel.  What kind of travel?  I just

21   can't fathom spending that amount of money.  The

22   other issue --

23           MR. TORRES-ORTÍZ:  Your Honor, if I may.

24           THE COURT:  Yes.

25           MR. TORRES-ORTÍZ:  If I may just correct

1    that.  I just talked with the police director from

2    the reform office and they explain me that the table

3    that was given has an error because it's supposed to

4    say -- in Spanish it's gasto *de viaje* and *misceláneo.*

5    So it would be miscellaneous also.  So there are

6    other costs other than just travel.

7            THE COURT:  Okay, but I would like to know

8    what's miscellaneous, what's other, what's travel.

9    Because, for example, 2014 if we put travel and

10   miscellaneous, $6,659,306.17.  That's a lot.  2015,

11   $1,720,900.70.  2016, no travel, no expenditures.

12   2017, $14,000; 2018 so far it's been 32,000.  But,

13   again, those numbers -- at least those two first

14   years 2014 -- 15 are alarming.  And, again, I'd like

15   to know -- this was not during this administration,

16   but I'd like to know what was that.

17           The other thing I think is important for

18   purposes of the budget, and I'll just make a general

19   comment, when -- I know there's been issues

20   throughout the entire island, the government, with

21   PROMESA but specifically Section 204/1, this is a

22   case that there's an agreement between the parties

23   and cases that there's an agreement and payments have

24   to be made or disbursed such as this, the fiscal

25   board cannot touch upon those.

1    In the hierarchy, you know -- and, again, I

2 know this is probably an appeal but even assuming the

3 fiscal board is correct that there's the three

4 branches of the constitutional government in Puerto

5 Rico -- you have the executive, legislative, and

6 judicial, and because of PROMESA the fiscal board has

7 been put on top for fiscal matters, if

8 ultimately that is -- I know Judge Swain basically

9 made that ruling -- again, that can be appealed, it

10 can be taken to the Supreme Court if necessary -- but

11 even assuming that ruling is sustained, the PROMESA

12 board -- you know, this court is a federal court, the

13 PROMESA board is a Commonwealth entity created by

14 federal law, but it's a Commonwealth entity so the

15 fiscal board must respect and has to oblige to any

16 rulings pertaining to budget in the police reform.

17    The fiscal board cannot say, Oh, it's 20

18 million per year, we're going to give it 13 million.

19 That cannot be touched.  So I just want to make that

20 very clear because the budget in this case is outside

21 of the scope of PROMESA.  It is the government's

22 budget, but that is -- the PROMESA law specifically

23 looks into that.

24    So, having said that, what I'd like to hear

25 regarding budget first is to hear from Mr. Saucedo

1    then I'll hear from Mr. Torres.

2              MR. SAUCEDO:  Good afternoon, Your Honor.

3    With respect to budget, the parties and the TCA had a

4    meetings last week at police headquarters where these

5    figures were presented including the spent and

6    unspent funds during the capacity-building period

7    which began with the appointment of TCA in June of

8    2014.

9              We share the Court's concern about some of

10   these funds being unspent.  Last year we had a bit of

11   a crises where the money that had been allocated from

12   the asset forfeiture program were frozen and that led

13   to a number of requests for materials, for training,

14   for other critical needs of the police bureau to have

15   gone unmet for a period of time.  Luckily, we did

16   have a breakthrough ultimately, but I note that it

17   coincided with the 2017 year where a large portion of

18   the budget was unspent.  That is approximately

19   $15 million.

20             The TCA office and the members of his team

21   are every month visiting precincts all over the

22   island and they're noting serious deficiencies in the

23   lack of radios, the lack of other critical equipment;

24   and so it's of concern that this money was gone and

25   spent given the number of needs that Puerto Rico has

14

1    to meet.

2         Ultimately, Your Honor, the

3    capacity-building period was included as part of this

4    case to put the police in the best possible position

5    to successfully implement the Agreement.  So there

6    have been many investments made.  Our understanding

7    is that a lot of the more costly information systems

8    are still in development, being implemented; but they

9    were started during the capacity-building period and

10   those are moving along.

11        Your Honor, as you also noted, PROMESA at

12   Section 204 and then again later in Section 304 the

13   law itself provides that the fiscal control board

14   cannot impede the actions taken by the Commonwealth

15   to comply with the consent decree.  So one has to ask

16   sort of what was happening within the Commonwealth

17   for this to have happened given that PROMESA was not

18   an impediment itself to the funds that were being

19   allocated.

20        I also -- I do want to note, Your Honor,

21   that both the certified budget and I believe also the

22   other budgets that were approved this fiscal year

23   include the $20 million.  And we know that --

24        THE COURT:  So for this year's budget again

25   there's no issue with the fiscal board.  Last year or

1   this year there have not been any issues.

2         MR. SAUCEDO:  That's correct, Your Honor.

3   That's correct.  And we would ask, Your Honor, that

4   in the self reports that the Commonwealth provides to

5   this Court -- the next one is due September 24th --

6   that those reports include the same information that

7   we're receiving today, the number of -- the amount of

8   money allocated and the amount of money spent;

9   because we do believe that it's very important, given

10  the challenges facing the island, that there be

11  greater transparency in the use of these funds.  And

12  so --

13        THE COURT:  We're beginning in October the

14  monitoring phase.  What I'm going to ask is that on

15  the 1st of each month the Commonwealth inform the

16  parties -- and, again, this doesn't have to be filed

17  with the Court -- and actually I would like to see it

18  also on a monthly basis.  But what I'll do is give it

19  informally to the parties, I'm going to ask the

20  Monitor to provide me a copy just so I can see it,

21  but it should be provided the 1st of each month.

22  That's my directive as of now on.  And I think it's

23  important because that way either the U.S. DOJ or the

24  Commonwealth -- the Commonwealth or the TCA, anybody

25  can say, What's this item or why haven't we spent

1    this amount or why have we spent more?  And I think

2    it helps everybody so...

3            MR. SAUCEDO:  Your Honor, I have nothing

4    further on the budget.

5            THE COURT:  Okay, let me just double-check

6    if I have any questions for you and, if not, I'll go

7    to the Commonwealth.  Let me then hear -- and I want

8    to recognize -- I don't know if Mr. Torres noted that

9    she was here but Clementina Vega, the director of the

10   police reform office, is here as well.

11           Now, Mr. Torres, my question then I'll hear

12   from you in regards to everything that I've mentioned

13   and Mr. Saucedo, but my question is if -- I

14   understand, for example, if last year there was

15   budget that was unused, approximately 15 million or a

16   little over that, is that budget still available to

17   the Reform or where is that budget?  And if it's not

18   available, was it spent or what happened?  That's my

19   big question.  Sorry to put you in that spot but...

20           MR. TORRES-ORTÍZ:  Yes, Your Honor.  Well,

21   because of Law 26 of the Commonwealth, that money

22   that was not used for the Commonwealth -- I mean, for

23   the police reform, it was sent back to the Department

24   of Treasury of Puerto Rico.  So, it is not available

25   at this moment to be used in the police reform.

1    But --

2              THE COURT:  So that money what was not used

3    for any past fiscal year, Treasury has that or it's

4    not earmarked for the reform anymore?

5              MR. TORRES-ORTÍZ:  Yes, Your Honor.  And

6    that's due to local Law 26 of the Commonwealth.

7              THE COURT:  So what you're saying is that

8    when local Law 26 was enacted due to the, I guess,

9    bureaucratic, administrative, all those other

10   changes, those moneys were not used to further the

11   Reform?

12             MR. TORRES-ORTÍZ:  They were not used, Your

13   Honor.  But I think it's important to note -- and I

14   would like to allow the budget director to give more

15   information on the budget across the board on the

16   whole year.  But I think it is important to know

17   that, you know, in these past years $80 million have

18   been used in the police reform; and that's an

19   incredible amount of money that could not have been

20   used if this police reform wasn't in place.  So, you

21   know, the Commonwealth has to thank Mr. Saucedo, the

22   United States, and also the Court and TCA because

23   without this police reform we wouldn't be able to use

24   and invest in the police $80 million.

25             We need to have better use of the

1    $20 million that are being assigned each year.  I

2    think it's important that, you know, we recognize

3    that that year was a transition administration year

4    and, you know, that brings, you know, its

5    difficulties.  And we want to take measures so that

6    that does not happen again.

7         And we have to agree that the order that you

8    just informed the Court and we will comply with that

9    order.  And first month we will talk how we're going

10   to comply and inform, you know, the money that is

11   being used for the police reform.

12        THE COURT:  For example, compare if you add

13   2014, 2015, 2016, and 2017 that's $80 million; 20

14   million for each year of the Reform.  And almost

15   every year I would say at least -- I have the numbers

16   here.  In 2014, $985,973.27 were not used, so 1almost

17   19 million were used.

18        In 2015, 17,331,049.78 were used, so

19   approximately 2.23 million were not used.  In 2016,

20   $19,382,549.08 were used, so that left 617,450.92 not

21   used.  But then we go to 2017, it's $4,853,822.13

22   used, but that leaves 15,146,177.87.

23        Now, if we look at those four years

24   globally, out of $80 million that were provided by

25   the legislative assembly to the Reform that means

1    that almost 20 million, so a fourth were not used for

2    the reform.  And, again, last year it was the bill

3    bulk, it was 50 million, but in the other years -- so

4    it's money that's been available there that the

5    legislative hasn't used.

6            Now, if we go to 2018 and the fiscal year

7    for 2018 began in July, so we have one month and

8    we're halfway through August.  Out of those 20

9    million, $6,633,419.16 has been used.  Now, I don't

10   know if this is a red flag or not, but it would

11   appear to me that we have 12 months, it should be

12   more than that.  Or, again, there may be other months

13   where there's other things coming, but that's how we

14   stand now.  And I'm not raising a red flag, but if

15   for every other month that is the amount spent, there

16   is going to be probably about 13, 14 million unused.

17           So, that is the Court's concern.  And,

18   again, I think that's why the money has to be tracked

19   so it's used.  U.S. DOJ and the Monitor can always

20   recommend, You're not using this, or it can ask --

21   again, I think this is important because we see how

22   the moneys are spent in attorneys, medical services,

23   professional services, purchases, materials,

24   equipment.

25           Something I -- again, when you look to

1    equipment, this year out of one month in the fiscal

2    year almost 5 million --

3            MR. ORONA-AMILIVIA:  Your Honor, if I may

4    interject, to be clear on the table, that's the

5    fiscal year.  So when it says 2017 it's fiscal year

6    2016-2017.

7            THE COURT:  Yes, that ends in 2017.

8            MR. ORONA-AMILIVIA:  So when we're talking

9    about 2018 it's the past fiscal year, 2017-2018.  So

10   the $19.3 million that's for the past fiscal year.

11           THE COURT:  Yes, for 2018 almost the whole

12   budget was used.

13           MR. ORONA-AMILIVIA:  Yes, exactly.

14           THE COURT:  And now we're beginning with the

15   new budget.  This doesn't -- again, that was my

16   mistake.

17           MR. SAUCEDO:  Your Honor, one other point of

18   clarification and that is that the Commonwealth

19   included fiscal year 2013-14, so in fact it's

20   five years, not four years.

21           THE COURT:  It's five years.

22           MR. SAUCEDO:  That's correct.  So there's

23   $100 million that were assigned for Reform.

24           THE COURT:  Out of which I believe

25   20-something million were not used in that five-year

1  period.

2          MR. SAUCEDO:  That's correct, Your Honor.

3          THE COURT:  So it would be probably about a

4  fourth of...

5          Okay.  So, again, I think if -- I have no

6  other issues.  I don't know if the Monitor has

7  anything he'd like to mention about this.  I think

8  with my directives for the first of each month that

9  the Monitor and U.S. DOJ be provided this breakdown

10 everybody will be in a better position.  Do you

11 agree, Mr. Claudio?

12         TCA ARNALDO CLAUDIO:  Yes, Your Honor, I

13 agree.  The only thing that I would add to that is

14 the fact that when there's a distribution of money

15 within the Reform, it needs to be very clear in the

16 aspects of what is being used.  To use "travel" and

17 "miscellaneous" is not going to cut it; they have to

18 be very specific.

19         THE COURT:  So they should be separated.

20 And this fiscal year is beginning, but I think it's

21 important.  And, again, the Monitor or U.S. DOJ may

22 have more specific questions so whenever that's asked

23 that should be provided because it could be what kind

24 of travel -- was this training?  Was this other type

25 of travel?  So, that's Issue 1.

1          Let's move on to the second matter on the

2     agenda and that is the canine division.  Let me note,

3     as my introductory remarks that I believe it was

4     towards the end of 2016 along with Mr. Claudio -- and

5     Attorney Saucedo arrived after finding it a little

6     late, but he did make it there because it's almost

7     impossible to find the canine unit.  But we went

8     there.  There had been many issues in the years

9     before 2016 of the canine unit, the handler, the

10    kennel master had to be recertified, again it was

11    sent.  And there were a lot of issues.

12          The kennel master I believe in 2016 or late

13    2015 went to training in Indiana -- I think it was in

14    Indiana somewhere, he got recertified.  And then

15    other additional folks in the division were certified

16    as well.  A lot of money was invested in that

17    division, and around the end of 2016 it was operating

18    like at a 90 percent capacity.  It was very

19    impressive compared to what it had before.

20          Now, the information that I have is

21    notwithstanding that investment and the funds for

22    that division the operation is somewhere around

23    50 percent or less.  I think these canines -- I don't

24    think, I know from my perspective as a judge, they're

25    very useful.  I've had several cases where obviously

1    they come and because of sniffs and their work --

2    usually here we have drugs but they also find

3    explosives.  I know at the airport there are canines.

4    These are rough statistics, but you invest in 60,000

5    in training a dog that dog gets millions and millions

6    of dollars in illegal drugs, so it is a benefit to

7    everybody in the Commonwealth.

8            The other problem is, if the dogs are not

9    certified, they're not handled correctly, they're not

10   operating well, the problem is that every case that

11   results from the canine sniffs, if nobody's

12   certified, the government can seize the drugs but the

13   perpetrators -- you know, the prosecutors may not be

14   able to prove the case.  So I think that's why that

15   division is so important.

16           I looked into the equestrian unit which is

17   very close by.  If it's horses and dogs, you know,

18   they're all animals and they need to be taken care

19   of, but the dogs are extremely important for searches

20   and seizures and other matters that the police need

21   them.  So I'd like to hear from Mr. Saucedo and then

22   I'll hear from Mr. Torres.  And I believe we have a

23   visiting canine here so you can bring him in or her.

24   So Mr. Saucedo.

25           MR. SAUCEDO:  Yes, Your Honor.  The canine

1    unit is an important part of this case because

2    canines are used as a form of less lethal force in

3    apprehending suspects and so it's very important that

4    the equipment is available, that the dogs are fully

5    trained, and that the handlers are duly certified.

6    And, Your Honor, as you noted, there were great

7    improvements that were made during the course of the

8    capacity-building period including having I believe

9    the first certified kennel master in the history of

10   the police bureau.  And so --

11             THE COURT:  That is Lieutenant Rivera.

12             MR. SAUCEDO:  That's correct, Your Honor.

13             THE COURT:  Let me add, I think it's

14   important to know that the fact that there's been ups

15   and downs in no way should be attributed to the

16   leadership or the work of Lieutenant Rivera; it's

17   things that have happened perhaps to the budget and

18   other reasons.  So, again, I just want to make that

19   very clear.

20             MR. SAUCEDO:  Yes, Your Honor.  In addition

21   to the use of force, the canines are also an

22   important tool for the police in conducting searches

23   and seizures; and for that reason the training and

24   resources and oversight of this unit are very

25   important.

1          We have met with the canine unit in the past

2     and have obtained information.  The TCA has also

3     provided information about the canine unit.  The -- I

4     think what we've observed, like the police academy

5     for example, where great investments were made and

6     slowly some of the pressure comes off and the

7     performance level drops.  I think it's important that

8     for this to be a sustainable reform that the

9     attention and the level of support that these units

10    receives needs to be ongoing.

11          So we are looking forward to I believe a

12    presentation today, but my understanding is that some

13    of the training and equipment needs of this unit have

14    been brought up consistently by the police bureau.

15    And so if there are any deficiencies on that end, it

16    appears to be that above the police bureau and other

17    levels is where the impediments have laid, Your

18    Honor.  And it's important that the entire Government

19    of Puerto Rico support all of the efforts of the

20    police bureau, including those of the canine unit, to

21    make sure that they're successful.  They're a key

22    part of ensuring that the use of force is used

23    appropriately and that searches and seizures are

24    within the law.

25               THE COURT:  Let me ask, I believe there was

1     an issue at one point, there is some pending money

2     federal money for the canines, but I don't know if

3     it's management or budget or at the treasury

4     department it's been stuck there for a while.  Are

5     you aware of that?

6              MR. SAUCEDO:  Your Honor, if you're

7     referring to the asset forfeiture money --

8              THE COURT:  Yes.

9              MR. SAUCEDO:  -- that would come from the

10    DOJ treasury department.

11             THE COURT:  Okay, I think that's the money

12    that I think at some point was going to be used for

13    canines as well, correct?

