# ASSESSMENT REPORT
## Police of Puerto Rico's Response to the demonstrations and incidents involving the May 1st, 2018 (Worker's Day)

*Office of the Federal Monitor to the Agreement for the Sustainable Reform of the Puerto Rico Police Bureau*

| TCA Assessment Report | 2018 |
|---|---|

# Table of Contents

Table of Contents                                                                   1

Executive Summary                                                                   2

TCA Reports under the Agreement                                                     18

Introduction                                                                        19

**Section I** Crowd Control Policies

History                                                                             22

Under the Agreement                                                                 24

**Section II** Training on Crowd Control

Training of PRPB Personnel                                                          29

Training of Personnel Deployed                                                      29

People and Units Trained under the Crowd Management and Control Policy              30

**Section III** Implementation of Policies and Training

Analysis of Operational Plans                                                       31

Analysis of Strategy and Tactics                                                    39

**Section IV** Related/Relevant Policy Issues

Policy and Training                                                                 42

Analysis of the Events: Findings and Recommendations                               45

**Section V** Review of PRPB's Self-Assessment

Review of After-Action Reports                                                      73

Review of Use of Force reports and Complaints                                       75

Arrests and related Judicial procedures                                            77

**Section VI** Analysis of Best Practices and Models

Models and Best Practices                                                           78

# Executive Summary

This is the Federal Monitor's Report for the Court and the Parties in the Agreement for the Sustainable Reform of the Puerto Rico Police Bureau ("Agreement") on the demonstrations and incidents on May 1st, 2018.  The Report assesses the Puerto Rico Police Bureau's ("PRPB") response to these events.[1]

On May 4, 2018, Docket 831 issued by the United States District Court in case Number 3:12-cv-02039 issued an Order authorizing the TCA to assess events and report on findings as follows: "**The Court hereby designates retired United States special agent and TCA investigator Jose Pujol to conduct an independent evaluation and assessment, followed by a report, of the May 1 demonstrations. The parties shall fully cooperate with him and immediately agree as to the evaluation's methodology. See, e.g., Order of April 26, 2017, Docket No. 511 at 2, lines 4-7. Signed by Judge Gustavo A. Gelpí on 5/4/18." Order of 05/04/2018, Docket #831**.

.

## EVIDENCE AND ANALYSIS' RESULTS

## USE OF FORCE:

It is common knowledge that before the Court approved and entered the Agreement as an Order in 2013, demonstrations and protests ended in violent responses by the PRPB against the protesters.  The United States Department of Justice ("USDOJ") investigation of 2011 uncovered excessive force and pervasive civil rights and liberties violations during these past demonstrations.

The Monitor reviewed PRPB's response to demonstrations that took place in April and May 2017 and concluded that the Reform, even during the capacity building stage, brought very positive changes in the way the PRPB responded to these situations and events, notwithstanding some incidental abuses of force and procedural errors.

---

[1] With the implementation of Act 20 of 2017, the former Puerto Rico Police Department (PRPD) is now known as the Puerto Rico Police Bureau (PRPB).

| TCA Assessment Report | 2018 |
| --- | --- |

Demonstrations May 1st, 2018:

On May 1st, 2018, the PRPB expected that there were going to be six (6) groups that intended to march (demonstrate), but it was noticed that one (1) of the groups merged with the others resulting that finally five (5) were accounted for. It should be noted that four (4) of these five (5) marches took place in a peaceful and orderly manner.

The demonstration that started at the University of Puerto Rico, hereinafter UPR, marched Northbound on Ponce de Leon Avenue, where it met with the group of marchers that started in the vicinity of the Department of Labor (Departamento del Trabajo) building. Both marches continued until they arrived at the intersection of Ponce de Leon Avenue and Muñoz Rivera Avenue, where the Liberty building is located at. There, instead of continuing their march to the public expression platform (set up in consultation with the PRPB) previously located at the intersection of Roosevelt and Munoz Rivera Avenues, they stopped because there was a thick line of Police Agents that blocked the Ponce de Leon Avenue. It should be noted that the evidence examined regarding this specific location reflects many protesters covered their faces with masks, shirts, and other pieces of clothing. Many of them carried wooden shields very similar to the ones used by the violent protestors involved in the May 1st of 2017[2] demonstrations. Some loud detonations were heard[3] by PRPB officers and were audible in the video recordings reviewed by IC Jose Pujol. According to PRPB officers interviewed were cherry bombs used by the protestors to throw against the officers. Video images show the point in time when the protestors were throwing rocks, solid objects and even using slingshots[4] with projectiles thrown at the officers. Some of objects hit the officers[5]. The Police used loudspeakers to order the protesters to quit throwing objects at them and to give dispersal orders[6].

Interviewed leaders of the group of protesters marching on Ponce de Leon, protesters, and observers from organizations present at that location claimed that the protesters had the right to continue marching through Ponce De Leon Avenue and that the Police had violated their right. The PRPB in turn claimed that the blockade of the Ponce De Leon Avenue was intended solely to protect the banks' area that the past May 1st of 2017 received damages for amounts totaling almost two million dollars ($2,000,000.00) and that they had the authority to restrict pass through Ponce de Leon Avenue. They further alleged that they were not impeding the protesters from their right to manifest their protest, because the protesters had access to the stage area of the event via Roosevelt Avenue (that is located nearby and visible from that location).

---

[2] As seen in Telemundo video live coverage at 12:22 PM, 12:23 PM, 12:43 PM, 12:44 PM, 12:45 PM
[3] As heard in Telemundo video live coverage at 12:33 PM, CRADIC DVD # 7, Segment 2
[4] As seen in CRADIC DVD # 8, Segment 2
[5] As seen in Telemundo video live coverage at 12:30 PM, 12:34PM, 12:36 PM, 12:37 PM, 12:43 PM
[6]As seen in CRADIC DVD #1, Segment # 3 and 4

3

TCA Assessment Report | 2018

After a long wait, the line of Police Agents located near the Liberty building permitted access to the Ponce de Leon Avenue[7] and protesters were able to continue Northbound, until they encountered another compact line of Police Agents before arriving at the intersection with Bolivia Street.  PRPB Commissioner Henry Escalera claimed that the situation was becoming too intense (at the Liberty site) and he made a good faith decision and honored the negotiations the Police made in the field with observers of different organizations. PRPB Officer #21 explained that the PRPB's Commissioner decided allowing the manifestation to pass through the Ponce de Leon Avenue, but they were going to observe their behavior. He said that as soon as they were allowed to go through, the protesters started to vandalize property.  Approximately eight (8) or nine (9) glass windows were broken at the Liberty building and some others at the Plaza building[8].  At that point in time PRPB Officer #1 decided to again to block Ponce de Leon Avenue, near the intersection with Bolivia Street, in order to prevent that more damages could ensue to properties in the area (reviewed video recordings corroborate a timing and a sequence of events in the movement of Police groups fully consistent with the explanation provided by PRPB Officer #21.)

At this second blockade, protesters were observed throwing rocks, marbles, liquids that caused chemical burns against the Police agents there.  They were also hitting the Police agents with sticks.  Several Police agents were injured along with some of the protesters.  The evidence shows how several individuals with their faces covered, using wooden shields and carrying sticks engaged in throwing rocks, pieces of concrete tiles and objects to the Police for prolonged periods of time.  There was an individual (who appears to be Subject "Q") using a speaker that was encouraging the protesters, who, after being boxed (encased) in that location for some time became visibly nervous and impatient.  Once this group of well-organized individuals showed a clear intention to confront the Police, encouraged by the instructions from their loudspeaker started to push the line of Police Officers, the Police commenced using chemical agents against the protesters.  The Police, despite that this was one of the findings on the Assessment of May 1st, 2017, ignored the instructions on Section 625 of the General Order, and did not provide any dispersal order this second time, didn't inform the protesters of the violations that they were doing and did not inform them that they were about to use chemical agents against them.  The Police, as already stated, acted in complete disregard of General Order 600, Section 625 and in complete disregard of the recommendation made in the Assessment Report prepared by IC Pujol related to the May 1st, 2017 events.  Notwithstanding the aforesaid, as the action develops, it becomes evident that the use of force to repel aggression at that point was a reasonable reaction considering there was a clear and strong threat of bodily injury against the officers and actual use of force by the protesters trying to overpower the Police. The individual vociferating on the loudspeaker encouraged the protesters to increase the level of violent protesters' actions.  Recorded

---

[7] As seen in Telemundo video life coverage at 12:27 PM
[8] CRADIC DVD #1, Segment 4 shows one broken window, Photograph of the building shows some broken windows

| TCA Assessment Report | 2018 |
|---|---|

images show clear signs that this was an organized operation by part of the protesters, not a product of a random incident[9].

One very important matter remains. The videos depict action that reflects the Police had no intention to allow the protesters to arrive to the Banco Popular area. It defies common sense why they allowed them to pass by the first blockade made at the Liberty building. From the strategic viewpoint of avoiding confrontation with a crowd, this action fails to make sense. While at the Liberty building blockade, the Police had better control of the situation and the protesters had ample space where, if dispersal orders were given, they could easily disband encountering less hazardous situations than they had at the second location where the limited dispersal opportunities and the use of chemical agents created a hectic and dangerous situation for hundreds of protesters of which, the majority was arguably not violent and did not represent an immediate danger.

From the viewing of videotapes recorded at the scene, it surfaced that according to a news reporter from Telemundo, he was told by PRPB Officer #1 that it was the Governor of Puerto Rico who made the decision of removing the line of Policemen at the Liberty building allowing the protesters to go through (the reporter repeated this information in three different occasions)[10]. According to the Puerto Rico Police Bureau Commissioner, Mr. Henry Escalera, it was him who made the decision, which he made "based on good faith." The protesters and observers interviewed are of the opinion that this was part of a scheme with the objective of trapping the protesters there. The fact is that when it comes to protest policing, the Puerto Rico Police Bureau PRPB is confronted with two very important but sometimes conflicting goals. On one hand the PRPB has the obligation to preserve public safety and property, but at the same time they must allow demonstrators their Constitutional Right to free speech to communicate their messages. Therefore, it is essential for the PRPB to balance these objectives. The essence of this Assessment is to objectively analyze the decision of the PRPB to permit the protesters to continue their march along Ponce de Leon Avenue to the location where the second blockade was organized resulting in a bottleneck type restriction of movement of several hundred protesters. This area on Ponce De Leon Avenue, in the segment between Roosevelt Ave. and South of Bolivia Street, has limited exit areas which are the narrow entrance to Mexico Street or retreating all the way back on Ponce de Leon Avenue.

---

[9] Information covered by this complete paragraph is seen in Telemundo video life coverage from 1:00 PM through 2:10 PM and CRADIC video recordings

[10] As seen in Telemundo (Channel 2) video life coverage at 12:55 PM, 12:58 PM and 01:18 PM. This information is not subject to corroboration and should be considered as "inadmissible hearsay evidence" in any judicial proceeding.

TCA Assessment Report | 2018

As previously described, the situation at this second location heated up with the protesters being incited by the person using the loudspeaker asking them to continue charging toward the police line with their wooden shields, the throwing of rocks and marbles using slingshots and the use of skin burning chemical substances. This action resulted in PRPB having to utilize gas as well as rubber bullets to drive the protesters back after they charged against the police line. Analyzing how this PRPB tactic compares to best practices utilized by major city police departments throughout the United States when dealing with crowd control involving large numbers of protesters, it appears the Puerto Rico Police Bureau, by its actions, had three (3) objectives during that incident of the protest:

- The intent to prevent demonstrations from interfering with the normal operation of the Banking area.
- To control and limit access of the protesters marches to sensitive areas which in prior events were targeted by demonstrators for vandalism.
- To display strength in police numbers and appearance to discourage violence.

The objectives mentioned above are part of the "Command and Control" method of protest policing developed by the NYPD in the early 2000. Though not every major police department in the United States employs the "Command and Control" method of protest policing, events often lead strategy in that direction.  The PRPB's strategy to confine several hundred protesters to an enclosed area with minimal exit access may well have exacerbated the situation. The demonstration included passive protesters intermingled with those protesters who were bound to commit acts of civil unrest. There were many individuals who exercised their constitutional right to peacefully assemble and speak out for their cause. Unfortunately, there was another group of individuals who chose to engage in criminal acts, hurling objects at police. When police used gas to attempt to disperse and push back the demonstrators, everyone was affected. In addition, according to observers, police failed to announce the disperse order or warning that less then lethal weapons were about to be deployed.  Given the frenzied situation taking place on Ponce De Leon Ave, the police actions to deploy gas and other less than lethal weapons were within Bureau policy guidelines except for the failure to inform the dispersal order. **The need to use force would have been significantly reduced had the police made proper announcements to the protesters and the PRPB had remained at first line in the vicinity of the Liberty building**. The Puerto Rico Police Bureau will undoubtably have to deal with similar demonstrations in the future. Therefore, it is of vital importance for the Bureau to constantly reevaluate and assess its strategies on how to properly deal with demonstrations/protests with an eye towards improving their response to these events.

The high-ranking members in the staff of the PRPB were asked about their specific knowledge of the May 1st Operation at Ponce de Leon Avenue regarding the blockade. They pointed out that the order to open the line in the Liberty Building and let the protesters pass by came directly from the Commissioner Mr. Henry Escalera. **The conversation with these officers showed a sharp resent with the order that ended in the confrontation that subsequently took place with the demonstrators. As an example, PRPB Officer #1, the Incident**

6

TCA Assessment Report | 2018

**Commander, stated that if his boss would not have given him the order to open the line at the Liberty building, he would not have done it.** In the interview with Commissioner Mr. Henry Escalera, he took responsibility over the order to permit access at the Liberty Building blockade area to the protesters. None of the officers interviewed could explain the reason for the change as there was no meeting to discuss how this would affect, both tactically and/or operationally. Their consensus was that the Commissioner acted in good faith.

**It should be noted that hearsay information transpired to the media to the effect that the order to open the blockade came directly from Fortaleza (the Governor's mansion). The misinformation was that PRPB Officer #1, the Incident Commander, allegedly informed journalist Jose Estevez (Telemundo) that it was the Governor who gave the order to the PRPB Commissioner. The PRPB Commissioner was interviewed and he discredited the rumor stating that it was his own decision to open the blockade at the intersection of Ponce de Leon and Roosevelt Avenue to permit the protesters to go through.**

During the course of the assessment, participating high-ranking staff members of the PRPB provided contradictory accounts regarding the dispersal order. Some informed that dispersal orders were given before using chemical agents against the protesters while others asserted they couldn't hear them, and the rest **admitted that the orders were not given**. The Officers alleging that the orders were given argue that the sound equipment they used was so weak that it could not overpower the noise of the manifestation and the orders could not be heard. The known fact is that when previous dispersal orders were given at the Liberty building area, they were clearly recorded in the news reporters' recordings. When confronted with this specific fact, the officers claiming a second dispersal order was given alleged that the equipment they used at the second location, near Bolivia Street, was different and of much lower quality. It should be further noted that several video recordings for the Bolivia Street location were reviewed and in none of them the orders can be heard. Not even garbled sounds that could resemble words on a loudspeaker. Upon considering the totality of the evidence reviewed along with the testimonies heard and the analysis of electronic evidence (videos), IC José Pujol must conclude that the dispersal orders at the intersection of Ponce de Leon and Bolivia Street were not given to the protesters before using chemical agents against them, in violation of General Order, Section 625 of the General Order. Furthermore, high-ranking staff members of the PRPB have admitted that the PRPB did not place an agent behind the protesters in order to listen to and record the dispersal orders as required by Section 625 of the General Order, Subsections:

III.B.10: MPPR are responsible for warning demonstrators before force or coercion is used.
III.C.3.d.viii: The Incident commander shall not use crowd dispersal techniques without first making repeated warnings citing the laws violated, requesting dispersal or risking arrest. If there is a dispersal order from the Court, it shall be read to the demonstrators.
III.C.3.d.ix: Use loudspeakers to instruct dispersal and identify exit routes.

| TCA Assessment Report | 2018 |
|---|---|

III.D.3:  Except in extreme circumstances that justify immediate action, PRPB cannot arrest or use of force first without first given warnings or commands under General Order Section 601.

At this juncture, it is respectfully submitted that many of the errors pointed out as negative findings in the 2017 Assessment have been repeated again in 2018. Several directives of General Order 600, Section 625 again were not observed in spite of the fact that there were previous 2017 findings and recommendations pointing out that on May 1, 2017, no dispersal orders were given, no advice of use of chemical agents was provided and no advice of the violations being committed was provided.  Additionally, many incidents of abuse of force were alleged during the interview of participants in the demonstrations, and some of them were corroborated by IC Jose Pujol reviewing video images and/or photographs, which will be covered in this report.

.

**REPORTING USE OF FORCE:**

The evidence reflected that the reporting and documenting of the use of force by PRPB **is again grossly inadequate**. The reporting of the Use of Force by the PRPB consisted of only four (4) PPR-854 "Use of Force Report" forms.  Due to the large number of instances involving "Use of Force" during May 1st, 2018, the reports provided by PRPB fail to comply with General Order Chapter 600, Section 605, "Reporting and Investigating Use of Force by Members of the PRPB," and Section 625 "Crowd Management and Control".  During the Assessment of the event of May 1st, 2017 this failure to comply with the General Oder was also properly addressed and reported and recommendations were made.  Accordingly, the present failure to comply with the General Order in the events of May 1st, 2018, is viewed as poorer than the reporting effort for the 2017 events, which by itself was manifestly inadequate.  The review and analysis of video recordings and PRPB reports reveals that in many instances in which "Use of Force" was employed, it was not reported or was not properly reported as the General Order requires.  This issue will be the object of additional comments further on in this report.

In spite of the importance and the strict requirement of properly documenting the use of force by its personnel, the evidence showed that the PRPB did not properly comply with this factor, hence precluding by those means, to the degree of making it impossibility, to determine if the force used was within departmental guidelines. The considerations for these determinations were made by independent means, that is, video evidence, interviews, and available documentation.  Given the discrepancies in the reporting of the number of incidents involving use of force *vis a vis* the evidence examined, it is obvious there was incomplete documentation by the PRPB of these incidents, particularly when force was used. Therefore, General Order Chapter 600, Sections 605 and 625 were not adhered to.

None of the four (4) prepared PPR-854 forms provide any information about the events and arrests that happened in Santa Rita, Rio Piedras.  Interviews with the PRPB personnel

| TCA Assessment Report | 2018 |
|---|---|

involved in the arrests informed about the arrests made there and the use of force employed, but the four PPR-854 presented to IC Pujol failed to inform about these events.  By reading the four PPR-854 forms provided for inspection, a lay person would never know that something involving use of force occurred there. **This is found to be completely unacceptable**.

The PRPB by not reporting most of the instances of Use of Force failed to comply with Section 625 of the General Order, Subsections:
III.B.11: Once activity is finished, officers will complete all necessary reports, including Use of Force reports.
III.D.4 & 5.  All uses of force must be reported.
III.D.5.a.  Officers who authorize use of force must complete a report.

