# Interview Data: Officers and Civilians

1. On May 15, 2018, IC Pujol interviewed Subject "A" about his knowledge of the events related to the Worker's Day event (May 1st, 2018) that took place at the Hato Rey area. Subject "A", hereinafter referred to as Subject "A", in essence stated the following:

   Subject "A" stated that he participated in the events of the Worker's Day (May 1st, 2018). He commenced his march with his family and friends at the Labor Department building going through Ponce de Leon Avenue. They came upon a line of Police Officers blocking Ponce de Leon at the intersection with Roosevelt Avenue. They were directed to Muñoz Rivera Avenue where the stage for the activity was located at. They remained there until around noon. He noticed that there were a lot of persons facing the line of Police Agents. At some point, the line of Police Agents retreated a little, several yards, immediately followed by the protesters. He had no knowledge of what caused these movements, but he heard rumors that they were negotiating. He explained that at approximately 1 PM they went back to his residence. At approximately 2:00 PM he received a message from his brother explaining that things were getting ugly over in Hato Rey. He turned on the TV and saw that there were confrontations between the Police and the protesters. Around 2:11 PM his brother told him that he was going in the direction of the CVS Pharmacy on Muñoz Rivera Avenue. He left his home and went to the CVS Pharmacy and started recording some videos. Later on, he went back to the entrance of his gated community where he recorded additional videos of protesters placing assorted items in the middle of the street and the Police using gas against the protesters. He observed that one canister of gas fell at the gated community where he was located. He understood some of this gas penetrated some of the residences. Some gas might have reached the last residences of the Urbanization, but he believes that other gas could have been thrown from Domenech Avenue. He was heavily affected by the gas and stopped at the Urbanization guards' station to clear his vision with water. The gas inhaled made him vomit. When he felt little better, he went back to his house and after a while turned the TV on and saw his cousins in Rio Piedras were on the TV broadcast of the event. He left his house and arrived at the scene where the Police was located and started recording from behind the line of Policemen. At the time the Police arrived at the Rio Piedras location they split in two groups. One group moved through University Avenue and the other group took the street where a Pollo Tropical is located. He attempted to cross and to enter that street but was not allowed by the Police. He witnessed when the Police stroke a reporter from Metro newspaper. He then moved and arrived at a place where some arrests were taking place and he found a cousin in the area who was upset because the police had arrested some people that he knew. From there he returned home through Muñoz Rivera Avenue and found everything was calm there.

2. On May 24, 2018, IC Pujol met at the ACLU's office in Puerto Rico, with several persons herein designated as Subjects "B", "C", D", E", F', and "G". During the

meeting Subject "B" explained to IC Pujol that after the incidents at the Milla de Oro ended, they were returning to their offices and a group of Police agents made two lines and closed the way to their office notwithstanding the fact they were wearing observer's jackets for the day's events. He expressed that they were told that they were not permitted to go through in a menacing tone of voice. He told the Police agents that they were working as observers, and they had to return to their offices. He showed them his ID and was finally allowed to go through.

Subject "B" informed that before the event, around 10:00 AM, he received a telephone call from a reporter who informed that everything was quiet but that there was a line of Police Officers at Ponce de Leon Avenue blocking the avenue and that this situation was going to bring problems. He stated that when the protesters coming through Ponce De Leon Avenue arrived at the intersection with Roosevelt Avenue, he thought that there was going to be a confrontation, but it didn't happen, patience was observed. He said that only a few objects were thrown to the Police agents blocking the avenue. The policemen opened the formation line allowing the protesters to go through. The Police agents moved to the sides of Ponce de Leon Avenue and moved towards the center of the Milla the Oro along with the protesters. He thought that this movement was suspicious and that he suspected that these agents intended to make another formation down the avenue to block the pass again to make a deliberate ambush. He stated that the Police blocked Roosevelt Avenue and Mexico Street once they started using gases against the protesters. He said that while people were dispersing because of the gases, they were physically attacked by the Police. As an example, he pointed out that a male individual that was there selling water, was shot at several times with a shotgun using rubber ball ammunition. Another person, a woman formerly in the US military, while walking on her way to leave the area was heavily sprayed with a chemical agent. He further stated that the Police impeded the exit of many protesters, to preclude them from leaving the area. He said that the most mistreated protesters were female protesters and insisted the Police deliberately ambushed the protesters.

Subject "C" informed that before the event they met with PRPB Officer #28. He also stated that he and Subject "M" met with Union leaders to coordinate the march that was to depart from the Condado Area to the Capitol building. He explained that on 04/27/2018 they met with PRPB Officer #2, with whom they talked about the past year experiences. PRPB Officer #2 told them that they couldn't comply with Section 625 of the General Order because this section mandates that they had to give a dispersal order before using chemical agents and they had to place an Agent behind the protesters to hear the dispersal order. Subject "C" stated that this year (2018), the Police failed to comply with that part of Section 625 before using the chemical agents against the protesters. He stated that about 10:00 AM he saw the line of Police Agents blocking Ponce de Leon Avenue near the Liberty building. He explained that a march that consisted of a group of women weren't allowed to through their scheduled route at the line of Police Agents. The group of women asked the reason for the denial and they were informed that it was because they were protecting the commercial buildings. Subject "C" explained that a

member of the Police located at the Liberty location informed to some of the observers that they had orders to not to have tasers, but the observers could see that the Police agents had the tasers with them.  He stated that at the Liberty location at a point in time the Bar Association observers negotiated with the Police. He also stated that when the Police made the second and last blockade in Ponce de Leon Avenue, it was heard by him that there was an agreement by which the Police would open the line and permit the protesters to continue their march. He stated that blocking Ponce de Leon Avenue was a violation to the protester's rights and that this was an attitude that invited to a confrontation.  He explained that when they asked the Police why they were denying the pass to the protesters at Ponce de Leon Avenue they answered that it was to protect the commercial buildings and that the route of the march was not previously coordinated.  He explained believing that what happened at Ponce de Leon Avenue was previously designed and premeditated.  Subject "C" provided a DVD to IC Pujol that it is commented on part "IV. B, Analysis of the Events: Findings and Recommendations" ahead in this report.

3. On May 25, 2018, IC Pujol interviewed Subject "H" about his knowledge of the events related to the Worker's Day event (May 1st, 2018) that took place at the Hato Rey Banking area. He stated that he is the spokesman for "Pueblo Unido" and "Trabajadores en Defensa del Ambiente". He explained that in Pueblo Unido converge civic, labor unions and political organizations. The objectives of Pueblo Unido are to fight against privatization and tax plans, which bring serious consequences against workers. The celebration of the First day of May is a historic celebration for workers and other sectors of civil society; provides a space for citizens to express, in a civilized and peaceful manner their discomfort. There were going to be six (6) marches, but (1) one was integrated with the others and then there were five (5) left.

Subject "H" said that the organization of the demonstration was discussed and widely planned in Pueblo Unido. They decided to carry out six (6) marches that would converge on the Golden Mile. The one starting at the Medical Center was the one that was integrated with the UTIER march, that started at the Hiram Bithron.

Subject "H" explained that days before May First they learned from reliable sources that the Police was visiting the merchants in the routes of the marches that had cameras installed, to guide them on how to focus the cameras in relation to the protesters. Days before, they heard public expressions of the Secretary of the Department of Public Safety (DPS) and the Commissioner of the Police in which they reported that 1,100 police officers were assigned "to attend the march of May First." Likewise, the Secretary of the DPS publicly requested that the organizers of the march should "denounce to the police the possible criminals." He also pointed out that the Secretary of the DPS stated that he "could identify the criminals just by looking at them". They publicly exhorted them to meet, but they (Pueblo Unido) discussed the issue with each other and decided against it because of the intimidation the PRPB was doing against them.

Subject "H" explained that all the marches, except the one coming from Sagrado Corazon, faced problems with the perimeters, with the exaggerated surveillance of police, with the diversion of routes and with the march of policemen within each march (with the exception of the one coming from Sagrado Corazon). Subject "H" also said that a group of women was denied access.  He also explained that the Police was concentrated at Ponce de León Avenue, where they halted the march of hundreds of demonstrators coming down that avenue nearby the Liberty company building. On that location he approached three (3) policemen, two (2) which were not identified and the third one with a name tag Centeno. He asked for their supervisor, but none of them answered. They did not want to talk. At one point they opened the blockade and let the protesters pass by, but the policemen then moved along the sidewalks marching alongside the demonstrators, mainly on the right side of the avenue. A second blockade was made, and they started throwing gas without giving the protesters an "eviction warning." The police did beat some of the demonstrators that were affected by the gases.

Subject "H" also said that after the march the police chased protesters to Rio Piedras, made arrests, entered homes without authorization and hit a young woman. He said that the Governor offered a television message supporting the actions of the Police. He also explained that, to questions from the press, in relation to persecuting protesters to Rio Piedras, the Commissioner of the Police responded that it was a "hot pursuit". Subject "H" went on to say that both the Governor and the Secretary of the DPS stated that previous agreements had been violated, which to him is not something possible because Pueblo Unido never met with the Police, so there were no agreements. Subject "H" said that the Secretary of Public Affairs at La Fortaleza publicly stated that "there was a meeting" between the police and the groups and that after that meeting, the groups "changed their position as to the stage platform."

