**Legal Assessment and Viewpoint on the May 1, 2018 event circumscribed to the Incidents at Ponce De León, Roosevelt and Muñoz Rivera Avenues**

## Introduction:

An Assessment of the events that took place at the Ponce de León, Roosevelt and Muñoz Rivera Avenues was prepared by IC José Pujol pursuant to the Order of the District Court at Docket 831 of May 4, 2018.  The facts for the discussion of the legal issues were taken from this comprehensive Assessment where thorough attention was given to all details.

The events that took place on May 1, 2018, the "International Worker's Day[1],"
merit an impartial analysis and assessment of the rights and limitations of those involved, from a legal viewpoint. This writing is not intended as an ultimate opinion of who was right or who was wrong.  The legal advice herein is projected to serve as a stepping stone to reach a future remedy by learning from prior experiences and jurisprudence, with a keen interest in foreseeing a solution to this situation that seems destined to continue on a yearly basis.

**"If you can find a way to jam up a highway — literally have the city have a heart attack, blocking an artery — it causes people to stand up and pay attention,"**
said Nathan Connolly.[2] This statement accurately depicts the strategy behind having protest marches through the roads of a city.  It gets the attention of most citizens to a problem the protesters want everyone to become aware of.   The

---

1The May 1 or Day of Worker's Solidarity and Protest dates back to the year 1886 when 200,000 American workers engineered a nationwide strike demanding for an eight (8) hours workday.  In 1889 the International Socialist Conference declared May 1 would be an international holiday for labor.
2**Nathan Connolly**, an assistant professor of history at **John Hopkins University** and author of several history books.

coverage in the news media is precisely the essence of the movement to take control of a public road.  The road at issue in this writing is Ponce de León Avenue, at the segment popularly known as "The Golden Mile." This location is situated precisely at Puerto Rico's Banking District, where certain banking institutions and the Financial Oversight and Management Board of Puerto Rico had been targeted by diverse groups of local organizations in the Worker's Day March the previous year (2017) for reasons of economic grievances not pertinent to this writing.

## Brief Summary of Pertinent Facts

On a date prior to the May 1, 2018 Worker's Day event, the Police of Puerto Rico held a "press conference" informing their wish to meet with the coordinators of the different organizations expected to participate in the marching and free speech event.[3]  The first day of the month of May of every year is the date where the "Worker's Day" is traditionally celebrated in Puerto Rico. Six organizations were expected to march on that date but only the U.T.I.E.R.[4] met with the PRPB to negotiate their march from the premises of the Ben Brothers (Dos Hermanos) Bridge to the Capitol Building in the islet of San Juan.  This march started and

---

3       The Press Conference appears to be an improvised substitute in lieu of compliance with the mandates of Law 366 of September 16, 2004 (Title 25 L.P.R.A § 1181 et seq.)  It should be noted that in spite of the mandates of the aforesaid law, the government did not have in place the Interagency Committee required in Article 5 intended to be composed by the Police Superintendent (now the Police Commissioner), the Executive Director of the Highway's Authority, the Secretary of the Department of Transportation and Public Works, the President of the Public Service Commission and the Secretary of the Department of Labor and Human Resources of the Commonwealth of Puerto Rico.

4       Unión de Trabajadores de Industria Eléctrica y Riego.

ended without any known incidents.  According to PRPB Officer #1, a Colonel[5], the U.T.I.E.R. further negotiated with the PRPB that the platform from which the public would be addressed would be placed at the intersection of the Luis Muñoz Rivera and Franklin D. Roosevelt Avenues.  The different marching organizations arrived at the designated location (Golden Mile) without incident; however, those marching from the University of Puerto Rico were joined near the Commonwealth's Department of Labor building by another group of protesters participating under the adopted name of "Se Acabaron Las Promesas."   The comingled march arrived at the intersection of Franklin D. Roosevelt with Ponce de León Avenue to find that said avenue had been blocked by PRPB and rather than turning left towards the location of the platform, they insisted on going thru the blockade at Ponce de León Avenue.  It should be noted that the PRPB had also blocked the intersection at Ponce de León Avenue with Bolivia Street, further down from the first blocked intersection. At a point in time prior to the incidents to be discussed herein, a peaceful march coming from the Office of the Women's Solicitor (Procuradoria de la Mujer) further down Ponce de León Avenue, identified as "Marea Femenina" was permitted to pass by the side of Banco Popular to access Muñoz Rivera Avenue and move towards the stage area. It

---

5PRPB Officer #1is the highest ranking officer involved in the event and mentioned in the Operational Plan as the Incident Commander.  PRPB Officer #2, a Lt. Col., has claimed to be the Incident Commander and acted as such according to witnesses present at the event.  IC Jose L. Pujol has made findings to the effect that there were two Incident Commanders.  See Assessment at pages 18-19.

should be noted that the "PRPB Operational Plans" examined by I.C. José L. Pujol, state that there would be policemen posted at both intersections but do not affirmatively express they would be blocked.

## The Procedure in Place that Wasn't Followed:

Before engaging in a discussion of the legal issues arising from the facts at bar, it is proper to give ample consideration to the following:

Since September 16, 2004, Law 366 (Ley para la Planificación de Actividades de Impacto Público, Título 25 L.P.R.A.§1181 et seq.) is in force.   Article 2 of Law 366 (Declaration of Public Policy) states that the public policy of the Commonwealth of Puerto Rico is to provide the mechanism, the conditions and guarantee to all citizens that any activity involving public expression will be undertaken efficiently, with respect and in harmony with all laws and statutes (sic) in force.  It further states that the government (Estado) shall promote and protect public demonstrations and activities by groups or by persons on the public thoroughfares of the island.   It also encourages coordination between the participating organizations in relation to general aspects, such as, criteria on time or place where the intended activity is to take place within a context of reasonability, safety and stability that guarantees the rights of all members of our society.

