

**GOBIERNO DE PUERTO RICO**
DEPARTAMENTO DE SEGURIDAD PÚBLICA
Negociado de la Policía de Puerto Rico

Héctor M. Pesquera
Secretario

Henry Escalera Rivera
Comisionado

OS-1-1-375

25 de octubre de 2018

Lic. Valerie Concepción Cintrón
División de Litigios Federales y Quiebras
Departamento de Justicia

Cor. Reinaldo Bermúdez
Comisionado Asociado

**Comentarios del Negociado de la Policía de Puerto Rico al Informe de Evaluación de la Manifestación del primero de mayo de 2018 presentado por la Oficina del Monitor**



Hacemos referencia al informe "ASSESSMENT REPORT Police of Puerto Rico's Response to the demonstrations and incidents involving the May 1, 2018 (Worker's Day)" (en adelante "Informe") presentado el 10 de octubre de 2018 por la Oficina del Monitor Federal. El Informe evalúa la respuesta del Negociado de Policía de Puerto Rico (en adelante NPPR) a los eventos ocurridos el primero de mayo de 2018 y conforme a las instrucciones del Hon. Gustavo A. Gelpi, Juez Presidente de la Corte de Distrito de los Estados Unidos, que detalla los hallazgos del Investigador José Pujol, Miembro del Equipo del Monitor, respecto a la investigación realizada. El Investigador hace referencia a los diferentes mecanismos para recopilar la información: búsqueda y revisión de documentos provistos por el NPPR entrevistas individuales, colectivas y de grupos focales, observación de videos disponibles, evaluación de adiestramientos, entre otros. Luego de recibido el Informe final por parte de la Oficina del Monitor, el NPPR presenta la respuesta a los hallazgos más significativos expuestos por el Investigador en dicho Informe. La respuesta del NPPR se presenta mediante temas independientes en un orden lógico de los eventos.

**Comentarios del Negociado de la Policía de Puerto Rico al Informe de Evaluación de la Manifestación del primero de mayo de 2018 presentado por la Oficina del Monitor**

## 1. Plan de Trabajo

Como parte de las conclusiones a las que llegó el Sr. Pujol, este determina que el Plan de Trabajo adolece de diversos aspectos. Primero, es preciso detallar de manera individual las conclusiones del Investigador para una mejor comprensión.

Concluye el Sr. Pujol que el NPPR no informó las vías o la ruta que debían seguir los manifestantes para llegar a la plataforma destinada para el ejercicio libre de la expresión.[1] A esos efectos, es importante mencionar que el NPPR hizo una convocatoria mediante conferencia de prensa dirigida a todos los participantes de la manifestación para que informaran y coordinaran junto al NPPR cualquier necesidad particular o inquietud que fuera pertinente al ejercicio legítimo de libertad de expresión que se materializaría el primero de mayo. Esta conferencia de prensa se llevó a cabo el 24 de abril de 2018.



---

[1] Assessment Report, pág. 22.

Comentarios del Negociado de la Policía de Puerto Rico al Informe de Evaluación de la Manifestación del primero de mayo de 2018 presentado por la Oficina del Monitor

La incomparecencia de los grupos a la convocatoria que hizo el NPPR impidió que se tomara en consideración sus opiniones o preferencias en cuanto a las rutas trazadas. Solo compareció a la convocatoria la UTIER y unos algunos grupos más. El equipo de abogados constitucionales de la Oficina del Monitor Federal hizo un extenso análisis legal en cuanto a la controversia relacionada a si la Policía podía establecer la ruta a seguir para los manifestantes. Luego de un análisis legal sobre la jurisprudencia estatal y federal aplicable, estos determinaron que el Gobierno de Puerto Rico puede regular en tiempo, lugar y manera la manifestación. Por tanto, el establecimiento unilateral de la ruta que seguirían los manifestantes por parte de la Policía fue un ejercicio legal y legítimo. El Sr. Pujol establece, a manera de recomendación para futuras ocasiones, que se comparta con la ciudadanía a través de diversos medios informativos, la ruta que deberán seguir los manifestantes.[2]

El Sr. Pujol reconoce en su Informe que el NPPR no tiene la obligación en ley de compartir de antemano con la ciudadanía la ruta a seguirse el día de la manifestación.



Expresa el Investigador que el NPPR presentó un Plan Operacional que no contemplaba un sinnúmero de posibilidades que podrían surgir antes, durante y después de la manifestación y que debieron haber sido anticipadas y contempladas en el mismo. Diferimos de la apreciación del Sr. Pujol. La característica principal que debe tener un Plan Operacional es la flexibilidad. Esto porque debe ser capaz de ajustarse y moldearse a cualquier eventualidad que se presente. Sería contraproducente crear o enumerar en un Plan Operacional la infinidad de eventos que podrían ocurrir durante una manifestación o evento multitudinario. La experiencia y pericia del Comandante de Incidente, al igual que la de los Oficiales destacados en la manifestación, servirá para tomar la determinación más razonable y prudente que la circunstancia requiera. La conducta humana es tan variable que sería imposible desarrollar un Plan Operacional que contenga toda la creatividad que es capaz de manifestar una persona.

Valga destacar que el NPPR llevó a cabo esfuerzos razonables para convocar a los grupos que asistirían a dicha manifestación, logrando el Superintendente Auxiliar de Operaciones de Campo, Cor. Luis Colón, reunirse con varios grupos. Ello, conforme a

---

[2] *Id.*, pág. 43.

