**No. 18-_____**

═══════════════════════════════════

### In The
# Supreme Court of the United States

————————◆————————

RAFAEL PABÓN ORTEGA,

*Petitioner,*

v.

ISABEL LLOMPART-ZENO, in her personal capacity;
SIGFRIDO STEIDEL FIGUEROA, in his official capacity
as Administrator of the Administration of Tribunals
of the Commonwealth of Puerto Rico,

*Respondents.*

————————◆————————

**On Petition For Writ Of Certiorari
To The United States Court Of Appeals
For The First Circuit**

————————◆————————

**PETITION FOR WRIT OF CERTIORARI**

————————◆————————

CARLOS A. DEL VALLE CRUZ
*Counsel of Record*
DEL VALLE LAW
P.O. Box 9022473
San Juan, Puerto Rico 00902-2473
(939) 218 1332
cdvlawpr@gmail.com

September 11, 2018

═══════════════════════════════════

i

## QUESTION PRESENTED

Whether the automatic stay provisions of the Bankruptcy Code, 11 U.S.C. §§ 362, 922, as incorporated into PROMESA are unconstitutional as applied by the First Circuit to suspend—during the minimum 4 year life of the Commonwealth's PROMESA's petition—the prosecution of Petitioner's First Amendment civil rights action under the Civil Rights Act of 1871, 42 U.S.C. § 1983; particularly where the § 1983 action: (a) does not pursue economic damages against the Commonwealth; and (b) solely seeks damages against the state official in her personal capacity and prospective equitable relief against the state official in his official capacity, consistent with *Ex parte Young* and its progeny.

ii

## PARTIES TO THE PROCEEDINGS BELOW

The Petitioner, Rafael Pabón Ortega, a discharged employee of the Puerto Rico Administration of Tribunals (AOT), was the plaintiff-appellant before the First Circuit Court of Appeals.

The Respondent, Isabel Llompart Zeno, was at all relevant times the Administrator of the AOT, and the defendant-appellee before the First Circuit Court of Appeals. During the appeal, Llompart Zeno resigned from the AOT, and was substituted in her official position as AOT Administrator by Respondent Sigfrido Steidel Figueroa, such that she continued as a defendant-appellee only in her personal capacity for damages, and he assumed her official position as defendant-appellee solely for purposes of prospective injunctive relief to ensure constitutional compliance.

iii

## TABLE OF CONTENTS

Page

QUESTION PRESENTED ................................... i

PARTIES TO THE PROCEEDINGS BELOW ..... ii

TABLE OF CONTENTS ..................................... iii

TABLE OF AUTHORITIES ................................ v

INTRODUCTION .............................................. 1

OPINIONS BELOW ........................................... 9

  (1)  Order of November 29, 2017, ordering briefing ................................................ 10

  (2)  Order January 24, 2018, ordering stay ........... 10

  (3)  Order of June 13, 2018, denying petition for rehearing ............................................ 10

STATEMENT OF JURISDICTION ..................... 10

CERTIFICATION IN COMPLIANCE WITH SU-PREME COURT RULE 29(b) .......................... 11

CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED ......................................... 12

STATEMENT OF THE CASE ............................. 18

  A.  Proceedings Below .................................... 18

  B.  Background ............................................... 20

REASONS FOR GRANTING THE WRIT ........... 23

iv

TABLE OF CONTENTS – Continued

Page

A.  The First Circuit Decision Staying Peti-
tioner's First Amendment § 1983 Civil
Rights Case Repudiates This Court's Prece-
dents Which Recognize the Fundamental
Constitutional Rights of American Citizens
and Other Residents in Puerto Rico............  23

B.  This Writ Raises Issues of National Im-
portance Concerning the Interplay of the Au-
tomatic Stay of the Bankruptcy Code and the
Fundamental Rights Applicable to American
Citizens and Other Residents of Puerto Rico
Pursuant to the *Insular Cases*.....................  29

CONCLUSION...................................................  33


APPENDIX

APPENDIX A: United States Court of Appeals
for the First Circuit, Order Of Court, Novem-
ber 29, 2017 .......................................................App. 1

APPENDIX B: United States Court of Appeals
for the First Circuit, Order Of Court, January
24, 2018 ............................................................App. 3

APPENDIX C: United States Court of Appeals
for the First Circuit, Order Of Court, June 13,
2018 .................................................................App. 4

v

## TABLE OF AUTHORITIES

Page

CASES

*Armstrong v. United States*, 182 U.S. 243 (1901).........1

*Asociación de Educación Privada de Puerto Rico, Inc. v. García–Padilla*, 490 F.3d 1 (1st Cir. 2007) ...............................................................32

*Balzac v. Porto Rico*, 258 U.S. 298 (1922)...........*passim*

*Boumediene v. Bush*, 533 U.S. 723 (2008) .................31

*Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663 (1974) ......................................................25

*Califano v. Torres*, 435 U.S. 1 (1978) .....................8, 32

*Commonwealth v. Sanchez*, 136 S.Ct. 1863 (2016)...................................................................25

*De Lima v. Bidwell*, 182 U.S. 1 (1901)...............*passim*

*Dooley v. United States*, 182 U.S. 222 (1901) .....*passim*

*Dooley v. United States*, 183 U.S. 151 (1901) .....*passim*

*Dorr v. United States*, 195 U.S. 138 (1904).........*passim*

*Downes v. Bidwell*, 182 U.S. 244 (1901) ............*passim*

*Edelman v. Jordan*, 415 U.S. 651 (1974)...................28

*Elrod v. Burns*, 427 U.S. 347 (1976) ..........................32

*Ex parte Young*, 209 U.S. 123 (1908) ...... 1, 7, 19, 28, 29

*Examining Board v. Flores de Otero*, 426 U.S. 572 (1976)............................................................25

*Fourteen Diamond Rings v. United States*, 183 U.S. 176 (1901) ...............................................*passim*

vi

TABLE OF AUTHORITIES – Continued

Page

*Franklin California Tax-Free Trust v. Puerto Rico*, 805 F.3d 322 (1st Cir. 2015) ..........................22

*Goetze v. United States*, 182 U.S. 221 (1901)......*passim*

*Hafer v. Melo*, 502 U.S. 21 (1991) ...............................28

*Harris v. Rosario*, 446 U.S. 651 (1980) ...................8, 32

*Hawaii v. Mankichi*, 190 U.S. 197 (1903)...........*passim*

*Huus v. N.Y. & Porto Rico S.S. Co.*, 182 U.S. 392 (1901)...............................................................*passim*

*Igartua de la Rosa v. United States*, 229 F.3d 80 (1st Cir. 2000) ........................................................32

*Igartua de la Rosa v. United States*, 32 F.3d 8 (1st Cir. 1994), cert. denied, 514 U.S. 1049 (1995).....................................................................31

*Igartua v. Obama*, 842 F.3d 149 (1st Cir. 2016).........32

*Igartua v. U.S.*, 654 F.3d 59 (1st Cir. 2011) ...............32

*Igartua v. United States*, 626 F.3d 592 (1st Cir. 2010) (Congressional representation), en banc review denied, 654 F.3d 99 (1st Cir. 2011), cert. denied, 566 U.S. 986 (2012)....................................32

