Job No. 8595

Evelyn Ramirez Lluveras, et al v. Javier Pagan Cruz, et al

Alejandro del Carmen

August 12, 2010



MERIT COURT REPORTERS
CERTIFIED SHORTHAND REPORTERS

307 W. 7th Street, Suite 1350
Fort Worth, Texas 76102

817-336-3042 * depos@merittexas.com

CERTIFIED
COPY

## Page 1

1
2
3      IN THE UNITED STATES DISTRICT COURT
       FOR THE DISTRICT OF PUERTO RICO

       EVELYN RAMIREZ LLUVERAS,    *
       et al,                      *
4             Plaintiffs           *
                                   *
5      v.                          *   Civ. Number 08-1486 FAB
                                   *
6      JAVIER PAGAN CRUZ, et al,   *
              Defendants           *
7
8
9         ORAL DEPOSITION OF ALEJANDRO DEL CARMEN
10                     VOLUME I
11
12      August 12, 2010          Grand Prairie, Texas
13
14         REPORTED BY:  Amy L. Sturgess, CSR
15
16
17
18
19
20
       Job No. 8595
21
22
23
24
25

## Page 2

1
2      APPEARANCES:

3      COUNSEL FOR THE PLAINTIFFS:

4              BERKAN/MENDEZ
               Calle O'Neill G-11
               San Juan, Puerto Rico  00918
5              BY:  Judith Berkan and Mary Jo Mendez
6      COUNSEL FOR THE DEFENDANTS:
7              ALDARONDO & LOPEZ BRAS
               ALB Plaza
8              #16 Carr. 199 Suite 400
               Guaynabo, Puerto Rico  00969
9              BY:  Michael Craig McCall
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 3

1
2                    I N D E X
       ALEJANDRO DEL CARMEN - August 12, 2010
3

4      AGREEMENTS ...................................    5
       DIRECT EXAMINATION BY MS. BERKAN..............   12
       CHANGES AND SIGNATURE ........................  283
5      REPORTER'S CERTIFICATE .......................  285
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 4

1
2                E X H I B I T   I N D E X
       ALEJANDRO DEL CARMEN - August 12, 2010
3

       NUMBERS          DESCRIPTION                  PAGE

4      1     del Carmen Report............................18

5      2     Notice.......................................24

6      3     Time Records.................................25

7      4a    Letter from Mr. Abraham......................46

8      4b    Response to Exhibit 4a.......................46

9      5     Diploma......................................55
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1 (Pages 1 to 4)

Page 5

```
 1          A G R E E M E N T S
 2          DEPOSITION AND ANSWERS OF ALEJANDRO DEL
 3   CARMEN, taken herein by Counsel for the Plaintiffs
 4   before AMY L. STURGESS, a Certified Shorthand Reporter
 5   in and for the State of Texas, on August 12, 2010,
 6   commencing at 8:59 AM, in the Offices of THORNE
 7   SKINNER & THORNE 123 West Main Street Suite 300, in
 8   the city of Grand Prairie, County of Dallas, State of
 9   Texas, pursuant to the following stipulations and
10   agreements:
11          IT WAS AGREED by and between counsel for
12   the Plaintiff and Defendant in the above-numbered
13   and-styled cause, that all requirements by the Officer
14   pursuant to Federal Rules of Civil Procedure 30(b)(4)
15   are hereby waived.
16          IT WAS FURTHER AGREED that all
17   formalities are specifically waived, and that the oral
18   deposition of ALEJANDRO DEL CARMEN may be taken herein
19   forthwith before AMY L. STURGESS, a Certified
20   Shorthand Reporter in and for the State of Texas, said
21   deposition being taken with the same force and effect
22   as though all requirements of the statutes and rules
23   had  been fully complied with.
24          IT WAS FURTHER AGREED that no objections
25   need be made by any party at the time of taking said
```

Page 6

```
 1   deposition, except objections as to the form of the
 2   question or the responsiveness of the answer, which if
 3   not made during the deposition are waived; but if and
 4   when said deposition, or any portion thereof is
 5   offered in evidence on the trial of this cause by any
 6   party hereto, it shall be subject to any and all other
 7   legal objections, such objections to be made at the
 8   time of the tender, the same as though the witness
 9   were on the stand personally testifying.
10          IT WAS FURTHER AGREED that the witness
11   shall sign the deposition transcript before any notary
12   public or official authorized to administer oaths;
13   and, at such time, the witness has the privilege of
14   reading over said transcript and making any
15   corrections to be made in accordance with all
16   applicable Bankruptcy Rules of Procedure and Federal
17   Rules of Civil Procedure.
18          IT WAS FURTHER AGREED that after said
19   deposition transcript has been returned to the
20   deposition officer along with changes, if any, made by
21   the witness in accordance with all applicable
22   Bankruptcy Rules of Procedure and the Federal Rules of
23   Procedure, that the original deposition transcript,
24   together with copies of all exhibits, will be
25   delivered to the custodial attorney for safekeeping
```

Page 7

```
 1   and use in trial.
 2          IT WAS FURTHER AGREED that after said
 3   deposition transcript has been returned to counsel in
 4   accordance with these stipulations and agreements, it
 5   will be treated by the parties hereto and may be used
 6   herein with the same force and effect as though all
 7   statutes and rules relating to the taking and
 8   returning into court of depositions had been fully
 9   complied with.
10
11          -oOo-
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 8

```
 1          P R O C E E D I N G S
 2          THE REPORTER:  We're on the record at
 3   8:59.
 4          ALEX DEL CARMEN, do you realize that the
 5   testimony that you will give today will have the same
 6   force and effect as if you were in a court before a
 7   judge and jury?
 8          THE WITNESS:  I do.
 9          THE REPORTER:  Will you raise your right
10   hand, please, and be sworn.
11          Do you solemnly swear, or affirm, that
12   the testimony you will give in this case will be the
13   truth, the whole truth, and nothing but the truth, so
14   help you God?
15          THE WITNESS:  I do.
16          THE REPORTER:  Thank you.
17          Any agreements for the record?
18          MS. BERKAN:  The only agreements that
19   we'll state are, you know, obviously that objections
20   except to privilege and form need not be raised in the
21   course of the deposition; that we will send a copy of
22   the deposition transcript to Mr. McCall, who will make
23   it available to you Dr. Del Carmen, Professor, Alex,
24   Alejandro.
25          THE WITNESS:  Either way.  You can call
```

Job No. 8595
Evelyn Ramirez Lluveras, et al v. Javier Pagan Cruz, et al

Alejandro del Carmen
August 12, 2010

---

**Page 9**

1  me whatever you want.
2          MS. BERKAN:  We will make it available to
3  counsel for the defense, who will then get it to you.
4  You know the system.  You have 30 days to make
5  corrections.
6          THE WITNESS:  Yes, ma'am.
7          MS. BERKAN:  And if you don't make them
8  within the 30 days, it's understood to be correct as
9  transcribed.
10          I should also state for the record --
11          (Mr. Gray enters the conference room.)
12          MS. BERKAN:  I should also state for the
13  record that Cameron Gray just arrived.  And we've
14  already addressed off the record with defense counsel
15  that he may be present for some of this deposition.
16  This does not mean that he's an attorney in the case.
17          Mary Jo Mendez, Michael McCall.
18          Off the record a second.
19          (Discussion off the record.)
20          MR. MCCALL:  We have no objection to him
21  sitting in.
22          MS. BERKAN:  Off the record after a brief
23  interruption, Mr. McCall indicated that he has no
24  objection if Mr. Gray comes in for some of the
25  deposition.

---

**Page 10**

1          I should also state for the record that
2  the other attorneys who represent the other defendants
3  in this case were notified of this deposition and
4  apparently decided not to come, which we had known
5  before this.  But I do want to make sure that they
6  know that they were cited.
7          MR. MCCALL:  I have one question just
8  before we get on the merits.
9          We typically -- I know that we stipulated
10  that we weren't going to have a notary here.
11  Typically we do the oath for the stenographer as well.
12  Are we going to do an informal oath for --
13          MS. BERKAN:  I don't know what the rule
14  is in Texas.
15          THE REPORTER:  I have placed him under
16  oath already.
17          MS. BERKAN:  Yeah, but generally, in
18  Puerto Rico at least, we put the stenographer under
19  oath.
20          THE REPORTER:  Well, I'm an officer of
21  the court.  And in Texas that's not common practice.
22          MR. MCCALL:  Okay, that's fine.
23          MS. BERKAN:  All right.  Then we have no
24  problem.
25          MR. MCCALL:  Yeah, I stipulate that

---

**Page 11**

1  that's a valid practice.
2          MS. BERKAN:  I had no idea she was going
3  to take the oath.  I think that's wonderful because in
4  Puerto Rico there's a separation between attorneys,
5  notaries, and non-attorneys.  So that is it.  But I
6  know that that's the practice, as she did, in many
7  jurisdictions.  So I was not surprised by it.  So
8  let's start.
9          ALEJANDRO DEL CARMEN,
10  having been first duly sworn, testified as follows:
11          EXAMINATION
12  BY MS. BERKAN:
13      Q.  Professor, can you give me your full name,
14  please?
15      A.  Sure.  It's Alejandro.  Last name is
16  del Carmen.
17      Q.  With a lower case "d," right?
18      A.  Lower case "d," yes, ma'am.
19      Q.  And did you read any documents in preparation
20  for your deposition?  Not the documents you read in
21  preparation for your report; but specifically for the
22  deposition, did you read any documents?
23      A.  Not specifically, no, ma'am.
24      Q.  Did you have a meeting with Mr. McCall
25  yesterday or today?

---

**Page 12**

1      A.  I did, yes, ma'am, yesterday.
2      Q.  When was that, yesterday?
3      A.  Yesterday, yeah.
4      Q.  How long did that last?
5      A.  About two hours.
6      Q.  Did Mr. McCall tell you what had transpired
7  in the deposition of Lou Reiter?
8      A.  He gave me a brief description of the
9  highlights of what had happened.
10      Q.  And what were those highlights?
11      A.  He essentially said that the deposition went
12  until 6:00 p.m., and that there were some questions
13  that were made to Mr. Reiter regarding --
14      Q.  Reiter.  (Different pronunciation.)  He calls
15  it "Reeter," but it's "Riter."
16      A.  Okay.  I'll make a note of that because I've
17  been calling him Reeter.  I want to do it right.
18  People butcher my name here often, and so I want to
19  get it right.
20          Mr. McCall mentioned that Mr. Reiter was
21  asked, you know, different questions relevant to the
22  case, specifically that there were questions relevant
23  to whether or not he had read the record, which was in
24  Spanish; and that Mr. Reiter had responded that he did
25  not speak Spanish fluently and that there had been

---

3 (Pages 9 to 12)

## Page 13

1 some translation made to the record. But that's
2 pretty much the gist of it.
3     Q. Did you have a chance to review -- strike
4 that.
5         Did Mr. McCall indicate to you that he
6 had a -- what do you call those?
7     A. Flash drive.
8     Q. Flash drive. Thank you.
9     A. Yes, ma'am.
10     Q. A flash drive that had the documents reviewed
11 by Mr. Reiter?
12     A. He told me that he had a flash drive in his
13 possession that Mr. Reiter had made available after
14 the deposition.
15     Q. Okay. Actually it was during the deposition,
16 but --
17     A. Okay, during.
18     Q. But did you review any of the documents on
19 that disk drive -- that flash drive?
20     A. I did not, no. I did not.
21     Q. So you have no opinion as to whether or not
22 the translations which were supplied to him were
23 correct?
24     A. That is correct, ma'am.
25     Q. It's correct that you have no --

## Page 14

1     A. It's correct that I have no opinion. I'm
2 sorry.
3     Q. And you did your work reading the documents
4 in the original Spanish?
5     A. Yes, ma'am, I did.
6     Q. And you're fluent in Spanish?
7     A. I am.
8     Q. Have you taken any medications today that
9 would in any way interfere with your ability to
10 testify truthfully?
11     A. No, ma'am.
12     Q. And obviously, as the court reporter
13 instructed you, you understand your obligation to tell
14 the truth in this deposition?
15     A. Yes, ma'am.
16     Q. And you also understand that that obligation
17 also refers -- also applies to any reports you have
18 filed in this and in other cases?
19     A. Yes, ma'am.
20     Q. And you have given depositions in other
21 cases?
22     A. A few, yes, ma'am.
23     Q. Yes. You provided us with a list of the
24 documents -- excuse me -- the cases in which you had
25 given expertise in the last four years?

## Page 15

1     A. (Witness nods head up and down.)
2     Q. Is there any update to that?
3     A. No, ma'am. The list that I have supplied
4 Mr. McCall is pretty much the list of cases that I
5 worked on to the best of my recollection.
6     Q. There are two cases at the end in that
7 listing which are -- well, there's only one, actually:
8 Tobon versus City of Bellaire?
9     A. Yes, ma'am.
10     Q. All right. Have you produced a report?
11     A. I have not.
12     Q. So the last case on which you produced a
13 report would have been which?
14     A. It was the one with the Las Cruces, New
15 Mexico, case, ma'am.
16     Q. Apolonio Hernandez?
17     A. Yes, ma'am.
18     Q. All right. And Mr. Dwayne --
19     A. Baker maybe?
20     Q. -- Baker took your deposition in that case,
21 right?
22     A. Yes, ma'am. Uh-huh, yes, ma'am.
23     Q. Do you know if the defendants in that case
24 are going to use you as an expert?
25     A. I don't know with the -- I went ahead and did

## Page 16

1 the report for that case. Mr. Baker arranged a
2 telephone call where my deposition was taken
3 subsequent to the submission of the report. And I
4 have not heard back, you know, as to what the status
5 of the case is right now.
6     Q. You don't know if they have abandoned you as
7 a witness?
8     A. I don't know, ma'am, no.
9     Q. And in that case you were working for the
10 defendants?
11     A. I was working for the defendants, yes, ma'am.
12     Q. Did you bring documents here today in
13 response to my notice?
14     A. Yes, ma'am. I brought all the hard copies of
15 all the documents that I have reviewed.
16     Q. So if we have to make reference to the
17 documents --
18     A. Yes, ma'am.
19     Q. Now, that would be the list of documents that
20 is included in your report?
21     A. Yes, ma'am.
22     Q. It's at page 20-something?
23         MS. MENDEZ: Yeah, we have --
24         MS. BERKAN: Yeah, I know.
25         MS. MENDEZ: -- 24.

4 (Pages 13 to 16)

Job No. 8595
Evelyn Ramirez Lluveras, et al v. Javier Pagan Cruz, et al

Alejandro del Carmen
August 12, 2010

## Page 17

1    Q.  24, 25 of your report.
2         Do you have your report there?
3    A.  Yes, ma'am, I do.
4    Q.  All right.  What I'd like to do, and we'll
5    save a space for it for now, rather than take up time,
6    is Exhibit 1 to this deposition will be the Alejandro
7    del Carmen report.  For now I'll just have a space
8    saver, and then we'll work it out with the court
9    reporter how best to make sure that --
10        Now, the report that we have has an
11   Exhibit A comprehending the Pages 24 through 26.
12   A.  (Witness nods head up and down.)
13   Q.  And those are the documents you reviewed?
14   A.  Yes, ma'am.
15   Q.  And you reviewed them between July 1st and
16   July 26th?
17   A.  It was between -- yeah, I believe it was June
18   30th and -- or July 1st maybe, around those dates, and
19   then the day that I submitted the report, on the 26th
20   of July, yes, ma'am.
21   Q.  Yeah, the reason I said July 1st, though it
22   could well have been June 30th, was that was the day
23   you subscribed the agreement?
24   A.  Yes, ma'am, yes, ma'am.
25   Q.  The agreement with the Aldarondo law firm?

## Page 18

1    A.  Yes, ma'am, yes, ma'am.
2    Q.  And you should -- I didn't give you all the
3    instructions, but you should try not to talk over me
4    for the benefit of the court reporter.
5    A.  Yes, ma'am.
6    Q.  I do it all the time.  Don't worry.
7    A.  Yes, ma'am.
8    Q.  Let's talk about the process by which you
9    were contacted on this case.
10        What was your first contact?
11   A.  I'm sorry, where or when?
12   Q.  What was your first contact?
13   A.  It was Mr. McCall.
14   Q.  By phone, I assume?
15   A.  By phone, yes, ma'am.
16   Q.  When was that?
17   A.  I want to say it was around June 30th.
18   That's why that date sticks in my head.  It was
19   towards the latter part of June.
20   Q.  Okay.  And what did he tell you?
21   A.  He said that he had a case, that he wanted to
22   know if I would be interested in working that case.
23   And then he provided to me that the case was -- that
24   he had to have a very quick turnaround on the report.
25        I've worked with a few attorneys in the

## Page 19

1    past, and I've never heard anything different from
2    that.  So I was used to the short turnaround.
3         He said that it would be a few weeks, and
4    he specified I think a date of July 30th, if I'm not
5    mistaken, by which time I would have to have a report
6    in.
7    Q.  Did he indicate what the case was about?
8    A.  He gave me some parameters of the case.  He
9    said that it involved five individuals that were
10   defendants in the case that he was representing, and
11   these five individuals had been -- the complaint was
12   based on a mismanagement of police practices as it
13   related to the shooting of Mr. Pagan on August 11th,
14   2007.
15   Q.  I'm sorry, you mean the shooting by Mr.
16   Pagan?
17   A.  Oh, by Mr. Pagan, right.
18   Q.  Of Mr. Caceres?
19   A.  Right, ma'am.
20        (Clarification by the Reporter.)
21   Q.  And did he provide you anything in writing at
22   that time?
23   A.  No, ma'am, he did not.
24   Q.  I -- sorry.
25   A.  I believe that he sent me soon thereafter --

## Page 20

1    I have been in the midst of juggling my schedule this
2    summer with my children and the university.  And so I
3    explained to him that I have a special needs child
4    that requires attention, and so I couldn't just leave
5    him alone.  And, therefore, I was trying to juggle and
6    figure out if I had the time, you know, to do this.
7    Q.  Uh-huh.
8    A.  And so Mr. McCall mentioned that he was going
9    to send me the amended complaint and the original
10   complaint, and for me to take a look at it and let him
11   know if this is something that I could do.
12   Q.  So the first two documents you received were
13   the original complaint and the amended complaint?
14   A.  I believe so, yes, ma'am.
15   Q.  And you had about a day turnaround to sign
16   the --
17   A.  Yeah, I don't think it was a day.  I want to
18   say that it was likely a weekend that I kind of looked
19   at what he had sent me.
20        And I don't have a calendar in front of
21   me, but I think he called me towards the end of the
22   week.  And then -- and then on -- early that next
23   week, then he stated that it was -- the record or the
24   number of things that I had to review was quite large.
25   And so that's when we began to talk about the

## Page 21

1   parameters of the case and whether or not this is
2   something that I would do within that amount of time.
3       Q.   And how about the fee schedule, when did you
4   talk about that?
5       A.   Well, that was actually based on the fact
6   that he mentioned that they had hired a previous
7   expert on the case, and that the previous expert was
8   going to -- had -- or there had been some discussion
9   that there were going to be over eight thousand pages
10  of the record for me to review.
11          And he asked me if I could provide him
12  sort of different scenarios.  One of them would be a
13  representation of per hour, you know, cost on what it
14  would take for me to read that.  And then the second
15  one would be a flat fee.
16          And so I represented to him both of the
17  models, and then he subsequent -- he said he had to
18  run this by Justice so that Justice would approve it.
19  And then I heard from him a few days later letting me
20  know they had approved the flat fee schedule.
21      Q.   And Justice you understand to be the Puerto
22  Rico Department of Justice?
23      A.   Yes, ma'am.
24      Q.   And you understand that they will be paying
25  for this?

## Page 22

1       A.   Yes, ma'am, that they will be reimbursing the
2   law firm for the expenses that are incurred associated
3   with my testimony and -- strike that.  Not testimony,
4   my report.
5       Q.   And that fee schedule and a retainer
6   agreement is included in the documents that were sent
7   to us?
8       A.   Yes, ma'am.  And I have -- I have a -- I
9   brought a copy for you as well so you would have it.
10      Q.   Did you bring a copy of your hourly work?
11      A.   In terms of the representation of how many
12  hours I worked?
13      Q.   Uh-huh.
14      A.   No, ma'am, I did not.
15      Q.   Do you keep a copy of your hourly work?
16      A.   I do typically.  And I kept sort of a log
17  that had a few of the hours that I had worked, or most
18  of the hours that I had worked.
19          But being that this was a flat fee
20  arrangement, you know, it was understood from the
21  beginning with Mr. McCall that I was simply going to
22  be representing to him an invoice along with the
23  report once I finished it.
24      Q.   As I understand your fee agreement, the
25  $43,000 is up to and including the report plus 20

## Page 23

1   hours; is that correct?
2       A.   Yes, ma'am, that is correct.
3       Q.   All right.  So do you have an accounting of
4   your time since the report?
5       A.   I do, yes, ma'am.
6       Q.   Do you have that here with you?
7       A.   Not with me, no, ma'am.  But I can --
8       Q.   Wasn't that comprehended in the notice that I
9   gave you?
10      A.   That was not my understanding, but I'll be
11  glad to produce that.
12      Q.   Well, let's mark as -- later on I'll do
13  this -- Exhibit 2 will be the notice, unless you have
14  one handy.  The notice of this deposition.
15          (Marked for identification Deposition
16  Exhibit No. 2.)
17          MS. BERKAN:  Oh, the court reporter has
18  one because we sent it to her.
19          This will be Mr. 2.  Mr. McCall, do you
20  want to check it and make sure it's what was sent?
21          MR. MCCALL:  Looks to be what I received,
22  yes, uh-huh.
23      Q.   All right.  And you read this, Mr. -- I mean
24  Professor del Carmen?
25      A.   I did, yes, ma'am.

## Page 24

1       Q.   All right.  Number F:  Any and all documents,
2   including bills, invoices, time sheets, notes of time
3   spent, or any other document which reflects the time
4   you have spent working on this case.
5           Did you read that?
6       A.   Yes, ma'am.
7       Q.   And you understood that time records were not
8   included?
9       A.   No, ma'am.  The thing is I actually
10  started -- I kept on working until the late hours last
11  night, and so I didn't have a current update on the
12  time that I have worked up to last night.  And that's
13  the reason as to why I haven't produced that.  But
14  I'll be glad to produce it.
15      Q.   Will you please produce that?
16      A.   Yes, ma'am.  No problem.
17      Q.   And you can produce that quite quickly, no?
18      A.   Yes, ma'am.
19      Q.   So I assume you'll send it electronically to
20  Mr. McCall who will forward it to me?
21      A.   I will do that tonight as soon as I get home
22  from the university.
23      Q.   All right.  So Exhibit 3 will be time
24  records, and I'll make arrangements with the court
25  reporter to make sure that gets there.

Job No. 8595
Evelyn Ramirez Lluveras, et al v. Javier Pagan Cruz, et al

Alejandro del Carmen
August 12, 2010

**Page 25**

1    Do you know how many hours you have
2    worked since you rendered the report on or about July
3    26th?
4    A.  Approximately 25, ma'am.  My understanding
5    with Mr. McCall was that I would keep track of those
6    hours, and then I would submit an invoice at the end
7    of the month.
8    But of the 25 hours, 20 of them are part
9    of the agreement that him and I had which are
10   basically non-billable hours.
11   Q.  Yes.  And I assume that today, since we're
12   paying for you -- oh, I have a check for you, by the
13   way.
14   A.  I have no doubt.
15   Q.  I have the check with me.
16   A.  Sure, ma'am.  It's not a problem.
17   Q.  And in the break I'll get it to you.
18   A.  Thank you.
19   Q.  The hours for today are not billed
20   separately?
21   A.  No, ma'am.
22   Q.  Those are billed to us only?
23   A.  Yes, ma'am.
24   Q.  Now, do you have -- what is your obligation
25   at 4:00 p.m. today?

**Page 26**

1    A.  I'm a professor at the University of Texas at
2    Arlington, and I'm also the Chair of the Department of
3    Criminology there.  And I teach a class on Thursday
4    nights.  And tonight happens to be the final exam.
5    This evening.
6    Q.  And is it only Thursday night that you're
7    teaching this summer?
8    A.  Yes, ma'am, yes, ma'am.
9    Q.  And how long is the class?
10   A.  It goes from 6:00 until about 9:20.
11   Q.  And you mentioned your family
12   responsibilities.  Are you a single father?
13   A.  I am a single father, yes, ma'am.
14   Q.  And your kids live with you?
15   A.  They do for the most part.
16   Q.  Okay.  Now, you -- your Ph.D., was it in
17   criminology or criminology and criminal justice or
18   what?
19   A.  The Ph.D. is in criminology.  It's actually
20   from the now College of Criminology and Criminal
21   Justice at the Florida State University.
22   Q.  And your master's?
23   A.  It's in criminology.
24   Q.  Also from Florida, no?
25   A.  Florida State, yes, ma'am.

**Page 27**

1    Q.  And your bachelor's?
2    A.  It is in criminal justice.
3    Q.  Criminology is the study of deviant behavior?
4    A.  In part, yes, ma'am.
5    Q.  What else?
6    A.  I would say it's also the study of the social
7    control agencies and the way that they respond to the
8    system.
9    Q.  And for that definition, let me give a
10   preface.  I've looked at some of your prior testimony.
11   And in prior testimony you've talked about the study
12   of deviant behavior.
13   Now you also say it's social control
14   agencies and how they respond.  For that second
15   definition of criminology, where would I go to find
16   that definition?
17   A.  I think most of the introductory textbooks
18   and most of the books that talk about what a
19   criminologist does, or what we do, you would find that
20   we study the deviant behavior as a whole.  But that
21   deviant behavior is in relation to the criminal
22   justice system.
23   Q.  Now, is it the criminal justice system or the
24   criminal -- the social agencies -- let me get your
25   previous deposition -- social control agencies and how

**Page 28**

1    they respond?
2    A.  Well, the social control agencies and the way
3    they respond is the criminal justice system.  They
4    include policing, courts, and corrections.
5    So when we say we study the criminal
6    justice system, we also study, depending on which
7    perspective you take a look at it from, a critical
8    perspective, we call them the social control agencies.
9    From a standard criminal justice standpoint, we call
10   them, obviously, criminal justice agencies.
11   Q.  And your department at Arlington, University
12   of Texas at Arlington, is called Criminology and
13   Criminal Justice?
14   A.  Yes, ma'am.
15   Q.  And within that do you have people who
16   specialize in one or the other?
17   A.  We have a combination of both.  We have
18   individuals that are attorneys, and in one case an
19   attorney who also has a Ph.D.
20   We also have individuals that have a
21   criminal justice degree from places like Sam Houston
22   State University, and then we also have criminologists
23   who have a degree in criminology.
24   Q.  And in terms of yourself, do you teach
25   courses in criminology or in criminal justice?

7  (Pages 25 to 28)

## Page 29

1    A. I teach in both areas, ma'am.

2    Q. Which ones specifically go to criminal

3    justice?

4    A. I've taught policing courses, a management

5    course. We have a cohort master's program that we

6    started last year at the UTA Fort Worth campus which

7    is a graduate program there. And I teach criminal

8    justice courses there.

9        I've taught corrections. I've taught

10   policing. In a few cases I've taught about the court

11   system as well.

12   Q. This course that you're teaching this summer,

13   which is it?

14   A. It's an advanced-level statistics course.

15   Q. And last semester what did you teach?

16   A. Last semester I taught, for the cohort

17   program, a policing issues course.

18   Q. What did it cover?

19   A. It covered management issues, also some of

20   the challenges that police departments are now facing

21   with respect to budget crunches and, you know, the

22   management of personnel.

23   Q. When you say management issues, what are you

24   talking about?

25   A. I'm talking about personnel management

## Page 30

1    structures. We talked about the Compstat model, which

2    is C-O-M-P-S-T-A-T.

3    Q. I know it.

4    A. For her benefit, not yours.

5    Q. Oh, okay.

6    A. And then we also talked about racial

7    profiling as well, and various other components of

8    things that are facing the law enforcement agencies

9    today.

10   Q. Now, if I were going to look for your

11   syllabus on a website, this would be at UTA Fort

12   Worth?

13   A. No, ma'am. It would be at the uta.edu

14   website. In that particular website there is an icon

15   called Faculty Profiles. And within Faculty Profiles

16   you would find the syllabus posted. You know, we try

17   to keep up with every semester there. That's in

18   place.

19   Q. And this would be -- the syllabus on the

20   cohort-based would be there?

21   A. Yes, ma'am, it would be. We talk about it in

22   the context of being a separate entity, but it's

23   really part of our university. And, you know, we

24   follow the same rules and guidelines that the

25   university follows.

## Page 31

1    Q. And besides this cohort course, what did you

2    teach last semester?

3    A. I believe I also taught an online course as

4    well, and I believe that was a criminal justice

5    research course that I taught online.

6    Q. Criminal justice --

7    A. -- research.

8    Q. Research.

9        You've also been hired as an expert

10   through Steward Group?

11   A. I have, yes, ma'am.

12   Q. And what is that group?

13   A. It is -- Dr. Steward runs his consulting firm

14   to provide assessments relevant to, you know, the

15   economic loss of individuals who file a lawsuit. So

16   he's an economist by training.

17       So in the past, back in 2001, I was

18   involved with the ACLU on racial profiling issues in

19   the state of Texas. And Dr. Steward was the hired

20   expert by the ACLU. So we partnered together in

21   coming up with mutual reports on racial profiling,

22   police accountability projects, and various other

23   components. And we developed a relationship which led

24   to a few cases that we worked together.

25   Q. And your work on those cases was regarding

## Page 32

1    racial profiling and statistics, no?

2    A. No, ma'am. I believe that the cases that I

3    worked with Dr. Steward, I believe there were two

4    of them maybe. And in those particular cases it

5    involved policing-related issues, from what I recall.

6    Q. What do you mean by policing-related issues?

7    A. In one instance I believe that the case

8    involved a police officer who was terminated by the

9    police agency for having sexual intercourse with two

10   minors.

11       This officer was convicted and is

12   currently, from what I understand, serving time in

13   prison.

14       In that particular case, DART, which was

15   the Dallas area rapid transportation system, was sued

16   as a result of the case. And so Dr. Steward and I

17   worked the case to try to, you know, make the case

18   against the other side about --

19   Q. You were hired by DART or through

20   Dr. Steward?

21   A. You know, I was hired by DART in one

22   instance, Ms. Berkan. And in another instance I

23   believe I was hired through Dr. Steward, yes, ma'am.

24   Q. All right. But, regardless, you were working

25   on the DART side of that case? D-A-R-T?

Merit Court Reporters

817-336-3042      depos@merittexas.com      817-335-1203

**Page 33**

1    A.  Yes, ma'am.
2    Q.  And you did two cases for them?
3    A.  I believe so, as best I can recall.
4    Q.  And the other one, what did it relate to?
5    A.  I was trying to remember this morning in
6    foreseeing that you would ask me that.  I -- I believe
7    that it also related to police -- to a police
8    management issue.  But I can't seem to recall exactly
9    what -- you know, what the case was about.
10    Q.  Didn't you do a racial profiling case in --
11    that was filed in 2003 regarding an incident in 2001
12    in the case of McKin versus DART?
13    A.  I don't know that it was a racial profiling
14    case.  I believe it -- but I really, honestly don't
15    have any recollection right off the bat.
16    Q.  Wasn't it a case where the plaintiffs alleged
17    they had been targeted by a DART officer because they
18    were black, and that everybody on the train who was
19    black was asked to get their tickets and --
20    A.  (Witness nods head up and down.)
21    Q.  -- then he -- the officer was supposedly
22    rough with this woman who was holding young children?
23    A.  That's right.  Yes, ma'am, you're right.
24    Q.  That refreshes your memory about that case?
25    A.  Yes, ma'am, that's right.

**Page 34**

1    Q.  All right.  And the argument against DART was
2    that there was an excessive force policy fostering
3    excessive force against African Americans.  And you
4    did it as part of a Steward Research Group; is that
5    correct?
6    A.  Yes, ma'am.
7    Q.  All right.  And in the course of that work,
8    you viewed statistics and analysis regarding contact
9    information on -- that was pursuant to the racial
10    profiling law of Texas; is that correct?
11    A.  I did, yes, ma'am.
12    Q.  And what were the records specifically that
13    you reviewed?
14    A.  Ma'am, I honestly don't --
15    Q.  I mean what kind of records.  I know you're
16    not going to do the exact --
17    A.  Yeah, I likely reviewed statistical data that
18    was collected in terms of contracts that officers had
19    with citizens, both minority as well as Caucasian, to
20    try to compare both of them.
21    Q.  And those statistics were routinely kept by
22    DART?
23    A.  Yes, ma'am.  In 2001 the State of Texas
24    passed a law, Senate Bill 1074, which requires police
25    departments to, effective January 1st of '02, collect

**Page 35**

1    data relevant to racial profiling.
2    Q.  And what is the purpose of that data?
3    A.  The purpose of the data is to try to
4    demonstrate whether or not police departments are
5    engaging in racial profiling.
6    Q.  And they require data about the underlying
7    contact and the -- what else?
8    A.  Yeah, the data is rather limited.  The data
9    is relevant to whether or not police officers came in
10    contact with a suspect.  And they, you know, were
11    supposed to track the ethnicity and the race of the
12    individual.
13        And then subsequent to that, the
14    searches, whether or not there was a search, and if
15    the search contained probable cause or had consent as
16    a component.
17        And then ultimately an arrest, if the
18    individual was arrested.
19    Q.  And after reviewing the documentation in
20    DART, you concluded that there was no evidence of
21    targeting of blacks for the purpose of racial
22    profiling?
23    A.  In that particular case from what I recall --
24    and again, you brought up the specifics of the case
25    which reminded me a little bit of it.  You know, I

**Page 36**

1    sadly had forgotten about the parameters of it.
2    But I will tell you that with regards to
3    that case, from what I remember, the data was rather
4    limited as to what we could really see.  You know, as
5    you know, one of the challenges on racial profiling is
6    that we have to really see what the intent of the
7    officer was and whether or not profiling was a
8    component of that officer's stop.
9        And, therefore, that was -- that was part
10    of the issue that we had, which is, how do you figure
11    out the intent of the police officer by just simply
12    looking at data?
13    Q.  Well, are the statistics useful, are the data
14    gathering useful to DART or to other law enforcement
15    agencies in terms of future management controls and
16    things like that, in addition to in an expert witness
17    context?
18    A.  Right.  Yes, ma'am, they are.  And the idea
19    of the passage of the law was to try to, you know,
20    make police departments accountable for -- you know,
21    for the behavior that many have construed to be
22    undesirable in terms of racism and biases.
23        And so, not only from a management
24    perspective, but also from a hiring perspective and,
25    you know, different components that we wanted to make

## Page 37

1   sure police departments represented the community at
2   large.
3    Q. And would you say it's Best Practices to
4   maintain those kind of statistics?
5    A. Yes, ma'am.
6    Q. In that DART case, the McKin case, it is
7   listed on your disclosures?
8    A. Yes, ma'am.
9    Q. In that case you also did a content analysis
10   of his -- of Officer Lynch's training materials; is
11   that correct?
12    A. Yes, ma'am.
13    Q. And what did that content analysis consist
14   of?
15    A. From what I recall, I looked at the
16   TCLEOSE -- and that's T-C-L-E-O-E [sic], which is the
17   Texas law enforcement commission on standards and
18   training. TCLEOSE is an agency that is based out of
19   Austin, and it's a State agency. And they keep the
20   training records of all the police officers in the
21   state. So if you take X number of hours, you know,
22   those records will be kept with TCLEOSE.
23    And so with regards to this particular
24   officer, my recollection is that we obtained his
25   training records and analyzed those training records

## Page 38

1   to determine that he was trained in areas relevant to
2   ethics and various different components.
3    Q. And you reviewed the specific courses that he
4   had taken, and you did content analysis of those
5   materials, correct?
6    A. Yes, ma'am, yes, ma'am.
7    Q. He also had subsequent on-the-job training?
8    A. Yes, ma'am.
9    Q. And you reviewed that?
10    A. Yes, ma'am.
11    Q. Now, you also did another case for DART, no?
12    A. I believe so, yes, ma'am.
13    Q. And what was that about?
14    A. I believe that case is the one that I talked
15   a little bit about earlier where a police officer --
16    Q. Raped?
17    A. Yes, ma'am. He raped a couple of young
18   ladies.
19    Q. I'm sorry, it wasn't sexual harassment; it
20   was rape, as I recall.
21    A. It was rape. No, no. It was rape, yeah.
22    Q. And in that case what was your work?
23    A. In that case what ended up happening was I
24   reviewed -- again I believe I reviewed the officer's
25   record as it pertained to training and different areas

## Page 39

1   of his background to determine whether or not the
2   officer had the exposure to training that would have
3   perhaps prevented him from engaging in such an
4   activity.
5    Q. And you also concluded that DART was not
6   responsible in that case?
7    A. I concluded that DART was not to be held
8   liable in that case, because the officer had actually
9   been trained, had been supervised, and all the, you
10   know, quote/unquote, right ingredients of that
11   officer's, you know, pattern in his tenure had been
12   followed.
13    If I'm not mistaken, that particular
14   officer was also someone who also had been a chief of
15   police in a couple of instances.
16    Q. Isn't that Lynch that had been the chief of
17   police?
18    A. Or maybe I'm confusing them, yeah.
19    Q. I believe it was Lynch, in that he was in
20   his -- in his recruitment process, people had
21   characterized him as honest and forthright, or words
22   to that effect. I've got that in my notes.
23    A. Yes, ma'am, yes, ma'am.
24    Q. All right. On those two DART cases, you
25   worked with a female attorney. What was her name, do

## Page 40

1   you remember?
2    A. Patty Reed I believe was her name.
3    Q. All right. And on both of those cases, you
4   did not testify?
5    A. That is correct.
6    Q. Did you do deps on those cases?
7    A. I don't believe so, no.
8    Q. And prior to those two cases, you had done a
9   shopping center case?
10    A. That's right.
11    Q. And the issue there was what?
12    A. It was a security officer who had been shot
13   and subsequently died as a result of that shooting in
14   that particular facility.
15    Q. And you were hired by which side?
16    A. By the plaintiff.
17    Q. And your conclusion was regarding what?
18    A. Conclusion was regarding that the officer --
19   the security officer was not given the proper
20   equipment or the proper training to be able to fend
21   off the individual aggressor.
22    And if I remember correctly, in that
23   particular case there was an issue that he called with
24   his radio for backup. And the person that -- you
25   know, that was the -- you know, if you want to call it

Merit Court Reporters

817-336-3042      depos@merittexas.com      817-335-1203

Alejandro del Carmen
August 12, 2010

**Page 41**

1 at the command center, you know, calling in for 911,
2 delayed the call to 911. And that -- you know, and he
3 died as a result of that, so --
4 Q. Now, in that case you didn't testify either?
5 A. I actually -- I think there was a deposition
6 in that case, but I did not -- I did not go to trial,
7 no, ma'am.
8 Q. In fact you've never testified in court?
9 A. I have never testified in court as a trial
10 expert, no, ma'am.
11 Q. And you've been excluded as an expert?
12 A. In one particular case to my knowledge, yes,
13 ma'am. In one particular case.
14 Q. And that was the Powers case, no?
15 A. That was the case with El Paso.
16 Q. Powers?
17 A. Yes, ma'am.
18 Q. And do you know why you were excluded?
19 A. Yes, ma'am. It had to do -- the case was
20 very specific to use of force.
21 Q. Uh-huh.
22 A. And the statement -- or the report that I
23 wrote was on use of force issues, per se. And the
24 judge felt that my training and my academic background
25 did not -- were not necessarily consistent with a

**Page 42**

1 justification to what I wrote.
2 Q. Have you received correspondence from the
3 attorney on that case regarding whether -- your
4 actions in that case --
5 A. Yes, ma'am.
6 Q. -- the attorney for the plaintiff?
7 A. Yes, ma'am. It was on behalf of the
8 plaintiff. And while I was working on this case, I
9 received a copy of the judge's statement or ruling on
10 the matter.
11 It went up for summary judgment, and the
12 judge has allowed for the case to continue.
13 Q. But there were two experts whose testimony
14 was challenged?
15 A. Yes, ma'am.
16 Q. And the judge allowed the other expert,
17 Dr. Schrode, to go through?
18 A. That's right. There was a medical doctor and
19 then mine. And he ruled to allow the medical
20 doctor's, you know, statement to continue; and he
21 struck out mine.
22 Q. How about the Dwayne -- I think it's
23 Dwayne -- Wayne Good, the Good case, G-O-O-D, not --
24 with a capital G, G-O-O-D?
25 A. I don't have any knowledge of that case --

**Page 43**

1 Q. That's the case --
2 A. -- in terms of --
3 Q. -- involving an officer -- let me see how I
4 can succinctly -- 1983 investigation leading to the
5 conviction of somebody. And you worked for the
6 plaintiff and said that the City of Irving --
7 A. Oh, right.
8 Q. -- was responsible?
9 A. Right, right. I thank you for bringing that
10 to my recollection.
11 In that particular case I wrote a report.
12 I was deposed by the opposing counsel.
13 Q. Mr. Pearce?
14 A. Yes, ma'am.
15 And last I heard -- and really I haven't
16 heard any updates from the attorney that hired me as
17 to what happened in that case.
18 Q. You don't know that he's been asking for you
19 to be excluded as well in that case?
20 A. No, ma'am, not to my knowledge.
21 Q. But you did give a depo in that case?
22 A. Yes, ma'am, I did.
23 Q. And what was that case about?
24 A. If I --
25 Q. Or actually let me go back a second.

**Page 44**

1 A. Yeah.
2 Q. Did you get paid in the Powers case?
3 A. I did.
4 Q. And did the plaintiff's counsel ever ask for
5 some of that money back?
6 A. He did. He requested for me to return the
7 check.
8 Q. And what happened?
9 A. I returned the check.
10 Q. Why did you do that?
11 A. Well, you know, I'm at a point in my life
12 right now that, you know, I'm looking for a lot of
13 peace and tranquility. And I did not feel that I
14 wanted to fight this, and simply just --
15 Q. Well, didn't he say you had been deceptive in
16 your advertising of yourself?
17 A. He said that he felt that the fact that I had
18 acknowledged in my brochure, the statement that I had
19 put together for advertisement purposes, there was a
20 statement on use of force; and that he felt that that
21 was deceptive; and that if he did not receive his
22 money back, he was going to pursue a lawsuit.
23 Q. Do you have a copy of that letter?
24 A. I do not. I can provide it, though.
25 Q. All right. So Exhibit 4 will be a copy of

11 (Pages 41 to 44)

**Page 45**

1 the letter. Is this from Mr. Abraham or Mr. -- I
2 don't remember the names of the lawyers.
3     A. That's correct, Mr. Abraham.
4     Q. It is Mr. Abraham?
5     A. That's the law firm, yes, ma'am.
6     Q. And how long ago was that?
7     A. I received that letter while I was working on
8 this report, ma'am; so it must have been about three
9 or four weeks ago.
10     Q. Oops. I started writing notes there. We'll
11 have a paper to set aside that Exhibit 4 will be the
12 letter from Mr. Abraham.
13         Did you write back to him?
14     A. I wrote back to him. And I wrote, you know,
15 a simple statement that said it was not my intention
16 to ever be deceptive. And so, therefore, I felt this
17 was the check -- you know, the check was being sent
18 back to him. That was that.
19     Q. Okay. I'd like that response as well?
20     A. Sure.
21     Q. And we'll make that 4A and B.
22         And how much had Mr. Abraham paid you
23 prior to that?
24     A. I believe it was $7,500.
25     Q. And that was based on an hourly rate?

**Page 46**

1     A. It was based on a flat rate. And I went
2 ahead and did most of the work towards the end of the
3 case without charging him.
4     Q. Now, before I went back, we were talking
5 about the Good case?
6     A. Yes, ma'am.
7     Q. Versus City of Irvine -- Irving?
8     A. Irving.
9     Q. Irving. I keep saying Irvine, but that's
10 California, I think?
11     A. Uh-huh.
12     Q. And what was your opinion based on in the
13 Good case?
14     A. It was my opinion -- I believe the case dealt
15 with a gentleman who had been imprisoned for a number
16 of years as a result of careless practices and, you
17 know, practices of a police officer who simply booked
18 them without checking all the necessary pieces of
19 evidence that he should have checked in order for this
20 man to be cleared.
21         So he was actually imprisoned as a result
22 of that, and for a number of years. And so he has
23 been released and is now pursuing a lawsuit against
24 the police department.
25     Q. And you provided opinions both as to the

**Page 47**

1 investigative processes in the 1983 investigation and
2 as to the responsibility of the City of Irving,
3 whether it was deliberately indifferent in terms of
4 its management and supervision of the officer
5 involved?
6     A. I believe so, yes, ma'am.
7     Q. And on the first one you were challenged in
8 your deposition, on the one about the investigative
9 processes.
10     A. (Witness nods head up and down.)
11     Q. You were challenged in your deposition on the
12 basis that you were applying 2008 standards to 1983,
13 correct?
14     A. Yes, ma'am.
15     Q. And is it appropriate in your view to apply
16 2008 standards to events that occurred in 1983?
17     A. Well, in this particular case we had -- from
18 what I remember, we had actually looked at, you know,
19 what had actually occurred back then. And
20 irrespective of that, the amount of time that he had
21 served, which actually extended beyond the time of
22 when it actually occurred.
23     Q. Well, my question --
24         MR. MCCALL: Can I ask for a
25 clarification on that?

**Page 48**

1     Q. My question was --
2         MS. BERKAN: He hasn't answered the
3 question. Let him answer the question, and then
4 whatever clarification you need.
5         MR. MCCALL: It goes to the term -- the
6 form of -- I just want to -- when you said 1983,
7 you're referring to time frame, not the statute?
8         MS. BERKAN: Yes. Yes, yes. Thank you
9 for that clarification. Perfectly appropriate.
10     Q. My question was: Was it appropriate for you
11 as an expert in you view to apply 2008 standards to
12 1983 events? Events occurring in the year 1983, not
13 Section 1983.
14     A. When you say 2008 standards, what do you mean
15 by that?
16     Q. Well, you, in your testimony, in your
17 deposition, said you were applying 2008 standards.
18     A. Right. And when you say standards, though,
19 are you referring to the way --
20     Q. As to the quality of the investigation.
21     A. Right. Comparing the -- what happened in
22 1983 versus what would have happened today, and
23 comparing how police would have handled that matter.
24 That's what you're asking me?
25     Q. I'm sorry. Didn't you reach a conclusion in

12 (Pages 45 to 48)

Page 49

1    that case that the officers who had carried out the
2    investigation had failed to comply with their duties?
3        A.  Yes, ma'am.
4        Q.  And you did that on the basis of standards
5    that were existing in 2008, whereas the actions of the
6    officers had taken place in 1983?
7        A.  I really don't recall that part.
8        Q.  All right.  But if we see that in your
9    deposition under sworn testimony in the Good case, you
10   told the truth in the Good deposition?
11       A.  Absolutely. (Witness nods head up and down.)
12       Q.  All right.  There was a second angle there
13   which was how the City should have supervised the
14   officer.  I believe his name was Lynch?
15       A.  Right.
16       Q.  And your opinion was that they had been
17   deliberately indifferent in their supervision,
18   correct?
19       A.  Yes, ma'am.
20       Q.  And that was based on the fact that in five
21   of eleven evaluations -- although all the evaluations
22   were satisfactory or higher, that in five of eleven of
23   them, the lowest score, a satisfactory score, had
24   been -- on individual items had been in the item of
25   community relations, or relations with the community?

Page 50

1        A.  I believe so, yes, ma'am.
2        Q.  And also that he had two complaints of verbal
3    misconduct, being rude to people, over a six-year
4    career?
5        A.  Yes, ma'am.
6        Q.  And you made a determination that the failure
7    of the City of Irving to consider those facts, the
8    lowest score on community relations in five of eleven
9    evaluations, and the two complaints of being rude to
10   people, that that caused his later lack of
11   professional conduct in the investigation of Mr. Good?
12       A.  I believe that there were more than just
13   those two items.  But, yeah, absolutely, those two
14   items were considered.  But there were other issues.
15   I don't have the -- you know, the report in front
16   of --
17       Q.  I'll tell you what I'll do.  I'll give you
18   your report at a break --
19       A.  Okay.
20       Q.  -- and you can look at it --
21       A.  Sure.
22       Q.  -- and see if there was anything else.
23           But if you testified in your deposition
24   in that case that those were the only reasons why you
25   believed the City of Irving to be deliberately

Page 51

1    indifferent, that would have been the truth?
2        A.  That would have been the truth, yes, ma'am.
3        Q.  And the question that you were asked for it
4    was:  Was the Irving Police Department deliberately
5    indifferent in failing to supervise or take corrective
6    action on Officer Curtis in his interactions with the
7    public generally and Donald Wayne Good specifically?
8        A.  I believe that's correct.
9        Q.  And in that case you concluded that those
10   failings on the part of the City of Irving --
11   obviously acts through its own employees?
12       A.  Right.
13       Q.  Those failings caused the subsequent
14   unprofessional conduct?
15       A.  I believe that's correct.
16       Q.  And can you tell me what you mean by cause --
17   actually, to be totally forthcoming with you, you said
18   resulted in.  Is that the same as cause?  That the
19   failure to take account of those evaluations and the
20   two complaints of being rude to citizens over a
21   six-year period resulted in his unprofessional
22   handling of the investigation?
23       A.  I think there is -- the aspect of a causal
24   relationship has to do with whether the presence of A
25   ensures the presence of B, in other words, if

Page 52

1    something that is in place, you know, it actually,
2    directly results in the presence of something else.
3           And then I believe the result that I used
4    had to do with the fact that there was a direct impact
5    between the actions that the City of Irving had taken
6    and the end result of what actually happened.
7        Q.  Isn't that cause?
8        A.  I would say it would probably be conceived as
9    correlation.  I mean, there's a relationship between
10   what the City of Irving did and what actually
11   happened.
12           But I'll be honest with you, Ms. Berkan.
13   I haven't read that report in a number of years, and
14   so I don't really recall exactly how I phrased it and
15   how I wrote that.
16       Q.  Well, when you say something results in
17   something else, it's not cause?
18       A.  It could be causal, yes.
19       Q.  And your deposition in this case, in the
20   Powers -- oh, I'm sorry, that's Powers.  I'll get to
21   Good.  Give me a sec.
22           Your deposition was taken two years ago?
23       A.  Right.
24       Q.  July of 2008?
25       A.  Yes, ma'am.

13  (Pages  49  to  52)

**Page 53**

1  Q. And your deposition testimony was consistent
2  with your report in that case?
3  A. Yes, ma'am.
4  Q. And you felt comfortable in that case saying
5  that the City of Irving was deliberately indifferent?
6  A. That was my expert opinion, yes, ma'am.
7  Q. Give me a sec.
8  MS. BERKAN: Off the record.
9  (Discussion off the record.)
10  Q. Do you have your report in front of you?
11  A. Yes, ma'am, I do.
12  Q. Now, that first page of the report is
13  basically standard language which you use in all of
14  your reports and you slightly modify, correct?
15  A. Yes, ma'am. You're referring to the title
16  page?
17  Q. The personal statement.
18  A. Yes, ma'am.
19  Q. All right. That personal statement, at least
20  in the reports I've reviewed, appears in every report?
21  A. Yes, ma'am.
22  Q. And it may be slightly different?
23  A. Yes, ma'am.
24  Q. Now, in the personal statement in the report
25  with respect to the case that we're talking about, you

**Page 54**

1  say that you are -- you have a Ph.D. in criminology,
2  correct?
3  A. Yes, ma'am.
4  Q. And you also said that in the Hernandez case,
5  correct?
6  A. Yes, ma'am.
7  Q. Now, in the Good case and in the Powers case
8  nonetheless, you said that you had a Ph.D. in
9  criminology and criminal justice; is that correct?
10  A. Yes, ma'am, probably.
11  Q. What do you mean, probably?
12  A. Well, if it's there, it's probably something
13  that I wrote, yes, ma'am.
14  Q. Do you have a copy of your diploma?
15  A. I do not, not on me, no.
16  Q. No, I know you don't have it on you.
17  A. Yeah.
18  Q. But you would have it at your office?
19  A. Yes, ma'am, I do.
20  Q. Could you make a photocopy of it and send it
21  to us?
22  A. Sure.
23  Q. And that will be Exhibit 5.
24  And in the report in our case, in the
25  case that brings us here today, you also say

**Page 55**

1  criminology and don't put criminal justice?
2  A. That is correct.
3  Q. So in the last two reports you have prepared,
4  you've eliminated criminal justice?
5  A. It was probably a typo, ma'am, that I added
6  criminal justice on that.
7  Q. That was a typo?
8  A. It was not misrepresentation on my part.
9  Q. Okay. Now, in the Good case and in all the
10  previous cases before that, you said that you -- your
11  firm conducts analysis for several law enforcement
12  agencies in Texas.
13  Towards the end of that, the similar
14  paragraph in our -- the report in Ramirez --
15  A. Yes, ma'am.
16  Q. -- relevant to police issues --
17  A. Yes, ma'am.
18  Q. -- including but not limited to. And in
19  Good, for example, you said use of force?
20  A. (Witness nods head up and down.)
21  Q. Was that a true statement?
22  A. It was. We actually -- I actually did a
23  study for a -- the City of Allen, Texas, on use of
24  force. The case went before the courts. And I was
25  asked by the Chief of Police over there to analyze the

**Page 56**

1  use of force as it pertained to two officers that had
2  been accused of using excessive force on an
3  individual.
4  And so Dr. Steward and I actually came on
5  board, and we did a study for them which was
6  specifically done for his attorney, or the attorney
7  for the City.
8  Q. Okay.
9  A. That report was never introduced as evidence,
10  and my -- and we were never retained in the case as
11  experts. But he wanted to know how these two officers
12  compared to the rest of the police department with
13  regards to use of force.
14  Q. And this is in a department of about 120
15  officers, no?
16  A. The City of Allen, yes, ma'am, uh-huh.
17  Q. And what records were you able to access in
18  order to do that analysis?
19  A. Well, we looked at the use-of-force records
20  that the two officers had -- and for the past I want
21  to say maybe three, four years -- and we compared
22  those to the records of the other officers.
23  And what I mean by records is any
24  use-of-force incident that would have taken place, it
25  was recorded and subsequently submitted.

Job No. 8595
Case 3:12-cv-02039-GAG   Document 1295-1   Filed 07/25/19   Page 17 of 114
Evelyn Ramirez Lluveras, et al v. Javier Pagan Cruz, et al
Alejandro del Carmen
August 12, 2010

Page 57

1    Q.  And how were those documents maintained or
2  filed so that you could access it for the purpose of
3  doing your work?
4    A.  The police department keeps a record of any
5  use-of-force incident that takes place in the city,
6  and that's how they were maintained.
7    Q.  Are such records kept in Puerto Rico?
8    A.  My understanding is that they are not.
9       And when you say Puerto Rico, I presume
10  you're talking at the Puerto Rico Police Department?
11    Q.  Yeah.  That's a good clarification.  For
12  every purpose in this deposition --
13    A.  Yes, ma'am.
14    Q.  -- when I say Puerto Rico and I'm referring
15  to a department, it's the island-wide police
16  department.
17    A.  Right, yes, ma'am.
18    Q.  So how come you eliminated use of force in
19  your personal statement in the case that we have
20  before us --
21    A.  I've made --
22    Q.  -- and in Hernandez as well?
23    A.  Right.  First of all, because the court
24  challenged me in terms of the use-of-force testimony.
25    Q.  Uh-huh.

Page 58

1    A.  And to my knowledge that's the first time
2  that I've been challenged on that particular aspect.
3  And so I felt that it was going to be, you know, not
4  honest for me to continue advertising my consulting
5  firm as one that relies on use-of-force expertise when
6  in fact the court disagrees with that.
7    Q.  In Allen, in the Allen case --
8    A.  Yes, ma'am,--
9    Q.  -- I mean, it's not the case --
10    A.  Right.
11    Q.  -- but in the case of the City of Allen, did
12  you make opinions as to whether the particular use of
13  force that was the subject of that inquiry was
14  justified or not, or did you just look at statistics?
15    A.  I -- from what I recall, I looked at the
16  statistics as it related to these two officers; and I
17  compared them to the rest of the department.  And then
18  in comparison, I went ahead and analyzed --
19       Or I think we gave an opinion as to
20  whether or not these two officers, you know, were
21  using, you know, more force with more frequency, more
22  duration, to what the -- you know, the suspects were
23  in each case as it pertained to the other officers in
24  the department.
25    Q.  So you didn't do an analysis of the

Page 59

1  particular use of force that was being questioned, but
2  rather --
3    A.  No, it was not done on the particular
4  incident that took place, yes, ma'am.
5    Q.  Such as you had done in the case in which you
6  were excluded?
7    A.  Right, yeah.  It was not -- we were not hired
8  as expert witnesses on the case.  This was simply a
9  study that we did for the police department to compare
10  these two officers' use-of-force activity for previous
11  years and compare it to other use-of-force incidents.
12    Q.  And did you produce a written document?
13    A.  I believe we did.  I believe we produced a
14  written document once again to -- directly to counsel
15  in this case.
16    Q.  And that written document was based on
17  recordkeeping by Allen?
18    A.  Yes, ma'am.
19    Q.  Allen being the city, not a person.
20       Now, in comparing your personal statement
21  in this case with other personal statements I've been
22  able to access, I see that you add in the last part --
23  I guess it's the last three sentences -- you've done
24  seminars for law enforcement agencies associated with
25  Best Practices, including Seven Habits of Highly

Page 60

1  Effective People.
2       What is that?
3    A.  That is the Steven Covey seminar that is
4  held.  I'm actually certified as an instructor with
5  the Covey company.
6    Q.  Could you spell that, please?
7    A.  Sure.  C-O-V-E-Y.
8    Q.  Covey?
9    A.  Right.
10       Steven Covey is the author of the Seven
11  Habits of Highly Effective People, which is a book
12  that has sold over seven million copies.
13    Q.  Well, you'll have to orient me, because I
14  haven't read it; and I read a lot.
15       Is it a "v" or "ph" Stephen?
16    A.  Yeah, S-T-E-P-H --
17    Q.  P-H.
18    A.  -- E-N.
19    Q.  All right.  So he has a book that sold over
20  seven million copies?
21    A.  Right.  This particular --
22    Q.  Is it a motivational book?
23    A.  It's a book on, essentially, how to live your
24  life, and also how companies from all over the world
25  send their CEOs and corporate types to these seminars

15  (Pages 57 to 60)

## Page 61

1　that are, you know, about the seven habits that one
2　would follow and should follow, you know, in the
3　everyday life as well as professional, you know,
4　endeavors as well.
5　　Q.　Okay.　It's not specifically related to
6　police?
7　　A.　No, ma'am, it's not; although he has a line
8　on his -- that he has developed that pertains
9　specifically to police.
10　　Q.　I'm sorry, a line?　What do you mean?
11　　A.　Meaning a type of seminar.
12　　Q.　Oh.
13　　A.　Like he sort of created a specific -- you
14　know, his principles, and he applied them to the
15　policing world.
16　　Q.　And you offer these seminars through an
17　agency, through something?
18　　A.　The Steven Covey company actually is the one
19　that trains.　If you were, for instance, interested in
20　attending, you would attend the seminar for -- I
21　believe it's three days.　And then subsequent to you
22　taking the seminar and completing it, you could then
23　certify -- or become certified as an instructor for
24　the seminar.　And then you would essentially go on and
25　become a certified instructor by taking additional

## Page 62

1　courses to lead to that certification.
2　　Q.　And so how many courses have you taken
3　through Covey?
4　　A.　Well, I've taken, I want to say, maybe two or
5　three of these courses.　I took the basic courses in
6　Dallas.　Actually in Irving is where the seminar took
7　place.　And then subsequent to that I went ahead and
8　took the certification.
9　　Q.　And how long have you been certified?
10　　A.　I want to say maybe for about four years.
11　　Q.　And you've offered these seminars, the Covey
12　seminars I'll call them, or the seven habits,
13　whatever --
14　　A.　Sure, that's fine.
15　　Q.　You offer it directly to the police
16　department through Del Carmen Consulting?　How does it
17　work?
18　　A.　Yes, ma'am.　I essentially announced I had
19　been certified and that I thought this would be a
20　really good program for police departments to
21　undertake.　And so the City of Rosenberg, which is
22　right outside Houston, contracted me out to do a
23　city-wide training, and then one specific to police
24　officers for the City.
25　　　I've also conducted the same series of

## Page 63

1　seminars for the City of Grapevine as well, for the
2　police department there.　And I believe there may be
3　another or two that I'm missing, but I --
4　　Q.　Do you have a standard syllabus for the
5　police officer -- I'm not talking about the general
6　Covey --
7　　A.　Yeah, it's -- when you say syllabus, do you
8　mean like apply the concepts to policing?　Is that
9　what you're --
10　　Q.　No.　Let me be, actually, more clear.
11　　A.　Right.
12　　Q.　Is there a document that you could refer to
13　which would provide me with the content of what you
14　give in those seminars?
15　　A.　There is a manual that you purchase which is
16　the instructor's manual, which is sort of a lesson
17　plan; and it also has the content of the seminar that
18　we use to teach.
19　　Q.　When you go to Rosenberg or Grapevine, do you
20　actually distribute materials?
21　　A.　No, ma'am.　You can purchase the -- Covey
22　essentially -- they are a company that I presume make
23　a lot of their profit by the selling of the --
24　　Q.　Yeah, that's what I imagine.
25　　A.　Yeah, they sell the brochures.　They sell the

## Page 64

1　books.　They sell, you know, planners and various
2　things.
3　　　And so you can purchase the -- or a lot
4　of the participants purchase the little packet that
5　they complete through the day directly from the Covey
6　company.
7　　Q.　So you give the seminar, but you have Covey
8　materials available for purchase?
9　　A.　Yes, yes, ma'am.　Well, they order them prior
10　to my arrival.
11　　Q.　Okay.
12　　A.　So when I show up to the class, they each
13　have like a little booklet they complete and they
14　follow through in my seminar.
15　　Q.　And how much did you get paid for those
16　seminars?
17　　A.　I believe it went anywhere between $1200 and
18　$1500 a day.　But it ranges, and I really don't
19　specifically remember, you know.
20　　Q.　And you do that through Del Carmen
21　Consulting?
22　　A.　Yes, ma'am, I do.
23　　Q.　Now, Del Carmen Consulting at the -- going
24　back to your statement in our case, you say you're a
25　principal of Del Carmen Consulting?

16　(Pages 61 to 64)

Page 65

```
 1        A.  I am.
 2        Q.  And is the capital "D" correct there, or is
 3   that a typo?
 4        A.  Well, you know, it's not a typo.  That's the
 5   way I spell it.  Because every time I would put it on
 6   a Word document, it would always capitalize it.
 7        Q.  Yeah, it would come up that -- yeah, I know
 8   what you mean.  That happened when I was preparing the
 9   depo also.
10        A.  Yeah, right.
11        Q.  And --
12        MR. McCALL:  Word knows better than you
13   do what you want.
14        MS. BERKAN:  They keep changing.  And
15   when I do Spanish templates, it starts messing up my
16   English words.
17        Q.  Now, it says you're a principal of Del Carmen
18   Consulting.  In fact you're the only employee?
19        A.  I am, yes, ma'am.
20        Q.  All right.  And this is an S corporation or
21   something like that?
22        A.  Yes, ma'am, it's an S corporation, yes.
23        Q.  Do you receive a salary from Del Carmen, or
24   do you take profits?
25        A.  No, what I do is I essentially -- because
```

Page 66

```
 1   it's an S corp, I file my -- I do what's called the
 2   payroll.  You know, a check that I write myself every
 3   so often to simply be able to receive compensation.
 4        Q.  Okay.  Now, Del Carmen Consulting is
 5   primarily focused on racial profiling?
 6        A.  Yes, ma'am.
 7        Q.  And that's how you're advertised on your
 8   website, no?
 9        A.  That is correct.
10        Q.  And your TCLEOSE or whatever -- what's the
11   acronym?
12        A.  Yeah, it's TCLEOSE.
13        Q.  Okay, I know.  I've gone on their website.
14   But TCLEOSE, whatever it is, I get it wrong --
15        A.  Yeah.
16        Q.  -- but I can call it for this TCLEOSE?
17        A.  Yes, ma'am.
18        Q.  I know it has law enforcement there
19   somewhere.
20        Your TCLEOSE work, that's primarily on
21   racial profiling as well?
22        A.  No.  Actually what TCLEOSE -- because TCLEOSE
23   is the State of Texas sort of principal agency that
24   regulates police standards throughout the state, you
25   can become certified as an instructor for them.  Just
```

Page 67

```
 1   as an instructor, period.  I mean, it doesn't have to
 2   be a specific area of instruction.
 3        And so I took their course.  It's a
 4   40-hour, a week course at the Police Academy in
 5   Arlington a number of years ago.  And at the
 6   completion of that course, I became a
 7   TCLEOSE-certified instructor.
 8        Q.  And the --
 9        A.  Which means that when I conduct a seminar, if
10   I provide the syllabus right to TCLEOSE, that they
11   will award X number of hours, you know, to the
12   officers for TCLEOSE credit.
13        Q.  And what has been the focus of the seminars
14   you have given for TCLEOSE?
15        A.  Well, I have given seminars on Compstat.  I
16   have given seminars on racial profiling.  I have given
17   seminars on the legal issues that affect law
18   enforcement.
19        Specifically, Dr. Steward and I conducted
20   three seminars a few years back on -- throughout the
21   state on, you know, exactly what the liability issues
22   are that come up to police agencies.
23        And he used and I used a couple of the --
24   you know, sort of the general premises on which police
25   departments are sued.
```

Page 68

```
 1        I have conducted seminars on police
 2   management issues.  We have.  I've done a few where
 3   we -- I only do what's called command staff, which is
 4   essentially sergeants, lieutenants, and in some cases,
 5   you know, the chief of police and the assistant chief.
 6   And we perform -- conduct those seminars relevant to
 7   some of the strategies that are in place on
 8   management, how to widen the scope of supervision, how
 9   to manage effectively.
10        And what led me to all of this was that
11   in 2001, when the State of Texas passed its law on
12   racial profiling, LEMIT -- which is the Law
13   Enforcement Management Institute of Texas -- they
14   hired me to essentially train the 1200 chiefs, or
15   plus, in Texas on that topic.
16        Q.  And of all this work that you have set forth
17   that you do for TCLEOSE, what portion of it is related
18   to racial profiling?
19        A.  I would say that a substantial amount of it
20   is on racial profiling.  I don't really do it for
21   TCLEOSE.  I do it, you know, obviously --
22        Q.  As a TCLEOSE certified --
23        A.  Right.
24        Q.  I'm sorry.  I misspoke.
25        A.  But I would say a substantial amount of it
```

17 (Pages 65 to 68)

Page 69

1  relates to racial profiling.
2      Q.  And for those seminars, how much do you get
3  paid?
4      A.  It varies.  You know, it varies by client and
5  by agency.  But I would give you probably the same
6  parameter that I gave you before, between $1200 and
7  $1500 a day.
8      Q.  In the past year, how much of your time was
9  dedicated -- if you could give me sort of a ballpark,
10 I know it can't be exact --
11     A.  Right.
12     Q.  -- how much of your time was dedicated to
13 your academic work as a professor, your work as an
14 expert, and your work as a trainer?
15     A.  Hmmm.  I would say that my academic work is
16 probably about 70 percent of my time.  I would say as
17 a consultant, maybe 20 percent.  And when I say a
18 consultant, I mean racial profiling consulting issues
19 and all that.
20         I would say with the legal aspect of it,
21 I've only been involved in a handful of cases.  It
22 hasn't been a lot.  So maybe I've done two or three
23 cases perhaps at most a year.  Some years I haven't
24 done any.
25     Q.  Let's go over those cases a little bit.

Page 70

1         In Good, how much were you paid?
2      A.  I don't recall, ma'am, offhand in any of
3  those cases.  I can tell you that there is a range
4  between $7500 and about, you know, $15,000, around
5  there.  And that's a ballpark, you know.
6      Q.  Well, let me ask you this:  In your -- now
7  let's not focus on time -- I'm sorry, when I -- go
8  back a sec.
9         Okay.  You gave me 70/20, so am I to
10 conclude about 10 percent of the expert consulting?
11     A.  Yeah.
12     Q.  More or less, it could be 5 to 10.  I'm
13 not --
14     A.  Yeah, at most.  It's a very minimal aspect of
15 my life, yes, ma'am.
16     Q.  All right.  And in terms of income, what
17 portion of your income relates to your academic work?
18     A.  If you look at my income annually, I would
19 say that about -- it's probably about -- you know, as
20 of late, it's probably been about a 60 percent of my
21 income derives from my consulting on racial profiling.
22 And I would say that a good probably 40 percent or 30
23 percent derives from my academic work.
24     Q.  Wait a second.  Let me go back.
25     A.  Sure.

Page 71

1      Q.  I just got distracted.
2         The consulting on racial profiling and
3  related work is about 60 percent; is that what you
4  said?
5      A.  Yeah, it's about 60 --
6      Q.  I wasn't sure which one you were talking
7  about.
8      A.  I understand, yeah.
9         And when I say consulting, I want to be
10 clear.  I'm really referring to racial
11 profiling-specific issues.  I mean, like when --
12     Q.  You --
13     A.  I'm sorry.
14     Q.  No, I interrupted you.  Sorry.
15     A.  No, no.
16         The consulting work I do for the most
17 part relates to working with police agencies and
18 making sure they comply with the law on racial
19 profiling.
20         So when I say that most of my consulting
21 work or my consulting funds derive from that, I would
22 say that a good 50 or 60 percent of my income derives
23 from the consulting work that I do with police
24 agencies on racial profiling.
25     Q.  Okay.

Page 72

1      A.  I would say that about another 30 percent
2  perhaps or 40 percent derives from my academic work at
3  UTA.  And the remaining amount, which is a rather, you
4  know -- you figure $7500 or $10,000 or $12,000 a year
5  as a whole, in totality, derived from the work that I
6  do as an expert.
7      Q.  Well, and this year you're going to get at
8  least $43,000?
9      A.  I haven't received it yet, Ms. Berkan, but
10 that's the promise.
11     Q.  All right.  And that's the most you have ever
12 received?
13     A.  Yes, ma'am, it is.
14     Q.  And the second most you have ever received
15 for work on a report?
16     A.  And again this is -- it goes to my
17 recollection.
18     Q.  Sure.
19     A.  I'm thinking anywhere between $15,000 and
20 $20,000 maybe.  And that would be from DART.
21     Q.  And the DART cases were sometime ago?
22     A.  Yes, ma'am, they were sometime ago.
23     Q.  The more recent cases -- Good, Powers,
24 Hernandez -- what's the highest of those?
25     A.  The one with Irving is probably about $10,000

18  (Pages 69 to 72)

Page 73

1    maybe. But, again, I'm going off my memory right now.
2       Q.  Hernandez?
3       A.  This is the one with --
4       Q.  This is the one up near New Mexico -- or in
5    New Mexico.
6       A.  Oh, that one was actually about $12,000, I
7    believe.
8       Q.  And that was recently, wasn't it?
9       A.  Yes, ma'am, uh-huh.  It was a few months
10   back.
11      Q.  Yeah.  In fact your report was this year?
12      A.  Yes, ma'am.
13      Q.  In March of this year?
14      A.  Yes, ma'am.
15      Q.  And you got paid on that?
16      A.  Yes, ma'am.  It was done through a company
17   called Roundtable out of Washington, D.C.
18      Q.  Yeah.
19      A.  And they -- they bill them I suppose a higher
20   amount, and then they pay me from there.
21      Q.  But you're paid at $250 an hour for that
22   case?
23      A.  Yes, ma'am, I believe so.
24      Q.  So in that case you probably spent -- just
25   doing a quick -- assuming your 12,000 is more or less

Page 74

1    ballpark -- and when you receive your deposition, if
2    you want to correct that, I have no problem --
3       A.  Sure, that's fine.
4       Q.  -- if you have more accurate records.
5           Assuming that's ballpark, there would be
6    about 48 hours on that case?
7       A.  That's approximate.  And again, I'm going
8    straight off memory here.
9       Q.  And I'm doing my mathematical calculation in
10   my head.
11      A.  Yes, ma'am.
12      Q.  So this year, assuming that you get paid by
13   the Puerto Rico Department of Justice --
14      A.  (Laughter.)
15      Q.  -- you'll have at least $53,000?
16      A.  Yes, ma'am.
17      Q.  And more, actually, because you have already
18   worked beyond the 20 hours?
19      A.  It is -- I think, you know, my totality of
20   time after the report was done was about 25 hours, of
21   which 20 of them have already been credited to -- as
22   per the agreement.  So it would be probably about 5
23   hours.
24      Q.  And how much time did you spend before
25   producing the report, an approximation?

Page 75

1       A.  What do you mean, before?
2       Q.  In that time period where you were on a lump
3    sum --
4       A.  Uh-huh.
5       Q.  -- you reviewed about eight thousand pages of
6    documents?
7       A.  Yeah, I haven't counted them, but I -- you
8    know, what was represented to me by counsel was that
9    it was going to be about that many pages.
10          I have been working on this case for a
11   little bit over a month pretty much almost, you know,
12   I would say weekends, all weekends, you know, and
13   every single day.  You know, reading depositions and
14   all of that, so --
15      Q.  Did you take notes?
16      A.  I did not.  I actually read a great deal.
17   And then I got in front of the computer and started
18   typing the report.
19      Q.  Were there drafts of the report?
20      A.  No, ma'am.  There was pretty much one copy of
21   the report that I did, and that was that.  I reread it
22   several times to make sure I had no grammatical and
23   spelling errors, but it was one draft.
24      Q.  And did you, yourself, write every word in
25   that report?

Page 76

1       A.  Yes, ma'am.
2       Q.  On the report I'd like to ask you if you
3    wrote a particular note on Page 5.
4       A.  Uh-huh, yes, ma'am, I did.  This actually
5    comes from the fact that I had two discussions with
6    Mr. McCall during the time that I wrote the report.
7    And during those discussions I mentioned to him that I
8    was -- you know, kind of giving the premise of the
9    report that I had written, and we discussed the
10   Ashcroft case.
11          And so I included language in here that
12   simply stipulated the fact that I was addressing the
13   issue of deliberate difference, but not necessarily
14   suggesting to the court that this was the ruling they
15   would make on it, or based on that information.
16      Q.  And he was the one that provided you with the
17   cites of Maldonado versus --
18      A.  No, I actually -- I'm sorry, I didn't let you
19   finish.
20          I actually looked at his motion that he
21   filed --
22      Q.  Okay.
23      A.  -- before the court on --
24      Q.  The motion to dismiss?
25      A.  To dismiss, yes, ma'am, based on Ashcroft.

19  (Pages 73 to 76)

**Page 77**

1    And that's where I obtained the citations on that.
2       Q.   Okay.  There's another similar note somewhere
3    in here.  I'll see if I find it.  If you find an
4    asterisk, it's another asterisk.
5       A.   Okay, sure.  Yeah, it's on Page 16.
6       Q.   On 16, yeah.
7            The Puerto Rico Police Department is not
8    a party in the civil suits against the defendants in
9    this case?
10      A.   I -- I'm sorry, go ahead.
11      Q.   No.  Did you write that?
12      A.   Yes, ma'am, I did.
13      Q.   And why did you write that?
14      A.   Because I had found myself that I was talking
15   about Puerto Rico Police Department in several places.
16   And I wanted to make sure, for the benefit of the
17   court and anyone else that read the report, that it
18   was acknowledged that I wasn't an expert witness on
19   behalf of the Puerto Rico Police Department.
20      Q.   That you were for the five supervisors?
21      A.   Yes, ma'am.
22      Q.   Do you know if the Puerto Rico Police
23   Department is a suable entity?
24      A.   I have no idea.
25      Q.   Now, you say you worked very intensely on the

**Page 78**

1    case over the course of the about 26 days that you had
2    to review and write the report?
3       A.   It's a little bit extra from the time that I
4    received the original complaint but, yeah, it's close
5    to 30.  But, yeah, around there.
6       Q.   And during that time what else were you
7    working on besides this?
8       A.   Well, I had -- I have a class that I teach at
9    UT Arlington on Thursday nights.  And I had made
10   arrangements with -- which is part of the reason why I
11   told Mr. McCall that I had to see if this was
12   something that I would work on based on my time
13   availability -- made arrangements at the university to
14   make sure that --
15           I was going to go to the university, but
16   it was going to be on a very limited basis based on
17   the fact I was going to be working on the report.
18      Q.   You had no administrative duties as Chair of
19   the department?
20      A.   I do.  I have administrative duties.  I have
21   people that help me out, take care of things over the
22   summer typically.  But, yes, ma'am, I do.
23      Q.   And you didn't spend any time on those during
24   this --
25      A.   I did, I spent time on it.  But, once again,

**Page 79**

1    a lot of it was done through email and telephone
2    calls.  And I did, you know, go to campuses.
3            You know, in the university setting, we
4    have -- we're nine-month employees.  And so over the
5    course of the summer, even though those of us that are
6    administrators have a responsibility to make sure that
7    the department runs and runs, you know, fairly well
8    and all of that, you know, we have a rather lighter
9    schedule.
10           And we also don't have faculty meetings.
11   We don't have a lot of the things that we will be
12   facing in a few weeks when I return back to campus.
13      Q.   You worked out of your home?
14      A.   Yes, ma'am, I did.
15      Q.   And besides the course that you said you were
16   teaching on Thursday nights, which is what?  I'm
17   sorry, I don't remember.
18      A.   It was a statistics course, an advanced-level
19   stats, yes, ma'am.
20      Q.   For graduate students?
21      A.   For graduate students.
22      Q.   Besides that course -- strike that.
23           That was a summer course?
24      A.   Yes, ma'am.
25      Q.   Were there any other courses you were

**Page 80**

1    teaching this summer?
2       A.   I taught an online -- actually, strike that.
3    I -- let me see.
4            I taught the stats course.
5            No, because that's the only course that
6    I'm allowed to teach.  At UTA, as a Chair, you're only
7    allowed one course.  But I taught a Maymester class.
8       Q.   I'm sorry?
9       A.   It's called Maymester.  It's --
10      Q.   Oh, yeah.  I saw that in the website.
11   Maymester.
12      A.   Right.  It's essentially like -- basically
13   like ten or twelve days between May and June.  When we
14   finish the spring term, we have like ten days that you
15   can complete a class at a very rapid pace.
16           I taught an intro to criminal justice
17   class which was held between 8:00 and 12:00 in the
18   morning -- 8:00 a.m. to 12:00 p.m.  And it's a very
19   intense course.
20      Q.   But that wasn't after you started working on
21   this case?
22      A.   No, ma'am.  That was prior to.
23      Q.   All right.  Did you do any consulting work
24   during the month of July?
25      A.   You know, I probably did in the context of --

Page 81

1    I work with agencies in that I do what's called an
2    audit on their data. I review their data sets and
3    make sure that their data sets are being collected
4    accurately. And I probably did a few of those audits.
5         But they are typically minimal in that
6    you kind of just review the data set and make sure
7    it's kind of what I call a maintenance, you know,
8    program where I just look at their data set and make
9    sure that I flag something that may stand out.
10        Q.   What kind of data are you looking at?
11        A.   Contact data is what we call it, which is
12   essentially the data that pertains to the officer
13   stopping an individual and being able to, you know,
14   determine if the person is -- the officer is racially
15   profiling or not.
16        Q.   And these are all in the context of racial
17   profiling?
18        A.   They are in the context of racial profiling.
19   And I would say, yeah, all of them were in July, yes,
20   ma'am.
21        Q.   And about how much time did you dedicate to
22   that?
23        A.   Probably about, you know, maybe five hours.
24        Q.   Over the course of the month?
25        A.   Yes, ma'am.

Page 82

1         Q.   And you've mentioned, both in your testimony
2    today and at other times that I've read, other
3    testimonies, you mention that you do audits?
4         A.   Right.
5         Q.   Audits are exclusively in the area of racial
6    profiling or something else?
7         A.   Yes, ma'am, they are exclusively in the area
8    of racial profiling.
9         Q.   And for that you have statistical data that
10   you analyze?
11        A.   Yes, ma'am.
12        Q.   Which is produced by the police departments?
13        A.   By the police department, that's correct.
14        Q.   And as a result of your analysis, what
15   happens?
16        A.   I typically either -- I generate a letter. I
17   provide that letter to the Chief of Police. And in
18   that letter I address if there are any areas that need
19   improvement or any areas that are not in compliance
20   with the law.
21        Q.   And what is the use of the statistical data
22   in terms of addressing areas?
23        A.   The use of the data is that the data
24   highlights the areas that are not in compliance with
25   the law.

Page 83

1         You know, keep in mind that the Texas law
2    on racial profiling is very specific to the collection
3    of data. And so essentially what a lot of agencies
4    are concerned with is that they are not in compliance
5    with what the State is requiring them to provide.
6         Q.   And your analysis of the collection of data
7    is then given to the police department for future
8    management corrective action, if necessary?
9         A.   Yes, ma'am.
10        Q.   And your analysis that you do in this
11   consulting work, are you analyzing the way in which
12   the data is collected if it complies with the law, or
13   the results of that data collection for further
14   action, or both?
15        A.   Both, both.
16        Q.   Have I made a distinction that makes sense?
17        A.   Yes, ma'am.
18        Q.   I think so. My co-counsel made that.
19        A.   Yeah, that's wonderful. You would do well in
20   my staff.
21        Q.   I always give credit.
22        A.   The data analysis that I conduct, or I
23   perform, reviews the data of the -- that the police
24   department has produced.
25        And then what I'm looking for is to make

Page 84

1    sure that the -- and I'll give you an example. Maybe
2    this will answer your question.
3         Q.   That'd be fine, fine, fine.
4         A.   In Texas a contact, as defined by the law,
5    was a traffic-related contact where an individual
6    citation was produced or an arrest was made.
7         And so if -- you know, sadly, there were
8    some agencies that did not, you know, provide -- or
9    did not do this, did not follow suit to what a contact
10   was. And so they would essentially either include all
11   contacts that the officers made, or would include
12   warnings, or would include other components that were
13   not required to be submitted.
14        And quite frankly they had the tendency
15   of confusing the data and making it seem like, you
16   know, either a lot of Caucasians were stopped or
17   Hispanics were stopped.
18        And so what these audits do is they
19   singled out instances where that would happen.
20        And another -- and the last example that
21   I'll give you is an individual being stopped whose
22   name is Juan Gonzales. Well, in Puerto Rico I know
23   you may not have that issue. But here in Texas, you
24   know, when you provide a driver's license and the
25   officer swipes the driver's license on a portable

Job No. 8595 Case 3:12-cv-02039-GAG Document 1295-1 Filed 07/25/19 Page 24 of 114 Alejandro del Carmen
Evelyn Ramirez Lluveras, et al v. Javier Pagan Cruz, et al
August 12, 2010

**Page 85**

1  device that, you know, records that information --
2      Q.  Uh-huh.
3      A.  -- or enters the driver's license number onto
4  the system, the race of the individual is recorded.
5      Well, that race of the person -- in Texas
6  Hispanics are considered to be white in the context of
7  the DPS, Department of Public Safety.
8      So I flag those and I tell police
9  departments, hey, you are combining, you know,
10  Hispanics as Caucasians.  And by virtue of that, at
11  the end of the year you're going to be reporting that
12  you stopped 5,000 whites, when in reality you stopped
13  2,000; and you stopped, you know, 500 more Hispanics
14  than what you are claiming that you did.
15      Q.  So that example demonstrates how an audit of
16  yours might be directed at the department's compliance
17  with the standards and the law with respect to how
18  they collect the data?
19      A.  Right.
20      Q.  Then there's the second aspect?
21      A.  Which is a report.  There is a State-mandated
22  report that is produced by March 1 of every year.  And
23  this report is a report that goes to the City Council
24  and that the Chief of Police has to produce to the
25  City Council.  And subsequently, as you know, it's

**Page 86**

1  subject to open records from anyone that applies for
2  that to the City Council.
3      But essentially this report has a great
4  deal of statistical information, and then it's also
5  analyzed.  And in the analysis of the report, it is
6  speculated whether or not, or it's indicated whether
7  or not, the data is suggestive of the police
8  department engaging in profiling or not.
9      Q.  And if it is, what kinds of recommendations
10  are implemented or given?
11      A.  Well, yeah.  The -- if the police -- it's
12  very difficult to try to show that an individual
13  officer is engaging in racial profiling by virtue of
14  looking at aggregate data.
15      If you look at the police department
16  that -- you know, if I tell you that a certain city in
17  the state of Texas has 5,000 contacts, and in turn --
18  you know, with Hispanics, you know, and they have
19  10,000 contacts with whites, well, that doesn't have
20  much meaning per se.
21      And so there's been a great deal of
22  debate as to what the baseline should be between the
23  contacts and that baseline that we use as a -- if you
24  want to call it as a thermometer or as a measure to
25  figure out what the totality of that is.

**Page 87**

1      And so that's been very hard.  And so
2  we've looked at -- we have to go back and see if the
3  individual officer is engaging in racial profiling for
4  its -- it's almost -- you know, it's very difficult to
5  detect one officer engaging in the practice --
6      Q.  Sure.
7      A.  -- with aggregate data.
8      So we come up with recommendations of
9  more training.  We recommend for the officers -- for
10  the department to make a genuine effort to recruit
11  minorities, individuals that would represent the
12  department in terms of its demographical reality.
13      We also make recommendations for better
14  data to be collected, audits to be done on a quarterly
15  basis.  Just those are examples.
16      Q.  All right.  Could you also ascertain whether
17  particular departments, particular divisions within
18  departments appear to have a problem that may be
19  addressed?
20      A.  You know, we -- we have -- it's hard from the
21  report to gauge that.  But I will tell you that in the
22  past we have looked at the data.  And, again, it's
23  aggregate data, so you don't know which subdivision
24  within the department is producing that.
25      Most of Texas is rural, rural law

**Page 88**

1  enforcement.  So out of the 1200-plus agencies that
2  are in the state, the majority of them are rural
3  agencies where there's very few police chiefs that --
4  you know, they -- they are essentially the chief of
5  the police and also the patrolman or woman, you know.
6  And so it's difficult to gauge that.
7      Q.  Now, in your -- in the Powers case, which was
8  the case that you were disqualified -- correct --
9  the --
10      A.  That's the one with El Paso, yes, ma'am.
11      Q.  There was an administrative shooting review
12  team --
13      A.  Uh-huh.
14      Q.  -- in that case?
15      A.  Yes, ma'am.
16      Q.  Do you recall that?
17      A.  I do.
18      Q.  What was the purpose of that administrative
19  shooting review team?
20      A.  From what I recall, it was a review team that
21  was in place to review the actual shooting incident
22  and determine whether or not it was justified or not.
23      Q.  And is it best police practices to have such
24  shooting reviews?
25      A.  I think police departments vary from

22  (Pages 85 to 88)

Job No. 8595

Alejandro del Carmen

Evelyn Ramirez Lluveras, et al v. Javier Pagan Cruz, et al

August 12, 2010

---

**Page 89**

1  jurisdiction to jurisdiction.  And, you know, in some
2  cases having such a review team is helpful.  In other
3  cases police departments handle them through the
4  Internal Affairs section within the department.
5      It's a good idea overall to have, you
6  know, reviews of any incidents that take place,
7  obviously a full disclosure and transparency to the
8  public, yes, ma'am.
9      Q.  You're aware of the concept of
10  officer-involved shooting?
11      A.  I am.
12      Q.  And have you ever seen any department that
13  keeps statistics on officer-involved shootings?
14      A.  I believe a lot of departments, at least in
15  Texas, that I'm most familiar with, they keep records
16  of use-of-force, you know, incidents, and including
17  officer-involved shootings.
18      And if I'm not mistaken, they produce
19  those to the FBI for the UCR purposes, for the Uniform
20  Crime Report purposes.
21      Q.  How about New York?  Are you aware of the
22  SOPs in New York that have been in effect since the
23  '70s regarding --
24      A.  Somewhat.  New York has revamped a great deal
25  of their policing deployment tactics and a lot of

**Page 90**

1  their records management.  They have improved greatly
2  from the time of Giuliani.  And I think in 2001, after
3  9/11, all that became even more professional and they
4  were really under way to do --
5      Q.  Do you know what data is collected on
6  officer-involved shootings in New York?
7      A.  Not offhand.  But I do know if they -- if it
8  follows the standard that a great deal of other
9  agencies collect is that they collect standards
10  relevant to the officer that shot, in what
11  circumstances the officer, you know, shot or
12  discharged the weapon, the victim, the location of the
13  incident, and all of that.
14      Q.  Whether someone was injured, whether someone
15  was killed, do they --
16      A.  Yes, ma'am.
17      Q.  -- maintain that as well?
18      A.  Yes, ma'am.
19      Q.  And what use do they make of that?
20      A.  Well, they learn from that particular data.
21  And they also employ, you know, techniques and
22  policies that they learn from that assessment.
23      Q.  Are you familiar with the US Department of
24  Justice Civil Rights Division literature section that
25  includes access to consent decrees by various

**Page 91**

1  departments?
2      A.  I believe so, yes, ma'am.
3      Q.  Do you recall any of the departments that had
4  consent decrees with the Department of Justice?
5      A.  I believe New York is one of them.  I don't
6  recall offhand the other departments.
7      Q.  Do you remember if the Virgin Islands had
8  one, if Los Angeles --
9      A.  Believe LA has one.  When the previous Chief
10  of Police arrived in LA from New York, he employed
11  that.  I believe he did.
12      Q.  Do you review those in the course of your
13  work in any way, those consent decrees?
14      A.  Not typically, no, ma'am.
15      Q.  Do they -- do those consent decrees have any
16  bearing on what best police practices are?
17      A.  You mean within the police department or as a
18  whole?
19      Q.  No.  I mean, you used throughout your
20  testimony in this case -- or not so much testimony --
21  in your report and also previous testimony and
22  previous reports, you use a term called best police
23  practices?
24      A.  Yes, ma'am.
25      Q.  And you say it's not a symbolic thing; it's a

**Page 92**

1  real thing?
2      A.  It's a real thing.
3      Q.  All right.  Now I want to know if the Justice
4  Department's consent decrees with different police
5  departments in any way informed your analysis of what
6  are best police practices?
7      A.  I believe that anytime -- and the answer to
8  that is yes, in short.  But I will tell you I believe
9  that anytime a police department engages in
10  transparent activity with regards to disclosing to the
11  public, learning from its mistakes, it is all part of
12  that Best Practices model, yes, ma'am.
13      Q.  Now, on your website you're referred to as a
14  nationally recognized scholar who specializes in
15  racial sensitivity training including racial
16  profiling.
17      Is that a fair statement?
18      A.  Yes, ma'am.
19      Q.  And the materials that can be purchased at a
20  fraction of the cost, what is that, that comes off of
21  your website?
22      A.  Can you read the whole thing or --
23      Q.  I can probably pull out the page because I
24  probably printed it up.
25      According to this, you offer a four-hour

23  (Pages 89 to 92)

**Page 93**

1  training course called Beyond the Basics, on racial
2  profiling. And then your website goes on to say that:
3  There are materials which can be purchased at a
4  fraction of the cost.
5      A. Oh, it's probably related to the actual
6  template that I developed back in 2001 when the law
7  passed and LEMIT contacted me to provide the training
8  on the -- you know, for the chiefs of police starting
9  in '02.
10         I developed a template based on what the
11  law required. And this template is an item that I
12  sold to police agencies for around $50 so that they
13  could, you know, use it and provide a report, comply
14  with the law.
15      Q. And how much of your income derives from
16  that?
17      A. You know, I actually -- that template is
18  widely used now throughout the state. The way it was
19  disseminated was that I went ahead and gave it to
20  LEMIT as part of my agreement with them; and they
21  supplied it for free to all the agencies. So they
22  paid for it, and then supplied --
23      Q. After that it's not very marketable?
24      A. Every year I update it with the new tables
25  and the new things that come up. And we just had a

**Page 94**

1  recent change in the law this past year which has
2  taken effect this year.
3         And so even though the new -- if you want
4  to call it the new requirements, now bring a template.
5  And so that's pretty much no longer going to be
6  something that I will be pursuing.
7      Q. Okay. How much do you get paid as a
8  professor at Arlington?
9      A. I believe it's about $86,000, is my salary.
10      Q. For a year's work?
11      A. Nine months. And then we --
12      Q. The summer, as you have described?
13      A. Yes, ma'am. And then we teach in the summer.
14  We get paid 10 percent extra per class that we teach
15  up to two courses for a regular faculty member. But
16  since I have an administrative rank, I'm limited to
17  only one.
18      Q. And the $86,000 includes that 10 percent or
19  not?
20      A. No, it does not. It actually excludes the 10
21  percent. So it's in addition to that you can make.
22         But it's also limited to I believe
23  $7,000, the maximum that you can make on a class. And
24  so if you teach a class, you would make an additional
25  $7,000.

**Page 95**

1      Q. All right. Let's go back to 2009, because we
2  don't have 2010 completely yet.
3         So in 2009 your income was somewhere in
4  the order of 90-something at the university?
5      A. I would say a little bit over that, because I
6  also receive a stipend as Chair.
7      Q. Yeah.
8      A. And that stipend is around, I want to say
9  about -- it's $15,000 or $16,000 a year.
10      Q. So you're over a hundred?
11      A. Yes, ma'am. I'm about 105, $110,000.
12      Q. All right. And your income from the
13  consulting work?
14      A. Last year?
15      Q. Yeah, in 2009.
16      A. From the consulting work as it pertains to
17  racial profiling, I probably made around 200, 180,
18  $200,000.
19      Q. And other consulting work that's not
20  pertaining to racial profiling?
21      A. I would say, you know, less than $20,000
22  maybe.
23      Q. And what's comprehended there?
24      A. Probably expert witnessing things that I did.
25  And, once again, I don't recall exactly what that was.

**Page 96**

1  But I -- you know, probably less -- I know the El Paso
2  case paid me the $7500. And it was less than $15,000
3  if at all.
4      Q. Okay. Any other item of compensation I've
5  left out? The seminars for --
6      A. That's included in the --
7      Q. That's included?
8      A. Yes, ma'am.
9      Q. All right, all right. Are you currently
10  writing any books?
11      A. I am currently under contract to write a book
12  on gangs. And I am also considering writing a book
13  about my experiences as a child in Nicaragua.
14      Q. Is that under contract to anybody?
15      A. No, ma'am.
16      Q. Have you written any of it?
17      A. In my mind.
18      Q. Okay. And who contracted you to write on
19  gangs?
20      A. I believe it was Prentice Hall, but I'm not
21  certain if -- this was a contract that we had for two
22  or three years now, and the book hasn't really
23  materialized. And so I'm trying to make sure that
24  everybody kind of -- it's a book that I'm co-authoring
25  with two or three other people.

**Page 97**

1   Q.   Okay.
2   A.   And so I'm trying to make sure everybody
3   comes back to the table to actually write.
4   Q.   And have you received an advance from
5   Prentice Hall?
6   A.   No, ma'am.
7   Q.   Have you dedicated any time this summer to
8   these writing efforts?
9   A.   I have not.  I've actually been quite busy
10   taking care of my children this summer, so...
11   Q.   And how much of a time commitment is that,
12   taking care of your kids?  I'm a mother.  She's a
13   mother.  He's a father.
14   A.   Well, it's 120 percent of my time.  But what
15   I've done is put them in summer camps, and also they
16   have stayed at home a great deal while I've been
17   working through the summer.
18   Q.   Now, what did you understand your task to be
19   in this case?
20   A.   My task was to simply review -- specifically
21   to review the report by Mr. Reiter.  I understood that
22   this case involved police management issues, and that
23   by reviewing the report it was -- you know, I was to
24   provide an expert opinion on the facts as he relayed
25   them.

**Page 98**

1   Q.   Expert opinion as to what?
2   A.   As to whether or not the five individual
3   defendants were liable under the premise of deliberate
4   difference which were used by Mr. Reiter.
5   Q.   You've not taken any legal cases -- I mean
6   legal studies?  You're not a lawyer?
7   A.   No, ma'am, I am not an attorney.
8   Q.   Have you studied law?
9   A.   I've studied law in the context of the
10   university in the Ph.D. program that I attended.  We
11   did have some law classes; but, no, I'm not an
12   attorney.
13   Q.   In those law classes did you study the
14   deliberate indifference standard?
15   A.   We did.  We actually discussed it in a couple
16   of our classes, yes, ma'am.
17   Q.   That would be -- at what level were you?
18   A.   At the Ph.D. level and master's too.
19   Q.   And these courses were taught by lawyers?
20   A.   They were taught by attorneys, yes, ma'am.
21   Q.   Now, you've -- you have a long list of
22   publications.  I unfortunately did not bring it.  But
23   that list of publications includes the four books?
24   A.   Yes, ma'am.
25   Q.   Now, are any of them related to issues of

**Page 99**

1   supervision, deliberate indifference standard, and
2   applicable to supervision?
3   A.   Not specifically, no, ma'am.
4   Q.   All right.  Is it discussed in any of those
5   four books?
6   A.   Not deliberate indifference, but I do discuss
7   the issue of police management.  I believe in the
8   intro to criminal justice reader that I authored
9   sometime I ago, I believe there are a couple of
10   articles that are there on that topic.  But I'm not
11   certain.
12   Q.   On what, within police management at large?
13   A.   That part I can't remember.
14          Essentially it was a reader that we put
15   together from other people that contributed to the
16   topics at hand.
17   Q.   But you didn't write that part?
18   A.   Not that part, no, ma'am.
19   Q.   How about in your many, many articles, do any
20   of them have to do with deliberate indifference in
21   management of police officers?
22   A.   Not deliberate indifference specifically.
23   Some of the articles that I have written relate to
24   police management as it pertains to several issues,
25   for instance, racial profiling and, you know, Best

**Page 100**

1   Practices models, and various other components.
2   Q.   How about monitoring and supervision of
3   underlings, or subordinates?
4   A.   I believe there are -- and, again, I'm going
5   off memory here.  But I believe there are one or two
6   articles that relate to that topic, to the topic of
7   police management.
8   Q.   Yeah, but police management is a very -- what
9   do you understand by police management, since you've
10   been using it?
11   A.   Well, police management pertains to the
12   ability of the -- you know, the scope of work that a
13   police supervisor has, you know, in that role as a
14   police supervisor.
15          And that can encompass a great many
16   things.  You know, it could encompass the individual
17   officer supervisor to chain-of-command issues, you
18   know, use-of-force issues.  Racial profiling can fall
19   within that.
20   Q.   Now, you say some of your articles address
21   that?
22   A.   I believe one or two of them actually include
23   or make references to issues relevant to police
24   management as a whole.
25   Q.   I tell you what.  When we break for lunch,

Alejandro del Carmen
August 12, 2010

Evelyn Ramirez Lluveras, et al v. Javier Pagan Cruz, et al

---

**Page 101**

1    I'd like you to review your curriculum vitae --
2    A.  Sure.
3    Q.  -- and identify those articles for me.
4    A.  Yes, ma'am.
5    Q.  And the specific issues that are addressed.
6    A.  Sure.
7    Q.  You've never been a police officer?
8    A.  I have not.
9    Q.  Obviously you've never been a police
10   supervisor?
11   A.  Right.
12   Q.  I'm sorry?
13   A.  Right.  I'm sorry.
14   Q.  You've never fired a weapon in a hostile
15   situation?
16   A.  I have not.
17   Q.  Do you know which weapon was involved in this
18   case?
19   A.  I believe it was the standard weapon issued
20   to Officer Pagan, and the type of model I can't recall
21   right now.
22   Q.  Have you taught at a police academy?
23   A.  I have.
24   Q.  On issues other than racial profiling?
25   A.  I have.  I taught at the Arlington Police

---

**Page 102**

1    Academy a number of years back on issues relevant to
2    the what's called the SARA model, the S-A-R-A model.
3         Also community policing, CPTED,
4    C-P-T-E-D, Crime Prevention Through Environmental
5    Design.  I've also taught on liability issues relevant
6    to police misconduct on minorities.  And -- and then
7    of course racial profiling.
8    Q.  All right.  SARA, can you give me the
9    acronym, what it stands for?
10   A.  I believe it's the --
11   Q.  I saw it somewhere, but I don't remember it.
12   A.  Yeah, let me remember here.  It's the -- it
13   has to do with -- and I can correct this on the record
14   if I'm not a hundred percent accurate, but let me
15   think for a second.
16        I know it's assessment, response.
17   Q.  Oh, scanning, assessment --
18   A.  Thank you, very good.
19   Q.  When you said assessment, I remembered
20   scanning.  Scanning, Assessment, and --
21   A.  Assessment, Response, and...
22   Q.  I can't remember the last one either.
23   A.  Right.
24   Q.  And that goes to what kind of incident or
25   what kind of -- you know, where is SARA useful?

---

**Page 103**

1    A.  Yeah, SARA is useful when the police officer
2    is trying to -- we teach police officers to not just
3    simply respond to the scene and be done with the
4    paperwork and go home; we teach police officers to
5    assess the situation.  And if there is a need to
6    provide some degree of solution to the issue --
7         For instance, a domestic violation issue.
8    That comes up often.  You know, the standard practice
9    under the traditional model of policing is that the
10   officer will respond and simply arrest the person and
11   take him to jail and be done for the day.
12        Well, that officer comes back the next
13   day or the following day, and that call becomes
14   pervasive.
15        And so what we teach them is, instead of
16   spending, you know, your time, and quite frankly
17   risking the life of the victim as well as yours, you
18   know, you need to assess the situation and provide
19   some degree of -- you know, it may be the individual
20   is an alcoholic.  Maybe there is underlying, you know,
21   issues that affect that issue.  And, therefore, by
22   virtue of that, you may want to provide that person
23   with some degree of a solution or a referral, you
24   know, to address the situation.
25   Q.  Now, this SARA method which you've described

---

**Page 104**

1    now, and the community policing methods that I know
2    you've been involved with, would you contrast that to
3    the brick and mortar, old style of doing police work?
4    A.  SARA model is not.
5    Q.  I mean, would they be the alternative to a
6    brick and mortar?
7    A.  Yes, ma'am, they would be.  Right.
8    Q.  You say you've taught liability issues
9    regarding what?
10   A.  It was the treatment of minorities and how to
11   treat minorities, again within the realm of racial
12   profiling.  You know, it's how police officers, you
13   know, should behave, you know, when they obviously
14   stop someone and instruct them on, for instance, the
15   differences among the Latinos and Latinas in the
16   state; that we're not all from the same component,
17   that we have different cultural realities within Latin
18   America that we bring to the United States when we
19   migrate, so...
20   Q.  Have you ever taught at a police academy
21   regarding monitoring of officers with violent
22   tendencies?
23   A.  I have not.
24   Q.  Have you ever taught at a police academy
25   regarding maintenance of statistics regarding

---

26 (Pages 101 to 104)

Job No. 8595
Evelyn Ramirez Lluveras, et al v. Javier Pagan Cruz, et al

Alejandro del Carmen
August 12, 2010

Page 105

1  officer-involved shootings, and not within the context
2  of racial profiling data?
3      A.  No, ma'am, I have not.
4      Q.  Have you ever been employed as a consultant
5  to provide advice to police -- police institutions,
6  police entities, regarding management of supervisors
7  with violent tendencies?
8      A.  I have not.
9      Q.  Have you ever taught at a police academy
10  regarding disciplinary systems within the police
11  department?
12      A.  Not taught at a police academy regarding
13  disciplinary systems.
14          I have, however, consulted with several
15  chiefs on policy that relates to discipline and how
16  to, you know, comply with the law with regards to
17  that, and also how to phrase terminology, so --
18      Q.  What do you mean, comply with the law?
19      A.  Well, again, on racial profiling there has to
20  be a policy in place on disciplinary processes.  And
21  so they often send me a policy and say, Dr. del
22  Carmen, does this look like a policy that is
23  consistent with the law?
24          There is a model that LEMIT put together
25  on an ideal policy, and this policy was created by

Page 106

1  both the ACLU and a lot of civil rights groups along
2  with police chiefs in Texas.
3      Q.  So your answer to my question, where you say
4  you have taught -- or consulted, excuse me --
5  consulted with respect to disciplinary systems is
6  within the context of the law on racial profiling?
7      A.  For the most part, yes, ma'am.
8      Q.  Any other part besides for the most part?
9      A.  No, actually, no.  It's -- I'll restate my
10  response.
11          It's entirely on racial profiling, within
12  the construct of that.
13      Q.  Have you ever written a policy on
14  administrative review of officer-involved shootings?
15      A.  I have not.
16      Q.  Have you ever seen a policy on administrative
17  review of officer-involved shootings?
18      A.  I have.
19      Q.  Where have you seen it?
20      A.  I believe I've seen it in Arlington,
21  Arlington Police Department.  I believe in the city of
22  Allen as well.
23      Q.  And these are policies which require what?
24      A.  Which require the assessment of a police
25  shooting based on the consequences, or after the fact

Page 107

1  that the shooting takes place.  The police departments
2  will come in and simply assess the situation and
3  provide, you know, the evidence that, you know,
4  constituted the shooting.
5      Q.  And both Arlington and Allen have such
6  policies?
7      A.  I believe they -- I don't know if they
8  currently have them, but I know --
9      Q.  Or had at the time --
10      A.  Yes, ma'am.  I know throughout the time that
11  I've been associated with them, for almost twelve
12  years, they have had them.
13      Q.  And are those policies in conformity with
14  Best Practices?
15      A.  Yes, ma'am.
16      Q.  And you have said that you haven't seen the
17  consent decrees that are on the Justice Department --
18      A.  I have not, no.
19      Q.  I wanted to make sure I asked you that.  I
20  thought I did.
21      A.  Yes, ma'am.
22      Q.  Have you ever written a policy on police
23  supervision other than racial profiling?
24      A.  I have not.
25      Q.  Have you taught that to law enforcement?

Page 108

1      A.  Police supervision as a whole?
2      Q.  Yes.
3      A.  Yes, ma'am, I have.  I've taught police
4  supervision in the -- I'll give you an example.
5          In the cohort program that we have
6  through the university, most of the individuals that
7  are in that cohort program are police officers.
8          And so I've taught police supervision
9  basis, you know, or content to them in the context of
10  a class.  And I've also taught in I believe two
11  instances in the course of the past few years on
12  police management as it relates to the Covey seminar.
13  I've, you know, kind of included that within command
14  stuff.
15          And I can tell you specifically in the
16  City of Grapevine about two years ago, I conducted
17  about three seminars specifically geared towards
18  command staff, that is sergeants and above, where I
19  taught police management within the context of the
20  Covey best principles -- or seven habits.
21      Q.  Now, if I were to try to get a content
22  analysis of both the work that you did in the cohort
23  program and in the seminars you just recently
24  referenced, where would I go to get that content
25  analysis?

27  (Pages 105 to 108)

## Page 109

1    A.  The syllabus would illustrate some of the
2  topics we discussed in the classroom, you know, or in
3  the course of the topic.  But as you know being an
4  instructor yourself, sometimes --
5    Q.  Who told you I was an instructor?
6    A.  You do your homework, I did mine, Ms. Berkan.
7    Q.  Then you know I was the lawyer on Gutierrez
8  22 years ago.
9    A.  And I also know that you graduated from
10 Harvard, which my sister is there now.
11   Q.  Makes no difference, believe me.
12   A.  I know -- well, you know.
13      I also did the -- I'm sorry, what was the
14 last question?
15   Q.  I want to know, did you charge Mr. McCall for
16 the work in investigating my educational background?
17 (Laughter.)
18   A.  I did not.  Can we go off the record for a
19 second?
20      MS. BERKAN:  Yeah, let's go off.
21      (Discussion off the record.)
22   Q.  We had a very short break.  And I will ask
23 you, Professor, if you can get for me -- and we'll
24 mark as Exhibit 6 -- the syllabuses -- syllabi --
25   A.  Syllabi.

## Page 110

1    Q.  -- of the course that you mentioned, which
2  is -- I can't remember.
3    A.  Yeah, the policing issues course.
4      MS. MENDEZ:  The cohort program.
5    Q.  The cohort program.  And you mentioned one
6  other?
7    A.  I mentioned that I used in my Covey
8  seminars -- that I kind of implemented or addressed
9  some of the management issues within the context of
10 the Steven Covey application.  And I'll try to find
11 something in that area as well to give you.
12   Q.  Yeah, I know there might be --
13   A.  Well, yeah.
14   Q.  -- copyright issues or something like that.
15   A.  There are, yeah.  They're very protective of
16 that.
17   Q.  Yeah.
18   A.  But I'll try to find something for you.
19   Q.  But the cohort program -- and I did not see
20 it on the website, so maybe I just missed it.
21      MS. MENDEZ:  This is about the courses
22 that had to do with management?
23   Q.  That had to do with management?
24   A.  Yes, ma'am.
25   Q.  Do any of these courses deal with supervisory

## Page 111

1  issues related to police officers with troubling
2  disciplinary records?
3    A.  I think we touch upon them as a topic,
4  especially in the cohort program.  We have -- in that
5  particular class we have several police administrators
6  that are from Fort Worth and other cities in the area.
7  And so we do discuss it but not -- it's not part of
8  the central focus of the course.
9    Q.  All right.  But if you can supply those to
10 me, I would really appreciate it.
11   A.  Yes, ma'am.
12   Q.  Including your, you know, caveat that you
13 don't always of course put every word in the syllabus.
14   A.  Right.
15   Q.  But just the --
16   A.  I understand.
17   Q.  -- matters that are addressed.
18      All right.  I'd like to go to your report
19 now and look at Page 24 through 26, which I believe
20 have the things you looked at?
21   A.  Yes, ma'am.
22   Q.  Now, you have a list of 59 documents,
23 including your vitae?
24   A.  Yes, ma'am.
25   Q.  All right.  And are those here today?

## Page 112

1    A.  They are, excluding the vitae.  I did not
2  bring it, and I apologize in advance for that.
3      I was told by counsel that he had
4  provided that to you --
5    Q.  Yeah.
6    A.  -- so I didn't think that you --
7      And also, the other item that I did not
8  bring is the video, because I can't copy it.  It's on
9  You Tube.
10   Q.  You saw the video on You Tube?
11   A.  I saw a very short -- you know, that one
12 second -- there are several videos floating around, I
13 think.
14   Q.  Yeah.
15   A.  And I saw the one on You Tube that was a very
16 quick --
17   Q.  Did you just put in some key words, or did
18 Mr. McCall tell you --
19   A.  No, no.  Actually, when I -- this was
20 initially when I was interested in the case and I
21 began to figure out what this case was about.  I went
22 on Google, and I typed up "Officer Pagan," and you
23 know, all types of hits come up and --
24   Q.  Yeah, it comes up.
25   A.  -- so, you know --

28  (Pages 109 to 112)

Page 113

1    Q.  And you've seen one version of it or more
2    than one version?
3        A.  No, I saw only one.  But I noticed that there
4    were several places where they have it as well.
5        Q.  Yeah, I mean, some people have put music to
6    it, that kind of thing.
7        A.  Right, right.
8        Q.  But you obviously haven't seen the video that
9    was taken?
10       A.  No, ma'am, I have not, no.
11       Q.  That's at the Institute of Forensic Sciences
12   or the -- their enhanced copy --
13       A.  Yes, ma'am.
14       Q.  -- you are aware of that?
15           Now, this list of documents, is there any
16   order to this list?
17       A.  No, ma'am.  I got them in increments, and
18   that's how I listed it; so there's no order.
19       Q.  All right.  And did you choose or request any
20   of the documents on this list?
21       A.  I did not.
22       Q.  So the process was that Mr. McCall or someone
23   from his office would just forward documents to you?
24       A.  Yes, ma'am.  My understanding was that some
25   or, you know, all of these documents had been produced

Page 114

1    to the prior expert.  And so they essentially sent me
2    what the prior expert had received.
3        Q.  The prior expert being Mr. Levine?
4        A.  I don't know his name, but I assume that --
5        Q.  But the prior expert for the defendants?
6        A.  For the defendants, yes, ma'am.
7        Q.  Were you told if Mr. Levine charged anything
8    to the defendants?
9        A.  I was told -- in fact I asked Mr. McCall
10   yesterday because I did not -- all he said was there
11   was -- initially that there had been an expert that
12   had been retained, and that this expert simply said
13   that he could not do it considering the time line.
14           And yesterday he mentioned I think in
15   passing that they had compensated this expert, you
16   know, for the time that he had reviewed some of the
17   documents.
18       Q.  Did you receive any written documents from
19   that expert, or notes of his or --
20       A.  No, ma'am, none at all.  I didn't even know
21   who he was.
22       Q.  All right.  Now I'd like to look at some of
23   the specific documents and have you describe to me
24   what they are.
25           The hard copies of the criminal trial.

Page 115

1    Obviously you don't -- do you have a list of the
2    witnesses who testified?
3        A.  I do not, ma'am.  I did not make that list,
4    no.
5        Q.  And when you read it, I understand you did
6    not take notes?
7        A.  I did not take notes.  I read it more in
8    terms of -- I understood that my role was not going to
9    be to attest as to Officer Pagan's actions.  And so I
10   read it more in the context of being able to
11   understand, you know, the sequence of events and what
12   had happened and to put it in context as to why the
13   supervisors were being sued.
14       Q.  But you did read the entire trial?
15       A.  I did, yes, ma'am.  I read all of it.
16       Q.  Did anyone tell you about the witnesses'
17   subsequent deposition testimony?
18       A.  No.  I did not -- I did not -- no one told me
19   about anything relevant to that.
20       Q.  Did anyone tell you about the depositions
21   that were taken of Zulma Diaz and Carlos Sustache?
22       A.  No, ma'am.
23       Q.  Do you know what they testified about with
24   regard to their training?
25       A.  No, ma'am.

Page 116

1        Q.  Now, you were not hired to offer an opinion
2    as to the -- whether or not Mr. Pagan's intervention
3    and killing of Mr. Caceres comported with Best
4    Practices?
5        A.  That is correct, ma'am.
6        Q.  Nor were you hired to offer an opinion as to
7    whether Zulma Diaz or Carlos Sustache -- in some way
8    their actions violated Best Police Practices?
9        A.  That is correct.
10       Q.  Your analysis is limited to the five
11   supervisory defendants?
12       A.  Yes, ma'am.  And it actually is further
13   limited to the response to Mr. Reiter's report.  You
14   know, I -- my primary concern or, you know, premise
15   for writing this report was to review his report and
16   in turn provide an assessment of what he had written
17   and compare and contrast it to the record.
18       Q.  Do you have an opinion as to the adequacy of
19   or the -- whether or not the actions of Mr. Pagan
20   and/or Ms. Diaz and Mr. Sustache violated Best
21   Practices?
22       A.  I don't have an opinion on it.  And I will
23   tell you that, you know, I -- when I received
24   notification from the El Paso firm that my testimony
25   had been struck out, I felt that I really should

29  (Pages 113 to 116)

Job No. 8595 Case 3:12-cv-02039-GAG Document 1295-1 Filed 07/25/19 Page 32 of 114
Evelyn Ramirez Lluveras, et al v. Javier Pagan Cruz, et al

Alejandro del Carmen
August 12, 2010

**Page 117**

1    not -- should refrain from offering any opinion on
2    this particular use-of-force issue, in an attempt to
3    be -- you know, for full disclosure and, you know, not
4    extend the boundaries of which I can offer an opinion.
5        Q.  And what makes you qualified to give an
6    opinion as to the five supervisory defendants?
7        A.  It was for the past twelve, thirteen years,
8    I've been working as -- we spent a considerable amount
9    of time earlier this morning on my record.  And I've
10    spent a great deal of time working with law
11    enforcement agencies throughout the state.
12        Even though the bulk of my work has been
13    on racial profiling, I have become acquainted with and
14    taught and learned about the different aspects of
15    policing that relate to police practices and
16    management.
17        Most of my work, even though the -- if
18    you want to call it the central focus is racial
19    profiling, most of my work by virtue of training, by
20    virtue of research that I've done on that topic relate
21    to managers, to police management.
22        In fact Chief Halstead from Fort Worth
23    and I have even discussed the possibility of writing a
24    book about what it's like to be a police chief and,
25    you know, the different implications that a police

**Page 118**

1    chief has in the realm of his or her work.
2        So in addition to that, I received the
3    academic training.  Florida State University's now
4    College of Criminology and Criminal Justice is the
5    oldest college in the United States as it pertains to
6    a Ph.D. in the discipline.  I had professors like
7    C. Ray Jeffrey, who were the authors of CPTED, you
8    know, various others that have been very visible in
9    the United States, and across the world really, in
10    terms of criminology.
11        I did take police management courses at
12    Florida State within the realm of, you know,
13    criminological theory.  It's a school that has both
14    criminology and criminal justice components there.
15        So I have been -- done level of analysis
16    on police issues for the past twelve, thirteen years;
17    and, therefore, I felt that I could offer an opinion
18    on this case.
19        Q.  And where do the standards come from
20    regarding the adequacy of a supervisor's conduct with
21    respect to the persons that he or she supervises in
22    the context of police cases?
23        A.  I think police -- the magical question of,
24    you know, what is the standard that we follow? comes
25    from several sources.  I think, you know, obviously we

**Page 119**

1    have textbooks that have been written on the subject.
2    We also have --
3        Q.  On what subject?
4        A.  On the subject of police management and
5    standards that are followed in police departments.
6    You know, some of them are cited by Mr. Reiter, one of
7    them specifically with, you know, the Taylor, et al,
8    textbook on police management which is a classic that
9    is used.
10        And so in addition to that, there have
11    been professional -- the professionalization of
12    policing started since the 1950s and '60s with the
13    LEAA years, Law Enforcement Assistance Administration,
14    that essentially was a federal mandate to pay police
15    officers to become educated.  August Vollmer in
16    California instituted a great deal of that.
17    Fingerprinting became professionalized.
18        Today we have a wide range of
19    organizations throughout the United States that
20    provide guidance, provide standards for police
21    departments to follow.  Although they are not legally
22    binding, these are standards that -- you know, they
23    encompass what is conceived as the Best Practices
24    model.
25        Q.  And where is the Best Practices model, as

**Page 120**

1    that phraseology which you use, where is that set
2    forth?
3        A.  Where was that established?  Is that what
4    you're asking or --
5        Q.  What literature can I go to that would say,
6    this is the Best Practices model?
7        A.  Aside from the academic literature, which
8    once again has had a tremendous impact on policing,
9    you know, Dr. Goldstein, for instance, who I had a
10    chance of meeting recently, who is the father of
11    community policing, you know, he developed through the
12    COPS office which is the Community --
13        Q.  Okay.  Well, I don't want to interrupt you,
14    but I'm really trying to look -- obviously my interest
15    is in Best Practices with respect to disciplinary
16    systems, with respect to red-flagging people who have
17    disciplinary problems, with respect to handling of
18    people who are under suspension, and with respect to
19    officer-involved shootings, all right?
20        A.  Right.
21        MR. MCCALL:  I think you asked a
22    question, though, that he was in the process of
23    answering.
24        MS. BERKAN:  I simply interrupted him
25    because I think he misunderstood my question.

Job No. 8595

Evelyn Ramirez Lluveras, et al v. Javier Pagan Cruz, et al

Alejandro del Carmen

August 12, 2010

## Page 121

1  THE WITNESS: Yeah, I was getting --
2  MS. BERKAN: I mean, you can finish your
3  answer. I have no problem with your finishing your
4  answer, and I'm sorry I interrupted.
5  THE WITNESS: No, that's okay.
6  MS. BERKAN: But I want to focus in on
7  those issues.
8  THE WITNESS: I understand, right. But
9  I'm trying to kind of put it in context for you, but
10  I'll be glad to get to that point specifically.
11  A. After the -- you know, we had scholars that
12  contributed to the literature with regards to
13  professional standards and things for police
14  departments to follow which include those items that
15  you highlighted earlier.
16  We also had the emergence of police
17  organizations that -- you know, for instance PERF,
18  Police Executive Research Forum; IACP, the
19  International Association of Chiefs of Police, which
20  Mr. Reiter cites; and various other organizations,
21  Police Foundation, the COPS office out of the
22  Department of Justice.
23  And these organizations, what they did is
24  they -- and they continue to do that -- they promote
25  the idea of professionalization. In some states, like

## Page 122

1  for instance the state of Texas, we even have the
2  accreditation of police departments which they follow
3  through CALEA -- C-A-L-E-A -- and they simply accredit
4  police departments based on different components that
5  the police department may have: policies, procedures,
6  training, and various others.
7  And so all of that encompasses the Best
8  Practices model, of which part of that is the, you
9  know, management style, leadership, shootings, use of
10  force, and management issues.
11  Q. All right. And these references that you've
12  given me, would they use the words, Best Practices?
13  A. Well, I think so, yeah. I think some of them
14  do. You know, and they -- you know, we talk about
15  what the ideal police department, you know, should be.
16  And within the context of that, we have Best Practices
17  as a component as well.
18  Q. Can you give me any specific references that
19  refer to Best Practices besides your own reports?
20  A. References as to?
21  Q. You know, if the --
22  A. You mean give you examples of them?
23  Q. No, no, no. I was talking about with the
24  Taylor -- I know the Taylor -- Robert, I think it is,
25  Taylor --

## Page 123

1  A. Yeah.
2  Q. -- book it is.
3  Would that book talk about best police
4  practices?
5  A. Yes, ma'am. The book is -- you know, has
6  multiple chapters that discuss, for instance, how the
7  recruitment of police officers should be done; how the
8  training of police officers should be done. In fact
9  there's a whole chapter, 14, which deals with
10  liability issues as it pertains to management of
11  police officers.
12  Q. And it would use the terms, Best Practices?
13  A. I think it uses the best -- the term, best
14  practice. I can't confirm that. I don't remember
15  specifically reading that. But it is within the
16  context of that that those publications are created.
17  Q. Is there a difference in your mind between
18  Best Practices and generally accepted practices?
19  A. There is a difference between what -- you
20  know, generally accepted practices in my mind would be
21  conceived as having a range of practices, those that
22  are minimally versus those that are, you know, perhaps
23  within the context of the ideal police department.
24  Best Practices would be in my mind a
25  police department that has executed and applied the

## Page 124

1  ideal components of policing, and it is following that
2  model.
3  Q. But you have in the past offered opinions
4  that the failure to follow the Best Practices model is
5  a basis for deliberate indifference liability?
6  A. I have, yes, ma'am.
7  Q. Now, getting back to the specific areas of
8  inquiry that I was concerned about -- disciplinary
9  system, management of officers who return from
10  disciplinary sanctions, officer-involved shootings,
11  statistic keeping for the purpose of future management
12  steps to correct deficiencies -- can you tell me what
13  sources there are for the standards applicable in
14  those situations?
15  A. I would say that the Police Executive
16  Research Forum would be one of them, where they
17  actually have produced a great deal of publications
18  relevant to supervisory activity.
19  You know, I think there are even a few on
20  liability issues that they have produced.
21  They also conduct an annual conference
22  that they have put in place where they invite -- you
23  know, all the members of PERF are invited, but they
24  also put in speakers, you know, individuals that are
25  well known in the discipline, particularly

Merit Court Reporters

817-336-3042          depos@merittexas.com          817-335-1203

Page 125

1 practitioners. The chief of police from LA, chief of
2 police from New York are typically on panels. In
3 addition, the IACP --
4    Q.  IACP, International Association of Chiefs of
5 Police?
6    A.  Right. Chiefs of Police, yes, ma'am.
7         The IACP also has a series of
8 publications -- which Mr. Reiter cites some of them --
9 with regards to, you know, how to conduct business,
10 how to write policies.
11        Then we also have, you know, the COPS
12 office, which is the Community Policing Services
13 Office out of the Department of Justice, which -- in
14 fact they have a website that, you know, one can even
15 go to and place a question, an inquiry; and there are
16 several articles that automatically are generated to
17 try to respond to that.
18        So there are different sources in the
19 practical aspect of it, and then there are the
20 academic sources that I listed earlier.
21    Q.  The academic sources being Mr. Taylor's book?
22    A.  I would say that that would be an example of
23 one.
24        I would also say that there are articles
25 that have been written on, for instance, use of force,

Page 126

1 liability issues of management. They are written in
2 journals like Police Quarterly, the Criminology
3 Journal, Justice Quarterly, and various other -- you
4 know, Journal of Criminal Justice, for instance, and
5 various other journals that encompass, you know, an
6 array of topics where this would be appropriate for
7 publication.
8    Q.  Are you a member of PERF?
9    A.  I am.
10    Q.  Since when?
11    A.  I believe I became a member two years ago.
12    Q.  Do you receive some sort of publication from
13 them?
14    A.  I do. They have a daily email that they send
15 out with highlights, you know, that you can read from
16 different newspapers throughout the United States.
17        There's also a list of publications that
18 you can order that you receive from them quarterly.
19        There's also a newsletter that they
20 generate. And there's also a conference that they
21 invite people to attend and present papers and all of
22 that.
23    Q.  Have you gone to those conferences?
24    A.  I have not.
25    Q.  But you do receive the emails and the

Page 127

1 newsletter?
2    A.  Yes, ma'am.
3    Q.  And in your work in this case, did you
4 consult any of the PERF literature regarding
5 supervisors or officer-involved shootings --
6    A.  No, ma'am.
7    Q.  -- liability issues?
8    A.  No, ma'am, I did not.
9    Q.  Do you have any specific recollection of
10 reading in your past -- you know, not specifically for
11 this case -- any literature connected with PERF
12 regarding the issues which I've been talking about,
13 about discipline, supervisor liability, management
14 issues relating --
15    A.  Yeah.
16    Q.  -- to returning and officer-involved
17 shootings?
18    A.  Management issues I have. I have a
19 recollection of reading the literature from PERF on --
20 in that specific area.
21    Q.  On what area within management issues?
22    A.  I believe it was -- it had to do with the
23 scope of control that managers have, different tasks
24 that they perform, you know, and the complexity that
25 is in accordance with those principles.

Page 128

1    Q.  Okay. Any others in the past that you can
2 recall?
3    A.  Outside of PERF?
4    Q.  No, no, within PERF.
5    A.  Within PERF.
6    Q.  And we'll go over each one.
7    A.  No, I think those are the ones. Because I've
8 been a member for two years, even though I've been
9 aware of their existence for a number of years. And
10 unequivocally in criminology, because it is a rather,
11 you know, small area of academic work, we run into,
12 you know, each other a great deal at conferences.
13    Q.  Sure.
14    A.  And we have PERF members that participate in
15 our other conferences and do that, so they generate
16 papers. So it's extremely likely that I would have
17 read other literature from them, but I can't
18 specifically recall --
19    Q.  Do you recall anything specifically related
20 to monitoring and evaluating officer-involved
21 shootings?
22    A.  I do not.
23    Q.  You mentioned the IACP, which I know was also
24 addressed in the Toledo deposition?
25    A.  Right.

Job No. 8595                                                    Alejandro del Carmen
Evelyn Ramirez Lluveras, et al v. Javier Pagan Cruz, et al                        August 12, 2010

Page 129

1    Q.  I assume you're not a member?
2    A.  No, I'm not, because I'm not a chief of
3    police.
4    Q.  I know, exactly.
5    A.  Yes, ma'am.
6    Q.  But you're familiar with their model
7    policies?
8    A.  I am.  I actually had a graduate student by
9    the name of Ian Hamilton, who is actually an employee
10   of IACP.  And he -- you know, I think he left the
11   university about four years ago with his master's
12   degree.  And his father is an architect, and he's a
13   professor at UTA.  And he works for them.
14          We frequently -- or I frequently visit
15   their website and, you know, go through the different
16   models that are in place and all of that.
17          So the answer to your question is, yes,
18   ma'am, I've read in the past particular publications
19   that they've had on management-related standards,
20   officer reviews, you know, officer shooting reviews
21   standards, policy recommendations that they've had.
22   And some of the stuff that Mr. Reiter cited in his
23   report.
24   Q.  Did you review that, those model policies in
25   connection with your work in this case?

Page 130

1    A.  No.  I reviewed them prior to this case.  And
2    I thought that was the question, but --
3    Q.  No, no.  That was the former question.
4    A.  Right, yes, ma'am, but not in connection to
5    this case.
6    Q.  Do those model policies -- are they peer
7    reviewed, the model policies?
8    A.  I believe they are constructed among
9    several -- you know, several individual chiefs that
10   they get together and they have sort of a think tank
11   approach to the policy.  And then from that, they
12   generate, you know, what would they construe as being
13   a model policy and standards that they can put in
14   place.
15   Q.  Do you know if police departments -- any
16   police departments use those model policies to provide
17   basic concepts for their work?
18   A.  I think some do.  You know, specifically I
19   can't really name any.  But I know that many of the
20   members of IACP, you know, come back with literature
21   to the police department when they come back.  And
22   they -- you know, for instance, if they learned about
23   a new standard that is in place.
24          And police departments, oftentimes they
25   perform along the lines of copying from each other --

Page 131

1    Q.  Sure.
2    A.  -- what -- you know, if so-and-so police
3    department --
4    Q.  Lawyers do that too.
5    A.  Well, I know.  But if so-and-so, you know, is
6    doing something.  And, you know, especially midsized
7    to smaller cities, you know, they oftentimes try to
8    model what the big cities are doing.  And so they come
9    back with ideas.
10          And in fact oftentimes you hear among the
11   command staff members the common, you know: Oh, my
12   God.  My chief is coming back from IACP, so you know
13   we're going to be working for the next six months on
14   these great, innovative ideas we have to put in place.
15   Q.  And do the model policies of the IACP have
16   anything to do with Best Practices?
17   A.  I think that they established the -- if you
18   want to call it, you know, as a component of the Best
19   Practices model as it pertains to what the ideal
20   police department, you know, should adhere to and how
21   they should perform.
22   Q.  And for what purpose would you go to the
23   website you say you frequently visit?  Why would you
24   do that?
25   A.  Since I do work with police departments, and

Page 132

1    even though my area of focus has been on racial
2    profiling, there's been other areas that I have helped
3    them in, both in training as well as consulting.
4          I go -- I often visit the website to try
5    to keep up with the literature, keep up with what is
6    coming out from the practical aspect of the field.
7    Q.  Now, the Community Policing Services
8    Office -- that was another source your mentioned?
9    A.  Yes, ma'am, it's the COPS office, uh-huh.
10   Q.  And what kind of information do you get from
11   their website?
12   A.  Yeah, they -- they are generated by the
13   Department of Justice.  And what they do is they put
14   together seminars.  I've attended a couple, and these
15   seminars are out of Washington, D.C.  And what they do
16   is they invite certain, you know, police command staff
17   members in from different police departments.  In one
18   case where I was present, they had about 23 different
19   departments represented.
20          And what they do is teach seminars about,
21   for instance, how to write a policy, how to conduct
22   business on, you know, a professional basis, how to
23   improve the quality of lives of many people.
24          And if there is an issue, such as
25   immigration -- as you know in Arizona recently that's

33  (Pages 129 to 132)

Job No. 8595   Case 3:12-cv-02039-GAG   Document 1295-1   Filed 07/25/19   Page 36 of 114   Alejandro del Carmen
Evelyn Ramirez Lluveras, et al v. Javier Pagan Cruz, et al
August 12, 2010

## Page 133

1  been, you know, a rather, you know, interesting, you
2  know, issue that's affecting law enforcement. If
3  there would be an issue such as that that is kind of
4  affecting the paradigm of contemporary law enforcement
5  practices, what they do is they would bring somebody
6  from Arizona, for instance. Or they would have
7  somebody there that would talk to us:
8        You know, hey, this is the challenge that
9  we're having. This may be something that you may have
10  in the coming year or two. You may want to start
11  getting ready for that particular issue.
12        Because panhandlers, as they call them
13  here in Texas -- you know, it's the idea that you have
14  a great deal of illegal aliens that are sitting along
15  the side of the street. And they are looking for a
16  job. They are looking to eat, you know.
17        And the police department is often called
18  to respond to a situation like that. And so from the
19  police management perspective, it's a reality they
20  have to face. But at the same time, the community
21  wants them arrested. The department doesn't want to
22  arrest them, but they want them out of the city.
23        And so those are the complexities that
24  often — you know, so somebody like COPS, they'll put
25  together a publication or series of publications that

## Page 134

1  deal with that particular issue, and they will
2  disseminate that.
3        Q. And have you gone to these seminars?
4        A. I have. Yeah, I have attended two of them,
5  like I told you, at the COPS office. And I actually
6  spoke in one of them.
7        Q. What did you speak on?
8        A. It was on -- I believe it was on community
9  policing and the SARA model issues as well. It was a
10  number of years back, probably about seven or eight
11  years ago.
12        Q. And have you seen any conference materials or
13  other materials from them regarding the issues of
14  officer-involved shootings, disciplinary system,
15  management of officers who returned from disciplinary
16  sanctions?
17        A. Yeah, I believe the management of officers, I
18  have seen or read some documentations on that.
19  Officer-involved shootings as it pertains to community
20  policing and the fact that there's a theory that
21  floats around that says that if you engage in
22  community policing, you're likely going to be reducing
23  excessive use-of-force issues and all of that.
24        Those pieces of literature, components of
25  it, I have read through the COPS office, yes, ma'am.

## Page 135

1        Q. How about maintaining statistics on
2  officer-involved shootings for the purpose of future
3  management steps?
4        A. Not from the COPS office, I haven't seen
5  anything on that.
6        Q. Did you actually read the entire trial?
7        A. Ms. Berkan, I read the entire trial.
8        Q. Did you find any words you didn't understand?
9        A. Yeah, I believe one of them had to do with
10  holster. And you guys in Puerto Rico call it a
11  different name than I --
12        Q. What's the word you know for holster?
13        A. El -- el -- we call it pouch, which is in
14  English, you know. But we call it a pouch.
15        (Clarification by the Reporter.)
16        A. I can't remember what it was called in the
17  depo -- in the transcript. I think it was gabache
18  maybe or something like that? I can't remember,
19  but --
20        Q. Any others? Any other words that you -- you
21  figured out that it was the holster?
22        A. Yes, ma'am, I did. I did.
23        Q. Did you have to go onto dictionaries or
24  anything like that?
25        A. No, but that was the only -- that was one of

## Page 136

1  the few. I learned how to say Humacao and various
2  other words. But I -- there is a person that works at
3  Starbucks that is from Puerto Rico, and I asked him
4  what that word meant; and he told me.
5        Q. Good source.
6        A. Well, you know, it's not an academic source,
7  but I figured he would know.
8        Q. How about chambonear, do you know that word?
9        A. Chambonear, which is to roughen up, I think
10  is what it's called, or close to that. But, yeah,
11  there are a lot of -- as you know, in Spanish there's
12  a variation from region to region, so --
13        Q. Yeah.
14        You mentioned the investigative files of
15  Maria Cabrera's complaint and Mr. Bezares's complaint,
16  which are 24 and 25.
17        Did you see investigative files on any
18  other --
19        A. No, ma'am. What is listed here is what I
20  looked at. I did not see anything else.
21        Q. Well, then you also have a general -- 32 is
22  records of Officer Pagan's -- Pagan's, I'm talking
23  like Mr. McCall -- Pagan's Internal Affairs files?
24        A. Yes, ma'am. There was a -- there's a
25  folder --

Merit Court Reporters
depos@merittexas.com
817-336-3042                                                817-335-1203

Page 137

1    MR. MCCALL:  You've been in the States
2  too long.
3    MS. BERKAN:  Two days.  It messes up my
4  Spanish.
5    (Discussion off the record.)
6    A.  There is a file that I brought with me to
7  give you which has a few of the -- you know, I can't
8  remember how many, but it has some of the records
9  relevant to Officer Pagan's --
10    Q.  Can you just locate that so I know what
11  you're talking about?
12    A.  Sure.  It's going to be a while because I
13  don't have these enumerated.  May I do that during
14  break or --
15    Q.  Yeah, let's do it during a break.
16    A.  Yeah.
17    Q.  The same way, I want to know what you're
18  talking about when you talk about -- well, actually,
19  let me go back to Bezares and Cabrera.
20    Are you familiar with investigations of
21  Mr. Pagan beyond those two?
22    A.  I am not.  What I'm aware of is that on the
23  records of Officer Pagan's Internal Affairs files, if
24  I can remember correctly, when I looked at those,
25  there were some disciplinary -- or some accusations

Page 138

1  made on Officer Pagan's behavior which were noted in
2  this particular file.
3    And he had the original complaint, for
4  lack of a better word, of the individual that felt
5  that he had used his gun inappropriately and
6  threatened her with -- you know, to take her life and
7  various other components.  And so that's part of that.
8    Q.  That would be the Cabrera file?
9    A.  The Cabrera file, yes, ma'am.
10    Q.  And Bezares, what kind of complaint was that?
11    A.  I don't recall offhand exactly what the
12  nature of the complaint was, but I know that there was
13  another allegation that was made against officer -- it
14  was -- what was it on?
15    I can't recall offhand.  But it was some
16  sort of inappropriate behavior that Officer, you know,
17  Pagan had conducted; and this complaint was filed
18  against him.
19    Q.  All right.  That was Bezares?
20    A.  Yes, ma'am.
21    Q.  And those are the only two you are aware of?
22    A.  Yes, ma'am.  The only two that I read,
23  yeah -- that I was given.
24    Q.  If there were more than those two, would that
25  affect your opinion?

Page 139

1    A.  Well, you know, sure.  I mean, if there are
2  complaints filed against officers -- against an
3  officer that, you know, depict the officer, you know,
4  shooting somebody or -- you know, or threatening the
5  life of somebody else, that are grave, obviously it
6  would put this case in a different context.
7    Q.  Well, in the Good case you were concerned
8  about two complaints that had to do with being rude to
9  people, correct?
10    A.  I believe that that was part of the -- part
11  of what I reviewed, yes, ma'am.
12    Q.  Well, didn't you offer an opinion that the
13  fact that the lowest score on some of his evaluations
14  was in community -- relations with the community, plus
15  those two complaints of being rude, was sufficient to
16  put his superiors on notice that there was a problem?
17    A.  Right.  Because the other -- from what I
18  recall in that case, the other scores that he received
19  were rather high.  And so these were the ones that he
20  consistently received as low scorings, or low
21  markings; and, therefore, it would have been
22  noticeable to a supervisor to look at those and
23  highlight the fact that he had some sort of an issue
24  with the community.
25    And if I remember correctly, in that case

Page 140

1  there were some complaints that were made also against
2  the officer by people that said he -- you know, he was
3  rude.  He was -- he talked to me this way.  He was
4  very condescending.
5    So when you add that to the score that he
6  received, you know, that should have highlighted or
7  illustrated to the supervisor that maybe there was
8  some sort of an issue going on.
9    Q.  Have you seen the evaluations of Mr. Pagan?
10    A.  I have not seen the evaluations of Mr. Pagan.
11  I don't believe that that was part of the review.
12    Q.  Do you know if the --
13    A.  It was noted in the report.
14    Q.  Do you know what the scale is of evaluations
15  in Puerto Rico?
16    A.  I don't know the scale.  I read a deposition
17  that was -- that was done by one of his supervisors as
18  to the scale on -- and I think you questioned him on
19  that -- the scale that was used.  But I don't -- I
20  don't remember seeing the scale or being familiar with
21  the scale.
22    Q.  Well, I'll represent to you it's one to five.
23    And do you know if any officers ever get
24  anything below a three?
25    A.  In Puerto Rico or anywhere else?

**Page 141**

1    Q. Yeah, in Puerto Rico.
2    A. No, ma'am, I'm not aware of it.
3    Q. You do know that there may be an arbitrary
4    inflation of evaluations scores? You said it in Good.
5    A. Yeah. I mean, obviously police officers --
6    you know, the same thing as a student evaluation in
7    the classroom. They typically are very generous
8    across the board, you know, with the way that they
9    rank an instructor, you know. So I, you know...
10   Q. All right. Now getting back to your list:
11   Numb 32. I want to know what that is, but we can do
12   that after the break.
13   A. Yes, ma'am.
14   Q. Because you do mention the two investigative
15   files --
16   A. Uh-huh.
17   Q. -- 24 and 25 on your list.
18   A. Right.
19   Q. But there are other files, and I want to know
20   if they are reflected anywhere.
21   A. Okay.
22   Q. How about his training certifications, what
23   is that?
24   A. He had -- in the documents that were provided
25   to me, there were some -- and I brought them also.

**Page 142**

1    Q. Okay.
2    A. There are some certifications of his
3    completion of different trainings that he had taken
4    throughout the police department and --
5    Q. What kind of trainings?
6    A. I believe that it had to do with tactical
7    training. You know, different aspects of his police,
8    you know -- you know, with the realm of policing,
9    so --
10   Q. Do you know if these were trainings related
11   to his being transferred to Tactical Operations
12   Division?
13   A. No, ma'am, I do not.
14   Q. Do these also include training records
15   prior -- you know, his original training records at
16   the academy?
17   A. I believe that there were some that were,
18   because there's paperwork there that I remember
19   reviewing, or looking at, that had to do with the
20   initial application that he submitted. And, you know,
21   some of that initial --
22   Q. His recruitment file?
23   A. His recruitment file, yeah.
24   Q. Have you done a content analysis of the
25   trainings that he received?

**Page 143**

1    A. I have not. I reviewed them to make sure
2    that he had received some training. And plus they
3    weren't given to me, so I wanted to make sure that
4    they had a -- you know, that I had reviewed them. But
5    I have not done a content analysis on them.
6    Q. In the DART case that we talked about at the
7    beginning of the deposition, you did do a content
8    analysis?
9    A. Yes, ma'am, I did.
10   Q. Did you make a conclusion about the adequacy
11   of his training?
12   A. I did not.
13   Q. Let's go to the next one. I mean, again, I'm
14   asking you these things. And then if you look at the
15   document and your memory hasn't been right, I have no
16   problem with you correcting it --
17   A. Sure, I understand.
18   Q. -- because we'll have the documents
19   available. And we'll do that over lunch.
20        The weekly crime reports listed in 27,
21   what is that? Informational file on weekly crime
22   reports?
23   A. These are -- they seem to be, you know,
24   statistical -- and I'll be generous to the
25   terminology -- but statistical, you know, reports that

**Page 144**

1    are produced that have frequencies, you know, numbers
2    that relate to the type of crime that was committed in
3    that particular area at that particular time.
4    Q. Okay. But these have nothing to do with
5    officer-involved crimes and the fact that the --
6    A. No.
7    Q. -- officer might be criminally charged?
8    A. Not necessarily. I believe it encompasses
9    all criminal activity that took place in that area.
10   Q. Do you know if there's any -- within the
11   police department in Puerto Rico, any separate
12   accounting for crimes in which officers are involved?
13   A. From what I recall reading on the deposition
14   of Superintendent Toledo, when you deposed him, from
15   what I recall, he mentioned that there is a separate
16   division within the police department that actually
17   captures some data relevant to --
18   Q. Well, I mean, that's talking about the Office
19   of Public Responsibility, which before -- I've done
20   this for a long time -- used to be called the Office
21   of Public Integrity, which before used to be called
22   the Office of Assistant Superintendent Investigations
23   and Administrative Discipline.
24   A. Right.
25   Q. All right. What kind of records do they

36 (Pages 141 to 144)

**Page 145**

1  keep?
2      That's the same office; it's just been
3  changed. I'll make that representation to you.
4      A.  From my recollection, they keep data relevant
5  to the crime activity that takes place in the
6  different areas of Puerto Rico.  But I don't really
7  know beyond that.
8      Q.  All right.
9      A.  I just went by what --
10     Q.  But you've never seen any documents that
11 provide separate statistics on crimes committed by
12 police officers?
13     A.  In Puerto Rico?
14     Q.  In Puerto Rico.
15     A.  No, ma'am.
16     Q.  In other places have you seen that?
17     A.  The UCR, the Uniform Crime Report, does have
18 data relevant to police shootings, particularly how
19 many police officers have died in the line of duty and
20 how many have been injured.
21         And as you know, they produce this UCR
22 through the FBI in the Crimes in the United States
23 publication.  And then subsequent to that, they use
24 that for -- you know, in other areas.
25     Q.  Okay.  Did this file on weekly crime reports

**Page 146**

1  impact upon your analysis in this case?
2      A.  No, ma'am.
3      Q.  How about the training certifications for
4  Mr. Pagan?
5      A.  No, ma'am.
6      Q.  All right.  Now, the next one I have no idea
7  what you're talking about:  Files relevant to
8  superintendent and supervisors' narratives and
9  memoranda on Officer Pagan?
10     A.  Yeah, this was part of the file that was
11 given to me on Officer Pagan.  I also have those here.
12 Essentially these are notes or scripts that have been
13 written by the superintendent and supervisors that he
14 had relevant to Officer Pagan.
15         So, for instance, if he received a
16 commendation or -- I'm giving you examples; I'm
17 not saying that he received one --
18     Q.  Yeah, we'll look at it later.  Right.
19     A.  -- because I don't remember.  But I'm giving
20 you examples to kind of characterize what was in
21 there.
22         If he had received some sort of, you
23 know, an acknowledgment -- positive or negative --
24 this would be generated in a memorandum which was part
25 of his file.  So that's what was produced to me.

**Page 147**

1      Q.  We'll take a look at that after lunch as
2  well.
3      A.  Sure.
4      Q.  Did you use those files relevant to
5  supervisors and superintendent narratives and
6  memoranda on Officer Pagan in any way in coming to
7  your conclusions in this?
8      A.  I did not, ma'am.
9      Q.  Did you see any disciplinary memos which had
10 been sent to Zulma Diaz?
11     A.  I have not.
12     Q.  Do you know anything about her disciplinary
13 file?
14     A.  I do not.
15     Q.  Do you know how long she's been a police
16 officer?
17     A.  I do not.
18     Q.  Do you know how long Pagan's been a police
19 officer?
20     A.  From what I remember reading on the trial
21 transcript, in which that was actually discussed in
22 passing, obviously it's more than eight years.
23     Q.  Yes, obviously.  We know why.
24     A.  And so -- but I want to say it was less than
25 fifteen years.

**Page 148**

1      Q.  Yeah, you're in the ballpark.  I think it was
2  '97 or '98, somewhere in there.
3      A.  Yeah, I don't remember offhand.
4      Q.  I'd have to look at my own notes on that.
5  But it's late '90s.  He's got like ten, twelve years
6  when the event occurs.
7      A.  Right, right.
8      Q.  Do you have any sense of the expectation of
9  number of complete -- complaints involving excessive
10 force or verbal or physical misconduct with citizens
11 you'd expect of an officer?
12     A.  Okay.  So your question has to do with -- I
13 want to make sure I understand this correctly -- what
14 the threshold would be?  Is that what you're asking?
15     Q.  I'm saying I know there's differences,
16 obviously, between someone who has a desk job and
17 someone on the streets, et cetera.
18     A.  Right.
19     Q.  But as an expert in police administration, as
20 you characterize yourself, would you have a notion of
21 how many complaints would be troublesome over a period
22 of time?
23     A.  It depends on the nature of the complaint.
24     Q.  I'm -- I'll limit myself to interactions with
25 citizens:  rudeness to physical contact, excessive

37 (Pages 145 to 148)

## Page 149

1 force.

2 　　A. Well, again, it depends on the nature of the

3 complaint.

4 　　　　One complaint on excessive use of force

5 is too many. You know, and also, when it comes to

6 characterizing a police officer as being rude or as

7 being unruly or as being out of control, you know, if

8 there is enough evidence to suggest that this officer

9 has had a pattern of this type of behavior -- not

10 necessarily the number of instances.

11 　　　　I know in your question you asked me on

12 the previous cases, you know, would two instances be

13 enough, would one instance be enough? I would argue

14 it has to do with the nature of it.

15 　　　　If there's an officer that obviously

16 shows that he or she has a history of, you know, use

17 of force, violence, disregard for the law, one time

18 would be enough.

19 　　　　Today the COPS office funded, or has

20 funded in the past few years, the -- a

21 computer-generated program that is -- has the, if you

22 want to call it, the aim of identifying early on. You

23 know, it's called the Early Warning System, is what

24 it's called.

25 　　　　And what they do is they try to -- this

## Page 150

1 computer system generates or populates a great deal of

2 information.

3 　　　　For instance, if the officer, you know,

4 was late to work, you know, a number -- even one time,

5 it will record it.

6 　　　　If there was a complaint filed on the

7 officer, that would be recorded.

8 　　　　If the officer became divorced, that

9 would be recorded.

10 　　　　So all of these components would be

11 recorded in this system. And then subsequent to that,

12 it would flag, you know, an officer that would be

13 according to the system.

14 　　　　But every police department has to

15 generate the parameters by which the system should

16 flag it.

17 　　Q. Sure.

18 　　A. So, in other words, if you're a police chief

19 somewhere and you think one or two complaints is

20 enough, then you would design the system in such a way

21 that after the first complaint, it would flag it.

22 　　Q. And flagging would -- I'm sorry.

23 　　A. And flagging it would mean that the officer

24 needs to be approached --

25 　　Q. Counseled?

## Page 151

1 　　A. Counseled, referred to -- you know, not

2 necessarily disciplined, because they already know

3 that there's a system of discipline within the police

4 department. But that there is a place for the officer

5 to be -- you know, to go to and try to address it

6 early on, before we have some sort of a -- you know,

7 an incident that may result in something bigger.

8 　　Q. In the case of Mr. Pagan, did you ever come

9 across any information that indicated that a prior

10 sergeant had filed a complaint against him?

11 　　A. I did not.

12 　　Q. Did you ever come across any information that

13 a prior sergeant had indicated that he had pretty

14 severe discipline issues?

15 　　A. I did not.

16 　　Q. Did you have any information regarding

17 whether his co-worker, Mr. Sustache, thought he was a

18 little volatile? Let's use that word.

19 　　A. I don't recall that from either the trial

20 transcripts or anything else that I read.

21 　　Q. Yeah, but you didn't read Mr. Sustache's

22 deposition?

23 　　A. I don't believe so, ma'am, no.

24 　　Q. Do you have any information about the

25 Tactical Operations Division --

## Page 152

1 　　　　MR. MCCALL: I'm sorry. When you say the

2 Sustache deposition, you're referring to -- because we

3 don't have a transcript yet of the one taken in this

4 case.

5 　　　　MS. BERKAN: Oh, I sent it to you as soon

6 as I got it, before you left Puerto Rico.

7 　　　　MR. MCCALL: You're right. I do have an

8 electronic -- okay.

9 　　　　MS. BERKAN: And there is a Sustache

10 deposition in the other case.

11 　　Q. Did you read in the Sustache deposition in

12 the Santiago case?

13 　　A. I believe I did, yes, ma'am.

14 　　Q. Is it on your list?

15 　　A. I don't know that I --

16 　　Q. I don't think it is.

17 　　A. Yeah, if it's not here, I didn't read it. So

18 I'm going off -- straight by memory reacting to that.

19 But I did not read anything that is beyond this list.

20 So what's in here is what I've read.

21 　　Q. The Edwin Rivera deposition in the other

22 case, in the Santiago case?

23 　　A. No, ma'am, I don't believe that -- if it's

24 not here, I did not read it.

25 　　Q. For the purposes of the record, there was a

Page 153

1    Rivera deposition in the Santiago case, which was the
2    event that had occurred one week earlier.
3         A.  Yes, ma'am.
4         Q.  And there's two Sustache depositions.  One is
5    very recently.  I mean, I took it on July 21st.
6         A.  Right.
7         Q.  So -- and I immediately sent -- as soon as I
8    got the transcript, I sent it to Mr. McCall.  But you
9    certainly didn't have time to read it before your
10   report.  That would be the Sustache deposition in this
11   case.
12        But there is a Sustache deposition in the
13   Santiago case, and I understand you did not read that
14   either?
15        A.  Yes, ma'am.
16        MR. McCALL:  Just to state for the
17   record, we raised a question as to its use in this
18   case.  It's noted in the record of that.  I'm just
19   going to state it.
20        MS. BERKAN:  As to which?  It's prior
21   testimony.
22        MR. McCALL:  There is a distinction as
23   to -- just for the record -- as to Rivera.  There was
24   a particular request as to that one, whether we would
25   be willing to use the one in the prior testimony and

Page 154

1    not depose him again in this case.  And we did agree
2    to that.
3         As to Sustache, it's different factual --
4    both sides have been stated in the record.
5         MS. BERKAN:  Yes.  It is sworn testimony.
6    It will be admissible on summary judgment.  It would
7    be admissible according to Rule 32 of the Federal
8    Rules of Civil Procedure.  So I agree that there is a
9    distinction.
10        MR. McCALL:  I'm not going to go point by
11   point.  It's just noted for the record.
12        MS. BERKAN:  It's noted, yeah.
13        Q.  Okay.  The next item I'd like to ask you
14   about -- actually, let me ask you this:  Do you know
15   how many -- you know the word, me propongo?
16        A.  Yes, ma'am.  I intend.
17        (Clarification by the Reporter.)
18        (Discussion off the record.)
19        Q.  In your mind, me propongo is what?
20        A.  Me propongo is the intent that the, you know,
21   superintendent, or the person in charge, has to
22   discipline the officer.  And so essentially the
23   officer is served with a me propongo which announces
24   to the officer early on what the likely scenario is
25   going to be with regards to the outcome of whatever it

Page 155

1    is that they are investigating or they have resolved
2    on.
3         Q.  When you say early on -- (Laughter) -- after
4    the initial administrative process has taken place?
5         A.  Yes, ma'am.  I say early on, I mean before
6    it's final.  So, yes, ma'am, correct.
7         Q.  Do you know if there was a me propongo in
8    this case?
9         A.  In the case of Pagan, yes, ma'am.
10        Q.  Do you know what date it was?
11        A.  I don't recall the date exactly.  But I know
12   that he was, quote/unquote, served with a me propongo
13   at one point by, I believe it was, Sergeant Figueroa.
14        Q.  Yes.
15        Is there a -- have you seen the document
16   which is dated, I will now tell you, August 30th,
17   2004, which was signed by former police
18   superintendent, Augustine Cartagena, proposing
19   expulsion?
20        A.  I don't believe I saw it, ma'am, no.
21        Q.  All right.  Did you see the document in which
22   the expulsion was reduced to 60 days' suspension in
23   the summer of 2006?
24        A.  I don't believe I've seen that either.
25        Q.  All right.  You do know that it -- there was

Page 156

1    an expulsion order and that it was reduced?
2         A.  Yes, ma'am.  I read that on the --
3         Q.  Or an expulsion suggestion, to be totally --
4         A.  Right, the intent.
5         I believe I read it on a deposition -- or
6    several depositions, and I also read it in
7    Mr. Reiter's report as well.
8         Q.  Okay.  Do you know whether Mr. Pagan was sent
9    to the Tactical Operations Division during the time
10   that the expulsion order was still pending?
11        A.  I believe that he was.
12        Q.  Does that cause you any concern?
13        A.  Well, you know, from the standpoint of what I
14   reviewed --
15        MR. McCALL:  Can I ask you one thing?
16   You're using the phrase, expulsion order.
17        MS. BERKAN:  Expulsion recommendation.
18        A.  All right.  The -- my -- the scope in which I
19   read, once again, Mr. Pagan's record and what had
20   taken place was only to put it in context as to what
21   had happened with Mr. Reiter's report.
22        I didn't see my role as one that would
23   provide comments as to whether or not proper or
24   improper, you know, disciplinary efforts were
25   initiated against Officer Pagan.

## Page 157

1    Q.  I'm not putting it in the context of proper
2  disciplinary efforts. I'm putting it in the context
3  of supervisory decisions that were made in the two
4  years or so that this expulsion recommendation was
5  pending, and whether that caused you any concern as to
6  his assignments when he was pending a possible
7  expulsion.
8    A.  There are two points that I want to make in
9  my response.
10    One of them is that typically in a police
11  department, when an accusation is made against an
12  officer and an investigation is launched, that
13  officer -- depending obviously on the nature of the
14  accusation and the nature of the investigation, that
15  officer -- if it's a grave situation, if it's
16  something that the officer's been accused of killing
17  somebody or has been accused of raping someone, for
18  instance, there's almost an automatic suspension of
19  the officer. The officer is not assigned --
20    Q.  You haven't been to Puerto Rico. Have you
21  ever been to Puerto Rico?
22    A.  I have not, I have not.
23    Q.  That's all right. I'll get to that in a
24  second.
25    A.  But there's typically a suspension of the

## Page 158

1  officer, you know, immediately. You know, sometimes
2  with pay, sometimes without pay, depending, again, on
3  the circumstances that led to that issue.
4    Once the investigation is concluded --
5  and as you know as an attorney, they're very careful
6  about phrasing the word, you know, accused or
7  convicted; because we all have the presumption of
8  innocence.
9    And so it's not until the very end that
10  this particular issue is resolved. Then it's either
11  upheld, or it's denied and the officer comes back to
12  work.
13    In the case of Puerto Rico, my
14  understanding is that this me propongo, or intent
15  order, you know, it's very unusual to have that in
16  place in a police department. Because in most police
17  departments there is no "intent to" announcement.
18    It's simply, you know, you have a meeting
19  with the chief of police, and the end result is well
20  known right away.
21    So in this particular case, what I read
22  and what I know about the me propongo that was served
23  on Officer Pagan, I had assumed when I read this that
24  the -- that they had not taken action against the
25  officer in either reassigning him or discipline or

## Page 159

1  this and the other, because it had not been resolved.
2  You know, the situation had not been -- there was not
3  a final, you know, statement or resolution as to, you
4  know, what had happened.
5    And, therefore, when the me propongo
6  came, you know, my understanding was that it was not
7  final, and that, therefore, you know, the discipline,
8  for lack of a better concept, was not rendered at that
9  point.
10    Q.  That's true.
11    A.  So I made the analogy to what happens in
12  other states and in other places in terms of the
13  disciplinary process, that he was presumed to be
14  innocent until such time that the final word is
15  written that says, this is where you're going to go
16  and that's what you're going to end up doing.
17    Q.  And during that time -- during that time that
18  there is pending a recommendation of an expulsion, and
19  the officer is appealing it through the disciplinary
20  system in Puerto Rico, during that time do you have an
21  opinion as to whether or not the superiors who are
22  dealing with the officer on a daily basis should have
23  access to that information?
24    A.  Well, you know, typically, again going back
25  to, you know, the standard, for lack of a better term,

## Page 160

1  of what happens in other police departments: When an
2  officer is accused of a wrongdoing, there is a
3  specific unit within the police department that
4  handles that particular incident.
5    Q.  Uh-huh.
6    A.  In a typical police department, that would be
7  Internal Affairs. They are a separate branch from,
8  you know, every other branch within a police
9  department; and they report directly to the chief of
10  police. There is no vacuum in between.
11    Q.  But let's talk about --
12    A.  I know. I'm getting to a point.
13    Q.  Get there, please.
14    A.  And so what happens is when you have an
15  incident where a police officer is accused of a
16  wrongdoing, the supervisors that that officer has in
17  the interim, while the investigation is being
18  conducted, are typically not briefed as to what
19  happened in this case or the particular investigation
20  that's taking place; because they actually keep that
21  information confidentially.
22    Now, in reality you have a lot of police
23  officers that read the newspaper. They are aware of,
24  you know, what happened to this person if it's a
25  public, you know, issue. And then at that point it

Merit Court Reporters
817-336-3042                    depos@meritttexas.com                    817-335-1203

Job No. 8595
Evelyn Ramirez Lluveras, et al v. Javier Pagan Cruz, et al

Alejandro del Carmen
August 12, 2010

Page 161

1    leads on to that disclosure.
2        Q.  You read 87.14, I assume?
3        A.  You know, actually I have not.  I read about
4    it, but I didn't read it.
5        Q.  It wasn't among the General Orders you were
6    supplied?
7        A.  I don't think so, ma'am, no.
8        Q.  Are you aware of the fact that 87.14, which
9    Superintendent Toledo said was still in effect,
10   requires supervisors to access the histories and the
11   files -- the disciplinary files of the officers, even
12   those that are not final?
13       A.  I have not.
14       Q.  You don't know if that's required?
15       A.  No, I did not know that that was required.
16       Q.  Have you read the Gutierrez case?
17       A.  I have not.
18       Q.  Do you know the Gutierrez case?
19       A.  I know about it.
20       Q.  Do you know if 87.14 -- or the responsibility
21   of supervisors to monitor their agents in terms of
22   what their disciplinary files and histories look
23   like -- are discussed in Gutierrez?
24       A.  Not to my knowledge, ma'am, no.
25       Q.  You've never been to Puerto Rico?

Page 162

1        A.  I've never been to Puerto Rico.
2        Q.  What's the largest police force for which
3    you've done counseling?
4        A.  Training for?
5        Q.  I mean consulting.  Consulting.  I'm sorry,
6    wrong word.
7        A.  Yeah.
8            The City of Fort Worth would be one of
9    them.
10       Q.  How big is that?
11       A.  You know, offhand I can't remember how many
12   officers, but I would say probably about 800.
13       Q.  Okay.
14       A.  To a thousand.
15           And then the City of Arlington I have
16   worked for -- done some work for.  That has
17   approximately 550 officers.
18           So -- and then of course I've trained the
19   chiefs of polices from agencies like Houston, which
20   have about 3,000 officers.
21       Q.  So you've never had direct contact with a
22   police force -- in terms of your consulting work -- of
23   the size of Puerto Rico's?
24       A.  Puerto Rico Police Department, having 15,000
25   officers, and a capacity of 20,000 from what I

Page 163

1    remember reading --
2        Q.  It's been 20,000 in the past.
3        A.  Okay, yeah.  But it's 15 right now from what
4    I read, or close to that.
5            Regardless, though, a large number such
6    as that one is very unusual in the United States.  I
7    think you would only find perhaps LA, New York, and
8    Puerto Rico to be --
9        Q.  It goes New York, Chicago, Puerto Rico.  And
10   Chicago and Puerto Rico are always battling for second
11   and third.  And then LA right after that.
12       A.  It is a very large police department.
13       Q.  Do you know how many recommendations for
14   expulsion there are on an annual basis in Puerto Rico?
15       A.  Superintendent Toledo I think alluded to
16   that, but I can't recall offhand from his deposition
17   how many he said.  Although, I think I read in
18   Mr. Reiter's report that there were close to 10,000
19   maybe.  Maybe that number is --
20       Q.  No, I'm talking about recommendations for
21   expulsion.
22       A.  Oh, within the complaint -- no, I'm sorry.  I
23   did not -- I misunderstood your question.
24           I don't know.  I don't know that.
25       Q.  All right.  Have you looked at any statistics

Page 164

1    produced -- I think you say it in one of your -- don't
2    you say statistics somewhere?  Or is it just the
3    weekly crime reports?
4        A.  No, just the weekly crime reports.
5        Q.  I'm sorry, I misspoke.
6            Would it surprise you to learn that less
7    than 30 -- or somewhere around 30 officers of the
8    15,000 or so are expelled every year?
9        A.  That would be unusual.
10       Q.  What would be unusual?
11       A.  The number of people that are disciplined, 30
12   out of 15,000.
13       Q.  All right.  So would you expect that the
14   supervisors who receive a me propongo up to and
15   including expulsion -- or just on expulsion should
16   look at the underlying situation which led to the
17   me propongo?
18       A.  If it would be part of the policy -- and once
19   again let me remind you, I did not read the specific
20   policy that you cited.
21       Q.  87.14.
22       A.  87.14.  But if it would be part of the
23   component of their duties, absolutely, police officers
24   should read and adhere to the policy.
25       Q.  The number that you referred to earlier --

41 (Pages 161 to 164)

Page 165

1    which I believe, and correct me if I'm wrong -- was
2    8,000, was the number of complaints each year,
3    something like that?
4        A.   It was a vague recollection.
5        Q.   Yeah, it's somewhere in those --
6        A.   I think it's somewhere around 8 to 10,000
7    maybe.  I can't recall offhand exactly, but I know
8    it's in the thousands, so --
9        Q.   Yeah.
10            Do you know what the word, archivo means
11   in the context of the Puerto Rico --
12           (Clarification by the Reporter.)
13       A.   I'm sorry, what was your question again?
14       Q.   Do you know what the word, archivo, means in
15   the context of the disciplinary system in Puerto Rico?
16       A.   I do not.
17       Q.   Do you remember seeing it in any of the files
18   that you were -- observed -- or read?
19       A.   Maybe.  Maybe, yeah.  But I don't seem to
20   recall offhand.
21       Q.   What can you tell me about the way the
22   disciplinary system works in Puerto Rico?
23       A.   My understanding of it is that -- and as per
24   the deposition of Superintendent Toledo --
25       Q.   Uh-huh.

Page 166

1        A.   -- that at some point the Legislature became
2    very concerned with the number of complaints that had
3    been filed on police officers on an annual basis, and
4    that given their concern for the large number, that
5    they simply enacted or placed this auxiliary
6    superintendent position in place.
7        Q.   Which one?
8        A.   I'm sorry?
9        Q.   What auxiliary superintendent seat?
10       A.   That they created an auxiliary superintendent
11   position in place to handle complaints or to
12   administer the complaints that were going to be filed
13   against police officers.
14            And that this particular -- that even
15   though the superintendent was the ultimate word, per
16   se, you know, in terms of the actions of discipline
17   that were relevant to an officer, this auxiliary
18   superintendent was the person that would be in charge
19   of, you know, processing the information and then
20   assessing whether or not the case had any merits, and
21   then simply referring it on to be investigated.
22            And then me propongo would come in
23   afterwards with the auxiliary superintendent's
24   signature to the --
25       Q.   That's what Mr. Toledo specified.  But the

Page 167

1    auxiliary superintendent was not for disciplinary
2    purposes.  The auxiliary superintendent was to relieve
3    the police superintendent of some of his work, right?
4        A.   Right.
5        Q.   Which he said he used to have that person --
6        A.   Do that particular issue --
7        Q.   -- do that particular --
8        A.   -- right, yes, ma'am.
9        Q.   But do you know if he had the ultimate
10   authority, the police superintendent?
11       A.   Well, his answer to you on the deposition was
12   that the auxiliary superintendent had the ultimate
13   authority to do this.
14       Q.   What a surprise.
15            Do you know what the statute says?
16       A.   But I presume, ma'am, that based on the
17   models of other police agencies throughout the
18   country, the last word always stops with the chief of
19   police.
20       Q.   You actually testified to that in one of the
21   depos, which I could find.
22       A.   Right.
23       Q.   You said the chief of police is the --
24       A.   Yeah.  And that's -- I understand that as an
25   attorney, you have to go back to the previous

Page 168

1    depositions that I've had.  But I promise you, I'm
2    giving you candid responses.
3        Q.   No, no, I appreciate that.
4            Do you know -- when I asked you about the
5    disciplinary system and you went right to Toledo and
6    the assistant superintendent -- and I say assistant
7    superintendent because the word in Spanish is
8    auxiliary, and nobody knows whether we should
9    translate it as auxiliary or assistant.
10           MS. BERKAN:  Just in time for lunch
11   Mr. Gray comes in.
12           (Discussion off the record.)
13       Q.   I want to know what you know -- my question
14   -- and I know you answered it in terms of the
15   auxiliary.  And what I was explaining was that some of
16   the translations of auxiliary are assistant, and some
17   are auxiliary; but we're talking the same thing.
18       A.   Yes, ma'am.
19       Q.   What I want to know is what you know about
20   the disciplinary system in Puerto Rico from the time
21   the complaint is filed up until it gets to the
22   me propongo.
23       A.   It's what I just told you.  I don't know
24   anything beyond that.  I mean, all I know is that when
25   there is an accusation made --

### Page 169

1   Q.  When you say accusation, you're not talking
2   criminal accusation --
3   A.  No, no, no, I'm talking about --
4   Q.  -- you're talking about a disciplinary
5   complaint?
6   A.  Yes, ma'am, an institutional complaint that
7   is made against an officer.
8   It is referred on to a specific unit that
9   reviews the premises of the accusation.
10  Q.  And do you know if there were determinations
11  that -- in this case the specific unit was the -- I
12  just don't know what time it was, but what we have
13  referred to at different times as the auxiliary
14  superintendent overseeing the investigation, and
15  Disciplinary Affairs, and then became Public
16  Integrity, and then became Professional
17  Responsibility -- I don't know exactly what point
18  those things -- but that unit, with those different
19  names over time, do you know if they made a
20  determination about whether the domestic violence
21  complaint was substantiated at any time?
22  A.  I don't know that.
23  Q.  Do you know how many steps the complaint went
24  through in its eight years?
25  A.  I do not know that.

### Page 170

1   Q.  Do you know the steps -- do you know if it
2   was dealt with, with the Domestic Violence Unit at any
3   time?
4   A.  I don't know.
5   I do know that there was a, you know,
6   statement made that -- I believe in Mr. Reiter's
7   report, that one of the individuals that advocates for
8   domestic violation prevention, this and the other,
9   said it was out of the ordinary that Officer Pagan had
10  not been referred to, you know, counseling and various
11  other components.  I can't remember the exact language
12  he used.
13  Q.  You're talking Vilma Fernandez?
14  A.  Fernandez, right.
15  Q.  And do you know that there was actually a
16  referral to psychological counseling, but there was no
17  psychological counseling given?
18  A.  That was -- yes, ma'am.  I read that
19  somewhere in either Mr. Reiter's report or the
20  original transcript.
21  Q.  Do you know why it took eight years for this
22  discipline to come down?
23  A.  I do not know.
24  Q.  Do you know if that kind of delay is frequent
25  in Puerto Rico?

### Page 171

1   A.  In Puerto Rico, I do not know.
2   Q.  Once the me propongo comes down, do you know
3   what the system is beyond that?
4   A.  I do not.
5   Q.  Do you know how many opportunities the police
6   officer has to question the discipline that's being
7   imposed?
8   A.  I believe one time, from what I read, the --
9   once Sergeant Figueroa served Officer Pagan with the
10  documents -- and again I'm going by their depositions
11  and what they stated to you -- the -- my understanding
12  was that Officer Pagan had an opportunity to appeal,
13  you know, the me propongo, and that at that point then
14  a final resolution would be initiated.
15  Q.  Do you know if Officer Pagan -- did you read
16  Officer Pagan's deposition in the Santiago case, which
17  was specifically and explicitly stipulated would serve
18  for both cases?
19  A.  I don't think it's listed here, no, ma'am.
20  Q.  Okay.  Do you know if Officer Pagan, during
21  the time that he had the me propongo pending for his
22  expulsion, feared expulsion?
23  A.  I do not know that either.
24  Q.  You haven't seen his testimony regarding
25  that?

### Page 172

1   A.  I have not, no, ma'am.
2   Q.  Would it impact upon your testimony -- on
3   your opinion if he testified that he was sure he would
4   get beyond it, that he wasn't worried about the
5   me propongo?
6   A.  Not on my opinion about these five
7   defendants.  But it would change my opinion -- or it
8   would affect my opinion as it pertains to -- you know,
9   to the process by which they would have that in place,
10  what would lead an officer to assume that.
11  Q.  Okay.  Did you see any other testimonies from
12  other supervisors or officers, line officers, to the
13  effect that it was very typical for complaints to
14  languish in the system for many years?
15  A.  I did not.
16  Q.  Did you see Mr. Pagan's -- strike that.
17  Did you see how long other complaints
18  against Mr. Pagan had lasted in the disciplinary
19  system?
20  A.  I did not.  I did not see that, no.
21  Q.  Do you -- would you agree with me that the
22  failures or strengths of a disciplinary system are
23  within the authority of the police superintendent?
24  A.  The police chief or supervisor, yes, ma'am.
25  Q.  Are you familiar -- I asked you about

Page 173

1  Gutierrez.
2         Are you familiar with Bordanaro?
3  **A.  I'm not.**
4  Q.  Do you know what circuit we're in?
5  **A.  First.**
6  Q.  You got that one.  They got you on another
7  depo there.
8  **A.  They did, they did.**
9  Q.  I figured that you would know this one.
10 **A.  Yes, ma'am.  I've learned.**
11 Q.  Do you know if the police superintendent was
12 found liable in Gutierrez?
13 **A.  I do not know that.**
14 Q.  So you wouldn't know, obviously, that it was
15 related to his implementation of a disciplinary system
16 that was inadequate?
17        MR. MCCALL:  Objection to the form,
18 assuming that's exactly what he was.  But if you
19 want to state it as a hypothetical, I don't have any
20 objection to it.
21        MS. BERKAN:  No.  I mean, I was the
22 lawyer on that case.  I went to a five-week trial, so
23 I know.  So, object to the form.
24 Q.  Do you -- I noticed in your report that you
25 indicated a couple of times -- and we can get to the

Page 174

1  precise language because I'll be going into that more
2  after lunch.
3         But you indicated a couple of times that
4  Mr. Reiter had somehow acted beyond his scope by
5  bringing to bear his knowledge of previous cases
6  within Puerto Rico and the disciplinary system in
7  Puerto Rico.
8         Is that your opinion?
9  **A.  I felt that as -- it was out of the ordinary**
10 **that he would write that this was -- he was placing it**
11 **almost in context as far as the Puerto Rico Police**
12 **Department, you know, with regards to behaviors and**
13 **procedures and norms that he was familiar with as an**
14 **expert.**
15 **        I felt that that was unusual, for an**
16 **expert to characterize a police department, other --**
17 **outside of the record, you know, outside of what was**
18 **there in place.**
19 Q.  Well, saying it's unusual I may well agree
20 with you.  But if he has that knowledge and has
21 reviewed hundreds of complaints, and has looked at
22 documents on the disciplinary system at least since
23 1987 or so, which was when I -- the Gutierrez case was
24 being litigated, do you think it's improper for him to
25 bring that knowledge to bear on his opinion?

Page 175

1         MR. MCCALL:  I would object to the form
2  of that question in that there's a lot of factual
3  predicates stated in it --
4         MS. BERKAN:  Fine.
5         MR. MCCALL:  -- that are not proven here,
6  that Mr. Reiter had in fact looked at all these
7  documents and what the extent of it was.
8         MS. BERKAN:  Fine.
9  Q.  Assume for purposes of this question -- and
10 I'm a very honest person.
11 **A.  And so am I.**
12 Q.  I guess that sense.  I'm happy about that.
13        Assume for the purpose of this question
14 that Mr. Reiter has in fact reviewed hundreds of
15 disciplinary complaints, in my cases and in other
16 cases in Puerto Rico; has looked closely at 87.14; has
17 looked closely at other General Orders related to this
18 matter; has seen the delays in the disciplinary
19 system.
20        If this were all true, would it be
21 improper in your view for him as an expert to use that
22 knowledge in forming an opinion?
23 **A.  Let me give you an answer, okay --**
24 Q.  Yeah --
25 **A.  -- and it's an honest answer.**

Page 176

1  Q.  That's what I want.  Uh-huh?
2  **A.  For me to walk up to a police department,**
3  **just any police department, and as an expert or as a**
4  **researcher -- or as a person, rather, not as a**
5  **researcher --**
6  Q.  Uh-huh.
7  **A.  -- to know that -- he's watched the news,**
8  **let's say, and read books and read articles about a**
9  **number of police officers that have been related to**
10 **use of force and scandals and this and the other.**
11 **        To me -- that doesn't suffice to me to**
12 **have enough material to be able to write about it and**
13 **say, this police department is in trouble.**
14 **        Because for all I know, it could very**
15 **well be that out of the entire population -- and I'm**
16 **not characterizing Puerto Rico one way or the other,**
17 **Ms. Berkan.  But I'm just letting you know that if you**
18 **look at a police department, you can go by what your**
19 **experience has been with them.  Even in the context of**
20 **a few cases, albeit some of them are very famous and**
21 **landmark cases that you worked with him on before, to**
22 **sort of characterize the entire police department as**
23 **such.**
24 **        If Mr. Reiter had said that he had**
25 **conducted research on this police department and that**

Page 177

1  he compared it to other police departments that were
2  similar to that, and that he was able to compare and
3  contrast use-of-force incidents, delays of
4  disciplinary actions and all of that, I believe that
5  that would carry merit.
6      Q.  No, but that's a different question.  I
7  appreciate your answer, but it's a different question.
8          Can Mr. Reiter in your opinion, in
9  developing an opinion in this case, draw on his
10  previous review of hundreds of depositions, hundreds
11  of police disciplinary files, General Orders,
12  testimony of previous superintendents, previous
13  testimony of Mr. Toledo, et cetera; or does he have to
14  be limited to the documents reviewed in this case?
15          MR. MCCALL:  Just same objection noted.
16          MS. BERKAN:  Fine.  Your objection is
17  noted.
18      A.  He can look at anything he wants, you know.
19      Q.  But do you think it's improper in developing
20  an expert opinion that he brings to bear his prior
21  knowledge of this department through such matters as
22  deposition -- sworn deposition testimony, reports,
23  disciplinary files, historales, et cetera?
24      A.  I think not only is it unusual, which you
25  both agreed on, but I would say that it is -- I mean,

Page 178

1  I don't know how to answer that, you know.
2  (Laughter.)
3      Q.  Is it improper?  Does he have to ignore
4  everything that he knows from before?
5      A.  No, he doesn't have to ignore everything he
6  knows from before.  But I would say that it's unusual.
7  And it's also something that, you know, unless there
8  is some basis for it, I don't know that there would be
9  any utility, other than perhaps his personal
10  reflections and what he draws from.  But not relevant
11  to these five supervisors.
12      Q.  What do you mean, some basis for it?
13      A.  I'm sorry?
14      Q.  What do you mean, some basis for it?
15      A.  Well, like, you know, if I'm aware that a
16  police department, by virtue of working hundreds of
17  depositions and hundreds of cases in this police
18  department, that this police department seems to have
19  issues relevant to use of force, management aspects
20  and all of that, I would use that knowledge, you know,
21  as a -- if you want to call it, as appropriate history
22  and context in which I can write the report.
23          But I don't know that I would refer to it
24  in a report as being substantive of five defendants
25  that are being accused of inappropriate management of

Page 179

1  a police officer.
2      Q.  Well, Mr. Toledo, between the years from
3  1997, let's say, until 2007, for how many of those
4  years was Mr. Toledo the police superintendent?
5      A.  He survived I believe two governors from two
6  different parties --
7      Q.  That's right.
8      A.  -- from what I remember reading.
9      Q.  And he got hell for it, I'll tell you, from
10  the other party.
11      A.  And so I -- you know, he's been -- he was
12  there for a while, you know.
13      Q.  Yeah.
14          So would information about what had
15  occurred and that had been the subject of previous
16  litigation, specifically with respect to Mr. Toledo or
17  with respect to disciplinary issues under his control
18  at that point, would that information go to his
19  liability in any way?
20          MR. MCCALL:  Objection to the form of
21  that, in that it assumes that what Reiter was doing
22  actually focused on that, which I'm not sure has been
23  established in his report or here.
24          MS. BERKAN:  Fine.
25      Q.  Could you answer the question?

Page 180

1      A.  Could you restate the question?  Sorry.
2      Q.  I probably can't.
3      A.  I'm sorry.
4      Q.  If Mr. Reiter -- assume for the purpose of
5  this question that Mr. Reiter has analyzed documents
6  regarding the disciplinary system in place during the
7  superintendencies -- it was two different times --
8      A.  Uh-huh.
9      Q.  -- of Mr. Toledo, would it be proper for
10  Mr. Reiter to employ his knowledge about that -- those
11  disciplinary processes while Mr. Toledo was
12  superintendent, even if they occurred before this
13  case?
14      A.  I would say that it would be appropriate for
15  him to have used that and placed in historical context
16  in developing an opinion.
17      Q.  As we speak today, have you read any case law
18  which specifically addresses failings -- disciplinary
19  failings in the Puerto Rico Police Department?
20      A.  No, ma'am.
21      Q.  The General Orders that you refer to in your
22  list -- where are they -- Number 29.  Do you know what
23  those General Orders are?
24      A.  Not offhand, ma'am.  I've got them here too.
25  I'll be glad to show you those after lunch.

45  (Pages 177 to 180)

**Page 181**

1  Q. All right. And the human resources and
2  police records, what are those, the next one?
3  A. That's what we discussed earlier. They're
4  actually the original paperwork that Officer Pagan
5  filled out upon the scope of employment.
6  Q. And disciplinary resolutions, informational
7  sheets, would those be what's called historales?
8  A. Historales, yes, ma'am, I believe so.
9  Q. Do you know what historales are used for in
10 the context of the Puerto Rico disciplinary system?
11 A. I do not. But I imagine that they are used
12 as a -- you know, the history of the officer's, you
13 know, actions and behaviors for the past, you know,
14 number of years.
15 Q. All right. I think we're at a logical point
16 for a break, having received a note to that effect
17 from my co-counsel.
18     MR. MCCALL: Lunch.
19     MS. BERKAN: Let's go off the record.
20     (Discussion off the record.)
21 Q. Okay. I'm sorry, I was not entirely truthful
22 when I said we're going for lunch.
23 A. Okay.
24 Q. I have one last question.
25     It was Number 55 on your list, which is

**Page 182**

1  the deposition of Jose Rivera Rodriguez. What was
2  that, do you recall?
3  A. Not offhand, no.
4  Q. Do you recall who Rivera Rodriguez was -- is?
5  A. I believe it was a witness, but I can't
6  remember exactly what else was on there, no.
7  Q. All right.
8     MS. BERKAN: So let's take the break.
9  And we'll do what we said. And I thank the court
10 reporter for going off the record.
11     (Recess for lunch.)
12 Q. All right. We've had a moment after lunch to
13 do a quick review of the documentary evidence that was
14 considered by Professor del Carmen, and I would like
15 to ask Professor del Carmen that if there's any -- I
16 think that last file you put is also documentary
17 evidence, that's not a depo?
18 A. Right. If you want to see them, you can see
19 them.
20 Q. We're interested -- and the agreement we made
21 was as follows:
22     That we're going to make some
23 representations for the record now about the content
24 of the information reviewed by Mr. -- by Professor
25 del Carmen. Since I go mister, I try to say

**Page 183**

1  professor.
2  A. That's okay, you're fine.
3  Q. And where possible we'll make reference to
4  the Bates stamps, which we've said throughout this
5  entire litigation was done by my office as I received
6  the documents.
7     Dr. del Carmen has agreed that within the
8  next few days --
9  A. (Witness nods head up and down.)
10 Q. -- subject to his own, you know, needs and
11 all that -- so you don't have to worry about it being
12 tomorrow or anything --
13 A. Thank you.
14 Q. -- that he will take this to a photocopying
15 place, whether internal or external I don't know, and
16 make copies of those documents which are not
17 depositions --
18 A. (Witness nods head up and down.)
19 Q. -- or trial transcripts.
20 A. (Witness nods head up and down.)
21 Q. Because the representation has been made to
22 us, which we accept obviously, that the depositions
23 that are listed in your report were sent in their
24 entirety. And since we already have that, there's no
25 need for us to get it again.

**Page 184**

1  A. Yes, ma'am.
2  Q. But we do want to have a sense -- and some of
3  the other listings in your report show -- they're
4  given a title which was given. And we didn't know
5  what was comprehended within that title.
6     We're going to identify those documents,
7  you'll make the photocopies, you'll make them
8  available to Mr. McCall, who will then make sets
9  either electronically or otherwise available to all
10 the other counsel in the case, including those who are
11 not here present.
12     So with that caveat, I have a couple of
13 questions. First question is, I have in front of me
14 the Pedro Toledo deposition and there are some marks
15 on it, and with some paragraphs bracketed or circled.
16 I don't know if this is true of other depositions,
17 but -- who made those marks?
18 A. I did, ma'am.
19 Q. All right. Well then, before the end of the
20 day, I may want to just take a quick look at the
21 depositions just so see those marks?
22 A. Sure.
23 Q. Only for that purpose, all right?
24 A. Sure.
25 Q. So I can see what parts you -- when you make

Job No. 8595
Evelyn Ramirez Lluveras, et al v. Javier Pagan Cruz, et al

Alejandro del Carmen
August 12, 2010

Page 185

1  those marks, circling or bracketing, was it because
2  you saw it to be of some significance?
3      A. I thought it made certain points that I
4  wanted to kind of go back and read when I was reading
5  them, yes, ma'am.
6      Q. All right. That's what I assumed.
7          So we'll go through those depos at
8  another break just to identify those pages where there
9  are marks and maybe get photocopies of those pages
10 alone.
11     A. Yes, ma'am.
12     Q. Other than that we don't need the depos or
13 the trial transcripts.
14         Now let's go over the files one by one,
15 get a sense of where -- and if you can have your
16 listing of documents, Exhibit A, on Page 24 of your
17 report --
18     A. Yes, ma'am.
19     Q. -- before you?
20         And I'm going to show you the files one
21 by one, and I'll make reference to the Bates stamps.
22 I have, in reverse order, 69 -- 000069
23 through 72. And this is one file.
24         And I have some unmarked pages, and then
25 I have 68 down to -- well, 68 and 67, and then an

Page 186

1  unmarked page. It just may be that my office didn't
2  Bates stamp them all, because they seem to be
3  sequential.
4      A. Right.
5      Q. And then I have 13 down to?
6          MS. MENDEZ: 4?
7          MS. BERKAN: No, I think 6.
8      Q. 13 down to 6, and then I go back to 64 down
9  to -- and the references I'm making in page numbers
10 are all to my own Bates stamps from my office -- 59.
11 And then 49 --
12         MR. MCCALL: Just to make it clear, I
13 think for all of these it's like three or four zeros
14 before --
15         MS. BERKAN: Yeah, before this they're
16 all zeros. These were obviously the first documents
17 we got.
18         MR. MCCALL: Okay.
19         MS. BERKAN: And I'm doing it in reverse
20 order.
21         MR. MCCALL: You said 64 to something and
22 I didn't get it.
23         MS. MENDEZ: 59.
24         MR. MCCALL: Thank you.
25     Q. And 49 to 43 -- or 43 to 49. And Number 5

Page 187

1  and Number 58.
2          All right, now, having now identified the
3  documents in this one file, can you tell me what this
4  file is in terms of your listing on Exhibit A?
5      A. And I will try to reconcile it as best as I
6  can, Ms. Berkan --
7      Q. I understand.
8      A. -- because I should have labeled it, and I
9  didn't label them.
10     Q. No, I understand.
11         (Short pause.)
12     A. Here's one that's labeled, I believe -- this
13 may be the Item Number 30, which is the human
14 resources and police records of Officer Pagan.
15     Q. Okay. They do some of --
16     A. Yes, ma'am. They have the solicited empleo,
17 which is an employment --
18     Q. Application?
19     A. Application for employment.
20         (Clarification by the Reporter.)
21     Q. And there's another file which I believe is
22 related to that, so I'm going to go to it now --
23     A. Yes, ma'am.
24     Q. -- which is Pages 1 through 3, 4 -- 1 through
25 4 instead of 1 through 3 -- 14 through -- seems to be

Page 188

1  sequential, just going along, and in the right order
2  this time.
3      A. Right, right.
4      Q. 14 through 213. And then there are some
5  little marks which I believe are in your handwriting,
6  Professor --
7      A. Yes, ma'am.
8      Q. -- next --
9      A. No, those are not mine.
10     Q. Those are not yours?
11     A. Those I received just as such.
12     Q. All right. And the ones -- the last four
13 pages have to do with leave time, and they appear not
14 to be numbered.
15         Would these -- did I get to the last
16 number? 1 through --
17         THE REPORTER: 213.
18         MS. BERKAN: 213. This is some 200
19 pages.
20         MR. MCCALL: Is it 1 through 213, or 1
21 through 4 and then 14 through 213.
22         MS. BERKAN: 1 through 4 and then 14
23 through 213.
24         MR. MCCALL: Okay, thank you.
25     Q. There's a -- in the first page there's a

47 (Pages 185 to 188)

---

**Page 189**

1  little pink Post-It which says "missing," and then it
2  shows some missing pages.
3       Do you know who wrote that?
4       **A.  I have no idea.**
5       Q.  All right.  That's the way it came to you?
6       **A.  Yes, ma'am.**
7       Q.  Now, would it be fair to say that this file
8  that I'm now working with are also from his personnel
9  records?
10      **A.  From Officer Pagan's?**
11      Q.  Yeah.
12      **A.  Yes, ma'am, I think so.**
13      Q.  That's what it appears to me.  There's no big
14 mystery there.
15      **A.  Right.**
16      Q.  So that would also -- that would be part
17 of -- that would be Number 23, I believe, because
18 that's really his personnel file.
19      **A.  Yes, ma'am.**
20      Q.  All right.  Now, those two files, which are
21 the first two that I'm identifying with the Bates
22 stamps that I've said, did you rely on those files in
23 any way in forming the opinions in your case?
24      **A.  No, ma'am.  I looked at them just to make**
25 **sure that, you know, I had looked at all the**

---

**Page 190**

1       **information that was there in place.**
2       Q.  Okay, all right.  But you can't today
3  identify a particular opinion or a particular
4  conclusion that depended on those files?
5       **A.  No, ma'am.**
6       Q.  All right.  Let's now go to -- all right -- a
7  file that starts at Page 576, and apparently -- I
8  won't swear to it because I'm not going to go over
9  each and every page.  But it looks to me to be
10 sequentially in order up to 718.
11      **A.  (Witness nods head up and down.)**
12      Q.  I don't immediately see any gaps, but
13 that's --
14      **A.  Sure.**
15      Q.  -- what it appears to be.
16      Can you tell me what that is?  Again, I'm
17 referring to -- the numbers have 00 in front of them,
18 and it -- I'm referring to our Bates stamps.
19      **A.  These seem to be disciplinary records of**
20 **Officer Pagan.**
21      Q.  Related to a particular complainant?
22      **A.  To Fernando Bezares.**
23      Q.  Can I take a look at it quickly?
24      **A.  Yes, ma'am.**
25      Q.  No, the whole file.

---

**Page 191**

1       **A.  Yeah, there you go.**
2       Q.  And I will ask you while I'm just quickly
3  looking at it if anything in this file -- did you rely
4  on anything in this file with respect to the opinions
5  that you reached in this case?
6       **A.  No, ma'am.**
7       Q.  And do you recall what Mr. Bezares's
8  allegations were in broad terms?
9       **A.  Not offhand.  Once again, I believe it has to**
10 **do with Officer Pagan's behavior towards him; but I**
11 **can't recall exactly what.  Perhaps if I get a chance**
12 **to look at one of the pages --**
13      Q.  Sure.
14      **A.  -- I can remind myself.**
15      Q.  And there's a notification for April 1st,
16 2004, the first document in this file, which is
17 titled, Archivo.  That's the word that we talked about
18 earlier today?
19      **A.  Yes, ma'am.**
20      Q.  And you don't know what that means?
21      **A.  Archivo typically means when you are going to**
22 **put something in an archive or be able to secure it in**
23 **a place for recordkeeping.  I know what the word**
24 **means, but I don't know what it means in the context**
25 **of that particular police department as to what they**

---

**Page 192**

1       do with it.
2       Q.  All right.
3       **A.  Would you like for me to review this or --**
4       Q.  No, no.  For now, no.
5       **A.  Okay.**
6       Q.  Just a minute.
7       **A.  Sure.**
8            (Short pause.)
9            MS. BERKAN:  Off the record a sec.
10           (Discussion off the record.)
11      Q.  I also have -- it's in the same file, but it
12 covers more than one incident from my quick review.
13 And maybe that had got -- maybe the papers were mixed
14 up.
15      All right.  There is one -- three
16 documents:  116, 117, and 118.  They're even out of
17 order.  I'm going to show you the first three
18 documents of this file, because they appear to be
19 something different from the other documents in the
20 file.
21      **A.  Yes, ma'am.**
22      Q.  All right.  Those have to do with the
23 suspension and expulsion related to Mr. Caceres'
24 death?
25      **A.  Yes, ma'am.**

---

Merit Court Reporters
817-336-3042          depos@merittexas.com          817-335-1203

Page 193

1    Q.  All right.  Then I have within that same
2  file -- and we'll separate it but keep it in the same
3  file --
4    A.  Sure.
5    Q.  -- I have documents which begin at Bates
6  Stamp 976 -- no, there's one document at 976, one
7  document at 1010 through --
8        MR. MCCALL:  I'm sorry, what was the
9  other number you said?
10        MS. BERKAN:  976.
11        MR. MCCALL:  The second one.
12        MS. BERKAN:  1010 through --
13        MR. MCCALL:  Thank you.
14        MS. BERKAN:  These do seem to be
15  sequential.
16    Q.  Okay.  It's a matter of the documents being
17  out of order, because I saw my -- all right.
18        This file, besides those two or three
19  pages I just showed you which appear to be about the
20  instant case, there's sequential documents from 1010
21  through 1042.  Let me hand you those documents.
22        Can you tell me what they appear to be
23  about?
24    A.  This seems to be a disciplinary resolution on
25  Officer Pagan on the 8th of May of the year 2000,

Page 194

1  around that time.
2    Q.  And there's a recommendation -- they find
3  that the complaint is sustained?
4    A.  Yes, ma'am.
5    Q.  All right.  And there's a recommendation for what?
6  amonestacion?
7    A.  Yes.
8    Q.  All right.  And do you know what the word,
9  amonestcion, means?
10    A.  It's to reprimand, to, you know, order
11  sanction.
12    Q.  And those are the complainant in that case,
13  do you know the name?
14        (Short pause.)
15    A.  I didn't cite the numbers here early on, so
16  I'm going to have to -- one more second.
17        (Short pause.)
18        Sergeant Rufino Cordon Ortiz.
19    Q.  Who was the supervisor of Mr. Pagan?
20    A.  Yes.
21    Q.  I believe it was in Juncs at that time.
22        Did you take this complaint into
23  account --
24    A.  No, ma'am.
25    Q.  -- in arriving at your opinions?

Page 195

1    A.  No, ma'am.
2    Q.  All right.  And then there are some other
3  documents, which are kind of out of order, which are
4  related to the Maria Cabrera -- and correct me if I'm
5  wrong.  But from what I'm reviewing, they seem to be
6  related to the Maria Cabrera complaint.  And they run
7  from 976 to 987, and from 963 -- that's backwards --
8  to 967, and from 0000083 and 84 --
9        I'll have you take a look at those and
10  see if I'm correct that those all have to do with the
11  Maria Cabrera complaint.
12    A.  Yes, ma'am.
13    Q.  And take a look there.  Within that set of
14  documents, the numbers I've just said, there is a
15  document dated August 30th, 2004, and signed by the
16  former superintendent, Augustine Cartagena.  And I'll
17  look over your shoulder, because I'm going to ask a
18  question of you and I don't have a copy.
19        The title of that document, what is it?
20    A.  A Resolution of the Charges.
21    Q.  All right.  And it starts out by saying the
22  police of Puerto Rico underwent an investigation --
23  administrative investigation related to your conduct
24  as a member of the force, et cetera.  And it then goes
25  on to reference Maria Cabrera Santiago?

Page 196

1    A.  Right.
2    Q.  All right.  Now, in this -- is this a
3  me propongo?
4    A.  It's a final resolution of the charges, so I
5  don't think this is a me propongo.  It sounds like
6  it's definitive.
7    Q.  Well, but does it give at the end of it an
8  opportunity for the --
9    A.  Oh, yes.
10    Q.  -- police officer to question?
11        And does it have language in bold that
12  says, because of what is hereinbefore set forth, I
13  propose expelling you from the position you occupy in
14  the police of Puerto Rico?
15    A.  Yes, ma'am.
16    Q.  All right.  So would you agree with me now,
17  having reviewed it more closely, that it is a
18  me propongo?
19    A.  Yes, ma'am.
20    Q.  And this me propongo, does it set forth what
21  the nature of the charges are in broad terms?
22    A.  Does it set forth the charges?
23    Q.  Well, no, both the charges and the underlying
24  facts, I mean summarized?
25    A.  Yes, ma'am.

49  (Pages 193 to 196)

**Page 197**

1  Q.  All right.  Have you seen the me propongos
2  under Superintendent Toledo?
3  A.  I have not.
4  Q.  Do you know if they set forth the nature of
5  the facts and the violations?
6  A.  I do not know.
7  Q.  All right.  I'm going to show you another
8  one.  And I'm assuming these are all under what
9  category?  These last that I've been showing you,
10  which are different disciplinary complaints against
11  Mr. Pagan.  I think
12  A.  I think they are Number 31 on the exhibit
13  list.
14  Q.  I'm going to show you some other pages that
15  are in the same file which are Bates-stamped 967
16  through 970.  And actually I will represent to you
17  that my understanding is this is also the same --
18  actually, I'll give you some more: 000084 and 83.
19  Well, strike that.
20        Let me start with the 967, 968, 969, and
21  70.  I think these are also Maria Cabrera, but let me
22  know if you can tell.
23  A.  Yes, ma'am.
24  Q.  Now I'm going to show you -- I think these
25  are the last documents on Maria Cabrera -- unless I

**Page 198**

1  find some more -- which are 84 and 83.  Can you tell
2  me what that is?
3  A.  This is a suspension of employment and of
4  salary for a duration of 60 days.
5  Q.  All right.  And that's signed by the
6  associate superintendent under Mr. Toledo?
7  A.  Yes, ma'am.
8  Q.  Mr. Ortega Rodriguez?
9  A.  Right.
10  Q.  And if you go back to the previous page, is
11  there any information setting forth the charges and
12  the nature of the facts leading to those charges?
13  A.  No, ma'am, there doesn't seem to be one.
14  Q.  And it informs Mr. Pagan of yet another
15  appeal right that he has, correct?
16  A.  Yes, ma'am.
17  Q.  All right.  And this is subsequent to the
18  appeal right that was informed in the me propongo of
19  August 2004?
20  A.  Yes, ma'am.
21  Q.  All right.  So that's, I believe, the end of
22  Maria Cabrera.
23        Now I'm going to show you from that same
24  file, which is 31 -- part of 31.  Number 22 -- I'm
25  sorry, there's some more.  No, no, this -- all right.

**Page 199**

1        2215 and 2216.  It's dated the 14th of
2  August, 2007; so it's three days after the incident
3  which gives rise to this complaint.
4        Can you tell me what that is?
5  A.  It's a resolution of the charges.
6  Q.  As to whom?
7  A.  Officer Pagan.
8  Q.  For what complainant?
9  A.  Sergeant Rufino Cordon Ortiz.
10  Q.  From what date were those charges?
11  A.  The 22nd of March of 1999.
12  Q.  And the resolution was eight years later?
13  A.  Yes, ma'am, appears to be.
14  Q.  Did you take this into account in -- these
15  last two pages into account --
16  A.  No, ma'am.
17  Q.  -- in arriving at your opinions?
18        Then there are several pages which have
19  to do with the summary suspension, which are 946
20  through 951, in connection with the killing of
21  Mr. Caceres?
22  A.  Yes, ma'am.
23  Q.  All right.  And from those -- from your
24  review of the files in this case, are you aware that
25  Mr. Toledo had the power of summary suspension?

**Page 200**

1  A.  Yes, ma'am.
2  Q.  And the power of expulsion?
3  A.  Yes, ma'am.
4  Q.  All right.  Now, did you take those last few
5  pages, from 946 onward, into account in making your
6  determinations or conclusions or opinions in this
7  case?
8  A.  No, ma'am.
9  Q.  All right.  Now I'm going to show you another
10  set of documents.
11        MS. BERKAN:  And when I say a set of
12  documents, Mr. McCall, so you know, I'm pulling them
13  out as they are paper clipped within this file.
14        MR. MCCALL:  Okay.
15        MS. BERKAN:  All right.  Some of them are
16  a little out of order and all that but they --
17        THE WITNESS:  Right, sure.
18  Q.  But generally I've been giving you documents
19  which are related to a particular single theme.
20  A.  Yes, ma'am.
21  Q.  All right.  Here's another four pages from
22  959 to the 962.  And the first document is a document
23  dated the 6th of April, 2005.
24        Can you tell me what those documents are?
25  A.  Yeah, it's related to Officer Pagan Cruz's

**Page 201**

1    investigation that was done on him back in 2005.
2        Q.    And the complainant's names?
3        A.    Believe it's Alexis Guzmon and Julio Negron.
4        Q.    And this is regarding events which occurred
5    what date?
6        A.    The 4th of March of 2004.
7        Q.    And do you know what Mr. Negron and
8    Mr. Guzman alleged?
9        A.    Not offhand.  But if I have a chance to
10   review this, I can tell you.
11            It was unjustified aggression on behalf
12   of Officer Pagan.
13       Q.    Okay.  So you would agree with me that
14   considering the facts alleged by Maria Cabrera, which
15   was at least a threat with a service revolver among
16   many other things, and the allegations made by
17   Mr. Guzman and Mr. Negron, they were allegations that
18   he had been aggressive and threatening, at least two,
19   prior to August 11th, 2007?  He being Officer Pagan?
20       A.    Yes, ma'am.
21       Q.    How does that compare with Officer Lynch's
22   disciplinary file?
23            That's without counting what the
24   sergeant, Rufino Cordon, said he had done.
25       A.    Yeah, it would show that there is a record of

**Page 202**

1    aggression towards citizens in the community, which
2    should raise a flag.
3        Q.    Okay.  And Rufino Cordon -- here's some more
4    pages here about the same thing.  There are several
5    other pages.  Actually this clipping together includes
6    both things related to the Rufino Cordon complaint of
7    1999 and the August 11th incident which has brought us
8    here today.  And the numbers is how they appear in the
9    police files.  937 through 945 comprehend both of
10   those.  Would you agree with me?
11       A.    Yes, ma'am.
12       Q.    And while you're at it, take a look at 728
13   and 727, which happen to be repeats of that same
14   thing.  726 and 725 and 724, which also have to do
15   with the Rufino Cordon.
16       A.    Yes, ma'am.
17       Q.    And I'm putting those documents back in this
18   file.
19            Rufino Cordon alleged, among other
20   things, use of foul language to a supervisor, correct?
21       A.    Yes, ma'am.
22       Q.    Now, the last set of documents in here
23   doesn't relate to Mr. Pagan.  It relates to
24   Mr. Sustache, which was the summary suspension
25   subsequent to the events in this case.  And it's Bates

**Page 203**

1    Stamps 2247 through 2251?
2        A.    Yes, ma'am.
3        Q.    All right.  So you would agree with me, after
4    having reviewed this, that from these documents alone,
5    you know of five disciplinary complaints against
6    Mr. Pagan?
7        A.    Yes, ma'am.
8        Q.    And you know there were others?  There was
9    one for not appearing in court.  Do you know about
10   that one?
11       A.    Not particularly, no.
12       Q.    I think it may be addressed in one of the --
13   and another about loss of equipment from his car or
14   robbery.  I'm not sure exactly; we can check that in
15   the record.
16       A.    Sure.
17       Q.    But as to either offensive behavior in terms
18   of being rude to supervisors, bad language to
19   supervisors, or aggressions or threats of aggressions
20   against citizens, counting the event that gave rise to
21   this complaint, in these records which you reviewed
22   there are five?
23       A.    Yes, ma'am.
24       Q.    Now let's go to another file.  It says:
25   Training, Javier Pagan?

**Page 204**

1        A.    Yes, ma'am.
2        Q.    Is that your writing, or is that how it came
3    to you?
4        A.    No, ma'am, how it came to me.
5        Q.    All right.  And here we have Pages 2267
6    through 2271.  I'm separating out from the clip just
7    because it's out of order.
8        A.    Sure.
9        Q.    2341 through 2363.  All right.  So let's
10   start with the one -- now, you don't know what's at
11   Pages -- between 2271 and 2341?
12       A.    I have no idea.
13       Q.    All right.  I don't know either, just so you
14   know.  I mean, I can check back in my office.
15       A.    Right.
16       Q.    But I'd like you to take a look at this and
17   tell me what you understand these files to be.  And
18   again I'm going to look over your shoulder if it's
19   okay?
20       A.    Sure.
21            These appear to be Officer Pagan
22   participating in the usage of OC spray.
23       Q.    Which would be pepper spray?
24       A.    Pepper spray.
25       Q.    All right.  There's a certification that in

---

**Page 205**

1   November of 2006, he took a training --
2     **A. Right.**
3   Q. -- on pepper spray.
4     Do you know how long that training
5   lasted?
6     **A. I do not.**
7   Q. Do you know what that training was?
8     **A. It typically, you know -- and I don't know**
9   **what it was in the case of Mr. Pagan --**
10   Q. Sure.
11     **A. -- but typically what police officers are**
12   **asked to do is to basically participate in the usage**
13   **of OC spray as to a mechanism to subdue a suspect.**
14     **In addition to that, in some cases they**
15   **are actually sprayed OC spray.**
16   Q. Well, I'll tell you that's what Mr. Sustache
17   testified to, the fact that they sprayed them. And if
18   they broke rank, they sprayed them again.
19     **A. Right; just to be able to see what the**
20   **effects of OC spray are on the body, yes, ma'am.**
21   Q. All right. Then there's a -- 2267 is a
22   certification for training also in November of 2006,
23   and it is about what?
24     **A. This is use of the baton.**
25   Q. Do you know which baton that is?

---

**Page 206**

1     **A. That's the tactical baton that is expandable.**
2   Q. Uh-huh, that's larger?
3     **A. Larger, yes.**
4   Q. Do you know what the word for baton is in
5   Spanish, besides --
6     **A. Baton.**
7   Q. -- baton? In the common phrase, have you
8   heard the word, roten?
9     **A. I have not.**
10   Q. Okay. And do you know how long that training
11   lasts?
12     **A. It was offered for two days, the 13th and**
13   **14th of November.**
14   Q. Okay. All right. Now, in the incident that
15   we've -- that brings us here, was there any use of the
16   baton or the pepper spray that you know of?
17     **A. I don't think so, ma'am.**
18   Q. All right. You have no knowledge to --
19     **A. I have no knowledge, right.**
20   Q. Yeah. Let's continue.
21     All right. There is a training from the
22   28th of February to the 11th of March of 2005, and do
23   you know -- I mean, it's a lot of points?
24     **A. Yeah, General Orders.**
25   Q. But do you know if that's the basic training

---

**Page 207**

1   that's given to officers when they are transferred to
2   the Tactical Operations --
3     **A. I believe --**
4   Q. -- division?
5     **A. -- I believe from what I read, this was one**
6   **of the requirements that they had.**
7   Q. Yes.
8     **A. And this is a training on disturbances and**
9   **tactical operations.**
10   Q. I believe you're right.
11     And do you know if Mr. Sustache was ever
12   given that training?
13     **A. I do not know that.**
14   Q. And the time. You do know, do you not, that
15   Mr. Pagan was transferred to OT in late 2004; so this
16   would be shortly after his transfer?
17     **A. Yes, ma'am.**
18   Q. All right. Then you have one from the 19th
19   of November 2004 on tactical medical?
20     **A. Yes, ma'am.**
21   Q. All right. Another from 2001 to 2005 about
22   survival awareness?
23     **A. That is correct.**
24   Q. Okay. I think we should stop there for a
25   moment.

---

**Page 208**

1     In your report at some point you say that
2   he received retraining every three years.
3     Do you remember what the basis for the --
4   or the source for that assertion is?
5     **A. I think it was from a deposition that I read.**
6   Q. Do you have any idea?
7     **A. As to whose deposition?**
8   Q. Yeah, or where that came from?
9     **A. I can't recall offhand. It may be**
10   **Superintendent Toledo maybe, that he talked about**
11   **officers having training every so often perhaps.**
12   Q. Well, he talked about a new order which
13   requires psychological evaluation --
14     **A. Right.**
15   Q. -- every three years, which wasn't in effect
16   at the time of this event.
17     **A. Right. I can't remember offhand.**
18   Q. I'm asking you, and I'm being quite frank --
19     **A. So am I.**
20   Q. -- because I've done a lot of -- I would ask
21   if you are able to locate -- maybe it's a mistake.
22     **A. Yeah.**
23   Q. My understanding of the police force is they
24   don't do retraining every three years.
25     **A. Okay.**

---

Merit Court Reporters
817-336-3042       depos@merittexas.com       817-335-1203

**Page 209**

1    Q.  But if I'm missing something or if you --
2    A.  I'll go back and find it.  If it's there,
3    I'll find it.
4    Q.  All right.  Now, then we have a number of
5    documents which start at 2271 and then continue from
6    2341 --
7        MR. MCCALL:  Sorry, you said it starts at
8    2271 and then it goes...
9        MS. BERKAN:  And then jumps to 2341 to
10    2363.  The others are all --
11        MR. MCCALL:  Okay.  So 2271 is out of
12    sequence, just that one page?
13        MS. BERKAN:  Yeah.
14    Q.  2271 is dated June 5th, 2007; so it's about
15    two months before the events in this case, correct?
16    A.  Yes, ma'am.
17    Q.  And it talks about -- what is the title?
18    A.  It's called the local academy.
19    Q.  Okay.  And it's in the district of Humacao,
20    no?
21    A.  That's right.
22    Q.  So that's not a training record with respect
23    to Mr. Pagan?
24    A.  No, ma'am.
25    Q.  All right.  Now, in 2006, May 17th -- which

**Page 210**

1    is my birthday -- there was a memo for a local
2    academy.  And who writes the memo?
3    A.  Sergeant Juan Colon-Biez.
4    Q.  And at that point what was his interim
5    position?
6    A.  He was the interim Director of the Division
7    of Tactical Operations.
8    Q.  Do you understand at that point he was
9    directly supervising Mr. Pagan?
10    A.  I believe so, yes, ma'am.
11    Q.  Okay.  In fact you're aware, are you not,
12    that there was always just one sergeant or lieutenant
13    in charge of Humacao tactical operations?
14    A.  I believe that's right, yes, ma'am.
15    Q.  All right.  And this is a three-page
16    document, and it's signed -- the attendance sheet is
17    signed by Mr. Pagan?
18    A.  Yes, ma'am.
19    Q.  All right.  Do you consider this a training
20    document?
21    A.  It is a training document.
22    Q.  And what training was given?
23    A.  It sounds like this is an acknowledgment from
24    the -- from Sergeant Juan Colon-Biez at the local
25    academy, that they had -- in the months of April and

**Page 211**

1    May of 2006 the Division of Tactical Operations in the
2    area of you Humacao, that the following things were
3    discussed.
4    Q.  All right.  And they are mostly
5    communications from -- do you know what AH means?
6    A.  I do not.
7    Q.  That means area of -- Humacao area.
8    A.  Humacao area.
9    Q.  And Number 1 means from the area commander.
10    Number 2 means the second in charge.  So I've told you
11    how now to read those little numbers on these
12    documents --
13    A.  (Laughter.)
14    Q.  -- all right?
15        But they are all just documents that come
16    from the area command, right?
17    A.  Yes, ma'am.
18    Q.  And they discussed areas like getting to
19    court, turning in your schedules on time, discipline,
20    availability, commitment and loyalty.
21        I don't really know what Number 2 means.
22    Do you know what it means?
23    A.  (No response.)
24    Q.  I assume it's a form that has to be filled
25    out correctly because it doesn't make sense.

**Page 212**

1    A.  Yeah, it doesn't make sense at all.  It's
2    vehicles that have been in usage --
3    Q.  But then it says, to fill out in all their
4    part, which is --
5    A.  All their parts.  Yeah, it's probably a form
6    that needs to be completed in all its parts.
7    Q.  Right.  With regard to the use of vehicles or
8    something like that?
9    A.  Right.
10    Q.  And then the following two pages show that
11    Mr. Pagan, among others, went to that training?
12    A.  Yes, ma'am.
13    Q.  Now, did he go to training when he was on
14    suspension in 2006 -- I'm sorry.  I correct myself --
15    not training, that local academy?  Do you know what
16    a local academy is?
17    A.  It's like a subdivision of the academy where
18    they actually do the trainings?  Is that correct?
19    Q.  No, that's not correct.
20    A.  Okay.
21    Q.  These are monthly meetings that are required
22    to be held in every unit --
23    A.  Oh, right.
24    Q.  -- to impart instructions, et cetera.
25    A.  So they are briefings, essentially.

## Page 213

1   Q.  Yeah, briefings.
2   A.  Right.
3   Q.  But they call them local academies.
4        But do you know that administratively it
5   has no connection with the academy?
6   A.  Right, I knew that, yeah.
7   Q.  Now, then there's one that took place the
8   20th of October of 2006.  And the first pages are very
9   similar in the sense that they are documents from the
10  area command, either by the first or the second in
11  charge of the area command.
12       And then other discussions were, again,
13  availability, discipline, commitment and loyalty, the
14  same thing about the vehicle document --
15  A.  Right.
16  Q.  -- getting to court, putting your schedules
17  in on time, certifying the libro de entrada y
18  salida -- I'll say it in English -- certifying the
19  entry and exit book.
20  A.  Okay.
21  Q.  All right.  And do you know what the second
22  one is:  Uenar Novedades?
23  A.  No, I don't.
24  Q.  All right.  Then you have the attendance at
25  that local academy in 2006 -- in October of 2006, and

## Page 214

1   you have -- what's the indication next to Agent
2   Pagan's --
3   A.  It reads, LES.
4   Q.  Do you know what that means?
5   A.  No, I do not.
6   Q.  Would it surprise you if I represented to you
7   that it's on leave for employment and wages?  Unpaid
8   leave?
9   A.  Unpaid leave?
10  Q.  Licencia de empleo y sueldo.
11  A.  Oh.
12  Q.  So you don't know?
13  A.  I don't know.
14  Q.  I'm representing that to you.  But reading
15  this, does it appear he wasn't there?
16  A.  Right.
17  Q.  All right.  And he was on suspension for that
18  period?
19  A.  All right.
20  Q.  So then this is not a training record for
21  him, what appears on 2353 and 235 --
22  A.  Right, that is correct.
23  Q.  -- I'm sorry, on 2358 and 9?
24  A.  Right.
25  Q.  All right.  And the remaining records in this

## Page 215

1   packet are also about local academies and pretty much
2   bear the same format, correct?
3   A.  Yes, ma'am.
4   Q.  All right.  Now, we've gone through those
5   local academy records.  Did those go into your thought
6   process, or did you rely on them in reaching the
7   conclusions you reached in this case?
8   A.  No, ma'am.
9   Q.  And this is Number 26 that you --
10  A.  Yes, ma'am.
11  Q.  All right.
12  A.  Am I keeping these or --
13  Q.  Yes, yeah.  I'm handing them back to you
14  unless I need them, and the court reporter will need
15  that.
16       (Discussion off the record.)
17  Q.  Now, the next set of documents is from 1989
18  to 96, and then from 1975 to -- through 1988.  So that
19  could be said also 1975 through 1996.  And then it
20  continues from 1997 --
21  A.  Ms. Berkan, could I ask you for a break in a
22  few minutes whenever we can break?
23  Q.  Sure.  Let me just --
24  A.  No, that's fine.
25  Q.  I'll be at a logical breaking point in about

## Page 216

1   five minutes.
2   A.  Thank you.  No, you're fine.
3   Q.  1996 through 2004.  Those are all sequential,
4   just out of order.
5   A.  Yes, ma'am.
6   Q.  And then from 2391 to 2405.
7        Now, take a look at these documents --
8        MR. MCCALL:  I'm sorry, Judith.  When you
9   were saying them a few minutes ago, you were saying
10  page numbers not chronological?  When you said 1989 to
11  1996, I thought it was a period of years; but it's a
12  Bates stamp?
13       MS. BERKAN:  No, they're page numbers.
14       MR. MCCALL:  Okay.
15       MS. BERKAN:  Everything that starts with
16  19 is not a year.
17       MR. MCCALL:  No, but --
18       MS. BERKAN:  Or a section of US Code.
19       MR. MCCALL:  At first I thought it was,
20  and then I had a doubt.  That's why I --
21  Q.  All right.  And then the last set -- and this
22  is as they're clipped -- is 2391 to 2405.  Now, this
23  is in a file with the words, impact unit?
24  A.  Yes, ma'am.
25  Q.  Did you write those words?

Page 217

1   A.  No, ma'am.
2   Q.  This was as it was sent to you?
3   A.  Yes, ma'am.
4   Q.  And can you tell me many broad terms what
5   that is and where it appears on your record?
6   A.  I believe these are the crime statistics that
7   I cite here, or the informational file on weekly crime
8   reports.
9   Q.  All right.  These are the results of
10  particular -- of the labor carried out in a particular
11  week?
12  A.  Yes, ma'am.
13  Q.  All right.  So those are limited to the
14  Humacao area?
15  A.  I believe so.
16  Q.  All right.  And so that would be 27?
17  Informational file?  Or do you have some other
18  statistics?  Where...
19  A.  And, Ms. Berkan, I apologize.  I should have
20  labeled each one of these folders --
21  Q.  It's okay.  Don't worry about it.
22  A.  -- with my own handwriting.  It's hard to
23  reconcile as to what I was thinking when I read them
24  and how I put them there, but --
25  Q.  But I accept in good faith that you've

Page 218

1   brought everything here, so --
2   A.  Yeah, I do.  I do have everything here.  It's
3   just that I don't remember how to -- you know, I want
4   to do the best that I can for you to coincide these
5   with the file.
6        But I believe that's what this was in my
7   interpretation of the document, which were weekly
8   labors realized here in the following week.  And
9   that's the only reason why I think these were the
10  ones, because it says terminale, which is weekly.
11  Q.  Yeah, okay.  But those don't do any
12  comparison between Humacao and other areas and --
13  A.  No, ma'am.  I was simply making a note of the
14  documents that were sent to me for review.
15  Q.  All right.  And then we have some more
16  disciplinary files.  I'll get those to you in a second
17  and ask you a general question.
18       Then we have a document which is entitled
19  in Spanish -- and I'm translating from Spanish --
20  Memoranda to the Superintendent About the Incident.
21  A.  (Witness nods head up and down.)
22  Q.  And I assume that came that way to you?
23  A.  Yes, ma'am.
24  Q.  All right.  And I will represent to you that
25  all these documents which are at Pages 1420 through

Page 219

1   1423, 2441 through --
2        MR. MCCALL:  I'm sorry, you said 2441?
3        MS. BERKAN:  Yes.
4   Q.  -- through -- 2441 through 2446.  Then it
5   goes out of order, 2447 through 2451 and 2452.  So
6   it's continuing the sequence through 2474.  And then a
7   single page, 2460.  And then 2430 and 2431, 2437
8   through 2440.
9        I'm not going to ask you any questions
10  about this at the time, but would you agree with me
11  that those are related to the incident of August 11,
12  2007?
13  A.  Yes, ma'am.
14  Q.  All right.  Then we have some General Orders.
15  All right.  And they are 90-5, two pages;
16  OS-1-16-1301, a pretty lengthy document signed by
17  Victor Rivera, who was the former superintendent;
18  90-4; 98-11; a regulation which is issued the 20th of
19  August of 2002, Regulation Number 6506.  It's quite
20  lengthy.
21       98-16; General Order 2004-3; General
22  Order 2006-7.
23       I'm not giving the page numbers because
24  it would be too burdensome, but I'm going through each
25  one.

Page 220

1   A.  Sure.
2   Q.  General Order 2008-3, which is subsequent to
3   the events in this case.  87-14.  And there's one that
4   starts on Page 14 -- no, excuse me -- 40-13, which is
5   a regulation, but the first page appears to be
6   missing; so I can't give you the number of the
7   regulation from the first page.
8        MR. MCCALL:  Can you give us the page
9   numbers of this?
10       MS. BERKAN:  Yeah, that's what I started
11  doing.
12       41-3 through 4043.
13       MR. MCCALL:  I'm sorry --
14       MS. BERKAN:  4013 to 4043.
15       MR. MCCALL:  Thank you.
16  Q.  Signed by then Governor Sila Calderon,
17  Governor at that point, on the 16th of August 2002.
18       Now, did you take any of these orders or
19  regulations into account in arriving at the opinions
20  in your case?
21  A.  No, ma'am.
22  Q.  Now, during -- somewhere in your report --
23  and we can get to the exact reference if you want --
24  you say that 87-14 was not binding, was just a guide.
25       What is your basis for saying that?

55  (Pages 217 to 220)

Page 221

1    A. I believe what I said was that the -- that in
2 general, policies and procedures relevant to police
3 departments are -- you know, they establish the
4 parameters by which police officers will act in a
5 certain way; that, you know, you don't typically find
6 that a policy is a legal mandate for an officer to act
7 a certain way as represented by the courts.
8    And, therefore, you know, most of the
9 policies that we have in place, they establish, you
10 know, the boundaries by which they can behave in a
11 certain way, procedures that they have to follow. But
12 they are not -- there's no universal legal clause or
13 premise by which police departments have to adopt a
14 particular type of policy in place.
15    Q. But do you know in Puerto Rico if General
16 Orders are considered binding on the people subject to
17 them?
18    A. I do not know that.
19    Q. Do you know where the authority for the
20 superintendent to issue a General Order comes from?
21    A. I imagine it's from the Legislature.
22    Q. Do you believe that in Puerto Rico, if there
23 is a General Order, it is expected of police officers
24 that they follow it?
25    A. I think that's not only specific to Puerto

Page 222

1 Rico. I think that's generally the premise in most
2 police departments.
3    Q. Okay. You wanted your break.
4    A. Yes, ma'am, please.
5    Q. Let's take it. And we only have about an
6 hour, so, as quick as you can.
7    (Brief recess.)
8    Q. We've had a short break. And I'm going to
9 show you two other files quickly without identifying
10 the precise page numbers, just because we have a short
11 period of time.
12    And in my quick review, these two other
13 files concern matters that we've discussed already.
14 They are other documents related to complaints of some
15 of the complainants that we've discussed already.
16    A. Yes, ma'am.
17    Q. So these are -- one has the title blocked
18 out, and the other one -- but they are the blue and
19 the green file. Let's call them that.
20    A. Yes, ma'am.
21    Q. And I don't want to go over page by page.
22 But just take a quick review and see if you agree with
23 me that those concern complaints that we have already
24 addressed.
25    A. Yes, ma'am, they do.

Page 223

1    Q. And, you know, after this depo, if you look
2 at those files and you say, oh, no, there was a page
3 in there that doesn't concern one of the complaints --
4    A. I understand.
5    Q. -- you just let us know with a letter, and
6 we'll append it --
7    A. Yes, ma'am.
8    Q. -- to the depo or something of that order.
9    A. Yes, ma'am.
10    Q. Or do further follow-up in the telephone
11 deposition.
12    Now, have you ever heard of -- oh, wait.
13 There's actually a couple more.
14    MS. MENDEZ: Just one.
15    Q. Just one.
16    These also have to do with resolution of
17 charges. And the title of the document is
18 resolution -- I mean, the title of the file, which I
19 understand was not your handwriting --
20    A. Yes, ma'am.
21    Q. -- from your previous testimony?
22    It has various resolution of charges. I
23 think I will give the page numbers on this without
24 going over each one of them.
25    The title of the document -- the file is

Page 224

1 resolution of charges. And they have Page 116 -- with
2 the four zeros -- or three zeros before it, 116
3 through 118. 1010 --
4    MR. MCCALL: You said 1010?
5    MS. BERKAN: 1010.
6    MR. MCCALL: Thanks.
7    Q. -- 1010 through 1042, 976 through 987.
8    I think we actually went through this
9 before. Yeah, I think 963 -- yeah, we went through
10 this file before.
11    MS. MENDEZ: Yeah, that was part of
12 Number 31.
13    MS. BERKAN: 963 through --
14    MS. MENDEZ: Yeah, that was 31.
15    Q. Okay. This is 31 also. So these are
16 resolution of charges, correct?
17    A. Yes, ma'am.
18    Q. And if you come across a complaint that we
19 haven't at least briefly mentioned in the deposition
20 today and it's in one of the files and you want to
21 make a note of it and make it known to us either in
22 your -- the follow-up that we're going to finish the
23 depo from Puerto Rico or through a letter to counsel,
24 it's okay with me.
25    A. Yes, ma'am.

Merit Court Reporters
depos@merittexas.com
817-336-3042      817-335-1203

Page 225

1   Q. Not to me. Through a letter to Mr. McCall,
2   and he'll make it available to me.
3   A. (Witness nods head up and down.)
4   Q. All right. And one of the other issues I had
5   was with regard to Jose Rivera Rodriguez -- or
6   Rodriguez Rivera -- Rivera Rodriguez, Number 55.
7       And you said you believed that he was a
8   witness in this case?
9   A. I don't recall, Ms. Berkan. I think so, but,
10  you know --
11  Q. All right. And would you -- Mr. McCall
12  already said it, but that person actually didn't give
13  a deposition. Do you recall that? He was cited to
14  give a deposition but didn't show up?
15  A. That's right, that's right. I think it was
16  actually referenced in a deposition that that was the
17  case. I think you entered that into the record, I
18  remember.
19  Q. And his supervisor -- he's a homicide agent.
20  And his supervisor is Juan Torres.
21      Have you seen the -- who is referenced in
22  55 and 56?
23  A. Yes, ma'am.
24  Q. And have you seen the -- have you seen the
25  memo that he wrote on the night of the incident?

Page 226

1   A. I don't recall seeing that, no.
2   Q. Do you recall reference to a man named
3   Mr. Huerts, H-U-E-R-T-S?
4   A. I remember that name, but I don't recall
5   exactly where from.
6   Q. Do you recall a memo that said that
7   Mr. Huerts gave a version of the events that night,
8   that there were other witnesses; but their versions
9   weren't favorable to the police?
10  A. I remember Mr. Reiter writing something about
11  that, I think. But I don't remember seeing that off
12  the record, no, ma'am.
13  Q. All right. But you did get the exhibits to
14  the depos?
15  A. I did. And I was telling Mr. McCall that I
16  don't -- I mean, I need to go back and make sure that
17  I've got all of them. Because the way that they were
18  stapled, I'm not certain of that.
19  MR. MCCALL: I will represent that we had
20  originally sent the depo transcripts to the first
21  expert, Mr. Levine. And he informed us after that
22  that the exhibits were not attached.
23      And we then contacted your office, and we
24  got them. But when the transcripts originally went in
25  the packet, the exhibits were not attached at that

Page 227

1   point. And we didn't realize it. Then we sent it.
2   MS. BERKAN: Yeah, but the exhibits were
3   eventually given --
4   MR. MCCALL: Right. And I think they
5   were sent, but --
6   MS. BERKAN: We had said already -- I
7   mean, just so the record is totally clear, in
8   accordance with the agreement of counsel at the time,
9   we had provided the complete deposition to Mr. Corona,
10  who evidently did not distribute it to the other
11  defendants. And that included the exhibits.
12      And then when the --
13  MR. MCCALL: You had produced them. As
14  soon as we brought up -- I'm just saying when we
15  originally forwarded, I didn't realize at the time
16  that the exhibits were not attached. We then sent
17  them. And they may not be next to each other in the
18  file because they were a different --
19  MS. BERKAN: Sure. No, I don't care that
20  the exhibits -- and we responded immediately when we
21  became aware that Mr. McCall did not have the --
22  MR. MCCALL: That is correct, yes.
23  MS. BERKAN: -- exhibits.
24  Q. But you did look at the exhibits, even if you
25  couldn't connect them with individual depos?

Page 228

1   A. Yes, ma'am. Those that were given to me I
2   did.
3   Q. And there's a document in there which is by
4   Mr. Rivera, which we could pull out exactly, that says
5   that Mr. Huerts says -- and this is not an exact
6   quote. But Mr. Huerts indicated that Mr. Caceres
7   provoked the incident.
8       And then it goes on to say that Mr. --
9   there were many citizens who gave a version, but their
10  version was adverse to the police; and so their names
11  are not mentioned.
12      Were you aware of that document?
13  A. No, ma'am, I'm not offhand.
14  Q. In terms of best police practices, what do
15  you think about the homicide investigator --
16  assuming -- and assuming for the purpose of the
17  question that what I have just represented to you is
18  correct: that the homicide investigator who met with
19  Mr. -- Defendant Colon-Biez, Defendant Victor Cruz,
20  and one other person that night, that he stated in a
21  memo that night a fairly extensive version of what had
22  occurred by Zulma Diaz, a fairly extensive -- less
23  extensive of what occurred by Mr. Sustache, and that
24  one little paragraph that said Mr. Huerts thinks that
25  Mr. Caceres provoked the incident; and there were

Page 229

1  other citizens who had other views of this, but their
2  views were contrary to the interest of the police
3  officers --
4        MR. MCCALL: I'm going to object to the
5  form of the question.
6        MS. BERKAN: I'm saying assuming for the
7  purpose of this question.
8        MR. MCCALL: Okay, all right.
9     Q.  Do you think that's -- think that's --
10    A.  The standard in police practices is that an
11 investigator -- you know, a homicide investigator that
12 is assigned to a homicide or to a police shooting will
13 speak to all witnesses that are relevant and that may
14 provide some disclosure on the case.
15        Not taking sides or, you know,
16 partitioning perspectives, but rather somebody who is
17 on a fact-gathering mission of providing the facts,
18 providing the -- you know, the sequence of events, so
19 that at a later point it can be determined as to what
20 happened.
21    Q.  Do you have an opinion about whether it is
22 best police practices to separate witnesses to a
23 homicide or a potential homicide?
24    A.  Typically in a homicide situation, the
25 witnesses are often interviewed by detectives.  And

Page 230

1  they are separated when it is determined that there
2  may be a reason as to why they are corroborating
3  stories with one another.
4        And that's standard police work.  For
5  instance, if somebody gets pulled over and, you know,
6  one of them -- you know, the driver makes a statement
7  as to, you know, well, I don't really -- you know, I
8  was just really driving to my grandmother's house, you
9  know.  And that person is asked to step out of the
10 car.
11        And then the other person in the driver's
12 seat may be separated from that person and asked, why
13 were you here, what were you doing?  And so --
14    Q.  Well, let's talk about a homicide
15 situation --
16    A.  Right.
17    Q.  -- particularly an officer-involved shooting.
18        Do you think it was appropriate to -- or
19 consistent with best police practices to allow
20 Mr. Sustache, and Ms. Diaz to remain together with the
21 police lieutenant and police sergeant, and to then
22 travel on their own back to the -- from the hospital
23 to the police station without being separated for
24 several hours?
25        MR. MCCALL: Objection to the form.

Page 231

1        If you want to state that, assuming that
2  happened --
3     Q.  Assume that happened.
4     A.  I would say that assuming that that happened,
5  it wouldn't be within the context of best police
6  practices to allow for such an event to take place.
7     Q.  It would not be?
8     A.  It would not be.
9     Q.  Do you have any information as to what I just
10 said being true or not true?
11    A.  I recall that on the original trial
12 transcript of Officer Pagan that I read, there were
13 statements that were made by different witnesses that
14 were there that both Sustache and Diaz basically got
15 to the hospital, and once they were in the hospital
16 they simply returned, you know.  There was never any
17 statements made as to -- actually strike that.
18        It was not on the -- it was not on the
19 original transcript.  It was in one of the
20 depositions, I believe, where it was acknowledged
21 that -- that the officers showed up to the hospital.
22 And when they showed up to the hospital, their
23 statements were not taken.  They were not, you know,
24 asked to write or describe what had happened.
25    Q.  So you have no specific recall of a

Page 232

1  memorandum by a Jose Rivera which sets forth in a fair
2  amount of detail the interviews that were conducted of
3  Mr. Sustache and Ms. Diaz that night?
4     A.  No, I don't recall seeing that.  I recall
5  that -- it's possible that I read through it, but I
6  don't specifically recall looking at the document that
7  specified as to whether or not --
8        I remember Mr. Reiter making a claim in
9  his report that they were not separated --
10    Q.  Uh-huh.
11    A.  -- at the -- at the hospital and -- but I
12 don't recall offhand, Ms. Berkan.
13    Q.  Do you recall Mr. Colon-Biez's testimony and
14 Mr. Victor Cruz's testimony with regard to that
15 matter?
16    A.  I do.  And I believe Lieutenant Cruz
17 specified that he showed up to the hospital and that
18 he spoke to Officer Pagan once he got there.
19    Q.  Well, I'm actually focussing more on Officer
20 Diaz and Officer Sustache.
21        Do you recall their testimony about those
22 two officers?
23    A.  You're talking about Lieutenant Cruz's
24 testimony on Sustache and Diaz?
25    Q.  Yes.  And Victor Cruz and Colon-Biez.

Job No. 8595
Evelyn Ramirez Lluveras, et al v. Javier Pagan Cruz, et al

Alejandro del Carmen
August 12, 2010

---

Page 233

1    A.  It's possible that I read that, yes, ma'am.
2    Q.  Would you pull out from your file the
3    exhibits to the Rivera Merced deposition?
4    A.  (The Witness complies.)
5    Q.  Do you have the exhibits there?
6    A.  I should have them, yes, ma'am.  I just need
7    to find -- this is how -- this is part of the problem,
8    see?  They were attached like this, and some of them
9    were not.  And so, you know --
10   Q.  Well, I can show you the document.
11   A.  Okay, go ahead.  Yeah, that's better.
12   Q.  I'm assuming you got it.  But it's
13   SAIC-AH-CIC-2-532, and it's by Jose Rivera Rodriguez,
14   who is a person who didn't show up for his deposition.
15   Take a look at it.
16   A.  Yeah.
17   Q.  It's, I believe, a four-page document.
18   A.  Yes, ma'am.
19   Q.  You remember seeing that document?
20   A.  I think so, yes.
21   Q.  Would you agree with me that it mentions --
22   the only civilian it mentions is Hector Huerts?
23   A.  Yes, ma'am.
24   Q.  And that there is a fairly lengthy couple
25   pages of Zulma Diaz of an interview?

---

Page 234

1    A.  Yes, ma'am.
2    Q.  And a shorter interview of Mr. Sustache?
3    A.  Yes, ma'am.
4    Q.  And the last page -- it looks four -- is
5    it four or five?
6    A.  Four.  No, it's five.
7    Q.  Five.  On the last page, can you translate to
8    me the second full paragraph -- or the first full
9    paragraph, atemas?
10   A.  Atemas.
11       (Translating):  Several people were
12   interviewed at the scene, but they informed adverse
13   statements against the agents.
14   Q.  All right.  And those people are not listed,
15   correct?
16   A.  No, ma'am.
17   Q.  But Mr. Huerts is listed by name, correct?
18   A.  Yes, ma'am.
19   Q.  So -- as a matter of fact, Ms. Diaz and
20   Mr. Sustache did give versions of the events that
21   night?
22   A.  Yes, ma'am.
23   Q.  And do you know if this was written before or
24   after the video surfaced?
25   A.  I don't know.

---

Page 235

1    Q.  Okay.  I'd like to take a look at -- well,
2    actually, let me ask you another question.
3        Do you know how many officer-involved
4    shootings there were in Puerto Rico in 2007?
5    A.  No, ma'am, not offhand.
6    Q.  How about 2006?
7    A.  I do not.
8    Q.  Do you know if statistics are maintained
9    about that?
10   A.  There -- from what I understand, there has
11   been a dispute between -- you know, in the previous
12   depositions as to whether -- what kind of statistics
13   are collected and who collects them and who is
14   responsible for them.
15       So my understanding of that is that
16   that's disputable at this point.
17   Q.  Have you seen statistics --
18   A.  I have not seen them, ma'am, no.
19   Q.  -- on officer-involved shootings?
20   A.  I have not.
21   Q.  Do you know how many there were in Humacao?
22   A.  I do not know.
23   Q.  Do you know how many officers were subject to
24   me propongos for expulsions in Humacao area?
25   A.  No, ma'am.

---

Page 236

1    Q.  Do you know how many officers there are in
2    the Humacao area?
3    A.  I do not know.
4    Q.  Do you know how many towns are comprised by
5    the Humacao area?
6    A.  That I do not know either.
7    Q.  You do know that Edwin Rivera Merced was the
8    area commander?
9    A.  Yes, ma'am.
10   Q.  What are his responsibilities as area
11   commander?
12   A.  To oversee the area that is assigned to him
13   and report that to the superintendent.
14   Q.  How many area commands are there in Puerto
15   Rico?
16   A.  From what I recall -- and, again, this is
17   vague recollection here -- I believe there are around
18   eight or ten.
19   Q.  Yeah, I don't recall exactly.
20   A.  Yeah, I think that's what --
21   Q.  But it's in the ballpark.
22   A.  -- was acknowledged.
23   Q.  Is Humacao one of the larger or one of the
24   smaller ones?
25   A.  I think it's one of the larger ones, if I

---

Merit Court Reporters
depos@merittexas.com

817-336-3042                                    817-335-1203

Job No. 8595    Case 3:12-cv-02039-GAG    Document 1295-1    Filed 07/25/19    Page 62 of 114    Alejandro del Carmen
Evelyn Ramirez Lluveras, et al v. Javier Pagan Cruz, et al
August 12, 2010

Page 237

1  remember.
2      Q.  It's one of the smallest.
3      A.  One of the smallest, okay.
4      Q.  No, I mean, I'm telling you, but you don't
5  have to accept my word for it.  I'm just telling you.
6      A.  Okay.  Well, I believe you.  I just don't
7  recall that.
8      Q.  Do you know how many people live in Humacao?
9      A.  I do not know, ma'am.
10     Q.  Do you know how many people live in San Juan?
11     A.  I do not know.
12     Q.  Have you ever met a police officer from
13  San Juan or Humacao?
14     A.  You know, I don't recall ever meeting one,
15  but that's not to say that I haven't at a professional
16  conference or a professional event.
17     Q.  Yeah, sure, sure.
18         All right.  Do you know what the role of
19  the area commander is in terms of placement of
20  officers once they return from a suspension without
21  pay?
22     A.  I believe that they are placed in a -- sort
23  of like a reintegration component.  From what I
24  remember reading, it was kind of --
25     Q.  I'll give a word that is going to cause the

Page 238

1  court reporter to --
2         MS. MENDEZ:  Replacement Center.
3      A.  Replacement center, or centro de remplazo.
4         MS. BERKAN:  She'll write it down for
5  you.
6         THE REPORTER:  Thank you.
7      Q.  And who makes the determination as to whether
8  or not they go back to the unit that they were in
9  prior to the suspension?
10     A.  I believe it's the area commander that makes
11  that decision.
12     Q.  And within the unit, who makes the decision
13  as to the specific assignments that are assigned to
14  that officer?
15     A.  I believe that the ultimate word rests with
16  the commander.  But the -- you know, person in charge
17  of the area.
18         But I believe that the lieutenant --
19  can't remember if it's the lieutenant or the sergeant
20  that actually, you know, determines where exactly
21  they're going to be.
22     Q.  Okay.  How many officers were there in DOT in
23  tactical operations in Humacao?  Approximation.
24     A.  I want to say over around 80, a hundred
25  maybe?

Page 239

1      Q.  No, I think you're way off.
2      A.  I might be.
3      Q.  But, regardless, I mean, are you aware
4  that -- I'm not doing this as a test of your exact
5  memory, you know.  I'm just trying to get a context.
6      A.  Well, and I'm trying to give you what I
7  remember, but I --
8      Q.  Yeah, I understand.
9         Are you aware that there are some desk
10  jobs, vehicle maintenance jobs --
11     A.  Yes, ma'am.
12     Q.  -- that do not imply direct contact with
13  citizens?
14     A.  Right.
15     Q.  And there's also a reten, R-E-T-E-N.  Do you
16  know what a reten is?
17     A.  It's the individuals that stop other -- is
18  that right?  Is that what you're asking?
19     Q.  No.  The word is used as the duty officer.
20  The person that, when you arrive at the station, takes
21  your complaint or --
22     A.  Right.  The desk sergeant or --
23     Q.  No, it wouldn't be a sergeant, but the desk
24  officer.
25     A.  Officer.

Page 240

1      Q.  Do you know who was the head of tactical
2  operations when Mr. Pagan came back from his
3  suspension?
4      A.  I thought it was Lieutenant Rodriguez.  He
5  was the one in charge of -- the one that Officer Pagan
6  reported to on August 11th.  But I don't recall that
7  ma'am, no.
8      Q.  All right.  Assuming -- I have a very good
9  memory -- that Victor Cruz was the head of tactical
10  operations when Mr. Pagan came back from his
11  suspension --
12     A.  (Witness nods head up and down.)
13     Q.  -- now, are you -- assuming that, would you
14  agree with me that Victor Cruz had decisions to make,
15  and decided to make certain determinations about
16  whether he would be put on street duty, impact
17  services, vehicle maintenance, desk duty, et cetera?
18         MR. MCCALL:  Objection to the form in
19  that it assumes in it that decisions were made.
20         MS. BERKAN:  Okay.  He went to work every
21  day, so decisions were made.  But anyway, continue.
22         MR. MCCALL:  No, as opposed to perhaps a
23  decision wasn't made and something happened.  That's
24  the question that --
25         MS. BERKAN:  All right, your objection is

Page 241

1  noted.
2      Q. Could you please answer the question?
3      A. If Lieutenant Cruz was in charge of Officer
4  Pagan's immediate duties, you know, it would have been
5  Lieutenant Cruz to decide as to where Officer Pagan
6  was going to be assigned to.
7      Q. All right. And subsequent thereto -- and
8  this was part of our confusion right at the beginning
9  of the case also. Because what happens is Victor Cruz
10  is then transferred to be the head of the district of
11  Humacao.
12      A. Uh-huh.
13      Q. Are you clear on the district zone and area?
14      A. Somewhat, from the deposition of
15  Superintendent Toledo.
16      Q. Okay. What you have is an area, which is,
17  you know, the eight or ten -- the whole country. And
18  then there's the area commander, and Humacao had about
19  five or six hundred men, women, both. Then you
20  have -- and that covers five towns. And then within
21  that you have two zones. And then within that you
22  have two what would normally be called in the States
23  precincts, but we call them districts.
24      A. Right, right.
25      Q. Then you have some specialized units within

Page 242

1  the area. Is that your understanding?
2      A. Right, yes, ma'am.
3      Q. All right. So in terms of hierarchy on up,
4  there's three times we use the word, Humacao, and
5  that's where the confusion comes in. Which is the
6  district, which is like a precinct; the zone, which
7  covers two or three towns; and the area, which covers
8  the whole five towns.
9          And so you're aware of that, that there
10  were those hierarchies.
11          So at some point you're aware that Victor
12  Cruz becomes the commander of the district?
13      A. Yes, ma'am.
14      Q. And as commander of the district, he's
15  supervising, directly or indirectly, Zulma Diaz?
16      A. That is correct.
17      Q. All right. At some point Sergeant Figueroa
18  becomes the head of the tactical operations. In fact
19  he's there in Humacao. He's there on two different
20  occasions --
21      A. Yes, ma'am.
22      Q. -- are you aware of that?
23      A. Yes, ma'am.
24      Q. Because he's the one who delivers the
25  me propongo. And he's also there just before the

Page 243

1  events that occurred --
2      A. Yes, ma'am.
3      Q. -- in this case.
4          And when he goes out on vacation,
5  Colon-Biez, who had also previously been the interim
6  director, again becomes the interim director?
7      A. That is my understanding, yes, ma'am.
8      Q. So all three of these individuals supervised
9  Mr. Pagan at some point in the year before the events
10  which led us to this case.
11      A. At some point.
12      Q. All right. And Victor Cruz also supervised
13  Zulma Diaz --
14      A. Yes, ma'am.
15      Q. -- when he was over in the district?
16      A. Yes, yes, ma'am.
17      Q. All right. Now, Mr. Rodriguez was not a
18  regular supervisor of any of them, was he?
19      A. That I don't know.
20      Q. He was the highest-level supervisor on the
21  impact service on the night of August 11th?
22      A. Yes, ma'am.
23      Q. But above him, as -- the person in charge of
24  the entire area at that time was who, do you know?
25      A. Well, the superintendent was. And then below

Page 244

1  the superintendent was the commander of the area.
2      Q. And the commander of the area -- who was
3  acting commander of the area at that moment?
4      A. Was that Lieutenant Cruz?
5      Q. Yes. I mean, not acting. I mean, to be
6  honest, he was the officer delegated from the area
7  commander to be in charge of the area at that
8  particular moment.
9      A. Yes, ma'am.
10      Q. All right. Do you think any of these
11  officers that I've just mentioned -- Figueroa, Colon,
12  and Cruz -- had any supervisory responsibilities with
13  respect to Mr. Pagan and/or Ms. Diaz and/or
14  Mr. Sustache in the year before the incidents?
15      A. They had -- they had supervisory roles to
16  play throughout the course of time that you just
17  described, yes, ma'am.
18      Q. Okay. Let me ask you this. I'm switching
19  matters at this point, to try to get some stuff in
20  that I want to make sure I touch upon today. And I
21  know time is short for you.
22          When you were -- you took on this
23  assignment for the Justice Department basically, or
24  for Mr. Aldarondo's office, you did not request any
25  particular documents?

Job No. 8595    Case 3:12-cv-02039-GAG    Document 1295-1    Filed 07/25/19    Page 64 of 114    Alejandro del Carmen
Evelyn Ramirez Lluveras, et al v. Javier Pagan Cruz, et al
August 12, 2010

**Page 245**

1    A.  No, ma'am.  I had a conversation with
2  Mr. McCall early on.  And in that conversation I told
3  him that my prior experience -- you know, I would want
4  to see as much information as they could possibly give
5  me, you know, including the officer's records, you
6  know, any depositions that had been transcribed, and
7  any other documents that would be part of that.
8    And his response was that they were going
9  to send me pretty much all the works that -- you know,
10  it was rather comprehensive from -- from the -- that
11  had been given to the previous expert.
12    Q.  Did you request any particular class of
13  documents?
14    A.  I requested the training records of Officer
15  Pagan.  I requested the depositions that had been
16  taken that would explain the incident.  The original
17  trial transcript, so that I could understand the
18  events that took place.
19    I also requested -- I believe I talked
20  about an organizational chart at some point so that I
21  could see which supervisor was in charge of what, at
22  what time.
23    Q.  Did you ever get that?
24    A.  No, not that part, no.
25    Q.  And what did you do upon getting that

**Page 246**

1  information?  Did you have a method to your madness?
2  That's not meant derogatorily.
3    A.  Thank you.
4    Q.  Did you have a method in terms of looking for
5  specific facts, or did you just read everything and
6  come up with conclusions?
7    A.  Well, what I wanted to do, first of all, is
8  to understand the case.  And I wanted to understand
9  what happened on August the 11th, 2007.
10    And so -- but I saw my role, Ms. Berkan,
11  more specific to responding to the report that
12  Mr. Reiter had written, you know, specifically.
13    And so what I did is I went back and I
14  read the original case to find out, you know, what had
15  happened with Officer Pagan, what happened that day,
16  Mr. Caceres, where he was located, you know, and what
17  led to the shooting.
18    Then afterwards I began to read the
19  depositions to try to understand that.  And then I
20  read Mr. Reiter's report in between.
21    Q.  You didn't read Mr. Reiter's report first?
22    A.  I read it about one third of the way into the
23  case.
24    Q.  Okay.
25    A.  Because of the way that the documents came to

**Page 247**

1  me, they came in sequence.  And so once -- I received
2  one, one day; and then two, three days later I
3  received a another batch of documents.
4    Q.  Now, in your previous testimonies -- and as I
5  said, I know you haven't given court testimony.  But
6  in your previous report preparation, have you ever had
7  the task of responding to a report by another expert?
8    A.  Yes, ma'am, I have.
9    Q.  In which case?
10    A.  In the El Paso case I responded to the
11  testimony that was written by Dr. Bob Taylor.
12    Q.  And your report was divided the same way it
13  is here, which was --
14    A.  No, ma'am.  I did not respond to the
15  specifics of the report, but rather to the case as a
16  whole.  But my role was that of responding to the
17  report.  I'm sorry, strike that.  That's not accurate.
18  It's -- let me go back and think.
19    Q.  Okay.  I found your curriculum vitae.
20    A.  Oh, there you go.
21    Q.  It was in another report.
22    A.  There you go.  May be dated, but you can use
23  it.
24    Q.  Yeah.
25    A.  Let me think back.  Hang on.

**Page 248**

1    Q.  I have the --
2    A.  No, no, it wouldn't be in the El Paso case,
3  because Dr. Taylor responded to my report.  So it
4  was -- I had them backwards.
5    Q.  Uh-huh.
6    A.  Let me think.
7    I don't believe so, Ms. Berkan.
8    Q.  I mean, I haven't seen one.  I'll be
9  perfectly honest.
10    A.  I don't think I have.  Now that I think about
11  it, I don't think I have.
12    Q.  Do you understand the methodology is
13  different when you're responding to a report than when
14  you're drawing your own conclusions?
15    A.  The approach is different, yes, ma'am.
16    Q.  I want to know about the methodology.
17    A.  I'm a statistician.  That's what I teach at
18  the university.  So when you tell me methodology, I
19  immediately consider the -- you know, the
20  comprehensive research methods approach to a
21  particular problem, so --
22    Q.  So did you use a comprehensive research
23  approach for this?
24    A.  I looked into the points that Mr. Reiter had
25  made, and I went back to the record to see where he

## Page 249

1    was drawing that information from.
2        Q.  And you believe that some of the things that
3    he concluded were not supported by the record?
4        A.  Yes, ma'am.
5        Q.  Are you aware that Mr. Luis Rodriguez,
6    Lieutenant Luis Rodriguez, arrived on the scene within
7    eight minutes of the shooting?
8        A.  Yes, ma'am.  I read that in a deposition
9    somewhere.
10       Q.  All right.  And are you aware, was he hurt by
11   the crowd?
12       A.  He was not hurt by the crowd, no.
13       Q.  In fact what do you believe he did, from your
14   reading of the testimony, when he arrived on the
15   scene?
16       A.  You know, that part is not clear from what I
17   remember reading.
18           Lieutenant Cruz in his deposition talks a
19   little bit about --
20       Q.  Victor Cruz?
21       A.  Yes, ma'am.
22       Q.  Okay.
23       A.  Talks a little bit about the fact that when
24   he arrived at the scene, he found Lieutenant Rodriguez
25   already there.

## Page 250

1        Q.  I think you're mistaken.  I mean, Victor Cruz
2    did not arrive at the scene.  I mean, check it out.
3    I'm just --
4        A.  Yeah, maybe.  Okay.
5        Q.  Luis Rodriguez arrives at the scene.  Victor
6    Cruz goes right to the hospital.
7        A.  I'm sorry, you're right.
8            And Lieutenant Cruz -- let me go back.
9            Lieutenant Cruz is at McDonalds when he
10   hears the fact that he's -- he's given the information
11   that the shooting took place.  And so he hears on the
12   radio.  That's what it was.  He hears on the radio
13   that Lieutenant Rodriguez is already at the scene, so
14   he goes directly to the hospital.  You're correct.
15       Q.  All right.  And Lieutenant Rodriguez didn't
16   suffer any injuries or --
17       A.  Not to my knowledge, ma'am.
18       Q.  -- at the scene?
19           And did he manage to calm the crowd by
20   saying, we're really going to look into this; we'll
21   see what happened?
22       A.  Yes, ma'am, from what I remember reading.
23       Q.  And you're aware of many witnesses who
24   testified that what had occurred there had been
25   essentially an assassination?

## Page 251

1        A.  There were many witnesses that were very,
2    very upset.  And I recall reading from the original
3    transcript of trial several of the witnesses, that the
4    fiscal, or prosecutor, brought forth.  And he brought
5    upon several witnesses that said that it was a very --
6    you know, people were very upset about what happened.
7    And there were a lot of comments that were made to
8    Officer Pagan as he was shooting Mr. Caceres as to
9    what was going on and, you know --
10       Q.  Didn't you hear on the videotape that you saw
11   on You Tube people shouting, abusador?
12       A.  Yeah, I do remember that.
13       Q.  You can hear that, right?
14       A.  Yes, ma'am, I heard.  And there was a lot of
15   screams --
16       Q.  Yeah.
17       A.  -- you know, being made.
18           And I also remember reading from the
19   transcript, you know, that there were -- that they
20   were very upset, and there were people screaming from
21   the crowd onto him.
22       Q.  Does that surprise you, given the events?
23       A.  Does it surprise me that people were
24   screaming?
25       Q.  Uh-huh.

## Page 252

1        A.  No, ma'am.
2        Q.  Do you know how many times Mr. Pagan got out
3    of his vehicle at the scene?
4        A.  I believe twice, from what I remember.
5        Q.  All right.  And what do you believe occurred
6    in the first time he got out?
7        A.  There is conflicting testimony, as you know,
8    from the original transcript.  But from what I recall
9    reading, some people allege that Mr. Caceres was
10   directing traffic in the middle of the street.
11           And so the unit pulls up to where
12   Mr. Caceres is, and there is an exchange between
13   Officer Pagan and Mr. Caceres.  And Officer Pagan
14   tells Mr. Caceres to go ahead and move the mopeds or
15   the --
16       Q.  Scooters?
17       A.  -- scooters over there onto the sidewalk.
18           And then at that point Mr. Caceres
19   complies with the request.  There is again conflicting
20   testimony as to who said what after that.
21       Q.  Uh-huh.
22       A.  Some people claim that Mr. Caceres said
23   something very rude to the officer.  Some other people
24   say that the officer got out of the car and basically
25   began to walk towards Mr. Caceres.

Page 253

1    Q.  And then -- but that's before he gets back in
2    the car?
3        A.  I think there is a -- there's one instance
4    when he gets out, gets back in the car, then he gets
5    out again.
6        Q.  Do you know why he got out again?  Did
7    anybody say anything about that?
8        A.  Yeah, I think, from what I remember reading,
9    there were some people that said that he -- that
10   Mr. Caceres said something to him that made him get
11   out, which was, you know, insulting or derogatory.
12       And I don't remember the particular
13   statement that was made.
14       And other people say that he just got out
15   abruptly, and he just kind of, you know, exited the
16   vehicle and walked up to Mr. Caceres.
17       Q.  Are you aware that Superintendent Toledo,
18   shortly after the events, called it an execution?
19       A.  I am.  I am.
20       Q.  Having reviewed a little bit of Mr. Pagan's
21   record today, and seeing that he had more than just
22   the Bezares and the Cabrera complaint, had at least
23   two others that involved either verbal or physical
24   aggression or threats of the same, would you modify
25   your conclusion in Paragraph 4 of your report?

Page 254

1        A.  On what page?
2        Q.  Paragraph 4, Page 8.
3        A.  Page 8?.
4            MS. MENDEZ:  8 to 9.
5        Q.  8 to 9.
6        A.  I would modify it to the extent that I would
7    argue that there were other incidents that were in
8    place that merited for Officer Pagan to be reviewed.
9        Q.  You would agree with me that he had fewer
10   complaints and more severe complaints than did Officer
11   Lynch in the Irving case?
12       A.  From what?
13       Q.  Irving.  Curtis or Lynch?
14       A.  No, it's Lynch.
15       Q.  Yeah.
16           MS. MENDEZ:  Fewer complaints or more
17   complaints?
18           MS. BERKAN:  Did I say fewer?  I'm sorry.
19       Q.  You would agree that Officer Lynch in the --
20           THE WITNESS:  Now I know why you brought
21   her here.
22           MS. BERKAN:  It's late in the day.
23       Q.  Officer Lynch in the Good case had fewer and
24   less severe complaints that you found to be a red flag
25   in -- than did Mr. Pagan?

Page 255

1        A.  From what I remember, yes, ma'am.
2        Q.  All right.  Now, in this Paragraph 4 you also
3    say:  Given the training and experience of these
4    officers -- all right.  The whole sentence says it
5    supports the notion that they could have relied, you
6    know, on that.
7            Now you're talking about the training and
8    experience in those files that we looked at today?
9        A.  Of Officer Pagan, is that what you're --
10       Q.  Yes.
11       A.  Yes, ma'am.
12       Q.  Well, you say these officers.
13       A.  Uh-huh.
14       Q.  But you don't know anything about the
15   training and experience of Sustache and Diaz?
16       A.  Yeah, it's actually not worded properly.
17       Q.  It should be this officer?
18       A.  Yes, ma'am.  It should be this officer
19   instead of these officers.
20       Q.  And the training you're talking about is the
21   file that we went over a short while ago?
22       A.  Yes, ma'am, the file that was represented to
23   me.
24       Q.  Do you know if Mr. Pagan ever received
25   counseling on his problems or any problems he may have

Page 256

1    or may not have had --
2        A.  For --
3        Q.  -- on self-control?
4        A.  Yeah, my recollection is that he did see
5    someone a couple of times, or a psychologist I
6    believe.
7        Q.  Where did you get that from?
8        A.  I think it was from the trial testimony, if
9    I'm not mistaken.  Or I can't remember exactly where
10   it came from, but --
11       Q.  He testifies to that in his deposition in the
12   Santiago case, but --
13       A.  I haven't seen that, so --
14       Q.  You haven't seen that?
15       A.  No.
16       Q.  It may be mentioned by Mr. Reiter maybe.
17       A.  Yeah.
18       Q.  But do you know if there's any evidence that
19   he actually got that, other than his say-so?
20       A.  No, ma'am.
21           And you're right, it's Mr. Reiter that
22   actually acknowledges that.
23       Q.  And it's also -- you know that if he got that
24   through the police services, it would have been
25   reflected in the document through police services --

Job No. 8595

Evelyn Ramirez Lluveras, et al v. Javier Pagan Cruz, et al

Alejandro del Carmen
August 12, 2010

Page 257

1    A.  It's likely, yes.
2    Q.  -- that were requested in discovery on many
3  occasions and have never appeared?
4    A.  Yes, ma'am.
5    Q.  I'd like to look -- I'm going to be scattered
6  all over just to touch a few points which --
7        MS. MENDEZ:  You still have about twenty
8  minutes?
9    Q.  All right.  Just to touch a few points that
10  are kind of scattered, loose end kind of points
11  that --
12    A.  Yes, ma'am.
13    Q.  Okay.  After what I've -- what we have talked
14  about today, do you want to make any modifications to
15  Paragraph 9 on Page 10 of your complaint -- I mean --
16  complaint -- your report.
17        It's getting late in the day.
18        MR. MCCALL:  We can stipulate to that.
19        MS. BERKAN:  That it's getting late?
20  That I'm beginning to misspeak?
21        (Laughter.)
22        MR. MCCALL:  I'm kind of running out of
23  gas myself.
24        MS. BERKAN:  Yeah, it's worse being there
25  than here.

Page 258

1        THE WITNESS:  I don't know about that,
2  about what you just said.  Probably worse being there
3  than there.
4        MS. BERKAN:  Go off the record.
5        (Discussion off the record.)
6    Q.  I think there might be actually -- from the
7  record, since there was some banter, I want to make
8  sure that your response -- you said something that
9  made it look like you were answering my question but
10  you weren't?
11    A.  Yes, ma'am, I know.
12    Q.  But my question is:  On the basis of the
13  documents I've shown you today, some of the ones that
14  actually came from your files, at this point in time
15  would you make any alterations to your opinion on
16  Number 9?
17    A.  The reason why I would not, Ms. Berkan, is
18  because this particular point relates to the domestic
19  violence case specifically.  And, you know, in my
20  judgment, the domestic violence incident does not
21  necessarily preclude that an officer will one day
22  shoot somebody and kill them.
23        And so when I read the report that
24  Mr. Reiter wrote, I felt it would be a stretch to say,
25  you know, if you have an incident of domestic

Page 259

1  violence -- now, in all fairness to the truth, and as
2  candid as I have been with you today, I will tell you
3  it obviously would raise a concern, you know, to look
4  at domestic violence incident and respond to it.
5  There's no question about it.
6        But that would not be a causal
7  relationship between the domestic violence incident
8  and the shooting that took place on August 11th, 2007.
9    Q.  Do you understand that Mr. Reiter was saying
10  that it's the domestic violence complaint alone which
11  causes him to conclude that the supervisors were --
12  didn't comply with their duties?
13    A.  What Mr. Reiter -- from what I'm reading here
14  from my report, what Mr. Reiter makes the point of is
15  that Officer Pagan's immediate supervisors did not
16  know that he had been involved in a domestic violence
17  incident.
18    Q.  Uh-huh.
19    A.  And as a result of that, you know, that this
20  was somehow escalated to the point that Officer Pagan
21  later on, you know, took the actions that he did on
22  August the 11th.
23        And so my point here was that the
24  domestic -- that the knowledge of the domestic
25  violence case one way or the other would not

Page 260

1  necessarily have much to do with the actual shooting
2  that took place on that particular day.
3    Q.  Well, but how about the knowledge of the
4  other three complaints in which there had been
5  allegations of aggressive behavior and, in a couple of
6  the cases, excessive force?
7    A.  Within the context of best police practices,
8  I think that there is no question that police, you
9  know, supervisors as a whole have a responsibility to
10  know and be aware of what happens to their workmen.
11        In a police department of 15,000
12  officers, with the many different branches within that
13  police department -- and I think that's one of the
14  structural issues that perhaps makes this case very
15  unique, is that there's so many different components
16  of the police department that fall within its
17  structure.  It would have been almost -- very
18  difficult from an organizational perspective for them
19  to know.
20        Should they have known?  Sure.  You know,
21  could -- would that have made a difference in what
22  happened with Officer Pagan?  You know, it's probably
23  unlikely that that somehow would have prevented, that
24  Officer Pagan wouldn't have shot Mr. Caceres on August
25  the 11th.

65  (Pages 257 to 260)

**Page 261**

1      Q.  Would you -- you say, should they have known,
2   sure.
3           For what purpose?  If a supervisor knows
4   about the domestic violence, about the aggression
5   against -- or the alleged aggression against Negron
6   and the other fellow, about the problem of swearing at
7   the police -- at his police sergeant, about the
8   problem -- there was one other.
9           If they had known all that, what was a
10  good supervisor supposed to do?
11     A.  I think, first of all, let me answer your
12  question with a caveat -- or with a statement, rather,
13  first.
14     Q.  Uh-huh.
15     A.  Generally in police work, most subordinates
16  are -- most police officers don't walk around with
17  their IA file, or their Internal Affairs file, or
18  disciplinary file from one supervisor to the next.
19         Police supervisors in the United States
20  typically -- depending on what rank and at what level
21  -- but typically a sergeant or a lieutenant would have
22  very limited access to the Internal Affairs records
23  that that officer would have.
24     Q.  Yes.  But 87-14 says something different,
25  doesn't it?

**Page 262**

1      A.  The underlying component of that is that if
2   you -- if you have access to those records --
3      Q.  Uh-huh.
4      A.  -- you are likely going to be one of the
5   higher-ups in the police department in terms of
6   organizational structure.
7           In this particular case, if the
8   supervisors would have had access to this particular
9   record, perhaps it would have helped them decide as to
10  the kind of training that Officer Pagan should have
11  received and various other components of -- within the
12  management structure.
13     Q.  There is a retraining for patterns of conduct
14  within the police of Puerto Rico under 90-3 or -5, is
15  that right --
16     A.  I believe, yes, ma'am.
17     Q.  -- one of the General Orders?
18         All right.  I'm going to show you what
19  was Exhibit 7 from the Edwin Rivera deposition.  And
20  it's the week of the 6th through the 12th of August,
21  so it comprises the date that we're talking about.
22  And it's just to give you a sense because --
23     A.  I was trying to help you come this way.  Go
24  ahead.
25     Q.  Okay.

**Page 263**

1           The head of the unit at that point,
2   according to this list of service, is?
3      A.  Juan Colon-Biez.
4      Q.  All right.  And at the 9:00 a.m. to 7:00 p.m.
5   shift, four women and a man.  Office work, no?
6   (Laughter.)  Sorry.  A little side comment.
7      A.  That's okay.
8      Q.  All right.  And on the 7:00 p.m. to 5 a.m.
9   shift, how many people are there?
10     A.  7 through 18, so that's 11.
11     Q.  Should be 12?
12     A.  12.  It's getting late.
13     Q.  Yeah, you've got to count the first one and
14  the last one.
15     A.  That's right.
16     Q.  And then there's a person in charge of
17  vehicles.  And then there are six more assigned to
18  impact.  And then there are people that are in other
19  places through leaves, whether it be regular leave,
20  reconcentrated -- which means they are in another
21  division for a short period of time -- or military
22  leave.  All right?
23     A.  Yes, ma'am.
24     Q.  All right.  So Mr. Colon-Biez, if he wanted
25  to look at the files of his active personnel, he would

**Page 264**

1   have a total of, 6 -- 18, 19 -- about 25 --
2      A.  Yes, ma'am.
3      Q.  -- files?
4           So before, when I said you were off when
5   you said 80 --
6      A.  Right, I understand.
7      Q.  -- there it is.
8           All right.  Now, there's another part of
9   your report where you say that Mr. Reiter is wrong on
10  the facts.  And you say -- let me see if I can get to
11  it.  Something about the roadblock.
12         Do you remember where that was?
13         The sequence of events.  It's in this
14  portion.
15     A.  Which page are you looking at?
16     Q.  Page 12.  You say he oversimplifies them and
17  omits key pieces of information.  All right?  And you
18  say that they were assigned to a roadblock operation
19  designed to identify motorist violators, and they --
20  they observed Mr. Caceres and his friend in the
21  roadway.
22         What's wrong with that statement that
23  Mr. Reiter makes?
24     A.  My understanding was that a roadblock
25  operation suggested that they were actually,

Page 265

1  physically present on the street, stopping traffic --
2  traffic.
3      Q.  They were assigned to a roadblock operation,
4  weren't they; but it just wasn't there?
5      A.  Right.
6      Q.  Maybe you misread Mr. Reiter.
7          They were on their way, were they not, to
8  Nheuabo, and they had arrived -- the other cars had
9  already made it to Nheuabo, where they were doing a
10  roadblock operation.
11         And Mr. Pagan, Mr. Sustache, and Ms. Diaz
12  were coming late because Ms. Diaz had arrived late.
13  So they stayed back to pick her up; is that right?
14     A.  That -- I haven't read that, ma'am, but I
15  have no reason to doubt you.
16     Q.  All right.  If I represent to you that
17  Mr. Rodriguez testified that it was a blockade
18  operation, the impact service --
19         MR. MCCALL:  I'm sorry, which Rodriguez
20  is that?
21         MS. BERKAN:  I'm sorry, yes.
22     Q.  Luis Rodriguez.  Well, the other Rodriguez
23  didn't show up for his depo.
24         He testified -- Luis Rodriguez testified
25  that the operation with several cars that night was a

Page 266

1  roadblock, or a blockade is what he called it.  It was
2  translated to blockade, bloqueo.  Then would
3  Mr. Reiter's statement be accurate?
4      A.  It would seem to be accurate, yes, ma'am.
5      Q.  Okay.  Now, in the next phrase there on the
6  next page, he also fails to acknowledge that
7  Mr. Caceres resisted arrest.
8          All right.  Can you tell me why you
9  included that in your report, the fact that he
10  resisted arrest?
11     A.  Because I think that the way -- the way that
12  I read Mr. Reiter's report almost suggested that Pagan
13  was getting out of the vehicle purposely to go shoot
14  somebody almost, you know.
15         And I wanted to make the point that, even
16  though I was not assigned to specifically review the
17  Pagan shooting, per se, that I wanted to make the
18  point that there were even some witnesses and some
19  people that testified at trial that had suggested that
20  Mr. Caceres actually resisted arrest.
21         And in fact in one case the witness that
22  is testifying at trial indicated that he had actually
23  helped -- or he was trying to prevent Officer Pagan
24  from arresting Mr. Caceres.
25     Q.  And was there an underlying criminal offense

Page 267

1  that you've been able to identify?
2      A.  That's beyond the scope of what I was asked
3  to review.
4      Q.  All right.  And you're not -- I'm sorry.  I
5  interrupted you.
6      A.  No, that's just beyond the scope of what I
7  was asked to review.
8          So I'm not offering an opinion on whether
9  or not this was justified or not.  I'm simply making
10  the point for the factual statement that that part
11  should have been included.
12     Q.  And what was the resistance?  Did he have his
13  hands up and say, don't touch me?
14     A.  My understanding was that he started backing
15  away from Officer Pagan.  And then Officer Diaz
16  mentioned to him, you're under arrest.  And he
17  continued to walk backwards, away from them.
18     Q.  And you're not suggesting that that entitled
19  Officer Pagan to kill him?
20     A.  No, ma'am, I'm not.
21     Q.  You were pretty horrified, weren't you, when
22  you saw the killing on the video?
23     A.  Ms. Berkan, I will tell you in the last few
24  minutes that we have that I -- as a child I was raised
25  in Nicaragua --

Page 268

1      Q.  I know that.
2      A.  -- and I went through a war as a child.
3      Q.  Uh-huh.
4      A.  And I saw people getting killed as a child.
5  And I lived under Communism for a few years.
6          So anytime there is a loss of a life, I'm
7  horrified, regardless of the circumstances of that.
8      Q.  Well, when you saw it, did you see anything
9  that justified the use of that level of force on what
10  at worst was a traffic violation?
11     A.  I will tell you that, you know, I don't offer
12  opinions on -- any longer on use-of-force
13  circumstances, because I -- I simply -- you know, even
14  though one court's opinion may be different from the
15  other, I simply don't have -- don't want to intrude in
16  that territory which is beyond the scope of what I'm
17  doing here.
18     Q.  In that case, there was a sex offender who
19  had a gun.  And you even opined that the first couple
20  of shots were justified, right?
21     A.  Ma'am?
22     Q.  In that case where you did offer, the
23  offender was a much more dangerous person than --
24     A.  It was a person that had a gun.  And to the
25  officer's perception, that gun was real.

Job No. 8595   Case 3:12-cv-02039-GAG   Document 1295-1   Filed 07/25/19   Page 70 of 114 Carmen
Evelyn Ramirez Lluveras, et al v. Javier Pagan Cruz, et al

August 12, 2010

Page 269

1    Q. Yeah, yeah.
2        So besides the -- well, continuing on
3    that same paragraph on Page 13, you have now mentioned
4    he fails to acknowledge that he -- that Mr. Caceres
5    resisted arrest -- I actually have another question on
6    that.
7        Can you resist arrest that has no
8    underlying basis for the arrest?
9    A. No. The premise in which people operate -- a
10   citizen operates is that if a police officer walks up
11   to me today having this deposition and says, you're
12   under arrest --
13   Q. Uh-huh.
14   A. -- even though in my judgment that police
15   officer may not have a justifiable reason to arrest
16   me, it is not for me to resist arrest from the
17   officer, but rather -- that's why the courts are in
18   place, is to be able to clarify the matter, per se.
19   Q. And the resistance that you refer to with
20   respect to Mr. Caceres, was it -- there are levels of
21   resistance.
22        Aren't you taught about passive
23   resistance, active resistance, aggressive resistance?
24   A. Yes, ma'am.
25   Q. Where would you put his resistance?

Page 270

1    A. It would likely be a passive resistance.
2    Q. And when you say at the end of the first
3    paragraph -- first incomplete paragraph of Page 13
4    that: Due to his omissions of fact, lack of
5    citations, and questions relevant to actual sources
6    examined, his report is inherently unreliable -- do
7    you affirm that that's the case?
8    A. Yes, ma'am.
9    Q. And the omissions of fact that were -- that
10   led you to believe that with respect to Mr. Reiter,
11   what are they?
12   A. Well, we'd have to go back through the entire
13   report and cite them. But I -- I --
14   Q. Well, I think I pointed out the ones that --
15   A. You pointed out one, yes, ma'am.
16   Q. All right. Omitting key pieces of
17   information in the preceding page regarding the
18   sequence of events, and you have already stated that
19   you may be in error with respect to whether they were
20   assigned to a roadblock operation...
21   A. Right. And the fact that I looked at
22   Mr. Reiter's statement as the assignment instead of
23   the actual happenings of it.
24   Q. Yeah, I understand that.
25   A. Yeah.

Page 271

1    Q. And the fact that he failed to acknowledge
2    that Mr. Caceres resisted arrest?
3    A. Right.
4    Q. Any others that you can see?
5    A. Not offhand, no.
6    Q. I think there might be one other, which is
7    the meaning of 87-14; where you say that it's just
8    sort of a guide, not an order, even though it's
9    entitled, General Order?
10       That's at the top of Page 12.
11   A. Right, I'm looking at it. Yeah.
12   Q. Do you think those are omissions in
13   Mr. Reiter's report?
14   A. I think Mr. Reiter wrote a report which in my
15   view had certain components of it which were not --
16   they were -- they failed to show a direct cause
17   between the supervisors that were in this case and the
18   actual event that took place on August the 11th, 2007.
19       And in my judgment, you know, the fact --
20   and I didn't know if -- and it was hard to see from
21   the report that I read, having no citations as to
22   where exactly he was getting this information and
23   where exactly he was extracting it.
24       And when I went back and I reviewed the
25   record, I found that there was opposing information,

Page 272

1    which I cited in my report.
2    Q. What opposing information do you cite that's
3    different from Mr. Reiter's information?
4    A. Well, I mean, I made these points clear on
5    each one of them, I thought.
6    Q. Well --
7    A. On the report, so --
8    Q. I don't see opposing information except your
9    view that his conclusions --
10   A. Well, the interpretation is what I meant, not
11   necessarily --
12   Q. All right. But I wanted to know in terms of
13   information. You mentioned that citizens were
14   shouting at the officers on the scene.
15   A. (Witness nods head up and down.)
16   Q. Was that significant to your -- I'm now on
17   Page 7. Was that significant in your conclusions as
18   to the responsibility of any of the supervisor
19   defendants?
20   A. No, it was not significant.
21   Q. All right. So the next one was -- I'm going
22   paragraph by paragraph.
23   A. I will caution you, though, without trying to
24   limit your questioning, that it is 4:05; and I need to
25   get to the university.

**Page 273**

1    Q.  Give me about five more minutes, and I'll --
2    A.  Yes, ma'am.
3    Q.  -- stop.
4        I appreciate that because I know you have
5    an obligation.
6    A.  You bet.
7    Q.  Number 2 is an overall statement, doesn't
8    apply to specifics, correct?
9    A.  Okay, say that again, ma'am.
10   Q.  Number 2?
11   A.  Uh-huh.
12   Q.  On Page 7 to 8?
13   A.  Right.
14   Q.  Is just an overall statement of your
15   disagreement with his conclusions.  It doesn't provide
16   for specifics as to omissions?
17   A.  Right.  It's a disagreement with the
18   characterization that he made.
19   Q.  Number 3 talks about causation.  We addressed
20   that early in the deposition, because you found a
21   causal relationship in the case of Mr. Lynch and the
22   City of Irving?
23   A.  (Witness nods head up and down.)
24   Q.  So you have made causal determinations in
25   similar situations, right?

**Page 274**

1    A.  Yes, ma'am.
2    Q.  All right.  Number 4, that they were seasoned
3    officers doesn't -- the conclusions might be different
4    from the fact that they were seasoned officers, but
5    there's no omissions that you're talking about?
6    A.  Right.
7    Q.  And you've already modified that somewhat in
8    your testimony today.
9        Now, Number 5 is again conclusions from
10   facts that you don't disagree with Mr. Reiter on?
11   A.  Right.
12   Q.  Number 6 is the issue of whether he has --
13   it's correct for Mr. Reiter to view his previous
14   history with the department and use what he knows
15   about the department based on earlier reviews of files
16   in making conclusions in this case.
17       So that's a methodological difference,
18   correct?
19   A.  There is a difference of opinion as to
20   whether he should have included that or not, yes,
21   ma'am.
22   Q.  Same with Number 7?
23   A.  That's correct.
24   Q.  All right.  Number 8, you disagree with
25   Mr. Reiter that Mr. Pagan had personal knowledge of

**Page 275**

1    the failures of the discipline system?
2    A.  From the record that I reviewed, yes, ma'am,
3    I do.
4    Q.  All right.  But if you saw Mr. Pagan's
5    deposition and he said something else, his deposition
6    in Santiago --
7    A.  It would show otherwise.
8    Q.  It would say otherwise.  All right.
9        Number 9 -- I'm trying to do this very
10   quickly.  And if you want to make clarifications in
11   the phone follow-up, you can.  But I want to get this
12   basic stuff before you have to leave.
13   A.  Okay.
14   Q.  And I appreciate your staying another five or
15   ten minutes.
16       Number 9, 10 have to do with essentially
17   the obligations of supervisors in the Puerto Rico
18   Police Department to monitor the disciplinary
19   complaint files of their underlings?
20   A.  Yes, ma'am.  I was responding to Mr. Reiter's
21   statements on those.
22   Q.  IACP we'll leave aside for now.  That's
23   Number 11.
24       Number 12 has to do with -- there's no
25   omissions there.  It's just that Colonel Rivera Merced

**Page 276**

1    did not seek to find any statistics or figure out if
2    there was a problem of officer-involved shootings in
3    his area?
4    A.  Right.
5    Q.  And you're aware of an officer-involved
6    shooting the week before?
7    A.  Yes, ma'am.
8    Q.  And you're aware that Mr. Sustache and
9    Mr. Pagan were on the scene within seconds of the
10   shooting?
11   A.  Right.  My recollection from reading is that
12   they had arrived a few seconds, a few minutes later,
13   shortly thereafter.
14   Q.  I don't think it reaches a few minutes.
15   A.  Okay.
16   Q.  But we can look at the testimony on that.
17   A.  Sure.
18   Q.  Do you know if they were interviewed about
19   that shooting?
20   A.  I believe that that was raised by Mr. Reiter
21   in his report, that they were not.
22   Q.  They were not interviewed.
23       Okay.  87-14, you conclude that General
24   Orders in police departments are meant to provide
25   parameters and guidelines, not specific instructions.

69  (Pages 273 to 276)

Job No. 8595    Case 3:12-cv-02039-GAG    Document 1295-1    Filed 07/25/19    Page 72 of 114    Alejandro del Carmen
Evelyn Ramirez Lluveras, et al v. Javier Pagan Cruz, et al
August 12, 2010

Page 277

```
1        So if you're wrong on that, that
2    paragraph goes out?
3        A.  Well, if I'm wrong on any statement that I've
4    made, the statement would go out, right?
5        (Laughter.)
6        I'm tired but not that tired.
7    Q.  I've been watching 87-14 for many years.
8        All right.  And then the rest just say
9    it's unreliable, et cetera, and it's unclear how he
10   reached his conclusions and the lack -- I mean, we've
11   already gone through the specific failings and
12   omissions you talked about already?
13       A.  (Witness nods head up and down.)
14   Q.  So, I mean, we can go on later on, and we
15   still have to go over each of the things -- the --
16       A.  Officers.
17   Q.  -- the individual parts at the end of this.
18       But I would ask you one last question,
19   which is:  Are you in any way -- is your opinion in
20   this case in any way impacted by the fact that
21   Mr. Sustache and Mr. Pagan were on the site of an
22   officer-involved shooting exactly one week before
23   which resulted in the death of a young man who was
24   actually the son of one of their colleagues, a police
25   officer's son, Mr. Santiago; the fact that they were
```

Page 278

```
1    not interviewed, counseled, in any way asked about
2    that incident, would that impact upon your opinion in
3    this case?
4        A.  My understanding, Ms. Berkan, is that they
5    were not part of that particular situation.  They
6    simply reacted to it a few seconds later.  But they
7    were not necessarily involved in that particular --
8    Q.  You don't think they saw the man bleeding to
9    death right in front of their eyes?
10       A.  I have not read except what has been in the
11   deposition acknowledging that they had actually
12   been -- you know, had responded to that.  And mostly
13   what I went by is Mr. Reiter's report, which as you
14   know does not stipulate that.
15   Q.  And you think it's irrelevant, the fact that
16   there was an officer-involved shooting and that two of
17   the officers who a week later were on the scene when
18   another man is killed had just witnessed a man being
19   killed one week earlier?
20       A.  And that's the part that I'm not clear,
21   because I didn't read the exact case and --
22   Q.  I'm not representing to you, because I am
23   totally honest, that they were --
24       A.  Right.
25   Q.  -- actually, physically present at the moment
```

Page 279

```
1    of the shots.  They were there within seconds.  They
2    saw the man bleeding on the street.  They saw -- they
3    were involved in the preservation of evidence.  They
4    were there when the officer was whisked off the scene.
5    They were there -- you know, they were assigned to the
6    same place; they were just several yards away.
7        Assuming that --
8        A.  It would stand to reason that somebody that's
9    investigating the scene should have asked a few
10   questions from them as to what they saw, right?
11   Q.  Would it stand to reason under Best Practices
12   model that their supervisors would inquire as to
13   whether they were affected by that, that they just saw
14   a man killed?
15       A.  I wouldn't say the supervisors, but the
16   investigating officer should have asked questions
17   to --
18   Q.  You don't think their supervisors should
19   have -- like I saw on Law & Order:  Elliott, take a
20   break this week.  You just saw somebody killed.
21       You don't think that that should be done?
22       A.  Ms. Berkan, if I had used my experiences from
23   LA Law --
24   Q.  No, I said Law & Order.
25       A.  No, I know.  But I'm making the analogy here
```

Page 280

```
1    as to how attorneys behave.  I wouldn't be sitting
2    across this table with you right now.
3    Q.  I model myself on Perry Mason and the
4    Defenders, you know.
5        A.  There you go.
6    Q.  But honestly, I mean in all seriousness --
7    and this will be the last question for today, and then
8    we'll figure out a time for follow-up; because I know
9    you've extended your time, and I appreciate it.
10       As supervisors of two officers who had
11   witnessed this event -- not the actual shooting, but
12   within seconds -- and had seen a dying man being
13   gathered up by his father, taken over to the CDT,
14   which is the health -- little health office in the
15   town, and died a few minutes later, and were there
16   preserving the scene, et cetera, assigned to the same
17   youth festival, would you expect that their
18   supervisors would at least try to ascertain whether
19   they were in any way affected by that?
20       A.  And, again, I'm giving you an honest answer.
21   It may not be the answer you want, but I'll give you
22   an honest answer.
23   Q.  Sure.
24       A.  Typically in police work, police supervisors
25   will not necessarily inquire -- or, you know, they
```

Merit Court Reporters
817-336-3042                depos@merittexas.com                817-335-1203

## Page 281

1    would do it informally.  They would say, hey, are you
2    okay?  You know, do you need to see somebody?  Do you
3    need --
4            But typically in police work, the
5    individual detective that handles and processes the
6    crime scene would be the one that would be
7    responsible.  And I would agree with the fact that
8    under the Best Practices model, that detective should
9    have asked questions of any officer that would have
10   witnessed anything relevant to an incident such as
11   that one.
12           But for the supervisors to know or to
13   inquire, you know, in a police department of 15,000
14   people, I don't know that that's --
15   Q.  In a unit of 25 people --
16   A.  Well, and that --
17   Q.  -- in which four of the officers had
18   witnessed that?
19   A.  Right.
20   Q.  You don't think they should have --
21   A.  You know, should have known about it, should
22   have asked?  You know, I would have to really go back
23   and see exactly what happened and when they showed up
24   and -- to formulate an opinion, so --
25   Q.  All right.  Thank you very much.

## Page 282

1    A.  Thank you, ma'am.
2        MS. BERKAN:  We will continue this at an
3    agreed-upon date.  I suspect that I have an hour or
4    two, max.  I mean, we've done most of what I intend to
5    do.  I do intend to go over the latter part of your
6    report, which is basically the big gap I have so far.
7        THE WITNESS:  Are we going to schedule it
8    now or --
9        MS. BERKAN:  Off the record.
10       (End of proceedings.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 283

```
                          CHANGES AND SIGNATURE
1
2  PAGE/LINE        CHANGE                        REASON
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 284

```
1
2              I, ALEJANDRO DEL CARMEN, have read the
   foregoing deposition and hereby affix my signature
3  that same is true and correct, except as noted above.
4
5
                          _____
                          ALEJANDRO DEL CARMEN
6
7  STATE OF _____)
   COUNTY OF _____)
8
9
              Before me, _____, on
10 this day personally appeared ALEJANDRO DEL CARMEN,
   known to me (or proved to me under oath or through
11 _____) (description of identity card or
   other document) to be the person whose name is
12 subscribed to the foregoing instrument and
   acknowledged to me that they executed the same for the
13 purposes and consideration therein expressed.
14
15            Given under my hand and seal of office this
   _____, _____.
16     day of
17 NOTARY PUBLIC IN AND
   FOR THE STATE OF TEXAS
18 My commission Expires:
19
20
21
22
23
24
25
```

**Page 285**

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF PUERTO RICO
 2
 3    EVELYN RAMIREZ LLUVERAS,     *
      et al,                       *
 4            Plaintiffs           *
                                   *
 5    v.                           *  Civ. Number 08-1486 FAB
                                   *
 6    JAVIER PAGAN CRUZ, et al,    *
              Defendants           *
 7
 8
 9              I, Amy L. Sturgess, a Certified Shorthand
10    Reporter in and for the State of Texas, do hereby
11    certify that, pursuant to the agreement hereinbefore
12    set forth, there came before me ALEJANDRO DEL CARMEN,
      who was by me duly sworn to testify the truth, the
13    whole truth, and nothing but the truth of said
14    witness's knowledge concerning the matters in
15    controversy in this cause; and the said witness was
16    thereupon carefully examined upon said oath, and said
17    examination reduced to writing under my supervision;
18    that the deposition is a true record of the testimony
19    given by said witness, same to be sworn to and
20    subscribed by said witness before any notary public,
21    pursuant to the agreement of the parties.
22              I further certify that I am neither
23    counsel for nor related to any party in this cause and
24    am not financially interested in its outcome.
25
```

**Page 286**

```
 1              GIVEN UNDER MY HAND AND SEAL of office on
 2    this the 27th day of August, 2010.
 3
 4
 5              AMY L. STURGESS, Texas CSR 095
                Expiration Date: 12/31/1
 6              Merit Court Reporters
                307 W. 7th Street
 7              Suite 1350 Commerce Building
                Fort Worth, Texas  76102
 8              817.336.3042
                asturgess@merittexas.com
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Job No. 8595
Case 3:12-cv-02039-GAG   Document 1295-1   Filed 07/25/19   Page 75 of 114
Evelyn Ramirez Lluveras, et al v. Javier Pagan Cruz, et al
Alejandro del Carmen
August 12, 2010

Page 287

## A

**abandoned** 16:6
**ability** 14:9 100:12
**able** 40:20 56:17
59:22 66:3 81:13
115:10 176:12
177:2 191:22
205:19 208:21
267:1 269:18
**above-numbered**
5:12
**Abraham** 4:7 45:1
45:3,4,12,22
**abruptly** 253:15
**absolutely** 49:11
50:13 164:23
**abusador** 251:11
**academic** 41:24
69:13,15 70:17
70:23 72:2 118:3
120:7 125:20,21
128:11 136:6
**academies** 213:3
215:1
**academy** 67:4
101:22 102:1
104:20,24 105:9
105:12 142:16
209:18 210:2,25
212:15,16,17
213:5,25 215:5
**accept** 183:22
217:25 237:5
**accepted** 123:18
123:20
**access** 56:17 57:2
59:22 90:25
159:23 161:10
261:22 262:2,8
**account** 51:19
194:23 199:14,15
200:5 220:19
**accountability**
31:22
**accountable** 36:20
**accounting** 23:3
144:12
**accredit** 122:3

**accreditation**
122:2
**accurate** 74:4
102:14 247:17
266:3,4
**accurately** 81:4
**accusation** 157:11
157:14 168:25
169:1,2,9
**accusations**
137:25
**accused** 56:2
157:16,17 158:6
160:2,15 178:25
**acknowledge**
266:6 269:4
271:1
**acknowledged**
44:18 77:18
231:20 236:22
284:12
**acknowledges**
256:22
**acknowledging**
278:11
**acknowledgment**
146:23 210:23
**ACLU** 31:18,20
106:1
**acquainted** 117:13
**acronym** 66:11
102:9
**act** 221:4,6
**acted** 174:4
**acting** 244:3,5
**action** 51:6 83:8
83:14 158:24
**actions** 42:4 49:5
52:5 115:9 116:8
116:19 166:16
177:4 181:13
259:21
**active** 263:25
269:23
**activity** 39:4 59:10
92:10 124:18
144:9 145:5
**acts** 51:11

**actual** 88:21 93:5
260:1 270:5,23
271:18 280:11
**add** 59:22 140:5
**added** 55:5
**addition** 36:16
94:21 118:2
119:10 125:3
205:14
**additional** 61:25
94:24
**address** 82:18
100:20 103:24
151:5
**addressed** 9:14
87:19 101:5
110:8 111:17
128:24 203:12
222:24 273:19
**addresses** 180:18
**addressing** 76:12
82:22
**adequacy** 116:18
118:20 143:10
**adhere** 131:20
164:24
**administer** 6:12
166:12
**administration**
119:13 148:19
**administrative**
78:18,20 88:11
88:18 94:16
106:14,16 144:23
155:4 195:23
**administratively**
213:4
**administrators**
79:6 111:5
**admissible** 154:6,7
**adopt** 221:13
**advance** 97:4
112:2
**advanced-level**
29:14 79:18
**adverse** 228:10
234:12
**advertised** 66:7

**advertisement**
44:19
**advertising** 44:16
58:4
**advice** 105:5
**advocates** 170:7
**Affairs** 89:4
136:23 137:23
160:7 169:15
261:17,22
**affect** 67:17
103:21 138:25
172:8
**affirm** 8:11 270:7
**affix** 284:2
**African** 34:3
**agencies** 27:7,14
27:24,25 28:2,8
28:10 30:8 36:15
55:12 59:24
67:22 71:17,24
81:1 83:3 84:8
88:1,3 90:9
93:12,21 117:11
162:19 167:17
**agency** 32:9 37:18
37:19 61:17
66:23 69:5
**agent** 214:1
225:19
**agents** 161:21
234:13
**aggregate** 86:14
87:7,23
**aggression** 201:11
202:1 253:24
261:4,5
**aggressions**
203:19,19
**aggressive** 201:18
260:5 269:23
**aggressor** 40:21
**ago** 45:6,9 52:22
67:5 72:21,22
99:9 108:16
109:8 126:11
129:11 134:11
216:9 255:21

**agree** 154:1,8
172:21 174:19
196:16 201:13
202:10 203:3
219:10 222:22
233:21 240:14
254:9,19 281:7
**agreed** 5:11,16,24
6:10,18 7:2
177:25 183:7
**agreed-upon**
282:3
**agreement** 17:23
17:25 22:6,24
25:9 74:22 93:20
182:20 227:8
285:11,22
**agreements** 3:3
5:10 7:4 8:17,18
**AH** 211:5
**ahead** 15:25 46:2
58:18 62:7 77:10
93:19 233:11
252:14 262:24
**aim** 149:22
**al** 1:3,6 119:7
285:3,6
**ALB** 2:7
**albeit** 176:20
**alcoholic** 103:20
**Aldarondo** 2:7
17:25
**Aldarondo's**
244:24
**Alejandro** 1:9 3:2
4:2 5:2,18 8:24
11:9,15 17:6
284:2,5,10
285:12
**Alex** 8:4,23
**Alexis** 201:3
**aliens** 133:14
**allegation** 138:13
**allegations** 191:8
201:16,17 260:5
**allege** 252:9
**alleged** 33:16
201:8,14 202:19

Case 3:12-cv-02039-GAG   Document 1295-1   Filed 07/25/19   Page 76 of 114

August 12, 2010

261:5
**Allen** 55:23 56:16
58:7,7,11 59:17
59:19 106:22
107:5
**allow** 42:19 230:19
231:6
**allowed** 42:12,16
80:6,7
**alluded** 163:15
**alterations** 258:15
**alternative** 104:5
**amended** 20:9,13
**America** 104:18
**Americans** 34:3
**amonestacion**
194:6
**amonestcion** 194:9
**amount** 21:2 47:20
68:19,25 72:3
73:20 117:8
232:2
**Amy** 1:14 5:4,19
285:9 286:4
**analogy** 159:11
279:25
**analysis** 34:8 37:9
37:13 38:4 55:11
56:18 58:25
82:14 83:6,10,22
86:5 92:5 108:22
108:25 116:10
118:15 142:24
143:5,8 146:1
**analyze** 55:25
82:10
**analyzed** 37:25
86:5 180:5
**analyzing** 83:11
**and-styled** 5:13
**and/or** 116:20
244:13,13
**Angeles** 91:8
**angle** 49:12
**announced** 62:18
**announcement**
158:17
**announces** 154:23

**annual** 124:21
163:14 166:3
**annually** 70:18
**answer** 6:2 48:3
84:2 92:7 106:3
121:3,4 129:17
167:11 175:23,25
177:7 178:1
179:25 241:2
261:11 280:20,21
280:22
**answered** 48:2
168:14
**answering** 120:23
258:9
**ANSWERS** 5:2
**anybody** 96:14
253:7
**anytime** 92:7,9
268:6
**anyway** 240:21
**apologize** 112:2
217:19
**Apolonio** 15:16
**apparently** 10:4
190:7
**appeal** 171:12
198:15,18
**appealing** 159:19
**appear** 87:18
188:13 192:18
193:19,22 202:8
204:21 214:15
**APPEARANCES**
2:1
**appeared** 257:3
284:10
**appearing** 203:9
**appears** 53:20
189:13 190:15
199:13 214:21
217:5 220:5
**append** 223:6
**applicable** 6:16,21
99:2 124:13
**application** 110:10
142:20 187:18,19
**applied** 61:14

123:25
**applies** 14:17 86:1
**apply** 47:15 48:11
63:8 273:8
**applying** 47:12
48:17
**appreciate** 111:10
168:3 177:7
273:4 275:14
280:9
**approach** 130:11
248:15,20,23
**approached**
150:24
**appropriate** 47:15
48:9,10 126:6
178:21 180:14
230:18
**approve** 21:18
**approved** 21:20
**approximate** 74:7
**approximately**
25:4 162:17
**approximation**
74:25 238:23
**April** 191:15
200:23 210:25
**arbitrary** 141:3
**architect** 129:12
**archive** 191:22
**archivo** 165:10,14
191:17,21
**area** 32:15 67:2
82:5,7 110:11
111:6 127:20,21
128:11 132:1
144:3,9 211:2,7,7
211:8,9,16
213:10,11 217:14
235:24 236:2,5,8
236:10,12,14
237:19 238:10,17
241:13,16,18
242:1,7 243:24
244:1,2,3,6,7
276:3
**areas** 29:1 38:1,25
82:18,19,22,24

124:7 132:2
145:6,24 211:18
218:12
**argue** 149:13
254:7
**argument** 34:1
**Arizona** 132:25
133:6
**Arlington** 26:2
28:11,12 67:5
78:9 94:8 101:25
106:20,21 107:5
162:15
**arranged** 16:1
**arrangement**
22:20
**arrangements**
24:24 78:10,13
**array** 126:6
**arrest** 35:17 84:6
103:10 133:22
266:7,10,20
267:16 269:5,7,8
269:12,15,16
271:2
**arrested** 35:18
133:21
**arresting** 266:24
**arrival** 64:10
**arrive** 239:20
250:2
**arrived** 9:13 91:10
249:6,14,24
265:8,12 276:12
**arrives** 250:5
**arriving** 194:25
199:17 220:19
**articles** 99:10,19
99:23 100:6,20
101:3 125:16,24
176:8
**ascertain** 87:16
280:18
**Ashcroft** 76:10,25
**aside** 45:11 120:7
275:22
**asked** 12:21 21:11
33:19 51:3 55:25

107:19 114:9
120:21 136:3
149:11 168:4
172:25 205:12
230:9,12 231:24
267:2,7 278:1
279:9,16 281:9
281:22
**asking** 43:18 48:24
120:4 143:14
148:14 208:18
239:18
**aspect** 51:23 58:2
69:20 70:14
85:20 125:19
132:6
**aspects** 117:14
142:7 178:19
**assassination**
250:25
**assertion** 208:4
**assess** 103:5,18
107:2
**assessing** 166:20
**assessment** 90:22
102:16,17,19,20
102:21 106:24
116:16
**assessments** 31:14
**assigned** 157:19
229:12 236:12
238:13 241:6
263:17 264:18
265:3 266:16
270:20 279:5
280:16
**assignment** 244:23
270:22
**assignments** 157:6
238:13
**Assistance** 119:13
**assistant** 68:5
144:22 168:6,6,9
168:16
**associate** 198:6
**associated** 22:2
59:24 107:11
**Association**

Job No. 13505
Case 3:12-cv-02039-GAG   Document 1295-1   Filed 07/25/19   Page 77 of 114

Alejandro del Carmen
August 12, 2010

Evelyn Ramirez Lluveras, et al v. Javier Pagan Cruz, et al

Page 289

121:19 125:4
**assume** 18:14
24:19 25:11
114:4 129:1
161:2 172:10
175:9,13 180:4
211:24 218:22
231:3
**assumed** 158:23
185:6
**assumes** 179:21
240:19
**assuming** 73:25
74:5,12 173:18
197:8 228:16,16
229:6 231:1,4
233:12 240:8,13
279:7
**asterisk** 77:4,4
**asturgess@meri...**
286:8
**atemas** 234:9,10
**attached** 226:22
226:25 227:16
233:8
**attempt** 117:2
**attend** 61:20
126:21
**attendance** 210:16
213:24
**attended** 98:10
132:14 134:4
**attending** 61:20
**attention** 20:4
**attest** 115:9
**attorney** 6:25 9:16
28:19 39:25 42:3
42:6 43:16 56:6
56:6 98:7,12
158:5 167:25
**attorneys** 10:2
11:4 18:25 28:18
98:20 280:1
**audit** 81:2 85:15
**audits** 81:4 82:3,5
84:18 87:14
**August** 1:12 3:2
4:2 5:5 19:13

119:15 155:16
195:15 198:19
199:2 201:19
202:7 219:11,19
220:17 240:6
243:21 246:9
259:8,22 260:24
262:20 271:18
286:2
**Augustine** 155:18
195:16
**Austin** 37:19
**author** 60:10
**authored** 99:8
**authority** 167:10
167:13 172:23
221:19
**authorized** 6:12
**authors** 118:7
**automatic** 157:18
**automatically**
125:16
**auxiliary** 166:5,9
166:10,17,23
167:1,2,12 168:8
168:9,15,16,17
169:13
**availability** 78:13
211:20 213:13
**available** 8:23 9:2
13:13 64:8
143:19 184:8,9
225:2
**award** 67:11
**aware** 89:9,21
113:14 128:9
137:22 138:21
141:2 160:23
161:8 178:15
199:24 210:11
227:21 228:12
239:3,9 242:9,11
242:22 249:5,10
250:23 253:17
260:10 276:5,8
**awareness** 207:22
**a.m** 80:18 263:4,8

**B**

**B** 4:1 45:21 51:25
**bachelor's** 27:1
**back** 16:4 31:17
43:25 44:5,22
45:13,14,18 46:4
47:19 64:24
67:20 70:8,24
73:10 79:12 87:2
93:6 95:1 97:3
102:1 103:12
124:7 130:20,21
131:9,12 134:10
137:19 141:10
158:11 159:24
167:25 185:4
186:8 198:10
201:1 202:17
204:14 209:2
215:13 226:16
230:22 238:8
240:2,10 246:13
247:18,25 248:25
250:8 253:1,4
265:13 270:12
271:24 281:22
**background** 39:1
41:24 109:16
**backing** 267:14
**backup** 40:24
**backwards** 195:7
248:4 267:17
**bad** 203:18
**Baker** 15:19,20
16:1
**ballpark** 69:9 70:5
74:1,5 148:1
236:21
**Bankruptcy** 6:16
6:22
**banter** 258:7
**based** 19:12 21:5
37:18 45:25 46:1
46:12 49:20
59:16 76:15,25
78:12,16 93:10
106:25 122:4
167:16 274:15

**baseline** 86:22,23
**basic** 62:5 130:17
206:25 275:12
**basically** 25:10
53:13 80:12
205:12 231:14
244:23 252:24
282:6
**Basics** 93:1
**basis** 47:12 49:4
78:16 87:15
108:9 124:5
132:22 159:22
163:14 166:3
178:8,12,14
208:3 220:25
258:12 269:8
**bat** 33:15
**batch** 247:3
**Bates** 183:4
185:21 186:2,10
189:21 190:18
193:5 202:25
216:12
**Bates-stamped**
197:15
**baton** 205:24,25
206:1,4,6,7,16
**battling** 163:10
**bear** 174:5,25
177:20 215:2
**bearing** 91:16
**began** 20:25
112:21 246:18
252:25
**beginning** 22:21
143:7 241:8
257:20
**behalf** 42:7 77:19
201:11
**behave** 104:13
221:10 280:1
**behavior** 27:3,12
27:20,21 36:21
138:1,16 149:9
191:10 203:17
260:5
**behaviors** 174:12

181:13
**believe** 17:17
19:25 20:14 31:3
31:4 32:2,3,7,23
33:3,6,14 38:12
38:14,24 39:19
40:2,7 45:24
46:14 47:6 49:14
50:1,12 51:8,15
52:3 59:13,13
61:21 63:2 64:17
73:7,23 89:14
91:2,5,9,11 92:7
92:8 94:9,22
96:20 99:7,9
100:4,5,22
101:19 102:10
106:20,21 107:7
108:10 109:11
111:19 126:11
127:22 130:8
134:8,17 135:9
139:10 140:11
142:6,17 144:8
151:23 152:13,23
155:13,20,24
156:5,11 165:1
170:6 171:8
177:4 179:5
181:8 182:5
187:12,21 188:5
189:17 191:9
194:21 198:21
201:3 207:3,5,10
210:10,14 217:6
217:15 218:6
221:1,22 231:20
232:16 233:17
236:17 237:6,22
238:10,15,18
245:19 248:7
249:2,13 252:4,5
256:6 262:16
270:10 276:20
**believed** 50:25
225:7
**Bellaire** 15:8
**benefit** 18:4 30:4

**Berkan** 2:5 3:4
8:18 9:2,7,12,22
10:13,17,23 11:2
11:12 16:24
23:17 32:22 48:2
48:8 52:12 53:8
65:14 72:9 109:6
109:20 120:24
121:2,6 135:7
137:3 152:5,9
153:20 154:5,12
156:17 168:10
173:21 175:4,8
176:17 177:16
179:24 181:19
182:8 186:7,15
186:19 187:6
188:18,22 192:9
193:10,12,14
200:11,15 209:9
209:13 215:21
216:13,15,18
217:19 219:3
220:10,14 224:5
224:13 225:9
227:2,6,19,23
229:6 232:12
238:4 240:20,25
246:10 248:7
254:18,22 257:19
257:24 258:4,17
265:21 267:23
278:4 279:22
282:2,9
**BERKAN/MEN...**
2:3
**best** 15:5 17:9 33:3
37:3 59:25 88:23
91:16,22 92:6,12
99:25 107:14
108:20 116:3,8
116:20 119:23,25
120:6,15 122:7
122:12,16,19
123:3,12,13,13
123:18,24 124:4
131:16,18 187:5
218:4 228:14

229:22 230:19
231:5 260:7
279:11 281:8
**bet** 273:6
**better** 65:12 87:13
138:4 159:8,25
233:11
**beyond** 47:21
74:18 93:1
137:21 145:7
152:19 168:24
171:3 172:4
174:4 267:2,6
268:16
**Bezares** 137:19
138:10,19 190:22
253:22
**Bezares's** 136:15
191:7
**biases** 36:22
**big** 131:8 162:10
189:13 282:6
**bigger** 151:7
**bill** 34:24 73:19
**billed** 25:19,22
**bills** 24:2
**binding** 119:22
220:24 221:16
**birthday** 210:1
**bit** 35:25 38:15
69:25 75:11 78:3
95:5 249:19,23
253:20
**black** 33:18,19
**blacks** 35:21
**bleeding** 278:8
279:2
**blockade** 265:17
266:1,2
**blocked** 222:17
**bloqueo** 266:2
**blue** 222:18
**board** 56:5 141:8
**Bob** 247:11
**body** 205:20
**bold** 196:11
**book** 60:11,19,22
60:23 96:11,12

96:22,24 117:24
123:2,3,5 125:21
213:19
**booked** 46:17
**booklet** 64:13
**books** 27:18 64:1
96:10 98:23 99:5
176:8
**Bordanaro** 173:2
**boundaries** 117:4
221:10
**bracketed** 184:15
**bracketing** 185:1
**branch** 160:7,8
**branches** 260:12
**BRAS** 2:7
**break** 25:17 50:18
100:25 109:22
137:14,15 141:12
181:16 182:8
185:8 215:21,22
222:3,8 279:20
**breaking** 215:25
**brick** 104:3,6
**brief** 9:22 12:8
222:7
**briefed** 160:18
**briefings** 212:25
213:1
**briefly** 224:19
**bring** 16:12 22:10
94:4 98:22
104:18 112:2,8
133:5 174:25
**bringing** 43:9
174:5
**brings** 54:25
177:20 206:15
**broad** 191:8
196:21 217:4
**brochure** 44:18
**brochures** 63:25
**broke** 255:18
**brought** 16:14
22:9 35:24 137:6
141:25 202:7
218:1 227:14
251:4,4 254:20

**budget** 29:21
**Building** 286:6
**bulk** 117:12
**burdensome**
219:24
**business** 125:9
132:22
**busy** 97:9
**butcher** 12:18

**C**

**C** 8:1 118:7
**Cabrera** 137:19
138:8,9 195:4,6
195:11,25 197:21
197:25 198:22
201:14 253:22
**Cabrera's** 136:15
**Caceres** 19:18
116:3 192:23
199:21 228:6,25
246:16 251:8
252:9,12,13,14
252:18,22,25
253:10,16 260:24
264:20 266:7,20
266:24 269:4,20
271:2
**calculation** 74:9
**Calderon** 220:16
**CALEA** 122:3
**calendar** 20:20
**California** 46:10
119:16
**call** 8:25 13:6 16:2
28:8,9 40:25
41:2 62:12 66:16
81:7,11 86:24
94:4 103:13
117:18 131:18
133:12 135:10,13
135:14 149:22
178:21 213:3
222:19 241:23
**Calle** 2:4
**called** 20:21 28:12
30:15 40:23 66:1
68:3 73:17 80:9

81:1 91:22 93:1
102:2 133:17
135:16 136:10
144:20,21 149:23
149:24 181:7
209:18 241:22
253:18 266:1
**calling** 12:17 41:1
**calls** 12:14 79:2
**calm** 250:19
**Cameron** 9:13
**camps** 97:15
**campus** 29:6 79:12
**campuses** 79:2
**candid** 168:2
259:2
**capacity** 162:25
**capital** 42:24 65:2
**capitalize** 65:6
**captures** 144:17
**car** 203:13 230:10
252:24 253:2,4
**card** 284:11
**care** 78:21 97:10
97:12 227:19
**career** 50:4
**careful** 158:5
**carefully** 285:17
**careless** 46:16
**Carlos** 115:21
116:7
**Carmen** 1:9 3:2
4:2,4 5:3,18 8:4
8:23 11:9,16
17:7 23:24 62:16
64:20,23,25
65:17,23 66:4
105:22 182:14,15
182:25 183:7
284:2,5,10
285:12
**Carr** 2:8
**carried** 49:1
217:10
**carry** 177:5
**cars** 265:8,25
**Cartagena** 155:18
195:16

Job No. 4995
Case 3:12-cv-02039-GAG   Document 1295-1   Filed 07/25/19   Page 79 of 114
Alejandro del Carmen
August 12, 2010

Evelyn Ramirez Lluveras, et al v. Javier Pagan Cruz, et al

Page 291

case 8:12 9:16 10:3
11:17,18 12:22
15:12,15,20,23
16:1,5,9 18:9,21
18:22,23 19:7,8
19:10 21:1,7
24:4 28:18 32:7
32:14,16,17,17
32:25 33:9,10,12
33:14,16,24
35:23,24 36:3
37:6,6,9 38:11,14
38:22,23 39:6,8
40:9,23 41:4,6,12
41:13,14,15,19
42:3,4,8,12,23,25
43:1,11,17,19,21
43:23 44:2 46:3
46:5,13,14 47:17
49:1,9 50:24
51:9 52:19 53:2
53:4,25 54:4,7,7
54:24,25 55:9,24
56:10 57:19 58:7
58:9,11,23 59:5,8
59:15,21 64:24
73:22,24 74:6
75:10 76:10 77:9
78:1 80:21 88:7
88:8,14 91:20
96:2 97:19,22
101:18 112:20,21
118:18 127:3,11
129:25 130:1,5
132:18 139:6,7
139:18,25 143:6
146:1 151:8
152:4,10,12,22
152:22 153:1,11
153:13,18 154:1
155:8,9 158:13
158:21 160:19
161:16,18 166:20
169:11 171:16
173:22 174:23
177:9,14 180:13
180:17 184:10
189:23 191:5

193:20 194:12
199:24 200:7
202:25 205:9
209:15 215:7
220:3,20 225:8
225:17 229:14
241:9 243:3,10
246:8,14,23
247:9,10,15
248:2 254:11,23
256:12 258:19
259:25 260:14
262:7 266:21
268:18,22 270:7
271:17 273:21
274:16 277:20
278:3,21
cases 14:18,21,24
15:4,6 29:10
31:24,25 32:2,4
33:2 39:24 40:3
40:6,8 55:10
68:4 69:21,23,25
70:3 72:21,23
89:2,3 98:5
118:22 149:12
171:18 174:5
175:15,16 176:20
176:21 178:17
205:14 260:6
category 197:9
Caucasian 34:19
Caucasians 84:16
85:10
causal 51:23 52:18
259:6 273:21,24
causation 273:19
cause 5:13 6:5
35:15 51:16,18
52:7,17 156:12
237:25 271:16
285:16,24
caused 50:10
51:13 157:5
causes 259:11
caution 272:23
caveat 111:12
184:12 261:12

CDT 280:13
center 40:9 41:1
238:2,3
central 111:8
117:18
centro 238:3
CEOs 60:25
certain 86:16
96:21 99:11
132:16 185:3
221:5,7,11
226:18 240:15
271:15
certainly 153:9
CERTIFICATE
3:5
certification 62:1
62:8 204:25
205:22
certifications
141:22 142:2
146:3
certified 5:4,19
60:4 61:23,25
62:9,19 66:25
68:22 285:9
certify 61:23
285:11,23
certifying 213:17
213:18
cetera 148:17
177:13,23 195:24
212:24 240:17
277:9 280:16
chain-of-comma...
100:17
Chair 26:2 78:18
80:6 95:6
challenge 133:8
challenged 42:14
47:7,11 57:24
58:2
challenges 29:20
36:5
chambonear 136:8
136:9
chance 13:3
120:10 191:11

201:9
change 94:1 172:7
283:2
changed 145:3
changes 3:4 6:20
283:1
changing 65:14
chapter 123:9
chapters 123:6
characterization
273:18
characterize
146:20 148:20
174:16 176:22
characterized
39:21
characterizing
149:6 176:16
charge 109:15
154:21 166:18
210:13 211:10
213:11 238:16
240:5 241:3
243:23 244:7
245:21 263:16
charged 114:7
144:7
charges 195:20
196:4,21,22,23
198:11,12 199:5
199:10 223:17,22
224:1,16
charging 46:3
chart 245:20
check 23:20 25:12
25:15 44:7,9
45:17,17 66:2
203:14 204:14
250:2
checked 46:19
checking 46:18
Chicago 163:9,10
chief 39:14,16
55:25 68:5,5
82:17 85:24 88:4
91:9 117:22,24
118:1 125:1,1
129:2 131:12

150:18 158:19
160:9 167:18,23
172:24
chiefs 68:14 88:3
93:8 105:15
106:2 121:19
125:4,6 130:9
162:19
child 20:3 96:13
267:24 268:2,4
children 20:2
33:22 97:10
choose 113:19
chronological
216:10
circled 184:15
circling 185:1
circuit 173:4
circumstances
90:11 158:3
268:7,13
citation 84:6
citations 77:1
270:5 271:21
cite 194:15 217:7
270:13 272:2
cited 10:6 119:6
129:22 164:20
225:13 272:1
cites 76:17 121:20
125:8
cities 111:6 131:7
131:8
citizen 269:10
citizens 34:19
51:20 148:10,25
202:1 203:20
228:9 229:1
239:13 272:13
city 5:18 15:8 43:6
46:7 47:2 49:13
50:7,25 51:10
52:5,10 53:5
55:23 56:7,16
57:5 58:11 59:19
62:21,24 63:1
85:23,25 86:2,16
106:21 108:16

Job No. 8593
Case 3:12-cv-02039-GAG   Document 1295-1   Filed 07/25/19   Page 80 of 114
Evelyn Ramirez Lluveras, et al v. Javier Pagan Cruz, et al                                                                Carmen
                                                                                                          August 12, 2010

Page 292

133:22 162:8,15
273:22
**city-wide** 62:23
**Civ** 1:5 285:5
**civil** 5:14 6:17 77:8
90:24 106:1
154:8
**civilian** 233:22
**claim** 232:8 252:22
**claiming** 85:14
**clarification** 19:20
47:25 48:4,9
57:11 135:15
154:17 165:12
187:20
**clarifications**
275:10
**clarify** 269:18
**class** 26:3,9 64:12
78:8 80:7,15,17
94:14,23,24
108:10 111:5
245:12
**classes** 98:11,13,16
**classic** 119:8
**classroom** 109:2
141:7
**clause** 221:12
**clear** 63:10 71:10
186:12 227:7
241:13 249:16
272:4 278:20
**cleared** 46:20
**client** 69:4
**clip** 204:6
**clipped** 200:13
216:22
**clipping** 202:5
**close** 78:4 136:10
163:4,18
**closely** 175:16,17
196:17
**Code** 216:18
**cohort** 29:5,16
31:1 108:5,7,22
110:4,5,19 111:4
**cohort-based**
30:20

**coincide** 218:4
**colleagues** 277:24
**collect** 34:25 85:18
90:9,9
**collected** 34:18
81:3 83:12 87:14
90:5 235:13
**collection** 83:2,6
83:13
**collects** 235:13
**college** 26:20
118:4,5
**Colon** 244:11
**Colonel** 275:25
**Colon-Biez** 210:3
210:24 228:19
232:25 243:5
263:3,24
**Colon-Biez's**
232:13
**combination** 28:17
**combining** 85:9
**come** 10:4 57:18
65:7 67:22 87:8
93:25 107:2
112:23 118:19
130:20,21 131:8
151:8,12 166:22
170:22 211:15
224:18 246:6
262:23
**comes** 9:24 76:5
92:20 97:3 103:8
103:12 112:24
118:24 149:5
158:11 168:11
171:2 221:20
242:5
**comfortable** 53:4
**coming** 31:21
131:12 132:6
133:10 147:6
265:12
**command** 41:1
68:3 108:13,18
131:11 132:16
211:16 213:10,11
**commander** 211:9

236:8,11 237:19
238:10,16 241:18
242:12,14 244:1
244:2,3,7
**commands** 236:14
**commencing** 5:6
**commendation**
146:16
**comment** 263:6
**comments** 156:23
251:7
**Commerce** 286:6
**commission** 37:17
284:18
**commitment** 97:11
211:20 213:13
**committed** 144:2
145:11
**common** 10:21
131:11 206:7
**communications**
211:5
**Communism**
268:5
**community** 37:1
49:25,25 50:8
102:3 104:1
120:11,12 125:12
132:7 133:20
134:8,19,22
139:14,14,24
202:1
**companies** 60:24
**company** 60:5
61:18 63:22 64:6
73:16
**compare** 34:20
59:9,11 116:17
177:2 201:21
**compared** 56:12
56:21 58:17
177:1
**comparing** 48:21
48:23 59:20
**comparison** 58:18
218:12
**compensated**
114:15

**compensation**
66:3 96:4
**complainant**
190:21 194:12
199:8
**complainants**
222:15
**complainant's**
201:2
**complaint** 19:11
20:9,10,13,13
78:4 136:15,15
138:3,10,12,17
148:23 149:3,4
150:6,21 151:10
163:22 168:21
169:5,6,21,23
194:3,22 195:6
195:11 199:3
202:6 203:21
224:18 239:21
253:22 257:15,16
259:10 275:19
**complaints** 50:2,9
51:20 139:2,8,15
140:1 148:9,21
150:19 165:2
166:2,11,12
172:13,17 174:21
175:15 197:10
203:5 222:14,23
223:3 254:10,10
254:16,17,24
260:4
**complete** 64:5,13
80:15 148:9
227:9
**completed** 212:6
**completely** 95:2
**completing** 61:22
**completion** 67:6
142:3
**complexities**
133:23
**complexity** 127:24
**compliance** 82:19
82:24 83:4 85:16
**complied** 5:23 7:9

**complies** 83:12
233:4 252:19
**comply** 49:2 71:18
93:13 105:16,18
259:12
**component** 35:16
36:8 104:16
122:17 131:18
164:23 237:23
262:1
**components** 30:7
31:23 36:25 38:2
84:12 100:1
118:14 122:4
124:1 134:24
138:7 150:10
170:11 260:15
262:11 271:15
**comported** 116:3
**comprehend** 202:9
**comprehended**
23:8 95:23 184:5
**comprehending**
17:11
**comprehensive**
245:10 248:20,22
**comprised** 236:4
**comprises** 262:21
**Compstat** 30:1
67:15
**computer** 75:17
150:1
**computer-gener...**
149:21
**conceived** 52:8
119:23 123:21
**concept** 89:9 159:8
**concepts** 63:8
130:17
**concern** 116:14
156:12 157:5
166:4 222:13,23
223:3 259:3
**concerned** 83:4
124:8 139:7
166:2
**concerning** 285:15
**conclude** 70:10

Job No. 8595    Case 3:12-cv-02039-GAG    Document 1295-1    Filed 07/25/19    Page 81 of 114    Alejandro del Carmen
Evelyn Ramirez Lluveras, et al v. Javier Pagan Cruz, et al                                                                                                    August 12, 2010

Page 293

259:11 276:23
**concluded** 35:20
39:5,7 51:9
158:4 249:3
**conclusion** 40:17
40:18 48:25
143:10 190:4
253:25
**conclusions** 147:7
200:6 215:7
246:6 248:14
272:9,17 273:15
274:3,9,16
277:10
**condescending**
140:4
**conduct** 50:11
51:14 67:9 68:6
83:22 118:20
124:21 125:9
132:21 195:23
262:13
**conducted** 62:25
67:19 68:1
108:16 138:17
160:18 176:25
232:2
**conducts** 55:11
**conference** 9:11
124:21 126:20
134:12 237:16
**conferences**
126:23 128:12,15
**confidentially**
160:21
**confirm** 123:14
**conflicting** 252:7
252:19
**conformity** 107:13
**confusing** 39:18
84:15
**confusion** 241:8
242:5
**connect** 227:25
**connected** 127:11
**connection** 129:25
130:4 199:20
213:5

**consent** 35:15
90:25 91:4,13,15
92:4 107:17
**consequences**
106:25
**consider** 50:7
210:19 248:19
**considerable**
117:8
**consideration**
284:13
**considered** 50:14
85:6 182:14
221:16
**considering** 96:12
114:13 201:14
**consist** 37:13
**consistent** 41:25
53:1 105:23
230:19
**consistently**
139:20
**constituted** 107:4
**construct** 106:12
**constructed** 130:8
**construe** 130:12
**construed** 36:21
**consult** 127:4
**consultant** 69:17
69:18 105:4
**consulted** 105:14
106:4,5
**consulting** 31:13
58:4 62:16 64:21
64:23,25 65:18
66:4 69:18 70:10
70:21 71:2,9,16
71:20,21,23
80:23 83:11
95:13,16,19
132:3 162:5,5,22
**contact** 18:10,12
34:8 35:7,10
81:11 84:4,5,9
148:25 162:21
239:12
**contacted** 18:9
93:7 226:23

**contacts** 84:11
86:17,19,23
**contained** 35:15
**contemporary**
133:4
**content** 37:9,13
38:4 63:13,17
108:9,21,24
142:24 143:5,7
182:23
**context** 30:22
36:17 80:25
81:16,18 85:6
98:9 105:1 106:6
108:9,19 110:9
115:10,12 118:22
121:9 122:16
123:16,23 139:6
156:20 157:1,2
165:11,15 174:11
176:19 178:22
180:15 181:10
191:24 231:5
239:5 260:7
**continue** 42:12,20
58:4 121:24
206:20 209:5
240:21 282:2
**continued** 267:17
**continues** 215:20
**continuing** 219:6
269:2
**contract** 96:11,14
96:21
**contracted** 62:22
96:18
**contracts** 34:18
**contrary** 229:2
**contrast** 104:2
116:17 177:3
**contributed** 99:15
121:12
**control** 27:7,13,25
28:2,8 127:23
149:7 179:17
**controls** 36:15
**controversy**
285:16

**conversation**
245:1,2
**convicted** 32:11
158:7
**conviction** 43:5
**copies** 6:24 16:14
60:12,20 114:25
183:16
**COPS** 120:12
121:21 125:11
132:9 133:24
134:5,25 135:4
149:19
**copy** 8:21 22:9,10
22:15 42:9 44:23
44:25 54:14
75:20 112:8
113:12 195:18
**copying** 130:25
**copyright** 110:14
**Cordon** 194:18
199:9 201:24
202:3,6,15,19
**Corona** 227:9
**corp** 66:1
**corporate** 60:25
**corporation** 65:20
65:22
**correct** 9:8 13:23
13:24,25 14:1
23:1,2 34:5,10
37:11 38:5 40:5
45:3 47:13 49:18
51:8,15 53:14
54:2,5,9 55:2
65:2 66:9 74:2
82:13 88:8
102:13 116:5,9
124:12 139:9
155:6 165:1
195:4,10 198:15
202:20 207:23
209:15 212:14,18
212:19 214:22
215:2 224:16
227:22 228:18
234:15,17 242:16
250:14 273:8

274:13,18,23
284:3
**correcting** 143:16
**corrections** 6:15
9:5 28:4 29:9
**corrective** 51:5
83:8
**correctly** 40:22
137:24 139:25
148:13 211:25
**correlation** 52:9
**correspondence**
42:2
**corroborating**
230:2
**cost** 21:13 92:20
93:4
**Council** 85:23,25
86:2
**counsel** 2:2,6 5:3
5:11 7:3 9:3,14
43:12 44:4 59:14
75:8 112:3
184:10 224:23
227:8 285:24
**counseled** 150:25
151:1 278:1
**counseling** 162:3
170:10,16,17
255:25
**count** 263:13
**counted** 75:7
**counting** 201:23
203:20
**country** 167:18
241:17
**County** 5:8 284:7
**couple** 38:17 39:15
67:23 98:15 99:9
132:14 173:25
174:3 184:12
223:13 233:24
256:5 260:5
268:19
**course** 8:21 29:5
29:12,14,17 31:1
31:3,5 34:7 67:3
67:4,6 78:1 79:5

Job No. 8598

Case 3:12-cv-02039-GAG    Document 1295-1    Filed 07/25/19    Page 82 of 114

The People vs. Carmen

Evelyn Ramirez Lluveras, et al v. Javier Pagan Cruz, et al

August 12, 2010

Page 294

79:15,18,22,23
80:4,5,7,19 81:24
91:12 93:1 102:7
108:11 109:3
110:1,3 111:8,13
162:18 244:16
**courses** 28:25 29:4
29:8 38:3 62:1,2
62:5,5 79:25
94:15 98:19
110:21,25 118:11
**court** 1:1 7:8 8:6
10:21 14:12 17:8
18:4 23:17 24:24
29:10 41:8,9
57:23 58:6 76:14
76:23 77:17
182:9 203:9
211:19 213:16
215:14 238:1
247:5 285:1
286:5
**courts** 28:4 55:24
221:7 269:17
**court's** 268:14
**cover** 29:18
**covered** 29:19
**covers** 192:12
241:20 242:7,7
**Covey** 60:3,5,8,10
61:18 62:3,11
63:6,21 64:5,7
108:12,20 110:7
110:10
**co-authoring**
96:24
**co-counsel** 83:18
181:17
**co-worker** 151:17
**CPTED** 102:3
118:7
**Craig** 2:9
**created** 61:13
105:25 123:16
166:10
**credit** 67:12 83:21
**credited** 74:21
**crime** 89:20 102:4

143:20,21 144:2
145:5,17,25
164:3,4 217:6,7
281:6
**crimes** 144:5,12
145:11,22
**criminal** 26:17,20
27:2,21,23,24
28:3,5,9,10,13,21
28:25 29:2,7
31:4,6 54:9 55:1
55:4,6 80:16
99:8 114:25
118:4,14 126:4
144:9 169:2
266:25
**criminally** 144:7
**criminological**
118:13
**criminologist**
27:19
**criminologists**
28:22
**criminology** 26:3
26:17,17,19,20
26:23 27:3,15
28:12,23,25 54:1
54:9 55:1 118:4
118:10,14 126:2
128:10
**critical** 28:7
**crowd** 249:11,12
250:19 251:21
**Cruces** 15:14
**crunches** 29:21
**Cruz** 1:6 228:19
232:16,25 240:9
240:14 241:3,5,9
242:12 243:12
244:4,12 249:18
249:20 250:1,6,8
250:9 285:6
**Cruz's** 200:25
232:14,23
**CSR** 1:14 286:4
**cultural** 104:17
**current** 24:11
**currently** 32:12

96:9,11 107:8
**curriculum** 101:1
247:19
**Curtis** 51:6 254:13
**custodial** 6:25
**C-A-L-E-A** 122:3
**C-O-M-P-S-T-A...**
30:2
**C-O-V-E-Y** 60:7
**C-P-T-E-D** 102:4

**D**

**d** 3:1 4:1 8:1 11:17
11:18 65:2
**daily** 126:14
159:22
**Dallas** 5:8 32:15
62:6
**dangerous** 268:23
**DART** 32:14,19,21
32:25 33:12,17
34:1,22 35:20
36:14 37:6 38:11
39:5,7,24 72:20
72:21 143:6
**data** 34:17 35:1,2
35:3,6,8,8 36:3
36:12,13 81:2,2,3
81:6,8,10,11,12
82:9,21,23,23
83:3,6,12,13,22
83:23 84:15
85:18 86:7,14
87:7,14,22,23
90:5,20 105:2
144:17 145:4,18
**date** 18:18 19:4
155:10,11 199:10
201:5 262:21
282:3 286:5
**dated** 155:16
195:15 199:1
200:23 209:14
247:22
**dates** 17:18
**day** 17:19,22 20:15
20:17 64:5,18
69:7 75:13

103:11,13,13
184:20 240:21
246:15 247:2
254:22 257:17
258:21 260:2
284:10,15 286:2
**days** 9:4,8 21:19
61:21 78:1 80:13
80:14 137:3
155:22 183:8
198:4 199:2
206:12 247:2
**de** 213:17 214:10
238:3
**deal** 75:16 86:4,21
89:24 90:8 97:16
110:25 117:10
119:16 124:17
128:12 133:14
134:1 150:1
**dealing** 159:22
**deals** 123:9
**dealt** 46:14 170:2
**death** 192:24
277:23 278:9
**debate** 86:22
**deceptive** 44:15,21
45:16
**decide** 241:5 262:9
**decided** 10:4
240:15
**decision** 238:11,12
240:23
**decisions** 157:3
240:14,19,21
**decrees** 90:25 91:4
91:13,15 92:4
107:17
**dedicate** 81:21
**dedicated** 69:9,12
97:7
**Defendant** 5:12
228:19,19
**defendants** 1:6 2:6
10:2 15:23 16:10
16:11 19:10 77:8
98:3 114:5,6,8
116:11 117:6

172:7 178:24
227:11 272:19
285:6
**Defenders** 280:4
**defense** 9:3,14
**deficiencies**
124:12
**defined** 84:4
**definition** 27:9,15
27:16
**definitive** 196:6
**degree** 28:21,23
103:6,19,23
129:12
**del** 1:9 3:2 4:2,4
5:2,18 8:4,23
11:9,16 17:7
23:24 62:16
64:20,23,25
65:17,23 66:4
105:21 182:14,15
182:25 183:7
284:2,5,10
285:12
**delay** 170:24
**delayed** 41:2
**delays** 175:18
177:3
**delegated** 244:6
**deliberate** 76:13
98:3,14 99:1,6,20
99:22 124:5
**deliberately** 47:3
49:17 50:25 51:4
53:5
**delivered** 6:25
**delivers** 242:24
**demographical**
87:12
**demonstrate** 35:4
**demonstrates**
85:15
**denied** 158:11
**department** 21:22
26:2 28:11 46:24
51:4 56:12,14
57:4,10,15,16
58:17,24 59:9

Job No. 8595
Evelyn Ramirez Lluveras, et al v. Javier Pagan Cruz, et al

Alejandro del Carmen
August 12, 2010

Page 295

62:16 63:2 74:13
77:7,15,19,23
78:19 79:7 82:15
83:7,24 85:7
86:8,15 87:10,12
87:24 89:4,12
90:23 91:4,17
92:9 105:11
106:21 107:17
121:22 122:5,15
123:23,25 125:13
130:21 131:3,20
132:13 133:17,21
142:4 144:11,16
150:14 151:4
157:11 158:16
160:3,6,9 162:24
163:12 174:12,16
176:2,3,13,18,22
176:25 177:21
178:16,18,18
180:19 191:25
244:23 260:11,13
260:16 262:5
274:14,15 275:18
281:13
**departments**
29:20 34:25 35:4
36:20 37:1 62:20
67:25 82:12 85:9
87:17,18 88:25
89:3,14 91:1,3,6
92:5 107:1 119:5
119:21 121:14
122:2,4 130:15
130:16,24 131:25
132:17,19 158:17
160:1 177:1
221:3,13 222:2
276:24
**department's**
85:16 92:4
**depended** 190:4
**depending** 28:6
157:13 158:2
261:20
**depends** 148:23
149:2

**depict** 139:3
**deployment** 89:25
**depo** 43:21 65:9
135:17 173:7
182:17 223:1,8
224:23 226:20
265:23
**depos** 167:21
185:7,12 226:14
227:25
**depose** 154:1
**deposed** 43:12
144:14
**deposition** 1:9 5:2
5:18,21 6:1,3,4
6:11,19,20,23 7:3
8:21,22 9:15,25
10:3 11:20,22
12:7,11 13:14,15
14:14 15:20 16:2
17:6 23:14,15
27:25 41:5 47:8
47:11 48:17 49:9
49:10 50:23
52:19,22 53:1
57:12 74:1
115:17 128:24
140:16 143:7
144:13 151:22
152:2,10,11,21
153:1,10,12
156:5 163:16
165:24 167:11
171:16 177:22,22
182:1 184:14
208:5,7 223:11
224:19 225:13,14
225:16 227:9
233:3,14 241:14
249:8,18 256:11
262:19 269:11
273:20 275:5,5
278:11 284:2
285:19
**depositions** 7:8
14:20 75:13
115:20 153:4
156:6 168:1

171:10 177:10
178:17 183:17,22
184:16,21 231:20
235:12 245:6,15
246:19
**deps** 40:6
**derive** 71:21
**derived** 72:5
**derives** 70:21,23
71:22 72:2 93:15
**derogatorily** 246:2
**derogatory** 253:11
**describe** 114:23
231:24
**described** 94:12
103:25 244:17
**description** 4:3
12:8 284:11
**design** 102:5
150:20
**designed** 264:19
**desk** 148:16 239:9
239:22,23 240:17
**detail** 232:2
**detect** 87:5
**detective** 281:5,8
**detectives** 229:25
**determination**
50:6 169:20
238:7
**determinations**
169:10 200:6
240:15 273:24
**determine** 38:1
39:1 81:14 88:22
**determined**
229:19 230:1
**determines** 238:20
**developed** 31:23
61:8 93:6,10
120:11
**developing** 177:9
177:19 180:16
**deviant** 27:3,12,20
27:21
**device** 85:1
**Diaz** 115:21 116:7
116:20 147:10

228:22 230:20
231:14 232:3,20
232:24 233:25
234:19 242:15
243:13 244:13
255:15 265:11,12
267:15
**dictionaries**
135:23
**died** 40:13 41:3
145:19 280:15
**difference** 76:13
98:4 109:11
123:17,19 260:21
274:17,19
**differences** 104:15
148:15
**different** 12:14,21
19:1 21:12 36:25
38:2,25 53:22
92:4 104:17
117:14,25 122:4
125:18 126:16
127:23 129:15
132:17,18 135:11
139:6 142:3,7
145:6 154:3
169:13,18 177:6
177:7 179:6
180:7 192:19
197:10 227:18
231:13 242:19
248:13,15 260:12
260:15 261:24
268:14 272:3
274:3
**difficult** 86:12
87:4 88:6 260:18
**diploma** 4:9 54:14
**direct** 3:4 52:4
162:21 239:12
271:16
**directed** 85:16
**directing** 252:10
**directly** 52:2 59:14
62:15 64:5 160:9
210:9 242:15
250:14

**director** 210:6
243:6,6
**disagree** 274:10,24
**disagreement**
273:15,17
**disagrees** 58:6
**discharged** 90:12
**disciplinary**
105:10,13,20
106:5 111:2
120:15,17 124:8
124:10 134:14,15
137:25 147:9,12
156:24 157:2
159:13,19 161:11
161:22 165:15,22
167:1 168:5,20
169:4,15 172:18
172:22 173:15
174:6,22 175:15
175:18 177:4,11
177:23 179:17
180:6,11,18
181:6,10 190:19
193:24 197:10
201:22 203:5
218:16 261:18
275:18
**discipline** 105:15
118:6 124:25
127:13 144:23
151:3,14 154:22
158:25 159:7
166:16 170:22
171:6 211:19
213:13 275:1
**disciplined** 151:2
164:11
**disclosing** 92:10
**disclosure** 89:7
117:3 161:1
229:14
**disclosures** 37:7
**discovery** 257:2
**discuss** 99:6 111:7
123:6
**discussed** 76:9
98:15 99:4 109:2

Case 3:12-cv-02039-GAG   Document 1295-1   Filed 07/25/19   Page 84 of 114

Evelyn Ramirez Lluveras, et al v. Javier Pagan Cruz, et al

Aguadilla 111 Carmen
August 12, 2010

117:23 147:21
161:23 181:3
211:3,18 222:13
222:15
**discussion** 9:19
21:8 53:9 109:21
137:5 154:18
168:12 181:20
192:10 215:16
258:5
**discussions** 76:5,7
213:12
**disk** 13:19
**dismiss** 76:24,25
**disputable** 235:16
**dispute** 235:11
**disqualified** 88:8
**disregard** 149:17
**disseminate** 134:2
**disseminated**
93:19
**distinction** 83:16
153:22 154:9
**distracted** 71:1
**distribute** 63:20
227:10
**district** 1:1,1
209:19 241:10,13
242:6,12,14
243:15 285:1,1
**districts** 241:23
**disturbances**
207:8
**divided** 247:12
**division** 90:24
142:12 144:16
151:25 156:9
207:4 210:6
211:1 263:21
**divisions** 87:17
**divorced** 150:8
**doctor** 42:18
**doctor's** 42:20
**document** 24:3
59:12,14,16
63:12 65:6
143:15 155:15,21
191:16 193:6,7

195:15,19 200:22
200:22 210:16,20
210:21 213:14
218:7,18 219:16
223:17,25 228:3
228:12 232:6
233:10,17,19
256:25 284:11
**documentary**
182:13,16
**documentation**
35:19
**documentations**
134:18
**documents** 11:19
11:20,22 13:10
13:18 14:3,24
16:12,15,17,19
17:13 20:12 22:6
24:1 57:1 75:6
111:22 113:15,20
113:23,25 114:17
114:18,23 141:24
143:18 145:10
171:10 174:22
175:7 177:14
180:5 183:6,16
184:6 185:16
186:16 187:3
192:16,18,19
193:5,16,20,21
195:3,14 197:25
200:10,12,18,24
202:17,22 203:4
209:5 211:12,15
213:9 215:17
216:7 218:14,25
222:14 244:25
245:7,13 246:25
247:3 258:13
**doing** 57:3 73:25
74:9 104:3 131:6
131:8 159:16
179:21 186:19
220:11 230:13
239:4 265:9
268:17
**domestic** 103:7

169:20 170:2,8
258:18,20,25
259:4,7,10,16,24
259:24 261:4
**Donald** 51:7
**DOT** 238:22
**doubt** 25:14
216:20 265:15
**DPS** 85:7
**Dr** 8:23 31:13,19
32:3,16,20,23
42:17 56:4 67:19
105:21 120:9
183:7 247:11
248:3
**draft** 75:23
**drafts** 75:19
**draw** 177:9
**drawing** 248:14
249:1
**draws** 178:10
**drive** 13:7,8,10,12
13:19,19
**driver** 230:6
**driver's** 84:24,25
85:3 230:11
**driving** 230:8
**Due** 270:4
**duly** 11:10 285:13
**duration** 58:22
198:4
**duties** 49:2 78:18
78:20 164:23
241:4 259:12
**duty** 145:19
239:19 240:16,17
**Dwayne** 15:18
42:22,23
**dying** 280:12
**D-A-R-T** 32:25
**D.C** 73:17 132:15

———————
E
———————
**E** 3:1 4:1,1 5:1,1,1
8:1,1
**earlier** 38:15 117:9
121:15 125:20
153:2 164:25

181:3 191:18
274:15 278:19
**early** 20:22 149:22
149:23 151:6
154:24 155:3,5
194:15 245:2
273:20
**eat** 133:16
**economic** 31:15
**economist** 31:16
**educated** 119:15
**educational**
109:16
**Edwin** 152:21
236:7 262:19
**effect** 5:21 7:6 8:6
39:22 89:22 94:2
161:9 172:13
181:16 208:15
**effective** 34:25
60:1,11
**effectively** 68:9
**effects** 205:20
**effort** 87:10
**efforts** 97:8 156:24
157:2
**eight** 21:9 75:5
134:10 147:22
169:24 170:21
199:12 236:18
241:17 249:7
**either** 8:25 41:4
82:16 84:10,16
102:22 151:19
153:14 155:24
158:10,25 170:19
171:23 184:9
203:17 204:13
213:10 224:21
236:6 253:23
**el** 41:15 88:10 96:1
116:24 135:13,13
247:10 248:2
**electronic** 152:8
**electronically**
24:19 184:9
**eleven** 49:21,22
50:8

**eliminated** 55:4
57:18
**Elliott** 279:19
**email** 79:1 126:14
**emails** 126:25
**emergence** 121:16
**empleo** 187:16
214:10
**employ** 90:21
180:10
**employed** 91:10
105:4
**employee** 65:18
129:9
**employees** 51:11
79:4
**employment** 181:5
187:17,19 198:3
214:7
**enacted** 166:5
**encompass** 100:15
100:16 119:23
126:5
**encompasses**
122:7 144:8
**endeavors** 61:4
**ended** 38:23
**enforcement** 30:8
36:14 37:17
55:11 59:24
66:18 67:18
68:13 88:1
107:25 117:11
119:13 133:2,4
**engage** 134:21
**engages** 92:9
**engaging** 35:5
39:3 86:8,13
87:3,5
**English** 65:16
135:14 213:18
**enhanced** 113:12
**ensures** 51:25
**entered** 225:17
**enters** 9:11 85:3
**entire** 115:14
135:6,7 176:15
176:22 183:5

Job No. 8595
Case 3:12-cv-02039-GAG   Document 1295-1   Filed 07/25/19   Page 85 of 114
Evelyn Ramirez Lluveras, et al v. Javier Pagan Cruz, et al

Alejandro del Carmen
August 12, 2010

Page 297

243:24 270:12
**entirely** 106:11
181:21
**entirety** 183:24
**entities** 105:6
**entitled** 218:18
267:18 271:9
**entity** 30:22 77:23
**entrada** 213:17
**entry** 213:19
**enumerated**
137:13
**Environmental**
102:4
**equipment** 40:20
203:13
**error** 270:19
**errors** 75:23
**escalated** 259:20
**especially** 111:4
131:6
**essentially** 12:11
60:23 61:24
62:18 63:22
65:25 68:4,14
80:12 81:12 83:3
84:10 86:3 88:4
99:14 114:1
119:14 146:12
154:22 212:25
250:25 275:16
**establish** 221:3,9
**established** 120:3
131:17 179:23
**et** 1:3,6 119:7
148:17 177:13,23
195:24 212:24
240:17 277:9
280:16 285:3,6
**ethics** 38:2
**ethnicity** 35:11
**evaluated** 58:18
**evaluating** 128:20
**evaluation** 141:6
208:13
**evaluations** 49:21
49:21 50:9 51:19
139:13 140:9,10

140:14 141:4
**EVELYN** 1:3
285:3
**evening** 26:5
**event** 148:6 153:2
203:20 208:16
231:6 237:16
271:18 280:11
**events** 47:16 48:12
48:12 115:11
201:4 202:25
209:15 220:3
226:7 229:18
234:20 243:1,9
245:18 251:22
253:18 264:13
270:18
**eventually** 227:3
**everybody** 33:18
96:24 97:2
**everyday** 61:3
**evidence** 6:5 35:20
46:19 56:9 107:3
149:8 182:13,17
256:18 279:3
**evidently** 227:10
**exact** 34:16 69:10
170:11 220:23
228:5 239:4
278:21
**exactly** 33:8 52:14
67:21 95:25
129:4 138:11
155:11 165:7
169:17 173:18
182:6 191:11
203:14 226:5
228:4 236:19
238:20 256:9
271:22,23 277:22
281:23
**exam** 26:4
**examination** 3:4
11:11 285:18
**examined** 270:6
285:17
**example** 55:19
84:1,20 85:15

108:4 125:22
**examples** 87:15
122:22 146:16,20
**excessive** 34:2,3
56:2 134:23
148:9,25 149:4
260:6
**exchange** 252:12
**excluded** 41:11,18
43:19 59:6
**excludes** 94:20
**excluding** 112:1
**exclusively** 82:5,7
**excuse** 14:24 106:4
220:4
**executed** 123:25
284:12
**execution** 253:18
**Executive** 121:18
124:15
**exhibit** 4:8 17:6,11
23:13,16 24:23
44:25 45:11
54:23 109:24
185:16 187:4
197:12 262:19
**exhibits** 6:24
226:13,22,25
227:2,11,16,20
227:23,24 233:3
233:5
**existence** 128:9
**existing** 49:5
**exit** 213:19
**exited** 253:15
**expandable** 206:1
**expect** 148:11
164:13 280:17
**expectation** 148:8
**expected** 221:23
**expelled** 164:8
**expelling** 196:13
**expenses** 22:2
**experience** 176:19
245:3 255:3,8,15
**experiences** 96:13
279:22
**expert** 15:24 21:7

21:7 31:9,20
36:16 41:10,11
42:16 48:11 53:6
59:8 69:14 70:10
72:6 77:18 95:24
97:24 98:1 114:1
114:2,3,5,11,12
114:15,19 148:19
174:14,16 175:21
176:3 177:20
226:21 245:11
247:7
**expertise** 14:25
58:5
**experts** 42:13
56:11
**Expiration** 286:5
**Expires** 284:18
**explain** 245:16
**explained** 20:3
**explaining** 168:15
**explicitly** 171:17
**exposure** 39:2
**expressed** 284:13
**expulsion** 155:19
155:22 156:1,3
156:10,16,17
157:4,7 159:18
163:14,21 164:15
164:15 171:22,22
192:23 200:2
**expulsions** 235:24
**extend** 117:4
**extended** 47:21
280:9
**extensive** 228:21
228:22,23
**extent** 175:7 254:6
**external** 183:15
**extra** 78:3 94:14
**extracting** 271:23
**extremely** 128:16
**eyes** 278:9
**E-N** 60:18

**F**

**F** 24:1
**FAB** 1:5 285:5

**face** 133:20
**facility** 40:14
**facing** 29:20 30:8
79:12
**fact** 21:5 41:8
44:17 49:20 52:4
58:6 65:18 73:11
76:5,12 78:17
106:25 114:9
117:22 123:8
125:14 131:10
134:20 139:13,23
144:5 161:8
175:6,14 205:17
210:11 234:19
242:18 249:13,23
250:10 266:9,21
270:4,9,21 271:1
271:19 274:4
277:20,25 278:15
281:7
**facts** 50:7 97:24
196:24 197:5
198:12 201:14
229:17 246:5
264:10 274:10
**factual** 154:3
175:2 267:10
**fact-gathering**
229:17
**faculty** 30:15,15
79:10 94:15
**failed** 49:2 271:1
271:16
**failing** 51:5
**failings** 51:10,13
180:18,19 277:11
**fails** 266:6 269:4
**failure** 50:6 51:19
124:4
**failures** 172:22
275:1
**fair** 92:17 189:7
232:1
**fairly** 79:7 228:21
228:22 233:24
**fairness** 259:1
**faith** 217:25

Job No. 8508
Evelyn Ramirez Lluveras, et al v. Javier Pagan Cruz, et al

Case 3:12-cv-02039-GAG   Document 1295-1   Filed 07/25/19   Page 86 of 114

Ramirez, et al v. Carmen
August 12, 2010

Page 298

**fall** 100:18 260:16
**familiar** 89:15
  90:23 129:6
  137:20 140:20
  172:25 173:2
  174:13
**family** 26:11
**famous** 176:20
**far** 174:11 282:6
**father** 26:12,13
  97:13 120:10
  129:12 280:13
**favorable** 226:9
**FBI** 89:19 145:22
**feared** 171:22
**February** 206:22
**federal** 5:14 6:16
  6:22 119:14
  154:7
**fee** 21:3,15,20 22:5
  22:19,24
**feel** 44:13
**fellow** 261:6
**felt** 41:24 44:17,20
  45:16 53:4 58:3
  116:25 118:17
  138:4 174:9,15
  258:24
**female** 39:25
**fend** 40:20
**Fernandez** 170:13
  170:14
**Fernando** 190:22
**festival** 280:17
**fewer** 254:9,16,18
  254:23
**field** 132:6
**fifteen** 147:25
**fight** 44:14
**Figueroa** 155:13
  171:9 242:17
  244:11
**figure** 20:6 36:10
  72:4 86:25
  112:21 276:1
  280:8
**figured** 135:21
  136:7 173:9

**file** 31:15 66:1
  137:6 138:2,8,9
  142:22,23 143:21
  145:25 146:10,25
  147:13 182:16
  185:23 187:3,4
  187:21 189:7,18
  190:7,25 191:3,4
  191:16 192:11,18
  192:20 193:2,3
  193:18 197:15
  198:24 200:13
  201:22 202:18
  203:24 216:23
  217:7,17 218:5
  222:19 223:18,25
  224:10 227:18
  233:2 255:21,22
  261:17,17,18
**filed** 14:18 33:11
  57:2 76:21
  138:17 139:2
  150:6 151:10
  166:3,12 168:21
**files** 136:14,17,23
  137:23 141:15,19
  146:7 147:4
  161:11,11,22
  165:17 177:11,23
  185:14,20 189:20
  189:22 190:4
  199:24 202:9
  204:17 218:16
  222:9,13 223:2
  224:20 255:8
  258:14 263:25
  264:3 274:15
  275:19
**fill** 212:3
**filled** 181:5 211:24
**final** 26:4 155:6
  159:3,7,14
  161:12 171:14
  196:4
**financially** 285:25
**find** 27:15,19
  30:16 77:3,3
  110:10,18 135:8

  163:7 167:21
  194:2 198:1
  209:2,3 221:5
  233:7 246:14
  276:1
**fine** 10:22 62:14
  74:3 84:3,3,3
  175:4,8 177:16
  179:24 183:2
  215:24 216:2
**Fingerprinting**
  119:17
**finish** 76:19 80:14
  121:2 224:22
**finished** 22:23
**finishing** 121:3
**fired** 101:14
**firm** 17:25 22:2
  31:13 45:5 55:11
  58:5 116:24
**first** 11:10 18:10
  18:12 20:12 47:7
  53:12 57:23 58:1
  150:21 173:5
  184:13 186:16
  188:25 189:21
  191:16 192:17
  200:22 213:8,10
  216:19 220:5,7
  226:20 234:8
  246:7,21 252:6
  261:11,13 263:13
  268:19 270:2,3
**fiscal** 251:4
**five** 19:9,11 49:20
  49:22 50:8 77:20
  81:23 98:2
  116:10 117:6
  140:22 172:6
  178:11,24 203:5
  203:22 216:1
  234:5,6,7 241:19
  241:20 242:8
  273:1 275:14
**five-week** 173:22
**flag** 81:9 85:8
  150:12,16,21
  202:2 254:24

**flagging** 150:22,23
**flash** 13:7,8,10,12
  13:19
**flat** 21:15,20 22:19
  46:1
**floating** 112:12
**floats** 134:21
**Florida** 26:21,24
  26:25 118:3,12
**fluent** 14:6
**fluently** 12:25
**focus** 67:13 70:7
  111:8 117:18
  121:6 132:1
**focused** 66:5
  179:22
**focussing** 232:19
**folder** 136:25
**folders** 217:20
**follow** 30:24 61:2
  61:2 64:14 84:9
  118:24 119:21
  121:14 122:2
  124:4 221:11,24
**followed** 39:12
  119:5
**following** 5:9
  103:13 124:1
  211:2 212:10
  218:8
**follows** 11:10
  30:25 90:8
  182:21
**follow-up** 223:10
  224:22 275:11
  280:8
**force** 5:21 7:6 8:6
  34:2,3 41:20,23
  44:20 55:19,24
  56:1,2,13 57:18
  58:13,21 59:1
  122:10 125:25
  148:10 149:1,4
  149:17 162:2,22
  176:10 178:19
  195:24 208:23
  260:6 268:9
**foregoing** 284:2,12

**Forensic** 113:11
**foreseeing** 33:6
**forgotten** 36:1
**form** 6:1 8:20 48:6
  173:17,23 175:1
  179:20 211:24
  212:5 229:5
  230:25 240:18
**formalities** 5:17
**format** 215:2
**former** 130:3
  155:17 195:16
  219:17
**forming** 175:22
  189:23
**formulate** 281:24
**Fort** 29:6 30:11
  111:6 117:22
  162:8 286:7
**forth** 68:16 120:2
  196:12,20,22
  197:4 198:11
  232:1 251:4
  285:12
**forthcoming** 51:17
**forthright** 39:21
**forthwith** 5:19
**Forum** 121:18
  124:16
**forward** 24:20
  113:23
**forwarded** 227:15
**fostering** 34:2
**foul** 202:20
**found** 77:14
  173:12 247:19
  249:24 254:24
  271:25 273:20
**Foundation**
  121:21
**four** 14:25 45:9
  56:21 62:10
  98:23 99:5
  129:11 186:13
  188:12 200:21
  224:2 234:4,5,6
  263:5 281:17
**four-hour** 92:25

Job No. 8595
Case 3:12-cv-02039-GAG   Document 1295-1   Filed 07/25/19   Page 87 of 114
Evelyn Ramirez Lluveras, et al v. Javier Pagan Cruz, et al
Alejandro del Carmen
August 12, 2010

Page 299

**four-page** 233:17
**fraction** 92:20
93:4
**frame** 48:7
**frank** 208:18
**frankly** 84:14
103:16
**free** 93:21
**frequencies** 144:1
**frequency** 58:21
**frequent** 170:24
**frequently** 129:14
129:14 131:23
**friend** 264:20
**front** 20:20 50:15
53:10 75:17
184:13 190:17
278:9
**full** 11:13 89:7
117:3 234:8,8
**fully** 5:23 7:8
**funded** 149:19,20
**funds** 71:21
**further** 5:16,24
6:10,18 7:2
83:13 116:12
223:10 285:23
**future** 36:15 83:7
124:11 135:2

_____
**G**
**G** 5:1 8:1 42:24
**gabache** 135:17
**gangs** 96:12,19
**gap** 282:6
**gaps** 190:12
**gas** 257:23
**gathered** 280:13
**gathering** 36:14
**gauge** 87:21 88:6
**geared** 108:17
**general** 63:5 67:24
136:21 161:5
175:17 177:11
180:21,23 206:24
218:17 219:14,21
219:21 220:2
221:2,15,20,23

262:17 271:9
276:23
**generally** 10:17
51:7 123:18,20
200:18 222:1
261:15
**generate** 82:16
126:20 128:15
130:12 150:15
**generated** 125:16
132:12 146:24
**generates** 150:1
**generous** 141:7
143:24
**gentleman** 46:15
**genuine** 87:10
**getting** 121:1
124:7 133:11
141:10 160:12
211:18 213:16
245:25 257:17,19
263:12 266:13
268:4 271:22
**gist** 13:2
**Giuliani** 90:2
**give** 8:5,12 11:13
18:2 27:9 43:21
50:17 52:21 53:7
63:14 64:7 69:5
69:9 83:21 84:1
84:21 102:8
108:4 110:11
117:5 122:18,22
137:7 175:23
196:7 197:18
220:6,8 223:23
225:12,14 234:20
237:25 239:6
245:4 262:22
273:1 280:21
**given** 14:20,25
40:19 67:14,15
67:16,16 83:7
86:10 122:12
138:23 143:3
146:11 166:4
170:17 184:4,4
207:1,12 210:22

227:3 228:1
245:11 247:5
250:10 251:22
255:3 284:15
285:20 286:1
**gives** 199:3
**giving** 76:8 146:16
146:19 168:2
200:18 219:23
280:20
**glad** 23:11 24:14
121:10 180:25
**go** 27:15 29:2 41:6
42:17 43:25
61:24 63:19
69:25 70:7,24
77:10 78:15 79:2
87:2 95:1 103:4
108:24 109:18,20
111:18 120:5
125:15 128:6
129:15 131:22
132:4 135:23
137:19 143:13
151:5 154:10
159:15 167:25
176:18 179:18
181:19 182:25
185:4,7,14 186:8
187:22 190:6,8
191:1 198:10
203:24 209:2
212:13 215:5
222:21 226:16
233:11 238:8,21
247:18,20,22
250:8 252:14
258:4 262:23
266:13 270:12
277:4,14,15
280:5 281:22
282:5
**God** 8:14 131:12
**goes** 26:10 48:5
72:16 85:23 93:2
102:24 163:9
195:24 209:8
219:5 228:8

243:4 250:6,14
277:2
**going** 10:10,12
11:2 15:24 20:8
21:8,9 22:21
30:10 34:16
44:22 58:3 64:23
72:7 73:1 74:7
75:9 78:15,16,17
85:11 94:5 100:4
115:8 131:13
134:22 137:12
140:8 152:18
153:19 154:10,25
159:15,16,24
166:12 171:10
174:1 181:22
182:10,22 184:6
185:20 187:22
188:1 190:8
191:21 192:17
194:16 195:17
197:7,14,24
198:23 200:9
204:18 219:9,24
222:8 223:24
224:22 229:4
237:25 238:21
241:6 245:8
250:20 251:9
257:5 262:4,18
272:21 282:7
**Goldstein** 120:9
**Gonzales** 84:22
**good** 42:23,23 46:5
46:13 49:9,10
50:11 51:7 52:21
54:7 55:9,19
57:11 62:20 70:1
70:22 71:22
72:23 89:5
102:18 136:5
139:7 141:4
217:25 240:8
254:23 261:10
**Google** 112:22
**Governor** 220:16
220:17

**governors** 179:5
**graduate** 29:7
79:20,21 129:8
**graduated** 109:9
**grammatical**
75:22
**Grand** 1:12 5:8
**grandmother's**
230:8
**Grapevine** 63:1,19
108:16
**grave** 139:5
157:15
**Gray** 9:11,13,24
168:11
**great** 75:16 86:3
86:21 89:24 90:8
97:16 100:15
117:10 119:16
124:17 128:12
131:14 133:14
150:1
**greatly** 90:1
**green** 222:19
**group** 31:10,12
34:4
**groups** 106:1
**Guaynabo** 2:8
**guess** 59:23 175:12
**guidance** 119:20
**guide** 220:24
271:8
**guidelines** 30:24
276:25
**gun** 138:5 268:19
268:24,25
**Gutierrez** 109:7
161:16,18,23
173:1,12 174:23
**guys** 135:10
**Guzman** 201:8,17
**Guzmon** 201:3
**G-O-O-D** 42:23,24
**G-11** 2:4

_____
**H**
**H** 4:1
**habits** 59:25 60:11

Job No. 8598

Case 3:12-cv-02039-GAG    Document 1295-1    Filed 07/25/19    Page 88 of 114

Evelyn Ramirez Lluveras, et al v. Javier Pagan Cruz, et al

Alejandro del Carmen
August 12, 2010

Page 300

61:1 62:12 108:20
**Hall** 96:20 97:5
**Halstead** 117:22
**Hamilton** 129:9
**hand** 8:10 99:16 193:21 284:15 286:1
**handful** 69:21
**handing** 215:13
**handle** 89:3 166:11
**handled** 48:23
**handles** 160:4 281:5
**handling** 51:22 120:17
**hands** 267:13
**handwriting** 188:5 217:22 223:19
**handy** 23:14
**Hang** 247:25
**happen** 84:19 202:13
**happened** 12:9 43:17 44:8 48:21 48:22 52:6,11 65:8 115:12 156:21 159:4 160:19,24 229:20 231:2,3,4,24 240:23 246:9,15 246:15 250:21 251:6 260:22 281:23
**happening** 38:23
**happenings** 270:23
**happens** 26:4 82:15 159:11 160:1,14 241:9 260:10
**happy** 175:12
**harassment** 38:19
**hard** 16:14 87:1,20 114:25 217:22 271:20
**Harvard** 109:10

**head** 15:1 17:12 18:18 33:20 47:10 49:11 55:20 74:10 183:9,18,20 190:11 218:21 225:3 240:1,9,12 241:10 242:18 263:1 272:15 273:23 277:13
**health** 280:14,14
**hear** 131:10 251:10,13
**heard** 16:4 19:1 21:19 43:15,16 206:8 223:12 251:14
**hears** 250:10,11,12
**Hector** 233:22
**held** 39:7 60:4 80:17 212:22
**hell** 179:9
**help** 8:14 78:21 262:23
**helped** 132:2 262:9 266:23
**helpful** 89:2
**hereinbefore** 196:12 285:11
**hereto** 6:6 7:5
**Hernandez** 15:16 54:4 57:22 72:24 73:2
**hey** 85:9 133:8 281:1
**he'll** 225:2
**hierarchies** 242:10
**hierarchy** 242:3
**high** 139:19
**higher** 49:22 73:19
**higher-ups** 262:5
**highest** 72:24
**highest-level** 243:20
**highlight** 139:23
**highlighted** 121:15 140:6
**highlights** 12:9,10

82:24 126:15
**Highly** 59:25 60:11
**hired** 21:6 31:9,19 32:19,21,23 40:15 43:16 59:7 68:14 116:1,6
**hiring** 36:24
**Hispanics** 84:17 85:6,10,13 86:18
**historales** 177:23 181:7,8,9
**historical** 180:15
**histories** 161:10 161:22
**history** 149:16 178:21 181:12 274:14
**hits** 112:23
**Hmmm** 69:15
**holding** 33:22
**holster** 135:10,12 135:21
**home** 24:21 79:13 97:16 103:4
**homework** 109:6
**homicide** 225:19 228:15,18 229:11 229:12,23,23,24 230:14
**honest** 39:21 52:12 58:4 175:10,25 244:6 248:9 278:23 280:20,22
**honestly** 33:14 34:14 280:6
**horrified** 267:21 268:7
**hospital** 230:22 231:15,15,21,22 232:11,17 250:6 250:14
**hostile** 101:14
**hour** 21:13 73:21 222:6 282:3
**hourly** 22:10,15 45:25
**hours** 12:5 22:12

22:17,18 23:1 24:10 25:1,6,8,10 25:19 37:21 67:11 74:6,18,20 74:23 81:23 230:24
**house** 230:8
**Houston** 28:21 62:22 162:19
**Huerts** 226:3,7 228:5,6,24 233:22 234:17
**Humacao** 136:1 209:19 210:13 211:2,7,8 217:14 218:12 235:21,24 236:2,5,23 237:8 237:13 238:23 241:11,18 242:4 242:19
**human** 181:1 187:13
**hundred** 95:10 102:14 238:24 241:19
**hundreds** 174:21 175:14 177:10,10 178:16,17
**hurt** 249:10,12
**hypothetical** 73:19
**H-U-E-R-T-S** 226:3

**I**

**IA** 261:17
**IACP** 121:18 125:3,4,7 128:23 129:10 130:20 131:12,15 275:22
**Ian** 129:9
**icon** 30:14
**idea** 11:2 36:18 77:24 89:5 121:25 133:13 146:6 189:4 204:12 208:6
**ideal** 105:25

122:15 123:23 124:1 131:19
**ideas** 131:9,14
**identification** 23:15
**identified** 187:2
**identify** 101:3 184:6 185:8 190:3 264:19 267:1
**identifying** 149:22 189:21 222:9
**identity** 284:11
**ignore** 178:3,5
**illegal** 133:14
**illustrate** 109:1
**illustrated** 140:7
**imagine** 63:24 181:11 221:21
**immediate** 241:4 259:15
**immediately** 153:7 158:1 190:12 227:20 248:19
**immigration** 132:25
**impact** 52:4 120:8 146:1 172:2 216:23 240:16 243:21 263:18 265:18 278:2
**impacted** 277:20
**impart** 212:24
**implementation** 173:15
**implemented** 86:10 110:8
**implications** 117:25
**imply** 239:12
**imposed** 171:7
**imprisoned** 46:15 46:21
**improper** 156:24 174:24 175:21 177:19 178:3
**improve** 132:23
**improved** 90:1

Job No. 8595
Case 3:12-cv-02039-GAG    Document 1295-1    Filed 07/25/19    Page 89 of 114
Evelyn Ramirez Lluveras, et al v. Javier Pagan Cruz, et al
Alejandro del Carmen
August 12, 2010

Page 301

improvement
82:19
inadequate 173:16
inappropriate
138:16 178:25
inappropriately
138:5
incident 33:11
56:24 57:5 59:4
88:21 90:13
102:24 151:7
160:4,15 192:12
199:2 202:7
206:14 218:20
219:11 225:25
228:7,25 245:16
258:20,25 259:4
259:7,17 278:2
281:10
incidents 59:11
89:6,16 177:3
244:14 254:7
include 28:4 84:10
84:11,12 100:22
121:14 142:14
included 16:20
22:6 24:8 76:11
96:6,7 108:13
227:11 266:9
267:11 274:20
includes 90:25
94:18 98:23
202:5
including 22:25
24:2 55:18 59:25
89:16 92:15
111:12,23 164:15
184:10 245:5
income 70:16,17
70:18,21 71:22
93:15 95:3,12
incomplete 270:3
increments 113:17
incurred 22:2
indicate 13:5 19:7
indicated 9:23
86:6 151:9,13
173:25 174:3

228:6 266:22
indication 214:1
indifference 98:14
99:1,6,20,22
124:5
indifferent 47:3
49:17 51:1,5
53:5
indirectly 242:15
individual 35:12
35:18 40:21
49:24 56:3 81:13
84:5,21 85:4
86:12 87:3 98:2
100:16 103:19
130:9 138:4
227:25 277:17
281:5
individuals 19:9
19:11 28:18,20
31:15 87:11
108:6 124:24
170:7 239:17
243:8
inflation 141:4
informal 10:12
informally 281:1
information 34:9
76:15 85:1 86:4
132:10 150:2
151:9,12,16,24
159:23 160:21
166:19 179:14,18
182:24 190:1
198:11 231:9
245:4 246:1
249:1 250:10
264:17 270:17
271:22,25 272:2
272:3,8,13
informational
143:21 181:6
217:7,17
informed 92:5
198:18 226:21
234:12
informs 198:14
ingredients 39:10

inherently 270:6
initial 142:20,21
155:4
initially 112:20
114:11
initiated 156:25
171:14
injured 90:14
145:20
injuries 250:16
innocence 158:8
innocent 159:14
innovative 131:14
inquire 279:12
280:25 281:13
inquiry 58:13
124:8 125:15
instance 32:7,22
32:22 61:19
99:25 103:7
104:14 120:9
121:17 122:1
123:6 125:25
126:4 130:22
132:21 133:6
146:15 149:13
150:3 157:18
230:5 253:3
instances 39:15
84:19 108:11
149:10,12
instant 193:20
Institute 68:13
113:11
instituted 119:16
institutional 169:6
institutions 105:5
instruct 104:14
instructed 14:13
instruction 67:2
instructions 18:3
212:24 276:25
instructor 60:4
61:23,25 66:25
67:1,7 109:4,5
141:9
instructor's 63:16
instrument 284:12

insulting 253:11
Integrity 144:21
169:16
intend 154:16
282:4,5
intense 80:19
intensely 77:25
intent 36:6,11
154:20 156:4
158:14,17
intention 45:15
interactions 51:6
148:24
intercourse 32:9
interest 120:14
229:2
interested 18:22
61:19 112:20
182:20 285:25
interesting 133:1
interfere 14:9
interim 160:17
210:4,6 243:5,6
internal 89:4
136:23 137:23
160:7 183:15
261:17,22
International
121:19 125:4
interpretation
218:7 272:10
interrupt 120:13
interrupted 71:14
120:24 121:4
267:5
interruption 9:23
intervention 116:2
interview 233:25
234:2
interviewed
229:25 234:12
276:18,22 278:1
interviews 232:2
intro 80:16 99:8
introduced 56:9
introductory
27:17
intrude 268:15

investigated
166:21
investigating
109:16 155:1
279:9,16
investigation 43:4
47:1 48:20 49:2
50:11 51:22
157:12,14 158:4
160:17,19 169:14
195:22,23 201:1
investigations
137:20 144:22
investigative 47:1
47:8 136:14,17
141:14
investigator
228:15,18 229:11
229:11
invite 124:22
126:21 132:16
invited 124:23
invoice 22:22 25:6
invoices 24:2
involved 19:9
31:18 32:5,8
47:5 69:21 97:22
101:17 104:2
144:12 253:23
259:16 278:7
279:3
involving 43:3
148:9
irrelevant 278:15
irrespective 47:20
Irvine 46:7,9
Irving 43:6 46:7,8
46:9 47:2 50:7
50:25 51:4,10
52:5,10 53:5
62:6 72:25
254:11,13 273:22
Islands 91:7
island-wide 57:15
issue 33:8 36:10
40:11,23 76:13
84:23 99:7 103:6
103:7,21 117:2

Page 302

| | | | | |
|---|---|---|---|---|
| 132:24 133:2,3 | 210:3,24 225:20 | **keeping** 124:11 | 61:2,3,14 64:1,19 | 132:22,25 133:1 |
| 133:11 134:1 | 237:10,13 263:3 | 215:12 | 65:4,7 66:2,13,18 | 133:1,2,8,13,16 |
| 139:23 140:8 | **judge** 8:7 41:24 | **keeps** 57:4 89:13 | 67:11,21,24 68:5 | 133:24 135:12,14 |
| 158:3,10 160:25 | 42:12,16 | **kept** 22:16 24:10 | 68:21 69:4,10 | 136:6,7,8,11 |
| 167:6 221:20 | **judge's** 42:9 | 34:21 37:22 57:7 | 70:4,5,19 72:4 | 137:7,10,17 |
| 274:12 | **judgment** 42:11 | **key** 112:17 264:17 | 74:19 75:8,11,12 | 138:6,12,16 |
| **issued** 101:19 | 154:6 258:20 | 270:16 | 75:13 76:8 77:22 | 139:1,3,3,4 140:2 |
| 219:18 | 269:14 271:19 | **kids** 26:14 97:12 | 79:2,3,7,8 80:25 | 140:6,12,14,16 |
| **issues** 29:17,19,23 | **Judith** 2:5 216:8 | **kill** 258:22 267:19 | 81:7,13,23 83:1 | 140:23 141:3,6,8 |
| 31:18 32:5,6 | **juggle** 20:5 | **killed** 90:15 268:4 | 84:7,8,16,22,24 | 141:9,9,11,19 |
| 41:23 50:14 | **juggling** 20:1 | 278:18,19 279:14 | 85:1,9,13,25 | 142:7,8,8,10,15 |
| 55:16 67:17,21 | **Julio** 201:3 | 279:20 | 86:16,18,18 87:4 | 142:20 143:4,23 |
| 68:2 69:18 71:11 | **July** 17:15,16,18 | **killing** 116:3 | 87:20,23 88:4,5 | 143:25 144:1,10 |
| 97:22 98:25 | 17:20,21 19:4 | 157:16 199:20 | 89:1,6,16 90:5,7 | 145:7,21,24 |
| 99:24 100:17,18 | 25:2 52:24 80:24 | 267:22 | 90:11,21 92:3 | 146:23 147:12,15 |
| 100:23 101:5,24 | 81:19 153:5 | **kind** 20:18 34:15 | 93:8,13,17 95:21 | 147:18,23 148:15 |
| 102:1,5 103:21 | **jumps** 209:9 | 37:4 76:8 81:6,7 | 96:1,1 97:23 | 149:5,7,11,12,16 |
| 104:8 110:3,9,14 | **Juncs** 194:21 | 81:10 96:24 | 99:25 100:12,13 | 149:23 150:3,4 |
| 111:1 118:16 | **June** 17:17,22 | 102:24,25 108:13 | 100:16,18 101:17 | 150:12 151:1,2,5 |
| 121:7 122:10 | 18:17,19 80:13 | 110:8 113:6 | 102:16,25 103:8 | 151:6 152:15 |
| 123:10 124:20 | 209:14 | 121:9 132:10 | 103:16,18,19,20 | 154:14,15,20 |
| 126:1 127:7,12 | **jurisdiction** 89:1,1 | 133:3 138:10 | 103:24 104:1,12 | 155:7,10,11,25 |
| 127:14,18,21 | **jurisdictions** 11:7 | 142:5 144:25 | 104:13,13 105:16 | 156:8,13,24 |
| 134:9,13,23 | **jury** 8:7 | 146:20 170:24 | 107:3,3,7,8,10 | 158:1,1,5,6,15,18 |
| 151:14 178:19 | **justice** 21:18,18,21 | 185:4 195:3 | 108:9,13 109:2,3 | 158:22 159:2,3,4 |
| 179:17 225:4 | 21:22 26:17,21 | 235:12 237:24 | 109:7,9,12,12,15 | 159:6,7,24,25 |
| 260:14 | 27:2,22,23 28:3,6 | 253:15 257:10,10 | 110:12 111:12 | 160:8,12,24,25 |
| **item** 49:24 93:11 | 28:9,10,13,21,25 | 257:22 262:10 | 112:11,23,25 | 161:3,14,15,18 |
| 96:4 112:7 | 29:3,8 31:4,6 | **kinds** 86:9 | 113:25 114:4,16 | 161:19,20 162:11 |
| 154:13 187:13 | 54:9 55:1,4,6 | **knew** 213:6 | 114:20 115:11,23 | 163:13,24,24 |
| **items** 49:24 50:13 | 74:13 80:16 | **know** 8:19 9:4 | 116:14,14,23 | 165:7,10,14 |
| 50:14 121:14 | 90:24 91:4 92:3 | 10:6,9,13 11:6 | 117:3,3,25 118:8 | 166:16,19 167:9 |
| | 99:8 107:17 | 12:21 15:23,25 | 118:12,24,25 | 167:15 168:4,13 |
| ——————— | 118:4,14 121:22 | 16:4,6,8,24 18:22 | 119:6,7,22 120:9 | 168:13,14,19,19 |
| **J** | 125:13 126:3,4 | 20:6,11 21:13,20 | 120:11 121:11,17 | 168:23,24 169:10 |
| **jail** 103:11 | 132:13 244:23 | 22:20 25:1 29:21 | 122:9,14,14,15 | 169:12,17,19,22 |
| **January** 34:25 | **justifiable** 269:15 | 30:3,16,23 31:14 | 122:21,24 123:5 | 169:23,25 170:1 |
| **Javier** 1:6 203:25 | **justification** 42:1 | 32:17,21 33:9,13 | 123:20,22 124:19 | 170:1,4,5,5,10,15 |
| 285:6 | **justified** 58:14 | 34:15 35:10,25 | 124:23,24 125:9 | 170:21,23,24 |
| **Jeffrey** 118:7 | 88:22 267:9 | 36:4,5,19,20,25 | 125:11,14 126:4 | 171:1,2,5,13,15 |
| **Jo** 2:5 9:17 | 268:9,20 | 37:21 39:10,11 | 126:5,15 127:10 | 171:20,23 172:8 |
| **job** 1:20 133:16 | | 40:25,25 41:1,2 | 127:24 128:11,12 | 173:4,9,11,13,14 |
| 148:16 | ——————— | 41:18 42:20 | 128:23 129:4,10 | 173:23 174:12,17 |
| **jobs** 239:10,10 | **K** | 43:18 44:11,12 | 129:15,20 130:9 | 176:7,14,17 |
| **Jose** 182:1 225:5 | **keep** 22:15 25:5 | 45:14,17 46:17 | 130:12,15,18,19 | 177:18 178:1,1,7 |
| 232:1 233:13 | 30:17 37:19 46:9 | 47:18 50:15 52:1 | 130:20,22 131:2 | 178:8,15,20,23 |
| **Journal** 126:3,4 | 65:14 83:1 89:15 | 54:16 56:11 58:3 | 131:5,5,6,7,11,12 | 179:11,12 180:22 |
| **journals** 126:2,5 | 132:5,5 145:1,4 | 58:20,21,22 61:1 | 131:18,20 132:16 | 181:9,12,13,13 |
| **Juan** 2:4 84:22 | 160:20 193:2 | | | |

Job No. 8595
Case 3:12-cv-02039-GAG   Document 1295-1   Filed 07/25/19   Page 91 of 114
Evelyn Ramirez Lluveras, et al v. Javier Pagan Cruz, et al

Alejandro del Carmen
August 12, 2010

Page  303

183:10,15 184:4
184:16 189:3,25
191:20,23,24
194:8,10,13
197:4,6,22
200:12 201:7
203:5,8,9 204:10
204:13,14 205:4
205:7,8,8,25
206:4,10,16,23
206:25 207:11,13
207:14 211:5,21
211:22 212:15
213:4,21 214:4
214:12,13 218:3
221:3,5,8,10,15
221:18,19 223:1
223:5 225:10
229:11,15,18
230:5,6,7,7,9
231:16,23 233:9
234:23,25 235:3
235:8,11,21,22
235:23 236:1,3,4
236:6,7 237:8,9
237:10,11,14,18
238:16,20 239:5
239:16 240:1
241:4,17 243:19
243:24 244:21
245:3,5,6,9
246:12,14,16
247:5 248:16,19
249:16 251:6,9
251:17,19 252:2
252:7 253:6,11
253:15 254:20
255:6,14,24
256:18,23 258:1
258:11,19,25
259:3,16,19,21
260:9,10,19,20
260:22 266:14
268:1,11,13
271:19,20 272:12
273:4 276:18
278:12,14 279:5
279:25 280:4,8

280:25 281:2,12
281:13,14,21,22
knowledge 41:12
42:25 43:20 58:1
161:24 174:5,20
174:25 175:22
177:21 178:20
180:10 206:18,19
250:17 259:24
260:3 274:25
285:15
known 10:4
124:25 158:20
224:21 260:20
261:1,9 281:21
284:10
knows 65:12 168:8
178:4,6 261:3
274:14

_____ L _____

L 1:14 5:4,19
285:9 286:4
LA 91:9,10 125:1
163:7,11 279:23
label 187:9
labeled 187:8,12
217:20
labor 217:10
labors 218:8
lack 50:10 138:4
159:8,25 270:4
277:10
ladies 38:18
landmark 176:21
language 53:13
76:11 170:11
174:1 196:11
202:20 203:18
languish 172:14
large 20:24 37:2
99:12 163:5,12
166:4
larger 206:2,3
236:23,25
largest 162:2
Las 15:14
lasted 172:18

205:5
lasts 206:11
late 24:10 70:20
148:5 150:4
207:15 254:22
257:17,19 263:12
265:12,12
Latin 104:17
Latinas 104:15
Latinos 104:15
Laughter 74:14
109:17 155:3
178:2 211:13
257:21 263:6
277:5
launched 157:12
law 17:25 22:2
30:8 34:10,24
36:14,19 37:17
45:5 55:11 59:24
66:18 67:17
68:11,12 71:18
82:20,25 83:1,12
84:4 85:17 87:25
93:6,11,14 94:1
98:8,9,11,13
105:16,18,23
106:6 107:25
117:10 119:13
133:2,4 149:17
180:17 279:19,23
279:24
lawsuit 31:15
44:22 46:23
lawyer 98:6 109:7
173:22
lawyers 45:2 98:19
131:4
LEAA 119:13
lead 62:1 172:10
leadership 122:9
leading 43:4
198:12
leads 161:1
learn 90:20,22
164:6
learned 117:14
130:22 136:1

173:10
learning 92:11
leave 20:4 188:13
214:7,8,9 263:19
263:22 275:12,22
leaves 263:19
led 31:23 68:10
158:3 164:16
243:10 246:17
270:10
left 96:5 129:10
152:6
legal 6:7 67:17
69:20 98:5,6
221:6,12
legally 119:21
Legislature 166:1
221:21
LEMIT 68:12
93:7,20 105:24
lengthy 219:16,20
233:24
LES 214:3
lesson 63:16
letter 4:7 44:23
45:1,7,12 82:16
82:17,18 223:5
224:23 225:1
letting 21:19
176:17
let's 11:8 18:8
23:12 69:25 70:7
95:1 109:20
137:15 143:13
151:18 160:11
176:8 179:3
181:19 182:8
185:14 190:6
203:24 204:9
206:20 222:5,19
230:14
level 98:17,18
118:15 261:20
268:9
levels 269:20
Levine 114:3,7
226:21
liability 67:21

102:5 104:8
123:10 124:5,20
126:1 127:7,13
179:19
liable 39:8 98:3
173:12
libro 213:17
Licencia 214:10
license 84:24,25
85:3
lieutenant 210:12
230:21 232:16,23
238:18,19 240:4
241:3,5 244:4
249:6,18,24
250:8,9,13,15
261:21
lieutenants 68:4
life 44:11 60:24
62:3 70:15
103:17 138:6
139:5 268:6
lighter 79:8
limit 148:24
272:24
limited 35:8 36:4
55:18 78:16
94:16,22 116:10
116:13 177:14
217:13 261:22
line 61:7,10 114:13
145:19 172:12
lines 130:25
list 14:23 15:3,4
16:19 98:21,23
111:22 113:15,16
113:20 115:1,3
126:17 141:10,17
152:14,19 180:22
181:25 197:13
263:2
listed 37:7 113:18
125:20 136:19
143:20 171:19
183:23 234:14,17
listing 15:7 185:16
187:4
listings 184:3

Job No. 8508  Case 3:12-cv-02039-GAG   Document 1295-1   Filed 07/25/19   Page 92 of 114 Carmen
Evelyn Ramirez Lluveras, et al v. Javier Pagan Cruz, et al                                    August 12, 2010

Page 304

**literature** 90:24
 120:5,7 121:12
 127:4,11,19
 128:17 130:20
 132:5 134:24
**litigated** 174:24
**litigation** 179:16
 183:5
**little** 35:25 38:15
 64:4,13 69:25
 75:11 78:3 95:5
 151:18 188:5
 189:1 200:16
 211:11 228:24
 249:19,23 253:20
 263:6 280:14
**live** 26:14 60:23
 237:8,10
**lived** 268:5
**lives** 132:23
**LLUVERAS** 1:3
 285:3
**local** 209:18 210:1
 210:24 212:15,16
 213:3,25 215:1,5
**locate** 137:10
 208:21
**located** 246:16
**location** 90:12
**log** 22:16
**logical** 181:15
 215:25
**long** 12:4 26:9
 45:6 62:9 98:21
 137:2 144:20
 147:15,18 172:17
 205:4 206:10
**longer** 94:5 268:12
**look** 20:10 28:7
 30:10 50:20
 58:14 70:18 81:8
 86:15 105:22
 111:19 114:22
 120:14 139:22
 143:14 146:18
 147:1 148:4
 161:22 164:16
 176:18 177:18

 184:20 190:23
 191:12 195:9,13
 195:17 202:12
 204:16,18 216:7
 223:1 227:24
 233:15 235:1
 250:20 257:5
 258:9 259:3
 263:25 276:16
**looked** 20:18
 27:10 37:15
 47:18 56:19
 58:15 76:20 87:2
 87:22 111:20
 136:20 137:24
 163:25 174:21
 175:6,16,17
 189:24,25 248:24
 255:8 270:21
**looking** 36:12
 44:12 81:10
 83:25 86:14
 133:15,16 142:19
 191:3 232:6
 246:4 264:15
 271:11
**looks** 23:21 190:9
 234:4
**loose** 257:10
**LOPEZ** 2:7
**Los** 91:8
**loss** 31:15 203:13
 268:6
**lot** 44:12 60:14
 63:23 64:3 69:22
 79:1,11 83:3
 84:16 89:14,25
 106:1 136:11
 160:22 175:2
 206:23 208:20
 251:7,14
**Lou** 12:7
**low** 139:20,20
**lower** 11:17,18
**lowest** 49:23 50:8
 139:13
**loyalty** 211:20
 213:13

**Luis** 249:5,6 250:5
 265:22,24
**lump** 75:2
**lunch** 100:25
 143:19 147:1
 168:10 174:2
 180:25 181:18,22
 182:11,12
**Lynch** 39:16,19
 49:14 254:11,13
 254:14,19,23
 273:21
**Lynch's** 37:10
 201:21

———— **M** ————

**M** 5:1
**madness** 246:1
**magical** 118:23
**Main** 5:7
**maintain** 37:4
 90:17
**maintained** 57:1,6
 235:8
**maintaining** 135:1
**maintenance** 81:7
 104:25 239:10
 240:17
**majority** 88:2
**making** 6:14 71:18
 84:15 186:9
 200:5 218:13
 232:8 267:9
 274:16 279:25
**Maldonado** 76:17
**man** 46:20 226:2
 263:5 277:23
 278:8,18,18
 279:2,14 280:12
**manage** 68:9
 250:19
**management** 29:4
 29:19,22,23,25
 33:8 36:15,23
 47:4 68:2,8,13
 83:8 90:1 97:22
 99:7,12,21,24
 100:7,8,9,11,24

 105:6 108:12,19
 110:9,22,23
 117:16,21 118:11
 119:4,8 122:9,10
 123:10 124:9,11
 126:1 127:13,18
 127:21 133:19
 134:15,17 135:3
 178:19,25 262:12
**management-rel...**
 129:19
**managers** 117:21
 127:23
**mandate** 119:14
 221:6
**manual** 63:15,16
**March** 73:13
 85:22 199:11
 201:6 206:22
**Maria** 136:15
 195:4,6,11,25
 197:21,25 198:22
 201:14
**mark** 23:12 109:24
**Marked** 23:15
**marketable** 93:23
**markings** 139:21
**marks** 184:14,17
 184:21 185:1,9
 188:5
**Mary** 2:5 9:17
**Mason** 280:3
**master's** 26:22
 29:5 98:18
 129:11
**material** 176:12
**materialized** 96:23
**materials** 37:10
 38:5 63:20 64:8
 92:19 93:3
 134:12,13
**mathematical** 74:9
**matter** 42:10
 48:23 175:18
 193:16 232:15
 234:19 269:18
**matters** 111:17
 177:21 222:13

 244:19 285:15
**max** 282:4
**maximum** 94:23
**Maymester** 80:7,9
 80:11
**ma'am** 9:6 11:18
 11:23 12:1 13:9
 13:24 14:5,11,15
 14:19,22 15:3,9
 15:15,17,22,22
 16:8,11,14,18,21
 17:3,14,20,24,24
 18:1,1,5,7,15
 19:19,23 20:14
 21:23 22:1,8,14
 23:2,5,7,25 24:6
 24:9,16,18 25:4
 25:16,21,23 26:8
 26:8,13,25 27:4
 28:14 29:1 30:13
 30:21 31:11 32:2
 32:23 33:1,23,25
 34:6,11,14,23
 36:18 37:5,8,12
 38:6,6,8,10,12,17
 39:23,23 41:7,10
 41:13,17,19 42:5
 42:7,15 43:14,20
 43:22 45:5,8
 46:6 47:6,14
 49:3,19 50:1,5
 51:2 52:25 53:3
 53:6,11,15,18,21
 53:23 54:3,6,10
 54:13,19 55:5,15
 55:17 56:16
 57:13,17 58:8
 59:4,18 61:7
 62:18 63:21 64:9
 64:22 65:19,22
 66:6,17 70:2,15
 72:13,22 73:9,12
 73:14,16,23
 74:11,16 75:20
 76:1,4,25 77:12
 77:21 78:22
 79:14,19,24
 80:22 81:20,25

Job No. 8595                                                                    Alejandro del Carmen
Evelyn Ramirez Lluveras, et al v. Javier Pagan Cruz, et al                      August 12, 2010

82:7,11 83:9,17
88:10,15 89:8
90:16,18 91:2,14
91:24 92:12,18
94:13 95:11 96:8
96:15 97:6 98:7
98:16,20,24 99:3
99:18 101:4
104:7 105:3
106:7 107:10,15
107:21 108:3
110:24 111:11,21
111:24 113:10,13
113:17,24 114:6
114:20 115:3,15
115:22,25 116:5
116:12 123:5
124:6 125:6
127:2,6,8 129:5
129:18 130:4
132:9 134:25
135:22 136:19,24
138:9,20,22
139:11 141:2,13
142:13 143:9
145:15 146:2,5
147:8 151:23
152:13,23 153:3
153:15 154:16
155:5,6,9,20
156:2 161:7,24
167:8,16 168:18
169:6 170:18
171:19 172:1,24
173:10 180:20,24
181:8 184:1,18
185:5,11,18
187:16,23 188:7
189:6,12,19,24
190:5,24 191:6
191:19 192:21,25
194:4,24 195:1
195:12 196:15,19
196:25 197:23
198:7,13,16,20
199:13,16,22
200:1,3,8,20
201:20 202:11,16

202:21 203:2,7
203:23 204:1,4
205:20 206:17
207:17,20 209:16
209:24 210:10,14
210:18 211:17
212:12 215:3,8
215:10 216:5,24
217:1,3,12
218:13,23 219:13
220:21 222:4,16
222:20,25 223:7
223:9,20 224:17
224:25 225:23
226:12 228:1,13
233:1,6,18,23
234:1,3,16,18,22
235:5,18,25
236:9 237:9
239:11 240:7
242:2,13,21,23
243:2,7,14,16,16
243:22 244:9,17
245:1 247:8,14
248:15 249:4,8
249:21 250:17,22
251:14 252:1
255:1,11,18,22
256:20 257:4,12
258:11 262:16
263:23 264:2
265:14 266:4
267:20 268:21
269:24 270:8,15
273:2,9 274:1,21
275:2,20 276:7
282:1

**McCall** 2:9 8:22
9:17,20,23 10:7
10:22,25 11:24
12:6,20 13:5
15:4 18:13 20:8
22:21 23:19,21
24:20 25:5 47:24
48:5 65:12 76:6
78:11 109:15
112:18 113:22
114:9 120:21

136:23 137:1
152:1,7 153:8,16
153:22 154:10
156:15 173:17
175:1,5 177:15
179:20 181:18
184:8 186:12,18
186:21,24 188:20
188:24 193:8,11
193:13 200:12,14
209:7,11 216:8
216:14,17,19
219:2 220:8,13
220:15 224:4,6
225:1,11 226:15
226:19 227:4,13
227:21,22 229:4
229:8 230:25
240:18,22 245:2
257:18,22 265:19
**McDonalds** 250:9
**McKin** 33:12 37:6
**mean** 9:16 19:15
23:23 32:6 34:15
48:14 51:16 52:9
54:11 56:23 58:9
61:10 63:8 65:8
67:1 69:18 71:11
75:1 91:17,19
98:5 104:5
105:18 113:5
121:2 122:22
139:1 141:5
143:13 144:18
150:23 153:5
155:5 162:5
168:24 173:21
177:25 178:12,14
196:24 204:14
206:23 223:18
226:16 227:7
237:4 239:3
244:5,5 248:8
250:1,2 257:15
272:4 277:10,14
280:6 282:4
**meaning** 61:11
86:20 271:7

**means** 67:9 165:10
165:14 191:20,21
191:24,24 194:19
211:5,7,9,10,21
211:22 214:4
263:20
**meant** 136:4 246:2
272:10 276:24
**measure** 86:24
**mechanism** 205:13
**medical** 42:18,19
207:19
**medications** 14:8
**meeting** 11:24
120:10 158:18
237:14
**meetings** 79:10
212:21
**member** 94:15
126:8,11 128:8
129:1 195:24
**members** 124:23
128:14 130:20
131:11 132:17
**memo** 210:1,2
225:25 226:6
228:21
**memoranda** 146:9
147:6 218:20
**memorandum**
146:24 232:1
**memory** 33:24
73:1 74:8 100:5
143:15 152:18
239:5 240:9
**memos** 147:9
**men** 241:19
**Mendez** 2:5 9:17
16:23,25 110:4
110:21 186:6,23
223:14 224:11,14
238:2 254:4,16
257:7
**mention** 82:3
141:14
**mentioned** 12:20
20:8 21:6 26:11
76:7 82:1 110:1

110:5,7 114:14
128:23 132:8
136:14 144:15
224:19 228:11
244:11 256:16
267:16 269:3
272:13
**mentions** 233:21
233:22
**Merced** 233:3
236:7 275:25
**merit** 177:5 286:5
**merited** 254:8
**merits** 10:8 166:20
**messes** 137:3
**messing** 65:15
**met** 228:18 237:12
**method** 103:25
246:1,4
**methodological**
274:17
**methodology**
248:12,16,18
**methods** 104:1
248:20
**Mexico** 15:15 73:4
73:5
**Michael** 2:9 9:17
**middle** 252:10
**midsized** 131:6
**midst** 20:1
**migrate** 104:19
**military** 263:21
**million** 60:12,20
**mind** 83:1 96:17
123:17,20,24
154:19
**mine** 42:19,21
109:6 188:9
**minimal** 70:14
81:5
**minimally** 123:22
**minorities** 87:11
102:6 104:10,11
**minority** 34:19
**minors** 32:10
**minute** 192:6
**minutes** 215:22

216:1,9 249:7
257:8 267:24
273:1 275:15
276:12,14 280:15
**misconduct** 50:3
102:6 148:10
**mismanagement**
19:12
**misread** 265:6
**misrepresentation**
55:8
**missed** 110:20
**missing** 63:3 189:1
189:2 209:1
220:6
**mission** 229:17
**misspeak** 257:20
**misspoke** 68:24
164:5
**mistake** 208:21
**mistaken** 19:5
39:13 89:18
250:1 256:9
**mistakes** 92:11
**mister** 182:25
**misunderstood**
120:25 163:23
**mixed** 192:13
**model** 30:1 92:12
101:20 102:2,2
103:9 104:4
105:24 119:24,25
120:6 122:8
124:2,4 129:6,24
130:6,7,13,16
131:8,15,19
134:9 279:12
280:3 281:8
**models** 21:17
100:1 129:16
167:17
**modifications**
257:14
**modified** 274:7
**modify** 53:14
253:24 254:6
**moment** 182:12
207:25 244:3,8

278:25
**money** 44:5,22
**monitor** 161:21
275:18
**monitoring** 100:2
104:21 128:20
**month** 25:7 75:11
80:24 81:24
**monthly** 212:21
**months** 73:9 94:11
131:13 209:15
210:25
**mopeds** 252:14
**morning** 33:5
80:18 117:9
**mortar** 104:3,6
**mother** 97:12,13
**motion** 76:20,24
**motivational**
60:22
**motorist** 264:19
**move** 252:14
**multiple** 126:3
**music** 113:5
**mutual** 31:21
**mystery** 189:14

## N

N 3:1 4:1 5:1 8:1
**name** 11:13,15
12:18 39:25 40:2
49:14 84:22
114:4 129:9
130:19 135:11
194:13 226:4
234:17 284:11
**named** 226:2
**names** 45:2 169:19
201:2 228:10
**narratives** 146:8
147:5
**nationally** 92:14
**nature** 138:12
148:23 149:2,14
157:13,14 196:21
197:4 198:12
**near** 73:4
**necessarily** 41:25

76:13 144:8
149:10 151:2
258:21 260:1
272:11 278:7
280:25
**necessary** 46:18
83:8
**need** 5:25 8:20
48:4 82:18 103:5
103:18 183:25
185:12 215:14,14
226:16 233:6
272:24 281:2,3
**needs** 20:3 150:24
183:10 212:6
**negative** 146:23
**Negron** 201:3,7,17
261:5
**neither** 285:23
**never** 19:1 41:8,9
56:9,10 101:7,9
101:14 145:10
161:25 162:1,21
231:16 257:3
**new** 15:14 73:4,5
89:21,22,24 90:6
91:5,10 93:24,25
94:3,4 125:2
130:23 163:7,9
208:12
**news** 176:7
**newsletter** 126:19
127:1
**newspaper** 160:23
**newspapers**
126:16
**Nheuabo** 265:8,9
**Nicaragua** 96:13
267:25
**night** 24:11,12
26:6 225:25
226:7 228:20,21
232:3 234:21
243:21 265:25
**nights** 26:4 78:9
79:16
**Nine** 94:11
**nine-month** 79:4

**nods** 15:1 17:12
33:20 47:10
49:11 55:20
183:9,18,20
190:11 218:21
225:3 240:12
272:15 273:23
277:13
**non-attorneys**
11:5
**non-billable** 25:10
**normally** 241:22
**norms** 174:13
**notaries** 11:5
**notary** 6:11 10:10
284:17 285:21
**note** 12:16 76:3
77:2 181:16
218:13 224:21
**noted** 138:1
140:13 153:18
154:11,12 177:15
177:17 241:1
284:3
**notes** 24:2 39:22
45:10 75:15
114:19 115:6,7
146:12 148:4
**notice** 4:5 16:13
23:8,13,14
139:16
**noticeable** 139:22
**noticed** 113:3
173:24
**notification**
116:24 191:15
**notified** 10:3
**notion** 148:20
255:5
**Novedades** 213:22
**November** 205:1
205:22 206:13
207:19
**Numb** 141:11
**number** 1:5 20:24
24:1 37:21 46:15
46:22 52:13 67:5
67:11 85:3 102:1

128:9 134:10
148:9 149:10
150:4 163:5,19
164:11,25 165:2
166:2,4 176:9
180:22 181:14,25
186:25 187:1,13
188:16 189:17
193:9 197:12
198:24 209:4
211:9,10,21
215:9 219:19
220:6 224:12
225:6 258:16
273:7,10,19
274:2,9,12,22,24
275:9,16,23,24
285:5
**numbered** 188:14
**numbers** 4:3 144:1
186:9 190:17
194:15 195:14
202:8 211:11
216:10,13 219:23
220:9 222:10
223:23

## O

O 8:1
**oath** 10:11,12,16
10:19 11:3
284:10 285:17
**oaths** 6:12
**object** 173:23
175:1 229:4
**objection** 9:20,24
173:17,20 177:15
177:16 179:20
230:25 240:18,25
**objections** 5:24
6:1,7,7 8:19
**obligation** 14:13
14:16 25:24
273:5
**obligations** 275:17
**observed** 165:18
264:20
**obtained** 37:24

Job No. 8595   Case 3:12-cv-02039-GAG   Document 1295-1   Filed 07/25/19   Page 95 of 114
Evelyn Ramirez Lluveras, et al v. Javier Pagan Cruz, et al   Alejandro del Carmen
August 12, 2010

Page 307

77:1
**obviously** 8:19
14:12 28:10
51:11 68:21 89:7
101:9 104:13
113:8 115:1
118:25 120:14
139:5 141:5
147:22,23 148:16
149:15 157:13
173:14 183:22
186:16 259:3
**OC** 204:22 205:13
205:15,20
**occasions** 242:20
257:3
**occupy** 196:13
**occurred** 47:16,19
47:22 153:2
179:15 180:12
201:4 228:22,23
243:1 250:24
252:5
**occurring** 48:12
**occurs** 148:6
**October** 213:8,25
**offender** 268:18
268:23
**offense** 266:25
**offensive** 203:17
**offer** 61:16 62:15
92:25 116:1,6
117:4 118:17
139:12 268:11,22
**offered** 6:5 62:11
124:3 206:12
**offering** 117:1
267:8
**offhand** 70:2 90:7
91:6 138:11,15
148:3 162:11
163:16 165:7,20
180:24 182:3
191:9 201:9
208:9,17 228:13
232:12 235:5
271:5
**office** 54:18

113:23 120:12
121:21 125:12,13
132:8,9 134:5,25
135:4 144:18,20
144:22 145:2
149:19 183:5
186:1,10 204:14
226:23 244:24
263:5 280:14
284:15 286:1
**officer** 5:13 6:20
10:20 32:8,11
33:17,21 36:7,11
37:10,24 38:15
39:2,8,14 40:12
40:18,19 43:3
46:17 47:4 49:14
51:6 63:5 81:12
81:14 84:25
86:13 87:3,5
90:10,11 100:17
101:7,20 103:1
103:10,12 112:22
115:9 129:20,20
136:22 137:9,23
138:1,13,16
139:3,3 140:2
144:7 146:9,11
146:14 147:6,16
147:19 148:11
149:6,8,15 150:3
150:7,8,12,23
151:4 154:22,23
154:24 156:25
157:12,13,15,19
157:19 158:1,11
158:23,25 159:19
159:22 160:2,15
160:16 166:17
169:7 170:9
171:6,9,12,15,16
171:20 172:10
179:1 181:4
187:14 189:10
190:20 191:10
193:25 196:10
199:7 200:25
201:12,19,21

204:21 221:6
231:12 232:18,19
232:20 237:12
238:14 239:19,24
239:25 240:5
241:3,5 244:6
245:14 246:15
251:8 252:13,13
252:23,24 254:8
254:10,19,23
255:9,17,18
258:21 259:15,20
260:22,24 261:23
262:10 266:23
267:15,15,19
269:10,15,17
279:4,16 281:9
**officers** 34:18 35:9
37:20 49:1,6
56:1,11,15,20,22
58:16,20,23
59:10 62:24
67:12 84:11 87:9
99:21 103:2,4
104:12,21 108:7
111:1 119:15
123:7,8,11 124:9
134:15,17 139:2
140:23 141:5
144:12 145:12,19
160:23 161:11
162:12,17,20,25
164:7,23 166:3
166:13 172:12,12
176:9 205:11
207:1 208:11
221:4,23 229:3
231:21 232:22
235:23 236:1
237:20 238:22
244:11 255:4,12
255:19 260:12
261:16 272:14
274:3,4 277:16
278:17 280:10
281:17
**officer's** 36:8
38:24 39:11

157:16 181:12
245:5 268:25
277:25
**officer-involved**
89:10,13,17 90:6
105:1 106:14,17
120:19 124:10
127:5,16 128:20
134:14,19 135:2
144:5 230:17
235:3,19 276:2,5
277:22 278:16
**Offices** 5:6
**official** 6:12
**oftentimes** 130:24
131:7,10
**oh** 19:17 23:17
25:12 30:5 43:7
52:20 61:12 73:6
80:10 93:5
102:17 131:11
152:5 163:22
196:9 212:23
214:11 223:2,12
247:20
**okay** 10:22 12:16
13:15,17 18:20
26:16 30:5 45:19
50:19 55:9 56:8
61:5 64:11 66:4
66:13 70:9 71:25
76:22 77:2,5
94:7 96:4,18
97:1 120:13
121:5 128:1
141:21 142:1
144:4 145:25
148:12 152:8
154:13 156:8
162:13 163:3
171:20 172:11
175:23 181:21,23
183:2 186:18
187:15 188:24
190:2 192:5
193:16 200:14
201:13 202:3
204:19 206:10,14

207:24 208:25
209:11,19 210:11
212:20 213:20
216:14 217:21
218:11 222:3
224:15,24 229:8
233:11 235:1
237:3,6 238:22
240:20 241:16
244:18 246:24
247:19 249:22
250:4 257:13
262:25 263:7
266:5 273:9
275:13 276:15,23
281:2
**old** 104:3
**oldest** 118:5
**omissions** 270:4,9
271:12 273:16
274:5 275:25
277:12
**omits** 264:17
**Omitting** 270:16
**once** 22:23 59:14
78:25 95:25
120:8 156:19
158:4 164:18
171:2,9 191:9
231:15 232:18
237:20 247:1
**ones** 29:2 128:7
139:19 188:12
218:10 236:24,25
258:13 270:14
**online** 31:3,5 80:2
**onward** 200:5
**on-the-job** 38:7
**oOo** 7:11
**Oops** 45:10
**open** 86:1
**operate** 269:9
**operates** 269:10
**operation** 264:18
264:25 265:3,10
265:18,25 270:20
**operations** 142:11
151:25 156:9

Page 308

| | | | | |
|---|---|---|---|---|
| 207:2,9 210:7,13 | orders 161:5 | 112:22 116:19 | 223:23 224:1 | 51:10 55:8 59:22 |
| 211:1 238:23 | 175:17 177:11 | 137:21 138:17 | 234:4,7 254:1,2,3 | 71:17 78:10 |
| 240:2,10 242:18 | 180:21,23 206:24 | 140:9,10 146:4,9 | 257:15 264:15,16 | 92:11 93:20 |
| **opined** 268:19 | 219:14 220:18 | 146:11,14 147:6 | 266:6 269:3 | 99:13,17,18 |
| **opinion** 13:21 14:1 | 221:16 262:17 | 151:8 155:9 | 270:3,17 271:10 | 106:7,8,8 111:7 |
| 46:12,14 49:16 | 276:24 | 156:8,25 158:23 | 272:17 273:12 | 122:8 138:7 |
| 53:6 58:19 97:24 | **ordinary** 170:9 | 170:9 171:9,12 | **pages** 17:11 21:9 | 139:10,10 140:11 |
| 98:1 116:1,6,18 | 174:9 | 171:15,20 172:18 | 75:5,9 185:8,9,24 | 146:10,24 164:18 |
| 116:22 117:1,4,6 | **organizational** | 181:4 187:14 | 187:24 188:13,19 | 164:22 189:16 |
| 118:17 138:25 | 245:20 260:18 | 190:20 193:25 | 189:2 191:12 | 198:24 212:4 |
| 139:12 159:21 | 262:6 | 194:19 197:11 | 193:19 197:14 | 224:11 233:7 |
| 172:3,6,7,8 174:8 | **organizations** | 198:14 199:7 | 199:15,18 200:5 | 241:8 245:7,24 |
| 174:25 175:22 | 119:19 121:17,20 | 200:25 201:12,19 | 200:21 202:4,5 | 249:16 264:8 |
| 177:8,9,20 | 121:23 | 202:23 203:6,25 | 204:5,11 212:10 | 267:10 278:5,20 |
| 180:16 190:3 | **orient** 60:13 | 204:21 205:9 | 213:8 218:25 | 282:5 |
| 229:21 258:15 | **original** 6:23 14:4 | 207:15 209:23 | 219:15 233:25 | **participants** 64:4 |
| 267:8 268:14 | 20:9,13 78:4 | 210:9,17 212:11 | **PAGE/LINE** | **participate** 128:14 |
| 274:19 277:19 | 138:3 142:15 | 231:12 232:18 | 283:2 | 205:12 |
| 278:2 281:24 | 170:20 181:4 | 240:2,5,10 241:5 | **paid** 44:2 45:22 | **participating** |
| **opinions** 46:25 | 231:11,19 245:16 | 243:9 244:13 | 64:15 69:3 70:1 | 204:22 |
| 58:12 124:3 | 246:14 251:2 | 245:15 246:15 | 73:15,21 74:12 | **particular** 30:14 |
| 189:23 191:4 | 252:8 | 251:8 252:2,13 | 93:22 94:7,14 | 32:4,14 35:23 |
| 194:25 199:17 | **originally** 226:20 | 252:13 254:8,25 | 96:2 | 37:23 39:13 |
| 200:6 220:19 | 226:24 227:15 | 255:9,24 259:20 | **panels** 125:2 | 40:14,23 41:12 |
| 268:12 | **Ortega** 198:8 | 260:22,24 262:10 | **panhandlers** | 41:13 43:11 |
| **opportunities** | **Ortiz** 194:18 199:9 | 265:11 266:12,17 | 133:12 | 47:17 58:2,12 |
| 171:5 | **OS-1-16-1301** | 266:23 267:15,19 | **paper** 45:11 | 59:1,3 60:21 |
| **opportunity** | 219:16 | 274:25 276:9 | 200:13 | 76:3 87:17,17 |
| 171:12 196:8 | **OT** 207:15 | 277:21 285:6 | **papers** 126:21 | 90:20 111:5 |
| **opposed** 240:22 | **outcome** 154:25 | **Pagan's** 115:9 | 128:16 192:13 | 117:2 129:18 |
| **opposing** 43:12 | 285:25 | 116:2 136:22,22 | **paperwork** 103:4 | 133:11 134:11 |
| 271:25 272:2,8 | **outside** 62:22 | 136:23 137:9,23 | 142:18 181:4 | 138:2 144:3,3 |
| **oral** 1:9 5:17 | 128:3 174:17,17 | 138:1 147:18 | **paradigm** 133:4 | 153:24 158:10,21 |
| **order** 46:19 56:18 | **overall** 89:5 273:7 | 156:19 171:16 | **paragraph** 55:14 | 160:4,19 166:14 |
| 64:9 95:4 113:16 | 273:14 | 172:16 189:10 | 228:24 234:8,9 | 167:6,7 190:3,3 |
| 113:18 126:18 | **oversee** 236:12 | 191:10 214:2 | 253:25 254:2 | 190:21 191:25 |
| 156:1,10,16 | **overseeing** 169:14 | 241:4 253:20 | 255:2 257:15 | 200:19 217:10,10 |
| 158:15 185:22 | **oversimplifies** | 259:15 275:4 | 269:3 270:3,3 | 221:14 244:8,25 |
| 186:20 188:1 | 264:16 | **page** 4:3 16:22 | 272:22,22 277:2 | 245:12 248:21 |
| 190:10 192:17 | **O'Neill** 2:4 | 53:12,16 76:3 | **paragraphs** | 253:12 258:18 |
| 193:17 194:10 | | 77:5 92:23 | 184:15 | 260:2 262:7,8 |
| 195:3 200:16 | **——— P ———** | 111:19 185:16 | **parameter** 69:6 | 278:5,7 |
| 204:7 208:12 | **P** 8:1 | 186:1,9 188:25 | **parameters** 19:8 | **particularly** |
| 216:4 219:5,21 | **pace** 80:15 | 190:7,9 198:10 | 21:1 36:1 150:15 | 124:25 145:18 |
| 219:22 220:2 | **packet** 64:4 215:1 | 209:12 216:10,13 | 221:4 276:25 | 203:11 230:17 |
| 221:20,23 223:8 | 226:25 | 219:7,23 220:4,5 | **part** 18:19 25:8 | **parties** 7:5 179:6 |
| 271:8,9 279:19 | **Pagan** 1:6 19:13 | 220:7,8 222:10 | 26:15 27:4 30:23 | 285:22 |
| 279:24 | 19:16,17 101:20 | 222:21,21 223:2 | 34:4 36:9 49:7 | **partitioning** |

Job No. 8595   Case 3:12-cv-02039-GAG   Document 1295-1   Filed 07/25/19   Page 97 of 114
Alejandro del Carmen
Evelyn Ramirez Lluveras, et al v. Javier Pagan Cruz, et al
August 12, 2010

Page 309

229:16
partnered 31:20
parts 184:25 212:5
    212:6 277:17
party 5:25 6:6
    77:8 179:10
    285:24
Paso 41:15 88:10
    96:1 116:24
    247:10 248:2
passage 36:19
passed 34:24
    68:11 93:7
passing 114:15
    147:22
passive 269:22
    270:1
patrolman 88:5
pattern 39:11
    149:9
patterns 262:13
Patty 40:2
pause 187:11
    192:8 194:14,17
pay 73:20 119:14
    158:2,2 237:21
paying 21:24
    25:12
payroll 66:2
peace 44:13
Pearce 43:13
Pedro 184:14
peer 130:6
pending 156:10
    157:5,6 159:18
    171:21
people 12:18 28:15
    39:20 50:3,10
    60:1,11 78:21
    96:25 99:15
    113:5 120:16,18
    126:21 132:23
    139:9 140:2
    164:11 221:16
    234:11,14 237:8
    237:10 251:6,11
    251:20,23 252:9
    252:22,23 253:9

253:14 263:9,18
    266:19 268:4
    269:9 281:14,15
pepper 204:23,24
    205:3 206:16
percent 69:16,17
    70:10,20,22,23
    71:3,22 72:1,2
    94:14,18,21
    97:14 102:14
perception 268:25
PERF 121:17
    124:23 126:8
    127:4,11,19
    128:3,4,5,14
perfectly 48:9
    248:9
perform 68:6
    83:23 127:24
    130:25 131:21
period 51:21 67:1
    75:2 148:21
    214:18 216:11
    222:11 263:21
Perry 280:3
person 40:24
    59:19 81:14 85:5
    103:10,22 136:2
    154:21 160:24
    166:18 167:5
    175:10 176:4
    225:12 228:20
    230:9,11,12
    233:14 238:16
    239:20 243:23
    263:16 268:23,24
    284:11
personal 53:17,19
    53:24 57:19
    59:20,21 178:9
    274:25
personally 6:9
    284:10
personnel 29:22
    29:25 189:8,18
    263:25
persons 118:21
perspective 28:7,8

36:24,24 133:19
    260:18
perspectives
    229:16
pertained 38:25
    56:1 58:23
pertaining 95:20
pertains 61:8
    81:12 95:16
    99:24 100:11
    118:5 123:10
    131:19 134:19
    172:8
pervasive 103:14
ph 60:15
phone 18:14,15
    275:11
photocopies 184:7
    185:9
photocopy 54:20
photocopying
    183:14
phrase 105:17
    156:16 206:7
    266:5
phrased 52:14
phraseology 120:1
phrasing 158:6
physical 148:10,25
    253:23
physically 265:1
    278:25
Ph.D 26:16,19
    28:19 54:1,8
    98:10,18 118:6
pick 265:13
pieces 46:18
    134:24 264:17
    270:16
pink 189:1
place 30:18 49:6
    52:1 56:24 57:5
    59:4 62:7 68:7
    88:21 89:6
    105:20 107:1
    124:22 125:15
    129:16 130:14,23
    131:14 144:9

145:5 151:4
    155:4 156:20
    158:16 160:20
    166:6,11 172:9
    174:18 180:6
    183:15 190:1
    191:23 213:7
    221:9,14 231:6
    245:18 250:11
    254:8 259:8
    260:2 269:18
    271:18 279:6
placed 10:15 166:5
    180:15 237:22
placement 237:19
places 28:21 77:15
    113:4 145:16
    159:12 263:19
placing 174:10
plaintiff 5:12
    40:16 42:6,8
    43:6
plaintiffs 1:4 2:2
    5:3 33:16 285:4
plaintiff's 44:4
plan 63:17
planners 64:1
play 244:16
Plaza 2:7
please 8:10 11:14
    24:15 60:6
    160:13 222:4
    241:2
plus 22:25 68:15
    139:14 143:2
point 44:11 121:10
    154:10,11 155:13
    159:9 160:12,25
    166:1 169:17
    171:13 179:18
    181:15 208:1
    210:4,8 215:25
    220:17 227:1
    229:19 235:16
    242:11,17 243:9
    243:11 244:19
    245:20 252:18
    258:14,18 259:14

259:20,23 263:1
    266:15,18 267:10
pointed 270:14,15
points 157:8 185:3
    206:23 248:24
    257:6,9,10 272:4
police 19:12 29:20
    31:22 32:8,9
    33:7,7 34:24
    35:4,9 36:11,20
    37:1,20 38:15
    39:15,17 46:17
    46:24 48:23 51:4
    55:16,25 56:12
    57:4,10,15 59:9
    61:6,9 62:15,20
    62:23 63:2,5
    66:24 67:4,22,24
    68:1,5 71:17,23
    77:7,15,19,22
    82:12,13,17 83:7
    83:23 85:8,24
    86:7,11,15 88:3,5
    88:23,25 89:3
    91:10,16,17,22
    92:4,6,9 93:8,12
    97:22 99:7,12,21
    99:24 100:7,8,9
    100:11,13,14,23
    101:7,9,22,25
    102:6 103:1,2,4
    104:3,12,20,24
    105:5,5,6,9,10,12
    106:2,21,24
    107:1,22 108:1,3
    108:7,8,12,19
    111:1,5 116:8
    117:15,21,24,25
    118:11,16,22,23
    119:4,5,8,14,20
    121:13,16,18,19
    121:21 122:2,4,5
    122:15 123:3,7,8
    123:11,23,25
    124:15 125:1,2,5
    125:6 126:2
    129:3 130:15,16
    130:21,24 131:2

Job No. 8598
Case 3:12-cv-02039-GAG    Document 1295-1    Filed 07/25/19    Page 98 of 114

Evelyn Ramirez Lluveras, et al v. Javier Pagan Cruz, et al

Margarita del Carmen
August 12, 2010

Page 310

131:20,25 132:16
132:17 133:17,19
141:5 142:4,7
144:11,16 145:12
145:18,19 147:15
147:18 148:19
149:6 150:14,18
151:3 155:17
157:10 158:16,16
158:19 160:1,3,6
160:8,10,15,22
162:2,22,24
163:12 164:23
166:3,13 167:3
167:10,17,19,23
171:5 172:23,24
173:11 174:11,16
176:2,3,9,13,18
176:22,25 177:1
177:11 178:16,17
178:18 179:1,4
180:19 181:2
187:14 191:25
195:22 196:10,14
202:9 205:11
208:23 221:2,4
221:13,23 222:2
226:9 228:10,14
229:2,10,12,22
230:4,19,21,21
230:23 231:5
237:12 256:24,25
260:7,8,11,13,16
261:7,7,15,16,19
262:5,14 269:10
269:14 275:18
276:24 277:24
280:24,24 281:4
281:13
**polices** 162:19
**policies** 90:22
  106:23 107:6,13
  122:5 125:10
  129:7,24 130:6,7
  130:16 131:15
  221:2,9
**policing** 28:4 29:4
  29:10,17 61:15

63:8 89:25 102:3
103:9 104:1
110:3 117:15
119:12 120:8,11
124:1 125:12
132:7 134:9,20
134:22 142:8
**policing-related**
  32:5,6
**policy** 34:2 105:15
  105:20,21,22,25
  105:25 106:13,16
  107:22 129:21
  130:11,13 132:21
  164:18,20,24
  221:6,14
**populates** 150:1
**population** 176:15
**portable** 84:25
**portion** 6:4 68:17
  70:17 264:14
**position** 166:6,11
  196:13 210:5
**positive** 146:23
**possession** 13:13
**possibility** 117:23
**possible** 157:6
  183:3 232:5
  233:1
**possibly** 245:4
**posted** 30:16
**Post-It** 189:1
**potential** 229:23
**pouch** 135:13,14
**power** 199:25
  200:2
**Powers** 41:14,16
  44:2 52:20,20
  54:7 72:23 88:7
**practical** 125:19
  132:6
**practice** 10:21
  11:1,6 87:5
  103:8 123:14
**practices** 19:12
  37:3 46:16,17
  59:25 88:23
  91:16,23 92:6,12

100:1 107:14
116:4,8,21
117:15 119:23,25
120:6,15 122:8
122:12,16,19
123:4,12,18,18
123:20,21,24
124:4 131:16,19
133:5 228:14
229:10,22 230:19
231:6 260:7
279:11 281:8
**practitioners**
  125:1
**Prairie** 1:12 5:8
**preceding** 270:17
**precinct** 242:6
**precincts** 241:23
**precise** 174:1
  222:10
**preclude** 258:21
**predicates** 175:3
**preface** 27:10
**premise** 76:8 98:3
  116:14 221:13
  222:1 269:9
**premises** 67:24
  169:9
**Prentice** 96:20
  97:5
**preparation** 11:19
  11:21 247:6
**prepared** 55:3
**preparing** 65:8
**presence** 51:24,25
  52:2
**present** 9:15
  126:21 132:18
  184:11 265:1
  278:25
**preservation**
  279:3
**preserving** 280:16
**presume** 57:9
  63:22 167:16
**presumed** 159:13
**presumption**
  158:7

**pretty** 13:2 15:4
  75:11,20 94:5
  151:13 215:1
  219:16 245:9
  267:21
**prevent** 266:23
**prevented** 39:3
  260:23
**prevention** 102:4
  170:8
**previous** 21:6,7
  27:25 55:10
  59:10 91:9,21,22
  149:12 167:25
  174:5 177:10,12
  177:12 179:15
  198:10 223:21
  235:11 245:11
  247:4,6 274:13
**previously** 243:5
**primarily** 66:5,20
**primary** 116:14
**principal** 64:25
  65:17 66:23
**principles** 61:14
  108:20 127:25
**printed** 92:24
**prior** 27:10,11
  40:8 45:23 64:9
  80:22 114:1,2,3,5
  130:1 142:15
  151:9,13 153:20
  153:25 177:20
  201:19 238:9
  245:3
**prison** 32:13
**privilege** 6:13 8:20
**probable** 35:15
**probably** 52:8
  54:10,11,12 55:5
  69:5,16 70:19,20
  70:22 72:25
  73:24 74:22
  80:25 81:4,23
  92:23,24 93:5
  95:17,24 96:1
  134:10 162:12
  180:2 212:5

258:2 260:22
**problem** 10:24
  24:16 25:16 74:2
  87:18 121:3
  139:16 143:16
  233:7 248:21
  261:6,8 276:2
**problems** 120:17
  255:25,25
**Procedure** 5:14
  6:16,17,22,23
  154:8
**procedures** 122:5
  174:13 221:2,11
**proceedings**
  282:10
**process** 18:8 39:20
  113:22 120:22
  155:4 159:13
  172:9 215:6
**processes** 47:1,9
  105:20 180:11
  281:5
**processing** 166:19
**produce** 23:11
  24:14,15,17
  59:12 85:24
  89:18 145:21
**produced** 15:10,12
  24:13 59:13
  82:12 83:24 84:6
  85:22 113:25
  124:17,20 144:1
  146:25 164:1
  227:13
**producing** 74:25
  87:24
**professional** 50:11
  61:3 90:3 119:11
  121:13 132:22
  169:16 237:15,16
**professionalizati...**
  119:11 121:25
**professionalized**
  119:17
**professor** 8:23
  11:13 23:24 26:1
  69:13 94:8

Job No. 8595   Case 3:12-cv-02039-GAG   Document 1295-1   Filed 07/25/19   Page 99 of 114
Evelyn Ramirez Lluveras, et al v. Javier Pagan Cruz, et al

Alejandro del Carmen
August 12, 2010

Page 311

109:23 129:13
182:14,15,24
183:1 188:6
**professors** 118:6
**Profiles** 30:15,15
**profiling** 30:7
31:18,21 32:1
33:10,13 34:10
35:1,5,22 36:5,7
66:5,21 67:16
68:12,18,20 69:1
69:18 70:21 71:2
71:19,24 81:15
81:17,18 82:6,8
83:2 86:8,13
87:3 92:16 93:2
95:17,20 99:25
100:18 101:24
102:7 104:12
105:2,19 106:6
106:11 107:23
117:13,19 132:2
**profiling-specific**
71:11
**profit** 63:23
**profits** 65:24
**program** 29:5,7,17
62:20 81:8 98:10
108:5,7,23 110:4
110:5,19 111:4
149:21
**projects** 31:22
**promise** 72:10
168:1
**promote** 121:24
**pronunciation**
12:14
**proper** 40:19,20
156:23 157:1
180:9
**properly** 255:16
**propongo** 154:15
154:19,20,23
155:7,12 158:14
158:22 159:5
164:14,17 166:22
168:22 171:2,13
171:21 172:5

196:3,5,18,20
198:18 242:25
**propongos** 197:1
235:24
**propose** 196:13
**proposing** 155:18
**prosecutor** 251:4
**protective** 110:15
**proved** 284:10
**proven** 175:5
**provide** 19:21
21:11 31:14
44:24 63:13
67:10 82:17 83:5
84:8,24 93:7,13
97:24 103:6,18
103:22 105:5
107:3 116:16
119:20,20 130:16
145:11 156:23
229:14 273:15
276:24
**provided** 14:23
18:23 46:25
76:16 112:4
141:24 227:9
**providing** 229:17
229:18
**provoked** 228:7,25
**psychological**
170:16,17 208:13
**psychologist** 256:5
**public** 6:12 51:7
85:7 89:8 92:11
144:19,21 160:25
169:15 284:17
285:21
**publication** 126:7
126:12 133:25
145:23
**publications** 98:22
98:23 123:16
124:17 125:8
126:17 129:18
133:25
**Puerto** 1:1 2:4,8
10:18 11:4 21:21
57:7,9,10,14

74:13 77:7,15,19
77:22 84:22
135:10 136:3
140:15,25 141:1
144:11 145:6,13
145:14 152:6
157:20,21 158:13
159:20 161:25
162:1,23,24
163:8,9,10,14
165:11,15,22
168:20 170:25
171:1 174:6,7,11
175:16 176:16
180:19 181:10
195:22 196:14
221:15,22,25
224:23 235:4
236:14 262:14
275:17 285:1
**pull** 92:23 228:4
233:2
**pulled** 230:5
**pulling** 200:12
**pulls** 252:11
**purchase** 63:15,21
64:3,4,8
**purchased** 92:19
93:3
**purpose** 35:2,3,21
57:2,12 88:18
124:11 131:22
135:2 175:13
180:4 184:23
228:16 229:7
261:3
**purposely** 266:13
**purposes** 44:19
89:19,20 152:25
167:2 175:9
284:13
**pursuant** 5:9,14
34:9 285:11,22
**pursue** 44:22
**pursuing** 46:23
94:6
**put** 10:18 44:19
55:1 65:5 97:15

99:14 105:24
111:13 112:17
113:5 115:12
121:9 124:22,24
130:13 131:14
132:13 133:24
139:6,16 156:20
182:16 191:22
217:24 240:16
269:25
**putting** 157:1,2
202:17 213:16
**P-H** 60:17
**p.m** 12:12 25:25
80:18 263:4,8

### Q

**qualified** 117:5
**quality** 48:20
132:23
**quarterly** 87:14
126:2,3,18
**question** 6:2 10:7
47:23 48:1,3,3,10
51:3 84:2 106:3
109:14 118:23
120:22,25 125:15
129:17 130:2,3
148:12 149:11
153:17 163:23
165:13 168:13
171:6 175:2,9,13
177:6,7 179:25
180:1,5 181:24
184:13 195:18
196:10 218:17
228:17 229:5,7
235:2 240:24
241:2 258:9,12
259:5 260:8
261:12 269:5
277:18 280:7
**questioned** 59:1
140:18
**questioning**
272:24
**questions** 12:12,21
12:22 184:13

219:9 270:5
279:10,16 281:9
**quick** 18:24 73:25
112:16 182:13
184:20 192:12
222:6,12,22
**quickly** 24:17
190:23 191:2
222:9 275:10
**quite** 20:24 24:17
84:14 97:9
103:16 208:18
219:19
**quote** 228:6
**quote/unquote**
39:10 155:12

### R

**R** 5:1 8:1
**race** 35:11 85:4,5
**racial** 30:6 31:18
31:21 32:1 33:10
33:13 34:9 35:1
35:5,21 36:5
66:5,21 67:16
68:12,18,20 69:1
69:18 70:21 71:2
71:10,18,24
81:16,18 82:5,8
83:2 86:13 87:3
92:15,15 93:1
95:17,20 99:25
100:18 101:24
102:7 104:11
105:2,19 106:6
106:11 107:23
117:13,18 132:1
**racially** 81:14
**racism** 36:22
**radio** 40:24 250:12
250:12
**raise** 8:9 202:2
259:1
**raised** 8:20 153:17
267:24 276:20
**Ramirez** 1:3 55:14
285:3
**range** 70:3 119:18

123:21
**ranges** 64:18
**rank** 94:16 141:9
  205:18 261:20
**rape** 38:20,21,21
**raped** 38:16,17
**rapid** 32:15 80:15
**raping** 157:17
**rate** 45:25 46:1
**Ray** 118:7
**reach** 48:25
**reached** 191:5
  215:7 277:10
**reaches** 276:14
**reaching** 215:6
**reacted** 278:6
**reacting** 152:18
**read** 11:19,20,22
  12:23 21:14
  23:23 24:5 52:13
  60:14,14 75:16
  77:17 82:2 92:22
  115:5,7,10,14,15
  126:15 128:17
  129:18 134:18,25
  135:6,7 138:22
  140:16 151:20,21
  152:11,17,19,20
  152:24 153:9,13
  156:2,5,6,19
  158:21,23 160:23
  161:2,3,4,16
  163:4,17 164:19
  164:24 165:18
  170:18 171:8,15
  176:8,8 180:17
  185:4 207:5
  208:5 211:11
  217:23 231:12
  232:5 233:1
  246:5,14,18,20
  246:21,22 249:8
  258:23 265:14
  266:12 271:21
  278:10,21 284:2
**reader** 99:8,14
**reading** 6:14 14:3
  75:13 123:15

127:10,19 144:13
  147:20 163:1
  179:8 185:4
  214:14 237:24
  249:14,17 250:22
  251:2,18 252:9
  253:8 259:13
  276:11
**reads** 214:3
**ready** 133:11
**real** 92:1,2 268:25
**realities** 104:17
**reality** 85:12 87:12
  133:19 160:22
**realize** 8:4 227:1
  227:15
**realized** 218:8
**really** 30:23 33:14
  36:4,6 43:15
  49:7 52:14 62:20
  64:18 68:20
  71:10 90:4 96:22
  111:10 116:25
  118:9 120:14
  130:19 145:6
  189:18 211:21
  230:7,8 250:20
  281:22
**realm** 104:11
  118:1,12 142:8
**reason** 17:21
  24:13 78:10
  218:9 230:2
  258:17 265:15
  269:15 279:8,11
  283:2
**reasons** 50:24
**reassigning** 158:25
**recall** 32:5 33:3,8
  35:23 37:15
  38:20 49:7 52:14
  58:15 70:2 88:16
  88:20 91:3,6
  95:25 101:20
  128:2,18,19
  138:11,15 139:18
  144:13,15 151:19
  155:11 163:16

165:7,20 182:2,4
  191:7,11 208:9
  225:9,13 226:1,2
  226:4,6 231:11
  231:25 232:4,4,6
  232:12,13,21
  236:16,19 237:7
  237:14 240:6
  251:2 252:8
**receive** 44:21
  65:23 66:3 74:1
  95:6 114:18
  126:12,18,25
  164:14
**received** 20:12
  23:21 42:2,9
  45:7 72:9,12,14
  78:4 97:4 114:2
  116:23 118:2
  139:18,20 140:6
  142:25 143:2
  146:15,17,22
  181:16 183:5
  188:11 208:2
  247:1,3 255:24
  262:11
**recess** 182:11
  222:7
**recognized** 92:14
**recollection** 15:5
  33:15 37:24
  43:10 72:17
  127:9,19 145:4
  165:4 236:17
  256:4 276:11
**recommend** 87:9
**recommendation**
  156:17 157:4
  159:18 194:2,5
**recommendations**
  86:9 87:8,13
  129:21 163:13,20
**reconcentrated**
  263:20
**reconcile** 187:5
  217:23
**record** 8:2,17 9:10
  9:13,14,18,19,22

10:1 12:23 13:1
  20:23 21:10
  38:25 53:8,9
  57:4 102:13
  109:18,21 116:17
  117:9 137:5
  150:5 152:25
  153:17,18,23
  154:4,11,18
  156:19 168:12
  174:17 181:19,20
  182:10,23 192:9
  192:10 201:25
  203:15 209:22
  214:20 215:16
  217:5 225:17
  226:12 227:7
  248:25 249:3
  253:21 258:4,5,7
  262:9 271:25
  275:2 282:9
  285:19
**recorded** 56:25
  85:4 150:7,9,11
**recordkeeping**
  59:17 191:23
**records** 4:6 24:7
  24:24 34:12,15
  37:20,22,25,25
  56:17,19,22,23
  57:7 74:4 85:1
  86:1 89:15 90:1
  111:2 136:22
  137:8,23 142:14
  142:15 144:25
  181:2 187:14
  189:9 190:19
  203:21 214:25
  215:5 245:5,14
  261:22 262:2
**recruit** 87:10
**recruitment** 39:20
  123:7 142:22,23
**red** 254:24
**reduced** 155:22
  156:1 285:18
**reducing** 134:22
**red-flagging**

120:16
**Reed** 40:2
**Reeter** 12:15,17
**refer** 63:12 122:19
  178:23 180:21
  269:19
**reference** 16:16
  183:3 185:21
  195:25 220:23
  226:2
**referenced** 108:24
  225:16,21
**references** 100:23
  122:11,18,20
  186:9
**referral** 103:23
  170:16
**referred** 92:13
  151:1 164:25
  169:8,13 170:10
**referring** 48:7,19
  53:15 57:14
  71:10 152:2
  166:21 190:17,18
**refers** 14:17
**reflected** 141:20
  256:25
**reflections** 178:10
**reflects** 24:3
**refrain** 117:1
**refreshes** 33:24
**regard** 115:24
  212:7 225:5
  232:14
**regarding** 12:13
  31:25 33:11 34:8
  40:17,18 42:3
  89:23 104:9,21
  104:25,25 105:6
  105:10,12 118:20
  127:4,12 134:13
  151:16 171:24
  180:6 201:4
  270:17
**regardless** 32:24
  163:5 239:3
  268:7
**regards** 36:2 37:23

Case 3:12-cv-02039-GAG   Document 1295-1   Filed 07/25/19   Page 101 of 114
Job No. 8595
Alejandro del Carmen
Evelyn Ramirez Lluveras, et al v. Javier Pagan Cruz, et al
August 12, 2010

Page 313

56:13 92:10
105:16 121:12
125:9 154:25
174:12
**region** 136:12,12
**regular** 94:15
243:18 263:19
**regulates** 66:24
**regulation** 219:18
219:19 220:5,7
**regulations** 220:19
**reimbursing** 22:1
**reintegration**
237:23
**Reiter** 12:7,13,14
12:20,24 13:11
13:13 97:21 98:4
119:6 121:20
125:8 129:22
174:4 175:6,14
176:24 177:8
179:21 180:4,5
180:10 226:10
232:8 246:12
248:24 256:16,21
258:24 259:9,13
259:14 264:9,23
265:6 270:10
271:14 274:10,13
274:25 276:20
**Reiter's** 116:13
156:7,21 163:18
170:6,19 246:20
246:21 266:3,12
270:22 271:13
272:3 275:20
278:13
**relate** 33:4 99:23
100:6 117:15,20
144:2 202:23
**related** 19:13 33:7
58:16 61:5 68:17
71:3 93:5 98:25
111:1 128:19
142:10 173:15
175:17 176:9
187:22 190:21
192:23 195:4,6

195:23 200:19,25
202:6 219:11
222:14 285:24
**relates** 69:1 70:17
71:17 105:15
108:12 202:23
258:18
**relating** 7:7
127:14
**relation** 27:21
**relations** 49:25,25
50:8 139:14
**relationship** 31:23
51:24 52:9 259:7
273:21
**relayed** 97:24
**released** 46:23
**relevant** 12:21,22
31:14 35:1,9
38:1 55:16 68:6
90:10 100:23
102:1,5 115:19
124:18 137:9
144:17 145:4,18
146:7,14 147:4
166:17 178:10,19
221:2 229:13
270:5 281:10
**relied** 255:5
**relies** 58:5
**relieve** 167:2
**rely** 189:22 191:3
215:6
**remain** 230:20
**remaining** 72:3
214:25
**remember** 33:5
36:3 40:1,22
45:2 47:18 64:19
79:17 91:7 99:13
102:11,12,22
110:2 123:14
135:16,18 137:8
137:24 139:25
140:20 142:18
146:19 147:20
148:3 162:11
163:1 165:17

170:11 179:8
182:6 208:3,17
218:3 225:18
226:4,10,11
232:8 233:19
237:1,24 238:19
239:7 249:17
250:22 251:12,18
252:4 253:8,12
255:1 256:9
264:12
**remembered**
102:19
**remind** 164:19
191:14
**reminded** 35:25
**remplazo** 238:3
**rendered** 25:2
159:8
**repeats** 202:13
**Replacement**
238:2,3
**report** 4:4 11:21
15:10,13 16:1,3
16:20 17:1,2,7,10
17:19 18:24 19:5
22:4,23,25 23:4
25:2 41:22 43:11
45:8 50:15,18
52:13 53:2,10,12
53:20,24 54:24
55:14 56:9 72:15
73:11 74:20,25
75:18,19,21,25
76:2,6,9 77:17
78:2,17 85:21,22
85:23,23 86:3,5
87:21 89:20
91:21 93:13
97:21,23 111:18
116:13,15,15
129:23 140:13
145:17 153:10
156:7,21 160:9
163:18 170:7,19
173:24 178:22,24
179:23 183:23
184:3 185:17

208:1 220:22
232:9 236:13
246:11,20,21
247:6,7,12,15,17
247:21 248:3,13
253:25 257:16
258:23 259:14
264:9 266:9,12
270:6,13 271:13
271:14,21 272:1
272:7 276:21
278:13 282:6
**reported** 1:14
240:6
**reporter** 5:4,20
8:2,9,16 10:15,20
14:12 17:9 18:4
19:20 23:17
24:25 135:15
154:17 165:12
182:10 187:20
188:17 215:14
238:1,6 285:10
**Reporters** 286:5
**REPORTER'S**
3:5
**reporting** 85:11
**reports** 14:17
31:21 53:14,20
55:3 91:22
122:19 143:20,22
143:25 145:25
164:3,4 177:22
217:8
**represent** 10:2
87:11 140:22
197:16 218:24
226:19 265:16
**representation**
21:13 22:11
145:3 183:21
**representations**
182:23
**represented** 21:16
37:1 75:8 132:19
214:6 221:7
228:17 255:22
**representing**

19:10 22:22
214:14 278:22
**reprimand** 194:10
**request** 113:19
153:24 244:24
245:12 252:19
**requested** 44:6
245:14,15,19
257:2
**require** 35:6
106:23,24
**required** 84:13
93:11 161:14,15
212:21
**requirements** 5:13
5:22 94:4 207:6
**requires** 20:4
34:24 161:10
208:13
**requiring** 83:5
**reread** 75:21
**research** 31:5,7,8
34:4 117:20
121:18 124:16
176:25 248:20,22
**researcher** 176:4,5
**resist** 269:7,16
**resistance** 267:12
269:19,21,23,23
269:23,25 270:1
**resisted** 266:7,10
266:20 269:5
271:2
**resolution** 159:3
171:14 193:24
195:20 196:4
199:5,12 223:16
223:18,22 224:1
224:16
**resolutions** 181:6
**resolved** 155:1
158:10 159:1
**resources** 181:1
187:14
**respect** 29:21
53:25 85:17
106:5 118:21
120:15,16,17,18

Page 314

179:16,17 191:4
209:22 244:13
269:20 270:10,19
**respond** 27:7,14
28:1,3 103:3,10
125:17 133:18
247:14 259:4
**responded** 12:24
227:20 247:10
248:3 278:12
**responding** 246:11
247:7,16 248:13
275:20
**response** 4:8 16:13
45:19 102:16,21
106:10 116:13
157:9 211:23
245:8 258:8
**responses** 168:2
**responsibilities**
26:12 236:10
244:12
**responsibility** 47:2
79:6 144:19
161:20 169:17
260:9 272:18
**responsible** 39:6
43:8 235:14
281:7
**responsiveness** 6:2
**rest** 56:12 58:17
277:8
**restate** 106:9
180:1
**rests** 238:15
**result** 32:16 40:13
41:3 46:16,21
52:3,6 82:14
151:7 158:19
259:19
**resulted** 51:18,21
277:23
**results** 52:2,16
83:13 217:9
**retained** 56:10
114:12
**retainer** 22:5
**reten** 239:15,16

**retraining** 208:2
208:24 262:13
**return** 44:6 79:12
124:9 237:20
**returned** 6:19 7:3
44:9 134:15
231:16
**returning** 7:8
127:16
**revamped** 89:24
**reverse** 185:22
186:19
**review** 13:3,18
20:24 21:10 78:2
81:2,6 88:11,19
88:20,21 89:2
91:12 97:20,21
101:1 106:14,17
116:15 129:24
140:11 177:10
182:13 192:3,12
199:24 201:10
218:14 222:12,22
266:16 267:3,7
**reviewed** 13:10
16:15 17:13,15
34:13,17 38:3,9
38:24,24 53:20
75:5 114:16
130:1,7 139:11
143:1,4 156:14
174:21 175:14
177:14 182:24
196:17 203:4,21
253:20 254:8
271:24 275:2
**reviewing** 35:19
97:23 142:19
195:5
**reviews** 83:23
88:24 89:6
129:20,20 169:9
274:15
**revolver** 201:15
**Rico** 1:1 2:4,8
10:18 11:4 21:22
57:7,9,10,14
74:13 77:7,15,19

77:22 84:22
135:10 136:3
140:15,25 141:1
144:11 145:6,13
145:14 152:6
157:20,21 158:13
159:20 161:25
162:1,24 163:8,9
163:10,14 165:11
165:15,22 168:20
170:25 171:1
174:6,7,11
175:16 176:16
180:19 181:10
195:22 196:14
221:15,22 222:1
224:23 235:4
236:15 262:14
275:17 285:1
**Rico's** 162:23
**right** 8:9 10:23
11:17 12:17,19
15:10,18,21 16:5
17:4 19:17,19
23:3,23 24:1,23
32:24 33:15,23
33:23,25 34:1,7
36:18 39:10,24
40:3,10 42:18
43:7,9,9 44:12,25
48:18,21 49:8,12
49:15 51:12
52:23 53:19
57:17,23 58:10
59:7 60:9,19,21
62:22 63:11
65:10,20 67:10
68:23 69:11
70:16 72:11 73:1
80:12,23 82:4
85:19 87:16 92:3
95:1,12 96:9,9
99:4 101:11,13
101:21 102:8,23
104:7 111:9,14
111:18,25 113:7
113:7,19 114:22
120:19,20 121:8

122:11 125:6
128:25 130:4
138:19 139:17
141:10,18 143:15
144:24,25 145:8
146:6,18 148:7,7
148:18 152:7
153:6 155:21,25
156:4,18 157:23
158:20 163:3,11
163:25 164:13
167:3,4,8,22
168:5 170:14
179:7 181:1,15
182:7,12,18
184:19,23 185:6
186:4 187:2
188:1,3,3,12
189:5,15,20
190:2,6,6 192:2
192:15,22 193:1
193:17 194:8
195:2,21 196:1,2
196:16 197:1,7
198:5,9,15,17,18
198:21,25 199:23
200:4,9,15,17,21
203:3 204:5,9,13
204:15,25 205:2
205:19,21 206:14
206:18,19,21
207:10,18,21
208:14,17 209:4
209:21,25 210:14
210:15,19 211:4
211:14,16 212:7
212:9,23 213:2,6
213:15,21,24
214:16,17,19,22
214:24,25 215:4
215:11 216:21
217:9,13,16
218:15,24 219:14
219:15 225:4,11
225:15,15 226:13
227:4 229:8
230:16 234:14
237:18 239:14,18

239:22 240:8,25
241:7,8,24,24
242:2,3,17
243:12,17 244:10
249:10 250:6,7
250:15 251:13
252:5 255:2,4
256:21 257:9
262:15,18 263:4
263:8,15,22,24
264:6,8,17 265:5
265:13,16 266:8
267:4 268:20
270:16,21 271:3
271:11 272:12,21
273:13,17,25
274:2,6,11,24
275:4,8 276:4,11
277:4,8 278:9,24
279:10 280:2
281:19,25
**rights** 90:24 106:1
**rise** 199:3 203:20
**risking** 103:17
**Riter** 12:15
**Rivera** 152:21
153:1,23 182:1,4
219:17 225:5,6,6
228:4 232:1
233:3,13 236:7
262:19 275:25
**roadblock** 264:11
264:18,24 265:3
265:10 266:1
270:20
**roadway** 264:21
**robbery** 203:14
**Robert** 122:24
**Rodriguez** 182:1,4
198:8 225:5,6,6
233:13 240:4
243:17 249:5,6
249:24 250:5,13
250:15 265:17,19
265:22,22,24
**role** 100:13 115:8
156:22 237:18
246:10 247:16

Job No. 88595   Case 3:12-cv-02039-GAG   Document 1295-1   Filed 07/25/19   Page 103 of 114
Evelyn Ramirez Lluveras, et al v. Javier Pagan Cruz, et al

Alejandro del Carmen
August 12, 2010

Page 315

roles 244:15
room 9:11
Rosenberg 62:21
  63:19
roten 206:8
rough 33:22
roughen 136:9
Roundtable 73:17
routinely 34:21
rude 50:3,9 51:20
  139:8,15 140:3
  149:6 203:18
  252:23
rudeness 148:25
Rufino 194:18
  199:9 201:24
  202:3,6,15,19
rule 10:13 154:7
ruled 42:19
rules 5:14,22 6:16
  6:17,22,22 7:7
  30:24 154:8
ruling 42:9 76:14
run 21:18 128:11
  195:6
running 257:22
runs 31:13 79:7,7
rural 87:25,25
  88:2
R-E-T-E-N 239:15

**S**

S 5:1 8:1 65:20,22
  66:1
sadly 36:1 84:7
safekeeping 6:25
Safety 85:7
SAIC-AH-CIC-...
  233:13
salary 65:23 94:9
  198:4
salida 213:18
Sam 28:21
San 2:4 237:10,13
sanction 194:11
sanctions 124:10
  134:16
Santiago 152:12

152:22 153:1,13
  171:16 195:25
  256:12 275:6
  277:25
SARA 102:2,8,25
  103:1,25 104:4
  134:9
satisfactory 49:22
  49:23
save 17:5
saver 17:8
saw 80:10 102:11
  112:10,11,15
  113:3 155:20
  185:2 193:17
  246:10 251:10
  267:22 268:4,8
  275:4 278:8
  279:2,2,10,13,19
  279:20
saying 46:9 53:4
  146:17 148:15
  174:19 195:21
  216:9,9 220:25
  227:14 229:6
  250:20 259:9
says 65:17 134:21
  159:15 167:15
  189:1 196:12
  203:24 212:3
  218:10 228:4,5
  255:4 261:24
  269:11
say-so 256:19
scale 140:14,16,18
  140:19,20,21
scandals 176:10
scanning 102:17
  102:20,20
scattered 257:5,10
scenario 154:24
scenarios 21:12
scene 103:3 234:12
  249:6,15,24
  250:2,5,13,18
  252:3 272:14
  276:9 278:17
  279:4,9 280:16

281:6
schedule 20:1 21:3
  21:20 22:5 79:9
  282:7
schedules 211:19
  213:16
scholar 92:14
scholars 121:11
school 118:13
Schrode 42:17
Sciences 113:11
scooters 252:16,17
scope 68:8 100:12
  127:23 156:18
  174:4 181:5
  267:2,6 268:16
score 49:23,23
  50:8 139:13
  140:5
scores 139:18
  141:4
scorings 139:20
screaming 251:20
  251:24
screams 251:15
scripts 146:12
se 41:23 86:20
  166:16 266:17
  269:18
seal 284:15 286:1
search 35:14,15
searches 35:14
seasoned 274:2,4
seat 166:9 230:12
sec 52:21 53:7 70:8
  192:9
second 9:18 21:14
  27:14 43:25
  49:12 70:24
  72:14 85:20
  102:15 109:19
  112:12 157:24
  163:10 193:11
  194:16 211:10
  213:10,21 218:16
  234:8
seconds 276:9,12
  278:6 279:1

280:12
section 48:13 89:4
  90:24 216:18
secure 191:22
security 40:12,19
see 36:4,6 43:3
  49:8 50:22 59:22
  77:3 78:11 80:3
  87:2 110:19
  136:17,20 147:9
  155:21 156:22
  172:11,16,17,20
  182:18,18 184:21
  184:25 190:12
  195:10 205:19
  222:22 233:8
  245:4,21 248:25
  250:21 256:4
  264:10 268:8
  271:4,20 272:8
  281:2,23
seeing 140:20
  165:17 226:1,11
  232:4 233:19
  253:21
seek 276:1
seen 89:12 106:16
  106:19,20 107:16
  113:1,8 134:12
  134:18 135:4
  140:9,10 145:10
  145:16 155:15,24
  171:24 175:18
  197:1 225:21,24
  225:24 235:17,18
  248:8 256:13,14
  280:12
self-control 256:3
sell 63:25,25 64:1
selling 63:23
semester 29:15,16
  30:17 31:2
seminar 60:3
  61:11,20,22,24
  62:6 63:17 64:7
  64:14 67:9
  108:12
seminars 59:24

60:25 61:16
  62:11,12 63:1,14
  64:16 67:13,15
  67:16,17,20 68:1
  68:6 69:2 96:5
  108:17,23 110:8
  132:14,15,20
  134:3
Senate 34:24
send 8:21 20:9
  24:19 54:20
  60:25 105:21
  126:14 245:9
sense 83:16 148:8
  175:12 184:2
  185:15 211:25
  212:1 213:9
  262:22
sensitivity 92:15
sent 19:25 20:19
  22:6 23:18,20
  45:17 114:1
  147:10 152:5
  153:7,8 156:8
  183:23 217:2
  218:14 226:20
  227:1,5,16
sentence 255:4
sentences 59:23
separate 30:22
  144:11,15 145:11
  160:7 193:2
  229:22
separated 230:1
  230:12,23 232:9
separately 25:20
separating 204:6
separation 11:4
sequence 115:11
  209:12 219:6
  229:18 247:1
  264:13 270:18
sequential 186:3
  188:1 193:15,20
  216:3
sequentially
  190:10
sergeant 151:10,13

155:13 171:9
194:18 199:9
201:24 210:3,12
210:24 230:21
238:19 239:22,23
242:17 261:7,21
**sergeants** 68:4
108:18
**series** 62:25 125:7
133:25
**seriousness** 280:6
**serve** 171:17
**served** 47:21
154:23 155:12
158:22 171:9
**service** 201:15
243:21 263:2
265:18
**services** 125:12
132:7 240:17
256:24,25
**serving** 32:12
**set** 45:11 68:16
81:6,8 120:1
195:13 196:12,20
196:22 197:4
200:10,11 202:22
215:17 216:21
285:12
**sets** 81:2,3 184:8
232:1
**setting** 79:3
198:11
**seven** 59:25 60:10
60:12,20 61:1
62:12 108:20
134:10
**severe** 151:14
254:10,24
**sex** 268:18
**sexual** 32:9 38:19
**sheet** 210:16
**sheets** 24:2 181:7
**She'll** 238:4
**shift** 263:5,9
**shoot** 258:22
266:13
**shooting** 19:13,15

40:13 88:11,19
88:21,24 89:10
106:25 107:1,4
129:20 139:4
229:12 230:17
246:17 249:7
250:11 251:8
259:8 260:1
266:17 276:6,10
276:19 277:22
278:16 280:11
**shootings** 89:13,17
90:6 105:1
106:14,17 120:19
122:9 124:10
127:5,17 128:21
134:14,19 135:2
145:18 235:4,19
276:2
**shopping** 40:9
**short** 19:2 92:8
109:22 112:11
187:11 192:8
194:14,17 222:8
222:10 244:21
255:21 263:21
**shorter** 234:2
**Shorthand** 5:4,20
285:9
**shortly** 207:16
253:18 276:13
**shot** 40:12 90:10
90:11 260:24
**shots** 268:20 279:1
**shoulder** 195:17
204:18
**shouting** 251:11
272:14
**show** 64:12 86:12
180:25 184:3
185:20 192:17
197:7,14,24
198:23 200:9
201:25 212:10
222:9 225:14
233:10,14 262:18
265:23 271:16
275:7

**showed** 193:19
231:21,22 232:17
281:23
**showing** 197:9
**shown** 258:13
**shows** 149:16
189:2
**sic** 37:16
**side** 32:18,25
40:15 133:15
263:6
**sides** 154:4 229:15
**sidewalk** 252:17
**sign** 6:11 20:15
**signature** 3:4
166:24 283:1
284:2
**signed** 155:17
195:15 198:5
210:16,17 219:16
220:16
**significance** 185:2
**significant** 272:16
272:17,20
**Sila** 220:16
**similar** 55:13 77:2
177:2 213:9
273:25
**simple** 45:15
**simply** 22:21
36:11 44:14
46:17 59:8 66:3
76:12 97:20
103:3,10 107:2
114:12 120:24
122:3 158:18
166:5,21 218:13
231:16 267:9
268:13,15 278:6
**single** 26:12,13
75:13 200:19
219:7
**singled** 84:19
**sister** 109:10
**site** 277:21
**sitting** 9:21 133:14
280:1
**situation** 101:15

103:5,18,24
107:2 133:18
157:15 159:2
164:16 229:24
230:15 278:5
**situations** 124:14
273:25
**six** 131:13 241:19
263:17
**six-year** 50:3
51:21
**size** 162:23
**SKINNER** 5:7
**slightly** 53:14,22
**small** 128:11
**smaller** 131:7
236:24
**smallest** 237:2,3
**social** 27:6,13,24
27:25 28:2,8
**sold** 60:12,19
93:12
**solemnly** 8:11
**solicited** 187:16
**solution** 103:6,23
**somebody** 43:5
133:5,7,24 139:4
139:5 157:17
229:16 230:5
258:22 266:14
279:8,20 281:2
**somewhat** 89:24
241:14 274:7
**son** 277:24,25
**soon** 19:25 24:21
152:5 153:7
227:14
**SOPs** 89:22
**sorry** 14:2 18:11
19:15,24 38:19
48:25 52:20
61:10 68:24 70:7
71:13,14 76:18
77:10 79:17 80:8
101:12,13 109:13
121:4 150:22
152:1 162:5
163:22 164:5

165:13 166:8
178:13 180:1,3
181:21 193:8
198:25 209:7
212:14 214:23
216:8 219:2
220:13 247:17
250:7 254:18
263:6 265:19,21
267:4
**sort** 21:12 22:16
61:13 63:16
66:23 67:24 69:9
126:12 130:10
138:16 139:23
140:8 146:22
151:6 176:22
237:22 271:8
**sounds** 196:5
210:23
**source** 132:8 136:5
136:6 208:4
**sources** 118:25
124:13 125:18,20
125:21 270:5
**so-and-so** 131:2,5
**space** 17:5,7
**Spanish** 12:24,25
14:4,6 65:15
136:11 137:4
168:7 206:5
218:19,19
**speak** 12:25 134:7
180:17 229:13
**speakers** 124:24
**special** 20:3
**specialize** 28:16
**specialized** 241:25
**specializes** 92:14
**specific** 38:3 41:20
61:13 62:23 67:2
83:2 101:5
114:23 122:18
124:7 127:9,20
160:3 164:19
169:8,11 221:25
231:25 238:13
246:5,11 276:25

Case 3:12-cv-02039-GAG    Document 1295-1    Filed 07/25/19    Page 105 of 114
Job No.  8595                                                    Alejandro del Carmen
Evelyn Ramirez Lluveras, et al v. Javier Pagan Cruz, et al          August 12, 2010

Page  317

277:11
**specifically** 5:17
  11:21,23 12:22
  29:2 34:12 51:7
  56:6 61:5,9
  64:19 67:19
  97:20 99:3,22
  108:15,17 119:7
  121:10 123:15
  127:10 128:18,19
  130:18 171:17
  179:16 180:18
  232:6 246:12
  258:19 266:16
**specifics** 35:24
  247:15 273:8,16
**specified** 19:4
  166:25 232:7,17
**speculated** 86:6
**spell** 60:6 65:5
**spelling** 75:23
**spend** 74:24 78:23
**spending** 103:16
**spent** 24:3,4 73:24
  78:25 117:8,10
**spoke** 134:6
  232:18
**spray** 204:22,23
  204:24 205:3,13
  205:15,20 206:16
**sprayed** 205:15,17
  205:18
**spring** 80:14
**staff** 68:3 83:20
  108:18 131:11
  132:16
**stamp** 186:2 193:6
  216:12
**stamps** 183:4
  185:21 186:10
  189:22 190:18
  203:1
**stand** 6:9 81:9
  279:8,11
**standard** 28:9
  53:13 63:4 90:8
  98:14 99:1
  101:19 103:8

118:24 130:23
  159:25 229:10
  230:4
**standards** 37:17
  47:12,16 48:11
  48:14,17,18 49:4
  66:24 85:17 90:9
  118:19 119:5,20
  119:22 121:13
  124:13 129:19,21
  130:13
**standpoint** 28:9
  156:13
**stands** 102:9
**stapled** 226:18
**Starbucks** 136:3
**start** 11:8 133:10
  197:20 204:10
  209:5
**started** 24:10 29:6
  45:10 75:17
  80:20 119:12
  220:10 267:14
**starting** 93:8
**starts** 65:15 190:7
  195:21 209:7
  216:15 220:4
**state** 5:5,8,20 8:19
  9:10,12 10:1
  26:21,25 28:22
  31:19 34:23
  37:19,21 66:23
  66:24 67:21
  68:11 83:5 86:17
  88:2 93:18
  104:16 117:11
  118:3,12 122:1
  153:16,19 173:19
  231:1 284:7,17
  285:10
**stated** 20:23 154:4
  171:11 175:3
  228:20 270:18
**statement** 41:22
  42:9,20 44:18,20
  45:15 53:17,19
  53:24 55:21
  57:19 59:20

64:24 92:17
  159:3 170:6
  230:6 253:13
  261:12 264:22
  266:3 267:10
  270:22 273:7,14
  277:3,4
**statements** 59:21
  231:13,17,23
  234:13 275:21
**states** 11:4 104:18
  118:5,9 119:19
  121:25 126:16
  137:1 145:22
  159:12 163:6
  241:22 261:19
  285:1
**State-mandated**
  85:21
**station** 230:23
  239:20
**statistic** 124:11
**statistical** 34:17
  82:9,21 86:4
  143:24,25
**statistician** 248:17
**statistics** 29:14
  32:1 34:8,21
  36:13 37:4 58:14
  58:16 79:18
  89:13 104:25
  135:1 145:11
  163:25 164:2
  217:6,18 235:8
  235:12,17 276:1
**stats** 79:19 80:4
**status** 16:4
**statute** 48:7
  167:15
**statutes** 5:22 7:7
**stayed** 97:16
  265:13
**staying** 275:14
**stenographer**
  10:11,18
**step** 230:9
**Stephen** 60:15
**steps** 124:12 135:3

169:23 170:1
**Steven** 60:3,10
  61:18 110:10
**Steward** 31:10,13
  31:19 32:3,16,20
  32:23 34:4 56:4
  67:19
**sticks** 18:18
**stipend** 95:6,8
**stipulate** 10:25
  257:18 278:14
**stipulated** 10:9
  76:12 171:17
**stipulations** 5:9
  7:4
**stop** 36:8 104:14
  207:24 239:17
  273:3
**stopped** 84:16,17
  84:21 85:12,12
  85:13
**stopping** 81:13
  265:1
**stops** 167:18
**stories** 230:3
**straight** 74:8
  152:18
**strategies** 68:7
**street** 5:7 133:15
  240:16 252:10
  265:1 279:2
  286:6
**streets** 148:17
**strengths** 172:22
**stretch** 258:24
**strike** 13:3 22:3
  79:22 80:2
  172:16 197:19
  231:17 247:17
**struck** 42:21
  116:25
**structural** 260:14
**structure** 260:17
  262:6,12
**structures** 30:1
**student** 129:8
  141:6
**students** 79:20,21

**studied** 98:8,9
**studies** 98:6
**study** 27:3,6,11,20
  28:5,6 55:23
  56:5 59:9 98:13
**stuff** 108:14
  129:22 244:19
  275:12
**Sturgess** 1:14 5:4
  5:19 285:9 286:4
**style** 104:3 122:9
**suable** 77:23
**subdivision** 87:23
  212:17
**subdue** 205:13
**subject** 6:6 58:13
  86:1 119:1,3,4
  179:15 183:10
  221:16 235:23
**submission** 16:3
**submit** 25:6
**submitted** 17:19
  56:25 84:13
  142:20
**subordinates**
  100:3 261:15
**subscribed** 17:23
  284:12 285:21
**subsequent** 16:3
  21:17 35:13 38:7
  51:13 61:21 62:7
  115:17 145:23
  150:11 198:17
  202:25 220:2
  241:7
**subsequently**
  40:13 56:25
  85:25
**substantial** 68:19
  68:25
**substantiated**
  169:21
**substantive** 178:24
**succinctly** 43:4
**sued** 32:15 67:25
  115:13
**sueido** 214:10
**suffer** 250:16

Job No. 8538
Case 3:12-cv-02039-GAG   Document 1295-1   Filed 07/25/19   Page 106 of 114
Evelyn Ramirez Lluveras, et al v. Javier Pagan Cruz, et al
Acta, and/or del Carmen
August 12, 2010

Page 318

suffice 176:11
sufficient 139:15
suggest 149:8
suggested 264:25
  266:12,19
suggesting 76:14
  267:18
suggestion 156:3
suggestive 86:7
suit 84:9
Suite 2:8 5:7 286:6
suits 77:8
sum 75:3
summarized
  196:24
summary 42:11
  154:6 199:19,25
  202:24
summer 20:2 26:7
  29:12 78:22 79:5
  79:23 80:1 94:12
  94:13 97:7,10,15
  97:17 155:23
superintendencies
  180:7
superintendent
  144:14,22 146:8
  146:13 147:5
  154:21 155:18
  161:9 163:15
  165:24 166:6,9
  166:10,15,18
  167:1,2,3,10,12
  168:6,7 169:14
  172:23 173:11
  179:4 180:12
  195:16 197:2
  198:6 208:10
  218:20 219:17
  221:20 236:13
  241:15 243:25
  244:1 253:17
superintendents
  177:12
superintendent's
  166:23
superiors 139:16
  159:21

supervise 51:5
supervised 39:9
  49:13 243:8,12
supervises 118:21
supervising 210:9
  242:15
supervision 47:4
  49:17 68:8 99:1
  99:2 100:2
  107:23 108:1,4,8
  285:18
supervisor 100:13
  100:14,17 101:10
  127:13 139:22
  140:7 172:24
  194:19 202:20
  225:19,20 243:18
  243:20 245:21
  261:3,10,18
  272:18
supervisors 77:20
  105:6 115:13
  127:5 140:17
  146:8,13 147:5
  160:16 161:10,21
  164:14 172:12
  178:11 203:18,19
  259:11,15 260:9
  261:19 262:8
  271:17 275:17
  279:12,15,18
  280:10,18,24
  281:12
supervisory
  110:25 116:11
  117:6 124:18
  157:3 244:12,15
supervisor's
  118:20
supplied 13:22
  15:3 93:21,22
  161:6
supply 111:9
supported 249:3
supports 255:5
suppose 73:19
supposed 35:11
  261:10

supposedly 33:21
sure 10:5 11:15
  17:9 23:20 24:25
  25:16 37:1 45:20
  50:21 54:22 60:7
  62:14 70:25 71:6
  71:18 72:18 74:3
  75:22 77:5,16
  78:14 79:6 81:3
  81:6,9 84:1 87:6
  96:23 97:2 101:2
  101:6 107:19
  128:13 131:1
  137:12 139:1
  143:1,3,17 147:3
  148:13 150:17
  172:3 179:22
  184:22,24 189:25
  190:14 191:13
  192:7 193:4
  200:17 203:14,16
  204:8,20 205:10
  215:23 220:1
  226:16 227:19
  237:17,17 244:20
  258:8 260:20
  261:2 276:17
  280:23
surfaced 234:24
surprise 164:6
  167:14 214:6
  251:22,23
surprised 11:7
survival 207:22
survived 179:5
suspect 35:10
  205:13 282:3
suspects 58:22
suspension 120:18
  155:22 157:18,25
  192:23 198:3
  199:19,25 202:24
  212:14 214:17
  237:20 238:9
  240:3,11
Sustache 115:21
  116:7,20 151:17
  152:2,9,11 153:4

153:10,12 154:3
  202:24 205:16
  207:11 228:23
  230:20 231:14
  232:3,20,24
  234:2,20 244:14
  255:15 265:11
  276:8 277:21
Sustache's 151:21
sustained 194:3
swear 8:11 190:8
swearing 261:6
swipes 84:25
switching 244:18
sworn 8:10 11:10
  49:9 154:5
  177:22 285:13,20
syllabi 109:24,25
syllabus 30:11,16
  30:19 63:4,7
  67:10 109:1
  111:13
syllabuses 109:24
symbolic 91:25
system 9:4 27:8,22
  27:23 28:3,6
  29:11 32:15 85:4
  124:9 134:14
  149:23 150:1,11
  150:13,15,20
  151:3 159:20
  165:15,22 168:5
  168:20 171:3
  172:14,19,22
  173:15 174:6,22
  175:19 180:6
  181:10 275:1
systems 105:10,13
  106:5 120:16
S-A-R-A 102:2
S-T-E-P-H 60:16

T
T 4:1 5:1
table 97:3 280:2
tables 93:24
tactical 142:6,11
  151:25 156:9

206:1 207:2,9,19
  210:7,13 211:1
  238:23 240:1,9
  242:18
tactics 89:25
take 11:3 17:5
  20:10 21:14 28:7
  37:21 51:5,19
  65:24 75:15
  78:21 89:6
  103:11 115:6,7
  118:11 138:6
  147:1 182:8
  183:14 184:20
  190:23 194:22
  195:9,13 199:14
  200:4 202:12
  204:16 216:7
  220:18 222:5,22
  231:6 233:15
  235:1 279:19
taken 5:3,18,21
  14:8 16:2 38:4
  49:6 52:5,22
  56:24 62:2,4
  94:2 98:5 113:9
  115:21 142:3
  152:3 155:4
  156:20 158:24
  231:23 245:16
  280:13
takes 57:5 107:1
  145:5 239:20
talk 18:3,8 20:25
  21:4 27:18 30:21
  122:14 123:3
  133:7 137:18
  160:11 230:14
talked 27:11 30:1
  30:6 38:14 140:3
  143:6 191:17
  208:10,12 245:19
  257:13 277:12
talking 29:24,25
  46:4 53:25 57:10
  63:5 71:6 77:14
  122:23 127:12
  136:22 137:11,18

Job No. 8595
Case 3:12-cv-02039-GAG   Document 1295-1   Filed 07/25/19   Page 107 of 114
Evelyn Ramirez Lluveras, et al v. Javier Pagan Cruz, et al

Alejandro del Carmen
August 12, 2010

Page 319

144:18 146:7
163:20 168:17
169:1,3,4 170:13
232:23 255:7,20
262:21 274:5
**talks** 209:17
249:18,23 273:19
**tank** 130:10
**targeted** 33:17
**targeting** 35:21
**task** 97:18,20
247:7
**tasks** 127:23
**taught** 29:4,9,9,10
29:16 31:3,5
80:2,4,7,16 98:19
98:20 101:22,25
102:5 104:8,20
104:24 105:9,12
106:4 107:25
108:3,8,10,19
117:14 269:22
**Taylor** 119:7
122:24,24,25
247:11 248:3
**Taylor's** 125:21
**TCLEOSE** 37:16
37:18,22 66:10
66:12,14,16,20
66:22,22 67:10
67:12,14 68:17
68:21,22
**TCLEOSE-certi...**
67:7
**teach** 26:3 28:24
29:1,7,15 31:2
63:18 78:8 80:6
94:13,14,24
103:2,4,15
132:20 248:17
**teaching** 26:7
29:12 79:16 80:1
**team** 88:12,19,20
89:2
**techniques** 90:21
**telephone** 16:2
79:1 223:10
**tell** 12:6 14:13

18:20 36:2 50:17
51:16 70:3 85:8
86:16 87:21 92:8
100:25 108:15
112:18 115:16,20
116:23 124:12
155:16 165:21
179:9 187:3
190:16 193:22
197:22 198:1
199:4 200:24
201:10 204:17
205:16 217:4
248:18 259:2
266:8 267:23
268:11
**telling** 226:15
237:4,5
**tells** 252:14
**template** 93:6,10
93:11,17 94:4
**templates** 65:15
**ten** 80:13,14 148:5
236:18 241:17
275:15
**tendencies** 104:22
105:7
**tendency** 84:14
**tender** 6:8
**tenure** 39:11
**term** 48:5 80:14
91:22 123:13
159:25
**terminale** 218:10
**terminated** 32:8
**terminology**
105:17 143:25
**terms** 22:11 28:24
34:18 36:15,22
43:2 47:3 57:24
70:16 82:22
87:12 115:8
118:10 123:12
159:12 161:21
162:22 166:16
168:14 187:4
191:8 196:21
203:17 217:4

228:14 237:19
242:3 246:4
262:5 272:12
**territory** 268:16
**test** 239:4
**testified** 11:10
41:8,9 50:23
115:2,23 167:20
172:3 205:17
250:24 265:17,24
265:24 266:19
**testifies** 256:11
**testify** 14:10 40:4
41:4 285:13
**testifying** 6:9
266:22
**testimonies** 82:3
172:11 247:4
**testimony** 8:5,12
22:3,3 27:10,11
42:13 48:16 49:9
53:1 57:24 82:1
91:20,20,21
115:17 116:24
153:21,25 154:5
171:24 172:2
177:12,13,22
223:21 232:13,14
232:21,24 247:5
247:11 249:14
252:7,20 256:8
274:8 276:16
285:19
**Texas** 1:12 5:5,9
5:20 10:14,21
26:1 28:12 31:19
34:10,23 37:17
55:12,23 66:23
68:11,13,15 83:1
84:4,23 85:5
86:17 87:25
89:15 106:2
122:1 133:13
284:17 285:10
286:4,7
**textbook** 119:8
**textbooks** 27:17
119:1

**thank** 8:16 13:8
25:18 43:9 48:8
102:18 182:9
183:13 186:24
188:24 193:13
216:2 220:15
238:6 246:3
281:25 282:1
**Thanks** 224:6
**That'd** 84:3
**theme** 200:19
**theory** 118:13
134:20
**thereof** 6:4
**thereto** 241:7
**thermometer**
86:24
**thing** 24:9 91:25
92:1,2,22 113:6
141:6 156:15
168:17 202:4,14
213:14
**things** 20:24 30:8
36:16 64:2 79:11
93:25 95:24
100:16 111:20
121:13 143:14
169:18 201:16
202:6,20 211:2
249:2 277:15
**think** 11:3 19:4
20:17,21 27:17
41:5 42:22 46:10
51:23 58:19
74:19 83:18
88:25 90:2
102:15 111:3
112:6,13 114:14
118:23,25 120:21
120:25 122:13,13
122:24 123:13
124:19 128:7
129:10 130:10,18
131:17 135:17
136:9 140:18
148:1 150:19
152:16 161:7
163:7,15,17

164:1 165:6
171:19 174:24
177:19,24 181:15
182:16 186:7,13
189:12 196:5
197:12,21,24
203:12 206:17
207:24 208:5
218:9 221:25
222:1 223:23
224:8,9 225:9,15
225:17 226:11
227:4 228:15
229:9,9 230:18
233:20 236:20,25
239:1 244:10
247:18,25 248:6
248:10,10,11
250:1 253:3,8
256:8 258:6
260:8,13 261:11
266:11 270:14
271:6,12,14
276:14 278:8,15
279:18,21 281:20
**thinking** 72:19
217:23
**thinks** 228:24
**third** 163:11
246:22
**thirteen** 117:7
118:16
**THORNE** 5:6,7
**thought** 62:19
107:20 130:2
151:17 185:3
215:5 216:11,19
240:4 272:5
**thousand** 21:9
75:5 162:14
**thousands** 165:8
**threat** 201:15
**threatened** 138:6
**threatening** 139:4
201:18
**threats** 203:19
253:24
**three** 45:8 56:21

Case 3:12-cv-02039-GAG   Document 1295-1   Filed 07/25/19   Page 108 of 114

Job No. 8595
Evelyn Ramirez Lluveras, et al v. Javier Pagan Cruz, et al

Alejandro del Carmen
August 12, 2010

Page 320

59:23 61:21 62:5
67:20 69:22
96:22,25 108:17
140:24 186:13
192:15,17 193:18
199:2 208:2,15
208:24 224:2
242:4,7 243:8
247:2 260:4
**three-page** 210:15
**threshold** 148:14
**Thursday** 26:3,6
78:9 79:16
**tickets** 33:19
**time** 4:6 5:25 6:8
6:13 17:5 18:6
19:5,22 20:6
21:2 23:4 24:2,2
24:3,7,12,23
32:12 47:20,21
48:7 58:1 65:5
69:8,12,16 70:7
74:20,24 75:2
76:6 78:3,6,12,23
78:25 81:21 90:2
97:7,11,14
103:16 107:9,10
114:13,16 117:9
117:10 133:20
144:3,20 148:22
149:17 150:4
153:9 156:9
159:14,17,17,20
168:10,20 169:12
169:19,21 170:3
171:8,21 188:2
188:13 194:1,21
207:14 208:16
211:19 213:17
219:10 222:11
227:8,15 243:24
244:16,21 245:22
252:6 258:14
263:21 280:8,9
**times** 75:22 82:2
169:13 173:25
174:3 180:7
242:4 252:2

256:5
**tired** 277:6,6
**title** 53:15 184:4,5
195:19 209:17
222:17 223:17,18
223:25
**titled** 191:17
**Tobon** 15:8
**today** 8:5 11:25
14:8 16:12 25:11
25:19,25 30:9
48:22 54:25 82:2
111:25 119:18
149:19 180:17
190:2 191:18
202:8 224:20
244:20 253:21
255:8 257:14
258:13 259:2
269:11 274:8
280:7
**told** 13:12 49:10
78:11 109:5
112:3 114:7,9
115:18 134:5
136:4 168:23
211:10 245:2
**Toledo** 128:24
144:14 161:9
163:15 165:24
166:25 168:5
177:13 179:2,4
179:16 180:9,11
184:14 197:2
198:6 199:25
208:10 241:15
253:17
**tomorrow** 183:12
**tonight** 24:21 26:4
**top** 271:10
**topic** 68:15 99:10
100:6,6 109:3
111:3 117:20
**topics** 99:16 109:2
126:6
**Torres** 225:20
**total** 264:1
**totality** 72:5 74:19

86:25
**totally** 51:17 156:3
227:7 278:23
**touch** 111:3
244:20 257:6,9
267:13
**town** 280:15
**towns** 236:4
241:20 242:7,8
**track** 25:5 35:11
**traditional** 103:9
**traffic** 252:10
265:1,2 268:10
**traffic-related**
84:5
**train** 33:18 68:14
**trained** 38:1 39:9
162:18
**trainer** 69:14
**training** 31:16
37:10,18,20,25
37:25 38:7,25
39:2 40:20 41:24
62:23 87:9 92:15
93:1,7 115:24
117:19 118:3
122:6 123:8
132:3 141:22
142:7,14,15
143:2,11 146:3
162:4 203:25
205:1,4,7,22
206:10,21,25
207:8,12 208:11
209:22 210:19,21
210:22 212:11,13
212:15 214:20
245:14 255:3,7
255:15,20 262:10
**trainings** 142:3,5
142:10,25 212:18
**trains** 61:19
**tranquility** 44:13
**transcribed** 9:9
245:6
**transcript** 6:11,14
6:19,23 7:3 8:22
135:17 147:21

152:3 153:8
170:20 231:12,19
245:17 251:3,19
252:8
**transcripts** 151:20
183:19 185:13
226:20,24
**transfer** 207:16
**transferred**
142:11 207:1,15
241:10
**translate** 168:9
234:7
**translated** 266:2
**translating** 218:19
234:11
**translation** 13:1
**translations** 13:22
168:16
**transparency** 89:7
**transparent** 92:10
**transpired** 12:6
**transportation**
32:15
**travel** 230:22
**treat** 104:11
**treated** 7:5
**treatment** 104:10
**tremendous** 120:8
**trial** 6:5 7:1 41:6,9
114:25 115:14
135:6,7 147:20
151:19 173:22
183:19 185:13
231:11 245:17
251:3 256:8
266:19,22
**trouble** 176:13
**troublesome**
148:21
**troubling** 111:1
**true** 55:21 159:10
175:20 184:16
231:10,10 284:3
285:19
**truth** 8:13,13,13
14:14 49:10 51:1
51:2 259:1

285:13,14,14
**truthful** 181:21
**truthfully** 14:10
**try** 18:3 30:16
32:17 34:20 35:3
36:19 86:12
108:21 110:10,18
125:17 131:7
132:4 149:25
151:5 182:25
187:5 244:19
246:19 280:18
**trying** 20:5 33:5
96:23 97:2 103:2
120:14 121:9
239:5,6 262:23
266:23 272:23
275:9
**Tube** 112:9,10,15
251:11
**turn** 86:17 116:16
**turnaround** 18:24
19:2 20:15
**turning** 211:19
**twelve** 80:13
107:11 117:7
118:16 148:5
**twenty** 257:7
**twice** 252:4
**two** 12:5 15:6
20:12 32:3,9
33:2 39:24 40:8
42:13 50:2,9,13
50:13 51:20
52:22 55:3 56:1
56:11,20 58:16
58:20 59:10 62:4
63:3 69:22 76:5
94:15 96:21,25
100:5,22 108:10
108:16 126:11
128:8 133:10
134:4 137:3,21
138:21,22,24
139:8,15 141:14
149:12 150:19
153:4 157:3,8
179:5,5 180:7

Case 3:12-cv-02039-GAG   Document 1295-1   Filed 07/25/19   Page 109 of 114
Job No. 6595                                                      Alejandro del Carmen
Evelyn Ramirez Lluveras, et al v. Javier Pagan Cruz, et al                    August 12, 2010

Page 321

189:20,21 193:18
199:15 201:18
206:12 209:15
212:10 219:15
222:9,12 232:22
241:21,22 242:7
242:19 247:2
253:23 278:16
280:10 282:4
**type** 61:11 101:20
144:2 149:9
221:14
**typed** 112:22
**types** 60:25 112:23
**typical** 160:6
172:13
**typically** 10:9,11
22:16 78:22 81:5
82:16 91:14
125:2 141:7
157:10,25 159:24
160:18 191:21
205:8,11 221:5
229:24 261:20,21
280:24 281:4
**typing** 75:18
**typo** 55:5,7 65:3,4
**T-C-L-E-O-E**
37:16

---

**U**

**UCR** 89:19 145:17
145:21
**Uenar** 213:22
**uh-huh** 15:22 20:7
22:13 23:22
41:21 46:11
56:16 57:25 73:9
75:4 76:4 85:2
88:13 132:9
141:16 160:5
165:25 176:1,6
180:8 206:2
232:10 241:12
248:5 251:25
252:21 255:13
259:18 261:14
262:3 268:3

269:13 273:11
**ultimate** 166:15
167:9,12 238:15
**ultimately** 35:17
**unclear** 277:9
**underlings** 100:3
275:19
**underlying** 35:6
103:20 164:16
196:23 262:1
266:25 269:8
**understand** 14:13
14:16 21:21,24
22:24 32:12 71:8
97:18 100:9
111:16 115:5,11
121:8 135:8
143:17 148:13
153:13 167:24
187:7,10 204:17
210:8 223:4,19
235:10 239:8
245:17 246:8,8
246:19 248:12
259:9 264:6
270:24
**understanding**
23:10 25:4 57:8
113:24 158:14
159:6 165:23
171:11 197:17
208:23 235:15
242:1 243:7
264:24 267:14
278:4
**understood** 9:8
22:20 24:7 97:21
115:8
**undertake** 62:21
**underwent** 195:22
**undesirable** 36:22
**unequivocally**
128:10
**unfortunately**
98:22
**Uniform** 89:19
145:17
**unique** 260:15

**unit** 160:3 169:8
169:11,18 170:2
212:22 216:23
238:8,12 252:11
263:1 281:15
**United** 1:1 104:18
118:5,9 119:19
126:16 145:22
163:6 261:19
285:1
**units** 241:25
**universal** 221:12
**university** 20:2
24:22 26:1,21
28:11,22 30:23
30:25 78:13,15
79:3 95:4 98:10
108:6 129:11
248:18 272:25
**University's** 118:3
**unjustified** 201:11
**unmarked** 185:24
186:1
**Unpaid** 214:7,9
**unprofessional**
51:14,21
**unreliable** 270:6
277:9
**unruly** 149:7
**unusual** 158:15
163:6 164:9,10
174:15,19 177:24
178:6
**update** 15:2 24:11
93:24
**updates** 43:16
**upheld** 158:11
**upset** 251:2,6,20
**usage** 204:22
205:12 212:2
**use** 7:1 15:24
41:20,23 44:20
53:13 55:19,23
56:1,13 57:18
58:12 59:1 63:18
82:21,23 86:23
90:19 91:22
93:13 120:1

122:9,12 123:12
125:25 130:16
145:23 147:4
149:4,16 151:18
153:17,25 175:21
176:10 178:19,20
202:20 205:24
206:15 212:7
242:4 247:22
248:22 268:9
274:14
**useful** 36:13,14
102:25 103:1
**uses** 123:13
**use-of-force** 56:19
56:24 57:5,24
58:5 59:10,11
89:16 100:18
117:2 134:23
177:3 268:12
**UT** 78:9
**UTA** 29:6 30:11
72:3 80:6 129:13
**uta.edu** 30:13
**utility** 178:9

---

**V**

**v** 1:5 60:15 285:5
**vacation** 243:4
**vacuum** 160:10
**vague** 165:4
236:17
**valid** 11:1
**variation** 136:12
**varies** 69:4,4
**various** 30:7 31:22
38:2 64:1 90:25
100:1 118:8
121:20 122:6
126:3,5 136:1
138:7 170:10
223:22 262:11
**vary** 88:25
**vehicle** 213:14
239:10 240:17
252:3 253:16
266:13
**vehicles** 212:2,7

263:17
**verbal** 50:2 148:10
253:23
**version** 113:1,2
226:7 228:9,10
228:21
**versions** 226:8
234:20
**versus** 15:8 33:12
46:7 48:22 76:17
123:22
**victim** 90:12
103:17
**Victor** 219:17
228:19 232:14,25
240:9,14 241:9
242:11 243:12
249:20 250:1,5
**video** 112:8,10
113:8 234:24
267:22
**videos** 112:12
**videotape** 251:10
**view** 47:15 48:11
175:21 271:15
272:9 274:13
**viewed** 34:8
**views** 229:1,2
**Vilma** 170:13
**violated** 116:8,20
**violation** 103:7
170:8 268:10
**violations** 197:5
**violators** 264:19
**violence** 149:17
169:20 170:2
258:19,20 259:1
259:4,7,10,16,25
261:4
**violent** 104:21
105:7
**Virgin** 91:7
**virtue** 85:10 86:13
103:22 117:19,20
178:16
**visible** 118:8
**visit** 129:14 131:23
132:4

Job No. 8538 Case 3:12-cv-02039-GAG   Document 1295-1   Filed 07/25/19   Page 110 of 114 Alejandro del Carmen
Evelyn Ramirez Lluveras, et al v. Javier Pagan Cruz, et al
August 12, 2010

Page 322

**vitae** 101:1 111:23
  112:1 247:19
**volatile** 151:18
**Vollmer** 119:15
**VOLUME** 1:10

### W

**W** 286:6
**wages** 214:7
**wait** 70:24 223:12
**waived** 5:15,17 6:3
**walk** 176:2 252:25
  261:16 267:17
**walked** 253:16
**walks** 269:10
**want** 9:1 10:5
  12:17,18 18:17
  20:17 23:20
  40:25 48:6 56:20
  62:4,10 65:13
  71:9 74:2 86:24
  92:3 94:3 95:8
  103:22 109:15
  117:18 120:13
  121:6 131:18
  133:10,21,22
  137:17 141:11,19
  147:24 148:13
  149:22 157:8
  168:13,19 173:19
  176:1 178:21
  182:18 184:2,20
  218:3 220:23
  222:21 224:20
  231:1 238:24
  244:20 245:3
  248:16 257:14
  258:7 268:15
  275:10,11 280:21
**wanted** 18:21
  36:25 44:14
  56:11 77:16
  107:19 143:3
  185:4 222:3
  246:7,8 263:24
  266:15,17 272:12
**wants** 133:21
  177:18

**war** 268:2
**Warning** 149:23
**warnings** 84:12
**Washington** 73:17
  132:15
**wasn't** 23:8 33:16
  38:19 71:6 73:8
  77:18 80:20
  161:5 172:4
  208:15 214:15
  240:23 265:4
**watched** 176:7
**watching** 277:7
**way** 8:25 14:9
  25:13 27:7 28:2
  48:19 65:5 83:11
  90:4 91:13 92:5
  93:18 116:7
  137:17 140:3
  141:8 147:6
  150:20 165:21
  176:16 179:19
  189:5,23 218:22
  221:5,7,11
  226:17 239:1
  246:22,25 247:12
  259:25 262:23
  265:7 266:11,11
  277:19,20 278:1
  280:19
**Wayne** 42:23 51:7
**weapon** 90:12
  101:14,17,19
**website** 30:11,14
  30:14 66:8,13
  80:10 92:13,21
  93:2 110:20
  125:14 129:15
  131:23 132:4,11
**week** 20:22,23
  67:4 153:2
  217:11 218:8
  262:20 276:6
  277:22 278:17,19
  279:20
**weekend** 20:18
**weekends** 75:12
  75:12

**weekly** 143:20,21
  145:25 164:3,4
  217:7 218:7,10
**weeks** 19:3 45:9
  79:12
**went** 12:11 15:25
  42:11 46:1,4
  55:24 58:18 62:7
  64:17 93:19
  112:21 145:9
  168:5 169:23
  173:22 212:11
  224:8,9 226:24
  240:20 246:13
  248:25 255:21
  268:2 271:24
  278:13
**weren't** 10:10
  143:3 226:9
  258:10 265:4
  267:21
**West** 5:7
**we'll** 8:19 17:4,8
  45:10,21 109:23
  128:6 143:18,19
  146:18 147:1
  182:9 183:3
  185:7 193:2
  223:6 250:20
  275:22 280:8
**we're** 8:2 25:11
  53:25 79:4
  104:16 131:13
  133:9 168:17
  173:4 181:15,22
  182:20,22 184:6
  224:22 250:20
  262:21
**we've** 9:13 87:2
  182:12 183:4
  206:15 215:4
  222:8,13,15
  277:10 282:4
**whisked** 279:4
**white** 85:6
**whites** 85:12 86:19
**wide** 119:18
**widely** 93:18

**widen** 68:8
**willing** 153:25
**witness** 6:8,10,13
  6:21 8:8,15,25
  9:6 15:1 16:7
  17:12 33:20
  36:16 47:10
  49:11 55:20
  77:18 121:1,5,8
  182:5 183:9,18
  183:20 190:11
  200:17 218:21
  225:3,8 233:4
  240:12 254:20
  258:1 266:21
  272:15 273:23
  277:13 282:7
  285:16,20,21
**witnessed** 278:18
  280:11 281:10,18
**witnesses** 59:8
  115:2,16 226:8
  229:13,22,25
  231:13 250:23
  251:1,3,5 266:18
**witnessing** 95:24
**witness's** 285:15
**woman** 33:22 88:5
**women** 241:19
  263:5
**wonderful** 11:3
  83:19
**word** 65:6,12
  75:24 111:13
  135:12 136:4,8
  138:4 151:18
  154:15 158:6
  159:14 162:6
  165:10,14 166:15
  167:18 168:7
  191:17,23 194:8
  206:4,8 237:5,25
  238:15 239:19
  242:4
**worded** 255:16
**words** 39:21 51:25
  65:16 112:17
  122:12 135:8,20

  136:2 150:18
  216:23,25
**work** 14:3 17:8
  22:10,15 31:25
  34:7 38:22 46:2
  57:3 62:17 66:20
  68:16 69:13,13
  69:14,15 70:17
  70:23 71:3,16,21
  71:23 72:2,5,15
  78:12 80:23 81:1
  83:11 91:13
  94:10 95:13,16
  95:19 100:12
  104:3 108:22
  109:16 117:12,17
  117:19 118:1
  127:3 128:11
  129:25 130:17
  131:25 150:4
  158:12 162:16,22
  167:3 230:4
  240:20 261:15
  263:5 280:24
  281:4
**worked** 15:5 18:25
  22:12,17,18
  24:12 25:2 31:24
  32:3,17 39:25
  43:5 74:18 77:25
  79:13 162:16
  176:21
**working** 16:9,11
  18:22 24:4,10
  32:24 42:8 45:7
  71:17 75:10 78:7
  78:17 80:20
  97:17 117:8,10
  131:13 178:16
  189:8
**workmen** 260:10
**works** 129:13
  136:2 165:22
  245:9
**world** 60:24 61:15
  118:9
**worried** 172:4
**worry** 18:6 183:11

Case 3:12-cv-02039-GAG   Document 1295-1   Filed 07/25/19   Page 111 of 114

Job No. 8595
Evelyn Ramirez Lluveras, et al v. Javier Pagan Cruz, et al

Alejandro del Carmen
August 12, 2010

Page 323

217:21
**worse** 257:24
258:2
**worst** 268:10
**Worth** 29:6 30:12
111:6 117:22
162:8 286:7
**wouldn't** 173:14
231:5 239:23
248:2 260:24
279:15 280:1
**write** 45:13 66:2
75:24 77:11,13
78:2 96:11,18
97:3 99:17
125:10 132:21
174:10 176:12
178:22 216:25
231:24 238:4
**writes** 210:2
**writing** 19:21
45:10 96:10,12
97:8 116:15
117:23 204:2
226:10 285:18
**written** 59:12,14
59:16 76:9 96:16
99:23 106:13
107:22 114:18
116:16 119:1
125:25 126:1
146:13 159:15
234:23 246:12
247:11
**wrong** 66:14 162:6
165:1 195:5
264:9,22 277:1,3
**wrongdoing** 160:2
160:16
**wrote** 41:23 42:1
43:11 45:14,14
52:15 54:13 76:3
76:6 189:3
225:25 258:24
271:14

**X**

**X** 3:1 4:1,1 37:21

67:11

**Y**

**y** 213:17 214:10
**yards** 279:6
**yeah** 10:17,25 12:3
16:23,24 17:17
17:21 20:17
34:17 35:8 38:21
39:18 44:1 50:13
54:17 57:11 59:7
60:16 63:7,24,25
65:7,7,10 66:12
66:15 70:11,14
71:5,8 73:11,18
75:7 77:5,6 78:4
78:5 80:10 81:19
83:19 86:11 95:7
95:15 100:8
102:12 103:1
109:20 110:3,12
110:13,15,17
112:5,14,24
113:5 121:1
122:13 123:1
127:15 132:12
134:4,17 135:9
136:10,13 137:15
137:16 138:23
141:1,5 142:23
146:10,18 148:1
148:3 151:21
152:17 154:12
162:7 163:3
165:5,9,19
167:24 175:24
179:13 186:15
189:11 191:1
200:25 201:25
206:20,24 208:8
208:22 209:13
212:1,5 213:1,6
215:13 218:2,11
220:10 224:9,9
224:11,14 227:2
233:11,16 236:19
236:20 237:17
239:8 247:24

250:4 251:12,16
253:8 254:15
255:16 256:4,17
257:24 263:13
269:1,1 270:24
270:25 271:11
**year** 29:6 48:12
69:8,23 72:4,7
73:11,13 74:12
85:11,22 93:24
94:1,2 95:9,14
133:10 164:8
165:2 193:25
216:16 243:9
244:14
**years** 14:25 46:16
46:22 52:13,22
56:21 59:11
62:10 67:5,20
69:23 96:22
102:1 107:12
108:11,16 109:8
117:7 118:16
119:13 126:11
128:8,9 129:11
134:10,11 147:22
147:25 148:5
149:20 157:4
169:24 170:21
172:14 179:2,4
181:14 199:12
208:2,15,24
216:11 268:5
277:7
**year's** 94:10
**yesterday** 11:25
12:1,2,3 114:10
114:14
**York** 89:21,22,24
90:6 91:5,10
125:2 163:7,9
**young** 33:22 38:17
277:23
**youth** 280:17

**Z**

**zeros** 186:13,16
224:2,2

**zone** 241:13 242:6
**zones** 241:21
**Zulma** 115:21
116:7 147:10
228:22 233:25
242:15 243:13

**$**

**$10,000** 72:4,25
**$110,000** 95:11
**$12,000** 72:4 73:6
**$1200** 64:17 69:6
**$15,000** 70:4 72:19
95:9 96:2
**$1500** 64:18 69:7
**$16,000** 95:9
**$20,000** 72:20
95:21
**$200,000** 95:18
**$250** 73:21
**$43,000** 22:25 72:8
**$50** 93:12
**$53,000** 74:15
**$7,000** 94:23,25
**$7,500** 45:24
**$7500** 70:4 72:4
96:2
**$86,000** 94:9,18

**#**

**#16** 2:8

**0**

**00** 190:17
**0000083** 195:8
**000069** 185:22
**000084** 197:18
**00918** 2:4
**00969** 2:8
**02** 34:25 93:9
**08-1486** 1:5 285:5

**1**

**1** 4:4 17:6 85:22
187:24,24,25
188:16,20,20,22
211:9
**1st** 17:15,18,21
34:25 191:15

**10** 70:10,12 94:14
94:18,20 257:15
275:16
**10,000** 86:19
163:18 165:6
**1010** 193:7,12,20
224:3,4,5,7
**1042** 193:21 224:7
**105** 95:11
**1074** 34:24
**11** 219:11 263:10
275:23
**11th** 19:13 201:19
202:7 206:22
240:6 243:21
246:9 259:8,22
260:25 271:18
**116** 192:16 224:1,2
**117** 192:16
**118** 192:16 224:3
**12** 1:12 3:2,4 4:2
5:5 263:11,12
264:16 271:10
275:24
**12th** 262:20
**12,000** 73:25
**12/31/11** 286:5
**12:00** 80:17,18
**120** 56:14 97:14
**1200** 68:14
**1200-plus** 88:1
**123** 5:7
**13** 186:5,8 269:3
270:3
**13th** 206:12
**1350** 286:6
**14** 123:9 187:25
188:4,21,22
220:4
**14th** 199:1 206:13
**1420** 218:25
**1423** 219:1
**15** 163:3
**15,000** 162:24
164:8,12 260:11
281:13
**16** 77:5,6
**16th** 220:17

Job No. 8588

Case 3:12-cv-02039-GAG   Document 1295-1   Filed 07/25/19   Page 112 of 114

Evelyn Ramirez Lluveras, et al v. Javier Pagan Cruz, et al

Alejandro del Carmen

August 12, 2010

Page 324

**17th** 209:25
**18** 4:4 263:10
  264:1
**180** 95:17
**19** 216:16 264:1
**19th** 207:18
**1950s** 119:12
**1975** 215:18,19
**1983** 43:4 47:1,12
  47:16 48:6,12,12
  48:13,22 49:6
**1987** 174:23
**1988** 215:18
**1989** 215:17
  216:10
**199** 2:8
**1996** 215:19 216:3
  216:11
**1997** 179:3 215:20
**1999** 199:11 202:7

_____

**2**

**2** 4:5 23:13,16,19
  211:10,21 273:7
  273:10
**2,000** 85:13
**20** 22:25 25:8
  69:17 74:18,21
**20th** 213:8 219:18
**20,000** 162:25
  163:2
**20-something**
  16:22
**200** 95:17 188:18
**2000** 193:25
**2001** 31:17 33:11
  34:23 68:11 90:2
  93:6 207:21
**2002** 219:19
  220:17
**2003** 33:11
**2004** 155:17
  191:16 195:15
  198:19 201:6
  207:15,19 216:3
**2004-3** 219:21
**2005** 200:23 201:1
  206:22 207:21

**2006** 155:23 205:1
  205:22 209:25
  211:1 212:14
  213:8,25,25
  235:6
**2006-7** 219:22
**2007** 19:14 179:3
  199:2 201:19
  209:14 219:12
  235:4 246:9
  259:8 271:18
**2008** 47:12,16
  48:11,14,17 49:5
  52:24
**2008-3** 220:2
**2009** 95:1,3,15
**2010** 1:12 3:2 4:2
  5:5 95:2 286:2
**21st** 153:5
**213** 188:4,17,18,20
  188:21,23
**22** 109:8 198:24
**22nd** 199:11
**2215** 199:1
**2216** 199:1
**2247** 203:1
**2251** 203:1
**2267** 204:5 205:21
**2271** 204:6,11
  209:5,8,11,14
**23** 132:18 189:17
**2341** 204:9,11
  209:6,9
**235** 214:21
**2353** 214:21
**2358** 214:23
**2363** 204:9 209:10
**2391** 216:6,22
**24** 4:5 16:25 17:1
  17:11 111:19
  136:16 141:17
  185:16
**2405** 216:6,22
**2430** 219:7
**2431** 219:7
**2437** 219:7
**2440** 219:8
**2441** 219:1,2,4

**2446** 219:4
**2447** 219:5
**2451** 219:5
**2452** 219:5
**2460** 219:7
**2474** 219:6
**25** 4:6 17:1 25:4,8
  74:20 136:16
  141:17 264:1
  281:15
**26** 17:11 78:1
  111:19 215:9
**26th** 17:16,19 25:3
**27** 143:20 217:16
**27th** 286:2
**28th** 206:22
**283** 3:4
**285** 3:5
**29** 180:22

_____

**3**

**3** 4:6 24:23 187:24
  187:25 273:19
**3,000** 162:20
**30** 9:4,8 70:22 72:1
  78:5 164:7,7,11
  187:13
**30th** 17:18,22
  18:17 19:4
  155:16 195:15
**30(b)(4)** 5:14
**300** 5:7
**307** 286:6
**31** 197:12 198:24
  198:24 224:12,14
  224:15
**32** 136:21 141:11
  154:7

_____

**4**

**4** 44:25 45:11
  186:6 187:24,25
  188:21,22 253:25
  254:2 255:2
  274:2
**4a** 4:7,8 45:21
**4b** 4:8
**4th** 201:6

**4:00** 25:25
**4:05** 272:24
**40** 70:22 72:2
**40-hour** 67:4
**40-13** 220:4
**400** 2:8
**4013** 220:14
**4043** 220:12,14
**41-3** 220:12
**43** 186:25,25
**46** 4:7,8
**48** 74:6
**49** 186:11,25,25

_____

**5**

**5** 3:3 4:9 54:23
  70:12 74:22 76:3
  186:25 262:14
  263:8 274:9
**5th** 209:14
**5,000** 85:12 86:17
**50** 71:22
**500** 85:13
**55** 4:9 181:25
  225:6,22
**550** 162:17
**56** 225:22
**576** 190:7
**58** 187:1
**59** 111:22 186:10
  186:23

_____

**6**

**6** 109:24 186:7,8
  264:1 274:12
**6th** 200:23 262:20
**6:00** 12:12 26:10
**60** 70:20 71:3,5,22
  155:22 198:4
**60s** 119:12
**64** 186:8,21
**6506** 219:19
**67** 185:25
**68** 185:25,25
**69** 185:22
**6993** 286:4

_____

**7**

**7** 262:19 263:10
  272:17 273:12
  274:22
**7th** 286:6
**7:00** 263:4,8
**70** 69:16 197:21
**70s** 89:23
**70/20** 70:9
**718** 190:10
**72** 185:23
**724** 202:14
**725** 202:14
**726** 202:14
**727** 202:13
**728** 202:12
**76102** 286:7

_____

**8**

**8** 165:6 254:2,3,4,5
  273:12 274:24
**8th** 193:25
**8,000** 165:2
**8:00** 80:17,18
**8:59** 5:6 8:3
**80** 238:24 264:5
**800** 162:12
**817.336.3042**
  286:7
**83** 197:18 198:1
**84** 195:8 198:1
**8595** 1:20
**87-14** 220:3,24
  261:24 271:7
  276:23 277:7
**87.14** 161:2,8,20
  164:21,22 175:16

_____

**9**

**9** 214:23 254:4,5
  257:15 258:16
  275:9,16
**9/11** 90:3
**9:00** 263:4
**9:20** 26:10
**90s** 148:5
**90-something** 95:4
**90-3** 262:14
**90-4** 219:18

**90-5** 219:15
**911** 41:1,2
**937** 202:9
**945** 202:9
**946** 199:19 200:5
**951** 199:20
**959** 200:22
**96** 215:18
**962** 200:22
**963** 195:7 224:9,13
**967** 195:8 197:15
  197:20
**968** 197:20
**969** 197:20
**97** 148:2
**970** 197:16
**976** 193:6,6,10
  195:7 224:7
**98** 148:2
**98-11** 219:18
**98-16** 219:21
**987** 195:7 224:7