# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| EVELYN RAMÍREZ-LLUVERAS;<br>JANITZA CÁCERES; MC and MAC,<br>represented in this action by<br>their mother Evelyn Ramírez-Lluveras<br><br>        Plaintiffs<br><br>   v.<br><br>JAVIER PAGÁN CRUZ; CARLOS SUSTACHE<br>SUSTACHE; ZULMA DÍAZ; EDWIN RIVERA<br>MERCED; MIGUEL VÁZQUEZ SAN ANTONIO;<br>et al.<br><br>        Defendants | CIVIL NO. 08-1486<br>(RLA) |

## CONTINUATION VIA TELEPHONE
### DEPOSITION OF ALEJANDRO DEL CARMEN, PH.D.

DATE:          Monday, August 23, 2010

TIME:          9:00 a.m.

PLACE:         Berkan/Méndez Law Office
               G-11 O'Neill Street
               Hato Rey, Puerto Rico

## A P P E A R A N C E S

**DEPONENT:**

ALEJANDRO DEL CARMEN, Ph.D.
(Via telephone from Arlington, Texas)


**ATTORNEYS FOR PLAINTIFFS:**

JUDITH BERKAN, ESQ.,
MARY JO MÉNDEZ, ESQ. and
JOSÉ GUILLERMO PÉREZ, ESQ.
Berkan/Méndez
G-11 O'Neill Street
Hato Rey, P.R.  00918


**ATTORNEY FOR SUPERVISORY DEFENDANTS RAFAEL FIGUEROA SOLÍS, JUAN COLÓN BÁEZ, VÍCTOR CRUZ SÁNCHEZ, PEDRO TOLEDO DÁVILA & EDWIN RIVERA MERCED:**

MICHAEL CRAIG McCALL, ESQ.
Via telephone from the law offices of
Aldarondo & López-Bras
16 Route 199, Suite 400
Guaynabo, Puerto Rico 00969


**COURT REPORTER:**

MS. NELLY RIVERA-MARRERO
NRM Bilingual Reporting
908 Harvard Street
University Gardens
San Juan, PR  00927


**ALSO PRESENT:**

MS. SURIMA QUIÑONES (Law student)

1                  **P R O C E E D I N G S**

2

3          MS. BERKAN: Good morning everybody. We're here on

4     the record in San Juan, Puerto Rico and in Grand

5     Prairie or Arlington, Texas for the continuation of the

6     deposition of defense expert del Carmen, Alex del

7     Carmen or Alejandro del Carmen. For the purpose of the

8     record, I'm Judith Berkan. I'm accompanied by Mary Jo

9     Méndez and José Guillermo Pérez.

10         The court reporter here in San Juan is Nelly

11    Rivera. I will take her oath, upon agreement of

12    counsel. Dr. del Carmen will remain under the oath that

13    was administered to him on August 12th.

14         All of the stipulations remain as they were at the

15    beginning of the previous deposition. So I will

16    proceed. Mr. McCall is at his office, I assume, in

17    Guaynabo.

18         MR. McCALL: That is correct, attorney Berkan.

19         MS. BERKAN: So I will proceed...

20         MR. McCALL: Attorney Cardona my join us, but he is

21    not present here. I'm just letting you know in advance.

22         MS. BERKAN: No problem, no problem. I will take

23    the oath of Nelly Rivera. Do you swear to faithfully

24    transcribe everything that's said in the course of the

25    deposition today?

1           REPORTER: I do.

2           MS. BERKAN: Okay. And we'll make an arrangement

3      with Ms. Rivera to... once we get the transcript, the

4      final transcript from the other court reporter, Ms.

5      Sturgess in Texas, we will ask Ms. Rivera to begin her

6      enumeration of the pages, starting with the page after

7      the final page, so we don't have repeats of pages. All

8      right, Dr. del Carmen, good morning again.

9           DEPONENT: Good morning, Ms. Berkan. How are you,

10     ma'am?

11          MS. BERKAN: How are you? We received on Friday a

12     number of documents which were forwarded to us by Mr.

13     McCall. They included documents which we have

14     previously provided to Mr. McCall in such areas as

15     Javier Pagán's personnel record, the impact service,

16     things like that, the general orders, that were made

17     reference to in the previous deposition. Were those the

18     documents that you reviewed? Have you seen the list

19     that I sent to Mr. McCall?

20          DEPONENT: Yes, ma'am. I went to... on Monday of

21     the week that followed the deposition I went to a local

22     Kinkos and FedEx place and I had them make copies and

23     sent them on to Mr. McCall of all the exhibits that you

24     requested that I send him.

25          MS. BERKAN: Fantastic. These...

1        DEPONENT: One thing that I noticed is that
2    apparently on some of the back pages, 'cause there were
3    double... they were copied on both sides, on the back
4    page of some of the documents were not copied.
5        MS. BERKAN: All right. So some of them were all
6    evens or all odds? We should understand that the page
7    in between you did actually review?
8        DEPONENT: Yes, ma'am, in the cases where the
9    copies were made on both sides.
10       MS. BERKAN: All right. And, Mr. McCall, those are
11   the documents that were forwarded to us through
12   Doubleday?
13       MR. McCALL: Yes, Ms. Berkan, the ones I received
14   from him. And then at some point thereafter, reviewing
15   it, we realized that certain documents, some of the
16   orders, for example, appear to be just all odds or all
17   evens. And I confirmed with Dr. del Carmen that the
18   ones that had been sent to him did have all pages of
19   them, but they were copied front and back.
20       MS. BERKAN: Okay. All right.
21       MR. McCALL: And when Kinkos copied them they
22   missed it.
23       MS. BERKAN: All right, fine.
24       MR. McCALL: But [UNINTELLIGIBLE] copies of those
25   we can. But I'll represent... he's represented to me

1    that the originals... the copy that he had did have the

2    full copy.

3        MS. BERKAN:  No  problem.  In  addition  to  those

4    documents,  we  received  a  number  of  other  documents

5    which we will mark as the next exhibit in line. I don't

6    know which one it is, but it will be the only exhibit

7    to this deposition. We'll get the number in a minute.

8    But the pages that we received additionally were a one-

9    page document about... with time sheets from August 4th

10   to August 11th; a one-page document from Joseph (Sib)

11   Abraham;  a  one-page  document  from  the  website  of  Del

12   Carmen  Consulting  that  begins  with  the  words  in  the

13   text "Staff Analysis"; a copy of a July 7, 2010 letter

14   from Dr. del Carmen to Sib Abraham; and a... about five

15   or six-page... I may have it... off a minute. There's

16   two more, actually. There's about five or six pages for

17   course  number  CRCJ  5319,  Issues  in  Policing,  Spring

18   2010,  Dr.  del  Carmen,  Monday/Wednesday,  4:00  to  6:00

19   p.m.  And,  finally,  a  copy  of  the  doctorate  in

20   philosophy in criminology, Alejandro del Carmen, given

21   at  Tallahassee,  Florida,  in  August  of  1997. So  I'll

22   mark those all as **EXHIBIT**...

23       MS. MÉNDEZ: **7.**

24       REPORTER: **7.**

25       MS. BERKAN: ...**7.**

1     MR. McCALL: Ms. Berkan, just before we go further,

2     I just want to confirm that you've started the

3     questioning, but I'm assuming that all stipulations

4     we've entered into previously will govern this

5     continuation as well.

6         MS. BERKAN: I said that, Mr. McCall. If you had

7     listened, I said that previously. I do not want to

8     waste my time on repeating things.

9         MR. McCALL: Another point that I want to bring up

10    to you before we go forward and that is, pursuant to

11    the court order, docket 165, issued on August 5th, this

12    deposition is not to extend beyond seven hours of

13    testimony taken. My understanding is we started at 9:00

14    a.m. in Texas; we went till 4:15; we took a break of

15    not more than an hour. We've had six hours and fifteen

16    minutes of...

17        MS. MÉNDEZ: No, I wrote down the time.

18        MS. BERKAN: That's...

19        MR. McCALL: I'm assuming that not more than an

20    hour...

21        MS. BERKAN: That is not true. We will address that

22    if I need to beyond that. We have a listing of the

23    exact amount of time we have spent and this is the

24    first notice of that, and you have consistently said it

25    would be from 9:00 to 1:00... I mean to...

1          MS. MÉNDEZ: To... to 11:00

2          MS. BERKAN: Sorry, 9:00 to 11:00.

3          MR. McCALL: I have never done that. You...

4          MS. BERKAN: All right, you're wasting time right

5      now. It is 9:08. We will get you an exact listing of

6      the time. I want to get to my deposition. Will you

7      allow me to start my deposition, Mr. McCall?

8          MR. McCALL: Yes. And at 10:08, it's our position

9      that the deposition will be over, pursuant to the court

10     order.

11         MS. BERKAN: And I will continue to ask questions.

12     We will get the exact time that we have spent. We keep

13     an exact record. We don't do casual records; we keep an

14     exact record. Okay, but let us continue.

15     **CONTINUATION OF DIRECT EXAMINATION OF ALEJANDRO DEL CARMEN**

16                    **BY JUDITH BERKAN, ESQ.**

17     Q.   Dr. del Carmen, have you reviewed any additional

18     documents since your last deposition?

19     A.   No, ma'am.

20     Q.   All right. Have you read 87-14 since your last

21     deposition?

22     A.   I did go through it, ma'am, and several other

23     uh... I did not review any additional uh...

24     Q.   Okay.

25     A.   ...but I reviewed some of the existing general

 1  orders  that  you  highlighted  to  me  in  the  previous

 2  deposition.

 3      Q.    Besides 87-14 what else did you review?

 4      A.    Just  some  of  the  general  depositions  that were in

 5  one of the exhibits that I sent you, ma'am. I don't remember

 6  exactly the number.

 7      Q.    Did you take any notes?

 8      A.    No, ma'am, I did not.

 9      Q.    All  right. And  your  testimony  is  that  throughout

10  your work on this case you have taken no notes?

11      A.    That is correct, ma'am.

12      Q.    After  the last  deposition  day, did  you change  any

13  of your opinions?

14      A.    No, ma'am.

15      Q.    Did  you  find  the  reference  as  to  there  being

16  training every three years?

17      A.    Yes,  ma'am,  I  went  back  and  I  looked  at  the

18  document that I had reviewed and one of the... what I found

19  is  on  page  178  of  Mr.  Toledo's  deposition  there  is  a...

