**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | |
| Plaintiff, | CIVIL NO. 12-2039 (GAG) |
| v. | |
| **COMMONWEALTH OF PUERTO RICO**, et al., | |
| Defendants. | |

## MOTION SUBMITTING DEFENDANTS' ARGUMENTS IN SUPPORT OF RESTRICTED FILING OF PAR. 241 SURVEY REPORTS

TO THE HONORABLE COURT:

COME NOW Defendants Commonwealth of Puerto Rico and the Puerto Rico Police Department ("PRPB"), by and through the undersigned counsel, and respectfully state and pray the Court as follows:

### I.  INTRODUCTION

Among the numerous matters discussed at the Status Conference that was held on December 9, 2019, the Court noted that "[a]s per Paragraph 241 of the Agreement the Monitor in 2020 will continue to develop and engage in community surveys."  *See* Minutes (Docket No. 1388, at ¶ 7).  The Parties agreed that the Monitor continue to engage in community surveys, as provided in the Agreement for the Sustainable Reform of the Puerto Rico Police Department (the "Reform Agreement"). *See* Docket No. 60. The Parties disagreed, however, as to whether the survey results should be filed under a public or a restricted, "case

participants" viewing level.  Consequently, the Honorable Judge Gelpí directed the Parties to brief and file their respective positions on this issue.[1]

For the reasons discussed below, Defendants respectfully submit that (a) all survey reports should be filed under a "case participants" viewing level; (b) the viewing level of the survey reports at Docket Nos. 406-1 and 774-1 should be modified accordingly; and (c) Docket No. 774-1 should be withdrawn from the case link in the Court's website. In the alternative, all **future** survey reports should remain confidential and be filed in a restricted manner under a "case participants" viewing level.

## II.  ARGUMENT

### a.  Paragraph 241 of the Reform Agreement Must Be Interpreted as Allowing the Restricted Filing of Survey Reports.

This case was settled in 2013 when the Parties entered into the Reform Agreement. The Court subsequently entered Judgment conditionally dismissing the action and retaining jurisdiction to enforce the Reform Agreement.   *See* Docket No. 61.   Hence, the judicial oversight involved in the enforcement of the Agreement's terms makes plain that it is a consent decree. *See Aronov v. Napolitano*, 562 F.3d 84, 90 (1st Cir. 2009) ("The Supreme Court has described what it meant by a 'court-ordered consent decree.' It distinguished such consent decrees from 'private settlements' … saying '[p]rivate settlements do not entail the judicial approval and oversight involved in consent decrees.'" (*citing Buckhannon Board & Care Home, Inc. v. West Virginia Department of Health & Human Resources*, 532 U.S. 598, 604 n. 7 (2001)).

---

[1] The deadline for the briefs is not included in the Minutes.  Defendants understood that the Parties would file simultaneous briefs but, in recent conversation with counsel for Plaintiff, it was clarified that Defendants were to file first (by the end of the year) and Plaintiff would then have time to reply.  As a result of a good faith confusion as to the process and deadline, not meant to delay the proceedings or disregard this Court's directives, Defendants are filing today.

Consent decrees are specifically enforceable as written.  *See U.S. v. ITT Continental Baking Co.*, 420 U.S. 223, 236 (1975).  However, if the decree is silent on certain issues or contains terms that may plausibly be interpreted in more ways than one, the court may rely upon external aids to construction in determining which interpretation is correct. *Id.,* at 238. Moreover, when the performance of a party threatens to **frustrate the purpose of the decree**, it is the court's duty to ensure that the terms of the decree are adequately enforced. *See Bolden v. Pennsylvania State Police*, 73 F.R.D. 370 (E.D. Pa. 1976)*; see also Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 33 n. 19 (1978) (Supreme Court stating that where a statute or rule creates a procedure to seal certain court records or to deny access to the public, even if existing "courthouse records" could otherwise "serve as a source of public information," the court **legitimately denies access to the courthouse records in order to protect the underlying processes**).

