# UNITED STATES DISTRICT COURT FOR THE
# DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

        Plaintiff;

v.

COMMONWEALTH OF PUERTO RICO, ET AL.,

        Defendants.

No. 12-cv-2039 (GAG)

## UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO RESTRICT THE FILING OF PARAGRAPH 241 SURVEY REPORTS.

TO THE HONORABLE COURT:

Defendants' Motion in Support of Restricted Filing of Paragraph 241 Survey Reports (Motion to Restrict Surveys), ECF 1397, is a belated attempt to set aside an Order entered upon joint recommendation of the Parties nearly two years ago and should be denied. *See* Jt. Mot. to Lift Restriction, ECF 785 (filed Mar. 16, 2018); Order Lifting Restriction, ECF 786 (entered Mar. 19, 2018). At the urging of both Parties, the Court ordered that the results of a survey required by the consent decree in this case be made public. ECF 786. Indeed, for most of this case, both Parties understood that the surveys would become public in the process of implementing the decree as a means of public accountability, a principle expressly embraced by both Parties. Defendants therefore stipulated in the March 16, 2018, Joint Motion that the surveys required by the consent decree are judicial records that carry a strong presumption of public access because they bear on Defendants' overall compliance with the consent decree and the effectiveness of the consent decree's reforms. Defendants' current attempt to keep the surveys secret from the public is inconsistent with the consent decree, their previous positions in this case, and the law, and should therefore be denied.

I.  **BACKGROUND**

The Agreement for the Sustainable Reform of the Puerto Rico Police Department (the "Agreement") requires the Monitor to conduct annual surveys "to assess PRPD's overall compliance with and the effectiveness of this Agreement[.]" Agreement, ¶ 241, ECF 60.  These surveys are a typical feature of the United States' agreements with local law enforcement agencies to remedy an alleged pattern or practice of constitutional or federal law violations.[1]  The results of these surveys are regularly made public during the implementation of the agreements.[2] The Agreement in this case also explicitly identifies transparency and public accountability as one if its primary goals:

> To ensure public accountability, this Agreement requires the collection and public dissemination of information regarding the reform efforts and their results.  It is critical to strengthen the community's trust in PRPD that there be timely and reliable public information about PRPD's progress and accomplishments under these reforms.

*Id.* at ¶ 4.

---

[1] *See, e.g.*, Amended & Restated Consent Decree Regarding the New Orleans Police Department ¶¶ 230-233, *United States v. New Orleans*, No. 2:12-cv-01924 (E.D. La. Oct. 2, 2018), ECF 565; Consent Decree ¶¶ 22-24, *United States v. Newark*, No. 2:16-cv-01731 (D.N.J. Apr. 5, 2016), ECF 5; Settlement Agreement ¶¶ 361-366, *United States v. Cleveland*, No. 1:15-cv-01046, (N.D. Ohio June 12, 2015), ECF 7-1; Settlement Agreement ¶¶ 98-101, *United States v. County of Los Angeles*, No. 2:15-cv-03174 (C.D. Cal. Apr. 28, 2015), ECF 4; Mem. of Understanding between the United States and the City of Seattle ¶ 13 (July 27, 2012), *available at* http://www.seattlemonitor.com/reports-resources.

[2] *See, e.g.,* New Orleans Police Department Consent Decree Monitor, Reports: Special Reports, http://consentdecreemonitor.com/reports (publishing community surveys); Newark Police Department Independent Monitor, Reports/Resources: Community Survey Results, https://www.newarkpdmonitor.com/reportsresources/ (same); Cleveland Police Monitor, Resources & Reports: Assessments, http://www.clevelandpolicemonitor.net/resources-reports (same); Los Angeles County Sheriff's Department Monitor, Monitoring of the Antelope Valley Settlement Agreement: Documents & Reports – Community Surveys, http://www.antelopevalleysettlementmonitoring.info/#documents (same); Seattle Police Monitor, Reports & Resources: Assessments of Community Perceptions, http://www.seattlemonitor.com/reports-resources (same).

