# First Report of the Federal Monitor

March 2020, Covering October 2018 through June 2019

Compliance status of the Puerto Rico Police Bureau in accordance with the Federal Court approved Settlement Agreement between the United States Department of Justice and the Commonwealth of Puerto Rico

John Romero
Federal Monitor

# Table of Contents

EXECUTIVE SUMMARY ..................................................................................................................... 3

INTRODUCTION .............................................................................................................................. 7

MONITOR'S ASSESSMENT OF PRPB POLICIES AND PROCEDURES ............................................... 10

QUANTITATIVE ANALYSIS OF PRPB USE OF FORCE INVESTIGATIONS ......................................... 13

QUALITATIVE ANALYSIS OF PRPB USE OF FORCE INVESTIGATIONS............................................. 22

QUALITATIVE ASSESSMENT OF PRPB CROWD CONTROL POLICIES AND PERFORMANCE DURING MAY 1, 2019 MASS
       DEMONSTRATION .............................................................................................................. 37

QUALITATIVE ASSESSMENT OF PRPB INFORMATION SYSTEMS AND TECHNOLOGY DEVELOPMENT....................................... 41

CONCLUSIONS................................................................................................................................ 44

APPENDIX A: BACKGROUND TO THE PRPB MONITORING MISSION ........................................... 47

APPENDIX B: METHODOLOGY....................................................................................................... 50

APPENDIX C: COMPLIANCE STATUS TABLES FOR POLICIES AND PROCEDURES........................... 53

APPENDIX D: PERSISTENT PROBLEMS WITH UOF INVESTIGATION OF OFFICER-INVOLVED SHOOTINGS ............................... 59

# Tables and Figures

Table 1: General Orders Adopted by PRPB............................................................................... 11

Table 2: Compliance Status for Paragraphs Addressing Policy and Procedure ...................... 11

Table 3: Officer-Involved Shootings by the Numbers ............................................................. 15

Table 4: Compliance Status for Paragraphs Addressing Use of Force ................................... 35

Table 5: Compliance Status for Paragraphs Addressing Information Technology................... 43

Table 6: Policies sampled for analysis in the First Report of the Federal Monitor ................ 53

Table 7: Paragraph 109 Compliance Assessment ................................................................... 55

Table 8: Paragraph 110 Compliance Assessment ................................................................... 55

Table 9: Paragraph 111 Compliance Assessment ................................................................... 55

Table 10: Paragraph 112 Compliance Assessment ................................................................. 56

Table 11: Paragraph 113 Compliance Assessment ................................................................. 56

Table 12: Paragraph 114 Compliance Assessment ................................................................. 57

Table 13: Paragraph 115 Compliance Assessment ................................................................. 57

Table 14: Paragraph 116 Compliance Assessment ................................................................. 58

# Executive Summary

This is the first report of the Monitor's Office outlining the current compliance levels of the Puerto Rico Police Bureau in relation to the Consent Decree entered into between the United States and the Commonwealth of Puerto Rico. This report is the first assessment following the four-year capacity building period established by the decree that ran from June 2014 to October 2018 and covers the period from October 2018 through June 2019.

The report provides the Monitor's assessment of three substantive areas of performance: 1) policies and procedures, 2) use of force, including a) officer-involved shootings and b) PRPB response to the May 1, 2019 mass demonstration, and 3) information technology. Appendix B defines the assessment ratings and outlines methodology used to assess compliance. The next compliance assessment period will run from June 2019 to March 2020, and along with future reports will assess all remaining performance areas of the Consent Decree.

## Policies and Procedures

One of the first steps taken by the Bureau to implement reforms was to develop and promulgate sound policies and procedures that we consider to be consistent with broadly accepted police standards in the United States. The PRPB undertook a massive commitment of effort and resources to draft over one hundred fifty new policies and procedures, as well as to train and certify officers regarding the same. We praise this effort, and we find PRPB to be in Substantial Compliance with the requirement to draft new policies. Training on policies will be assessed in future reports. Appendix C outlines the compliance status for all policies assessed as part of the report.

| Paragraph | Stipulations | Monitor's Rating |
|-----------|--------------|------------------|
| 109 | Comprehensive policies | Substantial Compliance |
| 110 | Department-wide policy manuals | Partial Compliant |
| 111 | Unit-level policy manuals | Partial Compliance |
| 112 | Initial internal policy review | Substantial Compliance |
| 113 | Bi-annual internal policy review | Substantial Compliance |
| 114 | Training on all new policies | Substantial Compliance |
| 115 | Documentation of all trainings | Substantial Compliance |
| 116 | Notice of disciplinary action for non-compliance | Substantial Compliance |

3

## Use of Force

The PRPB created a Force Investigation Unit (FIU) to address all incidents in which PRPB personnel use deadly force in the line of duty. While the Monitor's office is encouraged by the policy to create the FIU, by the training and deployment of FIU investigators across Puerto Rico, and by their efforts to investigate both intentional and accidental firearms discharges involving PRPB personnel, we have very serious concerns in the thoroughness of FIU investigations and accuracy of their conclusions. An example of the above can be verified by the fact that a significant proportion of FIU reports rely solely on police witnesses, and rarely incorporate interviews with or observations from unbiased civilian witnesses as mandated in a proper investigation. In addition to the above, we have also assessed that the investigative practices followed by the FIU lack objectivity and therefore we opine that PRPB is only in <u>Partial Compliance</u> regarding Use of Force.

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 36 | Develop use of force policy | Substantial Compliance |
| 37 | Report all use of force in writing | Partial Compliance |
| 38 | Provide medical service for all injuries stemming from UOF | Substantial Compliance |
| 39 | Written reports of UOF submitted to supervisors | Partial Compliance |
| 40 | Force Review Boards to determine if UOF was justified | Substantial Compliance |
| 41 | Create a reliable tracking system for UOF | Partial Compliance |
| 42 | UOF reviews to be included in performance reviews | Rating Deferred |
| 43 | Supervisors to respond to scene of any excessive UOF | Substantial Compliance |
| 44 | Supervisors to review all excessive UOF or injury | Substantial Compliance |
| 45 | Supervisors to complete and submit reviews within 5 days | Partial Compliance |
| 46 | Force Review Boards to review supervisory reviews | Rating Deferred |
| 47 | Reviewing officers to notify their supervisors of misconduct | Rating Deferred |
| 48 | Force Review Boards to be composed of qualified personnel | Partial Compliance |
| 49 | Supervisors to report all serious UOF to Force Review Board | Substantial Compliance |
| 50 | FIU to immediately notify PRDOJ of any criminal conduct | Partial Compliance |
| 51 | FIU to conclude investigation & report result within 45 days | Partial Compliance |
| 52 | Superintendent's FRB shall evaluate all FIU investigations | Partial Compliance |

## Qualitative Assessment of PRPB Crowd Control Policies and Performance During May 1, 2019 Mass Demonstration

In relation to Use of Force, the Monitoring Team was presented with an opportunity to witness PRPB deployment for crowd control during a May 1, 2019 demonstration in *Milla de Oro*, San Juan, Puerto Rico. The PRPB responded to the event with appropriate actions aimed at ensuring protestors' right to free expression in a civil environment. Acting in

line with their deployment plan and applicable policies and procedures, the PRPB established a positive dialogue with the organizers and participants of the event. Additional documents were provided to the Monitoring Team during the preparation of the present report, allowing the Monitor to conclude that PRPB's crowd control response to this incident was consistent with existing policies. This observation of one incident is not intended as an assessment of PRPB's broader crowd control policies, which will be assessed per the full methodology in later reports.

## Information Technology

With regard to PRPB's Information Technology (IT) and Systems implementations, we assess that the PRPB remains appreciably behind other US police agencies of comparable size and geographic responsibility. PRPB had yet to deploy and fully integrate transformational systems such as Computer Aided Dispatch (CAD) and Records Management Systems during the assessment period. These two IT platforms alone would create significant gains in management, analytics, innovation and crime fighting. Delays in establishing both machine and human analytical capacity adversely impact PRPB's ability to capture and analyze operational policing data in near-real time. In light of the above and in regard to the gains to be realized in public safety planning, operations and problem solving, the PRPB would greatly benefit by dedicating substantial resources to IT development in order to achieve the capacity to efficiently assess their own compliance with the Agreement. Therefore, we find that the PRPB is in <u>Partial Compliance</u> with regard to the agreement as it pertains explicitly to the availability of IT.

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 218 | Establish IT infrastructure | Partial Compliance |
| 219 | Collect and maintain records necessary for implementing the Agreement and performing duties | Partial Compliance |
| 220 | Develop protocols for collecting, analyzing, and reporting information | Partial Compliance |
| 221 | Develop and maintain a record management system | Partial Compliance |
| 222 | Provide supervisors with handheld recording devices | Non-Compliant |
| 223 | Access to National Crime Information Center data | Non-Compliant |

In Summary, the PRPB has demonstrated a commitment to reform during the four-year "capacity-building" period of the Agreement. This commitment notwithstanding, the PRPB still lags behind the performance benchmarks outlined in the Agreement. The Monitor expects PRPB to achieve significant progress in the upcoming year. The Monitor's recommendations are summarized in the table below.

| Para | Stipulations | Recommendations |
|---|---|---|
| 37 | Report all use of force in writing | Additional training and supervision be given and provided by the PRPB to its officers and front-line supervisors to eliminate the boilerplate and stereotype language from these incident reports. |
| 39 | Written reports of UOF submitted to supervisors | PRPB instruct officers to ensure that their Use of Force Reports are written in block letters, until such time as they are prepared on a wholly digital platform. |
| 41 | Create a reliable tracking system for UOF | PRPB make all possible effort to ensure that FIU investigations receive all relevant evidence, including video and photographic evidence, before reaching a determination as to whether a shooting was within policy. Furthermore, the Monitor recommends that PRPB reevaluate all FIU investigations in order to incorporate new data that has been received after the FIU investigations reached their conclusions. |
| 50 | FIU to immediately notify PRDOJ of any criminal conduct | |
| 51 | FIU to conclude investigation & report result within 45 days | |
| 52 | Superintendent's FRB shall evaluate all FIU investigations | |
| 45 | Supervisors to complete and submit reviews within 5 days | PRPB take advantage of this procedural opportunity offered by the Agreement to assure quality and thoroughness in these crucial investigations, while at the same time actively seek to learn lessons or identify their standard practices in these incidents. |
| 48 | Force Review Boards to be composed of qualified personnel | PRPB members be proactively trained and that a practical training curriculum be updated and given to the FIU in light of these findings. |
| 110 | Department-wide policy manuals | PRPB take active measures to ensure that department-wide and unit-level policy manuals are made available in hard copy to all PRPB personnel |
| 111 | Unit-level policy manuals | |
| 218 | Establish IT infrastructure | PRPB invest in both IT resources and IT skilled subject matter experts to better provide PRPB with the ability to continue its quest for the systems and data it requires both to police more effectively and track its compliance with the Agreement. |
| 219 | Collect and maintain records necessary for implementing the Agreement and performing duties | |
| 220 | Develop protocols for collecting, analyzing, and reporting information | |
| 221 | Develop and maintain a record management system | |
| 222 | Provide supervisors with handheld recording devices | |
| 223 | Access to National Crime Information Center data | |

## Introduction

This report will outline the current compliance status of the Puerto Rico Police Bureau (hereafter "PRPB" or "the Bureau") with the Federal Court approved Settlement Agreement (hereafter the "Agreement" or "Consent Decree"). This report was prepared by the Technical Compliance Advisor (hereafter "Monitor") pursuant to paragraphs 242, 251, and 252 of the agreement to inform the Court, the parties and residents of the Commonwealth about the status of the implementation and compliance with the Agreement. The Monitor's Office (or "Monitoring Team") will make itself available to the Court, the parties, and community groups to explain the Monitor's findings and the compliance assessments presented in the report.

By virtue of the Agreement, the Commonwealth of Puerto Rico and the Government of the United States are committed to promoting effective, transparent and constitutional policing practices in Puerto Rico. It is challenging to effect institutional change within an organization the size of the Puerto Rico Police Bureau, one of the largest police agencies in the United States. The PRPB has demonstrated a commitment to reform which the Monitoring Team has witnessed first-hand during the four-year "capacity-building" period of the Agreement. The men and women of the PRPB clearly understand their responsibility to provide the residents of Puerto Rico with constitutionally sound community police practices. This commitment notwithstanding, the PRPB still lags behind in relation to the performance benchmarks outlined for the above-mentioned period in the Agreement. Nevertheless, the Monitor expects PRPB to achieve significant progress in the upcoming year.

The Agreement was fashioned to provide PRPB officers with the tools, guidance and resources that they need to fight crime effectively and reform old unconstitutional practices. The Parties both recognize that constitutional policing and the community's trust in its police force are interdependent. Accordingly, the full and sustained implementation of the Agreement will guarantee constitutional rights, and correspondingly increase public confidence in the PRPB and its officers. In addition, and perhaps most importantly, the Agreement also aspires to develop on the part of the PRPB, a dynamic leadership and management skills aimed at transforming the bureau for the benefit of all who reside in or visit the Commonwealth.

In a joint effort, the parties identified each of the following areas for improvement, enhancement or reform in the PRPB. All of these relevant areas are specifically mentioned in corresponding paragraphs in the Agreement:

7

(1)   Professionalization;
(2)   Use of Force;
(3)   Searches and Seizures;
(4)   Equal Protection and Non-Discrimination;
(5)   Recruitment, Selection and Hiring;
(6)   Policies and Procedures;
(7)   Training;
(8)   Supervision and Management;
(9)   Civilian Complaints, Internal Investigations and Discipline;
(10)  Community Engagement and Public Information; and
(11)  Information Systems and Technology.

