**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF PUERTO RICO**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff;<br><br>v.<br><br>COMMONWEALTH OF PUERTO RICO, ET AL.,<br><br>Defendants. | No. 12-cv-2039 (GAG) |

**UNITED STATES' RESPONSE TO THE MONITOR'S FIRST REPORT**

TO THE HONORABLE COURT:

Plaintiff, the United States of America, through the undersigned counsel, respectfully submits its response to the "First Report of the Federal Monitor" (First Report), ECF No. 1435-1 (Mar. 29, 2020), pursuant to Paragraph 252 of the Agreement for the Sustainable Reform of the Puerto Rico Police Department (Agreement), ECF No. 60 (July 17, 2013). The United States recognizes the Monitoring Team for its hard work and thoughtful analysis in preparing its first report of the new compliance monitoring phase of the case.

The First Report identifies striking deficiencies in the investigations of officer-involved shootings conducted by the Puerto Rico Police Bureau (PRPB). The systemic nature of the problems will require a sustained and coordinated effort to ensure that PRPB conducts the kind of thorough investigations of officer-involved shootings required by the Agreement. This First Report's assessment of a sample of PRPB's policies and procedures should be expanded in future reports to include all policies and procedures. This will enable the Monitor to fulfill the requirements of the monitoring methodologies approved by the Court. *See* Consensus Methodologies, ECF Nos. 1255-2, 1272,1, 1363-4.

A. **The Monitor's First Report**

The First Report is the Monitor's first semi-annual assessment of the Commonwealth's compliance with the Agreement. It comes after 52 months of capacity building in which the Commonwealth had the opportunity to address PRPB's resource, staffing, infrastructure, and technology needs to place PRPB "in a position to implement each of the Agreement's provisions" across eleven substantive areas.[1]  Agreement ¶ 237. In the compliance monitoring phase, the Monitor is charged with assessing and reporting on the Commonwealth's implementation of the Agreement every six months to determine whether each paragraph is: (a) incorporated into an implemented policy; (b) the subject of sufficient training; and (c) implemented in practice. *Id.* ¶¶ 242, 251(b). The Monitor need not assess every requirement in each report, so long as each requirement is assessed at least annually. *Id.* ¶¶ 245(b), 251(b).

A monitoring methodology, developed jointly with the Parties and approved by the Court, guides the Monitor's compliance assessments. *Id.* ¶¶ 245, 248. The methodology permits the Monitor to measure the Commonwealth's compliance in a consistent and systematic manner every six months until the Commonwealth achieves and maintains substantial compliance with each substantive paragraph for at least two years. *See id.* ¶ 294. As the Court observed in its October 30, 2019, Order approving the final set of methodologies:

> The importance of a consensus methodology lies on the fact that both parties and monitor, with the direction of the former special master, have agreed on the manner in which the PRPB will be evaluated over the next several years. Most importantly, they have agreed as to the manner in which "success" will be

---

[1] The capacity-building period began with the appointment of the former Monitor (or Technical Compliance Advisor) in June 2014 and culminated in October 2018 for most capacity-building activities. *See* Order, ECF No. 954 (Sept. 22, 2018). All of the Monitor's prior semi-annual reports focused on the Commonwealth's compliance with its approved action plans, rather than with the Agreement, as required by Paragraph 240. Agreement ¶ 240.

> attained in each of the 11 areas of the reform.  This is a historical achievement and one that ensures that the process is both valid and reliable.

Order at 1, ECF No. 1364 (Oct. 30, 2019).

The scope of the First Report is limited on account of several unexpected developments over the past year, including the departure of the former Monitor in May 2019 and the demonstrations in July 2019 that led to the former Governor's resignation.  The Court also granted a two-month extension to prepare the First Report after PRPB did not produce timely information requested by the Monitor.  *See* Mins. of Proceedings ¶ 6, ECF No. 1388 (Dec. 9, 2019).  Specifically, the First Report evaluates the Commonwealth's implementation of 28 of 211 substantive paragraphs in three of the eleven areas of the Agreement:  Policies and Procedures (Paragraphs 109-116); Use of Force (Paragraphs 36-41, 43-45, 48-52); and Information Systems and Technology (Paragraphs 218-223).  It covers incidents and implementation activities from October 1, 2018, to June 30, 2019.[2]

The Monitor's compliance ratings on use of force are based on an evaluation of intentional firearm discharges.  Going forward, the Monitor will need to assess all types of force by officers, as set forth in the approved methodology.  *See, e.g.,* Consensus Methodology on Use of Force ¶¶ 36, 40, ECF No. 1255-2 (June 13, 2019).  The Monitor's compliance ratings on policies are based on a 20 percent sample of all relevant policies issued by PRPB.  The Monitor will need to review all relevant policies to determine whether each substantive paragraph of the Agreement is incorporated into an implemented policy, pursuant to Paragraph 242 of the Agreement.  These scoping limitations are understandable given the circumstances mentioned

---

[2]  Because of the additional time necessary to complete the monitoring methodology after the former Monitor's departure, the Monitor agreed to assess a nine-month period for the First Report.  The Monitor's next report will also cover a nine-month period, from July 2019 to March 2020, before he resumes six-month reporting cycles, as required by Paragraph 251 of the Agreement.

