December 2020



# Second Report of the Federal Monitor

Covering the Period from July 2019 through March 2020

Compliance status of the Puerto Rico Police Bureau in accordance with the Federal Court approved Settlement Agreement between the United States Department of Justice and the Commonwealth of Puerto Rico

John Romero
Federal Monitor

# Table of Contents

EXECUTIVE SUMMARY .................................................................................................................................... 6

INTRODUCTION .......................................................................................................................................... 12
    General Background on the Agreement and Monitoring Process ..................................................12
    Scope of the Monitor's Second Report ...........................................................................................13

I. USE OF FORCE ......................................................................................................................................... 15
    1. General Provision...........................................................................................................................15
    2. Specialized Tactical Units..............................................................................................................16
    3. Crowd Control Policies and Performance ....................................................................................17
    4. Force Reporting.............................................................................................................................22
    5. Force Review, Investigation, and Analysis ..................................................................................25
    6. Supervisory and FRB Reviews ......................................................................................................27
    7. FIU Investigations and Force Reviews by SFRB ...........................................................................29
    8. Use of Force Training ....................................................................................................................33
    9. Responding to Behavioral/Mental Health Crisis .........................................................................33
    Conclusions Regarding Use of Force ...............................................................................................34

II. SEARCHES AND SEIZURES ...................................................................................................................... 36
    1. General Provisions ........................................................................................................................36
    2. Investigatory Stops and Searches.................................................................................................37
    3. Arrests ..........................................................................................................................................38
    4. Searches ........................................................................................................................................40
    5. Training on Stops, Searches, and Seizures ...................................................................................41

III. EQUAL PROTECTION AND NON-DISCRIMINATION .................................................................................. 41
    1. General Provisions ........................................................................................................................41
    2. Discriminatory Policing .................................................................................................................43
    3. Sexual Assault and Domestic Violence ........................................................................................45

IV. RECRUITMENT, SELECTION, AND HIRING .............................................................................................. 46
    1. General Provisions ........................................................................................................................46
    2. Recruitment Plan ..........................................................................................................................48
    3. Hiring Reforms ..............................................................................................................................49

V. TRAINING .............................................................................................................................................. 51
    1. General Provisions ........................................................................................................................51
    2. Pre-Service Education and Training ..............................................................................................52
    3. Field Training Program ..................................................................................................................56
    4. In-Service Training ........................................................................................................................57
    5. Training Records ...........................................................................................................................61

VI. SUPERVISION AND MANAGEMENT ....................................................................................................... 62
    1. General Provisions ........................................................................................................................62
    3. Supervisor Training .......................................................................................................................64
    4. Performance Evaluation ...............................................................................................................66
    5. Early Identification System ...........................................................................................................67
    6. Internal Audits and Interagency Feedback...................................................................................69

VII. CIVILIAN COMPLAINTS, INTERNAL INVESTIGATIONS, AND DISCIPLINE ................................................. 71
    1. General Provisions ........................................................................................................................71

2. Civilian Complaints ........................................................................................................... 71
3. Internal Investigations ...................................................................................................... 72
4. Complaint Intake, Classification, Assignment, and Tracking ............................................ 78
5. Investigation of Complaints .............................................................................................. 81
6. Staffing, Selection, and Training Requirements ............................................................... 85
7. Preventing Retaliation ...................................................................................................... 86
8. Discipline .......................................................................................................................... 86
9. Officer Assistance and Support ........................................................................................ 88

VIII. COMMUNITY ENGAGEMENT AND PUBLIC INFORMATION ....................................................... 89

1. General Provisions ............................................................................................................ 90
2. Community Oriented Policing ........................................................................................... 90
3. Community Interaction Councils ....................................................................................... 91
4. Public Information ............................................................................................................ 93

IX. INFORMATION SYSTEMS AND TECHNOLOGY .......................................................................... 94

Observations ........................................................................................................................ 95
Data Assessment .................................................................................................................. 96
Recommendations ............................................................................................................... 98

APPENDIX A: BACKGROUND TO THE PRPB MONITORING MISSION .................................................. 99

APPENDIX B: METHODOLOGY ........................................................................................................ 102

APPENDIX C: SUMMARY OF THE MONITOR'S ON-SITE OBSERVATIONS OF PRPB RESPONSE TO MASS DEMONSTRATIONS IN OLD SAN JUAN ON JAN. 20, 23, AND 31, 2020 .................................................................................. 103

APPENDIX D: NOTES ON SELECT FIU INVESTIGATIONS AND FORCE REVIEWS BY SFRB OF INTENTIONAL FIREARMS DISCHARGES ............................................................................................................................ 111

APPENDIX E: NOTES ON SELECT INTERNAL INVESTIGATIONS .......................................................... 120

APPENDIX F: COMPLIANCE TABLES FOR PARAGRAPHS ASSESSED IN CMR-2 .................................... 128

Use of Force, Paragraphs 22-57 ........................................................................................... 128
Search and Seizure and Arrest and Summons, Paragraphs 58-79 ........................................ 145
Equal Protection and Non-Discrimination, Paragraphs 84-99 ............................................. 155
Recruitment, Selection, and Hiring, Paragraphs 101-108 .................................................... 160
Training, Paragraphs 117-134 .............................................................................................. 164
Supervision and Management, Paragraphs 135-158 ............................................................ 172
Civilian Complaints, Internal Investigations, and Discipline, Paragraphs 159-204 .............. 184
Community Engagement and Public Information, Paragraphs 205-217 ................................ 201
Information Systems and Technology ................................................................................... 208

CMR-2 Draft | December 2, 2020

## Table of Figures

Table 1: Compliance Status for Paragraphs 22-26 .................................................................. 15

Table 2: Compliance Status for Paragraphs 27-31 .................................................................. 16

Table 3: Compliance Status for Paragraphs 32-35 .................................................................. 17

Table 4: Compliance Status for Paragraphs 36-39 .................................................................. 22

Table 5: Discrepancies in the Reporting and Documentation of Use of Force Incidents ........ 23

Table 6: Compliance Status for Paragraphs 40-42 .................................................................. 25

Table 7: Compliance Status for Paragraphs 43-47 .................................................................. 27

Table 8: FRB Investigations Reviewed .................................................................................... 28

Table 9: Compliance Status for Paragraphs 48-52 .................................................................. 30

Table 10: Compliance Status for Paragraphs 53-55 ................................................................ 33

Table 11: Compliance Status for Paragraphs 56-57 ................................................................ 34

Table 12: Compliance Status for Paragraphs 58-59 ................................................................ 37

Table 13: Compliance Status for Paragraphs 60-64 ................................................................ 37

Table 14: Compliance Status for Paragraphs 65-73 ................................................................ 38

Table 15: Compliance Status for Paragraphs 74-77 ................................................................ 40

Table 16: Compliance Status for Paragraphs 78-79 ................................................................ 41

Table 17: Compliance Status for Paragraphs 84-86 ................................................................ 42

Table 18: Compliance Status for Paragraphs 88-92 ................................................................ 43

Table 19: Compliance Status for Paragraphs 93, 96 & 99 ...................................................... 45

Table 20: Compliance Status for Paragraph 101 .................................................................... 47

Table 21: Police Academy Class 229 Summary ...................................................................... 47

Table 22: Compliance Status for Paragraphs 102-103 ............................................................ 48

Table 23: Compliance Status for Paragraphs 104-108 ............................................................ 50

Table 24: Compliance Status for Paragraph 117 .................................................................... 51

Table 25: Compliance Status for Paragraphs 118-122 ............................................................ 52

Table 26: Compliance Status for Paragraphs 123-128 ............................................................ 56

Table 27: Compliance Status for Paragraphs 129-132 ............................................................ 58

Table 28: Compliance Status for Paragraphs 133 & 134 ......................................................... 61

Table 29: Compliance Status for Paragraph 135 .................................................................... 62

Table 30: Compliance Status for Paragraphs 136-140 ............................................................ 63

Table 31: Compliance Status for Paragraphs 141-144 ............................................................ 64

Table 32: Compliance Status for Paragraphs 145 & 146 ......................................................... 66

CMR-2 Draft | December 2, 2020

Table 33: Compliance Status for Paragraphs 147-153 ............................................................... 67

Table 34: Compliance Status for Paragraphs 154-158 ............................................................... 69

Table 34: Compliance Status for Paragraph 159 ....................................................................... 71

Table 35: Compliance Status for Paragraphs 160-162 ............................................................... 71

Table 36: Compliance Status for Paragraphs 163-165 ............................................................... 72

Table 37: Compliance Status for Paragraphs 166-176 ............................................................... 79

Table 38: Compliance Status for Paragraphs 177-193 ............................................................... 81

Table 39: Compliance Status for Paragraphs 194-196 ............................................................... 85

Table 40: Compliance Status for Paragraph 197 ....................................................................... 86

Table 41: Compliance Status for Paragraphs 198-200 ............................................................... 86

Table 42: Compliance Status for Paragraphs 201-204 ............................................................... 89

Table 43: Compliance Status for Paragraphs 205 ...................................................................... 90

Table 44: Compliance Status for Paragraphs 206-208 ............................................................... 90

Table 45: Compliance Status for Paragraphs 209-213 ............................................................... 91

Table 46: Compliance Status for Paragraphs 214-217 ............................................................... 93

## Executive Summary

This is the second Chief Monitor's Report (CMR-2) outlining the current compliance levels of the Puerto Rico Police Bureau ("PRPB") in relation to the Consent Decree entered between the United States and the Commonwealth of Puerto Rico. This report provides the second assessment following the four-year capacity building period established by the decree that ran from June 2014 to October 2018 and covers the period from July 2019 through March 2020.

PRPB has generally developed policies consistent with requirements of the Agreement and with generally accepted police practices and have further trained relevant personnel on these policies. However, implementation of these reforms still lags behind the policies that were approved during the capacity building period. Furthermore, significant limitations remain in PRPB's information technology development. These lapses hinder both the monitoring process, as well as PRPB's ability to fulfill its policing mission.

### 1. Use of Force

PRPB has implemented some of the Monitor's most recent recommendations from CMR-1, but significant problems remain in use of force reporting. The Chief Monitor uncovered serious discrepancies in bureau-wide reporting of use of force numbers for the thirteen Area Commands. The Monitor requested that PRPB modify the relevant form and tracking system to require additional data on the use of force before the system generates a complaint number. PRPB adopted these recommendations, and the monitor expects to see the results of this reform in CMR-3. Nevertheless, the Monitor remains concerned with discrepancies in the documentation and reporting of Use of Force incidents. It is imperative that arresting officers call Centro de Mando and provide information on the arrests and incidents of UOF. PRPB should also be working to develop an electronic tracking system with field reporting capability. Until such a system is implemented, however, Centro de Mando must have the ability to track the numbers for purposes of monitoring and analyzing use of force dynamics.

The Monitor also found that on certain occasions PRPB officers used force in response to mass demonstration incidents in ways that violated the Agreement. Though PRPB response to mass demonstrations has been broadly consistent with policy during the period covered in CMR-2, officers used less-than-lethal force against civilians in dangerous and indiscriminate ways during the July 2019 protests, often after crowds were already dispersing. PRPB officers further combined multiple use of force incidents under

CMR-2 Draft | December 2, 2020

one report for each location in these mass demonstrations, which is not in keeping with generally accepted police practices and violates the spirit and text of the Agreement.

| Use of Force Sub-Section | Count of Paragraphs per Section by Compliance Status | | | |
|---|---|---|---|---|
| | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 2 | 3 | 0 | 0 |
| Specialized Tactical Units | 2 | 3 | 0 | 0 |
| Crowd Control | 3 | 1 | 0 | 0 |
| Force Reporting | 0 | 3 | 1 | 0 |
| Force Review & Investigation | 0 | 1 | 2 | 0 |
| Supervisory and FRB Reviews | 1 | 4 | 0 | 0 |
| FIU Investigations & SFRB Reviews | 0 | 4 | 1 | 0 |
| Use of Force Training | 1 | 2 | 0 | 0 |
| Responding to Mental Health Crisis | 0 | 1 | 1 | 0 |
| **Total** | **9** | **22** | **4** | **0** |

## 2. Searches and Seizures

PRPB has developed policies on arrests, searches, and seizures that are consistent with the stipulations of agreement and with generally accepted police practices. Search warrants written by PRPB Units generally have well documented probable cause and supporting evidence. In contrast, arrests forms filled out by PRPB officers do not always properly document probable cause, and many arrest files are missing key forms such as booking sheets and medical examinations that have been signed by supervisors.

| Searches and Seizures Sub-Section | Count of Paragraphs per Section by Compliance Status | | | |
|---|---|---|---|---|
| | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 0 | 2 | 0 | 0 |
| Investigatory Stops and Searches | 0 | 0 | 0 | 5 |
| Arrests | 0 | 8 | 1 | 0 |
| Searches | 2 | 1 | 1 | 0 |
| Training on Stops, Searches, and Seizures | 0 | 2 | 0 | 0 |
| **Total** | **2** | **13** | **2** | **5** |

## 3. Equal Protection and Non-Discrimination

PRPB supplied the Monitor with evidence that each member of the hiring, promotion, and performance assessment committees was properly certified in bias-free policing and equal protection. However, PRPB did not provide the Monitor access to a representative sample of officers from underrepresented groups to verify that this anti-bias certification

is implemented in practice. PRPB has generally developed policy on non-discrimination and trained personnel on those policies, but bureau-wide practices lag behind these efforts.

| Equal Protection and Non-Discrimination Sub-Section | Count of Paragraphs per Section by Compliance Status | | | |
|---|---|---|---|---|
| | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 0 | 1 | 2 | 0 |
| Discriminatory Policing | 2 | 0 | 2 | 0 |
| Sexual Assault and Domestic Violence | 1 | 1 | 1 | 0 |
| **Total** | **3** | **2** | **5** | **0** |

## 4. Recruitment, Selection, and Hiring

The Monitor finds that PRPB is in partial compliance with the Agreement regarding recruitment, selection, and hiring policies and procedures. PRPB has made a demonstrable effort to recruit and hire qualified personnel and developed recruitment strategies that promote inclusive selection practices that better reflect a diverse cross-section of the Puerto Rican public. However, the Monitor finds that the lapses in information technology negatively impact PRPB's ability to report consistently on its selection and hiring practices or to track its efforts to recruit members of underrepresented communities and comply fully with the Agreement.

| Recruitment, Selection, and Hiring Sub-Section | Count of Paragraphs per Section by Compliance Status | | | |
|---|---|---|---|---|
| | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 0 | 1 | 0 | 0 |
| Recruitment Plan | 0 | 2 | 0 | 0 |
| Hiring Reforms | 0 | 5 | 0 | 0 |
| **Total** | **0** | **7** | **0** | **0** |

## 5. Training

Training of PRPB personnel has not stopped despite the recent events that have impacted Puerto Rico (earthquakes, tropical storms, and civil unrest). The personnel whose records were reviewed by the Monitor's team are in substantial compliance with training requirements in a large percentage of the training areas. However, there remained some areas of non-compliance, such as in-service training on domestic violence investigations and equal protection, as well as training at the beginning of shifts or tours of duty for all officers. Additionally, training represents another area where IT gaps prevent PRPB from providing the Monitor's Office with consistent data in a timely manner.

CMR-2 Draft | December 2, 2020

| Training Sub-Section | Count of Paragraphs per Section by Compliance Status | | | |
|---|---|---|---|---|
| | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 0 | 0 | 0 | 1 |
| Pre-Service Education and Training | 0 | 1 | 1 | 3 |
| Field Training Program | 0 | 3 | 3 | 0 |
| In-Service Training | 0 | 1 | 2 | 1 |
| Training Records | 0 | 0 | 2 | 0 |
| **Total** | **0** | **5** | **8** | **5** |

## 6. Supervision and Management

Interviews and site visits conducted by the monitoring team showed PRPB lacks the proper number of first-line supervisors (Sergeants). This results in inexperienced agents taking on the role of a Supervisor. During the site visits and interviews with supervisors the Monitor observed that supervisors do not generally supervise more than ten agents. However, PRPB was unable to provide a list of personnel to validate this observation on a bureau-wide basis. PRPB must ensure that an adequate number of qualified first-line supervisors are deployed in the field to allow supervisors to provide the close and effective supervision necessary for officers to improve and grow professionally, to police actively and effectively, and to identify, correct, and prevent misconduct.

| Supervision and Management Sub-Section | Count of Paragraphs per Section by Compliance Status | | | |
|---|---|---|---|---|
| | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 0 | 1 | 0 | 0 |
| Duties of Supervisors | 0 | 0 | 4 | 1 |
| Supervisor Training | 1 | 2 | 0 | 1 |
| Performance Evaluation | 0 | 0 | 2 | 0 |
| Early Identification System | 0 | 0 | 7 | 0 |
| Internal Audits and Interagency Feedback | 0 | 0 | 5 | 0 |
| **Total** | **1** | **3** | **18** | **2** |

## 7. Civilian Complaints, Internal Investigations, and Discipline

The Monitor recognizes that PRPB is making an effort to comply with the Agreement provisions that apply to Internal Investigations and Discipline. The Monitor was particularly impressed with the leadership of the SARP Commander and her team. That

CMR-2 Draft | December 2, 2020

said, SARP investigations regularly end before exhausting all leads and reach conclusions that are not born out by facts (see Appendix D). Work remains in improving the quality of SARP investigations before PRPB is in substantial compliance with the agreement.

| Civilian Complaints, Internal Investigations, and Discipline Sub-Section | Count of Paragraphs per Section by Compliance Status | | | |
|---|---|---|---|---|
| | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 0 | 1 | 0 | 0 |
| Civilian Complaints | 2 | 0 | 0 | 1 |
| Internal Investigations | 2 | 1 | 0 | 0 |
| Complaint Intake & Handling | 7 | 2 | 0 | 1 |
| Investigation of Complaints | 7 | 6 | 0 | 4 |
| Staffing, Selection, & Training Requirements | 1 | 2 | 0 | 0 |
| Preventing Retaliation | 0 | 0 | 1 | 0 |
| Discipline | 0 | 1 | 1 | 1 |
| Officer Assistance and Support | 4 | 0 | 0 | 0 |
| **Total** | **23** | **13** | **2** | **7** |

## 8. Community Engagement and Public Information

PRPB has minimally implemented community policing and problem-solving strategies in its police areas by assigning one or two officers as community policing agents who attend community meetings to present to residents and listen to their concerns. PRPB reports that all officers (99.99%), including command officers and CIC members, have been trained in community policing, although community policing has not been implemented agency-wide as a strategy.

| Community Engagement and Public Information Sub-Section | Count of Paragraphs per Section by Compliance Status | | | |
|---|---|---|---|---|
| | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 0 | 1 | 0 | 0 |
| Community Oriented Policing | 0 | 1 | 2 | 0 |
| Community Interaction Councils | 1 | 3 | 1 | 0 |
| Public Information | 0 | 1 | 3 | 0 |
| **Total** | **1** | **7** | **5** | **0** |

## 9. Information Technology

Progress on information technology remains behind the schedule established by the Agreement. IT development and training have not progressed to the point where PRPB can successfully leverage IT systems to complete its policing mandates or chart compliance in other areas of the Consent Decree. These gaps have been demonstrated,

in particular, by inconsistencies in the data on use of force. The significance of establishing "Real Time" accurate information on use of force incidents occurring Bureau-wide cannot be overstated. As previously noted, for PRPB to effectively monitor its members' use of force, it must have accurate and timely information. PRPB must also be transparent and provide that information to the residents of Puerto Rico upon request.

| Information Technology Sub-Section | Count of Paragraphs per Section by Compliance Status | | | |
|---|---|---|---|---|
| | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 0 | 0 | 6 | 0 |

In summary, PRPB has demonstrated a commitment to reform and has already allocated efforts and resources toward implementing the most recent recommendations of the Monitor's Office. Nevertheless, significant reform efforts lie ahead before PRPB achieves all the key performance benchmarks outlined in the Agreement. The Monitor's recommendations are summarized in the sections below.

CMR-2 Draft | December 2, 2020

## Introduction

This report will outline the current compliance status of the Puerto Rico Police Bureau (hereafter "PRPB" or "the Bureau") with the federal court approved Settlement Agreement (hereafter the "Agreement" or "Consent Decree"). It was prepared by the Technical Compliance Advisor (hereafter "Monitor") pursuant to paragraphs 242, 251, and 252 of the Agreement to inform the court, the parties and residents of the Commonwealth about the status of the implementation and compliance with the Agreement. The Monitor's Office (or "monitoring team") will make itself available to the Court, the parties, and community groups to explain the Monitor's findings and the compliance assessments presented in the report.

### General Background on the Agreement and Monitoring Process

The Agreement was fashioned to provide PRPB officers with the tools, guidance and resources that they need to reform old unconstitutional practices and to fight crime effectively. The Parties both recognize that constitutional policing and the community's trust in its police force are interdependent. Accordingly, the full and sustained implementation of the Agreement will guarantee constitutional rights, and correspondingly increase public confidence in PRPB and its officers. In addition, and perhaps most importantly, the Agreement also aspires to develop on the part of PRPB a dynamic leadership and management skills aimed at transforming the bureau for the benefit of all who reside in or visit the Commonwealth.

In a joint effort, the parties identified each of the following areas for improvement, enhancement, or reform in PRPB. All of these relevant areas are specifically mentioned in corresponding paragraphs in the Agreement:

(1)    Professionalization;
(2)    Use of Force;
(3)    Searches and Seizures;
(4)    Equal Protection and Non-Discrimination;
(5)    Recruitment, Selection and Hiring;
(6)    Policies and Procedures;
(7)    Training;
(8)    Supervision and Management;
(9)    Civilian Complaints, Internal Investigations and Discipline;
(10)   Community Engagement and Public Information; and
(11)   Information Systems and Technology.

To carry out the above reforms, PRPB developed Action Plans for each of these substantive areas. These Action Plans set forth in detail the steps agreed upon to execute and implement the reforms and achieve the desired outcomes in each area. Moreover, the above reforms also require the implementation of new or amended policies, practices, training, corresponding documentation, internal review, and the monitoring of sustainable compliance fall within the scope of objective oversight, analysis and reporting of the Monitor.

The collection, analysis, reporting and public dissemination of data regarding the ongoing PRPB sustainable reform efforts was designed to ensure public accountability, and to promote trust in PRPB. Therefore, the Agreement not only requires timely reporting and publication of the objective standards for compliance, it also calls for frequent reporting on the present status of police reform efforts, as well as the milestones reached or impediments that might be encountered by PRPB during the duration of the Agreement.

During the capacity-building period, the Monitor assessed compliance based on the Commonwealth's own Action Plans, pursuant to Paragraph 240 of the Agreement. However, with the end of the capacity-building period, the compliance orientation has changed. Beginning with CMR-1, the Monitor has been assessing PRPB compliance in relation to the Agreement.

## Scope of the Monitor's Second Report

The Chief Monitor's Second Report covers the period between July 2019 and March 31, 2020. Per the monitoring methodology agreed on by the Parties, 183 paragraphs were scheduled for assessment in CMR-2, out of 212 total paragraphs which the Monitor's Office is tasked to assess. This report excludes the sections of the Agreement covering Professionalization and Policy and Procedure, as well as specific paragraphs throughout the other sections that are assessed on an annual basis and were covered by CMR-1.

The period of performance covered by the present report pushes up against the beginning of the Coronavirus pandemic and the resulting social and economic impacts of the large-scale quarantine. Though the period of performance being evaluated for CMR-2 largely predate the pandemic, the monitoring process itself was significantly impacted by travel restrictions and the temporary closure of PRPB's Reform Office as part of quarantine efforts at its headquarters.

Despite these difficulties, however, the Monitor's Office and PRPB cooperated intensively to achieve the most comprehensive and valid assessment of PRPB performance possible

under the circumstances. The PRPB Reform Office worked to provide the Monitor's Office with requested data, and the monitoring team pursued all available sources of information to verify remotely the data that PRPB provided. Nevertheless, the difficulties imposed by the epidemic and the closure of government offices, particularly the PRPB Reform Office, caused delays that forced the Monitor to defer the assessment of a number of paragraphs.

Furthermore, the difficulties of accessing data for CMR-2 made it apparent that PRPB leadership is relying on the Reform Office to make up for the Bureau's IT lapses through manual labor. Officers in the Reform Office worked tirelessly to provide the Monitor's Office with scanned versions of all requested records, but in most cases these records should already exist on functioning information technology systems per PRPB's own IT action plans. The Monitor's Office praises the efforts of our colleagues in the Reform Office, but reiterates its position that PRPB cannot come into compliance with most areas of the decree so long as IT lags in development and the Reform Office is forced to make up for that lapse.

CMR-2 covers nine of the eleven performance areas of the Agreement: 1) Use of Force, 2) Searches and Seizures, 3) Equal Protection and Non-Discrimination, 4) Recruitment, Selection, and Hiring, 5) Training, 6) Supervision and Management, 7) Civilian Complaints and Internal Investigations, 8) Community Engagement and Public Information, and 9) Information Technology.

For each of these areas, the Monitor's Office presents its objective assessment based on a desk review of data provided by PRPB, as well as on interviews, site visits and the current state of information technology development. Though site visits were hindered starting from April of 2020, the monitoring team did engage in a variety of on-site monitoring activities related to CMR-2 in February and March of 2020.

In the report sections below, the Monitor provides the assessment and analysis produced by the subject matter experts of the monitoring team, who bring decades of experience drawn from police agencies across the United States. All criticisms and recommendations are offered in a spirit of collaboration as suggestions for how PRPB can achieve a "pathway to compliance, and ultimately to sustainable compliance."

# I. Use of Force

Generally, PRPB demonstrated compliance with a number of paragraphs of the Agreement governing Use of Force. Use of Force reporting, however, is still not compliant. Adequate reporting is paramount for PRPB's success in achieving compliance with the Agreement's Use of Force paragraphs. During the monitoring period for CMR-2, PRPB underreported uses of force – both to the Monitor's Office and the public.

This systematic underreporting appears to result from deficient reporting and knowledge-management practices, rather than from intentional concealment of the total volume of uses of force by PRPB personnel. Such reporting deficiencies, in turn: 1) failed to hold PRPB accountable for the greater number of force incidents that actually occurred and 2) failed to provide PRPB's management with the necessary information to make informed decisions.

Below, the Monitor provides an overview of all areas of the Consent Decree related to Use of Force. Compliance tables with the full language and other details can be found in Appendix F.

## 1. General Provision

As it relates to paragraphs 22-26, the Monitor's Office has concluded that PRPB properly categorized use of force by level based on degree of seriousness. The policies cover all force technologies and weapons authorized for use by PRPB, including specialized Bureau units. In addition, the Monitor's Office has verified both through site visits to the SWAT Facility and through documentation that, as per General Order 600-601, CN gas has been both decommissioned and disposed of.

*Table 1: Compliance Status for Paragraphs 22-26*

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 22 | Rely primarily on non-force techniques to police; use force in accordance with the law and prohibit unreasonable UOF. | Partially Compliant |
| 23 | Comprehensive UOF policy shall categorize all reportable uses of force into levels grouped by degree of seriousness. | Partially Compliant |
| 24 | Develop policies concerning kinds of force and sharing information with the public regarding serious uses of force. | Partially Compliant |
| 25 | Continue to prohibit the use of Chloroacetophenone. | Substantially Compliant |
| 26 | Maintain a list of officers who qualify with their regulation firearm or other firearms that they are authorized to use. | Substantially Compliant |

CMR-2 Draft | December 2, 2020

## 2. Specialized Tactical Units

As it relates to paragraphs 27-31 the Monitor's Office has concluded that PRPB has developed use of force policies for specialized tactical units and that these policies are consistent with the Bureau's agency-wide use of force policy. The Monitor's Office has verified through document review that specialized units are not conducting general policing functions, i.e., regular patrol. In addition, the Monitor's Office has verified via document review that specialized units are properly documenting their activities.

Table 2: Compliance Status for Paragraphs 27-31

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 27 | Develop policies on use of force by members of specialized tactical units consistent with agency-wide policy. | Partially Compliant |
| 28 | Prohibit STUs from conducting general patrol and policing functions. | Substantially Compliant |
| 29 | Develop eligibility criteria for assignment to STUs that emphasize capacity to carry out the mission of STU. | Partially Compliant |
| 30 | Require STUs to document all law enforcement activities to include operational plans and after-action reports. | Substantially Compliant |
| 31 | Track the number of STU deployments, including the reason, result, and legal authority for each deployment. | Partially Compliant |

In relation to policies on Use of Force, PRPB must revise the practice of assigning one complaint number to all uses of less-than-lethal weapons at a demonstration/protest. This practice is technically consistent within PRPB policy, but not in keeping with generally accepted policing practices. Therefore, the Monitor recommends that PRPB revise their policy to curtail this practice.

As it relates to transfers, PRPB has developed a policy which identifies eligibility criteria as well as selection to specialized units. To that end, the Monitor's Office reviewed the records of PRPB personnel assigned to SWAT/DOT during the reviewing period. Based on the information provided by PRPB, the Monitor's Office concluded that of the five personnel transferred, four met the requirements for assignment and were transferred in a manner consistent with the Agreement and Bureau policy. However, one officer had recently returned to PRPB after an eight-year leave of absence (with the right to reinstatement), during which he served as a member of the Parole Board, and upon returning to the Puerto Rico Police Bureau was subsequently transferred to DOT. This officer was not properly assigned to the specialized unit i.e., DOT-Arecibo. It should be noted that, in response to the Monitor's Office inquiry, PRPB provided documentation stating that the officer did not serve in an operational capacity, but instead served in an

CMR-2 Draft | December 2, 2020

administrative role. Nevertheless, this transfer did not conform with the Agreement or Bureau policy.

In relation to tracking STU deployments, the SWAT reported thirteen uses of force between 7/1/19 and 11/30/19 as required by Paragraph 31 point (e). However, these incidents did not appear in the use of force numbers reported by FIU. Therefore, PRPB cannot be considered in substantial compliance with the paragraph requirements that the STU tracking system accounts for all elements in the paragraph and that the STU tracking system is accurate.

## 3. Crowd Control Policies and Performance

This section provides a brief analysis of PRPB crowd control performance in relation to The July 2019 and January 2020 demonstrations. Members of the monitoring team were able to directly observe PRPB's performance during these demonstrations. Subsequently, the monitoring team requested documents related to the Bureau's policies as well as action plans related to the events. Those documents, in conjunction with first-hand observation of the demonstrations, supplied the monitoring team with sufficient data to determine that PRPB acted consistently with its own policies in relation to the mass demonstrations.

*Table 3: Compliance Status for Paragraphs 32-35*

| Paragraph | Stipulations | Monitor's Rating |
|-----------|--------------|------------------|
| 32 | Develop crowd control and incident management policies that comply with applicable law and policing practices. | Partially Compliant |
| 33 | Ranking officer or higher-level PRPD official at the scene of a crowd situation to assume command and control. | Substantially Compliant |
| 34 | Require the use of crowd control techniques and tactics that respect protected speech and lawful assembly. | Substantially Compliant |
| 35 | Require the assessment of law enforcement activities following each response to crowd situation. | Substantially Compliant |

Policies and trainings on crowd control and incident management are in place for crowd control, and all STU personnel and supervisors are receiving training. However, per compliance target 3, less than 95% of PRPB supervisors throughout the bureau are receiving training in incident management.

PRPB was partially compliant with the Agreement in its response to planned and unplanned mass demonstrations. During the Period of Period of Performance for CMR-2, there were no unplanned mass demonstration events to which STU personnel were deployed, so the Monitor's Office was unable to monitor this compliance target. PRPB's

response to planned mass demonstrations was mostly within policy, but was marred by serious violations in response to the July 2019 demonstrations.

During its response to the July 2019 protests, PRPB response was largely consistent with PRPB policy, with the Agreement, and with generally accepted police practices. However, PRPB personnel used less-than-lethal force in dangerous and indiscriminate ways on several occasions where officers crossed police lines, often after crowds were already disbursing. Furthermore, per the Monitor's comments on Paragraph 27, PRPB reported these incidents with reports that each covered multiple use of force incidents committed by PRPB personnel over an extended period of time and occurring on multiple city blocks. PRPB policy does not prevent this practice in UOF reporting, but it is not in keeping with generally accepted police practices.

The Monitor's Office emphasizes that these violations were few in comparison to the total number of STU deployments over the 9-month Period of Performance covered by CMR-2. Nevertheless, they were significant. The Monitor's Office also emphasizes that it did see significant improvement in PRPB response to planned mass demonstrations in January of 2020.

These observations will be covered in a special report by the Monitor's Office on the July 2019 protests. In the present report, however, the Monitor provides a brief overview of the findings related to PRPB response to these demonstrations.

Crowd Control Policies and Performance during the July 2019 Mass Demonstrations in Old San Juan.

In July 2019, tens of thousands of Puerto Ricans took to the streets in protest against Governor Ricardo A. Rossello. Protests lasted 15 days and took place primarily next to Gov. Rosello's official residence, La Fortaleza, but also in other public spaces such as highways, squares, and streets. The civil rights advocacy group, Kilometro Cero, issued a document in July 2019 critical of PRPB performance during the Fortaleza Protests, which included photos and videos of alleged police misuse of and/or excessive use of force. The Federal Monitor's Team was present at primary protest sites to observe and collect data on PRPB's response to the mass protests. The Monitor conducted a thorough review of the information published by Kilometro Cero and major news outlets, including photos and videos, and statements made to by the alleged victims/demonstrators. The result of that review will be addressed in full in a supplemental report by the Monitor's Office.

Overall, PRPB responded to protests in keeping with policy and generally accepted police practice. According to the observations of the Federal Monitor's Office, the police took

effort to avoid having to use tear gas to disperse the crowd, and used force in keeping with Bureau policy (G.O. 600-625) in the cases when force had to be used. Moreover, there was a sufficient ratio of officers to supervisors (10 to 1) at most protest sites. Officers were replaced at the line regularly to avoid fatigue and ensure they remained properly hydrated. Finally, the Monitor's Office took note that PRPB did its best to act according to the dynamic of the protesters – increasing or decreasing the threat level depending on how protesters behaved at any given time, and in general giving warnings prior to the use of tear gas.

The Federal Monitor's Office did, however, also identify areas of concern, particularly those incidents where PRPB's response indicated excessive use of force in violation with the Bureau policies and unreasonable use of force and other misconduct in violation of First Amendment rights. Based on our investigation, we found that these incidents took place when the police used tear gas, pepper spray, batons, rubber pellets and bullets, and other objects after dispersing the crowd at the initial police line on Fortaleza St. During these heated moments, some of the actions taken by individual PRPB officers were in violation with the Bureau's policy and were not properly reported and investigated in line with the policies (G.O 600-605). In addition, PRPB deployed units to the site of the demonstrations that are neither trained in crowd control techniques nor permitted to engage in crowd control under PRPB policy and the terms of the Agreement. In particular, a specialized unit from the Department of Corrections and Rehabilitation was deployed to assist and even to relieve officers at the Fortaleza, which increased the risk of improper use of force in response to the demonstration.

In the aftermath of the protests, PRPB did not identify officers engaged in excessive use of force and did not deploy punitive disciplinary actions where necessary in line with G.O. 600-625. Further, PRPB did not provide the Monitor's Office with any information and/ or documentation demonstrating that PRPB took any non-punitive corrective action. PRPB should provide consistent guidance to officers and personnel on the use of force, which was not the case during these events. All incidents of the use of force need to be properly and consistently documented and reported. Moreover, PRPB must institute mechanisms for internal investigations through which it can identify cases of misconduct in a timely fashion. In those instances when officers who violate PRPB policies are identified, PRPB needs to retrain officers and engage in disciplinary action as required by the Bureau's policies G.O. 600-601 Use of Force, G.O. 600-605 Reporting and Investigating Use of Force, and G.O. 600-620 Specialized Weapons of the Specialized Tactical Divisions.

## Crowd Control Policies and Performance during January 2020 Mass Demonstrations in Old San Juan.

The monitoring team was presented with the opportunity to witness and assess PRPB deployment for crowd control during several demonstrations in Old San Juan, Puerto Rico. The mass demonstrations were in protest of the Puerto Rican Government. These mass protests provided members of the monitoring team ample opportunity to witness firsthand PRPB's responses to crowd control situations.

As authorized under the Agreement, several members of the Monitor's team were assigned to monitor the PRPB response to the public's constitutionally protected demonstration. The monitoring team also evaluated PRPB's operational plans in relation to the demonstrations.

PRPB responded to the event with appropriate actions aimed at ensuring protesters' rights to free speech in a civil environment. At the same time, PRPB was prepared to deter clear and present danger situations to avoid civil disturbance or harm to others. The creative use of water-filled barriers prevented the protesters from entering established police lines and effectively prevented close confrontation with the demonstrators. The supervision ratio allowed for effective "command, control, and communications." All officers of PRPB were properly identified and appropriately equipped for the situation. A policy of 30-minute breaks prevented officers from becoming exhausted and ineffective. Water was also made available to all public safety participants during these often-long events.

Acting in compliance with their deployment plan, PRPB established positive dialogue with demonstration participants where possible. Their inter-agency communications and cooperation appeared to be similarly effective. PRPB did utilize gas to disperse the crowd on the 23rd, and then proceeded to cross the police line in order to continue dispersing the crowd. In contrast with the response to the July 2019 protests, however, the Monitor observed that PRPB supervisors maintained control over the officers under their command and providing consistent guidance on tactics.

There were minimal arrests over the course of the three demonstrations. Except for the January 23rd demonstration, no property damage or personal injury were reported. Given these factors, the Monitor considers this deployment to have been highly effective. Furthermore, PRPB's preparations were consistent with generally accepted police practices regarding mass demonstrations.

The Monitor's Office assessment is based solely on the three demonstrations at the Fortaleza where Monitor Team members were present and acting in the capacity of observers. Appendix C provides a condensed summary of the Monitor's on-scene observations of mass demonstrations on each day.

## Document Review

As requested by the Monitor's Office, PRPB provided documentation to the Monitor allowing the Monitor time to review, analyze, and reach logical conclusions based upon the data received. The documents received were pursuant to an official document request submitted by the Federal Monitor to PRPB relating to its preparation, execution, follow up, and assessment of the January 2020 demonstrations. This request was made during the month of April 2020.

The Monitor considered the following documents to reach a conclusion as to whether PRPB was substantially or partially compliant with the Agreement as it applies to mass demonstrations:

1) PRPB's work plan for the demonstrations included the following categories:
   a) Situation/Introduction;
   b) Mission;
   c) Objective;
   d) Chain of Command;
   e) Internal Coordination (Inter-Bureau);
   f) External Coordination (Outside Agencies);
   g) Legal Base; and
   h) Implementation.
2) PPR-920 – Request for activation of the Specialized Tactics Divisions
     PPR-920A – Record of Mobilizations of the Divisions of Specialized Tactics
     PPR-920B – Assessment of the Division Strategies of Specialized Tactics
3) Report on Constitutional Activities and/or Civil Unrest (PPR-174).
4) Record of Mobilization of the Specialized Tactical Divisions.

## Conclusions Regarding Crowd Control Findings

Based on the review and analysis of documents and data provided by PRPB in combination with the monitoring team members' observations, the Monitor's Office concludes that PRPB's actions during the January, 2020 demonstrations were consistent with generally accepted police practices, with Bureau Policy, and were in compliance with the Agreement as it relates to Crowd Control and Incident Management.

CMR-2 Draft | December 2, 2020

One issue that should be brought to PRPB's attention is the fact that at all these demonstrations/protest at the Fortaleza the protesters stood on top of the police barriers to use the barriers as a makeshift stage. In some cases, this was done to attempt to incite the protesters. PRPB should take steps to modify the barriers so protesters cannot stand on them.

PRPB should immediately cease the practice of reporting multiple uses of less-than-lethal force by STUs under the umbrella of a single use of force complaint number in crowd control situations. Some of these actions take place minutes and blocks away from the initial use of less-than-lethal force and are totally separate actions. Including these incidents under the same complaint number is not consistent with generally accepted police practice. (Note it is understood that according to Bureau policy an officer who uses force against an individual person is required to prepare a use of force report with its own complaint number.)

## 4. Force Reporting

The Monitor's assessment of PRPB compliance with policies and procedures ("P&P"), specifically those related to the Use of Force ("UOF"), are based on the use of force reports submitted by the Force Investigation Unit (FIU) to the Monitor's Office for review. As a result, the Monitor identified a significant discrepancy between the number of UOF incidents reported by the FIU and those reported by Centro de Mando. One of the Monitor office's major concerns is the fact that many of the incidents reported by Area Command Centro de Mandos were not included in the FIU's Master Spreadsheet of all Use of Force incidents which occurred during the period between July 1- November 30th, 2019. This is concerning because PRPB utilized this number as its official reporting number to the Court, the Monitor's Office, and the general public.

Furthermore, per the Monitor's comments on Paragraph 27, PRPB must revise the practice of assigning one complaint number to all uses of less-than-lethal weapons at a demonstration/protest. This practice is technically consistent within PRPB policy, but not in keeping with generally accepted policing practices. Therefore, the Monitor recommends that PRPB revise their policy to curtail this practice.

*Table 4: Compliance Status for Paragraphs 36-39*

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 36 | Develop a Use of Force Reporting Policy that complies with law and comports with accepted policing practices. | Partially Compliant |
| 37 | Officers shall report any use of force in writing in a Use of Force Report Form before the end of the shift. | Partially Compliant |

CMR-2 Draft | December 2, 2020

| 38 | Officers shall request medical services immediately when an individual is injured following a use of force. | Partially Compliant |
| 39 | Officers shall submit copies of Use of Force Reports to their immediate supervisor and to SPR for tracking and analysis. | Not Compliant |

It should be noted that during the Monitor's first request for documentation on use of force incidents by PRPB personnel, PRPB/FIU provided a total number of one hundred seventy-seven incidents. Upon documentation review of other sources of data by the Monitor's Office, it was evident that the number provided underreported the actual use of force incidents. This documentation was provided to PRPB who conducted an internal review and determined the initial number provided was inaccurate.

Numerous incidents reported by FIU did not have a corresponding PPR-84 form in Centro Mando's records. Conversely, several incidents reported on PPR-84 forms do not appear in FIU records. Table 1 details the identified discrepancies in the reporting and documentation of the use of force incidents.

*Table 5: Discrepancies in the Reporting and Documentation of Use of Force Incidents*

| Area Command | FIU List of Use of Force Incidents | Centro Mando List of Use of Force Incidents (PPR-84) | Number of FIU Incidents that have no Corresponding PPR-84 | Number Of PPR-84 Records that have no FIU Records |
|---|---|---|---|---|
| San Juan | 26 (13 Incidents) | 21 | 6 | 15 |
| Arecibo | 17 (7 Incidents) | 3 | 17 | 3 |
| Ponce | 17 (12 Incidents) | 21 | 2 | 6 |
| Humacao | 6 (4 Incidents) | 11 | 0 | 5 |
| Mayaguez | 19 (11 Incidents) | 6 | 7 | 2 |
| Caguas | 6 (5 Incidents) | 4 | 4 | 2 |
| Carolina | 4 (3 Incidents) | 26 | 0 | 22 |
| Bayamon | 42(18 Incidents) | 24 | 22 | 4 |
| Guayama | 7 (7 Incidents) | 12 | 5 | 10 |
| Aguadilla | 15 (8 Incidents) | 21 | 0 | 6 |
| Utuado | 2 (2 Incidents) | 3 | 1 | 2 |
| Fajardo | 2 (2 Incidents) | 5 | 2 | 5 |
| Aibonito | 14 (9 Incidents) | 4 | 14 | 4 |
| Total | 177 | 161 | 80 | 86[1] |

Moreover, the Area Command Centro de Mandos PPR-84 submitted data relating to arrests to the Monitor's Office for review. Due to the limited narrative many of these reports did not clearly identify whether force was used when making arrest. This posed an additional challenge to the Monitor's Office, making it difficult to determine if force

---

[1] It should be noted that this is a conservative number. The actual figure has proven to be higher.

was used. Despite these inconsistencies, the Chief Monitor uncovered eighty-six cases of use of force that did not appear in the FIU spreadsheet which tracks use of force incidents occurring Bureau-wide for the given period. This caused the Monitor serious concern.

The Monitor appeared to a site visit from March 2nd- March 5th, 2020. During that time the Monitor met with PRPB and participated in many discussions between PRPB and the United States Department of Justice. As a result, Monitor's Office determined that SAOC was maintaining a database independent of SARP/FIU. Furthermore, the Reform Office and Bureau legal representatives were surprised to discover that this database had presumably all field reports from the thirteen Area Commands relating to uses of force This database reported 380 uses of force for the period of review.

Upon reviewing, the Chief Monitor discovered that thirteen incidents of use of force were missing from this database which had been reported by SWAT and documented by the Monitor's Office during a site visit to SWAT. This brought the number of identified incidents of UOF for the period to 393 in total (note the number grew to 439). It should also be noted, however, that the Chief Monitor visited Radio Control and concluded that its numbers relating to use of force were in sync with that of SAOC. PRPB's use of FIU's inconsistent data for its official report to the public and the Court amplified the problem.

## Recommendations

The Chief Monitor requested PRPB to modify the PPR-84[2] to require two additional data points on the use of force: 1) whether force was used, and if so, 2) by how many officers. The Monitor's Office also recommended that PRPB should modify its PPR-84 system so that the additional data points have to be completed prior to the system generating a complaint number. This would allow the Force Investigation Unit ("FIU")—the Bureau's repository for all use of force incidents—to provide accurate numbers of use of force incidents on any given day. PRPB confirmed that it has adopted these recommendations and revised the PPR-84 (now PPR-126.2). The Monitor's Office believes that PRPB's adoption of these recommendations is an improvement to PRPB's substantial compliance with the consent decree.

The Monitor's Office, however, is still concerned with discrepancies in documentation and reporting of Use of Force ("UOF") incidents. Area Command Centro de Mandos must be able to accurately report use of force incidents. The steps PRPB has taken per the Monitor's request to include additional data fields in UOF reports will be helpful in

---

[2] Centro de Mando's screen form to enter data and generate a complaint number

CMR-2 Draft | December 2, 2020

ensuring that information relating to use of force is properly recorded. It is imperative that arrest officers call Centro de Mando and provide information on the arrests and incidents of UOF. PRPB should also be working to develop an electronic tracking system with field reporting capability. Until such a system is implemented, however, Centro de Mando must have the ability to track the numbers for purposes of monitoring and analyzing use of force dynamics.

## 5. Force Review, Investigation, and Analysis

The Monitor's Office reviewed a significant number of UOF reports (65) for the period under review to determine if PRPB properly reported and investigated use of force incidents in the field. The Monitor's Office concludes the UOF reports on file at FIU where properly prepared and investigated. However, it is noted that 26% of the reports upon their initial arrival at FIU were incomplete and, thus, returned to PRPB for additional and/or corrected information. It should be noted that in most cases the missing information was of a minor nature and would not have altered the Monitor's findings. The specifics are spelled out further in this report.

*Table 6: Compliance Status for Paragraphs 40-42*

| Paragraph | Stipulations | Monitor's Rating |
|-----------|--------------|------------------|
| 40 | Force reviews and investigations comply with applicable law and comport with generally accepted policing practices. | Partially Compliant |
| 41 | PRPD shall be responsible for maintaining a reliable and accurate tracking system on all officers' use of force. | Not Compliant |
| 42 | The quality of force reviews and investigations shall be taken into account in performance evaluations. | Not Compliant |

The following section presents key observations based on a review of sixty-five UOF Reports. In reviewing a random sample of PRPB's UOF Reports PPR-605.1 (July 1st through November 30th) the Monitor's Office determined that the majority of the reports had been properly prepared and that required actions relating to use of force incidents had been carried out as per the Agreement.

Of these reports, only two were not in compliance. However, the following should be noted. As per PRPB policy, SARP/FIU has been deemed the repository for all use of force reports upon completion of investigation and evaluation. The FIU also has the responsibility to review each report for proper preparation, accuracy, and completeness. Upon arriving at FIU, the Monitor discovered that many of the above reports had missing information such as boxes being left blank. In other instances, required action was not carried out or documented, i.e. evaluation by FRB. The practice of having use of force

reports, subsequent investigation, and evaluation reviewed by FIU for accuracy and completeness is an improvement. Yet, it should be noted that many of these reports do not arrive at FIU for a considerable amount of time, depending on what track the investigation follows. Therefore, a procedure should be implemented by PRPB that identifies mistakes and/or omissions earlier in the process.

In reviewing and determining levels of compliance with the Agreement, the Monitor's Office must look at the reports when they are deemed complete and accurate by PRPB, which is when FIU makes the determination. To that end, PRPB has met that threshold.

The Monitor's Office believes that PRPB should be cognizant of omissions and errors in the reports that arrive at SARP/FIU during the initial submission which require corrections or additional information. The following is a list of observations by the Monitor's Office:

- Of the reports reviewed (PPR-605.1), 26% had missing or incomplete information.
- In preparing PPR-113.3, Evaluation of Use of Force Report, the FIU referred to PPR-605.1 by its former designation of PPR-854 in a significant number of reports.
- There were instances where outdated use of force reports (PPR-854) were utilized in the field instead of the new PPR-605.1.
- Some reports had incorrect levels of force which needed correction.
- There were instances where supervisors were notified of use of force before the force was taken. This pertained exclusively to the euthanizing of animals (cattle and horses) involved in motor vehicle accidents. It is understood that the supervisor in those instances could have been forewarned, but the notification of the use of force must be made after the officers discharge their weapon.
- In instances where Specialized Units utilized less-than-lethal weapons at demonstrations or protests, the weapons employed were not always identified in the report, e.g., rubber bullets.
- In instances where more than one officer used force in an incident and the levels of force used by the officers varied, it must be clear in each officer's report what level of force they used and if it caused an injury. In some reports reviewed, officers indicated using a Level 1 or Level 2 which did not cause injury to the subject, however, elsewhere in their report, the officers indicated that the subject sustained injuries. Upon further review it was determined that the injuries are the result of other officer(s) force involved in the incident. This can be confusing.

CMR-2 Draft | December 2, 2020

- In an incident where an Electrical Control Device (taser) was utilized by an officer, the darts struck the subject in the neck and the incident was initially identified as a Level 3 by the officer. The supervisor assigned to investigate the force determined it to be a Level 4 and notified FIU.
- One report identified as improperly prepared was submitted three days after the incident. The case was referred to SARP for investigation.
- A lieutenant investigated a use of force and then evaluated his own investigation as the commanding officer.
- FIU utilized the same PPR-113.3 Evaluation of Use of Force to report on two uses of force in the same incident. The Monitor recommends there be one report for each use of force reported.

## 6. Supervisory and FRB Reviews

The Monitor's Office review concludes that PRPB supervisors properly respond to incidents of serious use of force by members under their supervision. In cases where FIU presence was needed, proper notification was made to FIU. In the sixty-five cases reviewed, supervisors were notified in every case. In two cases, however, notification was not made in a timely manner. In some incidents where the force involved euthanizing an animal, notification of the anticipated force was provided to the supervisor in advance.

In 26% of the cases a supervisor did not respond to the scene of the force. In all reports reviewed supervisors completed their review within the five days as outlined in General Order 600-605.

The Monitor's Office reviewed the training records of all members assigned to the thirteen Area Command Force Review Board. All members have the required training necessary to serve on the Board, including training on force-related policies.

As it relates to the returning of reports for incomplete or incorrect information, only three of the area boards reported that it was necessary to do so for investigations occurring during this reporting period.

During this period of review there were no reports of apparent misconduct or apparent criminal conduct. The Monitor's Office concludes that the mechanism to report such conduct is in place.

*Table 7: Compliance Status for Paragraphs 43-47*

| Paragraph | Stipulations | Monitor's Rating |
|-----------|--------------|------------------|
| 43 | A supervisor shall respond to the scene of a serious use of force | Substantially Compliant |

CMR-2 Draft | December 2, 2020

| | | or allegation of excessive force upon notification. | |
|---|---|---|---|
| 44 | | Supervisor shall conduct a supervisory review of all uses of force, prisoner injuries, or allegations of excessive force. | Partially Compliant |
| 45 | | Supervisors shall complete use of force reviews within five business days of receiving the officer's use of force report. | Partially Compliant |
| 46 | | A Force Review Board shall evaluate supervisory reviews. | Partially Compliant |
| 47 | | Any UOF misconduct shall be immediately referred to the appropriate investigating unit or the PRDOJ. | Partially Compliant |

In determining compliance to paragraphs 46 & 47 the Monitor's Office reviewed a random sample of use of force incidents evaluated by Area Command FRBs. The period reviewed was July 1st through November 30th, 2019. To that end, PRPB provided 131 cases of UOF incidents. In the 131 incidents, according to PRPB records, 157 officers used force in those incidents.

During the Monitor's Office site visit of March 2nd to 5th, 2020 the Chief Monitor reviewed the following five FRB investigation files:

*Table 8: FRB Investigations Reviewed*

| Area Command | Complaint Number | Date Evaluated by Board |
|---|---|---|
| Aibonito | 2019-13-022-04106 | October 23rd 2019 |
| Aguadilla | 2019-10-199-1937 | September 11th 2019 |
| Aguadilla | 2019-10-051-3351 | August 30th 2019 |
| Bayamon | 2019-7-111-7446 | July 9th 2019 |
| Bayamon | 2019-7-075-4827 | August 7th 2019 |

Due to the coronavirus pandemic, the Monitor's Office had to cancel the Team's April site visit, and instead requested the remaining, randomly—selected, fifteen FRB case files be copied and forwarded to the Monitor's Office, which they were. Upon a subsequent second request the five files reviewed in Puerto Rico were also requested and provided.

Findings:

- PRPB General Order 500-502 specifies the conduct requirement of the FRB proceedings.
- PRPB General Order 600-601 establishes levels of force below serious that shall be reviewed by FRB.
- PRPB General Order 500-502 establishes that FRB will review Supervisory Review for completeness and accuracy.
- PRPB General Order 500-502 outlines how each FRB proceeding will be documented, including findings and recommendations.

CMR-2 Draft | December 2, 2020

- FRB returned reports due to incomplete or incorrect information in Humacao, Ponce, and San Juan.
- There was no indication that it was necessary to return a report in other regions.

Based on reviews of the randomly selected FRB files there were no reported referrals. However, in the cases reviewed, no such need was uncovered. The full results of the reviews of those files can be found in Appendix D.

## Observation related to Area Command FRB evaluations

As requested by the Monitor, PRPB provided all Area Command FRB evaluations for the period July 1st through November 30th, 2019. Some observations are as follows:

- Some reports were returned due to incomplete or incorrect information.
- The Monitor's Office requested a list of all cases reviewed by the Boards during the reviewing period. In the list provided Ponce, San Juan, and Guayama reported reviewing cases that were not required to be reviewed as per G.O. 500-502. In fact, the files reflected no evaluation by the board. Therefore, these cases identified as evaluated are in error.
- The Monitor's review of FRB evaluation indicated appropriate action by the Boards.

## 7. FIU Investigations and Force Reviews by SFRB

PRPB created a Force Investigation Unit (FIU) to address all incidents in which PRPB personnel use deadly force in the line of duty. As indicated in the Monitor's First Report (CMR-1), the FIU was mandated to investigate all incidents of use of force across Puerto Rico, including both intentional and accidental firearms discharges involving PRPB personnel.

In CMR-1, the Monitor's Office voiced serious concerns about the thoroughness of FIU investigations and the accuracy of their conclusions. This was based on several findings, including that a significant proportion of FIU reports relied solely on police witnesses, and rarely incorporated interviews or observations from unbiased civilian witnesses as mandated in a proper investigation. In addition, the Monitor's Office also assessed that the investigative practices followed by the FIU lacked objectivity.

In assessing PRPB's effort in this area for CMR-2, the Monitor's Office determined that PRPB has made some improvements in their investigations of firearm discharges. However, the Bureau still fall short in certain areas. For example, the final report prepared

CMR-2 Draft | December 2, 2020

by the investigator (not the PPR-113.2 Investigation Report) does not encompass all the details of the event. In CMR-1 the Monitor's Office recommended that the final report of the incident contain all details of the incident, including what precipitated the firearm discharge.

*Table 9: Compliance Status for Paragraphs 48-52*

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 48 | Ensure that all serious uses of force and allegations of excessive force are investigated fully and fairly. | Partially Compliant |
| 49 | A supervisor responding to a serious use of force or allegation of excessive force shall immediately notify FIU. | Partially Compliant |
| 50 | FIU shall immediately notify and consult with PRDOJ regarding any UOF indicating criminal conduct by an officer. | Partially Compliant |
| 51 | FIU shall complete its administrative use of force investigation within 45 days of the use of force. | Partially Compliant |
| 52 | The Force Review Board shall evaluate all FIU investigations, including FIU reports and determinations. | Not Compliant |

The Monitor's Office has reviewed the case files and found that PRPB has adopted some of our recommendations provided in CMR-1. These changes are reflected in the investigations. However, there are still major deficiencies. Firstly, the investigator submitted the final report months after the incident took place, which provided ample time for the investigator to review all documents and prepare a complete report. Yet, we have come across discrepancies that were not properly addressed.

Secondly, in reviewing the case files, the Monitor's Office found that some witness statements are incomplete, i.e. pertinent information relating to what they did or did not observe is not spelled out, which brings in to question the interviewer's skills and training. Thirdly, PRPB stated that it would expand the training of FIU personnel and would adopt many of the recommendations of the Monitor's Office provided in CMR-1. However, PRPB has not provided any documentation that it has organized or provided the training to date.

Prior to the filing of CMR-1 to the Court, the Monitor's Office met in November and December 2019 with PRPB personnel to discuss deficiencies identified by the Monitor's Office in FIU's investigations of firearm discharges. For the purposes of CMR-2, the Monitor's Office reviewed four intentional firearm discharges for the month of January 2020. The purpose was to conduct a qualitative review of firearms discharges. In all the cases reviewed, the perpetrator exhibited a weapon, however, did not discharge the weapon.

CMR-2 Draft | December 2, 2020

The month of January was selected because it provided sufficient time for PRPB to implement the recommendations provided by the Monitor's Office. We note that PRPB, at the request of the Monitor's Office, produced investigation files for four officer-involved shootings in January 2020. Based on information provided by PRPB, there were a total of 44 firearm discharges during the evaluation period for CMR-2 (July 1, 2019 – March 31, 2020).

The goal of the review was not to establish a compliance level, but to determine if measurable changes have been made by FIU in how they conduct their investigation. To that end, the Monitor's office reviewed these firearm discharges with the purpose of confirming if PRPB had undertaken any substantive changes in its investigations related to intentional firearm discharges. Given the limited number of changes to the investigative process witnessed in the four investigations, it is clear that if the Monitor's Office were to apply a compliance rating, it would not rate it as being in compliance.

The Monitor's Office reviewed cases involving shootings. These reports were provided by PRPB and included sketches of the shootings. However, some of these sketches appeared to be very rudimentary and lacked key details, such as the person preparing the diagram, dates, and the location of evidence. Although diagrams were included in cases produced for CMR2 (in contrast to cases produced for CMR1), we did not see any directive or other order specifying the requirements for diagrams.

Generally, the FIU investigator did not use the diagram to evaluate the physical evidence, including whether it supported or refuted the version of events offered by officers (e.g., reviewing shooting angles, impacts, location of evidence). Thus, it appears that the diagrams offered little added value in the final conclusions reached by FIU regarding the justification for the shooting, tactics, training, or policy.

In no case did we see an attempt to interview the subjects about the use of force. In some cases, the subjects confessed about the underlying crimes, but we did not see evidence that investigators attempted to learn the facts pertaining to the use of force from the subject. Furthermore, while we observed that spent casings were recovered by investigators at the scene, we did not see evidence that Forensic Sciences provided any analysis or report.

While it was referenced, we did not see evidence in the file regarding Case (-00356) that administrative investigations were opened against the officers for negligence for allegedly failing to transport the prisoner to a police station, nor against the sergeant for allegedly failing to secure his firearm when his utility belt was left behind in the police vehicle with

the unsupervised prisoner. Additional information relating to the four cases investigated by FIU can be found in Appendix D of the report.

Paragraph 52 requires the CFRB to review all investigations conducted by FIU for the purpose of verifying that investigations are complete, include evidentiary support, and that they comply with PRPB policy. CFRB is also required to document each use of force proceeding, which shall include findings and recommendations to the Superintendent.

To date, the Monitor's Office has reviewed four cases. The Monitor's Office has received documentation provided by PRPB, dated July 29th, 2020, that includes a signed memo from the President of the Force Evaluation Board indicating that the cases have been referred to, and received by, the CFRB (during the month of June/2020).[3] However, the process of the Board evaluating the firearm discharges has not been completed. The Lt. Colonel in the memo explains that the Board requested an extension due to the COVID-19 pandemic.

As it relates to the Firearm discharges reviewed by the Monitor's Office, SARP/CFRB, in at least one of the cases, has not met the timeline established in the Bureau's General Order 500-502, "Evaluation Boards of Incidents of Use of Force." However, there appear to be mitigating circumstances, as stated above. We also acknowledge that the Monitor's Office received information from PRPB's former legal counsel that the SARP FIU Unit was given an extension beyond the forty-five (45) days outlined in the General Order to allow sufficient time to review and analyze all evidentiary material before making a determination as to whether the firearm discharge was within Bureau guidelines.

In summation, the four FIU investigations examined were selected to provide the Monitor with a snapshot of how PRPB has revised its procedures regarding officer-involved shootings in response to the Monitor's findings in CMR-1. Though FIU showed improvement, the time required to conduct thorough investigations went well beyond the time stipulated as outlined in G.O. 100-113. The problems presented by these investigations demonstrate that PRPB has substantially more progress to make before they can be considered compliant with this paragraph.

Note: The Monitor welcomes and supports that PRPB's FIU wants to receive, review, and analyze all evidence before making determinations. Nevertheless, policy timelines need to be followed. If more time is needed, PRPB should revise the timelines established in General Order 100-113 "Investigations Division of Incidents of Use of Force" (FIU) to

[3] Note: Additional information relating to the four (4) cases investigated by FIU can be found in Appendix D of the report.

reflect additional time requirements. The Monitor's Office also recommends that PRPB review timelines established in General Order 500-502, "Evaluation Boards of Incidents of Use of Force."

## 8. Use of Force Training

The Monitor's Office finds that PRPB is compliant with the paragraphs of the Agreement which stipulate that personnel must be trained and certified on use of force policies. The monitoring team conducted a site visit to the Puerto Rico Police Bureau on July 24th, 2020 and verified that the training materials employed by PRPB are consistent with policy and generally accepted policing practices. The monitoring team also selected a random sample of PRPB personnel and verified that their training records included certification on UOF policies. We followed similar steps in verifying that the training on Firearms was conducted by PRPB.

The Monitor's office verified that the training for supervisors, FIU personnel and command personnel is up to date. However, PRPB has not provided data/information on the additional training that it had planned to organize soon. PRPB had planned to hold an additional training for its FIU personnel focused on investigating firearms discharges (Level 4 Use of Force). This was in response to the Monitor's first report, CMR-1, which identified significant deficiencies in FIU's investigations into firearms discharges (Level 4 Use of Force).

*Table 10: Compliance Status for Paragraphs 53-55*

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 53 | Train all PRPD officers on PRPD's use of force policies and assess trainings on an ongoing basis | Partially Compliant |
| 54 | Provide an appropriate firearm training program that meets all requirements outlined in the Agreement. | Substantially Compliant |
| 55 | PRPD shall train all supervisors, FIU members, and command officers on PRPD's use of force policies. | Partially Compliant |

## 9. Responding to Behavioral/Mental Health Crisis

PRPB has implemented a CIT Pilot Project in the Arecibo Area Command. Fifteen officers from the Arecibo Area Command participated in the training as CIT First Response Officers. The training for the officers took place at the PRPB Academy. Officers were required to pass a written exam at which point they could proceed to the 'Scenario Based Training' segment. The course, (CITE 8061) "Intervention Team in Crisis," consisted of 40 hours of training. PRPB provided the course curriculum as well as a certified list of those

who were trained to the Monitors Office for review. An expert in Justice and Policing, who has contracted with USDOJ, also provided training to the CIT First Responders.

*Table 11: Compliance Status for Paragraphs 56-57*

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 56 | Improve PRPB response behavioral or mental health crisis, and minimize unnecessary UOF against such individuals. | Partially Compliant |
| 57 | Train officers in CIT program and ensure that CIT-trained officers are assigned to each shift in each police region. | Not Compliant |

Understanding the importance of having resources that First Response CIT Officers could draw upon, PRPB has partnered with hospitals and agencies. This was confirmed by the Monitor's office and USDOJ who conducted site visits to the PRPB Academy and the supporting hospitals and agencies. Monitor Team personnel along with USDOJ personnel participated in "ride along" activities with CIT Responders.

Based on documentation provided to the Monitor's Office during the monitoring period, the CIT trained personnel responded to twelve incidents. The Monitor's Office is encouraged by the development and implementation of officer training during the pilot project in Arecibo Area Command, yet it should be noted that the program should have been implemented island-wide by this time, as per the Agreement. Also, PRPB produced no documentation that members were assigned to each shift (in Arecibo) during the pilot project, which is required as per paragraph #57 of the Agreement.

A mental health crisis is occurring island-wide, and as such PRPB needs to accelerate and expand this program bureau-wide. Following the pilot project, which concluded in November 2020, PRPB should conduct a self-assessment of the project to determine "lessons learned" in order to facilitate the expansion to other areas commands. The Monitor's Office expects PRPB to make substantial progress in the training of officers to handle individuals with mental health problems, so that such incidents do not escalate into confrontations in which PRPB members use force.

## Conclusions Regarding Use of Force

The Monitor's Office is encouraged to see that PRPB has indicated that they have implemented the Monitor's most recent recommendations relating to modification of Centro Mandos PPR 126.02 (formally PPR-84). However, several issues still raise concern, including discrepancies in documentation and reporting of UOF incidents.

First, to follow the Agreement, Area Command Centro de Mando must report accurate numbers for incidents of uses of force by its members. Secondly, the online PPR-126.2

system must be revised, as promised by PRPB, to include specific fields where information relating to use of force is properly recorded. For this to happen, arresting officers must in all cases, as required, follow Bureau policy by calling Centro de Mando and providing information relative to the arrests and to the incidents of UOF. Centro Mando must also track the numbers for purposes of monitoring and analysis of use of force numbers.

In the past, the Chief Monitor conveyed to PRPB that it needed to modify the PPR-84[4] to require two additional data points, including: 1) "Was force used in making arrest?" 2) "By how many officers?". Adopting this strategy would help PRPB to avoid the discrepancies outlined in the table above. The data points would be based on those questions and PRPB would have the capacity to query the system in order to extract information relating to incidents of use of force by its personnel.

The Monitor's Office also recommended that PRPB should modify its Screen form system so these additional data points would be required to be completed prior to the system generating a complaint number. By implementing this procedure, FIU, the Bureau's repository for all use of force incident reports would have the capability to access the system on a daily basis to verify the numbers of use of force incidents occurring Bureau-wide. In addition, the system would allow all relevant parties to run queries in the system and obtain accurate numbers of use of force incidents on any given day.

It is the understanding of the Monitor's Office that on March 31, 2020, PRPB adopted the recommendation of the Monitor's Office and revised the PPR-84, now designated as PPR-126.2. The revision of the screen form as well as the implementation will be reviewed in CMR-3. Therefore, going forward, the deficiency of inaccurate use of force numbers should be rectified.

The significance of establishing "Real Time" accurate information on use of force incidents occurring Bureau-wide cannot be overstated. As previously noted, for the Puerto Rico Police Bureau to effectively monitor its members' use of force, it must have accurate and timely information and must also be transparent and provide that information to the residents of Puerto Rico upon request.

---

[4] The screen form to enter data and generate a complaint number.

## II. Searches and Seizures

PRPB has created policies on Search and Seizure (GO 600-612) and Arrests and Summons (GO 600-615) that comport to the demands of Puerto Rico and US Constitutions, as well as generally accepted policing practice. These general orders were reviewed and approved by the Federal Monitor and the USDOJ. The Monitor reviewed 50 randomly chosen search warrants and affidavits written by PRPB Units. All have well documented probable cause and supporting evidence, which were pre-approved by supervisors and respective commanders, as well as by the District Attorney, before being presented to the presiding Judge. However, many files were missing the supervisor's review of arrest (PPR-880 or PPR615.8) when there was one, as well as the booking sheet (Egress/Ingress PPR-82 or PPR 631.1).

Incident reports (PPR-468 or PPR-621.1) on arrests filled out by PRPB officers almost never properly documented probable cause. In addition, 52 of 80 randomly selected arrest files were incomplete as these files did not include all the forms necessary in the files, such as the booking sheet (Egress/Ingress PPR-82 or PPR-631.1), Property Inventory (PPR-126 or PPR-636.1) and Arrest Review by Supervisor (PPR-880 or PPR-615.8), among others.

Monitor's Note: The analysis provided below was prepared after examining 130 randomly selected search warrant and arrest files provided by PRPB, comprising thousands of pages. These were all scanned pages, some of which were handwritten and in cursive. For the Monitor to read and analyze the scanned printed and hand-written data documents provided by PRPB takes an enormous number of hours, making the process much more expensive to the Commonwealth than it should be. PRPB must prioritize implementing the planned automated records management system to facilitate document sharing and/or giving direct access for the Monitor's Office .

### 1. General Provisions

PRPB has created policies on Search and Seizure (GO 600-612) and Arrests and Summons (GO 600-615) that conform to the demands of Puerto Rico and US Constitutions, comply with Criminal Statutes, and comport with generally accepted policing practice. Those general orders were reviewed and approved by the Federal Monitor and the USDOJ when first created and periodical reviews as per the Agreement were also conducted. Review and revision of these policies is on-going: The Monitor last reviewed and approved General Order 615 in July 2018. The General Order was due for review again in July 2020 and will be assessed by the Monitor's Office in CRM-3.

*Table 12: Compliance Status for Paragraphs 58-59*

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 58 | Ensure that all stops, searches, and arrests are conducted in accordance with the law | Partially Compliant |
| 59 | Develop and implement policies and procedures that comply with applicable law on stops, searches, and arrests. | Partially Compliant |

Paragraph 58 requires that PRPB demonstrate substantial compliance with all other paragraphs relating to search and seizure. PRPB is currently only in substantial compliance with some of these paragraphs.

Paragraph 59 is assessed together with numerous other paragraphs related to policy, training, and implementation (see Appendix F for details). PRPB is compliant with the development of policy for this paragraph, but not with the training and implementation requirements.

## 2. Investigatory Stops and Searches

*Table 13: Compliance Status for Paragraphs 60-64*

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 60 | Develop a policy and system to collect data on all investigatory stops and searches. | Rating Deferred |
| 61 | Stops and searches reporting policy shall explicitly prohibit the use of boilerplate or conclusory language in all reports. | Rating Deferred |
| 62 | A supervisor shall review each report to determine whether the stop or search was within policy and this Agreement. | Rating Deferred |
| 63 | A command-level officer shall review in writing all auditable forms related to investigatory stops and detentions. | Rating Deferred |
| 64 | Analyze investigatory stop and search data to determine trends and identify and correct deficiencies. | Rating Deferred |

In accordance with the Constitution of Puerto Rico and the jurisprudence of the PR Supreme Court, PRPB is not authorized to carry out investigatory stops, also known as "Terry stops," based on reasonable suspicion. Therefore, no "Investigatory Stops and Searches" reporting policy exist in Puerto Rico. Thus, the Monitor will be analyzing detentions based on probable cause.

PRPB Search and Seizure G. O. 600-612 explicitly prohibits boiler-plate conclusory language.

CMR-2 Draft | December 2, 2020

## 3. Arrests

*Table 14: Compliance Status for Paragraphs 65-73*

| Paragraph | Stipulations | Monitor's Rating |
|-----------|-------------|------------------|
| 65 | Ensure that policies on arrests comply with applicable law and comport with generally accepted policing practices. | Partially Compliant |
| 66 | Require that officers notify the communications command center and a supervisor immediately after an arrest. | Partially Compliant |
| 67 | When transporting an arrestee, officers shall take the safest and most direct route to the booking location. | Partially Compliant |
| 68 | Supervisor shall inspect each detainee or arrestee for injury and ensure that the individual receives medical attention. | Partially Compliant |
| 69 | Require that booking recommendations be approved in writing by a supervisor within 12 hours of the arrest. | Partially Compliant |
| 70 | Supervisor shall document arrests that are unsupported by probable cause or are in violation of policy. | Partially Compliant |
| 71 | A command-level officer or official shall review, in writing, all auditable forms related to arrests. | Partially Compliant |
| 72 | Require officers to provide written receipts to individuals whenever property is seized from the individuals. | Partially Compliant |
| 73 | Seek formal feedback from judicial sector partners regarding the quality of PRPD investigations, arrests, etc. | Not Compliant |

PRPB has created a policy on Arrests and Summons (GO 600-615) that conform to the demands of Puerto Rico and US Constitutions and Criminal Statutes and comport with generally accepted policing practice. The general order was reviewed and approved by the Federal Monitor and the USDOJ. The Monitor last reviewed and approved this general order in July 2018. It is due for review again in July 2020.

When PRPB includes the Supervisor's arrest review in the files, these indicate that the supervisor was notified through the communications command and he/she responded personally or spoke to the officer by phone. However, most arrest files were incomplete, with 33 files out of 80 missing the supervisor review. Thus, the Monitor could not determine if the officer notified the supervisor in those cases. Also, the monitor could not determine from any of the arrest files how officers recorded that they took the most direct and safest route to booking location.

Supervisors document inspections of arrestees on the booking form (PPR-82 or PPR-631.1) and take note of any injuries observed and provide medical assistance when needed. However, these forms were not always included in the files. Specifically, of the eighty (80) randomly selected arrest files inspected by the Monitor, 51 were missing the Ingress/Egress form (Booking Sheet). The Monitor noticed that arrestees were booked at the station within 12 hours of arrest in those cases that a booking sheet was included in

the files inspected. All booking sheets and arrest incident reports inspected by the Monitor had the District/Precinct/Unit Commander's review and approval. However, as stated above, many booking sheets (51 out of 80) were missing from the files. Supervisors and Commanders must pay attention to this issue and ensure all files contain the appropriate documents.

Most arrest incident reports completed by PRPB officers did not properly document probable cause. In Puerto Rico, an arrest is not allowed to be presented in court until the District Attorney reviews it for probable cause and gives his/her approval. This leads the Monitor to believe that probable cause existed in the officer's mind in most cases, but was not properly documented on the police report. This problem with report writing is a training issue for officers, as well as for supervisors who did not catch the omission. Nevertheless, the sample of arrests examined for CMR-2 did not contain any complaints recorded by a supervisor against an officer for violation of policy or for unsupported probable cause.

The lack of documented probable cause speaks to a broader issue with incomplete arrest files that PRPB must address. Of the 80 arrest files selected in the sample, 33 files were missing supervisor's reviews, while 73 files were missing Property Inventory form PPR126/636.1. PRPB provides property inventory form PPR-126/PPR-636.1 for officers to record seized personal property from arrestees which includes a place to sign when they get the property back. The few forms that were in the submitted files were properly completed. However, 73 of the 80 files inspected did not include this form. The fact that there were so many documents missing from the files indicates a lack of proper training and supervision.

Regarding interagency cooperation and feedback, PRPB has created a protocol to seek assistance from other criminal justice agencies and institutions. However, this protocol was created in May of 2020, after the period under review for CMR-2. Thus, PRPB is not compliant for paragraph 73 for the purposes of the present report. Furthermore, the protocol has not been ratified by partner agencies or implemented. Thus, there is no existing system to receive regular, formal feedback from the other components of the criminal justice system regarding how PRPB is complying with the requirements of probable cause in the arrest of suspects. Neither the district attorneys nor the judiciary have provided feedback as to PRPB's compliance with probable cause requirements. Therefore, the Monitor's Office is unable to determine PRPB's full compliance with that requirement of arrest procedure.

CMR-2 Draft | December 2, 2020

## 4. Searches

*Table 15: Compliance Status for Paragraphs 74-77*

| Paragraph | Stipulations | Monitor's Rating |
|:---:|:---|:---:|
| 74 | Ensure that policies on searches comply with applicable law and comport with generally accepted policing practices. | Partially Compliant |
| 75 | Require that a supervisor approve in writing each request for a search or arrest warrant. | Partially Compliant |
| 76 | Track each search warrant, the case file where a copy of such warrant is maintained, etc. | Not Compliant |
| 77 | Require officers to obtain and document consent to a voluntary search as part of routine stops. | Partially Compliant |

PRPB has created General Order PPR600-612 which deals with search warrants and warrantless searches. The Monitor, along with the Parties, has reviewed and approved this general order which is due for next review in May 2021. However, PRPB has not yet created a tracking system for search warrants or for detentions that do not lead to an arrest, such as stops for traffic violations.

All randomly selected search warrants written by PRPB Units and reviewed by the Monitor have well documented probable cause and supporting evidence. The affidavits go through an approval process that includes the officer's immediate supervisor, Commander, and the District Attorney before being presented to a Judge for final approval. Nevertheless, PRPB cannot be considered to be in full compliance with paragraphs 74 and 75, whose implementation is to be assessed in conjunction with paragraph 76 per the court-approved methodology.

Consent searches are documented on form PPR-879 (or new form PPR612.1). The Monitor examined 194 search warrant and arrest files randomly chosen covering this period of compliance. Consent searches were conducted in 17 of these cases. Of these 17, consent forms were properly and completely filled out in 11 cases. Five were missing a witness' signature, and one was not included in the file. Supervisors and officers must ensure that another officer witnesses the voluntary signature of the subject, and the officer signs the form confirming so, as required. Supervisors must also ensure that a copy of these forms is included in search files.

## 5. Training on Stops, Searches, and Seizures

*Table 16: Compliance Status for Paragraphs 78-79*

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 78 | Provide all PRPD officers with training on PRPD's stop, search, and seizure policies. | Partially Compliant |
| 79 | Provide all PRPD supervisors and command officers with training on PRPD's stop, search, and seizure policies. | Partially Compliant |

PRPB reported that it has trained 99.85%  of its officers in search and seizure during the capacity-building period (essentially 100%, as a small number of officers were not available due to long-term leave). This 99.85 % training figure includes supervisors and command officers. The training conducted during the capacity-building period was approved by members of the Monitor Team, which reviewed the curriculum and attended search and seizure classes in person at the Police Academy. However, for the period covered by CMR-02, PRPB was not able to update trainings due to the strain exerted on human resources by recent natural disasters. For that reason, PRPB is only partially compliant with the training requirements of paragraphs 78 and 79.

# III. Equal Protection and Non-Discrimination

Due to PRPB's system for sharing data with the Monitor's Office, the Monitor was unable to establish an acceptable level of verification regarding compliance with many of the agreed upon areas of Equal Protection and Non-Discrimination. Ordinarily, the Monitor could remedy this defect through on-site, in-person inspections. However, due to the novel coronavirus pandemic, the opportunity to conduct these inspections was foreclosed beginning in mid-March of 2020. Due to the data sharing challenges, and in the absence of data requested by the Monitor, we must treat some findings as "provisional" and give these areas further review in CMR-3.

## 1. General Provisions

PRPB supplied the Monitor with documents supporting the stipulation that each member of the respective committees was properly certified in bias-free policing and equal protection as they apply to hiring, promotion, and performance assessment processes. However, PRPB did not provide the Monitor access to a representative sample from these groups for verification. Accordingly, in areas where personnel lists cannot be matched with individual training records and histories for verification purposes, we must treat our finding as provisional, subject to verification on the ground.

CMR-2 Draft | December 2, 2020

*Table 17: Compliance Status for Paragraphs 84-86*

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 80 | Ensure that police services are delivered equitably, respectfully, and free of unlawful bias. | Not Due for Assessment |
| 81 | Develop policies and procedures on bias-free policing that comply with law and generally accepted policing practices. | Not Due for Assessment |
| 82 | Revise complaint classification policies to capture and track civilian complaints alleging discriminatory policing. | Not Due for Assessment |
| 83 | Revise documentation of officer-civilian interactions so that it permits officers to record demographic information. | Not Due for Assessment |
| 84 | Incorporate bias-free policing and equal protection into hiring, promotion, and performance assessment processes. | Partially Compliant |
| 85 | Use the National Incident Based Reporting System ("NIBRS") to collect and report crime data. | Not Compliant |
| 86 | Collect accurate and reliable data on hate crimes on an ongoing basis and submit the data to the FBI. | Not Compliant |

The recruitment to hiring flow chart and data forwarded to the Monitor is indicative of a highly organized and thoughtful workflow, beginning at recruitment and ending at academy graduation, with progressive filtration measures along the way. In the last class, PRPB began with 1,758 recruited candidates, which was reduced to 1,166 after psychological testing, later to 824 after polygraph, later to 515 after background investigation, down to 417 after medical examination, later to 368 after an in-person psychological interview, then to 348 after physical ability testing, and after drug testing down to the final class size of 264. The filtration process from recruitment to hiring seemingly eliminates approximately 85% of candidates in an objective manner, which is well within the parameters of a modern and healthy police agency. Furthermore, the use of a candidate selection committee comprised of representatives from various areas of PRPB helps to ensure fairer candidate assessment by PRPB in its final class selection decision.

All except one out of 261 individuals involved in conducting these filtration processes have been trained and certified within the past 18 months. The only area of recruiting where PRPB seemingly falls short is the certification of officers who are involved in the actual recruitment outreach process itself. According to their own admission, 32% of the 156 Community Service Officers involved in local recruitment outreach have not been trained and certified in bias free and equal protection. PRPB should correct this and become substantially compliant in its next review.

NIBRS continues to be challenge for PRPB, as it involves training, technological development, and institutional change. As of this report, PRPB has trained thirty-two

CMR-2 Draft | December 2, 2020

instructors to deliver a NIBRS course. Fifty members of PRPB have been trained on NIBRS, all of whom were attached to the Training Bureau. The Monitor's Office hopes to see significantly more progress made on NIBRS for CMR-3. PRPB can achieve at least partial compliance as the Bureau begins to train its line personnel and preparing them to report within the NIBRS system.

Another area where PRPB needs to improve concerns performance evaluations of members of PRPB under consideration for promotion in rank. Based upon our interview in San Juan on 10 December 2019, PRPB had yet to complete its process of being able to measure performance in a bias-free manner.

## 2. Discriminatory Policing

We note that PRPB has elaborated a policy to conduct their activities in such a way as to protect all persons equally and to not discriminate. This policy extends to the LBGTQ (LGBTT) community and had been updated in the past year. This update has been reflected in the new iteration of the relevant course. The sample of personnel training records selected for review, however, indicates that only 28% of PRPB has received this updated training. We also note that investigative reports for abuse allegations in juvenile facilities were not up to par.

*Table 18: Compliance Status for Paragraphs 88-92*

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 87 | Administer all programs, initiatives, and activities without discriminating on the basis of race, religion, gender, etc. | Not Due for Assessment |
| 88 | Develop policies to provide all individuals with police services in a non-discriminatory fashion. | Substantially Compliant |
| 89 | Develop a policy to guide officers' interactions with transgender or transsexual individuals. | Substantially Compliant |
| 90 | Provide all PRPD officers with regular training on bias-free policing. | Not Compliant |
| 91 | Assess programs and activities to ensure that they are administered in a manner that guarantees equal protection. | Not Due for Assessment |
| 92 | Provide preliminary investigation reports for each allegation of abuse in secure juvenile correctional facilities. | Not Compliant |

PRPB is tasked with investigating allegations of abuse committed by staff against minors in secure juvenile detention facilities. Such allegations merit a prompt and thorough investigation by PRPB. The Monitor's review of three cases, all purported to be completed and closed, does not meet this standard. This is a causes the Monitor's Office serious concern and should be promptly addressed by PRPB.

PRPB must require that all reports concerning abuse or mistreatment in a secure prison be typewritten. This must include victim and witness statements, suspect declarations, observations, and findings. The one case that appears to have been investigated at length —Querella 2020-3-758-000406—which involved an alleged sexual assault committed by several minors against another detained juvenile, was handwritten unintelligibly. Therefore, the Monitor was unable to determine whether the investigation was conducted appropriately. Moving forward, the Monitor recommends that *all* sensitive PRPB investigations be typewritten, in particular those involving allegations of abuse against juveniles held in detention.

The two remaining cases are problematic. In Querella 2020-3-758-002476, which is alleged to have occurred on 14 February, 2020, the 17-year-old alleged victim accused a staff member at a juvenile detention facility of inappropriately using force by grabbing him by the neck when he objected to closing the door to his dormitory. From the initial report it took 17 days for the investigation to be assigned to an investigator from Ponce. The next entry in the case was on June 24, 2020, *over 18 weeks after the incident was reported*, indicating that, due to COVID19, he could not conduct any interview with the alleged victim or witnesses. The update is silent on why the investigator could not interview the alleged perpetrator or the other police percipient witness.

Lastly, in Querella 2020-3-758-002658, the director of the juvenile detention facility denounced a staff member for not following protocol in advising her immediately of an attempted suicide of a detained minor, but no investigation was ever made to support this accusation. There are no investigative notes and no interviews of anyone, including the complainant, the accused, or the minor. The complaint was received on March 6, 2020. While the staff member's failure to report the incident is uncontested, the resulting disciplinary process shows the absence of a thorough investigation, which as a result could help the staff member escape discipline.[5] PRPB should promptly take corrective measures to ensure that it fully complies with constitutional requirements and generally accepted police practices in this area.

---

[5] As a general rule, an accused staff member is entitled to due process in any disciplinary hearing. One key element of procedural due process is to question statements made by any party to the investigation and to put these statements to the test during direct testimony as well as cross-examination. If no such report exists or does not record statements that were made, then a staff member may create sufficient doubt in the mind of a fact finder. The officer could therefore prevail in the absence of a preponderance of evidence against him/her.

CMR-2 Draft | December 2, 2020

## 3. Sexual Assault and Domestic Violence

On August 1st, 2020, the Monitor's Office visited the Sex Crimes Investigation Unit for the specific purpose of verifying its operability and ensuring that its members had received the proper training. His observations lead the Monitor to conclude that the office is staffed 24/7 and equipped to handle reports of sex crimes.

*Table 19: Compliance Status for Paragraphs 93, 96 & 99*

| Paragraph | Stipulations | Monitor's Rating |
|:---:|:---|:---:|
| 93 | Investigate reports of sexual assault and domestic violence professionally, effectively, and free of gender-based bias. | Partially Compliant |
| 94 | Provide clear and detailed guidelines for each stage of PRPD's response to a reported sexual assault. | Not Due for Assessment |
| 95 | Re-assess and revise, where needed, classification protocols for crimes involving sexual assaults. | Not Due for Assessment |
| 96 | Sex Crimes Investigation Unit is accessible through a hotline that is staffed 24-hours a day with trained responders. | Substantially Compliant |
| 97 | Track dispositions of sexual assault investigations. | Not Due for Assessment |
| 98 | Policies shall provide clear and detailed guidelines for each stage of response to a report of domestic violence. | Not Due for Assessment |
| 99 | Implement measures to respond to reports of domestic violence and sexual assault involving PRPD officers. | Not Compliant |
| 100 | Track dispositions of domestic violence investigations. | Not Due for Assessment |

Paragraph 93: PRPB supplied the Monitor with a list of 69 instructors who were trained and certified in teaching domestic violence investigation. A review of a statistically relevant sample of PRPB sworn officers indicated that 19 out of 82 officers (23%) had not been trained in investigating domestic violence incidents. The same review showed that all 82 officers were trained and certified in sexual assault investigations.

The Monitor verified that more than 95% of domestic violence investigations were conducted thoroughly and in a manner that complied with the requirements of Paragraph 93. However, the Monitor was unable to review a sufficient number of sexual assault investigations to reach a determination on compliance target 4.

Paragraph 96: As indicated in the Monitor's assessment of Paragraph 93, PRPB records indicate that the Sex Crimes Investigative Unit has been trained and certified in accordance with the Agreement.  A site visit to the Sex Crimes Unit by the Monitor's investigative delegate revealed that the site is manned 24/7 and that a cell-phone forwarding scheme is employed in case of emergency to ensure that no calls to this unit are ever missed.

Paragraph 99: A review of three concluded PRPB internal investigations of domestic violence revealed that all three were adequately investigated. However, per the comments on Paragraph 93, the Monitor was unable to review a sufficient number of sexual assault investigations to reach a determination as to compliance on Paragraph 99.

The Monitor's Office takes note of the number of domestic violence incidents that are occurring in Puerto Rico and of the importance of well-documented and speedy investigations of those incidents by PRPB, which helps to curtail domestic violence throughout the island. PRPB should strengthen its units that investigate domestic violence cases, and take the necessary measures to increase its response to those incidents. This will ensure that victims have access to protection, support, and justice.

In light of the increase in domestic violence incidents in Puerto Rico, and the number of allegations of domestic and sexual violence against officers of the PRPB, future reports by the Monitor's Office will devote particular attention to internal investigations involving such allegations. The Monitor's Office will work with PRPB's Reform Office to ensure that the sample of internal investigations analyzed contains a significant number of investigations that involve allegations of domestic and/or sexual violence against PRPB officers.


## IV. Recruitment, Selection, and Hiring

The Monitor finds that PRPB is generally in compliance with the Agreement regarding recruitment, selection, and hiring policies and procedures. PRPB has made a demonstrable effort to recruit and hire qualified personnel and develop recruitment strategies that promote inclusive selection practices that better reflect a diverse cross-section of the Puerto Rican public.

### 1. General Provisions

The Monitor conducted interviews with the Director of the PRPB Human Resources Department and members of the Recruitment Division with regards to their recruitment plan. According to those interviewed, PRPB has developed a comprehensive recruiting

CMR-2 Draft | December 2, 2020

and hiring program and policy to successfully attract qualified candidates. Regulation 9050[6] and General Order 501[7] are included in this program and policy.

*Table 20: Compliance Status for Paragraph 101*

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 101 | Develop a comprehensive recruitment and hiring program that successfully attracts and hires qualified individuals. | Partially Compliant |

The Director of the PRPB Human Resources Department provided both documents to the Monitor's Office. She explained that after having negotiated with the Federal Monitor and the Department of Justice, PRPB is now working in accordance with another Regulation. Both organizations consented to include the requirement that candidates must hold an Associate degree obtained from a university and shall be required to provide a Diploma and a Certificate of Completion upon request. This new Regulation is a minor amendment to Section 12.2, which discusses questions related to compensation.

The Director of PRPB Human Resources explained that PRPB accepted 134 candidates for Class 229, which started the program in 2019. She elaborated that PRPB received significant interest, estimating that approximately 817 interested individuals were recruited, 693 applied, and 134 met all eligibility requirements and joined class 229. However, the numbers provided on the incoming class showed inconsistencies. See Table 21 below.

*Table 21: Police Academy Class 229 Summary*

| Police Academy Class 229 | Running Total |
|---|---|
| Total Applicants | 817 (estimated) |
| Total Candidates Examined for Eligibility | 693 |
| Did not appear for entry exam | (72) |
| Declined to proceed after entry exam | (136) |
| Disqualified – Psychological evaluation | (19) |
| Disqualified – Physical evaluation | (41) |
| Disqualified – Medical evaluation | (24) |
| Disqualified – Background investigation | (81) |
| Disqualified – Polygraph | (206) |
| **Total Eligible Candidates** | 114 |
| **Total Cadets Admitted to Class 229** | 134 (20 more than total number of eligible candidates) |

[6] Regulations to Amend Section 12.2 of Article 12 of the Regulations of the Puerto Rico Police
[7] Recruitment Board for Cadet Applicants of the Police of Puerto Rico

By the official numbers, only 114 applicants met all eligibility requirements, 20 fewer than the 134 cadets admitted. Furthermore, the Director of Human Resources admitted that the figure of 817 individuals recruited is just an estimation of the total number who interacted with official recruiters or other PRPB personnel who engaged in recruitment activity. There is no official number tracking recruitment, which is problematic given the Agreement's emphasis on recruiting potential PRPB officers from historically underrepresented communities. It is impossible to determine the full scope of PRPB's efforts to recruit from underrepresented communities in the absence of official recruitment numbers, and only tracking the number of applicants.

According to PRPB, the Bureau has an agenda to develop a more accurate digital database in 2021. The Recruitment Division should develop a self-evaluation program to determine current capabilities so that it can allocate its resources appropriately given the need to hire new agents within the limitations of PRPB's resources and budgetary restraints.

The Monitor recommends continuing efforts to ensure that training on recruitment is consistent with approved policies. Furthermore, the Monitor recommends that information on all recruitment activities is tracked in a centralized digital database. The lack of information on recruitment and the inconsistent numbers on entering cadets speaks to the need for better record-keeping practices.

## 2. Recruitment Plan

The Agreement establishes inclusive selection practices as a clear goal for hiring reform, with the goal of promoting greater representation among PRPB personnel of the diversity of the Puerto Rican public. PRPB has taken steps to make recruitment and selection practices more inclusive, and these steps are beginning to produce positive results in terms of more diversity in the hiring pool.

*Table 22: Compliance Status for Paragraphs 102-103*

| Paragraph | Stipulations | Monitor's Rating |
|-----------|-------------|------------------|
| 102 | Develop a recruitment plan that includes clear goals for attracting qualified applicants from across the community. | Partially Compliant |
| 103 | Recruitment plan shall attract a diverse pool of applicants including members of historically underrepresented groups. | Partially Compliant |

Paragraph 102: The Monitor's office has determined via interviews and documents that PRPB has been using the following documents as working tools in the recruitment process: Regulation 9050, General Orders 310, 501, and 702, the Recruitment and Hiring

Strategic Plan, and the recruitment flowchart. These documents establish clear objectives for the recruitment of police officers and assign responsibilities of each of the parties in the recruitment process.

Paragraph 103: The Monitor's office learned that PRPB uses the Monthly Strategic Plan to set goals and objectives in attracting qualified applicants from a broad section of the community. The Director of the PRPB Human Resources Department provided a copy of the Strategic Recruitment Plan for October 2019. This corroborates her explanation of the process.

The Director of the PRPB Human Resources Department stated that PRPB provided all the necessary documentation to the Women's Solicitor ("Procuradora de las Mujeres") to show that PRPB promoted recruitment and hiring of women. She also added that PRPB promoted the recruitment of candidates from diverse backgrounds, and with this goal, organized a series of conferences to provide both verbal and written information to potential candidates. The Director of the PRPB Human Resources Department and the Recruitment Division stated that they have attempted to be inclusive and to reach out to the groups currently underrepresented in the PRPB force including, among others, women and people of Dominican descent.

The Director of the PRPB Human Resources Department stated that PRPB manages its public relations and communication through the media, universities, community colleges, CICs, and other community groups that serve underrepresented populations. She explained that PRPB is attempting to eliminate discrimination and to recruit and hire as objectively as possible. The Director of PRPB Human Resources explained that PRPB accepted 134 candidates for Class 229, which is in the Police Academy at this time. She provided a summary of the reasons that the other candidates that were not successful in being hired by PRPB. The Director of the PRPB Human Resources Department stated that there are currently 124 PRPB recruiting officers. She is hopeful that members of the Community Relations Bureau of the 13 police areas will be trained as recruiters in the future, however, she provided no clear action plan to achieve this goal.

The Monitor's Office is very supportive of the recruitment training goals for the members of the Community Relations Bureau. However, the Monitor expects these goals to be implemented by a clear action plan.

### 3. Hiring Reforms

Hiring decisions are one of the most important decisions PRPB can make. PRPB is selecting the face that the agency will present to the community and determine PRPB's future goals

CMR-2 Draft | December 2, 2020

and values. Favoritism, bias, discrimination, and nepotism should not be factors in the hiring of new police recruits.

*Table 23: Compliance Status for Paragraphs 104-108*

| Paragraph | Stipulations | Monitor's Rating |
|-----------|--------------|------------------|
| 104 | Develop an objective system to select recruits with minimum standards to enter into PRPB. | Partially Compliant |
| 105 | Publish qualifications for sworn personnel that are consistent with generally accepted policing practice. | Partially Compliant |
| 106 | Require all candidates for sworn positions to undergo a psychological, medical, and polygraph examination. | Partially Compliant |
| 107 | Ensure thorough, objective, and timely background investigations of candidates for sworn personnel positions. | Partially Compliant |
| 108 | Ensure that recruits and cadets do not qualify for civil service employment protections until properly assessed. | Partially Compliant |

Paragraph 104: Regulation 9050, General Orders # 310, 501, and 702, current hiring brochure, and Strategic Plan for Recruitment and Hiring have all been analyzed by the monitoring team as tools to set goals and objectives in attracting qualified applicants from a broad section of the community. The monthly strategic plan sets goals and objectives for hiring these same qualified individuals.

Paragraph 105: A member of the monitoring team reviewed the current hiring announcement for 2019 and the flowchart that illustrates the process that a potential cadet is required to follow for being hired.

Paragraph 106: According to the Director of the PRPB Human Resources Department and members of the Recruitment Division, PRPB requires that all candidates applying to become a PRPB Officer undergo a psychological, medical, and polygraph examination to assess their fitness for employment. A member of the monitoring team reviewed the documents that are required to be hired and spoke with the psychologist that is used by PRPB for the psychological examination to assess fitness for employment.

Paragraph 107: According to the Director of PRPB Human Resources and members of the Recruitment Division, the Office of Safety and Protection performs the candidates Background Investigation. This investigation includes evaluation of each candidate's credit history, criminal history, employment history, use and abuse of controlled substances, and ability to work with various communities without prejudices. In the future, a random sample will be selected by the monitoring team verifying the above information. The PRPB Recruitment and Hiring Department should establish an information system and utilize technology to support the implementation of this paragraph.

Paragraph 108: The Monitor inquired as to whether PRPB has reviewed and implemented hiring-related policies and practices to ensure that PRPB recruits and cadets qualify for public service employment protections. This qualification should only be done after a thorough evaluation of their skills and abilities. The Director of the PRPB Human Resources Department and members of the Recruitment Division confirmed this is to be the current policy and added that this has been instituted in accordance with General Order # 310. The Director of the PRPB Human Resources Department also stated that the candidates are subject to a probation period, which is required by the General Order and the Regulations. She added that General Order #310 also covers this topic. In the past, the PRPB specialists reviewed the rights of candidates during the probation period. General Order # 310 includes the results of their analysis and was reviewed by the monitoring team.

Paragraphs 109-116, covering policies and procedures,
were not due for assessment in CMR-2.


## V. Training

Training has often been cited as one of the most important responsibilities in any law enforcement agency. Agencies are constantly being held legally accountable for the actions of their personnel and for failing to provide initial or remedial training.

It should be noted that PRPB made references to the University College of Criminal Justice (UCCJ) in Paragraphs 117-134 to be in compliance with the original Agreement, but the term UCCJ is no longer operational. PRPB now operates the Police Academy through the Auxiliary Superintendence for Education and Training, which is tasked to provide necessary trainings. Subsequently, PRPB has taken over all the implementation and compliance responsibilities previously assigned to UCCJ.

### 1. General Provisions

*Table 24: Compliance Status for Paragraph 117*

| Paragraph | Stipulations | Monitor's Rating |
|-----------|-------------|------------------|
| 117 | Ensure that every PRPB officer and employee receives effective and comprehensive training. | Rating Deferred |

Paragraph 117: The PRPB Police Academy's role is to provide foundational police training. A firmly built foundation with proper materials by quality instructors will directly affect

CMR-2 Draft | December 2, 2020

the structural integrity and success of the entire department. This must include training in policy, procedures and directives, standards, assessment tools, centralized training records, core curriculum, appropriate equipment, and guidelines on the use of technology.

The Monitors were able to visit Puerto Rico to observe training methods in the first half of the Period of Performance for CMR-2, but were not able to return during the latter half of the performance period to verify instruction methods in person. As a result of travel restrictions, the Monitor's Office did not make sufficient observations of training methods to reach a determination. However, the Monitors have a number of observations based on the site visits that they were able to conduct. While PRPB is working on these training elements, there is a further need to strengthen training and to establish an unvarying training process. The PRPB Police Academy must give more attention to assessments of instructors, centralized training records, use of technology, and appropriate equipment.

## 2. Pre-Service Education and Training

The Pre-Service Education and Training is consistent with generally accepted policing practices. Recently, a new course was added to the curriculum on Ethics which was prepared with assistance from the University of Puerto Rico.

*Table 25: Compliance Status for Paragraphs 118-122*

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 118 | Provide pre-service education and training to candidates for sworn personnel positions in PRPD. | Rating Deferred |
| 119 | Provide a pre-service training program for PRPD cadets once they meet all eligibility criteria. | Rating Deferred |
| 120 | Revise pre-service training curriculum to ensure quality, consistency, and compliance with applicable law and policy. | Not Compliant |
| 121 | Develop a training plan and standards and conduct regular needs assessments to ensure that training supports the Agreement. | Partially Compliant |
| 122 | Select and train qualified officer and academic instructors, and ensure that only  approved lesson plans are taught. | Rating Deferred |

Paragraph 118: As was stated in regards to paragraph 117, The monitors were able to observe training methods in the first half of the period of performance for CMR-2, but those observations did not suffice for reaching a determination on compliance. However, the Monitor's Office has a number of observations.

Members of the monitoring team interviewed a Colonel (Auxiliary Commissioner for Education and Training); a Lieutenant (Training Coordinator); two Sergeants (Training

Coordinators) at the PRPB's Academy located in Gurabo, PR. During these interviews, the monitoring team's focus was to clarify the current Academy Curriculum and verify that its compliance with generally accepted policing standards. For a list of changes to the curriculum, see paragraph 120.

The Federal Monitor's Office, as per PRPB Staff, were to receive copies of the revised Cadet curriculum, In-Service Training curriculum, and Special Unit curriculum from the Reform Unit. The Reform Unit was to share these materials with the Monitor's Office in a timely manner. It should be noted that the curriculum was revised, and hours were added to the Cadet curriculum. The monitoring team did not receive the curriculum in a timely manner, receiving it on August 24, 2020. It should be noted that one recruit academy began in July of 2019. Policies, training, and implementation conformed to the methodology. The Reform Team should provide requested information in a timelier manner.

Paragraph 119: Once candidates meet all criteria they are approved by the Recruitment, Selection, and Hiring Committee and are eligible for the Pre-Training Program for PRPB Cadets. The Recruitment, Selection, and Hiring Committee provided necessary information on qualifications for PRPB Cadets and gave a copy of the requirements to the monitoring team. The pre-service training program, consisting of 1,310 hours, including the curriculum and related training materials, is consistent with approved policies.

The Police Academy needs to improve data systems so they can provide the monitoring team with the requested data in a timely manner. The lack of proper data not only limits the Monitor's efforts to assess this important area, but also limits PRPB's capacity to improve its performance.

Paragraph 120: The Monitoring Team inquired if the current Academy Curriculum provided to the Monitor's Office shows any changes from previous curricula. A Lieutenant discussed the kinds of changes that they introduced, specifying that they added the following courses to the Curriculum:

1) A 24-hour training module on Ethical Thinking developed by the Institute of Ethical Development of the University of Puerto Rico (Bayamon campus) focusing on decision making;
2) Police pursuit training;
3) Training on handling crises.

The Lieutenant also shared that they eliminated training that focuses on conducting interviews and interrogations, but they added this topic to the Criminal Investigations course. A Sergeant stated that they plan to include the requirement for a written report after each exercise in the new curriculum. This a good addition to the exercise but it is recommended that the report should be "written" in a typed or computer-generated format.

The monitoring team inquired with PRPB if they had plans to train its personnel on de-escalation of confrontational situations. The Sergeant explained that they practice de-escalation by simulating different scenarios with a role player in the practical part of the Use of Force course. In these exercises, Cadets are expected to choose whether to take effective action towards the role player or to de-escalate the situation. After each exercise, Instructors engage Cadets in a discussion as to why they took effective action towards the role player or why they chose to de-escalate the situation. The Sergeant explained that the key goal of these trainings is to teach Cadets how and when to act against their counterpart and when to de-escalate a potentially confrontational situation. The Sergeant stated that they plan to include the requirement for a written report after each exercise in the new Curriculum. These reports should also be typed, so the Monitors will have no problems reading the documents.

The Sergeant and the Lieutenant also added that they have already taken different strategies to avoid confrontations when they oversee mass demonstrations. These strategies consist of placing several levels of separation fences between the Agents and protesters and placing a row of regular Agents in the front lines of the Police. If confrontations get out of control, then the Tactical Operations Units and SWAT will approach and take action. The specialized units retreat from the area when they are no longer necessary, allowing regular agents to return to the area. They explained that having the specialized units out of protesters' sight helps to prevent a protest from escalating into violent action.

It is a good idea that a report be written explaining the de-escalating action the cadets took towards a role player in a potentially confrontational situation. It is recommended this report be typed or in a computer-generated format for ease of reading.

Paragraph 121: The Monitoring team determined that the training plan and standards are consistent with accepted police practices, that the evaluation methods are appropriate, and that cadets and officers are attaining the necessary knowledge, skills, and competencies to implement all requirements of the Agreement. The police academy

needs to improve data systems so they can provide the monitoring team with the requested data in a timely manner.

Paragraph 122: The Monitor's Office has verified in past observations that PRPB ensures that instructors are trained and certified. However, the Monitors were unable to travel to Puerto Rico to verify the training and qualifications of instructors for the Period of Performance being assessed for CMR-2. Therefore, the Monitor's Office cannot reach a determination of compliance status for CMR-2. However, the Monitors do have a number of on-site observations:

The Monitoring team inquired as to how an Agent is selected to become an Academy Instructor. The Lieutenant explained that, in line with the Policy, they announce a call for instructors according to their needs. In the announcements, the Academy details the profile of a candidate that they are seeking. Once they receive all the applications, the Faculty Evaluation Committee (governed by General Order # 702), assesses skills of the candidates. The Monitors recommend that potential instructors be observed by the Committee teaching a course before being allowed to teach that course.

The Committee also looks into the background of each candidate, their disciplinary record, as well as their record for any past violations of civil rights. Candidates must be able to pass a Physical Proficiency Test and must have the operational experience stated in the call for applications. After reviewing all the information combined, the Committee decides which candidate is the most suitable for an Instructor position.

The Lieutenant shared that a separate Evaluation Committee evaluates the Academy Instructors. The Committee members, together with the Director of the Department, visit Instructors' classrooms and evaluates each Instructor using form 702.1. If the evaluation is positive, the Supervisor informs an instructor on successful compliance. In the case that the committee finds any shortcomings in a particular instructor's teaching methods, they should duly inform the instructor so that instructor can make any necessary corrections.

The Lieutenant informed the monitoring team that all the Instructors are duly certified and that each time instructors takes external training and subsequently submit evidence to the Academy to be included in their file. After reviewing all the information combined, the Committee decides which candidate is the most suitable for the instructor position. In the Continental United States, it is typical that before a final decision is made that the instructor candidate conducts an in-person presentation to a class or a panel of evaluators in order to assess presentation platform skills. This type of system is recommended by the monitoring team.

CMR-2 Draft | December 2, 2020

The police academy needs to improve data systems so they can provide the monitoring team with the requested data in a timely manner. During the period of CMR-2, members of the monitoring team attended classes, confirmed attendance, quality of instruction, and ensured that evaluations of both classes and instructors were completed by the students.

## 3. Field Training Program

The Field Training Program is designed to provide directed field experience to police agents. The goal is to ensure the new Agent transitions from the Police Academy to the actual performance of general law enforcement duties. The interviews showed compliance with the Agreement in this area of training. The Academy informed the Monitor that these new Agents received 800 hours of field training under different FTOs.

*Table 26: Compliance Status for Paragraphs 123-128*

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 123 | Develop a field training program that reflects the substantive requirements of this Agreement. | Not Compliant |
| 124 | Policies on field training shall delineate the criteria and methodology for selecting Field Training Officers ("FTOs"). | Not Compliant |
| 125 | Ensure that all FTOs receive training in key areas. | Not Compliant |
| 126 | Recruits in the field training program are trained in a variety of shifts and geographic areas and with several FTOs. | Partially Compliant |
| 127 | Develop a program to assess FTO performance using appropriate evaluation tools. | Partially Compliant |
| 128 | Create a mechanism for recruits to provide confidential feedback regarding their field training and their FTO. | Partially Compliant |

Due to the limited time allowed for data requests and analysis for CMR-2, documents related Paragraphs 123, 124 and 125 were not requested, received, and analyzed in sufficient volume to reach a determination in this report. These paragraphs have thus been given a deferred rating. However, the Monitor does have observations related to Paragraphs 126, 127, and 128.

Paragraph 123: Members of the monitoring team asked if Cadets must pass a Field Training Program. The Colonel and Lieutenant explained that once the Cadets graduate, they become Agents and that they must successfully pass a Field Training Program. They explained that this training consists of 800 hours of work supervised by different mentor Agents (FTOs) and that the Superintendence of Field Operations (SAOC) supervises the FTOs. Curriculum information was not submitted to the monitoring team.

Paragraph 124: PRPB submitted no data pertaining to the selection of FTO appointments

Paragraph 125: PRPB submitted no data demonstrating that all FTOs receive training in key areas. Similarly, curriculum information was not submitted to the Monitoring Team in reference to the FTO program during the CMR 2 compliance period. Finally, PRPB submitted no data to the Monitoring Team in reference to the selection and appointment of FTOs. The Monitoring Team has still not received a list of individuals who were selected and appointed as FTOs. It is presumed that this information will be submitted to the Monitoring Team during the compliance period for CMR-4.

Paragraph 126: The monitoring team has verified that recruits in the Field Training Program are trained in different shifts and in a variety of geographic areas. It is recommended by the monitoring team that all FTOs meet after they pass the FTO program to discuss improvement measures. This recommendation was made several years ago, however, it has not been implemented.

Though Paragraph 126 is intended to be assessed with 123, which is deferred for CMR-2, the Monitors have verified that PRPB is following the pathway to compliance outlined by the Monitors previously and is therefore in partial compliance.

Paragraph 127: The Monitor's Office has reviewed an evaluation of an FTO by his trainee agent. The Monitor's Office has also reviewed the FTO Manual and found it to be thorough and complete. See comments related to this paragraph in Appendix F of this report for further details.

Paragraph 128. PRPB Academy personnel interviewed report that Trainee Agents have an opportunity to provide feedback on the FTOs. The Monitor's Office confirmed that the feedback system does exist and observed the form filled out by a Trainee Agent.

## 4. In-Service Training

The inspection made by the Monitor's team at the Police Academy demonstrated compliance with the in-service training that PRPB Agents receive. Training on Equal Protection and Non-Discrimination showed compliance of approximately 28% of the Agents. The Academy training personnel explained they stopped this Training in August 2019 and it was under revision; however, they are now prepared to start again.

The inspection also demonstrated a considerable percentage of Officers are not up to date with their training on Investigating Domestic Violence (approximately 23%), which is

concerning given the sensitivity of this investigative area. The inspection showed that out of the 82 Agents randomly selected, 76 Agents qualified at the range, 5 Agents did not qualify or PRPB did not provide information about their qualifications, 1 Agent did not qualify due to a justified medical condition. In summary, 92.7% of the randomly selected Agents had qualified at the range, 6.1% did not qualify or PRPB did not provide information otherwise, and 1.2% did not qualify due to a justified medical condition.

Members of the Monitor Team confirmed that PRPB Agents are following the online training in Sections 600-618. Members of the monitoring team found that PRPB needs to further computerize the percentage of Agents who have qualified in the practical phase at the shooting range.

There needs to be a more formalized decision-making policy reference as to what topics will be taught at the In-Service Training level. Other cities under consent decrees emphasize a wide array of issues that deserve regular training for PRPB personnel. These include community policing, anti-bias, de-escalation, domestic violence, and handling individuals with behavioral issues and intellectual impairments.

*Table 27: Compliance Status for Paragraphs 129-132*

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 129 | Establish a mandatory annual in-service training program. | Partially Compliant |
| 130 | Create in-service training tracks for the key groups. | Not Compliant |
| 131 | Identify critical in-service training topic areas. | Rating Deferred |
| 132 | Develop a comprehensive training program that is delivered at the beginning of shifts or tours of duty for all officers. | Not Compliant |

Paragraph 129: The monitoring team verified that PRPB provides and requires annual In-Service training of at least 40 hours. Agents receive trainings in the Use of Force, Protection, and Anti-Discrimination annually.

The monitoring team conducted an inspection at the PRPB Academy in Gurabo, Puerto Rico, in which they verified the status of training of a representative sample of 92 Agents. The inspection showed that training of PRPB staff has not stopped. The inspection demonstrated that agents are in full compliance with their training in a large percentage of the training areas. They were not in compliance in some areas, however, including training at the beginning of shifts or tours of duty for all officers. Moreover, the interviews conducted showed that this type of training does not appear to exist in PRPB.

The monitoring team inquired if PRPB provides and requires annual In-Service training of at least 40 hours. All agents received trainings in the Use of Force and Anti-Discrimination

annually. However, 23% of agents had not received training on investigating domestic violence, and 72% of agents had not received training on equal protection and non-discrimination. The full breakdown of in-service training rates is as follows:

This inspection started with a random sample of 92 PRPB Agents/Officers. PRPB explained that 10 officers were not on active duty for the following reasons:

- 5 Agents are on Military Leave
- 2 Agents on Leave Without Pay
- 1 Agent quit his job with PRPB
- 2 Cadets are still in Academy Training

The inspection was left with 82 Agents/Officers. The following paragraphs outline the compliance status of these officers with all required areas of training.

## 1. Use of Force

The inspection checked if these Agents completed the Training on General Order 600, 601 through 605. Still, the Academy explained that Agents are in compliance with Use of Force if they completed the two following Courses:

- VUF-100 "Online Training on Use of Force"
- VUF-100-P "Practical Phase on Use of Force"

The analysis of the 82 Agents/Officers revealed that:

- 5 Agents completed 601 through 605

Of the remaining 77 Agents the inspection revealed that:

- 77 Agents competed VUF-100
- 72 Agents completed VUF-100-P, but 5 Agents DID NOT complete VUF-100-P

## 2. General Order 600, Section 612

The inspection revealed that all 82 Agents completed this Training

## 3. General Order 600, Section 615

The inspection revealed that all 82 Agents completed this Training, but many of them in the year 2018. The Academy personnel explained that this certification of 2018 is still valid for the year 2020.

## 4. General Order 600, Section 618

The inspection showed the following:

- All 82 Agents completed the Online Course
- 58 Agents qualified at the Range
- The PRPB indicated to the Monitor's Office that they would have to manually check to see if the remaining 24 agents qualified at the range

**5. General Order 600, Section 803**
- 78 Agents completed the Training
- 4 Agents DID NOT complete the Training

**6. Course Title: Multi-temático Igual Protección y No Discrimen**
Out of the 82 Agents:
- 59 Agents DID NOT complete the Training
- 23 Agents completed the Training

Academy personnel explained that they stopped this Training in August 2019, and it was under revision. They said they are now prepared to begin this training again.

7. **Course Title: Investigación Incidentes Violencia Doméstica.**
Out of the 82 Agents:

- 19 Agents DID NOT complete the Training
- 44 Agents completed the Training
- 19 Agents completed the Training on 2017 (Academy personnel explained their Certification was still valid today)

**8. Aspectos Investigativos Incidentes Delitos Sexuales**
The inspection showed that all 82 Agents completed the Training.

Courses That All Officers <u>Above the Rank of Sergeant</u> Should Have Completed:

**9. Proceso y Manejo Querellas Administrativas y Medidas Correctivas no Punitivas por los Supervisores**

The inspection showed that **18** of the 82 Agents/Officers were **Supervisors**.
The inspection showed that:
- 16 Supervisors completed the Course
- 2 Supervisors DID NOT complete the Course

**10. Programa de Ayuda al Empleado**

The inspection showed that all 18 Supervisors completed the Course.

Paragraph 130: In-Service training for all PRPB officers is set at 40 hours, although additional hours of training are given to officers as required by their assignment. However, the in-service training of command staff and specialized units could not be verified by the Monitor's Office through site visits due to travel restrictions. PRPB did not provide the requested material in support of this paragraph; therefore, PRPB has been assessed as not in compliance with paragraph 130.

Paragraph 131: Members of the Federal monitoring team have not received documents that show that meetings have taken place where PRPB members have contributed information regarding In-Service training topics. Due to the limited nature and scope of CMR-2, documents related to some cited portions of the Agreement were neither asked for nor received by the monitors and therefore cannot be subject to review in this report. Paragraphs 131 is one of these areas of performance considered in this report and has been given a deferred rating.

Paragraph 132: The monitoring team did not receive sufficient evidence to verify that a comprehensive training program is delivered at the beginning of shifts or tours of duty for all officers.

## 5. Training Records

PRPB should emphasize the computerization of training records as manual records are becoming obsolete. The inspection team was able to view computerized training records on its visit to the Police Academy, but the Police Training Management System (PTMS) is not completely developed and functional. This limitation should be promptly addressed.

*Table 28: Compliance Status for Paragraphs 133 & 134*

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 133 | Electronically maintain complete and accurate records in a central, commonly accessible, and organized file system. | Not Compliant |
| 134 | Track, maintain, and report detailed, real-time training records and statistics via an electronic database. | Not Compliant |

Paragraph 133: The Monitoring Team examined whether PRPB maintains electronic copies of the Curriculum, as well as lesson plans and other materials for all trainings. A Lieutenant explained that they retain electronic copies of all the Handbooks, Guides, Class Programs, and Instructor materials, which are available to all PRPB members. During his

site visit to the Police Academy, the Monitors conducted a random analysis of 82 PRPB Agents to ensure they had completed the proper training courses. However, PRPB did not provide all the training materials requested, and the Monitor therefore did not examine the materials for all required trainings.

Members of the Academy staff were able to utilize the Police Training Management System to identify their training. However, it was necessary for members of the training staff to utilize the old computer system to identify the other members of the 82 who were part of the random analysis. This points out that the PTMS is not completely developed and more integration of training information between PTMS and the old computer system has not been completed. Also, they are lacking a central, commonly accessible computerized location. It is important that curriculum materials and training records be accessible to training coordinators at all locations.

Paragraph 134: Follow-up site visits conducted by the Monitor's Office demonstrated that PRPB was in some cases tracking, maintaining, and reporting detailed real-time training records, but the PTMS system was still not complete and needs further development. The PTMS system was not fully developed, and further integration of the training information between the PTMS and the old computer system has not been completed as of this reporting period.


## VI. Supervision and Management

### 1. General Provisions

Interviews conducted by the Monitor's team showed that in some cases PRPB lacks the proper number of first-line supervisors (Sergeants). This results in the delegation of these important tasks to other Agents who must assume the role of a Supervisor. In addition, with no supervision, inexperienced officers are subject to making improper/wrong decisions. It should be noted that the Agreement requires one supervisor should be supervising no more than ten Agents.

PRPB must ensure that an adequate number of qualified first-line supervisors are deployed in the field to allow supervisors to provide the close and effective supervision necessary for Agents to improve and grow professionally; to police actively and effectively; and to identify, correct, and prevent misconduct.

*Table 29: Compliance Status for Paragraph 135*

| Paragraph | Stipulations | Monitor's Rating |
|-----------|--------------|------------------|

CMR-2 Draft | December 2, 2020

| | | |
|---|---|---|
| 135 | Ensure that an adequate number of first-line supervisors are deployed in the field to provide effective supervision. | Partially Compliant |

Paragraph 135: The Monitor's Office verified that an outside consultant (V2A) conducted a staff study which appears to have been helpful to PRPB. However, the Monitor's Office questions whether any redeployment of assets was made based on the staff study. Redeploying to bring staffing in line with the study would serve to make PRPB more effective and efficient. Information has not been provided to the monitoring team verifying that an adequate number of Supervisors have been deployed in the field, or that the recommendations of the Staff Study have been properly implemented by PRPB.

The Monitor recommends that PRPB should promptly revisit the Staff Study to ensure that proper deployment is being utilized. In addition, Supervisors should not be transferred from area to area to supplement a lack of supervisors.

2. Duties of Supervisors

As part of their responsibility, supervisors must thoroughly, objectively, and routinely review all aspects of Agent conduct, including a review of: (1) all uses of force; (2) probable cause for arrests and the appropriateness of charges filed; and (3) reasonable suspicion for stops and searches that do not result in an arrest.

*Table 30: Compliance Status for Paragraphs 136-140*

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 136 | All operational field officers shall be assigned to a single, consistent, and clearly identified supervisor. | Not Compliant |
| 137 | Field supervisors shall supervise no more than ten officers. | Not Compliant |
| 138 | Develop a program to ensure consistent field supervision when assigned supervisors are unavailable for duty. | Not Compliant |
| 139 | Precinct and unit commanders shall closely and effectively supervise the officers under their command. | Not Compliant |
| 140 | Commanders and supervisors shall ensure that all officers under their command comply with policy and law. | Rating Deferred |

Paragraph 136: The monitoring team has not been provided with information verifying that policies incorporate all the requirements of Paragraphs 136-140 and officer and supervisor schedules, assignments, and ratios are consistent with supervision policies. Further interviews of agents and analysis by the monitoring team must also be done to ensure that 95% of interviewed personnel feel that supervision is close and effective.

Paragraph 137: The monitoring team requested evidence that one supervisor oversees 10 individuals. During demonstrations observed by the monitoring team, it appeared that

the supervisors did not have more than 10 agents. The monitoring team has yet to see clear evidence that this is the case. Once an automated system is effective, it should be easy for PRPB to generate data from the 13 areas that show each supervisor and his or her subordinates. The monitoring team requests that this information be provided as soon as possible. PRPB needs to improve data systems so they can provide the monitoring team with the requested data in a timely manner.

Paragraph 138: While making site visits, the monitoring team saw some supervisors being brought from other precincts to supervise. A more complete system should be developed that provide for true supervisors, not acting supervisors, to be deployed in the field. Once an automated system is effective for the patrol division, it should be relatively simple for PRPB to generate data from the 13 areas that show each supervisor and his or her subordinates. According to the IT Monitor, the CRONOS and SITA systems are not yet available to check the span of control.

Paragraph 139: As in other U.S. jurisdictions, supervisors vary. Some supervise closely and effectively, while others are more lenient with their personnel. This observation of PRPB supervision is based on the Monitor's limited site visits conducted prior to the COVID-19 pandemic. Officers with the rank of Sergeant and above should always be an example for their team. Further training on mentoring and career development should be implemented by PRPB.

Paragraph 140: Observation of PRPB supervision is based on the Monitor's limited site visits conducted prior to the COVID-19 pandemic and during assessments of various demonstrations. Commanders and supervisors have greater responsibilities based on their positions, specifically to ensure that officers under their command comply with Bureau policy and law. Further interviews with supervisors and their personnel need to be conducted by the monitoring team.

## 3. Supervisor Training

A review of supervisor training indicates delivery of generally accepted policing practices of leadership and management.

*Table 31: Compliance Status for Paragraphs 141-144*

| Paragraph | Stipulations | Monitor's Rating |
|-----------|--------------|------------------|
| 141 | Each supervisor shall receive mandatory management, supervisory, leadership, and accountability training. | Partially Compliant |
| 142 | All current PRPB supervisors shall receive the supervisor training within 18 months after it is first implemented. | Substantially Compliant |

CMR-2 Draft | December 2, 2020

| 143 | The supervisory training program shall include instruction on a variety of key topics. | Partially Compliant |
| 144 | Commanders and supervisors must receive Equal Employment Opportunity training. | Rating Deferred |

Paragraph 141: The Monitor performed a content analysis of policies related to supervisor training and verified that the training materials employed by PRPB are consistent with policy and generally-accepted policing practices. All current PRPB supervisors sampled have received the supervisor training developed pursuant to the Agreement or they are not allowed to assume their position. Due to travel restrictions, the Monitor's Office was only able to examine a sample of 18 supervisors for the Period of Performance for CMR-2. The sample found no evidence of non-compliance with Paragraph 142 (and earlier site visits verified this). However, of the 18 supervisors sampled, 16 had completed their mandatory 40 hours of in-service trainings, while two were one course short of management training requirements. These two officers represented 11% of the sample, which exceeds the 5% margin for substantial compliance.

Paragraph 142: All current PRPB supervisors have received the supervisor training developed pursuant to this Agreement or they are not allowed to assume their position. There has been a policy in existence for several years which ensures Supervisors are not allowed to assume their positions until after they were trained. The monitoring team through site visits and training records verified that this was accurate.

Paragraph 143: The Supervisor Training Program is not yet complete because supervisors cannot yet use EIS to facilitate close, effective supervision. The platform is not yet completely developed. The EIS system should be implemented by PRPB as soon as possible and the platform fully developed. Nevertheless, given the small sample size and the compliance on other targets for the paragraph, the Monitor's Office chooses to render a determination of partial compliance.

Paragraph 144: Virtual training has been utilized to train officers appointed to the rank of Lieutenant Colonel, Colonel, and Commanding Officer to a PRPB Superintendency or units. Any other supervisors must receive Equal Employment Opportunity ("EEO") training, on PRPB policies, and federal and Commonwealth anti-discrimination laws.

The Monitor has previously found that PRPB is actively implementing EEO training for all commanding officers of the rank Colonel and above. The Monitor has further seen evidence that EEO training is being implemented virtually. During an interview by the Monitor, one Colonel reported that he and some of his supervisors had not received this training. This counterfactual is indicative of a larger problem; all required individuals

should receive the virtual training on EEO as soon as possible. Evidence of compliance with these training requirements will be assessed in CMR-4 Therefore, the Monitor's Office is deferring its rating for Paragraph 144 while verifying the virtual training records to ascertain whether or not PRPB is compliant with the Paragraph.

## 4. Performance Evaluation

According to the PRPB Bi-Annual Status Report, "The purpose of the PROMEDIA Project is to establish an effective evaluation system that allows a greater degree of uniformity and objectivity in establishing the criteria for measuring the performance of the MPRPBs in their functions. The PROMEDIA system has been completed. By July 2020, all supervisors were required to conduct performance evaluations using this system." The training for this new system was not completed until July of 2020. Information about the training for this new system was not sent to the monitoring team until after March 2020 for their analysis.

*Table 32: Compliance Status for Paragraphs 145 & 146*

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 145 | Develop and implement a system to accurately evaluate the qualifications and performance of all PRPB officers. | Not Compliant |
| 146 | Establish a system documenting annual performance evaluations of each officer by the officer's direct supervisor. | Not Compliant |

Paragraph 145: PRPB reports that all supervisors will be required to submit evaluations through the PROMEDIA system by July 2020. As the Period of Performance for CMR-2 ended in March this system was not completely developed or implemented, and was not being utilized by supervisors for 95% of performance evaluations during the required timeframe.

Paragraph 146: PRPB is utilizing a revised evaluation system (PROMEDIA). PRPB states in its Bi-Annual Status Report that by July of 2020 all Supervisors were required to conduct performance evaluations using this PROMEDIA system. This timeline is after the March CMR-2 compliance period. The monitoring team needs to further verify compliance with SARP, and the PROMEDIA system should continue to be developed and additional training provided in working with employees' goals and objectives.

## 5. Early Identification System

PRPB must develop an Early Identification System (EIS) that encompasses a range of clearly defined information and ensures that corrective action is based on appropriate evaluation and not reserved for a mere accumulation of violations. Currently, the EIS is under development and is not available for use by Supervisors. The EIS is a critical component of risk assessment and management systems and should be a priority for PRPB.

The Monitor's Office maintains the position that PRPB can only be considered to be in compliance with Paragraphs 147-153 when EIS is developed to the point where 1) supervisors are readily and consistently able to access the system to enter and retrieve all datapoints required by the Agreement and PRPB policy and 2) PRPB leadership and third party overseers are able to conduct data analysis of policing practices and outcomes using the EIS system.

PRPB must ensure that an Early Intervention System (EIS) is a non-punitive, proactive method for identifying agents that may need training, counseling or other intervention before issues arise involving agent misconduct.

An EIS is usually computerized and commercially available. An EIS would track and flag agents based on common criteria such as:

> Citizen complaints (sustained or not).
> Number and nature of arrests.
> Use of force incidents.
> Policy violations such as tardy, AWOL.
> Previous administrative warnings and disciplinary actions.
> Number of vehicle pursuits.
> Workplace accidents and other agency specific criteria.

PRPB should continue to develop the platform so that supervisors can utilize the information from EIS data and records. This will mean that EIS can become an effective supervisory tool that timely addresses potentially problematic behavior in a non-punitive manner.

*Table 33: Compliance Status for Paragraphs 147-153*

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 147 | Develop and maintain an early identification system to support the effective supervision and management. | Not Compliant |

| 148 | EIS shall include a computerized relational database. | Not Compliant |
|---|---|---|
| 149 | Establish a unit to develop and maintain the EIS. | Not Compliant |
| 150 | Maintain necessary equipment to permit appropriate personnel ready and secure access to the EIS system. | Not Compliant |
| 151 | Develop a protocol for using the EIS and information obtained from it. | Not Compliant |
| 152 | Maintain information about personnel included in the EIS for at least five years following separation from the agency. | Not Compliant |
| 153 | PRPB may propose in writing to modify the EIS regarding its structure and the content uploaded to the system. | Not Compliant |

Paragraph 147: Training and a policy for EIS have been developed, but the system itself remains in the developmental stage. Four modules are up and running, but access to the system and use of the system remains inconsistent, with some supervisors stating that they cannot access the information.

Paragraph 148: In the EIS system, PRPB should include a computerized relational database, which shall be used to collect, maintain, integrate, and retrieve detailed data. The platform for the EIS system has not yet been developed and supervisors cannot yet utilize the information available from an EIS system. PRPB should develop the EIS system in a timely manner.

Paragraph 149: PRPB should establish a unit to develop, implement, and maintain the EIS with sufficient resources to facilitate data input and provide training and assistance to EIS users. The policy and training have been developed by PRPB, but the system has not been implemented. The EIS unit should be established as soon as possible by PRPB.

Paragraph 150: As the paragraph states, PRPB should maintain necessary equipment, in sufficient amount and in good working order, to permit access to the EIS system, allowing for timely input and review of EIS data. This would be for the use of appropriate personnel, including supervisors and commanders.

A memo dated April 6, 2020 states that additional terminals have been distributed to help meet the requirements of Paragraph 150. The Period of Performance for CMR-2 ended March 2020. PRPB remains non-compliant for the present report. The Monitor recommends implementation of paragraph requirements as soon as possible and that the platform for the EIS also be developed.

Paragraph 151: The EIS curriculum has been developed and training has been given on the EIS to PRPB members. However, PRPB has not yet successfully implemented this protocol in practice. The Monitor recommends implementation of paragraph requirements as soon as possible and that the platform for the EIS also be developed.

Paragraph 152: As the paragraph states, PRPB should maintain all personally identifiable information about officers and employees included in the EIS for at least five years following their separation from the agency. Information necessary for aggregate statistical analysis should be maintained indefinitely in the EIS. On an ongoing basis, PRPB will enter information into the EIS in a timely, accurate, and complete manner, and shall maintain the data in a secure and confidential manner. The Monitor recommends implementation of the requirements of the paragraph as soon as possible and develop the platform for the EIS.

Paragraph 153 PRPB may propose to add, subtract, or modify data cables and fields; modify the list of documents scanned or electronically attached; and add, subtract, or modify standardized reports. The Monitor recommends implementation of the paragraph requirements as soon as possible and the development of the platform for the EIS.

## 6. Internal Audits and Interagency Feedback

An internal auditing process was signed by the Commissioner on April 21, 2020. PRPB should utilize this tool to become more effective and efficient as an organization. A protocol was also signed by the Commissioner on May 1, 2020 for the information exchange, but no reports have been released as to its effect with other agencies in the criminal justice system.

*Table 34: Compliance Status for Paragraphs 154-158*

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 154 | Establish an auditing system that identifies operational deficiencies and implements effective remedial action. | Not Compliant |
| 155 | Develop a protocol for conducting operational audits related to the material terms of this Agreement. | Not Compliant |
| 156 | Auditors shall issue a report to the Superintendent on the result of each audit. | Not Compliant |
| 157 | Develop and implement a plan for organizing and executing regular, targeted, and random integrity audits. | Not Compliant |
| 158 | Establish a liaison committee that communicates with federal and local criminal justice components. | Not Compliant |

Paragraph 154: The Monitor recognizes that PRPB has been making efforts to come into compliance with Paragraphs 154-156. Unfortunately, protocols for 154 and 158 were signed after the March CMR-2.

PRPB should use the auditing system to identify operation deficiencies, analyses, causal and contributing factors, so that effective remedial action may be implemented. They

should also continue to develop protocols based on generally accepted policing practices. This will help foster a culture of accountability and continuous improvement among all PRPB units and personnel.

Paragraph 155: PRPB has developed a protocol for conducting operational audits related to the material terms of the Agreement. Where appropriate, audits shall assess operational consistency among similar units throughout PRPB. PRPB should also summarize the conclusions and recommendations of audits conducted during the time period covered by the report in an annual report. This protocol was developed later than the March 2020 compliance period. PRPB should provide information to the monitoring team with regard to results of the various audits.

Paragraph 156: The PRPB auditors are to issue a report to the Commissioner on the result of each audit. The monitoring team hopes that the Commissioner will review each audit for appropriate policy, disciplinary, or non-punitive corrective action. The Monitor also hopes to see that the Commander of each precinct and specialized unit will also review all audit reports regarding employees under their command. This system should be developed ensuring that Commanders review any audit involving an employee under their command.

Paragraph 157: Random integrity audits in Puerto Rico are legal. These same audits are currently being conducted by large police departments such as New York and Los Angeles. A review by DOJ, the Monitor, and the Counsel for the monitoring team have confirmed this fact. PRPB should create a personal integrity audit system, including written policies outlining how integrity audits will be performed.

Paragraph 158: A protocol has been developed; however, other criminal justice agencies in Puerto Rico have not responded to or ratified the protocol developed by PRPB. No report of progress in enacting an agreement has been forwarded to the monitoring team. The Monitor's Office recognizes the efforts being made by PRPB. However, the protocol was developed after the March 2020 compliance period. The new protocol was signed by the Commissioner on May 1, 2020. The Federal Monitor responsible for reviewing SARP reports that allegations of misconduct or potential criminal activity cases have been referred to SARP for investigation.

The Monitor points out that the total EIS system, outlined in paragraphs 147 to 153, has not been developed, and that only certain sections are available. Furthermore, during on-site visits Commanders clearly noted in interviews their inability to utilize the EIS system. The Auditing system were recently submitted to the Monitoring Team for approval but the system is not yet operational.

CMR-2 Draft | December 2, 2020

## VII. Civilian Complaints, Internal Investigations, and Discipline

### 1. General Provisions

The Monitor recognizes that PRPB is making an effort to fully comply with the Agreement provisions that apply to Internal Investigations and Discipline. The Monitor was particularly impressed with the leadership of SARP Commander George and her team. That said, work remains to bring PRPB into substantial compliance with the Agreement.

*Table 35: Compliance Status for Paragraph 159*

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 159 | Ensure that all allegations of officer misconduct are investigated and that officers are held accountable. | Partially Compliant |

### 2. Civilian Complaints

Despite one public, erroneous assertion by a ranking member of PRPB, the Monitor finds that enough evidence exists to show that the complaint process is an open one, with broad access to all who may have concerns about a member of PRPB. Our review of the website itself as well as the form documentation used reveals no language that might discourage a person from making such a complaint. But it should be noted that, owing to the Novel Coronavirus Pandemic, we were unable to verify the wide availability of PRPB Form 311.1 throughout the island, other than from its presence on the Internet.

*Table 36: Compliance Status for Paragraphs 160-162*

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 160 | Implement a program to inform persons that they may make complaints regarding the performance of any officer. | Substantially Compliant |
| 161 | Complaint forms shall not include any language that discourages civilians from submitting complaints. | Substantially Compliant |
| 162 | PRPD shall make complaint forms and informational materials available at all facilities and on the PRPD website. | Rating Deferred |

While in-person site visits were made impossible by the COVID19 crisis, the Monitor has had adequate examples to review the digital means of outreach to the public by way of the internet as well as highly-publicized statements made by a ranking member of PRPB concerning demonstrations held throughout the island. In the case cited, the ranking member of the Bureau created the impression that a paper complaint form (PPR 311.1) needed to be filled out by the offended party. However there remains a robust ability described on the PRPB website to collect complaints in all forms, including those submitted anonymously. The member neglected to mention that complaints could be

submitted anonymously, but by specifically referencing the digital platform, any harm created by this inadvertent confusion on the part of the member would have been rectified by simply reading the website. PRPB should ensure that when members of the Bureau make statements relating to complaints, they stress the fact that all varieties of complaints other than those in writing are accepted and investigated by the SARP. Nevertheless, we find that PRPB is compliant in the spirit above the letter of the Agreement regarding Paragraph 160.

The Monitor's review of the language contained within the PRPB website reveals nothing that could seemingly dissuade a person from making a complaint against a PRPB member. In addition, complaints may be and have been registered via anonymous letter to PRPB without using the form at all. During the Monitor's site visit on March of 2020, which coincidentally was the last Monitor visit to the island prior to the COVID19 pandemic, he noted several SARP cases that were investigated based upon such anonymous, unsigned letters from concerned residents.

## 3. Internal Investigations

The in-person review of SARP cases revealed that PRPB has a well-trained cadre of internal investigators, some of whom are exceptional. There is room for improvement, however, as eight of the thirty-nine cases reviewed had some shortcomings ranging from minor to moderate. PRPB must remain cognizant of the fact that the public expects a complete, thorough, and transparent investigation of all complaints, irrespective of the level of misconduct.

In our view, many of these shortcomings could be cured with a more effective supervisory review of casework by mid-level SARP supervisors prior to passing "completed" cases up through the chain of command. Lastly, the Monitor's Office strongly encourages the Office of the Legal Advisor as well as the Office of the Police Commissioner to refamiliarize themselves with the parameters of the four categories of findings, e.g. sustained, not sustained, unfounded and exonerated. More than a few cases were reported as unfounded or exonerated, when they really ought to have been classified as not sustained, which is the finding more in tenor with the facts revealed in the investigation.

*Table 37: Compliance Status for Paragraphs 163-165*

| Paragraph | Stipulations | Monitor's Rating |
|-----------|--------------|------------------|
| 163 | Require that all personnel report misconduct to a supervisor or directly to SPR for review and investigation. | Substantially Compliant |
| 164 | Require supervisors to investigate and take appropriate corrective action when made aware of minor misconduct. | Substantially Compliant |

| 165 | The results of unit investigations shall be referred to and evaluated by unit commanders for underlying problems. | Partially Compliant |
|---|---|---|

Paragraph 163: Addressed in the key observations below.

Paragraph 164: The Monitor's Office personally reviewed multiple cases in SARP headquarter in San Juan. Several of these cases were internally generated, as opposed to coming from civilians outside the institution. From our observations of these internal cases, a paper trail established that PRPB is conducting reviews and investigations of its own members at the supervisory and unit command level and that this paper trail is monitored by the SARP office and command itself.

Paragraph 165: The Monitor's Office, while investigating compliance with Paragraph 164, also uncovered several examples of unit investigations in which deficiencies in either policy or training were noted. This is empirical evidence that PRPB understands the relationship between erroneous tactics, faulty training, and poor results among its members. We will continue to review this area to ensure that this positive trend continues.

Key Observations:

During the month of March, the Monitor's Office personally selected 41 SARP Internal Affairs cases for an in-person review. Over the course of three full days, the Monitor in charge of Internal Investigations, read through each file jacket and documented relevant observations. Present in the office during this in-person review were the chief of internal affairs, a legal PRPB representative, and a varying number of the chief's staffers.

Out of the forty-one files selected at random, two were deemed so voluminous that they were saved for last, should time allow. One of these files consisted of an approximately ten-inch-high stack of documents, while the second large file was slightly less voluminous. The files ran the gamut of what would normally be found in any police internal affairs agency; citizen complaints of negligence, discourtesy, internal disciplinary accusations ranging from negligence to outright insubordination, and sexual harassment.

These qualitative metrics were applied to each case:

1. Was the case properly reported and documented (intake)?
2. Was the case assigned for investigation within the PRPB General Order timeline?
3. Was the investigator thorough in his/her investigation?
4. Was the level of communication with the complainant sufficient?
5. Were the investigator's findings consistent with the evidence?

CMR-2 Draft | December 2, 2020

6. Was appropriate supervisory oversight exercised over the investigation/ findings?
7. Was the finding consistent with the PRPB General Orders?
8. Was/were the finding(s) communicated to the accused and the complainant in timely fashion?
9. Were the complainant and accused informed of their rights to appeal?

Out of the forty-one files reviewed, twenty-five were both well-investigated and documented according to the objective and qualitative metrics applied. Some of these cases were so exceptionally investigated that it became quite evident which of SARP investigators had been the best practitioners. Those individual investigators were identified to the commanding officer as not only deserving of praise, but also for consideration as potential formative and field trainers of future SARP investigators.

Eight cases were found to be notably lacking in one or more objective qualitative evaluation metrics. To serve as specific examples of these shortcomings, the Monitor cites the following:

2019-01071: A female participant in a USJ demonstration alleged that she was struck by officers who broke ranks at the demonstration. She accuses the officers of hitting her across the back and the back of her head, inflicting injuries including a scalp laceration. While the PRPB incident plan for the demonstration specifically instructed the CRADIC Unit to video record the demonstration, the investigator never checked with CRADIC to determine whether the incident was caught on video. Conversely, if the SARP investigator did check with CRADIC, they did not document such in the case file, which would have been a noteworthy omission.

2019-01165: An officer was accused of negligently handling the case of a dog bite by urging the complainant to accept money extrajudicially from the dog owner rather than proceeding in accordance with the law. The SARP investigator neglected to ask the officer if he knew the owner of the dog, if he had any connection to the owner, or if the officer had in fact suggested an extra-judicial settlement, as he was accused of doing. These questions, had they been asked, might have ruled out the possibility of the responding officer being biased in favor of the dog owner. On the other hand, there appears to be no motive for the complainant to be untruthful.

Three weeks to the day after reporting the incident, a family member of the complainant went to the police station asking for the original incident report and was told that the report wasn't completed yet (NB: this could possibility be due to the rollout of the digital reporting system, however the SARP investigator should have verified this). Ultimately,

the case did proceed through the judicial system and was finally adjudicated in accordance with the law.

SARP recommended that the officer be exonerated, which means that the officer did what he was accused of, and that this action was in tenor with Puerto Rican law and the PRPB General Orders. This finding is incongruent with the facts of the investigation. In the light most favorable to the accused officer, and if the appropriate questions to the officer had been answered in the negative, this case should have been closed as "not sustained."

2019-01194: An anonymous letter alleged that several lieutenants were calling sergeants into their office to collude testimony before they went to SARP for questioning. One of the superior officers so accused was not questioned regarding this letter. Collusion, particularly among those responsible for overseeing and supervising officers, is a very serious charge and ought to have been much more aggressively investigated. The findings were "not sustained," against two officers, and sustained against four officers. Despite the failure to exhaustively investigate a very serious charge, the investigator did note deficiencies in the PRPB General Orders 300-307 and 100-101, which is a positive outcome in and of itself.

2019-01197: An internal disciplinary matter in which a complainant officer (Officer A) alleged that her sergeant assigned a defective vehicle to her and her partner (Officer B), while allowing a third officer (Officer C) to use an operational vehicle and to take that vehicle to his home for lunch. This was allegedly retaliatory due to a previous complaint that Officer A had made against both the sergeant and another officer. Officer C was allegedly told to exchange his vehicle with Officer A and B right after said lunch break. The exchange never took place.

Officer A reported that she filled out a vehicle inspection report noting that the tires were unsafe, and that neither the emergency brake nor the air conditioning was functioning. The investigator never examined either vehicle to establish the truth of Officer A's assertions. In his defense, the sergeant claimed that Officer A's inspection notations were made at the end of her shift. Interestingly, Officer B's memory failed when he was questioned as to the timing of the inspection report. This is a crucial line of inquiry because Officer B could prove that either Officer A or the sergeant was withholding the truth. The investigator should have pressed both Officers B and C. The case was closed as "exonerated," when at best the finding should have been "not sustained" because facts material to the case were left unproven.

2019-01245: The complainant alleged that her 14-year old grandson suffered a broken nose when the police failed to execute a 408 Order of Involuntary Confinement (due to

mental health issues). The complainant called the local station at 2121 hours, which was at or near shift change. According to the complainant, a male officer answered and said that, "…if it was the mother hitting the child, nothing could be done." The officer did not dispatch a unit. The officer in question reported to SARP that he took the call, but that the caller did not mention that there was a minor involved, nor that the minor was cornered and actively being beaten.

Given the information he was provided, the officer instructed the caller on how to obtain a 408 Protective Order. Additionally, the officer claimed that the caller interrupted him during the telephone conversation, told him that she now had the child in her custody and promptly hung up. When the officer's supervisor was questioned, the supervisor claimed that the officer had answered the call, but that the complainant hung up on him before he could collect her information. Neither the supervisor nor SARP questioned any other male officers who might have been in the station at the time of the call. Given the ongoing violent attack, the officer should have asked for a callback number or address immediately and then dispatched a unit. While this case may have been justifiably classified as "not sustained," owing to a lack of preponderance of the evidence to support the complaint as alleged, SARP should have called for retraining of the officer by his supervisor (see Regla 9001), so as to avoid a future reoccurrence with catastrophic consequences.

2019-01260 The investigation appears to have been adequate, however this case falls into trouble regarding how it is classified. The investigating officer begins by stating that the officer did not commit the alleged offense. Later the investigator classified the case as exonerated, which means that the conduct did occur and was appropriate, given the facts and circumstances. Lastly, the letter to the complainant from the Commissioner says the case was "dismissed," not exonerated. "Dismissed" is not one of the four possible findings of a SARP investigation and ought not to have been used.

The Monitor noted this confusion or misclassification of findings by either the Office of Legal Affairs and/or the Office of the Police Commissioner in multiple cases. This points strongly to a need to retrain elements in both of those offices. A complaining citizen or complained against police officer should expect, and in fact deserves, clarity in the ultimate judgement of PRPB in these investigations.

2019-01277 In a case similar to the previous, the SARP investigator conducted a thorough investigation. Notwithstanding the acceptable performance of SARP, the letter sent from the Commissioner's Office to the officer indicated a finding of "exonerated," when it should have been classified as "unfounded."

76

2019-01591 In this case closed as "not sustained," the ex-husband of the complainant had an outstanding arrest warrant for domestic violence. The local PRPB tried to lure the man into the police station under the pretext that he had to pick up his 10-year-old daughter there. According to the complainant, the subject escaped arrest because one of the officers was a friend of both the subject as well as the subject's brother. The officer denied that he was a friend of the subject.

When the officer was asked if he had a conversation with the subject that day, the officer recounted that the subject said to him, "[You know what it is," as he fled. Curiously, no further follow up questions were asked of the officer by the investigator. In particular, the investigator never asked the officer if he did communicate with the brother of the subject, nor was he asked what he interpreted the suspect's words to mean. A more in-depth questioning of the officer could have adequately addressed many remaining doubts and lingering concerns about the propriety of the officer's actions.

Turning now to the qualitative metrics applied to the sample of SARP cases analyzed, we reach the following conclusions:

1. **Was the case properly reported and documented (intake)?** We find substantial documentation that PRPB is properly documenting complaints concerning their officers whether in-person, via email, via confidential complaints, or internally generated.

2. **Was the case assigned for investigation within the PRPB General Order timeline?** We find that cases are assigned for investigation in a timely basis in conformance with the General Order.

3. **Was the investigator thorough in his/her investigation?** While we noted that some cases were very well investigated, in our professional opinion, we also found others that were not thoroughly investigated. Important questions were left unasked and police witnesses were not pressed when their versions left room for legitimate further inquiry into key facts in dispute.

4. **Was the level of communication with the complainant sufficient?** Generally, civilian complainants were interviewed by SARP investigators. A deposition style question and answer format is often employed. This limits the interaction and flow of questioning between investigator and person being interviewed. In very few cases did investigators divert from the inquisitive "script" to follow up questions that should naturally flow from the initial line of questioning presented. Additional important and relevant lines of questioning were thereby either ignored or missed

entirely. As such, important information that could shed more light on the case remains undiscovered by the investigator. The Monitor recommends that each SARP investigator receive additional training in interviewing techniques[8]. Furthermore, the Monitor recommends that each subject be asked for permission to audio or video record the interview[9]. If the subject agrees in writing to the recording, then the recording and subsequent transcripts should be made.

5. **Were the investigator's findings consistent with the evidence?** In the Monitor's professional opinion, we have found cases that were closed as "not sustained," where a "sustained" finding could have been reached if the SARP investigator had taken into account the officer's history of similar alleged conduct. SARP investigators should be reminded that the standard of proof is based upon a "preponderance of evidence," which may be numerically expressed as 51/49.

6. **Was appropriate supervisory oversight exercised over the investigation/findings?** Not entirely. Problematic cases were passed along until archived, and as pointed out, contained obvious flaws.

7. **Was the finding consistent with the PRPB General Orders?** Not in every circumstance. The PRPB General Orders classify complaint findings into four categories: Sustained, Not Sustained, Exonerated and Unfounded. There were sufficient cases found where findings were confusing and inaccurately applied.

8. **Was the finding communicated to the accused and the complainant in timely fashion?** Yes.

9. **Were the complainant and accused informed of their rights to appeal?** Yes.

The foregoing noted deficiencies and suggestions for improvement supplied by the Monitor are in keeping with his stated goal to provide PRPB with a, "pathway to compliance."

## 4. Complaint Intake, Classification, Assignment, and Tracking

The Monitor received incomplete data on complaints relating to civil and criminal causes of action against its members, some of which was received with insufficient time for

---

[8] Paragraph 196 of the Agreement calls for annual refresher training of SARP investigators, this retraining in interviewing techniques would make effective use of some/all of that time.

[9] Puerto Rico is a "two-party consent" jurisdiction, which means that no audio capture of any conversation may take place unless as a precondition, both parties' consent to such recording.

analysis and evaluation. The Monitor lacks sufficient data to reach a determination on Paragraph 170 in particular, which calls for interviews to be made with relevant PRPB members, which was not possible due to the pandemic. Accordingly, the Monitor will defer the rating on Paragraph 170 until proper interviews and analysis of documentation may be conducted.

*Table 38: Compliance Status for Paragraphs 166-176*

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 166 | Train all officers in how to handle complaint intake. | Partially Compliant |
| 167 | Inhibiting a misconduct complaint or providing false or misleading information shall be grounds for discipline. | Substantially Compliant |
| 168 | Accept all misconduct complaints, including anonymous and third- party complaints, for review and investigation. | Substantially Compliant |
| 169 | Establish a protocol that provides procedures to be followed when an individual objects to an officer's conduct. | Partially Compliant |
| 170 | Ensure that allegations of misconduct made during criminal or civil litigation are assessed for further investigation. | Rating Deferred |
| 171 | Maintain a centralized numbering and tracking system for all misconduct complaints. | Substantially Compliant |
| 172 | All complaints should be referred to SPR by the end of tour of duty, absent exceptional circumstances. | Substantially Compliant |
| 173 | SPR shall reach a determination for a misconduct complaint within five business days of the receipt of the complaint. | Substantially Compliant |
| 174 | Develop a complaint classification protocol that is allegation-based rather than outcome-based to guide SPR. | Not Due for Assessment |
| 175 | A misconduct investigation may not be conducted by any supervisor who used force during the incident. | Substantially Compliant |
| 176 | Tracking system shall maintain reliable data regarding the number, nature, and status of all misconduct complaints. | Substantially Compliant |

Paragraph 166: The Monitor acknowledges that a policy does exist, but cannot reach a conclusion on complaint intake, classification, assignment, and tracking trainings due to travel restrictions. A sample of supervisors demonstrated that 16 out of 18, or 89%, had taken all of the required trainings, which is outside of the 95% allowance for achieving substantial compliance.

Paragraph 167: Assessed with paragraphs 166 and 177.

Paragraph 168: The Monitor's Office has reviewed PRPB 311.1, its pre-printed complaint form, and finds it to be clear, concise, and objective in its design. Furthermore, there appears to be no language found that would tend to discourage any person from submitting a complaint to the PRPB SARP. PRPB has a clearly distinguishable portal on its

website to submit officer misconduct complaints that does not require the complainant to identify him/herself.

Paragraph 169: Despite repeated requests for copies of SARP complaints received, "in the field," the Monitor was not supplied with the requested data by the time the Monitor wrote his report.

Paragraph 170: In his Second Request for Production of Documents, the Monitor made a request for a list of all PRPB officers currently facing criminal charges or named in civil lawsuits served upon PRPB between July 1, 2019 and March 31, 2020. The list was to contain the date of the alleged underlying incident, the PRPB member(s) name(s) and the cause(s) of action(s) claimed by the plaintiff(s). This material was provided in July, as this report was being prepared.

From the data supplied, we can see that approximately sixty officers had been charged with domestic violence. Some charges included findings of probable cause, while others included no probable cause, and still other cases remained pending at the time of writing. A just conclusion may be reached on PRPB level of compliance once these actual files are reviewed in a future visit.

A separate table provided listed approximately eighty officers currently under criminal investigation for other crimes, the nature of which was not divulged to the Monitor as requested. Yet another table indicated fourteen officers that had been charged with serious offenses, in four of which cases probable cause was found and four where it was not.

Nine officers were named in civil causes of action during the reporting period, and of that number, two of these cases had notations of findings made by SARP – one of exoneration and the other of not sustained. The remaining cases were presumably in various stages of investigation or review. There were nine SARP cases where reprisal was alleged by an officer, and in all the cases detailed the accused was a male officer. In all but two cases, the accuser was also male.

Paragraph 171: The Monitor's Office personally inspected the PRPB SARP and found that the unique numerical case assignment system to be in use and functioning as intended by the Parties.

Paragraph 172: In all of the cases reviewed during his March 2020 site visit where a supervisor took a field complaint of officer misconduct, that supervisor gathered

CMR-2 Draft | December 2, 2020

information relevant to the complaint, generated PRPB 311.1, and forwarded that complaint to SARP within the time limit provided in the Agreement.

Paragraph 173-175: In all the cases reviewed, SARP made the designation as to how the case would be assigned for investigation within the five business days provided for in the Agreement. In all the cases reviewed, supervisors were excluded from the investigation process, in accordance with approved policies.

Paragraph 176. The Monitor personally reviewed a randomly selected, statistically significant number of SARP cases in San Juan during his March 2020 visit as well as the EIS database from which they were extracted. The Monitor was thus able to conclude that PRPB maintains accurate and reliable data regarding the number, nature, and status of misconduct complaints, from initial intake to final disposition, including investigation timeliness and notification to the complainant of the interim status and final disposition of the investigation.

## 5. Investigation of Complaints

After an in-person examination of a randomly selected cross-section of SARP files during the Monitor's March 2020 visit, the Monitor makes the following findings: with respect to Paragraph 177, Partially Compliant due to lingering concerns over investigations of retaliation. Paragraphs 178 and 179, substantially compliant.

*Table 39: Compliance Status for Paragraphs 177-193*

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 177 | Ensure that policies and procedures clearly establish that complaints are adjudicated on the basis of the evidence. | Partially Compliant |
| 178 | Investigate all misconduct complaints and document the investigation and its findings and conclusions in writing. | Substantially Compliant |
| 179 | Ensure that all administrative investigations shall be completed within 90 days of the receipt of the complaint. | Substantially Compliant |
| 180 | Ensure that investigations of officer misconduct are thorough, and the findings are consistent with the facts. | Partially Compliant |
| 181 | Require officers to cooperate with administrative investigations. | Rating Deferred |
| 182 | The subject officer of a potential criminal investigation shall not be compelled to provide a statement to investigators. | Substantially Compliant |
| 183 | Absent a criminal investigation, subject officers shall not be notified of their right not to provide a statement. | Substantially Compliant |
| 184 | Upon determination that there may have been criminal conduct, an investigator shall notify the SPR commander. | Rating Deferred |
| 185 | Ensure that the criminal and administrative investigations are kept appropriately separate. | Rating Deferred |

CMR-2 Draft | December 2, 2020

| | | |
|---|---|---|
| 186 | Consider all relevant evidence in each investigation, including circumstantial, direct, and physical evidence. | Partially Compliant |
| 187 | A misconduct investigation shall not be closed because the complaint is withdrawn or the victim is unable to testify. | Substantially Compliant |
| 188 | The investigator shall recommend dispositions for each allegation of misconduct in an administrative investigation. | Substantially Compliant |
| 189 | The unit commander of the investigating supervisor shall accept, reject, or modify all recommended dispositions. | Partially Compliant |
| 190 | The SPR commander shall review the investigator's recommended disposition and accept, reject, or modify it. | Partially Compliant |
| 191 | Administrative investigations shall assess and document whether the action was in compliance with training. | Partially Compliant |
| 192 | Each complainant will be notified regarding the initiation and disposition of an investigation and any action taken. | Substantially Compliant |
| 193 | SPR shall retain all misconduct investigation records for at least five years after the officer's separation from PRPB. | Rating Deferred |

Paragraph 177: The Monitor personally reviewed a randomly selected, statistically significant number of SARP cases in San Juan during his March 2020 visit. In at least two and possibly four of the cases, an allegation of retaliation was made by a subordinate against his or her superior officer.[10] These cases were unevenly investigated and, in several situations, the officer witnesses' versions of events were not sufficiently tested during their questioning. Therefore, the Monitor rates PRPB partially compliant with Paragraph 177.

Paragraph 178: The monitor personally reviewed a randomly selected, statistically significant number of SARP cases in San Juan during his March 2020 visit. Several of these cases represented isolated cases of minor policy violations which did not constitute a pattern of misconduct or duplicate other allegations. The Monitor found that the cases were justifiably and, therefore, appropriately closed administratively.

Paragraph 179: The reviewed cases fell within the established framework of timelines required by the Agreement as they applied to investigative and adjudicatory time limits, or alternatively, were appropriately documented with extensions under justifiable circumstances.

Paragraph 181 requires the Monitor to hold interviews with selected SARP investigators. Due to the COVID19 Pandemic, this was not possible. Assessment has been deferred until

---

[10] See the following PRPB cases; 201901197, 201901416, 201901066 201901194

such time as the Monitor can conduct these interviews in accordance with the agreed-upon methodology.

182-184. In the cases involving a potential criminal investigation, none of SARP investigators compelled the officer to make any statement or declaration. Conversely, in cases where no possible exposure to criminal prosecution existed, records indicated that the SARP investigator did not warn the subject officer that he or she had a right not to provide a statement that could be self-incriminating. In fact, none of these cases that involved possible criminal conduct involved an identified officer. Therefore, no officer subject of a reviewed SARP investigation was warned that he or she had a right not to provide a statement that could be self-incriminating.

Paragraph 185: An analysis of level of compliance on the part of PRPB requires a highly particular set of circumstances, specifically where an officer is being investigated simultaneously by both administrative (SARP) and criminal investigators arising from the same incident or set of underlying facts.[11] As none of the files reviewed during the March site visit were indicative of this set of circumstances, the Monitor cannot determine compliance at this time.

With respect to Paragraphs 182 – 185, the Monitor understands that the PRPB SARP EIS System does not have the capability to identify SARP cases where the possibility exists for criminal prosecution of the accused PRPB member. Until such time as the PRPB EIS develops the capability to search for SARP cases where criminal prosecution may be indicated, the Monitor is left to rely upon whether such cases are encountered in the random sample of all SARP files. Failing that ability to search, identify and randomly select samples of these particular cases, the Monitor will be unable to make a fair determination of PRPB compliance until such time as it is both feasible and practical to conduct a random, in-person hand search of all SARP files for any given reporting period.

Paragraph 186. As mentioned repeatedly within his assessment, the Monitor found some investigations that were conducted thoroughly and others where more information might have been forthcoming if sought. The objective of an internal investigation is to complete an investigation and close the case with a defendable outcome which should reflect all the evidence available to the investigator. The PRPB SARP must use its annual 40-hour retraining requirements to address some performance gaps among some of its staff, particularly as related to interviews conducted as part of investigations. The Monitor finds

---

[11] See Garrity v. New Jersey, 285 U.S. 493 (1967).

that SARP interviewing techniques, even among its best-investigated cases, follow a routine scripted line of questioning rooted in the inquisitive style of jurisprudence. SARP investigators are not constrained by lawyerly considerations such as relevance and hearsay, for example. Open-ended questions presented with follow-ups into other areas relevant to the case will elicit far more information from interviewees, both civilian and sworn.

Paragraph 187. None of the reviewed SARP cases were closed due to the withdrawal of a complaint, nor due to the inability of the complainant or witnesses to provide further information, nor due to any outcome of any pending charge against the complainant or witnesses.

Paragraph 188. Each of the cases reviewed contained a recommended finding by the SARP investigator.

Paragraphs 189 and 190 require a robust, immediate, supervisory and command level review of the investigative file before signing off on the investigation. The Monitor finds that this review process occurs at both supervisory and command levels, but remains at a suboptimal level of accountability. The Monitor finds that many, if not all the errors and omissions noted in his discussion of problematic cases should have been spotted during supervisory or command review, with the case remitted to the investigator for additional efforts. PRPB is off to a good start, but more work needs to be done to achieve substantial compliance.[12]

With respect to Paragraph 191, the Monitor noted several cases where training was called into question as a causative factor of the underlying incident that precipitated the complaint. This is a good sign. The Monitor does suggest that each case investigated by SARP contain, as a matter of course, a section that answers whether; *(a) the action was in compliance with training and legal standards; (b) the use of different procedures should or could have been employed to achieve a potentially better outcome; (c) the incident indicates a need for additional training, counseling, or other non-punitive corrective action; and (d) the incident suggests that PRPD should revise its policies, strategies, tactics, or training.* Once this section of a SARP report becomes obligatory and PRPB can show that its investigators are interpreting the findings of their investigation through the

---

[12] The Monitor has generated extensive field notes recorded during his in-person review of the 41 randomly selected files. These notes may be consulted by any of the Parties in order to properly diagnose and remedy investigative shortcomings encountered. These notes may be found within the Appendices of this Report.

lens of "lessons learned," then the Monitor will be satisfied that PRPB is substantially compliant with this aspect of the Agreement.

Paragraph 192: To its credit, PRPB has a documented paper trail that is indicative of its communication with complainants regarding the outcome of a given case.

Paragraph 193: As the capacity-building component of the Agreement ended only last year, PRPB only has one year of post-capacity building performance to show that it retains internal investigative files of officers who were discharged. The Monitor will make a future determination as to PRPB level of compliance as the Agreement matures.

## 6. Staffing, Selection, and Training Requirements

Although PRPB has generally worked to ensure that SPR is staffed with properly trained officers, deficiencies remain in SPR's ability to reviews misconduct investigations in a thorough and timely manner. In addition, the Monitor's Office requires further evidence before it is able to conclude that SPR officers received continuous training every year.

*Table 40: Compliance Status for Paragraphs 194-196*

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 194 | Ensure that sufficient staff are available to complete and review misconduct investigations in a timely manner. | Partially Compliant |
| 195 | Establish a term of duty of up to three years for SPR officers and supervisors who conduct investigations. | Substantially Compliant |
| 196 | SPR personnel conducting investigations shall receive 40 hours of initial training and additional training each year. | Partially Compliant |

Paragraph 194: Per the Monitor's comments on paragraph 177, interview techniques and outcomes are not consistent with PRPB policy or generally accepted police practices. This lapse indicates that training on interview techniques is not achieving the goals and objectives stated in the policy. Furthermore, the internal investigations unit should have the ability to record interviews – audio at a minimum, but ideally video recording – if all parties consent to such recording. Finally, most retained personnel have demonstrated effective performance – but not all.

Paragraph 195: Records supplied by PRPB SARP indicate that all investigators reviewed were within the three-year period established in the Agreement.

Paragraph 196: Though SPR personnel do receive 40 hours of training in conducting officer misconduct investigations, the Monitor has found that training in interview techniques is lacking.

CMR-2 Draft | December 2, 2020

## 7. Preventing Retaliation

The Monitor requested copies of SARP cases within the reporting period that involved a specific allegation of retaliation. This information was not provided by PRPB in a timely manner to allow proper analysis. Therefore, the Monitor cannot reach a determination on this paragraph for CMR-2.

*Table 41: Compliance Status for Paragraph 197*

| Paragraph | Stipulations | Monitor's Rating |
|-----------|-------------|------------------|
| 197 | Prohibit all retaliation against any civilian or officer who reports misconduct or cooperates with an investigation. | Not Compliant |

## 8. Discipline

A review of both General Order 600 s.639 and Rule 9001 gives demonstrative evidence that both a fair and consistent scheme of progressive discipline exists on paper within PRPB. We were unable to review a statistically relevant sample of disciplinary outcomes across the disciplinary spectrum to reach a finding on their practical application. Given that we lack data on the actual use of these policies, we may only assess PRPB's compliance provisionally by virtue of the existence of these policies.

As for drug testing, we are concerned that only two drug tests were conducted during three straight months of the reporting period, especially considering PRPB's stated policy of drug testing each employee a minimum of once a year. The fact that only one subject tested positive out of 1,505 during the reporting period is a cause for concern. A full discussion and analysis of the technical and scientific material requested, and the material delivered should shed some light as to why the rate for positive tests could possibly be unusually low. A conclusion based on better and more complete evidence will have to wait for the resumption of Monitor field visits. Until that time, the Monitor will defer his compliance assessment.

*Table 42: Compliance Status for Paragraphs 198-200*

| Paragraph | Stipulations | Monitor's Rating |
|-----------|-------------|------------------|
| 198 | Ensure that discipline for misconduct is fair, consistent, based on the nature of the allegation. | Rating Deferred |
| 199 | Establish a disciplinary matrix for sustained findings to facilitate consistency in the imposition of discipline. | Partially Compliant |
| 200 | Review drug testing program continually to ensure that testing for new and existing officers is reliable and valid. | Not Compliant |

In paragraphs 198 and 199, the Monitor examined General Order 600 s.639, which established a baseline system of progressive discipline within PRPB. This system incorporates a scale of verbal warning, written warning, referral to Employee Assistance, referral to training, retraining, or closer supervision for a certain period. The order also talks about the role of the Early Intervention System in maintaining sufficient records of employee infractions and measures taken.

The Monitor is concerned that PRPB reported only one failure of a drug test during the report timeline.[13] Additionally, the Monitor is concerned by the fact that, in an agency of 12,000 men and women, only two random drug tests were conducted during the 90-day period between July 1, 2019 and September 30, 2019. For the reporting period, only 12.5% of the sworn members of PRPB were tested. This also raises grave concern, given the declaration of Article 11(A) of the PRPB Drug Testing Policy #6403, which calls for all members to be tested up to twice a year, absent special circumstances, which include among other common events, e.g., "…upon transfer to a specialized unit…upon promotion in rank… upon terminating the officer's probationary period."

On the subject of test results, it seems implausible that out of 1,500 members randomly tested during the five months remaining in the reporting period, only one officer failed. It is for this reason that the Monitor requested specific technical information regarding the methodology and implementation to determine the accuracy and methodology of the test and delivery mechanisms for both PRPB officers and aspirants. That information could likely have revealed gaps in testing including the science employed, look-back period[14], prior notice to test subjects, randomization used, counter-spoofing measures,

---

[13] For Federally mandated safety sensitive workforce members, a 2.4% failure rate was reported for random urinalysis-based drug screening in 2018. Much earlier in the Boston Police Department, a far higher 3.8% failure rate was cited after drug testing (using hair follicles) began on its active duty officers in the 2000s, (http://archive.boston.com/news/local/articles/2006/07/30/75_officers_failed_city_drug_tests/) If we were to take the minimum failure rate reported of 2.4%, then we might anticipate a failure rate of 36 PRPB officers out of the 1,500 tested rather than only one reported failure.

[14] Certain drug screening protocols, namely the type of test employed, and the prior notice provided to test subjects selected at random can actually provide the test subjects with sufficient notice to avoid testing positive for certain controlled substances with a short half-life, specifically cocaine and heroin. Both of these controlled substances have a short plasma half-life in humans, which makes them quickly metabolized and thus difficult to detect in urine. Specifically, in the case of cocaine, the plasma half-life of the substance itself is limited to hours and for detection of its metabolite in urine - 1 to 2 days. In the case of heroin (diacetyl morphine), the plasma half-life is even less, making its detection of its metabolite (6-monoacetylmorphine) in urine less likely beyond 24 hours from last use. If an officer had sufficient forewarning of an upcoming urinalysis exam, that officer could effectively avoid detection by abstaining from use of either substance for a relatively short period of time. The plasma half-life of the most commonly used amphetamine MDMA, a.k.a. "Molly," "Ecstasy," or "X" fares slightly better at 6 – 10 hours, allowing for possible detection through effective urinalysis within 1 to 3 days. Methamphetamine's plasma half-life is longer at 6 – 17 hours and may be detectable using effective urinalysis for 1 –

and other collection methodology. All of this may have been better used to help identify officers with substance abuse problems and apply necessary disciplinary and treatment protocols.

In early July, the Monitor received a copy of Rule 6403 which lays out the PRPB drug testing policy and mechanism in broad strokes. In addition to the previously mentioned incongruity concerning the percentage of tested subjects for the reporting period, the Monitor was left with unanswered questions concerning the methodology used as described in Article 13(B)(2) and (3). Specifically, the Monitor needs to have more information concerning the selection process and the selected area for testing as well as the corresponding level of secrecy concerning both. As mentioned in the footnote, some of the most pernicious controlled substances leave a very narrow window of detectability via urinalysis. Any foreknowledge whatsoever as to who is to be tested or where the test is to be conducted can have the effect of producing highly questionable results.

There is a possible quality assurance gap in Article 13(C) between sections 5 and 6, in which section 5 talks about the field handling of the sample and calls for the sample to be refrigerated at the ICF laboratory if not tested immediately. The quality assurance gap is the noteworthy lack of refrigeration between the time the sample is collected remotely in the field and its arrival at ICF. Article 14(B)(6) speaks of evidence provided by the positive test taker that undermine the initial laboratory finding, which is not without precedent, yet highly improbable. Due to this level of improbability, 14(B)(6) should call for the full inclusion of all contrary empirical and documentary evidence within the employee's file and within the confidential report to the Superintendent.

## 9. Officer Assistance and Support

The Monitor finds that PRPB has an Employee Assistance Program designed to help their employees with substance abuse and mental health issues and that knowledge of the existence of this program is apparently widespread across the agency. The documentation supplied by PRPB does indicate that mental health professionals are involved in the program itself and that HIPAA confidentiality is well-established. Lastly the sampled training records of supervisors indicated that each supervisor was trained.

---

5 days. Lastly, Cannabis (11-Nor-9-Carboxy-Delta-9- Tetrahydrocannabinol) has a plasma half-life of 4 – 12 hours. Because of THC's fat-soluble nature however, cannabinoid metabolites may be detected between 1 to 45 days of its last used, provided effective urinalysis is employed.

CMR-2 Draft | December 2, 2020

*Table 43: Compliance Status for Paragraphs 201-204*

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 201 | Provide personnel with a range of non-punitive supports and services to address and correct problem behavior. | Substantially Compliant |
| 202 | Train management and supervisory personnel in officer support services to ensure wide availability and use. | Substantially Compliant |
| 203 | Involve mental health professionals in training on mental health stressors and the services available to officers. | Substantially Compliant |
| 204 | Ensure that any mental health counseling services provided to PRPD employees remain confidential. | Substantially Compliant |

Given both the recent strife concerning police practices in the United States and the unique stressors that police officers experience daily, Employee Assistance Programs ("EAP") are essential. While we are satisfied that PRPB is off to a good start with their EAP, the Monitor will conduct on-the-ground follow up to ensure that this vital service to both employee and agency continues to develop and thrive.

## VIII. Community Engagement and Public Information

Although, PRPB reports that all officers (99.99%), including command officers and CIC members, have been trained in community policing, community policing as a strategy has not been fully implemented agency wide. PRPB has only minimally implemented community policing and problem-solving strategies in its police areas by assigning one or two officers as community policing agents who attend community meetings to present to residents and listen to their concerns.

Although attending community meetings is a component of what community policing is, it is not what community policing is all about. It requires that the same officer be assigned to the same police sector every time, or at least most of the times, and requires the use of the SARA (Scan, Analysis, Respond and Assess) model for problem solving. This is a particularly important area that should be addressed in order for PRPB to develop the trust and confidence of the community and engage them in helping to solve issues that, if left unattended, may develop into conflicts that require police intervention and the use of force.

CMR-2 Draft | December 2, 2020

## 1. General Provisions

*Table 44: Compliance Status for Paragraphs 205*

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 205 | Engage constructively with the community to facilitate collaboration, ethical policing, and crime prevention. | Partially Compliant |

PRPB reports that Community Policing training has been provided to 99.99% of its personnel and command officers, and to CIC members. However, there is no evidence of PRPB implementing problem-oriented policing nor a deployment system that adheres to community policing principles. PRPB has reached out to community members, government institutions and social services agencies to form alliances and hold meetings in some police Areas.[15] However, other Superintendencies, such as SAIC, and SARP, have not reported any alliances. This document further states that 90 percent of the alliances submitted are informal and do not address quality of life issues, even though this is one of the goals in a community policing strategy.[16] The Monitor will continue to request relevant data and documents from PRPB for review and assessment, and conduct interviews with community members to confirm information from PRPB in future Monitor reports (CMR's).

## 2. Community Oriented Policing

*Table 45: Compliance Status for Paragraphs 206-208*

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 206 | Reassess staffing allocation and personnel deployment to support community policing and problem-solving goals. | Not Compliant |
| 207 | Conduct outreach to a broad cross-section of community stakeholders to build mutual respect and trust. | Partially Compliant |
| 208 | Develop systems to measure community partnerships and problem-solving strategies and assess their effectiveness. | Not Compliant |

Paragraph 206: PRPB has conducted a personnel study and a consolidation analysis[17] to re-allocate personnel to support community policing. However, this process is still in the beginning stages, and PRPB has not re-allocated personnel as required. PRPB has not provided the Monitor evidence that it has implemented a community policing strategy nor the SARA model of solving problems.

---

[15] See PRPB Document # MON-OR-CMR-21865 through MON-OR-CMR2-21869 listing alliances by Area in SAOC.
[16] See Doc # MON-OR-CMR2- 21870.
[17] PR Gov. Document N-OR-CMR2-10656

CMR-2 Draft | December 2, 2020

Paragraph 207: PRPB has reached out to community members, government institutions and social services agencies to form alliances and hold meetings in some police Areas[18]. However, other Superintendencies, such as SAIC, and SARP, have not reported any alliances during this period. This document further states that 90 percent of the alliances submitted are informal and do not address quality of life issues as is the goal in a community policing strategy.[19]

During a Monitor interview with the Coordinator of the Community Policing strategy for the Agency, he said that, "There is a gap within the organization chart, which is that the Districts and Precincts do not have designated personnel [for community policing]. Thus, they receive limited information, since the Districts do not have agents nominated for Community Policing."  He added that they also lack adequate training. The Coordinator further stated that there is a great need to appoint dedicated personnel and train them correctly at the Academy. He also feels that the districts, precincts, and units lack a directory of public agencies and alliances to apply the SARA model to find better solutions to problems.

PRPB must continue to address the lack of alliances with the community and other stakeholders. This is an area of serious concern to the Monitor's Office, and one of utmost importance in the Agreement. The Monitor's Office will follow up with meetings with community members and stakeholders to confirm any alliances reported by PRPB.

Paragraph 208: The Monitor has not received any evidence from PRPB that a mechanism to measure its community partnerships and problem-solving strategies is in place. Monitor will continue to request data and proof of such strategy. The experience in other jurisdictions with good outreach to the community has proven decisive in improving the effectiveness of policing, as well as strengthening the ties of the police with the community.

## 3. Community Interaction Councils

*Table 46: Compliance Status for Paragraphs 209-213*

| Paragraph | Stipulations | Monitor's Rating |
|-----------|-------------|------------------|
| 209 | Maintain Community Interaction Councils jointly with community representatives. | Partially Compliant |
| 210 | Develop a mechanism to select a representative cross section of | Substantially Compliant |

---

[18] See PRPB Document # MON-OR-CMR-21865 through MON-OR-CMR2-21869 listing alliances by Area in SAOC
[19] See Doc # MON-OR-CMR2- 21870

| | community members and PRPD officers for CICs. | |
|---|---|---|
| 211 | Ensure that CICs possess the means, staffing, access, training, and mandate necessary to fulfill their mission. | Partially Compliant |
| 212 | Develop a comprehensive community policing approach that addresses crime and safety issues. | Partially Compliant |
| 213 | CICs shall memorialize their recommendations in reports that shall be available in PRPD facilities and on the web. | Not Compliant |

Community Interaction Councils (CIC) have been formed in all police areas, although there have been some issues with lack of resources, training, and personnel. Interview respondents during this period in the Aguadilla CIC mentioned to the Monitor that they are three members short. Respondents in the Aibonito CIC also stated that they need resources and personnel, as well as additional training. Community policing training has been provided to members, they said, but they have not seen evidence of implementation of the community policing strategy. These CIC members stated that they meet regularly to discuss issues. For example, the Aibonito member interviewed stated that they meet on the second Tuesday of every month.

Though neither CIC visited has seen an annual report from PRPB, both stated that PRPB has responded well to the community when a request is made and during the states of emergency declared during this compliance period.

Both CICs and community stakeholders have been provided the opportunity to give their recommendations on policies and policing issues. The Monitor has received documentation on this subject from PRPB.[20] PRPB also provided documentation that CICs were given copy of General Order 400-401 on body cameras for their comments and suggestions, as well as a list of suggestions and recommendations given by CICs.[21] Finally, PRPB provided a list of Central CIC members.[22]

CICs were formed from community members from the outset by PRPB and training was provided.[23] However, resources are lacking. CIC members need additional members and office space for meetings. CICs should look for community spaces not connected to any law enforcement agency to conduct their meetings. This practice would help CICs avoid

---

[20] Doc MON-OR-CMR02-10578 through 10587
[21] Documents MON-OR-CMR2-10588 through 10626
[22] Document MON-OR-CMR2-10627
[23] PRPB documents MON-OR-CMR2-10185, MON-OR-CMR2-9740 (Ratings of teachers), MON-OR-CMR2-10213 (List of participants), MON-OR-CMR2-10216 (Seminar Power Point Presentation), MON-OR-CMR2-10577 (PRPB liaisons to CIC's).

the perception of being dependent on the police, and help to welcome those community members who may be hesitant to meet in spaces located within police facilities.

The Monitor has not seen an operating budget, and annual reports are not yet available. This is a cause of concern for the Monitor's Office and will be investigated further in future reports.

## 4. Public Information

*Table 47: Compliance Status for Paragraphs 214-217*

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 214 | Develop a Community Outreach and Public Information program in all operational subdivisions. | Not Compliant |
| 215 | The community outreach program shall require at least bi-annual open meetings that shall be widely publicized. | Partially Compliant |
| 216 | Community outreach meetings shall summarize all audits, reports, and policy changes or other significant actions. | Not Compliant |
| 217 | Publicly disseminate accurate and updated crime statistics, including those related to hate crimes, on a monthly basis. | Not Compliant |

PRPB provided documents which list the dates and police area where community meetings were held, as well as the dates of upcoming meetings with the community.[24] However, only a minimal number of Police Areas had scheduled community meetings for the compliance period in question. The Monitor has not seen evidence of the publication of these meetings or their content.

PRPB's web site list crime statistics but they are not up to date, and only cover the period from 2018 to 2019. No statistics from 2020 were found. As an example, the Monitor determined in earlier reports that Use of Force statistics reported for the last several years by PRPB were inaccurate.

On the annual reports, the Community Policing Coordinator explained to the Monitor that the Area/Precinct Commanders make an Alliance report each year, but that this says very little. He does not believe that this report is being made accessible to the public. PRPB's SAOC provided the Monitor with government documentation listing groups newly formed during this period.[25]

---

[24] MON-OR-CMR2-10652 through 10655; MON-OR-CMR2-12305 through 12307
[25] MON-OR-CMR2-9735

## IX. Information Systems and Technology

PRPB's IT fulfillment continues at a very slow pace. The uniform enterprise deployment of infrastructure and capabilities needed for transformation in the other areas of the Decree are, as of yet, inadequate. Data and evidence of IT achievement is inconsistent. Improvements can be accomplished through effective requirements management and prioritization, addition of skilled staff, and receipt of adequate financial resources for development.

The IT assessment for this period was completed by conducting on-site visits and by reviewing information provided by PRPB between 1 July 2019 and 31 March 2020. The criteria used for assessment were codified in a joint motion filed on 30 October 2019. As such, the monitor assesses PRPB's IT compliance with the decree to be as follows.

Because information technology must be an enabler to policing functions, it is necessary to express compliance in two ways: 1) The rating below – that of the IT systems made available by the Bureau of Technology that must facilitate the PRPB mission in its normal police functions. 2) The utility and effectiveness of those same systems for the purposes of conforming and complying with the Decree's intent to transform. As to the second, PRPB is not yet compliant.

PRPB can continue to move forward, but the pace must be substantially accelerated. As for IT professionalism, the minutes and meetings identified in deliverables provided are positive but there must be more rigor and consistency in their management of IT outcomes and resources.

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 218 | Establish information systems and utilize technology to support the implementation of this Agreement. | Not Compliant |
| 219 | Collect and maintain all data and records necessary to fulfill this agreement. | Not Compliant |
| 220 | Develop protocols for collecting, analyzing, and reporting the information required by this Agreement. | Not Compliant |
| 221 | Develop and maintain a record management system as part of the Action Plans developed for each Agreement section. | Not Compliant |
| 222 | Provide supervisors with handheld recording devices to record statements for UOF or misconduct investigations. | Not Compliant |
| 223 | All officers shall have access to National Crime Information Center data for valid law enforcement purposes only. | Not Compliant |

## Observations

Between July 2019 and March 2020, PRPB made few if any appreciable enhancements to its IT capabilities and has provided no compelling evidence of a broadly-based operational capability except for CAD which itself is incomplete and has not been formally trained to agents. To have achieved broadly-based capacity would have required consistent availability of systems and applications, broad and consistent formal training, and routinization of IT practices in mission areas such that the terms of the Consent Decree could be satisfied.

Also, as previously cited, although PRPB has made some progress over time, there is little to indicate that substantial progress as result of management intervention or adequate support from leadership is imminent. More importantly, PRPB has also not demonstrated that its information technology and systems are effective analytically in the other 10 policing areas of the Consent Decree. Examples of this are PRPB's continuing inability to capture use of force data effectively and the languishing implementation of EIS.

The IT monitor met with PRPB Bureau of Technology representatives' multiple times over the period assessed for CMR-2. In August 2019, the project manager for the implementation of Kronos briefed the monitors on the status of that effort and the data dictionary. Unfortunately, at the end of the briefing the project manager expressed appreciable concern that PRPB infrastructure was at risk due to its fragility and unpredictability, though the Kronos functionality would be delivered for overtime computations and payment to agents. This concern highlighted the continuing inadequacy of the IT enterprise.

After meeting again with PRPB in September, the IT monitor recorded that "there continues to be no compelling evidence that PRPB is making adequate, marked, or "step function" improvements that change their IT processes and systems significantly enough to comply with the Decree." In December of 2019, PRPB's legal representatives commented that it "is apparent that the capture of information for any event concerning search and seizure practices will not be readily or easily searchable, by or in, an automated system."

In February of 2020, Bureau of Technology representatives commented that the Project management system "is practically finished" and that testing would begin in March 2020. Yet, the IT monitor notes that prior commitments to impending implementation date back to 2017, and a demonstration of functionality has not yet been provided. EIS was claimed to be 90% in production which was inconsistent with other data provided during

this period. As of the date of writing this report, information provided to the monitor indicates no change in the degree of production usability.

In March 2020, the monitor noted that Use of Force data was inconsistent. PRPB commented that needed revisions to CAD had not been incorporated and could not offer a projected timeline for doing so.

As for comments from field staff, during a field visit to Carolina Norte, precinct staff cited that they preferred their computers and that they needed better access to the internet. They also noted that reports should be digitized and that shortages of field computers forced officers to have to go back to precincts to file their reports. Finally, they asserted that they cannot do background checks in real time which hampers verification. In Puerto Nuevo, the staff stated that GTE contains redundant data fields and information, and that the application is slow and affects their productivity.

Positively however, while in Puerto Nuevo, comments were made that "the Kronos demonstration for time keeping is excellent," although not in production. And that field staff are using CAD & GTE effectively for statistics and it is "very good for creating bi-weekly and monthly reports."

## Data Assessment

A formal IT data request was submitted to PRPB in Dec 2019 asking 16 IT specific questions that were based on the claims of PRPB's 6-month report from October 2019. Those questions, in conjunction with the court-approved methodology, were used to assess the status of PRPB compliance with the Decree. PRPB provided 39 documents in response housing them in the shared IT Folder. It's important to note that when responding, PRPB did not provide background, cataloging, justification, explanation or insight into the documents provided or their intended use. Interpretation was left solely to the monitor. It is within reason to argue that PRPB claims were made without adequate substantiation. The data requests of Dec 2019 and assessments were as follows:

### Data Requests by System

| System | Data Requested | PRPB Response |
|--------|----------------|---------------|
| CAD | The final report of the "paperless pilot", the conclusions and recommendations. | PRPB was not responsive |
| CAD | Any formal documentation related to the 6-month report of PRPB regarding the "application completed". | PRPB was not responsive – Clear, concise and unambiguous documents were not provided. |

CMR-2 Draft | December 2, 2020

| | | |
|---|---|---|
| CAD | The CAD life cycle plan | PRPB was not responsive. Two loosely coupled documents indexed as 17337 and 17352 were provided but contained random meeting minutes. These materials did not rise to the level of an articulated, vetted, approved, and resourced plan. Conventional project management best practices require, at minimum, details concerning cost, as well as a schedule and performance of the resourced CAD project. |
| CAD | Inventory of all CAD systems, installed or not installed, by location, operating status. | PRPB was only partially responsive providing an incomplete inventory containing only some details. Scale, completed installs, and priorities are indeterminable by the data provided. |
| CAD | List of "Canned queries" currently against any data ordered for any purpose by PRPB. | PRPB was unresponsive. |
| CAD | CAD training data, alphabetically and by date for all students. | PRPB was only partially responsive. Although the details of some of the training cohorts was delivered, no context was provided concerning percentage complete versus the total population of agents. Without these details there is no way to understand the plan or progress. |
| STU system | Current life cycle plan for development and implementation, including budgeted resources. | PRPB was unresponsive. CIO certification that the STU system is in a requirement's gathering phase is not evidence enough that there is a plan or resources. A formal, vetted, signed, and approved plan is essential and will comply with industry practices for project management. Lastly, the date of the CIO's certification in February of 2020 suggests a curious coincidental certification provided only after the request for status. |
| STU system | Requirements document that identifies system functions and specific data captures (data dictionary.) | PRPB was unresponsive. |
| STU system | Minutes of meetings and decisions regarding functional requirements and planning activities. | PRPB is being assessed as unresponsive because only one set of minutes were provided with little information and no actions that would indicate a process for gathering requirements. |
| EIS | 1. Meeting minutes for the requirements analysis sessions<br>2. Project plan (cost, calendar and performance) for the development and implementation of EIS<br>3. Registration of functional requirements | PRPB was responsive but it must be noted that the EIS materials were not fluid or what could be considered as complete. The monitor recommends a full spectrum Program Review of EIS consistent with the Software Engineering Institutes – Capability Maturity Model. |

CMR-2 Draft | December 2, 2020

## Data Request by IT Capability

| Capability | Data Requested | PRPB Response |
|---|---|---|
| IT Training | Training records of completed training by individual name and date completed for Crime Mapping and Administrative Complaints systems. | Partially responsive but short of enterprise context. |
| SAEA | Test sampling for all physical records of the SAEA that have been digitized and their location. | PRPB was partially responsive. Although a sample of digitized records were provided the context and storage location were not provided. |
| SARP | Evidence of digitized complaints | PRPB certified digitization but provided no information on archiving and use. |
| Analysis | Evidence of analytical methods used to generate metrics and analysis for the use of force, the safety of agents and civilians. | PRPD was unresponsive. |

## Recommendations

- Formal IT training, especially for CAD and GTE, is essential and must be completed across all precincts and with all agents. Formal training must be instituted.
- Skilled IT subject matter experts must be available to the Bureau of Technology's development and implementation efforts to achieve success.
- PRPB must prioritize needed revisions to CAD and immediately follow with its fullest implementation.
- PRPB must expedite their timelines for implementing capabilities and transitioning to digital records.
- PRPB leadership must reinforce collecting and recording pertinent data in the field and HQ and by supervisory elements.
- PRPB leadership must publicly state their commitment to move to digital data and records.
- PRPB must acknowledge that their technology and systems needs are likely satisfied by currently available systems already developed by other law enforcement organizations. Well thought through "make or buy" decisions should be vetted such that risks are mitigated, overarching investments are less costly, and the speed to implementation is shorter.

## Appendix A: Background to the PRPB Monitoring Mission

In 2008, USDOJ initiated an investigation of PRPB into an alleged pattern or practice of using excessive force, conducting unlawful searches and seizures and unlawful discrimination, all of which are proscribed by the United States Constitution. USDOJ conducted their investigation pursuant to the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141, and the anti-discrimination provisions of the Omnibus Crime Control and Safe Streets Act, 42 U.S.C. § 3789d. PRPB accepted the grounds for the investigation and pledged cooperation, and has worked in partnership with USDOJ to establish the reforms outlined in this Agreement.

As part of its investigation, USDOJ and its police practices expert consultants conducted a detailed fact-finding review with the assistance and full cooperation of PRPB, including: a) tours of police areas; b) interviews with PRPB officers, supervisors, command staff, Commonwealth officials, members of the public, and other stakeholders; c) review of many thousands of documents, including policies and procedures, incident reports, internal investigation of civilian complaint records, external audit reports, and legislative materials; d) accompanying line officers and supervisors during their respective tours of duty. PRPB's Superintendent and command staff officials met personally with USDOJ representatives and consultants on multiple occasions and pledged their full support and cooperation.

In response to the concerns expressed in the Agreement and in recognition of the need to modernize and professionalize its operations, PRPB undertook its own internal reform efforts. These efforts culminated in the issuance in March 2011 of PRPB's own internal reform plan. The plan included: 1) the development and implementation of new policies regarding use of force and a wide range of other substantive areas; 2) the training of all appropriate officers in the new use of force policies through "train-the-trainer" pedagogy; 3) the adoption of a reformed disciplinary system; 4) the improvement of citizen complaint procedures; 5) the strengthening of community outreach efforts through Citizen Interaction Committees; and 6) a staffing review to improve supervisor to officer ratios.

In September 2011, USDOJ issued a written report of its investigative findings ("the Report"). The Report presented USDOJ's findings related to use of force, use of force to suppress the exercise of First Amendment rights, and searches and seizures. The Report identified several additional areas of serious concern, including discriminatory policing and the insufficient quality of investigation into sex crimes and domestic violence. Finally, the Report outlined a series of other performance issues: 1) systemic deficiencies in

PRPB's policies and procedures; 2) conduct of specialized units; 3) formative and in-service training; 4) supervision; 5) intake, internal investigation, and institutional adjudication of administrative misconduct complaints; 6) corrupt acts and other crimes committed by PRPB officers; 7) substandard processes for promotion in rank; 8) lack of risk management; 9) poor external oversight and accountability; and 10) a lack of sufficient community engagement. The Report concludes that the performance of PRPB was undermined by a number of entrenched and long-standing problems, which in the estimation of USDOJ called for a systemic remedy.

While PRPB did not concur with all the findings and conclusions in the Report, the Parties met throughout 2012 to exchange ideas and proposals for modernizing and professionalizing PRPB and to discuss numerous reforms already underway at PRPB's own initiative. Once the newly elected Commonwealth administration took office in January 2013, the administration familiarized itself with the Agreement and continued negotiating to reach a final Agreement. The Agreement is the product of these good faith negotiations. In July of 2013, the draft Agreement was presented to the Honorable Gustavo A. Gelpi, Chief Judge of the US District Court for the District of Puerto Rico, who approved the draft, formalizing the Agreement.

On June 5, 2014, the Court approved the selection and hiring of an independent monitor to help PRPB during the capacity building phase and thereafter monitoring the compliance period of the Agreement.

Unlike other consent decrees throughout the United States and its territories and owing to the unique institutional development and needs of the Commonwealth, the Agreement between the USDOJ and Commonwealth of Puerto Rico included a four-year "capacity-building" phase. During that phase, PRPB was expected to develop policies, procedures, and technologies to address serious deficiencies within the agency. The monitoring team, which is comprised of subject matter experts, was expected to provide substantive expertise and technical assistance to guide PRPB in its implementation and development efforts, while at the same time providing the public with assurance that PRPB's progress would be evaluated in a reliable, independent and transparent manner.

The capacity-building period concluded on October 8, 2018, at which time the "monitoring phase" was to commence according to the Agreement. However, at that time the Monitor and Parties were unable to come to a consensus on the methodology matrices that the Monitor's office proposed to use to measure PRPB's compliance with the Agreement. This resulted in a delay in the start of the monitoring phase, and the Court subsequently suspended monitoring measures pending the finalization and acceptance

of a compliance assessment methodology agreeable to the Parties. PRPB, legal counsel, and the USDOJ conferred with the monitoring team over the course of six months to develop methodology matrices necessary to measure compliance for the eleven performance areas outlined in the Agreement. After review, and with the assent of the Parties, the Court accepted the objective methodologies put forth by the Monitor's Office.

In March of 2020, the court approved and published the First Report of the Federal Monitor, which focused primarily on policy and procedures, use of force, and information technology. CMR-1 found broad compliance on policy and procedure and certain areas of use of force, but nevertheless found a series of key lapses in use of force investigations and IT infrastructure.

CMR-2 was intended to provide a more comprehensive overview of PRPB performance, covering a significantly larger number of Consent Decree paragraphs. As such, CMR-2 is a model for Monitor's reports going forward. Nevertheless, the findings for CMR-2 were limited somewhat due to the Coronavirus pandemic, as well as the ongoing negotiations among the parties over how to implement the court-approved methodology in practice, particularly regarding the drawing of random samples.

## Appendix B: Methodology

In agreement with the approved methodology, the monitoring team uses a combination of quantitative and qualitative methods to assess PRPB's compliance with the Agreement in the three areas of performance selected for this report. Each paragraph in the Agreement has been assigned a methodology that was agreed on by the Parties and approved by the court. These methodologies include information on the data source, sampling method (if relevant), compliance target, etc. The full methodology can be accessed at the Monitor's website at https://www.fpmpr.org.

In all cases where the Monitor's office obtained sufficient evidence to reach a conclusion, we have provided an assessment of PRPB policies and practices according to the degree with the paragraphs in the Agreement. Where there was insufficient evidence to reach a determination for a particular paragraph of the agreement, the report indicates as such. The compliance levels are defined as follows:

- **Full Compliance:** Where PRPB has objectively demonstrated extensive compliance with the cited portion of the Agreement for a period of more than two years;
- **Substantial Compliance:** Where PRPB has objectively demonstrated extensive compliance with the cited portion of the Agreement for a period of less than two years;
- **Partial Compliance:** Where PRPB has objectively demonstrated sub-optimal level of compliance with the cited portion of the Agreement;
- **Non-Compliance:** Where PRPB has not objectively demonstrated compliance with the cited portion of the Agreement;
- **Rating Deferred:** Where the monitoring team has not received sufficient evidence to reach a determination as to compliance status with the cited portion of the Agreement.

Documents related to some cited portions of the Agreement were neither asked for nor received by the Monitors and therefore cannot be subject to review in this Report. As such, no conclusions should be drawn by any Party or the Court regarding other areas of the Agreement not covered in the present Report. We have marked these particular areas of the Agreement, as "Rating Deferred."

## Appendix C: Summary of the Monitor's On-Site Observations of PRPB Response to Mass Demonstrations in Old San Juan on Jan. 20, 23, and 31, 2020

January 20th, 2020, Monitor's observations of the protest that took place at Calle de la Fortaleza at the intersection of Calle Cristo in Old San Juan. The Monitor was present at this and other protests to assess whether PRPB was complying with the policies and procedures developed during the capacity building period. These policies and procedures serve to guarantee that the individuals participating in the activity could freely exercise their constitutionally protected rights of free speech and freedom of association, while also ensuring that the demonstration could proceed peacefully:

- On January 20, 2020, the monitoring team was alerted to a report of a street demonstration and reported to the site at around 1530. Upon our arrival, we were briefed by the Incident Commander for the street demonstration. He described the PRPB operation plan and corresponding deployment for this event, which included the deployment of water-filled physical barriers. These barriers were approximately 1.2 meters in height and were placed across Calle Fortaleza an estimated 15 meters west of the intersection of Calle Cristo. This had the dual effects of preventing further demonstrator encroachment upon Calle de la Fortaleza towards the Governor's Mansion, while at the same time creating a safe space for the demonstrators to assemble in a lawful manner.

- The Incident Commander had deployed ten uniformed PRPB units dressed in normal uniforms who were standing at parade rest behind the barriers. Because the officers were deployed without helmets or riot batons, they remained approximately 1.5 meters behind the water barricades for their own safety. A group of Tactical Officers dressed appropriately in issued tactical gear was held in reserve and stationed outside the purview of the demonstrators to avoid antagonize them. A police negotiator, several scene supervisors, as well as representatives of the Puerto Rico Fire Department were also deployed to the scene. A charged firehose lay nearby on the sidewalk in case water was needed to counter any sort of conflagrative device.

- The monitoring team observed a group of approximately 150 people demonstrators, most of whom were females under the age of 35, filling the space on Calle de la Fortaleza from Calle Cristo to where the barriers had been installed. We observed that the crowd was vociferous, yet they demonstrated no physical hostility towards the police.

- We observed no attempts by any of the demonstrators to damage property belonging to either the Commonwealth or any private party. We noticed that, according to the Incident Commander's deployment plan, the ten line-officers were replaced every thirty minutes to ensure they were well rested. The officers were also provided with drinking water.

- At 17:20 the crowd diminished to approximately half its original size and remained peaceful.

- Once the demonstration showed signs of winding down, the Monitors departed the scene. During our period of observation, we saw that the PRPB officers remained calm and focused on the task of public safety. They appeared well-supervised with sergeants and lieutenants present and under the command of the incident commander. We observed neither acts of violence or incivility, nor any use of force by any PRPB members.

- It should be noted that numerous recordings were made of the demonstration by members of the press and demonstrators alike. We are unaware if these recordings contain any unobserved acts of demonstrator violence or incivility. Nor are we aware of any corresponding enforcement actions or undue/illegal uses of force by PRPB officers in response to those actions contained in these videos. Should it come to our attention, the Monitor's Office shall undertake an evaluation of the incident recordings to assess PRPB's level of compliance with relevant portions of the Agreement.

January 23rd, 2020, The Monitor's observations of the manifestation taking place beginning at the "Capitolio" and finishing at Calle de la Fortaleza, at the intersection of Calle Cristo in Old San Juan:

- On January 23, 2020, the monitor team responded to the "Capitolio" for a scheduled demonstration and protest organized by a Major League Baseball player and a recording artist known as "Residente." The demonstration was scheduled to start at 5:00 PM. By 4:15 PM there were approximately two-hundred demonstrators/protesters on scene.

- Upon our arrival, the Incident Commander briefed us on the state of the demonstration. He described the PRPB operation plan and corresponding deployment for this event, which included two units of DOT who were kept in

reserve out of sight of the demonstrators. He also informed the Monitor that there would be several speakers at the event and that, at approximately 6:00 PM, it was expected that the demonstrators would march to the intersection of Calle Cristo and Fortaleza. The incident commander stated that police had established a line there which included the deployment of water-filled physical barriers. These barriers (approximately 1.2 meters in height) had been placed across Calle Fortaleza, west of the intersection of Calle Cristo. Fire personnel were also present on the scene and were equipped with a charged firehose, kept nearby on the sidewalk, in case water was needed to counter any sort of incendiary device thrown at officers or elsewhere. The police line and the barriers effectively prevented the demonstrators from advancing further towards the Governor's Mansion, while simultaneously creating a space safe for lawful assembly.

- By 5:45 PM the crowd at the "Capitolio" was estimated at seven hundred. At 6:00 PM the demonstrators began to march towards the Fortaleza.

- At the Fortaleza, the Monitor met with the Secretary of DSP; PRPB Commissioner; and several high-ranking personnel from the Bureau including a number of Colonels. At the Fortaleza, we engaged in a discussion concerning the day's planned demonstrations and protests with relative parties. The operation plan called for a police line at Cristo/Fortaleza consisting of PRPB officers specially trained in crowd control tactics. The plan also called for three units of DOT to be in "reserve mode," out of sight of the demonstrators.

- By 7:00 PM it was estimated that there were approximately seven hundred demonstrators/protesters at the police line at Cristo and Fortaleza.

- By 8:00 PM that number grew to fifteen hundred. The demonstrators were loud and boisterous, yet the demonstration remained peaceful. Both organizers of the event addressed the protesters. There was no physical hostility towards the police at this point. We did not witness any attempt by demonstrators to damage property.

- At 9:00 PM the police lines were reinforced by additional police officers wearing protective gear, due in part to the changing demeanor of the demonstrators and their attempts to move the barriers. At this point the demonstrators were warned

via an electronic bullhorn to cease and desist. PRPB took the precautionary measure of assigning additional officers to the police line.

- By 10:30 PM most of the demonstrators had left the scene; however, a group of fifty to seventy remained. Many of those wore masks or bandanas covering their face, and some had gas masks and helmets.

- At 10:45 PM the remaining demonstrators and protesters began throwing objects at police, including gas canisters, frozen water bottles, a liquid that appeared to be motor oil, cans and bottles filled with an unknown substance, and other types of projectiles. According to the PRPB Commissioner, an officer on the line received a cut on the hand by a protestor. The officer's cut required three stiches.

- During this stage of the event, the police provided multiple warnings via an electronic bullhorn telling protesters to cease, desist, and disperse.

- At 10:50 PM Police utilized gas to disperse the unruly protesters. As police were attempting to disperse the protesters, several were engaged in illegal activity, including breaking windows and vandalizing commercial businesses and vehicles parked in the area.

- During our observation period, we saw that the PRPB officers remained calm and focused on the task of public safety. They appeared well supervised, with sergeants, lieutenants, and other higher-ranking supervisors present, all of whom were under the command of the Incident Commander. It should be noted that numerous recordings were made of the demonstration by members of the press and demonstrators alike. Should it come to our attention that the response of the police did not correspond to the conduct of the demonstrators, the Monitor's Office shall undertake an evaluation of the incident recordings to assess PRPB's level of compliance with relevant portions of the Agreement.

January 31, 2020, Monitor's observations of the activity taking place at Calle de la Fortaleza (Fortaleza St.) at the intersection of Calle Cristo (Cristo St.) in Old San Juan:

- At about 3:30 P.M. on January 31st, the Monitor met with PRPB Reform Unit officers and then responded to the Fortaleza (The Governor's Mansion) for a scheduled 5 P.M. demonstration/protest. At about 4 P.M., the Monitor met with a PRPB Lt Colonel on the scene who briefed the Monitor on PRPB's planned activities and

available resources for this event. He stated that he was assisting the event's Incident Commander (IC), who was on his way to the event. The Lt Colonel stated he had approximately two hundred-fifty officers available, including DOT officers, who were present at the scene but out of sight of the public. We asked for a copy of the Operational Plan and were told that it was still being worked on. The Lt Colonel said he expected the crowd to gather at Fortaleza Street at the intersection of Cristo St.

- At about 5 P.M., the Monitor walked around Fortaleza Street and observed about forty to sixty demonstrators, including the press, protesting peacefully. A line of ten PRPB officers wearing soft hats, led by a sergeant, protected the intersection which leads to the Governor's Mansion. The intersection was blocked with two rows of water-filled plastic barriers.

- At about 5:45 P.M., the Incident Commander arrived on scene. He stated to the Monitor that he was not sure what to expect from the organizing group. He said the group was mostly made up of non-violent women, but they would sometimes be joined by another group that tended to get violent. He went on to say that he had not yet seen any aggressive behavior, but that the aggressors tend to show up around 11 pm. The incident commander stated that he was prepared and had enough resources to face any situation.

- At about 6:20 pm, the protesting group had grown to about a hundred boisterous but peaceful protesters. The same number of PRPB soft-hat officers remained on the line.

- By about 7:30 pm, the demonstrators and protesters diminished to approximately eighty people and remained peaceful. At about 8 pm, a group of protesters, consisting of both men and women wearing red t-shirts and carrying backpacks, showed up and joined the other protesters. This group, the incident commander said, are the ones who tend to get violent, so PRPB was keeping a close eye on them.

- Around this time, the Monitor observed two members of the red t-shirt group push the first row of water-filled barriers out of the way. An unknown projectile was also thrown towards the police line from the crowd. The police (a Lt Colonel), speaking clearly from a loudspeaker, then issued several warnings to the crowd to desist

from throwing objects at the police and to stop pushing the barriers. At the same time, the IC ordered helmet-wearing DOT officers to the front line to improve the protection of officers and bystanders. The group stopped pushing the barriers.

- At around 9:15 pm the crowd continued to protest but hand calmed down, having diminished to about twenty protesters. The police de-escalated their response by removing the DOT and bringing back the soft-hat officers to the line. Throughout the night, the IC replaced both DOT and soft-hats officers at the line every thirty to forty minutes to ensure they were well rested.

- The monitoring team stayed on the scene until about 10 p.m., departing after having a conference with the incident commander who said he did not expect any further issues at the line. By the time the Monitor left, there were only about three to five persons standing around across from the police line who appeared to be curious bystanders or tourists.

- During our period of observation, the Monitor saw that the PRPB officers remained calm and focused on the task of public safety. They appeared well supervised with sergeants, lieutenants, and other higher-ranking supervisors present, all of whom were under the command of the Incident Commander.

During the preparation of the present report, PRPB provided the Monitor with additional documentation, including crowd control policies and internal reporting on the PRPB response to the January 2020 mass protests. The monitoring team's first-hand observations of the PRPB response, in combination with these materials, were sufficient for the Monitor to conclude that PRPB acted in substantial compliance with the Agreement, as it pertains to managing mass demonstrations, on the given dates.

The following is a condensed summary of the Monitor's observations:

- PRPB allowed the demonstrators to freely express their constitutionally protected rights to assembly and freedom of speech.

- As a result, the public was granted the opportunity to exercise their constitutional rights in a safe and secure environment.

- PRPB responded with an appropriate show of force, acting as a deterrent to those protesters' intent on provoking the police. The use of water-filled barriers, which were practically immobile, allowed the demonstrators to

freely express their constitutionally protected rights of assembly and freedom of speech. The use of barriers also prevented protestors from entering established police lines or physically confronting officials deployed to guarantee public safety, the well-being of the participants, and the right of participants to free expression.

- The supervisor to officer ratio was modified to appropriate levels (one supervisor for every ten subordinates), allowing for clear command, control, and communications.

- PRPB maintained its Specialized Tactical Units in reserve to avoid inciting the protesters. They only utilized DOT on the frontlines when protesters began to push barriers or began throwing projectiles. In instances where the protesters desisted, DOT personnel were then removed from the frontlines.

- During instances where protesters began pushing barriers or throwing projectiles, police provided multiple warnings via an electronic bullhorn instructing protesters to cease and desist.

- All personnel present were trained on General Order 600-625, "Crowd Control."

- The PRPB's action plan allowed for all officers to be relieved on regular basis. This prevented officers from becoming exhausted and possibly ineffective, among other concerns. Water was also made available to all crowd control participants.

- PRPB established constructive and effective dialogue and communication between ranking Bureau personnel as well as with other agencies present. Furthermore, where possible, PRPB attempted to establish constructive and effective dialogue with participants and diverse groups that were present at the demonstration.

- PRPB prepared and executed a well thought out action plan on how to utilize DOT. As previously stated, DOT personnel were kept in reserve and out of sight unless their presence on the frontlines was deemed necessary.

- Inter-agency communications and cooperation appeared to be effective. PRPB established a command post.

- The PRPB's officers were properly identified and had equipment that was necessary and appropriate for the situation.

- During the January 23rd demonstrations, when police crossed their line to continue dispersing the crowd, it was evident that the officers were acting under the direct supervision of supervisors. In previous demonstrations where the Monitor's Office was present and acting as observers, this level of control was not present. The above preparations by PRPB are consistent with generally accepted police practices to deal with these types of mass demonstrations.

CMR-2 Draft | December 2, 2020

## Appendix D: Notes on Select FIU Investigations and Force Reviews by SFRB of Intentional Firearms Discharges

### Case # 2020-8-616-00065 Carolina

In the report of his investigation of the firearm discharge, the FIU investigator offers a brief narrative of the events that transpired. He states that the officer was in a struggle with the defendant, who was trying to get his weapon. Then, fearing for his life, the officer fired his weapon. However, the officer's statement does not support this narrative. The report prepared by the agent[26] states that he was struggling with the defendant, who was trying to take his weapon. The officer stated that he feared that if the defendant got his weapon, he could cause injury to the robbery victim, the security guard, or to him. In the ensuing struggle with the defendant for the weapon, the agent claims he heard a loud detonation, like that of a firearm discharge.

It should be noted that this report was prepared on June 22, 2020. This is almost six months after the incident took place, and well after all related reports and documents had been prepared. The investigator had ample time to review all the reports and documents related to the incident prior to preparing his report. The final report should have resolved all reporting discrepancies concerning the firearm discharge. At the very least, the investigator should have identified the discrepancies, including conflicting statements.

Note: As the Monitor's Office stated in CMR-1, there should be one cohesive report that contains all the facts of the incident and is prepared by the investigating officer. The report should include events leading up to the incident, with the expectation that the final report would narrate the whole story, from start to finish, instead of reports in the file revealing new details.

Acknowledgements:

- Civilian witnesses were interviewed.

- Photos were taken.

- Technical services and CIC were on scene.

---

[26] "Use of Force Report" PPR-605.1

- Spent casing were recovered.

- The number of rounds fired were verified.

- Photos taken of the officer's clothing are consistent with his altercation with the defendant.

- FBI took the case federally. The perpetrators were part of a carjacking gang. In fact, it was reported that when the officer confronted the perpetrators, they had just carjacked another victim.

- Checklist of all items are included in the file.

Shortcomings:

- The Officer and complainant were at the police station when they realized they could track the phone and then proceeded to do so without assistance of on-duty personnel. It's unclear as to why the officer took it upon himself to track the phone, rather than asking on-duty personnel to do it.

- Based on the officer's report, he notified the precinct supervisor in Carolina that they had the phone location via GPS, and that it was in Carolina. The supervisor said there was only one unit and it could not respond because it was attending to a domestic violence case.

- The officer then notified the lieutenant of the area and informed him of the situation. However, he does not state as to what action the lieutenant directed.

- According to the officer, the phone appeared to be stationary. After some minutes the officer took it upon himself to proceed to the place where the GPS indicated the phone was located. He believed that the perpetrators had discarded the phone.

- It should be noted the victim's cell phone was taken during a violent crime committed at gunpoint. The Officer's actions were imprudent, given that he had no way of knowing if the armed perpetrators were still in possession of the phone.

- In addition, if recovered, the phone could have possibly yielded fingerprints or DNA that could be used to identify the perpetrator.

- Also, there is a probability that the chain of evidence could have been compromised.

- The Officer was off duty.

- Upon arrival, the officer accompanied by the robbery victim attempted to locate the phone. This allowed the perpetrators to recognize the victim.

- In the process of doing so, the complainant identified three individuals in the area as those who had robbed her. The off-duty officer elected to engage the suspects without proper back up.

- The perpetrators, upon seeing the complainant, took notice. This should have been expected as a possibility by the officer.

- By approaching the suspects alone, the officer placed himself in a difficult position.

- The officer reported that one individual pointed a firearm at him and then fled in the suspect's vehicle. The two remaining suspects fled on foot and the officer pursued in his private vehicle. He confronted the individuals with his gun drawn, identified himself as a police officer, and attempted to place them under arrest. That is when, according to the officer, one of them attacked him and attempted to take his firearm. During the struggle, the weapon was discharged. This was totally avoidable if the officer had left the matter to on-duty PRPB personnel.

- There was a possibility that one of the surveillance cameras in the business area may have caught the confrontation, yet there is no indication that officers made any effort to locate video evidence.

- In reviewing this report it was discovered that three different complaint numbers appear in the file.

- There is a picture taken from surveillance camera footage, however, it appears that no video of the scene was recovered.

- There are no notes of the interview with the security guard, a key independent witness who had no apparent relationship with the shooting officer. The other

civilian witness would not be considered an independent witness for two reasons: 1) because she was the girlfriend of the shooting officer's relative, and 2) she accompanied the officer in recovering her cell phone.

- The shooting officer indicated in his written statement that he directed both the security guard and the alleged carjacking victim to call the police, both during and after the struggle with the subject that resulted in the discharge of one round. It is unknown if the calls were made or if the 911 tapes were sought.

- The shooting officer drafted a memorandum to his supervisor in the Special Arrests and Extradition Unit separate from his UOFR, which was dated 1/4/20. This appears to be the same narrative as the UOFR. The memo is dated 1/10/20. Are these memos required and are they routinely included in force investigation files? The FIU investigator references this memo in his investigation report when summarizing his interview with the shooting officer. Did the FIU investigator interview the shooting officer or simply rely on his written statements?

### Case # 2020-12-061-00180 Fajardo

The Field Administrative Investigation states that three individuals approached a vehicle and that one of them took out a firearm announcing an assault. As the agent exited the vehicle, one of the males pointed a weapon at the officer and the officer then discharged his firearm. To be more specific, in its introduction, the FIU Investigator's report states that the three subjects approached the officer's vehicle, two of them opened the doors and one of them announced it was an assault. It was reported that after the assailants fled the scene, a firearm in a bag was recovered from a mailbox within the vicinity of the suspects.

All narratives describing the incident before and "after the fact" should be consistent across different reports.

Acknowledgments:

- Photos are available.

- Surveillance video was located and obtained.

- A diagram of the scene was sketched.

- A bullet casing was recovered.

- The Ballistics team took the officer's gun, providing him with a temporary firearm.

- The reports are generally consistent.

- The perpetrator's weapon was recovered.

- The file contains a checklist of all items included.

Shortcomings:

- It does not appear that civilian witnesses were identified or interviewed.

- A note from the FIU investigator indicates that a ballistics test was not requested because no one at ICF is working to accept requests. As of 5/18/20, no one had returned to take requests at ICF.

- The *Tarjeta de Querella* (MON-OR-CMR2-19589) indicates that officers did not provide starting or ending mileage of the vehicle when transporting the suspects. No other details were provided about the arrestees.

- Text box 22 on form 605.1 asks for the equipment assigned to the officer. As a recommendation, consider asking what equipment the officer was carrying at the time of the incident. An officer who is on-duty (and especially those who are off-duty) may not be carrying all their equipment, although it may have been assigned to them.

- Based on training records, as of 3/26/20, the officer last qualified with his regulation firearm on 4/11/17. He took the UOF Practice Section on 10/17/18. See MON-OR-CMR2-19666. The second officer last qualified with his regulation firearm on 7/6/17. He took the UOF Practice Section on 9/18/19. See MON-OR-CMR2-19668.

- There is no discussion about the recovered shell casing nor whether PRPB confirmed that it came from the officer's firearm. There is a request for a ballistics test to compare the shell casing with the officer's firearm, yet there is no report or response from ICF.

CMR-2 Draft | December 2, 2020

Case # 2020-12-027-00356 Fajardo

The Bureau accepts that the officers should not have left a prisoner alone in their vehicle, which is in violation of Bureau policy. The officer violated the Bureau policy (G.O. Use and Management of Regulatory Weapon) which in turn allowed the prisoner to gain access to the sergeant's firearm.

Acknowledgments:

- Technical Services were on the scene.

- Photos were provided.

- Bullet casings were recovered.

- Civilian witnesses were interviewed.

- Videos were obtained from the establishment.

- Form PPR 113.2 (the investigative report form) is very thorough and encompasses all the facts of the case.

- A diagram of scene was sketched.

- Both guns were taken and tested.

- The Monitor's Office is encouraged to see that, according to the FIU, the Fajardo Administrative Investigations Division conducted a full investigation into the matter. It should be noted, however, that there is no supporting documentation.

Shortcomings:

- The reports do not indicate whether the prisoner was handcuffed in the front or back of his body while in the vehicle. However, the "Extraordinary Events Report" states the prisoner was cuffed to the rear. This information should have been in the report itself.

- The Sergeant indicated that because his belt broke, his weapon was accidently left in the car. While the investigator acknowledged that the buckle was defective, he

116

rightfully stated that this was not a viable defense and singled out the Sergeant for violating the Bureau policy for failure to safeguard the weapon. The investigator further stated that the Sergeant was not authorized for the holster in which the gun was housed.

- The investigator noted that there is no documentation stating that the officer in question completed the practical phase of use of force training.

- PPR-621.1, Annex #4, pages 4, 9, and 14 of 15, note section, incorrectly report two rounds were discharged by the officer. It should state three rounds.

- As cited in our CMR-1 report, until such time as all use of force reports (PPR-605.1) are digitized, all reports should be legibly printed and not handwritten because many instances of handwritten reports are unintelligible. That was the case in this report.

- The investigator uses the term "allege" in relation to the Sergeant's version of why the weapon was left in the car. This is a welcome change. This terminology was not used in our review of firearm discharges for CMR-1, rather, the subject officer's explanation statement was simply repeated as fact.

## Case # 2020-12-019-00010 Fajardo

- When the officers arrived on the scene, they positioned their vehicle in front of the stolen vehicle, as the vehicle was facing the officer's vehicle (indicated by sketch provided in file).

Acknowledgments:

- Technical Services were on the scene.

- Photos were provided.

- Bullet casings were recovered.

- Civilian witnesses were identified.

- Both guns were taken and tested.

- The file contains a checklist of all items.

- Detailed diagram was made of the cars and the position of the officers at the time that they discharged their weapons.

- The Sergeant stated that he fired one round. A check of the guns revealed that the Sergeant had twelve rounds in his gun (13 round capacity). The agent reportedly fired four rounds, and a check of his weapon revealed he had eleven rounds (15 round capacity). This demonstrates a consistency in the number of rounds in the officer's weapon, which the Monitor's Office had previously stated should be standardized by weapon model.

Shortcomings:

- Poor tactics were utilized, as is apparent by the fact that the suspect's vehicle was facing the officer's vehicle. The officers should have positioned their vehicle in such a way that, if the suspect fled, they would have been in a better position to pursue. As positioned, they would have to turn their vehicle around. The officers report drawing their weapons as they approached what they believed to be a stolen vehicle (a felony car stop) with an occupant in the driver's seat. By doing so, they left themselves exposed when the occupant chose to drive at the officers and point a firearm at them.

- The sketch provided has the police vehicle parallel to the road. Correct tactics would have been to angle the vehicle to block an escape forward and at the same time provide officers a necessary cover. From that position they could have given commands to the occupant to exit vehicle with his hands behind his head and to lay on the ground, thereby minimizing their risk of injury.

- According to the report, the vehicle was in an accident with another vehicle and fled the scene, at which point PRPB was informed that the vehicle may be stolen.

- It is not clear from the narrative how the police became aware that the car was, in fact, stolen. Were there any witnesses that could testify about the first accident prior to the police response?

- It appears that there was no effort to identify which officer's bullet struck the suspect, which is a major concern to the Monitor's Office because this deficiency

was pointed out in the Monitor's CMR-1 Report. PRPB could have used trajectory rods, which would have traced the path of the bullets fired by the two officers and thereby made a determination as to which officer's round struck the perpetrator.

- The report does not state how many of the officer's rounds struck the vehicle.

- There was no review of the tactics used by officers involved in the firearms discharges.

- PPR-113.2 prepared by FIU investigator identifies a witness who reports the suspect as being in possession of the vehicle and observed a firearm in his pocket. It does not elaborate, however whether this witness was identified after a canvass of the area for potential witnesses, after the fact?

- In the memo returning the sergeant's firearm the Director of Auto Theft (Fajardo) states that the sergeant utilized his weapon in an exchange of fire with an armed suspect. It should be noted that the suspect, while reportedly armed, according to the officers, did not fire the weapon. Similar comments were made when returning the agent's weapon as well. Both these statements are totally inaccurate.

- There is no note in the case file indicating whether the alleged firearm brandished by the subject was recovered.

CMR-2 Draft | December 2, 2020

## Appendix E: Notes on Select Internal Investigations

| SARP File Number | Final Disposition | Monitor's Determination |
|---|---|---|
| 2019-01622 | Exonerated | Compliant |

This investigation was clearly the best I have reviewed thus far. The investigator went the distance to disprove all of the allegations raised and therefore was able to exonerate the officers involved.

| SARP File Number | Final Disposition | Monitor's Determination |
|---|---|---|
| 201901050 | Not Sustained | Compliant |

- Notified the Officer 27 Aug 2019
- Notified the Complainant 27 Aug 2019

The complaint reported to police that a tenant allegedly made changes to his apartment without consulting the landlord. The landlord didn't like that the case had been closed.

| SARP File Number | Final Disposition | Monitor's Determination |
|---|---|---|
| 201901071 | No Finding because officers involved could not be identified | Not Compliant |

Case involves a woman participant in a USJ demonstration that was hit by officers who broke ranks at the demonstration, hitting her across the back of her head and back. Supposedly, CRADIC was supposed to film the demonstration according to the plan. The FIU registered no UOF report. The Investigator should have reviewed the CRADIC videos to determine if someone could identify the units involved.

| SARP File Number | Final Disposition | Monitor's Determination |
|---|---|---|
| 201901102 | Not Sustained, 2 other officers involved, Unfounded and Exonerated | Compliant |

The complainant was a municipal police officer who seemingly has mental issues.

| SARP File Number | Final Disposition | Monitor's Determination |
|---|---|---|
| 201901115 | N/A | Compliant |

A PRPB Officer was allegedly abused, both physically and emotionally, by his wife. His supervisor was accused of not following PRPB domestic violence protocol in the case.

| SARP File Number | Final Disposition | Monitor's Determination |
|---|---|---|
| 201901263 | Exonerated | Compliant |

An officer was accused of negligently handling an accident report.

CMR-2 Draft | December 2, 2020

| SARP File Number | Final Disposition | Monitor's Determination |
|---|---|---|
| 201901151 | Preliminary Finding – Sustained. Now in the hands of the Office of Legal Affairs. | Compliant |

An Officer was accused of not reporting for proscribed training events.

| SARP File Number | Final Disposition | Monitor's Determination |
|---|---|---|
| 201901165 | Preliminary Finding – Exonerated | Not Compliant |

An officer was accused of negligently handling the case of a dog bite. The officer is alleged to have urged the complainant to settle with the dog owner for money instead of proceeding with the case. The officer was never asked if he knew the owner of the dog, had any connection to this person or even if he had suggested an extra-judicial settlement of the case. If he did know the person then he should have excused himself from the investigation and had another officer investigate it.

It seems unlikely that the complainant would allege this if it were not true. What motive would the complainant have to lie? Also, 21 days after the incident, the stepfather alleges that he went to the police station looking for the original incident report and was told it was not yet completed (this could have been a possibility due to the rollout of the digital reporting system).

The case did proceed through the judicial system and was ultimately adjudicated normally. Which is probably why SARP recommended exoneration. The lack of thoroughness of the questioning of the accused officer undermines the exoneration of the case.

| SARP File Number | Final Disposition | Monitor's Determination |
|---|---|---|
| 201901197 | Exonerated | Not Compliant |

This case is an internal matter where Officer A alleges that she and her partner Officer B were assigned a defective vehicle when another unit (Officer C) was assigned a better vehicle. Supposedly, this happened because Officer A had complained against both Officer C and their sergeant. Officer C was allegedly allowed to take the vehicle home for lunch (and medical treatment) and was supposedly told to exchange his vehicle with the Officers A and B afterwards. The exchange never took place.

Officer A filled out an inspection report on the substandard vehicle, on which she claims that she noted the tires were bad. She also noted that neither the air conditioning nor the emergency brake was working. The sergeant claimed that the vehicle inspection comments were added by Officer A at the end of her shift. When asked about this accusation, Officer B replied that he "did not know," which was true. The investigator should have gone into more depth with Officer B to get to the bottom of this accusation, as it involves retaliation. He should also have pressed Officer C concerning the time spent at his house and why he did not give the car over to the other officer as ordered by the sergeant. (It is unclear what time did the sergeant give the order).

This case should never have been exonerated given the scarcity of facts revealed. It is at best a "not sustained" case finding.

CMR-2 Draft | December 2, 2020

| SARP File Number | Final Disposition | Monitor's Determination |
|---|---|---|
| 201901238 | Not Sustained | Compliant |

Case involved two sisters who went to the police station to complain that of one of them had been harassed. They were attended to by a woman officer whose attention was diverted to another case while the women were trying to identify the harasser. When they found his name, they asked the Sergeant to handle the case. The women say that they were treated pedantically, verbally abused, and tossed out of the police station. A percipient witness-officer backs up the sergeant, who had a history of verbal abuse complaints. Investigator recommended unfounded.

Case was closed as NS. Why NS instead of unfounded?

| SARP File Number | Final Disposition | Monitor's Determination |
|---|---|---|
| 201901245 | Not Sustained | Partially Compliant |

The complainant alleges that the police failed to attend to a case involving her 14-year-old grandson, who suffered a broken nose as a result of the failure to execute a 408 order of involuntary confinement (due to mental issues). The complainant called the local police at 2121 hours, during shift change, and a male officer answered. He stated that if it was the mother hitting the child then nothing could be done. He did not send a unit.

The responding officer acknowledges that he took the call but that the caller did not mention that there was a minor involved nor that the minor was cornered and being beaten. The officer alleges that he instructed the caller on how to get a 408 protective order. The caller immediately interrupted him and told him that she now had the child, and she hung up. The supervisor says that the officer answered, but that the complainant hung up on him before he could get her information. The supervisor did not question any other male officers who might have been in the police station at the time of the call.

Given the violent nature of the act and the fact that a minor was involved, the officer should have asked for a callback number or address. Even if the not sustained finding was borne out by the facts, according to Regla 9001 the supervisor could have ordered the officer to be retrained.

| SARP File Number | Final Disposition | Monitor's Determination |
|---|---|---|
| 201901247 | Not Sustained | Compliant |

The officer was alleged to have elbowed the complainant and transported a young person without a car seat. The car seat allegation has been explained and should remain NS. The elbowing could have been sustained because a witness, a lawyer related to his son's stepfather, saw the incident and classified it as hostile. The officer admitted to defensive contact, but he should have avoided the situation by stepping back.

| SARP File Number | Final Disposition | Monitor's Determination |
|---|---|---|
| 201901301 | Not Sustained | Compliant |

A traffic dispute, both witness and accused. The accused was a retired cop who admitted having phone in his hand.

CMR-2 Draft | December 2, 2020

| SARP File Number | Final Disposition | Monitor's Determination |
|---|---|---|
| 201901345 | Exonerated | Compliant |

Complainant involved in an altercation in a supermarket alleged that the police did not properly investigate the incident. The case was well documented, given the circumstances.

| SARP File Number | Final Disposition | Monitor's Determination |
|---|---|---|
| 201901350 | Not Sustained | Partially Compliant |

Technically, the officer should have taken the complaint of a woman whose car had been broken into. A supervisor should have been called because this officer was assigned to report to the Fortaleza during the demonstrations.

A supervisor should have instructed the officer to follow the proper procedure and to take a complaint from any citizen, or to have used better judgement by calling a supervisor.

| SARP File Number | Final Disposition | Monitor's Determination |
|---|---|---|
| 201901357 | Sustained | Compliant |

Insubordination committed by one officer and negligence by a second. Exhaustively documented.

| SARP File Number | Final Disposition | Monitor's Determination |
|---|---|---|
| 201901325 | Sustained | Compliant |

Multiple complaints of noise in a small town. The sergeant and one of his men failed to take action. The two others not involved were cleared.

| SARP File Number | Final Disposition | Monitor's Determination |
|---|---|---|
| 201901403 | Not Sustained | Compliant |

Improper Conduct. The father of a wanted, violent criminal alleges harassment by police officers searching to capture his son.

| SARP File Number | Final Disposition | Monitor's Determination |
|---|---|---|
| 201901416 | Not Sustained | Not Compliant |

The Lieutenant claims that a Sergeant disobeyed orders to stay out of the station and had also disobeyed orders not to work with a subordinate who had made a complaint against him. The secretary said that the Sergeant made changes to his own schedule (permitted) and had also changed his subordinate's schedule.

The record is not clear as to whether the Sergeant assigned his subordinate the same tours of duty as his own.

CMR-2 Draft | December 2, 2020

| SARP File Number | Final Disposition | Monitor's Determination |
|---|---|---|
| 201901468 | Not Sustained | Compliant |

PRPB has no rule against an officer involving himself in situations involving friends, only with family members is this proscribed. There was a question of mental illness involved in this case as well, which undermines the allegation.

| SARP File Number | Final Disposition | Monitor's Determination |
|---|---|---|
| 201901591 | Not Sustained | Not Compliant |

The ex-husband of the child's mother had an arrest warrant for domestic violence issued on 14 November. She tried to lure the man into a local police station under the pretext that he had to pick up his 10-year-old daughter there. According to her, the man was allowed to escape arrest because one of the officers is the man's friend. The officer in question declared that he was not the subject's friend, and when asked if he had a conversation with the subject that day, the officer claimed the subject said to him, "You know what it is," as he fled.

The investigator asked no follow up questions, and the Officer in question was never asked if he communicated with the subject's brother. The officer never asked what he interpreted the suspect's words to meaning. The local police station video was inaccessible.

| SARP File Number | Final Disposition | Monitor's Determination |
|---|---|---|
| 201901622 | Exonerated | Compliant |

This investigation was clearly the best I have reviewed thus far. The investigator went the distance to disprove all of the allegations raised, and therefore was able to exonerate the officers involved.

| SARP File Number | Final Disposition | Monitor's Determination |
|---|---|---|
| 201901060 | Sustained changed to not sustained | Compliant |

This was most likely because the officer was given back a copy of his own complaint so that he could correct or amplify it. Therefore, no privacy violation actually occurred.

| SARP File Number | Final Disposition | Monitor's Determination |
|---|---|---|
| 201901066 | Sustained and NS | Compliant |

Insubordination by an agent towards the Sergeant. Were there cross complaints?
Sergeant—NS. The Agent—Sustained with a 30-day suspension.

| SARP File Number | Final Disposition | Monitor's Determination |
|---|---|---|
| 201901106 | Sustained | Compliant |

An agent took a photograph of the demonstrators at the Fortaleza and posted it on Facebook, mocking the demonstrators.

CMR-2 Draft | December 2, 2020

| SARP File Number | Final Disposition | Monitor's Determination |
|---|---|---|
| 201901228 | Not Sustained | Compliant |

The traffic violator asked to see the radar reading (allowed by law). When he was allowed to view it, he tried to take a cellphone image of it. The officer allegedly pushed him, but the officer denies contact. The officer incorrectly tells the violator that he can only view the radar but cannot photograph it. A fellow officer backs up his partner's statement. The sergeant says that the violator never complained of being pushed.

Suggest a training bulletin to clarify the photography of radar policy.

| SARP File Number | Final Disposition | Monitor's Determination |
|---|---|---|
| 201901257 | Not Sustained | Compliant |

The complainant alleges that she was stopped for using a cellphone, and that the officer took a video of her, posting it on social media. The officer denies doing so and claims that several bystanders took video footage, and alleges that one of these people uploaded the video to social media.

| SARP File Number | Final Disposition | Monitor's Determination |
|---|---|---|
| 201901255 | None | Compliant |

Domestic violence and abuse. Very well investigated in Mayagüez.

| SARP File Number | Final Disposition | Monitor's Determination |
|---|---|---|
| 201901260 | Exonerated | Not Compliant |

The letter to the complainant from the Commissioner states that the case is "dismissed," but it should have said that "the alleged conduct did occur and was appropriate, given the circumstances, and therefore was Exonerated." The investigator's findings start off by saying that the officer "no incurrio" in violations. Only at the end of this section is the officer exoneration mentioned.

| SARP File Number | Final Disposition | Monitor's Determination |
|---|---|---|
| 201901269 | Sustained | Compliant |

Supposedly, officers got involved in a civil repossession case. These officers allegedly threatened to arrest the possessor of the vehicle. The vehicle was owned by another PRPB officer's son who gave it to the complainant with the understanding that she would make the payments on the vehicle.

This case was well-investigated and documented.

| SARP File Number | Final Disposition | Monitor's Determination |
|---|---|---|
| 201901277 | Exonerated | Not Compliant |

A letter from the Commissioner to one officer says "exonerated" when it should state "unfounded." This is a problem in the Legal Affairs Office or Commissioner's Office.

This case was a well-investigated.

| SARP File Number | Final Disposition | Monitor's Determination |
|---|---|---|
| 201901307 | Not Sustained | Compliant |

The Monitor reviewed this case remotely. While the case seems well-investigated, it appears as though it could have been sustained. This is because the Captain's extensive record of sexual harassment allegations clearly shows a tendency towards sexual aggression. The Monitor brought this to a Commander's attention, and she decided to have this captain retrained on sexual harassment.

| SARP File Number | Final Disposition | Monitor's Determination |
|---|---|---|
| 201901341 | | Compliant |

The Commissioner's letters to the complainant and officer don't correspond with the findings. The case was not sustained. The letter to the accused said the case showed the conduct did not occur, the letter to the complainant said correctly that the conduct could not be proven.

| SARP File Number | Final Disposition | Monitor's Determination |
|---|---|---|
| 201901370 | Not Sustained | Compliant |

This was a Domestic Violence case. A protective order was involved. There was a disputed allegation of rude insults made by the wife against the officer-husband. There was no violence involved.

| SARP File Number | Final Disposition | Monitor's Determination |
|---|---|---|
| 201901517 | Not Sustained | Compliant |

The case was Not Sustained against both officers for unlawful search. The investigator did a great job in discovering that the percipient witnesses contradicted the complainant, who was not present.

| SARP File Number | Final Disposition | Monitor's Determination |
|---|---|---|
| 201901586 | Sustained | Compliant |

Police Cadet traveled outside PR without turning in firearm and was AWOL.

| SARP File Number | Final Disposition | Monitor's Determination |
|---|---|---|
| 201901194 | Not sustained against 2 officers; sustained against 4 officers. | Not Compliant |

The investigator noticed deficiencies in the PRPB GOs 300-307 and 100-101 which need to be better defined to clearly establish the protocols to follow.

One observation made was that one of the lieutenants was not questioned about an allegation received via an anonymous letter. The letter alleged that he and the other lieutenants were calling sergeants into their office to collude testimony before they went to SARP. The lack of thorough questioning of the Lieutenant in a case where retaliation is alleged is very troubling.

CMR-2 Draft | December 2, 2020

## Appendix F: Compliance Tables for Paragraphs Assessed in CMR-2

## Use of Force, Paragraphs 22-57

| Paragraph 22 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| **Paragraph Language** | PRPD officers shall use force in accordance with the rights, privileges, and immunities secured or protected by the Constitution or laws of the United States and the Commonwealth of Puerto Rico, and shall prohibit the use of unreasonable force. PRPD shall develop policies and procedures that enable officers to rely primarily on non-force techniques to effectively police; use force only when necessary; and de-escalate the use of force at the earliest possible moment. | |
| **Compliance Target(s)** | Compliance is determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 23-57, and (2) the results of outcome assessments, pursuant to Paragraph 243. | |
| **Comments & Recommendations** | Despite broad compliance, problems remain, e.g., there have been an inordinate number of firearm discharges at or from moving vehicles. | |

| Paragraph 23 | Assessment Frequency | Overall Compliance Status | |
|---|---|---|---|
| | Annually | Partially Compliant | |
| **Paragraph Language** | PRPB complies with applicable law and comports with generally accepted policing practices. The comprehensive use of force policy shall categorize all reportable uses of force into multiple levels, grouped by degree of seriousness, and shall include all force techniques, technologies develop a comprehensive and agency-PRPD shall wide use of force policy that, and weapons, both lethal and less-lethal, that are available to PRPD officers, including officers assigned to specialized tactical units. The comprehensive use of force policy shall clearly define and describe each force level option and the circumstances under which each force level is appropriate. The highest level of force described by the policy shall include all serious uses of force, as defined in this Agreement. | | |
| **Compliance Target(s)** | **Compliance Target** | | **Status** |
| | | | Yes ☐ |
| | Policies incorporate all of the requirements of Paragraphs 22-24. | | No ☒ |
| **Comments & Recommendations** | PRPB must revise the practice of assigning one complaint number to all uses of less-than-lethal weapons at a demonstration/protest. This practice is technically consistent within PRPB policy, but not in keeping with generally accepted policing practices. Therefore, the Monitor recommends that PRPB revise their policy to curtail this practice. | | |

| Paragraph 24 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Partially Compliant |
| Paragraph Language | PRPD shall develop comprehensive and agency-wide policies that comply with applicable law and comport with generally accepted policing practices concerning the use of: (a) lethal force; (b) firearms; (c) canines; (d) ECWs; (e) chemical agents; (f) less lethal munitions; (g) batons and impact weapons; and (h) any other force technology, weapon, or implement authorized by PRPD during the life of this Agreement. PRPD shall also develop a policy on sharing information with the public regarding serious uses of force and the dissemination of information to family members of civilians involved in a use of force incident. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | | Yes ☐ |
| | Policies incorporate all of the requirements of Paragraphs 22-24. | No ☒ |

| Comments & Recommendations | Rating based on underreporting use of force incidents & deficient FIU investigations into firearm discharges by members of PRPB. These lapses indicate that there is need for revisions to the relevant policies to bring UOF reporting fully in line with the Agreement. |
|---|---|

| Paragraph 25 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Substantially Compliant |
| Paragraph Language | PRPD shall continue to prohibit the use of Chloroacetophenone (commonly referred to as "CN gas"). | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | | Yes ☒ |
| | 1. Policy prohibits use of CN gas. | No ☐ |
| | 2. No supply of CN gas is identified in armories or other locations through unannounced site visits. | Yes ☒ No ☐ |
| | 3. No supply of CN gas is identified in armories or other locations through inspections. | Yes ☒ No ☐ |
| | | Yes ☒ |
| | 4. CN gas is never used by STUs. | No ☐ |

| Comments & Recommendations | |
|---|---|

| Paragraph 26 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Substantially Compliant |
| Paragraph Language | PRPD shall maintain an accurate, current list of officers who successfully qualify with their regulation firearm, including any other firearm that officers are authorized to use or carry. Officers who fail to re-qualify shall be relieved of police powers and immediately relinquish all firearms, including personal firearms. Those officers who fail to re-qualify after remedial training within a reasonable time shall be subject to disciplinary action. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | | Yes ☒ |
| | 1. Policies incorporate all of the requirements of the paragraph. | No ☐ |
| | 2. All officers on the qualification list are qualified and certified on the use of firearms in accordance with policy. | Yes ☒ |

CMR-2 Draft | December 2, 2020

| | | No ☐ |
|---|---|---|
| | 3. All officers who fail the qualification re-test on the same day are relieved of operational duty, disarmed, and summoned for re-training before leaving the Academy. | Yes ☒ <br> No ☐ |
| | 4. All officers who fail to qualify after re-training remain relieved of operational duty, remain disarmed, and are referred for disciplinary action. | Yes ☒ <br> No ☐ |
| | 5. All officers are disciplined for failing to qualify after re-training or have a valid justification for not qualifying in accordance with policy. | Yes ☒ <br> No ☐ |
| | 6. All officers with more than one regulation firearm are qualified in all authorized firearms. | Yes ☒ <br> No ☐ |
| **Comments & Recommendations** | | |

| Paragraph 27 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| **Paragraph Language** | PRPD shall develop policies on the use of force by members of specialized tactical units ("STUs"). This policy shall be consistent with PRPD's agency-wide use of force policy. | |
| **Compliance Target(s)** | **Compliance Target** | **Status** |
| | 1. Policies incorporate all of the requirements of the paragraph. | Yes ☒ <br> No ☐ |
| | 2. All use of force training involving STUs is consistent with approved policies. | Yes ☒ <br> No ☐ |
| | 3. 95% of officers are trained and certified in all use of force policies involving STUs, or are scheduled for training, in the case of mid-year review. | Yes ☒ <br> No ☐ |
| | 4. 95% of uses of force by STU officers are within policy. | Yes ☐ <br> No ☒ |
| **Comments & Recommendations** | PRPB must revise the practice of assigning one complaint number to all uses of less-than-lethal weapons at a demonstration/protest. This practice is technically consistent within PRPB policy, but not in keeping with generally accepted policing practices. Therefore, the Monitor recommends that PRPB revise their policy to curtail this practice. | |

| Paragraph 28 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Substantially Compliant |
| **Paragraph Language** | PRPD shall prohibit STUs from conducting general patrol and policing functions. | |
| **Compliance Target(s)** | **Compliance Target** | **Status** |
| | 1. Policies incorporate all requirements of the paragraph. | Yes ☒ <br> No ☐ |
| | 2. Training involving STUs is consistent with approved policies. | Yes ☒ <br> No ☐ |
| | 3. 95% of STU officers are trained and certified in STU policies, or are scheduled for training, in the case of mid-year reviews. | Yes ☒ <br> No ☐ |

CMR-2 Draft | December 2, 2020

| | | |
|---|---|---|
| | 4. Presentation of data on STU deployments and activations. | Yes ☒<br>No ☐ |
| | 5. 95% of all STU deployments/activations for general patrol and policing functions are justified within policy. | Yes ☒<br>No ☐ |
| | 6. 95% of all assignments of individual STU officers to general patrol and policing functions are justified and carried out within policy. | Yes ☒<br>No ☐ |
| **Comments & Recommendations** | There were no instances discovered in which STUs were assigned to general patrol. | |

| Paragraph 29 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Partially Compliant |
| **Paragraph Language** | PRPD shall develop eligibility criteria and selection devices for assignment to STUs that emphasize demonstrated capacity to carry out the mission of STU in a constitutional manner. Officers assigned to STUs who are unable to maintain eligibility shall be removed from STUs. Assignments to STUs shall be for a determined period, as specified by PRPD policy, unless there are extenuating circumstances that justify an extended assignment. | |
| **Compliance Target(s)** | **Compliance Target** | **Status** |
| | 1. Policies incorporate all of the requirements of the paragraph. | Yes ☒<br>No ☐ |
| | 2. Training for evaluation boards is consistent with approved policies. | Yes ☒<br>No ☐ |
| | 3. 95% of evaluation board members are trained. | Yes ☒<br>No ☐ |
| | 4. All officers selected to STUs meet eligibility requirements. | Yes ☐<br>No ☒ |
| | 5. All officers assigned to STUs who do not maintain eligibility are removed from STUs. | Yes ☒<br>No ☐ |
| | 6. 95% of all extensions of STU assignments are justified as extenuating circumstances within policy. | Yes ☒<br>No ☐ |
| **Comments & Recommendations** | Sampled data found one officer serving on DOT Arecibo who was not eligible. Though the officer served in an administrative capacity, this transfer does not comport with PRPB policy or the Agreement. | |

| Paragraph 30 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Substantially Compliant |
| **Paragraph Language** | PRPD shall require STUs to document in writing all law enforcement activities to include operational plans and after-action reports prepared in consistent formats for all call-outs and deployments. Supervisors shall review the law enforcement activities of STUs periodically to ensure compliance with applicable laws and PRPD policies and procedures. | |
| **Compliance Target(s)** | **Compliance Target** | **Status** |
| | 1. Policies incorporate all of the requirements of the paragraph. | Yes ☒<br>No ☐ |
| | 2. Training for STUs is consistent with approved policies. | Yes ☒<br>No s☐ |

CMR-2 Draft | December 2, 2020

| | | |
|---|---|---|
| 3. 95% of law enforcement activities by STUs, including deployments and activations, are documented within policy. | Yes ☒ No ☐ | |
| 4. 95% of law enforcement activities by STUs, including deployments and activations, are reviewed by supervisors. | Yes ☒ No ☐ | |
| **Comments & Recommendations** | Note: The SWAT Division is a support unit for both the Puerto Rico Police Bureau and Federal Agencies, and therefore, is covered under their Operations Plan. | |

| **Paragraph 31** | **Assessment Frequency** | **Overall Compliance Status** |
|---|---|---|
| | Bi-annually | Partially Compliant |
| **Paragraph Language** | PRPD shall track the number of STU deployments, the reason for each activation and deployment of STU, the legal authority, including type of warrant, if any, for each activation and deployment of STU, and the result of each activation and deployment of STU, including: (a) the approximate location of the STU deployment; (b) the number of arrests made; (c) the type of evidence or property seized; (d) whether a forcible entry was made; (e) whether force was used by an STU member or other officer; and (f) whether a person was injured or killed by an STU member. | |
| **Compliance Target(s)** | **Compliance Target** | **Status** |
| | 1. The STU tracking system accounts for all elements in the paragraph and outcome measures as required by Paragraph 243. | Yes ☐ No ☒ |
| | 2. The STU tracking system is accurate and current; all deployments are tracked. | Yes ☐ No S☒ |
| **Comments & Recommendations** | The SWAT reported thirteen uses of force between 7/1/19 and 11/30/19 as required by Paragraph 31 point (e). However, these incidents did not appear in the use of force numbers reported by FIU. Therefore, PRPB cannot be considered in substantial compliance with the paragraph requirements that the STU tracking system accounts for all elements in the paragraph and that the STU tracking system is accurate. | |

| **Paragraph 32** | **Assessment Frequency** | **Overall Compliance Status** |
|---|---|---|
| | Bi-annually | Partially Compliant |
| **Paragraph Language** | PRPD shall develop crowd control and incident management policies that comply with applicable law and comport with generally accepted policing practices. | |
| **Compliance Target(s)** | **Compliance Target** | **Status** |
| | 1. Policies incorporate all of the requirements of the paragraph. | Yes ☒ No ☐ |
| | 2. Training on crowd control and incident management is consistent with approved policies. | Yes ☒ No ☐ |
| | 3. 95% of STU officers, supervisors, and other officers are trained and certified in crowd control, or are scheduled for training, in the case of mid-year reviews; 95% of all supervisors are trained in incident management, or are scheduled for training, in the case of mid-year reviews. | Yes ☐ No ☒ |
| | 4. 95% of police responses to unplanned events are within policy. | Yes ☐ No ☐ |
| | 5. 95% of police responses to planned events are within policy. | Yes ☐ No ☒ |

CMR-2 Draft | December 2, 2020

| | | |
|---|---|---|
| 6. 95% of armories inspected by STU supervisors indicate that less lethal weapons and ammunition are controlled and maintained in accordance with policy. | Yes ☒ No ☐ | |
| 7. 95% of armories indicate that less lethal weapons and ammunition are controlled and maintained in accordance with policy. | Yes ☒ No ☐ | |

| | |
|---|---|
| **Comments & Recommendations** | Findings:<br><br>Policies and trainings on crowd control and incident management are in place for crowd control, and all STU personnel and supervisors are receiving training. However, per compliance target 3, less than 95% of PRPB supervisors, bureau-wide, are receiving training in incident management.<br><br>During the Period of Period of Performance for CMR-2, there were no unplanned mass demonstration events to which STU personnel were deployed, so the Monitor's Office was unable to monitor this compliance target.<br><br>PRPB's response to planned mass demonstrations was mostly within policy, but was marred by serious violations in response to the July 2019 demonstrations. On multiple occasions, PRPB personnel used less-than-lethal force in dangerous and indiscriminate ways, often after crowds had already disbursed. Furthermore, per the Monitor's comments on Paragraph 27, PRPB reported these incidents with reports that each covered multiple uses of force committed by PRPB personnel over an extended period of time and multiple city blocks. PRPB policy does not prevent this practice in UOF reporting, but it is not in keeping with generally accepted police practices. These observations will be covered in a special report by the Monitor's Office on the July 2019 protests.<br><br>The Monitor's Office emphasizes that these violations were few in comparison to the total number of STU deployments over the 9-month Period of Performance covered by CMR-2. Nevertheless, they were significant. The Monitor's Office also emphasizes that it did see significant improvement in PRPB response to planned mass demonstrations in January of 2020. |

| **Paragraph 33** | **Assessment Frequency** | **Overall Compliance Status** |
|---|---|---|
| | Bi-annually | Substantially Compliant |
| **Paragraph Language** | The incident management policy shall provide that a ranking officer or other higher-level PRPD official at the scene of a mass demonstration, civil disturbance, or other crowd situation assume command and control and provide approval prior to deploying force as a crowd dispersal technique. | |
| **Compliance Target(s)** | This paragraph is assessed with paragraph 32. | |
| **Comments & Recommendations** | | |

| **Paragraph 34** | **Assessment Frequency** | **Overall Compliance Status** |
|---|---|---|
| | Bi-annually | Substantially Compliant |
| **Paragraph Language** | The crowd control policy shall require the use of crowd control techniques and tactics that respect protected speech and the right to lawful assembly. | |

CMR-2 Draft | December 2, 2020

| Compliance Target(s) | This paragraph is assessed with paragraph 32. |
|---|---|
| Comments & Recommendations | |

| Paragraph 35 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Substantially Compliant |
| Paragraph Language | PRPD policy shall require the assessment of law enforcement activities following each response to a mass demonstration, civil disturbance, or other crowd situation to ensure compliance with applicable laws and PRPD policies and procedures. | |
| Compliance Target(s) | This paragraph is assessed with paragraph 32. | |
| Comments & Recommendations | | |

| Paragraph 36 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| Paragraph Language | PRPD shall develop a Use of Force Reporting Policy and Use of Force Report Form that comply with applicable law and comport with generally accepted policing practices. The Use of Force Reporting Policy will require officers to notify their immediate supervisor following any use of force, prisoner injury, or allegation of excessive force. In cases involving a serious use of force, notification will be within one hour, absent exigent circumstances. | |
| Compliance Target(s) | Compliance Target | Status |
| | 1. Policies and forms incorporate all of the requirements of the paragraph. | Yes ☒ No ☐ |
| | 2. Training on force reporting is consistent with approved policies. | Yes ☒ No ☐ |
| | 3. 95% of officers are trained and certified in force reporting policies (or are scheduled for training, in the case of mid-year reviews) | Yes ☒ No ☐ |
| | 4a. 95% of use of force incidents are notified to immediate supervisors or adequately justified as an exigent circumstance in accordance with policy. | Yes ☐ No ☒ |
| | 4b. 95% of use of force reports are completed within prescribed periods and are documented in accordance with policy. | Yes ☐ No ☒ |
| | 4c. All failures to report use of force are referred to SARP for investigation. | Yes ☐ No ☒ |
| | 4d. 95% of requests for medical services in connection with a use of force are within policy. | Yes ☐ No ☒ |
| | 4e. 95% of force incidents where a civilian is transported to a medical facility indicate that the officer notified the vehicle mileage and that the mileage was recorded. Mileage discrepancies are identified and addressed by supervisors as required by policy. | Yes ☐ No ☒ |
| | 4f. 95% of all use of force reports are submitted to supervisors and SARP within prescribed time frames as required by policy. | Yes ☐ No ☒ |
| | 4g. All use of force reports are stored and maintained by SARP as required by policy. | Yes ☐ No ☒ |

CMR-2 Draft | December 2, 2020

| Comments & Recommendations | Due to the inconsistencies in UOF data previously mentioned, the Monitor was only able to examine five months of data related to use of force. Though PRPB demonstrated high levels of compliance in much of this data, the Monitor's Office is unable to confer a rating of substantial compliance without drawing a representative sample from data for the full 9-month period examined for CMR-2. |
|---|---|

| Paragraph 37 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| Paragraph Language | The Use of Force Reporting Policy shall require all officers to report any use of force in writing in a Use of Force Report Form before the end of the shift. The Use of Force Report shall include: (a) a detailed account of the incident from the officer's perspective; (b) the reason for the initial police presence; (c) a specific description of the acts that led to the use of force, including the subject(s)' behavior; (d) the level of resistance encountered; and (e) a description of every type of force used. The Use of Force Reporting Policy shall explicitly prohibit the use of boilerplate or conclusory language in all reports documenting use of force. Failure to report a use of force or prisoner injury by a PRPD officer shall subject an officer, including supervisors and commanders, to disciplinary action. | |
| Compliance Target(s) | This paragraph is assessed with paragraph 36. | |
| Comments & Recommendations | Use of force reports reviewed indicated that officers reported use of in writing before the end of their shift. However, given the inability to confirm the data relating to the numbers of use of force incidents that occurred during the reporting period, the Monitor's Office can only provide a partial compliance.<br><br>Per the Monitor's comments on Paragraph 27, PRPB must revise the practice of assigning one complaint number to all uses of less-than-lethal weapons at a demonstration/protest. This practice is technically consistent within PRPB policy, but not in keeping with generally accepted policing practices. Therefore, the Monitor recommends that PRPB should promptly revise their policy to curtail this practice. | |

| Paragraph 38 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| Paragraph Language | PRPD policy shall require officers to request medical services immediately when an individual is injured or complains of injury following a use of force. The policy shall also require officers who transport a civilian to a medical facility for treatment to take the safest and most direct route to the medical facility. The policy shall further require that officers notify the communications command center of the starting and ending mileage on the transporting vehicle. | |
| Compliance Target(s) | This paragraph is assessed with paragraph 36. | |
| Comments & Recommendations | In the cases reviewed by the Monitor's Office, the Monitor determine that PRPB requested medical services immediately when an individual was injured. However, given the inability to confirm the data relating to the numbers of use of force incidents that occurred during the reporting period, the Monitor's Office can only provide a rating of partial compliance. | |

135

CMR-2 Draft | December 2, 2020

| Paragraph 39 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | PRPD's Use of Force Reporting Policy shall require that officers submit copies of Use of Force Reports to their immediate supervisor and to SPR for tracking and analysis. SPR shall maintain master copies of these reports in a central location. | |
| Compliance Target(s) | This paragraph is assessed with paragraph 36. | |
| Comments & Recommendations | There is no evidence that there is an effective tracking and analysis system in place. | |

| Paragraph 40 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually for policy compliance and bi-annually for training compliance. | Partially Compliant |
| Paragraph Language | PRPD policy shall specify that the conduct of all force reviews and investigations comply with applicable law and comport with generally accepted policing practices. All force reviews and investigations shall, to the extent reasonably possible, determine whether the officers' conduct was justified and within PRPD policy. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. The policy incorporates all of the requirements of the policy. | Yes ☒<br>No ☐ |
| | 2. Training on force reviews and investigations is consistent with approved policies. | Yes ☐<br>No ☒ |
| | 3. 95% of officers are trained and certified in force reviews and investigation policies in accordance with their rank or assignment to FIU, or are scheduled for training, in the case of mid-year reviews. | Yes ☒<br>No ☐ |
| Comments & Recommendations | The Monitor determined that existing trainings were insufficient, and PRPB committed to providing FIU investigators with additional training. However, the Monitor's Office has not received any evidence that additional training was administered, and FIU Firearm Discharge Investigations continue to be deficient. | |

| Paragraph 41 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually related to the tracking system; annually related to the annual report; and quarterly related to site visits to the Radio Control Center. | Not Compliant |
| Paragraph Language | PRPD shall be responsible for maintaining a reliable and accurate tracking system on all officers' use of force; all force reviews carried out by supervisors; all force investigations carried out by Force Investigation Units ("FIU"); and all force reviews conducted by Force Review Boards ("FRB") and the Superintendent's Force Review Board ("SFRB"). At least annually, PRPD shall analyze data on officers' use of force to determine significant trends, identify and correct deficiencies revealed by this analysis, and document its findings in a public report. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Tracking system accounts for all of the elements in the paragraph and outcome measures as required by Paragraph 243. | Yes ☐<br>No ☒ |
| | 2. All uses of force are tracked in the tracking system. | Yes ☐<br>No ☒ |

CMR-2 Draft | December 2, 2020

| | | |
|---|---|---|
| | 3. Annual use of force reports provide meaningful data analysis, identify significant trends, discuss corrective action (if necessary), and present supportable findings based on accurate and current data, as required by policy. | Yes ☐ No ☒ |
| | 4. Records maintained by the Radio Control Center on use of force are consistent with data in the use of force tracking system. | Yes ☐ No ☒ |
| **Comments & Recommendations** | PRPB has not provided any evidence that it has properly maintained a reliable and accurate tracking system on all officers' use of force. See the Chief Monitor's comments on PRPB's ability to maintain accurate use of force numbers. | |

| **Paragraph 42** | **Assessment Frequency** | **Overall Compliance Status** |
|---|---|---|
| | Bi-annually | Not Compliant |
| **Paragraph Language** | The quality of force reviews, force investigations, and investigation reviews shall be taken into account in the performance evaluations of the officers performing such investigations and reviews. | |
| **Compliance Target(s)** | This Paragraph is assessed with Paragraphs 145-146 on Performance Evaluations. | |
| **Comments & Recommendations** | The Monitor has seen no effort on the part of PRPB to include this information in the Supervisor's evaluation. | |

| **Paragraph 43** | **Assessment Frequency** | **Overall Compliance Status** |
|---|---|---|
| | Bi-annually | Substantially Compliant |
| **Paragraph Language** | A supervisor shall respond to the scene of a serious use of force or allegation of excessive force involving an officer under his/her command upon notification of the incident. | |
| **Compliance Target(s)** | This paragraph is assessed with Paragraphs 48-52. | |
| **Recommendations** | | |

| **Paragraph 44** | **Assessment Frequency** | **Overall Compliance Status** |
|---|---|---|
| | Bi-annually | Partially Compliant |
| **Paragraph Language** | The supervisor shall conduct a supervisory review of all uses of force, prisoner injuries, or allegations of excessive force, except those incidents involving a serious use of force or force indicating apparent criminal conduct by an officer, which shall be investigated by FIU, SPR, and/or PRDOJ. No supervisor who was involved in the incident, including by participating in, ordering, or authorizing the force being investigated, shall be responsible for the review of the incident. | |
| **Compliance Target(s)** | **Compliance Target** | **Status** |
| | 1. Policies incorporate all of the requirements of the paragraph. | Yes ☒ No ☐ |
| | 2. Training on force reviews and investigations for supervisors is consistent with approved policies. | Yes ☒ No ☐ |
| | 3. 95% of supervisors are trained and certified in force reviews and investigation policies (or are scheduled for training, in the case of mid-year reviews) | Yes ☒ No ☐ |

CMR-2 Draft | December 2, 2020

| | | |
|---|---|---|
| | 4a. 95% of use of force incidents classified as Level 1-3 are reported, reviewed, and investigated by supervisors and commanders within policy. | Yes ☐ No ☒ |
| | 4b. 95% of supervisory force reviews are completed within five business days or have valid justifications for longer periods, based on exceptional circumstances. | Yes ☐ No ☒ |
| | 4c. All use of force reviews and investigations by supervisors reach reasonably justified conclusions on officers' conduct and recommend disciplinary or corrective action, as necessary, in accordance with policy. | Yes ☐ No ☒ |
| | 5a. 95% of reviews by Force Review Boards are within policy. | Yes ☐ No ☒ |
| | 5b. The use of force tracking system accounts for all Force Review Board reports and underlying documents. | Yes ☐ No ☒ |
| | 5c. Force Review Board determinations and recommendations are tracked and analyzed by SPR. | Yes ☐ No ☒ |
| **Comments & Recommendations** | Due to the inconsistencies in UOF data previously mentioned, the Monitor was only able to examine five months of data related to use of force. Though PRPB demonstrated high levels of compliance in much of this data, the Monitor's Office is unable to confer a rating of substantial compliance without drawing a representative sample from data for the full 9-month period examined for CMR-2. | |

| **Paragraph 45** | **Assessment Frequency** | **Overall Compliance Status** |
|---|---|---|
| | Bi-annually | Partially Compliant |
| **Paragraph Language** | Supervisors shall complete use of force reviews within five business days of receiving the officer's use of force report. The reviewing supervisor shall: (a) determine whether the use of force was consistent with PRPD policy and/or raises any policy or operational concerns; (b) review all Use of Force Reports and ensure that all reports include the information required by this Agreement and PRPD policy; (c) document each use of force review promptly using a Supervisor's Force Review Report; and (d) consider whether there are non-punitive corrective actions or training needs. A higher-ranking officer within the investigating supervisor's chain-of-command shall review the Supervisor's Force Review Report for completeness and conformance with PRPD policy. The reviewing officer shall evaluate the investigating supervisor's conclusions and document whether the reviewing officer concurs, disagrees (with an explanation of the disagreement and the alternate conclusion), or defers until further investigation is completed. | |
| **Compliance Target(s)** | This paragraph is assessed with Paragraph 44. | |
| **Comments & Recommendations** | | |

| **Paragraph 46** | **Assessment Frequency** | **Overall Compliance Status** |
|---|---|---|
| | Bi-annually | Partially Compliant |
| **Paragraph Language** | A Force Review Board shall evaluate supervisory reviews, including Supervisor's Force Review Reports and reviewing officers' determinations. FRBs shall be composed of command staff from varying assignments. PRPD policies shall specify the conduct and requirements of FRB proceedings to ensure thorough, timely, and | |

|  | objective reviews. PRPD policy shall establish objective criteria that identify the force levels below serious uses of force that shall be reviewed by FRBs. FRBs shall review supervisory review for completeness, evidentiary support, and compliance with PRPD policy. FRB shall document each FRB proceeding, which shall include findings and recommendations to the regional commander. FRB may also return force reviews to supervisors for additional review, as necessary, to ensure thorough and complete reviews. Copies of all Force Review Reports and underlying documents shall be submitted to SPR for tracking and analysis. |
|---|---|
| Compliance Target(s) | This Paragraph is assessed with Paragraph 44. |
| Comments & Recommendations | All board members from all areas have been properly trained or certified in use of force related policies. |

| Paragraph 47 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
|  | Bi-annually | Partially Compliant |
| Paragraph Language | Whenever a reviewing supervisor, FRB, or other reviewing officer finds evidence of a use of force indicating apparent misconduct or apparent criminal conduct by an officer, he or she shall immediately notify his or her supervisor for referral to the appropriate investigating unit or the PRDOJ. The Superintendent shall be notified of the referral. | |
| Compliance Target(s) | This paragraph is assessed with Paragraph 44. | |
| Comments & Recommendations | | |

| Paragraph 48 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
|  | Bi-annually | Partially Compliant |
| Paragraph Language | PRPD shall ensure that all serious uses of force and allegations of excessive force are investigated fully and fairly by individuals with appropriate expertise, independence, and investigative skills to ensure that uses of force that are contrary to law or policy are identified and appropriately resolved and that policy or operational deficiencies related to the use of force are identified and corrected. To this end, PRPD shall create FIUs to conduct investigations of serious uses of force, uses of force indicating apparent criminal conduct by an officer, uses of force by PRPD personnel of a rank higher than sergeant, or uses of force reassigned to FIU by the Superintendent, his or her designee, SPR, or FRB. PRPD policies shall specify the membership requirements, conduct of investigations, and operational procedures of FIUs. | |
| Compliance Target(s) | Compliance Target | Status |
|  |  | Yes ☒ |
|  | 1. Policies incorporate all of the requirements of the paragraph. | No ☐ |
|  |  | Yes ☒ |
|  | 2. Training for FIU officers is consistent with approved policies. | No ☐ |
|  | 3. 95% of FIU officers are trained and certified in force reporting and investigation, or are scheduled for training, in the case of mid-year reviews. | Yes ☐ No ☒ |
|  |  | Yes ☐ |
|  | 4. All officers assigned to FIU meet eligibility requirements. | No ☒ |

CMR-2 Draft | December 2, 2020

| Comments & Recommendations | PRPB has not provided any documentation indicating that FIU Investigators have received additional training. Furthermore, it is evident that PRPB serious use of force investigations relating to firearm discharges are sub-standard. The Monitor recommends that PRPB ensures that all FIU Investigators receive additional training, especially concerning firearm discharges. |
|---|---|

| Paragraph 49 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |

| Paragraph Language | A supervisor responding to a serious use of force or allegation of excessive force shall immediately notify FIU. FIU shall respond to the scene and commence an investigation. FIU may decline to respond to the scene following consultation and approval by the FIU supervisor. Declinations shall be documented in writing. | |
|---|---|---|
| Compliance Target(s) | Compliance Target | Status |
| | | Yes ☒ |
| | 1. Policies incorporate all of the requirements of the paragraph. | No ☐ |
| | 2a. 95% of use of force incidents classified as Level 4 are reported, reviewed, and investigated by officers, supervisors, commanders, and FIU officers within policy. | Yes ☒ No ☐ |
| | 2b. 95% of FIU investigations are completed within 45 days of the use of force or have valid justifications for longer periods based on exceptional circumstances. | Yes ☒ No ☐ |
| | 2c. All use of force reviews and investigations by FIU reach reasonably justified conclusions on officers' conduct and recommend disciplinary or corrective action, as necessary, in accordance with policy. | Yes ☒ No ☐ |
| | 3a. 95% of reviews by the Commissioner's Force Review Boards are within policy. | Yes ☒ No ☐ |
| | 3b. The use of force tracking system includes all Commissioner's Force Review Board reports and underlying documents. | Yes ☒ No ☐ |
| | 3c. Commissioner's Force Review Board determinations and recommendations are tracked and analyzed by SPR. | Yes ☒ No ☐ |
| Comments & Recommendations | Due to the inconsistencies in UOF data previously mentioned, the Monitor was only able to examine five months of data related to use of force. Though PRPB demonstrated high levels of compliance in much of this data, the Monitor's Office is unable to confer a rating of substantial compliance without drawing a representative sample from data for the full 9-month period examined for CMR-2. | |

| Paragraph 50 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |

| Paragraph Language | FIU shall immediately notify and consult with PRDOJ regarding any use of force indicating apparent criminal conduct by an officer. If PRDOJ indicates that it may proceed criminally, or PRPD requests a criminal prosecution, any compelled interview of the subject officers shall be delayed until after consultation with PRDOJ or expressly permitted by the Superintendent. No other part of the investigation shall be held in abeyance unless specifically authorized by the Superintendent in consultation with PRDOJ. |
|---|---|
| Compliance Target(s) | This paragraph is assessed with Paragraph 48. |

CMR-2 Draft | December 2, 2020

**Comments & Recommendations**

| Paragraph 51 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| **Paragraph Language** | FIU shall complete its administrative use of force investigation within 45 days of the use of force, absent exceptional circumstances. At the conclusion of each use of force investigation, FIU shall prepare a report on the investigation and shall forward the report to SFRB for review and to SPR for tracking and analysis. | |
| **Compliance Target(s)** | This Paragraph is assessed with Paragraph 48. | |
| **Comments & Recommendations** | PRPB has provided additional time to FIU to complete their investigations concerning firearm discharges. If the FIU requires additional time beyond the established 45 days to collect, receive, and analyze evidence then PRPB should consider modifying General Order 500-502 to accommodate for the additional time. | |

| Paragraph 52 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| **Paragraph Language** | The Superintendent's Force Review Board shall evaluate all FIU investigations, including FIU reports and determinations. SFRB shall be composed of senior command staff from varying units. PRPD policies shall specify the conduct and requirements of SFRB proceedings to ensure thorough, timely, and objective reviews. SFRB shall review each FIU investigation for completeness, evidentiary support, and compliance with PRPD policy. SFRB shall document each force review proceeding, which shall include findings and recommendations, to the Superintendent. SFRB may also return force investigations to FIU for additional investigation, as necessary, to ensure thorough and complete investigations. Copies of all Force Review Reports completed by SFRB and underlying documents shall be submitted to SPR for tracking and analysis. | |
| **Compliance Target(s)** | This Paragraph is assessed with Paragraph 48. | |
| **Comments & Recommendations** | The Monitor reviewed four firearm discharges. To date, none of these have been evaluated by CFRB. PRPB policy requires that CFRB investigations be completed within 45 days, which PRPB now acknowledges is insufficient time for completing thorough investigations. Months after these four investigations were opened, FIU had not been provided with the information required to reach a determination as of the time of writing CMR-2. The delay, therefore, was not caused by FIU or CFRB, but still prevents PRPB from being compliant with Paragraph 52.

The Monitor's Office recommends that PRPB review its policy on firearm investigations, and consider providing FIU and CFRB with sufficient time to complete thorough investigations. Furthermore, PRPB must ensure that FIU and CFRB are provided with all facts and information related to each investigation in a timely manner. | |

CMR-2 Draft | December 2, 2020

| Paragraph 53 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |

| Paragraph Language | PRPD shall train all PRPD officers on PRPD's use of force policies. Thereafter, PRPD shall provide all PRPD officers with use of force training at least every two years for the first four years of this Agreement, and annually thereafter. PRPD shall also provide training on use of force as necessary, based on developments in applicable law and PRPD policy. At least annually, PRPD shall assess all use of force policies and training. PRPD's use of force training program shall include the following topics: a) legal standards for reasonable force; b) PRPD's use of force policy; c) reporting use of force, requesting medical service, and preserving evidence; d) scenario-based training and interactive exercises that illustrate proper use of force decision-making; e) the proper deployment and use of all weapons or technologies, including firearms, batons, chemical agents, and ECWs; f) threat assessment and de-escalation techniques that encourage officers to make arrests without using force, and instruction that disengagement, area containment, surveillance, waiting out a subject, summoning reinforcements, calling in specialized units, or delaying arrest may be the appropriate response to a situation, even when the use of force would be legally justified; g) crisis intervention and interacting with people with mental illnesses, including instruction by mental health practitioners and an emphasis on de-escalation strategies; h) factors to consider in initiating or continuing a foot pursuit; and i) appropriate training on conflict management. |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Training on use of force is consistent with approved policies and the requirements of the paragraph. | Yes ☒<br>No ☐ |
| | 2. 95% of officers are trained and certified in use of force, or are scheduled for training, in the case of mid-year reviews. | Yes ☐<br>No ☒ |

| Comments & Recommendations | In response to CMR-1, PRPB reported that they would provide additional training to FIU personnel. PRPB has not provided evidence that the training was developed or that personnel were trained. |
|---|---|

| Paragraph 54 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Substantially Compliant |

| Paragraph Language | PRPD shall provide an appropriate firearm training program that: a) requires officers to complete and satisfactorily pass firearm training and qualify on each firearm the officer is required or authorized to carry on an annual basis; b) requires cadets, officers in probationary periods, and officers who return from unarmed status or extended leave to complete and satisfactorily pass firearm training and qualify on each firearm the officer is required or authorized to carry before such personnel are permitted to carry and use firearms; c) incorporates night training, stress training (i.e., training in using a firearm after undergoing physical exertion), and proper use of force decision-making training, including continuous threat assessment techniques, in the annual in-service |

CMR-2 Draft | December 2, 2020

training program;

d) ensures that firearm instructors critically observe students and provide corrective instruction regarding deficient firearm techniques and failure to utilize safe gun handling procedures at all times; and

e) requires comprehensive testing that shows complete understanding of rules, regulations, and skills regarding firearm use.

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Training on the use of firearms is consistent with approved policies and the requirements of the paragraph. | Yes ☒<br>No ☐ |
| | 2. 100% of officers are trained, certified, and qualified in use of firearms or have a valid justification for not qualifying in accordance with policies. | Yes ☒<br>No ☐ |
| Comments & Recommendations | Requirement: Firearms training (both day and night- time firing) verified via training records provided by PRPB for the entire Bureau. Check random officer's files for compliance and review training curriculum<br><br>PRPB Academy provides firearms training in two yearly sessions with day and night firing. Training is provided by SAEA certified instructors and officers must meet proficiency levels to qualify. | |

| Paragraph 55 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Partially Compliant |
| Paragraph Language | PRPD shall train all supervisors, FIU members, and command officers on PRPD's use of force policies. Thereafter, PRPD shall provide all supervisors, FIU members, and command officers with training on use of force, force investigations, and force investigation reviews at least annually and, as necessary, based on developments in applicable law and PRPD policy. PRPD's use of force training for supervisors, FIU members, and command officers shall include the following topics:<br>a) requesting medical services and determining the appropriate use of force reporting levels;<br>b) identifying and interviewing involved officers, witness personnel, subjects upon whom force was used, and civilian witnesses;<br>c) ensuring proper collection of evidence;<br>d) reviewing use of force and supplemental reports for completeness, accuracy, and quality, including recognizing boilerplate language and document discrepancies;<br>e) assessing the legality and appropriateness of a detention and subsequent arrest;<br>f) legal standards governing the use of reasonable force, including legal standards and requirements for criminal accountability, administrative accountability, and performance improvement related to tactics, training, equipment, and policy sufficiency;<br>g) recommending and administering proper discipline and non-punitive corrective action related to use of force; and<br>h) report writing. | |
| | Compliance Target | Status |

| Compliance Target(s) | 1. Training on the use of force, force investigations, and force investigation reviews is consistent with approved policies and the requirements of the paragraph. | Yes ☒<br>No ☐ |
|---|---|---|
| | 2. 95% of supervisors, FIU officers, and commanders are trained and certified in use of force, force investigations, and force investigation reviews, or are scheduled for training, in the case of mid-year reviews. | Yes ☐<br>No ☒ |
| Comments & Recommendations | See comments for Paragraph 53. | |

| Paragraph 56 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| Paragraph Language | PRPD shall develop policies and procedures to improve its response to individuals in behavioral or mental health crisis, and to minimize the use of unnecessary force against such individuals. To achieve this outcome, PRPD shall, in addition to providing all officers with basic training on responding to persons in behavioral or mental health crisis, implement and train a comprehensive first responder Crisis Intervention Team ("CIT") to develop and maintain specially-trained CIT officers. The CIT shall incorporate the following requirements:<br>a) The CIT shall develop policies and procedures for the transfer of custody or voluntary referral of individuals between PRPD, receiving facilities, and local mental health and social service agencies.<br>b) The CIT policies and procedures shall require that whenever officers encounter juveniles in mental health crisis that officers refer them to appropriate mental health services located in the community.<br>c) The CIT officers shall be assigned to field operations units and maintain their standard patrol duties, except when called to respond to potential behavioral or mental health crisis events where the officers may be required to respond outside of their assigned patrol district. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Policies incorporate all of the requirements of the paragraph. | Yes ☒<br>No ☐ |
| | 2. Training on basic behavioral health is consistent with approved policies and includes general instruction on the CIT program. | Yes ☒<br>No ☐ |
| | 3. 95% of officers are trained and certified in basic behavioral health, or are scheduled for training, in the case of mid-year reviews. | Yes ☐<br>No ☒ |
| | 4. Training on crisis intervention for CIT officers is consistent with approved policies. | Yes ☒<br>No ☐ |
| | 5. 100% of officers assigned to CIT are trained and certified in crisis intervention. | Yes ☒<br>No ☐ |
| | 6. 100% of all officers assigned to CIT meet eligibility requirements. | Yes ☒<br>No ☐ |
| | 7. 95% of responses to incidents involving persons in mental health crisis are within policy. | Yes ☐<br>No ☒ |
| | 8. The incident tracking system tracks all incidents involving persons in mental health crisis and the disposition of the incident. Data analyzed as part of PRPB's annual report on use of force as required by policy. | Yes ☐<br>No ☒ |

CMR-2 Draft | December 2, 2020

| Comments & Recommendations | PRPB has currently implemented a CIT Pilot Project in Arecibo. However, PRPB is behind schedule on implementing CIT Bureau-wide. According to documentation provided by PRPB, only personnel from Arecibo Area Command have been trained as CIT Officers. PRPB needs to address this issue. | |
|---|---|---|

| Paragraph 57 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | PRPD shall train PRPD field operations unit officers in the CIT program and shall ensure that CIT-trained officers are assigned to each shift in each police region. PRPD shall provide crisis intervention training to all dispatchers to enable them to identify calls for service that involve behavioral or mental health crisis events. | |
| Compliance Target(s) | **Compliance Target** | **Status** |
| | | Yes ☐ |
| | 1. 95% of shifts have at least one CIT-trained and certified officer. | No ☒ |
| | 2. Training on crisis intervention for call dispatchers is consistent with approved policies. | Yes ☐ |
| | | No ☒ |
| | 3. 95% of call takers are trained and certified in crisis intervention, or are scheduled for training, in the case of mid-year reviews. | Yes ☐ |
| | | No ☒ |
| Comments & Recommendations | PRPB has not provided any documentation showing that CIT trained Officers have been assigned to each shift in Arecibo. PRPB needs to explain the program and implement compliance with this paragraph. | |

## Search and Seizure and Arrest and Summons, Paragraphs 58-79

| Paragraph 58 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| Paragraph Language | PRPD shall ensure that all investigatory stops, searches, and arrests are conducted in accordance with the rights, privileges, or immunities secured or protected by the Constitution and laws of the United States and the Commonwealth of Puerto Rico. PRPD shall ensure that investigatory stops, searches, and arrests are conducted as part of effective crime prevention strategies that are consistent with community priorities for enforcement. | |
| Compliance Target(s) | Compliance is determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 59-79, and (2) the results of outcome assessments, pursuant to Paragraph 243. | |
| Comments & Recommendations | PRPB has reported to the Monitor that conducting investigatory stops is prohibited by statute. Therefore, there is no data available to be provided to the Monitor and no assessment has been made at this time. | |

| Paragraph 59 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Partially Compliant |
| Paragraph Language | PRPD shall develop policies and procedures that comply with applicable law and comport with generally accepted policing practices on stops, searches, and arrests; provide training; ensure consistent supervision; and hold officers accountable for complying with applicable law and policy. PRPD policies shall define all terms clearly and provide guidance on the facts and circumstances that should be considered in | |

CMR-2 Draft | December 2, 2020

initiating, conducting, terminating, and expanding an investigatory stop, detention, or search.

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | The policy requirements of this paragraph are assessed with Paragraphs 65, 72, 74, and 78. | Yes ☒ <br> No ☐ |
| | Training is assessed as part of Section E (paragraphs78-79) on Training on Stops, Searches, and Seizures. | Yes ☒ <br> No ☐ |
| | Implementation is assessed as part of the compliance reviews for Sections B (paragraphs 60-64), C (paragraphs 65-73), and D (paragraphs 74-77) on Investigatory Stops and Searches, Arrests, and Searches, respectively. | Yes ☐ <br> No ☒ |
| Comments & Recommendations | | |

| Paragraph 60 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Rating Deferred |
| Paragraph Language | PRPD shall develop an Investigatory Stops and Searches Reporting Policy and a system to collect data on all investigatory stops and searches, whether or not they result in an arrest or issuance of a citation. PRPD's stop data collection system shall be subject to the review and approval of the TCA, and shall require officers to document the following: (a) the date, time, location, and duration of the stop and/or search; (b) the reason for the stop and/or search; (c) the subject's apparent race, color, ethnicity or national origin, gender, and age; (d) whether any contraband or evidence was seized, and the nature of the contraband or evidence; and (e) the disposition of the stop, including whether a citation was issued or an arrest made. PRPD shall require that officers submit written reports regarding investigatory stops and searches to their supervisor by end of shift for review. A copy of these reports shall be forwarded to SPR and the Reform Unit for tracking and analysis. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. 100% of stops and searches are justified based on probable cause. For stops and searches based on a lesser standard, or that are otherwise unjustified, PRPB takes corrective or disciplinary action. | Yes ☐ <br> No ☐ |
| | 2. 100% of stops and searches reviewed as part of other areas of the Agreement are based on probable cause. For stops and searches based on a lesser standard or that otherwise unjustified, PRPB takes corrective or disciplinary action. | Yes ☐ <br> No ☐ |
| Comments & Recommendations | PRPB has not authorized investigatory stops (aka "Terry stops") based on reasonable suspicion. Concerning paragraphs 60-64, the Monitor's Office will assess the basis for stops and arrests based on probable cause. | |

| Paragraph 61 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Rating Deferred |
| Paragraph Language | PRPD's Investigatory Stops and Searches Reporting Policy shall explicitly prohibit the use of boilerplate or conclusory language in all reports. PRPD policies shall also expressly prohibit officers from knowingly using or relying on information known to be materially false or incorrect in effectuating an investigatory stop or detention. | |

146

CMR-2 Draft | December 2, 2020

| Compliance Target(s) | This Paragraph is assessed with Paragraph 60. |
|---|---|
| Comments & Recommendations | PRPB has not authorized investigatory stops (aka "Terry stops") based on reasonable suspicion. Therefore, no "Investigatory Stops and Searches reporting policy" exists at this time. The compliance assessment has been deferred until and when such a policy is created and valid. |

| Paragraph 62 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Rating Deferred |
| Paragraph Language | A supervisor shall review each report on Investigatory Stops and Searches to determine whether the stop or search was within PRPD policy and this Agreement. For any investigatory stop or search deemed to be outside of PRPD policy or this Agreement, the supervisor shall determine if the stop or search: (a) should result in an internal investigation by SPR; (b) indicates a need for additional training, counseling, or any other non-punitive corrective measure for the involved officer; and (c) suggests the need for revising or reformulating agency policy, strategy, tactics, or training. The supervisor shall document on an auditable form those investigatory stops and searches that are unsupported by reasonable suspicion; are in violation of PRPD policy or this Agreement; or that indicate a need for corrective action or review of agency policy, strategy, tactics, or training. The quality of these supervisory reviews shall be taken into account in the supervisor's performance evaluations. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 60. | |
| Comments & Recommendations | PRPB has not authorized investigatory stops (aka "Terry stops") based on reasonable suspicion. | |

| Paragraph 63 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Rating Deferred |
| Paragraph Language | A command-level officer or official shall review, in writing, all supervisory auditable forms related to investigatory stops and detentions. The commander's review shall be completed within three business days of receiving the document reporting the event. The commander shall evaluate the corrective action and recommendations in the supervisor's written report and ensure that all appropriate corrective action is taken, including referring the incident for administrative or criminal investigation. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 60. | |
| Comments & Recommendations | PRPB has not authorized investigatory stops (aka "Terry stops") based on reasonable suspicion. | |

| Paragraph 64 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Rating Deferred |
| Paragraph Language | At least annually, PRPD shall analyze investigatory stop and search data to determine significant trends, identify and correct deficiencies revealed by this analysis, and document its findings in a public report. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 60. | |

CMR-2 Draft | December 2, 2020

| Comments & Recommendations | PRPB has not authorized investigatory stops (aka "Terry stops") based on reasonable suspicion. |
|---|---|

| Paragraph 65 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually with respect to Data Source #1. Bi- annually for all others. | Partially Compliant |

| Paragraph Language | PRPD shall revise its policies on arrests to ensure that they comply with applicable law and comport with generally accepted policing practices. | |
|---|---|---|
| **Compliance Target(s)** | **Compliance Target** | **Status** |
| | 1. Policies and forms incorporate all of the requirements of Paragraphs 59, 65-71. | Yes ☒ No ☐ |
| | 2. 95% of selected arrests are notified and reviewed by supervisors in accordance with approved policies. | Yes ☐ No ☒ |
| | 3. Officers transport arrestees and complete required arrest documentation in accordance with approved policies in 95% of selected arrests. | Yes ☐ No ☒ |
| | 4a. Supervisors respond to injuries and complaints of pain by detainees or arrestees in accordance with approved policies in 95% of selected arrests. | Yes ☐ No ☒ |
| | 4b-e. Supervisors review, document, and take corrective action, including making referrals when necessary, as required by approved policies in 95% of selected arrests. | Yes ☐ No ☒ |
| | 5. Unit commanders review, document, and take corrective action, including making referrals when necessary, as required by approved policies in 95% of selected arrests. | Yes ☐ No ☒ |
| **Comments & Recommendations** | PRPB created GO 600-615 on arrests and summons. The Monitor has reviewed GO 600-615 and determined it complies with applicable laws and generally accepted police practices. The Monitor last reviewed and approved this general order in July 2018. This GO was due for review again in July 2020 and will be assessed in CMR-3. However, many arrest files were missing pertaining forms, including booking sheets and supervisory review forms, among others. | |

| Paragraph 66 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| **Paragraph Language** | PRPD shall require that officers notify the communications command center and a supervisor immediately after an arrest, or as soon as practicable. For felony arrests, or an arrest for obstructing or resisting an officer, PRPD shall require a field supervisor to respond to the scene of the incident and approve the officer's arrest determination, based on the existence of probable cause. If an officer's arrest determination is insufficient, or otherwise unjustified, the supervisor may, if necessary, interview the subject. The supervisor shall take appropriate action to address violations or deficiencies in an officer's arrest determination, including releasing the subject, recommending non-punitive corrective action for the involved officer, or referring the incident for administrative or criminal investigation. If a supervisor is unavailable to respond to the scene or there are exigent circumstances, the officer shall notify his or her immediate supervisor over a recorded channel of the elements of probable cause for the felony arrest or arrest for obstructing or resisting an officer. If the officer's immediate supervisor is | |

CMR-2 Draft | December 2, 2020

| | unavailable, the officer shall notify any field supervisor over a recorded channel of the elements of probable cause for the felony arrest or arrest for obstructing or resisting an officer. |
|---|---|
| **Compliance Target(s)** | This Paragraph is assessed with Paragraph 65. |
| **Comments & Recommendations** | Supervisors respond to arrest scenes and officers do notify Communication Command Centers of arrests. When PRPB includes the Supervisor's arrest review in the files, these indicate that the supervisor was notified through the communications command and he/she responded personally or spoke to the officer by phone. However, most arrest files were incomplete, with 33 files out of 80 missing the supervisor review. Thus, the Monitor could not determine if the officer notified the supervisor in those cases.<br><br>The Monitor has not seen any reports of a supervisor declining an arrest due to lack of probable cause, nor has the Monitor seen any arrest reports for obstructing or resisting an officer among the arrest files submitted to the Monitor this period. |

| **Paragraph 67** | **Assessment Frequency** | **Overall Compliance Status** |
|---|---|---|
| | Bi-annually | Partially Compliant |
| **Paragraph Language** | When transporting an arrestee, officers shall take the safest and most direct route to the booking location. PRPD policy shall require that officers notify the communications command center of the starting and ending mileage on the transporting vehicle, as well as the gender, race, ethnicity, national origin, and apparent age of the arrestee. The officer shall complete all written arrest forms and booking recommendations at the time an arrestee is presented at any PRPD precinct, station, or specialized unit for booking. | |
| **Compliance Target(s)** | This Paragraph is assessed with Paragraph 65. | |
| **Comments & Recommendations** | Arrest reports are completed at time of booking or shortly thereafter before officers end their shifts. However, the Monitor is unaware of how PRPB tracks or records starting and ending mileage, as well as descriptions of the arrestees during transportation. | |

| **Paragraph 68** | **Assessment Frequency** | **Overall Compliance Status** |
|---|---|---|
| | Bi-annually | Partially Compliant |
| **Paragraph Language** | At the time of presentment at a PRPD precinct, station, or specialized unit, a watch commander or supervisor shall visually inspect each detainee or arrestee for injury, interview the detainee or arrestee for complaints of pain, and ensure that the detainee or arrestee receives medical attention from an appropriate medical provider, as necessary. | |
| **Compliance Target(s)** | This Paragraph is assessed with Paragraph 65. | |
| **Comments & Recommendations** | Arrest files that included the Ingress/Egress form, PPR-82/631.1, showed that supervisors inspected arrestees for injuries at time of booking and provided medical assistance when needed. However, of the 80 randomly selected arrest files inspected by the Monitor, 51 were missing the Ingress/Egress form. PRPB must ensure that arrest files are properly completed, including all the pertaining forms and signatures. Monitor to continue to review arrest files. | |

CMR-2 Draft | December 2, 2020

| Paragraph 69 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| Paragraph Language | PRPD shall require that all booking recommendations be personally reviewed and approved in writing in an auditable form by a supervisor as to appropriateness, legality, and conformance with PRPD policies within 12 hours of the arrest, absent exceptional circumstances. Supervisors shall also examine arrest reports and forms related to the arrest for boilerplate or conclusory language, inconsistent information, lack of articulation of the legal basis for the action, or other indicia that the information in the reports or forms is not authentic or correct. Supervisors shall evaluate each incident in which a person is arrested for interfering with a police officer, resisting arrest, assault on a police officer, or other similar charge to determine whether the incident raises any issue or concern regarding the basis for the arrest or implications on training, policies, or tactics. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 65. | |
| Comments & Recommendations | Supervisors review and approve arrests on PPR-880 or PPR-615.1. However, many reports lack documentation of probable cause. When PRPB includes the supervisor's arrest review in the files, supervisors indicate they have reviewed the arrest and indicate approval. However, most arrest files were incomplete and 33 files out of 80 were missing the supervisor review (PPR-880 or PPR-615.1). Thus, the Monitor could not determine if the officer notified the supervisor in those cases and whether the supervisor reviewed and approved the arrest.<br><br>Also, the Monitor detected boiler-plate language in many of the arrests, especially those arrests for Operating Under the Influence (OUI or DWI) submitted by the Transit Units (Patrulla de Carreteras or Autopista) Department-wide.<br><br>PRPB must re-train officers and supervisors on how to properly establish and document probable cause and avoid boiler-plate language. | |

| Paragraph 70 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| Paragraph Language | As part of the supervisory review, the supervisor shall document on an auditable form those arrests that are unsupported by probable cause, are in violation of PRPD policy or this Agreement, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or training. The quality of these supervisory reviews shall be taken into account in the supervisor's performance evaluations. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 65. | |
| Comments & Recommendations | Many arrests forms completed by PRPB officers do not always properly document probable cause. It must be said that in PR arrests are not allowed to be presented in court until the District Attorney reviews it for probable cause and gives the ok. This leads the Monitor to believe that the probable cause existed in the officer's mind but was not properly documented on the police report (PPR-468 or PPR-621.1). This is a training issue that PRPB must address. Additional training on proper way to document probable cause on the incident report PPR-468/PPR-621.1 is recommended. | |

CMR-2 Draft | December 2, 2020

| Paragraph 71 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| Paragraph Language | A command-level officer or official shall review, in writing, all auditable forms related to arrests. The commander's review shall be completed within seven days of receiving the document reporting the event. The commander shall evaluate the corrective action and recommendations in the supervisor's written report and ensure that all appropriate corrective action is taken. Whenever a reviewing supervisor or command-level officer finds evidence of an arrest indicating apparent misconduct or apparent criminal conduct by an officer, he or she shall immediately notify his or her supervisor for referral to the appropriate investigating unit or the PRDOJ. The Superintendent shall be notified of the referral. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 65. | |
| Comments & Recommendations | Police reports examined show that supervisors do respond to arrest scenes when available and arrests are notified to the Communications Command Centers. Supervisors document inspections of arrestees on the arrest forms and take note of any injuries observed and provide medical assistance when needed. Commanders review and sign arrest and supervisor review forms. All booking sheets inspected by the Monitor had the District/Precinct/Unit Director's approval. However, as stated above, many booking sheets and supervisory review forms were missing from the files. Monitor is not aware of any supervisor or command-level reports of misconduct or apparent criminal conduct by an officer. | |

| Paragraph 72 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually with respect to Data Source #1. Bi-annually for all others. | Partially Compliant |
| Paragraph Language | PRPD shall require officers to provide written receipts to individuals whenever property is seized from the individuals. PRPD shall establish procedures that are based on generally accepted policing practices to ensure that all seized property is properly stored and returned, as appropriate. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Policies incorporate all of the requirements of Paragraphs 59 and 72. | Yes ☒<br>No ☐ |
| | 2. Property is seized, stored, and returned, as appropriate, in accordance with approved policies in 95% of selected arrests. | Yes ☐<br>No ☒ |
| | 3. PRPB takes disciplinary or corrective action in response to all sustained complaints where an officer fails to issue a receipt, store, or return seized property in accordance with approved policies. | Yes ☐<br>No ☒ |
| Comments & Recommendations | Forms for Property Inventory, M/V Inventory, Interrogation were created and are utilized by officers when applicable. PRPB provides property inventory form PPR-126/PPR-636.1 for officers to record seized personal property from arrestees which includes a place to sign when property is returned. The few forms that were in the submitted files were properly completed. However, 73 of the 80 files inspected did not include this form. PRPB must ensure arrest files are complete and include all applicable forms. Monitor to continue to review these forms. | |

CMR-2 Draft | December 2, 2020

| Paragraph 73 | Assessment Frequency | | Overall Compliance Status | |
|---|---|---|---|---|
| | Annually | | Not Compliant | |
| Paragraph Language | PRPD shall develop a protocol to seek formal feedback from the prosecutor's office, the public defender's office, and Commonwealth judges on a regular basis regarding the quality of PRPD investigations, arrests, court testimony, and indicia of misconduct and to make operational and policy changes based upon this feedback. In addition, PRPD shall refer to SPR for investigation any information regarding specific incidents of possible officer misconduct received through this protocol. | | | |
| Compliance Target(s) | Compliance Target | | | Status |
| | 1. Interagency agreements and policies incorporate the requirements of the paragraph. | | | Yes ☐ No ☐ |
| | 2. PRPB officers seek and obtain feedback from criminal justice agencies and entities as required by approved agreements and policies. | | | Yes ☐ No ☐ |
| | 3. 100% of alleged misconduct noted in protocol documentation corresponds with a SARP investigation. | | | Yes ☐ No ☐ |
| Comments & Recommendations | PRPB has created a protocol to seek assistance from other criminal justice agencies and institutions, but has not formally received any feedback. PRPB to continue seeking cooperation. | | | |

| Paragraph 74 | Assessment Frequency | | Overall Compliance Status | |
|---|---|---|---|---|
| | Annually with respect to Data Source #1. Bi-annually for all others. | | Substantially Compliant | |
| Paragraph Language | PRPD shall revise its policies on searches to ensure that they comply with applicable law and comport with generally accepted policing practices. PRPD policies shall define all terms clearly and specify procedures for executing search warrants and warrantless searches, including handling, recording, and taking custody of seized property or evidence. | | | |
| Compliance Target(s) | Compliance Target | | | Status |
| | 1. Policies and forms incorporate all of the requirements of Paragraphs 59, 74-77. | | | Yes ☒ No ☐ |
| | 2. Searches are conducted and reviewed by supervisors in accordance with approved policies in 95% of selected searches. | | | Yes ☒ No ☐ |
| Comments & Recommendations | PRPB has created General Order 600-612 which deals with search warrants and warrantless searches. The Monitor, along with the Parties, has reviewed and approved the General Order which is due for next review in May 2021. Continue review/revision as per the Agreement. | | | |

| Paragraph 75 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Substantially Compliant |
| Paragraph Language | PRPD shall require that a supervisor review and approve in writing each request for a search or arrest warrant, including each affidavit or declaration before it is filed by an officer in support of a warrant application, for appropriateness, legality, and conformance with PRPD policy. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 74. | |

CMR-2 Draft | December 2, 2020

| Comments & Recommendations | All randomly selected search warrants written by PRPB Units and reviewed by the Monitor have well documented probable cause and supporting evidence. The affidavits go through an approval process that includes the officer's immediate supervisor, Commander, and the District Attorney before being presented to a Judge for final approval. |
|---|---|

| Paragraph 76 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually with respect to Data Source #2, and Annually for all others. | Not Compliant |

| Paragraph Language | PRPD shall track each search warrant, the case file where a copy of such warrant is maintained, the officer who applied for the warrant, and each supervisor who reviewed the application for a search warrant. | |
|---|---|---|

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Tracking system accounts for all of the elements in the paragraph and outcome measures as required by Paragraph 243. | Yes ☐<br>No ☒ |
| | 2. All search warrants are tracked in the tracking system. | Yes ☐<br>No ☒ |
| | 3. Documentation on search warrants is maintained in accordance with approved policies in 95% of precincts and units visited. | Yes ☐<br>No ☒ |

| Comments & Recommendations | PRPB has not set up a tracking system for search warrants. |
|---|---|

| Paragraph 77 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |

| Paragraph Language | PRPD shall require officers to obtain and document consent from an individual who consents to a voluntary search of his/her person or vehicle when the search is conducted as part of a routine pedestrian or vehicle stop, unless a non-consensual search is otherwise legally permissible. |
|---|---|

| Compliance Target(s) | This Paragraph is assessed with Paragraph 74. |
|---|---|

| Comments & Recommendations | Consent searches are documented on form PPR-879 (or new form PPR612.1). The Monitor examined 194 search warrant and arrest files randomly chosen covering this period of compliance. Consent searches were conducted in 17 of these cases. Eleven of the 17 forms were properly and completely filled out, five were missing the witness signature, and one was not included in the file. The Monitor's review of documents is on-going. |
|---|---|

| Paragraph 78 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Partially Compliant |

| Paragraph Language | PRPD shall train all PRPD officers on PRPD's stop, search, and seizure policies. Thereafter, PRPD shall provide all PRPD officers with training at least every two years for the first four years of this Agreement, and annually thereafter. PRPD shall also provide training on stops, searches, and seizures as necessary, based on developments in applicable law and PRPD policy. PRPD shall coordinate and review all policies and training on stops, searches, and seizures to ensure quality, consistency, and compliance with the Constitution and laws of the United States and the Commonwealth of Puerto Rico, this Agreement, and PRPD policy. PRPD shall conduct regular subsequent reviews of this training at least annually, and |
|---|---|

CMR-2 Draft | December 2, 2020

report its findings. PRPD's training program shall include the following topics:
a) PRPD policies and requirements in this Agreement regarding stops, searches, and seizures;
b) the Fourth Amendment and related law;
c) examples of scenarios faced by PRPD officers and interactive exercises that illustrate proper police practices, methods, and tactics in conducting consensual field interviews, investigatory stops, consent and non-consent searches, and arrests. These training scenarios shall address the difference between various police contacts by the scope and level of police intrusion; between probable cause, reasonable suspicion and mere speculation; and voluntary consent from mere acquiescence to police authority; and
d) comprehensive testing that shows complete understanding of rules and regulations.

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Training on stops, searches and seizures is consistent with approved policies and the requirements of Paragraphs 59, 65-78. | Yes ☒<br>No ☐ |
| | 2. 95% of officers are trained and certified in stops, searches, and seizures or are scheduled for training, in the case of mid-year review. | Yes ☒<br>No ☐ |
| | 3. 95% of relevant trainings are reviewed at least once a year. | Yes ☒<br>No ☐ |
| Comments & Recommendations | PRPB has trained 99.85% of its personnel in search and seizure GO 600-612. The Monitor reviewed and attended some of the classes at the PRPB Academy in person, and subsequently approved the training. GO 600-612 complies with the requirements in the Agreement. The Monitor will continue to make periodic reviews of the training. | |

| Paragraph 79 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Partially Compliant |
| Paragraph Language | PRPD shall train all supervisors and command officers on PRPD's stop, search, and seizure policies. Thereafter, PRPD shall provide all supervisors and command officers with training on reviewing subordinates' stops, searches, and seizures at least annually and, as necessary, based on developments in applicable law and PRPD policy. PRPD shall coordinate and review all policies and training on stops, searches, and seizures to ensure quality, consistency, and compliance with the Constitution and laws of the United States and the Commonwealth of Puerto Rico, this Agreement, and PRPD policy. PRPD shall conduct regular subsequent reviews of this training at least annually, and report its findings. PRPD's training on stops, searches, and seizures for supervisors and command officers shall include the following topics:<br>a) requesting medical services and questioning detainees and arrestees for pain or injury;<br>b) report writing, including reviewing reports on stops, searches, and seizures for completeness, accuracy, and quality, including recognizing boilerplate language and how to document discrepancies;<br>c) assessing the legality and appropriateness of a stop, search, or seizure;<br>d) legal standards governing searches and seizures, including legal standards and requirements for criminal accountability, administrative accountability, and performance improvement related to tactics, training, equipment, and policy sufficiency; and | |

|  | e) recommending and administering proper discipline and non-punitive corrective action related to searches and seizures. | |
|---|---|---|
| **Compliance Target(s)** | **Compliance Target** | **Status** |
|  | 1. Training on stops, searches, and seizures is consistent with approved policies and the requirements of Paragraphs 59, 65-77, and 79. | Yes ☒ <br> No ☐ |
|  | 2. 95% of supervisors and commanders are trained and certified in stops, searches, and seizures, or are scheduled for training, in the case of mid-year reviews. | Yes ☒ <br> No ☐ |
|  | 3. 95% of relevant trainings are reviewed at least once a year. | Yes ☒ <br> No ☐ |
| **Comments & Recommendations** | PRPB has trained 99.85% of its personnel, including supervisors and command staff, in search and seizure GO 600-612. The Monitor reviewed and attended some of the classes at the PRPB Academy in person, and subsequently approved the training. GO 600-612 complies with the requirements in the Agreement. The Monitor will continue to make periodic reviews of the training. | |

## Equal Protection and Non-Discrimination, Paragraphs 84-99

| **Paragraph 84** | **Assessment Frequency** | **Overall Compliance Status** |
|---|---|---|
|  | Bi-annually for Data Sources #3, #4, and #11. Annually for the other Data Sources. | Partially Compliant |
| **Paragraph Language** | PRPD shall incorporate concrete requirements regarding bias-free policing and equal protection into its hiring, promotion, and performance assessment processes, including giving significant weight to an individual's documented history of bias-free policing. PRPD will comply with the non-discrimination requirements of Title VII of the Civil Rights Act of 1964, as amended. | |
| **Compliance Target(s)** | **Compliance Target** | **Status** |
|  | 1. PRPB policies and procedures regarding hiring process comply with the requirements of the Paragraph. | Yes ☒ <br> No ☐ |
|  | 2. Hiring process trainings are consistent with bias-free policing and equal protection provisions of approved policies. | Yes ☒ <br> No ☐ |
|  | 3. 95% of sampled personnel are trained and certified in all policies related to the civilian complaint program or are scheduled for training, in the case of mid-year reviews. | Yes ☐ <br> No ☒ |
|  | 4. 95% of reviewed candidates were selected consistent with approved policies regarding bias-free policing and equal protection. | Yes ☐ <br> No ☒ |
|  | 5. PRPB policies and procedures regarding promotion assessment process comply with the requirements of the Paragraph. | Yes ☒ <br> No ☐ |
|  | 6. Promotion assessment trainings are consistent with bias-free policing and equal protection provisions of approved policies. | Yes ☒ <br> No ☐ |
|  | 7. 95% of sampled personnel are trained and certified in all policies related to the civilian complaint program, or are scheduled for training, in the case of mid-year reviews. | Yes ☐ <br> No ☒ |
|  | 8. 95% of the reviewed promotions were awarded consistent with approved policies regarding bias-free policing and equal protection. | Yes ☐ <br> No ☒ |

CMR-2 Draft | December 2, 2020

| | | |
|---|---|---|
| 9. PRPB policies and procedures regarding performance assessment comply with the requirements of the Paragraph. | Yes ☒ |
| | No ☐ |
| 10. Performance assessment trainings are consistent with bias-free policing and equal protection provisions of approved policies. | Yes ☒ |
| | No ☐ |
| 11. 95% of sampled personnel are trained and certified in all policies related to performance evaluations, or are scheduled for training, in the case of mid-year reviews. | Yes ☐ |
| | No ☒ |
| 12. 95% of performance evaluations reviewed are consistent with approved policies regarding bias-free policing and equal protection. | Yes ☐ |
| | No ☒ |

| Comments & Recommendations | |
|---|---|
| | |

| Paragraph 85 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually/Bi-Annually for various Data Sources. | Not Compliant |
| Paragraph Language | PRPD shall use the National Incident Based Reporting System ("NIBRS") to collect and report crime data. | |
| Compliance Target(s) | Compliance Target | Status |
| | 1. Policies, procedures, and forms/modules incorporate the requirements of the Paragraph. | Yes ☒ |
| | | No ☐ |
| | 2. NIBRS training are consistent with approved policies and procedures. | Yes ☐ |
| | | No ☒ |
| | 3. 95% of sampled PRPB members are trained and certified in NIBRS. | Yes ☐ |
| | | No ☒ |
| | 4. PRPB is using the NIBRS to collect and report crime data. | Yes ☐ |
| | | No ☒ |

| Comments & Recommendations | |
|---|---|
| | |

| Paragraph 86 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually for Data Source #3. Annually for the remaining Data Sources. | Not Compliant |
| Paragraph Language | PRPD shall collect accurate and reliable data on hate crimes on an ongoing basis and shall submit the data to the Federal Bureau of Investigation ("FBI") for analysis and publication in the FBI's Hate Crimes Statistics report in accordance with FBI submission requirements. | |
| Compliance Target(s) | Compliance Target | Status |
| | 1. Policies on criminal investigations incorporate all of the requirements of this Paragraph. | Yes ☒ |
| | | No ☐ |
| | 2. Criminal investigation trainings are consistent with approved policies. | Yes ☐ |
| | | No ☒ |
| | 3. 95% of sampled personnel are trained and certified in all policies related to identifying, collecting, and reporting hate crimes, or are scheduled for training, in the case of mid-year reviews. | Yes ☐ |
| | | No ☒ |
| | 4. PRPB notifies the FBI of all identified instances of hate crimes. | Yes ☐ |
| | | No ☒ |

CMR-2 Draft | December 2, 2020

| 5. 95% of investigations of hate crimes accurately identify and report hate crimes. | Yes ☐<br>No ☒ |
|---|---|
| **Comments & Recommendations** | |

| **Paragraph 88** | **Assessment Frequency** | **Overall Compliance Status** |
|---|---|---|
| | Annually/Bi-Annually for various Data Sources. | Substantially Compliant |
| **Paragraph Language** | PRPD shall develop policies to provide all individuals within the Commonwealth with police services in a non-discriminatory fashion in order to build and preserve trust among community members and more effectively prevent and solve crime. As part of these efforts, PRPD shall seek the assistance of community advocates in widely disseminating to the public its written policies on immigration-related laws. | |
| **Compliance Target(s)** | **Compliance Target** | **Status** |
| | 1. PRPB policies complied with the requirements of the Paragraph. | Yes ☒<br>No ☐ |
| | 2. Trainings on discrimination free policing are consistent with approved policies. | Yes ☒<br>No ☐ |
| | 3. 95% of sampled PRPB members are trained and certified in discrimination free policing. | Yes ☒<br>No ☐ |
| | 4. Pertinent policies on pertinent immigration-related law were widely disseminated to the public. | Yes ☒<br>No ☐ |
| **Comments & Recommendations** | | |

| **Paragraph 89** | **Assessment Frequency** | **Overall Compliance Status** |
|---|---|---|
| | Annually for Data Sources #1 and #2. Bi-annually for all remaining Data Sources. | Substantially Compliant |
| **Paragraph Language** | PRPD shall develop a specific policy to guide officers' interactions with transgender or transsexual individuals that addresses gender identification, gender expression, transportation, processing, housing, and medical treatment. | |
| **Compliance Target(s)** | **Compliance Target** | **Status** |
| | 1. PRPB policies guide officer interactions with transgender or transsexual individuals as required by the Paragraph. | Yes ☒<br>No ☐ |
| | 2. PRPB trainings on interactions with transgender or transsexual individuals are consistent with approved policies. | Yes ☒<br>No ☐ |
| | 3. 95% of sampled PRPB members are trained and certified in policies regarding interactions with transgender or transsexual individuals. | Yes ☒<br>No ☐ |
| | 4. 95% of reviewed PRPB reports suggest compliance with PRPB policies regarding interactions with transgender or transsexual individuals. | Yes ☒<br>No ☐ |
| **Comments & Recommendations** | | |

157

CMR-2 Draft | December 2, 2020

| Paragraph 90 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually for Data Source #5. Annually for the remaining Data Sources. | Not Compliant |
| Paragraph Language | PRPD shall provide all PRPD officers with training on biased-free policing at least every two years for the first four years of this Agreement, and annually thereafter. PRPD shall also provide training on biased-free policing as necessary, based on developments in applicable law and PRPD policy. PRPD's training program shall include the following topics:<br>a) PRPD policies and requirements in this Agreement regarding biased-free policing;<br>b) community perspectives of discriminatory policing;<br>c) constitutional and other legal requirements related to equal protection and unlawful discrimination;<br>d) the protection of civil rights as a central part of the police mission;<br>e) arbitrary classifications and stereotyping based on age, race, color, ethnicity, national origin, religion, gender, disability, sexual orientation, gender identity, gender expression and political ideology or affiliation;<br>f) interacting with diverse populations, including persons who are homeless and economically disadvantaged;<br>g) identification of key decision points where prohibited discrimination can take effect at both the incident and operational planning levels;<br>h) methods, strategies, and techniques to reduce misunderstanding, conflict, and complaints due to perceived bias or discrimination, including community-oriented policing strategies; and<br>i) comprehensive testing that shows complete understanding of rules and regulations. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. PRPB trainings on discrimination free policing are consistent with the requirements of the Paragraph. | Yes ☒<br>No ☐ |
| | 2. 95% of reviewed training records complied with the training frequency requirements of the Paragraph. | Yes ☐<br>No ☒ |
| | 3. 95% of reviewed training curriculums complied with the content requirements of the Paragraph. | Yes ☒<br>No ☐ |
| | 4. Tests accurately assess an understanding of rules and regulations related biased-free policing. | Yes ☒<br>No ☐ |
| | 5. 95% of sampled PRPB members are trained and certified in bias-free policing. | Yes ☐<br>No ☒ |

| Comments & Recommendations | |
|---|---|

| Paragraph 92 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | Within five business days, PRPD shall prepare and provide to PRDOJ and the Puerto Rico Department of the Family the preliminary investigation report prepared in response to each allegation of abuse and mistreatment originating in secure juvenile correctional facilities. Such allegations include physical and mental abuse, | |

| | juvenile on juvenile assaults, staff on juvenile abuse, and excessive use of force by staff. | |
|---|---|---|
| **Compliance Target(s)** | **Compliance Target** | **Status** |
| | All allegations of abuse and mistreatment originating in secure correctional facilities are timely reported to the PRDOJ and the PR Department of the Family. | Yes ☐<br>No ☒ |
| **Comments & Recommendations** | | |

| **Paragraph 93** | **Assessment Frequency** | **Overall Compliance Status** |
|---|---|---|
| | Annually/Bi-Annually for various Data Sources. | Partially Compliant |
| **Paragraph Language** | PRPD shall respond to and investigate reports of sexual assault and domestic violence professionally, effectively, and in a manner free of gender-based bias. PRPD shall appropriately classify and investigate reports of sexual assault and domestic violence, collaborate closely with community stakeholders, and apply a victim-centered approach at every stage of its response. PRPD shall develop policies and procedures on responding to sexual assault and domestic violence, including incidents involving PRPD officers, that comply with applicable law and comport with generally accepted policing practices. | |
| **Compliance Target(s)** | **Compliance Target** | **Status** |
| | 1. Reviewed policies and procedures on responding to sexual assault and domestic violence comply with applicable law and generally accepted policing practices. | Yes ☒<br>No ☐ |
| | 2. Trainings on responding to sexual assault and domestic violence are consistent with approved policies. | Yes ☒<br>No ☐ |
| | 3. 95% of sampled PRPB members are trained and certified in responding to sexual assault and domestic violence consistent with approved policies. | Yes ☐<br>No ☒ |
| | 4. 95% of reviewed sexual assault and domestic violence investigations complied with requirements of the Paragraph. | Yes ☐<br>No ☐ |
| **Comments & Recommendations** | PRPB supplied the Monitor with a list of 69 instructors who were trained and certified in teaching domestic violence investigation. A review of a statistically relevant sample of PRPB sworn officers indicated that 19 out of 82 officers (23%) had not been trained in investigating domestic violence incidents. The same review showed that all 82 officers were trained and certified in sexual assault investigations.<br><br>The Monitor verified that more than 95% of domestic violence investigations were conducted thoroughly and in a manner that complied with the requirements of Paragraph 93. However, the Monitor was unable to review sufficient sexual assault investigations to reach a determination on compliance target 4. | |

| **Paragraph 96** | **Assessment Frequency** | **Overall Compliance Status** |
|---|---|---|
| | Annually/Bi-Annually for various Data Sources. | Substantially Compliant |
| **Paragraph Language** | PRPD shall ensure that its Sex Crimes Investigation Unit is accessible through a hotline that is staffed 24-hours a day with trained responders. | |

CMR-2 Draft | December 2, 2020

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Policy on Sex Crimes Investigation Unit incorporates the requirements of the Paragraph. | Yes ☒<br>No ☐ |
| | 2. Training on response to sex crimes related calls is in accordance with approved policy. | Yes ☒<br>No ☐ |
| | 3. 100% of sampled 24-hour hotline PRPB personnel are trained and certified in responding to sex crimes related calls. | Yes ☒<br>No ☐ |
| | 4. PRPB maintains a staffed 24-hour a day hotline with trained responders for sex crimes. | Yes ☒<br>No ☐ |
| | 5. The manned hotline provides the public access to the Sex Crimes Investigation Unit. | Yes ☒<br>No ☐ |
| Comments & Recommendations | | |

| Paragraph 99 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Not Compliant |
| Paragraph Language | PRPD shall implement measures to respond to reports of domestic violence and sexual assault involving PRPD officers, including disarming officers and assessing their fitness for duty. | |
| Compliance Target(s) | Compliance Target | Status |
| | 1. PRPB policies and procedures implement measures to respond to reports of domestic violence and sexual assault involving PRPB officers, including disarming officers and assessing their fitness for duty. | Yes ☐<br>No ☐ |
| | 2. 95% of reviewed investigations of domestic violence and sexual assault involving a PRPB officers complied with requirements of the Paragraph. | Yes ☐<br>No ☐ |
| Comments & Recommendations | Per the comments on Paragraph 93, the Monitor verified that more than 95% of domestic violence investigations were conducted thoroughly and in a manner that complied with the requirements of Paragraph 93. However, the Monitor was unable to review sufficient sexual assault investigations to reach a determination on Paragraph 99. | |

## Recruitment, Selection, and Hiring, Paragraphs 101-108

| Paragraph 101 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Partially Compliant |
| Paragraph Language | PRPD shall develop a comprehensive recruitment and hiring program that successfully attracts and hires qualified individuals. PRPD shall develop a recruitment policy and program that establishes clear guidance and objectives for recruiting police officers and clearly and transparently allocates responsibilities for recruitment efforts. | |
| Compliance Target(s) | Compliance is determined on two separate, but inter-dependent bases:<br>(1) the implementation of Paragraphs 102-108, and<br>(2) the results of outcome assessments, pursuant to Paragraph 243. | |
| Comments & Recommendations | The Monitor conducted interviews with the Director of the PRPB Human Resources Department and a Colonel and 2nd Lieutenant from the Recruitment Division who | |

support the recruitment plan. According to those interviewed, PRPB has developed a comprehensive recruiting and hiring program and policy to successfully attract qualified candidates. Regulation 9050 (Regulations to Amend Section 12.2 of Article 12 of the Regulations of the Puerto Rico Police) and General Order 501 (Recruitment Board for Cadet Applicants of the Police of Puerto Rico) include this program and policy. The Monitor recommends continuing to ensure recruitment training is consistent with approved policies.

| Paragraph 102 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Partially Compliant |

| Paragraph Language | PRPD shall develop a recruitment plan that includes clear goals, objectives, and action steps for attracting qualified applicants from a broad cross-section of the community. PRPD's recruitment plan shall establish and clearly identify the goals of PRPD's recruitment efforts and the duties of officers and staff implementing the plan. | |
|---|---|---|
| **Compliance Target(s)** | **Compliance Target** | **Status** |
| | 1. Policies and recruitment plans incorporate all of the requirements of Paragraphs 101-103. | Yes ☒ No ☐ |
| | 2. Training on recruitment is consistent with approved policies. | Yes ☒ No ☐ |
| | 3. 95% of sampled personnel are trained and certified in recruitment policies and plans, or are scheduled for training, in the case of mid-year reviews. | Yes ☐ No ☒ |
| | 4a-d, f. PRPB's recruitment plan was developed, implemented, and evaluated in accordance with approved policies on recruitment. | Yes ☒ No ☐ |
| | 4e. 85% of activities required by the recruitment plan and directed at recruiting underrepresented groups were implemented, including any missed activities that are reasonably justified. | Yes ☐ No ☒ |
| **Comments & Recommendations** | The Monitor's office has determined via interviews and documents PRPB has been using Regulation 9050, General Orders #501 and 702, and the Recruitment and Hiring Strategic Plan as working tools in the recruitment process. These documents establish clear objectives for the recruitment of police officers and assign responsibilities of each of the parties in the recruitment process.<br><br>PRPB should continue to give conferences to varied groups to whom they provide verbal and written information to promote the recruitment of candidates of diverse backgrounds. They should also continue to work with the Counsel of the Dominican Republic and representatives of the LGTBQ community in order to help promote recruitment in these communities. | |

| Paragraph 103 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Partially Compliant |

| Paragraph Language | The recruitment plan shall include specific strategies for attracting a diverse pool of applicants including members of groups that have been historically underrepresented in PRPD. A "Recruitment Officer" will be responsible for the development of the plan, together with a working group that includes officers from diverse backgrounds. The working group will also consult with community stakeholders to receive recommended strategies to attract a diverse pool of | |
|---|---|---|

CMR-2 Draft | December 2, 2020

| | |
|---|---|
| | applicants. The plan will include both outreach to the general population and targeted outreach to populations currently underrepresented on the PRPD force including, but not limited to, women and the Dominican population, through media outlets, universities, community colleges, advocacy groups, and other community groups that serve or are likely to reach such populations. The "Recruitment Officer" and his or her staff, as determined by the Superintendent, will be responsible for the implementation of the plan. |
| **Compliance Target(s)** | This Paragraph is assessed together with Paragraph 102. |
| **Comments & Recommendations** | The Monitor's office learned that PRPB uses the Monthly Strategic Plan to set goals and objectives in attracting qualified applicants from a broad section of the community. Director of the PRPB Human Resources Department provided a copy of the Strategic Recruitment Plan for October 2019. This corroborates her explanation of the process.<br><br>The Director of the PRPB Human Resources Department and members of the Recruitment Division stated that there are currently 124 PRPB recruiting officers, adding that she desires that members of the Community Relations Bureau of the 13 police areas to be trained in the future. The Monitor recommends that members of the Community Relations Bureau of the 13 police areas to be trained in the future as recruiters. |

| Paragraph 104 | Assessment Frequency | Overall Compliance Status | |
|---|---|---|---|
| | Annually | Partially Compliant | |
| **Paragraph Language** | PRPD shall develop an objective system to select recruits to enter into UCCJ. The system will establish minimum standards for recruiting and an objective process for selection that employs reliable and valid selection devices that comport with generally accepted policing practice and anti-discrimination laws. | | |
| **Compliance Target(s)** | **Compliance Target** | | **Status** |
| | 1. Policies incorporate all the requirements of Paragraphs 104-07. | | Yes ☒<br>No ☐ |
| | 2. Training on the recruit selection process is consistent with approved policies. | | Yes ☒<br>No ☐ |
| | 3. 95% of sampled personnel are trained and certified in all recruit selection process policies, or are scheduled for training, in the case of mid-year reviews. | | Yes ☐<br>No ☒ |
| | 4a. 100% of recruits meet qualifications required by policy. | | Yes ☐<br>No ☒ |
| | 4b. The recruit selection process was implemented in accordance with approved policies. | | Yes ☐<br>No ☒ |
| **Comments & Recommendations** | See the report provided by the Monitor's Office, Regulations 9050, 310, and 501, current hiring brochure, recruiting flowchart, and the Strategic Plan for Recruitment and Hiring, which were analyzed by the monitoring team.<br><br>A member of the Recruitment Section had agreed to provide the document reflecting the number of applicants to class 229, including those that were accepted and the reason for rejecting other candidates. That document was not provided until September. | | |

162

| Paragraph 105 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Partially Compliant |
| Paragraph Language | PRPD shall establish and publish qualifications for sworn personnel that are consistent with generally accepted policing practice. PRPD shall continue to require a two-year post-secondary degree, or its equivalent, as part of the requirements for sworn personnel. | |
| Compliance Target(s) | This Paragraph is assessed together with Paragraph 104. | |
| Comments & Recommendations | See Report by the Monitor's Office, announcement November 21, 2018, and Regulation 9050. A current hiring announcement for 2020 was also analyzed by the monitoring team. | |

| Paragraph 106 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Partially Compliant |
| Paragraph Language | PRPD shall require all candidates for sworn personnel positions to undergo a psychological, medical, and polygraph examination to assess their fitness for employment with PRPD. | |
| Compliance Target(s) | This Paragraph is assessed together with Paragraph 104. | |
| Comments & Recommendations | According to the Director of the PRPB Human Resources Department, PRPB requires that all candidates applying to become a PRPB Officer undergo a psychological, medical, and polygraph examination to assess their fitness for employment. A member of the monitoring team has also spoken with the psychologist utilized by PRPB for the psychological examination to assess fitness for employment. | |

| Paragraph 107 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Partially Compliant |
| Paragraph Language | PRPD shall assess and revise its policies and practices to ensure thorough, objective, and timely background investigations of candidates for sworn personnel positions based on generally accepted policing practice. PRPD's suitability determination shall include an assessment of a candidate's credit history, criminal history, employment history, use and abuse of controlled substances, and ability to work with diverse communities and act without impermissible bias. Favorable suitability determinations shall expire six months after the determination. | |
| Compliance Target(s) | This Paragraph is assessed together with Paragraph 104. | |
| Comments & Recommendations | According to the Director of PRPB Human Resources, the Office of Safety and Protection performs the Background Investigation of the candidates, including evaluation of each candidate's credit history, criminal history, employment history, use and abuse of controlled substances, and ability to both work with various communities and to carry out duties without prejudice.<br><br>The Monitor recommends that, in the future, a random sampling be conducted by the monitoring team to verify the aforementioned information. The PRPB Recruitment and Hiring Department should establish an information system and utilize technology to support the implementation of this paragraph. | |

CMR-2 Draft | December 2, 2020

| Paragraph 108 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Partially Compliant |
| Paragraph Language | PRPD and the UCCJ shall revise and implement policies and practices related to hiring to ensure that PRPD recruits and cadets do not qualify for civil service employment protections until their aptitude and abilities are properly assessed. | |
| Compliance Target(s) | Policies incorporate all of the requirements of the paragraph. | |
| Comments & Recommendations | The Monitor inquired as to whether PRPB has reviewed and implemented hiring-related policies and practices to ensure that the PRPB recruits and cadets qualify for public service employment protections. This qualification should only be done after a thorough evaluation of their skills and abilities. The Director of the PRPB Human Resources Department confirmed this is to be the current policy and added that this has been instituted in accordance with the General Order. The Director of the PRPB Human Resources Department also stated that the candidates are subject to a probation period, which is required by the General Order and the Regulations. She added that General Order #310 also covers this topic. In the past, PRPB specialists reviewed the rights of candidates during the probation period. General Order# 310 includes the results of their analysis and was reviewed by the monitoring team. | |

## Training, Paragraphs 117-134

| Paragraph 117 | Assessment Frequency | | Overall Compliance Status |
|---|---|---|---|
| | Annually | | Rating Deferred |
| Paragraph Language | PRPD shall ensure that every PRPD officer and employee receives effective and comprehensive training that ensures they understand their responsibilities, the scope of their authority, and PRPD policy, and are able to fulfill these responsibilities and police effectively. Qualified trainers and instructors shall deliver instruction through generally accepted methods and techniques that are approved by UCCJ and are designed to achieve clear and articulated learning objectives. Trainers and instructors shall utilize generally accepted evaluation methods approved by UCCJ to assess proficiency and competency. | | |
| Compliance Target(s) | **Compliance Target** | | **Status** |
| | 1. Policies incorporate all of the requirements of the paragraph related to qualified instructors, instruction delivery, and evaluation methods. | | Yes ☒  No ☐ |
| | 2. Training for trainers and instructors is consistent with approved policies. | | Yes ☒  No ☐ |
| | 3. Instructors and trainers are qualified and certified as required by policy in 95% of selected training courses. | | Yes ☐  No ☐ |
| | 4. Instruction is delivered in accordance with policy in 95% of selected training classes. | | Yes ☐  No ☐ |
| | 5. Evaluation methods are used and documented in accordance with policy in 95% of selected training course files. | | Yes ☐  No ☐ |
| Comments & Recommendations | The PRPB Police Academy's role is to provide foundational police training. A firmly built foundation with proper materials by quality instructors will directly affect the structural integrity and success of the entire department. This must include training | | |

in policy, procedures and directives, standards, assessment tools, centralized training records, core curriculum, appropriate equipment, and guidelines on the use of technology.

The Monitors were able to visit Puerto Rico to observe training methods in the first half of the Period of Performance for CMR-2, but were not able to return during the latter half of the performance period to verify instruction methods in person. As a result of travel restrictions, the Monitor's Office did not make sufficient observations of training methods to reach a determination. However, the Monitors have a number of observations based on the site visits that they were able to conduct. While PRPB is working on these training elements, there is a further need to strengthen training and to establish an unvarying training process. The PRPB Police Academy must give attention to assessments of instructors, centralized training records, use of technology, and appropriate equipment.

| Paragraph 118 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Rating Deferred |
| Paragraph Language | UCCJ shall provide pre-service education and training to candidates for sworn personnel positions in PRPD in accordance with its enabling statute and regulations. To the extent that UCCJ will confer Associate or equivalent degrees recognized by nationally or regionally accredited institutions of higher learning in the continental United States, UCCJ shall maintain its license in good standing from the Puerto Rico Council on Education and attain full accreditation from the Middle States Association of Colleges and Schools within two years of the decision to confer such degrees. | |
| Compliance Target(s) | **Compliance Target** | **Status** |
| | 1. Policies incorporate all of the requirements of Paragraphs 118-121. | Yes ☒ <br> No ☐ |
| | 2. The pre-service training program, including curriculum and related training materials, is consistent with approved policies. | Yes ☐ <br> No ☐ |
| | 3. Training plans and standards are consistent with approved policies. | Yes ☐ <br> No ☐ |
| | 4. 95% of personnel who complete the pre-service training program are trained and certified (or are scheduled for training, in the case of mid-year reviews) in accordance with training plans, standards, and policy. | Yes ☐ <br> No ☐ |
| | 5. The pre-service training curriculum is reviewed and revised in accordance with policy. | Yes ☐ <br> No ☐ |
| | 6. Findings and recommendations of bi-annual reviews of the pre-service training curriculum are submitted to the Commissioner in written reports. | Yes ☐ <br> No ☒ |
| | 7. Needs assessments are conducted in accordance with policy. | Yes ☐ <br> No ☒ |
| Comments & Recommendations | The Monitors were able to visit Puerto Rico to observe training methods in the first half of the Period of Performance for CMR-2, but were not able to return during the latter half of the performance period to verify instruction methods in person. As a result of travel restrictions, the Monitor's Office did not make sufficient observations of training methods to reach a determination. However, the Monitors | |

have a number of observations based on the site visits that they were able to conduct.

| Paragraph 119 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Rating Deferred |
| Paragraph Language | Once candidates meet all educational requirements and eligibility criteria, UCCJ shall establish and provide a pre-service training program for PRPD cadets consisting of at least 900 hours of instruction that comports with generally accepted policing practice with respect to quality and content, and that reflects the requirements of this Agreement. | |
| Compliance Target(s) | This Paragraph is assessed together with Paragraph 118. | |
| Comments & Recommendations | Once candidates meet all criteria they are approved by the Recruitment, Selection, and Hiring Committee and are eligible for the Pre-Training Program for PRPB Cadets. The Recruitment, Selection, and Hiring Committee provided necessary information on qualifications for PRPB Cadets and gave a copy of the requirements to the Federal Monitoring Team. The pre-service training program, consisting of 1,310 hours, including the curriculum and related training materials, is consistent with approved policies.<br><br>The police academy needs to improve data systems so they can provide the monitoring team with the requested data in a timely manner. | |

| Paragraph 120 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Not Compliant |
| Paragraph Language | PRPD and UCCJ shall review and revise its pre-service training curriculum to ensure quality, consistency, and compliance with applicable law, PRPD policy, and this Agreement. PRPD and UCCJ shall conduct regular subsequent reviews, at least semi-annually, and submit their findings and recommendations in written reports to the Superintendent. | |
| Compliance Target(s) | This Paragraph is assessed together with Paragraph 118. | |
| Comments & Recommendations | The Monitor recommends that a report be written explaining the de-escalating action the cadets took towards a role player in a potentially confrontational situation. It is recommended this report be typed or in a computer-generated format for ease of reading. | |

| Paragraph 121 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Partially Compliant |
| Paragraph Language | PRPD and UCCJ shall develop an appropriate training plan and standards including, but not limited to, establishing appropriate passing criteria, attendance, and participation requirements, and valid evaluation methods, to ensure that cadets and officers attain necessary knowledge, skills, and competencies to implement all requirements in this Agreement. PRPD and UCCJ shall conduct regular needs assessments to ensure that training related to the implementation of this Agreement is responsive to the knowledge, skills, and abilities of the cadets and officers being trained. | |

CMR-2 Draft | December 2, 2020

| Compliance Target(s) | This Paragraph is assessed together with Paragraph 118. |
|---|---|
| Comments & Recommendations | The Monitoring team determined that the training plan and standards are consistent with accepted police practices, that the evaluation methods are appropriate, and that cadets and officers are attaining the necessary knowledge, skills, and competencies to implement all requirements of the Agreement. The police academy needs to improve data systems so they can provide the monitoring team with the requested data in a timely manner. |

| Paragraph 122 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Rating Deferred |
| Paragraph Language | PRPD and UCCJ shall select and train qualified officer and academic instructors and shall ensure that only mandated objectives and approved lesson plans are taught by instructors. Instructors shall engage students in meaningful dialogue, role playing, and test taking, as appropriate, regarding particular scenarios, preferably taken from actual incidents involving PRPD officers, with the goal of educating students regarding the legal and tactical issues raised by the scenarios. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Policies incorporate all of the requirements of the paragraph related to qualified instructors, instruction delivery, and evaluation methods. | Yes ☐ No ☐ |
| | 2. Training for trainers and instructors is consistent with approved policies. | Yes ☐ No ☐ |
| | 3. Instructors and trainers are qualified and certified as required by policy in 95% of selected training courses. | Yes ☐ No ☐ |
| | 4. Instruction is delivered in accordance with policy in 95% of selected training classes. | Yes ☒ No ☐ |
| Comments & Recommendations | The Monitor's Office has verified in past observations that PRPB ensures that instructors are trained and certified. However, the Monitors were unable to travel to Puerto Rico to verify the training and qualifications of instructors for the Period of Performance being assessed for CMR-2. Therefore, the Monitor's Office cannot reach a determination of compliance status for CMR-2. | |

| Paragraph 123 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Not Compliant |
| Paragraph Language | PRPD shall develop a field training program that consists of at least 800 hours and that comports with generally accepted policing practice with respect to quality and content, and that reflects the substantive requirements of this Agreement. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Policies incorporate all of the requirements of Paragraphs 123, 126. | Yes ☐ No ☐ |
| | 2. The field training program, including curriculum and related training materials, is consistent with approved policies. | Yes ☐ No ☐ |
| | 3. 95% of personnel who complete the field training program are trained and certified—or are scheduled for training in the case of mid-year reviews—in accordance with approved policies. | Yes ☐ No ☐ |

CMR-2 Draft | December 2, 2020

| Comments & Recommendations | The Monitoring Team asked if Cadets must pass a Field Training Program. The Colonel and Lieutenant explained that once the Cadets graduate, they become Agents and must successfully pass a Field Training Program. They explained that this training consists of 800 hours of work supervised by a mentor Agent (FTO) and that the Superintendency of Field Operations (SAOC) supervises the FTOs. Curriculum information was not submitted to the monitoring team in reference to the FTO program. |
|---|---|

| Paragraph 124 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Not Compliant |

| Paragraph Language | PRPD's policies and procedures on field training shall delineate the criteria and methodology for selecting Field Training Officers ("FTOs"). PRPD shall permit only qualified officers to serve as FTOs. To determine qualifications, PRPD shall consider officer experience, disciplinary history, and demonstrated leadership skills, among other factors. PRPD shall strive to assemble FTOs that represent a broad cross-section of the community. | |
|---|---|---|
| Compliance Target(s) | Compliance Target | Status |
| | 1. Policies incorporate all of the requirements of the paragraph. | Yes ☐ |
| | | No ☐ |
| | 2. Selection devices used by the FTO evaluation boards are consistent with approved policies. | Yes ☐ |
| | | No ☐ |
| | 3. Selected FTOs meet eligibility requirements. | Yes ☐ |
| | | No ☐ |
| | 4. All FTOs who do not maintain eligibility are removed as FTOs in accordance with approved policies. | Yes ☐ |
| | | No ☐ |
| Comments & Recommendations | There is no submission of data pertaining to the selection and appointment of FTOs. | |

| Paragraph 125 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Not Compliant |

| Paragraph Language | PRPD shall ensure that all FTOs receive training in the following areas: management and supervision; community-oriented policing; effective problem-solving techniques; and field communication, among others. FTOs shall be required to maintain, and demonstrate on a regular basis, their proficiency in managing recruits and subordinates, practicing community-oriented policing, and solving problems effectively. | |
|---|---|---|
| Compliance Target(s) | Compliance Target | Status |
| | 1. Policies incorporate all of the requirements of this Paragraph. | Yes ☐ |
| | | No ☐ |
| | 2. Training for FTOs is consistent with approved policies. | Yes ☐ |
| | | No ☐ |
| | 3. 95% of personnel who complete the training for FTOs are certified (or scheduled for training, in the case of mid-year reviews) in accordance with approved policies | Yes ☐ |
| | | No ☐ |
| Comments & Recommendations | There is no submission of data ensuring that all FTOs receive training in key areas. | |

CMR-2 Draft | December 2, 2020

| Paragraph 126 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Partially Compliant |
| Paragraph Language | PRPD shall ensure that recruits in the field training program are trained in a variety of geographic areas within Puerto Rico; in a variety of shifts; and with several FTOs. | |
| Compliance Target(s) | This Paragraph is assessed together with Paragraph 123. | |
| Comments & Recommendations | The Monitoring Team has verified that recruits in the Field Training Program are trained in different shifts and in a variety of geographic areas. It is recommended that all FTOs meet after they pass the FTO program to discuss improvement measures. This recommendation was made several years ago, however, it has not been implemented.<br><br>Though Paragraph 126 is intended to be assessed with 123, which is deferred for CMR-3, the Monitors have verified that PRPB is following the pathway to compliance outlined previously by the Monitors, and is therefore in partial compliance. | |

| Paragraph 127 | Assessment Frequency | Overall Compliance Status | |
|---|---|---|---|
| | Annually | Partially Compliant | |
| Paragraph Language | PRPD shall develop a program to assess FTO performance using appropriate evaluation tools. PRPD shall review and evaluate the performance of FTOs, with re-certification dependent on strong prior performance and feedback from other staff. Any recommendation from a FTO to terminate a trainee during their field training program shall be reviewed and evaluated by the chain of command. | | |
| Compliance Target(s) | **Compliance Target** | **Status** | |
| | 1. The FTO performance assessment program incorporates all of the requirements of the paragraph. | Yes ☒<br>No ☐ | |
| | 2. Training for supervisors evaluating the performance of FTOs is consistent with approved policies. | Yes ☒<br>No ☐ | |
| | 3. 95% of performance assessments for selected FTOs are within policy. | Yes ☐<br>No ☒ | |
| | 4. 95% of personnel files for selected FTOs who were recertified to serve as FTOs are within policy. | Yes ☐<br>No ☒ | |
| | 5. 95% of recommendations by FTOs to terminate a trainee from the field training program are reviewed and evaluated by the chain of command. | Yes ☐<br>No ☒ | |
| Comments & Recommendations | The Monitor's Office has reviewed an evaluation of an FTO by his trainee agent. The Monitor's Office has also reviewed the FTO Manual and found it to be thorough and complete. See comments related to this paragraph in Appendix F of this report for further details. | | |

| Paragraph 128 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Partially Compliant |
| Paragraph Language | PRPD shall create a mechanism for recruits to provide confidential feedback regarding the quality of their field training and their FTO, including the extent to which their field training was consistent with what they learned, and suggestions for changes to training based upon their experience in the FTO program. | |

CMR-2 Draft | December 2, 2020

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Policies incorporate all of the requirements of the paragraph. | Yes ☒<br>No ☐ |
| | 2. Training for relevant personnel includes training on the feedback mechanism. | Yes ☐<br>No ☒ |
| | 3. All relevant personnel are trained on the feedback mechanism. | Yes ☒<br>No ☐ |
| | 4. Feedback and suggestions of recruits is considered when reviewing and revising the field training program. | Yes ☐<br>No ☒ |
| Comments & Recommendations | The PRPB Academy personnel interviewed reported that Trainee Agents have an opportunity to provide feedback on the FTOs. The Monitor's Office confirmed that the feedback system does exist. | |

| Paragraph 129 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Partially Compliant |
| Paragraph Language | PRPD shall establish a mandatory annual in-service training program that consists of at least 40 hours and that comports with generally accepted policing practice with respect to quality and content, and that reflects the requirements of this Agreement. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Policies incorporate all of the requirements of Paragraphs 129-131. | Yes ☒<br>No ☐ |
| | 2. The in-service training program, including curriculum and related training materials, is consistent with approved policies. | Yes ☒<br>No ☐ |
| | 3. 95% of personnel who complete the in-service training program are trained and certified, or are scheduled for training, in the case of mid-year reviews, in accordance with approved policies. | Yes ☐<br>No ☒ |
| | 4. The in-service training program includes training tracks in accordance with approved policies and the Agreement. | Yes ☒<br>No ☐ |
| | 5. Reviews and revisions of the in-service training program are based on multiple factors in accordance with approved policies and the Agreement. | Yes ☒<br>No ☐ |
| Comments & Recommendations | The monitoring team inquired if PRPB provides and requires annual In-Service training of at least 40 hours. All agents received trainings in the Use of Force and Anti-Discrimination annually. However, 23% of agents had not received training on investigating domestic violence, and 72% of agents had not received training on equal protection and non-discrimination. | |

| Paragraph 130 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Not Compliant |
| Paragraph Language | PRPD shall create in-service training tracks for the following groups, including, but not limited to, command staff; lieutenants and sergeants; detectives; narcotics and vice investigators; specialized units; and professional responsibility investigators. | |
| Compliance Target(s) | This Paragraph is assessed together with Paragraph 129. | |
| Comments & Recommendations | In-Service training for all PRPB officers is set at 40 hours, although additional hours of training are given to officers as required by their assignment. However, the in- | |

CMR-2 Draft | December 2, 2020

service training of command staff and specialized units could not be verified by the Monitor's Office through site visits due to travel restrictions.

| Paragraph 131 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Rating Deferred |
| Paragraph Language | PRPD shall identify critical in-service training topic areas based on an analysis of factors that include but are not limited to officer safety issues, community concerns, use-of-force statistics, internal affairs statistics, court decisions, research reflecting the latest law enforcement trends, individual precinct needs, and input from members at all levels of the Department, the Superintendent's Citizens' Interaction Committee ("CIC") and members of the community. | |
| Compliance Target(s) | This Paragraph is assessed together with Paragraph 129. | |
| Comments & Recommendations | Members of the Federal monitoring team have not received documents showing that meetings have taken place where PRPB members have contributed information regarding In-Service training topics. | |

| Paragraph 132 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Not Compliant |
| Paragraph Language | PRPD shall develop a comprehensive training program to supplement the 40-hour formal in-service training that is delivered at the beginning of shifts or tours of duty for all officers. Training may include special topics selected by UCCJ and precinct or unit Commanders that address constitutional policing, officer safety, readiness, community concerns, or departmental procedural matters. | |
| Compliance Target(s) | **Compliance Target** | **Status** |
| | 1. Policies incorporate all of the requirements of the paragraph. | Yes ☐ No ☒ |
| | 2. Monthly meetings are consistent with approved policies and the Agreement. | Yes ☐ No ☒ |
| | 3. 95% of selected monthly meetings comply with approved policies. | Yes ☐ No ☒ |
| Comments & Recommendations | The monitoring team did not receive sufficient evidence to verify that a comprehensive training program is delivered at the beginning of shifts or tours of duty for all officers. A roll call training program should be developed by PRPB. | |

| Paragraph 133 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Not Compliant |
| Paragraph Language | PRPD shall electronically maintain complete and accurate records of current curricula, lesson plans, and other training materials in a central, commonly accessible, and organized file system. | |
| Compliance Target(s) | **Compliance Target** | **Status** |
| | 1. Policies incorporate all of the requirements of the paragraph. | Yes ☒ No ☐ |
| | 2. Training on the storage and preservation of training records and materials is consistent with approved policies. | Yes ☐ No ☒ |
| | 3. Training records and materials are stored and preserved in accordance with approved policies in 95% of selected courses. | Yes ☐ No ☒ |

CMR-2 Draft | December 2, 2020

| Comments & Recommendations | PTMS is not completely developed and more integration of training information between PTMS and the old computer system has not been integrated. Also, PRPB lacks a central, commonly accessible computerized location for curriculum materials. It is important that curriculum materials and training records be accessible to training coordinators at all locations. |
|---|---|

| Paragraph 134 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Not Compliant |
| Paragraph Language | PRPD shall track, maintain, and report detailed, real-time training records and statistics. PRPD shall develop an electronic database to create and maintain records for each recruit and each sworn and unsworn member of the PRPD, including a standard electronic training record and electronic copies of certificates and other materials. The training records shall include the following information: the course description and duration, curriculum, location of training, and name of instructor. PRPD will provide the Superintendent with annual reports, or more often as needed, on training attendance and testing results. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. The electronic database accounts for all of the elements in the paragraph and outcome measures as required by Paragraph 243. | Yes ☐<br>No ☒ |
| | 2. All training records and statistics are tracked in the electronic database. | Yes ☐<br>No ☒ |
| | 3. Training reports provide current and accurate information to the Commissioner. | Yes ☐<br>No ☒ |
| Comments & Recommendations | Follow up site visits conducted by the Monitor's Office demonstrated that PRPB was in some cases tracking, maintaining, and reporting detailed real-time training records but the PTMS system was still not complete and needs further development. | |

## Supervision and Management, Paragraphs 135-158

| Paragraph 135 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Partially Compliant |
| Paragraph Language | PRPD shall ensure that an adequate number of qualified first-line supervisors are deployed in the field to allow supervisors to provide close and effective supervision to each officer under the supervisor's direct command, to provide officers with the direction and guidance necessary to improve and develop as police officers, and to identify, correct, and prevent misconduct. PRPD shall develop policies for supervision that set out clear requirements for supervisors and are consistent with generally accepted policing practices. | |
| Compliance Target(s) | Compliance is determined on two separate, but inter-dependent bases:<br>(1) the implementation of Paragraphs 136-158, and<br>(2) the results of outcome assessments, pursuant to Paragraph 243. | |
| Comments & Recommendations | The Monitor's Office verified that an outside consultant conducted a staff study, V2A, which appears to have been helpful to PRPB. However, the Monitor's Office questions whether any redeployment of assets was made based on the staff study. Redeploying to bring staffing in line with the study would serve to make PRPB more | |

CMR-2 Draft | December 2, 2020

effective and efficient. Information has not been provided to the Monitoring Team verifying that an adequate number of Supervisors have been deployed in the field.

The Monitor recommends revisiting the Staff Study to ensure that proper deployment is being utilized. Supervisors should not be transferred from area to area to supplement a lack of supervisors.

| Paragraph 136 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |

| Paragraph Language | All operational field officers shall be assigned to a single, consistent, and clearly identified supervisor. Supervisors shall be assigned to and shall substantially work the same days and hours as the officers they are assigned to supervise, absent exceptional circumstances. Scheduled leave (such as vacation time), unscheduled leave (such as sick leave due to illness or injury) and other routine absences (such as court appearances and training obligations) shall not be deemed noncompliance with this provision. |
|---|---|

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Policies incorporate all the requirements of Paragraphs 136-140. | Yes ☒<br>No ☐ |
| | 2. Supervision trainings are consistent with approved policies. | Yes ☒<br>No ☐ |
| | 3. 95% of sampled supervisors are trained and certified in all policies related to supervision (or scheduled for training, in the case of mid-year reviews). | Yes ☒<br>No ☐ |
| | 4. Officer and supervisor schedules, assignments, and ratios are consistent with supervision policies. | Yes ☐<br>No ☒ |
| | 5. Supervisors are assigned and deployed in accordance with approved supervision policies. | Yes ☐<br>No ☐ |
| | 6. 95% of interviewed personnel perceive that supervision is close and effective. | Yes ☐<br>No ☒ |
| | 7. 95% of sampled referrals indicate proactive observation and intervention to ensure adherence to policies, law, and the Agreement. | Yes ☐<br>No ☒ |
| Comments & Recommendations | The Monitoring Team has not been provided with information verifying that officer and supervisor schedules, assignments, and ratios are consistent with supervision policies. Further analysis and interviews of personnel need to be conducted by the Monitoring Team to ensure that supervision is close and effective. Further interviews of agents and analysis by the monitoring team must also be done to ensure that 95% of interviewed personnel feel that supervision is close and effective. | |

| Paragraph 137 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |

| Paragraph Language | First-line field supervisors shall be assigned to supervise no more than ten officers for the first five years of this Agreement. After considering the results of the staffing study required by Paragraph 13 and whether the first-line supervisors are meeting all of the supervisory requirements of this Agreement at the current officer to supervisor ratios, the TCA and the Parties shall determine whether to lower the |
|---|---|

| | |
|---|---|
| | number of officers supervised by each first-line field supervisor. On-duty field supervisors shall be available throughout their shift to respond to the field to provide supervision to officers under their direct command and, as needed, to provide supervisory assistance to other units. |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 136. |
| Comments & Recommendations | The Monitoring Team requested evidence that one supervisor oversees 10 individuals. During demonstrations observed by the Monitoring Team it appeared that the supervisors did not have more than 10 agents. The Monitoring Team has yet to see clear evidence that this is the case. Once an automated system is effective, it should be easy for PRPB to generate data from the 13 areas that show each supervisor and his or her subordinates. The monitoring team requests that this information be provided as soon as possible. PRPB needs to improve data systems so they can provide the monitoring team with the requested data in a timely manner. |

| Paragraph 138 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | PRPD shall develop a program to ensure consistent field supervision when assigned supervisors are absent or otherwise unavailable for their tour of duty. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 136. | |
| Comments & Recommendations | While making site visits, the Monitoring Team saw some supervisors being brought from other precincts to supervise. A more complete system should be developed that provide for true supervisors, not acting supervisors, to be deployed in the field. | |

| Paragraph 139 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | Precinct and unit commanders shall closely and effectively supervise the officers under their command. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 136. | |
| Comments & Recommendations | As in other U.S. jurisdictions, supervisors vary. Some supervise closely and effectively, while others are more lenient with their personnel. This observation of PRPB supervision is based on the Monitor's limited site visits conducted prior to the COVID-19 pandemic. Officers with the rank of Sergeant and above should always be an example for their team. Further training on mentoring and career development should be implemented by PRPB. | |

| Paragraph 140 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Rating Deferred |
| Paragraph Language | All PRPD commanders and supervisors shall ensure that all supervisors and officers under their command comply with PRPD policy, Commonwealth of Puerto Rico and federal law, and the requirements of this Agreement. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 136. | |
| Comments & Recommendations | Observation of PRPB supervision is based on the Monitor's limited site visits conducted prior to the COVID-19 pandemic and during assessments of various | |

demonstrations. Commanders and supervisors have greater responsibilities based on their positions, specifically to ensure that officers under their command comply with Bureau policy and law. Further interviews with supervisors and their personnel need to be conducted by the monitoring team.

| Paragraph 141 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Partially Compliant |
| **Paragraph Language** | Each supervisor shall receive mandatory management, supervisory, leadership, and command accountability training, tailored to each level of supervision and command, of no fewer than 40 hours in duration, prior to assuming supervisory responsibilities. Each supervisor shall receive no fewer than 40 hours of in-service training annually thereafter. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Policies incorporate all the requirements of Paragraphs 141-143. | Yes ☒ No ☐ |
| | 2. Supervisor trainings are consistent with Paragraphs 141-143. | Yes ☒ No ☐ |
| | 3. 95% of sampled supervisors are trained and certified in supervision requirements, or are scheduled for training, in the case of mid-year reviews. With respect to Paragraph 142, 100% of PRPB personnel serving as supervisors on or before July 17, 2013, were trained and certified in supervision requirements by October 8, 2018. | Yes ☐ No ☐ |
| **Comments & Recommendations** | Due to travel restrictions, the Monitor's Office was only able to examine a sample of 18 supervisors for the Period of Performance for CMR-2. The sample found no evidence of non-compliance with Paragraphs 141 or 142, but still provided insufficient evidence for the Monitor's Office to reach a determination regarding compliance for CMR-2. <br><br> All PRPB supervisors sampled receive 40 hours of mandatory management, supervisory, leadership, and command accountability prior to assuming their responsibilities. However, of the 18 supervisors sampled, 16 had completed their mandatory 40 hours of in-service trainings, while two were one course short of requirements. These two officers represent 11% of the sample, which exceeds the 5% margin for substantial compliance. Nevertheless, given the small sample size and the compliance on other targets for the paragraph, the Monitor's Office chooses to render a determination of partial compliance. | |

| Paragraph 142 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | One-Time Compliance | Substantially Compliant |
| **Paragraph Language** | All current PRPD supervisors shall receive the supervisor training developed pursuant to this Agreement within 18 months after it is developed and first implemented. | |
| **Compliance Target(s)** | This Paragraph is assessed with Paragraph 141. | |
| **Comments & Recommendations** | All current PRPB supervisors have received the supervisor training developed pursuant to this Agreement or they are not allowed to assume their position. There has been a policy in existence for several years which ensures Supervisors are not | |

allowed to assume their positions until after they were trained. The monitoring team needs to ensure that this policy continues to be followed.

| Paragraph 143 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Partially Compliant |
| Paragraph Language | The supervisory training program shall include, but not be limited to, instruction in the following topics:<br>a) techniques for effectively guiding and directing officers and promoting effective and ethical police practices;<br>b) de-escalating conflict;<br>c) evaluation of written reports;<br>d) investigating officer uses of force;<br>e) responding to and investigating allegations of officer misconduct;<br>f) risk assessment and risk management;<br>g) evaluating officer performance;<br>h) appropriate disciplinary sanctions and non-punitive corrective action; and<br>i) using EIS to facilitate close and effective supervision. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 141. | |
| Comments & Recommendations | The Supervisor Training Program is not complete because supervisors cannot yet use EIS to facilitate close, effective supervision. The platform is not yet completely developed. The EIS system should be implemented by PRPB as soon as possible and the platform fully developed. | |

| Paragraph 144 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Rating Deferred |
| Paragraph Language | Officers appointed to the rank of Lieutenant Colonel, Colonel, commanding officer to a PRPD superintendency or unit, and any other supervisors must receive Equal Employment Opportunity ("EEO") training on PRPD's policies and federal and Commonwealth anti-discrimination laws. This training shall include protocols for supervisors to follow in the event they are made aware of complaints involving discrimination and/or harassment. The training shall also include instruction on PRPD policies prohibiting retaliation against any individual opposing the alleged discrimination or harassment and/or participating in a proceeding or investigation of discrimination or harassment. Supervisors receiving the EEO training shall be evaluated in part based on their knowledge and implementation of the policies, guidance, and laws covered in that training. | |
| Compliance Target(s) | Compliance Target | Status |
| | 1. Policies incorporate all the requirements of this Paragraph. | Yes ☒<br>No ☐ |
| | 2. Supervision trainings are consistent with approved policies. | Yes ☒<br>No ☐ |
| | 3. 95% of sampled personnel are trained and certified in EEO and anti-discrimination laws, or are scheduled for training, in the case of mid-year reviews. | Yes ☐<br>No ☐ |

CMR-2 Draft | December 2, 2020

| | | |
|---|---|---|
| | 4. Supervisor evaluations and SARP investigations indicate that supervisors are implementing policies and training on EEO and anti-discrimination laws in 95% of selected personnel files. | Yes ☐<br>No ☐ |
| **Comments & Recommendations** | Virtual training has been utilized to train officers appointed to the rank of Lieutenant Colonel, Colonel, and Commanding Officer to a PRPB Superintendency or units. Any other supervisors must receive Equal Employment Opportunity ("EEO") training, on PRPB policies, and federal and Commonwealth anti-discrimination laws.<br><br>The Monitor has previously found that PRPB is actively implementing EEO training for all commanding officers of the rank of Colonel and above. The Monitor has further seen evidence that EEO training is being implemented virtually. During interviews, however, one Colonel reported that he had not received this training. Therefore, the Monitor's Office is deferring its rating for Paragraph 144 while verifying the virtual training records to ascertain whether or not PRPB is compliant with the Paragraph. | |

| **Paragraph 145** | **Assessment Frequency** | **Overall Compliance Status** | |
|---|---|---|---|
| | Bi-annually | Not Compliant | |
| **Paragraph Language** | PRPD shall develop and implement a specific system to accurately evaluate the qualifications and performance of all PRPD officers in areas that include, but are not limited to, constitutional policing, integrity, community policing, and critical police functions on both an ongoing and annual basis. PRPD shall develop objective criteria to assess whether officers meet minimum qualifications and performance standards, including officers in inactive status, where appropriate. The evaluation system shall provide for appropriate remedial or disciplinary action. | | |
| **Compliance Target(s)** | **Compliance Target** | | **Status** |
| | 1. Policies incorporate all the requirements of Paragraphs 145-146. | | Yes ☒<br>No ☐ |
| | 2. Training on performance evaluations is consistent with approved policies. | | Yes ☒<br>No ☐ |
| | 3. 95% of sampled personnel files indicate that supervisors are trained and certified on policies regarding performance evaluations, or are scheduled for training, in the case of mid-year reviews. | | Yes ☐<br>No ☒ |
| | 4. 95% of sampled officers meet minimum qualifications and eligibility criteria. | | Yes ☐<br>No ☒ |
| | 5. 95% of sampled performance evaluations adhere to approved policies. | | Yes ☐<br>No ☒ |
| **Comments & Recommendations** | PRPB reports that all supervisors will be required to submit evaluations through the PROMEDIA system by July 2020. As of the Period of Performance for CMR-2, however, this system is not being utilized by supervisors for 95% of performance evaluations. | | |

| **Paragraph 146** | **Assessment Frequency** | **Overall Compliance Status** |
|---|---|---|
| | Bi-annually | Not Compliant |
| **Paragraph Language** | As part of this system, PRPD shall establish a formalized system documenting annual performance evaluations of each officer by the officer's direct supervisor. | |

CMR-2 Draft | December 2, 2020

| | |
|---|---|
| | PRPD shall hold supervisors accountable for completing timely, accurate, and complete performance evaluations of their subordinates. |
| **Compliance Target(s)** | This Paragraph is assessed with Paragraph 145. |
| **Comments & Recommendations** | A revised evaluation system (PROMEDIA) is in process of being implemented. PRPB states in its Bi-Annual Status Report that by July of 2020 all Supervisors were required to conduct performance evaluations using this PROMEDIA system. This timeline is after the March compliance period. The monitoring team needs to further verify compliance with SARP, and the PROMEDIA system should continue to be further developed and accurate with its information. |

| **Paragraph 147** | **Assessment Frequency** | **Overall Compliance Status** |
|---|---|---|
| | Bi-annually | Not Compliant |

| | | |
|---|---|---|
| **Paragraph Language** | PRPD shall develop, implement, and maintain an early identification system ("EIS") to support the effective supervision and management of PRPD officers and employees, including the identification of and response to problematic behaviors as early as possible. PRPD shall regularly use EIS data to promote ethical and professional police practices; to manage risk and liability; and to evaluate the performance of PRPD employees across all ranks, units, shifts, commands, and organization components. | |
| **Compliance Target(s)** | **Compliance Target** | **Status** |
| | 1. Policies incorporate all the requirements of Paragraphs 147-153. | Yes ☒ No ☐ |
| | 2. Training on EIS is consistent with approved policies. | Yes ☒ No ☐ |
| | 3. 95% of sampled supervisors and personnel administering EIS are trained and certified in EIS policies, or are scheduled for training, in the case of mid-year reviews. | Yes ☐ No ☒ |
| | 4. EIS data and records demonstrate compliance with EIS policy for 95% of selected officers who trigger EIS and officers who do not trigger EIS. | Yes ☐ No ☒ |
| | 5. 95% of interviewed officers, supervisors, SARP personnel, and IT staff perceive EIS as an effective supervisory tool that addresses potential problematic behavior in a non-punitive manner. | Yes ☐ No ☒ |
| | 6. EIS is functioning as designed, equipment is in good working order, and information is secure in 95% of selected units. | Yes ☐ No ☒ |
| **Comments & Recommendations** | Training and a policy for EIS have been developed, but the system itself remains in the developmental stage. Four modules are up and running, but access to the system and use of the system remains inconsistent, with some supervisors stating that they cannot access the information.<br><br>The Monitor's Office maintains the position that PRPB can only be considered to be in compliance with Paragraphs 147-153 when EIS is developed to the point where 1) supervisors are readily and consistently able to access the system to enter and retrieve *all* datapoints required by the Agreement and PRPB policy and 2) PRPB leadership and third party overseers are able to conduct data analysis of policing practices and outcomes using the EIS system. | |

CMR-2 Draft | December 2, 2020

PRPB should continue to develop the platform so that supervisors can utilize the information from EIS data and records. This will mean that EIS can become an effective supervisory tool that addresses potentially problematic behavior in a non-punitive manner.

| Paragraph 148 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | The EIS shall include a computerized relational database which shall be used to collect, maintain, integrate, and retrieve detailed data department-wide and for each officer regarding:<br>a) all uses of force;<br>b) injuries to and deaths of persons in custody;<br>c) all complaints and their dispositions;<br>d) data compiled under the stop data collection mechanism;<br>e) all criminal proceedings initiated, as well as all civil or administrative claims filed, that bear upon an officer's performance or fitness including, but not limited to, domestic violence and protective orders;<br>f) all judicial proceedings involving domestic violence, protective orders, and any other judicial proceedings which may be related to an officer's performance;<br>g) all instances in which PRPD is informed by a prosecuting authority that a declination to prosecute any crime was based, in whole or in part, upon concerns about the credibility of a PRPD employee or that a motion to suppress evidence was granted on the grounds of a constitutional violation by a PRPD employee;<br>h) all disciplinary action taken against employees;<br>i) all non-punitive corrective action required of employees;<br>j) all awards and commendations received by employees;<br>k) training history for each employee; and<br>l) identifying information for each PRPD officer and employee and;<br>m) demographic data for each civilian involved in a use of force or search and seizure incident sufficient to assess bias. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 147. | |
| Comments & Recommendations | In the EIS system, PRPB should include a computerized relational database, which shall be used to collect, maintain, integrate, and retrieve detailed data. The platform for the EIS system has not yet been developed and supervisors cannot yet utilize the information available from an EIS system. PRPB should develop the EIS system in a timely manner. | |

| Paragraph 149 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | PRPD shall establish a unit to develop, implement, and maintain the EIS with sufficient resources to facilitate data input and provide training and assistance to EIS users. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 147. | |

CMR-2 Draft | December 2, 2020

| Comments & Recommendations | PRPB should establish a unit to develop, implement, and maintain the EIS with sufficient resources to facilitate data input and provide training and assistance to EIS users. The policy and training have been developed by PRPB, but the system has not been implemented. The EIS unit should be established as soon as possible by PRPB. |
|---|---|

| Paragraph 150 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | PRPD shall maintain necessary equipment, in sufficient amount and in good working order, to permit appropriate personnel, including supervisors and commanders, ready and secure access to the EIS system to allow for timely input and review of EIS data. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 147. | |
| Comments & Recommendations | As the paragraph states, PRPB should maintain necessary equipment, in sufficient amount and in good working order, to permit access to the EIS system, allowing for timely input and review of EIS data. This would be for the use of appropriate personnel, including supervisors and commanders.<br><br>A memo dated April 6, 2020 states that additional terminals have been distributed to help meet the requirements of Paragraph 150. As the Period of Performance for CMR-2 extends through March 2020, however, PRPB remains non-compliant for the present report. The Monitor recommends implementation of paragraph requirements as soon as possible and that the platform for the EIS also be developed. | |

| Paragraph 151 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | PRPD shall develop a protocol for using the EIS and information obtained from it. The protocol for using the EIS shall address data storage, data retrieval, reporting, data analysis, pattern identification, supervisory use, supervisory/departmental intervention, documentation and audits, access to the system, and confidentiality of personally identifiable information. The protocol shall also require unit supervisors to periodically review EIS data for officers under their command, including upon transfer between PRPD units or regions. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 147. | |
| Comments & Recommendations | The EIS curriculum has been developed and training has been given on the EIS to PRPB members. However, PRPB has not yet successfully implemented this protocol in practice. The Monitor recommends implementation of paragraph requirements as soon as possible and that the platform for the EIS also be developed. | |

| Paragraph 152 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | PRPD shall maintain all personally identifiable information about officers and employees included in the EIS for at least five years following their separation from the agency. Information necessary for aggregate statistical analysis shall be maintained indefinitely in the EIS. On an ongoing basis, PRPD will enter information | |

|  | into the EIS in a timely, accurate, and complete manner, and shall maintain the data in a secure and confidential manner. |
| --- | --- |
| **Compliance Target(s)** | This Paragraph is assessed with Paragraph 147. |
| **Comments & Recommendations** | As the paragraph states, PRPB should maintain all personally identifiable information about officers and employees included in the EIS for at least five years following their separation from the agency. Information necessary for aggregate statistical analysis should be maintained indefinitely in the EIS. On an ongoing basis, PRPB will enter information into the EIS in a timely, accurate, and complete manner, and shall maintain the data in a secure and confidential manner. The Monitor recommends implementation of the requirements of the paragraph as soon as possible and develop the platform for the EIS. |

| **Paragraph 153** | **Assessment Frequency** | **Overall Compliance Status** |
| --- | --- | --- |
|  | Bi-annually | Not Compliant |
| **Paragraph Language** | Following the initial implementation of the EIS, and as experience and the availability of new technology may warrant, PRPD may propose to add, subtract, or modify data tables and fields, modify the list of documents scanned or electronically attached, and add, subtract, or modify standardized reports and queries. PRPD will submit all such proposals for review and approval as set forth in Paragraph 229. | |
| **Compliance Target(s)** | This Paragraph is assessed with Paragraph 147. | |
| **Comments & Recommendations** | PRPB may propose to add, subtract, or modify data cables and fields; modify the list of documents scanned or electronically attached; and add, subtract, or modify standardized reports. The Monitor recommends implementation of the paragraph requirements as soon as possible and the development of the platform for the EIS. | |

| **Paragraph 154** | **Assessment Frequency** | **Overall Compliance Status** |
| --- | --- | --- |
|  | Bi-annually | Not Compliant |
| **Paragraph Language** | As part of PRPD's continuous improvement efforts and to ensure compliance with this Agreement, PRPD shall establish an auditing system that identifies operational deficiencies, analyzes causal and contributing factors, and implements effective remedial action. To effectuate the system, PRPD shall develop and implement auditing protocols that are based on generally accepted policing practices. The protocols shall provide the audited unit an opportunity to respond to preliminary findings and recommendations, as appropriate, to foster a culture of accountability and continuous improvement among all PRPD units and personnel. | |

| **Compliance Target(s)** | **Compliance Target** | **Status** |
| --- | --- | --- |
|  | 1. Policies incorporate all the requirements of Paragraphs 154-156. | Yes ☒ <br> No ☐ |
|  | 2. Training on internal audits and inspections are consistent with approved policies. | Yes ☒ <br> No ☐ |
|  | 3. 95% of sampled personnel are trained and certified on the auditing and inspections system, or are scheduled for training, in the case of mid-year reviews. | Yes ☐ <br> No ☒ |
|  | 4. 95% of selected internal audits and inspections comply with policy. | Yes ☐ <br> No ☒ |

CMR-2 Draft | December 2, 2020

| | | |
|---|---|---|
| | 5. Internal audits and inspections are scheduled regularly for all PRPB units, locations, and personnel. | Yes ☐<br>No ☒ |
| | 6. PRPB prepares an annual report that (a) includes the conclusions and recommendations of internal audits and inspections conducted for the covered period and (b) is reviewed by the Commissioner and unit commanders to guide corrective action, as appropriate. | Yes ☐<br>No ☒ |
| Comments & Recommendations | The Monitor recognizes that PRPB has been making efforts to come into compliance with Paragraphs 154-156. However, PRPB has not provided the Monitor's Office with sufficient evidence of progress to confer a rating of partial or substantial compliance. E.g., PRPB has not provided information on the results of internal audits or a copy of a report that was reviewed by the Commissioner.<br><br>PRPB should establish an auditing system that identifies operation deficiencies, analyses, causal and contributing factors, so that effective remedial action may be implemented. | |

| Paragraph 155 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Not Compliant |
| Paragraph Language | PRPD shall develop a protocol for conducting operational audits related to the material terms of this Agreement. The protocol shall establish a regular and fixed schedule to ensure that such audits occur with sufficient frequency and cover all PRPD units and Command Areas. Audits shall assess, where appropriate, operational consistency among similar units throughout PRPD to ensure that all geographic areas are provided with appropriate levels of service delivery. PRPD shall summarize in an annual report the conclusions and recommendations of audits conducted during the time period covered by the report. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 154. | |
| Comments & Recommendations | PRPB has developed a protocol for conducting operational audits related to the material terms of the Agreement. Where appropriate, audits shall assess operational consistency among similar units throughout PRPB. PRPB shall also summarize the conclusions and recommendations of audits conducted during the time period covered by the report in an annual report. This protocol was developed and signed on April 21, 2020 by the Commissioner. PRPB should also provide information to the monitoring team in regards to results of the various audits. | |

| Paragraph 156 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | PRPD auditors shall issue a report to the Superintendent on the result of each audit. The Superintendent will review each audit for appropriate policy, disciplinary, and/or non-punitive corrective action. The commander of each precinct or specialized unit shall review all audit reports regarding employees under their command and, if appropriate, shall take non-punitive corrective action or disciplinary action. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 154. | |
| Comments & Recommendations | The PRPB auditors are to issue a report to the Commissioner on the result of each audit. The monitoring team hopes that the Commissioner will review each audit for | |

appropriate policy, disciplinary, or non-punitive corrective action. The Monitor also hopes to see that the Commander of each precinct and specialized unit will also review all audit reports regarding employees under their command. This system should be developed ensuring that Commanders review any audit involving an employee under their command.

| Paragraph 157 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |

| Paragraph Language | PRPD shall develop and implement a plan for organizing and executing regular, targeted, and random integrity audits. The integrity audits will be used to identify and investigate officers engaging in misconduct including, but not limited to, unlawful stops, searches, seizures (including false arrests), excessive uses of force, potential criminal behavior, racial or ethnic profiling, and bias against lesbian, gay, bisexual, and transgendered persons, or any other form of misconduct. These operations shall also seek to identify officers who discourage the filing of a complaint, fail to report misconduct or complaints, or otherwise undermine PRPD's integrity and accountability systems. SPR shall have the oversight responsibility within PRPD for these operations. SPR shall use relevant EIS data and other relevant information in selecting targets for integrity audits. | | |
|---|---|---|---|

| Compliance Target(s) | Compliance Target | Status | |
|---|---|---|---|
| | 1. Policies incorporate all the requirements of this Paragraph. | Yes ☒ | |
| | | No ☐ | |
| | 2. Training on integrity audits is consistent with approved policies. | Yes ☐ | |
| | | No ☒ | |
| | 3. 95% of sampled personnel are trained and certified on integrity audits, or are scheduled for training, in the case of mid-year reviews. | Yes ☐ | |
| | | No ☒ | |
| | 4. 95% of selected integrity audits are designed effectively and comply with approved policies. | Yes ☐ | |
| | | No ☒ | |
| | 5. EIS and other relevant information is considered when selecting targets for integrity audits in 95% of selected integrity audits. | Yes ☐ | |
| | | No ☒ | |

| Comments & Recommendations | Further research needs to be done regarding random integrity audits in Puerto Rico. The monitoring team was told by several individuals that random integrity audits are a violation of privacy and are illegal in Puerto Rico. DOJ, Judge Denton, the Monitor, and the Counsel for the monitoring team are working on a resolution of this issue. This issue should be resolved as soon as possible but is also reliant on the EIS system platform being developed. |
|---|---|

| Paragraph 158 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Quarterly | Not Compliant |

| Paragraph Language | PRPD shall establish an executive-level liaison committee consisting of high-level command officers of the PRPD who communicate, on at least a quarterly basis, with representatives of federal and local criminal justice components in all regions in Puerto Rico, including judicial courts, prosecutors, the University College, and municipal police departments. The committee shall seek mutual feedback and information on improving Puerto Rico's criminal justice system, including performance issues or concerns related to PRPD, its officers, employees, or units. All PRPD high-level commanders who participate in the executive-level liaison |
|---|---|

CMR-2 Draft | December 2, 2020

| | committee shall ensure that all allegations of misconduct or potential criminal activity are referred to SPR and/or PRDOJ for investigation, as appropriate. | |
|---|---|---|
| Compliance Target(s) | **Compliance Target** | **Status** |
| | 1. Agreements and protocols incorporate all the requirements of this Paragraph. | Yes ☐ No ☒ |
| | 2. PRPB solicits feedback and shares information with criminal justice components, and refers allegations of misconduct or potential criminal activity it obtains from such components to SARP for investigation. | Yes ☐ No ☒ |
| Comments & Recommendations | A protocol has been developed; however, other criminal justice agencies in PR have not responded to or ratified the protocol developed by PRPB. No report of progress in enacting an agreement has been forwarded to the monitoring team. The Monitor's Office recognizes the efforts being made by PRPB. However, the information exchange protocol developed was after the March 2020 compliance period and is meant to go into effect May 1, 2020. | |

## Civilian Complaints, Internal Investigations, and Discipline, Paragraphs 159-204

| Paragraph 159 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| Paragraph Language | PRPD shall ensure that all allegations of officer misconduct are received and are fully and fairly investigated; that all investigative findings are supported by a preponderance of the evidence; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair and consistent. PRPD shall develop policies and practices for the intake, investigation, and adjudication of misconduct complaints against PRPD officers. These policies and practices shall comply with applicable law and comport with generally accepted policing practices and shall include the requirements set out below. | |
| Compliance Target(s) | Compliance is determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 160-204, and (2) the results of outcome assessments, pursuant to Paragraph 243. | |
| Comments & Recommendations | | |

| Paragraph 160 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually/Bi-Annually for various Data Sources. | Substantially Compliant |
| Paragraph Language | PRPD will develop and implement a program to inform persons that they may make complaints regarding the performance of any officer. | |
| Compliance Target(s) | **Compliance Target** | **Status** |
| | 1. Policies incorporate all of the requirements of Paragraphs 160-162. | Yes ☒ No ☐ |
| | 2. Civilian complaint program trainings are consistent with approved policies. | Yes ☒ No ☐ |
| | 3. 95% of sampled press, office and SARP personnel are trained and certified in all policies related to the civilian complaint program, or are scheduled for training, in the case of mid-year reviews. | Yes ☒ No ☐ |

CMR-2 Draft | December 2, 2020

| | | |
|---|---|---|
| 4. PRPB has developed and implements a program to inform persons that they may make complaints regarding the performance of any officer. | Yes ☒<br>No ☐ | |

| **Comments & Recommendations** | |
|---|---|
| | |

| **Paragraph 161** | **Assessment Frequency** | **Overall Compliance Status** |
|---|---|---|
| | Bi-annually | Substantially Compliant |
| **Paragraph Language** | Pre-printed complaint forms shall not include any language that can be construed as discouraging civilians from submitting complaints, including warnings regarding potential criminal prosecution for false or untrue complaints. PRPD shall require all officers to carry complaint forms in their official vehicles at all times or on their person, if feasible. | |
| **Compliance Target(s)** | **Compliance Target** | **Status** |
| | Content of complaint forms is consistent with civilian complaint program policies. | Yes ☒<br>No ☐ |

| **Comments & Recommendations** | |
|---|---|
| | |

| **Paragraph 162** | **Assessment Frequency** | **Overall Compliance Status** |
|---|---|---|
| | Annually/Bi-Annually for various Data Sources. | Rating Deferred |
| **Paragraph Language** | PRPD shall make complaint forms and informational materials, including brochures and posters, available at all police facilities and on the PRPD website. Information shall be posted in Spanish and English. PRPD shall post and maintain a permanent placard describing the external complaint process at appropriate government buildings where public services are provided. The placard shall include relevant contact information, such as telephone numbers, email addresses, and websites. PRPD shall also post and maintain a placard explaining an individual's right to be free from involuntary searches and seizures and thus to decline consent to voluntary searches. | |
| **Compliance Target(s)** | **Compliance Target** | **Status** |
| | 1. Content of complaint forms and informational materials is consistent with civilian complaint program policies. | Yes ☐<br>No ☐ |
| | 2. The PRPB website and 95% of PRPB facilities and patrol vehicles have required civilian complaint materials. | Yes ☐<br>No ☐ |
| | 3. Placards as described in Par. 162 are displayed in 95% of all PRPD and DPS buildings, plus eleven regional judicial centers across the Island. | Yes ☐<br>No ☐ |
| **Comments & Recommendations** | The Monitor was unable to conduct car and site inspections due to travel restrictions. | |

| **Paragraph 163** | **Assessment Frequency** | **Overall Compliance Status** |
|---|---|---|
| | Annually/Bi-Annually for various Data Sources. | Substantially Compliant |
| **Paragraph Language** | PRPD shall require that all officers and employees report misconduct, including apparent, alleged, or perceived misconduct, by another PRPD officer or employee to a supervisor or directly to SPR for review and investigation. Where apparent | |

|  | misconduct is reported to a supervisor, the supervisor shall immediately document and report this information to SPR. Failure to report or document apparent or alleged misconduct or criminal behavior shall be grounds for discipline, up to and including termination of employment. The presumptive discipline for a failure to report apparent or alleged misconduct or criminal behavior shall be commensurate to the presumptive discipline for the underlying apparent or alleged conduct not reported. |  |
|---|---|---|
| **Compliance Target(s)** | **Compliance Target** | **Status** |
|  | 1. Policies incorporate all the requirements of the paragraph. | Yes ☒ No ☐ |
|  | 2. Training on internal reporting of misconduct and investigations is consistent with approved policies. | Yes ☒ No ☐ |
|  | 3. 95% of sampled personnel are trained and certified in relevant policies related to reporting and internal investigations, or are scheduled for training, in the case of mid-year reviews. | Yes ☒ No ☐ |
|  | 4. All reports of alleged or perceived misconduct are reviewed and investigated, as appropriate, by supervisors or SARP. | Yes ☒ No ☐ |
| **Comments & Recommendations** | | |

| **Paragraph 164** | **Assessment Frequency** | **Overall Compliance Status** |
|---|---|---|
|  | Annually/Bi-Annually for various Data Sources. | Substantially Compliant |
| **Paragraph Language** | PRPD shall develop protocols requiring supervisors to investigate and take appropriate disciplinary or non-punitive corrective action when the supervisor becomes aware of minor misconduct or policy infractions by an officer that do not merit an SPR notification. The incident of misconduct and the supervisor's response shall be reported to SPR within five business days for SPR's review. Where the officer disputes the misconduct allegation, the allegation shall be referred to SPR for investigation. | |
| **Compliance Target(s)** | **Compliance Target** | **Status** |
|  | 1. Policies incorporate all the requirements of Paragraphs 164 and 165. | Yes ☒ No ☐ |
|  | 2. Training on supervisory review of minor policy violations is consistent with approved policies. | Yes ☒ No ☐ |
|  | 3. 95% of sampled supervisors are trained and certified in policies related to supervisory review of minor policy violations, or are scheduled for training, in the case of mid-year reviews. | Yes ☒ No ☐ |
|  | 4. 95% of selected supervisory reviews and responses comply with approved policies. | Yes ☒ No ☐ |
|  | 5. 95% of selected supervisory reviews and investigations are reviewed and evaluated by unit commanders and the commanders identify needs, as appropriate, in accordance with Paragraphs 164 and 165. | Yes ☒ No ☐ |
|  | 6. 95% of selected supervisory reviews and investigations are sent to SARP and assessed according to approved policies. | Yes ☒ No ☐ |
| **Comments & Recommendations** | | |

CMR-2 Draft | December 2, 2020

| Paragraph 165 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually/Bi-Annually for various Data Sources. | Partially Compliant |
| Paragraph Language | The results of unit investigations, be they minor misconduct allegations, policy infractions, or SPR referrals, shall each be referred to and evaluated by unit commanders for underlying problems including supervisory, training, or other deficiencies. Unit evaluations shall be sent to SPR for further assessment of trends and potential deficiencies in tactics or training, among other considerations. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 164. | |
| Comments & Recommendations | The Monitor has determined that there is a lack of supervisory oversight of investigations, leading to incomplete investigations or conclusions that are inconsistent with the facts revealed by investigations. | |

| Paragraph 166 | Assessment Frequency | | Overall Compliance Status |
|---|---|---|---|
| | Annually/Bi-Annually for various Data Sources. | | Partially Compliant |
| Paragraph Language | PRPD shall train all officers in how to properly handle complaint intake. | | |
| Compliance Target(s) | Compliance Target | | Status |
| | 1. Policies incorporate all the requirements of Paragraphs 166-176. | | Yes ☒ No ☐ |
| | 2. Complaint intake, classification, assignment, and tracking trainings are consistent with approved policies. | | Yes ☐ No ☐ |
| | 3. 95% of sampled officers are trained and certified in relevant policies related to complaint intake, classification, assignment, and tracking, or are scheduled for training, in the case of mid-year reviews. | | Yes ☐ No ☒ |
| Comments & Recommendations | The Monitor acknowledges that a policy does exist, but cannot reach a conclusion on complaint intake, classification, assignment, or the tracking of trainings due to travel restrictions. A sample of supervisors demonstrated that 16 out of 18 had taken all of the required trainings, which is above the 5% allowance for achieving substantial compliance. | | |

| Paragraph 167 | Assessment Frequency | | Overall Compliance Status |
|---|---|---|---|
| | Annually/Bi-Annually for various Data Sources. | | Substantially Compliant |
| Paragraph Language | The refusal to accept a misconduct complaint, discouraging the filing of a misconduct complaint, or providing false or misleading information about filing a misconduct complaint, shall be grounds for discipline. | | |
| Compliance Target(s) | Compliance Target | | Status |
| | Policies and trainings are assessed as part of Paragraph 166. | | Yes ☒ No ☐ |
| | Implementation is assessed with Paragraphs 177 (Data Source #4), 198 and199. | | Yes ☒ No ☐ |
| Comments & Recommendations | | | |

CMR-2 Draft | December 2, 2020

| Paragraph 168 | Assessment Frequency | | Overall Compliance Status | |
|---|---|---|---|---|
| | Bi-annually | | Substantially Compliant | |
| Paragraph Language | PRPD shall accept all misconduct complaints, including anonymous and third- party complaints, for review and investigation. Complaints may be made in writing or verbally, in person or by mail, telephone (or TDD), facsimile, electronic mail, or any other appropriate electronic means. | | | |
| Compliance Target(s) | Compliance Target | | | Status |
| | PRPB accepts, reviews, and investigates complaints, as appropriate, in accordance with approved policies. | | | Yes ☒  No ☐ |
| Comments & Recommendations | | | | |

| Paragraph 169 | Assessment Frequency | | Overall Compliance Status | |
|---|---|---|---|---|
| | Bi-annually | | Partially Compliant | |
| Paragraph Language | PRPD will establish a protocol that provides procedures to be followed when an individual objects to an officer's conduct. The protocol shall provide that, absent exceptional circumstances, the officer will inform the individual of his or her right to make a complaint and shall provide the complaint form and the officer's name and identification number. If the individual indicates that he or she would like to make a complaint on the scene, the officer shall immediately inform his or her supervisor, who shall immediately respond to the scene and initiate the complaint process. In the absence of the officer's immediate supervisor, any supervisor may respond to the scene. All misconduct complaints received outside of SPR shall be forwarded to SPR before the end of the shift in which they were received. | | | |
| Compliance Target(s) | Compliance Target | | | Status |
| | 1. Intake protocol was followed in 95% of sampled investigations. | | | Yes ☒  No ☐ |
| | 2. Intake protocol was followed in 95% of sampled complaints received by officers in the field. | | | Yes ☐  No ☒ |
| Comments & Recommendations | The Monitor's Office did not receive data on implementation of the intake protocol in sufficient time to conduct a thorough analysis. | | | |

| Paragraph 170 | Assessment Frequency | | Overall Compliance Status | |
|---|---|---|---|---|
| | Bi-annually | | Rating Deferred | |
| Paragraph Language | PRPD shall develop a system to ensure that allegations of officer misconduct made during criminal prosecutions or civil lawsuits are identified and assessed for further investigation. Any decision to decline an investigation shall be documented. | | | |
| Compliance Target(s) | Compliance Target | | | Status |
| | 1. PRPB has a system to identify and assess civil lawsuits and criminal proceedings filed involving allegations of officer misconduct. | | | Yes ☒  No ☐ |
| | 2a. SARP reviews all allegations involving PRPB personnel to assess the need to investigation by PRPB. | | | Yes ☐  No ☐ |
| | 2b. 95% of such SARP reviews are documented in accordance with approved policies. | | | Yes ☐  No ☐ |
| Comments & Recommendations | The Monitor was unable to assess this paragraph due to travel restrictions. Though PRPB did provide the Monitor with some data on misconduct allegations, the Monitor was unable to review the content of misconduct files in person. | | | |

CMR-2 Draft | December 2, 2020

| Paragraph 171 | Assessment Frequency | Overall Compliance Status | |
|---|---|---|---|
| | Bi-annually | Substantially Compliant | |
| Paragraph Language | SPR shall maintain a centralized numbering and tracking system for all misconduct complaints. Upon the receipt of a complaint, SPR shall promptly assign a unique numerical identifier to the complaint, which shall be provided to the complainant as soon as practicable. | | |
| Compliance Target(s) | Compliance Target | | Status |
| | SARP administers a centralized numbering and tracking system for all misconduct complaints. | | Yes ☒ <br> No ☐ |
| Comments & Recommendations | | | |

| Paragraph 172 | Assessment Frequency | Overall Compliance Status | |
|---|---|---|---|
| | Bi-annually | Substantially Compliant | |
| Paragraph Language | Where a supervisor receives a misconduct complaint in the field alleging that misconduct has occurred, other than those incidents covered by Paragraph 44 of this Agreement, the supervisor shall gather all relevant information and evidence and provide these to SPR. All complaints should be referred to SPR by the end of tour of duty, absent exceptional circumstances. | | |
| Compliance Target(s) | Compliance Target | | Status |
| | 1a. 95% of sampled complaints were forwarded to SARP by the end of the relevant tour of duty or articulated exceptional circumstances. | | Yes ☒ <br> No ☐ |
| | 1b. 95% of sampled complaints document what information and evidence is collected by the PRPB supervisor. | | Yes ☒ <br> No ☐ |
| Comments & Recommendations | | | |

| Paragraph 173 | Assessment Frequency | Overall Compliance Status | |
|---|---|---|---|
| | Bi-annually | Substantially Compliant | |
| Paragraph Language | Within five business days of the receipt of a misconduct complaint, SPR shall determine whether the complaint will be assigned to a supervisor for a Supervisory Investigation, retained by SPR for investigation, and whether it will be investigated criminally by PRPD, PRDOJ, or both. | | |
| Compliance Target(s) | Compliance Target | | Status |
| | 95% of sampled SARP investigation files are assigned for investigation in accordance with approved policies. | | Yes ☒ <br> No ☐ |
| Comments & Recommendations | | | |

| Paragraph 174 | Assessment Frequency | Overall Compliance Status | |
|---|---|---|---|
| | Bi-annually | Substantially Compliant | |
| Paragraph Language | PRPD shall develop a complaint classification protocol that is allegation-based rather than outcome-based to guide SPR in determining where a complaint should be assigned. | | |
| | Compliance Target | | Status |

189

CMR-2 Draft | December 2, 2020

| Compliance Target(s) | SARP classifies complaints in accordance with policy. | Yes ☒<br>No ☐ |
|---|---|---|
| Comments & Recommendations | | |

| Paragraph 175 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Substantially Compliant |
| Paragraph Language | A misconduct complaint investigation may not be conducted by any supervisor who used force during the incident; whose conduct led to the injury to a person; who authorized the conduct that led to the reported incident or complaint; who was on the scene at the time of the incident leading to the allegation of misconduct; or by any officer or supervisor who has a conflict of interest as defined by PRPD policy. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | All misconduct complaint investigations are conducted by persons not prohibited from doing so, as required by the Paragraph. | Yes ☒<br>No ☐ |
| Comments & Recommendations | | |

| Paragraph 176 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Substantially Compliant |
| Paragraph Language | PRPD's centralized numbering and tracking system shall maintain accurate and reliable data regarding the number, nature, and status of all misconduct complaints, from initial intake to final disposition, including investigation timeliness and notification to the complainant of the interim status and final disposition of the investigation. This system shall be used for periodic assessment of compliance with PRPD policies and procedures and this Agreement. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | SARP's record management system maintains accurate and reliable data for operational and internal compliance purposes. | Yes ☒<br>No ☐ |
| Comments & Recommendations | | |

| Paragraph 177 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| Paragraph Language | PRPD shall ensure that policies and procedures regarding the investigation of complaints clearly establish that complaints are adjudicated on the basis of the preponderance of the evidence. This standard should be clearly delineated in policies and procedures and accompanied by extensive examples to ensure proper application by investigators. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | | Yes ☒ |
| | 1. Policies incorporate all the requirements of Paragraphs 177-193. | No ☐ |
| | 2. Investigation of complaints trainings are consistent with approved policies. | Yes ☐<br>No ☒ |
| | 3. 95% of sampled personnel are trained and certified in relevant policies related to investigation of complaints, or are scheduled for training, in the case of mid-year reviews. | Yes ☒<br>No ☐ |

CMR-2 Draft | December 2, 2020

| | | |
|---|---|---|
| | 4. 100% of sampled investigation files were adjudicated using a preponderance of the evidence standard. | Yes ☐<br>No ☒ |
| Comments & Recommendations | The Monitor found that retaliation allegations were unevenly investigated, and witness testimonies were insufficiently tested. Though personnel are trained and certified on these policies, the Monitor's observations indicate that these trainings are lacking. The Monitor has observed that interviews take on an inquisitorial quality, with PRPB personnel asking a standard set of questions with no follow-up questions based on the answers provided by interviewees. | |

| Paragraph 178 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Substantially Compliant |
| **Paragraph Language** | PRPD shall investigate all misconduct complaints and document the investigation and its findings and conclusions in writing. PRPD shall develop and implement a policy that specifies those complaints that may be resolved via administrative closing or informal resolution. Administrative closing shall be used for minor policy violations that do not constitute a pattern of misconduct, duplicate allegations, or allegations that even if true would not constitute misconduct, among others. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 95% of sampled complaints are investigated, documented, and resolved, and relevant PRPB personnel were so advised, in accordance with approved policies. | Yes ☒<br>No ☐ |
| **Comments & Recommendations** | | |

| Paragraph 179 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Substantially Compliant |
| **Paragraph Language** | PRPD shall ensure that all administrative investigations conducted by SPR shall be completed within 90 days of the receipt of the complaint, including assignment, investigation, review, and final approval. The SPR commander is authorized to grant additional 30-day extensions, for up to 90 additional days in the aggregate, for justifiable circumstances, which shall be documented in writing. For purposes of these extensions, workload shall not constitute justification for extensions. Where an allegation is sustained, PRPD shall have 30 days to determine and notify the officer of the appropriate discipline. The appropriate discipline shall be imposed as soon as practicable, consistent with PRPD's disciplinary procedures. All administrative investigations shall be subject to appropriate tolling periods as necessary to conduct a parallel criminal investigation or as provided by law. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1a. 95% of sampled investigations were adjudicated and notified within authorized timeframes in accordance with approved policies. | Yes ☒<br>No ☐ |
| | 1b. 95% of disciplinary actions were imposed within authorized timeframes in accordance with approved policies. | Yes ☒<br>No ☐ |
| | 2. 95% of SARP investigations that were not completed within prescribed timeframes have justified extension approvals as required by approved policies. | Yes ☒<br>No ☐ |
| **Comments & Recommendations** | | |

CMR-2 Draft | December 2, 2020

| Paragraph 180 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| Paragraph Language | PRPD shall ensure that investigations of officer misconduct are thorough and the findings are consistent with the facts. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 95% of selected investigations are thorough and findings are consistent with the facts. | Yes ☐<br>No ☒ |

| Comments & Recommendations | Though the Monitor found that most investigations are thoroughly investigated and produce finings that are consistent with the facts of the investigation. However, as a result of the factors identified in relation to Paragraph 177, a significant number of investigations reach findings that are not consistent with the facts. |
|---|---|

| Paragraph 181 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Rating Deferred |
| Paragraph Language | PRPD shall require officers to cooperate with administrative investigations, including appearing for an interview when requested by a PRPD or Commonwealth investigator and providing all requested documents and evidence. Supervisors shall be notified when an officer under their supervision is summoned as part of an administrative investigation and shall facilitate the officer's appearance, unless such notification would compromise the integrity of the investigation. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Officers cooperate and supervisors are notified about SARP summons, as required by approved policies, in 95% of selected investigations. | Yes ☐<br>No ☐ |
| | 2. SARP personnel indicate that the level of cooperation of officers and supervisors with SARP investigations is acceptable in accordance with generally accepted practices. | Yes ☐<br>No ☐ |

| Comments & Recommendations | Due to travel restrictions, the Monitor was unable to conduct the necessary site investigations to reach a determination on compliance status. |
|---|---|

| Paragraph 182 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Substantially Compliant |
| Paragraph Language | The subject officer of an administrative investigation shall not be compelled to provide a statement to administrative investigators where there is a potential criminal investigation or prosecution of the officer until the remainder of the investigation has been completed, and after the administrative investigators have consulted with the prosecutor's office and the SPR commander, except where the taking of such a statement is authorized by the Superintendent after consulting with the prosecutor's office. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | Compelled statements are taken in accordance with approved policies and officers' constitutional rights. | Yes ☒<br>No ☐ |

| Comments & Recommendations | |
|---|---|

| Paragraph 183 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Substantially Compliant |

CMR-2 Draft | December 2, 2020

| Paragraph Language | Where there is no potential criminal investigation or prosecution of the subject officer, SPR investigators shall not warn the subject officer that he or she has a right not to provide a statement that may be self-incriminating. | |
|---|---|---|
| Compliance Target(s) | **Compliance Target** | **Status** |
| | Subject officers are not given Miranda warnings where there is no potential for criminal investigation or prosecution. | Yes ☒<br>No ☐ |
| Comments & Recommendations | | |

| Paragraph 184 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Rating Deferred |
| Paragraph Language | If at any time during complaint intake or investigation the investigator determines that there may have been criminal conduct on the part of any officer or employee, the investigator shall immediately notify the SPR commander. The SPR commander shall immediately notify the Superintendent and shall consult with the prosecutor's office regarding the initiation of a criminal investigation. Where an allegation is investigated criminally, SPR shall continue with the administrative investigation of the allegation, except that it may delay or decline to conduct an interview of the subject officer(s) or other witnesses until completion of the criminal investigation unless, after consultation with the prosecutor's office and PRPD Superintendent, such interviews are deemed appropriate. | |
| Compliance Target(s) | **Compliance Target** | **Status** |
| | 1a. Investigators notify SARP and SARP consults with prosecutors in accordance with approved policies when an investigator determines that there may have been criminal conduct on the part of any officer or employee. | Yes ☒<br>No ☐ |
| | 1b. Administrative investigations continue when a parallel criminal investigation is also ongoing in accordance with approved policies. | Yes ☐<br>No ☐ |
| Comments & Recommendations | The circumstances outlined in compliance target 1b did not arise in the dataset requested by the Monitor's Office for CMR-2. As a result, the Monitor cannot reach a determination on compliance. | |

| Paragraph 185 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Rating Deferred |
| Paragraph Language | PRPD, PRDOJ, and the prosecutor's office shall develop protocols to ensure that the criminal and administrative investigations are kept appropriately separate after a subject officer has provided a compelled statement. Nothing in this Agreement or PRPD policy shall hamper an officer's obligation to provide a public safety statement regarding a work-related incident or activity. | |
| Compliance Target(s) | **Compliance Target** | **Status** |
| | Administrative and criminal investigations are conducted separately as required by approved policies after a subject officer has provided a compelled statement. | Yes ☐<br>No ☐ |
| Comments & Recommendations | The circumstances outlined for Paragraph 185 did not arise in the dataset requested by the Monitor's Office for CMR-2. As a result, the Monitor cannot reach a determination of compliance. | |

| Paragraph 186 | Assessment Frequency | Overall Compliance Status |
|---|---|---|

|  | Bi-annually | Partially Compliant |
|---|---|---|
| **Paragraph Language** | In each investigation, PRPD shall consider all relevant evidence, including circumstantial, direct, and physical evidence. There will be no automatic preference for an officer's statement over a non-officer's statement, nor will PRPD disregard a witness' statement merely because the witness has some connection to the complainant or because of any criminal history. PRPD shall make efforts to resolve material inconsistencies between witness statements. | |

| **Compliance Target(s)** | **Compliance Target** | **Status** |
|---|---|---|
| | 95% of sampled investigations considered all relevant evidence in a manner consistent with this Paragraph, and tried to resolve material inconsistencies between witness statements. | Yes ☐ <br> No ☒ |

| **Comments & Recommendations** | Per the Monitor's comments on Paragraph 177, most investigations consider all relevant evidence, but not a sufficient number to reach the 95% target for substantial compliance. |
|---|---|

| **Paragraph 187** | **Assessment Frequency** | **Overall Compliance Status** |
|---|---|---|
| | Bi-annually | Substantially Compliant |
| **Paragraph Language** | A misconduct investigation shall not be closed simply because the complaint is withdrawn or the alleged victim is unwilling or unable to provide additional information beyond the initial complaint, or because the complainant pled guilty or was found guilty of an offense. | |

| **Compliance Target(s)** | **Compliance Target** | **Status** |
|---|---|---|
| | 95% of sampled investigations were not closed simply because the complaint is withdrawn or the alleged victim is unwilling or unable to provide additional information beyond the initial complaint, or because the complainant pled guilty or was found guilty of an offense. | Yes ☒ <br> No ☐ |

| **Comments & Recommendations** | |
|---|---|

| **Paragraph 188** | **Assessment Frequency** | **Overall Compliance Status** |
|---|---|---|
| | Bi-annually | Substantially Compliant |
| **Paragraph Language** | The misconduct investigator shall explicitly identify and recommend one of the following dispositions for each allegation of misconduct in an administrative investigation: <br> a) "Unfounded," where the investigation determines by clear and convincing evidence that the alleged misconduct did not occur or did not involve the subject officer; <br> b) "Sustained," where the investigation determines, by a preponderance of the evidence, that the alleged misconduct did occur; <br> c) "Not Sustained," where the investigation is unable to determine, by a preponderance of the evidence, whether the alleged misconduct occurred; or <br> d) "Exonerated," where the investigation determines by clear and convincing evidence that the alleged conduct did occur but did not violate PRPD policies, procedures, or training. | |
| | **Compliance Target** | **Status** |

194

CMR-2 Draft | December 2, 2020

| Compliance Target(s) | Misconduct investigators identify and recommend one of the listed dispositions for each allegation of misconduct in an administrative investigation. | Yes ☒<br><br>No ☐ |
|---|---|---|
| Comments & Recommendations | | |

| Paragraph 189 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| Paragraph Language | The unit commander of the investigating supervisor shall review the supervisor's recommended disposition and accept, reject, or modify it. The unit commander shall document rejected or modified recommendations from supervisors in writing. Supervisory investigation reports and all related documentation and evidence shall be provided to SPR immediately upon completion of the investigation, but no later than within three business days. SPR shall review disposition recommendations made by unit commanders to ensure that investigative standards are met. SPR shall retain misconduct investigation reports and related records. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | The unit commanders complied with the requirements of this Paragraph in 95% of selected investigations. | Yes ☐<br>No ☒ |
| Comments & Recommendations | The Monitor finds that this review process occurs at both supervisory and command levels, but still at a sub-optimal level. Many, if not all, of the errors noted should have been spotted in the review and remanded for additional investigation. Problematic cases were inappropriately closed without sufficient follow up, and reached dispositions that were incongruent with the evidence found in the investigation. | |

| Paragraph 190 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| Paragraph Language | The SPR commander shall review the investigator's recommended disposition and accept, reject, or modify it. The SPR commander shall document rejected or modified recommendations from investigators in writing. The Superintendent, or his or her designee(s), shall review the SPR commander's recommended disposition and accept, reject, or modify it. The Superintendent, or his or her designee(s), shall document rejected or modified recommendations from SPR. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1a. The SARP commander reviews and resolves the complaint in accordance with the paragraph in 95% of selected investigations. | Yes ☐<br>No ☒ |
| | 1b. The Commissioner reviews and resolves the complaint in accordance with the paragraph in 95% of selected investigations. | Yes ☐<br>No ☒ |
| Comments & Recommendations | The Monitor finds that this review process occurs at both supervisory and command levels, but still at a sub-optimal level. Many, if not all, of the errors noted should have been spotted in the review and remanded for additional investigation. Problematic cases were inappropriately closed without sufficient follow up and reached dispositions that were incongruent with the evidence found in the investigation. | |

| Paragraph 191 | Assessment Frequency | Overall Compliance Status |
|---|---|---|

|  | Bi-annually | Partially Compliant |
|---|---|---|
| **Paragraph Language** | In addition to determining whether the officer committed the alleged misconduct, administrative investigations shall assess and document whether: (a) the action was in compliance with training and legal standards; (b) the use of different procedures should or could have been employed to achieve a potentially better outcome; (c) the incident indicates a need for additional training, counseling or other non-punitive corrective action; and (d) the incident suggests that PRPD should revise its policies, strategies, tactics, or training. This information shall be shared with the relevant commander(s). | |
| **Compliance Target(s)** | This Paragraph is assessed with Paragraph 178. | |
| **Comments & Recommendations** | The Monitor suggests that each case investigated by SARP contain, as a matter of course, a section that answers whether; (a) the action was in compliance with training and legal standards; (b) the use of different procedures should or could have been employed to achieve a potentially better outcome; (c) the incident indicates a need for additional training, counseling, or other non-punitive corrective action; and (d) the incident suggests that PRPD should revise its policies, strategies, tactics, or training. | |

| **Paragraph 192** | **Assessment Frequency** | **Overall Compliance Status** |
|---|---|---|
|  | Bi-annually | Substantially Compliant |
| **Paragraph Language** | Each misconduct complainant will be notified in writing regarding the initiation of an investigation, the final disposition of the investigation, any disciplinary or non-punitive action taken, and the right to seek further review of the final disposition under applicable law. If an investigation goes beyond the 90-day limit, the complainant will be notified that an extension has been granted. PRPD shall establish procedures for complainants dissatisfied with the outcome to discuss their concerns with SPR commanders. | |

| **Compliance Target(s)** | **Compliance Target** | **Status** |
|---|---|---|
|  | 1. Complainants are notified about the status of the investigation and outcome in accordance with approved policies in 95% of selected investigations. | Yes ☒ No ☐ |
|  | 2. Complainants are given the opportunity to appeal the determination before the Investigation, Processing and Appeals Commission. | Yes ☒ No ☐ |

| **Comments & Recommendations** | | |
|---|---|---|

| **Paragraph 193** | **Assessment Frequency** | **Overall Compliance Status** |
|---|---|---|
|  | Bi-annually | Rating Deferred |
| **Paragraph Language** | SPR shall retain all misconduct investigation records for at least five years after the officer's separation from the agency. This obligation shall apply to records regarding officers' credibility that come to the attention of SPR and that may be subject to disclosure under Brady v. Maryland, 373 U.S. 83 (1963), and its progeny. | |

| **Compliance Target(s)** | **Compliance Target** | **Status** |
|---|---|---|
|  | 1. SARP retains at least 95% of investigation files for persons who have separated from PRPB less than five years ago. | Yes ☐ No ☐ |

CMR-2 Draft | December 2, 2020

| | | |
|---|---|---|
| | 2. PRPB's document retention practices comply with approved policies. | Yes ☐ <br> No ☐ |
| **Comments & Recommendations** | The Monitor's Office will not be able to reach a determination on Paragraph 193 until SPR has tracked misconduct investigation records for the period of time required by the Paragraph. | |

| **Paragraph 194** | **Assessment Frequency** | **Overall Compliance Status** |
|---|---|---|
| | Annually/Bi-Annually for various Data Sources. | Partially Compliant |
| **Paragraph Language** | PRPD shall ensure that a sufficient number of well-trained staff are assigned and available to thoroughly complete and review misconduct investigations in a timely manner and in accordance with the requirements of this Agreement. PRPD further shall ensure it provides sufficient resources and equipment to conduct adequate criminal and administrative misconduct investigations. | |
| **Compliance Target(s)** | **Compliance Target** | **Status** |
| | 1. Policies incorporate all the requirements of Paragraphs 177-193. | Yes ☒ <br> No ☐ |
| | 2. Trainings for the internal investigation unit are consistent with approved policies. | Yes ☐ <br> No ☒ |
| | 3. All internal investigation unit personnel are trained and certified in relevant policies (or scheduled for training, in the case of mid-year reviews). | Yes ☒ <br> No ☐ |
| | 4. The internal investigation unit has sufficient resources and equipment, or is in the process of procuring needed resources and equipment. | Yes ☐ <br> No ☒ |
| | 5a. Internal investigation unit personnel serve three-year terms. | Yes ☒ <br> No ☐ |
| | 5b. Retained internal investigation unit personnel have demonstrated effective performance. | Yes ☐ <br> No ☒ |
| **Comments & Recommendations** | Per the Monitor's comments on paragraph 177, interview techniques and outcomes are not consistent with PRPB policy or generally accepted police practices. This lapse indicates that training on interview techniques is not achieving the goals and objectives stated in the policy. Furthermore, the internal investigations unit should have the ability to record interviews – audio at a minimum, but ideally video recording – if all parties consent to such recording. Most, but not all, retained personnel have demonstrated effective performance. | |

| **Paragraph 195** | **Assessment Frequency** | **Overall Compliance Status** |
|---|---|---|
| | Annually/Bi-Annually for various Data Sources. | Substantially Compliant |
| **Paragraph Language** | PRPD shall establish a term of duty of up to three years for SPR officers and supervisors who conduct investigations and may reappoint an officer to successive terms of duty if that officer has demonstrated effective performance based on an appropriate annual performance evaluation. | |
| **Compliance Target(s)** | This Paragraph is assessed with Paragraph 194. | |
| **Comments & Recommendations** | | |

CMR-2 Draft | December 2, 2020

| Paragraph 196 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually/Bi-Annually for various Data Sources. | Partially Compliant |
| Paragraph Language | All SPR personnel conducting officer misconduct investigations shall receive at least 40 hours of initial training in conducting officer misconduct investigations and shall receive additional in-service training each year. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 194. | |
| Comments & Recommendations | Though SPR personnel do receive 40 hours of training in conducting officer misconduct investigations, the Monitor has found that training in interview techniques is lacking. | |

| Paragraph 197 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually/Bi-Annually for various Data Sources. | Not Compliant |
| Paragraph Language | PRPD policy shall expressly prohibit all forms of retaliation, whether subtle or direct, including discouragement, intimidation, coercion, duty-station reassignment, or adverse action, against any person, civilian or officer, who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct. Retaliation shall be considered a serious policy violation and shall subject an officer to serious disciplinary action, up to and including termination. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Policies incorporate all the requirements of this Paragraph. | Yes ☒<br>No ☐ |
| | 2. Retaliation trainings are consistent with approved policies. | Yes ☐<br>No ☐ |
| | 3. 95% of sampled personnel are trained and certified in retaliation policies (or scheduled for training, in the case of mid-year reviews). | Yes ☐<br>No ☐ |
| | 4. Complaints involving alleged retaliation are investigated and adjudicated in accordance with approved policies and agency standards in 95% of selected complaints. | Yes ☐<br>No ☐ |
| | 5. 95% of interviewed personnel perceive retaliation for participating in an investigation of misconduct is not tolerated and leads to serious disciplinary action. | Yes ☐<br>No ☐ |
| Comments & Recommendations | The Monitor's Office requested data on retaliation relatively late in the reporting process, and PRPB provided only limited data as a result. Therefore, the Monitor cannot reach a determination on this paragraph for CMR-2. | |

| Paragraph 198 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually/Bi-Annually for various Data Sources. | Rating Deferred |
| Paragraph Language | PRPD shall ensure that discipline for sustained allegations of misconduct is fair, consistent, based on the nature of the allegation, and that mitigating and aggravating factors are set out and applied consistently. Discipline shall be based on objective criteria and shall not depend on or be influenced by rank or external considerations. | |
| | Compliance Target | Status |

CMR-2 Draft | December 2, 2020

| Compliance Target(s) | 1. Policies incorporate all the requirements of Paragraphs 198-199. | Yes ☒ |
| | | No ☐ |
| | 2. Discipline trainings are consistent with approved policies. | Yes ☐ |
| | | No ☐ |
| | 3. 95% of sampled personnel are trained and certified in discipline policies, or are scheduled for training, in the case of mid-year reviews. | Yes ☐ |
| | | No ☐ |
| | 4. Discipline is taken and documented in response to sustained misconduct complaints in accordance with approved policies in 95% of selected complaints. | Yes ☐ |
| | | No ☐ |
| | 5. Disciplinary matrix employs objective criteria to apply to sustained findings to assess the appropriate level of discipline. | Yes ☐ |
| | | No ☐ |
| Comments & Recommendations | | |

| Paragraph 199 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually/Bi-Annually for various Data Sources. | Partially Compliant |
| Paragraph Language | PRPD shall establish a disciplinary matrix for reviewing sustained findings and assessing the appropriate level of discipline to facilitate consistency in the imposition of discipline. All disciplinary decisions shall be documented, including the rationale behind any decision to deviate from the level of discipline set out in the disciplinary procedures. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 198. | |
| Comments & Recommendations | | |

| Paragraph 200 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually/Bi-Annually for various Data Sources. | Not Compliant |
| Paragraph Language | PRPD shall review its drug testing program on an ongoing basis to ensure that pre-service testing for new officers and random testing for existing officers is reliable and valid. The program shall be designed to detect use of banned or illegal substances, including steroids. | |
| Compliance Target(s) | **Compliance Target** | **Status** |
| | 1. Policies incorporate all the requirements of this Paragraph. | Yes ☒ |
| | | No ☐ |
| | 2. PRPB's drug testing program trainings are consistent with approved policies. | Yes ☐ |
| | | No ☒ |
| | 3. 95% of sampled personnel are trained and certified in PRPB's drug testing program policies, or are scheduled for training, in the case of mid-year reviews. | Yes ☒ |
| | | No ☐ |
| | 4. Drug tests are reliable, valid, and administered to new officers and a random selection of existing officers in accordance with the Paragraph. | Yes ☐ |
| | | No ☒ |
| Comments & Recommendations | The Monitor is concerned that in an agency of 12,000 men and women, only two random drug tests were conducted between July 2019 and March 2020. Furthermore, for the entire reporting period only 12.5% of sworn members were | |

CMR-2 Draft | December 2, 2020

tested, despite the policy requirement that all members be tested up to twice per year.

| Paragraph 201 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually/Bi-Annually for various Data Sources. | Substantially Compliant |
| Paragraph Language | PRPD shall provide officers and employees with a range of non-punitive supports and services to address and correct problem behavior, as part of PRPD's disciplinary and performance improvement systems. These supports and services shall include a comprehensive range of mental health services that include, but are not limited to: readily accessible confidential counseling services; critical incident debriefings and crisis counseling; mental health evaluations; and stress management training that comport with generally accepted practices. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Policies incorporate all the requirements of Paragraphs 201-204. | Yes ☒<br>No ☐ |
| | 2. Officer assistance and support trainings are consistent with approved policies. | Yes ☒<br>No ☐ |
| | 3. 95% of sampled personnel are trained and certified in officer assistance and support policies, or are scheduled for training, in the case of mid-year reviews. | Yes ☒<br>No ☐ |
| | 4. A variety of non-punitive supports and services that comport with generally accepted practices are available to officers and their families as required by approved policies. | Yes ☒<br>No ☐ |
| | 5. Mental health professionals are involved in developing and providing in-service training on mental health stressors related to law enforcement and the mental health services available to officers and their families. | Yes ☒<br>No ☐ |
| | 6. Mental health counseling provided to PRPB employees is confidential, pursuant to approved policies. | Yes ☒<br>No ☐ |
| Comments & Recommendations | | |

| Paragraph 202 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually/Bi-Annually for various Data Sources. | Substantially Compliant |
| Paragraph Language | PRPD shall train management and supervisory personnel in officer support services protocols to ensure wide availability and use of officer support services. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 201. | |
| Comments & Recommendations | | |

| Paragraph 203 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually/Bi-Annually for various Data Sources. | Substantially Compliant |

CMR-2 Draft | December 2, 2020

| Paragraph Language | PRPD shall involve mental health professionals in developing and providing in-service training on mental health stressors related to law enforcement and the mental health services available to officers and their families. |
|---|---|
| Compliance Target(s) | This Paragraph is assessed with Paragraph 201. |
| Comments & Recommendations | |

| Paragraph 204 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually/Bi-Annually for various Data Sources. | Substantially Compliant |
| Paragraph Language | PRPD shall ensure that any mental health counseling services provided to PRPD employees remain confidential as consistent with generally accepted practices in the field of mental health care. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 201. | |
| Comments & Recommendations | | |

## Community Engagement and Public Information, Paragraphs 205-217

| Paragraph 205 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| Paragraph Language | PRPD shall create robust community relationships and engage constructively with the community to ensure collaborative problem-solving, ethical and bias-free policing, and more effective crime prevention. PRPD shall integrate community and problem oriented policing principles into its management, policies and procedures, recruitment, training, personnel evaluations, tactics, deployment of resources, and systems of accountability. PRPD shall engage the public in the reform process through the dissemination of public information on a regular basis. | |
| Compliance Target(s) | Compliance is determined on two separate but inter-dependent bases: (1) the implementation of paragraphs 206 - 217, and (2) the results of outcome assessments, pursuant to Agreement Paragraph 243. | |
| Comments & Recommendations | PRPB reports that Community Policing training has been provided to 99.99% of PRPB personnel and command officers, and to CIC members. However, there is no evidence of PRPB implementing problem-oriented policing nor a deployment system that adheres to community policing principles. Monitor to continue requesting relevant data from PRPB for review and assessment, and conduct interviews with community members to confirm information from PRPB. | |

| Paragraph 206 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually/Bi-Annually for various Data Sources. | Not Compliant |

201

CMR-2 Draft | December 2, 2020

| Paragraph Language | PRPD shall reassess its staffing allocation and personnel deployment to ensure that they support community policing and problem-solving goals. PRPD shall employ a Scanning, Analysis, Response, and Assessment ("SARA") model to structure its problem- solving approach. | |
|---|---|---|
| Compliance Target(s) | **Compliance Target** | **Status** |
| | 1. Policies incorporate all the requirements of Paragraph 206. | Yes ☒<br>No ☐ |
| | 2. Community policing and problem-solving trainings are consistent with approved policies. | Yes ☐<br>No ☒ |
| | 3. 95% of sampled PRPB members are trained and certified in community policing and problem solving, including the SARA Model. | Yes ☐<br>No ☒ |
| | 4. Staff allocation and personnel deployment plan are aligned with community policing and problem solving. | Yes ☐<br>No ☒ |
| | 5. 95% of sampled PRPB precincts, districts, and units implement the SARA Model. | Yes ☐<br>No ☒ |
| Comments & Recommendations | PRPB has conducted a personnel study (Paragraph 13) and a Consolidation Analysis (PR Gov. Document N-OR-CMR2-10656) in order to re-allocate personnel to support community policing. However, this process is in the beginning stages and PRPB has not re-allocated personnel as required. PRPB has not provided the Monitor with evidence that the SARA model of solving problems has been implemented. The Monitor will continue to request evidence of the re-allocation of personnel to accommodate the community policing strategy and SARA implementation. | |

| Paragraph 207 | **Assessment Frequency** | **Overall Compliance Status** |
|---|---|---|
| | Annually/Bi-Annually for various Data Sources. | Partially Compliant |
| Paragraph Language | PRPD shall continue to conduct outreach to a broad cross-section of community stakeholders to establish extensive problem-solving partnerships and develop cooperative strategies that build mutual respect and trusting relationships. | |
| Compliance Target(s) | **Compliance Target** | **Status** |
| | 1. Policies incorporate all the requirements of Paragraph 207. | Yes ☒<br>No ☐ |
| | 2.Community partnerships and problem-solving strategies trainings are consistent with approved policies. | Yes ☒<br>No ☐ |
| | 3. 95% of sampled PRPB members are trained and certified in community partnerships and problem-solving strategies. | Yes ☐<br>No ☒ |
| | 4. 95% of sampled districts, precincts, and units conduct outreach to a broad cross-section of community stakeholders. | Yes ☐<br>No ☒ |
| Comments & Recommendations | PRPB has reached out to community members, government institutions and social services agencies to form alliances and hold meetings in some police Areas (See PRPB Document # MON-OR-CMR-21865 through MON-OR-CMR2-21869 listing alliances by Area in SAOC). However, other Superintendencies, such as SAIC, and SARP, have not reported any alliances during this period. This document further states that 90 percent of the alliances submitted are informal and do not address quality of life and crime issues as is the goal in a community policing strategy (See Doc # MON-OR-CMR2- 21870). | |

CMR-2 Draft | December 2, 2020

| Paragraph 208 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Not Compliant |
| Paragraph Language | PRPD shall develop and implement mechanisms to measure its community partnerships and problem-solving strategies and assess their effectiveness. PRPD shall prepare a publicly available report on at least an annual basis that details its community partnerships, meetings, and problem-solving activities, including specific problems addressed and steps taken by PRPD and the community toward their resolution. The report also shall identify obstacles faced and recommendations for future improvement. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Formal Community Partnership module incorporates all the requirements of Paragraph 208. | Yes ☐ No ☒ |
| | 2. 100% of PRPB annual reports are made publicly available. | Yes ☐ No ☒ |
| | 3. Annual report incorporates all the requirements of Paragraph 208. | Yes ☐ No ☒ |
| Comments & Recommendations | The Monitor has not received any evidence from PRPB that a mechanism to measure its community partnerships and problem-solving strategies is in place. Monitor will continue to request data and proof of such strategy. | |

| Paragraph 209 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Partially Compliant |
| Paragraph Language | PRPD shall continue to maintain Community Interaction Councils ("CICs") jointly with community representatives to facilitate regular communication and cooperation between PRPD and community leaders at the local level. CICs shall meet, at a minimum, every three months. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. PPRB policies require it maintain the CIC and they meet at least every three months. | Yes ☒ No ☐ |
| | 2. PRPB maintains CIC's as required by this Paragraph. | Yes ☐ No ☒ |
| Comments & Recommendations | PRPB has created CIC's in every police Area and maintains communication with the members. The Monitor has interviewed two CIC spoke persons: one from Aguadilla on May 20th, and one from Aibonito on May 26th. They both stated that communication with PRPB is good, that meetings are held regularly, and PRPB is giving 100% at the meetings. The Aibonito member interviewed stated that they meet on the second Tuesday of every month. They also said they have received training in Community Policing, but that CIC's need more resources and personnel. PRPB needs to maintain contact and provide needed resources, such as an independent and private place to meet, a budget, and additional personnel. | |

| Paragraph 210 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Substantially Compliant |

CMR-2 Draft | December 2, 2020

| Paragraph Language | In conjunction with community representatives, PRPD shall develop a mechanism to select the members of CICs, which shall include a representative cross section of community members and PRPD officers. | |
|---|---|---|
| Compliance Target(s) | **Compliance Target** | **Status** |
| | 1. PPRB has developed a mechanism to select the members of the CICs in accordance with this Paragraph. | Yes ☒<br>No ☐ |
| | 2. Selection process for CIC members complies with Paragraph 210 and relevant policies. | Yes ☒<br>No ☐ |
| Comments & Recommendations | PRPB has created CIC's in every police Area that included community members. The Monitor has interviewed CIC members in Aibonito and Aguadilla. The Monitor will continue to interview CIC members in all police areas. | |

| Paragraph 211 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually/Bi-Annually for various Data Sources. | Partially Compliant |
| Paragraph Language | PRPD shall allocate sufficient resources and authority to ensure that CICs possess the means, staffing, access, training, and mandate necessary to fulfill their mission and the requirements of this Agreement. The operating budget shall be revisited on an annual basis in consultation with the CICs. | |
| Compliance Target(s) | **Compliance Target** | **Status** |
| | 1. Policies related to CICs incorporate the requirements of the paragraph. | Yes ☒<br>No ☐ |
| | 2. CIC orientation course is consistent with approved policies. | Yes ☒<br>No ☐ |
| | 3. PRPB makes CIC orientation available to all members of the CICs. | Yes ☒<br>No ☐ |
| | 4. 85% of CICs possess the means, staffing, and access necessary to fulfill their mission and the requirements of this Agreement. | Yes ☐<br>No ☒ |
| Comments & Recommendations | PRPB formed CIC's from community members from the outset and also provided training utilizing PRPB documents MON-OR-CMR2-10185, MON-OR-CMR2-9740 (Ratings of teachers), MON-OR-CMR2-10213 (List of participants), MON-OR-CMR2-10216 (Seminar Power Point Presentation), MON-OR-CMR2-10577 (PRPB liaisons to CIC's). However, resources are lacking. The CIC members are also in need of additional members and office space for meetings. The Monitor has not seen an operating budget. The Monitor will continue requesting data and interview CIC members, as well as PRPB personnel. | |

| Paragraph 212 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Partially Compliant |
| Paragraph Language | PRPD shall work closely with CICs to develop a comprehensive community policing approach that collaboratively identifies and implements strategies to address crime and safety issues. In order to foster this collaboration, PRPD shall share appropriate information and documents with CICs, provided adequate safeguards are taken not to disclose confidential or otherwise law enforcement sensitive information. PRPD shall seek CIC assistance, counsel, recommendations, or participation in areas including: | |

CMR-2 Draft | December 2, 2020

a) reviewing and assessing the propriety and effectiveness of law enforcement priorities and related community policing strategies, materials, and training;

b) reviewing and assessing the propriety and effectiveness of PRPD policies on matters such as discriminatory policing, search and seizure, use of force, the civilian complaint process, and victim services;

c) reviewing and assessing concerns or recommendations about specific PRPD policing tactics and initiatives;

d) providing information to the community and conveying feedback from the community to PRPD;

e) advising the Superintendent on recruiting a qualified, diverse workforce; and

f) advising the Superintendent on ways to provide data and information, including information about PRPD's compliance with this Agreement, to the public in a transparent and public-friendly format, to the greatest extent allowable by law.

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. PRPB developed a community policing approach working closely with CIC as per the requirements of the paragraph. | Yes ☐ No ☒ |
| | 2. PRPB protects confidential and law enforcement sensitive information in documents and information it shares with the CICs. | Yes ☒ No ☐ |
| | 3. Every six months, PRPB sought assistance, counsel, recommendations or participation from the CICs, collectively, at least once in all areas specified by the Paragraph. | Yes ☐ No ☒ |
| Comments & Recommendations | The Monitor was provided with an email list of where PRPB officers provide CIC members copies of PRPB policies for their review, as well as comments and suggestions (Documents MON-OR-CMR2-10578 through 10587). Documentation was also provided that CIC's were given a copy of GO400-401 Body Cam for their comments and suggestions, as well as a list of suggestions and recommendations given by CIC's (Documents MON-OR-CMR2-10588 through 10626). No evidence has been provided of CIC members' review of policies on discriminatory matters, use of force, civilian complaints, search and seizure, recruiting issues, or of policing tactics and initiatives. Also, a list of Central CIC members was provided (Document MON-OR-CMR2-10627). However, there is no evidence of an established community policing strategy. The Monitor will continue requesting relevant data for assessment. | |

| Paragraph 213 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Not Compliant |
| Paragraph Language | CICs shall memorialize their recommendations in an annual public report that shall be available in PRPD facilities and on the official web pages of the Commonwealth of Puerto Rico and PRPD. The report shall include appropriate safeguards not to disclose confidential or otherwise law enforcement sensitive information and to protect sensitive personal or private information. | |
| Compliance Target(s) | Compliance Target | Status |
| | 1. PRPB published 100% of CICs annual public report with recommendations included are available on web pages of the Commonwealth of Puerto Rico and PRPB. | Yes ☐ No ☒ |

CMR-2 Draft | December 2, 2020

| | | |
|---|---|---|
| | 2. All CICs annual reports do not disclose confidential or otherwise law enforcement sensitive information and it protects sensitive personal or private information. | Yes ☐ No ☒ |
| **Comments & Recommendations** | The Monitor has not been provided with, nor seen, any evidence of an annual public report from the CIC's on the PRPB website, nor in any police facility. The Monitor will continue to request the annual report and check the police website for evidence. | |

| **Paragraph 214** | **Assessment Frequency** Bi-annually | **Overall Compliance Status** Not Compliant |
|---|---|---|
| **Paragraph Language** | PRPD shall develop a Community Outreach and Public Information program in each of the former thirteen police regions or in other operational subdivisions with comparable geographic coverage. | |
| **Compliance Target(s)** | **Compliance Target** | **Status** |
| | 1. Community Outreach and Public Information program was developed in each of the former thirteen police regions or geographic equivalent. | Yes ☐ No ☒ |
| | 2. At least bi-annual open meetings were held during the first two years of the Agreement. Then annually until the end of the Agreement. | Yes ☒ No ☐ |
| | 3. 95% of the meetings were widely publicized at least one week before such meeting. | Yes ☐ No ☒ |
| | 4. During 95% of the meetings reviewed the public was informed of the requirements of this Agreement, PRPB's progress meeting these requirements, and addressed areas of community concern. | Yes ☐ No ☒ |
| | 5. 95% of the Outcome Reports of open meetings reviewed comply with the parameters established by this Paragraph. | Yes ☐ No ☒ |
| | 6. 95% of the meetings reviewed included public education on an individual's right to decline consent to voluntary searches, consistent with Paragraph 77 of this Agreement. | Yes ☐ No ☒ |
| | 7. Community Outreach and Public Information program meetings comply with Paragraphs 214-216 and parameters established in associated monitoring worksheets. | Yes ☐ No ☒ |
| **Comments & Recommendations** | PRPB provided documents MON-OR-CMR2-10652 through 10655 which list the dates—by year and month—and the Police Area where community meetings were held. However, only a minimal number of Police Areas had scheduled community meetings for the compliance period in question. The Monitor has not seen evidence of the publication of these meetings or their content. PRPB to address the lack of outreach and information sharing in most police areas. PRPB's website lists crime stats but they are not up to date. They are from 2018-2019. No stats from 2020 were found. | |

| **Paragraph 215** | **Assessment Frequency** Bi-annually | **Overall Compliance Status** Partially Compliant |
|---|---|---|
| **Paragraph Language** | The Community Outreach and Public Information program shall require at least bi-annual open meetings for the first two years of this Agreement. During the meetings, PRPD officers from the police region and/or the Reform Unit shall inform | |

CMR-2 Draft | December 2, 2020

| | |
|---|---|
| | the public about the requirements of this Agreement, PRPD's progress meeting these requirements, and address areas of community concern. At least one week before such meetings, PRPD shall widely publicize the meetings using print media, the Internet, and public service announcements on television or radio. |
| **Compliance Target(s)** | This Paragraph is assessed with Paragraph 214. |
| **Comments & Recommendations** | PRPB provided documents MON-OR-CMR2-10652 through 10655 which list the dates—by year and month—and the Police Area where community meetings were held. Documents MON-OR-CMR2-12305 through 12307 which list the dates of upcoming meetings with the community were also provided. Only a minimal number of Police Areas had scheduled community meetings for the compliance period in question. However, the Monitor has not seen evidence of the publication of these meetings or their content.<br><br>PRPB to address the lack of these programs in some police areas; Monitor will request documentation, other evidence, and conduct interviews of stakeholders. |

| **Paragraph 216** | **Assessment Frequency** | **Overall Compliance Status** |
|---|---|---|
| | Bi-annually | Not Compliant |
| **Paragraph Language** | The Community Outreach and Public Information meetings shall, with appropriate safeguards to protect sensitive information, include summaries of all audits and reports completed pursuant to this Agreement and any policy changes made and other significant action taken as a result of this Agreement. The meetings shall also include public education on an individual's right to decline consent to voluntary searches, consistent with Paragraph 77 of this Agreement. | |
| **Compliance Target(s)** | This Paragraph is assessed with Paragraph 214. | |
| **Comments & Recommendations** | While PRPB has done some outreach and some public information, it has not done so in all police areas, and in addition, PRPB has no audits to share with the public during this compliance period. The documentation provided indicated that PRPB has not started conducting audits. The Monitor to request further documentations from PRPB for future CMR's. Meetings will be assessed in future reports when audits are available. The Monitor to request further documentations from PRPB for future CMR's. | |

| **Paragraph 217** | **Assessment Frequency** | **Overall Compliance Status** | |
|---|---|---|---|
| | Bi-annually | Not Compliant | |
| **Paragraph Language** | PRPD shall maintain and publicly disseminate accurate and updated crime statistics, including those related to hate crimes, on a monthly basis. | | |
| **Compliance Target(s)** | **Compliance Target** | | **Status** |
| | 1. PRPB disseminates crime statistics on a monthly basis. | | Yes ☐<br>No ☒ |
| | 2. 95% of reviewed crime statistics were publicly disseminated on a monthly basis. | | Yes ☐<br>No ☒ |
| | 3. 100% of hate crimes were publicly disseminated once they occurred. | | Yes ☐<br>No ☒ |
| | 4. PRPB communicated hate crimes statistics to the public in a clear and easily accessible way. | | Yes ☐<br>No ☒ |

CMR-2 Draft | December 2, 2020

| Comments & Recommendations | PRPB's website lists crime statistics, but they are not up to date. They are from 2018-2019. As an example, the Monitor determined in earlier reports that Use of Force statistics reported for the last several years by PRPB were inaccurate. No stats from 2020 was found on PRPB's website. PRPB should update its online crime stats and keep them up to date every day. |
|---|---|

## Information Systems and Technology

| Paragraph 218 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Not Compliant |
| Paragraph Language | PRPD shall establish information systems and utilize technology to support the implementation of this Agreement in an efficient and effective manner. | |
| Compliance Target(s) | Compliance is determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 219 – 224 in tandem with applicable Paragraphs in sections III through XII and (2) the results of outcome assessments, pursuant to Paragraph 243. | |
| Comments & Recommendations | Partially Compliant for IT capacity to fulfill PRPB policing mandate. Partially Compliant for IT capacity to track PRPB compliance with other areas of the Agreement. | |

| Paragraph 219 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | PRPD shall collect and maintain all data and records necessary to: (a) document implementation of and compliance with this Agreement, including assisting the TCA's outcome assessments and the data collection and reporting required by this Agreement; (b) perform ongoing performance improvement activities in each of the areas addressed by this Agreement; (c) facilitate and ensure transparency and wide public access to information related to PRPD decision making and activities, as permitted by law; and (d) promote officer and civilian safety. | |
| Compliance Target(s) | **Compliance Target** | **Status** |
| | 1. Data dictionary includes all data sets necessary to access compliance with the Agreement. | Yes ☐<br>No ☒ |
| | 2. The data systems permit PRPB to engage in ongoing performance improvement activities in each of the areas addressed by this Agreement. | Yes ☐<br>No ☒ |
| | 3. PRPB makes publicly available all data that the Agreement requires be published, in accordance with PRPB policy and applicable laws. | Yes ☐<br>No ☒ |
| | 4. PRPB collects and maintains data that is relevant, useful, and applicable to officer and civilian safety. | Yes ☐<br>No ☒ |
| | 5. PRPB maintains data and records in compliance with the Agreement and applicable laws. | Yes ☐<br>No ☒ |
| Comments & Recommendations | Not compliant for IT capacity to fulfill PRPB policing mandate. Not compliant for IT capacity to track PRPB compliance with other areas of the Agreement. | |

CMR-2 Draft | December 2, 2020

| Paragraph 220 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | PRPD shall develop protocols for collecting, analyzing, and reporting the information required by this Agreement. These protocols shall be developed and implemented in coordination with the TCA and shall be approved by the DOJ prior to implementation. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 219. | |
| Comments & Recommendations | Partially Compliant for IT capacity to fulfill PRPB policing mandate. Not compliant for IT capacity to track PRPB compliance with other areas of the Agreement. | |

| Paragraph 221 | Assessment Frequency | Overall Compliance Status | |
|---|---|---|---|
| | Annually | Not Compliant | |
| Paragraph Language | PRPD shall develop and maintain an automated record management system and electronic files as part of the Action Plans developed for each subsection above. | | |
| Compliance Target(s) | Compliance Target | | Status |
| | A record management system accounts for all the elements of the Paragraph and outcome measures as required by Paragraph 243. | | Yes ☐ No ☒ |
| Comments & Recommendations | Partially Compliant for IT capacity to fulfill PRPB policing mandate. Not compliant for IT capacity to track PRPB compliance with other areas of the Agreement. | | |

| Paragraph 222 | Assessment Frequency | Overall Compliance Status | |
|---|---|---|---|
| | Annually | Not Compliant | |
| Paragraph Language | PRPD shall provide each supervisor with handheld recording devices and require that supervisors use these devices to record complainant and witness statements taken as part of use of force or misconduct complaint investigations. | | |
| Compliance Target(s) | Compliance Target | | Status |
| | | | Yes ☐ |
| | 1. Policies incorporate all the requirements of this Paragraph. | | No ☒ |
| | 2. Handheld recording device trainings are consistent with approved policies. | | Yes ☐ No ☒ |
| | 3. 95% of sampled personnel are trained and certified in relevant policies related to handheld recording devices, or are scheduled for training, in the case of mid-year reviews. | | Yes ☐ No ☒ |
| | 4. Complaint and witness statements are recorded in 95% of use of force reviews. | | Yes ☐ No ☒ |
| | 5. Complaint and witness statements are recorded in 95% of misconduct complaint investigations. | | Yes ☐ No ☒ |
| | 6. All sampled units had access to functional handheld recording equipment. | | Yes ☐ No ☒ |
| Comments & Recommendations | Not compliant for IT capacity to fulfill PRPB policing mandate. Not compliant for IT capacity to track PRPB compliance with other areas of the Agreement. | | |

209

CMR-2 Draft | December 2, 2020

| Paragraph 223 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Not Compliant |
| **Paragraph Language** | All officers shall have access to National Crime Information Center ("NCIC") data for valid law enforcement purposes only. PRPD shall develop a protocol for the handling and use of NCIC data. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Policies incorporate all the requirements of this Paragraph. | Yes ☒ No ☐ |
| | 2. NCIC data trainings are consistent with approved policies. | Yes ☐ No ☒ |
| | 3. 95% of sampled personnel are trained and certified in relevant policies related to handling and use of NCIC data (or scheduled for training, in the case of mid-year reviews). | Yes ☐ No ☒ |
| | 4. NCIC data is considered in 95% of patrol interventions and investigations. | Yes ☐ No ☒ |
| | 5. All sampled units had access to NCIC data. | Yes ☐ No ☒ |
| | 6. PRPB safeguards appropriately protect sensitive data. | Yes ☐ No ☒ |
| **Comments & Recommendations** | Not compliant for IT capacity to fulfill PRPB policing mandate. Not compliant for IT capacity to track PRPB compliance with other areas of the Agreement. | |