

March 2021

# Third Report of the Federal Monitor

Covering the Period from April 2020 through September 2020

Compliance status of the Puerto Rico Police Bureau in accordance with the Federal Court approved Settlement Agreement between the United States Department of Justice and the Commonwealth of Puerto Rico

John Romero
Federal Monitor

## Table of Contents

INTRODUCTION ..................................................................................................................................... 5

General Background on the Agreement and Monitoring Process ....................................................... 5
Scope of the Monitor's Third Report .................................................................................................. 7
Recommendations by the Monitor's Office for PRPB's Response to the COVID-19 Pandemic.......... 8

I. PROFESSIONALIZATION ..................................................................................................................... 10

1. Staffing and Community Policing................................................................................................... 11
2. Promotions .................................................................................................................................... 12
3. Commander Corps.......................................................................................................................... 14

II. USE OF FORCE ................................................................................................................................... 15

1. General Provisions ......................................................................................................................... 16
2. Specialized Tactical Units .............................................................................................................. 17
3. Crowd Control Policies and Performance ..................................................................................... 19
4. Force Reporting .............................................................................................................................. 21
5. Force Review, Investigation, and Analysis .................................................................................... 24
6. Supervisory and FRB Reviews........................................................................................................ 26
7. FIU Investigations and Force Reviews CFRB ................................................................................. 28
8. Use of Force Training ..................................................................................................................... 31
9. Responding to Behavioral/Mental Health Crisis .......................................................................... 33

III. SEARCHES AND SEIZURES: INTERNAL CONTROLS AND ACCOUNTABILITY.................................... 35

1. Stops, Searches, and Seizures ....................................................................................................... 37
2. Investigatory Stops and Searches ................................................................................................. 37
3. Arrests ........................................................................................................................................... 39
4. Searches ......................................................................................................................................... 42
5. Training on Stops, Searches, and Seizures.................................................................................... 43

IV. EQUAL PROTECTION AND NON-DISCRIMINATION.......................................................................... 44

1. General Provisions ......................................................................................................................... 44
2. Discriminatory Policing .................................................................................................................. 46
3. Sexual Assault and Domestic Violence.......................................................................................... 47

V. RECRUITMENT, SELECTION, AND HIRING........................................................................................ 47

VI. POLICIES AND PROCEDURES............................................................................................................ 47

VII. TRAINING ........................................................................................................................................ 50

VIII. SUPERVISION AND MANAGEMENT ............................................................................................... 50

1. General Provisions ......................................................................................................................... 50
2. Duties of Supervisors ..................................................................................................................... 52
3. Supervisor Training ........................................................................................................................ 54
4. Performance Evaluation................................................................................................................. 54
5. Early Identification System ............................................................................................................ 55
6. Internal Audits and Interagency Feedback ................................................................................... 58

IX. CIVILIAN COMPLAINTS, INTERNAL INVESTIGATIONS, AND DISCIPLINE......................................... 59

1. Civilian Complaints ........................................................................................................................ 60
2. Internal Investigations ................................................................................................................... 61
3. Complaint Intake, Classification, Assignment, and Tracking ....................................................... 62
4. Investigation of Complaints........................................................................................................... 64

5. Staffing, Selection, and Training Requirements..................................................................................... 69
6. Preventing Retaliation ........................................................................................................................... 70
7. Discipline ................................................................................................................................................ 71
8. Officer Assistance and Support ............................................................................................................. 72

**X. COMMUNITY ENGAGEMENT AND PUBLIC INFORMATION ..........................................................74**

1. General Provisions ................................................................................................................................. 75
2. Community Oriented Policing ................................................................................................................ 76
3. Community Interaction Councils............................................................................................................ 79
4. Public Information ................................................................................................................................. 83

**XI. INFORMATION SYSTEMS AND TECHNOLOGY ..........................................................................85**

**APPENDIX A: BACKGROUND TO PRPB MONITORING MISSION ......................................................89**

**APPENDIX B: METHODOLOGY ....................................................................................................92**

**APPENDIX C: NOTES ON SELECT FIU INVESTIGATIONS AND FORCE REVIEWS BY SFRB OF INTENTIONAL FIREARMS
DISCHARGES ............................................................................................................................93**

**APPENDIX D: NOTES ON SELECT INTERNAL INVESTIGATIONS ......................................................104**

**APPENDIX E: CORRESPONDENCE BETWEEN THE MONITOR'S OFFICE AND PRPB REGARDING PRPB'S RESPONSE TO THE
COVID-19 PANDEMIC. ............................................................................................................107**

**APPENDIX F: COMPLIANCE TABLES FOR PARAGRAPHS ASSESSED IN CMR-3 ................................127**

Professionalization ................................................................................................................................. 127
Use of Force ............................................................................................................................................ 130
Searches and Seizures ............................................................................................................................ 146
Equal Protection and Non-Discrimination.............................................................................................. 157
Recruitment, Selection, and Hiring ........................................................................................................ 164
Policies and Procedures .......................................................................................................................... 164
Training.................................................................................................................................................... 168
Supervision and Management ................................................................................................................ 168
Civilian Complaints, Internal Investigations, and Discipline................................................................... 176
Community Engagement and Public Information .................................................................................... 194
Information Systems and Technology ..................................................................................................... 200

## Introduction

This report will outline the current compliance status of the Puerto Rico Police Bureau (hereafter, "PRPB" and at other times "the Bureau") with the federal court approved Settlement Agreement (hereafter, the "Agreement" and/or "Consent Decree"). It was prepared by the Technical Compliance Advisor (hereafter, "the Monitor") pursuant to paragraphs 242, 251, and 252 of the Agreement to inform the court, the parties, and residents of the Commonwealth of Puerto Rico ("Commonwealth") about the status of the implementation and the level of compliance with the Agreement. The Monitor's Office (or "monitoring team") will make itself available to the Court, the parties, and community groups to explain the Monitor's findings and the compliance assessments presented in the report through multiple means that comply with the exigent circumstances of the pandemic.

PRPB's compliance level in CMR-3 backslid significantly from CMR-2, due primarily to continued and significant problems with providing the Monitor's Office with valid data. It is essential that PRPB implement widely accepted policing practices in data collection, validation, and analysis. Proper knowledge management serves two essential goals: First, proper knowledge management, especially through operational IT systems, serves as a means of demonstrating compliance with the Agreement. More importantly, knowledge management serves as the cardinal means of informing PRPB's own leadership of police performance and law enforcement trends in Puerto Rico, enabling the Bureau to make more effective and efficient decisions in the interest of the public.

The Monitor's Office is tasked not merely with assessing PRPB's compliance with the agreement, but also with providing comments that outline a pathway to compliance for those areas where PRPB has not demonstrated compliance. Due to the significant issues with data reliability in CMR-3, however, the Monitor's Office was unable to offer a valid assessment of how PRPB can make progress toward compliance on many paragraphs. As a result, the primary guidance that the Monitor's Office offers throughout CMR-3 is for PRPB to improve their IT systems and knowledge management to the point where the Bureau can achieve the two goals stated above.

### General Background on the Agreement and Monitoring Process

The Agreement was fashioned to provide PRPB officers with the tools, guidance, and resources that they need to reform unconstitutional policing practices and to transform the same into a premiere constitutional police law enforcement entity. The Parties both recognize that constitutional policing and the community's trust in its police force are

interdependent. Accordingly, the full and sustained implementation of the Agreement will guarantee constitutional rights and will consequently increase public confidence in PRPB and its officers. In addition, and perhaps most importantly, the Agreement also aspires to develop on the part of PRPB dynamic leadership and management skills aimed at transforming the bureau for the benefit of the Commonwealth and its residents.

In a joint effort, the parties identified each of the following areas for improvement, enhancement, or reform in PRPB:

- Professionalization;
- Use of Force;
- Searches and Seizures;
- Equal Protection and Non-Discrimination;
- Recruitment, Selection and Hiring;
- Policies and Procedures;
- Training;
- Supervision and Management;
- Civilian Complaints, Internal Investigations and Discipline;
- Community Engagement and Public Information; and
- Information Systems and Technology.

To carry out necessary reforms in the above-mentioned areas, PRPB has developed Action Plans for each of the named substantive areas. These Action Plans set forth in detail the steps agreed upon to execute and implement the reforms and achieve the desired outcomes in each area. Moreover, the above reforms also require the implementation of new or amended policies, practices, training, corresponding documentation, and internal review. All such activities, together with the monitoring of sustainable compliance, fall within the scope of objective oversight, analysis and reporting of the Monitor.

The collection, analysis, reporting and public dissemination of data regarding the ongoing PRPB sustainable reform efforts were designed to strengthen and ultimately ensure public accountability and trust in PRPB. Therefore, the Agreement requires: a) that the Monitor's Office submit timely assessments as to compliance, as well as to PRPB achievements and impediments that the Bureau might be encountering; and b) that the Monitor's Office assist PRPB in finding solutions to all impediments to compliance until sustainable compliance is reached.

During the capacity-building period, the Monitor assessed compliance based on the Commonwealth's own Action Plans, pursuant to Paragraph 240 of the Agreement.

CMR-3 | March 2021

However, with the end of the capacity-building period, the mission of the Monitor's Office has changed. Beginning with CMR-1, the Monitor has been assessing PRPB compliance in relation to the Agreement.

## Scope of the Monitor's Third Report

The Chief Monitor's Third Report covers the period between April 2020 and September 2020 (previous administration). Per the monitoring methodology agreed on by the Parties, 168 paragraphs were scheduled for assessment in CMR-3, out of 212 total paragraphs which the Monitor's Office is tasked to assess. This report excludes the sections of the Agreement covering recruitment and training, as well as specific paragraphs throughout the other sections that are assessed on an annual basis and were covered in CMR-2.

The period of performance covered by CMR-3 covers the beginning of the COVID-19 pandemic up to September 2020. Both law enforcement activities and the monitoring process itself were significantly impacted by the response to the pandemic, including travel restrictions and the temporary closure of PRPB's Reform Office following the Commonwealth's mandatory quarantine requirements. Despite these difficulties, the Monitor's Office and PRPB cooperated intensively to achieve the most comprehensive assessment of PRPB performance possible under the extraordinary historical circumstances confronting both the Commonwealth and the world. Nevertheless, the restrictions imposed by the pandemic forced the Monitor's Office to defer the assessment of several paragraphs of the Agreement.

CMR-3 also represents the final Chief Monitor's Report under the administration of former Governor Wanda Vázquez Garced. The administration of incoming Governor Pedro Pierluisi has appointed a new Commissioner of PRPB, as well as a new Secretary of Public Safety, whose tenures began after the period of performance being reviewed for CMR-3. As such, the findings in CMR-3 are not a reflection of the performance of PRPB under the leadership of the current Commissioner or Secretary of Public Safety. Furthermore, the Chief Monitor wishes to note that the new Commissioner has signaled an eagerness to work with the Monitor's Office openly and in a spirit of cooperation and good faith to achieve the goals of the reform process under the Agreement.

CMR-3 covers nine of the eleven performance areas of the Agreement: 1) Professionalization, 2) Use of Force, 3) Searches and Seizures, 4) Equal Protection and Non-Discrimination, 5) Policy and Procedures, 6) Supervision and Management, 7) Civilian Complaints and Internal Investigations, 8) Community Engagement and Public

Information, and 9) Information Technology. For each of these areas, the Monitor's Office addresses its assessments base on the desk review of data that was provided by PRPB, as well as on interviews, site visits, and the current state of IT. Though site visits were hindered by the pandemic throughout the monitoring period, the Monitoring Team proceeded to conduct with anticipated limitations a variety of on-site monitoring activities.

In the forthcoming report sections, the Monitor provides the assessment and analysis produced by our office`s diverse subject matter experts. All recommendations and assessments are offered in the spirit of collaboration with the sole objective of assisting PRPB in order that they can achieve a pathway to compliance, and ultimately sustainable compliance.

## Recommendations by the Monitor's Office for PRPB's Response to the COVID-19 Pandemic.

The Commonwealth of Puerto Rico and its Police Bureau, like the rest of the globe, was not exempt from the spread of the deadly COVID-19 pandemic. The Monitor's Office understands that the coronavirus potentially poses a substantial threat to the Puerto Rico Police Bureau in the performance of its functions. Also, as the disease has progressed, it has both increased the demand on police personnel and resources, while also increasing the risk to personnel in course of performing their duty. Such an event far exceeds the efforts and capabilities normally expected of police and has potentially severe consequences.

To that end, the Monitor's Office reached out to the former Commissioner of the Puerto Rico Police Bureau early in 2020 to offer recommendations on how PRPB might better address the risks and challenges associated with the pandemic. The Monitoring Team has considerable experience dealing with critical situations, and offered both its assistance to PRPB, and suggestions on actions PRPB could undertake to help mitigate the impact on the Bureau. In return, PRPB provided the Monitor's Office with monthly status reports on their COVID-19 response operations, which are detailed in Appendix E.

The Court had also taken the initiative to inform the parties that it was willing to provide PRPB, through the Monitor`s Office, access to top U.S. experts to assist PRPB in updating its COVID-19 protocol. These experts include, but are not limited to, epidemiologists from the University of Massachusetts and the JCC in the Health Reform Case (CV-99-1435-GAG).

In particular, the Monitor's Office suggested that PRPB implement several safety measures to ensure the safety and well-being of PRPB personnel and the public. These suggestions included:

1. PRPB personnel should have adequate protective gear in case they come in contact with possible infected individuals;
2. PRPB should collaborate with other agencies within the Commonwealth and Federal agencies as to how quarantine enforcement will be carried out, if necessary;
3. PRPB should establish contingency plans to mobilize personnel to provide police services in areas where personnel have become infected;
4. The Commonwealth should implement a plan to sanitize police stations, police vehicles, and equipment throughout the island on a regular basis;
5. The Commonwealth should implement "return to work" guidelines for PRPB personnel after they complete quarantine due to potential exposure to individuals with COVID-19;
6. Non-essential training and travel should be suspended for an initial period of 30 days;
7. PRPB should establish communication with the Department of Health to ensure that PRPB members obtain "drive through" services for COVID-19 tests in cases of suspected exposure.

The Monitor's Office continued to offer further guidance as the events in the Commonwealth unfolded and requested that PRPB provide a comprehensive response due to the urgency of the matter.

In response to the above PRPB developed a monthly report to the Monitor's Office that addressed the Monitor's Guidance and the steps being taken by PRPB to respond to the pandemic. The report included the following Bureau-wide information:

1. Lists of PRPB personnel who have tested positive for COVID-19;
2. Lists of PRPB personnel who have quarantined;
3. Lists of PRPB personnel deceased due to COVID-19;
4. Status updates on the Reform Office's functions during the pandemic;
5. Levels of personal protective equipment available to PRPB personnel;
6. Facilities effected by the pandemic.

Throughout this period, the Monitor's Office maintained continuous communications with PRPB, USDOJ, and the Special Master with respect to the Court's orders regarding PRPB's response to COVID-19. These Court Orders addressed numerous issues, including

the role of the National Guard in supporting PRPB in its enforcement of the Executive Orders issued by the Governor. The Court issued specific orders regarding the role of the National Guard throughout the COVID-19 emergency in Puerto Rico, and the Monitor's Office aided the Special Master in the preparation of guidelines to be followed by PRPB and the National Guard throughout the emergency. The Court approved the Special Master's guidelines and recommendations to PRPB on the COVID-19 issue following the increase of police officers suffering from COVID-19. Full details on the correspondence between the Monitor's Office and PRPB on the COVID-19 pandemic can be found in Appendix E.

## I. Professionalization

The Monitor concludes that while PRPB has made some limited progress towards compliance with respect to professionalization, mostly in policy development, PRPB needs to improve its effort and resources to achieve substantial compliance.

| Paragraph | Stipulations | Monitor's Rating |
|-----------|-------------|------------------|
| 12 | Promote professional, ethical, and respectful policing; build public confidence; strengthen institutional structures. | Not Compliant |

**Paragraph 12:** A check of Chapter 600, Section 617 of the General Orders of PRPB reveals a written mechanism that prohibits a myriad of behaviors that are unprofessional, unethical, disrespectful, or otherwise undermine the relationship between PRPB and the community. The document was written on June 20, 2018 and made effective by the Commissioner's signature on May 28, 2019. The copy provided to the Monitor indicates no changes since the approval was made by the Monitor's Office as a formal policy or directive.

The Monitor's Office asked for curricula associated with the global training and certification mandated by the Agreement with highlights for any areas changed since its approval by the Monitor. PRPB provided a handbook, which contains a course outline for *Code of Ethics for Members of PRPB*. The outline provided calls for 8 hours of training that focuses on key components of ethics and discipline within PRPB. There is no indication that the course had been modified since its initial approval by the Monitor, nor does it seem to require any change based upon any superseding change in Puerto Rico law.

The Monitor's Office also requested a sample of 54 administrative investigation files for the reporting period. In response, PRPB provided 20 files which were closed and noted that 44 were still in varying phases of investigation or final adjudication, which is of some

concern. Two of the files were "administratively closed," which according to PRPB means that no policy violation was found from the outset. These files were not provided to the Monitor for verification. The Monitor finds that of the twenty investigative files reviewed, seven were deficient in one form or another.[1]

The Monitor's Office would like to note that SARP rules and procedures establish a strict timeline for intake, registration, classification, assignment, and investigation of administrative complaints. There is also an established mechanism to prolong the time allotted for investigations, provided that certain prerequisites are met and the SARP commander approves. In a significant number of SARP cases reviewed for this reporting period, the COVID-19 pandemic played a substantial role in the delay of some investigations. Some investigators had to conduct telephone interviews of complainants and witnesses at the behest of these individuals, which while less than optimal, is understandable given the level of fear of COVID-19 infection among the public. The Monitor acknowledges that the height of the pandemic may be the reason for these delays and will review this matter in upcoming reports. Further, the net effect of the number of finalized cases sent for the Monitor's review is not representative of the universe of SARP investigations closed during the period. And as noted below, the Monitor notes only partial compliance at best in a few key areas.

While this paragraph describes a system for internal audits for ethics violations to be further developed in paragraph 157, PRPB has informed the Monitor that no such audits have been conducted during the reporting period. As paragraph 157 speaks to these audits at far greater depth, the Monitor refers readers to Section VIII "Supervision and Management" for further assessment of compliance.

## 1. Staffing and Community Policing

PRPB has conducted a staffing study and developed an allocation plan ("the Plan") to align deployments of sworn personnel with demand for police services under the strategy of community policing. Site visits must be conducted in order to determine whether PRPB has implemented community deployments called for under the Plan. In addition, internal audits called for under the Plan must be executed to achieve substantial compliance.

| Paragraph | Stipulations | Monitor's Rating |
|:---:|:---|:---|
| 13 | Assess the appropriate number of personnel to fulfill its mission, and plan deployments in support of community policing. | Partially Compliant |

---

[1] See Appendix D for details.

**Paragraph 13:** The Monitor asked for and was provided with a copy of the Plan, which was approved by former Commissioner Escalera in September of 2018. There appears to have been no updates or amendments to the Plan since its approval by the Monitor and formal enactment by PRPB. The Plan shows that PRPB has begun shifting towards greater civilianization of administrative duties, which in turn frees up approximately 1300 additional sworn officers for field deployment. One of the goals of the Plan is to balance ongoing generational turnover in PRPB with increased recruitment and formative training classes.

The Agreement and corresponding Plan articulate the goal of having members assigned to areas from where they originate, or at least with which they are familiar. As with any agency with 12,000 men and women, transfers are frequently made in the ordinary course of business, often after specialized training or upon promotion in rank. Mindful of these factors, the Monitor specifically avoided requesting samples of certain districts to verify representation of community residents among locally deployed PRPB staff. In the Monitor's experience, this inquiry is best conducted by site visits, which would reveal where PRPB officers grew up and exactly how well they know the community in which they are currently assigned. In addition, a mere poll of where officers live and where they are assigned would tend to produce misleading results in the Monitor's view, as an officer who grew up in a certain area and is assigned to that same area may have relocated nearby for any number of reasons. The assessment of Paragraph 13 thus reflects the on-the-ground observations made in relation to other areas of the Agreement.

Lastly, the Plan contains a substantive IT component for the compilation of statistics. The Monitor refers readers to Section XI. Information Technology for a review and assessment of compliance with the IT component of the Plan.

## 2. Promotions

The Monitor's Office finds some areas concerning promotions that are problematic, while others require more data to reach a compliance rating. In the wake of the COVID-19 pandemic, PRPB has reported that no promotions were made during the reporting period. However, PRPB introduced a new promotion policy without consulting the Monitor's Office. The Monitor's Office has not been given the opportunity to review this policy, and as such promotions are currently governed by two competing policies. The Monitor has grave reservations over the lack of transparent qualifications and the lack of an open assessment process to promote command level officers.

| Paragraph | Stipulations | Monitor's Rating |
| --- | --- | --- |

CMR-3 | March 2021

| 14 | Promotion practices shall be merit-based and comply with equal opportunity employment principles. | Deferred |
|---|---|---|
| 15 | Publish detailed job descriptions for each rank among sworn personnel, specifying duties, responsibilities, and qualifications. | Substantially Compliant |
| 16 | Provide clear guidance on supervisor selection; ensure selection process is lawful, fair, and prioritizes ethical & effective policing. | Deferred |
| 17 | Utilize competitive written examinations as a component of promotions through the rank of Captain. | Deferred |
| 18 | Appointments to ranks above Captain shall be based on knowledge, skills, and abilities to perform core duties. | Not Compliant |
| 19 | Establish procedures for removal of officers from consideration for promotion for disciplinary action related to misconduct | Partially Compliant |
| 20 | Establish criteria for promotion of officers in supervisory roles, including complaints against officers under their supervision. | Partially Compliant |

**Paragraph 14:** PRPB reports making no promotions during the reporting period. However, PRPB introduced a new promotion policy without consulting the Monitor's Office. The Monitor's Office has not been given the opportunity to review this policy, and as such promotions are currently governed by two competing policies. Nevertheless, the Monitor will defer rating until such time as promotions are made and can be assessed for compliance.

**Paragraph 15:** PRPB published its manual of ranks and corresponding responsibilities in April of 2020. It is abundantly clear to the Monitor's Office that considerable time was spent to incorporate the changes prescribed by the Agreement into the qualifications, roles, and responsibilities of each rank. In particular, the Monitor is impressed by the educational prerequisite established in the manual for each rank, as not all police agencies in the mainland US have embraced such stringent minimal requirements, especially for entry-level ranks. For those aspiring to a command rank, a bachelor's degree is required. For the rank of Lieutenant Colonel and above, a graduate degree is required.

**Paragraph 16:** The PRPB Manual of Ranks provides substantial, objective guidance on selection criteria. Regulation 9001 establishes a comprehensive code of conduct for its employees. The report devotes greater attention to Regulation 9001 later in this Section as it applies to internal discipline. The Monitor has no data on the makeup, training, and certification of the promotions committee. As no promotions have been made, there are no candidates to interview concerning their perceptions of the promotions process.

**Paragraph 17:** The PRPB Manual of Ranks provides that a written examination is necessary to be considered for promotion from Agent to the rank of Captain. Written examination is not a prerequisite for attaining a command rank. As noted above, PRPB

has not conducted promotional examinations during the reporting period. The Monitor's Office is deferring rating until such a time that these examinations are conducted.

**Paragraph 18:** The Manual of Ranks describes the responsibilities, knowledge, skills, and abilities for consideration to the command ranks of Inspector, Commander, Lieutenant Colonel and Colonel. As mentioned previously, a higher level of formal education is also required for command rank. As there are no written, objective criteria for establishing proficiencies, we must assume that PRPB command promotions are based upon the Commissioner's decision, and that these command rank officers are promoted at the discretion of the Police Commissioner, a political appointee. It is perhaps for this very reason that the Agreement calls for PRPB to develop objective, merit-based criteria for selection of command officers. The Monitor recognizes the importance for the duly elected executive branch of government to have a PRPB command staff that reflects the administration's own public policy views. However, PRPB must realize that, absent exceptional circumstances, command staff officers do not change in conjunction with the arrival of a new administration, with the exception of the Police Commissioner. The promotion of an objectively unqualified person to PRPB command staff carries with it the risk of hobbling the institution's senior leadership, overall morale, and esprit de corps for years to come. It should be noted that throughout this reform period and thereafter, PRPB will need leaders that have embraced the necessary changes required as per the reform.

**Paragraph 19:** Regulation 9001 establishes disciplinary consequences for those infringing upon the established rules and procedures of PRPB. Among the range of outcomes, the regulation includes a negative indication for promotion in tenor with the Agreement.

**Paragraph 20:** Regulation 9001 establishes a clear sequence of responsibility in the chain of command, wherein supervisors are responsible for overseeing their subordinates, and commanders are in turn responsible for overseeing their staff officers. Unfortunately, the Monitor's Office has not seen evidence that this procedure has been implemented consistently.

### 3. Commander Corps

PRPB policy does have a written career path that at least in theory leads to the command staff. As it is written, the command path does emphasize ethics, leadership, education, and constitutional community policing at each level.

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 21 | Provide a career path toward command that emphasizes ethics leadership, education, and community & constitutional policing. | Deferred |

**Paragraph 21:** See Jt. Mot., ECF No. 1095 at 9 (proposing Special Master assist developing plan in accordance with Paragraph 21); Order, ECF No. 1102 at 2 (approving the same).

## II. Use of Force

The Monitor's Office concludes that PRPB has developed General Orders that properly categorize use of force ("UOF") level based on the degree of seriousness. The policies cover all force technologies and weapons authorized for use by PRPB, including specialized Bureau units. In addition, the Monitor's Office has verified through documentation that, as per General Order 600-601, CN gas has been both decommissioned and disposed of by a private vendor. However, the Monitor's Office was unable to conduct site visits to the SWAT facilities to verify this due to COVID-19 during this period. Nevertheless, the Monitor was able to check shortly after the period ended and determined that no CN gas was present.

As it relates to use of force incidents, PRPB continues to have no mechanism in place to verify the accuracy and validity of its reporting on incidents where force was used, and the number of forces used in those incidents. This issue was verified by PRPB's response to the Monitor's request for information. During the review period for CMR-3 the Monitor's Office requested the following information: 1) number of incidents where force was used, and 2) how many officers used force in those incidents. In response, PRPB provided three conflicting sets of numbers from different reporting sources within the Bureau. One set of data reported 366 incidents with 603 uses of force; another set of data reported 293 incidents with 602 uses of force; a third set of data reported 379 incidents with 619 uses of force.

Though the Monitor's Office recognizes that discrepancies are inevitable when multiple reporting steams track the same data, PRPB must implement mechanisms to probe these data sets for inconsistencies, so that the different reporting streams catch errors, resolve discrepancies, and validate one another.

This has been a recurring problem for PRPB, and one which was identified in both CMR-1 and CMR-2. It is an area of concern given that PRPB reported in CMR-2 that it would adopt the Monitor's Office recommendation that the on-screen form (PPR-84) currently used by the Bureau's thirteen Area Commands would be replaced with a new form (PPR-126.2) which would contain the necessary fields for information on use of force. According to PRPB, this new form was to take effect on March 31, 2020. However, during a site visit by the Monitor's Office to PRPB's San Juan Centro de Mando and PRPB's Reform Unit on November 16, 2020, the Monitor verified that the change never took place. As a result,

the Monitor's Office cannot verify that the information provided by PRPB on use of force by its members is valid.

| Paragraph | Stipulations | Monitor's Rating |
|-----------|-------------|------------------|
| 22 | Use force only when necessary and in accordance with the law; rely primarily on non-force techniques to police effectively. | Partially Compliant |

**Paragraph 22:** The Monitor has seen sufficient evidence of compliance to assess PRPB as being partially compliant in relation Paragraph 22, which governs use of force as a whole. However, significant obstacles must be addressed before PRPB comes into substantial compliance. These obstacles are addressed in-depth below.

### 1. General Provisions

| Paragraph | Stipulations | Monitor's Rating |
|-----------|-------------|------------------|
| 23 | Comprehensive UOF policy shall categorize all reportable uses of force into levels grouped by degree of seriousness. | Partially compliant |
| 24 | Develop policies concerning kinds of force and sharing information with the public regarding serious uses of force. | Partially compliant |
| 25 | Continue to prohibit the use of chloroacetophenone gas. | Substantially Compliant |
| 26 | Maintain a list of officers who qualify for authorized firearms, subject to disciplinary action for those who fail to qualify. | Not Compliant |

**Paragraph 23:** The Monitor's Office reviewed 63 use of force incidents and determined that the levels of force were accurately categorized into levels grouped by the degree of seriousness. However, as previously stated, the Monitor cannot verify that the use of force reports/investigations provided to the office reflect all use of force which occurred during the period under review.

**Paragraph 24:** PRPB has prepared comprehensive policies that are consistent with generally accepted police practices relating to use of force. However, PRPB has failed to properly provide accurate use of force information to the public.

**Paragraph 25:** As per the Agreement PRPB continues to prohibit the use of CN gas.

**Paragraph 26:** PRPB provided a list that reports that of the active 11,537 members, 4,433 (38.44%) qualified during the period. However, training certificates for the requested sampled personnel were not provided to the Monitor's Office and, as such, we are unable to verify compliance.

PRPB reports that no member of service failed to qualify with their authorized firearms during the period. While the Monitor does not doubt that all officers succeeded in

requalifying with their firearms, the Monitor does express skepticism that in a police force of over 12,000 sworn officers, all officers would qualify on the first attempt. PRPB must demonstrate that it is appropriately reporting which officers failed to qualify on their first attempt, and succeeded in qualifying on subsequent attempts per policy.

## 2. Specialized Tactical Units

As it relates to paragraphs 27-31, the Monitor's Office has concluded that PRPB has developed use of force policies for specialized tactical units, and that these policies are consistent with the Bureau's agency-wide use of force policy. The Monitor's Office has verified through document review that specialized units are not conducting general policing functions, i.e., regular patrol. In addition, the Monitor's Office has verified via document review that specialized units are properly documenting their activities.

In relation to policies on Use of Force, as previously stated in the Monitor's second report, PRPB must revise the practice of assigning one complaint number to all uses of less-than-lethal weapons at a demonstration/protest. This practice is technically consistent within PRPB policy, but not in keeping with generally accepted policing practices. It allows for officers to underreport their use of less-than-lethal weapons against crowds they determine are unruly, in some instances incorporating under one use of force report multiple incidents that occurred blocks away and after considerable time elapsed from the original site of the protest. The practice lends itself to abuse of power and lack of accountability, such that officers who may use force inappropriately feel a sense of anonymity as they are not required to prepare an individual use of force report (PPR-605.1) documenting their actions. Therefore, the Monitor recommends that PRPB revise their policy to curtail this practice.

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 27 | Develop policies on use of force by members of specialized tactical units consistent with agency-wide policy. | Partially Compliant |
| 28 | Prohibit STUs from conducting general patrol and policing functions without temporary reassignment of officers from STU. | Partially Compliant |
| 29 | Develop eligibility criteria for assignment to STUs that emphasize capacity to carry out STU mission in a constitutional manner. | Partially Compliant |
| 30 | Require STUs to document all law enforcement activities in writing, to include operational plans and after-action reports. | Partially Compliant |
| 31 | Track the number of STU deployments, including the reason, result, and legal authority for each deployment. | Not Compliant |

**Paragraph 27:** PRPB has developed use of force policies for specialized tactical units, and the policies are consistent with the Bureau's agency-wide use of force policy. As of the

reporting period, PRPB's specialized tactical units continue to use one single use of force incident report for all uses of force during demonstrations by the unit. The Monitor's Office recommends PRPB update the related policy to address this issue.

**Paragraph 28:** A review of DOT roll calls verifies that PRPB no longer utilizes DOT for general patrols in the capacity of DOT officers. However, PRPB did not provide evidence that DOT officers secure their DOT equipment while serving in a patrol capacity. G.O. 100-112 provides for scenarios in which DOT officers can perform patrol functions, but not in the capacity of DOT officers wearing specialized DOT equipment. Officers are to secure DOT equipment while serving in a general patrol capacity, ensuring that it is available in the event their DOT unit is mobilized. In documentation provided by PRPB, there was no information that officers complied with this requirement to secure their DOT equipment while serving in a general patrol capacity.

**Paragraph 29:** PRPB provided written documentation that during the reporting period there were no transfers in or out of specialized STU Units. Although, PRPB has developed a policy which identifies eligibility criteria as well as selection to specialized units, due to no transfers occurring during the relevant reporting period we are not able to assess for compliance.

**Paragraph 30:** A review of PRPB operations plans submitted to the Monitor's Office relating to DOT indicates that in situations where the Unit was given prior notification as to assignments, an operations plan was prepared. However, DOT units report that they did not actually participate in crowd control during the demonstrations that occurred during the reporting period. Rather, the mobilization involved placing the units on standby if needed. This was verified during a site visit on Friday, January 8, 2021, where documents were reviewed.

As it relates to SWAT, during the period of April 1st through September 30th, 2020 (previous administration), the Unit was activated 49 times. SWAT prepared an after-action-report in 48 of those instances. This was verified via document review during a visit to SWAT on Friday, January 8th, 2021. However, there were only 15 operations plans for the 49 activations. The commanding officer of SWAT reports that in many instances, the call-out involved backing up some of the federal task forces on operations, and no advance warning was provided.

During the site visit to SWAT, it was confirmed that no CN gas was present in the unit's arsenal. Moreover, the Monitor confirmed that supervisors conduct daily checks of weapons inventory. However, this site visit was conducted after the period ended.

**Paragraph 31:** PRPB's does not have a tracking system that captures all deployment data from STU Units throughout the Bureau. The information provided to the Monitor's Office came from each individual STU Unit, which confirms that PRPB is not compiling the information into one central database. While PRPB is collecting the deployment data at the unit level, it appears that PRPB does not collect the data at the bureau level. Therefore, PRPB is not compliant.

## 3. Crowd Control Policies and Performance

This section provides an analysis of PRPB's handling of demonstrations occurring during the period from April 1ˢᵗ through September 30ᵗʰ, 2020 (previous administration). The Monitor's Office selected a random sample of demonstrations/protest for purposes of reviewing operational plans and after-action reports. The Monitor selected incidents that required the mobilization of STU-DOT units, specifically in the Metro area where almost all the incidents took place.

For the relevant period, PRPB provided data/documentation that noted that there were no demonstrations and/or protests that required the mobilization of STU-DOT outside of the Metro and Carolina areas. Furthermore, PRPB also provided documentation that demonstrated that while there were demonstrations in Bayamon, San Juan, Mayaguez, and Utuado, DOT was not mobilized in those cases.

It should also be noted that PRPB area commands did not prepare after-action reports or assess the police response after demonstrations/protest took place in their areas. In response to the Monitor's Office inquiry, some area commands deferred to the DOT Unit on scene for the information. However, DOT did not provide any after-action reports or assessments.

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 32 | Develop crowd control and incident management policies that comply with applicable law and policing practices. | Partially Compliant |
| 33 | Ranking officer at the scene of a crowd situation to assume command and provide approval prior to deploying force. | Partially Compliant |
| 34 | Require the use of crowd control techniques and tactics that respect protected speech and lawful assembly. | Partially Compliant |
| 35 | Require the assessment of law enforcement activities following each response to a crowd situation. | Not Compliant |

**Paragraph 32:** PRPB reports that no additional training was provided on G.O. 600-625 "Crowd Control" during the reporting period. The number of people trained remains the same as in CMR-2.

**Paragraph 33:** During a site visit to Metro DOT, the Monitor reviewed a random sample of reports relating to demonstrations/protests where STU was mobilized. The Monitor learned that in instances where the Bureau had determined in advance that the STU Unit would be activated, an operations plan was developed by the DOT Unit. However, in instances where the determination to mobilize the Unit was last minute, no such plan was prepared by DOT. This was verified by the Monitor's review of data and documentation during the site visit conducted on January 8, 2021.

The Monitor further determined that not all STU mobilizations were followed up by proper after action reports. The Monitor's Office recommends that General Order 112 be revised to contain guidance on how to fill out PPR 112.3, including what information should be in the after action report.

During the site visit, the Monitor's Office confirmed that 100 percent of personnel had been trained on G.O. 600-625, and 100 percent of supervisors had been trained on Incident Management. In addition, the Commanding Officer of Metro DOT received training on Incident Command.

**Paragraph 34:** The Monitor's Office requested all reports (bureau-wide) relating to demonstrations/protests. Though PRPB provided this information, it provided documentation in 13 separate reports rather than one consolidated report. This response demonstrates that information only lies with the individual area commands. PRPB should be collecting this data bureau wide for the purpose of analysis and identifying possible training needs.

**Paragraph 35:** PRPB provided documentation that STU-DOT personnel have been trained on "Crowd Control", General Order 600-625. Based on document review and the site visit of January 8, 2021 to Metro DOT, the Monitor's Office found that the Unit did not prepare any after-action reports when activated. However, the Unit did not engage in the events and were simply on scene on stand-by mode.

PRPB provided no documentation referring to responses to unplanned demonstrations/ protests, going so far as to report that there were no unplanned demonstration events that took place during the reporting period of CMR-3. Based on the Monitor's experience, many smaller demonstrations/protests tend to be spontaneous, and seldom provide police with advance warning. The Monitor is thus skeptical of this claim, and as a result, the Monitor's Office is unable to establish that PRPB is in compliance with this target.

The Monitor considered numerous documents to reach a conclusion as to whether PRPB was substantially or partially compliant with the Agreement as it applies to mass

demonstrations. These included a review of PRPB's work plans for the demonstrations as well as its completion of PPR 112.1 Request for activation of the STU, and PPR-112.2 Record of Mobilizations of STU.

## Conclusions Regarding Crowd Control Findings

Based on the review and analysis of documents and data provided by PRPB, the Monitor's Office concludes that PRPB's actions during demonstrations/protest in the period covered in CMR-3 were consistent with generally accepted police practices and Bureau Policy. PRPB provided Operation Plans (PPR-625.2) for the various demonstrations/protests that occurred in the reporting period and Crowd Management and Control Report (PPR-625.3), which provided basic details of the event. However, the Monitor is concerned by the fact that PRPB produced no detailed after-action reports from Commanders relating to the demonstrations/protests which occurred in their respective area commands. Much can be learned by preparing an in depth after-action report. It allows a frank assessment as to what occurred and, in many cases, what can be improved upon. In addition, General Order 600-625 specifically states that PRPB will conduct self-assessment of such operations.

## 4. Force Reporting

The Monitor's assessment of PRPB compliance with policies and procedures, specifically those related to the Use of Force, are based on the use of force reports submitted by the Reform Unit to the Monitor's Office for review. As a result, the Monitor identified a significant discrepancy within the data provided.

PRPB continues to have no mechanism in place to verify the accuracy and validity of its reporting on incidents where force was used, and the number of forces used in those incidents. This issue was verified by PRPB's response to the Monitor's request for information. During the review period for CMR-3 the Monitor's Office requested the following information: 1) number of incidents where force was used, and 2) how many officers used force in those incidents. In response, PRPB provided three conflicting sets of numbers from different reporting sources within the Bureau. One set of data reported 366 incidents with 603 uses of force; another set of data reported 293 incidents with 602 uses of force; a third set of data reported 379 incidents with 619 uses of force.

Though the Monitor's Office recognizes that discrepancies are inevitable when multiple reporting steams track the same data, PRPB must implement mechanisms to probe these

CMR-3 | March 2021

data sets for inconsistencies, so that the different reporting streams catch errors, resolve discrepancies, and validate one another.

This has been a recurring problem for PRPB, and one which was identified in both CMR-1 and CMR-2. It is an area of concern given that PRPB reported in CMR-2 that it would adopt the Monitor's Office recommendation that the on-screen form (PPR-84) currently used by the Bureau's thirteen Area Commands would be replaced with a new form (PPR-126.2) which would contain the necessary fields for information on use of force. According to PRPB, this new form was to take effect on March 31, 2020. However, during a site visit by the Monitor's Office to PRPB's San Juan Centro de Mando and PRPB's Reform Unit on November 16, 2020, the Monitor verified that the change never took place. As a result, the Monitor's Office cannot verify that the information provided by PRPB on use of force by its members is valid.

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 36 | Develop a Use of Force Reporting Policy that complies with law and comports with accepted policing practices. | Not Compliant |
| 37 | Officers shall report any use of force in writing in a Use of Force Report Form before the end of the shift. | Not Compliant |
| 38 | Officers shall request medical services immediately when an individual is injured following a use of force. | Not Compliant |
| 39 | Officers shall submit copies of Use of Force Reports to their immediate supervisor and to SPR for tracking and analysis. | Not Compliant |

**Paragraph 36:** The Monitor's Office reviewed policies and related forms, which generally adhered to the requirements of the agreement. However, PRPB has failed to modify its use of force policy to end the practice of combining multiple uses of force under one report. Though PRPB policy currently allows this practice, it violates the requirements of the Agreement, and deviates from generally accepted police practices. Combining multiple uses of force prevents thorough and adequate investigation of each use of force to determine whether it was justified and adhered to policy.

The Monitor's Office will be reviewing the related training curriculum for CMR-4 to ensure that the changes made within policy are reflected.

**Paragraph 37:** Of the 63 use of force reports (PPR-605.1) reviewed by the Monitor's Office, four were not completed before the end of the officer's shift. However, as noted previously, PRPB's inability to maintain an accurate record of all use of force incidents and reports raises concern in ensuring that our review is representative of all use of force incidents.

**Paragraph 38:** In all use of force reports (PPR-605.1) reviewed by the Monitor's Office where medical aid was warranted, it was received. However, without an accurate number of use of force reports, the Monitor is unable to determine whether this finding is representative of all use of force incidents.

**Paragraph 39:** In all use of force reports (PPR-605.1) reviewed by the Monitor's Office, a use of force report was submitted to the officer's immediate supervisor. However, PRPB has not demonstrated that they have the capability to track and analyze these reports in compliance with the Agreement.

During the monitor's review for CMR-2, the Chief Monitor requested that PRPB modify the PPR-84 to require two additional data points on the use of force: 1) whether force was used, and if so, 2) by how many officers. The Monitor's Office also recommended that PRPB modify its PPR-84 system so that the additional data points are completed prior to the system generating a complaint number. This would allow the Force Investigation Unit ("FIU"), the Bureau's repository for all use of force incidents, to provide accurate numbers of use of force incidents on any given day. PRPB confirmed to the Monitor that it has adopted these recommendations (on March 31, 2020) and revised the PPR-84 (now PPR-126.2). The Monitor's Office reported in CMR-2 that it believed that PRPB's adoption of these recommendations would be, going forward, an improvement to PRPB's compliance with the consent decree. During a site visit to San Juan Centro de Mando, and after a meeting with the Reform Unit and personnel from PRPB's Information Technology Unit on November 16th, 2020, the Monitor verified that PPR 126.2 was in fact modified to include the recommendations of the Monitor's Office. However, the Monitor determined through conversation with PRPB personnel and a site visit to San Juan Centro de Mando that PRPB has not replaced PPR-84 with the revised PPR-126.2 as reported. This delay leaves PRPB in a position where it still cannot validate its own use of force data.

The steps PRPB has taken per the Monitor's request to include additional data fields in the PPR-126.2 report is essential in ensuring that information relating to use of force is properly recorded. PRPB needs to take immediate steps to replace the outdated PPR-84 form currently used by the thirteen area commands with the PPR-126.2 form. PRPB should also be working to develop an electronic tracking system with field reporting capability. However, until such a system is implemented, Centro de Mando must have the ability to track the numbers for purposes of monitoring and analyzing use of force dynamics.

## 5. Force Review, Investigation, and Analysis

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 40 | Force reviews and investigations comply with applicable law and comport with generally accepted policing practices. | Not Compliant |
| 41 | PRPB shall maintain an accurate tracking system on all officers' use of force, and analyzing and report UOF trends to the public. | Not Compliant |
| 42 | The quality of force reviews and investigations shall be reflected in the performance evaluations of officers conducting reviews. | Not Compliant |

**Paragraph 40:** Of the 63 use of force reports (PPR-605.1) reviewed by the Monitor's Office, only one incident appears not to have been properly investigated. In addition, four incidents out of the eight investigated by FIU did not include FIU's Preliminary Investigation Report (PPR-113.2). During a subsequent site visit to PRPB's Force Investigations Unit on Wednesday, January 20th, 2021, the Monitor was able to review the FIU's "Preliminary Investigation Report" in the four cases and verify that the use of force was properly investigated. However, as noted previously, PRPB's inability to maintain an accurate record of all use of force incidents and reports raises concern in ensuring that our review is representative of all use of force incidents.

**Paragraph 41:** As previously stated, PRPB has not demonstrated to the Monitor's Office that it has a credible tracking system, nor to date has the Bureau provided the public with accurate information relating to use of force trends.

**Paragraph 42:** PRPB has no mechanism in place to reflect the quality of force review investigations of supervisors when preparing performance evaluations.

The following section presents key observations based on a review of sixty-three UOF Reports. In reviewing a random sample of PRPB's UOF Reports PPR-605.1 (April 1 through September 30, 2020; previous administration) the Monitor's Office determined that the levels of force reported were consistent with the force used. The majority of the reports, in substance, had been properly prepared and the required actions relating to use of force incidents had been carried out as per the Agreement. In addition, if the actions and/or tactics were not consistent with PRPB policies, supervisors recommended re-training.

Of these reports, only one was not in compliance. However, there were a number of reports with errors or missing information. As per PRPB policy, SARP/FIU has been deemed the repository for all use of force reports upon completion of investigation and evaluation. FIU/SARP also has the responsibility to review each report for proper preparation, accuracy, and completeness. Based on the observations of the Monitor's Office, after reviewing the use of force reports provided by FIU, the Monitor discovered

that many of the above reports still had missing information. The practice of having use of force reports, subsequent investigation and evaluation reviewed by FIU for accuracy is of the utmost importance. It is also important to note that these use of force reports (PPR-605.1) need to be reviewed in the field for completeness and accuracy, especially considering that many of these reports do not arrive at FIU for a considerable amount of time, depending on what track the investigation follows. Therefore, as previously stated in CMR-2, a procedure should be in place at the area commands and specialized units that identifies mistakes and/or omissions earlier in the process.

In reviewing and determining levels of compliance with the Agreement, the Monitor's Office must look at the reports when they are deemed complete and accurate by PRPB, which is when FIU makes that determination. To that end, PRPB has to some degree accomplished the objective that the proper levels of force reported were consistent with the force used. However, some of the reports submitted to the Monitor's Office were incomplete or missing information, though these omissions did not affect the outcome of the investigation relating to its compliance with the Agreement and Bureau policy.

The Monitor's Office believes that PRPB should be more cognizant of omissions and errors in the reports that arrive at SARP/FIU during the initial submission, and ensure that corrections be made or required information added.

The following is a list of observations by the Monitor's Office:

- Of the reports reviewed (PPR-605.1), 16% had missing or incomplete information.
- PRPB needs to require that all use of force reports be typed or legibly printed. Reports should not be in script, which in some cases makes them illegible.
- PRPB's practice of sending District/Precinct officers to respond to ACT 408 orders by the court (involuntary admission to a hospital for psychiatric evaluation) should be reviewed. Many responses have resulted in an electronic control device or some other non-lethal weapon being used against the subject. Utilizing a trained CIT officer in these circumstances may result in less use of force.
- Reports should be clear and concise, and only include facts pertinent to the case.
- In several of the cases provided to the Monitor's Office involving firearm discharge, the FIU investigation documentation was not included. The Monitor's Office could not determine at the time if the force utilized was found to be within Bureau guidelines by PRPB. The information was subsequently obtained during a site visit to FIU.
- In one use of force incident provided to the monitor (a firearm discharge by a member assigned to a Federal Task Force), the investigation cited a DEA regulation

CMR-3 | March 2021

that prevented PRPB FIU investigators from interviewing the subject officer for 48 hours.

- In a number of cases, the reports were not properly signed. However, the investigator name was typed in.
- In many instances an agent acted in the capacity of a patrol or station supervisor. While that individual was not assigned to investigate the force, they were responsible for supervising that officer.
- PRPB should ensure that reports are dated on consistent way: either day/month/year or month/day/year. Currently, both approaches are being utilized, which can lead to confusion regarding the date of an incident.
- In instances where more than one officer used force in an incident and the levels of force used by the officers varied, it must be made clear in each officer's report what level of force they used and if it caused an injury. In some reports reviewed, officers indicated using a level 1 or level 2 which did not cause injury to the subject, while elsewhere in their report the officers indicated that the subject sustained injuries. Upon further review, it was determined that the injuries were the result of other officer(s) use of force involved in the incident. This potential point of confusion was also addressed in CMR-2.
- Four of the reports reviewed were not submitted by officers before the end of their shift.
- Five of the reports reviewed found that supervisors had not completed their review within five business days as outlined in the agreement.

## 6. Supervisory and FRB Reviews

The Monitor's review demonstrated that PRPB supervisors properly respond to incidents of serious use of force by members under their supervision. In cases where FIU presence was needed, proper notification was made to FIU, with the exception of one incident in which a Lieutenant pointed a firearm (level 3). This should have been investigated by FIU, which investigates all use of force by members above the rank of sergeant. There is no indication that a supervisory investigation was conducted.

It should be noted that in some instances the files provided to the Monitor's Office did not include FIU's information (Preliminary Investigation Report PPR-113.2). Supervisors were notified in all 63 cases reviewed. In one incident however, notification was not made in a timely manner. In all but five reports reviewed, supervisors completed their review within the five business days as outlined in General Order 600-605.

During this period of review, there were no reports of apparent misconduct or apparent criminal conduct. The Monitor's Office concludes that the mechanism to report such conduct is in place.

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 43 | A supervisor shall respond to the scene of a serious use of force or allegation of excessive force upon notification. | Not Compliant |
| 44 | Supervisor shall conduct a supervisory review of all uses of force, prisoner injuries, or allegations of excessive force. | Not Compliant |
| 45 | Supervisors shall complete use of force reviews within 5 business days of receiving the officer's use of force report. | Not Compliant |
| 46 | A Force Review Board shall evaluate supervisory reviews for completeness, evidentiary support, and compliance with policy. | Not Compliant |
| 47 | Any evidence of UOF misconduct shall be immediately referred to the appropriate investigating unit or the PRDOJ. | Deferred |

**Paragraph 43:** Of the 63 use of force reports (PPR-605.1) reviewed by the Monitor's Office, the monitor found only one instance in which a supervisor did not respond to a serious use of force. This use of force was investigated by FIU, but the FIU report was not included in the documentation provided to the Monitor's Office. Therefore, the Monitor's Office was unable to confirm initially if a supervisor responded to the scene. However, during a subsequent site visit to FIU, the Monitor's Office was able to determine that the incidents were properly investigated by FIU. It should also be reiterated that PRPB's inability to maintain an accurate record of all use of force incidents and reports raises concern in ensuring that our review is representative of all use of force incidents. This also applies to the compliance reviews conducted for paragraphs 44 and 45.

**Paragraph 44:** Of the 63 use of force reports (PPR-605.1) reviewed by the Monitor's Office, it appears one incident was not properly investigated, in which a lieutenant pointed a firearm at an individual. In another incident, the 605.1 report portion related to supervisory investigation is blank.

**Paragraph 45:** Of the 63 use of force reports (PPR-605.1) reviewed by the Monitor's Office, five did not complete their review in five business days as per the Agreement.

**Paragraph 46:** The Monitor's review of FRB evaluations indicated appropriate actions were taken by the Boards. In determining compliance to paragraphs 46 and 47, the Monitor's Office requested a list of all FRB investigations conducted by the 13 Area Command Force Review Boards during the given reporting period. To that end, PRPB provided 173 cases of UOF incidents, of which the Monitor randomly sampled 40 cases to review. The Monitor's review found that of the 40 cases reviewed:

- 25 cases were in fact reviewed by the Boards.
- Three of the remaining cases did not involve a use of force.
- Ten were not reviewable cases, as per General Order 500-502, "Evaluation Boards of Incidents of Use of Force." These cases include incidents such as euthanizing injured animals, SWAT pointing a firearm during an entry, etc. The Monitor notes that in these 10 cases, no FRB investigation was required or found, indicating that the reporting of these cases as reviewed by the FRB was in error.
- In one case, FIU indicated that they have not received the file.
- One case involved a duplicate case number.

Upon further review of the 25 cases, the Monitor made a number of findings, including that the evaluations of the Boards were unanimous in 24 cases. The remaining case had one dissenting vote. In two instances the board ordered the retraining of the officer.

Based on the reviews of the randomly selected Area Command FRB files, there were no reported referrals, nor was any such need uncovered. However, the Monitor again notes that it is impossible to conclude that these findings reflect PRPBs performance more broadly, given PRPB's continued problem with submitting valid use of force data.

**Paragraph 47:** There were no reports of misconduct in the cases reviewed, however Bureau policy clearly dictates what actions the Board must take with respect to reporting misconduct to the appropriate investigative unit or to the Puerto Rico Department of Justice.

## 7. FIU Investigations and Force Reviews CFRB

PRPB created a Force Investigation Unit (FIU) to address all incidents in which PRPB personnel use deadly force in the line of duty. As indicated in the Monitor's first and second report, FIU is required to investigate all incidents of use of deadly force across Puerto Rico, including both intentional and accidental firearms discharges involving PRPB personnel.

In both CMR-1 and CMR-2, the Monitor's Office voiced serious concerns about the thoroughness of FIU investigations and the accuracy of their conclusions. This was based on several findings, including that a significant proportion of FIU reports relied solely on police witnesses, and rarely incorporated interviews or observations from unbiased civilian witnesses.

For the period of CMR-3 (April 1 through September 30, 2020; previous administration) PRPB reported 68 uses of force investigated by its FIU Unit. The Monitor's Office selected

CMR-3 | March 2021

a random sample of 18 investigations for the purpose of assessing FIU's compliance with the Agreement and Bureau policy relative to investigation. Included in the cases reviewed were "accidental firearm discharges" as well as "intentional firearm discharges" and non-firearm incidents.

In assessing PRPB's effort in this area for CMR-3, the Monitor's Office determined that PRPB has made significant improvements in their investigations of firearm discharges. In some of the cases reviewed, the Monitor's Office observed an effort on the part of PRPB to locate and interview civilian witnesses. However, the deficit of civilian witnesses continues, even when civilians are seen in videos of the incident. It may be the case that these individuals did not see the specific discharge of the firearm but are seen in the video seconds after the incident occurred talking to the officer. Statements should have been taken from these potential witnesses. PRPB should document if there is a lack of cooperation from citizen witnesses.

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 48 | Ensure that all serious uses of force and allegations of excessive force are investigated fully and fairly by expert FIU investigators. | Partially Compliant |
| 49 | A supervisor responding to a serious use of force or allegation of excessive force shall immediately notify FIU for investigation. | Not Compliant |
| 50 | FIU shall immediately notify and consult with PRDOJ regarding any UOF indicating criminal conduct by an officer. | Deferred |
| 51 | FIU shall complete investigations within 45 days of each incident, and share its reports with SFRB for review and SPR for analysis. | Not Compliant |
| 52 | The Force Review Board shall evaluate all FIU investigations for completeness, evidentiary support, and compliance with policy. | Not Compliant |

**Paragraph 48:** In the investigations reviewed by the Monitor's Office, FIU responded to all reports of serious use of force. The Monitor noted, however, a number of key points from the analysis of FIU investigations:

- Accidental firearm discharges: The Monitor's Office reviewed four investigations. In three of the four cases, the discharge was a result of the officer carrying their firearm outside of the required holster (in their waistband) and getting in or out of their vehicle, causing injury to the officer. The fourth case involved an officer entering his Bureau vehicle with a long gun (rifle) and accidently placing his finger on the trigger causing a discharge through the windshield of his vehicle. In all of these cases it is evident that the officer was negligent in the handling of the weapon, thereby violating Bureau policy. FIU investigators came to that conclusion as well. However, the reports did not address disciplinary actions, though the findings in the cases are not in dispute. The lack of formal charges may be due in

part to the fact that the cases have not yet been evaluated by the Commissioner's Force Review Board. The Monitor's Office found that in some instances relating to accidental firearm discharges supervisors report the incident as a use of force. An accidental discharge should not be referred to as a use of force.

- Intentional firearm discharges: The Monitor's Office reviewed these firearm discharges with the purpose of confirming if PRPB had undertaken any substantive changes in its investigations related to intentional firearm discharges. The Monitor's Office reviewed 10 investigations and provides the following assessments:

- All case files included a sketch/diagram. However, the sketches were not very descriptive. In some instances, the sketch was an aerial photograph, while in others the sketches appeared to be very basic and lacked key details, such as the person preparing the diagram, line of fire, dates, and the location of recovered evidence.

- In instances where the officer discharged their weapon and did not strike the suspect, there appears to be little effort to locate the discharged round.

- In most of the reports where there is a firearm discharge by an officer, and the suspect flees the scene, the report states that there no injuries as a result of the discharge. It should state that there are no reported injuries at this time.

- FIU is experiencing delays in receiving photos associated with their investigations. In many instances FIU has made multiple requests.

- FIU has developed a "Progress Form" for cases establishing a timeline for receiving requested data/documents.

- The Monitor's Office has reviewed the case files and found that PRPB has adopted some of our recommendations provided in CMR-1 and CMR-2. These changes are reflected in the investigations. However, as pointed out above, there are still deficiencies.

- Generally, FIU investigators do not use diagrams to evaluate the physical evidence, including whether the diagrams supported or refuted the version of events offered by officers (e.g., reviewing shooting angles, impacts, location of evidence). Thus, it appears that the diagrams offered little added value in the final conclusions reached by FIU regarding the justification for the shooting, tactics, training, or policy.

- In many cases the Monitor's Office did see an attempt by investigators to interview the subject (i.e., the individual against whom force was used) about the use of force. Furthermore, while the Monitor observed that spent casings were recovered by investigators at the scene, we did not see evidence that Forensic Sciences

provided any analysis or report on the rounds or casings recovered, especially that of the perpetrator's firearm.

**Paragraph 49:** In the investigations reviewed by the Monitor's Office, there were three cases where the notification was not made in a timely manner.

**Paragraph 50:** PRPB asserts that no cases indicating criminal conduct occurred during this period.

**Paragraph 51:** Timeliness is an area of major concern to the Monitor's Office. Of all cases reviewed, none were completed in 45 days as outlined in the Agreement and Bureau policy. The Monitor notes that in some cases an extension was requested by the investigator. Even with these extensions, however, the time allowed was surpassed. This is due in large part to not receiving evidence that needs to be reviewed, which in most instances were photos and/or videos.

It should be noted that PRPB stated that it would expand the training of FIU personnel and would adopt many of the recommendations of the Monitor's Office. However, PRPB has not provided any documentation that it has organized or provided the training to date. The Monitor's Office was informed by ranking personnel from FIU, that the course is in development, and that FIU investigators will receive the additional training once it is completed. It was further reported that the development and training were hampered by COVID-19. This course is being developed in response to the Monitor's first and second reports, CMR-1 and CMR-2, which identified significant deficiencies in FIU's investigations into firearm discharges (Level 4 UOF).

**Paragraph 52:** PRPB provided the Monitor's Office with documentation that the Commissioner's Force Review Board (CFRB) did not meet during the reporting period for CMR-3 due to the COVID-19 pandemic. The documentation is signed by the President of the CFRB. In the correspondence, the President reports that members still evaluated investigations during the period. However, the Agreement requires that Board members convene a meeting to evaluate investigations and complete required documents. While it may be the case that individual board members reviewed FIU investigations, it does not meet the requirements as outlined in the Agreement.

## 8. Use of Force Training

The Monitor's Office finds that PRPB is compliant with the paragraphs of the Agreement which stipulate that personnel must be trained and certified on use of force policies. The Monitoring Team conducted a site visit to the Puerto Rico Police Bureau's FIU Unit on

Monday, January 4, 2021, and verified that the training materials employed by PRPB are consistent with policy and generally accepted policing practices. The Monitoring Team also reviewed the training records of the 21 members of the Unit and verified that their training records included certification on following UOF related policies:

- Rules for the Use of Force G.O. 600-601
- Report and Investigation of Incidents of Use of Force by PRPB G.O. 600-605
- Electrical Control Device G.O. 600-602
- Use and Handling of Expandable Baton G.O. 600-603
- Use and Handling of Pepper Gas G.O. 600-604
- Arrest and Citations G.O. 600-615
- Search and Seizures G.O. 600-612
- Code of Ethics for the Members of PRPB G.O. 600-617
- Standards for Interventions with People in Crisis G.O. 600-628
- Police Pursuits G.O. 600-623
- Crowd Control G.O. 600-625
- Interactions with Transgender and Transgender People G.O. 600-624

Furthermore, the Monitor's Office notes that the review of the training records of FIU personnel verified that FIU personnel have received the required training. However, 29% have not received training on G.O. 600-628 "Standards for Interventions with People in Crisis" and 38% have not received training in G.O. 600-625 "Crowd Control." The latter is of major concern to the Monitor's Office, given that FIU is responsible for investigating use of force by PRPB personnel at demonstrations/protests, as per G.O. 600-625 and G.O. 100-113.

The Monitor's Office verified that the training for supervisors, FIU personnel and command personnel is up to date. To date, however, PRPB has not provided additional training for its FIU personnel focused on investigating firearms discharges (Level 4 UOF). The Monitor's Office was informed by the Commanding Officer of FIU that the course is in development and that FIU investigators will receive the additional training when it is completed. The Lieutenant further reported that the development and training were hampered by COVID-19. This course is being developed in response to the first and second report, CMR-1 and CMR-2, which identified significant deficiencies in FIU's investigations into firearms discharges (Level 4 UOF).

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 53 | Train all PRPB officers on PRPB's use of force policies and assess all UOF policies and trainings on an ongoing basis. | Not Compliant |

| 54 | Provide an appropriate firearm training program that meets all requirements outlined in the Agreement. | Not Compliant |
| 55 | Train all supervisors, FIU members, and command officers on OUF policies, force investigations, and force reviews annually. | Partially Compliant |

**Paragraph 53:** PRPB has indicated that all officers have received use of force training, however, they have not supplied supporting documentation.

**Paragraph 54:** PRPB did not provide documentation that supports compliance.

**Paragraph 55:** All supervisors and FIU members have been trained on UOF-related policies and conducting force investigations. However, in response to CMR 1 and CMR-2, PRPB indicated that they would provide additional training on firearm discharge investigations. To date the curriculum has not been developed, nor has the training commenced. As it relates to annual reviews, neither FIU nor the Bureau can verify if the use of force numbers are accurate.


## 9. Responding to Behavioral/Mental Health Crisis

As stated in CMR-2, PRPB implemented a CIT Pilot Project in the Arecibo Area Command which concluded in November 2020. Since that time, PRPB has not expanded CIT coverage outside of Arecibo. Due to the pandemic, no additional training was provided to PRPB personnel during the period covered by CMR-3. A crisis in mental health is occurring island-wide, and as such, PRPB needs to accelerate and expand this program bureau-wide. Following the pilot project, PRPB should have conducted a self-assessment of the project to determine "lessons learned" in order to facilitate the expansion to other area commands.

Regarding police responses to individuals experiencing potential mental health crises, PRPB reported eight responses to incidents involving persons in crisis in Arecibo, and one in Carolina. No other area command reported any responses to incidents. However, during the review of use of force incident reports (PPR-605.1) the Monitor came across a number of incidents that involved involuntary commitment orders from the court (408 order). The Monitor suspects that these are incidents that may have involved persons in crisis, which should have been identified and treated as such.

The Monitor's Office expects PRPB to make substantial progress in the training of officers to handle individuals with mental health problems so that such incidents do not escalate into confrontations in which PRPB members use force.

| Paragraph | Stipulations | Monitor's Rating |

| 56 | Train a Crisis Intervention Team; improve response to behavioral or mental health crisis, with minimize unnecessary UOF. | Partially Compliant |
| 57 | Train officers and dispatchers in CIT program; ensure that CIT-trained officers are assigned to each shift in each police region. | Partially Compliant |

**Paragraph 56:** Preliminary data from the Arecibo pilot project are encouraging. Fifteen officers from the Arecibo Area Command participated in the training as CIT First Response Officers. The training for the officers took place at PRPB Academy during the previous reporting period. Officers were required to pass a written exam at which point they could proceed to the 'Scenario Based Training" segment. The course, (CITE 8061) "Intervention Team in Crisis," consisted of 40 hours of training. PRPB provided the course curriculum as well as a certified list of those who were trained to the Monitor's Office. Understanding the importance of having resources that First Response CIT Officers could draw upon, PRPB has partnered with hospitals and agencies in Arecibo, as was previously confirmed by the Monitor's Office in CMR-2.

Beyond the pilot project, however, the data are less encouraging. As it relates to the eight-hour basic training course, which all field members of Bureau are to receive, PRPB only produced 89 training certifications, all of which were issued on October 8, 2020, outside of the CMR-3 reporting period.

Based on the Monitor's review of use of force incidents, it is evident that PRPB regularly responds to incidents involving persons in behavioral or mental health crisis, as evidence by the number of persons reported in in use of force incidents who are transported to a hospital for involuntary commitment under ley 408. However, PRPB's reports do not directly address this issue, instead treating this as a regular call for service. In addition, supervisors are apparently not recognizing or disregarding the likelihood that less-than-lethal force is being used in such situations to subdue subjects who are not willing to surrender to police custody for the purpose of commitment. There should be additional training for supervisors on how such calls should be handled and classified. By not classifying these incidents as cases involving persons in behavioral or mental health crisis, in effect PRPB is under reporting cases and thereby minimizing the need for training and stricter supervision.

Thus, the Monitor's Office is encouraged by the development and implementation of officer training during the pilot project in Arecibo's Area Command, and appreciates the impact COVID-19 has had on training. However, we cannot overstate the importance of having CIT trained officers throughout the thirteen area commands. It must be noted that the program should have been implemented island-wide by this time, as per the

Agreement. PRPB should accelerate crisis intervention training for officers and supervisors, including developing virtual courses and prioritizing groups of officers for training at the academy from areas with high numbers of calls for involuntary commitment.

**Paragraph 57:** PRPB provided documentation that 6,177 officers have received basic training in "Intervention with Persons in Crisis." In addition, 40 personnel from Radio Control and the Area Command's thirteen Centro de Mandos received training. PRPB also provided the curricula for the courses, all of which the Monitor's Office has reviewed, provided comment, and approved in accordance with the Agreement.

The Monitor also notes that PRPB has indicated that training of CIT Officers was suspended during the period of CMR-3 due to COVID-19 restrictions. PRPB has provided a list of the 6,177 officers that have been trained to date. Nevertheless, training certificates for the requested sample of officers were not provided, and thus could not be verified by the Monitor.

In an effort to demonstrate compliance to paragraph 57 of the Agreement, PRPB produced documentation that members were assigned to the following shifts in Arecibo: 9:00 AM to 5:00 PM, and 4:00 AM to 12:00 PM during the period covered in CMR-3. However, based on the documentation provided, there appears to be no coverage between 5:00 PM and 4:00 AM.

## III. Searches and Seizures: Internal Controls and Accountability

The Monitor is concerned about the high percentage of search warrants conducted during this period which had negative results (i.e., no drugs were found, and no arrests were made). Out of 320 total search warrants served and reported to the Monitor, 97, or about 30%, had negative results. The vast majority of these were conducted by Drug Units department wide. In some Drug Units, the percentage is even higher. For example, Metro Drogas had a 45% negative result (22 of 53), Drogas Guayama had a 43% negative result (3 of 7), Drogas Arecibo had a 50% negative result (2 of 4), Drogas Humacao had a 66% negative result (2 of 3). The high number of search warrants with negative results could be an indication that officers are getting unreliable information from informants, or that their follow-up investigation could be flawed. This practice can potentially lead officers to unwittingly target innocent members of the public, or worse yet, lead to serious injuries or a life-threatening situation for both officers and citizens. The Monitor did not see any efforts by supervisors to address this issue in the data provided by PRPB. Supervisors must

pay attention going forward and address this important issue with new or better training, as well as closer supervision.

The search warrants and affidavits reviewed by the Monitor have well documented probable cause and supporting evidence, as each was pre-approved by a District Attorney and a Judge. However, PRPB officers continue to submit arrest and search warrant records (files) that are incomplete. For example, 12 out of 35 search warrants inspected did not contain PRPB's PPR-631.1 Egress/Ingress form, which is essential because in this form supervisors must report whether they visually inspected the arrestee for injuries and steps taken, among other things. In addition, the Monitor found that 42 out of 52 arrest files and 18 out of 35 search warrant/consent search files were incomplete, as they did not include all the applicable forms required under PRPB's General Order 600-615 (Section V.B.6 "El expediente de arresto…"). These required forms include booking sheets (Egress/Ingress PPR-82 or PPR-631.1), property inventories (PPR-126 or PPR-636.1) and arrest reviews by supervisors (PPR-880 or PPR-615.8), among others. Moreover, some of these files contained outdated forms. PRPB should take steps to take obsolete forms out of circulation.

Most importantly, too many incident reports (PPR-468 or PPR-621.1) on arrests lack proper documentation of probable cause. The Monitor raised this issue in the second report to the court, but the problem persists in the data reviewed for CMR-3. This was the case in ten of the arrest cases analyzed. The Monitor's Office notes that this number would have been higher but for the fact that 16 of the total arrests analyzed were as a result of arrest warrants issued by the courts and served by PRPB Specialized Units. Such was also the case in five out of six consent searches where officers did not give enough information to establish probable cause. Most reports simply stated that the subject was arrested for violating a certain law of Puerto Rico. Per General Order 600-615, officers must document probable cause in the police report.

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 58 | Ensure that all stops, searches & arrests are conducted according to the law as part of effective crime prevention strategies. | Partially Compliant |

**Paragraph 58:** PRPB has ensured that all its policies regarding arrests require that officers comply with the rights of citizens secured by the U.S. and Puerto Rico Constitutions and laws. This applies to policies such as General Orders 600-615 and 600-612, as well policies 600-601 through 600-605, dealing with use of force. However, PRPB is prohibited by statute to conduct investigatory detentions, or Terry Stops as they are generally known, under the Commonwealth's Constitution. Therefore, no such data is available for these

types of stops at this time. Going forward, the Monitor will analyze other stops made on probable cause, such as traffic stops.

## 1. Stops, Searches, and Seizures

PRPB created General Order 600-612 on Searches and Seizures and has regularly submitted its revisions to the Monitor for reviews and guidance. The next review of this policy is due in 2021. The General Order provides clear and concise guidelines for officers conducting searches, whether by search warrant or on consent. This General Order also states the potential consequences for violating PRPB policies and laws. PRPB reported that virtual training was offered in Search and Seizure between July 10th and September 30, 2020 to re-certify all supervisors and commanders. PRPB also provided a list (with officers' names and ID numbers) of virtual training in Search and Seizures for agents, but did not provide the date the training took place. The Monitor has not been provided with the training material or the implementation of these virtual courses.

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 59 | Develop and implement policies and procedures that provide clear guidance for performing stops, searches, and arrests. | Partially Compliant |

**Paragraph 59:** PRPB created General Orders 600-615 on Arrests and Summons and 600-612 on Searches and Seizures. G.O. 600-15 was last reviewed by the Monitor in September 2020, and 600-612 is due for revision in 2021. Both of these general orders clearly guide officers on conducting lawful searches and arrests, and state the potential consequences for violating these policies and laws of the Commonwealth. PRPB reported that virtual training in Search and Seizure (PRPB Training Certificate # SAEA-1-17-122) was offered between July 10th and September 30, 2020 to re-certify supervisors. PRPB also provided a list of virtual training in Search and Seizures for agents, but did not provide a date. In addition, PRPB reported that no training in Arrests and Summons took place during this period (PRPB Certification # SAEA-1-17-121). The Monitor has not evaluated the training material nor the implementation of these virtual courses.

## 2. Investigatory Stops and Searches

PRPB has not created a reporting policy and system to collect stop and search data because investigatory stops and searches (also known as "Terry Stops") are prohibited in the Commonwealth of Puerto Rico. However, PRPB's G.O. 600-612 prohibits officers from using conclusory, boilerplate and stereotyped language, and materially false information. All supervisors are required by this Order to complete an arrest evaluation form, PPR-615.8, to document their reviews of arrests and searches. PRPB has not gathered data on

stops and searches to analyze trends and deficiencies, nor has it prepared a public report on this subject.

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 60 | Develop a reporting policy and system to collect data on all investigatory stops and searches. | Not Compliant |
| 61 | Stops and searches reporting policy shall prohibit the use of boilerplate, conclusory or materially false language in all reports. | Not Compliant |
| 62 | A supervisor shall review each report to determine whether the stop or search was within policy and report all policy breaches. | Not Compliant |
| 63 | A command-level officer shall review all reports submitted by supervisors related to investigatory stops and detentions. | Not Compliant |
| 64 | Analyze investigatory stop and search data to determine trends, identify and correct deficiencies, and prepare public reports. | Not Compliant |

**Paragraph 60:** PRPB has not developed a data collection system for stops and searches, whether based on probable cause or not.

**Paragraph 61:** PRPB Search and Seizure policy (600-612, Section III.B.4.b.) and Arrests and Summons policy (600-615, Section IV.3.e) clearly prohibit officers from using conclusory, boilerplate, stereotyped, or materially false language. However, assessment of implementation in conjunction with paragraphs 60-64 demonstrates that PRPB personnel do not fully comply with this policy. Over 90% of incident reports for arrests featured at least some boilerplate language, such as stating " [arrestee name] was arrested for violation of [statute]" without detailing how they arrived at such a conclusion. This issue extends to supervisor reviews of arrest reports, as is detailed in relation to paragraph 69 below.

**Paragraph 62:** Supervisor reviews were missing in a significant number of the stop and search files sampled for assessment. The Monitor found that 42 arrest files and 18 search warrant/consent search files were incomplete, as they did not include all the applicable forms required under PRPB's General Order 600-615 (Section V.B.). Missing forms included the booking sheet (Egress/Ingress PPR-82 or PPR-631.1), Property Inventory (PPR-126 or PPR-636.1) and Arrest Review by Supervisor (PPR-880 or PPR-615.8), among others.

**Paragraph 63:** Reviews by command-level officers were missing in a significant number of the stop and search files sampled for assessment. PRPB is not tracking investigatory stops and detentions based on reasonable suspicion or probable cause. PRPB has not reported to the Monitor the existence of a system to collect data on stops and searches.

CMR-3 | March 2021

**Paragraph 64:** The Monitor is not aware of any public reports by PRPB analyzing stop and search data for significant trends, or otherwise.

## 3. Arrests

The Monitor analyzed 52 out of 79 randomly selected arrest files and found that 42 arrest files were incomplete, as they did not include all the applicable forms required under PRPB's General Order 600-615 (Section V.B.6 "El expediente de arresto…"), such as the booking sheet (Egress/Ingress PPR-82 or PPR-631.1), Property Inventory (PPR-126 or PPR-636.1) and Arrest Review by Supervisor (PPR-880 or PPR-615.8), among others. Moreover, some of these files contained outdated forms.[2]

Moreover, many incident reports (PPR-468 or PPR-621.1) on arrests lack proper documentation of probable cause. This was the case in ten of the arrest cases analyzed. Most reports simply stated that the subject was arrested for violating a certain law of Puerto Rico. This practice is contrary to PRPB policy, as General Order 600-615 requires that officers must document probable cause on the police report itself (PPR-621.1).

Likewise, PRPB did not hold a meeting to request feedback from other judicial system agencies during this period.

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 65 | Ensure that policies on arrests comply with applicable law and comport with generally accepted policing practices. | Partially Compliant |
| 66 | Require that officers notify the communications command center and a supervisor immediately after an arrest. | Partially Compliant |
| 67 | When transporting an arrestee, officers shall take the safest and most direct route to the booking location. | Not Compliant |
| 68 | Supervisor shall inspect each detainee or arrestee for injury and ensure that the individual receives medical attention. | Partially Compliant |
| 69 | Supervisor shall review and approve booking recommendations in writing by within 12 hours of the arrest. | Not Compliant |
| 70 | Supervisor shall document arrests that are unsupported by probable cause or are in violation of policy. | Not Compliant |
| 71 | A command-level officer or official shall review, in writing, all auditable forms related to arrests within 7 days. | Not Compliant |
| 72 | Require officers to provide written receipts to individuals whenever property is seized from the individuals. | Not Compliant |
| 73 | Seek formal feedback from judicial sector partners regarding the quality of PRPB investigations, arrests, etc. | Not Compliant |

---

[2] PPR-126 (Complaint # 2020-12-400-000126), PPR-47 (Complaint # 2020-4-400-00039), PPR-264 (Complaint # 2020-10-051-02246). All these forms are obsolete.

**Paragraph 65:** The Monitor last reviewed G.O. 600-615 on Arrests and Summons in September 2020, and found that it complies with applicable laws and generally accepted policing practices. However, because the Supervisor Review form PPR-615.8 and the Ingress/Egress PPR-631.1 form were not included in arrest files in many of the cases reviewed, the Monitor is not able to determine whether the supervisor responded to the scene. For example, 12 out of 35 search warrants inspected did not contain PRPB's PPR-631.1 Egress/Ingress form, which is essential because supervisors must report whether they visually inspected the arrestee for injuries on this form, among other things.

In addition, the Monitor analyzed 52 out of 79 randomly selected arrest files and 35 out of 51 randomly selected search warrant/consent search files. The Monitor found that 42 arrest files and 18 search warrant/consent search files were incomplete, as they did not include all the applicable forms required under PRPB's General Order 600-615 (Section V.B.6 "El expediente de arresto…"), such as the booking sheet (Egress/Ingress PPR-82 or PPR-631.1), Property Inventory (PPR-126 or PPR-636.1) and Arrest Review by Supervisor (PPR-880 or PPR-615.8), among others. In cases where there was a PPR615.8 included, the supervisor failed to note whether s/he responded.

**Paragraph 66:** PRPB provided the Monitor's Office with obstruction of justice arrest reports. Upon review of the data submitted, however, the Monitor noted that several files submitted included more than one arrest report. In 2 of the 4 Obstruction of Justice arrest reports (2020-7-700-00682 and 2020-4-199-00493) reviewed by the Monitor, the supervisor noted that s/he did not respond to the scene and failed to state the reason. In complaint # 2020-7-700-00682, the officers also failed to properly document probable cause in the police report, and the supervisor did not address this lapse in the arrest evaluation report.

**Paragraph 67:** In examining police reports, the Monitor found no indication as to what route the officers took when transporting arrestees, nor the starting and ending mileage of the vehicle. Due to the Monitor complying with CDC guidelines regarding the COVID-19 pandemic, the Monitor was not able to perform site visits to PRPB and inspect communication command center recordings for evidence of this notification.

**Paragraph 68:** Many arrest files lack the Ingress/Egress form PPR-631.1 where injuries are noted by supervisors. 12 out of 35 search warrants inspected did not contain PRPB's PPR-631.1 Egress/Ingress form, which is essential because supervisors must report whether they visually inspected the arrestee for injuries on this form, among other things. Some arrest files that included the form failed to note the condition of the arrestee.

**Paragraph 69:** In several cases officers failed to properly document probable cause, yet supervisors reviewed and approved the arrest on PPR-615.8. In over 80% of the files inspected, supervisors simply wrote in their review that they spoke to the officer(s) and believed they had demonstrated proper probable cause for the arrest. District Commanders, in turn, simply agreed with the supervisor and did not pursue the issue.

PRPB risks civil liability and public scrutiny if the Department does not take corrective steps, such as additional training for officers and supervisors on how to document probable cause and review arrest reports properly. Command-level officers must pay attention to this issue when they receive arrest reports, and return reports to supervisors if they are not properly completed as required by the Agreement.

**Paragraph 70:** PRPB submitted to the Monitor signed confirmation from each Area Commander stating that there were no reports during this period from supervisor's regarding documentation of arrests unsupported by probable cause or in violation of PRPB policies. However, signed documents attesting to compliance do not constitute valid evidence of compliance.

**Paragraph 71:** Many sampled arrest files were lacking the supervisor review form PPR-615.8, so the Monitor was unable to determine in these cases whether command-level officers reviewed and approved those arrests. Moreover, in several cases supervisors simply stated they interviewed the arresting officers and believed s/he had demonstrated probable cause, without giving details. In all cases reviewed, the commander wrote they agreed with the supervisor's determination and failed to add specific detailed information.

**Paragraph 72:** Not all officers completed form Property Inventory PPR-636.1, and some who did complete them were missing the witness signatures. 27 of 52 arrest files analyzed were missing the Property Inventory form PPR-636.1. Also, all police reports in these cases do not mention whether the arrestee had personal property on his/her person, making it difficult for the Monitor to make a determination. PRPB provided no data on disciplinary or corrective action taken by supervisors in response to these failings.

**Paragraph 73:** PRPB submitted to the Monitor certification that no meetings were held to seek feedback from judicial sector partners due to COVID-19. PRPB further states that the Protocol was signed and disseminated to all pertaining judicial agencies and Department commanders. Despite the challenges presented by the pandemic, however, PRPB has an obligation to seek feedback via virtual meetings or other method.

## 4. Searches

PRPB created General Order 600-612 on Searches and Seizures and has submitted it to the Monitor for review on a regular basis. G.O. 600-612 is due for review in 2021. The General Order clearly guides officers on conducting lawful searches and arrests and states the potential consequences for violating PRPB policies and laws. Furthermore, the G.O. 600-612 comports to generally accepted policing practices. The Order requires supervisors to approve in writing all applications for search warrants before being presented to the District Attorney and Judge. However, PRPB has not created a search warrant tracking system as of this reporting period. PRPB also provides Consent Search form PPR-612.1 and requires officers to complete them properly whenever a consent search is conducted. G.O. 600-612 guides officers on when and how a consent search is properly conducted and requires officers to inform the subject that he/she has a right to refuse and/or stop such consent search.

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 74 | Ensure that policies on searches comply with applicable law and comport with generally accepted policing practices. | Partially Compliant |
| 75 | Supervisors shall review each request for a search or arrest warrant for appropriateness and legality and approve in writing. | Partially Compliant |
| 76 | Track each search warrant, the case file where a copy of such warrant is maintained, and the officer(s) and supervisor involved. | Not Compliant |
| 77 | Require officers to obtain and document consent to a voluntary search as part of routine stops. | Not Compliant |

**Paragraph 74:** PRPB created General Orders 600-615 on Arrests and Summons and 600-612 on Searches and Seizures and have submitted them to the Monitor for review on a regular basis. G.O. 600-615 was last reviewed by the Monitor in September 2020, and 600-612 is due for review in 2021. Both General Orders clearly guide officers on conducting lawful searches and arrests and state the potential consequences for violating these policies and laws. G.O. 600-612 comports to generally accepted policing practice. PRPB reported that virtual training in Search and Seizure was offered between July 10th and September 30, 2020 to re-certify all supervisors. PRPB also provided a list of virtual training in Search and Seizures for agents, but did not provide a date. The Monitor has not received the training material or the implementation of these virtual courses.

**Paragraph 75:** Supervisors generally provide written proof of their approval for an officer's application for search warrant. However, of the 35 search warrant files reviewed, 4 did not include supervisor's written approval for the application, thus the Monitor is unable to determine whether a review was conducted.

**Paragraph 76:** PRPB has not submitted evidence to the Monitor of the existence of a search warrant tracking system.

**Paragraph 77:** PRPB requires officers to document consent searches on PPR-612.1, as per G.O. 600-612. However, of the 5 consent search files inspected, all five did not provide enough written supporting evidence (on police report PPR-621.1) to establish probable cause. In addition, 3 of the 5 Consent Search PPR-612.1's included were missing the witness signature and one file contained the old obsolete Consent Search form PPR-879.

Missing witness signatures is an issue that the Monitor has pointed out to PRPB several times in recent years. PRPB must re-train officers on how to complete search forms. Officers must also learn how to document probable cause properly, as they are legally required to do, especially in consent searches. Supervisors have failed to detect these faults and address them, which indicates that they too need re-training.

### 5. Training on Stops, Searches, and Seizures

PRPB created General Order 600-612 on Searches and Seizures and has submitted it to the Monitor for review on a regular basis. G.O. 600-612 is due for review next in 2021. The General Order clearly guides officers on conducting lawful searches and states the potential consequences for violating PRPB policies and laws. G.O. 600-612 also comports to generally accepted policing practices. PRPB reported that virtual training in Search and Seizure to re-certify all supervisors was offered between July 10th and September 30, 2020. PRPB also provided a list of virtual training in Search and Seizures for agents, but did not provide a date for the training or the certification. The Monitor has not received the training material or the implementation of these virtual courses.

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 78 | Provide all PRPB officers with regular training on PRPB's stop, search, and seizure policies. | Partially Compliant |
| 79 | Provide all PRPB supervisors and command officers with regular training on PRPB's stop, search, and seizure policies. | Partially Compliant |

**Paragraph 78:** PRPB reported that virtual training in Search and Seizure was offered between July 10th and September 30, 2020 to re-certify all supervisors. PRPB also provided a list of virtual training in Search and Seizures for agents, but did not provide a date for the training or the certification. The Monitor has not evaluated the training material nor the implementation of these virtual courses.

**Paragraph 79:** As noted above, PRPB reported that virtual training in Search and Seizure was offered between July 10th and September 30th, 2020 to re-certify all supervisors,

including command officers. PRPB also provided a list of virtual training in Search and Seizures for agents, but did not provide a date for the training or the certification. The Monitor has not evaluated the training material nor the implementation of these virtual courses.

## IV. Equal Protection and Non-Discrimination

Due to PRPB's outdated technology system and unresponsiveness to data requests, the Monitor was unable to review a sufficient amount of evidence to establish compliance with many of the agreed upon stipulations regarding Equal Protection and Non-Discrimination. In addition, the COVID-19 pandemic foreclosed the opportunity for the Monitor's Office to conduct on-site, in-person inspections beginning in Mid-March of 2020. Given this paucity of data the Monitor's Office is forced to defer ratings on paragraphs where the absence of data is due solely to travel restrictions, and rate PRPB as not compliant on paragraphs where the lack of data is due to PRPB's unresponsiveness.

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 80 | Ensure that members of the public receive equal protection, and that police services are delivered equitably and free of bias. | Not Compliant |

**Paragraph 80:** The minimal data that was received fully supports the overall monitor's rating as not compliant. Data received included course listings and certifications. However, no additional data were submitted to the Monitor's Office for review, such as training curricula and materials, full department records, fully executed personnel evaluations, policy implementation evidence, interviews, and data systems utilized.

### 1. General Provisions

PRPB supplied the Monitor's Office with insufficient documents to determine whether the stipulations in this section have been implemented. No documents were received supporting the stipulation that each member of the respective committees was properly certified in bias-free policing and equal protection as they apply to hiring, promotion, and performance assessment processes. Accordingly, in areas where data was not received for purposes of verification, we categorize our finding as not compliant.

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 81 | Develop policies and provide training on bias-free policing; ensure consistent supervision and hold officers accountable. | Partially Compliant |
| 82 | Revise complaint classification policies to capture and track civilian complaints alleging discriminatory policing. | Not Compliant |

| 83 | Revise documentation of officer-civilian interactions so that it permits officers to record demographic information. | Partially Compliant |
| 84 | Incorporate bias-free policing and equal protection into hiring, promotion, and performance assessment processes. | Not Compliant |
| 85 | Use the National Incident Based Reporting System ("NIBRS") to collect and report crime data. | Not Compliant |
| 86 | Collect accurate and reliable data on hate crimes on an ongoing basis and submit the data to the FBI for analysis and publication. | Not Compliant |

**Paragraph 81:** Although the policy has been provided and reviewed by the Monitor's Office, the implementation of this policy has not been fulfilled. Virtual training (8 hours) was conducted on Interactions with Transgender and STET People (VITT 3081). However, no supervisory and field notes were submitted to the Monitor's Office for review to assess officer's accountability with such training.

**Paragraph 82:** PRPB did not submit the data necessary to the Monitor's Office to determine implementation.

**Paragraph 83:** PRPB has demonstrated that it tracks demographic data on use of force reports, in line with the intent of the Agreement. However, PRPB did not provide forms related to arrests, searches, etc. to demonstrate that officers have ability to record demographics in all forms of officer-civilian interaction.

**Paragraph 84:** No promotions were made during this evaluation period, as noted by the certificate submitted by PRPB. PRPB also provided certification that 13 Agents were trained on Recruitment of Aspiring Cadets; however, no curricula were submitted to the Monitor's Office to evaluate. The training was conducted on September 21, 2020 and was certified December 28, 2020. Furthermore, PRPB submitted no evidence of training on the civilian complaint program. Performance assessments (100 evaluations) were received. In review of the performance assessment documentation, however, the evaluations are not fully implemented. In reviewing these documents, the Monitor notes that the ratings score categories are filled out with generally high ratings in each evaluation. The sections in the evaluation for professional development and growth are left blank. Only three evaluations had one notation. Most of the evaluations did not include recognition, recommendations on administration, or recommendations for goals.

**Paragraph 85:** PRPB did not submit the data necessary to the Monitor's Office to determine compliance on training. Compliance on implementation is assessed annually, and was assessed as non-compliant for CMR-2.

CMR-3 | March 2021

**Paragraph 86:** PRPB did not submit the data necessary to the Monitor's Office to determine compliance on training. Compliance on implementation is assessed annually, and was assessed as non-compliant for CMR-2.

## 2. Discriminatory Policing

PRPB has expanded a policy to conduct their activities in such a way as to protect all persons equally and to not discriminate. This policy extends to the LBGTQ (LGBTT) community and had been updated in the past year. However, no implementation of the policy has been conducted or explained to the Monitor's Office. This update has been reflected in the new iteration of the relevant course, Virtual Training on Interactions with Transgender and Transsexual People (VITT 3081), for which a random sample of 92 PRPB personnel files was requested to document the training.

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 87 | Administer all programs, initiatives, and activities without discrimination; prohibit selective enforcement of the law. | Deferred |
| 88 | Develop policies and seek assistance from community advocates to provide police services in a non-discriminatory fashion. | Partially Compliant |
| 89 | Develop a policy to guide officers' interactions with transgender or transsexual individuals (transportation, housing, etc.). | Partially Compliant |
| 90 | Provide all PRPP officers with training on set topics in bias-free policing at least every two years. | Not Compliant |
| 91 | Assess programs and activities to ensure that they are administered in a manner that guarantees equal protection. | Not Compliant |
| 92 | Provide preliminary investigation reports for each allegation of abuse in secure juvenile correctional facilities within 5 days. | Deferred |

**Paragraph 87:** The Monitor's Office did not request or receive all data required to assess compliance on this paragraph.

**Paragraph 88:** Policy has been reviewed by the Monitor's Office. However, PRPB did not submit the data necessary to the Monitor's Office to determine compliance on training. Compliance on implementation is assessed annually, and was assessed as compliant for CMR-2.

**Paragraph 89:** Policy has been reviewed by the Monitor's Office. However, PRPB did not submit the data necessary to the Monitor's Office to determine implementation.

**Paragraph 90:** PRPB received a rating of not compliant for Paragraph 90 in CMR-2. Of the five compliance targets for this paragraph, only training records were due for assessment in CMR-3, and PRPB failed to provide sufficient records to reach a determination of

compliance. Therefore, PRPB remains not compliant for CMR-3. See Appendix F for details.

**Paragraph 91:** PRPB did not submit the data necessary to the Monitor's Office to determine implementation.

**Paragraph 92:** The Monitor's Office did not request or receive all data required to assess compliance on this paragraph. However, PRPB was assessed as being not in compliance with this paragraph in CMR-2.

### 3. Sexual Assault and Domestic Violence

Paragraphs 93-100 are not scheduled for assessment in CMR-3. However, the Monitor's Office takes note of the increased number of gender-based violence incidents that are occurring in Puerto Rico, and of the importance of well-documented and speedy investigations of those incidents by PRPB. PRPB should strengthen its units that investigate domestic violence cases and take the necessary measures to increase its response to those incidents. This will ensure that victims have access to protection, support, and justice.

The increase in gender-based violence attention during the COVID-19 pandemic, which imposed numerous hardships on the population of Puerto Rico, has received widespread attention, including a government declaration of emergency. Considering the increase in domestic violence incidents in Puerto Rico, and the number of allegations of domestic and sexual violence against officers of PRPB, the Monitor's Office will devote particular attention to internal investigations involving such allegations in CMR-4. The Monitor's Office will work with PRPB's Reform Office to ensure that the sample of internal investigations analyzed contains a significant number of investigations that involve allegations of gender-based and/or sexual violence lodged against PRPB officers.

## V. Recruitment, Selection, and Hiring

Paragraphs 101-108 are not scheduled for assessment in CMR-3. See CMR-2 for details.

## VI. Policies and Procedures

As per the agreed-upon Methodology, compliance for the Policies and Procedures section of the Agreement is dependent on the training of all PRPB personnel and full implementation of all policies related to the Agreement, which has not occurred.

Compliance in some paragraphs is also dependent on compliance in other paragraphs which have been determined to be in partial compliance. Although PRPB provided the Monitor with a list of virtual training conducted during this period, the courses are identified by an internal code, on which the Monitor sufficient information to determine which courses were provided. In addition, in order for the Monitor to comply with CDC Travel Guidance related to the COVID-19 Pandemic, the Monitor was unable to conduct site visits to interview relevant personnel and inspect related documents in person. For these reasons, the Monitor's rating for most paragraphs in this section remain at "Partial Compliance."

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 109 | Policies shall express core values and ensure that personnel lawfully, effectively, and ethically serve the community. | Partially Compliant |
| 110 | Publish a department-wide policy and procedure manual that will include all policies, procedures, and regulations. | Not Compliant |
| 111 | Unit-wide policies and procedures shall be collected in unit-level policy and procedure manuals. | Partially Compliant |
| 112 | Review and revise each newly developed policy to ensure that it provides effective guidance to PRPB personnel. | Partially Compliant |
| 113 | Review each policy or procedure regularly and make revisions to ensure that they remain consistent with the Agreement and law. | Partially Compliant |
| 114 | Ensure that all relevant PRPB personnel have received and been trained on all new or amended policies essential to their roles. | Partially Compliant |
| 115 | Document that each officer or employee has received, read, and been trained on relevant policies and procedures. | Partially Compliant |
| 116 | Advise all officers that violating policy may subject them to discipline, criminal prosecution, and/or civil liability. | Partially Compliant |

**Paragraph 109:** The policies that PRPB has created to date express PRPB's core values and require that personnel serve the community lawfully, effectively, and ethically. However, compliance with this paragraph is dependent on the implementation of Paragraphs 110 through 116, which require, in part, an Agency-wide Policies and Procedures Manual, unit-specific manuals, policy development protocols, site visits and personnel interviews, as well as training on information systems and agency communications. To date, PRPB has reached only partial compliance in these related areas of the Agreement.

**Paragraph 110:** PRPB has notified the Monitor that it is in the process of developing a virtual library that will include an Agency-wide Manual, as well as unit-wide manuals, among other documents. PRPB further reports that General Order 400-409 is in the final stages of being developed for this purpose.

**Paragraph 111:** While PRPB has created several unit-wide manuals over the last several years and during the present evaluation period, some manuals were not submitted to the Monitor for review and approval before being implemented. These manuals include:

- Stolen Vehicle Investigation Bureau Investigator's Manual, dated April 7, 2020 and published on April 8, 2020;
- Sworn Personnel Functions, Duties, and Responsibilities Description Manual dated April 20, 2020 and published on April 21, 2020;
- PPR-138.3 Use Manual WEB Edition, Driver's Daily Report, version 1.0 dated April 14, 2020 and published on April 15, 2020.

**Paragraph 112:** According to PRPB Calendar for Policy Review provided to the Monitor, PRPB policies are regularly reviewed and revised as necessary by PRPB personnel. However, PRPB has not provided the Monitor with a policy development protocol to ensure paragraph requirements are incorporated. Paragraph 112 also requires that all requirements of Paragraph 113 are incorporated. Paragraph 113 requires that "All PRPD policies, including but not limited to those created pursuant to this Agreement, shall be posted online and otherwise made publicly available in a timely manner." PRPB has created several new policies which it did not submit to the Monitor for review and approval during this period. Nor are all policies published online via its website.

Some of the policies not submitted to the Monitor for review are:

- General Order Chapter 100, Section 145, entitled: "Marine Patrol Division" dated April 17, 2020 and published on April 18, 2020;
- General Order Chapter 600, Section 643, entitled: "Administrative Fines for Violations of Act No. 22-2000" dated and published on May 20, 2020;
- General Order Chapter 400, Section 413, entitled: "Firearms Tracing Digital Platform" dated and published on May 27, 2020.

**Paragraph 113:** PRPB reviews new policies and revises them as appropriate, and has developed a schedule for biennial/annual review. However, this paragraph also requires that "All PRPD policies, including but not limited to those created pursuant to this Agreement, shall be posted online and otherwise made publicly available in a timely manner." As stated above in Paragraph 112, several policies were not submitted to the Monitor for review and approval. Compliance for this paragraph depends on compliance with Paragraph 112.

**Paragraph 114:** This paragraph requires that all relevant personnel have received, read, and been trained on all new or revised policies or procedures. PRPB has not provided

evidence of training on information systems and agency communications systems to prove the receipt, opening, and review of policies and procedures by all personnel. The paragraph methodology also requires a document review of materials related to monthly academies, which were not provided, and interviews with relevant personnel, which were not conducted due to compliance with the CDC Travel Advisory regarding the COVID-19 Pandemic.

**Paragraph 115:** This Paragraph requires the training of all officers and employees on relevant PRPB's policies and procedures. While PRPB provided documentation to the Monitor showing it conducted virtual training on some policies, such as G.O. 600-612, it has created new policies and amended others (see the comments on Paragraph 112 above), which were not submitted to the Monitor for review and approval prior to PRPB's official approval during this period. Furthermore, compliance in this Paragraph is dependent on compliance with Paragraph 114, which is only partial.

**Paragraph 116:** Policies created by PRPB warn officers that taking police action in violation of policy may subject them to discipline, criminal prosecution and/or civil liability. However, compliance with this Paragraph also requires compliance with Paragraph 114, which is only partial.

## VII. Training

Paragraphs 117-134 are not scheduled for assessment in CMR-3. See CMR-2 for details.

## VIII. Supervision and Management

Supervisors play a key role in creating the culture of PRPB. They serve as the two-way conduit of information between PRPB leaders and rank and file officers. Supervisors should spend time on the streets of Puerto Rico with their officers, to see how they perform. A successful supervisor must be able to understand and apply management principles in accordance with PRPB's policies, procedures, rules, administrative processes, management systems, generally accepted policing practices, and the Agreement.

### 1. General Provisions

Interviews and site visits conducted before the COVID-19 Pandemic by the Monitor's Office showed that in some cases PRPB lacked the proper number of first-line supervisors (Sergeants), which has resulted in inexperienced agents taking on the role of a *supervisor*.

It was also noted that in some cases supervisors generally supervised more than ten agents. However, in CMR-2 PRPB was unable to provide a list of personnel to validate this observation on a bureau-wide basis. This is also true for CMR-3.

In order to obtain partial or substantial compliance, PRPB needs to improve data systems so they can provide the Monitor's Office with the requested data in a timely manner. PRPB must ensure that an adequate number of qualified first-line supervisors are deployed in the field to allow supervisors to provide the close and effective supervision necessary for officers 1) to improve and grow professionally, 2) to police actively and effectively, 3) to prioritize community policing and problem solving, and 4) to identify, correct, and prevent misconduct. The Monitoring Team also encourages PRPB to complete the EIS and internal audits and inter-agency feedback systems.

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 135 | Ensure that an adequate number of qualified supervisors are deployed in the field to provide effective supervision. | Not Compliant |

**Paragraph 135:** The Monitor's Office verified that an outside consultant (V2A) conducted a staff study which appears to have been helpful to PRPB. However, the Monitor's Office questions whether any redeployment of assets was made based on the staff study. Redeploying to bring staffing in line with the study would serve to make PRPB more effective and efficient. Information has not been provided to the Monitor's Office verifying that an adequate number of supervisors have been deployed in the field, or that the recommendations of the Staff Study have been properly implemented by PRPB.

The Monitor's Office recommends that PRPB should promptly revisit the Staff Study to ensure that the study's recommendations remain valid as population and crime dynamics change, and to ensure that proper deployment is utilized accordingly. Temporary transfers for supervisors should only be implemented as a last resort to supplement a lack of supervisors. Non-supervisory personnel should not be considered for the role of a supervisor.

The Monitor's Office requested two months of staffing documents, including logbooks, for a random sample of the operational field units to determine the consistency of supervisory assignments and supervisor ratios in accordance with approved policies. However, this data was not provided. Training records demonstrating that supervisors are certified (including certification on EIS and internal audits) were also not provided to the Monitor's Office.

In order to help obtain partial compliance, PRPB should develop an automated system to determine what employees have been transferred and the reason why. This information was not provided to the Monitor's Office after it was requested. Although documents that tracked employees' locations and transfers were provided by PRPB, there was no explanation of why they were transferred, such as references to disciplinary transfers or staffing needs.

A random sample was developed by the Monitor's Office of 51 supervisors out of 304 transfers in PRPB that would track their transfers to other areas and commands from April 1 to September 30, 2020. Additional information was also requested including: (a) two months of staffing documents, (b) training records demonstrating supervisors are certified for all trainings required of them (including certification on EIS, internal audits, EEO, and anti-discrimination laws), (c) all referrals to SARP made by supervisors for performance evaluations and any SARP referrals of supervisors, (d) for any supervisors in the random sample that are assigned to specialized units, documentation proving that they are eligible to serve in those units. This information was not fully provided. Furthermore, supervisors were to be interviewed in person in regards to their supervision practices, the availability of EIS, etc., but these interviews were prevented by pandemic-related travel restrictions. The incomplete information makes it impossible to establish compliance with the Agreement. PRPB must provide the requested information to the Monitor's Office going forward.

## 2. Duties of Supervisors

As part of their responsibility, supervisors must thoroughly, objectively, and routinely review all aspects of Agent conduct, including a review of all uses of force; probable cause for arrests and the appropriateness of charges filed; and reasonable suspicion for stops and searches that do not result in an arrest. Additional responsibilities should include a thorough knowledge of the Agreement and community policing.

| Paragraph | Stipulations | Monitor's Rating |
|:---:|:---|:---:|
| 136 | All operational field officers shall be assigned to a single, consistent, and clearly identified supervisor. | Not Compliant |
| 137 | Field supervisors shall supervise no more than ten officers; on-duty supervisors shall be available throughout their shift. | Not Compliant |
| 138 | Develop a program to ensure consistent field supervision when assigned supervisors are unavailable for duty. | Not Compliant |
| 139 | Precinct and unit commanders shall closely and effectively supervise the officers under their command. | Not Compliant |
| 140 | Commanders and supervisors shall ensure that all officers under their command comply with policy, law, and the Agreement. | Deferred |

**Paragraph 136:** In order to determine compliance, the Monitor's Office requested two months of staffing documents, including logbooks, for a random sample of the operational field units to determine the consistency of supervisory assignments and supervisor ratios in accordance with approved policies. However, this information was not provided. Further, the Monitor's Office also requested documentation to verify that PRPB had developed an automated system to determine that supervisors are working the same days and hours as the officers they supervise, and that operational field officers are assigned to a single, consistent, and clearly identified supervisor. This documentation was also not provided by PRPB.

In addition, the Monitor's Office has not been provided with information to verify that policies incorporate all the requirements of Paragraphs 136-140, or that officer and supervisor schedules, assignments, and ratios are consistent with supervision policies. Further interviews of agents and analysis by the Monitor's Office must also be conducted to ensure that 95% of interviewed personnel feel that supervision is close and effective. However, due to COVID-19 restrictions and in accordance with CDC guidelines, the Monitor's Office was not able to conduct site visits to conduct these interviews.

**Paragraph 137:** The Monitor's Office requested that PRPB provide documentation to demonstrate that one supervisor oversees no more than 10 individuals. However, the Monitor's Office has yet to receive clear evidence that this is the case. Once an automated system is effective, it should be easy for PRPB to generate data from the 13 areas that show each supervisor and his or her assigned subordinates. In an effort to demonstrate compliance, the Monitor's Office requests that this information be provided as soon as possible. PRPB needs to improve data systems so they can provide the Monitor's Office with the requested data in a timely manner.

**Paragraph 138:** While making site visits before the COVID-19 Pandemic, the Monitor's Office saw some supervisors being brought from other precincts to supervise. PRPB should develop a more complete system that provides for true supervisors, not acting supervisors, to be deployed in the field. As noted above, an automated system is effective for the patrol division. It should be relatively simple for PRPB to generate data from the 13 areas that show each supervisor and his or her assigned subordinates. According to the assessment of the paragraphs addressing information technology, the CRONOS and SITA systems are not yet available to check the span of control. Furthermore, the Monitor's Office has not received any information about compliance with this paragraph.

**Paragraph 139:** As in other U.S. jurisdictions, the scope of a supervisor's role varies. Some supervise closely and effectively, while others are more lenient with their personnel. This

CMR-3 | March 2021

observation of PRPB supervision is based on the Monitor's limited site visits conducted prior to the COVID-19 pandemic. Officers with the rank of Sergeant and above should always be an example for their team. Further training on mentoring and career development should be implemented by PRPB. For this given reporting period, the Monitor's Office did not receive any information in reference to this paragraph.

**Paragraph 140:** Observation of PRPB supervision is based on the Monitoring Team's limited site visits conducted prior to the COVID-19 pandemic and during assessments of various demonstrations. Supervisors should help prepare their subordinates for possible promotion and additional responsibility. Commanders and supervisors have greater responsibilities based on their positions, specifically to ensure that officers under their command comply with Bureau policy and law. Further interviews with supervisors and their personnel need to be conducted by the Monitor's Office, which we were unable to conduct during this given reporting period due to the COVID-19 pandemic.

### 3. Supervisor Training

Paragraphs 141-144 are not scheduled for assessment for CMR-3. See CMR-2 for details.

### 4. Performance Evaluation

As the Monitor's Office noted in CMR-2, the "The purpose of the PROMEDIA Project is to establish an effective evaluation system that allows a greater degree of uniformity and objectivity in establishing the criteria for measuring the performance of the members of PRPB in their functions." PRPB failed to provide the requested data to demonstrate compliance during the given reporting period. As such, our analysis of compliance for the below paragraphs is limited.

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 145 | Develop and implement a system with objective criteria to evaluate the qualifications and performance of all PRPB officers. | Not Compliant |
| 146 | Establish a system documenting complete and accurate annual performance evaluations by each officer's direct supervisor. | Not Compliant |

**Paragraph 145:** PRPB reported that all supervisors would be required to submit evaluations through the PROMEDIA System by July 2020. However, the Monitor's Office has not received any information or reference documentation of annual performance evaluations completed by PRPB supervisors as requested for the given reporting period.

**Paragraph 146:** The Monitor's Office did not receive the requested information to demonstrate complete and accurate annual performance evaluations completed by PRPB

54

supervisors, and further did not receive any examples as requested. PRPB should develop an automated system to compile a list of all supervisors who have completed timely and accurate performance evaluations of their subordinates and provide samples to the Monitor's Office to improve the compliance rating with this paragraph. The performance evaluation system should continue to be developed and additional training provided in working with employee goals and objectives to strengthen the system.

## 5. Early Identification System

PRPB must develop an Early Identification System (EIS) that encompasses a range of clearly defined information and ensures that corrective action is based on appropriate evaluation, and not reserved for a mere accumulation of violations. Currently, EIS is under development and is not available for use by supervisors. EIS is a critical component of risk assessment and management systems, and should be a priority for PRPB.

The Monitor's Office maintains the position that PRPB can only be considered in compliance with Paragraphs 147-153 when EIS is developed to the point where 1) supervisors are readily and consistently able to access the system to enter and retrieve all datapoints required by the Agreement and PRPB policy, and 2) PRPB leadership and third-party overseers are able to conduct data analysis of policing practices and outcomes using the EIS system. During the given reporting period, PRPB was not able to demonstrate that the EIS system has been developed and implemented, and, as such, is not in compliance.

PRPB must ensure that EIS provides a non-punitive, proactive method for identifying agents that may need training, counseling or other intervention before issues arise involving agent misconduct.

An EIS is usually computerized and commercially available. An EIS would track and flag agents based on common criteria such as:

- Citizen complaints (sustained or not). Number and nature of arrests.
- Use of force incidents.
- Policy violations such as tardy, AWOL.
- Previous administrative warnings and disciplinary actions.
- Number of vehicle pursuits.
- Workplace accidents and other agency specific criteria.

PRPB should continue to develop the platform so that supervisors can utilize the information from EIS data and records. This will mean that EIS can become an effective

supervisory tool that addresses potentially problematic behavior in a timely and non-punitive manner.

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 147 | Develop and maintain an Early Identification System that is to be used regularly to support effective supervision and management. | Not Compliant |
| 148 | EIS shall include a computerized database to collect, maintain, integrate, and retrieve department-wide data for each officer. | Not Compliant |
| 149 | Establish a unit to develop and maintain the EIS, with sufficient resources to facilitate data input and train and assist EIS users. | Not Compliant |
| 150 | Maintain sufficient equipment to permit appropriate personnel access to the EIS system for timely input and review of data. | Not Compliant |
| 151 | Develop a protocol for using the EIS, including data storage, retrieval & analysis, supervisory use & intervention, etc. | Not Compliant |
| 152 | Following separation from PRPB, maintain personal information in EIS for five years, and aggregate information indefinitely. | Not Compliant |
| 153 | PRPB may propose in writing to modify the EIS regarding its structure and the content uploaded to the system. | Not Compliant |

**Paragraph 147:** PRPB provided a certification from a supervisor of PRPB that from April 1 through September 30, 2020 (previous administration), PRPB continued to develop the EIS system and identify personnel. Although the certification was provided, supporting documentation demonstrating PRPB's efforts towards development of the EIS were not provided. PRPB should expedite the completion of the early identification system.

Although training and policy for EIS continue to be developed, the system itself remains in the developmental stage. While some modules are up and running, access to the system and use of the system remains inconsistent, with some supervisors during CMR-2 stating that they cannot access the information. Interviews could not be conducted for the period under review for CMR-3.

**Paragraph 148:** As noted above, PRPB provided a certification from a PRPB supervisor attesting that from April 1 through September 30, 2020 (previous administration), PRPB continued to develop the EIS system. As noted above, no additional documentation to elucidate that the development process was provided, and as such PRPB is unable to demonstrate compliance with this paragraph.

In the EIS system, PRPB should include a computerized relational database, which shall be used to collect, maintain, integrate, and retrieve detailed data. The platform for the EIS system has not yet been developed, and supervisors cannot yet utilize the information available from an EIS system. PRPB should develop the EIS system in a timely manner.

**Paragraph 149:** As noted above, PRPB provided a certification from a PRPB supervisor attesting that from April 1 through September 30, 2020 (previous administration), PRPB continued to develop the EIS system.

PRPB continues to develop a unit to implement and maintain the EIS with sufficient resources to facilitate data input, and will provide training and assistance to EIS users. The policy and training continue to be developed by PRPB, but the curriculum has not been reviewed and approved by the Monitor's Office because the system has not been fully developed or implemented. The EIS unit should be established as soon as possible by PRPB.

**Paragraph 150:** As noted above, PRPB provided a certification from a PRPB supervisor attesting that from April 1 through September 30, 2020 (previous administration), PRPB continued to develop the EIS system.

As the paragraph states, PRPB should maintain necessary equipment, in sufficient amount and in good working order, to permit access to the EIS system, allowing for timely input and review of EIS data. This would be for the use of appropriate personnel, including supervisors and commanders.

A memo dated April 6, 2020 provided by PRPB stated that additional terminals have been distributed to help meet the requirements of Paragraph 150. However, PRPB remains non-compliant for the given report until it provides information verifying the computer locations and numbers. The Monitor's Office recommends implementation of paragraph requirements as soon as possible.

**Paragraph 151:** As noted above, PRPB provided a certification from a PRPB supervisor attesting that from April 1 through September 30, 2020 (previous administration), PRPB continued to develop the EIS system.

The EIS curriculum has not been fully developed or reviewed and approved by the Monitor's Office, and PRPB has not yet successfully implemented this protocol in practice. The Monitoring Team recommends implementation of paragraph requirements as soon as possible.

**Paragraph 152:** As noted above, PRPB provided a certification from a PRPB supervisor attesting that from April 1 through September 30, 2020 (previous administration), PRPB continued to develop the EIS system.

As the paragraph states, PRPB should maintain all personally identifiable information about officers and employees included in the EIS for at least five years following their

CMR-3 | March 2021

separation from the agency. Information necessary for aggregate statistical analysis should be maintained indefinitely in the EIS. On an ongoing basis, PRPB will enter information into the EIS in a timely, accurate, and complete manner, and shall maintain the data in a secure and confidential manner. As the system is still in development, PRPB is not able to demonstrate compliance with this paragraph.

**Paragraph 153:** As noted above, PRPB provided a certification from a PRPB supervisor attesting that from April 1 through September 30, 2020 (previous administration), PRPB continued to develop the EIS system.

According to this paragraph, PRPB may propose to add, subtract, or modify data cables and fields; modify the list of documents scanned or electronically attached; and add, subtract, or modify standardized reports. As of this reporting period, PRPB has not provided documentation to demonstrate the above.

## 6. Internal Audits and Interagency Feedback

An internal auditing process was signed by the Commissioner on April 21, 2020. PRPB should utilize this tool to improve effectiveness and efficiency as an organization. A protocol was also signed by the Commissioner on May 1, 2020 for information exchange, but no reports have been released as to its effect with other agencies in the criminal justice system.

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 154 | Establish an auditing system that identifies operational deficiencies and implements effective remedial action. | Not Compliant |
| 155 | Develop a protocol for conducting regular operational audits related to the material terms of this Agreement. | Not Rated |
| 156 | Auditors shall issue a report to the Superintendent; commanders shall review reports regarding employees under their command. | Not Compliant |
| 157 | Develop and implement a plan for executing regular, targeted, and random integrity audits under SPR oversight. | Not Compliant |
| 158 | Establish a liaison committee that communicates with federal and local criminal justice components regarding PRPB integrity. | Not Compliant |

**Paragraph 154:** PRPB provided a certification attesting that no inspections were conducted between April 1 and September 30, 2020 (previous administration). PRPB should develop an automated auditing system that would identify operational deficiencies, analyze contributing factors, and implement effective remedial action. Auditing protocols should be based on generally-accepted policing practices and cover all PRPB units and command areas. This would also include referrals to SARP of agents and supervisors.

Protocols for paragraphs 154-156 are still in development. PRPB should use the auditing system to identify operation deficiencies and their causes and contributing factors, so that effective remedial action may be implemented. The Bureau should also continue to develop protocols based on generally accepted policing practices. This will help foster a culture of accountability and continuous improvement among all PRPB units and personnel.

**Paragraph 155:** This paragraph is not scheduled for assessment for CMR-2. See CMR-2 for details.

**Paragraph 156:** PRPB auditors are to issue a report to the Commissioner on the result of each audit. The Monitor's Office received no information from PRPB indicating that any reports have been sent to the Commissioner and that reference audits are being conducted. The Monitor's Office hopes that the Commissioner will review each audit for appropriate policy, disciplinary, or non-punitive corrective action. The Monitor's Office also hopes to see that the Commander of each precinct and specialized unit will also review all audit reports regarding employees under their command. This system should be developed to ensure that Commanders review any audit involving an personnel under their command.

**Paragraph 157:** The Monitor's Office received no information from PRPB indicating there is a policy, procedure, or curriculum for personnel integrity audits.

**Paragraph 158:** PRPB provided a memorandum stating that from April 1 to September 30, 2020 (previous administration), the Commissioner had not received any minutes from police area meetings established contact with other parts of the criminal justice system, and requested that these meeting minutes and contacts be provided to the Commissioner.

Although a protocol has been developed, other criminal justice agencies in Puerto Rico have not responded to or ratified the protocol developed by PRPB. PRPB should develop an automated system to obtain copies, agreements, and protocols related to criminal justice committees and verify they incorporate all requirements of this paragraph to improve compliance with this paragraph.

## IX. Civilian Complaints, Internal Investigations, and Discipline

PRPB backslid significantly on compliance with paragraphs pertaining to internal investigations, largely due to the Bureau's failure to provide the data requested by the

Monitor's Office. The Monitor requested a representative sample of 44 internal investigations from the current period of review – 24 closed investigations and 20 open investigations. In response, PRPB provided only the 24 closed investigations, despite a ruling by the Court that the Monitor's Office has the authority to view open investigations. These 24 cases do not provide a representative sample of all internal investigations from the period of review.

Based on an examination of the data provided, PRPB has made progress to ensure that administrative misconduct complaints are solicited from all sources, thoroughly investigated, and fairly adjudicated so as to create transparency, trust, and public accountability of the institution. As indicated below, however, much more work needs to be performed in order to achieve a level of substantial compliance. Furthermore, the Monitor's Office is not able to state with confidence that the performance demonstrated in the 24 closed investigations provided can be generalized to SARP performance more broadly.

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 159 | Ensure that all allegations of officer misconduct are received, investigated fully & adjudicated fairly to enhance accountability. | Partially Compliant |

**Paragraph 159:** The Monitor refers the reader to Paragraphs 160-204 for detailed assessment.

## 1. Civilian Complaints

PRPB has a well-established mechanism for soliciting and intaking complaints from identified and unidentified complainants. Due to COVID-19 travel restrictions, however, the Monitor was unable to determine whether PPR Form 311.1 (the official complaint form) is ubiquitously present in the field as called for in the Agreement.

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 160 | Implement a program to inform persons that they may make complaints regarding the performance of any officer. | Partially Compliant |
| 161 | Officers shall carry complaint forms at all times; forms shall not include any language that discourages submission of complaints. | Deferred |
| 162 | PRPB shall make complaint forms and informational materials available at all facilities and on PRPB website. | Deferred |

**Paragraph 160:** While PRPB public policy concerning the public's ability to register an administrative complaint appears to remain unchanged, the Monitor received no data concerning the training and certification component mandated by this Paragraph.

**Paragraph 161:** Part of this finding is dependent upon ground inspection of a selection of PRPB installations and mobile patrols, which could not be conducted due to the COVID-19 pandemic and therefore must be deferred. For the record, however, the Monitor finds that the language contained in forms 311.1, 311.2 and 311.3 contain no language that would tend to discourage a person from submitting a complaint.

**Paragraph 162:** The methodology for this paragraph calls for on-site inspection of a selection of PRPB installations and mobile patrols, which could not be conducted due to the COVID-19 pandemic. PRPB does have a robust and comprehensive ability to collect administrative complaints via PRPB website. In fact, several of the investigations reviewed by the Monitor were submitted by the public using this platform. Therefore, the Monitor defers the rating on this paragraph until appropriate site visits can be conducted.

## 2. Internal Investigations

PRPB has an elaborate Code of Conduct, discipline, and corresponding processes for the reporting, registration, investigation, and adjudication of an array of, malfeasance and misconduct complaints concerning its members. The Monitor requested 52 specific administrative investigation cases out of 316 for the reporting period and received only 24, thus the Monitor has less than sufficient data from which to draw a representative finding as to whether reporting, investigation timeline and review processes are followed in a substantial majority of the cases occurring within the reporting period. As the sample of cases forwarded to the Monitor is insufficient, the Monitor must conclude that PRPB is not compliant in all areas of Internal Investigations.

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 163 | Require that all personnel report misconduct to a supervisor or to SPR for investigation, under threat of disciplinary action. | Not Compliant |
| 164 | Require supervisors to investigate and take corrective action within 5 days of being made aware of minor misconduct. | Not Compliant |
| 165 | The results of unit investigations shall be evaluated by unit commanders for underlying problems, and submitted to SPR. | Not Compliant |

**Paragraph 163:** In the Monitor's review of the partial response provided by PRPB, we find no evidence that PRPB is failing to report misconduct either 1) via the supervisory chain of command, which then is incorporated into a formal SARP complaint, or 2) via a SARP complaint itself. However, the Monitor notes that this assessment is based upon a review of actual SARP investigations only. It bears mentioning that the COVID-19 pandemic has precluded the Monitor's ability to perform site visits at area commands to ensure that misconduct of a PRPB member is documented onsite at the supervisory level and then

CMR-3 | March 2021

incorporated into the appropriate SARP complaint form. The Monitor also notes that no training and certification records were received as requested.

**Paragraph 164:** The Monitor's review of a randomly selected partial sample of SARP cases evidences that PRPB supervisors have documented SARP complaints within the five-day rule. No training and certification records were received as requested. The inadequate sample size provided by PRPB makes it impossible to quantify whether assessments, reviews and responses by supervisors or commanders are within the level specified by the Agreement. The Monitor was also unable to review unit-level administrative investigations completed by supervisors outside of SARP, as these records are kept at the area commands, and therefore require site visits to confirm compliance.

**Paragraph 165:** While every SARP Unit investigation in the inadequate sample had been signed off on by the SARP supervisor, the form used to document this review and approval process lacks the date of the review. The Monitor recommends that this form, which indicates whether the immediate SARP supervisor has reviewed the investigation and either concurs or disagrees with its findings, should contain the date upon which it was signed.

## 3. Complaint Intake, Classification, Assignment, and Tracking

By and large, PRPB did not comply with its requirements under complaint intake, classification, assignment, and tracking. Though there were some encouraging signs of compliance in the data reviewed, PRPB failed to supply sufficient evidence that would support its claims of compliance.

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 166 | Train all officers in how to handle complaint intake properly. | Partially Compliant |
| 167 | Inhibiting a misconduct complaint or providing false or misleading information shall be grounds for discipline. | Not Compliant |
| 168 | Accept all misconduct complaints, including anonymous and third-party complaints, for review and investigation. | Deferred |
| 169 | Establish a protocol that provides procedures to be followed when an individual objects to an officer's conduct. | Not Compliant |
| 170 | Ensure that allegations of misconduct made during criminal or civil litigation are assessed for further investigation. | Not Compliant |
| 171 | Maintain a centralized tracking system for all misconduct complaints; assign a unique number to all complaints promptly. | Deferred |
| 172 | All complaints shall be referred to SPR with relevant information by the end of tour of duty, absent exceptional circumstances. | Not Compliant |
| 173 | SPR shall determine next steps for each misconduct complaint within five business days of the receipt of the complaint. | Not Compliant |

| 174 | Develop a complaint classification protocol that is allegation-based rather than outcome-based to guide SPR. | Not Compliant |
| 175 | A misconduct investigation may not be conducted by any supervisor who may be implicated or has a conflict of interest. | Not Compliant |
| 176 | Tracking system shall maintain reliable data regarding the number, nature, and status of all misconduct complaints. | Deferred |

**Paragraph 166:** PRPB's policy regarding intake of complaint has not changed, and the data sample does indicate proper complaint intake, classification, assignment, and tracking. A random sample of training records drawn from the requested list of personnel files was not forwarded to the Monitor by the reporting deadline. Training records were assessed as compliant for CMR-2, but these records are subject to assessment every 6 months. Nevertheless, given the overall level of compliance with policy and implementation, the Monitor's Office rates PRPB as being partially compliant with this paragraph.

**Paragraph 167:** Based upon the analysis of SARP policy as well as actual SARP cases provided to the Monitor, it appears that PRPB are working to create awareness of the implications of providing false or misleading information during a SARP investigation, to include not only disciplinary sanctions, but criminal exposure as well.[3] A random sample of training records culled from the requested list of personnel files was not forwarded to the Monitor by the reporting deadline.

**Paragraph 168:** Unlike the sample of SARP complaints assessed for CMR-2, none of the partial sample of SARP complaints submitted to the Monitor for analysis in CMR-3 came from an anonymous source. Therefore, the Monitor is unable to assess compliance based upon the data sample received.

**Paragraph 169:** PRPB has established codified procedures and steps to handling all administrative complaints. The Monitor is in possession of a copy of a detailed flowchart describing the process. In order to support its affirmation of compliance, PRPB submitted a sample of ten cases from the reporting period. In each case, the Monitor found that PRPB met the requirement for forwarding Form 311.1 to SARP within the timeframe established by the written policy. Form 311.1 need not be amended to supply the information on where the form was actually received, as that field is included. The Monitor did, however, find examples in which that field (as well as the field indicating supervisory chain-of-command) were not properly filled out.

---

[3] Beginning with the Monitor's assessment in CMR-2 and continuing with CMR-3, the Monitor notes for the record that every single interview with a PRPB member conducted by SARP and reviewed by the Monitor is prefaced by various warnings, including one which states; "As this statement will be transcribed and sworn to, lying in this interview can lead to administrative and/or criminal sanctions."

**Paragraph 170:** PRPB has a system to identify and assess criminal prosecution or civil causes of action against its members, and reported that 47 civil causes of action and 5 criminal complaints concerning members of PRPB were received during the reporting period. However, no copies of the corresponding SARP complaints were received by the Monitor.

**Paragraph 171:** While previous visits have shown the SARP portion of the EIS system component to be functional and up to the task, the COVID-19 pandemic precluded the Monitor's ability to view the system at present. Therefore, the Monitor is unable to make a determination as to its current state of efficacy.

**Paragraph 172:** Based upon the analysis of the SARP cases provided to the Monitor, it appears that PRPB are forwarding SARP complaints via the established mechanism within the timeframe agreed upon. As noted above, however, the sample of cases forwarded to the Monitor is insufficient in size to reach a valid conclusion as to level of compliance.

**Paragraph 173:** Based upon the analysis of the SARP cases provided to the Monitor, it appears that SARP complaints are being handled within the timeframe agreed upon. As noted above, however, the sample of cases forwarded to the Monitor is insufficient in size to reach a valid conclusion as to level of compliance.

**Paragraph 174:** Based upon the analysis of the SARP cases provided to the Monitor for the respective reporting period as well as the previous reporting, the allegation-based classification protocol remains in full effect and is used universally. As noted above, however, the sample of cases forwarded to the Monitor is insufficient in size to reach a valid conclusion as to level of compliance.

**Paragraph 175:** Based upon the analysis of the SARP cases provided to the Monitor, the Monitor has not encountered a case where PRPB has not allowed a supervisor to conduct an administrative complaint investigation where the same supervisor is either implicated or has a conflict of interest. As noted above, however, the sample of cases forwarded to the Monitor is insufficient in size to reach a valid conclusion as to level of compliance.

**Paragraph 176:** Compliance with this paragraph is partially dependent on compliance with Paragraph 171, assessment of which was deferred due to travel restrictions.

## 4. Investigation of Complaints

As mentioned abobe, the unrepresentative sample of SARP investigations received by the Monitor's Office limits our ability to go beyond a finding of noncompliance in many of

CMR-3 | March 2021

these paragraphs. While the cases actually reviewed by the Monitor demonstrated largely good faith efforts by SARP, some of which may be enhanced and improved upon, the Monitor will require statistically relevant samples of data in the future to ensure that the Monitor's assessment of the sample can be validly generalized to the broader performance of SARP. Certain paragraphs of the Agreement only pertain to closed cases, and thus could be validly assessed based upon the sample of closed cases provided. Lastly, some paragraphs within this subsection of the Agreement could not be adequately assessed by the Monitor due to travel restrictions, and must be verified during site visits.

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 177 | Ensure that policies and procedures clearly establish that complaints are adjudicated on the basis of the evidence. | Not Compliant |
| 178 | Investigate all misconduct complaints and document; establish policy for administrative or informal resolution. | Not Compliant |
| 179 | Ensure that all administrative investigations shall be completed within 90 days of the receipt of the complaint. | Not Compliant |
| 180 | Ensure that investigations of officer misconduct are thorough and the findings are consistent with the facts. | Not Compliant |
| 181 | Require officers to cooperate with investigations; notify supervisors when a supervisee is summoned as part of an investigation. | Deferred |
| 182 | The subject officer of a criminal investigation shall not be compelled to provide a statement to administrative investigators. | Not Compliant |
| 183 | Absent a criminal investigation, subject officers shall not be notified of their right not to provide a statement. | Not Compliant |
| 184 | Upon identifying potential criminal conduct, an investigator shall notify the SPR commander, who shall notify the Superintendent. | Deferred |
| 185 | Develop protocols to ensure that simultaneous criminal and administrative investigations are kept appropriately separate. | Not Compliant |
| 186 | Investigations shall consider all relevant evidence, including direct and circumstantial; shall not prioritize officer statements. | Not Compliant |
| 187 | An investigation shall not be closed because the complaint is withdrawn or the victim is convicted or unable to testify. | Not Compliant |
| 188 | The investigator shall recommend defined dispositions for each allegation of misconduct in an administrative investigation. | Substantially Compliant |
| 189 | The unit commander of the investigating supervisor shall accept, reject, or modify recommended dispositions, and forward to SPR. | Substantially Compliant |
| 190 | The SPR commander shall accept, reject, or modify investigators' recommended dispositions, and forward to the Superintendent. | Partially Compliant |
| 191 | Misconduct investigations shall assess whether the action indicates a need to revise policy, training, strategies, tactics, etc. | Not Compliant |
| 192 | Each complainant will be notified regarding the initiation and disposition of an investigation and any disciplinary action taken. | Substantially Compliant |
| 193 | SPR shall retain all misconduct investigation records for at least five years after the officer's separation from PRPB. | Deferred |

**Paragraph 177:** No changes have been made to PRPB policies and procedures, which clearly established that administrative complaints are to be adjudicated on the basis of a preponderance of the available evidence. The Monitor not only lacks training and certification records, but also lacks a sufficient sample of cases to demonstrate compliance with quantified compliance targets.

**Paragraph 178:** The Monitor notes several circumstances where an agreed-upon term of suspension was applied to the offending officer. This course of action serves to benefit both the officer and PRPB, in that the matter is handled expediently, efficiently, and transparently. For more in-depth remarks, please refer to paragraph 180 and paragraph 12.

**Paragraph 179:** Nearly all the reviewed SARP files were completed within the 90-day window required by PRPB policy. Those that were not were appropriately allowed an extension for legitimately explained circumstances. Again, however, the sample provided does not permit the Monitor to state with certainty that the compliance observed can be generalized to SARP investigations more broadly.

**Paragraph 180:** The Monitor hereby incorporates by reference the previous comments made in regards to Paragraph.[4] In addition to the cases addressed under that paragraph, a separate group of completed SARP cases were forwarded to the Monitor for analysis. While some of these cases were well-investigated, while others were lacking or reached conclusions incongruent with the facts established. While SARP interviews nearly always ask the subject for a narrative declaration at the beginning of the interview, those declarations are more forthcoming in some cases than in others. In all interviews, the subjects are asked if they would like to make a declaration, it is then up to the individual to decide whether they wish to provide a narrative declaration followed by questions and answers, or only answer the questions asked by the investigator, as one would normally do in a civil deposition setting. The questions and answers that follow this declaration continue to resemble a deposition-style format and mostly tend not to expand upon the basic premise of the initially planned query.[5]

The Monitor strongly recommends updated training in interviewing techniques that employ open-ended questions with follow up questions that are formulated based upon responses given by the interview subject. To ask a series of pre-determined questions

[4] Due to the nature of PRPB Code of Ethics, virtually all SARP investigated administrative infractions fall within the category of a "breach of ethics." Therefore, all cases provided to the Monitor under his Request for Production of Documents pertaining to Paragraph 12 are incorporated into the Monitors analysis of PRPB compliance with Paragraph 180.

[5] To cite a glaring example of this faulty interviewing style, see case 435 in Appendix D.

CMR-3 | March 2021

forecloses other avenues flowing from the initial inquiry, which might present themselves in supplementary questions and answers.[6] Mindful of the standard of proof in a PRPB administrative investigation, (a preponderance of evidence, which may be numerically expressed as 51 or greater/49 or lesser), the Monitor recommends that a segment of each investigation include an analysis and discussion of the accused officer's prior disciplinary record. In an otherwise closely decided case, an officer's record of having committed misconduct in circumstances similar to that alleged in the instant case may be sufficient to help an investigator demonstrate a preponderance of evidence that indicates culpability. Conversely, a disciplinary record that contains no previous allegations of a similar nature in a closely decided case may serve to show the lack of a such a preponderance of evidence in such a case.

**Paragraph 181:** Based on the documents supplied by PRPB, the Monitor finds that a clear paper trail exists to document the fact that employees have been summoned in writing to provide a declaration to the SARP investigator. Notwithstanding this documentation, the officer in charge of ensuring service upon the employee must ensure that the form is filled out in its entirety and in legible form. In-person interviews with SARP members must be taken to ensure that SARP investigators are receiving an adequate level of cooperation with officers and supervisors.

**Paragraph 182:** No cases in which the possibility of criminal jeopardy on the part of the subject could be established were sent to the Monitor. Therefore, the Monitor is unable to assess compliance with this Paragraph.

**Paragraph 183:** In the preamble to a SARP interview where no possible criminal charges may be brought, the SARP investigator follows a set investigative protocol by delivering warning statements, which each PRPB member is expected to understand and accept. These administrative investigative interviews follow the black letter law established in <u>Garrity</u>,[7] wherein officers are not notified of any right not to provide a statement, as such a right does not exist in law.[8]

---

[6] See case 478 in Appendix D.

[7] See <u>Garrity v. New Jersey</u>, 385 U.S. 493 (1967)

[8] For instance PRPB Certified Declaration contains the following advisories, "You have the obligation to tell the truth about the acts alleged that form the basis of this complaint; To lie during this declaration can involve both administrative and criminal sanctions, as a transcript of this will be produced of this which you will then attest to; You have the obligation to inform the investigator of any affair which, although is not asked of you directly, is pertinent to this investigation; It is necessary to keep the investigator informed of any affair that is pertinent to this investigation of which you may gain knowledge of after this interview is conducted."

**Paragraph 184:** No cases in which the possibility of criminal jeopardy on the part of the subject could be established were provided to the Monitor. Therefore, the Monitor is unable to assess compliance with this Paragraph.

**Paragraph 185:** No cases in which the possibility of criminal jeopardy on the part of the subject could be established were part of the random sample requested by the Monitor. Therefore, the Monitor is unable to assess compliance with this Paragraph. In a similar vein, the Monitor saw no cases in CMR-2 in which parallel administrative and criminal investigations were being conducted.

**Paragraph 186:** Most issues addressed by the paragraph have been covered extensively under Paragraphs 12, 178 and 180. On the matter of giving preference to the accounts offered by PRPB personnel over the accounts offered by civilians, the Monitor finds that all declarants are treated as equal by the investigator, including and especially in situations where the declarant far outranks the investigator. The Monitor notes that while respect is shown to all ranks, deference, much less preference, is not. (See 4. Investigation of Complaints).

**Paragraph 187:** Of all the cases reviewed by the Monitor, in only one case did the Monitor see an actual withdrawal by a civilian complaining party. In that case, the investigation pressed on with other witnesses despite the lack of participation of the original complainant. The investigation reached, in the Monitor's professional opinion, the conclusion supported by the facts and circumstances of the case.

**Paragraph 188:** While the SARP investigator, as a matter of routine practice, makes a recommendation as to the finding with respect to charge(s) contained within the investigation, the Monitor has found several circumstances where that finding were changed, most often at the level of the Office of the Police Commissioner (or perhaps the Office of Legal Affairs). In the interest of full transparency, the Monitor recommends that any changes to a conclusion reached by the investigator be annotated as to the reason why the change has been made. This makes it clear to the officer involved, to the complainant, to the investigator, to PRPB, and to the general public why the finding was changed.

The Monitor's Office notes a key development in relation to the analysis provided in CMR-2. In CMR-2, the Monitor noted that the Office of Legal Affairs ("OLA") or the Office of the Police Commissioner ("OPC") would occasionally use inappropriate terminology in its correspondence concerning the final outcome of the case. It should be noted for the record that both the OLA and OPC now confine themselves to the four findings allowed under PRPB policy; "sustained, not sustained, unfounded or exonerated."

**Paragraph 189:** The Monitor refers the reader to the analysis provided within Paragraph 188. In addition, the Monitor finds that while the SARP Unit Supervisor routinely reviews and nearly always concurs with the findings reached by the SARP investigator, there is no field on the form for the investigator to note the date of his/her review. In the interest of creating a timeline and measuring efficient workflow of SARP investigative processes, the Monitor recommends adding a date to these review forms alongside the signature line.

**Paragraph 190:** Unlike the Unit Commander Review, the SARP Command Review contains a date where the SARP Commander or her Executive Officer accepts or modifies the conclusions reached in previous iterations of the SARP processes. As previously noted, no rationale is provided as to why an investigator's case finding has been modified. (See Paragraph 188).

**Paragraph 191:** The Monitor finds that periodically the SARP investigator identifies a training gap and at other time misses that opportunity. As a matter of course, each SARP investigator should ask him/herself in each investigation where the officer has committed an error or acted contrary to the rules and procedures established by PRPB, "Is there a lack of training in this particular area? Does this error or infraction stem from faulty training? Does this infraction involve a policy that ought to be amended?" See also the analysis provided in paragraph 180.

**Paragraph 192:** From the cases provided within the sample, PRPB SARP continues to be compliant vis a vis its communication with all parties to a complaint through the Office of the Police Commissioner, at both the complaint initiation phase and at its final determination phase.

**Paragraph 193:** PRPB has a clear document retention policy and practice. SARP case files provided to the Monitor indicate that misconduct investigative files are archived and held by PRPB after an employee has left the agency for a variety of reasons including death, retirement, resignation, or removal from the agency.

## 5. Staffing, Selection, and Training Requirements

Records indicate that PRPB adheres to its stated policy of 3-year terms for SARP investigators. Once the COVID-19 pandemic abates, the Monitor looks forward to conducting interviews of SARP investigators pursuant to this policy to ensure that the most proficient among them are offered an opportunity to continue their service, should they desire to. Furthermore, no current documentation was forwarded to the Monitor to indicate training or certification of SARP members.

CMR-3 | March 2021

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 194 | Ensure that sufficient well-trained staff are available to complete and review misconduct investigations in a timely manner. | Partially Compliant |
| 195 | Establish a term of duty of up to three years for SPR officers and supervisors; potential for reappointment based on performance. | Deferred |
| 196 | SPR personnel conducting investigations shall receive 40 hours of initial training and additional in-service training each year. | Not Compliant |

**Paragraph 194:** PRPB failed to provide current records that would demonstrate that current SARP staff has been trained and certified to conduct internal investigations. The Monitor is mindful of the fact that PRPB previously forwarded such data for the CMR-2 reporting period, however there is no current data for investigators who may possibly have been added to SARP in the intervening period of time.

**Paragraph 195:** Under SARP organizational protocol as codified within the General Order, SARP investigators serve a three-year appointment, which may then be extended based upon performance. From documents supplied during CMR-2, it appears that none of the SARP investigators have reached the three-year limit in order to be considered for re-appointment. Once the Monitor receives the documentation mentioned in our analysis of Paragraph 194 for CMR-4, the Monitor's Office may then identify any SARP investigators who are at the three-year limit and thus are subject to re-appointment. The Monitor plans to review the criteria established by PRPB for consideration for re-appointment to SARP at that time.

**Paragraph 196:** The Monitor's Office has not been provided with current training records for SARP investigators during the reporting period. Per the monitoring methodology, PRPB should provide the Monitor's Office both with the training curriculum for SARP personnel, as well as current training records as evidence that SARP investigators' training certifications are current.

## 6. Preventing Retaliation

PRPB's policy of proscribing retaliation remains in full force, as evidenced by PRPB Article 14 (General Order 9001). Through no fault of PRPB, the Monitor was unable to review any of the seven cases of alleged retaliation investigated by SARP during the reporting period.

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 197 | Prohibit all forms of retaliation against any civilian or officer who reports misconduct or cooperates with an investigation. | Deferred |

**Paragraph 197:** The segment of PRPB policy that speaks to retaliation, as codified in its Article 14 (G.O. 9001) has not changed since CMR-2.[9] PRPB did provide the Monitor with a spreadsheet of seven cases during the reporting period in which retaliation had been alleged. The Monitor did not request and PRPB did not supply a sample from the list of SARP complaints alleging retaliation during the reporting period. The Monitor's Office will defer rating until such time as the Monitor is able to review these files in sufficient detail.

## 7. Discipline

A review of cases involving imposed discipline during the reporting period indicates that PRPB follows its disciplinary matrix consistently. However, the Monitor continues to have concerns over the adequacy and efficacy of PRPB drug testing program.

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 198 | Ensure that discipline for misconduct is fair, consistent, based on objective criteria, and not influenced by rank or external factors. | Partially Compliant |
| 199 | Establish a disciplinary matrix for sustained findings to facilitate consistency in discipline; document all disciplinary decisions. | Partially Compliant |
| 200 | Review drug testing program continually to ensure that testing for new and existing officers is reliable and valid. | Not Compliant |

**Paragraph 198:** Article 14 (General Order 9001) establishes a codification of activities that are proscribed for its members, a codification of levels of infractions, which may be committed either by commission or omission by its members, and factors which could either mitigate or aggravate the underlying infraction. The Monitor finds that Article 14 has not been amended or changed since its approval by the Monitor as part of the capacity building phase of the Agreement. The Monitor reviewed a sample of adjudicated and finalized cases from within the reporting period, and finds that the sanctions imposed are in tenor with Article 14. The Monitor has not received training records that would show compliance with discipline training and certification policies. The Monitor finds, on the basis of documents provided, that when accused members of PRPB exercise their right to due process, PRPB does not infringe that right.[10] The Monitor finds that PRPB

---

[9] Falta Administrativa Leve 21, Falta Administrativa Grave 63, 64. See PRPB General Order 9001.

[10] Subsection 14.6.4 of Article 14 contains the provision for procedural due process for members of PRPB where an administrative complaint has been sustained and a sanction is to be applied. According to 14.6.4, an officer has 15 working days after being served with a *resolución de cargos* of PRPB, which assesses and details the discipline meted out by the bureau. The hearing is referred to as an informal administrative hearing where the rules of evidence of the Commonwealth do not apply. The member may opt to bring legal representation or not. Pursuant to the rule the hearing is not to be, "complex, complicated, extensive or formal." During the hearing, the employee may speak or submit a written document to explain why s/he should not be disciplined. After the hearing, the hearing officer may adopt, reject or amend the discipline recommended in the original finding. Lastly, PRPB member has a right to appeal the finding beyond the informal hearing to the *Comisión de Investigación, Procesamiento y Apelación*. See 1L.P.R.A. secs 171 et seq. (1972)

members subjected to discipline frequently exercise the right to due process, and according to the reviewed cases, this right is respected by PRPB. To be exhaustively thorough, future reviews by the Monitor should include the Monitor's attendance in at least some of these informal hearings in the role of a neutral observer.

**Paragraph 199:** Article 14 details a system of progressive discipline to be applied by PRPB, ranging from verbal warnings up to and including separation from the agency. Each type of infraction carries a corresponding sanction, which could either be mitigated or aggravated, depending upon the established facts of each individual case. Having reviewed all cases where a disciplinary finding was made during the reporting period, the Monitor finds that Article 14 progressive disciplinary procedure is being complied with. The Monitor, however, reserves the right to attend PRPB informal "due process" hearings to solidify the finding.

**Paragraph 200:** The Monitor requested information on the number of PRPB members tested for proscribed substances and the number found to have tested positive, but received no data from PRPB. The Monitor has reviewed PRPB drug testing policy and finds that it has not changed since the previous review in CMR-2. The Monitor reiterates concerns expressed in CMR-2 regarding the overall efficacy of PRPB's drug testing program, the operational secrecy, collection methodology used, the tests used, and the proper preservation of urine samples. The Monitor now fully understands that other agencies both public and private are involved in this endeavor. However, this in no way changes PRPB's responsibility to ensure that its officers are drug free.[11] Future site reviews may possibly allay the Monitor's multiple and previously expressed concerns over the efficacy and adequacy of PRPB drug testing policy and program, and thereby register some level of compliance.

## 8. Officer Assistance and Support

With respect to the documentation available, the Monitor finds the PRPB Employee Assistance Plan to be largely compliant in its *design*. However, PRPB failed to supply sufficient data on training and implementation of this plan, such as records to support the training segment. The Monitor will require more in-depth information to quantify and qualify results of the program and thereby determine a level of compliance. Owing to the

---

[11] The Institute for Forensic Science as well as private laboratories contracted by the Commonwealth provide drug testing services to PRPB. Limitations on Monitor site visits owing to the COVID-19 pandemic preclude the Monitor from actually observing the planning and operation of drug screening on the part of PRPB, ICF and/or its agents or representatives.

CMR-3 | March 2021

patient confidentiality constraints of HIPAA, this information should be reviewed in Puerto Rico.

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 201 | Provide personnel with a range of non-punitive supports and services to address and correct problem behavior. | Partially Compliant |
| 202 | Train management and supervisory personnel in officer support service protocols to ensure wide availability and use. | Not Compliant |
| 203 | Involve mental health professionals in training on mental health stressors and the services available to officers and their families. | Deferred |
| 204 | Ensure that any mental health counseling services provided to PRPB employees remain confidential. | Substantially Compliant |

**Paragraph 201:** The Monitor refers readers to the analysis and assessment of compliance provided in paragraphs 201 – 204 as well as 198 and 199. PRPB did not forward training records as requested by the Monitor. A comprehensive assessment on the involvement and availability of mental health services may be made only through post-pandemic site visits.

**Paragraph 202:** Training and certification documentation was requested by the Monitor in order to assess this and other training/certification paragraphs. This documentation was not provided to the Monitor within the prescribed timeframe.

**Paragraph 203:** Monitor finds that PRPB Employee Assistance Policy, has not changed since it was assessed as substantially compliant in CMR-2. This policy goes into great detail to involve mental health professionals in both training, diagnosing and offering corresponding services to PRPB members in need. While PRPB has forwarded documentation attesting to the fact that the program exists and is treating individuals, the Monitor was not able to quantify or qualify the program's scope or efficacy.

**Paragraph 204:** The Monitor has seen no evidence that would suggest that PRPB is failing to comply with the Health Information Portability and Privacy Act.[12] All data from across the monitoring process that would be governed by HIPAA, including correspondence with the Monitor's Office concerning the Employee Assistance Policy, has complied with patient confidentiality in tenor with HIPAA.

---

[12] See the HIPAA Privacy Rule, 45 CFR Part 160 and Subparts A and E of Part 164.

## X. Community Engagement and Public Information

Community Engagement and Public Information remains a work in progress. The Agreement requires that PRPB create robust and constructive community relationships through such efforts as a) engaging in community policing, b) developing and sustaining meaningful partnerships to solve problems, c) practicing ethical and bias free policing for effective crime prevention, and d) disseminating information to the public on the reform process. While the Monitor's Office recognizes that crime control and prevention are central priorities for PRPB, community policing strategies use a wide variety of methods to achieve and address these goals.

The essence of community policing is that the police work closely with all aspects of the community to identify concerns and to find the most effective solutions. PRPB embarked in conducting a needs study and developed a plan that anticipates a) resource allocation, b) training, c) personnel deployment, d) mechanisms to measure community partnerships, and e) effective problem-solving strategies to achieve said mission. However, PRPB has not fully demonstrated efforts to effectively implement the outcomes of this study.

Although CMR-2 captured that training in community policing has been provided to most officers, training content has not been evidenced by PRPB to date, including its full curriculum and methodology for implementation. As verified by the documents provided to the Monitor's Office, PRPB did not conduct in-service training. The curriculum for retraining (revised version as of October 2020) was not made available for the Monitor's Office review during this assessment period.

Community Interaction Councils (CIC) delegated to area commanders for community policing and problem-solving strategies reflect the need for uniform operational procedures and effective processes for implementation, including the allocation of resources and budgeting. Current assignment to community policing is limited to one or two officers in most police areas. In areas such as San Juan, Guayama, Orocovis and Patillas, PRPB's reports indicate that there are no officers assigned. Similarly, community cross section representation is not fully portrayed in some regions or police areas, and no evidence was produced to demonstrate efforts during this period to secure full representation.

Documents submitted to the Monitor's Office by PRPB state that community meetings did not take place in most police areas due to the COVID-19 pandemic. However, informal meetings with community members and organizations were held in some cases, such as

in the police areas of Carolina, Bayamon, and Fajardo. Formal organizations, including non-profit organizations, local government agencies, private sector actors, local businesses, and faith-based groups can serve as important partners in the effort to exchange information and coordinate with the public. These organizations can also facilitate the exchange of resources to jointly address quality of life issues and prioritize public safety issues that are most important to the community.

PRPB provided the Monitor's Office with documentation confirming that the SARA model (Scan, Analysis, Response, and Assessment) has not been employed as a strategic interactive tool for problem solving. Therefore, recurring community issues in the different police areas remain unidentified. Without applying the SARA model, the root causes of these distinctive problems cannot be analyzed for resolution.[13] Problem Oriented Policing and the application of the SARA model provide an approach developed for targeted interventions and should not be considered or viewed as an alternative to interventions, as evidenced through documents submitted by PRPB. Shared problem-solving based on the SARA Model can achieve significant reductions in crime over traditional (reactive) response models.

## 1. General Provisions

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 205 | Engage constructively with the community to facilitate reform, collaboration, ethical & bias-free policing, and crime prevention. | Partially Compliant |

**Paragraph 205:** Constructive engagement with the community involves recruitment, training, performance, interaction, and accountability. Achieving bias-free and problem-oriented policing requires a service-adept work force, which must be a primary goal of recruitment efforts. Relevant training in community policing also promotes constructive engagement with the community for collaboration, problem solving, crime prevention and sharing information, all of which have an impact on performance accountability.

The Monitor's Office is aware that PRPB has a strategic recruitment plan. In CMR-2, the Monitor's Office reported that PRPB had provided evidence that training in community policing was provided to 99.99% of the police force. However, the content of these trainings has not been provided to the Monitor's Office to date including the curriculum ("Prontuario"), and training methodology. The only documentation provided to date includes an enumerated list of coursework for training, contained in PRPB's Action Plan. In-service training curriculum for retraining (revised version as of October 2020) was not

---

[13] MON-OR-CMR3-2151, 2152, 2162, 2166-2172, 2174.

made available for the Monitor's Office to review during this assessment period. The Monitor's Office is aware through certified documents submitted by PRPB that no training endeavors took place during this assessment period, largely due to the restrictions imposed by the COVID-19 pandemic. Furthermore, PRPB did not submit performance evaluation documents for the Monitor's Office to review that would demonstrate the incorporation of community policing principles into performance evaluation practices.

In April 2018, PRPB conducted a needs and resource allocation study, and on September 27, 2018, developed an implementation plan in compliance with Paragraph 13 of the Agreement. This plan anticipates resource allocation for the organization as a whole, wherein areas of critical staffing need and surplus are identified and resolved through reassignment. The plan envisioned personnel redistribution within five years, two of which have already elapsed. However, the plan failed to identify a specific allocation of resources consistent with the principles of community policing, partnership development, or problem-solving strategies and techniques. Current police deployment and assignment to community policing is limited to one or two officers in most police areas. In other areas, PRPB's reports indicate that no officers have been assigned. Similarly, community cross section representation is not fully portrayed in some regions or areas, and evidence of efforts to secure full representation was not produced for this reporting period.

## 2. Community Oriented Policing

PRPB has not provided the Monitor's Office with evidence that staff allocation and personnel deployment are being implemented in support of community policing and problem solving goals. A review of the documentation submitted by PRPB revealed that personnel deployment is limited to one or two officers per police area. In some areas no staff has been allocated for community policing and problem solving. As was noted in our previous report, PRPB has yet to demonstrate the employment of the SARA model for solving problems bureau wide.

Partnerships, a core component of community policing, remain in developmental stages. PRPB has yet to develop a mechanism to measure partnership development and problem-solving strategies along with their efforts to address issues of quality of life effectively. As evidenced by PRPB, the alliances developed are informal in nature, and not all police areas have developed alliances during this assessment period. Moreover, community alliances should not be limited to an isolated incident or a specific timeframe. If well developed, community alliances become self-perpetuating. The Monitor's Office recommends that PRPB tap into their community safety councils and CICs for resources in order to solidify and formalize community alliances.

| Paragraph | Stipulations | Monitor's Rating |
|-----------|--------------|------------------|
| 206 | Reassess staffing allocation and personnel deployment to support community policing and problem-solving goals. | Partially compliant |
| 207 | Conduct outreach to a broad cross-section of community stakeholders to develop strategies and build mutual trust. | Not compliant |
| 208 | Develop systems to measure and report community partnerships and problem-solving strategies and assess their effectiveness. | Not compliant |

**Paragraph 206:** Community policing requires an adequate number and distribution of officers to make sure that all neighborhoods have assigned officers who are familiar with the geographic area, its particular issues, problems, and community leaders. These officers must also be capable of engaging in problem identification and problem-solving activities, and must work proactively together with members of the community. Community policing requires that police focus on the community's priorities to address quality of life issues through partnerships and alliances.

PRPB conducted a needs and resources allocation study and developed an implementation plan, wherein overall resource allocation was outlined for the Bureau. However, no specific allocation of resources was outlined in the plan to address the principles of community policing, partnership development, or problem-solving strategies and techniques. PRPB's documentation for assessment compliance during this reported period revealed that current deployment is limited to one or two officers in most police areas. In other areas such as San Juan, Guayama and Patillas, P.R., PRPB's reports indicate that there were no officers assigned.

PRPB needs to ensure that core operations within the Bureau supports community policing and problem-solving initiatives, and the Monitor's Office strongly encourages PRPB to modify any deployment strategies that are incompatible with effective community-oriented policing. The Monitor's Office notes that PRPB never fully implemented recommendations based off of the staffing study conducted in part to assess the staffing needs associated with community-oriented policing. Given the time that has passed since that study was conducted, the Monitor's Office recommends that the staffing study be updated, and that PRPB use the results and recommendations of that study to guide allocation of personnel and resources in line with community policing.

Problem Oriented Policing and the SARA model (Scan, Analysis, Response, and Assessment) are targeted interventions and should not be construed as an alternative to interventions generally. Certifications submitted to the Monitor's Office by PRPB's SAOC and the different police areas state that the SARA model was not employed during the

period of review from April through September 2020 (previous administration), which is inconsistent with PRPB's policy. Although, the police area of Carolina reported having employed the SARA model during this assessment period, no specific problems were identified within their narrative, nor any steps taken towards resolution. Thus, the Monitor lacks evidence of correct implementation of the SARA model.

Ponce police also submitted documentation to the Monitor's Office noting that they employed the SARA model. The document indicated that because the Community Relations' office was in quarantine during the COVID-19 pandemic, supporting evidence was to be submitted later. However, no evidence was received by the Monitor's Office. It has been the experience of the Monitor when conducting site visits for past CMRs that PRPB does not have the proper distribution of personnel to comply with community policing strategies.

**Paragraph 207:** One core practice of community policing involves reaching out to the community to form alliances and develop partnerships. Developing trust, in turn enables the police to gain greater community cooperation, potentially leading to the resolution and prevention of crimes and engendering support for crime-control measures.

Although CMR-2 showed that PRPB has reached out to develop formal alliances within the public and private sector and among social services agencies and faith-based groups, most of these alliances are informal in nature. Documents submitted by PRPB to the Monitor's Office for this assessment period for the Aguadilla, Arecibo, Ceiba, and Fajardo police areas certified that no formal or informal partnerships or alliances were formed during the present reporting period due to COVID-19. Furthermore, documentation from the police areas of Utuado and La Fortaleza reported that no alliances were formed, nor were any community meetings held, but did not specify the reasons for their non-compliance.

PRPB's areas of Carolina and Bayamon submitted documents evidencing the formation of informal alliances. PRPB's SARP submitted a document to the Monitor's Office stating that they cannot form community alliances without interfering with an impartial process between PRPB and the community. Although, the Monitor understands SARP's concerns, the development of alliances facilitates trust-building relationships and serves to bridge the gap in informing the public and the community about their rights to file a complaint against any police member engaging in misconduct. This relationship would also allow SARP the ability to obtain information for further referrals, as well as inform the community of the availability of resources to commend and recognize police members' service and performance.

Consistent with the findings in CMR-2, PRPB's SAIC did not report any alliances developed. The Monitor recommends that SAIC develop alliances with the community, which may assist them to encourage the community to learn more about crime trends within their communities and provide information to assist solving criminal investigations.

**Paragraph 208:** PRPB has not demonstrated the development of a mechanism to measure partnership development, problem-solving strategies, or their efforts to address issues of quality of life. The Monitor's Office has not received any information evidencing the implementation of said mechanisms to measure or assess their effectiveness. PRPB must identify and provide detailed information about the obstacles or roadblocks encountered in the development of formal partnerships in order address the objectives of community policing. PRPB's overall compliance with this paragraph is not in alignment with all the requirements of community policing and problem-solving strategies.

### 3. Community Interaction Councils

Community Interaction Councils (CIC) have been instituted in all police areas. Additionally, there is a Community Interaction Council at the Central Headquarters that is constituted by the spokespersons from the 13 police areas. Some CIC members were interviewed on January 14, 2021 and January 15, 2021 during this assessment period. PRPB submitted documentation evidencing the activity of Central CIC members, but this documentation appeared to be outdated, as it referenced the name of a former Secretary of Public Safety.

PRPB has demonstrated having a mechanism to select the members of the Community Interaction Councils (CIC) including a representative cross section of community members and an agent liaison/facilitator. Nevertheless, not all police areas have full CIC cross section community representation as corroborated through the documentation submitted by PRPB for this period and through the interviews conducted with CIC members.

PRPB provided documentation certifying that no trainings were facilitated for CIC members during this reporting period. As confirmed in interviews, however, CIC members have been previously trained. The Monitor's Office did not receive any documentation of training curriculum content to assess its quality during this assessment period, but the CIC members interviewed asserted that the training they received in the past was relevant and purposeful. Nevertheless, without the submission of documentation from PRPB, the Monitor's Office is unable to assess content quality.

All interviewees stated that PRPB has never consulted with them on the CIC operating budget. The Aguadilla CIC reported that the topic has come about in meetings in the past,

but no one appears to be clear on the matter. He added that whenever an engagement activity is held, refreshment purchases are subsidized through their own private funds. San Juan reported that they rely on voluntary donations.

| Paragraph | Stipulations | Monitor's Rating |
|:---------:|--------------|:----------------:|
| 209 | Maintain Community Interaction Councils (CICs) with community representatives to facilitate communication and cooperation. | Partially Compliant |
| 210 | Develop a mechanism to select a representative cross section of community members and PRPB officers for CICs. | Partially Compliant |
| 211 | Allocate resources to ensure that CICs possess the means, staffing, access, training, and mandate to fulfill their mission. | Partially Compliant |
| 212 | Collaborate with CICs to develop a comprehensive community policing approach that addresses crime and safety issues. | Partially Compliant |
| 213 | CICs shall memorialize their recommendations in reports that shall be available in PRPB facilities and on the web. | Not Compliant |

**Paragraph 209:** Community Interaction Councils (CIC) have been instituted in all police areas. The Central CIC is composed of spokespersons from the 13 police areas. Some of these CIC members were interviewed during this assessment period. However, PRPB's information on the Central CIC is outdated.

The majority of CICs have an agent facilitator, and in some cases, an alternate agent as well, which have been identified by the CICs interviewed as instrumental in the communication process. Nevertheless, not every police area has a designated agent facilitator. PRPB submitted partial evidence for CICs and their members as well as for their liaison agents or facilitators. PRPB did not submit documentation for the police areas of Aibonito, Caguas and Fajardo.

Interviewed CIC respondents from Guayama, San Juan, Arecibo, and Aguadilla, P.R. reported that they enjoy a good rapport with their area police, and that communication is fluid to some extent. They concur the same is possible through the communication between them and their facilitator agent, who keeps them abreast of news, information, and developments. All the interviewees noted that they are missing between one to three members in their areas for a full cross section of community representation (Arecibo, and San Juan are missing one member each, Guayama is missing two members and Aguadilla, three). Common trends identified during these interviews include the lack of personnel and other resources, and the need for office space. Additionally, the CIC members interviewed reported that retraining would be important, as the philosophy of community policing is understood, but has not been fully implemented. CIC Members

were also unclear about the SARA model and what it actually entailed as a strategy for problem solving.

CIC meetings were affected by the pandemic, and in most cases were not held. Virtual meetings were not possible, despite a directive from the Office of the Reform, as CIC members either did not have the technological resources to comply or feared exposing themselves by assembling where the technology was available. No documents were submitted to the Monitor's Office in support of quarterly CIC meetings held.

**Paragraph 210:** PRPB has demonstrated the existence of a mechanism to select the members of the CICs, including a representative cross section of community members and an agent liaison/facilitator. PRPB submitted partial evidence of the existence of CICs, their memberships, and their liaison agents or facilitators. Nevertheless, documents for the police areas of Aibonito, Caguas and Fajardo were not submitted. Not all police areas have full CIC cross section community representation, as verified by interviews with CIC members and the documentation submitted by PRPB for this period. Most CICs have a designated agent facilitator, and in some cases an alternate agent assigned as well. However, not every police area has an agent facilitator.

**Paragraph 211:** CICs remain in need of an allocation of resources and civilian members. The CIC members in each police area need a full cross section of community representation in their areas because they have reported that they are a few members short. CIC members interviewed also noted that they need a meeting space, which need not be a dedicated space for the CIC, but simply some space in a public institution other than a police facility (e.g. a scheduled meeting space in a town hall or other civic institution). Further, PRPB did not submit any documents necessary to the Monitor's Office to assess means, staffing and access to fulfill CICs mission and the requirements of the Agreement on at least 85% of the CICs.

Although CICs reported that they have received training in the past, they also believe that retraining on specific topics may assist them in fulfilling their mission. CIC members interviewed noted that while they believe that the philosophy of community policing has been developed, PRPB has not fully implemented it throughout the Bureau. The CICs interviewed recognized PRPB's limited personnel resources. PRPB did not submit any documents to the Monitor's Office in support of CICs orientation for content review and to determine compliance.

The CIC members interviewed suggested future retraining (Aguadilla and Guayama). The CIC from Aguadilla further suggested that sessions be held in the different police areas using local community space rather than solely at the Academy in Gurabo. One CIC

member noted that conducting the training at the Academy presents transportation and logistics challenges for some CIC members due to distance and full-time work responsibilities, especially given that their participation in the Committee is voluntary. A CIC member from Guayama stated that as long as there is a vehicle available for transportation, which has been the case in her area, there is no problem, especially if training is offered on Saturdays. San Juan CIC members reported that a vehicle is not always available, because it is a shared vehicle.

As noted above, the CIC members interviewed stated that they have not been consulted on the CIC operating budget, nor do they know about the availability of resources to draw upon from the budget in order to assist them in fulfilling their mission. Though PRPB is not required to share its broader operating budget directly with CIC members, the Agreement does require that PRPB consult CIC members regarding the operating budgets of local CICs, including the budget allocated for promotional and informational materials and any other materials they require to perform their duties and community activities. Consistent with Paragraph 211 of the  Agreement, therefore the Monitor's Office strongly recommends that PRPB actively seek CIC's feedback and consultation on their operating budget in order to meet compliance.

**Paragraph 212:** The CIC members interviewed believe that collaboration could be furthered if PRPB a) considered the exchange of information on strategies to tackle issues of safety and quality of life specific to their community, b) considered their recommendations, and c) became more open to constructive feedback. Some CICs believe that targeted recruitment efforts through job fairs at colleges, universities and outreach activities may strengthen PRPB's efforts to secure a qualified and diverse force.

CIC members interviewed also noted that they believe that they could collaborate further if PRPB makes their inclusion more dynamic and supportive. They would like to work together to improve the exchange of information and work on strategies specific to their community. Many CIC members interviewed expressed a desire to provide their recommendations and for PRPB to become more open to constructive feedback. Some interviewees stated that their participation and involvement should extend beyond committee work, and their involvement should be widespread. The Monitor's Office notes that this is a group of committed professionals whose vested interest is to contribute to their communities for the improvement of safety and quality of life. They hold a host of community-based resources upon which PRPB can draw to further partnerships and formalize alliances.

Regular meetings were hampered by the COVID-19 pandemic. As a result, community meetings did not take place in many police areas, despite a directive from the Community Relations Bureau to provide continuity to the CICs through virtual meetings.

The Aguadilla CIC stated that amid the pandemic some meetings were held, but their work plan was cancelled. The San Juan CIC reported that they engaged in limited activity through the telephone and email, and finalized a partnership with Colegio Universitario de San Juan, (subject for review in CMR-4). The Arecibo and Guayama CICs reported that no activities or meetings took place during the period of review. They also reported that virtual meetings were challenging because not every member had the technological resources or proficiency to engage in the process, while others fear exposing themselves to the pandemic through in-person gatherings at police headquarters.

The Aguadilla CIC submitted for the Central CIC's consideration that they be included in the COVID-19 vaccination process along with PRPB personnel. They assert that their risk for infection is heightened considering that they are in contact with the police, and in turn with the community. Evidence submitted in support of CIC's recommendations was received by the Monitor Office to consider evening meetings and virtual training and retraining.

**Paragraph 213:** The CICs prepared and submitted their annual report to PRPB, depicting a compilation of the CIC's recommendations to PRPB from the previous year. However, the report has not been made available to the Monitor's Office for review. Further, this report needs to be available to the public at PRPB's headquarters and published on PRPB's website. The report must be rendered yearly until full and effective compliance with the Agreement is determined. Notwithstanding, the last report published according to PRPB's website was in 2016 for the year 2015. No other source was made available to the Monitor's Office for review.

The Monitor's Office is aware that some CIC members have submitted their recommendations as required, but insufficient information has been submitted for the Monitor's Office to consider a rating of partial compliance. The Monitor's Office recommends that PRPB reach out to the Central CIC to share any concerns and assistance, and to demonstrate their support in meeting compliance for publication.

## 4. Public Information

The Monitor has not been able to determine whether a Community Outreach and Public Information program has been implemented in each of the 13 Police areas, because no documents were submitted in support of compliance. However, the Monitor has

CMR-3 | March 2021

reviewed and confirmed that there is policy in place wherein duties and responsibilities are outlined, including an execution plan.

The Monitor has documented that PRPB has disregarded compliance with the mandate for public dissemination of accurate and updated crime statistics, including on hate crimes. The PRPB website's tab for statistics lists outdated reports from 2008 and 2009, and does not capture or include hate crimes. The Agreement requires public dissemination of accurate and updated crime statistics monthly, including hate crimes . As such the Monitor's Office issues a rating of not compliant.

| Paragraph | Stipulations | Monitor's Rating |
|-----------|-------------|------------------|
| 214 | Develop a Community Outreach and Public Information program in all thirteen police regions and large operational subdivisions. | Not Compliant |
| 215 | During the first two years of the agreement, the community outreach program shall require bi-annual open meetings. | Not Compliant |
| 216 | Community outreach meetings shall summarize all audits, reports, and policy changes or other significant actions. | Not Compliant |
| 217 | Publicly disseminate accurate and updated crime statistics, including those related to hate crimes, on a monthly basis. | Not Compliant |

**Paragraph 214:** The Monitor's Office reviewed and confirmed that there is a policy in place, wherein duties and responsibilities for a public information program are outlined, including an execution plan. However, PRPB did not submit to the Monitor's Office any documents in support of compliance as to whether a Community Outreach and Public Information program has been implemented in each of the 13 Police areas. PRPB was deemed not compliant in CMR-2. The Monitor's Office is aware of related CDC guidelines amid COVID-19 and the Executive Orders issued by the Governor of Puerto Rico, but it remains a fact that PRPB has not been able to demonstrate the implementation of its Community Outreach Program in all 13 police areas.

**Paragraph 215:** PRPB did not submit any documentation of open meetings being held in general, or of publicity in support of meetings as required in the Agreement. The Fajardo police area submitted a document certifying that no meetings were held because they were concentrated on fulfilling the implementation of the Executive Order issued by former Governor Wanda Vazquez Garced.

**Paragraph 216:** Because PRPB did not submit any documents in support of outreach activities or meetings being held, there is no summary of any audits, reports or actions to review to determine compliance. As a result, they are also deemed not compliant. PRPB should have made efforts to continue its community outreach efforts via virtual meetings, social media, or other means.

**Paragraph 217:** As noted above, the Monitor's Office reviewed the PRPB website for statistics, and found outdated reports that do not capture or include hate crimes. The reports date statistics for 2008 and 2009, and no more recent years. The Agreement requires monthly public dissemination of accurate and updated crime statistics, including hate crimes. PRPB's lack of compliance with this paragraph is an issue unrelated to the pandemic.

## XI. Information Systems and Technology

PRPB is required to develop information technology (IT) systems that 1) enable PRPB to satisfy the terms of the Decree, 2) enable the parties to monitor compliance with the Agreement, and 3) enable commanders to monitor and analyze policing performance and outcomes. At this juncture, however, PRPB lacks sufficient IT capacity to accomplish these goals. To date PRPB has presented minimal evidence demonstrating its efforts to develop and implement adequate IT systems to support implementation of the Agreement.

Apart from CAD, PRPB has not demonstrated the IT functionality required to achieve compliance, nor its consistent operational availability to personnel. And although CAD is operational, it has not been shown that personnel being trained to use CAD effectively and routinely. PRPB has also not proven that CAD has been adapted or updated to meet the functional requirements identified more than two years ago by the Monitor's Office. Beyond CAD, PRPB has demonstrated poor progress toward developing other IT systems and the associated training necessary to utilize these systems in support of PRPB's policing mission in the spirit of the Decree. The status of EIS is an example of this situation. In the data provided, PRPB has supplied conflicting evidence regarding EIS development, some artifacts stating that EIS is 90% in production during periods covered by CMR-2 and CMR-3, while others stating in others state that only four of twelve modules are in operation. Therefore, the assessment by the Monitor for PRPB's IT status during CMR-3 can only be "Not Compliant."

Looking forward, PRPB must commit to on-site and "on-line" demonstrations of IT capacity. As recently as December 2020, PRPB responded to data requests for CMR-3 by providing statements attesting to compliance, rather than providing specific evidence. This is not adequate. Claims of progress must be proven in an operational and/or field context using operational equipment. At this stage in the reform process, nearly two years past the capacity-building period and into the compliance period, PRPB must demonstrate capacity to employ technology in its daily operations. The Bureau must

demonstrate their ability to analyze data at every level of supervision and management and collect and process the data necessary to track compliance with the Agreement.

| Paragraph | Stipulations | Monitor's Rating |
|---|---|---|
| 218 | Establish information systems and utilize technology effectively and efficiently to support the implementation of this Agreement. | Not Compliant |
| 219 | Collect and maintain all data necessary to document compliance, improve policing, facilitate transparency, and promote safety. | Not Compliant |
| 220 | Develop protocols for collecting, analyzing, and reporting the information required by this Agreement. | Not Compliant |
| 221 | Develop and maintain a record management system as part of the Action Plans developed for each Agreement section. | Not Compliant |
| 222 | Provide supervisors with handheld recording devices to record statements for UOF or misconduct investigations. | Not Compliant |
| 223 | Provide all officers access to NCIC data for valid law enforcement purposes; develop protocols for handling NCIC data. | Not Compliant |

**Paragraph 218:** Driven by the Monitor's request during summer 2020 to deconflict its Critical Action Plan, PRPB provided the Monitor with two periodic status reports from April and June of 2020, five weeks after the conclusion of CMR-3 monitoring period. Although these reports contained some usable information, they lacked sufficient evidence to demonstrate capacity, and the material was not parsed for relevancy as had been requested by the Monitor. Rather, these reports provided narratives regarding plans that were unsupported by metrics, methodology or statistical data detailing accomplishments. Finally, the Monitor was provided a table indicating the status of multiple IT systems and projects, but this table was again unsubstantiated and appeared to contain mostly reformatted information that had been previously provided.

Note also that missing from the Corrective Action Plan were details on the following systems:

- Integrated Crime Registry
- National Crime Information Center
- Crime Information Warehouse
- NIBRS
- Crime Mapping
- System for Handheld Portable Devices
- System to Digitize Physical Files

PRPB did not accommodate the Monitor's request to reconcile the conflicting material it had provided on IT development, and the Monitor ultimately had to perform a full reconciliation of the reports and materials provided to identify gaps in the inventory of IT

systems, some of which are outlined in the paragraphs below. Accordingly, PRPB is assessed as not compliant.

To demonstrate compliance, PRPB must prioritize full implementation of CAD in all aspects and conduct formal IT training, especially for CAD, GTE and EIS, across all precincts and to all agents. The Academy must formalize and routinize CAD training and not rely on "pilot" or "on-the-job" training given by the Technology Bureau. Ultimately PRPB must track the training against a plan for completion with targets for the number and rates of training.

**Paragraph 219:** Throughout the discussions concerning the sampling method led by the Special Master, it became clear that PRPB could not definitively state which IT systems would be sources of data for specific data requests from the Monitors to demonstrate compliance with the Agreement. This situation forced the deconfliction noted above under paragraph 218. PRPB has not yet consistently articulated with certainty which IT systems will serve as data sources for information needed for the Monitor's Office to assess compliance with specific paragraphs of the Agreement. For this reason, PRPB is assessed as not compliant.

To demonstrate progress, PRPB must establish and isolate with certainty, which systems serve as the "Sources of Record" for all data necessary for Policing and to achieve compliance with paragraphs 218 and 219 of the Agreement. Further, PRPB leadership must reinforce to supervisors that it is an essential responsibility for them and their supervisees to collect and record pertinent data in the field and at headquarters. Complete data collection is essential to any credible policing analysis.

**Paragraph 220:** This paragraph requires that PRPB develop protocols for collecting, analyzing, and reporting information. At this time PRPB has not provided sufficient evidence that it has developed *and* implemented protocols related to each IT system for collecting, analyzing, and reporting information required by this Agreement. PRPB has not proven with accompanying evidence that their systems are adequately implemented and comply with the criteria identified for assessment ratings. As such, PRPB is assessed as not compliant.

For PRPB to demonstrate compliance with the above paragraph, as well as paragraphs 218, 219, and 221, it should rigorously incorporate Industry and Federal IT best practices such as those found in Program Management Institutes learning curriculum and the Software Engineering Institutes Capability Maturity Modules.

**Paragraph 221:** The assessment criteria requires that PRPB develop and maintain a record management system as part of the Action Plans developed for each section of the Agreement. For the reasons cited above for paragraphs 218, 219, and 220 above, PRPB has not demonstrated its grasp or mastery of its inventory of systems necessary for policing and compliance with the Agreement. Accordingly, PRPB is assessed as not compliant.

PRPB should establish a catalog of IT systems that eliminates the inconsistencies that exist between PRPB's Draft Corrective Action Plan and any prior Action Plans dating back to July of 2017. Recurring indecisiveness and ambiguity will continue to hamper the Monitor's assessment process.

**Paragraph 222:** PRPB provided no information regarding supervisor access to handheld recorders. The original language of this paragraph required that all supervisors be provided with handheld recording devices "to record complainant and witness statements taken as part of use of force or misconduct complaint investigations." PRPB has requested that this target be modified to require only that supervisors have access to a sufficient number of shared recording devices such that they can meet the requirement to record all complaints and witness statements. However, PRPB has not demonstrated that they have made considerable progress toward achieving even this more modest goal that they proposed. As such, PRPB is assessed as not compliant.

**Paragraph 223:** In response to the Monitor's request for information relating to the schedule and functional status of integration of NCIC, PRPB responded that they had begun a test phase as of November 9, 2020. However, PRPB provided no accompanying material to substantiate this claim. Furthermore, the beginning of this testing phase began after the CMR-3 reporting period. Progress on this paragraph will be further assessed during CMR-4. For the reasons stated above, and because PRPB did not provide the Monitor with valid data on access to NCIC, PRPB is assessed as not compliant.

## Appendix A: Background to PRPB Monitoring Mission

In 2008, USDOJ initiated an investigation of PRPB into an alleged pattern or practice of using excessive force, conducting unlawful searches and seizures and unlawful discrimination, all of which are proscribed by the United States Constitution. USDOJ conducted their investigation pursuant to the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141, and the anti-discrimination provisions of the Omnibus Crime Control and Safe Streets Act, 42 U.S.C. § 3789d. PRPB accepted the grounds for the investigation and pledged cooperation and has worked in partnership with USDOJ to establish the reforms outlined in this Agreement.

As part of its investigation, USDOJ and its police practices expert consultants conducted a detailed fact-finding review with the assistance and full cooperation of PRPB, including: a) tours of police areas; b) interviews with PRPB officers, supervisors, command staff, Commonwealth officials, members of the public, and other stakeholders; c) review of many thousands of documents, including policies and procedures, incident reports, internal investigation of civilian complaint records, external audit reports, and legislative materials; d) accompanying line officers and supervisors during their respective tours of duty. PRPB's Superintendent and command staff officials met personally with USDOJ representatives and consultants on multiple occasions and pledged their full support and cooperation.

In response to the concerns expressed in the Agreement and in recognition of the need to modernize and professionalize its operations, PRPB undertook its own internal reform efforts. These efforts culminated in the issuance in March 2011 of PRPB's own internal reform plan. The plan included: 1) the development and implementation of new policies regarding use of force and a wide range of other substantive areas; 2) the training of all appropriate officers in the new use of force policies through "train-the-trainer" pedagogy; 3) the adoption of a reformed disciplinary system; 4) the improvement of citizen complaint procedures; 5) the strengthening of community outreach efforts through Citizen Interaction Committees; and 6) a staffing review to improve supervisor to officer ratios.

In September 2011, USDOJ issued a written report of its investigative findings ("the Report"). The Report presented USDOJ's findings related to use of force, use of force to suppress the exercise of First Amendment rights, and searches and seizures. The Report identified several additional areas of serious concern, including discriminatory policing and the insufficient quality of investigation into sex crimes and domestic violence. Finally, the Report outlined a series of other performance issues: 1) systemic deficiencies in

PRPB's policies and procedures; 2) conduct of specialized units; 3) formative and in-service training; 4) supervision; 5) intake, internal investigation, and institutional adjudication of administrative misconduct complaints; 6) corrupt acts and other crimes committed by PRPB officers; 7) substandard processes for promotion in rank; 8) lack of risk management; 9) poor external oversight and accountability; and 10) a lack of sufficient community engagement. The Report concludes that the performance of PRPB was undermined by a number of entrenched and long-standing problems, which in the estimation of USDOJ called for a systemic remedy.

While PRPB did not concur with all the findings and conclusions in the Report, the Parties met throughout 2012 to exchange ideas and proposals for modernizing and professionalizing PRPB and to discuss numerous reforms already underway at PRPB's own initiative. Once the newly elected Commonwealth administration took office in January 2013, the administration familiarized itself with the Agreement and continued negotiating to reach a final Agreement. The Agreement is the product of these good faith negotiations. In July of 2013, the draft Agreement was presented to the Honorable Gustavo A. Gelpi, Chief Judge of the US District Court for the District of Puerto Rico, who approved the draft, formalizing the Agreement.

On June 5, 2014, the Court approved the selection and hiring of an independent monitor to help PRPB during the capacity building phase and thereafter monitoring the compliance period of the Agreement.

Unlike other consent decrees throughout the United States and its territories and owing to the unique institutional development and needs of the Commonwealth, the Agreement between the USDOJ and Commonwealth of Puerto Rico included a four-year "capacity-building" phase. During that phase, PRPB was expected to develop policies, procedures, and technologies to address serious deficiencies within the agency. The Monitoring Team, which is comprised of subject matter experts, was expected to provide substantive expertise and technical assistance to guide PRPB in its implementation and development efforts, while at the same time providing the public with assurance that PRPB's progress would be evaluated in a reliable, independent and transparent manner.

The capacity-building period concluded on October 8, 2018, at which time the "monitoring phase" was to commence according to the Agreement. However, at that time the Monitor and Parties were unable to come to a consensus on the methodology matrices that the Monitor's Office proposed to use to measure PRPB's compliance with the Agreement. This resulted in a delay in the start of the monitoring phase, and the Court subsequently suspended monitoring measures pending the finalization and acceptance

of a compliance assessment methodology agreeable to the Parties. PRPB, legal counsel, and the USDOJ conferred with the Monitoring Team over the course of six months to develop methodology matrices necessary to measure compliance for the eleven performance areas outlined in the Agreement. After review, and with the assent of the Parties, the Court accepted the objective methodologies put forth by the Monitor's Office.

In March of 2020, the court approved and published the First Report of the Federal Monitor, which focused primarily on policy and procedures, use of force, and information technology. CMR-1 found broad compliance on policy and procedure and certain areas of use of force, but nevertheless found a series of key lapses in use of force investigations and IT infrastructure. Later that same year, CMR-2 provided a more comprehensive overview of PRPB performance, covering a significantly larger number of Consent Decree paragraphs. As such, CMR-2 provides a model for Monitor's reports going forward.

## Appendix B: Methodology

In agreement with the approved methodology, the Monitoring Team uses a combination of quantitative and qualitative methods to assess PRPB's compliance with the Agreement in the three areas of performance selected for this report. Each paragraph in the Agreement has been assigned a methodology that was agreed on by the Parties and approved by the court. These methodologies include information on the data source, sampling method (if relevant), and compliance target. The full methodology can be accessed at the Monitor's website at https://www.fpmpr.org.

The compliance levels are defined as follows:

- **Fully Compliant:** Where PRPB has objectively demonstrated substantial compliance with the cited portion of the Agreement for a period of more than two years;

- **Substantially Compliant:** Where PRPB has objectively demonstrated extensive compliance with the cited portion of the Agreement (as defined by the compliance targets for a given paragraph) for a period of less than two years;

- **Partially Compliant:** Where PRPB has objectively demonstrated a sub-optimal level of compliance with the cited portion of the Agreement, as defined by the compliance targets for a given paragraph;

- **Not Compliant:** Where PRPB has not objectively demonstrated compliance with the cited portion of the Agreement, either due to a lack of evidence, or due to evidence of significant shortfalls in compliance relative to the targets outlined for a given paragraph;

- **Rating Deferred:** Where the Monitoring Team has not obtained sufficient evidence to reach a determination as to compliance status with the cited portion of the Agreement, due to no fault on the part of PRPB.

The Court draws a clear distinction between a deferred rating and a rating of non compliance due to lack of information. In the latter case, the Monitor's Office is unable to reach a determination of compliance because PRPB failed to provide the Monitor's Office with requested data, and thus failed to provide evidence of compliance. In the former case, the Monitor's Office could not obtain sufficient data to reach a determination of compliance due to no fault on the part of PRPB, e.g. travel restrictions prevented the Monitor's Office from conducting required site visits.

## Appendix C: Notes on Select FIU Investigations and Force Reviews by SFRB of Intentional Firearms Discharges

### Case # 2020-1-462-001633 San Juan

- **Category:** Accidental Discharge
- June 9, 2020
- Officer Injured
- San Juan Centro Mando reported it to FIU almost an hour after the incident took place.
- FIU responded and took command of the investigation.
- Division of Technical Services responded and recovered the casing
- One round fired
- Officer had placed his weapon in his waistband without the holster
- He states that he felt the gun falling and he grabbed for the weapon and the weapon discharged causing injuries to his leg and gluteus maximus
- Conclusion: Discharge was not within Department guidelines
- Officer violated Department procedures for handling a firearm
- Case sent to CFRB for investigation.
- FIU looked for security cameras, none captured the incident.
- Diagram included
- Pictures taken document the scene
- FIU requested the officer's training records
- Firearm qualification records provided
- Paramedics were notified and responded to the scene, the officer was transported to the hospital
- FIU Officer requested an extension in reviewing the case, photos not available until October 19, 2020.
- Case not completed in 45 days as per G.O. 100-113
- December 14, 2020 case forwarded to SARP.
- No mention of disciplinary charges or CFRB evaluation.
- Timeline of all actions by date included
- PPR-113.1 and PPR-113.2 prepared

### Case # 2020-7-411-00495 Bayamon

- **Category:** Accidental Discharge

- Referred to SARP November 9, 2020
- Happened April 5, 2020 at 3:40 pm at gas station in Bayamon
- Officer on way to work exiting vehicle at gas station, gun was not in a holster.
- Paramedics responded and transported him to the hospital.
- Gunshot wound to right thigh.
- A sergeant from the command responded to the scene.
- Technical services took photos
- Video footage recovered
- Sketches done
- Weapon returned to officer prior to weapon being inspected for any defects
- During this investigation the officer was suspended, no explanation as to why
- The investigation found the officer to be negligent in the handling of his firearm.
- Training records requested
- Officer gave varying accounts as to how the accidental discharge occurred
- Officer's version of body movement does not agree with video analysis
- Officer said he was putting the gun in holster when it accidently discharged striking him in the right thigh.
- Video observes him moving as if he were looking for something in the front seat, lifted his coat, turned to look in backseat, you then see him jump (moment of discharge), later he got out of the vehicle touched his thigh and you could see a blood stain. This is not consistent with the statement he gave FIU investigator.
- No witnesses
- FIU investigator notified almost 2 hours after event, 5:38pm
- Extension was requested by the investigator due to not having seen the photos
- Officer suspended 20 days for a previous incident unrelated to this for actions that occurred on November 17, 2014, notified that the charges were substantiated on December 12, 2019.
- PPR-113.1 and PPR-113.2 prepared
- Timeline of all actions by date included

## Case # 2020-7-171-01283 Bayamon

- **Category:** Accidental Discharge
- Referred to SARP
- Happened outside Police Station 5 pm, April 17, 2020
- FIU notified in a timely manner

- Getting out of personal vehicle placed gun in waistband, no holster, pulling the trigger resulting in entry and exit wounds to right thigh
- The investigation found him to be in violation of G.O. 600-618, "Use and Handling of Regulation Weapon" and G.O. 200-204, "Procedures to Prevent Accidents", he was on duty
- Technical services were on the scene
- No witnesses
- Bullet casing recovered
- Diagram of scene
- PPR-113.1 and PPR-113.2 prepared
- Request for training records
- Timeline of all actions by date included
- Photos arrived September 3, 2020
- Investigation turned in by FIU on November 9, 2020

### Case # 2020-1-182-03778 San Juan

- **Category:** Intentional Firearm Discharge
- Happened July 13, 2020 4pm
- September 21, 2020 Investigation completed, beyond 45 days
- Suspect fired 2 rounds at cop. Officer fired back.
- Technical services on scene
- Photos taken of scene
- Photos document recovery of evidence
- No videos
- Casings recovered
- Perpetrator struck multiple times
- FIU notified 4:03pm by centro mando, on time
- In the investigator's introduction, report to the CO of FIU, it states that the Officer observed a male with a gun who points the gun at the officer in car. The officer exited his vehicle, identified himself as a police officer, the individual runs away and after a short distance turns and fires 2 shots at him, officer returns with 6 rounds of his regulation firearm. In PPR-113.2, which is the investigation, it is clear that the actions of the officer were not spontaneous, i.e., he did not exit his vehicle until additional PRPB personnel arrived on the scene. While this may be a minor point, the narrative needs to be consistent.
- Transported to hospital in police car

CMR-3 | March 2021

- PPR-113.1 and PPR-113.2 prepared
- Perps weapon recovered
- Witness statements provided (PRPB members)
- Requested training records
- No timeline chart
- No sketch of scene
- Complete investigation
- Justified

## Case # 1-182-004541 San Juan

- **Category**: Intentional Firearm Discharge
- Happened August 20, 2020
- Photos arrived October 29, 2020, not completed in 45 days due in part to photos. Investigation complete December 14, 2020
- Officers were seeking a federal fugitive in Hato Rey, they intervened with a vehicle that according to the officer almost ran him over fleeing the scene. The vehicle stops and the passenger of the vehicle points a firearm at the officer, both officers fire 1 round at the suspect, he got away, the driver of the vehicle was arrested.
- No cameras available
- No civilian witnesses
- Diagram shows where vehicles were, but not where officers who fired were or the perpetrator
- Officer's casings recovered
- No indication that the rounds fired by the officers were recovered
- No reported injuries, suspect fled
- Was suspect interviewed? Or did he decline
- Paragraph 8 of PPR-113.2 identifies the driver of the vehicle (who was arrested) as the subject, however he is not the individual who pointed a firearm at the officers. That individual, according to documentation, does not appear to have been arrested. And unless the rounds were located, PRPB cannot assume that the individual was not struck.
- Document request by FIU is in place regarding training etc.
- Training records provided
- No witness to the Miranda signing by individual arrested. Does not indicate if he voluntarily waived his rights or not. No box is checked.

- Nothing in the file indicates that an effort was made to identify the individual with the gun.
- FIU notified in a timely manner

## Case # 2020-8-145-01495 Carolina

- **Category**: Accidental Discharge
- Referred on November 6, 2020, not within 45 days
- Happened on August 16, 2020
- Officer getting comfortable in seat, rifle goes off
- In accommodating himself in vehicle he placed his finger on the trigger of the rifle
- FIU notified in a timely manor
- Damage to the front window of car
- No witnesses were found
- No questions asked of sergeant
- Documents requested by FIU
- Training records provided

## Case # 2020-10-103-02549 Aguadilla

- **Category:** Intentional Firearm Discharge
- Determination on July 13, 2020
- Happened on May 24, 2020
- Vehicle pursuit, stolen car, an officer fired 5 rounds at the vehicle, another officer pointed a firearm, another used level 1
- Discharge of weapon by Agent Rivera was not within department guidelines based on the FIU investigation. Not justified
- Referred to SARP
- Requested training records
- Technical service was on scene taking photos
- 3 of 5 casings recovered at the scene
- Detailed sketches of scene
- Found videos
- Video supports the fact that the officer was not in imminent danger, subject was trying to flee in vehicle
- Officer fired 5 rounds at a moving vehicle which at the time did not represent a direct threat. Violation of G.O. 600-618 "Use and Handling of Regulation Firearm"

CMR-3 | March 2021

and Bureau policy which prohibits firing at a moving vehicle when there is no threat.

- FIU recommended that officer be retrained on G.O. 600-618 "Use and Handling of Regulation Firearm "and G.O.600-601 "Use of Force." However, no recommendation for disciplinary charges.
- The officer's Lt. states in his report that the officer fired because the vehicle was coming at him and he feared for his life and the others. This is in direct contrast to the FIU investigation. He also said that "I can and responsibly conclude that the protocols, regulations, general orders and applicable laws were complied with in the process and handling of this case and in accordance with use of force."
- There are many instances in correspondence in this case file that supervisors are saying that the Officer's actions were appropriate and within department guidelines, even though FIU clearly indicated that they were not.
- FIU notified in a timely manner

### Case # 2020-11-273-01087 Utuado

- **Category:** Intentional Level 4 Taser (to sensitive area above chest, one struck lip)
- September 28, 2020 sent to SARP for further investigation, not within 45 days
- Happened on August 3, 2020
- Individual used a Taser on a person, Level 4, to sensitive area, hit lip and chest
- Treated at hospital
- The perpetrator approached the officer with a screwdriver
- Witnesses to scene
- Somewhat of a sketch (google map with marks)
- Requested officer's training records
- Perpetrator was interviewed
- Requested 911 call on September 15, 2020
- Unable to download the data from the electronic control device, gave a major fault code

### Case # 2020-12-076-00449 Island of Vieques

- **Category:** Intentional Firearm Discharge
- Sent to SARP, August 13, 2020 not within 45 days
- Happened May 3, 2020 12:45pm
- Got a call that there were people dressed in black in the woods with rifles

CMR-3 | March 2021

- Interviewed a witness that observed the individuals and called the police
- They identified themselves as police officers and the people pointed their guns at them
- Photos taken
- Technical services on scene
- One officer was injured, dislocated finger and contusions on his body, treated at hospital
- Agent Toro fires 2 rounds, Agent Vega fires 1 shot, Agent Leguillu fires 5 rounds
- The individual with the pistol slipped, falling into the ravine and dropping the firearm
- The commercial business did have a camera, however it erases itself automatically
- The officer was injured when he slipped bring the weapons up to the police vehicle
- Appears no one was injured from the officer's shots
- Only one person was apprehended, four fled, bail set at $4.8 million
- Sketch, overhead view of area
- 3 Rifles and two pistols were recovered, along with various rounds of ammunition
- Said they were hunting deer
- Perpetrator declined to make a statement
- Officer's training records provided
- Reassigned to new investigator on July 16, 2020, does not appear to be an explanation as to why in the file
- Timeline included

### Case # 2020-3-039-02626 Ponce

- **Category:** Intentional Firearm Discharge
- Referred December 8, 2020 to SARP, more than 45 days
- Happened September 2, 2020
- Officer assigned to Federal task force (DEA), due to DEA regulations, officer could not be interviewed for 48 hours after discharge
- Officer interviewed September 8, 2020, 6 days after the incident
- Civilian witnesses
- There was a firearm in the bag that the perpetrator grabbed exiting the vehicle
- Sketch of scene
- Requested training records

CMR-3 | March 2021

- Photos taken
- Photos requested but not provided to Monitor's Office.
- Officers were involved in a task force operation where they believed drugs and weapons were being transported between locations.
- While under surveillance officers confronted the perpetrator and fired 1 round after he grabbed a dark bag and pointed at the officer. Later inspection of bag revealed a firearm inside

Case # 2020-5-043-00701 Mayaguez

- **Category:** Intentional Firearms Discharge
- Referred to SARP on November 23, 2020, not in 45 days
- Happened on September 9, 2020
- Investigating report of vicious dogs, upon arriving one of the dogs that had killed 3 dogs attacked the officer, one officer fires 3 rounds failing to injure him, another officer fires four rounds killing the dog
- Witnesses to shooting that verify officer's version of what happened
- Sketch, aerial view
- Scene was photographed
- Training records provided
- Photos taken

Case # 2020-5-050-05458 Mayaguez

- **Category:** Soft Hands
- Referred to SARP on November 18, 2020. Not within the 45 days
- Occurred on July 11, 2020
- Notified of incident on July 20, 2020
- The Governor was engaged in an official act outside of the Mayaguez Hotel when an individual in the crowd disrupted the event by loudly protesting, waving his hands in an aggressive manner and removed his mask. He was asked to desist but continued and pushed the officer. Officer, using soft hand tactics removed the individual. He refused to identify himself and left the scene without further incident.
- Training records provided
- Sketch prepared
- News videos, social media footage was collected as evidence and provided

- FIU not notified in a timely manner

## Case # 2020-7-075-01896 Caguas

- **Category:** Intentional Firearm Discharge
- Referred to SARP on November 12, 2020. Not within 45 days
- Occurred on April 5, 2020.
- Arrested male was in possession of a gun which was reported stolen in Bayamon
- Officers respond to a burglary in progress. 3 males dressed in black clothing. One in possession of a handgun which he points at officer. Officer discharges his weapon (one round). Suspects flee. Officer apprehends the male with the weapon. No injuries as result of discharge.
- Owner of establishment received call from a neighbor reporting loud noises coming from rear of store. Owner then called police.
- Officers request information relating to cameras. Owner indicates they are old and are not functioning.
- Police requested information from owner relating to the person who called him. Owner refused to provide contact information, stating the person did not want to get involved.
- Suspect interviewed, stated he had nothing to say
- Sketch prepared
- Firearm recovered (13 rounds)
- Photos taken and requested
- Training records requested
- Progress form included
- Technical services on scene

## Case # 2020-7-232-01631 Bayamon

- **Category:** Intentional Firearms Discharge
- Referred to SARP November12, 2020. Not within 45 days
- Occurred on June 14, 2020
- Officer while conducting a perimeter check of police facility (drug unit) observes a male gain entrance into a vehicle which police were holding for investigation. Officer identified himself as police and the male pointed a gun at officer. Officer discharged (3) rounds at the suspect who ran from scene and entered a vehicle and fled to parts unknown.

CMR-3 | March 2021

- Photos taken and provided
- Technical services on scene
- A check of the interior of the vehicle produced an unregistered firearm.
- One casing recovered
- Camera in the drug unit not functional (5 years)
- Sketch of scene prepared
- Training certifications requested
- No injuries reported
- Progress form included

## Case # 2020-7-311-002671 Bayamon

- **Category:** Intentional Firearms Discharge
- May 19, 2020 happened
- Forwarded on December 14, 2020 to SARP not within 45 days
- Photos provided on October 9, 2020
- 2 individuals involved in robbery, 1 pointed firearm
- Armed robbery at gas station, the perpetrator pointed gun at officers, each officer (2) fired 4 rounds, subjects flee in a vehicle which was later found abandoned
- According to FIU investigators, upon arriving on the scene the officers observed the men getting into their vehicle, the suspect then pointed a gun at them as they were leaving the location, the officers fired and pursued the vehicle which was later found abandoned
- Blood found in car (driver's side), multiple bullet holes in car
- Vehicle's ignition had been vandalized in order to start the vehicle
- DNA collected from blood
- Witnesses to robbery
- Video footage provided
- Photos taken by technical services
- Casings recovered
- Training records were requested and provided
- Sketch provided
- 2nd set of Officers arriving on scene said that as the suspects boarded the vehicle to leave they heard several detonations, said they could not determine what the object was in the perpetrator's hand, therefore they drew their revolvers
- Gun was displayed during the robbery
- Robbery victims only heard shots, didn't see the shooting

- Progress form not included

## GENERAL COMMENTS

- The lack of civilian witnesses continues, even when civilians are seen in the videos.
- Because none of the cases have gone to the CFRB, there is no indication that the officers have been formally charged in those incidents involving accidental discharge through negligence.
- In many cases of accidental discharge there is reference to use of force, this is negligent handling of a firearm, not a use of force.
- All the sketches are not very descriptive. Lots of overhead views.
- In the instances where the officer discharged their weapon and did not strike the suspect, there appears to be no effort to locate the discharged round.
- Progress form prepared by FIU outlining the request and receiving of information in the investigation appears in many of the case files.
- FIU is experiencing delays in receiving photos associated with their investigation. In many instances FIU has made multiple requests.
- In most of the reports where there is a firearm discharge by an officer, and the suspect flees the scene, its reported no injuries as a result of the discharge. It should be, no reported injuries as of this time.
- Of the investigations reviewed none were completed in the 45 days as outlined in the Agreement and Bureau policy. Note: in some instances an extension was requested by the investigator, nevertheless even with the extension the time allowed was surpassed. This is due in large part to not receiving evidence which needs to be reviewed, in most instances photos and/or videos.

## Appendix D: Notes on Select Internal Investigations

Case 435: This case was studied under Paragraph 169. The complainant alleged that she was treated by a PRPB lieutenant in a manner which she considered inappropriate. During her interview, the complainant revealed that a coworker was present and could verify her claim. The question to the complainant and her response is as follows; SARP Investigator: "Is there a witness you want to present?" Complainant: "Yes, ma'am, at 12:05 am when Lieutenant [redacted] went to buy water, my co-worker Yilliam who was leaving her shift was there and could hear what [redacted] said to me."

A thorough investigator would have asked more questions to determine the identity of Yilliam, yet the investigator failed to ask the complainant one single follow up question to help identify her. According to the case file, the investigator's only follow up was sending a notice to appear to, "Yilliam, in care of the Shell Gas Station Country Club in Carolina." Needless to say, Yilliam never presented herself for an interview, nor was any further attempt made by the investigator to identify or speak to a percipient witness who could have been dispositive to this case. The Monitor would like to emphasize that complainants should not be asked if they, "have witnesses that they would like to present." A SARP investigative interview is not an adversarial legal proceeding where a party would be expected to present witnesses to bolster their side of a case. On the contrary, the principal goal of a thorough SARP interview is to establish and document the complainant's observations, a secondary goal is to identify any other percipient witnesses to the case.

Case 464: The Monitor finds that the investigator does not explain the lack of video evidence subpoenaed four months prior, does not discuss the other video evidence contained in the file, simply accepts the "I don't recall" assertions by police witnesses without putting them to further test, and fails to interview paramedics who responded to the scene.

Case 478: An off-duty officer accidentally shot himself in the right thigh while he was holstering a PRPB-issued Sig Sauer 9mm in an PRPB-issued off-duty holster while in his private vehicle. No examination was made of either the weapon or the holster before the SARP investigator found sufficient facts to establish negligence on the part of the officer. Not only does this incomplete investigation prejudice the officer, but it also leaves the lingering unanswered questions concerning the functionality of the weapon and the holster. If either of these PRPB-issued pieces of equipment are somehow defective or deficient, other officers might possibly suffer grave injury as a result. Lastly, if we are to

assume that both the holster and weapon were functioning as designed, there was no discussion of any possibility of a training gap in handling said weapon or holster.

Case 491: The investigator did not check the officer's attendance records, fails to interview the complainant and dismisses the complaint because, while the complainant got the vehicle type correct in his description, the color he noted (at 0455 hours, presumably when it is still dark) was not the actual color of the vehicle. Lastly the investigator relies on the current state of the pickup truck, which showed no damage 8 months after the incident was alleged to have occurred.

Case 530: This case was changed upon review from Sustained to Not Sustained, the officer complained against was never asked why she was not at home when she did not report for duty. The officer in question also has 3 prior charges against her for being AWOL or insubordinate.

Case 762: The Monitor notes that the finding was changed from Exonerated to Not Sustained upon review. The Monitor is troubled by the fact that the investigator places great emphasis on the complainant's emotional state (disrespectful and hostile), while not reviewing the digital (Life360) evidence, not subpoenaing telephone records which could have established that the complainant was correct. The investigator intimated that the complainant should have had a percipient witness and does not mention that the officers accused have had other accusations against them for negligence.

Case 824: The Monitor tends to disagree with the finding of "not sustained." The Monitor cites the fact that the investigation fails to mention any review on the part of the officer (or for that matter the SARP investigator) of video evidence, which could have been dispositive and also the fact that the officer involved had been suspended twice for 30 days each for similar infractions. At a minimum, if the case were to have been fully investigated with a "not sustained" finding, the officer should have been recommended for a full retraining or reassignment to regular patrol instead of traffic accident investigations, for which he seems unsuited.

Case 919: This case involved an allegation of a false or incorrect police report generated by the accused officer, which centers over who actually arrested the defendant involved. A key percipient witness, the prosecutor who allegedly ordered the arrest of the defendant, was never interviewed by the SARP investigator.

Case 1062: A US Coast Guard agent alleged an officer was rude and threatening while vacating a beach area pursuant to the Governor's COVID-19 Order. While circumstances do seem to indicate an overreaction by the accusing party, the same officer has two

additional pending SARP cases for similar conduct, which raises a red flag. Lastly, there were two percipient police officer witnesses on the beach at the time the alleged conduct occurred, and neither was interviewed by SARP.

CMR-3 | March 2021

## Appendix E: Correspondence between the Monitor's Office and PRPB Regarding PRPB's Response to the COVID-19 Pandemic.

**Email Sent to Commissioner (March 14th, 2020)**

Good Afternoon Commissioner Escalera,

In light of the events surrounding the spread of the coronavirus, which it is my understanding has now spread to Puerto Rico, the Monitor's Office has prepared some suggestions regarding safety measures that the Puerto Rico Police Bureau should consider implementing. The Monitor's Office understands that the coronavirus potentially poses a substantial threat to the Puerto Rico Police Bureau as the disease continues to spread. Also, as the disease progresses, the demand on police personnel and resources will increase exponentially. This type of event is one that is far beyond what is normally expected of a situation and is one that has potentially severe consequences. I have attached my recommendations. The Monitor Team has a considerable amount of experience dealing with critical situations and stands ready to assist in any way it is needed.

Thanks,

John Romero

Acting Federal Monitor

CMR-3 | March 2021

## Documentation Provided by PRPB (April through September 2020)

The following are documents provided to the Monitor's Office by PRPB.


MON-OR-41-12-5-2020

15 de mayo de 2020.

Sr. John Romero

Monitor Federal


Estimado Sr. Romero

Reciba un cordial saludo.

Hacemos referencia al requerimiento de información peticionado mediante conferencia el 1 de abril de 2020.

La solicitud de información está relacionada con los resultados de los planes de trabajo implementados por el Negociado de la Policía para atender la emergencia del Covid-19. De la semana del 6 – 13 de mayo de 2020.

**Sometemos en el documento información actualizada a la fecha de hoy 15 de mayo de 2020.**

Cordialmente,


*Firmado Electrónicamente*

Coronel Clementina Vega Rosario 1-13603

Directora Oficina de Reforma

**INFORMACIÓN ACTUALIZADA COVID-19**

Información de MNPR relacionado coronavirus.

Al momento el Negociado de la Policía de Puerto Rico (NPPR) trescientos noventa y uno (391) MNPPR en cuarentena, ochenta y uno (81) casos positivos a COVID -19 y uno (1) MNPPR fallecido[14].

**SUPERINTENDENCIA AUXILIAR OPERACIONES DE CAMPO**

| ÁREA | EN CUARENTENA | POSITIVOS COVID-19 |
|------|---------------|--------------------|
| SAN JUAN | 92 | 1 |
| ARECIBO | 2 | 5 |
| PONCE | 94 | 11 |
| HUMACAO | 1 | 0 |
| MAYAGÜEZ | 18 | 11 |
| CAGUAS | 10 | 8 |
| BAYAMÓN | 0 | 1 |
| CAROLINA | 13 | 6 |
| 6GUAYAMA | 5 | 0 |
| AGUADILLA | 11 | 2 |
| UTUADO | 10 | 0 |
| FAJARDO | 5 | 0 |
| AIBONITO | 3 | 0 |
| NEG. PAT. CARRETERA | 2 | 2 |
| **TOTALES** | **266** | **47** |

**SUPERINTENDENCIA AUXILIAR INVESTIGACIÓN CRIMINAL**

---

[14] [14] Semana del 21 al 27 de abril de 2020.

| ÁREAS | NEGOCIADO/ OFICINA/ DIVISION | CUARENTENA | POSITIVO COVID-19 |
|---|---|---|---|
| 03 PONCE | CIC | 1 | 0 |
| 05 MAYAGUEZ | CIC | 1 | 0 |
| 07 BAYAMÓN | CIC | 2 | 0 |
| 10 AGUADILLA | CIC | 10 | 0 |
| 11 UTUADO | CIC | 1 | 0 |
| 12 FAJARDO | CIC | 2 | 0 |
| 01 SAN JUAN | NEGOCIADO DE ARMAS | 1 | 0 |
| 03 PONCE | DIVISION DE DROGAS Y NARCOTICOS | 2 | 0 |
| 05 MAYAGUEZ | DIVISION DE DROGAS Y NARCOTICOS | 18 | 18 |
| 10 AGUADILLA | DIVISION DE DROGAS Y NARCOTICOS | 24 | 1 |
| 01 SAN JUAN | VEHICULOS HURTADOS (CENTRAL) | 12 | 1 |
| 01 SAN JUAN | VEHICULOS HURTADOS | 30 | 2 |
| 02 ARECIBO | VEHICULOS HURTADOS | 2 | 0 |
| 05 MAYAGUEZ | VEHICULOS HURTADOS | 1 | 0 |
| 08 CAROLINA | VEHICULOS HURTADOS | 1 | 1 |
| 09 GUAYAMA | VEHICULOS HURTADOS | 1 | 0 |
| 11 UTUADO | VEHICULOS HURTADOS | 1 | 0 |
| 12 FAJARDO | VEHICULOS HURTADOS | 2 | 2 |
| 01 SAN JUAN | OPERACIONES CONJUNTAS | 9 | 9 |

| 01 SAN JUAN | LABORATORIO        FOTOGRAFIA CRIMINAL | 3 | 0 |
|---|---|---|---|
| **TOTALES** | | **124** | **34** |

**SUPERINTENDENCIA AUXILIAR RESPONSABILIDAD PROFESIONAL**

| NEGOCIADO/ DIVISIÓN | POSITIVOS COVID - 19 | CUARENTENA |
|---|---|---|
| **TOTAL** | **0** | **0** |

**SUPERINTENDENCIA AUXILIAR EDUCACIÓN Y ADIESTRAMIENTO**

| SAEA | POSITIVOS COVID - 19 | CUARENTENA | OBSERVACIONES |
|---|---|---|---|
| **SAEA** | **2** | **0** | Este personal esta contabilizado en SAOC ya que estaban reforzando diferentes Áreas. Por eso no se suma. |

**SUPERINTENDENCIA AUXILIAR POLICÍA FORTALEZA**

| UNIDAD DE TRABAJO | POSITIVOS COVID - 19 | CUARENTENA |
|---|---|---|
| **TOTAL** | **0** | **0** |

**SUPERINTENDENCIA AUXILIAR SERVICIOS GERENCIALES**

| UNIDAD /OFICINA | POSITIVOS COVID - 19 | CUARENTENA |
|---|---|---|
| **TOTAL** | **0** | **0** |

**OFICINA DEL COMISIONADO**

CMR-3 | March 2021

| UNIDAD /OFICINA | POSITIVOS COVID - 19 | CUARENTENA |
|---|---|---|
| Oficina Seguridad y Protección | | 1 |
| TOTAL | 0 | 1 |

Facilidades afectadas

**Precinto 166 San Juan, Precinto 266 y Negociado Vehículos Hurtados San Juan**

Al momento no ha iniciado labores, hasta que lleguen los resultados de los MNPPR.

**División Drogas Aguadilla**

Supervisor inmediato impartió instrucciones a todo el personal para que salieran de la estructura ante el posible caso de coronavirus.

Se notificó al Negociado de Servicios Administrativos para la contratación de los servicios profesionales para la desinfección.

El proceso de desinfección fue realizado el 7 de mayo de 2020.

Al momento no se han iniciado labores, hasta que lleguen los resultados de los MNPPR.

**Reporte de la Unidades del NPPR desinfectadas:**

| REGISTRO DE FACILIDADES DESINFECTADAS POR EL NPPR RELACIONADO COVID 19 | | |
|---|---|---|
| SERVICIO DE DESINFECCIÓN | FECHA DE CERT. DESINFECCIÓN | OBSERVACIONES |
| 1 | Distrito Rincón | 27-marzo-2020 | Desinfección del Distrito completo, todos los vehículos oficiales y las motoras . |
| 2 | Distrito Aguas Buenas | 30-marzo-2020 | Desinfección del Distrito y 5 vehículos oficiales. |
| 3 | Precinto Caimito | 1-abri-2020 | Desinfección del Precinto, 7 vehículos oficiales y 3 motoras. |
| 4 | Distrito Moca | 2-abril-2020 | Desinfección del Distrito y 5 vehículos oficiales. |

112

| 5 | Distrito San Germán | 2-abril-2020 | Desinfección del Distrito y 5 vehículos oficiales |
|---|---|---|---|
| 6 | Antigua Comandancia Mayagüez<br>División Drogas Mayagüez | 10-abril-2020 | Desinfección Antigua Comandancia, 13 Veh. Oficiales Div. Drogas, 5 Veh. Oficiales Strike Force, 6 Veh. Oficiales DOT, 3 Veh. Oficiales Explosivos, 3 Veh. Oficiales UM y 1 Veh. Oficial Crímenes Cibernéticos. |
| 7 | Distrito Yauco | 3-abril-2020 | Desinfección del Distrito, 10 vehículos oficiales y 10 motoras. |
| 8 | Unidad Puertos San Juan | 7-abril-2020 | Desinfección 12 vehículos oficiales, 14 motoras y 1 helicóptero |
| 9 | Base Aérea | 10-abril-2020 | Desinfección del Hangar, 2 vehículos oficiales, 2 naves y 1 avión oficial. |
| 10 | Distrito Morovis | 10-abril-2020 | Desinfección Distrito y 4 Vehículos Oficiales. |
| 11 | Centro Mando Bayamón | 13-abril-2020 | Desinfección Centro de Mando. |
| 12 | Precinto Juan Domingo | 13-abril-2020 | Desinfección Precinto, 45 vehículos oficiales y Motora. |
| 13 | Distrito Naranjito | 13-abril-2020 | Desinfección Distrito,10 vehículos oficiales y 4 motoras. |
| 14 | Comandancia Carolina | 15-abril-2020 | Desinfección de los 3 niveles, pasillos y perímetro, 31vehiculos del CIC, 29 vehículos oficiales de la Comandancia. |
| 15 | Precinto Guaynabo | 15-abril-2020 | Desinfección 1ro y 2do piso del Precinto y 7 vehículos oficiales. |
| 16 | Unidad Motorizada Arecibo | 16-abril-2020 | Desinfección Área UM, 26 motoras y 3 vehículos Oficiales. |

| 17 | CIC Vega Baja | 16-abril-2020 | Desinfección Área del CIC, 18 vehículos oficiales y 4 motoras. |
| 18 | Distrito Rio Grande | 18-abril-2020 | Desinfección del Distrito y 7 vehículos oficiales. |
| 19 | Distrito Cayey | 18-abril-2020 | Desinfección del Distrito y 8 vehículos oficiales. |
| 20 | Centro de Adiestramiento Bayamón Monagas | 20-abril-2020 | Desinfección salón de adiestramiento (bunker) y 3 vehículos oficiales. |
| 21 | Comandancia Guayama | 18-abril-2020 | Desinfección de la Comandancia y 8 vehículos oficiales. |
| 22 | Distrito Las Marías | 22-abril-2020 | Desinfección del Distrito, 3 vehículos oficiales y 2 Motoras. |
| 23 | Unidad Motorizada y DOT Guayama | 23-abril-2020 | Desinfección las facilidades y 9 vehículos oficiales. |
| 24 | Autopista Ceiba | 24-abril-2020 | Desinfección facilidades y 4 vehículos oficiales. |
| 25 | Distrito Loíza | 25-abril-2020 | Desinfección Distrito y los vehículos oficiales. |
| 26 | Precinto 166 San Juan, Precinto 266 Santurce, Negociado Vehículos Hurtados | 5-mayo 2020 | Desinfección de primera y segunda planta y 11 vehículos oficiales. |
| 27 | División Drogas Aguadilla | 7-mayo-2020 | Desinfección facilidades y 7 vehículos oficiales |

MON-OR-39-5-5-2020

6 de mayo de 2020.

Sr. John Romero

Monitor Federal


Estimado Sr. Romero

Reciba un cordial saludo.

Hacemos referencia al requerimiento de información peticionado mediante conferencia el 1 de abril de 2020.

La solicitud de información está relacionada con los resultados de los planes de trabajo implementados por el Negociado de la Policía para atender la emergencia del Covid-19. De la semana del 29 abril al 6 de mayo de 2020.

**Sometemos en el documento información actualizada a la fecha de hoy 6 de mayo de 2020.**

Cordialmente,


*Firmado Electrónicamente*

Coronel Clementina Vega Rosario 1-13603

Directora Oficina de Reforma

CMR-3 | March 2021

**INFORMACIÓN ACTUALIZADA COVID-19**

Información de MNPR relacionado coronavirus.

Al momento el Negociado de la Policía de Puerto Rico (NPPR) cuatrocientos sesenta y ocho (468) MNPPR en cuarentena, ochenta y seis (86) casos positivos a COVID -19 y uno (1) MNPPR fallecido[15].

**SUPERINTENDENCIA AUXILIAR OPERACIONES DE CAMPO**

| ÁREA | EN CUARENTENA | POSITIVOS COVID-19 |
|---|---|---|
| SAN JUAN | 92 | 1 |
| ARECIBO | 5 | 5 |
| PONCE | 90 | 11 |
| HUMACAO | 4 | 0 |
| MAYAGÜEZ | 19 | 11 |
| CAGUAS | 10 | 8 |
| BAYAMÓN | 4 | 3 |
| CAROLINA | 35 | 4 |
| GUAYAMA | 3 | 0 |
| AGUADILLA | 13 | 4 |
| UTUADO | 10 | 0 |
| FAJARDO | 5 | 0 |
| AIBONITO | 2 | 0 |
| NEG. PAT. CARRETERA | 12 | 2 |
| NEG. FURA | 5 | 0 |
| DOTM | 0 | 0 |
| NEG. RELACIONES COMUNIDAD | 0 | 0 |

---

[15] Semana del 21 al 27 de abril de 2020.

CMR-3 | March 2021

| VIG. CUARTEL GENERAL | 0 | 0 |
|---|---|---|
| **TOTALES** | **309** | **49** |

**SUPERINTENDENCIA AUXILIAR INVESTIGACIÓN CRIMINAL**

| CIC / NEGOCIADO / DIVISIONES / UNIDADES | POSITIVOS COVID-19 | MUERTES COVID-19 | CUARENTENA |
|---|---|---|---|
| CIC SAN JUAN | 0 | 0 | 1 |
| CIC BAYAMÓN | 0 | 0 | 2 |
| CIC GUAYAMA | 0 | 0 | 42 |
| CIC AGUADILLA | 0 | 0 | 8 |
| CIC FAJARDO | 0 | 0 | 1 |
| NEGOCIADO DE DROGAS, NARCOTICOS, CONTROL DE VICIOS y ARMAS ILEGALES | | | |
| DROGAS METRO | 1 | 0 | 4 |
| DROGAS PONCE | 0 | 0 | 2 |
| DROGAS MAYAGUEZ | 23 | 0 | 23 |
| DROGAS AGUADILLA | 0 | 0 | 1 |
| NEGOCIADO DE INVESTIGACIONES DE VEHICULOS HURTADOS | | | |
| NEGOCIADO V.H. | 0 | 0 | 15 |
| SAN JUAN | 2 | 0 | 32 |
| PONCE | 0 | 0 | 3 |
| MAYAGUEZ | 0 | 0 | 1 |
| CAROLINA | 1 | 0 | 1 |
| GUAYAMA | 1 | 0 | 1 |

| UTUADO | 0 | 0 | 1 |
|---|---|---|---|
| DIVISIONES | | | |
| OPERACIONES CONJUNTAS | 9 | 1 | 17 |
| **TOTAL** | **37** | **1[16]** | **155** |

**SUPERINTENDENCIA AUXILIAR RESPONSABILIDAD PROFESIONAL**

| NEGOCIADO/ DIVISIÓN | POSITIVOS COVID - 19 | CUARENTENA |
|---|---|---|
| **SARP Central** | 0 | 1 |
| **TOTAL** | **0** | **1** |

**SUPERINTENDENCIA AUXILIAR EDUCACIÓN Y ADIESTRAMIENTO**

| SAEA | POSITIVOS COVID - 19 | CUARENTENA | OBSERVACIONES |
|---|---|---|---|
| **SAEA** | **2** | **0** | Este personal esta contabilizado en SAOC ya que estaban reforzando diferentes Áreas. Por eso no se suma. |

**SUPERINTENDENCIA AUXILIAR POLICÍA FORTALEZA**

| UNIDAD DE TRABAJO | POSITIVOS COVID - 19 | CUARENTENA |
|---|---|---|
| Destacamento El Convento | 0 | 1 |
| **TOTAL** | **0** | **1** |

**SUPERINTENDENCIA AUXILIAR SERVICIOS GERENCIALES**

---

[16] Semana del 21 al 27 de abril de 2020.

CMR-3 | March 2021

| UNIDAD /OFICINA | POSITIVOS COVID - 19 | CUARENTENA |
|---|---|---|
| TOTAL | 0 | 0 |

**OFICINA DEL COMISIONADO**

| UNIDAD /OFICINA | POSITIVOS COVID - 19 | CUARENTENA |
|---|---|---|
| Oficina Seguridad y Protección | | 2 |
| TOTAL | 0 | 2 |

Estatus de la Oficina de Reforma. Actualizada

Trabajando de forma remota y presencial aplicando las instrucciones de la Carta Circular DSP-1-2020-CC-003 y DSP-1-2020-CC-004.

La asistencia se está registrando por computadora, y correo electrónico. Diariamente al finalizar turno reportan resultados del trabajo asignado. Semanalmente se le reporta al Comisionado un resumen del trabajo realizado.

Desglose personal Oficina:

Los niveles de equipo de protección disponibles para el personal del NPPR.

Distribución de Materiales de Higiene y Protección

Se ha continuado con la distribución de materiales básicos de higiene y protección a las Comandancias, Cuarteles y Unidades de Trabajo.

Facilidades afectadas (Actualizada y verificar si están operando de forma normal)

**Distrito Guaynabo**

Al momento no ha iniciado labores, hasta que lleguen los resultados de los MNPPR.

**Aeropuerto Carolina**

Iniciaron labores el 27 de abril de 2020.

**Distrito Cayey**

Iniciaron labores el 30 de abril de 2020.

**Unidad Motorizada Guayama**

Iniciaron labores el 4 de mayo de 2020.

CMR-3 | March 2021

**Sección Adiestramiento Bayamón**

Iniciaron labores el 27 de abril de 2020.

**Distrito Patillas**

Iniciaron labores el 30 de abril de 2020.

**Distrito Arroyo**

Iniciaron labores el 30 de abril de 2020.

**DOT Guayama**

Iniciaron labores el 29 de abril de 2020.

**Precinto 166 San Juan, Precinto 266 y Negociado Vehículos Hurtados San Juan**

Supervisor inmediato impartió instrucciones a todo el personal para que salieran de la estructura ante el posible caso de coronavirus.

Se notificó al Negociado de Servicios Administrativos para la contratación de los servicios profesionales para la desinfección.

El proceso de desinfección se fue realizado el 3 de mayo de 2020.

Personal adscrito al a la Unidad de Puertos y a la Unidad Motorizada estarán cubriendo las querellas.

Al momento no se han iniciado labores, hasta que lleguen los resultados de los MNPPR.

**Reporte de la Unidades del NPPR desinfectadas:**

| REGISTRO DE FACILIDADES DESINFECTADAS POR EL NPPR RELACIONADO COVID 19 | | | |
|---|---|---|---|
| SERVICIO DE DESINFECCIÓN | | FECHA DE CERT. DESINFECCIÓN | OBSERVACIONES |
| 1 | Distrito Rincón | 27-marzo-2020 | Desinfección del Distrito completo, todos los vehículos oficiales y las motoras . |
| 2 | Distrito Aguas Buenas | 30-marzo-2020 | Desinfección del Distrito y 5 vehículos oficiales. |
| 3 | Precinto Caimito | 1-abri-2020 | Desinfección del Precinto, 7 vehículos oficiales y 3 motoras. |
| 4 | Distrito Moca | 2-abril-2020 | Desinfección del Distrito y 5 vehículos oficiales. |

| 5 | Distrito San Germán | 2-abril-2020 | Desinfección del Distrito y 5 vehículos oficiales |
| 6 | Antigua Comandancia Mayagüez<br>División Drogas Mayagüez | 10-abril-2020 | Desinfección Antigua Comandancia, 13 Veh. Oficiales Div. Drogas, 5 Veh. Oficiales Strike Force, 6 Veh. Oficiales DOT, 3 Veh. Oficiales Explosivos, 3 Veh. Oficiales UM y 1 Veh. Oficial Crímenes Cibernéticos. |
| 7 | Distrito Yauco | 3-abril-2020 | Desinfección del Distrito, 10 vehículos oficiales y 10 motoras. |
| 8 | Unidad Puertos San Juan | 7-abril-2020 | Desinfección 12 vehículos oficiales, 14 motoras y 1 helicóptero |
| 9 | Base Aérea | 10-abril-2020 | Desinfección del Hangar, 2 vehículos oficiales, 2 naves y 1 avión oficial. |
| 10 | Distrito Morovis | 10-abril-2020 | Desinfección Distrito y 4 Vehículos Oficiales. |
| 11 | Centro Mando Bayamón | 13-abril-2020 | Desinfección Centro de Mando. |
| 12 | Precinto Juan Domingo | 13-abril-2020 | Desinfección Precinto, 45 vehículos oficiales y Motora. |
| 13 | Distrito Naranjito | 13-abril-2020 | Desinfección Distrito,10 vehículos oficiales y 4 motoras. |
| 14 | Comandancia Carolina | 15-abril-2020 | Desinfección de los 3 niveles, pasillos y perímetro, 31vehiculos del CIC, 29 vehículos oficiales de la Comandancia. |
| 15 | Precinto Guaynabo | 15-abril-2020 | Desinfección 1ro y 2do piso del Precinto y 7 vehículos oficiales. |
| 16 | Unidad Motorizada Arecibo | 16-abril-2020 | Desinfección Área UM, 26 motoras y 3 vehículos Oficiales. |

| 17 | CIC Vega Baja | 16-abril-2020 | Desinfección Área del CIC, 18 vehículos oficiales y 4 motoras. |
| 18 | Distrito Rio Grande | 18-abril-2020 | Desinfección del Distrito y 7 vehículos oficiales. |
| 19 | Distrito Cayey | 18-abril-2020 | Desinfección del Distrito y 8 vehículos oficiales. |
| 20 | Centro de Adiestramiento Bayamón Monagas | 20-abril-2020 | Desinfección salón de adiestramiento (bunker) y 3 vehículos oficiales. |
| 21 | Comandancia Guayama | 18-abril-2020 | Desinfección de la Comandancia y 8 vehículos oficiales. |
| 22 | Distrito Las Marías | 22-abril-2020 | Desinfección del Distrito, 3 vehículos oficiales y 2 Motoras. |
| 23 | Unidad Motorizada y DOT Guayama | 23-abril-2020 | Desinfección las facilidades y 9 vehículos oficiales. |
| 24 | Autopista Ceiba | 24-abril-2020 | Desinfección facilidades y 4 vehículos oficiales. |
| 25 | Distrito Loíza | 25-abril-2020 | Desinfección Distrito y los vehículos oficiales. |
| 26 | Precinto 166 San Juan, Precinto 266 Santurce, Negociado Vehículos Hurtados | 5-mayo 2020 | Desinfección de primera y segunda planta y 11 vehículos oficiales. |

MON-0R-63-29-6-2020

30 de junio de 2020.

Sr. John Romero

Monitor Federal


Estimado Sr. Romero

Reciba un cordial saludo.

Hacemos referencia al requerimiento de información peticionado mediante conferencia el 1 de abril de 2020.

La solicitud de información está relacionada con los resultados de los planes de trabajo implementados por el Negociado de la Policía para atender la emergencia del Covid-19. Del mes de junio de 2020.

**Sometemos en el documento información actualizada a la fecha de hoy 30 de junio de 2020.**

Cordialmente,


*Firmado Electrónicamente*

Coronel Clementina Vega Rosario 1-13603

Directora Oficina de Reforma

CMR-3 | March 2021

**INFORMACIÓN ACTUALIZADA COVID-19**

Información de MNPR relacionado coronavirus.

Al momento el Negociado de la Policía de Puerto Rico (NPPR) tienen ciento ochenta y uno (181) MNPPR en cuarentena, cincuenta y cuatro (54) casos positivos a COVID -19 y dos (2) MNPPR fallecido[17].

**SUPERINTENDENCIA AUXILIAR OPERACIONES DE CAMPO**

| Área | Cuarentena | Positivos COVID-19 |
|------|-----------|--------------------|
| San Juan | 15 | 3 |
| Arecibo | 0 | 5 |
| Ponce | 105 | 12 |
| Mayagüez | 6 | 11 |
| Caguas | 18 | 9 |
| Bayamón | 2 | 1 |
| Carolina | 1 | 7 |
| Aguadilla | 3 | 1 |
| Utuado | 6 | 0 |
| Fajardo | 6 | 0 |
| Aibonito | 4 | 0 |
| **TOTALES** | **166** | **49** |

**SUPERINTENDENCIA AUXILIAR INVESTIGACIÓN CRIMINAL**

| Áreas | Nombre del negociado / oficina | Cuarentena | Positivos COVID-19 |
|-------|-------------------------------|-----------|--------------------|
| 01 San Juan | CIC | 1 | 0 |

---

[17] Un MNPR fallecido en la semana del 21 al 27 de abril de 2020 y un MNPPR fallecido en la semana 14 al 20 de mayo de 2020.

| 05 Mayagüez | CIC | 1 | 0 |
|---|---|---|---|
| 07 Bayamón | División de Drogas y Narcóticos (Metro) | 1 | 0 |
| 02 Arecibo | División de Drogas y Narcóticos | 1 | 0 |
| 03 Ponce | División de Drogas y Narcóticos (Ponce) | 1 | 0 |
| 03 Ponce | División de Drogas y Narcóticos (Yauco) | 2 | 0 |
| 05 Mayagüez | División de Drogas y Narcóticos | 2 | 2 |
| 06 Caguas | División de Drogas y Narcóticos | 1 | 0 |
| 10 Aguadilla | División de Drogas y Narcóticos | 1 | 0 |
| 11 Utuado | División de Drogas y Narcóticos | 1 | 0 |
| 01 San Juan | Negociado de Vehículos Hurtados (Central) | 1 | 1 |
| 01 San Juan | Operaciones Conjuntas | 2 | 2 |
| **TOTALES** | | **15** | **5** |

No se reportan casos de cuarentena, ni casos positivos de covid-19 en el resto de las Superintendencia Auxiliares.

El personal de la Oficina de Reforma se encuentra trabajando de manera presencial, preservando las medidas de salud, seguridad y control de infecciones establecidas en el Plan de Manejo de Riesgos y Control de Exposición COVID-19.

Reanudación de Adiestramientos[18]:

Se autorizan los adiestramientos de Vaqueta, desde el 29 de junio de 2020.

Se autorizan los adiestramientos de Tiro Diurno, desde el 13 de julio de 2020.

Se autorizan los cursos virtuales desde el 29 de junio de 2020 de:

Miembros del NPPR

Adiestramiento Virtual sobre Armas De Reglamento (VUAR 3082)

Adiestramiento Virtual sobre Persecuciones Policiales (VPEP 3081)

Adiestramiento Virtual sobre el Cuarto de Evidencias (VECE 3082)

Personal del Sistema Clasificado:

---

[18] Las reanudaciones de los adiestramientos se realizan tomando en consideración el Plan de Manejo de Riesgos y Control de Exposición COVID-19.

Adiestramiento Virtual sobre Interacción con Personas Transgenero (VITT 3082)

En el caso de la Superintendencia Auxiliar en Educación y Adiestramiento, se comenzará el Adiestramiento Previo al Servicio (Cadetes), el próximo lunes 6 de julio de 2020. Tomando en consideración la Guía OSHA-3992-03-2020.

Al momento no tenemos facilidades cerradas, afectadas, ni reporte adicional de la Unidades del NPPR desinfectadas.

MON-OR-72-28-07-2020

Sr. John Romero Monitor Federal

Estimado Sr. Romero Reciba un cordial saludo.

Hacemos referencia al requerimiento de información peticionado mediante conferencia el 1 de abril de 2020.

La solicitud de información está relacionada con los resultados de los planes de trabajo implementados por el Negociado de la Policía para atender la emergencia del Covid-19, del mes de julio de 2020.

Sometemos en el documento información actualizada a la fecha de hoy 30 de julio de 2020.

Cordialmente,

Coronel Clementina Vega Rosario 1-13603 Directora Oficina de Reforma

# Appendix F: Compliance Tables for Paragraphs Assessed in CMR-3

The tables below outline the compliance targets for each of the paragraphs assessed in CMR-3. The overall compliance status of each paragraph is a function of whether or not PRPB met the compliance targets established by the court-approved methodology for that paragraph. Though the Agreement outlines multiple levels of compliance with paragraphs (e.g. partial compliance, substantial compliance, full compliance), the methodology lays out binary compliance targets, which are noted below as follows:

Y – Yes, PRPB provided sufficient evidence of compliance to demonstrate that it has met the target;

N – No, PRPB has not provided sufficient evidence of compliance to demonstrate that it has met the target;

N/A – The Monitor was unable to review sufficient evidence of compliance for reasons outside of PRPB's control, e.g. Monitor unable to conduct on-site observation due to exigent circumstances.

The Monitor's Office has provided comments where necessary to substantiate ratings on compliance targets.

## Professionalization

| Paragraph 12 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Not Compliant |
| **Paragraph Language** | PRPD shall develop processes and mechanisms that promote professional, ethical, and respectful policing services to effectively address Puerto Rico's public safety challenges; consistently and uniformly apply constitutional police practices; build public confidence; and strengthen its institutional structures. PRPD shall promote continuous performance improvement among all PRPD personnel that regularly identifies problems or challenges, assesses causal or contributing factors, and takes reasonable measures to achieve performance expectations in areas related to this Agreement. | |

| **Compliance Target(s)** | Compliance Target | Status |
|---|---|---|
| | 1. Policies incorporate the requirements of the paragraph. | Y |
| | 2. Training on the code of ethics and conduct is consistent with approved policies. | N |
| | 3. 95% of sampled officers are trained and certified in the code of ethics and conduct (or scheduled for training, in the case of mid-year reviews). | N |
| | 4. 95% of sampled administrative investigation outcomes are within policy. | N |
| | 5. 95% of sampled integrity audit outcomes are within policy. | N |

CMR-3 | March 2021

| Comments & Recommendations | Aside from data on select trainings, PRPB did not provide training records requested by the Monitor's Office for a random sample of PRPB personnel. |
|---|---|

| Paragraph 13 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Partially Compliant |

| Paragraph Language | PRPD shall assess the appropriate number of sworn and civilian personnel to perform the different department functions necessary to fulfill its mission. To do so, PRPD shall conduct a staffing allocation and resource study. The study shall form the basis for a staffing and resource allocation plan that is consistent with community-oriented policing principles and supports the systematic use of partnerships and problem-solving techniques. To foster community-oriented policing, the plan shall consider deployment practices that offer officers opportunities to serve the communities in which they reside. |
|---|---|

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. PRPD conducted a Staffing Allocation and Resource Study to assess appropriate number of personnel. | Y |
| | 2. The Staffing and Resource Allocation Plan is consistent with the requirements of the paragraph and the Staffing Allocation and Resource Study. | Y |
| | 3. 95% of sampled units are staffed consistent with the Agreement and the Staffing and Resource Allocation Plan. | N |
| | 4. 85% of the initiatives in the Staffing and Resource Allocation Plan are implemented. | N |

| Comments & Recommendations | Donnie could not observe on the ground, but can confer with Merangelie and Al on data of partial compliance from other paragraphs. |
|---|---|

| Paragraph 14 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Deferred |

| Paragraph Language | PRPD's promotion practices shall be merit-based and comply with equal opportunity employment principles. |
|---|---|
| Compliance Target(s) | This paragraph is assessed with Paragraph 16. |
| Comments & Recommendations | |

| Paragraph 15 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Substantially Compliant |

| Paragraph Language | PRPD shall publish detailed job descriptions for each rank among sworn personnel, specifying the duties, responsibilities, and minimum qualifications for each position. PRPD shall develop the job descriptions in consultation with the TCA based on generally accepted policing practices. |
|---|---|

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Job descriptions for each rank among sworn personnel are: (a) based on generally accepted policing practices and (b) are detailed, specify duties, responsibilities, and minimum qualifications | Y |
| | 2. Job descriptions for each rank among sworn personnel are published. | Y |

128

CMR-3 | March 2021

**Comments & Recommendations**

| Paragraph 16 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Deferred |

| Paragraph Language | PRPD shall ensure that its supervisor selection process is lawful, fair, and consistent with generally accepted policing practices and anti-discrimination laws. PRPD shall develop objective selection criteria to ensure promotions are based on knowledge, skills, and abilities that are required to perform supervisory and management duties successfully in core substantive areas. PRPD shall provide clear guidance on promotional criteria, and prioritize effective, ethical, and community-oriented policing as criteria for promotion. These criteria should account for experience, civil rights and discipline record, training, and skills. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Promotion policies incorporate the requirements of Paragraphs 14, 16-20. | Y |
| | 2. All promotion trainings are consistent with approved policies. | |
| | 3. 95% of sampled promotions committee personnel are trained and certified in all promotions policies (or scheduled for training, in the case of mid-year reviews). | N |
| | 4. Selection devices comply with promotion policies. | Y |
| | 5. 95% of selected promotion files comply with policy. | |
| | 6. 95% of interviewed candidates perceive the promotion process as merit-based, fair, non-discriminatory and objective. | |

| Comments & Recommendations | Aside from data on select trainings, PRPB did not provide training records requested by the Monitor's Office for a random sample of PRPB personnel. |
|---|---|

| Paragraph 17 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Deferred |

| Paragraph Language | PRPD shall utilize competitive written examinations as a component of the selection process to award promotions through the rank of Captain. Written promotion examinations shall conform to generally-accepted professional standards for test validity and security and be designed to evaluate qualifications that are job related and consistent with business necessity. PRPD shall develop these examinations in consultation with the TCA based on generally accepted policing practices and in compliance with anti-discrimination laws. |
|---|---|

| Compliance Target(s) | This paragraph is assessed with Paragraph 16. |
|---|---|
| Comments & Recommendations | |

| Paragraph 18 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Not Compliant |

| Paragraph Language | All appointments to ranks above Captain shall be based on objective criteria that account for the knowledge, skills, and abilities to perform core management, supervisory, and leadership duties. |
|---|---|
| Compliance Target(s) | This paragraph is assessed with Paragraph 16. |

CMR-3 | March 2021

| **Comments & Recommendations** | No protocol developed for appointments above the rank of Captain. |
| --- | --- |

| **Paragraph 19** | **Assessment Frequency** | **Overall Compliance Status** |
| --- | --- | --- |
| | Annually | Partially Compliant |
| **Paragraph Language** | PRPD shall establish procedures that govern the removal of officers from consideration for promotion for disciplinary action related to serious misconduct. | |
| **Compliance Target(s)** | This paragraph is assessed with Paragraph 16. | |
| **Comments & Recommendations** | Though a procedure has existed for some time, the Monitor's Office has not seen evidence that the procedure has been implemented consistently (Paragraph 16, compliance targets 5 & 6). | |

| **Paragraph 20** | **Assessment Frequency** | **Overall Compliance Status** |
| --- | --- | --- |
| | Annually | Partially Compliant |
| **Paragraph Language** | PRPD shall establish specific criteria for the promotion of officers in direct supervisory roles. Officers in supervisory roles shall not be rendered ineligible for promotion based solely on the number of civilian complaints filed against officers under their supervision. The nature and type of civilian complaints, particularly those complaints that are investigated and substantiated by evidence, shall also be weighed when considering an officer for promotion. Promotions of officers with pending investigations or disciplinary action in a matter alleging serious misconduct shall be held in abeyance until the investigation or disciplinary action is resolved. | |
| **Compliance Target(s)** | This paragraph is assessed with Paragraph 16. | |
| **Comments & Recommendations** | Though a procedure has existed for some time, the Monitor's Office has not seen evidence that the procedure has been implemented consistently (Paragraph 16, compliance targets 5 & 6). | |

| **Paragraph 21** | **Assessment Frequency** | **Overall Compliance Status** |
| --- | --- | --- |
| | Deferred | Deferred |
| **Paragraph Language** | PRPD shall provide a developmental career path for officers aspiring to the command ranks that emphasizes leadership, ethics, community-oriented policing, educational achievement, and constitutional policing. | |
| **Compliance Target(s)** | Deferred. See Jt. Mot., ECF No. 1095 at 9 (proposing Special Master assist developing plan in accordance with Paragraph 21); Order, ECF No. 1102 at 2 (approving same). | |
| **Comments & Recommendations** | | |

## Use of Force

| **Paragraph 22** | **Assessment Frequency** | **Overall Compliance Status** |
| --- | --- | --- |
| | Bi-annually | Partially Compliant |
| **Paragraph Language** | PRPD officers shall use force in accordance with the rights, privileges, and immunities secured or protected by the Constitution or laws of the United States and the Commonwealth of Puerto Rico, and shall prohibit the use of unreasonable | |

CMR-3 | March 2021

| | force. PRPD shall develop policies and procedures that enable officers to rely primarily on non-force techniques to effectively police; use force only when necessary; and de-escalate the use of force at the earliest possible moment. |
|---|---|
| Compliance Target(s) | Compliance is determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 23-57, and (2) the results of outcome assessments, pursuant to Paragraph 243. |
| Comments & Recommendations | |

| Paragraph 23 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Partially Compliant |
| Paragraph Language | PRPB complies with applicable law and comports with generally accepted policing practices. The comprehensive use of force policy shall categorize all reportable uses of force into multiple levels, grouped by degree of seriousness, and shall include all force techniques, technologies develop a comprehensive and agency- PRPD shall wide use of force policy that, and weapons, both lethal and less-lethal, that are available to PRPD officers, including officers assigned to specialized tactical units. The comprehensive use of force policy shall clearly define and describe each force level option and the circumstances under which each force level is appropriate. The highest level of force described by the policy shall include all serious uses of force, as defined in this Agreement. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | Policies incorporate all of the requirements of Paragraphs 22-24. | N |
| Comments & Recommendations | • Policy exists, but application is inconsistent.<br>• PRPB must revise the practice of assigning one complaint number to all uses of less-than-lethal weapons at a demonstration/protest. This practice is technically consistent within PRPB policy, but not in keeping with generally accepted policing practices. Therefore, the Monitor recommends that PRPB revise their policy to curtail this practice | |

| Paragraph 24 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Partially Compliant |
| Paragraph Language | PRPD shall develop comprehensive and agency-wide policies that comply with applicable law and comport with generally accepted policing practices concerning the use of: (a) lethal force; (b) firearms; (c) canines; (d) ECWs; (e) chemical agents; (f) less lethal munitions; (g) batons and impact weapons; and (h) any other force technology, weapon, or implement authorized by PRPD during the life of this Agreement. PRPD shall also develop a policy on sharing information with the public regarding serious uses of force and the dissemination of information to family members of civilians involved in a use of force incident. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | Policies incorporate all of the requirements of Paragraphs 22-24. | N |
| Comments & Recommendations | • Policy exists, but application is inconsistent.<br>• Comments from CMR-2 remain valid: Rating based on inconsistent reporting use of force incidents & deficient FIU investigations into firearm discharges by members of PRPB. These lapses indicate that there is need for revisions to the relevant policies to bring UOF reporting fully in line with the Agreement. | |

CMR-3 | March 2021

| Paragraph 25 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Substantially Compliant |
| Paragraph Language | PRPD shall continue to prohibit the use of Chloroacetophenone (commonly referred to as "CN gas"). | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Policy prohibits use of CN gas. | Y |
| | 2. No supply of CN gas is identified in armories or other locations through unannounced site visits. | Y |
| | 3. No supply of CN gas is identified in armories or other locations through inspections. | Y |
| | 4. CN gas is never used by STUs. | Y |

| Comments & Recommendations | |
|---|---|
| | |

| Paragraph 26 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | PRPD shall maintain an accurate, current list of officers who successfully qualify with their regulation firearm, including any other firearm that officers are authorized to use or carry. Officers who fail to re-qualify shall be relieved of police powers and immediately relinquish all firearms, including personal firearms. Those officers who fail to re-qualify after remedial training within a reasonable time shall be subject to disciplinary action. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Policies incorporate all of the requirements of the paragraph. | Y |
| | 2. All officers on the qualification list are qualified and certified on the use of firearms in accordance with policy. | N |
| | 3. All officers who fail the qualification re-test on the same day are relieved of operational duty, disarmed, and summoned for re-training before leaving the Academy. | N/A |
| | 4. All officers who fail to qualify after re-training remain relieved of operational duty, remain disarmed, and are referred for disciplinary action. | N/A |
| | 5. All officers are disciplined for failing to qualify after re-training or have a valid justification for not qualifying in accordance with policy. | N/A |
| | 6. All officers with more than one regulation firearm are qualified in all authorized firearms. | N |

| Comments & Recommendations | |
|---|---|
| | • Target 2. PRPB provided a list of officers who were trained during the period of performance for CMR-3, but they did not provide documents demonstrating that a representative sample of personnel are properly certified for using firearms.<br>• Target 4. According to the documentation provided, no personnel failed training with firearms. This statement raises concerns for the Monitor related to data validation. In a department of over 12,000 officers, it is extremely unlikely that all officers should qualify with their firearm on the first attempt. This case raises concerns as to the validity of data produced by PRPB. |

- Target 6. PRPB did not provide a record for officers qualified for more than one firearm.

| Paragraph 27 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| Paragraph Language | PRPD shall develop policies on the use of force by members of specialized tactical units ("STUs"). This policy shall be consistent with PRPD's agency-wide use of force policy. tactical units ("STUs"). This policy shall be consistent with PRPD's agency-wide use of force policy. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Policies incorporate all of the requirements of the paragraph. | N |
| | 2. All use of force training involving STUs is consistent with approved policies. | Y |
| | 3. 95% of officers are trained and certified in all use of force policies involving STUs (or scheduled for training, in the case of mid-year reviews) | Y |
| | 4. 95% of uses of force by STU officers are within policy. | Y |
| Comments & Recommendations | Though PRPB has been reporting uses of force consistent with policy, the Monitor has stated that PRPB must revise the policy of incorporating multiple use of force incidents under one umbrella UOF report. | |

| Paragraph 28 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| Paragraph Language | PRPD shall prohibit STUs from conducting general patrol and policing functions. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Policies incorporate all requirements of the paragraph. | Y |
| | 2. Training involving STUs is consistent with approved policies. | Y |
| | 3. 95% of STU officers are trained and certified in STU policies (or scheduled for training, in the case of mid-year reviews). | Y |
| | 4. Presentation of data on STU deployments and activations. | Y |
| | 5. 95% of all STU deployments/activations for general patrol and policing functions are justified within policy. | Y |
| | 6. 95% of all assignments of individual STU officers to general patrol and policing functions are justified and carried out within policy. | Y |
| Comments & Recommendations | | |

| Paragraph 29 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Partially Compliant |
| Paragraph Language | PRPD shall develop eligibility criteria and selection devices for assignment to STUs that emphasize demonstrated capacity to carry out the mission of STU in a constitutional manner. Officers assigned to STUs who are unable to maintain eligibility shall be removed from STUs. Assignments to STUs shall be for a determined period, as specified by PRPD policy, unless there are extenuating circumstances that justify an extended assignment. | |
| | Compliance Target | Status |

| Compliance Target(s) | 1. Policies incorporate all of the requirements of the paragraph. | Y |
|---|---|---|
| | 2. Training for evaluation boards is consistent with approved policies. | Y |
| | 3. 95% of evaluation board members are trained. | N/A |
| | 4. All officers selected to STUs meet eligibility requirements. | N |
| | 5. All officers assigned to STUs who do not maintain eligibility are removed from STUs. | Y |
| | 6. 95% of all extensions of STU assignments are justified as extenuating circumstances within policy. | Y |
| Comments & Recommendations | | |

| Paragraph 30 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |

| Paragraph Language | PRPD shall require STUs to document in writing all law enforcement activities to include operational plans and after-action reports prepared in consistent formats for all call-outs and deployments. Supervisors shall review the law enforcement activities of STUs periodically to ensure compliance with applicable laws and PRPD policies and procedures. |
|---|---|

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Policies incorporate all of the requirements of the paragraph. | Y |
| | 2. Training for STUs is consistent with approved policies. | Y |
| | 3. 95% of law enforcement activities by STUs, including deployments and activations, are documented within policy. | N |
| | 4. 95% of law enforcement activities by STUs, including deployments and activations, are reviewed by supervisors. | Y |
| Comments & Recommendations | DOT has not been producing written after action reports. | |

| Paragraph 31 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |

| Paragraph Language | PRPD shall track the number of STU deployments, the reason for each activation and deployment of STU, the legal authority, including type of warrant, if any, for each activation and deployment of STU, and the result of each activation and deployment of STU, including: (a) the approximate location of the STU deployment; (b) the number of arrests made; (c) the type of evidence or property seized; (d) whether a forcible entry was made; (e) whether force was used by an STU member or other officer; and (f) whether a person was injured or killed by an STU member. |
|---|---|

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. The STU tracking system accounts for all elements in the paragraph and outcome measures as required by Paragraph 243. | N |
| | 2. The STU tracking system is accurate and current; all deployments are tracked. | N |
| Comments & Recommendations | No central tracking system in place. | |

| Paragraph 32 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |

CMR-3 | March 2021

| Paragraph Language | PRPD shall develop crowd control and incident management policies that comply with applicable law and comport with generally accepted policing practices. | |
|---|---|---|
| Compliance Target(s) | **Compliance Target** | **Status** |
| | 1. Policies incorporate all of the requirements of the paragraph. | Y |
| | 2. Training on crowd control and incident management is consistent with approved policies. | Y |
| | 3. 95% of STU officers, supervisors, and other officers are trained and certified in crowd control (or scheduled for training, in the case of mid-year reviews); 95% of all supervisors are trained in incident management (or scheduled for training, in the case of mid-year reviews). | N |
| | 4. 95% of police responses to unplanned events are within policy. | N/A |
| | 5. 95% of police responses to planned events are within policy. | Y |
| | 6. 95% of armories inspected by STU supervisors indicate that less lethal weapons and ammunition are controlled and maintained in accordance with policy. | Y |
| | 7. 95% of armories indicate that less lethal weapons and ammunition are controlled and maintained in accordance with policy. | Y |
| Comments & Recommendations | • PRPB maintains that there were no unplanned demonstration events; however, the Monitor expresses concern that PRPB has reported no unplanned events, given the population size of Puerto Rico. The Monitor considers it likely that at least small, local, unplanned demonstrations are taking place, of which DOT is unaware.<br>• Aside from data on select trainings, PRPB did not provide training records requested by the Monitor's Office for a random sample of PRPB personnel. | |

| Paragraph 33 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| Paragraph Language | The incident management policy shall provide that a ranking officer or other higher-level PRPD official at the scene of a mass demonstration, civil disturbance, or other crowd situation assume command and control and provide approval prior to deploying force as a crowd dispersal technique. | |
| Compliance Target(s) | This paragraph is assessed with paragraph 32. | |
| Comments & Recommendations | | |

| Paragraph 34 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| Paragraph Language | The crowd control policy shall require the use of crowd control techniques and tactics that respect protected speech and the right to lawful assembly. | |
| Compliance Target(s) | This paragraph is assessed with paragraph 32. | |
| Comments & Recommendations | Though PRPB has been reporting uses of force consistent with policy, the Monitor has stated that PRPB must revise the policy of incorporating multiple use of force incidents under one umbrella UOF report. | |

CMR-3 | March 2021

| Paragraph 35 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | PRPD policy shall require the assessment of law enforcement activities following each response to a mass demonstration, civil disturbance, or other crowd situation to ensure compliance with applicable laws and PRPD policies and procedures. | |
| Compliance Target(s) | This paragraph is assessed with paragraph 32. | |
| Comments & Recommendations | Requested information was not provided. Area commands did not provide an assessment of demonstration manifestations, but instead referred the Monitor to DOT units. | |

| Paragraph 36 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | PRPD shall develop a Use of Force Reporting Policy and Use of Force Report Form that comply with applicable law and comport with generally accepted policing practices. The Use of Force Reporting Policy will require officers to notify their immediate supervisor following any use of force, prisoner injury, or allegation of excessive force. In cases involving a serious use of force, notification will be within one hour, absent exigent circumstances. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Polices and forms incorporate all of the requirements of the paragraph. | N |
| | 2. Training on force reporting is consistent with approved policies. | Y |
| | 3. 95% of officers are trained and certified in force reporting policies (or are scheduled for training, in the case of mid-year reviews) | N |
| | 4a. 95% of use of force incidents are notified to immediate supervisors or adequately justified as an exigent circumstance in accordance with policy. | N |
| | 4b. 95% of use of force reports are completed within prescribed periods and are documented in accordance with policy. | N |
| | 4c. All failures to report use of force are referred to SARP for investigation. | N/A |
| | 4d. 95% of requests for medical services in connection with a use of force are within policy. | N |
| | 4e. 95% of force incidents where a civilian is transported to a medical facility indicate that the officer notified the vehicle mileage and that the mileage was recorded. Mileage discrepancies are identified and addressed by supervisors as required by policy. | N |
| | 4f. 95% of all use of force reports are submitted to supervisors and SARP within prescribed time frames as required by policy. | N |
| | 4g. All use of force reports are stored and maintained by SARP as required by policy. | N |
| Comments & Recommendations | • PRPB policy continues to allow officers to report multiple uses of force one general use of force form that covers an entire "incident." This practice and the policy that allows it violate both the requirements of the Agreement and widely-accepted policing practice. | |


- Aside from data on select trainings, PRPB did not provide training records requested by the Monitor's Office for a random sample of PRPB personnel.
- Though the sample provided by PRPB on use of force reports demonstrates high levels of compliance with policy and with the Agreement, the Monitor expresses serious concerns with both the force reporting policy and the lack of consistent and validated data related to use of force reporting. PRPB provided three different estimates of the total uses of force during the period of review for CMR-3.

| Paragraph 37 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | The Use of Force Reporting Policy shall require all officers to report any use of force in writing in a Use of Force Report Form before the end of the shift. The Use of Force Report shall include: (a) a detailed account of the incident from the officer's perspective; (b) the reason for the initial police presence; (c) a specific description of the acts that led to the use of force, including the subject(s)' behavior; (d) the level of resistance encountered; and (e) a description of every type of force used. The Use of Force Reporting Policy shall explicitly prohibit the use of boilerplate or conclusory language in all reports documenting use of force. Failure to report a use of force or prisoner injury by a PRPD officer shall subject an officer, including supervisors and commanders, to disciplinary action. | |
| Compliance Target(s) | This paragraph is assessed with paragraph 36. | |
| Comments & Recommendations | Though the sample provided by PRPB on use of force reports demonstrates high levels of compliance with policy and with the Agreement, the Monitor expresses serious concerns with the lack of consistent and validated data related to use of force reporting. | |

| Paragraph 38 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | PRPD policy shall require officers to request medical services immediately when an individual is injured or complains of injury following a use of force. The policy shall also require officers who transport a civilian to a medical facility for treatment to take the safest and most direct route to the medical facility. The policy shall further require that officers notify the communications command center of the starting and ending mileage on the transporting vehicle. | |
| Compliance Target(s) | This paragraph is assessed with paragraph 36. | |
| Comments & Recommendations | Though the sample provided by PRPB on use of force reports demonstrates high levels of compliance with policy and with the Agreement, the Monitor expresses serious concerns with the lack of consistent and validated data related to use of force reporting. | |

| Paragraph 39 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |

CMR-3 | March 2021

| Paragraph Language | PRPD's Use of Force Reporting Policy shall require that officers submit copies of Use of Force Reports to their immediate supervisor and to SPR for tracking and analysis. SPR shall maintain master copies of these reports in a central location. |
|---|---|
| Compliance Target(s) | This paragraph is assessed with paragraph 36. |
| Comments & Recommendations | Officers consistently submit copies of force reports to their supervisors, but these reports are not used for proper tracking and analysis. PRPB has not implemented the steps recommended by the Monitor to achieve compliance. |

| Paragraph 40 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually for policy compliance and bi-annually for training compliance. | Not Compliant |

| Paragraph Language | PRPD policy shall specify that the conduct of all force reviews and investigations comply with applicable law and comport with generally accepted policing practices. All force reviews and investigations shall, to the extent reasonably possible, determine whether the officers' conduct was justified and within PRPD policy. | |
|---|---|---|
| Compliance Target(s) | **Compliance Target** | **Status** |
| | 1. The policy incorporates all of the requirements of the policy. | Y |
| | 2. Training on force reviews and investigations is consistent with approved policies. | Y |
| | 3. 95% of officers are trained and certified in force reviews and investigation policies in accordance with their rank or assignment to FIU (or are scheduled for training, in the case of mid-year reviews) | Y |
| Comments & Recommendations | Though the sample provided by PRPB on use of force reports demonstrates high levels of compliance with policy and with the Agreement, the Monitor expresses serious concerns with the lack of consistent and validated data related to use of force reporting. | |

| Paragraph 41 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually related to the tracking system; annually related to the annual report; and quarterly related to site visits to Radio Control Center. | Not Compliant |

| Paragraph Language | PRPD shall be responsible for maintaining a reliable and accurate tracking system on all officers' use of force; all force reviews carried out by supervisors; all force investigations carried out by Force Investigation Units ("FIU"); and all force reviews conducted by Force Review Boards ("FRB") and the Superintendent's Force Review Board ("SFRB"). At least annually, PRPD shall analyze data on officers' use of force to determine significant trends, identify and correct deficiencies revealed by this analysis, and document its findings in a public report. | |
|---|---|---|
| Compliance Target(s) | **Compliance Target** | **Status** |
| | 1. Tracking system accounts for all of the elements in the paragraph and outcome measures as required by Paragraph 243. | N |
| | 2. All uses of force are tracked in the tracking system. | N |
| | 3. Annual use of force reports provide meaningful data analysis, identify significant trends, discuss corrective action (if necessary), and present supportable findings based on accurate and current data, as required by policy. | N |

| | | |
|---|---|---|
| | 4. Records maintained by the Radio Control Center on use of force are consistent with data in the use of force tracking system. | N |
| Comments & Recommendations | Though the sample provided by PRPB on use of force reports demonstrates high levels of compliance with policy and with the Agreement, the Monitor expresses serious concerns with the lack of consistent and validated data related to use of force reporting. | |

| Paragraph 42 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | The quality of force reviews, force investigations, and investigation reviews shall be taken into account in the performance evaluations of the officers performing such investigations and reviews. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraphs 145-146 on Performance Evaluations. | |
| Comments & Recommendations | | |

| Paragraph 43 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | A supervisor shall respond to the scene of a serious use of force or allegation of excessive force involving an officer under his/her command upon notification of the incident. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraphs 48-52. | |
| Recommendations | Though the sample provided by PRPB on use of force reports demonstrates high levels of compliance with policy and with the Agreement, the Monitor expresses serious concerns with the lack of consistent and validated data related to use of force reporting. | |

| Paragraph 44 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | The supervisor shall conduct a supervisory review of all uses of force, prisoner injuries, or allegations of excessive force, except those incidents involving a serious use of force or force indicating apparent criminal conduct by an officer, which shall be investigated by FIU, SPR, and/or PRDOJ. No supervisor who was involved in the incident, including by participating in, ordering, or authorizing the force being investigated, shall be responsible for the review of the incident. | |
| Compliance Target(s) | Compliance Target | Status |
| | 1. Policies incorporate all of the requirements of the paragraph. | Y |
| | 2. Training on force reviews and investigations for supervisors is consistent with approved policies. | Y |
| | 3. 95% of supervisors are trained and certified in force reviews and investigation policies (or are scheduled for training, in the case of mid-year reviews) | Y |
| | 4a. 95% of use of force incidents classified as Level 1-3 are reported, reviewed, and investigated by supervisors and commanders within policy. | N |

| | | |
|---|---|---|
| 4b. 95% of supervisory force reviews are completed within five business days or have valid justifications for longer periods, based on exceptional circumstances. | | N |
| 4c. All use of force reviews and investigations by supervisors reach reasonably justified conclusions on officers' conduct and recommend disciplinary or corrective action, as necessary, in accordance with policy. | | N |
| 5a. 95% of reviews by Force Review Boards are within policy. | | N |
| 5b. The use of force tracking system accounts for all Force Review Board reports and underlying documents. | | N |
| 5c. Force Review Board determinations and recommendations are tracked and analyzed by SPR. | | N |
| Comments & Recommendations | • Though the sample provided by PRPB on use of force reports demonstrates high levels of compliance with policy and with the Agreement, the Monitor expresses serious concerns with the lack of consistent and validated data related to use of force reporting.<br>• Target 4b: Some investigations go over the allowed period.<br>• Target 4c: There were cases in which disciplinary action was warranted but not applied.<br>• Target 5c: No evidence that SPR is tracking and analyzing FRB investigations. | |

| Paragraph 45 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | Supervisors shall complete use of force reviews within 5 business days of receiving the officer's use of force report. The reviewing supervisor shall: (a) determine whether the use of force was consistent with PRPD policy and/or raises any policy or operational concerns; (b) review all Use of Force Reports and ensure that all reports include the information required by this Agreement and PRPD policy; (c) document each use of force review promptly using a Supervisor's Force Review Report; and (d) consider whether there are non-punitive corrective actions or training needs. A higher ranking officer within the investigating supervisor's chain-of-command shall review the Supervisor's Force Review Report for completeness and conformance with PRPD policy. The reviewing officer shall evaluate the investigating supervisor's conclusions and document whether the reviewing officer concurs, disagrees (with an explanation of the disagreement and the alternate conclusion), or defers until further investigation is completed. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 44. | |
| Comments & Recommendations | • Though the sample provided by PRPB on use of force reports demonstrates high levels of compliance with policy and with the Agreement, the Monitor expresses serious concerns with the lack of consistent and validated data related to use of force reporting.<br>• Not all cases were reviewed within 5 days. | |

| Paragraph 46 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |

140

| Paragraph Language | A Force Review Board shall evaluate supervisory reviews, including Supervisor's Force Review Reports and reviewing officers' determinations. FRBs shall be composed of command staff from varying assignments. PRPD policies shall specify the conduct and requirements of FRB proceedings to ensure thorough, timely, and objective reviews. PRPD policy shall establish objective criteria that identify the force levels below serious uses of force that shall be reviewed by FRBs. FRBs shall review supervisory review for completeness, evidentiary support, and compliance with PRPD policy. FRB shall document each FRB proceeding, which shall include findings and recommendations to the regional commander. FRB may also return force reviews to supervisors for additional review, as necessary, to ensure thorough and complete reviews. Copies of all Force Review Reports and underlying documents shall be submitted to SPR for tracking and analysis. |
|---|---|
| Compliance Target(s) | This Paragraph is assessed with Paragraph 44. |
| Comments & Recommendations | Though the sample provided by PRPB on use of force reports demonstrates high levels of compliance with policy and with the Agreement, the Monitor expresses serious concerns with the lack of consistent and validated data related to use of force reporting. |

| Paragraph 47 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Deferred |
| Paragraph Language | Whenever a reviewing supervisor, FRB, or other reviewing officer finds evidence of a use of force indicating apparent misconduct or apparent criminal conduct by an officer, he or she shall immediately notify his or her supervisor for referral to the appropriate investigating unit or the PRDOJ. The Superintendent shall be notified of the referral. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 44. | |
| Comments & Recommendations | No applicable cases were drawn as part of the sample on use of force. | |

| Paragraph 48 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| Paragraph Language | PRPD shall ensure that all serious uses of force and allegations of excessive force are investigated fully and fairly by individuals with appropriate expertise, independence, and investigative skills to ensure that uses of force that are contrary to law or policy are identified and appropriately resolved and that policy or operational deficiencies related to the use of force are identified and corrected. To this end, PRPD shall create FIUs to conduct investigations of serious uses of force, uses of force indicating apparent criminal conduct by an officer, uses of force by PRPD personnel of a rank higher than sergeant, or uses of force reassigned to FIU by the Superintendent, his or her designee, SPR, or FRB. PRPD policies shall specify the membership requirements, conduct of investigations, and operational procedures of FIUs. | |
| Compliance Target(s) | Compliance Target | Status |
| | 1. Policies incorporate all of the requirements of the paragraph. | Y |
| | 2. Training for FIU officers is consistent with approved policies. | N |

CMR-3 | March 2021

| | | |
|---|---|---|
| | 3. 95% of FIU officers are trained and certified in force reporting and investigation policies (or are scheduled for training, in the case of mid-year reviews) | Y |
| | 4. All officers assigned to FIU meet eligibility requirements. | Y |
| **Comments & Recommendations** | FIU has not yet implemented additional training requested by the Monitor on investigating firearm discharges. PRPB proposed this additional training after the Monitor identified shortcomings in firearm discharge investigations, but to date no additional curriculum has been developed or implemented. | |

| **Paragraph 49** | **Assessment Frequency** | **Overall Compliance Status** |
|---|---|---|
| | Bi-annually | Not Compliant |
| **Paragraph Language** | A supervisor responding to a serious use of force or allegation of excessive force shall immediately notify FIU. FIU shall respond to the scene and commence an investigation. FIU may decline to respond to the scene following consultation and approval by the FIU supervisor. Declinations shall be documented in writing. | |
| **Compliance Target(s)** | **Compliance Target** | **Status** |
| | 1. Policies incorporate all of the requirements of the paragraph. | Y |
| | 2a. 95% of use of force incidents classified as Level 4 are reported, reviewed, and investigated by officers, supervisors, commanders, and FIU officers within policy. | Y |
| | 2b. 95% of FIU investigations are completed within 45 days of the use of force or have valid justifications for longer periods based on exceptional circumstances. | N |
| | 2c. All use of force reviews and investigations by FIU reach reasonably justified conclusions on officers' conduct and recommend disciplinary or corrective action, as necessary, in accordance with policy. | Y |
| | 3a. 95% of reviews by the Commissioner's Force Review Boards are within policy. | N |
| | 3b. The use of force tracking system includes all Commissioner's Force Review Board reports and underlying documents. | N |
| | 3c. Commissioner's Force Review Board determinations and recommendations are tracked and analyzed by SPR. | N |
| **Comments & Recommendations** | • Though the sample provided by PRPB on use of force reports demonstrates high levels of compliance with policy and with the Agreement, the Monitor expresses serious concerns with the lack of consistent and validated data related to use of force reporting.<br><br>• Target 3a-3C: The Commissioner's Force Review Boards did not conduct any reviews in the period of review for CMR-3, though there were applicable cases. | |

| **Paragraph 50** | **Assessment Frequency** | **Overall Compliance Status** |
|---|---|---|
| | Bi-annually | Deferred |
| **Paragraph Language** | FIU shall immediately notify and consult with PRDOJ regarding any use of force indicating apparent criminal conduct by an officer. If PRDOJ indicates that it may proceed criminally, or PRPD requests a criminal prosecution, any compelled interview of the subject officers shall be delayed until after consultation with PRDOJ or expressly permitted by the Superintendent. No other part of the investigation | |

CMR-3 | March 2021

| | |
|---|---|
| | shall be held in abeyance unless specifically authorized by the Superintendent in consultation with PRDOJ. |
| **Compliance Target(s)** | This Paragraph is assessed with Paragraph 48. |
| **Comments & Recommendations** | No applicable cases during the period of review for CMR-3. |

| Paragraph 51 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| **Paragraph Language** | FIU shall complete its administrative use of force investigation within 45 days of the use of force, absent exceptional circumstances. At the conclusion of each use of force investigation, FIU shall prepare a report on the investigation and shall forward the report to SFRB for review and to SPR for tracking and analysis. | |
| **Compliance Target(s)** | This Paragraph is assessed with Paragraph 48. | |
| **Comments & Recommendations** | | |

| Paragraph 52 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| **Paragraph Language** | The Superintendent's Force Review Board shall evaluate all FIU investigations, including FIU reports and determinations. SFRB shall be composed of senior command staff from varying units. PRPD policies shall specify the conduct and requirements of SFRB proceedings to ensure thorough, timely, and objective reviews. SFRB shall review each FIU investigation for completeness, evidentiary support, and compliance with PRPD policy. SFRB shall document each force review proceeding, which shall include findings and recommendations, to the Superintendent. SFRB may also return force investigations to FIU for additional investigation, as necessary, to ensure thorough and complete investigations. Copies of all Force Review Reports completed by SFRB and underlying documents shall be submitted to SPR for tracking and analysis. | |
| **Compliance Target(s)** | This Paragraph is assessed with Paragraph 48. | |
| **Comments & Recommendations** | The Superintendent's Force Review Board did not conduct any reviews in the period of review for CMR-3, though there were applicable cases. | |

| Paragraph 53 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| **Paragraph Language** | PRPD shall train all PRPD officers on PRPD's use of force policies. Thereafter, PRPD shall provide all PRPD officers with use of force training at least every two years for the first four years of this Agreement, and annually thereafter. PRPD shall also provide training on use of force as necessary, based on developments in applicable law and PRPD policy. At least annually, PRPD shall assess all use of force policies and training. PRPD's use of force training program shall include the following topics:<br>a) legal standards for reasonable force;<br>b) PRPD's use of force policy;<br>c) reporting use of force, requesting medical service, and preserving evidence;<br>d) scenario-based training and interactive exercises that illustrate proper use of | |

force decision-making;

e) the proper deployment and use of all weapons or technologies, including firearms, batons, chemical agents, and ECWs;

f) threat assessment and de-escalation techniques that encourage officers to make arrests without using force, and instruction that disengagement, area containment, surveillance, waiting out a subject, summoning reinforcements, calling in specialized units, or delaying arrest may be the appropriate response to a situation, even when the use of force would be legally justified;

g) crisis intervention and interacting with people with mental illnesses, including instruction by mental health practitioners and an emphasis on de-escalation strategies;

h) factors to consider in initiating or continuing a foot pursuit; and

i) appropriate training on conflict management.

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Training on use of force is consistent with approved policies and the requirements of the paragraph. | Y |
| | 2. 95% of officers are trained and certified in use of force (or scheduled for training, in the case of mid-year reviews). | N |
| Comments & Recommendations | Aside from data on select trainings, PRPB did not provide training records requested by the Monitor's Office for a random sample of PRPB personnel. | |

| Paragraph 54 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | PRPD shall provide an appropriate firearm training program that: a) requires officers to complete and satisfactorily pass firearm training and qualify on each firearm the officer is required or authorized to carry on an annual basis; b) requires cadets, officers in probationary periods, and officers who return from unarmed status or extended leave to complete and satisfactorily pass firearm training and qualify on each firearm the officer is required or authorized to carry before such personnel are permitted to carry and use firearms; c) incorporates night training, stress training (i.e., training in using a firearm after undergoing physical exertion), and proper use of force decision- making training, including continuous threat assessment techniques, in the annual in-service training program; d) ensures that firearm instructors critically observe students and provide corrective instruction regarding deficient firearm techniques and failure to utilize safe gun handling procedures at all times; and e) requires comprehensive testing that shows complete understanding of rules, regulations, and skills regarding firearm use. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Training on the use of firearms is consistent with approved policies and the requirements of the paragraph. | Y |
| | 2. 100% of officers are trained, certified, and qualified in use of firearms or have a valid justification for not qualifying in accordance with policies. | N |
| Comments & Recommendations | Aside from data on select trainings, PRPB did not provide training records requested by the Monitor's Office for a random sample of PRPB personnel. | |

| Paragraph 55 | Assessment Frequency | Overall Compliance Status |
|---|---|---|

| | Annually | Partially Compliant |
|---|---|---|
| **Paragraph Language** | PRPD shall train all supervisors, FIU members, and command officers on PRPD's use of force policies. Thereafter, PRPD shall provide all supervisors, FIU members, and command officers with training on use of force, force investigations, and force investigation reviews at least annually and, as necessary, based on developments in applicable law and PRPD policy. PRPD's use of force training for supervisors, FIU members, and command officers shall include the following topics: a) requesting medical services and determining the appropriate use of force reporting levels; b) identifying and interviewing involved officers, witness personnel, subjects upon whom force was used, and civilian witnesses; c) ensuring proper collection of evidence; d) reviewing use of force and supplemental reports for completeness, accuracy, and quality, including recognizing boilerplate language and document discrepancies; e) assessing the legality and appropriateness of a detention and subsequent arrest; f) legal standards governing the use of reasonable force, including legal standards and requirements for criminal accountability, administrative accountability, and performance improvement related to tactics, training, equipment, and policy sufficiency; g) recommending and administering proper discipline and non-punitive corrective action related to use of force; and h) report writing. | |

| **Compliance Target(s)** | **Compliance Target** | **Status** |
|---|---|---|
| | 1. Training on the use of force, force investigations, and force investigation reviews is consistent with approved policies and the requirements of the paragraph. | N |
| | 2. 95% of supervisors, FIU officers, and commanders are trained and certified in use of force, force investigations, and force investigation reviews (or scheduled for training, in the case of mid-year reviews). | Y |

| **Comments & Recommendations** | FIU has not yet implemented additional training requested by the Monitor on investigating firearm discharges. PRPB proposed this additional training after the Monitor identified shortcomings in firearm discharge investigations, but to date no additional curriculum has been developed or implemented. |
|---|---|

| **Paragraph 56** | **Assessment Frequency** | **Overall Compliance Status** |
|---|---|---|
| | Bi-annually | Partially Compliant |
| **Paragraph Language** | PRPD shall develop policies and procedures to improve its response to individuals in behavioral or mental health crisis, and to minimize the use of unnecessary force against such individuals. To achieve this outcome, PRPD shall, in addition to providing all officers with basic training on responding to persons in behavioral or mental health crisis, implement and train a comprehensive first responder Crisis Intervention Team ("CIT") to develop and maintain specially-trained CIT officers. The CIT shall incorporate the following requirements: a) The CIT shall develop policies and procedures for the transfer of custody or voluntary referral of individuals between PRPD, receiving facilities, and local mental health and social service agencies. b) The CIT policies and procedures shall require that whenever officers encounter juveniles in mental health crisis that officers refer them to appropriate mental health services located in the community. c) The CIT officers shall be assigned to field operations units and maintain their | |

|  | standard patrol duties, except when called to respond to potential behavioral or mental health crisis events where the officers may be required to respond outside of their assigned patrol district. | |
|---|---|---|
| Compliance Target(s) | **Compliance Target** | **Status** |
| | 1. Policies incorporate all of the requirements of the paragraph. | Y |
| | 2. Training on basic behavioral health is consistent with approved policies and includes general instruction on the CIT program. | Y |
| | 3. 95% of officers are trained and certified in basic behavioral health (or are scheduled for training, in the case of mid-year reviews) | N |
| | 4. Training on crisis intervention for CIT officers is consistent with approved policies. | Y |
| | 5. 100% of officers assigned to CIT are trained and certified in crisis intervention. | Y |
| | 6. 100% of all officers assigned to CIT meet eligibility requirements. | Y |
| | 7. 95% of responses to incidents involving persons in mental health crisis are within policy. | N |
| | 8. The incident tracking system tracks all incidents involving persons in mental health crisis and the disposition of the incident. Data analyzed as part of PRPB's annual report on use of force as required by policy. | N |
| Comments & Recommendations | The CIT training has not expanded beyond the pilot program conducted in Arecibo. | |

| Paragraph 57 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| Paragraph Language | PRPD shall train PRPD field operations unit officers in the CIT program and shall ensure that CIT-trained officers are assigned to each shift in each police region. PRPD shall provide crisis intervention training to all dispatchers to enable them to identify calls for service that involve behavioral or mental health crisis events. | |
| Compliance Target(s) | **Compliance Target** | **Status** |
| | 1. 95% of shifts have at least one CIT-trained and certified officer. | N |
| | 2. Training on crisis intervention for call dispatchers is consistent with approved policies. | Y |
| | 3. 95% of call takers are trained and certified in crisis intervention (or are scheduled for training, in the case of mid-year reviews) | N |
| Comments & Recommendations | The CIT training has not expanded beyond the pilot program conducted in Arecibo. | |

## Searches and Seizures

| Paragraph 58 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| Paragraph Language | PRPD shall ensure that all investigatory stops, searches, and arrests are conducted in accordance with the rights, privileges, or immunities secured or protected by the Constitution and laws of the United States and the Commonwealth of Puerto Rico. PRPD shall ensure that investigatory stops, searches, and arrests are conducted as part of effective crime prevention strategies that are consistent with community priorities for enforcement. | |

CMR-3 | March 2021

| Compliance Target(s) | Compliance is determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 59-79, and (2) the results of outcome assessments, pursuant to Paragraph 243. |
|---|---|
| Comments & Recommendations | PRPB has ensured that all its policies regarding arrests, such as General Orders 600-615, 600-612, as well policies 600-601 through 600-605, dealing with use of force, mandate that officers comply with the rights of citizens secured by the U.S. and Puerto Rico Constitutions and laws. However, PRPB is prohibited by statue to conduct investigatory detentions, or Terry Stops, as it is generally known. Therefore, no such data is available for these types of stops at this time. Going forward, the Monitor is analyzing other stops made on probable, such as traffic stops. PRPB must start gathering and analyzing this information and submitting it to the Monitor for analysis and compliance determination. |

| Paragraph 59 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Partially Compliant |
| Paragraph Language | PRPD shall develop policies and procedures that comply with applicable law and comport with generally accepted policing practices on stops, searches, and arrests; provide training; ensure consistent supervision; and hold officers accountable for complying with applicable law and policy. PRPD policies shall define all terms clearly and provide guidance on the facts and circumstances that should be considered in initiating, conducting, terminating, and expanding an investigatory stop, detention, or search. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | The policy requirements of this paragraph is assessed with Paragraphs 65, 72, 74, and 78. | N |
| | Training is assessed as part of Section E (¶¶ 78-79) on Training on Stops, Searches, and Seizures. | Y |
| | Implementation is assessed as part of the compliance reviews for Sections B (¶¶ 60-64), C (¶¶ 65-73), and D (¶¶ 74-77) on Investigatory Stops and Searches, Arrests, and Searches, respectively. | N |
| Comments & Recommendations | PRPB created General Orders 600-615 on Arrests and Summons and 600-612 on Searches and Seizures. G.O. 600-15 was last reviewed by the Monitor in September 2020, and 600-612 is due for revision in 2021. Both of these general orders clearly guide officers on conducting lawful searches and arrests and state the potential consequences for violating these policies and laws of the Commonwealth. PRPB reported (PRPB Training Certificate # SAEA-1-17-122) that virtual training in Search and Seizure to re-certify supervisors was offered between July 10th and September 30, 2020. PRPB also provided a list of virtual training in Search and Seizures for agents but did not provide a date. In addition, PRPB reported (PRPB Certification # SAEA-1-17-121) that no training in Arrests and Summons took place during this period. The Monitor has not evaluated the training material nor the implementation of these virtual courses. Investigatory stops are not permitted in Puerto Rico. The parties have agreed to assess paragraph 59 based on stops, such as traffic stops, due to probable cause. However, PRPB did not provide the requested data on these stops. | |

| Paragraph 60 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |

CMR-3 | March 2021

| Paragraph Language | PRPD shall develop an Investigatory Stops and Searches Reporting Policy and a system to collect data on all investigatory stops and searches, whether or not they result in an arrest or issuance of a citation. PRPD's stop data collection system shall be subject to the review and approval of the TCA, and shall require officers to document the following: (a) the date, time, location, and duration of the stop and/or search; (b) the reason for the stop and/or search; (c) the subject's apparent race, color, ethnicity or national origin, gender, and age; (d) whether any contraband or evidence was seized, and the nature of the contraband or evidence; and (e) the disposition of the stop, including whether a citation was issued or an arrest made. PRPD shall require that officers submit written reports regarding investigatory stops and searches to their supervisor by end of shift for review. A copy of these reports shall be forwarded to SPR and the Reform Unit for tracking and analysis. | |
|---|---|---|
| Compliance Target(s) | **Compliance Target** | **Status** |
| | 1. 100% of stops and searches are justified based on probable cause. For stops and searches based on a lesser standard or that are otherwise unjustified, PRPB takes corrective and/or disciplinary action. | N |
| | 2. 100% of stops and searches reviewed as part of other areas of the Agreement are based on probable cause. For stops and searches based on a lesser standard or that otherwise unjustified, PRPB takes corrective and/or disciplinary action. | N |
| Comments & Recommendations | PRPB has not developed a system to track and analyze data on stops, regardless whether based on probable cause. | |

| Paragraph 61 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | PRPD's Investigatory Stops and Searches Reporting Policy shall explicitly prohibit the use of boilerplate or conclusory language in all reports. PRPD policies shall also expressly prohibit officers from knowingly using or relying on information known to be materially false or incorrect in effectuating an investigatory stop or detention. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 60. PRPB Search and Seizure policy 600-612 clearly prohibits officers from using boilerplate, conclusory or materially false language (Section III.B.4.b.), and 600-615 Arrests and Summons (Section IV.3.e). However, this Paragraph is rated partial because it is dependent on compliance with Paragraphs 60 through 64, which are at Non-Compliance and Partial Compliance at this time. | |
| Comments & Recommendations | The policy does prohibit officers from using boilerplate or conclusory language in all reports. However, assessment of implementation in conjunction with paragraph 60 demonstrates that PRPB personnel do not fully comply with this policy. | |

| Paragraph 62 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | A supervisor shall review each report on Investigatory Stops and Searches to determine whether the stop or search was within PRPD policy and this Agreement. For any investigatory stop or search deemed to be outside of PRPD policy or this Agreement, the supervisor shall determine if the stop or search: (a) should result in an internal investigation by SPR; (b) indicates a need for additional training, counseling, or any other non-punitive corrective measure for the involved officer; | |

| | |
|---|---|
| | and (c) suggests the need for revising or reformulating agency policy, strategy, tactics, or training. The supervisor shall document on an auditable form those investigatory stops and searches that are unsupported by reasonable suspicion; are in violation of PRPD policy or this Agreement; or that indicate a need for corrective action or review of agency policy, strategy, tactics, or training. The quality of these supervisory reviews shall be taken into account in the supervisor's performance evaluations. |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 60. |
| Comments & Recommendations | Supervisor reviews were missing in a significant number of the stop and search files sampled for assessment. Monitor analyzed 52 out of 79 randomly selected arrest files and 35 out of 51 randomly selected search warrant/consent search files, and found that 42 arrest files and 18 search warrant/consent search files were deemed incomplete as they did not include all the applicable forms required under PRPB's General Order 600-615 (Section V.B.6 "El expediente de arresto…"), such as the booking sheet (Egress/Ingress PPR-82 or PPR-631.1), Property Inventory (PPR-126 or PPR-636.1) and Arrest Review by Supervisor (PPR-880 or PPR-615.8), among others. |

| Paragraph 63 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant. |
| Paragraph Language | A command-level officer or official shall review, in writing, all supervisory auditable forms related to investigatory stops and detentions. The commander's review shall be completed within three business days of receiving the document reporting the event. The commander shall evaluate the corrective action and recommendations in the supervisor's written report and ensure that all appropriate corrective action is taken, including referring the incident for administrative or criminal investigation. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 60. | |
| Comments & Recommendations | Reviews by command-level officers were missing in a significant number of the stop and search files sampled for assessment. PRPB is not tracking investigatory stops and detentions based on reasonable suspicion or probable cause. | |

| Paragraph 64 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | At least annually, PRPD shall analyze investigatory stop and search data to determine significant trends, identify and correct deficiencies revealed by this analysis, and document its findings in a public report. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 60. | |
| Comments & Recommendations | The Monitor is unaware of any publication of reports that analyze stop and search data for significant trends. | |

| Paragraph 65 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually with respect to Data Source #1. Bi- annually for all others. | Partially Compliant |
| Paragraph Language | PRPD shall revise its policies on arrests to ensure that they comply with applicable law and comport with generally accepted policing practices. | |

CMR-3 | March 2021

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Policies and forms incorporate all of the requirements of Paragraphs 59, 65-71. | Y |
| | 2. 95% of selected arrests are notified and reviewed by supervisors in accordance with approved policies. | N |
| | 3. Officers transport arrestees and complete required arrest documentation in accordance with approved policies in 95% of selected arrests. | N |
| | 4a. Supervisors respond to injuries and complaints of pain by detainees or arrestees in accordance with approved policies in 95% of selected arrests. | N |
| | 4b-e. Supervisors review, document, and take corrective action, including making referrals when necessary, as required by approved policies in 95% of selected arrests. | N |
| | 5. Unit commanders review, document, and take corrective action, including making referrals when necessary, as required by approved policies in 95% of selected arrests. | N |
| Comments & Recommendations | Very few, if any arrest files are completed with all required forms. The booking sheet in particular is frequently missing from arrest files. For example, 12 out of 35 search warrants inspected did not contain PRPB's PPR-631.1 Egress/Ingress form, which is essential because in this form supervisors must report whether they visually inspected the arrestee for injuries and steps taken, if any, among other things. In addition, the Monitor analyzed 52 out of 79 randomly selected arrest files and 35 out of 51 randomly selected search warrant/consent search files, and found that 42 arrest files and 18 search warrant/consent search files were deemed incomplete as they did not include all the applicable forms required under PRPB's General Order 600-615 (Section V.B.6 "El expediente de arresto…"), such as the booking sheet (Egress/Ingress PPR-82 or PPR-631.1), Property Inventory (PPR-126 or PPR-636.1) and Arrest Review by Supervisor (PPR-880 or PPR-615.8), among others. | |

| Paragraph 66 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| Paragraph Language | PRPD shall require that officers notify the communications command center and a supervisor immediately after an arrest, or as soon as practicable. For felony arrests, or an arrest for obstructing or resisting an officer, PRPD shall require a field supervisor to respond to the scene of the incident and approve the officer's arrest determination, based on the existence of probable cause. If an officer's arrest determination is insufficient, or otherwise unjustified, the supervisor may, if necessary, interview the subject. The supervisor shall take appropriate action to address violations or deficiencies in an officer's arrest determination, including releasing the subject, recommending non-punitive corrective action for the involved officer, or referring the incident for administrative or criminal investigation. If a supervisor is unavailable to respond to the scene or there are exigent circumstances, the officer shall notify his or her immediate supervisor over a recorded channel of the elements of probable cause for the felony arrest or arrest for obstructing or resisting an officer. If the officer's immediate supervisor is unavailable, the officer shall notify any field supervisor over a recorded channel of | |

CMR-3 | March 2021

| | the elements of probable cause for the felony arrest or arrest for obstructing or resisting an officer. |
|---|---|
| Compliance Target(s) | This Paragraph is assessed with Paragraph 65.<br>In 2 of the 4 Obstruction of Justice arrest reports (2020-7-700-00682 and 2020-4-199-00493) reviewed by the Monitor, the supervisor noted that he/she did not respond to the scene and failed to state the reason. In complaint # 2020-7-700-00682 the officers also failed to properly document probable cause in the police report and the supervisor did not address it in the arrest evaluation report. |
| Comments & Recommendations | |

| Paragraph 67 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | When transporting an arrestee, officers shall take the safest and most direct route to the booking location. PRPD policy shall require that officers notify the communications command center of the starting and ending mileage on the transporting vehicle, as well as the gender, race, ethnicity, national origin, and apparent age of the arrestee. The officer shall complete all written arrest forms and booking recommendations at the time an arrestee is presented at any PRPD precinct, station, or specialized unit for booking. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 65. | |
| Comments & Recommendations | • The Monitor seldom sees information in arrest files regarding the route taken to the booking location. In examining police reports, the Monitor found no indication as to what route the officers took when transporting an arrestee, nor the starting and ending mileage of the vehicle. Due to the Monitor complying with CDC guidelines regarding the COVID-19 pandemic, the Monitor was not able to perform site visits to PRPB and inspect communication command center recordings for evidence of this notification.<br>• PR law does not allow PRPD officers to collect information on gender, race, ethnicity, national origin, and apparent age of the arrestee. | |

| Paragraph 68 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| Paragraph Language | At the time of presentment at a PRPD precinct, station, or specialized unit, a watch commander or supervisor shall visually inspect each detainee or arrestee for injury, interview the detainee or arrestee for complaints of pain, and ensure that the detainee or arrestee receives medical attention from an appropriate medical provider, as necessary. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 65. | |
| Comments & Recommendations | Though this information is consistently included on booking sheets, a significant number of arrest files lack a booking sheet. 12 out of 35 search warrants inspected did not contain PRPB's PPR-631.1 Egress/Ingress form, which is essential because in this form supervisors must report whether they visually inspected the arrestee for injuries and steps taken, if any, among other things. | |

CMR-3 | March 2021

| Paragraph 69 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | PRPD shall require that all booking recommendations be personally reviewed and approved in writing in an auditable form by a supervisor as to appropriateness, legality, and conformance with PRPD policies within 12 hours of the arrest, absent exceptional circumstances. Supervisors shall also examine arrest reports and forms related to the arrest for boilerplate or conclusory language, inconsistent information, lack of articulation of the legal basis for the action, or other indicia that the information in the reports or forms is not authentic or correct. Supervisors shall evaluate each incident in which a person is arrested for interfering with a police officer, resisting arrest, assault on a police officer, or other similar charge to determine whether the incident raises any issue or concern regarding the basis for the arrest or implications on training, policies, or tactics. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 65. | |
| Comments & Recommendations | A significant number of arrest files lack key forms. The Monitor analyzed 52 out of 79 randomly selected arrest files and 35 out of 51 randomly selected search warrant/consent search files, and found that 42 arrest files and 18 search warrant/consent search files were deemed incomplete as they did not include all the applicable forms required under PRPB's General Order 600-615 (Section V.B.6 "El expediente de arresto…"), such as the booking sheet (Egress/Ingress PPR-82 or PPR-631.1), Property Inventory (PPR-126 or PPR-636.1) and Arrest Review by Supervisor (PPR-880 or PPR-615.8), In several cases officers failed to properly document probable cause, yet supervisors reviewed and approved the arrest on PPR-615.8. Most supervisors simply wrote that they spoke to the officer (s) and believed he/she had proper probable cause for the arrest. The District Commanders simply agreed with the supervisor and did not pursue the issue. | |

| Paragraph 70 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | As part of the supervisory review, the supervisor shall document on an auditable form those arrests that are unsupported by probable cause, are in violation of PRPD policy or this Agreement, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or training. The quality of these supervisory reviews shall be taken into account in the supervisor's performance evaluations. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 65. | |
| Comments & Recommendations | PRPB submitted to the Monitor signed confirmation from each Area Commander stating that there were no reports during this period from supervisor's regarding documentation of arrests unsupported by probable cause or in violation of PRPB policies. | |

| Paragraph 71 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | A command-level officer or official shall review, in writing, all auditable forms related to arrests. The commander's review shall be completed within seven days of receiving the document reporting the event. The commander shall evaluate the corrective action and recommendations in the supervisor's written report and | |

| | |
|---|---|
| | ensure that all appropriate corrective action is taken. Whenever a reviewing supervisor or command-level officer finds evidence of an arrest indicating apparent misconduct or apparent criminal conduct by an officer, he or she shall immediately notify his or her supervisor for referral to the appropriate investigating unit or the PRDOJ. The Superintendent shall be notified of the referral. |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 65. |
| Comments & Recommendations | PRPB submitted to the Monitor signed confirmation from each Area Commander stating that there were no reports during this period from supervisor's regarding documentation of arrests unsupported by probable cause or in violation of PRPB policies. |

| Paragraph 72 | Assessment Frequency | | Overall Compliance Status |
|---|---|---|---|
| | Annually with respect to Data Source #1. Bi- annually for all others. | | Not Compliant |
| Paragraph Language | PRPD shall require officers to provide written receipts to individuals whenever property is seized from the individuals. PRPD shall establish procedures that are based on generally accepted policing practices to ensure that all seized property is properly stored and returned, as appropriate. | | |
| Compliance Target(s) | Compliance Target | | Status |
| | 1. Policies incorporate all of the requirements of Paragraphs 59 and 72. | | Y |
| | 2. Property is seized, stored, and returned, as appropriate, in accordance with approved policies in 95% of selected arrests. | | N |
| | 3. PRPB takes disciplinary and/or corrective action in response to all sustained complaints where an officer fails to issue a receipt, store, or return seized property in accordance with approved policies. | | N |
| Comments & Recommendations | • More than 50% of sampled arrest files were missing Property Inventory form PPR 636.1. 27 of 52 arrest files analyzed were missing the form PPR-636.1. Also, all police reports in these cases do not mention whether the arrestee had personal property on his/her person, making it difficult for the Monitor to make a determination.<br><br>• PRPB provided no data on disciplinary or corrective action taken by supervisors in response to these failings. | | |

| Paragraph 73 | Assessment Frequency | | Overall Compliance Status |
|---|---|---|---|
| | Annually | | Not Compliant |
| Paragraph Language | PRPD shall develop a protocol to seek formal feedback from the prosecutor's office, the public defender's office, and Commonwealth judges on a regular basis regarding the quality of PRPD investigations, arrests, court testimony, and indicia of misconduct and to make operational and policy changes based upon this feedback. In addition, PRPD shall refer to SPR for investigation any information regarding specific incidents of possible officer misconduct received through this protocol. | | |
| Compliance Target(s) | Compliance Target | | Status |
| | 1. Interagency agreements and policies incorporate the requirements of the paragraph. | | Y |

| | | |
|---|---|---|
| 2. PRPB officers seek and obtain feedback from criminal justice agencies and entities as required by approved agreements and policies. | | N |
| 3. 100% of alleged misconduct noted in protocol documentation corresponds with a SARP investigation. | | N |
| **Comments & Recommendations** | PRPB provided no information on cooperation among criminal justice agencies in the period of review for CMR-3. PRPB submitted to the Monitor Certification # MON-OR-CMR3-52, where it states that no meetings were held to seek feedback from judicial sector partners due to COVID-19. PRPB further stated that the Protocol was signed and disseminated to all pertaining judicial agencies and Department commanders. | |

| **Paragraph 74** | **Assessment Frequency** | **Overall Compliance Status** |
|---|---|---|
| | Annually with respect to Data Source #1. Bi- annually for all others. | Partially Compliant |
| **Paragraph Language** | PRPD shall revise its policies on searches to ensure that they comply with applicable law and comport with generally accepted policing practices. PRPD policies shall define all terms clearly and specify procedures for executing search warrants and warrantless searches, including handling, recording, and taking custody of seized property or evidence. | |
| **Compliance Target(s)** | **Compliance Target** | **Status** |
| | 1. Policies and forms incorporate all of the requirements of Paragraphs 59, 74-77. | Y |
| | 2. Searches are conducted and reviewed by supervisors in accordance with approved policies in 95% of selected searches. | N |
| **Comments & Recommendations** | PRPB created General Orders 600-615 on Arrests and Summons and 600-612 on Searches and Seizures and have submitted them to the Monitor for review on a regular basis. G.O. 600-15 was last reviewed by the Monitor in September 2020, and 600-612 is due for review in 2021. Both of these General Orders clearly guide officers on conducting lawful searches and arrests and state the potential consequences for violating these policies, and the laws and Constitution of the Commonwealth and the U.S. G.O. 600-612 comports to generally accepted policing practice. PRPB reported (PRPB Training Certificate # SAEA-1-17-122) that virtual training in Search and Seizure to re-certify all supervisors was offered between July 10th and September 30, 2020. PRPB also provided a list of virtual training in Search and Seizures for agents but did not provide a date. The Monitor has not evaluated the training material nor the implementation of these virtual courses. | |

| **Paragraph 75** | **Assessment Frequency** | **Overall Compliance Status** |
|---|---|---|
| | Bi-annually | Partially Compliant |
| **Paragraph Language** | PRPD shall require that a supervisor review and approve in writing each request for a search or arrest warrant, including each affidavit or declaration before it is filed by an officer in support of a warrant application, for appropriateness, legality, and conformance with PRPD policy. | |
| **Compliance Target(s)** | This Paragraph is assessed with Paragraph 74. | |
| **Comments & Recommendations** | Supervisors generally provide written proof of their approval for officer's application for search warrant. However, of the 35 search warrant files reviewed, 4 | |

did not include supervisor's written approval for the application, thus the Monitor was unable to determine whether a review was conducted.

| Paragraph 76 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually with respect to Data Source #2, and Annually for all others. | Not Compliant |
| Paragraph Language | PRPD shall track each search warrant, the case file where a copy of such warrant is maintained, the officer who applied for the warrant, and each supervisor who reviewed the application for a search warrant. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Tracking system accounts for all of the elements in the paragraph and outcome measures as required by Paragraph 243. | N |
| | 2. All search warrants are tracked in the tracking system. | N |
| | 3. Documentation on search warrants is maintained in accordance with approved policies in 95% of precincts and units visited. | N |
| Comments & Recommendations | PRPB has not submitted evidence to the Monitor of the existence of a search warrant tracking system. | |

| Paragraph 77 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | PRPD shall require officers to obtain and document consent from an individual who consents to a voluntary search of his/her person or vehicle when the search is conducted as part of a routine pedestrian or vehicle stop, unless a non-consensual search is otherwise legally permissible. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 74. | |
| Comments & Recommendations | PRPB requires officers to document consent searches on PPR-612.1, as per G.O. 600-612. The consent searches sampled for assessment did not provide enough evidence to establish probable cause. More than half of the searches assessed did not include a witness signature form. Of the 5 consent search files inspected, all five did not provide enough written supporting evidence (on police report PPR-621.1) to establish probable cause. In addition, 3 of the 5 PPR-612.1's included were missing the witness signature, and one file contained the old obsolete Consent Search form PPR-879. | |

| Paragraph 78 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Partially Compliant |
| Paragraph Language | PRPD shall train all PRPD officers on PRPD's stop, search, and seizure policies. Thereafter, PRPD shall provide all PRPD officers with training at least every two years for the first four years of this Agreement, and annually thereafter. PRPD shall also provide training on stops, searches, and seizures as necessary, based on developments in applicable law and PRPD policy. PRPD shall coordinate and review all policies and training on stops, searches, and seizures to ensure quality, consistency, and compliance with the Constitution and laws of the United States and the Commonwealth of Puerto Rico, this Agreement, and PRPD policy. PRPD shall conduct regular subsequent reviews of this training at least annually and report its findings. PRPD's training program shall include the following topics: a) PRPD policies and requirements in this Agreement regarding stops, searches, and | |

seizures;
b) the Fourth Amendment and related law;
c) examples of scenarios faced by PRPD officers and interactive exercises that illustrate proper police practices, methods, and tactics in conducting consensual field interviews, investigatory stops, consent and non-consent searches, and arrests. These training scenarios shall address the difference between various police contacts by the scope and level of police intrusion; between probable cause, reasonable suspicion and mere speculation; and voluntary consent from mere acquiescence to police authority; and
d) comprehensive testing that shows complete understanding of rules and regulations.

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Training on stops, searches and seizures is consistent with approved policies and the requirements of Paragraphs 59, 65-78. | N |
| | 2. 95% of officers are trained and certified in stops, searches, and seizures (or scheduled for training, in the case of mid-year reviews). | Y |
| | 3. 95% of relevant trainings are reviewed at least once a year. | N |
| Comments & Recommendations | The Monitor's Office has not been provided with materials on the virtual trainings that PRPB is conducting in lieu of in-person training during the COVID-19 pandemic. PRPB reported (PRPB Training Certificate # SAEA-1-17-122) that virtual training in Search and Seizure to re-certify all supervisors was offered between July 10th and September 30, 2020. PRPB also provided a list of virtual training in Search and Seizures for agents but did not provide a date for the training or the certification. The Monitor has not evaluated the training material nor the implementation of these virtual courses. | |

| Paragraph 79 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Partially Compliant |
| Paragraph Language | PRPD shall train all supervisors and command officers on PRPD's stop, search, and seizure policies. Thereafter, PRPD shall provide all supervisors and command officers with training on reviewing subordinates' stops, searches, and seizures at least annually and, as necessary, based on developments in applicable law and PRPD policy. PRPD shall coordinate and review all policies and training on stops, searches, and seizures to ensure quality, consistency, and compliance with the Constitution and laws of the United States and the Commonwealth of Puerto Rico, this Agreement, and PRPD policy. PRPD shall conduct regular subsequent reviews of this training at least annually and report its findings. PRPD's training on stops, searches, and seizures for supervisors and command officers shall include the following topics:
a) requesting medical services and questioning detainees and arrestees for pain or injury;
b) report writing, including reviewing reports on stops, searches, and seizures for completeness, accuracy, and quality, including recognizing boilerplate language and how to document discrepancies;
c) assessing the legality and appropriateness of a stop, search, or seizure;
d) legal standards governing searches and seizures, including legal standards and requirements for criminal accountability, administrative accountability, and performance improvement related to tactics, training, equipment, and policy sufficiency; and | |

CMR-3 | March 2021

| | e) recommending and administering proper discipline and non-punitive corrective action related to searches and seizures. | |
|---|---|---|
| Compliance Target(s) | **Compliance Target** | **Status** |
| | 1. Training on stops, searches, and seizures is consistent with approved policies and the requirements of Paragraphs 59, 65-77, and 79. | N |
| | 2. 95% of supervisors and commanders are trained and certified in stops, searches, and seizures (or scheduled for training, in the case of mid-year reviews). | Y |
| | 3. 95% of relevant trainings are reviewed at least once a year. | Y |
| Comments & Recommendations | The Monitor's Office has not been provided with materials on the virtual trainings that PRPB is conducting in lieu of in-person training during the COVID-19 pandemic. PRPB reported (PRPB Training Certificate # SAEA-1-17-122) that virtual training in Search and Seizure to re-certify all supervisors was offered between July 10th and September 30, 2020. PRPB also provided a list of virtual training in Search and Seizures for agents but did not provide a date for the training or the certification. The Monitor has not evaluated the training material nor the implementation of these virtual courses. | |

## Equal Protection and Non-Discrimination

| Paragraph 80 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Not Compliant |
| Paragraph Language | PRPD shall ensure that police services are delivered equitably, respectfully, and free of unlawful bias, in a manner that promotes broad community engagement and supports effective crime prevention. In conducting its activities, PRPD shall ensure that members of the public receive equal protection of the law, without bias based on race, color, ethnicity, national origin, religion, gender, disability, sexual orientation, gender identity, gender expression, or political ideology or affiliation, and in accordance with the rights, privileges, or immunities secured or protected by the Constitution and laws of the United States and the Commonwealth of Puerto Rico. | |
| Compliance Target(s) | Compliance is determined on two separate but inter-dependent bases: (1) the implementation of Paragraphs 81 - 100, and (2) the results of outcome assessments, pursuant to Paragraph 243 of the Agreement. | |
| Comments & Recommendations | Summary of findings related to paragraph 80 and determining a compliance status could be achieved if data requested had been made available. The minimal data that was received fully supports the overall monitor's rating as not compliant. Data received included listings and certifications, however no training curricula and materials, full department records, fully executed personnel evaluations, policy implementation evidence, interviews, and data systems utilized were submitted to the Monitor's Office for review. | |

| Paragraph 81 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Partially Compliant |
| Paragraph Language | PRPD shall develop policies and procedures that comply with applicable law and comport with generally accepted policing practices on bias-free policing; provide | |

CMR-3 | March 2021

| | training as described in this Agreement; ensure consistent supervision; and hold officers accountable for complying with applicable law and policy. | |
|---|---|---|
| **Compliance Target(s)** | **Compliance Target** | **Status** |
| | 1. Policies and procedures comply with applicable law and comport with generally accepted policing practices on bias-free policing. | Y |
| | 2. Trainings comply with applicable law and comport with generally accepted policing practices on bias- free policing. | Y |
| | 3. 95% of reviewed supervisory and field records indicate that officers are supervised consistently. | N |
| **Comments & Recommendations** | Although the Policy has been provided and reviewed by the Monitor's Office, the implementation of this policy has not been fulfilled. Virtual training (8 hours) was conducted on Interactions with Transgender and Transexual People (VITT 3081). However, no supervisory and field notes were submitted to the Monitor's Office for review to assess officer's accountability. | |

| **Paragraph 82** | **Assessment Frequency** | **Overall Compliance Status** |
|---|---|---|
| | Annually | Not Compliant |
| **Paragraph Language** | PRPD shall revise its complaint classification policies to effectively capture and track civilian complaints alleging discriminatory policing, even if the complainant does not specifically label the misconduct as such. | |
| **Compliance Target(s)** | **Compliance Target** | **Status** |
| | 1. PRPB classification policies comply with the requirements of the Paragraph. | Y |
| | 2. PRPB classifies and tracks allegations of discriminatory policing in accordance with policy and this Paragraph. | N |
| **Comments & Recommendations** | PRPB provided no evidence that policy implementation has been fulfilled. | |

| **Paragraph 83** | **Assessment Frequency** | **Overall Compliance Status** |
|---|---|---|
| | Annually | Partially Compliant |
| **Paragraph Language** | PRPD shall revise all documentation produced in relation to officer and civilian interactions, including documentation related to arrests, traffic stops, investigatory stops and detentions, searches, property seizures, and civilian complaints, so that it permits officers to accurately record the demographic information of all involved persons, including alleged subjects and victims. | |
| **Compliance Target(s)** | **Compliance Target** | **Status** |
| | 1. All documentation produced in relation to officer and civilian interactions permits officers to accurately record the demographic information of all involved persons | N |
| **Comments & Recommendations** | Data received did not include documentation related to searches and civilian complaints. Therefore, not all documentation can be certified to compliance target. The Monitor's Office is aware that PRPB faces legal challenges to tracking this data under the PR Constitution. However, PRPB did not provide any information on the steps they are taking to address these challenges. | |

| **Paragraph 84** | **Assessment Frequency** | **Overall Compliance Status** |
|---|---|---|

CMR-3 | March 2021

|  | Bi-annually for Data Sources #3, #4, and #11. Annually for the other Data Sources. | Not Compliant |
|---|---|---|
| **Paragraph Language** | PRPD shall incorporate concrete requirements regarding bias-free policing and equal protection into its hiring, promotion, and performance assessment processes, including giving significant weight to an individual's documented history of bias-free policing. PRPD will comply with the non-discrimination requirements of Title VII of the Civil Rights Act of 1964, as amended. | |

| **Compliance Target(s)** | **Compliance Target** | **Status** |
|---|---|---|
| | 1. PRPB policies and procedures regarding hiring process comply with the requirements of the Paragraph. | Y |
| | 2. Hiring process trainings are consistent with bias-free policing and equal protection provisions of approved policies. | Y |
| | 3. 95% of sampled personnel are trained and certified in all policies related to the civilian complaint program (or scheduled for training, in the case of mid-year reviews). | N |
| | 4. 95% of reviewed candidates were selected consistent with approved policies regarding bias-free policing and equal protection. | N |
| | 5. PRPB policies and procedures regarding promotion assessment process comply with the requirements of the Paragraph. | Y |
| | 6. Promotion assessment trainings are consistent with bias-free policing and equal protection provisions of approved policies. | N |
| | 7. 95% of sampled personnel are trained and certified in all policies related to the civilian complaint program (or scheduled for training, in the case of mid-year reviews). | N |
| | 8. 95% of the reviewed promotions were awarded consistent with approved policies regarding bias-free policing and equal protection. | N |
| | 9. PRPB policies and procedures regarding performance assessment comply with the requirements of the Paragraph. | Y |
| | 10. Performance assessment trainings are consistent with bias-free policing and equal protection provisions of approved policies. | N |
| | 11. 95% of sampled personnel are trained and certified in all policies related to performance evaluations (or scheduled for training, in the case of mid-year reviews). | N |
| | 12. 95% of performance evaluations reviewed are consistent with approved policies regarding bias-free policing and equal protection. | N |
| **Comments & Recommendations** | <ul><li>Although the Policy has been provided and reviewed by the Monitor's Office, the Monitor's Office has not seen sufficient evidence of compliance on training or implementation.</li><li>Aside from data on select trainings, PRPB did not provide training records requested by the Monitor's Office for a random sample of PRPB personnel.</li><li>No promotions were made during this evaluation period as noted by the certificate submitted by PRPB. PRPB also provided certification that 13 Agents were trained on Recruitment of Aspiring Cadets; however, no curricula were submitted to the Monitor's Office to evaluate. The training was conducted on September 21, 2020 and was certified December 28, 2020. Performance Assessments data (100 evaluations) was received, however, in review of the performance assessment documentation, the evaluations are not fully implemented. In reviewing these documents, the Monitor notes that the</li></ul> | |

ratings scores categories are filled out with generally high ratings in each
evaluation. The sections in the evaluation for professional development and
growth are left blank. Only three evaluations had one notation. Most of the
evaluations did not include recognition, recommendations on administration,
or recommendations for goals.

| Paragraph 85 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually as to Data Sources #1, #2 and #4. Bi-annually for the remaining Data Sources. | Not Compliant |

| Paragraph Language | PRPD shall use the National Incident Based Reporting System ("NIBRS") to collect and report crime data. | |
|---|---|---|
| Compliance Target(s) | **Compliance Target** | **Status** |
| | 1. Policies, procedures, and forms/modules incorporate the requirements of the Paragraph. | Y |
| | 2. NIBRS training are consistent with approved policies and procedures. | N |
| | 3. 95% of sampled PRPB members are trained and certified in NIBRS. | N |
| | 4. PRPB is using the NIBRS to collect and report crime data. | N |
| Comments & Recommendations | • Aside from data on select trainings, PRPB did not provide training records requested by the Monitor's Office for a random sample of PRPB personnel.<br>• Implementation is assessed annually, and was assessed as non-compliant for CMR-2. | |

| Paragraph 86 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually for Data Source #3. Annually for the remaining Data Sources. | Not Compliant |

| Paragraph Language | PRPD shall collect accurate and reliable data on hate crimes on an ongoing basis and shall submit the data to the Federal Bureau of Investigation ("FBI") for analysis and publication in the FBI's Hate Crimes Statistics report in accordance with FBI submission requirements. | |
|---|---|---|
| Compliance Target(s) | **Compliance Target** | **Status** |
| | 1. Policies on criminal investigations incorporate all of the requirements of this Paragraph. | Y |
| | 2. Criminal investigation trainings are consistent with approved policies. | N |
| | 3. 95% of sampled personnel are trained and certified in all policies related to identifying, collecting, and reporting hate crimes (or scheduled for training, in the case of mid-year reviews). | N |
| | 4. PRPB notifies the FBI of all identified instances of hate crimes. | N |
| | 5. 95% of investigations of hate crimes accurately identify and report hate crimes. | N |
| Comments & Recommendations | • Aside from data on select trainings, PRPB did not provide training records requested by the Monitor's Office for a random sample of PRPB personnel.<br>• Implementation is assessed annually, and was assessed as non-compliant for CMR-2. | |

CMR-3 | March 2021

| Paragraph 87 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Deferred |
| Paragraph Language | PRPD shall apply and administer all programs, initiatives, and activities without discriminating on the basis of race, color, ethnicity, national origin, religion, gender, disability, sexual orientation, gender identity, gender expression, or political ideology or affiliation. PRPD shall develop policies and practices to prohibit selective enforcement or non-enforcement of the law based on these characteristics. These policies and practices shall comply with applicable law and comport with generally accepted policing practice. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. 95% of PRPB programs, initiatives, and activities conform to the requirements of the Paragraph. | NA |
| | 2. 95% of selected PRPB programs, initiatives, and activities are consistent with approved policies regarding bias-free policing and equal protection. | NA |
| Comments & Recommendations | The Monitor's Office did not request or receive all data required to assess compliance on this paragraph. | |

| Paragraph 88 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually as to Data Sources #1, #2 and #4. Bi-annually for the remaining Data | Partially Compliant |
| Paragraph Language | PRPD shall develop policies to provide all individuals within the Commonwealth with police services in a non-discriminatory fashion in order to build and preserve trust among community members and more effectively prevent and solve crime. As part of these efforts, PRPD shall seek the assistance of community advocates in widely disseminating to the public its written policies on immigration-related laws. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. PRPB policies complied with the requirements of the Paragraph. | Y |
| | 2. Trainings on discrimination free policing are consistent with approved policies. | Y |
| | 3. 95% of sampled PRPB members are trained and certified in discrimination free policing. | N |
| | 4. Pertinent policies on pertinent immigration-related law were widely disseminated to the public. | Y |
| Comments & Recommendations | • Aside from data on select trainings, PRPB did not provide training records requested by the Monitor's Office for a random sample of PRPB personnel.<br>• Compliance on implementation is assessed annually, and was rated as substantially compliant in CMR-2. | |

| Paragraph 89 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually for Data Sources #1 and #2. Bi-annually for all remaining Data Sources. | Partially Compliant |
| Paragraph Language | PRPD shall develop a specific policy to guide officers' interactions with transgender or transsexual individuals that addresses gender identification, gender expression, transportation, processing, housing, and medical treatment. | |
| | Compliance Target | Status |

CMR-3 | March 2021

| Compliance Target(s) | 1. PRPB policies guide officer interactions with transgender or transsexual individuals as required by the Paragraph. | Y |
|---|---|---|
| | 2. PRPB trainings on interactions with transgender or transsexual individuals are consistent with approved policies. | Y |
| | 3. 95% of sampled PRPB members are trained and certified in policies regarding interactions with transgender or transsexual individuals. | N |
| | 4. 95% of reviewed PRPB reports suggest compliance with PRPD policies regarding interactions with transgender or transsexual individuals. | N |
| Comments & Recommendations | • Aside from data on select trainings, PRPB did not provide training records requested by the Monitor's Office for a random sample of PRPB personnel.<br>• PRPB did not submit the data necessary for the Monitor's Office to determine implementation. PRPB has expanded a policy to conduct their activities in such a way as to protect all persons equally and to not discriminate. This policy extends to the LBGTQ (LGBTT) community and had been updated in the past year. However, no implementation of the policy has been conducted or explained with the Monitor's Office. This update has been reflected in the new iteration of the relevant course, Virtual Training on Interactions with Transgender and Transsexual People (VITT 3081). | |

| Paragraph 90 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually for Data Source #5. Annually for the remaining Data Sources. | Not Compliant |
| Paragraph Language | PRPD shall provide all PRPD officers with training on biased-free policing at least every two years for the first four years of this Agreement, and annually thereafter. PRPD shall also provide training on biased-free policing as necessary, based on developments in applicable law and PRPD policy. PRPD's training program shall include the following topics:<br>a) PRPD policies and requirements in this Agreement regarding biased-free policing;<br>b) community perspectives of discriminatory policing;<br>c) constitutional and other legal requirements related to equal protection and unlawful discrimination;<br>d) the protection of civil rights as a central part of the police mission;<br>e) arbitrary classifications and stereotyping based on age, race, color, ethnicity, national origin, religion, gender, disability, sexual orientation, gender identity, gender expression and political ideology or affiliation;<br>f) interacting with diverse populations, including persons who are homeless and economically disadvantaged;<br>g) identification of key decision points where prohibited discrimination can take effect at both the incident and operational planning levels;<br>h) methods, strategies, and techniques to reduce misunderstanding, conflict, and complaints due to perceived bias or discrimination, including community-oriented policing strategies; and<br>i) comprehensive testing that shows complete understanding of rules and regulations. | |
| Compliance Target(s) | **Compliance Target** | **Status** |
| | 1. PRPB trainings on discrimination free policing are consistent with the requirements of the Paragraph. | Y |

CMR-3 | March 2021

| | | |
|---|---|---|
| 2. 95% of reviewed training records complied with the training frequency requirements of the Paragraph. | | N |
| 3. 95% of reviewed training curriculums complied with the content requirements of the Paragraph. | | N |
| 4. Tests accurately assess an understanding of rules and regulations related biased-free policing. | | Y |
| 5. 95% of sampled PRPB members are trained and certified in bias-free policing. | | N |
| **Comments & Recommendations** | PRPB received a rating of not compliant for Paragraph 90 in CMR-2. Of the five compliance targets for this paragraph, only training records were due for assessment in CMR-3, and PRPB failed to provide sufficient records to reach a determination of compliance. Therefore, PRPB remains not compliant for CMR-3. | |

| Paragraph 91 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Not Compliant |
| **Paragraph Language** | PRPD shall assess its operational programs, initiatives, and activities at least every two years to ensure that they are applied or administered in a manner that guarantees equal protection. As part of its assessment, PRPD shall specifically include an assessment of use of force, motor vehicle and pedestrian stops, arrests, and deployment of STUs. PRPD shall also assess its operations and tactics as part of regulatory inspections, assistance to regulatory agencies, and covert vice activities. PRPD shall base its assessment of programs, initiatives, and activities on accurate, complete, and reliable data, including data contained in the EIS, stop and detention data, use of force analyses, and operational planning and after-action reports. PRPD shall make this assessment publicly available. | |
| **Compliance Target(s)** | Compliance Target | Status |
| | 1. 95% of reviewed programs, initiatives, and activities were assessed by PRPB at least every two years. | N |
| | 2. 95% of reviewed assessments conducted by PRPB included an assessment of use of force, motor vehicle and pedestrian stops, arrests, and deployment of STUs, operations and tactics as part of regulatory inspections, assistance to regulatory agencies, and covert vice activities. | N |
| | 3. 95% of reviewed assessments of program initiatives and activities were based on accurate, complete, and reliable data, as required by the Paragraph. | N |
| | 4. 95% of reviewed assessments were made publicly available by PRPB. | N |
| **Comments & Recommendations** | PRPB did not submit the data necessary for the Monitor's Office to determine implementation. | |

| Paragraph 92 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Deferred |
| **Paragraph Language** | Within five business days, PRPD shall prepare and provide to PRDOJ and the Puerto Rico Department of the Family the preliminary investigation report prepared in response to each allegation of abuse and mistreatment originating in secure juvenile correctional facilities. Such allegations include physical and mental abuse, | |

| | | |
|---|---|---|
| | juvenile on juvenile assaults, staff on juvenile abuse, and excessive use of force by staff. | |
| **Compliance Target(s)** | **Compliance Target** | **Status** |
| | All allegations of abuse and mistreatment originating in secure correctional facilities are timely reported to the PRDOJ and the PR Department of the Family. | N |
| **Comments & Recommendations** | The Monitor's Office did not request or receive all data required to assess compliance on this paragraph. | |

Paragraphs 93-100 were not scheduled for assessment in CMR-3.

## Recruitment, Selection, and Hiring

Paragraphs 101-108 were not scheduled for assessment in CMR-3.

## Policies and Procedures

| **Paragraph 109** | **Assessment Frequency** | **Overall Compliance Status** |
|---|---|---|
| | Annually | Partially Compliant |
| **Paragraph Language** | Policies and procedures shall reflect and express PRPD's core values and priorities and provide clear guidance to ensure that officers and civilian employees lawfully, effectively, and ethically serve the community. PRPD shall develop comprehensive and agency- wide policies and procedures to ensure consistency with, and full implementation of, each requirement of this Agreement. These policies and procedures shall define terms clearly, comply with applicable law, and comport with generally accepted policing practice. PRPD shall apply policies uniformly and hold officers accountable for complying with policies and advancing PRPD's core values and priorities. | |
| **Compliance Target(s)** | Compliance is determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 110-116, and (2) the results of outcome assessments, pursuant to Paragraph 243. | |
| **Comments & Recommendations** | PRPB's policies created to date do express core values and require that personnel serve the community lawfully, effectively, and ethically. However, compliance with this paragraph is dependent on the implementation of Paragraphs 110 through 116, which require, in part, an Agency-wide Policies and Procedures Manual, unit-specific manuals, policy development protocols, site visits and personnel interviews, as well as training on information systems and agency communications. As of this date, PRPB has reached only partial compliance in these areas of the Agreement | |

| **Paragraph 110** | **Assessment Frequency** | **Overall Compliance Status** |
|---|---|---|
| | Annually | Not Compliant |
| **Paragraph Language** | PRPD shall develop and publish a department-wide policy and procedure manual that will include all policies, procedures, and regulations governing all administrative and operational aspects of PRPD. The manual shall be organized by subject-matter and indexed for reference. | |
| | **Compliance Target** | **Status** |

CMR-3 | March 2021

| Compliance Target(s) | 1. The Policy and Procedures Manual is complete, organized, and indexed, as required by the Agreement. | N |
| | 2. The current Policy and Procedures Manual is accessible to officers in 95% of selected precincts and units. | N |
| Comments & Recommendations | PRPB has acknowledged that the policy manual is not complete, as the Bureau is in the process of moving to a virtual library. The policy regarding the virtual library, G.O. 400-409, is itself incomplete. | |

| Paragraph 111 | Assessment Frequency | Overall Compliance Status |
| | Annually | Partially Compliant |
| Paragraph Language | PRPD's unit-wide policies and procedures shall be collected in unit-level policy and procedure manuals. PRPD shall develop unit-level policy and procedure manuals for, at a minimum, the following PRPD units or functions: a) Field operations, including patrol, special and tactical operations, field support, special weapons and tactics, canines, supervision task forces, and mass demonstration or event policing; b) SPR, including case and records management, administrative investigations, confidential investigations, parallel criminal and administrative investigations, FIU investigations, audits, and officer drug testing; c) Use of Force Reporting, Investigation, and Review, including both Supervisory and Serious Use of Force Investigations and Review; and In- Custody Death Reviews; d) Criminal investigations, including sub-units assigned to investigate homicides, sexual assaults, domestic violence, narcotics, vice, and illegal firearms; and e) Recruitment and Training, including training provided by UCCJ and in- service training. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Unit-wide policies and procedures are collected in manuals for each of the five areas specified in the Agreement. | N |
| | 2. The current unit-level policy and procedures manual is accessible to officers in 95% of selected precincts and units. | N |
| Comments & Recommendations | PRPB has not developed unit-wide manuals for all units, and some current manuals were not approved by the Monitor's Office. Among those manuals are: Stolen Vehicle Investigation Bureau Investigator's Manual, dated April 7, 2020 and published on April 8, 2020; Sworn Personnel Functions, Duties, and Responsibilities Description Manual dated April 20, 2020 and published on April 21, 2020; and PPR-138.3 Use Manual WEB Edition, Driver's Daily Report, version 1.0 dated April 14, 2020 and published on April 15, 2020. | |

| Paragraph 112 | Assessment Frequency | Overall Compliance Status |
| | Annually | Partially Compliant |
| Paragraph Language | PRPD shall review each newly developed policy after it is issued and revise the policy as necessary to ensure that it provides effective guidance to PRPD personnel. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Policies on policy development incorporate the requirements of the paragraphs. | N |
| | 2. Orientation on policy development protocols is consistent with approved protocols. | N |
| | 3. 95% of policies and procedures due for review during the evaluation period are reviewed and, as necessary, revised. | Y |

CMR-3 | March 2021

| | | |
|---|---|---|
| | 4. Stakeholder comments are reviewed and considered as part of the policy review process. | N |
| | 5. Internal comments and recommendations are reviewed and considered as part of the policy review process. | N |
| | 6. Policies are posted online in a timely manner or otherwise made available to the public as required by approved policies. | Y |
| Comments & Recommendations | According to PRPB Calendar for Policy Review (Document #MON-OR-CMR3-1838) provided to the Monitor this period, PRPB policies are regularly reviewed and revised as necessary by PRPB personnel. However, PRPB has not provided the Monitor with a policy development protocol to ensure paragraph requirements are incorporated. Paragraph 112 also requires that all requirements of Paragraph 113 are incorporated. Paragraph 113 requires that "All PRPD policies, including but not limited to those created pursuant to this Agreement, shall be posted online and otherwise made publicly available in a timely manner". PRPB has created several new policies which it did not submit to the Monitor for review/approval during this period, nor are all policies published online via its website. Some of the policies not submitted to the Monitor for review are: General Order Chapter 100, Section 145, entitled: "Marine Patrol Division" dated April 17, 2020 and published on April 18, 2020; General Order Chapter 600, Section 643, entitled: "Administrative Fines for Violations of Act No. 22-2000" dated and published on May 20, 2020; and General Order Chapter 400, Section 413, entitled: "Firearms Tracing Digital Platform" dated and published on May 27, 2020, among others. | |

| Paragraph 113 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Partially Compliant |
| Paragraph Language | PRPD shall review each policy or procedure created or revised pursuant to this Agreement on an annual basis for the first three years from the Appointment Date or upon notice of a policy deficiency, and biannually thereafter. PRPD will develop a schedule for the biannual review. PRPD shall make revisions as necessary to ensure that policies and procedures remain consistent with this Agreement, generally accepted policing practice, and current law. All PRPD policies, including but not limited to those created pursuant to this Agreement, shall be posted online and otherwise made publicly available in a timely manner. Reasonable exceptions shall apply to policies and procedures that are law enforcement sensitive. | |
| Compliance Target(s) | This Paragraph is assessed together with Paragraph 112. | |
| Comments & Recommendations | PRPB reviews new policies accordingly and revises them as appropriate and has developed a schedule for biennial/annual review (PRPB Calendar for Policy Review, Document #MON-OR-CMR3-1838). However, this Paragraph also requires that "All PRPD policies, including but not limited to those created pursuant to this Agreement, shall be posted online and otherwise made publicly available in a timely manner." As stated above in Paragraph 112, there were several policies that PRPB did not submit to the Monitor for review and approval, and compliance for this paragraph depends on the assessment of Paragraph 112. | |

| Paragraph 114 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Partially Compliant |
| Paragraph Language | Within a reasonable period of time, PRPD shall ensure that all relevant PRPD personnel have received, read, and been trained on all new or amended policies or | |

procedures as necessary to fulfill their role as required by policies and procedures, including the obligation to report any policy or procedure violation.

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Policies incorporate the requirements of the paragraphs. | Y |
| | 2. Training on information systems and agency communications is consistent with approved policies. | N |
| | 3. 95% of selected officers received and opened all agency transmittals with policies that were approved and issued during the evaluation period. | N |
| | 4. 95% of selected precincts or units notified personnel of new or revised policies related to the Agreement that were approved and issued during the evaluation period through monthly academies. | N |
| | 5. 95% of selected personnel received notification of policies advising that they may be subject to discipline, possible criminal prosecution, and/or civil liability for violating PRPB policy. | N |
| Comments & Recommendations | This Paragraph requires that all relevant personnel have received, read, and been trained on all new or revised policies or procedures. PRPB has not provided evidence of training on information systems and agency communications systems to prove receipt, opening, and review of policies and procedures by its personnel. It also requires interviews of relevant personnel (not conducted due to compliance with the CDC Travel Advisory regarding the COVID-19 Pandemic) and document review of materials related to monthly academies, which were not provided. | |

| Paragraph 115 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Partially Compliant |
| Paragraph Language | PRPD shall document that each relevant PRPD officer or other employee has received, read, and been trained appropriately regarding PRPD's policies and procedures. | |
| Compliance Target(s) | This Paragraph is assessed together with Paragraph 114. | |
| Comments & Recommendations | This Paragraph requires training of all officers and employees on relevant PRPB's policies and procedures. While PRPB provided documentation to the Monitor showing it conducted virtual training on some policies, such as G.O. -600-612, it has created new policies and amended others (See comments on Paragraph 112 above), which were not submitted to the Monitor for review and approval prior to PRPB's official approval during this period. Also, compliance in this Paragraph is dependent on Paragraph 114, which is at partial compliance. | |

| Paragraph 116 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Partially Compliant |
| Paragraph Language | PRPD shall advise all officers that taking police action in violation of PRPD policy may subject officers to discipline, possible criminal prosecution, and/or civil liability. | |
| Compliance Target(s) | This Paragraph is assessed together with Paragraph 114. | |
| Comments & Recommendations | Policies created by PRPB warn officers that taking police action in violation of policy may subject them to discipline, criminal prosecution and/or civil liability. However, compliance in this Paragraph also requires compliance with Paragraph 114, which is at partial compliance at this time. | |

CMR-3 | March 2021

## Training

Paragraphs 117-134 were not scheduled for assessment in CMR-3.

## Supervision and Management

| Paragraph 135 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | PRPB shall ensure that an adequate number of qualified first-line supervisors are deployed in the field to allow supervisors to provide close and effective supervision to each officer under the supervisor's direct command, to provide officers with the direction and guidance necessary to improve and develop as police officers, and to identify, correct, and prevent misconduct. PRPB shall develop policies for supervision that set out clear requirements for supervisors and are consistent with generally accepted policing practices. | |
| Compliance Target(s) | Compliance is determined on two separate, but inter-dependent bases:<br>(1) the implementation of Paragraphs 136-158, and<br>(2) the results of outcome assessments, pursuant to Paragraph 243. | |
| Comments & Recommendations | • Document review of two months of staffing documents, including logbooks, for a random sample of the operational field units to determine the consistency of supervisory assignments and supervisor ratios in accordance with approved policies was not provided to the Monitoring Team. Training records demonstrating supervisors are certified (including certification on EIS and internal audits) were also not provided to the Monitoring Team.<br>• A random sample was developed by the Monitoring Team of 51 supervisors out of 304 transfers in PRPB that would track their transfers to other areas and commands from April 1 to September 30, 2020. Additional information was also requested, which included at least (1) two months of staffing documents, (2) training records demonstrating they are certified for all trainings required of supervisors (including certification on EIS, internal audits, EEO, and anti-discrimination laws), (3) all referrals to SARP made by supervisors for performance evaluations and any SARP referrals of supervisors, (4) for any supervisors in the random sample that are assigned to specialized units, documentation proving that they are eligible to serve in those units, and (5) supervisors should be made available for interviews in person in regards to their supervision practices, the availability of EIS, etc. The incomplete information makes it impossible to verify the requested random sample.<br>• In order to help obtain compliance, PRPB should develop an automated system to determine what employees have been transferred and the reason why. This information was not provided to the Monitoring Team after it was requested. Documents were sent that tracked where employees were and where they have been transferred to; however, there is no explanation of why they were transferred, including disciplinary transfers or staffing needs. | |

CMR-3 | March 2021

| Paragraph 136 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | All operational field officers shall be assigned to a single, consistent, and clearly identified supervisor. Supervisors shall be assigned to and shall substantially work the same days and hours as the officers they are assigned to supervise, absent exceptional circumstances. Scheduled leave (such as vacation time), unscheduled leave (such as sick leave due to illness or injury) and other routine absences (such as court appearances and training obligations) shall not be deemed noncompliance with this provision. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Policies incorporate all the requirements of Paragraphs 136-140. | Y |
| | 2. Supervision trainings are consistent with approved policies. | Y |
| | 3. 95% of sampled supervisors are trained and certified in all policies related to supervision (or scheduled for training, in the case of mid-year reviews). | N |
| | 4. Officer and supervisor schedules, assignments, and ratios are consistent with supervision policies. | N |
| | 5. Supervisors are assigned and deployed in accordance with approved supervision policies. | N |
| | 6. 95% of interviewed personnel perceive that supervision is close and effective. | N/A |
| | 7. 95% of sampled referrals indicate proactive observation and intervention to ensure adherence to policies, law, and the Agreement. | N |
| Comments & Recommendations | <ul><li>Aside from data on select trainings, PRPB did not provide training records requested by the Monitor's Office for a random sample of PRPB personnel.</li><li>Document review of two months of staffing documents, including logbooks, for a random sample of the operational field units to determine the consistency of supervisory assignments and supervisor ratios in accordance with approved policies was not provided to the Monitoring Team.</li><li>In order to help obtain compliance, PRPB should develop an automated system to determine that supervisors are working the same days and hours as the officers they supervise and that operational field officers are assigned to a single, consistent, and clearly identified supervisor.</li><li>The monitor was unable to conduct interviews per target 6. due to Covid-related travel restrictions.</li></ul> | |

| Paragraph 137 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | First-line field supervisors shall be assigned to supervise no more than ten officers for the first five years of this Agreement. After considering the results of the staffing study required by Paragraph 13 and whether the first-line supervisors are meeting all of the supervisory requirements of this Agreement at the current officer to supervisor ratios, the Monitoring Team and the Parties shall determine whether to lower the number of officers supervised by each first-line field supervisor. On-duty field supervisors should be available throughout their shift to respond to the | |

169

CMR-3 | March 2021

| | field to provide supervision to officers under their direct command and, as needed, to provide supervisory assistance to other units. |
|---|---|
| **Compliance Target(s)** | This Paragraph is assessed with Paragraph 136. |
| **Comments & Recommendations** | • Document review of two months of staffing documents, including logbooks, for a random sample was not provided to the Monitoring Team to determine the consistency of supervisory assignments and supervisor ratios in accordance with approved policies. <br> • In order to help obtain compliance, PRPB should a) modify supervision and management policy to clarify that supervisors oversee no more than 10 supervisees, per the language of the Agreement and the recommendations of the Staffing Study, and b) develop an automated system to determine that supervisors are assigned to supervise no more than 10 officers and to develop and ensure consistent field supervision when assigned supervisors are absent or otherwise unavailable for their tour of duty. |

| **Paragraph 138** | **Assessment Frequency** <br> Bi-annually | **Overall Compliance Status** <br> Not Compliant |
|---|---|---|
| **Paragraph Language** | PRPB shall develop a program to ensure consistent field supervision when assigned supervisors are absent or otherwise unavailable for their tour of duty. | |
| **Compliance Target(s)** | This Paragraph is assessed with Paragraph 136. | |
| **Comments & Recommendations** | The Monitoring Team has not received any information in reference to this Paragraph. | |

| **Paragraph 139** | **Assessment Frequency** <br> Bi-annually | **Overall Compliance Status** <br> Not Compliant |
|---|---|---|
| **Paragraph Language** | Precinct and unit commanders shall closely and effectively supervise the officers under their command. | |
| **Compliance Target(s)** | This Paragraph will be assessed with Paragraph 136. | |
| **Comments & Recommendations** | The Monitoring Team requested examples of performance evaluations written by a representative sample of supervisors. The Monitoring Team further requested performance evaluations for a representative sample of all active duty personnel. However, the Monitor's Office has not received any information in reference to this Paragraph. | |

| **Paragraph 140** | **Assessment Frequency** <br> Bi-annually | **Overall Compliance Status** <br> Deferred |
|---|---|---|
| **Paragraph Language** | All PRPB commanders and supervisors shall ensure that all supervisors and officers under their command comply with PRPB policy, Commonwealth of Puerto Rico and federal law, and the requirements of this Agreement. | |
| **Compliance Target(s)** | This Paragraph will be assessed with Paragraph 136. | |
| **Comments & Recommendations** | Due to COVID-19-related travel restrictions, this Paragraph will be assessed during CMR-4. | |

CMR-3 | March 2021

| Paragraph 145 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | PRPB shall develop and implement a specific system to accurately evaluate the qualifications and performance of all PRPB officers in areas that include, but are not limited to, constitutional policing, integrity, community policing, and critical police functions on both an ongoing and annual basis. PRPB shall develop objective criteria to assess whether officers meet minimum qualifications and performance standards, including officers in inactive status, where appropriate. The evaluation system shall provide for appropriate remedial or disciplinary action. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Policies incorporate all the requirements of Paragraphs 145-146. | Y |
| | 2. Training on performance evaluations is consistent with approved policies. | N |
| | 3. 95% of sampled personnel files indicate that supervisors are trained and certified on policies regarding performance evaluations (or scheduled for training, in the case of mid-year reviews). | N |
| | 4. 95% of sampled officers meet minimum qualifications and eligibility criteria. | N |
| | 5. 95% of sampled performance evaluations adhere to approved policies. | N |

| Comments & Recommendations | • Aside from data on select trainings, PRPB did not provide training records requested by the Monitor's Office for a random sample of PRPB personnel. |
|---|---|
| | • The Monitoring Team has not received any information reference documentation of annual performance evaluations completed by PRPB supervisors. |
| | • In order to help obtain compliance, PRPB should develop an automated system to compile an automated list of all supervisors who have completed timely and accurate performance evaluations of their subordinates. |

| Paragraph 146 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | As part of this system, PRPB shall establish a formalized system documenting annual performance evaluations of each officer by the officer's direct supervisor. PRPB shall hold supervisors accountable for completing timely, accurate, and complete performance evaluations of their subordinates. | |
| Compliance Target(s) | This Paragraph was assessed with Paragraph 145. | |
| Comments & Recommendations | • The Monitoring Team has not received any information reference documentation of annual performance evaluations completed by PRPB supervisors. | |
| | • In order to help obtain compliance, PRPB should develop an automated system to compile an automated list of all supervisors who have completed timely and accurate performance evaluations of their subordinates. | |

| Paragraph 147 | Assessment Frequency | Overall Compliance Status |
|---|---|---|

CMR-3 | March 2021

|  | Bi-annually | Not Compliant |
|---|---|---|
| **Paragraph Language** | PRPB shall develop, implement, and maintain an early identification system ("EIS") to support the effective supervision and management of PRPB officers and employees, including the identification of and response to problematic behaviors as early as possible. PRPB shall regularly use EIS data to promote ethical and professional police practices; to manage risk and liability; and to evaluate the performance of PRPB employees across all ranks, units, shifts, commands, and organization components. | |

| **Compliance Target(s)** | **Compliance Target** | **Status** |
|---|---|---|
| | 1. Policies incorporate all the requirements of Paragraphs 147-153. | N |
| | 2. Training on EIS is consistent with approved policies. | N |
| | 3. 95% of sampled supervisors and personnel administering EIS are trained and certified in EIS policies (or scheduled for training, in the case of mid-year reviews). | N |
| | 4. EIS data and records demonstrate compliance with EIS policy for 95% of selected officers who trigger EIS and officers who do not trigger EIS. | N |
| | 5. 95% of interviewed officers, supervisors, SARP personnel, and IT staff perceive EIS as an effective supervisory tool that addresses potential problematic behavior in a non-punitive manner. | N |
| | 6. EIS is functioning as designed, equipment is in good working order, and information is secure in 95% of selected units. | N |

| **Comments & Recommendations** | <ul><li>Aside from data on select trainings, PRPB did not provide training records requested by the Monitor's Office for a random sample of PRPB personnel.</li><li>A supervisor of PRPB certified that from April 1 through September 30, 2020, PRPB continues to develop the EIS system, identify its personnel, and that Paragraph 147 was still in development. PRPB has not yet completed a comprehensive policy that would cover all EIS modules outlined in paragraphs 147-153, and thus have not begun training on all required capabilities of EIS.</li><li>PRPB should expedite the completion of the EIS.</li></ul> |
|---|---|

| **Paragraph 148** | **Assessment Frequency** | **Overall Compliance Status** |
|---|---|---|
| | Bi-annually | Not Compliant |
| **Paragraph Language** | The EIS shall include a computerized relational database which shall be used to collect, maintain, integrate, and retrieve detailed data department-wide and for each officer regarding:<br>a) all uses of force;<br>b) injuries to and deaths of persons in custody;<br>c) all complaints and their dispositions;<br>d) data compiled under the stop data collection mechanism;<br>e) all criminal proceedings initiated, as well as all civil or administrative claims filed, that bear upon an officer's performance or fitness including, but not limited to, domestic violence and protective orders;<br>f) all judicial proceedings involving domestic violence, protective orders, and any other judicial proceedings which may be related to an officer's performance;<br>g) all instances in which PRPB is informed by a prosecuting authority that a declination to prosecute any crime was based, in whole or in part, upon concerns | |

CMR-3 | March 2021

| | about the credibility of a PRPB employee or that a motion to suppress evidence was granted on the grounds of a constitutional violation by a PRPB employee;<br>h) all disciplinary action taken against employees;<br>i) all non-punitive corrective action required of employees;<br>j) all awards and commendations received by employees;<br>k) training history for each employee; and<br>l) identifying information for each PRPB officer and employee and;<br>m) demographic data for each civilian involved in a use of force or search and seizure incident sufficient to assess bias. |
|---|---|
| Compliance Target(s) | This Paragraph is assessed with Paragraph 147. |
| Comments & Recommendations | A. supervisor of PRPB certified that from April 1 through September 30, 2020, PRPB continues to develop the EIS system, identify its personnel, and that Paragraph 147 was still in development. |

| Paragraph 149 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | PRPB shall establish a unit to develop, implement, and maintain the EIS with sufficient resources to facilitate data input and provide training and assistance to EIS users. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 147. | |
| Comments & Recommendations | A supervisor of PRPB certified that from April 1 through September 30, 2020, PRPB continues to develop the EIS system, identify its personnel, and that Paragraph 147 was still in development. | |

| Paragraph 150 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | PRPB shall maintain necessary equipment, in sufficient amount and in good working order, to permit appropriate personnel, including supervisors and commanders, ready and secure access to the EIS system to allow for timely input and review of EIS data. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 147. | |
| Comments & Recommendations | A supervisor of PRPB certified that from April 1 through September 30, 2020, PRPB continues to develop the EIS system, identify its personnel, and that Paragraph 147 was still in development. | |

| Paragraph 151 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | PRPB shall develop a protocol for using the EIS and information obtained from it. The protocol for using the EIS shall address data storage, data retrieval, reporting, data analysis, pattern identification, supervisory use, supervisory/departmental intervention, documentation and audits, access to the system, and confidentiality of personally identifiable information. The protocol shall also require unit supervisors to periodically review EIS data for officers under their command, including upon transfer between PRPB units or regions. | |

CMR-3 | March 2021

| Compliance Target(s) | This Paragraph is assessed with Paragraph 147. |
|---|---|
| Comments & Recommendations | A supervisor of PRPB certified that from April 1 through September 30, 2020, PRPB continues to develop the EIS system, identify its personnel, and that Paragraph 147 was still in development. |

| Paragraph 152 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | PRPB shall maintain all personally identifiable information about officers and employees included in the EIS for at least five years following their separation from the agency. Information necessary for aggregate statistical analysis shall be maintained indefinitely in the EIS. On an ongoing basis, PRPB will enter information into the EIS in a timely, accurate, and complete manner, and shall maintain the data in a secure and confidential manner. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 147. | |
| Comments & Recommendations | A supervisor of PRPB certified that from April 1 through September 30, 2020, PRPB continues to develop the EIS system, identify its personnel, and that Paragraph 147 was still in development. | |

| Paragraph 153 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | Following the initial implementation of the EIS, and as experience and the availability of new technology may warrant, PRPB may propose to add, subtract, or modify data tables and fields, modify the list of documents scanned or electronically attached, and add, subtract, or modify standardized reports and queries. PRPB will submit all such proposals for review and approval as set forth in Paragraph 229. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 147. | |
| Comments & Recommendations | A supervisor of PRPB certified that from April 1 through September 30, 2020, PRPB continues to develop the EIS system, identify its personnel, and that Paragraph 147 was still in development. | |

| Paragraph 154 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | As part of PRPB's continuous improvement efforts and to ensure compliance with this Agreement, PRPB shall establish an auditing system that identifies operational deficiencies, analyzes causal and contributing factors, and implements effective remedial action. To effectuate the system, PRPB shall develop and implement auditing protocols that are based on generally accepted policing practices. The protocols shall provide the audited unit an opportunity to respond to preliminary findings and recommendations, as appropriate, to foster a culture of accountability and continuous improvement among all PRPB units and personnel. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Policies incorporate all the requirements of Paragraphs 154-156. | N |
| | 2. Training on internal audits and inspections are consistent with approved policies. | N |

| | |
|---|---|
| 3. 95% of sampled personnel are trained and certified on the auditing and inspections system (or scheduled for training, in the case of mid-year reviews). | N |
| 4. 95% of selected internal audits and inspections comply with policy. | N |
| 5. Internal audits and inspections are scheduled regularly for all PRPB units, locations, and personnel. | N |
| 6. PRPB prepares an annual report that (a) includes the conclusions and recommendations of internal audits and inspections conducted for the covered period and (b) is reviewed by the Commissioner and unit commanders to guide corrective action, as appropriate. | N |

| Comments & Recommendations | • Aside from data on select trainings, PRPB did not provide training records requested by the Monitor's Office for a random sample of PRPB personnel.<br>• A member of PRPB certified that there were no inspections conducted between April 1, and September 30, 2020.<br>• In order to help obtain compliance, PRPB should develop an automated auditing system that would identify operational deficiencies, analyze contributing factors, and implement effective remedial action. Auditing protocols should be based on generally-accepted policing practices and cover all PRPB units and command areas. This would also include referrals to SARP of agents and supervisors. |
|---|---|

| Paragraph 156 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | PRPB auditors shall issue a report to the Superintendent on the result of each audit. The Superintendent will review each audit for appropriate policy, disciplinary, and/or non-punitive corrective action. The commander of each precinct or specialized unit shall review all audit reports regarding employees under their command and, if appropriate, shall take non- punitive corrective action or disciplinary action. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 154. | |
| Comments & Recommendations | No information has been received from PRPB indicating that any reports have been sent to the Commissioner reference audits being conducted. | |

| Paragraph 157 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | PRPB shall develop and implement a plan for organizing and executing regular, targeted, and random integrity audits. The integrity audits will be used to identify and investigate officers engaging in misconduct including, but not limited to, unlawful stops, searches, seizures (including false arrests), excessive uses of force, potential criminal behavior, racial or ethnic profiling, and bias against lesbian, gay, bisexual, and transgendered persons, or any other form of misconduct. These operations shall also seek to identify officers who discourage the filing of a complaint, fail to report misconduct or complaints, or otherwise undermine PRPB's integrity and accountability systems. SPR shall have the oversight responsibility within PRPB for these operations. SPR shall use relevant EIS data and other relevant information in selecting targets for integrity audits. | |

CMR-3 | March 2021

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Policies incorporate all the requirements of this Paragraph. | N |
| | 2. Training on integrity audits is consistent with approved policies. | N |
| | 3. 95% of sampled personnel are trained and certified on integrity audits (or scheduled for training, in the case of mid-year reviews). | N |
| | 4. 95% of selected integrity audits are designed effectively and comply with approved policies. | N |
| | 5. EIS and other relevant information is considered when selecting targets for integrity audits in 95% of selected integrity audits. | N |
| Comments & Recommendations | • No information has been received from PRPB indicating there is a policy, procedure, or curriculum for personnel integrity audits.<br>• Aside from data on select trainings, PRPB did not provide training records requested by the Monitor's Office for a random sample of PRPB personnel. | |

| Paragraph 158 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Quarterly | Not Compliant |
| Paragraph Language | PRPB shall establish an executive-level liaison committee consisting of high-level command officers of PRPB who communicate, on at least a quarterly basis, with representatives of federal and local criminal justice components in all regions in Puerto Rico, including judicial courts, prosecutors, the University College, and municipal police departments. The committee shall seek mutual feedback and information on improving Puerto Rico's criminal justice system, including performance issues or concerns related to PRPB, its officers, employees, or units. All PRPB high-level commanders who participate in the executive-level liaison committee shall ensure that all allegations of misconduct or potential criminal activity are referred to SPR and/or PRDOJ for investigation, as appropriate. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Agreements and protocols incorporate all the requirements of this Paragraph. | Y |
| | 2. PRPB solicits feedback and shares information with criminal justice components and refers allegations of misconduct or potential criminal activity it obtains from such components to SARP for investigation. | Y |
| Comments & Recommendations | • A member of PRPB sent a memorandum stating that from April 1, to September 30, 2020, the Commissioner had not received any minutes from police area meetings establishing contact with other parts of the criminal justice system and requested that they forward them to the Commissioner's office as soon as possible.<br>• In order to help obtain compliance, PRPB should develop an automated system to obtain copies, agreements, and protocols related to criminal justice committees and verify they incorporate all requirements of this paragraph. | |

## Civilian Complaints, Internal Investigations, and Discipline

| Paragraph 159 | Assessment Frequency | Overall Compliance Status |
|---|---|---|

176

| | Bi-annually | Partially Compliant |
|---|---|---|
| **Paragraph Language** | PRPD shall ensure that all allegations of officer misconduct are received and are fully and fairly investigated; that all investigative findings are supported by a preponderance of the evidence; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair and consistent. PRPD shall develop policies and practices for the intake, investigation, and adjudication of misconduct complaints against PRPD officers. These policies and practices shall comply with applicable law and comport with generally accepted policing practices, and shall include the requirements set out below. | |
| **Compliance Target(s)** | Compliance is determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 160-204, and (2) the results of outcome assessments, pursuant to Paragraph 243. | |
| **Comments & Recommendations** | Refer to paragraphs 160-204 for detailed assessment. | |

| **Paragraph 160** | **Assessment Frequency** | **Overall Compliance Status** |
|---|---|---|
| | Annually as to Data Sources #1 and #2. Bi-annually as to all other Data Sources. | Partially Compliant |
| **Paragraph Language** | PRPD will develop and implement a program to inform persons that they may make complaints regarding the performance of any officer. | |
| **Compliance Target(s)** | **Compliance Target** | **Status** |
| | 1. Policies incorporate all of the requirements of Paragraphs 160-162. | Y |
| | 2. Civilian complaint program trainings are consistent with approved policies. | Y |
| | 3. 95% of sampled press, office and SARP personnel are trained and certified in all policies related to the civilian complaint program (or scheduled for training, in the case of mid-year reviews). | N |
| | 4. PRPB has developed and implements a program to inform persons that they may make complaints regarding the performance of any officer. | Y |
| **Comments & Recommendations** | Aside from data on select trainings, PRPB did not provide training records requested by the Monitor's Office for a random sample of PRPB personnel. | |

| **Paragraph 161** | **Assessment Frequency** | **Overall Compliance Status** |
|---|---|---|
| | Bi-annually | Deferred |
| **Paragraph Language** | Pre-printed complaint forms shall not include any language that can be construed as discouraging civilians from submitting complaints, including warnings regarding potential criminal prosecution for false or untrue complaints. PRPD shall require all officers to carry complaint forms in their official vehicles at all times or on their person, if feasible. | |
| **Compliance Target(s)** | **Compliance Target** | **Status** |
| | Content of complaint forms is consistent with civilian complaint program policies. | Y |
| **Comments & Recommendations** | The Monitor verified that the relevant forms are consistent with civilian complaint program policies. Due to COVID-19-related travel restrictions, however, the Monitor's Office was unable to verify that officers carry forms with them at all times. | |

CMR-3 | March 2021

| Paragraph 162 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually as to Data Sources #1 and #3. Bi-annually as to all other Data Sources. | Deferred |
| Paragraph Language | PRPD shall make complaint forms and informational materials, including brochures and posters, available at all police facilities and on the PRPD website. Information shall be posted in Spanish and English. PRPD shall post and maintain a permanent placard describing the external complaint process at appropriate government buildings where public services are provided. The placard shall include relevant contact information, such as telephone numbers, email addresses, and websites. PRPD shall also post and maintain a placard explaining an individual's right to be free from involuntary searches and seizures and thus to decline consent to voluntary searches. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Content of complaint forms and informational materials is consistent with civilian complaint program policies. | Y |
| | 2. PRPB website and 95% of PRPB facilities and patrol vehicles have required civilian complaint materials. | Y |
| | 3. Placards as described in Par. 162 are displayed in 95% of all PRPD and DPS buildings, plus eleven regional judicial centers across the Island. | N/A |
| Comments & Recommendations | The Monitor verified that the relevant forms are consistent with civilian complaint program policies. Due to COVID-19-related travel restrictions, however, the Monitor's Office was unable to verify that officers carry forms with them at all times. | |

| Paragraph 163 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually as to Data Sources #1 and #2. Bi-annually as to all other Data Sources. | Not Compliant |
| Paragraph Language | PRPD shall require that all officers and employees report misconduct, including apparent, alleged, or perceived misconduct, by another PRPD officer or employee to a supervisor or directly to SPR for review and investigation. Where apparent misconduct is reported to a supervisor, the supervisor shall immediately document and report this information to SPR. Failure to report or document apparent or alleged misconduct or criminal behavior shall be grounds for discipline, up to and including termination of employment. The presumptive discipline for a failure to report apparent or alleged misconduct or criminal behavior shall be commensurate to the presumptive discipline for the underlying apparent or alleged conduct not reported. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Policies incorporate all the requirements of the paragraph. | Y |
| | 2. Training on internal reporting of misconduct and investigations is consistent with approved policies. | Y |
| | 3. 95% of sampled personnel are trained and certified in relevant policies related to reporting and internal investigations (or scheduled for training, in the case of mid-year reviews). | N |
| | 4. All reports of alleged or perceived misconduct are reviewed and investigated, as appropriate, by supervisors or SARP. | N |
| Comments & Recommendations | • Aside from data on select trainings, PRPB did not provide training records requested by the Monitor's Office for a random sample of PRPB personnel. | |

- In response to the Monitor's request for a sample of active and closed SARP investigations, PRPB only provided access to closed investigations. The Monitor's Office therefore lacks sufficient evidence to reach a determination of partial or substantial compliance.

| Paragraph 164 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually as to Data Sources #1 and #2. Bi-annually as to all other Data Sources. | Not Compliant |
| Paragraph Language | PRPD shall develop protocols requiring supervisors to investigate and take appropriate disciplinary or non-punitive corrective action when the supervisor becomes aware of minor misconduct or policy infractions by an officer that do not merit an SPR notification. The incident of misconduct and the supervisor's response shall be reported to SPR within five business days for SPR's review. Where the officer disputes the misconduct allegation, the allegation shall be referred to SPR for investigation. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Policies incorporate all the requirements of Paragraphs 164 and 165. | Y |
| | 2. Training on supervisory review of minor policy violations is consistent with approved policies. | Y |
| | 3. 95% of sampled supervisors are trained and certified in policies related to supervisory review of minor policy violations (or scheduled for training, in the case of mid-year reviews). | N |
| | 4. 95% of selected supervisory reviews and responses comply with approved policies. | N |
| | 5. 95% of selected supervisory reviews and investigations are reviewed and evaluated by unit commanders and the commanders identify needs, as appropriate, in accordance with Paragraphs 164 and 165. | N |
| | 6. 95% of selected supervisory reviews and investigations are sent to SARP and assessed according to approved policies. | N |

| Comments & Recommendations | <ul><li>Aside from data on select trainings, PRPB did not provide training records requested by the Monitor's Office for a random sample of PRPB personnel.</li><li>In response to the Monitor's request for a sample of active and closed SARP investigations, PRPB only provided access to closed investigations. The Monitor's Office therefore lacks sufficient evidence to reach a determination of partial or substantial compliance.</li></ul> |
|---|---|

| Paragraph 165 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually as to Data Sources #1 and #2. Bi-annually as to all other Data Sources. | Not Compliant |
| Paragraph Language | The results of unit investigations, be they minor misconduct allegations, policy infractions, or SPR referrals, shall each be referred to and evaluated by unit commanders for underlying problems including supervisory, training, or other deficiencies. Unit evaluations shall be sent to SPR for further assessment of trends and potential deficiencies in tactics or training, among other considerations. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 164. | |

CMR-3 | March 2021

| Comments & Recommendations | In response to the Monitor's request for a sample of active and closed SARP investigations, PRPB only provided access to closed investigations. The Monitor's Office therefore lacks sufficient evidence to reach a determination of partial or substantial compliance. |
|---|---|

| Paragraph 166 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually as to Data Sources #1 and #2. Bi-annually as to all other Data Sources. | Partially Compliant |

| Paragraph Language | PRPD shall train all officers in how to properly handle complaint intake. | |
|---|---|---|
| Compliance Target(s) | **Compliance Target** | **Status** |
| | 1. Policies incorporate all the requirements of Paragraphs 166-176. | Y |
| | 2. Complaint intake, classification, assignment, and tracking trainings are consistent with approved policies. | Y |
| | 3. 95% of sampled officers are trained and certified in relevant policies related to complaint intake, classification, assignment, and tracking (or scheduled for training, in the case of mid-year reviews). | N |
| Comments & Recommendations | Aside from data on select trainings, PRPB did not provide training records requested by the Monitor's Office for a random sample of PRPB personnel. | |

| Paragraph 167 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually as to Data Sources #1. Bi-annually as to Data Source #2. | Not Compliant |

| Paragraph Language | The refusal to accept a misconduct complaint, discouraging the filing of a misconduct complaint, or providing false or misleading information about filing a misconduct complaint, shall be grounds for discipline. | |
|---|---|---|
| Compliance Target(s) | **Compliance Target** | **Status** |
| | Policies and trainings is assessed as part of Paragraph 166. | N |
| | Implementation is assessed with Paragraphs 177 (Data Source #4), 198 and 199. | N |
| Comments & Recommendations | • Aside from data on select trainings, PRPB did not provide training records requested by the Monitor's Office for a random sample of PRPB personnel.<br><br>• In response to the Monitor's request for a sample of active and closed SARP investigations, PRPB only provided access to closed investigations. The Monitor's Office therefore lacks sufficient evidence to reach a determination of partial or substantial compliance. | |

| Paragraph 168 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Deferred |

| Paragraph Language | PRPD shall accept all misconduct complaints, including anonymous and third-party complaints, for review and investigation. Complaints may be made in writing or verbally, in person or by mail, telephone (or TDD), facsimile, electronic mail, or any other appropriate electronic means. | |
|---|---|---|
| Compliance Target(s) | **Compliance Target** | **Status** |
| | PRPB accepts, reviews, and investigates complaints, as appropriate, in accordance with approved policies. | N |

| Comments & Recommendations | In response to the Monitor's request for a sample of active and closed SARP investigations, PRPB only provided access to closed investigations. The Monitor's Office therefore lacks sufficient evidence to reach a determination of partial or substantial compliance. |
|---|---|

| Paragraph 169 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |

| Paragraph Language | PRPD will establish a protocol that provides procedures to be followed when an individual objects to an officer's conduct. The protocol shall provide that, absent exceptional circumstances, the officer will inform the individual of his or her right to make a complaint and shall provide the complaint form and the officer's name and identification number. If the individual indicates that he or she would like to make a complaint on the scene, the officer shall immediately inform his or her supervisor, who shall immediately respond to the scene and initiate the complaint process. In the absence of the officer's immediate supervisor, any supervisor may respond to the scene. All misconduct complaints received outside of SPR shall be forwarded to SPR before the end of the shift in which they were received. |
|---|---|

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Intake protocol was followed in 95% of sampled investigations. | N |
| | 2. Intake protocol was followed in 95% of sampled complaints received by officers in the field. | N |

| Comments & Recommendations | In response to the Monitor's request for a sample of active and closed SARP investigations, PRPB only provided access to closed investigations. The Monitor's Office therefore lacks sufficient evidence to reach a determination of partial or substantial compliance. |
|---|---|

| Paragraph 170 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |

| Paragraph Language | PRPD shall develop a system to ensure that allegations of officer misconduct made during criminal prosecutions or civil lawsuits are identified and assessed for further investigation. Any decision to decline an investigation shall be documented. |
|---|---|

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. PRPB has a system to identify and assess civil lawsuits and criminal proceedings filed involving allegations of officer misconduct. | Y |
| | 2a. SARP reviews all allegations involving PRPB personnel to assess the need to investigation by PRPB. | Y |
| | 2b. 95% of such SARP reviews are documented in accordance with approved policies. | N |

| Comments & Recommendations | PRPB did not respond to the Monitor's request for a sample of SARP investigations that involve potential litigation. |
|---|---|

| Paragraph 171 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Deferred |

| Paragraph Language | SPR shall maintain a centralized numbering and tracking system for all misconduct complaints. Upon the receipt of a complaint, SPR shall promptly assign a unique numerical identifier to the complaint, which shall be provided to the complainant as soon as practicable. |
|---|---|
| | Compliance Target | Status |

CMR-3 | March 2021

| Compliance Target(s) | SARP administers a centralized numbering and tracking system for all misconduct complaints. | N/A |
|---|---|---|
| Comments & Recommendations | The Monitor was unable to access the secured system due to COVID-related travel restrictions. | |

| Paragraph 172 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |

| Paragraph Language | Where a supervisor receives a misconduct complaint in the field alleging that misconduct has occurred, other than those incidents covered by Paragraph 44 of this Agreement, the supervisor shall gather all relevant information and evidence and provide these to SPR. All complaints should be referred to SPR by the end of tour of duty, absent exceptional circumstances. | |
|---|---|---|
| Compliance Target(s) | **Compliance Target** | **Status** |
| | 1a. 95% of sampled complaints were forwarded to SARP by the end of the relevant tour of duty or articulated exceptional circumstances. | N |
| | 1b. 95% of sampled complaints document what information and evidence is collected by PRPB supervisor. | N |
| Comments & Recommendations | In response to the Monitor's request for a sample of active and closed SARP investigations, PRPB only provided access to closed investigations. The Monitor's Office therefore lacks sufficient evidence to reach a determination of partial or substantial compliance. | |

| Paragraph 173 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |

| Paragraph Language | Within five business days of the receipt of a misconduct complaint, SPR shall determine whether the complaint will be assigned to a supervisor for a Supervisory Investigation, retained by SPR for investigation, and whether it will be investigated criminally by PRPD, PRDOJ, or both. | |
|---|---|---|
| Compliance Target(s) | **Compliance Target** | **Status** |
| | 95% of sampled SARP investigation files are assigned for investigation in accordance with approved policies. | N |
| Comments & Recommendations | In response to the Monitor's request for a sample of active and closed SARP investigations, PRPB only provided access to closed investigations. The Monitor's Office therefore lacks sufficient evidence to reach a determination of partial or substantial compliance. | |

| Paragraph 174 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |

| Paragraph Language | PRPD shall develop a complaint classification protocol that is allegation-based rather than outcome-based to guide SPR in determining where a complaint should be assigned. | |
|---|---|---|
| Compliance Target(s) | **Compliance Target** | **Status** |
| | SARP classifies complaints in accordance with policy. | N |
| Comments & Recommendations | In response to the Monitor's request for a sample of active and closed SARP investigations, PRPB only provided access to closed investigations. The Monitor's Office therefore lacks sufficient evidence to reach a determination of partial or substantial compliance. | |

| Paragraph 175 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |

| Paragraph Language | A misconduct complaint investigation may not be conducted by any supervisor who used force during the incident; whose conduct led to the injury to a person; who authorized the conduct that led to the reported incident or complaint; who was on the scene at the time of the incident leading to the allegation of misconduct; or by any officer or supervisor who has a conflict of interest as defined by PRPD policy. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | All misconduct complaint investigations are conducted by persons not prohibited from doing so, as required by the Paragraph. | N |

| Comments & Recommendations | In response to the Monitor's request for a sample of active and closed SARP investigations, PRPB only provided access to closed investigations. The Monitor's Office therefore lacks sufficient evidence to reach a determination of partial or substantial compliance. |
|---|---|

| Paragraph 176 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Deferred |

| Paragraph Language | PRPD's centralized numbering and tracking system shall maintain accurate and reliable data regarding the number, nature, and status of all misconduct complaints, from initial intake to final disposition, including investigation timeliness and notification to the complainant of the interim status and final disposition of the investigation. This system shall be used for periodic assessment of compliance with PRPD policies and procedures and this Agreement. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | SARP's record management system maintains accurate and reliable data for operational and internal compliance purposes. | N/A |

| Comments & Recommendations | The Monitor was unable to access the secured system due to COVID-related travel restrictions. |
|---|---|

| Paragraph 177 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |

| Paragraph Language | PRPD shall ensure that policies and procedures regarding the investigation of complaints clearly establish that complaints are adjudicated on the basis of the preponderance of the evidence. This standard should be clearly delineated in policies and procedures and accompanied by extensive examples to ensure proper application by investigators. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Policies incorporate all the requirements of Paragraphs 177-193. | Y |
| | 2. Investigation of complaints trainings are consistent with approved policies. | Y |
| | 3. 95% of sampled personnel are trained and certified in relevant policies related to investigation of complaints (or scheduled for training, in the case of mid-year reviews). | N |
| | 4. 100% of sampled investigation files were adjudicated using a preponderance of the evidence standard. | N |

| Comments & Recommendations | • Aside from data on select trainings, PRPB did not provide training records requested by the Monitor's Office for a random sample of PRPB personnel. |
|---|---|

- In response to the Monitor's request for a sample of active and closed SARP investigations, PRPB only provided access to closed investigations. The Monitor's Office therefore lacks sufficient evidence to reach a determination of partial or substantial compliance.

| Paragraph 178 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |

| Paragraph Language | PRPD shall investigate all misconduct complaints and document the investigation and its findings and conclusions in writing. PRPD shall develop and implement a policy that specifies those complaints that may be resolved via administrative closing or informal resolution. Administrative closing shall be used for minor policy violations that do not constitute a pattern of misconduct, duplicate allegations, or allegations that even if true would not constitute misconduct, among others. | |
|---|---|---|

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 95% of sampled complaints are investigated, documented, and resolved, and relevant PRPB personnel were so advised, in accordance with approved policies. | N |

| Comments & Recommendations | In response to the Monitor's request for a sample of active and closed SARP investigations, PRPB only provided access to closed investigations. The Monitor's Office therefore lacks sufficient evidence to reach a determination of partial or substantial compliance. |
|---|---|

| Paragraph 179 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |

| Paragraph Language | PRPD shall ensure that all administrative investigations conducted by SPR shall be completed within 90 days of the receipt of the complaint, including assignment, investigation, review, and final approval. The SPR commander is authorized to grant additional 30 day extensions, for up to 90 additional days in the aggregate, for justifiable circumstances, which shall be documented in writing. For purposes of these extensions, workload shall not constitute justification for extensions. Where an allegation is sustained, PRPD shall have 30 days to determine and notify the officer of the appropriate discipline. The appropriate discipline shall be imposed as soon as practicable, consistent with PRPD's disciplinary procedures. All administrative investigations shall be subject to appropriate tolling periods as necessary to conduct a parallel criminal investigation or as provided by law. | |
|---|---|---|

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1a. 95% of sampled investigations were adjudicated and notified within authorized timeframes in accordance with approved policies. | N |
| | 1b. 95% of disciplinary actions were imposed within authorized timeframes in accordance with approved policies. | N |
| | 2. 95% of SARP investigations that were not completed within prescribed timeframes have justified extension approvals as required by approved policies. | N |

| Comments & Recommendations | In response to the Monitor's request for a sample of active and closed SARP investigations, PRPB only provided access to closed investigations. The Monitor's Office therefore lacks sufficient evidence to reach a determination of partial or substantial compliance. |
|---|---|

CMR-3 | March 2021

| Paragraph 180 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| **Paragraph Language** | PRPD shall ensure that investigations of officer misconduct are thorough and the findings are consistent with the facts. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 95% of selected investigations are thorough and findings are consistent with the facts. | N |

| **Comments & Recommendations** | In response to the Monitor's request for a sample of active and closed SARP investigations, PRPB only provided access to closed investigations. The Monitor's Office therefore lacks sufficient evidence to reach a determination of partial or substantial compliance. |
|---|---|

| Paragraph 181 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Deferred |
| **Paragraph Language** | PRPD shall require officers to cooperate with administrative investigations, including appearing for an interview when requested by a PRPD or Commonwealth investigator and providing all requested documents and evidence. Supervisors shall be notified when an officer under their supervision is summoned as part of an administrative investigation and shall facilitate the officer's appearance, unless such notification would compromise the integrity of the investigation. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Officers cooperate and supervisors are notified about SARP summons, as required by approved policies, in 95% of selected investigations. | N |
| | 2. SARP personnel indicate that the level of cooperation of officers and supervisors with SARP investigations is acceptable in accordance with generally accepted practices. | N/A |

| **Comments & Recommendations** | Investigations examined demonstrate adequate cooperation with internal investigations by officers and supervisors. However, the Monitor was unable to interview SARP investigators in person due to COVID-related travel restrictions. |
|---|---|

| Paragraph 182 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| **Paragraph Language** | The subject officer of an administrative investigation shall not be compelled to provide a statement to administrative investigators where there is a potential criminal investigation or prosecution of the officer until the remainder of the investigation has been completed, and after the administrative investigators have consulted with the prosecutor's office and the SPR commander, except where the taking of such a statement is authorized by the Superintendent after consulting with the prosecutor's office. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | Compelled statements are taken in accordance with approved policies and officers' constitutional rights. | N |

| **Comments & Recommendations** | In response to the Monitor's request for a sample of active and closed SARP investigations, PRPB only provided access to closed investigations. The Monitor's Office therefore lacks sufficient evidence to reach a determination of partial or substantial compliance. |
|---|---|

| Paragraph 183 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |

| Paragraph Language | Where there is no potential criminal investigation or prosecution of the subject officer, SPR investigators shall not warn the subject officer that he or she has a right not to provide a statement that may be self-incriminating. | |
|---|---|---|

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | Subject officers are not given Miranda warnings where there is no potential for criminal investigation or prosecution. | N |

| Comments & Recommendations | In response to the Monitor's request for a sample of active and closed SARP investigations, PRPB only provided access to closed investigations. The Monitor's Office therefore lacks sufficient evidence to reach a determination of partial or substantial compliance. |
|---|---|

| Paragraph 184 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Deferred |

| Paragraph Language | If at any time during complaint intake or investigation the investigator determines that there may have been criminal conduct on the part of any officer or employee, the investigator shall immediately notify the SPR commander. The SPR commander shall immediately notify the Superintendent and shall consult with the prosecutor's office regarding the initiation of a criminal investigation. Where an allegation is investigated criminally, SPR shall continue with the administrative investigation of the allegation, except that it may delay or decline to conduct an interview of the subject officer(s) or other witnesses until completion of the criminal investigation unless, after consultation with the prosecutor's office and PRPD Superintendent, such interviews are deemed appropriate. | |
|---|---|---|

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1a. Investigators notify SARP and SARP consults with prosecutors in accordance with approved policies when an investigator determines that there may have been criminal conduct on the part of any officer or employee. | N |
| | 1b. Administrative investigations continue when a parallel criminal investigation is also ongoing in accordance with approved policies. | N |

| Comments & Recommendations | PRPB did not respond to the Monitor's request for a sample of SARP investigations that involve potential civil or criminal litigation. |
|---|---|

| Paragraph 185 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |

| Paragraph Language | PRPD, PRDOJ, and the prosecutor's office shall develop protocols to ensure that the criminal and administrative investigations are kept appropriately separate after a subject officer has provided a compelled statement. Nothing in this Agreement or PRPD policy shall hamper an officer's obligation to provide a public safety statement regarding a work related incident or activity. | |
|---|---|---|

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | Administrative and criminal investigations are conducted separately as required by approved policies after a subject officer has provided a compelled statement. | N |

| Comments & Recommendations | PRPB did not respond to the Monitor's request for a sample of SARP investigations that involve potential civil or criminal litigation. |
|---|---|

CMR-3 | March 2021

| Paragraph 186 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| **Paragraph Language** | In each investigation, PRPD shall consider all relevant evidence, including circumstantial, direct, and physical evidence. There will be no automatic preference for an officer's statement over a non-officer's statement, nor will PRPD disregard a witness' statement merely because the witness has some connection to the complainant or because of any criminal history. PRPD shall make efforts to resolve material inconsistencies between witness statements. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 95% of sampled investigations considered all relevant evidence in a manner consistent with this Paragraph, and tried to resolve material inconsistencies between witness statements. | N |
| **Comments & Recommendations** | In response to the Monitor's request for a sample of active and closed SARP investigations, PRPB only provided access to closed investigations. The Monitor's Office therefore lacks sufficient evidence to reach a determination of partial or substantial compliance. | |

| Paragraph 187 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| **Paragraph Language** | A misconduct investigation shall not be closed simply because the complaint is withdrawn or the alleged victim is unwilling or unable to provide additional information beyond the initial complaint, or because the complainant pled guilty or was found guilty of an offense. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 95% of sampled investigations were not closed simply because the complaint is withdrawn or the alleged victim is unwilling or unable to provide additional information beyond the initial complaint, or because the complainant pled guilty or was found guilty of an offense. | Y |
| **Comments & Recommendations** | In response to the Monitor's request for a sample of active and closed SARP investigations, PRPB only provided access to closed investigations. The Monitor's Office therefore lacks sufficient evidence to reach a determination of partial or substantial compliance. | |

| Paragraph 188 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Substantially Compliant |
| **Paragraph Language** | The misconduct investigator shall explicitly identify and recommend one of the following dispositions for each allegation of misconduct in an administrative investigation: a) "Unfounded," where the investigation determines by clear and convincing evidence that the alleged misconduct did not occur or did not involve the subject officer; <br> b) "Sustained," where the investigation determines, by a preponderance of the evidence, that the alleged misconduct did occur; <br> c) "Not Sustained," where the investigation is unable to determine, by a preponderance of the evidence, whether the alleged misconduct occurred; or <br> d) "Exonerated," where the investigation determines by clear and convincing evidence that the alleged conduct did occur but did not violate PRPD policies, procedures, or training. | |

187

CMR-3 | March 2021

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | Misconduct investigators identify and recommend one of the listed dispositions for each allegation of misconduct in an administrative investigation. | Y |
| Comments & Recommendations | This paragraph applies only to completed investigations. The sample of closed investigations provided by PRPB is therefore valid for assessing compliance. | |

| Paragraph 189 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Substantially Compliant |
| Paragraph Language | The unit commander of the investigating supervisor shall review the supervisor's recommended disposition and accept, reject, or modify it. The unit commander shall document rejected or modified recommendations from supervisors in writing. Supervisory investigation reports and all related documentation and evidence shall be provided to SPR immediately upon completion of the investigation, but no later than within three business days. SPR shall review disposition recommendations made by unit commanders to ensure that investigative standards are met. SPR shall retain misconduct investigation reports and related records. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | The unit commanders complied with the requirements of this Paragraph in 95% of selected investigations. | Y |
| Comments & Recommendations | This paragraph applies only to completed investigations. The sample of closed investigations provided by PRPB is therefore valid for assessing compliance. | |

| Paragraph 190 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| Paragraph Language | The SPR commander shall review the investigator's recommended disposition and accept, reject, or modify it. The SPR commander shall document rejected or modified recommendations from investigators in writing. The Superintendent, or his or her designee(s), shall review the SPR commander's recommended disposition and accept, reject, or modify it. The Superintendent, or his or her designee(s), shall document rejected or modified recommendations from SPR. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1a. The SARP commander reviews and resolves the complaint in accordance with the paragraph in 95% of selected investigations. | N |
| | 1b. The Commissioner reviews and resolves the complaint in accordance with the paragraph in 95% of selected investigations. | N |
| Comments & Recommendations | The sample of closed investigations demonstrated that the SPR commander and/or the Commissioner's Office have provided insufficient evidence of why they recommend modifying the dispositions recommended by SARP investigators. | |

| Paragraph 191 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | In addition to determining whether the officer committed the alleged misconduct, administrative investigations shall assess and document whether: (a) the action was in compliance with training and legal standards; (b) the use of different procedures should or could have been employed to achieve a potentially better outcome; (c) the incident indicates a need for additional training, counseling or other non-punitive corrective action; and (d) the incident suggests that PRPD should revise its | |

CMR-3 | March 2021

| | policies, strategies, tactics, or training. This information shall be shared with the relevant commander(s). |
|---|---|
| Compliance Target(s) | This Paragraph is assessed with Paragraph 178. |
| Comments & Recommendations | In response to the Monitor's request for a sample of active and closed SARP investigations, PRPB only provided access to closed investigations. The Monitor's Office therefore lacks sufficient evidence to reach a determination of partial or substantial compliance. |

| Paragraph 192 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Substantially Compliant |
| Paragraph Language | Each misconduct complainant will be notified in writing regarding the initiation of an investigation, the final disposition of the investigation, any disciplinary or non-punitive action taken, and the right to seek further review of the final disposition under applicable law. If an investigation goes beyond the 90 day limit, the complainant will be notified that an extension has been granted. PRPD shall establish procedures for complainants dissatisfied with the outcome to discuss their concerns with SPR commanders. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Complainants are notified about the status of the investigation and outcome in accordance with approved policies in 95% of selected investigations. | Y |
| | 2. Complainants are given the opportunity to appeal the determination before the Investigation, Processing and Appeals Commission. | Y |
| Comments & Recommendations | This paragraph applies only to completed investigations. The sample of closed investigations provided by PRPB is therefore valid for assessing compliance. | |

| Paragraph 193 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Deferred |
| Paragraph Language | SPR shall retain all misconduct investigation records for at least five years after the officer's separation from the agency. This obligation shall apply to records regarding officers' credibility that come to the attention of SPR and that may be subject to disclosure under Brady v. Maryland, 373 U.S. 83 (1963), and its progeny. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. SARP retains at least 95% of investigation files for persons who have separated from PRPB less than five years ago. | N/A |
| | 2. PRPB's document retention practices comply with approved policies. | N/A |
| Comments & Recommendations | Though PRPB is currently retaining all misconduct investigation records per the Agreement, 5 years have not yet passed since the beginning of the compliance stage. | |

| Paragraph 194 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually as to Data Sources #1 and #2. Bi-annually as to all other Data Sources | Partially Compliant |
| Paragraph Language | PRPD shall ensure that a sufficient number of well-trained staff are assigned and available to thoroughly complete and review misconduct investigations in a timely | |

CMR-3 | March 2021

|  | manner and in accordance with the requirements of this Agreement. PRPD further shall ensure it provides sufficient resources and equipment to conduct adequate criminal and administrative misconduct investigations. | |
|---|---|---|
| **Compliance Target(s)** | **Compliance Target** | **Status** |
|  | 1. Policies incorporate all the requirements of Paragraphs 177-193. | Y |
|  | 2. Trainings for the internal investigation unit are consistent with approved policies. | Y |
|  | 3. All internal investigation unit personnel are trained and certified in relevant policies (or scheduled for training, in the case of mid-year reviews). | N |
|  | 4. The internal investigation unit has sufficient resources and equipment, or is in the process of procuring needed resources and equipment. | N/A |
|  | 5a. Internal investigation unit personnel serve three-year terms. | N/A |
|  | 5b. Retained internal investigation unit personnel have demonstrated effective performance. | N/A |
| **Comments & Recommendations** | • Aside from data on select trainings, PRPB did not provide training records requested by the Monitor's Office for a random sample of PRPB personnel. <br> • Target 4: The Monitor was unable to conduct on-site observations due to COVID-related travel restrictions. <br> • Targets 5a-b: No current SARP investigators have reached the 3-year term limit. | |

| **Paragraph 195** | **Assessment Frequency** | **Overall Compliance Status** |
|---|---|---|
|  | Annually as to Data Sources #1 and #2. Bi-annually as to all other Data Sources | Deferred |
| **Paragraph Language** | PRPD shall establish a term of duty of up to three years for SPR officers and supervisors who conduct investigations and may reappoint an officer to successive terms of duty if that officer has demonstrated effective performance based on an appropriate annual performance evaluation. | |
| **Compliance Target(s)** | This Paragraph is assessed with Paragraph 194. | |
| **Comments & Recommendations** | No current SARP investigators have reached the 3-year term limit. | |

| **Paragraph 196** | **Assessment Frequency** | **Overall Compliance Status** |
|---|---|---|
|  | Annually as to Data Sources #1 and #2. Bi-annually as to all other Data Sources | Not Compliant |
| **Paragraph Language** | All SPR personnel conducting officer misconduct investigations shall receive at least 40 hours of initial training in conducting officer misconduct investigations and shall receive additional in-service training each year. | |
| **Compliance Target(s)** | This Paragraph is assessed with Paragraph 194. | |
| **Comments & Recommendations** | PRPB did not respond to the Monitor's Office's request for training records. | |

| **Paragraph 197** | **Assessment Frequency** | **Overall Compliance Status** |
|---|---|---|

| | Annually as to Data Sources #1 and #2. Bi-annually as to all other Data Sources | Deferred |
|---|---|---|
| **Paragraph Language** | PRPD policy shall expressly prohibit all forms of retaliation, whether subtle or direct, including discouragement, intimidation, coercion, duty-station reassignment, or adverse action, against any person, civilian or officer, who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct. Retaliation shall be considered a serious policy violation and shall subject an officer to serious disciplinary action, up to and including termination. | |

| **Compliance Target(s)** | **Compliance Target** | **Status** |
|---|---|---|
| | 1. Policies incorporate all the requirements of this Paragraph. | Y |
| | 2. Retaliation trainings are consistent with approved policies. | Y |
| | 3. 95% of sampled personnel are trained and certified in retaliation policies (or scheduled for training, in the case of mid-year reviews). | N |
| | 4. Complaints involving alleged retaliation are investigated and adjudicated in accordance with approved policies and agency standards in 95% of selected complaints. | N/A |
| | 5. 95% of interviewed personnel perceive retaliation for participating in an investigation of misconduct is not tolerated and leads to serious disciplinary action. | N/A |

| **Comments & Recommendations** | • Aside from data on select trainings, PRPD did not provide training records requested by the Monitor's Office for a random sample of PRPB personnel.<br>• The Monitor's Office did not request, nor did PRPB provide internal investigations involving alleged retaliation. |
|---|---|

| **Paragraph 198** | **Assessment Frequency** | **Overall Compliance Status** |
|---|---|---|
| | Annually as to Data Sources #1 and #2. Bi-annually as to all other Data Sources | Partially Compliant |
| **Paragraph Language** | PRPD shall ensure that discipline for sustained allegations of misconduct is fair, consistent, based on the nature of the allegation, and that mitigating and aggravating factors are set out and applied consistently. Discipline shall be based on objective criteria and shall not depend on or be influenced by rank or external considerations. | |

| **Compliance Target(s)** | **Compliance Target** | **Status** |
|---|---|---|
| | 1. Policies incorporate all the requirements of Paragraphs 198-199. | Y |
| | 2. Discipline trainings are consistent with approved policies. | Y |
| | 3. 95% of sampled personnel are trained and certified in discipline policies (or scheduled for training, in the case of mid-year reviews). | N |
| | 4. Discipline is taken and documented in response to sustained misconduct complaints in accordance with approved policies in 95% of selected complaints. | N |
| | 5. Disciplinary matrix employs objective criteria to apply to sustained findings to assess the appropriate level of discipline. | Y |

| **Comments & Recommendations** | Aside from data on select trainings, PRPB did not provide training records requested by the Monitor's Office for a random sample of PRPB personnel. |
|---|---|

| **Paragraph 199** | **Assessment Frequency** | **Overall Compliance Status** |
|---|---|---|
| | Annually as to Data Sources #1 and #2. Bi-annually as to all other Data Sources | Partially Compliant |

CMR-3 | March 2021

| Paragraph Language | PRPD shall establish a disciplinary matrix for reviewing sustained findings and assessing the appropriate level of discipline to facilitate consistency in the imposition of discipline. All disciplinary decisions shall be documented, including the rationale behind any decision to deviate from the level of discipline set out in the disciplinary procedures. |
|---|---|
| Compliance Target(s) | This Paragraph is assessed with Paragraph 198. |
| Comments & Recommendations | |

| Paragraph 200 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually as to Data Sources #1 and #2. Bi-annually as to all other Data Sources | Not Compliant |

| Paragraph Language | PRPD shall review its drug testing program on an ongoing basis to ensure that pre-service testing for new officers and random testing for existing officers is reliable and valid. The program shall be designed to detect use of banned or illegal substances, including steroids. | |
|---|---|---|
| Compliance Target(s) | **Compliance Target** | **Status** |
| | 1. Policies incorporate all the requirements of this Paragraph. | N |
| | 2. PRPB's drug testing program trainings are consistent with approved policies. | N |
| | 3. 95% of sampled personnel are trained and certified in PRPB's drug testing program policies (or scheduled for training, in the case of mid-year reviews). | N |
| | 4. Drug tests are reliable, valid, and administered to new officers and a random selection of existing officers in accordance with the Paragraph. | N |
| Comments & Recommendations | <ul><li>Aside from data on select trainings, PRPB did not provide training records requested by the Monitor's Office for a random sample of PRPB personnel.</li><li>The Monitor raised serious concerns with the design and implementation of the drug testing policy in CMR-2. PRPB has provided no evidence of improvement for the period under assessment for CMR-3.</li></ul> | |

| Paragraph 201 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually as to Data Sources #1 and #2. Bi-annually as to all other Data Sources | Partially Compliant |

| Paragraph Language | PRPD shall provide officers and employees with a range of non-punitive supports and services to address and correct problem behavior, as part of PRPD's disciplinary and performance improvement systems. These supports and services shall include a comprehensive range of mental health services that include, but are not limited to: readily accessible confidential counseling services; critical incident debriefings and crisis counseling; mental health evaluations; and stress management training that comport with generally accepted practices. | |
|---|---|---|
| Compliance Target(s) | **Compliance Target** | **Status** |
| | 1. Policies incorporate all the requirements of Paragraphs 201-204. | Y |
| | 2. Officer assistance and support trainings are consistent with approved policies. | Y |

CMR-3 | March 2021

|  | | |
|---|---|---|
| | 3. 95% of sampled personnel are trained and certified in officer assistance and support policies (or scheduled for training, in the case of mid-year reviews). | N |
| | 4. A variety of non-punitive supports and services that comport with generally accepted practices are available to officers and their families as required by approved policies. | N/A |
| | 5. Mental health professionals are involved in developing and providing in-service training on mental health stressors related to law enforcement and the mental health services available to officers and their families. | N/A |
| | 6. Mental health counseling provided to PRPB employees is confidential, pursuant to approved policies. | Y |
| Comments & Recommendations | • Aside from data on select trainings, PRPB did not provide training records requested by the Monitor's Office for a random sample of PRPB personnel.<br>• Targets 4-5: The Monitor was unable to conduct on-site observations due to COVID-related travel restrictions. | |

| Paragraph 202 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually as to Data Sources #1 and #2. Bi-annually as to all other Data Sources | Not Compliant |
| Paragraph Language | PRPD shall train management and supervisory personnel in officer support services protocols to ensure wide availability and use of officer support services. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 201. | |
| Comments & Recommendations | | |

| Paragraph 203 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually as to Data Sources #1 and #2. Bi-annually as to all other Data Sources | Deferred |
| Paragraph Language | PRPD shall involve mental health professionals in developing and providing in-service training on mental health stressors related to law enforcement and the mental health services available to officers and their families. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 201. | |
| Comments & Recommendations | The Monitor was unable to conduct on-site observations due to COVID-related travel restrictions. | |

| Paragraph 204 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually as to Data Sources #1 and #2. Bi-annually as to all other Data Sources | Substantially Compliant |
| Paragraph Language | PRPD shall ensure that any mental health counseling services provided to PRPD employees remain confidential as consistent with generally accepted practices in the field of mental health care. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 201. | |
| Comments & Recommendations | | |

CMR-3 | March 2021

## Community Engagement and Public Information

| Paragraph 205 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| Paragraph Language | PRPD shall create robust community relationships and engage constructively with the community to ensure collaborative problem-solving, ethical and bias-free policing, and more effective crime prevention. PRPD shall integrate community and problem oriented policing principles into its management, policies and procedures, recruitment, training, personnel evaluations, tactics, deployment of resources, and systems of accountability. PRPD shall engage the public in the reform process through the dissemination of public information on a regular basis. | |
| Compliance Target(s) | Compliance is determined on two separate but inter-dependent bases: (1) the implementation of paragraphs 206 - 217, and (2) the results of outcome assessments, pursuant to Paragraph 243 of the Agreement. | |
| Comments & Recommendations | Engaging constructively with the community encompasses recruitment, training, performance, interactions, and accountability. A service-adept work force is essential in the recruitment efforts towards bias-free, and problem-oriented policing to prevent crime. Relevant structured training in community policing also promotes the constructive engagement with the community for collaboration, problem solving, crime prevention and information on a regular basis, which has an impact on performance, and determines accountability also. PRPB is yet to fully implement Community policing principles into their Bureau. There is only one or two officers assigned to community policing within the 13 police areas, and in some areas there is no officer assigned. The essence of community policing is that the police work closely with all aspects of the community to identify concerns and to find the most effective solutions. PRPB conducted a needs study, developed a plan for the allocation of resources, training, personnel deployment, mechanisms to measure community partnerships and effective problem-solving strategies, but effective implementation has not been fully demonstrated. Community cross section representation is not fully portrayed in some regions or police areas. PRPB certified that the SARA model (Scanning, Analysis, Response, and Assessment) as a strategic interactive tool for problem solving was not employed. As a result, recurring community issues distinctive of the different police areas, remain unidentified in its root nor analyzed for resolution. The SARA model is an approach developed for targeted interventions, rather than an intervention itself, and should not be considered or viewed as an alternative to interventions. Training materials for content review and methodology were not submitted for review during this period. The Monitor was only able to review an enumerated coursework available in PRPB's Action Plan (SAEA). Moreover, the dissemination of accurate and updated crime statistic including hate crimes is outdated, reflecting a failure to report it to the public on a monthly basis. | |

| Paragraph 206 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually as to Data Sources #1 and #2. Bi-annually as to all other Data Sources. | Partially compliant |
| Paragraph Language | PRPD shall reassess its staffing allocation and personnel deployment to ensure that they support community policing and problem-solving goals. PRPD shall employ a | |

Scanning, Analysis, Response, and Assessment ("SARA") model to structure its problem- solving approach.

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Policies incorporate all the requirements of Paragraph 206. | Y |
| | 2. Community policing and problem solving trainings are consistent with approved policies. | N |
| | 3. 95% of sampled PRPB members are trained and certified in community policing and problem solving, including the SARA Model. | N |
| | 4. Staff allocation and personnel deployment plan are aligned with community policing and problem solving. | N |
| | 5. 95% of sampled PRPB precincts, districts, and units implement the SARA Model. | N |
| Comments & Recommendations | • Aside from data on select trainings, PRPB did not provide training records requested by the Monitor's Office for a random sample of PRPB personnel.<br><br>• Staffing allocation and personnel deployment has not been implemented despite a needs study conducted and an implementation plan developed. Evidence of content material or methodology for training was not provided to determine if training is consistent with approved policies. PRPB did not provide a list of the trained members for sampling at this time. There is no evidence that PRPB is employing SARA model to problem solving and certified that they have not employed the model for this assessment period. In a particular area where reports indicated the model had been used, there is no specific problem identified or defined nor the steps taken towards resolution, other than a narrative. | |

| Paragraph 207 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually as to Data Sources #1 and #2. Bi-annually as to all other Data Sources. | Not Compliant |
| Paragraph Language | PRPD shall continue to conduct outreach to a broad cross-section of community stakeholders to establish extensive problem-solving partnerships and develop cooperative strategies that build mutual respect and trusting relationships. | |
| Compliance Target(s) | Compliance Target | Status |
| | 1. Policies incorporate all the requirements of Paragraph 207. | Y |
| | 2. Community partnerships and problem-solving strategies trainings are consistent with approved policies. | Y |
| | 3. 95% of sampled PRPB members are trained and certified in community partnerships and problem-solving strategies. | N |
| | 4. 95% of sampled districts, precincts, and units conduct outreach to a broad cross-section of community stakeholders. | N |
| Comments & Recommendations | • Aside from data on select trainings, PRPB did not provide training records requested by the Monitor's Office for a random sample of PRPB personnel.<br><br>• PRPB did not evidence any outreach activities wherein problem-solving partnerships were established; some police areas attributed it to the COVID-19 pandemic. The reported alliances were informal and certified documents submitted indicated that no formal alliances were formed during this assessment period. No evidence was submitted regarding efforts to secure | |

CMR-3 | March 2021

formal alliances and partnership development. Training content and
methodology were not made available to the Monitor for review.

| Paragraph 208 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Not Compliant |
| **Paragraph Language** | PRPD shall develop and implement mechanisms to measure its community partnerships and problem-solving strategies and assess their effectiveness. PRPD shall prepare a publicly available report on at least an annual basis that details its community partnerships, meetings, and problem-solving activities, including specific problems addressed and steps taken by PRPD and the community toward their resolution. The report also shall identify obstacles faced and recommendations for future improvement. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Formal Community Partnership module incorporates all the requirements of Paragraph 208. | N |
| | 2. 100% of PRPB annual reports are made publicly available. | N |
| | 3. Annual report incorporates all the requirements of Paragraph 208. | N |
| **Comments & Recommendations** | PRPB has not demonstrated the development of a mechanism to measure partnership development, problem-solving strategies, and their efforts to address issues of quality of life effectively. The Monitor's Office has not received any information in support of implementation of said mechanisms to either measure or assess their effectiveness. Also, PRPB needs to identify and provide detailed information about the obstacles or roadblocks encountered into the development of formal partnerships in order address the objectives of community policing. PRPB's overall compliance with this paragraph is not in alignment with all the requirements of community policing and problem-solving strategies and have yet to become incorporated fully. | |

| Paragraph 209 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Partially Compliant |
| **Paragraph Language** | PRPD shall continue to maintain Community Interaction Councils ("CICs") jointly with community representatives to facilitate regular communication and cooperation between PRPD and community leaders at the local level. CICs shall meet, at a minimum, every three months. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. PPRB policies require it maintain the CIC and they meet at least every three months. | Y |
| | 2. PRPB maintains CIC's as required by this Paragraph. | N |
| **Comments & Recommendations** | Though the policy exists, implementation is falling far short of requirements. PRPB reported that no meetings were held due to the Pandemic. CICs in most police areas are not fully complete. They are missing some members for a full cross section community representation. PRPB must provide evidence of mechanisms and efforts to secure full representation. | |

| Paragraph 210 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Partially Compliant |

196

CMR-3 | March 2021

| Paragraph Language | In conjunction with community representatives, PRPD shall develop a mechanism to select the members of CICs, which shall include a representative cross section of community members and PRPD officers. | |
|---|---|---|
| Compliance Target(s) | **Compliance Target** | **Status** |
| | 1. PPRB has developed a mechanism to select the members of the CICs in accordance with this Paragraph. | Y |
| | 2. Selection process for CIC members complies with Paragraph 210 and relevant policies. | Y |
| Comments & Recommendations | PRPB has demonstrated having a mechanism to select the members of the Community Interaction Councils (CIC) including a representative cross section of community members and an agent liaison/facilitator. | |

| Paragraph 211 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually as to Data Sources #1 and #2. Bi-annually as to all other Data Sources. | Partially Compliant |

| Paragraph Language | PRPD shall allocate sufficient resources and authority to ensure that CICs possess the means, staffing, access, training, and mandate necessary to fulfill their mission and the requirements of this Agreement. The operating budget shall be revisited on an annual basis in consultation with the CICs. | |
|---|---|---|
| Compliance Target(s) | **Compliance Target** | **Status** |
| | 1. Policies related to CICs incorporate the requirements of the paragraph. | Y |
| | 2. CIC orientation course is consistent with approved policies. | Y |
| | 3. PRPB makes CIC orientation available to all members of the CICs. | Y |
| | 4. 85% of CICs possess the means, staffing, and access necessary to fulfill their mission and the requirements of this Agreement. | N |
| Comments & Recommendations | CIC's remain in need of allocation of resources and personnel. Local CICs need a full cross section of community representation in all thirteen Police areas. The CIC members interviewed also noted the need for office space. PRPB did not submit any documents necessary for the Monitor's Office to assess means, staffing and access to fulfill CICs mission and the requirements of the Agreement on at least 85% of the CICs . Interviewed CICs reported that they have received training in the past, but noted that retraining can be beneficial on specific topics relevant to assist them in fulfilling their mission. CIC members interviewed noted that while they believe that the philosophy of community policing has been developed, PRPB has not fully implemented it. PRPB did not submit any documents to the Monitor's Office in support of CIC's orientation for content review and to determine quality compliance. The CIC members interviewed stated that they have never been consulted on the operating budget, or the availability of resources from the budget in order to assist them in fulfilling their mission. The exchange of information and inclusion in the process of staff allocation, access, training and revising the budget should include consultation and active participation with CICs. | |

| Paragraph 212 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Partially Compliant |

| Paragraph Language | PRPD shall work closely with CICs to develop a comprehensive community policing approach that collaboratively identifies and implements strategies to address crime and safety issues. In order to foster this collaboration, PRPD shall share appropriate information and documents with CICs, provided adequate safeguards are taken not | |
|---|---|---|

197

to disclose confidential or otherwise law enforcement sensitive information. PRPD shall seek CIC assistance, counsel, recommendations, or participation in areas including:

a) reviewing and assessing the propriety and effectiveness of law enforcement priorities and related community policing strategies, materials, and training;

b) reviewing and assessing the propriety and effectiveness of PRPD policies on matters such as discriminatory policing, search and seizure, use of force, the civilian complaint process, and victim services;

c) reviewing and assessing concerns or recommendations about specific PRPD policing tactics and initiatives;

d) providing information to the community and conveying feedback from the community to PRPD;

e) advising the Superintendent on recruiting a qualified, diverse workforce; and

f) advising the Superintendent on ways to provide data and information, including information about PRPD's compliance with this Agreement, to the public in a transparent and public-friendly format, to the greatest extent allowable by law.

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. PRPB developed a community policing approach working closely with CIC as per the requirements of the paragraph. | N |
| | 2. PRPB protects confidential and law enforcement sensitive information in documents and information it shares with the CICs. | Y |
| | 3. Every six months, PRPB sought assistance, counsel, recommendations or participation from the CICs, collectively, at least once in all areas specified by the Paragraph. | Y |
| Comments & Recommendations | CIC members interviewed believe that collaboration could be furthered if PRPB considerers a more dynamic inclusion by actively exchanging information, and demonstrate their support working together and develop strategies to tackle issues of safety and quality of life specific to their community; consider their recommendations, and become more open to constructive feedback. Some CICs believe that targeting recruitment efforts through job fairs at colleges, universities and outreach activities may strengthen PRPB's efforts to secure a qualified and diverse force. It is recommended that PRPB actively seeks the CICs input and recommendations, and develop a plan to work closely with them. | |

| Paragraph 213 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Not Compliant |
| Paragraph Language | CICs shall memorialize their recommendations in an annual public report that shall be available in PRPD facilities and on the official web pages of the Commonwealth of Puerto Rico and PRPD. The report shall include appropriate safeguards not to disclose confidential or otherwise law enforcement sensitive information and to protect sensitive personal or private information. | |
| Compliance Target(s) | Compliance Target | Status |
| | 1. PRPB published 100% of CICs annual public report with recommendations included are available on web pages of the Commonwealth of Puerto Rico and PRPB. | N |
| | 2. All CICs annual reports do not disclose confidential or otherwise law enforcement sensitive information and it protects sensitive personal or private information. | N |

CMR-3 | March 2021

| Comments & Recommendations | PRPB has not complied with a compilation of the CIC's recommendations since 2016, which included the recommendations from 2015. Law enforcement sensitive information as well as confidential information can not be assessed at this time because no report has been rendered since 2016 despite the requirement for a yearly report. |
|---|---|

| Paragraph 214 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| **Paragraph Language** | PRPD shall develop a Community Outreach and Public Information program in each of the former thirteen police regions or in other operational subdivisions with comparable geographic coverage. | |
| **Compliance Target(s)** | **Compliance Target** | **Status** |
| | 1. Community Outreach and Public Information program was developed in each of the former thirteen police regions or geographic equivalent. | N |
| | 2. At least bi-annual open meetings were held during the first two years of the Agreement. Then annually until the end of the Agreement. | N |
| | 3. 95% of the meetings were widely publicized at least one week before such meeting. | N |
| | 4. During 95% of the meetings reviewed the public was informed of the requirements of this Agreement, PRPB's progress meeting these requirements, and addressed areas of community concern. | N |
| | 5. 95% of the Outcome Reports of open meetings reviewed comply with the parameters established by this Paragraph. | N |
| | 6. 95% of the meetings reviewed included public education on an individual's right to decline consent to voluntary searches, consistent with Paragraph 77 of this Agreement. | N |
| | 7. Community Outreach and Public Information program meetings comply with Paragraphs 214-216 and parameters established in associated monitoring worksheets. | N |
| **Comments & Recommendations** | The Monitor has not been able to review whether a Community Outreach and Public Information program has been implemented in each of the 13 Police areas, because no documents were submitted in support for compliance determination. However, there is policy in place wherein duties and responsibilities are outlined including an execution plan. Meetings have not been held due to the COVID-19 and the implementation of the Executive Orders by the former Governor Wanda Vazquez Garced, as some police areas reported. No outcome reports were made available to the Monitor for compliance review, consistent with the same results in CMR-2. | |

| Paragraph 215 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| **Paragraph Language** | The Community Outreach and Public Information program shall require at least bi-annual open meetings for the first two years of this Agreement. During the meetings, PRPD officers from the police region and/or the Reform Unit shall inform the public about the requirements of this Agreement, PRPD's progress meeting these requirements, and address areas of community concern. At least one week | |

| | before such meetings, PRPD shall widely publicize the meetings using print media, the Internet, and public service announcements on television or radio. |
|---|---|
| Compliance Target(s) | This Paragraph is assessed with Paragraph 214. |
| Comments & Recommendations | No evidence has been made available to the Monitor regarding Outreach or Public information endeavors nor evidence of publicized material. It is recommended that PRPB targets their outreach efforts utilizing social platforms to hold meetings and live discussions during the pandemic. |

| Paragraph 216 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | The Community Outreach and Public Information meetings shall, with appropriate safeguards to protect sensitive information, include summaries of all audits and reports completed pursuant to this Agreement and any policy changes made and other significant action taken as a result of this Agreement. The meetings shall also include public education on an individual's right to decline consent to voluntary searches, consistent with Paragraph 77 of this Agreement. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 214. | |
| Comments & Recommendations | The Monitor did not receive any documentation about outreach or Public information endeavors nor evidence of publicized material. It is recommended that PRPB targets their efforts to virtual meetings and live discussions through social media platforms during the pandemic. | |

| Paragraph 217 | Assessment Frequency | Overall Compliance Status | |
|---|---|---|---|
| | Bi-annually | Not Compliant | |
| Paragraph Language | PRPD shall maintain and publicly disseminate accurate and updated crime statistics, including those related to hate crimes, on a monthly basis. | | |
| Compliance Target(s) | Compliance Target | | Status |
| | 1. PRPB disseminates crime statistics on a monthly basis. | | N |
| | 2. 95% of reviewed crime statistics were publicly disseminated on a monthly basis. | | N |
| | 3. 100% of hate crimes were publicly disseminated once they occurred. | | N |
| | 4. PRPB communicated hate crimes statistics to the public in a clear and easily accessible way. | | N |
| Comments & Recommendations | A review of the Puerto Rico Police's website tab for statistics lists outdated reports and does not capture or include hate crimes. The reports have not been made public on a monthly basis as required and hate crimes are not listed or identified . PRPB's website lists statistics for 2008 and 2009 and no other years beyond. The Agreement requires public dissemination of accurate and updated crime statistics including hate crimes on a monthly basis; PRPB is deemed not in compliance as a result. | | |

## Information Systems and Technology

| Paragraph 218 | Assessment Frequency | Overall Compliance Status |
|---|---|---|

| | Annually | Not Compliant |
|---|---|---|
| **Paragraph Language** | PRPD shall establish information systems and utilize technology to support the implementation of this Agreement in an efficient and effective manner. | |
| **Compliance Target(s)** | Compliance is determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 219 – 224 in tandem with applicable Paragraphs in sections III through XII and (2) the results of outcome assessments, pursuant to Paragraph 243. | |
| **Comments & Recommendations** | • With regard to CAD only, the IT Monitor assesses PRPB as being partially compliant with the Agreement, recognizing that CAD implementation is incomplete; for example, routinized academy training is unverified.<br><br>• All other IT systems remain either in development or unverified; the IT Monitor has not been provided with sufficient evidence to assess PRPB as being compliant with regard to these IT systems. | |

| **Paragraph 219** | **Assessment Frequency** | **Overall Compliance Status** |
|---|---|---|
| | Bi-annually | Not Compliant |
| **Paragraph Language** | PRPD shall collect and maintain all data and records necessary to: (a) document implementation of and compliance with this Agreement, including assisting the TCA's outcome assessments and the data collection and reporting required by this Agreement; (b) perform ongoing performance improvement activities in each of the areas addressed by this Agreement; (c) facilitate and ensure transparency and wide public access to information related to PRPD decision making and activities, as permitted by law; and (d) promote officer and civilian safety. | |

| **Compliance Target(s)** | **Compliance Target** | **Status** |
|---|---|---|
| | 1. Data dictionary includes all data sets necessary to access compliance with the Agreement. | N |
| | 2. The data systems permit PRPB to engage in ongoing performance improvement activities in each of the areas addressed by this Agreement. | N |
| | 3. PRPB makes publicly available all data that the Agreement requires be published, in accordance with PRPB policy and applicable laws. | N |
| | 4. PRPB collects and maintains data that is relevant, useful, and applicable to officer and civilian safety. | N |
| | 5. PRPB maintains data and records in compliance with the Agreement and applicable laws. | N |
| **Comments & Recommendations** | The IT Monitor has not been provided with sufficient evidence to assess PRPB as being compliant with regard to these IT systems. | |

| **Paragraph 220** | **Assessment Frequency** | **Overall Compliance Status** |
|---|---|---|
| | Bi-annually | Not Compliant |
| **Paragraph Language** | PRPD shall develop protocols for collecting, analyzing, and reporting the information required by this Agreement. These protocols shall be developed and implemented in coordination with the TCA and shall be approved by the DOJ prior to implementation. | |
| **Compliance Target(s)** | This Paragraph is assessed with Paragraph 219. | |

CMR-3 | March 2021

| Comments & Recommendations | The IT Monitor has not been provided with evidence that PRPB has developed protocols for collecting, analyzing, and reporting the information required by this Agreement. |
|---|---|

| Paragraph 221 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Not Compliant |
| **Paragraph Language** | PRPD shall develop and maintain an automated record management system and electronic files as part of the Action Plans developed for each subsection above. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | A record management system accounts for all the elements of the Paragraph and outcome measures as required by Paragraph 243. | N |

| Comments & Recommendations | Except with regard to CAD, the IT Monitor has not been provided with sufficient evidence to assess PRPB as being compliant with regard to record management. |
|---|---|

| Paragraph 222 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Not Compliant |
| **Paragraph Language** | PRPD shall provide each supervisor with handheld recording devices and require that supervisors use these devices to record complainant and witness statements taken as part of use of force or misconduct complaint investigations. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Policies incorporate all the requirements of this Paragraph. | Y |
| | 2. Handheld recording device trainings are consistent with approved policies. | N |
| | 3. 95% of sampled personnel are trained and certified in relevant policies related to handheld recording devices (or scheduled for training, in the case of mid-year reviews). | N |
| | 4. Complaint and witness statements are recorded in 95% of use of force reviews. | N |
| | 5. Complaint and witness statements are recorded in 95% of misconduct complaint investigations. | N |
| | 6. All sampled units had access to functional handheld recording equipment. | N |

| Comments & Recommendations | • Aside from data on select trainings, PRPB did not provide training records requested by the Monitor's Office for a random sample of PRPB personnel. |
|---|---|
| | • The IT Monitor has not been provided with evidence that PRPB has provided supervisors with access to recording devices in agreement with policy. |

| Paragraph 223 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Not Compliant |
| **Paragraph Language** | All officers shall have access to National Crime Information Center ("NCIC") data for valid law enforcement purposes only. PRPD shall develop a protocol for the handling and use of NCIC data. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Policies incorporate all the requirements of this Paragraph. | Y |
| | 2. NCIC data trainings are consistent with approved policies. | N |

CMR-3 | March 2021

| | | |
|---|---|---|
| | 3. 95% of sampled personnel are trained and certified in relevant policies related to handling and use of NCIC data (or scheduled for training, in the case of mid-year reviews). | N |
| | 4. NCIC data is considered in 95% of patrol interventions and investigations. | N |
| | 5. All sampled units had access to NCIC data. | N |
| | 6. PRPB safeguards appropriately protect sensitive data. | N |
| Comments & Recommendations | • Aside from data on select trainings, PRPB did not provide training records requested by the Monitor's Office for a random sample of PRPB personnel.<br>• The IT Monitor has not been provided with evidence that PRPB has provided officers with access to NCIC. | |