EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Kilómetro 0, Inc.<br><br>Peticionaria<br><br>v.<br><br>Héctor M. Pesquera López, en su capacidad oficial como Secretario del Departamento de Seguridad Pública de Puerto Rico; Henry Escalera en su capacidad oficial como Comisionado del Negociado de la Policía y otros<br><br>Recurridos | CC-2020-0004 | Certiorari |

Sentencia

En San Juan, Puerto Rico, a 12 de abril de 2021.

Desde Soto v. Secretario de Justicia, infra, este Tribunal ha destacado la importancia de que la ciudadanía tenga acceso a aquella información pública que obra en manos del Gobierno, no sólo como corolario del ejercicio de un derecho fundamental, sino también como una parte vital de la fiscalización de la función pública. Sin embargo, también hemos reconocido que tal derecho no es absoluto, pues el Estado puede imponer restricciones al acceso a la información en servicio de un interés público superior.

CC-2020-0004                                                          2

En esta ocasión, nos corresponde examinar una restricción a tal derecho por la vía de un reclamo de confidencialidad por parte del Estado. En específico, debemos determinar si ciertos informes relacionados a la política pública promovida por la Reforma de la Policía son susceptibles a la revisión pública o si, por el contrario, el Estado tiene un interés apremiante en no divulgar tal documentación. Procedemos, entonces, a relatar el trasfondo fáctico y procesal de la controversia ante nuestra consideración.

I

El 18 de marzo de 2019, Kilómetro 0, Inc. (KM0) presentó una petición de mandamus en contra del Secretario del Departamento de Seguridad Pública, el Comisionado del Negociado de la Policía de Puerto Rico (NPPR), la Directora del Registro Demográfico y el Gobierno de Puerto Rico (Estado)[1]. En lo pertinente, solicitó la entrega de: (1) la base datos del NPPR sobre el uso de fuerza por parte de sus miembros desde el 2014 al presente, actualizada, en un formato procesable tipo Excel y sin datos agrupados; (2) las estadísticas de muertes, heridas graves y mutilaciones causadas por el uso de fuerza en el NPPR desde el 2014 al presente; y (3) las copias de todos los Informes de Uso de

---

[1] En aquel entonces, el Secretario del Departamento de Seguridad Pública era el Sr. Héctor M. Pesquera López; el Comisionado del Negociado de la Policía de Puerto Rico era el Sr. Henry Escalera y la Directora del Registro Demográfico era la Sra. Wanda Llovet Díaz.

Fuerza o Formularios PPR-854 emitidos desde el 2014 al presente.[2] Argumentó que se trata de información pública cuya divulgación no está protegida.

En respuesta, el Estado presentó una moción de desestimación.[3] En lo que nos concierne, arguyó que los Informes de Uso de Fuerza no son documentos públicos, pues constituyen una comunicación interna entre el miembro del NPPR y su supervisor. En la alternativa, planteó que éstos recogen información de testigos e informantes que, de revelarse, desmotivarían su participación en el proceso. Planteó que el Informe de Uso de Fuerza es de carácter privilegiado, pues contiene información sensitiva. A su vez, añadió que KM0 carecía de legitimación activa. Por último, razonó que la expedición del mandamus tendría un impacto adverso en los intereses públicos y constituiría una intromisión indebida en el poder ejecutivo.

Por su parte, KM0 se opuso a la desestimación.[4] Argumentó que los Informes de Uso de Fuerza son documentos públicos,

_____

[2]Con respecto al Registro Demográfico, KM0 solicitó copia de los certificados de defunción de veintiún (21) personas identificadas en los Informes de Uso de Fuerza, como también copia actualizada de la base de datos sobre causas de muerte. Eventualmente, fueron entregados los certificados de defunción disponibles y KM0 desistió de este reclamo. El Tribunal de Primera Instancia acogió el desistimiento en una sentencia parcial.

[3]El Estado acompañó su solicitud de desestimación con una copia de la base de datos sobre el uso de fuerza y afirmó su cumplimiento con la petición de las estadísticas sobre el uso de fuerza.

[4]Por otro lado, KM0 también sostuvo que el Estado no entregó la totalidad de la información estadística que

CC-2020-0004                                                      4

así originados, expedidos y conservados por el NPPR. Planteó

que la Orden General Capítulo 600, Sección 605 (OG 600-605)

del NPPR, firmada por el Superintendente de la Policía, sólo

cataloga como confidenciales los informes que involucran a

menores de edad. Adujo que ello tampoco supera el crisol del

escrutinio estricto y sugirió que cualquier información

confidencial podría tacharse o ennegrecerse. Afirmó su

legitimación activa al amparo del derecho constitucional al

acceso a la información.

En una réplica, el Estado indicó que, aún si los

Informes de Uso de Fuerza fueran documentos públicos, existe

un interés apremiante que justifica su confidencialidad.

Reiteró que KM0 no tiene legitimación activa y afirmó que la

controversia se tornó académica cuando entregó lo relacionado

a las bases de datos, las estadísticas y los certificados de

defunción.

Así las cosas, el Tribunal de Primera Instancia emitió

una sentencia en la cual reconoció, en primer lugar, que KM0

tiene legitimación activa para instar su reclamo. Concluyó,

además, que el Informe de Uso de Fuerza es un documento

público, pues es creado, expedido y conservado en el NPPR,

como también redactado por un funcionario público en el

desempeño de sus funciones. Determinó que documentos que

narran hechos acontecidos no son confidenciales. Asimismo,

infirió que el que un documento pueda utilizarse para la

solicitó y que la base de datos de uso de fuerza se entregó
con los datos agrupados.

CC-2020-0004                                                        5

implementación de políticas institucionales no lo exime de
ser publicado. Razonó que el Estado no presentó prueba o
fundamento que evidenciara que la divulgación de los Informes
de Uso de Fuerza afectaría o perjudicaría el interés público
o el funcionamiento del Gobierno.

En desacuerdo, el Estado presentó un recurso de
apelación y una solicitud de auxilio de jurisdicción ante el
foro apelativo intermedio. Adujo que no tiene un deber
ministerial de proveer acceso a los Informes de Uso de
Fuerza, pues se trata de un escrito sobre actuaciones
departamentales con fines internos. Afirmó que existen
razones de orden público que impiden su divulgación, a saber,
que éstos contienen información personal de testigos y
afectados, y que la divulgación inhibiría a los funcionarios
públicos de prepararlos sin temor. Indicó que su interés en
proteger las investigaciones de uso de fuerza es superior al
interés de KM0 en el acceso a tal información.

Con este planteamiento ante su consideración, el
Tribunal de Apelaciones emitió una sentencia y revocó el
dictamen del foro primario. Determinó que el derecho al
acceso a la información pública cede ante el interés de
salvaguardar los derechos de terceros. Esto, pues, los
Informes de Uso de Fuerza contienen información personal de
los testigos y los afectados. Añadió que su divulgación podía
impactar las investigaciones en curso o la Reforma de la
Policía ante el foro federal.

