

April 2021



Federal Monitor's Report: PRPB Response to the July Crisis

Assessment of the Puerto Rico Police Bureau's Response to the July 2019 Mass Demonstrations, in accordance with the Federal Court approved Settlement Agreement between the United States Department of Justice and the Commonwealth of Puerto Rico

John Romero
Federal Monitor

July 2019 Crisis | April 2021

## Table of Contents

**Introduction**……………………………………………………………………….... 3
**Overview of Findings**…………………………………………………………….... 5
**Assessment**……………………………………………………………………….... 5
  Areas of Compliance**………………………………………………………… 5
  Areas of Non-Compliance**……………………………………………….... 7
**Recommendations**……………………………………………………………….....12
**Conclusion**………………………………………………………………………….14
**Appendix A: Comparison of PRPB Use of Force Reporting and Independent Accounts of PRPB Use of Force**…………………………………………….16
**Appendix B: Day-by-day Analysis of Use of Force Incidents**………………..18
**Appendix C: Further Reading**……………………………………………………. 41

## I.   Introduction

During the summer of 2019, the Commonwealth of Puerto Rico ("Commonwealth") faced an unprecedented historic event when thousands of people[1] took to the streets to demand the resignation of then Governor, Ricardo A. Rosselló Nevares. The demonstrations followed the indictments and arrests of two high level cabinet members on corruption charges and the leak of a private Telegram chat between former Governor Rosselló and members of his inner circle.

The exchanges through the messaging application Telegram included derisive and offensive comments about numerous established government officials, journalists, and celebrities. The chats included discussions on how to destabilize public institutions such as the University of Puerto Rico, the government radio station WIPR, the Institute for Statistics, and the Electric Power Authority. The chats further included discussions of "how to interfere with the work of a federally appointed monitor for the police department," meaning the work of the Monitor's Office itself.[2]

The manifestations lasted around 15 days and took place primarily in the areas surrounding the Governor's official residence, La Fortaleza ("Palacio de Santa Catalina"), and many of the streets leading to and within Old San Juan. Demonstrations and marches also took place in other public spaces such as highways, squares and streets. The above events have gone down in Puerto Rican history as "the July crisis" and also commonly referred to as "the Summer of 2019".

Although there have been countless mass demonstration events throughout the Commonwealth's history, never before has a governor stepped down from its position due to public pressure and massive protests. It is the Federal Police Monitor's Office (FPM) opinion that this is a fundamental fact to consider in the analysis of the Puerto Rico Police Bureau's (PRPB) response to the mass demonstrations given the historical conjuncture of the same and the volatile environment that PRPB had to deal with during the entire 15 days of mass demonstrations.

---

[1] There is no official number of people who attended the mass protests.
[2] Yarimar Bonilla. 2019. "The Leaked Texts at the Heart of Puerto Rico's Massive Protests." https://www.thenation.com/article/archive/puerto-rico-rossello-protests-scandal/

Throughout the mass demonstrations, the Federal Monitor's Team maintained presence at points within, and at times, outside the premises of La Fortaleza, to observe PRPB's response to the mass protests and to monitor its compliance with the Agreement. The Monitors wrote daily reports of their observations at the police lines, which form the bases of the observations and recommendations of this report.

As the FPM team was able to observe, the vast majority of the PRPB members were diligent in handling the vast challenges that the mass protests generated. The FPM notes that the mass demonstrations remained mostly peaceful during the day, but turned hostile towards the PRPB, and at times violent, during night hours, which compelled the PRPB to use force to disperse the crowds and make arrests[3].

The present report intends to provide an assessment as to the handling of the above-mentioned events as they pertain to the PRPB and to serve as a supplement to the Chief Monitor's Second Report (CMR II) and as a reference in the event of mass protests premised on our recommendations. Our assessment is based on direct observations by the FPM team of the mass protests, as well as analysis of the video footage and additional documentation provided by traditional and social media at protest sites[4]. Based on these materials, the Federal Monitor's Office outlines a number of areas in which PRPB used force in compliance with PRPB policy, as well as incidents where PRPB personnel did not comply with use of force policies that have been developed by the Parties in relation to the Agreement.

However, after the July 2019 events, PRPB has shown evidence that it has learned from that experience and modified its strategy and tactics at the start of the following year. In January 2020 Puerto Rico experienced similar demonstrations/protest at La Fortaleza (three demonstrations/protest). In all three of these demonstrations, the FPM observed a more controlled response in cases where the police had to engage protestors.

---

[3] As the FPM team was able to see both through firsthand observations and through multiple media accounts, after the protests ended, the Old San Juan area suffered massive damages to public and private property and at times resembled a war zone.

[4] The present Report takes into account material that was published by the civil rights advocacy group, Kilómetro Cero, which issued a document in July 2019 in response to PRPB actions.

## II.    Overview of Findings

The Monitor's office notes that PRPB largely complied with pertinent approved policy in their response to the July 2019 mass demonstrations. The police made a commendable effort to avoid using force, and when necessary, generally used force consistent with the Bureau Policy (G.O. 600-625). For example, PRPB generally used tear gas to disperse crowds only when protesters turned aggressive and gave proper warning before using the same.

Moreover, there was a sufficient ratio of supervisors to officers (one supervisor per 10 officers) at most protest sites. Officers were replaced at the line regularly to avoid fatigue during hot nights and ensure they remained properly hydrated, especially after the first- and second-night demonstrations in Old San Juan. Finally, the Monitor's Office took note that PRPB expended significant effort to act according to the fluid dynamic of the protesters – increasing or decreasing the threat level depending on how protesters behaved at any given time. Areas of compliance are discussed in more detail in Section 3 below.

The Federal Monitor's Office did, however, identify areas of non-compliance, which relate to isolated meaningful events where PRPB's response indicated excessive or unreasonable use of force in violation with the Bureau policies adopted in accordance with the Agreement, or other misconduct in suppression of First Amendment rights. Said incidents of non-compliance will also be addressed in detail in Section 3 below and in a detailed day-by-day analysis of use of force incidents which is attached to the present Report as **Appendix B**.

## III.    Assessment

### A. Areas of Compliance

As noted above, the overall PRPB approach to the July 2019 protests was in line with Bureau Policies approved according to the Agreement. Below, we identify several key areas of compliance:

### 1. Operational Plans

The PRPB personnel working at protest sites prepared, met and discussed operational plans prior to the protests. A sufficient 1 to 10 ratios of supervisors to officers was maintained at most protest sites. Officers were replaced at the line every hour to avoid fatigue and ensure they remained properly hydrated.

### 2. Effort to Avoid Using Force

According to the observations of the Monitor's office, the police made a clear effort to avoid using tear gas to disperse the crowd. On every occasion that the Monitor team was present at the police line during the July demonstrations, Monitors observed that the PRPB avoided engaging with protesters unless it became necessary. When protesters became aggressive toward the police, usually beginning around 11pm, PRPB gave the crowd multiple warnings about dispersing from the area before using force. Throughout the night, the police would constantly ask the crowd to stop throwing dangerous objects at them, and that if they continued doing so, the police would be forced to disperse the crowd using approved and authorized use of force techniques such as the use of tear gas.

### 3. Most Uses of Force Abided by Policy

When force was used, it was largely consistent with PRPB policy. On the several occasions that attacks against police continued, the PRPB Incident Commander would give the corresponding order to disperse, along with instructions on which directions to disperse safely. The PRPB also warned any protesters who suffered from respiratory issues that tear gas would be utilized and they should leave the area immediately. On at least two occasions, the Monitor Team, as well as officers not wearing tear gas masks, were affected by the tear gas in the air due to wind direction factors and the narrow streets surrounding La Fortaleza and proximate streets.

The PRPB performed similarly at all protests the Monitoring Team was present. However, the Monitor cannot attest as to the performance of the PRPB once the police line was crossed and the police began utilizing crowd dispersing tactics and followed some of the protesters through the streets near Fortaleza. Beyond that point, supervision broke down and these incidents will be addressed further below.

### 4. Responding to Fluid Crowd Dynamics

PRPB responded to crowd dynamics by increasing and decreasing officer presence and threat levels as appropriate. When the crowd size grew at different points in time, PRPB increased the number of officers accordingly consistent with approved practices. Similarly, when the violent threat level from the crowd increased at times, PRPB substituted soft-uniformed officers at the front line with riot-equipped officers.

