

July 2021

# Fourth Report of the Federal Monitor

Covering the Period from October 2020 through March 2021

Compliance status of the Puerto Rico Police Bureau in accordance with the Federal Court approved Settlement Agreement between the United States Department of Justice and the Commonwealth of Puerto Rico

John Romero
Federal Monitor

## Table of Contents

INTRODUCTION..................................................................................................................4

    GENERAL BACKGROUND ON THE AGREEMENT AND MONITORING PROCESS ...........................4
    METHODOLOGY ...........................................................................................................5
    SCOPE OF THE MONITOR'S FOURTH REPORT ....................................................................6

I. USE OF FORCE ...............................................................................................................8

    1. GENERAL PROVISIONS ...............................................................................................8
    2. SPECIALIZED TACTICAL UNITS ...................................................................................12
    3. CROWD CONTROL POLICIES AND PERFORMANCE ..........................................................17
    4. FORCE REPORTING ..................................................................................................21
    5. FORCE REVIEW, INVESTIGATION, AND ANALYSIS ..........................................................25
    6. SUPERVISORY AND FRB REVIEWS..............................................................................28
    7. FIU INVESTIGATIONS AND FORCE REVIEWS CFRB.........................................................32
    8. USE OF FORCE TRAINING ..........................................................................................37
    9. RESPONDING TO BEHAVIORAL/MENTAL HEALTH CRISIS ..................................................39

II. SEARCHES AND SEIZURES..........................................................................................43

    1. GENERAL PROVISIONS .............................................................................................45
    2. INVESTIGATORY STOPS AND SEARCHES .......................................................................46
    3. ARRESTS ...............................................................................................................49
    4. SEARCHES..............................................................................................................56
    5. TRAINING ON STOPS, SEARCHES, AND SEIZURES ..........................................................58

III. EQUAL PROTECTION AND NON-DISCRIMINATION...................................................59

    1. GENERAL PROVISIONS .............................................................................................60
    2. DISCRIMINATORY POLICING ......................................................................................62
    3. SEXUAL ASSAULT AND DOMESTIC VIOLENCE ...............................................................66

IV. RECRUITMENT, SELECTION, AND HIRING ...............................................................68

    1. GENERAL PROVISIONS .............................................................................................68
    2. RECRUITMENT PLAN ................................................................................................69
    3. HIRING REFORMS ....................................................................................................72

V. TRAINING ....................................................................................................................74

    1. PRE-SERVICE EDUCATION AND TRAINING ...................................................................77
    2. FIELD TRAINING PROGRAM.......................................................................................80
    3. IN-SERVICE TRAINING..............................................................................................84
    4. TRAINING RECORDS .................................................................................................87

VI. SUPERVISION AND MANAGEMENT ...........................................................................88

    1. GENERAL PROVISIONS .............................................................................................88
    2. DUTIES OF SUPERVISORS..........................................................................................89
    3. SUPERVISOR TRAINING ............................................................................................92
    4. PERFORMANCE EVALUATION.....................................................................................95
    5. EARLY IDENTIFICATION SYSTEM ................................................................................96
    6. INTERNAL AUDITS AND INTERAGENCY FEEDBACK........................................................101

VII. CIVILIAN COMPLAINTS, INTERNAL INVESTIGATIONS, AND DISCIPLINE .............105

    1. CIVILIAN COMPLAINTS...........................................................................................109
    2. INTERNAL INVESTIGATIONS .....................................................................................111

3. Complaint Intake, Classification, Assignment, and Tracking.........................................................................113
4. Investigation of Complaints ...............................................................................................................................121
5. Staffing, Selection, and Training Requirements ............................................................................................132
6. Preventing Retaliation .........................................................................................................................................134
7. Discipline..................................................................................................................................................................135
8. Officer Assistance and Support .........................................................................................................................137

**VIII. COMMUNITY ENGAGEMENT AND PUBLIC INFORMATION** ...........................................................................**139**
1. Community Oriented Policing ............................................................................................................................143
2. Community Interaction Councils........................................................................................................................150
3. Public Information..................................................................................................................................................156

**IX. INFORMATION SYSTEMS AND TECHNOLOGY** .......................................................................................................**159**

**APPENDIX A: BACKGROUND TO PRPB MONITORING MISSION** ..........................................................................**165**

**APPENDIX B: METHODOLOGY**...........................................................................................................................................**168**

**APPENDIX C: NOTES ON SELECT INTERNAL INVESTIGATIONS** ...........................................................................**169**

## Introduction

This report will outline the current compliance status of the Puerto Rico Police Bureau (hereafter, "PRPB" and at other times "the Bureau") with the federal court approved Settlement Agreement (hereafter, the "Agreement" and/or "Consent Decree"). It was prepared by the Technical Compliance Advisor (hereafter, "the Monitor") pursuant to paragraphs 242, 251, and 252 of the Agreement to inform the court, the parties, and residents of the Commonwealth of Puerto Rico ("Commonwealth") about the status of the implementation and the level of compliance with the Agreement. The Monitor's Office (or "monitoring team") will make itself available to the Court, the parties, and community groups to explain the Monitor's findings and the compliance assessments presented in the report through multiple means that comply with the exigent circumstances of the pandemic.

The Monitor's Office is tasked not merely with assessing PRPB's compliance with the agreement, but also with providing comments that outline a pathway for those areas where PRPB has not demonstrated compliance. PRPB's compliance level in CMR-4 decreased compared to CMR-2, which was the previous report to assess the same paragraphs as CMR-4 (Approximately 2/3 of the 212 paragraphs tracked by the Monitor's Office are assessed biannually in each CMR, but the remaining 1/3 are assessed annually divided between alternating reports).

It remains essential that PRPB implement widely accepted policing practices in data collection, validation, and analysis. Proper knowledge management, especially through operational IT systems, serves two essential goals. First, proper knowledge management serves as a means of demonstrating compliance with the Agreement. Second, and more importantly, knowledge management apprises PRPB's own leadership of police performance and law enforcement trends in Puerto Rico, thus enabling police commanders to improve decision making in support of the public interest.

### General Background on the Agreement and Monitoring Process

The Agreement was fashioned to provide PRPB officers with the tools, guidance, and resources that it needs to reform unconstitutional policing practices and to bring the Bureau into line with generally-accepted practices of constitutional policing and law enforcement. The Parties both recognize that constitutional policing and the community's trust in its police force are interdependent. Accordingly, the full and sustained implementation of the Agreement will guarantee constitutional rights and will consequently increase public confidence in PRPB and its officers. In addition, and perhaps

most importantly, the Agreement also aspires to develop on the part of PRPB dynamic leadership and management skills aimed at transforming the bureau for the benefit of the Commonwealth and its residents.

In a joint effort, the parties identified each of the following areas for improvement, enhancement, or reform in PRPB:

1. Professionalization;
2. Use of Force;
3. Searches and Seizures;
4. Equal Protection and Non-Discrimination;
5. Recruitment, Selection and Hiring;
6. Policies and Procedures;
7. Training;
8. Supervision and Management;
9. Civilian Complaints, Internal Investigations and Discipline;
10. Community Engagement and Public Information; and
11. Information Systems and Technology.

To carry out necessary reforms in the above-mentioned areas, PRPB developed Action Plans for each of the named substantive areas. These Action Plans set forth in detail the steps agreed upon to execute and implement the reforms and achieve the desired outcomes in each area. Moreover, the above reforms also require the implementation of new or amended policies, practices, training, corresponding documentation, and internal review. All such activities, together with the monitoring of sustainable compliance, fall within the scope of objective oversight, analysis, and reporting of the Monitor.

During the capacity-building period, the Monitor assessed compliance based on the Commonwealth's own Action Plans, pursuant to Paragraph 240 of the Agreement. However, with the end of the capacity-building period, the mission of the Monitor's Office has changed. Beginning with CMR-1, the Monitor has been assessing PRPB compliance in relation to the Agreement.

## Methodology

The collection, analysis, reporting and public dissemination of data regarding the ongoing PRPB sustainable reform efforts were designed to strengthen and ultimately ensure public accountability and trust in PRPB. Therefore, the Agreement requires: a) that the Monitor's Office submit timely assessments as to compliance, as well as to PRPB achievements and impediments that the Bureau might be encountering; and b) that the

Monitor's Office assist PRPB in finding solutions to all impediments to compliance until sustainable compliance is reached.

In agreement with the approved methodology, the Monitoring Team uses a combination of quantitative and qualitative methods to assess PRPB's compliance with the Agreement in the three areas of performance selected for this report. Each paragraph in the Agreement has been assigned a methodology that was agreed on by the Parties and approved by the court. These methodologies include information on the data source, sampling method (if relevant), and compliance target. The compliance targets provided for each paragraph outline the objectives and thresholds PRPB must meet to reach full compliance with the paragraph. Further, if applicable, the compliance targets outline whether PRPB has incorporated the requirement into an implemented policy; trained all relevant personnel in the requirement and policy; and fully implemented the requirement in practice. As such, the compliance targets provide PRPB with a detailed pathway toward achieving full compliance.

Definitions for each of the compliance ratings used in the Monitor's assessment as well as additional detail on the methodology are provided within Appendix B.

## Scope of the Monitor's Fourth Report

The Chief Monitor's Fourth Report covers the period between October 2020 and March 2021. Per the monitoring methodology agreed on by the Parties, 178 paragraphs were scheduled for assessment in CMR-4, out of 212 total paragraphs which the Monitor's Office is tasked to assess. This report excludes the sections of the Agreement covering professionalization and policies and procedures, as well as specific paragraphs throughout the other sections that are assessed on an annual basis and were covered in CMR-3.

CMR-4 covers a period of review during which the COVID-19 pandemic continued to have a significant social and economic impact. Both law enforcement activities and the monitoring process itself were significantly affected by the quarantine restrictions enacted by the PR government. The restrictions imposed by the pandemic forced the Monitor's Office to defer the assessment of several paragraphs of the Agreement. Furthermore, PRPB failed to produce a self-assessment report, as required by Paragraph 261. This paragraph states that this status report "shall delineate the steps taken by PRPD during the review period to implement this Agreement and PRPD's assessment of the status of its progress and any response to concerns raised in prior TCA reports." While there have been delays in producing previous self-assessment reports, this is the first time

that Commonwealth has failed to produce a report. Despite these limitations, however, CMR-4 represents the most comprehensive assessment of PRPB performance possible under the extraordinary circumstances confronting both the Commonwealth and the world.

CMR-4 also represents the first Chief Monitor's Report under the administration of Governor Pedro Pierluisi. Pierluisi was inaugurated midway through the reporting period, and subsequently appointed a new Commissioner of PRPB and a new Secretary of Public Safety. The new administration took office with three months of CMR-4's period occurring under the previous administration and three months under the new administration. Nevertheless, the Chief Monitor wishes to note that the new Commissioner and the Secretary of Public Safety have shown cooperation and good faith to achieve the goals of the reform process under the Agreement.

CMR-4 covers nine of the eleven performance areas of the Agreement: 1) Use of Force, 2) Searches and Seizures, 3) Equal Protection and Non-Discrimination, 4) Recruitment, 5) Training, 6) Supervision and Management, 7) Civilian Complaints and Internal Investigations, 8) Community Engagement and Public Information, and 9) Information Technology. For each of these areas, the Monitor's Office addresses its assessments based on the desk review of data that was provided by PRPB, as well as interviews, site visits, and the current state of IT. Though site visits were hindered by the pandemic throughout the monitoring period, the Monitoring Team proceeded to conduct with anticipated limitations a variety of on-site monitoring activities.

In the forthcoming report sections, the Monitor provides the assessment and analysis produced by the diverse subject matter experts. All recommendations and assessments are offered in the spirit of collaboration with the sole objective of assisting PRPB in order that it can achieve a pathway to compliance, and ultimately sustainable compliance.

## I. Use of Force

As reported in Monitor's Office CMR-3, PRPB continues to have no mechanism in place to validate its reporting of incidents in which force was used, nor the number of uses of force (UOF) in those incidents. The Monitor verified this continuing issue during site visits to PRPB Headquarters during the period. PRPB's inability to validate its use of force numbers has been a recurring problem, and one which has been identified in all the Monitor's previous reports. This problem was perpetuated during the period of review for CMR-4 by PRPB's failure to replace the on-screen form, PPR-84, with form PPR-126.2 at the recommendation of the Monitor. Form PPR-126.2 contains two additional fields that track whether force used and if so, by how many officers. These statistics are imperative to ensuring accurate reporting on use of force.

However, it should be noted that upon his appointment, the Commissioner instructed the IT Unit of the Bureau to make the modifications to PPR-84 and PPR-126.2 as soon as possible. During a subsequent site visit to PRPB's San Juan Centro de Mando and PRPB's Reform Unit on April 5th, 2021, it was established that a "pilot project" involving the San Juan Centro de Mando would commence on or about May 15, 2021, whereby the current PPR-84 (on screen report) would be replaced with PPR-126.2. During a subsequent site visit to PRPB headquarters, the Monitor observed that PPR-126.2 was being implemented in the pilot on June 11th with the revised fields, as requested.

The Monitor is encouraged by the actions of PRPB to develop a system that, when fully implemented, will produce more accurate use of force numbers. However, the Monitor's Office cannot verify the accuracy of the information related to use of force provided by PRPB for CMR-4. Thus, while PRPB has developed comprehensive UOF policy and trained all relevant personnel in the requirements of those policies, implementation of this policy is still lacking. Furthermore, though the revised form PPR-126.2 contains the fields requested by the Monitor for recording use of force, force reporting will only be accurate if supervisors verify that use of force is recorded properly using PPR-126.2. The Monitor recommends that PRPB establish proper protocols requiring supervisors who are investigating a use of force to verify through the appropriate Centro de Mando that use of force is being properly recorded.

### 1. General Provisions

In relation to paragraphs 22-26, the Monitor's Office has concluded that PRPB has developed General Orders that properly categorize use of force by level based on the degree of seriousness. The policies cover all force technologies and weapons authorized

for use, including specialized Bureau units. In addition, the Monitor's Office has verified through documentation that, as per General Order 600-601, a private vendor has decommissioned and disposed of CN gas. The Monitor's Office confirmed this following inspection of the S.W.A.T. facility.

| Paragraph 22 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| Paragraph Language | PRPD officers shall use force in accordance with the rights, privileges, and immunities secured or protected by the Constitution or laws of the United States and the Commonwealth of Puerto Rico, and shall prohibit the use of unreasonable force. PRPD shall develop policies and procedures that enable officers to rely primarily on non-force techniques to effectively police; use force only when necessary; and de-escalate the use of force at the earliest possible moment. | |
| Compliance Target(s) | Compliance is determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 23-57, and (2) the results of outcome assessments, pursuant to Paragraph 243. | |

As in previous Chief Monitor Reports, the Monitor's Office requested the following information: 1) number of incidents where force was used and 2) how many officers used force in those incidents. In response, PRPB provided information attesting that 695 uses of force ("UOF") occurred during the reporting period (October 2020 through March 2021). On May 11, 2021, however, during a site visit to PRPB headquarters, the Monitor was provided data indicating 709 uses of force in 401 incidents for the same reporting period. The Monitor discovered further discrepancies during a site visit to S.W.A.T. on May 12, 2021. While reviewing documentation for CMR-4, the Monitor noted that S.W.A.T. reported 31 level-3 uses of force (pointing of a firearm during an entry). When cross-referencing these incidents with the master list of uses of force reported by PRPB, only 26 of the 31 level-3 UOF by S.W.A.T. were documented.

PRPB's discrepancy on its use of force data is of concern. This information comes from various sources and units throughout the Bureau, which potentially is the source of the problem. As previously stated, each area command's Centro de Mando should be the primary source of information. While PRPB may not be deliberately misrepresenting the number of reported uses of force, the data discrepancies impact the validity of the Monitor's compliance reviews.

| Paragraph 23 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Partially Compliant |
| Paragraph Language | PRPB complies with applicable law and comports with generally accepted policing practices. The comprehensive use of force policy shall categorize all reportable uses of force into multiple levels, grouped by degree of seriousness, and shall include all force techniques, technologies develop a comprehensive and agency- PRPD shall wide use of force policy that, and weapons, both lethal and less-lethal, that are available to PRPD officers, including officers assigned to specialized tactical units. The comprehensive use of force policy shall clearly define and describe each force level option and the circumstances under which each force level is appropriate. The highest level of force described by the policy shall include all serious uses of force, as defined in this Agreement. | |
| Compliance Target(s) | Compliance Target | Status |
| | Policies incorporate all of the requirements of Paragraphs 22-24. | N |

PRPB's use of force policies broadly comply with the language of the Agreement. However, PRPB policy continues to allow officers to group multiple uses of force under one blanked incident report, particularly in crowd control situations, which is not consistent with widely accepted policing practice.

The Monitor's office reviewed 53 use of force incidents and determined that the levels of force were accurately categorized into levels grouped by the degree of seriousness. However, as previously stated, the Monitor's office cannot verify that the use of force reports and investigations provided to the office reflect all uses of force which occurred during the period under review.

| Paragraph 24 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Partially Compliant |
| Paragraph Language | PRPD shall develop comprehensive and agency-wide policies that comply with applicable law and comport with generally accepted policing practices concerning the use of: (a) lethal force; (b) firearms; (c) canines; (d) ECWs; (e) chemical agents; (f) less lethal munitions; (g) batons and impact weapons; and (h) any other force technology, weapon, or implement authorized by PRPD during the life of this Agreement. PRPD shall also develop a policy on sharing information with the public regarding serious uses of force and the dissemination of information to family members of civilians involved in a use of force incident. | |
| Compliance Target(s) | Compliance Target | Status |
| | Policies incorporate all of the requirements of Paragraphs 22-24. | Y |

PRPB has prepared comprehensive policies and revised them periodically as outlined in the agreement. The policies are consistent with generally accepted police practices relating to use of force. However, PRPB continues to provide unverifiable use of force information to the public. As noted above, while PRPB has incorporated the paragraph

CMR-4 | July 21, 2021

requirement into a policy and trained all relevant personnel in the requirement and policy, implementation and operationalization of this policy is lacking.

| Paragraph 25 | Assessment Frequency | | Overall Compliance Status |
|---|---|---|---|
| | Bi-annually | | Substantially Compliant |
| Paragraph Language | PRPD shall continue to prohibit the use of Chloroacetophenone (commonly referred to as "CN gas"). | | |
| Compliance Target(s) | Compliance Target | | Status |
| | 1. Policy prohibits use of CN gas. | | Y |
| | 2. No supply of CN gas is identified in armories or other locations through unannounced site visits. | | Y |
| | 3. No supply of CN gas is identified in armories or other locations through inspections. | | Y |
| | 4. CN gas is never used by STUs. | | Y |

As per the Agreement, PRPB continues to prohibit the use of CN gas. The Monitor's site visits and observations of PRPB equipment rooms continue to show PRPB's compliance with this paragraph. PRPB's substantial compliance is reflective of its efforts to meet the policy, training, and implementation requirements of this paragraph.

| Paragraph 26 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| Paragraph Language | PRPD shall maintain an accurate, current list of officers who successfully qualify with their regulation firearm, including any other firearm that officers are authorized to use or carry. Officers who fail to re-qualify shall be relieved of police powers and immediately relinquish all firearms, including personal firearms. Those officers who fail to re-qualify after remedial training within a reasonable time shall be subject to disciplinary action. | |
| Compliance Target(s) | Compliance Target | Status |
| | 1. Policies incorporate all of the requirements of the paragraph. | Y |
| | 2. All officers on the qualification list are qualified and certified on the use of firearms in accordance with policy. | Y |
| | 3. All officers who fail the qualification re-test on the same day are relieved of operational duty, disarmed, and summoned for re-training before leaving the Academy. | N |
| | 4. All officers who fail to qualify after re-training remain relieved of operational duty, remain disarmed, and are referred for disciplinary action. | N |
| | 5. All officers are disciplined for failing to qualify after re-training or have a valid justification for not qualifying in accordance with policy. | N |
| | 6. All officers with more than one regulation firearm are qualified in all authorized firearms. | Y |

CMR-4 | July 21, 2021

PRPB provided no information on sworn officers who failed to qualify with their service weapon during the period, other than to state that the information will be provided once the compliance report process is completed. As in CMR-3, the Monitor expresses skepticism that no officers would fail to requalify with their service weapon on the first attempt in a police force as large as PRPB. The Monitor is confident that PRPB ensures that all officers are qualified to carry their service weapons, but PRPB's failure to provide any evidence of retesting or discipline seems to indicate that PRPB does not properly document cases of officers who fail to qualify on their first attempt. As such, while PRPB has incorporated the paragraph requirement into policy and trained all relevant personnel in the requirement and policy, implementation and operationalization of this policy is lacking.

## 2. Specialized Tactical Units

In relation to Paragraphs 27-31, the Monitor's Office has concluded that PRPB has developed use of force policies for specialized tactical units (STUs) and that these policies are consistent with the Bureau's agency-wide use of force policy. PRPB has also completed training related to these policies. A review of DOT roll call documents verifies continued compliance with policies. The Monitor's Office has verified through document review that specialized units are not conducting general policing functions except for non-specialized "Preventive Patrols" in high crime areas. In addition, the Monitor's Office has noted that most DOTs have provided documentation that officers assigned to preventive patrol do so in regular uniform and not in full tactical attire. It should be noted that PRPB has now revised form PPR-112.2, "Record of Mobilization of STU," to include this information.

As stated in the Monitor's previous reports, PRPB must revise the practice of allowing supervisors to prepare one blanket use of force report (PPR-605.1) for multiple uses of less-than-lethal force at a demonstration and/or protest. This practice is inconsistent with PRPB policy and generally-accepted police practices. General Order 600-620 is clear that each use of a specialized weapon against a person, animal, or crowd constitutes one independent use of force. GO 600-620 only allows a "group report" from a squadron leader who authorizes the use of chemical agents when there is exposure to tear gas during a civil disturbance. The policy clearly does not allow PRPB supervisors to produce one report that covers multiple uses of force that occurred at different points in time and were dispersed across multiple locations.

Based on the Monitor's Office review of UOF reports in response to crowd control events, PRPB has interpreted this procedure for crowd dispersal with gas as governing a wider

CMR-4 | July 21, 2021

range of dispersal techniques that involve multiple, separate uses of force. PRPB needs to align policy and practice. The current practice allows for officers to utilize less-than-lethal weapons with limited oversight or accountability against crowds that they have determine are unruly. By incorporating multiple uses of force under one umbrella incident, officers can under-report the amount of force used, in some instances combining under one incident report multiple uses of force that occurred blocks away from each other over an extended period. PRPB currently allows for officers to document their use of force actions on a PPR-605.2 (supplemental information), which is not a use of force report (PPR-605.1).

The foregoing practice may result in abuse of power and lack of accountability. Officers who use force inappropriately may then feel a sense of anonymity because they are not required to prepare a detailed use of force report (PPR-605.1) documenting their actions. PRPB must revise its policy to curtail this practice.

| Paragraph 27 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | PRPD shall develop policies on the use of force by members of specialized tactical units ("STUs"). This policy shall be consistent with PRPD's agency-wide use of force policy. tactical units ("STUs"). This policy shall be consistent with PRPD's agency-wide use of force policy. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Policies incorporate all of the requirements of the paragraph. | N |
| | 2. All use of force training involving STUs is consistent with approved policies. | N |
| | 3. 95% of officers are trained and certified in all use of force policies involving STUs (or scheduled for training, in the case of mid-year reviews) | N |
| | 4. 95% of uses of force by STU officers are within policy. | N |

PRPB has developed use of force policies for specialized tactical units. As of the reporting period, PRPB's specialized tactical units continue to use one single use of force incident report prepared by a supervisor along with PPR-605.2 Reports (supplemental report) prepared by officers who used the force, for all uses of force during demonstrations by the unit on site. The Monitor's Office recommends PRPB update the related policy (GO 600-620, Specialized Arms of the Division of Special Tactics) to address this issue.

PRPB General Order 100-112 precludes DOT to operate as a specialized group or be equipped with tactical equipment when conducting patrol functions. General Order 100-112 also bounds DOT members to always keep specialized weapons and tactical

CMR-4 | July 21, 2021

equipment accessible to respond to any authorized DOT event. During the Monitor's April 2021 site visit to Metro DOT, the Inspector in charge informed the Monitor that the equipment is kept at police facilities accessible to the officers in the event they are mobilized. The Chief Monitor recommended that, going forward at the start of these "Preventive Patrol" assignments, the supervisor inspects each officer's uniforms and create a log entry verifying compliance with General Order 100-112. The Inspector was receptive to this recommendation. In addition, during the May 2021 site visit, the Commanding Officer of the Reform Unit informed the Monitor that PRPB will be modifying its PPR-112.2 "Record of Mobilization of STU" to capture this information. During the Monitor's subsequent June site visit to Puerto Rico, the commanding officer of the reform unit presented the Chief Monitor with the revised PPR-112.2.

| Paragraph 28 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| Paragraph Language | PRPD shall prohibit STUs from conducting general patrol and policing functions. | |
| Compliance Target(s) | Compliance Target | Status |
| | 1. Policies incorporate all requirements of the paragraph. | Y |
| | 2. Training involving STUs is consistent with approved policies. | Y |
| | 3. 95% of STU officers are trained and certified in STU policies (or scheduled for training, in the case of mid-year reviews). | Y |
| | 4. Presentation of data on STU deployments and activations. | Y |
| | 5. 95% of all STU deployments/activations for general patrol and policing functions are justified within policy. | N |
| | 6. 95% of all assignments of individual STU officers to general patrol and policing functions are justified and carried out within policy. | N |

In relation to daily assignments, the Monitor's Office has verified that specialized units are properly documenting their activities. A document review of DOT roll calls, however, demonstrates only continued partial compliance. Specialized units are not conducting general policing functions apart from non-specialized "Preventive Patrols," which involve patrolling in high crime areas.

In addition, some officers assigned to preventive patrol are using regular uniforms rather than full tactical gear. However, this observation cannot be generalized to all DOTs. During the April 2021 site visit, the Monitor met with the Metro DOT's Inspector and recommended that supervisors inspect and document the officer's compliance with uniform requirements and at the start of the shift. The Inspector was receptive to this recommendation. As such, while PRPB has incorporated the paragraph requirement into

an implemented policy and trained all relevant personnel, its implementation and operationalization of this paragraph is lacking.

| Paragraph 29 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Partially Compliant |
| Paragraph Language | PRPD shall develop eligibility criteria and selection devices for assignment to STUs that emphasize demonstrated capacity to carry out the mission of STU in a constitutional manner. Officers assigned to STUs who are unable to maintain eligibility shall be removed from STUs. Assignments to STUs shall be for a determined period, as specified by PRPD policy, unless there are extenuating circumstances that justify an extended assignment. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Policies incorporate all of the requirements of the paragraph. | Y |
| | 2. Training for evaluation boards is consistent with approved policies. | Y |
| | 3. 95% of evaluation board members are trained. | Y |
| | 4. All officers selected to STUs meet eligibility requirements. | Y |
| | 5. All officers assigned to STUs who do not maintain eligibility are removed from STUs. | N/A |
| | 6. 95% of all extensions of STU assignments are justified as extenuating circumstances within policy. | N/A |

PRPB provided written documentation that during the reporting period three officers currently in DOT were transferred to other DOT Units and four additional officers left DOT. According to PRPB, 75% of the Officers in DOT will have completed their six years in January 2022. Therefore, if PRPB intends to retain these officers in their existing positions, PRPB should consider starting the process as outlined in General Order 100-112. PRPB has developed a General Order which identifies eligibility criteria as well as selection to specialized units. However, due to no incoming personnel transfers occurring during the CMR-4 reporting period, the Monitor's Office was not able to make an assessment for operational compliance.

| AREA | Joined Unit | Departed Unit |
|---|---|---|
| Aguadilla | 0 | 1 |
| Arecibo | 1 | 0 |
| Caguas | 0 | 0 |
| Fajardo | 0 | 1 |
| Guayama | 0 | 0 |
| Humacao | 1 | 0 |
| Mayaguez | 0 | 2 |
| Metro | 1 | 2 |
| Ponce | 0 | 1 |
| S.W.A.T. | 0 | 0 |
| Total | 3 | 7 |

| Paragraph 30 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| Paragraph Language | PRPD shall require STUs to document in writing all law enforcement activities to include operational plans and after-action reports prepared in consistent formats for all call-outs and deployments. Supervisors shall review the law enforcement activities of STUs periodically to ensure compliance with applicable laws and PRPD policies and procedures. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Policies incorporate all of the requirements of the paragraph. | Y |
| | 2. Training for STUs is consistent with approved policies. | Y |
| | 3. 95% of law enforcement activities by STUs, including deployments and activations, are documented within policy. | Y |
| | 4. 95% of law enforcement activities by STUs, including deployments and activations, are reviewed by supervisors. | Y |

A review of PRPB DOT operational plans indicated that in situations where the Unit was given prior notification as to assignments, an operational plan was prepared. However, DOT units also reported that they did not actually participate in crowd control activities during the demonstrations that occurred during the CMR-4 reporting period. Rather, the mobilization involved placing the units on standby if needed. This was verified during Monitor site visits in January & March of 2021. Subsequent documentation provided by the different DOTs Bureau-wide for CMR-4 have also been reviewed to verify compliance.

The S.W.A.T. unit was activated a total of 50 times during the period extending from October 2020 through February 2021. The Monitor's Office requested a random sample of 21 activations for the purpose of compliance review. In all the cases reviewed, S.W.A.T. prepared a Mobilization Report (PPR-112.2) and after-action report (PPR-112.3). However, the Monitor does note that the after-action reports prepared by S.W.A.T. lack evaluation and analysis of the unit's performance. The Monitor's Office emphasizes that self-reflective evaluation is essential to promoting improvements in the unit's performance and overall safety.

The S.W.A.T.'s commanding officer reported that, in many instances, no advance warning was received following the back up call-out to federal task forces or specialized units on operations. Therefore, there were no operational plans prepared.

Additional observations made by the Monitor during the CMR-4 reporting period include the following:

- In the 21 cases reviewed by the Monitor's Office, the S.W.A.T. Team used force in 12 incidents. Force consisted of the pointing of a firearm in all instances.

CMR-4 | July 21, 2021

- During the May 2021 site visit to S.W.A.T., the Monitor reviewed all data from October 2020 through March 2021, including uses of force. The Monitor discovered that five of the thirty-one uses of force reported by S.W.A.T. did not appear in PRPB's master list of uses of force.
- In 4 instances, outdated forms PPR-920a were used in place of PPR-112.2.
- During a site visit to S.W.A.T., no CN gas was present in the unit's arsenal (see paragraph 25). Moreover, the Monitor verified that supervisors conduct a daily weapon inventory check and submit a quarterly report.

| Paragraph 31 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| Paragraph Language | PRPD shall track the number of STU deployments, the reason for each activation and deployment of STU, the legal authority, including type of warrant, if any, for each activation and deployment of STU, and the result of each activation and deployment of STU, including: (a) the approximate location of the STU deployment; (b) the number of arrests made; (c) the type of evidence or property seized; (d) whether a forcible entry was made; (e) whether force was used by an STU member or other officer; and (f) whether a person was injured or killed by an STU member. | |
| Compliance Target(s) | **Compliance Target** | **Status** |
| | 1. The STU tracking system accounts for all elements in the paragraph and outcome measures as required by Paragraph 243. | Y |
| | 2. The STU tracking system is accurate and current; all deployments are tracked. | N |

As stated in previous Monitoring Reports, PRPB does not have a tracking system that captures all deployment data from STU Units throughout the Bureau. Individual STUs confirmed that PRPB is not compiling the information into one central database, which would assist PRPB's command staff in determining Bureau-wide needs as it relates to DOT. While PRPB is collecting the deployment data at the unit level, it appears that PRPB does not collect the data at the Bureau level. Therefore, PRPB is partially compliant under paragraph 31.

## 3. Crowd Control Policies and Performance

In response to the Monitor's Office request for a global list of demonstrations and protests that occurred during the reporting period, the Bureau provided data on responses to 108 protests island wide. The Monitor's Office selected a random sample of 22 demonstrations and protests for purposes of reviewing operational plans, after-action reports, and self-assessment reports as outlined in GO 600-625. The Monitor selected

incidents that required the mobilization of STU-DOT units, most of which were in the Metro area where over 56% of the demonstrations and protests took place.

For the relevant period, there were no demonstrations or protests that required the units participate in the crowd control activities, beyond the mobilization of STU-DOT on stand-by. In all the mobilizations during the period, DOT was kept in reserve and never interacted with demonstrators or protesters.

It should also be noted that in the area commands where the demonstrations and protests took place, PRPB area commands did not prepare self-assessment reports assessing the police response, even for events that occurred in their areas, as their units were merely placed on standby. In the same manner, DOT did not provide any after-action reports or assessments for these events, as they did not actively participate in crowd control activities beyond being placed on standby.

| Paragraph 32 | Assessment Frequency | | Overall Compliance Status |
|---|---|---|---|
| | Bi-annually | | Partially Compliant |
| Paragraph Language | PRPD shall develop crowd control and incident management policies that comply with applicable law and comport with generally accepted policing practices. | | |
| Compliance Target(s) | Compliance Target | | Status |
| | 1. Policies incorporate all of the requirements of the paragraph. | | Y |
| | 2. Training on crowd control and incident management is consistent with approved policies. | | Y |
| | 3. 95% of STU officers, supervisors, and other officers are trained and certified in crowd control (or scheduled for training, in the case of mid-year reviews); 95% of all supervisors are trained in incident management (or scheduled for training, in the case of mid-year reviews). | | Y |
| | 4. 95% of police responses to unplanned events are within policy. | | N |
| | 5. 95% of police responses to planned events are within policy. | | Y |
| | 6. 95% of armories inspected by STU supervisors indicate that less lethal weapons and ammunition are controlled and maintained in accordance with policy. | | Y |
| | 7. 95% of armories indicate that less lethal weapons and ammunition are controlled and maintained in accordance with policy. | | Y |

PRPB reports that no additional training was provided on GO 600-625 "Crowd Control" during the reporting period. The number of people trained remains the same as was reported in CMR-3.

As in CMR-3, PRPB provided no information on police responses to unplanned protests or other crowd control events, only to planned events. While reviewing data, however, the

CMR-4 | July 21, 2021

Monitor's Office did determine that PRPB did respond to several small unplanned events during the period of review for CMR-4. PRPB must properly document its responses to both planned and unplanned crowd control events.

| Paragraph 33 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Substantially Compliant |
| Paragraph Language | The incident management policy shall provide that a ranking officer or other higher-level PRPD official at the scene of a mass demonstration, civil disturbance, or other crowd situation assume command and control and provide approval prior to deploying force as a crowd dispersal technique. | |
| Compliance Target(s) | This paragraph is assessed with paragraph 32. | |

The Monitor's Office confirmed that 100% of DOT personnel have been trained on GO 600-625 and 100% of supervisors on Incident Management. In addition, the Commanding Officer of Metro DOT received training on Incident Command.

During a site visit to Metro DOT, the Monitor's Office reviewed a random sample of reports relating to demonstrations and protests where STU was mobilized. The Monitor's Office learned that in instances where the Bureau had determined in advance that the STU Unit would be activated, an operations plan was developed by the DOT Unit. However, in instances where the determination to mobilize the Unit was made at the time of the event, the DOT prepared no such plan. The Monitor verified this data during the site visit conducted in January and March of 2021.

| Paragraph 34 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| Paragraph Language | The crowd control policy shall require the use of crowd control techniques and tactics that respect protected speech and the right to lawful assembly. | |
| Compliance Target(s) | This paragraph is assessed with paragraph 32. | |

The Monitor's Office requested a list of all demonstrations/protests Bureau-wide. Upon review, it was clear that the data was not centralized. PRPB should be collecting this data bureau wide for the purpose of analyzing and identifying possible training needs.

CMR-4 | July 21, 2021

| Paragraph 35 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| Paragraph Language | PRPD policy shall require the assessment of law enforcement activities following each response to a mass demonstration, civil disturbance, or other crowd situation to ensure compliance with applicable laws and PRPD policies and procedures. | |
| Compliance Target(s) | This paragraph is assessed with paragraph 32. | |

PRPB provided documentation that STU-DOT personnel have been trained on "Crowd Control," General Order 600-625. The Monitor's Office found that the STUs did not prepare any after-action reports when activated. However, as previously noted, the Unit did not actively engage in any crowd control activities during these events and were merely placed on standby.

PRPB provided no documentation referring to responses to unplanned demonstrations or protests, going so far as to report that there were no unplanned demonstration events that took place during the reporting period of CMR-4. However, in reviewing files, the Monitor's Office found three demonstrations that PRPB self-identified as spontaneous events. Based on a review of the data and documentation provided by PRPB, these incidents were properly handled.

Not all demonstrations and/or protests are large-scale. It is likely that the Bureau experienced some additional protests that required minimal police coverage, such as a demonstration outside of a commercial establishment by its striking employees. Nevertheless, these small events should also be reported as protests, and PRPB's response should be thoroughly documented. PRPB must maintain a more accurate file on unplanned protests that includes small, spontaneous events.

The Monitor considered numerous documents to reach a conclusion as to PRPB's level of compliance with the Agreement as it applies to mass demonstrations. These included a review of PRPB's work plans for the demonstrations as well as its completion of PPR 112.1 Request for Activation of the STU, PPR-112.2 Record of Mobilizations of STU and PPR-112.3 Evaluation of Strategies of the STU.

The Monitor's Office concludes that PRPB's actions during demonstrations and protests in the period covered in CMR-4 were consistent with generally accepted police practices and Bureau Policy. PRPB provided the Monitor's Office with Operation Plans (PPR-625.2) for the various demonstrations and protests that occurred in the reporting period, as well as Crowd Management and Control Report (PPR-625.3) which provided basic details of each event. However, the fact that PRPB produced no detailed self-assessment reports from commanders relating to the demonstrations/protests which occurred in their

respective area commands is of concern. Much can be learned by preparing an in-depth report. It allows a frank assessment as to what occurred, and, in many cases, what can be improved upon. In addition, General Order 600-625 specifically states that PRPB will conduct a self-assessment exercise of the operations. Going forward, therefore, the Monitor's Office recommended PRPB to include self-assessment reports.

## 4. Force Reporting

 The Monitor's assessment of PRPB's compliance with force reporting policies and procedures were based on the use of force reports provided. However, PRPB still lacks a mechanism to ascertain the accuracy of use of force incidents, as well as the number of uses of force per incident. As previously stated, for example, S.W.A.T. reported 31 uses of force (level-3: pointing of firearm) over the course of all mobilizations from October 2020 through February 2021, and. However, in a crosscheck with PRPB's master list of use of force bureau-wide for the same period, the bureau-wide data record five fewer uses of force by S.W.A.T.

Such inconsistencies represent a recurring problem for PRPB, and one that was identified in all previous Monitor's reports. PRPB has reported on multiple occasions that it was close to resolving the problem by adopting a new form (PPR-126.2) rather than the on-screen form (PPR-84) currently used by PRPB's thirteen Area Command. The new form would contain the additional information necessary to enable PRPB to report accurate use of force numbers. During the March 2021 Monitor's site visit to PRPB Headquarters and San Juan Centro de Mando, the Chief Monitor confirmed that the proposed changes had not taken place. During a subsequent site visit by the Chief Monitor to the above locations in April 2021, it was verified that the change still had not taken place. During a site visit for CMR-5, however, the Monitor verified dispatcher center console computers in San Juan Centro de Mando had been updated with the new PPR-126.2 form as of June 11th, 2021, which PRPB indicated will replace the old on-screen form (PPR-84).

As a result of the above-mentioned issues, the Monitor's Office cannot at this time verify that PRPB's information relating to the number of uses of force for the period of CMR-4 are accurate. This is also concerning because PRPB utilizes this number as its official reporting number to the Court, the Monitor's Office, and the public. However, once the new dispatcher on screen form (PPR-126.2) is incorporated bureau-wide and properly utilized, PRPB will have an acceptable mechanism in place to report accurate use of force numbers, providing supervisors verify through the appropriate Centro Mando that all uses of force they are investigating are noted on PPR-126.2.

| Paragraph 36 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | PRPD shall develop a Use of Force Reporting Policy and Use of Force Report Form that comply with applicable law and comport with generally accepted policing practices. The Use of Force Reporting Policy will require officers to notify their immediate supervisor following any use of force, prisoner injury, or allegation of excessive force. In cases involving a serious use of force, notification will be within one hour, absent exigent circumstances. | |
| Compliance Target(s) | **Compliance Target** | **Status** |
| | 1. Polices and forms incorporate all of the requirements of the paragraph. | N |
| | 2. Training on force reporting is consistent with approved policies. | N |
| | 3. 95% of officers are trained and certified in force reporting policies (or are scheduled for training, in the case of mid-year reviews) | N |
| | 4a. 95% of use of force incidents are notified to immediate supervisors or adequately justified as an exigent circumstance in accordance with policy. | N |
| | 4b. 95% of use of force reports are completed within prescribed periods and are documented in accordance with policy. | N |
| | 4c. All failures to report use of force are referred to SARP for investigation. | N |
| | 4d. 95% of requests for medical services in connection with a use of force are within policy. | N |
| | 4e. 95% of force incidents where a civilian is transported to a medical facility indicate that the officer notified the vehicle mileage and that the mileage was recorded. Mileage discrepancies are identified and addressed by supervisors as required by policy. | N |
| | 4f. 95% of all use of force reports are submitted to supervisors and SARP within prescribed time frames as required by policy. | N |
| | 4g. All use of force reports are stored and maintained by SARP as required by policy. | N |

The Monitor's Office reviewed policies and related forms, which generally adhered to the requirements of the Agreement. However, PRPB has failed to modify its use of force policy to end the practice of combining multiple uses of force under one report (PPR-605.1). Although PRPB policy currently allows this practice, it violates the requirements of the Agreement and deviates from generally accepted police practices. Combining multiple uses of force prevents thorough and adequate investigation of each use of force to determine whether it was justified and adhered to policy.

| Paragraph 37 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| Paragraph Language | The Use of Force Reporting Policy shall require all officers to report any use of force in writing in a Use of Force Report Form before the end of the shift. The Use of Force Report shall include: (a) a detailed account of the incident from the officer's perspective; (b) the reason for the initial police presence; (c) a specific description of the acts that led to the use of force, including the subject(s)' behavior; (d) the level of resistance encountered; and (e) a description of every type of force used. The Use of Force Reporting Policy shall explicitly prohibit the use of boilerplate or conclusory language in all reports documenting use of force. Failure to report a use of force or prisoner injury by a PRPD officer shall subject an officer, including supervisors and commanders, to disciplinary action. | |
| Compliance Target(s) | This paragraph is assessed with paragraph 36. | |

Of the 53 use of force reports (PPR-605.1) reviewed by the Monitor's Office, only one was not completed before the end of the officer's shift. However, as noted previously, PRPB's inability to maintain a data system that can accurately capture all use of force incidents continues to hamper PRPB's efforts and prevents them from validating its use of force numbers.

In addition, as per directive of the PRPB Commissioner (provided to the Monitor's Office), the Bureau reports that effective June 1st, 2021, Divisions such as the Drug Unit, Transit and Auto Theft will follow the following guidelines: 1) when a member of PRPB assigned to any specialized unit is involved in an incident in which force was used, the officer will request a complaint number from the district or precinct corresponding to the jurisdiction where the incident occurred; 2) in incidents of use of force, PRPB has prohibited the use of complaint numbers with the prefix of the specialized unit; 3) PRPB's IT Bureau will take the corresponding steps to support compliance with Commissioner's Directive. This process will ensure that the Area Command where force took place is aware of the use of force.

The Monitor was also informed that the Centro de Mando of the thirteen area commands will become the Bureau's source of information relating to reported use of force incidents. FIU will continue to be the repository for use of force reports (PPR-605.1).

The Monitor's Office sees these actions by the Commissioner's Office as positive steps toward developing a path where PRPB can validate its use of force incident numbers.

CMR-4 | July 21, 2021

| Paragraph 38 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | PRPD policy shall require officers to request medical services immediately when an individual is injured or complains of injury following a use of force. The policy shall also require officers who transport a civilian to a medical facility for treatment to take the safest and most direct route to the medical facility. The policy shall further require that officers notify the communications command center of the starting and ending mileage on the transporting vehicle. | |
| Compliance Target(s) | This paragraph is assessed with paragraph 36. | |

In all use of force reports (PPR-605.1) reviewed by the Monitor's Office, whenever medical aid was warranted, it was received. However, without an accurate number of reports, the Monitor is unable to determine whether this finding is representative of all use of force incidents.

| Paragraph 39 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | PRPD's Use of Force Reporting Policy shall require that officers submit copies of Use of Force Reports to their immediate supervisor and to SPR for tracking and analysis. SPR shall maintain master copies of these reports in a central location. | |
| Compliance Target(s) | This paragraph is assessed with paragraph 36. | |

In all use of force reports (PPR-605.1) reviewed by the Monitor's Office, a use of force report was submitted to the officer's immediate supervisor. In relation to tracking and analysis, PRPB has not demonstrated that it has the capabilities to provide this function.

During the Monitor's review for CMR-2 and CMR-3, the Chief Monitor requested that PRPB modify the PPR-84 to require two additional data points on the use of force: 1) whether force was used, and if so, 2) by how many officers. The Monitor's Office also recommended that PRPB modify its PPR-84 system so that the additional data points are completed prior to the system generating a complaint number. This would allow the Force Investigation Unit ("FIU"), the Bureau's repository for all use of force incidents, to provide accurate numbers of use of force incidents on any given day.

PRPB confirmed to the Monitor that it would be adopting these recommendations. However, as previously stated, the change has yet to occur. PRPB has informed the Monitor's Office that it intends to replace the current onscreen form utilized by Centro de Mando dispatchers with the form PPR-126.2. However, PRPB has provided no timeline

for the change. Until it is adopted throughout the entire Bureau (all Centros de Mando), PRPB will be unable to validate its own use of force data.

PRPB should also be working to develop an electronic tracking system with field reporting capability. However, until such a system is implemented, Centro de Mando must have the ability to track the numbers for purposes of monitoring and analyzing use of force dynamics.

## 5. Force Review, Investigation, and Analysis

As stated in previous reports, the practice of having use of force reports (PPR-605.1), subsequent investigation and evaluation reviewed by FIU for accuracy is of the utmost importance. It is also important to note that these use of force reports (PPR-605.1) need to be reviewed for completeness and accuracy in the field, especially considering that many of these reports do not arrive at FIU for a considerable amount of time, depending on what track the investigation follows. Therefore, as previously stated, a procedure should be in place at the area commands and specialized units that identifies mistakes and/or omissions earlier in the process.

| Paragraph 40 | Assessment Frequency | | Overall Compliance Status |
|---|---|---|---|
| | Annually for policy compliance and bi-annually for training compliance. | | Partially Compliant |
| Paragraph Language | PRPD policy shall specify that the conduct of all force reviews and investigations comply with applicable law and comport with generally accepted policing practices. All force reviews and investigations shall, to the extent reasonably possible, determine whether the officers' conduct was justified and within PRPD policy. | | |
| Compliance Target(s) | Compliance Target | | Status |
| | 1. The policy incorporates all of the requirements of the paragraph. | | N |
| | 2. Training on force reviews and investigations is consistent with approved policies. | | Y |
| | 3. 95% of officers are trained and certified in force reviews and investigation policies in accordance with their rank or assignment to FIU (or are scheduled for training, in the case of mid-year reviews) | | y |
| | Implementation of the requirements of this paragraph will be assessed with Paragraphs 43-47 for level 1-3 uses of force. | | N |
| | Implementation of the requirements of this paragraph will be assessed with Paragraphs 48-52 for level 4 uses of force. | | N |

PRPB has no mechanism in place to reflect the quality of force review investigations of supervisors when preparing performance evaluations. This stipulation is not in the policy, supervisors have not been trained, nor has it been implemented.

CMR-4 | July 21, 2021

Of the 53 use of force reports (PPR-605.1) reviewed by the Monitor's Office, only two incidents appear not to have been properly investigated. In addition, there were four incidents (out of five) in which FIU investigated did not include FIU's Preliminary Investigation Report (PPR-113.2). Although PRPB meets the policy and training requirements for this paragraph, the issues with the proper tracking of use of force reports raises issues with operational compliance.

| Paragraph 41 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually related to the tracking system; annually related to the annual report; and quarterly related to site visits to Radio Control Center. | Not Compliant |
| Paragraph Language | PRPD shall be responsible for maintaining a reliable and accurate tracking system on all officers' use of force; all force reviews carried out by supervisors; all force investigations carried out by Force Investigation Units ("FIU"); and all force reviews conducted by Force Review Boards ("FRB") and the Superintendent's Force Review Board ("SFRB"). At least annually, PRPD shall analyze data on officers' use of force to determine significant trends, identify and correct deficiencies revealed by this analysis, and document its findings in a public report. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Tracking system accounts for all of the elements in the paragraph and outcome measures as required by Paragraph 243. | Y |
| | 2. All uses of force are tracked in the tracking system. | N |
| | 3. Annual use of force reports provide meaningful data analysis, identify significant trends, discuss corrective action (if necessary), and present supportable findings based on accurate and current data, as required by policy. | N |
| | 4. Records maintained by the Radio Control Center on use of force are consistent with data in the use of force tracking system. | N |

As previously stated, PRPB has not demonstrated to the Monitor's Office that it has a reliable tracking system, nor to date has it provided the public with accurate information relating to use of force trends.

| Paragraph 42 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | The quality of force reviews, force investigations, and investigation reviews shall be taken into account in the performance evaluations of the officers performing such investigations and reviews. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraphs 145-146 on Performance Evaluations. | |

The Monitor has made the following key observations based on a review of fifty-three UOF Reports. In reviewing a random sample of PRPB's UOF Reports PPR-605.1 (October/2020 through March 30, 2021) the Monitor's Office determined that apart from two incidents, the levels of force reported were consistent with the force used. Most of the reports, in substance, had been properly prepared and the required actions relating to use of force incidents had been carried out as per the Agreement.

There were several reports with minor errors or missing information. As per PRPB policy, SARP/FIU has been deemed the repository for all use of force reports upon completion of investigation and evaluation. SARP/FIU also has the responsibility to review each report for proper preparation, accuracy, and completeness. Based on the observations of the Monitor's Office, after reviewing the use of force reports provided by FIU, the Monitor discovered that many of the above reports still had missing information.

In reviewing and determining levels of compliance with the Agreement, the Monitor's Office must look at the reports when they are deemed complete and accurate by PRPB, which is where FIU makes that determination. To a certain degree, PRPB has accomplished that goal. For example, proper levels of force reported were consistent with the force used. However, some of the reports submitted to the Monitor's Office were incomplete or missing information, though these omissions did not affect the outcome of the investigation relating to its compliance with the Agreement and Bureau policy.

The Monitor's Office believes that PRPB should be more cognizant of omissions and errors in the reports that arrive at SARP/FIU which require corrections or additional information during the initial submission.

The Monitor's Office has made several additional observations regarding force reviews:

- Of the reports reviewed (PPR-605.1), 17% had missing, incorrect or incomplete information.
- PRPB needs to require that all use of force reports be typed or legibly printed. Reports should not be written in script, which in some cases makes them illegible.
- As previously stated, PRPB's policy to send District/Precinct officers to ACT 408 orders (involuntary admission to a hospital re: psychiatric evaluation) by the court should be reviewed. Many have resulted in an electronic control device being used against the subject or some other non-lethal weapon utilized. Utilizing a trained CIT officer in these circumstances may result in less use of force.
- In the random sample of use of force, four of the five cases which were investigated by FIU did not include the Preliminary Investigation Report (PPR-113.2). The

Monitor's Office at that time of review could not determine if the force utilized was found to be within Bureau guidelines by PRPB.
- Note: A follow-up site visit to FIU (May 2021) established that the investigation in these 4 cases had not been completed.
- Outdated Use of Force Forms (PPR-605.1) were used in many cases.
- In several cases the reports were not properly signed, however the investigator's name is typed in.
- In one instance an agent acted in the capacity of a patrol or station supervisor. While that individual was not assigned to investigate the force, they were responsible for supervising that officer.
- PRPB should ensure that reports are either done day/month/year or month/day/year. The Monitor is still seeing both conventions utilized, and this can cause confusion regarding the date of the incident.
- In some instances, military time was used, however instances of this only appeared in outdated PPR-605.1 reports.
- Only one report was not submitted by the officer before the end of their shift.
- Five of the reports reviewed (9.4%) found that supervisors had not completed their review within the five business days as outlined in the Agreement.
- In just two cases, supervisors were not notified of use of force in a timely manner.
- Supervisors responded to all serious uses of force.
- In one case, a use of force that was properly classified as a Level 2, the supervisor in his declaration (Box 46, PPR-605.1) referred to the force as a level 3 in explaining it was within Bureau/policy guidelines.

## 6. Supervisory and FRB Reviews

The Monitor's Office review concluded that PRPB supervisors properly respond to incidents of serious use of force by members under their supervision. In cases where FIU presence was needed, proper notification was made to FIU.

It should be noted, in some instances, the files provided to the Monitor's Office did not include FIU's Preliminary Investigation Report PPR-113.2. In the 53 cases reviewed, supervisors were notified of the use of force. In two incidents, however, notification was not made in a timely manner. In all but five reports reviewed, supervisors completed their review within the five business days as outlined in General Order 600-605.

During this period of review, there were no reports of apparent misconduct or apparent criminal conduct. The Monitor's Office concludes that the mechanism to report such conduct is in place.

| Paragraph 43 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| **Paragraph Language** | A supervisor shall respond to the scene of a serious use of force or allegation of excessive force involving an officer under his/her command upon notification of the incident. | |
| **Compliance Target(s)** | This Paragraph is assessed with Paragraphs 48-52. | |

Of the 53 use of force reports (PPR-605.1) reviewed by the Monitor's Office, the monitor found no instance, based on the documentation provided, that a supervisor failed to respond to a serious use of force. However, since the Monitor's Office cannot verify the accuracy of the information related to use of force provided by PRPB this paragraph is rated as not compliant.

| Paragraph 44 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| **Paragraph Language** | The supervisor shall conduct a supervisory review of all uses of force, prisoner injuries, or allegations of excessive force, except those incidents involving a serious use of force or force indicating apparent criminal conduct by an officer, which shall be investigated by FIU, SPR, and/or PRDOJ. No supervisor who was involved in the incident, including by participating in, ordering, or authorizing the force being investigated, shall be responsible for the review of the incident. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Policies incorporate all of the requirements of the paragraph. | Y |
| | 2. Training on force reviews and investigations for supervisors is consistent with approved policies. | Y |
| | 3. 95% of supervisors are trained and certified in force reviews and investigation policies (or are scheduled for training, in the case of mid-year reviews) | Y |
| | 4a. 95% of use of force incidents classified as Level 1-3 are reported, reviewed, and investigated by supervisors and commanders within policy. | N |
| | 4b. 95% of supervisory force reviews are completed within five business days or have valid justifications for longer periods, based on exceptional circumstances. | N |
| | 4c. All use of force reviews and investigations by supervisors reach reasonably justified conclusions on officers' conduct and recommend disciplinary or corrective action, as necessary, in accordance with policy. | N |
| | 5a. 95% of reviews by Force Review Boards are within policy. | N |
| | 5b. The use of force tracking system accounts for all Force Review Board reports and underlying documents. | N |
| | 5c. Force Review Board determinations and recommendations are tracked and analyzed by SPR. | N |

CMR-4 | July 21, 2021

Of the 53 use of force reports (PPR-605.1) reviewed by the Monitor's Office, the office did not find any instance where the supervisor failed to conform to what was required. As noted above, because the Monitor's Office cannot verify the accuracy of the information related to use of force provided by PRPB this paragraph is rated as not compliant.

| Paragraph 45 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | Supervisors shall complete use of force reviews within 5 business days of receiving the officer's use of force report. The reviewing supervisor shall: (a) determine whether the use of force was consistent with PRPD policy and/or raises any policy or operational concerns; (b) review all Use of Force Reports and ensure that all reports include the information required by this Agreement and PRPD policy; (c) document each use of force review promptly using a Supervisor's Force Review Report; and (d) consider whether there are non-punitive corrective actions or training needs. A higher ranking officer within the investigating supervisor's chain-of-command shall review the Supervisor's Force Review Report for completeness and conformance with PRPD policy. The reviewing officer shall evaluate the investigating supervisor's conclusions and document whether the reviewing officer concurs, disagrees (with an explanation of the disagreement and the alternate conclusion), or defers until further investigation is completed. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 44. | |

Of the 53 use of force reports (PPR-605.1) reviewed by the Monitor's Office, five did not complete their review in the five business days as per the Agreement. The Monitor's Office cannot verify the accuracy of the information related to use of force provided by PRPB this paragraph. Thus, it is rated as not compliant.

| Paragraph 46 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| Paragraph Language | A Force Review Board shall evaluate supervisory reviews, including Supervisor's Force Review Reports and reviewing officers' determinations. FRBs shall be composed of command staff from varying assignments. PRPD policies shall specify the conduct and requirements of FRB proceedings to ensure thorough, timely, and objective reviews. PRPD policy shall establish objective criteria that identify the force levels below serious uses of force that shall be reviewed by FRBs. FRBs shall review supervisory review for completeness, evidentiary support, and compliance with PRPD policy. FRB shall document each FRB proceeding, which shall include findings and recommendations to the regional commander. FRB may also return force reviews to supervisors for additional review, as necessary, to ensure thorough and complete reviews. Copies of all Force Review Reports and underlying documents shall be submitted to SPR for tracking and analysis. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 44. | |

CMR-4 | July 21, 2021

The Monitor's Office requested the training/certification records of 21 randomly selected members of the Area Command Force Review Boards. PRPB's Office of the Registrar of the Auxiliary Superintendency in Education and Training (SAEA) provided certifications records for 16 of the 21 selected members. Five of the selected members, according to PRPB's SAEA, have no certification on file to serve on the Boards.

For the purposes of determining compliance to paragraphs 46 and 47, the Monitor's Office requested a list of all FRB investigations conducted by the 13 Area Command Force Review Boards during the October 2020 through March 2021. To that end, PRPB provided a list of 147 cases of UOF evaluated incidents of which the Monitor randomly selected 36 cases to review. PRPB provided information on 34 cases and indicated that 2 cases had not been evaluated by the San Juan Area Force Review Board. Of those 36 cases, 14 case files were missing significant information, i.e., PPR-502.1 "Evaluation of Use of Force" and PPR-502.2 "Determination of Use of Force." Therefore, the remaining cases that had complete information were insufficient to provide a large enough sample to determine compliance, even though the Monitor's review of FRB evaluations in those cases indicated that the Boards took appropriate actions. As a result, no determination as to the proper level of force can be made by the Monitor's Office. The Monitor's Office recommends, going forward, that monthly, Area Commands review completed case files for the purpose of ensuring that all required documents are present.

The following is an assessment of the information provided:

- Fourteen cases were missing PRR-502.1 "Evaluation of Use of Force" and PPR-502.2 "Determination of Use of Force." Therefore, no determination as to the proper level of force can be made by the Monitor's Office.
- Twenty cases provided documentation that the Force Review Board reviewed the case.
- Two cases were not sent (San Juan).
- In four cases the Board ordered retraining.
- The Boards evaluations were unanimous in all 20 cases.
- In five cases the file was returned by the Board due to missing or incomplete information.

Based on the reviews of the randomly selected Area Command FRB files, there were no reported referrals, nor was any such need uncovered. However, the Monitor again notes that it is impossible to conclude that these findings reflect PRPB's performance more broadly, given PRPB's continued problem with submitting accurate use of force data.

CMR-4 | July 21, 2021

| Paragraph 47 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Deferred |
| Paragraph Language | Whenever a reviewing supervisor, FRB, or other reviewing officer finds evidence of a use of force indicating apparent misconduct or apparent criminal conduct by an officer, he or she shall immediately notify his or her supervisor for referral to the appropriate investigating unit or the PRDOJ. The Superintendent shall be notified of the referral. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 44. | |

There were no reports of misconduct in the cases reviewed during the CMR-4 reporting period. However, Bureau policy clearly dictates what actions the Board must take with respect to reporting misconduct to the appropriate investigative unit or Puerto Rico Department of Justice. It should be noted that the Monitor reviewed a statistically significant random sample and found no referrals to the appropriate investigating unit or the PRDOJ. This absence of referrals calls into question compliance with reporting requirements.

## 7. FIU Investigations and Force Reviews CFRB

As indicated in previous Monitor reports, Force Investigation Unit (FIU) is required, among other investigations, to investigate all serious incidents of use of force across Puerto Rico, including both intentional and accidental firearms discharges involving PRPB personnel.

In reports, the Monitor's Office voiced serious concerns about the thoroughness of FIU investigations and the accuracy of their conclusions. The concerns were based on several findings, including that a significant proportion of FIU reports relied solely on police witnesses, and rarely incorporated interviews or observations from civilian witnesses.

For the period of CMR-4, PRPB reported 73 uses of force investigated by the FIU Unit. The Monitor's Office selected a random sample of 26 investigations for the purpose of assessing FIU's compliance with the Agreement and Bureau policy. Included in the cases requested were "accidental firearm discharges" as well as "intentional firearm discharges" and "non- firearm incidents."

On April 30th, 2021, the Monitor's Office received information from PRPB's Reform Unit that two of the cases requested were duplicates and of the remaining 24 cases requested, only four had been completed. The certification stated that in the remaining 20 cases FIU had not completed its investigation. The Monitor's Office, during the May/2021 site visit reconfirmed that the 20 cases had not been completed.

CMR-4 | July 21, 2021

Given the lack of completed cases, the Monitor is unable to determine PRPB's compliance in this area.

This low level of data provision is of major concern to the Monitor's Office. The fact that almost all the cases investigated by FIU requested for review by the Monitor were not completed in the 45 days as outlined in General Order 100-113. In further discussions with FIU, it was noted that one of the root causes for failing to complete the investigation in the time required by the general order is a delay in receiving analysis and results of forensic/evidentiary material i.e., video, photographs, and other evidence recovered at the scene. In these cases, FIU must rely on other units of the Bureau and within DSP to complete their task before the investigation can be closed. In past reviews of FIU cases, the Monitor has noted FIU's multiple requests for information. The Monitor's Office recommends that PRPB discuss this issue with the respective units involved.

| Paragraph 48 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| Paragraph Language | PRPD shall ensure that all serious uses of force and allegations of excessive force are investigated fully and fairly by individuals with appropriate expertise, independence, and investigative skills to ensure that uses of force that are contrary to law or policy are identified and appropriately resolved and that policy or operational deficiencies related to the use of force are identified and corrected. To this end, PRPD shall create FIUs to conduct investigations of serious uses of force, uses of force indicating apparent criminal conduct by an officer, uses of force by PRPD personnel of a rank higher than sergeant, or uses of force reassigned to FIU by the Superintendent, his or her designee, SPR, or FRB. PRPD policies shall specify the membership requirements, conduct of investigations, and operational procedures of FIUs. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Policies incorporate all of the requirements of the paragraph. | Y |
| | 2. Training for FIU officers is consistent with approved policies. | N |
| | 3. 95% of FIU officers are trained and certified in force reporting and investigation policies (or are scheduled for training, in the case of mid-year reviews) | N |
| | 4. All officers assigned to FIU meet eligibility requirements. | Y |

As noted above, because a majority of the FIU investigations had not been completed and thus were not provided to the Monitor's Office, the Monitor is unable to decide if PRPB is in compliance. The fact that almost all the cases investigated by FIU requested for review by the Monitor were not completed in the 45 days as outlined in General Order 100-113 is a concern to the Monitor's Office. The lack of files for the Monitor to review also impacts the compliance ratings of Paragraphs 49-51.

| Paragraph 49 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |

| Paragraph Language | A supervisor responding to a serious use of force or allegation of excessive force shall immediately notify FIU. FIU shall respond to the scene and commence an investigation. FIU may decline to respond to the scene following consultation and approval by the FIU supervisor. Declinations shall be documented in writing. | |
|---|---|---|
| Compliance Target(s) | **Compliance Target** | **Status** |
| | 1. Policies incorporate all of the requirements of the paragraph. | Y |
| | 2a. 95% of use of force incidents classified as Level 4 are reported, reviewed, and investigated by officers, supervisors, commanders, and FIU officers within policy. | Y |
| | 2b. 95% of FIU investigations are completed within 45 days of the use of force or have valid justifications for longer periods based on exceptional circumstances. | N |
| | 2c. All use of force reviews and investigations by FIU reach reasonably justified conclusions on officers' conduct and recommend disciplinary or corrective action, as necessary, in accordance with policy. | Y |
| | 3a. 95% of reviews by the Commissioner's Force Review Boards are within policy. | N |
| | 3b. The use of force tracking system includes all Commissioner's Force Review Board reports and underlying documents. | N/A |
| | 3c. Commissioner's Force Review Board determinations and recommendations are tracked and analyzed by SPR. | N/A |

The Monitor's compliance rating for this paragraph is stipulated based on the above noted issues and concerns. The Monitor also notes, though, that CFRB generally does not finish their reviews within the timeframe required by policy.

| Paragraph 50 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |

| Paragraph Language | FIU shall immediately notify and consult with PRDOJ regarding any use of force indicating apparent criminal conduct by an officer. If PRDOJ indicates that it may proceed criminally, or PRPD requests a criminal prosecution, any compelled interview of the subject officers shall be delayed until after consultation with PRDOJ or expressly permitted by the Superintendent. No other part of the investigation shall be held in abeyance unless specifically authorized by the Superintendent in consultation with PRDOJ. |
|---|---|
| Compliance Target(s) | This Paragraph is assessed with Paragraph 48. |

The Monitor's compliance rating for this paragraph is stipulated based on the above noted issues and concerns.

| Paragraph 51 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | FIU shall complete its administrative use of force investigation within 45 days of the use of force, absent exceptional circumstances. At the conclusion of each use of force investigation, FIU shall prepare a report on the investigation and shall forward the report to SFRB for review and to SPR for tracking and analysis. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 48. | |

The Monitor's compliance rating for this paragraph is stipulated based on the above noted issues and concerns.

| Paragraph 52 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| Paragraph Language | The Superintendent's Force Review Board shall evaluate all FIU investigations, including FIU reports and determinations. SFRB shall be composed of senior command staff from varying units. PRPD policies shall specify the conduct and requirements of SFRB proceedings to ensure thorough, timely, and objective reviews. SFRB shall review each FIU investigation for completeness, evidentiary support, and compliance with PRPD policy. SFRB shall document each force review proceeding, which shall include findings and recommendations, to the Superintendent. SFRB may also return force investigations to FIU for additional investigation, as necessary, to ensure thorough and complete investigations. Copies of all Force Review Reports completed by SFRB and underlying documents shall be submitted to SPR for tracking and analysis. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 48. | |

PRPB provided the Monitor's Office with documentation that the Commissioner's Force Review Board (CFRB) evaluated 57 FIU investigations relating to use of force during the CMR-4 reporting period. The Monitor's Office requested a random sample of 20 cases from these 57, and generally found that CFRB reviews are objective, but not timely.

PRPB provided data/documentation for 17 cases and indicated that three cases had yet to be reviewed by the CFRB. Of the 17 cases identified, 16 provided documentation of the evaluation by the board.

Two of the cases reviewed by CFRB involved accidental discharge. The investigations by FIU determined negligence. The cases were sent to CFRB for evaluation. After reviewing documentation provided by CFRB, the Monitor concurs with their recommendation that PRPB should have a protocol in place providing those investigations of accidental discharges involving officer negligence are sent directly to SARP for administrative investigation and not to CFRB.

- In reviewing the CFRB evaluations of FIU investigations, the Monitor's Office determined that FIU did not complete any of the investigations in the 45 days as outlined in General Order 100-113.
- In relation to CFRB, all evaluations exceeded the 30 days identified in General Order 500- 502 to complete the evaluation.
- Apart from one case, the Board found the force used was in accordance with Bureau policy. The Monitor notes that the case that CFRB determined was not in accordance with bureau policy involved an officer, who according to the FIU investigator, violated Bureau policy when he discharged his weapon. Details are as follows: A PRPB sergeant (off-duty) while in his residence observes a vehicle come down his dead-end street. Sergeant observes a male from the vehicle attempting to gain entry to the Sergeant's vehicle parked in his carport. The Sergeant confronts the male suspect and identifies himself as a police officer. The Sergeant states that at this time the male suspect points a black object at him which he believed to be a weapon (cell phone recovered from the location). At this time, the Sergeant fired one round at the suspect who then fled to his awaiting vehicle. The Sergeant gave chase, as the suspect entered the vehicle, the Sergeant then fired an additional 10 rounds at the vehicle, stating he feared the vehicle could have been put in reverse, thereby putting him in danger. FIU determined that the firing of the 10 rounds was in violation of Bureau policy and included that the some of those rounds were fired as the vehicle fled the scene. There were no injuries reported because of the discharges.
- In the cases reviewed by the Monitor's Office the findings were unanimous by the board members.
- There were no instances where re-training was directed.
- All necessary documentation was prepared and signed by board members.
- No reports were returned due to incorrect or incomplete and/or missing information.
- In two cases evaluated by the board relating to accidental discharge, the board determined that this was due to negligence and the case should have gone directly to SARP for an administrative investigation.

In addition, the Monitor's Office requested the training certification records of the three members of the Commissioner's Force Review Board. PRPB's Office of the Registrar of the Auxiliary Superintendency in Education and Training provided certifications records for the three members assigned to the board.

CMR-4 | July 21, 2021

## 8. Use of Force Training

The Monitor's Office finds that PRPB is compliant with the paragraphs of the Agreement which stipulate those personnel must be trained and certified on use of force policies. The Monitoring Team conducted a site visit to the Puerto Rico Police Bureau's FIU Unit on Monday, January 4, 2021, and verified that the training materials employed by PRPB are consistent with policy and generally accepted policing practices. The Monitoring Team also reviewed the training records of members of the Unit and verified that its training records included certification on use of force related policies.

All supervisors and FIU members have been trained on use of force related policies and conducting force investigations. However, in response to previous CMRs, PRPB indicated that it would provide additional training on firearm discharge investigations. To date the curriculum has not been developed, nor has the training commenced. In relation to annual reviews of uses of force, neither FIU nor the Bureau can verify that the use of force number is accurate.

| Paragraph 53 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| **Paragraph Language** | PRPD shall train all PRPD officers on PRPD's use of force policies. Thereafter, PRPD shall provide all PRPD officers with use of force training at least every two years for the first four years of this Agreement, and annually thereafter. PRPD shall also provide training on use of force as necessary, based on developments in applicable law and PRPD policy. At least annually, PRPD shall assess all use of force policies and training. PRPD's use of force training program shall include the following topics: a) legal standards for reasonable force; b) PRPD's use of force policy; c) reporting use of force, requesting medical service, and preserving evidence; d) scenario-based training and interactive exercises that illustrate proper use of force decision-making; e) the proper deployment and use of all weapons or technologies, including firearms, batons, chemical agents, and ECWs; f) threat assessment and de-escalation techniques that encourage officers to make arrests without using force, and instruction that disengagement, area containment, surveillance, waiting out a subject, summoning reinforcements, calling in specialized units, or delaying arrest may be the appropriate response to a situation, even when the use of force would be legally justified; g) crisis intervention and interacting with people with mental illnesses, including instruction by mental health practitioners and an emphasis on de-escalation strategies; h) factors to consider in initiating or continuing a foot pursuit; and i) appropriate training on conflict management. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Training on use of force is consistent with approved policies and the requirements of the paragraph. | N |
| | 2. 95% of officers are trained and certified in use of force (or scheduled for training, in the case of mid-year reviews). | Y |

According to PRPB, training on use of force was limited due to the pandemic. As a result, FIU investigators have yet to receive additional training on firearm discharge investigations, as the Monitor previously suggested.

| Paragraph 54 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Deferred |
| Paragraph Language | PRPD shall provide an appropriate firearm training program that: a) requires officers to complete and satisfactorily pass firearm training and qualify on each firearm the officer is required or authorized to carry on an annual basis; b) requires cadets, officers in probationary periods, and officers who return from unarmed status or extended leave to complete and satisfactorily pass firearm training and qualify on each firearm the officer is required or authorized to carry before such personnel are permitted to carry and use firearms; c) incorporates night training, stress training (i.e., training in using a firearm after undergoing physical exertion), and proper use of force decision- making training, including continuous threat assessment techniques, in the annual in-service training program; d) ensures that firearm instructors critically observe students and provide corrective instruction regarding deficient firearm techniques and failure to utilize safe gun handling procedures at all times; and e) requires comprehensive testing that shows complete understanding of rules, regulations, and skills regarding firearm use. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Training on the use of firearms is consistent with approved policies and the requirements of the paragraph. | Y |
| | 2. 100% of officers are trained, certified, and qualified in use of firearms or have a valid justification for not qualifying in accordance with policies. | N/A |

PRPB provided evidence that it conducted training in daytime firing during the period of CMR-4. However, the Monitor received insufficient evidence to conclude that all officers are currently certified in both daytime and nighttime firing. The Monitor notes that Paragraph 54 establishes an extremely high bar for compliance, and therefore requires full access to data on firearms training. Data on the number of officers trained does not suffice to demonstrate that 100% of officers are trained and certified in use of firearms or have a valid justification for not qualifying. PRPB must work with the Monitor's Office to grant the Monitor direct access to the PTMS system or other structured data so that the Monitor can directly verify rates of firearm certification and justifications for all officers that are not currently certified.

| Paragraph 55 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Partially Compliant |

| | |
|---|---|
| **Paragraph Language** | PRPD shall train all supervisors, FIU members, and command officers on PRPD's use of force policies. Thereafter, PRPD shall provide all supervisors, FIU members, and command officers with training on use of force, force investigations, and force investigation reviews at least annually and, as necessary, based on developments in applicable law and PRPD policy. PRPD's use of force training for supervisors, FIU members, and command officers shall include the following topics: a) requesting medical services and determining the appropriate use of force reporting levels; b) identifying and interviewing involved officers, witness personnel, subjects upon whom force was used, and civilian witnesses; c) ensuring proper collection of evidence; d) reviewing use of force and supplemental reports for completeness, accuracy, and quality, including recognizing boilerplate language and document discrepancies; e) assessing the legality and appropriateness of a detention and subsequent arrest; f) legal standards governing the use of reasonable force, including legal standards and requirements for criminal accountability, administrative accountability, and performance improvement related to tactics, training, equipment, and policy sufficiency; g) recommending and administering proper discipline and non-punitive corrective action related to use of force; and h) report writing. |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Training on the use of force, force investigations, and force investigation reviews is consistent with approved policies and the requirements of the paragraph. | N |
| | 2. 95% of supervisors, FIU officers, and commanders are trained and certified in use of force, force investigations, and force investigation reviews (or scheduled for training, in the case of mid-year reviews). | Y |

The Monitor's Office verified that the training for supervisors, FIU personnel and command personnel is up to date. As noted above, however, PRPB has yet to provide additional training for its FIU personnel focused on investigating firearms discharges (Level 4 Use of Force). The FIU Commanding Officer informed the Monitor's Office that the course is in the development stage and when completed, FIU investigators will receive the additional training. The Lieutenant further reported that the development and training were hampered by COVID-19. This additional training was in response to the Monitor's previous reports, which identified significant deficiencies in FIU's investigations into firearms discharges (Level 4 Use of Force).

## 9. Responding to Behavioral/Mental Health Crisis

As determined in previous reports, PRPB implemented a Crisis Intervention Team (CIT) Pilot Project in the Arecibo Area Command which concluded in November 2020. Fifteen officers from the Arecibo Area Command participated in the training as CIT First Response

Officers. The training for CIT officers took place at PRPB Academy during a previous reporting period. Officers were required to pass a written exam at which point they could proceed to the 'Scenario Based Training" segment. The course, (CITE 8061) "Intervention Team in Crisis," consisted of 40 hours of training. PRPB provided the course curriculum as well as a certified list of those who were trained to the Monitor's Office.

Outside of Arecibo, where PRPB reported six responses to incidents involving persons in crisis, no other area command reported any responses to incidents. It appears PRPB is only classifying these encounters properly in the area where CIT personnel are assigned. It should be noted that during the review of use of force incident reports (PPR-605.1), the Monitor's Office came across several incidents that involved involuntary commitment orders from the court (order 408). These are incidents that may have involved persons in crisis and should have been identified and reported as such.

In relation to the eight- hour basic training course which all field members of Bureau are to receive, PRPB only produced an additional 89 Certifications, all of which were issued on October 8, 2020. PRPB provided information that due to the pandemic, no additional training was provided to PRPB personnel during the period covered by CMR-4. The Monitor understands that the implementation of the eight-hour bureau-wide training, was significantly impacted by COVID-19 pandemic. Nevertheless, the Monitor's Office expects to see significant progress in training all PRPB personnel in crisis intervention as the CIT pilot project expands beyond Arecibo's Area Command.

PRPB has yet to expand CIT coverage outside of Arecibo. PRPB provided the Monitor's Office with a plan that would expand the CIT program to all police areas in stages over the course of two years. However, the Monitor objected to this protracted timeline. During a meeting with the Acting Commanding Officer of the Academy and his staff on Thursday April 8th, 2021, the Monitor's Office learned that the program in Arecibo would be implemented in all Area Commands in a more expedited manner.

As previously stated, it is paramount to have CIT trained officers throughout the thirteen area commands. PRPB needs to accelerate and expand this program Bureau-wide. Following the pilot project, PRPB should have conducted a self-assessment of the project to determine "lessons learned" to facilitate the expansion to remaining area commands. The Monitor's Office expects PRPB to make substantial progress in the training of officers to handle individuals with mental health problems so that such incidents do not escalate into confrontations in which PRPB members use force.

CMR-4 | July 21, 2021

| Paragraph 56 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |

| Paragraph Language | PRPD shall develop policies and procedures to improve its response to individuals in behavioral or mental health crisis, and to minimize the use of unnecessary force against such individuals. To achieve this outcome, PRPD shall, in addition to providing all officers with basic training on responding to persons in behavioral or mental health crisis, implement and train a comprehensive first responder Crisis Intervention Team ("CIT") to develop and maintain specially-trained CIT officers. The CIT shall incorporate the following requirements: <br> a) The CIT shall develop policies and procedures for the transfer of custody or voluntary referral of individuals between PRPD, receiving facilities, and local mental health and social service agencies. <br> b) The CIT policies and procedures shall require that whenever officers encounter juveniles in mental health crisis that officers refer them to appropriate mental health services located in the community. <br> c) The CIT officers shall be assigned to field operations units and maintain their standard patrol duties, except when called to respond to potential behavioral or mental health crisis events where the officers may be required to respond outside of their assigned patrol district. |
|---|---|

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Policies incorporate all of the requirements of the paragraph. | Y |
| | 2. Training on basic behavioral health is consistent with approved policies and includes general instruction on the CIT program. | Y |
| | 3. 95% of officers are trained and certified in basic behavioral health (or are scheduled for training, in the case of mid-year reviews) | N |
| | 4. Training on crisis intervention for CIT officers is consistent with approved policies. | Y |
| | 5. 100% of officers assigned to CIT are trained and certified in crisis intervention. | Y |
| | 6. 100% of all officers assigned to CIT meet eligibility requirements. | Y |
| | 7. 95% of responses to incidents involving persons in mental health crisis are within policy. | N |
| | 8. The incident tracking system tracks all incidents involving persons in mental health crisis and the disposition of the incident. Data analyzed as part of PRPB's annual report on use of force as required by policy. | N |

On April 30, 2021, PRPB provided the Monitor's Office with a proposed revised GO 600-628 for review as per paragraph 229 of the Agreement. In Section lll, "Rules and Procedures" subsection B, "Expansion of the Crisis Intervention Team," the proposed revised policy states that over the next two years from the date of signature of the revised General Order, every six months the CAOC, through consultation with the Commissioner, will indicate the police areas to include in the program expansion. PRPB has indicated that in the first six months the program will be expanded to the area commands of Aguadilla, Fajardo, Mayagüez, and Ponce. If in fact the program is expanded to these areas, it will

CMR-4 | July 21, 2021

be assessed in CMR-5. In addition, PRPB, via the proposed policy, states that a CIT Coordinator with a minimum rank of sergeant will be established in each area.

The Monitor's Office, while encouraged with the expansion of the program, found this timeline for implementation to be problematic. It was the Monitor's understanding that the purpose of the Arecibo pilot project was to develop a working formula, which once established, would be rolled out to the remaining 12 Area Commands. Rolling out the program in stages will result in a substantial delay in implementing it Bureau-wide, in this case, two years from the signing of the general order. After raising our concerns with PRPB reform unit, the Monitor's Office was informed that PRPB would be adopting our recommendation to expand the CIT program Bureau-wide to all areas, rather than expanding in multiple stages over two years. The Monitor's Office understands that establishing CIT teams in all areas in an expedited manner may be difficult initially. However, the presence of CIT trained officers, bureau-wide, will enhance PRPB's ability to handle "calls for service" involving persons in crisis.

Those officers selected to be certified as CIT officers (40 hrs. training) will continue in their normal capacity as patrol officers. If that is the case, the Monitor's Office recommends that PRPB should consider expanding the training to include 15 officers from each of the remaining area commands. Based on the 15 trained for Arecibo, that would be around 180 officers. This would provide PRPB the flexibility to expand the number of area commands that it adds, thereby reducing the time needed to have fully staffed CIT officers in all area commands on all shifts.

| Paragraph 57 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| Paragraph Language | PRPD shall train PRPD field operations unit officers in the CIT program and shall ensure that CIT-trained officers are assigned to each shift in each police region. PRPD shall provide crisis intervention training to all dispatchers to enable them to identify calls for service that involve behavioral or mental health crisis events. | |
| Compliance Target(s) | **Compliance Target** | **Status** |
| | 1. 95% of shifts have at least one CIT-trained and certified officer. | N |
| | 2. Training on crisis intervention for call dispatchers is consistent with approved policies. | Y |
| | 3. 95% of call takers are trained and certified in crisis intervention (or are scheduled for training, in the case of mid-year reviews) | N |

PRPB has provided some training to field personnel and dispatchers relating to CIT. In relation to Arecibo, CIT personnel are assigned to various shifts. Additional training to field personnel and dispatchers is needed to ensure compliance with this paragraph.

Further, once CIT is established in each of the 13 police regions, each will require a CIT officer assigned to each shift.

PRPB provided documentation that 6,177 officers have received basic training in "Intervention with Persons in Crisis" (note: this was the same list as provided for CMR-3). Of those, 89 officers were trained during the CMR-4 reporting period. In addition, PRPB reports 241 personnel from Radio Control and the Area Command's thirteen Centro de Mando have received training. Also provided were the Curriculums for the courses (note: these were the same curricula as provided for CMR-3), all of which the Monitor's Office has reviewed, provided comment, and approved in accordance with the Agreement.

The Monitor also notes that PRPB has indicated that training of CIT Officers was suspended for almost all the period covered by CMR-4 due to COVID-19 restrictions. The PRPB Academy reports that all officers of PRPB who have yet to receive the 8-hour training, will do so virtually.

## II. Searches and Seizures

PRPB reported that it served 546 search warrants island-wide between October 1, 2020, and March 31, 2021. 187, or 34%, had negative results (nothing seized, and no arrests made) and 6 were not served. The Monitor continues to be concerned with the high percentage of search warrants with negative results. More than half of the 546 search warrants (330) were served by Drug Units bureau wide. About 41% (134) of search warrants served by Drug Units, resulted in no contraband found, and, consequently, no arrests made. During this reporting period, Metro Drogas showed no improvement from last reporting period (CMR-3) with a negative result rate of 47% (50 out of 106) versus 45% (22 of 53) negative result found last period; Drogas Guayama improved from 43% negative result (3 of 7) to 25% (3 out of 12); Drogas Arecibo also improved to 38% (5 out of 13) from a 50% negative result (2 of 4); Drogas Humacao lowered its negative result from 66% (2 of 3) to 22% (5 of 23). During this reporting period, PRPB Intelligence Unit island-wide had a 35% failure rate when conducting search warrants (12 of 34).

By comparison two studies of the Chicago, IL and San Diego, CA Police Departments show a much lower negative search rate. The City of Chicago's Office of the Inspector General's Second Interim Report, issued May 2021, showed that overall search warrants served

there had a negative rate of about 10%.[1] And an independent study of the San Diego, CA Police Department showed a negative rate of 12%.[2] For drug warrants, San Diego had an effective rate of about 74% and Chicago had a recovery rate of 75.6%.

Although some PRPB units have shown progress in this area, PRPB has not provided the Monitor with specific evidence that its supervisors and commanders are addressing the issue, either through mentoring or additional training. Nor has PRPB provided an explanation for the high failure rate of the Drug and Intelligence investigative units. The Monitor recommends that PRPB be vigilant of this issue and have supervisors and commanders track and analyze search warrants to determine whether there is an issue that could be addressed through training or closer supervision to avoid potential problem. PRPB may find that additional training may be needed in how to properly cultivate and vest confidential informants and in how to properly conduct follow-up investigations to corroborate confidential information and/or tips received from the public.

PRPB investigators are adept at documenting probable cause and supporting evidence when preparing affidavits for search warrants. However, these same officers invariably submit arrest and search warrant files that are incomplete and do not include the proper PPR forms as required by the Agreement and PRPB policies 600-612 and 600-615. For example, 44 of 61 search warrant files reviewed were rated "Partial Compliance" or lower due to officers not including forms, such as PPR-631.1 Egress/Ingress, while others also lacked the PPR-636.1, personal property inventory form. 3 had consent search forms PPR-612.1 with no witness signature. PRPB General Order 600-615, Section V.B.5 requires that these forms be included in each arrest/search warrant file. It is mainly the lack of these forms that prompted the Monitor to rate them partial and not "Substantial."

In addition, the Monitor rated 6 search warrant files as "Non-Compliant": 3 of these files lacked copies of the search warrants and the affidavits (Complaint #'s 2020-7-154-002972, 2021-2-400-0039 and 2021-2-400-003), among other forms; and 2 included no police report, PPR-621.1 (Complaint #'s 2021-2-400-00064 and 2021-7-400-00085). Without police reports and copies of search warrants and/or affidavits, the Monitor is not able to get a full picture of the officers' actions or probable cause to determine compliance with PRPB policies and the Agreement.

---

[1] City of Chicago, Office of the Inspector General. May 2021. Second Interim Report: Search Warrants Executed by the Chicago Police Department, 2017-2020.

[2] Benner, Laurence A. and Charles T. Samarkos (2000) "Searching for Narcotics in San Diego: Preliminary Findings From the San Diego Search Warrant Project," California Western Law Review: Vol. 36: No. 2, Article 3.).

CMR-4 | July 21, 2021

Likewise, the Monitor analyzed 118 randomly selected arrest files and rated 98 files "Partial Compliance" or below due to the lack of applicable forms required under PRPB's General Order 600-615, Section V.B.5 "El expediente de arresto…," such as the booking sheet (Egress/Ingress PPR-631.1), Property Inventory (PPR-636.1) and Arrest Review by Supervisor (PPR-615.8). In some cases, the police report, PPR-621.1, was also missing. Additionally, PRPB officers continue to fail to document probable cause on these incident reports, as required by the Agreement and PRPB policies. Again, most reports simply stated that the subject was arrested for violating the law and then cite the law, and in most cases, they do not cite the crime. Per General Order 600-615, Section III.B.8.e, (page 14), officers must document probable cause in the police report.

PRPB has ensured that all its policies regarding arrests mandate that officers comply with the rights of citizens secured by the U.S. and Puerto Rico Constitutions and laws. In particular, PRPB is prohibited by legal statute and policy to conduct investigatory detentions, or Terry Stops as they are generally known. As a result, currently there is no data available for Terry Stops, and the Monitor has analyzed only stops based on probable cause, such as traffic stops. The Monitor was recently informed by PRPB that it is in the process of designing a form for officers to fill out when they conduct a motor vehicle stop. This form will include the demographic information required by the Agreement.

## 1. General Provisions

| Paragraph 58 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| Paragraph Language | PRPD shall ensure that all investigatory stops, searches, and arrests are conducted in accordance with the rights, privileges, or immunities secured or protected by the Constitution and laws of the United States and the Commonwealth of Puerto Rico. PRPD shall ensure that investigatory stops, searches, and arrests are conducted as part of effective crime prevention strategies that are consistent with community priorities for enforcement. | |
| Compliance Target(s) | Compliance is determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 59-79, and (2) the results of outcome assessments, pursuant to Paragraph 243. | |

PRPB created General Order 600-612 on Searches and Seizures and has regularly submitted revisions of this policy to the Monitor for review and guidance. The next review of this policy was due in May 2021. The General Order provides clear and concise guidelines for officers conducting searches, whether by search warrant, incident to arrest, inventory searches, or on consent searches. It also states the potential consequences for

violating PRPB policies and laws and the Constitution of the Commonwealth and the U.S.A.

PRPB reported (PRPB Training Certificate # SAEA-1-17-055, Doc # CMR4-TR-217) that virtual training in Search and Seizure to re-certify supervisors and officers was offered between July 10th and October 7, 2020. In addition, PRPB reported (PRPB Certification # SAEA 1-17-056, Document # CMR4-TR-96) that no training in Arrests and Summons took place during this period. PRPB has not conducted the in-person training component of Search and Seizure due to the Pandemic. The Monitor has not evaluated the training material nor the implementation of the virtual courses. The last two issues were taken into consideration when applying compliance.

PRPB also created General Order 600-615 on Arrests and Summons. The Order was last reviewed by the Monitor in September 2020.  It clearly provides proper guidance to officers in conducting lawful arrests and states the potential consequences for violating PRPB policies and the laws of the Commonwealth. PRPB reported that no training in Arrests and Summons took place during this period.  The Monitor has not evaluated the training material nor the implementation of these virtual courses. In person training of search and seizure and arrests is essential, especially given the deficiencies noted by the Monitor in the ensuing sections.


## 2. Investigatory Stops and Searches

PRPB has not created a reporting policy and system to collect search and stop data because investigatory stops and searches (also known as "Terry Stops") are prohibited by PRPB policy based on decisions by the Supreme Court of the Commonwealth of Puerto Rico. PRPB's GO 600-612 prohibits officers from using boilerplate and conclusory language, and materially false information, and all supervisors are required by this Order to complete an arrest evaluation form, PPR-615.8, to document their reviews of arrests and searches. However, many of the supervisors' reviews fail to ensure that officers properly document probable cause. PRPB has not gathered data on stops and searches to analyze trends and deficiencies, nor has it prepared a public report on this subject. During a site visit conducted for CMR-5, the Monitor was informed by PRPB that it is in the process of designing a form for officers to fill out when they conduct a motor vehicle stop. This form will require the demographical information required by the Agreement.

| Paragraph 60 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |

| Paragraph Language | PRPD shall develop an Investigatory Stops and Searches Reporting Policy and a system to collect data on all investigatory stops and searches, whether or not they result in an arrest or issuance of a citation. PRPD's stop data collection system shall be subject to the review and approval of the TCA, and shall require officers to document the following: (a) the date, time, location, and duration of the stop and/or search; (b) the reason for the stop and/or search; (c) the subject's apparent race, color, ethnicity or national origin, gender, and age; (d) whether any contraband or evidence was seized, and the nature of the contraband or evidence; and (e) the disposition of the stop, including whether a citation was issued or an arrest made. PRPD shall require that officers submit written reports regarding investigatory stops and searches to their supervisor by end of shift for review. A copy of these reports shall be forwarded to SPR and the Reform Unit for tracking and analysis. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. 100% of stops and searches are justified based on probable cause. For stops and searches based on a lesser standard or that are otherwise unjustified, PRPB takes corrective and/or disciplinary action. | N |
| | 2. 100% of stops and searches reviewed as part of other areas of the Agreement are based on probable cause. For stops and searches based on a lesser standard or that otherwise unjustified, PRPB takes corrective and/or disciplinary action. | N |

PRPB has not developed a data collection system for stops and searches based on probable cause or otherwise. The Monitor was informed by PRPB that it is in the process of designing a form for officers to fill out when they conduct a motor vehicle stop. This form will require the demographical information required by the Agreement. However, PRPB will not attain compliance on this and subsequent paragraphs in this section until it develops a system to record all stops and detentions, including motor vehicle stops.

| Paragraph 61 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |

| Paragraph Language | PRPD's Investigatory Stops and Searches Reporting Policy shall explicitly prohibit the use of boilerplate or conclusory language in all reports. PRPD policies shall also expressly prohibit officers from knowingly using or relying on information known to be materially false or incorrect in effectuating an investigatory stop or detention. |
|---|---|
| Compliance Target(s) | This Paragraph is assessed with Paragraph 60. |

PRPB Search and Seizure policy 600-612 clearly prohibits officers from using boilerplate, conclusory or materially false language (Section III.B.4.b.), and 600-615 Arrests and Summons (Section IV.3.e). However, this Paragraph is rated not compliant because it is

dependent on compliance with Paragraphs 60 through 64, which are also rated non-compliant at this time. Also, during the review of arrest files, the Monitor observed some files where supervisors during their review on PPR615.8 simply copied and pasted language from the officers' arrest report PPR-621.1 and failed to properly check for probable cause. Most supervisors report in their reviews that they spoke to the officer(s) and believed they had probable cause without elaborating. The last two points are serious issues and are major contributors to the non-compliance rating of this paragraph.

| Paragraph 62 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | A supervisor shall review each report on Investigatory Stops and Searches to determine whether the stop or search was within PRPD policy and this Agreement. For any investigatory stop or search deemed to be outside of PRPD policy or this Agreement, the supervisor shall determine if the stop or search: (a) should result in an internal investigation by SPR; (b) indicates a need for additional training, counseling, or any other non-punitive corrective measure for the involved officer; and (c) suggests the need for revising or reformulating agency policy, strategy, tactics, or training. The supervisor shall document on an auditable form those investigatory stops and searches that are unsupported by reasonable suspicion; are in violation of PRPD policy or this Agreement; or that indicate a need for corrective action or review of agency policy, strategy, tactics, or training. The quality of these supervisory reviews shall be taken into account in the supervisor's performance evaluations. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 60. | |

The Monitor's analysis of 61 search warrant files found that five lacked the supervisors' review (PPR-615.8), nine contained no police reports (PPR621.1), while 25 files that involved at least one arrest did not include the booking sheet (or Ingress/Egress form PPR631.1). Seven consent searches contained consent search forms (PPR-612.1), that lacked the witness signature, as required by the form and PRPB policy. PRPB policy requires that all these forms be included in the file. PRPB, as of this report, has no system to collect data on searches and stops.

| Paragraph 63 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | A command-level officer or official shall review, in writing, all supervisory auditable forms related to investigatory stops and detentions. The commander's review shall be completed within three business days of receiving the document reporting the event. The commander shall evaluate the corrective action and recommendations | |

|  | in the supervisor's written report and ensure that all appropriate corrective action is taken, including referring the incident for administrative or criminal investigation. |
|---|---|
| **Compliance Target(s)** | This Paragraph is assessed with Paragraph 60. |

PRPB is not tracking or reviewing investigatory stops and detentions nor searches whether based on reasonable suspicion or probable cause. The Monitor is not aware whether PRPB is planning to create a tracking system as of this writing.

| **Paragraph 64** | Assessment Frequency | Overall Compliance Status |
|---|---|---|
|  | Bi-annually | Not Compliant |
| **Paragraph Language** | At least annually, PRPD shall analyze investigatory stop and search data to determine significant trends, identify and correct deficiencies revealed by this analysis, and document its findings in a public report. | |
| **Compliance Target(s)** | This Paragraph is assessed with Paragraph 60. | |

PRPB has not reported to the Monitor the existence of any system to analyze stop and search data for significant trends or otherwise.

## 3. Arrests

The Monitor analyzed 118 randomly selected arrest files and 98 were rated at "Partial Compliance" or below due to incomplete files (lack of forms required under PRPB's General Order 600-615, Section V.B.5 "El expediente de arresto…," such as the booking sheet, Egress/Ingress PPR-631.1, Property Inventory, PPR-636.1, and in 15 cases the police report, 621.1, was missing.

Many incident reports, PPR-621.1, lacked proper documentation of probable cause. This was the case in 30 of the 118 arrest cases analyzed. As reported in previous CMR's, most reports simply stated that the subject was arrested for violating the law of Puerto Rico and then go on to cite the law. This is contrary to PRPB policies, as General Order 600-615, Section III.B.8.e. requires that officers must document probable cause on the police report itself.

In addition, Command-level officers continue to routinely sign off on these defective reports. The Monitor has recommended additional training and closer supervision on these issues for officers and supervisors in past CMR's. The Monitor has received no evidence from PRPB that it has taken any steps to correct this deficiency in training and

supervision, or even that it has called it to the attention of supervisors and command officers for corrective action.

| Paragraph 65 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually with respect to Data Source #1. Bi- annually for all others. | Partially Compliant |
| Paragraph Language | PRPD shall revise its policies on arrests to ensure that they comply with applicable law and comport with generally accepted policing practices. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Policies and forms incorporate all of the requirements of Paragraphs 59, 65-71. | Y |
| | 2. 95% of selected arrests are notified and reviewed by supervisors in accordance with approved policies. | N |
| | 3. Officers transport arrestees and complete required arrest documentation in accordance with approved policies in 95% of selected arrests. | N |
| | 4a. Supervisors respond to injuries and complaints of pain by detainees or arrestees in accordance with approved policies in 95% of selected arrests. | N |
| | 4b-e. Supervisors review, document, and take corrective action, including making referrals when necessary, as required by approved policies in 95% of selected arrests. | N |
| | 5. Unit commanders review, document, and take corrective action, including making referrals when necessary, as required by approved policies in 95% of selected arrests. | N |

The Monitor last reviewed GO 600-615 on Arrests and Summons in September 2020 and found it complies with applicable laws and generally accepted policing practices. However, PRPB failed to attain compliance because supervisor arrest review forms PPR-615.8 and/or the Ingress/Egress PPR-631.1 forms were missing from several arrest and search warrant files reviewed. On these forms supervisors must document the details of probable cause that led to the arrest and note any injuries and medical aid rendered. Without these, the Monitor was not able to ascertain whether in these cases supervisors responded to the scene and whether arrestees were inspected for injuries: 53 of 118 arrest files lacked the booking sheet and 20 files had no supervisor review; 25 of 61 search warrants inspected did not include Egress/Ingress forms and four lacked supervisor reviews. Three search warrant files and 24 arrest files that contained supervisor's reviews failed to note whether he/she responded.

CMR-4 | July 21, 2021

| Paragraph 66 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| Paragraph Language | PRPD shall require that officers notify the communications command center and a supervisor immediately after an arrest, or as soon as practicable. For felony arrests, or an arrest for obstructing or resisting an officer, PRPD shall require a field supervisor to respond to the scene of the incident and approve the officer's arrest determination, based on the existence of probable cause. If an officer's arrest determination is insufficient, or otherwise unjustified, the supervisor may, if necessary, interview the subject. The supervisor shall take appropriate action to address violations or deficiencies in an officer's arrest determination, including releasing the subject, recommending non-punitive corrective action for the involved officer, or referring the incident for administrative or criminal investigation. If a supervisor is unavailable to respond to the scene or there are exigent circumstances, the officer shall notify his or her immediate supervisor over a recorded channel of the elements of probable cause for the felony arrest or arrest for obstructing or resisting an officer. If the officer's immediate supervisor is unavailable, the officer shall notify any field supervisor over a recorded channel of the elements of probable cause for the felony arrest or arrest for obstructing or resisting an officer. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 65. | |

In May 2021, the Monitor visited PRPB'S Radio Communication Control Center in Headquarters to listen to recordings of officers' communication with supervisors during 9 randomly selected arrests for obstruction of justice and/or resisting arrest. PRPB reported that 6 of 9 recordings were not available due to the unavailability of the digital radio system to record, P-25. Those specific districts were still operating with the analog system at time of the incidents, which does not record. In two recordings the Monitor was able to hear the officer notifying the supervisor and in one the communication was not clear enough to detect the notification, as there was a lot of radio traffic going on at the same time.

Overall, in 24 arrest files supervisor's reviews failed to note whether he/she responded. Additionally, in several obstruction of justice and/or resisting arrest cases, there was no supervisor review form (PPR-615.8) included in the files, therefore there was no way to know whether the supervisor responded.[3]

The Monitor also noticed several arrests for obstruction of justice and/or resisting arrest where supervisors failed to question the officer's probable cause, or lack of, for the arrest: In one complaint from Bayamon Norte, the officer wrote that he/she arrested the subject for "not allowing the officer to search for illegal substance." In another complaint, the

---

[3] Complaint numbers 2020-4-044-2881, 2020-4-053-2086, 2020-5-041-03204, 2020-7-211-010202, 2020-8-072-006912

officer's reason for the arrest was that the person refused to show driver's documents. In yet another complaint from District of Isabela, the subject was arrested for swearing at the officer. Finally, in a complaint from Rincon, the subject was arrested for refusing to identify him/herself. In all these cases, neither the supervisor nor the commander questioned the officer's probable cause. They simply signed off on the report.

There are cases where there is no indication that a supervisor responded.[4] These cases require the response of the supervisor to determine whether probable cause exists. At least one of these cases presents a questionable reason for the arrest,[5] yet there was no supervisory review of the facts, as required by the Agreement. PRPB must ensure that supervisors respond and properly review these arrests to determine whether proper police procedures were followed, and that probable cause is clearly established.

| Paragraph 67 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | When transporting an arrestee, officers shall take the safest and most direct route to the booking location. PRPD policy shall require that officers notify the communications command center of the starting and ending mileage on the transporting vehicle, as well as the gender, race, ethnicity, national origin, and apparent age of the arrestee. The officer shall complete all written arrest forms and booking recommendations at the time an arrestee is presented at any PRPD precinct, station, or specialized unit for booking. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 65. | |

In examining PPR-126.2, PRPB's form on which Centro de Mando records route the officers took when transporting an arrestee, the Monitor found no such information. In addition, although PPR-126.2 was approved for use by PRPB in early 2020, most Centro de Mando were still using the old form, PPR-84, which does not record this information.

| Paragraph 68 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | At the time of presentment at a PRPD precinct, station, or specialized unit, a watch commander or supervisor shall visually inspect each detainee or arrestee for injury, interview the detainee or arrestee for complaints of pain, and ensure that the | |

---

[4] Complaint numbers 2020-2-034-003519, 2020-5-041-03204, 2020-7-211-010202, 2020-8-072-006912, and 2021-10-199-000302.
[5] Complaint number 2020-2-034-003519.

| | detainee or arrestee receives medical attention from an appropriate medical provider, as necessary. |
|---|---|
| **Compliance Target(s)** | This Paragraph is assessed with Paragraph 65. |

Several arrest and search warrant files inspected lacked the Ingress/Egress form PPR-631.1 where injuries are noted by supervisors. Fifteen search warrant files and 50 arrest files did not include the Ingress/Egress forms. Some arrest files that included the form failed to note the condition of the arrestee.

| **Paragraph 69** | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| **Paragraph Language** | PRPD shall require that all booking recommendations be personally reviewed and approved in writing in an auditable form by a supervisor as to appropriateness, legality, and conformance with PRPD policies within 12 hours of the arrest, absent exceptional circumstances. Supervisors shall also examine arrest reports and forms related to the arrest for boilerplate or conclusory language, inconsistent information, lack of articulation of the legal basis for the action, or other indicia that the information in the reports or forms is not authentic or correct. Supervisors shall evaluate each incident in which a person is arrested for interfering with a police officer, resisting arrest, assault on a police officer, or other similar charge to determine whether the incident raises any issue or concern regarding the basis for the arrest or implications on training, policies, or tactics. | |
| **Compliance Target(s)** | This Paragraph is assessed with Paragraph 65. | |

Again, in 30 of the 118 arrest cases analyzed, officers failed to properly document probable cause on the PPR-621.1, yet supervisors reviewed and approved the arrest on PPR-615.8. Supervisors simply wrote that they spoke to the officer (s) and believed he/she had proper probable cause for the arrest. Reviewing District Commanders simply re-affirmed the supervisor's statements and did not raise the issue.

| **Paragraph 70** | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| **Paragraph Language** | As part of the supervisory review, the supervisor shall document on an auditable form those arrests that are unsupported by probable cause, are in violation of PRPD policy or this Agreement, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or training. The quality of these supervisory reviews shall be taken into account in the supervisor's performance evaluations. | |
| **Compliance Target(s)** | This Paragraph is assessed with Paragraph 65. | |

PRPB submitted to the Monitor signed confirmation (Certification # CMR4-SER-3965 through CMR4-SE-3996) from each Area Commander stating that there were no reports during this period from supervisor's regarding documentation of arrests unsupported by probable cause or in violation of PRPB arrest policies. However, as stated above, in several cases officers failed to properly document probable cause on the police report, PPR-621.1, yet supervisors, as well as commanders, reviewed and approved the arrest on PPR-615.8.

| Paragraph 71 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | A command-level officer or official shall review, in writing, all auditable forms related to arrests. The commander's review shall be completed within seven days of receiving the document reporting the event. The commander shall evaluate the corrective action and recommendations in the supervisor's written report and ensure that all appropriate corrective action is taken. Whenever a reviewing supervisor or command-level officer finds evidence of an arrest indicating apparent misconduct or apparent criminal conduct by an officer, he or she shall immediately notify his or her supervisor for referral to the appropriate investigating unit or the PRDOJ. The Superintendent shall be notified of the referral. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 65. | |

Several sampled arrest files contained no supervisor review form PPR-615.8, so the Monitor was unable to determine in these cases whether command-level officers reviewed and approved those arrests. 6 arrest files had no supervisor review, as well as 4 search warrant files were lacking the supervisor reviews. Two arrest reviews were conducted after the 7-day period allowed.[6] Another file was missing the Director's review page.[7] In addition, commanders generally agreed with the supervisor's determination of probable cause indifferent to whether it had been properly documented.

| Paragraph 72 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually with respect to Data Source #1. Bi- annually for all others. | Not Compliant |
| Paragraph Language | PRPD shall require officers to provide written receipts to individuals whenever property is seized from the individuals. PRPD shall establish procedures that are | |

---

[6] Complaint # 2020-2-700-00500, reviewed 5 months later, and 2020-8-015-04345, reportedly reviewed 19 days later.
[7] Complaint # 2020-05-400-000131.

CMR-4 | July 21, 2021

| | | |
|---|---|---|
| | based on generally accepted policing practices to ensure that all seized property is properly stored and returned, as appropriate. | |
| Compliance Target(s) | **Compliance Target** | **Status** |
| | 1. Polices incorporate all of the requirements of Paragraphs 59 and 72. | Y |
| | 2. Property is seized, stored, and returned, as appropriate, in accordance with approved policies in 95% of selected arrests. | N |
| | 3. PRPB takes disciplinary and/or corrective action in response to all sustained complaints where an officer fails to issue a receipt, store, or return seized property in accordance with approved policies. | N |

Generally, officers who completed the Property Inventory form, PPR-636.1, did so properly. However, many of the forms were missing the witness signatures. But more concerning is that a great number of files did not include the form at all. 71 of 118 arrest files analyzed were missing the Property Inventory form, while 4 search warrant files did not include it. Also, most police reports in these cases did not mention whether the arrestee had personal property on his/her person, making it difficult for the Monitor to determine whether property inventory forms were necessary and properly completed.

In May 2021, the Monitor made a site visit to SARP to inquire about any administrative complaints for unreturned or lost personal property officers had seized during CMR-04 period. The Monitor was informed that SARP does not specifically track this type of complaint. These complaints are categorized under the general term of negligence. The Monitor asked SARP if its system could separate this category for analysis going forward and the Monitor was assured it was possible and will be done.

Upon inquiring, the Monitor was told that there were 80 negligence complaints filed during the period, and that to find out the subcategory, all eighty files would have to be opened and read. The Monitor proceeded to ask for 20 randomly selected (one of every 4) in the hope that some fell within the category sought. Upon receiving the files, the Monitor analyzed each and found only one file that qualified under the personal property seized category. Following is a summary of the investigation.

An administrative complaint was filed with SARP regarding the seizure of several firearms from a deceased person was filed by relatives. SARP investigated and determined that the officer acted appropriately. The deceased person's relative had filed a complaint claiming the seizing officer refused to return the firearms. It was determined that the officer had followed protocol by sending the firearms for storage to the Department's Armory until some legal issues could be resolved. There was a delay in retrieving the firearms due to the Pandemic of 2020 and some laws that had been changed by the legislature around the time of the incident. In the end, the complainant received the firearms and refused to follow-up on the complaint.

CMR-4 │ July 21, 2021

## 4. Searches

PRPB created General Order 600-612 on Searches and Seizures and has submitted it to the Monitor for review on a regular basis. GO 600-612 is due for review in May 2021. The General Order clearly guides officers on conducting lawful searches and arrests and states the potential consequences for violating PRPB policies, and the laws and Constitution of the Commonwealth and the U.S.; further, GO 600-612 comports to generally accepted policing practices. The Order requires supervisors to review and approve in writing all applications for search warrants before being presented to a District Attorney and Judge. However, PRPB has not created a search warrant tracking system as of this reporting period. PRPB also created Consent Search form PPR-612.1 and requires officers to complete them properly whenever a consent search is conducted. GO 600-612 guides officers on when and how a consent search is properly conducted and requires officers to inform the subject that he/she has a right to refuse and/or stop such consent search at any time.

Officers generally follow GO 600-612 when officers seek, obtain, and serve search warrants. However, PRPB has not created a search warrant tracking system as of this reporting period. GO 600-612 guides officers on when and how a consent search is properly conducted and requires officers to inform the subject that he/she has a right to refuse and/or stop such consent search at any time. PRPB created Consent Search form PPR-612.1 and requires officers to complete them properly whenever a consent search is conducted. PRPB has informed the Monitor that officers are trained on new forms during the Monthly Academy and in virtual training. The Monitor's analysis found that 100% of officers in this sample completed this form when conducting a consent search, however, some officers failed to secure the signature of a witness to the subject's voluntary acceptance and signature. This issue has been raised by the Monitor in other sections of this report and in past reports.

| Paragraph 74 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually with respect to Data Source #1. Bi- annually for all others. | Partially Compliant |
| Paragraph Language | PRPD shall revise its policies on searches to ensure that they comply with applicable law and comport with generally accepted policing practices. PRPD policies shall define all terms clearly and specify procedures for executing search warrants and warrantless searches, including handling, recording, and taking custody of seized property or evidence. | |
| Compliance Target(s) | Compliance Target | Status |
| | 1. Polices and forms incorporate all of the requirements of Paragraphs 59, 74-77. | Y |

56

| | |
|---|---|
| 2. Searches are conducted and reviewed by supervisors in accordance with approved policies in 95% of selected searches. | N |

PRPB created General Order 600-612 on Searches and Seizures and has submitted it to the Monitor for review on a regular basis. GO 600-612 is due for review in May 2021. The general order clearly guides officers on conducting lawful searches and arrests and state the potential consequences for violating the policy and the laws and Constitution of the Commonwealth and the U.S. The Monitor has determined that GO 600-612 comports to generally accepted policing practice. PRPB reported that virtual training in Search and Seizure to re-certify all supervisors and officers was offered between July 10th and October 7, 2020.[8] The Monitor has not evaluated the training material nor the implementation of these virtual courses. The in-presence (practical) part of search and seizure training has not been held due to the Pandemic the past year. PRPB must try to include this important part of training going forward.

| Paragraph 75 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| Paragraph Language | PRPD shall require that a supervisor review and approve in writing each request for a search or arrest warrant, including each affidavit or declaration before it is filed by an officer in support of a warrant application, for appropriateness, legality, and conformance with PRPD policy. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 74. | |

Most search warrant files contain written proof of the supervisor approval of officer's application for a search warrant. In 54 of the 61 search warrant files reviewed, a supervisor review and approval were included, but 6 of these files did not include such written approval for the application. The Monitor is unable to determine whether a review was conducted in these cases. The Monitor believes this is a documentation issue: failing to include the approval form in the file. The Monitor observed that PRPB documented supervisor's approval of search warrant applications in different ways for different units. For example, some units had a separate sheet completed and signed by the supervisor, while others signed off on a letterhead to the Commander. PRPB should design a form for this purpose and to ensure consistency. Another file was not applicable (abandoned motor vehicles). To reach substantial compliance, PRPB must show that 95%, or 58, of the applications were reviewed and approved by a supervisor.

[8] PRPB Training Certificate # SAEA-1-17-055, Doc # CMR4-TR-217.

| Paragraph 76 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually with respect to Data Source #2, and Annually for all others. | Not Compliant |
| Paragraph Language | PRPD shall track each search warrant, the case file where a copy of such warrant is maintained, the officer who applied for the warrant, and each supervisor who reviewed the application for a search warrant. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Tracking system accounts for all of the elements in the paragraph and outcome measures as required by Paragraph 243. | N |
| | 2. All search warrants are tracked in the tracking system. | N |
| | 3. Documentation on search warrants is maintained in accordance with approved policies in 95% of precincts and units visited. | N |

PRPB has neither submitted evidence to the Monitor of the existence of a search warrant tracking system, nor if one is the process of development.

| Paragraph 77 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | PRPD shall require officers to obtain and document consent from an individual who consents to a voluntary search of his/her person or vehicle when the search is conducted as part of a routine pedestrian or vehicle stop, unless a non-consensual search is otherwise legally permissible. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 74. | |

PRPB requires officers to document consent searches on PPR-612.1, as per GO 600-612. The Monitor reviewed 12 consent search files. 7 of the Consent Search PPR-612.1 forms were missing the witness signature and one form was incomplete. Witness signature is required by the form and supervisors failed to catch this and take corrective action. During a site visit conducted for CMR-5, PRPB informed the Monitor that it is in the process of designing a form to be included with CAD for officers to complete every time they make a motor vehicle stop, whether they make an arrest or not. This form will capture the geographical and demographical data required under the Agreement.

## 5. Training on Stops, Searches, and Seizures

Paragraphs 78 and 79 are not due for assessment in CMR-4. As such, the Monitor has not evaluated the training material or the implementation of these virtual courses. The Monitor has reviewed the relevant policies in previous reports, however, and has determined that GO 600-612 on Searches and Seizures comport with generally accepted policing practices. The General Order clearly guides officers on conducting lawful searches and states the potential consequences for violating PRPB policies, and the laws and

Constitution of the Commonwealth and the U.S. Training and implementation of these policies will be assessed in CMR-5.

## III. Equal Protection and Non-Discrimination

The Equal Protection and Non-Discrimination section of the Agreement identifies cases specifically related to sexual assault, domestic violence and other cases that entail any abuse behavior by one person to maintain power over another in a close relationship. PRPB must continue to develop its reporting processes to ensure that PRPB demonstrates its ability to respond to these types of cases in the most effective and professional manner. In this reporting period, PRPB submitted some documents tantamount to partial compliance. However due to incomplete documentation, PRPB has failed to demonstrate its capacity of comprehending these important police responses.

Violence against your partner is a human rights violation. Emerging data during Covid-19 has shown that all types of violence against women and girls, particularly domestic violence, has exacerbated. High-profile cases in Puerto Rico have heightened the attention of violence against women. The reports of the victims deserve a timely and adequate response pursuant to the policies implemented. This is essential for the victims because they need to be attended to with expertise and attentiveness to address the crime.

Gender-based violence and its associated policing responses, such as investigations and follow-up, are very important issues. Related paragraphs in this agreement exist to evaluate the processes that PRPB must implement. Specific related paragraphs state that PRPB shall engage with community advocates to disseminate immigration information. Additionally, PRPB is required to incorporate requirements regarding bias-free policing and equal protection into its hiring, promotion, and performance assessments. PRPB must ensure the agency is responsive to all communities, by certifying initial hire of bias-free cadets that follow the agency mission, policy, training, to proactively address and justly respond to sexual violence in LGBTQ+ communities.

PRPB cannot stop sexual assault or domestic violence. However, PRPB has a significant role to prioritize addressing violence against women. In response, PRPB can provide up-to-date information and support advocacy programs, which delivers a vital message to any person who is experiencing violence.

CMR-4 | July 21, 2021

## 1. General Provisions

PRPB did not provide the Monitor with documents supporting the stipulation that each member of the respective committees was properly certified in bias-free policing and equal protection as it applies to hiring, promotion, and performance assessment processes. However, PRPB did provide the Monitor access to a representative sample from these groups for verification. Accordingly, in areas where personnel lists cannot be matched with individual training records and histories for verification purposes, we must treat our finding as provisional, subject to verification on the ground.

| Paragraph 84 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually for Data Sources #3, #4, and #11. Annually for the other Data Sources. | Not Compliant |
| Paragraph Language | PRPD shall incorporate concrete requirements regarding bias-free policing and equal protection into its hiring, promotion, and performance assessment processes, including giving significant weight to an individual's documented history of bias-free policing. PRPD will comply with the non-discrimination requirements of Title VII of the Civil Rights Act of 1964, as amended. | |
| Compliance Target(s) | **Compliance Target** | **Status** |
| | 1. PRPB policies and procedures regarding hiring process comply with the requirements of the Paragraph. | Y |
| | 2. Hiring process trainings are consistent with bias-free policing and equal protection provisions of approved policies. | N |
| | 3. 95% of sampled personnel are trained and certified in all policies related to the civilian complaint program (or scheduled for training, in the case of mid-year reviews). | N |
| | 4. 95% of reviewed candidates were selected consistent with approved policies regarding bias-free policing and equal protection. | N |
| | 5. PRPB policies and procedures regarding promotion assessment process comply with the requirements of the Paragraph. | Y |
| | 6. Promotion assessment trainings are consistent with bias-free policing and equal protection provisions of approved policies. | N |
| | 7. 95% of sampled personnel are trained and certified in all policies related to the civilian complaint program (or scheduled for training, in the case of mid-year reviews). | N |
| | 8. 95% of the reviewed promotions were awarded consistent with approved policies regarding bias-free policing and equal protection. | N |
| | 9. PRPB policies and procedures regarding performance assessment comply with the requirements of the Paragraph. | Y |
| | 10. Performance assessment trainings are consistent with bias-free policing and equal protection provisions of approved policies. | N |
| | 11. 95% of sampled personnel are trained and certified in all policies related to performance evaluations (or scheduled for training, in the case of mid-year reviews). | N |

| | |
|---|---|
| 12. 95% of performance evaluations reviewed are consistent with approved policies regarding bias-free policing and equal protection. | N |

No promotions were made during this evaluation period, however no letter to that effect was received by the Monitor's Office, unlike in previous reporting periods. Further, PRPB did not provide documentation that agents were trained on Recruitment of Aspiring Cadets, nor curricula were submitted to evaluate. Additionally, no evidence of training on the civilian complaint program or performance assessments were received.

| Paragraph 85 | Assessment Frequency | Overall Compliance Status | |
|---|---|---|---|
| | Annually as to Data Sources #1, #2 and #4. Bi-annually for the remaining Data Sources. | Not Compliant | |
| Paragraph Language | PRPD shall use the National Incident Based Reporting System ("NIBRS") to collect and report crime data. | | |
| Compliance Target(s) | **Compliance Target** | | **Status** |
| | 1. Policies, procedures, and forms/modules incorporate the requirements of the Paragraph. | | Y |
| | 2. NIBRS training are consistent with approved policies and procedures. | | N |
| | 3. 95% of sampled PRPB members are trained and certified in NIBRS. | | N |
| | 4. PRPB is using the NIBRS to collect and report crime data. | | N |

PRPB did not submit data to allow the Monitor's Office to determine if current policy and training complies with implementation of NIBRS. The two files that the Monitor's Office did receive contained copy of a blank police report and a copy of blank information plan. PRPB must develop the capacity of NIBRS compliance from policy to implementation. PRPB has provided no evidence that it has responded in any appreciable way to implement NIBRS, although it has been given information and tools to do so by DoJ and FBI. NIBRS demonstration was conducted during the CMR-5 reporting period, in June 2021. Noted correspondence provided between the FBI and Special Masters Office indicated that the FBI had provided training to PRPB on October 24 - 28, 2017, and November 5 - 7, 2019. Additionally, the CJIS Division hosted a train the trainer event on September 19 - 20, 2018.

| Paragraph 86 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually for Data Source #3. Annually for the remaining Data Sources. | Not Compliant |
| Paragraph Language | PRPD shall collect accurate and reliable data on hate crimes on an ongoing basis and shall submit the data to the Federal Bureau of Investigation ("FBI") for analysis | |

| | | |
|---|---|---|
| | and publication in the FBI's Hate Crimes Statistics report in accordance with FBI submission requirements. | |
| Compliance Target(s) | **Compliance Target** | **Status** |
| | 1. Policies on criminal investigations incorporate all of the requirements of this Paragraph. | Y |
| | 2. Criminal investigation trainings are consistent with approved policies. | N |
| | 3. 95% of sampled personnel are trained and certified in all policies related to identifying, collecting, and reporting hate crimes (or scheduled for training, in the case of mid-year reviews). | N |
| | 4. PRPB notifies the FBI of all identified instances of hate crimes. | N |
| | 5. 95% of investigations of hate crimes accurately identify and report hate crimes. | N |

PRPB did not submit data to determine policy, training, implementation of this paragraph. The Monitor's Office received a certificate stating no referrals of hate crime data were made to the divisions of SAIC. Further, the EIS module on hate crimes is not currently operational, which has created a lapse in reporting on potential hate crimes. Local news outlets and members of the LGBT community continue to report numerous crimes that may be in part motivated by anti-LGBT prejudice, which stands in stark contrast to PRPB's certification to the Monitor's Office that that it made no hate crime referrals during the period of review for CMR-4. Finally, PRPB should not refer to its hate crimes tracking system as EIS to avoid confusion and expanding on the belief that EIS is a punitive process.

## 2. Discriminatory Policing

PRPB has elaborated a policy to conduct its activities in such a way as to protect all persons equally and to not discriminate by policy GO 617, Code of Ethics of Members of PRPB revised May 2019. Additionally, PRPB's policy to the LBGTQ (LGBTT) community has been updated in the past year. This update has been reflected in the new iteration of the relevant course titled Interactions with Transgender and Transsexual Persons (VITT 3068). The sample of personnel training records selected for review indicate the majority of PRPB personnel have received this training. However, the Monitor has not assessed the curriculum content of VITT3068. Monthly statistical reports of abuse allegations in juvenile facilities indicate that there is a minimal time lapse from report taking to follow-up. Review of seven juvenile facilities cases do not provide enough information to determine procedural accuracy in the follow up process.

| **Paragraph 88** | **Assessment Frequency** | **Overall Compliance Status** |
|---|---|---|
| | Annually as to Data Sources #1, #2 and #4. Bi-annually for the remaining Data | Not Compliant |

CMR-4 | July 21, 2021

| Paragraph Language | PRPD shall develop policies to provide all individuals within the Commonwealth with police services in a non-discriminatory fashion in order to build and preserve trust among community members and more effectively prevent and solve crime. As part of these efforts, PRPD shall seek the assistance of community advocates in widely disseminating to the public its written policies on immigration-related laws. | |
|---|---|---|
| Compliance Target(s) | **Compliance Target** | **Status** |
| | 1. PRPB policies complied with the requirements of the Paragraph. | Y |
| | 2. Trainings on discrimination free policing are consistent with approved policies. | N |
| | 3. 95% of sampled PRPB members are trained and certified in discrimination free policing. | N |
| | 4. Pertinent policies on pertinent immigration-related law were widely disseminated to the public. | N |

A memo from Captain Valencia Figueroa states that compliance with this paragraph is in "negative" status. It is recommended that PRPB submit documents pertaining to how PRPB disseminates pertinent policies on immigration-related laws to the public in preparation for the next monitoring report. Additionally, the identification of what is considered discrimination free policing by PRPB is needed to verify that PRPB personnel are receiving the training required as per the Agreement. In this and the last CMR, the training reported by PRPC, Interactions with Transsexual and Transgender Persons (VTT3068), is the only training that PRPB personnel has received.

| **Paragraph 89** | **Assessment Frequency** | **Overall Compliance Status** |
|---|---|---|
| | Annually for Data Sources #1 and #2. Bi-annually for all remaining Data Sources. | Not Compliant |
| Paragraph Language | PRPD shall develop a specific policy to guide officers' interactions with transgender or transsexual individuals that addresses gender identification, gender expression, transportation, processing, housing, and medical treatment. | |
| Compliance Target(s) | **Compliance Target** | **Status** |
| | 1. PRPB policies guide officer interactions with transgender or transsexual individuals as required by the Paragraph. | Y |
| | 2. PRPB trainings on interactions with transgender or transsexual individuals are consistent with approved policies. | N |
| | 3. 95% of sampled PRPB members are trained and certified in policies regarding interactions with transgender or transsexual individuals. | Y |
| | 4. 95% of reviewed PRPB reports suggest compliance with PRPB policies regarding interactions with transgender or transsexual individuals. | N |

PRPB provided insufficient evidence that the policy governing interaction with transgender or transsexual individuals has been implemented. PRPB submitted a file containing 89 names of officers who completed Orientation of Victims of Sexual Assault (LVVS 622) and six names of officers who did not take the same training. The Monitor's

CMR-4 | July 21, 2021

Office requested the training curricula for those courses related to interactions with transgender or transsexual individuals. No curricula were received. Only the listing of officers who has received the training, as noted in the report. With no curricula review PRPB is non-compliant in this area because no determination that the training is compliant with the approved policy can be made. The only item submitted by PRPB to the Monitor was a listing of those officers who had trained in the course titled: Orientation of Victims of Sexual Assault.

| Paragraph 90 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually for Data Source #5. Annually for the remaining Data Sources. | Not Compliant |
| Paragraph Language | PRPD shall provide all PRPD officers with training on biased-free policing at least every two years for the first four years of this Agreement, and annually thereafter. PRPD shall also provide training on biased-free policing as necessary, based on developments in applicable law and PRPD policy. PRPD's training program shall include the following topics:<br>a) PRPD policies and requirements in this Agreement regarding biased-free policing;<br>b) community perspectives of discriminatory policing;<br>c) constitutional and other legal requirements related to equal protection and unlawful discrimination;<br>d) the protection of civil rights as a central part of the police mission;<br>e) arbitrary classifications and stereotyping based on age, race, color, ethnicity, national origin, religion, gender, disability, sexual orientation, gender identity, gender expression and political ideology or affiliation;<br>f) interacting with diverse populations, including persons who are homeless and economically disadvantaged;<br>g) identification of key decision points where prohibited discrimination can take effect at both the incident and operational planning levels;<br>h) methods, strategies, and techniques to reduce misunderstanding, conflict, and complaints due to perceived bias or discrimination, including community-oriented policing strategies; and<br>i) comprehensive testing that shows complete understanding of rules and regulations. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. PRPB trainings on discrimination free policing are consistent with the requirements of the Paragraph. | N |
| | 2. 95% of reviewed training records complied with the training frequency requirements of the Paragraph. | N |
| | 3. 95% of reviewed training curriculums complied with the content requirements of the Paragraph. | N |
| | 4. Tests accurately assess an understanding of rules and regulations related biased-free policing. | N |
| | 5. 95% of sampled PRPB members are trained and certified in bias-free policing. | N |

CMR-4 | July 21, 2021

This six-month document review of PRPB personnel files found that there was substantial delivery of VITT 3068, Interactions with Transsexual and Transgender Persons. Although PRPB provided an extensive list of hundreds of personnel that received the training, no certificates or curriculum was attached to the file provided. It is recommended that PRPB outline what specific courses are identified as set topics in bias-free policing as required by this Paragraph. PRPB has done a good job in the delivery of VITT 3068, and it should be recognized that despite the COVID-19 pandemic, the training was still delivered. It is just as important for PRPB to identify courses related to the delivery of bias-free policing.

| Paragraph 92 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | Within five business days, PRPD shall prepare and provide to PRDOJ and the Puerto Rico Department of the Family the preliminary investigation report prepared in response to each allegation of abuse and mistreatment originating in secure juvenile correctional facilities. Such allegations include physical and mental abuse, juvenile on juvenile assaults, staff on juvenile abuse, and excessive use of force by staff. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | All allegations of abuse and mistreatment originating in secure correctional facilities are timely reported to the PRDOJ and the PR Department of the Family. | N |

Data list of cases in juvenile facilities in Ponce show that in April 2019, the initial report and the cases assigned for investigation occurred on the same date. In May 2019 both cases reported a delay from the point in which the incident was reported to the point in which an investigator was assigned, 19 days and 18 days respectfully for those two cases in May. In February 2020 there were 8 cases where the initial date and the assigned date occurred on same date. November 2020 has one case where the initial report and assignment was the same date. In 2020 a case of institutional abuse took five months to be assigned to an investigator. The Monitor conducted a content analysis of investigation files related to allegations of abuse and mistreatment originating in secure prisons to determine whether PRPB submitted preliminary investigation reports within five business days of identifying the allegation to the PRDOJ and the PR Department of the Family.

Upon review, the Monitor could not determine whether PRPB submitted preliminary investigation reports within five business days. The list on the status of case, the date of when the initial report was taken and a notation that it was subsequently assigned was all that was received by the Monitor. It is recommended that in the body of the monthly statistical report titled "Preliminary Investigations of Complaints of Intuitional Abuse" there be a category noting the date of referral of the case to PRDOJ and PR Department

of Family. Investigative follow up is essential.  The Monitor recommends that PRPB establish a case management system that tracks the status of the case and that the agents assigned to the case submit a supplemental report every thirty days to acknowledge the progress in the case. Additionally, supervisors of those agents should ensure that thorough processes are proceeding.

## 3. Sexual Assault and Domestic Violence

Due to the Covid-19 travel restrictions, the Monitor's Office was unable to travel to observe the PRPB Sex Crimes Investigation Unit operations to verify operability, ensure its members had received proper training, or that the 24-hour hotline was adequately equality and accurately staffed with trained personnel. Monitors did receive Power Point documents and lists of trained personnel on some of the required training.

| Paragraph 93 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually as to Data Sources #1, #2 and #4. Bi-annually for the remaining Data | Not Compliant |
| Paragraph Language | PRPD shall respond to and investigate reports of sexual assault and domestic violence professionally, effectively, and in a manner free of gender-based bias. PRPD shall appropriately classify and investigate reports of sexual assault and domestic violence, collaborate closely with community stakeholders, and apply a victim-centered approach at every stage of its response. PRPD shall develop policies and procedures on responding to sexual assault and domestic violence, including incidents involving PRPD officers, that comply with applicable law and comport with generally accepted policing practices. | |
| Compliance Target(s) | Compliance Target | Status |
| | 1. Reviewed policies and procedures on responding to sexual assault and domestic violence comply with applicable law and generally accepted policing practices. | N |
| | 2. Trainings on responding to sexual assault and domestic violence are consistent with approved policies. | N |
| | 3. 95% of sampled PRPB members are trained and certified in responding to sexual assault and domestic violence consistent with approved policies. | N |
| | 4. 95% of reviewed sexual assault and domestic violence investigations complied with requirements of the Paragraph. | N |

The Monitor's Office reviewed documentation provided by PRPB that demonstrated personnel did receive virtual training (LVVS622) on Orientation of Victims of Sexual Assault. However, no documents received demonstrated that PRPB had received training on Domestic Violence. In review of the power point presentations, not including lesson plans, the information provided by PRPB appears to be up to date and the guidance provided states the process officers should follow in responding to sexual assault and

domestic violence cases. The Monitor recommends that the actual lesson plans for the courses mentioned be submitted for review. The Monitor also recommends that PRPB review and consider the Domestic Violence Model Policy by the International Association of Chiefs of Police ("IACP") when updating a policy. This model policy assists departments of any size to implement priorities, guidelines, and procedures to be followed by law enforcement officers in response to domestic violence calls. This model policy prioritizes all the generally accepted policing practices that keep officers safe when responding to domestic violence calls, to support victims in a trauma-informed way, and to hold suspects accountable.

Additionally, grant opportunities can provide resources to assist PRPB in numerous ways to respond to Sexual Assault and Domestic Violence issues. For example, earlier this year, the U.S. Department of Justice's Office on Violence Against Women ("OVW") accepted applications for a program called: Improving Criminal Justice Responses to Sexual Assault, Domestic Violence, Dating Violence, and Stalking Grant Program. It was open to governments, courts, victim service providers, coalitions, and rape crisis centers. From all indications PRPB would have eligibility to apply. The purpose of this program is to improve the capacity of law enforcement, prosecutors, courts, probation, and victim services to effectively respond to domestic violence, sexual assault, dating violence, and stalking. Although the grant application period has ended, PRPB should maintain awareness of similar grant opportunities. It is recommended that PRPB have a member register on the DOJ website to receive the solicitation notifications of these types of grants. An extensive review of cases will be conducted in CMR-5 to assess if PRPB investigates cases effectively, professionally, and free of a gender bias.

| **Paragraph 96** | **Assessment Frequency** | **Overall Compliance Status** | |
|---|---|---|---|
| | Annually as to Data Sources #1 and #2. Bi-annually for the remaining Data Sources. | Deferred | |
| **Paragraph Language** | PRPD shall ensure that its Sex Crimes Investigation Unit is accessible through a hotline that is staffed 24-hours a day with trained responders. | | |
| **Compliance Target(s)** | **Compliance Target** | | **Status** |
| | 1. Policy on Sex Crimes Investigation Unit incorporates the requirements of the Paragraph. | | Y |
| | 2. Training on response to sex crimes related calls is in accordance with approved policy. | | N |
| | 3. 100% of sampled 24-hour hotline PRPB personnel are trained and certified in responding to sex crimes related calls. | | N |
| | 4. PRPB maintains a staffed 24-hour a day hotline with trained responders for sex crimes. | | N |

| | |
|---|---|
| 5. The manned hotline provides the public access to the Sex Crimes Investigation Unit. | N/A |

PRPB failed to provide documents to determine whether personnel assigned to the 24-hour hotline are trained and certified in responding to sex crimes related calls. Additionally, the Monitor did not receive hotline complaints to validate that the hotline is staffed and operating 24-hours a day with trained responders. Due to COVID-19 travel restrictions, the Monitor was unable to visit the manned hotline to ensure that the Sex Crimes Investigation Unit is accessible to the public as required by the Paragraph.

Paragraphs 97-100 will be assessed in CMR-5.

## IV. Recruitment, Selection, and Hiring

The Monitor finds that PRPB is in partial compliance with the Agreement regarding recruitment, selection, and hiring policies and procedures. PRPB has tried to recruit and hire qualified personnel and develop recruitment strategies that promote inclusive selection practices that better reflect a diverse cross-section of the Puerto Rican community. PRPB, however, still needs to improve in certain areas to achieve substantial compliance.

### 1. General Provisions

The Monitor conducted interviews with the Interim Director of the Recruitment Division, the Interim Director of the PRPB Human Resources Department, a Lieutenant from the PRPB police academy, and a Lieutenant from the Reform Unit. According to those interviewed, PRPB has developed a comprehensive recruiting and hiring program and policy to successfully attract qualified candidates. Regulation 9050 and General Order 501 (Recruitment Board for Cadet Applicants of the Police of Puerto Rico) are included in this program and policy. The Monitor's Office reviewed all General Orders and Regulations and verified they meet best policing practices and standards.

| Paragraph 101 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Partially Compliant |
| Paragraph Language | PRPD shall develop a comprehensive recruitment and hiring program that successfully attracts and hires qualified individuals. PRPD shall develop a recruitment policy and program that establishes clear guidance and objectives for recruiting police officers and clearly and transparently allocates responsibilities for recruitment efforts. | |

| Compliance Target(s) | Compliance is determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 102-108, and (2) the results of outcome assessments, pursuant to Paragraph 243. |
|---|---|

The Interim Director of the PRPB Recruitment Division provided documents and data on recruitment to the Monitor's Office, including pertinent regulations and general orders, data on the number of prospective cadets who were recruited and vetted, and the gender and education composition of PRPB Academy classes 229, 230, and 231. Summaries of this data are provided in the tables below. The Monitor supports the efforts of the Interim Director both to recruit qualified applicants from a broad cross-section of Puerto Rican society, as well as to track recruitment performance thoroughly and provide that data to the Monitor's Office.

The Interim Director of PRPB Recruitment Division explained that PRPB accepted 134 candidates for Class #229, which began on July 6, 2020. He also said that Class #230 had 119 cadets and began September 14, 2020. It should be noted that PRPB was affected by health regulations established under the COVID pandemic. Class #231 with 136 cadets began on March 8, 2021. Class #232 will have between 135 to 140 cadets will probably begin in June or July. He also provided a summary of the reasons why other candidates were not successful in being hired by PRPB to the Monitoring Team.

## 2. Recruitment Plan

PRPB has been authorized to hire 450 new cadets in 2021. The Agreement identifies inclusive selection practices as a clear objective for hiring reform, with the goal of promoting greater representation among PRPB personnel of the diversity of Puerto Rican society. PRPB has taken steps to make recruitment practices more inclusive, and these steps have begun to produce positive results in terms of diversity in the hiring pool.

| Paragraph 102 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Partially Compliant |
| Paragraph Language | PRPD shall develop a recruitment plan that includes clear goals, objectives, and action steps for attracting qualified applicants from a broad cross-section of the community. PRPD's recruitment plan shall establish and clearly identify the goals of PRPD's recruitment efforts and the duties of officers and staff implementing the plan. | |
| Compliance Target(s) | **Compliance Target** | **Status** |
| | 1. Policies and recruitment plans incorporate all of the requirements of Paragraphs 101-103. | Y |
| | 2. Training on recruitment is consistent with approved policies. | Y |

CMR-4 | July 21, 2021

| | |
|---|---|
| 3. 95% of sampled personnel are trained and certified in recruitment policies and plans, or are scheduled for training, in the case of mid-year reviews. | N |
| 4a-d, f. PRPB's recruitment plan was developed, implemented, and evaluated in accordance with approved policies on recruitment. | Y |
| 4e. 85% of activities required by the recruitment plan and directed at recruiting underrepresented groups were implemented, including any missed activities that are reasonably justified. | N |

The Monitor's office has determined via interviews and documents that PRPB has been using Regulation 9050, General Orders #310, 501, and 702, the Recruitment and Hiring Strategic Plan, and the recruitment flowchart as working tools in the recruitment process. These documents establish clear objectives for the recruitment of police officers and assign responsibilities of each of the parties in the recruitment process.

The Covid Pandemic has had a detrimental impact on recruiting efforts. Nevertheless, the recruitment office provided data that demonstrates a concerted effort both to recruit qualified candidates, and to vet them thoroughly. The table below demonstrates the number of aspiring cadets who progressed to each stage of the recruitment process.

*Recruitment Data from October 01, 2020 until March 31, 2021*

| Recruitment Stage | Number of Recruits |
|---|---|
| Requests received | 528 |
| Scheduled entrance examination | 412 |
| Eligible based on examination result | 371 |
| Favorable polygraph result | 297 |
| Passed psychological examination | 239 |
| Passed medical examination | 239 |
| Passed physical fitness test | 204 |
| Passed drug test | 180 |

PRPB should continue to give conferences to varied groups to whom it provides verbal and written information to promote the recruitment of candidates of diverse backgrounds. They should also continue to work with the Counsel of the Dominican Republic and representatives of the LGTBQ community to help promote recruitment in these communities.

| Paragraph 103 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Partially Compliant |
| Paragraph Language | The recruitment plan shall include specific strategies for attracting a diverse pool of applicants including members of groups that have been historically underrepresented in PRPD. A "Recruitment Officer" will be responsible for the | |

| | development of the plan, together with a working group that includes officers from diverse backgrounds. The working group will also consult with community stakeholders to receive recommended strategies to attract a diverse pool of applicants. The plan will include both outreach to the general population and targeted outreach to populations currently underrepresented on the PRPD force including, but not limited to, women and the Dominican population, through media outlets, universities, community colleges, advocacy groups, and other community groups that serve or are likely to reach such populations. The "Recruitment Officer" and his or her staff, as determined by the Superintendent, will be responsible for the implementation of the plan. |
|---|---|
| Compliance Target(s) | This Paragraph is assessed together with Paragraph 102. |

The Interim Director of the PRPB Recruitment Division provided the Monitor with a current copy of the Strategic Recruitment Plan for 2021.

Both the Interim Director of the PRPB Human Resources Department and the Interim Director of the PRPB Recruitment Division stated that they have attempted to be inclusive and to reach out to the groups currently underrepresented in PRPB, including, women and people of Dominican descent. As an example, the Monitoring Team received a recruiting promotion with the Consulates of Mexico, Colombia, El Salvador, the Dominican Republic, and Uruguay. Documentation was provided to the Monitoring Team demonstrating the use of CIT members and members of various universities.

*Education Level of Entering Cadets for Academy Classes during CMR-4 Review Period*

| Highest Education Level Achieved | Class 229 | | Class 230 | | Class 231 | | Total | |
|---|---|---|---|---|---|---|---|---|
| | Women | Men | Women | Men | Women | Men | Women | Men |
| Associate's Degree | 10 | 41 | 8 | 39 | 15 | 38 | 33 | 118 |
| Bachelor's Degree | 22 | 56 | 25 | 49 | 34 | 41 | 81 | 146 |
| Master's Degree | 3 | 2 | 2 | 3 | 5 | 2 | 10 | 7 |
| Doctor's Degree | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| Total | 35 | 99 | 35 | 91 | 54 | 82 | 124 | 272 |

The Interim Director of the PRPB Recruitment Division stated that there are over 100 recruiting officers in PRPB. He is hopeful that members of the Community Relations Bureau of the 13 police areas will be trained as recruiters in the future and this is a priority for the Recruitment Division.

The Monitor is very supportive of recruitment training for the members of the Community Relations Bureau of the 13 police areas.

CMR-4 | July 21, 2021

## 3. Hiring Reforms

Hiring decisions are one of the most important responsibilities of PRPB. PRPB is selecting the face that the agency will present to the community and determine PRPB's future goals and values. Favoritism, bias, discrimination, and nepotism should not be factors in the hiring of new police recruits. Anti-bias training has been prioritized by the police academy.

| Paragraph 104 | Assessment Frequency | Overall Compliance Status | |
|---|---|---|---|
| | Annually | Partially Compliant | |
| Paragraph Language | PRPD shall develop an objective system to select recruits to enter into UCCJ. The system will establish minimum standards for recruiting and an objective process for selection that employs reliable and valid selection devices that comport with generally accepted policing practices and anti-discrimination laws. | | |
| Compliance Target(s) | Compliance Target | | Status |
| | 1. Policies incorporate all the requirements of Paragraphs 104-07. | | Y |
| | 2. Training on the recruit selection process is consistent with approved policies. | | Y |
| | 3. 95% of sampled personnel are trained and certified in all recruit selection process policies, or are scheduled for training, in the case of mid-year reviews. | | N |
| | 4a. 100% of recruits meet qualifications required by policy. | | N |
| | 4b. The recruit selection process was implemented in accordance with approved policies. | | Y |

Regulation 9050, General Orders # 310, 501, and 702, current hiring brochure, and Strategic Plan for Recruitment and Hiring have all been analyzed by the Monitoring Team as tools to set goals and objectives in attracting qualified applicants from a broad section of the community. The monthly strategic plan sets goals and objectives for hiring these same qualified individuals. The Monitoring Office received a copy of the 2021 Monthly Strategic Plan. The Interim Director of the Recruitment Division provided the document reflecting the number of applicants to Class 229, 230, 231, and in the future Class 232, including those that were accepted and the reason for rejecting other candidates. That document was provided by the Recruitment Division during the April site visit.

| Paragraph 105 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Partially Compliant |
| Paragraph Language | PRPD shall establish and publish qualifications for sworn personnel that are consistent with generally accepted policing practices. PRPD shall continue to require a two-year post-secondary degree, or its equivalent, as part of the requirements for sworn personnel. | |
| Compliance Target(s) | This Paragraph is assessed together with Paragraph 104. | |

A member of the Monitoring Team reviewed the current hiring announcement and brochure for 2021 and the flowchart that illustrates the process that a potential cadet is required to follow for being hired. The 2021 hiring announcement brochure is being revised.

| Paragraph 106 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Partially Compliant |
| Paragraph Language | PRPD shall require all candidates for sworn personnel positions to undergo a psychological, medical, and polygraph examination to assess their fitness for employment with PRPD. | |
| Compliance Target(s) | This Paragraph is assessed together with Paragraph 104. | |

According to the Interim Director of the PRPB Human Resources Department and the Interim Director of the Recruitment Division, PRPB requires that all candidates applying to become a PRPB Officer undergo a psychological, medical, and polygraph examination to assess their fitness for employment. A member of the Monitoring Team reviewed the documents that are required for a candidate to be hired and previously spoke with one of the psychologists that are used by PRPB for the psychological examination to assess fitness for employment.

| Paragraph 107 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Partially Compliant |
| Paragraph Language | PRPD shall assess and revise its policies and practices to ensure thorough, objective, and timely background investigations of candidates for sworn personnel positions based on generally accepted policing practices. PRPD's suitability determination shall include an assessment of a candidate's credit history, criminal history, employment history, use and abuse of controlled substances, and ability to work with diverse communities and act without impermissible bias. Favorable suitability determinations shall expire six months after the determination. | |
| Compliance Target(s) | This Paragraph is assessed together with Paragraph 104. | |

According to the Interim Director of the PRPB Recruitment Division, the Office of Safety and Protection performs the background Investigation of the candidates, including evaluation of each candidate's credit history, criminal history, employment history, use and abuse of controlled substances, and ability to both work with various communities and to carry out duties without prejudice. The USDOJ and the monitoring team recently reviewed the manual utilized by the Office of Safety and Protection and recommended changes to the manual, which will help ensure that PRPB complies with generally accepted policing practices. Included in the recommendations for the manual are that

CMR-4 | July 21, 2021

PRPB should be requesting the Criminal Record Returns from the DOJ's Bureau of Criminal Identification and Investigation, the FBI Criminal Record Return document, and the DOJ Firearms Eligibility Clearance Return in a timely manner.

The Monitor recommends that in the future a further random sampling be conducted by the monitoring team to verify the recommendations have been added to the manual and are being utilized by the PRPB. The Office of Safety and Protection should establish an information system and utilize technology to support the implementation of the revised manual.

| Paragraph 108 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Partially Compliant |
| Paragraph Language | PRPD and the UCCJ shall revise and implement policies and practices related to hiring to ensure that PRPD recruits and cadets do not qualify for civil service employment protections until their aptitude and abilities are properly assessed. | |
| Compliance Target(s) | Policies incorporate all of the requirements of the paragraph. | Y |

The Monitor inquired as to whether PRPB has reviewed and implemented hiring-related policies and practices to ensure that PRPB recruits and cadets qualify for public service employment protections. This qualification should only be done after a thorough evaluation of their skills and abilities. The Interim Director of the PRPB Recruitment Division confirmed this is to be the current policy and added that this has been instituted in accordance with General Order #310. The Interim Director also stated that the candidates are subject to a probation period, which is required by the General Order and the Regulations. He added that General Order #310 also covers this topic. In the past, PRPB specialists reviewed the rights of candidates during the probation period. General Order #310 includes the results of their analysis and was reviewed by the Monitoring Team and was found to comply. A policy was developed, training has been given, and the implementation of policy has been verified by the Monitoring Team.

Paragraphs 109-116, covering policies and procedures, were not due for assessment in CMR-4.


## V. Training

Training has often been cited as one of the most important responsibilities in any law enforcement agency. Agencies are constantly being held legally accountable for the actions of their personnel and for failing to provide initial or remedial training. PRPB

reports that between April 1, 2020, and March 31, 2021, it conducted 53 training course deliverables.

It should be noted that PRPB operates the Police Academy through the Auxiliary Superintendence for Education and Training, which is tasked to provide necessary trainings. Subsequently, PRPB has taken over all the implementation and compliance responsibilities previously assigned to the University College of Criminal Justice (UCCJ).

The Monitor's assessment of PRPB compliance with training are based on the training documents submitted to the Monitor's Office for review. It should be noted, however, that in response to a request for training materials across PRPB's pre-service and in-service curricula, PRPB provided mostly PowerPoint slide decks and other materials used in instruction, which do not suffice. To determine compliance, the Monitor's Office must review lesson plans, instructor credentials, test/examinations, and additional documents that attest to the full scope and structure of the pre-service and in-service training curricula.

It is also important to note that an allegation of test cheating disrupted online training after the close of the evaluation period for CMR-4. An individual allegedly leaked the answers to the questions for online tests, dramatically disrupting PRPB's capability to continue conducting online training in response to the COVID-19 pandemic. At the time of writing this report PRPB had paused all online training and initiated an investigation. This incident does not fall within the period of review for CMR-4, but the Monitor's Office will track the progress of this investigation and any outcomes that will impact training during future reporting periods.

| Paragraph 117 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Not Compliant |
| Paragraph Language | PRPD shall ensure that every PRPD officer and employee receives effective and comprehensive training that ensures they understand their responsibilities, the scope of their authority, and PRPD policy, and are able to fulfill these responsibilities and police effectively. Qualified trainers and instructors shall deliver instruction through generally accepted methods and techniques that are approved by UCCJ and are designed to achieve clear and articulated learning objectives. Trainers and instructors shall utilize generally accepted evaluation methods approved by UCCJ to assess proficiency and competency. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Policies incorporate all of the requirements of the paragraph related to qualified instructors, instruction delivery, and evaluation methods. | N |

| | |
|---|---|
| 2. Training for trainers and instructors is consistent with approved policies. | N |
| 3. Instructors and trainers are qualified and certified as required by policy in 95% of selected training courses. | N |
| 4. Instruction is delivered in accordance with policy in 95% of selected training classes. | N |
| 5. Evaluation methods are used and documented in accordance with policy in 95% of selected training course files. | N |

The PRPB Police Academy's role is to provide foundational police training. A firmly built foundation with proper materials by quality instructors will directly affect the structural integrity and success of the entire department. This must include training in policy, procedures and directives, standards, assessment tools, centralized training records, core curriculum, appropriate equipment, and guidelines on the use of technology.

As a result of travel restrictions, the Monitor's Office did not make sufficient observations of training methods to reach a determination of training achievements during CMR-4. However, the Monitors found that PRPB had established a COVID-19 response to training. Virtual training platform "Canvas" was utilized to manage training delivery. The Canvas training was utilized to deliver required training such as Interactions with Transgender & Transsexual Persons (VITT 3082) which started June 29, 2020, and Harassment, Discrimination, Retaliation, and Sexual Misconduct (VREG3081) which started July 10, 2020. Nevertheless, the Monitor has not reviewed that curriculum content. The score sheet for VITT 3082 exam was the only document received by the Monitor. In this submission of documents there were examples of group exercise, examinations and score sheets with answers provided.

PRPB is working on strengthening training and to establish an unvarying training process. The PRPB Police Academy must continue to give more attention to assessments of instructors, full utilization of the PTMS for centralized training records, use of technology, use of appropriate equipment, and learning comprehension assessments.

Some of the data submitted shows that PRPB conducted monthly community meetings from October 1, 2020, to March 31, 2021, in San Sebastián. However, other than notification and roster of attendees there is no other documentation such as meeting agendas and notes submitted to document what was discussed. PRPB to partially comply with Paragraph 131 will need to submit documentation of community feedback on professional development of PRP personnel.

CMR-4 | July 21, 2021

PRPB did submit documentation to show that it is achieving training deliverables during this monitoring period. Numerous certificates indicate PRPB did conduct training for members of specialized units in NUC and PTMS.

## 1. Pre-Service Education and Training

The Pre-Service Education and Training topics is consistent with generally accepted policing practices. During CMR-4 period no new topics have been developed. The Academy staff is awaiting an updated policy approval on community policing to start training delivery on the topic.

| Paragraph 118 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Not Compliant |
| **Paragraph Language** | UCCJ shall provide pre-service education and training to candidates for sworn personnel positions in PRPD in accordance with its enabling statute and regulations. To the extent that UCCJ will confer Associate or equivalent degrees recognized by nationally or regionally accredited institutions of higher learning in the continental United States, UCCJ shall maintain its license in good standing from the Puerto Rico Council on Education and attain full accreditation from the Middle States Association of Colleges and Schools within two years of the decision to confer such degrees. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Policies incorporate all of the requirements of Paragraphs 118-121. | Y |
| | 2. The pre-service training program, including curriculum and related training materials, is consistent with approved policies. | N |
| | 3. Training plans and standards are consistent with approved policies. | N |
| | 4. 95% of personnel who complete the pre-service training program are trained and certified (or scheduled for training, in the case of mid-year reviews) in accordance with training plans, standards, and policy. | N |
| | 5. The pre-service training curriculum is reviewed and revised in accordance with policy. | N |
| | 6. Findings and recommendations of bi-annual reviews of the pre-service training curriculum are submitted to the Commissioner in written reports. | N |
| | 7. Needs assessments are conducted in accordance with policy. | N |

PRPB Academy staff report that face to face pre-service training was not delivered during the COVID-19 pause. However, a virtual course delivery using "Canvas" as the online platform was provided to comply with training requirements. The Monitors were unable to observe training methods in the period of performance for CMR-4 due to COVID-19 restrictions.  The applicable significance of this paragraph should be modified due to PRPB no longer having an educational provider relationship with UCCJ. Recommendations for

CMR-4 | July 21, 2021

improving pre-service training will be provided upon further review and observation of the training delivered.

| Paragraph 119 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Not Compliant |
| Paragraph Language | Once candidates meet all educational requirements and eligibility criteria, UCCJ shall establish and provide a pre-service training program for PRPD cadets consisting of at least 900 hours of instruction that comports with generally accepted policing practice with respect to quality and content, and that reflects the requirements of this Agreement. | |
| Compliance Target(s) | This Paragraph is assessed together with Paragraph 118. | |

The Recruitment, Selection, and Hiring Committee provided information on eligibility qualifications for PRPB Cadets and provided a copy of the eligibility requirements to the Monitoring Team. Documents of the eligibility qualifications for Class #229 (134 cadets), Class #230 (119 Cadets), and Class # 231 (136 Cadets) met all criteria, therefore were approved by the Recruitment, Selection, and Hiring Committee and were eligible for the Pre-Training Program for PRPB Cadets.

The pre-service training program, consisting of 1,310 hours, including the curriculum and related training materials, is consistent with approved policies. However, the cadet training records that were provided to the Monitor's Office lacked key details to verify compliance with this curriculum.  For some officers, the number of registered hours on certificates deviates from the curriculum, despite their records showing that they completed the academy. In one instance, a cadet had an accumulation of only 776 hours in his training record, and no indication of whether he is a current cadet or has been released was provided. There was no further explanation found on the status of the cadet to help explain the discrepancy on the shortage of the required 900 hours.

The applicable significance of this paragraph should be modified due to PRPB no longer having an educational provider relationship with UCCJ.

| Paragraph 120 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Not Compliant |
| Paragraph Language | PRPD and UCCJ shall review and revise its pre-service training curriculum to ensure quality, consistency, and compliance with applicable law, PRPD policy, and this Agreement. PRPD and UCCJ shall conduct regular subsequent reviews, at least | |

CMR-4 | July 21, 2021

| | semi-annually, and submit their findings and recommendations in written reports to the Superintendent. |
|---|---|
| Compliance Target(s) | This Paragraph is assessed together with Paragraph 118. |

The Monitoring Team inquired if there had been any current Academy Curriculum changes. PRPB reported none during this reporting period. A curriculum development lieutenant discussed the kinds of changes that PRPB expects to build are based on specific mandates and on generally accepted policing practices. However, while PRPB works to build a course, PRPB does wait until any policy implication is approved before delivering the course.

| Paragraph 121 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Not Compliant |
| Paragraph Language | PRPD and UCCJ shall develop an appropriate training plan and standards including, but not limited to, establishing appropriate passing criteria, attendance, and participation requirements, and valid evaluation methods, to ensure that cadets and officers attain necessary knowledge, skills, and competencies to implement all requirements in this Agreement. PRPD and UCCJ shall conduct regular needs assessments to ensure that training related to the implementation of this Agreement is responsive to the knowledge, skills, and abilities of the cadets and officers being trained. | |
| Compliance Target(s) | This Paragraph is assessed together with Paragraph 118. | |

Specific detailed training plans for daytime shooting (qualifications), virtual course delivery using "Canvas" as the online platform, a face-to-face training restart protocol in response to COVID-19, crowd control and management training, and investigative procedures were all found to be developed following generally accepted policing practices. It is recommended that a training needs assessment be conducted to outline an overall training program that supports the Agreement.

| Paragraph 122 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Partially Compliant |
| Paragraph Language | PRPD and UCCJ shall select and train qualified officer and academic instructors and shall ensure that only mandated objectives and approved lesson plans are taught by instructors. Instructors shall engage students in meaningful dialogue, role playing, and test taking, as appropriate, regarding particular scenarios, preferably taken from actual incidents involving PRPD officers, with the goal of educating students regarding the legal and tactical issues raised by the scenarios. | |
| | Compliance Target | Status |

CMR-4 | July 21, 2021

| Compliance Target(s) | 1. Policies incorporate all of the requirements of the paragraph related to qualified instructors, instruction delivery, and evaluation methods. | Y |
|---|---|---|
| | 2. Training for trainers and instructors is consistent with approved policies. | Y |
| | 3. Instructors and trainers are qualified and certified as required by policy in 95% of selected training courses. | N |
| | 4. Instruction is delivered in accordance with policy in 95% of selected training classes. | N |

The Monitor's on-site visit provided opportunity to interview three police trainers. The selection process supports qualified well-suited instructors for training. After applying to the training academy, they are interviewed, and given an opportunity to demonstrate teaching proficiency. After reviewing all the information combined, the Committee decides which candidate is the most suitable for the instructor position.

All training topics are initially learned in a train-the-trainer method. They are evaluated and assessed to determine if they should continue teaching that topic. They receive a certification upon completion. The topics mentioned that these trainers teach are criminology, community relations, laws (juvenile and special), ethics, interactions with transsexual and transgender persons, use of force (Taser, baton), CIT training, Field Training Officer, mentoring, vehicle driving, mechanics of arrest, and de-escalation.

## 2. Field Training Program

PRPB has a Field Training Officer committee, which consists of a lieutenant, three agents, a contract advisor, and psychologist. It is not known what their exact role or function is. Overall field training program is not evaluated due to no documents received by the Monitor during this reporting period.

PRPB submitted lists of FTO's assigned to the various districts. PRPB provided no documentation on the selection of FTO's. The documentation submitted supports that FTO's attended eight hours of mentoring during this reporting period.

| **Paragraph 123** | **Assessment Frequency** | **Overall Compliance Status** | |
|---|---|---|---|
| | Annually | Not Compliant | |
| **Paragraph Language** | PRPD shall develop a field training program that consists of at least 800 hours and that comports with generally accepted policing practice with respect to quality and content, and that reflects the substantive requirements of this Agreement. | | |
| **Compliance Target(s)** | **Compliance Target** | | **Status** |
| | 1. Policies incorporate all of the requirements of Paragraphs 123, 126. | | Y |

| | |
|---|---|
| 2. The field training program, including curriculum and related training materials, is consistent with approved policies. | N |
| 3. 95% of personnel who complete the field training program are trained and certified (or scheduled for training, in the case of mid-year reviews) in accordance with approved policies. | N |

PRPB did not submit data or documents on the field training program and the model used to conduct the program. Members of the Monitoring Team asked if cadets must pass a Field Training Officer (FTO) Program. Once the Cadets graduate, they become agents and they must successfully pass the FTO program. FTO training consists of 800 hours of work supervised by different mentor Agents (FTOs) and the Superintendence of Field Operations (SAOC) supervises the FTOs. Curriculum information was not submitted to the Monitoring Team. The Monitoring Team recommends that PRPB consider the Reno, NV Police Department's FTO model as an example.[9]

The Monitor also recommends that PRPB examine the resource, A Problem-Based Learning Manual for Training and Evaluating Police Trainees.[10] Both training evaluation models provide step by step guidance in the FTO process. These two models also follow generally accepted police practices.

| Paragraph 124 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Not Compliant |
| Paragraph Language | PRPD's policies and procedures on field training shall delineate the criteria and methodology for selecting Field Training Officers ("FTOs"). PRPD shall permit only qualified officers to serve as FTOs. To determine qualifications, PRPD shall consider officer experience, disciplinary history, and demonstrated leadership skills, among other factors. PRPD shall strive to assemble FTOs that represent a broad cross-section of the community. | |
| Compliance Target(s) | **Compliance Target** | **Status** |
| | 1. Policies incorporate all of the requirements of the paragraph. | N |
| | 2. Selection devices used by the FTO evaluation boards are consistent with approved policies. | N |
| | 3. Selected FTOs meet eligibility requirements. | N |
| | 4. All FTOs who do not maintain eligibility are removed as FTOs in accordance with approved policies. | N |

PRPB provided no data pertaining to the selection of FTO appointments or on the selection and appointment of FTOs. The Monitoring Team received a list of individuals

---

[9] https://www.renopd.com/formAdmin/content/pdfs_lib/PTO_2_0_Manual.pdf
[10] https://cops.usdoj.gov/RIC/Publications/cops-w0358-pub.pdf

CMR-4 | July 21, 2021

who were selected and appointed as FTOs, however no documentation on the assessment results on selection process were received.

| Paragraph 125 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Not Compliant |

| Paragraph Language | PRPD shall ensure that all FTOs receive training in the following areas: management and supervision; community-oriented policing; effective problem solving techniques; and field communication, among others. FTOs shall be required to maintain, and demonstrate on a regular basis, their proficiency in managing recruits and subordinates, practicing community-oriented policing, and solving problems effectively. | |
|---|---|---|
| Compliance Target(s) | Compliance Target | Status |
| | 1. Policies incorporate all of the requirements of this Paragraph. | N |
| | 2. Training for FTOs is consistent with approved policies. | N |
| | 3. 95% of personnel who complete the training for FTOs are certified (or scheduled for training, in the case of mid-year reviews) in accordance with approved policies | N |

PRPB submitted training certification document stating FTO's received eight hours of mentoring training. No other data ensuring that all FTOs receive the forty-hour required FTO training was submitted. Similarly, curriculum information was not submitted to the Monitoring Team in reference to the FTO program during the CMR-4 reporting period.

| Paragraph 126 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Not Compliant |

| Paragraph Language | PRPD shall ensure that recruits in the field training program are trained in a variety of geographic areas within Puerto Rico; in a variety of shifts; and with several FTOs. |
|---|---|
| Compliance Target(s) | This Paragraph is assessed together with Paragraph 123. |

PRPB did not submit data to document that recruits are trained in all geographic areas and all shifts by various FTO's for CMR-4. However, in CMR-2 the Monitoring Team verified that recruits in the Field Training Program are trained in different shifts and in a variety of geographic areas. It is recommended that all FTOs meet after they pass the FTO program to discuss improvement measures. This recommendation was made several years ago, however, it has not been implemented. Though Paragraph 126 is intended to be assessed with 123, which is partially compliant for CMR-2, the Monitors previously verified that PRPB is following the pathway to compliance as outlined by Monitors. However, for CMR-4 there is no supporting documentation to demonstrate continual compliance. Therefore, the rating is non-compliant.

CMR-4 | July 21, 2021

| Paragraph 127 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Not Compliant |
| Paragraph Language | PRPD shall develop a program to assess FTO performance using appropriate evaluation tools. PRPD shall review and evaluate the performance of FTOs, with re-certification dependent on strong prior performance and feedback from other staff. Any recommendation from a FTO to terminate a trainee during their field training program shall be reviewed and evaluated by the chain of command. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. The FTO performance assessment program incorporates all of the requirements of the paragraph. | N |
| | 2. Training for supervisors evaluating the performance of FTOs is consistent with approved policies. | N |
| | 3. 95% of performance assessments for selected FTOs are within policy. | N |
| | 4. 95% of personnel files for selected FTOs who were recertified to serve as FTOs are within policy. | N |
| | 5. 95% of recommendations by FTOs to terminate a trainee from the field training program are reviewed and evaluated by the chain of command. | N |

PRPB did not submit documentation to show that it has developed a program to assess FTO performance using appropriate evaluation tools, basing re-certification on prior performance. In CMR-2 it was recommended that all FTO's meet after the FTO period ends to discuss improvement measures. PRPB provided no documentation to show implementation of this recommendation during the CMR-4 reporting period.

| Paragraph 128 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Not Compliant |
| Paragraph Language | PRPD shall create a mechanism for recruits to provide confidential feedback regarding the quality of their field training and their FTO, including the extent to which their field training was consistent with what they learned, and suggestions for changes to training based upon their experience in the FTO program. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Policies incorporate all of the requirements of the paragraph. | Y |
| | 2. Training for relevant personnel includes training on the feedback mechanism. | N |
| | 3. All relevant personnel are trained on the feedback mechanism. | N |
| | 4. Feedback and suggestions of recruits is considered when reviewing and revising the field training program. | N |

PPRB did not submit documentation to show that it has created a mechanism for recruits to provide confidential feedback and suggestions regarding their field training and their FTO. PRPB should develop an anonymous process that cadets can provide feedback on their own FTO experience and on their individual FTO.

### 3. In-Service Training

PRPB requires annual in-service training of at least 40 hours. This monitoring period presented a training pause due to the global pandemic, COVID-19. However, PRPB recognized the challenge and moved to an in-service online training model. With the utilization of the "Canvas" platform, virtual online training was made available. The training availability was conducive to a 24-hour, 7 day a week availability. The document inspection made by the Monitor found compliance with in-service training that PRPB Agents receive on topics such as Interactions with Transgender and Transsexual Persons (VITT 3082) and Harassment, Discrimination, Retaliation and Sexual Misconduct (VREG3081). The random sample of produced training records indicated full compliance with this training requirement. PRPB did provide a memo certifying non-compliance and listing agent who did not receive required training. There were fifteen agents who were in non-compliance for in-serve training. This was a certified list of personnel who have no documentation (digital or manual) of training history. They are listed as classified personnel. There were four cadets who had not completed training courses. The non-compliance document was signed April 22, 2021. There was no further documentation to support what these PRPB personnel did to get back into compliance.

Training documentation on the following topics was submitted to the Monitor: Interactions with Transgender and Transsexual Persons (VITT3068), SARP personnel who completed NUC training, SARP personnel who completed PTMS, sworn personnel who completed PTMS training, and civilian personnel who have completed PTMS training.

A more formalized decision-making policy referencing what topics will be taught at the in-service training level is recommended. Other cities under consent decrees emphasize a wide array of issues that deserve regular training for department personnel. These include community policing, anti-bias, de-escalation, and domestic violence. Crisis Intervention Team (CIT) program and the handling individuals with behavioral issues and intellectual impairments is critical. A Crisis Intervention Team (CIT) is a police mental health collaborative program. The term "CIT" is often used to describe both a program and a training in law enforcement to help guide interactions between law enforcement and those living with a mental illness.

PRPB complies in some areas, however, training at the beginning of shifts or tours of duty for all officers, is not occurring. Moreover, the interviews conducted showed that this type of training does not appear to currently exist in PRPB.

CMR-4 | July 21, 2021

| Paragraph 129 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Not Compliant |
| Paragraph Language | PRPD shall establish a mandatory annual in-service training program that consists of at least 40 hours and that comports with generally accepted policing practice with respect to quality and content, and that reflects the requirements of this Agreement. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Policies incorporate all of the requirements of Paragraphs 129-131. | Y |
| | 2. The in-service training program, including curriculum and related training materials, is consistent with approved policies. | N |
| | 3. 95% of personnel who complete the in-service training program are trained and certified (or scheduled for training, in the case of mid-year reviews) in accordance with approved policies. | N |
| | 4. The in-service training program includes training tracks in accordance with approved policies and the Agreement. | N |
| | 5. Reviews and revisions of the in-service training program are based on multiple factors in accordance with approved policies and the Agreement. | N |

PRPB requires annual in-service training of at least 40 hours. Agents are required to receive trainings in the Use of Force, Protection, and Anti-Discrimination annually. Initial Covid-19 response to training suspended all training. During the CMR-4 reporting period PRPB responded with a plan to resume training virtually using "Canvas" for its online platform. Inspection of training records show that even virtually PRPB continued with mandatory training. The inspection demonstrated that agents are incompliance with their training on some topics but not on the mandatory training of Use of Force.

| Paragraph 130 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Not Compliant |
| Paragraph Language | PRPD shall create in-service training tracks for the following groups, including, but not limited to, command staff; lieutenants and sergeants; detectives; narcotics and vice investigators; specialized units; and professional responsibility investigators. | |
| Compliance Target(s) | This Paragraph is assessed together with Paragraph 129. | |

In-service training for all PRPB officers is set at 40 hours, although additional hours of training are given to officers as required by their assignment. PRPB responded to COVID-19 parameters and started in-service training of command staff, detectives, and specialized units. PRPB provided training records both from both PTMS and from NUC. However, no other specialized units such as S.W.A.T. or Community Relations training records were submitted.

CMR-4 | July 21, 2021

| Paragraph 131 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Not Compliant |
| Paragraph Language | PRPD shall identify critical in-service training topic areas based on an analysis of factors that include but are not limited to officer safety issues, community concerns, use-of-force statistics, internal affairs statistics, court decisions, research reflecting the latest law enforcement trends, individual precinct needs, and input from members at all levels of the Department, the Superintendent's Citizens' Interaction Committee ("CIC") and members of the community. | |
| Compliance Target(s) | This Paragraph is assessed together with Paragraph 129. | |

The Monitor received documents of monthly community meetings held in San Sebastián from October 1, 2020, through March 31, 2021. No other areas or regions documentations were submitted. The documents supported those meetings were held and included rosters of attendees. However, not received were meeting notes or agendas to indicate discussion of training suggestions made by community stakeholders. There was no data to support training suggestions from data analysis or court rulings. Additionally, no documents were submitted that show that meetings have taken place where PRPB members have contributed information regarding In-Service training topics.

| Paragraph 132 | Assessment Frequency | | Overall Compliance Status |
|---|---|---|---|
| | Annually | | Not Compliant |
| Paragraph Language | PRPD shall develop a comprehensive training program to supplement the 40-hour formal in-service training that is delivered at the beginning of shifts or tours of duty for all officers. Training may include special topics selected by UCCJ and precinct or unit Commanders that address constitutional policing, officer safety, readiness, community concerns, or departmental procedural matters. | | |
| Compliance Target(s) | Compliance Target | | Status |
| | 1. Policies incorporate all of the requirements of the paragraph. | | Y |
| | 2. Monthly meetings are consistent with approved policies and the Agreement. | | N |
| | 3. 95% of selected monthly meetings comply with approved policies. | | N |

PRPB submitted no documentation to show that it has created a comprehensive training program that is delivered at the beginning of shifts or tours of duty for all officers. Also called a "training roll call meeting" this training program allows the organization to outline new policies, share any new law or procedural changes (i.e.: executive orders), new policing mechanics, or most up-to-date law enforcement news, incident analysis, and police resources with officers at the start of their shifts.

## 4. Training Records

PRPR has started utilizing an electronic system called Police Training Management System (PTMS) to maintain related training records in a centralized system.

| Paragraph 133 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Not Compliant |
| **Paragraph Language** | PRPD shall electronically maintain complete and accurate records of current curricula, lesson plans, and other training materials in a central, commonly-accessible, and organized file system. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Policies incorporate all of the requirements of the paragraph. | Y |
| | 2. Training on the storage and preservation of training records and materials is consistent with approved policies. | N |
| | 3. Training records and materials are stored and preserved in accordance with approved policies in 95% of selected courses. | N |

PRPB has started using the Police Training Management System (PTMS) to maintain training records. The full utilization of the system is still being implemented. PRPB is still in process of integrating training curricula/materials in the system. Full implementation of PTMS is has not been fully achieved. Training staff are entering training records into two computer systems for training documentation.

| Paragraph 134 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Not Compliant |
| **Paragraph Language** | PRPD shall track, maintain, and report detailed, real-time training records and statistics. PRPD shall develop an electronic database to create and maintain records for each recruit and each sworn and unsworn member of the PRPD, including a standard electronic training record and electronic copies of certificates and other materials. The training records shall include the following information: the course description and duration, curriculum, location of training, and name of instructor. PRPD will provide the Superintendent with annual reports, or more often as needed, on training attendance and testing results. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. The electronic database accounts for all of the elements in the paragraph and outcome measures as required by Paragraph 243. | N |
| | 2. All training records and statistics are tracked in the electronic database. | N |
| | 3. Training reports provide current and accurate information to the Commissioner. | N |

PRPB has started using the Police Training Management System (PTMS) to maintain training records. The full utilization of the system is still being developed. Some training

records in this CMR-4 reporting period were submitted utilizing the PTMS system. The integration of training information between the PTMS and the old computer system has not been completed as of this reporting period. However, there have been some positive steps regarding integration. For example, a review of documents within PTMS showed some records to include an agent's training history from 2018 through 2020.

## VI. Supervision and Management

Supervisors are essential in creating the generally accepted police practices for PRPB. They serve as the two-way conduit of information between PRPB leaders and the rank and file. It is necessary for Supervisors to spend time on the field with their agents to evaluate their performance. Some agents report that their supervisors do support them in the field. A supervisor must understand and apply management principles in accordance with PRPB's policies, procedures, rules, administrative processes, management systems, generally accepted policing practices, and the Agreement.

### 1. General Provisions

| Paragraph 135 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | PRPB shall ensure that an adequate number of qualified first-line supervisors are deployed in the field to allow supervisors to provide close and effective supervision to each officer under the supervisor's direct command, to provide officers with the direction and guidance necessary to improve and develop as police officers, and to identify, correct, and prevent misconduct. PRPB shall develop policies for supervision that set out clear requirements for supervisors and are consistent with generally accepted policing practices. | |
| Compliance Target(s) | Compliance is determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 136-158, and (2) the results of outcome assessments, pursuant to Paragraph 243. | |

PRPB must ensure that an adequate number of qualified first-line supervisors are deployed in the field to provide the close and effective supervision necessary for officers 1) to improve and grow professionally, 2) to police actively and effectively, 3) to prioritize community policing and problem solving, and 4) to identify, correct, and prevent misconduct. The Monitoring Team also encourages PRPB to complete the development and implementation of EIS, conduct personnel integrity audits, and complete the implementation of inter-agency feedback systems.

The Monitor's Office is supportive of the staffing study V2A. However, the Monitor's Office continues to question whether any redeployment of assets has been made based on the

staffing study. Redeploying to bring staffing in line with the study would serve to make PRPB more effective and efficient. Information has not yet been provided to the Monitor's Office verifying that an adequate number of supervisors have been deployed in the field, or that the recommendations of the staffing study has been properly implemented by PRPB. Police departments across the country use staffing studies to better serve the community and operate the organization efficiently and effectively.

The Monitor's Office recommends that PRPB should review the staffing study in 2021 to ensure that the study's recommendations remain pertinent as population and crime dynamics change, and that proper deployment is utilized accordingly.

The Monitor's Office requested two months of staffing documents, including logbooks, for a random sample of the operational field units to determine the consistency of supervisory assignments and supervisor ratios in accordance with approved policies. This data was not thorough. Training records demonstrating that supervisors are certified (including certification on EIS and internal audits) were also not provided.

To help obtain compliance, PRPB should develop an automated system to determine which employees have been transferred and why. Notwithstanding the Monitor's request, PRPB did not provide that information. The documents provided were of tracked employees' locations and transfers. These documents, however, failed to explain why the employees were transferred.

Additional information such as training records were also requested from PRPB. To achieve compliance, PRPB must provide all the requested information.

## 2. Duties of Supervisors

As part of their responsibility, supervisors must thoroughly, objectively, and routinely review all aspects of Agent conduct, including a review of all uses of force, probable cause for arrests and the appropriateness of charges filed, and reasonable suspicion for stops and searches that do not result in an arrest. Additional responsibilities should include a thorough knowledge of the requirements of the Agreement and community policing.

| Paragraph 136 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | All operational field officers shall be assigned to a single, consistent, and clearly identified supervisor. Supervisors shall be assigned to and shall substantially work the same days and hours as the officers they are assigned to supervise, absent | |

| | exceptional circumstances. Scheduled leave (such as vacation time), unscheduled leave (such as sick leave due to illness or injury) and other routine absences (such as court appearances and training obligations) shall not be deemed noncompliance with this provision. | |
|---|---|---|
| **Compliance Target(s)** | **Compliance Target** | **Status** |
| | 1. Policies incorporate all the requirements of Paragraphs 136-140. | N |
| | 2. Supervision trainings are consistent with approved policies. | Y |
| | 3. 95% of sampled supervisors are trained and certified in all policies related to supervision (or scheduled for training, in the case of mid-year reviews). | N |
| | 4. Officer and supervisor schedules, assignments, and ratios are consistent with supervision policies. | N |
| | 5. Supervisors are assigned and deployed in accordance with approved supervision policies. | N |
| | 6. 95% of interviewed personnel perceive that supervision is close and effective. | N/A |
| | 7. 95% of sampled referrals indicate proactive observation and intervention to ensure adherence to policies, law, and the Agreement. | N |

To determine compliance, the Monitor's Office requested two months of staffing documents, including logbooks, for a random sample of the operational field units to determine the consistency of supervisory assignments and supervisor ratios in accordance with approved policies. Further, the Monitor's Office also requested documentation to verify that PRPB had developed an automated system to determine that supervisors are working the same days and hours as the officers they supervise, and that operational field officers are assigned to a single, consistent, and clearly identified supervisor. This documentation was also not provided by PRPB.

In addition, the Monitor's Office has not been provided with information to verify that policies incorporate all the requirements of Paragraphs 136-140, or that officer and supervisor schedules, assignments, and ratios are consistent with supervision policies. Further interviews of agents and analysis by the Monitor's Office must also be conducted to ensure that 95% of interviewed personnel feel that supervision is close and effective. However, due to COVID-19 restrictions and in accordance with CDC guidelines, the Monitor's Office was not able to conduct extensive site visits and interviews to make such compliance determinations.

| **Paragraph 137** | **Assessment Frequency** | **Overall Compliance Status** |
|---|---|---|
| | Bi-annually | Not Compliant |
| **Paragraph Language** | First-line field supervisors shall be assigned to supervise no more than ten officers for the first five years of this Agreement. After considering the results of the | |

| | staffing study required by Paragraph 13 and whether the first-line supervisors are meeting all of the supervisory requirements of this Agreement at the current officer to supervisor ratios, the Monitoring Team and the Parties shall determine whether to lower the number of officers supervised by each first-line field supervisor. On-duty field supervisors should be available throughout their shift to respond to the field to provide supervision to officers under their direct command and, as needed, to provide supervisory assistance to other units. |
|---|---|
| Compliance Target(s) | This Paragraph is assessed with Paragraph 136. |

The Monitor's Office requested that PRPB provide documentation to demonstrate that one supervisor oversees no more than 10 individuals. However, the Monitor's Office has yet to receive clear evidence that this is the case. Once an automated system is in effect, it should be easy for PRPB to generate data from the 13 areas that show each supervisor and assigned subordinates. To demonstrate compliance, the Monitor's Office requests that this information be provided in preparation for the next monitoring report. PRPB needs to improve its data systems so it can provide the Monitor's Office with the requested data in a more efficient manner.

| Paragraph 138 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | PRPB shall develop a program to ensure consistent field supervision when assigned supervisors are absent or otherwise unavailable for their tour of duty. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 136. | |

Site visits prior to the COVID-19 Pandemic, the Monitor's Office observed supervisors being brought from other precincts to fill personnel gaps. PRPB should develop a more complete information management system utilizing the CRONOS and SITA systems. As noted above, an automated system is effective for the patrol division. It should be simple for PRPB to generate data from the 13 areas that show each supervisor and his or her assigned subordinates. According to the assessment of the paragraphs addressing information technology, the CRONOS and SITA systems are not yet completely available to check the span of control. Furthermore, the Monitor's Office has not received any additional information about compliance with this paragraph.

| Paragraph 139 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| Paragraph Language | Precinct and unit commanders shall closely and effectively supervise the officers under their command. | |

CMR-4 | July 21, 2021

| Compliance Target(s) | This Paragraph will be assessed with Paragraph 136. |
|---|---|

As observed in previous site visits and noted in previous monitoring reports, PRPB's methods of supervision vary by supervisor; this is not an uncommon finding when examining the practices of other police agencies across the country. As noted in previous CMRs, further supervisory training on mentoring and career development should be implemented by PRPB. Recently, the Monitoring Team conducted a survey of supervisors being evaluated by their personnel to assist them in becoming better supervisors. Due to the COVID-19 travel restrictions and the Monitor's inability to conduct extensive interviews and site visits, the rating for this paragraph has been determined to be partial. Despite these restrictions, the Monitor's office was able to conduct a few interviews of PRPB supervisors. In April interviews with PRPB personnel showed that in most cases agents were satisfied with their supervisors.

| Paragraph 140 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | All PRPB commanders and supervisors shall ensure that all supervisors and officers under their command comply with PRPB policy, Commonwealth of Puerto Rico and federal law, and the requirements of this Agreement. | |
| Compliance Target(s) | This Paragraph will be assessed with Paragraph 136. | |

Supervisors should help prepare their subordinates for possible promotion and additional responsibility. Commanders and supervisors have greater responsibilities based on their positions, specifically to ensure that officers under their command comply with Bureau policy and law. Further interviews with supervisors and their personnel need to be conducted by the Monitor's Office. The Monitoring Team was unable to conduct these interviews during this reporting period due to the COVID-19 pandemic.

## 3. Supervisor Training

A review of supervisor training indicates delivery of generally accepted policing practices of leadership and management.

| Paragraph 141 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Substantially Compliant |
| Paragraph Language | Each supervisor shall receive mandatory management, supervisory, leadership, and command accountability training, tailored to each level of supervision and command, of no fewer than 40 hours in duration, prior to assuming supervisory responsibilities. Each supervisor shall receive no fewer than 40 hours of in-service training annually thereafter. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Policies incorporate all the requirements of Paragraphs 141-143. | Y |
| | 2. Supervisor trainings are consistent with Paragraphs 141-143. | Y |
| | 3. 95% of sampled supervisors are trained and certified in supervision requirements, or are scheduled for training, in the case of mid-year reviews. With respect to Paragraph 142, 100% of PRPB personnel serving as supervisors on or before July 17, 2013, were trained and certified in supervision requirements by October 8, 2018. | Y |

The Monitor performed a content analysis of policies related to supervisor training and verified that the training materials currently employed by PRPB are consistent with policy and generally accepted policing practices. All current PRPB supervisors sampled have received the supervisor training developed pursuant to the Agreement. Due to travel restrictions, the Monitor's Office was only able to interview a small sample of supervisors for the CMR-4 reporting period. However, all interviewees confirmed that officers are not permitted to take on a new supervisory role until they have completed all required trainings and could be barred from their position if they failed to complete required trainings. Supervisors also noted that training for a supervisory position is delayed only in the circumstance that budget constraints do not allow an officer to take on a new supervisory position for which they have been designated. Under those circumstances, the officer must wait until the supervisory position is funded, and then begin taking the training required for that position. Additional interviews will be conducted to verify that the policies and training previously conducted are implemented accordingly.

| Paragraph 142 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | One-Time Compliance | Substantially Compliant |
| Paragraph Language | All current PRPD supervisors shall receive the supervisor training developed pursuant to this Agreement within 18 months after it is developed and first implemented. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 141. | |

CMR-4 | July 21, 2021

All current PRPB supervisors have received the supervisor training developed pursuant to this Agreement or they are barred from their position. There has been a continuous policy for several years that ensures Supervisors will be barred from their positions until after training. The Monitoring Team reviewed the training records provided for this reporting period and verified substantial compliance.

| Paragraph 143 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Partially Compliant |
| **Paragraph Language** | The supervisory training program shall include, but not be limited to, instruction in the following topics: a) techniques for effectively guiding and directing officers and promoting effective and ethical police practices; b) de-escalating conflict; c) evaluation of written reports; d) investigating officer uses of force; e) responding to and investigating allegations of officer misconduct; f) risk assessment and risk management; g) evaluating officer performance; h) appropriate disciplinary sanctions and non-punitive corrective action; and i) using EIS to facilitate close and effective supervision. | |
| **Compliance Target(s)** | This Paragraph is assessed with Paragraph 141. | |

The Supervisor Training Program is not yet complete because supervisors cannot yet use EIS to facilitate close, effective supervision. According to PRPB, the EIS platform is not fully developed.

| Paragraph 144 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Partially Compliant |
| **Paragraph Language** | Officers appointed to the rank of Lieutenant Colonel, Colonel, commanding officer to a PRPD superintendency or unit, and any other supervisors must receive Equal Employment Opportunity ("EEO") training on PRPD's policies and federal and Commonwealth anti-discrimination laws. This training shall include protocols for supervisors to follow in the event they are made aware of complaints involving discrimination and/or harassment. The training shall also include instruction on PRPD policies prohibiting retaliation against any individual opposing the alleged discrimination or harassment and/or participating in a proceeding or investigation of discrimination or harassment. Supervisors receiving the EEO training shall be evaluated in part based on their knowledge and implementation of the policies, guidance, and laws covered in that training. | |
| **Compliance Target(s)** | **Compliance Target** | **Status** |
| | 1. Policies incorporate all the requirements of this Paragraph. | Y |
| | 2. Supervision trainings are consistent with approved policies. | Y |

| | |
|---|---|
| 3. 95% of sampled personnel are trained and certified in EEO and anti-discrimination laws, or are scheduled for training, in the case of mid-year reviews. | N |
| 4. Supervisor evaluations and SARP investigations indicate that supervisors are implementing policies and training on EEO and anti-discrimination laws in 95% of selected personnel files. | N |

Virtual training has been utilized to train officers appointed to the rank of Lieutenant Colonel, Colonel, and Commanding Officer to a PRPB Superintendency or units. Any other supervisors must receive training on Equal Employment Opportunity ("EEO"), PRPB policies, and federal and Commonwealth anti-discrimination laws.

The Monitor has found that PRPB is actively implementing EEO training for all commanding officers of the rank Colonel and above. The Monitor has further seen evidence that EEO training is being implemented virtually.

## 4. Performance Evaluation

As the Monitor's Office noted in CMR-2, the purpose of the PROMEDIA Project is to establish an effective evaluation system that allows a greater degree of uniformity and objectivity in establishing the criteria for measuring the performance of the members of PRPB in their functions.

| Paragraph 145 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| Paragraph Language | PRPB shall develop and implement a specific system to accurately evaluate the qualifications and performance of all PRPB officers in areas that include, but are not limited to, constitutional policing, integrity, community policing, and critical police functions on both an ongoing and annual basis. PRPB shall develop objective criteria to assess whether officers meet minimum qualifications and performance standards, including officers in inactive status, where appropriate. The evaluation system shall provide for appropriate remedial or disciplinary action. | |
| Compliance Target(s) | **Compliance Target** | **Status** |
| | 1. Policies incorporate all the requirements of Paragraphs 145-146. | Y |
| | 2. Training on performance evaluations is consistent with approved policies. | Y |
| | 3. 95% of sampled personnel files indicate that supervisors are trained and certified on policies regarding performance evaluations (or scheduled for training, in the case of mid-year reviews). | Y |
| | 4. 95% of sampled officers meet minimum qualifications and eligibility criteria. | Y |
| | 5. 95% of sampled performance evaluations adhere to approved policies. | N |

CMR-4 | July 21, 2021

Aside from data on select trainings, PRPB provided training records requested by the Monitor's Office for a random sample of PRPB personnel. The Monitoring Team has received information reference documentation of annual performance evaluations completed by PRPB supervisors. Performance reviews continue to be inflated and lack substantive feedback to supervisees. More evidence required demonstrating quality conversations between supervisors and supervisees as part of reviews. To obtain compliance, PRPB should develop an automated system to compile an automated list of all supervisors who have completed timely and accurate performance evaluations of their subordinates.

| Paragraph 146 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| **Paragraph Language** | As part of this system, PRPB shall establish a formalized system documenting annual performance evaluations of each officer by the officer's direct supervisor. PRPB shall hold supervisors accountable for completing timely, accurate, and complete performance evaluations of their subordinates. | |
| **Compliance Target(s)** | This Paragraph was assessed with Paragraph 145. | |

The Monitor's Office did receive sufficient information to demonstrate complete and accurate annual performance evaluations of PRPB supervisors. PRPB should develop an automated system to compile a list of all supervisors who have completed timely and accurate performance evaluations of their subordinates and provide samples to the Monitor's Office to improve the compliance rating with this paragraph. The performance evaluation system should continue to be developed and additional training provided in working with employee goals and objectives to strengthen the system.

## 5. Early Identification System

PRPB must develop an Early Identification System (EIS) that encompasses a range of clearly defined information and ensures that corrective action is based on appropriate evaluation, and not reserved for a mere accumulation of violations. Currently, the EIS platform is under development and is not available for use by supervisors. EIS is a critical component of risk assessment and management systems and should be a priority for PRPB.

PRPB can only be considered in compliance with Paragraphs 147-153 when EIS is developed to the point where 1) supervisors are readily and consistently able to access the system to enter and retrieve all datapoints required by the Agreement and PRPB

policy, and 2) PRPB leadership and third-party overseers are able to conduct data analysis of policing practices and outcomes using the EIS system. During the given reporting period, PRPB was not able to demonstrate that the EIS system has been developed and implemented and, as such, is not in compliance.

PRPB must ensure that EIS provides a non-punitive, proactive method for identifying agents that may need training, counseling or other intervention before issues arise involving agent misconduct. The Special Master's Office is in the process of recommending an EIS system.

An EIS is usually computerized and commercially available. An EIS would track and flag agents based on common criteria such as:

- Citizen complaints (sustained or not). Number and nature of arrests.
- Use of force incidents.
- Policy violations such as tardy, AWOL.
- Previous administrative warnings and disciplinary actions.
- Number of vehicle pursuits.
- Workplace accidents and other agency specific criteria.

PRPB should continue to develop the platform so that supervisors can utilize the information from EIS data and records. This will mean that EIS can become an effective supervisory tool that addresses potentially problematic behavior in a timely and non-punitive manner.

| Paragraph 147 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | PRPB shall develop, implement, and maintain an early identification system ("EIS") to support the effective supervision and management of PRPB officers and employees, including the identification of and response to problematic behaviors as early as possible. PRPB shall regularly use EIS data to promote ethical and professional police practices; to manage risk and liability; and to evaluate the performance of PRPB employees across all ranks, units, shifts, commands, and organization components. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Policies incorporate all the requirements of Paragraphs 147-153. | Y |
| | 2. Training on EIS is consistent with approved policies. | Y |
| | 3. 95% of sampled supervisors and personnel administering EIS are trained and certified in EIS policies (or scheduled for training, in the case of mid-year reviews). | N |

| | |
|---|---|
| 4. EIS data and records demonstrate compliance with EIS policy for 95% of selected officers who trigger EIS and officers who do not trigger EIS. | N |
| 5. 95% of interviewed officers, supervisors, SARP personnel, and IT staff perceive EIS as an effective supervisory tool that addresses potential problematic behavior in a non-punitive manner. | N |
| 6. EIS is functioning as designed, equipment is in good working order, and information is secure in 95% of selected units. | N |

PRPB provided a certification that from October 1, 2020, to March 31, 2021, PRPB continued to develop the EIS system. Although the certification was provided, supporting documents demonstrating PRPB's efforts towards development of the EIS were not provided.

Although training and policy for EIS continues to be developed, the system itself remains in the developmental stage. While some modules are up and running, access to the system and use of the system remains inconsistent, with some supervisors during CMR-4 stating that they cannot access the information. Additional interviews will be conducted to validate the use of the EIS platform during the CMR-5 reporting period.

| **Paragraph 148** | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| **Paragraph Language** | The EIS shall include a computerized relational database which shall be used to collect, maintain, integrate, and retrieve detailed data department-wide and for each officer regarding: a) all uses of force; b) injuries to and deaths of persons in custody; c) all complaints and their dispositions; d) data compiled under the stop data collection mechanism; e) all criminal proceedings initiated, as well as all civil or administrative claims filed, that bear upon an officer's performance or fitness including, but not limited to, domestic violence and protective orders; f) all judicial proceedings involving domestic violence, protective orders, and any other judicial proceedings which may be related to an officer's performance; g) all instances in which PRPB is informed by a prosecuting authority that a declination to prosecute any crime was based, in whole or in part, upon concerns about the credibility of a PRPB employee or that a motion to suppress evidence was granted on the grounds of a constitutional violation by a PRPB employee; h) all disciplinary action taken against employees; i) all non-punitive corrective action required of employees; j) all awards and commendations received by employees; k) training history for each employee; and l) identifying information for each PRPB officer and employee and; m) demographic data for each civilian involved in a use of force or search and seizure incident sufficient to assess bias. | |
| **Compliance Target(s)** | This Paragraph is assessed with Paragraph 147. | |

As noted above, PRPB provided a certification from a PRPB supervisor attesting that from October 1, 2020, to March 31, 2021, PRPB continued to develop the EIS system.

In the EIS system, PRPB should include a computerized relational database, which shall be used to collect, maintain, integrate, and retrieve detailed data. The platform for the EIS system has not yet been developed, and supervisors cannot yet utilize the information available from an EIS system.

| Paragraph 149 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | PRPB shall establish a unit to develop, implement, and maintain the EIS with sufficient resources to facilitate data input and provide training and assistance to EIS users. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 147. | |

As noted above, PRPB provided a certification from a PRPB supervisor attesting that from October 1, 2020, to March 31, 2021, PRPB continued to develop the EIS system.

PRPB continues to develop a unit to implement and maintain the EIS with sufficient resources to facilitate data input and will provide training and assistance to EIS users. The policy and training continue to be developed by PRPB, but the curriculum has not been reviewed and approved by the Monitor's Office because the system has not been fully developed or implemented.

| Paragraph 150 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | PRPB shall maintain necessary equipment, in sufficient amount and in good working order, to permit appropriate personnel, including supervisors and commanders, ready and secure access to the EIS system to allow for timely input and review of EIS data. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 147. | |

As noted above, PRPB provided a certification from a PRPB supervisor attesting that from October 1, 2020, to March 31, 2021, PRPB continued to develop the EIS system.

As the paragraph states, PRPB should maintain necessary equipment, in sufficient amount and in good working order, to permit access to the EIS system, allowing for timely input

and review of EIS data. This would be for the use of appropriate personnel, including supervisors and commanders.

A memo dated April 6, 2020, CMR-3 stated that additional terminals have been distributed to help meet the requirements of Paragraph 150. However, PRPB remains non-compliant for the given report until it provides information verifying the computer locations and numbers.

| Paragraph 151 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | PRPB shall develop a protocol for using the EIS and information obtained from it. The protocol for using the EIS shall address data storage, data retrieval, reporting, data analysis, pattern identification, supervisory use, supervisory/departmental intervention, documentation and audits, access to the system, and confidentiality of personally identifiable information. The protocol shall also require unit supervisors to periodically review EIS data for officers under their command, including upon transfer between PRPB units or regions. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 147. | |

As noted above, PRPB provided a certification from a PRPB supervisor attesting that from October 1, 2020, to March 31, 2021, PRPB continues to develop the EIS system.

The EIS curriculum has not been fully developed or reviewed and approved by the Monitor's Office, and PRPB has not yet successfully implemented this protocol in practice. The Monitoring Team recommends implementation of paragraph requirements as soon as possible.

| Paragraph 152 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | PRPB shall maintain all personally identifiable information about officers and employees included in the EIS for at least five years following their separation from the agency. Information necessary for aggregate statistical analysis shall be maintained indefinitely in the EIS. On an ongoing basis, PRPB will enter information into the EIS in a timely, accurate, and complete manner, and shall maintain the data in a secure and confidential manner. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 147. | |

As noted above, PRPB provided a certification from a PRPB supervisor attesting that from October 1, 2020, to March 31, 2021, PRPB continues to develop the EIS system.

As the paragraph states, PRPB should maintain all personally identifiable information about officers and employees included in the EIS for at least five years following their separation from the agency. Information necessary for aggregate statistical analysis should be maintained indefinitely in the EIS. On an ongoing basis, PRPB will enter information into the EIS in a timely, accurate, and complete manner, and shall maintain the data in a secure and confidential manner. As the system is still in development, PRPB is not able to demonstrate compliance with this paragraph.

| Paragraph 153 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | Following the initial implementation of the EIS, and as experience and the availability of new technology may warrant, PRPB may propose to add, subtract, or modify data tables and fields, modify the list of documents scanned or electronically attached, and add, subtract, or modify standardized reports and queries. PRPB will submit all such proposals for review and approval as set forth in Paragraph 229. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 147. | |

As noted above, PRPB provided a certification from a PRPB supervisor attesting that from October 1, 2020, to March 31, 2021, PRPB continues to develop the EIS system.

According to this paragraph, PRPB may propose to add, subtract, or modify data cables and fields; modify the list of documents scanned or electronically attached; and add, subtract, or modify standardized reports. As of this reporting period, PRPB has not provided documentation to demonstrate the above.

## 6. Internal Audits and Interagency Feedback

An internal auditing process was signed by the Commissioner on April 21, 2020. PRPB is utilizing this tool to improve effectiveness and efficiency as an organization. A protocol was also signed by the Commissioner on May 1, 2020, for information exchange, but no reports have been released as to its effect with other agencies in the criminal justice system.

| Paragraph 154 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| Paragraph Language | As part of PRPB's continuous improvement efforts and to ensure compliance with this Agreement, PRPB shall establish an auditing system that identifies operational deficiencies, analyzes causal and contributing factors, and implements effective remedial action. To effectuate the system, PRPB shall develop and implement | |

| | auditing protocols that are based on generally accepted policing practices. The protocols shall provide the audited unit an opportunity to respond to preliminary findings and recommendations, as appropriate, to foster a culture of accountability and continuous improvement among all PRPB units and personnel. | |
|---|---|---|
| **Compliance Target(s)** | **Compliance Target** | **Status** |
| | 1. Policies incorporate all the requirements of Paragraphs 154-156. | Y |
| | 2. Training on internal audits and inspections are consistent with approved policies. | Y |
| | 3. 95% of sampled personnel are trained and certified on the auditing and inspections system (or scheduled for training, in the case of mid-year reviews). | Y |
| | 4. 95% of selected internal audits and inspections comply with policy. | Y |
| | 5. Internal audits and inspections are scheduled regularly for all PRPB units, locations, and personnel. | N |
| | 6. PRPB prepares an annual report that (a) includes the conclusions and recommendations of internal audits and inspections conducted for the covered period and (b) is reviewed by the Commissioner and unit commanders to guide corrective action, as appropriate. | N |

PRPB certified that inspections were conducted between October 1, 2020, and March 31, 2021, and the Monitor verified these inspections. PRPB should continue to develop an automated auditing system that would identify operational deficiencies, analyze contributing factors, and implement effective remedial action. Auditing protocols should be based on generally accepted policing practices and cover all PRPB units and command areas. This would also include referrals to SARP of agents and supervisors. The Monitor's Office recommends that more audits be conducted throughout the island of Puerto Rico. Audits should help determine Unity of Command and Chain of Command, both of which are part of the Agreement.

It should be noted that inspections have been done of specialized tactical units (STUs) during the evaluation period of October 1, 2020, to March 31, 2021, in several locations such as Arecibo, Humacao, Fajardo, Caguas, Guayama, and Ponce. The Monitor's Office recommends audits be expanded to other areas besides specialized tactical units.

Protocols for paragraphs 154-156 are being utilized. PRPB is using the auditing system to identify operation deficiencies and their causes and contributing factors so that effective remedial action may be implemented. The Monitor's Office recommends that PRPB develop protocols that would ensure that existing policies and training be reviewed and revised in response to any systemic problems discovered during an audit. The Bureau should also continue to develop protocols based on generally accepted policing practices. This will help foster a culture of accountability and continuous improvement among all PRPB units and personnel.

CMR-4 | July 21, 2021

| Paragraph 155 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Partially Compliant |
| Paragraph Language | PRPD shall develop a protocol for conducting operational audits related to the material terms of this Agreement. The protocol shall establish a regular and fixed schedule to ensure that such audits occur with sufficient frequency and cover all PRPD units and Command Areas. Audits shall assess, where appropriate, operational consistency among similar units throughout PRPD to ensure that all geographic areas are provided with appropriate levels of service delivery. PRPD shall summarize in an annual report the conclusions and recommendations of audits conducted during the time period covered by the report. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 154. | |

PRPB has developed a protocol for conducting operational audits related to the material terms of the Agreement. This protocol directs PRPB to assess operational consistency among units throughout the bureau where appropriate, and to summarize the conclusions and recommendations of audits conducted during the period in an annual report. However, PRPB has not been proactive in ensuring that the results of all integrity audits are shared with the Monitor's Office. Audits tend to be provided in a piecemeal manner and without a clear structure for presenting analysis and findings. Furthermore, per the comments above, the audits that have been provided to the Monitor's Office focus primarily on STUs, whereas they should cover a wider variety of units.

PRPB should continue to provide information to the Monitoring Team regarding results of all audits. Furthermore, the Monitor's Office recommends that PRPB should publish the results of audits conducted during the designated period. This will help other areas to prepare for their audit and make use of the data that comes from other previous audits. This information will help other supervisors review management, supervisory, and other practices to ensure they follow PRPB policies and goals.

| Paragraph 156 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Deferred |
| Paragraph Language | PRPB auditors shall issue a report to the Superintendent on the result of each audit. The Superintendent will review each audit for appropriate policy, disciplinary, and/or non-punitive corrective action. The commander of each precinct or specialized unit shall review all audit reports regarding employees under their command and, if appropriate, shall take non- punitive corrective action or disciplinary action. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 154. | |

CMR-4 | July 21, 2021

The Monitor's Office has received information from PRPB indicating that reports have been sent to the Commissioner and that audits are being conducted. However, the Monitor's Office has not received confirmation that the Commissioner has reviewed the reports and taken any actions based on their findings. A signature from the Commissioner served as the only evidence that the Commissioner had read the report.

The Monitor's Office hopes that the Commissioner will review each audit for appropriate policy, disciplinary, or non-punitive corrective action. The Monitor's Office also hopes to see that the Commander of each precinct and specialized unit will also review all audit reports regarding employees under their command. A formal system should be developed whereby the Commissioner and key Commanders produce memos or other evidence that they have thoroughly read relevant audits and have developed strategies and corrective actions based on the results of those audits. The Monitor's Office must be able to review the final results of audits that were conducted, and memos outlining the specific actions taken by the Commissioner and involved Commanders. This system could ensure that Commanders review any audit involving any personnel under their command.

| Paragraph 157 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | PRPB shall develop and implement a plan for organizing and executing regular, targeted, and random integrity audits. The integrity audits will be used to identify and investigate officers engaging in misconduct including, but not limited to, unlawful stops, searches, seizures (including false arrests), excessive uses of force, potential criminal behavior, racial or ethnic profiling, and bias against lesbian, gay, bisexual, and transgendered persons, or any other form of misconduct. These operations shall also seek to identify officers who discourage the filing of a complaint, fail to report misconduct or complaints, or otherwise undermine PRPB's integrity and accountability systems. SPR shall have the oversight responsibility within PRPB for these operations. SPR shall use relevant EIS data and other relevant information in selecting targets for integrity audits. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Policies incorporate all the requirements of this Paragraph. | N |
| | 2. Training on integrity audits is consistent with approved policies. | N |
| | 3. 95% of sampled personnel are trained and certified on integrity audits (or scheduled for training, in the case of mid-year reviews). | N |
| | 4. 95% of selected integrity audits are designed effectively and comply with approved policies. | N |
| | 5. EIS and other relevant information is considered when selecting targets for integrity audits in 95% of selected integrity audits. | N |

The Monitor's Office received no verifiable information from PRPB indicating there is a policy, curriculum, training, or implementation in reference to the personnel integrity

audits during the reporting period. PRPB has recently submitted a new policy, which will be evaluated during CMR-5.

| Paragraph 158 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Quarterly | Partially Compliant |
| Paragraph Language | PRPB shall establish an executive-level liaison committee consisting of high-level command officers of PRPB who communicate, on at least a quarterly basis, with representatives of federal and local criminal justice components in all regions in Puerto Rico, including judicial courts, prosecutors, the University College, and municipal police departments. The committee shall seek mutual feedback and information on improving Puerto Rico's criminal justice system, including performance issues or concerns related to PRPB, its officers, employees, or units. All PRPB high-level commanders who participate in the executive-level liaison committee shall ensure that all allegations of misconduct or potential criminal activity are referred to SPR and/or PRDOJ for investigation, as appropriate. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Agreements and protocols incorporate all the requirements of this Paragraph. | Y |
| | 2. PRPB solicits feedback and shares information with criminal justice components and refers allegations of misconduct or potential criminal activity it obtains from such components to SARP for investigation. | Y |

The Monitor's Office has not been provided adequate information about the Commissioner receiving any minutes from police area meetings establishing contact with other parts of the criminal justice system.

Although a protocol has been developed, other criminal justice agencies in Puerto Rico have not responded to or ratified the protocols developed by PRPB. PRPB should develop an automated system to obtain copies, agreements, and protocols related to criminal justice committees and verify that these materials incorporate all requirements of this paragraph to improve compliance with this paragraph.

## VII. Civilian Complaints, Internal Investigations, and Discipline

PRPB was asked for a statistically valid sample of work in the arena of internal investigations. All cases were digitally uploaded for the Monitor's remote review and 45 cases were desk reviewed in San Juan. Overall, the casework by SARP and IA investigators was like that noted in previous reports with a few noteworthy advances.

The persistent question asked by the Monitor concerning the training in interviewing techniques received by SARP investigators seems to have been answered during the thirty-two interviews conducted on the ground in San Juan during the Monitor's April visit. Many in these interviews described how lawyers and prosecutors were among those who delivered the training, which may explain why many of the SARP interviews are conducted in a manner much akin to that of a deposition or courtroom examination of a live witness. Generally, trial practitioners are reluctant to ask questions of witnesses unless they are confident in the answer they will receive. Conversely, in any investigative matter, there should be no reluctance whatsoever to ask any questions at all.

A SARP interview, or any interview of potential misfeasance, malfeasance, or nonfeasance, for that matter, is not a limited inquiry such as a criminal or even a civil trial. Therefore, the interview should contain many open-ended questions, which are designed to open new and previously unknown avenues of inquiry, each of which should then be followed up exhaustively. Open-ended questions are designed to keep the subject honest and off-guard to get at the truth of the matter. All questions should remain on the table, especially those of probative or confirmative value or those that might generate additional leads previously unknown to investigators. While the Monitor did see some incremental improvement in some of these interviews, it simply is not enough to show substantive progress.

The Monitor recommends retraining of all SARP criminal and administrative workforce with at least 16 hours of interview training conducted by a recognized interviewing specialist, perhaps from the Federal Bureau of Investigation. This training should be highly practical and contain actual role players. Theory of non-verbal cues should be mentioned at the outset and later demonstrated during role play. The Monitor furthermore recommends that REA114's curricula be changed to allow for more focus on the practical art of interviewing persons and less time spent on theory. The Monitor is ready to lend PRPB his expertise in building interviewing capacity as well as pedagogy moving forward and where time allows.

Along the lines of interviews conducted, the Monitor questions the universal practice of taking notes, reducing those notes to writing and then having the writing ascribed to by the subject. The Monitor strongly recommends that each interview be recorded digitally in its entirety, physically transcribed, and then signed by both the interviewee and the interviewer, as is the norm in modern internal policing. Given that the Commonwealth is a two-party jurisdiction, which means that both parties to a conversation (or interview) must consent to such a recording, each subject will have to consent to such recording. During his out brief with the new SARP Commander, the Monitor was informed that a

written protocol for such practice was being contemplated. The Monitor strongly encourages PRPB to complete and forward such protocol as quickly as possible to the Monitor for review. If necessary, SARP written policy must specifically reflect the compulsory nature of recording police witnesses and subjects. All non-sworn witnesses should be strongly encouraged to consent to the recording of their interviews.

There were only a handful of cases where a police subject or police witness was handed an interview form or "hoja de entrevista" and asked to fill out what amounts to a narrative, subjective statement. In most cases, no warnings concerning lack of veracity and completeness are attached to this statement, as are *de riguer* with the normal in-person question and answer interviews. Curiously, these types of "hoja de entrevista" interviews are nearly exclusively conducted when an anonymous whistleblower reports wrongdoing, often of both an administrative and possibly criminal nature, by either a higher-ranking officer or those working under their direct supervision. This practice must cease forthwith. All subjects should be called in, interviewed after having been given the appropriate warnings, and questioned extensively about any case irrespective of how the complaint was received or who the subject of the investigation might be.

| Paragraph 159 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| Paragraph Language | PRPD shall ensure that all allegations of officer misconduct are received and are fully and fairly investigated; that all investigative findings are supported by a preponderance of the evidence; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair and consistent. PRPD shall develop policies and practices for the intake, investigation, and adjudication of misconduct complaints against PRPD officers. These policies and practices shall comply with applicable law and comport with generally accepted policing practices, and shall include the requirements set out below. | |
| Compliance Target(s) | Compliance is determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 160-204, and (2) the results of outcome assessments, pursuant to Paragraph 243. | |

Previously recommended steps have not been taken regarding the preservation of confidentiality of criminal investigations into PRPB personnel. Specifically, all the criminal investigators interviewed indicated that their offices, from which they are to conduct their investigations, interviews, interrogations, etc. are each located within regular PRPB police stations. In effect, this means that civilians or police personnel who wish to allege a crime committed by a member of PRPB must go to a police station, perhaps even the one where the accused officer works, and then make such a complaint. First, it should go without saying that any officer could take note of exactly who is entering the IA office and

thereby prejudice what ought to be the highly confidential nature of such a complaint. Secondly, the resulting high probability for the disclosure of sensitive information concerning the identity of a complainant, subject, or witness to alleged criminal activity committed by a PRPB member would certainly cast a pall over any IA investigation. IA investigators cited this lack of confidentiality as creating a nearly insurmountable disincentive to the public, or for that matter – fellow officers – in reporting possible criminal conduct committed by PRPB officers. This fatal defect is contrary to acceptable practice in modern American self-policing. Accordingly, and until such time as PRPB creates off-site locations for IA to both receive complaints and conduct their investigations surreptitiously across the island, PRPB will not be compliant with the respective provisions of the Agreement.

The Monitor also noted through his interviews that IA investigators, numbering approximately 20–25 across the island, lack essential tools such as surveillance equipment and undercover vehicles with which to perform the vital task of surreptitiously monitoring and recording the alleged criminal activities of PRPB officers. These are significant impediments to conducting some of the most sensitive, clandestine, and high-priority investigations performed by PRPB. Their level of resources should reflect the critical nature of their mission.

At a staffing level of 20 to 25 investigators - a small number of internal criminal investigators for a department of 12,000 men and women is intrinsically insufficient. One might imagine that this paltry number of investigators might be able to handle the number of investigations that people report presently, given the clear lack of confidentiality noted above. However, if IA offices are moved away from police facilities as PRPB was instructed during the capacity-building phase of the Agreement, then one could imagine far greater public confidence in raising a criminal allegation against a police official. A greater level of confidence would logically result in an increased number of allegations of criminal activity by PRPB members. 25 investigators would be hard pressed to keep up with the expected level of criminal allegations against police officers in an agency consisting of 12,000 sworn men and women.

It bears mentioning that problem of confidentiality of interviews is not just limited to the criminal side, it is also highly problematic along the administrative side. During interviews, the Monitor heard multiple accounts of administrative interviews being conducted with an utter lack of privacy and confidentiality, owing to the lack of private interview space available to the administrative investigator. This lack of confidentiality can only undermine the ability to conduct an effective and confidential investigation. To reach substantial compliance, PRPB must ensure that all administrative investigators have

access to private facilities to conduct their interviews in private and out of the purview of others.

## 1. Civilian Complaints

PRPB has a well-established mechanism for soliciting and intaking complaints from identified and unidentified complainants. While the Monitor found that protocols and training are in tenor with the Agreement, field inspections indicated areas for improvement of implementation. In the future, the Monitor will make additional field inspections to test for corrective actions.

| Paragraph 160 | Assessment Frequency | | Overall Compliance Status |
|---|---|---|---|
| | Annually as to Data Sources #1 and #2. Bi-Annually as to all other Data Sources. | | Substantially Compliant |
| Paragraph Language | PRPD will develop and implement a program to inform persons that they may make complaints regarding the performance of any officer. | | |
| Compliance Target(s) | Compliance Target | | Status |
| | 1. Policies incorporate all of the requirements of Paragraphs 160-162. | | Y |
| | 2. Civilian complaint program trainings are consistent with approved policies. | | Y |
| | 3. 95% of sampled press, office and SARP personnel are trained and certified in all policies related to the civilian complaint program (or scheduled for training, in the case of mid-year reviews). | | Y |
| | 4. PRPB has developed and implements a program to inform persons that they may make complaints regarding the performance of any officer. | | Y |

PRPB policy concerning the public's ability to register an administrative complaint appears to remain unchanged and substantially complies with the Agreement. The Monitor will revisit this assessment during future interviews and site visits, which unfortunately could not be conducted given the time and travel constraints owing to the COVID19 pandemic. However, based on the observations of the complaints themselves, the Monitor is satisfied with the effectiveness of the preliminary work conducted by those key persons within the PRPB who are responsible for public outreach and awareness campaign regarding the public's ability to make a complaint against a PRPB member in any variety of ways. The Monitor has observed complaints submitted through a variety of channels, including those made in person, via mail, the PRPB website and email from both known and anonymous complainants.

| Paragraph 161 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| Paragraph Language | Pre-printed complaint forms shall not include any language that can be construed as discouraging civilians from submitting complaints, including warnings regarding potential criminal prosecution for false or untrue complaints. PRPD shall require all officers to carry complaint forms in their official vehicles at all times or on their person, if feasible. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | Content of complaint forms is consistent with civilian complaint program policies. | N |

In addition to the findings expressed above. Monitor finds that the language contained in forms 311.1, 311.2 and 311.3 contain no language that would tend to discourage a person from submitting a complaint. However, the Monitor's field inspection uncovered several instances where PRPB officers were not carrying PRPB Form 311.1 with them on patrol. Officers must keep a copy of 311.1 with them while on patrol.

| Paragraph 162 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually as to Data Sources #1 and #3. Bi-Annually as to all other Data Sources. | Partially Compliant |
| Paragraph Language | PRPD shall make complaint forms and informational materials, including brochures and posters, available at all police facilities and on the PRPD website. Information shall be posted in Spanish and English. PRPD shall post and maintain a permanent placard describing the external complaint process at appropriate government buildings where public services are provided. The placard shall include relevant contact information, such as telephone numbers, email addresses, and websites. PRPD shall also post and maintain a placard explaining an individual's right to be free from involuntary searches and seizures and thus to decline consent to voluntary searches. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Content of complaint forms and informational materials is consistent with civilian complaint program policies. | Y |
| | 2. The PRPB website and 95% of PRPB facilities and patrol vehicles have required civilian complaint materials. | N |
| | 3. Placards as described in Par. 162 are displayed in 95% of all PRPD and DPS buildings, plus eleven regional judicial centers across the Island. | N |

The Monitor's inspections – both physical and digital - were largely positive, however the Monitor uncovered several locations where instructional/informational signage was either lacking or not displayed in a manner that would be easily visible to members of the public. These instances were pointed out to PRPB supervisors and will be checked in future visits to ensure that corrections were made.

## 2. Internal Investigations

PRPB has an elaborate Code of Conduct, a progressive disciplinary system, and corresponding processes for the reporting, registration, investigation, and adjudication of an array of internal misconduct complaints of both a criminal and administrative nature. The Monitor requested a random sample of administrative investigation cases, both open and closed for the reporting period and received and reviewed same. Each file contained original documentation that proved to the Monitor's satisfaction that complaints were received in the field, entered to EIS within the obligatory period, and assigned in due course pursuant to the Agreement. Due to time constraints upon visits, which were already aggravated by the COVID-19 pandemic, the Monitor was unable to review remote documentation at various PRPB installations. The Monitor reserves the right to revise his findings based upon future site visits, where time allows.

| Paragraph 163 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually as to Data Sources #1 and #2. Bi-Annually as to all other Data Sources. | Substantially Compliant |
| Paragraph Language | PRPD shall require that all officers and employees report misconduct, including apparent, alleged, or perceived misconduct, by another PRPD officer or employee to a supervisor or directly to SPR for review and investigation. Where apparent misconduct is reported to a supervisor, the supervisor shall immediately document and report this information to SPR. Failure to report or document apparent or alleged misconduct or criminal behavior shall be grounds for discipline, up to and including termination of employment. The presumptive discipline for a failure to report apparent or alleged misconduct or criminal behavior shall be commensurate to the presumptive discipline for the underlying apparent or alleged conduct not reported. | |
| Compliance Target(s) | **Compliance Target** | **Status** |
| | 1. Policies incorporate all the requirements of the paragraph. | Y |
| | 2. Training on internal reporting of misconduct and investigations is consistent with approved policies. | Y |
| | 3. 95% of sampled personnel are trained and certified in relevant policies related to reporting and internal investigations (or scheduled for training, in the case of mid-year reviews). | Y |
| | 4. All reports of alleged or perceived misconduct are reviewed and investigated, as appropriate, by supervisors or SARP. | Y |

In the Monitor's review of the response provided by PRPB, we find no evidence that PRPB is failing to report misconduct either 1) via the supervisory chain of command, which then is incorporated into a formal SARP complaint, or 2) via a SARP complaint itself. This assessment is based upon a review of actual SARP investigations only. Current protocol and practice may deter in-person reporting of criminal or administrative wrongdoing by

PRPB personnel to some degree. Nevertheless, protocol provides any potential complainant with other options to pursue a complaint without having to present themselves to a PRPB installation, e.g., via website, email, or standard mail. The Monitor has reviewed multiple investigations that were initiated by complaints submitted through these channels by both named and anonymous individuals.

While the COVID-19 pandemic has effectively constricted Monitor's time and ability to perform site visits at remote commands to ensure that misconduct of a PRPB member is documented onsite at the supervisory level and then incorporated into the appropriate SARP complaint form, the Monitor is aware that every administrative complaint reviewed, whether internally or externally generated, is logged within EIS, and given a unique file designator. To be more certain that every PRPB Form 311.1 is accounted for, the Monitor recommends that each blank Form 311.1 be given a unique identification number and be kept in a supervisory log. This impedes the possibility of this form being intentionally diverted or otherwise destroyed without supervisory knowledge. The Monitor reserves the right to revisit this assessment during future site inspections.

| Paragraph 164 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually as to Data Sources #1 and #2. Bi-Annually as to all other Data Sources. | Deferred |
| Paragraph Language | PRPD shall develop protocols requiring supervisors to investigate and take appropriate disciplinary or non-punitive corrective action when the supervisor becomes aware of minor misconduct or policy infractions by an officer that do not merit an SPR notification. The incident of misconduct and the supervisor's response shall be reported to SPR within five business days for SPR's review. Where the officer disputes the misconduct allegation, the allegation shall be referred to SPR for investigation. | |
| Compliance Target(s) | **Compliance Target** | **Status** |
| | 1. Policies incorporate all the requirements of Paragraphs 164 and 165. | Y |
| | 2. Training on supervisory review of minor policy violations is consistent with approved policies. | Y |
| | 3. 95% of sampled supervisors are trained and certified in policies related to supervisory review of minor policy violations (or scheduled for training, in the case of mid-year reviews). | Y |
| | 4. 95% of selected supervisory reviews and responses comply with approved policies. | N/A |
| | 5. 95% of selected supervisory reviews and investigations are reviewed and evaluated by unit commanders and the commanders identify needs, as appropriate, in accordance with Paragraphs 164 and 165. | N/A |
| | 6. 95% of selected supervisory reviews and investigations are sent to SARP and assessed according to approved policies. | N/A |

The Monitor's review of a randomly selected sample of SARP cases demonstrates that PRPB supervisors have documented SARP complaints within the established and approved rule. For reasons previously set forth, the Monitor was unable to review unit-level administrative investigations or non-punitive disciplinary procedures completed by supervisors outside of SARP where the officer involved did not dispute the accusation, as those records are kept at the area commands. The Monitor will revisit this assessment during future site inspections.

| Paragraph 165 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually as to Data Sources #1 and #2. Bi-Annually as to all other Data Sources. | Substantially Compliant |
| Paragraph Language | The results of unit investigations, be they minor misconduct allegations, policy infractions, or SPR referrals, shall each be referred to and evaluated by unit commanders for underlying problems including supervisory, training, or other deficiencies. Unit evaluations shall be sent to SPR for further assessment of trends and potential deficiencies in tactics or training, among other considerations. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 164. | |

Every SARP Unit investigation in the sample had been signed off on by the SARP supervisor, however the form used to document this review and approval process lacks the date of the review. The Monitor recommends that this form, which indicates whether the immediate SARP supervisor has reviewed the investigation and either concurs or disagrees with its findings, should contain the date upon which it was signed. It bears mentioning that the near-perfect consensus of the supervisor with the investigator is not a cause for concern, as multiple interviews with SARP investigators revealed an informal system of ongoing feedback to SARP investigators prior to their reports being formally submitted for review. By the time that this occurs, the SARP supervisor is, by and large, aware of the facts, circumstances, and findings of any given investigation.

## 3. Complaint Intake, Classification, Assignment, and Tracking

By and large, PRPB complied with requirements of complaint intake, classification, assignment, and tracking. There were a few red flags, especially concerning internally generated, anonymous whistleblower complaints of both criminal and administrative misconduct, which were clearly not taken seriously by PRPB. The Monitor also became aware of an isolated situation where the area SARP commander may have been compromised. The onus is on PRPB to look further into this matter to ensure the integrity

CMR-4 | July 21, 2021

of each investigation. The Monitor will follow this command closely to help ensure that PRPB, as a whole, becomes substantially compliant.

| Paragraph 166 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually as to Data Sources #1 and #2. Bi-Annually as to all other Data Sources. | Substantially Compliant |
| Paragraph Language | PRPD shall train all officers in how to properly handle complaint intake. | |
| Compliance Target(s) | Compliance Target | Status |
| | 1. Policies incorporate all the requirements of Paragraphs 166-176. | Y |
| | 2. Complaint intake, classification, assignment, and tracking trainings are consistent with approved policies. | Y |
| | 3. 95% of sampled officers are trained and certified in relevant policies related to complaint intake, classification, assignment, and tracking (or scheduled for training, in the case of mid-year reviews). | Y |

PRPB's policy regarding intake of complaint has not changed, and investigators are properly trained on these policies. Based on the Monitor's review of the investigations included in the data sample, complaint intake, classification, assignment, and tracking all comply with approved policies.

| Paragraph 167 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually as to Data Sources #1 and #2. Bi-Annually as to all other Data Sources. | Partially Compliant |
| Paragraph Language | The refusal to accept a misconduct complaint, discouraging the filing of a misconduct complaint, or providing false or misleading information about filing a misconduct complaint, shall be grounds for discipline. | |
| Compliance Target(s) | Compliance Target | Status |
| | Policies and trainings is assessed as part of Paragraph 166. | Y |
| | Implementation is assessed with Paragraphs 177 (Data Source #4), 198 and 199. | N |

The Monitor's desk review of case files selected at random raised no red flags regarding obstruction or interference. Indeed, most of the interviewees believed no one within their immediate chain of command impeded, hindered, interfered with, or obstructed their investigations. A substantial number of interviewees indicated that they are unaware if their findings had been changed once they were received at SARP, the Office of Legal Affairs or the Commissioner's Office. The Monitor's case review did reveal case findings changed at these levels of authority. Therefore, in the interest of transparency, accountability and preventing the appearance of impropriety, the Monitor recommends

that the investigator be advised for the rationale for such a change and that the case file contain a brief explanation as for why the original finding was changed.

While 30 interviewees indicated that they had no knowledge of supervisory meddling or interference in their cases, two of these internal administrative investigators raised an independently corroborated description of this activity. These interviewees, both from Fajardo, related that their shared immediate supervisor has on occasion interfered in their investigations in favor of implicated PRPB members. This supervisor told one investigator that she could do as she pleased, as she was well connected within the SARP hierarchy as well as with top PRPB leadership. If we take these two investigators' accounts at face value, there is nothing more deleterious to morale in an internal investigation setting than the shared perception of a supervisor protecting wrongdoers while claiming that she enjoys protective cover "from above."

To cite the gravest example of these alleged improprieties, one of the two investigators described a current administrative investigation filed in March, which alleged negligence by a front desk officer in Fajardo. The citizen complainant alleged that the front desk officer refused to accept a complaint involving her brother, who was allegedly assaulted and later died of these injuries. This is a grave allegation that implies perfidy and collusion. According to the police incident report, this man "fell" in a bar that was owned by a PRPB sergeant and this was the cause of these injuries. The man's sister (the complainant) however alleged that her brother was involved in a fight in that bar, was beaten severely, left in a paraplegic state and not long after died due to his extensive injuries. The complainant further alleges that a forensic examination shows that the man did not suffer his injuries from a fall, and likely was severely beaten. The front desk officer refused to take her complaint, which prompted the sister to file the PPRB Form 311.1.

According to the investigator assigned to the case, she was told by her SARP supervisor to interview the bar owner (a PRPB sergeant) as a *witness*, and not as a *subject* of the investigation. If evidence indicates that this man indeed died because of a beating in the sergeant's bar, the sergeant could possibly be implicated administratively, criminally, or *both*. Having an investigator treat this sergeant as a witness may open a Pandora's Box of unintended legal implications as well. If the sergeant were interviewed and implicated in any way, the Commonwealth would be effectively barred from using this statement, and perhaps anything derived from it, against the sergeant in a criminal proceeding. See Garrity v. New Jersey.

PRPB is left with a grave accusation of wrongdoing with a possible connection to a member, a complaint of battery leading to homicide, which it refused to receive, and the

implication of a SARP supervisor who may be actively involved in interfering with or undermining this and other internal investigations. The Monitor strongly recommends an in-depth review of all cases involving this supervisor by the Office of the Inspector General to establish if the case mentioned, or any other case whatsoever had been mishandled in any way by this supervisor. Any case where irregularities are noticed must be reinvestigated fully and handled transparently.

| Paragraph 168 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| Paragraph Language | PRPD shall accept all misconduct complaints, including anonymous and third- party complaints, for review and investigation. Complaints may be made in writing or verbally, in person or by mail, telephone (or TDD), facsimile, electronic mail, or any other appropriate electronic means. | |
| Compliance Target(s) | Compliance Target | Status |
| | PRPB accepts, reviews, and investigates complaints, as appropriate, in accordance with approved policies. | N |

There continues to be a level of variability with respect to the quality of PRPB internal investigations. One of the most problematic areas, as pointed out above, concerns that of anonymous whistleblower complaints. There are other examples of cases that indicate a suboptimal level of investigative quality or procedural handling, which would prevent the Monitor from assessing any compliance level beyond that of partial compliance. Some of these investigative shortcomings involve a lack of thorough questioning, not following up on leads, and the failure to consider prior history of officers with extensive records of having committed the very same offense.

While some procedural areas have been improved upon, there are other areas which call out for more transparency, most concerning the rationale for changing the finding either at the level of SARP Command, the Office of the Legal Advisor or that of the Commissioner's Office. To maintain the level of transparency needed to undermine any accusations of favoritism, influence, nepotism, etc., as well as appearance of any undue influence whatsoever, it is imperative that PRPB supply a reasoning for the change of these findings. Not all these changes benefit the accused officer. The Monitor has seen cases he views as properly investigated and classified as "exonerated" and later changed to "not sustained," without any reason or justification as to why. If conduct can show to have occurred and was appropriate based upon the preponderance of evidence, it should remain classified as an exoneration.

To its credit however, one noteworthy exception to this lack of transparency is contained within the findings of the informal PRPB "due process" hearings. In the cases reviewed

that ended up in this procedure, the Monitor often found written, well-reasoned findings for deviations from the original finding and corresponding sanction applied. In conclusion, it is clear from this evidence that PRPB has the institutional capacity to justify and document why changes to an investigator's decision were made. It ought to implement this practice across the board.

| Paragraph 169 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Substantially Compliant |
| Paragraph Language | PRPD will establish a protocol that provides procedures to be followed when an individual objects to an officer's conduct. The protocol shall provide that, absent exceptional circumstances, the officer will inform the individual of his or her right to make a complaint and shall provide the complaint form and the officer's name and identification number. If the individual indicates that he or she would like to make a complaint on the scene, the officer shall immediately inform his or her supervisor, who shall immediately respond to the scene and initiate the complaint process. In the absence of the officer's immediate supervisor, any supervisor may respond to the scene. All misconduct complaints received outside of SPR shall be forwarded to SPR before the end of the shift in which they were received. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Intake protocol was followed in 95% of sampled investigations. | Y |
| | 2. Intake protocol was followed in 95% of sampled complaints received by officers in the field. | Y |

In all cases involving a PR 311.1, the Monitor found that PRPB met the requirement for forwarding Form 311.1 to SARP within the timeframe established by the written policy. Furthermore, the data contained within the 311.1 is captured in a timely manner as provided within the Agreement (under 24 hours) and often in far less time. The Monitor continues to find examples in which the fields at the top of 311.1 were not filled out by SARP. This does not mean that the case was not captured immediately, it simply means that the person accepting the complaint just entered the data into the EIS database without filling out the top of the form. Even more puzzling, form 311.1 indicates that these fields are for SARP to fill out. In addition to the previous amendment recommended, the Monitor recommends that the form should be further amended to strike out the reference to SARP and simply ask for the police area where the complaint was received, the time and date it was received as well as the case number assigned by EIS at the top of the form. The rest of the form is well-designed in that it establishes who received the complaint and when as well as what supervisor reviewed it and when the review was conducted.

| Paragraph 170 | Assessment Frequency | Overall Compliance Status | |
|---|---|---|---|
| | Bi-annually | Substantially Compliant | |
| Paragraph Language | PRPD shall develop a system to ensure that allegations of officer misconduct made during criminal prosecutions or civil lawsuits are identified and assessed for further investigation. Any decision to decline an investigation shall be documented. | | |
| Compliance Target(s) | Compliance Target | | Status |
| | 1. PRPB has a system to identify and assess civil lawsuits and criminal proceedings filed involving allegations of officer misconduct. | | Y |
| | 2a. SARP reviews all allegations involving PRPB personnel to assess the need to investigation by PRPB. | | Y |
| | 2b. 95% of such SARP reviews are documented in accordance with approved policies. | | Y |

As mentioned in his previous report, PRPB has a system to identify and assess criminal prosecution or civil causes of action against its members. Reviews of these cases, as well as interviews of those responsible for tracking and inputting these cases were conducted and thus the Monitor is satisfied that this paragraph is being substantially complied with.

| Paragraph 171 | Assessment Frequency | Overall Compliance Status | |
|---|---|---|---|
| | Bi-annually | Substantially Compliant | |
| Paragraph Language | SPR shall maintain a centralized numbering and tracking system for all misconduct complaints. Upon the receipt of a complaint, SPR shall promptly assign a unique numerical identifier to the complaint, which shall be provided to the complainant as soon as practicable. | | |
| Compliance Target(s) | Compliance Target | | Status |
| | SARP administers a centralized numbering and tracking system for all misconduct complaints. | | Y |

The Monitor personally viewed and is satisfied with the internal investigative capture and tracking system components of PRPB EIS system. The Monitor has personally reviewed well over one hundred individual SARP case files, some of which are "not sustained" cases where the investigation can neither prove nor disprove that the complained of behavior occurred.  As expressed elsewhere in his report, the Monitor has not found one case where remarkably similar modus operandi in the past are considered to reach a level of preponderance of the evidence in favor of the accuser.

| Paragraph 172 | Assessment Frequency | Overall Compliance Status | |
|---|---|---|---|
| | Bi-annually | Substantially Compliant | |
| Paragraph Language | Where a supervisor receives a misconduct complaint in the field alleging that misconduct has occurred, other than those incidents covered by Paragraph 44 of this Agreement, the supervisor shall gather all relevant information and evidence | | |

| | and provide these to SPR. All complaints should be referred to SPR by the end of tour of duty, absent exceptional circumstances. | |
|---|---|---|
| **Compliance Target(s)** | **Compliance Target** | **Status** |
| | 1a. 95% of sampled complaints were forwarded to SARP by the end of the relevant tour of duty or articulated exceptional circumstances. | Y |
| | 1b. 95% of sampled complaints document what information and evidence is collected by the PRPB supervisor. | Y |

The data continues to show that PRPB captures administrative complaints within this timeframe. The Monitor notes that a desk review provides only insight into the evidence gathered by the supervisor and cannot be used to determine whether the supervisor successfully gathered *all* appropriate information and evidence. Except for supervisor-generated complaints, the supervisor is an interlocutor and not a witness. As such, the task of a supervisor is to document what information is relayed to and discovered by him or her. It is the task of the investigator to take that basic information and conduct a thorough investigation.

| **Paragraph 173** | **Assessment Frequency** | **Overall Compliance Status** |
|---|---|---|
| | Bi-annually | Substantially Compliant |
| **Paragraph Language** | Within five business days of the receipt of a misconduct complaint, SPR shall determine whether the complaint will be assigned to a supervisor for a Supervisory Investigation, retained by SPR for investigation, and whether it will be investigated criminally by PRPD, PRDOJ, or both. | |
| **Compliance Target(s)** | **Compliance Target** | **Status** |
| | 95% of sampled SARP investigation files are assigned for investigation in accordance with approved policies. | Y |

Based upon the analysis of the SARP cases provided to the Monitor, it appears that SARP complaints are being handled within the five-day rule, and often sooner than five days. The Monitor has found no cases in a complaint was sustained based on reports of similar actions in the past, whether in performance evaluations, EIS, or in past investigations. Though such reports may lend credence to the complaint that initiates an investigation, past actions alone are not considered sufficient to reach the level of a preponderance of evidence in favor of the sustaining the complaint.

| **Paragraph 174** | **Assessment Frequency** | **Overall Compliance Status** |
|---|---|---|
| | Bi-annually | Partially Compliant |
| **Paragraph Language** | PRPD shall develop a complaint classification protocol that is allegation-based rather than outcome-based to guide SPR in determining where a complaint should be assigned. | |
| | **Compliance Target** | **Status** |

CMR-4 | July 21, 2021

| Compliance Target(s) | SARP classifies complaints in accordance with policy. | N |
|---|---|---|

While the Monitor observed that PRPB adequately classifies (and for the most part - investigated) complaints from named and unnamed civilians with appropriate seriousness, the Monitor has grave concerns over PRPB's treatment of anonymous complaints of both administrative *and* criminal wrongdoing that obviously come from internal sources ("whistleblower complaints"). Not only were these whistleblower complaints inappropriately closed administratively with little if any investigation, but they were also misclassified as merely administrative in nature when clearly they could involve possible criminal activity as well. The Monitor found several examples of such cases that allegedly involved what could amount to the crime of fraud or larceny allegedly committed by members of PRPB. From the documentation provided, no Internal Affairs (criminal internal investigation) referral documentation was ever found within these files.[11]

| Paragraph 175 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Substantially Compliant |
| Paragraph Language | A misconduct complaint investigation may not be conducted by any supervisor who used force during the incident; whose conduct led to the injury to a person; who authorized the conduct that led to the reported incident or complaint; who was on the scene at the time of the incident leading to the allegation of misconduct; or by any officer or supervisor who has a conflict of interest as defined by PRPD policy. | |
| Compliance Target(s) | **Compliance Target** | **Status** |
| | All misconduct complaint investigations are conducted by persons not prohibited from doing so, as required by the Paragraph. | Y |

The Monitor's desk review found no complaints assigned to a person who had an apparent conflict of interest nor the appearance of any potential conflict. The interviews conducted with the two SARP investigators in Fajardo identified apparent interference of the SARP supervisor in cases in favor of PRPB officers, however no evidence to substantiate a conflict of interest as the motive for this alleged interference was uncovered by the Monitor.

---

[11] See cases 2020-01055, 2020-00512, and 2019-00915 in Appendix C.

| Paragraph 176 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Substantially Compliant |
| Paragraph Language | PRPD's centralized numbering and tracking system shall maintain accurate and reliable data regarding the number, nature, and status of all misconduct complaints, from initial intake to final disposition, including investigation timeliness and notification to the complainant of the interim status and final disposition of the investigation. This system shall be used for periodic assessment of compliance with PRPD policies and procedures and this Agreement. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | SARP's record management system maintains accurate and reliable data for operational and internal compliance purposes. | Y |

The Monitor's review of the SARP component of the EIS system provided the Monitor with a high degree of confidence that SARP cases were being tracked in number, nature, and status.

## 4. Investigation of Complaints

While the Monitor requested both open and completed cases, at the time of the Monitor's visit, only one case was still considered as open. This is hardly a surprise, given the 90-day general rule for completion of investigations. In terms of overall compliance with investigations, the Monitor concludes that some measure of progress has been made in internal investigations, there is still room for substantial improvement.

| Paragraph 177 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| Paragraph Language | PRPD shall ensure that policies and procedures regarding the investigation of complaints clearly establish that complaints are adjudicated on the basis of the preponderance of the evidence. This standard should be clearly delineated in policies and procedures and accompanied by extensive examples to ensure proper application by investigators. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Policies incorporate all the requirements of Paragraphs 177-193. | Y |
| | 2. Investigation of complaints trainings are consistent with approved policies. | N |
| | 3. 95% of sampled personnel are trained and certified in relevant policies related to investigation of complaints (or scheduled for training, in the case of mid-year reviews). | Y |
| | 4. 100% of sampled investigation files were adjudicated using a preponderance of the evidence standard. | N |

No changes have been made to PRPB policies and procedures, which establish that administrative complaints are to be adjudicated based on a preponderance of the

available evidence. The Monitor was supplied with a certification indicating that REA 114 has not been updated during the reporting period despite concerns previously raised in CMR3 and continuing in this present report. These concerns regard interviewing techniques as well as the weight of prior bad acts in close cases with similar modus operandi. Out of 32 investigators interviewed, not one investigator ever considered an accused officer's prior record of remarkably similar complaints in an otherwise closely decided "not sustained" case.

Lastly, there have been several new investigators transferred into SARP who have yet to receive their formative training in conducting administrative investigations.

| Paragraph 178 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| Paragraph Language | PRPD shall investigate all misconduct complaints and document the investigation and its findings and conclusions in writing. PRPD shall develop and implement a policy that specifies those complaints that may be resolved via administrative closing or informal resolution. Administrative closing shall be used for minor policy violations that do not constitute a pattern of misconduct, duplicate allegations, or allegations that even if true would not constitute misconduct, among others. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 95% of sampled complaints are investigated, documented, and resolved, and relevant PRPB personnel were so advised, in accordance with approved policies. | N |

As previously mentioned, concerning anonymous whistleblower complaints, the Monitor finds that several cases were improperly administratively closed after a merely superficial inquiry. All these cases had an element of possible criminality committed by the officers involved and therefore command a full administrative and possible criminal investigation regardless of how these accusations came to the attention of PRPB.

| Paragraph 179 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Substantially Compliant |
| Paragraph Language | PRPD shall ensure that all administrative investigations conducted by SPR shall be completed within 90 days of the receipt of the complaint, including assignment, investigation, review, and final approval. The SPR commander is authorized to grant additional 30 day extensions, for up to 90 additional days in the aggregate, for justifiable circumstances, which shall be documented in writing. For purposes of these extensions, workload shall not constitute justification for extensions. Where an allegation is sustained, PRPD shall have 30 days to determine and notify the officer of the appropriate discipline. The appropriate discipline shall be imposed as soon as practicable, consistent with PRPD's disciplinary procedures. All | |

| | administrative investigations shall be subject to appropriate tolling periods as necessary to conduct a parallel criminal investigation or as provided by law. | |
|---|---|---|
| **Compliance Target(s)** | **Compliance Target** | **Status** |
| | 1a. 95% of sampled investigations were adjudicated and notified within authorized timeframes in accordance with approved policies. | Y |
| | 1b. 95% of disciplinary actions were imposed within authorized timeframes in accordance with approved policies. | Y |
| | 2. 95% of SARP investigations that were not completed within prescribed timeframes have justified extension approvals as required by approved policies. | Y |

Nearly all the reviewed SARP files were completed within the 90-day window required by PRPB policy. Those that were not appropriately allowed extensions for legitimately explained circumstances.

| **Paragraph 180** | **Assessment Frequency** | **Overall Compliance Status** |
|---|---|---|
| | Bi-annually | Partially Compliant |
| **Paragraph Language** | PRPD shall ensure that investigations of officer misconduct are thorough and the findings are consistent with the facts. | |
| **Compliance Target(s)** | **Compliance Target** | **Status** |
| | 95% of selected investigations are thorough and findings are consistent with the facts. | N |

The Monitor hereby incorporates by reference all the previous comments made regarding anonymous whistleblower complaints, which raise serious allegations of misconduct. Overall, the Monitor finds that while many cases were well-investigated, others were lacking or reached conclusions incongruent with the facts established. Furthermore, the standard SARP interview practice has not changed. The SARP investigator asks the subject for a narrative declaration at the beginning of the interview, with some declarations more forthcoming than in others. In all interviews, the subjects are asked if they would like to make this declaration, it is then up to the individual to decide whether they wish to provide a narrative declaration followed by questions and answers, or only answer the questions posed by the investigator, as one would normally do in a civil deposition setting.

The questions and answers that follow this declaration are often leading in nature, not open-ended and therefore less likely to elicit the truth of a matter at issue. The Monitor reiterates his recommendation for a revamp of Course REA114 to include both content and pedagogy approved by the Federal Bureau of Investigation as they apply to proper interview technique. The Monitor's interviews with investigators revealed that REA114 was too long on theory and too short on practice. Time devoted to theoretical elements

should be reprogrammed in the interest of building true interviewing capacity and expertise.

| Paragraph 181 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| Paragraph Language | PRPD shall require officers to cooperate with administrative investigations, including appearing for an interview when requested by a PRPD or Commonwealth investigator and providing all requested documents and evidence. Supervisors shall be notified when an officer under their supervision is summoned as part of an administrative investigation and shall facilitate the officer's appearance, unless such notification would compromise the integrity of the investigation. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Officers cooperate and supervisors are notified about SARP summons, as required by approved policies, in 95% of selected investigations. | Y |
| | 2. SARP personnel indicate that the level of cooperation of officers and supervisors with SARP investigations is acceptable in accordance with generally accepted practices. | N |

The Monitor finds that the mechanism to compel an officer to appear and answer questions exists and functions. An officer who refuses to appear or answer questions is disciplined. That said, however, the Monitor is deeply troubled by the SARP reliance upon "hojas de entrevista." The Monitor finds these forms to be of little value and often submitted by the officer without any warning of consequences for untruthfulness. A written statement, standing on its own, is of little or no investigative value, and yet in some cases it is the only form of testimony supplied by an accused officer. Written declaratory statements may work as an investigative tool if they are both typewritten and legible.

However, in all events, a proper in-person and recorded interview must invariably follow the submission of a written declaratory statement. The Monitor strongly recommends that PRPB cease the practice of using "hojas de entrevista" exclusively as its interviewing methodology in any internal matter. Furthermore, the Monitor strongly recommends all witnesses be thoroughly questioned in a recorded setting (with the written consent of the interview subject) the recording transcribed and then sworn to by the subject or witness.

| Paragraph 182 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | The subject officer of an administrative investigation shall not be compelled to provide a statement to administrative investigators where there is a potential criminal investigation or prosecution of the officer until the remainder of the investigation has been completed, and after the administrative investigators have consulted with the prosecutor's office and the SPR commander, except where the taking of such a statement is authorized by the Superintendent after consulting with the prosecutor's office. | |
| Compliance Target(s) | **Compliance Target** | **Status** |
| | Compelled statements are taken in accordance with approved policies and officers' constitutional rights. | N |

According to all the interviews conducted, PRPB does not commence an administrative investigation into a member while he or she is under criminal investigation. This procedure nominally supports the ethical wall established in Garrity, which requires a strict separation of criminal and administrative investigations with regard to one's right not to self-incriminate but violates the stipulation of paragraph 184 that criminal and administrative investigations shall proceed simultaneously.

However, it was revealed that if an internal criminal investigation concludes without a trial, that same criminal investigator is often assigned to conduct the administrative investigation. Though Garrity does not require that separate investigators undertake the criminal and administrative investigations, practical application of Garrity within most jurisdictions creates separate and simultaneous investigative practices, which physically and organizationally divide the criminal and administrative internal investigators. For more insight into this practice, please refer to the discussion under paragraphs 182 and 185.

| Paragraph 183 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Substantially Compliant |
| Paragraph Language | Where there is no potential criminal investigation or prosecution of the subject officer, SPR investigators shall not warn the subject officer that he or she has a right not to provide a statement that may be self-incriminating. | |
| Compliance Target(s) | **Compliance Target** | **Status** |
| | Subject officers are not given Miranda warnings where there is no potential for criminal investigation or prosecution. | Y |

In the preamble to a SARP in-person interview where no possible criminal charges may be brought, the SARP investigator follows a set investigative protocol by delivering warning statements. These administrative investigative interviews follow the black letter

CMR-4 | July 21, 2021

law established in <u>Garrity</u>, wherein officers are not notified of any right not to provide a statement, as such a right does not exist in law.

| Paragraph 184 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |

| | | | |
|---|---|---|---|
| Paragraph Language | If at any time during complaint intake or investigation the investigator determines that there may have been criminal conduct on the part of any officer or employee, the investigator shall immediately notify the SPR commander. The SPR commander shall immediately notify the Superintendent and shall consult with the prosecutor's office regarding the initiation of a criminal investigation. Where an allegation is investigated criminally, SPR shall continue with the administrative investigation of the allegation, except that it may delay or decline to conduct an interview of the subject officer(s) or other witnesses until completion of the criminal investigation unless, after consultation with the prosecutor's office and PRPD Superintendent, such interviews are deemed appropriate. | | |
| Compliance Target(s) | **Compliance Target** | | **Status** |
| | 1a. Investigators notify SARP and SARP consults with prosecutors in accordance with approved policies when an investigator determines that there may have been criminal conduct on the part of any officer or employee. | | N |
| | 1b. Administrative investigations continue when a parallel criminal investigation is also ongoing in accordance with approved policies. | | N |

The Monitor discovered multiple instances of PRPB becoming aware of multiple accusations of potential crimes committed by PRPB members where there was no corresponding document in the file indicating that the SARP Commander or the Superintendent was ever notified.[12] Furthermore, the Monitor determined that PRPB is wrongly interpreting the paragraph by delaying administrative investigations until the conclusion of criminal investigations. The paragraph clearly states that criminal and administrative investigations should proceed simultaneously but makes an exception for interviews of the subject officer(s) or other witnesses until completion of the criminal investigation. Those key forms of evidence may be delayed or declined in keeping with the subject officer's right not to self-incriminate in a criminal investigation, as established by <u>Garrity</u>.

---

[12] See cases 2019-00915, 2019-01365,  2020-01055,  2020-00760, and 2020-00512 in Appendix C.

CMR-4 | July 21, 2021

| Paragraph 185 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | PRPD, PRDOJ, and the prosecutor's office shall develop protocols to ensure that the criminal and administrative investigations are kept appropriately separate after a subject officer has provided a compelled statement. Nothing in this Agreement or PRPD policy shall hamper an officer's obligation to provide a public safety statement regarding a work related incident or activity. | |
| Compliance Target(s) | Compliance Target | Status |
| | Administrative and criminal investigations are conducted separately as required by approved policies after a subject officer has provided a compelled statement. | N |

Internal Affairs investigators report having to conduct both administrative as well as criminal investigations. In cases where a criminal case against an officer has been concluded before trial and without adjudication – often after months of delay, the same criminal investigator is often told to conduct the administrative investigation against the same officer. After the Garrity decision, all jurisdictions fashioned a remedy to follow the black letter law established by the Court, which would allow simultaneous investigations of alleged police wrongdoing from both an administrative as well as criminal perspective. Most notably, all evidence gathered in a criminal internal investigation may pass over the wall to the administrative side. However, neither an administratively compelled statement nor any derivative therefrom may pass from the administrative side of the wall to the criminal side. PRPB must ensure that compelled statements gathered in the administrative investigation are not shared or made part of the criminal investigation.

It was also learned through interviews that criminal investigators lack access to an essential part of an administrative case – the accused's disciplinary history - most likely due to an erroneous legal conclusion that it represents part of an administrative investigation and therefore must remain on the administrative side of the wall. There is no legal basis for this practice.

| Paragraph 186 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | In each investigation, PRPD shall consider all relevant evidence, including circumstantial, direct, and physical evidence. There will be no automatic preference for an officer's statement over a non-officer's statement, nor will PRPD disregard a witness' statement merely because the witness has some connection to the complainant or because of any criminal history. PRPD shall make efforts to resolve material inconsistencies between witness statements. | |
| | Compliance Target | Status |

| Compliance Target(s) | 95% of sampled investigations considered all relevant evidence in a manner consistent with this Paragraph, and tried to resolve material inconsistencies between witness statements. | N |
|---|---|---|

During every interview of administrative investigators conducted by the Monitor in his field visits, the Monitor asked each investigator at what point - if at all - an investigator examined the historical or the accused officer's record of previous complaints lodged against him/her. A vast majority of these investigators voiced a preference for not looking at the officer's record until they had concluded their investigation. The main rationale expressed is that the officer would somehow become prejudiced by reviewing this data prior to or during their investigation. Most saved that data for review at the end of the case. The few who used the data for any purpose other than to merely tack it onto their investigative file, as called for under their procedures, cited only the possibility of its relevance in terms of identifying a training deficiency as the underlying cause of the complaint.

The Monitor however suggests that in the context of an administrative investigation where it is an evidentiary tie between the word of the complainant and the word of the accused officer, a record of the accused officer committing remarkably similar incidents in the past could tilt the balance in favor of a sustained finding. The Monitor also points out the unusual use of 'hojas de entrevista" in place of a full interview of those accused of rather serious misconduct. This practice goes against the Agreement's goal of not giving priority to officer's declarations.

| Paragraph 187 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Substantially Compliant |
| Paragraph Language | A misconduct investigation shall not be closed simply because the complaint is withdrawn or the alleged victim is unwilling or unable to provide additional information beyond the initial complaint, or because the complainant pled guilty or was found guilty of an offense. | |
| Compliance Target(s) | **Compliance Target** | **Status** |
| | 95% of sampled investigations were not closed simply because the complaint is withdrawn or the alleged victim is unwilling or unable to provide additional information beyond the initial complaint, or because the complainant pled guilty or was found guilty of an offense. | Y |

The Monitor continues to see evidence that, where a complainant has attempted to withdraw his complaint either actively or passively, the investigation continues in due course without any additional input or participation.

CMR-4 | July 21, 2021

| Paragraph 188 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Substantially Compliant |
| Paragraph Language | The misconduct investigator shall explicitly identify and recommend one of the following dispositions for each allegation of misconduct in an administrative investigation: a) "Unfounded," where the investigation determines by clear and convincing evidence that the alleged misconduct did not occur or did not involve the subject officer;<br>b) "Sustained," where the investigation determines, by a preponderance of the evidence, that the alleged misconduct did occur;<br>c) "Not Sustained," where the investigation is unable to determine, by a preponderance of the evidence, whether the alleged misconduct occurred; or<br>d) "Exonerated," where the investigation determines by clear and convincing evidence that the alleged conduct did occur but did not violate PRPD policies, procedures, or training. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | Misconduct investigators identify and recommend one of the listed dispositions for each allegation of misconduct in an administrative investigation. | Y |

While the SARP investigator, as a matter of routine practice, makes a recommendation as to the finding with respect to charge(s) contained within the investigation, the Monitor has found several circumstances where that finding was changed, most often at the level of the Office of the Police Commissioner (or perhaps the Office of Legal Affairs). In the interest of full transparency, the Monitor recommends that any changes to a conclusion reached by the investigator be annotated as to the reason why the change has been made. This makes it clear to the officer involved, to the complainant, to the investigator, to PRPB, and most importantly to the public as to why the finding was changed. (See Paragraph 190 for further discussion).

| Paragraph 189 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| Paragraph Language | The unit commander of the investigating supervisor shall review the supervisor's recommended disposition and accept, reject, or modify it. The unit commander shall document rejected or modified recommendations from supervisors in writing. Supervisory investigation reports and all related documentation and evidence shall be provided to SPR immediately upon completion of the investigation, but no later than within three business days. SPR shall review disposition recommendations made by unit commanders to ensure that investigative standards are met. SPR shall retain misconduct investigation reports and related records. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | The unit commanders complied with the requirements of this Paragraph in 95% of selected investigations. | Y |

129

CMR-4 | July 21, 2021

The Monitor finds that while the SARP Unit Supervisor routinely reviews and always concurs with the findings reached by the SARP investigator, there is no field on the form for the investigator to note the date of his/her review. In the interest of creating a timeline and measuring efficient workflow of SARP investigative processes, the Monitor recommends adding a date to these review forms alongside the signature line. The reason for universal approval by Unit Commanders is that they work in proximity and constant communication with their investigators. By the time the case is ready for their formal approval, the Unit Commander is usually well familiar with the facts of the investigation.

| Paragraph 190 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| **Paragraph Language** | The SPR commander shall review the investigator's recommended disposition and accept, reject, or modify it. The SPR commander shall document rejected or modified recommendations from investigators in writing. The Superintendent, or his or her designee(s), shall review the SPR commander's recommended disposition and accept, reject, or modify it. The Superintendent, or his or her designee(s), shall document rejected or modified recommendations from SPR. | |
| **Compliance Target(s)** | **Compliance Target** | **Status** |
| | 1a. The SARP commander reviews and resolves the complaint in accordance with the paragraph in 95% of selected investigations. | Y |
| | 1b. The Commissioner reviews and resolves the complaint in accordance with the paragraph in 95% of selected investigations. | N |

The local SARP Unit Commander invariably concurs with his/her investigator in writing. The reason for this highly unusual occurrence is that the SARP investigator is constantly communicating with his/her superior and receiving feedback on the case while it is still under investigation. The SARP Central Command Review contains a date where the SARP Commander or her Executive Officer accepts or modifies the conclusions reached in previous iterations of the SARP processes. As previously noted, no rationale is provided as to why an investigator's case finding has been modified. (See Paragraph 188).

Similarly, the Monitor has found cases where the local commander and SARP commander both agree upon the case finding, only to have the finding changed by either the Office of Legal Affairs ("OLA") or the Police Commissioner. In the interest of internal as well as external transparency, the Monitor feels that any change of disposition at the level of SARP Command, OLA or the Commissioner's office supply a written justification for the change.

| Paragraph 191 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | In addition to determining whether the officer committed the alleged misconduct, administrative investigations shall assess and document whether: (a) the action was in compliance with training and legal standards; (b) the use of different procedures should or could have been employed to achieve a potentially better outcome; (c) the incident indicates a need for additional training, counseling or other non-punitive corrective action; and (d) the incident suggests that PRPD should revise its policies, strategies, tactics, or training. This information shall be shared with the relevant commander(s). | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 178. | |

The Monitor finds that periodically the SARP investigator identifies a training gap and at other times misses that opportunity. It is incumbent on each SARP investigator in each investigation to answer the following questions: "Is there a lack of training in this particular area? Does this error or infraction stem from faulty training? Does this infraction involve a policy that ought to be amended?" See also the analysis provided in paragraph 180.

| Paragraph 192 | Assessment Frequency | | Overall Compliance Status |
|---|---|---|---|
| | Bi-annually | | Substantially Compliant |
| Paragraph Language | Each misconduct complainant will be notified in writing regarding the initiation of an investigation, the final disposition of the investigation, any disciplinary or non-punitive action taken, and the right to seek further review of the final disposition under applicable law. If an investigation goes beyond the 90 day limit, the complainant will be notified that an extension has been granted. PRPD shall establish procedures for complainants dissatisfied with the outcome to discuss their concerns with SPR commanders. | | |
| Compliance Target(s) | Compliance Target | | Status |
| | 1. Complainants are notified about the status of the investigation and outcome in accordance with approved policies in 95% of selected investigations. | | Y |
| | 2. Complainants are given the opportunity to appeal the determination before the Investigation, Processing and Appeals Commission. | | Y |

From the cases provided within the sample, PRPB SARP continues to be compliant vis a vis its communication with all parties to a complaint through the Office of the Police Commissioner, at both the complaint initiation phase and at its final determination phase.

CMR-4 | July 21, 2021

| Paragraph 193 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Deferred |
| **Paragraph Language** | SPR shall retain all misconduct investigation records for at least five years after the officer's separation from the agency. This obligation shall apply to records regarding officers' credibility that come to the attention of SPR and that may be subject to disclosure under Brady v. Maryland, 373 U.S. 83 (1963), and its progeny. | |
| **Compliance Target(s)** | **Compliance Target** | **Status** |
| | 1. SARP retains at least 95% of investigation files for persons who have separated from PRPB less than five years ago. | N/A |
| | 2. PRPB's document retention practices comply with approved policies. | Y |

PRPB has an established document retention policy and practice. SARP case files provided to the Monitor indicate that misconduct investigative files are archived and held by PRPB after an employee has left the agency for a variety of reasons including death, retirement, resignation, or removal from the agency.

## 5. Staffing, Selection, and Training Requirements

Records indicate that PRPB adheres to its stated policy of 3-year terms for SARP investigators. Once the COVID-19 pandemic abates, the Monitor looks forward to conducting interviews of SARP investigators pursuant to this policy to ensure that the most proficient among them are offered an opportunity to continue their service, should they desire to. The Monitor noted several new additions to the SARP investigation cadre who have not yet been formatively trained as internal investigators. This must be remedied.

| Paragraph 194 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually as to Data Sources #1 and #2. Bi-Annually as to all other Data Sources | Partially Compliant |
| **Paragraph Language** | PRPD shall ensure that a sufficient number of well-trained staff are assigned and available to thoroughly complete and review misconduct investigations in a timely manner and in accordance with the requirements of this Agreement. PRPD further shall ensure it provides sufficient resources and equipment to conduct adequate criminal and administrative misconduct investigations. | |
| **Compliance Target(s)** | **Compliance Target** | **Status** |
| | 1. Policies incorporate all the requirements of Paragraphs 177-193. | Y |
| | 2. Trainings for the internal investigation unit are consistent with approved policies. | N |
| | 3. All internal investigation unit personnel are trained and certified in relevant policies (or scheduled for training, in the case of mid-year reviews). | N |

| 4. The internal investigation unit has sufficient resources and equipment, or is in the process of procuring needed resources and equipment. | N |
|---|---|
| 5a. Internal investigation unit personnel serve three-year terms. | N/A |
| 5b. Retained internal investigation unit personnel have demonstrated effective performance. | N/A |

Out of the training records and certifications received by the Monitor, 3 are clearly lacking formative training and certification as internal investigators. The training records for a fourth officer were received in blank. In addition, PRPB has not been as diligent in ensuring that every investigator receives an annual internal affairs investigative refresher or in-service training component as called for in the Agreement.

| Paragraph 195 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually as to Data Sources #1 and #2. Bi-Annually as to all other Data Sources | Deferred |
| Paragraph Language | PRPD shall establish a term of duty of up to three years for SPR officers and supervisors who conduct investigations and may reappoint an officer to successive terms of duty if that officer has demonstrated effective performance based on an appropriate annual performance evaluation. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 194. | |

Under SARP organizational protocol as codified within the General Order, SARP investigators serve a three-year appointment, which may then be extended based upon performance. At present, it appears that none of the SARP investigators have reached the three-year limit post-formative training to be considered for re-appointment. The Monitor plans to revisit the three-year period during CMR-5, as it appears that a statistically relevant number of SARP investigators will have reached the three-year limit by that time. It is interesting to note the methodology of internally assessing SARP investigator performance.

Most of the interviewees were given very high ratings on their last evaluations averaging between 4.5 and a perfect rating of 5.0 (December – January 2021), which leaves little or no room for improvement. Not one was given suggestions for improving their individual performance. This is substandard management practice that can only result in substandard performance and artificially inflated performance ratings. This begs the question of how SARP will effectively decide which investigators will be offered extensions beyond the 3-year performance period.

| Paragraph 196 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually as to Data Sources #1 and #2. Bi-Annually as to all other Data Sources | Not Compliant |
| Paragraph Language | All SPR personnel conducting officer misconduct investigations shall receive at least 40 hours of initial training in conducting officer misconduct investigations and shall receive additional in-service training each year. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 194. | |

PRPB has not conducted additional in-service training as it relates specifically to internal investigations. While some investigators have received supplementary training in other investigative areas after having been trained and certified by REA114, the Monitor believes that the intent of the Parties was that SARP criminal and administrative investigators all receive in-service training directly relating to these specialties each year. This has not occurred during the reporting period. Also, please refer to Paragraph 194.

## 6. Preventing Retaliation

| Paragraph 197 | Assessment Frequency | | Overall Compliance Status |
|---|---|---|---|
| | Annually as to Data Sources #1 and #2. Bi-Annually as to all other Data Sources | | Partially Compliant |
| Paragraph Language | PRPD policy shall expressly prohibit all forms of retaliation, whether subtle or direct, including discouragement, intimidation, coercion, duty-station reassignment, or adverse action, against any person, civilian or officer, who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct. Retaliation shall be considered a serious policy violation and shall subject an officer to serious disciplinary action, up to and including termination. | | |
| Compliance Target(s) | Compliance Target | | Status |
| | 1. Policies incorporate all the requirements of this Paragraph. | | Y |
| | 2. Retaliation trainings are consistent with approved policies. | | Y |
| | 3. 95% of sampled personnel are trained and certified in retaliation policies (or scheduled for training, in the case of mid-year reviews). | | Y |
| | 4. Complaints involving alleged retaliation are investigated and adjudicated in accordance with approved policies and agency standards in 95% of selected complaints. | | N |
| | 5. 95% of interviewed personnel perceive retaliation for participating in an investigation of misconduct is not tolerated and leads to serious disciplinary action. | | N |

PRPB's policy of proscribing retaliation remains in full force, as evidenced by PRPB Article 14 (General Order 9001). PRPB provided a list of 8 cases alleging retaliation, however it did not forward these cases for Monitor desk review.

The segment of PRPB policy that speaks to retaliation, as codified in its article 14 (GO 9001) has not changed since CMR-2. While it appears that PRPB supplied a list of 8 cases

where retaliation as alleged, it does not appear that PRPB forwarded these cases to the Monitor for examination and analysis.

## 7. Discipline

A review of cases involving imposed discipline for sustained cases during the reporting period indicates that PRPB follows its disciplinary matrix consistently. However, the Monitor continues to have grave concerns over the adequacy and efficacy of PRPB drug testing program.

| Paragraph 198 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually as to Data Sources #1 and #2. Bi-Annually as to all other Data Sources | Substantially Compliant |
| Paragraph Language | PRPD shall ensure that discipline for sustained allegations of misconduct is fair, consistent, based on the nature of the allegation, and that mitigating and aggravating factors are set out and applied consistently. Discipline shall be based on objective criteria and shall not depend on or be influenced by rank or external considerations. | |
| Compliance Target(s) | Compliance Target | Status |
| | 1. Policies incorporate all the requirements of Paragraphs 198-199. | Y |
| | 2. Discipline trainings are consistent with approved policies. | Y |
| | 3. 95% of sampled personnel are trained and certified in discipline policies (or scheduled for training, in the case of mid-year reviews). | Y |
| | 4. Discipline is taken and documented in response to sustained misconduct complaints in accordance with approved policies in 95% of selected complaints. | Y |
| | 5. Disciplinary matrix employs objective criteria to apply to sustained findings to assess the appropriate level of discipline. | Y |

PRPB has drafted and approved a code of activities that are proscribed for its members, a codification of levels of infractions - either by commission or omission by its members - and factors which could either mitigate or aggravate the underlying infraction once it has been proven to have occurred. The Monitor finds that this code has not been amended or changed since its approval by the Monitor as part of the capacity building phase of the Agreement. The Monitor reviewed a sample of adjudicated and finalized cases from within the reporting period and finds that the sanctions imposed are in tenor with Article 14. Based on sustained administrative investigations, the Monitor finds that when accused members of PRPB exercise their constitutional right to a due process hearing, PRPB does not inhibit that right.

The Monitor finds that PRPB members subjected to discipline frequently exercise the right to due process, and according to the reviewed cases, this right is respected by PRPB. To

be exhaustively thorough, and only if time on the ground allows, the Monitor may consider attending some of these informal hearings in the role of a neutral observer.

| Paragraph 199 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually as to Data Sources #1 and #2. Bi-Annually as to all other Data Sources | Substantially Compliant |
| Paragraph Language | PRPD shall establish a disciplinary matrix for reviewing sustained findings and assessing the appropriate level of discipline to facilitate consistency in the imposition of discipline. All disciplinary decisions shall be documented, including the rationale behind any decision to deviate from the level of discipline set out in the disciplinary procedures. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 198. | |

Article 14 details a system of progressive discipline to be applied by PRPB, ranging from verbal warnings up to and including separation from the agency. Once a charge is sustained or admitted to by the member, the infraction carries a corresponding sanction, which could either be mitigated or aggravated, depending upon the established facts of each individual case. Having reviewed all cases where a disciplinary finding was made during the reporting period, the Monitor finds that Article 14 progressive disciplinary procedures are being complied with.

| Paragraph 200 | Assessment Frequency | | Overall Compliance Status |
|---|---|---|---|
| | Annually as to Data Sources #1 and #2. Bi-Annually as to all other Data Sources | | Not Compliant |
| Paragraph Language | PRPD shall review its drug testing program on an ongoing basis to ensure that pre-service testing for new officers and random testing for existing officers is reliable and valid. The program shall be designed to detect use of banned or illegal substances, including steroids. | | |
| Compliance Target(s) | Compliance Target | | Status |
| | 1. Policies incorporate all the requirements of this Paragraph. | | Y |
| | 2. PRPB's drug testing program trainings are consistent with approved policies. | | Y |
| | 3. 95% of sampled personnel are trained and certified in PRPB's drug testing program policies (or scheduled for training, in the case of mid-year reviews). | | Y |
| | 4. Drug tests are reliable, valid, and administered to new officers and a random selection of existing officers in accordance with the Paragraph. | | N |

The Monitor requested information on the number of PRPB members tested for proscribed substances during the entire reporting period and was forwarded a

spreadsheet indicating that, during the month of March 2021, 399 PRPB members were tested. No other documentation was forthcoming. The Monitor finds this number grossly deficient and must be improved upon forthwith to become even partially compliant in the future. The Monitor fully understands that other agencies both public and private are involved in its drug testing program. However, this in no way absolves PRPB from its responsibility to ensure that its officers are drug free in accordance with the Agreement. The Monitor expects to see thousands of officers – not hundreds – randomly drug tested in the future using an effective, scientifically reliable process and methodology. Nothing less will suffice.

## 8. Officer Assistance and Support

While the Monitor finds PRPB Employee Assistance Plan to be substantially compliant in its design, PRPB however failed to supply sufficient data on supervisor training concerning this plan. Further, although PRPB provided a list of psychologists participating in the program, the Monitor simply had no time on the ground to follow up with either interviews or site visits. In all fairness, while PRPB can be adjudged as non-compliant with respect to training management and supervisors, it should not be assessed on matters that involve interviews or site visits when none were possible. These inquiries will be conducted on future Monitor visits.

| Paragraph 201 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually as to Data Sources #1 and #2. Bi-Annually as to all other Data Sources | Substantially Compliant |
| Paragraph Language | PRPD shall provide officers and employees with a range of non-punitive supports and services to address and correct problem behavior, as part of PRPD's disciplinary and performance improvement systems. These supports and services shall include a comprehensive range of mental health services that include, but are not limited to: readily accessible confidential counseling services; critical incident debriefings and crisis counseling; mental health evaluations; and stress management training that comport with generally accepted practices. | |
| Compliance Target(s) | **Compliance Target** | **Status** |
| | 1. Policies incorporate all the requirements of Paragraphs 201-204. | Y |
| | 2. Officer assistance and support trainings are consistent with approved policies. | Y |
| | 3. 95% of sampled personnel are trained and certified in officer assistance and support policies (or scheduled for training, in the case of mid-year reviews). | Y |
| | 4. A variety of non-punitive supports and services that comport with generally accepted practices are available to officers and their families as required by approved policies. | Y |

| | | |
|---|---|---|
| 5. Mental health professionals are involved in developing and providing in-service training on mental health stressors related to law enforcement and the mental health services available to officers and their families. | | Y |
| 6. Mental health counseling provided to PRPB employees is confidential, pursuant to approved policies. | | Y |

Documentation supplied by PRPB demonstrates that the Employee Assistance Plan was properly designed by credentialed professionals and is in active use. With respect to the documentation available, the Monitor finds PRPB Employee Assistance Plan to be substantially compliant in its design. During the reporting period, PRPB recorded over one hundred referrals to the program with 83 referred by PRPB and 22 self-referrals. The data supplied to the Monitor was HIPAA compliant, as no individual was identified as a referral.

| Paragraph 202 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually as to Data Sources #1 and #2. Bi-Annually as to all other Data Sources | Not Compliant |
| Paragraph Language | PRPD shall train management and supervisory personnel in officer support services protocols to ensure wide availability and use of officer support services. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 201. | |

PRPB failed to supply sufficient data on supervisor training concerning this plan. The Monitor requests that PRPB provide additional data regarding supervisory training regarding officer support service protocols are provided for future monitoring reports.

| Paragraph 203 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually as to Data Sources #1 and #2. Bi-Annually as to all other Data Sources | Deferred |
| Paragraph Language | PRPD shall involve mental health professionals in developing and providing in-service training on mental health stressors related to law enforcement and the mental health services available to officers and their families. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 201. | |

Although PRPB prepared a list of psychologists participating in the program, the Monitor was unable to conduct site visit and interviews due to the COVID-19 travel restrictions. These inquiries will be conducted during future Monitor site visits.

| Paragraph 204 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually as to Data Sources #1 and #2. Bi-Annually as to all other Data Sources | Deferred |
| Paragraph Language | PRPD shall ensure that any mental health counseling services provided to PRPD employees remain confidential as consistent with generally accepted practices in the field of mental health care. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 201. | |

As noted in reference to paragraph 203, the Monitor was unable to conduct site visit and interviews due to the COVID-19 travel restrictions. Inquiries to determine whether PRPB ensures that any mental health counseling services provided to PRPB employees remain confidential will be conducted during future site visits.


## VIII. Community Engagement and Public Information

The Agreement requires PRPB to constructively engage and maintain robust community relationships. PRPB can achieve this in two ways. First, through community policing as well as developing and sustaining meaningful partnerships. Such efforts will ensure problem solving, ethical and bias free policing for effective crime prevention. It will further promote the dissemination of information to the public on the reform. Second, by integrating community and problem-oriented policing principles into its management, policies and procedures, recruitment, training, personnel evaluations, tactics, deployment of resources, and systems accountability.

To determine compliance, the Monitor has reviewed PRPB's Policy (OG 800-803), in effect since June 20, 2018, and the evidence and documentation submitted by PRPB, pursuant to the requirements in the Agreement. Additionally, the Monitor conducted interviews with PRPB personnel based on a random sample. The sample included PRPB's members at the different levels of the Organization including among others, Auxiliary Superintendencies, (SAOC, SAIC, SAEA), Zone Commanders, Recruitment, District and Precinct Commanders, Division Directors, Alliances Facilitators, Community Interaction Council's Agents Facilitators and some community organizations or representative groups.

To achieve substantial compliance PRPB needs to implement and demonstrate effective community policing Bureau wide. This can be achieved through recruitment efforts, training endeavors, deployment of resources, training, evaluations, and actual problem-solving strategies including the effective implementation of the S.A.R.A. Model in all thirteen police areas.

| Paragraph 205 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Partially Compliant |
| Paragraph Language | PRPD shall create robust community relationships and engage constructively with the community to ensure collaborative problem-solving, ethical and bias-free policing, and more effective crime prevention. PRPD shall integrate community and problem oriented policing principles into its management, policies and procedures, recruitment, training, personnel evaluations, tactics, deployment of resources, and systems of accountability. PRPD shall engage the public in the reform process through the dissemination of public information on a regular basis. | |
| Compliance Target(s) | Compliance is determined on two separate but inter-dependent bases: (1) the implementation of paragraphs 206 - 217, and (2) the results of outcome assessments, pursuant to Paragraph 243 of the Agreement. | |

PRPB conducted a needs and resources allocation study. On September 27, 2018, PRPB developed an implementation plan in compliance with the requirement of paragraph 13. This plan helped allocate and deploy resources for PRPB's organizational structure. The study identified areas of critical staffing need and surplus for redistribution assignment. PRPB, however, has not fully implemented its allocation of resources effectively, consistent with CMR-3's findings. Interviewed personnel reported that deployment of resources is limited in their respective police areas. Further, officers were never fully deployed per the needs study and in support of the principles of community policing, partnership development, problem-solving strategies, and community involvement. Moreover, interviewees stated that community policing endeavors are primarily delegated to the Bureau of Community Relations. They also reported that most of the time their deployment and assignment circumscribe to one agent per police area for alliances development and quality of life issues. This is not representative of an organizational transformation and is inconsistent with Policy GO 800-803: Community Policing.

Notably, some interviewed agents stated that they were recently assigned to community policing. These agents reported not having received adequate training for the implementation of problem-solving strategies through the S.A.R.A. Model, develop alliances and distinguishing between formal or informal alliances and ascertain quality of life issues for furthering the endeavor. Therefore, it is recommended that PRPB reassess its needs study, since no updates or amendments have been submitted since 2018. Should PRPB consider no need for changes, it is imperative that PRPB finalizes its redeployment of staff and allocate resources to improve community policing. It is further recommended that training and in-service training be resumed for the effective implementation of community policing agency wide.

PRPB has made a significant effort to recruit officers from a broad cross-section of Puerto Rican society. Nevertheless, PRPB's current strategic recruitment plan is updated monthly and mentions attempting to attract cross-sectional community representation in PRPB's recruitment endeavors.  The plan formally defines strategies to attract candidates geared towards community service. The Monitors recommend that PRPBs recruitment plan be constantly updated to better define the positive efforts already underway to recruit officers from a broad cross-section of Puerto Rican society.

PRPB recruitment division reported eleven recruitment efforts through the Community Relations Bureau. It targeted individuals at local shopping malls, through Informational tables, local pharmacies, (Walgreen's Pharmacy Guayama, P.R., March 17, 2021), inter-agencies job fairs (Luis Llorens Torres Public Housing, Jan. 30, 2021), and intra-agency police efforts (Paso Seco Community Santa Isabel, P.R., March 6, 2021).

The development of an implementation plan consistent with the philosophy of community policing is recommended along with an action plan targeted to attract cross-sectional community representation[13]. The plan must incorporate the Central Community Interaction Council's input and advise in the development of recruitment strategies to attract applicants of diverse backgrounds in compliance with paragraph 103 of the Reform Agreement. During our interview, the recruitment division was unable to provide demographic information or a percentage of recruited candidates representative of a diverse community group. The Monitor further recommends that PRPB develop a relationship with the chairperson of the Social Sciences departments at the local junior colleges and universities, as well as those in the education and helping profession fields; social advocacy groups, professional organizations, and faith-based groups to tap into their resources and talent for direct, representative, and purposeful community policing recruitment efforts. Additionally, it is recommended that PRPB explore conducting efforts by providing candidates with a realistic picture of police work at the different departments and Superintendencies, a useful tool in "selecting out" those not genuinely interested in such work. To promote cross-sectional community representation and diverse workforce hiring practices, PRPB is encouraged to consider using its Press Office and social media platforms; stating basic, minimum educational requirements, prior alcohol/ drug use notices, prior convictions caveats, and community-oriented policing qualities or traits to possess for consideration.

---

[13] "Sixteen Trait recruiters are looking for"; P. Patti, 2009, Police link: The Nation's Law Enforcement Community; wwwpolicelink.com/benefits/articles7602.

PRPB submitted a copy of its pre-service training outline and curriculum for quality and content evaluation in community policing. This outline should be revised. GO 800 Sec. 803 issued on October 16, 2016, was superseded by GO 800 Sec. 803 (Community Policing) effected on June 20, 2018 (the outline denotes the 2016 General Order). The same is applicable to GO 800 Sec. 805, (Community Encounters), superseded by GO 800 Sec. 805 issued on June 20, 2018. Both General Orders are overdue for revision since June 2020. Concerning the curriculum, it requires eight hours contact for training. Its content appears appropriate and relevant. Nevertheless, it is recommended that the training curriculum incorporates two eight-hour sessions for Community Policing, focusing on the structured application of the S.A.R.A. model. It must emphasize analysis and assessment and should consider including guided practical scenarios for implementation in the field. Also, training must include using and applying the Crime Triangle (victim, offender, and location) to understand a problem. The same applies to alliances development and the processes for implementation, including reviewing, assessing, and distinguishing between formal vs. informal alliances for structured documentation and validation.

PRPB's S.A.E.A. certified that no training was conducted during this assessment period.

Annual performance evaluations for PRPB members are conducted through PROMEDIA system. According to personnel interviewed involved in community policing, their annual evaluation does not reflect any information on the individual's performance in community policing nor it reflects any of their efforts in securing alliances, submitting referrals nor any participation as facilitators in connection with the Community Interaction Councils. The Monitor has learned that it is up to the officer's supervisor to highlight and distinguish such participation within the evaluation (i.e: Aguadilla Police area). A copy of the PROMEDIA matrix was not made available for the Monitor's review, wherein community-oriented policing goals are practical and achievable, and objectives are established and appraised. The Monitor also recommends that a computerized or automated system be developed reflecting supervisors' yearly subordinate appraisals completion, for sampling drawing review. PRPB is yet to implement an operational system with objective criteria to assess the qualifications and performance of all its officers engaged in community policing, based on the documents submitted for the Monitor's review.

PRPB has not implemented audit protocols consistent with paragraph 154, wherein a culture of accountability could be fostered, measured, and managed for continued improvement. The Early Identification System (EIS) continues under development and is not available for use. As a result, and based on the findings, the Monitor concludes that PRPB is partially compliant with paragraph 205 of the Agreement.

## 1. Community Oriented Policing

Community oriented policing considers proactively developing solutions to address the immediate conditions that produce public safety issues such as crime, social disorder, and fear of crime. It encourages the community's participation through partnerships to develop solutions to specific community problems and improve the public's trust. PRPB's operations and decision-making efforts must be embedded through proactive problem solving. A structured way to problem solving is the SARA model, (scanning, analysis, response, and assessment), the deployment of resources to solve problems and the creation of partnerships and community alliances to solve the problems.

PRPB has a policy in place (GO 800-803), and the same provides the structure and requirements under the guiding principles of community policing.

PRPB continues to struggle with the implementation of the S.A.R.A model, and the development of alliances for solving problems, identification of crime trends and addressing quality of life issues through community involvement in the thirteen police areas. PRPB has yet to fully develop meaningful partnerships; nor it has identified and established mechanisms to measure their effectiveness in their efforts.

The Monitor finds that although training has been available and is on-going through S.A.E.A., no in-service training/retraining has been offered during the past year to refresh and reinforce basic concepts in community policing, the S.A.R.A. model with its four elements, (operationally defined and applied), including partnerships and alliances development.

| Paragraph 206 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually as to Data Sources #1 and #2. Bi-annually as to all other Data Sources. | Partially Compliant |
| **Paragraph Language** | PRPD shall reassess its staffing allocation and personnel deployment to ensure that they support community policing and problem-solving goals. PRPD shall employ a Scanning, Analysis, Response, and Assessment ("SARA") model to structure its problem-solving approach. | |
| **Compliance Target(s)** | Compliance Target | Status |
| | 1. Policies incorporate all the requirements of Paragraph 206. | Y |
| | 2. Community policing and problem solving trainings are consistent with approved policies. | N |
| | 3. 95% of sampled PRPB members are trained and certified in community policing and problem solving, including the SARA Model. | N |
| | 4. Staff allocation and personnel deployment plan are aligned with community policing and problem solving. | N |

| | |
|---|---|
| 5. 95% of sampled PRPB precincts, districts, and units implement the SARA Model. | N |

Redeployment of resources and personnel in support of community policing and problem solving requires evidence of full implementation. PRPB has not demonstrated deployment practices to extend officers the opportunity to serve in the community they reside beyond the deployment of one officer assigned to community policing, as depicted from personnel interviews conducted. Interviewees at all levels of the Agency stated that community policing is discharged onto personnel assigned to the Community Relations' Bureau within their respective police areas.

Certified documents submitted by PRPB for review, revealed that the police areas of Arecibo, Aibonito, Fajardo, Mayagüez, Ponce District and Precinct, CRADIC, Office of the Press and S.A.E.A. reported no resources allocation during this assessment period. The remaining police areas failed to submit evidence of staff allocation for the Monitor's review.

It is recommended that PRPB reassesses its needs study for staff allocation and resources deployment; modifies any strategies that are incompatible with effective community-oriented policing and ascertain that the recommendations are current and represent valid staff allocation, since crime and populations are dynamic and subject to change over time.

PRPB's policy for Community Policing Policy (OG 800 Sec. 803) has been in place since 2018. However, its revision is past due since June 2020. Interviewed PRPB personnel reported that they have been advised the policy is under revision, citing among the reasons for the lack of training/retraining despite their recognized need. Nevertheless, the Monitor has not received the proposed and prospective amendments and the document has not been submitted by PRPB, for the Monitor's review during this assessment period.

PRPB's policy stipulates Scanning, Analysis, Response, Assessment (S.A.R.A.) model for problem solving and has trained its members in the use of the model in the past. However, the Monitor concludes that PRPB has fallen short in its implementation process throughout the thirteen police areas. PRPB's submitted documentation for the Monitor's review on application of the S.A.R.A. model revealed that seven out the thirteen police areas did not implement the model during this assessment period (Aibonito, Arecibo, Carolina, Fajardo, Guayama, Ponce and Caguas, P.R., (except for stolen vehicles division in Caguas, P.R. which submitted one form P.R.). Bayamon, and Utuado reported having implemented the model but provided no evidence in support (PPR 803.4). The Superintendencies of Professional Responsibility, (SARP) and Education and Training,

(SAEA) also certified not having implemented the model either. Similar findings have been made in previous Monitoring reports.

To PRPB's partial credit, police areas of Aguadilla, Carolina Sur, Mayagüez, San Juan and Humacao certified and provided evidence of the model's implementation. Notwithstanding, a review and assessment of the documents, denote a poorly executed implementation process. Documents reviewed from the five police areas submitted, revealed missing strategies to address problems, unspecified nature of the problem, no assessments, poorly established objectives, no community involvement, missing or incomplete criteria for the determination of alliances and missing signatures of supervisors, and/or zone commanders, among other implementation issues. Two forms (PPR 803.4) reviewed from a police area in the eastern part of the island, submitted the implementation of the model, which appeared for implementation in the future. The same became relevant upon review, by the way the forms were structured in their objectives, strategies, responsible groups, or individuals for each of the strategies and the configuration of the necessary tasks for execution. Additionally, the forms were not signed, nor approved by either party. One of the forms contradicted itself. It depicted the date of the response's completion, but no assessment was completed; wherein it further indicated, responses were in development. From the police areas that submitted the implementation of the S.A.R.A. model (PPR 803.4), only one submitted a referral regarding a quality-of-life issue (PPR 803.1) in compliance with policy, and none of them submitted the monthly registry form for quality of life issues received and/or resolved (PPR 803.2, PPR 803.3).

The Monitor recommends in-service training to retrain officers on the S.A.R.A. model. Retraining must emphasize analysis and assessment and should consider including guided practical scenarios for implementation in the field. Also, training must include using and applying the Crime Triangle (victim, offender, and location) to understand a problem.[14] A review of PRPB's forms' (PPR803.1, 803.2 and 803.3) use and purpose is firmly advised within the training objectives and curriculum, including partnerships and alliances.

During CMR3 review, the Monitor requested training certificates in community policing and problem solving which were not received. The Agreement requires its review every six months to determine whether all members of PRPB are certified in community policing

---

[14] John E. Eck, "Police Problems: The Complexity of Problem Theory, Research and Evaluation," in Problem-Oriented Policing: From Innovation to Mainstream, ed. Johannes Knutsson, vol. 15 of Crime Prevention Studies (Monsey, NY: Criminal Justice Press, 2003), 79–114.

and problem solving including the S.A.R.A. model. The Monitor did not receive any training certificates for this assessment period either. PRPB has not produced training certificates in a year. Currently, it is unknown how many PRPB members are certified in community policing. Therefore, considering that SAEA certified that no training was conducted during this assessment period, the Monitor concludes that PRPB is not in compliance with training. PRPB remains in need to implement a systematic process for examining and addressing the problems that the public expects them to handle.

| Paragraph 207 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually as to Data Sources #1 and #2. Bi-annually as to all other Data Sources. | Not Compliant |
| Paragraph Language | PRPD shall continue to conduct outreach to a broad cross-section of community stakeholders to establish extensive problem-solving partnerships and develop cooperative strategies that build mutual respect and trusting relationships. | |
| Compliance Target(s) | Compliance Target | Status |
| | 1. Policies incorporate all the requirements of Paragraph 207. | Y |
| | 2. Community partnerships and problem-solving strategies trainings are consistent with approved policies. | Y |
| | 3. 95% of sampled PRPB members are trained and certified in community partnerships and problem-solving strategies. | N |
| | 4. 95% of sampled districts, precincts, and units conduct outreach to a broad cross-section of community stakeholders. | N |

Pursuant to GO 800-803, the success of the alliances depends on PRPB's ability to integrate the community actively and constructively in planning, implementing, and evaluating the strategies and goals established. This continues to be a pitfall for PRPB.

The Monitor concludes that the alliances developed by PRPB during this assessment period are at the minimal level of compliance agency wide. PRPB currently relies on the field Operations Superintendency (SAOC) for implementation through the Bureau of Community Relations, which is responsible for the prevention programs throughout the thirteen police areas.

A review of the submitted documents for assessment revealed that PRPB submitted listings of community leaders identified for the *prospective* development of informal alliances within the different police areas, but little if no informal alliances were duly reported by PRPB. The listings were submitted from the police areas of Fajardo, Humacao, Mayagüez, Ponce, Utuado, Arecibo and Guayama. Those listings, however, only contained individuals' names and the individuals' community or residential district; no contact information was included for furthering the alliance's processes or verification purposes.

PRPB failed to submit formal community alliances through the utilization of PPR 803.5, which is the official document for PRPB to capture the intended process, pursuant to GO 800, Section 803, due for submission yearly by January 10th. PRPB further failed to submit work plans or minutes to evince informal alliances.

The police area of Bayamon and Fajardo reported no alliances. The same was reported by SARP, SAEA and SAIC. SARP continues to report that it holds no digital platform to report alliances. The Monitor reiterates that SARP's development of alliances facilitates building trust within the community, serves to bridge the gap in informing the public and the community about their rights to file a complaint against any police member engaging in any act of misconduct, and obtain information for further referrals. SARP must demonstrate more proactive efforts. Alliances may serve SARP to inform the community on the availability of resources to commend police members' service and performance, consistent with the Agreement.

PRPB's deployed unit at La Fortaleza did not submit any reports.

The Community Relations Bureau through SAOC submitted its yearly report, wherein the following alliances were captured: Department of Labor and Human Resources, to assist PRPB in recruitment efforts; Department of Sports and Recreation for community sports development, talent identification and training irrespective of socioeconomic level; Dept. of Education focusing on youth at risk and high risks behavior challenges; Hogar Solo por Hoy to facilitate detoxification services for the homeless; Centro Ayuda Social, to facilitate vulnerable communities easy access to services, identification documents, rehab services and community reintegration; Iniciativa Communitaria, for placement, detox, and treatment for drug/alcohol/HIV homeless. The police area of Ponce established two formal alliances as reported: one with a local radio station for safety and crime prevention orientation, and Proyecto Vida Segura for services and assistance to victims of crimes. The police area of Guayama reported two formal alliances: PAVIC and COVIM to aid victims of crime and services for the youth in recovery from alcohol and controlled substances dependency. None of these alliances were supported by a collaborative effort agreement for review. The police area of Fajardo reported having formalized an alliance with Proyecto Escudo, a service provider for gender violence victims (collaborative effort agreement, submitted and reviewed).

In its report, the Community Relation's Bureau indicated that the police areas of Arecibo, Caguas, Aguadilla, Humacao, San Juan, Carolina, Aibonito and Utuado engaged in activities through services rendered in relation to the Athletic League, Vuelta a la Vida program, prevention and empowering activities at a local private school, and food and

supplies donations. These activities do not constitute formal alliances, but informal ones or services to the community as part of its program's platform and mission.

To PRPB's credit, the bureau further pointed out that there appears to be great confusion, which has been attributed to a proficiency gap between the formal, and informal alliances identification and development, and issues of quality of life; the Monitor concurs. Therefore, it is recommended that the Superintendency of Education and Training (SAEA) develop training for the alliance facilitators and quality of life officers. Also, to conduct retraining at the organizational level for competencies' acquisition. It is further recommended that formal alliances be reported electronically and that PPR 803.5 is utilized as established per the General Order. Collaborative agreements must be included in support of evidence of formal alliances developed/implemented, minutes, agendas and/or work plans need to be submitted in support of informal alliances, rather than narratives within the reports.

Interviewees at all levels of the agency stated that community policing is primarily delegated to personnel assigned to the Community Relations' Bureau within their respective police areas. Through the interviews, the Monitor also learned that in some police areas, MPRPB at higher ranks in the organization, appeared disconnected or detached from the philosophy of community-oriented policing. Additionally, interviewed personnel reported that in some police areas the commanders delegate onto lieutenants or sergeants their regular attendance to community meetings, while others were actively supportive and involved.

It should be noted that the policy for promotions remains under revision. This policy must incorporate concrete requirements and evaluation methods in the promotion process to the higher ranks to ensure that commanders embrace and promote community policing at all levels of PRPB. Among existing commanders and higher-rank supervisors, however, further training and field practice are necessary to affect institutional transformation and a change in culture toward a better balance between service and law enforcement.

Outreach activities, although effected in several police areas, (Fajardo, Aguadilla, Caguas, San Juan, Utuado, and Aibonito and SARP which conducted a safety fair at a shopping mall in the metropolitan area), were limited. The Monitor did not receive any other documents in support of outreach activities from the other police areas. Therefore, PRPB is yet to reach a 95% outreach endeavor to a broad cross-section representation of the community. Outreach activities could be conducted in open spaces such as parks, basketball courts and the outdoors to comply with the P.R. Department of Health's recommendations on COVID-19 capacity guidelines.

CMR-4 | July 21, 2021

PRPB must address the lack of sufficient and meaningful alliances with the community. The Monitor's office is committed to follow through with meetings with community stakeholders to confirm the alliances reported. In future efforts, it is recommended that beyond the social impact for direct community assistance (supplies, food donations, PPE, music, and entertainment) outreach efforts include a balanced, structured, and coordinated efforts with community safety councils focusing on prevention, education, listening to concerns and receiving feedback. Community safety councils' involvement also facilitate greater access to the community, stimulates participation, enables connection, inspires trust, and empowerment. As a result, PRPB is deemed partially compliant.

| Paragraph 208 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Not Compliant |
| Paragraph Language | PRPD shall develop and implement mechanisms to measure its community partnerships and problem-solving strategies and assess their effectiveness. PRPD shall prepare a publicly available report on at least an annual basis that details its community partnerships, meetings, and problem-solving activities, including specific problems addressed and steps taken by PRPD and the community toward their resolution. The report also shall identify obstacles faced and recommendations for future improvement. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Formal Community Partnership module incorporates all the requirements of Paragraph 208. | N |
| | 2. 100% of PRPB annual reports are made publicly available. | N |
| | 3. Annual report incorporates all the requirements of Paragraph 208. | N |

PRPB has not implemented an audit protocol or mechanism to measure and assess partnership development, problem solving strategies and efforts to address quality of life issues effectively. PRPB lacks a data source or IT module that incorporates all the requirements of this paragraph. Also, PRPB needs to identify and provide detailed information about the any roadblocks encountered into the development of formal partnerships for improvement. Therefore, the Monitor concludes that PRPB is not compliant.

It is recommended that PRPB taps into its own resources and seeks external ones for assistance if necessary; including IT personnel for the development of an effective mechanism to measure outcomes efficiently.

## 2. Community Interaction Councils

The Community Interaction Council, (CIC), a group of volunteers, professionals in their respective fields, represented by diverse members of the community, assist PRPB to identify and implement strategies to tackle public safety issues such as crime, social disorder, fear of crime and address quality of life issues. As contemplated in PRPB's Policy, (OG 800-801), the CICs advise, review, and recommend PRPB on policies, recruitment, and implemented strategies among other initiatives from the perspective of the community sector they represent and in concert with community leaders or councils. Pursuant to policy, the CICs also advise the Commissioner on how to submit information to the public in a transparent easy and understandable way, including PRPB's compliance with the Agreement. The policy reflects an organizational and functional structure with duties and responsibilities established; operational and administrative functions including the requirements to be part of the CIC; elements consistent with the Agreement.

CIC's are established in the thirteen police areas and have a spokesperson, who represents the police areas at the central level. The spokespersons from each police area constitute the Central CIC along with the Community Safety council's president, a representative from civil rights organizations appointed by the Commissioner and the Executive Director. The CICs also have internal bylaws.

Most CICs have been active in their respective police areas, have held meetings under a hybrid model (virtual and in-person) in compliance with the Executive Orders due to COVID-19 Pandemic. They have also reviewed General Orders submitted by PRPB and have for the most part rendered their recommendations.

CICs remain in need to add resources to their respective police areas in terms of securing full cross section representation and the need of training facilitated by PRPB to confirm pending committee members. Some police areas need to secure a place to hold their meetings away from police headquarters.

The Monitor has not received for review the CIC's annual report depicting a compilation of the CIC's recommendations to PRPB from the previous natural year. Said report needs to be available to the public at PRPB's headquarters and published on PRPB's website. The report must be redacted and submitted yearly until full and effective compliance with the Agreement is determined.[15] A review of PRPB's website reveals that the last report published was in 2016 for the natural year of 2015. The Monitor is aware that some CIC

---

[15] PPR GO 800-801D5J.

members have submitted their recommendations as required, but no sufficient information has been submitted to the Monitor to consider a partial compliance. Moreover, a redacted document has not been evidenced as prepared and published beyond 2016, to meet compliance.

| Paragraph 209 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Partially Compliant |
| Paragraph Language | PRPD shall continue to maintain Community Interaction Councils ("CICs") jointly with community representatives to facilitate regular communication and cooperation between PRPD and community leaders at the local level. CICs shall meet, at a minimum, every three months. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. PPRB policies require it maintain the CIC and they meet at least every three months. | Y |
| | 2. PRPB maintains CIC's as required by this Paragraph. | N |

PRPB's Policy, (OG 800-801), policy reflects an organizational and functional structure with duties and responsibilities established including the requirements to be part of the CIC and to select a representative cross section of community members.

Most CIC's were active during this assessment period. Monthly meetings were held, as verified through copies of their minutes. Humacao and Aguadilla held discussion (Conversatorio) with the community on a virtual mode through their local radio station, and through Facebook live presentations. They were among the most structured, organized and documented their processes throughout. The Police areas of Ponce, Arecibo, Bayamon, Aguadilla, San Juan, Humacao and Mayagüez, held at least one meeting during this assessment period. However, they did not hold their discussion with the community (Conversatorio) as required per policy.

The Central CIC held its meeting on March 29, 2021, under strict rules and protocols per Covid-19. CICs meetings for the police areas of Utuado, Guayama, Aibonito, and Carolina were not held, as confirmed through the documents submitted to the Monitor by PRPB for review. The CICs also reviewed and rendered recommendations on OG 600-634 "Drones." As a result, the Monitor concludes that PRPB is partially compliant.

It is recommended that all area commanders actively pursue and maintain CICs involvement and communication. Also, to provide the necessary support including meetings attendance and resources to engage the community and motivate their participation. The Monitor further recommends thar at least one Community discussion (Conversatorio) be held in an open space either at local basketball courts or community

CMR-4 | July 21, 2021

parks to reach a broader group including those who lack the technological resources or are unfamiliar with social media platforms.

| Paragraph 210 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Partially Compliant |
| Paragraph Language | In conjunction with community representatives, PRPD shall develop a mechanism to select the members of CICs, which shall include a representative cross section of community members and PRPD officers. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. PPRB has developed a mechanism to select the members of the CICs in accordance with this Paragraph. | Y |
| | 2. Selection process for CIC members complies with Paragraph 210 and relevant policies. | N |

The policy contemplates all requirements and protocols for the selection of CIC members and to select a representative cross section of community members. However, Community Interaction Councils continue encountering difficulties to secure full cross-section representation in most police areas. Only two police areas have full representation in their committees and there is one police area missing five representatives. Interviewed spokespersons from the police areas of Fajardo, Utuado, Mayagüez, Carolina, Arecibo, Humacao, Bayamon, Ponce and the Central CIC concurred that among the obstacles encountered is the lack of available training for CIC candidates to complete before they can be confirmed, because training has not been offered at the Academy. Interviewees stated that since the candidates are not permitted full committee participation or involvement until they are fully trained and confirmed, they lose interest and abandon the process. Some other spokespersons reported that interested candidates are family members, who are precluded from participating because it is against the policy.

The agent facilitator for the police area of Aguadilla confirmed that their committee is pending confirmation of three members due to needed training. Other spokespersons reported similar status. Based on the reviewed information and policy requirements and structure, the Monitor deems PRPB as substantially compliant.

The Monitor recommends the review of the Policy on the requirements to become a CIC member when a family member is already a member of a committee and the candidate could represent another community sector. The monitor also recommends that training at the Academy be reinstated expeditiously to facilitate confirmation of pending members. It is further suggested that the Academy holds training on remote with the ability of connectivity at the CIC candidate's police area to comply with Covid protocols if

that is an encountered obstacle. In the alternative, it is suggested the deployment of trainers to regional police areas or local community space for training in smaller clusters per region.

| Paragraph 211 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually as to Data Sources #1 and #2. Bi-annually as to all other Data Sources. | Not Compliant |
| Paragraph Language | PRPD shall allocate sufficient resources and authority to ensure that CICs possess the means, staffing, access, training, and mandate necessary to fulfill their mission and the requirements of this Agreement. The operating budget shall be revisited on an annual basis in consultation with the CICs. | |
| Compliance Target(s) | **Compliance Target** | **Status** |
| | 1. Policies related to CICs incorporate the requirements of the paragraph. | Y |
| | 2. CIC orientation course is consistent with approved policies. | N |
| | 3. PRPB makes CIC orientation available to all members of the CICs. | N |
| | 4. 85% of CICs possess the means, staffing, and access necessary to fulfill their mission and the requirements of this Agreement. | N |

Resources continue to be a problem for CIC's in terms of securing full cross section representation within their respective police areas. Also, a place to hold meetings away from the police headquarters continues being unresolved. PRPB did not submit any documents necessary to assess means, staffing and access to fulfill CICs mission and the requirements of the Agreement on any of the CICs, (85% would be the marker). Interviewed CIC members and/or facilitators reported that some committee members remain without identification cards despite multiple requests to the central office.

PRPB certified that it has not conducted any training orientation (multi-themed workshops) for the CIC's during this assessment period and did not submit the CIC's training curriculum for the Monitor's review. The Monitor is aware about the multi-themed workshops for CICs through the coursework enumerated within the policy. PRPB has not made the curriculum available to the Monitor for content and quality assessment. During CMR3 CIC members interviewed considered training relevant and believed a refresher would be beneficial. Interviewed respondents for CMR 4, reaffirmed the need for a refresher because it assists them in fulfilling their mission. The Monitor concludes that PRPB is not in compliance.

It is recommended that PRPB structures a refresher course for the CIC's and makes available any relevant training or workshop to assist them in fulfilling their mission and finalizes training for those candidates pending confirmation.

CMR-4 | July 21, 2021

It is further recommended that PRPB submits the CICs training curriculum beyond enumerated themes for content and quality review. Additionally, PRPB should include a listing of all certified CIC members per police area and a current listing of all spokespersons at the Central CIC level, not submitted for this assessment period.

| Paragraph 212 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Not Compliant |
| **Paragraph Language** | PRPD shall work closely with CICs to develop a comprehensive community policing approach that collaboratively identifies and implements strategies to address crime and safety issues. In order to foster this collaboration, PRPD shall share appropriate information and documents with CICs, provided adequate safeguards are taken not to disclose confidential or otherwise law enforcement sensitive information. PRPD shall seek CIC assistance, counsel, recommendations, or participation in areas including: <br> a) reviewing and assessing the propriety and effectiveness of law enforcement priorities and related community policing strategies, materials, and training; <br> b) reviewing and assessing the propriety and effectiveness of PRPD policies on matters such as discriminatory policing, search and seizure, use of force, the civilian complaint process, and victim services; <br> c) reviewing and assessing concerns or recommendations about specific PRPD policing tactics and initiatives; <br> d) providing information to the community and conveying feedback from the community to PRPD; <br> e) advising the Superintendent on recruiting a qualified, diverse workforce; and <br> f) advising the Superintendent on ways to provide data and information, including information about PRPD's compliance with this Agreement, to the public in a transparent and public-friendly format, to the greatest extent allowable by law. | |

| **Compliance Target(s)** | Compliance Target | Status |
|---|---|---|
| | 1. PRPB developed a community policing approach working closely with CIC as per the requirements of the paragraph. | N |
| | 2. PRPB protects confidential and law enforcement sensitive information in documents and information it shares with the CICs. | N |
| | 3. Every six months, PRPB sought assistance, counsel, recommendations or participation from the CICs, collectively, at least once in all areas specified by the Paragraph. | N |

The Monitor did not receive any documents regarding policies submitted to the CICs for review. Nevertheless, through copies of the CIC's meeting minutes, the Monitor learned that the CICs reviewed GO 600-634 and rendered their recommendations. The Monitor did review a notice from the Office of the Reform that the CICs received a draft on the revised OG 800-803. The CIC from Bayamon and the Community Safety Council of El Condado, P.R. rendered their recommendations, which are pending PRPB's submission for the Monitor's review and comments under paragraph 229.

CMR-4 | July 21, 2021

CIC members interviewed reported that they met with the Commissioner and believe that communication is improving, and mutual collaboration could be reciprocal for them to fulfill their mission. They feel motivated and renewed and are willing to continue facilitating communication between PRPB and the community despite previous challenges encountered. It should be noted that the Monitor has not been provided with any documents for CICs review of policies regarding recruitment, on discriminatory matters, use of force, civilian complaints, search, and seizure, pursuant to policy, and there is no evidence available for review about an established strategy in community policing in consultation with the CICs. Therefore, the Monitor concludes that PRPB is partially compliant.

| Paragraph 213 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Not Compliant |
| Paragraph Language | CICs shall memorialize their recommendations in an annual public report that shall be available in PRPD facilities and on the official web pages of the Commonwealth of Puerto Rico and PRPD. The report shall include appropriate safeguards not to disclose confidential or otherwise law enforcement sensitive information and to protect sensitive personal or private information. | |
| Compliance Target(s) | **Compliance Target** | **Status** |
| | 1. PRPB published 100% of CICs annual public report with recommendations included are available on web pages of the Commonwealth of Puerto Rico and the PRPB. | N |
| | 2. All CICs annual reports do not disclose confidential or otherwise law enforcement sensitive information and it protects sensitive personal or private information. | N |

The CICs have submitted their semester's recommendations from their respective police areas. PRPB certified that the yearly report is yet to be evaluated and approved by the CICs. Their annual report captures a compilation of the CICs recommendations to PRPB from the previous year. Per policy, said report needs to be made available to the public through PRPB's website and a copy submitted to the Office of the Reform on or before January 31st of the following year. Because the yearly report is not available, the Monitor concludes that PRPB is not in compliance.

It is recommended that PRPB becomes available to provide the necessary resources including technological ones to facilitate the compilation and completion of the CIC's recommendations for publication. For CMR3, the Monitor learned through the Central CIC that the report had been rendered and the CICs were convened by PRPB for signatures, but the report was never published.

## 3. Public Information

The Agreement stipulates that PRPB shall maintain the community and the public informed about monthly crime statistics, processes, and progress on the Reform. PRPB shall also inform the public on its use of force, the community's right on voluntary consent to searches, filing civilian complaints, report incidents or allegations of police misconduct, discrimination, commend officers in their performance of their duties, through open meetings at least twice per year. Additionally, PRPB must foster the community's collaboration through the development of alliances to educate, prevent and fight crime, address issues of quality of life and attend areas of public concern.

PRPB does not have a policy on public information. However, it discharges said responsibility on the Press Office through GO 100-125. The Press Office is responsible for organizing, directing, and controlling the efforts of disseminating information to the public through public broadcasts, social media platforms on the internet, including PRPB's web page, mass media, press releases and conferences to communicate any activities or any other information from PRPB, relevant to the public. The Policy is currently under revision. PRPB submitted amendments to the policy under paragraph 229 of the Agreement. The Monitor has reviewed PRPB's amendments to the policy and has rendered recommendations to include all aspects on community policing's philosophy into its operational policy.

| Paragraph 214 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | PRPD shall develop a Community Outreach and Public Information program in each of the former thirteen police regions or in other operational subdivisions with comparable geographic coverage. | |
| Compliance Target(s) | Compliance Target | Status |
| | 1. Community Outreach and Public Information program was developed in each of the former thirteen police regions or geographic equivalent. | N |
| | 2. At least bi-annual open meetings were held during the first two years of the Agreement. Then annually until the end of the Agreement. | N |
| | 3. 95% of the meetings were widely publicized at least one week before such meeting. | N |
| | 4. During 95% of the meetings reviewed the public was informed of the requirements of this Agreement, PRPB's progress meeting these requirements, and addressed areas of community concern. | N |
| | 5. 95% of the Outcome Reports of open meetings reviewed comply with the parameters established by this Paragraph. | N |

| | |
|---|---|
| 6. 95% of the meetings reviewed included public education on an individual's right to decline consent to voluntary searches, consistent with Paragraph 77 of this Agreement. | N |
| 7. Community Outreach and Public Information program meetings comply with Paragraphs 214-216 and parameters established in associated monitoring worksheets. | N |

PRPB has not complied with the community outreach plan through encounters or public meetings which requires at least two open meetings per year. It has failed to inform the public on their progress on the Reform; the use of force, the public's rights to voluntary consent or denial to searches, filing civilian complaints, report incidents or allegations of police misconduct, discrimination, commend officers in their performance of their duties.

PRPB submitted documentation from each police area certifying that community encounters did not take place. Officers from the police area of Caguas submitted documentation of a community activity held at a local public housing project which they classified as a community encounter/outreach, but the same did not meet the criteria nor had the structure of a community encounter in compliance with the agreement.

The Monitor is unaware of a Community Outreach and Public Information program developed in each of the 13 Police areas, because no documents have been submitted by PRPB for compliance determination. However, there is policy in place wherein duties and responsibilities are outlined including an execution plan.[16] It is recommended that the plan be executed and implemented.

| Paragraph 215 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | The Community Outreach and Public Information program shall require at least bi-annual open meetings for the first two years of this Agreement. During the meetings, PRPD officers from the police region and/or the Reform Unit shall inform the public about the requirements of this Agreement, PRPD's progress meeting these requirements, and address areas of community concern. At least one week before such meetings, PRPD shall widely publicize the meetings using print media, the Internet, and public service announcements on television or radio. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 214. | |

PRPB did not provide a copy of a calendar with the planned or proposed meetings nor locations per police area as required. The meetings did not appear to be contemplated in

---

[16] PPR GO 800-805.

any of PRPB's plans for support and assistance from SAIC and SARP according to policy. A review of PRPB's website denotes that the last year the calendar was updated for Community encounters was in 2018. Therefore, PRPB is deemed not compliant.

| Paragraph 216 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | The Community Outreach and Public Information meetings shall, with appropriate safeguards to protect sensitive information, include summaries of all audits and reports completed pursuant to this Agreement and any policy changes made and other significant action taken as a result of this Agreement. The meetings shall also include public education on an individual's right to decline consent to voluntary searches, consistent with Paragraph 77 of this Agreement. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 214. | |

Since PRPB has held no community outreach meetings and certified the same for all thirteen police areas, PRPB is deemed not compliant.

| Paragraph 217 | Assessment Frequency | | Overall Compliance Status |
|---|---|---|---|
| | Bi-annually | | Not Compliant |
| Paragraph Language | PRPD shall maintain and publicly disseminate accurate and updated crime statistics, including those related to hate crimes, on a monthly basis. | | |
| Compliance Target(s) | Compliance Target | | Status |
| | 1. PRPB disseminates crime statistics on a monthly basis. | | N |
| | 2. 95% of reviewed crime statistics were publicly disseminated on a monthly basis. | | N |
| | 3. 100% of hate crimes were publicly disseminated once they occurred. | | N |
| | 4. PRPB communicated hate crimes statistics to the public in a clear and easily accessible way. | | N |

The Agreement requires public dissemination of accurate and updated crime statistics including hate crimes monthly.

PRPB certified that its statistics have been updated through SAEC a computerized statistics analysis system, but it has not been made available to the public on PRPB's website because the program is not available for data update. PRPB further certified that hate crimes are collected through NBRIS under code 8A, but it relies on the investigations' outcome for the final determination and classification of the offense. According to the

certification submitted, the CIC (Corps of Criminal Investigations) has not reported any hate crimes to the statistical division[17].

The Monitor is aware that NBRIS is not operational at PRPB and that although PRPB was scheduled to transition into NBRIS in January 2021, the transition did not take place. The Monitor concludes that PRPB is not in compliance, as it did not meet compliance in CMR2 and CMR3 as well.

It is recommended that statistics be informed to the public in a transparent accessible, easily, and understandable manner. PRPB must remedy its technological deficiencies not only to inform the public as required in the agreement, but for its own benefit to obtain the necessary data to develop work plans, resources deployment and promote officer and civilian safety among other operational functions. In the interim, it is strongly advised to utilize PRPB's social media accounts and its internal resources to keep the public informed, report on its statistics and progress on the Reform, among other issues relevant to the public such as strategies to fight crime, crime trends, quality of life matters, awareness, prevention, and education.

## IX. Information Systems and Technology

During the CMR-3 assessment period and continuing into CMR-4, although PRPB began to achieve some progress toward partial compliance for technology, beyond the technology itself it had not yet made sufficient progress toward full implementation of end-to-end solutions. An example of this is CAD (and Mobile CAD). Although deployed, SAEA had yet to provide a formal training curriculum. In response as a stop-gap measure, the Bureau of Technology provided orientation training to agents and staff. But this is inadequate. As well, the Use of Force change to CAD Form PPR 126.6 has not been implemented. For these reasons, while the technology is partially available, because continuing adaptations are needed and formal training is not yet available, PRPB cannot be considered other than partially compliant.

With respect to EIS, its operational status was also unvalidated. Four of Twelve modules are purportedly developed but its functionality has not been proven.

Regarding PRPB's analytic capabilities, PRPB has yet to show that it possesses substantive acumen coupled with a mastery of its data resources such that it could measurably exploit

---

[17] CO-21-217.

CMR-4 | July 21, 2021

its information and data resources to advance the transformation and Decree. This is of continuing concern because while operational staff can query data and generate reports, there is no explicit measurable proof of PRPB using analytic outputs to address the expected transformation within the Decree.

Moving forward, it is critical that PRPB be able to consistently demonstrate a viable analytical practice. The AH Data Analytics report of March 2021 made similar mention of this recommendation. And as it was cited during CMR-3, to validate compliance PRPB must commit to providing on-site demonstrations of its IT capabilities coincident with proofing that the mission processes that the IT is intended to support. Finally, and most significantly, PRPB must be able to baseline its capabilities to be able to move toward compliant processes and practice improvement, founded on metrics and analytical data available from repeatable and consistent use of credible IT applications.

| Paragraph 218 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Not Compliant |
| Paragraph Language | PRPD shall establish information systems and utilize technology to support the implementation of this Agreement in an efficient and effective manner. | |
| Compliance Target(s) | Compliance is determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 219 – 224 in tandem with applicable Paragraphs in sections III through XII and (2) the results of outcome assessments, pursuant to Paragraph 243. | |

Important to note at this stage of IT monitoring, compliance may be assessed in terms of being both; 1) technologically compliant and 2) procedurally compliant whereby "procedurally" refers to the full and overarching implementation of the technology and processes applicable to a specified transformation in the Decree. Guiding this premise is the convention that successful adaptation of technology itself can demonstrate commitment to transformation in the absence of a comprehensive procedural policing transformation.

Furthermore, compliance can be recurringly evaluated on a continuum whereas compliance might be achieved and lost throughout its life cycle depending on PRPB responses and sustainment of those achievements.

And so, under these tenets the following applications are currently assessed as;

- CAD/CAD Mobile – Partially Compliant
- Kronos – Deferred
- PTMS – Deferred

CMR-4 | July 21, 2021

- EIS – Deferred
- Virtual Training – Deferred

Noting that CAD and Mobile CAD are available, the requisite formal training is not. The Bureau of Technology has provided orientations, but SAEA has not yet responded with a formal curriculum. This situation leaves any utilization of CAD susceptible to scrutiny and criticism.

Although Kronos is operational and available to PRPB personnel it will be deferred until a demonstration can be completed. The monitor is confident that technologically Kronos will be assessed as partially compliant during CMR-5. Demonstrated use of Kronos data as well as the ability to effectively analyze all Kronos data interfaced with other systems such as PTMS and EIS could render Kronos as substantially compliant during the CMR-5 phase. This utility is not yet proven.

At this time PTMS, EIS, and the Virtual Training System must be considered as **Deferred** until PRPB can capably demonstrate each to the Federal Monitors. Live demonstrations are planned for June 2021.

| Paragraph 219 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | PRPD shall collect and maintain all data and records necessary to: (a) document implementation of and compliance with this Agreement, including assisting the TCA's outcome assessments and the data collection and reporting required by this Agreement; (b) perform ongoing performance improvement activities in each of the areas addressed by this Agreement; (c) facilitate and ensure transparency and wide public access to information related to PRPD decision making and activities, as permitted by law; and (d) promote officer and civilian safety. | |

| Compliance Target(s) | Compliance Target | Status |
|---|---|---|
| | 1. Data dictionary includes all data sets necessary to access compliance with the Agreement. | N |
| | 2. The data systems permit PRPB to engage in ongoing performance improvement activities in each of the areas addressed by this Agreement. | N |
| | 3. PRPB makes publicly available all data that the Agreement requires be published, in accordance with PRPB policy and applicable laws. | N |
| | 4. PRPB collects and maintains data that is relevant, useful, and applicable to officer and civilian safety. | N |
| | 5. PRPB maintains data and records in compliance with the Agreement and applicable laws. | N |

PRPB has not yet consistently articulated with certainty which data sources are to be used to extract information needed to perform analytical functions. Therefore, the assessment

is **Not Compliant** until June 2021 when a determination might be made regarding compliance during on-site review. During the demonstrations PRPB must be able to establish and isolate with certainty which systems are the "Sources of Record" for all data necessary for Policing and to achieve compliance with paragraph 218 of the Agreement.

| Paragraph 220 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Bi-annually | Not Compliant |
| Paragraph Language | PRPD shall develop protocols for collecting, analyzing, and reporting the information required by this Agreement. These protocols shall be developed and implemented in coordination with the TCA and shall be approved by the DOJ prior to implementation. | |
| Compliance Target(s) | This Paragraph is assessed with Paragraph 219. | |

This paragraph requires that PRPB develop protocols for collecting, analyzing, and reporting information. At this time, PRPB has not provided sufficient evidence that it has developed protocols related to each IT system for collecting, analyzing, and reporting information required by this Agreement. As such, PRPB is assessed as **Not Compliant.**

To demonstrate compliance with the above paragraph as well as paragraphs 218, 219, and 221, PRPB must rigorously incorporate data management and analytical mastery in its IT Capabilities and expertise talent portfolio. The AH Data Analytics report makes the same recommendation.

| Paragraph 221 | Assessment Frequency | | Overall Compliance Status |
|---|---|---|---|
| | Annually | | Partially Compliant |
| Paragraph Language | PRPD shall develop and maintain an automated record management system and electronic files as part of the Action Plans developed for each subsection above. | | |
| Compliance Target(s) | Compliance Target | | Status |
| | A record management system accounts for all the elements of the Paragraph and outcome measures as required by Paragraph 243. | | N |

The assessment criteria requires that PRPB develop and maintain a record management system as part of the Action Plans developed for each section of the Agreement. During the CMR-4 assessment period, PRPB failed to demonstrate its complete grasp and mastery of its inventory of systems necessary for policing and compliance with the Agreement. However, because foundational IT capacity exists, this rating will be **partially compliant** until an on-site assessment can be conducted in June 2021.

CMR-4 | July 21, 2021

Note - It is very important to acknowledge that achieving partial or substantial compliance in these areas can be temporary and that unless PRPB strives to continuously improve and upgrade its technology systems, PRPB could in fact backslide to non-compliance at any time.

| Paragraph 222 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Not Compliant |
| Paragraph Language | PRPD shall provide each supervisor with handheld recording devices and require that supervisors use these devices to record complainant and witness statements taken as part of use of force or misconduct complaint investigations. | |
| Compliance Target(s) | Compliance Target | Status |
| | 1. Policies incorporate all the requirements of this Paragraph. | N |
| | 2. Handheld recording device trainings are consistent with approved policies. | N |
| | 3. 95% of sampled personnel are trained and certified in relevant policies related to handheld recording devices (or scheduled for training, in the case of mid-year reviews). | N |
| | 4. Complaint and witness statements are recorded in 95% of use of force reviews. | N |
| | 5. Complaint and witness statements are recorded in 95% of misconduct complaint investigations. | N |
| | 6. All sampled units had access to functional handheld recording equipment. | N |

PRPB provided insufficient information and evidence during the period to support an assessment. Therefore, this assessment is **not compliant** until an in-person on-site review of materials can be conducted.

| Paragraph 223 | Assessment Frequency | Overall Compliance Status |
|---|---|---|
| | Annually | Not Compliant |
| Paragraph Language | All officers shall have access to National Crime Information Center ("NCIC") data for valid law enforcement purposes only. PRPD shall develop a protocol for the handling and use of NCIC data. | |
| Compliance Target(s) | Compliance Target | Status |
| | 1. Policies incorporate all the requirements of this Paragraph. | Y |
| | 2. NCIC data trainings are consistent with approved policies. | N |
| | 3. 95% of sampled personnel are trained and certified in relevant policies related to handling and use of NCIC data (or scheduled for training, in the case of mid-year reviews). | N |
| | 4. NCIC data is considered in 95% of patrol interventions and investigations. | N |
| | 5. All sampled units had access to NCIC data. | N |

| 6. PRPB safeguards appropriately protect sensitive data. | N |
| --- | --- |

PRPB provided insufficient information and evidence during the period to support an assessment. Therefore, this assessment is **<u>not compliant</u>** until an in-person on-site review of materials can be conducted.

## Appendix A: Background to PRPB Monitoring Mission

In 2008, USDOJ initiated an investigation of PRPB into an alleged pattern or practice of using excessive force, conducting unlawful searches and seizures and unlawful discrimination, all of which are proscribed by the United States Constitution. USDOJ conducted their investigation pursuant to the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141, and the anti-discrimination provisions of the Omnibus Crime Control and Safe Streets Act, 42 U.S.C. § 3789d. PRPB accepted the grounds for the investigation and pledged cooperation and has worked in partnership with USDOJ to establish the reforms outlined in this Agreement.

As part of its investigation, USDOJ and its police practices expert consultants conducted a detailed fact-finding review with the assistance and full cooperation of PRPB, including: a) tours of police areas; b) interviews with PRPB officers, supervisors, command staff, Commonwealth officials, members of the public, and other stakeholders; c) review of many thousands of documents, including policies and procedures, incident reports, internal investigation of civilian complaint records, external audit reports, and legislative materials; d) accompanying line officers and supervisors during their respective tours of duty. PRPB's Superintendent and command staff officials met personally with USDOJ representatives and consultants on multiple occasions and pledged their full support and cooperation.

In response to the concerns raised by USDOJ during its practice investigation of PRPB, and in recognition of the need to modernize and professionalize its operations, PRPB undertook its own internal reform efforts. These efforts culminated in the issuance in March 2011 of PRPB's own internal reform plan. The plan included: 1) the development and implementation of new policies regarding use of force and a wide range of other substantive areas; 2) the training of all appropriate officers in the new use of force policies through "train-the-trainer" pedagogy; 3) the adoption of a reformed disciplinary system; 4) the improvement of citizen complaint procedures; 5) the strengthening of community outreach efforts through Citizen Interaction Committees; and 6) a staffing review to improve supervisor to officer ratios.

In September 2011, USDOJ issued a written report of its investigative findings ("the Report"). The Report presented USDOJ's findings related to use of force, use of force to suppress the exercise of First Amendment rights, and searches and seizures. The Report identified several additional areas of serious concern, including discriminatory policing and the insufficient quality of investigation into sex crimes and domestic violence. Finally, the Report outlined a series of other performance issues: 1) systemic deficiencies in

PRPB's policies and procedures; 2) conduct of specialized units; 3) formative and in-service training; 4) supervision; 5) intake, internal investigation, and institutional adjudication of administrative misconduct complaints; 6) corrupt acts and other crimes committed by PRPB officers; 7) substandard processes for promotion in rank; 8) lack of risk management; 9) poor external oversight and accountability; and 10) a lack of sufficient community engagement. The Report concludes that the performance of PRPB was undermined by several entrenched and long-standing problems, which in the estimation of USDOJ called for a systemic remedy.

While PRPB did not concur with all the findings and conclusions in the Report, the Parties met throughout 2012 to exchange ideas and proposals for modernizing and professionalizing PRPB and to discuss numerous reforms already underway at PRPB's own initiative. Once the newly elected Commonwealth administration took office in January 2013, the administration familiarized itself with the Agreement and continued negotiating to reach a final Agreement. The Agreement is the product of these good faith negotiations. In July of 2013, the draft Agreement was presented to the Honorable Gustavo A. Gelpi, Chief Judge of the US District Court for the District of Puerto Rico, who approved the draft, formalizing the Agreement.

On June 5, 2014, the Court approved the selection and hiring of an independent monitor to help PRPB during the capacity building phase and thereafter monitoring the compliance period of the Agreement.

Unlike other consent decrees throughout the United States and its territories and owing to the unique institutional development and needs of the Commonwealth, the Agreement between the USDOJ and Commonwealth of Puerto Rico included a four-year "capacity-building" phase. During that phase, PRPB was expected to develop policies, procedures, and technologies to address serious deficiencies within the agency. The Monitoring Team, which is comprised of subject matter experts, was expected to provide substantive expertise and technical assistance to guide PRPB in its implementation and development efforts, while at the same time providing the public with assurance that PRPB's progress would be evaluated in a reliable, independent, and transparent manner.

The capacity-building period concluded on October 8, 2018, at which time the "monitoring phase" was to commence according to the Agreement. However, at that time the Monitor and Parties were unable to come to a consensus on the methodology matrices that the Monitor's Office proposed to use to measure PRPB's compliance with the Agreement. This resulted in a delay in the start of the monitoring phase, and the Court subsequently suspended monitoring measures pending the finalization and acceptance

of a compliance assessment methodology agreeable to the Parties. PRPB, legal counsel, and the USDOJ conferred with the Monitoring Team over the course of six months to develop methodology matrices necessary to measure compliance for the eleven performance areas outlined in the Agreement. After review, and with the assent of the Parties, the Court accepted the objective methodologies put forth by the Monitor's Office.

In March of 2020, the court approved and published the First Report of the Federal Monitor, which focused primarily on policy and procedures, use of force, and information technology. CMR-1 found broad compliance on policy and procedure and certain areas of use of force, but nevertheless found a series of key lapses in use of force investigations and IT infrastructure. Later that same year, CMR-2 provided a more comprehensive overview of PRPB performance, covering a significantly larger number of Consent Decree paragraphs. As such, CMR-2 provided a model for Monitor's reports going forward. CMRs 3 and 4 have continued assessing PRPB on all paragraphs that require biannual evaluation, and approximately half of the paragraphs that require annual evaluation.

## Appendix B: Methodology

In agreement with the approved methodology, the Monitoring Team uses a combination of quantitative and qualitative methods to assess PRPB's compliance with the Agreement in the three areas of performance selected for this report. Each paragraph in the Agreement has been assigned a methodology that was agreed on by the Parties and approved by the court. These methodologies include information on the data source, sampling method (if relevant), and compliance target. The full methodology can be accessed at the Monitor's website at https://www.fpmpr.org.

The compliance levels are defined as follows:

- **Fully Compliant:** Where PRPB has objectively demonstrated substantial compliance with the cited portion of the Agreement for a period of more than two years;
- **Substantially Compliant:** Where PRPB has objectively demonstrated extensive compliance with the cited portion of the Agreement (as defined by the compliance targets for a given paragraph) for a period of less than two years;
- **Partially Compliant:** Where PRPB has objectively demonstrated a sub-optimal level of compliance with the cited portion of the Agreement, as defined by the compliance targets for a given paragraph;
- **Not Compliant:** Where PRPB has not objectively demonstrated compliance with the cited portion of the Agreement, either due to a lack of evidence, or due to evidence of significant shortfalls in compliance relative to the targets outlined for a given paragraph;
- **Rating Deferred:** Where the Monitoring Team has not obtained sufficient evidence to reach a determination as to compliance status with the cited portion of the Agreement, due to no fault on the part of PRPB.

The Court draws a clear distinction between a deferred rating and a rating of non-compliance due to lack of information. In the latter case, the Monitor's Office is unable to reach a determination of compliance because PRPB failed to provide the Monitor's Office with requested data, and thus failed to provide evidence of compliance. In the former case, the Monitor's Office could not obtain sufficient data to reach a determination of compliance due to no fault on the part of PRPB, e.g., travel restrictions prevented the Monitor's Office from conducting required site visits.

## Appendix C: Notes on Select Internal Investigations

### Case 2020 – 01055

This case involves a senior officer in a romantic relationship with a direct subordinate officer and allegedly resulting in preferential treatment, misuse of vehicle and granting of unwarranted vacation time as well as a possible coverup over loss of her service weapon. Case 2020-00760 Anonymous whistleblower complaint that alleges favoritism, diversion of taxpayer paid labor, unethical behavior, etc. The "interviews" conducted were not sworn declarations involving questioning and answers, but rather a form wherein the interviewee presented a narrative conclusory statement regarding the allegations. These "interviews" were handwritten in an indecipherable cursive. All officers involved should have been thoroughly interviewed rather than forwarding an untested, one-sided written statement.

### Case 2020-00512

This case involves allegations of a police officer acting as an escort for a former Superintendent wherein she altered her hours of entry and exit to illicitly collect for hours not worked. A lieutenant allegedly caught her once and told her to fix the fraudulent entry. The same "hoja de entrevista" is used to get a narrative from the lieutenant who could confirm the wrongdoing. In his written statement, the lieutenant avers by saying, "I don't remember having any administrative problems with her as far as her schedule, all of the escorts have assigned tours and punch [the clock] when they arrive and depart." None of this narrative statement, consisting of ~100 words, is ever challenged by the investigator. Other nearly indecipherable and unchallenged "hojas de entrevista" submitted by other potential witnesses claiming, "no knowledge" of wrongdoing or that the alleged offender was "not under my supervision." The subject of the complaint submitted the same unchallenged hoja de entrevista without any warning whatsoever.

### Case 2019-00915

While not a whistleblower complaint, this case concerns an allegation by an arrestee that the arresting officers stole some of the cash he had at the time of the arrest. Officers were subjected to 2019 "Declaraciones por Entrevista" which consisted of a written statement provided in narrative form and not tested in any way by questions from the investigator. In a case such as this, where money is alleged to have been taken by the police, this is not proper investigative procedure. All witnesses should have been subjected to sworn declarations in 2020 and close questioning/examination of the facts underlying this serious accusation.

CMR-4 | July 21, 2021

### Case 2019-00915

This case involves an allegation of theft of money from a prisoner. This may constitute felonious larceny.

### Case 2019-01365

This case involves police officers on sick leave who are alleged to have been working during that same time on the mainland, which could consider mail fraud. Even though the officers resigned, the case should have been referred for criminal investigation.

### Case 2020-01055

This complaint alleges that a superior officer involved in a relationship with a subordinate credited her with extra vacation time, which she allegedly did not earn. This may be considered fraud.

### Case 2020-00760

This complaint alleges that a group of officers in the Stolen Car Unit received pay for which they were not entitled, which may constitute mail fraud.

### Case 2020-00512

This complaint alleges that a PRPB officer was paid overtime for hour not worked, which may constitute mail fraud.