1                  IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF PUERTO RICO
2    :_____:

3       THE UNITED STATES OF AMERICA,      :
                       Plaintiff,          :
4                                          :
                   vs.                     :  Case No: 12-CV-2039 GAG
5                                          :
        THE COMMONWEALTH OF PUERTO RICO,   :
6       et al,                             :
                       Defendant.          :
7    :_____:

8                 TRANSCRIPT OF STATUS CONFERENCE
        HELD BEFORE THE HONORABLE CHIEF JUDGE GUSTAVO A. GELPÍ
9     JOSÉ V. TOLEDO U.S. COURTHOUSE, OLD SAN JUAN, PUERTO RICO
          THURSDAY, SEPTEMBER 9, 2021, BEGINNING AT 9:07 A.M.
10   :_____:

11   A P P E A R A N C E S:

12                  U.S. DEPARTMENT OF JUSTICE-Civil Right Division
                    BY LUIS E. SAUCEDO, ESQUIRE and
13                  JORGE M. CASTILLO, ESQUIRE
                    950 Pennsylvania Avenue, NW
14                  Washington, DC 20530
                    For the Plaintiff
15
                    CANCIO, NADAL & RIVERA, L.L.C.
16                  BY GABRIEL A. PEÑAGARÍCANO, ESQUIRE and
                    RAFAEL BARRETO-SOLÁ, ESQUIRE
17                  403 Muñoz Rivera Avenue
                    San Juan, Puerto Rico 00918
18                  For the Defendant

19   ALSO PRESENT:

20        Sonia C. Cardona, Courtroom Deputy Clerk

21        Mayra Cardona, Spanish Interpreter

22        John Romero, Monitor & Monitor's Team

23        Dr. Alejandro Del Carmen, Special Master

24        Colonel Antonio López-Figueroa, Police Commissioner

25

1          THE COURTROOM DEPUTY:  All rise.

2          (The Court enters the room.)

3          THE COURT:  Please be seated and good morning

4    to all.  Today we're going to hold the second part of

5    our status conference public hearing.  And the idea of

6    having it at this time of the year where we're already

7    in mid-September.  Last hearing we covered five areas

8    of the agreement, today we're going to cover the other

9    six areas.  But my intention with these hearings is to

10   have at the close of today's session a very frank and

11   honest snapshot of where PRPB stands.  And with that

12   in mind it's going to be very feasible for PRPB not

13   only from the monitor's report but from the

14   self-assessment and all comments that are going to be

15   done here where it needs to move forward in the next

16   couple of months.  So that's the idea of this hearing.

17   To me it's important to hear from all the different

18   areas given that with the COVID pandemic we really

19   hadn't had these hearings.

20          I do want to note that, as ordered by the

21   Court, the Commonwealth of Puerto Rico filed it's,

22   let's say, self assessment of the different areas at

23   Docket 1841 -- no, 1830.  And also at 1841 it filed

24   another document that was filed by the Puerto Rico

25   Justice Department that has to do with domestic

1    violence.  Those two documents have been filed and the

2    United States Department of Justice filed its response

3    to the Commonwealth's motion at Docket 1830 at Docket

4    1837.  So I've reviewed that for the record and I want

5    to thank both parties for putting in the effort they

6    did into these filings which are very important.  And

7    there's other documents submitted by community members

8    and I'll make reference to them probably in the

9    afternoon session.

10            I also want to note I want to say something

11   very briefly.  Obviously when we address the

12   Commonwealth's memorandum at Docket 1830, but

13   something that struck my attention which I think is

14   very important for this case moving on forward is that

15   in this memorandum the commissioner of police,

16   Mr. López-Figueroa, what I find very commendable about

17   this report is that it takes the point that the

18   monitor is making in the last report and basically

19   saying this is what the monitor noted.  As of today

20   this is where we stand, we're complying with this,

21   we're looking forward to start complying with this

22   other matter but it is a very positive memorandum

23   because it's taken the monitor's report as a tool to

24   move forward.  So I think it shows that PRPB is taking

25   measures to comply.  And obviously today we're going

4

1    to see areas where compliance may be better,

2    compliance needs to improve, but this is what is very

3    important that the police have this attitude.

4            I also do want to thank -- well, before we

5    start formally, and I'm going to recognize everybody

6    from the DOJ and the parties who are here, but before

7    that I want to take a moment to note that I'm formally

8    announcing that Attorney Alfredo Castellanos and

9    Retired Justice Federico Hernández-Denton, who are

10   senior counsel, special counsel to the monitor in this

11   case, are retiring.  They've been with us for close to

12   a decade almost, it seems like yesterday.  They were

13   planning on doing so about two years ago, but I

14   basically twisted their arms and begged them to stay

15   because there was a transition in the monitor's

16   office.  And the monitor John Romero was there but he

17   was understaffed.  Now the office is fully staffed, it

18   has general counsel, and it has all the subject matter

19   experts and support personnel.

20           So at this time I accepted their petition to

21   step down.  We will miss them, but at the same time I

22   want to thank them for all their efforts and work

23   throughout this case.  This has been a difficult time.

24   We've gone through the earthquakes, we've gone through

25   the COVID, we've gone through the hurricanes, and

1    they've worked on many, many things particularly when

2    we were short-staffed -- well, the Monitor's office

3    was short-staffed, they helped prepare the Monitor's

4    reports and other special reports.  And also when it

5    came to certain protocols and other matters had to be

6    prepared and other matters it was all resolved.

7          I do note Mr. Castellanos at one point there

8    was the issue about the elections here and PRPB wasn't

9    allowed to advertise in compliance with the reform or

10   announce anything and he was also able to resolve that

11   matter dealing with the separate agencies.

12         So again their work has been extremely

13   valuable.  Justice Hernández-Denton's insight, a

14   former Supreme Court justice for 30 years, was

15   extremely valuable as well.  So we will miss them and

16   I applaud them and I thank them for their work here.

17         Since the Monitor's here, John Romero, before

18   I formally introduce anything, is there anything you

19   would add now that I've mentioned this retirement

20   about Mr. Castellanos or Justice Hernández-Denton?

21         MONITOR ROMERO:  Well, Your Honor, I would

22   just add you're absolutely right.  They've served the

23   Monitor's office for almost eight years and two and a

24   half years ago when I took over as monitor it was a

25   very difficult time.  We know half the team had left

1  and there was a brief transition period, and without

2  Attorney Castellanos and Judge Denton we wouldn't have

3  been able to make it.  They were there for us and I

4  just cannot thank them enough for being there.

5          I know at that time they were thinking about

6  stepping down and you convinced them to stay and that

7  was a very important decision and it helped the

8  Monitor's office very much.  I thank them for the

9  service that they provided to the Monitor's office and

10  to me personally.  It meant quite a bit.  Thank you,

11  Your Honor.

12          THE COURT:  So let me formally introduce for

13  the record counsel from U.S. DOJ Luis Saucedo is

14  present, as well as Jorge Castillo.  I believe there

15  are other persons, they're appearing via zoom.  There

16  are other persons from U.S. DOJ who are participating

17  in the hearing but they're only participating in audio

18  and so I want to note that.

19          Then for purposes of the Commonwealth

20  Attorney Barreto and Attorney Peñagarícano are both

21  here and then I'd like both of you to introduce who

22  are the members of the police or the Commonwealth who

23  are here today.  So please go ahead.

24          MR. PEÑAGARÍCANO:  Good morning, Your Honor.

25  On behalf of the Commonwealth present this morning is

1    the governor's representative Attorney Maria del Mar

2    Ortíz.  From the Puerto Rico Police Bureau the

3    commissioner, Colonel Antonio López-Figueroa; the

4    associate commissioner, Juan Rodríguez-Dávila; the

5    director of the reform office, Captain Carlos

6    Figueroa-Ortolaza; the in-house counsel of the reform

7    office, attorney José Vázquez-Rivera.

8            Also, from the Department of Justice of

9    Puerto Rico my dear first cousin Attorney Susana

10   Peñagarícano-Brown; and Attorney Laura

11   Hernández-Gutiérrez.  Also presenting on the six

12   categories today present from the Bureau is Colonel

13   José Ramírez-Ramos, Colonel Luis Colón-Ortíz,

14   Commander Wilson Lebrón, Sergeant Yvette

15   Rivera-Velázquez, Lieutenant II Georgiani

16   Mulero-Andino, Lieutenant II Alexis Quiñones-Ortíz.

17           THE COURT:  Okay, thank you.

18           MR. PEÑAGARÍCANO:  Thank you.

19           THE COURT:  And I welcome Commissioner

20   Antonio López and also the governor's personal

21   representative Maria del Mar Ortíz.  I do want to say

22   as to both of you it's very important that you've both

23   been at these hearings whether live or the ones we've

24   had previously via Zoom.  Ms. Ortíz in all the other

25   consent decree cases has been present and I think

1    that's very important.  I have never seen a governor's

2    personal representative not miss a single hearing and

3    again it's very important and it helps things move on,

4    so thank you very much.

5         So now from U.S. DOJ, Mr. Saucedo or

6    Mr. Castillo, I know there's been some coordination

7    and there are several members from the community that

8    are here.  I don't know of anybody else who has

9    coordinated through your office or through the

10   Monitor's office to be here, but if there's anybody

11   you would like to introduce and then I'll give you, if

12   you want to have an extra minute, I know both of you

13   and particularly you, Mr. Saucedo, worked along with

14   Justice Hernández-Denton and Attorney Castellanos so

15   if there's anything you want to state for the record.

16   They're not here today but they'll see the transcript

17   at some point, so please go ahead.  And then I'll have

18   the Monitor introduce the team after that.

19        MR. SAUCEDO:  Yes, sir.  Good morning, Your

20   Honor, Luis Saucedo for the United States.  I do want

21   to take a minute here to thank Attorney Castellanos

22   and Justice Hernández-Denton for their service on this

23   case.  I know that each has made contributions to

24   advancing the work.  We especially thank Attorney

25   Castillanos for all of his efforts on the public

1    hearing.  I know he took responsibility for trying to

2    take these proceedings out of San Juan and closer to

3    people around the island who are affected by the

4    reform effort.

5         And also Chief Justice Hernández-Denton who

6    was instrumental in trying to finish the large group

7    of policies that were being created and revised.  He

8    was very helpful in ensuring that those policies were

9    sound and were consistent with Commonwealth Law so

10   that was very helpful.

11        I also want to thank the public officials,

12   the governor's personal representative, the

13   commissioner, and other PRPB officials who are here

14   this morning.  I especially want to thank the members

15   of the community who took the time to be here.  I

16   think it's important to keep in mind, at least it's

17   important for us as the DOJ, to remember that this

18   case really means something different for people who

19   live there and it's because they're affected by the

20   police interactions every day.  And so we appreciate

21   their efforts, we thank them for being here this

22   morning.

23        It's important for us to continue to listen

24   and to take their views into consideration as this

25   case moves forward.  I don't have quite the attendance

1    list of people who are there.  I do see Mr. José

2    Rodríguez from the Dominican Committee For Human

3    Rights, Modesta Irizarry who was here with us last

4    time.  And I'm not sure who else is in the room, but I

5    want to thank you all for being here and for being

6    part of this case.  We appreciate it.

7              THE COURT:  Okay, thank you, Mr. Saucedo.

8              MR. SAUCEDO:  Your Honor, as far as

9    substance --

10             THE COURT:  Oh, yes, go ahead.

11             MR. SAUCEDO:  Your Honor, I just wanted to

12   note that, you know, we'll reserve specific comments

13   and an introduction for the afternoon session.  So

14   thank you very much for holding these proceedings and

15   for creating a record of where we are and where we're

16   headed.

17             THE COURT:  Okay, thank you.  And what I will

18   do is during the morning, as during the last hearing,

19   the idea is to hear -- well, I've read what PRPB has

20   submitted so I'll be asking particular questions to

21   the deponents and once I'm done I'm going to allow

22   U.S. DOJ to make some follow-up questions that I may

23   have missed, and then PRPB can also ask if there's

24   anything they want to follow-up on that.  So it's

25   going to be the same format as last time.  We're going

1    to go until about 11:30 this morning and then resume

2    at 2:30.  Why the three-hour break? because there's

3    not too many restaurants in Old San Juan, they're

4    slow.  And again I just want everybody to have a good

5    lunch, relax, and come back.  And again this is not a

6    contentious hearing; the idea is to try to get

7    everything for the record so we all know where

8    everybody stands.

9         Now, what I'd like to do is for the monitor

10   to introduce everybody from his team.  I believe

11   everybody except Luis Hidalgo who is excused, he's

12   taking his daughters to college and he's got two at

13   the same time.  So aside from that introduce everybody

14   and then I'll ask somebody from your team, it doesn't

15   have to be right now but maybe at one of the breaks,

16   to figure out who from the community is here so we can

17   identify everybody who is here later.

18        I have received some written statements from

19   the community leaders, some wanted to speak today, but

20   because the calendar is charged I don't think we're

21   going to have time.  I have the written statements.

22   If we finish earlier perhaps I'll be able to give

23   everybody two or three minutes but I have read those

24   statements and they will be made part of the record as

25   well.

1          So Mr. Romero introduce your team, please go

2     ahead.

3          MONITOR ROMERO:  Thank you, Your Honor.  With

4     me at the table is General Counsel Roberto Abesada and

5     Deputy Chief Monitor Denise Rodríguez.  The subject

6     matter presented here today Rafael Ruiz, Al Young,

7     Scott Craig.  We also have a number of support staff

8     and I didn't have a list of --

9          THE COURT:  Merangelie Serrano is also here.

10          MONITOR ROMERO:  We don't have a total list

11     of everybody here, Your Honor, but the entire team is

12     here.  If you give me a second I can provide you the

13     names.

14          THE COURT:  I believe Rita Watkins is here.

15          MONITOR ROMERO:  Rita Watkins is here as

16     well.

17          THE COURT:  Don Goslett is here.  Javier

18     González is here.

19          MONITOR ROMERO:  Hipolito Castro is here.

20     Manuel is here.

21          THE COURT:  Ruben Arroyo is here, as well as

22     Javier González.  Claudia Camera is also here, support

23     staff from the office, and Stephanie --

24          MONITOR ROMERO:  I think that's the entire

25     staff.

1          THE COURT:  Okay, so with that said, let me

2     then go directly as we say in Spanish, *directo al*

3     *grano*.  And we're going to go through the six areas in

4     the public hearing.  Let me -- I'm going to refer to

5     Docket 1830 and that's the Commonwealth's memorandum.

6     Let me get my notes here one second.  Areas by areas.

7          So the first are I'd like to address is the

8     use of force.  So I'd like to know who the officer in

9     charge of use of force is.  And let me say, the first

10    is going to be use of force; next is going to be equal

11    protection and nondiscrimination; and third we're

12    going to have policies and procedures; and then

13    complaints and internal investigation is fourth;

14    professionalization, fifth.  I may have missed -- I

15    believe that would cover everything.  And we don't

16    have to swear in the witnesses obviously it's not a --

17          MR. BARRETO-SOLÁ:  Your Honor, if I may

18    please the Court, I will request permission to have

19    attorney and the director of the reform office sit

20    with us.

21          THE COURT:  Oh, he can sit there.  If he's

22    vaccinated you can all sit together.  And I know

23    everybody filled their questionnaires beforehand so

24    thank you for that.  Health comes first.

25          Okay, so let me then just have the witness

1    introduce himself and then I'll begin asking some of

2    the questions.

3             Okay, good morning.  Just for the record

4    identify yourself and then I have a few questions for

5    you.

6             COLONEL COLÓN-ORTÍZ:  Good morning.  I

7    address you this morning.  This is Office of the

8    Commissioner, Colonel Luis Colón-Ortíz.  I preside the

9    board of the use of force in the Office of the

10   Commissioner.

11            THE COURT:  So welcome.  And let me start,

12   I've read all the materials so you don't need to read

13   everything just answer the particular questions that I

14   or the counsel for the parties may have.

15            So my first question is, does the Puerto Rico

16   Police Bureau have a tracking mechanism to provide

17   valid use of force numbers both internally and also

18   externally?  When I say externally, I refer does the

19   general public get to know what these numbers are?  If

20   this mechanism is not in place, when will PRPB have

21   the capacity to be able to track use of force numbers?

22            COLONEL COLÓN-ORTÍZ:  Certainly the Puerto

23   Rico Police Bureau together with the commissioner have

24   established the tracking of numbers of use of force.

25   And right now we have dealt with changes in the

```
 1    documents.  The one that was PPR-84 has now become
 2    PPR-102.
 3              THE COURT:  I also want to note for the
 4    record.  I forgot, the special master is here by way
 5    of VTC and I believe his staff.  Yes, they're also
 6    there with him.  Mr. Petrowski and -- I can't see
 7    well, but I believe all the staff is here and he'll be
 8    addressing the Court in the afternoon as well.  I
 9    believe Gary is also here from the Special Master's
10    Office.
11              Okay, so please continue.
12              COLONEL COLÓN-ORTÍZ:  As to the question that
13    Your Honor has stated as to whether the numbers are
14    applied to the citizens I can tell you that right now
15    I cannot answer as to whether these numbers are
16    reaching the citizens.
17              THE COURT:  And let me also ask you, the
18    policies have changed in order to reflect the use of
19    force.  Are these use of force -- is the data for use
20    of force available all of it electronically once it's
21    processed or it's still in paper form?
22              COLONEL COLÓN-ORTÍZ:  Yes, the policies have
23    changed recently with the monitor and the commission
24    on the reform.  They have approved about five or six
25    of these manuals including the one on the use of
```

1  force.  The virtual library has also been created.

2  That serves as reference for the members of the police

3  force and also the citizens can look at it on the Web

4  page of the police.

5          THE COURT:  Okay, but let me ask you, can the

6  citizens look in the police Web page to use of force

7  data or that's not available in the Web page?

8          COLONEL COLÓN-ORTÍZ:  On the Web page of the

9  Puerto Rico Police Bureau it is open to the citizens

10 where there are different items where they can choose

11 and they can see the data.

12         THE COURT:  I think he said the policies.

13         COLONEL COLÓN-ORTÍZ:  Correct, yes.

14         THE COURT:  But can the citizenry see the

15 data?  That's what I want to know.

16         COLONEL COLÓN-ORTÍZ:  Statistical data?

17         THE COURT:  Yes, statistical data.

18         COLONEL COLÓN-ORTÍZ:  I do not have knowledge

19 of statistical data.

20         THE COURT:  Okay, let me move on.  The use of

21 force investigations they have a timeline that they

22 have to be completed, and referring I believe it's

23 general order 100-113.  So I want to ask you, to the

24 best of your knowledge, are these investigations being

25 conducted on time; if not, what steps are being taken

1    to remedy this matter?

2              COLONEL COLÓN-ORTÍZ:  The 100-1 13 is the

3    policies created by the unit on the use of force and

4    it's known as the FIU.  In the manual that was

5    approved by the commissioner in these past days,

6    August 31st, the manual on the use of force, it

7    establishes the timelines when the complaint is

8    investigated, when the supervisors, investigate it,

9    when the regional area supervisor investigates it.

10   And it also gives the timeline to investigate the FIU

11   which is 45 days of investigation.  And we also have

12   the timeline for the board of the use of force to

13   conclude the investigations on the use of force.

14             THE COURT:  And there's also, and this is

15   general order 500-502, there's a commissioner's force

16   review board as well.  I would assume that your

17   answers as to that would be similar as well, that they

18   have deadlines and basically they are complying with

19   the deadlines.

20             COLONEL COLÓN-ORTÍZ:  Correct.  Upon assuming

21   the presidency of the commission on the use of force

22   of the commissioner, we reviewed the cases pending to

23   be reviewed by the board.  We noticed that due to the

24   pandemic, although they had been documented, there

25   were 74 cases that had not been completed.  We

1    proceeded to establish dates which were June 29th and

2    30, and July 7th, and we attended to 74 cases that

3    were verified and corroborated.  And on August 31st,

4    according to the deadline and the workplan, 14

5    additional cases were added for a total of 88 cases

6    from June to the present.

7         THE COURT:  Would you know the number of any

8    still outstanding pending cases or basically

9    everything is within the time limits at this time?

10        COLONEL COLÓN-ORTÍZ:  Well, I understand that

11   if there is any case pending it would be scheduled for

12   September 27th according to the work plan.  And this

13   may be due to, according to the general order, some

14   cases need to be verified by the special bureau or the

15   special investigations bureau.