14             MR. SAUCEDO:  Yes, Your Honor.  We

15    understand that a number of requests were made by the

16    canine unit through the Reform office for equipment

17    and for canines that were going to be lost if they

18    weren't recertified.  And our understanding is that

19    as a result of some miscoding of the account that

20    those funds were frozen.  Our asset forfeiture and

21    money laundering section that overseas the equitable

22    sharing program was here last year --

23             THE COURT:  But they were frozen federally.

24             MR. SAUCEDO:  No, Your Honor, they were --

25             THE COURT:  Or were they frozen locally?

1          MR. SAUCEDO:  They were frozen locally.  And

2     in fact --

3          THE COURT:  That's the issue, that they were

4     provided by the Federal Government and then it was

5     frozen locally.  And then the problem is if it's not

6     used, it must go back.

7          MR. SAUCEDO:  Yes, Your Honor.  And in fact

8     the asset forfeiture section was here to find out why

9     this money wasn't being spent because this money is

10    specifically allocated for law enforcement purposes;

11    and if it's not being used for that purpose, the

12    Department of Justice and treasury can pull that

13    money back.

14         THE COURT:  And as of now it's still in the

15    Commonwealth as far as you know or it's been pulled

16    back?

17         MR. SAUCEDO:  Those funds have not been

18    pulled back.  My understanding is that the coding

19    issues with the account were addressed.  The

20    Commonwealth may have more additional information.

21    But that money is available still for the

22    Commonwealth.

23         THE COURT:  Okay, let me hear from

24    Mr. Torres then in regards to the canine.

25         MR. TORRES-ORTÍZ:  Yes, Your Honor.  We're

1    going to have a presentation from Lieutenant Alberto

2    Rivera-Ortíz, but first I would like to address what

3    we were just speaking briefly.  The money from the

4    asset forfeiture was -- you know, it was an issue

5    that was attended to.  That money was used to buy

6    bulletproof vests for the whole PRPD force.  And

7    prospectively we have taken measures not to have that

8    issue happen again.  So, hopefully, you know, it's

9    something that has remained in the past.

10            THE COURT:  Well, whatever were frozen here

11   were used for purposes --

12            MR. TORRES-ORTÍZ:  For purposes of the

13   police reform.

14            THE COURT:  When I look at the budget, they

15   don't appear in this budget because they're not part

16   of the Puerto Rico legislative budget, so that's why

17   we don't see those here.

18            MR. TORRES-ORTÍZ:  That's correct, Your

19   Honor.

20            THE COURT:  Now, for purposes of the

21   October 1st and any further monthly reports, please

22   always have an annex.  Again, there may be federal

23   funds that are provided that benefit the Reform.  You

24   can simply inform the Monitor what they are, they've

25   been used obviously, because that's important for us

1    to know.  And, again, that's something -- for

2    example, if those funds were used in fiscal year 2018

3    and obviously it may have benefitted the Reform.  For

4    example, if the budget used was 19,336,000,000,

5    et cetera, et cetera, may be in those -- you know, I

6    think those assets come to like 15 or 20 million.  Am

7    I correct?  It was several millions, I can't

8    remember.

9         MR. TORRES-ORTÍZ:  I don't have that

10   information.

11        THE COURT:  Mr. Saucedo, you don't remember

12   how much it was?

13        MR. SAUCEDO:  Yes, Your Honor.  Initially it

14   was around that amount and that was because the

15   Federal Government had frozen the account when the

16   Reform process started, and those funds are

17   replenished continuously throughout the year.

18        THE COURT:  Okay, but I think it's important

19   to know that because, again, out of those -- let's

20   say it's 20 million federal funds, let's say seven,

21   eight, went to the Reform.  We have no idea.  And,

22   again, if it's something that they were used, it's

23   important for the Monitor to know as well.  And they

24   can be used for many other things.  So just keep that

25   in mind.

1          Let me then -- if Lieutenant Rivera-Ortíz is

2     here we should then hear him.  There you are.  So we

3     have the presentation here.

4          THE INTERPRETER:  Can we come over here?

5          THE COURT:  Yes, you may approach.

6          Okay, so please proceed.  And we have the

7     interpreter, so we're doing everything for the

8     record.  I note I've been provided a report.  What I

9     would like is obviously for the agent to summarize

10    the report.  And you may be seated.  Thank you.

11    Welcome.

12          (Mr. Horta interprets.)

13          LIEUTENANT RIVERA-ORTÍZ:  Good afternoon.

14          THE COURT:  So please proceed.

15          LIEUTENANT RIVERA-ORTÍZ:  Your Honor.  We

16    are here present with the intent of bringing

17    up-to-date the canine -- the status of the canine

18    unit.  We are going to be brief in our presentation.

19    As far as personnel is concerned we are six

20    sergeants, one female; 85 agents, 11 females.

21          At the present time, all specialties of the

22    canine unit are in function:  Cadavers, explosives,

23    drugs, weapons, and patrolling.  The trainings,

24    Reform as well as canine division, are up-to-date.

25    At the present time we have 62 teams operating.

1          THE COURT:  And when you say 62, what does

2     each number comprise?  Is it a canine and officer or

3     two officers?

4          LIEUTENANT RIVERA-ORTÍZ:  When we refer to a

5     team, we're talking about the canine agent, the dog,

6     and the vehicle.

7          In June, we traveled to Vohne Liche Academy

8     in Indianapolis to be recertified.

9          THE COURT:  And for the record, it's spelled

10    V-o-h-n-e and another word L-i-c-h-e Kennels in

11    Indiana.  Vohne Liche Kennels Academy in Indiana.

12         And you were recertified, correct?

13         LIEUTENANT RIVERA-ORTÍZ:  Yes, sir.  Myself

14    and three agents as instructors.

15         THE COURT:  Okay, continue.

16         LIEUTENANT RIVERA-ORTÍZ:  The agents are

17    complying with the 26 reform regulations.  On June

18    the 29th, all canine personnel was enrolled in the

19    virtual training courses.

20         All agents submitted to physical fit exams

21    annually complying with the public policy.  This year

22    four did not approve and three could not be submitted

23    to the test because of high blood pressure.  In

24    compliance with the regulations of the police, these

25    agents are referred to the specialized division, to

1    the evaluations committee of specialized units.

2              Recently we received 96 leashes at 30 feet

3    each; 96 at six feet, 96 muzzles, and 96 tracking

4    collars.

5              THE COURT:  And *bozal de canasta,* the

6    muzzles, that's what's put over the mouth.

7              LIEUTENANT RIVERA-ORTÍZ:  Yes.  That is a

8    large muzzle and it allows the dog to continue its

9    work in the location where there's many people.

10             And lastly we were requested to update

11   requisitions and purchases.  We have requisites in

12   spending at the technology divisions.  We submitted

13   training equipment to the Reform office.  Through our

14   requisition we petitioned that five dogs would be

15   purchased.

16             THE COURT:  Was it five or ten?  Because I

17   believe here it says ten.

18             LIEUTENANT RIVERA-ORTÍZ:  The ten were

19   postponed.

20             THE COURT:  Okay.

21             LIEUTENANT RIVERA-ORTÍZ:  And now, lastly,

22   at the present time the canine division, the 116

23   policy division, it is being reviewed.  And to start

24   with we are going to get going with the

25   digitalization of the files and records.  This will

1     facilitate delivering documents to the courts.

2            And we petitioned the Reform office to

3     establish a retention for agents that finish the

4     handler course, for them to work at least for

5     two years, a two-year period at the division.  This

6     is because of the cost of the training.

7            THE COURT:  Okay.  Thank you.  Let me ask

8     you a question, I was there obviously before the

9     hurricane and the facilities have been -- when I went

10    there and it was probably late 2016 with Monitor

11    Claudio, I note that there was a part with obstacles

12    where the dogs would be trained.  There was also a

13    training room very close by across the little street.

14    My question is, after Hurricane Maria are those in

15    operation or were there sustained damages?  Was it

16    affected in any way?

17           LIEUTENANT RIVERA-ORTÍZ:  Yes, it was

18    affected.

19           THE COURT:  And how was it after the

20    hurricane?  Is there still work to be done?

21           LIEUTENANT RIVERA-ORTÍZ:  Obviously with the

22    effort of agents who work there at the present time

23    the division is one hundred percent operational.

24           THE COURT:  Let and me note, and correct me

25    if I'm wrong, I recall that when I went there you had

1    informed me that basically that training room was

2    basically put up by you and the other agents working

3    the division, and that you painted it, you worked on

4    the woodwork and other matters.  So it wasn't -- the

5    refurbishing of that building was really at no cost

6    or at minimal cost to the police; am I correct?

7            LIEUTENANT RIVERA-ORTÍZ:  Yes.  And after

8    the hurricane we did the same thing.  As a matter of

9    fact, the FEMA personnel visited us.

10           THE COURT:  Okay, my last comment.  Again,

11   you may not be able to fully answer this but

12   something I think particularly for the commissioner I

13   think it's important and for the Monitor, you're

14   mentioning that you're contemplating or at least

15   there's a request to digitalize the files as to the

16   dogs, their updates as to the agents and everything.

17   I think that's a brilliant idea.

18           My question is, where is that?  Is it in

19   limbo?  Is it in the process?  If you don't know and

20   you submitted the request that obviously is not for

21   you to answer.  But the request has been submitted I

22   believe, correct?

23           LIEUTENANT RIVERA-ORTÍZ:  We already have

24   three of our evaluations digitalized by the Reform

25   office.

1           THE COURT:  Okay.  Well, I don't have any

2    questions.  If you could just stay there in the event

3    Mr. Saucedo or Mr. Torres or the Monitor has one or

4    two brief questions and you could answer for the

5    benefit of everybody.  So let me hear from

6    Mr. Saucedo.  I heard from you, but you might have

7    additional --

8           MR. SAUCEDO:  No, Your Honor, just a quick

9    observation that one of the concerns that we had

10   heard about a few months ago was the lack of

11   equipment when the canine units supports the SWAT

12   teams.  And the SWAT teams of course have additional

13   protective gear and other equipment.  And to the

14   extent that the canine unit was providing support

15   during call-outs for the SWAT, it was important that

16   the canine unit also have the same type of protective

17   gear.  And so looking at the report that was just

18   submitted, Your Honor, we're pleased to hear that the

19   request has been made and that funds were allocated

20   for that purpose.  That was an important need that

21   had been identified by the police previously.

22          THE COURT:  Mr. Torres, anything you would

23   like to add?

24          MR. TORRES-ORTÍZ:  I would just like to add,

25   Your Honor, that all the recommendations that

1    Lieutenant Rivera has mentioned today they were

2    implemented in the policy when it was revised by the

3    police reform.

4         THE COURT:  And what he mentioned about

5    digitalization, that's in the works and, as he

6    informed, a lot has been digitalized and I assume the

7    goal is to have everything digitalized for quick

8    reference and use.

9         MR. TORRES-ORTÍZ:  That's correct, Your

10   Honor.

11        THE COURT:  So, it's similar to a KRONOS

12   type of thing.  Okay, Mr. Claudio anything you would

13   like to add?

14        TCA ARNALDO CLAUDIO:  Yes, sir.  As you

15   know, I don't give too much accolades, but I have to

16   admit that since I met Lieutenant Rivera I have found

17   a professional who is dedicated, a well-focused and

18   strategic person that has just tried to do the best

19   for the canine unit in the Puerto Rico Police Bureau.

20   My only request is continue to support Lieutenant

21   Rivera.

22        LIEUTENANT RIVERA-ORTÍZ:  Thank you.

23        TCA ARNALDO CLAUDIO:  That support will

24   continue to take the canine unit to higher levels of

25   readiness which is important in this process.  So I

1    thank Lieutenant Rivera because every time we go

2    there it's completely open and has been one of the

3    brightest stars as we move forward in the Reform

4    process, so my hats off to Lieutenant Rivera.

5           LIEUTENANT RIVERA-ORTÍZ:  Thank you.

6           THE COURT:  And what I will be doing

7    hopefully maybe mid to late November or if not early

8    December I will be hopefully visiting the canine

9    unit, since the equestrian unit is walking distance I

10   will visit the horses as well.  But, again, thank you

11   very much and you're excused.

12          LIEUTENANT RIVERA-ORTÍZ:  Okay, thank you.

13          THE COURT:  The next item is the report -

14   the update on the SARP.  That's the *Superintendencia*

15   *Auxiliar en Responsabilidad Profesional*, Auxiliary

16   Superintendency for Professional Responsibility.

17   Just some general comments.  Dr. Alex del Carmen on

18   the Monitor's team, who is a statistician, did

19   review -- over the last month or two months has been

20   coming to Puerto Rico, maybe a little longer, for

21   purposes of reviewing the complaints -- those that

22   are resolved, those that have not been resolved.

23          There are a lot of challenges.  The

24   report -- it's not a final report -- but that he

25   submitted to the Monitor has been provided to the

1    parties.  I believe Deputy Marcos Soler will be

2    addressing that and I'll hear then from the parties.

3    There are concerns, a lot of paper trail.  There are

4    some complaints that are well over the 90-day period,

5    others dismissed.  And, again, statistically again

6    not everything is wrong but it's -- this is a system

7    that has been inherited by this administration from

8    the past administration to the past administration to

9    the past administration that needs to be improved

10   because the way it's been carried out the numbers do

11   not necessarily add up.

12          So let me hear if Marcos Soler, the chief

13   deputy monitor, wishes to brief everybody on this and

14   then I'll hear from the parties.

15          DEPUTY TCA MARCOS SOLER:  Your Honor, Marcos

16   Soler, Deputy TCA.  We started to focus on SARP for a

17   while ago.  Certainly this was one of the key

18   elements of our last report, our last sixth-month

19   report.  We highlighted some of the deficiencies and

20   since then we have had Dr. Del Carmen continue our

21   work, our field trips, visits, to figure out exactly

22   what are the main problems going on with that

23   specific unit.

24          Dr. Del Carmen has identified primarily

25   three areas of concern and I bring it here to the

1    Court.  You have mentioned some of them.  One is a

2    high level of workload amongst officers which are the

3    results primarily of two things going on at the same

4    time.  One, fewer personnel assigned to SARP and at

5    the same time increase in cases some of the cases

6    coming.  Certainly that's something that we are

7    looking into.  We are looked specifically at some

8    locations such as Rio Grande, et cetera, and we

9    certainly have identified both problems going on:

10   Fewer officers, again, and higher workloads as a

11   result of more cases.

12           Number two, there are significant training

13   challenges among those officers who are working

14   there.  Certainly that has an impact on certain areas

15   in the ability the officers have to do the jobs.

16   Primarily what we have identified as key problems, a

17   key area of concern, are the fact that officers are

18   having problems articulating what is the criteria to

19   designate complaints and allocate complaints amongst

20   areas.

21           So this impacts obviously referrals between

22   jurisdictions.  This also impacts the ability of the

23   investigators to make key findings and determine key

24   concepts and what are the key concepts that are going

25   to apply to each category.  That leads often to

1   misclassification and additional allegations.  It

2   might lead to a disproportionate situation.  Often,

3   for instance, result of disproportionate

4   precautionary measures.  And finally it leads overall

5   a concern about the integrity of the investigation

6   and violations of policy.  For all these reasons we

7   certainly think it's imperative not only that we

8   attend the sheer number of people working at SARP but

9   also, Your Honor, identify what are these current

10  challenges in terms of training and deal with them

11  effectively.

12          And finally, Your Honor, the other part or

13  the other main concern that we find --

14          THE COURT:  Before you go into the other

15  part, can you explain what you mean by the integrity

16  of the investigation.

17          DEPUTY TCA MARCOS SOLER:  Yes.  What I mean,

18  Your Honor, by integrity of the investigation is that

19  when you have had an officer, for instance, that

20  determines that of multiple allegations that you

21  might have in a complaint, they decide only to define

22  the complaint by one allegation.  Then there are

23  multiple allegations in the complaint that are not

24  addressed properly.  The complaint might be

25  mischaracterized and, therefore, you cannot complete

1    a full investigation of all the allegations in the

2    complaint.  The officer -- the SARP officer might be

3    only focusing on one specific allegation that he or

4    she considers the most important, ignoring other

5    things and other issues that might be also relevant.

6    That is what I define by the integrity of the

7    allegation.

8         THE COURT:  Would an example be, for

9    example, Officer Bazán has a complaint filed but it

10   has -- well, there's ten complaints and one is

11   excessive use of force, the other is use of equipment

12   for personal use, and there's ten allegations.

13   They're investigated and let's assume the use of

14   force is dismissed, the others -- one or two are

15   dismissed, and then there's findings for one or two

16   but then it's characterized as a use of force

17   complaint exclusively instead of all the areas.

18   That' what you're saying?

19        DEPUTY TCA MARCOS SOLER:  Correct.  And that

20   is one area of concern because the question is, when

21   you only identify one complaint in that way we are

22   not sure exactly the other parts of the complaint,

23   all the other allegations are investigated.  To what

24   degree the officer who was -- the investigator who

25   was conducting the investigation was understanding

1    were the other concerns.  And most importantly, Your

2    Honor, is the interrelationship between those

3    allegations.

4              THE COURT:  And let me say this, and this is

5    just again a general observation but just from what

6    you're telling me, and Mr. Torres and

7    Ms. Peñagarícano are well-aware of this, but what can

8    happen is if everything is not categorized, for

9    example, if the complaint is dismissed on failure to

10   report or personal use of equipment and it goes down

11   on that, when the supervisors are reviewing those

12   files they say, Oh, this is not to alert anything.

13   But there could have been a finding perhaps for use

14   of force.