**Upon concluding this Assessment Report, a copy of the same was provided to the PRPB pursuant to the Agreement. The PRPB reacted by informing they have twelve (12) additional Use of Force Reports (UOF)[11].  Concerning these additional twelve UOF reports, the Monitor's Office will review them by means of the projected reviews of the Federal Monitor Core Team that are now being conducted during the compliance phase and adhering to the methodology agreed by the Parties and my office. CT member, Mr. John Romero, lead UOF CT Monitor will conduct the evaluation.   The undersigned will not review nor consider the aforesaid forms in this Assessment Report because such permissive action would send an erroneous message to the PRPB. The PRPB must assimilate that when a representative of the Federal Monitor, acting pursuant to an Order of the United States District Court, files a <u>request for information</u> such request most be strictly complied with.  Failure to fully comply is tantamount to a breach of the Court's Order under the Agreement that may carry significant consequences.**


**ABUSE OF FORCE:**

The video recordings and photographs reviewed by IC Pujol revealed at least three clear incidents in which an excessive use of force was employed:

- The first one is the force employed against Subject "L", who allegedly is a street seller of water and refreshments.  Subject "L" informed that at the time the Police used the chemical agents at Ponce de Leon Avenue, the police were moving forward in his direction when they encountered and shot him at close range in

---

[11] Originally only four (4) Use of Force Reports were provided.

several occasions. He asserts he offered no resistance and that he was just trying to leave the area pulling some coolers in which he kept the merchandise he was selling. The action described is contrary to the mandates of Section 620 of General Order 600 (Rules and Procedures for the Use of Specialized Weapons by Members of the Specialized Tactical Units). The photograph of the victim shows at least nine (9) shots on his back.



A SWAT supervisor informed that this type of ammunition is not allowed to be shot directly against individuals. He confided his belief that the injuries were caused by plastic balls, not rubber balls that are the ones that the Police uses. He stated that this type of ammunition could have been used by private security guards because when the victim was interviewed on TV, he stated that the agents were wearing gray clothes, not green clothing as SWAT uses. He stated believing that, based on the dispersal pattern of the ball injuries shown in the photograph, the shots had to be fired from approximately ten yards away.

Even in the improbable scenario that the event happened as the SWAT supervisor suggested, but never actually denied it could have been the PRPB who made the shots, the PRPB was responsible for the control of the area of manifestation, and hence failed by not avoiding/preventing a private security company to engage in an action that was not authorized, because they were not part of the Operational Plan and they were not part of the PRPB chain of command.

**No PPR Form 854 was provided for this incident of Use of Force.**

TCA Assessment Report | 2018

- The second incident one was the spraying of chemical agents made by a SWAT Agent against Subject "K"[12]. The evidence shows that this person didn't represent a threat or a risk to property or the safety of any officer. She only displayed passive resistance that did not merit aggressive techniques. Section 604 of the General Order states that PRPB agents will avoid the use of pepper spray at a distance of less than three (3) feet of a person, unless the situation involves an imminent risk or threat of suffering grave bodily injury, and the use of the pepper spray is the only reasonable method to control the person and avoid the damage. According to Section 604, the minimum distance to use the chemical agent is six (6) feet away from the person, which was not the situation in this case:





---

[12] Names have been substituted by numbers in this Assessment to protect the identity of the individual. Only the Court will be provided with their names in a separate sealed document.

TCA Assessment Report | 2018



**No PPR-854 was provided for this Use of Force although it is patently clear a PRPB officer was involved in the same.**

- The third incident depicted in the sequence of photographs below involves aggressive action taken by PRPB officers against a bona fide member of the press while attempting to cover an arrest incident with his hand-held camera equipment. The evidence shows that the Metro newspaper reporter had properly identified himself and was complying with an agent's instructions when he was struck with a baton in his back by another PRPB agent.

**No PPR Form 854 was provided for this Use of Force.**

Video taken by the reporter's camera:



TCA Assessment Report                    | 2018

 

Just before and after being struck

## USE OF CHEMICAL AGENTS:

The evidence showed that the PRPB completely failed, **like it did on the 2017 demonstrations**, to adhere to its policies, prior to using chemical agents and less than lethal ammunition against the protesters, by not providing repetitive information to the protesters via loud speakers about:  1) the violations they were committing;  2) informing them of the dispersal order; 3) and informing them about the routes to be taken to leave the area.  The evidence also showed that the PRPB failed by not placing a police officer in civilian clothes in the back of the protesters to listen[13] to the required communications/orders from the police to the protestors.  In sum, the PRPB should have followed the aforesaid mandated procedures and also had to comply with preparing a video recording of the required compliance with General Order Chapter 600 Section 625 (Manejo y Control de Multitudes).  Such recordings also require the video documentation of the protesters' response to police orders and warnings.  It should be noted that these same findings were reported in the 2017 Assessment.  Recommendations for compliance on these issues were provided by IC Jose Pujol, but, no positive improvement has been substantiated on the part of PRPB.

Subject "M" explained that before the events of the May 1st, 2018, he/she met with the PRPB along with Subject "C" and representatives of the labor unions.  On behalf of the PRPB were present PRPB Officers #1 and #2, and other unnamed officers.  They talked mainly about the march that would depart from the bridge known as "Dos Hermanos" and end in front of the Capitol building.  Subject "M" informed reminding the PRPB Officers that the previous year they failed by not providing the dispersal orders and following all the steps that Section 625 mandates before making use of chemical agents against a crowd.  Allegedly, PRPB Officer #2 responded that such Section of the General Order **"es un disparate"** (Spanish for **"it is nonsense"**).  According to Subject "M", such statement was made in front of PRPB Officer #1 and the other Officers.

The evidence shows that PRPB Officer #2 was in a leadership position on May 1st, 2018, at the point in time when the chemical agents were used against the protesters.  The fact that there was a failure to provide the "Dispersal Orders" along with the other requirements of Section 625 prior to deploying chemical agents against the protesters gives additional credence to the information provided by Subject "M" as it relates to how PRPB Officer #2 deals with Section 625, the one he continuously fails to comply with. Failure to follow this particular regulation deprived the protesters of knowing that chemical agents were going to be used against them in order to be able to take cautionary measure to disperse before these were deployed.

## Arrests and related Judicial Procedures:

On a document dated May 17, 2018, PRPB Officer #1 informed that during the Manifestations of May 1st, 2018, nineteen (19) individuals were arrested.  The Report

---

[13] To provide assurance the dispersal order was heard.

provides the names of the arrestees, the crime/s they committed and the names of the Agents that performed the arrests.  The crimes listed in the report are: Causing damages to property, Obstruction of Justice, Grave Aggression, Weapons Law, Arson and Robbery.

Statistics provided by the Office of Court Administration include information up October 10, 2018, which revealed that only eight (8) of the arrestees have been charged of any crime.

Out of the eight (8) charged arrestees:
- One (1) of them was cleared of the charges by a Judge, who found "No Cause" against him in a Rule 6 hearing.  No appeal was submitted.
- The other seven (7) arrestees: one (1) has trial scheduled for December 10, 2018, four (4) have preliminary hearings scheduled for November 30, 2018 and the remaining two (2) have a Status Conference scheduled for January 15, 2019.

The fact that only eight (8) of the nineteen (19) arrestees have been charged with any crime before a Court, and that one (1) of them has already been cleared by a Judge, could create doubts of if some of the other eleven (11) not charged arrestees could have been arrested without enough evidence to sustain charges in a Court of Law.

The PRPB provided documentation in relation to only ten (10) of the arrestees, in which all of them the PRPB Supervisor found that the arrests were made with probable cause.  Three (3) out of the ten (10) arrestees were treated at medical centers for small injuries and traumas, as informed in the provided documentation.


**"PLANES DE TRABAJO" (OPERATIONAL PLANS):**

The PRPB provided to the TCA an Operational Plan identified as "PLAN DE TRABAJO, 1 DE MAYO" (Spanish for "OPERATIONAL PLAN, MAY 1ST).  This Operational Plan (OP), prepared by PRPB Officer #1, is addressed to the PRPB Commissioner, and is a general OP which PRPB Officer #1 complemented with a series of OPs as follows:
- Annex A – SAN JUAN
- Annex B – F.U.R.A.
- Annex C – PATRULLA DE CARRETERAS ("ROAD PATROL DIVISION")
- Annex D – PPR, which consists of several PRPB blank forms that could be used during the Operation, and additionally provides OPs for the following regions:
  - Mayaguez
  - Aguadilla

| TCA Assessment Report | 2018 |
| --- | --- |

- Carolina
- Ponce
- CRADIC (not a region, it is the video recording Division of the PRPB)

The OP and its Annexes were analyzed by IC Jose Pujol, who found that they lacked most of the information required by the Section 625, Chapter 600 of the General Order.  A detailed analysis of the provided OPs reflected varying degrees of deficiencies, among them:

- The Operational Plan (ANNEX A – SAN JUAN) prepared by PRPB Officer #2 informed that there were two (2) Command Centers:
    1) Command Center located at the Jose Miguel Agrelot Coliseum
    2) Operational Center located at the Banco Popular Center building.

    During the interview of PRPB Officer #21, information disclosed revealed that they had two (2) Command Centers and one (1) Observation Post that were located at:
    1) near the Jose Miguel Agrelot Coliseum (Command Center)
    2) at the FUSION Center (PROB HQ) (Command Center)
    3) at the Banco Popular Center building (Observation Post).

    PRPB officers interviewed confirmed the Command Post located at the Banco popular Center only as an Observation Post.  It should be noted that at page #3 of the "Plan de Trabajo Para Manifestacion Grupos Sindicales 1ro de mayo de 2018" ("Operational Plan for the Manifestation of Labor Unions May 1st of 2018") signed by PRPB Agent #10, dated April 23, 2018, Agent #10 assigned a Sergeant to be located at the "**Command Post (Edificio Popular Center)"**.

    TCA Observer #1, who was present at the FUSION Center (PRPB Headquarters) during the event, assured that there was not any decision making at the FUSION Center, which in his opinion **was not a Command Center,** only an Observation Center.

    The TCA's Office is highly concerned with the misinformation that the FUSION Center was the Command Center of the Operation.  Based on the aforesaid misinformation the TCA assigned Observer #1 to be present at that location.  The aforementioned misinformation was re submitted during the interview of PRPB Officer #21 (a high ranking PRPB Officer) who described the Popular Center Building as an Observation Post. The official PRPB "Plan de Trabajo" (Operational Plan) defined such location as a "Command Post" while another Official PRPB "Plan de Trabajo" ("Operational Plan) portrayed such location as an Operational Center.

TCA Assessment Report | 2018

- The Operation Plan prepared by PRPB Officer #1 identified the Incident Commander for the Operation as Officer #1. The part of the Operational Plan prepared by PRPB Officer #2 identified the Incident Commander for the Operation as PRPB Officer #1. During the interview of PRPB Officer #1, he identified himself as being the Incident Commander of the event and stated that during the event he made decisions as the Incident Commander. At the same time, when interviewed, PRPB Officer #2 stated that he crafted the Operational Plan and he **directed the plan** (in the field). TCA Observer #2, who spent a considerable amount of time in the Milla de Oro scenario, explained that he spoke to several Police Agents there and all of them acknowledged that the Incident Commander was PRPB Officer #2. Moreover, TCA Observer #2 observed that PRPB Officer #2 was the Officer acting as Incident Commander at the Ponce de Leon Ave., the main scenario of the confrontation. The aforementioned two statements, and the facts learned from observation by TCA Observer #2, indicate that it is likely that there were two PRPB Officers directing the plan, in other words**,** acting as Incident Commanders. This multiplicity of Incident Commanders can be detrimental for any Law Enforcement Operation. The PRPB must identify with absolute certainty which officer will be the Incident Commander and plainly advise that the Operational Plan will be strictly followed.

- The General Operational Plan and its Attachments did not point out which part of the Milla de Oro was off limits for the protesters to march. The OP specifically fails to explain that the march coming from Ponce de Leon Avenue would not be able to pass through the intersection of Ponce de Leon and Roosevelt Avenue where the Liberty building is located. The OP did no state there would be a police blockade at the intersection of Ponce the Leon Avenue with Roosevelt Avenue to divert protesters towards the public expression platform placed at the intersection of Munoz Rivera with Roosevelt Avenue.

- The interviews to the Incident Commander (PRPB Officer #1) and PRPB Officer #2 revealed that they had reached several critical decisions related to the Operational Plan previous to the event, which were not provided for or covered in the official Operational Plan ("Plan de Trabajo") of this main event. This defeats one of the main purposes of making an Operational Plan which is precisely to define all actions to be taken in each of the areas covered by the plan, impose all officers and enlistees prior to the event of what is expected and what line of action is predetermined for each situation. In other words, everyone must be fully cognizant of the strategy in place. A good OP provides for a procedure to follow (protocol) in cases of unexpected situations. It also provides for a meeting prior to the event, the chain of command for every location. Persons in charge of collecting the evidence at the different points where confrontations are expected and most important all, a good

17

TCA Assessment Report | 2018

system of communications to make information flow to the officer in command (Incident Commander).

## TRAINNING

According to the information received from the PRPB, **nobody** in the PRPB had been trained on the General Order, Chapter 600, Section 625, titled "Manejo y Control de Multitudes" (Spanish for "Crowd Management and Control") when the May 1, 2018 events occurred.

The PRPB informed that they coordinated and worked an external course titled "Field Force Operations" issued by the Center for Domestic Preparedness of F.E.M.A. which was offered in the Spanish language. This course included the necessary elements, according to the best practices, about how to operate in crowd control situations. Personnel from DOT, Arrests and Extraditions, SWAT and the Auxiliary Superintendence in Education and Training participated in this Course. They accomplished the certification of sixteen (16) instructors and approximately two hundred (200) DOT personnel. Additionally to this Course, they were trained in the REA-111 "Civil and Human Rights" and DOT-603 "Use and Handling of the Rigid Baton".

The PRPB alleged that despite there is no personnel at this time directly certified in the General order Chapter 600 Section 625; the personnel of the DOT, on May 1st, 2018, had within their knowledge and abilities several trainings that qualified them at individual and group level (Operator in Crowd Management and Control), therefore, made them able to operationally handle any situation of risk that would be necessary to intervene. This information has been corroborated by a member of the Federal Monitor team.

## ESTABLISHING CONTACT WITH THE EVENTS' ORGANIZERS:

The evidence showed that the PRPB made some attempts to contact the organizers of the demonstrations, and that in one instance they did meet with the organizers of one of them. These attempts and the actual meeting with some of the organizers reflects some improvement of the PRPB's performance on this area, comparing to failures found by a prior Assessment related to events occurred in year 2017.

## LEGAL ASSESSMENT:

This Assessment encountered three different claims about a legal issue:

TCA Assessment Report | 2018

- Interviewed leaders of protesters, protesters, and observers from civic organizations claimed that the protesters had the right to pass through Ponce De Leon Avenue and that the Police violated their right.
- Section 625 of the General Order, Part III.C.2.d states that: "No supervisor shall interrupt a constitutional activity or demonstration before the demonstrators act illegally or demonstrate aggressive conduct", and the evidence (video recordings) shows that the blockage of the Ponce De Leon Avenue was in place before any illegal or aggressive conduct was demonstrated.
- The Police claimed that the blockage of the Ponce De Leon Avenue was intended solely to protect the banks' area that the past May 1st of 2017 received damages for an amount near two million dollars ($2,000,000) and that they had the right to restrict the pass through the avenue because they weren't impeding the protesters to manifest their protest, because the protesters had access to the stage area of the event via the Roosevelt Avenue (that was located nearby and was visible from that point). The PRPB did not inform when they exactly decided to create the blockage of the Ponce De Leon Avenue, but it was previous to the event and it was not documented in any of the reports provided to the Monitor's Office.

Due to the complexity of this legal issue, the TCA authorized IC Jose Pujol to refer this legal matter to a Counsel who is part of the TCA's Core Team, Antonio Bazan, Esq.  His Legal Assessment is included as a part of this report as an Appendix.

# TCA Reports under the Agreement

*Paragraph 227 of the Agreement:*

"In order to assess and report on PRPD's implementation of this Agreement and whether implementation is having the intended beneficial impact on policing and community trust in Puerto Rico, the TCA shall conduct the reviews specified in this Agreement; shall review PRPD policies, training material, protocols, and programs developed and implemented pursuant to this Agreement; and conduct such additional audits, reviews, and assessments as the TCA or the Parties deem appropriate, or the Court, consistent with this Agreement and the dismissal order."

| TCA Assessment Report | 2018 |
|---|---|

*Paragraph 250 of the Agreement:*

"During the <u>first four years</u>, from the Appointment Date, the TCA shall file with the Court, written public reports every six months that shall include:

a) a description of the work conducted by the TCA;

b) a listing of each detailed step in the Action Plans and its timeframe indicating whether the timeframe has been met, and whether the Commonwealth of Puerto Rico is making satisfactory progress toward implementation of the Agreement by rating PRPD in full, partial, or non-compliance steps in the Action Plan;

c) the methodology and specific findings for each review conducted, where appropriate, and redacted as necessary for privacy concerns. An un-redacted version shall be filed under seal with the Court and provided to the Parties. The underlying data for each audit or review shall not be publicly available, but shall be retained by the TCA and provided to either or both Parties upon request;

d) for any detailed steps that were reviewed and found not to have been fully implemented in practice, the TCA's recommendations regarding necessary steps to achieve compliance; and

e) a projection of the work to be completed during the upcoming reporting period and any anticipated challenges or concerns related to implementation of the Agreement."

# Introduction

This is the Technical Compliance Advisor's ("TCA") Report ("Report") for the Court and the Parties in the Agreement for the Sustainable Reform of the Puerto Rico Police Bureau ("Agreement") on the demonstrations and incidents on May 1st, 2018.  The Report assesses the Puerto Rico Police Bureau's ("PRPB") response to these events.

Pursuant to the Court's instructions to assess events and report on findings, Docket 831, dated May 4, 2018; "**The Court hereby designates retired United States special agent and TCA investigator Jose Pujol to conduct an independent evaluation and assessment, followed by a report, of the May 1, 2018 (Worker's Day) demonstrations. The parties shall fully cooperate with him and immediately agree as to the evaluation's methodology. See, e.g., Order of April 26, 2017, Docket No. 511 at 2, lines 4-7".**

| TCA Assessment Report | 2018 |
|---|---|

Given the Court's instructions to assess events and report on findings, the TCA has assessed the PRPB's response to the demonstrations and incidents involving the PRPB protesters on May 1, 2018 (Worker's Day).  The focus of the **assessment** is the PRPB's compliance with the "Agreement for the Sustainable Reform of the PRPB" ("Agreement") and the Civil Rights of citizens pursuant to the Constitutions of the United States and the Commonwealth of Puerto Rico with special attention to policies and trainings on policing of mass demonstrations, command and control, as well as communications and the use of Information Technology ("IT").

Under the Agreement, the TCA has the authority to assess and report on whether the provisions of this Agreement have been implemented resulting in constitutional and effective policing, increased professionalism, and increased community trust. Under the supervision and orders of the Court, the TCA conducts its duties including the duty to report and assess, review policies and trainings, and conduct such additional audits, reviews, and assessments as the TCA or the Parties deem appropriate, or the Court, consistent with the Agreement.

This assessment report covers and evaluates actions taken before, during and after the above described events, regarding the following areas of the Agreement: Supervision and Management; Equal Protection and Non-discrimination; Use of Force; Crowd Control; Search and Seizures; Arrests and Citations; Training and its implementation; Community Engagement and Internal Investigations, Civil Complaints and Discipline section.

This report has been prepared by Investigative Consultant (IC) Jose L Pujol using:

- His Law Enforcement training and experience as a federal Special Agent for approximately twenty-one years.
- His knowledge as Defensive Tactics Instructor (certified in 1997 by the Federal Law Enforcement Training Center located in Glynco, Brunswick, Georgia).
- The Agreement for the Sustainable Reform of the Puerto Rico Police Department.
- The Puerto Rico Police Department's General Orders.

IC Jose Pujol based on his law enforcement experience, training, knowledge of the Agreement for the Sustainable Reform of the Puerto Rico Police Department and the Puerto Rico Police Bureau's General Orders, all the evidence and facts collected during the Assessment, all the work performed (as described above), the support and advice received from all the TCA team, formulated findings and recommendations that are fully described in this Assessment Report and hereby submitted.