Subject #8 summed up that days before the First of May, the Police proceeded to criminalize the event with the purpose of demobilizing the participation and creating conditions for acts of aggression. He expressed that the perimeters and work plans of the Police were their internal matters of operation but are not guidelines for the demonstrators. He further complained that he police cannot decide where citizens can go, that marching is not a crime, that there was an excess of police force, tear gas was thrown at them without warning and without providing them with a place to escape. He also complained the police beat the demonstrators while they dispersed fleeing from the tear gas and the only meeting they had with the police prior to the event was with PRPB Officer #2 and it was in relation how the stage platform was going to be placed.  Also, as part of the excessive force, they used rubber bullets and beat protesters in the back while escaping the tear gas. Nobody knew who was in charge.  As well, they understand that the process of intimidation prior to the event, the persistent blockade of protesters on Avenida Ponce de León, the pursuit of protesters to Rio Piedras and then the planned speech of the governor, were part of a police plan against the protesting groups.

4. Subject "I" and Subject "J", are representatives of the Puerto Rico Bar Association. They were interviewed regarding their knowledge of the events related to the Worker's Day event (May 1st, 2018), which took place at the Hato Rey area. Subject "I" and Subject "J," in essence, stated, the following:

They informed they were present at the time representatives of the movement known as "Marea Feminista" made its appearance and were later on permitted to continue their march through Bolivia Street going in the direction of Munoz Rivera Avenue. They commented that the Police had planned the route of the march by blocking specific locations to compel marchers to go to the previously designated stage area where the platform was located. They further stated that they tried to negotiate with the police but soon realized that failure to comply with the Police's directives would have ended in a confrontation[1]. They understood there was no room for negotiation. The Marea Feminista march walked Southbound Ponce de Leon Ave. until it arrived at the intersection with Bolivia Street where they found a line of Policemen that didn't allow them to continue marching through Ponce de Leon Avenue. The Police wanted to make them go back marching again in front of the Popular Center building and turn left somewhere to go to Muñoz Rivera Avenue and then on to the stage area. After they were finally allowed to turn right on Bolivia Street passing by the South side of Popular Center and on to Muñoz Rivera Avenue and to the stage area. Subject "I" said he tried to talk to PRPB Officer #2 but refused to negotiate. Finally. PRPB Officer #29 negotiated with them and allowed the marchers to go through.

They mentioned that the atmosphere that day were very tense since the early morning hours. Neither of them was present during the negotiations at the blocked location nearby the Liberty building. They confided that they had a member of their organization there, Subject "R", with who they were in contact.

Both observers commented the policemen appeared, at odds regarding negotiation with the protesters. Subject "J" was present at Ponce De Leon #273, where the confrontation with the Police finally took place. She was told that PRPB Officer #1 was in charge. She asked for the opportunity to talk and negotiate with him, but they ignored her request. She was able to observe high rank Police Officers behind the lines of Police Agents that blocked Ponce de Leon Avenue. It appeared to her as if there was a conflict among them. According to her, the agents in the line wanted to negotiate but their leaders did not. In her opinion, the people in the march were getting nervous and irritated because they were completely boxed and encased in that location. Additionally, time spent waiting with no changes was what aggravated the situation.

Both observers coincided in their personal opinions that what took place at that location had been previously planned.

---

[1] Notwithstanding the comments of Subject I and J, Marea Feminista was finally allowed to march through Bolivia Street, passing by the side of Banco Popular and unto Munoz Rivera Avenue.

5. Subject "K" was interviewed about her experience regarding an incident that took place during the events related to the Worker's Day event in which she was sprayed with chemical agents by an agent.  Subject "K" declared the following:

Subject "K" explained that the Police was pushing some protesters, herself included, from the Liberty building to Southbound Muñoz Rivera Avenue, by using chemical agents against them.  Everyone, including her, was getting affected and upset by the gases.   The Police made a line formation near the Walgreens Pharmacy located at Muñoz Rivera Avenue.  She approached the policemen and told them that they, the policemen, were affected by the situation as well, by the crisis PR is currently going through. She also told them that they had the choice of not following unfair orders, violent orders.  The Policemen said that they were going to advance, she told them that she was an Army veteran, and that this situation was not a war and reminded them that they were public servants.  All of a sudden, the SWAT agents started using gases.  She approached them to tell them to stop, and one of the SWAT agents grabbed her and they struggled a little and he pushed her.  It was then that she was heavily sprayed with chemicals by one of the SWAT agents.  After this happened she was helped by many individuals and she was taken to a medical center where she was allowed to shower and was given treatment.

6. Subject "L" was interviewed regarding his knowledge of an incident that occurred during the events related to the Worker's Day of May 1st, 2018) in Hato Rey when he was allegedly shot with rubber pellets by police agent(s). Subject "L" stated the following:

Subject "L" explained that on May 1, 2018 he arrived at the Milla de Oro before noon to sell water and soft drinks, an activity that he considers his means of support.  He stated that he was located near to the stage area when the march at the Ponce de Leon moved forward into the avenue.  He moved to Ponce de Leon Avenue to sell the bottles of water.  Once there, he heard an explosion and saw smoke.  He recognized what this was, and he told his wife to run away quickly. He took off his T-shirt and soaked it with water and covered his mouth and nose with it, so the gases wouldn't affect him, or at least, in a minor way.  He tried to pull the coolers away from the area when he encountered some policemen.  At that moment he was already affected by the gases.  A person approached him and asked if he was doing well and threw some liquid to his face that helped him to recover a little.  He started walking away from the area pulling the coolers, but gases kept falling near him and affecting him again.  A man told him that he was putting a $20.00 bill in his pocket, so he could give water to the protesters.  He complied with the request and gave bottles of water to the protesters as he continued to walk away.  Gases kept falling near him and he was again helped by the guy that put the $20.00 bill in his pocket.  The policemen told him to move away, and he replied that he was only selling water and moved away but he was

located between policemen when a policeman wearing green clothes shot him with a large weapon (rifle type) from a distance of approximately 10 feet away. The rubber pellets hit him in his stomach and ear. He turned his back and was shot again in his back approximately 15 to 16 more impacts of rubber pellets in his back and buttocks. He was then approached by individuals asking if they could take pictures of him. Other persons helped him by trying to disinfect the open injuries. He saw that he was bleeding, and he got really scared. After a while, his wife met with him. He was interviewed by a reporter from Channel 4 (WAPA TV). Later on, he went to Doctor's Center to get his injuries treated. At the hospital there were Policemen who started asking him questions. He pointed out that a policeman in civilian clothes wanted to force the attending physician to write in the report that he was treating him for burnings related to the gases and added that they were not using rubber pellets ammunition. The PRPB did not provide any documentation reflecting officers went to the Hospital, and this fact could not be corroborated.

7. Subject "M" was interviewed about her knowledge of the incidents that took place during the events related to the Worker's Day event of May 1st, 2018 in the Hato Rey area. Subject "M" stated the following:

Subject "M" explained that before the events of the May 1st, 2018, she met with the PRPB along with Subject "C" and representatives of labor unions. On the part of the PRPB were present PRPB Officer #2, PRPB Officer #1, and other officers. They talked mainly about the manifestation that would depart from the bridge known as "Dos Hermanos" and end in front of the Capitol building. Subject "M" and Subject "C" reminded to them that there were other manifestations that were departing from different points and ending at the Milla de Oro. They were told by the PRPB that they invited everyone but that these decided not to meet with the PRPB. Subject "M" reminded the PRPB Officers that the previous year they failed by not providing the dispersal orders and following all the steps that Section 625 mandates before making use of chemical agents against a crowd. PRPB Officer #2 responded that such Section of the General order **"es un disparate"** (Spanish for **"it is nonsense"**). According to Subject "M", such statement was made in front of PRPB Officer #1 and the other Officers.

Subject "M" explained that on May 1st, 2018, when they arrived at the intersection of Roosevelt Avenue with Ponce de Leon Avenue, where the Liberty building is located, she asked for the Officer in Charge from the PRPB. She stated that an Officer appeared, and they asked him why the line of PRPB Agents didn't allow the march to go through. They were told that those were the instructions that they had received and that they would not change anything. When the large group of protesters arrived, the situation was heating up. She called PRPB Officer #1 using her cell phone and she told him that the situation was getting uncomfortable and questioned him on why the manifestation wasn't allowed to go through at that location. She stated that PRPB Officer #1 told her that the decision was already made and that given the fact the protesters didn't want to meet with them (the

police) before the events, they made their plans which were not subject to change. She explained to him that many of the protesters had no leaders who could meet with the Police, a statement that upset PRPB Officer #1 who told her not to be disrespectful with him, ending the conversation that way.

Subject "M" stated that once the Police opened the blockade, at the Liberty building location. she continued flowing with the protesters until they arrived at the second line of PRPB agents blocking Ponce de Leon Avenue. Again, she placed a phone call to PRPB Officer #2. She stated that the Officer picked up the call and tried to hang up without talking but instead left the telephone "off the hook" and she stayed listening to what they were talking. At some point she heard PRPB Officer #2 saying "los pillamos en Santa Rita" (Spanish for "we caught them in Santa Rita" or "we'll catch them in Santa Rita").

Subject "M" explained that there were at least three incidents in which women were harassed by the Police and were sprayed with chemicals or were hit. She further stated that the Police acted very aggressive with women in general.

8. Subject "N" was interviewed about her knowledge of the incidents that took place during the events related to the Worker's Day event of May 1, 2018 in the Hato Rey area. Subject "N" provided the following information:

Subject "N" explained that in the past she had organized activities like the march in which she participated on May 1st of 2017, but this time she only participated as a protester. The march in which she participated was the "Marea Feminista" march.