Article 3 of Law 366 states that, the principal objectives of the law are that within the legal and constitutional framework and in coordination with the participating organizations, the general aspects of the way in which the public impact activity will take place will be established.  This superficial statement fails to provide additional information on the when, where and how and within which parameters this will be accomplished.  Article 4 (a) defines activities of "Public Impact" as those involving marches, manifestations, concentration of persons or protests conducted by organizations, groups or individuals with the intention of making known or expressing their position or opinion over issues of public interest that are conducted in public thoroughfares.  Part (b) specifies the main expressways included in the law.  Part (c) states that the term shall be understood to include the expressways and highways that are part of the thoroughfare network of Puerto Rico.

Article 5 provides for the creation of an Interagency Committee with a main goal of coordinating matters related to the implementation of Law 366.  This article provides that the Police Superintendent (now Police Commissioner) will chair this committee and the other named members are supposed to be the Executive Director of the Highway's Authority, the Secretary of the Department of Transportation and Public Works, the President of the Public Service Commission and the Secretary of the Department of Labor and Human Resources of the

Commonwealth of Puerto Rico. Any of the aforementioned members may be substituted by authorized personnel of the pertinent agency. It is further mandated that the aforesaid Committee has the faculty, pursuant to regulations adopted for said purpose, to have any manifestations, which by its nature, seriousness or implications, be resolved solely by the chief of the concerned government agency who is a part of the Committee. This Committee has the additional function of meeting periodically with organizations, groups or persons intending to carry out a manifestation, at their own request, to seek an administrative resolution without the need to conduct an activity of Public Impact as defined in article 4 of the law.

The assessment conducted by IC José L. Pujol, including the Operational Plan of PRPB, does not reflect that compliance with the creation of the Interagency Committee, nor that the subsequent mandates of Art. 5 (25 L.P.R.A. §1184-1185) were followed. As expressed before, a "press conference" was conducted to request participants in the march to meet with PRPB. Arguably General Order 600-625 prepared by the Reform Unit of the Puerto Rico Police Bureau was used in lieu of the regulations that the law required from the Committee, but still the PRPB GO 600-625 in place by May 1, 2018, lacked substantial requirements and elements contained in the law and therefore failed to comply with the statute's mandates.

It should be noted that Law 366 of 2004 was approved in September 16, 2004 and was immediately in force[6]. No constitutional challenges to said law are known. Allegations of ignorance of the existence of Law 366 of 2004 will not benefit any of those involved considering the legal maxim that "[I]gnorantia legis neminem excusat[7]."

**The parties dispute the following**:

The PRPB argues that those marching through Ponce de León Avenue, upon reaching the intersection with Roosevelt Avenue, only had to make a left turn and they would immediately reach the platform designated for public expression, thus the PRPB was not in violation of the rights of those who insisted to continue marching through Ponce de León Avenue. They further sustain that their decision to block Ponce de León Avenue was based on prior acts of vandalism and acts of violence committed against banking institutions in the same area on May 1, 2017.

On the other hand, members of the American Civil Liberties Union, hereinafter ACLU, and other individuals participating in the march, which were also interviewed by I.C. José L. Pujol, claimed that their rights were violated because they intended to conduct their public manifestation throughout Ponce de León

---

6       There are no known regulations by an Interagency Committee following Law 366.
7       Ignorantia legis neminem excusat is a legal principle holding that a person who is unaware of a **law** may not escape liability for violating that law merely because he or she was unaware of its content.

Avenue. They further claimed that the police set up a trap for them at Ponce de León Avenue.

In view of the above described opposing legal theories, the legal issues to be considered are the following:

**1:    Whether the PRPB has legal authority to establish the route to be followed by organized protesters to the location designated for "free speech expression?**

**II:    Whether the PRPB has the authority to block a street in the pathway where protesters intended to march?**

**III:    Whether the PRPB failed to comply with the mandates of General Order 600-625, that is, to provide audible dispersal orders to protesters?**

**IV:    Whether the PRPB engaged in excessive use of force?**

**THE FACTS:[8]**

**The intersection at Ponce de León and Roosevelt Avenues:**

In this specific location a line of policemen was posted establishing a human blockade of the Avenue that met protesters coming from the University of Puerto Rico and the group "Se Acabaron Las Promesas." During the span of time that elapsed at that location, the protesters threw stones, heavy objects and used

---

[8]    The facts gathered through the meticulous Assessment prepared by I.C. Jose Pujol:

slingshots to throw glass marbles at the policemen standing in the line. Audible warnings for dispersal[9] were given by the PRPB but in that span of time Police officers and a representative of the protesters engaged in verbal negotiations while the situation kept heating up. At a given point in time, a decision was taken to open the blockade at the intersection of Ponce de León with Roosevelt Avenue to permit the protesters to continue on their way through Ponce de León Avenue.  The immediate result was the breaking of glass windows in at least two buildings and graffiti being written in the outer walls of buildings.  A line of policemen blocking Méjico Street was also discontinued as the protesters moved further down the Avenue.

The PRPB had assembled a second blockade in Ponce de León Avenue near the intersection with Bolivia Street, where other specialized units had joined to reinforce the line.  The protesters arrived at this second blockade armed with wood shields, wood sticks, stones, slingshots, glass marbles and rubber balloons filled with liquid skin burning substances.  A pickup truck with loudspeakers was brought near the police line and it carried stones, a loudspeaker and a subject that continuously encouraged protesters to overcome the line of policemen.  Another stone throwing and vandalism outbreak followed and the PRPB advised the

---

9       The videos examined by I.C. José Pujol reflect the dispersal advice was given at this location and the same was audible.

protesters to cease the violence.   The protesters were chanting "somos más[10]"
Further negotiations were intended but at a certain moment, the pickup truck was
removed and the man encouraging the protesters urged them to charge against the
line of policemen. Stones and skin burning liquid substances were thrown, sling
shots were used and the protesters charged and confronted the line of policemen
pushing them with the wood shield and hitting them with wood sticks.   The
policemen immediately reacted using their expandable batons and making use of
gas and smoke grenades that resulted in getting the protesters on the run and the
Police in pursuit of them.