**Comentarios del Negociado de la Policía de Puerto Rico al Informe de Evaluación de la Manifestación del primero de mayo de 2018 presentado por la Oficina del Monitor**

lo que establece la Ley 366-2004, según enmendada, conocida como la *Ley para la Planificación y Coordinación de Actividades de Impacto Público* que de manera general tiene como fin garantizar el derecho a la libre expresión, pero dentro de un contexto de tranquilidad, estabilidad y seguridad para todas las personas. Por ello, el estatuto establece un marco de política pública que viabilice mecanismos de planificación y contingencia, que le permita al Estado coordinar con las distintas organizaciones las actividades, las marchas y las protestas de todos los sectores cívicos, sociales, sindicales, políticos y religiosos del País. El NPPR cumplió con dicha política pública de manera diáfana.

En relación con la temática de los planes de trabajo, reiteramos que los mismos son herramientas de trabajo que tienen que ajustarse a la amplia gama de posibilidades que pueden surgir en ese tipo de evento.

Respetuosamente, diferimos de lo expuesto por el Sr. Pujol referente a que el NPPR tiene la responsabilidad absoluta de evitar que las agencias de seguridad privada estuvieran presentes en el área de la manifestación.[3] En nuestro ordenamiento jurídico, las mismas están regidas por la Ley Núm. 108 de 29 de junio de 1965, según enmendada, conocida como la *"Ley para Regular las Profesiones de Detectives Privados y Guardias de Seguridad en Puerto Rico"* 25 LPRA sec. 285 y ss. (Ley Núm. 108).

El Artículo 9 de la Ley Núm. 108 establece lo relacionado a licencias de agencias de seguridad para la protección de personas o propiedad mueble o inmueble y dispone que el Superintendente (Comisionado) otorgará la licencia de agencia de seguridad cuando lo soliciten uno o más detectives privados y cuando la solicite una corporación organizada a los fines de operar una agencia, siempre que su principal funcionario ejecutivo sea un detective privado con licencia otorgada por el Superintendente (Comisionado). 25 LPRA sec. 285(h).

Nótese que el NPPR regula la expedición de licencias para las agencias de seguridad, detectives privados y guardias de seguridad, mas no incide en la facultad que tienen los negocios y entidades privadas de contratar las mismas para proteger su propiedad. Es

---

[3] Assessment Report, pág. 26.

Case 3:12-cv-02039-FAB   Document 1044-1   Filed 12/07/18   Page 5 of 20

Comentarios del Negociado de la Policía de Puerto Rico al Informe de Evaluación de la Manifestación del primero de mayo de 2018 presentado por la Oficina del Monitor

un asunto que incide en la facultad legal que tienen tales empresas privadas de contratar compañías privadas; relación contractual que el NPPR no puede menoscabar. Sobre el particular, el Artículo 2 de la Ley Núm. 108 establece que los guardias de seguridad privada tienen facultades tales como: proteger personas o propiedad mueble o inmueble; o para evitar incidentes peligrosos, riesgos, delitos, hurtos, o la malversación o sustracción ilegal de dinero, bonos, acciones, o cualesquiera clases de valores o documentos, con un fin preventivo dirigido a mantener el orden en un área específica. 25 LPRA sec. 285(a).



Puntualizamos el hecho de que el derecho a la libertad de expresión no supone una irrestricción absoluta. Es decir, puede la misma quedar subordinada a otros intereses cuando la necesidad, seguridad y conveniencia pública lo requiera. *Mari Bras v. Casañas*, 96 DPR 15. En ese aspecto, no se le puede exigir al NPPR planes operacionales infalibles, porque en ese tipo de manifestación de libertad de expresión puede ocurrir un sinnúmero de variantes de seguridad pública, en las cuales los miembros del NPPR tienen que guardar un justo balance entre defender que se efectúe el ejercicio de libertad de expresión, pero promoviendo a la vez la protección de la seguridad de las personas y de la propiedad.

El ejercicio de violencia no goza de protección bajo el manto del derecho constitucional a la libertad de expresión. La violencia u otros tipos de conductas potencialmente expresivas, pero dañosas, independientemente de su posible impacto comunicativo, constituyen prácticas desprovistas de protección constitucional. Esa visión que afirma que, siempre que se esté intentando comunicar una idea, es ilimitada la variedad de conducta que puede ser etiquetada de "expresión", ha sido rechazada. Por ello, una agresión física no representa conducta expresiva protegida por la Primera Enmienda de la Constitución Federal. *Pueblo v. Figueroa Jaramillo*, 170 DPR 932 (2007)). En dicha manifestación, resultaron heridos quince (15) policías por parte de personas que pretendieron desencadenar la violencia en un acto de libertad de expresión. Ahora bien, no pretendemos generalizar; fue un puñado de personas las que acudieron con intención de utilizar la violencia y desvirtuar un ejercicio constitucional válido, lo que el NPPR no permitió. El Tribunal Supremo de Puerto Rico (TSPR) ha establecido que los actos o

Case 3:12-cv-02039-FAB   Document 1044-1   Filed 12/07/18   Page 6 of 20

Comentarios del Negociado de la Policía de Puerto Rico al Informe de Evaluación de la Manifestación del primero de mayo de 2018 presentado por la Oficina del Monitor

conductas expresivas individuales o concertadas que presenten violencia, desorden significativo o la invasión de los derechos de otros ciudadanos, aún dentro del contexto de una disputa obrero patronal, pueden ser restringidos por la autoridad gubernamental. El mantenimiento del orden y la paz pública, de la sana convivencia social y del bienestar general son valores que merecen protección, por encima de cualquier consideración de carácter individual o de un grupo particular. *Pueblo v. Figueroa Jaramillo, supra*, pág. 941..