*Korematsu v. United States*, 323 U.S. 214 (1944).........9

*López Quiñones v. PR National Guard*, 526 F.3d 23 (1st Cir. 2008) ....................................................25

*Maceira v. Pagan*, 649 F.2d 8 (1st Cir. 1981).............32

*Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400 (1968) .......................................................27

vii

TABLE OF AUTHORITIES – Continued

Page

*Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1 (1st Cir. 2011) ........................................................25

*Peaje Inv. LLC v. García–Padilla*, 845 F.3d 505 (1st Cir. 2017) ........................................................22

*Pickering v. Bd. of Educ.*, 408 U.S. 563 (1972) ...........18

*Plessy v. Ferguson*, 163 U.S. 537 (1896)........................9

*Posadas de Puerto Rico v. Tourism Co.*, 478 U.S. 328 (1986)................................................................25

*Puerto Rico v. Franklin California Tax-Free Trust*, 136 S.Ct. 1938 (2016) ...................................22

*Puerto Rico v. Franklin California Tax-Free Trust*, 579 U.S. ___, 136 S.Ct. 1938 (2016)................3

*Puerto Rico v. Sanchez Valle*, 579 U.S. ___, 136 S.Ct. 1863 (2016) ................................................2

*Reid v. Covert*, 354 U.S. 1 (1957) .............................7, 8

*Rivera Schatz v. The Financial Oversight and Management Board for Puerto Rico, José B. Carrión III, et al.*, ___ F.Supp. ___, 2018 WL 3753018, (D.P.R. August 7, 2018)............................5

*Schrier v. Univ. of Col.*, 427 F.3d 1253 (10th Cir. 2005) ....................................................................32

*Scott v. Sanford*, 60 U.S. 393 (1857) ............................9

*Sindicato Puertorriqueño de Trabajadores v. Torres-Nieves*, 699 F.3d 1 (1st Cir. 2012) ...............32

*Sprint Comm., Inc. v. Jacobs*, 571 U.S. ___, 134 S.Ct. 584 (2013) ......................................................19

viii

TABLE OF AUTHORITIES – Continued

Page

*Torres v. Puerto Rico*, 442 U.S. 465 (1979) ................25

*Wal-Mart P.R., Inc. v. Zaragoza-Gomez*, 174 F. Supp. 3d 585 (D.P.R. 2016), aff'd, 834 F.3d 110 (1st Cir. 2016) ....................................................22

*Younger v. Harris*, 401 U.S. 37 (1971) ........................19


CONSTITUTIONAL PROVISIONS

U.S. Const. amend. I ..........................................*passim*

U.S. Const. amend. IV...............................................25

U.S. Const. amend. V ................................................25

U.S. Const. amend. X .................................................4

U.S. Const. amend. XI....................................19, 28, 31

U.S. Const. art. I, § 8, cl. 4...........................................1

U.S. Const. art. IV ......................................................2

U.S. Const. art. IV, § 3, cl. 2 .......................................12


STATUTES

11 U.S.C. § 101(52).......................................................2

11 U.S.C. § 109(c)(2).....................................................3

11 U.S.C. §§ 361–362 .................................................23

11 U.S.C. § 362 ...........................................1, 11, 14, 15

11 U.S.C. § 922 ...........................................1, 11, 14, 17

28 U.S.C. § 1254(1).....................................................11

28 U.S.C. § 2101(e).....................................................11

ix

TABLE OF AUTHORITIES – Continued

Page

42 U.S.C. § 1983 ................................................*passim*

48 U.S.C. § 405(b)..........................................................23

48 U.S.C. § 2106 ..........................................................29

48 U.S.C. § 2121 ..........................................................22

48 U.S.C. § 2121(a)..........................................................4

48 U.S.C. §§ 2161–2177 ............................................22

48 U.S.C. § 2161 ..........................................................14

48 U.S.C. § 2161(a)......................................................23

48 U.S.C. § 2194 ..........................................................14

48 U.S.C. § 2403(a).......................................................12

Puerto Rico Oversight, Management, and Eco-
    nomic Stability Act ("PROMESA"), Public
    Law No. 114–187, 130 Stat. 549 (2016) (codi-
    fied at 48 U.S.C. §§ 2101–2241) .....................*passim*

RULES AND REGULATIONS

Sup. Ct. R. 13 ............................................................11

Sup. Ct. R. 29(b)..................................................11, 12

x

TABLE OF AUTHORITIES – Continued

Page

OTHER AUTHORITIES

Addressing Puerto Rico's Economic And Fiscal
Crisis And Creating A Path To Recovery:
Roadmap For Congressional Action (Oct. 21,
2015), www.Whitehouse.gov/Sites/Default/Files/
Roadmap_For_CongressionalActionPuerto_Rico
Final.pdf [Roadmap For Congressional Ac-
tion].........................................................................21

Anne O. Krueger, Ranjit Teja & Andrew Wolfe,
Puerto Rico—A Way Forward (2015), http://
www.Bgfpr.com/Documents/Puertoricoaway
forward.pdf .............................................................21

Commonwealth of P.R., Financial Information
and Operating Data Report (2016).........................21

Congressional Task Force On Economic Growth
In Puerto Rico, 114th Cong. (2016).........................21

D. Andrew Austin, Cong. Research Serv.,
R44095, Puerto Rico's Current Fiscal Chal-
lenges (2016) ...........................................................21

Efrén Rivera Ramos, *The Legal Construction of
Identity: The Judicial and Social Legacy of
American Colonialism in Puerto Rico* (2001).........24

*Foreign in a Domestic Sense: Puerto Rico, Amer-
ican Expansion and the Constitution* (eds.
Christina Duffy Burnett & Burke Marshall).........23

Gustavo A. Gelpi, *The Constitutional Evolution
of Puerto Rico and Other U.S. Territories*
(1898-present) (2017)..............................................24

xi

## TABLE OF AUTHORITIES – Continued

Page

Homer, *Iliad* 6.179–182 .................................................4

Jose A. Cabranes, *Citizenship and the American Empire: Notes on the Legislative History of the United States Citizenship of Puerto Ricans* (1979).......................................................................24

Jose Trias Monge, *The Trials of the Oldest Colony in the World* (1997)...........................................24

Juan R. Torruella, *The Supreme Court and Puerto Rico: The Doctrine of Separate and Unequal* (1985).............................................................24

Juan R. Torruella, Why Puerto Rico Does Not Need Further Experimentation with Its Future: A Reply to the Notion of "Territorial Federalism", U.S. Territories Commentary Series, January 2018, Harv. Law. Rev. Vol. 131, No. 3 (Jan. 2018).............................................................27

Rafael Hernández Colón, The Evolution of Democratic Governance Under the Territorial Clause of the U.S. Constitution, L Suffolk U. L. Rev. 587 (2017)...................................................24