20  under...  there  are  some  statements  relevant  to  a  training

21  cycle that he had instituted on his... as per your questions

22  to him, on the last uh... I think it was on the last tenure

23  or the last cycle of his tenure as Superintendent.

24      Q.    And this is in his deposition of what date?

25      A.    Give  me  one  second. Let  me  pull  that  out  real

1    quick. It is dated Friday, April 24th of 2010.

2         Q.   April 24th? Just a moment.

3                        [PAUSE]

4         Q.   I'm sorry, the deposition is dated what date?

5         A.   It is on Friday, April 24th, 2010.

6              MS. BERKAN: Just a moment.

7                        [PAUSE]

8         Q.   All right. Since the last deposition, how many

9    hours have you spent on this case?

10        A.   Maybe about another five hours. I haven't... I

11   haven't totaled the number of hours that I've spent on it.

12   I've been sick, running a fever, and so I haven't really,

13   you know, had a time to go back and verify that.

14        Q.   Sir, you're referring to Toledo's testimony at

15   178, which says, and I quote: "One of the things I did..."

16   (I'm eliminating language which doesn't go to the issue)

17   "...was retraining of officers. I believe it's every two or

18   three years retraining. The officers have to go to the

19   Academy, I think, for a two-week training, retraining in

20   order to refresh, you know, in all those aspects." Is that

21   what you're referring to?

22        A.   Yes, ma'am.

23        Q.   All right. Do you know if that was done with

24   respect to Mr. Pagán?

25        A.   I do not, but I understood that his last uh... his

 1  last tenure was during the time that Mr. Pagán was still an

 2  officer.

 3      Q.   Do you know how long his last tenure was?

 4      A.   I think it was four years, but I can't... I can't

 5  really recall that.

 6      Q.   Would it surprise you to know it was eight years

 7  and it ran from two thousand and... 2001 to 2009?

 8      A.   Yes, ma'am, that's... that's correct, I'm sure.

 9      Q.   So it's eight years. Now, do you know if that was

10  instituted in... No, I'm sorry, I'm being told...

11          MR. McCALL: What did you say, Judith?

12          MS. BERKAN: I'm sorry, I'm wrong...

13          MR. McCALL: 2001 to 2009?

14          MS. MÉNDEZ: [UNINTELLIGIBLE]

15          MR. McCALL: I don't think that's accurate. I mean,

16      the record will show the time he was there. He was

17      there for the full Rosselló and for one other term.

18          MS. BERKAN: Rosselló? I'm sorry...

19          MS. MÉNDEZ: [UNINTELLIGIBLE]

20          MR. McCALL: Yeah, for eight years of Rosselló and

21      four years after that, it's my understanding; not eight

22      years after that.

23          MS. BERKAN: All right, he was there... You're

24      absolutely right. I stand corrected. It was 2005 to

25      2009. Correct?

1          MR. McCALL: I believe so.

2     MS. BERKAN CONTINUES:

3          Q.   Now, do you know when this order for retraining

4     every two to three years came down, that he thinks he made?

5          A.   No, ma'am, I do not.

6          Q.   Have you seen the order?

7          A.   I don't think I have.

8          Q.   Do you know if each of the fifteen or seventeen

9     thousand police officers in the PRPD were subject to that

10    order?

11         A.   I believe that the... that the... as part of the

12    testimony that he indicated on that particular page, either

13    you or he made reference to the number of officers that were

14    in the Police Department at the time. And I think it was

15    alluded that... by him to you, that given the large volume

16    of police officers that were at the Police Department at the

17    time that they had to do it every so often because of the

18    large volume.

19         Q.   All right. So it would be fair to say that you

20    have no idea if Mr. Pagán in fact went to that retraining?

21         A.   That is correct. I do not have any... any evidence

22    that suggests that he underwent that training.

23         Q.   Okay. So you want to correct your report?

24         A.   I will make the modifications, yes, ma'am.

25         Q.   All right. Does that change your opinion as to the

1   adequacy of his training or the fact that the supervisor

2   should have relied on his training?

3        A.   No, ma'am, it does not.

4        Q.   Okay. Now, your time sheets, such as we received,

5   do not have any detail. Is that how you invoice usually?

6        A.   Yes, ma'am. Typically I just write down the time

7   that I've spent on certain documents and then I send that

8   time sheet relevant to that. I don't specifically keep track

9   of what document I reviewed when, unless I am asked. And I

10   haven't been requested that.

11       Q.   According to your contract with the Aldarondo law

12   firm it is okay for you not to specify what you spend time

13   on?

14       A.   Ma'am, I read the contract to keep track of the

15   time. I did not read it...

16       Q.   Okay.

17       A.   ...as to the specific items that I was reviewing.

18   But I'm fairly certain that I may have something that may

19   suggest as to what document I have reviewed at that time.

20       Q.   Well, what would the thing that you're fairly

21   certain that you have that may suggest might be?

22       A.   Well, I keep notes as to, you know, my schedule.

23   And so I... but I would have to go back and see if I have

24   something to that effect.

25            MS. BERKAN: Well, if you find anything to that

1    effect, that would give us a little more light as to

2    what exactly it is that you spent time on, I would

3    appreciate it.

4        DEPONENT: Yes, ma'am.

5    Q.   Now, do you have any estimate of how many hours

6    you spent on the first $43,000 worth of payment?

7    A.   You know, ma'am, I don't. As we had discussed on

8    the 12th, I did not keep track of specifics on terms of

9    time. We uh... You know, my understanding was a flat rate

10   and that given that, you know, time was uh... almost pretty

11   much irrelevant as to how much time I have spent on

12   different items.

13   Q.   Okay. How did you come up with the number forty-

14   three thousand?

15       MR. McCALL: Attorney Cardona has joined us, Ms.

16   Berkan.

17       MS. BERKAN: Fine. I'm...

18       MR. CARDONA: Good morning.

19       MS. BERKAN: Good morning, Mr. Cardona.

20   MS. BERKAN CONTINUES:

21   Q.   How did you come up with the number forty-three

22   thousand?

23   A.   When we actually discussed the fees initially, Mr.

24   McCall had suggested to me or presented to me that there

25   were going to be, you know, over 8,000 pages for me to

1   review and that I had essentially about a month to do so in

2   order to produce a report. And so, by virtue of that, I went

3   ahead and provided him an estimate of how many hours, you

4   know, I thought it would be to go over 8,000 pages and also

5   write a report. And so once I gave him that estimate, he

6   asked me to give him two... you know, essentially two

7   scenarios. One that would be based on the number of hours

8   that I would spend on the documents and reading them and

9   writing the report and the other...

10      Q.   Yeah, I know that part.

11      A.   ...scenario would be one that would have a flat

12  fee.

13      Q.   Okay. The flat fee was... how many hours did you

14  think it would take?

15      A.   You know, I don't recall offhand but I... but,

16  obviously, it was $250.00 an hour, you know, divided by the

17  number of hours that it took me to review that. So that

18  would surmount the forty-three thousand.

19      Q.   Okay. But... So the fact that you charged

20  considerably less in your other cases is because you've

21  spent less time?

22      A.   Well, part of it was because of the brevity of the

23  time in which I was going to have this done. Secondly, it

24  was because of the amount of time that I was going to invest

25  reading every single transcript as well as going over the

1  exhibits and being able to write the report. You know, it...

2  You know, my previous history in doing these types of works

3  relate to the notion that it takes a considerable amount of

4  time to go through every deposition, to read it, to think

5  about it, to reflect on it and to move on to the next one.

6  So I gave them the two scenarios based on what I at the time

7  thought it would be in terms of the total amount of time

8  spent on them.

9      Q.   Now, the transcripts of the trial, did you use

10  them for anything in your report?

11      A.   I read them to understand, you know, exactly what

12  had happened with Mr. Pagán and so... and those were the

13  first batch of documents that were produced to me. So I

14  spent a considerable amount of time going through all of

15  them, yes, ma'am. But I did not... I did not... I used them

16  in the context of understanding what had happened on August

17  the 11th, but I did not make any reference to them, except

18  in those instances where I actually cite the testimony that

19  was given by different witnesses at the time of trial

20  regarding Mr. Pagán.

21      Q.   Okay. I'd like to go to the document that you sent

22  to us that says... that's from your website.

23      A.   Yes, ma'am.

24      Q.   And where it says "...specializes in use of force

25  analysis", what does that mean? Second uh... Second

1    subsection, "Use of Force Studies".

2         A.   Okay. That means that I have done some studies on

3    use of force in the past and I have reviewed use of force

4    data with other police departments.

5         Q.   That's on a level of statistical studies or

6    analysis of patterns?

7         A.   Yes, ma'am, I have... When I started engaging in

8    research at the University of Texas at Arlington twelve

9    years ago, I started working on a part-time basis for the

10   Arlington Police Department as a consultant. At the time,

11   the Chief of Police in Arlington was Chief Concord. That was

12   soon transitioned to Chief Bowman, who is the Chief of

13   Police today.

14        Q.   All right, I don't need names. What I need is what

15   you did.

16        A.   I understand that. I'm trying to put it in context

17   for you.

18        Q.   I appreciate that but...

19        A.   Working for them, they asked me in two or three

20   instances to review their use of force data and to provide a

21   statistical analysis as to the use of force that was used

22   and the levels of resistance that had been made on that

23   particular issue.

24        Q.   Is this in the context of racial profiling?

25        A.   Ma'am?

1      Q.    Is this in the context of racial profiling?

2      A.    No, ma'am, this is strictly use of force.

3      Q.    All right. And what statistics were available,

4    what kinds of statistics?

5      A.    The Police Department kept up with data as to when

6    a police officer, for instance, would remove the gun from

7    his or her holster. Then that would... they would have to

8    fill out a use of force report. And that use of force report

9    and that data that was made available to me was the data

10   that I analyzed.

11     Q.    Okay. And is the preparation of use of force

12   reports of this nature consistent with best practices?

13     A.    I'm sorry, I didn't understand that question.

14     Q.    Is the preparation by a police department of use

15   of force of this kind of... of this nature consistent with

16   best practices?

17     A.    Yes, ma'am, it is.

18     Q.    Is it required by best practices?

19     A.    In some police departments it is, yes, ma'am.

20     Q.    And would you have been able to have done the

21   analysis... Would you have been able to do the analysis of

22   patterns or anything with regard to the use of force in the

23   Arlington Police Department without this data?

24     A.    It would have been very difficult. You know, one

25   of the things that we looked at was the level of resistance

1    that was posed by another individual when facing off the

2    officer and what level of resistance the officer would have

3    towards that individual.