Paragraph 241 of the Reform Agreement fails to state whether the Technical Compliance Advisor ("TCA")'s community surveys may be filed publicly; in fact, it fails to state whether they ought to be filed with the Court **at all**.  Paragraph 241 reads as follows:

> **In order to asses PRPD's overall compliance with and the effectiveness of this Agreement**, the TCA shall conduct a reliable, comprehensive survey of members of the Puerto Rico community regarding their experiences with and perceptions of PRPD once during the first three years of this Agreement and annually thereafter.  The community survey should be **statistically valid, based on sound methodology, and conducted by an independent entity**. This community survey shall include measures to ensure input from individuals of each demographic category. The survey shall also assess the number and variety of community partnerships with PRPD and the depth and effectiveness of those partnerships. In particular, the survey shall: a) include interviews with a random sample of residents of Puerto Rico, PRPD officers, and detainees arrested by PRPD within the past week; b) ensure the anonymity of all interview participants; and c) survey participants regarding community-police relations;

PRPD's integrity, effectiveness, and service; and how it treats members of different demographic groups.

(Emphasis added.)

However, upon review of the above paragraph (and considering the Reform Agreement's objectives), what *is* clear is that the community surveys are meant as nothing more than tools for the TCA, the Parties, and the Court – *not the general public* – **to evaluate the PRPB's performance and compliance with the terms of the Reform Agreement and to determine whether said agreement has been effective in guiding the reform process**. That is intrinsically a function for the Parties, the Monitor and the Court; not the public.

The undersigned acknowledge that attorney Antonio Bazán filed the results of the first survey (Docket No. 406-1) publicly on behalf of former Monitor Arnaldo Claudio. The undersigned further acknowledge that, while attorney Bazán filed the results of the second survey under a restricted viewing level due to the "sensitive information" contained therein (Docket Nos. 773 and 774-1), Plaintiff and Defendants – *the latter represented at that time by different counsel*, Mr. Joel Torres Ortiz – jointly moved the Court to lift said viewing restriction. *See* Docket No. 785. Thereafter, the Court not only lifted the restriction, but also included the survey results at Docket No. 774-1 in the case link at the Court's website so the general public could access the same. *See* Order at Docket No. 786. As explained below, making past and future survey results available for public scrutiny is likely to frustrate the purpose of Paragraph 241: a reliable assessment of the "PRPD's compliance with and the effectiveness of th[e] Agreement." Therefore, the undersigned respectfully move the Court to ensure the intent and terms of Paragraph 241 are adequately enforced and, accordingly, enter an Order determining that access to all community survey results must be limited to case participants.

### b.  There is No Public Right of Access to the Surveys.

The crux of the Parties' misguided request to lift the viewing restrictions on the survey report at Docket No. 774-1 rests on a specious argument: that it qualifies as a judicial record and, as such, is "presumptively accessible by the public."  *See* Docket No. 785, at p. 3.  In support thereof, the Parties cited to *U.S. v. Kravetz*, 706 F.3d 47 (1st Cir. 2013).  However, as set forth below, a close reading of *Kravetz* reveals that the community surveys, and the reports containing their results, do not meet the definition of judicial records.

#### i.  There is no Common Law Right of Access.

"Courts have long recognized that public monitoring of the judicial system fosters the important values of quality, honesty and respect for our legal system. This recognition is embodied in two related but distinct presumptions of public access to judicial proceedings and records: a common-law right of access to judicial documents, and a First Amendment right of access to certain criminal proceedings and materials submitted therein."  *Kravetz*, 706 F.3d at 52 (internal quotations and citations omitted). As for the common-law right of access to judicial documents, "not all documents filed with courts are judicial records". *Metlife, Inc. v. Financial Stability Oversight Council*, 865 F.3d 661 (D.C. Cir. 2017). Therefore, "[w]hen considering whether the common law right of access applies, the cases turn on whether the documents that are sought constitute judicial records. Such records are those **materials on which a court relies in *determining* the litigants' *substantive rights*. Such materials are *distinguished* from those that relate merely to the judge's role in *management* of the trial and therefore *play no role in the adjudication process*.**"  *Kravetz*, 706 F.3d at 54 (internal quotations and citations omitted) (emphasis added); *see also Chao v. Estate of Fitzsimmons*, 349 F. Supp.2d 1082, 1085 (N.D. Ill. 2004) (holding that reports of the Independent Special Counsel (ISC) appointed by the Court to oversee compliance with a Consent Decree which did not provide any basis for judicial action were not subject to public