In 2015, then-TCA/Monitor Arnaldo Claudio proposed Dr. Blanco-Peck to conduct the surveys under ¶ 241.  The Parties participated in vetting Dr. Blanco-Peck and his proposal for the first survey.  *See* TCA 3rd Semi-Annual Report 13, ECF 306 ("As part of the recruitment processes, the Parties had the opportunity to examine Dr. Blanco Peck's credentials, assessing his proposal for professional services and a plan of activities that he presented for the consideration of the TCA.").  In particular, Defendants played a significant role in reviewing the questions used in the surveys and what the survey would seek to evaluate.  *See id.* ("During the process, the Parties have participated and have been involved in the development of the questionnaires and in the selection of variables to be included in the survey.").  Neither Party objected to the appointment of Dr. Blanco-Peck or the design of the first survey.

On August 23, 2016, Mr. Claudio publicly filed the first survey results.  ECF 406-1.  No Party objected to the final survey or the public's access to it.  Rather, Defendants took remedial action to address some of the survey's findings.  *See, e.g.*, PRPB's 5th Self-Assessment Report at 51, ECF 451-1 ("One of the survey results [of the first survey] showed that the persons from the sector of young and/or college people do not know about the PRPD Reform.  This open house activity was realized to address this situation first hand and make known to this sector what the Reform process is[.]").

As they did for the first survey, Defendants assisted Dr. Blanco-Peck in the design and implementation of the second survey.  *See, e.g.*, Minutes, TCA Meeting Regarding Paragraph 241 Survey (Oct. 3, 2016) (first meeting regarding the second survey, in which PRPB participated in discussions regarding what groups and topics would be the focus of the survey), attached hereto as Exhibit A; *see also* TCA 6th Semi-Annual Report 29, ECF 609 ("[T]he TCA would like to thank the PRPD for supporting the TCA's efforts related to the design and

3

implementation of the surveys under Paragraph 241."). The survey was designed to collect qualitative data to complement the quantitative data of the 2015 survey. Again, neither Party objected to the use of Dr. Blanco-Peck or the design of the second survey.

On March 9, 2018, Mr. Claudio filed the final version of the second survey as a restricted filing, not viewable by the public, based on his practice at the time.[3] ECF 774. A week later, the Parties filed a motion submitting a joint recommendation to unrestrict the second survey, affirming that making them public would further the goals of the Agreement and that the surveys were judicial records that carry a presumptive right to public access. ECF 785. The Court accepted the Parties' recommendation, ordering that the court clerk unrestrict the second survey and post it on the court's public website. ECF 786.

In 2018, Dr. Blanco-Peck began working on the third survey using the same questionnaire from the first survey. *See* Dr. Blanco-Peck, Summary of Exhaustive Survey Activities (May 2018), attached hereto as Exhibit B. The Court confirmed in an August 20, 2018, status conference: "[T]he parties have agreed [to the methodology] like last time. This is not a survey performed by the Monitor *ex parte* . . . it is agreed by everybody." Tr. 74:19-25, ECF 992. Neither Party disputed the Court's statement or objected to the third survey.

As in the past, Mr. Claudio shared the results of the third survey with the Parties for comment. In a letter to Mr. Claudio dated February 14, 2019, Commissioner Henry Escalera described ways that PRPB highlights the "importance of reporting" to the public about reform issues, including through the surveys. Letter from Commissioner Henry Escalera to Monitor Arnaldo Claudio at 3 (Feb. 14, 2019) (hereinafter "Commissioner Ltr."), attached hereto as

---

[3] *See, e.g.*, ECF 720, 722 (Mr. Claudio's motions to restrict assessment reports); ECF 742 (joint motion to lift restrictions); ECF 745 (order lifting restrictions on reports).