To carry out the above reforms, PRPB developed Action Plans for each of these substantive areas. These Action Plans set forth in detail the steps agreed upon to execute and implement the reforms and achieve the desired outcomes in each area. Moreover, the above reforms also require the implementation of new or amended policies, practices, training, corresponding documentation, internal review, and the monitoring of sustainable compliance fall within the scope of objective oversight, analysis and reporting of the Monitor.

The collection, analysis, reporting and public dissemination of data regarding the ongoing PRPB sustainable reform efforts was designed to ensure public accountability, and to promote trust in the PRPB. Therefore, the Agreement not only requires timely reporting and publication of the objective standards for compliance, it also calls for frequent reporting on the present status of police reform efforts, as well as the milestones reached or impediments that might be encountered by the PRPB during the duration of the Agreement.

During the capacity-building period, the Monitor assessed compliance based on the Commonwealth's own Action Plans, pursuant to Paragraph 240 of the Agreement. With the end of the capacity-building period, however, the compliance orientation has changed. Beginning with this report, the Monitor will assess PRPB compliance in relation to the Agreement.

## Scope of the Monitor's First Report

The Chief Monitor's First Report covers the time period between October 2018 and June 2019. Pursuant with the directives of the Court, the report is limited in scope to three of the eleven performance areas outlined in the Agreement. The areas assessed in this report include: 1) Policies and Procedures, 2) Use of Force (limited to firearm discharges

and crowd control), and 3) Information Technology Development. Future reports will address all other performance areas, as well as those covered in the present report, on a semiannual basis as outlined in the Agreement.

In this report, the Monitor's Office presents its objective assessment based on a desk review of manuals and documentary data provided by PRPB, and as well as site visits to witness, investigate and inform the current state of information technology development. Our assessment regarding PRPB crowd control practices are based on first-hand observations made by the Monitoring Team of the PRPB handing of the May 1, 2019 mass demonstration, as well as documents furnished by PRPB in relation to the event.

It is important to note, that in addition to our monitoring role, our team is comprised of subject matter experts with decades of experience drawn from police agencies across the United States. As such, we feel compelled in the spirit of collaboration and expert assistance to propose recommendations or suggestions as to how the PRPB can achieve a "pathway to compliance, and ultimately to sustainable compliance."

To this end, the Monitoring Team's November 2019 site visit to Puerto Rico was extremely constructive for the preparation of the present report. In many cases, the site visit led to the discovery of significant material that demonstrated the Bureau's compliance with the Agreement, including photographic and video evidence contained within FIU files that had not initially been shared with the Monitor's Office. The site visits also allowed the monitoring team to better assess the institutional impediments that prevented the sharing of information between the CIC and FIU, and the vital element of SFRB compliance mandated in the Agreement.[1] Overall, the information obtained during the November 2019 site visit led to a far *more favorable* review of PRPB's Use of Force practices, which underscores the importance of frequent site visits by the Monitoring Team.

---

[1] PRPB has limited ability to provide the Monitor's Office with digitized data and complete information in a timely manner. Valid assessment requires complete data, and to present assessments on incomplete data would be to do a disservice to the Court, the parties, and the public. Until complete and comprehensive data can be available for remote desk review by the Monitoring Team, all Parties can expect at a minimum, monthly site visits by the Monitoring Team.

## Monitor's Assessment of PRPB Policies and Procedures

The Monitor's overall assessment of PRPB policies and procedures ("P&P") finds substantial levels of compliance with the Agreement. The monitor further finds that this level of compliance is, to a large degree, due the extended capacity-building period granted to PRPB under the Agreement, which the PRPB used to undertake significant modernization and professionalization in close collaboration with the Monitoring Team. Nevertheless, there are still significant areas of partial or non-compliance with the Agreement, including requirements that PRPB incorporate all policy and procedure changes into manuals and make all such documents available to the Monitor for review.

Over the course of the capacity-building period and the monitoring period for the Monitor's First Report, the Monitor's Office reviewed a total of 154 policy documents. Of these, 131 one documents were directly related to the Consent Decree and addressed requirements of the Decree. The Monitor sought all required Policy and Procedure documents prior to the November 2019 site visit, but was met with initial delays in the delivery of all required documents. Consequently, the Court issued the Monitor an extension for the completion of this report beyond the 2019 calendar year. This extension allowed sufficient time for PRPB to deliver all requested documents, and for the Monitoring Team to assess them.[2]

During that period of extension, the PRPB provided a document entitled *Reform Policies in Accordance with the Agreement*, which outlined P&P revisions in response to our requests for this data. This document outlines 131 P&P items related to the Agreement, organized into the following categories: General Orders (by area), Glossaries, Manuals, Protocols and Regulations. The Monitoring Team counts 130 items as related, however, and our office sampled 26 for our P&P assessment.

The Monitoring Team used this document to draw a random sample of twenty-six (26) out of the 130 total documents, which represents 20% of all Reform P&P and corresponds with the methodology agreed to by the parties and approved by the court. For the purpose of selecting this random sample, the Monitor's office selected every fifth item, beginning with the first item on the document list. The details of that sample are outlined in Table 1, and a full analysis of each P&P item is presented in Appendix C.

---

[2] The Monitor's Office expects that the issues causing delays in the delivery of policies and other materials will be resolved for future reports, preempting the need for similar extensions. Due to these delays and time constraints in the preparation of CMR-1, some findings are based on a provisional implementation of the monitoring methodology; future monitor reports will substantiate the Monitor's assessment with a full implementation of the Agreement methodology

TABLE 1: GENERAL ORDERS ADOPTED BY PRPB

| Type of Policy Item | Subject | Number of Items | Number Reviewed | Level of Compliance |
|---|---|---|---|---|
| General Orders, Chapter 100 | Organizational Structure | 33 | 5 | Substantial |
| General Orders, Chapter 200 | Administration | 3 | 1 | Deferred |
| General Orders, Chapter 300 | Personnel | 7 | 3 | Substantial |
| General Orders, Chapter 400 | Technology | 7 | 1 | Substantial |
| General Orders, Chapter 500 | Boards and Committees | 3 | 0 | Deferred |
| General Orders, Chapter 600 | Operational | 39 | 9 | Substantial |
| General Orders, Chapter 700 | Training | 5 | 1 | Substantial |
| General Orders, Chapter 800 | Community Affairs | 3 | 0 | Deferred |
| Glossaries | | 2 | 0 | Substantial |
| Manuals | | 20 | 5 | Substantial |
| Protocols | | 1 | 0 | Unknown |
| Regulations | | 7 | 1 | Deferred |
| **Total** | | **130** | **26 (20%)** | |

Monitors were assigned to review each of the 26 documents and determine the level of compliance based on the following criteria: 1) Was the document promulgated within the corresponding deadline? 2) Was the document reviewed by PRPB within the timeframe established by the Agreement? 3) Does the substance of the document comply with the language of the Agreement (paragraphs 109-116) and with broadly accepted policing standards? The subject matter experts on the Monitoring Team evaluated the content of each selected policy to ensure that it was broadly consistent with the language of the decree and with widely-used policing standards.

Table 2 below and the related tables in Appendix C outline PRPB's compliance with P&P according to the relevant paragraph.

TABLE 2: COMPLIANCE STATUS FOR PARAGRAPHS ADDRESSING POLICY AND PROCEDURE

| Paragraph | Stipulations | Due Date | Monitor's Rating |
|---|---|---|---|
| 109 | Comprehensive policies | Various | Substantial Compliance |
| 110 | Department-wide policy manuals | Capacity-building period | Partial Compliance |
| 111 | Unit-level policy manuals | Various | Partial Compliance |
| 112 | Initial internal policy review | Various | Substantial Compliance |
| 113 | Bi-annual internal policy review | Various | Substantial Compliance |
| 114 | Training on all new policies | Various | Substantial Compliance |
| 115 | Documentation of all trainings | Various | Substantial Compliance |
| 116 | Notice of disciplinary action for non-compliance with new policies. | Various | Substantial Compliance |

In sum, the Monitor finds that the **PRPB is in compliance with 6 out of 8 paragraphs of the Agreement that address P&P**. The monitor recommends that PRPB take active measures to ensure that department-wide and unit-level policy manuals are made available in hard copy to all PRPB personnel.

## Quantitative Analysis of PRPB Use of Force Investigations

The sanctity of human life and the guarantee of civil rights is of the utmost importance in American society. The gravest action a police officer may take is to use a firearm and apply a level of force that could cause devastating bodily injury, or worse, end a person's life. All PRPB officers are trained and authorized to carry firearms in the course of their service to the public, and all are aware that any firearms use commands a commensurately high level of responsibility and accountability. The PRPB has publicly affirmed its commitment to investigate all uses of deadly force by a PRPB officer thoroughly. To that end the Bureau, by way of General Orders (G.O. 100-113 & G.O. 500-502,) created the Force Investigation Unit (FIU) and the Force Review Board ("SFRB").

Having reviewed the work of the FIU, however, the Monitor concludes that there are significant shortcomings in Use of Force Investigations. In support of this conclusion, we note that many cases lack any crime scene sketches or diagrams, ballistics trajectories or analysis of ballistics and firearms evidence collected. Similarly, slightly less than half of the cases contained photographic and/or video evidence of evidentiary value. Such pieces of evidence are essential to the work of the FIU, as they would provide crucial support for conclusions made of either justifiable or non-justifiable use of deadly force by a PRPB officer.

Unfortunately for most cases, this photographic and/or video evidence appears to have not been available to FIU investigators prior to the conclusion of their investigations. The Monitoring Team became aware of this apparent lag during the November 2019 site visit, which uncovered significant photographic and video evidence that had not been shared with the Monitor's Office previously, but had since been included in FIU investigation files. We noted that in a small number of cases (5), the record was unclear as to whether the photo or video evidence was received prior to concluding the FIU investigation.

The Monitor cannot reach a determination as to why this material was not originally made available to the Monitor's Office, but we suspect that it was merely due to the lag that FIU investigators face in receiving data from the relevant actors within and beyond the PRPB. Given that much of the evidence uncovered during the November 2019 site visit led to a more favorable review of PRPB UOF practices, the Monitor has no reason to believe that this data was intentionally withheld. Even if looking at these cases in a light most favorable to the PRPB, we must still conclude with certainty that 60% of the cases closed by FIU contain no video or photographic evidence, and we recommend that these cases be reevaluated by PRPB in light of the new evidence contained within FIU files.

We have seen no unilateral information sharing from PRPB criminal investigative entities, such as Homicide or CIC more broadly (of which Homicide is a part), to FIU or the SFRB. It is well settled that the criminal side of internal police investigations may freely share information with administrative investigators, (see, <u>Garrity v. United States</u>, 385 U.S. 493, 1967). Under Garrity, which is referenced in paragraph 47 of the Agreement, a one way sharing of information from the criminal side to administrative (FIU, in this case) is clearly permissible and ought to be consistently and expeditiously facilitated.

PRPB General Order 114 states:

> *…when the Assistant Superintendence in Responsibility requests documents from any of the Agency's work units, they will be supplied immediately, without entering into the merits of the investigation or of the person who is the subject of the investigation within the framework of total confidentiality, by means of a verbal or written communication by the investigator.*[3]

General Order 114 ("G.O.114") is very clear and broad in its apparent inclusion of the entire PRPB and the various departments and subsections that belong to it. An FIU investigator is a part of SARP, and upon that investigator's written or verbal request, information from any branch of the PRPB shall be supplied immediately to said investigator.

PRPB criminal investigators, specifically from the CIC and Homicide, should have access to a broad array of data that could shed light on cases where they may have involvement. We surmise that as the principal investigator, Homicide must have copies of documents crucial to the investigation such as crime scene diagrams, measurements, supplementary photographs, witness statements, suspect statements, and the results of a variety of forensic examinations conducted by the *Instituto de Ciencias Forenses* ("ICF"). All of these information sources are extremely useful for transparent and constructive investigative purposes in any given case. The rules set forth in Garrity, in by G.O.114 mandate that CIC, or for that matter, any branch of the PRPB must share these documents diligently with FIU.

---

[3] Original text in Spanish: "…cuando la Superintendencia Auxiliar en Responsabilidad solicite documentos a cualquier unidad de trabajo de la Agencia, estos serán suministrados de manera inmediata, sin entrar en los meritos de la investigacion o de la persona que es objeto de la investigacion dentro del marco de total confidencialidad. Para ello mediara una comunicacion verbal o escrita por parte del investigador. <u>PRPB General Order 114, Section 5, #2.</u>

Failure to encourage, or to impede taking advantage of this unilateral information sharing mandate, is to deny the FIU or SFRB valuable evidence which can support their conclusions as to justifiability, to identify procedural errors or identify errors in training.

Reviewing these cases through the experienced eyes of subject matter experts, the Monitor must conclude that there were likely gaps either in the investigative formative curricula, in the delivery of that curricula, or in practical learning pedagogy, or in all three. We also surmise that there are internal barriers within the PRPB that act as obstacles to sharing this important data with FIU investigators. Lastly, regarding FIU capacity, we hold the position that the number of FIU-certified officers is insufficient to investigate these incidents properly and continuously across the island. The recruitment and training of new FIU certified officers should be a high priority for the PRPB.