3

above. Still, the First Report provides considerable insight into officers' use of deadly force from the Monitor's targeted review of officer-involved shootings.

### B. Monitor's Review of Officer-Involved Shootings

The Monitor reviewed all 48 PRPB investigations of intentional firearm discharges reported by PRPB from October 1, 2018, to June 30, 2019. Although the Monitor found some steps in the reporting and investigation process to be in "substantial compliance" with the Agreement, such as the timing for completing initial force reports, the on-scene response of the Force Investigation Unit, and calling for medical assistance when an individual is injured, the Monitor found that the overall quality of the investigations is lacking: "Our desk review has uncovered repeated examples of substandard investigative practices which fall well short of standard police practices in this category of specialized investigations." First Rep. at 31.

Specifically, the problems include failures to: (a) identify and interview witnesses; (b) seek video recordings; (c) obtain and analyze ballistic and firearm examinations; (d) obtain and analyze photographs, diagrams, and other physical evidence; and (e) examine officers' statements against other evidence. *Id.* at 17-22.[3] The Monitor observed that in many cases "there was a complete lack of empirical and independent forensic evidence or witness statements that could support (or undermine) the officers' assertion that his/her use of force was within policy and therefore justified." *Id.* at 20. The Monitor concluded that these problems, taken together, raise serious concerns regarding the objectivity, thoroughness, and accuracy of PRPB's investigations. *Id.* at 4.

The Monitor also found that the Commissioner's Force Review Board essentially worked as a "rubber stamp procedure" by failing to critically review the Force Investigation Unit's

---

[3] Appendix D includes a full list of "persistent problems" uncovered by the Monitor. First Rep. at 60.

investigations.  *Id*.  The Monitor found it "not acceptable" that the Force Review Board did not return a single case back to the Force Investigation Unit for further investigation or recommend changes to agency rules or procedures "[g]iven the lack of basic investigative steps taken in so many of [the] cases."  *Id.* at 19.  He concluded:  "The fact that so many cases lacked both witness statements and forensic evidence, and yet were closed by [the Force Investigation Unit] and upheld by [the Commissioner's Force Review Board] as justified in-policy uses of force is implausible and would most likely not stand up to inevitably intense public scrutiny."  *Id.* at 20.

The problems identified by the Monitor are systemic and will require sustained corrective action to improve the quality of investigations and the effectiveness of internal accountability systems in accordance with the Agreement.  For instance, the Monitor attributed repeated problems to factors that include insufficient training for investigators, barriers to information-sharing among units and agencies, and understaffing at the Force Investigation Unit.  *Id.* at 15.  The Monitor also found that, in many cases, the Force Investigation Unit reached determinations without obtaining and analyzing key evidence, such as photographs and ballistic analyses, that "would provide crucial support for conclusions made of either justifiable or non-justifiable use of deadly force by a PRPB officer."  *Id.* at 13.  The First Report includes a list of recommendations to address these issues, pursuant to Paragraph 251(d) of the Agreement.  *Id.* at 6.  A key recommendation calls for PRPB to reexamine investigations to determine whether the Force Investigation Unit reached a determination on the use of force "before all relevant evidence was acquired and included into the FIU file."  *Id.* at 32.  If so, the Monitor recommends that PRPB reopen these investigations and reconsider the determinations within 90 days after proper investigations are completed and new and relevant information is incorporated into the investigation.  *Id.* at 32-33.  The United States concurs with the Monitor's recommendations and the need to reexamine incomplete investigations within 90 days.  In addition, the United States

recommends that the Commonwealth develop a corrective action plan that incorporates the Monitor's recommendations and assigns responsibilities to high-level officials to ensure that appropriate and timely action is taken to bring PRPB into substantial compliance with the Agreement's requirements regarding investigations of officer-involved shootings.