CC-2020-0004                                                        6

Inconforme, KMO presentó una solicitud de <u>certiorari</u> ante este Foro. Expedimos el recurso solicitado el 6 de marzo de 2020. En suma, KMO señaló que los informes sólo contienen una narración de hechos, no evaluaciones sobre los mismos o recomendaciones de política pública. Rechazó, además, que éstos se utilizaran únicamente para fines investigativos internos. Argumentó que limitar el acceso a este tipo de documento imposibilitaría la fiscalización pública. Reiteró que nada impide que se divulgue toda la información que no sea confidencial.[5]

Por su parte, el Estado argumentó que el derecho al acceso a la información no es absoluto y cede ante intereses públicos, como lo son el proteger información confidencial y prevenir un impacto sobre investigaciones o sobre la Reforma de la Policía.

Con el beneficio de los escritos de ambas partes, procedemos a resolver si, en primer lugar, los <u>Informes de Uso de Fuerza</u> constituyen documentos públicos susceptibles a ser divulgados y revisados por la ciudadanía. En segundo lugar, este Tribunal debe determinar si el Estado probó el interés apremiante que justifica la denegación del acceso a los mismos. Veamos.

**II**

**A.**

---

[5]Además, KMO indicó que el NPPR todavía no había provisto la base de datos actualizada en un formato procesable y sin datos agrupados.

CC-2020-0004                                                        7

Como pilar de toda sociedad democrática, los ciudadanos y ciudadanas de Puerto Rico poseen un derecho fundamental al acceso a la información pública, el cual está estrechamente vinculado con los derechos a la libertad de palabra, prensa y asociación. Art. II, Sec. 4, Const. ELA, LPRA, Tomo 1; Trans Ad de P.R. v. Junta de Subastas, 174 DPR 56, 67 (2008); Ortiz v. Dir. Adm. de los Tribunales, 152 DPR 161 (2000); Soto v. Srio. de Justicia, 112 DPR 477, 485-486 (1982). Este derecho garantiza que toda persona pueda examinar el contenido de los expedientes, **informes** y documentos **que hayan sido recopilados por el Estado durante sus gestiones gubernamentales.** Ortiz v. Dir. Adm. de los Tribunales, supra. Este mandato constitucional también ha sido avalado en nuestro ordenamiento por la vía estatutaria, la cual reconoce que "[t]odo ciudadano tiene derecho a inspeccionar y sacar copia de cualquier documento público de Puerto Rico, salvo lo expresamente dispuesto en contrario por la ley". Art. 409 del Código de Enjuiciamiento Civil de Puerto Rico, 32 LPRA sec. 1781.

El derecho al acceso a la información pública se ancla en la idea de que todas las personas están legitimadas a saber y a conocer de los asuntos gubernamentales. E. Rivera Ramos, La libertad de información: Necesidad de su reglamentación en Puerto Rico, 44 Rev. Jur. UPR 67, 67-68 (1975). Esto, pues, en una sociedad democrática, "resulta imperativo reconocer al ciudadano común el derecho legal de examinar e investigar cómo se conducen sus asuntos". Ortiz

v. Dir. Adm. de los Tribunales, supra (citando a Soto v.
Srio de Justicia, supra, pág. 485). Su importancia está
enraizada en la noción de que el conocimiento de las
gestiones públicas facilita la libre discusión de los
asuntos gubernamentales y, por ende, el ejercicio pleno de
la libre expresión. Colón Cabrera v. Caribbean Petroleum,
170 DPR 582, 590 (2007).

Asimismo, tal conocimiento permite evaluar y
fiscalizar la función pública de forma más adecuada, como
también cataliza una participación ciudadana más efectiva e
inteligente en los procesos gubernamentales. Esto, a su vez,
promueve la transparencia en la función gubernamental,
estimulando, así, la sana administración pública. Bhatia
Gautier v. Gobernador, 199 DPR 59, 80-81 (2017). Dicho de
otro modo, como herramienta fiscalizadora, el derecho al
acceso a la información faculta a las personas a emitir
juicios informados sobre los actos de su gobierno. Colón
Cabrera v. Caribbean Petroleum, supra. Como se sabe,
nuestros principios democráticos "garantizan el derecho del
pueblo a pasar un juicio fiscalizador sobre todas las
acciones y determinaciones del Gobierno". Trans Ad de P.R.
v. Junta de Subastas, supra, pág. 67. De lo contrario,
"[p]ermitir que el gobierno maneje los asuntos públicos bajo
el manto de la secretividad es invitar a la arbitrariedad,
la mala administración, la indiferencia gubernamental, la
irresponsabilidad pública y la corrupción". Rivera Ramos,
op. cit., pág. 69. Por lo cual, "[h]oy día la secretividad

en los asuntos públicos es excepción y no norma". <u>Santiago</u>

<u>v. Bobb y El Mundo, Inc.</u>, 117 DPR 153, 159 (1986).

Ahora bien, el derecho al acceso a la información

requiere, como precursor, que la información que se solicita

sea, en efecto, de naturaleza pública. <u>Bhatia Gautier v.</u>

<u>Gobernador</u>, supra, pág. 81. A esos fines, el Artículo 1(b)

de la Ley de Administración de Documentos Públicos de Puerto

Rico, Ley Núm. 5 de 8 de diciembre de 1955, según enmendada,

3 LPRA sec. 1001, define documento público como:

> [T]odo documento que se origine, conserve o
> reciba en cualquier dependencia del Estado
> Libre Asociado de Puerto Rico de acuerdo con la
> ley o en relación con el manejo de los asuntos
> públicos y que de conformidad con lo dispuesto
> en la sec. 1002 de este título se haga conservar
> que se requiera conservar permanentemente o
> temporalmente como prueba de las transacciones
> o por su valor legal. Incluye aquellos
> producidos de forma electrónica que cumplan con
> los requisitos establecidos por las leyes y
> reglamentos.

Es decir, "un documento público es el que un organismo

estatal recibe en el curso de sus procedimientos y que está

obligado a preservar." <u>Trans Ad de P.R. v. Junta de</u>

<u>Subastas</u>, supra, pág. 69. Así, "[u]na véz un documento cae

bajo alguna de estas definiciones, el ciudadano común tiene

derecho a solicitar acceso a la información y, como

veremos, el Estado sólo podrá negar válidamente el acceso

a un ciudadano interesado en un número determinado de

supuestos." <u>Ortiz v. Dir. Adm. De Los Tribunales</u>, supra,

pág. 176. Entiéndase, una vez el documento es catalogado

como público, todo ciudadano y ciudadana tiene legitimación

CC-2020-0004                                                    10

activa para solicitar y acceder a tal información. Colón
Cabrera v. Caribbean Petroleum, supra, pág. 589. Esto, pues
"[e]n la medida en que todo ciudadano tiene el derecho a
inspeccionar cualquier documento público, el acto de
denegar el acceso, por sí mismo, causa al solicitante un
daño claro, palpable y real". Ortiz v. Dir. Adm. de los
Tribunales, supra, pág. 177. En fin, este derecho requiere
que el Estado divulgue toda información pública con el fin
de "expeditar el camino de los ciudadanos interesados --
inclusive críticos y adversarios-- en averiguar la verdad
y no sembrar el camino de obstáculos". Soto v. Srio de
Justicia, supra, pág. 504.