PRPB increased or decreased the threat level in accordance with how the dynamic among protesters evolved over time at each protest site. The Monitor personally observed this strategy in display on several occasions between July 15th and July 29th. During the July 15th protests at Fortaleza, when the protesters began to throw rocks and other dangerous projectiles, including scissors (which landed a few feet away from the Monitors) at the officers, the front-line officers were immediately replaced by officers with safety equipment and supported by Division of Tactical Operations (DOT) personnel.

When protesters began hurling objects at officers, they were warned by police via loudspeakers to cease and desist, and PRPB further announced that they wished to avoid confrontation with protesters. When protests took on more peaceful dynamic, the PRPB scaled back its police coverage. There were no reported "life threatening injuries" on either side as the numbers of protesters and the number of police accordingly grew in size.

### 5. PRPB worked with Monitor's Recommendations

Finally, PRPB showed its openness to accepting and implementing recommendations from the Monitor's Office. A daily report by the Monitor's Office from July 16th, 2019 indicates that PRPB implemented recommendations from July 15th, 2019, including provision of additional gas masks for personnel, additional shields for frontline personnel, and adding rooftop observers to determine crowd size and direction of protests. Another recommendation that was implemented included removing officers without helmets from the front lines. When individual protesters attempted to breach the perimeter at protest sites, PRPB conducted arrests in line with the Bureau Policy (G.O. 600-625 Crowd Control).

### B. Areas of Non-Compliance

Despite the overall well-organized response to mass protests previously described, there were also areas of non-compliance and isolated meaningful events that raise serious concerns for the Monitor. According to observations by the Monitor's Office, as well as accounts from independent media, individual PRPB officers used excessive force in some instances. Additionally, there is a discrepancy between the number of uses of force cases reported by the PRPB and instances of excessive use of force as reported by the media and observers. A comparison of PRPB use of force reporting and independent accounts of PRPB use of force in those incidents is attached to the present Report as **Appendix A**.

Based on our investigation, we found that the abovementioned events took place when the police used additional force against protesters after dispersing the crowd at the initial police line on Fortaleza Street. In numerous cases, once the crowd had already begun dispersing, PRPB personnel ventured out beyond the police line and continued using additional methods of force, including tear gas, pepper spray, batons, rubber pellets and bullets.

During these heated moments, some of the actions taken by individual PRPB officers were in violation with the Bureau's policy and were not properly reported and investigated in line with the policies (G.O 600-605). In the aftermath of the protests, the PRPB did not identify officers engaged in excessive use of force and did not take the corresponding disciplinary actions where necessary in line with G.O. 600-625.

The following are several areas of non-compliance that should be noted:

### 1.  Insufficient Equipment

During the protests, there were limited numbers of masks and shields provided to the officers, particularly those at the front lines. The Monitor's office reported this in their report based on the observations of the protest at Fortaleza on July 15th, 2019. This violates generally accepted policing practices and puts officers in danger by leaving them exposed to gas, as well as rocks and other projectiles thrown at the police by protesters.

### 2.  Poor Communication

At some protest sites there was a lack of information related to crowd size, location and direction. The Monitor's Office deems it important that the PRPB assigns Incident Commanders to each of the Command Centers, so that all information or requests can be directed to the Incident Commander.

### 3.  Use of Corrections Officers at the Police Line

A specialized unit from the Department of Corrections and Rehabilitation was deployed to assist and even to relieve officers at La Fortaleza. The unit deployed is trained to handle prison riots, which is an entirely different form of crowd control that is not adequate for use against civilians exercising their freedom of expression and to peaceful assemble to petition the government for redress. The Monitor's

Office strongly cautioned the PRPB and the Secretary of Public Safety that this unit should not be deployed to the police line, and instead should only be used to protect La Fortaleza from behind the perimeter gates, at which point any protesters who would encounter the corrections officers would officially be trespassing. These officers were not properly trained to adequately respond to protest according to the policies required by the Agreement. However, notwithstanding our recommendations the Monitors observed that members of the corrections unit were deployed to the police line to relieve police officers, which significantly increased the risk of improper use of force against demonstrators.

### 4. Breakdown in Supervision

Though PRPB largely used force per policy to disperse aggressive and unruly crowds, individual officers did use excessive force when they ventured out beyond established police lines to pursue the already dispersing crowd. Most of the excessive uses of force occurred beyond police lines, when officers were acting without effective supervision.

According to the Monitoring Team's observations and the evidence documented by traditional and social media, the Monitor's Office has reached the conclusion that there was no command structure in place once the police breached their own lines in an effort to further disperse the crowd. Officers acted independently and not under the instructions of supervisors who should have been directing their actions and providing supervision. In many cases, as previously stated, this breakdown in supervision resulted in individual officers using unnecessary and excessive force (such as rubber bullets, batons, tear gas, etc.) beyond the initial police line and not properly reporting such uses of force as required by PRPB forms, as per Policy 600-625.

### 5. Excessive Use of Force

During the previously described events, individual PRPB officers used excessive force on numerous occasions, including beating with batons, kicking and punching, and improper and dangerous use of less-than-lethal munitions. Numerous videos document PRPB personnel inflicting physical injuries on protesters, even in instances when those protesters did not appear to have resisted arrest or to have posed risk to officers or bystanders at the that force was used.

As stated above, a detailed account of specific incidents is attached to the present Report as Appendix B. Based on these events, the Monitor's Office notes multiple

areas in which PRPB officers used excessive force and/or in violation of PRPB policy and the Agreement:

**Use of baton:** The videos provided by the New York Times in its coverage of the July Crisis document two incidents in which police use batons on protesters. In these cases, the use of force needed to be in compliance with G.O. 600-601 (governing Use of Force) and G.O. 600-605 (governing Reporting and Investigating Use of Force). After the use of force, PRPB officers should have made arrests and report the reason both for the arrest and the use of force but did not.

**Use of pepper spray:** According to independent media reports, PRPB used pepper spray in numerous occasions, and without any advance warning. These uses of force, many of which have been addressed above in the day-by-day analysis, stand in marked contrast to PRPB use of tear gas to disperse crowds. In the latter case, PRPB made significant effort to warn the crowds assembled at the police line ahead of using tear gas to disperse them. In the accounts shared regarding use of pepper spray, in contrast, individual PRPB personnel appear to have used pepper spray without providing protesters the opportunity to comply with their orders. This practice and tactic must cease in future mass events.

**Use of rubber pellets and bullets:** In numerous videos provided by independent media sources, PRPB personnel are seen using less-than-lethal munitions in a manner that is inconsistent with PRPB policy and can lead to serious and even death. Some of the cases reported demonstrate clear violations of PRPB policy as will be explained in detail in Appendix 2.

In numerous other cases, however, the Monitor's Office is not able to reach a determination based on the evidence provided. In many of the documented cases of PRPB using rubber bullets/pellets against protesters, sources provide evidence of injury, but not of police misconduct. The incidents were addressed by PRPB through general use of force reports. **However, the Monitor's Office has not seen a single use of force investigation regarding these particular incidents**. **This is a matter of serious concern since one would expect that during the time that has elapsed after the July 2019 protests PRPB should have investigated those incidents and prepared the corresponding reports.**

### 6. Reporting and Investigating Uses of Force

PRPB is required to properly document and investigate all uses of force to determine that they were lawful and justified. The Monitor's Office has concluded that PRPB did not properly document, report or investigate every instance when use of force was used.

This issue in part reflects a shortcoming with PRPB force reporting policy, which allows PRPB officers to report multiple uses of less-than-lethal force under a single umbrella report. The Monitor's Office has determined that in most cases PRPB filed general use of force reports that only refer to the initial lawful dispersal of the crowd during protests.  Some of the subsequent police actions included in this report took place blocks away from the initial use of less-than-lethal force incidents and **represent totally separate actions**. Though PRPB policy allows force to be reported in this manner, including these incidents under the same complaint number, this is not consistent with generally accepted police practices. In other instances, however, the lack of force reporting appears to have resulted from the breakdown in supervision and a lack of will to hold officers accountable. In cases such as this, where there were clear violations by officers, PRPB should have made every effort to identify those officers who engaged in excessive use of force. Those officers who were identified should have been disciplined accordingly. In instances where the officers could not be identified, PRPB should have engaged in wholesale retraining of the officers and supervisors of the respective units consistent with General Orders 600-625, 600-601, 600-620 and any additional pertinent general order.

## IV.   Recommendations

In order to ensure that the inappropriate actions taken by some PRPB officers are not repeated in response to future protests, the FPM furnishes several recommendations that will assist PRPB in reaching the aforementioned goal.