16        THE COURT:  Okay.  Now, another separate

17   area.  In previous monitor reports it was recommended

18   by the monitor and agreed by PRPB to expand the

19   training of use of force investigators as it relates

20   to firearm discharges.  There was an issue because

21   firearms discharges were either not being reported

22   correctly or they were missing.  So my question is,

23   has this training begun?  Has the curriculum been

24   created to train these investigators to properly

25   address the firearms discharges?

```
 1          COLONEL COLÓN-ORTÍZ:  Well, the board of use
 2    of force is examining the critical negligent
 3    discharges.  There are two different types of
 4    discharges, there's critical discharge and negligent
 5    discharge.  And in both cases, in many of the cases,
 6    the board recommends to have training on each one, the
 7    critical and negligent.
 8          THE COURT:  All right.  Now moving to another
 9    area.  PRPB implemented a pilot project in Arecibo
10    area last year, it was a crisis intervention team.
11    What are PRPB's plans to expand the crisis
12    intervention team to all other areas?  I was looking
13    at the document submitted by PRPB, I believe I read it
14    somewhere.  I can't find it right now, but I believe
15    that your answer will be that this private program has
16    been expanded or is in the process of being expanded
17    to the other areas.
18          Let me interrupt again.  I did find it, it's
19    at page 1 of Docket 1830.  I knew I had read it and
20    highlighted it.  In this document as of march of this
21    year the plan was to extend the program to Fajardo,
22    Mayagüez, and Ponce, and the idea was to have in the
23    13 police areas within a two-year period.  So I want
24    to ask you particularly about Fajardo, Mayagüez, and
25    Ponce.  In March there were plans to expand the
```

1    program; is the program in place already there and if

2    it's not when will it begin?

3            COLONEL COLÓN-ORTÍZ:  I understand that it

4    has not been established in Mayagüez, Fajardo, and

5    Ponce because the Monitor Romero, I understand,

6    suggested to Commissioner Antonio López not to do it

7    staggeredly rather to do it globally.

8            THE COURT:  And my last question is the

9    following.  It's a little long.  Like many other

10   departments across the United States over the last

11   several years, PRPB has responded to a number of

12   demonstrations or protests throughout this

13   jurisdiction.  And I can take judicial notice and we

14   all know what these protests have been.

15           Police departments throughout the United

16   States have instituted policies requiring personnel to

17   prepare self-assessment reports after the completion

18   or when these events, these protests or

19   manifestations, end as much can be learned by

20   preparing an in-depth report.  And by preparing those

21   reports it allows the police departments to complete a

22   frank assessment as to what occurred and in some cases

23   what can be improved upon.  In addition, the Bureau's

24   general order 600-625, which is managing and crowd

25   control, specifically requires PRPB to conduct a

1    self-assessment exercise of the operations during each

2    these incidents or proceedings or

3    protests/manifestations.  So my question is, has PRPB

4    prepared these reports as outlined in policy 600-625?

5         COLONEL COLÓN-ORTÍZ:  Operationally when a

6    workplan is established due to a situation that may be

7    planned or spontaneous, we have the responsibility,

8    the commanders, the officers in charge, to call a

9    meeting after the event with all persons in charge in

10   the different areas of the manifestation and to carry

11   out a critique to analyze those matters that you have

12   mentioned according to general order 600-625, and a

13   minute is recorded as to it.

14        THE COURT:  Let me ask you also, you do that

15   internally but the monitor periodically also issues

16   his reports and sometimes special reports.  I know as

17   to summer of 2019 there was a pretty lengthy report

18   filed.  How does PRPB take into account the Monitor's

19   report along with the self-assessment moving forward?

20        COLONEL COLÓN-ORTÍZ:  According to the report

21   of the CMRs depending on the different numbers we are

22   taking into account and making adjustments in the

23   practice and in policies.

24        THE COURT:  Let me just give an example.  I

25   know if you look at the report for 2019, it took a

1    while to prepare but it's there, the police had

2    been -- after the summer of 2019 had been informed of

3    what areas of concern the monitor had, what possible

4    shortcomings occurred.  And then there was another

5    protest, smaller-sized, but it was in December end of

6    2019.  And if you look and compare the monitor's

7    findings in both by the second protests under the new

8    governor a lot of those areas of concerns were

9    incidents that occurred basically outside of the

10   perimeter where the protests were taking place had

11   improved.  So I assume that's an example of how the

12   police takes the monitor's input and also its own

13   self-assessment, am I correct?

14           COLONEL COLÓN-ORTÍZ:  Yes, sir.

15           THE COURT:  Okay.  So I have no further

16   questions for you.

17           Mr. Saucedo, you're on the screen.  And now I

18   can see everyone on the screen.  I had a very small

19   screen but now I can see everybody from the special

20   master's office.  So Mr. Saucedo, if you want to ask

21   any particular questions to this officer, please go

22   ahead.

23           MR. SAUCEDO:  Yes, thank you, Your Honor.  I

24   want to thank Colonel Colón for being here this

25   morning.  The agreement requires that PRPB track uses

1    of force and that it create a system because PRPB has

2    agreed to investigate every single use of force

3    whether a civilian complains about it or not PRPB has

4    an obligation to ensure that that use of force was

5    within the law and within PRPB policy.  I remember

6    speaking with Colonel Colón a few years ago about the

7    need to have a reliable data system -- yes?  I will

8    pause.

9            The police has a responsibility to

10   investigate all uses of force whether or not there's a

11   civilian complaint about the incident.

12           COLONEL COLÓN-ORTÍZ:  Yes, sir.

13           MR. SAUCEDO:  So we had a conversation awhile

14   back about the need for a tracking system.  We know

15   that the IT bureau is working on developing a tracking

16   system.  My question is, who at PRPB IT -- my question

17   is, at the last status conference we talked about the

18   need for PRPB leadership to ensure that these systems

19   are developed and used by its personnel.  My question

20   is, who at PRPB is responsible at the executive level

21   for the development of the use of force tracking

22   system?

23           COLONEL COLÓN-ORTÍZ:  Yes, at the executive

24   level all members are responsible -- the commissioner

25   and the supervisor on professionalism, and all

1   officers are responsible.  And we've already developed

2   a card for complaints, No. 126.2, where it has two

3   items that specify whether use of force was used, what

4   level of use of force was used, and whether there was

5   an arrest.  And so ever since then we have been able

6   to follow-up on the tracing of the use of force and we

7   have also established an electronic module that allows

8   us to keep track of the use of force digitally.

9           MR. SAUCEDO:  Your Honor, there's great

10  interest in all uses of force but especially firearm

11  discharges by police officers.  The police bureau had

12  a practice of announcing to the public when those

13  incidents took place.  Has that practice been

14  suspended and if it has will it resume so that the

15  public is informed when officers use force, deadly

16  force, and under what circumstances?

17          COLONEL COLÓN-ORTÍZ:  To answer Mr. Saucedo's

18  question, certainly both types of discharges are

19  investigated, critical discharge and the critical

20  negligent discharge.  The critical discharge is the

21  discharge that occurs when there is a shooting out on

22  the street and the critical negligent discharge is

23  when there is an accidental discharge by a police

24  officer.

25          MR. SAUCEDO:  But my question was about

1    informing the public when those critical firearm

2    discharges occurred.

3              THE COURT:  And let me add to the question.

4    Is currently the public being informed or at this time

5    it is not being informed?

6              COLONEL COLÓN-ORTÍZ:  I do not know that.

7              THE COURT:  So that is something I would ask

8    you to follow-up on that and let counsel Saucedo and

9    also the monitor know.  And it's almost Friday so let

10   him know at some time by the close of next week.

11             Okay, Mr. Saucedo, anything else?

12             MR. SAUCEDO:  Yes, just one last question,

13   and that was one that Your Honor asked and I think

14   Colonel Colón answered a different question.  And that

15   is, that it is important that force investigators have

16   appropriate training.

17             I'll pause there.  It pertains to those

18   officers who are charged with investigating the use of

19   force.  Have those investigators been trained to

20   conduct force investigations?

21             COLONEL COLÓN-ORTÍZ:  Yes.  The Puerto Rico

22   Police is up-to-date on the yearly trainings and they

23   are done either virtually or in person and all

24   employees and all members of the force have been

25   trained.  However, we did make an approach with

1  Commissioner Francisco Rodríguez who is the deputy

2  commissioner on training and education of the police,

3  to prepare a training properly for the board on the

4  use of force on the use of force and on the FIU and to

5  train all the members of the board and yours truly on

6  the investigation on the use of force.  And the

7  committee has already been established that will

8  prepare the plan and the curriculum for the training

9  that will be given to these fellow officers.

10         MR. SAUCEDO:  Thank you, Your Honor.  I don't

11  have any other questions.

12         THE COURT:  Then let me ask Mr. Peñagarícano

13  or Mr. Barreto, any follow-up comment or question let

14  me know.

15         MR. PEÑAGARÍCANO:  Thank you, Your Honor.

16  Just to mention for the Court to know that on the

17  very, very good question from the Court about the

18  availability of use of force statistics to the public.

19  That topic will be specifically addressed in the

20  policy and procedure presentation that's coming.

21         THE COURT:  Okay, so thank you.  So you're

22  excused, thank you very much.  The next police

23  representative is the one who is going to be

24  addressing equal protection and nondiscrimination.

25  Before that occurs, I forgot to allow Dr. Del Carmen,

1    who is the special master, to introduce himself and

2    members of his team.  So if you want to take one or

3    two minutes to do so I already noted that Gary

4    Loeffert and Tom Petrowski were there with you.  And I

5    apologize because now I have the screen in front of me

6    and I can see; this morning I had just tiny dots on

7    the screen so I couldn't see.  And I know also you

8    worked closely with Attorney Castellanos and Justice

9    Hernández-Denton so if you want to make a comment

10   after that.  Obviously in the afternoon you'll have an

11   opportunity to address other matters.  Please go ahead

12   and introduce yourself.

13            SPECIAL MASTER DEL CARMEN:  Yes, Your Honor,

14   good morning.  This morning we have from the Office of

15   the Special Master, Gary Loeffert and Tom Petrowski

16   both assistant special masters.  And to your note, I

17   also our office wishes to thank Mr. Castellanos and

18   Judge Denton for their contributions over the past

19   years.  I had an opportunity to work with both of them

20   both as a monitor and in their current role as a

21   special master.  Their contributions were invaluable,

22   we wish them well.  And thank you, Your Honor.

23            THE COURT:  Okay, thank you, and we'll hear

24   from you this afternoon.

25            MR. BARRETO-SOLÁ:  Your Honor, if I may

1    please the Court.  I have here Captain Figueroa who

2    wanted to address the Court just to clarify a few

3    points that were addressed now just to keep the record

4    straight.

5              THE COURT:  Yes.  And he's sitting there at

6    counsel's table so you don't have to stand up, you can

7    speak into the microphone.  And I note just for the

8    record he's the director of the reform unit.

9              CAPTAIN FIGUEROA-ORTOLAZA:  Good morning,

10   Honorable Judge Gustavo Gelpí.  I want to clarify some

11   questions that you asked as to whether the police is

12   disclosing statistics on use of force.  As soon as the

13   commissioner assigned this he was very specific and

14   clear that he wanted to establish a dashboard to be

15   able to have on realtime the statistics on use of

16   force which will be generated through the complaints

17   card that was created.  The monitor, as recently as

18   last Tuesday, was able to observe the dashboard and

19   submit recommendations to it.

20             As to the other part of the reporting of

21   manually reporting subjects on incidents of use of

22   force, through the module that was prepared for

23   investigations, the division module, it will allow us

24   to inform the public the annual trends on incidents of

25   use of force at all levels.

1    And with regards to the report that the

2    monitor made as to the manifestations of December of

3    2019, we did take the recommendations of the monitor

4    seriously.  And so much so that we let know the team

5    of the monitor that as soon as he submitted that

6    report a broad review was going to be made as to

7    general order 600-625 which we expect to submit to the

8    parties for their consideration on Part 229 toward the

9    end of this month.

10    And with regards to the investigations of use

11    of force, as well as the actions -- the situations of

12    use of force in which the committee has already been

13    established at the academy, because we were waiting to

14    establish the curriculum for the evaluations, that

15    committee is composed by the members of the reform of

16    psychology and the members of the use of force unit,

17    as well as staff from the academy and investigators of

18    incidents of the use of force.

19    And I understand that the monitor is

20    concerned about the trainings for the members of the

21    board, as well as for the FIU but we're moving towards

22    it being a training that addresses all recommendations

23    and all lessons learned throughout the process in

24    order to carry out revisions of investigations of use

25    of force as the agreement includes.  And that would be

1    all and thank you for the chance to talk.

2            THE COURT:  Thank you.  And what I'm going to

3    do is, Mr. Romero, particularly as to the dashboard,

4    since you had the opportunity to review that, when

5    it's your turn this afternoon to speak you may want to

6    address that.  I think it would be very helpful.

7    These are things that are recent as of one or two

8    days.

9            MONITOR ROMERO:  Yes, Your Honor, and those

10   things are in my notes for the afternoon.

11           THE COURT:  Great.  So we're going to move

12   now to the area of equal protection and

13   nondiscrimination.

14           MR. PEÑAGARÍCANO:  Your Honor, if I may.

15           THE COURT:  Yes.

16           MR. PEÑAGARÍCANO:  Much respect to the Court,

17   we've been told if there's any opportunity for the

18   Court to hear now the presentation of the justice

19   department as they have I think some pressing matters

20   at the department that need their attention.

21           THE COURT:  Okay, so then let's hear from

22   your cousin.

23           MR. PEÑAGARÍCANO:  Thank you very much, Your

24   Honor.

25           THE COURT:  And she's been working there for

1   many years before you even ended up representing the

2   PRPB so...

3             And the interpreter can take a break.  I know

4   Ms. Peñagarícano has argued in this court many times

5   before the Court of Appeals so she doesn't need an

6   interpreter.

7             MR. PEÑAGARÍCANO:  Thank you, Your Honor.

8             THE COURT:  So then I do note

9   Ms. Peñagarícano that you filed -- and this is at

10  Docket 1841, it is the attachment.  It's a statement

11  about domestic violence from the Puerto Rico

12  Department of Justice, and that is something that I

13  had asked last time.  What I would do is, since you

14  know how to abide by time limits, if you can in a

15  synopsis summarize the most important -- this is in

16  the record already, but if you want to highlight the

17  most important matters that you have addressed in this

18  document without reading it, please go ahead.  I may

19  have one or two other questions and so may

20  Mr. Saucedo.  Please go ahead.

21            MS. PEÑAGARÍCANO-BROWN:  Good morning.

22  Susana Peñagarícano for the record.  I'll be brief.

23  On behalf of the Secretary of Justice, Honorable

24  Domingo Emanuelli Hernández, I thank the Court for

25  extending an invitation for today's public hearing.

1      As the Court is aware, the secretary of justice

2      supports the police reform and is readily joining

3      forces with the PRPB through collaboration protocols

4      and open channels of communication in order to address

5      pressing and sensitive matters such as hate crime,

6      gender violence, and domestic violence.

7           Today I have with me Prosecutor Laura

8      Hernández-Gutiérrez, she's the director of the

9      coordinating division of special units in domestic

10     violence, sexual offenses, child abuse, and drug

11     courts.  And she will be able to brief the Court, as

12     the Court sees fit, as to the collaborative efforts

13     and other matters that the Department of Justice is

14     taken upon themselves to address the before mentioned

15     violent criminal activity.  So I'll allow Prosecutor

16     Laura Hernández to address the Court on that issue.

17           THE COURT:  Okay.  So good morning,

18     Ms. Hernández, and welcome.  Let me say that I'm very

19     familiar with the domestic violence units in the

20     Puerto Rico Department of Justice.  And I also --

21     Ms. Peñagarícano mentioned the drug courts and when I

22     was there, it's almost a quarter century ago, that's

23     when the specialized prosecutor units were first

24     organized.  And actually Governor Wanda Vázquez was

25     then in charge of the projects; she was Prosecutor II

1   or III at the time.  I happened to be solicitor

2   general at the time and I also worked closely with the

3   drug courts, so I'm glad to see that these very

4   important programs and sexual offense programs and

5   hate crimes are still being addressed as they should

6   in the Puerto Rico DOJ.

7           So I'll allow you if you want to -- don't

8   read anything, but if you want to give us an overview

9   of what you think are the most salient points that can

10  be helpful for everybody here.  And for the record

11  please go ahead five, six, seven minutes, go ahead.

12  And I may have some questions.

13          MS. HERNÁNDEZ-GUTIÉRREZ:  (In English.)  Good

14  morning, Your Honor.  First of all, I'm very honored

15  to be here this morning.  I would like to express

16  myself in Spanish since it is my main language and

17  it's easier for me to detail everything so I will

18  start in Spanish.

19          (In Spanish.)  My name is Laura

20  Hernández-Gutierrez.  I've been a prosecutor for the

21  Department of Justice of Puerto Rico for 21 years.  I

22  was assigned to direct the coordination of specialized

23  unit in February of this year.  I had previously been

24  working in a specialized unit in Carolina and San

25  Juan, and my first ten years were in the general

1    prosecutor's office in Carolina and Fajardo.

2            When I started working my priority was to

3    identify how we could improve the statistics to expand

4    the specialized unit throughout all of the judicial

5    regions in Puerto Rico because at the time there were

6    only four specialized units when the public policy of

7    the Department of Justice established that there

8    should be 13 throughout Puerto Rico.  And knowing how

9    important it is to investigate cases of sexual abuse

10   and child abuse in Puerto Rico, I decided that it was

11   a priority to extend this program throughout the whole

12   island.

13           And also to expand on the specialized unit I

14   wanted to establish a project that would keep track of

15   the incidents of hate crimes in Puerto Rico.  And so

16   we can proudly say that due to the fact of having true

17   and accurate statistics the financial oversight board

18   assigned us a budget in order to be able to create

19   these new specialized units and we are currently

20   hiring and recruiting.  And so our main objective is

21   by October to establish the program so that the

22   Financial Oversight and Management Board can assign a

23   budget to us so that we can create the specialized

24   unit and expand it perpetually.

25           But it is indispensable for this project that

1    the Puerto Rico Police reinforce its divisions of

2    child abuse and sexual abuse crimes throughout Puerto

3    Rico.  In my experience as a prosecutor, I found that

4    many times these sexual crimes divisions did not have

5    the resources to adequately address and investigate

6    these situations, these events.  And so only the

7    investigations that were hot that had just recently

8    occurred were being investigated.  And so the

9    long-term investigations would just stay as cold

10   cases.

11          And so I wanted to take advantage today to

12   say that not only I want to express that we're working

13   very excitedly on improving this but we also need the

14   Puerto Rico Police to reinforce its investigations in

15   the sexual crime division and the child abuse division

16   because we need to address the populations that are so

17   affected, the most vulnerable populations.

18          THE COURT:  When you refer to cold cases, I

19   assume that when you have the cases that you mentioned

20   are processed those are usually the ones where the

21   victim immediately calls the police, they're

22   photographed, whatever evidence is taken on the spot,

23   the statement is taken right away, the complaint is

24   filed and the person is arrested and those usually --

25   you know, it moves on swifter.

1          I think what you mean by a cold case is

2      somebody can be the victim of domestic violence and

3      may three weeks later she's gone to the hospital

4      privately, maybe it got reported, but then finally she

5      or he goes and files a complaint, shows some

6      photographs or maybe doesn't have photographs, but

7      since that took place the personnel that are available

8      are attending ongoing and not cold cases.  So that's

9      why sometimes these older cases by the time they get

10     it or they're not investigated adequately or there's

11     no resources, that's why sometimes we see these

12     incidents and then there's a second incident because

13     the person is not yet prosecuted.  Am I correct?

14          MS. HERNÁNDEZ-GUTIÉRREZ:  Not necessarily.

15     The cases that do concern me that do worry me a lot

16     are cases of sexual abuse, of child abuse, that are

17     not necessarily reported on time.  When the police

18     finally knows about it and initiates the

19     investigation, the prosecutor will identify that that

20     child may need services before being able to act as a

21     witness in any proceeding.  And so many times what

22     happens is that the case stays in the stage of

23     providing services and then the agent who is in charge

24     of the sexual crimes may be either transferred or he

25     has to deal with other cases and, you know, he has a

1    big workload so then we do not have the resources to

2    follow-up on these cases and then they stay out and

3    are not addressed.

4            THE COURT:  But what you're saying about

5    these crimes this could also happen now with the hate

6    crimes, it could also happen with domestic violence

7    crimes because sometimes the victim needs intervention

8    or, you know, somebody ends up in a mental hospital

9    for several months or, as you said, officers can

10   retire or an officer can say I'm moving to California,

11   nobody knows.  Am I correct?

12           MS. HERNÁNDEZ-GUTIÉRREZ:  It could happen.

13   It could be, but when it's an adult victim the adult

14   can communicate with the police and something can be

15   done.  But these cases they are children and children

16   cannot voice out, and many times the situation occurs

17   in their family environment.

18           THE COURT:  And what you're saying about the

19   Financial Board and additional resources I take it

20   ideally you would have the current staff that is

21   attending the ongoing crimes that can be resolved

22   quickly, but for particularly the cold cases you would

23   need additional personnel who can focus on those

24   cases.  And I know, for example, the justice

25   department in Puerto Rico you have the district

1    attorney offices and they handle things on the spot.

2    Also, at main justice you have different units who

3    investigate and take judicial time to prosecute and

4    those can be like financial crimes or other matters

5    that you take your time and you investigate and then

6    you prosecute.  So definitely I understand what you're

7    saying is the Financial Board has to take that into

8    consideration and has to allow the greatest number of

9    resources.  Am I correct?

10          MS. HERNÁNDEZ-GUTIÉRREZ:  Yes.  The other

11    project that is very important is to develop the

12    statistics on hate crime incidents.  So the

13    declaration of emergency by the governor and the

14    creation of PARE Committee has been integral.  So at

15    this time we are trying to expand the gathering of

16    information so that we not only rely on the statistics

17    of the Puerto Rico Police through complaints but we

18    also can use information from the prosecutors who

19    identify these events.