15             And the problem is, at some point it could

16   be under Section 1983 of the civil rights law a

17   failure to train, failure to supervise.  There's

18   issues that, again, the supervisors should have been

19   made aware but because of the way SARP is carried out

20   that they don't find out but they're sued three or

21   four or five years later and they could end up here

22   in court.  And, again, I've had cases, I've dismissed

23   them --

24             DEPUTY TCA MARCOS SOLER:  Correct.

25             THE COURT:  -- on appeal I've been reversed.

1       So that's what this -- you know, making sure all the

2       methodology, all the investigation, all the

3       particular items, everything can be seen from the

4       record.  That's why the clarity is so important.  And

5       this is something -- it's important for the Reform,

6       but I think in the long run for liability and for

7       purposes of any possible losses or anything, this is

8       important for the police to know.  And, again, if

9       somebody has been using excessive use of force for

10      years the commissioner can -- or, you know, maybe not

11      for years but once or twice, the commissioner can

12      take actions and unarm the person and his liability

13      or the supervisor's liability will be minimalized.

14              DEPUTY TCA MARCOS SOLER:  That's correct.

15      And it's not just a question of liability.  There's

16      not a specific complaint allegation that has been

17      investigated, but certainly a much larger systematic

18      impact since there might be situations in which a

19      continuous downgrading of allegations for an officer

20      on a continuous norm certainly a full investigation

21      of an allegation might lead to an ability to see a

22      trend emerging on a particular officer.

23              THE COURT:  That's exactly what -- you hit

24      the nail on the coffin.  There's a trend emerging

25      and, again, particularly you could have a new officer

1    and you see there's a trend -- you know, there may be

2    allegations for excessive use of force, SARP

3    determines it wasn't excessive but there's something

4    out there, a red flag, that officer can be trained

5    and that won't happen again.  Whereas if it's

6    miscategorized you have no idea of knowing that and

7    then it may be too late.

8              DEPUTY TCA MARCOS SOLER:  Correct, Your

9    Honor.  And that leads to concern No. 3.  After

10   Dr. Alex Del Carmen has found and shared with the

11   team that there are also obviously a delay in the

12   implementation of the technology associated with

13   the -- you know, with maintaining the complaint --

14   the internal affairs complaints and the proper

15   filing --

16             THE COURT:  And that's the paper trail.

17             DEPUTY TCA MARCOS SOLER:  And that's on the

18   paper trail.  And when you have the situations and

19   when your system is not up and running you might have

20   that situation in which down the line we might be

21   missing a lot of information that could be crucial

22   particularly with implementation of the early

23   intervention systems which are a crucial part of the

24   Agreement.

25             THE COURT:  Let me ask, I did review his

 1    preliminary report and something that comes up with

 2    the paper trail is obviously if it's a low-ranking

 3    officer there's a -- again, it's still paper trail

 4    but there's more of a paper trail.  When it's a

 5    higher-ranking police officer not much happens

 6    because he's not -- you know, the levels of

 7    supervision are lower than somebody lower down.  And

 8    that is the problem.  If it's paper trail that can be

 9    lost, misplaced, or, you know, dismissed for X, Y, Z

10    reasons whereas when there's no paper trail it's

11    digitalized it's easier -- and there's a methodology

12    for everything.  That's what the Reform looks at,

13    that everybody -- everything be resolved and there be

14    no red flags, Oh, supervisors are not getting

15    sanctions because on occasions they are.  But that's

16    the situation.

17             DEPUTY TCA MARCOS SOLER:  That's correct,

18    Your Honor.  There is a concern about impartiality

19    and integrity of the investigation.  And also there's

20    a disconnect to the issue of time limits.  And we

21    have mentioned, part of the reasons why you don't

22    want investigations to keep going on forever is you

23    want to make sure that all officers, that all

24    allegations are investigated in a timely fashion so

25    you don't have a propensity of a system to basically,

1    okay, that allegation is open for a year, down the

2    line people forget about the allegations and forget

3    about everything and no remedy can be taken.

4              THE COURT:  Let me ask to the extent you

5    know, and I'll hear from the parties as to this,

6    because at some point I remember Superintendent

7    Caldero had mentioned it.  Again, I could be wrong,

8    but I remember there was a 90-day period and he said

9    we're trying to get everything out in 45 days.  Am I

10   correct, Mr. Claudio, that was pertaining to SARP?

11             TCA ARNALDO CLAUDIO:  That was correct.

12   That was the policy.

13             THE COURT:  That was an internal goal of

14   that was --

15             TCA ARNALDO CLAUDIO:  [Inaudible] Colonel

16   Rodríguez.

17             THE COURT:  Okay.  Thank you very much,

18   Mr. Soler.

19             Then let me hear from Mr. Saucedo and then

20   I'll hear from Mr. Torres.

21             MR. SAUCEDO:  Yes, Your Honor.  The internal

22   affairs or what is commonly referred to as internal

23   affairs in Puerto Rico it's the responsibility --

24   professional responsibility office.  This is an area

25   that the United States intends to focus on in the

1    next few months.  We know that --

2         THE COURT:  As part of the monitoring

3    theory.

4         MR. SAUCEDO:  That's correct, Your Honor.

5    SARP essentially acts like a police of the police,

6    it's sort of their internal watchdog.  They conduct

7    both administrative and criminal investigations of

8    officers.  And it's very important that they're

9    reformed just as much as the other parts of this --

10   the other units.  We appreciate the efforts of

11   Dr. Del Carmen to review documents and actually look

12   at the process and determine whether it's working or

13   not and what needs are ongoing.

14        I do want to point out a few things, Your

15   Honor.  At the end of the capacity-building period we

16   do have a SARP policy, and in that time the police

17   bureau was able to update the regulation on the

18   handling of administrative complaints; but there are

19   some key steps that are still needed, and they are

20   the subject of some of the extension requests that

21   will be requested by the Commonwealth.  They include

22   training for SARP and the office of legal affairs.

23        This is the first time, as far as we

24   understand, Your Honor, where SARP will have its own

25   training on the handling of administrative

1    investigations and so this is critical.  Our

2    understanding is that the projection is to have those

3    staff trained by July 1, 2019.  And so of course

4    having the policies just one step of this you've got

5    to train everybody and then you need to ensure that

6    people are following the training.

7           On that note, Your Honor, another issue that

8    we identified, as well as the TCA is the reassignment

9    of some cases to the special investigations bureau.

10   And this was something that the TCA mentioned in his

11   report, six-month report 7.  Of course if you have

12   the policy and the regulations you need to be

13   implementing them and following them.  They were set

14   up for a reason.

15          There's a another issue which is the

16   implementation of a record management system.

17   Oftentimes we hear from the community that they

18   submit or they file a complaint but they don't hear

19   anything back, and so the development of this record

20   management system is important for a number of

21   reasons.  Number one, it goes directly to the

22   integrity issue and the paper trail that's generated.

23   There's also, you know, time stamping of who goes

24   into the systems, to identify who has access to them

25   and so they are an important integrity check.  But

1    they also serve as a reminder to let the community

2    know the status of their complaint.  And it's

3    important that if the Commonwealth has made a

4    commitment to complete these investigations within

5    much shorter periods of time that they have the

6    system to be able to do that.

7           The Commonwealth is also digitizing the

8    mounds and mounds of paper that are at SARP.  They've

9    asked for a time until October of 2019 on that, so

10   there's a lot of work that's ongoing with this unit

11   but it's -- you know, the internal affairs

12   assignments are amongst the most challenging within

13   the police departments.  The system issues are also

14   getting in the way of the lack of training, the lack

15   of equipment.  And we certainly are going to be

16   paying close attention to the implementation of these

17   paragraphs because they're critical to the process.

18          THE COURT:  Okay.  Let me also note that one

19   of the issues, and, again, I think this may have an

20   explanation, but when Dr. Del Carmen was performing

21   the statistics -- of course one of the issues is in

22   order to have the statistics there has to be a

23   methodology.  And, again, when it's a paper trial

24   it's very hard to keep a methodology; when it's all

25   digitalized it's very simple and you can pull out the

1    numbers.

2              But the other thing is one of the things

3    that is -- one of the comments is that sometimes

4    there's not that much explanation.  For example, you

5    can have officers who are sanctioned or not

6    sanctioned, their cases are closed favorably or

7    unfavorably for whatever reasons, but sometimes when

8    you go to the higher-ups in the chain of command they

9    can be dismissed but there's like no literally

10   explanation.  Again, I realize that somebody up there

11   probably may have instead of 20 supervisors, or

12   whatever number of layers up, it's harder to report,

13   but that is something that is important.

14             Again, let's assume a colonel is referred to

15   SARP, his file should contain almost everything that

16   a lieutenant or a cadet has at SARP.  And that's one

17   of the things that there's a dichotomy that the

18   higher up the person is when the cases are closed

19   there's not much to follow up.  And, again, there may

20   be a very reasonable explanation for that.  I don't

21   know if you have anything to add about that.

22             MR. SAUCEDO:  Yes, Your Honor, there's a

23   transparency, I believe, that's needed here.

24             THE COURT:  That's --

25             MR. SAUCEDO:  Yes, Your Honor, there's a

1   level of transparency that's needed to make sure

2   that -- transparency and independence.  I think one

3   of the key features of having a healthy internal

4   affairs office is that it be able to operate in as

5   independent a manner as possible.  The Agreement does

6   require, Your Honor, that whenever the commissioner

7   does not accept or another supervisor does not accept

8   the recommendation of an investigator that they

9   document that declination.  In other words, if an

10  investigator determines that there's sufficient

11  evidence to sustain a complaint and that then

12  requires some sort of discipline, that if in the

13  commissioner then reverses that or doesn't accept

14  that recommendation or rejects it --

15          THE COURT:  Or rejects it.

16          MR. SAUCEDO:  Yes, Your Honor.  That's an

17  important part of the paper trail that you were

18  referring to.  The fact that the commissioner as part

19  of this process, or whoever is ultimately the person

20  who reviews these investigations, needs to be --

21  needs to account for the final determination that's

22  taken by the agency.

23          THE COURT:  And, again, if that is not the

24  case, he runs into the danger of supervisory

25  liability.  Again, obviously not the scope of this

1    case.  But let me say -- and, again, the flipside is

2    also correct.  Let's assume SARP recommends a

3    sanction and the commissioner understands that that

4    sanction should not be issued, that has to be also

5    explained or vice versa both sides, because the SARP

6    could recommend or not recommend a commissioner as

7    the ultimate authority; but that's -- in either case

8    if he overturns the decision of the SARP that's what

9    has to be on the record.  And it has to be explained

10   by a memo or something else.

11          MR. SAUCEDO:  Yes, Your Honor.  It's

12   paragraph 190 of the Agreement.  This in no way takes

13   away any of the authority that the commissioner has

14   in disciplining members of the police force; however,

15   whenever there is that either a modification or

16   rejecting a recommendation that was made by SARP that

17   there be a paper trail created hopefully it will be a

18   digital paper trail that's part of this RMS system

19   that's being developed, but the idea is that you

20   would have documentation of when those -- whenever

21   dispositions are rejected or modified.

22          THE COURT:  Okay, thank you.

23          Mr. Torres, on behalf of the Commonwealth,

24   any matters you wish to address.

25          MR. TORRES-ORTÍZ:  Yes, Your Honor.  You

1    know, there has been a lot of progress made in SARP.

2    Basically policy has been put in place.  And, you

3    know, it will be reviewed and all the assessment that

4    the TCA and the U.S. DOJ have made it will be taken

5    part of the policy review but at the same time there

6    are challenges and we need to address them.  And I

7    would like to have the director of the auxiliary

8    superintendent of professional responsibility explain

9    to the Court more information.

10           THE COURT:  And something I would, either

11   from you or from him, I'd like to hear is, as was

12   informed I believe it could have been by Mr. Saucedo

13   or it could've been by Deputy TCA Marcos Soler, for

14   some of these investigations personnel from the

15   special investigations bureau -- NIE in Spanish for

16   the acronym -- has participated.  The NIE all the

17   agents were originally from the Puerto Rico Justice

18   Department and they did -- of course they

19   investigated, but it was usually for criminal

20   investigations.  It was criminal investigations or

21   sometimes they served subpoenas or other matters that

22   they helped the Attorney General in Puerto Rico.

23           Now, if they're going to be participating in

24   the SARP, they need to get trained because their

25   training is very, very -- it's kind of like if I'm an

1   FBI agent and all of a sudden I decide to become an

2   immigration agent I need to be -- there's a lot of

3   things in common but I need to be trained for

4   immigration.  So that is just a concern that having

5   that mentioned but either if you or somebody else or

6   the commissioner might have information about the NIE

7   agents who might be participating at some point --

8   and, again, if they're trained and it's within -- you

9   know, as long as the reform is being kept, it's

10  really not up to the Court to say how are you doing

11  it.  The thing is that it be done correctly.  So

12  that's an observation I had.

13          MR. TORRES-ORTÍZ:  Your Honor, there are no

14  complaints at NIE that are administrative; we only

15  have criminal complaints that NIE is handling.

16          THE COURT:  Okay, so anything from the SARP

17  that's referred to NIE that would be a criminal

18  matter.

19          MR. TORRES-ORTÍZ:  Yes, Your Honor.

20          THE COURT:  So then let me hear from -- who

21  is here to --

22          MR. TORRES-ORTÍZ:  Colonel José

23  Ramírez-Ramos.

24          (Mr. Horta interprets.)

25          THE COURT:  Okay, so please come up.

1              Good afternoon, Colonel.  Welcome back.

2    Long time no see.

3              COLONEL RAMÍREZ-RAMOS:  Good afternoon, Your

4    Honor.

5              THE COURT:  Please proceed with your

6    presentation.  Obviously I have everything here in

7    writing, it's been submitted, so if you could just

8    make a general summary.  Please go ahead.

9              COLONEL RAMÍREZ-RAMOS:  I'm going to try to

10   be as brief as possible.  We are going to be talking

11   about the new policies and about the revision of the

12   existing policies according to the requirements of

13   the sustainable reform.  We start with general order

14   Chapter 100-114.  That is the general order, that

15   governs what is the superintendency for the

16   professional responsibility.  That was revised on

17   July 31st of this year with the purpose of having the

18   administrative investigations done in an equitable

19   and impartial manner.

20             We also have general order Chapter 100-113

21   and it creates the division that investigates the use

22   of force, incidents with the use of force.  This unit

23   was necessary to be created to investigate the

24   incidents of the use of extreme force that point to

25   an empirical criminal behavior by a member of the

1    Police of Puerto Rico.  This division is located on

2    the first floor of the general police headquarters

3    and it is open so that anyone who is interested in

4    knowing how that office functions can go by there to

5    see how that office functions always maintaining

6    confidentiality as to certain cases.

7         Also, regulations 90-01 was created.  This

8    regulation leads us to have supervisors investigate

9    and take nonpunitive corrective measures.  This

10   prevents that on many occasions the situations that

11   occur with citizens are resolved at the work unit

12   level and some immediate measures are taken when this

13   type of complaint comes in.

14        THE COURT:  And let me ask what those

15   immediate disciplinary corrective measures could be.

16   For example, somebody can be sent to a training.

17   Somebody can be given an orientation, can be given

18   just a verbal admonition.  I assume that kind,

19   correct?

20        COLONEL RAMÍREZ-RAMOS:  That is correct.

21        THE COURT:  Okay, continue.

22        COLONEL RAMÍREZ-RAMOS:  Regulation 90-01

23   establishes some two minor values and those are the

24   ones that will be worked on by the supervisor at the

25   work area of his immediate area.  The general order

1    that goes hand to hand with this regulation is

2    pending approval.

3            Regulation 64-03 it is a regulation that

4    deals with the detection of controlled substances in

5    officers and officials of the Police of Puerto Rico.

6    I have to inform that as of the 1st of January up to

7    the 31st of July 2,528 tests have been performed.

8    These do not include steroids testing since those are

9    not regulated.  We are working with the legal

10   advisors of the Reform office, as well as the local

11   justice department to submit a bill to amend Act 78

12   which is the one that regulates the problem of

13   detection of controlled substances in the public

14   sector.

15           Now, once this legislature is approved it

16   would take us to comply with the Requirement 200

17   where the tests for prohibited or regulated

18   substances is established.  We continue --

19           THE COURT:  Sorry to interrupt.  Let me ask

20   you a question.  Currently, for example, if officers

21   are using steroid, and there can be ranging from A to

22   Z, unless the law is amended you can -- and, again,

23   there are steroid that, as you mentioned in your

24   presentation, could affect adversely how the officer

25   functions in his duties.

1          So, that's what the police -- and I guess

2     this is something that obviously the commissioner and

3     obviously the secretary of public safety are working

4     on.  So if the law is amended that would cover also

5     that, that would be the intent, correct?

6          COLONEL RAMÍREZ-RAMOS:  Correct, that is the

7     purpose.

8          THE COURT:  And let me ask, I'm not going to

9     ask, let me say in general terms I think, and I know

10    the commissioner is here, I think that is something

11    that is advisable.  Obviously I don't lobby on behalf

12    of the agency, but I think it's very important

13    because there's steroids and there's steroid.  And

14    you might need a destroyed to heal and it's

15    medicated, but you can also obtain steroids elsewhere

16    and we all know the adverse effects.  And sometimes

17    maybe either bodybuilders and people working out, but

18    something it's the officers.  Arnold Schwarzenegger

19    in his prime looks like a Boy Scout but that could

20    have adverse effects.