21

| TCA Assessment Report | 2018 |
| --- | --- |

# Section I: Crowd Control Policies

## I.A Historical Reference: Crowd Control Policies Prior to the Agreement

Under the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141 (re-codified as 34 U.S.C. § 12601) and the anti-discrimination provisions of the Omnibus Crime Control and Safe Streets Act, 42 U.S.C. § 3789d, in 2008, the United States Department of Justice (USDOJ) initiated an investigation of an alleged pattern or practice of use of excessive force, unconstitutional searches, and discriminatory policing by the PRPD.  In September 2011, USDOJ issued a written report with findings that the PRPB engaged in a pattern of using force to suppress the exercise of First Amendment rights.[14]  The following is a summary of the two main findings of the USDOJ investigation of 2011:

> "Officers' use of excessive force also chills speech in violation of the First Amendment.  While some individuals may engage in unlawful activity during protests and civil demonstrations, only a fraction of the force used by PRPD is directed at specific threats or criminal behavior, as evidenced by the dearth of arrests supported by probable cause.  Instead, PRPD officers regularly rely on the indiscriminate use of force or threat of force well beyond what is necessary to protect public safety when engaging with crowds.  Specifically, PRPD indiscriminately used chemical agents, batons, and physical force against demonstrators and other individuals on University Avenue in August 2009, at the Sheraton Hotel in May 2010, and at the Capitol in June 2010.  PRPD officers also used choke holds and pressure techniques against protestors who were passively resisting or otherwise not posing any significant threat as recently as December 2010 and January 2011.  In February 2011, officers pushed, struck, and sprayed protestors at a university campus, and officers threw rocks and other objects at individuals who likewise posed no significant threat. The use of excessive force by PRPD officers in these instances, along with other tactics aimed at intimidating demonstrators, has garnered significant public attention and discouraged residents of Puerto Rico from engaging in protected First Amendment activities.   While we recognize that prolonged strikes and civil demonstrations strain PRPD personnel and resources, Puerto Rico must not waver in its duty to uphold the fundamental rights of all residents, even when their viewpoints or affiliations may be disagreeable."[15]

---

[14] Paragraphs 5 and 8 of the Agreement.
[15] USDOJ, Investigation of the PRPD: Executive Summary, 2011, page 4.

| TCA Assessment Report | 2018 |
|---|---|

And

"PRPD has been on notice for years that officers assigned to tactical units routinely employ excessive force when interacting with civilians. These units all too frequently rely on intimidation, fear, and extreme use of force to manage crowds and are often deployed to low-income and minority communities on routine patrols. These units operate with insufficient training and guidance on the lawful exercise of police power."[16]

As a result of the negotiated agreement between the United States and the Commonwealth of Puerto Rico, the Agreement for the Sustainable Reform of the Puerto Rico Police was drafted.

During the interviews conducted on 2017 to Officers of the Puerto Rico Police Department, IC Jose Pujol asked two officers of the PRPB about the PRPB's rules and/or guides they followed during crowd control operations before General Order Chapter 600 Section 625 "Manejo y Control de Multitudes" entered into effect. The two officers answered as follows:

- PRPB Officer #2, the San Juan Area Commander on 2017, who during his approximately twenty three (23) years in the PR Police Department (PRPB) had worked in dozens of manifestations similar to the ones covered by this Assessment, explained the following: "before the General Order Chapter 600 Section 625 "Manejo y Control de Multitudes" entered into effect, there wasn't any established official protocol; we worked based on experience, which was obtained by years of working in the streets, and working in similar scenarios".

- PRPB Officer #23, stated that in the past he was part of the DOT (Tactical Operations Division) and that during his long career with the PRPB he participated in large number of manifestations/protests/scenarios like the ones covered by this assessment. PRPB Officer #23 explained that before the General Order Chapter 600 Section 625 "Manejo y Control de Multitudes" entered into effect, there was great disorganization. Before any event, similar to the ones covered by this assessment, they planned for any possible scenario. He further added that back then, the guidelines (in the General Order) weren't clear for this type of events.

---

[16] USDOJ, Investigation of the PRPD: Executive Summary, 2011, page 6.

# I.B Analysis of the Current Policy on Crowd Control Under the Agreement

Under the Agreement, the PRPB is to develop crowd control and incident management policies that comply with applicable law and comport with generally accepted policing practices (Paragraph 32).    Paragraphs 33, 34 and 35 of the Agreement expand on this requirement.

> "33. The incident management policy shall provide that a ranking officer or other higher-level PRPD official at the scene of a mass demonstration, civil disturbance, or other crowd situation assume command and control and provide approval prior to deploying force as a crowd dispersal technique.
>
> 34. The crowd control policy shall require the use of crowd control techniques and tactics that respect protected speech and the right to lawful assembly.
>
> 35. PRPD policy shall require the assessment of law enforcement activities following each response to a mass demonstration, civil disturbance, or other crowd situation to ensure compliance with applicable laws and PRPD policies and procedures."

The Action Plan on the Use of Force further expanded on the requirements set forth by the Agreement. In particular, the Action Plan required the PRPB to develop a General Order on Crowd Control and Incident Management (OG. 600-625) by September 2015.

On January 28, 2016, the PRPB's Reform Unit met with the TCA and the USDOJ to discuss written recommendations and comments on the PRPB's "Final Draft" of the Management and Crowd Control Policy. These comments and recommendations were subsequently adopted and incorporated into the Policy. The Order was approved on April 19 of 2016.  On April 30, 2017, an Annual Review was conducted on this Policy.

In preparation for this Report, the following areas of the policy were extensively reviewed:

- Purpose Section
- Definition Section
- Policy and Procedure Section
- General Disposition Section

This Management and Crowd Control Policy has been instrumental in providing established guidelines to PRPB personnel in managing crowds and preserving the peace during demonstrations, constitutional activities and spontaneous disturbances. Police, the most

TCA Assessment Report | 2018

visible form of government, must continue to ensure that the First Amendment rights of the public they serve are protected and guaranteed. However, it should be understood, that in part, the effectiveness of this Policy will be based on the training component implemented by the PRPB, as well as strict compliance to the Policy.

This General Order establishes policy and procedures in managing and controlling of crowds. Because physical force by PRPB may be necessary in some of these instances, the Order references the following related General Orders:

- Chapter 600, Section 601, Rules of Use of Force
- Chapter 600, Section 602, Use and Management of Electronic Control Devices
- Chapter 600, Section 603, Use and Management of Impact Weapons
- Chapter 600, Section 604, Use and Management of Chemical Agents
- Chapter 600, Section 605, Reporting and Investigating Use of Force by PRPB Members
- Chapter 600, Section 620, Use of Intermediate and Specialized Weapons (less-than-lethal)

In Puerto Rico, all persons have the right to free speech and assembly guaranteed by the First Amendment of the Constitution of the United States and the Constitution of Puerto Rico. A fundamental role of law enforcement is the protection of the rights all people to peaceably assemble, demonstrate, protest or rally. In turn, law enforcement also has the responsibility to ensure public safety and to protect the lives and property of all people. The often-competing goals of maintaining order while protecting the freedoms of speech and assembly stand as one of law enforcement's greatest challenges.

Demonstrations throughout the United States, especially in 2017, have clearly put law enforcement agencies on notice that they have an obligation to prepare their departments for a proper response to these events. Preparation to address crowd control is best achieved through policy and training on how to manage crowds while protecting First and Fourth Amendment rights.

As in all high-liability areas the following is needed:

- Knowledge of the legal standards applicable to First Amendment conduct
- Effective Information Gathering
- Proper Policy Guidance
- Detailed Planning
- Effective Training
- Effective Leadership
- Proper Use of Force

| TCA Assessment Report | 2018 |
| --- | --- |

The Policy and Procedures Section A. 1., states that all organizations or groups interested in having a constitutional activity or demonstration shall notify the PRPB thirty-six (36) hours in advance of the event. It is well known that this rarely occurs, however it is strongly suggested that the PRPB, together with the other government agencies mentioned in Law 366, should make all efforts to strictly comply with all its articles including the creation of the Interagency Committee headed by the Police Commissioner and the creation of all by-laws required by the Act for crowd safety and control.[17]

Subsection D. 1., states: "The use of force is limited to circumstances permitted by General Order 600, Section 601, entitled 'Rules for the Use of Force by Members of the Puerto Rico Police' (hereinafter, OG-601) and to a reasonable extent necessary in light of the circumstances faced by the PRPB. However, during a civil disturbance, the PRPB will act according to the legal instructions given by the Squad Leader, Platoon Leader or the Incident Commander, as applicable."

Subsection D. 2., 3., 4. and 5., are strong parts of the Policy and should continue to be enforced:

- "2. Except in extreme circumstances that warrant immediate action, PRPBs may not make arrests or use force without making the warnings and commands as set forth in OG-601 and General Order 615, entitled 'Puerto Rico Police Authority to carry out Arrests and Citations' (hereinafter, OG-615.)"
- "3. In any individual incident where force has been used, an arrested person has been injured or allegations of excessive force being used, the PRPB shall follow the procedure established in General Order 600, Section 605, entitled 'Report and Investigation of Incidents of Use of Force of Members of the Police of Puerto Rico' (hereinafter, OG-605.)"
- "4. Each use of weapons authorized by the PRPB against a person, animal or crowd constitutes one (1) independent use of force. Therefore, each use requires detailed justification and explanation on Form PPR-854, entitled 'Use of Force Report' and as set forth in OG-605. Officials authorizing the use of force to control or manage a disturbance of crowds shall complete a Report."
- "5. The injured will be treated in accordance with the provisions of OG-605."

PRPB should embrace collaboration with community stakeholders when planning for and responding to public assemblies and gatherings.  It should be noted that Law 366, Section 8 specifically provides for the creation of a Citizen Information Program to keep citizens informed of the nature of the activity to be held.  This same section further states that "[T]he Interagency Committee may use the press media or public service slots in the press media

---

[17] A copy of Law 366 of 2004 is included and made part of this Assessment and assigned number 1

| TCA Assessment Report | 2018 |
|---|---|

as a mechanism to diffuse citizen information programs. **To this effect, it should be understood that the agencies participating in the Interagency Committee shall undertake initiatives and set aside resources in order to enable compliance with this provision."** (Emboldened for emphasis)

Community stakeholders may include:

- Business associations
- Civil right organizations
- Labor organizations
- Advocacy groups
- Leaders of local/state government
- Elected officials
- Special interest groups
- Neighborhood associations
- Religious groups/clergy
- Schools/colleges/universities

The following training information is available to the PRPB. These following resources are currently being utilized in the United States for training in management and crowd control:

- IACP National Law Enforcement Policy Center-Civil Disturbances—12/2005
- Law Enforcement Guidelines for First Amendment-Protected Events—10/2011
- Privacy, Civil Rights and Civil Liberties Policy Development Guide—4/2012
- Independent Investigation Occupy Oakland Response—10/2012
- The Reynoso Task Force Report-UC Davis November 18, 2012
- CA POST Guidelines Crowd Management, Intervention and Control
- Ferguson Review—2015

Pursuant to Section 9 of Law 366, "[T]he Puerto Rico Police is hereby empowered to impose an initial administrative fine of not more and not less than (250) dollars on any natural or juridical person who fails to comply with the duties established in Section 7 of this Act. On subsequent occasions, a fine shall be imposed, to be greater than two hundred fifty (250) dollars, but not greater than five hundred (500) dollars. Provided, further, that the amount of the fine imposed shall be proportionate to the damages or injuries caused to the interest legally protected under this Act. i.e. the safety or mobility of the people not participating in the demonstration and the interest of the Commonwealth in having demonstrations conducted within reason, stability and safety."

| TCA Assessment Report | 2018 |

The above referenced Section 9 imposes penalties for failure to comply with Section 7 of Law 366, which imposes duties and responsibilities to "Groups or Persons[18]" who intend to conduct a public impact activity as follows:

"a. To notify within a reasonable period, not to be greater than 36 hours in advance of the event, the intent to conduct the activity, event or demonstration, subject to the non-applicability of the exceptions established in this Act; it being understood as an exception that the preceding restriction shall not apply when the event or situation which motivates the demonstration arises within the immediacies of the event in question or at a time before the thirty-six hours that precede the demonstration.  In these cases, the duty to notify shall be performed within a prudent and reasonable period, not to be less than twenty four (24) hours, so as to allow for the activity to be coordinated with sufficient time in advance in order to enforce the provisions of this Act.[19]

b. To provide information on the nature and scope of the activity as to the number of people expected to attend, time and duration of the activity, activity starting and ending points in geographic terms, security plans, or other contingency measures.  By no means shall said information include data or aspects regarding strategies, plans, subjects or objectives devised by the participating person or group; these shall be their exclusive property and shall not be subject to the duty to notify established in this Act.

c. To cooperate with the agencies concerned in the adoption of contingency and security measures in order to allow for the orderly and reasonable conduct of the activity being held, so long as these do not undermine the constitutional right to freedom of speech and free association to (sic) which protects demonstrating persons and groups

d. To take the corresponding actions in order for the people participating in the demonstration to abide by the criteria and demands set forth in this Act and by coordination adopted pursuant thereto so as to allow for its enforcement in an orderly and efficient manner.

e. To cooperate with the Committee before holding the activity in order to formalize a coordinated plan to facilitate the conduct of the activity, event, or demonstration without interfering unreasonably with the stability, mobility or safety of the people or groups not participating in the activity."

---

[18] In the case of persons or groups that fail to comply with this Section of Law 366, it would probably border in the realm of the impossible trying to asses which person or group should take responsibility for a failure to inform on the activity.  Most reactionary groups lack an identity by which they could be imposed responsibility.  The same applies in trying to affix responsibility to a person regarding the duty to inform about an activity.

[19] The Constitutionality of this Section has not been challenged in the Courts of the Commonwealth of Puerto Rico.

| TCA Assessment Report | 2018 |
|---|---|

The PRPB Reform Unit has developed a comprehensive policy, crafted by the PRPB Reform Unit, that provides PRPB with established guidelines for managing crowds and preserving the peace during demonstrations and civil disturbances. The development of this in-depth policy, although not one based on the policy that was supposed to be crafted by the Interagency Committee pursuant to Law 366, has become sort of an amenable working substitute that provides detailed protocols and clear guidelines to members of the PRPB.  It should be noted that this is a new Policy and the only prior reference to anything resembling crowd control was in repealed General Order 2006-6 entitled "Rules and Procedures to Intervene in Labor Conflicts" (Oden General 2006-6 Normas y Procedimientos Para la Intervencion en Conflictos Obrero-Patronales.)  It would have been presumably better if Law 366 had been followed.

# Section II: Training

## II.A Training Received by All PRPD Personnel Regarding Crowd Control

According to the information received from the PRPB, **nobody** in the PRPB had been trained on the General Order, Chapter 600, Section 625, titled "Manejo y Control de Multitudes" (Spanish for "Crowd Management and Control") when the May 1, 2018 events occurred.  Nevertheless, the PRPB informed that the DOT personnel that participated during the May 1st, 2018 events, had within their knowledge and skills the ones learned after participating in trainings that educated them individually and in groups (Operator in Management and Control of Crowds), which made them able to operationally handle any situation of risk in which was necessary for them to intervene.

## II.B Personnel Deployed and Their Crowd Control and Related Training

IC Jose Pujol requested from the PRPB a list of all members of the PRPB present during the events of May 1st, 2018, and information of all trainings taken by these Officers/Agents. The PRPB produced many groups of documents in response to this request.  Reviewing these documents IC Pujol verified that the PRPB provided the requested information about the trainings taken by approximately two-hundred eighty-seven (287) Officers/Agents.  This number falls **quite short** from the one thousand two hundred twenty-five (1,225)

participating members of the PRPB utilized during the operation, according to **Form** PPR-174 signed by PRPB Officer #1.   The PRPB grossly failed to provide the requested information.

## II.C Number of People and Units Trained Under the Crowd Management and Control Policy

According to the information received from the PRPB, nobody in the PRPB had been trained on the General Order, Chapter 600, Section 625, titled "Manejo y Control de Multitudes" (Spanish for "Crowd Management and Control") when the May 1, 2018 event took place.

The PRPB has informed that they coordinated and worked an external course titled "Field Force Operations" issued by the Center for Domestic Preparedness of F.E.M.A., which was offered in the Spanish language.   This course allegedly included the necessary elements, according to the best practices, on how to operate in crowd control situations.   Personnel from DOT, Arrests and Extraditions, SWAT and the Auxiliary Superintendence in Education and Training participated in this Course.   They accomplished the certification of sixteen (16) instructors and approximately two hundred (200) DOT personnel.   Additionally, to this Course, they were trained in the REA-111 "Civil and Human Rights" and DOT-603 "Use and Handling of the Rigid Baton".   According to the available information, the Incident Commanders of the May1st Operation were not trained or certified by the FEMA instructors.

The PRPB claims that regardless of the fact that there is no personnel at this time directly certified in the General order Chapter 600 Section 625; the personnel of the DOT, on May 1st 2018, had within their knowledge and abilities several trainings that qualified them, at individual and group level (Operator in Crowd Management and Control), to handle crowd control situations and therefore, enabled them to operationally handle any situation of risk that would be necessary to intervene.   The majority of officers that participated in the police response were not from DOT.   Specialized tactical unit officers, not part of DOT, used force in two of the three problematic incidents discussed in this report and were not trained by the FEMA instructors.

| TCA Assessment Report | 2018 |
|---|---|

# Section III: Implementation of Crowd Control Policies and Training Under the Agreement

PRPB General Order Chapter 600 Section 625 (effective since April 19, 2016) establishes the rules, procedures and guidelines that the members of the PRPB shall follow to establish crowd control and preserve the peace during demonstrations, programmed events, protests, strikes, or to recover the order during and spontaneous disturbance. It also covers the use of force (including chemical agents like tear gas), training, arrests and reporting requirements.  This section also covers the circumstances under which the PRPB will activate the specialized units like Operaciones Tacticas (DOT), SWAT units, the Mounted Police units and the Motorcycle units.

## III. Analysis of specific Operational Plans (OPs) developed by PRPB for crowd control and mass demonstrations that are the focus of this study. Findings and Recommendations.

PRPB's Order Chapter 600 Section 625, III Rules and Procedures, A. Programmed Constitutional Activities and Crowd Control, paragraph number 6, establishes how the PRPB Area Commander will prepare the Operational Plan ("Plan de Trabajo").

1. On March 15, 2018, an Operational Plan (OP) for the May 1st event, the Worker's Day, was prepared by the PRPB and signed by PRPB Officer #1, titled "PLAN DE TRABAJO 1 DE MAYO" (Spanish for "OPERATIONAL PLAN MAY 1ST")

    o "ATTACHMENT A – SAN JUAN" is an Operational Plan prepared by PRPB Officer #2 titled "PLAN DE TRABAJO PARA ATENDER MANIFESTACIONES DIA INTERNACIONAL DE LOS TRABAJADORES EN MILLA DE ORO" (Spanish for "OPERATIONAL PLAN TO MANAGE MANIFESTATIONS WORKERS' INTERNATIONAL DAY IN GOLDEN MILE").

    o "ATTACHMENT B – F.U.R.A." is an Operational Plan prepared by PRPB Officer #3 titled "PLAN DE TRABAJO "PARO GENERAL 1 DE MAYO (Maritimo, Aereo, Terrestre)" (Spanish for "OPERATIONAL PLAN FOR "NATIONAL STRIKE MAY 1ST (Maritime, Aerial and on Land).

| TCA Assessment Report | 2018 |

- o "ATTACHMENT C - PATRULLA DE CARRETERAS" is an Operational Plan prepared by PRPB Officer #4 titled "PLAN DE TRABAJO PARA ATENDER "CONTROL Y DIRECCION DEL TRANSITO DURANTE PARO NACIONAL" (Spanish for "OPERATIONAL PLAN TO MANAGE "TRAFFIC CONTROL AND DIRECTION DURING NATIONAL STRIKE".
- o "ATTACHMENT D - PPR" is composed of several blank forms to be utilized if necessary.