Subject "N" stated that before 9 AM, she was walking with at least another person Northbound on Ponce de Leon Avenue. When they approached the Liberty Company's building, it called her attention the large number of Police Agents there, but they were able to go through the intersection without encountering any problem. While going by she saw many Police agents in the building's parking lot. After they went by, the Police started to organize the line of Police agents to block the pass of Ponce de Leon Avenue. When they arrived at the intersection with Bolivia Street, there were no Police agents there. Later on, she saw Police agents moving from the Liberty building area to relocate at the intersection with Bolivia street, where the second blockade was assembled. Earlier during that same day, when she was at the "Women's **Solicitor's Office** (Oficina de la Procuradora de la Mujer), someone asked her what the march's route was, and she answered, believing it was Southbound Ponce de Leon Avenue until arriving at Roosevelt Avenue, where she was told later on they could not use that route. She was told the change of route was the result of a negotiation between Subject "O" and the Police. She found this information was strange because Subject "O" was not part of the organizers. Later on, she spoke to Subject "O" who told her that such information was not correct. Subject "O" informed Subject "N" that she had received a call on her cell phone from a number she did not recognize, and

she ignored the call.  Soon after, she received a text message from that same number in which PRPB Officer #15 informed he was trying to reach her. Subject "O" never returned the phone call.

Subject "N" added that she believes negotiations with the Police are possible, but they are not mandatory, and that there is a clear right to protest making a march.

Subject "N" said the route of Marea Feminista had been planned to go Southbound on Ponce De Leon Avenue up to the intersection with Roosevelt Avenue, and this route had been published by them before the event but, the Police blocked their route making them turn right on Bolivia street passing by the side of Banco Popular until arriving to Muñoz Rivera Avenue.  The Police insisted that the change of route had been negotiated, which to Subject "N" appeared as a false assertion on the part of the Police.[2]

Subject "N" recalled another situation which called her attention, that is, she saw male individuals walking within the group of women in the march who appeared to be plain clothes policemen.  She reached this conclusion based on her experience in organizing and participating in many other marches during her life.

Subject "N" commented that the general attitude of the Police was hostile. She further stated that she believes she saw Police agents without the name tag and badge number in their uniforms.

9. Subject "P" was interviewed about his knowledge of the incidents that took place during the events related to the Worker's Day event of May 1, 2018 in the Hato Rey area.  Subject "P" stated the following:

Subject "P" informed that on May 1, 2018 he worked with the organization of the event assigned to the security team by the stage.  His responsibility was to guard the gate allowing access to the stage.  Anyone going up to the stage had to go through him.  He stated that at approximately 10:30 AM, people approached the stage area saying the Police said[3] they would not allow the UPR students to reach the event's main location, in front of the stage in Muñoz Rivera Avenue.

Subject "P" stated that he saw behind the stage many individuals in green uniforms carrying shotguns and other tactical weapons.

---

[2] Notwithstanding the allegation of Subject "N," the reader's attention is called to consider the fact that only UTIER met with the NPPR to plan the route of the march and the location of the platform.  Neither Marea Feminista nor Subject "N" was a party to prior negotiations with NPPR in the planning of the event.  A dim view of this statement is taken for the purpose of this Assessment.

[3] This part of the statement is provided here for purposes of completeness but is noted as an unsubstantiated hearsay statement for the purposes of this assessment.

| Assessment Report- INTERVIEW DATA | 2018 |
|---|---|

When gases were used, Subject "P" explained there were gases with white smoke and others with orange smoke. He was told[4] the orange ones were gases used by private security companies.

Subject "P" commented he was sure that what happened at the Milla the Oro was not a random occurrence. It was clearly planned.[5]

10. PRPB Officer #9 was interviewed pursuant to the Assessment ordered by the Honorable Gustavo A. Gelpi, U.S. District Court Judge, in relation to the demonstrations and incidents involving the Puerto Rico Police and protesters, on May 1, 2018; all as part of the assessment of PRPD's implementation of the "AGREEMENT FOR THE SUSTAINABLE REFORM OF THE PUERTO RICO POLICE DEPARTMENT" during its capacity building period.  PRPB Officer #9 stated the following:

PRPB Officer #9 informed he is the Director of the Tactical Operations Division (DOT) of San Juan.  His responsibility is to supervise DOT San Juan.  He further explained that when an event takes place which requires that the DOT of the entire island to be activated, he supervises of all of them.

PRPB Officer #9 stated that during his career with the PRPD he has worked in dozens of manifestations/protests similar to the ones covered by this Assessment.
PRPB Officer #9 confirmed his knowledge of Sections 620 and 625 of Chapter 600 of the General Order, but these sections were not discussed before the event with DOT personnel.  They only addressed Sections 601 and 605.

The account of participation of Officer #9 in the event is summarized as follows:

May 1, 2018
- He was present at the event with many squads of DOT which he supervised.  His mission was to manage and direct the DOT squads he had under his command according to the instructions in the work plan provide to him by his supervisors, which on this event were PRPB Officer #2 and PRPB Officer #1.
- He explained placed two (2) squads of DOT with each of the marches present that day.  He stated his personnel did not take any action because the marchers behaved properly.
- He explained DOT only prepared one PPR-920 Form (prepared by PRPB Officer #10) summarizing DOT's participation in the events.
- He explained that he was informed by his supervisors the marches were not going to be allowed to pass the intersection of Ponce de Leon with Roosevelt

---

[4]   There is no reference as to who told him that information which is provided here for the purpose of completeness but considered as a hearsay statement for the purposes of this assessment.
[5]  Subject "P" did not mention that at any time he was present or a witness to the events at the "Milla de Oro."

Avenue. A line formation of Police agents not part of the DOT, was placed there to hold and redirect the march. His DOT squads were located behind the line in case they were needed. He stated that at the intersection of Bolivia St. with Ponce de Leon Avenue they placed another line of Police agents to cover the back of the ones at the Liberty building. Nobody was supposed to go through this part of Ponce de Leon Avenue, but they realized some people were entering this area through Mexico St., and in order to correct this situation, they placed another line of Police agents there to prevent anyone from entering Ponce de Leon Avenue through Mejico Street.

- He informed that at some point, PRPB Officer #1 ordered to withdraw the line of Police agents at the Liberty Building and gave access to the protesters to march on Ponce de Leon Avenue. DOT personnel were retreating in a line formation towards Bolivia Street. Approximately 20 to 30 yards after passing by Mexico Street, PRPB Officer #1 ordered to block Ponce de Leon Avenue again because some of the protesters had damaged (vandalized) property at the Liberty building.

- PRPB Officer #9 also informed what transpired at the second blockade regarding the aggressive attitude of the protesters.[6]. He stated that once chemical agents were used by SWAT, they moved their way South to regain the lost security perimeter, as they are trained. He stated they provided assistance to two protesters who were hit by rocks thrown by their own people. One DOT platoon accompanied SWAT and Special Arrests squads to Rio Piedras. PRPB Officer #9 accompanied PRPB Officers #2 and #11, who were also part of the group that moved to Rio Piedras. They entered Santa Rita to arrest individuals that had previously attacked a Police agent while he was intervening with them. DOT established a security perimeter so that the Special Arrests agents could arrest the individuals.

- Photographs of the agents that attacked the Metro newspaper reporter were shown to him and he said that they were not part of DOT.


11. PRPB Officer #12 was also interviewed as a part of the Assessment ordered by the Honorable U.S. District Court Judge Gustavo A. Gelpi. PRPB Officer #12 stated the following:

PRPB Officer #12 informed he is the Director of the SWAT Division since 2012, but he joined SWAT twenty-one (21) years ago.

PRPB Officer #12 stated that before the "AGREEMENT FOR THE SUSTAINABLE REFORM OF THE PUERTO RICO POLICE DEPARTMENT" was implemented, he had worked in dozens of manifestations/protests similar to the ones covered by this Assessment.

PRPB Officer #12 informed knowing and being familiar with General Order Chapter 600 Section 625 "Crowd Management and Control" and with Section 620

---

[6] His explanation matching what IC Jose Pujol watched in the many videos he reviewed.

"Rules and Procedures for the Use of Specialized Weapons by Members of Specialized Tactical Divisions".

The following is a summary of activities he was involved on May 1, 2018:

- PRPB Officer #12 participated in this event as the SWAT Commander.
- He stated the reports they prepared related to the day's events were the PPR-920, prepared by PRPB Agent #1, and the Use of Force forms.
- He stated the SWAT mission was there to assist DOT with the use of chemical agents and the use of less than lethal ammunition.  During the operation, he reported to PRPB Officer #1.
- He said he had 3 (three) groups under his command, one at the Command Center located at the Puerto Rico Coliseum, another one at the Command Center located at the facilities of Banco Popular and he disclosed the third one was a floating one, which would move wherever it was deemed necessary.
- He explained that when the situation was restless at the Liberty building area, the group assigned to the Coliseum was called to provide support to PRPB Officer #1.  When PRPB Officer #1 decided to allow the protesters to pass the blockade at the Liberty building area, the SWAT group stayed there, at the Liberty building.  When PRPB Officer #1 created the second blockade, he was supported by the other two SWAT groups.
- When the protesters attacked the Police with rocks, burning fluids, cherry bombs and tried to overpower the Police line, PRPB Officer #1 decided that SWAT would start using chemical agents and CS gas.  He stated that protesters were very well organized when trying to push and overpower the Police, which he believed such action had to be planned before.
- He explained the first three devices they used against the protesters were only smoke grenades to psychologically affect and disperse them, after these ones, they used the gas gun with CS gas.  He stated the orange smoke seen in the video recordings didn't belong to the Police, which could have been used by the protesters or by private security.  He said he heard paint ball guns being shot which he believed was done by private security teams.
- When he was asked if the dispersal order and other requirements mandated by Section 625 were followed, he stated that he was with PRPB Officer #9, about 40 feet away, and he didn't hear any dispersal order from the Police, despite them having a megaphone.  What he stated knowing is that the Police had an agent assigned behind the protesters to hear the dispersal order and identifying the escape routes for the protesters[7].  He stated knowing such information because he heard PRPB Agent #11, who was accompanying PRPB Officer #1, talking about this agent.  He said he does not know the identity of this agent.