**Points of Interest:**

According to the "Assessment" conducted by I.C. José L. Pujol, in due course the
Police Commissioner decided to permit the demonstrators to go through the first
blockade at Ponce de León Avenue to honor the negotiations made by his officer at
the scene. Since the individuals facing the police at that location continued their
acts of violence and vandalism PRPB Officer #1[11], a Colonel, decided to continue
the blockade further down at Ponce de León Avenue.  PRPB Officer #1 personally
informed I.C. José L. Pujol that it was the Police Commissioner who gave him the
order to open up Ponce de León Avenue, however, on that same date, May 1, 2018,

---

10Spanish for "We are more," meaning the protesters were more in numbers than the policemen.
11The information obtained from the interviews conducted reflects that Lt. Col. PRPB Officer #2 acted as the
Incident Commander and during his interview with I. C. José Pujol, he claimed he authored the Operational Plan for
the location referred to as "La Milla de Oro."

news reporter José Estevez (Telemundo), reporting live, stated that PRPB Officer #1, had told him that the order to open up Ponce de León Avenue had come directly from Governor Ricardo Rosselló.[12]  Notwithstanding the aforesaid order, it is also reported that PRPB Officer #1 decided by himself to block Ponce de León Avenue closer to the intersection with Bolivia Street where violent incidents were taking place. This determination was taken on account of policemen being pushed by passing protesters and glass windows being broken.  While dispersal orders[13] were given to protestors at the blockade in the proximity of the Liberty Building, none were given at the location of the blockade formed near Bolivia street where the attack conducted by protesters was sudden and strong and gas and smoke devices had to be used as soon as possible according to the statements made by PRPD Officer #2, a Lt. Colonel in the Memorandum of Interview prepared by I.C. José L. Pujol.   It should also be considered that the Operational Plan for the event was prepared by PRPB officers #1 and #2.

---

[12]No weight is given to this statement which is considered as inadmissible "Hearsay evidence."

[13]Both the Second and the Seventh Circuits have relied on Cox v. Louisiana,  379 US 536 (1965) which analyzed the issue primarily under the Due Process Clause, Id. at 571–72. In those cases, courts have recognized a substantially similar right. Specifically, they have held that, where demonstrators reasonably believe that they are lawfully exercising their First Amendment rights, officers cannot arrest or disperse them without first giving "fair warning as to what [about their conduct] is illegal." Cox, 379 U.S. at 574; see also Garcia v. Bloomberg, 865 F. Supp. 2d 478, 487 (S.D.N.Y. 2012).  Most  commonly, courts find that demonstrators reasonably believe that their actions are lawful because police officers have either expressly or apparently permitted those actions.8 In other cases, however, courts have imputed a right to fair warning to demonstrators simply because those demonstrators "had an undeniable right" to engage in "peaceable protest activities."9 Where courts attribute a right to fair warning to demonstrators, they generally forbid officers from dispersing or arresting

**Prior Known Incidents**:

According to known facts resulting from an exhausting Assessment[14], on the Worker's Day march held on May 1, 2017, there were several violent incidents where acts of vandalism took place involving the property of Banco Popular de Puerto Rico, a banking institution located at the intersection of Ponce de León Avenue and Bolivia Street.  As a result of the criminal deportment displayed at that location by protesters, property damages were estimated to be around two million dollars ($2,000,000.00) and a female individual was convicted and sentenced by the United States District Court for the District of Puerto Rico for a violation of Title 18 United States Code, Section 371, a conspiracy involving the use of an explosive device.

**Legal Authorities**:

In order to analyze the situation, we must start by considering the basic rights of those that elected to protest and the duties that had to be observed by those who by reason of their employment, the policemen, were sworn to serve and protect the citizens of Puerto Rico, the property of the citizens and the government.

The Bill of Rights of the Constitution of the Commonwealth of Puerto Rico, Section 1 reads as follows:

---

14An Assessment of the Worker's Day March of May 1, 2017 was ordered by the Hon. Gustavo A. Gelpi, United States District Judge.

Section 1. "The dignity of the human being is inviolable. All men are equal before the law. No discrimination shall be made on account of race, color, sex, birth, social origin or condition, **or political or religious ideas.** Both the laws and the system of public education shall embody these principles of essential human equality (Emboldened for emphasis)."

Reference is also made to the text of the Bill of Rights at Section 4, which states the following:

Section 4. "No law shall be made abridging the freedom of speech or of the press, or **the right of the people peaceably to assemble** and to petition the government for a redress of grievances (Emboldened for emphasis).

In the seminal case of <u>Burson   v. Freeman</u>, 504 U.S. 191 (1992), the Supreme Court of the United States expressed the following:

"The first amendment provides that "Congress shall make no law . . . abridging the freedom of speech . . . ."This Court in **Thornhill v. Alabama**, 310 US 88, 95 (1940), said: "The freedom of speech . . . which [is] secured by the First Amendment against abridgment by the United States, [is] among the fundamental personal rights and liberties which are secured to all persons by the Fourteenth Amendment against abridgment by a State."