Otra de las áreas que informa el Sr. Pujol como deficiencias en el desarrollo del Plan Operacional consiste en que el mencionado Plan (anejo A) determinaba la existencia de dos (2) Centros de Comando.[4] Por el contrario, un Oficial el cual identificó como el número 21, informó que habría dos (2) Centros de Comando y uno (1) de observación. Esa manifestación del Oficial no responde a lo plasmado en el Plan Operacional, según se desprende de lo informado por el Sr. Pujol. Por tanto, no sería correcto señalar una deficiencia en el Plan Operacional.

El anejo A del Plan de Trabajo establecía un Centro de Comando Interagencial ubicado en el Coliseo de Puerto Rico, José Miguel Agrelot y un Centro Operacional ubicado en el piso 10 del Banco Popular. Conforme a este Plan, se constituyeron ambos Centros. Las declaraciones realizadas por un oficial no constituyen evidencia de que el NPPR haya establecido un Centro de Observación. Cabe señalar que de la investigación realizada por el equipo de trabajo del Sr. Pujol no se presentó evidencia de ese tercer Centro de Observación. Por tanto, señalar en un informe que será publicado a la ciudadanía la información dada por un oficial de la existencia de dicho Centro sin tener evidencia que sustente la alegación del oficial puede enviar un mensaje equivocado a la ciudadanía sobre las actuaciones del NPPR e interpretarse como una intención deliberada por parte del NPPR de desinformar a la Oficina del Monitor sobre la verdadera ubicación.

El Sr. Pujol alega una falla en el Plan Operacional y una violación a la Orden General Capítulo 600 Sección 625, titulada: "Manejo y Control de Multitudes" (OG 625)

---

[4] Assessment Report, pág. 21.

Case 3:12-cv-02039-FAB Document 1044-1 Filed 12/07/18 Page 7 of 20

Comentarios del Negociado de la Policía de Puerto Rico al Informe de Evaluación de la Manifestación del primero de mayo de 2018 presentado por la Oficina del Monitor

consistente en que había dos (2) Comandantes de Incidente. Uno que alegadamente era el designado para atender la manifestación y otro que redactó el Plan y lo implementaría en el "field". Según se desprende del Plan de Trabajo, el Coronel Luis O. Colón Ortiz, Comisionado Auxiliar de la Superintendencia Auxiliar en Operaciones de Campo, fue designado Comandante de Incidente. Cabe señalar, que tomando en consideración la experiencia previa ocurrida el primero de mayo de 2017 se designaron Tenientes Coroneles en los diferentes puestos del evento, con la responsabilidad de cubrir un perímetro con el propósito de lograr un manejo eficiente del evento.

Es meritorio reiterar que el Plan de Trabajo fue realizado por el Cor. Luis O. Colón Ortiz y se incluyeron como anejos los diferentes Planes de Trabajo que redactaron el Comandante de Área, el Negociado de Fuerzas Unidad de Rápida Acción (FURA), el Negociado de Patrullas de Carretera, entre otros. Si algún Oficial percibió que estar a cargo de un perímetro significaba que era el Comandante de Incidente, su apreciación no fue correcta. El NPPR se reafirma en que solamente hubo un Comandante de Incidente que participó en la Manifestación del primero de mayo de 2018.



2. Levantamiento del primer bloqueo

El Sr. Pujol manifiesta en su Informe que el NPPR violentó la OG 625, al permitir que desde la Fortaleza se tomaran determinaciones en cuanto a permitir el paso de los manifestantes en el primer bloqueo. Esto debido a una entrevista de un Oficial identificado como número 1 (Comandante de Incidente) quien le manifestó al periodista José Estévez de Telemundo que la determinación de dar paso a los manifestantes la dio el Gobernador. Esto, según el Sr. Pujol, resta habilidad al Comandante de Incidente para controlar las acciones de acuerdo al plan establecido. Sin embargo, el Gobernador de Puerto Rico es el Comandante en Jefe del NPPR. El Secretario del Departamento de Seguridad Pública le sigue en autoridad para tomar determinaciones por disposición de la Ley Núm. 20-2017, según enmendada, conocida como la *Ley del Departamento de Seguridad Pública de Puerto Rico* (Ley Núm. 20). Ni el Acuerdo para la Reforma Sostenible, ni la OG 625 ni cualquier otro estatuto o norma interna del Negociado puede

Case 3:12-cv-02039-FAB   Document 1044-1   Filed 12/07/18   Page 8 of 20

Comentarios del Negociado de la Policía de Puerto Rico al Informe de Evaluación de la Manifestación del primero de mayo de 2018 presentado por la Oficina del Monitor

limitar la facultad legal que tiene el Gobernador de emitir instrucciones legales a sus Jefes de Agencias.

Negamos el hecho de que el Gobernador emitiera instrucciones en dicha manifestación. No obstante, de así haberlo hecho, sería cónsono a sus poderes y facultades como el Primer Ejecutivo del País. Sustenta nuestro argumento el hecho que bajo el palio del Artículo IV, Sección 4 de la Constitución del Gobierno de Puerto Rico se establece como uno de los poderes del Gobernador, precisamente, ser el Comandante en Jefe del ámbito de seguridad pública. Así también, el Artículo 1.04. de la Ley Núm. 20 establece que la autoridad suprema en cuanto a la dirección del Departamento de Seguridad Pública será ejercida por el Gobernador de Puerto Rico; y la administración y supervisión inmediata de la organización está delegada al Secretario de Seguridad Pública. Por su parte, el Artículo 1.05 (a) establece que el Secretario tendrá, sin limitarse, deberes y facultades como tener a su cargo la autoridad jerárquica, administración y supervisión inmediata del Departamento de Seguridad Pública. A su vez, el Artículo 2.01 de la Ley Núm. 20 dispone que el NPPR estará adscrito al Departamento de Seguridad Pública de Puerto Rico, bajo la supervisión directa e indelegable del Secretario de Seguridad Pública.