*Reconsidering the Insular Cases* (Gerald L. Neuman & Tomiko Brown-Nagin eds., 2015) ...............23

Treaty of Paris (1898)................................................24

1

## INTRODUCTION

This case concerns a First Circuit decision invoking the automatic stay provisions of the Bankruptcy Code, 11 U.S.C. §§ 362, 922, to suspend for a four-year minimum period the prosecution of all § 1983 civil rights actions against Commonwealth officials in their personal and official capacities, even though those actions do not produce economic claims or liabilities against the Commonwealth itself.[1] *Ex parte Young*, 209 U.S. 123 (1908). The result is the repudiation of the *Insular Cases* and the full suppression of the Bill of Rights of American citizens and other residents of Puerto Rico for no rational reason at all.[2]

At all times during its existence under the American flag, Puerto Rico has been treated as an unincorporated Territory, in many statutory instances akin to a State, for purposes of the Constitution. As an unincorporated Territory, the American citizens and other residents of Puerto Rico have enjoyed the protection of all the fundamental rights of the Bill of Rights of the

---

[1] See U.S. Const. art. I, § 8, cl. 4: "The Congress shall have Power To . . . establish . . . uniform Laws on the subject of Bankruptcies throughout the United States. . . ."

[2] Generally the *Insular Cases* are deemed to encompass the following decisions: *De Lima v. Bidwell*, 182 U.S. 1 (1901); *Goetze v. United States*, 182 U.S. 221 (1901); *Dooley v. United States*, 182 U.S. 222 (1901); *Armstrong v. United States*, 182 U.S. 243 (1901); *Downes v. Bidwell*, 182 U.S. 244 (1901); *Huus v. N.Y. & Porto Rico S.S. Co.*, 182 U.S. 392 (1901); *Dooley v. United States*, 183 U.S. 151 (1901); *Fourteen Diamond Rings v. United States*, 183 U.S. 176 (1901); *Hawaii v. Mankichi*, 190 U.S. 197 (1903); *Dorr v. United States*, 195 U.S. 138 (1904); and some commentators close the list with *Balzac v. Porto Rico*, 258 U.S. 298 (1922).

2

Constitution. See *Dorr v. United States*, 195 U.S. 138, 146 (1904) ("Congress, in legislating for the territories, [is] subject to those fundamental limitations in favor of personal rights which are formulated in the Constitution and its amendments[.]"). The doctrine of incorporation, as it is called, has been a cardinal principle supporting the territorial relationship between Puerto Rico and the United States. Therefore, even though Congress has "broad latitude" in matters of territorial governance; that authority does not supplant the role of federal courts in protecting fundamental constitutional rights. See *Puerto Rico v. Sanchez Valle*, 579 U.S. ___, 136 S.Ct. 1863, 1876 (2016) (holding that Congress has no capacity "to rewrite its own foundational role"). U.S. Const. art. IV.

The First Circuit decision below, however, has stripped the people of Puerto Rico of its fundamental constitutional rights by employing the automatic stay provisions of the Bankruptcy Code to suppress all § 1983 civil rights action against Commonwealth officials, both in their personal and official capacity. The path to this state of affairs can be dated back to 1984, when Congress amended the Bankruptcy Code's definition of State to retain Puerto Rico within the definition of State, "*except for the purpose of defining who may be a debtor under chapter 9*." (Emphasis supplied). Bankruptcy Amendments and Federal Judgeship Act, 98 Stat. 368, at 11 U.S.C. § 101(52). The insertion of this little phrase had the devastating effect of impeding Puerto Rico from authorizing its municipalities to seek Chapter 9 relief and deleted the statutory

3

"gateway" alternative for Commonwealth public utili-
ties to seek Chapter 9 rehabilitation. See 11 U.S.C.
§ 109(c)(2).

The loss of this protection contributed to the astro-
nomical rise in municipal debts and in 2014 led Puerto
Rico to enact the Puerto Rico Public Corporation Debt
Enforcement and Recovery Act. 2014 Laws P. R. p. 371.
The Act authorized Puerto Rico's public utilities to re-
structure their debts while continuing to provide es-
sential public services like water and electricity. In
*Puerto Rico v. Franklin California Tax-Free Trust*, 579
U.S. ___, 136 S.Ct. 1938 (2016), however, this Court de-
clared this Recovery Act preempted by the federal
Bankruptcy Code. The Court noted that the 1984
amendment not only eliminated the gateway provision
for municipalities, but by otherwise retaining Puerto
Rico within the definition of State, and since it did not
remove Puerto Rico from the scope of the preemption
provision, it remained captive of the preemption provi-
sion of the Bankruptcy Code. Both excluded from the
Code, and unable to self-legislate, Puerto Rico was
caught in a juridical limbo that reverted to Congress
to decide the path put of its oncoming insolvency.

*Franklin* theoretically gave Congress the easiest
of mechanisms for resolving Puerto Rico's fiscal crisis
by the simple expedient of eliminating the little phrase
that had been added in 1984 ("except for the purpose
of defining who may be a debtor under chapter 9"). Said
amendment would have devolved to Puerto Rico the
capacity to seek Bankruptcy Code reorganization be-
fore the default alarm bells had a chance to ring.

4

Instead, Congress did nothing until June 30, 2016, when propelled by institutional bond holders. It did not restore the 1984 provision, and instead enacted a bankruptcy-like statute for Puerto Rico and other territories, named the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), Public Law No. 114–187, 130 Stat. 549 (2016) (codified at 48 U.S.C. §§ 2101–2241). The aim of PROMESA was to provide for Puerto Rico "to achieve fiscal responsibility and access to the capital markets." 48 U.S.C. § 2121(a).

PROMESA, however, is a chimaera, the mythological creature composed of the head of a lion, the back of a goat and the tail of a serpent.[3] The Bankruptcy Code does not apply to States, out of Tenth Amendment concerns, and thus States can neither file for bankruptcy nor enjoy the protection of the automatic stay provisions of the Code. Prior to 1984, Puerto Rico too was treated as a State, and shared the same limitations as the other States. But under PROMESA Congress equated Puerto Rico as a lion State for preemption purposes, as a serpent municipality, with the right to shows its fangs for purposes of debt adjustment and the automatic stay venom, and as goat for ceding the historical rights accomplished via Public Law No. 600 and Public Law No. 447 to self-determination, home rule, and fiscal autonomy. Instead, the PROMESA creature gives the Oversight Board full authority to override the Puerto Rico legislative and executive branch insofar as it has plenary authority to certify

---

[3] Homer, *Iliad* 6.179–182.