4         Q.   And this is a department of about how many? I'm

5    sorry, I know we went into this last...

6         A.   Yeah. The Department has about 550 police officers

7    now, and that's an estimate on my end.

8         Q.   And about how many use of force incidents per year

9    were there in that department?

10        A.   I don't recall off hand, Ms. Berkan. But back then

11   probably less than 50 a year. And that's, again, an estimate

12   on my end.

13        Q.   Okay. Now, can you tell me what you understand the

14   role of the Police Superintendent to be in Puerto Rico?

15        A.   The role of Superintendent is to simply be the

16   chief administrator of the Police Department, where pretty

17   much all the organizational mandates are subscribed from.

18   This individual is the one that sets the tone for the Police

19   Department and is also the individual that oversees pretty

20   much all the police officers that work for Puerto Rico.

21        Q.   Have you looked at the statutory references with

22   respect to the role of the Superintendent?

23        A.   I have not, ma'am.

24        Q.   Do you know what role Mr. Toledo had in setting

25   forth the standards for the investigative processes in

1    Puerto Rico?

2        A.   My understanding from his deposition was that

3    he... there was a legislative mandate that required for an

4    Auxiliary Superintendent to be in place as a result of the

5    number of complaints that were filed and the large volume,

6    and the fact that the Superintendent's Office was

7    overwhelmed with those complaints and so...

8        Q.   Yeah, we went into that. I'm going to...

9        A.   [UNINTELLIGIBLE] ...to authorize for an Auxiliary

10   Superintendent and the different other departments that are

11   in place that investigate and provide a resolution as to the

12   complaints that are filed against the officers.

13       Q.   Is that the only role of the Auxiliary

14   Superintendent, according to your knowledge?

15       A.   No, ma'am, that is not.

16       Q.   Okay. And do you know how long it has been that

17   there has been a Superintendency or, you know, that's how

18   it's called here, a Superintendency to deal with

19   administrative complaints? Do you know how long that's been

20   in existence in Puerto Rico?

21       A.   I do not, ma'am.

22       Q.   Do you know if there have ever been changes

23   through general or special orders concerning the nature or

24   functions of the Superintendency, which has had different

25   names at different times but that is dealing with

1  administrative complaints in Puerto Rico?

2      A.   I do not, ma'am, but I believe in his testimony he

3  alluded to the fact that there had been several changes

4  prior to his arrival, if I'm not mistaken.

5      Q.   And you saw his testimony that 87-14 remains in

6  effect?

7      A.   Yes, ma'am.

8      Q.   And  87-14  requires  superior  officers  or

9  supervisors to review the administrative complaints files of

10  their supervisees, correct?

11     A.   Yes, ma'am.

12     Q.   All right. Do you know if Victor Cruz ever did

13  that?

14     A.   I do not believe he did.

15     Q.   Do you know if Rafael Figueroa Solís ever did

16  that?

17     A.   I don't believe so. I believe that it was Sergeant

18  Figueroa who claimed in his testimony that he did not have

19  access to that.

20     Q.   Didn't Colón Báez also claim that?

21     A.   I believe so, yes, ma'am.

22     Q.   All right. And if they made that claim, they

23  either didn't know about or chose not to follow 87-14,

24  right?

25     A.   I believe that they claimed in their testimony

1   that they did not have access to the... to that information.

2   I'm not sure that they said that they chose not to follow

3   that.

4        Q.   Well, you know that 87-14 says they have to look

5   at it?

6        A.   Yes, ma'am.

7        Q.   All right. Do you know if they ever tried to look

8   at it?

9        A.   That part I don't know, no, ma'am.

10       Q.   Do you know if Victor Cruz ever supervised Mr.

11   Pagán?

12       A.   Did Mr. Cruz ever supervise Mr. Pagán?

13       Q.   Uh-huh.

14       A.   I believe he did at some point, yes, ma'am.

15       Q.   Do you know if he signed an evaluation of him on

16   the six months period when he was out for two months on

17   suspension?

18       A.   Yeah, that's right. Now you're reminding me of

19   this. He did evaluate Mr. Pagán at the time, yes, ma'am.

20       Q.   You would agree with me that Victor Cruz, Rafael

21   Figueroa and Colón Báez at different times in the year prior

22   to the incident had direct supervisory responsibility over

23   Javier Pagán?

24       A.   I believe that's correct, yes, ma'am.

25       Q.   Do you think it was appropriate that Javier Pagán,

1  after a 60-day suspension, immediately was put out on the

2  streets?

3      A.   My understanding of this was that he was... that

4  this was a process by which none of the immediate

5  supervisors had any hearsay as to where he was going to be

6  placed.

7      Q.   I'm sorry, sir. Within Tactical Operations there

8  are different functions, aren't there?

9      A.   Yes, ma'am.

10     Q.   And within... Obviously... Well, let me ask... Let

11 me backtrack. If they didn't have the authority to decide

12 where he's going to be placed, you'd agree with me that

13 Rivera Merced had the authority within the Area where to

14 place him, correct?

15         MR. McCALL: Objection to the form of the question

16     in that...

17         MS. BERKAN: Okay.

18         MR. McCALL: ...it doesn't specify a specific time

19     that...

20         MS. BERKAN: Fine, fine. At the time that he

21     returned from his...

22         MR. McCALL: ...he had direct supervisory authority

23     over Mr. Pagán.

24         MS. BERKAN: Fine.

25

1   MS. BERKAN CONTINUES:

2       Q.   At the time that Mr. Pagán returned from his 60-

3   day suspension, you would agree with me that the person who

4   had the authority as to where to place him within the

5   Humacao Area was the Area Commander, Edwin Rivera Merced?

6       A.   Yes, ma'am.

7       Q.   All right. Assuming that Edwin Rivera Merced sent

8   him back to Tactical Operations, do you have any problems

9   with that? Do you think that that presented any difficulties

10  in terms of his compliance with his responsibilities?

11      A.   Can you say that last part of the sentence.

12      Q.   All right, I'm sorry. Do you think it was

13  appropriate or consistent with best practices for the Area

14  Commander to send Mr. Pagán back to Tactical Operations upon

15  the completion of the 60-day suspension?

16      A.   Within the best practices practical model, no,

17  ma'am.

18      Q.   And once he goes to Tactical Operations, he...

19  they... what happens here (and I will represent to you that

20  in different moments of that first... those first seven-

21  eight months back from the suspension Victor Cruz, Rafael

22  Figueroa and Colón Báez were supervising Mr. Pagán

23  directly)...

24          MR. McCALL: Objection to the form that you're

25          introducing into evidence stuff not there. If you want

1      to do it as a hypothetical...

2         MS. BERKAN: I will do it as a hypothetical.

3    MS. BERKAN CONTINUES:

4       Q.   Assume those facts, which are supported by the

5    record, but just assume them, that at different points in

6    time, do you believe that Victor Cruz, Rafael Figueroa

7    and/or Colón Báez had the authority to choose what tasks,

8    specific tasks within Tactical Operations he would be

9    assigned to?

10      A.   Okay, I'm assuming that these three individuals

11   what? Say that last part again, please.

12      Q.   Assume that these three individual defendants at

13   different times in the last ten months or nine months

14   after... between Mr. Pagán's return from his suspension

15   until he killed Mr. Cáceres, that at different times in that

16   period they had direct supervisory authority over him as a

17   Tactical Operations agent within Humacao. Assume those

18   facts. Would you say that they had the authority to place

19   him in positions within Tactical Operations where he would

20   not have direct contact with the public?

21      A.   Yes, ma'am.

22      Q.   Do you believe that it was best practices of these

23   people, assuming that they had no authority... Assume all

24   the facts I've told you, but assume that they had no

25   authority to decide whether or not he went to Tactical

1   Operations, would it have been consistent with best

2   practices to ease him into Tactical Operations by assigning

3   him desk jobs for a period to evaluate him upon his return?

4         MR. McCALL: When you use the phrase "Tactical

5      Operations", what are you referring to specifically...

6         MS. BERKAN: Oh, '¡*por favor!*'

7         MR. McCALL: ..."Tactical Operations"?

8         MS. BERKAN: All right, that's obstructive. You

9      know what Tactical Operations is. It's a unit within

10      Humacao. You want me to repeat it each time? When I say

11      the words "Tactical Operations" what I mean is Humacao

12      Tactical Operations Unit. Okay? Would you answer the

13      question.

14   A.   Yes, ma'am. I think that the... the...  if they

15   would have had reason to... you know, to question whether or

16   not officer Pagán would have been a threat to society or

17   would have been... or would have posed a particular, you

18   know, a disposition that would have been out of... you know,

19   aggressive or... or that would have lead him to...

20   obviously, somebody's death, they should have, you know,

21   regarded him as someone who perhaps should have, as you say,

22   eased his way into... into a Tactical Operation Unit that

23   would have had contact with the public.

24   Q.   And what kind of information would give him...

25   would give those supervisors information which would allow

1   them to conclude or have reason to believe that he might be

2   a threat?

3        A.   That... that... What you just asked, Ms. Berkan,

4   is the million dollar question in policing, you know, when

5   it comes to management and supervisory roles of individuals.

6   And what I mean by that is, you know, typically police

7   departments have to depict, you know, what types of

8   behaviors are behaviors that are... I don't want to use the

9   word "allowed", behaviors that are within the parameters,

10  you know, of acceptance. Even in the early warning systems

11  that they have in place that you and I discussed on the 12th

12  of August in my deposition then, they still insert the

13  parameters that police departments should adhere to that may

14  be predictors of that officer engaging in violence in the

15  future or perhaps, you know, committing suicide or, you

16  know, engaging in alcoholism and all of that. So, you know,

17  they would have had to decide what those parameters are and

18  when to pull that officer aside and provide, you know,

19  counseling or provide some sort of a special treatment for

20  this individual.

21       Q.   All right. Do you think... Do you know if Mr.

22  Pagán had any complaints alleging aggressive behavior other

23  than the domestic violence complaint pending in the last two

24  years of his tenure in the Police Department?

25       A.   Yes, ma'am, at our last deposition you highlighted

1    to  me  several  exhibits  that  showed  Mr.  Pagán's  other

2    disciplinary issues.

3         Q.   You'd agree with me that past behavior is the best

4    predictor of future behavior?

5         A.   Generally, yes, ma'am.

6         Q.   And if you look at past behavior and evaluate the

7    allegations citizens are making as to aggressive behavior,

8    that that could raise a red flag?