access: "The quarterly reports have provided a convenient means for the ISC; to update the court without conferences. While over the years they have provided useful information that was not confidential, they have also provided a means for the ISC to express subjective opinions about a variety of topics, as previously noted. Until the August 5, 2003, report, **none provided any basis for judicial action. In those circumstances we doubt that the** earlier **reports**, over more than 20 years, **can properly be deemed to be judicial documents** […]." (Emphasis added)).

In this case, the community surveys are meant as tools for the TCA to assess the PRPB's compliance phase with the Reform Agreement and for the Parties and the Court to be informed thereof. Hence, because the survey reports relate merely to Judge Gelpí's role in the enforcement of the consent decree (*i.e. the Agreement that the Parties executed **to avoid adjudication of the litigants' substantive rights** of the case at bar*) those reports cannot and do not, by definition, qualify as judicial records.  Consequently, no common law right of access attaches to the surveys at issue.

### *ii.   There is No First Amendment Right of Access.*

While the case at bar is a civil action, Plaintiff might also argue that, given the significant public interest involved in the PRPD reform process, the First Amendment right of access applicable to criminal matters should analogously attach to the survey reports, because public interest lies at the heart of the First Amendment right of access to criminal proceedings and records.  However, no such right applies in this case.

As the *Kravetz* court emphasized, the U.S. Supreme Court has explained that "in determining whether a First Amendment right of access attaches to a particular type of proceeding or document, courts should consider two complementary considerations: whether [they] have historically been open to the press and general public (the 'experience' prong) and **whether public access plays a significant *positive* role in the functioning of the**

**particular process in question (the 'logic' prong)**." *Kravetz*, 706 F.3d at 53-54 (*citing Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8-9 (1986)) (internal quotations omitted) (emphasis added).  "As for logic, there is **scant value and considerable danger** in a rule that could result in requiring counsel for a criminal defendant to prematurely expose trial strategy to public scrutiny. Accordingly, we agree with those courts that have found that public access has little positive role in the criminal discovery process. Those decisions are **grounded largely on concerns surrounding the *deleterious effect* that public access would have on the parties' *search for and exchange of information*** in the discovery process." *Kravetz*, 706 F.3d at 54 (internal citations omitted) (emphasis added).

Paragraph 241 of the Reform Agreement states "**[i]n order to assess PRPD's overall compliance with and the effectiveness of this Agreement**, the TCA shall conduct a **reliable**, comprehensive survey of members of the Puerto Rico community regarding their experiences and perceptions of PRPD…" (Emphasis added).  Community survey results are likely to attract excessive attention from the press, political analysts, politicians and the public in general.  Consequently, there is "**scant value and considerable danger**" in subjecting the community survey reports to public scrutiny as they may negatively influence public perception of the valid and genuine compliance efforts of the PRPD in the reform process and taint the results of future surveys, rendering them **unreliable**. Excessive attention by the media, pundits and politicians in Puerto Rico to these surveys may in fact dilute and diminish the work and effort of the PRPD throughout this critical juncture and process.  Moreover, allowing public access to the survey reports at Docket Nos. 406-1 and 774-1 is especially harmful given the questionable methodology employed in conducting those surveys, explained in subsection (c) below.

In sum, the *Kravetz* court held that "no presumptive right of access, based either in the common law or the First Amendment, attache[d] to the Rule 17(c) subpoenas or the

related documents filed in connection with the underlying criminal prosecution in [that] case." *Kravetz*, 706 F.3d at 56.   As shown above, the same logic applies here.   Therefore, Defendants respectfully submit that past and future survey reports should be docketed under a restricted or "case participant" viewing level as it is the only way to ensure reliable assessment of the public's perception of the Puerto Rico Police and its reform process.