Exhibit C. Although the Commissioner expressed concern with some of the questions to one group of interviewees and recommended a revision to future surveys, *id.* at 5-6, he did not object to the survey's methodology or findings. Instead, the Commissioner described various initiatives to address the survey's findings, such as informing the public about the reform process through radio and television. *Id.* at 3-4.

At a December 9, 2019, status conference, Defendants raised concerns with the surveys and argued that the surveys should be restricted. The Court instructed Defendants to file their reasons for restricting the Monitor's surveys by December 31, 2019. Defendants filed the instant motion on January 27, 2020, almost four weeks after the deadline.

## II.     ARGUMENT

### A. Public Disclosure of the Survey Results Is Consistent with the Agreement and Defendants' Prior Representations to the Court.

Public disclosure of the Monitor's survey results is consistent with the terms and purposes of the Agreement, as well as with Defendants' prior actions in this case and their representations to the Court. By its own terms, the Agreement seeks to "ensure public accountability" through "the collection and public dissemination of information regarding the reform efforts and their results." Agreement ¶ 4. The Monitor's surveys "assess PRPD's overall compliance with and the effectiveness of this Agreement," *id.* at ¶ 241, making them "information regarding the reform efforts and their results" that the Agreement seeks to disseminate publicly. The surveys are part of a number of court-ordered compliance assessments, such as the semiannual reports the Monitor compiles, that have been regularly made public and ensure that the implementation of this Agreement between governmental entities is accountable to the people that we each serve. *See id.* at ¶¶ 250, 251; *see, e.g.*, TCA's 8th Semi-

Annual Report, ECF 1017-1.  Therefore, maintaining public access to the surveys furthers the objectives of the Agreement.

The United States regularly includes surveys such as those included in the Agreement in its agreements with law enforcement agencies across the country.  *See, e.g.*, settlement agreements, *supra* note 1.  These surveys serve several important goals:  (1) they provide a means of demonstrating to the public, the Parties, and the Court, whether public confidence in the law enforcement agency—one of the critical goals of each agreement—is increasing; (2) they show the public, the Parties, and the Court, whether this confidence is increasing uniformly across all demographic categories, or if certain groups are not yet experiencing the effects of the reforms; and (3) they provide one measure among many of whether the agreement has achieved its goals.  These survey results are regularly made public during the course of the implementation of those agreements.  *See, e.g.*, publicly available community surveys, *supra* note 2.  Contrary to Defendants' assertions, making these survey results accessible to the public has not frustrated the purpose of any of those decrees; instead, they have demonstrated the progress those agencies have made in implementing their respective agreements and the improvements in community confidence in those agencies.  *See, e.g.*, Bryian Stryker, Seattle Police Community Trend Survey 1 (Oct. 18, 2016) (comparing the 2013 and 2016 surveys, finding "The Seattle Police Department's performance rating continues to improve."), *available at* Seattle Police Monitor, Reports & Resources:  Assessments of Community Perceptions – October 2016 Survey, http://www.seattlemonitor.com/reports-resources.

Consistent with the United States' experience in other cases, public disclosure of the survey results was the norm in this case until Defendants' recent reversal.  Almost two years ago, Defendants admitted that "[t]he language and purpose of the [consent decree] therefore support

6

the unsealing." ECF 785.  Less than a year ago, the Commissioner of PRPB reaffirmed the importance of reporting the surveys to the public.  Commissioner Ltr. at 3.  Indeed, Defendants worked collaboratively with the Monitor's Office to design and perform the surveys, see, e.g., Tr. 74:10-25, ECF 992, raised no concerns when the former Monitor filed the results of the first survey in August 2016 for public viewing, ECF 406-1, and jointly moved the Court along with the United States to make the results of the second survey available to the public.  ECF 785.  The Court, relying on the Parties' positions in that joint motion, ordered that the survey results be made public, and posted the results on its website.  ECF 786.

Despite its past course of conduct and representations to the Court in this case, Defendants now suggest that the appointment of new counsel allows them to revisit the issue and take the opposite position.  Defs.' Mot. 4.  This argument fails for two principal reasons.