## Quantitative Analysis

Over the period of time examined for this report, there were a total of 48 officer-involved shootings, 24 of which involved multiple officers. Table 3 below presents the breakdown of officer-involved shootings by number of officers involved. It must be noted, however, that these discrepancies among the numbers presented in different documents provided to the Monitor by PRPB:

TABLE 3: OFFICER-INVOLVED SHOOTINGS BY THE NUMBERS

| Number of Officers per Incident | Number of Incidents |
|---|---|
| 1 Officer | 24 |
| 2 Officers | 15 |
| 3 Officers | 5 |
| 4 Officers | 2 |
| 5 Officers | 2 |
| **Total: 87 officers involved in 48 incidents** | |

While designing the desk analysis worksheets designed to quantitatively measure compliance with the Agreement, we specifically cite *Reglas para el Uso de Fuerza por Miembros de la Policía de Puerto Rico*, General Order 601. We concentrated our assessment on eighteen (18) factors that could be clearly quantified by reviewing the content of each investigative file. The above factors and our corresponding quantitative analysis are as follows:

*a. Was the notification (of use of deadly force) made (to FIU) within one hour?*

In 44 out of 48 cases (92%) the notification to FIU of the use of deadly force was made in accordance with PRPB policy. The above policy compliance is highly favorable and suggests substantial compliance.

### b. Did FIU decline to respond (to the scene)?

We found absolutely no "non-response" on the part of FIU to any scene where deadly force was applied.

### c. Was the Use of Force Report completed by the officer(s) involved prior to the completion of the officer(s)' shift?

Forty seven (47) out of forty eight (48) (98%) of Use of Force Reports were completed before the end of the officers' shift. That said, there were some Use of Force reports submitted by off-duty police officers who were not on active duty at the time force was used by the officer. The goal of the above sensitive mandate was to ensure timely reporting. Consequently, we identify positive signs of substantial policy compliance.

### d. Was the 45-day rule extended for any reason, (if so,) What was the justification?

The purpose of this inquiry was to measure overall compliance with the 45-day deadline for FIU to report its findings internally, and in the cases where an extension may have been necessary, to ensure that the extension was justifiable, granted for valid reasons. In our evaluation our Team found that 11% of Use of Force investigations did not meet the 45-day mandatory deadline. In the Qualitative Analysis segment of this report, we discuss the objective validity of all granted extensions.

### e. Did the investigation verify the duty status of the subject officer(s)?

The duty status of every officer involved in each shooting was duly verified in all 48 cases that we reviewed.

### f. Were PRPB Academy training records checked to see if the officer received Use of Force training within the past two years?

In 73% of the cases we reviewed, the investigation revealed that the officer had received Use of Force Training. In over a quarter of these cases, we have no indication in the file that the officer has received the updated and mandatory force training. The actual percentage of officers who have received the training may be even higher, but the information received by the Monitoring Team did allow us to verify the exact figure. The majority of cases show documents from FIU to the

Academy seeking the training. Nevertheless, it is extremely difficult to reconcile the above with the absence of documents confirming baseline training in so many incidents of deadly force.

### g. Were PRPB Academy training records checked to see whether the officer was qualified with the firearm that was discharged?

In 81% of the cases, Academy records show that the officers were proficient with the weapon that was used in the incident. The above statistic demonstrates improvement in the Use of Force Policy Training. Nevertheless, the remaining 19% for whom there is no such record speaks to remaining deficiencies that need to be addressed.

### h. Did FIU investigate whether officer(s) not in uniform identified themselves as police officers?

In 92% of the cases that FIU investigated, the police officer (if not in uniform) identified himself as a police officer. In the remaining 8% of cases, officers did not have the opportunity to identify themselves given the exigent circumstances.

### i. Were efforts made to locate any potential witnesses from nearby residences and businesses at the scene where the weapon was discharged?

The Commonwealth of Puerto Rico is, for the most part, a rather densely populated island, with many of these incidents occurring within or very close to well-populated areas. It follows logically that an incident involving the police and firearms would naturally call the attention of most civilians in these populated areas. While a civilian does not usually have the expertise to offer an opinion as to whether a use of force was legally justified, they do serve an important role as a neutral potential witness. Therefore, it is utterly perplexing that in only 27% of these cases was any attempt made to seek and interview percipient witnesses other than sworn police officers.

### j. Did FIU make attempts to locate and secure surveillance footage that may have captured portions of the incident?

The FIU is required to make an effort to obtain surveillance footage in all deadly Use of Force Incidents. This policy holds both in rural areas where there are likely to be few surveillance cameras deployed, and in major population centers where covert and overt surveillance cameras can be found in locations ranging from supermarkets to ATM machines. Video evidence is often highly dispositive in cases of police use of deadly force. In fact, one PRPB deadly force case we examined

17

contained video of a shooting involving an aggressor armed with a rifle, who had already shot and wounded a third party. The officers, both witnesses to this assault, are clearly shown reacting appropriately and heroically; engaging the aggressor, neutralizing him and ending the threat to innocent life. Had the majority of these reports mentioned that an investigator had conducted a search for digitally recorded video evidence, that would at least demonstrate that a mindful effort was made to determine whether or not such evidence existed, whether it was probative and whether it could be extracted and archived. The fact that a search for this evidence is specifically mentioned in only 6% of deadly force cases leads the Monitor to assess that PRBP is not in compliance with these provisions of Use of Force Policy.

### k. *Was ballistic evidence was recovered? If so, was it consistent with the number of discharges reported?*

An essential element to any investigation where firearms are involved, be it aggravated assault, armed robbery, suicide or homicide – justifiable or not, is a thorough examination of ballistics evidence. It is one of the first steps that an investigator should or must take in any firearms related investigation. Critical evidence lies in these weapons, shell casings, projectiles and trajectories that lend unequivocal support to reaching proper conclusion. Therefore, it is shocking to note the lack of ballistics and firearms examinations in these case files. Only 31% of the cases analyzed by the Monitor included substantive mention of basic crime scene and reporting procedures when it came to the subject of firearms and ballistics. This evidence is often dispositive, particularly in cases where it is unclear as to which officer wounded or killed the subject and under what conditions that particular officer used deadly force. In our Qualitative Analysis section, we will discuss several of these deficient cases and the implications of not having conducted proper crime scene searches, documentation, memorialization, recovery and processing of firearms and ballistics evidence.

### l. *Was medical assistance requested?*

The Monitoring Team next turned its attention to the portion of the relevant rule regarding notification of emergency medical teams to intervene in cases where a person had been wounded. In 71% of the cases examined by the Team, a medical intervention was called for. At first glance, this number seemed low. On closer examination however, a good portion of deadly force cases result in no injury to either police, suspects or innocent bystanders. In these cases, no medical attention would have been warranted, thus eliminating the need for calling

emergency medical services. We are of the opinion that there is substantial compliance with this provision of the Agreement mandating the summoning of medical attention in cases involving the use of deadly force.

### m. Did SFRB (CFRB) review the case file?

PRPB policy creates an executive board that is designed to review the thoroughness and sufficiency of a Level 4 Use of Force Investigation as well as whether the SARP findings are supported by existing evidence, as called for in all relevant PRPB Rules. According to the rule, cases that include conclusions not supported by the investigation, or conclusions that are not concurrent with existing evidence are returned to SARP/FIU for reinvestigation. The rule also calls for SFRB to determine whether PRPB must revise its policies based on issues observed in these incidents. Furthermore, the rule places the ultimate responsibility on SFRB to identify training gaps regarding these often life or death situations, and to consult with the Police Academy for retraining an individual or modifying curricula and pedagogy to remedy training gaps. SFRB is a critical internal quality control mechanism for ensuring the integrity of the FIU investigation.

Prior to our November 2019 visit to Puerto Rico, and based upon our remote desk document review, we were only aware of SFRB reviews in twenty seven percent 27% of all cases. Most case files delivered to us simply did not include any SFRB review paperwork, thus lending themselves to the incorrect inference that reviews were not conducted in accordance with this paragraph.

Our on-site review revealed that 81% of the FIU investigations (39 out of 48) were actually reviewed by the SFRB, with SFRB final determination pending in only one case. Given the lack of basic investigative steps taken in so many of these cases, we are deeply concerned as to why not one single case was returned to the FIU investigator for further investigation as is required. Similarly, not a single case included recommendations for changes in rules and procedures. Finally, only one case proposed a recommendation to the effect that an officer should receive retraining.

At this stage of the Reform, the above-stated circumstances are simply not acceptable. The Monitor's Office has provided recommendations below for the work of the FIU and SFRB broadly, and will continue to make recommendations for PRPB to achieve compliance under Paragraph 251(d). Further discussion of SFRB review, as well as the practice of the Monitor conducting remote desk reviews versus on-site inspections, will be found in the Qualitative Analysis part of this report.

### n. Was a determination made by FIU or SFRB that the firearm(s) discharge(s) were in policy?

In 81% of the cases examined by the Monitoring Team, FIU reached the conclusion that the discharge(s) were in accordance with relevant policy and therefore justified. In what appears to be a rubber stamp procedure, rather than a critical examination of the case file, SFRB mirrors the original findings made by FIU in its review of 38 of these 39 cases.[4] Some of FIU's conclusions were reached upon a mere restatement of the officer(s) version as cited in the report. In some cases, which we will touch upon in the Qualitative Analysis Section, officers actually contradicted one another on relevant aspects of a given case. In many other cases, there was a complete lack of empirical and independent forensic evidence or witness statements that could support (or undermine) the officers' assertion that his/her use of force was within policy and therefore justified. Demonstrative evidence in the form of properly gathered and analyzed forensic evidence and therefore eliminates margins of error. The fact that so many cases lacked both witness statements and forensic evidence, and yet were closed by FIU and upheld by SFRB as justified in-policy uses of force is implausible and would most likely not stand up to inevitably intense public scrutiny. This is also a deeply troubling matter that must be rectified immediately by the PRPB.

### o. If the case was determined to be outside policy and possibly criminal, was PRDOJ notified?

We found one specific example of a discharged firearm which specifically referred to PRDOJ. That said, there were several other questionable uses of deadly force that, according to the case files, were handled by the PRPB Homicide Unit, the Office of Special Investigations and/or the Commonwealth`s District Attorney`s Office. These cases in particular were examples where the officer(s) from the outset were either clearly unjustified in the use of their weapon or force, or even worst, were suspected of conduct that rose to a potential criminal level.

### p. Did FIU reach a reasonable justified conclusion on officers' conduct and where appropriate recommended disciplinary or corrective action, in accordance with policy?

In 81% of the cases reviewed by the Monitoring Team, the FIU reached a conclusion that the officer(s) use of deadly force was justified. As previously mentioned, we

---

[4] SFRB undertook the review of 2019-8-015-01650 but has yet to publish its determination on the case.

are troubled at the questionable evidence relied upon in some of these cases. We shall go into more specific findings in our Qualitative Analysis section.

**q. Did Commissioner's Force Review Board (SFRB) verify that this use of force was within policy?**

Our desk review found only thirteen percent (13%) of the 48 cases in which the SFRB ratified the conclusions reached in the FIU investigative report. Our on-site review in San Juan showed that four out of five cases were reviewed by the SFRB. While we were encouraged to see this level of oversight, we were simply astonished that the overwhelming majority of cases were ruled as justified by SFRB with only one additional training need identified and no recommendations for policy revision. Not one case was sent back for further investigation, in spite of our opinion as subject matter experts that many of these cases were submitted to SFRB without photographic, forensic or other rudimentary crime scene data such as drawings or diagrams.

**r. Did PRPB share information with the public and/or family members of civilians involved in all use of force incidents?**

In some of the cases we examined, there was no injury suffered by the civilian involved in the use of deadly force and accordingly, there would be no pressing need to divulge information or findings to that person or his family. That said, we have identified many situations where persons have been killed or wounded by police officers. Overall, in only 8% of the cases examined was there any information sharing with either the public or with family members in the course of a deadly force investigation. Family members should always hear the truth regarding how their loved one lost their life. On a similar note, the public deserves a level of transparency on the part of those who have the unique and devastating ability to take the life of another while acting under color of law. With such awesome responsibility comes a duty to be transparent and above board at all times. No exceptions.

After our remote desk review and due to our concerns over the content of the files received digitally from the PRPB, in the interest of crafting a comprehensive report to all Parties, we placed the Parties on notice that we had set aside three full days (17 – 19 November 2019) with SARP/FIU to discuss and review our preliminary notes from each of the 48 intentional firearms discharges studied by our team.

Instead of the three days requested, we met with PRPB on 18th and 19th of November to manually review the case files. We were surprised to find that nearly half of these files

actually contained photographic and/or video evidence. These site visits thus led to a substantially less critical assessment of SARP/FIU practices. Had we relied solely upon a remote desk review of documents provided by the PRPB to make our assessments of compliance rather than conducting an on-site review, some of our overall resulting assessments would have been unfavorable to the PRPB.

Our in-person review of cases with photo or video evidence showed in most of these cases, the FIU investigator only had access to these images after he/she had already concluded their investigation. *Only 30% of FIU cases actually contained photographic evidence at the time they were adjudicated by the FIU investigator*. Lastly, we opine that, in all of the cases where the photographs were added to the file *after* the FIU concluded its investigation, the photographic or video evidence in that file was of probative value and could have aided the investigator in supporting his/her findings.

The Monitor acknowledges that the thoroughness of FIU investigations depends on more than just the FIU itself. Multiple law-enforcement actors – including both Commonwealth and federal actors – contribute to the investigative work that informs FIU conclusions. The Monitor recognizes the need for all parties to coordinate in order to inform FIU investigations. Nevertheless, it is critical that PRPB find a way to reconcile this issue and acquire all proper evidence in order for investigators to make an accurate determinations whether a discharge was within department guidelines.

***Monitor's Assessment: Partial Compliance***

## Qualitative Analysis of PRPB Use of Force Investigations

The Monitor's Office has sought to determine using approved methodology, based upon documentary evidence received in the 48 cases of intentional firearms discharges, and juxtaposed with specific paragraphs in the Agreement, what level of compliance, if any, the PRPB has demonstrated regarding enumerated paragraphs of the Agreement.