### C. Policies and Procedures

The Monitor assessed the Commonwealth's compliance with eight paragraphs of the Agreement on policies and procedures, Paragraphs 109-116, based on 26 of 130 reform-related policies developed by PRPB, which represents a 20% sample. First Rep. at 10. Of the eight paragraphs, the Monitor found six paragraphs in substantial compliance and two paragraphs in partial compliance. We understand the Monitor's decision to review only a sample of policies given the Commonwealth's delay in producing information. *See id.* The approved methodology provides for sampling of officers, units, and precincts for certain paragraphs, such as Paragraphs 111 and 114, but not for policies. *See* Consensus Methodology, ECF No. 1272-1 (July 1, 2019). For future reports, we recommend that the Monitor review additional policies and conduct the other monitoring activities outlined in the approved methodology for Paragraphs 109-116, such as site visits, interviews, and document review, to validate the compliance ratings in the First Report. We address specific compliance ratings regarding policies in Section D, below

### D. Response to Specific Compliance Ratings

1. <u>Ratings for Subject-Matter Areas</u>: The Monitor rated sections of the Agreement as follows: Policies and Procedures in Substantial Compliance; Use of Force in Partial Compliance; and Information Systems and Technology in Partial Compliance. First Rep. at 5. Neither the Agreement nor the approved methodology contemplates the use of section-wide ratings. The Agreement requires, at Paragraph 251, that the Monitor assess and report on "each

6

Agreement requirement." We recommend that the Monitor avoid using section-wide ratings and instead present the cumulative ratings for all paragraphs in the section.

2. Use of Force Ratings (Paragraphs 36-52): The ratings for these paragraphs are based on the Monitor's review of officer-involved shootings alone. Both the paragraphs and the approved methodology require that the Monitor assess all types of force. We recommend that the Monitor treat its ratings for these paragraphs as preliminary while additional types of force are assessed and integrated in accordance with the approved methodology.

3. Paragraph 40: We disagree with the Monitor's observation that the paragraph "pertains to investigative policy and not to the actual investigative process or practice." First Rep. at 25. The Agreement requires, at Paragraph 242, that the Monitor assess and report whether the Commonwealth "has, for each Agreement requirement: (a) incorporated the requirement into an implemented policy; (b) trained all relevant personnel in the requirement and policy; and (c) fully implemented in practice." While we agree that PRPB has incorporated the Paragraph's requirements into a policy by issuing General Orders 100-113 and 600-605, the Monitor must still assess the training and implementation components of Paragraph 242. Thus, it would be consistent with the Agreement and approved methodology to rate the policy component of this paragraph in Substantial Compliance, but not the entire paragraph until the training and implementation components are also assessed. If a component is not assessed during the evaluation period, the Monitor should rate the component as "Not Yet Assessed" or "Rating Deferred."

4. Paragraphs 44-45: The Monitor rated Paragraph 44 in Substantial Compliance and Paragraph 45 in Partial Compliance. However, the approved methodology calls for a review of use of force incidents classified as Level 1-3, which were not reviewed for the First Report (officer-involved shootings are classified as Level 4). Because the Monitor did not assess the

7

relevant events, these paragraphs should be rated as "Rating Deferred," for consistency with the approved methodology.

5. <u>Paragraph 109</u>: The Monitor rated this paragraph in Substantial Compliance. Like other introductory paragraphs in each of the eleven areas of the Agreement, the approved methodology provides that the Monitor will evaluate Paragraph 109 based on the implementation of all of the other paragraphs in the section. Consensus Methodology on Policies ¶ 109, ECF No. 1272-1 (July 1, 2019). According to the First Report, the Commonwealth has complied only partially with Paragraphs 110 and 111. Thus, a rating of "Partial Compliance" or "Rating Deferred" for Paragraph 109 would be more appropriate.

WHEREFORE, the United States respectfully requests that the Court take notice of the United States' response to the Monitor's First Report, pursuant to Paragraph 252 of the Agreement.

I HEREBY CERTIFY that on this date I filed the foregoing pleading electronically through the CM/ECF system, which caused the parties, counsel of record and the Monitor on the service list to be served by electronic means.

Respectfully submitted, this 28th day of April, 2020,

        **STEVEN H. ROSENBAUM**
        Chief, Special Litigation Section
        Civil Rights Division

        *s/ Luis E. Saucedo*
        **TIMOTHY D. MYGATT**
        Deputy Chief
        **LUIS E. SAUCEDO** (G01613)
        Senior Trial Attorney
        **JORGE CASTILLO** (G02912)
        Trial Attorney
        U.S. Department of Justice
        Special Litigation Section

Civil Rights Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
Tel: (202) 598-0482
Fax: (202) 514-4883
luis.e.saucedo@usdoj.gov
jorge.castillo@usdoj.gov

Attorneys for the United States