No obstante, en ocasiones previas hemos reconocido
circunstancias particulares en las que el Estado puede
reclamar que se preserve la confidencialidad de cierta
información pública. Para que un reclamo de
confidencialidad triunfe, el Estado debe probar de forma
precisa e inequívoca la aplicabilidad de alguna de las
siguientes excepciones: (1) que una ley así lo declara;
(2) que la comunicación está protegida por algún privilegio
evidenciario; (3) que la divulgación de la información
puede lesionar derechos fundamentales de terceros; (4) que
se trate de un confidente, según la Regla 515 de Evidencia
de 2009, 32 LPRA Ap. VI, o (5) que sea información oficial
conforme a la Regla 514 de Evidencia de 2009, 32 LPRA Ap.
VI. Santiago v. Bobb y El Mundo, Inc., supra.

Sin embargo, aquellas restricciones que el Estado impone en el acceso a la información deben satisfacer los criterios de un escrutinio estricto. Véase, <u>Bhatia Gautier v. Gobernador</u>, supra, pág. 82; <u>Ortiz v. Dir. Adm. de los Tribunales</u>, supra, pág. 178; <u>Colón Cabrera v. Caribbean Petroleum</u>, supra, pág. 593. Es decir, al momento de invocar alguna de las excepciones precitadas, el Estado no puede negar el acceso a la información pública de forma caprichosa o arbitraria. <u>Colón Cabrera v. Caribbean Petroleum</u>, supra, pág. 590. Cuando el Estado reclama la confidencialidad de algún documento público, éste "tiene la carga de probar que satisface cualquiera de las excepciones antes enumeradas". Íd., pág. 591. Por consiguiente, la negación por parte del Estado a la divulgación de información pública debe estar fundamentada y justificada, pues "[n]o bastan meras generalizaciones". <u>Santiago v. Bobb y El Mundo, Inc.</u>, supra.

Por tal razón, los tribunales debemos ser "cautelosos en conceder livianamente cualquier pedido de confidencialidad del Estado". <u>Santiago v. Bobb y El Mundo, Inc.</u>, supra. Así, "[a]nte la hermética resistencia del Estado a viabilizar el derecho de acceso a la información, corresponde a los tribunales franquear el camino". <u>Soto v. Srio de Justicia</u>, supra, pág. 504. De lo contrario, se avalaría el retroceder en los avances a favor del derecho al acceso a la información gubernamental y a la igualdad entre el Estado y los ciudadanos. <u>Eng'g Servs. Int'l, Inc.</u>

CC-2020-0004                                          12

v. Autoridad de Energía Eléctrica de Puerto Rico, 2020 TSPR

103 (citando a Santiago v. Bobb y El Mundo, Inc., supra,

pág. 160.)

**B.**

En el 2008, el Departamento de Justicia de los Estados

Unidos (DOJ por sus siglas en inglés) comenzó una

investigación sobre unos alegados patrones de uso de fuerza

excesivo, registros y allanamientos inconstitucionales, y

ciertas prácticas policiacas discriminatorias en la entonces

llamada Policía de Puerto Rico (PPR). En respuesta, la PPR se

comprometió a una reforma mediante la publicación de su Plan

de Excelencia en el 2011. En ese mismo año, el DOJ publicó un

informe en el cual identificó ciertas deficiencias que debían

ser atendidas de forma sistemática en la PPR, entre éstas: el

uso de fuerza, la supervisión externa y rendición de cuentas,

y la interacción con la comunidad.

Luego de ciertos años de cooperación entre la PPR y el

DOJ, el 17 de julio de 2013, el Gobierno de Puerto Rico y los

Estados Unidos suscribieron el Acuerdo para la Reforma

Sostenible de la Policía de Puerto Rico (Acuerdo).[6] Éste se

presentó ante el Tribunal de Distrito de Puerto Rico con el

propósito de afirmar el compromiso de la PPR con ofrecer

servicios     policiacos     al     margen     de     los     derechos

---

[6]Policía de Puerto Rico, Acuerdo para la Reforma
Sostenible de la Policía de Puerto Rico,
https://docs.google.com/file/d/0Bztr-
H26ENotOUdvR2hzajdVM0E/view (última visita, 19 de febrero
de 2021).

constitucionalmente garantizados a la ciudadanía. Asimismo, el Acuerdo consignó el reconocimiento de que la seguridad pública, las actuaciones policiacas constitucionales y la confianza de la comunidad operan de forma interdependiente.

En el esfuerzo de reformar las prácticas de la PPR, el Acuerdo destacó las siguientes áreas para desarrollo: (1) profesionalización; (2) uso de fuerza[7]; (3) registros y allanamientos; (4) igual protección y no discrimen; (5) reclutamiento, selección y nombramiento; (6) políticas y procedimientos; (7) adiestramiento; (8) supervisión y administración; (9) querellas administrativas, investigaciones internas y disciplina; (10) interacción con la comunidad e información pública, y (11) sistemas de información y tecnología. En lo pertinente, el Acuerdo estableció un procedimiento para la notificación de cualquier uso de fuerza por parte de un miembro de la PPR:

> 36. La PPR desarrollará una política de elaboración de informes sobre uso de fuerza y un formulario de Informe de Uso de Fuerza que cumplan con las leyes aplicables y estén acordes con las prácticas policiacas generalmente aceptadas. La política de Informes de Uso de Fuerza obligará a los miembros de la PPR a notificar a su supervisor inmediato luego de cualquier uso de fuerza, lesión a un arrestado o alegación de uso de fuerza excesiva. En los casos que involucren el uso fuerza grave, la notificación será dentro de una (1) hora, a menos que existan circunstancias apremiantes.
>
> 37. La política de Informes de Uso de Fuerza requerirá que todos los miembros de la PPR informen

---

[7] Según las definiciones del Acuerdo, el uso de fuerza se refiere a "cualquier coacción física utilizada para afectar, influenciar o persuadir a una persona para que cumpla con una orden de un miembro de la PPR, más allá de ser esposado sin oponer resistencia, incluyendo desenfundar un arma de fuego y apuntarla."

CC-2020-0004                                                   14

por escrito todo uso de fuerza usando un formulario
de Informe de Uso de Fuerza antes de finalizar su
turno. Dicho Informe incluirá: (a) una descripción
detallada del incidente desde la perspectiva del
miembro de la PPR; (b) el motivo de la presencia
inicial de la policía; (c) una descripción
específica de los actos que motivaron el uso de
fuerza, incluyendo el comportamiento de el o los
individuos; (d) el nivel de resistencia
enfrentado; y (e) una descripción de cada tipo de
fuerza utilizado. La política de Informes de Uso
de Fuerza prohibirá explícitamente el uso de
lenguaje repetitivo o concluyente en todos los
informes de uso de fuerza. El hecho de no reportar
un uso de fuerza o lesión a un arrestado por parte
de un miembro de la PPR será causa para someter a
dicho miembro de la PPR, incluidos sus
supervisores y oficiales de alto rango, a medidas
disciplinarias.
     [...]
     39. La política de Informes de Uso de Fuerza
dispondrá que los miembros de la PPR presenten copias
de dicho Informe a su supervisor inmediato y a la SARP
para su seguimiento y análisis. La SARP conservará
las copias originales de estos Informes en un lugar
central.