Although only a limited number of officers were seen using excessive force, the Monitor's Office expects PRPB to accept the conclusions presented on these cases and take ownership for the actions which were not in compliance with the Bureau's policy. The Monitor's Office proposes the following recommendations to be implemented by the PRPB:

July 2019 Crisis | April 2021

Use of Force and Force Reporting Policy

1. **Ensure consistency in guidance on the use of force:** PRPB must review its own guidance and ensure that it is consistent across different operational units.

2. **Ensure that the use of force is sufficiently and consistently reported:** Given the inconsistencies between the actual PRPB reports on the use of force and additional data that the Monitor's Officer were able to access, we recommend that the PRPB pays close attention and ensures that all officers report all cases of application of force for review. PRPB must immediately cease the practice of reporting multiple uses of less-than-lethal force by STUs under the umbrella of a single use of force complaint number in crowd control situations.

3. **Consider updating their methods of crowd control to include less use of force to bring PRPB in line with the best police practices:** Use of rubber bullets, pepper spray and Gas by PRPB is permitted by their regulations (PPR600-620) under certain circumstances. However, the Monitor reminds PRPB that the use of rubber bullets can be fatal. Members of the Monitor team have reviewed the policies of other major police departments in the United States.  It is well known that the use of rubber bullets has declined in other police forces and other means are currently being used.

4. **Institute mechanisms for internal investigations through which PRPB can identify and investigate cases of misconduct in a timely fashion.**

5. **Take all steps possible to identify, investigate and discipline those officers who used excessive force during protests of July 2019**.

6. **Require identified officers to go through retraining on G.O. 600-625 if PRPB determines it to be necessary.**

7. **In instances where the officers cannot be identified, PRPB needs to retrain DOT officers and supervisors:** The accounts analyzed by the Monitors demonstrate a need to retrain DOT officers and supervisors on how to disperse unruly crowds beyond the police lines in compliance with the Bureau's policies G.O. 600-601, Use of Force, G.O. 600-605 Reporting and Investigating Use of Force, and G.O. 600-620 Specialized Weapons of the Specialized Tactical Divisions.

July 2019 Crisis | April 2021

## Internal Investigations

In relation to the July Crisis events, SARP should conduct the following after-action reports for crowd control incidents:

1. **Statistical Analysis:** SARP should compile the number of arrests and citations resulting from the protests per Consent Decree requirements;

2. **Arrest Review:** SARP should review a random sample of arrests conducted during the protests to assess reports for adherence with Consent Decree requirements and applicable PRPB policies. In this review SARP should also examine if the arrestees were promptly taken before a magistrate and what was the determination in each of those cases;

3. **Use of Force Review:** SARP should review all levels of uses of force that occurred during the protest events for compliance with PRPB's use of force policies and relevant First Amendment Consent Decree provisions;

4. **General Supervisory and Front-Line Response Review:** SARP should conduct a general review of the quality of departmental planning and supervision during the events, as well as the officer response to protests outside of the sampled arrest events and levels of use of force incidents; and

5. **Misconduct Review:** SARP should review the status of all complaints pertaining to these protests, detailed in a Misconduct Complaint Review.

## V.   Conclusion

Despite the isolated meaningful events of non-compliance outlined in this report, PRPB generally followed accepted police practices when responding to the July 2019 Fortaleza mass demonstrations and acted to enforce a safe and civil environment in which demonstrators could practice their constitutional rights to free speech and public gathering. The police officers on the front lines displayed extraordinary levels of tolerance in the face of protesters who, on some nights, clearly wanted to draw the police into a confrontation. PRPB command personnel, via an electronic loudspeaker, each night provided clear and precise instructions several times to the protesters; each night the Monitor was present the public was given every opportunity to voice their constitutional rights in a safe and secure environment.

It was only when police came under attack and aggression from some in the crowds that the police gave dispersal orders after several warnings. In most cases, the force used to disperse crowds was reasonable and within PRPB policy.

However, individual PRPB officers engaged in numerous and in some cases serious violations of use of force policy once they ventured beyond the police line to continue dispersing the crowd. The Monitor's Office concludes that supervision broke down beyond the police line, leading both to excessive and unwarranted uses of force, as well as failures to report those uses of force properly. PRPB has not taken the steps necessary to investigate these uses of force properly and hold individual officers accountable for their actions.

Despite these failures, PRPB has shown evidence that it has learned from July 2019 and changed its tactics at the start of the following year. In January 2020 Puerto Rico experienced similar demonstrations/protest at the Fortaleza (three demonstrations/protest). The Monitor's Office was present at all three and observed a more controlled response in cases when the police had to engage protestors. In one of those incidents PRPB was required to use tear gas to disperse the protesters after the protesters began attacking police by throwing projectiles at the officers, including some containing gasoline. Unlike in July 2019, in this incident, when police crossed their own line to continue dispersing the crowd, they did so in an orderly manner under the direction of a supervisor who directed their actions.

The Monitor's Office also recognizes the steps that PRPB has taken to address incidents of misconduct during the July 2019 protests and adjusted its crowd management tactics accordingly. However, the FPM reiterates its call for a more thorough investigation into alleged misconduct during the July Crisis and the need to take additional steps to ensure that the meaningful events of non-compliance that transpired during the same do not happen again in future mass demonstrations.

Moreover, there is still much work to be done in order to enable the Federal Monitor to render the corresponding evaluations and type of reports that the people of Puerto Rico expect from our Office. Although we are aware that PRPB is taking measures to improve the systemic problem of furnishing of all information to the FPM in relation to the Agreement, the fact remains that until PRPB can implement measures to eradicate the same (as we have identified in our monitoring reports), they will not be able to reach sustainable compliance, which is the goal and aspiration of those involved in the Police Reform.

If the above issues can be resolved, the FPM can help PRPB achieve sustainable compliance and in the process, keep the community informed so that both community trust and the relationship with the community are further strengthen as we progress to the abovementioned goal.

July 2019 Crisis | April 2021

## Appendix A: Comparison of PRPB Use of Force Reporting and Independent Accounts of PRPB Use of Force

*Table 1: Reported Number of Uses of Force*

| DAY | PRPB REPORTS | INDEPENDENT SOURCES |
|---|---|---|
| **7/14/19** | | 7 |
| **7/15/19** | 4 | 12 |
| **7/16/19** | | 1 |
| **7/17/19** | 4 | 13 |
| **7/18/19** | | |
| **7/19/19** | | |
| **7/20/19** | | 1 |
| **7/21/19** | | 2 |
| **7/22/19** | 1 | 15 |

*Table 2: Number and Kind of Incidents per Day*

| DAY | PRPB REPORTS | INDEPENDENT SOURCES |
|---|---|---|
| **7/14/19** | | Arrests reported by civilians (1); Use of tear gas/pepper spray (3); Use of multiple force techniques (1); Other types of assault (2). |
| **7/15/19** | Arrests reported (5); Police injured (21); Complaints/calls for service (7). | Arrests reported by civilians (5); Use of tear gas/pepper spray (1); Use of rubber pellets and bullets (3); Use of multiple force techniques (2); Other types of assault (1). |
| **7/16/19** | | Arrests reported by civilians (1) |
| **7/17/19** | Arrests reported (7); Civilians injured (7); Police injured (4); Use of force | Arrests reported by civilians (8); Use of rubber pellets and |

| | | |
|---|---|---|
| | (tear gas, dispersal techniques, restraining) (4); Complaints/calls for service (5); Calls for medical aid (2); Misc. incidents (2). | bullets (3); Use of multiple force techniques (2). |
| **7/18/19** | | |
| **7/19/19** | | |
| **7/20/19** | | Use of multiple force techniques (1) |
| **7/21/19** | | Use of tear gas/pepper spray (2) |
| **7/22/19** | Arrests reported (1); Police injured (3); Use of force (tear gas, dispersal techniques, restraining) (1); Warnings issued (14); Complaints/calls for service (6). | Arrests reported by civilians (2); Use of tear gas/pepper spray (3); Use of rubber pellets and bullets (6); Use of taser guns (1); Use of multiple force techniques (1); Other types of assault (2). |

## Appendix B: Day-by-Day Analysis of Use of Force Incidents

The FPM hereby provides a day-by-day analysis of the uses of force observed by the Monitors and reported by the PRPB and independent sources. According to these accounts, PRPB personnel used force primarily on six occasions during the 15 days of protest. These occasions, during which large crowds protested outside the Fortaleza, often started in the late evening and continued past midnight, thus carrying over from one day to the following day.