20          I can assure that the communication between

21    the Department of Justice and the Puerto Rico Bureau

22    has been excellent -- the Puerto Rico Justice

23    Department and the Puerto Rico Police has been

24    excellent.  We have a lot of work groups where we have

25    the needs, and we also have seminars where we can

1    share experience and knowledge.  But I definitely

2    understand that there is a need to reinforce the

3    divisions of sexual crimes, sexual abuse, and child

4    abuse, and hate crimes.

5          And I bring to the attention, for example,

6    Fajardo; they only have two agents to deal with sexual

7    crimes and child abuse.  And so it is important that

8    because the Department of Justice is taking all these

9    steps it is important for the Puerto Rico Police to do

10   so.  We will not be able to have results if the Puerto

11   Rico Police does not improve in the distribution of

12   resources in these items.

13         THE COURT:  And let me also ask, so I think

14   what you're saying -- and this is something obviously,

15   you know, the Financial Oversight Board is an entity

16   of the Puerto Rico government even though it was

17   created by federal law.  But I think what is important

18   is that the board -- and obviously we have a

19   transcript here so we can at some point show it to the

20   board.  But I think what you're saying is it's very

21   important that, particularly for these sorts of crimes

22   overall for policing and prosecution, you can't look

23   it as a line item in a budget spreadsheet because if

24   you do so then you don't have the resources to attend

25   all these crimes the way they have to be attended.

1    Correct?

2              MS. HERNÁNDEZ-GUTIÉRREZ:  Yes, Your Honor.

3              THE COURT:  So I agree with what you've been

4    saying.  What I can do as a judge -- I concur with the

5    Puerto Rico Justice Department and I would urge the

6    Financial Board to the extent possible to again take

7    special consideration of these particular needs.  This

8    is very important.

9              Let me also ask you another question.  I know

10   that at least for the hate crimes and also when minors

11   are involved or abused there's a lot of a joint effort

12   with the FBI.  And that continues, correct?

13             MS. HERNÁNDEZ-GUTIÉRREZ:  We have had

14   collaboration with the FBI and the HSI.  And

15   especially with the HSI we do have a memorandum of

16   understanding.  And I have to say that this has been

17   an experience -- not just an experience, it has been a

18   collaborative process that has been completely

19   excellent.  And we have -- there's joint

20   investigations by the HSI and the FBI.  And in cases

21   that are contact cases it's the state that will enact

22   them, but when they are cases of child pornography his

23   intervenes.

24             THE COURT:  And let me note that HSI is

25   Homeland Security for the record.

1          MS. HERNÁNDEZ-GUTIÉRREZ:  And I need to

2     inform the Court that we are collaborating not only in

3     the investigation and prosecution but also ICE has

4     been involved in training investigations through

5     social networks.

6          THE COURT:  And I note from my experience

7     here in the court normally the cases that do get

8     referred to HSI, sometimes FBI, of course are cases,

9     as you mentioned, involve the Internet or use of cell

10    phones or photographing, or using material that has

11    been shipped or transported in interstate commerce so

12    there's federal jurisdiction.

13         When it's abuse but it's abuse that takes

14    place by a relative in a home and no Internet or

15    anything is used then those are the ones that are

16    prosecuted locally.  So you workshare the different

17    types of cases to go federally or state.

18         MS. HERNÁNDEZ-GUTIÉRREZ:  I'm going to give

19    Your Honor an example.  This type of thing happens all

20    the time.  Children are connected to social media and

21    an adult may connect.  The adult exchanges photographs

22    maybe with the minor and then there is contact.  When

23    this contact occurs and there is sexual abuse and the

24    child, who in these cases tends to be a preteenager or

25    a teenager, reports the incident to his parents and

1    ends up reporting it to the police, when the policeman

2    consults the case with the state agent we immediately

3    contact the agents from ICE and we initiate a joint

4    investigation.

5         The case of sexual abuse by contact is filed

6    by the state prosecutor and the ICE agent may have

7    already consulted or talked with the federal agent.

8    So once the person is charged in state court they are

9    indicted in federal court.  And so the situation turns

10   out that because we have the problem of the double

11   jeopardy, not being accused of the same crime, we

12   rather split the accusations when it's contact.  The

13   sexual contact would be charged on the state side and

14   the Internet or the social media would be charged on

15   the federal side.  And then the transportation of the

16   minor would be done under the federal care and maybe

17   the child will not have to testify in the state case.

18   And the defendant in the federal case usually reaches

19   a plea which then it eliminates that case having to be

20   in the system for so long.

21        And when I talk about not being able to

22   charge in two different jurisdictions I'm talking

23   about the *Sánchez-Valle* case.

24        THE COURT:  One last question, one of the

25   challenges.  The police may have evidence, may know

1    exactly what has happened but from a prosecutor's

2    perspective, this is something I had asked last time,

3    when the cases are brought to the Puerto Rico

4    Department of Justice or the district attorneys --

5    obviously probable cause is very easy for you to file

6    a complaint, but in order to prove the case eventually

7    unless there's a plea you need to have proof beyond a

8    reasonable doubt.  And I would suspect that, again

9    even though the police may be doing their best job

10   there are going to be times when a prosecutor like you

11   who has experience you might have a case and say,

12   Well, this statement is not admissible or, you know,

13   this was recorded that violates Puerto Rico Law and

14   this is not admissible.

15           So there are also matters that occur once the

16   prosecutor has the case that either you cannot move

17   forward with the case necessarily, or what can happen

18   is you do your best but the judge is going to suppress

19   or dismiss.  In the federal court it's a little

20   different because there's a grand jury and most of the

21   cases there's much more evidence that is admissible

22   but not admissible in state court.  But at the state

23   court level that is one of the issues that, I was at

24   the justice department, we've also had.  I had cases I

25   had to appeal and I said there's no way that we can

1    prevail here because of the -- so you also have that

2    particular factor, right?

3              MS. HERNÁNDEZ-GUTIÉRREZ:  Yes, Your Honor.

4              THE COURT:  I have no further questions.

5    Thank you very much.  Let me ask Mr. Saucedo if you

6    want to ask a couple of questions.

7              MR. SAUCEDO:  Your Honor, Mr. Castillo is

8    going to be asking a few questions on behalf of the

9    United States.

10             MR. CASTILLO:  Thank you, Your Honor, and

11   I'll be brief.  First, we want to welcome the Puerto

12   Rico Department of Justice to focus on these very

13   important issues, as well as their commitment that I'm

14   hearing providing feedback to the Puerto Rico Police

15   Department, its operations, and its individual

16   officers.  Focusing first just on the hate crime

17   statistics that are being developed, is there data

18   that can be shared now?

19             MS. HERNÁNDEZ-GUTIÉRREZ:  Unfortunately, no.

20             MR. CASTILLO:  I understand that one of your

21   efforts is for prosecutors to do their own analysis

22   whether certain events constitute a hate crimes.  Are

23   the prosecutors going to be using the same criteria

24   that the Puerto Rico Police Department uses to

25   identify hate crimes?

1              MS. HERNÁNDEZ-GUTIÉRREZ:  We use the rules of

2    criminal procedure to establish the factors for the

3    crime, heightened factors.  And it is Rule 171 which

4    establishes the aggravating factor which indicates

5    that the accused person has acted by prejudice or bias

6    or hate and it includes all the criteria.  But the

7    Department of Justice has a proposal for the PARE

8    Committee.  It's to assign the money to us so that the

9    programming of our integrated criminal registry

10   include the stages of finding a probable cause and

11   accusation, to include the aggravating factors and to

12   include the hate crimes in Puerto Rico.

13             So when the prosecutors file a case and they

14   identify the hate crimes criteria they can identify

15   the registry all of this information and be able to

16   have statistics.  We are presenting that proposal

17   today and we expect it to be approved.  That proposal

18   obtained recommendations from nonprofit organizations,

19   so we can say that it is a joint effort from the

20   government and the society.

21             MR. CASTILLO:  Thank you very much.  The last

22   point is more focused on domestic violence issues that

23   you raised.  We have some concerns about the number of

24   PRPB officers who are involved in the alleged cases of

25   domestic violence.  Is the Puerto Rico Department of

1    Justice looking at these cases in particular and how

2    is it participating, how is it processing these cases?

3           MS. HERNÁNDEZ-GUTIÉRREZ:  This type of case

4    is addressed as any other type of case.  As it is

5    known, many policemen do not live in the areas or

6    regions where they work.  So when a complaint for a

7    domestic violence is charged where the suspect is a

8    member of the police many times the prosecutors of

9    that region don't know that policeman.  If it does

10   happen that it is a policeman who investigates in the

11   same region where the incident occurs and the

12   prosecutor understands that there could be a conflict

13   of interest, a request is made to the chief of

14   prosecutors so that the investigation can be continued

15   in a different region.  And so it's making sure that

16   the citizen's fears are addressed in terms of how the

17   investigation is conducted, that there's no assistance

18   or benefit to the policeman because he works in that

19   region.

20          MR. CASTILLO:  Thank you very much.

21          THE COURT:  Okay, thank you.

22   Mr. Peñagarícano or Barreto, any other questions or

23   any other person want to clarify, or Ms. Peñagarícano?

24          MR. PEÑAGARÍCANO:  Thank you, Your Honor.

25   Yes, just briefly, the Commonwealth would like to

1   share with the Court that under the guidance of the

2   commissioner of the police bureau, the CIC, *Cuerpo de*

3   *Investigaciones Criminales*, has been restructured and

4   new policies have been drafted which will go through

5   the reform process, paragraph 229, but I would like to

6   if the Court will allow Captain Figueroa to briefly

7   address the Court.

8           THE COURT:  Two minutes because I want to

9   move on.  And in the afternoon we have additional time

10  and we can also expand on that.

11          MR. PEÑAGARÍCANO:  Okay.

12          THE COURT:  So let me excuse the witness then

13  and Ms. Peñagarícano thank you very much.  This has

14  been extremely helpful.

15          MS. PEÑAGARÍCANO-BROWN:  Thank you, Your

16  Honor, for allowing us to go ahead of time.  Thank

17  you.

18          MS. HERNÁNDEZ-GUTIÉRREZ:  Thank you.  Have a

19  nice day.

20          THE COURT:  Let's hear from the director of

21  the reform unit.

22          CAPTAIN FIGUEROA-ORTOLAZA:  Good morning

23  again.  As soon as the commissioner arrived, and this

24  has been his priority, we've seen how the police has

25  been dealing immediately with these gender crimes.

1    The commissioner has established a pilot project in

2    Fajardo that will be expanded to the 13 different CIC

3    regions.  And training will be given to all of the

4    agents to deal with crimes of domestic violence, child

5    abuse, and sexual crimes so that any agent can deal in

6    all of those cases including the creation of a center

7    for processing and retraining orders that Sergeant

8    Rivera may be able to expand on that further on.

9    Therefore, there should be no doubt that the Puerto

10   Rico Police Bureau has taken the measures to address

11   quickly and efficiently all cases of gender violence

12   crime.  That would be all.

13            THE COURT:  Okay, thank you.

14            Okay, then let's continue with the police

15   officer who's in charge of the area of equal

16   protection.  Who is it going to be?

17            Good morning.  For the record please state

18   your full name.

19            SERGEANT RIVERA-VELÁZQUEZ:  Good morning.

20   Hello to Judge Gelpí and to everyone present.  This is

21   Sergeant Yvette Rivera-Velázquez.  I've been in the

22   Puerto Rico Police for 28 years.  I am currently

23   deputy director of the gender violence crimes of the

24   Puerto Rico Police.  I'm usually the supervisor of

25   that unit, and I am here to make a presentation.

1          THE COURT:  Okay.  Let me ask, you heard the

2     prosecutor from the Commonwealth Justice Department

3     who spoke to us about a half hour and answered some

4     questions.  I believe that was Laura

5     Hernández-Gutiérrez.  I don't want you to re-read

6     anything that has been submitted in writing, but let

7     me ask you first, and this is probably an easier

8     question, I assume you concur with what she has stated

9     am I correct?

10          SERGEANT RIVERA-VELÁZQUEZ:  Not with

11     everything.

12          THE COURT:  Not with everything.  If you can

13     state what you're not in agreement.

14          SERGEANT RIVERA-VELÁZQUEZ:  In the police, in

15     cases of child abuse it does a criminal investigation.

16     So the investigation is geared to gathering all of the

17     evidence so that the case can stand in all its stages

18     in court.  And in the case of children there is a

19     procedure that goes through the system for the

20     assistance of victims and children.  And it is the

21     prosecutor who decides whether this child is not

22     prepared to testify in court and they are sent to

23     evaluations and to be seen by psychiatrists to make

24     sure that the child is fit to attend the hearing.

25     Knowing that in all cases of children what is known as

1    closed circuit does not apply, so it's not in our

2    hands that the procedure would stop.

3            And another thing I don't agree is that, yes,

4    it is true that some agents are moved or they are no

5    longer with the police but the cases are reassigned

6    immediately.  And many times if the agent is relocated

7    he will continue with the case regardless of the area

8    where he's working of course safeguarding not to

9    re-victimize the child of the case.  And likewise

10   there is also movement of prosecutors and we expect

11   cases to be reassigned, so we expect that there be

12   collaboration between the police and the prosecutors.

13           And so as the commissioner of police has

14   stated, Mr. Figueroa-Ortolaza, they are trying to

15   unify the sexual crimes and child abuse cases.  And as

16   recently as 2019, the trainings on domestic violence

17   are being given to agents that deal with sexual

18   crimes.  And the trainings that are given usually to

19   the sexual crimes agents are being now provided to the

20   agents dealing in domestic violence.  And so the

21   general order was even modified in terms of aggravated

22   sexual assault in marriages in the Article 2.5 of Law

23   54 which was previously being investigated by the

24   sexual crimes.  Now it's being investigated by the

25   domestic violence unit.

1            THE COURT:  Okay, thank you.  You've answered

2     most of the questions that I had, so that's good.  Two

3     more questions before I allow Mr. Saucedo or

4     Mr. Castillo to ask any questions.  What steps in the

5     area that you cover are being taken to inform the

6     public and that the statistics, if any, are available,

7     accessible, they're transparent for domestic violence

8     crimes, hate crimes?  What is PRPB doing to make that

9     transparent and accessible to the public so they know

10    what's happening?

11            SERGEANT RIVERA-VELÁZQUEZ:  Well, in the Web

12    page of the Puerto Rico Police they have the

13    statistics that are gathered in the stage of early

14    intervention.  And I also want to add that we are

15    adding on the Web page of the Puerto Rico Police the

16    different public policies in investigations so that

17    the citizens can understand how the process goes.  And

18    it will also be included in the dashboard as

19    previously mentioned.

20            THE COURT:  Okay.  You covered all my

21    questions so let me move to -- Mr. Castillo, do you

22    have some questions?  Go ahead.

23            MR. CASTILLO:  Thank you, Your Honor.  No

24    questions.  We just want to note that it is our

25    understanding that the Monitor's office will be

1    conducting a close review of these types of cases in

2    the upcoming report and so we look forward to that

3    analysis and working with the Commonwealth to identify

4    and address things that need to be addressed.

5              MR. PEÑAGARÍCANO:  No questions.

6              THE COURT:  The witness is excused.  One

7    thing I want to comment -- and I don't know if the

8    person -- be ready to address it this afternoon.

9    Within equal protection it's the area of immigration,

10   immigration-related stops.  This is also going to go

11   into community relations but that's something I want

12   to discuss this afternoon.  So let me move then to the

13   next area at this time.  Again, with the footnote that

14   immigration will be left for this afternoon and let's

15   go to searches and seizures.

16             Okay, good afternoon.  And if you could

17   introduce yourself for the record.

18             COMMANDER LEBRÓN:  Yes, good afternoon to the

19   honorable judge.  My name is Wilson Lebrón, I'm the

20   commissioner of drug and vice control of the Puerto

21   Rico Police.

22             THE COURT:  Okay, so I'm going to go directly

23   to the questions.  I note that one of the monitor's

24   recurring concerns is that, in particular I believe it

25   was in the last report CMR-4, that in executing search

1    warrants there is a significant percentage of warrants

2    that basically have a failure rate.  For example,

3    search warrant for drugs or weapons, nothing is found.

4    I note that in the PRPB's presentation which I have

5    before me PRPB notes that this matter is outside of

6    the control of PRPB and it acknowledges that there are

7    negative results.

8              Do you have any particular explanation as to

9    why the results can be negative?  I do realize, and

10   again from experience of many years, sometimes PRPB

11   can get a search warrant but by the time they're ready

12   to execute whoever had the weapons or drugs moved them

13   somewhere else.  But aside from that do you have any

14   other explanations?

15             And let me add, in Puerto Rico, at least in

16   the metro drug unit in the metropolitan area, there's

17   a failure rate or lack of success rate in the search

18   warrants.  It's approximately a 47 rate, bureau-wide

19   it's 41 percent.  And when you look at other huge

20   police departments, San Diego Police, it's about 10 to

21   12 percent.  So that's the question.

22             COMMANDER LEBRÓN:  Well, in terms of the

23   positives we are over 60; 41 goes as to the negatives.

24   And in the area of the analysis we do know that we

25   need to make changes in strategies because drug

1    trafficking in Puerto Rico.  And so the dynamics are

2    that it's like a spider; when you touch one area of

3    the spider web everything moves.  And so generally

4    when we want to execute a search warrant we take the

5    team necessary for the execution among them the canine

6    unit.

7            And so in several cases we've had the

8    situation where we bring in the canine and they mark

9    in two different areas which means that there is a

10   possibility of having illegal material in the two

11   different areas.  And so as a responsibility of our

12   functions and our component we request the owner of

13   the area which is where the canine is marking to allow

14   us to search, and we get the person's consent which is

15   called the consented search.

16           Generally those searches end up negative.

17   However, we have to record them as searches.  So in

18   that case if we had one area to search and we had two

19   positive areas that we search then we would be in a

20   30 percent of negative.

21           THE COURT:  Sorry to interrupt.  What you're

22   saying is that the way the statistics are kept if the

23   statistics are kept or carried in a different

24   manner -- for example, you had these consent searches

25   where the negatives may be higher separated from when

1    you actually have a search warrant.  Those numbers

2    would be higher but the way they're compiled that's

3    why the numbers seem so alarming.  Am I correct?

4            COMMANDER LEBRÓN:  That is a factor.

5            THE COURT:  And has PRPB thought of ways of

6    improving this or asking maybe the special master for

7    assistance or to see how it's done in other

8    jurisdictions? because I'm sure this is also an issue

9    elsewhere.  And maybe San Diego knows how to separate

10   the numbers and do them in a manner -- because what

11   you're saying is you're getting contraband but then

12   you're trying to see if there's more, maybe there's

13   consent but you don't get it, and then the numbers

14   look bad.  Any thoughts on that?

15           COMMANDER LEBRÓN:  Yes, we are evaluating the

16   different strategies.  And I've seen the work in San

17   Diego so basically they were focusing on the

18   expeditiousness of the execution of the search warrant

19   once it has been issued by the judge.  And there's the

20   percentage of cases where in general terms they are

21   going to the specific area to be searched.  So we are

22   considering and evaluating the logistics.  Sometimes

23   we are doing two, three, four, five searches at the

24   same time in order not to lose the evidence because we

25   do know that we all communicate with each other

1   through the technology.  And we're trying to develop

2   entry teams and logistics teams so that we can be able

3   to be more efficient when we do all these simultaneous

4   search warrants.  And so in terms of the accounting

5   for it, well, the negative numbers are required that

6   we have to inform them at all times.

7          THE COURT:  Okay, thank you as to that.  I'm

8   going to move to another area.  Before I do I'm going

9   to assign and have the special master look into this

10  to see how it consists because the monitor is going to

11  continue collecting data and I think that's something

12  I think the special master may be helpful comparing

13  different jurisdictions.  And perhaps in the different

14  police districts, perhaps in Texas he may have some

15  valuable ideas and insights so one more matter for the

16  special master team.

17          Let me ask you a brief follow-up question.

18  PRPB general order 600-615 on arrest and citation and

19  order 600-612 on search and seizure lists all the PRPB

20  forms to be included such as police report, egress,

21  ingress form, and supervisor arrest review form.

22          Translate that and then I'll continue my

23  question.

24          However, over the last two or three years

25  PRPB has submitted to the monitor a substantial number

1    of files missing many of these forms and the monitor

2    has made these findings.  What is PRPB doing to

3    address this situation?

4           COMMANDER LEBRÓN:  That is real, we did have

5    that flaw.  We have taken administrative measures

6    demanding responsibility on each one of the directors

7    of where the flaws were detected.  It is important

8    that we designated a compliance officer to follow-up

9    on the compliance of the situations.  Sometimes some

10    excuses were brought forth, some were reasonable,

11    others we need to evaluate.

12           THE COURT:  Okay, thank you.  And my last

13    question and then I'm going to move to another area.

14    And this is something that since early on in this

15    consent decree case this matter has been raised on and

16    off and I've always had some concern, and I'm

17    referring to what are known as investigative stops,

18    under federal constitutional law Terry Stops.