21         Let me also ask, I don't see it here.

22    Again, there could be an officer who is taking, for

23    example, Xanax to sleep.  And the problem is not can

24    he take the Xanax but the problem is let's assume

25    that officer quarterly is prescribed Xanax but

1    instead of taking one pill a night he's taking one

2    throughout the day.  That's still an abuse of

3    controlled substances even though technically he's

4    not -- he has them for his own medical use.  Would

5    that regulation or that be something that needs to be

6    amended as well?

7              COLONEL RAMÍREZ-RAMOS:  Well, right now the

8    way that the tests for controlled substances works is

9    that when you go to forensic sciences to do the

10   corresponding tests the person informs whether he or

11   she is using any type of medication subsequently.

12   This is analyzed with the reviewing physician

13   whenever that person makes the pertinent

14   recommendation as to whether that person is engaged

15   in some type of illegal use.

16             THE COURT:  Okay.  And let me ask, again you

17   may be able to answer or you may not and it's not

18   something that we can always -- but locally medical

19   marijuana is not illegal in Puerto Rico, but it's

20   still illegal at the federal level.  So my question

21   is, if an officer for X, Y, Z reason or any other

22   member of the police force -- again, I understand

23   that the regulation also applies to other officials

24   who may not be police officers.  Is it contemplated

25   that some police officers or members of the police or

1    civilians may be using medical marijuana, or is that

2    being tested or is that an issue?

3            COLONEL RAMÍREZ-RAMOS:  At the present time

4    that has not happened but we have talked about it,

5    with the office that performs the test in these

6    cases.  And if there was a positive result we would

7    then have to discuss.  You're talking about

8    medicated.

9            THE COURT:  Yes, because if it's --

10           COLONEL RAMÍREZ-RAMOS:  We would then have

11   to talk about the steps that are going to be

12   followed.

13           THE COURT:  So what I take it is up to now

14   it has not been an issue up to now, correct?

15           COLONEL RAMÍREZ-RAMOS:  Up to now it has not

16   been an issue.

17           THE COURT:  And the commissioner is here,

18   Mr. Orona.  That's just food for thought, and it's

19   something I guess from the TCA and U.S. DOJ's

20   positions they can also comment.  Let me say, the

21   only reason I'm asking this is there's been an issue

22   not at the federal government because federal agents

23   it's not recognized; but there's states that -- and I

24   read about this the other day -- even county or state

25   judges using medical marijuana and then they're

1    sentencing in criminal cases.  So that's one of the

2    things that when it comes to law enforcement it is a

3    bit awkward more so when -- at least at the federal

4    level it's not approved.  So let's move ahead.

5         COLONEL RAMÍREZ-RAMOS:  Now continuing with

6    my presentation, I'm going to be talking to you about

7    the EIS policy.  That is the early intervention

8    system.  This is related to an application for

9    complaint control where as of the beginning of the

10   complaint we're going to be having an allegations

11   classification system so we can then determine in an

12   easier manner and quicker the term established that

13   is going to be assigned to each complaint.

14        This application would have a system of

15   classification of allegations which is going to give

16   us besides data, as well as the status of the

17   complaint that are received and processed by SARP.

18   Your Honor, what this is going to do is it's going to

19   allow us to have precise statistics that are

20   immediate and a control of the complaint from the

21   very beginning.  It is going to allow us to detect

22   some behavior from a member of the force that needs

23   some type of retraining or employee assistance.

24        Also, we're in the process of digitalizing

25   the administrative investigations files.  We start

1    with badges 37,000 going down to badges 23,000.

2           THE COURT:  And I assume that's because

3    again Badge 37,000 those are the more recent

4    additions to the police form, the older ones have

5    been longer, so you're doing it from the newer

6    members to the older members, correct?

7           COLONEL RAMÍREZ-RAMOS:  Correct.

8           THE COURT:  And let me also ask, that the

9    benefit of this method that is being implemented is

10   that every time something is filed it's filed

11   electronically, it's not something that if you have

12   the paper somebody can disagree, Let me throw that

13   out, put it there.  Once it's in the system it's in

14   the system, correct?

15          COLONEL RAMÍREZ-RAMOS:  That is correct.

16          THE COURT:  And everybody, including from

17   officer who started yesterday up to the officer with

18   the highest rank and longest tenure, this system

19   applies equally to everybody.

20          COLONEL RAMÍREZ-RAMOS:  Everyone, that's

21   correct.

22          THE COURT:  Another issue, this has been

23   raised over the years as part of the Reform, the

24   issue of transparency, this in a sense it's my

25   impression that from the public's perception and in

1    practice this depoliticizes the system.  For example,

2    somebody -- let's assume somebody is in the SARP

3    system and there's a complaint number and

4    everything's digitalized.  And let's assume it

5    happens in October 2020, what would happen in the

6    past, and I'm talking about a paper trail, somebody

7    could say, Well, I have this here but there's going

8    to be a change in the administration and my new

9    friends are going to help me out; let's get rid of

10   this, let's get rid of that, nobody can follow the

11   paper trail.

12          But this system, regardless if there's a

13   change in the administration or there's a new

14   commissioner or new supervisor, everything remains in

15   the system forever, correct?

16          COLONEL RAMÍREZ-RAMOS:  That is so.

17          THE COURT:  So if there's a change in

18   administration, for example, whoever comes in cannot

19   say, Well, let's take this out, throw it out.

20   Whoever makes any changes would have to document why

21   that decision was made or not made or overturned but

22   it would all be in the system, correct?

23          COLONEL RAMÍREZ-RAMOS:  That is so, yes.

24   And there would be a record of whomever did a change

25   in the system or changed something in the system.

```
 1              THE COURT:  Okay.  As to this I have no

 2    further questions.  I've reviewed the documents you

 3    gave me.  I want to move on a little bit.  I also

 4    note that you provided -- this is the updated manual

 5    of the investigator for SARP.  Let me ask,

 6    Mr. Claudio, you've seen this before?

 7              TCA ARNALDO CLAUDIO:  I have.

 8              THE COURT:  And Mr. Saucedo.  I don't have

 9    any questions as to that, I'll take a look later.

10    And I do note that -- yeah, that's been mentioned in

11    your report.  Obviously the report also mentioned

12    that SARP is represented in the 13 police areas.  And

13    I don't -- I know the trainings, again like the

14    canine division, they're ongoing, and there's

15    trainings -- everybody's been trained.  There's

16    training -- almost everybody's been trained and

17    they're in the process.  So I don't know if you have

18    any concluding thoughts.  I know you have some

19    pictures here, so if you could tell me what those

20    photos are.  I believe that's the new system for

21    filing those rolling cabinets, correct?

22              COLONEL RAMÍREZ-RAMOS:  That is correct.

23    We're in the final phase by now.  We should be ending

24    this week in putting up the files.

25              THE COURT:  And eventually there should be
```

1    no more files once everything's digitalized, correct?

2            COLONEL RAMÍREZ-RAMOS:  Well, that is the

3    purpose -- right now that's going to be useful to us

4    as a backup.  The purpose is that at the end

5    everything's digitalized and there will be no need

6    for files as such.

7            THE COURT:  Let me -- just one last

8    question.  In any of the SARP documents and did any

9    of the regions that were not digitalized suffer any

10   damages or were ruined or destroyed or wiped out

11   because of the hurricanes, or that did not happen

12   regarding SARP investigations?

13           COLONEL RAMÍREZ-RAMOS:  Correct.  In terms

14   of the damages caused by the hurricanes, all command

15   headquarters were affected.  But as far as receiving

16   complaints that was never paralyzed, that never was

17   stopped.

18           THE COURT:  Okay, thank you very much.  Let

19   me ask if Mr. Torres or Mr. Saucedo have any final

20   thoughts or questions.  If not, we'll move to the

21   next are.  I see no showing of hands.

22           MR. TORRES-ORTÍZ:  No questions.

23           MR. SAUCEDO:  Your Honor.

24           THE COURT:  Mr. Saucedo.

25           MR. SAUCEDO:  Yes, Your Honor.  I appreciate

1    the information that the colonel provided.  At first

2    I thought he may have misspoken when he talked about

3    the Early Intervention System, EIS, but in looking

4    through the submission, Your Honor, the written

5    submission, it's clear to me that there's -- there

6    continues to be a misunderstanding of what the Early

7    Intervention System is.

8            Certainly, Your Honor, SARP needs a record

9    management system, an electronic way to track every

10   single complaint and to know the status of each of

11   those complaints, but that is not what EIS is, the

12   early identification system, Your Honor.  EIS is not

13   a tool primarily used by SARP, it is a tool for

14   managers, for supervisors to supervise officers.

15           The purpose of having an EIS is not to wait

16   until someone submits a complaint or there's an

17   incident or an allegation of a civil rights

18   violation.  The entire purpose of having an EIS is to

19   try and detect at an early stage whether that officer

20   is having any problems.  And the solution is not

21   submitting the case to SARP for discipline.  The

22   case -- the situation that we have here is the

23   situation where we want to be able to intervene with

24   an officer early on before there is a civil rights

25   violation or some other problem.

1           If you look at EIS, Your Honor, EIS is in

2    the supervision section of the Agreement, it is not

3    in the SARP section of the Agreement.  The reason

4    this is important and the reason this is so is EIS

5    includes information from SARP.  And so you want

6    the -- so there's sensitive information in the system

7    and you want the unit that's in charge of the most

8    sensitive information to oversee the program.  But if

9    you -- Your Honor, it's Paragraph 147.  "The police

10   bureau shall develop, implement, and maintain an

11   early identification system to support the effective

12   supervision and management of PRPB officers and

13   employees including the identification of and

14   response to problematic behaviors as early as

15   possible."

16          We want to avoid situations where there are

17   civil rights violations.  And there may be indicators

18   along the way.  For example, Your Honor, you raised

19   the example of someone who may be taking more Xanax

20   than not.  We don't want to wait for a complaint to

21   come in because that officer committed some incident,

22   used excessively force or had some other civil rights

23   issue.  If this supervisor is paying close attention,

24   you're going to notice behavior changes.  Perhaps

25   it's an usual number of absences.

1            Your Honor, Paragraph 148 outlines all of

2     the data that needs to go into EIS so that

3     supervisors are aware of the behavior of their

4     officers.  Your Honor, good supervisors are already

5     doing this -- they're aware, they're paying close

6     attention, and if they see a sign of trouble, they're

7     going to ask and approach the officer if they need

8     some assistance.

9            The idea behind the EIS is to make all our

10    supervisors good supervisors, that they're all aware

11    of basic information about whether officers are

12    showing up on time, whether they're having an unusual

13    number of uses of force, and it's a way to prompt

14    that supervisor to ask questions.  It's not punitive,

15    it is not punishment; it is a preventative tool.

16            THE COURT:  So it's, as we say in Spanish,

17    *No confundan la gimnasia con la magnesia.*  Don't

18    confuse -- in English how would you translate that?

19    Don't mix apples with oranges.  But I think what

20    you're saying is that anything that's EIS should be

21    implemented outside of SARP.  Again, there may be

22    matters that are EIS that end up in SARP, but they

23    should be independent of one another.  EIS should not

24    be mixed up in SARP.

25            MR. SAUCEDO:  No, Your Honor, EIS is

```
1    overseen by SARP because it includes SARP information

2    that's amongst the most sensitive the agency has.  So

3    it only makes sense that SARP -- and most internal

4    affairs divisions oversee the implementation of early

5    intervention, but the use is intended for

6    supervisors.  This information is a value to

7    supervisors.  SARP is going to have its own record

8    management system to keep track of complaints when

9    they come in, when they're due.  This mechanism --

10              THE COURT:  So you need not have a complaint

11   in order to activate EIS.

12              MR. SAUCEDO:  That's correct, Your Honor.

13              THE COURT:  Or something could happen at

14   SARP that EIS is also warranted.

15              MR. SAUCEDO:  Yes, Your Honor.  It could be

16   excessive absences, it could be minor infractions

17   that are accumulating.  Your Honor, this system is

18   intending to identify the outliers.  Right?  If there

19   are certain averages and uses of force or other types

20   of civilian complaints, this system is set up to

21   identify and to alert the police bureau of people who

22   are acting outside the norm, and it's a prompt to the

23   supervisor to take some action.

24              Again, the purpose of EIS is to prevent

25   misconduct, it's not intended as a record management
```

1    system.  It includes it but, it's not the totality of

2    what that system is.  And the reason I raise this,

3    Your Honor, is because we've been making these

4    comments over and over to get the policy and the

5    manual right that are being written for this

6    purpose -- and that's another reason why it's

7    important to keep a close eye on this.  This is among

8    the most difficult systems to build.

9         The Los Angeles Police Department that went

10   through a reform process just like this, they have

11   10,000 police officers, their EIS was among the last

12   thing to come in compliance because it's so complex.

13   It takes information from human resources, from SARP,

14   from a bunch of -- from the academy, because you're

15   also looking at training.  And so what this system

16   does is it pools all that together and it tells

17   supervisors who the outliers are of the people

18   they're supervising.  It's not a record management

19   system, it's a supervision tool, Your Honor.

20        THE COURT:  As you mentioned, EIS can

21   involve matters in SARP and it could also involved,

22   as you mentioned, human resources matters.

23        MR. SAUCEDO:  Yes, Your Honor.  The --

24        THE COURT:  So if you have an officer who on

25   three occasions is new and he just tells his

1    co-workers, his co-officers, "*Oye, mamita*, Hey baby,"

2    or something, and the supervisor or the agent says,

3    I've heard you say that three times, that's an early

4    indication that that could lead, if not taken care

5    of, to eventual harassment claims or conduct.  And

6    that's what EIS tries to look for.

7         MR. SAUCEDO:  Yes, Your Honor, it's not just

8    to prevent a misconduct situation where there's a

9    civil rights violation; this is also intended to help

10   save that officer's career.  And if -- yes, Your

11   Honor.  I mean, just looking at the cases where

12   officers have been arrested for civil rights

13   violations -- I'm talking historically here -- in

14   cases where the police bureau has sustained

15   complaints of civil rights violations, if you look

16   back and you try to identify whether there were

17   indicators early on, that's what we're trying to

18   build.  We're trying to prevent misconduct through

19   this system, Your Honor.

20        THE COURT:  Let me ask -- again, this is a

21   little unrelated, but it's similar to EIS and has to

22   do with supervisors, and I forget the term but --

23   when some of us have been at the conferences in the

24   University of Texas A&M, the Monitor from New

25   Orleans -- and I forget the acronym.  This is the

1    reporting system where all officers agree to report

2    each other.  For example, if Mr. Bazán and

3    Castellanos are police officers and Mr. Bazán sees

4    something that could lead to EIS for a supervisor, he

5    will go up to him or he will go to the supervisor to

6    help everybody out.  What's the acronym for that?  I

7    forget.

8            TCA ARNALDO CLAUDIO:  I'm going to look at

9    it right now.

10           THE COURT:  Well, we'll figure it out.

11   Well, that is something -- it's not exactly what's

12   contemplated here, this would be outside, but I'm

13   just mentioning that because it is something that's a

14   new trend in police reforms.  Okay, so thank you very

15   much.

16           Mr. Torres, if you have anything else to

17   add.

18           MR. TORRES-ORTÍZ:  Yes, Your Honor.

19           THE COURT:  Yes, Mr. Torres.

20           MR. TORRES-ORTÍZ:  Yes.  We have taken note

21   of the comments that Attorney Saucedo has just made.

22   We're going to take those comments and review the

23   policy and attend to the matter.

24           THE COURT:  And, again, he does have what I

25   think is something.  You should discuss, discuss with

1    DOJ.  I thank very much for the presentation.  And,

2    again, I'm happy that there's a new manual in place,

3    things are moving along but, again, we will continue.

4            And Mr. Claudio when you figure out what

5    that program is called just share it with everybody.

6            TCA ARNALDO CLAUDIO:  The one that the

7    lawyer from Washington, D.C.

8            THE COURT:  Yeah, who is the Monitor but I

9    forget the name.

10           Okay, then thank you very much, you're

11   excused.

12           Okay, then there's two items, 4 and 5.  I

13   want Mr. Claudio -- that should be brief updates on

14   the survey at Paragraph 241 and the assessment for

15   the May 1 I believe protest or assessment.  So brief

16   me on those very briefly.  I'll take comments from

17   the parties and then I'm going take a ten-minute

18   recess and then go with the other items.  I think

19   we've covered the big bulk on what was going to take

20   more time, but let me hear from you.

21           TCA ARNALDO CLAUDIO:  Yes, sir.  Concerning

22   Paragraph 241, as you know, in 2015 we conducted a

23   survey that related to the public police officers,

24   personnel that was detained for seven days.  So what

25   we're doing right now is we're conducting the same

1    type of survey to ensure we have a parallel

2    understanding of what happened in 2015 versus what's

3    happening right now in 2018.

4            I was informed that 1,327 people were

5    already surveyed, okay, for the population throughout

6    Puerto Rico, the 78 towns.  Approximately about 400

7    officers had been interviewed and then that were --

8    they're working right now in terms of the personnel

9    that has been detained.