FINDINGS REGARDING May 1, 2018 events, General Plan and Attachments A, B and C, PRPB Officers #1, 2, 3 and 4):

- The Operational Plan prepared by PRPB Officer #2 informed that there were two (2) Command Centers:
    1) Command Center located at the Jose Miguel Agrelot Coliseum
    2) Operational Center located at the Banco Popular Center building.

   During his interview, PRPB Officer #21 informed that they had two (2) Command Centers and one (1) Observation Post that were located at:
    1) near the Jose Miguel Agrelot Coliseum (Command Center)
    2) at the FUSION Center (PROB HQ) (Command Center)
    3) at the Banco Popular Center building (Observation Post).

   During the interviews of high-ranking Officers of the PRPB, they described the Command Post located at the Banco popular Center only as an Observation Post. However, at page 3 of the "Plan de Trabajo Para Manifestacion Grupos Sindicales 1ro. de mayo de 2018" (Spanish for "Operational Plan for the Manifestation of Labor Unions May 1st of 2018") signed by PRPB Agent #10 and dated April 23, 2018, Director of the Explosives Metro Division, PRPB Agent #10 assigned a Sergeant to be located at the **Command Post (Edificio Popular Center)".**

   TCA Observer #1, who was present at the FUSION Center (PRPB Headquarters) during the event, stated being sure that there was not any decision making at the FUSION Center, which in his opinion, "**it was never a Command Center,** only an Observation Center."

   It is extremely pertinent to remark that the TCA Office was completely misled when informed that the FUSION Center was the Command Center of the Operation.  It was for that reason that TCA Observer #1 was assigned to be present there.  Other misleading information was provided during the interview of PRPB Officer #21 (a high ranking PRPB Officer) who described the Popular Center Building as an Observation Post, when one Official PRPB "Plan de

Trabajo" (Operational Plan) stated such location was a "Command Post." Another Official PRPB "Plan de Trabajo" (Operational plan) defined such location as an Operational Center.

- The Operation Plan prepared by PRPB Officer #1 informed that the Incident Commander for the Operation was PRPB Officer #1.  The Operational Plan prepared by PRPB Officer #2 stated the Incident Commander for the Operation was PRPB Officer #1.  During the interview of PRPB Officer #1, he identified himself as being the Incident Commander of the event, and during the event made decisions as the Incident Commander.  At the same time, when interviewed, PRPB Officer #2 stated that he made the Operational Plan and he **directed the plan** (in the field).  These two opposing statements indicate that there were two PRPB Officers directing the plan in the field, in other words acting as Incident Commanders.  TCA Observer #2, who spent a considerable amount of time in the Milla de Oro scenario, explained that he spoke to several Police Agents there and all of them acknowledged that the Incident Commander was PRPB Officer #2.  Moreover, TCA Observer #2 observed that PRPB Officer #2 was the Officer acting as Incident Commander at the Ponce de Leon Ave., the main scenario of the confrontation. The aforementioned two statements, and the facts learned from observation by TCA Observer #2, indicate that it is likely that there were two PRPB Officers directing the plan, in other words, acting as Incident Commanders.  A multiplicity of Incident Commanders can be detrimental for any Law Enforcement Operation.  The PRPB must be more emphatic in clarifying in their Operational Plans who has the Incident Commander role in the field.

- The General Plan and the Attachments fail to report which parts of the Milla de Oro were off limits for the protesters to march.  More specifically, the OP fails to explain that the march coming from Ponce de Leon Avenue would not to able to pass through the intersection of such avenue with the Roosevelt Avenue, where the Liberty building is located.  The OP also fails to explain that a line of Police Officer would be placed in that intersection to prevent the march to pass through it and continue marching on Ponce de Leon Avenue.

- The interviews of PRPB Officer #1 and Officer #2 revealed that they had worked several parts of the operational plan and reached several decisions which were not covered in the official Operational Plan ("Plan de Trabajo") of the main event.  This action defeats one of the main purposes of making an Operational Plan which is precisely to define all actions to be taken in each of the areas covered by the plan, impose all officers and enlistees prior to the event of what is expected and what line of action is predetermined for each situation.  In other words,

33

everyone must be fully cognizant of the strategy in place.  A good OP provides for a procedure to follow (protocol) in cases of unexpected situations.  It also provides for a meeting prior to the event, the chain of command for every location.  Persons in charge of collecting the evidence at the different points where confrontations are expected and most important of all, a good system of communications to make information flow to the officer in command (Incident Commander).

- In the general Plan, Paragraph "IX. DISPOSICIONES ESPECIALES" (IX. SPECIAL DISPOSITIONS), the OP establishes the Sections of the General Order that apply to it: 601, 602,603, 607, 609, 610, 612, 615, 617, 618 and 623. The OP fails to inform that Section 625 "MANEJO Y CONTROL DE MULTITUDES" (Spanish for "Crowd Management and Control"), applies as one of the main Sections to events like this one.

- Attachment "B", the OP for FURA also fails to inform that Section 625 "MANEJO Y CONTROL DE MULTITUDES" (Spanish for "Crowd Management and Control"), applies as one of the main Sections to events like this one.

- The OPs did not provide any information related to any attempt made by the Area Commander or his/her representative to establish contact and communication with the event/protesters/organizers.

- The OPs failed to include information regarding the previous experience with this type of Constitutional activity or manifestation and with the leaders of the groups as well as the results of the auto-evaluations made by the PRPB (paragraph no. 6, section c).

- The OPs failed to inform about the expected number of participants or convoked individuals (paragraph #6 section d).

- The OP failed to inform if copies of any documents informing about the activity had been presented.  It should be noted that paragraph no. 6 section (e) makes reference to "the required permits had been requested and/or delivered" but this is an error.  Constitutional activities involving free speech cannot be subjected to, limited or conditioned to the granting of a permit.

TCA Assessment Report | 2018

- The OPs failed to inform if the event coincides with other large activities/events like for example, sports events, religious or labor events (paragraph #6 section f).

- The OPs failed to inform if they expected groups in opposition or support to the event (paragraph #6 section g).

- The OPs failed to inform about a designated zone to provide first aid in case of being necessary (paragraph #6 section p ii).

- The OPs failed to identify the places where they would place legible and visible signs informing about the event's entry and exit, and the places assigned for the participants (paragraph #6 section r).

- The OPs failed to include an intelligence section that would prompt the commander to identify external variables to consider when formulating operational tactics and rules of engagement.


2. An Operational Plan was prepared by PRPB Officer #5, from the Mayaguez Area, titled "PLAN PARA ATENDER MANIFESTACIONES (PARO GENERAL) EN INSTITUCIONES GUBERNAMENTALES Y CORPORACIONES PUBLICAS" (Spanish for "OPERATIONAL PLAN TO MANAGE MANIFESTATIONS (GENERAL STRIKE) IN GOVERNMENT INSTITUTIONS AND PUBLIC CORPORATIONS"").
This plan was prepared as a contingency plan for any possible manifestation/protest that could develop that day, but without having any specific knowledge of the existence of any planned protest. Notwithstanding the aforesaid, the approved plan failed to comply with several of the requirements established in PRPB Order Chapter 600 Section 625, Section III Rules and Procedures, Part A. Programmed Constitutional Activities and Crowd Control, paragraph number 6:

FINDINGS (May 1st events, Mayaguez area, PRPB Officer #5):
- The OP failed to inform the previous experiences with this type of Constitutional activities or manifestations and with the leaders of the groups and the result of the auto-evaluations made by the PRPB (paragraph #6 section c).

- The OP failed to inform if copies of any documents informing about the activity had been presented.  It should be noted that paragraph no. 6 section (e) makes reference to "the required permits had been requested and/or delivered" but this

TCA Assessment Report | 2018

is an error. Constitutional activities involving free speech cannot be subjected to, limited or conditioned to the granting of a permit.

- The OP failed to inform if the event, should it occur, coincides with other large activities/events like for example, sports events, religious or labor events (paragraph #6 section f).

3. An Operational Plan prepared by PRPB Officer #6, from the Aguadilla Area, titled "PLAN DE TRABAJO PARA ATENDER PARO NACIONAL" (Spanish for "OPERATIONAL PLAN TO MANAGE NATIONAL STRIKE"). This contingency plan is prepared to be used in the eventuality of a possible manifestation/protest should it occur during that day, but without having any specific knowledge of the existence of any planned protest. Anyway, the approved plan failed in comply with several of the requirements established in PRPB Order Chapter 600 Section 625, III Rules and Procedures, A. Programmed Constitutional Activities and Crowd Control, paragraph number 6:

FINDINGS (May 1st events, Aguadilla area, PRPB Officer #6):
- The OP failed to inform the previous experiences with this type of Constitutional activities or manifestations and with the leaders of the groups and the result of the auto-evaluations made by the PRPB (paragraph #6 section c).

- The OP failed to inform if copies of any documents informing about the activity had been presented. It should be noted that paragraph no. 6 section (e) makes reference to "the required permits had been requested and/or delivered" but this is an error. Constitutional activities involving free speech cannot be subjected to, limited or conditioned to the granting of a permit.

- The OP failed to inform if the event, should it occur, coincides with other large activities/events like for example, sports events, religious or labor events (paragraph #6 section f).

4. An Operational Plan prepared by PRPB Officer #7, from the Ponce Area, titled "PLAN DE TRABAJO PARA ATENDER POSIBLES MANIFESTACIONES 1 DE MAYO DE 2018 AREA DE PONCE" (Spanish for "OPERATIONAL PLAN TO MANAGE POSIBLE MANIFESTATIONS MAY 1ST 2018 PONCE AREA") This plan is prepared in the prevention of any possible manifestation/protest should it occur during such day, but without having any specific knowledge of the existence

of any planned protest. The approved plan failed to comply with several of the requirements established in PRPB Order Chapter 600 Section 625, III., A. 6:

FINDINGS (May 1st events, Ponce area, PRPB Officer #7):

- The OP failed to inform the previous experiences with this type of Constitutional activities or manifestations and with the leaders of the groups and the result of the auto-evaluations made by the PRPB (paragraph #6 section c).

- The OP failed to inform if copies of any documents informing about the activity had been presented. It should be noted that paragraph no. 6 section (e) makes reference to "the required permits had been requested and/or delivered" but this is an error. Constitutional activities involving free speech cannot be subjected to, limited or conditioned to the granting of a permit.

- The OP failed to inform if the event, should it occur, coincides with other large activities/events like for example, sports events, religious or labor events (paragraph #6 section f).

5. An Operational Plan prepared by PRPB Officer #8, from the Centro Recopilacion, Analisis y Diseminacion de inteligencia Criminal (CRADIC) (Spanish for Center for Compilation, Analysis and Dissemination of Criminal Intelligence (CRADIC)). This plan is specifically prepared to establish the Rules and Procedures for Video Recordings during Crowded Events.

This plan fails only by not providing the type of video cameras that were to be used during the event. The plan establishes that 13 (thirteen) video cameras will be used, but it doesn't provide any additional information.

This plan failed to outline the chain of custody for the video recordings. In addition, failed to provide direct accountability of which officer was responsible for what area.

## OTHER FINDINGS AND RECOMMENDATIONS SUBMITTED:

The above referenced Operational Plans lacked important information and details that, despite not being required by the General Order, should be considered for incorporation to the General Order:

- The Operation Plans should clearly identify who the Incident Commander (IC) for an Operation is and comply with this in the field. In spite of the fact that the OP was prepared by PRPB Officers #1 and #2 and the same informed the IC as

| TCA Assessment Report | 2018 |
|---|---|

being PRPB Officer #1, during the field operations both Officers acted as and assumed being the IC.

- The Operational Plans should clearly identify where the Command Center is located at and who is responsible for its execution. Additionally, the OPs should clearly specify the ways of communication with the Command Center and identify the personnel who will be the point of contact in there.

- The OPs lacked detailed explanation of the arrest procedures to be undertaken in mass arrests situations. It is submitted that such OPs must provide for a situation in the foreseeable event that a large number of persons could be arrested and separated from the crowd to be controlled in extraordinary circumstances. Notwithstanding the aforesaid, it should be noted that such procedures were in place (as the video recordings reviewed by IC Jose Pujol show) although not written in the OPs.

- The OPs did not provide a description of the equipment to be used during crowd control events. Reference is only made to the vehicles and to the personnel assigned equipment. It is submitted that the PRPB should go into detail about which personnel is assigned what equipment. OPs should also provide detailed information of all equipment that the SWAT and DOT units will have available for use, i.e., the agent's personal assigned equipment, the equipment to be used with chemical agents, the identification and inventory of all available chemical agents, the amount and identification of all other available less than lethal weapons and ammunitions. It is strongly submitted that the OPs should contain a certification that chemical agents distributed to the SWAT units are not expired.

- The majority of the OPs do not provide for "anticipated scenarios" and how to react in the event of any of them develops into a threatening event. It is also advised that the PRPB should engage in contingency planning regarding foreseeable aggressive/violent scenarios and provide alternate methods of engagement. The rules of engagement should be outlined in the operational plan.

- The OPs contain a paragraph entitled General Dispositions (DISPOSICIONES GENERALES) which details the Chapters and Sections (Capitulos y Secciones) that apply to the operation. This notice assumes any participant in the operation knows and is able to remember every disposition enumerated therein. It is submitted that the OPs should provide more detailed information referencing rules and regulations for the Use of Force in Major Crowd Situations that could

apply to the specific operation, with specificity on the authority of the Incident Commander to deployment chemical agents and impact ammunitions, and how to document and report the use of them.

- The OPs do not provide information on how to deal with contingent situations like for example; explaining in detail how to react if individuals invade and/or damage public properties or set fires, or take hold of public roadways not included in the original planned marches, etc.  It is submitted that the OPs should cover contingency plans for viable scenarios in the event that they become a threat to citizens, property or the policemen.

- The OPs do not provide a protocol to deal with the Media representatives, provide for their safety and allow them to conduct their right to cover the events. It is suggested that the OPs should direct the Incident Commanders to remind the PRPB agents the following: "The Media has a right to cover demonstrations/protests, including the right to record the event on video, film or in photographs.  The Media should be permitted to observe and should be permitted access close enough to the event. Even after a dispersal order has been given, clearly identified Media should be permitted to carry out their professional duties in any area, unless their presence would unduly interfere with the enforcement action or place them at great risk.  The Media should be permitted to observe and shall be permitted access close enough to arrestees, if any, to record their names. The Media and Legal Observers should never be targeted for dispersal or enforcement action because of their status unless their lives are threatened.  The PRPB should imbed media as a practice to enhance transparency in future events.
Section 625 of the General Order, Subsection III.I.2 provides the following: Members of the press may participate and record.  If an activity becomes a civil disturbance, the CI may designate a space for the press.

## III.B Analysis of Strategy and Tactics During the Event

The analysis of the events of **May 1, 2018** revealed the following:

The demonstration that started at the UPR and marched Northbound on Ponce de Leon Avenue, met with the group that started its march near the Department of Labor building (Departamento del Trabajo).  Both marches continued until arriving at the intersection of Ponce de Leon with Muñoz Rivera Avenue, where the Liberty building is located at (the PRPB did not report whether the two marches were led by the same representatives or separate

ones).  There, they had to stop because there was a thick line of Police Agents that blocked the Ponce de Leon Avenue. Video images show when the protesters threw rocks and other objects to the Police.  The video images show many protesters covered their faces with masks, shirts, and other pieces of clothing.  Many of them carried wooden shields identical to the ones used by the violent protesters in the May 1st of 2017.  Minor explosion like sounds were heard that when members of the PRPB were interviewed claimed those were cherry bombs used by the protesters against them.  Some objects thrown against the Police got to hit the agents. The Police made use of the loudspeakers to warn and ask the protesters not to throw objects at them and to convey dispersal orders.

Upon being interviewed, group leaders of protesters, protesters, and observers from civic organizations claimed that the protesters had the right to march through Ponce De Leon Avenue and that the Police had violated their right. The Police claimed that the barrier at Ponce De Leon Avenue was intended solely to protect the banks' area that in the past Worker's Day celebration of May 1, 2017 was vandalized with damages ascending to almost two million dollars ($2,000,000). They further maintained that they had the right to restrict entrance because they weren't keeping the protesters from conducting their protest because access to the stage area of the event was provided via Roosevelt Avenue. The decision of blocking the access to the Ponce de Leon near to the Liberty building was made previous to the event by the Incident Commander and other high-ranking members of the PRPB.

After a prolonged span of time, Police Agents permitted access to Ponce de Leon Avenue and the protesters were able to continue until they arrived at another Police barrier close to the intersection with Bolivia Street.  PRPB Commissioner Henry Escalera, upon interview, claimed that the situation was getting intense at the Liberty Building location and he made a "good faith decision[20]" and honored the negotiations the Police in the field had made with observers of different organizations. PRPB Officer #21, upon being interviewed, explained that the PRPB Commissioner decided allowing the protesters to go through the Ponce de Leon Avenue, but he intended to continue observing their behavior. He said that as soon as they were allowed to continue their march, protesters started to vandalize properties. Eight (8) or nine (9) glass windows were destroyed at the Liberty building and others at the Plaza building.  He further stated that it was then that PRPB Officer #1 decided to block Ponce de Leon Avenue, near Bolivia Street to prevent additional damages to other properties in the area.  Reviewed video recordings show a viable timing consistent with the movement of Police personnel in the area and the explanation provided by PRPB Officer #21.

While at this second barrier, protesters threw rocks, used slingshots to hurl marbles and threw skin burning chemical substances against the Police agents.  They also assaulted Police

---

[20] This is yet another member of the PRPB that assumes responsibility for permitting the protesters to continue marching through Ponce de Leon Avenue.

| TCA Assessment Report | 2018 |
|---|---|

agents with sticks.  This mêlée resulted in several Police agents injured along with some protesters.  Video images depict various individuals with their faces covered, armed with homemade shields and wood sticks engaged in throwing rocks and hurling assorted objects at the Police for sustained periods of time.  An individual using a loudspeaker was observed inciting and rousing the protesters to maintain their violent deportment. The extended confrontation at that location made both sides visibly tense and impatient.  At certain point in time the organized group of protesters started to push their way into the line of Police Officers and the Police in turn reacted using chemical agents against the protesters.  The use of force by the Police at that point comes as a reaction to repeal intense use of force by the mass of protesters trying to overpower and break through the Police barrier incited by the agitator using the loudspeaker (video recordings reflect how the violence and the organization of the violent protesters was progressively developing, which gave enough time to the PRPB to announce the dispersal order and warning that less then lethal weapons were about to be deployed).

Recorded video images portray an organized operation on the part of the protesters. Those images by no means reflect the occurrence of a casual encounter product of a random situation.

## Findings:

The sudden change of strategy consisting of lifting the barrier at the Liberty building area (giving full credence to the explanation by the PRPB that it was done in a good faith), to rapidly re-establish a second barrier at the Ponce de Leon Ave. near the intersection with Bolivia Street, had the effect of confining several hundred protesters in an enclosed area with reduced exit access. This may well have contributed to aggravate the situation. It is assumed the demonstration included passive protesters intermingled with those protesters who were bound to commit acts of civil unrest. There were many individuals who exercised their constitutional right to peaceably assemble and speak out for their cause; however, it appears that instead of continuing to the platform at Munoz Rivera intersection, they chose to join the protesters intending to continue their march through Ponce de Leon Avenue. Unfortunately, there was a large group of individuals who chose to engage in criminal acts, hurling objects at police. At the time the Police used gas to disperse and push back the demonstrators, all were affected.  As previously mentioned, the police failed to announce at the second barrier the dispersal order or warning that less then lethal weapons were about to be deployed, which negatively affected the passive protesters and reporters that were exercising their right to protest or to exercise their duty as reporters.  Video recordings reflect how the violence and the organization of the violent protesters was progressively developing, which gave enough time to the PRPB to announce the dispersal order and warning that less then lethal weapons were about to be deployed.