---

[7]  It should be noted that the name of the agent required to be behind the protesters regarding the dispersal order has not been provided, nor there has been any reference to said agent in the Operational Plan nor in any report provided by PRPB after the event or in after action reports.

- He explained that after deploying chemical agents, they advanced forward and if they encountered aggressive individuals they allowed DOT and Special Arrests units to act accordingly.
- He was shown the photograph of the injuries suffered by Subject "L". He stated that this type of ammunition is not allowed to be shot directly against individuals. He stated believing the injuries were caused by plastic balls, not rubber balls that are the ones that the Police use. He stated that this type of ammunition could have been used by private security because when Hernandez was interviewed on TV, he stated that the agents were wearing gray clothes, not green clothing as SWAT uses. He stated believing that, based on the dispersal pattern of the balls shown in the photograph, the shots had to be fired from approximately ten yards away[8].
- He was shown photographs of the event related to Subject "K" who was sprayed with pepper spray by SWAT. He explained that PRPB Officer #13 was at the site. He explained Subject "K" was located between aggressive protesters and the Police, and SWAT was ordered to urgently go near the Fire Station where a Police agent was seriously injured, and other Police agents were in a difficult situation. PRPB Officer #14 told Subject "K" to move in several occasions but she did not comply making a gesture towards a SWAT agent who pushed her. After that, she made another attack gesture with a bottle on her hands and it was then that they applied the spray on her. He stated this was their only option because they didn't have personnel from DOT or Special Arrests to deal with her for detention purposes. He further stated she escalated the situation and they responded with the spray.
- He stated they did not participate in the event related to the aggression to the Metro newspaper reporter, and that they helped a reporter affected by the gas at the Ponce de Leon Avenue. He further explained that when they were finding individuals affected by the gas they never acted with violence against them, they had paramedics and rescue personnel to help them.
- He explained that they never entered Santa Rita area, clarifying the SWAT personnel did not participate in the arrests made there.

12. PRPB Officer #16 was interviewed as a part of the Assessment ordered by the Honorable U.S. District Court Judge Gustavo A. Gelpi. PRPB Officer #16 stated the following:

PRPB Officer #16 informed he is the Director of the Division of "Arrestos Especiales" (Spanish for "Special Arrests").

PRPB Officer #16 stated he had worked in several manifestations/protests similar to the ones covered by this Assessment, approximately five (5) to ten (10) times.

---

[8] There are no reports by PRPB that show either rubber of plastic ammunition balls was recovered.

PRPB Officer #16 informed knowing and being familiar with the General Order Chapter 600 Section 625 "Crowd Management and Control".

The following is a summary of activities he was involved on May 1, 2018:

- PRPB Officer #16 explained he assigned three (3) squads of the Special Arrests Unit to DOT, to provide support to them by executing any necessary arrest during the Operation.  These squads were supervised by PRPB Agent #4, PRPB Agent #3 and PRPB Agent #7.   He coordinated the logistics related to his personnel (in his vehicle he had medical equipment, decontaminating materials, water, food, etc....)
- PRPB Officer #16 stated he reported to PRPB Officer #2.
- PRPB Officer #16 informed the original plan consisted, in case of having to clear the Milla de Oro, of pushing the protesters to the Roosevelt Avenue and from there to Barbosa Avenue.  The plan was somehow changed, and when the moment arrived, they used Muñoz Rivera Avenue instead of Barbosa Avenue.
- PRPB Officer #16 stated that at some point he was contacted by PRPB Officer #1 who instructed him to move the squad assigned to the airport to the Milla de Oro.  He contacted PRPB Officer #9, who already knew the instructions of PRPB Officer #1 and was already moving the personnel from one site to the other.
- PRPB Officer #16 explained that at the time he arrived at the intersection of Roosevelt Avenue with Ponce de Leon Avenue he heard PRPB Officer #2 was asking for reinforcements for the Santa Rita area.   The protesters were accessing it via Añasco Street.  He moved to Añasco St. at the intersection with the marginal of Piñero Avenue with PRPB Agent #2 and the group of PRPB Agent #3.  PRPB Agent #4 arrived there while they were dispersing protesters and met them there.   They assembled a line squad covering the complete Añasco St.  He explained there is a street going across from the location of the Hipopotamo Restaurant to Añasco St., and the protesters moved through it knocking down plant pots and throwing rocks to the DOT personnel in pursuit of them.  He started walking with his personnel from Añasco St. to Universidad Avenue and they encountered regular non-violent protesters.  They asked them to move and they complied with the request. They  arrived at a street through which approximately fifty (50) members of the DOT were moving towards them. The DOT personnel started marching behind him and part of the Special Arrests personnel went towards Avenida Universidad.  At some point, the policemen in the motorcycle squad passed by in pursuit of protesters that were throwing rocks at them.  They continued walking, but one of the agents on a motorcycle stayed in front of them (his name is PRPB Agent #5).  When they arrived at Balboa St., PRPB Agent #5 made a left turn and stopped nearby a house.  When PRPB Officer #16 got nearby the house, he witnessed PRPB Agent #5 having a strong conversation with somebody in the house.  PRPB Agent #5 continued on towards Baldiororty Avenue and he followed him.  Unexpectedly an individual

came running towards them out of a street to their left.   PRPB Agent #5 attempted to stop him but that person threw a bottle or its contents to the agent. He perceived this as an aggression on the part of the subject against PRPB Agent #5.   He tried to arrest the individual, but he went by running on the sidewalk, followed by PRPB Agent #8 who arrested him with the help of PRPB Agent #5.   They arrested him after he jumped into the front yard of a house. Inside this property there were individuals that started to attack the agents, one of them being Arrestee #7.   They seized from him a small pepper spray container, a slingshot and marbles[9].   PRPB Officer #16 tried to move through the sidewalk and he was pushed by a female individual who hit him with her hands.   Her name is Arrestee #9.   As part of the arrest procedure, he took her to the ground to handcuff her but her brother, Arrestee #8 assailed PRPB Officer #16 who tried to get rid of him, but it was two (2) other agents that were able to subdue and arrest him.   These agents were PRPB Agents #2 and #6.   Arrestee #9 was still on the ground under his custody.   From the area behind the gate a male and a female individual appeared.   The female individual had a wooden ax handle and attempted to hit him with it. He was pushed by the male individual. PRPB Officer #16 stated that all these events took place very quickly while there was a big group of persons screaming improprieties at them.   The male individual who pushed him went inside the house. He attempted to make this male individual come out of the house but PRPB Officer #1, who was present there, told him to not aggravate the situation any further and to investigate it later, so as not to escalate the already hectic situation.

- PRPB Officer #16 stated that the District attorney was provided a video recording depicting all these events along with several photographs.   IC Jose Pujol asked for copies of the video recording and photographs.
- PRPB Officer #16 explained that when the individual threw the liquid substance in the bottle to the agent, this was an aggression, because during the day's event some protesters used chemical substances that were thrown against the agents. Nevertheless, this individual was already running away from the Police because he was being chased for throwing rocks to the policemen.
- PRPB Officer #16 stated that they prepared three (3) Use of Force forms and all the forms required for each of the three (3) arrests.

13.   PRPB Officer #17 was interviewed and stated the following:

PRPB Officer #17 informed he presides the Use of Force Board and has worked in approximately four (4) or five (5) manifestations like the one that took place on May 1, 2018.

PRPB Officer #17 informed knowing and being familiar with General Order Chapter 600 Section 625 "Crowd Management and Control".

---

[9]  Slingshots and marbles were used at the second blockade at Ponce de Leon Avenue prior to this incident.

| Assessment Report- INTERVIEW DATA | 2018 |
|---|---|

The following is a summary of activities he was involved on May 1, 2018:

- PRPB Officer #17 informed that he worked in the first phase of the Operation, which consisted of strategic prevention work the night before the event. He was in charge of a group of forty individuals, that is, one (1) Lieutenant, two (2) Sergeants and approximately thirty-seven (37) agents.
- Their mission consisted of conducting surveillance of the area of Muñoz Rivera Avenue, Ponce de Leon Avenue, and the "Dos Hermanos bridge" and the area nearby the University of Puerto Rico. They had to ensure these areas were under control during the night.
- Their schedule started on April 30, at 9:00 PM, and it was supposed to end at 5:00 AM, on May 1st, but it was extended until 6 AM.
- He explained nothing happened during their night shift. Everything was quiet and under control.
- He stated that at the Board, he handles the cases involving Use of Force type 2 and 3 involving injuries, otherwise SARP handles them. He informed that he has received some cases from this year's May 1, 2018 event, but that the Board has not convened to work on them yet

14. PRPB Officer #18 was interviewed and stated the following:

PRPB Officer #18 informed he is PRPD's Carolina Area Commander. He is responsible for all the administrative and operational work in the Carolina Police Area where he supervises ten (10) Police Stations and the investigative branch as well.