Further reference is hereby made to the text of the First Amendment to the Constitution of the United States of America, which reads as follows:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or **the right of the people peaceably to assemble**, and to petition the Government for a redress of grievances. (Emboldened for emphasis)"

It immediately surfaces that the phrase "**the right of the people peaceably to assemble**" is common to both, Section 4 of the Bill of Rights of the Constitution of the Commonwealth of Puerto Rico and to the First Amendment of the Constitution of the United States.   A sensible interpretation of such wording understandably leads to the conclusion that disruptive behavior is not a constitutionally protected right or activity within the right to assemble here in Puerto Rico or in the United States.   In plain words, there is not a constitutionally protected right to conduct a riot. Generally, all types of expression are constitutionally protected in traditional "public forums" such as streets, sidewalks and parks. Speech activity may be permitted to take place at other public locations that the government has opened up to similar speech activities, such as the plazas in front of government buildings.   It should be noted that the Commonwealth of Puerto Rico, like many states of the Union, has a law that requires participants to, prior to an activity, inform the government that they will engage in a free speech activity or a march to protest any grievance.   The enactment of Law 366 of 2004 in the Commonwealth of Puerto Rico was intended to solve many problems by having the would-be protestors inform the place or places where they intend to march, the location where free speech activity will take place and the expected duration of the event.   This appears to be a very judicious solution to minimize problems such as eventual traffic jams, crisis situations where ambulances are not impeded of conducting their emergency

responses, unnecessary conflicts with persons not involved in the protest and other situations that necessarily involve public safety or the sound level of the amplification equipment in the vicinity of certain areas such as hospitals or private enterprises who are not the object of the protest.   In an ideal world, the reason for this is that there should be a "balance" between the citizens' right to lawfully assemble and the location, date, time and the way the assembly is intended to come about.   It should be pellucid clear that the government cannot require that individuals or groups obtain a permit in order to speak or protest in a public forum.[15]   [See **Snyder v. Phelps**, 562 US 443 (2011), a case where the Supreme Court ruled that speech on a matter of public concern, on a public street, cannot be the basis of liability for a tort of emotional distress, even in the circumstances that the speech is viewed or interpreted as "offensive" or "outrageous".]   However, Justice Samuel Alito, the only dissenting opinion, stated the following:   "Our profound national commitment to free and open debate is not a license for the vicious verbal assault that occurred in this case." He concluded, "In order to have a society in which public issues can be openly and vigorously debated, it is not necessary to allow the brutalization of innocent victims like petitioner."

At this juncture it is respectfully submitted that the matter is ripe to engage in the first issue presented by this legal assessment, that is:

---

[15]Law 366 of 2004  was carefully redacted to reflect that the same does not imposes nor intends to impose the obligation to obtain a permit to speak or protest in a public forum.

**Whether the PRPB has legal authority to establish the route to be followed by organized protesters to the location designated for "free speech expression?**

In those jurisdictions where a law[16] or a city ordinance requires the protesters to inform in advance the date, time and location of the free speech event, including the roads selected to march towards the designated location, the government may review the time, place and manner of the public assembly or demonstration and weigh these factors against the group's right to demonstrate. [*See* Grayned v. City of Rochester, 408 U.S. 104 (1972).]

The rule generally accepted in construing laws relative to the right of assemble is that if there is a conflict between the law and the right to peaceably assemble then the law must be narrowly tailored in such a way as to permit the right to peacefully assemble. It should be noted that protest speech cannot be banned because of fear that others may react violently to the speech.  In that same vein, demonstrators cannot be punished or forbidden from speaking because they might offend a hostile mob. Unfortunately, rules of civility cannot be expected to prevail in situations where a hostile group feels offended and then the policemen at the scene need to protect themselves and conduct arrests when offenses are committed in their presence.

---

16Law 366 of 2004 requires the protesters to inform in advance the date, time and location of the free speech event, including the roads selected to march towards the designated location, but regarding the route the police may alter the same for public and safety concerns.

It was predictable that there would be protest marches on the 1st. day of May, 2018. Although the government did not fully comply with the mandates of Law 366 of 2004, as it refers to the creation of an "Interagency Committee" and regulations to manage Public Impact Activities, the Puerto Rico Police Bureau was conscious of the upcoming event and held a "press conference" informing their wish to meet with the coordinators of the different organizations expected to participate in the marching and free speech event.  Six organizations were expected to march on that date but only the U.T.I.E.R.[17] met with the PRPB to negotiate their march and that particular march had a route starting at Ben Brothers Bridge and ending at the Capitol Building in Old San Juan.  It is known that the U.T.I.E.R. was also involved in the determination of the location of the public expression platform located at Munoz Rivera and Roosevelt Avenue intersection.  Since no other organizations participated, apparently no information was published or in any way disseminated as to the routes to be followed to reach the public expression platform.  Nonetheless, the police positioned their assets in locations where they could block access of demonstrators to the Banking District.  Advance notice of the routes to be followed leading to the public expression platform could have dissipated beforehand any doubts as to the locations where access would be permitted. However, it is hereby acknowledged that such action may not have

_____

[17]Unión de Trabajadores de Industria Eléctrica y Riego.

posed a deterrent to marchers who would still insist on reaching the Banking zone by any possible means, including violent demeanor.

Since no established routes were made known in advance to would be protesters, a false sense of empowerment to go anywhere may be claimed by those who insisted on marching through Ponce de León Avenue towards the Banking District. Consideration must be given to the fact that the particular group involved in the skirmish must have made plans of their own and set their own routes in the absence of prior notice of which locations would have limited or no access at all.  It is highly recommended that in future public impact events the routes to be followed and the location of the public expression platform is made known in advance to would be marchers/protesters through the media and by any additional means of communication to their known leaders.

The fact that the Police Operational Plan[18] did not exactly provide for blocking Ponce de León Avenue at the intersection of Roosevelt Avenue[19] could well have added to the problem by creating hesitation and confusion among those policemen placed at that specific location.  The situation was compounded later on with inapposite and contradictory instructions on whether or not the protesters would be

---

18 Police operational plans are internal documents.  These operational plans were obtained pursuant to an Order of the District Court and are not available to the public prior to or after a public impact event.
19 PRPB operational plans" examined by I.C. Jose L. Pujol, state that there would be policemen posted at both intersections but do not affirmatively express they would be blocked.

permitted to go through while the policemen in the front-line endured insults and physical abuse for extended periods of time.