Por otra parte, debemos señalar que la razón que motivó el levantamiento del primer bloqueo respondió a la importancia de honrar los acuerdos alcanzados entre el NPPR y los manifestantes, quienes solicitaron acceso al paso a través de la Avenida Ponce de León e informaron que mantendrían el orden. Los actos de violencia provocados por los manifestantes una vez atravesaron el primer bloqueo demostró que sería imposible permitirles continuar el paso por la mencionada avenida.

### 3. Segundo bloqueo

Durante el segundo bloqueo en la Avenida Ponce de León, intersección con la Calle Bolivia, la conducta de los manifestantes era altamente violenta. Se desprende del Informe del Sr. Pujol que los manifestantes estaban lanzando piedras, ladrillos, líquidos con contenido irritante, entre otros objetos cortantes y contundentes contra los Miembros del NPPR que se encontraban en la formación del bloqueo.[5]. Ante esa conducta, fue

---

[5] Assessment Report, pág. 10.

Case 3:12-cv-02039-FAB   Document 1044-1   Filed 12/07/18   Page 9 of 20

**Comentarios del Negociado de la Policía de Puerto Rico al Informe de Evaluación de la Manifestación del primero de mayo de 2018 presentado por la Oficina del Monitor**

inevitable la utilización de gases y otras armas menos letales para controlar la situación que como el mismo investigador reconoce a lo largo de su escrito, era un peligro inminente para todas las partes allí presentes.

La controversia presentada por el Investigador radica en que recibió información contradictoria en cuanto al cumplimiento de la OG 625 en la disposición que impone al NPPR la obligación de hacer avisos de dispersión antes de emplear los gases o utilizar las armas menos letales. No obstante, muy respetuosamente disentimos y reafirmamos que erró el Investigador al concluir que las órdenes de dispersión no se dieron. Surge del mismo Informe que el Sr. Pujol recibió informaciones encontradas por parte de diversos Oficiales. Algunos de esos Oficiales le informaron que los avisos de dispersión se dieron, pero que el equipo utilizado por el NPPR en ese segundo bloqueo era de menor capacidad de decibeles que el equipo utilizado en el primer bloqueo.[6] Por tanto, el vehículo de sonido con el que contaban los manifestantes no permitió que se escucharan las advertencias. Otros Oficiales informaron al Investigador que las advertencias no se dieron. Esta contradicción en la información recibida por el Investigador no le permite, de manera razonable y objetiva, llegar a ninguna conclusión. Por otra parte, es menester indicar que el responsable de emitir a los manifestantes las advertencias que preceden a la orden de dispersión fue el Comandante Guillermo Rivera Rosario, Placa 3-16569.[7]



El segundo bloque presenta otra controversia. Esta es a los efectos de que el NPPR no ubicó en la parte de atrás de los manifestantes, un Miembro del NPPR (en adelante, MNPPR) que pudiera grabar y evidenciar que las advertencias de dispersión se ofrecieron. Esto, en cumplimiento con la OG 625. El NPPR reconoce que ese MNPPR no fue ubicado. La razón de esta determinación respondió directamente al grado de peligrosidad extrema al que se hubiera expuesto ese MNPPR de ser agredido o asesinado por algunos de los manifestantes que estaban cometiendo delito. La realidad que se vivió ese primero de mayo de 2018, minutos antes de las dispersiones de gases, fue reconocida por el propio Investigador. El equipo de abogados constitucionales de la

---

[6] *Id.*, pág. 13.
[7] A esos efectos, refiérase al **Anejo 1** del presente escrito: Megáfonos utilizados durante la manifestación del 1 de mayo de 2018.

Comentarios del Negociado de la Policía de Puerto Rico al Informe de Evaluación de la Manifestación del primero de mayo de 2018 presentado por la Oficina del Monitor

Oficina del Monitor, en reconocimiento del grado de peligrosidad que representa ubicar un Miembro del NPPR en esas circunstancias, recomienda auscultar la posibilidad de enmendar la OG 625 a los efectos de eliminar dicho requisito. El NPPR concurre con la apreciación del equipo experto en asuntos constitucionales del Monitor e informa que estará solicitando formalmente al Departamento de Justicia Federal así como al Monitor la eliminación de ese requisito en la OG 625.

No obstante, el NPPR informa que el Cor. Francisco Rodríguez, el Cor. Luis Colón y el Tnte. Cor. Israel Vázquez se encontraban en el área cercana a la zona desde donde se emitieron las órdenes de dispersión con las correspondientes advertencias y estos aseguran haberlas escuchado.

### 4. Uso de Fuerza

Según el Informe presentado, hubo múltiples incidentes de uso de fuerzo que no fueron documentados o se documentaron de manera deficiente.[8] En entrevista con el Tnte. Javier Santiago, Director de FIU, este informó que tenía cuatro (4) Informes de Uso de Fuerza. Posteriormente, en reunión sostenida por el NPPR con el Tnte. Santiago, este expresó que la cantidad de Usos de Fuerza ascendió a quince (15). El NPPR reconoce la obligación de confeccionar todos los Informes de Uso de Fuerza (PPR-854). Por tal razón, se emitió una instrucción para que todos los Informes de Uso de Fuerza o cualquier otro informe que se haya generado como consecuencia de la manifestación del primero de mayo, incluyendo los PPR 920 (A), titulado: "Registro de Movilizaciones de las Divisiones de Tácticas Especializadas (DTE)" sean identificados y analizadas con detenimiento como parte de un proceso de autoevaluación. Así también, los mismos serán referidos a la Oficina del Monitor para el correspondiente avalúo.