5

long-term Fiscal Plans and Annual Budgets that must be obeyed by the elected government of Puerto Rico. In sum, instead of dealing with municipal debt via restored Bankruptcy Code, the pretenses of Commonwealth democratic gains have been wiped out by a sui generis statute that better serves the interest of institutional creditors. See *Rivera Schatz v. The Financial Oversight and Management Board for Puerto Rico, José B. Carrión III, et al.*, ___ F.Supp. ___, 2018 WL 3753018, (D.P.R. August 7, 2018) (LTS). There, Judge Laura Taylor Swain did not mince words:

> *6 Plaintiffs argue that the Oversight Board's rejection of the Legislative's budgetary action and implementation of its own budget illegally invaded the Legislature's lawmaking power under the Constitution of Puerto Rico and also ran afoul of Section 303 of PROMESA, which generally preserves the territory's governmental powers. As the Court recently explained in *In re Financial Oversight & Management Board for Puerto Rico*, ___ F.Supp.3d ___, 2018 WL 3425294 (D.P.R. July 13, 2018), Congress exercised its powers under the territories clause of the federal constitution in approving Puerto Rico's Constitution and in enacting PROMESA. The territories clause empowers Congress to make rules and regulations for Puerto Rico, and to alter those rules as well. Id. at ___, at *6.

> As noted above, PROMESA commits to the Oversight Board the sole discretion to determine whether proposed budgets are consistent with PROMESA's requirements, and

6

sole power to certify, and thus put into effect, budgets while the Board is in place. PROMESA includes a specific preemption provision, declaring that "[t]he provisions of [PROMESA] shall prevail over any general or specific provisions of territory law . . . or regulation that is inconsistent with [PROMESA]." 48 U.S.C.A. § 2103 (West 2017). Congress' determination, in PROMESA, to empower the Oversight Board to accept, reject, develop and certify budgets, and to render certified budgets effective by operation of law, prevails over the general allocation of budgetary power to Puerto Rico's legislature.7 Likewise, Congress has made PROMESA Section 303's general reservation of governmental rights "[s]ubject to the limitations set forth in title I and II of [PROMESA]." 48 U.S.C.A. § 2163 (West 2017). Section 202, which is within Title II, specifically empowers the Oversight Board to take the actions challenged here. See 48 U.S.C.A. § 2142(e)(3).

To top it off, the Oversight Board determinations are regal, not even subject to judicial review. See § 106(e) of PROMESA: "There shall be no jurisdiction in any United States district court to review challenges to the Oversight Board's certification determinations under this chapter."

But this begs the question: does the Territorial Clause allow the First Circuit to decide that the automatic stay provisions of the Code allow the Court to suppress all civil rights action against Puerto Rico, with the effect of depriving all of its citizens of its

7

fundamental rights under the Bill of Rights for a num-
ber of no less and probably more than 4 years: to im-
pose a constitutional curfew, so to speak.

Neither the language nor the legislative history of
PROMESA, however, contemplated that the automatic
stay provisions of the Code would additionally be used
to halt all § 1983 civil rights litigation against State
officials in their personal and official capacities. Thus,
the First Circuit decision begets two deformed results.
First, the use of the automatic stay provision for an in-
determinate period to freeze civil rights cases arising
under § 1983 nullifies a myriad of this Court's prece-
dents, starting with the *Insular Cases*, that mandate
that the First Amendment and all other fundamental
rights of the Bill of Rights will protect all American cit-
izens living in Puerto Rico from unconstitutional State
acts. Second, PROMESA ignores *Ex parte Young*, 209
U.S. 123 (1908), which provides the Eleventh Amend-
ment does not bar civil rights actions against State of-
ficials in their personal capacity for damages, nor in
the official capacity for equitable relief in the form of
prospective compliance with the Constitution. Thus,
the automatic stay plays no relevant or rational func-
tion under PROMESA as the underlying civil rights
action does not produce a claim or liability against the
Commonwealth.

It is appropriate to remember the words of
Justice Black in *Reid v. Covert*, 354 U.S. 1, 475–476
(1957) (plurality opinion), words good to this day: . . .
"The concept that the Bill of Rights and other consti-
tutional protections against arbitrary government are
inoperative when they become inconvenient or when

8

expediency dictates otherwise is a very dangerous doc-
trine and if allowed to flourish would destroy the ben-
efit of a written Constitution and undermine the basis
of our Government."

> Whatever the validity of the old cases such as
> *Downes v. Bidwell*, 182 U.S. 244 (1901), *Dorr
> v. United States*, 195 U.S. 138 (1904), and *Bal-
> zac v. Porto Rico*, 258 U.S. 298 (1922), in the
> particular historical context in which they
> were decided, those cases are clearly not au-
> thority for questioning the application of the
> Fourth Amendment—or any other provision
> of the Bill of Rights—to the Commonwealth of
> Puerto Rico in the 1970's. As Mr. Justice Black
> declared in *Reid v. Covert*, 354 U.S. 1, 14
> (1957) (plurality opinion): . . . *"The concept
> that the Bill of Rights and other constitutional
> protections against arbitrary government are
> inoperative when they become inconvenient or
> when expediency dictates otherwise is a very
> dangerous doctrine and if allowed to flourish
> would destroy the benefit of a written Consti-
> tution and undermine the basis of our Govern-
> ment.*" at 475–476. (Emphasis added.)

Finally, it bears highlighting that the First Circuit
decision here is far more objectionable than other judi-
cial decisions that have allowed the uneven treatment
of American residents because of their residence in
Puerto Rico. See *Harris v. Rosario*, 446 U.S. 651, 651–
652 (1980) (per curiam) (holding that American citi-
zens in Puerto Rico can be treated differently than
American citizens in the States for purposes of socio-
economic legislation); *Califano v. Torres*, 435 U.S. 1, 5

9

(1978) (same). Here, the First Circuit has abetted the full suppression of the fundamental constitutional rights of American citizens living in the island; and, in particular, the judicial effacing of Petitioner's social commentary concerning the effects of the socio-economic implosion befalling the people of Puerto Rico. To stop Petitioner's First Amendment civil rights suit, even for short periods of time, is both repression and censorship. This result likens the decision here to the more abominable, demeaning, muting and segregationist precedents of the national panorama, such as *Scott v. Sanford*, 60 U.S. 393 (1857), *Plessy v. Ferguson*, 163 U.S. 537 (1896) and *Korematsu v. United States*, 323 U.S. 214 (1944).

The First Circuit made short shrift of the question presented by this writ. But Petitioner respectfully submits that the case presented is of such imperative public importance, for Petitioner personally and for the American citizens residing in Puerto Rico collectively, that it justifies deviation from normal appellate practice and requires immediate determination in this Court.

———————◆———————

## OPINIONS BELOW

The First Circuit decision of January 24, 2013 has not been published in the Federal Register nor in Westlaw. For convenience sake, it is reproduced below. It, as well as two procedural decisions, neither of them published, comprise the Appendix.

10

(1)   Order of November 29, 2017

The Order of November 29, 2017, requires the parties to brief the Court as to whether the automatic stay applies to this appeal.

See App. 1.

(2)   Order January 24, 2018

The Order of January 24, 2018 is the object of this appeal. It provides:

*In view of the petition to restructure its debts filed by the Commonwealth of Puerto Rico, this appeal is stayed.* The parties shall file status reports every ninety days.

See App. 3.

(3)   Order of June 13, 2018

This is the final boilerplate Order denying the petition for rehearing and rehearing en banc. See App. 4.