9         A.   If  the  previous  behavior  is  suggestive  that  an

10   officer is going to... Well, let me backtrack a little bit

11   and tell you. If the previous behavior is suggestive that a

12   police officer is going to, you know, represent a threat to

13   society, within the best practices model police officers are

14   either terminated or they're asked to step down. Because no

15   police  department  wants  to  have  a  police  officer  that

16   basically  would  be...  or  would  pose  a  threat  to  fellow

17   citizens. The... the... But there are other behaviors that

18   are not say lethal, that have not presented a causal pattern

19   to a future behavior that could be, for instance, counseled

20   or  advised,  where  the  officer  would  be  referred  to  a

21   different unit, where the officer would have limited contact

22   with  the  public  until  that  particular  issue  that  is

23   affecting the officer has been resolved and the threat has

24   been minimized.

25        Q.   Okay.  You  know  that  in  the  Puerto  Rico  Police

1    Department there is a general order about repetitive

2    conduct? Have you seen that order?

3        A.   Yes, ma'am, I believe there is a... there's a

4    general order to that effect.

5        Q.   And that imposes a requirement upon supervisors to

6    identify officers who have repetitive conduct?

7        A.   I believe you're right, yes, ma'am.

8        Q.   Do you know if Pagán was ever sent for repetitive

9    conduct retraining?

10       A.   I don't believe so, no.

11       Q.   You state in your report, at paragraph three... I

12   don't have the exact page. Let me see if I can get the page.

13   Paragraph three on page eight, I believe, that it is

14   "unreasonable to assume that in the course of an

15   investigation other officers would be aware of the

16   particulars".

17       A.   Okay, what page is that in?

18       Q.   On paragraph three, on page 15.

19       A.   Fifteen. Okay, hang on. Okay.

20       Q.   When you're talking about Superintendent Toledo's

21   testimony...

22       A.   Okay, give me one second. Let me get to that. Yes,

23   ma'am, go ahead.

24       Q.   You say that it would be "unreasonable to

25   assume..." I'm sorry, I'm on page... I'm on the...

1      A.    You're on page 15, number three, right?

2      Q.    Three, about six lines down.

3      A.    I see it, yes, ma'am, go ahead.

4      Q.    "Thus it would be unreasonable to assume that

5   throughout the course of the investigation other officers

6   and supervisors of the Puerto Rico Police Department would

7   be made aware of the particulars regarding an accusation

8   against an officer". Do you still stand by that?

9      A.    Typically... What is referenced there and what I

10  mean by that typically in police departments that are in

11  place, you know, throughout the United States, that

12  particularly a size of the Puerto Rico Police Department

13  with 15,000 police officers, it is extremely difficult to

14  assume that every police supervisor will be fully aware,

15  kept up to date with what the particular officers have done

16  in terms of their past. Within the best practices model, you

17  know, is that something that should happen? Absolutely.

18  Should police officers become aware of what, you know, their

19  constituents or their officers are doing... Strike that.

20  Should police supervisors be aware of what their officers

21  are doing? No question. But in a police department of 15,000

22  individuals it is hard to fathom that a police supervisor

23  would be made aware and would be aware of every single

24  detail regarding every previous instance that an officer

25  that reports to him or her...

1      Q.   Well, you've seen '*Historiales*', haven't you? H-I-
2   S-T-O-R-I-A-L-E-S.   I realize we have a Spanish-speaking
3   court report here. [LAUGH]

4      A.   Right, we don't have that issue anymore.

5      Q.   What's that?

6      A.   Can you repeat that again, Ms. Berkan, I...

7      Q.   All right, sorry. You've seen '*Historiales*'?

8      A.   '*Historiales*', yes, ma'am.

9      Q.   And they're included in every disciplinary file,
10  right?

11     A.   Yes, ma'am.

12     Q.   And those have at least a brief statement of the
13  previous complaints.

14     A.   I believe that's right, yes, ma'am.

15     Q.   And do you know how long it would take to read a
16  page of '*Historiales*'?

17     A.   Not very long, ma'am.

18     Q.   All right. Do you know if any of the supervisors
19  in this case read any of the '*Historiales*'?

20     A.   I don't believe so.

21     Q.   Do you know if according to 87-14 they're supposed
22  to read the '*Historiales*'?

23     A.   I believe that that's correct.

24          MS. BERKAN: All right. Just a moment, sir.

25          DEPONENT: Sure.

1                        [PAUSE]

2        Q.   On page 15, number three, you also indicate that:

3   "Defendants' lack of..." —the same paragraph, but further

4   down— "Defendants' lack of knowledge about the domestic

5   violence incident serves as evidence that these types of

6   matters and complaints are handled by the Legal Division,

7   which does not communicate directly with supervisors while

8   allegations are being investigated". Do you still stand by

9   that statement?

10       A.   Okay, let me find that paragraph again. You said

11  it's at the bottom of number three?

12       Q.   It's further on down. I think it's just about a

13  couple of sentences down.

14       A.   Okay, I see it, hang on. That it's the

15  "defendants' lack of knowledge about the domestic violence

16  incident related to officer Pagán serves as evidence that

17  these types of matters and complaints are handled..." No, I

18  would modify that, yes, ma'am.

19       Q.   All right. How would you modify it and why?

20       A.   I would say that the defendants' lack of knowledge

21  about the domestic violence incident, you know, established

22  in the presence of the general order that requires them to

23  do that, you know, is a... it's a re... it's within the best

24  practices model to have the supervisors read and become

25  aware of all incidents relevant to an officer.

1      Q.   Now, do you... At some point —and I'd have to find

2    the reference— but in some point in your report you say that

3    87-14 is just a guidance, not a mandatory requirement?

4      A.   I believe what I say about the general orders in

5    general is that the general orders are typically... they

6    provide guidelines. For instance, if a general order is in

7    place to, you know, discipline an officer for, you know,

8    I'll give you an example, engaging in racial profiling...

9      Q.   No, I'm talking about 87-14.

10     A.   I don't think eighty... I'm not sure that I made

11   reference specifically to that but I may have. I don't

12   recall. If you can find the page number, I will...

13     Q.   I will, I will. I'll get it. We're looking for it

14   because I know you did.

15     A.   Sure.

16          MS. MÉNDEZ: [UNINTELLIGIBLE]

17     Q.   Okay. Number 13 on page 11.

18     A.   Okay, let me go to that page. Give me one second.

19   [PAUSE] Okay, go ahead, ma'am.

20     Q.   You say: "Mr. Reiter makes..." When you're

21   criticizing his report, you say that he makes reference to

22   87-14 which, according to his interpretation, police

23   supervisors are mandated to research and become aware of the

24   disciplinary history of officers assigned to them. And then

25   you go on to say that he fails to indicate that general

1  orders are generally meant to provide parameters and
2  guidelines, not specific instructions or steps for
3  individual officers. Now, when you wrote that, had you read
4  87-14?

5      A.   I had not, no, ma'am.

6      Q.   Okay. So now that you've read 87-14, you would
7  modify that?

8      A.   Yes. I would say that 87-14 mandates for...
9  requires for police supervisors to read... to understand the
10 history of the officers, you know. Yeah, I would say that.
11 And I would still keep the statement that general orders in
12 general are meant to guide and provide guidance.

13     Q.   Okay. I'd like to look at where you discussed the
14 responsibility of Edwin Rivera Merced.

15     A.   Okay. Towards the end of the report?

16     Q.   Yeah, on page 18, I believe.

17     A.   Okay.

18     Q.   All right. You say that he was unaware of the 60-
19 day suspension. I mean, you were quoting Mr. Reiter saying
20 he was unaware of the 60-day suspension. Do you agree that
21 that's what the evidence shows?

22     A.   That's what Mr. Reiter cited.

23     Q.   But you don't... In the original evidence you
24 didn't see that?

25     A.   I'm sorry, ma'am?

1    Q.   You didn't see that in the evidence, that he

2   testified that he was unaware of the 60-day suspension?

3    A.   I believe that I... I believe that I may have. I

4   don't recall offhand if I did or did not.

5         REPORTER: One moment. I'm sorry.

6         MS. BERKAN: We're waiting for a tape change.

7         DEPONENT: Okay.

8         [PAUSE FOR CHANGE OF AUDIO TAPES]

9    Q.   Okay, and are you... Let me ask you a general

10   question before I go into the specifics here. Are you

11   concerned at all about the eight-year lag time between the

12   event and the imposition of punishment in a case where

13   serious charges were found to be substantiated?

14   A.   Yeah, we had discussed that, you and I, on the

15   12th and you asked me about whether or not this was within

16   the best practices model. And I... my response is still the

17   same, which is that it's not. It is not within the best

18   practices model to, you know, to wait eight years to be

19   disciplined for an action that an officer committed.

20   Q.   Okay. And do you know how frequently that happens

21   in Puerto Rico?

22   A.   I think... I think what you told me, when you

23   asked me that question, was that I should go to Puerto Rico

24   and find out.

25   Q.   [LAUGH] I appreciate...

1    A.   But I am not aware, ma'am, of how long it takes
2  over there to do this. But, from what I understood and from
3  what I inferred from Superintendent Toledo's testimony was
4  that this was something that was... that they had actually
5  created this whole, you know, Auxiliary Superintendent
6  position in order to alleviate what was described as a large
7  volume of complaints that were filed.

8    Q.   Do you know when the Auxiliary Superintendency was
9  created?

10   A.   Ma'am?

11   Q.   Do you know when it was created?

12   A.   I... You know, Ms. Berkan, I know that I saw... I
13 may have seen the date on that, but I don't recall off hand.

14   Q.   Okay. Do you believe that... Let's talk about
15 statistics. Are you aware of the fact that no statistics
16 regarding officer-involved shootings as an entity by itself
17 have been produced in the course of the discovery in this
18 case?

19       MR. McCALL: Objection to the form of the question
20       and what's meant by officer-involved shooting, since
21       statistics have been produced. If you can define what
22       you mean by it.