**c. The Methodologies Employed in Past Surveys are Faulty and Making them Publicly Accessible Frustrates the Purpose of Paragraph 241.**

Further to the foregoing, it bears emphasis that the methodologies employed in the survey reports at Docket Nos. 406-1 and 774-1 are questionable and, consequently, public access to such reports plays a negative role in the reform process, actively hindering the assessment of its progress and effectiveness by tainting public opinion with unreliable results.

Federal Rule of Evidence 702 states: "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."   *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 580 (1993) ("The Rule's requirement that the testimony 'assist the trier of fact to understand the evidence or to determine a fact in issue' goes primarily to relevance by demanding a **valid scientific connection to the pertinent inquiry as a precondition to admissibility**." (Emphasis added)).   Since the surveys at issue are meant to aid the Monitor, Parties and the Court in determining whether the PRPB is complying effectively with the Reform Agreement, it is worth evaluating if the survey reports meet the *Daubert*/FRE 702 elements.   Defendants respectfully submit that the survey reports at Docket Nos. 406-1 and 774-1 fail to meet those

requirements, because they are based on insufficient data and are the product of unreliable methods incapable of being reliably applied to the facts.

Paragraph 241 reads: "[i]n order to assess PRPD's overall compliance with and the effectiveness of this Agreement, the TCA shall conduct a **reliable**, **comprehensive** survey of members of the Puerto Rico community regarding their experiences and perceptions of PRPD… The community survey should be **statistically valid**, based on **sound methodology**, and conducted by an **independent entity**. This community survey shall include measures to ensure input from individuals of each demographic category. … In particular, the survey shall (a) include interviews with a **random sample** of residents of Puerto Rico, PRPD officers, and detainees arrested by the PRPD within the past week…" (Emphasis added).

While the 2015 survey and its report (Docket No. 406-1) loosely adhered to the requirements set forth in Paragraph 241 given that it employed quantitative methods – such as structured interviews[2] – among a random sample of the population, it failed to fully meet the requirements of FRE 702 and Paragraph 241 for two main reasons: (a) an overwhelming number of interviewees were not aware or were, at best, ill-informed of the Police Reform and the existing  Reform Agreement; therefore, issuing their opinions and answers based on others' biased opinions, news articles, broadcast news and repetitive social media postings; and, (b) it was conducted by Dr. Richard Blanco-Peck, a Professor of Social Sciences at the University of Puerto Rico, who cannot be considered an independent entity given the notorious confrontations that have taken place between members of this particular university community (both faculty and students) and the Police during the University's longstanding

---

[2] Structured interviews or surveys consist of predetermined questions with a corresponding set of answers from which the participant chooses one (for each question).

history of strikes.[3] The foregoing including many of the confrontations that prompted the USDOJ to commence the investigation of the PRPB, which ultimately led to the Reform Agreement.

The 2017 survey and ensuing report (Docket No. 774-1) were also prepared by Dr. Richard Blanco-Peck.   More importantly, however, Dr. Blanco-Peck opted to employ qualitative methods in this survey, conducting unstructured interviews[4] of only 71 participants *not belonging to a random sample*, but to *nine specific focus groups* not representative of the community at large (eight marginalized communities and, oddly enough, a group of UPR students interviewed by UPR students).  The office of the then Monitor even offered names of participants in several of the focus groups conducted for this report. Therefore, the 2017 qualitative research report is by definition especially and dangerously unreliable.  At best, representing the personal opinions of those 71 participants; and, because it is included it in the case link at the Court's website, there is a greater risk that it will unduly influence public perception and taint future survey results, thus frustrating the purpose of Paragraph 241. Being included in the above referenced case link makes it all the more likely that the public will perceive the 2017 qualitative research report as having received the Court's *imprimatur* and thus accept it as credible authority.   "By admitting (or upholding the admission of) the opinions of forensic analysts not *known* to be expert, trial an appellate judges have lent the **imprimatur of their courts to techniques of unknown value**. In isolation, and without the resources or authority of the state, the defendant is somehow expected to identify actual errors (remote from the crime scene and the laboratory) and expose misrepresentations and

---

[3] The 2018 survey and ensuing report, which have yet to be filed with the Court, also fail to meet requirements of FRE 702 and Paragraph 241 of the Reform Agreement essentially for the same reasons.