First, change of counsel, alone, is insufficient grounds to allow Defendants to reverse their position now.[4]  *See Roman-Oliveras v. P.R. Elec. Power Auth.*, No. CV 07-1498 (GAG), 2013 WL 12200097, at *2 & n.1 (D.P.R. June 24, 2013); *aff'd*, 797 F.3d 83 (noting that a party is bound by previous counsel's representations that settlement was reached).  Here, too, the Parties agreed that public disclosure of the survey results advances the purpose of the Agreement and jointly moved the court to make the results public.  ECF 785.  The Court acted on the Parties' joint representations in ordering the court clerk to unrestrict the second survey.  Order, ECF 786.

Second, by joining the motion to unrestrict the second survey, Puerto Rico helped create law of the case in favor of keeping the survey results public.  *See* Order, ECF 786; *Ellis v. United*

---

[4] Attorneys for the Puerto Rico Department of Justice, led by the former Justice Secretary who is now serving as Puerto Rico's Governor, represented Defendants at that time for what current counsel now calls a "misguided request."

7

*States*, 313 F.3d 636, 646 (1st Cir. 2002) ("[A] court ordinarily ought to respect and follow its own rulings, made earlier in the same case.") (citing *Arizona v. California*, 460 U.S. 605, 618 (1983)).  A court should not disturb its prior rulings in a case absent compelling reasons for doing so, because it upsets the settled expectations of the parties and encourages re-litigation of already decided issues.  Defendants offer no compelling reason to reverse the Court's prior rulings on the survey results, and instead should be bound by their previous representations.

In support of their contention that public disclosure of the survey results would frustrate the Agreement, Defendants rely on two inapposite cases.  In *Bolden v. Pa. State Police*, defendants changed its process for hiring officers after entering into a consent decree in a way that would delay the achievement of certain objectives of the decree by over a decade, and the court considered proposed modifications in response.  73 F.R.D. 370, 372 (E.D. Pa. 1976).  Here, no change in facts has fundamentally altered the Agreement with respect to the survey, and no Party requests modification.  In *Seattle Times Co. v. Rhinehart*, the controversy was over whether documents produced during discovery that were subject to a protective order should be made public.  467 U.S. 20, 33 & n.19 (1984).  The Supreme Court examined the interests served by a protective order under Rule 26 compared to an interest in accessing the information under the First Amendment.  Here, there is no protective order in place to prevent disclosure of the survey results, so there is nothing to balance against the interest in public access.  On the contrary, public disclosure of the survey results is consistent with the terms and purposes of the Agreement.[5]

---

[5] Defendants also allege that Dr. Blanco-Peck is biased against PRPB because of his prior employment with the University of Puerto Rico (UPR), and that this bias has undermined the survey results.  Defendants did not raise an allegation of bias against Dr. Blanco-Peck during his vetting and appointment or after the publication of his previous survey reports.  For instance, during the August 2018 public hearing, the Court specifically referenced Dr. Blanco-Peck's

Public disclosure of the survey results is consistent with the purposes of the Agreement and the Parties' settled expectations in this case, and the Court should therefore reject Defendants' Motion to Restrict Surveys and affirm its prior decision to make the survey results publicly available.

### B. As the Parties Agreed and the Court Endorsed, the Surveys Are Judicial Records that Carry a Strong Presumption of Public Access.

The results of the Monitor's surveys are also judicial records that are presumptively publicly available, as the Parties previously represented to the Court before it decided to make the results of the second survey available in 2018. By the terms of the Agreement, the surveys assess PRPB's "overall compliance with and the effectiveness of" the Agreement. Agreement ¶ 241. Defendants concede as much, acknowledging the surveys are a tool for the Parties, the Monitor, and the Court "to evaluate the PRPB's performance and compliance with the terms of the Reform Agreement," and relate to the Court's "role in the enforcement of the consent decree." Motion to Restrict Surveys 4, 6. Because the surveys are "relevant to [the Court's] judicial activities," and can be considered "for the purposes of ruling on an enforcement motion brought by either of the parties," it qualifies as a judicial record. *United States v. Erie County*, 763 F.3d 235, 240 (2d Cir. 2014); *see United States v. Kravetz*, 706 F.3d 47, 54 (1st Cir. 2013) (holding "judicial records" are those that can have an impact on a party's substantive rights or which might be relevant to the adjudication process). Defendants cite *Chao v. Estate of*