### Paragraph 36 of the Agreement provides as follows;

> *PRPD shall develop a Use of Force Reporting Policy and Use of Force Report Form that comply with applicable law and comport with generally accepted policing practices. The Use of Force Reporting Policy will require officers to notify their immediate supervisor following any use of force, prisoner injury, or allegation of excessive force. In cases involving a serious use of force, notification will be within one-hour, absent exigent circumstances.*

Observations and Findings:

We find the PRPB to be in <u>Substantial Compliance</u> with the provisions of this paragraph as they apply to firearms discharges. To support our conclusion, we point to development of General Order 600-605 (Report and Investigation of Use of Force). The rule itself, in our estimation, complies with relevant Commonwealth statutes and Federal law. This rule contains a great measure of generally accepted policing practices in the United States relating to police firearms investigations.

As to the practice required by the Agreement, we point to the quantitative analysis (section a) conducted by our team, which found that in 92% of the 48 applications of deadly force, the Firearms Investigative Unit ("FIU") was notified within the one-hour time frame.

**Paragraph 37 of the Agreement provides;**

*The Use of Force Reporting Police shall require all officers to report any use of force in writing in a Use of Force Report Form before the end of shift. The Use of Force Report shall include:*

> *(a.)  A detailed account of the incident from the officer's perspective;*
> *(b.)  The reason for the initial police presence;*
> *(c.)  A specific description of the acts that led to the use of force, including the subject's behavior;*
> *(d.)  The level of resistance encountered; and*
> *(e.)  A description of every type of force used.*

*The <u>Use of Force Reporting Policy shall explicitly prohibit the use of boilerplate or conclusory language</u> in all reports documenting the use of force. Failure to report a use of force or prisoner injury by a PRPD officer shall subject an officer, including supervisors and commanders, to disciplinary action* (emphasis added).

Observations and Findings:

While we find that the PRPB drafted and promulgated General Order 600-605 (Report and Investigation of Use of Force) to comply with this paragraph of the Agreement, we find that the actual execution of this order in the case of applications of deadly force via firearms is deficient. Indeed, in 98% of the cases analyzed, a Use of Force Report is generated before the end of the officer's shift. However, in reading through each of the 48 cases of intentional use of firearm deadly force, we noted many examples of boilerplate language being employed by officers in these reports. The language used was almost uncanny in similarity

23

across different incidents at different times and in different parts of the Commonwealth. It appears that the PRPB has still not eradicated the incorrect practice of using stereotype language in their reports. This matter must be addressed immediately.

In view of the above, we suggest that additional training and supervision be given and provided by the PRPB to its officers and front-line supervisors to eliminate the boilerplate and stereotype language from these incident reports. Until we see satisfactory results from such efforts, we must take the position that the PRPB is in <u>Partial Compliance</u> with respect to this paragraph.

### Paragraph 38 provides;

*PRPD policy shall require officers to request medical services immediately when an individual is injured or complains of injury following a use of force. The policy shall also require officers who transport a civilian to a medical facility for treatment to take the safest and most direct route to the medical facility. The policy shall further require that officers notify the communications command center of the starting and ending mileage on the transporting vehicle.*

### Observations and Findings:

As previously noted, in 71% of the cases reviewed, medical intervention was sought as the PRPB policy provides. Reaching an opinion on compliance based solely upon this statistical analysis would yield an incorrect result. In reviewing the substance of these case reports, we came across a significant number where no one was injured, thus rendering the issue of calling for medical attention moot. We therefore find the PRPB to be in <u>Substantial Compliance</u> with Paragraph 38.

### Paragraph 39 provides;

*PRPD's Use of Force Reporting Policy shall require that officers submit copies of Use of Force Reports to their immediate supervisor and to SPR for tracking and analysis. SPR shall maintain master copies of these reports in a central location.*

### Observations and Findings:

We do find that the policy makes it incumbent upon officers to submit their reports to their supervisors and that they are maintained by SARP in an analog archive as a paper case file and in a secure digital archive as a scanned TIFF image. We do find however that many of these reports are written in cursive, as opposed

to block letters, which makes them harder to read and at times incomprehensible, to supervisors, SARP, the SFRB and the Monitors. We recommend that the PRPB instruct officers to ensure that their Use of Force Reports are written in block letters, until such time as they are prepared on a wholly digital platform. Notwithstanding the issue of legibility, we find the PRPB to be <u>Partial Compliance</u> with Paragraph 39.

## Paragraph 40 provides;

*PRPD policy shall specify that the conduct of all force reviews and investigations comply with applicable law and comport with generally accepted policing practices. All force reviews and investigations shall, to the extent reasonably possible, determine whether the officers' conduct was justified and within PRPD policy.*

## Observations and Findings:

This paragraph pertains to investigative policy and not to the actual investigative process or practice. As written and promulgated, General Orders 600-605 (Report and Investigation of Use of Force) and 100-113 (Division of Investigations of Use of Force, Firearm Discharge), mandate investigations that comply with all applicable laws and comport with generally accepted policing practices. We are of the opinion that every investigation has reached a determination, as the policy dictates, as to whether the officers' conduct was justified and in compliance PRPB policy. As far as policy alone is concerned, we find the PRPB to be in <u>Substantial Compliance</u>.

## Paragraph 41 provides the following;

*PRPD shall be responsible for maintaining a reliable and accurate tracking system on all officers' use of force; all force reviews carried out by supervisors; all force investigations carried out by Force Investigation Units ("FIU"); and all force reviews conducted by Force Review Boards ("FRB") and the Superintendent's Force Review Board ("SFRB"). <u>At least annually, PRPD shall analyze data on officers' use of force to determine significant trends, identify and correct deficiencies revealed by this analysis, and document its findings in a public report</u>. (Emphasis supplied)*

## Observations and Findings:

We have seen firsthand the records compiled by FIU regarding their investigations, which points to some level of tracking on the part of the PRPB at the FIU level. We

have noted that some of these cases have *pro forma* reviews carried out by the officer's supervisor. In other cases, owing to the absence of supervisory reporting, we surmise that the FIU investigator has stepped into the shoes of the officer's immediate supervisor to cover that aspect of supervisory oversight. Though the monitor acknowledges that the FIU assumes jurisdiction in such cases in order to promote independent investigations, the Monitor recommends that the FIU treat information from the responding supervisor as critical to the investigation, not to be discounted.

As we have previously mentioned in our quantitative analysis,[5] we received little documentation of SFRB review in the case files digitally forwarded by the PRPB to the Monitor for remote desk review. Even after reviewing supplementary SFRB material provided to us in person in San Juan, we have seen no documentation that would serve as evidence that the SFRB is tracking or analyzing PRPB uses of force so as to *determine significant trends, identify and correct deficiencies,* much less make their analysis accessible to the public, which is also specifically called for in this policy. Though FIU does prepare an annual report with trend analysis, the Monitor has determined upon investigation of UOF incidents that the data used in this analysis is incomplete regarding all use of force. Until such time as the SFRB performs the duties that is incumbent upon it, we must find that the PRPB is in Partial Compliance with this paragraph.

**Paragraph 42 provides as follows;**

*The quality of force reviews, force investigations, and investigation reviews shall be taken into account in the performance evaluations of the officers performing such investigations and reviews.*

## Observations and Findings:

As mentioned in the outset of this report, the Monitor's focus was limited in its scope to the policy and process of documenting, investigating, and assessing the justifiability of intentional firearms discharges by PRPB personnel. As such, tangential issues such as human relations-related performance evaluations of those conducting these investigations was not within the scope of the Monitor's review at this time. No material to assess compliance with this paragraph was either requested or supplied by the PRPB. Hence, we look forward to assessing

---

[5] See Quantitative Analysis, part m.

PRPB compliance level in regard to paragraph 42 in our next report. <u>Rating Deferred.</u>

### Paragraphs 43 and 44 provide the following;

*43. A supervisor shall respond to the scene of a serious use of force or allegation of excessive force involving an officer under his/her command upon notification of the incident.*

*44. The supervisor shall conduct a supervisory review of all uses of force, prisoner injuries, or allegations of excessive force, except those incidents involving a serious use of force or force indicating apparent criminal conduct by an officer, which shall be investigated by FIU, SPR, and/or PRDOJ. No supervisor who was involved in the incident, including by participating in, ordering, or authorizing the force being investigated, shall be responsible for the review of the incident.*

### Observations and Findings:

As mentioned previously in this report, we have found varying levels of immediate supervisory response and oversight with respect to intentional firearms discharges. While technically compliant with their General Order regarding firearms discharges, the PRPB misses an opportunity to ensure that they, "get it right" by not taking advantage of this two-layer review procedure. While we urge the PRPB to take advantage of this review procedure as called for within its own rule, we must assess the PRPB as in <u>Substantial Compliance</u> to the letter of the Agreement.

### Paragraph 45 provides as follows;

*Supervisors shall complete use of force reviews within 5 business days of receiving the officer's use of force report. The reviewing supervisor shall:*

   *a) determine whether the use of force was consistent with PRPD policy and/or raises any policy or operational concerns;*
   *b) review all Use of Force Reports and ensure that all reports include the information required by this Agreement and PRPD policy;*
   *c) document each use of force review promptly using a Supervisor's Force Review Report; and,*
   *d) consider whether there are non-punitive corrective actions or training needs.*

*A higher-ranking officer within the investigating supervisor's chain-of-command shall review the Supervisor's Force Review Report for completeness and conformance with PRPD policy. The reviewing officer shall evaluate the investigating supervisor's conclusions and document whether the reviewing officer concurs, disagrees (with an explanation of the disagreement and the alternate conclusion), or defers until further investigation is completed.*

## Observations and Findings:

Our review of the 48 intentional firearms discharges during the relevant period of time indicates quite clearly that, by and large, supervisory reviews as framed above, are taking place within that time frame. However, we have noted that the vast majority of these supervisory reviews contain a mere restatement of the subject officer(s)' point of view, often lifted word-for-word. Our review of these reports indicated that they frequently do not contain observations, whether contravening or supporting, from percipient civilian witnesses to these incidents.

On a similar note, we have seen sparse evidence that the supervisor or FIU investigator has identified, "policy or operational concerns," in their reviews of these firearms discharges as called for in this paragraph. The Monitor's Office is skeptical of the absence of any PRPB self-assessment at that level. Our decades of policing experience in the United States, has taught us that these incidents, even when justified, frequently lend themselves to policy corrections or operational adjustments, identifying supplementary training needs, or identifying deficiencies in present training modules, each of which are specifically called for in paragraph 45(d). The lack of this level of analysis on the part of the PRPB is a serious procedural or substantive deficiency that needs to be rectified immediately.

Finally, the "higher-ranking officer review" procedure called for in the last part of paragraph 45 is, in practice, largely a restatement and ratification of the officer's version of the discharge. We have seen very limited evidence of objective review of the facts and circumstances that can generate disagreement, alternate conclusions or remanding the case for a more thorough investigation. Moving forward, PRPB must take advantage of this procedural opportunity to assure quality and thoroughness in these crucial investigations, while at the same time actively seek to learn lessons or identify their standard practices in these incidents. In light of the evidence that we have reviewed, we find the PRPB to be at best in Partial Compliance with this paragraph of the Agreement.

**Paragraph 46 provides as follows;**

*A Force Review Board shall evaluate supervisory reviews, including Supervisor's Force Review Reports and reviewing officers' determinations. FRBs shall be composed of command staff from varying assignments. PRPD policies shall specify the conduct and requirements of FRB proceedings to ensure thorough, timely, and objective reviews. PRPD policy shall establish objective criteria that identify the force levels below serious uses of force that shall be reviewed by FRBs. FRBs shall review supervisory review for completeness, evidentiary support, and compliance with PRPD policy. FRB shall document each FRB proceeding, which shall include findings and recommendations to the regional commander. FRB may also return force reviews to supervisors for additional review, as necessary, to ensure thorough and complete reviews. Copies of all Force Review Reports and underlying documents shall be submitted to SPR for tracking and analysis.*

## Observations and Findings:

As mentioned at the outset of this report, the Monitor's focus was limited in its scope to the policy and process of documenting, investigating, and assessing the justifiability of intentional firearms discharges by PRPB personnel. As such, tangentially related issues such as the sufficiency of FRB proceedings did not come into the Monitor's purview at this time. No material to assess compliance with this paragraph was either requested or supplied by the PRPB. We make no finding at this time with respect to paragraph 46. <u>Rating Deferred.</u>

**Paragraph 47 provides as follows;**

*Whenever a reviewing supervisor, FRB, or other reviewing officer finds evidence of a use of force indicating apparent misconduct or apparent criminal conduct by an officer, he or she shall immediately notify his or her supervisor for referral to the appropriate investigating unit or the PRDOJ. The Superintendent shall be notified of the referral.*

## Observations and Findings:

Per the Agreement methodology, paragraph 47 must be assessed together with paragraph 44, which addresses level 1-3 uses of force investigations by FRB. As such, the Monitor has not reached a determination of compliance on paragraph 47 at this time. Nevertheless, the Monitoring team did make relevant observations of how FIU addresses similar findings of misconduct in regard to level 4 Use of Force. We have seen several examples of problematic, intentional firearms

discharges resulting in death or bodily injury where the officer's actions are clearly called into question vis-à-vis PRPB policy and/or criminal statute. In these clear-cut cases, we have noted prompt referral to the Homicide Unit of the PRPB, the Fiscalia, the PRDOJ as well as the Special Investigative Unit ("NIE"). <u>Rating Deferred</u>.