     A su vez, el Acuerdo instauró un procedimiento escalonado
para la revisión, investigación y análisis de tales informes
con el fin de determinar si la conducta estuvo justificada y
ajustada a la política de la PPR. También impuso a la PPR la
responsabilidad de, por lo menos una (1) vez al año, analizar
la data "para determinar las tendencias significativas,
identificar y corregir las deficiencias detectadas por este
análisis, y documentar sus conclusiones en un informe
público."

     A raíz de esta política, se crearon la Orden General
Capítulo 600, Sección 601, intitulada "Reglas para el Uso de

CC-2020-0004                                                    15

la Fuerza" (OG-600-601)[8], y la Orden General Capítulo 600, Sección 605, titulada "Informe e Investigación de Incidentes de Uso de Fuerza de Miembros de la Policía de Puerto Rico" (OG 600-605)[9]. La OG 600-601 fija los límites que rigen el uso de fuerza por parte de los miembros del ahora llamado NPPR, el cual debe amoldarse a los derechos de la ciudadanía así reconocidos en nuestro ordenamiento. En suma, ésta instruye a los miembros del NPPR a utilizar un nivel de fuerza mínimo, razonable y proporcional a la amenaza. Además, ordena a todos los miembros del NPPR involucrados en un incidente de uso de fuerza a notificarlo a su supervisor inmediato y a cumplir con el procedimiento implantado por la OG 600-605.

Por su parte, la OG 600-605 decreta la política pública de que todos los incidentes de uso de fuerza tienen que ser reportados por los miembros del NPPR de forma oportuna, completa y precisa. A su vez, asienta las normas y los procedimientos para reportar e investigar todos los incidentes de uso de fuerza. En esencia, todo miembro del NPPR que utilice la fuerza contra más de una (1) persona o animal tiene que completar un Informe de Uso de Fuerza, también conocido como el Formulario PPR-854. Cada informe debe incluir una descripción detallada del incidente desde la

---

[8] Policía de Puerto Rico, Orden General 600-601, https://docs.google.com/file/d/1yVPFAatDYvSnQpoON6z403Lmd 3sM--Zh/view (última visita, 19 de febrero de 2021).

[9] Policía de Puerto Rico, Orden General 600-605, https://docs.google.com/file/d/0Bztr-H26ENotSU14aUs5U1B2Nnc/view (última visita, 19 de febrero de 2021).

CC-2020-0004                                                    16

perspectiva del miembro del NPPR, sin lenguaje estereotipado
o concluyente, y, además: el motivo de la presencia inicial
del NPPR en el lugar; una descripción específica de los actos
que motivaron el uso de fuerza, incluyendo el comportamiento
de la persona contra quien se utilizó la fuerza; el nivel de
resistencia enfrentado; una descripción de cada tipo de fuerza
utilizado, y toda aquella información relacionada a lesiones
y tratamiento médico recibido o rechazado por el miembro del
NPPR o la persona contra quien se utilizó la fuerza.

                              c.

    El mandamus es un recurso altamente privilegiado y
discrecional mediante el cual se exige a una persona natural
o jurídica el cumplimiento de un deber ministerial dentro de
las atribuciones o deberes del cargo que ocupa. Art. 649 del
Código de Enjuiciamiento Civil, 32 LPRA sec. 3421. Un deber
ministerial se refiere a un mandato específico que no admite
ejercicio de discreción en su cumplimiento. Romero Lugo v.
Cruz Soto, 2020 TSPR 143; AMPR v. Srio. Educación, ELA, 178
DPR 253, 264 (2010); Báez Galib y otros v. C.E.E. II, 152 DPR
382 (2000). Debido a su naturaleza extraordinaria, el mandamus
está disponible únicamente cuando "el peticionario carece de
un recurso adecuado y eficaz en el curso ordinario de la ley".
Art. 651 del Código de Enjuiciamiento Civil, 32 LPRA sec.
3423; Aponte Rosario v. Presidente Comisión Estatal de
Elecciones, 2020 TSPR 119.

    Ahora bien, al momento de considerar si procede o no
conceder el mandamus, los tribunales tienen la obligación de

CC-2020-0004                                                      17

considerar el impacto del recurso en los intereses públicos involucrados, la posible intromisión indebida en las gestiones de la Rama Ejecutiva y el efecto sobre los derechos de terceros. Romero Lugo v. Cruz Soto, supra (citando a Noriega v. Hernández Colón, 135 DPR 406, 448 (1994)); Bhatia Gautier v. Gobernador, supra, pág. 75. En lo que concierne al caso ante nuestra consideración, este Tribunal ha determinado que el recurso de mandamus es el indicado para "lograr la inspección y para obtener copia de documentos públicos." Bhatia Gautier v. Gobernador, supra (citando a Ortiz v. Panel F.E.I., 155 DPR 219 (2001)).

Expuesto el derecho aplicable, procedemos a discutir su aplicación a esta controversia.

### III

En su petición ante este Tribunal, KMO afirma que los Informes de Uso de Fuerza son documentos públicos y mantiene que su divulgación facilitaría la fiscalización del NPPR por parte de la ciudadanía. Niega que los informes se usen exclusivamente para propósitos internos investigativos y aduce que, aún si estos incluyeran información confidencial, nada impide el acceso a aquella que no goce de tal condición. Añade que el Estado no ha demostrado el interés apremiante que supera su derecho al acceso a la información.

Por su parte, el Estado reitera que la divulgación no procede ante el interés público de proteger información confidencial y prevenir un impacto en sus investigaciones. A su vez, reafirma que los Informes de Uso de Fuerza no son

de naturaleza pública, pues se producen como parte de las funciones del miembro del NPPR para fines internos administrativos e investigativos.

Conforme discutimos, toda controversia sobre el derecho al acceso a la información requiere que, en primer lugar, determinemos si el documento o la información que se solicita es de carácter público. Precisa, pues, examinar si los Informes de Uso de Fuerza solicitados por KMO constituyen información pública sujeta a la revisión de la ciudadanía. Según indicamos, nuestro ordenamiento considera como documento público todo aquel que se origina, conserva o reciba en cualquier dependencia de Estado y que esté relacionado con el manejo de asuntos públicos. Ley de Administración de Documentos Públicos de Puerto Rico, supra, 3 LPRA sec. 1001(b). Asimismo, este Tribunal ha reconocido que el término "documentos públicos" incluye aquella gama de escritos oficiales que son preparados por funcionarios públicos en el desempeño de un deber público. Pueblo v. Millán Meléndez, 110 DPR 171, 176 (1980) (citando a Cirino v. Fuentes Fluviales, 91 DPR 608, 614-616 (1964)).