In reviewing the available evidence, the Monitor's Office has assigned uses of force by PRPB personnel into three main categories — 1) uses of force for crowd dispersal, 2) uses of force against individuals during arrest, and 3) uses of force that raise serious concern.

Per PRPB policy and the Agreement, PRPB personnel must rely primarily on non-force techniques, and should use force **only** against individuals when necessary. However, PRPB policy permits officers to use force within clearly defined guidelines for crowd dispersal and when making arrests. Absent specific evidence of misconduct, the Monitor's Office cannot reach a conclusion that officers used force excessively or inappropriately, use of force incidents must be accompanied by proper documentation related to crowd dispersal and arrest.

**Uses of Force for Crowd Dispersal:** Per PRPB policy, the laws of Puerto Rico, and the Agreement, PRPB is permitted to use force against crowds that are engaged in civil disturbance or represent an imminent threat to PRPB personnel or others. Use of rubber bullets, pepper spray and gas by PRPB is permitted by regulation PPR600-620 under clearly defined circumstances.

Many of the incidents in which PRPB personnel used force against protestors at Fortaleza fall under this regulation. In numerous cases reported by independent media sources, PRPB used force against protestors who were not merely exercising their right to free expression but undertook actions that represented a threat to other protestors and PRPB personnel. <u>In such cases, the Monitor's Office cannot reach a determination that PRPB personnel used excessive force or violated policy absent clear evidence to the contrary[5].</u>

---

[5] The lack of information that the FPM requires to make the corresponding assessment is unacceptable and the FPM hopes that this matter does not become a problem again in future. The failure to provide the FPM with the necessary information significantly limits the Federal Monitor's ability to properly investigate if PRPB is complying with the mandates of the Agreement in terms of use of force.

**Uses of Force Leading to Arrest:** In addition to crowd dispersal techniques, force was used on numerous individuals during the protests. Per PRPB policy, officers are allowed to use force on individuals in certain clearly defined circumstances, including situations where those individuals represent an immediate threat to an officer or to others, disorderly conduct toward peaceful protesters, and damaging property, all of which constitutes grounds for detention and/or arrest. In cases where force was to repel attacks against officers, PRPB should have arrested the subjects instigating such aggression against the officers, and properly documented such instances.

Per PRPB policy, therefore, use of force against individuals should always be accompanied by an arrest report recording circumstances of the arrest. Uses of force against individuals that are not accompanied by a detailed arrest report constitute a violation of PRPB policy and of the intentions of the Agreement.

PRPB arrested and detained numerous individuals over the course of the July crisis. In most of these cases, these uses of force were accompanied by an arrest report explaining the circumstances of the arrest. <u>As such, the Monitor's Office cannot reach a determination that PRPB personnel used excessive force or violated policy in these cases, absent clear evidence to the contrary</u>[6].

**Uses of Force that Raise Serious Concern:** However, in numerous cases reported by independent media, PRPB personnel appear to use force in a manner that violates PRPB policy and widely accepted policing practices. In such cases, PRPB personnel either used force in an excessive, dangerous and/or indiscriminate manner, or otherwise violated PRPB policy.

In numerous cases of excessive, dangerous, or indiscriminate uses of force, PRPB personnel used non-lethal force in a way that violates PRPB policy and their training, and which can lead to serious injury or death. Less lethal munitions in particular have the potential to be lethal when fired at the head and upper torso of individuals or at ranges where they lose accuracy.

In numerous other cases that violated policy, PRPB personnel used of force against individuals without making a rightful arrest and documenting the circumstances of the arrest in a properly filed report. Once again, all uses of force

---

[6] The lack of information that the FPM requires to make the corresponding assessment is unacceptable and the FPM hopes that this matter does not become a problem again in future. The failure to provide the FPM with the necessary information significantly limits the Federal Monitor's ability to properly investigate if PRPB is complying with the mandates of the Agreement in terms of use of force.

must be accompanied by arrest, except in cases where force is used against a crowd as a means of dispersal.

All uses of force by PRPB personnel that fail to conform to PRPB policy due to either of the criteria outlined above raise serious concern for the Monitor's Office. Those concerns are documented in the daily account below.

### Sunday, July 14th

| 7/14/19 | PRPB Reports | Independent Sources |
|---|---|---|
| Number and Kind of Incidents | Police injured (1); Use of force (tear gas, dispersal techniques, restraining) (1) | Arrests reported by civilians (1); Use of tear gas/pepper spray (3); Use of multiple force techniques (1); Other types of assault (2). |
| Total Reported Uses of Force | 1 | 7 |

### Uses of Force for Crowd Dispersal

Cases in which PRPB personnel used force for crowd control on the 14th relate to one incident in which PRPB personnel escorted an official vehicle from La Fortaleza.

**Independent Media Account:** Four individuals affected by pepper spray, and two uses of physical force by PRPB personnel against protestors — one resulting in a dislocated arm. Reviewing a number of media reports of this incident, the following account was provided:

> During the protest on the evening of Sunday, July 14th, there was an incident on the grounds of La Fortaleza, when police officers informed protestors that they were going to let an official vehicle exit. As soon as the car exited, the Police began to strike blows with their batons and fire pepper spray.[7]

---

[7] Kilómetro Cero, 2019, *Documentation on interventions and cases of use of force by the Puerto Rico Police Department during the #RickyRenuncia protests*, p. 6. https://docs.google.com/document/d/1--IPFG_XwMppj71-v45EHeSe5QuIq0gRTXlWvDBGbg4/edit?ts=5e94ad3f#

**PRPB Account:** "On the above date, at the time and place, several DOT squads were mobilized due to a demonstration in the Fortaleza, Sgt. Mercado was mobilized to escort several official vehicles that were at the rear of La Fortaleza (the only entrance and exit of these vehicles). A crowd of protesters was standing in the place, blocking the passage of the vehicles, throwing objects, water bottles, among other things, and shouting insults at the MNPPR who were in the place. After several attempts to persuade the protesters, Sgt. Mercado used pepper spray as they continued to throw metal fence and objects at the agents, so the security of the MNPPR was at risk. During this event, several of the agents belonging to said squad were injured such as Agt. Sharlene Santana Reyes 30470 that one of the vehicles ran over her foot; she refused to receive medical assistance. It should be noted that said use of force was reported on July 19th, 2019 at about 8:22pm to this writer by Lt. Javier R. Burgos Diaz 6-20972. Related to these facts we will be reporting more about it in the form PPR-113- 2" (report #2019-01-166-03473).

**Monitor's Observations:** PRPB filed a general use of force report on PPR605.1 "Use of Force" (Incident # 2019-1-166-03423). It was investigated by Sgt. Priscilla Margolla Coll, ID 8-29843, from FIU. The actions (the use of less than lethal force against an unruly crowd) by Sgt. Mercado and his squad were found to be justified. Although Kilómetro Cero alleges use of batons by police, they do not provide any evidence, such as photos, videos or statements from demonstrators. Therefore, the Monitor is unable to make a determination on this issue.

Kilómetro Cero further states that PRPB personnel used pepper spray on the protesters without advance warning. The report provides numerous witness statements, including that of journalist Tatiana Perez Ramos from WAPA TB, who was affected by the pepper spray.[8] Though these witnesses state that pepper spray was used without warning, **Kilómetro Cero acknowledges police statements that they gave the demonstrators a warning that they needed to clear the path for vehicles to exit Fortaleza.**

Uses of Force Leading to Arrest

*Incident #2019-1-166-3435: arrest of Alberto de Jesus Mercado (aka Tito Kayak)*

**Independent Media Account:** "On Sunday, July 14th, the activist Alberto De Jesús Mercado, better known as Tito Kayak, was arrested after scaling the building of the police station on Clara Lair Street in Old San Juan. Mr. De Jesús displayed a banner from the rooftop of the building and demanded the resignation of the

---

[8] ibid, p. 13.

governor. This action is considered an exercise of free speech protected by both the Constitution of the United Stated and the Commonwealth.  According to a note from local newspaper Primera Hora, he was caught by surprise from the back by a police officer when he displayed his banner. In the arrest complaint, he was accused of having allegedly broken an electricity duct and a police barricade. Mr. De Jesús was not charged and he was released on Monday, July 15th."[9]

**Monitor's Observations:** PRPB states that they presented the case to the District Attorney who refused to press charges. Mr. De Jesús was subsequently released. Though Kilómetro Cero alleges that Mr. De Jesús' rights were violated, there is no supporting evidence of excessive use of force, nor was a complaint was filed with PRPB. Therefore, the Monitor's Office cannot reach a determination that there was police misconduct in this case.