19           In this particular case, I'm referring to

20    Docket 1830, this is the police presentation, page 6.

21    And let me note that this has been submitted in

22    Spanish, I've granted leave so it's going to be

23    submitted in English for the record but obviously I'm

24    bilingual so I can read it.

25           Something that I'm a bit concerned about is

1    the monitor indicates that PRPB does not have a system

2    to document and collect investigative or Terry Stop

3    data in accordance with the agreement.  The response,

4    what PRPB says, is that actually investigative stops

5    or detention are prohibited under Commonwealth law.

6    And I would say this is a constitutional matter

7    they're prohibited under Commonwealth law.  That is

8    the PRPB's position.  And then it reads that the

9    Police of Puerto Rico is in conversations with U.S.

10   DOJ to prepare a plan to modify paragraph 60 to 64 of

11   the agreement in light of that.

12           Translate that and then I'll come up with a

13   question.

14           Let me say this because I think it's

15   important for the record.  The Puerto Rico Supreme

16   Court, which would be the court who can interpret, the

17   only court, in a binding matter that would interpret,

18   you know, and create precedent as to if the Puerto

19   Rico constitution has broader protections therefore

20   Terry Stops cannot occur in Puerto Rico.  The Puerto

21   Rico Supreme Court has never ruled on that issue.  I

22   did my research up to today and that has never come up

23   before the Puerto Rico Supreme Court.  I remember many

24   years ago there were cases but they never reached the

25   Puerto Rico Supreme Court.  So at this time there is

1    no certified prohibition by the Puerto Rico Supreme

2    Court, there's nothing from the Supreme Court on the

3    other hand saying, Oh, yes, they're valid.  The Puerto

4    Rico Supreme Court has never expressed itself one way

5    or another.  But the police are saying that they're

6    prohibited in Puerto Rico, so that's the Puerto Rico

7    Police's view.

8            But my concern goes even a little further

9    because in fact Terry Stops, investigative stops, are

10   taking place -- I'm not saying how frequently, maybe

11   they're not a day-to-day issue, but when we talk this

12   afternoon about the area of immigration there have

13   been investigative stops, detention without probable

14   cause of aliens and in fact they have been arrested.

15   So in fact PRPB -- again, I don't know, it could be a

16   .05 percent, it could be 1 or 2 percent.  I'm not

17   saying these are huge alarming numbers of 90 percent

18   or more, no.  It's a small number, but in fact

19   investigative detentions are taking place.  So I do

20   have that concern.

21           So is there anything you want to add?  I

22   don't know if you have the exact knowledge.  Probably

23   somebody this afternoon may have more knowledge about

24   the immigration stops, but anything you have to

25   address regarding these Terry Stops because they are

1   in fact taking place occasionally in Puerto Rico.

2              It is alarming if it is happening.  I'm

3   saying it's not happening in humongous numbers, but

4   even one or two unlawful arrests is something that is

5   alarming in that perspective.  But what, if any,

6   reaction -- again, you might not be the person who can

7   answer that, but knowing that at least in immigration

8   crimes, Terry Stops or persons who are here illegally

9   are being stopped on a Terry basis, do you have

10  anything you would have to say about PRPB -- if the

11  position is Terry Stops can occur and they are

12  occurring, what is your position as to that?

13             And let me further add, sorry.  I have from

14  my experience here in federal court I have had drugs

15  and firearms cases prosecuted here in federal court

16  that began with an arrest by PRPB.  And that arrest

17  was based on a Terry Stop and of course Terry Stops,

18  if they're not legal I'm assuming in state court,

19  they're legal in federal court.  So you can have

20  police officers conducting a Terry Stop and then the

21  evidence is admissible in federal court even though it

22  may violate state law.  So I do have that concern but

23  again not only immigration but I have from past

24  experience knowledge that Terry Stops do take place

25  occasionally or maybe more frequently than we know.

1           COMMANDER LEBRÓN:  The general order of the

2    drug division establishes clearly the response in

3    civil and criminal administrative liabilities of not

4    abiding by the general order.  And so in cases of

5    searches and seizures the monitor has found that the

6    investigating agents who performed the searches and

7    seizures have been highly competent to find probable

8    cause for the arrests.  So I'm talking about that this

9    is a finding that was made directly to our personnel,

10   to our bureau, to drugs and narcotics.  However, we

11   will be evaluating this and escalating this to our

12   bosses to evaluate it.

13           THE COURT:  Okay, thank you.  I have no

14   further questions.  Let me note that this afternoon

15   when Mr. Romero addresses the Court for the record I

16   want you two or three minutes to provide some

17   information of your reports or your monitoring as to

18   Terry Stops taking place.

19           And before I hear from U.S. DOJ let me say

20   this I'll hear the answer from U.S. DOJ this

21   afternoon, but I think the time is ripe.  And, again,

22   this is something that really impacts the reform.  I

23   am very inclined -- and, again, this is an easy

24   question but I am very inclined to certify to the

25   Puerto Rico Supreme Court the issue straightforward,

1    Are Terry Stops constitutionally permissible under the

2    Puerto Rico constitution, yes or no?  If they are,

3    fine; if not, fine.  But at least there is a rule of

4    law locally.  And, again, it could be the same test as

5    the U.S. Supreme Court or Puerto Rico, like other

6    states, could interpret it to have further protection.

7    But I think it is something that perhaps the time is

8    ripe because this is going to continue coming up and

9    we're going to address it this afternoon regarding

10   immigration.  I don't need an answer now, but we'll

11   talk about that this afternoon.

12           So, Mr. Castillo, any questions to this

13   officer?

14           MR. CASTILLO:  I'm of the opinion --

15           MR. SAUCEDO:  Your Honor, I'll take it just

16   briefly.  Yes, we do want to address the hit rate

17   discussion in the afternoon and clarify some points

18   about what is useful in comparing and how those rates

19   serve as indicators rather than any dispositive of

20   anything wrong.  I think the Puerto Rico witness just

21   told us that that hit rate is a useful indicator to

22   find out if there is any change in strategy that needs

23   to take place.  I think that was what the monitor was

24   pointing out in his report, that the hit rate should

25   serve as an indicator that should be considered by

1    PRPB in its cases.

2           THE COURT:  Anything else, Mr. Saucedo, you

3    want to address at this time?

4           MR. SAUCEDO:  Well, we'd like to take up the

5    issue about the Terry Stops in the afternoon, but I do

6    want to say that we saw Terry Stops occur during the

7    investigation, the monitor continues to find problems

8    in the way that PRPB describes or justifies an arrest.

9    One question I do have for the Puerto Rico witness,

10   because I think this is relevant, is that PRPB

11   currently does not have a system to track when an

12   officer stops or detains someone but there is no

13   arrest that's made.  And perhaps the Puerto Rico

14   witness can confirm [distortion] --

15           Is that stop ever documented in PRPB in a way

16   that's tracked?

17           COMMANDER LEBRÓN:  In the Puerto Rico Police

18   all arrests are accounted for but not all are filed.

19           THE COURT:  But what Mr. Saucedo is asking is

20   that there are times you may not have an arrest but

21   you have an intervention and that's a Terry Stop and

22   the police officers can stop somebody not on probable

23   cause, you don't have probable cause to arrest, but

24   you have reasonable suspicion at least.  That's what

25   is permissible under federal law.  And you can briefly

1    detain that person and even conduct a pat-down.

2    Again, you may not find anything and the person goes.

3            What Mr. Saucedo is saying is any time a

4    non-arrest event takes place those are likely not

5    reported.  So is there any way to report those cases

6    or they're not reported?  That's the question.

7            COMMANDER LEBRÓN:  If the arrest emanates

8    from an illegal intervention --

9            THE COURT:  Let me interrupt.  These are

10   situations where there is no arrest.  So the police

11   intervene, they may do a pat-down, they may briefly

12   detain a person to ask him questions but they don't

13   find anything and, Well, we've got to let you go.  Is

14   that documented or not?  I believe the answer is no.

15           COMMANDER LEBRÓN:  Well, the thing is that in

16   Puerto Rico the Terry Stop I mean it does not happen.

17   I mean, it could happen.  If it does happen, then the

18   supervisor would have to be responsible to evaluate

19   that case if it happened.  And so in the case, in the

20   totality of cases when it is and there's suspicion of

21   a felony the cases are consulted and they always end

22   up in an arrest.

23           THE COURT:  This is something we'll discuss

24   further in the afternoon with the Terry Stop issue

25   because we're going to talk about immigration.  Let me

1    ask, Mr. Saucedo, any other questions?  We're almost

2    getting to lunchtime.

3            MR. SAUCEDO:  No, Your Honor, thank you.

4            THE COURT:  Okay, Mr. Peñagarícano, anything

5    else you want to address at this time with this

6    witness?

7            MR. PEÑAGARÍCANO:  Not at this time, Your

8    Honor, we do have some points on the Terry Stop but

9    because we're going to discuss it this afternoon we

10   will discuss it then.

11           THE COURT:  Okay.  So you're excused I do

12   want to cover one more area before we break for lunch

13   but I believe it's just one very simple question that

14   I have and I believe that Captain Figueroa-Ortolaza

15   can answer it, and if he does briefly then we can

16   break out for lunch.  And then the other two areas

17   will be for this afternoon.  The most lengthy areas of

18   discussion have taken place now in the morning.

19           We're going to refer now -- I'm going to move

20   on now to policies and procedure.  I just have one

21   simple question.  And if Captain Figueroa can answer

22   that, he's the only thing keeping us between lunch.

23   But, again, you can take as much time as you need.

24           This refers to policies and procedures.  The

25   question is simple.  How is PRPB planning to prove or

1    to evidence that all of its officers receive and read

2    all new and revised policies?

3            And I say this because obviously in the last

4    couple of months PRPB has been very active working

5    along with PRPB the special master and the monitor and

6    a lot of policies have been implemented, for example

7    the promotions policies.  But how can you prove or

8    ascertain that all officers are reading, reviewing and

9    are familiar with all new policies?  Do you have an

10   electronic system that requires proof of electronic

11   signature as a receipt, or how do you evidence that?

12   Because you have thousands of police officers and

13   again the policies they've been approved so they're

14   excellent, they're great policies, but how do you

15   ascertain that?  And I know there's trainings and

16   other matters, but how do you ascertain that every

17   officer is reviewing these new policies?  That's the

18   only question.

19           CAPTAIN FIGUEROA-ORTOLAZA:  Good morning

20   again.  As to the policies, once it is signed by the

21   commissioner it is loaded up onto the virtual library

22   and it is notified through *Informa Policía.*  Through

23   that mailing it is transmitted to all of the members

24   of the police, all under rank and all that are

25   classified.

1          And, also according to the general order in

2     the monthly meetings, according to the 700-704 it has

3     to be discussed in what is known as monthly meetings.

4     And the director has to document it through two

5     documents that were created for this 704.1 and 704.2.

6     One of the documents is the agenda that indicates all

7     the subjects or the policies that were scheduled to be

8     discussed in that monthly meeting, the other document

9     is one where each participant of that meeting has to

10    sign in.  In the case that an employee cannot attend

11    that monthly meeting within the following five days

12    that the employee comes back that policy has to be

13    discussed with him.  And that is one of the areas that

14    the police is currently carrying out.

15          And I want to give you my own experience.

16    When I came into the police, I was working in the

17    command center and we did not have access to the

18    policies.  The command center director had worked with

19    my father and thanks to that relationship on Friday

20    afternoons I would take the files of the policies that

21    he had in the office to take them to a printer and

22    with my own money make copies of each one of those

23    policies.  And to see nowadays that I have the policy

24    so accessible on my own phone is really a

25    transformation.

```
 1              THE COURT:  Okay, thank you.  I have no
 2     questions.
 3              Mr. Saucedo, any follow-up question?
 4     Mr. Saucedo, any follow-up question as to this?  Or
 5     Mr. Castillo?
 6              MR. SAUCEDO:  No, Your Honor, no questions.
 7     Thank you very much.
 8              THE COURT:  I think Mr. Peñagarícano I put it
 9     hard on you.  Any follow-up?
10              MR. PEÑAGARÍCANO:  No questions, Your Honor.
11     Just a question to the Court whether on this area of
12     policy and procedure is the Court going to have
13     further questions to the Lieutenant Quiñones?
14              THE COURT:  No, that's the only matter on
15     policy and procedure.  This afternoon when we come
16     back we're going to talk about professionalization and
17     then complaints and internal investigations, those two
18     areas.  My questions are much more limited than the
19     ones this morning so it should take us 45 minutes or
20     an hour and then we'll go address all the other
21     matters.  If we're going past 5:00 p.m., maybe 5:30 a
22     little bit, we'll do so that way we don't have to
23     reconvene tomorrow.  We definitely can finish today.
24     Everybody have a great lunch.  In Mr. Saucedo's case
25     have a good breakfast now.  And with the Dallas folks
```

1    you have about another hour for lunch.  So let's

2    recess and I'll see you at 2:30.

3              (Hearing recessed at 11:38 a.m. and resumed

4    at 2:30 p.m.)

5              THE COURT:  Please be seated.  I hope you had

6    a nice lunch or in Mr. Saucedo's case breakfast.

7    We're now going to continue with the afternoon's

8    session right where we left.  I want to note for the

9    record that this hearing is open to the public and

10   it's a public hearing and it's live with the exception

11   of Mr. Saucedo and the Special Master's team and

12   Mr. Castillo but it is a live hearing and it's open to

13   the public.

14             I want to before we go to the next area if

15   the Monitor or Mr. Saucedo could identify -- I know

16   there's I believe it's six members of the community

17   who are here you can identify.  I think you probably

18   have the whole list so it would be good to identify

19   who is here for the record.

20             MR. SAUCEDO:  Yes, Your Honor.  Thank you for

21   this opportunity and I apologize for not having this

22   list earlier in the morning.  We're joined today by

23   Ms. Modesta Irizarry who is a community leader in

24   Loiza.  Mr. José Rodríguez who is from the Dominican

25   Committee For Human Rights.  Ms. Milagros Catalá,

1    community leader in Naranjito and the community

2    neighborhood council.  Ms. Yarima González from

3    Kilometro Zero.  Angelica García-Romero from Alianza

4    Por la Paz.  Yorely Rivera from Iniciativa

5    Comunitaria.  And also present, Ilene Rivera-Rijo

6    representing the general counsel of the Dominican

7    Republic.  We thank each of these members on behalf of

8    the United States for being here.  Their input

9    continues to be valuable in this process.  Thank you.

10           THE COURT:  Okay, thank you very much for

11   being here.

12           I'll say it Spanish and you can translate for

13   the record.

14           THE INTERPRETER:  Thank you all for being

15   here.  Your contribution is very valuable for the

16   Monitor, for the Puerto Rico Police Bureau, and for

17   this Court.  So you are all very welcome here.

18           THE COURT:  Okay, Mr. Peñagarícano, you had

19   something you wanted to say before we proceed.

20           MR. PEÑAGARÍCANO:  Yes, Your Honor, thank

21   you.  We'd also like the record to show also

22   Carmencita del Rosario from the community of Fajardo

23   is also here present.  And also on behalf of the

24   Commonwealth in the afternoon session the subsecretary

25   of the Department of Public Safety, Rafael is present

1    as well as Arturo Buford-Crowley and Attorney Miguel

2    Candelario who is the in-house counsel for the

3    department.

4            THE COURT:  Okay, so welcome all.  And we're

5    going to proceed then.

6            Okay, so the two topics that we have left

7    before we go into the status conference part of the

8    public hearing are professionalization and internal

9    investigations and complaint.  So let me start then

10   with professionalization.  Who is going to be

11   addressing the Court?

12           MR. PEÑAGARÍCANO:  Lieutenant Jojanie Mulero.

13           THE COURT:  Okay, so good afternoon

14   Lieutenant Mulero.  For the record, we already know

15   your name but if you could state your background and

16   your experience with PRPB and then I'll proceed to ask

17   you, it's very few questions.

18           LIEUTENANT MULERO-ANDINO:  Good afternoon to

19   the court and everyone present.  My name is Jojanie

20   Mulero-Andino and ever since march 8 of this year I've

21   been directing the human resources bureau.  I've been

22   in the police for 17 years and I'm available to answer

23   the questions of the honorable court.

24           THE COURT:  Okay, so let me begin.  Actually

25   I have two questions maybe one with subparts.  The

1   first question is as follows:  The Monitor has

2   interviewed people who successfully completed the

3   promotional -- or officers who successfully completed

4   the promotional process from sergeant to first

5   lieutenant and from first to second lieutenant.  That

6   test had been given to these members nearly five years

7   ago.

8          The question is, has PRPB come up with a plan

9   to conduct more frequent exams that would allow a

10  greater number of qualified men and women to compete

11  on a more frequent basis for ranks up to and including

12  captain?

13          LIEUTENANT MULERO-ANDINO:  Yes, correct.

14  Yes.  The Commissioner, Antonio López-Figueroa, one of

15  the things he has done is he has endeavored us to

16  create the promotions examination board.  Once the

17  board is constituted then the examinations will be

18  created and the convocations made and we'll prepare

19  everything necessary to administer the test.

20          THE COURT:  Okay.  And when do you estimate

21  the promotions board would be -- would have everything

22  in place to begin opening these positions for

23  competition?

24          LIEUTENANT MULERO-ANDINO:  I cannot give you

25  a date right now.

1          THE COURT:  Could you estimate maybe end of

2     this year?  End of next year?  Very rough time frame

3     nonbinding any anybody.

4          LIEUTENANT MULERO-ANDINO:  No, I do not have

5     the answer.

6          THE COURT:  Okay.  And my follow-up question

7     is, obviously you are being in charge of the Bureau of

8     Human Resources, this promotions process which it goes

9     all the way to second lieutenant, as the promotions

10    process that goes all the way to the highest ranks I

11    assume or I would hope to hear that your answer is

12    going to be what I hope to hear, but it's being --

13    it's a process that is merit based and depoliticized.

14    So whoever does well on the exams it shows necessary

15    characters and all other considerations that are

16    objective will be selected.  Am I correct?

17          LIEUTENANT MULERO-ANDINO:  Yes, correct.

18          THE COURT:  Okay, thank you.  Now, my next

19    question is the following.  And when the Monitor was

20    interviewing PRPB candidates for promotions this issue

21    has -- or this topic has come up.

22          The question is, why does PRPB extend a

23    ten-point overall benefit to anyone who has a record

24    of active reserve guard U.S. military service in the

25    past irrespective of whether the person was in a

1    combat unit, wounded, disabled, or decorated?  Is this

2    due to any law or merely an executive decision made by

3    PRPB?

4            If it is discretionary, then why does a

5    current or former member of any military unit with no

6    college education merit ten points while an officer

7    who studied for and received a four-year bachelor's

8    degree merit only five additional points?

9            Has PRPB conducted any study showing that a

10   current former member of the military with no college

11   makes a better superior officer than one who studied

12   and received a four-year degree?

13           Again, I'm taking no position and I note my

14   own objection because it's a compound question so if

15   you need me to repeat, I will.  Please go ahead.

16           LIEUTENANT MULERO-ANDINO:  No, I don't know.

17           THE COURT:  Okay, I have no further

18   questions.  Let me ask if Mr. Saucedo has additional

19   questions.

20           MR. SAUCEDO:  Yes, Your Honor, briefly.  The

21   appropriate allocation of personnel and resources is

22   necessary to provide quality service to the community.

23   Is PRPB using the V-28 tools that were developed to

24   allocate appropriate staffing?

25           THE INTERPRETER:  I'm sorry, Counsel, can you

1    repeat the question.  I missed something.

2           MR. SAUCEDO:  Sure.  Ensuring that there's

3    appropriate personnel and resources that's necessary

4    for providing quality service to the community, is the

5    PRPB using the V- 28 staffing study to help allocate

6    those resources throughout the agency?

7           LIEUTENANT MULERO-ANDINO:  The V-28 study is

8    from 2018.  The company delivered the data for the

9    study and the IT bureau together with the interboro

10   company will adjust those necessities to the reality

11   of the Puerto Rico Police.  We will be able to see in

12   modules on realtime the needs of the agency.

13          THE COURT:  Okay.  And --

14          MR. SAUCEDO:  I have one more question, Your

15   Honor.

16          THE COURT:  Let me just follow-up on that

17   question briefly.

18          Any time frame again rough estimate?

19          LIEUTENANT MULERO-ANDINO:  No, no.  It may

20   take a few months.

21          THE COURT:  Okay, Mr. Saucedo.

22          MR. SAUCEDO:  Just one last question, Your

23   Honor.  What steps does PRPB take to allocate officers

24   closer to home to promote community policing?  And is

25   that system currently in operation?

1            LIEUTENANT MULERO-ANDINO:  The reality of the

2     police, based on recruitment statistics recently, out

3     of 664 recruits only 28 are from the metropolitan

4     area, from San Juan.  So with regards to the transfer

5     it's worked on according to the transfer registry.

6            THE COURT:  Let me ask you, would you have --

7            MR. SAUCEDO:  One last question.

8            THE COURT:  Let me follow-up on this one and

9     then you can ask your last one.