10           In this venture, we had a cooperation

11   between the Puerto Rico Police Bureau and ourselves

12   to get this done.  Commissioner Escalera signed a

13   piece of paper to ensure that everybody within all

14   the precinct knew that we were coming.  We have some

15   hiccups in terms of the detainees.  I work with the

16   Associate Colonel Bermúdez to deal with that, but

17   it's ongoing.  So the results of that will be here

18   pretty soon on that survey.  It's --

19           THE COURT:  Let me add something, the

20   methodology Dr. Blanco-Peck is using for the survey

21   that has been proposed by the TCA, and the parties

22   have agreed like last time.  This is not a survey

23   performed by the Monitor *ex parte* --

24           TCA ARNALDO CLAUDIO:  No, sir, correct.

25           THE COURT:  -- it is agreed by everybody.

1    And the idea is to, again, update that survey from

2    about a year and a half ago to see what the public is

3    perceiving about the Reform, what officers are

4    perceiving.  I remember some of the questions to the

5    officers -- Do you know about the Reform?  What do

6    you think about it?  Same with the public.  And

7    that's that update.

8              TCA ARNALDO CLAUDIO:  That is correct.

9              THE COURT:  Let me also note that the budget

10   for this Dr. Blanco-Peck works for UPR so rather than

11   using one of these consulting groups that would cost,

12   you know, 300,000 to do this, it's a very -- it's a

13   di minimus cost and it's paid with the TCA's funds.

14             TCA ARNALDO CLAUDIO:  That is correct, sir.

15             THE COURT:  So we continued, I think, to try

16   and save as much government money as possible.

17             TCA ARNALDO CLAUDIO:  Yes, sir.  When we

18   went out there we even had a proposal of half a

19   million dollars and when you see that

20   Dr. Blanco-Peck's $35,000 it's like an incredible

21   minimum amount of dollars.

22             THE COURT:  So, that's --

23             TCA ARNALDO CLAUDIO:  On the 1 May basically

24   we have had also the cooperations of PRPB where the

25   assessment has been extremely satisfactory at this

1    time.  We have interviewed personnel.  We have

2    interviewed victims or presumed victims, I should

3    say.  We have included also witnesses which

4    include --

5           THE COURT:  When you say presumed or

6    purported or alleged victims, it could be individuals

7    who allege that they were mishandled by the police.

8           TCA ARNALDO CLAUDIO:  That's correct.

9           THE COURT:  But you could also have police

10   officers who may allege that they were thrown objects

11   or --

12          TCA ARNALDO CLAUDIO:  It goes both ways.  It

13   goes both ways on this.  We also had including the

14   ACLU and the bar association personnel, we have

15   talked to them.  We have also interviewed obviously

16   the PRPB including the commissioner that helped us

17   out through this process.  We have reviewed videos.

18   PRPB actually extended to us 12 DVDs provided by

19   Attorney Joel Torres.  We're looking at some other

20   DVDs that were furnished to us by the ACLU, videos

21   from Telemundo that we captured on that day and then

22   several of the hundreds of pages provided by PRPB in

23   terms of documentation that had to do with special

24   orders, plans, and so forth and so on.

25          We had a self assessment also by PRPB that

1    we've received, and to this date we have worked over

2    about 200 hours in this assessment, so the assessment

3    should be -- actually it's in the hands of Attorney

4    Bazán right now for a final look for the

5    constitutional side to be turned in.  The way it's

6    going to happen is before it is presented to you,

7    sir, we're going to go to both the parties.  And our

8    protocol is to go and brief the commissioner.  Once

9    we brief the commissioner then we will bring it to

10   the Court.

11          THE COURT:  Okay, and let me also ask this

12   report again as, you mentioned, it's being reviewed

13   by Attorney Bazán.  I understand that still you need

14   to get -- after it's reviewed before it's submitted,

15   there was a team of the TCA office that was present.

16   Those interviews or that input has not been I think

17   as of yet added, but that would be Attorney

18   Castellanos who was present at I believe two of the

19   locations and actually Retired Justice

20   Hernández-Denton so obviously that would be added to

21   what you have now for a final --

22          TCA ARNALDO CLAUDIO:  Right.  During the

23   time that 1 May was ongoing, that the TCA's office

24   actually put observers out on the streets, that was

25   obviously Attorney Castellanos, Attorney

1    Hernández-Denton, and Mr. Pujol.  Mr. -- Attorney

2    Denton himself he was at the -- what we thought was

3    the operations center for the police, and then that

4    didn't happen because the operations center actually

5    was moved to the Banco Popular de Puerto Rico.  So

6    that's something that we will talk about and discuss

7    when we're ready to present the report.

8            THE COURT:  Okay, so when that is -- the

9    parties will have an opportunity to --

10           TCA ARNALDO CLAUDIO:  Right.  The most

11   important piece is that when we finish we present it

12   to the parties for comments, and then we'll go ahead

13   and present it to the commissioner itself because it

14   comes to you, sir.

15           THE COURT:  And just on the observers, I

16   know Mr. Pujol and Attorney Castellanos were out

17   there.  Just so everybody knows, we set some

18   directives, the parties worked on them, and whenever

19   there's protests the TCA staff will wear jackets,

20   badges to identify themselves.  We'll be informing I

21   guess the area commanders, where they -- and they

22   will be given an area where they can participate.

23           I know -- this is obviously for a next

24   hearing at some point lessons learned, but just to

25   highlight a few because I have talked to you and your

1    team.  One of the things obviously the words

2    "Monitor's Staff" has to be larger in the jackets and

3    maybe bigger cards.  And obviously at some point I

4    know there were some gases and the TCA staff was

5    right there where it is so obviously for future times

6    we have to take additional precautions or measures.

7         But I do note that from the perspective --

8    again, the report is not final but there was

9    coordination.  Again, we have to do for your report

10   the lessons learned part, but I think it's important

11   that there were no issues with having the TCA and its

12   staff at the protest.  And, again, since May --

13        TCA ARNALDO CLAUDIO:  Actually that day the

14   commissioner talked to members of the server team,

15   and remember the focus of this whole when we're

16   looking at the evaluation it's general Order 625,

17   which basically is *manejo de manifestaciones*.  And

18   that's where we're looking at kind of the centerpiece

19   when we look at this.  Also, we look at where the

20   action of the incident commander at that point in

21   time.  Right now the incident commander imparted

22   orders as we go forward.

23        THE COURT:  So if there's -- I'm going to

24   hear from the parties if there's anything and then

25   I'll take a short recess.  And think we'll have one

1    or two matters that may take a few minutes and the

2    rest I think should be fairly short.  So let me ask

3    Mr. Saucedo any comments as to what Mr. Claudio has

4    said and if not then I'll hear from Mr. Torres.

5          MR. SAUCEDO:  Your Honor, just briefly we

6    appreciate the work of Dr. Blanco-Peck in getting the

7    survey done.  Last year he conducted focus groups

8    that were very helpful in this process, and so the

9    surveys are going to provide us an indication of

10   whether the Reform office is working because among

11   the things it measures is confidence that the

12   community has in the police and so that data is very

13   important.

14         I also want to thank Mr. Pujol and his team

15   for working on the May Day protests and the work

16   that's being done there.  We look forward to the

17   report.  I do want to make a quick note since we are

18   going, Your Honor, into the compliance phase of this

19   case.  And what's very important is that --

20         THE COURT:  We're at the monitoring phase.

21         MR. SAUCEDO:  Well, the compliance phase

22   with the Agreement rather than the action plans, Your

23   Honor.

24         THE COURT:  Okay.

25         MR. SAUCEDO:  And that is that it's

1   important for the Commonwealth to view the TCA's

2   report as a source of information about how its

3   processes are working.  They shouldn't be relics,

4   right.  So this is now the second report that the TCA

5   and his team have done on the May Day protest.  There

6   was a protest in 2017 that was reviewed.  There was a

7   protest this year that was reviewed.  It's important

8   that once the TCA makes recommendations that we pay

9   close attention to how PRPB evaluates those

10  recommendations and how they implement them into

11  their policies and trainings.

12          Our understanding is that the police bureau

13  has incorporated some of the fine findings that were

14  made in the first report into the updated and revised

15  policy, but it's something that on an ongoing basis

16  the TCA's recommendations, whether the Commonwealth

17  accepts them or not, they are findings that should be

18  taken into account and should be incorporated into

19  improving the processes going forward.

20          THE COURT:  Well, let me ask, I think it's

21  important because the government may not be the

22  Commonwealth in total agreement with perhaps a

23  conclusion, a particular conclusion, but the

24  important thing, as you well mentioned, is the

25  recommendation of the TCA.  And this is not a

1    he-said, she-said thing.  I think what is important

2    is, moving forward, how can we use this report as a

3    tool.  And I know in this report -- and Mr. Claudio

4    still has not issued the final draft report to the

5    parties -- something that may be very valuable is if

6    there's matters that were present in the 2017

7    protest, they were not in this protest.  The

8    Commonwealth was able to handle using those

9    observations in the earlier report, that's something

10   that should be highlighted to the police what is

11   good.  And if there's something that needs room for

12   improvement also notify.  But I think with these

13   reports that's the idea.  You hit the nail on the

14   coffin, Mr. Saucedo.  These reports are not meant to

15   establish liability or other matters; they're meant

16   as a working tool to the Commonwealth.

17          So let me --

18          TCA ARNALDO CLAUDIO:  Yes, sir.  I mean,

19   that's an important factor because like, for example,

20   in the first report we're very poignant about the

21   incident commander.  And then when you look at 2018,

22   without giving too much detail here, you see again

23   the same issue with the incident commander that

24   instead of one incident commander there's various

25   incident commanders, there's various colonels

1    present.  So an order was given.  Who was giving the

2    order, how the chain of command was --

3            THE COURT:  But those may be recurring

4    patterns.  They may be good, they may be things you

5    have to criticize, things you have to recommend.  But

6    I think it's something that is being documented I

7    think for the first time in the history of Puerto

8    Rico.  So anything else on behalf of the Commonwealth

9    before I take a very short break?

10           MR. TORRES-ORTÍZ:  Yes, Your Honor.  We look

11   forward reviewing the assessment from the TCA and on

12   the recommendations that the report has, but also I

13   was informed that the police is also working on a

14   report based on the same event from May 1st.

15           THE COURT:  Okay.  Great.

16           TCA ARNALDO CLAUDIO:  So then it will be

17   very important for us to receive that self-assessment

18   before I present --

19           THE COURT:  It could be very positive.

20           TCA ARNALDO CLAUDIO:  Right.  I mean, we

21   might learn from them certain things that we did not

22   know so we actually would need to discuss that point

23   before --

24           THE COURT:  I would urge the parties to

25   discuss and agree to when that would be provided,

1    then you can perhaps provide yours a bit later

2    because it may be very valuable input.

3          So I will take a short recess so my court

4    reporter can relax a little bit for a few minutes and

5    stretch.  It is 4:20.  Let's all be back here at 4:30

6    and I'm starting with whoever is here.  And, again,

7    we should be out by 5:00, 5:15, but I think overall

8    this has been very useful thus far.  Let's take a

9    ten-minute recess.

10          (The Court exits the room.)

11          (Public hearing recessed at 4:20 p.m. and

12    resumed at 4:40 p.m.)

13          THE COURTROOM DEPUTY:  All rise.

14          (The Court enters the room.)

15          THE COURT:  Please be seated.  Let's now go

16    to Item No. 6.  It's the TCA's assessment of

17    transfers at FURA.  That's the United Forces of Rapid

18    Action in English.  And let me hear from Mr. Claudio.

19    And you said you would be brief as to this matter.

20          TCA ARNALDO CLAUDIO:  Extremely brief.

21          MR. TORRES-ORTÍZ:  Excuse me, Your Honor, if

22    I may.

23          THE COURT:  Yes.

24          MR. TORRES-ORTÍZ:  I have one thing I would

25    like to state for the record on a previous topic.

1          THE COURT:  Yes, please go ahead.

2          MR. TORRES-ORTÍZ:  I just spoke with the

3   police reform office and I was informed that the

4   concerns that Attorney Saucedo told the Court they're

5   already part of the policy that is going to be given

6   to the U.S. DOJ and TCA on August 31st.

7          THE COURT:  Okay, and that's as to the last

8   item.

9          MR. TORRES-ORTÍZ:  The EIS, yeah.

10         THE COURT:  The EIS, okay.

11         Okay, so Mr. Claudio on Item No. 6.

12         TCA ARNALDO CLAUDIO:  Yes.  Very quickly,

13  Your Honor.  As you remember, in the last status

14  conference we spoke about an evaluation on the

15  transfers that were conducted by the Puerto Rico

16  Police Bureau referring those transfers.  There were

17  ten specific transfers on the month of June that

18  occurred and we want to look at that evaluation.  The

19  Court agreed to that and based on the Agreement of

20  the Court we wrote --

21         THE COURT:  Well, I ordered that.

22         TCA ARNALDO CLAUDIO:  Yes, sir.  Agreed and

23  ordered that.  You also ordered for a methodology to

24  be constructed, we did the methodology.

25         THE COURT:  That was approved.

1            TCA ARNALDO CLAUDIO:  Yes, sir.  We share it

2      and approved.  So today we supposedly should have

3      started with that evaluation; however, we were told

4      last week by PRPB that neither officers that we have

5      requested for interview nor the paperwork would be

6      available.  So we're bringing that matter to the

7      Court today for the Court to give us some guidance on

8      that.

9            THE COURT:  I'll hear first from Mr. Saucedo

10     and then Mr. Torres, but let me start by saying that

11     I don't even know why this is an issue.  This had all

12     been discussed previously, and Mr. Pujol this

13     investigation is -- this is not a public

14     investigation he's going to be sharing with

15     everybody; it is a TCA investigation for the use and

16     benefit of the parties and that information should

17     have been provided.  So let me hear from Mr. Saucedo

18     and then I'll hear from Mr. Torres.

19            MR. SAUCEDO:  Yes, Your Honor, briefly.

20     Having looked at the draft methodology and the one

21     that was approved in final, Your Honor, the scope of

22     the study is not just transfers involving FURA.  So

23     just to clarify the record, the United States

24     understands that the assessment that will be

25     conducted by the TCA is of transfers from June and

1    July and that includes units beyond FURA.  And --

2            THE COURT:  And I stand corrected.

3            MR. SAUCEDO:  Yes, Your Honor.  And the

4    second point is one of our comments to the

5    methodology is that it be connected to the staffing

6    study and plan that are being developed by Paragraph

7    13 or under Paragraph 13.  A lot of work and effort

8    will be undertaken to ensure that the different areas

9    of the police bureau have the right staffing.  And

10   illegal or unjust transfers that go against policy

11   are going to defeat that purpose because, again, the

12   whole point of having a staffing plan is to ensure

13   that the resources that the police bureau has go to

14   the right places.  And when you're moving people

15   around there is a risk of undermining those efforts.

16           And so we welcome the TCA's review of these

17   transfers.  We believe it fits squarely within the

18   purpose of Paragraph 13 and the allocution of

19   resources.  I'm not prejudging here, we have not

20   looked at any of these cases of transfers so we're --

21   we will await the TCA's evaluation of these

22   transfers.  The only thing I wanted to point out is

23   that whenever there are transfers that are not in

24   compliance with the Agreement or with local laws that

25   is, Your Honor, we put at risk all the efforts that's

1    going into allocating resources effectively within

2    the agency.

3              THE COURT:  Let me ask you, are you in

4    agreement or in disagreement to the effect that

5    pursuant to my directives and the methodology already

6    approved Mr. Pujol should have been given immediate

7    access to the paperwork to conduct the interviews?

8              MR. SAUCEDO:  Your Honor, the Agreement does

9    require notice of documents and of reasonable period.

10   I believe the word is "reasonable access."  But, you

11   know, there are exceptions in the Agreement for

12   attorney-client privilege and so I can understand

13   where some time is needed to review documents or

14   other materials before they are submitted; however,

15   I'm not certain what the circumstances are for the

16   request for additional time from the Commonwealth.

17             THE COURT:  So let me hear from the

18   Commonwealth because I understood this was a done

19   deal, it was not an issue, we had discussed it

20   previously, and Mr. Pujol was going to commence.  But

21   obviously he wasn't able to commence.  So let me hear

22   from Mr. Torres.

23             MR. TORRES-ORTÍZ:  Yes, Your Honor.  Thank

24   you for the opportunity to clarify.  We are not

25   objecting to the methodology.  Mr. Pujol sent a

1    request for documents and interview on Wednesday.

2    And the police asked if I could give an assessment of

3    the request that was made to the police.  And, you

4    know, as part of the attorney guidance that is given

5    to its clients, I asked Mr. Pujol to give us until

6    next Wednesday, that is August 22nd, to give any

7    explanation or any concern that we have with the

8    request.  But we are not objecting to the methodology

9    that was submitted to the Court and approved by the

10   Court.

11        THE COURT:  Okay, because let me say what

12   concerns me.  And, again, I hope that -- I start a

13   trial in about a week, it's a murder case.  And,

14   again, I can't be -- you know, for minor issues that

15   come up.  Whether documents were provided or not,

16   these matters should be resolved readily.  And I

17   think Mr. Pujol is here pursuant to the methodology.

18        And, again, this is taking me back a year,

19   two, three, four years ago when -- and it's happened

20   also in the health reform case involving the persons

21   with mental disabilities that, you know, somebody

22   goes to obtain documents one of the TCA members or

23   Monitor's members, and somebody is second-guessing

24   or, you know, we can't provide this, we can't provide

25   that.  Again, the Monitor is there to help everybody

1    to obtain the information.  He's not there to

2    prosecute anybody or to file suit against anybody,

3    and these documents, this information, should be

4    provided.