41

The sudden change of strategy appears to be an improvisation not intended as a scenario considered when the PRPB planned their strategy of creating the blockage at the Liberty building. Additionally, and as stated before, no blockages were part of their Operational Plans. This fact emphasizes the importance of including all planned strategies in the Operational Plans and studying and including possible foreseeable scenarios in them.  The Operational Plans provided by PRPB failed to not provide for additional probable scenarios that may be encountered during the extent of the Operation nor provides a viable strategy to react to them.

# Section IV: Analysis of Related and Relevant Policy Issues Stemming from Policing these Demonstrations: Use of Force, Search and Seizure, Supervision, Administrative Complaints, Detention

## IV.A Policies and Training Involving these Related and Relevant Issues

The policies involving these related and relevant issues are the following:

a)  The PRPB General Order, Chapter 600, Section 625, titled "Manejo y Control de Multitudes" (Spanish for "Crowd Management and Control") is in force since April 19, 2016.  It establishes the rules, procedures and guidelines to be utilized by the PRPB members for crowd control events, covering use of force (including chemical agents like tear gas), training, arrests and reporting requirements.  This section also covers the circumstances under which the PRPB will activate the Tactical Operations Division (Operaciones Tácticas DOT) and SWAT units, the Mounted Police units and the Motorcycle units.

This Section 625 of the Chapter 600 of the General Order, refers and incorporates/adopts other sections of the Chapter 600 as follows:

b)  The PRPB General Order, Chapter 600, Section 620, titled "Normas y Procedimientos para la Utilización de Armas Especializadas por Miembros de las Divisiones de Tacticas Especializadas (DTE)" (Spanish for "Regulations and Procedures for the Use of Specialized Weapons by Members of the Specialized Tactical Divisions (DTE)" (Item #19), establishes the rules, procedures and

guidelines to be utilized by the PRPB members when utilizing specialized and intermediate weapons. It establishes that only properly trained and certified members of the DTE will be allowed the use of the specialized weapons. It also establishes the guidelines for the authorized use of less than lethal weapons and ammunitions and under what circumstances they will be authorized to be used and when its use is proscribed. It also establishes the obligations and responsibilities of the members of the PRPB forces when using less than lethal weapons and ammunitions. It includes the required training to use these weapons and ammunitions and how these weapons and ammunitions will be stored and transported.

c) The PRPB General Order, Chapter 600, Section 601, titled "Reglas para el Uso de la Fuerza por Miembros de la Policia de Puerto Rico" (Spanish for "Rules for the Use of Force by Members of the Police of Puerto Rico") (Item #11) establishes the rules and limits that regulates the use of force by the members of the PRPB. It establishes: the rules for the use of force, the escalated use of force, the immediate medical attention needed after force has been used, the duty to intervene to avoid excessive use of force, the use of lethal force in order to protect human life, the restrictions on the use of lethal force, the rules for the use of less than lethal force, reports related to the use of force, monitoring of the use of force and training in the policies of use of force.

d) The PRPB General Order, Chapter 600, Section 602, titled "Uso y Manejo del Dispositivo de Control Electrico" (Spanish for "Use and Operation of the Electric Control Device") (Item #12) establishes the rules and procedures for the use, operation and maintenance of the Electric Control Device (ECD), according to the policies and practices of the PRPB relating to use of force. It establishes: the rules applicable to the use of force with the ECD, the procedure for the use of the ECD, permitted use of the ECD, prohibited use of the ECD, people in crisis or with mental and/or behavioral problems and the use of the ECD, medical treatment after the use of the ECD, procedures after the use of the ECD, responsibilities of the supervisors, trainings and certifications in the use and operation of the ECD, rules for the use, operation and maintenance of the ECD, assigning and change of the ECD, procedure to repair the ECD, duties of the technician at central level, duties of the technicians in the Police areas, unloading of information of the data port.

e) The PRPB General Order, Chapter 600, Section 603, titled "Uso y Manejo de Armas de Impacto" (Spanish for "Use and Operation of Impact Weapons") (Item #13) establishes the rules and procedures for the use and operation of the impact weapons used as less than lethal force by the PRPB. It regulates the carrying of the impact weapon, the use and operation of the impact weapon, the use of the

equipment, description of the body areas that should be avoided when using impact weapons, warnings or verbal commands to be used, referral/transportation for medical treatment, required training, notifications, required reports and the responsibilities of supervisors.

f) The PRPB General Order, Chapter 600, Section 604, titled "Uso y Manejo de Agentes Quimicos" (Spanish for "Use and Operation of Chemical Agents) (Item #14) establishes the guides and procedures that will regulate the use and operation of chemical agents by the members of the PRPB. It establishes the rules for the use of chemical agents, acts not considered as use of force, the carrying and allowed uses of pepper spray, the forbidden use of pepper spray, the verbal warnings, the techniques for the use of pepper spray, the training and certification in the use and operation of pepper spray, the use of tear gas, the procedures for the decontamination and treatment, the required notifications and reports, the storage, the coordinator of chemical agents, the assigning and replacement.

g) The PRPB General Order, Chapter 600, Section 605, titled "Informe e Investigacion de Incidentes de Uso de Fuerza de Miembros de la Policia de Puerto Rico" (Spanish for "Report and Investigation of Incidents of Use of Force by Members of the Police of Puerto Rico") (Item #15) establishes the rules and procedures to report and investigate the use of force made by members of the PRPB in the line of duty. It establishes the reportable use of force (levels 1 to 4), the responsibility to inform of the use of force, referrals/transfers for medical treatment, the responsibilities of the immediate supervisor and upper rank supervisors, operations and search warrants and the required training.

h) The PRPB General Order, Chapter 600, Section 610, titled "Normas a seguir para la grabacion de eventos publicos" (Spanish for "Rules for the recording of public events") (Item #16) establishes the rules and regulations for the recording by the PRPB of public events.

i) The PRPB General Order, Chapter 600, Section 612, titled "Autoridad de la Policia de Puerto Rico para llevar a cabo registros y allanamientos", (Spanish for "Authority of the Puerto Rico Police to perform searches and seizures".) (Item #17). This Section is intended to establish the directives that members of the Puerto Rico Police must follow in the exercise of their legal authority to carry out searches and seizures and execute search warrants.

j) The PRPB General Order, Chapter 600, Section 615, titled "Autoridad de la Policía de Puerto Rico para llevar a cabo Arrestos y Citaciones" (Spanish for "Authority of

TCA Assessment Report | 2018

the Puerto Rico Police to conduct Arrests and serve Summons") (Item #18). The purpose of this section is to regulate the policy and the rules that members of the Police of Puerto Rico must follow in the exercise of its legal authority to conduct arrests and serve summons.

The trainings involving these related and relevant issues are the following:

- Persuasion, Mediation and Conflict Resolution
- Techniques and Verbal Commands
- Soft Hands Techniques
- Hard hands Techniques
- Techniques for crowd control
- Emotional Health and Stress Management for the Police
- Basic Formations Course
- Use and Handling of the rigid baton
- Use and Handling of the less than lethal weapons and ammunition
- Use and Handling of Tear Gas (CS)

## IV.B Analysis of the Events (by analyzing documents, video recordings and interviews): Findings and Recommendations

**May 1, 2018:**

Dozens of organizations, assorted groups, and students from the University of Puerto Rico (UPR) organized and more likely than not mapped out the national strike route scheduled for May 1, 2018, known as the International Workers' Day without consulting the PRPB or in total disregard of the news conference inviting dialogue prior to the date of the event. Only members of the U.T.I.E.R. attended the meeting with PRPB to plan the route they would follow. The other groups of protesters would concentrate on several marches that would leave from different points in the metropolitan area to presumably arrive at a stage located in the intersection between Muñoz Rivera and Roosevelt Avenue. The demonstrations would have their main site on the "Milla de Oro" (Spanish for the "Golden Mile") in Hato Rey, San Juan, PR.  The issues with and relevant facts of each of the marches have been addressed previously in this assessment.  The incidents that took place at Ponce de Leon Ave. have also been properly addressed throughout all this Assessment Report.

The PRPB provided a copy of a PPR Form-920, REGISTRO DE MOVILIZACIONES DE LAS DIVISIONES DE TACTICAS ESPECIALIZADAS (Spanish for "REGISTRY OF MOBILIZATIONS OF THE DIVISIONS OF SPECIALIZED TACTICS") dated 05/01/2018 signed by PRPB Agent #1.  The report informs about the possibility of several protests marches on May 1, 2018, the majority of them ending at the Muñoz Rivera Avenue and only one at the Capitol building.  It says that in the afternoon, a group of individuals belonging to an organization identified as "Jornada Se Acabaron las Promesas " (Spanish for "We are done with the promises") wanted to change the established route of the march but the Police didn't allow them to do it.  The protesters broke glass windows from one of the buildings in the area and threw all kind of objects (rocks, bottles, balloons containing skin burning chemical substances at the Police.  It was necessary to activate the SWAT teams who utilized chemical agents and less than lethal weapons to control and disperse the crowd who became hostile and aggressive.  The report stated that PRPB Officer #1 authorized the use of chemical agents. The report has a check mark in the Arrests box but does not provide a number of arrestees.  The report has a check mark in the box Use of Force and states that there were 2 (two), Types 2 and 3, that is, Use of Chemical Agents (OC, CS) and less than lethal ammunitions.  The report has a check mark in the "Arrestos" (Spanish for "Arrests") box as "YES", but it doesn't state the number of persons arrested.  The report has a checkmark in the box for [NO] to Lesions, Deaths or Seized Property.

The PRPB provided copy of a PPR-920 A, REGISTRO DE MOVILIZACIONES DE LAS DIVISIONES DE TACTICAS ESPECIALIZADAS DTE (Spanish for "REGISTRY OF MOBILIZATIONS OF THE DIVISIONS OF SPECIALIZED TACTICS DTE" dated 05/01/2018 and signed by PRPB Officer #10.  The report has a check mark in the Arrests box but does not provide a number.  The report has a check mark in the box "Use of Force with Lesions" but does not provide a number.  The box identified as Impact Weapons has a check mark in the "Rigid" subsection.  The report explains that all personnel belonging to the DOT that was mobilized, participated in briefing about the May 1st events and that they reviewed Sections 601 and 605 of the General Order.  At 4:00 AM they moved to the PR Coliseum, to assign personnel to the different meeting points established by the protesters.  PRPB Officer #10 was assigned a team of two squads constituted by agents of DOT from Aguadilla and Guayama, having three (3) Sergeants and eighteen (18) Agents.  His group met the group led by PRPB Officer #7 to go to Centro Medico from where one of the marches was scheduled to depart from.  At about 5:30 AM they located the two squads at the Lt. Luis Gonzalez Street.  At 10 AM, they were ordered by PRPB Officer #9 to move the squads that he supervised to the marginal street of the Jesus T. Piñero Avenue, where it accesses Ponce de Leon Avenue near the Auxilio Mutuo Hospital. They stayed there until 11:00 AM, when he received an order to move his Agents to the area of the Popular Center building.  They left the vehicles at Bolivia Street and moved on foot to the Ponce de Leon Avenue, to reinforce two (2) DOT squads that were located in front building 279

46

in Ponce de Leon Ave.  In front of the squads there, there was a group of Agents and Sergeants led by PRPB Officer #30, that assembled a linear formation blocking the pass of the protesters through the Ponce de Leon Avenue. He placed one of his squads in a narrow passageway that goes between buildings 304 and 268 in the direction of Muñoz Rivera Avenue, to reinforce a group of female Agents that blocked the access to Ponce de Leon Avenue.  To this place also arrived the squads led by PRPB Officers #31 and #32. This way, they had more control, should any confrontations occur with protesters located in front of the Agents led by PRPB Officer #30 at the intersection of Ponce de Leon with Roosevelt Avenue.  They stayed there for approximately two (2) hours, while the protesters threw rocks and cherry bombs to the Police.  It was then that PRPB Officer #9 approached the squads instructing to withdraw from that location.  They retreated to Bolivia Street, while this happened, PRPB Officer #9 ordered the squads to stop and make another linear formation in front of building #217 (MCS Plaza) and building #252 (City Bank Tower), all because protesters were allowed to enter into Ponce de Leon Avenue. Once allowed to continue their march, they continued to brake glass windows and throw objects at the Police.  He ordered his personnel to use their gas masks in a preventive way should the violence of the protesters increase attacking the Police.  The protesters continued to approach the Police squads throwing rocks, cherry bombs, balloons with burning chemical substances, bottles filled unknown liquids, lead balls and marbles thrown using slingshots. The protesters also made use wooden shields and sticks.  The squads there were reinforced by two (2) more squads led by PRPB Officer #33, and Agents from SWAT and Special Arrests.  The protesters moved a pickup truck that had sound equipment near to the Police, from that truck the protesters were getting the objects that they were throwing against the Police.  Once, he went to talk to PRPB Officer #9 about the situation encountered there.  PRPB Officer #9 was accompanied by the PRPB Commissioner Mr. Henry Escalera and PRPB Officer # 21 to whom he explained the situation.  He informed them that he already had injured Police Agents.  PRPB Officer #9 informed that they would likely withdraw the squads, and PRPB Officer # 21 informed PRPB Officer #9 and the other Officers that he was going to talk to the protesters to inform them, so they would calm down their aggressive attitude.  He went to the individuals leading the protesters and informed that they would retreat but that they had to stop the violence.  He returned to PRPB Officer #9 that told him that they had to wait for confirmation before doing anything else.  While waiting, the protesters continued throwing objects to the Police and removed the pick-up truck.  Once they removed the truck, a subject among the protesters commanded the protesters to make a formation and using their shields the protesters charged against the Police, pushing and hitting them with the shields and wooden implements.  The aggression against the agents increased.  He saw that the line of policemen was being overpowered in one side by the protesters, and he ordered his agents to push forward. This action fragmented the squads, so he approached the SWAT agents screaming "GAS, GAS,

47

GAS".  This action was taken because the Police line was being fragmented, and they needed to regain control of the situation by regrouping their personnel because they were largely outnumbered by the protesters.  Once most of the protesters were dispersed, they regrouped their personnel and they advanced to Roosevelt Avenue where he observed PRPB Officer #34 to whom he asked how to proceed.  PRPB Officer #34 instructed him to place his squads at Roosevelt Avenue, pointing towards Barbosa Avenue, next to the Liberty building, where they remained until they controlled the situation in the area.  Once PRPB Officer #1 arrived, he ordered to move the squads towards Ponce De Leon Avenue, placing them in front of building #279, so they could check if any of the agents was hurt. They made arrangements with Medical Emergency and Technical Services to treat the agents contaminated with chemicals and treat the agents that were hit by objects. Thereafter the squads were re-positioned at the entrance of the Seaborne Building to receive instructions and to finish the day's activities.


The PRPB provided several reports identifying the personnel that was assigned to work of the May 1st operation.

The PRPB provided copies of several PPR-174 "INFORME SOBRE ACTIVIDADES CONSTITUCIONALES O DISTURBIOS CIVILES" (Spanish for "REPORT ON CONSTITUTIONAL ACTIVITIES OR CIVIL DISTURBANCES"):

- One was dated 05/01/2018 and was signed by PRPB Officer #35.  He informed the following:
  NO arrests were made, NO use of force, NO injuries or deaths occurred and that the total number of PRPB personnel engaged in the event was one hundred and one (101) agents.  He explained that they established a perimeter, so they could prevent the protesters from accessing the highway over the bridge at Roosevelt Ave., should they had attempted to do it.  The PRPB escorted a group of marchers that departed from the Roberto Clemente Coliseum to the designated area of the Luis Muñoz Rivera Avenue in Hato Rey without any inconveniences.

- Another report was dated May 2, 2018 and it was signed by PRPB Officer #34 and he informed the following:
  NO arrests were made, NO use of force, NO injuries or deaths happened and the total number of PRPB personnel utilized was 80 (eighty) members. In his PPR Form 174, Officer #34 informed that on May 1, 2018, approximately one thousand (1,000) students of the University of Puerto Rico (UPR) met at Ponce de Leon Avenue, right in front of the UPR, to assemble a group of persons to march towards the intersection with Roosevelt Avenue.  The PRPB escorted the march until they

arrived at Roosevelt Avenue without any incidents taking place. While still on their way to Roosevelt Avenue, the march passed by near the Labor Department's building where joined by another group identified as "Se acabaron las promesas" (Spanish for "We are done with the promises").  Upon arrival at the intersection with Roosevelt Avenue, the protesters remained there instead of continuing their march to the platform area on Munoz Rivera Avenue.  PRPB personnel led by Officer #34 stayed near the CVS Pharmacy located in that area.  There were repeated incidents of disturbance that occurred in that location that were documented by PRPB Officer #30 who oversaw the activity in the perimeter.

- Another PPR Form 174 Report dated May 1, 2018 signed by PRPB Officer #27 informed the following:
  NO arrests were made, NO use of force made, NO injuries or deaths happened and the total number of PRPB personnel utilized was 45 (forty-five) members.  He informed that the march that left from the Department of Education HQ went all the way to the intersection of Muñoz Rivera Avenue and Domenech Avenue. The same went by in an orderly manner without any incident being noticed or reported.

- Another report (PPR Form 174), dated May 2, 2018, signed by PRPB Officer #13 informed the following:
  NO arrests were made, NO use of force was reported, NO injuries or deaths happened and the total number of PRPB personnel utilized was 60 (sixty) members. He indicated that at approximately 10:00 AM, four hundred (400) persons of the group identified as "Se acabaron las promesas" arrived at the Muñoz Rivera Avenue near the Department of Labor building. There joined with the group of students from the UPR and continued their march up to the intersection with Roosevelt Avenue escorted by PRPB Officer #34.  His personnel stayed at Muñoz Rivera Avenue in front of the CVS Pharmacy.

- Another PPR Form 174 dated May 2, 2018, signed by PRPB Officer #1 informed the following:
  (19) arrests were made, property was seized, there were twelve (12) incidents of use of force, twenty-three (23) injured persons, and no deaths were reported.  A total of one thousand two hundred twenty-five (1,225) members of the PRPB participated in this event.  It was reported that on May 1, 2018, beginning at 9:00 AM, approximately 5,000 persons participated in six (6) marches which ended with a big manifestation at the intersection of Roosevelt Avenue with Ponce de Leon and Muñoz Rivera Avenues.  The march organized by UPR students joined the march

49

of a group identified by the name "Se Acabaron las Promesas" and marched together until they arrived at the intersection of Ponce de Leon Avenue with Roosevelt Avenue. The labor organization UTIER met with personnel of the PRPB days before the event to coordinate the logistics of their march. The rest of the groups didn't meet with the PRPB despite the fact they were invited through written communications and a public press conference. All marches followed the established routes without incident prior to arriving at the activity's site. The UPR student's march and the group "Se Acabaron las Promesas", upon arriving in the vicinity of the activity's location, insisted on forcing their way through Ponce de Leon Avenue towards the Popular Center building, a banking institution vandalized by protesters during the same celebration of the "Workers' day" in 2017. The PRPB had established a security perimeter in the intersection of Ponce de Leon Avenue and Roosevelt Avenues as a cautionary measure to avoid damages to private properties. At that location protesters commenced throwing objects against the Police and the glass windows of the Liberty building. The protesters were blocked by uniformed personnel from the Bayamon Area and by personnel of DOT and SWAT. Three (3) warnings were given to the protesters advising them to cease their violent activity or else they would be forced to use chemical agents. In order to avoid using the chemical agents they decided to withdraw the personnel and allow the protesters to pass through Ponce de Leon Avenue and as soon the personnel was removed the protesters started throwing objects like rocks, marbles and small projectiles (balls) with the use of slingshots towards the agents who had moved to the sidewalks of Ponce de Leon Avenue and against the glass windows of Plaza Building 273. In view of such action, an order was given to assemble the DOT squads again to avoid further aggression to PRPB personnel from Bayamon and to preclude protesters from causing further damages to the rest of the buildings and private property in that location. A total of forty- five minutes to an hour elapsed with the protesters continuously engaged in the throwing of rocks, marbles, projectiles (balls) and balloons filled with chemical substances to the Police which caused injuries to Police agents and protesters. At some point a dialogue was established to withdraw PRPB personnel conditioned to protesters refraining from further aggressions and going all the way back without marching into the banking area.