PRPB Officer #18 stated that has worked in approximately twenty (20) to twenty-five (25) manifestations/protests like the ones covered by this Assessment.

PRPB Officer #18 informed knowing and being familiar with General Order Chapter 600 Section 625 "Crowd Management and Control".

PRPB Officer #18 stated that on May 1, 2018 he supervised approximately eighty (80) agents located at the Muñoz Rivera Avenue intersection with Chardon Avenue, in front of the UBS and Oriental Building. They had to ensure the safety of protesters and the integrity of the infrastructure on this area under his command. He explained that nothing happened that made them act. When chemical agents were deployed at Ponce de Leon Avenue, many protesters passed near them and they were very upset and insulted the Police agents, but nothing happened that triggered the Police intervention. The Police agents were verbally provoked, but they didn't respond to the provocations.

15. PRPB Officer #4 was interviewed and stated the following:

PRPB Officer #4 informed he oversees the Road/Highway Control Department within the PRPB.  He said his career has always been around traffic control, and that on this capacity he has worked in many manifestations like the one of May 1, 2018.

PRPB Officer #4 stated knowing Section 625 of the Chapter 600 of the General Order.

The following is a summary of activities he was involved on May 1, 2018:

PRPB Officer #4 explained that on May 1st, 2018 he had two roles:

1) Managing the logistics in the intersections and the main roads that gave access to the manifestations' areas.  He had to ensure that traffic would flow.  He assigned personnel at the intersections located at the Milla de Oro, Roosevelt and Muñoz Rivera Avenues.  These personnel had a mission to prevent cars from hitting any pedestrian.   The logistics also involved overseeing help to any bus with protesters that would develop mechanical problems or get involved in a traffic accident.
2) His second role consisted of helping and protecting any manifestation departing from "Dos Hermanos" bridge in the Condado area.  He met with the organizers and established a plan on how the protesters would march from "Dos Hermanos bridge" and how the manifestation would flow.  He stated this was a successful operation.

PRPB Officer #4 explained that an agent assigned to him, PRPB Agent #9, was hit with a hammer.  He stated that a protester was spray-painting the hood of the agent's patrol car with red paint.  He intervened with him, but another protester approached him from his back and hit him hard.  This incident occurred at the intersection of Roosevelt and Muñoz Rivera Avenues.  A female individual was detained having among her possessions a hammer, marbles and a slingshot.  He stated they don't have enough evidence to charge her yet, but the case is still under investigation.

16. PRPB Officer #2 was interviewed and stated the following:

PRPB Officer #2 has been the San Juan Area Commander since 01/24/2017, and is responsible for thirteen (13) Precincts and two (2) Specialized Units.   He supervises approximately one thousand eighty (1,080) agents.

PRPB Officer #2 stated that during his approximately his twenty-three (23) years in the PR Police Department (PRPD) he has worked in dozens of manifestations similar to the ones covered by this Assessment.

PRPB Officer #2 explained that before the General Order Chapter 600 Section 625 "Manejo y Control de Multitudes" entered into effect, there wasn't any established official protocol; they worked based on their experience, which was obtained by

Assessment Report- INTERVIEW DATA | 2018

years of working in the streets and working in similar scenarios. He stated knowing about Sections 604, 620 and 625 of the Chapter 600 of the General Order.

The following is a summary of activities he was involved on May 1, 2018:

- PRPB Officer #2 stated he authored and he directed the Operational Plan.
- He stated that his immediate supervisor was PRPB Officer #1.
- He stated that before the event, they requested to meet with organizers of the manifestations via the press, on the other hand the only ones that responded and met with them were the UTIER.
- He explained that at the Liberty building they built a security perimeter by blocking the pass to Ponce de Leon Avenue. The plan was that the march coming from the UPR and the Labor Department building could not get to the bank's area. They reached this decision based on the prior experience they had from last year's event. They also assembled a perimeter at the Ponce de Leon intersection with Bolivia Street. There, when the organized march called "Marea Feminista" (Spanish for "Feminist Tide") arrived, they allowed them to pass by the side of Banco Popular building to reach Muñoz Rivera avenue and the stage area. They knew that this was a peaceful march.
- PRPB Officer #2 insisted that Section 625 of the GO must be revised. He stated he never said that this Section was nonsense, but he insisted it must be revised because placing an agent behind the crowd to listen and record the dispersal order is too dangerous.
- PRPB Officer #2 stated that the order to open the blockade at the Liberty building was given by the Commissioner, Mr. Henry Escalera. The reasoning behind this decision was to avoid confrontation and show the Police acted in good faith. He further explained that when the protesters passed the Liberty building and marched Northbound on Ponce de Leon Avenue, some of them pushed Police agents, broke glass windows, and this was the reason why PRPB Officer #1 ordered to assemble another blockade on the avenue, near to Bolivia Street, so he could avoid the protesters approaching Banco Popular and having a repetition of the vandalism experienced the year before.
- PRPB Officer #2 stated while they had the formation at the Liberty building, dispersal orders were given to the protesters, but he didn't hear if the dispersal orders were given in this second location, but he knew they had megaphones available. PRPB Officer #2 brought PRPB Officer #9 before the presence of IC Jose Pujol. PRPB Officer #9 validated that in the second location no dispersal orders were given to the protesters, because the attack of the protesters was so sudden and strong they decided to use the gas against them as fast as possible.
- PRPB Officer #2 stated they didn't place an agent behind the protesters to listen to the dispersal order and to record it as Section 625 of the GO mandates.
- PRPB Officer #2 explained they arrived at Santa Rita because the protesters, while they were retreating, were destroying and/or damaging property, all in violation of the law. They continued to pursue them in attempt to avoid acts of vandalism being done to properties.

| Assessment Report- INTERVIEW DATA | 2018 |
|---|---|

- PRPB Officer #2 stated that the real intention of the manifestation that came from the UPR and the Labor Department building was never getting to the stage area. They were afforded the opportunity to get to the stage area and they didn't do it; all they wanted was to reach the banking area.
- PRPB Officer #2 informed that a Police agent suffered a strong burning injury in one arm which was caused by chemicals substances that protesters threw at him. They seized a balloon containing this type of chemicals which was sent for forensic analysis.

17. PRPB Officer #19 was interviewed and stated the following:

PRPB Officer #19 informed his responsibility in the PRPB are to organize and direct the operations related to the Criminal Investigations worked by the PRPB, and to advise the PRPB's Commissioner regarding the Criminal Investigations area.

PRPB Officer #19 explained that he had worked six (6) or seven (7) manifestations like the May 1st manifestation, but always as a Chief of Security and Protection. His responsibility is to protect the VIP personnel.

PRPB Officer #19 stated knowing Section 625 of the General Order.

The following is a summary of activities he was involved on May 1, 2018:

- PB Officer #19 stated he didn't have a role in the operation's plan and he was not assigned to any group. He was a facilitator among the groups, but the groups had been instructed by PRPB Officer #2, therefore he didn't have any direct participation.
- PRPB Officer #19 explained he was in the perimeters of the operation waiting for instructions, which never arrived. He interviewed PRPB Officer #20 to ask him if they needed help, but PRPB Officer #20 answered he already had the resources to make the investigations related to the arrested individuals. PRPB Officer #20 informed him that two (2) or three (3) buildings received damages, which were going to be photographed by Technical Services personnel, along with approximately forty (40) structures that were painted with graffiti.
- PRPB Officer #19 stated that he was never at the Bolivia Street incidents.

18. PRPB Officer #21 was interviewed and stated the following:

PRPB Officer #21 informed that he is the Associate Commissioner of the PRPB. His duties are to act as the Commissioner in the Commissioner's absence with regular assigned duties of working on operational and administrative matters.

| Assessment Report- INTERVIEW DATA | 2018 |

PRPB Officer #21 stated that **in** his career of approximately 32 years in the PRPB, he has participated in approximately one hundred (100) to one hundred and fifty (150) manifestations like the one of May 1, 2018.

The following is a summary of activities Officer #21 was involved on May 1, 2018:

- PRPB Officer #21 reported that PRPB Officer #1, PRPB Officer #22 and PRPB Officer #2 worked the operational plan in preparation for the event. They tried to meet with the Unions' leaders, some of which attended the meeting, but the rest failed to comply.  PRPB arranged a press conference and invited leaders of organizations expected to participate to meet with them.  He met with leaders of truck drivers' Unions who informed that they would not participate.   The Colonels finished their operational plan and presented it to the Commissioner.   They decided, based on last years' experience, they would have high ranking Officers leading a determined perimeter to have a better control of their people and to be able to conduct an appropriate supervision.  These high-ranking Officers were to report to the Incident Commander, PRPB Officer #1.

- PRPB Officer #21 stated that, based on what they had learned from last year's incidents in which they were criticized with allegations that the Police didn't act, and many damages to private property were sustained, a decision was made to place the stage at Roosevelt Avenue.  They also decided to close access to the banks' area by placing a security line formation of agents at Ponce de Leon Avenue intersection with Roosevelt Avenue (Liberty building) and another line at Ponce de Leon Avenue at the intersection with Bolivia Street.

- PRPB Officer #21 stated that the Command Centers were located at the "Choliseo" (PR Coliseum) and at the Fusion Center (PRPB HQ).   He mentioned there was an observation center at the Popular Center building.