While it may be debatable whether the protesters intending to march all the way through Ponce de León Avenue had a Constitutional Right to demonstrate at certain banking area, there is no law or Constitutional precept that entitles anyone to force its way by intimidation and/or a display of violence against authority.  The proper venue to assert Constitutional rights are the Courts of our judiciary system.

This case presents a particularly challenging compromise: the accommodation of the right to march through public streets to engage in political/protest discourse with the sworn duty of the government, through the Puerto Rico Police Bureau, to safeguard and protect lives and property, a guarantee of the government to its citizens in a country observant of law and order, a vested right at the heart of our democracy.

There is ample jurisprudence to the effect that the government may, under certain conditions determine the time, place and the manner in which the right to free speech will be expressed.  See Perry Educ. Association v. Perry Local Educators' Association, 460 U.S. 37 (1983) at page 45.  See also, Hill v. Colo., 530 U.S. 703, 726 (2000); Burson v. Freeman, 504 U.S. 191, 197 (1992).

Without limitations or restrictions to free speech our democratic society would be deprived of a sensible degree of order or civility in such a way that citizens would be free to express their message without restrictions as to context of place, time or the means of expression.

Public forums include those places" which by long tradition or by government fiat have been devoted to assembly and debate," such as parks, streets, and sidewalks. Perry Education Assn. v. Perry Local Educators' Assn. supra." Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens."Hague v. CIO, 307 US 496, 515 (1939) (opinion of Roberts, J.). At the same time, however, expressive activity, even in a quintessential public forum, may interfere with other important activities for which the property is used. Accordingly, the Supreme Court of the United States has held that the government may regulate the time, place, and manner of the expressive activity, so long as such restrictions are content neutral, are narrowly tailored to serve a significant governmental interest, and leave open ample alternatives for communication.  United States v. Grace,  461 US 171 at 177 (1983).  See also Ward v. Rock Against Racism, , 491 US 781,791 (1989).

Law 366 of 2004 was and still is in place at the time of this Legal Assessment. Although not fully complied with, the PRPB used the media to request and invite any and all intending to march in the May 1, 2018 event.  Only U.T.I.E.R.

complied and routes were established for their march and a platform at a selected location was prepared to provide and permit anyone and everyone to exercise the right to free speech.  As commented before, it would have been for the benefit of everyone if such route had been notified to the media and the organizations expected to demonstrate although it is not a statutory requisite to inform and or publish the course of the route.  Not being a statutory requisite, the same is not enforceable.

The Supreme Court of the United States has permitted in limited occasions restrictions to free speech, when there is a clear regulation strictly designed to proscribe certain types of expressions by reason of its content when it falls within the following categories:

(1) speech that incites to imminent lawless action, such as a speaker who urges the lynch mob to attack; (2) speech that triggers an automatic violent response (so called "fighting words" or "true threats"); (3) obscenity, (which the Court narrowly defines to exclude much material that the popular press often describes as pornography); (4) child pornography, a limited category of speech involving photographs and films of young children; (5) certain types of defamatory speech; and (6) certain types of commercial speech, primarily false or misleading speech connected to the sale of a service or product, or offers to engage in illegal activity, such as advertisement for a male-only employee when the law forbids sex discrimination.

The Supreme Court of Puerto Rico has also ruled that on certain limited exceptions the government may regulate free speech based on content of the message when

the message is (1) subversive, (2) defamatory, (3) is an invasion of privacy,[20]  (4) is

obscene or (5) of a commercial nature.  See Colón v. Romero Barceló, 112 D.P.R.

573 (1982); Pueblo v. Olivero Rodríguez, 112 D.P.R. 369 (1982); Pueblo v.

Burgos, 75 D.P.R. 551 (1953); Guadalupe v. Bravo, 71 D.P.R. 975 (1950).

Although the Supreme Court of Puerto Rico has also expressed that freedom of

speech is not an absolute right and freedom of speech may be subordinated to other

interests when public needs and convenience so require, the case of Mari Bras v.

Casañas, 96 D.P.R. 15 at page 21 (1968), must be considered.  In that case, five

days prior to the general elections of 1964, the Elections Board issued regulations

to close down any locations distributing political propaganda in the vicinity of

electoral colleges and to prohibit the use of amplifiers with political propaganda on

elections day so as to prevent any type of arguments or conduct that would lead to

disorderly conduct.  The defendants in that case used a vehicle with an amplifier to

ask would be voters to abstain from voting.  The Supreme Court reversed the

ruling of the lower court denying a request for Habeas Corpus and held that the

regulations were unconstitutional as they prohibited free speech precisely for the

dissemination of concepts and ideas.  The amplifier was merely a mechanical mean

to amplify free speech. This case should be considered with the case of Burson v.

Freeman, 504 U.S. 191 (1992) where the Supreme Court of the United States

---

20      The phrase used in the Spanish language is "[I]nvasora de la intimidad."

upheld a Tennessee Elections Board Regulation that prohibited political propaganda within 100 feet of a polling station on election day.  The Court held that the government may regulate the time, place, and manner of the expressive activity, so long as such restrictions are content neutral, are narrowly tailored to serve a significant governmental interest, and leave open ample alternatives for communication.  The government had a compelling interest in protecting the citizen's right to vote.

In view of the above, it is respectfully submitted that the PRPB was entitled to establish the routes to be followed by the protesters on Worker's Day of May 1, 2018.  Furthermore, Law 366 of 2004 was and still is in place and no Constitutional challenges have been filed in Court involving the precise issues of establishing marching routes,  selection of a location to exercise free speech or a claim the aforesaid Law 366 is in any way restrictive of free speech.