Uno de los incidentes que alega en el Informe que no fue documentado, fue el de un vendedor ambulante de agua. Este hombre recibió nueve (9) impactos de lo que parece ser balas de goma o plásticas. Resulta insostenible la conclusión del Sr. Pujol en cuanto

---

[8] Assessment Report, a las págs. 14 y 110.

Case 3:12-cv-02039-FAB   Document 1044-1   Filed 12/07/18   Page 11 of 20

**Comentarios del Negociado de la Policía de Puerto Rico al Informe de Evaluación de la Manifestación del primero de mayo de 2018 presentado por la Oficina del Monitor**

a que las heridas recibidas por el hombre fueron causadas por un Miembro del NPPR. La prueba evaluada por el Investigador fue, en primera instancia, el testimonio del propio perjudicado quien describe la vestimenta del responsable de propinarle las heridas como una de color gris.[9]

En entrevista con el Oficial #12, Director de la Unidad de SWAT, este manifestó al Sr. Pujol que el color del uniforme de los miembros de su unidad de trabajo y el cual fue utilizado el día de la manifestación es verde. Declaró también que en su opinión y peritaje, las heridas presentadas por el caballero no son compatibles con las balas de goma que utiliza la Unidad SWAT. Por el contrario, parecen ser causadas por balas de plástico, las cuales no son utilizadas por su unidad de trabajo. La experiencia del Oficial #12 sobre patrones de dispersión de las balas de goma, sus efectos y las marcas físicas que deja en el cuerpo, fueron producto de sus adiestramientos en esa materia. En entrevista con el Oficial #12, Pujol determina inconsistencias insalvables entre lo declarado por el entrevistado y la Orden General Capítulo 600, Sección 620 Armas Especializadas para las Divisiones Tácticas Especializadas en cuanto al tema de las distancias de los disparos.



El Sr. Pujol alude a que el Oficial #12 le declaró lo siguiente: "si la persona está localizada a 6 pies o menos de la distancia del Miembro del NPPR, éstos deberán disparar al piso para que los "ricochet" impacten la persona. Si la persona está localizada a 6 pies o más, se podrá disparar directamente a la persona"[10]. El NPPR aclara que lo manifestado por el Oficial #12 fue que la Orden General 620, supra dispone sobre técnicas de dispersión y unos adiestramientos que deberán tomar los Miembros del NPPR adscritos a las Unidades Tácticas Especializadas. Posteriormente, en el adiestramiento, se prepara a los MNPPR para que puedan hacer disparos al piso cuando la persona está a menos de seis (6) metros. No seis (6) pies como dijo el Sr. Pujol. El Oficial #12 nunca declaró que la información sobre las distancias obraba en la Orden General 620, supra, sino en el adiestramiento. También informó que el patrón y las marcas circulares de las heridas

---

[9] *Id.*, a las págs. 16 y 63.
[10] Assessment Report, a las págs. 76 y 109.

Case 3:12-cv-02039-FAB   Document 1044-1   Filed 12/07/18   Page 12 of 20

**Comentarios del Negociado de la Policía de Puerto Rico al Informe de Evaluación de la Manifestación del primero de mayo de 2018 presentado por la Oficina del Monitor**

presentadas por el individuo no son compatibles con los "pellets" de la munición de impacto menos letal utilizada por la División S.W.A.T.

El patrón irregular, las marcas circulares y la profundidad observada en la foto demuestran que la munición que fue disparada contra el individuo es de un calibre o medida más alto del utilizado por la División. Actualmente, en el mercado existen una variedad de municiones menos letales de impacto con "pellets" de mayor medida y de distintos materiales como el plástico sólido, entre otros, y que son de fácil acceso para las agencias correccionales y de seguridad privada tanto en venta directa, en la tiendas locales y en el Internet. Para concluir nuestra apreciación sobre este incidente, expresamos que no se confeccionó ningún Informe de Uso de Fuerza en cuanto a este evento porque el mismo no es aceptado por el NPPR. El NPPR no reconoce que el incidente fue cometido por un Miembro del NPPR.

Otro incidente de Uso de Fuerza discutido por el Sr. Pujol es el de una dama que se encontraba en la manifestación y recibió una aplicación de gas pimienta por parte de un Miembro del NPPR perteneciente a una Unidad de trabajo que podría concluirse que es SWAT. El Sr. Pujol alega en su Informe que no se confeccionó ningún PPR-854, titulado: "Informe de Uso de Fuerza".[11] No obstante, resulta de vital importancia hacer alusión a la página 16 del "ASSESSMENT REPORT" presentado por la Oficina del Monitor, en la que el Investigador evaluó la fotografía que allí se presenta. Es incorrecto concluir que el evento allí presentado carecía de justificación alguna. La totalidad de las circunstancias que rodearon los instantes previos a la toma de esa fotografía es desconocida para el Investigador.

El tercer incidente mencionado por el Investigador señala las alegadas acciones agresivas de unos Miembros del NPPR hacia un periodista del periódico Metro.[12] El Sr. Pujol indicó que no se confeccionó ningún PPR-854, titulado: "Informe de Uso de Fuerza". Es preciso manifestar que el caso fue referido a la Superintendencia Auxiliar en Responsabilidad Profesional (SARP) por el propio Comisionado para los

---

[11] Assessment Report, pág. 17.
[12] *Id.*

Case 3:12-cv-02039-FAB   Document 1044-1   Filed 12/07/18   Page 13 of 20

**Comentarios del Negociado de la Policía de Puerto Rico al Informe de Evaluación de la Manifestación del primero de mayo de 2018 presentado por la Oficina del Monitor**

correspondientes procedimientos investigativos. Ello, como una acción afirmativa del compromiso del NPPR de atender con responsabilidad y diligencia las alegaciones presentadas. La investigación administrativa continúa su curso.