———————◆———————

## STATEMENT OF JURISDICTION

The Court of Appeals issued the stay Order that Petitioner seeks to review on January 24, 2018. On January 31, 2018, Appellant sought rehearing and rehearing en banc of the same. The Court denied the petition for rehearing on June 13, 2018. While no term is provided for the filing a writ of certiorari regarding an Order before Judgment, this Writ is being filed on

11

September 11, 2018, within the ninety-day period provided by Supreme Court Rule 13.

This Court has jurisdiction to address a writ of certiorari before the entry of final judgment where the circumstances of the petition so evidence it. Rule 11 of the Rules of the Supreme Court provides for certiorari to a United States Court of Appeals before judgment "upon a showing that the case is of such imperative public importance as to justify deviation from normal appellate practice and to require immediate determination in this Court." Likewise, 28 U.S.C. § 2101(e) provides that: "An application to the Supreme Court for a writ of certiorari to review a case *before* judgment has been rendered in the court of appeals may be made at any time before judgment." (Emphasis supplied). Finally, the certiorari statute provides that this Court may review writs of certiorari "before or after the rendition of a judgment or decree." 28 U.S.C. § 1254(1).

———————◆———————

## CERTIFICATION IN COMPLIANCE WITH SUPREME COURT RULE 29(b)

Pursuant to Supreme Court Rule 29(b), the Petitioner informs the Supreme Court that this writ questions the constitutionality of an Act of Congress, specifically the automatic stay provisions of the Bankruptcy Code, 11 U.S.C. §§ 362, 922, in light of the First Amendment, as applied. Neither the United States nor any federal department, office, agency, officer, or employee is a party.

12

At no time did the United States Court of Appeals certify to the Attorney General, pursuant to 48 U.S.C. § 2403(a), the fact that the constitutionality of an Act of Congress was drawn into question.

Pursuant to Rule 29(b), Petitioner hereby informs the Court that 48 U.S.C. § 2403(a) may apply and that Petitioner shall serve a copy of the writ for certiorari on the Solicitor General of the United States, Room 5614, Department of Justice, 950 Pennsylvania Ave., N. W., Washington, DC 20530-0001.

———————◆———————

## CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED

### A. CONSTITUTIONAL PROVISIONS

First Amendment

Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances.

Territorial Clause, art. IV, § 3, cl. 2

The Congress shall have power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States; and nothing in this Constitution shall be so construed as to Prejudice any Claims of the United States, or of any particular State.

13

## B.  STATUTORY PROVISIONS

### 42 U.S. Code § 1983—Civil action for deprivation of rights

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

14

**PROMESA**[4]

**48 U.S.C. § 2194. Automatic stay upon enactment**

(a)  . . .

(b)  In general

Except as provided in subsection (c) of this section, the establishment of an Oversight Board for Puerto Rico (i.e., the enactment of this chapter) in accordance with section 2121 of this title operates with respect to a Liability as a stay, applicable to all entities (as such term is defined in section 101 of Title 11), of—

(1)  the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the Government of Puerto Rico that was or could have been commenced before the enactment of this chapter, or to recover a Liability Claim against the Government of Puerto Rico that arose before the enactment of this chapter;

(2)  the enforcement, against the Government of Puerto Rico or against property of the Government of Puerto Rico, of a judgment obtained before the enactment of this chapter;

---

[4] The original PROMESA automatic stay provision was provisional and expired in February 2017. After the filing of the Commonwealth petition on May 3, 2017, it was superseded by the automatic stay provision of §§ 362 and 922 of the Code. See 48 U.S.C. §§ 2161, 2194; 11 U.S.C. §§ 362, 922. See Order of November 29, 2017.

15

(3)   any act to obtain possession of property of the Government of Puerto Rico or of property from the Government of Puerto Rico or to exercise control over property of the Government of Puerto Rico;

(4)   any act to create, perfect, or enforce any lien against property of the Government of Puerto Rico;

(5)   any act to create, perfect, or enforce against property of the Government of Puerto Rico any lien to the extent that such lien secures a Liability Claim that arose before the enactment of this chapter;

(6)   any act to collect, assess, or recover a Liability Claim against the Government of Puerto Rico that arose before the enactment of this chapter; and

(7)   the setoff of any debt owing to the Government of Puerto Rico that arose before the enactment of this chapter against any Liability Claim against the Government of Puerto Rico.

## BANKRUPTCY CODE

### 11 U.S.C. § 362—Automatic stay

(a)   Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970, operates as a stay, applicable to all entities, of—

16

(1)   the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

(2)   the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title;

(3)   any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

(4)   any act to create, perfect, or enforce any lien against property of the estate;

(5)   any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title;

(6)   any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title;

(7)   the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor; and

17

(8)   the commencement or continuation of a proceeding before the United States Tax Court concerning a tax liability of a debtor that is a corporation for a taxable period the bankruptcy court may determine or concerning the tax liability of a debtor who is an individual for a taxable period ending before the date of the order for relief under this title.

## Chapter 9—Adjustment of Debts of a Municipality

Section 922—Automatic stay of enforcement of claims against the debtor

(a)   A petition filed under this chapter operates as a stay, in addition to the stay provided by section 362 of this title, applicable to all entities, of—

(1)   the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against an officer or inhabitant of the debtor that seeks to enforce a claim against the debtor; and

(2)   the enforcement of a lien on or arising out of taxes or assessments owed to the debtor.

(b)   Subsections (c), (d), (e), (f), and (g) of section 362 of this title apply to a stay under subsection (a) of this section the same as such subsections apply to a stay under section 362(a) of this title.

18

(c)   If the debtor provides, under section 362, 364, or 922 of this title, adequate protection of the interest of the holder of a claim secured by a lien on property of the debtor and if, not-withstanding such protection such creditor has a claim arising from the stay of action against such property under section 362 or 922 of this title or from the granting of a lien under section 364(d) of this title, then such claim shall be allowable as an administrative expense under section 503(b) of this title.

(d)   . . .

————◆————

## STATEMENT OF THE CASE

### A.  Proceedings Below

The underlying case is a straightforward § 1983 civil rights action filed on February 3, 2016 before the district court by Petitioner Rafael Pabón Ortega, a career employee at the judicial branch, alleging that he was dismissed by the Respondent, Isabel Llompart Zeno, then Administrator of the Judicial branch, for running a Facebook blog that chronicled the impact of Puerto Rico's socio-economic implosion on the lives of ordinary people. Respondent found the Facebook blog offensive, unbecoming of a judicial employee and damaging to the reputation of the judicial system. Petitioner responded with a § 1983 action claiming his Facebook blog was a running commentary concerning Puerto Rico's cultural, social and political situation protected under the First Amendment by *Pickering v.*

19

*Bd. of Educ.*, 408 U.S. 563, 568 (1972). The dismissal, therefore, was unconstitutional.

On May 9, 2017, the district court dismissed the case pursuant to *Younger v. Harris*, 401 U.S. 37 (1971) claiming that the Appellant forfeited his right to the federal forum when the Appellant availed himself of a voluntary administrative review of his termination.