23       MS. BERKAN: Statistics have been produced where
24       the officer-involved shootings are subsumed into other
25       statistics and do not separate out officer-involved

1      shootings. Now, as to what officer-involved shootings
2      mean, they are shootings when officers shoot. Is that
3      understood?
4          MR. McCALL: It has been produced. It had officer-
5      involved shootings contained within them by your
6      admission. Correct, Ms. Berkan?
7          MS. BERKAN: I don't know because they do not
8      directly state whether officer-involved shootings are
9      involved or not. You... I am going to ask your expert
10     to assume that after many efforts the Police Department
11     has not produced any statistics that specifically
12     demonstrate the number of officer-involved shootings,
13     the nature of officer-involved shootings, whether the
14     officer took out his gun (such as was analyzed in
15     Arlington), whether he actually shot, whether he was
16     shot at, whether someone was injured, whether someone
17     was fatally insured.
18 MS. BERKAN CONTINUES:
19     Q.   Would you assume that as a hypothetical, mister...
20 Dr. del Carmen.
21     A.   Okay, I... I'm not going to ask you to repeat the
22 entire...
23          MS. BERKAN: [LAUGH] Thank you.
24     A.   But I'm going to ask you to say... Do you mean
25 that the statistics are not kept, right?

1    Q.    They're not kept which single out officer-involved

2    shootings. They may be subsumed under an excessive force

3    complaint. They may be subsumed under analysis of crime

4    statistics, if the officer was charged. But there's no

5    specific statistics kept as to officer-involved shootings.

6    Assume that to be the case.

7    A.    Okay.

8    Q.    All right? Would that be consistent with best

9    practices, to not keep those statistics?

10   A.    No, it would not be.

11   Q.    Thank you. Would you expect... No, strike that. I

12   know I asked you in the last deposition as to whether or not

13   you were aware of the shooting of Nelson Santiago, a young

14   son of a police officer who died one week earlier. And I ask

15   you now, would you expect Edwin Rivera Merced as Area

16   Commander, to know who was —among his five or six hundred

17   officers— who was present either at the time of shooting or

18   immediately thereafter?

19   A.    Typically, in a police... you know, in the police

20   world, I should say, you know, when there is an area

21   commander, you know, overseeing so many people and so many

22   individuals, you know, that individual is, you know,

23   notified of the event. Typically they're not given that

24   level of detail relevant to every officer that was involved

25   and what the... you know... Now, did he have access to it?

1  Sure. Could he have seen it if he wanted to? Sure. But,
2  typically, police commanders, police supervisors, they're
3  not briefed, you know, with that level of detail that would
4  depict as to who was there and who was not there.
5      Q.   Would someone in the supervisory structure try,
6  under the best practices model, to find out what officers
7  were present either at the actual moment of the shooting or
8  within seconds thereafter?
9      A.   Typically, in... within the best practices model,
10  the immediate supervisor, you know, or the individual that,
11  you know, that took over the crime scene, the person who
12  is... whose jurisdiction was affected by that type of
13  shooting would be made aware of, you know, of the
14  particulars of that incident. That typically happens in
15  the... you know, if you want to call it the police world,
16  that typically happens at the level of a sergeant, you know,
17  perhaps a lieutenant. But, typically, a sergeant would be
18  made aware of, you know, the specifics regarding a police
19  shooting, yes, ma'am.
20      Q.   And for what purpose would he or she be made
21  aware?
22      A.   Typically, to make sure that the subordinate or
23  the individual officer that responded to the scene follow
24  the protocol of what to do, how to, you know... you know,
25  preserve the evidence, you know, if there was any liability

1  or any type of issues that came up on behalf of the

2  officers, you know, where that was being assigned to. So

3  it's a matter of just oversight, to make sure that the

4  police department is doing its job.

5    Q.   Would there be any other follow-up with respect to

6  those officers who had observed a shooting that resulted in

7  a death under the best practices model?

8    A.   If the officers had a direct involvement in the

9  shooting, absolutely. If the officers witnessed the

10  shooting, sure. But if the officers were... you know,

11  responded to the scene as a secondary or tertiary unit, in

12  other words, they're not the primary unit that responded to

13  the scene; they're not the ones processing the crime scene;

14  they're not the ones that are directly responsible for that,

15  typically, you know, there are some... there may be some

16  questions that may be given to them. But typically those

17  individuals are not... they're not there to provide any

18  evidence or any insights into the occurrence of what

19  happened, so they're not of the main concern of the

20  investigatory unit.

21    Q.   All right. But when you say secondary, tertiary,

22  you're not referring to the officers who are the first

23  officers on the scene immediately after the shooting?

24    A.   Right. If the... if the... If the officers that

25  responded to the incident, which I would coin that to be the

1   primary unit that responds to the incident, they would be

2   the ones that would be responsible for, you know, processing

3   the unit, you know uh... you know, being able to provide

4   information to the detectives as to what happened. You know,

5   in the United States these individuals would also be

6   responsible for writing on a piece of paper, you know, the

7   report, you know, the details of what happened, the names of

8   the witnesses that were present and various other pieces of

9   information.

10       Q.   Do you know that the Tactical Operations Unit of

11   Humacao was assigned to the very same Youth Festival where

12   Nelson Santiago was killed?

13       A.   No, ma'am, I was not aware of that.

14       Q.   Are you aware that Mr. Pagán and Mr. Sustache

15   arrived on the scene within seconds of the shooting and that

16   members of their unit actually occupied the gun?

17       A.   I believe you told me, you presented to me at the

18   last deposition on the 12th you mentioned to me that this

19   had been the case, that officer Pagán and Sustache had

20   responded to that particular incident. If I recall

21   correctly, that was...

22       Q.   Are you aware of the fact that Mr. Pagán and Abdel

23   Morales had previously worked together?

24       A.   I'm sorry, and who else?

25       Q.   I'm sorry. Abdel Morales was the shooter.

1      A.   No, ma'am, I was not.

2      Q.   All right. Are you aware that they had a personal

3   relationship, friendship?

4      A.   I was not aware of that.

5           MR. McCALL: Objection. Go ahead, you can answer.

6           DEPONENT: I'm sorry, Mr. McCall.

7           MR. McCALL: No, it's find. Go ahead, Ms. Berkan.

8   MS. BERKAN CONTINUES:

9      Q.   Now, you do indicate, in discussing Victor Cruz

10  and Colón Báez... Well, actually, let me go back to Rafael

11  Figueroa Solís. You mention that he was on vacation during

12  the incident. Correct?

13     A.   Yes, ma'am.

14     Q.   If he had supervisory responsibilities up to

15  approximately one month before the incident, would that have

16  any relevance whatsoever as to whether or not he complied

17  with those supervisory responsibilities?

18     A.   Okay, you're asking me...

19          MR. McCALL: Objection to the form of the question

20          and what supervisory responsibilities you're referring

21          to and what time period.

22          MS. BERKAN: That he headed the unit where Mr.

23          Pagán was assigned up to about four weeks before the...

24          I mean, he was still heading the unit at the time of

25          the event, but was on vacation for the last four weeks.

1          MR. McCALL: Not the unit that took place the night

2     of the shooting. So, are you interested in what...

3          MS. BERKAN: I'm sorry...

4          MR. McCALL: ...happened the night of the shooting

5     or...

6          MS. BERKAN: ...it's the Tactical Operations Unit.

7          MR. McCALL: ...a month before?

8          MS. BERKAN: I'm sorry, sir. Let me ask this

9     question.

10  MS. BERKAN CONTINUES:

11     Q.   Dr. del Carmen, you would agree with me, would you

12  not that supervisory responsibility in this case does not

13  depend only on what happened on the night of August 11th?

14     A.   Supervisory responsibility as a whole, Ms. Berkan,

15  is obviously within the timeframe that that supervisor had a

16  role as the supervisor of that individual.

17     Q.   Correct. So if... if there were specific —and this

18  is a hypothetical— if 'X' of the defendants had specific

19  supervisory responsibilities in the months leading up to

20  August 11th but were off duty that night, could they still

21  be    found    to    have    failed    in    their    supervisory

22  responsibilities with respect to officer Pagán?

23     A.   The failure... When you say failure, do you mean

24  that they failed to supervise as per what, the general

25  orders, the... the...

1    Q.    Well, I mean...

2    A.    ...the best practices model? What are you asking

3    me?

4    Q.    We can go with best practices if you want, but I'm

5    not giving you specifics of those failures. What I'm trying

6    to establish is, and correct me if I'm wrong, that when you

7    looked at supervisory responsibility in this case, you

8    weren't looking only at what happened on August 11th and who

9    was on duty, were you?

10    A.    Let me answer both questions. [LAUGH] The

11    supervisory responsibility of the individuals that oversaw

12    officer Pagán had to do with their diligence, with their

13    professionalism within the best practices model during the

14    time that they supervised officer Pagán.

15    Q.    Right. And that would be the equivalent of what

16    you found, I mean in... conceptually, when you looked at the

17    situation with officer Lynch in the *Good* case, you were

18    looking at signs, red flags, disciplinary failures which you

19    believed resulted in the later lack of professional

20    activity... lack of professionalism in his, in that case,

21    management of a criminal investigation.

22    A.    I believe that in that particular case all of

23    those elements that you mention were causal to the actual

24    wrongful conviction of an individual for a number of years.

25    When the supervisor had produced an exhibit or a... (strike

1   that, not an exhibit) ...a series of pictures that were used

2   to identify the suspect and had darkened the picture where

3   the suspect had been illustrated, to be suggestive to the

4   witness or to the victim that that was the person that they

5   wanted to incarcerate. There were issues relevant to a

6   camera that was not used...

7       Q.   I know, but I'm asking about the supervisory

8   failings...

9       MR. McCALL: The question... He hasn't finished

10      answering the question, Ms. Berkan. You put a question

11      on and he's entitled...

12      MS. BERKAN: I'm asking about the supervisor. I

13      have the right to ask that he answer the question. I

14      understand that he's trying to be complete, but I'm not

15      interested in the camera, I'm not interested in the

16      photo spread. What I'm interested in is the predictors

17      that...

18      MR. McCALL: Well, he's trying to answer the

19      question. You're trying to make an analogy from another

20      case and he's giving you the facts as to why it is or

21      is not analogous. I think he has a right to answer the

22      question you asked.

23  MS. BERKAN CONTINUES:

24      Q.   Do you believe it was not analogous, Dr. del

25  Carmen?

1       MR. McCALL: And he has the right to finish his

2       answer.

3       Q.   Do you believe it was not analogous?

4       A.   Ms. Berkan, I believe that every case is very

5   different from the other. And in this particular case that

6   you mentioned, I believe that the individual supervisor

7   basically allowed for these direct causal matters that

8   related to the wrongful conviction of a man to take place.