[4] In unstructured interviews, participants may be guided by a predetermined set of questions, but they are allowed to answer freely in narrative form, which often leads to tangents and irrelevant data.

exaggerations and persuade the jury of the significance of methodological limitations and omissions. … The trial is **not a level playing field** and there is equality of arms between the prosecution and defense in only a tiny proportion of contested cases. Prosecutors and **judges should be much more attentive to the dangers created by the admission of speculative and unreliable opinions**." Gary Edmund, Forensic Science Evidence and the Conditions for Rational (Jury) Evaluation, 39 Melb. U. L. Rev. 77, 105-106 (2015) (emphasis added). Indeed, if the "playing field" is not level between defense attorneys and prosecutors, it is much less even between members of the Court and the general public, the latter of whom can only be expected to assign credence to, and be swayed by, any document published on the Court's website.  In this case, should the Honorable Court be disinclined to restrict access to the 2015 and 2017 survey reports, given the length of time in which they have already been publicly available, the undersigned respectfully submit that the Court should err on the side of caution and **restrict access to the 2018 survey report upon its filing, as well as all future survey reports,** to ensure accurate and untainted results.

## III. CONCLUSION

In the "Joint Motion Submitting Recommendation to Lift Restriction on Docket Entries 774 and 774-1," the Parties argued that "the language and purpose of the Agreement [] support the unsealing of the Motion and Report."  *See* Docket No. 785, at p. 3.  The above discussion, however, supports the opposite conclusion.  In short, there is no right of public access to the survey reports, which were conceived as tools for the TCA, the Parties, and the Court to assess the PRPB's compliance with the Reform Agreement and do not constitute "judicial documents;" and, assuming future surveys employed methodologies that fully complied with the requirements set forth in Paragraph 241 (which, thus far, they have not), there is a significant risk that making the reports public will nevertheless unduly bias survey participants, taint future survey results, and hinder the reform process.

**WHEREFORE**, Defendants respectfully request the Court to take notice of the above, and enter an Order directing (a) all future survey reports to be filed under a "case participants" viewing level; (b) that the viewing level of the surveys reports at Docket Nos. 406-1 and 774-1 be modified to "case participants;" and (c) that Docket No. 774-1 be withdrawn from the case link in the Court's website. Alternatively, the Court should (d) provide that the 2018 survey report, which has yet to be filed with the Court, as well as all **future** survey reports remain confidential and be filed in a restricted manner under a "case participants" viewing level.

**RESPECTFULLY SUBMITTED**.

**WE HEREBY CERTIFY**: That today we have electronically filed the foregoing document with the Clerk of the Court for the District of Puerto Rico, using the CM/ECF system which will send a copy and notification of filing to all counsel of record.

In San Juan, Puerto Rico, this 27th day of January, 2020.

**MCCONNELL VALDÉS LLC**
P.O.Box  364225
San Juan, Puerto Rico 00936-4225
Tel: (787) 250-5632
Fax: (787) 759-8282

*s/ Arturo J. García-Solá*
Arturo J. García-Solá
USDC-PR No. 201903
ajg@mcvpr.com

*s/ Lizzie M. Portela-Fernández*
Lizzie M. Portela Fernández
USDC-PR No. 208401
lpf@mcvpr.com

*s/ Sonia M. López del Valle*
Sonia M. López del Valle
USDC-PR No. 231413
sld@mcvpr.com

*Counsel for Defendants*