---

affiliation with UPR to highlight the cost-savings associated with using Puerto Rico's flagship public university for the surveys: "Let me also note that the budget for this[,] Dr. Blanco-Peck works for UPR so rather than using one of these consulting groups that would cost, you know, 300,000 to do this, it's a very – it's a di minumus cost and it's paid with the TCA's funds." Tr. 75:9-13, ECF 992. Defendants also rejected an offer to speak with Dr. Blanco-Peck to explore their alleged concerns. Despite reference to civil rights disputes between members of UPR in general and PRPB, Defs.' Mot. 9-10, Defendants provide no specific evidence that Dr. Blanco-Peck is biased against PRPB.

*Fitzsimmons*, which further supports the proposition that judicial records include filings "that needed to be followed as part of the monitoring of compliance with the Consent Decree." No. 1:78-cv-00342, 2004 WL 3094821, at *1 (N.D. Ill. Dec. 9, 2004).

In addition, this is a case between two public entities—two governments—about a matter of significant public concern. *See In re Providence Journal Co., Inc.*, 293 F.3d 1, 9-10 (1st Cir. 2002) (holding the public has a presumptive right to judicial records). As the Second Circuit succinctly put it regarding a dispute over the public disclosure of monitoring reports: "[E]very aspect of this litigation is public. The United States Department of Justice is a *public* agency, which brought a claim before a *public* court, the District Court . . . , arguing that a *public* government . . . failed to meet constitutional requirements in operating" its law enforcement agency. *Erie County*, 763 F.3d at 241 (emphasis in original). In the same vein, this Court has found that there is "great public interest in the Police Reform Process." Order 1, ECF 726. "No party in this case should be surprised by the breadth and depth of public interest." *P.R. Land & Fruit, S.E. v. Municipio de Culebra*, No. CV 09-2280 (ADC/BJM), 2019 WL 3987751, at *2 (D.P.R. July 23, 2019), *report and recommendation adopted,* 2019 WL 3996731 (D.P.R. Aug. 22, 2019) (applying *Erie County*'s analysis, ordering unsealed a court-monitored settlement agreement). The common law presumption of public access is therefore particularly applicable here, where public accountability of two public entities on a matter of significant public interest is at issue.

Defendants have not articulated any concern, such as privacy, business, or safety, that could overcome the common law presumptive right to access the survey. Without any specific concern, Defendants have not met their burden to keep the surveys hidden from the public, and the surveys should remain accessible to the public as judicial records.

## III.     CONCLUSION

For the foregoing reasons, Defendants' Motion to Restrict Surveys should be denied.

WE HEREBY CERTIFY that on today's date, we filed the foregoing pleading electronically through the CM/ECF system, which caused the parties, counsel of record, and the Acting Monitor on the service list to be served by electronic means.

Respectfully submitted, this 10th day of February, 2020,

**STEVEN H. ROSENBAUM**
Chief, Special Litigation Section
Civil Rights Division

*s/ Jorge M. Castillo*
**TIMOTHY D. MYGATT**
Deputy Chief
**LUIS E. SAUCEDO** (G01613)
Counselor to the Chief
**JORGE CASTILLO** (G02912)
Trial Attorney
U.S. Department of Justice
Civil Rights Division
Special Litigation Section

950 Pennsylvania Avenue, NW
Washington, DC 20530
Telephone: (202) 598-0482
Fax: (202) 514-4883
luis.e.saucedo@usdoj.gov
jorge.castillo@usdoj.gov

Attorneys for Plaintiff