**Paragraph 48 provides as follows;**

*PRPD shall ensure that all serious uses of force and allegations of excessive force are investigated fully and fairly by individuals with appropriate expertise, independence, and investigative skills to ensure that uses of force that are contrary to law or policy are identified and appropriately resolved and that policy or operational deficiencies related to the use of force are identified and corrected. To this end, PRPD shall create FIUs to conduct investigations of serious uses of force, uses of force indicating apparent criminal conduct by an officer, uses of force by PRPD personnel of a rank higher than sergeant, or uses of force reassigned to FIU by the Superintendent, his or her designee, SPR, or FRB. PRPD policies shall specify the membership requirements, conduct of investigations, and operational procedures of FIUs.*

Observations and Finding:

We have examined the PRPB General Order 100-113 (Division of Investigations of Use of Force), which creates and defines the role, responsibility and procedures of the FIU. These roles and procedures include:

(1) The investigative process will include the nature of evidence to be collected and preserved as well as number of shots fired;

(2) In those cases where the Division's investigation is related to negligent firearm discharges, investigators will work and document the scene using diagrams, photographs and video recordings. If possible, they will include any information on the location and recovery process of the bullets fired by the MNPPR where available;

(3) In cases where a critical discharge is investigated, the FIU investigator will work in coordination with the CIC Investigator, Forensic, NIE or Prosecutor, to cover the probative angles necessary for administrative investigation, including certified copy of documents, photos, sketches, videos, among others; and

(4) In all cases of use of force incidents under the jurisdiction of FIU, investigators will determine if there are surveillance cameras in the area that can provide useful evidence for the investigation.

While we have no concerns over the policy itself, we are deeply concerned with the actual investigative procedures and practices of the FIU. Our desk review has uncovered repeated examples of substandard investigative practices which fall well short of standard police practices in this category of specialized investigations. For instance, and as previously noted, we continuously find repeated failure to canvas for civilian witnesses or take statements from same. We see an overall failure to diagram firearms discharge scenes.

We also notice efforts made to photograph relevant and probative physical evidence in only half of the identified intentional discharges. We see variable substandard practices used to locate, document, collect and process firearms and ballistics evidence. We see little or no evidence of ballistics evidence analysis and conclusions in these files. In scenes where there are wounded suspects and multiple police shooters, we are presented with investigations that do not seek to establish which officer's projectile struck the subject.

We are also compelled to highlight that upon review of multiple cases where automobiles were alleged to have been used offensively against police officers, purportedly placing them in fear of death or great bodily injury we never observe diagrams, tire mark or tire impression evidence that could prove or disprove an assertion made by the officer that goes to the core of their justification for using deadly force. The above absence of valuable and necessary information is simply not acceptable to the Monitor.

We fail to understand how the PRPB's FIU is still performing at a highly deficient level after having five years to train, deploy and field test an effective, specialized investigative process. Unsatisfactory practices seem endemic among FIU investigators, and we strongly recommend that all relevant officers be subject retraining in order to correct deficiencies. In line with this observation, we recommend that PRPB members be proactively trained and that a practical training curriculum be updated and given to the FIU in light of these findings. Our office is available and willing to help better define and remedy these shortcomings as soon as possible.

In conclusion as to paragraph 48, We find that the PRPB has fashioned a proper policy to create, select, train and staff the FIU. In practice however, they have fallen short in the execution of this policy. At best, the PRPB is in <u>Partial Compliance</u> with paragraph 48.

**Paragraph 49 provides as follows;**

*A supervisor responding to a serious use of force or allegation of excessive force shall immediately notify FIU. FIU shall respond to the scene and commence an investigation. FIU may decline to respond to the scene following consultation and approval by the FIU supervisor. Declinations shall be documented in writing.*

## Observations and Finding:

As mentioned previously as part of our quantitative analysis, our desk review of the documents provided by the PRPB show clearly that in the overwhelming majority of intentional firearms discharges, the FIU is reasonably notified in accordance to policy and responds to these shooting scenes in a timely manner. We saw no evidence of any FIU declinations, either written or otherwise, in our desk review of the documents provided. We find the PRPB is in Substantial Compliance with paragraph 49.

**Paragraph 50 provides as follows;**

*FIU shall immediately notify and consult with PRDOJ regarding any use of force indicating apparent criminal conduct by an officer. If PRDOJ indicates that it may proceed criminally, or PRPD requests a criminal prosecution, any compelled interview of the subject officers shall be delayed until after consultation with PRDOJ or expressly permitted by the Superintendent. No other part of the investigation shall be held in abeyance unless specifically authorized by the Superintendent in consultation with PRDOJ.*

## Observations and Finding:

We have seen multiple intentional shooting incidents referred to the Homicide Unit, the NIE and the PRDOJ. These cases were often situations where the officers' use of force was clearly called into question. We saw no documentary evidence of a Garrity interview being allowed or consultation with the PRDOJ or the PRPB Superintendent regarding same. We infer through the various cases referred to Fiscalia, Homicide and NIE that the spirit, if not the letter of paragraph 50 is being complied with. We therefore find PRPB is in Partial Compliance with this paragraph.

As stated above in the quantitative assessment of Use of Force, the Monitor recommends reevaluating all FIU investigations to determine whether or not the FIU reached conclusions in each case before all relevant evidence was acquired and included into the FIU file. In all cases in which it is determined that additional

evidence should be acquired or has been acquired since the FIU reached a conclusion, the Monitor recommends that the case be reopened. The FIU should reach a new determination on such cases within 90 days after a) completing all aspects of an officer-involved shooting investigation per the Agreement and widely-used police practices, and b) incorporates all new and relevant evidence that has been collected since the FIU reached its previous determination. The Monitor's assessment of Use of Force in future reports will be determined in part by PRPB's willingness and capacity to ensure that such new evidence is addressed in a timely manner.

## Paragraph 51 provides as follows;

*FIU shall complete its administrative use of force investigation within 45 days of the use of force, absent exceptional circumstances. At the conclusion of each use of force investigation, FIU shall prepare a report on the investigation and shall forward the report to SFRB for review and to SPR for tracking and analysis.*

### Observations and Finding:

As shown from the quantitative analysis cited earlier in this report, only 11% of intentional firearms discharge reports went beyond the 45-day rule. However, only one extended case provided the exceptional circumstances for an extension called for by the rule, (the medical incapacitation of the FIU investigator - unrelated to the investigation). FIU has a satisfactory record of completing their investigations within the 45-day limit, although they could improve documenting extensions in relation to the 45-day rule. The above being said, and irrespective of whether the 45-day rule is being complied with or not, for the assessment purposes the FIU is simply not performing high quality investigations for reasons previously outlined. Given that basic investigative steps were not taken early in so many investigations, it is doubtful that extending the 45-day rule would result in better investigative reports. For the sole purpose of assessing compliance with the 45-day rule, we find that the PRPB is in <u>Partial Compliance</u>.

## Paragraph 52 provides;

*The Superintendent's Force Review Board shall evaluate all FIU investigations, including FIU reports and determinations. SFRB shall be composed of senior command staff from varying units. PRPD policies shall specify the conduct and requirements of SFRB proceedings to ensure thorough, timely, and objective reviews. SFRB shall review each FIU investigation for completeness, evidentiary*

*support, and compliance with PRPD policy. SFRB shall document each force review proceeding, which shall include findings and recommendations, to the Superintendent. SFRB may also return force investigations to FIU for additional investigation, as necessary, to ensure thorough and complete investigations. Copies of all Force Review Reports completed by SFRB and underlying documents shall be submitted to SPR for tracking and analysis.*

## Observations and Finding:

Public accountability of police use of deadly force is a cornerstone of trust between the PRPB and the community that they protect. Any lack of transparency in these matters of significant public concern will only result in a detrimental impact on the public's confidence in their police bureau. The above is clearly antagonistic to the goals in the Agreement, fortunately the Monitor is of the opinion that with timely efforts, the above precarious situation can be properly addressed and remediate.

Our quantitative analysis initially indicated that SFRB had supported the conclusion of 13% of all FIU investigations. In most of these cases, the language used to ratify the findings of FIU was lifted nearly word for word from the FIU report, which is hardly the critical review that is required in the General Order establishing SFRB oversight. The above predicament and unsound practice must be addressed and resolved expeditiously. At this stage of the implementation of the Agreement the people of Puerto Rico expect a lot more from the PRPB. Our office intends to assist the PRPB in regaining public trust.

We are also compelled to mention that once we also reviewed cases in San Juan, we quickly discovered important missing data that showed conclusively that the SFRB undertook the review of 39 out of 48 cases completed by the FIU.[6] As previously stated In the 38 cases completed by the SFRB, every single one has been upheld by the SFRB as submitted. Where SFRB comments in writing, they are prone to repeat FIU findings. In only one case was an officer sent for retraining. In not one case was a policy revision called for, in spite of multiple cases involving use of deadly force against automobiles with resulting deaths and injuries sustained by civilians and police officers.[7]

---

[6] We find evidence that 39 out of the 48 investigations conducted by FIU have been evaluated by SFRB.

[7] Most US police agencies have come to the realization that a projectile weighing 50 grams and traveling at 750 feet per second (i.e. a .40 caliber pistol round) is incapable of halting the movement of a vehicle weighing 800 kg and traveling at

We find it problematic and inconsistent with UOF policy that the SFRB would not flag some of these cases that lack interviews with civilian witness, diagrams, and analysis of physical evidence, just to cite several examples of deficiencies commonly observed in our review of these investigations. Not only does SFRB have a role as PRPB's primary quality control mechanism for serious use of force, it is also charged with developing institutional corrective measures to address deficiencies in use of force training and procedure.

The Monitor finds the PRPB to be only in <u>Partial Compliance</u> with paragraph 52, as the Monitoring Team has seen little evidence that SFRB is exercising the significant oversight and quality control roles granted to it under this policy.

TABLE 4: COMPLIANCE STATUS FOR PARAGRAPHS ADDRESSING USE OF FORCE

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 36 | Develop use of force policy | Substantial Compliance |
| 37 | Report all use of force in writing | Partial Compliance |
| 38 | Provide medical service for all injuries stemming from UOF | Substantial Compliance |
| 39 | Written reports of UOF submitted to supervisors | Partial Compliance |
| 40 | Force Review Boards to determine if UOF was justified | Substantial Compliance |
| 41 | Create a reliable tracking system for UOF | Partial Compliance |
| 42 | UOF reviews to be included in performance reviews | Rating Deferred |
| 43 | Supervisors to respond to scene of any excessive UOF | Substantial Compliance |
| 44 | Supervisors to review all excessive UOF or injury | Substantial Compliance |
| 45 | Supervisors to complete and submit reviews within 5 days | Partial Compliance |
| 46 | Force Review Boards to review supervisory reviews | Rating Deferred |
| 47 | Reviewing officers to notify their supervisors of misconduct | Rating Deferred |
| 48 | Force Review Boards to be composed of qualified personnel | Partial Compliance |
| 49 | Supervisors to report all serious UOF to Force Review Board | Substantial Compliance |
| 50 | FIU to immediately notify PRDOJ of any criminal conduct | Partial Compliance |
| 51 | FIU to conclude investigation & report result within 45 days | Partial Compliance |
| 52 | Superintendent's FRB shall evaluate all FIU investigations | Partial Compliance |

In relation to the paragraphs of the Agreement that address level-4 Use of Force (use of deadly force), the Monitor finds that **PRPB is in substantial compliance with 6 of 17 paragraphs, and partial compliance with 8 of 17 paragraphs**. The assessment was deferred for 3 paragraphs either per the methodology or because of a lack of information

any speed. Accordingly, many large departments have amended their policies and training to reflect this reality. We recommend that the PRPB do the same.

necessary to reach a determination. The monitor advises PRPB to consult the recommendations that have been made throughout this section in order to work toward substantial compliance for all related paragraphs of the Agreement.

# Qualitative Assessment of PRPB Crowd Control Policies and Performance During May 1, 2019 Mass Demonstration

This section provides a brief analysis of PRPB crowd control performance in relation to a May 2019 demonstration, which the Monitor's Office had the good fortune to observe while in Puerto Rico for scheduled site visits. Members of the Monitoring Team were able to observe PRPB's performance during the demonstration directly pursuant to paragraphs 33 and 34 of the Agreement, and subsequently requested documents related to the Bureau's policies and action plan related to the event, pursuant to paragraphs 32 and 35 of the Agreement.

The document review was limited by a delay in receiving the relevant documents, but the documents were ultimately submitted during the preparation of this report. Those documents, in conjunction with first-hand observation of the May 1, 2019 demonstration, supplied sufficient data for the Monitoring team to determine that PRPB acted consistently with its own policies in relation the May 1, 2019 mass demonstration. However, the Monitor's analysis of this single incident is not to be understood as an assessment of broader compliance with the Agreement.

## May 2019 Demonstration in *Milla de Oro*

The Monitoring Team was presented with the opportunity to witness and assess PRPB deployment for crowd control during a May 1, 2019 demonstration in *Milla de Oro*, San Juan, Puerto Rico. On May 1st, 2019, various civic and employee organizations conducted demonstrations throughout the city of San Juan to celebrate International Worker's Day, with several groups converging at the intersection of Avenida Muñoz Rivera at Calle Bolivia and Avenida Carlos Chardón, an area known as *Milla de Oro*. The civil demonstrations for International Workers' Day provided ample opportunity for members of the Monitoring Team to witness PRPB response firsthand.[8]

Several members of the Federal Monitor Office were assigned, as authorized under the Agreement, to monitor the PRPB response to this public and constitutionally protected demonstration. These members of the Monitoring Team also evaluated PRPB's operational plans in relation to the demonstration.

---

[8] Though the present report focuses only on the May 1, 2019 demonstration, the Monitor is committed to observing and reporting on PRPB response to other significant mass demonstrations. The Monitor's Office will offer an independent report on the mass demonstrations that took place in July 2019, during the events that are publicly known as the July Crisis.