En el caso que nos ocupa, el Acuerdo decreta que el Informe de Uso de Fuerza se refiere a un informe escrito en el cual los miembros del NPPR documentan todos los usos de fuerza por encima de la colocación de esposas sin oposición. Como es sabido, el NPPR es una dependencia del Departamento de Seguridad Pública, así adscrita al poder ejecutivo. Los informes en controversia se producen en el NPPR y, en virtud

CC-2020-0004                                                          19

del Acuerdo y la OG 600-605, son completados por los miembros del NPPR y se conservan en la Superintendencia Auxiliar de Responsabilidad Profesional (SARP), división del NPPR que realiza las investigaciones internas de los miembros y empleados del NPPR. Es decir, los Informes de Uso de Fuerza se originan, reciben y conservan en una dependencia del Estado. Asimismo, se trata de documentos que recopilan información sobre incidentes específicos que ocurren durante el desempeño del deber público y que deben prepararse como parte de las funciones del cargo que ocupan los miembros del NPPR. En consecuencia, debemos concluir que los Informes sobre el Uso de la Fuerza son, en efecto, documentos públicos.

Así determinado que la información que solicita KMO emana de un documento público, nace el derecho de todo ciudadano o ciudadana a accederla. Como hemos expresado, toda persona tiene derecho a acceder a la información pública que se recopila en la gestión gubernamental. Eng'g Servs. Int'l, Inc. v. Autoridad de Energía Eléctrica de Puerto Rico, supra. Sin embargo, tal derecho no es absoluto, pues puede estar sujeto a limitaciones por parte del Estado siempre y cuando estas no sean caprichosas o arbitrarias. Es decir, tales obstáculos al ejercicio del derecho a acceder la información pública deben servir un interés apremiante del Estado. Bhatia Gautier v. Gobernador, supra, pág. 61.

CC-2020-0004                                                    20

Por consiguiente, ahora debemos escudriñar la negación del Estado a divulgar los _Informes de Uso de Fuerza_. En ocasiones previas, este Tribunal ha reconocido circunstancias excepcionales en las que el derecho al acceso a la información pública se ve forzado a ceder ante consideraciones de política pública y, en consecuencia, la información se mantiene confidencial. _Trans Ad de P.R. v. Junta de Subastas_, supra, pág. 68. Estas circunstancias se limitan a: (1) cuando una ley así lo declara; (2) cuando la comunicación está protegida por algún privilegio evidenciario que pueda ser invocado por los ciudadanos, _Sierra v. Tribunal Superior_, 81 DPR 554 (1959); (3) si revelar la información puede lesionar los derechos fundamentales de terceros, _E.L.A. v. P.R. Tel. Co._, 114 DPR 394 (1983); (4) si se trata de un confidente, según la Regla 515 de Evidencia de 2009, y (5) si es información oficial, según la Regla 514 de Evidencia de 2009. Véase _Colón Cabrera v. Caribbean Petroleum_, supra, pág. 591. Cónsono con esto, el Estado es quien tiene el peso de demostrar que la confidencialidad de un documento público se justifica mediante un interés apremiante. En este contexto, no bastan las meras generalizaciones ni los fundamentos arbitrarios. _Santiago v. Bobb y El Mundo, Inc._, supra.

Ahora bien, el análisis judicial de un reclamo de confidencialidad "dependerá de la excepción que invoque el Estado _vis-à-vis_ el pedido de información". _Nieves v. Junta_, 160 DPR 97, 104 (2003). Sin embargo, es importante

enfatizar que nuestra jurisprudencia ha reconocido que, entre esos dos (2) derechos, la balanza debe inclinarse a favor del reclamante de la solicitud y en contra del privilegio. Nieves v. Junta, supra; López Vives v. Policía de P.R., 118 DPR 219, 233 (1987). Entiéndase, "[l]a balanza debe inclinarse hacia un reconocimiento mayor del derecho a la información". A.M. López Pérez, El privilegio ejecutivo frente al derecho a la información pública, 34 (Núms. 2-3) Rev. Der. Pur. 345, 359 (1994).

En suma, el reclamo de confidencialidad del Estado en el caso de autos se fundamenta en tres (3) razones principales: (1) que los Informes de Uso de Fuerza se recopilan para fines investigativos y su divulgación podría afectar las investigaciones en curso; (2) que los informes contienen información sensitiva de terceros, y (3) que su divulgación representaría un disuasivo para que los miembros del NPPR o los testigos completen el Formulario PPR-854 con la sinceridad y franqueza requerida.

En cuanto al primer fundamento, este Tribunal coincide con que la protección de investigaciones en curso constituye un interés gubernamental apremiante. En efecto, el descargue adecuado de la función de seguridad pública requiere que el Estado tenga a su disposición un aparato investigativo capaz. Soto v. Srio. de Justicia, supra, pág. 494. No obstante, no se puede perder de vista que el interés en proteger las investigaciones en curso concluye de forma simultánea con el fin de la investigación. Es decir, una

CC-2020-0004                                                    22

vez termina la indagación oficial, cesa el riesgo de que la

divulgación de los Informes de Uso de Fuerza tenga un

impacto sobre la misma. En consecuencia, si bien este

interés puede excusar que se limite el acceso a aquellos

Informes de Uso de Fuerza que están bajo investigación,

éste no justifica la restricción del acceso a los informes

cuya pesquisa arribó a su fin.[10]

---

[10]Cabe mencionar que algunas cortes en jurisdicciones
estatales han explorado y rechazado aserciones similares a
las que el Estado presenta en este caso. A modo de ejemplo,
la Corte Suprema de Nueva Jersey concluyó que, en contraste
con declaraciones de testigos y reportes investigativos con
detalles narrativos, la divulgación de los Informes de Uso
de Fuerza "presents far less of a risk of taint to an
ongoing investigation", en especial ante una falta de
evidencia sobre su efecto adverso en el interés público. N.
Jersey Media Grp., Inc. v. Twp. of Lyndhurst, 229 N.J. 541,
577-78, 163 A.3d 887, 908 (2017). Asimismo, ciertos
tribunales estatales parecen descartar la contención de que
estos informes no pueden divulgarse por tratarse de
documentos internos que velan por el cumplimiento con la
política pública de la agencia y la conducta de sus
miembros. Entre éstos, una corte en Nueva Jersey determinó
que no considera "the possible, speculative use of a UFR in
an internal affairs investigation to provide the necessary
basis for precluding access under [the Open Public Records
Act]." O'Shea v. Twp. of W. Milford, 410 N.J. Super. 371,
386, 982 A.2d 459, 468 (App. Div. 2009). Análogamente, la
Corte Suprema de Arkansas denegó que informes de esta
naturaleza constituyeran un tipo de evaluación del empleado
público o que generara récords internos sobre su empleo, de
modo que estuvieran exentos de ser divulgados. Thomas v.
Hall, 2012 Ark. 66, 15, 399 S.W.3d 387, 395 (2012). También,
una corte en Nueva York rechazó que los Informes de Uso de
Fuerza cualificaran como récords personales y que, por ende,
estuviera prohibida su divulgación, pues razonó que, aun si
estos pudieran usarse para evaluar el desempeño de un
oficial, ese no sería su único uso. Prisoners' Legal Servs.
of New York v. New York State Dep't of Corr. & Cmty.
Supervision, 173 A.D.3d 8, 13, 98 N.Y.S.3d 677, 681 (2019).
De forma similar, una corte en Texas refutó que los Informes
de Uso de Fuerza no pudieran divulgarse "because they are
not any more reasonably related to an individual officer's
employment relationship with the department than an
'offense report' completed by the same officer detailing