### Monday, July 15th

| 7/15/19 | PRPB Reports | Independent Sources |
|---|---|---|
| *Number and Kind of Incidents* | Arrests reported (5); Police injured  (21); complaints/ calls for service  (7). | Arrests reported by civilians (5); Use of tear gas/pepper spray (1); Use of rubber pellets and bullets (3); Use of multiple force techniques (2); Other types of assault (1). |
| *Total Reported Uses of Force* | 4 | 12 |

### Uses of Force for Crowd Dispersal

The Monitoring Team observed protest dynamics and police response on the night of July 15th. The Monitor observed and heard PRPB give the crowd several loud and clear warnings once they became aggressive and violent against the police, which began at approximately 11:00 p.m.

Most of the excessive and dangerous uses of force occurred after PRPB personnel crossed the police line in an effort to further disburse the crowd. For safety reasons,

---

[9] ibid, p. 7.

the Monitoring Team did not follow the police past the police line where the crowd was being dispersed. <u>Therefore, the Monitor made no observations of police action past this point.</u>

**Independent Media Account:** Numerous media reports of force used against the crowd as a means of crowd dispersal on July 15th were compiled. Among the many cases are numerous incidents that raise serious concern for the Monitor (addressed below). In other cases, reported by media sources, there is no conclusive evidence of inappropriate use of force.[10]

The Monitor is unable to determine from the report on these cases whether there were any violations committed by PRPB. Though Kilómetro Cero presents these incidents as evidence of excessive use of force, the police order to disperse was lawful and applies to all present at the demonstration. **The actions depicted in the media sources cited do not constitute violations of PRPB policy, as use of pepper spray and rubber bullets is permitted as a means of crowd dispersal.**

**Monitor's Observations:** The Monitoring Team was present at the police line and can confirm that the police asked the crowd to stop throwing dangerous objects at them, and announced that if they continued, the police would be forced to disperse the crowd using tear gas. Aggression from the crowd included throwing water bottles, Molotov-type bombs, pieces of paver bricks, fireworks, and even a 5-6-inch pair of scissors which landed about five feet away from where the Monitor Team was standing.

It was only when the attacks against police continued that the PRPB Incident Commander gave the order to disperse after giving the crowd several warnings and instructions on which directions to disperse safely. The PRPB also warned any protesters who suffered from respiratory issues that tear gas would be utilized and they should leave the area immediately. It is worth mentioning that PRPB officers and commanders were wearing no protective masks, and officers were affected by tear gas and pepper spray due to wind direction on more than one occasion during the protests.

---

[10] Kilometro Cero reports the following cases: Mariana Amaury, hit by rubber bullets; Roberto Lopez, indirectly hit by rubber bullets; Unnamed 38-year old male, hand hurt by rubber bullets; Unnamed protester, pepper sprayed by police; Giovanni Torres, hit in head by tear gas canister. https://docs.google.com/document/d/1--IPFG_XwMppj71-v45EHeSe5QuIq0gRTXlWvDBGbg4/edit?ts=5e94ad3f#

## Uses of Force Leading to Arrest

**The following arrests were properly reported by PRPB. There is no definitive evidence that would lead the Monitor to conclude that the arresting officers engaged in misconduct.**

*Incident #2019-1-166-03455: arrest of Javier Smith Torres*

Mr. Smith Torres alleges that PRPB personnel fractured his thumb and ripped an earring, causing injury to his ear. However, no complaint was filed with PRPB.

**PRPB Account:** "Observations: Milestone of 2019: 1- 166: 003455: Mr. Javier Smith Torres was arrested since the same used a stone to assault Agt. Charlie Burgos 35791. These facts occurred on July 15th, 2019 at about 12:50 a.m. Agt. Charlie Burgos 35791"

*Incident #2019-1-166-03456: arrest of Manuel Toucet Medina*

**PRPB Account:** "Mr. Manuel Toucet Medina was arrested since he committed aggression with a stone on Agt. Ricardo Morales 22808. These facts occurred on July 15th, 2019 around 10:15 p.m."

*Incident #2019-1-166-00343: arrest of Rafael Elías Trujillo*

Mr. Trujillo was detained for allegedly throwing a rock at an officer during the protests.

PRPB Arrest Report #2019-1-166-003435 and Use of Force Report PPR-928A filed: "Mr. Rafael Elías Trujillo was arrested as the same assaulted Agt. Omar Morales 32062 in the area of the arm. These facts occurred on July 15th, 2019. Agt. Parrilla 23701."

*Incident #2019-1-166-03454: arrest of Perla López*

Ms. López was detained, and alleges no charges were filed against her. Use of Force form 928A was filed.

**PRPB Account:** "Ms. Perla López Nazario was arrested as she was throwing stones toward the police at the manifestation against Ricky Roselló. These facts occurred on July 15th, 2019 around 10:15 p.m. Agt. Padilla 26258."

*Incident # 2019-1-166-003457: arrest of Robert Brandon Talanehzar*

Mr. Talenehzar was in the area of the protests as a tourist and was arrested for failing to comply with police instructions.

**PRPB Account:** "Milestone of 2019: 1-166: The address has been changed: 2019-1-166-003457 from Calle Cristo to Calle Cristo corner Calle Fortaleza. Arrested was Mr. Robert Brandon Talanehzar for obstruction of justice, since the same did not follow the instructions given by the police. Occurring on July 15th, 2019 around 9:00 p.m."

## Uses of Force that Raise Serious Concern

**The following cases raise serious concern for the Monitor's Office. The reports collected by Kilómetro Cero provide evidence of excessive and dangerous uses of force that constitute serious violations of PRPB policy.**

*Incident 1: Peaceful protestor shot in the back by rubber bullets.*

The Monitor's Office read media accounts of this incident and viewed video shared by the New York Times, which shows use of force against a young woman standing between the police in riot gear and a large crowd.[11] The woman appears to be trying to appease the crowd while standing with her back to the police. Suddenly, some type of shot (possibly rubber bullets) comes from the direction of the police and appears to strike her in the back. She turns to face the police and appears to complain to them while walking away. At this point, another shot appears to come from among the police (again, possibly rubber bullets), and strikes her in the lower part of her body.

**Monitor's Observations:** After analysis of this video, the Monitor does not see any justification for the police action against this person. In a search of the data sent by PRPB regarding this intervention, the Monitor did not find any use of force report or arrest report regarding this specific incident. It is very difficult, if not impossible, to identify the officer(s) who fired the shot.

The Monitor is not aware whether PRPB has viewed this video, although it is inexcusable if they have not, given that the video was reported by a major news outlet and can be found in the public domain and on social media. Such incidents can provide opportunities for PRPB to show good faith to the public, if they are investigated thoroughly and expeditiously. If PRPB is unable to identify the officer(s) who fired the shots, PRPB should, at the very least, provide additional training to the units involved in this crowd control incident.

---

[11] New York Times, 2019. "Did Puerto Rican Police Go Too Far During Protests? What the Video Shows," https://www.nytimes.com/2019/07/27/us/puerto-rico-violence-protests.html

*Incident 2: Officer strikes a man who is live streaming the protest.*

This video captures an officer swinging a baton at a male subject who was live streaming the protest on Facebook. The video does not show contact; however, it shows what appears to be blood on the subject's hand.

**Independent Media Account:** The incident was posted to social media and also reported in numerous media outlets, including in the New York Times article detailing PRPB response to the July Crisis. Kilómetro Cero provides the following account of the incident:

> Mambrú de León was recording the protest on Monday night. Near Cristo Street, he was hit in the head by a police officer with an expandable baton, which is considered lethal force (when the blow is to the head), which can cause death. Despite the fact that Mambrú told the officers, "I am calm here, I am calm here, I haven't don't anything," they ignored him and hit him. Mambrú's recording shows when he was hit, at around minute 23:12. While giving his statement, with an injury to his head, it appears that he was going to lose consciousness, as described by The New York Times.[12]

**Monitor Observations:** The actions of the subject are not captured in the video, so it is not possible to determine what, if any resistance, he used towards police. However, this point becomes moot if the force was not reported and investigated as required in G.O. 600-601 & 600-605. In this case the subject was not arrested for law violations. Nevertheless, striking a subject on the head with a baton is a violation of department policy.

The Monitor has not found any PRPB use of force report for this incident in the data and documents submitted by PRPB to the Monitor. **There is no evidence that PRPB looked into or investigated this incident**. From the video, it is almost impossible to identify the officer who is seen swinging the baton. It is also unknown if the civilian struck by the officer has filed a complaint with PRPB.