10           Would you have any reason or idea why out of

11     the 600 plus recruits only 28 were from San Juan?  One

12     possible answer is that San Juan municipal police may

13     offer some better benefits or higher salary.  I'm just

14     speculating.  But any ideas of why is that?  Because

15     San Juan is probably the largest -- well, it is the

16     largest area in Puerto Rico.

17           LIEUTENANT MULERO-ANDINO:  Well, the reality

18     is that entering the Puerto Rico Police it is a

19     difficult recruitment.  In terms of the San Juan

20     municipal police the Puerto Rico Police has better

21     salaries and better benefits.

22           THE COURT:  Okay.  Mr. Saucedo, your final

23     question.

24           MR. SAUCEDO:  Yes, I was just going to ask

25     whether the human resources office manages the

1    registry of transfers that was just discussed earlier?

2         LIEUTENANT MULERO-ANDINO:  Yes, correct.

3         MR. SAUCEDO:  Thank you.

4         THE COURT:  Does the Commonwealth have any

5    follow-up questions or does Captain Figueroa want to

6    clarify anything?

7         MR. PEÑAGARÍCANO:  Very briefly, Your Honor,

8    just a couple of points on the rough estimate that the

9    Court was seeking regarding the implementation of the

10   protocol and the board.  As the witness said, it's

11   hard to estimate but a few months is as best as we can

12   tell the Court at this time.  The entire reform

13   process will be included in the entire process of such

14   implementation.  The second point was regarding the

15   questions of the Court regarding the ten-point system

16   regarding the protocol and that corresponds to an act.

17   And we will be glad to provide the Court at a later

18   time more details about it.

19        THE COURT:  Okay, thank you.  Okay, so you're

20   excused.  Thank you very much.

21        And the last area we're going to cover now is

22   complaints and internal investigations.

23        MR. PEÑAGARÍCANO:  Your Honor, in the

24   transition to the next witness I just want to say for

25   the record that also from the office of the governor

1    Marsha de Jesus is also present for the Commonwealth.

2              THE COURT:  Okay, welcome.  Okay, so who is

3    here now for this sixth area?

4              MR. PEÑAGARÍCANO:  Colonel José Ramírez.

5              THE COURT:  Welcome back Colonel Ramírez.

6              COLONEL RAMÍREZ:  Good afternoon, Honorable

7    Judge.

8              THE COURT:  Just a few questions so I'll get

9    to the point.  The first question is, the Monitor is

10   concerned that the PRPB random drug screening program

11   is not as effective as it should be or could be.  In

12   particular, the Monitor has been concerned that not

13   enough officers are being screened annually and that a

14   seemingly small percentage of said subjects test

15   positive.

16             With respect to the small number of positive

17   tests among its workforce, how does PRPB explain this

18   small percentage?

19             COLONEL RAMÍREZ:  Well, certainly last year

20   with the situation that happened of COVID there was a

21   situation with the Forensic Sciences Institute where

22   we provide the logistics and we perform a random

23   system for drug testing that's confidential and it is

24   for the whole island.

25             As of today in this year we have 1,896 tests

1    performed.  And so always in the month of July the

2    system is affected because we need to renew the

3    contract with the Forensic Sciences Institute and the

4    physician.  We will be meeting soon with the

5    commissioner who is already interested in having

6    greater drug tests and we now have a budget for it.

7         THE COURT:  And let me also note that this is

8    something that is a fact.  The Forensic Science

9    Institute was until recently, I believe early in this

10   administration, under the umbrella of the Department

11   of Public Safety.  It's no longer part of the

12   department and before it was as it currently is.

13        Obviously, as you said, I assume that's why

14   we're back to having contractual issues, they have

15   their budget issues, budget issues.  So it all

16   depends.  Again, Secretary Alexis Torres can no longer

17   give administrative supervisory instructions to

18   Forensic Science, correct?

19        COLONEL RAMÍREZ:  Well, obviously, yes, I

20   mean we do have the staff available and we have the

21   logistics to perform these tests but obviously we

22   depend on the Institute of Forensic Sciences and with

23   COVID and all they have their own protocols and so

24   sometimes things are delayed.

25        THE COURT:  Okay, going to another area, in

1  the fourth monitor report the Monitor described from

2  its investigations or review two independent versions

3  of the same SARP supervisor taking measures that could

4  amount to interference in a subordinate's

5  investigation with a possible obstruction of justice.

6  And let me say that it is not the norm, it is an

7  isolated case, but it's important to bring this matter

8  up.  Translate that and I'll continue with the

9  question.

10       COLONEL RAMÍREZ:  In regards to that case,

11  Your Honor, an investigation was ordered on behalf of

12  Internal Affairs to evaluate all of the information

13  that came in from the Monitor's report and we will

14  soon have a complete report that will be referred to

15  the commissioner.

16       THE COURT:  Okay.  Now, let me also say I

17  assume this will be part of the report, but in the

18  meantime what measures have been taken to ensure the

19  integrity of the SARP investigations signed off by

20  that particular supervisor?  And what plan does PRPB

21  have to ensure the integrity of its employees and

22  investigating findings moving on forward?

23       COLONEL RAMÍREZ:  Yes, one of the priorities

24  of the Office of Professional Responsibility is that

25  all investigations be diligent, exhaustive, clear,

1    fair and impartial.  And so when I met with the

2    commissioner he was very clear that this was very

3    warranted and there would be monitoring.  And if any

4    irregularity were to be detected then the appropriate

5    sanctions would be imposed.

6              THE COURT:  Okay, thank you.  Last question,

7    during the last status conference and public hearing

8    we addressed the issue of the IES and the issue of

9    whether it's placed under SARP and that it may be

10   viewed as a punitive instrument when it is not so.  I

11   want to ask you if you have any follow-up on that

12   since our last status conference.

13             COLONEL RAMÍREZ:  Well, the IES system we

14   participate as part as an application and it's been

15   very effective ever since it's been implemented with

16   the complaint control system because it allows us to

17   keep direct supervision ever since the complaint is

18   initiated until it is investigated in order to abide

19   by the terms according to the *Reforma* agreement.

20             THE COURT:  Okay, I don't have any further

21   questions so let me open it up to Counsel Saucedo or

22   Mr. Castillo.

23             MR. CASTILLO:  Thank you, Your Honor.  Just

24   one or two questions.  First, speaking of the matter

25   of the supervisor who may have been interfering with

1    SARP investigations, was that referral for an

2    investigation, an internal investigation, on that

3    supervisor's actions made before or after the Monitor

4    published its fourth report?

5           COLONEL RAMÍREZ:  No.  We pay attention to

6    all of the reports of the Monitor pertaining to the

7    SARP and we order the corresponding investigation

8    because we do not have knowledge at the central level

9    of that information that the Monitor obtained.

10          THE COURT:  Let me follow-up on that

11   question.  And this is not going to happen overnight

12   but let's assume that in the next couple of years this

13   case is closed and there is no monitor.  If there is

14   no monitor, information such as this would then never

15   arrive through proper investigation.  And I'm saying

16   this not to have anybody panic -- and this is

17   something that perhaps the director of the reform

18   office can answer, but it is something that I know in

19   other jurisdictions -- and, again, I'm not the super

20   expert, but in other jurisdictions there's no federal

21   monitoring but the state has created sort of like a --

22   in New Orleans, for example, there's an independent

23   Monitor's office created by the state and once the

24   Monitor of that case is closed there's still

25   independent monitoring.

1              Am I correct in saying that without some sort

2      of oversight that perhaps is created by state law, or

3      right now we have federal monitoring, information like

4      this probably would have never reached you, am I

5      correct?

6              COLONEL RAMÍREZ:  We do agree.

7              THE COURT:  The case is not going to be

8      closed now but that is something that I think

9      everybody should have in the back of their minds

10     because at some point I know the Commonwealth does not

11     want to be under federal supervision.  And I just

12     bring the New Orleans model -- and if anybody from

13     PRPB wants to consult Dr. Del Carmen is familiar with

14     that office and I did go to that office once or twice

15     when I was there.  But I think it's a good point and

16     thank you for your honesty in answering that question.

17     But, again, in the long run that's something the

18     Commonwealth has to think about what steps guarantees

19     this so information like this will actually get to

20     PRPB.

21             Mr. Castillo, more questions?

22             MR. CASTILLO:  No further questions.  Thank

23     you.

24             THE COURT:  Mr. Peñagarícano, anything you

25     want to address?

1          MR. PEÑAGARÍCANO:  No, Judge, not at this

2     time.

3          THE COURT:  So you're excused Colonel

4     Ramírez.

5          And now we're going to move to the next part

6     of the -- we're done with the public hearing part and

7     now we're going to go to the status conference part.

8     Okay.  Now, before we go into this let me note that I

9     have -- there were submitted to the Court three

10    written presentations from members of the community.

11    One is from *Alianza Para La Paz Social* submitted by

12    ALAPÁS.  I read it.  I thank the representatives from

13    ALAPÁS.  This will be made part of the record.  I'll

14    give it to the courtroom deputy and I'll have the

15    court interpreter as soon as possible translate it for

16    the record.

17         The second one I have is from Carmen Milagros

18    Catalá-Otero from Naranjito, submitted another

19    statement.  And then the third one is from Maria del

20    Carmen Rosario from Fajardo.

21         MR. BARRETO-SOLÁ:  Your Honor.

22         THE COURT:  Yes, Mr. Barreto.

23         MR. BARRETO-SOLÁ:  May it please the Court.

24    Counsel for the Puerto Rico Police Department have not

25    been privy to those documents, so we have never had a

1    chance to read those.  And we would like to have a

2    chance to read that report before it's admitted into

3    the record.

4          THE COURT:  Okay, so I do have it here, I'm

5    going to give it to the courtroom deputy.  Once we're

6    done with the hearing -- I don't know if U.S. DOJ has

7    seen them.  Mr. Castillo, have you seen them or not?

8          MR. SAUCEDO:  Your Honor, we have not seen

9    those letters.

10          THE COURT:  Okay, so what I will do is I

11    won't make them part of the record right now.  I'll

12    give them to the Monitor.  I believe the Monitor

13    provided them to me.  Maybe one of them may have been

14    sent directly to the Court.  I thought everybody had

15    them, but the Monitor will provide them to everyone

16    else, everyone can take a look, and I just want to

17    make sure everybody has them.  I note for the record

18    that I did receive these three separate written

19    statements from the community.  So I'll give them to

20    the courtroom deputy and she has them.

21          Okay.  So now let me just very briefly in

22    closing.  We've now gone over the 11 areas of the

23    reform agreement.  I do want to say that over the last

24    two sessions I've received many satisfactory

25    responses.  I think -- I don't think -- PRPB I want to

1    say is on the right track.  Rather than challenging

2    everything that the Monitor finds they're taking a

3    proactive approach and they're saying if that's the

4    finding let's see how we're going to move along and

5    move ahead and we're planning towards that.  So I want

6    to commend that.

7           There are some unanswered questions, but I

8    think the deponents have been very honest by saying I

9    don't have an answer or we're going to follow-up on

10   that, so that's also very important.  But the bottom

11   line of all of this is it is very important to have

12   the inside of where PRPB is now.  U.S. DOJ needs to

13   know that, the Court needs to know that, the Monitor

14   needs to know that, more importantly PRPB needs to

15   know that.  And there are areas also that are very

16   important because the Special Master will be helping

17   in certain troubled areas.  Particularly there were a

18   couple of areas last status conference and one other

19   area today that I'm going to assign to the Special

20   Master.  So overall I think it's been a very

21   productive public hearing part discussing all of these

22   11 policies.

23          We're now going to proceed to the other part

24   of the status conference which is basically hearing

25   from the attorneys themselves but before that let me

1    start by asking -- I know that the secretary of public

2    safety excused himself.  I know the deputy secretary

3    Mr. Riviera is here.  If you would like to make a very

4    brief statement, it could be a simple good afternoon

5    everybody, but you're welcome.  If Mr. Riviera wants

6    to say anything, please go ahead.

7              MR. RIVIERA:  Thank you.  Good afternoon,

8    Your Honor.  Members from the U.S. DOJ, the federal

9    monitor and his team Special Master and the

10   representatives of the community that we serve and

11   we're part of.  On behalf of the secretary of the

12   Department of Public Safety, Alexis Torres, we again

13   welcome the opportunity to address the Court on the

14   continued efforts to ensure that the sustainable

15   reform of the Puerto Rico Police Bureau attains

16   maturity.

17             We continue to invest time and resources on

18   all 11 compliance areas of the decree.  Last update

19   details several area for successes while also

20   highlighting some areas for continued improvement.

21   For this update under policies and procedures we have

22   worked in step with all parties involved to continue

23   to make necessary and timely adjustments.

24             As it pertains to search and seizures, our

25   methodology are fully compliant and we are aligned

1   with all the requirements laid out in the decree.  We

2   are taking very seriously the Monitor's concern on the

3   percent of those searches producing negative results.

4   The police bureau has made significant strides as it

5   pertains to the use of force which the Monitor has

6   duly recognized; however, we have the opportunity to

7   improve administratively by adjusting our procedures

8   in regards to single versus multiple reporting during

9   use of force events.

10          As it pertains to complaints and internal

11   investigations, we're taking steps to increase the

12   number of personnel assigned to our division of

13   professional responsibility in addition to identifying

14   adequate funding.

15          The Department of Public Safety in this case

16   specifically our police bureau is enforcing all

17   mechanisms available which enhance equal protection

18   and prevent discriminatory practices.

19   Professionalization of the police force is a key area

20   in which we, to include the commissioner of the police

21   bureau, and working arduously.  Specifically we are

22   reinvesting in the police academy both in physical

23   improvements, as well as working to enhance curriculum

24   and training in a manner that would produce a more

25   well-rounded police officer.

1          As it pertains to information technology

2     systems, the secretary, in concert with Police

3     Commissioner Antonio López, has authorized a contract

4     that would tie all relevant platforms into a single

5     data collection and analysis repository.  In addition

6     to the GAAP analysis already completed on this matter,

7     it will provide readily available data and analytics

8     framework in order to facilitate all aspects of the

9     decree compliance.

10          I thank you, Your Honor, for the Court's

11    time.

12          THE COURT:  Okay, thank you Mr. Riviera and

13    you're always welcome here.

14          Okay, now let's hear then -- I should have

15    done this first, but I'm a little bit out of order

16    today.  Ms. Ortíz from the governor's office.  His

17    personal representative is here.  Ms. Ortíz, if

18    there's anything you would like to say.  It can be

19    simply hi, good afternoon.

20          MS. ORTÍZ-RIVERA:  Very briefly just to

21    inform the Court and all the parties that we have been

22    working with several health requests to coordinate the

23    transportation for the Monitor's office and we have

24    made some advances and we will have an answer today

25    for the request of the transportation issue that we

1    are facing right now.

2         THE COURT:  Okay, thank you.  Let me just ask

3    you another question.  You can answer it now, if not

4    later.  Let me ask you, from your perspective working

5    directly alongside with the governor, how useful are

6    these public hearings?  Because I know you're here and

7    you take information.  You might not meet with him

8    today but when he's got his time directly for you he's

9    got all your attention, you submit this information.

10   How helpful is that?  I think it is, but I want to

11   hear from you.

12        MS. ORTÍZ-RIVERA:  Well, I do think it is

13   because I can get all the picture of all the issues

14   that are being discussed apart from, you know, reading

15   the reports, and also to inform the governor where

16   we're at, and to tell him exactly where the stage that

17   we're in and the realities of what needs to be done

18   within a specific time frame.  So that's basically

19   what I think is helpful for these hearings.

20        THE COURT:  Glad to know it's helping.  Okay,

21   thank you very much and welcome.

22        Now we have the commissioner is here also so

23   let's hear from the commissioner, Mr. López.

24        COMMISSIONER LÓPEZ-FIGUEROA:  Good afternoon,

25   Your Honor.  Good afternoon to everyone present.  Good

1    afternoon, Honorable Judge.  I'm Commissioner Antonio

2    López-Figueroa of the Puerto Rico Police Bureau and

3    this afternoon -- I was present this morning -- I

4    would like to clarify several points of discussion.

5    For example, in the case where Prosecutor Laura

6    Hernández rendered a report this morning regarding

7    matters of children and sexual crimes.  Possibly in

8    prior years the situation that she very well explained

9    may have happened in the past; however, ever since

10   January 4th of 2021 when yours truly assumed the

11   leadership of the Puerto Rico Police I established as

12   a goal to merge the divisions of sexual crimes, gender

13   violence, and children's matters so that a single

14   investigator can and can have the capacity and the

15   training to investigate all three types of crimes or

16   incidents without having to re-victimize the affected

17   person.  In turn, it also serves to maximize resources

18   that exist in these divisions.

19          Another matter regarding transfers wherein a

20   sustainable reform agreement of the Puerto Rico Police

21   demands and requires that each one of the personnel

22   transfers to other police areas be strictly by number

23   of application presented because in the past transfers

24   were made without taking into account the time that it

25   represented.  And those were complaints that had been

1   filed by people who had been working in the

2   metropolitan area for 18 to 20 years who were entitled

3   to be transferred to the area where they live and it

4   was not possible in that aspect.  So now it's being

5   done strictly by turn of transfer.

6           We always appreciate team work by Monitor

7   John Romero who is doing an excellent work in the

8   monitoring and oversight of the agreement.  However,

9   the police has extremely capable officers that assume

10  the responsibility of attending any situation like the

11  one that was presented this afternoon of alleged and

12  undue influence in administrative investigations which

13  have no space under the leadership of yours truly nor

14  in the Puerto Rico Police Bureau.

15          As soon as we learned of that situation,

16  Colonel Ramírez informed me and the investigation

17  immediately ensued, and we are very close to receiving

18  the results thereof so that the persons involved could

19  receive what corresponds to them.  As always, we are

20  willing to work as a team in everything related to

21  this agreement and in the search that it can all be

22  resolved by 2023.  That is all.  Thank you very much.

23  Good afternoon.

24          THE COURT:  Okay, thank you.  Commissioner,

25  just two questions.  The first question, I assume this

1   continues to be the norm but how frequently do you

2   meet with the Attorney General?  I assume in the past

3   I know, and I worked for the government, that at

4   Fortaleza the governor would have counsel for security

5   and you would meet.  But also I'm sure you meet with

6   him periodically to discuss.  And I'm sure after this

7   hearing there are issues that are important that

8   everyone talk together.  But do you meet frequently

9   with the secretary of justice or the person who is

10  known as the Attorney General in other states?

11          COMMISSIONER LÓPEZ-FIGUEROA:  Weekly.  And I

12  was in his office yesterday.  We have an excellent

13  relationship.  We're working as a team and we have

14  seen the result by the constant filing of criminal

15  cases and by phone calls also constantly.

16          THE COURT:  And let me follow-up on that.  I

17  know the answer to this one also but for the record, I

18  understand currently PRPB's and your relationship with

19  FBI, DEA, Homeland Security and all the other agencies

20  is excellent.  And you continue to work alongside and

21  together and you have many task force officers who are

22  helping these federal agencies and that continues to

23  be the case, correct?

24          COMMISSIONER LÓPEZ-FIGUEROA:  Yes.  I've met

25  with each one of them.  They have 453 Puerto Rico

1    Police agents in their task force.  And all cases that

2    we're following up are with persons who continue to

3    conduct criminal activity.  We all work as a team so

4    that they can assume jurisdiction of those cases.

5            THE COURT:  Thank you.  That's good to hear.

6    And finally, do you have a date for the next

7    graduation or not yet from the academy?

8            COMMISSIONER LÓPEZ-FIGUEROA:  It's scheduled

9    for September 20th; however, I'll give you the date

10   next week.  It will possibly be in October, early

11   October.

12           THE COURT:  Okay, please do because that's

13   one of my favorite parts of my job, going there and

14   seeing everybody.  The culmination of -- I've seen

15   these curriculums since they were created so for me

16   it's important to see these fine men and women

17   graduates.  I have to say the women have been getting

18   the top award.  We're seeing more and more women

19   graduate and that is excellent so I look forward and

20   the Monitor looks forward, if possible, to attend.

21   And I have to say it's the last time the governor was

22   there and I think to the extent he can always be there

23   it's very important.  So thank you very much,

24   Commissioner.

25           COMMISSIONER LÓPEZ-FIGUEROA:  Thank you.

1          THE COURT:  Okay, thank you.

2          Now we're going to hear from the Monitor and

3     the Special Master.  I know since Dr. Del Carmen has

4     not been here in Puerto Rico I'm sure he hasn't spoken

5     at least for a little bit.  Let me hear from Dr. Del

6     Carmen his report from the Special Master.  I assigned

7     you one additional task today so let me hear of all

8     the matters you're working on.  Give me good news.

9          SPECIAL MASTER DEL CARMEN:  Yes, Your Honor.

10    I don't know about good news but I'll certainly give

11    you reality and the truth.  So for starters I will

12    tell you that the Special Master's office was assigned

13    initially various tasks including the integrity

14    checks, racial profiling and biased based policing,

15    EIS and promotion protocols among others.

16         In addition to that, Your Honor, the Court

17    assigned us CIT data collection and analysis virtual

18    training, and I know that today you assigned us an

19    additional task.  We have been working very actively

20    with PRPB.  And before giving you a quick summation of

21    some our findings of some of our reports rather, I

22    wanted to let you know that Captain Figueroa has been

23    outstanding to work with.  He has been a wonderful

24    asset for the reform and has been very active and very

25    proactive in the work that we have done with him, as

1    well as Mr. Garfer in the secretary's office.