5         Again, I don't think -- the Monitor is not

6    here working on a basis of bad faith and let me go on

7    a fishing expedition.  Mr. Pujol is an experienced

8    investigator for many years, he knows exactly where

9    he's looking.  And if there's something there to make

10   a finding, he will report it; and if there's nothing

11   there to make a finding, he will say there's nothing

12   here.  But, again, if the parties want to agree on

13   24 hours or 48 hours whenever a request is made, I

14   have no problem if it is done; but it is something

15   that unilaterally the police cannot simply say, We

16   want to consult this, we need additional time,

17   because then he's never going to end his evaluation.

18        So what I'm going to do is obviously set a

19   directive.  Obviously it's working days.  Whenever

20   Mr. Pujol makes a request or anybody from the

21   Monitor's office, it should be provided within

22   48 hours.  If I understand there may be something in

23   there that's attorney-client privilege or if there's

24   anything -- you know, it might just double-check

25   everything, but he should be allowed to interview the

1    officers.  Again, I don't want -- come time

2    Wednesday, Oh, no, Mr. Pujol, another week and

3    another week.  And that is something that should

4    be his.

5         So what I'm going to do is pertaining to

6    this particular investigation or assessment, let me

7    call it assessment, or any other matters, we're going

8    to start with the monitoring period, there has to

9    be -- you know, it's not like, We're not ready, we're

10   going to take two weeks or three weeks.  Again, I

11   recognize during Christmastime it may be harder,

12   everybody's on vacation.  Nobody's going to say,

13   Well, it's the 1st of the year.  We're conscientious

14   of that.  But let me set prospectively, for this or

15   any other matter, when requests are made for matters

16   of this, it's 48 hours.

17        If it's something that's attorney privilege,

18   the TCA or Mr. Saucedo can discuss that with you but

19   we need to move things along; otherwise, this drags

20   along and it gives the impression that the

21   Commonwealth -- and what you're saying is the

22   Commonwealth has no issues, but it gives the

23   impression of lack of transparency, that the

24   Commonwealth doesn't want to cooperate.  And that

25   looks bad on the commissioner.  Again, I don't want

1    to give that impression.

2              And I think everybody can live with the

3    48 hours.  Is everybody in agreement?

4              TCA ARNALDO CLAUDIO:  Yes.

5              THE COURT:  This is a directive there may be

6    exceptional circumstance but we Inc. we had --

7              MR. TORRES-ORTÍZ:  Your Honor, it's

8    important to know that, you know, this has been a TCA

9    visit week, it has been very hectic.  We had two town

10   hall meetings, one Saturday, we had another one on

11   Wednesday.  And so if, you know, circumstances arise

12   to it, you know, we might need an extension.

13             THE COURT:  I understand the circumstances.

14   As a general operating rule, 48 hours, two working

15   days.  And if it's requested on a Thursday, then

16   obviously Friday, you know, don't count the weekends

17   in between, but let's leave it like that for now.

18   Hopefully it won't be an issue.

19             TCA ARNALDO CLAUDIO:  So, Your Honor, excuse

20   me.  So I can say that we will receive the

21   information by Wednesday morning.

22             THE COURT:  By Wednesday morning.

23             TCA ARNALDO CLAUDIO:  Thank you, sir.

24             THE COURT:  Except if there's any issues of

25   privilege then the TCA has its attorney, Mr. Saucedo

1    is an attorney, so you can discuss that internally if

2    there's any issues, but, again, that's going to be a

3    very slight percentage, I understand.

4           Item No. 7, is the update on the proposal

5    regarding the PRPB police academy.  I note that the I

6    continue to be informed on a monthly basis.  I know

7    Ana G. Méndez University has continued their

8    proposal.  But let me first hear at this time from

9    Mr. Saucedo.

10          MR. SAUCEDO:  Yes, Your Honor.  The TCA

11   informed the Court and the parties about this

12   unsolicited proposal last year in May of 2017.  And

13   at that time the Commonwealth agreed to keep the TCA

14   and the United States apprised of developments in the

15   consideration of that proposal.  The.

16          United States is not involved in the

17   selection or the review of any of these materials.

18   We did receive a briefing and did discuss this last

19   week with the Commonwealth.  We understand that they

20   are at a very preliminary stage of consideration of

21   this proposal.  It was -- and I can understand that

22   the Commonwealth does not want to share details about

23   that proposal until it determines for itself that

24   it's a viable proposal and so that is understandable.

25          The United States' concern is that, you

1    know, it's been more than a year since these plans

2    first came to light to us in this case and in the

3    meantime there are some very serious needs at the

4    police academy.  And so while the Commonwealth is

5    considering who will at some point operate the police

6    academy and under what model, we have some concerns

7    about the physical plant issues at the academy, the

8    administration of the academy, and how many people

9    are assigned to work there, the information systems

10   that are being developed, the contracts with

11   instructors.

12           So, there's ongoing in-service training that

13   is required.  At some point the police bureau will

14   hopefully recruit new cadets and the police academy

15   needs to be prepared for that eventuality.  And so

16   while the Commonwealth continues to evaluate this

17   proposal, we've agreed as of last week to continue to

18   focus on the current needs of the academy to make

19   sure that that academy has the resources and support

20   it needs to be able to carry out its mission.

21           THE COURT:  And let me ask, from your

22   perspective, and I'll ask the same question of the

23   Commonwealth, the academy -- we have not had a new

24   academy.  And when I say a new academy, a new cadet

25   class graduating for about three years, but the

1    academy is still in operation and officers go there

2    to take courses.  And courses are being given at the

3    particular regions, which was one of the important

4    things, that the officer -- you know, if somebody is

5    from Peñuelas he doesn't have to go to Gurabo to the

6    academy.  But the physical structure of the building

7    is still there but a lot of the training is given

8    on-site.  Am I correct?  That's still ongoing?

9           MR. SAUCEDO:  Yes, Your Honor.  The United

10   States' understanding is that the police bureau did

11   create individual centers, training centers, in each

12   of the 13 areas.  They've also started to implement

13   virtual training so that officers can take training

14   wherever they're located.  The question is the cadets

15   will have to go to the academy, they won't be able to

16   get trained at any of these regional sites.  And so

17   it's important, as part of the planning for the

18   recruitment of these officers, that we make sure that

19   the academy is prepared to take them in and has the

20   resources it needs to do a quality job.

21          And the TCA may have more recent

22   information, I know that they were visiting there

23   last week.

24          THE COURT:  I'm going to ask him to provide

25   any other information he has and then Mr. Torres can

1    respond.  I have a few comments.

2         TCA ARNALDO CLAUDIO:  Yes, sir.  I had a

3    visit to the academy actually the last week and the

4    physical structure of the academy cannot withstand

5    right now an academy.  It cannot.  It lacks the

6    dining facility, all the 900 or 600 places where the

7    cadets will sleep they're in pretty bad shape,

8    they're deteriorated --

9         THE COURT:  And that's because of the

10   hurricane in part?

11        TCA ARNALDO CLAUDIO:  The hurricane in part

12   and because nothing has been really done at this

13   point in time.  So if you really take an assessment

14   just on the infrastructure, it will take between six

15   or eight months just to put the academy together so

16   people can actually go in an academy to -- and we're

17   talking about millions of dollars of investment in

18   the whole thing.

19        So it is good and we applaud the effort of

20   thinking about getting, you know, some referrals for

21   new cadets, but the matter of fact is that the

22   academy, the infrastructure, will not be ready.

23        THE COURT:  They need a facility.

24        TCA ARNALDO CLAUDIO:  It has to be a major

25   effort and total dedication for this.

1    Notwithstanding that a lot of the staff is gone.

2    They're also -- some of them have put in either for

3    retirement or just to get out of the police at this

4    time.  So you're going to look at the staff and

5    revamp the staff and give and Colonel Rivera, a

6    productive staff going forward, and that includes the

7    civilian staff.  So this needs a major overhaul in

8    infrastructure, human resources, and a proposed

9    budget that can facilitate both of those.

10            THE COURT:  Okay, thank you.  I'll hear now

11    from Mr. Torres.  Let me just make two or three

12    general comments before I hear from the Commonwealth.

13    First of all, as I have always mentioned, the

14    decision whether to go to public/private partnership

15    is solely in the hands of the Commonwealth.

16            From my perspective, that's what this

17    administration proposed at the beginning when it came

18    into power and, again, that intent will be respected.

19    And that's important for everybody to know.  And it

20    will be supported.  And once an A.P.P. -- again, the

21    proposal has been Ana G. Méndez.  And I will note for

22    the record that university system has been in place

23    in Puerto Rico, I believe, for over 50 years.  It

24    does have programs right now.  It's a big university,

25    private university.  It does have programs and it's

1   offering a similar academy for corrections officers.

2   But I think from -- and I know Mr. Orona is here so

3   that's why I'm saying this as well.  It's very

4   important that the Commonwealth expedite its process.

5         It would appear to be that Ana G. Méndez is

6   a viable candidate.  The decision is not mine to

7   make.  But it's important that whatever is going to

8   happen be done.  The election cycle is in 2020 so

9   we're still in 2018, but once we reach November this

10  point of year it's half the term of this

11  administration.  And I think it's important because

12  this should not be something that's done in the last

13  three months of an administration.

14        I think we're reaching the mark where Puerto

15  Rico needs a new academy, a group of new cadets.

16  Again, due to financial restraints it may not be a

17  huge class.  But it's very worrying that for the last

18  three years I did not -- I have not seen a

19  graduation.  Plus, the last one almost three years

20  ago was mostly, I would say, 90 percent municipal

21  officers.  So Commonwealth officers it's been maybe

22  three and a half years since that has happened.  And

23  Colonel Clementina Vega can probably recall when the

24  last class was.

25        But I think it's important that the

1    Commonwealth what its plans are, move them ahead,

2    expedite them.  If Ana G. Méndez is approved

3    before -- and has been mentioned, you can approve it

4    but then the TCA and the U.S. DOJ have to come in,

5    they have to review everything just to make sure it

6    qualifies with the police reform and ultimately I

7    would have to approve it upon the recommendation.

8    Again, so it's not a matter of selecting and saying

9    this is the selection; it needs approval ultimately

10   from the Court.

11          And, again, I don't see any obstacles, no

12   impediments, except that the Commonwealth really

13   needs to move on this.  It's important getting that

14   academy.  I know the building -- what Mr. Claudio has

15   mentioned, that presents some other challenges,

16   raising the moneys, but I think what is foremost

17   important is that there be an academy operating and

18   not a big question mark of what's going to happen.

19          And I know, again, when you have a public or

20   private partnership the cost for the government may

21   be reduced.  I know that's a model of the future,

22   it's been done not only here; it's been done

23   nationally at all levels.  So I think given the

24   fiscal situation it's a very good idea, but it has to

25   be done the right way and it has to be done sooner

1    than later.  So, those are my general comments.

2           I'd like to hear from counsel.  I know

3    Mr. Orona is here, so Mr. Orona if you have anything

4    else you need to add I think it would be very

5    important to hear from you as well.

6           MR. TORRES-ORTÍZ:  Your Honor, if I may talk

7    about -- in regards of the physical structure of the

8    academy, I've been informed that the dining hall is

9    currently being fixed and the theater area is

10   functioning at the moment.  And in respect to the

11   sleeping areas it is going to be looked into to see

12   how much it will be needed to get it fixed.

13          THE COURT:  Okay.  And, again, one of the

14   important things is the officers are training

15   physically part of the day but they're also training

16   and they have homework.  That's one of the things

17   that the facilities are so important because they

18   have to stay there, they're quartered there.  And,

19   again, if it's no new fans, no air conditioning, no

20   light, it's hard for them to do this.  And I know

21   that's something you'll have to assess but keep

22   updated.

23          So if Mr. Orona has anything to add from

24   the -- not the day-to-day of the academy but the

25   bigger issue with Ana G. Méndez or any other

1    proposal.

2            MR. ORONA-AMILIVIA:  Your Honor, I think

3    it's important, you know that -- first of all, the

4    Commonwealth agrees and shares their concerns

5    regarding the need to update the facilities in the

6    academy both presented by the U.S. DOJ and the TCA.

7    And I think that's something that we -- even though

8    our financial constraints, we're taking steps to

9    actually try to find the moneys necessary to bring

10   back and create another academy and to bring

11   up-to-date the physical structure even though those

12   financial constraints are there.  And unknown to the

13   public, we have been taking additional steps to do

14   that.

15           But I think it's important to note that

16   regarding the proposal made by Ana G. Méndez it was

17   an unsolicited proposal which means that it's not

18   really -- it wasn't really something that was part of

19   the public policy per se of the government, it was

20   just a proposal that was received from Ana G. Méndez.

21   And how the process works is that after the

22   desirability study is conducted it goes to a board

23   and if the board approves an R.F.P. is issued for

24   that public/private alliance or partnership.

25           So right now we're still on the preliminary

1     process to determine whether or not that proposal is

2     desirable, and when that's happened it goes to the

3     board so that they could issue a public announcement

4     for public comments.

5          Our, and what has been our compromise is

6     that once between -- after if it's decided that the

7     project is something that we want to do and before it

8     goes to the board, we are going to sit down with the

9     U.S. DOJ and the TCA office to make sure that what

10    goes out from the 3-P alliance includes and it takes

11    into consideration all of the aspects that if a

12    public -- if a private/public partnership is actually

13    coming into place, it has to include everything that

14    the Agreement -- that it has complied with everything

15    that is on the Agreement.

16          And, secondly, it is important to note that

17    even though Ana G. Méndez is actually the one that

18    actually presented the proposal that doesn't mean

19    that the proposal is not going to be open for

20    competition from other institutions that may be

21    willing to participate or that have interest in

22    creating a private and public partnership with the

23    government regarding the academy.  So in that sense,

24    you know, there were other issues that actually, and

25    I agree, that has delayed the process but we're

1    working on it.  And once the process comes to a

2    completion and if we decide that the process is

3    desirable for the Government of Puerto Rico, then we

4    will sit down and make sure that all the processes

5    that come after that are in compliance with the

6    Agreement and in compliance with the Reform process.

7         THE COURT:  Okay.  So what I ask is for

8    Mr. Torres just continue to inform monthly of any

9    matters.  And, again, my -- it's not an order but my

10   advice to the Commonwealth is that to the extent it's

11   considering Ana G. Méndez or you have to go through a

12   whole sort of process it should be done on a most

13   expedited basis.  Ideally, January, February or March

14   of next year there should be somebody ready to have

15   the academy and then maybe by the summer at the

16   latest a new group of cadets.

17        Again, officers continue to retire, there's

18   also those who have left after the hurricane and all

19   the conditions, but new recruits are needed.  So,

20   let's leave it at that for now, we'll continue to

21   revisit these issues.  Thanks for everybody's

22   comments.

23        Now, the next item, and I'll address that in

24   three seconds.  I think it's important -- and I know

25   Mr. Orona you're here and so is Commissioner

1    Escalera, when we have these statuses -- and, again,

2    I will probably have them every two months or --

3    definitely not next month, I have a trial.  But it's

4    important.  And I will set them at a time when

5    everybody's available, usually in the afternoon.  But

6    it's important that you continue to come because I

7    think your input and at least your observations and

8    just seeing what everybody's thinking is very

9    important.  So, that's that issue.

10          The next issue is the update on the town

11   hall meetings.  Mr. Claudio if you want to say

12   anything about this and then I know Mr. Castellanos

13   is here who's been organizing these town hall

14   meetings.  Let me just -- I don't know if everybody

15   knows how I came up with this idea.

16          As you all know, I like basketball and I

17   like the movie Hoosiers.  And there's a scene in that

18   movie where Gene Hackman who's the coach is about to

19   be fired by the municipal assembly and there's a town

20   hall meeting.  And the assembly comes out and he

21   listens to everybody, and anybody from the town can

22   come and explain his concerns.  Don't fire him, fire

23   him, do this and that.  And they do fire Gene

24   Hackman, but then the star player says, I'm going to

25   play, but only if Coach stays.  And everybody says,

1    Hey, let's vote for Coach.

2          That's the concept of town hall meetings

3    because it's not only the decisionmakers who are

4    there talking what their plans are or having the TCA

5    say, This is what we're doing, this is our

6    methodology, having Mr. Torres say, Well, DOJ is

7    doing this, and Mr. Saucedo saying this is what U.S.

8    DOJ did.  You share that, but then you get input from

9    police officers, from the region, from the community.

10   You also hear from persons affected or benefited by

11   the police reform, and I think that's very unique and

12   important.

13         I was trying to do that in my bigger status

14   conferences, it's just very -- just hearing from

15   particular officers or programs like I've been doing

16   today and mixing that with the opponents from the

17   community it's very hard and more so now with my

18   extra added duties that I did not ask for them but I

19   inherited them.  But I think this is what the town

20   halls seek.  And I try to participate.  I did send a

21   video, a very short video welcoming everybody.  That

22   will be played every time.  But let me hear from

23   Mr. Claudio and Mr. Castellanos.

24         TCA ARNALDO CLAUDIO:  Sir, not to be

25   repetitive so I'm just going to go ahead and ask

1    Mr. Castellanos to present the town halls.

2              THE COURT:  Okay.

3              MR. CASTELLANOS-BAYOUTH:  Thank you, Your

4    Honor.  And thank you for the TCA also for yielding

5    his time so I could address the Court.