The protesters continued the pattern of aggression and resolve to reach the banking area and commenced to attempt to overcome the police blockade by pushing policemen. At that time those actions got to the point that they were considered a "civil disturbance" that placed at risk the safety of policemen and protesters. Based on this, an order was given to disperse the protesters using chemical agents. They

advised the protesters[21] not less than five times about the possibility of using chemical agents against them, should they continue with their acts of aggression. At that location personnel from Medical Emergencies had been posted since 6:00 AM as a part of the PRPB workplan.

A total of 18 (eighteen) arrests were made along with the detention of a juvenile for local offenses ranging from aggravated assault and battery, damages to property, inciting a riot, obstruction of justice, to possession of controlled substances, among other charges which are being evaluated by the San Juan District Attorney. The dispersal action continued through Muñoz Rivera Avenue up to Santa Rita Urbanization in Rio Piedras due to the fact that the protesters continued to damage property, set on fire assorted objects and throwing objects to the Police. At the Santa Rita Urbanization, four (4) persons were arrested for assaulting a PRPB agent and obstruction of justice. Two of the arrests were conducted in the front yard of a residence because the persons attempted to flee by going into the yard of the house and the agents followed in hot pursuit. While a group of policemen gathered in that vicinity, several protesters at Fernando Primero Street, commenced to vandalize an official marked Police vehicle. The PRPB agent who intervened with them was assaulted by the protesters who hit him in the head with a hammer. A woman was arrested in this event.

- Another PPR Form 174 Report one was dated May 1, 2018 and it was signed by PRPB Officer #36. He informed the following:
NO arrests were made, NO use of force reported, NO injuries or deaths occurred and the total number of PRPB personnel utilized was one hundred and three (103) policemen. He explained that a manifestation was made by the "Union Central de Trabajadores," Spanish for Worker's Central Union where they invited all the unions to participate, including those representing government employees. The march started at 10:30 AM with the participation of approximately one thousand three hundred (1,300) protesters and ended at 4:00 PM without any incidents reported.
The PRPB provided a document titled "Lista de Agentes y Ciudadanos Lesionados en Manifestacion del 1ro. de Mayo de 2018" ("List of Agents and Citizens Injured during the Manifestation of May 1st, 2018"). In this list they provided the names, with assigned complaint number included, of nine (9) agents and seven (7) citizens. The PRPB also provided a document titled "Lista de Personas Arrestadas y Daños a la Propiedad en manifestacion de 1ro de mayo de 2018" (List of Arrested Persons and Damaged Property during the course of the Manifestation of May 1st, 2018"). In this document they listed the names of nineteen (19) individuals arrested and the

---

21    This part of the report appears to be in conflict with other reports and interviews conducted in this Assessment.

| TCA Assessment Report | 2018 |
|---|---|

criminal offenses for which they were arrested for. These individuals will be referred to in this report as **Arrestee #1** through **Arrestee #19**.

IC Jose Pujol IC Jose Pujol requested from the PRPB a list of all members of the PRPB present during the events of May 1st, 2018, and information of all prior training of these Officers/Agents. The PRPB produced seventeen (17) groups of documents in response to this request.

The PRPB submitted one (1) PPR Form-468 titled "Informe de Incidente" ("Incident Report"), one (1) PPR Form-880 "Declaracion Narrativa del Miembro de la PPR Sobre Informe de Incidente" (Narrative Statement by PRPB Member Regarding Incident Report"), one (1) PPR Form-126 "Inventario de Propiedad Ocupada" form (Inventory of Seized Property), one (1) PPR Form-82 "Condicion de Persona Ingresada/Egresada a Celda" (Condition of Person Incarcerated/Released from Cell), one (1) PPR Form-264 "Formulario de Advertencias Para Personas Sospechosas En Custodia" Warning and Waiver of Rights Form for Suspects Under Custody"), one (1) PPR Form-879 "Formulario de Consentimiento A Un Registro" form (Consent To Search Form), all the above related to **Arrestee #11**.

The PRPB submitted one (1) PPR Form-468 form, one (1) PPR Form-77 "Memorando" form (Spanish for "Memorandum"), one (1) "Formulario Sobre Autorizacion Para La Disposicion De Sustancias Controladas" form (Spanish for "Authorization Form for The Disposition of Controlled Substances"), one (1) PPR Form-126 form, one (1) PPR Form -264 form, one (1) PPR-880 form, all related to **Arrestee #5**.

The PRPB submitted produced one (1) PPR-Form 468, one (1) PPR Form-880, one (1) PPR Form-264 and one (1) PPR Form-82, all related to **Arrestee #2**.

The PRPB submitted one (1) PPR Form-468, one (1) PPR Form-264, one (1) PPR Form-82 and one (1) PPR Form-880, all related to **Arrestee #3**.

The PRPB submitted one (1) PPR Form-468, one (1) PPR Form-880, one (1) PPR Form-264 and one (1) PPR Form-82, all related to **Arrestee #4**.

The PRPB submitted one (1) PPR Form-468, one "Certificado de Asistencia" (Assistance Certificate), one (1) PPR Form-126, one (1) PPR Form -264 and one (1) PPR Form-880 all related to **Arrestee #6**.

The PRPB submitted one (1) PPR Form-468, one (1) PPR Form-126, one (1) PPR Form 240 "Registro de Evidencia" (Evidence Inventory), one (1) PPR Form-880 one (1) PPR-264, one (1) PPR-82 form, all related to **Arrestee #7**. Additionally, in the same file, the

| TCA Assessment Report | 2018 |

PRPB included one (1) PPR Form-82 related to **Arrestee #9.** No other forms for this Arrestee were provided.

The PRPB submitted one (1) PPR Form-468, one (1) PPR Form-77, one (1) 'Citacion Official" ("Official Summons"), one (1) PPR Form-880, one (1) Report dated 05-24-2018 with narrative of the arrest, one (1) copy of "Denuncia" (Complaint) #20180116203623, one (1) PPR Form-264 and one "Certificado de Asistencia" (Assistance Certificate), all related to **Arrestee #10.**

The PRPB submitted Produced one (1) PPR-468 form, one (1) PPR-880 form and one "Certificado de Asistencia" (Spanish for "Assistance Certification") form, all related to **Arrestee #12.**

The PRPB provided a document consisting of eleven (11) pages as compliance for the request of the **After-Action reports made by IC Jose Pujol.** The document is titled "MINUTA: EVALUACION "CRITIQUE" SOBRE LAS ACTUACIONES DE LA PPR EN LAS MANIFESTACIONES OCURRIDAS EL 1 DE MAYO DE 2018" (MINUTES: EVALUATION "CRITIQUE" OF THE ACTIONS TAKEN BY THE PPR IN THE MANIFESTATIONS OF MAY 1, 2018"). The document references a meeting that the Incident Commander had with the following personnel: one (1) Colonel, twelve (12) Lt. Colonels, one (1) Commander, two (2) Inspectors and two (2) Lieutenants. The document it is a compendium of the collective opinions of all participating officers, all of which reached consistent conclusions on the following issues:

- STRENGTHS: 1) Participation of all assigned personnel. 2) The back-up, presence and control of the high-ranking Officers in the different manifestations. 3) The proper amount of human resources. 4) The logistics for food and water were excellent. 5) The commitment and courage of the Police personnel was demonstrated. 6) The PRPB personnel was highly tolerant of insults, aggressions and physical and psychological pressures. 7) The organization of the Operational Plan and the previous briefings and meetings were excellent.

- WEAKNESSES: 1) The radio communications. 2) The protective and safety equipment for the Agents. 3) The delay in decision making.

Next is a review by IC Jose Pujol of video recordings of the events of May 1st, 2018 shown live on television by one of the main local stations. In the following account, the times made reference to are the times electronically imposed in the video by the TV station.

- The five marches departed from: 1) Labor Department Building ("Se Acabaron las Promesas" - (We are done with promises) 2) Department of Education HQ; 3)

| TCA Assessment Report | 2018 |
|---|---|

University of Puerto Rico (UPR), Rio Piedras campus; 4) Hiram Bithorn Stadium; and 5) Puente Dos Hermanos (Ben Brothers Bridge).

**AT APPROXIMATELY:**
- 10:46 AM, the march from the UPR departed from the vicinity of UPR.
- 11:10 AM, some individuals covering their faces with masks and having wooden made shields can be seen at the "Se Acabaron las Promesas" march.
- 11:15 AM, the UPR march meets the "Se Acabaron las Promesas" march.
- 11:17 AM, the big march starts moving North on Ponce the Leon Avenue.
- 11:25 AM, the march of the Ponce the Leon Avenue starts arriving at the intersection with Roosevelt Avenue, where they encounter a line of Police Officers blocking their pass and denying entrance to the banking area of Ponce de Leon Avenue.
- 11:28 AM, many protesters that were denied entrance to the banking segment of Ponce De Leon Avenue turned left towards the stage area, from where protest speakers are heard addressing the crowd.
- 11:40 AM, the march that departed from the Department of Education HQ marches in front of the Federal Building where they made use of loudspeakers to demand the liberation of Nina Droz from federal custody.  Members of the PRPB Tactical Operations Division dialogued with the protesters and the march continued in a peaceful manner.
- 11:41 AM, it can be observed that a large crowd of protesters are gathering in front of the line of police agents in front of the Liberty Building in Ponce de Leon Avenue.
- 11:51 AM, members of the UTIER were observed marching on Roosevelt Avenue toward the Milla de Oro sector.
- At noon, an aerial visual shot shows that a large crowd is gathering at the Milla de Oro.
- 12:05 PM, a clearly established line of protesters is observed facing the line of the Police Agents, with some reporters in the middle taking photographs and recording videos of the confrontation.
- 12:16 PM, a video apparently shot from the rooftop of one of the adjacent buildings shows that very large crowd of protesters is facing the line of Police Agents at Ponce de Leon Ave.
- 12:22 PM, Subject "Q" speaks to a reporter and says that they negotiated with PRPB Officer #26 to pass-through Ponce de Leon Avenue but that the Police Inspector denied their request.  This video also shows protesters with their faces covered with masks and holding wooden shields.
- 12:28 PM, the line of protesters approached the lines of Police Agents blocking Ponce de Leon Avenue.  Many of the protesters are observed with their faces

TCA Assessment Report | 2018

covered with masks.  A couple minutes later the video shows when an object is thrown to the Police by the protesters.

- 12:32 PM, the line of Police Agents takes on a defensive tactical position and it can be heard when some explosives detonate (fireworks grade detonations).
- 12:34 PM the police agents get their batons in a defensive/ready position and negotiators intervene attempting to calm the situation.  The Police Officers put on their anti-gas masks.  The reporter explains that a bottle thrown by the protesters hit one of the Police agents.
- 12:37 PM, several objects were thrown against the Police and some hit the Police agents.
- 12:39 PM the line of Police Officers advanced some steps forward intensifying the already heated up situation.
- 12:42 PM, the TV reporter stated that there was a confrontation in progress at Ponce de Leon Avenue.  She added that some explosions were heard and that rocks were thrown against the Police.
- 12:43 PM, a line of protesters was observed holding wooden shields and facing the line of Police agents.  Many objects are thrown against the agents.
- 12:46 PM, Subject "S," who allegedly attempted to mediate with the Police, claimed that she was pushed by the agents.
- 12:47 PM, unexpectedly the line of Police Agents moved away from the intersection going on North Ponce de Leon Avenue.
- 12:49 PM, an individual known as Subject "Q" states he believes that this move could be an entrapment by the Police, and he makes reference to "possible new blood bath," when no such event had taken place at that location.
- 12:50 PM, the line of Police Officers is observed located in one side of Ponce de Leon Avenue.  Members of the SWAT team are also observed.
- 12:53 PM, policemen riding in motorcycles are seen leaving Roosevelt Avenue and a large number of protesters going into the Milla de Oro through the Ponce de Leon Avenue, at the intersection where the police blockade was previously established.
- 12:55 PM, an aerial shot taken by a camera on an R/C drone craft shows that segment of Ponce de Leon Avenue.  Protesters passed by the building identified as Plaza 2713.  Protesters holding wooden shields are visible.  A TV news reporter (Jose Estevez) informed that the Police opened the intersection of Ponce de Leon with Roosevelt Avenue following the Governor's instructions, information that was allegedly provided to him by PRPB Officer #1.

TCA Assessment Report | 2018

- 12:56 PM, the Police assembles a new blockade in Ponce de Leon Avenue almost in front of the MCS building. Subject "Q" and PRPB Officer #26 are presumably intending to talk to negotiate.
- 12:58 PM the TV news reporter (Jose Estevez) informed again that the Police opened the intersection of Ponce de Leon with Roosevelt Avenue following the Governor's instructions, information that was allegedly provided to him by PRPB Officer #1. A line of masked protesters is seen facing the line of Police Agents. The number of masked protesters rapidly increased.
- 1 PM, a triple line of Police Agents can be seen in front of the MCS building, just after a fast food restaurant located there. Minutes later, Police agents wearing gas masks are observed. A vehicle adapted with a huge sound equipment is observed approaching the line of Police Officers and is placed in the space between the protesters and the lines of Police agents.
- 1:07 PM, the TV reporter informed the protesters broke glass windows at the Plaza 273 building.
- 1:15 PM, Subject "T" spoke to the TV news reporter and stated that the Police pushed a protester who felt to the ground and that some of the Police agents were not properly identified and that the SWAT agents had no IDs. She stated she had photographs of the Police agent that pushed the protester and of his badge number.
- 1:18 PM, the TV news reporter (José Estevez) stated again that he was informed by PRPB Officer #1 that the Governor personally gave the order to open the blockade located at the intersection of Ponce de Leon with Roosevelt Avenue.
- 1:21 PM, masked protesters are seen breaking concrete tiles into small pieces. All these individuals wore similar clothing. A short span of time later, a female person talking on a loud speaker is heard inciting the protesters and asking the Police to negotiate.
- 1:24 PM, the masked protesters that were breaking the concrete tiles are observed holding a hammer and metallic pipes.
- 1:25 PM, the man using the loudspeaker calls PRPB Officer #26 but keeps heating up the situation stating that the Police doesn't want to talk to them and deprived them of their right to march.
- 1:27 PM, the Police Agents are observed getting ready to react. Subject "Q" talks through the loudspeakers stating that they will march through the Milla de Oro. He tells the Police to give up their intent to confront them, that no one will leave running, that they are only one militant group and that they will give a decisive blow to reach their goal. He again invites PRPB Officer #26 to negotiate.
- 1:32 PM the vehicle carrying the loudspeakers is removed from the frontline a short moment later the protesters are observed getting closer to the line of police agents.

TCA Assessment Report | 2018

- 1:37 PM, another line of police agents can be seen at the intersection with Bolivia Street.
- 1:41 PM, loud bursts are heard in the protesters side and immediately thereafter rocks are thrown against the police agents and a line of protesters holding wooden shields advance to face the line of police agents. More rocks are observed being thrown against the Police.
- 1:45 PM, many police agents are observed wearing gas masks and replacing those without gas masks, so they can go get theirs. Many rocks are observed in front of the line of Police officers, rocks that had been thrown at them minutes before.
- 1:47 PM, is seen throwing objects against the Police. A minute later, many objects are thrown again against the Police.
- 1:49 PM, some protesters collect the rocks located in front of the line of police agents.
- 1:51 PM, harangues[22] are voiced from the loudspeakers again heating up the situation. A policeman is observed moving forward, apparently to dialog with the protesters. The protesters continuously chant that they are more, meaning they are larger in numbers.
- 1:53 PM, the TV reporter stated that apparently the Police will move from the area if the protesters stop throwing objects to them. Minutes later, an apparent dialogue between the Police and some protesters is observed.
- 1:58 PM, the protesters advance towards the Police and stop a few feet away from them. Some reporters place themselves between the two opposing lines.
- 2:04 PM, some protesters are observed throwing projectiles to the Police using slingshots.
- 2:10 PM, the protesters are observed clashing against the line of police agents. The Police starts using CS gas against the protesters and also charges against them, causing the protesters to retreat. No dispersal order and/or advise that gas will be launched at the protesters is audible in the video.
- 2:12 PM, the protesters are observed retreating. Some move to Muñoz Rivera Avenue and others to Roosevelt Avenue.
- 2:16 PM, a line of policemen at Ponce de Leon and Roosevelt Avenues are observed advancing towards intersection with Roosevelt Avenue. Protesters appear to have been removed from Ponce de Leon Ave.
- 2:20 PM, Police agents can be seen on both avenues advancing southbound making use of gas.

---

[22] Angry speech. Arenga in the Spanish language

- 2:26 PM, Muñoz Rivera Avenue can be seen cleared of most of the protesters. There is a line of Police agents at Chardon Street.  SWAT teams advance southbound on Muñoz Rivera avenue.
- 2:28 PM, lines of Police Agents block the entrance to Ponce de Leon, Muñoz Rivera and Roosevelt Avenues.
- 2:31 PM, the Police advances southbound on Muñoz Rivera Avenue passing under the urban train bridge and still facing many protesters. Again, rocks are thrown against the Police Officers.
- 2:37 PM, the acting PRPB Commissioner, Henry Escalera talks to a TV news reporter.  He informed the following: that they cleared the blockage located at Ponce de Leon Avenue and Roosevelt Avenue (Liberty building), but the protesters broke glass windows and injured police officers, so they decided to block the avenue again.  An agreement was reached that they would let the protesters pass through conditioned to the protesters stop throwing objects at the Police, but this understanding didn't materialize.  He decided then, as Police Commissioner, to authorize the use of gas against the protesters.  He informed that a lady, an agent and a Police Officer were injured.  He stated he was satisfied with the work performed by the Police and added that at that moment he had no information about arrests.
- 2:41 PM, the protesters were located near the Labor Department building.  The Police was still using gas against them.

A review of a recording of the news at Telemundo, "Telenoticias", at 4 PM showed the following:

- They showed clear images of the protesters breaking the concrete tiles to make smaller pieces to throw to the Police.
- A reporter stated that the confrontation was expected since much earlier in the morning.
- PRPB Officer #27 explained that: at the Eleanor Roosevelt Street protesters attacked a teacher and were arrested.  That they arrested several persons that attacked Police Officers.  That he didn't agree with the protesters that argued they could march through Ponce the Leon Avenue.  That police reports reflected minimal damages to buildings.
- The TV channel goes live on Avenida Universidad where an attorney identified as Subject "U" informs that the Police alleged that the arrested protesters had thrown rocks at them, which he denied and argued that they were just retreating and talking. That at the time the Police intervened with them, they were not advised of the

| TCA Assessment Report | 2018 |
|---|---|

Miranda rights and were placed under arrest.  That the protester didn't resist arrest. That no damage was made to any property.

- A reporter informed that approximately ten persons (10) were arrested, seven (7) of them in relation with the confrontation with a teacher.  The reporter further informed that two arrestees, Arrestee #3 and Arrestee #2, were taken to the Barrio Obrero Police Station.