- PRPB Officer #21 explained that at the Liberty Building location the protesters were throwing rocks, marbles, bottles and other objects to the Police. They used megaphones to order dispersal and to instruct protesters to stop the violence against the Police.   The representatives of the protesters insisted that they wanted to go through in a pacific way up to the Popular Center to then turn left to connect with the Muñoz Rivera Avenue. He stated that organizations like ACLU were involved in these negotiations. He explained that the PRPB's Commissioner decided to allow the manifestation to through the Ponce de Leon Avenue, but they were going to observe their behavior. He said that as soon as they allowed them to pass, the protesters commenced to vandalize private property. Approximately eight (8) or nine (9) glass windows were broken at the Liberty building and some more at the Plaza building.  It was then that PRPB Officer #1 decided to block Ponce de Leon Avenue near the intersection with Bolivia Street,

foreseeing that additional damages could be inflicted to other properties in the area.

- IC Jose Pujol coincides with PRPB Officer #21 in the narrative of the violent events that took place at the second blockade, which thoroughly documented and depicted in the many video recordings made available to IC Pujol. PRPB Officer #21 stated that dispersal orders were given in about five (5) occasions but with megaphones[10] that the PRPB brought which were very weak and lacked the aural capacity to be heard over the prevailing noise in the area. PRPB Officer #21 also stated that the use of chemical agents was appropriate, because the law instructed them to follow the criminals in order to arrest them. The protesters, while fleeing, were causing damage to private properties, drawing graffiti on the outer walls of buildings and setting on fire assorted objects, all in violation of the law. In view of the on-going criminal deportment of certain protesters, they followed them up to the area of the sector known as Santa Rita, with a determination to arrest the individuals committing those crimes. He stated that article three (3) of Law 53, and also article 201 of the DSP law (Ley 20), allowed them to follow the protesters while they were committing crimes in order to arrest them.

- Officer #21 was shown a photograph of the person that was shot in the back with rubber ball ammunition. PRPB Officer #21 brought to the attention of IC Pujol a wooden shield that was located near the injured subject. Officer #21 alleged the shield matches the look of the shields used by the violent protesters, thus attempting to create a doubt on whether the man was a violent protester instead of a water seller.

- When shown the photographs of the female individual that was heavily sprayed by SWAT personnel, PRPB Officer #21 stated that Police are humans and they can commit a mistake while being under pressure. He added that no complaint has been filed by this female individual.

- When the incident with the reporter of Metro newspaper was brought to the attention of PRPB Officer #21 informed that the Commissioner ordered an investigation and if the agent is at fault and they have to fire or discipline him, they will do it.

19. PRPB Commissioner Henry Escalera was also interviewed as part of the Assessment ordered by the Honorable U.S. District Court Judge Gustavo A. Gelpí.

---

[10] **PRPB Officer #21 testimony regarding the alleged low capacity megaphones with which alleged dispersal orders were voiced at least five (5) times, is in open contradiction to the testimony of many officers who declared no such order was given at the second blockade. Furthermore, IC Pujol has analyzed the videos of the initial blockade at the area of the Liberty building where dispersal orders were given and heard loud and clear in said videos.**

| Assessment Report- INTERVIEW DATA | 2018 |
|---|---|

PRPB Commissioner Henry Escalera (hereinafter referred to as Commissioner Escalera) stated, in essence, the following:

Commissioner Escalera has been the Commissioner of the PRPB for approximately one year (including the time he was acting as the interim Commissioner.  His career with PRPB spans approximately 30 years.

Commissioner Escalera stated that during his career he has worked approximately in ten (10) manifestations similar to the one of May 1, 2018.

Commissioner Escalera stated knowing Section 625 of Chapter 600 of the General Order (GO).[11]

The following is a summary of activities Commissioner Henry Escalera was involved on May 1, 2018:

- Commissioner Escalera informed that he made the decision and gave the order to open the blockade at the intersection of Ponce de Leon with Roosevelt Avenue in the vicinity of the Liberty building.  The situation was getting intense and he made a good faith decision and honored the negotiations the Police in the field had made with observers of the different organizations. He explained PRPB Officer #1 decided to stop the march near the area of Bolivia Street because the protesters were causing damages to buildings in Ponce De Leon Avenue.  At the second blockade the protesters were throwing rocks, marbles and liquid substances that caused burnings on Police agents at the scene. They were also hitting the Police agents with sticks.  There were several Police agents injured along with some protesters.  Commissioner Escalera stated he gave the order to PRPB Officer #2 to use chemical agents against the protesters and it coincided in time with the same order given by PRPB Officer #9 who was at the scene.

- Commissioner Escalera explained that prior to May 1st, 2018 the PRPB formulated an initiative of contacting the leaders of the organizations which could potentially participate in the manifestations and they used several ways of communication, including a press conference.  Some of these leaders met with the PRPB and some failed to show up.   When asked about the leaders that attended the press conference assembled by PRPB prior to the event, he specifically stated that Subject "Q" never met with them.

- Commissioner Escalera explained that since many protesters acted violently, they transformed the manifestation into an illegal one because they opted to commit crimes instead of exercising their right to free speech.

When Commissioner Escalera was asked about the failure to communicate a dispersal order at the second blockade near Bolivia Street, he alleged the

---

[11]  General Orders of the PRPB require the approval and signature of the Police Commissioner to be enforceable.

| Assessment Report- INTERVIEW DATA | 2018 |
|---|---|

protesters had a powerful sound equipment and the Police's megaphones were very weak.  He said he could not affirm or deny if the order was given and he has to rely on the reports submitted by his personnel.

20. PRPB Officer #1 was interviewed as part of the Assessment ordered by the Honorable U.S. District Court Judge Gustavo A. Gelpí and stated the following:

PRPB Officer #1 stated that before the "AGREEMENT FOR THE SUSTAINABLE REFORM OF THE PUERTO RICO POLICE DEPARTMENT" was implemented, he had worked in many manifestations/protests similar to the ones covered by this Assessment.  He also added that the May 1, 2017 event was the first one in which he participated after the "AGREEMENT FOR THE SUSTAINABLE REFORM OF THE PUERTO RICO POLICE DEPARTMENT" was implemented.

PRPB Officer #1 explained knowing and being familiar with General Order Chapter 600 Section 625 "Crowd Management and Control", and with Section 620 "Rules and Procedures for the Use of Specialized Weapons by Members of Specialized Tactical Divisions".

The following is a summary of activities PRPB Officer #1 was involved on May 1, 2018:

- PRPB Officer #1 informed he was the Incident Commander of the May 1, 2018 Police Operation.  He worked with PRPB Officer #2 in the strategy to be followed in the event, including the preparation of the Operation Plan.

- PRPB Officer #1 corroborated the information provided by PRPB Officer #2 when he stated that they blocked the pass of the protesters at the intersection of Roosevelt Avenue with Ponce de Leon Avenue, so the protesters could not have access to the Banks' area. They made such decision based on the previous year's incidents.  He explained that the way their plan was conceived, they didn't hinder the protesters' rights to expression and access to the stage area.

- PRPB Officer #1 stated that the PRPB's Commissioner was the one that decided to let the protesters go through at the above described intersection. He said that the Commissioner tried to be diplomatic because they were approached by the ACLU and other organizations.  The Commissioner made the decision as an act of good faith, despite the fact protesters were throwing marbles, cherry bombs, bottles, balloons filled with a clear burning liquid substance and other objects to the Police.

- PRPB Officer #1 decided to block the Ponce de Leon Avenue a second time because the protesters were entering into the Ponce de Leon Avenue and were vandalizing buildings and attacking Police agents by throwing marbles and rocks to them.  He stated that in spite of the good faith efforts on the

part of PRPB, the protesters continued their aggressive activity. He said that the policemen that were in the front line at the Liberty building blockade, moved to the side of the avenue and they were attacked by the protesters. He then moved with these officers to block Mexico St. at the East intersection with Ponce de Leon Ave. He remained at that location, so he was not present at the second blockade near Bolivia Street, hence, has no knowledge whether a dispersal order was given.

- PRPB Officer #1 explained that after the chemical agents were dispersed, he moved with his personnel to Chile St. to try to turn away the protesters from going West to Roosevelt Ave. and re-try to come back to the banks' area. He stated one protester was arrested at that location for throwing rocks to the Police. He added that while they were at Ponce de Leon Avenue, they arrested one protester who jumped a fence and upon conducting a security check of the body and pockets of that person they seized Controlled Substance marihuana from him.

- PRPB Officer #1 explained that later on he rode to Rio Piedras in a motorcycle. On his way there, he noticed assorted objects had been set on fire, there were burning tires and a refrigerator left in the middle of Muñoz Rivera Avenue. Upon arriving at Santa Rita, he was advised that persons had been arrested. There was almost a riot. The Police had to establish a perimeter. They were thrown cans of tomato sauce and beans from a nearby building. In one of the houses there were Police agents talking to an individual who was inside that house. He intervened and asked the agents if they had obtained the information needed from the individuals and when they answered affirmatively, he asked a Lieutenant from the Special Arrests Unit if he was going to get Court Order to enter the house. The Lieutenant's answer was in the negative and he then ordered all Police personnel to leave the scene. PRPB Officer #1 was confronted with the opinion of several individuals that the Operation at the Ponce de Leon Avenue was a trap the Police set up for the protesters and he answered that this was a ridiculous assertion. He stated that if his boss had not given him the order to open the line at the Liberty building, he would not have done it on his own.