**Whether the PRPB had the authority to block a street in the pathway where protesters intended to march?**

From the information provided to I.C. José. Pujol, it is clear that the decision to block Ponce de León Avenue took place before the protesters coming from the University of Puerto Rico and the vicinity of the Department of Labor arrived at the intersection with Roosevelt Avenue. This situation could understandably be the

result of a lack of communication attributable to this group of protesters not having a previous meeting with the Police compounded by the fact that the established routes and the location of the free speech platform had not been given appropriate publicity as previously commented.  The police intended the protesters to march towards the platform at the intersection of Roosevelt with Muñoz Rivera Avenue, as per the previously established marching route, expecting from them to voice a common grievance against the labor situation or against the Fiscal Oversight and Management Board. The protesters from the University of Puerto Rico and the group identified as "Se Acabaron las Promesas" insisted to continue marching on Ponce de León Avenue.  The specific reason for selecting Ponce de León Avenue rather than the platform used by other groups for public expression may never be known, but the videos of the actions taken of some of the individuals in that commingled group are relevant to prior preparation and commitment for violent deportment.

It should be noted that in cases where the police traces a route to reach the place where the free speech constitutional activity is to take place, even in the case where no permit was issued or agreement was reached as to the route to be followed, but the police accompanies the marching protesters holding up traffic at intersections or permitting a traffic jam while the protesters are en-route, the police cannot arrest them for traffic violations or for failure to obtain a permit to conduct the march

through public roads. Four United States Circuit Courts of Appeals have decided the issue in the negative.[21] The issue has been resolved to the extent that demonstrators may sue officers over such arrests.

The way the different courts reached the same conclusion varies. The Court of Appeals for the Second Circuit held that even officers who have a "lawful basis to interfere with [a] demonstration" under the Fourth Amendment can nonetheless violate the "separate" requirements of the First Amendment. The Seventh Circuit has analyzed an arrest of demonstrators entirely under the Fourth Amendment, characterizing parallel First Amendment claims as "largely duplicative." In their respective conclusions, both the Second and the Seventh Circuits relied on the Supreme Court's decision in Cox v. Louisiana, 379 US 536 (1965) where the issue was analyzed under the Due Process Clause. The rights recognized by these courts are quite similar. The courts have expressly held that, where demonstrators reasonably believe that they are lawfully exercising their First Amendment rights, officers cannot arrest or disperse them without first giving "fair warning as to what [about their conduct] is illegal." Most commonly, courts find that demonstrators reasonably believe that their actions are lawful because police officers have either expressly or apparently permitted those actions. In other cases, courts have

---

21 See generally Garcia v. Does,  779 F.3d 84 (2d. Cir. 2014) 2014); Vodak v. City of Chicago, 639 F.3d 738 (7th Cir. 2011); Buck v. City of Albuquerque, 549 F.3d 1269 (10th Cir. 2008), cert. denied (2015); Papineau v. Parmley, 465 F.3d 46 (2d Cir. 2006); Dellums v. Powell, 566 F.2d 167 (D.C. Cir. 1977).

imputed a right to fair warning to demonstrators simply because those demonstrators "had an undeniable right" to engage in "peaceable protest activities." In those cases where the courts have recognized a right to provide fair warning to demonstrators, officers may not be allowed to disperse or arrest until the demonstrators receive a reasonable opportunity to conform their conduct to the officers' demands. The right to fair warning imposes a difficult burden on officers in cases like the one herein under assessment. Before officers may engage in enforcement mechanisms, the right to fair warning requires them to clearly communicate a message to a large mass of people and to give that mass a reasonable opportunity to comply.[22]

Having already favorably considered that the jurisprudence analyzed and the law permits the PRPB to establish the routes to be followed to the designated/agreed upon free speech platform, it follows that the Police also has legitimate authority to oversee that marchers follow said routes.   Again, the fact that the established marching routes were apparently unknown to those marching on Ponce de León Avenue,  might have given them a false sense of empowerment to determine their marching routes.  It is also fair to assume the leaders of those organizations knew about Law 366 of 2004 and could have attended the meeting with PRPB as did the U.T.I.E.R.  Once again, ignorance of the law is unacceptable as an excuse for non

---

22      PRPB General Order 600-625 provides accordingly.

compliance. Even if for the sake of argument it could go unquestioned the protesters were entitled to continue their march on Ponce de León Avenue, it will never be a valid argument that they were entitled to engage in the commission of criminal offenses to overpower the Police. The evidence reflects that in spite of the stone throwing incidents, the Police negotiated with the protesters and permitted them to continue their march even after the situation heated up to the point that dispersal orders were given. Notwithstanding the fact that the protesters were allowed to continue their march on Ponce de Leon Avenue, the evidence observed in the videos and the statements of eyewitnesses show the acts of aggression and vandalism immediately had resurgence.

Upon strict legal consideration of the preceding facts, was it sound judgment on the part of the Police to reinforce the second line of policemen near the intersection with Bolivia Street? Could the Police assume that the group of protesters turned into an angry crowd would continue to engage in the commission of further public offenses and acts of vandalism? Both questions must be answered in the affirmative. There was prior knowledge of public offenses and acts of vandalism that took place in the year 2017. In addition to that, the prior recent incidents that took place immediately after the protesters were allowed to go past the first blockade was a clear indication of what to expect next. This march was certainly

not the peaceable protest activity to which the Constitutions of the United States and the Commonwealth of Puerto Rico make reference to.

Considering the facts stated above and the applicable law it can be concluded with certainty that the Police of Puerto Rico, was entitled to block Ponce de León Avenue and attempt to direct the protesters to the designated free speech platform.