Es menester considerar a su vez que el rotativo Metro presentó el 3 de mayo de 2018 una Solicitud de Interdicto Provisional y Permanente contra el Departamento de Seguridad Pública y el NPPR ante el Tribunal de Primera Instancia (TPI) de San Juan.[13] . El 4 de mayo siguiente el Tribunal dictó *Orden y Citación* mediante la cual denegó la solicitud, pero señaló una vista urgente para resolver la procedencia del Interdicto solicitado. A esos efectos, el Gobierno de Puerto Rico presentó una *Moción Urgente en Solicitud de Desestimación,* así como un recurso de *Certiorari* y *Auxilio de Jurisdicción* ante el Tribunal de Apelaciones. Dicho Foro emitió *Resolución* que paralizó los procedimientos ante el TPI y otorgó un término a la parte demandante-recurrida para fijar su posición en torno al recurso presentado. Celebradas dos vistas en el Tribunal de San Juan, el pasado 25 de septiembre de 2018 el Hon. Juez Anthony Cuevas Ramos emitió la siguiente *Orden* a Metro:



> En la vista celebrada el 13 de septiembre de 2018, ordenamos a la parte demandante exponer cuál será su posición con respecto a su inserción en los procedimientos administrativos y judiciales llevados a cabo a través de la Reforma de la Policía y el Monitor Federal asignado por el Juez Gelpí, del Tribunal Federal. Específicamente, se le requirió que exprese los motivos por el cual no deberíamos desestimar la demanda en vista de estos remedios adecuados en ley para atender su reclamo. Proceda a exponer su posición fundamentada.

Por ende, el asunto procesal se mantiene pendiente de resolución.

Por su parte, el Investigador concluye que faltan informes de Uso de Fuerza que no fueron confeccionados porque las imágenes que pudo observar de la manifestación mostraban una gran cantidad de interacciones entre los Miembros del NPPR y los manifestantes. Debemos recordar que la OG 625 dispone que, "como regla general, no efectuarán arrestos de personas solamente porque desobedezcan las instrucciones del NPPR durante un disturbio civil. No obstante, durante este tipo de situación se

---

[13] Metro Puerto Rico, LLC y Otros vs. Departamento de Seguridad Pública, civil núm. SJ2018-CV-02876.

Case 3:12-cv-02039-FAB   Document 1044-1   Filed 12/07/18   Page 14 of 20

Comentarios del Negociado de la Policía de Puerto Rico al Informe de Evaluación de la Manifestación del primero de mayo de 2018 presentado por la Oficina del Monitor

considerará razonable usar técnicas de control de manos suaves, manos duras y técnicas de levantamiento de personas". En síntesis, no es correcta la apreciación de que todos los contactos físicos entre manifestantes y MNPPR necesariamente generan un reporte de Incidente de Uso de Fuerza.

Es importante señalar que la OG 625 dispone que, de haber Usos de Fuerza por parte de Miembros del NPPR de una escuadra, los informes de Uso de Fuerza se harán de forma grupal a través del Líder de Escuadra que dio la instrucción del uso de los agentes químicos o armas menos letales. (Ver inciso 7, página 24 de la OG 625). Estos informes grupales se hicieron y están disponibles para la evaluación del Sr. Pujol al igual que del Monitor Federal.

La parte III, sección D en la Orden General 600-625 titulada: Manejo y Control de Multitudes dispone que cada uso de armas y municiones menos letales contra una personal o animal constituye un uso de fuerza independiente. Cabe señalar que en estos eventos cuando un MNPPR realiza un uso de fuerza, el supervisor tiene cinco (5) días laborables para efectuar la investigación, el Director del Precinto tiene tres (3) días laborables para revisar la investigación del supervisor y el Comandante de Área tendrá igual término que el Director. Ahora bien, en el caso de incidentes de uso de fuerza nivel 2 y 3 el Comandante de Área deberá activar la Junta de Uso de Fuerza, una vez esta Junta evalúa el incidente, entrega al Comandante de Área los resultados quien tendrá quince (15) días laborables para completar la evaluación del incidente.

Culminado este procedimiento se remite a la Superintendencia Auxiliar en Responsabilidad Profesional para su análisis y seguimiento. El procedimiento antes descrito provocó que al momento que el Sr. Pujol solicitó los reportes de uso de fuerza a la División de Investigación de Incidentes de Uso de Fuerza, solamente mostraran cuatro (4) reporte. Esta era la cantidad que se había recibido hasta ese momento, sin embargo, durante el evento ocurrieron ocho incidentes con dieciséis (16) reporte de uso de fuerza. Solicitamos respetuosamente que reconsidere y verifique los restantes informes de uso de fuerza que están disponibles en la División de Investigación de Incidentes de uso de Fuerza.

Case 3:12-cv-02039-FAB   Document 1044-1   Filed 12/07/18   Page 15 of 20

Comentarios del Negociado de la Policía de Puerto Rico al Informe de Evaluación de la Manifestación del primero de mayo de 2018 presentado por la Oficina del Monitor

Es pertinente señalar que se establecerá un protocolo para facilitar la contabilización del reporte de uso de Fuerza en futuros eventos durante manifestaciones y eventos multitudinarios.