Petitioner appealed said decision to the First Circuit alleging legal error as it is well-established that *Younger* does not apply to non-coercive, post-termination administrative proceedings. *Sprint Comm., Inc. v. Jacobs*, 571 U.S. ___, 134 S.Ct. 584 (2013). Given that there was no factual issue in dispute, Petitioner requested the Circuit to decide not only the abstention issue, but the merits of the First Amendment claim.

Oral arguments were held on November 3, 2016. On November 29, 2017, the Court on its own directed the parties to address whether the automatic stay provisions of the Bankruptcy Code applied to its appeal.

Both parties amply briefed the Court. Petitioner argued that the application of the automatic stay provision for an indeterminate period of time to civil rights cases arising under § 1983 was unconstitutional and contrary to the *Insular Cases* as it nullified the application specifically of the First Amendment and generally of all the fundamental rights of the Bill of Rights to all American citizens living in Puerto Rico. In addition, Petitioner contended that following *Ex parte Young*, 209 U.S. 123 (1908), the Eleventh Amendment did not bar civil rights actions against State officials in

20

their personal capacity for damages, nor in the official capacity for equitable relief in the form of prospective compliance with the Constitution. Neither did PROMESA nor the Court contemplated the automatic stay of civil rights action under § 1983 as said actions do not impose monetary claims or liability against the Commonwealth.

On January 24, 2018, the Court, without any analysis or reasoning, stayed the appeal, holding: "In view of the petition to restructure its debts [under the Code] filed by the Commonwealth of Puerto Rico, this appeal is stayed." See App. 3. On January 31, 2018, Petitioner sought a rehearing of the case. On June 13, 2018, the Court denied the rehearing. See App. 4. This writ followed.

## B. Background

The First Circuit Order of January 24, 2018, which allows the Commonwealth to automatically stay all civil rights litigation against it, is the product of PROMESA's rather unique features, and the unanticipated dilemma caused when a statutory chimaera is created. The Bankruptcy Code does not allow a State to invoke Chapter 9 bankruptcy protection. PROMESA, on the other hand, treats the Commonwealth as a potential debtor eligible to participate in the formal debt restructuring process. The First Circuit interpret that in so doing, Congress gave the Commonwealth a mutant power alien to any State: the capacity to automatically stay for indefinite periods of time all litigation

21

that seeks to establish liabilities against it. The First Circuit, however, exceeded its hermeneutical authority, when it included § 1983 actions within the grasp of the automatic stay provisions.

From 1938 to 1984, Puerto Rico has enjoyed the protections of the Bankruptcy Code. This safeguard was surreptitiously removed in 1984, eliminating the power that Puerto Rico once had been granted by Congress to authorize its public utilities to file for Chapter 9 relief. Congress then failed to enact subsequent legislation reauthorizing Puerto Rico to approve municipal bankruptcies. This situation, in turn, sparked an astronomic spike in bondholder's liability, such that Puerto Rico's accumulated debts well surpassed its capacity to pay. At present, Puerto Rico's present public debt is approximately $72 billion, not counting the approximately $164 billion that the Puerto Rico government has in deficits to its public health system and government employee pension plans.[5]

Given this situation, Puerto Rico enacted its own restructuring mechanism, known in short as the Recovery Act of 2014, to forestall economic doom. The

---

[5] See Commonwealth of P.R., Financial Information and Operating Data Report (2016); Congressional Task Force On Economic Growth In Puerto Rico, 114th Cong. (2016); Anne O. Krueger, Ranjit Teja & Andrew Wolfe, Puerto Rico—A Way Forward (2015), http://www.Bgfpr.com/Documents/Puertoricoawayforward.pdf; Addressing Puerto Rico's Economic And Fiscal Crisis And Creating A Path To Recovery: Roadmap For Congressional Action (Oct. 21, 2015), www.Whitehouse.gov/Sites/Default/Files/Roadmap_For_CongressionalActionPuerto_RicoFinal.pdf [Roadmap For Congressional Action]; D. Andrew Austin, Cong. Research Serv., R44095, Puerto Rico's Current Fiscal Challenges (2016).

22

Recovery Act, however, was found to be pre-empted by the Bankruptcy Code. See *Franklin California Tax-Free Trust v. Puerto Rico*, 805 F.3d 322 (1st Cir. 2015), aff'd, *Puerto Rico v. Franklin California Tax-Free Trust*, 136 S.Ct. 1938 (2016). Likewise, the Commonwealth enacted additional revenue raising measures aimed at megastores like Wal-Mart, but these too were deemed to be unconstitutional. *Wal-Mart P.R., Inc. v. Zaragoza-Gomez*, 174 F. Supp. 3d 585 (D.P.R. 2016), aff'd, 834 F.3d 110 (1st Cir. 2016). In the words of the district court in *Wal-Mart*, "The Commonwealth of Puerto Rico is insolvent and no longer able to pay its debts as they become due." *Wal-Mart*, 174 F. Supp. 3d at 592.

Given the oncoming fiscal collapse, on June 30, 2016 Congress enacted the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), 48 U.S.C. §§ 2101–2241, a bankruptcy-like statute designed to address the impending insolvency and the humanitarian crisis induced by it. See generally *Peaje Inv. LLC v. García–Padilla*, 845 F.3d 505, 509 (1st Cir. 2017) (discussing the statute's purpose). PROMESA establishes a Financial Oversight and Management Board to "provide a method for the covered territory to achieve fiscal responsibility and access to the capital markets." 48 U.S.C. § 2121. Title III creates a mechanism to allow the Board to restructure and adjust the Commonwealth's debt obligations. 48 U.S.C. §§ 2161–2177. In enacting PROMESA, Congress instituted a stay of all creditor litigation against the Commonwealth to allow a litigation free

23

negotiation period. 48 U.S.C. § 405(b). While the PROMESA stay is temporary, until February 15, 2017 unless extended, its expiration is irrelevant, since upon the filing of the Commonwealth petition of May 3, 2017, the automatic stay provisions of the Bankruptcy Code kicked in. See 48 U.S.C. § 2161(a) (incorporating 11 U.S.C. §§ 361–362 into Title III proceedings).

This brings us to the controversy at hand. In applying the automatic stay provisions of PROMESA to this appeal, the Circuit adopted a norm that allows the Commonwealth to freeze all civil rights litigation against it. Appellant argues that said reading is not countenanced by the Constitution.