9       Q.   All right, very good.

10      A.   So, I... in my mind it is very different from a

11  police supervisor that may be in fact... failed to engage in

12  the best practices model but does not directly cause the

13  death of another human being.

14      Q.   All right. Do you believe that Victor Cruz and

15  Colón Báez followed best practices when they did not

16  separate Zulma Díaz and Carlos Sustache?

17      MR. McCALL: Objection to the form of the question.

18      It's assuming facts that you haven't put in evidence.

19      If you want to ask as a hypothetical and ask his

20      opinion, I won't object.

21  MS. BERKAN CONTINUES:

22      Q.   Assume that every piece of evidence that has been

23  presented in this case demonstrates that sergeant Colón Báez

24  and Victor Cruz did not order Sustache and Ms. Díaz to be

25  separated. Would that be consistent with best practices?

1     A.   I believe that if the role of the supervisors at
2  the time of the incident would have been to investigate the
3  actual incident that took place, you're right, it would not
4  be best practices. However, if the role that they had at the
5  time of the incident was not relevant to the incident,
6  meaning that their supervisory role they were either off or
7  they were not assigned to that particular unit or they were
8  not assigned to that particular officer, I think in those
9  particular cases in most police departments throughout the
10 United States they would not be expected to even have a role
11 in the crime scene, because it's being processed and it's
12 being handled by other people.

13     Q.   And who was present at Reiter Hospital when Zulma
14 Díaz and Carlos Sustache was there? Who was present from the
15 Police Force? What supervisors were present?

16     A.   If my memory serves me well, I believe that one of
17 the lieutenants showed up at the hospital.

18     Q.   And he was on when he showed up, wasn't he?

19     A.   Ma'am?

20     Q.   He was on when he showed up?

21     MR. McCALL: Objection to "on", as to what you mean
22 as...

23     MS. BERKAN: He used the word "on". I'm using his
24 word, Mr. McCall.

25     MR. McCALL:  [UNINTELLIGIBLE]  these  individual

1      defendants or not? I object to the form of the question

2      without that specification. It goes [UNINTELLIGIBLE]...

3           MS. BERKAN: I assume that...

4           MR. McCALL: ...to the supervisor at that point

5      over them as members of the impact unit.

6  MS. BERKAN CONTINUES:

7      Q.   Would you agree with Mr. McCall's testimony that

8  once Mr. Pagán was assigned to the impact unit that his

9  regular supervisor had no supervisory authority over him? Is

10 that your understanding, Dr. del Carmen, in all honesty?

11     A.   Ms. Berkan, at this point I'm utterly confused as

12 to what exactly the point is here. But I will... But let me

13 see if I can answer your question. Okay?

14     Q.   I know, there's been a lot of interruption and I

15 appreciate your being responsive to my answers.

16     A.   [CHUCKLE] Well, let me... Let me go back a little

17 bit and tell you. I... My understanding from the testimony

18 that I read of Lieutenant Cruz was that Lieutenant Cruz

19 actually re... you know, went to the hospital (and this was

20 from his deposition that was taken back in March of this

21 year) and that essentially that he was... that he showed up

22 to the hospital and he saw officer Pagán, from what I

23 remember, that he was on a stretcher. And he began to have a

24 conversation with officer Pagán and that medical attention

25 was being rendered. And I think he even described in his

1    deposition that there were some medical personnel present

2    there and... I'm sorry, not only medical personnel but

3    people that were part of Mr. Cáceres' family that were

4    there.

5        Q.   I'm sorry, sir, I was asking about Zulma Díaz and

6    Sustache, not about Mr. Pagán.

7        A.   I'm sorry. I'm sorry, I... I...

8        Q.   I agree, I understand you're trying to answer my

9    question, but there's been a lot of interruptions so it's

10   hard. But I'm asking are you aware of the fact that Mr.

11   Colón and Mr. Cruz were in the presence of Zulma Díaz and

12   Carlos Sustache at Ryder Hospital?

13       A.   Yes, ma'am. And I believe that he was within

14   proximity of both of them, yes.

15       Q.   And are you aware that they did not separate them,

16   Mr. Sustache and Mr. Díaz... uh, Ms. Díaz?

17       A.   From what I read in the testimony, I believe

18   that's correct.

19       Q.   And are you aware that several hours later Mr.

20   Cruz and Mr. Colón Báez met with José Rivera, the Homicide

21   detective and with a prosecutor?

22              MR. McCALL: Objection to the form. It assumes

23         facts not in evidence. If you want to ask as a

24         hypothetical.

25              MS. BERKAN: It's a hypothetical based on the

1     evidence.

2   MS. BERKAN CONTINUES:

3       Q.   Are you aware, assuming that's a hypothetical, are

4   you aware of it?

5       A.   No, ma'am.

6       Q.   Do   you   know   if   Victor   Cruz   was   the   highest

7   supervisor on duty the night of the impact unit?

8       A.   I believe that Lieutenant Rodríguez was also...

9   was the actual supervisor and the one that responded...

10      Q.   He was the actual...

11      A.   ...but I believe that Mr. Cruz went ahead and

12  reported   what   had   happened   via   a   telephone   call   to   a

13  supervisor.

14      Q.   Wasn't it the fact that Mr. Cruz was the agent in

15  charge of the Humacao Area that night because Edwin Rivera

16  Merced was not on duty and that Mr. Rodríguez, Lieutenant

17  Rodríguez was the supervisor of the impact unit alone?

18      A.   I believe that's correct, Ms. Berkan.

19      Q.   Assuming that's correct, you would agree with me

20  that Mr. Cruz did have an indirect supervisory relationship

21  to the... Pagán, Sustache and Díaz on the night of the 11th?

22      A.   I   believe   that   Mr.   Cruz   was   not...   on   that

23  particular night he was not the lieutenant in charge of what

24  had occurred. So I don't know how we would coin the phrase

25  or we would deem it to be indirect supervision. I'm not sure

1   what that...

2      Q.   Who did Mr. Rodríguez, Lieutenant Rodríguez

3   respond to that night?

4      A.   I'm sorry?

5      Q.   Who did Lieutenant Rodríguez in the impact unit

6   respond to that night?

7      A.   Who did he respond to?

8      Q.   Yeah, who was his superior?

9      A.   I... I... I don't recall that, ma'am.

10     Q.   Do you agree that at the time of the event the

11  person in charge of the Tactical Operations Unit in Humacao

12  was Colón Báez?

13     A.   Uh...

14         MR. McCALL: The time of what even?

15         MS. BERKAN: Oh, come on!

16         MR. McCALL: [UNINTELLIGIBLE]

17         MS. BERKAN: August 11th, 2007.

18         MR. McCALL: Okay.

19         DEPONENT: Okay, so you're asking me if Sergeant

20     Colón Báez was responsible for or was in charge at that

21     time. Is that what you're asking?

22  MS. BERKAN CONTINUES:

23     Q.   Was he the head of the Tactical Operations Unit of

24  Humacao on August 11, 20007?

25         MR. McCALL: As opposed to the impact unit.

1      A.   Yes, yes, ma'am.

2      Q.   Are you... At page 16 of your report...

3      A.   Okay, ma'am.

4      Q.   ...you indicate that Mr. Reiter's opinions "are

5  baseless and for the most part not related to the shooting

6  incident of August 11, 2007". Do you stand by that

7  statement?

8      A.   I'm sorry, let me get to that page.

9      Q.   Okay, you spoke...

10     A.   You said page 16 at the bottom?

11     Q.   Yeah, at the bottom.

12     A.   Okay. Let me read that real quick. "It is worth

13  examining the allegations [UNINTELLIGIBLE] The inference

14  made by Mr. Reiter's report upon each individual defendant

15  while noting the fact that they are baseless and for the

16  most part not related to the shooting incident of August 11,

17  2007." What... Right. What I... what... what... What is

18  depicted here and what I was thinking when I wrote this is

19  that the point that he made about deliberate indifference on

20  each one of the defendants they're not related to the

21  incident on August the 11th, 2007 on a causal manner.

22     Q.   Okay. Do you stand by this statement that they are

23  "baseless"?

24     A.   I stand by the statement that they are, yes,

25  ma'am.

1    Q.   Do you... say "for the most part not related". So

2    some of them are related?

3    A.   No, ma'am.

4    Q.   None of them are related? None of those

5    observations are related?

6    A.   I don't believe that the observations that Mr.

7    Reiter made in his report are related specifically on a

8    causal effect model, you know, meaning that supervisors had

9    a direct cause or caused the death of Cáceres on August the

10   11th. I don't believe that.

11   Q.   All right. And that's according to best practices,

12   that's not a legal determination?

13   A.   That is correct, ma'am, I'm not an attorney.

14   Q.   Do you believe that failures in the setup of an

15   administrative disciplinary file can lead to supervisory

16   responsibility of a Superintendent in Puerto Rico?

17   A.   Okay, say that again, ma'am.

18   Q.   Do you believe that failures in the manner in

19   which a disciplinary model is set up and/or implemented can

20   lead to, in appropriate circumstances, the responsibility of

21   a police superintendent for events which occur in the field?

22   A.   I'm not sure that I understand what you're asking,

23   but...

24   Q.   Well then, don't answer it.

25   A.   [CHUCKLE] I don't know...

1    Q.   Don't answer it if you're not... I don't want you

2  to answer anything you're not clear on. Do you...

3    A.   What I'm... If you're asking...

4    Q.   Are   you   aware   of   the   fact   that   police

5  superintendents in Puerto Rico, including Mr. Toledo, have

6  been found responsible for the failures in the disciplinary

7  system in Puerto Rico?

8         MR. McCALL: Objection to the form. It assumes

9         something in evidence. If you want to ask...

10        MS. BERKAN: Yes, it does. I've litigated those

11        cases. I'm assuming those in evidence, yes. Your

12        objection is noted.

13  MS. BERKAN CONTINUES:

14    Q.   Are you aware of that, sir?

15    A.   Okay, am I aware of... of... of Superintendent

16  Toledo's failure, is that what you're saying, to institute a

17  disciplinary process?

18    Q.   As being elements in finding liability against

19  police superintendents in Puerto Rico.

20    A.   I am not, ma'am.

21    Q.   Are you concerned at all about the fact that

22  according... And correct me on the exact numbers, Professor

23  del Carmen, I'm doing this from memory. You say there are

24  approximately 15,000 officers and approximately 10,000

25  complaints per year?