The PRPB responded to the event with appropriate actions aimed at ensuring protestors' right to free expression in a civil environment. The creative use of water filled barriers prevented the protesters from entering established police lines, and effectively prevented close confrontation with the demonstrators. The ratio of supervision allowed for effective "command, control and communications." All officers of the PRPB, with few exceptions, were properly identified and appeared to have been appropriately equipped for the situation. A policy of 30-minute breaks prevented officers from becoming exhausted and ineffective. Water and food were also made available to all public safety participants to satisfy basic human needs during these often long events.

Acting in tenor with their deployment plan, the PRPB established positive dialogue and communication both with the organizers of the events and with demonstration participants. Their inter-agency communications and cooperation appeared to be similarly effective.

Over the course of the May 1, 2019 demonstration, there were no arrests and scarce reports of property damage or personal injury. Given these factors, the Monitor considers this deployment to have been highly effective. Furthermore, we hold the position that the PRPB's preparations were consistent with generally accepted police practices regarding mass demonstration.

During the preparation of the present report, PRPB furnished the Monitor with additional documentation, including crowd control policies and internal reporting on PRPB response to the May 1, 2019 demonstration. Together with the Monitoring Team's first-hand observation of the PRPB response, these materials sufficed for the monitor to conclude that PRPP acted in substantial compliance with the Agreement in regard to the May 1, 2019 mass demonstration.

The following is a condensed summary of the Monitor's observations:

- PRPB established constructive and effective dialogue and communication between the organizers of the events and ranking personnel of the Bureau. Furthermore, at all locations PRPB established constructive and effective dialogue with participants and diverse groups that were present in the demonstration.

- The PRPB also responded to the event with an appropriate show of force that acted as a deterrent to those protesters intent on changing the nature of the event and provoking the police. The use of water-filled barriers, which were practically immobile, allowed the demonstrators to freely express their constitutionally-protected right to assembly and freedom of speech, while at

the same time preventing them from entering established police lines and physically confronting those deployed to guarantee public safety, the well-being of the participants, and the right of participants to free expression.

- The ratio of Supervisors to officers was modified to the appropriate levels (1 supervisor for every 10 subordinates), allowing for clear command, control and communications.

- The PRPB's action plan allowed for all officers to be relieved every 30 minutes. This prevented officers from becoming exhausted and thus possibly ineffective among other concerns. Water and food were also made available to all participants.

- PRPB prepared and executed a well thought out action plan on how to utilize DOT and SWAT personnel and other units from Puerto Rico's Department of Safety.

- Inter-agency communications and cooperation appeared to be effective; PRPB established a mobile command post which, in the event they had to mobilize to another location, could easily be relocated. Furthermore, there were locations established to process any arrestees, as well as medical triage centers established in the vicinity of police lines for any injured participant or citizen.

- Officers of the PRPB observed by the Team, with few exceptions, were properly identified and had necessary and appropriate equipment for the situation.

- The public was given every opportunity to exercise their constitutional rights in a safe and secure environment.

The above preparations by PRPB are consistent with generally accepted police practices to deal with these types of mass demonstrations.

## Document Review

As previously noted, the Court ordered a brief extension to the parties to provide documentation to the Monitors and to allow the Monitors time to review, analyze and reach logical conclusions based upon the data received. The documents received were pursuant to an official document request submitted by the Monitor to the Puerto Rico Police Bureau relating to the Bureau's preparation, execution, follow up and assessment of the demonstration. This request was made during the last quarter of 2019.

The documents requested were made available by PRPB to the Monitor's Office. The documents/data received were reviewed and analyzed by the Monitor's Office in order

to submit to the Parties a full and appropriately documented report of the police response to the May 2019 demonstration. The Monitor considered the following documents in order to reach a full conclusion as to whether the PRPB was substantially or partially compliant with the Agreement as it applies to mass demonstrations:

1) PRPB Work Plan for the May 1st, 2019 Demonstrations including the following categories:
   a) Situation/Introduction;
   b) Mission;
   c) Objective;
   d) Chain of Command;
   e) Internal Coordination (Inter-Bureau);
   f) External Coordination (Outside Agencies);
   g) Legal Base; and
   h) Implementation.
2) Minutes from the After-Action Meeting held on May 8, 2019 to discuss police action during the event.
3) Report on Constitutional Activities and/or Civil Unrest (PPR-174).
4) Record of Mobilization of the Specialized Tactical Divisions.

## Findings

Based on the review and analysis of document/data provided by PRPB and the observations of the Monitoring Team members present, the Monitor's Office concludes that PRPB's actions during the May 1, 2019 demonstration were consistent with generally accepted police practices, within Bureau Policy and in compliance with the Agreement as it relates to Crowd Control and Incident Management. Again, however, the Monitor's analysis of this single incident is not to be understood as an assessment of broader compliance with the Agreement in regard to crowd control policies. The Monitor will reach a determination on crowd control in CMR-2 based on based on direct observation of PRPB response to three further mass demonstrations.

# Qualitative Assessment of PRPB Information Systems and Technology Development

Information Technology capabilities and systems must enable transformation in other areas of the Agreement. The ability to reliably produce and collect accurate empirical operational data is essential to gaining an overarching understanding of performance; compliance with standards, regulations and policies; transformation progress; analytical awareness; etc. The credibility of the Bureau and its agents rests upon their ability to objectively apply that understanding and knowledge to the reform and transformation of its policing practices. Ultimately, PRPB's transformation in accordance with the Agreement will by evidenced by its current and future use of IT in a timely manner, both operationally and simultaneously to measure its progress toward transformation. In relation to these criteria, PRPB has not yet made adequate progress operationalizing its IT in support of the Decree, and is therefore in Partial Compliance.

Although the capacity-building period for IT was extended for a year, much remains to be accomplished. Systems availability should have been facilitating the self-awareness of PRPB's officers and leaders to reform deficient practices to meet the intended goals of the Agreement. It would have been advantageous if PRPB were able to implement IT solutions that were in use operationally that could have been assessed effectively by the Monitoring Team. There is much work to be done before such solutions will be operational, and PRPB should act quickly and with high priority in this matter.

## Key Observations

Through July of calendar year 2019, visits were conducted at PRPB Headquarters and in the field to review technology implementations as well as the Bureau of Technology's efforts to provide IT solutions that support compliance with the Agreement. In general, there was partial implementation of some of the IT solutions required in the mandate. Nevertheless, PRPB recognized that it was not in a position to be deemed in compliance with the agreement, and applied for an extension of IT capacity-building beyond the 4-year capacity-building period laid out for other areas in the Agreement.

While PRPB's logic may have aligned with the extended IT capacity building period, it was unresponsive to the Decree such that there are no fully operationalized compliant solutions available to adequately support the Decree. At this phase of the monitoring timeline, the IT transformation necessary for compliance could and perhaps should be rated simply as either implemented or not implemented.

The pressures on PRPB's success and reasons for the current state of IT are many and could be illustrated by the following examples:

1) **Access to and commitment of human capital.**

   - The PRPB Chief Information Officer CIO has two roles, one as PRPB CIO and the other as DSP CIO. This forces him to split his available time and his schedule between PRPB and the Department of Public Safety.

   - PRPB has a noticeable lack of skilled IT subject matter experts. PRPB has contracted external expertise to fill this gap, and the Monitor recognizes this effort. Nevertheless, a 2018 staffing allocation and resource study conducted for PRPB showed a need for 16 additional IT support technicians.[9]

   - It should be noted that the Kronos IT Project Manager has expressed concerns over the lack of available support from the Bureau of Technology; and

2) **Deployment and Implementation.**

   - Three (3) field visits in January 2019 found CAD deployed, but insufficient institutional training conducted.

   - In August, the Kronos PM urged a network assessment after gaining firsthand experience of the frailty of the infrastructure while developing the Kronos Overtime module.

   - Use of Force data fields on CAD Form PPR-84; although the matter has been raised on several occasions by the Interim Monitor, PRPB has yet to implement the CAD fields (and the forms) to adequately collect specific Use of Force data such as the number of officers involved in a UOF incident in order to discern the number of uses of force during any one incident.

   - Computer Aided Dispatch implementation – Although more pervasive than in the past, it is unclear to what degree CAD is 'fully" implemented island wide and whether or not training has been completed. In addition, commentaries from operational officers in the field indicates that the system is not well regarded from an operational perspective.

   - Early Intervention System – Unfortunately, PRPB has not furnished the Monitoring Team with any evidence that a functional EIS has been implemented. Though PRPB claims to have developed EIS, police commanders

---

[9] V2A & Weiss Consulting, PRPB Staffing Allocation and Resource Study, April 2018.

report that they either cannot access the system to monitor the activity of people under their command or cannot ender data into the system.

- Analytics/Assessment – Unfortunately no substantive indications of analytical capacity have been furnished to our Team thus far.

The IT findings are summarized by paragraph in table 5 below.

TABLE 5: COMPLIANCE STATUS FOR PARAGRAPHS ADDRESSING INFORMATION TECHNOLOGY

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 218 | Establish IT infrastructure | Partial Compliance |
| 219 | Collect and maintain records necessary for implementing the Agreement and performing duties | Partial Compliance |
| 220 | Develop protocols for collecting, analyzing, and reporting information | Partial Compliance |
| 221 | Develop and maintain a record management system | Partial Compliance |
| 222 | Provide supervisors with handheld recording devices | Non-Compliant |
| 223 | Access to National Crime Information Center data | Non-Compliant |

The Monitor finds that **PRPB is in partial compliance with 4 of the 6 paragraphs that address Information Technology, and non-compliance with 2 of the 6 paragraphs.** The Monitor recommends broadly that PRPB invest in both IT resources and IT-related human resources, which would provide PRPB with the data it requires both to police more effectively and to track its compliance with the Agreement.

## Conclusions

We must conclude through our quantitative and qualitative analysis that the PRPB has made some measurable progress towards complying with the mandates of the Agreement, particularly with respect to investigating use of deadly force, as well as planning and responding to a mass demonstration. These positive developments are no doubt the result of reforms PRPB undertook during the four-year capacity-building period granted under the Agreement. The Monitoring team recognizes and commends PRPB for these accomplishments.

Nevertheless, these reforms still lag behind the performance benchmarks outlined in multiple performance areas of the Agreement, especially regarding Information Technology and the work of the Force Investigation Unit. After having five years to build investigative capacity to analyze and adjudicate their officers' involvement in deadly force cases, the Monitoring Team expected to see a far more effective, efficient and transparent process to address incidents that can have a negative effect on public trust and confidence in their police bureau. There is clear need for both capacity building as well as the removal of internal and external information-sharing barriers in order to bring the PRPB into substantial compliance across the board in use of deadly force investigations.

Paragraph #48 of the Agreement requires PRPB to create and establish the Force Investigations Unit (FIU) which shall ensure that all serious uses of force and allegations of excessive force are investigated fully and fairly by individuals with appropriate expertise, independence, and investigative skills to ensure that uses of force that are contrary to law or policy are identified and appropriately resolved and that policy or operational deficiencies related to the use of force are identified and corrected.

In order for FIU to accomplish their mission they must have access to critical information collected internally (by other units within the Bureau) and externally (by other agencies within DSP). The fact that the Monitoring Team uncovered that these units and agencies were not sharing critical information with FIU is inexplicable. What was even more troubling, is the fact that it took the Monitoring Team reviewing intentional firearm discharges to bring the problem to light. FIU has been in existence since 2015. At that time this issue should have been properly discussed and any barriers relating to the sharing of information should have been addressed and resolved.

We mentioned at the outset of this report, our duty is to monitor, assess and objectively report. We also acknowledge a concurrent duty to both the PRPB and the residents of

the Commonwealth to provide constructive criticism and suggestions when warranted, in order to help the PRPB accelerate its pathway to full compliance.

Consequently, we have attached an appendix (Appendix D) to this report, which includes a list prepared by the Monitor of recurrent problems or issues that the Monitoring Team has seen broadly across the data. The PRPB may find both documents helpful in further identifying the areas in their formative training, specialized training, investigative operations, review processes and workflow that hinder their present ability to satisfy the mandates of the Agreement. Furthermore, the Monitoring Team stands ready to further assist the PRPB to help develop or enhance the capacity needed.

While we have insufficient data to declare the PRPB is in substantial compliance with regard to managing mass civil demonstrations, we are greatly encouraged by what we witnessed in May 1st ,2019. If this particular case is in fact a template of a PRPB mass demonstration response, we will no doubt eventually find that the PRPB is in sustainable compliance with the Agreement.

In the realm of IT, we still await the PRPB's successful transition from capacity building to compliance monitoring. From the Monitor's perspective, PRPB IT development will make the monitoring process timely and far more efficient. From the perspective of the residents of Puerto Rico, enhancement of community policing across the Commonwealth through well-developed and effective IT systems will increase trust in the police. The importance of the above accomplishment cannot be underestimated.

As a general rule in policing, the cost of human resources increases over time. It is also well accepted that the cost and power of technology actually decreases over time. Any capital or human investment made in IT is certain to benefit the PRPB by making it more efficient, thereby ultimately lowering the human cost of police operations.

Even though some of our findings and assessments are not at this time favorable to the PRPB, The Monitor is certain that all deficiencies will be overcome by the bureau with the unwavering support of USDOJ and the Monitoring Team.

## Recommendations

- Per Paragraph 37, the Monitor recommends that additional training and supervision be given and provided by the PRPB to its officers and front-line supervisors to eliminate the boilerplate and stereotype language from these incident reports.