CC-2020-0004                                                    23

Por otra parte, ante el planteamiento de que existe una clasificación categórica de confidencialidad para los <u>Informes de Uso de Fuerza</u>, es necesario señalar que el Acuerdo no establece que toda la información recopilada como parte de sus iniciativas está cobijada por manto alguno de confidencialidad. De hecho, el Acuerdo se limita a establecer que el Asesor de Cumplimiento Técnico (también llamado el Monitor Federal) y el DOJ

> "mantendrán la confidencialidad de toda la información **que no sea de naturaleza pública provista por la PPR,** el CUJC, o cualquier otra agencia del ELA, conforme a este Acuerdo. Salvo en lo provisto expresamente en el Acuerdo, este Acuerdo no se considerará una renuncia a ningún derecho o privilegio que la PPR, el CUJC, o cualquiera otra agencia del ELA pueda ejercer, incluidos aquellos reconocidos por el derecho común o establecidos por ley, reglas o reglamentos, contra cualquier otra persona o entidad respecto a la divulgación de cualquier documento." (Énfasis suplido).

Como cuestión de hecho, la única protección expresa que fija el Acuerdo con respecto a la información recopilada se extiende a aquella información de identificación personal.

En esta línea, el segundo fundamento del Estado está relacionado con la protección de los derechos de terceros a preservar la confidencialidad su información personal o sensitiva. Sobre el particular, según ha establecido este Tribunal en ocasiones reiteradas, cuando una ley o un reglamento niega a un ciudadano el acceso a la información

---

the same incident." <u>City of San Antonio v. San Antonio Exp.- News</u>, 47 S.W.3d 556, 565 (Tex. App. 2000).

pública, la regulación debe satisfacer un escrutinio judicial estricto. <u>Ortiz v. Dir. Adm. de los Tribunales</u>, supra, pág. 178. Tal estándar se mide con los siguientes requisitos: (i) que el ejercicio regulatorio esté dentro del poder constitucional del gobierno; (ii) que éste propulse un interés gubernamental apremiante; (iii) que tal interés no esté directamente relacionado con la supresión de la libertad de expresión; y (iv) que la restricción a la libertad de expresión no sea mayor de lo necesario para propulsar dicho interés. Íd.

Al aplicar los lineamientos jurídicos antes citados a la negación cabal del Estado de divulgar los informes, resulta meridianamente claro que obstaculizar el acceso a la totalidad de la información meramente porque contiene información personal constituye una restricción mayor de lo necesario para proteger su interés. Dicho de otro modo, salvaguardar el derecho de terceros a que la información que los identifique no se revele no impide permitir el acceso a aquella parte del documento que no infringe tal protección.

Ante ese cuadro, la OG 600-605 cataloga como confidencial una única categoría de <u>Informes de Uso de Fuerza</u> y ordena a la SARP a "[m]antener de manera independiente, separada y confidencial los expedientes sobre incidentes de uso de fuerza que involucren menores de edad, incluyendo los originales de los Informes de Uso de Fuerza. Estos expedientes no serán accesibles sin mediar

orden judicial, aun cuando la investigación haya concluido." Sin embargo, esa imposición de confidencialidad no está respaldada por un interés apremiante que justifique mantenerla. Entiéndase, ni la OG 600-605 ni las comparecencias del Estado durante este trámite judicial acreditan un interés particular e imperioso sobre la confidencialidad de los Informes de Uso de Fuerza que involucran a menores de edad.[11]

Si, como fue el caso con el resto de los Informes de Uso de Fuerza, el interés del Estado yace en proteger la información de identificación personal del menor, como ya se discutió, ello no requiere la denegación tajante del acceso al informe. En efecto, nuestro ordenamiento ha reconocido como política pública el proteger la información personal de víctimas y testigos, incluyendo a menores de

---

[11] De forma similar, el Estado apunta al Artículo XV del Reglamento para el Recibo, Trámite, Investigación y Adjudicación de Querellas Administrativas contra Empleados de la Policía de Puerto Rico, Reglamento Núm. 8841 de 31 de octubre de 2016, como fundamento para argumentar que existe un mandato expreso que prohíbe el acceso a la información recopilada en los expedientes de investigación que se albergan en el SARP, salvo a ciertas instancias específicas. Cabe mencionar que este artículo no hace referencia alguna a los Informes de Uso de Fuerza, sino que versa sobre las investigaciones de las querellas administrativas contra los miembros del NPPR. Además, conforme ya discutimos, un reglamento que prohíbe plenamente el acceso a la información pública debe, entre otros requisitos, proteger un interés apremiante y no ser más excesivo de lo necesario para proteger tal interés. El artículo precitado no hace mención de un interés apremiante, pero, presumiendo que el interés descansa en proteger las investigaciones en curso o la información de identificación personal, aplica el mismo razonamiento ya expuesto.

edad, dentro de un contexto judicial o investigativo.[12] No
obstante, como ya indicamos, esto no obtura la divulgación
del resto del informe, más aún cuando este tipo de
información representa una herramienta clave en la
vindicación de los derechos de las víctimas. Ello es todavía
más imperante en los casos de menores de edad, quienes se
encuentran en una posición incluso más vulnerable en
circunstancias de esta índole.

En definitiva, el interés en proteger la información
de identificación de las víctimas, testigos y menores no es
incompatible con la divulgación del resto del Informe. Negar
el acceso a la totalidad de esta información es,
inequívocamente, una restricción mayor de lo necesario para
proteger tal interés. La garantía de salvaguardar la
información de identificación personal puede asegurarse sin
atrancar el acceso al resto de la información a la que tiene
derecho la ciudadanía y cuya reserva el Estado aún no ha
podido justificar.

Como argumento final, el Estado sostiene que la
divulgación de los Informes de Uso de Fuerza tendría un
efecto disuasivo sobre los miembros del NPPR, quienes se
sentirían inhibidos de completar los informes con la
sinceridad, franqueza y honestidad que requiere el proceso.
Avalar la confidencialidad de estos informes usando como

---

[12]Véase, la Ley Núm. 22 del 22 de abril de 1988, según
enmendada, conocida como la Ley para Establecer la Carta de
Derechos de las Víctimas y Testigos de Delito, 25 LPRA sec.
973 et seq.

escudo la idea de que, de ser revelados a la ciudadanía, el
Estado no podría asegurar la responsabilidad y honestidad
de los miembros del NPPR, obra en contra de la propia
política pública que persiguen el Acuerdo y la OG 600-605.
En consecuencia, es una paradoja invocar el interés de
promover que los miembros de la Policía sean más honestos
reportando los incidentes de uso de la fuerza condicionando
tal deber a que sea ejercido bajo un manto de secretismo.
Esa pretensión no constituye un interés apremiante, sino un
interés preocupante y contrario a la Reforma de la Policía.