*Incident 3: Officers strike a man who is fleeing*

The video provided appears to show officers swinging batons at a civilian during the dispersal of a crowd. The identity of the civilian and the officers is unknown and very difficult, almost impossible, to detect from the video.

---

[12] ibid, p. 24.

**Independent Media Account:** The following account of the incident was provided:

A man was chased and hit by several officers. Film evidence shows officers pushing him and hitting him with police batons. The man's name is unknown.[13]

**Monitor's Observations:** The data submitted by PRPB to the Monitor does not include any mention of this incident, nor was a use of force report found. Again, PRPB has prepared use of force reports covering general use of non-lethal force by the DOT or other units, rather than reports that address individual cases. There are no arrest reports that cover this incident specifically in the data submitted by PRPB. Although the use of police batons is permitted under certain circumstances, it is impossible to determine from the information provided here whether any policy violations took place.  However, the lack of a use of force report as required by policy is a serious violation of the policies adopted through the Reform and should be promptly addressed by PRPB and action taken against the officers who violated the policies.

The Monitor's Office is particularly concerned that in its report regarding use of force incidents on May 1st protest in previous years, violations were found by its investigators and recommendations were made to PRPB to prevent future use of force in similar incidents and the ones previously described

*Incident 4: Young woman struck by officers armed with expandable batons.*

**Independent Media Account:** The following account of the incident was provided:

According to her statement, Janmarie Romero Alicea was hit by three police officers who did not have their badge number or name visible, on the night of Monday, July 15th, near Parque de las Palomas in Old San Juan.[14]

**Monitor's observations:** Based on this brief account, it appears PRPB officer(s) may have improperly used the baton on this subject. However, independent sources provide no evidence to corroborate the statement provided by the young woman in this incident. The Monitor is not aware of any complaints filed with PRPB by Ms. Romero.

---

[13] ibid, p. 25.

[14] ibid, p. 26.

Since the subject gave her name and can potentially be identified through Kilómetro Cero, PRPB should attempt to contact her and document her story, if she wishes. An in-depth administrative investigation should be conducted to identify the officers involved.

### July 16th Protest at Fortaleza

| 7/16/19 | PRPB Reports | Independent Sources |
|---|---|---|
| Number and Kind of Incidents | N/A | Arrests reported by civilians (1) |
| Total Reported Uses of Force | 0 | 1 |

Uses of Force Leading to Arrest

*Incident # 2019-01-166-03459: Second arrest of Alberto De Jesús Mercado*

**PRPB Account:** PRPB provides the following account of the arrest from PPR-174:

During the July 16th, 2019 at 5:00 p.m., the protests continued in Calle Cristo y Fortaleza against the permanence of the Hon. Ricardo Rosselló Nevares as Governor of Puerto Rico. The demonstration passed in complete order until 7:00 p.m. when the activist Alberto De Jesús Mercado known as "Tito Kayak" climbed on the fences of the security perimeter and jumped on Agt. Frankie Torres Soriano and Agt. Elsa Sanabria Padua from Police Task Force.

He was arrested for violating the police perimeter and inciting to riot since his actions provoked the protesters to become aggressive against the agents yelling profanity. The protesters' spirits subsided, and they continued their demonstration in a peaceful manner until the end at 2:00 a.m. An arrest report with complaint number 2019 -166-03459 was prepared."[15]

**Independent Media Account:** The following account of the incident was provided:

Tito Kayak was arrested for a second time during the Fortaleza protests on Tuesday, July 16th. The press has given two different versions of the cause of the arrest. Primera Hora and El Nuevo Día reported that Tito Kayak was arrested for allegedly trying to cross the

---

[15] PPR-174,  Report on Constitutional Activities and Civic Disturbances.

established security perimeter. On the other hand, Noticel and Metro, based on press releases from the Police Department, reported that Tito jumped on two officers when he went over a cement barricade and started a riot.[16]

**Monitor's Observations:** The Monitor cannot reach a determination that either the arrest of Mr. Mercado or the force used violated PRPB policy. PRPB stated they presented the case to the District Attorney who refused to press charges and Mr. Mercado was released. The Monitor is not aware of any formal complaints filed against PRPB by Mr. De Jesús Mercado. In the Puerto Rico Justice system, the District Attorney's Office has significant influence on whether criminal cases go forward for prosecution and the police department rarely oppose it.

### July 17th Protest at Fortaleza, extending to early morning of July 18th

| *7/17/19* | *PRPB Reports* | *Independent Sources* |
|---|---|---|
| *Number and Kind of Incidents* | Arrests reported (7); Civilians injured (7); Police injured (4); Use of force (tear gas, dispersal techniques, restraining) (4); Complaints/calls for service (5); Calls for medical aid (2); Misc. incidents (2). | Arrests reported by civilians (8); Use of rubber pellets and bullets (3); Use of multiple force techniques (2). |
| *Total Reported Uses of Force* | 4 | 13 |

### Uses of Force for Crowd Dispersal

On July 17th, 2019, Federal Monitor John Romero and assistants Rafael Ruiz and Alfredo Castellanos reported to Fortaleza Street at Cristo Street at about 2:30 p.m. and proceeded to the onsite Command Center. At that location, the Monitor Team met with ranking personnel from the PRPB, which included Commissioner

---

[16] Kilómetro Cero, 2019, *Documentation on interventions and cases of use of force by the Puerto Rico Police Department during the #RickyRenuncia protests*, p. 31. https://docs.google.com/document/d/1--IPFG_XwMppj71-v45EHeSe5QuIq0gRTXlWvDBGbg4/edit?ts=5e94ad3f#

Escalera. At the command center, the Monitor was provided with the operations plan for the day's operation relating to the planned demonstration/protests. The Team then proceeded to the area of the protest where Lt. Col. Samuel Luciano, the Incident Commander for the demonstration/protest, briefed the Monitor and his Team as to how the Bureau would be deploying personnel.

As in the previous nights, there were three entry points to La Fortaleza being guarded and barricaded by the police. With the announcement that many "well known" entertainers/artists would be participating in today's demonstration/protest, it was expected that all three entry points would attract large crowds. The Monitor Team then responded to the police lines where the team observed groups of protesters starting to assemble. Over the course of the evening, the crowd size reached at least 20,000 people. The Monitor Team continued to observe from the police lines throughout the evening; their observations are provided below.

Independent Media Account: The following account of use of force by PRPB personnel on July 17th and 18th was provided:

> During the protests on Wednesday, July 17th, the media described use of tear gas, pepper spray, and weapons with rubber bullets. Observers present at the protest reported that gas was fired for two hours and they chased protestors to different spaces where they distanced themselves in order to recover from the effect of the gases. At first, the Police Department confirmed 7 arrests on July 17th. However, neither the names of the person detained, nor the crimes committed were published. Later, other news came up where one of the arrestees was identified and another case was added to the list. Below is a list of the 8 persons arrested.[17]

The report documents numerous individuals injured by PRPB actions to disperse the crowd.[18] Though Kilómetro Cero presents these incidents as evidence of excessive use of force, the actions depicted in the media sources cited do not

[17] Kilómetro Cero, 2019, Documentation on interventions and cases of use of force by the Puerto Rico Police Department during the #RickyRenuncia protests, p. 35. https://docs.google.com/document/d/1--IPFG_XwMppj71-v45EHeSe5QuIq0gRTXlWvDBGbg4/edit?ts=5e94ad3f#

[18] Kilometro Cero reports the following cases:  An unnamed tourist injured by rubber bullets; A photojournalist, Joe Readle, hit by rubber bullets; Tatiana Cartagena)- hit by rubber bullets; Jose Maldonado, hit by rubber bullets; Nelson Rodriguez, affected by tear gas and rubber bullets. https://docs.google.com/document/d/1--IPFG_XwMppj71-v45EHeSe5QuIq0gRTXlWvDBGbg4/edit?ts=5e94ad3f#

constitute violations of PRPB policy, as use of pepper spray and rubber bullets is permitted as a means of crowd dispersal.

**PRPB Account:** PRPB provided the Monitor's Office with the following account of the events of July 17th:

On July 17th, 2019 at 5:00 p.m., a mass march and demonstration of over 50,000 participants marched from the Capitol to the Fifth Centennial Plaza and La Fortaleza in demand of the resignation of the Governor of Puerto Rico Hon. Ricardo Rosselló Nevares. Activities were normally conducted until approximately 9:00 p.m. when several protesters began throwing objects of cement and plastic filled with water at Police personnel who were on Calle Cristo y Fortaleza at a clearly established security perimeter with fences. For two hours, no less than 11 notices were given to them to desist from their actions, which represented criminal acts not protected by the Constitution. The actions of protesters were escalating, increasing the frequency and intent of objects that were launched against PRPB personnel, such as water bottles, accelerant liquids and explosive devices like firecrackers, and cherry bombs.