2           So notwithstanding that, our observations are

3    as follow:  As you know, we're not monitors, we're

4    simply here to enable and help PRPB to succeed in

5    being able to achieve the level of maturity necessary

6    to be able to graduate from the reform agreement.

7    Let's use that word which very scholarly, right?

8           I will tell you, Your Honor, that what

9    concerns me is that we heard repeatedly even today

10   that they want to be out of this agreement in two more

11   years.  And although I congratulate them for having

12   wonderful standards, I will tell you that the data

13   component is simply lacking at this point.  There are

14   concerns that I have personally about the type of data

15   that's being collected and more specifically the data

16   that is missing and needs to be collected.

17          In addition to that, we are concerned about

18   the fact that if the data is not being collected

19   adequately PRPB will have no ability of being able to

20   self-analyze and diagnose any issues that come up.

21   And subsequently they will not be able to communicate

22   that information to the Monitor's office.

23          As I said before, we are in a spirit of

24   collaboration, everyone's working together, and I

25   think that's commendable in this case.  But I will

1    tell you that my concern continues as a matter of fact

2    in the speed in which we get things done.  We're

3    simply not up to par with the goals that in two more

4    years they wish to be in a situation where they would

5    be in compliance with most, if not all, of the

6    agreements as established in this case.

7         So I will ask the Court once again to

8    continue to provide guidance to allow us to move

9    quickly.  I think that the disposition of Captain

10   Figueroa, Mr. Garfer, the secretary's office is there,

11   but we just simply need to get through the bureaucracy

12   and get to roll up our sleeves and work.  Right?

13        And I'll give you an example, Your Honor,

14   before I finish.  We're currently working on the

15   racial profiling bias based policing piece and it's

16   been a challenge to try to find out exactly what data

17   is being collected in this pilot study that's actually

18   in place right now.  And I know Captain Figueroa has

19   already facilitated a presentation by the vendor in

20   the pilot study which we appreciate but to me, having

21   had experience in working in another decree and, as

22   you know, Your Honor, having had the ability of

23   engaging and talking in the other cases across the

24   United States vis-à-vis the conference that we hold

25   once a year or once every couple of years at my

1  university, I find it incredibly challenging for us to

2  be able to complete our assignments in due time in

3  order to be able to help the police department achieve

4  such ambitious goals.  So I would ask the Court to

5  continue helping us help them.  And once again I

6  congratulate the leadership and the attorneys of the

7  Commonwealth for they have been a joy to work with and

8  once again in a collaborative spirit.  So thank you,

9  Your Honor.

10           THE COURT:  And Dr. Del Carmen let me also

11  add that once sustainability has been reached the goal

12  is a ten-year period there's still two years that that

13  sustainability must be maintained in order for the

14  agreement to terminate.  That's also part of that

15  because you might reach -- as you said, if all goals

16  are reached but for the next year and I think this is

17  something extremely familiar but I know Seattle was

18  very close to sustainability and then during that

19  period things went back to square one.  So that's

20  something that has to be really considered, am I

21  correct?

22           SPECIAL MASTER DEL CARMEN:  Yes, Your Honor,

23  exactly.  What is also important is that in order to

24  be able to get to that point of compliance, to be able

25  to go into the last two years of oversight, the police

1   department needs to be able to not crawl and not

2   barely walk but run in this marathon.  So what I mean

3   by that is the data component needs to be solidified

4   in such a way that they will be at this point

5   perfecting the data collection as opposed to creating

6   it.

7          So it is very, very important that -- and,

8   again, we are willing and able and ready to help as we

9   have and we continue to do so.  We think that the team

10  is in place right now in the Commonwealth through --

11  to really put a fast pedal through this process, but I

12  just think that we need to really have an honest and

13  candid conversation about expectations versus reality.

14         THE COURT:  Dr. Del Carmen an analogy to what

15  you're saying in order to have full compliance in data

16  collection is what Sulu would say to Captain Kirk,

17  full warp speed ahead.  I'm going warp two, warp 3,

18  and warp 4, am I correct?

19         SPECIAL MASTER DEL CARMEN:  Yes, Your Honor.

20  I'm not as familiar with movies and TV programs as you

21  are.  I've been cautioned by my judge wife not to ever

22  agree with the judge unless I know exactly what I'm

23  agreeing to, but I will tell you, Your Honor, that

24  from my perspective, yes, full speed ahead but with a

25  clear vision of where we're headed and also with a

100

1    clear ship as to where we are and ensuring that the

2    gas is filled up and that the mechanics are standing

3    by in case it breaks down, Your Honor.

4            THE COURT:  Thank you, Dr. Del Carmen.  Let's

5    hear now from John Romero, the Monitor, and you can

6    stay where you are.  You have a microphone there.

7    Good afternoon.

8            MONITOR ROMERO:  Good afternoon, Your Honor,

9    and those present.  If I may, Your Honor, I would like

10   to provide a brief overview of the Monitor's fourth

11   report as it relates to the six areas of the agreement

12   which are being discussed today.

13           On July 21st of this year, the Office of the

14   Monitor submitted to the Court our fourth compliance

15   report.  The report outlined the areas that PRPB has

16   shown improvement and reached various levels of

17   compliance in those areas where improvement was needed

18   in order to be in compliance with the agreement.  As

19   stated during the August status conference, PRPB has

20   made some measurable progress towards complying with

21   those mandates of the agreement; however, reform

22   efforts are lagging behind in some areas.  To that

23   end, the Monitor's office has been working closely

24   with PRPB's reform unit.

25           Given that PRPB currently has not reached the

1    technology level where the majority of its data is

2    digitized, PRPB has had to scan documents in order to

3    meet the Monitor's office requests for data.  We're

4    clearly aware that this has presented a monumental

5    challenge to the PRPB reform unit; however, Captain

6    Figueroa and the bureau reform unit staff have

7    continued to make every effort to provide us the data

8    in a timely manner.

9         Your Honor, I must note the high level of

10   cooperation between the parties and the willingness to

11   work together with the Monitor's office.  The Office

12   of the Monitor greatly appreciates the efforts of the

13   Special Master and U.S. DOJ who have worked closely

14   with the Monitor's team and PRPB providing invaluable

15   assistance.

16        If I may, Your Honor, I will now provide a

17   brief synopsis by area as to PRPB's compliance model.

18        THE COURT:  Okay, before you do that, let me

19   go back.  And I see that you are in full accord with

20   the Special Master Dr. Del Carmen that all the 11

21   areas are important but IT needs to be up-to-date; it

22   has to be the most modern IT in order to move this

23   along, am I correct?  That's been something that's --

24        MONITOR ROMERO:  That's correct.

25        THE COURT:  -- slothfully keeping PRPB of not

1    complying faster, am I correct?  Or at least you could

2    be monitoring or making findings faster so PRPB can

3    correct them, correct?

4            MONITOR ROMERO:  Correct.  The technology

5    touches all 11 areas of the decree.

6            THE COURT:  Okay, noted.

7            MONITOR ROMERO:  In the area of

8    professionalization, this area was not covered in our

9    fourth report but will be addressed in our fifth

10   report; however, we can note that we work with the

11   Special Master, the parties in the development of the

12   protocol.  In going forward, we will be monitoring

13   PRPB's development of the new protocols and its

14   implementations.

15           As it relates to this protocol we cannot

16   overemphasis the importance of this work and the

17   valuable that an equitable and fair promotion will

18   bring to the agency and at the same time put forth

19   sustainable reform.

20           In the area of policy and procedures this

21   area was also not addressed in our fourth report but

22   will be assessed in the next report.  Your Honor, the

23   majority of work done in this area was accomplished

24   during the capacity phase of the agreement.  Now along

25   with U.S. DOJ and the Special Master's office we are

1    continually reviewing and providing comments on

2    various policies as they come up for review.  We

3    should also note PRPB's implementation of the virtual

4    library and agency's progress in ensuring that agents

5    in the field are having access and reviewed data and

6    updated policies.

7            In the area of internal affairs, the

8    Monitor's office noted that PRPB was substantially

9    compliant in a number of areas within the section;

10   however, the following was noted.  Additional

11   resources are needed within SARP; there are simply not

12   enough investigators.  It's our understanding that

13   PRPB is working on this issue.  The Monitor's office

14   also identified that PRPB needs to revise its

15   interviewing techniques allowing for more objective,

16   open-ended questions.

17           We also offer the following recommendations:

18   The retraining of all SARP criminal and administrative

19   personnel with at least 16 hours of interview and

20   training conducted by a recognized interviewing

21   specialist.  A change to the curriculum to allow for

22   more focus on the practical art of interviewing and

23   that each interview be recorded in its entirety.

24           In the area of search and seizure, in our

25   fourth report PRPB generally received compliance

1    levels of partial.  What contributes to those ratings?

2    General orders, arrest and citations, and search and

3    seizure lists all the PRPB forms required to be

4    included.  Yet, a review of the file provided by PRPB

5    lacks many of the required PRPB forms.

6         Also, a lack of documentation establishing

7    probable cause in the reports as well.  Paragraph six

8    of the agreement requires PRPB to develop an

9    investigatory stop and search policy and assisted to

10   collect data investigatory stop and searches whether

11   or not they result in the arrest or issue of citation.

12   At this moment that is not in place.  It is my

13   understanding that the Monitor's office and PRPB is

14   also working to address this issue.

15        In the use of force PRPB generally receives

16   compliance levels of partial.  Some of the reasons

17   relate to the following:  For the period covered in

18   the report, PRPB did not have a tracking mechanism to

19   provide a valid use of force numbers both internally

20   and externally; however, during the month of June

21   through August of 2021 PRPB developed and implemented

22   a pilot project where you replace all area command

23   center modules replace this form with a new form where

24   PRPB has the capacity to a dashboard to determine a

25   number of incidents where force was used and by how

1    many officers.  While this is a significant step, it's

2    only the first step; nevertheless, the Monitor is

3    encouraged by this development.

4          The investigation of serious use of force is

5    conducted by PRPB's Force Investigation Unit, FIU.

6    The FIU is outlined in general order 100-113 and it

7    has 45 days to complete their investigations.  What

8    the Monitor found in reviewing these documents for the

9    report is that in the majority of its investigations

10   the FIU was not meeting this timeline although much of

11   that delay was due to FIU not receiving the bulk of

12   evidentiary material that it requested.

13         Another area of concern is the Commissioner's

14   Force Review Board, CFRB.  As per Bureau policy, all

15   FIU investigations are evaluated by the CFRB which has

16   30 days to complete the review.  However, what the

17   Monitor found was that almost all of the evaluations

18   exceeded the 30 days.

19         PRPB's implementation of a Crisis

20   Intervention Team, CIT, a pilot project in Arecibo are

21   command was concluded in November of last year.  The

22   Bureau did not expand the program beyond the pilot

23   project to any other are command during the period

24   covered in our report; however, PRPB has begun the

25   process of expanding the CIT program to all remaining

1     area commands.  CIT coordinators have been selected

2     and are in place in all are commands.  PRPB is also in

3     the process of identifying potential candidates for

4     the position of CIT officer.  PRPB efforts in advanced

5     of this area will be addressed in subsequent reports.

6         In the area of equal protection this area in

7     the fourth report was predominately noncompliant.

8     While many of the policies have been developed, PRPB

9     has not provided the curriculum and training materials

10     in all areas within review.  It has not demonstrated

11     implementation in many of the paragraphs.  However,

12     PRPB has done a good job in delivery of virtual

13     training and interaction with transgender and

14     transsexual persons.

15         It should be recognized that despite the

16     COVID-19 pandemic the training was still delivered.

17     The Bureau's work on a 24-hour hotline should also be

18     commended.  The staff they have assigned are dedicated

19     to their work.  This will be noted in our fifth

20     report, though additional resources are needed in this

21     regard as it relates to staff and technology.  PRPB

22     must continue to develop its reporting process to

23     ensure PRPB demonstrates its ability to respond to

24     these types of cases in the most effective and

25     professional manner.

1              Violence against your partner is a human

2     rights violation.  High-profile cases in Puerto Rico

3     have heightened the attention of violence against

4     women.  Victims deserve a timely and adequate response

5     pursuant to policies implemented.  PRPB cannot stop

6     sexual assault and domestic violence however PRPB has

7     a significant role to prioritize addressing violence

8     against women.  The Monitor's office is reviewing

9     cases filed of all sexual assaults and domestic

10    violence investigations in our CMR-5 report.

11             To sum up, Your Honor, PRPB has made some

12    progress with compliance with the agreement; however,

13    more needs to be done.  The Monitor's office is

14    committed to working with PRPB to achieve that goal of

15    full compliance.  Thank you, Your Honor.

16             THE COURT:  Thank you, Mr. Romero.  Let me

17    ask you one question.  This report that's forthcoming,

18    what period -- I assume that's from March of this year

19    until like maybe June or July.  What period does it

20    cover?

21             MONITOR ROMERO:  It's April through

22    September.  Now, which means a lot of what we're going

23    to see in CMR-5 is what we saw in CMR-4.  But we are

24    going to note the progress that has been made.

25    Specifically in that dashboard we talked about use of

1    force, that is a major step.  And after the

2    presentation which I received on Tuesday I did go down

3    to FIU, and FIU was able to show me the procedure

4    where it now as a result of the changeover from the

5    PPR-84 to 126, that information now is being filtered

6    to radio control which is a master communication unit

7    and they are producing realtime numbers on use of

8    force incidents again being fed from the 13 command

9    areas.  That is a good first step.

10           What PRPB has to make sure is that there is

11   oversight of this because what you're seeing in the

12   dashboard is the numbers but behind those numbers

13   there has to be information.  And what FIU was able to

14   show me in a practical application was that in fact

15   the use of force report, which is now digitized as of

16   August 31st, all reports submitted will be digitized

17   for a week now or a little more than a week.  And that

18   information is provided in with the 126 in that

19   dashboard, you can now activate it on the internal

20   side.

21           And 605, 602, which is a supplemental report,

22   it's an additional information required, that can also

23   can be viewed in that file, as well as 605-3 which is

24   the reporting of the use of force as well.  So this is

25   a good first step.  I expect we're going to see the

1    benefits of this specifically in CMR-6, Your Honor.

2              THE COURT:  Yeah, because CMR-6 will cover a

3    period from October until March of next year.

4              MONITOR ROMERO:  Correct.

5              THE COURT:  And basically this period for

6    CMR-5 is where this administration has tackled all the

7    problems and tried to fix everything that's not

8    working but obviously the curve, the progress curve,

9    it may not be as high and it is expected that for 6 it

10   should start going up.

11             MONITOR ROMERO:  Right.  And if I could just

12   add one more thing.  When CIT -- after the pilot

13   project in Arecibo, the intent of the PRPB was to kind

14   of roll over the course in the next two years, roll

15   out CIT in the remaining 12 years.  I had a

16   conversation with Captain Figueroa, who I can't say

17   enough about him.  He's doing a fantastic job here.

18   And I said, You know what, the whole idea of having a

19   pilot project is to see how it works, if it's

20   effective work out the kinks while it's in play, and

21   then expand that to the remaining areas.  He along

22   with the commissioner discussed the issue and came

23   back and said, We're going to do that.  That level of

24   cooperation is very important because to spread this

25   out over two years I think would not benefit either

1    PRPB or the people of the Commonwealth.

2             THE COURT:  Okay, thank you, Mr. Romero.

3             Okay, now I'm going to hear -- this is the

4    last part of the hearing, the status conference --

5    first from U.S. DOJ and then I'm going to hear from

6    the Commonwealth.  I know the Commonwealth filed its

7    memorandum at Docket 1830, and The United States at

8    Docket 1837.  So you need not rehash everything, it's

9    for the record and I've read it.

10            I do want to note that there are two areas

11   that I want from whatever you discuss or bring to the

12   Court's attention to address.  And, as I mentioned in

13   the morning, one is the Terry Stop issue.  As I

14   mentioned, I was thinking, you know, maybe this is

15   something that could be certified to the Puerto Rico

16   Supreme Court but what we want is -- you know, what I

17   would like is an answer, yes or no.  But this is sort

18   of -- I'm starting to think this is not litigation.

19   There may be a possibility of a case is in controversy

20   but I don't know if this is the sort of issue that

21   should really be certified to the Supreme Court, I'd

22   have to give it more thought, because U.S. DOJ

23   probably wouldn't take the position on either way.

24            And, again, the parties may not be actively

25   litigating this.  So there would probably have to be a

1     more live case in controversy.  Again, I'm not saying

2     there isn't grounds to refer it.  I know some state

3     Supreme Courts can offer advisory opinions; the Puerto

4     Rico Supreme Court, not really, but there may be more,

5     there may be less.  That is something that you might

6     want to think about.

7          The other thing is, I don't know if the

8     parties or the Commonwealth can stipulate whether

9     they're going to use Terry Stops or not use Terry

10    Stops, but the fact is that Terry Stops are being

11    carried out, so if they are they have to meet federal

12    parameters.  And if they are they would also have to

13    meet state parameters.  Right now there are -- there's

14    no prohibition, but that is something that they are in

15    fact occurring.

16         Along those issues, I also want to hear from

17    the parties regarding stops based on immigration

18    status.  And I want to say this is not something that

19    may be happening every day but one isolated incident

20    or a few isolated incidents should not be happening.

21    And, for example, and this was reported in the media.

22    On May 19th -- well, actually not May 19th.  April 7th

23    approximately 2021, there was an intervention in the

24    southern part or the western part of Puerto Rico.

25    There was a motor vehicle that was stopped for a

1    speeding violation.  I think it was 15 miles more than

2    the traffic limit and all the persons there were

3    detained, they were arrested, and they were illegal

4    immigrants.  So that's the sort of thing that is sort

5    of troubling.  I'd like to hear from the parties and

6    to see what can be done.

7           Again, Puerto Rico does not have authority to

8    arrest, process, immigration offenses nor do the

9    states; those are federal crimes and immigration is

10   usually under the Federal Government's control.  And I

11   don't think for at least this incident, it's not an

12   incident where there's task force agents or Puerto

13   Rico Police working with border patrol or other

14   federal agencies, so that is something that is

15   concerning.  And, again, this also happened to involve

16   a Terry Stop.  So I would like to hear about those two

17   matters when you address the Court.  So Mr. Saucedo,

18   you have all the time you need.

19          MR. SAUCEDO:  Yes, Your Honor.  And we had

20   planned to address the four areas that were assigned

21   to the parties as part of their memoranda, but I do

22   want to take up these two issues that the Court has

23   laid out -- the Terry Stop issue and the

24   immigration-based enforcement.

25          On Terry Stops, Your Honor, we do not believe

1    that certifying a question to the Supreme Court of

2    Puerto Rico is necessary for PRPB to comply with the

3    agreement.  We had also identified instances where

4    PRPB was detaining individuals short of probable

5    cause.  And the Monitor continues to find files and

6    instances where that level of justification is not

7    provided by officers in their reports.  What the

8    agreement requires is that if you're going to do them

9    you must have a policy and you must train officers on

10   how to conduct them.  If you're not going to do them

11   you still need a way of ensuring that they don't

12   occur, you know, just like excessive use of force.

13   PRPB prohibits the excessive use of force, but it has

14   an accountability system to make sure that that does

15   not happen.

16        So if PRPB is going to prohibit Terry Stops,

17   and they have under policy, they need to establish a

18   system, an accountability system, to ensure that that

19   does not happen.  They can't just say, Well, we've

20   banded it under policy so we can all rest assured that

21   they're not occurring.  Well, PRPB needs a system, an

22   accountability system, to be able to detect when they

23   do occur and then to correct it when it happens.

24        Your Honor, so we don't believe that

25   certifying a question is necessary at this point but

1    we do believe that PRPB should be establishing a

2    system where they track every stop.  That's a critical

3    point here, Your Honor, is that -- and the Monitor has

4    identified this in his reports.  PRPB currently does

5    not have a system where they document a stop unless

6    there's an arrest.  So if you stop someone and deprive

7    them of their liberty and they're not free to go but

8    you don't arrest them -- maybe you give them a

9    citation, maybe you give them a warning -- unless it

10   ends in an arrest, that stop isn't documented or

11   tracked.  And that's what's part of the problem.

12   That's what needs to be done in order to ensure that

13   PRPB policy prohibiting Terry Stops is actually

14   carried out.

15           THE COURT:  Thank you.  And let me add, after

16   the lunch break and I looked into this a little bit

17   more, I'm in agreement at this time.  This is

18   something that really shouldn't be certified to the

19   Supreme Court, but obviously PRPB obviously does need

20   to have a system in place because it's not going to

21   use Terry Stops.  Officers need to know what a Terry

22   Stops is and there has to be instructions, You can't

23   Terry Stop.  Or if you're going to Terry Stop then

24   comply with federal law which is the minimum that

25   needs to be complied with.  Okay, move on.  Thank you.