6              Before I make some particular statements as

7    to what we're doing and what we intend to do for the

8    remainder of the year, I think it's imperative that

9    the Court and everybody who is listening understands

10   that from the perspective of the office of the TCA,

11   and I'm sure of this Court, the importance of the

12   town hall meetings is premised on the importance of

13   the people participating in the process of reforming

14   their police.

15             As Your Honor knows, because we've shared in

16   conferences outside of this jurisdiction, not

17   everyone throughout the United States feels the same

18   way as to the capability of the people taking action

19   in an affirmative matter in assisting their police

20   officers and their police department transforming

21   itself and becoming a better police overall.

22             With that being said, I think we set out

23   some objectives of identifying different regions

24   throughout Puerto Rico where we felt that throughout

25   the last couple of years, obviously because of the

1    workload of Your Honor and this court, we haven't

2    listened to the people as to their concerns, their

3    opinions, and their vision as to the police reform.

4    So we set an agenda commencing in Ponce then we

5    proceeded to Caguas, then we just concluded an

6    extremely successful public hearing, town halls as

7    Your Honor calls them, in Fajardo this past Saturday.

8    And we still have for the remainder of the year town

9    halls scheduled for Bayamón, Arecibo, Guayama, and

10   Mayagüez.

11         So far we have spent nine hours in town

12   halls.  We have received testimony from 36 different

13   speakers in total, but including even representatives

14   of public housing communities from all sectors of

15   society and with particular emphasis on the key areas

16   that have been identified in the police reform

17   agreement so that the community ultimately feels

18   empowered and feels a part of creating that necessary

19   bond between the community and the police force.

20         We feel that if, well, Your Honor's vision

21   isn't put into effect those bonds that have been

22   identified by both the Department of Justice of the

23   United States and have been acknowledged by the

24   Department of Justice of the Commonwealth of Puerto

25   Rico aren't strengthened, ultimately the Reform

1     itself will not be sustainable.

2          So we have received participations again

3     including mayors, including community leaders.  The

4     police has been present.  And from a personal -- from

5     my individual capacity, and I may utter this and some

6     may agree, some may not, I think in the matter that

7     the police commissioner and even at times the

8     secretary of the Department of Public Security can

9     participate in some of these town hall meetings,

10    they'll get a better understanding of what's actually

11    going on and what the people are actually feeling in

12    terms of the police reform.

13         THE COURT:  When you say the people are

14    actually feeling, it's the citizens but it's also the

15    police officers who are working in that region.

16         MR. CASTELLANOS-BAYOUTH:  Correct.  So

17    ultimately it's not the same because of the distance

18    and the size of the Reform -- and this is my personal

19    opinion, because it has been uttered in different

20    town hall meetings.  But I think in the matter --

21    everybody knows their busy schedules, everybody knows

22    they have a lot of commitments.  But in the matter

23    that once in a while they can participate and they

24    can be present in these town hall meetings, it will

25    only strengthen the outcome of the town hall

1    meetings.  And if Your Honor deems it necessary, at

2    the time that we're compelled or asked to generate a

3    report as to what matters we have identified that

4    need special attention and we share the same with the

5    parties, Your Honor, I think, will be convinced that

6    this participation, this presence, will ultimately

7    benefit the proceedings, will benefit the credibility

8    of the proceedings.  And ultimately we will all

9    benefit from more activism from at least the high

10   level hierarchy of the police department.

11           That being said, I commend -- I have

12   commended numerous members of the police force.  I've

13   written to them personally because without the active

14   participation of members of the police department

15   both area commanders and the personnel that they have

16   designated to assist this Court and the TCA's office

17   to organize the town halls, these town halls would

18   not have proven as successful as they have proven.

19           We have encountered hiccups.  When we have

20   encountered hiccups, we have had conferences,

21   telephone conferences, with the participation of the

22   parties.  We have tried to fine-tune these hiccups

23   and we have proceeded and moved forward.  And I think

24   after Saturday's town hall meetings we are finally

25   seeing the benefits of everybody's contributions.

1    But we have an ambitious agenda, we have an ambitious

2    objective, and maybe these objectives will take us

3    beyond 2018 and into 2019 once Your Honor gets --

4    receives the benefits of the fruits of what is taking

5    place in these town hall meetings.

6             THE COURT:  Thank you.  What I would like --

7    and, again, this is a cycle, I call it the

8    2018-cycle, it's these six town halls.  I assume next

9    year there will probably be town halls at some --

10   it'll be like baseball season, we can have it at

11   different parts of the year.  Once these town halls

12   conclude, I believe in December, that the TCA and I

13   guess through you who has been setting it up but also

14   with the TCA's comments prepare a -- again, it

15   doesn't have to be a huge 45-, 30-page report, but it

16   could a 8-to-12-page report.  But I assume there's

17   going to be common trends in different town halls.

18   There's going to be issues that are specific here and

19   there, lessons learned.  So I think that report to

20   share with the parties, just like when Mr. Pujol has

21   been doing his evaluation, I think a self-assessment

22   evaluation from the TCA's perspective would be very

23   welcome to the Court so then we can plan ahead

24   possibly another cycle.

25             I do want to advance obviously unrelated to

1   this case, in the health reform case that I also

2   have, another agreement between the United States and

3   Commonwealth, obviously I'm not holding them this

4   year not to conflict with these, but it is something

5   that I'm contemplating probably beginning February of

6   next year perhaps a shorter cycle, but I think it's

7   something we can adapt to that.  So I think it's

8   been -- I have not heard anything negative, to the

9   contrary, I commend the TCA and you.  I know the

10  challenges setting these meetings up and coordinating

11  and just keeping the clock for everybody.  I know I

12  issued some orders.

13          And let me just ask you, has everybody -- I

14  guess the first one you kind of learn to -- and each

15  time you improved but at least in Fajardo everybody's

16  sticking to the time clock, I assume.

17          MR. CASTELLANOS-BAYOUTH:  Yes, Your Honor.

18  Since the second town hall meeting in Caguas I

19  actually developed a red card caution as to the

20  duration of time left, remaining in each speaker's

21  turn.  I was not required to use it once.  And in

22  Fajardo, thanks to Your Honor, we had granted

23  additional time so that the people of Vieques and

24  Culebra could fully express themselves.  They did,

25  they used their time.

1          And we received the participation of

2     additional speakers such as the mayor of Ceiba, and

3     that added a certain dynamic to that town hall

4     meeting that warranted -- like I mentioned to the

5     TCA, the little discretion that I have I think I used

6     it to make everybody feel that they had an

7     opportunity to address those who were present and to

8     speak directly to representatives of the TCA the,

9     Department of Justice of the United States, and the

10    Department of Justice of the Commonwealth of Puerto

11    Rico.

12          And I'm proud to say to this day, Your

13    Honor, not a single person who has requested an

14    opportunity to speak in any of the town hall meetings

15    has not been granted the authorization to speak.

16          THE COURT:  And everybody has shown up,

17    correct?

18          MR. CASTELLANOS-BAYOUTH:  We've had maybe

19    out of the three maybe two individuals who excused

20    themselves, but overall for the undersigned

21    specifically and I'm sure for the officers of the TCA

22    and the parties, the fact that everybody who has

23    requested an opportunity to speak has been granted

24    one is of great importance and worth mentioning to

25    the Court.

1          THE COURT:  Okay, thank you.  Let me hear

2    from Mr. Saucedo in regards to if there's anything

3    you want to comment.  I know you were present.

4    What's DOJ's impression of these town halls.  I think

5    that's important also to the Court.

6          MR. SAUCEDO:  Yes, Your Honor.  The United

7    States often does town halls as part of

8    investigations --

9          THE COURT:  And you did so when this case

10   was being investigated here.

11         MR. SAUCEDO:  That's correct, Your Honor.

12   And having them during the compliance phase is very

13   helpful.  Your Honor, I think the town halls have

14   been of mutual benefit.  It gives an opportunity for

15   the TCA and the parties who are working on the case

16   day-to-day to have an opportunity to have a dialog

17   and a conversation with members of the public who

18   have questions on their minds.  But, more

19   importantly, it's an opportunity to learn from them

20   and to hear their experiences, and it's a reminder of

21   what's at stake in this case.  You have two

22   governments who are the parties in this case, but

23   many people are affected and impacted.

24         We've heard some very compelling stories and

25   experiences from members of the public.  We heard

1    some of them on Saturday in Fajardo, and we do look

2    forward to trying to get those more difficult

3    communities to come out and participate.  There are

4    some communities where there's still some trust

5    issues.  It may not happen on this cycle, but it's

6    going to require some ongoing effort to get some

7    individuals to come out and to share their

8    experiences.

9            We have heard a range of perspectives.

10   We've heard very positive supportive experiences that

11   people have had and we've also heard the opposite.

12   But I think the town hall is an opportunity, whether

13   you have a positive or negative view, to learn about

14   the Reform process and to get involved and to support

15   it because ultimately the success and implementing

16   the Agreement is a success for everybody.  And I'm

17   hoping that that's the takeaway for everyone who

18   participates.

19           Finally, Your Honor, I do want to commend

20   the civilian interaction committee for Fajardo

21   because they were not on the original list of six

22   locations where they were going to have these.  And

23   it was through their advocacy that we added, I

24   believe, a seventh town hall this year on Saturday at

25   a time and place that was convenient for them to

1    participate.  And so just another example of how the

2    community's had an impact in this.

3              THE COURT:  And the amicus from the Fajardo

4    from the community leaders he was there.  He's the --

5    what's his name?

6              MR. CASTELLANOS-BAYOUTH:  Licenciado Vega.

7    And he helps a lot.

8              THE COURT:  Okay, well, thank you.

9              Let me hear from Mr. Torres.  I assume you

10   echo Mr. Saucedo's comments.  I did see the

11   photographs and everybody looked happy there.

12             MR. TORRES-ORTÍZ:  Yes, Your Honor.  We

13   agree with the comments of the U.S. DOJ and also with

14   Attorney Castellanos'.  I wasn't thrilled that it was

15   on a Saturday, but I was glad that we went there

16   because especially the one in Fajardo was really

17   productive.  And one thing we took out of it was that

18   the area commander for that town that we were

19   visiting needs to be prepared and the area commander

20   from Fajardo was really prepared and really informed

21   the public on all the issues that they were talking

22   about that day.  And we're looking forward on the

23   next town hall meeting and having the area commander

24   have that same productive meeting.

25             THE COURT:  Thank you.  And let me just

1    comment on this.  I know the police commissioner is

2    here, so is Mr. Orona, but if at any point at the

3    remaining town halls you could do a cameo appearance

4    and you can arrange -- it could be on a surprise

5    basis and just show up and perhaps be the first

6    speaker if you have to leave or if you're able to

7    stay, you'll probably get some very good input.  And

8    obviously that's a court proceedings and we'll take

9    any measures to adequately accommodate you.  Same, my

10   invitation extended to Secretary Pesquera because I

11   think so far everything's.  One of the things --

12              MR. TORRES-ORTÍZ:  Your Honor, if I may.

13              THE COURT:  Yes Mr. Torres.

14              MR. TORRES-ORTÍZ:  Police Commissioner Henry

15   Escalera was also in Ponce and I would like to

16   appreciate his presence.

17              THE COURT:  Thank you very much.

18              Let me say this, the whole agenda, the

19   matters that have been discussed, I know members of

20   the media are here.  And these are matters that are

21   ongoing, they are subject to the Court's evaluation

22   or rulings, so technically they can't be commented

23   on.  But as to the town hall meetings, once we're

24   done, the Monitor or Mr. Castellanos they have leave

25   if you want to ask them any questions.  Again,

1    there's no dispute about anything pertaining to the

2    town hall meetings, how they're set, so if you have

3    any questions about those, member of the media, as to

4    the town halls please feel free to ask them.

5              Okay, we have three brief remaining matters.

6    No. 10 is the compliance -- we should be done in

7    about 15 or 20 minutes -- Compliance Methodology For

8    the Period Following the Capacity-Building Period.

9    Marcos Soler, Deputy TCA, your turn.  Short, sweet,

10   to the point.

11             DEPUTY TCA MARCOS SOLER:  Yes.  Direct and

12   to the point, Your Honor, as you indicated, we will

13   be introducing on August 30th the methodology.  What

14   we are trying to do is very simple.  As you know,

15   Article -- Requirement 294 of the Agreement requires

16   for us to be able to measure full and effective

17   compliance.

18             In order to do that we have two different

19   ways to proceed:  One way is certainly to determine

20   compliance with all the requirements of the Agreement

21   under 245.  That means to evaluate that all the

22   policies are in place and all the trainings are in

23   place and in practice these things are implemented

24   both from a qualitative and a quantitative

25   perspective.  The other option, Your Honor, is to

1    measure outcomes which are determined in Article 243.

2    And also Article 246 gives the opportunity for the

3    TCA to recommend additional outcomes that might be

4    appropriate.

5            So the way to explain what we're trying to

6    do is, for instance, we take Requirement 38 of the

7    Agreement about requests for medical services in case

8    of injury to people who are arrested.  And what we

9    are trying to do is not only to look at compliance in

10   terms of policy, whether there's a policy, whether

11   there's training, how this is done in practice, but

12   what we are trying to do is also to develop outcome

13   indicators that will connect with the main idea.

14           What is the main idea?  Whether the number

15   of people who are -- who receive -- who suffer

16   injuries are treated appropriately.  And in order to

17   do that we conduct that to all the other parts of the

18   Agreement.  Requirement 68 talks about supervisors

19   and the role of supervisors.  Article --

20   Requirement 148 talks about how in case of injuries

21   how they should be captured in the Early Intervention

22   System or other parts of the Agreement.

23           The idea is in all cases to have a

24   comprehensive analysis by which we can measure the

25   progress or lack of progress that the Commonwealth is

1    making in terms of compliance.  Whether, again, by

2    looking at compliance with a specific requirement or

3    by the intended outcome and effect that we think is

4    part of the Agreement.

5              THE COURT:  Okay, thank you.

6              Mr. Saucedo any brief comments as to this or

7    Mr. Torres?

8              MR. SAUCEDO:  Your Honor, very briefly, the

9    compliance monitoring methodology is going to begin

10   on October 8, 2018 once the capacity-building period

11   ends.  And, Your Honor, we don't always have

12   capacity-building periods in these cases --

13             THE COURT:  I believe this is the first one.

14             MR. SAUCEDO:  Yes, Your Honor.  And, you

15   know, I've been doing institutional reform cases for

16   about 17 years and many administrators and

17   commissioners and police chiefs always talk about the

18   difficulty of reforming their agency while they're

19   having to operate.  You can't just hit the pause

20   button for a police department and say we're going to

21   stop doing that while we fix the systems.  And so

22   many of them have talked about driving the car while

23   it's getting all the work done.

24             Essentially what we've done is we've allowed

25   the Commonwealth -- we've hit the pause button on

1    compliance monitoring while the Commonwealth builds

2    the system.  So they've had four years now to make

3    investments and training and equipment and the

4    facilities, information systems, but that period will

5    come to a close on October 7th.  At that point the

6    focus of the TCA will shift from one of providing

7    primarily technical assistance to build these systems

8    to one more of determining compliance with the

9    Agreement.

10           So the methodology that Mr. Soler --

11   Dr. Soler spoke about is very important.  There

12   should be no mystery about how the Commonwealth's

13   compliance will be measured in terms of the

14   Agreement.  And so that methodology is important.

15   The parties will have an opportunity to review it and

16   I think our timing here is to have that ready by

17   mid-September --

18           TCA ARNALDO CLAUDIO:  That's correct.

19           MR. SAUCEDO:  -- for use.  So we -- you

20   know, again, the main purpose of this

21   capacity-building period was to put the police bureau

22   in the best possible position to successfully

23   implement the Agreement.  And so we are where we are

24   when it comes to October 7th and we will continue to

25   support this effort.  But it's time now to start

1    looking at the results and whether the policies and

2    training are being put into practice.

3           THE COURT:  Okay.  And so we'll wait for

4    that methodology.  Aside from that -- and obviously

5    that is not something the Monitor right now looks

6    into.  Hopefully I will have no noncompliance.  I

7    know there's going to be instances, sometimes there's

8    going to be findings.  Let me ask, from the U.S.

9    DOJ's experience in these cases, let's assume, let's

10   take for example the canine unit just to -- let's

11   assume there is noncompliance and that is continued,

12   there is a pattern, what are the actions?  I guess

13   the U.S. DOJ would move for the appropriate remedy if

14   that's the situation, correct, as in other

15   jurisdictions?

16          MR. SAUCEDO:  Well, Your Honor, the role of

17   the United States in this case is to enforce the

18   Agreement.  And it's not just an agreement between

19   the parties and two governments, it's Your Honor's

20   orders, so that opens up a number of different

21   options that are available.

22          Obviously we all want to see the police

23   bureau succeed.  We don't want this to take decades

24   like other institutional reform cases have taken.  We

25   project ten years of capacity-building -- excuse me,

122

1    of implementation of this Agreement.  But there are a

2    range of options that are available when we are a

3    talking about a violation of a Court order.  They

4    could include contempt, motions for specific

5    enforcement --

6            THE COURT:  Monetary, nonmonetary.

7            MR. SAUCEDO:  Yes, Your Honor.  Your Honor,

8    there have been other cases where they have been able

9    to build hospitals based on all the contempt fines

10   that have been levied.  We tried to avoid that

11   situation by --

12           THE COURT:  It's not mentioned in the

13   Agreement so if there's any noncompliance it would be

14   up to the Court to set a method for -- you know, once

15   it's reported to the Court it's basically U.S. DOJ,

16   Judge, you give the appropriate remedy or the

17   appropriate --

18           MR. SAUCEDO:  Yes, Your Honor.  The idea of

19   having the capacity-building period was for the

20   Commonwealth to make these investments up-front.

21           THE COURT:  It would put the Commonwealth in

22   a better position not to fall in these pitfalls.