A review of a video found on the internet titled "Arrestos en Rio Piedras. 1 Mayo Paro Nacional" ("Arrests in Rio Piedras. May 1st National Strike") shows the following;

- There is a Police Officer in from of a yellow house arguing with some individuals standing behind the house's fence.
- A person is observed running very fast towards the house and he tosses a liquid substance from a bottle to a Police Officer.  He goes behind the house's gate and the policeman follows in hot pursuit and goes on to arrest him.  At least two other persons are arrested on that street.  Many Police agents are observed at the scene, and they are thrown assorted objects from behind the gate.

A review of video recordings of the events of May 1, 2018 shown on the webpage of Metro newspaper revealed the following:

- A reporter covering the events of May 1, 2018 for the Metro newspaper was approaching a site where a protester was being arrested while he was video recording the scene.
- A Police agent stopped him, and the reporter identified himself as "Prensa" (Spanish for "Press").
- The Police agent commanded the reporter to retreat a few times, order that he complied with by moving back a few steps.  All of a sudden, the reporter falls to the ground and screams.
- A shot taken by another reporter located behind him, clearly shows that the Metro reporter fell because he was hit in the back by another policeman who used a baton.

The American Civil Liberties Union had observers in the area and gracefully provided their video evidence of the event:

59

| TCA Assessment Report | 2018 |
|---|---|

The DVD contains the following folders:

Name

- 📁 Acceso denegado a observadores
- 📁 Acceso denegado Liberty
- 📁 Acceso denegado Marea Feminista
- 📁 Efectos gases lacrimogenos
- 📁 Eventos posteriores
- 📁 Incidentes
- 📁 Marchas
- 📁 Material recopilado
- 📁 Operativo Rio Piedras
- 📁 Policías enmascarados
- 📁 Policías sin identificación
- 📁 Ponce de Leon
- 📁 Seguridad privada
- 📁 Unidades y Areas

A review of a DVD provided by the ACLU shows the following:

- The folder identified as "Acceso denegado a observadores" contains two video recordings showing how the ACLU members were denied entrance to Muñoz Rivera Avenue on their way to their offices by the Police in spite of explanations for their presence there and properly identifying themselves as legal observers of the event. Among them were legal observers of the PR Bar Association and some protesters.

- The folder identified as "Acceso denegado Liberty" contains three photographs showing the lines of Police Agents at intersection of Ponce De Leon with Roosevelt Avenue. The folder also contains two video recordings showing the same lines of police agents. In one of the videos a male individual can be heard saying on a loud speaker that they are there to ensure the safety of the protesters.

- The folder identified as "Acceso denegado Marea Feminista" contains three photographs of the lines of police agents impeding the group Marea Feminista from continuing their march through Ponce de Leon Avenue. The folder also includes four video recordings depicting the aforesaid.[23]

---

[23] It should be noted that the PRPB later on permitted Marea Feminista, a non-violent group to continue their march passing by the side of Banco Popular building on to Munoz Rivera Avenue.

| TCA Assessment Report | 2018 |
| --- | --- |

- The folder identified as "Efectos Gases Lacrimogenos" contains five photographs of members of the ACLU and other subjects depicting the effects of the CS gases on their faces.  The folder also contains three video recordings:
    - "IMG_1973" is a video recording of a female teacher with her three children affected by the CS gas.  The teacher explains how unjust it is not being able to go to a pacific public demonstration for self-expression without being punished for that.
    - "IMG_2113" is a video showing many protesters running/walking on Ponce de Leon Avenue fleeing from the Police that had just made use of CS gas against them.  The video was recorded near the building identified with #273.
    - "IMG_2234" is a video showing members of the ACLU and protesters leaving the confrontation area, specifically walking on Muñoz Rivera Avenue, while affected by the CS gas.

- The folder identified as "Eventos Posteriores" contains three (3) photographs showing the lines of Police agents at different locations, and six (6) video recordings as follows:
    - "IMG_2253" is a video showing a line of policemen blocking Muñoz Rivera Avenue, and another line of policemen blocking at Chardon Avenue just after passing the Liberty building.
    - "IMG_2256" is a video showing lines of policemen blocking Muñoz Rivera Avenue.
    - "IMG_2722" is a video showing two lines of policemen on Ponce de Leon Avenue, hundreds of yards away one line from the other and protesters trapped between the two lines.  Gas is apparently being thrown to them.
    - "IMG_2816" is a video showing a group of SWAT personnel that has recently dispersed gas.  One of the agents is observed with a shot gun on his hands facing an observer and appears to be confronting him but is dissuaded by another SWAT member.  A lady seriously affected by chemical agents is seen in the video.  This action takes place on Muñoz Rivera Avenue near the Walgreens pharmacy.
    - "VIDEO0051" is a video showing an individual running Southbound on Muñoz Rivera Avenue but falls down and a Police Agent tries to detain him.
    - "YESJ7152" is a video showing a group of SWAT personnel that has shot gas recently on Muñoz Rivera Avenue near the Walgreens pharmacy.  A lady seriously affected by chemical agents is audible in the video and observed being helped by a male individual.

| TCA Assessment Report | 2018 |
|---|---|

- The folder identified as "Incidentes" contains three (3) photographs. Two of them show the injuries suffered by an individual that appears have received a shot of ammunition used by the Police at close range. This non-lethal ammunition (pellets) is fired using a shot gun and the pellets are contained in one shell. The other photograph shows a SWAT agent about to spray a lady in a red shirt with pepper spray.

- The folder identified as "Marchas" contains three (3) photographs of lines of policemen related to the different marches.

- The folder identified as "Material recopilado" contains three (3) photographs of used ammunition (by SWAT) that were collected by the ACLU. There is a fourth photograph that depicts remnants of what appears to have been an improvised (homemade) gas mask.

- The folder identified as "Operativo Rio Piedras" contains four (4) photographs and two (2) video recordings. The photographs show Police agents presumably in the Rio Piedras area. One of the videos shows a group of Police agents in Rio Piedras, and the other one shows a huge line of policemen in Muñoz Rivera Avenue.

- The folder identified as "Policias enmascarados" has three (3) photographs. In each of these photographs there is an agent covering his face with a tactical mask. In two of them, the masked agents clothing shows their name and badge number. In the third one is hard to tell because the agent has her arms crossed in a way that doesn't allow to confirm or deny whether she wore a name tag with a badge number.

- The folder identified as "Policias sin identificacion" contains three (3) photographs. In each of these photographs there is an agent that, despite having the Police clothing and equipment (handgun, taser) is not properly identified. A cursory examination of the set of photographs may give support to the theory that the group's lack of identification is not accidental.

- The folder identified as "Ponce de Leon" contains two (2) photographs and six (6) video recordings. One (1) of the photographs shows a line of policemen blocking Mexico Street (with no protesters around) and the other one (1) a line of policemen blocking the intersection of Muñoz Rivera Ave with Bolivia St. The six videos show the following:

- "IMG_2252" is a video recording made from a rooftop showing the line of policemen facing hundreds of protesters. In the audio of this video the crowd is continuously chanting "somos mas" (Spanish for "we are more"). Someone in the crowd with a loudspeaker (apparently Subject "Q") instructs the crowd to move two steps forward, which they do, pushing their way against the lines of policemen. The Police is able to hold for a while, but a fight erupts between some protesters with policemen. It is then that the Police starts using CS gas against the crowd. The crowd rapidly retreats because large amounts of gas used. The Police is observed rapidly moving forward after the crowd's quick retreat.
- "IMG_2691" is a video recording showing many policemen in front of Banco Popular, and a line of agents blocking the intersection between Muñoz Rivera Avenue and Bolivia St. It also shows several policemen at Ponce de Leon Avenue walking towards Roosevelt Ave.
- "IMG_2704" is a video recording showing some protesters assisting a lady apparently in need of medical assistance. It also depicts a line of the policemen observing without interfering with the situation.
- "IMG_2724" is a video recording showing the line of policemen at the Liberty building with a protester using a loudspeaker to call PRPB Officer #26 to dialogue with him. Some SWAT personnel is seen retreating behind the lines of Police Agents
- "IMG_2725" is a video recording showing the lines of policemen at Ponce de Leon Avenue wearing gas masks.
- "MVI_0937" is a video recording showing when SWAT personnel started using chemical agents against the crowd taken from a different location of a previously reviewed video recording of the same incident.

- The folder identified as "Seguridad Privada" contains three (3) photographs of private security agents at the building identified as Plaza #2713.

- The folder identified as "Unidades y Areas" has thirteen (13) photographs of several Police vehicles and Police Agents. One photograph shows three (3) vehicles of the COPS association. This organization identifies itself as: "The Organized Corporation of Police and Security, (C.O.P.S.) a nonprofit organization purportedly promoting the social and economic progress of each of its partners, as well as the general welfare of public employees".

On May 25, 2018, twelve (12) DVDs from CRADIC were delivered to the TCA Office. A review of the DVDs revealed the following:

- DVD #1.  This DVD contains sixteen video clips.  It starts at the first blockade made by the Police on Ponce Leon, near the Liberty building.  It shows when the Police talks with loudspeakers to the protesters asking for the protesters not to throw objects to them.  It also shows that once the protesters are allowed to go past the blockade, the Police forms at the right side of the avenue and the protesters move Northbound on Ponce de Leon.  The cameraman apparently stops and remains in a lateral street in front of a building identified as AON Center #394.  Later on, in this video it is observed from a distance gas are thrown and protesters retreat using that same avenue.  The recording shows the Police in pursuit Southbound on Ponce de Leon and continues up to the point in time when they reach a street in Rio Piedras.

- DVD #2.  This DVD has fifteen (15) video clips.  In one of the video clips it is seen whet the Police performs an arrest at Roosevelt Avenue, near the Yum Yum Tree Restaurant.  The arrestee is a female and the audio heard reflects that she is being arrested for throwing rocks to the Police.  Another video clip shows a policeman, apparently injured, with a big bandage wrapped around his head.  Other video clips show, like it is shown in DVD #1, how the Police moves along Muñoz Rivera Avenue until they arrive at a blockade made with metallic fences prepared by the protesters.  They proceed to remove the makeshift fence and are shot at with marbles fired from slingshots. The Police reacts by using gas against the protesters.  The video then shows the Police arriving at a street located to their left, presumably Avenida Universidad, where they enter the area known as Santa Rita in Rios Piedras.  A group of protesters confronts the Police.  One of the video clips shows the arrest a male individual wearing shorts.  Several video clips show the damages sustained by my many Police motorcycles.

- DVD #3.  This DVD shows dozens of policemen in front of the Seaborne building.  Three Officers appear thanking them for the job done.

- DVD #4.  This DVD contains ten (10) video-clips.  The first four were shot near the UPR before the march started.  The fifth one shows a line of policemen blocking Ponce de Leon Avenue at the intersection with Muñoz Rivera Avenue, from the other side of the Liberty building.  It also shows the action that took place when protesters on account of the gases thrown at them at the Milla de Oro.  Two (2) male individuals were arrested while seating in front of the line of Police Agents.  The gas arrived at the line of the

64

Police Agents, but they maintained the line.  Some of the Policeman coming from the Milla de Oro turn on Ave. Roosevelt towards Ave. Barbosa following some of the protesters.  After a while they returned to Ponce de Leon Ave.  Another video shot shows how they arrest a male individual in front of the Walgreens located at Muñoz Rivera Ave.  Other video shots show how Police Agents advance Southbound Muñoz Rivera Avenue.

- DVD #5.  This DVD contains only one video-clip.  This video on this recording is shot from the line of policemen located at Roosevelt Avenue just meters down from the location of the "Tren Urbano Station".  Protesters can be observed moving in a Southerly direction in Ponce de Leon Avenue, fleeing from the Milla de Oro.

- DVD #6.   This DVD contains fourteen (14) video-clips.   These video recordings are shot from a rooftop of a building.  The video clips show when the first line of policemen, at the Liberty building, opens up and allows the protesters to pass by.  It shows the incident that took place at the second blockade prepared by policemen at Ponce De Leon Avenue.  It shows how the conflict between protesters and policemen initiated, including the stone throwing by the protesters against the Police followed by the clash of protesters to overcome the Police line, and the subsequent reaction using chemical agents and other non-lethal weapons against the protesters.

- DVD #7.   This DVD contains fourteen (16) video-clips.   These video recordings show the same events as DVD #6 but were recorded from a different rooftop.

- DVD #8. This DVD contains fourteen (14) video-clips.  The first video clips are shot from a building and recorded the action of protesters at the Liberty building in front of the first line of policemen.  Some protesters are observed with their faces covered and using slingshots to throw rocks to the Police.  In a following segment of the video the protesters are observed after being allowed to go pass the Liberty building line and one of the policeman is heard saying "eso es malo, les dieron la oportunidad de que entraran, ahora nos van a destrozar eso alla adentro" (Spanish for "this is awful, they gave them the opportunity to enter, now they are going to destroy things in there").  The video depicts the first smoke grenade landing at Ponce de Leon Ave. and the protesters commencing to scatter.  The rest of the camera shots taken is this video are all taken at ground level, following SWAT and other policemen

TCA Assessment Report | 2018

moving South on Muñoz Rivera Avenue until they reach near Jesus T. Pinero Avenue (Avenida Central).

- DVD #9. This DVD contains nine (9) video clips. The first video clips shot from a building recorded protesters at the Liberty building by the first line of policemen. Some protesters are observed with their faces covered using slingshots to throw rocks to the Police. A pickup truck used by the protesters that had its license plate covered also appears in these video recordings. The action in the videos reflects the cameraman followed the policemen to Rio Piedras.

- DVD #10. This DVD has five (5) video clips and eleven (11) photographs. The video clips are recorded from a rooftop that has a view of Ponce de Leon and Muñoz Rivera Avenues where they respectively intersect with Bolivia Street and Chardon Street. The first video was filmed before any action had taken place in the area. The second video shows some Policemen moving from the line at Bolivia Street Southward on Ponce de Leon Avenue. On the third and fourth video clips show when the Teacher's march coming from Chardon street arrives at Muñoz Rivera Avenue and continue to march in the direction of Roosevelt Avenue where the platform was located at. The last video shot shows people gathered in front of the Seaborne building and the stretch of road towards Roosevelt Avenue. The eleven photographs depict two unidentified persons which are located in the upper levels of a building.

- DVD#11. This DVD contains three (3) video clips. These recordings were filmed from the same location of PRPB DVD#10. In one of the segments the line of policemen that blocked Ponce de Leon Avenue, near Bolivia St. is observed.

- DVD#12. This DVD contains two (2) video clips. These recordings were taken from the same location DVDs #10 and 11. The action was filmed from a location behind line of policemen at the intersection with Bolivia Street before and after the chemicals were used against the protesters. The last segment shows the protesters using Mexico St. as an escape route.

| TCA Assessment Report | 2018 |
| --- | --- |

**FINDINGS:**

- The events took place on May 1, 2018 are fully analyzed in the Executive Summary {on pages 8 through 23 of this report. Specific accounts of the six (6) marches covered in this Assessment, as reported by eyewitnesses and designated observers, including the various incidents at Ponce de Leon Avenue, have been covered along with Police videos and written reports provided pursuant to the Order of the United States District Court. The videos included in this Assessment were obtained from different sources for purposes of total transparency.

- During the course of preparing this Assessment high-ranking officers of the PRPB were asked several questions on whether dispersal orders, which are mandatory, were issued at the several instances where chemical agents are used. There are two specific instances where there was a known need to provide dispersal order through the Police loudspeakers. The first instance took place at the location right in front of the Liberty Building where the Police had established its first blockade. The videos examined have audios that confirm that such dispersal orders were given at that specific location. In view of the fact that no chemical agents were used at that location and the fact that protesters were allowed to continue their march, further discussion of compliance at this location in unnecessary. The second instance is the most relevant for the purposes of this Assessment since chemical agents were deployed against the protesters. Assorted answers were provided. Some of Police Officers stated that dispersal orders were given before using chemical agents against the protesters, others alleged they couldn't hear them, and others admitted that the orders were not given. The Police Officers claiming that the orders were given alleged that the sound equipment they used was so weak that it could not overpower the noise of the manifestation and protester's loudspeakers that caused the orders could not be heard. A known fact is that when, more than two (2) hours before, these orders were given at the Liberty building area, they were recorded loud and clear in the TV reporters' videos. When confronted with this fact, Officers alleged that the equipment they used at the second location, near Bolivia Street, was different and of much lower quality. The prevalent fact is that several video recordings were reviewed and in none of them the orders are heard, not even a noise that could resemble said order to create a doubt about it. Hence the evidence extensively examined for the purpose of this Assessment reasonably reflects that the Dispersal Orders were not given to the protesters before using chemical agents against them at the location of Ponce de Leon Avenue close to the intersection with Bolivia Street all in violation of Section 625 of the General Order. It is further submitted that the high-ranking staff of the PRPB admitted that the PRPB did not place an agent behind the protesters to listen to and record the dispersal orders as mandated by Section 625 in General Order

| TCA Assessment Report | 2018 |

600.   Notwithstanding the above determination, the videos of the specific incident graphically show that once the protesters were urged/ordered to clash against the police line using their shields and sticks, aided by a multiplicity of small marble balls hurled at the policemen using slingshots, a quick reaction was needed to repeal that violent and arguably life-threatening attack by a using gas to discourage further aggression.

- The PRPB pushed the protesters away from the Milla de Oro, Southbound on Muñoz Rivera Avenue, to Rio Piedras.  The Police explained that the protesters, while retreating, were vandalizing property, scribbling graffiti on the walls of buildings setting assorted objects on fire in the streets, acts of defiance in violation of the law.  The action of the protesters, as observed in the videos, had the expected direct consequence that the Police would follow and attempt to arrest those responsible for the illegal deportment.  Police Officers interviewed cited article three (3) of Law 53, and also article 201 of the DSP Law 20 (Ley 20), as their authority to follow the protesters while they were committing crimes in order to arrest them.  It should be noted that the authority to arrest a person committing an offense in the presence of a police officer comes from Rule 11(a), (b) and (c) of the Rules of Criminal Procedure of the Commonwealth of Puerto Rico.

- The video recordings and photographs reviewed by IC Pujol revealed at least three clear instances in which excessive use of force was employed, which are covered in the Executive Summary part of this report.  See Abuse of Force Section, pages 14 to 18.

- The PRPB provided copy of a PPR-920, REGISTRO DE MOVILIZACIONES DE LAS DIVISIONES DE TACTICAS ESPECIALIZADAS (Spanish for "REGISTRY OF MOBILIZATIONS OF THE DIVISIONS OF SPECIALIZED TACTICS" dated 05/01/2018 and signed by PRPB Agent #1.  The report explains about the existence of several protests on May 1st, 2018, the majority ending in the Muñoz Rivera Avenue and one in the Capitol building. The report explains about the use of different types of force and chemical agents.  The report provides a very, extremely short explanation of the actions taken by the SWAT teams during the day's operation.  Any lay person or law enforcement person reading this report cannot grasp an idea of what the SWAT and Special Arrest units did that day.  It falls really very, extremely short, in providing information.  The PRPB **failed** in providing a detail account, in this report, of the actions taken by the SWAT Teams and Special Arrest Units during the day's operation.

- The PRPB provided copy of a PPR-920 A, REGISTRO DE MOVILIZACIONES DE LAS DIVISIONES DE TACTICAS ESPECIALIZADAS DTE (Spanish for "REGISTRY OF MOBILIZATIONS OF THE DIVISIONS OF SPECIALIZED

TACTICS DTE" dated 05/01/2018 and signed by PRPB Officer #10. This report pertains to one of the DOT teams that were working that day. The PRPB **failed** by not preparing, or by not providing, a report for each of the DOT teams that worked that day, for example: the team led by PRPB Officer #37, PRPB Officer #31, PRPB Officer #32. The Report prepared by PRPB Officer #10 **does not provide** a complete explanation of what the other teams did that day, they are only referenced when they interacted with his team. The Report **fails** by not reporting the number of Uses of Force and the number of Arrestees, when it admits that Use of Force was used, and Arrests were made. The report states that before the Operation the personnel were oriented on Sections 601 and 605 of the General Order (GO), but they failed to provide orientation on Sections 620 and 625 of the GO.