- IC Jose Pujol showed PRPB Officer #1 the photographs of the protester with the injuries caused by shots of rubber pellets, the female protester that was sprayed with chemical agents and the photographs of the reporter of the Metro newspaper.

- PRPB Officer #1 stated that the Police invited many organizations to meet with them before the event and that the UTIER was the only one that attended the meeting and agreed where to place the stage area for the event.

- PRPB Officer #1 explained that he visited all the areas where the manifestations took place riding a motorcycle and all of them "flew[12]" properly except for the one coming from the UPR as they arrived at the Milla de Oro. He stated that they started throwing rocks at approximately 12:38 PM.

21. PRPB Officer #12 was interviewed again in relation to the demonstrations and incidents, involving the Puerto Rico Police and protesters, which occurred in Puerto Rico on May 1, 2018.  PRPB Officer #12 stated the following:

- PRPB Officer #12 explained that the Agents of SWAT assigned to the May 1, 2018 demonstration were equipped with the less-than-lethal weapons utilized to fire rubber pellets.  He stated that there was a total of six (6) agents assigned to the demonstration and that all of them were certified in the use of such weapons.

- PRPB Officer #12 stated that the PRPB uses <u>12-gauge shotguns </u>to fire 12mm caliber shells containing rubber pellets.  The ammunition they use is a caliber 12mm shell/round that contains eighteen (18) rubber pellets.  This type of shell is known as the "Multiple". He strongly emphasized the point that this is the only type of ammunition they use in demonstrations like the May 1, 2018 demonstration, despite being authorized to use two (2) more types: one identified as "Bean-bag", and the other one as the "Single" which they never use for any type of operation.  When asked if these shotguns can shoot shells containing plastic pellets he said yes but stated that the PRPB doesn't use them.

- PRPB Officer #12 was asked if the PRPB is authorized to shoot this type of ammunition directly against a person.  He answered that if the person is located six (6) feet away or less, they have to shoot to the ground for the pellets to ricochet and hit the person, but if the person is located six (6) feet or farther away, they are authorized to shoot directly against the person.  He stated that the regulation on how to shoot this type of ammunition is explained in Section 620 of General Order 600.

- PRPB Officer #12 explained that during the May 1, 2018 demonstration they used the 12mm caliber shells containing 18 rubber pellets (identified as "Multiple" shell/round"), as Section 620 of the General Order authorizes them.  They shot these rounds after using the chemical agents and against people that didn't disperse and were in active resistance (even violent).  He explained that once the active Operation is in course, each operator is authorized (under the supervision of a team leader) to shoot the shells when he deems it necessary.

---

12      "Flew" meaning that they took place in an orderly fashion.

- PRPB Officer #12 stated the "Use of Force Reports" were prepared for all incidents where less-than-lethal was utilized.

- During the first interview, PRPB Officer #12 explained that the injuries sustained by Subject "L" may have been at the hands of non-police private security in the area of the demonstration. When asked if he was aware of any non-police security personnel on the scene of the manifestation, PRPB Officer #12 answered affirmatively and explained that the private security personnel covered the perimeters of some buildings at Ponce de Leon and Muñoz Rivera Avenues. When asked if those security personnel were armed, PRPB Officer #12 answered that he saw them carrying weapons, including long weapons like shotguns. When asked if those type of companies were authorized to carry long weapons PRPB Officer #12 explained that under the Weapons law some companies are authorized to carry long weapons (he provided the example of Wells Fargo[13]). He stated that he believes the use of less-than-lethal shells/rounds is not covered under the Weapons Law and/or any other regulation. When asked if any effort was made to prevent these private security personnel from involving themselves in the policing of the demonstration, he stated that he always saw them inside the buildings' perimeters and that he never saw them using their weapons. He added that if he would have seen a member of a security company intervene with their weapons in the demonstration he would have intervened with them, including arresting them if necessary.

- PRPB Officer #12 was asked where their offices are located, he provided an explanation regarding the location. When asked where they stored their ammunition and weapons, he informed that they have a security vault. IC Pujol asked PRPB Officer #12 if he could visit the SWAT facilities and he agreed. IC Pujol visited the SWAT facilities in the company of PRPB Officer #12 and Agent Marilyn Santana.

- Once at the SWAT facilities, PRPB Officer #12 showed the vault to IC Pujol who was able to observe the same and found it very organized. IC Pujol randomly selected one of the kits they have prepared in case of an emergency and he was able to corroborate that the only shells with pellets in the kit were the 12mm shells carrying 18 rubber pellets, as previously stated by PRPB Officer #12. PRPB Officer #12 opened one shell in front of IC Jose Pujol who was able to count them and corroborate it contains 18 rubber pellets. Each kit contained one (1) Gas Gun (37 mm), one (1) Shotgun (12 mm), twenty (20) shells with rubber pellets and nineteen (19) rounds with OC Liquid. He explained that when they have an operation like the demonstration of May 1, 2018, they prepare one kit for each operator. PRPB Officer #12 explained that they make a daily inventory of their vault.

---

13      It should be noted that personnel from Wells Fargo carry rifle type long weapons, not shotguns, as they use regular ammunition instead of rubber pellets.

- They reviewed the photograph of Subject "L" again, and PRPB Officer #12 stated again that the pattern of the injuries looked weird to him, because the pattern that their ammunition makes is a circular one. IC Pujol informed that Subject "L" stated that he was shot more than once which could have made this irregular pattern in his back. This information presented a doubt on PRPB Officer #12 and another SWAT member present there. When directly asked by IC Pujol, PRPB Officer #12 answered that he could not affirm or deny that the Police did or did not make the shots to Subject "L". Despite that, PRPB Officer #12 stated that the lacerations on Subject "L"'s back didn't match, in his opinion, as being caused by their ammunition.

- PRPB Officer #12 stated understanding that regardless of whether the injuries sustained by the individual in the picture were at the hands of a rogue security guard or as a result of police action, it must be understood that the responsibility for the control of the demonstration rested solely with the Puerto Rico Police Bureau.

22. TCA Observer #1 was interviewed regarding his participation in the Worker's Day event of May 1, 2018 as an Observer representing the TCA at the FUSION Center, at the PRPB Headquarters. TCA Observer #1 stated the following:

TCA Observer #1 informed he arrived at the FUSION Center around 7:00 AM. The Center was commanded by a PRPB Colonel. He explained that the FUSION Center had approximately six (6) closed circuit television screens from where he could view what was happening in the field. He also explained that PRPB didn't have constant communication with the field, but that they were able to listen to the radio communications that the PRPB personnel in the field were having among them. He did not observe any decision making at the FUSION Center, and in his opinion, the FUSION Center was not a Command Center. He said that it was more of an Observation Center. In that location he was never told that there were two (2) Command Centers outside the PRPB Headquarters. Based on his observations at the FUSION Center his opinion is that the Incident Commander in the field was PRPB Officer #2.

23. TCA Observer #3 is the Executive Director of the TCA Office, and he was interviewed about his recollection of events related to the Worker's Day event (May 1, 2018). TCA Observer #3 stated the following:

TCA Observer #3 informed he met with TCA Observer #2 between 8:00 and 8:30 AM. They met with the supervisor of the marshals for the Commonwealth Court of Appeals located at the Seaborne Building and they were allowed to visit the facilities used by them to observe the manifestation.

TCA Observers #2 and #3 stated that at approximately 9:15 to 9:30 AM they met with PRPB Officer #2 (the Incident Commander) and explained to him that they were designated by the TCA as observes of the event, observing the activities. From there, TCA Observers #2 and #3 walked the perimeter (Muñoz Rivera

Ave., Roosevelt Ave. and Ponce de Leon Ave.).  They were able to see the line of Police officers that blocked the access to the Ponce de Leon Avenue in its intersection with Roosevelt Ave., where the Liberty building is located at. They witnessed many participants of the marches arriving at the area.  They went by the stage area and from there they moved to Ponce de Leon Avenue and positioned themselves just behind the line of Police Agents formed at the Liberty building area.  They were able to speak with observers from ACLU and the PR Bar Association.

TCA Observer #3 stated that at some point in time, the UPR's march commenced to arrive at the area. The other groups had already arrived at that location. When UPR group arrived, the situation started getting tense.  TCA Observers #3 and #2 moved from the stage area to Ponce de Leon Ave. at the intersection with Chardon Street where they were stopped by a line of Police Agents that requested identification to let them go through.  Upon arriving at Ponce de Leon Ave., they met the PRPB Commissioner Mr. Henry Escalera who greeted them and thanked them for being there helping in the event.  TCA Observer #3 warned that there was a tense atmosphere in the area.

TCA Observer #3 informed that after mid-day TCA Observer #4 and Mr. Jose Pujol (both TCA Observers) joined TCA Observer #2 and #3.  All were able to observe when the Governor's Counsel, attorney Alfonso Orona, arrived at the area in a black vehicle and he met with the PRPB Commissioner.  Counsel Orona and the Police Commissioner were observed speaking on their respective cell phones and approximately ten (10) minutes later they were observed leaving the area.