**Whether the PRPB failed to comply with the mandates of General Order 600-625, that is, to provide audible dispersal orders to protesters?**

This is one of the main legal issues under scrutiny in this case.  General Order No. 600, Section 625, crafted by the Reform Unit of the Police of Puerto Rico and then also in place, imposes to members of the Puerto Rico Police Bureau, engaged in crowd control situations, such obligation to provide "fair warning" to protesters. The jurisprudence cited herein also imposes such obligation. The courts have expressly held that, where demonstrators reasonably believe that they are lawfully exercising their First Amendment rights, officers cannot arrest or disperse them without first giving "fair warning as to what [about their conduct] is illegal."  In practice, the right to fair warning frequently imposes a difficult burden on officers. Occasionally, placing an agent behind the protesters to record and make sure the dispersal orders ("fair warning") are audible places the agent in grave danger when the protesters become aggressive even before the warning is given through loudspeakers.  Unfortunately this requirement is considered among "best practices"

in many jurisdictions in the United States.  The Reform Unit of the PRPB may consider amendments to this particular requirement of the General Order after due consideration and consulting high ranking officers.

There is reliable evidence that the dispersal orders were given at the first blockade and they were audible, therefore that event merits no further discussion.  The main concern is the alleged dispersal orders at the second blockade.  The videos examined do not reflect audible evidence that dispersal orders were given. Reference is made to the Assessment prepared by I.C. Jose Pujol where high ranking police officers provided statements ranging from absolute certainty that the dispersal orders were given to those that candidly admitted there were no dispersal orders.  There were also non committal statements that they could not hear the orders, the orders could not be heard on account of the loudspeaker equipment of the protesters impeding and making inaudible the Police equipment.  Another version provided to I.C. Pujol was that the sudden assault by the protesters to the Police line did not provide for enough time to air the warnings, which constitutes a clear admission that the dispersal orders were not given at the second blockade. On the other hand, the evidence in the videos distinctly show a very tense atmosphere with episodes of stones, glass marbles fired from slingshots and skin burning substances being thrown at the police.  There is also evidence that the man handling the protester's loudspeaker equipment gave an order to charge against the

police line.  The protesters in the front had wood shields and immediately clashed with the line of policemen.

Although it is evident that the dispersal orders were not given at the second blockade and it certainly affected the rights of non aggressive protesters, it is quite hard to assume there was time to air those orders on the loudspeakers and even less time to place a policeman behind the protesters to gage the audibility and record the same. It is not sensible to place any type of blame on the front line policemen who used their batons to defend themselves.  Given the number of protesters, less than lethal weapons, including gas and smoke grenades were required hold the position and disperse the violent crowd.  The aftermath of the skirmish at the second blockade leads to the fourth issue in this legal assessment.

**Whether the PRPB engaged in excessive use of force?**

The assessment prepared by IC José L. Pujol informs in detail the instances of when and where the "use of force" was engaged and whether the same was warranted or not. Broadly speaking, the **use of force** by law enforcement officers becomes necessary and is permitted under specific circumstances, such as in self-defense or in defense of another individual or group. There is no single, universally agreed-upon definition of "**use of force**" however; illegal/forbidden use of force becomes obvious when you see an individual placed at a disadvantageous situation

subjected to unwarranted punishment.   Paraphrasing Justice Potter Stewart's comments in the case of <u>Jacobellis v. Ohio</u>, 378 US 184 (1964), you know excessive use of force when you see it.[23] In support of the aforesaid, there is photographic evidence of excessive use of force by policemen at Munoz Rivera Avenue where the person in the photograph was heavily sprayed with a chemical agent at a distance of less than six feet in a situation where the person, a woman carrying a bottle of water, a purse and a handbag, did not represent any type of threat to the safety of the policemen.



---

[23]      Characterization of pornography by Supreme Court Justice Potter Stewart: "I know it when I see it", <u>Jacobellis v. Ohio</u>, 378 US 184 (1964).





Another instance depicting excessive use of force by the Police during the May 1, 2018, protest is shown in the sequence of photographs below, where a reporter who had properly identified himself and was complying with an agent's instructions was struck with a baton in his back by another agent. Surprisingly, a PPR Form-854 was not prepared for any of the use of force instances depicted in these photographs.

Failure to fill out PPR Form 854 in both instances raises the specter of suspicion of wrongdoing even more.







The proper remedy against unwarranted/illegal use of force by the police against a citizen is to contact federal authorities to investigate and file a Complaint/Indictment for violation of Civil Rights.[24] The agency in charge of investigating complaints of Civil Rights violations is the Federal Bureau of Investigations (FBI) through its duty agent.

---

[24]Title 18 United States Code Section 242 provides as follows:

"Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such person being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined under this title or imprisoned not more than one year, or both;  and if bodily injury results from the acts committed in violation of this section or if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire, shall be fined under this title or imprisoned not more than ten years, or both;  and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse, or an attempt to commit aggravated sexual abuse, or an attempt to kill, shall be fined under this title, or imprisoned for any term of years or for life, or both, or may be sentenced to death."

It should be noted that in the Assessment prepared by IC José L. Pujol, he comments that the evidence showed that the PRPB failed, like it did in the previous year (2017), demonstrations, "to adhere to its policies, prior to using chemical agents and less than lethal ammunition against the protesters, by not providing repetitive information to the protesters via loud speakers about 1) the violations they were committing; 2) informing them of the dispersal order; 3) and informing them about the routes to be taken to leave the area.  The evidence also showed that the PRPB failed by not placing a police officer in civilian clothes in the area behind the protesters to listen to and determine if the required communications/orders from the police to the protesters were audible[25]."   Furthermore the PRPB should have followed the aforesaid mandated procedures of General Order 600-625[26] to also comply with preparing a video recording of the required compliance.