## 5. Personas arrestadas:

El Investigador establece una relación directa entre la no radicación de cargos criminales a once (11) de las diecinueve (19) personas arrestadas durante la manifestación del primero de mayo y una actuación indebida e improcedente en derecho por parte de los Miembros del NPPR. El Sr. Pujol descansa en el hecho de que la no radicación de cargos responde a la falta de prueba suficiente *"enough evidence"* para prevalecer en corte.[14] Es importante señalar que el estándar de derecho en Puerto Rico para justificar la intervención de un Miembro del NPPR con un ciudadano es el de "motivos fundados" al amparo de la Regla 11 de de Procedimiento Criminal, 34 LPRA Ap. II.



En ese sentido, es necesario tener presente que un agente del orden público está facultado para efectuar un arresto en las siguientes circunstancias:

a. Cuando tuviere motivos fundados para creer que la persona que va a ser arrestada ha cometido un delito en su presencia. En este caso deberá hacerse el arresto inmediatamente o dentro de un término razonable después de la comisión del delito. De lo contrario el funcionario deberá solicitar que se expida una orden de arresto.

b. Cuando la persona arrestada hubiese cometido un delito grave (felony), aunque no en su presencia.

c. Cuando tuviere motivos fundados para creer que la persona que va a ser arrestada ha cometido un delito grave (felony), independientemente de que dicho delito se hubiere cometido o no en realidad. 34 LPRA Ap. II, R. 11.

En numerosos pronunciamientos emitidos, el Tribunal Supremo de Puerto Rico ha definido en qué consisten esos "motivos fundados", que por excepción, permiten el arresto sin orden judicial. A tales efectos se ha resuelto que tales motivos fundados

---

[14] Assessment Report, pág. 20.

Case 3:12-cv-02039-FAB   Document 1044-1   Filed 12/07/18   Page 16 of 20

Comentarios del Negociado de la Policía de Puerto Rico al Informe de Evaluación de la Manifestación del primero de mayo de 2018 presentado por la Oficina del Monitor

existen si se desprende de la totalidad de las circunstancias del caso en cuestión que una persona ordinaria y prudente poseería aquella información y conocimiento que la llevarían a creer que la persona arrestada ha cometido o va a cometer el delito en cuestión. *Pueblo v. Colón Bernier*, 128 DPR 180(1999). Los arrestos efectuados por los Miembros del NPPR respondieron a las máximas legales existentes sobre la manera de realizar los mismos, muy particularmente bajo lo contemplado en la Regla 11 de las de Procedimiento Criminal.

Por otra parte, lo cierto es que la determinación última sobre la radicación o no radicación de cargos criminales contra una persona no descansa sobre el NPPR, sino sobre un fiscal del Departamento de Justicia. Su determinación de no radicar puede responder a un sinnúmero de factores que no necesariamente estarán relacionados con el proceder del Miembro del NPPR.

## 6. Adiestramientos

El Investigador solicitó la información de todos los adiestramientos tomados por los Miembros del NPPR que participaron en la manifestación. Según el Informe, fueron 1,225 los MNPPR que participaron en las manifestaciones del primero de mayo y solo se brindó información de los adiestramientos tomados por 287 de ellos.

En cuanto a la OG 625, es necesario establecer que ha sido ampliamente discutido los retos que ha confrontado el NPPR para el desarrollo de adiestramientos. Uno de los aspectos particularmente determinantes obedeció a que los instructores existentes no se recertificaban hacía aproximadamente diez (10) años, lo que implicó un nuevo escenario a considerar en el proceso del diseño de adiestramientos. Ahora bien, en julio de 2017 la Superintendencia Auxiliar en Educación y Adiestramiento (SAEA) junto a FEMA certificó a 16 instructores, así como a todo el personal de la División de Operaciones Tácticas respecto al curso de Manejo y Control de Multitudes diseñado para esta División.

Obra como parte de la Moción en Conjunto presentada por el Departamento de Justicia de Estados Unidos y el Departamento de Justicia de Puerto Rico para la prórroga de las

Case 3:12-cv-02039-FAB Document 1044-1 Filed 12/07/18 Page 17 of 20

Comentarios del Negociado de la Policía de Puerto Rico al Informe de Evaluación de la Manifestación del primero de mayo de 2018 presentado por la Oficina del Monitor

33 actividades de los Planes de Acción, un escrito que establece las acciones afirmativas realizadas por la SAEA para procurar con la mayor inmediatez posible el cumplimiento con el desarrollo de los adiestramientos de Manejo y Control de Multitudes para todos los Miembros del NPPR, así como el adiestramiento de Comandante Incidente dirigido a la oficialidad de alto rango del Negociado. Reconocemos que es un asunto de vital prioridad para nosotros y que continuamos trabajando en la consecución de dichos proyectos.

Es preciso considerar a su vez, que nos encontramos en proceso de desarrollo y validación de varios sistemas tecnológicos que tienen como objetivo ulterior la digitalización de los procesos. Estamos próximos a inaugurar un sistema que contendrá el historial de adiestramiento de los Miembros del NPPR. El mismo estará actualizado con los registros que ostenta la Oficina de Registraduría de la SAEA. Ello permitirá una radiografía del historial de cada MNPPR. Ello a su vez facilitará la producción de información requerida. Actualmente, no toda la información se encuentra mecanizada en nuestros registros, lo que hace oneroso la identificación del historial de adiestramiento de cada MNPPR que haya participado en las manifestaciones.[15]



## 7. Autoevaluación

El Sr. Pujol expresa que el Informe sobre Autoevaluación que presentó en NPPR adolece de información importante, ya que el mismo solo incluye siete (7) fortalezas y tres (3) debilidades.[16] A base de lo anterior, el Investigador emite varias recomendaciones en torno a lo que, a su juicio y según las mejores prácticas policiacas, debe contener un informe de autoevaluación. El NPPR agradece las recomendaciones provistas por el Sr. Pujol y con mucho respeto informa que la Autoevaluación presentada cumple con lo estipulado en la OG 625 (página 27 inciso (d)).