––––––––––◆––––––––––

## REASONS FOR GRANTING THE WRIT

### A. The First Circuit Decision Staying Petitioner's First Amendment § 1983 Civil Rights Case Repudiates This Court's Precedents Which Recognize the Fundamental Constitutional Rights of American Citizens and Other Residents in Puerto Rico

While often challenged, disdained and questioned, there is no dispute that the *Insular Cases* regulate the constitutional relationship between the United States and Puerto Rico.[6] These cases go back to the transfer

––––––––––

[6] For a variety of views, see generally: *Reconsidering the Insular Cases* (Gerald L. Neuman & Tomiko Brown-Nagin eds., 2015); *Foreign in a Domestic Sense: Puerto Rico, American Expansion and the Constitution* (eds. Christina Duffy Burnett & Burke

24

of Puerto Rico from Spain to the United States by the Treaty of Paris of 1898. In a series of cases known collectively as the *Insular Cases*, the Court weighed whether the Constitution, by its own force, applies in any territory that is not a State. After evaluating historical, cultural and political considerations, the Court developed the doctrine of territorial incorporation, under which the Constitution applies in full to Territories surely destined for statehood, and thus called incorporated; but only as to fundamental rights to Territories governed merely by reason of sovereign power, and thus called unincorporated. As the Court stated in *Balzac v. Puerto Rico*, 258 U.S. 298, 312 (1922), "the real issue in the *Insular Cases* was not whether the Constitution extended to the Philippines or Porto Rico when we went there, but which of its provisions were applicable by way of limitation upon the exercise of executive and legislative power in dealing with new conditions and requirements." In the case of Puerto Rico, the Court determined that it was an unincorporated territory, and as such, "only fundamental

---

Marshall); Jose A. Cabranes, *Citizenship and the American Empire: Notes on the Legislative History of the United States Citizenship of Puerto Ricans* (1979); Jose Trias Monge, *The Trials of the Oldest Colony in the World* (1997); Juan R. Torruella, *The Supreme Court and Puerto Rico: The Doctrine of Separate and Unequal* (1985); Efrén Rivera Ramos, *The Legal Construction of Identity: The Judicial and Social Legacy of American Colonialism in Puerto Rico* (2001); Gustavo A. Gelpi, *The Constitutional Evolution of Puerto Rico and Other U.S. Territories* (1898-present) (2017); Rafael Hernández Colón, The Evolution of Democratic Governance Under the Territorial Clause of the U.S. Constitution, L Suffolk U. L. Rev. 587 (2017).

25

constitutional rights extend to unincorporated United States territories." Id.

Over time, the Supreme Court has identified those fundamental constitutional provisions that serve as "limitation upon the exercise of executive and legislative power." In its opinions, the Court has held that the First Amendment, Fourth Amendment, Fifth Amendment (except for the grand jury provision), Due Process and Equal Protection provisions of the Constitution protect American citizens in Puerto Rico. See *Calero-Toledo v. Pearson Yacht Leasing Co*., 416 U.S. 663 (1974) (Due Process); *Examining Board v. Flores de Otero*, 426 U.S. 572 (1976) (Equal Protection); *Torres v. Puerto Rico*, 442 U.S. 465 (1979) (Fourth Amendment); *Posadas de Puerto Rico v. Tourism Co*., 478 U.S. 328 (1986) (First Amendment); *Commonwealth v. Sanchez*, 136 S.Ct. 1863 (2016) (Fifth Amendment but for grand jury requirement).

In addition, the Supreme Court should take notice of that variant of the First Amendment cases that fall under the category of political discrimination. Puerto Rico is perhaps the top jurisdiction under the American flag most plagued by this modality of First Amendment violation. See *López Quiñones v. PR National Guard*, 526 F.3d 23, 29 (1st Cir. 2008) ("This circuit leads the nation as one of the most prolific generators of political discrimination cases; in this area of litigation, the District of Puerto Rico has the dubious distinction of being the most fecund district in the circuit."); *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 19 (1st Cir. 2011) ("'Read as a whole, the

26

plaintiffs' complaint unquestionably describes a plausible discriminatory sequence that is all too familiar in this circuit.").

The foregoing review highlights two points. First, there is no doubt that the First Amendment applies to Puerto Rico and is enforceable via § 1983. Second, the failure to judicially enforce the Bill of Rights would leave Puerto Rico bereft of civil rights prosecution in one of the jurisdictions that most relies on it for the effective, impartial and honest performance of the governmental function. The underlying case is a good example of the house of horrors that judicial abstinence may propagate. A government employee is dismissed for a Facebook blog that describes how the ongoing Puerto Rican implosion impacts unfortunate persons. Upon being deprived of his job, he becomes one of these unfortunate persons. The damages caused to him are cumulative and compounded: he loses his livelihood, he is forced to leave his homeland to seek a job in the United States, his family is disrupted as his wife cannot give up her job in Puerto Rico, his future is dismantled by unanticipated contingencies, he suffers depression. In sum, grievous harms for a rather innocuous blog.

In Puerto Rico, the federal court has long been perceived as the one arena that operates impartially without the distortions of power politics that riddle Puerto Rican society. The incidence of political discrimination and other civil rights cases is no accident: it is the product of an intense civil struggle over status, power and money, multi-manifold by ample inequities,

27

inoperative systems and a trying colonial condition. Thus, the abundance of civil rights cases in Puerto Rico is not solely the product of a broken and fractious society, it is as importantly a judicial weathervane, a warning phenomenon invested with a compelling public interest that functions as a social dissuasive against even more rampant spoils.

In addition, this Court should be mindful that: "When a plaintiff succeeds in remedying a civil rights violation, we have stated, he serves "as a 'private attorney general,' vindicating a policy that Congress considered of the highest priority." *Newman v. Piggie Park Enterprises, Inc*., 390 U.S. 400, 402 (1968) (per curiam). Given the mechanical application of automatic stays to § 1983 civil rights actions adopted by the Court below, it has immobilized Puerto Rico's private attorney generals, immunized State actors from constitutional violations and remitted American citizens in Puerto Rico to a lawless jurisdiction deprived of the Bill of Rights. If it is the function of the judicial system to serve as the guardian of the people's rights under the Bill of Rights, the First Circuit Order here represents a giant leap away from this role. To abandon this role, would signal the relinquishment of its constitutional role in Puerto Rico. See Juan R. Torruella, Why Puerto Rico Does Not Need Further Experimentation with Its Future: A Reply to the Notion of "Territorial Federalism", U.S. Territories Commentary Series, January 2018, Harv.Law.Rev. Vol. 131, No. 3 (Jan. 2018) (PROMESA represents a return to the Foraker era).

28

Appellant can anticipate that the Commonwealth will argue that the stay is compelled given the gravity of the fiscal condition and the finite although open-ended duration of the stay. There's no weight to these arguments. In the first place, the application of the stay provisions to civil rights cases do not fall within the type of liability contemplated by PROMESA. Since *Ex parte Young*, 209 U.S. 123 (1908), § 1983 cases are not considered to affect the State treasury—that is, are not barred by the Eleventh Amendment. Action for damages are restricted to damages against a state official in her personal capacity, and the injunctive relief is limited to prospective compliance with the Constitution. Thus, in *Hafer v. Melo*, 502 U.S. 21 (1991), a unanimous Supreme Court held that a civil rights suit seeking damages against the state official in her individual capacity is not barred by the Eleventh Amendment because the money damages come from the officer's own pocket, not the State's purse. Similarly, when the suit is against a State officer in his official capacity in the form of prospective injunctive compliance with the Constitution, there is no Eleventh Amendment bar, even if there is some cost to the State, because prospective constitutional compliance is a necessary cost of federalism. *Edelman v. Jordan*, 415 U.S. 651 (1974).