1    A.   Yes, ma'am, from what I read from Mr. Reiter's
2  report, I believe that's right.

3    Q.   All right. So you'd say there's like one complaint
4  for every one and a half officers more or less? [CHUCKLE]

5    A.   Either that or you have a group of them that are
6  very active in complaints.

7    Q.   Do you know if there are any... [LAUGH] Sorry.
8  Good point. Do you know if any analysis has ever been done
9  to see if there is a group that are particularly active?

10    A.   I am not aware of that, ma'am, no.

11    Q.   Do you know if statistics keeping in Puerto Rico
12  is such that that analysis could be done?

13    A.   If you're asking me from a researcher perspective,
14  any analysis could be done any time, yes, ma'am. Now,
15  whether or not they keep the data that would be useful for
16  that analysis and, you know, and all that, but typically
17  police departments keep a healthy level of data that could
18  be used for analytical purposes.

19    Q.   Do you know if that's done in Puerto Rico?

20    A.   I do not know, ma'am. My recollection from what I
21  read relevant to statistics is that there's a separate unit
22  that handles the statistical, you know, I don't want to use
23  the word analysis because I don't recall that specifically,
24  but that serves as sort of a data bank for the Police
25  Department.

1    Q.   Do  you  know  if  the  statistics  department  only

2  keeps  track  of  crime  statistics  and  not  officer-involved

3  events?

4    A.   I don't, I don't recall that, ma'am, and I don't

5  know so I can't answer to that.

6    Q.   In sheer numbers, is there any cause for concern

7  with that rate of complaints? I mean, you indicated... Let

8  me preface that.

9    A.   Yeah.

10   Q.   I asked  you  about  Arlington.  You  said  they're

11  somewhere  in  the  order  of  550  officers  and  about  50

12  complaints per year. So it's about one in ten. Again, with

13  your  clarification.  It  doesn't  mean  it's  one  in  ten

14  officers, you know, it could... I understand the statistical

15  problems, but just in  sheer  numbers.  Allen,  you  did  some

16  research on their statistics, no?

17   A.   Yes, ma'am.

18   Q.   And there's about a 120 officers?

19   A.   Yes, ma'am, that's correct.

20   Q.   And about how many complaints per year?

21   A.   I'm sorry?

22   Q.   About how many complaints per year?

23   A.   For which one, for City of Allen?

24   Q.   Allen, yeah.

25   A.   I don't recall offhand, you know. But it's less

1  than 50. You know, it's probably around 20, and that's just

2  a guesstimate on my part.

3      Q.   All right. So in Puerto Rico does the sheer number

4  give you any cause for concern?

5      A.   Of 15,000 police officers, if in fact there are

6  10,000 complaints filed each year on the average, that would

7  be concerning, yes.

8      Q.   And what would be the concern?

9      A.   Of the large volume.

10     Q.   And what would that... What red flags would that

11  raise, I know subject to further analysis?

12     A.   Well, you know, looking at it from an objectively

13  statistical perspective, you have one of the conditions that

14  are taking place. Either you have... Actually, one of three.

15  Either you have a population that likes to complain a lot,

16  which we know that geographically, you know, there are some

17  cities that have particular neighborhoods, for instance,

18  where people see just anything, a cat, you know, walking on

19  the wrong side of the street, and they call 9-1-1 to report

20  it. Or you may have the second, you know, possibility is

21  that you may have police officers as a whole that are

22  engaging in behavior that rises to the level of a complaint.

23  Or, number three, you may have a small sample of people that

24  are engaging in a great deal of activity that would give

25  rise to complaints.

1    Q.   Do you know if there have been any reviews or
2  studies about the fact that people in Puerto Rico are
3  fearful of complaining...

4    A.   No, ma'am, I...

5    Q.   ...and there tends to be underreporting? Have you
6  seen any of those studies?

7    A.   Well, I've seen studies of... of... I've actually
8  done a few on fear of crime as a whole, where we actually
9  measure, you know, the level of confidence that people have
10 about the police department and how they perceive, you know,
11 the police department response and how quickly it is and all
12 that. I've done a few of those. I have not seen one specific
13 to Puerto Rico.

14     MR. McCALL: Ms. Berkan, I just note that we're in
15     excess of the hour. It's...

16     MS. BERKAN: We... Our previous deposition was five
17     hours and 26 minutes.

18     MR. McCALL: Seven hours and 21 minutes, so...

19     MS. BERKAN: It was five hours and 26 minutes, our
20     previous deposition. We have the exact times. One hour
21     and 56; one hour and 25 and one hour and one.

22     MR. McCALL: 9:00 a.m. We were there till 4:15. We
23     took less than an hour for lunch...

24     MS. BERKAN: We have...

25     MS. MÉNDEZ: It was... We have the exact times, Mr.

1        McCall. It went from 8:59...

2             MR. McCALL: An hour and 15 minutes.

3             MS. MÉNDEZ: ...to 10:55 a.m. Then we took a 13

4        minute break. It went from 11:08 a.m. through 12:33.

5        Then we came back on record at 1:52. At 2:53 we took a

6        ten-minute break, and we were there until 4:15. It's

7        five hours and 26 minutes.

8             MS. BERKAN: Okay, I'm going to continue.

9        Q.   Do you know how many incidents of police violence

10   there were in 2007 in Puerto Rico?

11       A.   I'm sorry, say that again, Ms. Berkan.

12       Q.   Do you know how many incidents of police violence

13   against citizens there were in 2007 in Puerto Rico?

14       A.   Not specifically, ma'am, no.

15       Q.   Do you know how many officer-involved shootings

16   there were in Puerto Rico in 2007?

17       A.   I do not.

18       Q.   How about in the Humacao Area?

19       A.   No, ma'am, not specific to that.

20       Q.   Have you heard or have any reason to believe that

21   Tactical Operations Division in Puerto Rico (and I'm now not

22   referring specifically to Humacao, but in general the

23   Tactical Operations Division) is viewed by the community as

24   being particularly violent?

25       A.   No, ma'am, I do not.

1      Q.   Do  you  know  if  there  have  been  other  cases  of

2   alleged  police  brutality  in  Puerto  Rico?

3      A.   Well,  by  Mr.  Reiter's  report,  I  heard  that  he  had

4   worked  with  you  in  previous  cases  that  related  to  police

5   management  issues  and  police  use  of  force  issues  as  well.

6      Q.   All  right.  But  besides  working  with  me,  do  you

7   know  of  any  other  cases?

8      A.   No,  ma'am,  not  that  I'm  particularly  aware  of,  no.

9      Q.   In  the  *Powers*  case  that  you  worked  on,  there  was

10   an  administrative  shooting  review  team,  is  that  correct?

11      A.   Yes,  ma'am.  I  believe  you  asked  me  that  on  the

12   12th.

13      Q.   Oh,  I  did  ask  you  that?  I'm  going  over  some  of  my

14   previous  notes...

15      A.   No,  that's  fine,  that's  fine.  I'm  just  trying  to

16   recall  whether  or  not  I  answered  the  question  back  then.  So,

17   yes.

18          MS.  BERKAN:  And  Dr.  del  Carmen,  let  me  tell  you,  I

19      really  appreciate  your  answers.  I  think  they  are  quite

20      straightforward.

21          DEPONENT:  I'm  trying,  Ms.  Berkan.  [CHUCKLE]  I'm

22      running  a...

23          MS.  BERKAN:  Yes,  I  know  you...

24          DEPONENT:  And  I'm  holding  a  jacket  in  front  of  me

25      so  that  I  don't  pass  out,  but  I'm  trying  to  do  the  best

1    that I can.

2    MS. BERKAN: No, I really do appreciate it.

3    Q.   And did I ask you (I'm sorry, sir, I really don't

4    remember) if the best practices model is written anywhere?

5    A.   No, Ms. Berkan. I think we talked a little bit

6    about that last time, but I don't remember that you asked me

7    that specifically. I... The best practices model is really a

8    summation of articles and books and, you know, police, you

9    know, directives that have been found over the years, you

10   know. And we talked a little bit about the PERF, which is

11   the Police Executive Research Forum.

12   Q.   Oh, yes, I do recall that, sir. You're absolutely

13   right. But there's no single listing?

14   A.   That is correct, yeah. There's no, you know, one

15   book that you can go to or directive or, you know, direct

16   that would suggest that.

17   Q.   And the IACP model policies, do you look to them

18   at all?

19   A.   Which model, ma'am?

20   Q.   The IACP.

21   A.   The IACP models are in fact relevant, yes, ma'am.

22   Q.   And relevant in what sense?

23   A.   Well, they establish guidelines and, you know, if

24   you want to call it a template, you know, along with, you

25   know, PERF and various other organizations that are, you

1   know, throughout the United States, they establish templates

2   for police departments to follow and represent, you know,

3   the best practices model.

4        Q.   Okay. And PERF is Police Enforcement Research...

5        A.   Police Executive Research Forum, P-E-R-F.

6        Q.   Executive. And do they also come up with model

7   policies?

8        A.   I believe they do. They have a series of

9   publications that they produce and they sell. They also have

10  an annual conference where participants go to from all over

11  the world, really. And they give them, you know, policies

12  and procedures and they talk about best practices.

13       Q.   Okay. And do you look to those PERF or IACP models

14  when you... model policies when you're analyzing situations

15  involving potential police responsibility or in your audits

16  or in your consultation work?

17       A.   Yeah, we... we... Most of my consulting work that

18  I do with police agencies, even though it's very... you

19  know, I've done, you know, different types of works for them

20  but, you know, a lot of it doesn't relate specifically to

21  whether or not they have the right policy. I think the

22  only... the only difference... the only exception to that is

23  those on racial profiling. And, typically, those agencies

24  don't have those policies on that. But I do know that many

25  police agencies throughout the United States look at the

1  policies as general guidelines and parameters in which
2  they... they would adopt to put in place at the police
3  department.

4    Q.   And in your previous work in consulting —let's
5  start with consulting— what work in consulting would you say
6  is directly applicable to the matters that you discussed in
7  your report with respect to the Cáceres shooting?

8    A.   Well, I've actually... When I started doing the
9  consulting work about 12 years ago, I started conducting
10  seminars. In fact, that's what... that's how I started in
11  consulting. Chief Concord at the time hired me to provide
12  three or four seminars on... for sergeants and lieutenants
13  on police supervisory roles. Now, we talked about the
14  burning out process and about how to identify officers that
15  were basically on the edge, you know. We looked at the
16  communication aspect of policing and how it was... it was...
17  how to effectively communicate with their supervisors and
18  their subordinates as well. And that led me into doing some
19  research for... and served really as an adviser for police
20  departments on management issues.