- Per Paragraph 39, the Monitor recommends that the PRPB instruct officers to ensure that their Use of Force Reports are written in block letters, until such time as they are prepared on a wholly digital platform.
- Per Paragraphs 41, 50, 51, and 52, the Monitor acknowledges the delay that FIU investigators face in receiving all relevant data to reach determinations on officer-involved shootings, but nevertheless recommends that PRPPB make all possible effort to ensure that FIU investigations receive all relevant evidence, including video and photographic evidence, before reaching a determination as to whether a shooting was within policy. Furthermore, the Monitor recommends that PRPB reevaluate all FIU investigations in order to incorporate new data that has been received after the FIU investigations reached their conclusions.
- Per Paragraph 45, the Monitor recommends that PRPB take advantage of the procedural opportunity offered by the Agreement to assure quality and thoroughness in these crucial investigations, while at the same time actively seek to learn lessons or identify their standard practices in these incidents.
- Per Paragraph 34, the Monitor recommends that PRPB members be proactively trained and that a practical training curriculum be updated and given to the FIU in light of these findings.
- Per Paragraphs 110 and 111, the Monitor recommends that PRPB take active measures to ensure that department-wide and unit-level policy manuals are made available in hard copy to all PRPB personnel.
- Per Paragraphs 218-223, the Monitor recommends broadly that PRPB invest in both IT resources and IT-related human resources, which would provide PRPB with the data it requires both to police more effectively and to track its compliance with the Agreement.

46

# Appendix A: Background to the PRPB Monitoring Mission

In 2008, USDOJ initiated an investigation of PRPB into an alleged pattern or practice of using excessive force, conducting unlawful searches and seizures and unlawful discrimination, all of which are proscribed by the United States Constitution. USDOJ conducted their investigation pursuant to the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141, and the anti-discrimination provisions of the Omnibus Crime Control and Safe Streets Act, 42 U.S.C. § 3789d. PRPB accepted the grounds for the investigation and pledged cooperation, and has worked in partnership with USDOJ to establish the reforms outlined in this Agreement.

As part of its investigation, USDOJ and its police practices expert consultants conducted a detailed fact-finding review with the assistance and full cooperation of PRPB, including a) tours of police areas; b) interviews with PRPB officers, supervisors, command staff, Commonwealth officials, members of the public, and other stakeholders; c) review of many thousands of documents, including policies and procedures, incident reports, internal investigation of civilian complaint records, external audit reports, and legislative materials; d) accompanying line officers and supervisors during their respective tours of duty. PRPB's Superintendent and command staff officials met personally with USDOJ representatives and consultants on multiple occasions and pledged their full support and cooperation.

In response to the concerns expressed in the Agreement and in recognition of the need to modernize and professionalize its operations, the PRPB undertook its own internal reform efforts. These efforts culminated in the issuance in March 2011 of PRPB's own internal reform plan. The plan included 1) the development and implementation of new policies regarding use of force and a wide range of other substantive areas; 2) the training of all appropriate officers in the new use of force policies through "train-the-trainer" pedagogy; 3) the adoption of a reformed disciplinary system; 4) the improvement of citizen complaint procedures; 5) the strengthening of community outreach efforts through Citizen Interaction Committees; and 6) a staffing review to improve supervisor to officer ratios.

In September 2011, USDOJ issued a written report of its investigative findings ("the Report"). The Report presented USDOJ's findings related to use of force, use of force to suppress the exercise of First Amendment rights, and searches and seizures. The Report identified several additional areas of serious concern, including discriminatory policing and the insufficient quality of investigation into sex crimes and domestic violence. Finally, the Report outlined a series of other performance issues: 1) systemic deficiencies in PRPB's policies and procedures; 2) conduct of specialized units; 3) formative and in-

service training; 4) supervision; 5) intake, internal investigation, and institutional adjudication of administrative misconduct complaints; 6) corrupt acts and other crimes committed by PRPB officers; 7) substandard processes for promotion in rank; 8) lack of risk management; 9) poor external oversight and accountability; and 10) a lack of sufficient community engagement. The Report concludes that the performance of PRPB was undermined by a number of entrenched and long-standing problems, which in the estimation of USDOJ called for a systemic remedy.

While PRPB did not concur with all of the findings and conclusions in the Report, the Parties met throughout 2012 to exchange ideas and proposals for modernizing and professionalizing PRPB and to discuss numerous reforms already underway at PRPB's own initiative. Once the newly elected Commonwealth administration took office in January 2013, the administration familiarized itself with the Agreement and continued negotiating to reach a final Agreement. The Agreement is the product of these good faith negotiations. In July of 2013, the draft Agreement was presented to the Honorable Gustavo A. Gelpi, Chief Judge of the US District Court for the District of Puerto Rico, who approved the draft, formalizing the Agreement.

On June 5, 2014, the Court approved the selection and hiring of an independent monitor to help the PRPB during the capacity building phase and thereafter monitoring the compliance period of the Agreement.

Unlike other consent decrees throughout the United States and its territories, and owing to the unique institutional development and needs of the Commonwealth, the Agreement between the USDOJ and Commonwealth of Puerto Rico included a four-year "capacity-building" phase. During that phase, the PRPB was expected to develop policies, procedures and technologies to address serious deficiencies within the agency. The Monitoring Team, which is comprised of subject matter experts, was expected to provide substantive expertise and technical assistance to guide PRPB in its implementation and development efforts, while at the same time providing the public with assurance that PRPB's progress would be evaluated in a reliable, independent and transparent manner.

The capacity-building period concluded on October 8, 2018, at which time the "monitoring phase" was to commence according to the Agreement. However, at that time the Monitor and Parties were unable to come to a consensus on the methodology matrices that the Monitor's office proposed to use to measure PRPB's compliance with the Agreement. This resulted in a delay in the start of the monitoring phase, and the Court subsequently suspended monitoring measures pending the finalization and acceptance of a compliance assessment methodology agreeable to the Parties. The PRPB, legal counsel and the USDOJ conferred with the Monitoring team over the course of six (6)

months to develop methodology matrices necessary to measure compliance for the eleven (11) performance areas outlined in the Agreement. After review, and with the assent of the Parties, the Court accepted the objective methodologies put forth by the Monitor's Office.

For example, the Monitor assesses compliance to determine compliance with policy, training, and implementation requirements, pursuant to Paragraph 242. The semi-annual reports are prepared in accordance with Paragraph 251. The Monitor is to assess the Commonwealth's compliance based on the agreed-upon and approved monitoring methodologies, pursuant to Paragraph 248.

# Appendix B: Methodology

In agreement with the approved methodology, the Monitoring Team uses a combination of quantitative and qualitative methods to assess PRPB's compliance with the Agreement in the three areas of performance selected for this report. For the present report, these methods include a desk review of documents provided by the PRPB, quantitative analysis of Use of Force investigations, and site visits to determine the implementation of the practices outlined for policies and procedures.[10]

In all cases where the Monitor's office obtained sufficient evidence to reach a conclusion, we have provided an assessment of PRPB policies and practices according to the degree with the paragraphs in the Agreement. Where there was insufficient evidence to reach a determination for a particular paragraph of the agreement, the report indicates as such. The compliance levels are defined as follows:

- **Full Compliance:** Where the PRPB has objectively demonstrated extensive compliance with the cited portion of the Agreement for a period of more than two years;
- **Substantial Compliance:** Where the PRPB has objectively demonstrated extensive compliance with the cited portion of the Agreement for a period of less than two years;
- **Partial Compliance:** Where the PRPB has objectively demonstrated sub-optimal level of compliance with the cited portion of the Agreement;
- **Non-Compliance:** Where the PRPB has not objectively demonstrated compliance with the cited portion of the Agreement;
- **Rating Deferred:** Where the Monitoring team has not received sufficient evidence to reach a determination as to compliance status with the cited portion of the Agreement.

Due to the limited nature and scope of this particular assessment, documents related to some cited portions of the Agreement were neither asked for nor received by the Monitors and therefore cannot be subject to review in this Report. As such, no conclusions should be drawn by any Party or the Court regarding other areas of the Agreement not covered in the present Report. We have marked these particular areas of the Agreement, as "Rating Deferred."

---

[10] Due to the extended negotiation of the monitoring methodology and time constraints in the preparation of CMR-1, some findings are based on a provisional implementation of the monitoring methodology; future monitor reports will substantiate the Monitor's assessment with a full implementation of the Agreement methodology.

Two of the areas of performance considered in this report – Policies and Procedures and Use of Force – are sufficiently broad in scope and volume of data that the Monitoring Team had to draw a representative sample of data for analysis in reaching our assessment as to the level of compliance. The sampling process for those two areas is outlined below. The Monitor's assessment of Information Technology Systems capacity relies on the written observations of the IT subject matter expert Monitor over the course of multiple on-site visits over an extended period of time.

## Policies and Procedures

The Monitoring Team assessed PRPB Policies and Procedures ("P&P") by conducting a desk review of the written content of these policies and procedures, and comparing it to the requirements established in the Agreement. This review was somewhat hindered by delays in the delivery of the relevant documents by the PRPB. The Monitor sought P&P documents multiple times prior to the 2019 site visit, and again while on the ground in San Juan in November 2019. However, the PRPB was unable to provide all documents necessary for a valid desk review within the allotted time, and the Court issued the Monitor an extension for the completion of this report beyond the 2019 calendar year.

During that period of extension, the PRPB provided a document entitled *Reform Policies in Accordance with the Agreement*, which outlined P&P revisions in response to the Monitor's multiple requests for this data. This document outlines 131 P&P items in the following categories: General Orders (by area), Glossaries, Manuals, Protocols and Regulations. The Monitoring Team utilized this document to draw a random sample of twenty-six (26) out of the 131 total documents, which represents 20% of all Reform Policies and corresponds with the methodology that the parties had previously agreed upon. For the purpose of selecting this random sample, the Monitor's office selected every fifth item, beginning with the first item on the document list.

## Use of Force

In assessing Use of Force, investigative efficacy was challenged by the sheer volume of electronic and paper documents. Some of these documents were highly relevant, while others were partially relevant or not relevant at all. Despite the volume of data, all cases required careful review by one of the members of the Monitoring Team qualified to conduct such an examination and reach a determination. There were only four such members of the Monitoring Team, however, requiring that the Monitor limit the scope of its inquiry accordingly.

As a result, the Monitoring Team confined its inquiry into the Firearms Investigative Unit ("FIU") to a nine-month period. This resulting sample covers all FIU investigations for the period of performance covered by the present report, and provides a robust evidence as to the quality and thoroughness of PRPB investigations and SFRB review of intentional firearms discharges by its members. The Monitor requested all administrative investigation files of PRPB's Force Investigations Unit (FIU) from October/2018 through June/2019 involving intentional firearms discharge. To that end, the Monitor's Office reviewed forty-eight (48) case files involving eighty-seven (87) members of the service who each intentionally discharged a firearm. Nine cases deemed to be accidental discharges were intentionally excluded from the sample.

Through the use of a Worksheet format, qualified Team members conducted a desk review of each file in order to determine whether certain established procedures for these investigations were followed by the original investigator(s). Each of these 18 desk review inquiries was answered either in the affirmative or negative, and assigned a binary score to determine the percentage of compliance with the Agreement and/or generally accepted practices to investigate police-involved firearm discharges in the United States.

Upon concluding the desk review component of our methodology, we noted a paucity of important investigative information in the firearm discharge investigative files as they pertained to both physical evidence and crime scene documentation. Due to the dearth of information contained within these files, it was impossible to reach any meaningful conclusion with regard to SARP's tracking system and any strategic, policy or training decisions based upon same.

In light of this observation, the Monitor decided to make note of deficiencies observed in each case, and conduct on-site file reviews in San Juan to ensure that no document relating to our report was overlooked. This decision was reached in the best interest of crafting a comprehensive report, not to mention in the interest of fairness to the PRPB. As mentioned previously, the Monitoring Team are greatly relieved that we chose to wait for the results of our site review before making our determination on compliance for this report.

# Appendix C: Compliance Status Tables for Policies and Procedures

This appendix presents the Monitor's assessment of Policies and Procedures. The appendix organizes this assessment *both* by policies assessed (Table 3) and by paragraph of the Consent Decree (Tables 4-11). Monitors reviewed 26 of the 131 documents produced by PRPB to determine the level of compliance based on the following criteria: 1) Was the document promulgated within the corresponding deadline? 2) Was the document reviewed by PRPB within the timeframe established by the Agreement? 3) Does the substance of the document comply with the language of the Agreement (paragraphs 109-116) and with broadly accepted policing standards?

Compliance status for paragraphs, in turn, were assessed based on the compliance level of the sampled documents.