Siendo la transparencia y la rendición de cuentas
principios rectores de la Reforma de la Policía, el Acuerdo
reconoce que, "[p]ara garantizar la responsabilidad pública
de la PPR", es necesaria "la recopilación y la difusión
pública de información sobre los esfuerzos realizados a la
reforma y sus resultados", publicados de "manera oportuna
y confiable para así fortalecer la confianza de la
ciudadanía en la PPR." A su vez, el Acuerdo ordena al NPPR
a desarrollar "una política de intercambio de información
con el público sobre el uso de fuerza grave y la
diseminación de información a los miembros de las familias
de los civiles involucrados en un incidente donde se haga
uso de fuerza." Conforme lo reconoció el Monitor Federal en
su Primer Informe, "[l]a rendición de cuentas pública del
uso policial de la fuerza letal es una piedra angular de la
confianza entre el NPPR y la comunidad a la que protegen.
Cualquier falta de transparencia en estos asuntos de interés

CC-2020-0004                                                              28

público   significativo   solo   resultará   en   un   impacto
perjudicial en la confianza del pueblo en su Policía. Lo
anterior es claramente antagónico con los objetivos del
Acuerdo."[13]   Queda   diáfanamente   claro,   pues,   que   la
fiscalización ciudadana no solo es fomentada por el Acuerdo,
sino que también es parte esencial de la implementación
efectiva de la Reforma de la Policía.[14]

---

[13]Policía de Puerto Rico, <u>Primer Informe del Monitor
Federal Marzo 2020, cubriendo de octubre 2018 a junio 2019;
Estado del Negociado de la Policía de Puerto Rico de
conformidad con el Acuerdo entre el Departamento de Justicia
de los Estados Unidos y el Estado Libre Asociado de Puerto
Rico     aprobado     por     la     Corte     Federal,
https://policia.pr.gov/wp-content/uploads/2020/06/Primer-
Informe-del-Monitor-Federal-espanol.pdf</u> (última visita, 19
de febrero de 2021).

[14]En el Primer Informe antes citado, el cual se presentó
en el caso <u>United States of America v. Commonwealth of
Puerto Rico and Police Department of Puerto Rico</u>, Civil No.
3:12-cv-2039, el Monitor Federal expresó sus preocupaciones
sobre   la   rigurosidad   de   las   investigaciones   y   las
conclusiones sobre los incidentes de uso de fuerza: "[e]l
hecho que tantos casos carecen tanto de declaraciones de
testigos como de evidencia forense, y a pesar de ello,
fueron cerrados por la [División de Investigación de Uso de
Fuerza] y confirmados por la [Junta de Revisión de Uso de
Fuerza del Superintendente] como usos justificados de
fuerza en conformidad con la política, es inverosímil **y
probablemente no sobreviviría un escrutinio público
intenso.**" (Énfasis suplido). Asimismo, pronunció que "el
público merece un nivel de transparencia por parte de
aquellos que tienen la capacidad única y devastadora de
quitarle la vida a otro mientras actúan bajo el palio de la
ley. Una responsabilidad tan significativa conlleva el
deber de ser transparente y actuar de conformidad con la
ley en todo momento, sin excepciones." En su Segundo
Informe, el Monitor Federal encontró discrepancias en la
documentación y el reporte de los incidentes de uso de la
fuerza por parte de los miembros del NPPR, concluyendo que
tales deficiencias "1) failed to hold PRPB accountable for
the greater number of force incidents that actually occurred
and 2) failed to provide PRPB's management with the
necessary information to make informed decisions." De igual
forma, reiteró que "[t]he significance of establishing

Por ende, en ausencia de un interés apremiante que justifique infringir incondicionalmente sobre el derecho al acceso a la información de la ciudadanía, el Estado no puede ocultar los <u>Informes de Uso de Fuerza</u> de investigaciones que ya concluyeron. Asimismo, su reclamo de confidencialidad se puede extender únicamente a la información de identificación personal de las víctimas, testigos y menores de edad, por lo que, fuera de esto, el

---

"Real Time" accurate information on use of force incidents occurring Bureau-wide cannot be overstated. As previously noted, for the Puerto Rico Police Bureau to effectively monitor its members' use of force, **it must have accurate and timely information and must also be transparent and provide that information to the residents of Puerto Rico upon request.**" (Énfasis suplido). Policía de Puerto Rico, <u>Second Report of the Federal Monitor – December 2020 (July 2019 to March 2020); Compliance status of the Puerto Rico Police Bureau in accordance with the Federal Court approved Settlement Agreement between the United States Department of Justice and the Commonwealth of Puerto Rico,</u> https://noticiasmicrojuris.files.wordpress.com/2020/12/1649-1.pdf (última visita, 19 de febrero de 2021). Por otro lado, en su reporte de diciembre de 2014 a junio de 2015, el Monitor Federal notó discrepancias y anomalías estadísticas en los reportes del uso de la fuerza. Policía de Puerto Rico, <u>Six-Month Report of the Technical Compliance Advisor December 7, 2014 – June 7, 2015,</u> https://docs.google.com/file/d/0Bztr-H26ENotblVWWXpjVFg5ZkU/view (última visita, 19 de febrero de 2021). En otro reporte, **enfatizó su preocupación sobre la habilidad del NPPR para auditar sus propias estadísticas sobre el uso de la fuerza.** Policía de Puerto Rico, <u>Six-Month Report of the Technical Compliance Advisor December 9, 2015 – June 9, 20169, 2016,</u> https://docs.google.com/file/d/0Bztr-H26ENotdVFCQ3EwTnlNNms/view (última visita, 19 de febrero de 2021). Recientemente, también reiteró la existencia de inconsistencias en la documentación y el reporte de incidentes de uso de la fuerza. Policía de Puerto Rico, <u>Seventh Six-Month Report of the Technical Advisor June 10, 2017 – March 31, 2018,</u> https://docs.google.com/file/d/1-iNE61EgOjgdyJUns3PY0L6x1DP5yHgt/view (última visita, 19 de febrero de 2021).

CC-2020-0004                                          30

resto del <u>Informe de Uso de Fuerza</u> es susceptible a ser divulgado.