The actions put at risk the PRPB personnel and all the people gathering in the place. Verbal commands were given that their actions constituted a civil disturbance that would provoke the start of a dispersion. At a certain moment, several protesters threw a Molotov bomb and fireworks against the agents, attempting against their physical security and their lives, which is why the dispersal process began using tear gas, rubber bullets, containment techniques to restore order and public safety on site. The actions ended at 2:00 a.m. and established security perimeters on the grounds of La Fortaleza.

**Monitor's Observations:** In contrast to the police response on July 15th, in which command appeared to break down once PRPB personnel ventured past police lines, PRPB response to protests on July 17th was better aligned with use of force policy.

Up until about 9:00 p.m. the crowd was loud and boisterous, but demonstrated no hostility towards police, nor did they make any attempt to damage property. At approximately 9:20 p.m. protesters began throwing projectiles at the police officers on the frontline. It should be noted that by this time, all three locations had a massive number of protesters. Police provided several warnings to the protesters to cease and desist and the protesters appeared to comply. However, by 10:00

p.m. the protesters again began throwing projectiles at police. The demonstrators were then given additional warnings to cease and desist and the protesters again appeared to comply.

At 11:30 p.m. protesters threw bottles and other projectiles at PRPB officers and launched fireworks directly at them. Warnings were again given to cease and desist, along with a disperse order and the route to be utilized. However, this was ignored by the protesters and they continued throwing objects at the officers. At this time, protesters were told that if they did not disperse, gas would be utilized. According to the Incident Commander, Lieutenant Colonel Luciano, prior to police utilizing gas, the protesters threw gas canisters at the police. Note: The Monitor Team is unable to verify this, due to the fact that when the protesters began throwing projectiles, the Team had to move further to the rear of the police lines.

After police utilized gas to disperse the unruly protesters in the area of police lines, a bottle with a rag stuffed in the opening filled with an unknown liquid, appearing to be an accelerant, was discovered. As the Federal Monitor and Counsel Alfredo Castellanos, Esq., were able to witness, FBI Special Agents responded and took possession of the bottle and its contents, as well as other evidence at the scene. However, the FPM is unaware if PRPB has held contacts with the FBI regarding the matter or the result of the corresponding investigation of this incident by the FBI.

## Uses of Force Leading to Arrest

### Incident #2019-1-166-03473: Arrest of multiple protestors

**Independent Media Account:** Media outlets Telemundo and Pimera Hora documented multiple arrests made on the evening of July 17th and the morning of July 18th. Eight of these cases in particular were compiled by Kilómetro Cero in their investigation of the July Crisis (cases 23-30 in their report). However, these reports only document the incident, and provide no detailed accounts of police conduct, proper or improper.[19]

**PRPB Account (continued from above):** PRPB provided the Monitor's Office with the following account of the incident.

   "As a result of the events, 7 people were arrested for riot, crossing the police perimeter, and assaults, among other crimes. In addition, 7

---

[19] ibid, pp. 36-37.

civilians and 4 members of the Police were injured. The events were attended by means of the work plans executed simultaneously with communication numbers SAOC-CSJ-1-OCA-1-327 and SAOC-CSJ-1-OCA-1-330. Incident report was prepared with complaint number 2019-1-166-03473."

**Monitor's Observations:** The account provided by PRPB indicates that the uses of force and arrests made on July 17th were within department policy. However, this incident again attests to the need to reform the practice of assigning one use of force number to single, broadly conceived incident. PRPB documentation assigns seven arrests to a single use of force incident. Widely accepted policing practice holds that each use of force should be documented separately with its own report. This practice of assigning a single UOF report to multiple arrests makes it impossible to ascertain the cause of the discrepancy between the account of seven arrests per PRPB reporting and eight arrests by independent sources.

### July 20th Protest at Fortaleza

| 7/20/19 | PRPB Reports | Independent Sources |
|---|---|---|
| *Number and Kind of Incidents* | | Use of multiple force techniques (1) |
| *Total Reported Uses of Force* | 0 | 1 |

It was reported that an unnamed 25-year-old protestor was hit by rubber bullets and affected by pepper spray on July 20th.[20] However, the Monitor's Office believes that the complainant in this case may have shared the wrong date when he allegedly was injured. The Monitor and his team were present at Fortaleza St. and Cristo St. on both dates, July 19th and July 20th and can attest that those nights the crowd was peaceful, and no actions were taken by either the police or the protesters while the Monitor was present at these locations. See the Monitor's summary reports below prepared hours after each night:

---

[20] Kilómetro Cero, 2019, Documentation on interventions and cases of use of force by the Puerto Rico Police Department during the #RickyRenuncia protests, p. 46. https://docs.google.com/document/d/1--IPFG_XwMppj71-v45EHeSe5QuIq0gRTXIWvDBGbg4/edit?ts=5e94ad3f#

On July 19th, 2019, Federal Monitor John Romero and assistants Rafael Ruiz and Alan Youngs reported to Fortaleza at about 5:00 p.m. and proceeded to the onsite Command Center. At the Center, the Monitor Team met with Secretary Roman DSP, Commissioner Escalera, Colonel Bermudez, PRPB, Colonel Rodríguez and Colonel Colón of PRPB. The parties present discussed the operations plan for the day's planned demonstration/protest.

Upon completion of the meeting, the Team proceeded to the area of the protest. The Monitor Team then met with the Incident Commander for the demonstration/protest, Lieutenant Colonel Colón, to inform him of our presence. As in previous nights, police were assigned to the three entry points to La Fortaleza.

At approximately 11:00 p.m., PRPB received information that there were 7-8 demonstrators dressed in black, wearing masks and carrying buckets with tubes. Based on the information, the PRPB raised the threat response to a level 2, which prompted a formation of additional officers behind the police lines. In addition, a Level 3 response "show of force" was readied and put in place in the event they were needed. However, there was no aggression by the demonstrators, and after a half hour the threat response was downgraded.

## July 21st Protest at Guaynabo

| 7/21/19 | PRPB Reports | Independent Sources |
|---|---|---|
| Number and Kind of Incidents | | Use of tear gas/pepper spray (2) |
| Total Reported Uses of Force | 0 | 2 |

### Uses of Force for Crowd Dispersal

The Monitor was not present at the demonstration held in Guaynabo. However, the information presented by media sources does not provide any evidence of misconduct by PRPB. The Monitor was informed about the protest in Guaynabo and the police action that took place. The Monitor is not aware of any formal complaints filed against PRPB at this time.

Additionally, PRPB maintained order at La Fortaleza during the July 21st protest. During the course of the night, two of the entry points had some protesters,

including a large religious group at San Francisco Street. However, at the Fortaleza Street/Cristo Street police line, the most active location, there were about 150 protesters which remained consistent through the course of the night. The protesters were noisy but peaceful, and the Monitor Team did not observe any incidents of aggression by the protesters against police, or aggression by the police against protesters. The police kept a minimum number (12-15) of officers at the line and never had to increase the threat level.

**PRPB Account:** PRPB provided the following report on the demonstration at Yolanda Guerrero center in Guaynabo, PR (Incident # 2019-7-132-05616):

Today, July 21, 2019, at 10:30 p.m. in the aforementioned place, there were approximately 250 protesters, who stood in front of the entrance and exit of said complex, preventing the passage of vehicles and people who were present at the place before mentioned. The captain Alexis Navarro Alvarez 5-13589, Commander of the Guaynabo Zone, gave verbal commands to the protesters with a loudspeaker, he said that they have to move to the left side to have access to the entrance and exit of the place, the protesters ignored these instructions, so he had to place two squads of agents to be able to escort the vehicles out of the complex, the agents who were in the squad used the Expandable Baton to escort and impact the protesters who wanted to cross the perimeter, when the vehicles that were on the scene came out, the protesters began to throw objects against the vehicles and agents who were in the squads. The personnel of the Tactical Unit (SWAT-FURA) launched smoke bombs to achieve the tactical space so that the vehicles could leave the place, Team Swat when seeing that the protesters were still close to the vehicles and the agents launch the OC- MK-9 towards the vehicles that were being used to create indirect contamination, to create a safety zone and prevent protesters from approaching the vehicles, achieving their goal.