1          MR. SAUCEDO:  Yes, Your Honor.  On the

2   immigration-based arrest we learned through the

3   community that this arrest had taken place -- a driver

4   who was allegedly speeding and had passengers who were

5   noncitizens.  And when we learned about this incident

6   we asked for information in details and learned that

7   the arrest reports themselves indicated that the

8   arrest was for immigration reasons.  These individuals

9   were stopped, they were detained, arrested, kept in

10  PRPB custody while they were transported to federal

11  authorities.

12          Now, the question was why did that happen and

13  under what authority did PRPB detain these

14  individuals?  But, second, the other problem we found

15  was that every level of review every single supervisor

16  signed off on it.  They signed off on the arrest

17  report saying that these individuals were arrested for

18  immigration-related offenses.  It went through a

19  supervisor, a unit commander, and, not only that, PRPB

20  issued a press release about it.  So that obviously

21  caught our attention and we asked PRPB how many other

22  instances are there where these types of arrests

23  occur.

24          Your Honor, you asked the Commonwealth to

25  provide that data for this hearing and we did not see

1    it in any of the findings.  I think it's important to

2    know the extent of how often this occurs.  Your Honor

3    mentioned that maybe it's .05 percent.  The reality is

4    we don't know because PRPB does not track and document

5    every time it stops someone.  It needs to do that to

6    be able to tell us which are lawful and within policy

7    and which are not.

8              THE COURT:  Okay, Mr. Saucedo.

9              MR. SAUCEDO:  The problem is that PRPB is not

10   tracking when they stop an individual and that's one

11   of the things that needs to be done here.  We have

12   asked for information on this and we weren't even sure

13   if we could talk about this particular incident

14   because we don't know if PRPB has opened an

15   investigation into it, and if it is obviously we don't

16   want to get into details about it.  But I know that

17   Dominican consulate was interested in knowing more

18   about these types of cases.  I think it's important

19   for the police bureau to be able to communicate

20   clearly to the community when it's authorized to do

21   immigration enforcement and when it is not.

22              Just in the last few weeks we've seen many

23   news stories of FURA doing immigration seizures and

24   arrests and that could be done through an agreement

25   with federal authorities, but the community needs to

1   know that.  They need to know when PRPB is authorized

2   to take such action and when they are not.  And what

3   we're seeing are cases where PRPB is stopping and

4   arresting individuals without anything else other than

5   they were suspected of being here illegally.

6          THE COURT:  And let me say something that

7   does concern me --

8          MR. SAUCEDO:  Your Honor.

9          THE COURT:  This is something that PRPB needs

10  to work on.  Let's assume -- it appears that in the

11  vehicle stop the passengers were all illegal aliens.

12  They were not here illegally so they were removed from

13  Puerto Rico, from the United States.  But what if they

14  had permanent residency or being U.S. citizens, U.S.

15  naturalized citizens or second-generation Dominican

16  born citizens here.  They're legally here and they

17  would have been stopped based on their nationality and

18  targeted because of their nationality.  And that is

19  something -- the reason why the complaint was filed

20  originally, that's one of the reasons.  The Dominican

21  community was constantly targeted, and that is

22  something that the reform has pushed or moved to

23  decreased that from happening.

24          And that's why the statistics are important

25  if this is happening.  Like I said, it could be .05,

1       it could be two or three instances and that was it and

2       the police was going to take action, remedial action,

3       but everybody needs to know the situation.

4              And, again, if people are violating and

5       coming illegally federal authorities can definitely

6       arrest them, remove them.  If there are recurring

7       violations or have felony records, they get prosecuted

8       in federal court here.  We see that all the time.  But

9       these are really federal matters so I just wanted to

10      add that.  Mr. Saucedo, continue.

11             MR. SAUCEDO:  Yes, Your Honor.  There's one

12      other issue that's related here that we would like to

13      work with PRPB on and I know that it's taking steps to

14      address.  And that's certifying when witnesses have a

15      significant role in an ongoing criminal investigation

16      so that they're eligible for special visas.  I know

17      that -- one of the things we're interested in looking

18      at is whether PRPB has such a process so that when

19      people do cooperate and they do help advance a

20      criminal investigation that makes them eligible for a

21      federal program that PRPB is in a position to be able

22      to make that certification and provide that

23      information.  I know that Captain Figueroa and others

24      at PRPB have been in touch with the consulates and

25      with other members of the public, and it's something

1    that we do want to follow-up with and want to work on

2    with everyone involved.

3           THE COURT:  Okay, thank you.  I know it's

4    pretty hot and we've asked that it be made cooler

5    here.  But if anybody's wearing a jacket and you want

6    to remove it you have leave to do so.  Go on,

7    Mr. Saucedo.

8           MR. SAUCEDO:  Your Honor, we're now going to

9    go on to use of force and cover that area.  I don't

10   know if you want us to pause here and have the

11   Commonwealth address the Terry Stops and the

12   immigration issues before we continue, Your Honor.

13          THE COURT:  Yes, let's do that.  These two

14   issues let's address them and then we can go into the

15   other topics.  So let me hear from the Commonwealth.

16          MR. PEÑAGARÍCANO:  Thank you, Your Honor.

17   Before addressing those two issues in particular, I

18   would like to briefly address the Court on the report

19   from Mr. Romero, from the Monitor, of compliance and

20   the comparison between March and the current scenario

21   of the compliance process.

22          THE COURT:  Go ahead.

23          MR. PEÑAGARÍCANO:  Thank you.  In the report

24   we filed -- as Your Honor mentioned we're not going to

25   go in detail because it's in the record -- what we

1    wanted to show there was what was the status of the

2    reform process in March when that CMR-4 was filed and

3    what is the reality today.

4          THE COURT:  And that is perfectly clear from

5    the report because it says when the report was filed

6    and August 2021 and it shows affirmative steps or

7    plans to move ahead, so that's why I mentioned CMR-5

8    should be more cohesive and favorable to the

9    Commonwealth.  CMR-6 really will be proving if it's

10   been meeting these expectations.

11         MR. PEÑAGARÍCANO:  And that was the point,

12   Your Honor, because it's progressive.  The data

13   management that the Special Master mentioned, that the

14   Monitor mentioned, that the Court mentioned, that's

15   going into contract now and that's where it's going to

16   show next year the real results and benefits of that.

17   Regarding compliance, we're going to see that next

18   year.

19         THE COURT:  And I'm perfectly clear on that.

20   The fact that CMR-5 the improvement may not be so

21   sharp is not reflective on PRPB not doing what it has

22   to do.  It's something that will probably show in the

23   sixth report, seventh report.  And from there on it

24   should be on a positive slope if things continue to be

25   in the collaboration as everybody's been talking

1    about.  So I'm aware of that.  So regarding the

2    immigration and the Terry Stop now.

3            MR. PEÑAGARÍCANO:  Well, on the Terry Stops,

4    Your Honor, frankly after listening to the different

5    presentations and this morning's discussion we don't

6    have much to say other than we had been focusing on

7    discussing with plaintiff, with the USA Mr. Saucedo, a

8    way to amend the agreement to reflect the current

9    legal scenario in Puerto Rico.  But after further

10   discussion probably, as Mr. Saucedo pointed in his

11   report, what's important regarding the Terry Stops is

12   that regardless of whether they're going to be

13   prohibited or not is that they occur.  And the

14   important thing is what to do to avoid that they

15   occur, and if they occur how to track it.

16           So we received a report a few days ago and

17   that is certainly something that internally in the

18   reform process we're going to take a look at and

19   deliberate as to those specific comments that were

20   made in that report and then come back to the DOJ with

21   our specific comments about it.

22           THE COURT:  And let me say this, the other

23   thing that can be done -- and I think the important

24   thing is establishing a rule and moving forward and

25   the police enforcing.  What I'm saying is the police

1   understands that Terry Stops should not be taking

2   place but they take place.  If the police need an

3   order from the Court to comply with the reform, you

4   can request -- it's a purely voluntary matter but if

5   it's happened in this case also in the mental health

6   case, consent decree, that the government, the local

7   government, has gone beyond its obligations and asked

8   the Court, can you approve this and we consent to X,

9   Y, Z and then it becomes part and there's an order

10  enforcing that.

11          So, again, it is up to the Commonwealth.  I

12  am not going to certify it.  I'm convinced more now by

13  what Mr. Saucedo stated and I think it would be kind

14  of ridiculous to put both parties when I think

15  everybody's almost -- you're seeing eye to eye on this

16  matter.  So what I would ask is let me know let's say

17  by October 1st if it's Monday.  I don't know if that's

18  a Monday or a weekday, but let me know -- regarding

19  the Terry Stops, I'd like to get a joint motion by the

20  1st workday of October.  It's a Friday.  So I will get

21  a joint motion by October 1st.

22          If you need to discuss that beyond

23  October 1st that is fine, but hopefully you might have

24  a good working plan or solution moving forward.  Okay,

25  now as to the immigration matter.

1             MR. PEÑAGARÍCANO:  As to the immigration

2     matter and the specific incident that has been

3     discussed, Your Honor, on I think April 7th it was,

4     the Monitor opened an investigation and sent us at

5     least a couple of document requests regarding that

6     incident.  We complied with both.  We sent them

7     everything we had on that instance.  And those

8     incidents do occur, Your Honor.  That incident where

9     the immigration detection occurred, that is a very

10    particular one.

11            That is a very particular one because it was

12    a speeding situation.  The agent didn't ask anything

13    about nationalities or immigration status.  The driver

14    or the person next to the driver volunteered, Hey, I'm

15    just carrying these.  These guys just came from the

16    Dominican Republic, they're here illegally and we're

17    taking them here.  That's the way the situation

18    evolved.  Rather than focusing on that and certainly

19    as the Monitor pointed out and Mr. Saucedo that the

20    way it was documented it has challenges and there's no

21    question about it.

22            What the reform process did as a result of

23    that is focus on restructuring the entire general

24    order that covers that type of detentions which is

25    600-626.  So there's a new general order which is in

1    the internal process of final revisions internally to

2    be distributed through the paragraph 229.  And we hope

3    with the new changes a lot of the situations that

4    occurred in that incident that we've been discussing

5    will be avoided.

6              THE COURT:  So I think also the parties can

7    report -- you might not be done by October 1st but at

8    least we can keep a tally or follow-up, but in that

9    same other motion regarding Terry update me.  And,

10   again, if we have the 225 meeting and that's been

11   discussed and resolved that would be fine.  But I

12   think it's dispositive that what the Commonwealth is

13   doing is taking measures so that this not happen again

14   regardless of whether it happened one way or another.

15   But, again, we have a reform agreement so, you know,

16   it's important to take into consideration what PRPB

17   can do and in particular when it comes to immigration

18   issues.

19             So let's go back to Mr. Saucedo so you can

20   address the other matters.  I read your response at

21   1837 docket number.  It's excellent and I think it

22   provides everything so go to the nitty-gritty.

23             MR. SAUCEDO:  Yes, Your Honor.  And just

24   really briefly I do want to thank the Commonwealth for

25   taking the approach and Mr. Peñagarícano and his

1    remarks right now.  I think that it's important that

2    we continue to problem solve.  We're not going to

3    agree on everything.  And I think we are restrained

4    when there are policy issues that PRPB and the

5    Commonwealth need to decide which direction they're

6    going, but then there are other firm lines where the

7    federal courts have set them.  And I think we, as

8    problems arise, need to be honest about what happens

9    and how we fix them.  And so I appreciate what

10   Mr. Peñagarícano just said and look forward to working

11   with him on that joint motion for the Court.

12           We wanted to turn to the use of force issue

13   and specifically on use of force data.  The police

14   bureau has consistently provided inaccurate data to

15   the Monitor and there are repercussions of that

16   downstream in the monitoring process.  If the Monitor

17   does not get an accurate number of use of force, he

18   cannot draw a representative sample that's required by

19   the monitoring methodology when he's looking at other

20   things like force investigations or the force review

21   board work.

22           Now, the PRPB told us this morning that they

23   are using a use of force module.  I think the problem

24   that we see is that these systems need not just IT

25   personnel working on them but they need executive

1    oversight.  They need an executive sponsor who is

2    going to carry them out, get the IT bureau the

3    resources it needs to get these things done.  And I

4    think what we've been asking for and I know the

5    Monitor's also asked, and I know that PRPB is working

6    on it, is that they identify the executive sponsor for

7    each IT system and a project manager that's going to

8    be handling all the different pieces to keep things

9    moving.

10           PRPB was able to do this very successfully

11   with its contractor on the staffing study.  They had a

12   clear plan of where they were going in creating a

13   staffing study and a plan and every month they would

14   give us an update about how they were moving along.

15   The IT bureau can develop a system but it's not going

16   to change people's behavior.  Right?

17           I think the KRONOS issue is instructive here,

18   right, the timekeeping system.  It's taken years to

19   put in place.  And that was not just put a clock on a

20   wall and let people stamp it, right, it really was

21   about changing people's behavior and having them use

22   it, having the system be reliable.  There's an IT

23   component to it but there's also a supervision and

24   management piece of it, and that's what I think the

25   use of force data part here needs.  And one thing we

1    want to work on with PRPB is to identify those

2    executive sponsors and those project managers who are

3    going to be carrying out each of the IT systems

4    including the use of force module.

5          Your Honor, the second issue is when we asked

6    Colonel Colón this morning and that is that we noticed

7    that PRPB consistently notified the public when an

8    officer used deadly forced and discharged his or her

9    weapon.  It was brought to our attention by members of

10   the community that those press releases have not been

11   issued all year.  And what we wanted to find out from

12   the Commonwealth, I don't know if there's a response

13   available, but whether that practice was suspended for

14   some reason and if so whether it will resume.  I think

15   it's important for the public to know when an officer

16   believes that he's authorized to take another life or

17   to stop a threat that might jeopardize someone's life.

18   And so those notices are very important.

19          THE COURT:  And let me say, Mr. Saucedo --

20          MR. SAUCEDO:  And finally, Your Honor --

21          THE COURT:  That last point you made, and

22   I've heard you say it many times, but it does go I

23   believe to transparency.  There may be times

24   unfortunately when an officer has to take away a human

25   life to preserve human lives, but if it's not

1    documented properly and informed the public out there

2    is going to think the officer just killed somebody out

3    of for no reason and that's why it's so important.

4    Correct?

5            MR. SAUCEDO:  Yes, Your Honor.  These could

6    be very volatile incidents.  They are of high public

7    interest and it's important for PRPB to be able to

8    share information it can as soon as it can.  And of

9    course to preserve the integrity of the investigation

10   but to balance that with the interest of the public to

11   know when an officer uses deadly force.

12           THE COURT:  Okay, thank you.  The third

13   point.

14           MR. SAUCEDO:  Finally, the third point was

15   about the need for investigator training on force

16   investigations.  Colonel Colón told us that the force

17   investigators have gotten the same training that all

18   other officers have received on use of force, but what

19   the agreement requires is that force investigators

20   receive specialized training in being able to detect

21   among their peers excessive use of force or policy

22   violations.  Many of our consent decrees around the

23   country require specialized units to investigate

24   serious uses of force and PRPB does not have to

25   reinvent the wheel here.

1          New Orleans has a force investigation unit,

2     Seattle, Miami, there are other departments that have

3     them.  And we encourage PRPB to look at those other

4     cases and be able to adopt them, to be able to provide

5     this training as quickly soon as possible.  This is

6     very important.  The Monitor has detected questionable

7     cases in each of his reports and we can't treat each

8     new report as just a new set of cases.  We can't

9     forget about those the Monitor has already reported.

10    So we have asked as part of our filing this week,

11    we've asked that the Monitor follow-up on those cases

12    that he has identified as being problematic so that we

13    can find out what ended up happening -- was an officer

14    disciplined?  Was the officer exonerated?  So those

15    sorts of details are really important going forward.

16         THE COURT:  Okay, thank you.  And you

17    mentioned New Orleans, Seattle, but I really urge the

18    Commonwealth police and the commissioner and anybody

19    else, the attorneys, to visit New Orleans.  That

20    agreement is -- it's about a year -- it was filed a

21    year before this agreement, but that case is almost

22    wrapping up or close to wrapping up.  I know Dr. Del

23    Carmen knows everybody there, I've met almost

24    everybody there including the judge.  But going to New

25    Orleans it's a smaller department but it had many or

1    similar issues as here and they've been resolved over

2    the monitoring period.  So I would urge -- if the

3    Commonwealth can arrange for that and the Monitor here

4    will help, he's got the contacts, but you should

5    really go out there.  And that's going to illuminate

6    you and help you self-assess.

7        Continue, Mr. Saucedo, next point.

8        MR. SAUCEDO:  Yes, Your Honor.  Mr. Castillo

9    was going to take on the next section on searches and

10   seizures, but I did want to point or address the issue

11   about a two-year sustainability period.  We've heard

12   today the need to -- you know, that hate crime

13   statistics still need to get collected, that there's a

14   lot of work restructuring gender-based violence units

15   that do those investigations.  We're talking about

16   seeing the impact of work that's taking place now in

17   the fifth evaluation period, seeing the impact of that

18   in the sixth report.

19       The sixth report covers 2022, right?  So the

20   agreement requires once the Commonwealth reaches

21   substantial compliance with the agreement, that then

22   starts a two-year clock for sustained compliance.  So

23   what that means is if PRPB wants to be out of this

24   agreement completely by 2023, it would have to come

25   into compliance with every area of the agreement this

1    year, you know, in the next three months.  I think

2    what we've talked about here is the need for

3    additional implementation and oversight to achieve

4    results.  So I think, Your Honor, you know, we

5    appreciate the Commonwealth's good faith, their

6    motivation and their drive to get this done and we

7    don't want to slow any of that down and we're partners

8    in trying to get the agreement implemented.  I think

9    perhaps a more realistic goal is to get the entire

10   case within a substantial compliance within that

11   period of 2023.  Right?

12            You know, the CIT units they're scheduled to

13   become active in all 13 areas in a year which takes us

14   into 2022.  So I think -- we appreciate I think the

15   drive and the motivation, we certainly want to

16   encourage that, but I think that's sustainability

17   period is really a test for PRPB to demonstrate that

18   the systems and reforms have taken hold and they're

19   not going to go away once this case disappears.

20            THE COURT:  And regarding that, Mr. Saucedo,

21   let me say I've always been under the impression --

22   and I'll hear from the Commonwealth when it's its

23   turn, but I was always under the impression that the

24   Commonwealth was targeting 2023, which I think would

25   be July or August.  That would be the 10th anniversary

1     of when the agreement was actually signed to meet that

2     four-year capacity building period plus six years of

3     monitoring to have sustainability.

4              And 2023, I mean 24, and 25 would be the

5     two-year sustainability period after, you know,

6     reaching sustainability in 2023 but we'll hear from

7     the Commonwealth.  But that to me is more realistic

8     even though the Commonwealth would have to move in

9     warp speed.  If the IT is there and all the measures

10    and policies and we have the monitoring and the

11    Special Master helping -- as Dr. Del Carmen also noted

12    it is very aggressive and I would very much love to

13    see in 2023 sustainability to say, okay, count two

14    years from now and make sure that this is all set and

15    that would be the end, but we all have to be

16    realistic.  But I think what the Commonwealth is

17    saying is that it can reach sustainability by 2023

18    then there's that two-year period that will follow

19    sustainability.  So Mr. Castillo, your area, search

20    and seizure.

21              MR. CASTILLO:  Thank you, Your Honor.  So

22    search and seizure I'm just going to focus on two

23    areas.  We've already discussed a bit in this

24    morning's session the failure to search -- finding

25    evidence or make arrests as a result of search

1      warrants, and the Monitor found that one out of three

2      search warrants resulted in no seizure of evidence or

3      arrest.  In its filings the Commonwealth looked and

4      attributed that to some facts about, you know, whether

5      they were -- the nature of the searches or focused on

6      consent searches which is a different pool of

7      evidence.  But today it brought a more open approach

8      to looking at these details which are important.

9              So we want to highlight this issue.  It's an

10     issue of PRPB's obligation to collect data including

11     tracking and search warrants and to analyze it so that

12     it can then make informed decisions.  And these are

13     the decisions about what training is needed, what

14     tactical adjustments might be needed or whether or not

15     things are working well and whether we should be

16     staying the course.  So we agree with the Court and

17     disagree with what the Commonwealth said in its filing

18     that the success or failures of its policing efforts

19     are beyond its control.  Rather, we agree with what

20     was said today which is that these search results are

21     a data point that can be and should be considered in

22     its practices.

23             One of the issues that is a stumbling block

24     in getting there is that PRPB still has not met

25     several of the requirements in the agreement that will

1    offer it that control and the ability to make these

2    more successful analyses.  Specifically, the

3    Commonwealth did not get tracking search warrants as

4    it's required to do under paragraph 76.  It is not

5    evaluating its programs including police operations

6    for bias as required under paragraph 91.  And there's

7    also a requirement under paragraph 154 about integrity

8    checks including confirming that there's no

9    misconduct, no corruption in the execution of its

10   search warrants.

11          So PRPB can be looking at this data once it's

12   able and it has the capacity to do that, to be looking

13   for outliers in officers or in unit and making sure

14   that the searches across the agency are going to be

15   more successful in adjusting to failures.