23           MR. SAUCEDO:  That's correct.

24           THE COURT:  So, again, at this time that has

25   not happened and we will deal with it.  But I hope

1     that, again, that this period has been as effective

2     as possible.  I remember *Morales-Feliciano* because I

3     worked for Judge Pérez-Giménez.  That went

4     immediately to the injunction stage and fines and

5     fines, no time was given to remedy.

6           Let me say this also.  The Monitor now will

7     be in a monitoring phase, but if the Monitor in his

8     monitoring efforts sees that something is wrong but

9     can be readily remedied, of course he's got the

10    experience of capacity-building; he can always say,

11    Well, you know, or recommend to the Court this should

12    not be the basis of sanctions, this is something that

13    can be cured in a very short period, this is how to

14    do it.  And I think the government is also willing to

15    assist in that, am I correct?

16          MR. SAUCEDO:  Yes, Your Honor.  And it's in

17    the Agreement that in every single monitoring report

18    from the TCA, the TCA is required to submit

19    recommendations for areas that they find in

20    noncompliance.  So that obligation is ongoing and

21    that commitment to help the Commonwealth is always

22    there.  But the focus is going to shift from doing

23    primarily technical assistance to one where we're

24    going to be measuring for results and implementation.

25          THE COURT:  Let me hear from Mr. Torres and

1    then we have one more item.  It's really 11 and 12,

2    but Mr. Saucedo can address both together.  Okay,

3    Mr. Torres.

4          MR. TORRES-ORTÍZ:  Yes, Your Honor.  We look

5    forward on reviewing the methodology from Dr. Soler.

6    I think it's important that once the compliance

7    period starts that we all know what the rules of the

8    game is so that everybody is aware and knows, you

9    know, what they need to do in order to achieve

10   compliance.  So we look forward on reviewing the

11   methodology.

12         THE COURT:  And let me say this, my

13   philosophy is I know at some point we're going to

14   come and there is going to be a finding this has not

15   occurred.  I think the most important thing is that

16   there has to be a will and a willingness to comply

17   with everything.  Sometimes -- if it's a failure

18   because everybody has done everything possible and

19   tried diligently, that, again, is going to be looked

20   upon favorably by the Court versus slothfulness or

21   just simply not complying or my giving another

22   deadline and nothing happening.

23         My philosophy is help me help you.  I know

24   if there is noncompliance there is a plethora of

25   sanctions but, again, what I was taught when I became

1    a judge, if everybody's doing his best, you start at

2    the lowest level, you don't have to start immediately

3    by going up to the worst alternative.  But, again, it

4    takes everybody -- you know, everybody has to be

5    onboard to help move this along.

6              Now, the last two issues, and Mr. Saucedo is

7    going to inform these, is the status of Paragraphs 56

8    and 57 regarding crisis intervention and an update on

9    the Commonwealth extension request under Paragraph

10   239.  So I'll hear from Mr. Saucedo.  If the parties

11   need some additional time to discuss those additional

12   requests you can request that time, but time is

13   running out.

14             MR. SAUCEDO:  Yes, Your Honor.  And being

15   cognizant of the time I will be brief in saying that

16   Item No. 11 regarding Paragraphs 56 and 57 those deal

17   with crises intervention and having a specialized

18   response by the police bureau when they're in

19   interacting with people who are in mental health

20   crises.

21             There are two requirements, two main

22   requirements, in Paragraph 56 and that is that the

23   Commonwealth has agreed to train every single officer

24   on basic behavior health.  This is understanding what

25   mental health is, what mental illness is, what the

1    symptoms are and how you could recognize it.  We're

2    not training officers to be psychologists.  They're

3    not going to have to assess and evaluate individuals

4    in the field, but as part of their ongoing threat

5    assessment it's important that they understand what

6    mental health is and what it isn't.

7            There are many myths out there that people

8    with mental illness are more violent than people

9    without it.  And that's a myth.  And this training is

10   geared or should be geared to that.

11           The second piece of Paragraph -- yes.

12           THE COURT:  Let me just before you go to the

13   second piece I note that in the conference we held I

14   believe it was in Ponce about two years ago, the

15   Monitor in the health reform case did depose, and

16   that was one of the issues that was discussed and I

17   think was very important.  I know there is a -- I

18   think the model to follow for this is in Oregon,

19   Portland because there is a consent decree there and

20   it's based on mental health.  Police officers see

21   somebody who is schizophrenic and they don't even

22   have the slightest idea how to approach it, and they

23   will arrest him or Taser him, or sometimes what was

24   happening there is they would be shot.  And I think

25   the training is very important.  I think also this

1    goes to community policing because officers who are

2    in the community will know this is -- in the old days

3    you'd have your local drunk and everybody knows the

4    guy as an alcoholic.  His family lives there, but he

5    likes sleeping on the street and he gets rowdy all

6    the time.  He's not a criminal, it's just that he's

7    mentally ill.  And that's that detection and

8    recognizing -- you know, distinguishing that from

9    ordinary criminal acts.  Am I correct, Mr. Saucedo?

10             MR. SAUCEDO:  Yes, Your Honor.

11             THE COURT:  Well, let me go as to the second

12   item.  Something I want to comment also is that --

13   and I know obviously to the extent possible, but I

14   think it is something that perhaps not this year but

15   early next year as to that prong if the parties think

16   it's reasonable and it would be helpful for training,

17   at some point I can probably talk to my colleague in

18   Oregon, in Portland, who is handling that case

19   perhaps when he has a status hearing or to meet with

20   the other police officers there who have been

21   trained.

22             I know Mr. Claudio and I originally in this

23   case went to New Orleans to get some ideas and that's

24   how we started having these status public hearings.

25   But anything that helps, I'll be as creative as

1    possible and I'll try to help.  Or it might be

2    feasible to bring some of those individuals here.

3    You know, it might be easier to bring three officers

4    here to help train and to share their experiences for

5    a day or two, but just keep that in mind because I

6    think it will be helpful.

7              MR. SAUCEDO:  Yes, Your Honor.  And the

8    second piece to Paragraph 56 is the creation of

9    crises intervention teams.  This is a model that's

10   existed for about 30 years.  It started in Memphis,

11   Tennessee and it was a collaboration among NAMI, the

12   national association for people with mental illness

13   who were advocates for people in that community; the

14   Memphis Police Department; the University of Memphis;

15   and the local medical school.

16              This recognized that addressing people with

17   mental illness who are in crises is not -- doesn't

18   require only a law enforcement response, it requires

19   a coordinated response.  And so the parties agreed

20   that as part of Paragraph 56 we would have these

21   teams.  These are teams of 40 -- of specialized first

22   responders who are trained in a basic curriculum of

23   about 40 hours.  Having a team helps build experience

24   and familiarity.  As Your Honor said, sometimes these

25   are individuals that you run into often or that are

1   subjects of calls for service often.  And by having a

2   dedicated team of first responders you're able to

3   develop an experience working with this population

4   and to improve and hone your skills.

5           The last feature of these teams is that it

6   expands options.  You're no longer having to arrest

7   or involuntarily commit an individual.  There are a

8   range of intermediate options that could be used.

9   And this is, again, a model that depends heavily on

10  partnerships that are built with the police

11  department and other government agencies and

12  community partners.

13          And so there's further discussions that are

14  needed on the creation of 56 -- excuse me of the

15  crises intervention teams.  We hope to have some

16  resolutions on those in the coming weeks and

17  definitely before the beginning of the compliance

18  period that starts in October 7th.

19          THE COURT:  Let me have Mr. Torres respond

20  to that Item 11 and then we'll have Mr. Saucedo on

21  the extension issue.

22          MR. TORRES-ORTÍZ:  Yes, Your Honor.  This

23  past week we had several meetings to discuss these

24  two paragraphs.  And the police reform office is

25  currently working on the policy and we're going to

1    prepare a proposal for both the TCA and U.S. DOJ.

2           THE COURT:  Okay, thank you.  Then let me

3    hear Mr. Saucedo as to Item No. 12 which is the last

4    item.

5           MR. SAUCEDO:  Yes, Your Honor.  The

6    Commonwealth -- as we all have talked about here

7    today, the end of the capacity-building period is

8    October 7, 2018.  Your Honor, did ask the parties to

9    get together and identify which activities of the

10   action plans needed more time as a result of

11   Hurricane Maria and the parties have done that.

12   They've submitted two motions with some extensions

13   related to those.

14          The Commonwealth asked to add some other

15   activities to that list.  We were able to

16   successfully whittle down that list from about 53

17   items, there are now currently about 34, 35.  These

18   are extensions of activities that were to be

19   completed during the capacity-building period but

20   because of the hurricane and other operational issues

21   they need to extend into the compliance monitoring

22   phase.  When you talk about 34 compared to the

23   200-plus activities, this is a small number of --

24          THE COURT:  Less than ten percent.

25          MR. SAUCEDO:  Yes, Your Honor.  Less than

1    two percent of the activities the Commonwealth had

2    agreed to implement during the capacity-building

3    period.  It's asking and it's proposed to extend

4    about 34 of those.  And so the parties will be

5    working to try and reach a final resolution.  We

6    expect to be able to submit a proposed motion by the

7    end of the month so that there's clarity on the

8    Monitor's -- on the TCA's team as far as what is

9    going to be extended into the compliance phase.

10           THE COURT:  Let me say this, I won't be able

11   available for this.  I hope you're able all to agree.

12   I do this in criminal cases.  Agree and, you know,

13   usually I follow the recommendations.  If you have an

14   impasse between one or two items, use the Monitor or

15   perhaps a mediator and try to reach a happy medium.

16           But, again, I do want to recognize that from

17   a much lower percentage to having -- I think there's

18   237 policies and 34 still need the extension,

19   that's -- I think it's -- kudos to the Commonwealth

20   within that compliance period.  This is very

21   favorable.  And, again, if not for Maria, I'm sure we

22   would be talking about one or two small areas or

23   probably zero.

24           Anything else, Mr. Torres, on this matter?

25           MR. TORRES-ORTÍZ:  No, Your Honor, we look

1    forward on finalizing the discussions on the

2    extension of times.

3            THE COURT:  Okay.  So then Item 13 which I

4    added, just some closing thoughts.  And then what

5    I'll do is Mr. Orona and Commissioner Escalera will

6    have an opportunity to address the Court if there's

7    anything you want to add.

8            But let me say, something that I recently

9    saw in the media, the governor is aware of the exodus

10   of police officers.  And particularly I would add to

11   that it's happening in other agencies.  I think it's

12   worrisome.  The Puerto Rico Department of Justice is

13   just another example.  Prosecutors who -- nobody ever

14   left the prosecutor's job unless it was something

15   amazing their leaving, but there are prosecutors

16   actually leaving.  There's attorneys from federal

17   litigation that that division -- and Ms. Peñagarícano

18   can account.

19           When I was at the Justice Department, the

20   Solicitor General's office had almost 40 attorneys,

21   now they're down to like 12.  Federal litigation has

22   maybe five or six.  And everybody's working more and

23   more and is getting drained.  So I think that

24   recruitment or bank of talent is important, so kudos

25   to that.  I think what is important is methods to be

1    able to hire officers because of the -- you know, we

2    did have some younger officers but the general

3    population of the police force is getting older.

4            And I think it's important perhaps for the

5    local government, the Puerto Rico government, to look

6    perhaps to federal funds and other sources of moneys.

7    I think that's very important.  I think the bank of

8    talent is a first step.  If I can put my two cents'

9    worth, I would extend that to the justice department

10   along with the Puerto Rico Police.  But, again, it's

11   something we can revisit later on, but I think it's

12   something -- at least it's a start.

13           Now, as to future status conferences, I will

14   probably hold another status conference it won't

15   probably be as long as this but since in October we

16   start the monitoring period so I will be looking for

17   a time in November -- again, I have the whole month

18   of September in a trial so I will look for a time in

19   November.

20           And God willing and time permitting towards

21   the end of the year I do want to visit the canine

22   unit.  We'll also coordinate it with Mr. Claudio

23   perhaps to visit one of the other police precincts I

24   have not visited.  I know I've been to Ponce, I've

25   been to other areas, but perhaps do one or two visits

1    in one day perhaps the same day as the canine visit

2    and equestrian visit since they are close by.

3            And something that I left that we were not

4    able to do in 2016, I do want to visit at some point

5    the officers in Vieques and Culebra.  This is overdue

6    from my part along with him.  And obviously this

7    would be something that we arrange so the

8    commissioner could come along and Mr. Saucedo, but I

9    think those two island municipalities deserve an

10   important visit.

11           The reason we did not do that the last time

12   was because of a fiscal crises and using --

13   Commissioner Caldero had or Secretary -- well,

14   whatever the title was before, I forget --

15   Superintendent Caldero had offered the use of the

16   FURA helicopters for us to transport there but when I

17   realized what the cost of fuel was it was just

18   unconscionable.  So I will probably be using the

19   ferry or some other method.  But we will be looking

20   into that.  So that can be sometime in November or

21   early mid-December, but those are kind of my plans.

22   And I will have to find the time, but I will.  I

23   stand committed to the Reform.

24           Something that I did discuss this with the

25   Monitor and the chief judge for the Court of Appeals,

1    when I became chief judge here it was, I have so much

2    administratively work, how am I going to do this?

3    And he has offered to help or to suggest that another

4    judge step in.  But I feel a commitment to the

5    Reform.  If somebody else gets in -- and a new judge

6    will probably get appointed soon.  I just can't give

7    this whole case to somebody who's going to have to

8    take two or three years to learn.

9              So, again, I think the town hall meetings

10   will help, the parties continuing to meet will help.

11   And hopefully -- I will continue at least every two

12   months or quarterly to meet with all of you for

13   updates so, that's my perspective.

14             Let me ask Mr. Orona, Attorney Orona, or the

15   commissioner if there's anything any of you want to

16   say.  If not, we'll conclude.

17             MR. ORONA-AMILIVIA:  Your Honor, I think

18   that we, as the Commonwealth, we're really looking

19   forward to this next step and it's the compliance

20   period.  There's some things that need to be

21   finalized, but as something that started in 2010 on

22   our part and I think that even there was a four-year

23   hiatus I worked with, on the government's part, with

24   the beginnings of what became the Agreement and the

25   Reform process.

1          I think that there has been a lot of

2    improvement in the police reform.  And I think that

3    that is important to know that, and also to make sure

4    that of course there's a lot still of road ahead and

5    a lot of areas that will still need monitoring and

6    will still need additional fine-tuning, but I think

7    that this is a good turning point and we're looking

8    forward to this new step and new stage in the Reform

9    process at the police department.

10          THE COURT:  Okay.  Commissioner, is there

11    anything you wish to state for the record?

12          COMMISSIONER ESCALERA:  No.

13          MR. TORRES-ORTÍZ:  Your Honor, on behalf of

14    the Commonwealth we believe we have talked

15    extensively of everything.

16          THE COURT:  We've been almost four hours

17    here.

18          MR. TORRES-ORTÍZ:  Yes.

19          THE COURT:  I think it's been worthwhile.

20    This is the sort of hearing whenever I'm going to

21    accommodate myself I will have.  At some point I'll

22    have a one-day hearing, but I think -- you know, I

23    thank everybody for being here, and I think the

24    exchange of ideas has been very valuable.

25          Mr. Claudio, any final thoughts, or Mr.

1    Saucedo anything else?

2            MR. SAUCEDO:  No, Your Honor, nothing

3    further from the United States.

4            THE COURT:  And Mr. Claudio briefly.

5            TCA ARNALDO CLAUDIO:  Just one more thing.

6    We have agreed with the PRPB that as soon as we get

7    the methodology we will come back -- and this was an

8    idea of Colonel Vega -- that we're going to go ahead

9    and brief the commissioner, we're going to brief all

10   the personnel specifically in the area of

11   administrative management and hope to accomplish this

12   within the compliance period.

13           THE COURT:  Well, having said that, court is

14   adjourned until tomorrow at 10:00 a.m.

15           THE COURTROOM DEPUTY:  All rise.

16           (The Court exits the room.)

17           (Public hearing concluded at 5:48 p.m.)

18                         ---

19

20

21

22

23

24

25

```
1    UNITED STATES DISTRICT COURT   )

2              OF                    )ss.

3         PUERTO RICO               )

4

5

6

7                        CERTIFICATE

8

9

10        I, EVILYS E. CARRIÓN-ESQUILÍN, hereby

11   certify that the proceedings and evidence are

12   contained fully and accurately, to the best of my

13   ability, in the notes recorded stenographically by

14   me, at the public hearing in the above matter; and

15   that the foregoing is a true and accurate transcript

16   of the same.

17

18                        /s/ Evilys E. Carrión-Esquilín

19                        EVILYS E. CARRIÓN-ESQUILÍN, RPR
                          Official Court Reporter
20                        United States District Court
                          Federal Building, Room 200
21                        San Juan, Puerto Rico 00918
                          787-772-3377
22

23

24

25
```