- The PRPB provided copy of a PPR-174 form prepared by PRPB Officer #1 dated May 2, 2018. In the form the Officer stated that "they advised the protesters not less than five times about the possibility of using chemical agents against them, should they continue with their aggressive acts". **Not even one of these alleged advises could be corroborated by watching many recordings of the events and interviewing many witnesses**. Personnel of the TCA Office was located behind the lines of Police Officers and no one of them heard any loudspeaker providing any of these alleged advises. By no means these advices had been corroborated and it is believed that **they failed** to provide the required dispersal orders and instructions mandated by Section 625 of the general Order.

- IC Jose Pujol requested from the PRPB a list of all members of the PRPB present during the events of May 1st, 2018, and information of all trainings taken by these Officers/Agents. The PRPB produced many groups of documents in response to this request. Reviewing these documents IC Pujol verified that the PRPB provided the requested information about the trainings taken by approximately two-hundred-eighty-seven (287) Officers/Agents. This number falls **very short** from the one thousand two hundred twenty-five (1,225) members of the PRPB utilized during the operation, according the PPR-174 form signed by PRPB Officer #1. The PRPB **grossly failed** in providing the requested information.

- The PRPB handed over a document titled "Lista de Personas Arrestadas y Daños a la Propiedad en manifestacion de 1ro. de mayo de 2018" (Spanish for "List of Arrested Persons and Damages to Properties during Manifestation of May 1st, 2018"). In this document they listed the names of nineteen (19) persons arrested and the offenses charged. The PRPB only provided documents related to the arrest and

69

related post arrest procedures of only ten (10) of the arrestees.   **The PRPB didn't provide any documents related to the arrest of**:

**Arrestee #1**

**Arrestee #8**

**Arrestee #13**

**Arrestee #14**

**Arrestee #15**

**Arrestee #16**

**Arrestee #17**

**Arrestee #18**

**Arrestee #19**

- IC Pujol found a definite inconsistency between the information provided by PRPB Officer #12 and the requirements of Section 620 of the General Order**.** Regarding the use of force related to firing rubber pellet ammunition, PRPB Officer #12 was asked if the PRPB is authorized to shoot this type of ammunition directly against a person.  He answered that if the person is located six (6) feet away or less, they have to shoot to the ground for the pellets to ricochet and hit the person, but if the person is located six (6) feet or further than that, they are authorized to shoot directly against the person.  He stated that this explained difference on how to shoot this type of ammunition is covered and regulated under Section 620 of the General Order.  IC Pujol reviewed Section 620 of the General Order and found no reference to the information provided by PRPB Officer #12.

- PRPB Agents followed protesters that were observed committing assorted offenses, including persons that allegedly assaulted policemen while being intervened, to a location known as Santa Rita.  A video examined shows an individual running very fast towards a house and as he passes by, he throws a liquid substance from a bottle to a Police Officer.  He goes past the gate with the Police after him in a hot pursuit and eventually arresting him. At least two other individuals were arrested on the street.  Many policemen present at the scene were thrown at objects from behind the gate in the house's yard.  The video images available to IC Pujol **are consistent** with the statements provided by the agents involved in this arrest. No wrongdoing is observed on the part of the agents. It should be noted that State and Federal jurisprudence permits the arrest of a

TCA Assessment Report | 2018

person by police agents in hot pursuit, even in cases where the person trying to escape enters into a duelling, irrespective of whether it is or is not his home. The video images do not show the reason why the person arrested was running at a fast pace towards the house before the throwing the liquid substance to the agent. The interviewed Police agents explained that this person was being chased by the agents to arresting him because he had assaulted a Police agent.

- Many discrepancies were found in the number and locations of the Command Centers, which are covered in the Executive part of this report at page 23.

## RECOMMENDATIONS:

1.      Use of Force reports allow supervisors and commanders to collect and analyze essential information about the factual circumstances surrounding a use of force. At the individual officer level, reliable and accurate information from these reports permits supervisors to formulate objective conclusions about an officer's conduct. More broadly, aggregate information on use of force allows agencies to improve policies, training, tactics, and management.   The production of documents by PRPB for the preparation of this Assessment has uncovered a questionable development regarding PPR Form-854 (Informe de Uso de Fuerza).  Many instances of use of force related to the Worker's Day event were not prepared in the many instances when they had to be prepared.  The preparation of this form is required for each individual use of force by a PRPD officer/agent. General Order Chapter 600, Sections 603, 604, 605, 620 and 625 clearly establish the requirement as mandatory.  The PRPB, starting from the Commissioner and going down to line agents, must understand the importance of complying with the preparation of Form 584.  Failure to prepare a use of force form (Form 584) when there was actually a use of force, breeds suspicion. Repeated instances of failure to prepare Form 584 in this case, where excessive use of force has been amply discussed, lingers in the realm of a pattern of non-compliance.

2.      The PRPB must ensure that all arrests are fully documented.  All circumstances pertinent to the arrest must be documented. Where it happened, when it happened, reason for the arrest, possible violations, name and complete information of the person(s) arrested, information regarding the arrestee's release or his/her transfer to a holding cell, inventory of items seized from the arrestee, referral for prosecution, etc.…

3.      Most of the Operational Plans were deficient by failing to provide all the information required by the General Order.  In the Section of Operational Plans in this Assessment, other general recommendations were previously provided.

| TCA Assessment Report | 2018 |
|---|---|

4.      Written reports recording the events that took place during crowd control events must improve, mainly by establishing a clear-cut timeline of the events that are reported and providing all possible pertinent details about any incident that transpired during the operation. Not all reviewed reports failed in this area but some of them failed to comply with the essential requisites.   More emphasis should be given to the importance of properly reporting all incidents and events, and the preparation of a timeline that mirrors every phase of the incident.

5.      The PRPB did not give the dispersal orders via loudspeakers before deploying chemical agents, as mandated by Section 625. The intent of a dispersal order is to permanently disperse a crowd, not to merely relocate the problem.  It should be made clear in the dispersal order that the crowd is expected to immediately leave the area and include a warning that force may be used which may inflict significant pain or result in serious injury. In the case of _Deorle v. Rutherford_, 272 F.3d 1272, 1284 (9th Cir. 2001), it was established that warnings should be given, when feasible, if the use of force may inflict significant pain or result in serious injury.  Deploying the chemical agents without proper dispersal orders is denying the crowd the choice of whether to disperse in order to avoid pain or even an injury or remain in place to face the consequences.

6.      The PRPB must ensure that the use of force is limited to situations where it is necessary as the General Order establishes.  It cannot be used in scenarios like the ones reported in this Assessment report in which an individual was presenting only a passive resistance (female individual that was heavily sprayed with pepper spray by SWAT), or complete compliance (the reporter of the Metro newspaper that was hit with a baton.)

7.      The PRPB raises again the concern that placing a PRPB agent within the crowd to hear and record the dispersal orders represents an imminent risk to the agent's safety.  This requirement is considered a "best practice" in many jurisdictions in the United States.  IC Jose Pujol understands the PRPB's concern and recommends to the PRPB to properly submit this issue to the Reform Unit, the TCA, the USDOJ and PRDOJ for further discussion and analysis.  A workable recommendation for the PRPB is to find and submit an alternative method by which to record the dispersal orders without placing an agent in a risky position.

TCA Assessment Report | 2018

# Section V: Review of the Self-Assessment Conducted by the PRPB

## V.A Review of After-Action Reports (AARs)

The After-Action Report provided by the PRPB reflects that the same only consists of the Minutes of a meeting of the high-ranking Officers involved in the May 1, 2018 Operation. In the aforementioned Minutes, each Officer made a general comment about how the Operation went in their assigned area. The report ends being the proverbial pat on the back of each other, praising their performance during the Operation. The Incident Commander stated in this report the Operation had seven (7) strengths and three (3) weaknesses as it was recognized during the meeting. This After-Action Report lacks the substance and completeness of what a report of this type should be.

In support of the above conclusion regarding the After-Action Report submitted by the PRPB, the material submitted is a summary of what are the areas covered by an After-Action Report following best practices. The same should also be considered as a model to follow in future reports:

*An* After-Action Report *must provide the chain of command with a synopsis of a critical incident or major event.*

*An* After-Action Report *Must Address Specific Items:*

*- Situation, a synopsis of information and drivers or the genus of the Incident Action Plan or response. The situation includes environmental and inclement conditions, issues, hazards, other organizations (resources) already involved, and efforts underway. This section should also include the length of event/incident (total number of hours, days, and/or operational periods).*

*- Assumptions, which are based on historical data such as past events/incidents, topography, storm water runoff, or group dynamics (behaviors). Assumptions include past practices and intelligence information impacting planning and response.*

*-The objectives carried forward to the* After-Action Report *are overall goals of the event/response. The objectives address the sustained police presence or unified command response.*

73

- *Response, an accounting of the actions taken to address the situations and objectives. It is the body of the report and responds to the objectives.*

- *De-Escalation. If force was employed during or as part of the incident, it shall be discussed whether de-escalation strategies or tactics were considered and, if so, what those tactics were.*

- *Best practices, which respond to the questions of effectiveness of information gathering, planning, and strategies/tactics. This includes discussion of what worked well towards achieving objectives and resource (staffing and materials) utilization. It also addresses tactics, techniques, and efforts likely to yield success for similar events/incidents.*

- *Gaps in response/capabilities. Gaps address shortcomings in the available response. Lacking technical assistance, resources, and information is addressed in this area. Available skills and the need for training in particular issues/tools may also be addressed under this heading.*

- *Notes forward are recommendations for follow-up training, policy review (or modification), and considerations for similar events. It is also where organization(s) point(s) of contact for future events, nuances and information to support future planning/response or to mitigate future issues/hazards are recorded. For example, "the EPA should be consulted as a partner for similar incidents."*

- *Contingencies, the incidents within the event/incident. Contingencies are issues which alter or detract for the incident response. These are the issues that siphon resources or must be addressed in the context of the event (e.g. the onslaught of hazardous or adverse conditions, responder injuries, etc.)*

- *Mitigation, the course of action necessary to suspend contingencies and return to incident response. Mitigation may not fully resolve the issues but allows the incident response to continue.*

- *Recovery, the course of action undertaken to return to normal condition or state. Post event/incident actions may include engaging the media in order to alert the community that status quo has been established.*

- *Financial impact (materials/staffing). Events and incidents have inherent fiscal costs. Containment and documentation of cost should not trump safety in planning. However, fiscal responsibility is an operating contingency. Indicate cost of expenditures and staffing.*

# V.B Review of Use of Force reports and Complaints

On July 30, 2018 IC Pujol visited the PRPB Headquarters, more specifically the FIU (Use of Force Investigations Division), to review all Use of Force forms prepared in relation to the May 1, 2018 Worker's Day event and all Complaints received by the PRPB. Second (2nd) Lieutenant Javier Santiago Feliciano, FIU's Director, provided four (4) PPR Form-854 to IC Pujol. IC Pujol asked if these were the only Use of Force forms prepared in relation to the events of May 1st, 2018. Lt. Santos Feliciano responded in the affirmative. After IC Pujol reviewed the alluded forms, Lt. Santos Feliciano was again asked if those were the only "Use of Force" forms prepared for that event and he again answered that these were the only forms, but in the event that any additional PPR-854 would surface, he would communicate it to IC Pujol through the Reform Unit. As of this date, the date of closure of this Report, IC Pujol has not received any further information from Lt. Santiago or the Reform Unit regarding the appearance of any other PPR-854 form.

The review of the four PPR-854 forms provided the following information which is summarized as follows:

- The first PPR-854 form was prepared by PRPB Officer #24. He reported the arrest of Arrestee #6. He reported that Arrestee #6 was accompanied by another individual that was throwing rocks to the Police, but who was able to evade arrest. In order to arrest Arrestee #6, PRPB Officer #24 informed that they had to take him to the ground. During the arrest, Arrestee #6 received a trauma in the right side of his face. The Supervisor concluded that the action was proportional to the resistance of Arrestee #6, who did not follow verbal commands, presented an active resistance by pushing the agents and attempted to evade arrest.

- The second PPR-854 form was prepared by PRPB Officer #10. PRPB Officer #10 provides a general synopsis of the involvement of the DOT Division during the events of May 1st, 2018 at the Ponce de Leon Avenue. The information provided by PRPB Officer #10 matches the information provided by in the interviews of the PRPB personnel and the images reviewed in the video recordings by IC Pujol. He informed that PRPB Officer #9 ordered him to remove his DOT squads at the Liberty building blockage. He also stated that PRPB Officer #9 again ordered him to post his squads at the second line in the Ponce de Leon Avenue.

  This PPR-854 is limited to explain movement of personnel facts that took place exclusively at the Ponce de Leon Avenue and makes no reference to any particular incident involving a use of force. It is relevant to point out that the Supervisor that reviewed this PPR-854 and investigated the facts, PRPB Officer #25, wrote in his

| TCA Assessment Report | 2018 |
|---|---|

comments "**... At this moment the SWAT Units used CS gas. No evidence was found during the investigation that any verbal commands were provided**".

- The third PPR-854 was prepared by PRPB Officer #1, the Incident Commander. PRPB Officer #1 provides a general synopsis of the events of May 1, 2018 at the Ponce de Leon Avenue, and not for any other site. The information provided by PRPB Officer #1 matches the information provided in the interviews of the PRPB personnel and the images reviewed in the video recordings by IC Pujol. PRPB Officer #1 additionally informed that nineteen (19) individuals were arrested and sixteen (16) individuals were injured, but he does not provide any detail about any of the arrests or the events related to the injured personnel. A use of force report should have been prepared for each of the arrests reported.

- The fourth PPR Form-854 was prepared by PRPB Agent #11. PRPB Agent #11 provides a general synopsis of the SWAT participation during the events of May 1st, 2018 at the Ponce de Leon, Roosevelt and Muñoz Rivera Avenues. The information provided by PRPB Officer #1 matches the information provided in the interviews of the PRPB personnel and the images reviewed in the video recordings by IC Pujol. The report was prepared in a general way without stating the degree of the use of force employed.

**FINDINGS:**

- The second, third and fourth PPR-854 forms fail to provide information to any individual Use of Force made by the PRPB. The limit to inform in a general fashion that OC gas, pepper spray and batons were used. No individual PPR-854 forms were prepared for each of the uses of force. Images reviewed in the video recordings provided show a large number of instances of Use of Force during the May 1, 2018. This reporting fails to comply with General Order Chapter 600, Section 605, "Reporting and Investigating Use of Force by Members of the PRPB," and Section 625 "Crowd management and control", which establish that each single use of force has to be reported in a separate PPR Form-854.

- Only the first PPR-854 form informs about one of the arrests. No PPR-854 forms were prepared for any of the other eighteen (18) arrests.

- None of the four (4) PPR Form-854 provided has any information about the events and arrests that took place in Santa Rita, Rio Piedras. Interviews with the PRPB personnel involved in the arrests yielded information that arrests executed at that location and use of force was employed. None of the four PPR Form-854 presented to IC Pujol had any type of information regarding those arrests. By reading the four PPR-854 forms provided

| TCA Assessment Report | 2018 |
|---|---|

for inspection, no one would know or find out that any of the events reported herein took place at the location known as Santa Rita.  This failure to report is found to be completely unacceptable.

**ADDITIONAL RECOMMENDATIONS:**

- The Worker's Day event of 2018, regarding the reporting requirements of the Puerto Rico Police Bureau, impresses as a repeat performance of the year 2017.   The failure to prepare and/or properly prepare PPR Form 854 (Use of Force Report) for each single/independent instance by each agent engaged in use of force, as required by General Order, Chapter 600, Sections, 603, 604, 605, 620 and 625 appears to be in the realm of a voluntary dereliction of duty.  Compliance with the cited General Orders applies to every sworn officer in the Puerto Rico Police Bureau.  High ranking officers are not exempt from compliance. Use of force reports allow supervisors and commanders to collect and analyze essential information about the factual circumstances surrounding a use of force. At the individual officer level, reliable and accurate information from these reports permits supervisors to formulate objective conclusions about an officer's conduct. More broadly, aggregate information on use of force allows agencies to improve policies, training, tactics, and management.

- As it was recommended in the 2017 Assessment, the PRPB must ensure that all arrests are fully documented.  All circumstances of the arrest must be documented: where it happened, when it happened, reason for the arrest, possible violations, name and complete information of the arrestee, information about the arrestee's release or his/her transfer to a holding cell, inventory of seized items from the arrestee, referral for prosecution, etc....

- On October 10, 2018, the supervisory four-year term of the Reform will be over, and the Puerto Rico Police Bureau will enter into the monitoring period of the Sustainable Reform.  From that date on, failure to comply or open derelictions of duty will be met with stiffer consequences.  Full compliance is of the essence for a continued career in law enforcement at PRPB.

## IV.D Arrests and related Judicial procedures.

On a document dated May 17, 2018, PRPB Officer #1 informed that during the Manifestations of May 1st, 2018, nineteen (19) individuals were arrested.  The Report provides the names of the arrestees, the offenses charged and the names of the agents that performed the arrests.

| TCA Assessment Report | 2018 |
|---|---|

A search conducted with the aid of the Judicial system revealed that up to this date, only eight (8) of the arrestees have been charged with the commission of a criminal offense.

Out of the eight (8) arrestees:
- One (1) of them was cleared of the charges by a Judge, who found "No Cause" against him in a Rule 6 hearing.  No appeal has been filed by the Department of Justice.
- The other seven (7) arrestees have hearings scheduled for August 23 and 28, 2018 and September 19 and 20 of 2018.

# Section VI: Analysis of Best Practices and Models on Policing of Mass Demonstrations

The main and most evident recommendation to the PRPB in managing mass demonstrations is that the PRPB must abide by all the Sections of Chapter 600 of their General Order. Mainly on Section 625 "Manejo y Control de Multitudes".  This Section provides the established guidelines to manage mass demonstrations. Full compliance with these Sections should suffice for a successful management of events involving crowd control. This Assessment Report has pointed out areas in which the Police has improved its performance but at the same time many serious deficiencies have surfaced in important areas which require expedited adjustments to efficiently manage future mass demonstrations. To initiate the process, PRPB must promptly provide intensive training on Section 625 to all personnel.  Training on Section 625 was highly recommended after the 2017 Worker's Day event of 2017 and none was provided to anyone.  At the time of the 2018 Worker's Day Protest, still no one had been trained on Section 625. Proper training may have precluded many unnecessary incidents although we cannot in any way get ourselves to believe that training on Section 625 would have done away with belligerent protesters, insults, improprieties, rock and irritating substances throwing, marbles thrown using slingshots, graffiti and vandalism.

The PRPB must continue to be committed to protecting free speech and facilitating protests regardless of the message being conveyed. The Bureau of Police must also continue to be committed to protecting the community from civil unrest, disorderly conduct and vandalism. Going forward, the competing goals of maintaining order while protecting the freedoms of speech and assembly stands as one of the PRPB's greatest challenges. This challenge MUST be addressed by completely adhering to departmental policy in the

form of General Orders crafted pursuant to the Agreement for the Sustainable Reform of the Police of Puerto Rico.

**Signed at San Juan, PR on November 5, 2018.**

**José L. Pujol**

**Investigations Consultant**

**OFFICE OF THE TECHNICAL COMPLIANCE ADVISOR**

**268 Muñoz Rivera, Suite 1001**

**San Juan, PR 00918**