TCA Observer #3 stated that the first Police line (barrier) nearby the Liberty building was opened permitting the protesters to go through but thereafter a second line of policemen was assembled approximately two-hundred (200) meters behind, near the intersection with Bolivia Street.  The situation became tense and the protesters started throwing rocks at the Police.  At a point in time, the TCA Observers saw at a short distance a Police Agent and a female individual that were injured and had to be transported to receive medical attention.  PRPB Officer #2 complained loud enough to be heard by all that he was upset because the blockade at Liberty building area had been opened and he didn't know who gave the order. That such change was not contemplated in the Operational Plan that he had worked on for the last two (2) or three (3) months; that he had worked for the PRPB for the last thirty-two (32) years and that it was time for him to retire.

TCA Observer #3 clarified that at some point, OC gas was tossed against the protesters and the wind moved a cloud of gas to the area where the TCA Observers were located, affecting all of them. TCA Observer #3 additionally explained that when he and TCA Observer #2 moved around the area, many people asked them what TCA stood for, and that when they explained that these letters represented the Monitor, these people were pleased with their presence

there.  TCA Observer #2 said that in future events the TCA Observers should have equipment for protection against gases at their disposal.

24. TCA Observer #4 is an employee at the TCA's Office.  He was interviewed regarding the events related to the Worker's Day event of May 1, 2018.  TCA Observer #4 stated the following:

TCA Observer #4 informed that he arrived at the TCA's Office around 8:30 AM. He said that during the early morning hours the area was quiet.  The marches were calmly arriving to the stage area.  He stated that approximately at noon time, a large contingent of the UPR march arrived.  In that group there were individuals wearing hoods or having their faces covered with T-shirts.  He stated that along with this group arrived a group of individuals dressed as clowns who improvised acts of a mockery by ridicule of Police Agents.  TCA Observer #4 stated that he positioned himself near to the line of Police Agents that blocked the pass at the intersection of Ponce de Leon with Roosevelt Avenue.  He explained that at that location he was able to see some Police Agents that didn't have their tag with their number visible to the public. Others had the tag covered by the bulletproof vests.  He also stated that he witnessed Police agents being verbally abused and spitted at without reacting to such strong provocations. Rocks and other objects were thrown at the policemen. He left the area when he saw that the individuals covering their faces were dangerously provoking a heated-up situation.

TCA Observer #4 stated that approximately thirty (30) minutes later the Police opened the pass at the Liberty building area, so the protesters could continue walking on Ponce de Leon Avenue.  He witnessed that the Police made another blockade near the intersection with Bolivia Street.  He observed that the Police was momentaneously losing control of the situation but regained their position after long while.  He witnessed the protesters throwing rocks, marbles and other objects to the Police.  At a certain moment, he witnessed the Police aiding a protester that was either sick or injured.  He explained that he, accompanied by TCA Observers #2 and #3, tried to go past a line of Police Agents located at Mexico Street but they were denied access until PRPB Officer #2 arrived and allowed them to pass.  There they observed the situation for a while and returned to the area of the Seaborne Plaza building.  He stated that ten (10) to fifteen (15) minutes later they heard some explosions and they decided to return to the Banco Popular area, behind the blockade made by the Police Agents.  There, Mr. Jose Pujol joined them.   On that location they observed PRPB Commissioner Henry Escalera and counsel Alfonso Orona.  They saw the press and TV reporters interviewing the Police Commissioner.  He was able to see PRPB Agent # 12 picking up a big rock thrown at the policemen by the protesters. PRPB Agent # 12 told the International Press to quickly interview the Commissioner which they did it for approximately five (5) minutes.  Moments later the Commissioner left the area and approximately five (5) minutes later erupted the violent aggressions of the protesters against the Police.  The Police made use of CS gas which affected many people. TCA Observer #4 witnessed

several affected persons laying on the ground.  TCA Observer #4 and the other TCA Observers affected by the gas, left the area to return to their office.

25. TCA Observer #2 was interviewed regarding his observations during the course of the Worker's Day event of May 1.  TCA Observer #2 informed the following:

TCA Observer #2 informed that he arrived at the TCA's Office (Seaborne building) at approximately 8:00 AM. He met with other Observers representing the TCA.   He was told that TCA Observer #1, was located at the PRPB Headquarters (FUSION Center). He stated that between the hours of 9:00 and 10:00 AM they went to the building's lobby and visited the security personnel (Marshals) of the Commonwealth Court of Appeals also located at the Seaborne building.   From this time on they commenced and continued to maintain communication with the TCA, TCA Observer #5, TCA Observer #1 and Mr. José Pujol.  After visiting the Marshals, they went down to the front of the building where they observed the movement of individuals in the area. After a while, they returned to the TCA office. These visits to the front of the building were repeated several times.  Between the hours of 10:30 AM and noon, they started receiving constant updates of the status of the marches and the general situation.  The information received reflected that individuals covering their faces with hoods were present in the UPR marching group, but the Police had opted not to intervene with them.

During the course of his assignment he had a telephone conversation with the TCA who asked if he had spoken with the Incident Commander (IC), who was PRPB Officer #2.  He again went to the location in front of the Seaborne building and asked to several policemen for the Incident Commander.  He was informed that the IC was PRPB Officer #2 and started looking for him.  He placed a telephone call to PRPB Officer #2, who at the time was having lunch.  A few minutes later PRPB Officer #2 arrived, and he informed PRPB Officer #2 that the TCA Observers were present in the area.  PRPB Officer #2 explained to him that the Police had a plan. Upon concluding his conversation with PRPB Officer #2, TCA Observer #2 returned to the location where the Marshals were at.  At that time, they started receiving information that the protesters were throwing all kind of objects (including pieces of bricks) to the Police.

At that point in time, marches from three different points had arrived at the area and the number of people in the march coming from Rio Piedras was increasing. The TCA Observers went to the Liberty building area where they saw the blockade made by the Police.  Later on, in the company of TCA Observer #3, they tried to access Ponce de Leon Avenue going through Mexico Street (the short part of the street located between Muñoz Rivera and Ponce de Leon Avenues), but they found a group of police agents that did not permit them to go through.  After a while, PRPB Officer #2 allowed them to pass.  TCA Observer #2 was able to observe that the situation was becoming quite intense. He spoke to PRPB Officer #2 and conveyed to him the information he had received, that is, that the incidents between the protesters and the Police had already started.

PRPB Officer #2 told them that if they wanted to approach the area they could do it, but that he couldn't guarantee their safety. He warned that in view of all the objects that were being thrown at the Police, it was wise not to approach the area. The TCA Observers returned to the TCA Office where they continued to receive updates of the situation.

Later on, TCA Observer #2 decided to visit the area of Banco Popular Center where he was stopped by the Police and upon identification was allowed to go through with the rest of the TCA Observers. There he met PRPB Officer #2 who was upset because "they[14]" changed the plan, allowing the protesters to pass the blockade located at the Liberty building. TCA Observer #2 asked PRPB Officer #2 if he had identified the leaders of the protesters and he responded that he had identified some of them, but that there were headless (without leaders) groups. TCA Observer #2 witnessed pieces of bricks and other objects being thrown at the Police by the protesters. He was able to observe at the scene injured Police Agents and an unidentified lady, who was also injured, being transported near the place he was at. He continued to observe lots thrown objects coming against the line of Police Agents/Officers. PRPB Officer #2 told him that he would lose many Agents/Officers [15] TCA Observer #2 further asked PRPB Officer #2 about the possibility of mediation. TCA observer #2 explained that in all the occasions that he spoke to PRPB Officer #2, he treated him in a very subtle way, asking questions with sensibility, because he didn't want PRPB Officer #2 to think that the TCA was trying to influence or interfere with his job in any manner. He explained that every time he spoke to PRPB Officer #2 he passed the information to TCA Observer #3, so he could convey it to the rest of members of the TCA team.

Sometime later, the PRPB Commissioner Henry Escalera and Mr. Alfonso Orona, Esq. arrived at the location. He could see that they were talking among themselves and apparently involved in making decisions. Members of the press were also observed in that location. PRPB Officer #2 introduced the Police Commissioner to TCA Observer #2. Moments later, PRPB Officer #2 was observed visiting the area of the Police blockade and returning to where he was located before. A while after the Commissioner and Counsel Orona left the area, PRPB Officer #2 stated "esto se acabó ya" (Spanish for "This is over now"), and seconds later the Police commenced tossing smoke grenades and CS gas at the protesters. A cross wind caused some of the smoke and CS gas to flow in the direction where the TCA Observers (TCA Observers #2, #3, #4 and Mr. José Pujol) were located at and TCA Observer #2 confronted breathing problems. They all rapidly moved out of the area completely affected by the CS gas and went to the Seaborne building's parking lot where they were provided with water to wash their eyes and faces.

---

[14]     "They" It should be noted that PRPB Officer #2 never identified who had changed his plan not to let the protesters pass through the blockade at the Liberty building.

[15]     The end result would be many absences on account of injuries received

TCA Observer #2 clarified that when he spoke to PRPB Officer #2 they talked about the Police plan and the decisions the Police was making, but he never questioned or interfered with any of their decisions.  It is his opinion, based on his observations, that the Incident Commander was PRPB Officer #2, because he never saw any other Police Officer leading in the field.  He could also see Police agents/Officers contacting PRPB Officer #2 asking for information and directives from him.  TCA Observer #2 also stated that PRPB Officer #2 informed him that they had previously summoned leaders of the organizations that were going to march, and that very few, almost none, complied with the request to meet with the Police.

**Signed at San Juan, PR on November 5, 2018.**

**José L. Pujol**

**Investigations Consultant**

**OFFICE OF THE TECHNICAL COMPLIANCE ADVISOR**

**268 Muñoz Rivera, Suite 1001**

**San Juan, PR 00918**