The different interviews conducted by I.C. José  Pujol reflect conflicting orders (1) to block the intersection at Ponce de León and Roosevelt Avenues (in front of the Liberty Building, (2) to block both sides of Ponce de León Avenue connecting to Calle Méjico, (3) an order of dispersion to protesters at the intersection of Ponce de León and F.D. Roosevelt avenues, (4) permission/acquiescence to continue marching on Ponce de León Avenue, (5) release of a blockade at both ends of Calle Méjico and

---

[25]In spite of the obligation pursuant to GO 600-625, reference is made to comments by the undersigned in this document.

[26]General Order 600-625 (Crowd Management and Control)

a (6) second blockade at the intersection of Ponce de León Avenue and Calle Bolivia where the situation heated up to the point dispersal orders were arguably time precluded.  At this juncture it appears the Operational Plan and the discretionary on-going determinations to be taken by the Incident Commander during the course of the occurrence were changed and one or more subjects took turns at improvising remedies that aggravated an already heated situation.  It should be noted that an observer present at the scene informed that he spoke to PRPB Officer #2, a Lt. Col. , who was upset because "they[27]" changed the plan, allowing the protesters to pass the blockade located at the Liberty building.

Considering the photographic evidence presented and the statements provided by the witnesses, it undisputable that certain policemen incurred in illegal use of force to the point their actions could be considered life threatening.  The PRPB should not hesitate to identify these offenders in uniform and charge them with administrative sanctions and criminal prosecution.  These motiveless abusive acts on the part of those representing law and order will eventually cost the government and the tax payers thousands, if not millions of dollars in civil claims.

### **Analysis – What happened and what could have been done?**

*"Hindsight is notably cleverer than foresight."*

> *United States Navy Fleet Admiral Chester W. Nimitz*

---

[27]"they."  It should be noted that PRBB Officer #2 never identified who had changed his plan not to let the protesters pass through the blockade at the Liberty building.

The undersigned firmly agrees that it's much easier to tell what went wrong than to be able to foresee what will go right, but the case in question has a variant that precluded the limited possibilities of getting it right the first time around, albeit this is historically the second time around. It is respectfully submitted that the lessons learned merit the following:

A.     Law 366 of 2004 needs to be fully complied with, its regulations published and given publicity in the news media.  This action will rule out most doubts regarding the process to follow before engaging in a protest march and will encourage participation in the selection of routes and the location of the platform.

B.     Established marching routes after meeting with protesters and agreeing to the marching route must be made known to all citizens and would be marchers that failed to attend the meeting with the Interagency Committee to make sure no person or entity planning to march can claim a false sense of empowerment to establish their own routes. Locations with limited or no access at all should also be informed.

C.     There is no place in our society for those that attempt to deny the people's right to free speech either directly, precluding the people from airing their protest or indirectly by challenging the authorities to the point of obtaining the dispersal of an event and thus precluding others from peacefully voicing their protest.  Both

sides, the Police and the protesters should collaborate to identify and prosecute those that obstruct free speech.

The right to "Free Speech" is among the most important, if not the most important right of the Constitution of the United States and the Constitution of the Commonwealth of Puerto Rico.  Citizens given the opportunity to be heard will certainly point out what's wrong and cause positive changes to the system.

**Conclusion:**

In the aftermath of the event we need to consider whether the same, in the best scenario, can be considered as a learning experience.  The lessons learned do not constitute a guarantee that there will not be a repeat performance of the unnecessary violence displayed on the first day of May 2018 at Ponce de León Avenue.  The PRPB failed to follow the mandates of Law 366 of 2004 and also failed to adequately inform the routes to the free speech platform.  There were also failures on the part of the Puerto Rico Police Bureau to follow the mandates of their own General Order 600-625.  Notwithstanding the aforesaid, the policemen following orders at the scene cannot be blamed for the faults in the work plan nor for the improvised changes to control the event or for the moments of hesitation the top echelon had in deciding whether to let the protesters through or stand by the determination to restrict entrance to the Banking District.  On the other hand, the

police apparently expected the protesters to abide by their orders and follow the pre-determined route to the platform; however, the intended march suddenly turned into an impatient crowd and from there into a state of lawlessness which required use of force to repeal. The evidence available in the videos reveals the protesters made use of slingshots with projectiles, full sized sticks, hurled heavy rocks and chemical substances at the policemen and vandalized public and private property on their way to attempt to overwhelm the police blockade. The evidence also shows occasional illegal unrestricted use of force on the part of some policemen to counter the action displayed by the protesters. What remains at this point in time, in terms of deterrence to discourage a repeat performance, is identification of the offenders from each side and strong prosecution to disperse any notion of permissiveness and impunity. There is no place for non-judgmental attitudes nor for anarchy in a society of law and order where free speech has been guaranteed to all who want to publicly make known their grievances against the government.[28]

The unnecessary distress and suffering of those caught in the commotion of the event bring into my recollection the following excerpt of a speech by former President Theodore Roosevelt.

---

28      Our government… teaches the whole people by its example. If the government becomes the lawbreaker, it breeds contempt for law, it invites every man to become a law unto himself; it invites anarchy. *Justice Louis D. Brandeis, United States Supreme Court.*

**THE MAN IN THE ARENA** (Excerpt of Speech by Theodore Roosevelt at the Sorbonne University, Paris, April 23, 1910).

*It is not the critic who counts; not the man who points out how the strong man stumbles, or where the doer of deeds could have done them better. The credit belongs to the man who is actually in the arena, whose face is marred by dust and sweat and blood; who strives valiantly; who errs, who comes short again and again, because there is no effort without error and shortcoming; but who does actually strive to do the deeds; who knows great enthusiasms, the great devotions; who spends himself in a worthy cause; who at the best knows in the end the triumph of high achievement, and who at the worst, if he fails, at least fails while daring greatly, so that his place shall never be with those cold and timid souls who neither know victory nor defeat.*

San Juan, Puerto Rico, this 7th. day of November 2018.

S/ Antonio R. Bazán