Es preciso resaltar, que el Informe ("Critique") preparado el 18 de mayo de 2018 por el Comisionado Auxiliar en Operaciones de Campo del NPPR cumple con los criterios establecidos en la citada Orden General. De hecho, en el mismo se describe

---

[15] A estos efectos, véase el **Anejo 2** del presente escrito: Justificación de Prórroga para Adiestramiento.
[16] Assessment Report, a las págs. 92 y 111.

Case 3:12-cv-02039-FAB   Document 1044-1   Filed 12/07/18   Page 18 of 20

**Comentarios del Negociado de la Policía de Puerto Rico al Informe de Evaluación de la Manifestación del primero de mayo de 2018 presentado por la Oficina del Monitor**

objetivamente cuáles fueron las debilidades y fortalezas ocurridas durante la manifestación. En términos generales, concluye que los MNPPR actuaron de conformidad a las instrucciones impartidas, según el plan de trabajo delineado para la manifestación. La autoevaluación realizada es una positiva ya que si comparamos la cantidad de querellas administrativas radicadas en contra del NPPR, ha sido un número ínfimo en proporción con los miles de manifestantes y el recurso humano activado para dicha ocasión. Lo anterior nos lleva a concluir que el NPPR realizó una labor ejemplar y admirable que se ajusta a la OG 625.

El NPPR agradece el esfuerzo de la Oficina del Monitor en identificar áreas que debemos mejorar. Sin embargo, son muchos los avances que ha alcanzado el NPPR en cuanto a la implementación del Acuerdo para la Reforma Sostenible y en particular, con la OG 625. Respetuosamente discrepamos de las conclusiones del Sr. Pujol en cuanto a la mayoría de los puntos medulares que el Informe le imputa al Negociado como fallas. Las fallas señaladas por la investigación tienen un alto elemento subjetivo en la apreciación de la evidencia que estuvo ante su consideración. No obstante, reconocemos que aún hay retos que debemos superar y nos encontramos en la total disposición de reforzar institucional y operacionalmente lo necesario, para cumplir con el deber dual de garantizar el ejercicio de la libertad de expresión, dentro de un ambiente que se garantice a su vez la vida y la propiedad de las personas. Esto, en cumplimiento de lo que ha establecido nuestro más alto Foro: "El principio de convivencia social pacífica tiene que seguir siendo nuestro norte y guía en el ejercicio democrático de nuestros derechos constitucionales y legales."*Pueblo v. Figueroa Jaramillo, supra,* pág. 947.

Luego de un análisis detallado y profundo sobre las conclusiones a las que llegó el Sr. Pujol, el NPPR solicita con el mayor respeto que se considere la posibilidad de enmendar el "ASSESMENT REPORT" presentado por la Oficina del Monitor Federal a los efectos de que se corrijan los hallazgos presentados como fallas, los cuales mencionaremos a continuación:

    i.    La determinación de que hubo usos de fuerzas no reportados por la mera observación de videos e imágenes que lo llevaron a concluir tal hecho, sin mayor información.

Case 3:12-cv-02039-FAB   Document 1044-1   Filed 12/07/18   Page 19 of 20

Comentarios del Negociado de la Policía de Puerto Rico al Informe de Evaluación de la Manifestación del primero de mayo de 2018 presentado por la Oficina del Monitor



ii. La determinación de que el Plan Operacional fue deficiente, por las razones anteriormente expuestas.

iii. La conclusión de que las advertencias que preceden a la dispersión de gases y usos de armas menos letales durante el segundo bloqueo, de conformidad con la OG 625, no se efectuaron.

iv. La determinación de que hubo más de un (1) Comandante de Incidente durante la Manifestación del primero de mayo.

v. La determinación e insinuación de que el NPPR deliberadamente mal informó a la Oficina del Monitor Federal sobre la ubicación real de los Centros de Comando.

vi. La interpretación de que la OG 625 establece que todos los usos de fuerzas deberán reportarse de manera individual. La OG 625 es clara en cuanto a la manera de reportar usos de fuerzas por MNPPR pertenecientes a escuadras de unidades especializadas.

vii. La declaración por parte del Investigador de atribuir responsabilidad absoluta a los MNPPR de controlar y evitar que cualquier agencia privada de seguridad que estuviera en funciones en el área de la manifestación, hiciera su trabajo.

viii. La determinación de que la no radicación de cargos criminales por parte del Departamento de Justicia contra algunas de las personas arrestadas durante la Manifestación del Primero de Mayo, respondió a que el NPPR no tenía "evidencia suficiente" para probar los cargos.

Nos enorgullece el desempeño de los Miembros del NPPR durante la manifestación del primero de mayo. Estos demostraron compromiso, entereza y cumplimiento con las normas y procedimientos establecidos. No coincidimos con la apreciación del Sr. Pujol en cuanto a que la Manifestación del primero de mayo de 2017 fue igual a ésta. Hubo grandes avances que no pueden pasarse por alto. Nos encontramos en un proceso de aprendizaje constante, por lo que aprovecharemos cualquier ventana de oportunidad que nos permita continuar el mejoramiento de nuestras prácticas policiacas. Finalmente, el

**Comentarios del Negociado de la Policía de Puerto Rico al Informe de Evaluación de la Manifestación del primero de mayo de 2018 presentado por la Oficina del Monitor**

NPPR se reitera en su compromiso e interés de llevar este Negociado a un cumplimiento total y efectivo con el Acuerdo para la Reforma Sostenible.