The Petitioner's case fits this cast: he seeks damages against the Respondent in her personal capacity and prospective injunctive relief against her successor in the form of reinstatement. There remedies fall outside both the Eleventh Amendment and PROMESA's definition of liability. In sum, Appellant's civil right

29

action does not constitute an economic claim or liability against the Commonwealth for PROMESA's purposes. It would be an abominable judicial repudiation of the most basic civil rights precedent—*Ex parte Young*—if the automatic stay provisions could place on uncertain hold this and any other § 1983 civil rights action allowed by it.

The automatic stay provisions at issue here must be read considering the mandate of § 2106, which provides that PROMESA "shall [not] be construed as impairing or in any manner relieving a territorial government, or any territorial instrumentality thereof, from compliance with Federal laws. . . ." 48 U.S.C. § 2106. We read the reference to "compliance with Federal laws" to encompass the Constitution. Thus, neither the nature of a § 1983 action, which does not expose the Commonwealth to monetary liability, nor PROMESA's statutory language, warrant extending the stay provisions to § 1983 actions seeking to enforce fundamental constitutional rights.

**B. This Writ Raises Issues of National Importance Concerning the Interplay of the Automatic Stay of the Bankruptcy Code and the Fundamental Rights Applicable to American Citizens and Other residents of Puerto Rico Pursuant to the *Insular Cases***

While the people of Puerto Rico should by now be accustomed to the subordinate role that Puerto Rico has been forced to play for 120 years as a conquered territory within the satellite relationship with the

30

United States under the Territorial Clause, a colonial relationship that constitutionally stretches longer than slavery itself, the First Circuit decision here strikes at the heart of the one single attainment achieved as a matter of constitutional grace: the application to the American citizens and other residents of Puerto Rico of the fundamental rights contained in the Constitution's Bill of Rights.

It is important that the Court review this issue, as there is little prospect that PROMESA will be applied to the other Territories, and it goes to the heart of the fundamental rights applicable under the Territorial Clause. As is, the application of the Code's automatic stay provisions to all civil rights cases arising under § 1983 for indeterminate periods of time repudiates the *Insular Cases* and nullifies the operation of the Bill of Rights to all Americans citizens living in Puerto Rico. In a jurisdiction that has repeatedly been recognized by the First Circuit as the premier jurisdiction for certain types of civil rights violations, the Court's unreasoned decision leaves the people of Puerto Rico rights-less and bereft of the protections ushered in by a line of cases dating to 1901, known as the *Insular Cases*. These cases, good law to this day, provide that the residents of Puerto Rico enjoy the protections of all the fundamental rights contained in the Bill of Rights of the Constitution.

The result of the First Circuit decision, however, is that it has suspended the application of the Bill of Rights to the residents of Puerto Rico probably during the life of PROMESA. While the circuit may have

31

arguably relied on the wooden application of the stay provision to protect Puerto Rico's finances, there is no rationale for this reading as it is well known that by virtue of the Eleventh Amendment, § 1983 actions are not against the State, but against state officers in their personal capacity for money damages; and against state officers in their official capacity only as necessary to accomplish prospective equitable compliance with the Constitution. In sum, § 1983 civil rights actions do not impose any monetary liability or claim against the Commonwealth under PROMESA or the Eleventh Amendment.

While theoretically the application of the automatic stay has an end, in practice the automatic stay of all § 1983 civil rights actions extends, should it dodge Murphy's law, at least for the life of PROMESA. As a result, the Order places American citizens living in Puerto Rico in a situation worse than enemy combatant held captive in Guantanamo, which the Court held were entitled to the fundamental rights of the Constitution. See *Boumediene v. Bush*, 533 U.S. 723, 765 (2008) "The Nation's basic charter cannot be contracted away like this," not in Guantanamo, not in Puerto Rico.

While the judiciary has seen fit to uphold the subordinate treatment of American citizens in Puerto Rico with respect to political representation in Congress and presidential elections,[7] and with respect to

---

[7] See *Igartua de la Rosa v. United States*, 32 F.3d 8 (1st Cir. 1994) (per curiam) (Igartua I), cert. denied, 514 U.S. 1049 (1995)

32

socio-economic legislation,[8] there is no precedent for the suppression of First Amendment and other fundamental rights under the Bill of Rights, "for even limited periods of time." *Elrod v. Burns*, 427 U.S. 347 (1976).[9] On the contrary, the *Insular Cases* provide that fundamental rights apply to American citizens in Puerto Rico as in a State. The First Circuit's reading of the Code's automatic stay deletes without analysis over a century of jurisprudence providing for the application of fundamental constitutional rights to territorial subjects. This Order, in sum, must be revoked as it represents a repudiation of the keystone doctrine

---

(presidential vote); *Igartua de la Rosa v. United States*, 229 F.3d 80 (1st Cir. 2000) (per curiam) (Igartua II) (same); *Igartua v. U.S.*, 654 F.3d 59 (1st Cir. 2011) (Igartua III); *Igartua v. United States* (Igartua IV), 626 F.3d 592, 594, 598 n.6 (1st Cir. 2010) (Congressional representation), en banc review denied, 654 F.3d 99 (1st Cir. 2011), cert. denied, 566 U.S. 986 (2012); *Igartua v. Obama*, 842 F.3d 149 (1st Cir. 2016) (Igartua V).

[8] See *Califano v. Torres*, 435 U.S. 1 (1978); *Harris v. Rosario*, 446 U.S. 651 (1980).

[9] Where the Appellant alleges a colorable First Amendment claim for preliminary injunction purposes, he is presumed to show an irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373 (1976): "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury"; *Schrier v. Univ. of Col.*, 427 F.3d 1253, 1266 (10th Cir. 2005) (where plaintiff had a colorable First Amendment claim for retaliatory termination he would have been able to make a showing of irreparable harm); *Sindicato Puertorriqueño de Trabajadores v. Torres-Nieves*, 699 F.3d 1, 10–11 (1st Cir. 2012) (citing Elrod); *Asociación de Educación Privada de Puerto Rico, Inc. v. García–Padilla*, 490 F.3d 1, 21 (1st Cir. 2007) (applying Elrod); *Maceira v. Pagan*, 649 F.2d 8, 18 (1st Cir. 1981) (citing Elrod).

33

regulating the relationship between the United States and Puerto Rico.

———————◆———————

## CONCLUSION

For the above reasons, Petitioner respectfully requests that the writ of certiorari to the First Circuit be granted.

In San Juan, Puerto Rico, this September 11, 2018.

Respectfully submitted,

CARLOS A. DEL VALLE CRUZ
*Counsel of Record*
DEL VALLE LAW
P.O. Box 9022473
San Juan, Puerto Rico 00902-2473
(939) 218 1332
cdvlawpr@gmail.com

September 11, 2018