21    I mentioned to you on the 12th that I had done some
22  Cove seminars, which really goes hand in hand with police
23  best practices relevant to police management. I've
24  supervised I think something like ninety plus theses as a
25  major professor since I've been at UTA where we've done some

1   work relevant to policing issues. As you saw from the

2   syllabus that I sent you, I have also taught classes at the

3   graduate level on policing issues where we talk also about

4   management efforts. So I've done, you know, a little bit of

5   everything in terms of training as well as analysis as well

6   as seminars for practitioners and in the academic setting as

7   well.

8       MS. BERKAN: All right, I have just about two more

9       questions on that and then I'm pretty much done.

10      DEPONENT: Yes, ma'am.

11   Q.   One is on that... You didn't bring me... You

12   didn't send me anything on the Cove training, and I'm

13   assuming because there was nothing that was not propriety.

14   A.   Yeah, let me... I did send Mr. McCall like a one

15   sheet of paper that had information on the Cove seminar. But

16   you were right, you know, that you told me that there may be

17   some restrictions on that. I went back and I looked at the

18   actual instructor's manual that I used and I'm not allowed

19   to distribute it. But, just so you know for the record and

20   for your privilege as well, the Cove seminars they have to

21   do with the seven habits, you know, of highly effective

22   people. And these seven habits have to do with basically how

23   police supervisors, you know, should employ their daily

24   lives and how they should be, you know, looking for

25   positive, you know, you know, instruments within their

1  organizational   structure.   It's...   Cove   is   made   for

2  management as a whole.

3     Q.   It   doesn't   go   specifically   to   how   supervisors

4  should identify potentially violent officers, correct?

5     A.   It does not.

6     Q.   And   it   does   not   go   to   how   police   departments

7  should   maintain   disciplinary   systems   so   that...   and/or

8  statistics  keeping  so  that  potentially  violent  behavior  is

9  identified and remedied?

10    A.   That is correct, ma'am.

11        MS. BERKAN: And  the  court  reporter  has  to  change

12     the  tape.  It  always  happens  when  I  have  like  one

13     question left.

14            [PAUSE FOR CHANGE OF AUDIO TAPES]

15        DEPONENT: Oh,  okay,  okay.  Okay,  say  that  again,

16     Ms. Berkan, I missed it.

17        MS.   BERKAN:   No,   no,   the   court   reporter   was

18     changing the tape. [CHUCKLE]

19        DEPONENT: Oh, okay, okay.

20        MS.  BERKAN:  And  your  issues  in  policing...  Mr.

21     McCall, can you send us that one page.

22        MR.  McCALL:  Yes,  Ms.  Berkan,  I  realized  that

23     evidently it was sent separate...

24        MS. BERKAN: Okay.

25        MR. McCALL: ...from the other packets. When I sent

1      the stuff on Friday I didn't realize. I will...

2          MS. BERKAN: All right, no problem.

3          MR. McCALL: ...send that.

4          DEPONENT: And I'm sorry about that, I didn't...

5          MS. BERKAN: No problem. No, no problem.

6  MS. BERKAN CONTINUES:

7      Q.   The issues in policy syllabus that you gave to us

8  doesn't go directly to the issue of identifying violent

9  officers, does it?

10     A.   No, ma'am.

11     Q.   All right. Have you ever taught any seminars which

12 go directly to the issue of identifying violent officers

13 and/or statistical analysis for that purpose?

14     A.   Not seminars, ma'am. I haven't instructed any on

15 that topic.

16     Q.   Have you done consulting on that topic?

17     A.   I believe the police department in the past, and

18 I'm often given data sets by police supervisors that relate

19 to whether or not police officers are engaging in, you know,

20 either excessive use of force or have disciplinary concerns

21 relevant to racial profiling. So in that sense I have

22 reviewed data sets, yes, ma'am.

23     Q.   And what are those data sets? What does that mean?

24     A.   Typically, what it is is like in the case of a

25 racial profiling incident...

1    Q.   No, not racial profiling, excessive force.

2    A.   Well, it would be in the context of having a

3  police officer that's had a series or a large volume of

4  complaints that were filed against him or her on use for

5  force and we look at the nature of the complaints, what the

6  outcome of the stop was or the use of force was. I did a...

7  I did a... I consulted without charging them anything, but I

8  consulted as part of my service that the university requires

9  us to do with the *Austin Statesman*, which is a newspaper out

10  of Austin, a number of years back when they ran several

11  articles on use of force for the Austin Police Department

12  and we reviewed the data that they had used related to use

13  of force against minorities, particularly African-Americans

14  and Hispanics.

15    Q.   Yes, I've seen the newspaper reports of that. But

16  there was data to analyze, correct?

17    A.   Yes, ma'am, that's correct.

18    Q.   And that data was generated because of the racial

19  profiling law in Texas?

20    A.   I don't know that... No, no, no. The data...

21    Q.   No?

22    A.   The data on racial profiling, yes, ma'am, that's

23  correct. But the data on use of force, no, it's independent

24  of that.

25    Q.   Austin has its own data collection on use of

1   force?

2       A.   Yes, ma'am, I believe so.

3       Q.   And does that serve any purpose?

4       A.   Yes, ma'am, it allows for their internal practices

5   to be able to highlight if there are concerns relevant to

6   use of force.

7       Q.   And it would also highlight particular units that

8   might have issues?

9       A.   Yes, ma'am.

10      Q.   Did you in your... in the course of your graduate

11  work... I mean, not graduate work, your supervision of

12  graduate students, have you supervised any theses directly

13  related to disciplinary systems within police agencies?

14      A.   We did... We've done a few. And, again, I'm going

15  straight by my recollection, but I believe we've done a few

16  studies that related to issues that were relevant to

17  management issues. For instance, you know, we did a use of

18  force perception study that was done on police officers. We

19  did a minority police officers in the United States,

20  particularly females, and measured tokenism there. Which all

21  of these related, you know, one way or another to

22  management, management of these individuals and police work.

23      Q.   Any that had to do specifically with the use of

24  data collection for the purpose of analyzing use of force?

25      A.   No, ma'am, I've never done an inventory of police

1   departments that re... you know, that have or have not done
2   any use of force data collection mechanisms.
3       Q.   Or in your supervision of graduate students?
4       A.   Right. That's correct.
5       Q.   All right. Or how about management issues related
6   to identifying those officers who may have violent
7   tendencies?
8       A.   Yes, Ms. Berkan, that's right.
9       Q.   Have you done any consultation that directly goes
10  to those issues about identification of officers with
11  violent tendencies?
12      A.   I've done some work, like we discussed on the
13  12th. I worked with the Arlington Police Department, you
14  know, at the time with Deputy Chief Collin on obtaining a
15  grant that would allow them to have an early warning system
16  that would help them identify police officers that were...
17  had issues. And I helped them create the parameters that
18  they had in place for that purpose. It included, obviously,
19  people that would have violent tendencies but not specific
20  to that, right.
21      Q.   Okay. Early warning system, can you define that?
22      A.   Yes, ma'am, it's the software that some police
23  departments have in place in order to allow them to identify
24  problematic officers.
25      Q.   Uh-huh, yeah, I think we actually addressed that

1    in the last deposition.

2        A.    Yes, ma'am.

3        Q.    Now and do you know if that software is in use in

4    Puerto Rico?

5        A.    I do not, ma'am.

6        Q.    In your supervision of graduate studies do you...

7    I mean your graduate students who are doing their theses,

8    and you're I assume a theses advisor, have you supervised

9    any theses regarding early warning systems or identification

10   of officers with violent tendencies?

11       A.    No, ma'am, not any theses.

12       Q.    Now, I believe I asked you last time, but I want

13   to me 100% sure. Did I ask you if you know of the commission

14   that was named by Pedro Toledo in 2007?

15       A.    I don't recall, Ms. Berkan.

16       Q.    You don't know about it or you haven't...

17       A.    I do you recall you asked me and I don't know

18   about it. [CHUCKLE]

19            MS. BERKAN: All right, all right. Let me just

20       review my notes a second. I think I'm done and I really

21       appreciate it. I hope this hasn't been too burdensome

22       for you, mister... Professor del Carmen.

23            DEPONENT: Well, and I thank you Ms. Berkan, for

24       your accommodating me as well.

25                                  [PAUSE]

1          MS. BERKAN: I believe that's it, sir.

2          DEPONENT: Thank you so much, Ms. Berkan.

3          MS. BERKAN: Thank you. Have a good day.

4          DEPONENT: Thank you.

5          [THE PROCEEDINGS WERE CONCLUDED AT 10:33 A.M.]

6                        *   *   *   *

7

1

## <u>CERTIFICATION</u> <u>OF</u> <u>TRANSCRIPT</u>

I, NELLY RIVERA-MARRERO, do hereby

CERTIFY:   That   the   foregoing   transcript   was   prepared
from a tape recording made by me via telephone and is a true
and correct transcription of the same.

I FURTHER CERTIFY that I have no interest whatsoever in
the outcome of the captioned case.

In San Juan, Puerto Rico, this  27th  day of September,
2010.


_____
                   Nelly Rivera-Marrero

## **DEPONENT'S CERTIFICATION**

I   HEREBY   CERTIFY   that   I   have   read   the   foregoing transcript of the continuation of my deposition testimony and that

_____ I have no objections.

_____ I have the objections set forth below.

In San Juan, Puerto Rico, this      day of          , 2010.


_____
                    ALEJANDRO DEL CARMEN

## LIST OF SUGGESTED CORRECTIONS

Page/Line      Suggested
Modifications

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

# O B J E C T I O N S

Pages

By Mr. McCall:

Form of the question                     309|310|322|328|
                                          332|333|335|340

Deponent has not finished
his answer                                                331

## REQUESTS FOR PRODUCTION OF INFORMATION AND/OR DOCUMENTS

Page

1.  Documentation reflecting time spent by
    deponent reviewing documents in this case          299

2.  One-page document on issues in policing           351

## E X H I B I T S

<u>Pages</u>

Exhibit 7  -    Deponent's time sheet for
                deposition preparation;
                letter from Joseph (Sib)
                Abraham of June 30, 2010;
                Del Carmen Consulting  web
                page; letter of July 7,
                2010 to Joseph(Sib) Abraham;
                course description for
                CRCJ 5319 Issues in Policing
                course for Spring 2010;
                Doctoral diploma of Alejandro
                del Carmen                                    292