TABLE 6: POLICIES SAMPLED FOR ANALYSIS IN THE FIRST REPORT OF THE FEDERAL MONITOR

| Policy # | Title | Date Promulgated | Last Reviewed | Level of Compliance |
|---|---|---|---|---|
| **G.O. 100-105** | Stolen Vehicles Investigation Bureau | July 03, 2008 | September 03, 2019 (every 2 years)- Not part of Action Plans | Substantial |
| **G.O. 100-112** | Division of Tactical Operations | January 21, 2016 | September 5, 2019 | Substantial |
| **G.O. 100-115** | Sex Crimes | April 21, 2016 | May 7, 2019 | Substantial |
| **G.O. 100-132** | Major Crime Division | May 30, 2017 | July 12, 2019 | Substantial |
| **G.O. 100-140** | Office of Explosives and Public Safety | August 3, 2018 | Review not yet due | Substantial |
| **G.O. 200-210** | Copyrights | December 12, 2018 | Not due yet (every 2 years) | Deferred |
| **G.O. 300-307** | Police and procedures for police personnel related to sickness, work-related injuries, and referrals to "La Corporación del Fondo del Seguro del Estado." | October 5, 2016 | In Progress (every 2 years) | Substantial |
| **G.O. 300-308** | Employee Assistance | Feb 28, 2017 | July 2019 | Substantial |
| **G.O. 300-311** | Citizen Complaints | November 2, 2015 | July 30, 2018 | Substantial |

| G.O. 400-408 | Access and Management of Criminal Justice Information Systems | January 14, 2019 | Review due January 2021 (every 2 years) | Substantial |
|---|---|---|---|---|
| G.O. 600-604 | Use and Management of Pepper Spray | January 31, 2012 | July 1, 2019 | Substantial |
| G.O. 600-612 | Search & Seizures | August 27, 2014 | May 28, 2019 | Substantial |
| G.O. 600-616 | Policies and procedures for the administration of PRPB aviation services. | February 20, 2015 | Review in progress (every 2 years)- not part of Action Plans | Substantial |
| G.O. 600-617 | Code of Ethics of Members of the PRPB | April 24, 2015 | May 28, 2019 | Substantial |
| G.O. 600-619 | Moving Vehicle Stops | May 26, 2016 | June 25, 2019 | Substantial |
| G.O. 600-620 | Specialized Weapons of the Division of Specialized Tactics | February 11, 2016 | March 8, 2019 | Substantial |
| G.O. 600-630 | Hate Crimes | October 13, 2016 | August 22, 2019 | Substantial |
| G.O. 600–632 | Elimination of Sexual Violations in Cells (PREA) | December 19, 2016 | October 25, 2018 9wvery 2 years) | Substantial |
| G.O. 600-636 | Evidence Room | April 26, 2017 | November 1, 2019 | Substantial |
| G.O. 700-702 | Recruit Training | April 12, 2017 | July 20, 2018 (every 2 years) | Substantial |
| Manual | Basic Glossary- Concepts of Use of Force Policies | August 24, 2016 | Review in Progress (every 2 years)- Not part of Action Plans | Substantial |
| Manual | Manual for the Use of Computerized Systems | July 30, 2018 | Review due July 2020 (every 2 years) | Substantial |
| Manual | Instruction manual for procedures of the division of security license expedition. | August 23, 2018 | Due August 2020 | Substantial |
| Manual | Instruction manual for traffic accident reports. | August 9, 2018 | March 12,2019<br><br>October 30, 2019 | Substantial |
| Manual | Public Disclosure of Incidents | April 1, 2019 | April 2021 | Substantial |
| Rule 4216 | Personnel Rules and Regulations | 1990 | In revision (every 5 years) | Deferred |

TABLE 7: PARAGRAPH 109 COMPLIANCE ASSESSMENT

| Paragraph 109 | Due Date: | Monitor's Rating: |
|---|---|---|
| | Various | Substantial Compliance |
| Paragraph Language | Policies and procedures shall reflect and express PRPD's core values and priorities and provide clear guidance to ensure that officers and civilian employees lawfully, effectively, and ethically serve the community. PRPD shall develop comprehensive and agency- wide policies and procedures to ensure consistency with, and full implementation of, each requirement of this Agreement. These policies and procedures shall define terms clearly, comply with applicable law, and comport with generally accepted policing practice. PRPD shall apply policies uniformly and hold officers accountable for complying with policies and advancing PRPD's core values and priorities. | |
| Monitor's Assessment | The Monitor and his team of subject matter experts reviewed and approved 154 PRPB policies during the capacity building period. These policies were also reviewed and approved by USDOJ. The policies reviewed provided clear guidance, were lawful, ethical and reflected generally accepted policing practice. | |
| Recommendations | The Monitor will continue to monitor and review all PRPB policies going forward to ensure they comply with the Agreement and that they are reviewed periodically as per the Agreement. | |

TABLE 8: PARAGRAPH 110 COMPLIANCE ASSESSMENT

| Paragraph 110 | Due Date: | Monitor's Rating: |
|---|---|---|
| | End of capacity-building period | Partial Compliance |
| Paragraph Language | PRPD shall develop and publish a department-wide policy and procedure manual that will include all policies, procedures, and regulations governing all administrative and operational aspects of PRPD. The manual shall be organized by subject-matter and indexed for reference. | |
| Monitor's Assessment | The PRPB reform unit has compiled a repository of all department-wide policies, procedures, and regulations. These materials have also been made available on PRPB's webpage. However, a department-wide policy manual has yet to be compiled and distributed. | |
| Recommendations | The Monitor will continue to assess this paragraph until PRPB complies | |

TABLE 9: PARAGRAPH 111 COMPLIANCE ASSESSMENT

| Paragraph 111 | Due Date: | Monitor's Rating: |
|---|---|---|
| | End of capacity-building period | Partial Compliance |

55

| Paragraph Language | PRPD's unit-wide policies and procedures shall be collected in unit-level policy and procedure manuals. PRPD shall develop unit-level policy and procedure manuals for, at a minimum, the following PRPD units or functions: |
|---|---|
| | a) Field operations, including patrol, special and tactical operations, field support, special weapons and tactics, canines, supervision task forces, and mass demonstration or event policing; |
| | b) SPR, including case and records management, administrative investigations, confidential investigations, parallel criminal and administrative investigations, FIU investigations, audits, and officer drug testing; |
| | c) Use of Force Reporting, Investigation, and Review, including both Supervisory and Serious Use of Force Investigations and Review; and In- Custody Death Reviews; |
| | d) Criminal investigations, including sub-units assigned to investigate homicides, sexual assaults, domestic violence, narcotics, vice, and illegal firearms; |
| | e) Recruitment and Training, including training provided by UCCJ and in- service training. |
| Monitor's Assessment | PRPB has created some of the manuals, such as in SAIC's Criminal Investigations Division: Drug Unit, Domestic Violence, and Sexual Assault Unit; SARP Manual; However, no SAOC manual as of this date, but some units under SAOC, such as SWAT and DOT have manuals. |
| Recommendations | PRPB has basically created all the policies required to be in these manuals. It's a matter of PRPB putting them together in a manual. Monitor will continue to review manuals as they are submitted by PRPB. |

TABLE 10: PARAGRAPH 112 COMPLIANCE ASSESSMENT

| Paragraph 112 | Due Date: Various | Monitor's Rating: Substantial Compliance |
|---|---|---|
| Paragraph Language | PRPD shall review each newly developed policy after it is issued and revise the policy as necessary to ensure that it provides effective guidance to PRPD personnel | |
| Monitor's Assessment | PRPB has created 154 policies and has reviewed and/or revised them when necessary. The Monitor as well as the Parties have also reviewed and approved these policies as they are issued. A schedule of review due for each policy has been submitted to the Monitor. | |
| Recommendations | PRPB to continue policy reviews/revision as per Agreement. The Monitor will continue to review each policy as it is submitted. | |

TABLE 11: PARAGRAPH 113 COMPLIANCE ASSESSMENT

| Paragraph 113 | Due Date: Various | Monitor's Rating: Substantial Compliance |
|---|---|---|
| Paragraph Language | PRPD shall review each policy or procedure created or revised pursuant to this Agreement on an annual basis for the first three years from the Appointment Date or upon notice of | |

| | |
|---|---|
| | a policy deficiency, and biannually thereafter. PRPD will develop a schedule for the biannual review. PRPD shall make revisions as necessary to ensure that policies and procedures remain consistent with this Agreement, generally accepted policing practice, and current law. All PRPD policies, including but not limited to those created pursuant to this Agreement, shall be posted online and otherwise made publicly available in a timely manner. Reasonable exceptions shall apply to policies and procedures that are law enforcement sensitive. |
| **Monitor's Assessment** | PRPB has reviewed and/or revised the vast majority of its policies in a timely manner in accordance with the Agreement. Biannual reviews/revisions have been conducted and comport to generally accepted policing practice. The policies reviewed were approved by the Monitor and the Parties. PRPB has created a schedule of reviews/revisions and submitted it to the Monitor and the Parties. |
| **Recommendations** | PRPB should continue to review/revise policies as per the Agreement. The Monitor will continue to review PRPB policies as they are issued to ensure compliance with the Agreement. |

TABLE 12: PARAGRAPH 114 COMPLIANCE ASSESSMENT

| Paragraph 114 | Due Date: Various | Monitor's Rating: Substantial Compliance |
|---|---|---|
| **Paragraph Language** | Within a reasonable period of time, PRPD shall ensure that all relevant PRPD personnel have received, read, and been trained on all new or amended policies or procedures as necessary to fulfill their role as required by policies and procedures, including the obligation to report any policy or procedure violation. | |
| **Monitor's Assessment** | PRPB reports that it ensures all personnel receive and read all policies and procedures by holding police directors and commanders accountable for their distribution; also, officers are read these new policies and revisions through monthly meetings, roll call, and monthly academies held at the Area and District levels. Training on policies is on-going. The Monitor has verified: a) officers sign-up sheets for receipt of policies; b) training on policies (personal observation); and the mandate for employees to report policy and procedure violations on many policies. | |
| **Recommendations** | Going forward, the Monitor will randomly check with Area and District Commanders, as well as with the Academy; also will inspect officer's personnel folders to ensure compliance continues. | |

TABLE 13: PARAGRAPH 115 COMPLIANCE ASSESSMENT

| Paragraph 115 | Due Date: Various | Monitor's Rating: Substantial Compliance |
|---|---|---|
| **Paragraph Language** | PRPD shall document that each relevant PRPD officer or other employee has received, read, and been trained appropriately regarding PRPD's policies and procedures. | |

| Monitor's Assessment | Main PRPB Academy, as well as monthly academy classes are held at the Area and District levels to train officers. The Monitor has attended some of these classes and verified proper training going on. The Academy keeps a record of all officers trained. This record is undergoing digitalization for better management and easier access by supervisory personnel. |
|---|---|
| Recommendations | The Monitor will continue to attend random classes at the Main Academy and Area's monthly academies, as well as roll calls to monitor for compliance. |

TABLE 14: PARAGRAPH 116 COMPLIANCE ASSESSMENT

| Paragraph 116 | Due Date:<br>Various | Monitor's Rating:<br><br>Substantial Compliance |
|---|---|---|
| Paragraph Language | PRPD shall advise all officers that taking police action in violation of PRPD policy may subject officers to discipline, possible criminal prosecution, and/or civil liability. | |
| Monitor's Assessment | The Monitor has reviewed and approved many PRPB policies where it is clearly stated that officers who violate policies are subject to discipline and possible criminal prosecution, and/or civil liability may be imposed. | |
| Recommendations | Going forward, the Monitor will continue to assess and look for this statement on all new or re-issued policies by PRPB. | |

58

# Appendix D: Persistent Problems with UOF Investigation of Officer-Involved Shootings

It is understandable that in the early stages of firearms investigation information is limited. Therefore, it's important that the initial report be clearly marked preliminary and subject to change as more information becomes available. Nevertheless, the Monitor encountered a number of persistent problems with the quality and outcomes of use of force investigations in relation to officer-involved shootings. This appendix outlines the major persistent issues encountered.

Paragraph 48 of the Agreement, as it relates to FIU Investigations and Force Reviews by CFRB, states PRPB shall ensure that all serious uses of force and allegations of excessive force are investigated fully and fairly by individuals with appropriate expertise, independence, and investigative skills to ensure that uses of force that are contrary to law or policy are identified and appropriately resolved and that policy or operational deficiencies related to the use of force are identified and corrected.

This emphasis on FIU investigations results from a number of officer-involved shootings that presented serious violations of UOF policies. These violations included shooting at motion vehicles and/or from motor vehicles, which risks injury to both the officer and to civilians. One particular incident involved an officer shooting from a motor vehicle at another motor vehicle in traffic. In another case, an officer stepped in front of a motor vehicle, placing himself at risk, before firing on the vehicle. Though the Monitor does not wish to speculate on the officer's motives, this incident might give the appearance that the officer intentionally put himself at risk in order to justify a higher level use of force.

To this end, PRPB shall create FIU to conduct investigation. However, while PRPB has developed this very important unit and review board, the investigations lack thoroughness. We have therefore provided a succinct list of the main accomplishments and persistent problems that the Monitoring Team has encountered in relation to the work of UOF investigations.

## Accomplishments

- Creation of the Force Investigation Unit FIU
- Creation of SARP Force Review Board
- Developed a comprehensive Use of Force Policy.
- Developed a comprehensive Force Reporting Policy

**Persistent Problems**

- There is no one report containing all of the precise details. There should be one cohesive report containing all of the actions by those involved. As you read through the reports you keep getting new information including discrepancies in the reports.
- FIU's report on completion of investigation only addresses if the discharge is within Bureau policy and consistent with the Agreement.
- In many of the cases reviewed it is reported that Forensic and /or Technical Services responded. While it appears these units respond, there is no evidence that they documented the scene and collected evidence.
- No evidence that officers are assigned to locate potential witnesses from the area.
- No mention of efforts to secure surveillance from local business and/or residents.
- No pictures or diagrams of the scene.
- No mention if reports generated by CIC relating to the discharge are made available to FIU. If they are made available, why are they not in the case file?
- It appears based on our review that in many instances the various reports related to the discharge (PPR-605.1, PPR-928, PPR113.1, PPR-113.2 etc.) have not been compared in order ensure accuracy and/or to identify discrepancies in the reporting.
- No mention if officers who are involved in a firearm discharge are secluded from other members who discharged their weapons in order to preserve the integrity of their declaration.
- After discharge, reports indicate weapons used in the firearm discharge are collected, however no mention as to whether the firearm was tested to determine if it is functioning properly.
- No comments related to a review of the tactics employed by officers involved in a firearm discharge. It could be important for future training purposes.
- The case files do not contain the CFRB's evaluation (Final Report) of the firearms investigation.