**IV**

Por los fundamentos antes expresados, se modifica la sentencia del Tribunal de Apelaciones. Por consiguiente, se ordena a la parte recurrida a entregar la documentación solicitada, según los parámetros aquí establecidos. Es decir, a entregar los informes o documentos relacionados con investigaciones ya concluidas y protegiendo la divulgación de información personal de las víctimas, testigos y menores de edad. En consecuencia, se devuelve el caso al Tribunal de Primera Instancia para los procedimientos ulteriores dirigidos a cumplir con lo aquí dictaminado y se dispone que tal foro ejercerá todos los mecanismos disponibles para garantizar que la parte recurrida cumpla con lo aquí ordenado.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. El Juez Asociado señor Rivera García concurre en parte y disiente en parte, con la siguiente expresión, a la cual se une la Jueza Asociada señora Pabón Charneco:

"No hay duda de que el acceso a la información pública es un pilar fundamental en toda sociedad democrática. Es por esto, que reconocimos que el derecho de la prensa y de los ciudadanos a tener acceso a la información

pública como uno fundamental. Véase *Soto v. Secretario v. de Justicia*, 112 DPR 477(1982). Es una garantía constitucional firmemente ligada al ejercicio de los derechos de libertad de palabra, prensa y asociación consagrados en nuestra constitución. Art. II, Sec. 4, Const. ELA, LPRA, Tomo I. En armonía con lo anterior, concurrimos con la presente sentencia al considerar que los **Informes sobre el Uso de Fuerza** son documentos públicos, según el Art. 3(b) de la Ley Núm. 5 de 8 de diciembre de 1955, conocida como la Ley de Administración de Documentos Públicos de Puerto Rico, según enmendada. No obstante, disentimos que estos Informes se deban divulgar, por entender que el Estado tiene un interés apremiante de proteger la información confidencial que se desprende de los mismos. Veamos.

Es menester puntualizar que este Tribunal ha expresado que el derecho a la información no es absoluto y está **sujeto a aquellas limitaciones que, por necesidad imperiosa, el Estado imponga.** *Bhatía Gautier v. Gobernador*, 199 DPR 59, 84 (2017). Sin embargo, estas restricciones deben estar debidamente justificadas, puesto que no puede negarse el acceso a la información pública

de manera caprichosa y arbitraria. *Colón Cabrera v. Caribbean Petroleum*, 170 DPR 582, 589 (2007). Dado que el acceso a la información pública es un derecho fundamental, para prevalecer, las restricciones impuestas por el aparato gubernamental deben responder a un **interés apremiante** del Estado. *Colón Cabrera v. Caribbean Petroleum,* supra. Así, hemos establecido que existen situaciones en que este derecho debe ceder en atención a otros imperativos de interés público.

En ese sentido, a través de nuestra jurisprudencia hemos establecido los supuestos en los cuales el Estado puede reclamar válidamente la confidencialidad de información que obra en su poder, a saber: (1) cuando una ley así lo declara; (2) cuando la comunicación está protegida por alguno de los privilegios evidenciarios que pueden invocar los ciudadanos; (3) cuando revelar la información puede lesionar derechos fundamentales de terceros; (4) cuando se trate de la identidad de un confidente; o **(5) cuando se trate de "información oficial", conforme a la Regla 514 de las de Evidencia,** 32 LPRA Ap. IV. *Bhatía Gautier v. Gobernador*, supra.

Consonó con lo anterior, la Regla 514 define "información oficial" como "aquélla adquirida en confidencia por una persona que es funcionaria o empleada pública en el desempeño de su deber y que no ha sido oficialmente revelada ni está accesible al público hasta el momento en que se invoca el privilegio". Regla 514(a) de las de Evidencia, supra. Por otro lado, este privilegio se activa "si el tribunal concluye que la materia es información oficial y su divulgación está prohibida por ley, o que divulgar la información en la acción sería **perjudicial a los intereses del gobierno**". Regla 514(b) de Evidencia, *supra*.[16] Por lo tanto, un reclamo de confidencialidad por parte del gobierno puede prosperar cuando se trate de información oficial que perjudique los intereses del gobierno.

Tal y como nos expresa el tratadista Chiesa Aponte, este privilegio surge de **la necesidad del gobierno de mantener confidencial cierta información para la buena marcha del gobierno**, particularmente en relación con la franca discusión de las alternativas gubernamentales o posibles cursos de acción para atender los múltiples problemas sociales, económicos —y de otra índole— del Estado [...].E.L. Chiesa Aponte,

*Tratado de derecho probatorio*, República Dominicana, Ed. Corripio, [s. año], T. I, pág. 292. Así pues, al evaluar un reclamo de confidencialidad, hay que sopesar, por un lado, la necesidad de que el gobierno mantenga como confidencial cierta información sensitiva y el perjuicio que pueda invocar el gobierno, y, por otro lado, la necesidad de la parte que solicita la información y su derecho a obtenerla. E.L. Chiesa Aponte, *Reglas de Evidencia comentadas*, San Juan, Ed. Situm, 2016, pág. 164.

En el presente caso, el Gobierno sostiene que los referidos Informes sobre Uso de Fuerza se preparan para fines internos de investigación. Además, arguye que bajo el *Acuerdo para la Reforma Sostenible de la Policía de Puerto Rico* (Acuerdo) se obliga a los miembros de la Policía a notificar a sus supervisores inmediatos sobre cualquier incidente de uso de fuerza, de lesión a un arrestado o de alegación de uso de fuerza excesiva, con el objetivo de mantener controles internos. Estos Informes sirven el propósito específico de que el Negociado de la Policía pueda mantener los controles internos que son requeridos como parte del Acuerdo. En ellos, los policías esbozan sus interpretaciones acerca de

CC-2020-0004                                                    35

los incidentes en los cuales hicieron uso de la fuerza, hechos ocurridos y plasman sus impresiones mentales y conclusiones subjetivas en cuanto a éstos.

En consecuencia, a la luz de estos planteamientos, entendemos que le asiste la razón al Estado. Ciertamente, existe un interés apremiante en cuanto a mantener la confidencialidad de dichos documentos que resulta muy superior al interés de la parte que desea acceder a tales informes. Es decir, proveer acceso a estos Informes tendría consecuencias adversas sobre el interés público que se busca proteger, pues podría disuadir a los funcionarios obligados a cumplimentarlos a actuar con la libertad y entereza necesaria para cumplir con el deber de reportar los incidentes de uso de fuerza. Somos del criterio, que ello podría aumentar exponencialmente las probabilidades de que estos opten por ocultar o alterar información sobre tales eventos. En consecuencia, el interés público se vería severamente afectado y se perjudicaría la efectividad de las investigaciones de incidentes de uso de la fuerza que tiene que realizar el Negociado de la Policía de Puerto Rico.

CC-2020-0004                                                    36

Es menester que los miembros de la Policía de Puerto Rico puedan cumplimentar dichos informes con la mayor libertad y franqueza, ya que esto promueve la mejor y más efectiva identificación y prevención de conducta impropia. Así se desarrollan controles internos que facilitan la imposición de las medidas correctivas y disciplinarias correspondientes para atacar los eventos de abuso de autoridad en la uniformada.

En consecuencia, razonamos que existe un interés apremiante por parte del Estado en limitar la divulgación de los señalados Informes sobre Uso de la Fuerza, cual responde a proteger la efectividad del funcionamiento del gobierno. Un curso de acción en contrario resultaría perjudicial a las gestiones investigativas de la principal agencia de seguridad en Puerto Rico. Precisamente, obstaculizaría el efectivo cumplimiento de los acuerdos otorgados con el Departamento de Justicia de los Estados Unidos para la Reforma de la Policía de Puerto Rico."

Lcda. Bettina Zeno González
Secretaria Interina del Tribunal Supremo