In this incident resulted in injuries to Agt. Henry Diodonet Rivera 24095 assigned to Motorized Unit of San Juan, he was impacted by an egg to the face area, he received no medical assistance; Agt. Osvaldo Santiago Rivera 34652 was stripped of his Expandable Baton.

**Independent Media Account:** Numerous sources document PRPB use of force to disperse protestors in Guaynabo. Also, two cases in which protestors were

affected by pepper spray were reported.[21] However, these videos only depict the aftermath of the use of force and the impact on affected protesters.

**Monitor's Observations:** At about 9:50 p.m., the Monitor received information that a group of protesters had blocked the exit of several mayors and other elected officials who were holding a meeting in Guaynabo. The police specialized units responded to the site, and the Monitor later learned that the Police Bureau was forced to disperse the crowd using smoke devices. No injuries were reported from this confrontation between police and demonstrators. It should be noted that the Guaynabo Municipal Police assisted PRPB. The Monitor was unable to respond to the scene but monitored the situation through media reports and video footage.

PRPB filed a use of force report notification PPR 113.1, to cover the use of less lethal force (Expandible Baton, Smoke Bomb, and OC-MK-9 Gas) by the SWAT team. The use of force incident, PPR 605.1, was investigated by FIU which found the action of SWAT to be justified in this incident (File# SARP-NIA-DIIUF-AH-2-032, dated 9/26/19; Complaint #2019-7-132-05616). As in the cases mentioned above, the lawful police order to disperse applies to all present at the demonstration.

## July 22nd -July 23rd Protest at Fortaleza

| 7/22/19 | PRPB Reports | Independent Sources |
|---|---|---|
| Number and Kind of Incidents | Arrests reported (1); Police injured (3); Use of force (tear gas, dispersal techniques, restraining) (1); Warnings issued (14); Complaints/calls for service (6). | Arrests reported by civilians (2); Use of tear gas/pepper spray (3); Use of rubber pellets and bullets (6); Use of taser guns (1); Use of multiple force techniques (1); Other types of assault (2). |
| Total Reported Uses of Force | 1 | 15 |

---

[21] Kilometro Cero reports that two men were affected by pepper spray; pp. 49-50.
https://docs.google.com/document/d/1--IPFG_XwMppj71-v45EHeSe5QuIq0gRTXlWvDBGbg4/edit?ts=5e94ad3f#

## Uses of Force for Crowd Dispersal

**Independent Media Account:** Numerous media reports of force used against the crowd as a means of crowd dispersal on July 22nd were compiled. Among the many cases are numerous incidents that raise serious concern for the Monitor (addressed below). In other cases, reported by media sources, there is no conclusive evidence of inappropriate use of force.

The Monitor is unable to determine from the report on these cases whether there were any violations committed by PRPB. Though Kilómetro Cero presents these incidents as evidence of excessive use of force, the police order to disperse was lawful and applies to all present at the demonstration. The actions depicted in the media sources cited do not constitute violations of PRPB policy, as use of pepper spray and rubber bullets is permitted as a means of crowd dispersal.[22]

### Uses of Force Leading to Arrest

*Case 39: The arrest of Carlos A. Santiago Ríos*

**Monitor's Observations:** This is the only arrest for which we have no incident number or account from PRPB to demonstrate that they followed policy.

Unrelated incident: The arrest of José Luis Mara Ríos.

**Independent Media Account:** Kilómetro Cero documents the arrest of José Luis Mara Ríos as part of its investigation into uses of force by PRPB. However, this individual was arrested by the U.S. Federal Protection Service, not PRPB.

### Cases that raise serious concern for the Monitor

*Incident 5: Poor management of traffic during protest march*

**Independent Media Account:** On Monday, July 22, it is estimated that, at least half a million people took part in the People's March, the objective of which was to demand the resignation of Governor Ricardo Rosselló.

**Monitor's Observations:** The Monitor feels that PRPB failed to plan properly to manage this protest and parade on the streets and highways of the city of San

---

[22] Kilometro Cero reports the following cases: Monica Flores- hit by rubber bullets; Claudia Luz- hit by rubber bullets; Cynthia Montalvo a reporter for Noticias Univisión- affected by tear gas; Ángel Sepúlveda of Noticias Univisión- affected by tear gas; Natalia de la Rosa Reyes- affected by the use of tear gas; José Ernesto Avilés- hit by a rock thrown by the police. https://docs.google.com/document/d/1--IPFG_XwMppj71-v45EHeSe5QuIq0gRTXlWvDBGbg4/edit?ts=5e94ad3f#

Juan. PRPB largely failed to control and block traffic to protect walkers. This left thousands of people at risk of being struck by passing vehicles and suffering serious injuries.

*Incident 6: Police shoot protester with rubber bullets at close range*

**Independent Media Account:** A number of media sources allege that PRPB personnel fired rubber bullets at protesters at close range or engaged in other violations of use of force policy.[23] Some of these accounts are substantiated by evidence of police misconduct, while others allege police behavior that would constitute a violation of use of force policy if their accounts were proven accurate. Interviewees in these sources allege that PRPB personnel used rubber bullets at close range, without warning, on citizens who were seeking to comply with PRPB orders to vacate the area. As one interviewee states:

> "Things were kind of tense, because there were two or three protestors throwing water bottles, cans… and out of nowhere, they (the Police) started to announce that that they were going to start to announce that they are going to evacuate the area. A few minutes later, they fired the first bomb, and everybody took off running. I was a little behind, on Cristo Street. Man, literally, they didn't give me 10 seconds to think where to go, where to take off running, and right there and then they shot the pellets..."[24]

Features of this account are repeated in other media accounts of PRPB activity on July 22nd, notably the use of rubber pellets at close range without warning and against individuals who were not given the opportunity to comply with orders to vacate the area.

**Monitor's Observations:** Only one of these accounts is substantiated by video evidence that allows the Monitor to determine that the officer violated RPB policy and used force in a dangerous way. In one video, an officer is seen firing what appear to be rubber bullets at close range at two subjects who do not appear to pose any threat to the officer. It is inappropriate and risky to fire this type of projectile directly at subjects at close range. Moreover, the purpose of the weapon

---

[23] Kilometro Cero reports the following cases: Joshua Hernandez- hit by rubber bullets; A young man is hit by rubber bullets from a short distance; Zuania Colón- hit by 6 rubber bullets on her legs; José Ernesto Avilés- hit by a rock thrown by the police. https://docs.google.com/document/d/1--IPFG_XwMppj71-v45EHeSe5QuIq0gRTXlWvDBGbg4/edit?ts=5e94ad3f#

[24] ibid, p. 59.

and this type of projectile is to encourage a crowd to disperse an area. In this case, there are only two subjects, who appear to beg the officer not to fire.

The other accounts allege similarly serious infractions of use of force policy but lack sufficient evidence to determine whether PRPB personnel used force in a manner that violates policy.

July 2019 Crisis | April 2021

## Appendix C: Further Reading

The Monitor's Office has compiled the following overview of literature that presents current trends in police response to protests in the United States and Canada. Most materials are available online, and those that are not can be provided by the Monitor's Office upon request.

Baltimore Police Department Office of Legal Affairs. 2009. Guidelines Regarding Persons who are Loitering or Protesting on Public Property.

DC Metropolitan Police. 2016. HANDLING FIRST AMENDMENT ASSEMBLIES AND MASS DEMONSTRATIONS. https://go.mpdconline.com/GO/SOP_16_01.pdf

IACP Law Enforcement Policy Center. 2019. Crowd Management. https://www.theiacp.org/sites/default/files/2020-08/Crowd%20Management%20FULL%20-%2008062020.pdf

Los Angeles Police Department. 2009. Guidelines for Crowd Management and Crowd Control. Emergency Operations Guide, Volume 5.

Major Cities Chiefs Association Intelligence Commanders Group. 2020. Report on the 2020 Protests and Civil Unrest. https://www.majorcitieschiefs.com/pdf/news/mcca_report_on_the_2020_protest_and_civil_unrest.pdf

Maryland State Police. 2018. Draft SOPs on Public Order and Crowd Control and LESS-LETHAL MUNITIONS AND CHEMICAL AGENTS.

New York Police Department. SRG Field Force Operations Training Guides. Modules 1-6 related to civil actions and police response.

U.S. News. 2021. Study: Less-Lethal Munitions Not Advised for Crowd Control. https://www.usnews.com/news/best-states/minnesota/articles/2021-01-25/study-less-lethal-munitions-not-advised-for-crowd-control