16          So as the Monitor pointed out in its fourth

17   report, it is incumbent on the Commonwealth to

18   recognize that it has outliers and it is an outlier in

19   terms of the failure rates for its search warrants,

20   and it must provide a data-driven response to that

21   fact.  So we look forward to continue to work with the

22   Commonwealth and the Monitor's continued evaluation as

23   it builds capacity to collect and analyze the data and

24   to make those operational decisions based on that

25   data.

1              THE COURT:  Okay, thank you.

2              MR. CASTILLO:  Turning to another observation

3    from the Monitor's office in the fourth report it

4    included that there were repeated supervisory

5    deficiencies in the arrest and search files and that

6    included the regular failure to include all the

7    documents that were required by policy and there was

8    regular use of canned or copy-and-pasted language,

9    conclusory statements.  Those are all issues that were

10   identified by the Monitor as existing in its sample.

11             Supervisors have an obligation to provide

12   more than a rubber stamp or even a cursory review.  It

13   is -- they're the first line to ensure that all the

14   necessary documentation is there, that there are

15   sufficient descriptions of facts that are needed to

16   support the actions by its officers.  And when that

17   information is missing it's those supervisors that

18   have an obligation to demand that those mistakes be

19   fixed and to think about and assess the fit of the

20   officers doing these things or the training needs or

21   what supports are needed to get people on track.

22             The Commonwealth hasn't contested these

23   deficiencies, to its credit it recognizes that there's

24   room for growth.  So now the job is to do a thorough

25   assessment of why these problems are occurring so that

1   the appropriate corrective actions can take place, and

2   these assessments should be documented and shared with

3   the Monitor.  The Monitor and the Department of

4   Justice want to see that self-analysis and that

5   self-reflection and may even be able to provide

6   technical assistance?  And then when solutions and

7   corrective measures are decided upon, accountability

8   to see that those corrective measures are timely and

9   effectively brought through.  So we hope to see that

10  going forward and working together with the

11  Commonwealth and the Monitor on this.

12          THE COURT:  Okay, thank you.  Anything else?

13          MR. CASTILLO:  I have some points on equal

14  protection as well.

15          THE COURT:  Okay, go ahead.

16          MR. CASTILLO:  Okay, sorry.  First, there was

17  some discussion on the filings on NIBRS.  And for

18  those who don't know, NIBRS is -- the obligation comes

19  from the agreement for Puerto Rico to collect and

20  report crime data using NIBRS.  The NIBRS system is a

21  richer data set than what existed before and it allows

22  for a greater depth of analysis.  And it is that

23  analysis the PRPB can then use to make its operation

24  on resources decisions.  You might be able to -- you

25  might be detecting a theme here.

1           And so we have shared with Puerto Rico an

2      example of the sort of quality analysis that is

3      possible in the context of sex crimes and that example

4      showed how you can break down data of sex crimes by

5      the demographics of victims or perpetrators, the

6      geographic locations or the relationships between

7      victims and perpetrators, and other -- even comparing

8      the rates of arrests or prosecutions in one set of

9      investigations versus another.  And this sort of data

10     can help Puerto Rico's leadership, and even the

11     investigative units themselves, figure out how to best

12     allocate resources and approach these crimes.

13          The problem is that NIBRS' implementation has

14     stalled.  And I won't repeat what's in our filings

15     about the history of that, but we just urge the

16     Monitor to remain vigilant on this issue, and we look

17     forward to its recommendations on the steps that

18     Puerto Rico must take to actually move forward and

19     implement NIBRS once and for all.

20          Regarding hate crimes, it was very helpful

21     this morning to hear from the Puerto Rico Department

22     of Justice about their work in identifying and

23     prosecuting hate crimes.  But apart from the review of

24     policies, we still need to learn more from the

25     Commonwealth about what its doing to properly identify

1    and investigate hate crimes because we know -- we all

2    agree that they are a key player in this area and we

3    know that PRPB is responding to at least some of the

4    violent crimes that are happening in the LGBTQ

5    community and Puerto Rico is also responding to many

6    crimes of gender violence that might potentially

7    qualify as hate crimes, so we urge the Monitor to

8    continue to evaluate this, this progress, and

9    including raising examples of individual cases so that

10   we can use those to see necessary steps to move

11   forward.

12          In addition to that, the Monitor should also

13   be reviewing Puerto Rico's strategic engagement of

14   community stakeholders in this area because this is an

15   area where these stakeholders can provide the

16   Commonwealth critical feedback on their performance,

17   as well as opening lines of communication to help and

18   manage these types of investigations.  And this would

19   be in accordance with some of the obligations that are

20   in the community engagement section of the agreement.

21          On the issue of gender violence, again this

22   is -- it was very helpful to hear from the Department

23   of Justice this morning on their work in domestic

24   violence and sex crimes both from its filing and the

25   testimony.  Also, I want to recognize that Puerto Rico

1    has identified several changes to its structures,

2    protocols, and the reasserted its commitment to

3    tackling gender violence.  We agree that this is an

4    important area that warrants an influx of resources,

5    victims services, interagency collaboration, constant

6    engagement of stakeholders.  And in its -- the

7    forthcoming monitoring report that is where the

8    Commonwealth -- rather the Monitor is going to do a

9    real comprehensive review of police department's

10   efforts in this area.  So we look forward to that

11   report and working with the Monitor and the

12   Commonwealth to deal with the findings.

13          And I guess I just want to add on that part.

14   We are trying to contribute to those efforts moving

15   forward by -- we have done a review of relevant

16   policies, trainings, and investigations with the

17   assistance of the Special Master -- not the Special

18   Master, excuse me, some subject matter experts and

19   we'll be sharing those efforts with the Commonwealth

20   in order to keep this moving forward as well.  So

21   that's it on equal protection.

22          Briefly, and I'm sorry for taking up all this

23   time, on the civilian complaints, and criminal

24   investigations and discipline, I just really want to

25   focus on two issues.  One of the issues that was not

1    fully addressed in the last status conference -- and

2    we talked about some of the issues about resources and

3    interviews the last time.

4          The Monitor made some specific findings with

5    respect to certain whistleblower complaints.  The

6    Commonwealth has committed to reviewing its

7    investigator manual to see what needs to be done

8    there, but the Monitor's concerns run deeper than

9    that.  It touches on the quality of the interviews,

10   the supervision.  And so it may not be just a policy

11   fix; it may be on training and improvements on the

12   supervisory review.  So not only will the Monitor need

13   to follow-up with how the Commonwealth and SARP maybe

14   specifically responds to the individual problems that

15   it identified but also how SARP responds to the

16   failure to capture those problems themselves.

17         The issue is not just that there were some

18   deficiencies in investigations but it's that those

19   investigations were getting through the entire SARP

20   review process with various levels of review and so we

21   need to all work to improve that.  You know, I think I

22   can end there, Your Honor.  Thank you.

23         THE COURT:  Okay, thank you Mr. Castillo and

24   Mr. Saucedo.  We'll now hear from the Commonwealth and

25   Mr. Peñagarícano or Mr. Barreto whoever wants to

1    address these issues or any other issues.  What I

2    would like to hear first, however, would be -- because

3    again I've always been under the impression that the

4    Commonwealth is looking to be in substantial

5    compliance by 2023 and then there's the two-year

6    sustainability period.  But if I'm incorrect in that

7    analysis, I'd like to hear what the Commonwealth's

8    position is as to when it's planning on being in

9    sustainability because, as Mr. Saucedo said, if it's

10   2021 there's still a lot of work to do; 2023 with full

11   warp speed ahead it may be possible.  So let me hear

12   then go to the other areas and anything else you may

13   want to say.  And I have reviewed the Commonwealth's

14   document at Docket 1830 as well.  Go ahead.

15          MR. PEÑAGARÍCANO:  Thank you, Your Honor.

16   Let me address first the observation on the timing and

17   the substantial compliance which is what the Court

18   want to hear first and then I'm going to let

19   Mr. Barreto address some of the other matters.

20          This has been the object of many, many, many

21   conversations with everyone in the reform process

22   about what the agreement says about compliance, the

23   timing, and the substantial compliance and the timing.

24   The Commonwealth is crystal clear about what the

25   agreement states.  There is no hesitancy, no doubt.

1    Everyone is clear what it says.

2          But very respectfully, Your Honor, whenever a

3    member of the Commonwealth states like a good-faith

4    goal, like a positive mentality about a year that they

5    wish for compliance then it's like, respectfully, it's

6    like everybody panics.  And then everybody goes again

7    expectations versus reality and that's not real, you

8    need two more years for -- it's fine.  Respectfully,

9    we know.  The Commonwealth knows what the agreement

10   states.  And that's all we have to say.  Very

11   respectfully, Your Honor.

12          THE COURT:  So then let's hear from

13   Mr. Barreto as to any comments as to what Mr. Saucedo

14   or Castillo have said or anything else you want to

15   bring to the Court's attention.

16          MR. BARRETO-SOLÁ:  Well, Your Honor, I have

17   to tell you that I think Mr. Castillo, as well as

18   Mr. Saucedo have mentioned in the different aspects of

19   their themes there is a common denominator and we

20   could even call it a magic wand which is I think,

21   correct me if I'm wrong, what they're identifying is

22   the lack of tools of the Puerto Rico Police Department

23   to properly codify and organize the data in order

24   to -- not only to provide the data to the Monitor and

25   to the U.S. DOJ but also to be able to use the data to

1   correct any defects that they could actually see once

2   the data is analyzed.

3          When we look at specifically the search and

4   warrants and the percentages of negative warrants,

5   Your Honor, you were absolutely correct that maybe the

6   data needs to be organized and we can actually use the

7   data to see where, if anywhere, we're failing in terms

8   of getting more positive results out of the warrants

9   that are being issued.  I think that that transports

10  itself to pretty much every other concern that has

11  been mentioned by the U.S. DOJ about the data, about

12  the Monitor not being able to analyze everything

13  because of the lack of the data, and maybe not even

14  the lack of the data but the lack of the availability

15  to analyze the data.

16         The Monitor well said this morning that the

17  police department is going through a very painstaking

18  process of many times having to use tools to transport

19  physical documents to data that can be analyzed.  It

20  was touched this morning but we want to make it very

21  clear to the Court that there has been an agreement

22  reached with Ben Horwitz regarding the IT.  We're

23  looking forward for that system to be in place as soon

24  as possible.  That obviously is going to mean that

25  programs are going to be developed and we're going to

1    need the personnel to enter the data into that system.

2    We're going to use the input from the Monitor, the

3    DOJ, to be able to produce the data that they are

4    seeking and to organize the data that will help

5    everybody.

6          And we cannot lose the fact that we're not

7    helping the Monitor, with all due respect, we're not

8    helping the Special Master, we're not helping the

9    Court.  We're helping the police department to be a

10   better police department so that the police department

11   can actually serve the community that it needs to

12   serve.  Many times what I hear from Mr. Saucedo and

13   Mr. Castillo is not that necessarily the police

14   department or their agents are doing something wrong

15   but that they're not getting the data that they need

16   to get in order to be able to analyze it if the

17   process that is being followed was correct or was not

18   correct.

19         We've spoken many, many times about the

20   specific incident where some illegal immigrants were

21   detained.  We've sat together, Attorney Peñagarícano

22   and myself, with members of the police department and

23   when we look at exactly what happened that day what we

24   have come up and analyzed was that the documentation

25   following that detention was not properly completed.

1    It was not the detention; this was not a detention

2    that was directed at illegal immigrants.  It was a

3    stop because somebody was speeding there was

4    information that came up from the people themselves

5    that were stopped.  And what I'm saying, Mr. Romero is

6    absolutely right.  If you would have completed the

7    record the way that it should have been completed we

8    wouldn't be in this position analyzing that specific

9    document.

10           So I think that the Court should be aware

11   that a major step is being taken and that that major

12   step is that that information will be duly organized.

13   We're going to have to retrain the agents in order for

14   the agents to be able to input the information into

15   the system, and once that system is in place the

16   information will flow freely.

17           One last thing I wanted to also mention.

18   This is very painstaking.  This person right next to

19   me works 24/7 on the reform.  We want to see light at

20   the end of the tunnel.  And even though sometimes all

21   of the parties are saying you're getting the system in

22   the right direction, we see a little bit of light but

23   then that gets shut down because they say, you know,

24   you're getting there but you're very far from getting

25   there.

1          One analysis that we need to make, and today

2     is probably not the day to discuss this, is the

3     compliance could be divided in two stages.  Maybe we

4     do not need to comply with all 11 sections at the same

5     time but once one section is deemed to be compliant,

6     substantially compliant, the years start running from

7     there because hopefully we see light at the end of the

8     tunnel.  I am certain that if I sit down with

9     Mr. Romero and I explain this to him we will reach an

10    agreement and this is something that we'll be seeking

11    at a later date.  Thank you, Your Honor.

12         THE COURT:  Anything else?  I'll go around

13    first from DOJ, I'll hear from the Monitor, and

14    Special Master if they have any brief matters.  Not

15    rehash anything but any brief comment you want to make

16    for the record this is the opportunity.  And I'll give

17    the Commonwealth a final say at the end.  Mr. Saucedo

18    or Mr. Castillo?

19         MR. SAUCEDO:  Yes, Your Honor.  I think the

20    data systems certainly are important because they tell

21    us if things are working or not, but this is no longer

22    sort of implementing the agreement.  Right?  Most of

23    the agreement is reflected in PRPB policy.  And so

24    this is now PRPB taking ownership of the process and

25    making sure that its own policies are being

1    implemented.  So I think that it's easier for PRPB to

2    move forward with that in mind, that these are all

3    things that are now its responsibility, its

4    requirements.  And I think they're -- they have a lot

5    of people who want to see this reform process succeed

6    and those all become allies for them and they should

7    draw from them.  It's people within the police bureau,

8    it's your new cadets coming in who haven't seen any

9    other ways of doing it but under the reform.  Those

10   become your change agents and your allies in changing.

11          We have nothing further, Your Honor.  There's

12   a lot of work to be done here and we appreciate you

13   holding these hearings.

14          THE COURT:  Okay, thank you.  Let me hear

15   from the Special Master Dr. Del Carmen.  Anything you

16   want to say in closing?

17          SPECIAL MASTER DEL CARMEN:  Yes, Your Honor.

18   First of all, thank you again for allowing us to be

19   part of it and we apologize once again not being able

20   to be there in person.  I wanted to just reiterate

21   very quickly that I don't think anyone on our team is

22   panicking or anxious about any kind of timelines in

23   which we're in.  I think all of us are eager to see

24   Puerto Rico succeed and succeed with distinction, that

25   it becomes the model for other police departments to

1    follow.

2         I think to our point, policies are only good,

3    Your Honor, if they're actually enforced.  Policies

4    are only good if they're actually -- if there's

5    actually accountability.  Data is only good if it's

6    actually analyzed.  So to produce data and to have

7    policies in place is the first step of many other

8    steps that need to be taken, and one of the things

9    we've seen in the current DOJ from the past three or

10   four months is that lack of accountability gets a DOJ

11   investigation in place.  Lack of policy implementation

12   gets the DOJ interested in looking at patterns and

13   practices.

14        So from our perspective we stand ready to

15   continue to help.  We are eager to get this process

16   underway and finalized.  And we also commend PRPB and

17   the Commonwealth.  And I agree with the Commonwealth's

18   counsel that the Captain Figueroa is a 24/7 operation.

19   We wish there would be other individuals like him

20   around, and we are convinced that through that kind of

21   leadership and that kind of energy we will get through

22   this and we're ready to assist.  Thanks again, Your

23   Honor.

24             THE COURT:  Mr. Romero, the Monitor.

25             MONITOR ROMERO:  Your Honor, I agree with

1    U.S. DOJ that what we're looking at here is

2    implementation and of course the ability to produce

3    verifiable data.  I also agree on the assessment of

4    Captain Figueroa.  What we want to see is that in

5    other individuals because one individual can't do this

6    alone.  And that type of involvement, that type of

7    commitment we'd like to see that throughout the

8    agency.  And I think there are people out there and I

9    think it needs to spread out more.  Captain Figueroa

10   is a good example of someone who, once he makes a

11   commitment, is following through.  And that's what we

12   need in this scenario.  Thank you, Your Honor.

13            THE COURT:  Okay, thank you.

14   Mr. Peñagarícano or Mr. Barreto, any last 30-second

15   thoughts?

16            MR. PEÑAGARÍCANO:  Thank you.  Just as

17   closing remarks and again thanking the Court for its

18   time into this process.  We would ask permission to

19   Captain Figueroa to address the Court in closing

20   remarks.

21            THE COURT:  Okay, so Captain Figueroa, please

22   go ahead.

23            CAPTAIN FIGUEROA-ORTOLAZA:  Good afternoon

24   once again.  This afternoon we have heard from the

25   Department of Justice, from Attorney Saucedo and

1    Attorney Castillo, the Special Master Alex Del Carmen

2    talking about the problem.  We know the problem.  We

3    identified the problem.  And the Puerto Rico Police

4    will talk about the solutions now.

5            On August 31st we submitted to the parties

6    the forms to verify arrests either by use of force

7    that was signed on August 31st.  Those forms contain

8    the demographic category elements that the agreement

9    contains that will allow us to review the IT systems

10   to analyze those new elements.  And as last key

11   element, in order for the data to be reliable it's to

12   have people who can verify the quality of that data

13   detail.

14           And an example of this is Form 100-113

15   special investigation on the use of force.  According

16   to the agreement, all reports of use of force reach

17   that office.  The field investigators have a form

18   which is known as form 113.3 and through those reports

19   they have to validate that that use of force report

20   does not contain conclusive or repetitive language and

21   that all fields of the report be completely accurate.

22   And that can allow us to have reliable data quality in

23   order for the Monitor to be able to evaluate the

24   resources.

25           This, together with the secretary of public

1    security, together with the commissioner of the Puerto

2    Rico Police, signed an agreement to continue the

3    project with Ben Horwitz which will allow us to

4    improve the quality of the data.  As I said in the

5    beginning, we know the problem already.  The police's

6    responsibility is what are the solutions to solve the

7    problem.  And those are parts of the solutions that

8    the police is doing and we are showing to the Court.

9    Thank you very much.

10              THE COURT:  Thank you.

11              So in finalizing everything again I thank

12   everybody for their input today.  This along with the

13   past status conference and public hearing have been

14   entirely productive.  I think everybody sees and

15   understands what needs to be done and what the

16   Commonwealth says.  And I do applaud the Commonwealth

17   for recognizing that it realizes what the issue is and

18   now it's time to resolve it.  So this is a very

19   positive step moving forward.

20              And I do want to recognize since this

21   administration came in its always said, We're not here

22   to litigate, we want to resolve the problems, and

23   you're doing your best to fix the problems.  And I

24   think the ball right now is in your park and you need

25   to put a lot of effort into moving it forward, but it

1    is something that again from where we are today

2    there's only moving forward.  So in that respect I am

3    very satisfied where everything stands.  Again, a lot

4    of work to be done, nobody's arguing against that, but

5    things continue to move along.

6            So I want to thank everybody here.  It's been

7    a long day, those that are traveling back tomorrow,

8    safe travel.  I guess Mr. Saucedo will be having lunch

9    in a few minutes.  I guess the ones in Texas or Ohio

10   or will be having their siesta in a bit.  And

11   everybody else drive home safely and then I'll hear

12   from you, I guess, October 1st in that joint motion

13   that the parties will submit.

14           I do want to -- also I appreciate the

15   collaboration there has been this year.  In these

16   cases nobody's going to see eye to eye 100 percent.

17   There's going to be discussions, honest differences,

18   but I have to say the filings it's almost been a

19   year -- nine months, ten months, and the number of

20   filings in this case has been minimal.  If we remove

21   the number of filings that are the monthly invoices

22   basically there will be no filings.  So that shows

23   that everybody is in a very positive and collaborative

24   track and really everybody wants to see an end to this

25   sooner or later.

1          Okay, well thank you very much.  Court is

2    adjourned.  Once everybody is out I'm going to stay

3    here with the monitoring team.  So I'll be in the

4    Judge's room but I'll come out to meet with the

5    monitors.  So Dr. Del Carmen if you can stay on zoom,

6    we'll sign off the others and then Mr. Del Carmen can

7    participate in the post-hearing discussion I'll have

8    with the monitoring team.  Okay, you're excused.  I'll

9    be back in about five minutes.

10              THE BAILIFF:  All rise.

11              (The Court exits the room.)

12              (Status Conference at 4:50 p.m.)

13                        ---

14

15

16

17

18

19

20

21

22

23

24

25

1    UNITED STATES DISTRICT COURT    )

2                OF                  )ss.

3        PUERTO RICO                 )

4

5

6

7                        <u>CERTIFICATE</u>

8

9

10        I, EVILYS E. CARRIÓN-ESQUILÍN, hereby certify

11   that the proceedings and evidence are contained fully

12   and accurately, to the best of my ability, in the

13   notes recorded stenographically by me, at the status

14   conference in the above matter; and that the foregoing

15   is a true and accurate transcript of the same.

16

17                        <u>/s/ Evilys E. Carrión-Esquilín</u>

18                        EVILYS E. CARRIÓN-ESQUILÍN, RPR
                          Official Court Reporter
19                        United States District Court
                          Federal Building, Room 200
20                        San Juan, Puerto Rico 00918
                          787-772-3377
21

22

23

24

25