December 2021



# Fifth Report of the Federal Monitor

Covering the Period from April 2021 through September 2021

Compliance status of the Puerto Rico Police Bureau in accordance with the Federal Court approved Settlement Agreement between the United States Department of Justice and the Commonwealth of Puerto Rico

John Romero
Federal Monitor

1

## Table of Contents

INTRODUCTION ...................................................................................................................................... 4

General Background on the Agreement and Monitoring Process ................................................................ 4

Scope and Methodology ............................................................................................................................... 5

Key Findings of the Monitor's Fifth Report .................................................................................................. 6

I. PROFESSIONALIZATION ....................................................................................................................... 7

1. Staffing and Community Policing ............................................................................................................. 9

2. Promotions ............................................................................................................................................. 10

3. Commander Corps .................................................................................................................................. 17

II. USE OF FORCE ................................................................................................................................... 18

1. General Provisions .................................................................................................................................. 22

2. Specialized Tactical Units ....................................................................................................................... 26

3. Crowd Control Policies and Performance .............................................................................................. 33

4. Force Reporting ...................................................................................................................................... 39

5. Force Review, Investigation, and Analysis ............................................................................................. 45

6. Supervisory and FRB Reviews ................................................................................................................ 48

7. FIU Investigations and Force Reviews by SFRB ...................................................................................... 53

8. Use of Force Training .............................................................................................................................. 60

9. Responding to Behavioral/Mental Health Crisis .................................................................................... 64

III. SEARCHES AND SEIZURES: INTERNAL CONTROLS AND ACCOUNTABILITY ..................................... 69

1. Stops, Searches, and Seizures ................................................................................................................ 71

2. Investigatory Stops and Searches .......................................................................................................... 73

3. Arrests .................................................................................................................................................... 78

4. Searches .................................................................................................................................................. 87

5. Training on Stops, Searches, and Seizures ............................................................................................. 91

IV. EQUAL PROTECTION AND NON-DISCRIMINATION .......................................................................... 93

1. General Provisions .................................................................................................................................. 95

2. Discriminatory Policing ......................................................................................................................... 103

3. Sexual Assault and Domestic Violence ................................................................................................. 111

V. POLICIES AND PROCEDURES ........................................................................................................... 122

VI. SUPERVISION AND MANAGEMENT ................................................................................................ 131

1. Duties of Supervisors ........................................................................................................................... 133

2. Supervisor Training ............................................................................................................................... 139

3. Performance Evaluation ....................................................................................................................... 139

4. Early Identification System ................................................................................................................... 141

5. Internal Audits and Interagency Feedback ........................................................................................... 147

VII. CIVILIAN COMPLAINTS, INTERNAL INVESTIGATIONS, AND DISCIPLINE ....................................... 151

1. Civilian Complaints ............................................................................................................................... 154

2. Internal Investigations .......................................................................................................................... 156

3. Complaint Intake, Classification, Assignment, and Tracking ................................................................ 160

4. Investigation of Complaints .................................................................................................................. 171

5. Staffing, Selection, and Training Requirements .................................................................................... 189

6. Preventing Retaliation .......................................................................................................................... 192

7. Discipline ............................................................................................................................................... 193

8. Officer Assistance and Support ............................................................................................................ 196

**VIII. COMMUNITY ENGAGEMENT AND PUBLIC INFORMATION** ..................................................................... 200

    1. COMMUNITY ORIENTED POLICING ............................................................................................................ 203

    2. COMMUNITY INTERACTION COUNCILS ....................................................................................................... 214

    3. PUBLIC INFORMATION ............................................................................................................................ 221

**IX. INFORMATION SYSTEMS AND TECHNOLOGY** ........................................................................................ 226

**APPENDIX A: BACKGROUND TO PRPB MONITORING MISSION** ................................................................... 235

**APPENDIX B: METHODOLOGY** ................................................................................................................... 237

**APPENDIX C: COMPLIANCE STATUS BY PARAGRAPH AND SUB-SECTION** .................................................... 239

**APPENDIX D: MONITOR'S REVIEW OF TRANSFERS** ................................................................................... 242

**APPENDIX E:  MONITOR'S REVIEW OF APRIL 7, 2021 INTERVENTION** ...................................................... 243

## Introduction

This report will outline the current compliance status of the Puerto Rico Police Bureau (hereafter, "PRPB" and at other times "the Bureau") with the federal court approved Settlement Agreement (hereafter, the "Agreement" and/or "Consent Decree"). It was prepared by the Technical Compliance Advisor (hereafter, "the Monitor") pursuant to paragraphs 242, 251, and 252 of the Agreement to inform the court, the parties, and residents of the Commonwealth of Puerto Rico ("Commonwealth") about the status of the implementation and the level of compliance with the Agreement. The Monitor's Office (or "Monitoring Team") will make itself available to the Court, the parties, and community groups to explain the Monitor's findings and the compliance assessments presented in the report through multiple means that comply with the exigent circumstances of the pandemic.

## General Background on the Agreement and Monitoring Process

The Agreement was fashioned to provide PRPB officers with the tools, guidance, and resources that it needs to reform unconstitutional policing practices and to bring the Bureau into line with generally accepted practices of constitutional policing and law enforcement. The Parties recognize that constitutional policing and the community's trust in its police force are interdependent. Accordingly, the full and sustained implementation of the Agreement will guarantee constitutional rights and will consequently increase public confidence in PRPB and its officers. In addition, and perhaps most importantly, the Agreement also aspires to develop on the part of PRPB dynamic leadership and management skills aimed at transforming the Bureau for the benefit of the Commonwealth and its residents.

In a joint effort, the parties identified each of the following areas for improvement, enhancement, or reform in PRPB:

1. Professionalization;
2. Use of Force;
3. Searches and Seizures;
4. Equal Protection and Non-Discrimination;
5. Recruitment, Selection and Hiring;
6. Policies and Procedures;
7. Training;
8. Supervision and Management;
9. Civilian Complaints, Internal Investigations, and Discipline;
10. Community Engagement and Public Information; and
11. Information Systems and Technology.

To carry out necessary reforms in the above-mentioned areas, PRPB developed Action Plans for each of the named substantive areas. These Action Plans set forth in detail the steps agreed upon to execute and implement the reforms and achieve the desired outcomes in each area. Moreover, the above reforms also require the implementation of new or amended policies, practices, training, corresponding documentation, and internal review. All such activities, together with the monitoring of sustainable compliance, fall within the scope of objective oversight, analysis, and reporting of the Monitor.

4

During the capacity-building period, the Monitor assessed compliance based on the Commonwealth's own Action Plans, pursuant to Paragraph 240 of the Agreement. However, with the end of the capacity-building period, the mission of the Monitor's Office has changed. Beginning with CMR-1 and since October 2018, the Monitor has been assessing PRPB compliance in relation to the Agreement.

## Scope and Methodology

The Chief Monitor's Fifth Report covers the period between April 2021 and September 2021. CMR-5 covers nine of the eleven performance areas of the Agreement: 1) Professionalization, 2) Use of Force, 3) Search and Seizures, 4) Equal Protection and Non-Discrimination, 5) Policies and Procedures, 6) Supervision and Management, 7) Civilian Complaints, Internal Investigations, and Discipline, 8) Community Engagement and Public Information, and 9) Information Systems and Technology. Per the monitoring methodology agreed on by the Parties, 181 paragraphs were scheduled for assessment in CMR-5, out of 212 total paragraphs which the Monitor's Office is tasked to assess. This report excludes the sections of the Agreement covering Recruitment, Selection, and Hiring and Training as well as specific paragraphs throughout the other sections that are assessed on an annual basis and were covered in CMR-4.

For each of these areas, the Monitor's Office addresses its assessments based on the desk review of data that was provided by PRPB, as well as interviews, questionnaires, site visits, and the current state of IT. The collection, analysis, reporting, and public dissemination of data regarding the ongoing PRPB sustainable reform efforts were designed to strengthen and ultimately ensure public accountability and trust in PRPB. Therefore, the Agreement requires: a) that the Monitor's Office submit timely assessments as to compliance, as well as to PRPB achievements and impediments that the Bureau might be encountering; and b) that the Monitor's Office assist PRPB in finding solutions to all impediments to compliance until sustainable compliance is reached.

In agreement with the approved methodology, the Monitoring Team uses a combination of quantitative and qualitative methods to assess PRPB's compliance with the Agreement in the three areas of performance (policy, training, and implementation) selected for this report. Each paragraph in the Agreement has been assigned a methodology that was agreed on by the Parties and approved by the court. These methodologies include information on the data source, sampling method (if relevant), and compliance target. The compliance targets provided for each paragraph outline the objectives and thresholds PRPB must meet to reach full compliance with the paragraph. Further, if applicable, the compliance targets outline whether PRPB has incorporated the requirement into an implemented policy; trained all relevant personnel in the requirement and policy; and fully implemented the requirement in practice. As such, the compliance targets provide PRPB with a detailed pathway toward achieving full compliance.

Definitions for each of the compliance ratings used in the Monitor's assessment as well as additional detail on the methodology are provided in Appendix B.

## Key Findings of the Monitor's Fifth Report

During this reporting period, PRPB began to make strides in its development of the Virtual Library, progress towards creating more fair and equitable promotional processes for higher ranking officials within PRPB, commitment to expand Crisis Intervention Teams (CIT) to all areas, conduct of training on community policing philosophy, and creating a new process to capture uses of force (UOFs). Because much of this work began in the latter half of CMR-5, the Monitor expects for CMR-6 to reflect PRPB's continued efforts in these areas.

Overall, the compliance assessment in this report demonstrates some progress, particularly in the area of partial compliance. Although PRPB has made significant progress in the development of its policies and procedures, much work remains to be done in the training and practical application of these policies and procedures, see figure 1. Further, when examining the total compliance targets assessed in this report (N=431) in comparison to the previous report, the Monitor notes PRPB has made minor progress during this reporting period, with 42% of compliance targets being met during this reporting period, in comparison to 36% met in CMR-4 and 32% met during CMR -3.



*Figure 1. Rate of Compliance Over Time*

More specifically, the Monitor found that additional work is needed to develop and or revise training and in operationally implementing the requirements in several areas including Professionalization, Community Engagement, Supervision and Management, Equal Protection and Non-Discrimination, and Search and Seizures. Issues with the integrity of the Virtual Training System and COVID-19 restrictions have hampered PRPB's ability to train its members on many topics required by the Agreement. Further exacerbating this issue is the shortage of personnel, more importantly supervisors, and the ripple effect that these personnel shortages are having on supervision, performance evaluations, parallel administrative and criminal investigations of police misconduct, and timely investigations of UOFs. As noted in previous reports, PRPB's lack of procedural compliance with Information Systems and

Technology and issues with its capacity to identify, collect, disseminate, and analyze valid data on its performance continues to be an area affecting the Bureau's compliance with much of the Agreement.

The Monitor acknowledges that PRPB is working with the Office of the Special Master on several issues identified in this report and looks forward to collaborating with the Parties on the pathway towards compliance.

Despite the challenges noted above, the Monitor is encouraged with the increase in collaboration and efforts on the part of PRPB to be responsive to our requests for data and information. This collaboration is key to the cooperative nature of our work, PRPB's full compliance with the Agreement, and ultimately in sustainable reform.

In the forthcoming report sections, the Monitor provides the assessment and analysis produced by the diverse subject matter experts. All recommendations and assessments are offered in the spirit of collaboration with the sole objective of assisting PRPB in order that it can achieve a pathway to compliance.

# I. Professionalization

With respect to Professionalization, the Monitor concludes that PRPB has made additional progress towards compliance since CMR-3, the last report that addressed this reform area. The development of policies for promotions and integrity audits, and PRPB's continued efforts related to ethics and conduct rules are some of the advancements noted in this section. While PRPB has implemented many stipulations of the Agreement in policy and training, the Bureau has not consistently demonstrated the application of these policies and training in practice. It is also important to note that the Office of the Special Master is assisting the PRPB with developing the necessary protocols and materials to further PRPB's implementation of this section. The Monitor's Office looks forward to continued progress.

Overall, PRPB's compliance with the 10 paragraphs within Professionalization reflect similar levels of progress to what was noted in previous reports. In CMR-3 40% of paragraphs were assessed as partially compliant and substantially compliant, like the current reporting period, where 40% of paragraphs were found to be Partially Compliant and Substantially Compliant. Increases in deferred ratings in the current reporting period are due to no promotions occurring during the reporting period.  See figure 2.



*Figure 2. Professionalization: Paragraph Compliance Status*

## Paragraph 12: Professionalization - General Provisions

*PRPD shall develop processes and mechanisms that promote professional, ethical, and respectful policing services to effectively address Puerto Rico's public safety challenges; consistently and uniformly apply constitutional police practices; build public confidence; and strengthen its institutional structures. PRPD shall promote continuous performance improvement among all PRPD personnel that regularly identifies problems or challenges, assesses causal or contributing factors, and takes reasonable measures to achieve performance expectations in areas related to this Agreement.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2020 – September 2021 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Training on the code of ethics and conduct is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled officers are trained and certified in the code of ethics and conduct (or scheduled for training, in the case of mid-year reviews). | ☑ Met | ☐ Missed |
| 4. 95% of sampled administrative investigation outcomes are within policy. | ☐ Met | ☑ Missed |
| 5. 95% of sampled integrity audit outcomes are within policy. | ☐ Met | ☑ Missed |

Note: Compliance will be determined on two separate but inter-dependent bases: (1) the implementation of paragraphs 13-21, and (2) the results of outcome assessments, pursuant to Paragraph 243 of the Agreement.

### Compliance Assessment

PRPB policies related to this paragraph are unchanged since the Monitor's last assessment. PRPB continues to incorporate the requirements of paragraph 12. Further, PRPB supplied documentation that indicates over 99% of its workforce is currently trained in ethics and conduct rules and such documentation is consistent with approved policies. In regard to administrative investigations, the Monitor noted several areas where PRPB uses the findings of investigations in relation to promotions and professional advancement. In addition, the Monitor found that 95% of sampled administrative investigation outcomes were not within policy and no integrity audits have been conducted. For further details on the lack of policy compliance with the administrative investigation outcomes, please refer to Section VII, subsection 4: Investigation of Complaints of the report. Lastly, PRPB submitted a draft policy wherein an integrity auditing unit would be formed and tasked. The unit seems to be focused on proactive investigations into suspected wrongdoing by PRPB members. Though this effort is laudable, the auditing capability of such a unit remains unclear. Please refer to section VI Paragraph 157 for additional details.

*Pathway Forward*

While the planned Integrity Auditing Unit is a step towards substantial compliance, the unit should also contemplate a proactive element to allow spot field inspections of PRPB paperwork pertaining to administrative investigations, to include both punitive and corrective actions, across the island. Such a capability would allow PRPB to self-ensure compliance with its procedures at all levels of the organization. The Monitor notes that the Office of the Special Master is currently assisting PRPB in developing related protocols and procedures for the Integrity Auditing Unit and looks forward to the developments resulting from this assistance.

## 1. Staffing and Community Policing

The Monitor is encouraged by PRPB's renewed effort to develop and align technological resources to this and other areas of the Bureau. Effective use of technology will produce timely data, which in turn will enhance PRPB's performance and inform strategy. The ability to produce this data quickly and accurately will further assist the Monitor in assessing levels of compliance moving forward.

### Paragraph 13: Professionalization - Staffing and Community Policing

*PRPD shall assess the appropriate number of sworn and civilian personnel to perform the different department functions necessary to fulfill its mission. To do so, PRPD shall conduct a staffing allocation and resource study. The study shall form the basis for a staffing and resource allocation plan that is consistent with community-oriented policing principles and supports the systematic use of partnerships and problem-solving techniques. To foster community-oriented policing, the plan shall consider deployment practices that offer officers opportunities to serve the communities in which they reside.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2020 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. PRPD conducted a Staffing Allocation and Resource Study to assess appropriate number of personnel. | ☑ Met | ☐ Missed |
| 2. The Staffing and Resource Allocation Plan is consistent with the requirements of the paragraph and the Staffing Allocation and Resource Study. | ☑ Met | ☐ Missed |
| 3. 95% of sampled units are staffed consistent with the Agreement and the Staffing and Resource Allocation Plan. | ☐ Met | ☑ Missed |
| 4. 85% of the initiatives in the Staffing and Resource Allocation Plan are implemented. | ☐ Met | ☑ Missed |

*Compliance Assessment*

As was noted in previous CMR reports, PRPB conducted a Staffing Allocation and Resource Study ("Study") in 2018. This Study outlined the appropriate number of personnel across various areas of the Bureau. Furthermore, the Staffing and Resource Allocation Plan (SRAP), as developed in response to the Study, was consistent with the requirements of the paragraph.

PRPB also provided a certification to the Monitor, which indicates that, as of July 2021, PRPB has assigned an IT developer ("Interboro") to design a digital solution for analysis of every PRPB bureau through the lens of the SRAP. This solution, when available, should assist the Monitor in accurately determining PRPB's compliance with SRAP. Meanwhile, the Monitor has requested a breakdown of deployments throughout PRPB along with staffing levels required by SRAP. Without data to support the implementation of this paragraph, the Monitor must therefore conclude partial compliance.

*Pathway Forward*

PRPB should continue working with Interboro to digitalize deployment data, among other data sets. This will assist both PRPB and the Monitor to efficiently reach conclusions on compliance levels. The Monitor looks forward to assessing the work of Interboro and the alignment of the resulting analysis with the SRAP.

## 2. Promotions

The Monitor acknowledges PRPB's improvement in the selection of mid-level management officers. Specifically, the absence of reports of perceived political interference in this process is a laudable and crucial step.  As PRPB continues to see the retirement of many members and the influx of new officers in an era of generational change, the permeation of transparent, fair, and merit-based promotions at all ranks is indispensable and must not be delayed. The Monitor will remain vigilant to ensure that this process of fair and merit-based promotions becomes the standard for all ranks.

The PRPB policy of preference for veterans in promotion decisions seems overly broad in its scope, in that the policy favors all members of the military, including reserve and National Guard units, and does not consider wartime status, combat status, or service disability as criterion, as many public safety veterans' preference policies do on the mainland. The Monitor recognizes that this policy was created by the Commonwealth's legislative body and is therefore statutory in nature. That said, the Monitor suggests engagement with the legislative body to refine this statute. The Monitor strongly recommends creating an equal preference for non-veteran candidates who possess an educational degree of baccalaureate or higher.

The Monitor looks forward to reviewing the result of the collaboration between the Special Master's Office and PRPB regarding career paths within the Bureau.

### Paragraph 14: Professionalization - Promotions

*PRPD's promotion practices shall be merit-based and comply with equal opportunity employment principles.*

| Compliance Status | Assessment Schedule |
|---|---|

| Partially Compliant | | Review Period | October 2020 – September 2021 |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

## *Compliance Targets*

Note: This paragraph is assessed with Paragraph 16.

## *Compliance Assessment*

As noted regarding paragraph 16, promotion policies incorporate the requirements of Paragraphs 14 and 16-20. These promotion trainings are consistent with approved policies.

In further review of this paragraph, PRPB indicated that the last promotions were made in December 2020, based upon a test given in 2016. There have been no promotional exams since 2016 or promotions made since last December. Thus, there is not yet a standing Promotions Committee beyond the level of cadets to assess compliance levels. However, the Monitor drew a random sample of 129 promotional candidates in December 2020 for interview during the team's field visit in June 2021. Twenty-one of 32 persons selected appeared and were interviewed. Though the sample contained no unsuccessful candidates, the Monitor identified the following trends among those interviewed:

1. No person perceived discrimination based upon any suspect class.[1]

2. No person perceived political interference of any kind.

3. Many respondents expressed frustration that promotion candidates who serve in Military Reserve Units, Active Military, or National Guard are permitted to miss the promotions examination and make it up at a later date by citing their military duties without providing any evidence of a schedule conflict. These service members were offered *the same promotional exam*, unchanged from the one administered to those unexcused, at a later date. Foreknowledge of exam content and answers provides an even greater advantage for military-postponed test takers and must be addressed effectively to ensure a level playing field for all test-takers.

4. Many of the interviewees expressed frustration that PRPB extends a 10-point overall benefit to anyone who has a record of active/reserve/guard U.S. military service in the past, irrespective of whether that person was in a combat unit, wounded, disabled, or decorated. Candidates with a 4-year degree relevant to policing received only a 5-point advantage. Candidates with the minimum study requirement (associates degree) with no military background received no additional points. The Monitor is aware that this "veterans' preference" policy is statutory and thus out of the hands of PRPB.

---

[1]See Appendix D: Gender Transfer Memo

*Pathway Forward*

As the Monitor continues to reassess this paragraph in future CMR reports, it will be important to interview a comprehensive sample that includes both successful and unsuccessful promotion candidates. In addition, the Monitor will continue to assess PRPB's efforts to move forward with the next promotion cycle to ensure that it is in compliance with the Agreement. Further, the Monitor urges PRPB to work with the Puerto Rico Legislature to create an equitable promotion solution that rewards officer candidates with university degrees as highly as it rewards military veterans lacking such a degree. Those who are excused from the original exam date due to a valid military commitment should provide a document as evidence attesting to this conflicting commitment and their inability to sit on the original exam date. Lastly, under no circumstances should a person with an excusable absence from any promotional exam receive the same exam given to other members of PRPB who were not excused.

Further, PRPB should examine whether it possess the legal authority to unilaterally extend additional points to promotional candidates with a baccalaureate, masters' degree, or doctorate in a discipline relevant to the management of public safety such as a BS/BA in Criminal Justice, an MPA, an MA/MS in Criminal Justice, or a Juris Doctorate degree. This credit would go beyond the ceiling of 5 points now conferred for education, and effectively level the playing field between veterans with no degree and those who earned a relevant degree in higher education.

## Paragraph 15: Professionalization - Promotions

*PRPD shall publish detailed job descriptions for each rank among sworn personnel, specifying the duties, responsibilities, and minimum qualifications for each position. PRPD shall develop the job descriptions in consultation with the TCA based on generally accepted policing practices.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2020 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Job descriptions for each rank among sworn personnel are: (a) based on generally accepted policing practices and (b) are detailed, specify duties, responsibilities, and minimum qualifications | ☑ Met | ☐ Missed |
| 2. Job descriptions for each rank among sworn personnel are published. | ☑ Met | ☐ Missed |

*Compliance Assessment*

In review of this paragraph, PRPB forwarded a copy of its Rank Structure: Functions, Duties, and Responsibilities to the Monitor, which has not changed since the Monitor's Office last review in 2020.

To further assist PRPB with creating a written career path, the Court has asked the Special Master's Office to research and assist PRPB in drafting such a document. The Monitor has reviewed the Special Master's initial draft of the career path document and looks forward to the continued assistance that they will provide to PRPB on this topic.

*Pathway Forward*

Although the current copy of the Rank Structure policy meets compliance for this paragraph, the Monitor recommends that PRPB update the Rank Structure policy, as needed, once the Special Master's Office has completed a vetted career path. Compliance with this paragraph will be contingent of its application of the career path and related job descriptions.

## Paragraph 16: Professionalization - Promotions

*PRPD shall ensure that its supervisor selection process is lawful, fair, and consistent with generally accepted policing practices and anti-discrimination laws. PRPD shall develop objective selection criteria to ensure promotions are based on knowledge, skills, and abilities that are required to perform supervisory and management duties successfully in core substantive areas. PRPD shall provide clear guidance on promotional criteria, and prioritize effective, ethical, and community-oriented policing as criteria for promotion. These criteria should account for experience, civil rights and discipline record, training, and skills.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | October 2020 – September 2021 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Deferred | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Promotion policies incorporate the requirements of Paragraphs 14, 16-20. | ☑ Met | ☐ Missed |
| 2. All promotion trainings are consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled promotions committee personnel are trained and certified in all promotions policies (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☐ Missed |
| 4. Selection devices comply with promotion policies. | ☐ Met | ☐ Missed |
| 5. 95% of selected promotion files comply with policy. | ☐ Met | ☐ Missed |
| 6. 95% of interviewed candidates perceive the promotion process as merit-based, fair, non--discriminatory and objective. | ☐ Met | ☐ Missed |

*Compliance Assessment*

PRPB indicated to the Monitor that no promotional exams or promotions have been executed between April 1, 2021, and September 20, 2021. Thus, there is no standing Promotions Committee to analyze or interview to gain insight into compliance during this reporting period. As noted in relation paragraph 14,

13

the Monitor did interview 21 promotions candidates during his field visit in June 2021. Although the interviews were neither entirely representative of the promotions conducted within the reporting period nor included candidates that were not selected for promotion, the interviews produced various common themes, which are listed within the assessment provided in Paragraph 14.

*Pathway Forward*

During a Status Conference in September 2021, the Monitor heard from PRPB that the "additional point" system for veterans is mandated by Commonwealth statute. The Monitor looks forward to reviewing that statute in its entirety.

As noted above, the sample of interviewees was not comprehensive, and was based upon a five-year-old promotion cycle. Nevertheless, based on the information gathered during these interviews there appears to be no evidence of suspect class discrimination or political interference in the promotions process, at least as it applies to the ranks of first and second lieutenant. A determination that PRPB is in substantial compliance must wait until the Monitor has a wider body of evidence available across all ranks to support that conclusion. Finally, to guarantee a level playing field for all test-takers, PRPB must design a separate exam for promotion for each exam iteration offered beyond the original test date, each with its own set of questions and answer choices.

## Paragraph 17: Professionalization - Promotions

*PRPD shall utilize competitive written examinations as a component of the selection process to award promotions through the rank of Captain. Written promotion examinations shall conform to generally-accepted professional standards for test validity and security and be designed to evaluate qualifications that are job related and consistent with business necessity. PRPD shall develop these examinations in consultation with the TCA based on generally accepted policing practices and in compliance with anti-discrimination laws.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | October 2020 – September 2021 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Deferred | | |

*Compliance Targets*

Note: This paragraph is assessed with Paragraph 16.

*Compliance Assessment*

As noted above, promotion policies incorporate the requirements of Paragraphs 14 and 16-20, and all promotion trainings are consistent with approved policies. However, PRPB indicated to the Monitor that from the period of April 1, 2021, through September 20, 2021, there were no promotional exams

14

administered or promotions made within the Bureau. As such, the Monitor is unable to assess the implementation of such policies and trainings in practice.

*Pathway Forward*

The Monitor will assess PRPB's compliance with this paragraph once it has completed a full cycle of test preparation, written testing, interviews, promotional trainings, and promotions in rank through the rank of Captain.

## Paragraph 18: Professionalization - Promotions

*All appointments to ranks above Captain shall be based on objective criteria that account for the knowledge, skills, and abilities to perform core management, supervisory, and leadership duties.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | October 2020 – September 2021 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Deferred | | |

*Compliance Targets*

Note: This paragraph is assessed with Paragraph 16.

*Compliance Assessment*

As noted above, PRPB indicated to the Monitor that from the period of April 1, 2021, until September 20, 2021, that there were no promotional exams administered or promotions made. In June 2021, PRPB circulated the draft of a new policy governing promotions to command staff ranks (Inspector to Colonel – inclusive). The document was reviewed by the Monitor, U.S. DOJ, and the Special Master. The revised policy was subsequently approved by the Parties and filed with the court and approved by the Chief Judge in August 2021.

*Pathway Forward*

The Monitor notes that the Office of the Special Master is assisting PRPB with developing the related protocols and materials in regard to promotions. As such, the Monitor will continue to assess PRPB's compliance with this paragraph after it has completed this work.

## Paragraph 19: Professionalization - Promotions

*PRPD shall establish procedures that govern the removal of officers from consideration for promotion for disciplinary action related to serious misconduct.*

| Compliance Status | Assessment Schedule |
|---|---|

15

| Deferred | | Review Period | October 2020 – September 2021 |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Deferred | | |

### Compliance Targets

Note: This paragraph is assessed with Paragraph 16.

### Compliance Assessment

As was noted in paragraph 16, PRPB has met the related policy compliance targets. In review of this paragraph, PRPB submitted a copy of Rule 4216. This rule provides for the disqualification of a candidate for promotion based upon relevant and objective data relating to misconduct. Specifically, a promotion candidate is disqualified from promotion for a sustained finding of a serious administrative misconduct for one year after that finding. In cases of minor misconduct, the disqualification period is six months. Because PRPB indicated that there have been no promotional exams or promotions made within the organization during this reporting period, the Monitor is unable to assess PRPB's compliance with the application and practice of this policy.

### Pathway Forward

The Monitor acknowledges that the Office of the Special Master is assisting PRPB in developing the related protocols and materials to implement promotions and looks forward to assessing PRPB's compliance with the training and practice of this paragraph after such time.

### Paragraph 20: Professionalization - Promotions

*PRPD shall establish specific criteria for the promotion of officers in direct supervisory roles. Officers in supervisory roles shall not be rendered ineligible for promotion based solely on the number of civilian complaints filed against officers under their supervision. The nature and type of civilian complaints, particularly those complaints that are investigated and substantiated by evidence, shall also be weighed when considering an officer for promotion. Promotions of officers with pending investigations or disciplinary action in a matter alleging serious misconduct shall be held in abeyance until the investigation or disciplinary action is resolved.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | October 2020 – September 2021 |
| Policy: | Implemented | | |
| Training: | Not Implemented | | Annually |



| Practice: | Deferred | Assessment Frequency | |
|-----------|----------|----------------------|---|

*Compliance Targets*

Note: This paragraph is assessed with Paragraph 16.

*Compliance Assessment*

As noted in the assessment of Paragraph 19, PRPB submitted a copy of Rule 4216. This rule provides for the disqualification of a candidate for promotion based upon relevant and objective data relating to misconduct. Specifically, a promotion candidate may not receive a promotion if s/he has a case pending in SARP. If and only if a case is concluded in favor of the accused officer may such an officer be promoted. In addition to this related policy, PRPB is working on establishing its Early Identification System (EIS), which will allow PRPB to more effectively review the nature and type of civilian complaints and any related disciplinary action as part of the promotional consideration process. Training on the related promotional practices has yet to be completed as of this reporting period.

*Pathway Forward*

The Monitor looks forward to assessing the practical application of Rule 4216, as well as further developments to the EIS. The training, use, and practice of such policies and systems will allow the Monitor's Office to assess PRPB's compliance with this paragraph more comprehensively.

## 3. Commander Corps

As mentioned previously, the creation of career paths that are fair, transparent, and free of bias or political interference is essential to the creation of a credible, effective, and competent command staff. The Monitor eagerly awaits the result of the collaboration between PRPB and the Special Master's Office in this regard.

### Paragraph 21: Professionalization - Commander corps

*PRPD shall provide a developmental career path for officers aspiring to the command ranks that emphasizes leadership, ethics, community-oriented policing, educational achievement, and constitutional policing.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | N/A |
| Policy: | Not Implemented | | |
| Training: | N/A | Assessment Frequency | Deferred |
| Practice: | Not Implemented | | |

*Compliance Targets*

17

Note: Deferred. See Jt. Mot., ECF No. 1095 at 9 (proposing Special Master assist developing plan in accordance with Paragraph 21); Order, ECF No. 1102 at 2 (approving same).

*Compliance Assessment*

As noted above, PRPB indicated to the Monitor that from the period of April 1, 2021, through September 20, 2021, that there were no promotional exams administered or promotions made within the organization. Further, the Office of the Special Master is assisting PRPB with developing command rank promotion criteria and related protocols. A draft career path policy was produced in August 2021 by the Special Master. PRPB indicated that they would continue working on the policy to complete a final draft for circulation to the Monitor in accordance with the Agreement. The Monitor has not reviewed a final draft of this policy as of this reporting period.

*Pathway Forward*

The Monitor acknowledges that the Office of the Special Master is assisting PRPB in developing the related protocols and materials to implement promotions and looks forward to assessing PRPB's compliance with the practice of this paragraph after such time.

## II. Use of Force

PRPB's inability to validate its UOF numbers has been a recurring problem that has been identified in the Monitor's previous reports.  For the period covered in CMR-5, PRPB continues to lack a mechanism to validate its reporting of incidents in which force was used, and the number of UOFs in those incidents. However, during the same period, PRPB developed a new process whereby it has replaced all Centro de Mandos PPR-84 on screen forms with PPR-126.2. The Monitor's Office confirmed via site visits that all 13 Centro de Mandos have completed the transition which took place from June 9, 2021, through August 12, 2021.

The Monitor's Office considers this a positive first step, which places PRPB on track to develop a valid system to report verifiable UOF numbers. It should be noted that upon his appointment, the Commissioner instructed the Information Technology (IT) Unit of the Bureau to make this modification (replacing PPR-84 with PPR-126.2) as soon as possible. The Monitor applauds the action of the commanding officer of the Reform Unit in accelerating this new process at the recommendation of the Monitor's Office and the U.S. Department of Justice (USDOJ).

During the August 2021 Monitor Team visit, PRPB unveiled its "Use of Force Dashboard" which provides the number of UOFs reported throughout the 13 area commands at any given time. In subsequent months, the Monitor's Office conducted "spot check" reviews of the system in order to determine the accuracy of the system. The results are reported in this section of CMR-5.

The Monitor recommends that PRPB establish a procedure requiring supervisors and/or Force Investigations Unit (FIU) personnel who are investigating a UOF to verify through the appropriate Centro de Mandos that UOF has been properly recorded. The Monitor's Office also recommends this procedure be documented, perhaps as an additional field to the Use of Force Report (PPR-605.1), or in

the case of a FIU investigation, PPR 113.2. PRPB should also consider verification via PPR-605.3 "Notification of Use of Force". The latter would require preparing the report when the supervisor competes their review of the UOF, which would be within five business days of the incident.

As it relates to FIU, the Monitor's Office remains concerned regarding the amount of time FIU is taking to complete its investigations. None of the cases reviewed were completed in the time outlined in General Order, Chapter 100, Section 113 (Force Investigation Unit). Some investigations dated back to 2019.

In past CMRs, FIU investigations tended to run over the 45-day deadline, and thus were not closed in sufficient time to provide to the Monitor's Office for review during the same reporting period that the incident occurred.

PRPB provided the Monitor's Office with documentation that the Commissioner's Force Review Board (CFRB) evaluated 88 FIU investigations relating to UOF during the CMR-5 reporting period. The Monitor's Office reviewed a sample of these cases and generally found that CFRB reviews are objective, but not timely. It should be noted that all the evaluations exceeded the time as outlined in the Agreement.

As it relates to CIT, PRPB has accepted the Monitor's Office recommendation that the program be expanded Bureau wide as opposed to several areas at a time. This is of critical importance in that the Monitor, in reviewing UOF incidents for the period of CMR-5, determined that 16% of the random cases selected involved a person being taken into custody (court order) for involuntary admission to a hospital for psychiatric evaluation.

Overall, PRPB's compliance with the 36 paragraphs assessed during this reporting period within Use of Force reflect similar levels of compliance to what was noted in previous reports. In CMR-4, 56% of paragraphs were assessed as Partially Compliant, in comparison to the current reporting period, where 53% of paragraphs were found to be Partially Compliant. Nine of the thirty-six paragraphs were also noted as Deferred in CMR-5, as a result of PRPB's recent efforts to address the inconsistency in UOF reporting. See figure 3.



*Figure 3. Use of Force: Paragraph Compliance Status*

19

## Paragraph 22: Use of Force - General Provisions

*PRPD officers shall use force in accordance with the rights, privileges, and immunities secured or protected by the Constitution or laws of the United States and the Commonwealth of Puerto Rico, and shall prohibit the use of unreasonable force. PRPD shall develop policies and procedures that enable officers to rely primarily on non-force techniques to effectively police; use force only when necessary; and de-escalate the use of force at the earliest possible moment.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: Compliance will be determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 23-57, and (2) the results of outcome assessments, pursuant to Paragraph 243.

### Compliance Assessment

As in previous Reports, the Monitor's Office requested the following information: 1) number of incidents in which force was used and 2) how many officers used force in each incident. In response, PRPB provided information attesting that force was used 803 times in 441 incidents during the reporting period. To provide reliable and valid information, PRPB instituted a new process whereby all dispatchers for every area command or *Centro de Mando* uses a web-based form (PPR-126.2) to report UOF incidents, rather than the form previously in use (PPR-84). The new form specifically requires that dispatchers ask the officer if force was used in each incident, and if so by how many officers. This system is intended to ensure more reliable UOF reporting by assigning an incident number only after those queries on UOF have been addressed.

To determine if this new process has produced accurate UOF numbers in comparison to what was globally reported by PRPB, the Monitor conducted several *spot checks*. For the first spot check, the Monitor requested PPR-126.2 forms for all incidents in which force was reported for the month of July 2021.[2] The Monitor then compared the number of UOF incidents and total UOFs reported through PPR-126.2 to the numbers reported in the global UOF list that PRPB prepared for the Monitor's Office for CMR-5. Two Centro de Mandos were selected for this spot check: San Juan and Carolina.

In the case of the San Juan Area Command, PRPB reported five incidents where force was used using the new PPR-126.2 form, for a total of seven officers using force. However, when comparing these reports to the global UOF list that PRPB compiled for the Monitor's Office, only four of these five

---

[2] Note: By July 2021, PRPB had implemented the new process in several area commands.

incidents from the San Juan Area Command appeared during the same time period. In the case of the Carolina Area Command, the Monitor's Office observed the opposite: PRPB reported five incidents in which force was used based on PPR-126.2s, for a total of six officers using force. However, the global UOF list that PRPB compiled for the Monitor's Office for the period included one additional incident that did not appear in the PPR-126.2s.

The second spot check involved comparing the UOF numbers reported by PRPB in its global UOF list to the numbers reported in PRPB's dashboard for the 13 areas for the period of August 15 through September 15, 2021. This period was selected because all 13 areas commands had converted to using the PPR-126.2 by August 12, 2021. The Global List reported 79 UOF incidents during this period, for a total of 121 officers using force. However, the dashboard reported only 77 incidents where force was used, with 140 officers using force. It should also be noted that Radio Control reported 128 UOFs for this period.

The third test involved comparing the numbers reported by PRPB in its global UOF list to the numbers reported in PRPB's dashboard for the 13 areas for the period of September 1 through September 30, 2021. The Global List reported 66 incidents in which force was used during this period, for a total of 99 officers using force. However, the dashboard reported 72 incidents during the period, with 117 officers using force.

From these spot tests, the Monitor's Office concludes that the new system is not yet producing sufficiently reliable or valid UOF data. During the Monitoring Team's October 2021 site visit, the Monitor discussed this topic with PRPB, who responded that they are working to resolve the discrepancy in UOF reporting. However, PRPB's discrepancies in its UOF data have been an ongoing area of concern for the Monitor.

This discrepancy is due in part to the fact that the information comes from various sources and units throughout the Bureau, producing multiple data streams that often do not match properly. Centro de Mandos, Radio Control, and FIU all track UOF numbers, but these numbers often do not align when PRPB compiles the numbers being reported by each source of data across all 13 police areas. Each area's Centro de Mando should be the primary source of information. While the Monitor's Office has found no reason to believe PRPB is deliberately misrepresenting the number of UOFs reported, the discrepancies in the data impact the Monitor's ability to accurately determine compliance in many of the paragraphs within this section.

*Pathway Forward*

The new process involving PPR-126.2 was not fully implemented until the end of the CMR-5 reporting period, as illustrated by the inconsistency in the data. The Monitor will reassess PRPB's progress in this area in CMR-6 and remains hopeful that PRPB will be able to produce more reliable data with the new process fully implemented. The Monitor also recommends that PRPB implement additional steps for data validation, including having supervisors and FIU investigators verify with Centro de Mandos that UOFs are being recorded properly. The Monitor's Office recommends that this procedure be documented, perhaps as an additional field in Use of Force Reports (PPR-605.1), in FIU investigation files (PPR-113.2), and/or in supervisors' reviews (PPR-605.3).

## 1. General Provisions

PRPB complies with applicable law and comports with generally accepted policing practices. The comprehensive UOF policy requires that PRPB categorize all reportable UOFs into multiple levels, grouped by degree of seriousness, and shall include all force techniques.

### Paragraph 23: Use of Force - General Provisions

*PRPB complies with applicable law and comports with generally accepted policing practices. The comprehensive use of force policy shall categorize all reportable uses of force into multiple levels, grouped by degree of seriousness, and shall include all force techniques, technologies develop a comprehensive and agency- PRPD shall wide use of force policy that, and weapons, both lethal and less-lethal, that are available to PRPD officers, including officers assigned to specialized tactical units. The comprehensive use of force policy shall clearly define and describe each force level option and the circumstances under which each force level is appropriate. The highest level of force described by the policy shall include all serious uses of force, as defined in this Agreement.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2020 – September 2021 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| 1. Policies incorporate all of the requirements of Paragraphs 22-24. | ☑ Met   ☐ Missed |
|---|---|

*Compliance Assessment*

PRPB's UOF policies broadly comply with the language of the Agreement. However, as it relates to General Order 600-620 "Specialized Arms of the Division of Special Tactics," some clarification was necessary and were completed. In reviewing General Order 600-620 as outlined in paragraph 229 of the Agreement, USDOJ and the Monitor's Office both noted in June 2021 that PRPB previously reported multiple UOFs under one blanket incident report in multiple cases, particularly in crowd control situations. This issue came to the Monitor's attention during previous UOF reviews, and was deemed inconsistent with widely accepted policing practice, as well as with PRPB policy. This practice was identified in the Monitor's Office's report on the July 2019 Demonstrations at the Fortaleza, which was filed with the Federal District Court of Puerto Rico in April 2021, as well as in the Monitor's CMR-4 Report. Additional details on the resolution of this issue are provided under the compliance assessment for Paragraph 27.

The Monitor's office reviewed 58 UOF incidents and determined that the force used by officers were accurately categorized into levels grouped by the degree of seriousness. However, due to the data

22

validity issues noted above, the Monitor's Office cannot verify that the UOF reports and investigations provided to the Monitor's Office reflect the total number of UOF incidents that occurred during the reporting period.

*Pathway Forward*

Now that the policy has been further clarified, the Monitor will continue to assess PRPB's compliance with ensuring that all UOFs are captured separately, unless it involves circumstances in which a crowd is exposed to tear gas. Furthermore, as noted above, PRPB's implementation of a new web-based form for capturing UOFs should increase validity and reliability of PRPB's UOF reporting, an area the Monitor will continue to assess in CMR-6.

## Paragraph 24: Use of Force - General Provisions

*PRPD shall develop comprehensive and agency-wide policies that comply with applicable law and comport with generally accepted policing practices concerning the use of: (a) lethal force; (b) firearms; (c) canines; (d) ECWs; (e) chemical agents; (f) less lethal munitions; (g) batons and impact weapons; and (h) any other force technology, weapon, or implement authorized by PRPD during the life of this Agreement. PRPD shall also develop a policy on sharing information with the public regarding serious uses of force and the dissemination of information to family members of civilians involved in a use of force incident.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2020 – September 2021 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. Policies incorporate all of the requirements of Paragraphs 22-24. | ☑ Met   ☐ Missed |

*Compliance Assessment*

PRPB has prepared comprehensive policies and revised them periodically as outlined in the Agreement. The policies are consistent with generally accepted police practices relating to UOF. However, for the period covered by this report (April 1, 2021, through September 30, 2021) PRPB continues to provide unverifiable UOF information to the general public. As noted above, while PRPB has incorporated the paragraph requirement into a policy and trained all relevant personnel in the requirement and policy, implementation of this policy in practice is still lacking.

23

*Pathway Forward*

As noted above, substantial compliance with this paragraph hinges on PRPB's ability to demonstrate reliable and valid data collection of its UOFs. The Monitor is hopeful that with the implementation of the new process, PRPB will be able to accurately track its UOFs. To accomplish this, PRPB must ensure integration of the information systems that feed data on UOFs into the Bureau's Global List. The accuracy of this data is not only integral to PRPB's compliance with the Agreement, but also to PRPB's efforts to report accurately on UOFs externally to the community, and internally so that PRPB leadership can respond rapidly and effectively to issues involving UOF policy, training, and practice.

## Paragraph 25: Use of Force - General Provisions

*PRPD shall continue to prohibit the use of Chloroacetophenone (commonly referred to as "CN gas").*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policy prohibits use of CN gas. | ☑ Met | ☐ Missed |
| 2. No supply of CN gas is identified in armories or other locations through unannounced site visits. | ☑ Met | ☐ Missed |
| 3. No supply of CN gas is identified in armories or other locations through inspections. | ☑ Met | ☐ Missed |
| 4. CN gas is never used by STUs. | ☑ Met | ☐ Missed |

*Compliance Assessment*

As per the Agreement, PRPB continues to prohibit the use of CN gas. The Monitor's site visits and observations of PRPB equipment rooms continue to demonstrate PRPB's compliance with this paragraph. PRPB's substantial compliance is reflective of its efforts to meet the policy, training, and implementation requirements of this paragraph.

*Pathway Forward*

The Monitor commends PRPB for its work on this paragraph and will continue to monitor PRPB's sustained compliance.

## Paragraph 26: Use of Force - General Provisions

*PRPD shall maintain an accurate, current list of officers who successfully qualify with their regulation firearm, including any other firearm that officers are authorized to use or carry. Officers who fail to re-qualify shall be relieved of police powers and immediately relinquish all firearms, including personal firearms. Those officers who fail to re-qualify after remedial training within a reasonable time shall be subject to disciplinary action.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. All officers on the qualification list are qualified and certified on the use of firearms in accordance with policy. | ☑ Met | ☐ Missed |
| 3. All officers who fail the qualification re-test on the same day are relieved of operational duty, disarmed, and summoned for re-training before leaving the Academy. | ☑ Met | ☐ Missed |
| 4. All officers who fail to qualify after re-training remain relieved of operational duty, remain disarmed, and are referred for disciplinary action. | ☑ Met | ☐ Missed |
| 5. All officers are disciplined for failing to qualify after re-training or have a valid justification for not qualifying in accordance with policy. | ☐ Met | ☑ Missed |
| 6. All officers with more than one regulation firearm are qualified in all authorized firearms. | ☐ Met | ☑ Missed |

### *Compliance Assessment*

In reviewing this paragraph, the Monitor found that PRPB's policies relating to firearms qualification incorporate all the requirements of the paragraph and that all officers on the qualification list were qualified and certified on the use of firearms in accordance with the policy. Further, the Monitor also noted that those officers who failed the qualification re-test (three officers) were relieved of operational duty, disarmed, and sent for re-training. During this reporting period, the Monitor noted that one officer failed to qualify, and the case was referred to the Auxiliary Commissioner of Professional Standards for appropriate action (Compliant #2021-00551). The information provided by PRPB in relation to this paragraph also noted that 14 officers failed due to medical reasons and 2 officers failed the rifle qualifications test.

*Pathway Forward*

In an effort to improve compliance with this paragraph, PRPB must maintain specific files documenting that officers are disciplined when failing to qualify on authorized firearms. Further, PRPB must maintain specific files identifying officers who are qualified on multiple weapons.

## 2. Specialized Tactical Units

In relation to Paragraphs 27-31, the Monitor's Office has concluded that PRPB has developed UOF policies for specialized tactical units (STUs) and that these policies are consistent with the Bureau's agency wide UOF policy. PRPB has also completed training related to these policies. A review of the tactical unit's (DOT) roll call documents verifies continued compliance with policies. The Monitor's Office has verified through document review that specialized units are not conducting general policing functions except for non-specialized preventive patrols in high crime areas. In addition, the Monitor's Office had noted in previous reports that some DOTs have provided documentation that officers assigned to preventive patrol do so in regular uniform and not in full tactical attire. It should be noted that PRPB has now revised form PPR-112.2, "Record of Mobilization of STU," to include this information for purpose of memorialization. PRPB has provided documentation that all STUs have received and are utilizing the revised PPR-112.2 However, the revision took place in July 2021, three months into the period of CMR-5, hence PRPB can only be found to be in partial compliance.

### Paragraph 27: Use of Force - Specialized Tactical Units

*PRPD shall develop policies on the use of force by members of specialized tactical units ("STUs"). This policy shall be consistent with PRPD's agency-wide use of force policy. tactical units ("STUs"). This policy shall be consistent with PRPD's agency-wide use of force policy.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Not Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☐ Met | ☒ Missed |
| 2. All use of force training involving STUs is consistent with approved policies. | ☒ Met | ☐ Missed |
| 3. 95% of officers are trained and certified in all use of force policies involving STUs (or scheduled for training, in the case of mid-year reviews) | ☒ Met | ☐ Missed |
| 4. 95% of uses of force by STU officers are within policy. | ☒ Met | ☐ Missed |

*Compliance Assessment*

As discussed earlier in this report, PRPB must revise the practice of allowing supervisors to prepare one blanket UOF report (PPR-605.1) for multiple uses of less-than-lethal force at a demonstration and/or protest. This practice is inconsistent with PRPB policy and generally accepted police practices. In June 2021, USDOJ noted in its review of General Order 600-620, Specialized Weapons, that the language in the policy is clear. The policy states that every use of a specialized weapon against a person, animal, or crowd constitutes an independent UOF that must be justified and reported. USDOJ noted the policy does permit a group report when multiple people are exposed to chemical agents. PRPB has since accepted the recommendation of USDOJ and the Monitor's Office and revised the policy to emphasize that "group reports" are only reported when a crowd is exposed to tear gas.

For previous reports the Monitor reviewed UOF reports in response to crowd control events and determined that PRPB had interpreted this procedure for crowd dispersal with gas and/or other less-than-lethal weapons as governing a wider range of dispersal techniques that involve multiple, separate UOFs. As a result, PRPB needed to align its actions with policy and eliminate the practice which allowed officers to utilize less-than-lethal weapons against crowds that they have determine are unruly with limited oversight or accountability. By incorporating multiple UOFs under one umbrella incident in the past, PRPB under-reported the amount of force used, in some instances combining under one incident report multiple UOFs that occurred blocks away from each other over an extended period of time.

*Pathway Forward*

PRPB has addressed this issue by adding language to GO 600-620 that clarifies the issue. However, this modification came mid-way through the reporting period, and as such PRPB will only be credited with implementing the paragraph's policy stipulations in CMR-6. Furthermore, there were no instances in which DOT was activated during the period of CMR-5, other than for "standby" status. As such, no DOT units utilized less-than-lethal force to disperse unruly protesters during the period. Going forward, the Monitor will assess compliance with the new stipulations of GO 600-620 when STUs use force to disperse crowds.

## Paragraph 28: Use of Force - Specialized Tactical Units

*PRPD shall prohibit STUs from conducting general patrol and policing functions.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

27

### Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Training involving STUs is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of STU officers are trained and certified in STU policies (or scheduled for training, in the case of mid-year reviews). | ☑ Met | ☐ Missed |
| 4. Presentation of data on STU deployments and activations. | ☑ Met | ☐ Missed |
| 5. 95% of all STU deployments/activations for general patrol and policing functions are justified within policy. | ☑ Met | ☐ Missed |
| 6. 95% of all assignments of individual STU officers to general patrol and policing functions are justified and carried out within policy. | ☐ Met | ☑ Missed |

### Compliance Assessment

In relation to the policy requirements of paragraph 28, PRPB General Order 100-112, Tactical Operations Divisions, allows DOT officers to be assigned to preventive patrol but precludes DOT from operating as a specialized unit or equipping tactical gear when conducting patrol functions. General Order 100-112 also requires that DOT members always keep specialized weapons and tactical equipment accessible in the event their unit is activated to respond to an authorized DOT event. During the Monitor's April 2021 site visit to Metro DOT, the Inspector in Charge informed the Monitor that DOT equipment is kept at police facilities accessible to the officers in the event they are mobilized. In addition, during the May 2021 site visit, the Director of the Reform Unit informed the Monitor that PRPB will be modifying its PPR-112.2 "Record of Mobilization of STU" to capture this information. During the Monitor's subsequent June 2021 site visit, the Director of the Reform Unit presented the Chief Monitor with a draft of the revised PPR-112.2. The form was subsequently revised and approved by the Monitor in July 2021.

In relation to daily assignments, the Monitor's Office has verified that specialized units are properly documenting their assignments in compliance with the agreement. Specialized units are not conducting general policing functions apart from preventive patrols in high crime areas. During the period of April through September 2021, PRPB submitted documentation that the Bureau's DOT Units conducted 409 preventive patrols. For purposes of determining compliance with the Agreement, the Monitor's Office requested a random sample of 63 records of preventive patrol, and upon review of the deployment records, determined that deployments were consistent with the Agreement and PRPB policy.

### Pathway Forward

During the April 2021 site visit, the Monitor met with the Metro DOT Inspector and recommended that supervisors inspect and document the officer's compliance with uniform requirements at the start of the shift. The Inspector was receptive to this recommendation. Although PRPB has modified PPR-112.2 to include the required information recommended by the Monitor, the modification was not in place for the entire reporting period covered in this report. As such, while PRPB has incorporated the paragraph requirement into an implemented policy and related form (PPR-112.2) and trained all

relevant personnel, its implementation of this paragraph in practice is lacking. This will be the case until the entire period reflects the information provided in the revised PPR-112.2 relative to uniforms.

## Paragraph 29: Use of Force - Specialized Tactical Units

*PRPD shall develop eligibility criteria and selection devices for assignment to STUs that emphasize demonstrated capacity to carry out the mission of STU in a constitutional manner. Officers assigned to STUs who are unable to maintain eligibility shall be removed from STUs. Assignments to STUs shall be for a determined period, as specified by PRPD policy, unless there are extenuating circumstances that justify an extended assignment.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | October 2020 – September 2021 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually |
| Practice: | Deferred | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Training for evaluation boards is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of evaluation board members are trained. | ☑ Met | ☐ Missed |
| 4. All officers selected to STUs meet eligibility requirements. | ☑ Met | ☐ Missed |
| 5. All officers assigned to STUs who do not maintain eligibility are removed from STUs. | ☐ Met | ☐ Missed |
| 6. 95% of all extensions of STU assignments are justified as extenuating circumstances within policy. | ☐ Met | ☐ Missed |

### Compliance Assessment

PRPB provided documentation that there are currently 195 personnel assigned to DOT Units throughout PRPB. The breakdown of those personnel by rank is as follows:

- 1 Inspector
- 1 Captain
- 2 First Lieutenants
- 8 Second Lieutenants
- 17 Sergeants
- 166 Agents

From the list of 195 DOT members the Monitor's Office selected a random sample of 37 members to verify their training records relative to their assignment. In all instances officers were properly trained.

It should be noted that, according to PRPB, 75% of the officers in DOT and 87% of officers assigned to SWAT will have completed their six-year assignments in January 2022. Therefore, if PRPB intends to retain these officers in their existing positions, PRPB should consider starting the process for retention as outlined in General Order 100-112. During a site visit to SWAT the Assistant Director noted that the process for retention has already begun and provided documentation confirming the same.

PRPB has developed a General Order which identifies eligibility criteria and selection processes for specialized units. PRPB provided written documentation that during the reporting period no officers were transferred out of DOT. PRPB additionally reported that 18 officers were transferred into DOT Units (see figure 4 below). The Monitor's Office identified seven individuals (two Sergeants and five Agents) and requested their personnel files for purposes of making an assessment for operational compliance. A review of the personnel files of those seven individuals revealed that officers were qualified for transfer to DOT, meeting requirements as outlined in PRPB policy and the Agreement.

|            | Joined Unit | Departed Unit |
|------------|:-----------:|:-------------:|
| Aguadilla  | 0           | 0             |
| Arecibo    | 4           | 0             |
| Caguas     | 1           | 0             |
| Fajardo    | 0           | 0             |
| Guayama    | 4           | 0             |
| Humacao    | 3           | 0             |
| Mayaguez   | 1           | 0             |
| Metro      | 5           | 0             |
| Ponce      | 0           | 0             |
| SWA.       | 0           | 0             |
| Total      | 18          | 0             |

Figure 4. DOT Member Arrivals and Departures

Although PRPB has meet the policy and training requirements of this paragraph, the Monitor is unable to assess PRPB's compliance with the application of these requirements in practice, as no officers assigned to these units have reached the six-year tenure and been removed due to expiration of time.

## Pathway Forward

As noted above, the tenure limit of six years expires in January 2022 for most of the officers in STUs. The Monitor will reassess PRPB's compliance with this paragraph in CMR-6.

## Paragraph 30: Use of Force - Specialized Tactical Units

*PRPD shall require STUs to document in writing all law enforcement activities to include operational plans and after-action reports prepared in consistent formats for all call-outs and deployments. Supervisors shall review the law enforcement activities of STUs periodically to ensure compliance with applicable laws and PRPD policies and procedures.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Training for STUs is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of law enforcement activities by STUs, including deployments and activations, are documented within policy. | ☐ Met | ☑ Missed |
| 4. 95% of law enforcement activities by STUs, including deployments and activations, are reviewed by supervisors. | ☐ Met | ☑ Missed |

*Compliance Assessment*

A review of PRPB DOT operational plans indicated that in situations where the unit was given prior assignment notification, an operational plan was prepared. However, DOT units also reported that they did not actually participate in crowd control activities during the demonstrations that occurred during the CMR-5 reporting period. Rather, the mobilization involved placing the units on standby if needed. PRPB provided documentation that through August 2021 there were no incidents where DOT/SWAT were deployed (other than standby) or utilized less-than-lethal weapons at a demonstration. The Monitor observed the same during site visits in August and September of 2021.

The SWAT Unit was activated a total of 69 times during the period extending from April 1, 2021, through August 31, 2021. The Monitor's Office also conducted a site visit to SWAT for purposes of reviewing documents and conducting visual inspections of equipment in September 2021.

In all the cases reviewed, SWAT prepared a Mobilization Report (PPR-112.2) and After-Action Report (PPR-112.3). The Monitor notes that the after-action reports prepared by SWAT lack evaluation and analysis of the unit's performance. The Lieutenant commanding the unit reported to the Monitor that the supervisor in charge of the operations meets with all team members who were part of the operation after each activation to discuss what went right, what could have been done better strategically, and what must be improved for training purposes. The Lieutenant reports that outside of

31

note taking by the supervisor for training purposes, this information is not memorialized in a formal manner. However, the Lieutenant did note that if a violation of PRPB policy or procedure takes place, a formal report documenting the violation and appropriate action taken would be produced.

The Monitor's Office emphasizes that self-reflective evaluation is essential to promoting improvements in the unit's performance and overall safety and is also consistent with generally accepted police practices. The Monitor also recommended that SWAT memorialize this information for internal purposes. The Lieutenant concurred and stated that going forward SWAT would do so.

The SWAT's commanding officer reported that, in many instances relating to mobilization, no advance warning was received following the request to "back up" federal task forces or specialized units operationally. Therefore, no operational plans were prepared during the period.

Additional observations made by the Monitor during the CMR-5 reporting period include the following:

- In the 69 cases reviewed by the Monitor's Office, SWAT reported using force in 34 incidents. Force consisted of pointing a firearm in all instances, a level 3 use of force.
- The information provided by SWAT was cross-checked and verified with PPRs-112.2 "Mobilization Report" and PRPB's Global List for accuracy.
- In all instances, SWAT utilized the updated form PPR-112.2 (no outdated PPRs-920 were utilized as in the previous CMR reporting period).
- During a site visit to SWAT, no CN gas was present in the unit's arsenal (see assessment for paragraph 25). Moreover, the Monitor verified that supervisors conduct a daily weapon inventory check and submit a quarterly report (documentation provided).
- During the period of CMR-5 no new officers were assigned to the unit.
- During the period of CMR-5 no officers were reassigned from SWAT.

Twenty of the twenty-three officers assigned to SWAT will have completed their six-year assignments in January 2022. With the six-year mark approaching for these officers' assignment to SWAT, PRPB has begun the process of retaining personnel per GO 100-117, SWAT.

*Pathway Forward*

The Monitor's Office emphasizes that self-reflective evaluation is essential to promoting improvements in the unit's performance and overall safety and is also consistent with generally accepted police practices. The Monitor also recommended that SWAT memorialize this information for internal purposes.

## Paragraph 31: Use of Force - Specialized Tactical Units

*PRPD shall track the number of STU deployments, the reason for each activation and deployment of STU, the legal authority, including type of warrant, if any, for each activation and deployment of STU, and the result of each activation and deployment of STU, including: (a) the approximate location of the STU deployment; (b) the number of arrests made; (c) the type of evidence or property seized; (d) whether a forcible entry was made; (e) whether force was used by an STU member or other officer; and (f) whether a person was injured or killed by an STU member.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. The STU tracking system accounts for all elements in the paragraph and outcome measures as required by Paragraph 243. | ☐ Met  ☑ Missed |
| 2. The STU tracking system is accurate and current; all deployments are tracked. | ☐ Met  ☑ Missed |

*Compliance Assessment*

As stated in previous CMRs, PRPB does not have a tracking system that captures all STU Unit deployment data throughout PRPB. Individual STUs confirmed that PRPB is not compiling the information in one central database, which would assist PRPB's command staff in determining Bureau-wide needs as it relates to DOT. While PRPB is collecting the deployment data at the unit level, it appears that PRPB does not collect the data at the Bureau level. Therefore, PRPB has not implemented this paragraph in practice.

*Pathway Forward*

To progress in compliance with this paragraph, PRPB must implement a Bureau-wide tracking system. The development of the tracking system is the responsibility of field operations who oversee STU operations. Furthermore, the data and report outputs of this system should be used to inform Bureau-wide DOT strategies and address gaps in resources and potential officer safety issues.

## 3. Crowd Control Policies and Performance

In general, PRPB has made significant progress in how it prepares for and operates during demonstrations. The Monitor's Office has had the opportunity to witness first-hand PRPB providing strategic policing coverage at demonstrations and protests throughout the Island over the course of the compliance period. The Monitor's Office notes that PRPB's actions in response to demonstrations and protests have become increasingly consistent with generally accepted police practices.

Most notably, PRPB used minimal force while responding to recent protests during the present period. PRPB did not deploy DOT in response to any demonstrations or protests, and only mobilized DOT units on stand-by in response to potential needs for crowd control activities. The Monitor considers this a significant finding, especially since PRPB responded to a substantial number of unplanned

33

demonstrations and protests during the CMR-5 period. In all instances, DOT was ultimately kept in reserve and never interacted with demonstrators or protesters. For that reason, DOT did not provide any after-action reports or assessments for these unplanned events, as they did not actively participate in crowd control activities beyond being placed on standby.

## Paragraph 32: Use of Force - Crowd Control and Incident Management

*PRPD shall develop crowd control and incident management policies that comply with applicable law and comport with generally accepted policing practices.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Training on crowd control and incident management is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of STU officers, supervisors, and other officers are trained and certified in crowd control (or scheduled for training, in the case of mid-year reviews); 95% of all supervisors are trained in incident management (or scheduled for training, in the case of mid-year reviews). | ☑ Met | ☐ Missed |
| 4. 95% of police responses to unplanned events are within policy. | ☐ Met | ☑ Missed |
| 5. 95% of police responses to planned events are within policy. | ☑ Met | ☐ Missed |
| 6. 95% of armories inspected by STU supervisors indicate that less lethal weapons and ammunition are controlled and maintained in accordance with policy. | ☑ Met | ☐ Missed |
| 7. 95% of armories indicate that less lethal weapons and ammunition are controlled and maintained in accordance with policy. | ☑ Met | ☐ Missed |

### *Compliance Assessment*

The Monitor's Office requested a list of all demonstrations and protests Bureau-wide. PRPB provided a list of 382 protests island-wide in response to the Monitor's Office request for a Global List. Upon review, however, it was evident that the data was not centralized. As in CMR-4, PRPB did not specify which of these protests, demonstrations, or other crowd control events were planned and which were unplanned. However, while reviewing data, the Monitor's Office determined that PRPB responded to possibly as many as 19 or more unplanned events during the reporting period. PRPB should collect

data on planned and unplanned crowd control events bureau-wide for the purpose of analyzing and identifying possible training needs as well as the distribution of personnel and resources.

The Monitor's Office selected a random sample of 54 crowd control events for purposes of reviewing operational plans, after-action reports, and self-assessment reports as outlined in GO 600-625 Management and Crowd Control. In response to the request, PRPB provided 47 of the 54 requested files (46 of the 54 requested and 1 not requested). PRPB's responses to the demonstrations were generally consistent with PRPB policy. However, despite its compliance with policy, PRPB failed to document its responses consistently to planned and unplanned crowd control events at the Bureau-level. This inconsistency presents obstacles to the practical application of the policy and other requirements of this paragraph.

In regard to training on the relevant crowd control policies, PRPB provided documentation that 184 members of DOT and 164 ranking officers were trained in GO 600-625, between April and August 2021. PRPB further provided reports that there were no Incident Commander trainings provided from April through July 2021, as all STU personnel are currently certified in these courses.

PRPB submitted the quarterly reports (PPR-618.1) of STU supervisors who conducted inspections of armories as required by the Agreement.

*Pathway Forward*

Although PRPB is Partially Compliant in this area, the Bureau must maintain a central list of all demonstrations, both planned and unplanned, and classify them as such. Currently, PRPB only maintains this data at the area command level, and that information is not centralized to include all demonstrations island-wide. PRPB should be collecting this data bureau-wide for the purpose of identifying the number of unplanned demonstrations that occurred and for analyzing and identifying possible training needs as well as the distribution of personnel and resources.

## Paragraph 33: Use of Force - Crowd Control and Incident Management

*The incident management policy shall provide that a ranking officer or other higher-level PRPD official at the scene of a mass demonstration, civil disturbance, or other crowd situation assume command and control and provide approval prior to deploying force as a crowd dispersal technique.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

Note: Compliance will be determined on two separate but inter-dependent bases: (1) the implementation of paragraphs 13-21, and (2) the results of outcome assessments, pursuant to Paragraph 243 of the Agreement.

## Compliance Assessment

The Monitor's Office confirmed that 100% of DOT personnel have been trained on GO 600-625, Management and Crowd Control, and 100% of supervisors have been trained on Incident Management. In addition, the Commanding Officer of Metro DOT received training on Incident Command.

During a site visit to Metro DOT and a review of data provided by the Reform Unit, the Monitor's Office reviewed reports relating to personnel deployment to demonstrations and protests where DOT was mobilized. The Monitor's Office learned that in instances where PRPB had determined in advance that the DOT Unit would be activated, an operations plan was developed by the unit. However, in instances where the determination to mobilize the unit was made at the time of the event, the DOT prepared no such plan. The Monitor verified this data via documentation provided by the Reform Unit.

## Pathway Forward

The Monitor's Office commends PRPB for its work on this paragraph and will continue to assess this paragraph in line with the requirements of paragraph 13-21 to ensure PRPB's continued substantial compliance.

## Paragraph 34: Use of Force - Crowd Control and Incident Management

*The crowd control policy shall require the use of crowd control techniques and tactics that respect protected speech and the right to lawful assembly.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

Note: Compliance will be determined on two separate but inter-dependent bases: (1) the implementation of paragraphs 13-21, and (2) the results of outcome assessments, pursuant to Paragraph 243 of the Agreement.

*Compliance Assessment*

PRPB used minimal force while responding to protests during the present period. For the present reporting period, PRPB did not deploy DOT in response to any demonstrations or protests. DOT Units were only mobilized in a stand-by capacity in response to potential needs for crowd control activities. The Monitor considers this a significant finding, especially since PRPB addressed a substantial number of unplanned demonstrations and protests during the CMR-5 period. In all instances during the period, DOT was ultimately kept in reserve and never interacted with demonstrators or protesters.

The only fault that the Monitor notes is that area commanders did not produce self-assessments after unplanned demonstrations. Area commanders are responsible for producing self-assessments after all demonstrations and protests, even if DOT was not deployed and only regular officers responded.

*Pathway Forward*

Area commanders must produce self-assessments after all protests and demonstrations occurring within their geographic area of responsibility, whether or not DOT was deployed in response to the protest.

## Paragraph 35: Use of Force - Crowd Control and Incident Management

*PRPD policy shall require the assessment of law enforcement activities following each response to a mass demonstration, civil disturbance, or other crowd situation to ensure compliance with applicable laws and PRPD policies and procedures.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: Compliance will be determined on two separate but inter-dependent bases: (1) the implementation of paragraphs 13-21, and (2) the results of outcome assessments, pursuant to Paragraph 243 of the Agreement.

*Compliance Assessment*

The Monitor considered numerous documents to reach a conclusion as to PRPB's level of compliance with the Agreement as it applies to mass demonstrations. These included a review of PRPB's work plans for the demonstrations as well as its completion of PPR 112.1, Request for Activation of the STU, PPR-112.2, Record of Mobilizations of STU, and PPR-112.3, Evaluation of Strategies of the STU. The Monitor's Office found that the STUs did not prepare any after-action reports when activated. However, as

previously noted, the unit did not actively engage in any crowd control activities during these events and were merely placed on standby.

The Monitor's Office concludes that PRPB's actions during demonstrations and protests in the CMR-5 period were consistent with generally accepted police practices and PRPB policy. PRPB provided the Monitor's Office with Operation Plans (PPR-625.2) for the various demonstrations and protests that occurred in the reporting period, as well as Crowd Management and Control Reports (PPR-625.3), which provided basic details of each event.

However, area commanders did not produce self-assessment reports for all demonstrations and protests which occurred in their geographic areas of responsibility, irrespective of whether the event was planned or unplanned, and whether DOT or regular police are deployed to the incident. Much can be learned by preparing an in-depth report that provides a frank assessment of what occurred, and, in many cases, what can be improved upon. In addition, General Order 600-625, Management and Crowd Control, specifically states that PRPB will conduct a self-assessment exercise of the operations. Going forward, the Monitor's Office recommends that PRPB include self-assessment reports.

*Pathway Forward*

To achieve compliance, PRPB area commanders must ensure that they and the DOT supervisors who report to them thoroughly assess all law enforcement activities following each response to a mass demonstration, civil disturbance, or other crowd situation to ensure compliance with applicable laws and PRPB policies and procedures. It should be noted that area commanders, in the areas where demonstrations and protests take place, provided some self-assessment reports (PPR-625.6) with varying degrees of thoroughness assessing the police response. Overall, however, PRPB did not prepare a self-assessment for all demonstrations for the period of this report. In total, 21 self-assessments were prepared for the 47 demonstrations and protests reviewed by the Monitor's Office.[3]

This issue was discussed during a site visit with the PRPB Reform Unit. At the request of the Reform Unit the Monitor's Office provided the following recommendations as to what should be assessed:

- Upon completion of the demonstration or protest the Incident Commander should assess how effective the process was to return officers to normal operational status.
- The Incident Commander should ensure that a debriefing of supervisors and agents are conducted in order determine what tactics were most useful or those that were ineffective.
- If possible, organizers of the protest or demonstration should be solicited for comments relating to police coverage of the event. Though some organizers may not respond, there are some whose only interest was to have a peaceful demonstration and may be willing to provide feedback.
- The Incident Commander should ensure that specialized units that participated in the event provide a copy of after-actions reports for the purpose of inclusion in the self-assessment report.
- The Incident Commander should review the effectiveness of their standing plans during the demonstration or protest.
- The Incident Commander should identify key decisions made that produced positive results.

---

[3] The Monitor's Office reviewed protests and demonstrations from San Juan, Ponce, Mayaguez, Bayamon, Aguadilla, Carolina, Fajardo, Arecibo, and Guayama.

- The Incident Commander should identify decisions made that resulted in poor outcomes.
- In those instances, where a work-plan was prepared in advance, the Incident Commander should provide comment on the effectiveness of the work-plan.

The Monitor's Office also recommends that PRPB review the *How to Conduct an After Action Review* resource developed by the National Police Foundation under the Office of Community Oriented Policing Services.[4]

## 4. Force Reporting

The Monitor's assessment of PRPB's compliance with force reporting policies and procedures were based on the UOF reports provided. However, PRPB still lacks a mechanism to verify the accuracy of UOF incidents, as well as the number of UOFs per incident. PRPB's discrepancies in its UOF data has been an area of concern since the beginning of the compliance monitoring phase, due in part to the fact that the information comes from various sources and units throughout PRPB. Each area's Centro de Mando should be the primary source of information, feeding that information to Radio Control in form PPR-126.2.

As stated earlier in this report, during the period of CMR-5 PRPB has developed a new process whereby it replaced all Centro de Mandos PPRs-84 (on screen forms) with PPRs-126.2. The Monitor's Office confirmed via site visits that all 13 Centro de Mandos had completed the transition, which took place from June 9 through August 12, 2021. Based on the discrepancies uncovered in the three tests where the Monitor's Office compared PRPB's UOF Dashboard to its Global List of UOFs, the Monitor's Office cannot confirm that the random sample selected is a fair representation of the UOFs that occurred during the CMR-5 period.

However, the Monitor acknowledges PRPB's efforts towards addressing this issue with the new process, which was implemented near the end of the reporting period. Therefore, the Monitor's Office will defer compliance of the paragraph and reassess in CMR-6. Further, the Monitor's review of the 58 UOF reports in the random sample demonstrated that PRPB was generally in compliance with what is outlined in the paragraph.

### Paragraph 36: Use of Force - Force Reporting

*PRPD shall develop a Use of Force Reporting Policy and Use of Force Report Form that comply with applicable law and comport with generally accepted policing practices. The Use of Force Reporting Policy will require officers to notify their immediate supervisor following any use of force, prisoner injury, or allegation of excessive force. In cases involving a serious use of force, notification will be within one hour, absent exigent circumstances.*

| Compliance Status | Assessment Schedule | |
|---|---|---|
| Deferred | Review | April 2021 – September 2021 |

---

[4] https://cops.usdoj.gov/RIC/Publications/cops-w0878-pub.pdf.

| | | | |
|---|---|---|---|
| | Implemented | Period | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. Polices and forms incorporate all of the requirements of the paragraph. | ☑ Met ☐ Missed |
| 2. Training on force reporting is consistent with approved policies. | ☑ Met ☐ Missed |
| 3. 95% of officers are trained and certified in force reporting policies (or are scheduled for training, in the case of mid-year reviews) | ☑ Met ☐ Missed |
| 4a. 95% of use of force incidents are notified to immediate supervisors or adequately justified as an exigent circumstance in accordance with policy. | ☑ Met ☐ Missed |
| 4b. 95% of use of force reports are completed within prescribed periods and are documented in accordance with policy. | ☐ Met ☑ Missed |
| 4c. All failures to report use of force are referred to SARP for investigation. | ☐ Met ☑ Missed |
| 4d. 95% of requests for medical services in connection with a use of force are within policy. | ☐ Met ☑ Missed |
| 4e. 95% of force incidents where a civilian is transported to a medical facility indicate that the officer notified the vehicle mileage and that the mileage was recorded. Mileage discrepancies are identified and addressed by supervisors as required by policy. | ☐ Met ☑ Missed |
| 4f. 95% of all use of force reports are submitted to supervisors and SARP within prescribed time frames as required by policy. | ☐ Met ☑ Missed |
| 4g. All use of force reports are stored and maintained by SARP as required by policy. | ☐ Met ☑ Missed |

*Compliance Assessment*

PRPB's inability to validate its UOF numbers has been a recurring problem, and one which the Chief Monitor has identified in all previous reports. PRPB took a positive first step to addressing this issue by taking the initiative to develop the PPR-126.2 to replace the PPR-84 at PRPB's Centro de Mandos, as recommended by the Monitor's Office. This new form places PRPB on track to having a reliable system to report valid UOF numbers going forward, provided that all steps in the system are completed when reporting each incident.

The new web-based form (PPR-126.2) allows Centro de Mandos to provide the number of incidents in which force was used and by how many officers when assigning complaint numbers. However, the system that holds the resulting data cannot yet be queried by users for the purpose of extracting information related to UOF. In addition, the revised PPR-126.2 form will only be accurate if supervisors verify that UOFs are recorded properly using PPR-126.2. The Monitor recommends that PRPB establish procedure requiring supervisors and/or the FIU personnel who are investigating a UOF to verify that UOF incidents have been properly recorded through the appropriate Centro de Mando. The Monitor's Office also recommends that this review procedure be documented, perhaps as an additional field on

40

the Use of Force Report (PPR-605.1) or in the case of a FIU investigation, forms PPR 113.2 "FIU Investigation Report" or by PPR-605.3 "Notification of Use of Force".

Therefore, when PRPB's new process is fully operational throughout the entire Monitor's Office review period, PRPB should have a system in place that validates it UOF numbers, provided that the safeguards recommended by the Monitor's Office are in place and current problems previously identified in this report are addressed. At the time of this writing, however, the Monitor's Office cannot verify the effectiveness of this new form on force reporting, much less verify the accuracy of bureau-wide data on UOF provided using this form. Therefore, the Monitor's Office will defer compliance of the paragraph and reassess in CMR-6.

*Pathway Forward*

PRPB's compliance with this paragraph hinges on its ability to demonstrate consistent and valid data collection of its UOFs. The Monitor is hopeful that with the implementation of the new process, PRPB will be able to accurately track its UOFs. To accomplish this, PRPB must ensure integration of the information systems that feed data on UOFs to the Bureau's Global List. The accuracy of this data is not only integral to PRPB's compliance with the Agreement, but also ensures that PRPB is able to operationally respond to and quickly address issues with UOF policy, training, and practice as well as accurately report out on UOFs, both internally and externally to its community.

## Paragraph 37: Use of Force - Force Reporting

*The Use of Force Reporting Policy shall require all officers to report any use of force in writing in a Use of Force Report Form before the end of the shift. The Use of Force Report shall include: (a) a detailed account of the incident from the officer's perspective; (b) the reason for the initial police presence; (c) a specific description of the acts that led to the use of force, including the subject(s)' behavior; (d) the level of resistance encountered; and (e) a description of every type of force used. The Use of Force Reporting Policy shall explicitly prohibit the use of boilerplate or conclusory language in all reports documenting use of force. Failure to report a use of force or prisoner injury by a PRPD officer shall subject an officer, including supervisors and commanders, to disciplinary action.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This paragraph is assessed with paragraph 36.

*Compliance Assessment*

The Monitor has made the following key observations based on a review of a random sample of 58 UOF Reports covering the period extending from April 2021 through September 30, 2021:

- The Monitor's Office determined that the levels of force reported were consistent with the force used.
- Of the reports reviewed (PPR-605.1), 9% had missing, incorrect and/or incomplete information.
- PRPB must require that all UOF reports be typed or legibly printed. Reports should not be written in script, which in some cases makes them illegible. Ideally, this issue will resolve itself with the change in PRPB policy requiring that all Use of Force Reports (PPR-605.1) be entered into the Global Technology Enterprise (GTE) system as of August 31, 2021.
- In several cases, the reports were not properly signed. The investigator's name is merely typed in.
- PRPB should ensure that reports are formatted as either day/month/year or month/day/year. The Monitor is still seeing both conventions utilized, and this can cause confusion regarding the date of the incident.
- Six reports (10%) were not submitted by the officer before the end of their shift.
- Seven reports (12%) were not reviewed by a supervisor within five business days, as outlined in the Agreement.
- Supervisors responded to all serious UOFs.
- One report had an additional UOF report with a different number.
- During one UOF incident investigation, the supervisor determined that the officer had never been trained on the UOF policy. This was later confirmed by the officer.

Though the sample of reviewed UOF reports demonstrated numerous areas of compliance, in which PRPB practice corresponded to the stipulations of the Agreement, there were sufficient shortcomings such that PRPB cannot be considered in substantial compliance with this paragraph. Despite those issues, however, the Monitor was informed of several proactive measures that PRPB is taking to ensure greater compliance going forward.

First, as per a directive by the PRPB Commissioner (provided to the Monitor's Office), PRPB reports that are effective as of June 1, 2021, including divisions such as the Drug Unit, Transit Unit, and Auto Theft Unit, will follow the following guidelines regarding force reporting: 1) when a member of PRPB assigned to any specialized unit is involved in an incident in which force was used, the officer will request a complaint number from the district or precinct corresponding to the jurisdiction where the incident occurred; 2) in UOF incidents, PRPB has prohibited the use of complaint numbers with the prefix of the specialized unit; 3) PRPB's IT Bureau will take the corresponding steps to support compliance with the Commissioner's Directive. This process will ensure that the Area Commands where force was used are aware of each incident.

The Monitor was also informed that the Centro de Mando of the 13 area commands, operating through Radio Control, will become PRPB's source of information for reported UOF incidents. FIU will continue to be the repository for UOF reports (PPR-605.1).

The Monitor's Office sees these actions by the Commissioner's Office, coupled with the change made relating to dispatchers on screen form PPR 126.2, as positive first steps toward developing a mechanism by which PRPB can validate its UOF incident numbers.

*Pathway Forward*

As noted above, PRPB's compliance with this paragraph hinges on its ability to demonstrate consistent and valid data collection of its UOFs. The Monitor is hopeful that with the implementation of the new process, PRPB will be able to accurately track its UOFs.

### Paragraph 38: Use of Force - Force Reporting

*PRPD policy shall require officers to request medical services immediately when an individual is injured or complains of injury following a use of force. The policy shall also require officers who transport a civilian to a medical facility for treatment to take the safest and most direct route to the medical facility. The policy shall further require that officers notify the communications command center of the starting and ending mileage on the transporting vehicle.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This paragraph is assessed with paragraph 36.

*Compliance Assessment*

In all UOF reports (PPR-605.1) reviewed by the Monitor's Office, whenever medical aid was warranted, it was received. However, without a valid list of UOF reports, the Monitor is unable to determine whether this finding is representative of all UOF incidents. Therefore, the Monitor's Office will defer compliance of the paragraph and reassess in CMR-6.

*Pathway Forward*

As previously stated, PRPB's compliance with this paragraph hinges on its ability to demonstrate consistent and valid data collection of its UOFs. The Monitor will assess the implementation of the new process and examine if PRPB is able to accurately track its UOFs in CMR-6.

43

## Paragraph 39: Use of Force - Force Reporting

*PRPD's Use of Force Reporting Policy shall require that officers submit copies of Use of Force Reports to their immediate supervisor and to SPR for tracking and analysis. SPR shall maintain master copies of these reports in a central location.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This paragraph is assessed with paragraph 36.

*Compliance Assessment*

In all UOF reports (PPR-605.1) reviewed by the Monitor's Office, a UOF report was submitted to the officer's immediate supervisor. In relation to the tracking and analysis of these UOF reports, PRPB has not demonstrated that it has the capabilities to provide this function. Furthermore, even though the revised PPR-126.2 form contains the fields requested by the Monitor for recording UOF, force reporting will only be accurate if supervisors or FIU personnel verify that UOFs are recorded properly using PPR-126.2.

The Monitor acknowledges PRPB's efforts towards addressing this issue with the new process, which was implemented near the end of the reporting period. Therefore, the Monitor's Office will defer compliance of the paragraph and reassess in CMR-6. Further, the Monitor's review of the 58 UOF reports in the random sample demonstrated that PRPB was generally in compliance with what is outlined in the paragraph.

*Pathway Forward*

All officers must submit a copy of their UOF reports to their immediate supervisor and the Superintendency of Professional Responsibility (SARP) for tracking and analysis. SPR must maintain a copy of those reports in a central location.

The Monitor recommends that PRPB establish proper procedures requiring supervisors and/or FIU personnel who are investigating a UOF to verify that UOFs are being properly recorded through the appropriate Centro de Mando. The Monitor's Office also recommends this procedure be documented, perhaps as an additional field on the Use of Force Report (PPR-605.1), or in the case of FIU

investigations, forms PPR 113.2 "FIU Investigation Report" and/or on PPR-605.3 "Notification of Use of Force".

As previously stated, PRPB has unveiled its "Use of Force Dashboard," which is a significant first step, however, much remains to be done. PRPB should also work to develop an electronic tracking system with field reporting capability. However, until such a system is implemented, Centro de Mando must have the ability to track the numbers for purposes of monitoring and analyzing UOF dynamics.

## 5. Force Review, Investigation, and Analysis

Although PRPB meets the policy and training requirements for these paragraphs, PRPB's implementation of these paragraphs in practice is hampered by persistent issues with its ability to track of UOF reports properly. In reviewing and determining levels of compliance with the Agreement, the Monitor's Office must look at the reports when they are deemed complete and accurate by PRPB, which is when FIU makes that determination. Of the 58 UOF reports (PPR-605.1) reviewed by the Monitor's Office, all appear to have been properly investigated. However, many of the reports submitted to the Monitor's Office were incomplete or missing information. Furthermore, PRPB has still not demonstrated that they have reliable mechanisms in place for tracking officers' UOF, or for reviewing the quality of force investigations when evaluating the performance of investigators.

### Paragraph 40: Use of Force - Force Review, Investigation, and Analysis

*PRPD policy shall specify that the conduct of all force reviews and investigations comply with applicable law and comport with generally accepted policing practices. All force reviews and investigations shall, to the extent reasonably possible, determine whether the officers' conduct was justified and within PRPD policy.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually for policy compliance and bi-annually for training compliance. |
| Practice: | Not Implemented | | |

#### Compliance Targets

| | | |
|---|---|---|
| 1. The policy incorporates all of the requirements of the policy. | ☒ Met | ☐ Missed |
| 2. Training on force reviews and investigations is consistent with approved policies. | ☒ Met | ☐ Missed |
| 3. 95% of officers are trained and certified in force reviews and investigation policies in accordance with their rank or assignment to FIU (or are scheduled for training, in the case of mid-year reviews) | ☒ Met | ☐ Missed |

Note: Implementation of the requirements of this paragraph is assessed with Paragraphs 43-47 for level 1-3 uses of force.

45

Note: Implementation of the requirements of this paragraph is assessed with Paragraphs 48-52 for level 4 uses of force.

*Compliance Assessment*

In the files provided to the Monitor's Office, there were several reports with minor errors and as many as five reports had missing pages of the Use of Force Report (PPR-605.1). The latter may have been an error in the copying of files. In 11 cases, the investigation was conducted by FIU, and documentation relating to their findings was not included in the files provided to the Monitor's Office. None of the cases investigated by FIU included the Preliminary Investigation Report (PPR-113.1). The Monitor's Office could not determine if the force utilized was found to be within PRPB guidelines.

These omissions do not appear to have affected the outcome of the investigation relating to its compliance with the Agreement and PRPB policy. Most of the reports, in substance, had been properly prepared and the required actions relating to UOF incidents had been carried out as per the Agreement. However, failure to include FIU forms, PPR-113.1 (Preliminary Notification of Force Use Incidents) and PPR-113.2 (Investigation Report) in some case files prevented the Monitor from deciding whether the force used was within PRPB guidelines.

*Pathway Forward*

As stated in previous reports, UOF reports (PPR-605.1) should be consistently reviewed by SARP or FIU for completeness and accuracy as a matter of general practice. FIU is the repository for all UOF reports and their subsequent investigations. UOF reports should be closely scrutinized during the review process, given the past observations of the Monitor's Office regarding errors and omissions. It should also be noted that in many instances, UOF reports take a considerable amount of time to arrive at FIU, depending on the track an investigation follows. Given how long it can take for a report to be reviewed by FIU, the Monitor's Office recommends that PRPB establish a procedure at the area commands and specialized units for reviewing reports for purpose of identifying mistakes and/or omissions earlier in the process.

## Paragraph 41: Use of Force - Force Review, Investigation, and Analysis

*PRPD shall be responsible for maintaining a reliable and accurate tracking system on all officers' use of force; all force reviews carried out by supervisors; all force investigations carried out by Force Investigation Units ("FIU"); and all force reviews conducted by Force Review Boards ("FRB") and the Superintendent's Force Review Board ("SFRB"). At least annually, PRPD shall analyze data on officers' use of force to determine significant trends, identify and correct deficiencies revealed by this analysis, and document its findings in a public report.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |

| | | | |
|---|---|---|---|
| Training: | N/A | Assessment Frequency | Bi-annually related to the tracking system; annually related to the annual report; and quarterly related to site visits to Radio Control Center. |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Tracking system accounts for all of the elements in the paragraph and outcome measures as required by Paragraph 243. | ☐ Met | ☑ Missed |
| 2. All uses of force are tracked in the tracking system. | ☐ Met | ☑ Missed |
| 3. Annual use of force reports provide meaningful data analysis, identify significant trends, discuss corrective action (if necessary), and present supportable findings based on accurate and current data, as required by policy. | ☐ Met | ☑ Missed |
| 4. Records maintained by the Radio Control Center on use of force are consistent with data in the use of force tracking system. | ☐ Met | ☑ Missed |

### Compliance Assessment

As previously stated, PRPB has not demonstrated to the Monitor's Office that it has a reliable tracking system, nor to date has it provided the public with accurate information relating to UOF trends. The Monitor acknowledges PRPB's efforts towards addressing this issue with the new process, which was implemented near the end of the reporting period. Although PRPB has demonstrated efforts towards addressing this issue, because of its lack of public reporting on use of force trends coupled with the current inability to analyze and reliable track uses of force this paragraph is rated at not compliant.

### Pathway Forward

PRPB's compliance with this paragraph hinges on its ability to demonstrate consistent and valid UOF data collection. The Monitor will assess the implementation of the new process and examine if PRPB is able to accurately track its UOFs in CMR-6.

### Paragraph 42: Use of Force - Force Review, Investigation, and Analysis

*The quality of force reviews, force investigations, and investigation reviews shall be taken into account in the performance evaluations of the officers performing such investigations and reviews.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Not Implemented | | |
| Training: | N/A | | Bi-annually |

|  Practice: | Not Implemented | Assessment Frequency | |
|---|---|---|---|

*Compliance Targets*

Note: This Paragraph is assessed with Paragraphs 145-146 on Performance Evaluations.

*Compliance Assessment*

PRPB has no mechanism in place to consider the quality of force review investigations by supervisors when preparing performance evaluations. This stipulation is not in the policy, and supervisors have not been trained to implement this practice.

*Pathway Forward*

PRPB must incorporate a quality review of investigator's force reviews into their performance evaluations. This process must also be outlined in the policy and procedures and incorporated into supervisory training. Doing so reiterates the value of such work in officer performance, encourages higher quality investigative work, and identifies ways in which investigators can seek to improve year to year.

## 6. Supervisory and FRB Reviews

The Monitor's Office concluded through its review that PRPB supervisors properly responded to incidents of serious UOF by officers under their supervision. In cases where FIU presence was needed, proper notification was made to FIU. During this review period, there were no reports of apparent misconduct or criminal conduct. The Monitor's Office concludes that the mechanism to report such conduct is in place.

### Paragraph 43: Use of Force - Supervisory and FRB Reviews

*A supervisor shall respond to the scene of a serious use of force or allegation of excessive force involving an officer under his/her command upon notification of the incident.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

48

Note: This Paragraph is assessed with Paragraphs 48-52.

*Compliance Assessment*

Of the 58 UOF reports (PPR-605.1) reviewed by the Monitor's Office, the Monitor found only 1 instance in which a supervisor failed to respond to a serious UOF. However, the Monitor's Office cannot verify the accuracy of the information related to UOFs provided by PRPB. The Monitor acknowledges PRPB's efforts towards addressing this issue with the new process, which was implemented near the end of the reporting period. Therefore, the Monitor's Office will defer compliance of the paragraph and reassess in CMR-6.

*Pathway Forward*

PRPB should ensure that a supervisor responds to the scene of a serious UOF or allegation of excessive force involving an officer under his/her command upon notification of the incident. Furthermore, as previously stated, PRPB's compliance with this paragraph hinges on its ability to demonstrate reliable and valid UOF data collection. The Monitor will continue to assess PRPB's ability to track UOFs accurately in future reports.

## Paragraph 44: Use of Force - Supervisory and FRB Reviews

*The supervisor shall conduct a supervisory review of all uses of force, prisoner injuries, or allegations of excessive force, except those incidents involving a serious use of force or force indicating apparent criminal conduct by an officer, which shall be investigated by FIU, SPR, and/or PRDOJ. No supervisor who was involved in the incident, including by participating in, ordering, or authorizing the force being investigated, shall be responsible for the review of the incident.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☒ Met | ☐ Missed |
| 2. Training on force reviews and investigations for supervisors is consistent with approved policies. | ☒ Met | ☐ Missed |
| 3. 95% of supervisors are trained and certified in force reviews and investigation policies (or are scheduled for training, in the case of mid-year reviews) | ☒ Met | ☐ Missed |
| 4a. 95% of use of force incidents classified as Level 1-3 are reported, reviewed, and investigated by supervisors and commanders within policy. | ☐ Met | ☒ Missed |

| | | |
|---|---|---|
| 4b. 95% of supervisory force reviews are completed within five business days or have valid justifications for longer periods, based on exceptional circumstances. | ☐ Met | ☑ Missed |
| 4c. All use of force reviews and investigations by supervisors reach reasonably justified conclusions on officers' conduct and recommend disciplinary or corrective action, as necessary, in accordance with policy. | ☐ Met | ☑ Missed |
| 5a. 95% of reviews by Force Review Boards are within policy. | ☐ Met | ☑ Missed |
| 5b. The use of force tracking system accounts for all Force Review Board reports and underlying documents. | ☐ Met | ☑ Missed |
| 5c. Force Review Board determinations and recommendations are tracked and analyzed by SPR. | ☐ Met | ☑ Missed |

*Compliance Assessment*

Of the 58 UOF reports (PPR-605.1) reviewed by the Monitor's Office, the Monitor found only 1 minor instance in which a supervisor failed to conform to what was required by policy. In that incident, the supervisor failed to go to the scene of a UOF, which was turned over to FIU to investigate. Despite the high level of compliance in the sampled investigations reviewed, the Monitor's Office cannot verify the accuracy of the information related to UOF provided by PRPB, and therefore defers compliance of the paragraph and will reassess in CMR-6.

*Pathway Forward*

As noted in other related paragraphs, compliance with this paragraph is largely contingent with PRPB's ability to accurately track all UOFs, ensuring that the Monitor's review of UOFs is representative. As such, the Monitor will re-assess compliance with this paragraph in CMR-6.

## Paragraph 45: Use of Force - Supervisory and FRB Reviews

*Supervisors shall complete use of force reviews within 5 business days of receiving the officer's use of force report. The reviewing supervisor shall: (a) determine whether the use of force was consistent with PRPD policy and/or raises any policy or operational concerns; (b) review all Use of Force Reports and ensure that all reports include the information required by this Agreement and PRPD policy; (c) document each use of force review promptly using a Supervisor's Force Review Report; and (d) consider whether there are non-punitive corrective actions or training needs. A higher ranking officer within the investigating supervisor's chain-of-command shall review the Supervisor's Force Review Report for completeness and conformance with PRPD policy. The reviewing officer shall evaluate the investigating supervisor's conclusions and document whether the reviewing officer concurs, disagrees (with an explanation of the disagreement and the alternate conclusion), or defers until further investigation is completed.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |

50

| Training: | Implemented | Assessment Frequency | Bi-annually |
|---|---|---|---|
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 44.

*Compliance Assessment*

Of the 58 UOF reports (PPR-605.1) reviewed by the Monitor's Office, 7 did not complete their review within 5 business days per the Agreement. Although this represents a small percentage of the total sample, it is significant enough to bring PRPB below the 95% target for compliance. Thus, this paragraph is rated as not compliant.

*Pathway Forward*

PRPB must ensure all UOF incidents are investigated in the time allotted as required by GO 600-605, Report and Investigation of Use of Force Incidents. As noted in previous paragraphs, the Monitor is aware of the new process implemented by PRPB at the end of this reporting period to address this issue and will reassess this paragraph and the accuracy of UOF reporting in CMR-6.

## Paragraph 46: Use of Force - Supervisory and FRB Reviews

*A Force Review Board shall evaluate supervisory reviews, including Supervisor's Force Review Reports and reviewing officers' determinations. FRBs shall be composed of command staff from varying assignments. PRPD policies shall specify the conduct and requirements of FRB proceedings to ensure thorough, timely, and objective reviews. PRPD policy shall establish objective criteria that identify the force levels below serious uses of force that shall be reviewed by FRBs. FRBs shall review supervisory review for completeness, evidentiary support, and compliance with PRPD policy. FRB shall document each FRB proceeding, which shall include findings and recommendations to the regional commander. FRB may also return force reviews to supervisors for additional review, as necessary, to ensure thorough and complete reviews. Copies of all Force Review Reports and underlying documents shall be submitted to SPR for tracking and analysis.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 44.

*Compliance Assessment*

PRPB provided the Monitor's Office a list of 72 officers assigned to 13 Area Command Force Review Boards (FRBs). The Monitor's Office requested the training and certification records of 21 randomly selected officers from this list to determine if they are qualified to serve on these boards as outlined in GO 500-502, Evaluation Boards of Incidents of Use of Force. In response, the Auxiliary Commissioner of Superintendency in Education and Training (SAEA) provided a memo (dated September 23, 2021) certifying that the training material for personnel assigned to Area Command FRBs is under evaluation by the Training Design Committee in accordance with the newly approved UOF policies on, which went into effect August 31, 2021. PRPB further stated that this will have an impact on the content of the new training. As a result, no training records of board personnel were provided. The Monitor's Office therefore cannot provide a determination on the qualifications of PRPB members serving on the board at this time.

For the purposes of determining compliance with paragraphs 46 and 47, the Monitor's Office requested a list of all FRB investigations conducted by the 13 Area Command FRBs from April through September 2021. PRPB provided a list of 185 cases of UOF incidents evaluated by FRBs, of which the Monitor randomly selected 42 cases for review. PRPB provided information on all selected cases. In only one case did the FRB determine that the level of force was incorrect, and after a discussion between board members a level-2 rating was changed to level-1. In all cases reviewed, the Monitor's Office determined that the Board took appropriate measures as it relates to verifying the actions of officers involved in those incidents under review.

The Monitor offers the following additional assessments of the information provided:

- In 10 cases reviewed, the president of the board did not sign box 52 of the Use of Force Report PPR-605.1; the box was instead signed by individual board members;
- All cases provided documentation that the FRB reviewed the case;
- In one case, the board ordered retraining;
- The Boards' evaluations were unanimous in all cases;
- One case file was returned by the Board due to missing or incomplete information;
- In some instances, outdated forms were utilized.

Based on the reviews of the randomly selected Area Command FRB files, there were no reported referrals, nor was any such need uncovered. It should be noted that the Monitor's Office has seen significant improvement in the Area Command FRBs relative to proper UOF evaluation.

*Pathway Forward*

The Monitor will review PRPB's updated training for FRB members and observe training once conducted to ensure that it adheres to the Agreement. Further, the Monitor notes that compliance with this paragraph is also contingent on PRPB's ability to accurately track and report on UOFs, as with many of the paragraphs in this section.

## Paragraph 47: Use of Force - Supervisory and FRB Reviews

*Whenever a reviewing supervisor, FRB, or other reviewing officer finds evidence of a use of force indicating apparent misconduct or apparent criminal conduct by an officer, he or she shall immediately notify his or her supervisor for referral to the appropriate investigating unit or the PRDOJ. The Superintendent shall be notified of the referral.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: This Paragraph is assessed with Paragraph 44.

### Compliance Assessment

PRPB policy clearly dictates the actions the Board and FIU must take with respect to reporting misconduct to the appropriate investigative unit or to the Puerto Rico Department of Justice. There was only one report of misconduct in the FIU cases reviewed during the CMR-5 reporting period. The case was referred to SARP for investigation of the relevant lieutenant's conduct and actions.

It should be noted that for CMR-5, the Monitor's Office reviewed four cases involving accidental discharges. In the three of the cases, officers sustained injuries. In all four cases FIU recommended that an administrative investigation be opened, but nevertheless forwarded the investigations to CFRB for review, adding additional time to the process. For all four investigations, CFRB concurred that an administrative investigation should be opened. CFRB members noted in their evaluations that such clear cases of negligence, should immediately be forwarded to SARP, in addition to being shared with CFRB.

### Pathway Forward

In the instances where FIU investigates a UOF and determines that it was an accidental discharge and not a UOF, the case must be immediately forwarded to SARP upon completion of investigation, and the eventual disposition should be included in the FIU file. The designation of UOF should then be removed.

## 7. FIU Investigations and Force Reviews by SFRB

As indicated in previous CMRs, FIU is required to investigate all serious UOF incidents, among other investigations, across Puerto Rico, including both intentional and accidental firearms discharges

involving PRPB personnel. In previous reports, the Monitor's Office has voiced serious concerns about the thoroughness of FIU investigations and the accuracy of their conclusions. The concerns were based on several findings, including that a significant proportion of FIU reports relied solely on police witnesses and rarely incorporated interviews or observations from civilian witnesses. In reviewing FIU investigations for CMR-5, the Monitor's Office has seen significant improvement in this area. Nevertheless, the Monitor's Office remains concerned regarding the amount of time FIU is taking to complete its investigations. None of the cases reviewed were completed in the 45-day deadline outlined in General Order, Chapter 100, Section 113 (Force Investigation Unit), and some dated back to 2019.

In past CMRs, these delays in concluding FIU investigations have prevented the Monitor's Office from reviewing sufficient FIU investigations to reach a compliance assessment. FIU investigations tended to overrun the 45-day deadline, and thus were not closed in sufficient time to provide to the Monitor's Office for review during the same reporting period that the incident occurred. To address this issue, and to better determine if FIU was properly investigating serious UOFs, as outlined in the Agreement, the Monitor's Office pivoted to requesting FIU investigations that were closed during the CMR-5 reporting period, rather than investigations that were opened. The Monitor's Office thus requested a list of all FIU investigations that were completed in the period of CMR-5, irrespective of when the incident occurred that prompted the opening of the investigation. Again, none of the resulting cases reviewed were completed within 45 days, and some dated back over a year to 2019.

### Paragraph 48: Use of Force - FIU Investigations and Force Reviews by SFRB

*PRPD shall ensure that all serious uses of force and allegations of excessive force are investigated fully and fairly by individuals with appropriate expertise, independence, and investigative skills to ensure that uses of force that are contrary to law or policy are identified and appropriately resolved and that policy or operational deficiencies related to the use of force are identified and corrected. To this end, PRPD shall create FIUs to conduct investigations of serious uses of force, uses of force indicating apparent criminal conduct by an officer, uses of force by PRPD personnel of a rank higher than sergeant, or uses of force reassigned to FIU by the Superintendent, his or her designee, SPR, or FRB. PRPD policies shall specify the membership requirements, conduct of investigations, and operational procedures of FIUs.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met   ☐ Missed |
|---|---|

| | | |
|---|---|---|
| 2. Training for FIU officers is consistent with approved policies. | ☐ Met | ☑ Missed |
| 3. 95% of FIU officers are trained and certified in force reporting and investigation policies (or are scheduled for training, in the case of mid-year reviews) | ☐ Met | ☑ Missed |
| 4. All officers assigned to FIU meet eligibility requirements. | ☑ Met | ☐ Missed |

*Compliance Assessment*

Regarding FIU training, the Monitoring Team conducted a site visit to the PRPB's FIU Unit and verified that the training materials employed by PRPB are consistent with policy and generally accepted policing practices in most cases. FIU is responsible for investigating serious UOFs, including a) accidental and intentional firearm discharges, b) UOF by supervisors above the rank of sergeant, c) UOF at protests, and d) any other UOF deemed appropriate by the commissioner. The Monitor determined that training related to investigating intentional firearm discharge has not commenced, nor has the curriculum been developed, as the Monitor previously requested. PRPB has informed the Monitor that they are developing a UOF training for the Boards' Use of Force Reviewers. This training will serve as a complement to the training that FIU Reviewers already receive. The Monitoring Team also reviewed the training records of members of the unit and verified that its training records included certification on UOF related policies.

*Pathway Forward*

As a result of COVID-19 and curriculum development, FIU investigators have yet to receive additional training on firearm discharge investigations, as the Monitor previously suggested. PRPB must develop the curriculum for firearm discharge investigations and train FIU personnel.

## Paragraph 49: Use of Force - FIU Investigations and Force Reviews by SFRB

*A supervisor responding to a serious use of force or allegation of excessive force shall immediately notify FIU. FIU shall respond to the scene and commence an investigation. FIU may decline to respond to the scene following consultation and approval by the FIU supervisor. Declinations shall be documented in writing.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |

55

| | | |
|---|---|---|
| 2a. 95% of use of force incidents classified as Level 4 are reported, reviewed, and investigated by officers, supervisors, commanders, and FIU officers within policy. | ☑ Met | ☐ Missed |
| 2b. 95% of FIU investigations are completed within 45 days of the use of force or have valid justifications for longer periods based on exceptional circumstances. | ☐ Met | ☑ Missed |
| 2c. All use of force reviews and investigations by FIU reach reasonably justified conclusions on officers' conduct and recommend disciplinary or corrective action, as necessary, in accordance with policy. | ☑ Met | ☐ Missed |
| 3a. 95% of reviews by the Commissioner's Force Review Boards are within policy. | ☐ Met | ☑ Missed |
| 3b. The use of force tracking system includes all Commissioner's Force Review Board reports and underlying documents. | ☐ Met | ☑ Missed |
| 3c. Commissioner's Force Review Board determinations and recommendations are tracked and analyzed by SPR. | ☐ Met | ☑ Missed |

*Compliance Assessment*

PRPB provided a list of 40 cases that were completed during the CMR-5 reporting period, including cases involving a) accidental firearm discharges, b) force by supervisor above the rank of sergeant, c) intentional firearm discharges, and d) non-firearm incidents. The Monitor's Office's selected a random sample of 19 investigation for the purpose of assessing FIU's compliance with the Agreement and with PRPB policies relevant to investigations. PRPB provided investigations files on 16 out of the 19 cases drawn in the sample. Of the three files not provided, one was not available, one case was incorrectly marked, and one was a duplicated case of another drawn in the sample, which PRPB substituted with one additional case.

As noted above, because a majority of the FIU investigations had not been completed and thus were not provided to the Monitor's Office, the Monitor is unable to decide if PRPB is in compliance. The fact that almost all the cases investigated by FIU requested for review by the Monitor were not completed in the 45 days as outlined in General Order 100-113, FIU, is a concern to the Monitor's Office. The lack of files for the Monitor to review also impacts the compliance ratings of Paragraphs 49-51.

Regarding training, all supervisors and FIU members have been trained on UOF related policies and conducting force investigations. However, in response to previous CMRs, PRPB indicated that it would provide additional training on firearm discharge investigations. PRPB provided documentation that the curriculum is under development and evaluation and that comments and recommendations provided in the Monitor's 3rd and 4th report were considered as well as recent changes to UOF policy.

*Pathway Forward*

PRPB must ensure that prompt notification is made to FIU in cases regarding their involvement. For the most part, this was the case, however some notifications were not made in a timely manner.

CFRB must complete its reviews within the time allotted in GO 500-502, Evaluation Boards of Incidents of Use of Force. PRPB must ensure that FIU has adequate personnel to conduct its investigations and ensure that all personnel have completed all necessary training to meet timelines relating to investigating serious UOFs.

## Paragraph 50: Use of Force - FIU Investigations and Force Reviews by SFRB

*FIU shall immediately notify and consult with PRDOJ regarding any use of force indicating apparent criminal conduct by an officer. If PRDOJ indicates that it may proceed criminally, or PRPD requests a criminal prosecution, any compelled interview of the subject officers shall be delayed until after consultation with PRDOJ or expressly permitted by the Superintendent. No other part of the investigation shall be held in abeyance unless specifically authorized by the Superintendent in consultation with PRDOJ.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Deferred | | |

### Compliance Targets

Note: These Paragraphs is assessed with Paragraph 48.

### Compliance Assessment

The Monitor's Office defers rendering a compliance rating for this paragraph since there were no related cases reviewed during the CMR-5 reporting period.

### Pathway Forward

The Monitor will continue to assess this paragraph in CMR-6. No additional recommendations are offered at this time.

## Paragraph 51: Use of Force - FIU Investigations and Force Reviews by SFRB

*FIU shall complete its administrative use of force investigation within 45 days of the use of force, absent exceptional circumstances. At the conclusion of each use of force investigation, FIU shall prepare a report on the investigation and shall forward the report to SFRB for review and to SPR for tracking and analysis.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | | Bi-annually |

|  Practice: | Not Implemented | Assessment Frequency | |
|---|---|---|---|

*Compliance Targets*

Note: These Paragraphs is assessed with Paragraph 48.

*Compliance Assessment*

For the CMR-5 period, PRPB reported 108 UOFs investigated by the FIU Unit. In only 12 cases has FIU completed its investigation. The remaining cases continue to be under investigation. The Monitor's Office, during the October 2021 site visit, reconfirmed that 96 of the cases that occurred during the CMR-5 period had not been completed. Given the lack of completed cases, the Monitor's Office can determine that FIU is not in compliance with the stipulation that FIU complete its investigation within 45 days.

In further discussions with FIU, investigators noted that the root cause for failing to complete investigation in the allotted time continues to be a delay in receiving the results of forensic and evidentiary material, e.g., video, photographs, and other evidence recovered at the scene of serious UOFs. In these cases, FIU must rely on other units of PRPB and within DSP to complete their task before the investigation can be closed. In past reviews of FIU cases, the Monitor has noted that FIU does make multiple requests for information. This low level of data provision is of major concern to the Monitor's Office. The fact that 89% of cases investigated by FIU for the CMR-5 period remain open clearly indicates that PRPB is not in compliance with the Agreement which requires FIU investigations to be competed in 45 days, though FIU cannot always be faulted for these delays.

*Pathway Forward*

PRPB should ensure that all FIU investigations are completed in 45 days, as outlined in GO 100-113, FIU. PRPB must ensure that FIU has the adequate staff and resources to complete these investigations. Further PRPB must work with internal units within DSP and external stakeholders to address FIU's inability to receive forensic data in sufficient time to complete its investigations in the 45 days as required by policy.

## Paragraph 52: Use of Force - FIU Investigations and Force Reviews by SFRB

*The Superintendent's Force Review Board shall evaluate all FIU investigations, including FIU reports and determinations. SFRB shall be composed of senior command staff from varying units. PRPD policies shall specify the conduct and requirements of SFRB proceedings to ensure thorough, timely, and objective reviews. SFRB shall review each FIU investigation for completeness, evidentiary support, and compliance with PRPD policy. SFRB shall document each force review proceeding, which shall include findings and recommendations, to the Superintendent. SFRB may also return force investigations to FIU for additional investigation, as necessary, to ensure thorough and complete investigations. Copies of all Force Review Reports completed by SFRB and underlying documents shall be submitted to SPR for tracking and analysis.*

| Compliance Status | Assessment Schedule |
|---|---|

| Partially Compliant | | Review Period | April 2021 – September 2021 |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: These Paragraphs is assessed with Paragraph 48.

*Compliance Assessment*

PRPB provided the Monitor's Office with documentation that the CFRB evaluated 88 FIU UOF investigations during the CMR-5 reporting period. The Monitor's Office requested a random sample of 36 cases for review, and generally found that CFRB reviews are objective, but not timely.

Six of the cases reviewed by CFRB and selected in the random sample involved accidental firearm discharges. The FIU investigations determined negligence in all cases and forwarded them to CFRB for evaluation. The Monitor's Office suggests that cases of that nature be forwarded to SARP for administrative investigation before submission to CFRB for evaluation. The Monitor's Office notes that CFRB members have made similar recommendations. The Monitor's Office therefore recommends PRPB consider establishing a protocol that requires that investigations of accidental discharges involving officer negligence be sent directly to SARP from FIU for administrative investigation, and not to the CFRB.

Additional notes regarding the CFRB evaluations reviewed by the Monitor:

- In relation to CFRB, all evaluations exceeded the 30 days for evaluation identified in General Order 500- 502, Evaluation Boards of Incidents of Use of Force.
- In the cases reviewed by the Monitor's Office the findings were unanimous by board members.
- Aside from unintentional firearm discharges, FIU determined that the officer's intentional actions violated PRPB policy and required referral to SARP in only one case. The FIU investigator determined that an officer violated PRPB policy when he discharged his weapon at a moving vehicle while he was in no danger of being struck by the suspects' vehicle. CFRB concurred with FIU's determination, and did not hear the case, instead choosing to refer the case to SARP for an internal investigation.
- There were no instances in which the CFRB directed re-training.
- Except for two cases, all necessary documentation for CFRB evaluations was prepared and signed by board members. No reports were returned due to incorrect or incomplete and/or missing information.

59

- In the six cases presented to the CFRB for evaluation by FIU relating to accidental discharge, the board determined that the discharge was due to officer negligence in three cases. In the remaining three cases there is no determination by the board.

In addition, the Monitor's Office requested the training certification records of the three members of the CFRB, as well as any other person who may have served on the CFRB during the CMR-5 period. This information serves to determine whether CFRB members are qualified to serve on the board, as outlined in GO 500-502. During the October 2021 site visit the Monitor was informed by the Reform Unit that the information provided to the Monitor's Office for the FRB members also applies to CFRB members.

The Auxiliary Commissioner of SAEA provided a memo (dated September 23, 2021) certifying that the training material for personnel assigned to Area Command FRBs is under evaluation by the Training Design Committee in accordance with the newly approved UOF policies which went into effect on August 31, 2021. PRPB further states this update will have an impact on the content of the new training. As a result, no training records of board personnel were provided. Thus, the Monitor's Office cannot provide a determination on the qualifications of PRPB members serving on the board at this time.

In conversations with the Monitor's Office, PRPB has acknowledged its shortfalls in the evaluation of cases investigated by FIU. In a positive sign, during a September 2021 Status Conference, presided over by the Honorable Judge Gelpi, the recently assigned Chairman of the CFRB reported that he was appointed by the Commissioner and instructed that the priority of the PRPB is to focus all efforts to comply with the Agreement. Since his appointment to the position, the Monitor's Office has seen improvement in the number of cases being evaluated by the CFRB.

*Pathway Forward*

PRPB should consider establishing a protocol providing that accidental discharge investigations involving officer negligence are sent directly to SARP from FIU for administrative investigation, not to CFRB. Additionally, CFRB should complete their investigations in the time allotted in GO 500-502. Finally, PRPB should ensure that all officers serving on CFRB have a certification of training. The Monitor will review the training developed as a result of the revised policy.

## 8. Use of Force Training

The Monitor's Office finds that PRPB is broadly compliant with the paragraphs of the Agreement which stipulate personnel must be trained and certified on UOF policies. Although, FIU training on firearm discharges is still in the process of being developed.

### Paragraph 53: Use of Force - Use of Force Training

*PRPD shall train all PRPD officers on PRPD's use of force policies. Thereafter, PRPD shall provide all PRPD officers with use of force training at least every two years for the first four years of this Agreement, and annually thereafter. PRPD shall also provide training on use of force as necessary, based on developments in applicable*

*law and PRPD policy. At least annually, PRPD shall assess all use of force policies and training. PRPD's use of force training program shall include the following topics:*

*a) legal standards for reasonable force;*

*b) PRPD's use of force policy;*

*c) reporting use of force, requesting medical service, and preserving evidence;*

*d) scenario-based training and interactive exercises that illustrate proper use of force decision-making;*

*e) the proper deployment and use of all weapons or technologies, including firearms, batons, chemical agents, and ECWs;*

*f) threat assessment and de-escalation techniques that encourage officers to make arrests without using force, and instruction that disengagement, area containment, surveillance, waiting out a subject, summoning*

*reinforcements, calling in specialized units, or delaying arrest may be the appropriate response to a situation, even when the use of force would be legally justified;*

*g) crisis intervention and interacting with people with mental illnesses, including instruction by mental health practitioners and an emphasis on de-escalation strategies;*

*h) factors to consider in initiating or continuing a foot pursuit; and*

*i) appropriate training on conflict management.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. Training on use of force is consistent with approved policies and the requirements of the paragraph. | ☑ Met   ☐ Missed |
| 2. 95% of officers are trained and certified in use of force (or scheduled for training, in the case of mid-year reviews). | ☑ Met   ☐ Missed |

### Compliance Assessment

As of August 31, 2021 PRPB updated all UOF policies. As a result, PRPB has begun developing new UOF training curriculums on these policies. Generally, PRPB officers are up to date on current UOF training, with the exception of FIU investigators, who require training on intentional firearm discharge investigations.

### Pathway Forward

The Monitor will review the updated UOF training curriculums and ensure continued compliance with this paragraph. The Monitor also notes that PRPB should ensure that this training is not conducted

61

solely using its Virtual Training System. Training on UOF, specifically the topics noted in this paragraph, should also be incorporated into in-person scenario-based training to ensure that officers understand the policy requirements and the practical application of such procedures.

## Paragraph 54: Use of Force - Use of Force Training

*PRPD shall provide an appropriate firearm training program that:*

*a) requires officers to complete and satisfactorily pass firearm training and qualify on each firearm the officer is required or authorized to carry on an annual basis;*

*b) requires cadets, officers in probationary periods, and officers who return from unarmed status or extended leave to complete and satisfactorily pass firearm training and qualify on each firearm the officer is required or authorized to carry before such personnel are permitted to carry and use firearms;*

*c) incorporates night training, stress training (i.e., training in using a firearm after undergoing physical exertion), and proper use of force decision- making training, including continuous threat assessment techniques, in the annual in-service training program;*

*d) ensures that firearm instructors critically observe students and provide corrective instruction regarding deficient firearm techniques and failure to utilize safe gun handling procedures at all times; and*

*e) requires comprehensive testing that shows complete understanding of rules, regulations, and skills regarding firearm use.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | |
|---|---|
| 1. Training on the use of firearms is consistent with approved policies and the requirements of the paragraph. | ☒ Met   ☐ Missed |
| 2. 100% of officers are trained, certified, and qualified in use of firearms or have a valid justification for not qualifying in accordance with policies. | ☐ Met   ☒ Missed |

### *Compliance Assessment*

PRPB provided evidence that it conducted training on daytime firing during the CMR-5 period. However, the Monitor received insufficient evidence to conclude that all officers are currently certified in both daytime and nighttime firing. The Monitor notes that Paragraph 54 establishes an extremely high bar for compliance, and therefore requires full access to data on firearms training. Data on the number of officers trained does not suffice to demonstrate that 100% of officers are trained and certified in use of firearms or have a valid justification for not qualifying. PRPB must work with the Monitor's Office to grant the Monitor direct access to the Police Training Management System (PTMS)

62

or other structured data sources so that the Monitor can directly verify rates of firearm certification and justifications for all officers that are not currently certified.

PRPB provided additional information relating to firearm qualifications on "Reduced Lighting" testing (night fire), and provided training records verifying the following:

- 14 officers failed due to medical reasons
- 3 failed to qualify with firearms (handguns) and were disarmed and sent for re-training
- 2 failed rifle qualifications
- 1 officer failed to qualify, and the case was referred to the Auxiliary Commissioner of Professional Standards for appropriate action (Compliant #2021-00551).

*Pathway Forward*

PRPB must create and maintain a master list which includes all sworn personnel and their status as it relates to firearm training.

## Paragraph 55: Use of Force - Use of Force Training

*PRPD shall train all supervisors, FIU members, and command officers on PRPD's use of force policies. Thereafter, PRPD shall provide all supervisors, FIU members, and command officers with training on use of force, force investigations, and force investigation reviews at least annually and, as necessary, based on developments in applicable law and PRPD policy. PRPD's use of force training for supervisors, FIU members, and command officers shall include the following topics:*

*a) requesting medical services and determining the appropriate use of force reporting levels;*

*b) identifying and interviewing involved officers, witness personnel, subjects upon whom force was used, and civilian witnesses;*

*c) ensuring proper collection of evidence;*

*d) reviewing use of force and supplemental reports for completeness, accuracy, and quality, including recognizing boilerplate language and document discrepancies;*

*e) assessing the legality and appropriateness of a detention and subsequent arrest;*

*f) legal standards governing the use of reasonable force, including legal standards and requirements for criminal accountability, administrative*

*accountability, and performance improvement related to tactics, training, equipment, and policy sufficiency;*

*g) recommending and administering proper discipline and non-punitive corrective action related to use of force; and*

*h) report writing.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2020 – September 2021 |
| Policy: | Implemented | | |

| Training: | Not Implemented | Assessment Frequency | Annually |
|---|---|---|---|
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Training on the use of force, force investigations, and force investigation reviews is consistent with approved policies and the requirements of the paragraph. | ☐ Met | ☑ Missed |
| 2. 95% of supervisors, FIU officers, and commanders are trained and certified in use of force, force investigations, and force investigation reviews (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |

*Compliance Assessment*

The Monitor's Office verified that most of the the training for supervisors, FIU personnel, and command personnel is up to date. However, as noted above, PRPB has yet to provide additional training for its FIU personnel focused on investigating intentional firearms discharges (Level 4 UOF). The FIU Commanding Officer informed the Monitor's Office that the course is in the development stage and when completed, FIU investigators will receive the additional training. The lieutenant further reported that the development and training were hampered by COVID-19. This additional training was in response to the Monitor's previous reports, which identified significant deficiencies in FIU's firearms discharge investigations (Level 4 UOF).

*Pathway Forward*

As noted in previous CMR reports, PRPB must develop the training curriculum for intentional firearm discharge investigations and train FIU personnel.

## 9. Responding to Behavioral/Mental Health Crisis

As previously stated, it is critically important to have CIT trained officers throughout the 13 Area Commands. Since the conclusion of the pilot project, PRPB has yet to expand CIT coverage outside of Arecibo. PRPB initially proposed expanding the CIT program to all police areas in stages, but the Monitor voiced objection to this protracted timeline. During a meeting with the Acting Commanding Officer of the Academy and his staff in April 2021, the Monitor's Office learned that the program in Arecibo would be implemented in other Area Commands in a more expedited manner, but not all areas at once. The Monitor's Office holds the position that PRPB must accelerate and expand this program bureau-wide. Following the pilot project, PRPB should have conducted a self-assessment of the project to determine lessons learned to facilitate the expansion to all remaining Area Commands.

## Paragraph 56: Use of Force - Responding to Behavioral/Mental Health Crisis

*PRPD shall develop policies and procedures to improve its response to individuals in behavioral or mental health crisis, and to minimize the use of unnecessary force against such individuals. To achieve this outcome, PRPD shall, in addition to providing all officers with basic training on responding to persons in behavioral or mental*

64

*health crisis, implement and train a comprehensive first responder Crisis Intervention Team ("CIT") to develop and maintain specially-trained CIT officers. The CIT shall incorporate the following requirements:*

*a) The CIT shall develop policies and procedures for the transfer of custody or voluntary referral of individuals between PRPD, receiving facilities, and local mental health and social service agencies.*

*b) The CIT policies and procedures shall require that whenever officers encounter juveniles in mental health crisis that officers refer them to appropriate mental health services located in the community.*

*c) The CIT officers shall be assigned to field operations units and maintain their standard patrol duties, except when called to respond to potential behavioral or mental health crisis events where the officers may be required to respond outside of their assigned patrol district.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | Met | Missed |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☒ Met | ☐ Missed |
| 2. Training on basic behavioral health is consistent with approved policies and includes general instruction on the CIT program. | ☒ Met | ☐ Missed |
| 3. 95% of officers are trained and certified in basic behavioral health (or are scheduled for training, in the case of mid-year reviews) | ☐ Met | ☒ Missed |
| 4.  Training on crisis intervention for CIT officers is consistent with approved policies. | ☒ Met | ☐ Missed |
| 5. 100% of officers assigned to CIT are trained and certified in crisis intervention. | ☒ Met | ☐ Missed |
| 6. 100% of all officers assigned to CIT meet eligibility requirements. | ☒ Met | ☐ Missed |
| 7. 95% of responses to incidents involving persons in mental health crisis are within policy. | ☐ Met | ☒ Missed |
| 8. The incident tracking system tracks all incidents involving persons in mental health crisis and the disposition of the incident. Data analyzed as part of PRPB's annual report on use of force as required by policy. | ☐ Met | ☒ Missed |

*Compliance Assessment*

PRPB has since adopted the Monitor's recommendation that the CIT program be simultaneously expanded to all Area Commands. PRPB has also selected CIT Coordinators with a minimum rank of sergeant in all Area Commands who are currently identifying prospective CIT officers. The Monitor's Office is encouraged with the expansion of the program to all areas. Rolling out the program in stages, as previously suggested, would have resulted in a substantial, two-year delay in implementing it Bureau-wide. The Monitor's Office understands that establishing CIT teams in all areas in an expedited

manner may be difficult initially. However, the presence of CIT trained officers, Bureau-wide, will enhance PRPB's ability to handle calls for service involving persons in crisis, especially those related to "Ley 408" Court Ordered "Involuntary Commitment."

Those officers selected to be certified as CIT officers (40 hours of training) will continue in their normal capacity as patrol officers. PRPB expects that approximately an additional 180 officers will be selected and trained. This will also provide PRPB the flexibility to have a CIT officer on each shift in each Area Command. PRPB has provided training to field personnel and dispatchers relating to CIT, assuring the Monitor's Office that training levels suffice to ensure that a CIT officer will be assigned to each shift once CITs are established in each of the 13 police areas. PRPB provided documentation that 10,276 officers have received basic training in "Intervention with Persons in Crisis". Of those, 1,482 officers were trained during the CMR-5 reporting period. The PRPB Academy similarly reports that all PRPB officers who have yet to receive the eight-hour basic CIT training, will do so virtually. As noted in various sections of this report, virtual training was halted when issues relating to the integrity of the training were brought forth. As such, no virtual trainings were conducted during the reporting period.

For the CMR-5 period covered, PRPB reported 16 cases of interactions with persons in crisis:

- Aibonito: 7
- Arecibo: 3
- Bayamon: 1
- Mayaguez: 1
- San Juan: 4

However, it should be noted that in the random sample of 58 UOF incidents reviewed for CMR-5, there were 9 "Ley 408" Court Ordered "Involuntary Commitment." These orders thus constituted 16% of the UOF incidents reviewed in the sample. These individuals would certainly fall within the definition of a person in crisis. If that proportion was to hold for the total 803 UOF incidents from which the sample of 58 incidents was drawn for the period, the number of persons in crisis could reach over 100.

*Pathway Forward*

PRPB must accelerate the expansion and subsequent training of CIT to the 13 Area Commands. The Monitor is aware that PRPB has already begun the process of expanding the CIT and is currently in the process of selecting personnel in each of the areas to undergo the training and be appointed as CIT officer. Further, the Monitor encourages PRPB to assess the issues and noted areas for improvement derived from the pilot project in Arecibo and ensure that these are addressed prior to the expansion.

As previously stated, PRPB's policy to send district/precinct officers to ACT 408 orders (involuntary admission to a hospital for psychiatric evaluation) by the court should be reviewed. In the random sample for the CMR-5 period there were nine cases of this, which projects to a significant number over the entire period for the 803 total reported UOFs.  Many have resulted in an electronic control device being used against the subject or some other non-lethal weapon utilized. Utilizing a trained CIT officer in these circumstances may result in less UOF. The Monitor's Office recommends that once the CIT program has been expanded to other Area Commands, a protocol should be established that calls for

service relating to involuntary committal (ley 408) will be handled by on-duty CIT officers, where possible.

## Paragraph 57: Use of Force - Responding to Behavioral/Mental Health Crisis

*PRPD shall train PRPD field operations unit officers in the CIT program and shall ensure that CIT-trained officers are assigned to each shift in each police region. PRPD shall provide crisis intervention training to all dispatchers to enable them to identify calls for service that involve behavioral or mental health crisis events.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. 95% of shifts have at least one CIT-trained and certified officer. | ☐ Met | ☒ Missed |
| 2. Training on crisis intervention for call dispatchers is consistent with approved policies. | ☒ Met | ☐ Missed |
| 3. 95% of call takers are trained and certified in crisis intervention (or are scheduled for training, in the case of mid-year reviews) | ☐ Met | ☒ Missed |

Note: Training on the CIT program for field operations officers is evaluated as part of the basic behavioral health training in Paragraph 56.

*Compliance Assessment*

As determined in previous reports, PRPB implemented a CIT Pilot Project in the Arecibo Area Command which concluded in November 2020. Fifteen officers from the Arecibo Area Command participated in the training as CIT First Response Officers. The training for CIT officers took place at the PRPB Academy during a previous reporting period. Officers were required to pass a written exam at which point they could proceed to the Scenario Based Training segment. The course, (CITE 8061) "Intervention Team in Crisis," consisted of 40 hours of training. PRPB provided the course curriculum as well as a certified list of those who were trained to the Monitor's Office.

On April 30, 2021, PRPB provided the Monitor's Office with a proposed revised GO 600-628, Intervention with People in Crisis, for review as per paragraph 229 of the Agreement. The draft policy called for PRPB to phase in the CIT program Bureau-wide over the course of two years. The Monitor's Office found this timeline for implementation to be problematic and again voiced its concern. It was the Monitor's understanding that the purpose of the Arecibo pilot project was to develop a working program, which once established, would be rolled out to the remaining 12 Area Commands.

The Chief Monitor addressed this issue with the commanding officer of the Reform Unit, and after some discussion, PRPB has since adopted the Monitor's recommendation that the CIT program be simultaneously expanded to all Area Commands. PRPB has also selected CIT Coordinators with a minimum rank of sergeant in all Area Commands (documentation provided) who are currently identifying prospective CIT officers. PRPB provided the Monitor's Office with the rating form that PRPB will use for prospective candidates to the program.

The Monitor's Office is encouraged with the expansion of the program to all areas. Rolling out the program in stages would have resulted in a substantial delay in implementing it bureau-wide, in this case, two years from the signing of the General Order. The Monitor's Office understands that establishing CIT teams in all areas in an expedited manner may be difficult initially given that support services may not be available in the early stage in some areas. However, the presence of CIT trained officers, Bureau-wide, will enhance PRPB's ability to handle calls for service involving persons in crisis, especially those related to "ley 408 Involuntary Commitment Orders."

Officers selected to be certified as CIT officers will continue in their normal capacity as patrol officers. PRPB expects that approximately an additional 180 officers will be selected and trained. This will provide PRPB the flexibility to have a CIT officer on each shift in each Area Command as outlined in the Agreement.

In relation to the eight-hour basic training course which all field members of PRPB are to receive, PRPB provided information that due to the pandemic, no additional in-person training was provided to PRPB personnel during the CMR-5 period. PRPB provided the Monitor's Office with the four new training modules utilized in officer training as well as the exam utilized to determine the level of proficiency in the material presented.  To that end, PRPB provided information that 1,482 PRPB officers were trained (virtually) during the months of April and May 2021 bringing the total number of trained officers to 10,276. 8,794 officers were trained in-person 2018 and 2019.

*Pathway Forward*

As noted above, PRPB must accelerate the expansion and subsequent training of CIT to the 13 Area Commands. The Monitor is aware that PRPB is in the process of developing and reinstating its virtual training and expects once completed, it will resume the virtual eight-hour basic CIT training course. Having developed a curriculum and training for the CIT program and having tested it in the field (Arecibo), the Monitor's Office expects PRPB to make substantial progress in implementing the program bureau-wide. The training of officers to handle individuals with mental health issues so that such incidents do not escalate into confrontations in which PRPB members use force is paramount.

The Monitor understands that the implementation of the eight-hour in-person bureau-wide training was significantly impacted by the COVID-19 pandemic. Nevertheless, the Monitor's Office expects to see significant progress in training all PRPB personnel in crisis intervention as the CIT pilot project is expanded to all Area Commands.

## III. Searches and Seizures: Internal Controls and Accountability

The Monitor's review of the paragraphs within this section were largely based on the review of the sampled arrest and search warrant files. In his review of 82 arrest files, the Monitor found that most were incomplete, lacking required PPR forms and/or documented probable cause. Of the 64 search warrant files reviewed, under half of the files were missing required forms, such as the police report (PPR-621.1), the Egress/Ingress form (PPR-631.1), and others.

The lack of documentation of probable cause in police reports persists despite the Monitor having alerted PRPB of this problem in past semi-annual reports. In particular, the Monitor found that 100% of the Highway Patrol Division's (HPD) reviewed cases lacked documented probable cause for arrest or detention.

Furthermore, during this reporting period, the Monitor's Office learned through the press that officers from the Highway Patrol Division had arrested five individuals suspected to have entered the United States (Puerto Rico) illegally. The Monitor requested information from PRPB, specifically the arrest report and all other police reports related to this incident. The Monitor's review of the arrest reports and other documentation submitted by PRPB found that:

> The officers stated in their report that they had stopped the motor vehicle because it was speeding on the highway (75 MPH). The driver produced a valid driver's license and proper documentation for the vehicle. However, the officers failed to document on the 621.1 police report specifically how they determined the passengers were undocumented immigrants and the probable cause for arresting, transporting, and holding them at the police facility until they were picked up by federal authorities. Supervisors and commanders who reviewed the arrest reports also failed to recognize that the officers had not given enough detailed information to conclude that they had the required probable cause to detain and arrest those individuals.

After conducting his review, the Monitor concluded that the arrests appeared to be in violation of PRPB GO 600-626, Intervention with Foreign Persons, which prohibits PRPB officers from detaining a person with only the intention of determining his/her immigration status (See Section III.A.1 and prohibits officers from detaining a person for a time longer than required by the ordinary process of detention or arrest (See Section III.A.2). Once the officers received a valid driver's license and legal registration for the vehicle from the driver, there does not appear to be any justification for further detaining and questioning the driver and his passengers, and no grounds to inquire into their immigration status.

Based on this information the Monitor requested that PRPB open an administrative investigation into this incident to determine whether these officers violated PRPB policy. For more detailed information about this case and the Monitor's review, please see Appendix E.

Additionally, in review of the arrest files, the Monitor noted that most copies of the PRPB Miranda Rights form (PPR-615.4) lack a witness signature, although the form requires that officers have a witness sign

the form, along with the officer reading the rights to the subject.[5] This issue has also been called to the attention of PRPB by the Monitor in the past, but there has been no progress.

Included in the arrest and search and seizure files received by the Monitor were 27 consent searches. In this area, PRPB's performance has improved. Of these 27 files, 26 (96%) had consent properly documented on the Consent Search Form (PPR-612.1), with just one lacking a description of the place or item to be searched.

Training on arrests, searches, and seizures has been delayed for over a year, due to a variety of factors that have undermined in-person and virtual training in the PRPB. PRPB's virtual training system was compromised due to issues with its integrity, and in-person training is very limited due to COVID-19 restrictions.

Overall, PRPB's compliance with the 22 paragraphs assessed during this reporting period within Search and Seizures reflect similar levels of compliance to what was noted in previous reports. In CMR-4 37% of paragraphs were assessed as Partially Compliant, in comparison to the current reporting period, where 36% of paragraphs assessed were found to be Partially Compliant. See figure 5.



*Figure 5. Searches and Seizures: Paragraph Compliance Status*

## Paragraph 58: Searches and Seizures - General Provisions

*PRPD shall ensure that all investigatory stops, searches, and arrests are conducted in accordance with the rights, privileges, or immunities secured or protected by the Constitution and laws of the United States and the Commonwealth of Puerto Rico. PRPD shall ensure that investigatory stops, searches, and arrests are conducted as part of effective crime prevention strategies that are consistent with community priorities for enforcement.*

| Compliance Status | Assessment Schedule | |
|---|---|---|
| Partially Compliant | Review | April 2021 – September 2021 |

---

[5] Also see GO 600-615 Section V.B.5.e, page 19.

| | | | |
|---|---|---|---|
| Policy: | Implemented | Period | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

## Compliance Targets

Note: Compliance will be determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 59-79, and (2) the results of outcome assessments, pursuant to Paragraph 243.

## Compliance Assessment

PRPB's General Orders on Searches and Seizures (600-612) and on Arrests and Summons (600-615) were last submitted to the Monitor for review in August 2021 and October 2021 respectively. These General Orders provide officers with the legal parameters for conducting searches, whether by search warrant, incident to arrest, inventory searches, or consent searches, as well as proper arrest procedures, including arrests made under probable cause or by an arrest warrant. They both state the potential consequences for violating PRPB policies and laws and the Constitution of the Commonwealth and the U.S.A.

Although PRPB instituted a virtual training system that has helped keep personnel up to date on training, the Monitor has not had an opportunity to review that system to determine its validity and effectiveness. In addition, in 2021 PRPB discovered that several officers had misused the virtual training system, and as a result ceased all virtual training, delaying the required training. Finally, in-person practical exercises have not taken place since 2020 due to COVID-19 restrictions, though they are required on certain policies such as General Orders 600-612, 600-601, and 600-615.

Furthermore, during this reporting period, the Monitor's Office learned through the press that PRPB had arrested five individuals suspected of having entered the United States (Puerto Rico) illegally. The Monitor requested and reviewed all documentation provided by PRPB on this incident. Upon completion of his review, the Monitor offers several observations and comments in Appendix E. Aside from questions about the legality of the detention and arrests of the individuals involved and noted policy violations, many of the issues noted within the Monitor's memo (i.e., noting probable cause within the reports) are similarly noted in the Monitor's assessment of the arrests files examined.

## Pathway Forward

The Monitor's Office was informed that the Bureau is in the process of partnering with a new vendor to develop, revise, and implement its virtual training programs. The Monitor will review and evaluate the virtual training on all policies, as well as in-person training, and continue to assess compliance in these areas.

## 1. Stops, Searches, and Seizures

PRPB has created sound policies that guide officers in conducting arrests, stops, and searches that comport with applicable laws and generally accepted policing practice. However, many officers are not

properly documenting probable cause in their arrest reports, and supervisors are failing to take action to correct the issue. The Monitor has called this to the attention of PRPB in past reports but has seen little progress in this area. PRPB has informed the Monitor that they are preparing a system to track and analyze traffic stops to comply with the Agreement.

As with nearly all in-service training in PRPB, training on stops, searches, and seizures has been negatively affected by several recent challenges. In-person training has suffered due to government-imposed restrictions because of the pandemic which began in 2020. All virtual training has been stopped while an investigation is conducted into an incident in which the virtual training system was compromised by some officers.

## Paragraph 59: Searches and Seizures - General Provisions

*PRPD shall develop policies and procedures that comply with applicable law and comport with generally accepted policing practices on stops, searches, and arrests; provide training; ensure consistent supervision; and hold officers accountable for complying with applicable law and policy. PRPD policies shall define all terms clearly and provide guidance on the facts and circumstances that should be considered in initiating, conducting, terminating, and expanding an investigatory stop, detention, or search.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2020 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

Note: Implementation is assessed as part of the compliance reviews for Sections B (Paragraphs 60-64), C (Paragraphs 65-73), and D (Paragraphs 74-77) on Investigatory Stops and Searches, Arrests, and Searches, respectively.

Note: The policy requirements of this paragraph is assessed with Paragraphs 65, 72, 74, and 78.

Note: Training is assessed as part of Section E (Paragraphs 78-79) on Training on Stops, Searches, and Seizures.

### *Compliance Assessment*

General Orders 600-612 and 600-615 provide officers with the legal parameters for conducting stops and searches, whether by search warrant, incident to arrest, inventory searches, or consent searches, as well as proper arrest procedures, including arrests made under probable cause or by an arrest warrant. However, supervisors are not holding their officers accountable for failing to state clearly in the police report (PPR-621.1) the probable cause they had for the arrest. For example, the Monitor reviewed 82 arrest files and 64 search warrant files for this period. 17 arrest files and 2 search warrant files failed to properly document probable cause in the police report (PPR-621.1). In addition, 13 search warrant files

72

and 9 arrest files contained no copy of the police report, forcing the Monitor to look at other PRPB documents to ascertain whether probable cause existed. Per GO 600-615, it is the responsibility of the officers and supervisors to ensure all forms are properly completed and probable cause documented in PPR-621.1 (See Section III.B.7.f.21.a. page 13 of GO 600-615). The Monitor saw no evidence that supervisors had taken corrective measures to remedy the situation.

There is evidence, however, that some officers acted on proper probable cause to make the arrest even if they did not document it, as 6 of the 17 arrest files with no probable cause documented were approved by the District Attorney to proceed as a case, while 5 cases had the charges dropped. Another six arrest files did not provide enough information to determine whether charges were filed.

*Pathway Forward*

When reviewing arrest files, supervisors must ensure that officers provide details of the reason, or probable cause, they relied on to make the arrest and, crucially, that they fully document it in their report. The solution may be as simple as additional supervisory training in establishing and properly documenting probable cause and/or supervisors taking corrective steps before submitting arrest reports for final approval.

## 2. Investigatory Stops and Searches

As of the CMR-5 reporting period, PRPB has no policy on investigatory stops and searches, other than GO 600-612 which governs searches and seizures. PRPB allows investigatory stops of motor vehicles based on probable cause only (See GO 600-612, Section III.B.14.B.1, page 16). For this reason, the Monitor has concentrated on closely reviewing those cases involving the unit that conducts most of the motor vehicle traffic stops in PRPB, the Highway Patrol Division. The Monitor had access to a small number of randomly selected traffic stops conducted by the Highway Patrol Division. Almost all arrest files failed to document probable cause for the stops and arrests, but nonetheless were submitted up the chain of command for approval with no remedial action taken by supervisors.

PRPB does not currently collect or track data on any type of stops but has informed the Monitor that they are working with the Office of the Special Master to develop a policy and system to track and analyze traffic stops by its officers. This will help PRPB to achieve partial compliance, however, for full compliance, PRPB must device a method to track, collect, and analyze all stop data, regardless of whether an arrest is made.

### Paragraph 60: Searches and Seizures - Investigatory Stops and Searches

*PRPD shall develop an Investigatory Stops and Searches Reporting Policy and a system to collect data on all investigatory stops and searches, whether or not they result in an arrest or issuance of a citation. PRPD's stop data collection system shall be subject to the review and approval of the TCA, and shall require officers to document the following: (a) the date, time, location, and duration of the stop and/or search; (b) the reason for the stop and/or search; (c) the subject's apparent race, color, ethnicity or national origin, gender, and age; (d) whether any contraband or evidence was seized, and the nature of the contraband or evidence; and (e) the disposition of the stop, including whether a citation was issued or an arrest made. PRPD shall require that officers*

*submit written reports regarding investigatory stops and searches to their supervisor by end of shift for review. A copy of these reports shall be forwarded to SPR and the Reform Unit for tracking and analysis.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

1. 100% of stops and searches are justified based on probable cause. For stops and searches based on a lesser standard or that are otherwise unjustified, PRPB takes corrective and/or disciplinary action. ☐ Met ☑ Missed

2. 100% of stops and searches reviewed as part of other areas of the Agreement are based on probable cause. For stops and searches based on a lesser standard or that otherwise unjustified, PRPB takes corrective and/or disciplinary action. ☐ Met ☑ Missed

Note: PRPB has not authorized investigatory or Terry stops based on reasonable suspicion. For Paragraphs 60-64, the Monitor's Office will assess the basis for stops and arrests based on probable cause.

### Compliance Assessment

PRPB has stated that it only allows officers to make investigatory stops based on probable cause. While reviewing arrest files the Monitor noted that the HPD tended to not properly document probable cause in the police report for several DUI arrests, and the language used by several officers assigned to different patrol units within HPD was brief and repetitive. The Monitor reviewed nine randomly selected arrest files from this division, and found that eight failed to document probable cause, while the remaining case file only included a copy of an accident report. Charges were dropped in four of those cases, and three did not provide enough information to determine whether charges were filed. PRPB has not provided the Monitor with any evidence that it is taking corrective measures against these officers and supervisors.

### Pathway Forward

As noted in Paragraph 59, to achieve compliance PRPB must provide additional training to officers and supervisors in establishing and properly documenting probable cause and/or supervisors must take corrective steps before submitting arrest reports for final approval. The implementation of a tracking and analysis system for at least traffic stops will help PRPB show progress towards compliance in this area. However, the implementation of a tracking, collection, and analysis system for all investigatory stops is required under the Agreement.

## Paragraph 61: Searches and Seizures - Investigatory Stops and Searches

*PRPD's Investigatory Stops and Searches Reporting Policy shall explicitly prohibit the use of boilerplate or conclusory language in all reports. PRPD policies shall also expressly prohibit officers from knowingly using or relying on information known to be materially false or incorrect in effectuating an investigatory stop or detention.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: This Paragraph is assessed with Paragraph 60.

### Compliance Assessment

PRPB's Search and Seizure Policy clearly prohibits officers from using boilerplate, conclusory, or materially false language (GO 600-612, Section III.B.4.b), as does the policy on Arrests and Summons (GO 600-615, Section III.B.6.iv.d, page 5 and Section III.B.7.f.21.d, page 13). Nevertheless, the Monitor observed that many officers regularly use repetitive language. Such was the case, especially, in the HPD. In the case of a DUI arrest, for example, officers often substituted detailed reports of the incident with statements such as, "The [subject] was arrested for driving under the influence of alcohol. The [subject] was taken to [a police facility] for a sobriety test and the result was..." Additionally, as stated in the review of Paragraph 60 above, PRPB supervisors have failed to ensure that officers properly document probable cause for stops and arrests, not only in the HPD, but also in many other police districts. There was a total of 17 arrest files with no probable cause documented, and 9 additional files did not include a police report.

### Pathway Forward

As stated above, to achieve compliance PRPB must provide additional training to officers and supervisors in establishing and properly documenting probable cause. Properly documenting probable cause in detail will help officers avoid being repetitive in their reports, as each case has unique facts and circumstances.  Also, supervisors must take corrective steps when they detect an issue and ensure that arrest files contain all the applicable PPR forms before submitting arrest reports for final approval.

## Paragraph 62: Searches and Seizures - Investigatory Stops and Searches

*A supervisor shall review each report on Investigatory Stops and Searches to determine whether the stop or search was within PRPD policy and this Agreement. For any investigatory stop or search deemed to be outside*

*of PRPD policy or this Agreement, the supervisor shall determine if the stop or search: (a) should result in an internal investigation by SPR; (b) indicates a need for additional training, counseling, or any other non-punitive corrective measure for the involved officer; and (c) suggests the need for revising or reformulating agency policy, strategy, tactics, or training. The supervisor shall document on an auditable form those investigatory stops and searches that are unsupported by reasonable suspicion; are in violation of PRPD policy or this Agreement; or that indicate a need for corrective action or review of agency policy, strategy, tactics, or training. The quality of these supervisory reviews shall be taken into account in the supervisor's performance evaluations.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 60.

*Compliance Assessment*

PRPB only allows officers to conduct investigatory stops when based on probable cause and does not track all contacts with the public unless there is an arrest. PRPB HPD, due to the nature of its assignment, usually conducts more traffic stops than other PRPB units. For this reason, the Monitor focused on several randomly selected motor vehicle traffic stops conducted by this division, which has patrol responsibility across the entire island. The Monitor has found that most HPD officers fail to document probable cause for the stop or the arrest. Out of nine such cases reviewed, eight (all for DUI) failed to document probable cause in the police report; the ninth case contained only a motor vehicle accident report. Four of the nine cases had the charges dropped, and three did not provide enough information for the Monitor to determine whether charges were filed. Failing to document probable cause properly is a violation of PRPB GO 600-615 and 600-612, but there is no indication that supervisors or commanders took any action to correct the problem, especially given that basic training or counseling could have addressed the issue. Furthermore, the Monitor made inquiry regarding SARP investigations concerning these types of policy violations, and none were found.

As noted in the review of Paragraph 58, the Monitor's Office learned through the press of the arrest of five individuals who were suspected to have entered the United States (Puerto Rico) illegally by HPD. The Monitor requested and reviewed all documentation provided by PRPB on this incident. Upon completion of his review, the Monitor offered several observations and comments, which are provided in Appendix E.

*Pathway Forward*

Training and thorough reviews of arrest reports by supervisors and commanders is of upmost importance to remedy the practice of improperly documenting probable cause. The Monitor encourages PRPB to address these issues and reiterate policy requirements through virtual training, in-person training (when reinstated), supervisory training, and, potentially, roll-call training sessions.

## Paragraph 63: Searches and Seizures - Investigatory Stops and Searches

*A command-level officer or official shall review, in writing, all supervisory auditable forms related to investigatory stops and detentions. The commander's review shall be completed within three business days of receiving the document reporting the event. The commander shall evaluate the corrective action and recommendations in the supervisor's written report and ensure that all appropriate corrective action is taken, including referring the incident for administrative or criminal investigation.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 60.

*Compliance Assessment*

In all cases where there was a supervisor review, the director (or commander) simply re-stated what the supervisor had said and signed off. There was no indication in the files that commanders made any effort to correct the weaknesses in the supervisory reviews. Out of 53 supervisory arrest reviews submitted, 29 lacked a proper determination of probable cause, while the other 24 had good reviews.

*Pathway Forward*

Supervisors and commanders need additional training in examining reports for proper probable cause documentation and taking corrective action when necessary. The Monitor would like to highlight some supervisor arrest reviews that properly examined the officer's reasoning for the arrest: Complaint #2021-10-199-932, #2021-13-010-2801, #2021-8-216-01541, and #2021-1-182-5433. The reviews of these incidents could serve as examples on how to complete an arrest review form in compliance with PRPB policy.

## Paragraph 64: Searches and Seizures - Investigatory Stops and Searches

*At least annually, PRPD shall analyze investigatory stop and search data to determine significant trends, identify and correct deficiencies revealed by this analysis, and document its findings in a public report.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 60.

*Compliance Assessment*

PRPB does not presently have a system to collect or track investigatory stop and search data or motor vehicle traffic stops or interventions.

*Pathway Forward*

The implementation of a tracking, collection, and analysis system for all investigatory stops, regardless of its outcome, is required under the Agreement. The Monitor notes that the Office of the Special Master is working with PRPB to examine and assist in developing a tracking and collection system for traffic stops. The development of this system will help PRPB demonstrate some progress toward compliance in this area.

## 3. Arrests

PRPB's arrest policy, GO 600-615, complies with applicable laws and U.S. and Puerto Rico constitutional mandates, as well as generally accepted policing practices. It also complies with the requirements of the Agreement, as it warns officers not to engage in any action in violation of PRPB policies or in any criminal activity. It further warns officers of the consequences they may face in these cases. As of this reporting period, the policy was under review. As noted throughout this report, training has been delayed due to integrity issues with the virtual training system and COVD-19 restrictions on in-person training. Additionally, the documenting of probable cause in police reports, as required by policy and the Agreement, continues to be a serious issue. Arrests files are incomplete, missing forms, and lacking documentable probable cause in many cases. It also appears to the Monitor that supervisors and commanders are not addressing these shortcomings as they review and approve these arrests.

78

## Paragraph 65: Searches and Seizures - Arrests

*PRPD shall revise its policies on arrests to ensure that they comply with applicable law and comport with generally accepted policing practices.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually with respect to Data Source #1. Bi-annually for all others. |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. Polices and forms incorporate all of the requirements of Paragraphs 59, 65-71. | ☒ Met | ☐ Missed |
| 2. 95% of selected arrests are notified and reviewed by supervisors in accordance with approved policies. | ☐ Met | ☒ Missed |
| 3. Officers transport arrestees and complete required arrest documentation in accordance with approved policies in 95% of selected arrests. | ☒ Met | ☐ Missed |
| 4a. Supervisors respond to injuries and complaints of pain by detainees or arrestees in accordance with approved policies in 95% of selected arrests. | ☒ Met | ☐ Missed |
| 4b-e. Supervisors review, document, and take corrective action, including making referrals when necessary, as required by approved policies in 95% of selected arrests. | ☐ Met | ☒ Missed |
| 5. Unit commanders review, document, and take corrective action, including making referrals when necessary, as required by approved policies in 95% of selected arrests. | ☐ Met | ☒ Missed |

Note: Training is assessed as part of Section E (Paragraphs 78-79) regarding Training on Stops, Searches, and Seizures.

### *Compliance Assessment*

PRPB GO 600-615 and all related forms comply with the Agreement requirements, but training has been delayed due to integrity issues with the virtual training system and COVD-19 restrictions on in-person training. Notification of arrests are being sent to the Command Center. However, supervisors are failing to review arrest reports properly per policy. The Monitor reviewed 82 arrest files, which contained 53 arrest reviews by supervisors. Seventeen of those reviews (32%) failed to establish probable cause, and nine others (17%) contained no police reports. Yet, supervisors and unit commanders took no corrective measures in any of these cases. No referrals were made to re-train or counsel the officers or supervisors.

Officers duly transport arrestees to the police station or detention facility but complete the required arrest forms in only some applicable cases. Of the 82 arrest cases reviewed, the Monitor noted that 63 (77%) did not meet compliance with these requirements in part or in whole, as most cases were missing some applicable form or did not provide an explanation for its absence. However, there is indication on

79

the Egress/Ingress forms that supervisors do check arrestees for injuries and provide medical assistance when necessary.

*Pathway Forward*

Officers, supervisors, and commanders need additional training and/or counseling in how to write detailed police arrest reports so that any reasonable person reading it can come to the conclusion that the officer had enough information to conduct the arrest. It is obvious in many cases that officers were acting on probable cause when making arrests, thought they failed to document it, as the District Attorney approved 6 of the 17 arrest files to go before a judge. In addition, PRPB must ensure that all applicable forms be included in each arrest file, as per PRPB policy 600-615.

## Paragraph 66: Searches and Seizures - Arrests

*PRPD shall require that officers notify the communications command center and a supervisor immediately after an arrest, or as soon as practicable. For felony arrests, or an arrest for obstructing or resisting an officer, PRPD shall require a field supervisor to respond to the scene of the incident and approve the officer's arrest determination, based on the existence of probable cause. If an officer's arrest determination is insufficient, or otherwise unjustified, the supervisor may, if necessary, interview the subject. The supervisor shall take appropriate action to address violations or deficiencies in an officer's arrest determination, including releasing the subject, recommending non-punitive corrective action for the involved officer, or referring the incident for administrative or criminal investigation. If a supervisor is unavailable to respond to the scene or there are exigent circumstances, the officer shall notify his or her immediate supervisor over a recorded channel of the elements of probable cause for the felony arrest or arrest for obstructing or resisting an officer. If the officer's immediate supervisor is unavailable, the officer shall notify any field supervisor over a recorded channel of the elements of probable cause for the felony arrest or arrest for obstructing or resisting an officer.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually with respect to Data Source #1. Bi-annually for all others. |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 65.

*Compliance Assessment*

Notification of arrests are being sent to the Command Center. However, supervisors are failing to review arrest reports properly per policy. The Monitor reviewed 82 arrest files, which contained 53 arrest reviews by supervisors. Seventeen of those reviews (32%) failed to establish probable cause, and nine others (17%) contained no police reports. Yet, supervisors and unit commanders took no corrective measures in any of those cases. No referrals were made to re-train or counsel the officers or supervisors.

Included in the arrest data submitted by PRPB to the Monitor were four arrests for resisting an officer, obstruction of justice, and/or assaulting an officer. In two cases in Fajardo (Complaint #2021-12-400-187) and Aguadilla (Complaint #2021-10-037-3420) the supervisor responded and found the officers had good probable cause; in the Aibonito case (Complaint #2021-13-005-02743) the supervisor did not respond, but reviewed the arrest and failed to document probable cause, although probable cause was found by the District Attorney and the Judge in the case; In a San Juan Case (Complaint #2021-1-182-004768), there was no arrest, as this was a sick assist (subject attempting suicide assaulted the officers and was taken to the hospital).

### *Pathway Forward*

Officers, supervisors, and commanders need additional training and/or counseling in how to write detailed police arrest reports so that any reasonable person reading them can come to the conclusion that the officer had enough information to conduct the arrest. It is obvious in many cases that officers were acting on probable cause when making arrests, thought they failed to document it, as the District Attorney approved 6 of the 17 arrest files to go before a judge.

### Paragraph 67: Searches and Seizures - Arrests

*When transporting an arrestee, officers shall take the safest and most direct route to the booking location. PRPD policy shall require that officers notify the communications command center of the starting and ending mileage on the transporting vehicle, as well as the gender, race, ethnicity, national origin, and apparent age of the arrestee. The officer shall complete all written arrest forms and booking recommendations at the time an arrestee is presented at any PRPD precinct, station, or specialized unit for booking.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually with respect to Data Source #1. Bi-annually for all others. |
| Practice: | Not Implemented | | |

### *Compliance Targets*

Note: This Paragraph is assessed with Paragraph 65.

### *Compliance Assessment*

The route taken by officers to transport arrestees cannot be determined by the Monitor. The Monitor is not aware of any mapping software employed by PRPB to track officers' route of travel when transporting an arrestee. Only 21 of the 82 arrest files reviewed had a PPR-126.2 Centro de Mando (Communication or Command Center) dispatch form, where demographic information is to be recorded. However, when examining those dispatch forms, only a few gave information about the arrestee, and in most cases the information was partial. It was difficult for the Monitor to determine whether officers

had completed all arrest forms when processing arrestees at the police station or specialized unit. As reported previously, of the 82 arrest cases reviewed, the Monitor rated 63 at "Partial Compliance" or "Non-Compliance" due to missing applicable arrest forms or not providing an explanation for their absence.

## Pathway Forward

PRPB must ensure officers provide all the pertinent demographic information of arrestees when available to Centro de Mando, and that Centro de Mando records such information on the dispatch form (PPR-126.2). Officers and supervisors should also ensure this information is recorded on the police report (PPR-621.1).

### Paragraph 68: Searches and Seizures - Arrests

*At the time of presentment at a PRPD precinct, station, or specialized unit, a watch commander or supervisor shall visually inspect each detainee or arrestee for injury, interview the detainee or arrestee for complaints of pain, and ensure that the detainee or arrestee receives medical attention from an appropriate medical provider, as necessary.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually with respect to Data Source #1. Bi-annually for all others. |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: This Paragraph is assessed with Paragraph 65.

### Compliance Assessment

There is an indication on the Egress/Ingress forms (PPR-631.1) provided to the Monitor that supervisors do check arrestees for injuries and provide medical assistance when necessary. However, 21 out of 82 arrest files reviewed (26%) did not contain the form as required by policy. Egress/Ingress Forms were missing from 5 out of 64 search warrant files (8%).

### Pathway Forward

Officers and supervisors should ensure the Egress/Ingress Form (a.k.a. the Booking Sheet, PPR-631.1) is properly completed and included in all arrest files, unless there is a proper explanation for its absence. This explanation should be formally documented and included in the file.

## Paragraph 69: Searches and Seizures - Arrests

*PRPD shall require that all booking recommendations be personally reviewed and approved in writing in an auditable form by a supervisor as to appropriateness, legality, and conformance with PRPD policies within 12 hours of the arrest, absent exceptional circumstances. Supervisors shall also examine arrest reports and forms related to the arrest for boilerplate or conclusory language, inconsistent information, lack of articulation of the legal basis for the action, or other indicia that the information in the reports or forms is not authentic or correct. Supervisors shall evaluate each incident in which a person is arrested for interfering with a police officer, resisting arrest, assault on a police officer, or other similar charge to determine whether the incident raises any issue or concern regarding the basis for the arrest or implications on training, policies, or tactics.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually with respect to Data Source #1. Bi-annually for all others. |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: This Paragraph is assessed with Paragraph 65.

### Compliance Assessment

Supervisors are reviewing and approving arrests by their officers on PPR-615.8, as required by policy. However, of the 53 PPRs-615.8 reviewed by the Monitor only 24 (45%) were found to be compliant with the requirements of this paragraph and policy. The remaining 29 (55%) were rated partially compliant or non-compliant due to lack of articulation of probable cause and failure on the part of the supervisor to point out boiler-plate language in police reports, especially those completed by the island-wide HPD.

### Pathway Forward

PRPB should hold officers and supervisors accountable for properly completing arrest forms as required by policy and this Agreement. Accountability is important in ensuring compliance with this policy. PRPB has provided officers and supervisors with the original training on this subject. However, as noted throughout this section, added supervisory in-service training would assist in reinforcing these requirements, whether conducted in person, virtually, or via roll call.

## Paragraph 70: Searches and Seizures - Arrests

*As part of the supervisory review, the supervisor shall document on an auditable form those arrests that are unsupported by probable cause, are in violation of PRPD policy or this Agreement, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or training. The quality of these supervisory reviews shall be taken into account in the supervisor's performance evaluations.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually with respect to Data Source #1. Bi-annually for all others. |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 65.

*Compliance Assessment*

In his review of 82 arrest files, the Monitor observed 13 cases (16%) that were dismissed for lack of probable cause or other issues, yet the Monitor has not been provided with any evidence or form where supervisors note arrest cases that they find to be unsupported by probable cause or in violation of PRPB policy or this Agreement. Nor has there been any evidence of re-training or disciplinary action taken by supervisors or commanders. This may be an indication that some officers lack a clear understanding of the legal requirements for arrests or what entails probable cause.

*Pathway Forward*

As noted above, additional training in Fourth Amendments issues for supervisors and officers may be needed. Supervisors must be held accountable for the proper supervision of their officers as required by PRPB policy. It is essential for PRPB to demonstrate compliance with this paragraph.

## Paragraph 71: Searches and Seizures - Arrests

*A command-level officer or official shall review, in writing, all auditable forms related to arrests. The commander's review shall be completed within seven days of receiving the document reporting the event. The commander shall evaluate the corrective action and recommendations in the supervisor's written report and ensure that all appropriate corrective action is taken. Whenever a reviewing supervisor or command-level officer finds evidence of an arrest indicating apparent misconduct or apparent criminal conduct by an officer, he or she shall immediately notify his or her supervisor for referral to the appropriate investigating unit or the PRDOJ. The Superintendent shall be notified of the referral.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | | |

84

|  Practice: | Not Implemented | Assessment Frequency | Annually with respect to Data Source #1. Bi-annually for all others. |
|---|---|---|---|

### Compliance Targets

Note: This Paragraph is assessed with Paragraph 65.

### Compliance Assessment

In his review of 82 arrest files, the Monitor observed that 13 cases were dismissed for lack of probable cause or other issues, yet the Monitor has not been provided with any evidence or form where commanders recommend disciplinary action in cases found to be unsupported by probable cause or in violation of PRPB policy or this Agreement. Nor has there been any evidence of re-training or disciplinary action taken by supervisors or commanders in these cases. In all cases where supervisors failed to ensure officers documented probable cause, commanders took no action and simply signed off on the supervisors' recommendations. Such was the case in 29 of 53 supervisory reviews (55%) submitted to the Monitor. This may be an indication that some officers and/or supervisors lack a clear understanding of the legal requirements for arrests or what entails probable cause.

### Pathway Forward

Additional training in Fourth Amendment issues for supervisors and commanders may be needed. Supervisors must be held accountable for the proper supervision of their officers as required by PRPB policy. It is essential for PRPB to demonstrate compliance with this paragraph.

### Paragraph 72: Searches and Seizures - Arrests

*PRPD shall require officers to provide written receipts to individuals whenever property is seized from the individuals. PRPD shall establish procedures that are based on generally accepted policing practices to ensure that all seized property is properly stored and returned, as appropriate.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually with respect to Data Source #1. Bi-annually for all others. |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Polices incorporate all of the requirements of Paragraphs 59 and 72. | ☑ Met | ☐ Missed |
| 2. Property is seized, stored, and returned, as appropriate, in accordance with approved policies in 95% of selected arrests. | ☐ Met | ☑ Missed |

| 3. PRPB takes disciplinary and/or corrective action in response to all sustained complaints where an officer fails to issue a receipt, store, or return seized property in accordance with approved policies. | ☐ Met ☑ Missed |

Note: Training is assessed as part of Section E (Paragraphs 78-79) regarding Training on Stops, Searches, and Seizures.

## *Compliance Assessment*

The Monitor reviewed 82 arrest files and 64 search and seizure files. Of the 82 arrest files 39 (48%) failed to include a property inventory form PPR 636.1 or did not provide an explanation for its absence; 5 of the search and seizure files (8%) did not contain the form or an explanation. In September 2021, the Monitor requested data from PRPB showing any administrative investigation or disciplinary action taken in response to complaints regarding an officer who failed to issue a receipt, store, or return seized property. The Monitor did not receive any such requested information.

## *Pathway Forward*

PRPB must ensure that officers properly complete a PPR-636.1 form for all personal property seized from arrestees or detained persons and hold supervisors accountable for their officers.

## Paragraph 73: Searches and Seizures - Arrests

*PRPD shall develop a protocol to seek formal feedback from the prosecutor's office, the public defender's office, and Commonwealth judges on a regular basis regarding the quality of PRPD investigations, arrests, court testimony, and indicia of misconduct and to make operational and policy changes based upon this feedback. In addition, PRPD shall refer to SPR for investigation any information regarding specific incidents of possible officer misconduct received through this protocol.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2020 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

## *Compliance Targets*

| 1. Interagency agreements and policies incorporate the requirements of the paragraph. | ☑ Met ☐ Missed |
| 2. PRPB officers seek and obtain feedback from criminal justice agencies and entities as required by approved agreements and policies. | ☐ Met ☑ Missed |
| 3. 100% of alleged misconduct noted in protocol documentation corresponds with a SARP investigation. | ☐ Met ☑ Missed |

86

*Compliance Assessment*

PRPB provided the Monitor with a copy of the Feedback Committee Protocol dated May 1, 2020. During the period covering CMR-5, April 1 to September 30, 2021, the Monitor interviewed several members of PRPB Police Area Feedback Committees. Those areas included: Arecibo, Bayamon, Carolina, Fajardo, Guayama, Humacao, Mayaguez, Ponce, San Juan, and Utuado. Most of these Feedback Committees held only one meeting or none in the last year. San Juan, Guayama, and Mayaguez had no meetings. Additionally, some of these committees are combining Feedback Committee meetings with regular staff meetings that discuss crime issues. Other committee members appear unclear on the responsibilities and duties of the Feedback Committee. Such was the case in the Carolina Police Area where a meeting was called to discuss crime issues affecting tourists in the area.

*Pathway Forward*

In a meeting with a member of the Central Feedback Committee, which supervises the Area Feedback Committees, the Monitor was informed that a meeting was held to orient Area Feedback Committee members about their responsibilities. PRPB needs to continue to make these orientations available to Area Feedback Committee members to achieve compliance moving forward.

## 4. Searches

General Order 600-612 provides officers with the legal parameters for conducting stops and searches, whether by search warrant, incident to arrest, inventory searches, or consent searches, as well as proper arrest procedures, including arrests made under probable cause or by an arrest warrant. It also guides officers in the proper way to record and take custody of seized property or evidence. However, incomplete or improper reviews by supervisors and commanders are affecting the compliance requirements under the Agreement and going against PRPB's own policies on arrests and searches. PRPB has no working search warrant tracking system as of this reporting period; search warrants are filed in file cabinets in alphabetical order and entered into a unit-based spreadsheet that provides only basic search capabilities.

### Paragraph 74: Searches and Seizures - Searches

*PRPD shall revise its policies on searches to ensure that they comply with applicable law and comport with generally accepted policing practices. PRPD policies shall define all terms clearly and specify procedures for executing search warrants and warrantless searches, including handling, recording, and taking custody of seized property or evidence.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | | |

| Practice: | Not Implemented | Assessment Frequency | Annually with respect to Data Source #1. Bi-annually for all others. |
|---|---|---|---|

*Compliance Targets*

| | |
|---|---|
| 1. Polices and forms incorporate all of the requirements of Paragraphs 59, 74-77. | ☑ Met   ☐ Missed |
| 2. Searches are conducted and reviewed by supervisors in accordance with approved policies in 95% of selected searches. | ☐ Met   ☑ Missed |
| Note: Training is assessed as part of Section E (Paragraphs 78-79) regarding Training on Stops, Searches, and Seizures. | |

## Compliance Assessment

General Order 600-612 provides officers with the legal parameters for conducting stops and searches, whether by search warrant, incident to arrest, inventory searches, or consent searches, as well as proper arrest procedures, including arrests made under probable cause or by an arrest warrant. It also guides officers in the proper way to record and take custody of seized property evidence. However, of the 64 search files reviewed, 31 (48%) had no supervisory reviews (PPR-615.8) due to no arrest being made or a consent search. Within the randomly selected search and arrest files, there were 27 consent searches. Of these, 26 (96%) were properly documented on the PPR-612.1 Consent Search Form. One had no description of the item/place searched.

## Pathway Forward

PRPB should develop a new form for supervisors to complete on all searches, whether by search warrant or warrantless, regardless of whether the search results in an arrest, as per the Agreement. The Monitor understands that PPR-615.8 is a supervisory review form for when there is an arrest. PRPB should use this form until a proper form is developed, with supervisors writing their reviews in the narrative portion of the form.

## Paragraph 75: Searches and Seizures - Searches

*PRPD shall require that a supervisor review and approve in writing each request for a search or arrest warrant, including each affidavit or declaration before it is filed by an officer in support of a warrant application, for appropriateness, legality, and conformance with PRPD policy.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

## *Compliance Targets*

Note: This Paragraph is assessed with Paragraph 74.

## *Compliance Assessment*

The 64 search files submitted by PRPB to the Monitor contained 43 searches authorized by a search warrant approved by the supervisor, the District Attorney, and a Judge. However, 31 search cases (48%) had no supervisory reviews (PPR-615.8) due to no arrest being made or a consent search. Fifteen searches with no supervisory reviews were conducted under a search warrant, and sixteen were conducted as a result of consent obtained from the subject. The Agreement requires that supervisory review be conducted for all searches, especially in consent search cases and cases resulting in no arrest.

## *Pathway Forward*

PRPB should develop a new form for supervisors to complete on all searches, whether by search warrant or warrantless, regardless of whether the search results in an arrest, as per the Agreement. The Monitor understands that PPR-615.8 is a supervisory review form for when there is an arrest. PRPB should use this form until a proper form is developed, with supervisors writing their reviews in the narrative portion of the form.

## Paragraph 76: Searches and Seizures - Searches

*PRPD shall track each search warrant, the case file where a copy of such warrant is maintained, the officer who applied for the warrant, and each supervisor who reviewed the application for a search warrant.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually with respect to Data Source #2, and Annually for all others. |
| Practice: | Not Implemented | | |

## *Compliance Targets*

| | | |
|---|---|---|
| 1. Tracking system accounts for all of the elements in the paragraph and outcome measures as required by Paragraph 243. | ☐ Met | ☑ Missed |
| 2. All search warrants are tracked in the tracking system. | ☐ Met | ☑ Missed |
| 3. Documentation on search warrants is maintained in accordance with approved policies in 95% of precincts and units visited. | ☐ Met | ☑ Missed |

Note: Policy content is assessed as part of Paragraph 74. Training is assessed as part of Section E 78-79) regarding Training on Stops, Searches, and Seizures.

*Compliance Assessment*

PRPB has no working search warrant tracking system as of this report. The Monitor has conducted visits to Criminal Investigation Corps (CIC) Divisions, where most search warrant files are held, and has observed that search warrant files are kept in folders in file cabinets. When asked about a tracking system, unit directors state they are not aware of any Bureau-wide system to track search warrants. All units interviewed stated they keep an in-house spreadsheet to record all search warrants of the unit, but that there is no Bureau-wide central system that categorizes search warrants as required by GO 600-612, Section V.B.

*Pathway Forward*

PRPB should develop a centralized, electronic tracking system to collect and analyze search warrant data to detect deficiencies or training issues (see PRPB GO 600-612, Section V.B).

## Paragraph 77: Searches and Seizures - Searches

*PRPD shall require officers to obtain and document consent from an individual who consents to a voluntary search of his/her person or vehicle when the search is conducted as part of a routine pedestrian or vehicle stop, unless a non-consensual search is otherwise legally permissible.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 74.

*Compliance Assessment*

The Monitor found that of the 64 search files and 82 arrest files submitted by PRPB, 27 searches were conducted at the consent of the subject. Twenty-six of which were properly documented on a consent form (PPR-612.1). One did not describe the place or item to be searched. However, as stated about Paragraph 74, 24 searches had no supervisory reviews (PPR-615.8) due to no arrest being made or because it was a consensual search.

*Pathway Forward*

To comply with the Agreement and methodology, PRPB should develop a new form for supervisors to complete for all searches, whether by search warrant or warrantless, regardless of whether the search results in an arrest. Meanwhile, PRPB should use the narrative portion of PPR-615.8 to write the reviews

until the new form is created. PRPB's lack of a system to collect and track all stops and searches, especially when there is no arrest and when consent is obtained, undermines its credibility with the public and hinders its ability to comply with the Agreement.

## 5. Training on Stops, Searches, and Seizures

Although PRPB instituted a virtual training system that has helped keep personnel up to date on training, the Monitor has not had an opportunity to review that system to determine its validity and effectiveness. In addition, in 2021 PRPB discovered that several officers had compromised the virtual training system, and as a result ceased all virtual training, delaying required training for all officers. Finally, in-person practical exercises have not taken place since 2020 due to COVID-19, though they are required on certain policies such as General Orders 600-612, 600-601, and 600-615. PRPB is in the process of reinstituting virtual and in-person training.

### Paragraph 78: Searches and Seizures - Training on Stops, Searches, and Seizures

*PRPD shall train all PRPD officers on PRPD's stop, search, and seizure policies. Thereafter, PRPD shall provide all PRPD officers with training at least every two years for the first four years of this Agreement, and annually thereafter. PRPD shall also provide training on stops, searches, and seizures as necessary, based on developments in applicable law and PRPD policy. PRPD shall coordinate and review all policies and training on stops, searches, and seizures to ensure quality, consistency, and compliance with the Constitution and laws of the*

*United States and the Commonwealth of Puerto Rico, this Agreement, and PRPD policy. PRPD shall conduct regular subsequent reviews of this training at least annually, and report its findings. PRPD's training program shall include the following topics:*

*a) PRPD policies and requirements in this Agreement regarding stops, searches, and seizures;*

*b) the Fourth Amendment and related law;*

*c) examples of scenarios faced by PRPD officers and interactive exercises that illustrate proper police practices, methods, and tactics in conducting consensual field interviews, investigatory stops, consent and non-consent searches, and arrests. These training scenarios shall address the difference between various police contacts by the scope and level of police intrusion; between probable cause, reasonable suspicion and mere speculation; and voluntary consent from mere acquiescence to police authority; and*

*d) comprehensive testing that shows complete understanding of rules and regulations.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2020 – September 2021 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Training on stops, searches and seizures is consistent with approved policies and the requirements of Paragraphs 59, 65-78. | ☐ Met | ☑ Missed |
| 2. 95% of officers are trained and certified in stops, searches, and seizures (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 3. 95% of relevant trainings are reviewed at least once a year. | ☐ Met | ☑ Missed |

*Compliance Assessment*

Policies for training on stops and searches and seizures (GOs 600-612 and 600-615) are in place and presently being reviewed for necessary modifications. However, training has been delayed since early 2021, when PRPB discovered that several officers had compromised the virtual training system. All virtual training has been stopped because of this discovery, delaying the required training for all officers. In-person practical exercises have not taken place since 2020 due to COVID-19 restrictions.

*Pathway Forward*

The reinstatement of virtual and in-person training will place PRPB back on the road to compliance with the Agreement and PRPB policies. PRPB should also ensure that training related to stops, searches, and seizures are not solely conducted via virtual training; in-person scenario-based training should also be utilized for these topics and will ensure that officers and supervisors understand the policy requirements and the practical application of such procedures.

## Paragraph 79: Searches and Seizures - Training on Stops, Searches, and Seizures

*PRPD shall train all supervisors and command officers on PRPD's stop, search, and seizure policies. Thereafter, PRPD shall provide all supervisors and command officers with training on reviewing subordinates' stops, searches, and seizures at least annually and, as necessary, based on developments in applicable law and PRPD policy. PRPD shall coordinate and review all policies and training on stops, searches, and seizures to ensure quality, consistency, and compliance with the Constitution and laws of the United States and the Commonwealth of Puerto Rico, this Agreement, and PRPD policy. PRPD shall conduct regular subsequent reviews of this training at least annually, and report its findings. PRPD's training on stops, searches, and seizures for supervisors and command officers shall include the following topics:*

*a) requesting medical services and questioning detainees and arrestees for pain or injury;*

*b) report writing, including reviewing reports on stops, searches, and seizures for completeness, accuracy, and quality, including recognizing boilerplate language and how to document discrepancies;*

*c) assessing the legality and appropriateness of a stop, search, or seizure;*

*d) legal standards governing searches and seizures, including legal standards and requirements for criminal accountability, administrative accountability, and performance improvement related to tactics, training, equipment, and policy sufficiency; and*

*e) recommending and administering proper discipline and non-punitive corrective action related to searches and seizures.*

| Compliance Status | Assessment Schedule | |
|---|---|---|
| Not Compliant | Review | October 2020 – September 2021 |

| | | | |
|---|---|---|---|
| Policy: | Implemented | Period | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Training on stops, searches, and seizures is consistent with approved policies and the requirements of Paragraphs 59, 65-77, and 79. | ☐ Met | ☑ Missed |
| 2. 95% of supervisors and commanders are trained and certified in stops, searches, and seizures (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 3. 95% of relevant trainings are reviewed at least once a year. | ☐ Met | ☑ Missed |

### Compliance Assessment

Policies for training on stops and searches and seizures (GOs 600-612 and 600-615) are in place and presently being reviewed for necessary modifications. However, training has been delayed since early 2021, when PRPB discovered that several officers had compromised the virtual training system. All virtual training has been stopped because of this discovery, delaying the required training for all officers, including supervisors and command staff. In-person practical exercises have not taken place due to COVID-19 restrictions. As stated above in reference to Paragraphs 62, 63, and 64, on arrests and searches, supervisors and commanders have demonstrated a need for training, as they fail to detect and correct arrest reports that lack probable cause documentation. Training and thorough reviews of arrest reports by supervisors and commanders is of the upmost importance to remedy this situation. Hopefully when the virtual training system is reinstated, PRPB will take full advantage of it and get their officers to comply with policy requirements.

### Pathway Forward

The reinstatement of virtual and in-person training will place PRPB back on the road to compliance with the Agreement and PRPB policies.

## IV. Equal Protection and Non-Discrimination

The Equal Protection and Non-Discrimination section captures an array of cases specifically related to sexual assault, domestic violence, and related cases that entail any abusive behavior by one person to maintain power over another in a close relationship. It is important that PRPB continue to develop its reporting processes to ensure that PRPB demonstrates its ability to respond to these types of cases in the most effective and professional manner. In this reporting period, PRPB submitted documents that predominately demonstrated either partial or non-compliance with the equal protection and non-discrimination provisions of the Agreement. This assessment is supported by the finding of incomplete documentation within the case files examined, lack of a Bureau-wide NIBRS implementation, need for additional training for investigators, PRPB's continued efforts related to the 24-hour hotline for the Sex

Crimes Investigation Unit, and tracking of dispositions of sexual assault investigations. PRPB has still not fully demonstrated its capacity of delivery on these important police responses.

PRPB has a role in prioritizing addressing sexual assault and domestic violence incidents. In response to these incidents, PRPB can provide up-to-date information and support advocacy programs, which delivers a vital message to any person who is experiencing violence. PRPB is establishing incremental steps in the response process of this section and building upon the policies it has established on equal protection and non-discrimination, but much work remains to achieve compliance.

In CMR-5 29% of the 21 paragraphs assessed are Partially Compliant. CMR-5 represents the first time this section was assessed for compliance in a comprehensive manner. In CMRs 3 and 4 only 13 and 9 paragraphs were assessed, respectively. As such, it is difficult to compare progress in compliance across CMRs for this given section in CMR-5.

## Paragraph 80: Equal Protection and Non-Discrimination - General Provisions

*PRPD shall ensure that police services are delivered equitably, respectfully, and free of unlawful bias, in a manner that promotes broad community engagement and supports effective crime prevention. In conducting its activities, PRPD shall ensure that members of the public receive equal protection of the law, without bias based on race, color, ethnicity, national origin, religion, gender, disability, sexual orientation, gender identity, gender expression, or political ideology or affiliation, and in accordance with the rights, privileges, or immunities secured or protected by the Constitution and laws of the United States and the Commonwealth of Puerto Rico.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2020 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

Note: Compliance will be determined on two separate but inter-dependent bases: (1) the implementation of Paragraphs 81 - 100, and (2) the results of outcome assessments, pursuant to Paragraph 243 of the Agreement.

### *Compliance Assessment*

The assessment data that was received supports the overall Monitor's rating as Not Compliant. Data received included listings and certifications of officers trained. However, no training curricula and materials, fully executed department records, fully executed personnel evaluations, policy implementation evidence collection documentation, interviews, or data systems utilized were submitted to the Monitor's Office for review.

94

Interviews conducted with sexual assault and domestic violence investigators signified that the agents understand the importance of a trauma informed, victim-centered approach in the investigative processes and procedures. Supervisors of the units interviewed noted that they would appreciate getting a better understanding of the selection of officers assigned to the units and on the required training. Many noted that they receive an officer transfer decision with little, to no input. It is not until after the transfer decision is made that the supervisor is advised of a new officer assignment. An officer assigned to units like sexual assault and domestic violence should understand the complexities of such investigations. Another expressed concern is training of the new investigator which may take longer to accomplish due to academy training scheduling. No virtual training has been implemented which also hinders training scheduling.

*Pathway Forward*

In this reporting period, PRPB submitted documents that show its efforts at aiming towards compliance. However, due to incomplete documentation, PRPB has not fully demonstrated its capacity of delivery on these important police responses. PRPB is making the strides needed to develop training and implement practice. The documents related to training in this area are in development in both a virtual and face-to-face format. The implementation of data driven processes to collect and analyze incidents is also in development. Complete investigation reports, program evaluations with documentation of community engagement, National Incident Based Reporting System (NIBRS) reporting, hate crime documentation with reporting to the Federal Bureau of Investigation (FBI), and documentation of interactions with transexual or transgender individuals is information that PRPB should provide for assessment to measure PRPB's compliance.

## 1. General Provisions

PRPB continues to incrementally develop the proper execution of the process of ensuring compliance with laws, regulations, and targets of the Agreement. To continue the development, PRPB must use updated manuals and reference materials. PRPB's attempt to effectuate successful implementation of policies by enforcing laws and regulations should be in partnership with external agencies. Collaborating with subject matter experts and seeking information from agencies designed to address specific policing matters, such as the FBI NIBRS team, are essential to this effort.

PRPB has a NIBRS policy and a manual. However, the NIBRS reporting structure within PRPB still lacks agency wide implementation. This is due to lack of Bureau-wide training and inadequate reporting methods. Further, the lack of data collection and analysis systems hinders PRPB from obtaining valuable information to assist in reducing crime and expanding crime prevention services.

### Paragraph 81: Equal Protection and Non-Discrimination - General Provisions

*PRPD shall develop policies and procedures that comply with applicable law and comport with generally accepted policing practices on bias-free policing; provide training as described in this Agreement; ensure consistent supervision; and hold officers accountable for complying with applicable law and policy.*

| Compliance Status | Assessment Schedule |
|---|---|

| Partially Compliant | | Review Period | October 2020 – September 2021 |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

## Compliance Targets

| | | |
|---|---|---|
| 1. Policies and procedures comply with applicable law and comport with generally accepted policing practices on bias-free policing. | ☑ Met | ☐ Missed |
| 2. Trainings comply with applicable law and comport with generally accepted policing practices on bias- free policing. | ☐ Met | ☑ Missed |
| 3. 95% of reviewed supervisory and field records indicate that officers are supervised consistently. | ☐ Met | ☑ Missed |

Note: The requirement of this Paragraph regarding PRPB's development of policies and procedures that comply with applicable law and comport with generally accepted policing practices on bias-free policing, is assessed together with Paragraphs 87, 88 and 109 of the Agreement.

Note: The requirement of this Paragraph that relates consistent supervision is assessed together with Paragraphs 135 (Supervision and Management), and 140 (Duties of Supervisors).

Note: The requirement of this Paragraph that relates to holding officers accountable for complying with applicable law and policy is assessed together with Paragraph 159 (Civilian Complaints, Internal Investigations, and Discipline).

Note: The requirement of this Paragraph that requires training as described in this Agreement is assessed together with Paragraphs 90, 117 (Training), 118 (Pre- Service Training), 123 (Field Service Training), and 129 (In- Service Training).

## Compliance Assessment

Although the policy has been provided and reviewed by the Monitor's Office, the implementation of this policy has not been fulfilled. During this evaluation period no virtual training was available to PRPB officers. Further, PRPB did not identify the specific courses that it utilizes to cover the criteria of trainings which comply with applicable law and comport with generally accepted policing practices on bias-free policing. No supervisory and field notes were submitted to the Monitor's Office for review to assess officer's accountability with such training.

## Pathway Forward

To fully implement Paragraph 81, PRPB should include training topics that span a spectrum of generally accepted policing practices on bias-free policing should be created and delivered. Examples include implicit bias training and racial profiling training. Documents that supervisors are accurately supervising their personnel, such as field notes and fully executed performance evaluation assessments, need to be reviewed. The Monitor has yet to receive any such documents. As noted throughout this report, the Monitor acknowledges that issues with the integrity of the virtual training hindered PRPB's capacity to continue virtual training on several topics. Further, COVID-19 restricted its ability to conduct in-person

training sessions. As noted in Section VI (Supervision and Management) challenges in the lack of supervisors Bureau-wide hampered PRPB's ability to provide consistent supervision of officers.

## Paragraph 82: Equal Protection and Non-Discrimination - General Provisions

*PRPD shall revise its complaint classification policies to effectively capture and track civilian complaints alleging discriminatory policing, even if the complainant does not specifically label the misconduct as such.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | October 2020 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. PRPB classification policies comply with the requirements of the Paragraph. | ☑ Met ☐ Missed |
| 2. PRPB classifies and tracks allegations of discriminatory policing in accordance with policy and this Paragraph. | ☐ Met ☐ Missed |

Note: This Paragraph is assessed with Paragraph 160 (Civilian Complaints) and Paragraph 174 of the Agreement (Complaint Intake, Classification, Assignment, and Tracking).

*Compliance Assessment*

PRPB provided documents and evidence, through SARP, that demonstrate how PRPB classifies and maintains a record of allegations of discrimination, according to current regulations and policy.

The Monitor noted that PRPB's use of EIS within SARP to document and manage administrative cases allowed PRPB to create a statistical report of violence against discrimination. It should be noted that the appropriate use of EIS should be for conduct intervention, however, PRPB is currently using its EIS as a system with which to record and manage investigations and cases as seen in the EIS modules used in SARP and the Domestic Violence and Sexual Assault units.  SARP maintains a report prepared by the Anti-Discrimination Affairs Committee as part of the statistics. During this reporting period four cases were documented. The following classification of complaints were alleged and documented: discrimination gender identity (1), physical impairment (2), and sexual orientation (1). Due to the small sample size of cases reviewed, the Monitor notes this paragraph as deferred.

Additionally, the PRPB global report reconciles with the EIS report. The report tracks the number of cases and the jurisdiction that the case occurred in. However, a larger sample is needed to determine comprehensive classification and tracking compliance.

*Pathway Forward*

PRPB should continue to maintain the same level of documentation, which classifies and tracks allegations of discriminatory policing. The Monitor will continue to assess this paragraph to determine if PRPB is correctly classifying and recording allegations of discrimination in a comprehensive manner. A larger sample of cases is needed to review to determine comprehensive classification and tracking. Four cases are not a sufficient sample with which to determine compliance.

## Paragraph 83: Equal Protection and Non-Discrimination - General Provisions

*PRPD shall revise all documentation produced in relation to officer and civilian interactions, including documentation related to arrests, traffic stops, investigatory stops and detentions, searches, property seizures, and civilian complaints, so that it permits officers to accurately record the demographic information of all involved persons, including alleged subjects and victims.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2020 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. All documentation produced in relation to officer and civilian interactions permits officers to accurately record the demographic information of all involved persons | ☐ Met | ☑ Missed |

Note: This Paragraph is assessed with Paragraph 160 (Civilian Complaints) and Paragraph 174 of the Agreement (Complaint Intake, Classification, Assignment, and Tracking).

*Compliance Assessment*

To demonstrate compliance with this paragraph, PRPB submitted a report template labeled "Motivation of the Crime", PPR-621.1. Demographic data on race, religion, ethnic group, sexual orientation, disability, gender, gender identity, and other information, is captured in this report. The report captures information in refence to the crime, victim, and suspect. However, no training curriculum or documentation demonstrating that officers were trained on the use of this form was received. Further, as stated in Section III: Searches and Seizures, the Monitor notes that PRPB is working with the Office of the Special Master to ensure that demographic data is captured in traffic and investigatory stops. A review of search warrants and arrests does find that PRPB is capturing demographic data. In most booking sheets and police reports, PRPB notes demographic data. However, the data is not searchable. This means that a person must read each report and look for the specific data points. Therefore, the use of demographic data for public information purposes is not producible.

*Pathway Forward*

PRPD should produce documentation on officer and civilian interactions, arrest documentation, traffic stops, investigatory stops and detentions, searches, property seizures, and civilian complaints, in a way that permits officers to accurately record the demographic information of all involved persons, including alleged subjects and victims.

## Paragraph 84: Equal Protection and Non-Discrimination - General Provisions

*PRPD shall incorporate concrete requirements regarding bias-free policing and equal protection into its hiring, promotion, and performance assessment processes, including giving significant weight to an individual's documented history of bias-free policing. PRPD will comply with the non-discrimination requirements of Title VII of the Civil Rights Act of 1964, as amended.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually for Data Sources #3, #4, and #11. Annually for the other Data Sources. |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. PRPB policies and procedures regarding hiring process comply with the requirements of the Paragraph. | ☑ Met | ☐ Missed |
| 2. Hiring process trainings are consistent with bias-free policing and equal protection provisions of approved policies. | ☐ Met | ☑ Missed |
| 3. 95% of sampled personnel are trained and certified in all policies related to the civilian complaint program (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 4. 95% of reviewed candidates were selected consistent with approved policies regarding bias-free policing and equal protection. | ☐ Met | ☑ Missed |
| 5. PRPB policies and procedures regarding promotion assessment process comply with the requirements of the Paragraph. | ☐ Met | ☑ Missed |
| 6. Promotion assessment trainings are consistent with bias-free policing and equal protection provisions of approved policies. | ☐ Met | ☐ Missed |
| 7. 95% of sampled personnel are trained and certified in all policies related to the civilian complaint program (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 8. 95% of the reviewed promotions were awarded consistent with approved policies regarding bias-free policing and equal protection. | ☐ Met | ☐ Missed |
| 9. PRPB policies and procedures regarding performance assessment comply with the requirements of the Paragraph. | ☐ Met | ☑ Missed |

99

| | | |
|---|---|---|
| 10. Performance assessment trainings are consistent with bias-free policing and equal protection provisions of approved policies. | ☐ Met | ☑ Missed |
| 11. 95% of sampled personnel are trained and certified in all policies related to performance evaluations (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 12. 95% of performance evaluations reviewed are consistent with approved policies regarding bias-free policing and equal protection. | ☐ Met | ☑ Missed |

Note: The requirement of this Paragraph that require PRPB to incorporate bias-free policing and equal protection into its hiring practices is assessed together with Paragraph 104 (Hiring Reforms).

Note: The requirement of this Paragraph that requires PRPB to incorporate bias-free policing and equal protection in its performance assessment process is assessed together with Paragraph 145 (Performance Evaluation).

Note: The requirement of this Paragraph that requires PRPB to incorporate bias-free policing and equal protection in its promotion assessment process is assessed together with Paragraph 14 (Promotions).

*Compliance Assessment*

As noted in Section 1, Professionalization, no promotions were administered during this reporting period, as such no related material was provided to the Monitor for review. As such, the Monitor could not evaluate the related processes or training to determine if they were consistent with bias-free policing and equal protection provisions. Compliance targets related to these areas of assessment, 6 and 8, are deferred.

In assessing the other aspects of this paragraph, the Monitor notes that PRPB provided certification that 13 agents were trained on Recruitment of Aspiring Cadets; however, no training curricula were submitted to the Monitor's Office for review. The training was conducted on September 21, 2020 and was certified on December 28, 2020. PRPB will need to submit documentation that more than 13 officers were trained to sufficiently achieve compliance.

Furthermore, PRPB submitted no evidence of training on the performance evaluation program.

Performance assessment data was received for 173 evaluations (48 supervisor evaluations and 95 officer evaluations), however, in review of the performance assessment documentation, the evaluations are not fully implemented. In reviewing these documents, the Monitor notes that the rating categories are filled out with generally high ratings in each evaluation. The sections in the evaluation for professional development and growth are left blank. Only three evaluations had one notation. Most of the evaluations did not include recognition, recommendations on performance, or recommendations for goals. It is unclear to the Monitor if the issues in the substantive and quality performance evaluations is due to issues with the supervisor to officer ratios and/or lack of adequate supervisory training around the conduct of these evaluations.

*Pathway Forward*

PRPB must document officers who are selected and hired in a manner consistent with approved policies regarding bias-free policing and equal protection. Documentation that officers have received training on civilian interactions, performance evaluation processes, promotion assessment processes, and the civilian complaint program is needed. It is anticipated that the curriculum associated with these training courses will be reviewed in CMR-6 as part of the Monitor's efforts to review Training. Further, as noted

in Section VI, Supervision and Management, PRPB must work to improve its supervisor to officer ratios and provide additional training to its supervisors to ensure more substantive performance evaluations.

## Paragraph 85: Equal Protection and Non-Discrimination - General Provisions

*PRPD shall use the National Incident Based Reporting System ("NIBRS") to collect and report crime data.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually as to Data Sources #1, #2 and #4. Bi-annually for the remaining Data Sources. |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies, procedures, and forms/modules incorporate the requirements of the Paragraph. | ☑ Met | ☐ Missed |
| 2. NIBRS training are consistent with approved policies and procedures. | ☐ Met | ☑ Missed |
| 3. 95% of sampled PRPB members are trained and certified in NIBRS. | ☐ Met | ☑ Missed |
| 4. PRPB is using the NIBRS to collect and report crime data. | ☐ Met | ☑ Missed |

*Compliance Assessment*

PRPB submitted a certification of compliance with this paragraph that states that the list of complaints captured is included in NIBRS annexes 1 to 15 using the Computer-Aided Dispatch (CAD) system that feeds into the GTE System and the SAEC. This is submitted as evidence NIBRS codes are collected. PRPB submitted a NIBRS manual to the Monitor for review that was dated 2018 and will be used for training. The current 2021 version was made available to PRPB by the Monitor. PRPB did not submit the entire data required for the Monitor's Office to determine full implementation. NIBRS training for all PRPB officers is yet to be conducted and completed. No percentage of trained PRPB officers is documented.

PRPB is using the CAD system within GTE and Superintendencia Auxiliar en Investigaciones Criminales (SAIC) to capture NIBRS codes. The FBI has acknowledged that data has been received from PRPB, just not uploaded, or recoded by them onto the FBI NIBRS site. In this review period it was found that PRPB has a policy and a manual. However, no officers or supervisors have been formally trained in the use of NIBRS. It was determined that PRPB trained crime analysts to manage the NIBRS process; however, no official reporting has been received by the FBI. The crime analyst reporting process is not sufficient and does not provide the mechanics for PRPB to report data to NIBRS.

*Pathway Forward*

NIBRS training for all PRPB officers and supervisors should be conducted and completed. It is important that the most current 2021 manual be used in the training process. The FBI has offered to conduct the training in a "train-the-trainer" method which will assist PRPB.

A clear understanding in the distinction between the user manual and the technical manual should be understood. Data submission to NIBRS should be in an XML format.

PRPB is developing their own in-house system to conduct NIBRS reporting. Therefore, it is critical the systems merge and reconcile with the FBI NIBRS manuals and protocols. The NIBRS certification process starts with capturing the data from PRPB records system, building test files in an XML format, and then sending those test files to the FBI for feedback and approval. Conducting these tests will allow PRPB to fully implement the required NIBRS reporting. The deadline for 2021 NIBRS data submissions is March 2022.

The development of a work plan for NIBRS reporting should be conducted in consultation with the FBI. Documentation and services that will assist in the process can be found at: https://www.fbi.gov/services/cjis/ucr/data-documentation - NIBRS

## Paragraph 86: Equal Protection and Non-Discrimination - General Provisions

*PRPD shall collect accurate and reliable data on hate crimes on an ongoing basis and shall submit the data to the Federal Bureau of Investigation ("FBI") for analysis and publication in the FBI's Hate Crimes Statistics report in accordance with FBI submission requirements.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually for Data Source #3. Annually for the remaining Data Sources. |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies on criminal investigations incorporate all of the requirements of this Paragraph. | ☒ Met | ☐ Missed |
| 2. Criminal investigation trainings are consistent with approved policies. | ☐ Met | ☒ Missed |
| 3. 95% of sampled personnel are trained and certified in all policies related to identifying, collecting, and reporting hate crimes (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☒ Missed |
| 4. PRPB notifies the FBI of all identified instances of hate crimes. | ☐ Met | ☒ Missed |
| 5. 95% of investigations of hate crimes accurately identify and report hate crimes. | ☐ Met | ☒ Missed |

Note: The requirement of this Paragraph that requires PRPB to track hate crimes on an ongoing basis is assessed together with Paragraph 85.

### Compliance Assessment

For this period, no documentation was received on criminal investigation trainings or of hate crime notification to the FBI. The Monitor did receive an excel document that stated "Negativo" under the category of hate crime reports, which presumably means that no hate crimes were investigated during the reporting period. PRPB continues to be slow in the progression of this area of the Agreement. PRPB must work to implement training and utilize supervisor capacity to make sure that crimes are investigated in a manner that sufficiently examines all variables of a case. PRPB has a policy (GO 600-630) and manual on hate crime classification, which contains the indicators of hate crime. This gives the officers the elements of how to classify a hate crime. However, the implementation of the process has not been sufficiently put into practice. A hate crime investigation course is taught at the police academy, but no review of this curriculum has been conducted by the Monitor during this review period.

### Pathway Forward

Documentation on criminal investigation training, conducted or scheduled, should be submitted for review. This will help make sure that officers are trained to accurately assess the case to determine if the matter is a hate crime. Additionally, it is essential that supervisors attend training to assist officers in hate crime investigations and assessments. Officers without thorough hate crime investigation training can miss the details of a hate crime case and may misreport the matter. Supervisors are the next level of assessment and accountability in these matters and should also receive training on hate crime investigations.

## 2. Discriminatory Policing

Fundamental to effective policing service is building trust with the community it serves. PRPB through its community services programs, initiatives, and activities is working towards building trusting relationships. Bias-free policing in hiring practice, promotional processes, and training is essential to trust. PRPB must develop systems to assess these programs with accurate, complete, and reliable data. Further, PRPB must also continue to analyze police conduct. These types of analysis will then provide the information needed to determine the effectiveness and reliability of PRPB services.

Sound conduct by police improves community interactions, enhances communication, and promotes shared responsibility for addressing crime and disorder. PRPB in its interactions with transgender or transexual individuals must be a continual engagement and partnership. Investigations of cases in juvenile facilitates must be thorough, timely, and in partnership with other governmental agencies. These are areas that PRPB must continue to evaluate and improve.

### Paragraph 87: Equal Protection and Non-Discrimination - Discriminatory Policing

*PRPD shall apply and administer all programs, initiatives, and activities without discriminating on the basis of race, color, ethnicity, national origin, religion, gender, disability, sexual orientation, gender identity, gender*

*expression, or political ideology or affiliation. PRPD shall develop policies and practices to prohibit selective enforcement or non-enforcement of the law based on these characteristics. These policies and practices shall comply with applicable law and comport with generally accepted policing practice.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2020 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. 95% of PRPB programs, initiatives, and activities conform to the requirements of the Paragraph. | ☐ Met | ☑ Missed |
| 2. 95% of selected PRPB programs, initiatives, and activities are consistent with approved policies regarding bias-free policing and equal protection. | ☑ Met | ☐ Missed |

Note: The section of this Paragraph that requires PRPB to develop policies and practices to conform to the requirements of this Paragraph is assessed together with Paragraphs 81, 88, and 109 (Policies and Procedures).

*Compliance Assessment*

PRPB submitted documentation of fifty-eight programs, initiatives, and activities related to this paragraph for review. The documentation of work plans covered 11 regions of Puerto Rico. The nature of the programs submitted for review were business inspections, weekend workplans, workplans of collaboration agreements to reinforce the integral plans of the new superintendent, and enforcements of executive order 2021-027 (COVID-19 protocols). The supporting documentation of the program's activity included a detailed report of the purpose/mission, execution, external coordination, methodology of actions, general provisions, special provisions, specific provisions, and the results of the findings of the inspections.

Of the 58, the Monitor sampled 20 programs for review. The Monitor also noted that the list of programs submitted to the Monitor did not include PRPB's broad work scope. For example, programs related to community outreach and crime victim advocacy were not listed. This paragraph states *all* programs should be administered in a bias-free manner. This cannot be determined with this sample of programming. While PRPB programs, initiatives, and activities selected by the Monitor for review demonstrate that they are consistent with approved policies regarding bias-free policing and equal protection, the comprehensive list of all programs submitted by PRPB does not include activities related to community outreach and crime victim advocacy, as previously noted.

*Pathway Forward*

Bias-free policing and equal protection programs, initiatives, and activities are created and coordinated by the Community Engagement Division of PRPB. PRPB should continue to deliver all police programs to prohibit selective enforcement or non-enforcement of the law. Activities should continue to be scheduled well in advance for proper notification and increased participation. Community engagement areas are identified with goals and objectives so that PRPB can be responsive to specific needs. A review of a diverse sampling of programs will be conducted in future reports to determine compliance with this paragraph.

## Paragraph 88: Equal Protection and Non-Discrimination - Discriminatory Policing

*PRPD shall develop policies to provide all individuals within the Commonwealth with police services in a non-discriminatory fashion in order to build and preserve trust among community members and more effectively prevent and solve crime. As part of these efforts, PRPD shall seek the assistance of community advocates in widely disseminating to the public its written policies on immigration-related laws.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually as to Data Sources #1, #2 and #4. Bi-annually for the remaining Data |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. PRPB policies complied with the requirements of the Paragraph. | ☒ Met ☐ Missed |
| 2. Trainings on discrimination free policing are consistent with approved policies. | ☐ Met ☒ Missed |
| 3. 95% of sampled PRPB members are trained and certified in discrimination free policing. | ☐ Met ☒ Missed |
| 4. Pertinent policies on pertinent immigration-related law were widely disseminated to the public. | ☐ Met ☒ Missed |

Note: This Paragraph is assessed together with Paragraphs 81, 87, and 109 (Policies and Procedures).

*Compliance Assessment*

The Monitor found that PRPB policy complies with the requirements of this paragraph. However, supporting documentation related to PRPB's non-discrimination policing training was not received. Therefore, the Monitor was unable to determine if 95% of sampled PRPB members were trained.

in meetings with the Consulate Generals of the Dominican Republic and Japan, the Monitor found that PRPB has a good working relationship with their communities and finds PRPB responsive to their community needs. Although the Dominican Republic Consulate General noted his concern related to a

traffic stop in which residents of the Dominican Republic were detained and deported, see Section III. He noted that he believes this was an isolated incident but explained the importance of accountability in PRPB's review of the traffic stop and detention.

The Monitor's Office was asked to review and provide feedback on a community outreach brochure that included information on resources, police security programs, and pertinent law updates to the information presented on its website. The brochure was to also include the steps involved in filing a complaint. To date, PRPB has not produced the brochure for community use. The community outreach PRPB has conducted has centered on UOF topics. No specific immigration law updates have been disseminated to the public as of this reporting period.

*Pathway Forward*

PRPB's method of disseminating information on immigration related laws starts with having a trusting relationship between the immigrant community and the police. A trusting relationship between parties will help build processes to effectively prevent and solve crime. The Monitor will continue to assess PRPB's efforts in seeking the assistance of community advocates to widely disseminate its written policies on immigration-related laws.

## Paragraph 89: Equal Protection and Non-Discrimination - Discriminatory Policing

*PRPD shall develop a specific policy to guide officers' interactions with transgender or transsexual individuals that addresses gender identification, gender expression, transportation, processing, housing, and medical treatment.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually for Data Sources #1 and #2. Bi-annually for all remaining Data Sources. |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. PRPB policies guide police officer interactions with transgender or transsexual individuals as required by the Paragraph. | ☑ Met | ☐ Missed |
| 2. PRPB trainings on interactions with transgender or transsexual individuals are consistent with approved policies. | ☐ Met | ☑ Missed |
| 3. 95% of sampled PRPB members are trained and certified in policies regarding interactions with transgender or transsexual individuals. | ☐ Met | ☑ Missed |
| 4. 95% of reviewed PRPB reports suggest compliance with PRPB policies regarding interactions with transgender or transsexual individuals. | ☐ Met | ☑ Missed |

*Compliance Assessment*

Although PRPB policy complies with the requirements of this paragraph, PRPB did not provide documentation to support that it has provided training specifically related to interactions with transgender or transexual individuals to 95% of the sampled PRPB members. In previous reviews PRPB has relied predominantly on the online training course titled: VITT 3083 Interactions with Transgender or Transexual Persons for compliance with this paragraph. The Monitor notes that PRPB ceased virtual training during this reporting period because of integrity issues and is currently in the process of reexamining the system and developing its virtual training courses. In the CMR-3 report PRPB provided police reports documenting interactions with transgender or transexual individuals. The Monitor was unable to assess PRPB's interactions with transgender or transexual individuals as no related reports were received for this monitoring period.

*Pathway Forward*

Both a traditional face-to-face offering, and an updated online version of the Interactions with Transgender or Transexual Persons training should be developed. It is also imperative that PPRB document interactions with transgender or transexual individuals accurately to comply with the consent decree. Therefore, documentation that these interactions are conducted in a manner that addresses gender identification, gender expression, transportation, processing, housing, and medical treatment is needed in order for the Monitor to review and determine compliance.

## Paragraph 90: Equal Protection and Non-Discrimination - Discriminatory Policing

*PRPD shall provide all PRPD officers with training on biased-free policing at least every two years for the first four years of this Agreement, and annually thereafter. PRPD shall also provide training on biased-free policing as necessary, based on developments in applicable law and PRPD policy. PRPD's training program shall include the following topics:*

*a) PRPD policies and requirements in this Agreement regarding biased-free policing;*
Policy:
*b) community perspectives of discriminatory policing;*

*c) constitutional and other legal requirements related to equal protection and unlawful discrimination;*

*d) the protection of civil rights as a central part of the police mission;*

*e) arbitrary classifications and stereotyping based on age, race, color, ethnicity, national origin, religion, gender, disability, sexual orientation, gender identity, gender expression and political ideology or affiliation;*

*f) interacting with diverse populations, including persons who are homeless and economically disadvantaged;*

*g) identification of key decision points where prohibited discrimination can take effect at both the incident and operational planning levels;*

*h) methods, strategies, and techniques to reduce misunderstanding, conflict, and complaints due to perceived bias or discrimination, including community-oriented policing strategies; and*

*i) comprehensive testing that shows complete understanding of rules and regulations.*

| Compliance Status | Assessment Schedule | |
|---|---|---|
| Not Compliant | Review | April 2021 – September 2021 |

| | | | |
|---|---|---|---|
| Policy: | Implemented | Period | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually for Data Source #5. Annually for the remaining Data Sources. |
| Practice: | Not Implemented | | |

## Compliance Targets

| | |
|---|---|
| 1. PRPB trainings on discrimination free policing are consistent with the requirements of the Paragraph. | ☐ Met  ☑ Missed |
| 2. 95% of reviewed training records complied with the training frequency requirements of the Paragraph. | ☐ Met  ☑ Missed |
| 3. 95% of reviewed training curriculums complied with the content requirements of the Paragraph. | ☐ Met  ☑ Missed |
| 4. Tests accurately assess an understanding of rules and regulations related biased-free policing. | ☐ Met  ☑ Missed |
| 5. 95% of sampled PRPB members are trained and certified in bias-free policing. | ☐ Met  ☑ Missed |

Note: This Paragraph is assessed together with Paragraph 81 and 117 (Training).

## Compliance Assessment

PRPB did not submit the data necessary for the Monitor's Office to determine compliance with this paragraph.

## Pathway Forward

Bias-free training is essential so that PRPB officers may understand all the points associated with this paragraph. The policy is one aspect of compliance with this paragraph and associated follow up training is essential to the implementation of bias free policing practices and processes. Training on implicit bias, racial profiling, de-escalation, and communication skills are some of the course development topics that PRPB should design for PRPB officers to be better equipped in their engagement with diverse communities.                                   Assessment

## Paragraph 91: Equal Protection and Non-Discrimination - Discriminatory Policing

*PRPD shall assess its operational programs, initiatives, and activities at least every two years to ensure that they are applied or administered in a manner that guarantees equal protection. As part of its assessment, PRPD shall specifically include an assessment of use of force, motor vehicle and pedestrian stops, arrests, and deployment of STUs. PRPD shall also assess its operations and tactics as part of regulatory inspections, assistance to regulatory agencies, and covert vice activities. PRPD shall base its assessment of programs, initiatives, and activities on accurate, complete, and reliable data, including data contained in the EIS, stop and detention data, use of force analyses, and operational planning and after action reports. PRPD shall make this assessment publicly available.*

| Compliance Status | Assessment Schedule |
|---|---|

| Not Compliant | | Review Period | October 2020 – September 2021 |
|---|---|---|---|
| Policy: | Implemented | Review Period | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | Assessment Frequency | |

### Compliance Targets

| | | |
|---|---|---|
| 1. 95% of reviewed programs, initiatives, and activities were assessed by PRPB at least every two years. | ☐ Met | ☑ Missed |
| 2. 95% of reviewed assessments conducted by PRPB included an assessment of use of force, motor vehicle and pedestrian stops, arrests, and deployment of STUs, operations and tactics as part of regulatory inspections, assistance to regulatory agencies, and covert vice activities. | ☐ Met | ☑ Missed |
| 3. 95% of reviewed assessments of program initiatives and activities were based on accurate, complete, and reliable data, as required by the Paragraph. | ☐ Met | ☑ Missed |
| 4. 95% of reviewed assessments were made publicly available by PRPB. | ☐ Met | ☑ Missed |

Note: The section of this Paragraph that requires reliance on PRPB assessment of programs, initiatives, and activities on accurate, complete, and reliable data is assessed together with Paragraph 219 (Information Systems and Technology) and 148 (Early Intervention System) as to Use of Force.

Note: The section of this Paragraph that requires that operational programs, initiatives, and activities be reviewed every two years and be made publicly available, shall be assessed together with Paragraph 113 (Policies and Procedures).

### Compliance Assessment

PRPB submitted a memo dated September 30, 2021, which noted that it is working on the above requirements of this paragraph and will be working with the Special Master on an assessment work plan. PRPB has been modifying forms to include demographic data that Paragraph 91 requires for the evaluation of PRPB programs. This will allow all forms used by police officers to document and collect the demographic data of the person who received the service. Additionally, PRPB will use this information to evaluate and monitor that the services are not offered in a discriminatory manner.

PRPB has prepared a form so that every member of PRPB documents a police interaction and collects the person's demographic information. PRPB is working with the Department of Transportation and Public Works (DTOP) to use the demographic information it collects in traffic related police interactions. PRPB plans for the form to be completed electronically.

In this reporting period, no supporting documentation that this process has been implemented has been received.

*Pathway Forward*

PRPB should continue the development of this process to avail itself with evaluation data to ensure that all police activities and interactions with citizens are applied or administered in a manner that guarantees equal protection. The data must be accurate, complete, and reliable.

## Paragraph 92: Equal Protection and Non-Discrimination - Discriminatory Policing

*Within five business days, PRPD shall prepare and provide to PRDOJ and the Puerto Rico Department of the Family the preliminary investigation report prepared in response to each allegation of abuse and mistreatment originating in secure juvenile correctional facilities. Such allegations include physical and mental abuse, juvenile on juvenile assaults, staff on juvenile abuse, and excessive use of force by staff.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. All allegations of abuse and mistreatment originating in secure correctional facilities are timely reported to the PRDOJ and the PR Department of the Family. | ☐ Met  ☑ Missed |

*Compliance Assessment*

One case file was submitted for review, Case #2021-3-758-5631. The handwritten portion of the report is illegible and difficult to read. Timely reporting to the Puerto Rico Department of Justice (PRDOJ) and the Puerto Rico Department of the Family cannot be determined.

*Pathway Forward*

If this is the only allegation in this review period, PRPB must certify the total number of cases in the future. Date and time report fields could be built into the report to document when the case was referred to PRDOJ and the Puerto Rico Family Department. PRPB documentation of cases forwarded to other agencies and departments is important in the procedural processes of the juvenile system.

It is recommended that in the body of the monthly statistical report, titled Preliminary Investigations of Complaints of Institutional Abuse, there be a category noting date of referral of the case to PRDOJ and the Puerto Rico Family Department. PRPB is to make the notification to these agencies within five business days. It is also important that PRPB follow specific timelines in the investigative processes of these types of cases. All cases should have status updates on the progress of the investigation. A status

report should be written every 30 days to acknowledge how the investigation is progressing and to assist with identification of any backlog.

This identifies the promptness of the investigation and any barriers that need to be addressed. PRPB could benefit in establishing recurrent meetings between PRPB and the Juvenile Facilities Director. Professional and transparent communication lines are essential to consultation, especially on the status of cases. It is recommended that an agenda and meeting notes between the parties be maintained. This will assist with information sharing, timelines, and responsiveness. It is also information that can assist the monitoring parties of PRPB, and the Juvenile Facilities reform monitors when reporting on compliance with the agreements.

## 3. Sexual Assault and Domestic Violence

Sexual assault and domestic violence policies and protocols were reviewed during this period. Additionally, case files were also reviewed to assess PRPB's compliance with policy and procedures. The case files produced were inconsistent and contained no structural organization. The order of reports, forms, and other documentation was often random. Further, illegible handwriting made the reports difficult to read and various forms were filled out in some cases, but not others. An example of this is escape security plans for victims.

The PRPB Hotline Center is adequately operational and maintains a 24-hour service. However, the unit's location and lack of adequate equipment needs attention in order for the unit to sustain the presence of a secure, confidential, and efficient service to victims. Staff and supervisors state that training on victim-centered approaches is part of the training received by unit members. However, no curriculum has been received to review. No verification of personnel training records was received. The only list submitted by PRPB was the shift scheduling list with the hours of coverage for the call center.

### Paragraph 93: Equal Protection and Non-Discrimination - Sexual Assault and Domestic Violence

*PRPD shall respond to and investigate reports of sexual assault and domestic violence professionally, effectively, and in a manner free of gender-based bias. PRPD shall appropriately classify and investigate reports of sexual assault and domestic violence, collaborate closely with community stakeholders, and apply a victim-centered approach at every stage of its response. PRPD shall develop policies and procedures on responding to sexual assault and domestic violence, including incidents involving PRPD officers, that comply with applicable law and comport with generally accepted policing practices.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | Not Implemented | | |

| Practice: | Not Implemented | Assessment Frequency | Annually as to Data Sources #1, #2 and #4. Bi-annually for the remaining Data |
|---|---|---|---|

*Compliance Targets*

| | |
|---|---|
| 1. Reviewed policies and procedures on responding to sexual assault and domestic violence comply with applicable law and generally accepted policing practices. | ☒ Met  ☐ Missed |
| 2. Trainings on responding to sexual assault and domestic violence are consistent with approved policies. | ☐ Met  ☒ Missed |
| 3. 95% of sampled PRPB members are trained and certified in responding to sexual assault and domestic violence consistent with approved policies. | ☐ Met  ☒ Missed |
| 4. 95% of reviewed sexual assault and domestic violence investigations complied with requirements of the Paragraph. | ☐ Met  ☒ Missed |
| Note: This Paragraph is assessed together with Paragraphs 94, 98 and 99. | |

*Compliance Assessment*

Although PRPB has policies and procedures on responding to sexual assault and domestic violence that comply with applicable law and generally accepted policing practices, the Bureau still lacks the implementation of training and practice. The sampled case files reviewed by the Monitor show that PRPB must continue to develop its proficiency in responding to and investigating sexual assault and domestic violence cases. The cases did not support the delivery of a victim-centered approach in every stage of the process. The stages of the case provide access to a safe, supportive, and non-judgmental environment. There should be access to appropriate information, such as giving explanations of what services can and cannot do for them and what options are available to the victim. Further, PRPB has not established a collective body of stakeholders to work together to address concerns on these types of cases. For example, in 2020 the Crimes Against Women Bureau was to be established. PRPB has not yet reported any progress towards its development.

While the documentation of sampled PRPB members training files supports that 95% of sampled PRPB members are trained and certified in responding to sexual assault and domestic violence, because the Monitor has not reviewed the related training and curricula material, compliance to determine if this training is consistent with approved policies is not met.

*Pathway Forward*

Emphasis must be given by PRPB to effectively investigate sexual assaults and domestic violence in a manner that is sensitive to the victim's needs. PRPB could benefit with conducting an agency self-assessment and community assessment. The International Association of Chiefs of Police (IACP) created the Agency Self-Assessment and Community Assessment so that agencies can both internally and externally assess their responses to and investigations of gender-based violence.[6] Together, these assessments are intended to assist agencies in comprehensively reviewing and evaluating their current

---

[6] https://www.theiacp.org/GBVAssessments

policies and practices related to domestic violence, sexual violence, stalking, and strangulation. These types of assessments can also provide strategic measures of process implementation.

IACP has partnered with the DOJ, and the Office on Violence Against Women (OVW) to provide training, resources, and technical assistance on trauma informed assault investigations.[7] This education is provided to police officers to strengthen the capacity of officers to respond effectively. The training provides officers with the education needed to understand the difficulty and trauma placed upon the victims of sexual assault and/or domestic violence.

The Gender Equity Observatory (GEO) is another resource that PRPB could benefit in partnering with.[8] This organization seeks to monitor and analyze the situation of gender-based violence in Puerto Rico, generate public policy recommendations, and monitors the response of government agencies to address gender violence on the Island. GEO is an initiative generated by a coalition of human rights community stakeholders in Puerto Rico. GEO is also part of the Latin American Network Against Gender Violence.

The Advisory Board of GEO is made up of the following organizations:
• Inter Mujeres Puerto Rico Corporation
• Coordinator Peace for Women (CPM)
• Health Workshop
• Matria Project
• Puerto Rican Organization of Working Women (OPMT)
• Kilometer 0
• Carmen Castelló - Project Case Tracking

Additionally, PRPB is a partner with PARE – Committee on the Prevention and Education of Gender-based Crime in Puerto Rico. PRPB should leverage its partnership to expand its community partnerships and work collaboratively with them on related initiatives.

## Paragraph 94: Equal Protection and Non-Discrimination - Sexual Assault and Domestic Violence

*PRPD's sexual assault policies and procedures shall provide clear and detailed guidelines for each stage of PRPD's response to a reported sexual assault, including (a) dispatch response; (b) initial officer response; (c) initial and follow-up victim interviews; and (d) on-scene and follow-up investigation. These protocols shall be based on recognized models and guidelines on forensic examinations, such as, for example, the National Protocol for Sexual Assault Medical Forensic Examinations issued by DOJ's Office of Violence Against Women.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2020 – September 2021 |
| Policy: | Implemented | | |

---

[7] https://www.justice.gov/ovw
[8] https://oig.cepal.org/en

| | | | |
|---|---|---|---|
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. PRPB's sexual assault policies and procedures comply with the requirements of the Paragraph. | ☑ Met | ☐ Missed |
| 2. 95% of reviewed sexual assault investigations complied with requirements of the Paragraph. | ☐ Met | ☑ Missed |

Note: This Paragraph is assessed together with Paragraphs 93, 98 and 99.

### Compliance Assessment

A review of case files in this period found inconsistent file folders and forms. The files are disorganized and randomly put together. The depth of detail in cases is inconsistent. Interview techniques were not consistent. Some interviews were handwritten by the victim and others were transcribed by the officer. There was no noted follow-up on corroborating evidence when the victim stated being stalked or harassed. Even when the victim shared additional crimes, there appeared to be no follow-up. The case was investigated only on the case elements that were reported. If the victim did not cooperate with the officer and did not express wanting to file charges the case was immediately closed, and no follow-up was conducted.

The interview techniques used by PRPB in these types of cases is also in need of a victim-centered approach. This includes aiding the victim with the support of an advocate. If PRPB is conducting this element in the investigative process it is not noted in the case file. Training associated on how to interview the victim, suspect(s), and outcry witnesses was not submitted to the Monitor for review.

Some files had supervisor approval and signed documentation that the supervisor approved the report. This is a good measure to keep in place and provides accountability to supervisors for follow-up and thoroughness of the report.

### Pathway Forward

As stipulated in the Agreement, PRPB is to collaborate closely with community advocates. PRPB could benefit from creating a multi-disciplinary group on how a sexual assault case should the handled. The group should consist of police, prosecutors, medical staff, and community advocates. These groups all handle a portion of the case, and the collaboration can help establish protocols. The group can aid in the development of protocols and training focused on victim-centered service delivery, as well as expanding on other victim service initiatives.

Training should provide PRPB with the necessary tools for providing consistent and appropriate services to crime victims, working collaboratively with partner agencies when serving victims, and providing a model of professionalism for victim-centered service.

Interviewing techniques and training can be found through End Violence Against Women International (EVAWI).[9] This international association's mission is to train those who respond to gender-based violence, equipping them with the knowledge and tools they need to support victims and hold perpetrators accountable. EVAWI promotes victim-centered approaches, multidisciplinary collaboration between professionals, allies, and the public. EVAWI held its annual conference earlier this year, but it has an online academy of training sessions available to assist PRPB.

## Paragraph 95: Equal Protection and Non-Discrimination - Sexual Assault and Domestic Violence

*PRPD shall re-assess and revise, where needed, its classification protocols for crimes involving sexual assaults. PRPD shall track all reports of felony sexual assault based on the UCR definitions.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2020 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. PRPB is appropriately classifying crimes involving sexual assault as required by the Paragraph. | ☑ Met   ☐ Missed |
| 2. PRPB's classification and tracking of felony sexual assault crimes comply with the Paragraph. | ☐ Met   ☑ Missed |
| Note: This Paragraph is assessed together with Paragraph 82. | |

### Compliance Assessment

PRPB submits incident reports of sexual assaults and abuse of minors in the EIS, which is currently used to manage cases. As part of this case management process, PRPB requires the investigating agents, and the supervisors of the respective division, to periodically verify the status of the case. Follow-up of the cases includes giving emphasis and attention to the alerts that the system generates through the official mail. PRPB has also started utilizing different statistical reports as ordered from GO 100-115, Division of Sexual Crimes and Abuse of Minors, to track the status of these cases.

PRPB submitted two documents as evidence of classifying and tracking of sexual assault cases. The Excel report provided states that these investigations produced 54 arrests and the EIS document (Domestic Violence Statistics) breaks down the report to provide spousal sexual assault investigations which produced 29 arrests. In utilizing the EIS/case management system it is important that the global report

---

[9] https://evawintl.org/

capture the breakdown of the number of cases reported in the Excel report. Further review is needed to determine if the system does provide the breakdown of data for classification and tracking purposes.

### Pathway Forward

The plan to utilize EIS as the record and report management system means that the system should be designed to capture classification protocols of crimes involving sexual assaults. The system should have the ability to track all reports of felony sexual assaults based on Uniform Crime Report (UCR) definitions. This statistical accuracy is important because of the relevancy to public reporting.

## Paragraph 96: Equal Protection and Non-Discrimination - Sexual Assault and Domestic Violence

*PRPD shall ensure that its Sex Crimes Investigation Unit is accessible through a hotline that is staffed 24-hours a day with trained responders.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually as to Data Sources #1 and #2. Bi-annually for the remaining Data Sources. |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Policy on Sex Crimes Investigation Unit incorporates the requirements of the Paragraph. | ☑ Met | ☐ Missed |
| 2. Training on response to sex crimes related calls is in accordance with approved policy. | ☐ Met | ☑ Missed |
| 3. 100% of sampled 24-hour hotline PRPB personnel are trained and certified in responding to sex crimes related calls. | ☐ Met | ☑ Missed |
| 4. PRPB maintains a staffed 24-hour a day hotline with trained responders for sex crimes. | ☑ Met | ☐ Missed |
| 5. The manned hotline provides the public access to the Sex Crimes Investigation Unit. | ☐ Met | ☑ Missed |

### Compliance Assessment

The Monitor conducted an onsite visit to the 24-hour hotline related to sexual assault calls and found the center to be staffed 24 hours a day. The center location however is not conducive for taking such calls. The center is a desk phone located on a reception desk, in an open public area. There is no mechanism to maintain phone connection with a caller if the call is dropped. Further, the documentation form used to capture information provided on the call is in critical need of updating. The form appeared to be a copy of a printed form that was reprinted several times. The unit still uses hard copy documentation, and no computerized system is in place. The unit needs a new printer for its scope of work and the officers assigned to the unit have to resort to using personal cell phones to have calls

116

transferred to them after normal work hours. The user manual located on the desk to help direct staff in their procedures is outdated, dated 2016. Copies of instructions, and document samples were found to be illegible and hard to read. PRPB submits that it has sufficient staff to operate the call center 24 hours.

*Pathway Forward*

The staffing hours documentation is the only piece of information that the Monitor received for review. Documentation of staff trainings and certifications of staff is necessary to review for compliance. New printers are needed, given the sensitivity and necessity of documentation to be legible. The utilization of a telephonic computer system that supports the call center is recommended, rather than the use of personal equipment. The 24-hour call center should also consider becoming credentialled through the National Organization of Victim Assistance (NOVA).[10] NOVA can customize the level of credentialing given the scope of work within PRPB.

## Paragraph 97: Equal Protection and Non-Discrimination - Sexual Assault and Domestic Violence

*PRPD shall track dispositions of sexual assault investigations, including arrests, whether the prosecutor charged the suspect, and whether a conviction resulted. PRPD shall also track sexual assaults by gender and incidents in which more than one participant is arrested. PRPD shall report this data as part of its annual report.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2020 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. PRPB is tracking dispositions of sexual assault investigations based on the requirements of the Paragraph. | ☑ Met | ☐ Missed |
| 2. PRPB is reporting the sexual assault disposition data in its annual report. | ☑ Met | ☐ Missed |

*Compliance Assessment*

PRPB submits as part of its annual report two tracking documents of sexual assault investigations. The documents are in a table format that report the details of victims by gender, the number of arrests and convictions, the number of cases where an investigation produced an arrest, the number of cases that a prosecutor ratified a charge, and the number of convictions. There was a total of 704 sexual assault cases reported between January 1 – December 31, 2020.

---

[10] https://www.trynova.org/credentialing/

117

*Pathway Forward*

A disposition tracking system in its records management system should isolate and collect final disposition information. Public dissemination of the sexual assault dispositions that should be included in the annual report are dispositions of sexual assault investigations, including arrests, whether the prosecutor charged the suspect, and whether a conviction resulted. This information is captured in this report and public dissemination is next step. PRPB could benefit greatly from expanding this report to include analysis of data, which could provide strategies to address any changes or issues. For example, the allocation of resources in particularly high crime areas or the development of advocacy outreach in areas with higher reporting numbers.

## Paragraph 98: Equal Protection and Non-Discrimination - Sexual Assault and Domestic Violence

*PRPD's domestic violence policies and procedures shall clearly delineate the duties of all PRPD officers and staff and provide clear and detailed guidelines for each stage of PRPD's response to a report of domestic violence.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2020 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. PRPB's policies and procedures regarding domestic violence meet the requirements of the Paragraph. | ☒ Met | ☐ Missed |
| 2. 95% of reviewed domestic violence investigations complied with requirements of the Paragraph. | ☐ Met | ☒ Missed |
| Note: This Paragraph is assessed with Paragraphs 93, 94 and 99. | | |

*Compliance Assessment*

The Monitor's summary assessment of findings from the domestic violence case review is the same as it was for sexual assault investigations. PRPB needs to manage the quality, content, and accuracy about the crime or incident. Review of case files in this period found inconsistent file folders and forms. The files are disorganized and randomly put together. The depth of detail in cases is inconsistent. Interview techniques were not consistent, some interviews with victims were handwritten by the victim and others were transcribed by the officer. The case was investigated only on the case elements that were reported. If the victim did not cooperate with the officer and wanted to file charges the case was immediately closed, and no follow-up was conducted.

118

Domestic violence advocacy referrals were not provided to the victim consistently. Some cases noted that the investigator did provide victims with next step information, which is a form used by PRPB to advise the victim on how to find a safe place away from the abuser. Not all cases contained the advocacy referral documentation.

The interview techniques used by PRPB in these types of cases is also in need of attention. Interviews miss establishing a victim-centered approach. This includes assigning the victim to an advocate. If PRPB is conducting this element in the investigative process it is not noted in the case file. Trainings on how to interview the victim, suspect(s), and outcry witnesses were not submitted for review.

Review of domestic violence reports found that each region of the Island has its own police report template. Specifically, four different report styles were reviewed. Aibonito, Arecibo, Bayamon, and Fajardo all had a different report template. Some of the reports were computer generated but most were handwritten. This made the reports difficult to read and comprehend.

Some files had supervisor approval, with signed documentation that the supervisor approved the report. This is a good measure to keep in place and provides accountability to supervisors for follow-up and thoroughness of the report.

*Pathway Forward*

Training should provide PRPB with the necessary tools for providing consistent and appropriate services to domestic violence crime victims. Working collaboratively with partner agencies when serving victims and providing a model of professionalism for victim-centered service, should be the objective of the police response. Educating officers on the techniques and available resources should also be included in the initial police response. Currently, PRPB police reports document two special processes. The first is an orientation notification, which explains to the victim or reporting party that the questions asked during the calls will not delay PRPB's response and/or delay the help they will receive. The second document is a victim escape plan. While these are important notations in a police report, these do not in whole qualify PRPB's role and interactions with victims in a victim-centered approach.

Additional information of shelters and local programs that provide support, counseling, safety planning, and other services to victims of abuse should be provided to the victim. Initial and follow-up investigators should provide the victim with advocacy support and document that support.

Documentation of advocacy referrals should be noted in police reports. A list of resources in Puerto Rico can be found at:

https://www.womenslaw.org/find-help/pr/advocates-and-shelters/local-programs

A standardized reporting template should be used throughout the state. PRPB has a records management system for generating a police report. Uniformity in police reporting will prove that the information is collected accurately and that all key components of the case are provided. For example, in the computer-generated report there is a category of services provided to the victim. This information is not captured in other report templates. Having this information will provide for continuity of services

119

for the victim. As importantly, it will also provide the investigative officer with a document that details all the facts, circumstances, and timelines of the events surrounding the incident.

## Paragraph 99: Equal Protection and Non-Discrimination - Sexual Assault and Domestic Violence

*PRPD shall implement measures to respond to reports of domestic violence and sexual assault involving PRPD officers, including disarming officers and assessing their fitness for duty.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2020 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. PRPB policies and procedures implement measures to respond to reports of domestic violence and sexual assault involving PRPB officers, including disarming officers and assessing their fitness for duty. | ☑ Met | ☐ Missed |
| 2. 95% of reviewed investigations of domestic violence and sexual assault involving a PRPB officers complied with requirements of the Paragraph. | ☐ Met | ☑ Missed |

Note: This Paragraph is assessed with Paragraphs 93, 94, and 98. The conduct envisioned by this Paragraph may also fall within the purview of Paragraph 184.

### Compliance Assessment

The Monitor reviewed both administrative and criminal domestic violence police cases involving PRPB members. The cases purport to demonstrate how PRPB handles incidents of sexual assault and/or domestic violence involving a PRPB officer.  It is noted that a victim-centered approach to the victim in these types of cases is higher than in those involving the public. This is determined from a review of the sexual assault and domestic violence cases in this reporting period. Therefore, PRPB's capabilities of handing a case with a victim-centered approach is evident.

PRPB must consistently apply a victim-centered approach. This finding leads to support that the investigators in this unit have the knowledge and educational application needed for a victim-centered approach throughout the investigation.

It is noted from reviewed SARP case files that PRPB does a good job in facilitating the Employee Assistance Program (EAP) and attending to victims of domestic violence that involves those in the department.

120

*Pathway Forward*

PRPB investigators assigned to the Domestic Violence and Sexual Assault Units could benefit from training on investigative protocols and processes taught by investigators assigned to SARP. These investigators have a level of proficiency and expertise in the investigative process that could greatly benefit the field investigators. Even the most serious violence problems afford opportunities for teaching and learning if such problems are taught by cross sections of a police agencies membership.

A recommendation is made to utilize mandated EAP to intervene proactively, before serious personal and job-related problems appear. This proposal suggests that police officers' styles of coping with stress are expressed much earlier in one's career than what is commonly assumed. A proactive EAP promotes wellness and teaches coping skills that are beneficial in handling personal and professional matters.

## Paragraph 100: Equal Protection and Non-Discrimination - Sexual Assault and Domestic Violence

*PRPD shall track dispositions of domestic violence investigations, including arrests, whether the prosecutor charged the suspect, and whether a conviction resulted. PRPD shall also track domestic violence arrests by gender and incidents in which more than one participant is arrested. PRPD shall report this data as part of its annual report.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2020 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. PRPB is tracking dispositions of sexual assault investigations based on the requirements of the Paragraph. | ☑ Met   ☐ Missed |
| 2. PRPB is reporting the sexual assault disposition data in its annual report. | ☑ Met   ☐ Missed |

*Compliance Assessment*

PRPB submits as part of its annual report a document that reports the details of victims by gender, the number of arrests and convictions, the number of cases where an investigation produced an arrest, the number of cases that a prosecutor ratified a charge, and the number of convictions. There was a total of 6,691 cases of domestic violence reported between January 1 – December 31, 2020. There are two sections of this report that were reviewed that list gender of the victim and the details of arrests and convictions. These sections are consistent with one another.

121

*Pathway Forward*

A disposition tracking system in its records management system should isolate and collect final disposition information. Public dissemination of the domestic violence dispositions to be included in the annual report are dispositions of domestic violence investigations, including arrests, whether the prosecutor charged the suspect, and whether a conviction resulted. Additionally, the annual report should include information of domestic violence assaults by gender and incidents in which more than one participant is arrested.

# V. Policies and Procedures

PRPB has made demonstrable progress in the development of its policies. Nevertheless, work remains to be done in terms of ensuring that both officers and the public have access to updated policies, and that officers are regularly trained on updated policies. PRPB's implementation of a Virtual Policy Library represents a considerable step in the right direction. However, as of the CMR-5 reporting period, the library is still in the initial stages of its release to the public. Further, PRPB will need to incorporate additional measures to ensure that the system is capturing data that may demonstrate whether officers have opened and read new and/or revised policies. Finally, issues with the system's integrity undermined PRPB's efforts to deliver virtual training in response to COVID-19 protocols that have limited PRPB's ability to conduct in-person trainings. As of this report, PRPB has begun initial steps to reinstate virtual training and, as COVID-19 restrictions are lifted, expand in-person trainings. The Monitor will continue to assess PRPB's compliance with this section and report on further progress in CMR-7.

Overall, PRPB's compliance with the eight paragraphs within Policies and Procedures reflect continued progress to what was noted in previous reports. In CMR-3, 88% of paragraphs were assessed as Partially Compliant, in comparison to the current reporting period, where 100% of paragraphs were found to be Partially Compliant. See figure 6.



*Figure 6. Policies and Procedures: Paragraph Compliance Status*

## Paragraph 109: Policies and Procedures - General Provisions

*Policies and procedures shall reflect and express PRPD's core values and priorities, and provide clear guidance to ensure that officers and civilian employees lawfully, effectively, and ethically serve the community. PRPD shall develop comprehensive and agency- wide policies and procedures to ensure consistency with, and full implementation of, each requirement of this Agreement. These policies and procedures shall define terms clearly, comply with applicable law, and comport with generally accepted policing practice. PRPD shall apply policies uniformly and hold officers accountable for complying with policies and advancing PRPD's core values and priorities.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2020 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

Note: Compliance will be determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 110-116, and (2) the results of outcome assessments, pursuant to Paragraph 243.

### *Compliance Assessment*

All PRPB policies reviewed to date express PRPB's core values and require that personnel serve the community lawfully, effectively, and ethically. However, compliance in this paragraph is dependent on the implementation of Paragraphs 110- 116, which require that all PRPB personnel be fully trained on all policies and fully implement those policies. Although PRPB instituted a virtual training system that has helped keep personnel up to date on training, the Monitor has not had an opportunity to review that system to determine its validity and effectiveness. In addition, in 2021 PRPB discovered that several officers had misused the virtual training system and as a result ceased all virtual training, delaying the required training. Finally, in-person practical exercises have not taken place since 2020 due to the pandemic, though they are required on certain policies such as General Orders 600-612, Searches and Seizures, 600-601, Rules for the Use of Force, and 600-615, Arrests and Summons.

### *Pathway Forward*

The Monitor looks forward to PRPB's reinstatement of virtual training. As of this report, the Monitor's Office was informed that PRPB is in the process of partnering with a new vendor to develop, revise, and implement its virtual training programs. The Monitor will review and evaluate the virtual training on all policies and continue to assess compliance with this paragraph along with the implementation of paragraphs 110-116.

## Paragraph 110: Policies and Procedures - General Provisions

*PRPD shall develop and publish a department-wide policy and procedure manual that will include all policies, procedures, and regulations governing all administrative and operational aspects of PRPD. The manual shall be organized by subject-matter and indexed for reference.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2020 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. The Policy and Procedures Manual is complete, organized, and indexed, as required by the Agreement. | ☐ Met | ☑ Missed |
| 2. The current Policy and Procedures Manual is accessible to officers in 95% of selected precincts and units. | ☑ Met | ☐ Missed |

### Compliance Assessment

In place of a "Policies and Procedures Manual", pursuant to GO 400-409, Virtual Library, PRPB has created a Virtual Library that lists PRPB policies, regulations, and manuals, which are easily accessed and searchable by title, key word, subject, and/or document number. The library is available via PRPB's web site to all officers with access to a computer or a smartphone with internet capability. However, the public's access to the virtual library is in its initial stages of release. The library was just made available to the public, in an abbreviated form, in early October 2021, outside of the reporting period covered by this report. The Monitor tested the publicly available system as it existed on October 14, 2021 and was able to access the following manuals and general orders: FIU, CIC, SARP, FTO, SAIC, SAEA, DOT, Special Weapons and Tactics (SWAT), Arrests and Summons, Search and Seizure, and Recruitment. Many other manuals, internal and external rules and regulations, and general orders were also listed. Though the Monitor observed that a great number of PRPB documents were listed on the system, the Agreement (Paragraph 111) requires that at least five manuals be included in the library, including all "…units or functions under SAOC, SARP and SAIC." However, at least one required policy, homicide investigations, is not listed separately yet. The Monitor noted that the Homicide Unit Investigator's responsibilities are listed in the CIC manual.

### Pathway Forward

The Monitor will continue to assess PRPB's progress with implementing the virtual library and its public accessibility. PRPB must include all policies and the five manuals listed in Paragraph 111 and ensure that all such information is accessible to all officers and the public to continue to move forward with fully complying with this paragraph.

124

## Paragraph 111: Policies and Procedures - General Provisions

*PRPD's unit-wide policies and procedures shall be collected in unit-level policy and procedure manuals. PRPD shall develop unit-level policy and procedure manuals for, at a minimum, the following PRPD units or functions:*

*a) Field operations, including patrol, special and tactical operations, field support, special weapons and tactics, canines, supervision task forces, and mass demonstration or event policing;*

*b) SPR, including case and records management, administrative investigations, confidential investigations, parallel criminal and administrative investigations, FIU investigations, audits, and officer drug testing;*

*c) Use of Force Reporting, Investigation, and Review, including both Supervisory and Serious Use of Force Investigations and Review; and In- Custody Death Reviews;*

*d) Criminal investigations, including sub-units assigned to investigate homicides, sexual assaults, domestic violence, narcotics, vice, and illegal firearms; and*

*e) Recruitment and Training, including training provided by UCCJ and in- service training.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2020 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Implemented | | |

### Compliance Targets

| | Met | Missed |
|---|---|---|
| 1. Unit-wide policies and procedures are collected in manuals for each of the five areas specified in the Agreement. | ☐ Met | ☒ Missed |
| 2. The current unit-level policy and procedures manual is accessible to officers in 95% of selected precincts and units. | ☒ Met | ☐ Missed |

### Compliance Assessment

A policy and procedure manual is an important codified document that outlines all the necessary policies, procedures, Standard Operating Procedures (SOPs), best practices, and rules that the employees of the organization must follow. It is necessary to codify the rules and create a manual that employees can reference for compliance and risk management purposes. For example, all officers should have easy access to rules and procedures regarding seized property, arrest procedures, use of force, etc. In place of a "Policies and Procedures Manual", PRPB created a Virtual Library pursuant to GO 400-409 which lists PRPB policies, regulations, and manuals. The library is available via the PRPB website to all officers with access to a computer or a smartphone with internet capability. The Monitor tested the publicly available system as it existed on October 14, 2021, and was able to access the following manuals and general orders: FIU, CIC, SARP, FTO, SAIC, SAEA, DOT, SWAT, Arrests and Summons, Search and Seizure, and Recruitment. Many other manuals, internal and external rules and regulations, and general orders were also listed. Though the Monitor observed that a great number of PRPB documents were listed on the system, the Agreement (Paragraph 111) requires that five manuals be included in the library,

125

including all "...units or functions under SAOC, SARP, and SAIC". However, at least one required policy that covers homicide investigations is not listed separately yet. The Monitor noted that the Homicide Unit Investigator's responsibilities are listed under the CIC manual.

*Pathway Forward*

PRPB is on the right path to creating an electronic manual via the Virtual Library. It should continue to develop the Virtual Library moving forward and include the five manuals and pertaining policies listed here and make them accessible to all officers and the public.

## Paragraph 112: Policies and Procedures - General Provisions

*PRPD shall review each newly developed policy after it is issued and revise the policy as necessary to ensure that it provides effective guidance to PRPD personnel.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2020 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies on policy development incorporate the requirements of the paragraphs. | ☑ Met | ☐ Missed |
| 2. Orientation on policy development protocols is consistent with approved protocols. | ☑ Met | ☐ Missed |
| 3. 95% of policies and procedures due for review during the evaluation period are reviewed and, as necessary, revised. | ☑ Met | ☐ Missed |
| 4. Stakeholder comments are reviewed and considered as part of the policy review process. | ☑ Met | ☐ Missed |
| 5. Internal comments and recommendations are reviewed and considered as part of the policy review process. | ☑ Met | ☐ Missed |
| 6. Policies are posted online in a timely manner or otherwise made available to the public as required by approved policies. | ☐ Met | ☑ Missed |

*Compliance Assessment*

In response to the Monitor's request for documentation related to this paragraph, PRPB submitted various annexes and certifications, including Annex A (See PRPB document #CMR5-PP-2675), which describes the protocol used to develop and review policies. In addition, PRPB submitted documents numbered OC-4-OR-1-549 and CMR5-PP-5462 through CMR5-PP-5470, which collectively provide a list of all the policies covered by the Agreement that were reviewed and/or revised during this period.

One component of compliance depends on whether internal and stakeholder comments and recommendations are reviewed and considered as part of the policy review process. To demonstrate

126

compliance with this stipulation, PRPB submitted documents CMR5-PP-4591 and CMR5-PP-4592, certifying that work unit comments are sought, reviewed, and considered as part of policy review (see also document CMR5-PP-04-2677).

PRPB submitted to the Monitor OC-4-OR-1-549 certifying that the Agency emails all new and revised policies to officers via *Policia Informa*, in addition to using the Virtual Library to which all officers have access. GO 200-201, which is the policy for PRPB's Written Communications System, also informs all officers and personnel that they are responsible for reading all policies and procedures sent to them via department email. However, as noted in our assessment of the above paragraphs, not all policies and manuals are listed within the Virtual Library or on PRPB's website, nor have all officers been trained on new and/or revised policies (see PRPB document CMR5-PP-2736 stating that Monthly Academy meetings were not held for the months of April through August 2021).

### Pathway Forward

The Monitor's review of the documents submitted by PRPB demonstrate continued progress towards compliance with this paragraph. PRPB is on the path to compliance with this paragraph, as evidenced by the creation of the Virtual Library, by PRPB's initial efforts to include all policies and manuals for its officers on this library in a timely manner, and by PRPB's work toward making the Virtual Library fully accessible to the public. The Monitor will continue to assess PRPB's efforts regarding the Virtual Library and the implementation of such policies into training and in practice.

### Paragraph 113: Policies and Procedures - General Provisions

*PRPD shall review each policy or procedure created or revised pursuant to this Agreement on an annual basis for the first three years from the Appointment Date or upon notice of a policy deficiency, and biannually thereafter. PRPD will develop a schedule for the biannual review. PRPD shall make revisions as necessary to ensure that policies and procedures remain consistent with this Agreement, generally accepted policing practice, and current law. All PRPD policies, including but not limited to those created pursuant to this Agreement, shall be posted online and otherwise made publicly available in a timely manner. Reasonable exceptions shall apply to policies and procedures that are law enforcement sensitive.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2020 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: This Paragraph is assessed together with Paragraph 112.

127

*Compliance Assessment*

PRPB submitted the Calendar of Policy Reviews, which lists all policies to be reviewed from 2019 through 2021.

As noted regarding paragraph 112,1) PRPB policies on policy development should incorporate the requirements of the paragraphs, 2) PRPB's orientation on policy development protocols is consistent with approved protocols, and 3) 95% of policies and procedures due for review during the evaluation period are reviewed and, as necessary, revised. Further, PRPB also made active efforts to review and consider stakeholder and internal comments as part of the policy review process. While, PRPB's internal Virtual Library has been fully implemented, its publicly accessible Virtual Library is not fully implemented in practice as of this report.

*Pathway Forward*

As noted in paragraph 112, substantial compliance with this paragraph hinges on the completion of reforms that PRPB has already begun. PRPB is on the path to compliance with this paragraph, as evidenced by the creation of the Virtual Library, by PRPB's initial efforts to include all policies and manuals for its officers on this library in a timely manner, and by PRPB's work toward making the Virtual Library fully accessible to the public. The Monitor will continue to assess PRPB's efforts regarding the Virtual Library and the implementation of such policies in training and in practice.

### Paragraph 114: Policies and Procedures - General Provisions

*Within a reasonable period of time, PRPD shall ensure that all relevant PRPD personnel have received, read, and been trained on all new or amended policies or procedures as necessary to fulfill their role as required by policies and procedures, including the obligation to report any policy or procedure violation.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2020 – September 2021 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | Met | Missed |
|---|---|---|
| 1. Policies incorporate the requirements of the paragraphs. | ☒ Met | ☐ Missed |
| 2. Training on information systems and agency communications is consistent with approved policies. | ☐ Met | ☒ Missed |
| 3. 95% of selected officers received and opened all agency transmittals with policies that were approved and issued during the evaluation period. | ☐ Met | ☒ Missed |
| 4. 95% of selected precincts or units notified personnel of new or revised policies related to the Agreement that were approved and issued during the evaluation period through monthly academies. | ☐ Met | ☒ Missed |

128

| | |
|---|---|
| 5. 95% of selected personnel received notification of policies advising that they may be subject to discipline, possible criminal prosecution, and/or civil liability for violating PRPB policy. | ☑ Met   ☐ Missed |

Note: Compliance with the training requirements in Paragraphs 114-115 will be based on the assessments for Paragraph 119 regarding pre-service training for new recruits and Paragraph 129 regarding in-service training for existing personnel.

## Compliance Assessment

All policies reviewed by the Monitor during this period incorporate the requirements of this paragraph. Examples include GOs 600-603, Expandable Baton, 600-624, Intervention with Transgender and Transexual People, and 600-632, Elimination of Sexual Violations in Cells, among others. All PRPB policies reviewed by the Monitor advise officers of the consequences of violating policies or for not reporting such violations by other officers. However, because of COVID-19 protocols in response to the pandemic, in-person training on new and revised policies has been suspended. Most PRPB districts and units reported that they did not conduct monthly academies during this reporting period or conducted only a few.

PRPB is in the process of developing new information systems for virtual training, which has resulted in a delay on policy training in these systems. Further, training on policies using existing systems is also lacking, due to integrity issues with the virtual training system. As noted in paragraph 109, misuse of the existing virtual training system resulted in the suspension of all virtual training.

As part of its review, the Monitor's Office requested documentation that could demonstrate that officers received and opened all agency transmittals of policies that were approved and issued during this period. In response to this request in relation to a representative sample of 163 randomly selected officers, PRPB was only able to certify that the policies were emailed via *Policia Informa*, but not that the officers opened and read the policies.

## Pathway Forward

As of this report, PRPB is working on reinstating its virtual training system. The Monitor will continue to assess progress on the reinstatement of training and in the protocols developed to ensure its integrity. Further, PRPB should ensure that it does not overuse the virtual training system. Training on topics such as UOF, tools and tactics, and arrests should not be solely conducted via virtual training. Scenario-based in-person training sessions on these topics is essential to an officer's understanding of the policy requirements and practical application of these procedures.

PRPB will be able to put itself back on the pathway to compliance when it is able to reinstate both virtual and in-person training, renew progress on the implementation of the Virtual Library, develop related information systems, and implement an electronic receipt system, such as PTMS, to indicate that officers actually received and opened email transmittals containing policies and/or other important messages.

## Paragraph 115: Policies and Procedures - General Provisions

*PRPD shall document that each relevant PRPD officer or other employee has received, read, and been trained appropriately regarding PRPD's policies and procedures.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2020 – September 2021 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed together with Paragraph 114.

*Compliance Assessment*

As noted in paragraph 114, the Monitor requested documentation showing that officers received and opened all agency transmittals with policies that were approved and issued during this period. The Monitor requested such information for a sample of 163 randomly selected officers in a data request dated August 25, 2021. In response, PRPB was able to certify that the policies were emailed via *Policía Informa* but were not able to provide evidence that the officers opened and read the policies. Furthermore, most PRPB districts and units reported that they did not conduct monthly academies during this reporting period or conducted only a few due to COVID-19 protocols in response to the pandemic. Finally, PRPB's in-service training was impacted by the integrity issues with the virtual training system, which caused PRPB to suspend virtual training in mid-2021. As of this report, PRPB is in the process of working with a new vendor towards reinstating its virtual training system.

*Pathway Forward*

Compliance with this paragraph is assessed together with paragraph 114, and as noted above, the Monitor will continue to assess PRPB's progress with reinstating its virtual training system. The Monitor will also track the continued implementation of the Virtual Library system to ensure that it is updated to include all policies and manuals, and accessible to all personnel and the public.

## Paragraph 116: Policies and Procedures - General Provisions

*PRPD shall advise all officers that taking police action in violation of PRPD policy may subject officers to discipline, possible criminal prosecution, and/or civil liability.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2020 – September 2021 |
| Policy: | Implemented | | |

| | | | |
|---|---|---|---|
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed together with Paragraph 114.

*Compliance Assessment*

All PRPB policies reviewed advise officers of the consequences of violating policies or not reporting such violations by other officers. Potential consequences include administrative discipline, as well as civil liability, and/or criminal prosecution. However, as this paragraph is assessed together with paragraph 114, PRPB must also ensure that these policies are available and accessible by both officers and the public, that officers are trained on these policies by way of in-person and/or virtual training, and that its information systems are implemented. Additional work on these aspects of the paragraph remains.

*Pathway Forward*

Compliance with this paragraph is assessed together with paragraph 114, and as noted above, the Monitor will continue to assess PRPB's progress on reinstating its virtual training system and monitor the continued implementation of the Virtual Library system to ensure that it is updated to include all policies and manuals and is accessible to all personnel and the public.

# VI. Supervision and Management

Supervisors are essential for bringing PRPB practice into alignment with generally accepted policing practices. They serve as the two-way conduit of information between PRPB leadership and the rank and file. It is essential for supervisors to spend time in the field with their agents to evaluate their performance, provide guidance, and hold their officers accountable when not following policies or training. Although some PRPB agents report that their supervisors support them in the field, PRPB compliance with various aspects of the paragraphs within this section require continued efforts. For example, supervisors are hampered in their ability to manage their agents because of the agency's limited and misuse of its current EIS and the shortage of supervisors. For PRPB to achieve compliance with the supervision and management paragraphs in the Agreement, all supervisors must understand and apply management principles in accordance with PRPB's policies, procedures, administrative processes, management systems, generally accepted policing practices, and the Agreement.

Overall, PRPB's compliance with the 19 paragraphs assessed during this reporting period (5 paragraphs are assessed annually and will be reviewed in CMR-6) within Supervision and Management reflect similar levels of compliance to what was noted in previous reports. In CMR-4, 26% of the 24 paragraphs were assessed as Partially Compliant, in comparison to the current reporting period, where 32% of the 19 paragraphs were found to be Partially Compliant. See figure 7.



*Figure 7. Supervision and Management: Paragraph Compliance Status*

## Paragraph 135: Supervision and Management - General Provisions

*PRPD shall ensure that an adequate number of qualified first-line supervisors are deployed in the field to allow supervisors to provide close and effective supervision to each officer under the supervisor's direct command, to provide officers with the direction and guidance necessary to improve and develop as police officers, and to identify, correct, and prevent misconduct. PRPD shall develop policies for supervision that set out clear requirements for supervisors and are consistent with generally accepted policing practices.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

Note: Compliance will be determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 136-158, and (2) the results of outcome assessments, pursuant to Paragraph 243.

### *Compliance Assessment*

The Monitor's Office acknowledges that it failed to request staffing documents for CMR-5 but is working with PRPB to ensure that the Bureau can provide the Monitor's Office with evidence of close and effective supervision going forward. Starting with CMR-6, the Monitor's Office is requesting that PRPB provide both logbooks and structured data from Kronos for a random sample of units. This data will allow the Monitor's Office to determine whether PRPB is complying with the stipulation of paragraphs 136-140 stating that PRPB maintain a ratio of one supervisor to ten supervisees across operational units during those two months.

132

It should be noted that members of the Monitor's Office have viewed sample staffing documents, which clearly identify all personnel in the area during several on-site visits, such as those conducted in Bayamon.

Further, to help obtain compliance, PRPB should develop and implement a system to document and track which employees have been transferred and why. The information provided by PRPB did not contain all requested information. The documents provided tracked employees' locations and transfers. However, the documents failed to explain the factors that determined why employees were transferred.

The Monitor's Office recommends that PRPB review the V2A staffing study, which was completed in 2018, to ensure that the study's recommendations remain pertinent as population and crime dynamics change, and to ensure that proper deployment is utilized accordingly. The Monitor's Office continues to question whether any redeployment of assets has been made based on the staffing study. Redeploying to bring staffing in line with the study would serve to make PRPB more effective and efficient. Information has not yet been provided to the Monitor's Office verifying that an adequate number of supervisors have been deployed in the field, or that the recommendations of the staffing study have been properly implemented by PRPB. Police departments across the country use staffing studies to better serve the community and operate the organization efficiently and effectively.

During the Status Conference held in September 2021, the court was informed that PRPB is working on a tool that would help them better utilize the information from the V2A staffing study.

Training records demonstrating that supervisors are certified (including certification on EIS and internal audits), have not been provided. This is because these systems continue to be in developmental stages.

*Pathway Forward*

PRPB must ensure that an adequate number of qualified first-line supervisors are deployed in the field to provide the close and effective supervision necessary for officers to 1) improve and grow professionally, 2) police actively and effectively, 3) prioritize community policing and problem solving, and 4) identify, correct, and prevent misconduct. The Monitor will again request supporting documentation from PRPB, including logbooks, that demonstrate an adequate ratio of supervisors to officers and will work with PRPB to clarify the specific documentation required for the assessment of this paragraph. The Monitor's Office also encourages PRPB to complete the development and implementation of EIS, conduct personnel integrity audits, and ensure the implementation of inter-agency feedback systems.

## 1. Duties of Supervisors

As part of their responsibility, supervisors must thoroughly, objectively, and routinely review all aspects of agent conduct, including a review of all uses of force, probable cause for arrests and the appropriateness of charges filed, and reasonable suspicion for stops and searches that do not result in an arrest. Additional responsibilities should include a thorough knowledge of the requirements of the Agreement, de-escalation, and community policing.

Although PRPB has made some progress, policies need to incorporate all requirements of the below paragraphs. Further, PRPB should ensure that officer and supervisor schedules, assignments, and ratios

are consistent with supervision policies and that supervisors are assigned and deployed in accordance with approved supervision policies. This, coupled with the issues in the consistency of supervisory assignments and supervisor ratios, hampers the agency's ability to achieve compliance with the paragraphs listed in this subsection.

## Paragraph 136: Supervision and Management - Duties of Supervisors

*All operational field officers shall be assigned to a single, consistent, and clearly identified supervisor. Supervisors shall be assigned to and shall substantially work the same days and hours as the officers they are assigned to supervise, absent exceptional circumstances. Scheduled leave (such as vacation time), unscheduled leave (such as sick leave due to illness or injury) and other routine absences (such as court appearances and training obligations) shall not be deemed noncompliance with this provision.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Not Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 136-140. | ☐ Met | ☑ Missed |
| 2. Supervision trainings are consistent with approved policies. | ☐ Met | ☑ Missed |
| 3. 95% of sampled supervisors are trained and certified in all policies related to supervision (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 4. Officer and supervisor schedules, assignments, and ratios are consistent with supervision policies. | ☐ Met | ☑ Missed |
| 5. Supervisors are assigned and deployed in accordance with approved supervision policies. | ☐ Met | ☑ Missed |
| 6. 95% of interviewed personnel perceive that supervision is close and effective. | ☐ Met | ☑ Missed |
| 7. 95% of sampled referrals indicate proactive observation and intervention to ensure adherence to policies, law, and the Agreement. | ☐ Met | ☑ Missed |

### *Compliance Assessment*

Current policies do not incorporate all the requirements of Paragraphs 136-140. This was confirmed in interviews with a random sample of PRPB supervisors. Supervision trainings are consistent with previously approved policies by the Monitor. However, the recent changes involving virtual training has impacted the ability of PRPB to offer in-service training. Many of the interviewed supervisors reported that it was difficult to obtain their 40 hours of in-service training due to COVID-19 restrictions and the fact that much of the virtual training ceased due to integrity issues. This paragraph stipulates that

supervisors must receive approved training before they are allowed to assume their position in PRPB, though COVID-19 has clearly impacted this compliance target.

Officer and supervisor schedules, assignments, and ratios are not consistent with supervision policies, as was reported by supervisors during interviews. Many of those interviewed noted morale problems within PRPB. 95% of interviewed personnel believe that supervision is close and effective. 95% of interviewed personnel also indicated proactive observation and intervention to ensure adherence to policies, law, and the Agreement.

The Monitor finds that because of PRPB's inability to demonstrate adequate supervision to agent ratios, and clear shortages in supervisory staff, PRPB is currently not compliant with this paragraph.

### *Pathway Forward*

PRPB should revise its policies to ensure that they incorporate all the requirements of Paragraphs 136-140. Further, PRPB should also ensure that officer and supervisor schedules, assignments, and ratios are consistent with supervision policies and that supervisors are assigned and deployed in accordance with approved supervision policies. The Monitor will continue to assess PRPB's progress with the above.

### Paragraph 137: Supervision and Management - Duties of Supervisors

*First-line field supervisors shall be assigned to supervise no more than ten officers for the first five years of this Agreement. After considering the results of the staffing study required by Paragraph 13 and whether the first-line supervisors are meeting all of the supervisory requirements of this Agreement at the current officer to supervisor ratios, the TCA and the Parties shall determine whether to lower the number of officers supervised by each first-line field supervisor. On-duty field supervisors shall be available throughout their shift to respond to the field to provide supervision to officers under their direct command and, as needed, to provide supervisory assistance to other units.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

Note: This Paragraph is assessed with Paragraph 136.

### *Compliance Assessment*

The Monitor's Office has requested that PRPB provide documentation to demonstrate that each supervisor oversees no more than 10 individuals. However, the Monitor's Office has yet to receive clear evidence that this is true. A review of the requested logbooks from Paragraph 135 would impact this

paragraph by determining the consistency of supervisory assignments and supervisor ratio in accordance with the approved policies. Issues with consistency in the supervisory assignments and ratios were also stated by several supervisors who were interviewed.

*Pathway Forward*

As part of PRPB's efforts to utilize the staffing study to inform its operations, it should also develop an automated system that would allow PRPB to generate data from the 13 areas that identifies each supervisor and his/her assigned subordinates. To demonstrate compliance, the Monitor's Office requests that this information be provided in preparation for CMR-6. As noted throughout this report PRPB needs to improve its information systems and their interoperability so it can provide the Monitor's Office with the requested data in a more efficient manner.

## Paragraph 138: Supervision and Management - Duties of Supervisors

*PRPD shall develop a program to ensure consistent field supervision when assigned supervisors are absent or otherwise unavailable for their tour of duty.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 136.

*Compliance Assessment*

The Monitor's Office has not received any information about compliance with Paragraph 138, which requires a program to ensure consistent field supervision when assigned supervisors are absent or otherwise unavailable. The Monitor's Office has not received clear and convincing evidence that a program is in effect to substitute supervisors when there is a need due to absence of a supervisor.

*Pathway Forward*

As noted above, PRPB must develop an automated system that allows for the patrol division to capture information in reference to individual statistics, workload, and crime analysis data. PRPB should develop a more complete information management system utilizing the KRONOS, SITA, CAD, and Radio Control systems. A system like this will make the patrol division more effective and allow them to generate data from the 13 areas that list each supervisor and his/her assigned subordinates.

## Paragraph 139: Supervision and Management - Duties of Supervisors

*Precinct and unit commanders shall closely and effectively supervise the officers under their command.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: This Paragraph is assessed with Paragraph 136.

### Compliance Assessment

The below is reflective of the feedback received from the interviews conducted. The Monitor acknowledges that the shortage of supervisors and PRPB's inability to demonstrate close and effective supervision by providing adequate supporting documentation, and as such rates this paragraph as not compliant. It should be noted that several of the common themes related to areas of improvement centered around and staffing shortages.

Positive areas that were mentioned:

- Oral communication within PRPB;

- Professional and committed supervisors;

- Empathetic supervisors;

- Supervisors are open to new ideas and change;

- **The Agreement is the best thing that has happened to the Police of Puerto Rico;**

- Belief that the Commissioner has made positive changes

- Steps towards better pay.

Areas needing improvement that were mentioned:

- Number of front-line supervisors;

- Written communication – It was noted by several individuals that communication was primarily verbal; a few noted that they think supervisors fear investigation if communication is put in writing;

- More expansive training;

- More recruitment and retention;

- Removal of political influence from PRPB;

- Improvement of the pension plan, which will in turn attract better candidates;

- Continued upgrading of equipment;

- Shortage of qualified police candidates;

137

- Additional time to prepare for promotion tests;
- Accessibility and availability to complete 40 in-service training hours;

- Lack of staffing causing burnout and reductions in morale;
- More consistent application of the law by the Judicial System;
- Weapons training.

### Pathway Forward

The command staff should capitalize on the strengths and attempt to improve the deficiencies mentioned by their employees. The Monitor will again request supporting documentation from PRPB, including log books, that demonstrate an adequate ratio of supervisors to officers and close and effective supervision of supervisors. Many of the interviewed PRPB supervisors were very supportive of their female supervisors and noted benefits of increased female representation in supervisory roles. The Monitor notes that there are many resources available to assist PRPB in better supporting and mentoring female employees.[11]

### Paragraph 140: Supervision and Management - Duties of Supervisors

*All PRPD commanders and supervisors shall ensure that all supervisors and officers under their command comply with PRPD policy, Commonwealth of Puerto Rico and federal law, and the requirements of this Agreement.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: This Paragraph is assessed with Paragraph 136.

### Compliance Assessment

Although many of the PRPB personnel interviewed were supportive of their supervisors and felt that they help them comply with Bureau policy and law, some indicated that their supervisors could improve their management skills with additional training. Further, as stated in paragraph 136, there remain issues with the consistency of officer and supervisor schedules, assignments, deployments, and ratios.

---

[11] NAWLEE - Lead Inspire Mentor; Women in Policing: Breaking Barriers and Blazing a Path (ojp.gov); 30x30 Initiative.

*Pathway Forward*

Commanders and supervisors have greater responsibilities to ensure that officers under their command comply with Bureau policy and law based on their positions. Further interviews with PRPB personnel need to be conducted by the Monitor's Office to determine if supervision by PRPB supervisors is close and effective.

## 2. Supervisor Training

*Paragraphs 141 through 144 are assessed annually and will be reviewed in CMR-6.*

## 3. Performance Evaluation

As the Monitor's Office noted in CMR-4, the purpose of the PROMEDIA Project is to establish an effective evaluation system that allows a greater degree of uniformity and objectivity in establishing the criteria for measuring the performance of the members of PRPB in their functions. The supervisors who were interviewed by the Monitor's Office were very supportive of the PROMEDIA project.

### Paragraph 145: Supervision and Management - Performance Evaluation

*PRPD shall develop and implement a specific system to accurately evaluate the qualifications and performance of all PRPD officers in areas that include, but are not limited to, constitutional policing, integrity, community policing, and critical police functions on both an ongoing and annual basis. PRPD shall develop objective criteria to assess whether officers meet minimum qualifications and performance standards, including officers in inactive status, where appropriate. The evaluation system shall provide for appropriate remedial or disciplinary action.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 145-146. | ☑ Met | ☐ Missed |
| 2. Training on performance e evaluations is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled personnel files indicate that supervisors are trained and certified on policies regarding performance evaluations (or scheduled for training, in the case of mid-year reviews). | ☑ Met | ☐ Missed |
| 4. 95% of sampled officers meet minimum qualifications and eligibility criteria. | ☑ Met | ☐ Missed |

139

| 5. 95% of sampled performance evaluations adhere to approved policies. | ☐ Met ☑ Missed |
|---|---|

*Compliance Assessment*

In review of the related policies, the Monitor has found that all related policies incorporate all requirements of Paragraphs 145 and 146, and that supervisory trainings are consistent with approved policies. Further, 95% of sampled personnel indicate supervisors are trained and certified on policies regarding performance evaluations and meet minimum qualifications and eligibility criteria.

*Pathway Forward*

The performance evaluation system should continue to be developed and additional training provided in working with employees on goals, objectives, and mentoring to strengthen the system. The Monitor's Office recommends the PROMEDIA evaluation form include any goals and objectives that were mutually established by the supervisor and their employee. Further, PRPB must also ensure that the ratio of supervisors to officers is adequate to ensure that supervisors have the capacity to complete comprehensive performance evaluations.

## Paragraph 146: Supervision and Management - Performance Evaluation

*As part of this system, PRPD shall establish a formalized system documenting annual performance evaluations of each officer by the officer's direct supervisor. PRPD shall hold supervisors accountable for completing timely, accurate, and complete performance evaluations of their subordinates.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 145.

*Compliance Assessment*

The Monitor's Office received sufficient information to demonstrate the establishment of a formalized system documenting annual performance evaluations of each officer by the officer's direct supervisor.

*Pathway Forward*

PRPB should develop an automated system to compile a list of all supervisors who have completed timely and accurate performance evaluations of their subordinates and provide samples to the Monitor's Office for future CMRs to improve the compliance rating with this paragraph. Further, PRPB must also ensure

that the ratio of supervisors to officers is adequate to ensure that supervisors have the capacity to complete comprehensive performance evaluations.

## 4. Early Identification System

PRPB has developed various modules within its EIS. However, upon examination of these modules and further discussion with PRPB personnel, the Monitor noted that the current EIS in use by PRPB requires further development to ensure it serves as a non-punitive, proactive method for identifying agents that may need training, counseling, or other intervention before issues arise involving agent misconduct.

PRPB can only be considered in compliance with Paragraphs 147-153 when EIS is developed to the point where 1) supervisors are readily and consistently able to access the system to enter and retrieve all datapoints required by the Agreement and PRPB policy, and 2) PRPB leadership and third-party overseers are able to conduct data analysis of policing practices and outcomes using the EIS.
As a result of further work needed to improve its EIS and PRPB's inability to demonstrate accurate use of EIS in a comprehensive manner, the Monitor must rate the below related paragraphs as not compliant.

The Monitor notes that the Office of the Special Master and PRPB are working to develop the EIS related policies and protocols and the Monitor looks forward to assessing this progress.

### Paragraph 147: Supervision and Management - Early Identification System

*PRPD shall develop, implement, and maintain an early identification system ("EIS") to support the effective supervision and management of PRPD officers and employees, including the identification of and response to problematic behaviors as early as possible. PRPD shall regularly use EIS data to promote ethical and professional police practices; to manage risk and liability; and to evaluate the performance of PRPD employees across all ranks, units, shifts, commands, and organization components.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Not Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 147-153. | ☐ Met | ☑ Missed |
| 2. Training on EIS is consistent with approved policies. | ☐ Met | ☑ Missed |
| 3. 95% of sampled supervisors and personnel administering EIS are trained and certified in EIS policies (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |

141

| | | |
|---|---|---|
| 4. EIS data and records demonstrate compliance with EIS policy for 95% of selected officers who trigger EIS and officers who do not trigger EIS. | ☐ Met | ☑ Missed |
| 5. 95% of interviewed officers, supervisors, SARP personnel, and IT staff perceive EIS as an effective supervisory tool that addresses potential problematic behavior in a non-punitive manner. | ☐ Met | ☑ Missed |
| 6. EIS is functioning as designed, equipment is in good working order, and information is secure in 95% of selected units. | ☐ Met | ☑ Missed |

*Compliance Assessment*

In review of PRPB's compliance with this paragraph, the Monitor found that the policies related to the EIS do not incorporate all requirements of Paragraphs 147-153. Training on EIS is not consistent with approved policies. 95% of sampled supervisors and personnel administering EIS are not trained and certified in EIS policies (or scheduled for training, in the case of mid-year reviews). Further, as noted in previous CMR reports, and evidenced by the certification provided by PRPB for this reporting period, the Bureau is continuing to develop this system. EIS data and records do not demonstrate compliance with EIS policy or utilization in practice. 95% of interviewed officers, supervisors, SARP personnel, and IT staff do not perceive EIS as an effective supervisory tool that addresses potential problematic behavior in a non-punitive manner. EIS is not functioning as designed, though equipment is in good working order and information is secure in 95% of selected units.

Although PRPB has developed and is utilizing various modules within its EIS, the use of these modules is inconsistent and various supervisors stated that they cannot access information. Furthermore, upon examination of the EIS modules used by PRPB, the Monitor noted that the system was used to manage SARP cases and records and not as a proactive method for identifying agents that may need training, counseling, or other non-punitive interventions before issues arise involving agent misconduct.

*Pathway Forward*

The Monitor notes that the Office of the Special Master and PRPB are working to remedy the above issues in developing EIS related protocols and procedures. The Monitor looks forward to assessing the developments of this work in its upcoming reports.

## Paragraph 148: Supervision and Management - Early Identification System

*The EIS shall include a computerized relational database which shall be used to collect, maintain, integrate, and retrieve detailed data department-wide and for each officer regarding:*

*a) all uses of force;*

*b) injuries to and deaths of persons in custody;*

*c) all complaints and their dispositions;*

*d) data compiled under the stop data collection mechanism;*

*e) all criminal proceedings initiated, as well as all civil or administrative*

*claims filed, that bear upon an officer's performance or fitness including, but not limited to, domestic violence and protective orders;*

*f) all judicial proceedings involving domestic violence, protective orders, and any other judicial proceedings which may be related to an officer's performance;*

g) all instances in which PRPD is informed by a prosecuting authority that a declination to prosecute any crime was based, in whole or in part, upon concerns about the credibility of a PRPD employee or that a motion to suppress evidence was granted on the grounds of a constitutional violation by a PRPD employee;

h) all disciplinary action taken against employees;

i) all non-punitive corrective action required of employees;

j) all awards and commendations received by employees;

k) training history for each employee; and

l) identifying information for each PRPD officer and employee and;

m) demographic data for each civilian involved in a use of force or search and seizure incident sufficient to assess bias.

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Not Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

Note: This Paragraph is assessed with Paragraph 147.

### *Compliance Assessment*

PRPB provided a certification from a PRPB supervisor attesting that from April 2021 to September 2021, PRPB continued to develop the EIS. In the EIS, PRPB should include a computerized relational database, which shall be used to collect, maintain, integrate, and retrieve detailed data. The platform for the EIS has not yet been completely developed, and supervisors cannot yet utilize the information available from the EIS.

### *Pathway Forward*

The Monitor notes that PRPB and the Office of the Special Master are working to develop EIS related protocols and procedures. The Monitor looks forward to assessing the developments of this work in its upcoming reports.

## Paragraph 149: Supervision and Management - Early Identification System

*PRPD shall establish a unit to develop, implement, and maintain the EIS with sufficient resources to facilitate data input and provide training and assistance to EIS users.*

| Compliance Status | Assessment Schedule |
|---|---|

| Not Compliant | | Review Period | April 2021 – September 2021 |
|---|---|---|---|
| Policy: | Not Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 147.

*Compliance Assessment*

PRPB provided a certification from a PRPB supervisor attesting that from April 2021 to September 2021, PRPB continued to develop the EIS.

PRPB continues to develop a unit to implement and maintain the EIS with sufficient resources to facilitate data input and will provide training and assistance to EIS users. The policy and training continue to be developed by PRPB. The training curriculum has yet to be reviewed by the Monitor's Office.

*Pathway Forward*

The Monitor notes that PRPB and the Office of the Special Master are working to develop EIS related protocols and procedures. The Monitor looks forward to assessing the developments of this work in its upcoming reports.

### Paragraph 150: Supervision and Management - Early Identification System

*PRPD shall maintain necessary equipment, in sufficient amount and in good working order, to permit appropriate personnel, including supervisors and commanders, ready and secure access to the EIS system to allow for timely input and review of EIS data.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Not Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 147.

*Compliance Assessment*

PRPB indicated that from April 2021 to September 2021, PRPB continued to develop the EIS. In addition to being assessed with paragraph 147, PRPB must also demonstrate that it is maintaining the necessary equipment to permit access to the EIS, allowing for timely input and review of EIS data.

*Pathway Forward*

The Monitor notes that PRPB and the Office of the Special Master are working to develop EIS related protocols and procedures. The Monitor looks forward to assessing the developments of this work in its upcoming reports.

## Paragraph 151: Supervision and Management - Early Identification System

*PRPD shall develop a protocol for using the EIS and information obtained from it. The protocol for using the EIS shall address data storage, data retrieval, reporting, data analysis, pattern identification, supervisory use, supervisory/departmental intervention, documentation and audits, access to the system, and confidentiality of personally identifiable information. The protocol shall also require unit supervisors to periodically review EIS data for officers under their command, including upon transfer between PRPD units or regions.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Not Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 147.

*Compliance Assessment*

PRPB provided a certification from a PRPB supervisor attesting that from April 2021 to September 2021, PRPB continued to develop the EIS.

*Pathway Forward*

The Monitor notes that PRPB and the Office of the Special Master are working to develop EIS related protocols and procedures. The Monitor looks forward to assessing the developments of this work in its upcoming reports.

## Paragraph 152: Supervision and Management - Early Identification System

*PRPD shall maintain all personally identifiable information about officers and employees included in the EIS for at least five years following their separation from the agency. Information necessary for aggregate statistical*

145

*analysis shall be maintained indefinitely in the EIS. On an ongoing basis, PRPD will enter information into the EIS in a timely, accurate, and complete manner, and shall maintain the data in a secure and confidential manner.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Not Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 147.

*Compliance Assessment*

PRPB provided a certification from a PRPB supervisor attesting that from April 2021 to September 2021, PRPB continued to develop the EIS.

As the paragraph states, PRPB should maintain all personally identifiable information (PII) entered into the EIS about officers and employees for at least five years following their separation from the agency. Information necessary for aggregate statistical analysis should be maintained indefinitely in the EIS. As the system is still in development, PRPB is not able to demonstrate compliance with this paragraph.

*Pathway Forward*

The Monitor notes that PRPB and the Office of the Special Master are working to develop EIS related protocols and procedures. The Monitor looks forward to assessing the developments of this work in its upcoming reports.

## Paragraph 153: Supervision and Management - Early Identification System

*Following the initial implementation of the EIS, and as experience and the availability of new technology may warrant, PRPD may propose to add, subtract, or modify data tables and fields, modify the list of documents scanned or electronically attached, and add, subtract, or modify standardized reports and queries. PRPD will submit all such proposals for review and approval as set forth in Paragraph 229.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Not Implemented | | |
| Training: | Not Implemented | | Bi-annually |



| | | | |
|---|---|---|---|
| Practice: | Not Implemented | Assessment Frequency | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 147.

*Compliance Assessment*

PRPB provided a certification from a PRPB supervisor attesting that from April 2021 through September 2021, PRPB continued to develop the EIS.

*Pathway Forward*

The Monitor notes that PRPB and the Office of the Special Master are working to develop EIS related protocols and procedures. The Monitor looks forward to assessing the developments of this work in its upcoming reports.

## 5. Internal Audits and Interagency Feedback

PRPB has established an auditing system that identifies operational deficiencies, analyzes casual and contributing factors, and implements effective remedial action. The auditing protocols are based on generally accepted policing practices.

### Paragraph 154: Supervision and Management - Internal Audits and Interagency Feedback

*As part of PRPD's continuous improvement efforts and to ensure compliance with this Agreement, PRPD shall establish an auditing system that identifies operational deficiencies, analyzes causal and contributing factors, and implements effective remedial action. To effectuate the system, PRPD shall develop and implement auditing protocols that are based on generally accepted policing practices. The protocols shall provide the audited unit an opportunity to respond to preliminary findings and recommendations, as appropriate, to foster a culture of accountability and continuous improvement among all PRPD units and personnel.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 154-156. | ☑ Met | ☐ Missed |
| 2. Training on internal audits and inspections are consistent with approved policies. | ☑ Met | ☐ Missed |

147

| | | |
|---|---|---|
| 3. 95% of sampled personnel are trained and certified on the auditing and inspections system (or scheduled for training, in the case of mid-year reviews). | ☑ Met | ☐ Missed |
| 4. 95% of selected internal audits and inspections comply with policy. | ☑ Met | ☐ Missed |
| 5. Internal audits and inspections are scheduled regularly for all PRPB units, locations, and personnel. | ☑ Met | ☐ Missed |
| 6. PRPB prepares an annual report that (a) includes the conclusions and recommendations of internal audits and inspections conducted for the covered period and (b) is reviewed by the Commissioner and unit commanders to guide corrective action, as appropriate. | ☐ Met | ☐ Missed |

*Compliance Assessment*

In assessing PRPB's compliance with this paragraph, the Monitor found that all related policies incorporate all requirements of Paragraphs 154-156. Training on internal audits and inspections are consistent with approved policies, and 95% of sampled personnel are trained and certified on the auditing and inspections system (or scheduled for training, in the case of mid-year reviews). Furthermore, the Monitor also noted that 95% of selected internal audits and inspections were complying with policy, that internal audits and inspections were scheduled regularly for all PRPB units, locations, and personnel, and that PRPB will prepare an annual report on these inspections, which is expected to be released in January 2022. As such, compliance with the related target is deferred.

PRPB demonstrated that inspections were conducted between April 2021 and September 2021, and the Monitor verified these inspections. Based on this review, PRPB is found to be using the auditing system to identify operational deficiencies and their causes and contributing factors so that effective remedial action may be implemented. The investigations manual is comprehensive and well received by PRPB supervisors.

*Pathway Forward*

The Monitor's Office commends PRPB for its work on this paragraph and will continue to assess PRPB compliance with this paragraph. The Monitor's Office recommends that PRPB track outcomes on Corrective Actions and there be clear and convincing evidence that any problem areas are addressed. Recommendations should be made by SARP and the Area Commander to resolve the problems. The Monitor will also review the annual report, which is scheduled for release in January 2022.

## Paragraph 155: Supervision and Management - Internal Audits and Interagency Feedback

*Paragraph 155 is assessed annually and will be reviewed in CMR-6.*

## Paragraph 156: Supervision and Management - Internal Audits and Interagency Feedback

*PRPD auditors shall issue a report to the Superintendent on the result of each audit. The Superintendent will review each audit for appropriate policy, disciplinary, and/or non-punitive corrective action. The commander of each precinct or specialized unit shall review all audit reports regarding employees under their command and, if appropriate, shall take non- punitive corrective action or disciplinary action.*

| Compliance Status | Assessment Schedule |
|---|---|

148

| Deferred | | Review Period | April 2021 – September 2021 |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

## Compliance Targets

Note: This Paragraph is assessed with Paragraph 154.

## Compliance Assessment

Although the Monitor's Office has received information from SARP indicating that audits are constantly being planned and conducted, documentation to demonstrate that the Superintendent reviews each audit for appropriate policy, disciplinary, and/or non-punitive corrective action was not provided. Further, documentation was not provided to demonstrate that the commander of each precinct or specialized unit reviewed all audit reports regarding employees under their command and, if appropriate, took nonpunitive corrective action or disciplinary action.

## Pathway Forward

PRPB should work on developing a formal system whereby the Commissioner and key commanders produce memos or other evidence that they have thoroughly read relevant audits and have developed strategies and corrective actions based on the results of those audits.

## Paragraph 157: Supervision and Management - Internal Audits and Interagency Feedback

*PRPD shall develop and implement a plan for organizing and executing regular, targeted, and random integrity audits. The integrity audits will be used to identify and investigate officers engaging in misconduct including, but not limited to, unlawful stops, searches, seizures (including false arrests), excessive uses of force, potential criminal behavior, racial or ethnic profiling, and bias against lesbian, gay, bisexual, and transgendered persons, or any other form of misconduct. These operations shall also seek to identify officers who discourage the filing of a complaint, fail to report misconduct or complaints, or otherwise undermine PRPD's integrity and accountability systems. SPR shall have the oversight responsibility within PRPD for these operations. SPR shall use relevant EIS data and other relevant information in selecting targets for integrity audits.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | Not Implemented | | Bi-annually |

| Practice: | Not Implemented | Assessment Frequency | |
|---|---|---|---|

### Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of this Paragraph. | ☑ Met | ☐ Missed |
| 2. Training on integrity audits is consistent with approved policies. | ☐ Met | ☑ Missed |
| 3. 95% of sampled personnel are trained and certified on integrity audits (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 4. 95% of selected integrity audits are designed effectively and comply with approved policies. | ☐ Met | ☑ Missed |
| 5. EIS and other relevant information is considered when selecting targets for integrity audits in 95% of selected integrity audits. | ☐ Met | ☑ Missed |

### Compliance Assessment

Although PRPB has recently developed a related policy and provided the policy to the Monitor for review, PRPB is continuing to develop a plan for organizing and executing regular, targeted, and random integrity audits as PRPB itself noted in its certification for the given reporting period.

### Pathway Forward

The Monitor's Office notes that the Office of the Special Master is working closely with PRPB to develop protocols and procedures related to integrity checks.

## Paragraph 158: Supervision and Management - Internal Audits and Interagency Feedback

*PRPD shall establish an executive-level liaison committee consisting of high- level command officers of the PRPD who communicate, on at least a quarterly basis, with representatives of federal and local criminal justice components in all regions in Puerto Rico, including judicial courts, prosecutors, the University College, and municipal police departments. The committee shall seek mutual feedback and information on improving Puerto Rico's criminal justice system, including performance issues or concerns related to PRPD, its officers, employees, or units. All PRPD high-level commanders who participate in the executive-level liaison committee shall ensure that all allegations of misconduct or potential criminal activity are referred to SPR and/or PRDOJ for investigation, as appropriate.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Quarterly |
| Practice: | Not Implemented | | |

### Compliance Targets

150

| 1. Agreements and protocols incorporate all the requirements of this Paragraph. | ☒ Met | ☐ Missed |
|---|---|---|
| 2. PRPB solicits feedback and shares information with criminal justice components, and refers allegations of misconduct or potential criminal activity it obtains from such components to SARP for investigation. | ☐ Met | ☒ Missed |

### Compliance Assessment

Agreements and protocols incorporate all requirements of this Paragraph. However, other members of the criminal justice system have not stepped forward and become part of the local criminal justice meetings. PRPB refers allegations of misconduct or potential criminal activity it obtains from such components to SARP for investigation.

Unfortunately, not all areas are following the requirements of the Paragraph. In some cases, a normal staff meeting in the area was submitted as evidence of compliance with the requirement to hold meetings with representatives of federal and local criminal justice components in all regions of Puerto Rico, including judicial courts, prosecutors, universities, and the municipal police department.

The Monitor notes that the area meetings conducted in Bayamon, Ponce, and Mayaguez should be used as examples for other areas. The committee meetings in these areas had broad participation with representatives of federal and local criminal justice components, a purposeful agenda and related discussion topics, and noted recommendations for action items and next steps to improve police services and the quality of investigations.

### Pathway Forward

The protocols to maintain related documentation should be utilized not only for compliance with the agreement, but more broadly to document the outcomes and action items from these meetings to ensure follow through and accountability.


# VII. Civilian Complaints, Internal Investigations, and Discipline

During this period, the Monitor asked for a list of all SARP investigations *closed* during the reporting period, irrespective of when these cases were opened. This gave the Monitor a wider cross-section of criminal and administrative cases from which to base his findings upon. Although some of these cases were up to two years old, the Monitor had a chance to observe the inner workings of case investigations from their inception and investigation, through SARP command, review by the Office of the Legal Advisor, and the optional appeals process or *vista informal*. The results were comprehensive and revealing.

PRPB continues to make strides towards substantial compliance with the Agreement in the realm of civilian complaints, internal investigations, and internal discipline.  While the mechanism for self-policing is apparently accepted by the island's society and has been proven to work, PRPB must continue to leverage this system. For example, more thorough investigations of anonymous internal complaints can help correct situations of misconduct or perceived corruption, both of which inevitably cause a deleterious effect on morale and esprit de corps.

151

Proactive use of the EIS should be used to intervene with problematic employees in a timely manner to better ensure the quality of their conduct and service to others. An internal auditing team should be tasked to ensure that disciplinary protocols and corresponding workflows are being carried out both centrally as well as remotely across the island. This auditing team should be a key tool to decreasing the number of unsatisfactory internal criminal and or administrative investigations conducted across the island. Finally, the Monitor has made specific recommendations on enhancing the quality of PRPB internal investigations of all types. These suggested adjustments to Rule 9088, regarding internal investigative methodology, will dramatically improve investigator ability to find the truth and document it.

Overall, PRPB's compliance with the 46 paragraphs assessed during this reporting period within Civilian Complaints, Internal Investigations, and Discipline reflect improved levels of compliance to what was noted in previous reports. In CMR-4, 72% of paragraphs were assessed as Partially Compliant and Substantially Compliant, in comparison to the current reporting period, where 89% of paragraphs were found to be Partially Compliant and Substantially Compliant. Many of these improved ratings were a result of paragraphs being previously noted as Deferred. See figure 8.



*Figure 8. Civilian Complaints, Internal Investigations, and Discipline: Paragraph Compliance Status*

## Paragraph 159: Civilian Complaints, Internal Investigations, and Discipline - General Provisions

*PRPD shall ensure that all allegations of officer misconduct are received and are fully and fairly investigated; that all investigative findings are supported by a preponderance of the evidence; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair and consistent. PRPD shall develop policies and practices for the intake, investigation, and adjudication of misconduct complaints against PRPD officers. These policies and practices shall comply with applicable law and comport with generally accepted policing practices, and shall include the requirements set out below.*

| Compliance Status | Assessment Schedule | |
|---|---|---|
| Partially Compliant | Review | April 2021 – September 2021 |

| Policy: | Implemented | Period | |
|---|---|---|---|
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: Compliance will be determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 160-204, and (2) the results of outcome assessments, pursuant to Paragraph 243.

### Compliance Assessment

As the reader will note in the respective subsections that follow, internal investigations have improved within PRPB. However, much follow-on effort is needed to reach a level of substantial compliance.

### Pathway Forward

The Monitor has indicated below where improvements are necessary and has made recommendations as to how they might be achieved.

### Paragraph 160: Civilian Complaints, Internal Investigations, and Discipline - Civilian Complaints

*PRPD will develop and implement a program to inform persons that they may make complaints regarding the performance of any officer.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually as to Data Sources #1 and #2. Bi-annually as to all other Data Sources. |
| Practice: | Not Implemented | | |

### Compliance Targets

| | Met | Missed |
|---|---|---|
| 1. Policies incorporate all of the requirements of Paragraphs 160-162. | ☒ Met | ☐ Missed |
| 2. Civilian complaint program trainings are consistent with approved policies. | ☒ Met | ☐ Missed |
| 3. 95% of sampled press, office and SARP personnel are trained and certified in all policies related to the civilian complaint program (or scheduled for training, in the case of mid-year reviews). | ☒ Met | ☐ Missed |
| 4. PRPB has developed and implements a program to inform persons that they may make complaints regarding the performance of any officer. | ☐ Met | ☒ Missed |

153

*Compliance Assessment*

PRPB policy, with respect to civilian complaints, internal complaints, and discipline, has not substantially changed since the Monitor's last review where it was found to be compliant with the Agreement. The Monitor has reviewed the corresponding training components and is impressed not only by the training content, but that a comprehensive written examination is required to pass the course. The Monitor has also interviewed officers charged with the responsibility of proactively communicating awareness of every person's right to register a complaint, or make a written commendation, as well as the mechanisms used to register such a complaint or commendation. The Monitor also acknowledges PRPB's efforts to post the complaint form in various locations in addition to its website. However, PRPB candidly admitted via certification to not having conducted any community encounter meetings during the reporting period, which means that SARP officers had no chance to complete their important mission during this period.  As such, the compliance target related to whether PRPB has developed and implemented a program to inform persons that they may make complaints regarding the performance of any officer is marked as missed.

The PRPB has implemented changes to the PPR 311.1 complaint form as previously recommended. Thus, the Monitor is satisfied that PRPB has complied with the policy and training provisions of the Agreement; however, PRPB must refocus efforts on the practice provision – most notably its proactive community encounters.

*Pathway Forward*

PRPB must return to holding proactive community encounters where the ability and mechanisms of how to complain or praise a member are discussed, in order to substantially comply with this paragraph.

## 1. Civilian Complaints

PRPB has taken the advice previously offered by the Monitor regarding signage as well as the content of its complaint form – PPR 311.1.

### Paragraph 161: Civilian Complaints, Internal Investigations, and Discipline - Civilian Complaints

*Pre-printed complaint forms shall not include any language that can be construed as discouraging civilians from submitting complaints, including warnings regarding potential criminal prosecution for false or untrue complaints. PRPD shall require all officers to carry complaint forms in their official vehicles at all times or on their person, if feasible.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | | Bi-annually |

154

| Practice: | Implemented | Assessment Frequency | |
|---|---|---|---|

## Compliance Targets

| 1. Content of complaint forms is consistent with civilian complaint program policies. | ☑ Met ☐ Missed |
|---|---|

Note: Policies and Trainings is assessed with Paragraph 160.

## Compliance Assessment

The modified version of PRPB Form 311.1 contains the proposed modifications recommended by the Monitor in his previous report. Spot checks conducted by the Monitor over several visits reveals near-universal compliance with the provision that Form 311.1 be carried by each member of PRPB during their duties.

## Pathway Forward

PRPB has achieved substantial compliance with this paragraph. The Monitor will continue to reassess PRPB's continued compliance in future reports.

## Paragraph 162: Civilian Complaints, Internal Investigations, and Discipline - Civilian Complaints

*PRPD shall make complaint forms and informational materials, including brochures and posters, available at all police facilities and on the PRPD website. Information shall be posted in Spanish and English. PRPD shall post and maintain a permanent placard describing the external complaint process at appropriate government buildings where public services are provided. The placard shall include relevant contact information, such as telephone numbers, email addresses, and websites. PRPD shall also post and maintain a placard explaining an individual's right to be free from involuntary searches and seizures and thus to decline consent to voluntary searches.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually as to Data Sources #1 and #2. Bi-annually as to all other Data Sources. |
| Practice: | Implemented | | |

## Compliance Targets

| 1. Content of complaint forms and informational materials is consistent with civilian complaint program policies. | ☑ Met ☐ Missed |
|---|---|
| 2. The PRPB website and 95% of PRPB facilities and patrol vehicles have required civilian complaint materials. | ☑ Met ☐ Missed |

| 3. Placards as described in Par. 162 are displayed in 95% of all PRPD and DPS buildings, plus eleven regional judicial centers across the Island. | ☑ Met   ☐ Missed |
|---|---|

Note: Policies and Trainings is assessed with Paragraph 160.

### Compliance Assessment

PRPB has modified form 311.1 as recommended by the Monitor in previous reviews. The Monitor's spot checks of facilities and patrol vehicles reveals near-universal compliance with the requirement of carrying form 311.1, as well as prominently displaying placards or postings in PRPB and related justice facilities that describe the process of making a complaint against a PRPB member.

### Pathway Forward

PRPB has achieved substantial compliance with this paragraph. The Monitor will continue to reassess PRPB's continued compliance in future reports.

## 2. Internal Investigations

PRPB has made some improvements in the way it conducts internal investigations. Moving forward, PRPB must hold members accountable for impeding a complaint or internal investigation either actively or passively. More frequent use of non-punitive discipline tools to address minor rule violations in smaller PRPB outposts could enhance morale in underperformers or outliers. Lastly, SARP must look at every single complaint, irrespective of its ultimate adjudication, as an opportunity to learn of potential gaps in PRPB policy, tactics, training, and supervision. System errors identified through this phase of the investigative process should be cured appropriately and documented as lessons learned by PRPB.

## Paragraph 163: Civilian Complaints, Internal Investigations, and Discipline - Internal Investigations

*PRPD shall require that all officers and employees report misconduct, including apparent, alleged, or perceived misconduct, by another PRPD officer or employee to a supervisor or directly to SPR for review and investigation. Where apparent misconduct is reported to a supervisor, the supervisor shall immediately document and report this information to SPR. Failure to report or document apparent or alleged misconduct or criminal behavior shall be grounds for discipline, up to and including termination of employment. The presumptive discipline for a failure to report apparent or alleged misconduct or criminal behavior shall be commensurate to the presumptive discipline for the underlying apparent or alleged conduct not reported.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually as to Data Sources #1 and #2. Bi-annually as to all other Data Sources. |
| Practice: | Implemented | | |

156

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Training on internal reporting of misconduct and investigations is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled personnel are trained and certified in relevant policies related to reporting and internal investigations (or scheduled for training, in the case of mid-year reviews). | ☑ Met | ☐ Missed |
| 4. All reports of alleged or perceived misconduct are reviewed and investigated, as appropriate, by supervisors or SARP. | ☑ Met | ☐ Missed |

Note: Implementation of the portion of this Paragraph regarding discipline is assessed with Paragraphs 177 (Data Source #4), 198, and 199.

*Compliance Assessment*

The Monitor traveled to numerous PRPB facilities to pull locally generated records, including non-punitive disciplinary files. As has been the case twice before this reporting cycle, the Monitor also closely examined a random sample of alleged misconduct cases during his October 2021 visit. During three in-person reviews of these cases conducted over the past eighteen months, the Monitor has found only one allegation that a complaint by a member of the public was refused at the scene.[12]

As far as tracking and recording cases is concerned, PRPB is using its EIS for one of its intended purposes – tracking and digitally warehousing internal investigations of all sorts. While the actual investigation may vary in terms of quality, PRPB appears to be substantially compliant with the actual acceptance, logging, and assigning of internal investigations.

*Pathway Forward*

In a case where it is alleged that a PRPB member refused to give a citizen a 311.1 form upon demand or call his/her supervisor to the scene, special attention must be given by the SARP investigator to determine the veracity of these allegations, among others made by the complainant. In any cases where it is proven by a preponderance of evidence that such a complaint was refused or frustrated in some way, those who are responsible for such refusal or concealment must be held accountable.

## Paragraph 164: Civilian Complaints, Internal Investigations, and Discipline - Internal Investigations

*PRPD shall develop protocols requiring supervisors to investigate and take appropriate disciplinary or non-punitive corrective action when the supervisor becomes aware of minor misconduct or policy infractions by an officer that do not merit an SPR notification. The incident of misconduct and the supervisor's response shall be reported to SPR within five business days for SPR's review. Where the officer disputes the misconduct allegation, the allegation shall be referred to SPR for investigation.*

| Compliance Status | Assessment Schedule |
|---|---|

---

[12] In SARP Case 2020-1359, the complainant alleges that the officer on the scene told him that he had to travel to a different jurisdiction to make a complaint about the officer's alleged negligence. While the complainant has some indications of mental health issues, a supervisor called to the scene could have resolved the matter immediately.

| Partially Compliant | | Review Period | April 2021 – September 2021 |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually as to Data Sources #1 and #2. Bi-annually as to all other Data Sources. |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 164 and 165. | ☑ Met | ☐ Missed |
| 2. Training on supervisory review of minor policy violations is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled supervisors are trained and certified in policies related to supervisory review of minor policy violations (or scheduled for training, in the case of mid-year reviews). | ☑ Met | ☐ Missed |
| 4. 95% of selected supervisory reviews and responses comply with approved policies. | ☑ Met | ☐ Missed |
| 5. 95% of selected supervisory reviews and investigations are reviewed and evaluated by unit commanders and the commanders identify needs, as appropriate, in accordance with Paragraphs 164 and 165. | ☐ Met | ☑ Missed |
| 6. 95% of selected supervisory reviews and investigations are sent to SARP and assessed according to approved policies. | ☑ Met | ☐ Missed |

*Compliance Assessment*

The Monitor personally visited a diverse array of PRPB installations seeking records of non-punitive or corrective discipline, which barring an objection from the subject officer, are not required to be entered into their disciplinary database, but rather kept on file at the respective police facility. The Monitor found that, generally, the rate of non-punitive discipline reports was directly proportional to the number of subordinates assigned to a given area. The more persons assigned to a given facility, the more non-punitive corrective discipline was likely to have been applied in the past. Typical cases involved officers not wearing the proper uniform of the day or reporting tardy for duty. The Monitor found no cases where the subject officer disagreed with the non-punitive discipline, which would mandate that the case be forwarded to SARP for registry and further investigation. The Monitor found several small PRPB outposts where non-punitive discipline has not occurred. Typically, this was observed where the supervisor is responsible for a relatively small number of subordinates.

*Pathway Forward*

Non-punitive discipline is an important tool to correct a slide towards disorderly activity, which if left unchecked, could worsen into more serious activities and lead to an overall lack of discipline and morale. The Monitor believes that smaller police installations foster closer relationships between supervisors and subordinates, which in turn may lead to less frequent use of this valuable tool. To let a minor infraction pass without comment in the interest of workplace comity does a disservice to both the subordinate as well as the institution. When properly framed by the supervisor, a non-punitive

disciplinary event presents an opportunity to "check in" with a subordinate, to ask questions and perhaps gain some understanding into why the subordinate is underperforming. This healthy conversation could lead to greater insight by both the supervisor and subordinate into how an officer's performance could be improved and how that might occur. While PRPB supervisors receive adequate training in the procedures of non-punitive discipline, the course might benefit from presenting a series of scenario-based hypotheticals where a PRPB supervisor should consider using this management tool. The Monitor will conduct follow up visits to smaller PRPB installations to ensure that non-punitive, corrective discipline is being used as a management tool across the board.

## Paragraph 165: Civilian Complaints, Internal Investigations, and Discipline - Internal Investigations

*The results of unit investigations, be they minor misconduct allegations, policy infractions, or SPR referrals, shall each be referred to and evaluated by unit commanders for underlying problems including supervisory, training, or other deficiencies. Unit evaluations shall be sent to SPR for further assessment of trends and potential deficiencies in tactics or training, among other considerations.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually as to Data Sources #1 and #2. Bi-annually as to all other Data Sources. |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 164.

*Compliance Assessment*

While the Monitor observed multiple examples of unit-generated disciplinary cases, the Monitor observed no cases where supervisory oversight or training was mentioned as a possible cause or contributing factor, when in certain cases they seemed to have been either or both. Some examples include; Case 2019-0502 involving an errant discharge of an electrical control weapon (Taser); Case 2019-0975 involving a dispute over which agency handles a UOF investigation; Case 2020-1342 where a superior officer in Fajardo was exonerated of creating a hostile work environment might have benefited from leadership retraining; Case 2021-0190 also alleging a misapplication of an electrical control weapon (Taser); and Case 2021-0301 involving a situation with a person who was most likely mentally disturbed or intoxicated.

*Pathway Forward*

The Monitor reiterates his comments from the last reporting cycle that each SARP investigator must consider deficiencies in training and/or supervision as an obligatory step in his/her analysis of any case. This is clearly not being routinely done as recommended.

## 3. Complaint Intake, Classification, Assignment, and Tracking

PRPB has performed well in ensuring that the public is aware of its right to make a complaint against a PRPB member for misconduct of any kind. From multiple observations across the island, citizen advisory placards have been placed in public areas of PRPB and related justice facilities. PRPB's digital presence and its ability to capture complaints from known and unknown civilians through its portal have long been established. Training efforts have made it a highly unlikely that an officer on patrol in the field is not in possession of the PRPB Complaint Form (PPR 311.1). PRPB's EIS has a well-designed capacity to track the phase of any investigation as well as to capture a digital version of its corresponding paperwork.[13]

Elsewhere in PRPB, its SAIC as well as the Office of Legal Affairs (OAL) have established a mechanism and practice of capturing alleged misconduct by PRPB officers through tort claims and criminal allegations.

While the PRPB SARP Unit has pledged to conduct internal administrative and related criminal investigations concurrently, the Monitor will closely observe these types of cases in the future to ensure that this is occurring.

### Paragraph 166: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*PRPD shall train all officers in how to properly handle complaint intake.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually as to Data Sources #1 and #2. Bi-annually as to all other Data Sources. |
| Practice: | Implemented | | |

*Compliance Targets*

---

[13] Future development of the EIS platform should include the ability to search any field of the 311.1, as well as the corresponding narrative of any SARP report, or for that matter – all written materials in each case. These text searches will enhance the ability to spot trends using the EIS for one of its key roles – as an early warning system designed to proactively correct employee misbehavior. In addition, the ability to search in EIS data settings allows future investigators to look at past cases where a pattern of identical alleged behavior resulted in a not-sustained finding. In certain situations, a pattern of not-sustained cases for nearly identical behavior could tip the balance in favor of a complainant using a preponderance of evidence standard.

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 166-176. | ☑ Met | ☐ Missed |
| 2. Complaint intake, classification, assignment, and tracking trainings are consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled officers are trained and certified in relevant policies related to complaint intake, classification, assignment, and tracking (or scheduled for training, in the case of mid-year reviews). | ☑ Met | ☐ Missed |

*Compliance Assessment*

Records clearly show that accepted policies are unchanged from previous reports, training is consistent with policy, and that over 95% of PRPB has been trained within the past two years.

*Pathway Forward*

PRPB has achieved substantial compliance with this paragraph. The Monitor will continue to reassess PRPB's continued compliance in future reports.

## Paragraph 167: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*The refusal to accept a misconduct complaint, discouraging the filing of a misconduct complaint, or providing false or misleading information about filing a misconduct complaint, shall be grounds for discipline.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually as to Data Source #1. Bi-annually as to Data Source #2. |
| Practice: | Implemented | | |

*Compliance Targets*

Note: Implementation is assessed with Paragraphs 177 (Data Source #4), 198 and199.

Note: Policies and trainings are assessed as part of Paragraph 166.

*Compliance Assessment*

In reviewing multiple cases over the last three reporting cycles, the Monitor has seen only one case that was alleged to have been discouraged or turned away by a PRPB member.[14] Other than this anomalous circumstance, cases are being actively solicited in writing from known and unknown complainants both in-person as well as in digital form. PRPB unit officers interviewed by the Monitor have described the

---

[14] See SARP Case 2020-1359 (supra)

active measures taken to inform citizens of this ability across the Commonwealth. The system, at least in this regard, seems to be working.

*Pathway Forward*

PRPB has achieved substantial compliance with this paragraph. The Monitor will continue to reassess PRPB's continued compliance in future reports.

## Paragraph 168: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*PRPD shall accept all misconduct complaints, including anonymous and third- party complaints, for review and investigation. Complaints may be made in writing or verbally, in person or by mail, telephone (or TDD), facsimile, electronic mail, or any other appropriate electronic means.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. PRPB accepts, reviews, and investigates complaints, as appropriate, in accordance with approved policies. | ☐ Met   ☑ Missed |
| Note: Policies and trainings are assessed as part of Paragraph 166. | |

*Compliance Assessment*

As previously mentioned, the evidence is clear that PRPB, at a minimum, accepts complaints of all varieties from known and unknown sources, both in physical and digital form. What is less evident to the Monitor is PRPB's review and investigation of cases from anonymous internal sources ("whistleblowers"). The whistleblower cases reviewed in this report may predate the Monitor's last issued report (CMR-4) and therefore may not have been corrected on time.[15]

*Pathway Forward*

Moving forward, the Monitor will pay very close attention to anonymous internally generated cases to ensure that they are accepted, reviewed, and thoroughly investigated in accordance with the Agreement.

---

[15] See Cases 2019-1424, 2020-0337, 2020-0708, and 2020-1403, all of which apparently precede the publication of CMR-4 by the Court.

## Paragraph 169: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*PRPD will establish a protocol that provides procedures to be followed when an individual objects to an officer's conduct. The protocol shall provide that, absent exceptional circumstances, the officer will inform the individual of his or her right to make a complaint and shall provide the complaint form and the officer's name and identification number. If the individual indicates that he or she would like to make a complaint on the scene, the officer shall immediately inform his or her supervisor, who shall immediately respond to the scene and initiate the complaint process. In the absence of the officer's immediate supervisor, any supervisor may respond to the scene. All misconduct complaints received outside of SPR shall be forwarded to SPR before the end of the shift in which they were received.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. Intake protocol was followed in 95% of sampled investigations. | ☑ Met  ☐ Missed |
| 2. Intake protocol was followed in 95% of sampled complaints received by officers in the field. | ☑ Met  ☐ Missed |
| Note: Policies and trainings are assessed as part of Paragraph 166. | |

*Compliance Assessment*

Despite having reviewed close to two hundred SARP cases, the Monitor has found only one example of this particular scenario described in the Agreement, which describes an unsatisfied citizen complaining to a particular officer *in flagrante* and not being provided with a Form 311.1, or in the alternative, not being attended to by the officer's immediate supervisor.[16] As the overwhelming number of cases over the past several reporting cycles, indicates citizen complaints are accepted and entered into the EIS before the end of the shift, as mandated in the Agreement.[17]

*Pathway Forward*

To guarantee substantial compliance, PRPB must pay close attention to any complaint which alleges that a police officer discouraged an attempt by a citizen to lodge a complaint, such as the one mentioned above.

---

[16] See SARP Case 2020-1359 (supra)

[17] The Monitor's case analysis revealed that 1 case out of 63 is equivalent to 1.5%, which may also be expressed as 98.5% of cases following intake protocol.

163

## Paragraph 170: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*PRPD shall develop a system to ensure that allegations of officer misconduct made during criminal prosecutions or civil lawsuits are identified and assessed for further investigation. Any decision to decline an investigation shall be documented.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. PRPB has a system to identify and assess civil lawsuits and criminal proceedings filed involving allegations of officer misconduct. | ☑ Met | ☐ Missed |
| 2a. SARP reviews all allegations involving PRPB personnel to assess the need to investigation by PRPB. | ☑ Met | ☐ Missed |
| 2b. 95% of such SARP reviews are documented in accordance with approved policies. | ☑ Met | ☐ Missed |

Note: Policies and trainings are assessed as part of Paragraph 166. Implementation is assessed, in part, with Paragraph 158.

### Compliance Assessment

PRPB has both a policy and procedure under which torts or alleged criminal acts committed by PRPB members are brought to the immediate attention of SARP. In the case of a civil action, the OAL informs SARP upon receipt of service of process. In the case of a criminal allegation involving a PRPB member, the SAIC investigator is obligated to inform SARP of potential criminal wrongdoing, whereupon SARP investigations of both possible criminal as well as administrative wrongdoing may proceed. The Monitor has seen multiple cases of alleged criminal wrongdoing as well as civil causes of action, all of which have been received by SARP for assessment.

### Pathway Forward

While the Monitor has seen sufficient evidence of SARP assessing allegations against PRPB members of both a criminal and civil nature, SARP must take measures to ensure that appropriate administrative as well as criminal investigations are being conducted simultaneously and that information is being shared between investigators in conformance with <u>Garrity v. New Jersey</u>.

164

## Paragraph 171: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*SPR shall maintain a centralized numbering and tracking system for all misconduct complaints. Upon the receipt of a complaint, SPR shall promptly assign a unique numerical identifier to the complaint, which shall be provided to the complainant as soon as practicable.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. SARP administers a centralized numbering and tracking system for all misconduct complaints. | ☑ Met | ☐ Missed |

Note: Policies and trainings are assessed as part of Paragraph 166. Implementation is assessed, in part, with Paragraph 178.

### Compliance Assessment

The Monitor has examined SARP's use of the EIS for its investigations and has concluded that it functions as a centralized numbering and tracking system as mandated by the Agreement. However, the Monitor encourages PRPB to consider improving the functions of EIS to ensure greater ability to track and analyze the data within.

### Pathway Forward

PRPB has achieved substantial compliance with this paragraph. The Monitor will continue to reassess PRPB's continued compliance in future reports. The Monitor also provides the following recommendations, future development of the EIS platform should include the ability to search any field of PPR 311.1, as well as the corresponding narrative of any SARP report, or for that matter – all written materials in each case. These text searches will enhance the ability to spot trends using the EIS for one of its key roles – as an early warning system designed to proactively correct employee misbehavior. In addition, the ability to search in EIS data settings allows future investigators to look at past cases where a pattern of identical alleged behavior resulted in a not-sustained finding. In certain situations, a pattern of not-sustained cases for nearly identical behavior could tip the balance in favor of a complainant using a preponderance of evidence standard.

## Paragraph 172: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*Where a supervisor receives a misconduct complaint in the field alleging that misconduct has occurred, other than those incidents covered by Paragraph 44 of this Agreement, the supervisor shall gather all relevant information and evidence and provide these to SPR. All complaints should be referred to SPR by the end of tour of duty, absent exceptional circumstances.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1a. 95% of sampled complaints were forwarded to SARP by the end of the relevant tour of duty or articulated exceptional circumstances. | ☒ Met   ☐ Missed |
| 1b. 95% of sampled complaints document what information and evidence is collected by the PRPB supervisor. | ☐ Met   ☒ Missed |
| Note: Policies and trainings are assessed as part of Paragraph 166. Implementation is assessed, in part, with Paragraph 136, Data Sources #6 and #7. | |

### Compliance Assessment

The Monitor has seen sufficient evidence that complaints are entered into EIS prior to the end of a shift and thereby electronically forwarded to SARP. What the Monitor has not seen is evidence that shows that supervisors are forwarding information or evidence concerning the allegation. There is, however, a valid role for the immediate supervisor to take in forwarding information to the SARP investigator. In a case such as 2020-0708, which exclusively involved PRPB witnesses to an allegation of domestic violence between two armed, supposedly on-duty police officers, the Monitor found a disturbing amount of direct conflict between police witnesses' testimony over key facts.  Certainly, written declarations by all parties could have helped to obtain a more accurate result.[18]

---

[18] Case 2020-0708 involves approximately a half dozen PRPB officers ranging in rank from agent to inspector. An anonymous whistleblower alleged that there was police intoxication while on duty, domestic violence, as well as the disarmament of two PRPB officers involved in the underlying incident. While the case was recommended as *sustained* by the original investigator it was later changed to *not sustained* by OAL. This case contains a clearly staggering level of officer witness conflict, obvious prevarication, and unchallenged obviously false assertions made by most participants and witnesses. Even in the most favorable light to those accused, this case should never have been classified as not sustained, and all found culpable should have received discipline – especially the superior officers involved.

166

*Pathway Forward*

The Monitor recommends that Rule 9088, Section B.(5)(c) be revisited. Presently, this segment describes the actual investigative methodology to be used to conduct the investigation (...*interview the complainant, the subject(s) of the complaint, and any other person who is pertinent to clarify the controversy that initiated the investigation*.)[19] Some investigators have opted to use a preprinted "Interview Form," which in the past has almost invariably been used to collect the subjective and unchallenged impressions of police officer witnesses in whistleblower cases. The Monitor recommends retitling this form to that of a "Declaration Form," wherein every officer who is a subject of a complaint, or who may have witnessed any allegation, or has any information which could tend to either prove or disprove an allegation <u>must</u> fill out a typewritten Declaration Form within 24 hours of receiving notice that such a complaint has been filed with SARP. The immediate supervisor should be responsible for ensuring that these Declaration Forms are comprehensive in nature, typed legibly, and uploaded into the EIS within the time allowed.

This declaration to be provided by each employee will create a permanent, indelible record as to their actions and observations taken closest to the time of the actual incident. This proposed amendment to mandate the use of Declaration Forms shall under no circumstances obviate the need for an investigator to conduct a subsequent in-person interview of the declarant. Rather than asking an officer to either provide an opening declaration or submitting to questions and answers in an interview, the written declarations should be probed and tested by the investigator during face-to-face interview of the officer or officer witness, which as the Monitor noted in his last report, should be both digitally recorded, transcribed, and certified by both the officer and the investigator. Officers who later disagree with or contravene their original written declaration will receive additional scrutiny during their interviews for veracity. Officers who claim in their interview that they do not remember certain key facts may refer to their written declaration to refresh their memories.

In addition, officer declarations are likely to provide avenues of investigation that go beyond the original complaint itself. In current practice on the mainland, these declarations are often used to test one officer's word against another's to reveal the truth of the matter at issue. In addition, declarations are also commonly found to reveal the existence of other witnesses, both sworn and civilian, who might possess evidence pertinent to determining the truth. Officers who were found to have withheld material facts from their written declarations, or those who later contradict their initial declaration ought to be disciplined appropriately should a preponderance of evidence exist of these serious rule violations.

Finally, so as not to prejudice the PRPB member, any written declaration that might cause criminal jeopardy to him/herself, or any derivative thereof must remain strictly within the confines of the administrative investigation and not be forwarded to any criminal investigator or prosecutor.[20] (See <u>Garrity v. New Jersey</u>). However, this does not preclude the possibility of officer witness(es) supplying

---

[19] PRPB Rule 9088, Section B(5)(c).

[20] As has been put forth in the past, the Monitor strongly recommends creating distance between administrative investigations and internal criminal investigations. No investigator should handle both types of an investigation for the same incident. The Monitor does recognize that certain, rarely invoked legal exemptions exist under Garrity where a prosecutor or a criminal might be entitled to see such declarations.

information that might tend to incriminate another PRPB member, which would obviously be available to criminal investigators for possible use in investigations of the subject officer.

The Monitor urges PRPB to make these changes to Rule 9088 and to update the internal interview technique where subjects choose between a narrative declaration or submitting to questions with answers. Rather than allowing a narrative declaration, the subject should be asked to reaffirm the written declaration and then submit to follow on questioning. Any deviation between the original declaration and the answers to questions provided should be closely analyzed to detect prevarication or attempts to mislead or stonewall the investigation. In a serious case where two PRPB members offer diametrically opposed versions involving a material fact, the case should not be closed without using every legal tool and method available to determine which version is true and which is false.[21] If an investigator has shown by a preponderance of the evidence that a PRPB member knowingly offered a false declaration in any legal matter, then that member should be disciplined appropriately up to and including separation from service.

## Paragraph 173: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*Within five business days of the receipt of a misconduct complaint, SPR shall determine whether the complaint will be assigned to a supervisor for a Supervisory Investigation, retained by SPR for investigation, and whether it will be investigated criminally by PRPD, PRDOJ, or both.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. 95% of sampled SARP investigation files are assigned for investigation in accordance with approved policies. | ☑ Met   ☐ Missed |

Note: Policies and trainings are assessed as part of Paragraph 166.

---

[21] Some examples of serious internal investigations would clearly involve an *administrative* allegation of a crime having been committed by a PRPB member, as well as serious internal disciplinary allegations such as reprisal, retaliation, missing property or evidence, damaged or missing PRPB property, as well as any form of discrimination alleged to have been committed by one PRPB against another. In these serious types of cases, all tools and measures must be employed in cases where one PRPB member clearly disputes another regarding a material fact that goes to the truth of the matter. PRPB must avoid closing these cases at all costs without establishing who is being truthful and who is not, based upon a preponderance of the evidence.

*Compliance Assessment*

The Monitor has consistently seen evidence showing that SARP is taking the action indicated in the Agreement within the prescribed timeframe.

*Pathway Forward*

PRPB has achieved substantial compliance with this paragraph. The Monitor will continue to reassess PRPB's continued compliance in future reports.

### Paragraph 174: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*PRPD shall develop a complaint classification protocol that is allegation-based rather than outcome-based to guide SPR in determining where a complaint should be assigned.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. SARP classifies complaints in accordance with policy. | ☐ Met | ☑ Missed |
| Note: Policies and trainings are assessed as part of Paragraph 166. | | |

*Compliance Assessment*

In the past, the Monitor has seen administrative SARP cases that could possibly constitute criminal liability on the part of the accused officer(s). The most common scenario where this occurs is in a whistleblower complaint, where allegations of misconduct could possibly be examined in both an administrative as well as criminal dimension. In the present review of cases, the Monitor took note of a case where a PRPB officer was anonymously accused of having received compensation for having acted as an aircraft pilot in situations where she either co-piloted the aircraft or was merely a passenger observer. The case was administratively closed.[22] If the investigation were conducted and reached the conclusion that the officer did in fact solicit compensation to which she was not entitled, then the officer could very well have been charged criminally for either larceny, fraud, or diversion.

---

[22] See Case 2019-1424.

*Pathway Forward*

Although this case dates to 2019, the Monitor is concerned that PRPB is still not properly classifying certain cases as having both administrative and criminal dimensions. The Monitor urges PRPB to proceed with an abundance of caution, especially when dealing with whistleblower cases, to ensure that the proper classifications are made in SARP and that the proper forms of inquiry are conducted.

## Paragraph 175: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*A misconduct complaint investigation may not be conducted by any supervisor who used force during the incident; whose conduct led to the injury to a person; who authorized the conduct that led to the reported incident or complaint; who was on the scene at the time of the incident leading to the allegation of misconduct; or by any officer or supervisor who has a conflict of interest as defined by PRPD policy.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. All misconduct complaint investigations are conducted by persons not prohibited from doing so, as required by the Paragraph. | ☑ Met  ☐ Missed |

Note: Policies and trainings are assessed as part of Paragraph 166.

### Compliance Assessment

The Monitor has seen ample evidence that tends to prove that PRPB excludes an officer alleged to have been involved in misconduct from participating as an investigator in that same underlying inquiry.

### Pathway Forward

PRPB has achieved substantial compliance with this paragraph. The Monitor will continue to reassess PRPB's continued compliance in future reports.

## Paragraph 176: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*PRPD's centralized numbering and tracking system shall maintain accurate and reliable data regarding the number, nature, and status of all misconduct complaints, from initial intake to final disposition, including investigation timeliness and notification to the complainant of the interim status and final disposition of the investigation. This system shall be used for periodic assessment of compliance with PRPD policies and procedures and this Agreement.*

170

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. SARP's record management system maintains accurate and reliable data for operational and internal compliance purposes. | ☒ Met   ☐ Missed |

Note: Policies and trainings are assessed as part of Paragraph 166.

*Compliance Assessment*

Having personally viewed the EIS on multiple occasions and having viewed countless documents extracted from this system in response to requests for production of these documents, the Monitor is satisfied that EIS maintains accurate and reliable data on SARP cases from start to finish.

*Pathway Forward*

PRPB has achieved substantial compliance with this paragraph. The Monitor will continue to reassess PRPB's continued compliance in future reports.

## 4. Investigation of Complaints

The Monitor's review of SARP investigations revealed a wide array of alleged administrative and criminal misconduct ranging from mere negligence in duty, to drug use proven by testing, to the sexual assault of a minor. Many of these investigations were professionally conducted with ample details to support conclusions.

Other cases were not as exhaustively investigated as they ought to have been, particularly those where an anonymous complainant alleged misconduct of another PRPB member that could possibly have been criminal in nature. PRPB must acknowledge the extraordinary difficulty facing an officer who becomes aware that a coworker is engaged in activity that is a rule violation at minimum, or worse - criminal in nature. An officer who openly reports misconduct of another officer faces the real threat of being ostracized by fellow police officers and left to fend for themself when facing danger. To report misdeeds allegedly committed by coworkers is to effectively choose between turning their back on something they are sworn to do, or in the alternative, reporting it either openly or anonymously. Each of these choices

carries substantial repercussions for individual officers as well as PRPB.[23] PRPB must consider that in nearly every anonymous internal complaint, there is a faceless audience of police officer bystanders waiting to see if PRPB will actually investigate, whether justice is ultimately done, or whether the incident is swept under the rug at any stage. As far as the latter outcome is concerned, the faceless audience is left to wonder whether PRPB truly embraces truth and justice for all its members, or just for a few. For those who are convinced that PRPB protects some while punishing others, a crushing effect on their morale likely follows.

Aside from problematic whistleblower complaints, the Monitor has made recommendations for changes in that officers account for themselves in writing and later in investigative interviews. These modifications are presented for PRPB review in the spirit of creating a pathway towards substantial compliance.

## Paragraph 177: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*PRPD shall ensure that policies and procedures regarding the investigation of complaints clearly establish that complaints are adjudicated on the basis of the preponderance of the evidence. This standard should be clearly delineated in policies and procedures and accompanied by extensive examples to ensure proper application by investigators.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 177-193. | ☒ Met | ☐ Missed |
| 2. Investigation of complaints trainings are consistent with approved policies. | ☒ Met | ☐ Missed |
| 3. 95% of sampled personnel are trained and certified in relevant policies related to investigation of complaints (or scheduled for training, in the case of mid-year reviews). | ☒ Met | ☐ Missed |
| 4. 100% of sampled investigation files were adjudicated using a preponderance of the evidence standard. | ☐ Met | ☒ Missed |

---

[23] The likely repercussion for a sworn individual officer is to breach both ethics and PRPB rules by remaining silent, or make a formal complaint, after which they are possibly ostracized by fellow officers and thereby in grave danger when presented with a dangerous street situation and no field backup. The likely repercussion for PRPB in situations where their officers refuse to report misconduct – even anonymously – is to prolong a code of silence in the PRPB with eventual catastrophic results.

*Compliance Assessment*

To begin with, PRPB is currently rewriting its SARP investigators course as recommended previously by the Monitor. The Monitor looks forward to reviewing said course once it has been drafted. Secondly, from the Monitor's multiple reviews of SARP cases, PRPB has not once used an officer's record of prior similar complaints, which resulted in "not sustained" findings, to decide a case when it is merely the officer's word against the complainant. During the Monitor's interviews with SARP investigators, all who were asked whether an officer's record of very similar prior complaints had any bearing whatsoever on their current investigations replied in the negative.

The Monitor has encountered numerous examples at the SARP command level where the finding "exonerated" has been unilaterally amended to "not sustained," without any written rationale in the case file.[24] To be clear, when an investigator finds that the alleged conduct not only occurred but was properly within both the law and PRPB policy, then the finding should remain as "exonerated." To unilaterally change the finding to "not sustained" is improper unless there is some doubt that the conduct occurred in the manner alleged. In this event, the person responsible for changing the finding ought to record the grounds of that doubt within the record. Changing a finding that exonerates an officer to a finding which does not clear that officer, in the absence of any rationale, may have a deleterious effect on the complainant's perception of the investigations as well as the morale and esprit de corps of the PRPB.

*Pathway Forward*

PRPB SARP investigators should review similar prior complaints made against an officer. In a closely decided administrative case, a prior officer's history of alleged misdeeds may be relevant to decide whether it is more likely than not that the alleged misconduct occurred. At a bare minimum, in "not sustained" cases where there are no witnesses other than the officer and the complainant, the investigator must perform a full analysis of the officer's disciplinary history and incorporate this analysis as part of his/her findings.

The Monitor recommends that cases modified by SARP at its command level to a finding that differs from the one recommended by the investigator contain, at a bare minimum, some written rationale for said change. In the interest of transparency, that rationale should also be shared with all parties including the investigator.

## Paragraph 178: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*PRPD shall investigate all misconduct complaints and document the investigation and its findings and conclusions in writing. PRPD shall develop and implement a policy that specifies those complaints that may be resolved via administrative closing or informal resolution. Administrative closing shall be used for minor policy violations that do not constitute a pattern of misconduct, duplicate allegations, or allegations that even if true would not constitute misconduct, among others.*

| Compliance Status | Assessment Schedule |
|---|---|

---

[24] A similar practice occurs less frequently at the OAL level. However, the OAL invariably appends its own legal analysis to support such a change, whereas in the SARP cases where the change occurs, no such analysis is written down.

| Partially Compliant | | Review Period | April 2021 – September 2021 |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. 95% of sampled complaints are investigated, documented, and resolved, and relevant PRPB personnel were so advised, in accordance with approved policies. | ☐ Met  ☑ Missed |

Note: Policies and trainings are assessed as part of Paragraph 177.

### Compliance Assessment

The Monitor's examination of SARP case files reveals that administrative closures are still being used when legitimate avenues of investigation remain in cases involving serious allegations of misconduct. In particular, the Monitor notes that cases involving anonymous whistleblower complaints are more prone to be closed administratively.[25]

### Pathway Forward

PRPB must take great care to ensure that whistleblower cases are administratively closed only in exceptional circumstances, and only when there is absolutely no legitimate avenue of investigation available, irrespective of whether that allegation is administrative and/or criminal in nature.

### Paragraph 179: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*PRPD shall ensure that all administrative investigations conducted by SPR shall be completed within 90 days of the receipt of the complaint, including assignment, investigation, review, and final approval. The SPR commander is authorized to grant additional 30 day extensions, for up to 90 additional days in the aggregate, for justifiable circumstances, which shall be documented in writing. For purposes of these extensions, workload shall not constitute justification for extensions. Where an allegation is sustained, PRPD shall have 30 days to determine and notify the officer of the appropriate discipline. The appropriate discipline shall be imposed as soon as practicable, consistent with PRPD's disciplinary procedures. All administrative investigations shall be subject to appropriate tolling periods as necessary to conduct a parallel criminal investigation or as provided by law.*

| Compliance Status | Assessment Schedule | |
|---|---|---|
| Substantially Compliant | Review | April 2021 – September 2021 |

---

[25] See SARP 2019-1424.

| 📄 Policy: | Implemented | Period | |
|---|---|---|---|
| 👥 Training: | N/A | Assessment Frequency | Bi-annually |
| 🛡 Practice: | Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1a. 95% of sampled investigations were adjudicated and notified within authorized timeframes in accordance with approved policies. | ☑ Met   ☐ Missed |
| 1b. 95% of disciplinary actions were imposed within authorized timeframes in accordance with approved policies. | ☑ Met   ☐ Missed |
| 2. 95% of SARP investigations that were not completed within prescribed timeframes have justified extension approvals as required by approved policies. | ☑ Met   ☐ Missed |
| Note: Policies and trainings are assessed as part of Paragraph 177. | |

*Compliance Assessment*

The Monitor finds an abundance of evidence that SARP investigators are held to the 90-day rule and that exceptions to the rule are granted upon a demonstration to SARP command that more time is needed for a legitimate investigative reason.

*Pathway Forward*

PRPB has achieved substantial compliance with this paragraph. The Monitor will continue to reassess PRPB's continued compliance in future reports.

## Paragraph 180: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*PRPD shall ensure that investigations of officer misconduct are thorough and the findings are consistent with the facts.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – September 2021 |
| 📄 Policy: | Implemented | | |
| 👥 Training: | N/A | Assessment Frequency | Bi-annually |
| 🛡 Practice: | Not Implemented | | |

*Compliance Targets*

175

| 1. 95% of selected investigations are thorough and findings are consistent with the facts | ☐ Met   ☑ Missed |
|---|---|

Note: Policies and trainings are assessed as part of Paragraph 177.

*Compliance Assessment*

The Monitor refers to previous discussion as to anonymous internal complaints, insufficient analysis of possible criminal case decisions, continued use of an improper method of questioning complainants, witnesses, and subjects, lack of mention of a pattern of similar cases alleged to have been committed in the past by an officer in closely-decided cases, the dearth of analysis for training and supervisory deficiencies in cases, as well as findings modified at SARP command level without explanation or legal rationale. On the opposite end of the spectrum, the Monitor has also found closed cases that were initially decided against the officer due to a clear lack of a thorough investigation.  One such case involved serious allegations of an injury to a citizen and conflict of interest, which was sustained at all levels with a recommendation to discharge the officer. It was only after a last minute second review by OAL, whereupon the case was remanded to the investigator once again with instructions to interview a key percipient witness. Once that interview was conducted and the case file updated to reflect the new evidence, the case was rightfully decided to be not sustained.[26]

*Pathway Forward*

All complaints, irrespective of whether they come from within or outside PRPB and regardless of whether the complainant is known or unknown, must be investigated thoroughly. In closely decided cases, an officer's history of previous complaints of a remarkably similar nature ought to be explored to determine a pattern of conduct, which could tip the balance in a preponderance of evidence standard, which is often mathematically expressed as 51/49. In serious cases where police officer witnesses give contradictory statements to get at the truth of the matter, a case should never be closed or adjudicated while one officer directly contradicts another on a key element showing culpability. To do so ensures that PRPB accepts that at least one of their officers is lying. Lastly, every single case investigated must contain at a minimum, a paragraph which identifies any fault in training or policy that may have been a causative or contributing factor in the underlying incident.

## Paragraph 181: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*PRPD shall require officers to cooperate with administrative investigations, including appearing for an interview when requested by a PRPD or Commonwealth investigator and providing all requested documents and evidence. Supervisors shall be notified when an officer under their supervision is summoned as part of an administrative*

---

[26] SARP Case 2020-0738 involved a domestic violence incident where the arresting police officer was alleged to have had a preceding romantic relationship with the alleged victim. The complainant alleged that the officer used excessive force in his arrest and injured him. For months the case was investigated and passed through SARP chain of command to OAL and then to the Commissioner's Office, which recommended dismissal. It was only after a second OAL review (just prior to the officer's discharge) that it became apparent that the woman involved in the domestic violence case (the alleged victim) had never been interviewed. During her interview, the woman specifically denied having been in a previous romantic relationship with the police officer. Because an investigator failed to interview a key percipient witness, this police officer had to endure months with the unjust threat of separation of service hanging over his head.

*investigation and shall facilitate the officer's appearance, unless such notification would compromise the integrity of the investigation.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. Officers cooperate and supervisors are notified about SARP summons, as required by approved policies, in 95% of selected investigations. | ☐ Met   ☑ Missed |
| 2. SARP personnel indicate that the level of cooperation of officers and supervisors with SARP investigations is acceptable in accordance with generally accepted practices. | ☑ Met   ☐ Missed |
| Note: Policies and trainings are assessed as part of Paragraph 177. | |

### Compliance Assessment

During interviews conducted with SARP investigators during the CMR-5 reporting period, all SARP investigators described the process of summonsing officers to appear and be interviewed as non-problematic. Furthermore, no SARP investigator could recall a case during the reporting period where a PRPB member refused to show up for an interview or otherwise failed to cooperate. If we are to frame this paragraph solely through the lens of an officer witness showing up as cited, then PRPB is seemingly substantially compliant. However, summonsing witness officers and having them show up for an interview is merely the first of several steps in seeking the truth through a PRPB member's obligatory cooperation with the process. A PRPB witness providing honest and clear answers to questions posed by an internal investigator - without equivocation- is truly the most telling form of cooperation possible. PRPB needs to work to develop this area of cooperation to become substantially compliant.

### Pathway Forward

Other than not showing up for an interview, there are certainly other ways for a PRPB officer to be less than cooperative in an internal investigation.  One such way is to allow officers to submit unchallenged and unverified *hojas de entrevista*, or self-declarations, to be used by police witnesses. Another possible way of participant non-cooperation is to show up, claim poor memory, withhold important information, or worse, actively mislead the investigator. These circumstances call for a change in the way that PRPB declarations and corresponding interviews are conducted as laid out by the Monitor in paragraph 172.

177

## Paragraph 182: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*The subject officer of an administrative investigation shall not be compelled to provide a statement to administrative investigators where there is a potential criminal investigation or prosecution of the officer until the remainder of the investigation has been completed, and after the administrative investigators have consulted with the prosecutor's office and the SPR commander, except where the taking of such a statement is authorized by the Superintendent after consulting with the prosecutor's office.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. Compelled statements are taken in accordance with approved policies and officers' constitutional rights. | ☐ Met   ☑ Missed |

Note: Policies and trainings are assessed as part of Paragraph 177.

### Compliance Assessment

By specifically exempting a PRPB member from providing a Garrity-compelled statement, *until the remainder of the investigation has completed, and after administrative investigators have consulted with the prosecutor's office and the SPR commander, … except where the taking of such a statement is authorized by the Superintendent after consulting with the prosecutor's office*, the Agreement between the Parties establishes a standard that goes well beyond the protective confines of Garrity. In three separate reviews (CMR-3, CMR-4, and CMR-5) the Monitor has yet to encounter a solitary use of a Garrity warning to compel an officer to make an administrative account of his conduct while simultaneously being subjected to a related criminal investigation for the same incident.

### Pathway Forward

There are simply no cases in the past three reporting cycles where a police officer was compelled to give a <u>Garrity</u> statement under any circumstances - including those set forth in the Agreement. While PRPB have created a policy that offers even more restrictive procedures than those expressed in Garrity, the Monitor has thus far not found a single case where those guidelines have been employed.  In short, the Monitor is left to conclude that the policy exists, and that training has been conducted as appropriate,

while lacking any data as to the practical application of the policy. It is therefore impossible to determine whether PRPB is compliant in any measure with the practical application of this paragraph.[27]

## Paragraph 183: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*Where there is no potential criminal investigation or prosecution of the subject officer, SPR investigators shall not warn the subject officer that he or she has a right not to provide a statement that may be self-incriminating.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. Subject officers are not given Miranda warnings where there is no potential for criminal investigation or prosecution. | ☑ Met  ☐ Missed |
| Note: Policies and trainings are assessed as part of Paragraph 177. | |

### Compliance Assessment

The Monitor has not found a single instance of a PRPB member being Mirandized where no possible criminal jeopardy could arise from the alleged facts.

### Pathway Forward

PRPB has achieved substantial compliance with this paragraph. The Monitor will continue to reassess PRPB's continued compliance in future reports.

## Paragraph 184: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*If at any time during complaint intake or investigation the investigator determines that there may have been criminal conduct on the part of any officer or employee, the investigator shall immediately notify the SPR commander. The SPR commander shall immediately notify the Superintendent and shall consult with the prosecutor's office regarding the initiation of a criminal investigation. Where an allegation is investigated criminally, SPR shall continue with the administrative investigation of the allegation, except that it may delay or decline to conduct an interview of the subject officer(s) or other witnesses until completion of the criminal*

---

[27] One possible remedy to cure this lack of data would be to request a sample of all cases closed during a reporting period where a Garrity statement was compelled from a PRPB member.  Any cases provided from within the sample would allow the Monitor to assess compliance. However, if that sample results in no cases, then it will be difficult, if not impossible, to determine compliance with the practical element of Paragraph 182.

*investigation unless, after consultation with the prosecutor's office and PRPD Superintendent, such interviews are deemed appropriate.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1a. Investigators notify SARP and SARP consults with prosecutors in accordance with approved policies when an investigator determines that there may have been criminal conduct on the part of any officer or employee. | ☐ Met | ☑ Missed |
| 1b. Administrative investigations continue when a parallel criminal investigation is also ongoing in accordance with approved policies. | ☐ Met | ☑ Missed |

Note: Policies and trainings are assessed as part of Paragraph 177.

*Compliance Assessment*

As previously noted in Paragraph 174, a SARP investigator clearly failed to notify the Fiscalia upon becoming aware of an anonymous allegation of a PRPB member alleged to have received monetary benefit under false pretenses to which she may not have been entitled.  Strictly speaking, and on its face, this allegation could have involved possible criminal liability for wire fraud and larceny.

The Monitor has not seen evidence that an internal case is being investigated criminally and administratively at the same time. However, in mid-July 2021 the Monitor saw correspondence from the Director of SARP instructing his investigators to conduct simultaneous investigations.

*Pathway Forward*

SARP investigators must remain acutely aware of any and all possible criminal dimensions of their cases and, as instructed by the Agreement, duly report and document these case referrals to the Fiscalia in every such circumstance, irrespective of whether the complaining party is known or unknown.

As noted in Paragraph 182, SARP must conduct simultaneous administrative and criminal investigations on employees when warranted by the facts of any given case. It is unacceptable to delay an internal administrative investigation until a related criminal one has concluded, especially if a Garrity statement from the accused officer is not necessary to reach a just conclusion. For those cases where a Garrity statement would be considered dispositive, proper safeguarding of an officer's inculpatory statements and their derivatives must be taken.

## Paragraph 185: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*PRPD, PRDOJ, and the prosecutor's office shall develop protocols to ensure that the criminal and administrative investigations are kept appropriately separate after a subject officer has provided a compelled statement. Nothing in this Agreement or PRPD policy shall hamper an officer's obligation to provide a public safety statement regarding a work related incident or activity.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. Administrative and criminal investigations are conducted separately as required by approved policies after a subject officer has provided a compelled statement. | ☒ Met   ☐ Missed |

Note: Policies and trainings are assessed as part of Paragraph 177.

### Compliance Assessment

The Monitor has not seen a case where administrative and criminal internal matters are investigated concurrently where the officer has been compelled to make a statement under Garrity.[28]

In a related positive development, PRPB has reported that internal criminal investigators are no longer assigned to conduct a subsequent administrative investigation of the same case.

### Pathway Forward

As noted above, SARP must conduct simultaneous administrative and criminal investigations on employees when warranted by the facts of any given case. To delay an internal administrative investigation until a related criminal one has concluded is unacceptable. Proper safeguarding of an officer's inculpatory statements and their derivatives should be firmly established in tenor with <u>Garrity v. New Jersey</u>.

## Paragraph 186: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*In each investigation, PRPD shall consider all relevant evidence, including circumstantial, direct, and physical evidence. There will be no automatic preference for an officer's statement over a non-officer's statement, nor*

---

[28] As indicated above, the Monitor will look to create a special sample of SARP cases that had both criminal and administrative exposure to determine whether Garrity statements were taken and under what circumstances. It is only by examining these unusual cases that the Monitor may assess compliance with Paragraph 185.

*will PRPD disregard a witness' statement merely because the witness has some connection to the complainant or because of any criminal history. PRPD shall make efforts to resolve material inconsistencies between witness statements.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

## Compliance Targets

| | |
|---|---|
| 1. 95% of sampled investigations considered all relevant evidence in a manner consistent with this Paragraph, and tried to resolve material inconsistencies between witness statements. | ☐ Met  ☑ Missed |
| Note: Policies and trainings are assessed as part of Paragraph 177. | |

## Compliance Assessment

The Monitor finds that there were a significant number of cases where investigators did not seek out or an analyze all relevant evidence to support a conclusion. Furthermore, and perhaps even more troubling, were whistleblower cases involving police officer witnesses who directly contradicted other police witnesses. In these particular cases, material inconsistencies in these statements were neither properly probed nor reconciled. In addition, please refer to the Monitor's comments in Paragraphs 179, 180, 181, and 182.

## Pathway Forward

PRPB must show a higher percentage of internal investigations conducted thoroughly and exhaustively. As mentioned previously, investigations into possible serious misconduct where police officer witnesses directly contradict one another cannot be left unresolved without using every skill, ability, method, and tool to conclude which officers are truthful and which are not. In cases where it is simply the officer's word versus the complainant's word with no other witnesses, investigators should examine an officer's internal records to determine whether an officer had been accused of committing a virtually identical act of misconduct in the past.[29] Investigators finding nearly identical incident(s) of misconduct in an accused's disciplinary file should comment on the correlations between various cases in their report and take these correlations into consideration when determining a preponderance of evidence of guilt or innocence.

---

[29] The same approach may also be properly used when assessing the truthfulness of a civilian complainant or witness. A person's history of untruthful accusations made against PRPB members, where proven, may also tip the balance in a closely decided case.

## Paragraph 187: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*A misconduct investigation shall not be closed simply because the complaint is withdrawn or the alleged victim is unwilling or unable to provide additional information beyond the initial complaint, or because the complainant pled guilty or was found guilty of an offense.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

| 1. 95% of sampled investigations were not closed simply because the complaint is withdrawn or the alleged victim is unwilling or unable to provide additional information beyond the initial complaint, or because the complainant pled guilty or was found guilty of an offense. | ☒ Met   ☐ Missed |
|---|---|

Note: Policies and trainings are assessed as part of Paragraph 177.

### Compliance Assessment

The Monitor has yet to observe a case within the last eighteen months, which has been closed simply because the complaint was withdrawn, the alleged victim failed to cooperate, or the complainant was found guilty of any offense.

### Pathway Forward

PRPB has achieved substantial compliance with this paragraph. The Monitor will continue to reassess PRPB's continued compliance in future reports.

## Paragraph 188: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*The misconduct investigator shall explicitly identify and recommend one of the following dispositions for each allegation of misconduct in an administrative investigation:*

*a) "Unfounded," where the investigation determines by clear and convincing evidence that the alleged misconduct did not occur or did not involve the subject officer;*

*b) "Sustained," where the investigation determines, by a preponderance of the evidence, that the alleged misconduct did occur;*

*c) "Not Sustained," where the investigation is unable to determine, by a preponderance of the evidence, whether the alleged misconduct occurred; or*

183

d) *"Exonerated," where the investigation determines by clear and convincing evidence that the alleged conduct did occur but did not violate PRPD policies, procedures, or training.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. Misconduct investigators identify and recommend one of the listed dispositions for each allegation of misconduct in an administrative investigation. | ☒ Met   ☐ Missed |

Note: Policies and trainings are assessed as part of Paragraph 177.

### Compliance Assessment

While the Monitor finds that the investigator is using the appropriate terminology to conclude any given case (although the Monitor reserves judgement as to the appropriateness of certain findings in cases previously cited), there is some lingering failure on the part of the OAL to properly describe a case finding. This most often shows up in correspondence to a complainant but may also show up in the case file as having been "dismissed."

### Pathway Forward

While investigators are using the appropriate four categories to recommend case findings, OAL must adhere to this same terminology in its correspondence.

### Paragraph 189: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*The unit commander of the investigating supervisor shall review the supervisor's recommended disposition and accept, reject, or modify it. The unit commander shall document rejected or modified recommendations from supervisors in writing. Supervisory investigation reports and all related documentation and evidence shall be provided to SPR immediately upon completion of the investigation, but no later than within three business days. SPR shall review disposition recommendations made by unit commanders to ensure that investigative standards are met. SPR shall retain misconduct investigation reports and related records.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |

| | | | |
|---|---|---|---|
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. The unit commanders complied with the requirements of this Paragraph in 95% of selected investigations. | ☐ Met  ☑ Missed |

Note: Policies and trainings are assessed as part of Paragraph 177.

*Compliance Assessment*

The Monitor finds SARP supervisors universally approved of their subordinates' case files. This is logical given that, if the supervisor were to disagree with a subordinate's findings or underlying investigation, then the case would be sent back to the investigator until such time as the supervisor signs off on approving the case. At times, the supervisory review conducted at SARP results in a changed recommended finding. In these cases, the investigator should be aware of what the changed finding was and what the rationale was for the change.

*Pathway Forward*

The Monitor recommends that all SARP supervisory case approvals be dated to indicate the date of their approval. Any changes made to a recommended case finding at SARP should be explained by SARP command and shared with the original investigator. See Paragraph 190 for additional analysis.

## Paragraph 190: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*The SPR commander shall review the investigator's recommended disposition and accept, reject, or modify it. The SPR commander shall document rejected or modified recommendations from investigators in writing. The Superintendent, or his or her designee(s), shall review the SPR commander's recommended disposition and accept, reject, or modify it. The Superintendent, or his or her designee(s), shall document rejected or modified recommendations from SPR.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| 1a. The SARP commander reviews and resolves the complaint in accordance with the paragraph in 95% of selected investigations. | ☐ Met | ☑ Missed |
|---|---|---|
| 1b. The Commissioner reviews and resolves the complaint in accordance with the paragraph in 95% of selected investigations. | ☑ Met | ☐ Missed |

Note: Policies and trainings are assessed as part of Paragraph 177.

## Compliance Assessment

The Monitor has seen multiple examples of SARP cases with findings that diverge from those recommended by the case investigator. The most common example is a change from "exonerated" where the investigator indicates that the behavior occurred and was within policy, to "not sustained" where the finding indicates that the behavior could not be proven or disproven. The Monitor is troubled by the SARP commander or the Commissioner's Office reversing an investigator's finding of fact that the underlying incident actually occurred.

## Pathway Forward

It is important to recognize that internal disciplinary investigations and outcomes are not only important to people outside of PRPB, but also to its members. To have an investigator show with a preponderance of evidence that certain conduct not only occurred but was also within policy and to later question whether that conduct actually occurred at all, and change a case finding to "not sustained" could have the unintended effect of hampering morale and esprits de corps in the PRPB. PRPB should never underestimate the damage that an improperly concluded investigation can cause – either externally or internally.

## Paragraph 191: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*In addition to determining whether the officer committed the alleged misconduct, administrative investigations shall assess and document whether: (a) the action was in compliance with training and legal standards; (b) the use of different procedures should or could have been employed to achieve a potentially better outcome; (c) the incident indicates a need for additional training, counseling or other non-punitive corrective action; and (d) the incident suggests that PRPD should revise its policies, strategies, tactics, or training. This information shall be shared with the relevant commander(s).*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

## Compliance Targets

186

Note: This Paragraph is assessed with Paragraph 178.

*Compliance Assessment*

The Monitor has not seen a single case in the current sample where any of these observations were mentioned:

(a) Compliance with training and legal standards;

(b) Whether the use of different procedures should or could have been employed to achieve a potentially better outcome;

(c) Whether the incident indicates a need for additional training, counseling, or other non-punitive corrective action; or

(d) Whether the incident suggests that PRPB should revise its policies, strategies, tactics, or training.

*Pathway Forward*

PRPB must compel SARP investigators to address each of these factors in their reports when they are relevant. SARP supervisors must check to ensure that these areas are adequately covered in subordinates' reports prior to concurring with the report and sending it along to SARP headquarters.

## Paragraph 192: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*Each misconduct complainant will be notified in writing regarding the initiation of an investigation, the final disposition of the investigation, any disciplinary or non-punitive action taken, and the right to seek further review of the final disposition under applicable law. If an investigation goes beyond the 90 day limit, the complainant will be notified that an extension has been granted. PRPD shall establish procedures for complainants dissatisfied with the outcome to discuss their concerns with SPR commanders.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. Complainants are notified about the status of the investigation and outcome in accordance with approved policies in 95% of selected investigations. | ☑ Met   ☐ Missed |
| 2. Complainants are given the opportunity to appeal the determination before the Investigation, Processing and Appeals Commission. | ☑ Met   ☐ Missed |
| Note: Policies and trainings are assessed as part of Paragraph 177. | |

*Compliance Assessment*

In all cases reviewed with a known complainant, the complainant received timely notification of the status and outcome of the SARP investigation. Additionally in these same cases, all complainants were notified of their ability to appeal a finding to CIPA.

*Pathway Forward*

PRPB has achieved substantial compliance with this paragraph. The Monitor will continue to reassess PRPB's continued compliance in future reports.

## Paragraph 193: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*SPR shall retain all misconduct investigation records for at least five years after the officer's separation from the agency. This obligation shall apply to records regarding officers' credibility that come to the attention of SPR and that may be subject to disclosure under Brady v. Maryland, 373 U.S. 83 (1963), and its progeny.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. SARP retains at least 95% of investigation files for persons who have separated from PRPB less than five years ago. | ☑ Met | ☐ Missed |
| 2. PRPB's document retention practices comply with approved policies. | ☑ Met | ☐ Missed |
| Note: Policies and trainings are assessed as part of Paragraph 177. | | |

*Compliance Assessment*

Document reviews by the Monitor indicate disciplinary files relating to officers separated from service are maintained by PRPB.

*Pathway Forward*

PRPB has achieved substantial compliance with this paragraph. The Monitor will continue to reassess PRPB's continued compliance in future reports.

## 5. Staffing, Selection, and Training Requirements

CMR-5 arrives at a time where many SARP investigators have concluded their three-year service billet. When SARP investigators were interviewed by the Monitor, all described receiving an assessment of their performance, which generally occurs near the end or the beginning of the calendar year. Most report receiving high marks in this process, with 90% claiming to have received between 4.5 to 5 out of 5 as a rating. Only one investigator out of four received any advice from their supervisor as to how they might improve their performance, which is a key area of any assessment and therefore a missed opportunity to improve the overall performance of SARP.

### Paragraph 194: Civilian Complaints, Internal Investigations, and Discipline - Staffing, Selection, and Training Requirements

*PRPD shall ensure that a sufficient number of well-trained staff are assigned and available to thoroughly complete and review misconduct investigations in a timely manner and in accordance with the requirements of this Agreement. PRPD further shall ensure it provides sufficient resources and equipment to conduct adequate criminal and administrative misconduct investigations.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually as to Data Sources #1 and #2. Bi-annually as to all other Data Sources. |
| Practice: | Not Implemented | | |

#### Compliance Targets

| | |
|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 177-193. | ☒ Met   ☐ Missed |
| 2. Trainings for the internal investigation unit are consistent with approved policies. | ☒ Met   ☐ Missed |
| 3. All internal investigation unit personnel are trained and certified in relevant policies (or scheduled for training, in the case of mid-year reviews). | ☒ Met   ☐ Missed |
| 4. The internal investigation unit has sufficient resources and equipment, or is in the process of procuring needed resources and equipment. | ☐ Met   ☒ Missed |
| 5a. Internal investigation unit personnel serve three-year terms. | ☒ Met   ☐ Missed |
| 5b. Retained internal investigation unit personnel have demonstrated effective performance. | ☒ Met   ☐ Missed |

#### Compliance Assessment

PRPB reports that, considering Monitor recommendations from CMR-4, the SARP Unit basic formative and annual specialized trainings are under careful review. The Monitor looks forward to seeing recommendations from both SAEA and SARP for the modified formative and specialized training of its investigators.

*Pathway Forward*

The Monitor employed a digital survey solution of all current and past SARP members who served in SARP for three years and then either transferred out or were asked to remain assigned to SARP under an extension. This survey captured important perceptions concerning annual performance evaluations and supervisory feedback - if it was offered. The lack of feedback made by supervisors to help improve their subordinates' performance is troubling. With the exception of receiving a perfect performance assessment of 5/5 - which should be a rare event - every performance evaluation should include some feedback from the supervisor as to how the subordinate can improve their performance.

The Monitor has yet to see evidence from PRPB that the SARP staffing and infrastructure deficiencies identified in past CMRs has been remedied, or at least are in the process of procurement – in the case of tangible goods, or formative training in preparation for deployment – in the case of increasing the amount of investigative personnel. The Monitor looks forward to receiving evidence in the future to determine whether the concerns expressed relating to office space and sufficiency, personnel levels, and transportation issues have been properly addressed by PRPB.

## Paragraph 195: Civilian Complaints, Internal Investigations, and Discipline - Staffing, Selection, and Training Requirements

*PRPD shall establish a term of duty of up to three years for SPR officers and supervisors who conduct investigations and may reappoint an officer to successive terms of duty if that officer has demonstrated effective performance based on an appropriate annual performance evaluation.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually as to Data Sources #1 and #2. Bi-annually as to all other Data Sources. |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 194.

*Compliance Assessment*

SARP investigators all describe a rigorous and competitive process to join the unit. The Monitor surveyed SARP investigators who had completed three years of service to determine compliance with this paragraph as well as the previous paragraph. Out of 42 valid respondents, 64% had their three-year tour extended, while 34% did not. From the data received, neither poor performance ratings nor promotions were a reliable indicator as to who would be retained and who would not. The Monitor plans to conduct face-to-face interviews with a cross section of investigators to delve deeper into SARP internal decision making as it applies to extensions of service within the unit.

*Pathway Forward*

As noted above, PRPB should ensure that annual and supervisory feedback provided by SARP investigators are substantive and of quality. Further, PRPB should remedy the staffing and infrastructure deficiencies identified in past CMRs.

### Paragraph 196: Civilian Complaints, Internal Investigations, and Discipline - Staffing, Selection, and Training Requirements

*All SPR personnel conducting officer misconduct investigations shall receive at least 40 hours of initial training in conducting officer misconduct investigations and shall receive additional in-service training each year.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually as to Data Sources #1 and #2. Bi-annually as to all other Data Sources. |
| Practice: | Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 194.

*Compliance Assessment*

PRPB reports that, considering Monitor recommendations from CMR-4, the SARP Unit basic formative and annual specialized trainings are under careful review. PRPB supplied the Monitor with a list of SARP personnel and corresponding dates of completion of their formative internal investigative training. Most records of this training are at least two years old, with many exceeding two years as of this report. Concerning the annual re-training component, records provided by PRPB indicate that course VMET 3081 was offered to SARP investigators, and the sample provided indicates partial compliance.

*Pathway Forward*

The Monitor looks forward to seeing recommendations from both SAEA and SARP for the modified formative and specialized training of its investigators, as well as a modified lesson plan and curriculum prior to reaching a conclusion of substantial compliance for this paragraph. PRPB must ensure that all SARP investigators receive an annual retraining to refamiliarize themselves with ethics, discrimination, and related disciplinary issues, to update them on any changes to SARP policy, protocol, and investigative methodology, and to hone their investigative skills.

191

## 6. Preventing Retaliation

In his requested sample, the Monitor has reviewed cases where retaliation may have been a factor. Several of these cases involved unnamed whistleblower complainants, which point back to retaliation or vengeance on the part of an allegedly aggrieved employee. Due to the anonymous nature of the complaint however, this conclusion is merely speculative. In other cases, the Monitor has seen direct contradictions between peers, supervisors, and coworkers left unanswered in investigations. Particularly as they apply to retaliation or other serious misconduct, these contradictions ought to be resolved through more thorough investigations.

### Paragraph 197: Civilian Complaints, Internal Investigations, and Discipline - Preventing Retaliation

*PRPD policy shall expressly prohibit all forms of retaliation, whether subtle or direct, including discouragement, intimidation, coercion, duty-station reassignment, or adverse action, against any person, civilian or officer, who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct. Retaliation shall be considered a serious policy violation and shall subject an officer to serious disciplinary action, up to and including termination.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually as to Data Sources #1 and #2. Bi-annually as to all other Data Sources. |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of this Paragraph. | ☑ Met | ☐ Missed |
| 2. Retaliation trainings are consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled personnel are trained and certified in retaliation policies (or scheduled for training, in the case of mid-year reviews). | ☑ Met | ☐ Missed |
| 4. Complaints involving alleged retaliation are investigated and adjudicated in accordance with approved policies and agency standards in 95% of selected complaints. | ☑ Met | ☐ Missed |
| 5. 95% of interviewed personnel perceive retaliation for participating in an investigation of misconduct is not tolerated and leads to serious disciplinary action. | ☐ Met | ☑ Missed |

*Compliance Assessment*

From the sample of SARP cases selected by the Monitor for review, cases involving retaliation were few. In those cases, the Monitor saw a satisfactory level of inquiry made. Unfortunately, some SARP cases are closed with direct contradictions remaining between statements made by sworn officers. In these cases, especially as they relate to allegations of retaliation, the investigator must make every effort and use

192

any legal tool or investigative methodology available to determine who is being truthful and who is not, irrespective of the person's rank or length of service. During his past face-to-face interviews with SARP investigators, the Monitor heard anecdotal evidence tending to show some level of favoritism extended to certain individuals.

### Pathway Forward

The Monitor will continue to identify cases where retaliation has been alleged and will conduct further interviews of investigators to better understand if retaliation (or the perception thereof) is an ongoing problem, or if it has been diminished in some measurable way. Serious cases, including those involving retaliation, should not be closed when there remains a diametrical contradiction of material fact between two or more members of the PRPB.

## 7. Discipline

The Monitor's investigation of PRPB discipline indicates a continued trend towards substantial compliance. Overall, PRPB officers are corrected by supervisors in the field for minor infractions, investigated for more serious infractions, and when the preponderance of evidence indicates a sustained finding of misconduct, disciplined according to a progressive matrix. It is also important to note that all officers are seasonally advised of their right to due process, which operates via an informal hearing where an officer or their representative can present facts or arguments to sway the hearing officer. Most of these informal hearings result in the same finding reached, however the Monitor has seen circumstances where the officer has successfully challenged the finding.

### Paragraph 198: Civilian Complaints, Internal Investigations, and Discipline - Discipline

*PRPD shall ensure that discipline for sustained allegations of misconduct is fair, consistent, based on the nature of the allegation, and that mitigating and aggravating factors are set out and applied consistently. Discipline shall be based on objective criteria and shall not depend on or be influenced by rank or external considerations.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually as to Data Sources #1 and #2. Bi-annually as to all other Data Sources. |
| Practice: | Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 198-199. | ☑ Met | ☐ Missed |
| 2. Discipline trainings are consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled personnel are trained and certified in discipline policies (or scheduled for training, in the case of mid-year reviews). | ☑ Met | ☐ Missed |

193

| | | |
|---|---|---|
| 4. Discipline is taken and documented in response to sustained misconduct complaints in accordance with approved policies in 95% of selected complaints. | ☑ Met | ☐ Missed |
| 5. Disciplinary matrix employs objective criteria to apply to sustained findings to assess the appropriate level of discipline. | ☑ Met | ☐ Missed |

*Compliance Assessment*

As mentioned at the outset, the Monitor has seen repeated examples of cases that have worked their way through the entire disciplinary matrix. The Monitor is particularly impressed with PRPB's application of its progressive disciplinary matrix. Additionally, the Monitor is by and large impressed with PRPB's due process hearing mechanism and functionality (Vista Administrativa), which provides the employee with the right to be heard, dispute findings, and seek a different outcome. The Monitor finds that PRPB generally acts within the scope of its progressive disciplinary matrix in issuing discipline.

*Pathway Forward*

PRPB has achieved substantial compliance with this paragraph. The Monitor will continue to reassess PRPB's continued compliance in future reports.

## Paragraph 199: Civilian Complaints, Internal Investigations, and Discipline - Discipline

*PRPD shall establish a disciplinary matrix for reviewing sustained findings and assessing the appropriate level of discipline to facilitate consistency in the imposition of discipline. All disciplinary decisions shall be documented, including the rationale behind any decision to deviate from the level of discipline set out in the disciplinary procedures.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually as to Data Sources #1 and #2. Bi-annually as to all other Data Sources. |
| Practice: | Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 198.

*Compliance Assessment*

The Monitor's review of cases deemed closed within the reporting period revealed a rich source of documentation as it applies to those who have allegedly violated PRPB rules and procedures. The Monitor finds abundant evidence that PRPB's progressive disciplinary matrix is being used as it was designed. Secondly, the Monitor sees ample evidence that officers are taking advantage of the *vista informal*, or due process hearing phase to question findings that they may disagree with. The Monitor

194

finds both the vista informal and OAL reviews to be generally well-documented and legally reasoned. The Monitor reminds OAL, for the sake of clarity, to limit its findings to one of the four acceptable categories when deviating from the original SARP recommendation.

*Pathway Forward*

When diverging from the original case recommendation of the investigator, SARP commanders should indicate the reason behind such a diversion. PRPB has achieved substantial compliance with this paragraph. The Monitor will continue to reassess PRPB's continued compliance in future reports.

### Paragraph 200: Civilian Complaints, Internal Investigations, and Discipline - Discipline

*PRPD shall review its drug testing program on an ongoing basis to ensure that pre-service testing for new officers and random testing for existing officers is reliable and valid. The program shall be designed to detect use of banned or illegal substances, including steroids.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually as to Data Sources #1 and #2. Bi-annually as to all other Data Sources. |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of this Paragraph. | ☒ Met | ☐ Missed |
| 2. PRPB's drug testing program trainings are consistent with approved policies. | ☐ Met | ☒ Missed |
| 3. 95% of sampled personnel are trained and certified in PRPB's drug testing program policies (or scheduled for training, in the case of mid-year reviews). | ☒ Met | ☐ Missed |
| 4. Drug tests are reliable, valid, and administered to new officers and a random selection of existing officers in accordance with the Paragraph. | ☐ Met | ☒ Missed |

*Compliance Assessment*

The Monitor spent a considerable time on the ground in San Juan with the administrator of PRPB's drug testing program, as well as his counterparts from the Institute of Forensic Sciences (ICF), which is a nationally certified testing laboratory, formally part of Puerto Rico's Department of Public Safety and now its own entity. PRPB arranges the logistics for the random drug tests of entire units for three types of controlled substances - marijuana, cocaine, and opiates. It then partners with the ICF to perform the actual drug screening via urinalysis with proper safeguarding of sample collection, labeling, transportation, and analysis. While the Agreement specifically calls for the inclusion of anabolic steroid

testing of PRPB members, that substance is currently not tested for.[30]  Psychedelic drugs such as lysergic acid diethylamide (LSD), psilocybin, and MDMA are also not tested for. In any event, the estimated per-unit cost of the screening panel to detect substances other than the ones currently tested for would be nearly double.

*Pathway Forward*

The key limiting factor to PRPB's drug screening program is funding. Funding levels dictate which substances may be tested for and how many PRPB members may be tested each year. While the drug testing unit is ably led by its director and enjoys a strong partnership with its counterparts in the ICF, it lacks sufficient funding to screen an adequate percentage of PRPB members on a rotating basis. Left open is the concept of whether the drug test itself tests for the controlled substances commonly abused in Puerto Rico. In other words, it would be wasteful to test for LSD, psilocybin, and MDMA within the PRPB should reliable data indicate scarce or miniscule levels of use of these substances on the island by members of the general public. As mentioned previously, the topic of testing for anabolic steroids, the abuse of which has resulted in aberrant and sometimes violent behavior by police officers on the mainland, remains an open question as to its legality under present statute in the Commonwealth.[31] If after due diligence PRPB determines that it may legally move forward with testing for anabolic steroid usage, the Monitor recommends against random testing for steroids in favor of "for cause" testing. Supervisors would require training to identify the warning signs of possible steroid use by PRPB members.[32]

In conclusion with the exception of steroids, the Monitor recommends that every single PRPB member should submit to a random drug test at least every 36 months, which means that PRPB would have to test at least 4,000 of its members each year. While the stated cost of these tests seems to be reasonable, Law 78 of 1997 Amended (Law Regulating Drug Testing of Public Sector Employees) does allow PRPB to contract with providers other than the ICF, if such bona fide providers were certified and could deliver the same or better services for less funding.

## 8. Officer Assistance and Support

The Monitor's investigation reveals PRPB has a robust capability to address officer wellness and mental health, which extends to the officer's family in certain instances. The staff interviewed were found to be highly capable and credentialed. However, the Monitor is troubled by the physical location of these services, which are most often located in command centers and therefore limited in their ability to guarantee absolute confidentiality of program participants, either sworn or civilian.

---

[30] When asked about the lack of steroid testing, one PRPB member cited that current law in the Commonwealth did not permit testing for anabolic steroids. In searching Law 4 of 1971 and its multiple amendments for controlled substance definitions, the Monitor did not find a specific mention of anabolic steroids as a controlled substance in Puerto Rico.
[31] Ley 4 de 23 Junio 1971, amended in 1998, creates levels of classification of certain drugs. It seems that anabolic steroids are not specifically mentioned in this statute.
[32] This could include unusually rapid gain and maintenance of muscle mass, overly aggressive behavior, rapid mood swings, acne, etc.

## Paragraph 201: Civilian Complaints, Internal Investigations, and Discipline - Officer Assistance and Support

*PRPD shall provide officers and employees with a range of non-punitive supports and services to address and correct problem behavior, as part of PRPD's disciplinary and performance improvement systems. These supports and services shall include a comprehensive range of mental health services that include, but are not limited to: readily accessible confidential counseling services; critical incident debriefings and crisis counseling; mental health evaluations; and stress management training that comport with generally accepted practices.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | Review Period | April 2021 – September 2021 |
| Training: | Implemented | Assessment Frequency | Annually as to Data Sources #1 and #2. Bi-annually as to all other Data Sources. |
| Practice: | Not Implemented | Assessment Frequency | Annually as to Data Sources #1 and #2. Bi-annually as to all other Data Sources. |

### Compliance Targets

| | |
|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 201-204. | ☒ Met ☐ Missed |
| 2. Officer assistance and support trainings are consistent with approved policies. | ☒ Met ☐ Missed |
| 3. 95% of sampled personnel are trained and certified in officer assistance and support policies (or scheduled for training, in the case of mid-year reviews). | ☒ Met ☐ Missed |
| 4. A variety of non-punitive supports and services that comport with generally accepted practices are available to officers and their families as required by approved policies. | ☐ Met ☒ Missed |
| 5. Mental health professionals are involved in developing and providing in-service training on mental health stressors related to law enforcement and the mental health services available to officers and their families. | ☒ Met ☐ Missed |
| 6. Mental health counseling provided to PRPB employees is confidential, pursuant to approved policies. | ☐ Met ☒ Missed |

### Compliance Assessment

The Monitor conducted individual, in-person interviews of a diverse array of professionals assigned with the responsibility of offering PRPB officers assistance and support. The Monitor was very impressed by the credentials of these talented caregivers. All had multiple years of experience as well as impressive academic credentials including many holding doctorate degrees in forensic or industrial psychology. All reported seeing both obligatory patients – those who were referred to them by PRPB itself, as well as self-referred – those who were experiencing mental health issues and seeking support on their own initiative. These self-referred patients were not limited to PRPB members. The Monitor heard multiple examples of spouses and dependents of PRPB members seeking out assistance from the Employee Assistance Program (PAE). Regarding those who are self-referred, the Monitor discovered a limiting factor reported by many of these patients – the location of the PAE office. In all cases reviewed, the PAE

197

office is located within the PRPB facility, and in many cases, the office is located near the command office. Most of the interviewees cited the location of the office as creating a strong disincentive for self-referred PRPB dependents, and especially PRPB members themselves, from taking better advantage of the program. It is worth mentioning that many agencies on the mainland intentionally locate their psychological services in off-site locations to maintain strict confidentiality of those who seek these important services.

### *Pathway Forward*

The PAE provides a good example of PRPB taking a firm step in the direction of promoting mental health wellness for both their members and dependents. As in any initiative of this kind, there is often room for improvement. The Monitor suggests that PRPB consider using technology to eliminate the perceived stigma associated with going to a police facility, where one may be observed going to the PAE office for help. Over the past eighteen months, the COVID-19 pandemic allowed mental health providers to expand upon experimental usage of secure, online videoconference solutions to allow people to remotely access mental health counseling. By fashioning such a capability, PRPB avoids the additional cost of providing off-site office space for PAE, while at the same time allowing the self-referred to access it in a highly confidential manner. The Monitor encourages PRPB to incorporate such a capability into the PAE program. It should go without saying that those who are referred to the PAE program by PRPB may continue making in-person visits to the office, or in the alternative, attend virtually at the discretion of PRPB.

Additionally, PRPB should consider creating a Peer Support Group as many mainland public safety agencies have done.  Peer support counselors (PSCs) are volunteer fellow officers who have received specialized training and certification in crisis intervention. Usually operating in small teams, PSCs often respond to particularly disturbing scenes to assist and debrief their fellow officers. Many agencies use PSCs to proactively reach out to officers in a variety of contexts to help connect them with mental health services.

### Paragraph 202: Civilian Complaints, Internal Investigations, and Discipline - Officer Assistance and Support

*PRPD shall train management and supervisory personnel in officer support services protocols to ensure wide availability and use of officer support services.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually as to Data Sources #1 and #2. Bi-annually as to all other Data Sources. |
| Practice: | Not Implemented | | |

### *Compliance Targets*

Note: This Paragraph is assessed with Paragraph 201.

## Compliance Assessment

The Monitor has seen evidence supplied by PRPB indicating that PRPB has trained a vast majority of its entire workforce in avoiding burnout, which is certainly one possible outcome of PAE efforts. That said, the Monitor does not have documentation that supervisors and managers have been trained in using PAE.

## Pathway Forward

While avoiding burnout is a commendable goal in any organization, PRPB needs to show evidence that its supervisors and managers have been trained in employee interventions – specifically concerning the use of the PAE.

## Paragraph 203: Civilian Complaints, Internal Investigations, and Discipline - Officer Assistance and Support

*PRPD shall involve mental health professionals in developing and providing in- service training on mental health stressors related to law enforcement and the mental health services available to officers and their families.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually as to Data Sources #1 and #2. Bi-annually as to all other Data Sources. |
| Practice: | Implemented | | |

## Compliance Targets

Note: This Paragraph is assessed with Paragraph 201.

## Compliance Assessment

The Monitor personally interviewed a randomly selected group of mental health professionals affiliated with PAE. Every single person interviewed was highly credentialed and objectively capable of performing their assigned duties. The Monitor also reviewed the end training product of these professionals and found it to be comprehensive in nature. Some of the PAE personnel interviewed teach the course.

## Pathway Forward

PRPB has achieved substantial compliance with this paragraph. The Monitor will continue to reassess PRPB's continued compliance in future reports.

199

## Paragraph 204: Civilian Complaints, Internal Investigations, and Discipline - Officer Assistance and Support

*PRPD shall ensure that any mental health counseling services provided to PRPD employees remain confidential as consistent with generally accepted practices in the field of mental health care.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually as to Data Sources #1 and #2. Bi-annually as to all other Data Sources. |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: This Paragraph is assessed with Paragraph 201.

### Compliance Assessment

The Monitor has found no evidence suggesting that the PAE program is not Health Insurance Portability and Accountability Act (HIPAA) compliant. All PAE professionals interviewed described scrupulous efforts to maintain patient record confidentiality. The Monitor refers to the comments noted above about creating virtual access to PAE services, which should combat the strong disincentive among the self-referred to physically visiting a PRPB facility for assistance.

### Pathway Forward

PRPB should consider either finding remote office space for the PAE to better ensure confidentiality or explore a secure on-line solution for delivering services to PAE clients.

## VIII. Community Engagement and Public Information

Community policing is primarily a partnership for problem solving. The community has problems it expects the police to handle, and the police cannot address crime and maintain public order without community support. Public safety and security are a collaborative responsibility of both the police and the community. Community policing includes two core components: partnerships or alliances to create and build relationships between police and communities, and problem solving, which includes the effort to identify and address the primary causes for the commission of certain crimes through community assistance and participation. It is a dynamic process and involves the concerted effort of the police agency to ensure institutional transformation. PRPB has made some efforts to implement community policing, but the geographic deployment of resources directed at community policing have yet to be completed.

PRPB has demonstrated progress in utilizing community-focused problem-solving strategies, including applying the S.A.R.A. model (scanning, analysis, response, and assessment), and developing community partnerships to engage and empower the community, facilitate cooperation, and join in activities toward the resolution of problems. PRPB has undertaken initiatives to solidify these processes, enroute to substantial compliance. Recent initiatives include the creation of a directory of Community Safety Councils and an electronic platform to capture, document, and measure the effective development of alliances and problem-solving strategies. These initiatives are still in developmental stages.

PRPB's strategic plans for recruitment and career advancement must promote the development of a workforce that represents the community and upholds the values of community policing. Furthermore, officer performance assessments must incorporate community policing work assignments, including competencies in problem-solving, implementing the S.A.R.A. model, and any other extraordinary work performed in support of community policing. PRPB has recently embarked in re-training endeavors to strengthen efforts to implement the community policing philosophy throughout its operations. This training is being provided to all area commanders, zone commanders, district directors, and precinct facilitators in each police area, and is expected to be completed by the Summer 2022. The Monitor's Office will continue to assess PRPB's progress in its continued implementation of community policing in all the above areas and in training.

Overall, PRPB's compliance with the 13 paragraphs assessed during this reporting period within Community Engagement and Public Information reflect similar levels of compliance to what was noted in previous reports. In CMR-4, 31% of paragraphs were assessed as Partially Compliant, in comparison to the current reporting period, where 38% of paragraphs were found to be Partially Compliant; all other paragraphs are noted as Not Compliant. See figure 9.



*Figure 9. Community Engagement and Public Information: Paragraph Compliance Status*

## Paragraph 205: Community Engagement and Public Information - General Provisions

*PRPD shall create robust community relationships and engage constructively with the community to ensure collaborative problem-solving, ethical and bias-free policing, and more effective crime prevention. PRPD shall integrate community and problem oriented policing principles into its management, policies and procedures, recruitment, training, personnel evaluations, tactics, deployment of resources, and systems of accountability.*

*PRPD shall engage the public in the reform process through the dissemination of public information on a regular basis.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: Compliance will be determined on two separate but inter-dependent bases: (1) the implementation of paragraphs 206 - 217, and (2) the results of outcome assessments, pursuant to Paragraph 243 of the Agreement.

*Compliance Assessment*

PRPB's policy for community policing, GO 800-803, has been in effect since 2018 and was recently reviewed by the Monitor's Office. PRPB certified that, once the policy is finalized, the training curriculum will be revised before training is conducted. The Agreement requires the review of this paragraph every six months to determine whether all members of PRPB are certified in community policing and problem solving including the S.A.R.A. model. As noted in CMR-4, the related policies and training are still undergoing review and development, as such PRPB is unable to demonstrate substantial compliance. Although PRPB has made some strides in its efforts to implement community policing during this reporting period, these efforts should expand bureau wide.

PRPB has also demonstrated progress toward recruiting a representative cross-section of the community. The Monitor's Office is aware that efforts have been directed towards reaching out to the community through various consulates, primarily Latin-American consulates on the island, in search of potential candidates. However, PRPB's recruitment plan and career path do not yet demonstrate a full commitment to the goal of securing a workforce that represents the community and upholds the values of community policing. The Monitor notes that PRPB is working closely with the Office of the Special Master to further develop its career path and job descriptions.

PRPB has embarked in re-training endeavors to strengthen the philosophy of community policing for all area commanders, zone commanders, district directors, and precinct facilitators. This training is aimed at bridging the gap in inconsistencies in the implementation of problem-solving strategies and in the development of community alliances, which has been previously noted by the Monitor and recognized by PRPB. This training, conducted through PRPB's Reform Office, is a three-cycle plan targeted at applying the S.A.R.A. model, developing alliances, and increasing collaboration between PRPB and Community Interaction Councils (CICs) and Community Safety Councils.

During this assessment period, PRPB engendered greater community involvement in addressing quality of life and crime prevention matters. PRPB achieved this progress by revamping community safety councils and developing a database to track inclusion for all Safety Councils in each police area. Additionally, PRPB has begun developing an electronic platform to capture and document community partnerships. Once operational, the platform will provide the capability to upload and document data that will assist PRPB in supporting community alliances, using the S.A.R.A. model, and assessing and measuring the effectiveness of each precinct's use of S.A.R.A. The Reform Office has verified that the platform is currently undergoing internal evaluation.

CICs continue to lack a representative cross-section of the community in most of the 13 police areas, and citizen participation and involvement varies by police area. However, the Monitor verified a substantial decrease in participation within the CICs. PRPB's outreach activities and initiatives, although increased since CMR-4, also vary by police area, and demonstrate peripheral community involvement in the planning of these events.

PRPB has not been able to demonstrate compliance with the Community Outreach Plan during this reporting period through community encounters (Encuentros Comunitarios) or public meetings, as stipulated in the Agreement. The Agreement required that PRPB conduct at least two open meetings per year to inform the public of its rights regarding a) unreasonable searches and seizures, b) use of force, c) filing civilian complaints, d) reporting allegations of police misconduct or discrimination, and e) commending officers in the performance of their duties during the first two years of the Agreement. To PRPB's credit this obligation was extended and is now stipulated by policy. As of this reporting period, PRPB has been ineffective in providing evidence that they have informed the public of progress on the Reform, though COVID-19 protocols have affected PRPB's ability to conduct extensive in-person community meetings.

*Pathway Forward*

To address many of the above noted concerns, the Monitor recommends that PRPB reassess its staffing allocation and personnel deployment, including personnel in specialized units, to ensure that core operations support community policing and problem-solving initiatives. The Monitor is aware that PRPB is working with its Human Resources and IT departments to examine its staffing allocation in comparison to the staffing study conducted in 2018. The Monitor's Office encourages PRPB to modify any deployment strategies that deemed incompatible with effective and community-oriented policing.

## 1. Community Oriented Policing

PRPB's Community Policing Policy, GO 800- 803, has been in effect since 2018 and is currently pending final revision. Overall, PRPB is within the developmental stages on the implementation process of a community-oriented police force. However, to succeed at organizational transformation, PRPB needs to secure a workforce that represents and upholds the values of community policing (service oriented, application of the SARA (Scanning, Analysis, Response, Assessment) Model, ability to think critically, possess collaborative problem-solving skills, strong communication/mediation skills, and sound judgment, among other characteristics). Community oriented policing characteristics should be encompassed in its strategic plan for recruitment, its career path and job descriptions, and in its performance appraisal process. PRPB must consistently train its workforce in community policing.

Notwithstanding, PRPB has demonstrated progress in its efforts to implement community policing through the application of problem-solving strategies, including the SARA model, and the expansion of community partnerships to engage and empower the community.

PRPB has also undertaken initiatives by creating a directory of Community Safety Councils. Additionally, it has developed an electronic platform to capture and document the development of alliances, and problem-solving strategies to ultimately measure the effectiveness of its implementation and has embarked in re-training activities to strengthen its efforts in the philosophy of community policing by extending it to all area commanders, zone commanders, district directors, and precinct facilitators. The Monitor's Office recognizes PRPB's progress towards recruiting a representative cross-section of the community and its directed efforts in search of potential candidates through various consulates. PRPB has also taken our recommendation to seek candidates through colleges, universities, faith-based groups, and community organizations.

PRPB is yet to demonstrate significant personnel deployment practices in line with community policing beyond the assignment of one or two officers to community policing, primarily from the Bureau of Community Relations nor has it extended the opportunity for officers to serve in the community they reside. The application of the SARA Model to problem solving revealed inconsistencies and deficiencies in the documentation and implementation process. Extensive problem-solving partnerships to develop cooperative strategies through outreach have been partially secured through informational tables and flyer distribution at health and safety fairs. However, engaging with community stakeholders and advocates for problem solving strategies development, information dissemination, and incorporating the requirements of equal protection to ensure that PRPB responds to all communities, is required to reach substantial compliance. PRPB's outreach activities must include addressing gender violence issues involving cross-sectional community members and underrepresented groups and should include strategies to respond to issues specific to targeted communities with documented efforts.

PRPB is in the process of developing a mechanism to measure its community partnerships and problem-solving strategies to assess effectiveness. The platform will include the capability to upload documentation in support of the alliances PRPB has developed and sustained, including the utilization of the SARA Model. However, said platform is in the trial stages. In the meantime, PRPB has developed some meaningful alliances ranging in scope from support services programs including housing, and detox services for the homeless and drug addicted individuals, to organizations serving victims of domestic violence. Other alliances encompass mentoring, education, and community engagement for the youth with learning and behavioral problems, early childhood intervention problem solving in some police areas, and policy review recommendations in collaboration with the Forensic Psychology Department's practicum students at the University of Puerto Rico. However, inconsistencies have been found in documenting efforts through PPR 803.5, the electronic reporting module intended for documenting various aspects of community alliances, including the submission of collaborative agreements for formal alliances, and minutes, agendas, and/or work plans to document informal ones.

## Paragraph 206: Community Engagement and Public Information - Community Oriented Policing

*PRPD shall reassess its staffing allocation and personnel deployment to ensure that they support community policing and problem-solving goals. PRPD shall employ a Scanning, Analysis, Response, and Assessment ("SARA") model to structure its problem-solving approach.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | Review Period | April 2021 – September 2021 |
| Training: | Not Implemented | Assessment Frequency | Annually as to Data Sources #1 and #2. Bi-annually as to all other Data Sources. |
| Practice: | Not Implemented | Assessment Frequency | Annually as to Data Sources #1 and #2. Bi-annually as to all other Data Sources. |

### Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraph 206. | ☑ Met | ☐ Missed |
| 2. Community policing and problem solving trainings are consistent with approved policies. | ☐ Met | ☑ Missed |
| 3. 95% of sampled PRPB members are trained and certified in community policing and problem solving, including the SARA Model. | ☐ Met | ☑ Missed |
| 4. Staff allocation and personnel deployment plan are aligned with community policing and problem solving. | ☐ Met | ☑ Missed |
| 5. 95% of sampled PRPB precincts, districts, and units implement the SARA Model. | ☐ Met | ☑ Missed |

Note: This paragraph is assessed together with Paragraph 13 of the Agreement.

### Compliance Assessment

PRPB's Community Policing policy (GO 800-803) was updated during this reporting period and is pending final approval before training can be conducted. As such, the Monitor did not receive any training certificates for this assessment period, nor was any information provided about the percentage of PRPB officers trained in community policing to date.

PRPB must adopt a significant geographic redeployment of resources to implement effective community policing and problem-solving in practice. PRPB has not demonstrated significant personnel deployment practices in line with community policing beyond assigning one or two officers to community policing efforts and extending opportunities to officers to serve in the community they reside. Since demographics and crime trends are dynamic, proper deployment of personnel must be similarly dynamic and responsive to community needs. PRPB submitted a list of area commanders and community policing facilitators in each police area. However, this information alone is not indicative of a larger staffing allocation strategy based on Community Policing principles.

As noted above, PRPB began retraining area commanders, zone commanders, district directors, and precinct facilitators during this reporting period to strengthen the philosophy of community policing in

the Bureau. Furthermore, according to documents reviewed by the Monitor's Office, PRPB's Reform Office introduced the philosophy of community policing to the Assistant Superintendency of Managerial Services (SASG), with the expressed goal of enhancing its leadership and contributing toward organizational transformation and professionalization.

As of this report, the police areas of Fajardo, Carolina, Humacao, Ponce, Aguadilla, and Bayamon, have completed their first training cycle in this process. The police areas of Fajardo, Carolina, Humacao, and Ponce are on schedule to complete their second cycle of training before the end of 2021. The police areas of Caguas and Utuado will begin their first retraining cycle in November and December 2021, respectively. All other police areas will begin their retraining cycles in early 2022.

The Monitor observed the implementation of the first training cycle for the police area of Bayamon from September 20-23, 2021. The cycle included theoretical and practical approaches to problem solving under the S.A.R.A. model, community collaboration, and organizational transformation. A group of thirty PRPB commanders, directors, and agent facilitators began working on self-assessment inventories (individual and collective) to identify strengths and weaknesses, perceptions, and challenges. Throughout the week, they worked on theoretical problem-solving strategies within the S.A.R.A. model's framework and conducted field work activities among the communities in Vega Alta and Alto de Cuba in Vega Baja,[33] to put the model in practice. Field visits included community door-to-door needs identification, quality of life issues inquiries in Vega Alta, and the mobilization of PRPB and other resources for direct services to address quality of life issues, including, Administración de Servicios de Salud Contra la Adicción (ASSMCA), a direct services agency for evaluation, diagnosis, and treatment of addictions and Guarabi, a transitional and permanent support services facility for the homeless and addicted in Vega Baja.

Community door-to-door inquiries and scanning processes were randomly conducted. However, the Monitor observed that none of the inquiries included the business sector on behalf of broader community cross-sectional representation, mapping, and demographic profiling for analysis.

The Monitor recommends that the community impact mobilization takes place at later stages in the implementation of subsequent cycles to promote a concerted effort and direct engagement with the Community Safety Councils and the CICs, including assistance in reaching out to the community to maximize the endeavor, develop analysis-based responses, and stimulate better community turnout.

The Monitor found numerous deficiencies in the application and documentation of the S.A.R.A. model. These deficiencies when applying the model to problem-solving underscore the need of full integration throughout PRPB. SARP certified that it did not implement the model during this assessment period, nor has it implemented it in the past, as noted in previous reports. SARP has not demonstrated proactive efforts to develop strategies for integrating the Model into its daily affairs, including the development of work plans. SARP alleges a conflict of interest between the goal of community outreach and its other responsibilities and duties. However, the Monitor observes that SARP has consistently missed opportunities to reach out to the community to inform them about the available processes for civilians to register complaints, report allegations of misconduct, or commend officers in the performance of their duties.

---

[33] These marginalized communities are characterized by relatively higher levels of socio-economic deprivation, homelessness and drug addiction compared to the general population.

The Bayamon police area submitted two PPR 803.4 forms (application of the S.A.R.A. model) for April and August 2021, respectively. In both cases, the nature of the problem that PRPB intended to address via the model was unspecified, objectives were not established, strategies to address the problem were missing, and no community members or alliances were identified as part of employing the model. In sum, the forms were incomplete or only filled out the cover sheet; one had a supervisory signature and the other was missing all signatures.[34]

PRPB subsequently submitted a form at the end of September 2021 for a quality of life issue (PPR 803.01). This form was not captured on the monthly registry (PPR 803.2), as required per policy. When the S.A.R.A. Model was applied and documented on (PPR 803.4), the application of the model failed to identify a community representative for involvement, despite having determined that the problem needed to be addressed in partnership with the community. The document also indicated that the problems required an organized strategy and identified government agencies to assist in what was described as a recurrent problem due to abandoned structures, drug addiction, the need for education, and the need for recreational facilities. Nevertheless, the strategy chosen to solve the problem relied on an informal alliance, and failed to establish structured strategies to meet objectives, enumerate groups, individuals, or organizations responsible for each strategy at the different stages. Additionally, the document lacked all signatures and supervisory approval. Coincidentally, the Monitor's Office was present during this described implementation, as was the Community Safety Council's area president and ASSMCA and GUARABI. The Monitor's peripheral scanning of the geographical area yielded several community organizations already established within the neighborhood, such as Iniciativa Comunitaria and a faith-based group. The latter could have been tapped to formalize efforts for partnership development, including the Department of Sports Recreation, the Department of Children and Families, and City Hall.

Further review of documents submitted by PRPB determined that quality of life referrals (PPR 803.1) from multiple police areas did not match the monthly registry of referrals (PPR 803.2), including those from Arecibo, Guayama, Mayaguez, Ponce, and Aguadilla. Very few of these referrals documented a resolution or listed the obstacles impeding resolution using PPR 803.3. The police area of Aibonito was the only area supporting its referrals with control and complaint numbers, as required per policy. However, evidence in support of the implementation of the S.A.R.A. Model through PPR 803.4 was not made available for the Monitor's review. In the case of the Caguas police area, one of the forms submitted was poorly handwritten and the Monitor's Office was unable to decipher the problem or additional assessment details for compliance determination. Notably, the form lacked a supervisory signature. The District of Aguas Buenas, submitted evidence in support of the implementation of the model. However, most efforts were subject to assessment during CMR-4 (preceding March 2021). Two other PPR 803.4 forms that were subject to compliance assessment during this period were missing supervisory and community representatives/organization's signatures, and the nature of the problem did not seem adequately addressed.

SAEA, SAIC Central, Carolina, and San Juan (including the unit assigned to La Fortaleza) did not provide evidence of implementation of the S.A.R.A. Model either. Significantly, PRPB failed to include any documentation in support of community policing for this assessment period from the La Fortaleza police unit. The Utuado police area submitted a dated PPR 803.4 form from September 2020. The Humacao

---

[34] CMR5-261-272

police area did not utilize PPR 803.4, and only submitted a narrative of a community safety council meeting held on September 2, 2021. It included a subsequent meeting scheduled for integration and collaboration and a chart demonstrating some scanning effected through some precinct wards, other identified problems within the different communities and potential referrals or proponents for action. Some proposed responses were prospective in nature or for services to the community as part of regular policing duties. Moreover, the document failed to demonstrate clearly established objectives or to identify community resources for response tasks and implementation. Success indicators and challenges by way of assessments were not included for continuity or follow-up.

The Fajardo police area represents a more successful case. It applied the model within the Municipal Island of Culebra at the ecological school (Escuela Ecologica de Culebra). PRPB identified speeding problems within a school zone resulting from lack of signage. PRPB determined that this had the potential to endanger the safety of children and the school's community in general. With the assistance of community leaders, safety councils, the public and private sectors, PRPB's statistical division, the Police Athletic League, and the Community Relations Bureau, information was obtained to develop a community geographical map and school profile. An action plan was developed to respond to the school community's needs, demonstrating a strong alliance with City Hall, the DTOP, the Fire Department, and the school community. Each organization jointly assisted with the cleaning and conditioning of surrounding areas, demarked a crosswalk, and installed a school zone speed limit sign, solving the school and the community's main safety concerns. PRPB's group was able to identify success indicators and challenges; among them, maintenance, and police presence to curtail speeding for follow up.

### Pathway Forward

PRPB is strongly advised to reassesses its staffing allocation and personnel deployment, including those in specialized units, to ascertain and ensure that core operations support community policing and problem-solving initiatives. PRPB can facilitate the effective execution of community-oriented policing by re-examining deployment strategies, using available technology to develop work plans and engaging the community in the process. The Monitor further recommends that once refined, the implementation of problem-solving policing (through the S.A.R.A. Model) be inclusive – not only to address quality of life issues, but to address crime and disorder more effectively by utilizing technological resources to their advantage to document and electronically submit forms and documentation in compliance with policy. PRPB is encouraged to explore additional methods of training and include the development of personal characteristics, problem-solving abilities, and skills integration in its curricula. Such methods will help PRPB achieve the goals of community policing on a behavioral level. The Monitor's Office further recommends that supervisors assist in the analytical process of the S.A.R.A. Model to facilitate its implementation and validate the process.

The Monitor notes that PRPB is currently working with Human Resources and IT to develop a management tool to compare current staffing allocations to that recommended in the 2018 staffing study. Furthermore, as noted in Section VIII; Supervision and Management, the Monitor is aware of the larger implications of shortages in supervisors and recommends PRPB assess and address the impact of this shortage as it continues to bolster its community engagement efforts.

## Paragraph 207: Community Engagement and Public Information - Community Oriented Policing

*PRPD shall continue to conduct outreach to a broad cross-section of community stakeholders to establish extensive problem-solving partnerships and develop cooperative strategies that build mutual respect and trusting relationships.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually as to Data Sources #1 and #2. Bi-annually as to all other Data Sources. |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraph 207. | ☑ Met | ☐ Missed |
| 2. Community partnerships and problem-solving strategies trainings are consistent with approved policies. | ☐ Met | ☑ Missed |
| 3. 95% of sampled PRPB members are trained and certified in community partnerships and problem-solving strategies. | ☐ Met | ☑ Missed |
| 4. 95% of sampled districts, precincts, and units conduct outreach to a broad cross-section of community stakeholders. | ☐ Met | ☑ Missed |

### *Compliance Assessment*

PRPB's outreach endeavors fall under General Order 800-803 for community policing, which has been in effect since 2018 and is currently undergoing revisions. These revisions have caused SAEA to temporarily stop training pending curriculum development in support of the revised policy. Under the current policy, outreach activities are geared toward crime prevention and training in general terms. Such activities are civic in nature and part of interagency efforts to engage the community through mechanisms such as organizing health and safety fairs, information stalls, etc. The Agreement requires outreach to stakeholders to establish extensive problem-solving partnerships and develop cooperative strategies that build mutual respect and trusting relationships.

The Monitor's Office interviewed randomly selected PRPB personnel of varying ranks, who consistently stated that no recent SAEA training on the community policing policy had occurred during this assessment period. Training certificates that are submitted for future compliance assessment must include the date that training or retraining on the updated General Order 800-803 was received.

The Monitor evaluated the 13 police areas during this assessment period to determine outreach to a broad cross-section of community stakeholders. Outreach reporting efforts varied in structure throughout the police areas. Some police areas actively engaged in meaningful outreach endeavors, while others demonstrated no efforts to engage in outreach activities. Among the latter cases, some

209

precincts submitted a certificate stating that no outreach activities were conducted during the period, while others did not submit any documents at all. The police areas of Mayaguez, Carolina (Executive level), SAEA, Humacao, Bayamon, and Arecibo did not conduct any outreach activities. However, an interview held with the Arecibo area commander revealed that efforts around prevention were conducted through SAIC's Domestic Violence Unit and through a local radio station.

Aguadilla submitted multiple entries for review which constituted safety council's meetings, funeral services, participation at an emergency summit (nature of the participation unknown or not specified); none of which directly constituted outreach activities. Only one activity was reported as an orientation on cybercrime through a local radio station and a virtual training focused on prevention through the Domestic Violence Unit. Aibonito submitted documents from a health fair sponsored by a local senator, but PRPB's participation is not listed.

The Ponce police area, through their Criminal Investigations Corps, conducted and documented outreach activities geared towards a group of private security students at Serrant Academy in Ponce on August 12, 2021. The group received orientation about GO 600-633, Law 88 Juvenile Law and Juvenile Interventions. They also targeted the children and youth in Villalba for awareness and prevention through the Community Relations' Bureau. Other outreach activities included safety fairs at Plaza del Caribe Mall and a crime-victim and services fair where workshops were held on gender violence and intrafamily violence.

Guayama held a virtual safety fair, and a safety and recruitment fair at Walmart. The Fajardo police area engaged in multiple outreach activities geared towards at-risk youth and residents of public housing projects to deliver educational material and school supplies. In partnership with community members, the children obtained free haircuts and hair styles in preparation for the new academic year. Also, the community council and the Fajardo police area offered cooked meals to 11 members of the community from the Pedro Rosario Nieves housing project as part of the effort, along with a basketball carnival, which included the Commissioner and his assistants' participation. The activities were evinced through pictures and memorandums to the area commander in compliance with policy.

Carolina, through the Community Relations Bureau, prepared a comprehensive outreach pilot program; "Somos Parte de Tu Gente" (We are part of your People), geared towards community empowerment, awareness, prevention, education, and recreation as part of the "Plan Integral de Seguridad", (Comprehensive Safety Plan). The plan included concerted interagency efforts from the Department of Children and Family Services, the Fire Department, Emergency Management Services, ASSMCA, the Housing Department, Sports and Recreation, and PRPB at the Roberto Clemente Public Housing in Carolina where the 1st Athletics' League Community Safety Council was secured.  The same project is in the works for replication in the municipality of Culebra at the Ecological School, subject to review during CMR-6. This was a very well documented effort from the Community Relations Bureau that should be replicated by all police areas, including all Superintendencies for maximization of internal resources. Other initiatives included domestic violence orientations at a local shopping mall and at the First Instance Courthouse in Carolina.

SARP submitted outreach activities in Ponce and Toa Baja but did not provide any evidence on the scope these outreach endeavors.

The Caguas police area submitted evidence of suicide prevention including work plans; however, none of the plans indicated whether they were approved by the area commander nor were they signed.

The Reform Office certified, through an initiative from the governor, Honorable Pedro Pierluisi, that PRPB participated in an interagency effort to provide community orientations through informational tables and flyers; some pictures were included as part of the effort. No information on the number of attendees or if any partnerships were developed as a result of this effort were provided.

*Pathway Forward*

PRPB should engage with community advocates to develop partnerships, disseminate information, incorporate the requirements of equal protection, and ensure that the agency responds to all communities. The Monitor's Office recommends reviewing the University of Kansas Community Toolbox for additional guidance and support.[35] PRPB must proactively demonstrate its ability to address gender violence (both physical and sexual) and issues involving the LGBTQIA+ community. PRPB should also consider recent crime trends to deliver a critical message to anyone experiencing violence, and document efforts in the most efficient manner.

Furthermore, PRPB must inform the Monitor's Office of the date that sworn personnel received training on the updated community policing policy, as part of its submission of training certificates. The Monitor's Office also recommends the development of structured workplans in support of outreach efforts, including community advocates as stakeholders, to foster cooperative strategies and expand the creation of extensive problem-solving partnerships. Outreach for partnership implementation and sustainability must include strategies to respond to quality-of-life issues specific to the targeted community. These strategies should engage Community Safety Councils to facilitate opportunities for PRPB to hear community concerns, receive feedback, make connections, inspire trust, and promote empowerment. Additionally, the Monitor's Office recommends streamlining the reporting of outreach activities to facilitate uniform and effective outcome measuring.

## Paragraph 208: Community Engagement and Public Information - Community Oriented Policing

*PRPD shall develop and implement mechanisms to measure its community partnerships and problem-solving strategies and assess their effectiveness. PRPD shall prepare a publicly available report on at least an annual basis that details its community partnerships, meetings, and problem-solving activities, including specific problems addressed and steps taken by PRPD and the community toward their resolution. The report also shall identify obstacles faced and recommendations for future improvement.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2020 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | | Annually |

---

[35] https://www.ctb.ku.edu A framework for Collaboration among Community Partnerships.

| Practice: | Not Implemented | Assessment Frequency | |
|---|---|---|---|

### Compliance Targets

| 1. Formal Community Partnership module incorporates all the requirements of Paragraph 208. | ☐ Met   ☑ Missed |
|---|---|
| 2. 100% of PRPB annual reports are made publicly available. | ☐ Met   ☑ Missed |
| 3. Annual report incorporates all the requirements of Paragraph 208. | ☐ Met   ☑ Missed |

### Compliance Assessment

Developing effective connections and meaningful relationships between the community and PRPB is essential to public safety, and critical to improving quality of life and deterring crime. Therefore, alliances must be viewed as a shared responsibility – a shared project for PRPB and the community to create joint work plans and communicate strategies for reducing potential concerns. Through partnerships and alliances, including coordinated monitoring of progress, PRPB can streamline resources and concentrate on activities that are most needed, increasing the overall effectiveness of its efforts to address community concerns.

The policy for community policing, OG 800-803, establishes community partnership and alliance-development as primary goals. PRPB is in the process of implementing a web-based platform to capture and document such partnerships. PRPB has also developed a database application for the Community Safety Councils within the 13 police areas as an additional resource to expand collaborative efforts. The platform includes the capability to upload documentation showcasing PRPB's support of the alliances it has developed and sustained, including the utilization of the S.A.R.A. Model. Once operational, the platform will have the capability to measure and assess community partnerships and problem-solving strategies through the S.A.R.A. Model for effective outcomes, as required in the Agreement.

The Monitor's Office attended and observed an orientation session held by the Reform Office, where this application was introduced to pre-selected PRPB personnel. The selected personnel were a representative group of the different superintendencies who agreed to participate in supporting the application on a trial basis. This trial will include performing mock exercises for a period of two weeks and providing feedback to the Reform Office for final implementation. The Reform Office certified that the application is undergoing internal evaluation before it can become part of the operational program. However, since the application is in the trial phase, PRPB must continue to certify all partnerships developed per police area or superintendency using PPR 803.5, the official document for PRPB to capture the process, as outlined in the general order 800 - 803.

The police areas of Guayama, SAIC Ponce, SAIC Fajardo, Arecibo, and Utuado submitted formal alliances using PPR 803.5, as required by policy. SAEA submitted a report outlining a formal alliance with the Bureau of Homeland Security Immigration and Customs Enforcement in support of addressing child pornography but offered no supporting evidence such as a collaborative agreement or PPR 803.5. SAIC Ponce submitted a collaborative agreement in support of their developed formal alliances, as did the police areas of Ponce (District of Yauco), Utuado, and Guayama, and the Community Relations Bureau in San Juan. SAIC Extradition and the Special Arrests Unit submitted documentation in support of its alliance with WIPR (a public broadcasting television station) which assists in sharing information with the public

related to crime prevention and apprehending wanted persons through the television program "Los Mas Buscados" (Most Wanted); however, no Collaborative Agreement or PPR 803.5 was submitted documenting this alliance.

PRPB's formal alliances range in scope from support services programs including housing and detox services for homeless and drug addicted individuals, to organizations servicing victims of domestic violence such as "La Perla del Gran Precio" and "Solo por Hoy" in San Juan, and "Programa Escudo" in Fajardo. The continuation of these self-renewed alliances is based on prior FPM assessments. Other alliances encompassed mentoring, education, and community engagement for youth with learning and behavioral problems, such as early childhood intervention (Head Start) in Guayama and problem solving strategies development and review for recommendations on GO 600-644 and GO100-108 in collaboration and support with the Forensic psychology Department's practicum students at the UPR in Ponce. The police areas of San Juan (besides the Community Relations Bureau) Aguadilla, Humacao, Mayaguez, Carolina, and Bayamon, reported no formal alliances during this assessment period. Overall, PRPB has not demonstrated sufficient agency-wide compliance with the Agreement's stipulations that PRPB develop formal alliances, although these alliances are improving in quantity and quality.

Informal alliances in police areas are based on immediate community needs and have been reasonably established within the 13 police areas. They are essential to the goals of maintaining direct connection with the community, responding reliably to unique local situations and circumstances, establishing presence, and increasing trust. As such, it is the Monitor's recommendation that meeting minutes, agendas, and/or work plans be submitted in support, rather than in narratives within the reports.

As noted in CMR-4, the Community Relations Bureau rendered an annual report listing the alliances developed with various state, local, and community-based organizations. PRPB also reported two additional alliances established in Ponce: one with a local radio station for safety and crime prevention orientations, and the other with Proyecto Vida Segura for victim assistance. Additionally, the report noted PAVIC and COVIM as organizations assisting with victim services and providing services for youth recovering from dependency on alcohol and controlled substances. None of these alliances were supported by a collaborative agreement during this reporting period and the Monitor is unsure if these alliances were sustained throughout the period. The only agreements submitted for review were those with Proyecto Escudo and Solo Por Hoy. It is the office of the Monitor's that those two alliances were the only ones sustained.

The Partnerships' Report was not publicized, and excluded key details, including meetings and activities conducted, problems addressed, obstacles encountered, steps taken toward problem resolution, and recommendations for improvement. PRPB recently launched a Virtual Library at the end of the reporting period, which at the time of this report offered limited accessibility for the public to access documents such as the Partnerships' Report. Nonetheless, the report must be fundamentally improved to capture those missed elements for the sake of public information and compliance determination.

### *Pathway Forward*

Within the Partnerships' Report for CMR-4, PRPB recognized a proficiency gap in identifying and developing formal vs. informal alliances. The report also acknowledged gaps in addressing quality of life issues. The Monitor reiterates its recommendation for retraining, specifically geared towards alliance facilitators and quality of life officers. The Monitor's Office maintains its recommendation that electronic

reporting be used to document formal alliances, and that PPR 803.5 be utilized as established per the General Order. The module is intended for documenting various aspects of community alliances, including the submission of collaborative agreements for formal alliances and minutes, agendas, and/or work plans to document informal alliances. The expedited training and implementation of PRPB's web-based platform module will facilitate the capturing, tracking, validation, and sustainability of all vested efforts.

## 2. Community Interaction Councils

The CIC is a volunteer based group of community members from the 13 police areas. They represent diverse members of the community, most of them professionals in a variety of fields. Per policy, OG 800-801, CICs, the CICs advise, review, and offer recommendations to PRPB on policies, recruitment, and implemented strategies, among other initiatives. The CICs offer their recommendations from the perspective of the communities they represent, and in concert with community leaders and councils with whom they are engaged. The CICs also advise the Commissioner on ways to make information readily available to the public and increase transparency.

Each of the CICs have a spokesperson, who represents the police areas at the central level. These spokespersons constitute the Central CIC, together with the Community Safety Council's president, the Executive Director, and representatives from civil rights organizations, who are appointed by the Commissioner.

Securing a representative cross-section of the community continues to be a challenge for all committees, one which PRPB must help to overcome. Area commanders and CIC members must jointly develop strategies to attract community members to become involved and meet the needs of their representative groups in all 13 areas. Strategies and work plans must be developed jointly to focus on the needs of specific policing areas. These workplans will aid PRPB and the CICs in working together on issues of mutual concern and to solve the problems that the community expects the police to address.

### Paragraph 209: Community Engagement and Public Information - Community Interaction Councils

*PRPD shall continue to maintain Community Interaction Councils ("CICs") jointly with community representatives to facilitate regular communication and cooperation between PRPD and community leaders at the local level. CICs shall meet, at a minimum, every three months.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2020 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | | Annually |

214

| Practice: | Not Implemented | Assessment Frequency | |
|---|---|---|---|

*Compliance Targets*

| | | |
|---|---|---|
| 1. PPRB policies require it maintain the CIC and they meet at least every three months. | ☐ Met | ☑ Missed |
| 2. PRPB maintains CICs as required by this Paragraph. | ☐ Met | ☑ Missed |

*Compliance Assessment*

Pursuant to policy GO 800-801, CICs, CICs are required to hold monthly meetings to discuss initiatives and work plans for their respective police areas. However, for compliance purposes, the requirement of the Agreement is for three meetings per committee, per police area, per semester. The Monitor's Office finds that only four police areas (Ponce, San Juan, Caguas, and Aguadilla) held the minimum number of meetings required for compliance and submitted meeting minutes. In interviews conducted by the Monitor, CIC members for the police areas of Carolina, Arecibo, and Aibonito reported having held at least the three required meetings; some held in person, others virtually. However, no evidence was submitted for the Monitor to review. Other police areas reported not holding any meetings or kept direct participation with the CICs. The inconsistency across areas and lack of engagement with the CICs is an area of concern for the Monitor's Office. Proactive measures must be taken to facilitate communication and cooperation between PRPB and the community through the CICs.

Securing full community representation within the CICs, as required in the Agreement, continues to be a challenge. Only 3 of the 13 committees from all police areas (Humacao, San Juan, and Aibonito) have full representation of the community as outlined by the Agreement. The police areas of Aguadilla, Utuado, Caguas, and Guayama are missing five to six CIC members each, which is concerning to the Monitor's Office. Mayaguez, Fajardo, Ponce, Bayamon, Carolina, and Arecibo are missing two to four CIC members. Nonetheless, the areas of Ponce and Caguas submitted evidence on the results of their referrals and the candidates are currently undergoing background investigations. The Fajardo CIC attested to the same, although no supporting evidence was provided.

Interviews conducted with various CIC members revealed a common concern with securing full committee representation, and a need for concerted assistance by area commanders and the safety councils. Some CIC members interviewed related that the current mechanisms for securing new members does not seem to be yielding the expected results. Most interviewees stated that they seek potential candidates through direct contact and invitation, because community members are not responsive to public announcements.

The Monitor's Office also reviewed documentation and held interviews with the area commanders, executive directors, and facilitators in Arecibo, Bayamon, Carolina, San Juan, Aguadilla, Aibonito, Caguas, and Fajardo to assess further compliance. Some area commanders reported that no initiatives or strategies were undertaken to secure full CIC representation in their police area. Among the reasons mentioned for this lack of initiative, area commanders mentioned the COVID-19 pandemic, the inability to hold meetings due to lack of a quorum, the technology resources and proficiency required for some CIC members to hold meetings virtually, and the lack of reliable internet services in remote police areas. Others reported that the endeavor is directly delegated to the committee for action.

215

The Carolina Area Commander and the Aguadilla CIC spokesperson reported that although the committee has made efforts, most people reference work schedule conflicts as the primary obstacle precluding involvement. Bayamon noted that efforts are conducted via the Community Relations Bureau (CRB) through referrals. The agent facilitator for the San Juan police area, reported that the Dominican Consulate was instrumental in assisting her committee with recruitment and facility use for meetings and Conversatorios. The Monitor's Office recommends replicating such efforts to benefit other police areas.

Agent facilitators from Fajardo and Aguadilla agreed that prominent issues hindering apt representation are the COVID-19 pandemic and lack of technological resources and proficiency to keep abreast. These issues prevent the elderly, who are most interested in these efforts, from participating.

The police areas of Aguadilla, Ponce, and Caguas submitted evidence of their recruitment efforts for the Monitors' Office review. The police area of Guayama, through CRB, submitted a work plan for daily recruitment efforts through the media and social networks. However, no outcome of such efforts was included for review. The Police areas of Arecibo, Mayaguez, Utuado, and Carolina certified that no initiatives or strategies were undertaken to secure full CIC representation in their police area during this assessment period.

Area commanders and CICs need to develop strategies and proactive ways to secure potential candidates with innovative ideas.[36] The documentation submitted show significant disparities in demonstrated efforts to secure full community representation in CICs and to hold meetings during this assessment period. The Monitor's Office thus concludes that PRPB is not compliant with this paragraph of the Agreement.

*Pathway Forward*

PRPB must make all efforts to document every endeavor at community engagement by utilizing their technological resources to their advantage. Compliance can be demonstrated by adhering to policies and to the Agreement and by submitting the necessary evidence to the Monitor's Office. Proactive measures must be taken to ensure organizational commitment at all levels for transformation and motivation through the committees.

## Paragraph 210: Community Engagement and Public Information - Community Interaction Councils

*In conjunction with community representatives, PRPD shall develop a mechanism to select the members of CICs, which shall include a representative cross section of community members and PRPD officers.*

| Compliance Status | Assessment Schedule |
|---|---|

---

[36] The Monitor recommends direct contact with community organizations, (SER, LGBTQA+) parents/guardians from the Police Athletic League's children, district schools, colleges, merchant associations, and faith-based groups in their police area to actively secure representation. Additionally, they should reach out to safety council members for referrals and document those efforts.

| Partially Compliant | | Review Period | October 2020 – September 2021 |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. PPRB has developed a mechanism to select the members of the CICs in accordance with this Paragraph. | ☑ Met | ☐ Missed |
| 2. Selection process for CIC members complies with Paragraph 210 and relevant policies. | ☐ Met | ☑ Missed |

### Compliance Assessment

PRPB has mechanisms in place to select their CIC members. Documentation was reviewed in support of CIC member candidates' application processes for the police areas of San Juan, Ponce, and Caguas. This process fulfills the requirement as stipulated in the GO, including a character field investigation. As previously stated, the challenge continues to be implementing the mechanisms in such a way to promote full community representation within the CICs.

### Pathway Forward

The Monitor's Office recommends that PRPB continue to proactively seek new candidates to fill representative vacancies through their own resources with support and assistance from their respective area commanders. Further, as noted above, PRPB should leverage its relationships with current CIC members, local community organizations, and leaders to expand its efforts to fill the CIC vacancies.

### Paragraph 211: Community Engagement and Public Information - Community Interaction Councils

*PRPD shall allocate sufficient resources and authority to ensure that CICs possess the means, staffing, access, training, and mandate necessary to fulfill their mission and the requirements of this Agreement. The operating budget shall be revisited on an annual basis in consultation with the CICs.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually as to Data Sources #1 and #2. Bi-annually as to all other Data Sources. |
| Practice: | Not Implemented | | |

## Compliance Targets

| | | |
|---|---|---|
| 1. Policies related to CICs incorporate the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. CIC orientation course is consistent with approved policies. | ☐ Met | ☑ Missed |
| 3. PRPB makes CIC orientation available to all members of the CICs. | ☐ Met | ☑ Missed |
| 4. 85% of CICs possess the means, staffing, and access necessary to fulfill their mission and the requirements of this Agreement. | ☑ Met | ☐ Missed |

### Compliance Assessment

The Monitor's Office reviewed evidence submitted in support of this paragraph and conducted interviews with CIC members to determine the CIC's overall possession of the means and access necessary to fulfill their mission. CICs for the police areas of Aguadilla, Aibonito, Arecibo, Bayamon, Mayaguez, Caguas, Carolina, Ponce, Utuado, and San Juan, including the Central CIC, attested that they possess the means and access necessary to fulfill their mission. The San Juan CIC attested that they need a vehicle to fulfill their endeavor, which the Monitor verified. PRPB provided no related documents to review for the police areas of Humacao, Fajardo, and Guayama to determine resource needs. However, an inquiry made by the Monitor's Office during interviews with CIC members indicated that Guayama and Fajardo have the means and access to necessary materials to fulfill their mission. The Guayama CIC spokesperson reported that the police area only has two vehicles; but transportation has been available through their agent facilitator.

According to interviewees, training, and retraining orientations (multi-themed workshops) for the CICs did not take place during this assessment period, which is likely due to current policy revision. However, PRPB provided no documentation to support its inability to host CIC training. Notably, new CIC members, as well as members recruited during the CMR-4 review, remain unconfirmed due to the lack of appropriate training to fulfill their mission. These trainings are past due by over a year. In the Monitor's assessment, this inefficiency hampers the CIC's motivation for valuable and continued contributions. Despite the reported lack of available multi-themed training for the CICs, the Monitor acknowledged and verified that the CICs did receive training in Crowd Control, as corroborated through interviews with the Executive Director at the Central CIC, some area commanders, CICs agent facilitators, and CIC spokespersons. It should be noted that no documents were submitted by PRPB in support of this undertaking. Some CIC members reported an inability to attend training sessions in Gurabo and have recommended that trainings be hosted in a variety of geographical areas to facilitate attendance and fulfill employment responsibilities.

### Pathway Forward

The Monitor's Office recommends that PRPB conduct a training needs assessment to outline an overall CIC training program in support of the GO and the Agreement. As in the past, the Monitor also recommends facilitating CIC training in police locations throughout the island.

## Paragraph 212: Community Engagement and Public Information - Community Interaction Councils

*PRPD shall work closely with CICs to develop a comprehensive community policing approach that collaboratively identifies and implements strategies to address crime and safety issues. In order to foster this collaboration, PRPD shall share appropriate information and documents with CICs, provided adequate safeguards are taken not to disclose confidential or otherwise law enforcement sensitive information. PRPD shall seek CIC assistance, counsel, recommendations, or participation in areas including:*

*a) reviewing and assessing the propriety and effectiveness of law enforcement priorities and related community policing strategies, materials, and training;*

*b) reviewing and assessing the propriety and effectiveness of PRPD policies on matters such as discriminatory policing, search and seizure, use of force, the civilian complaint process, and victim services;*

*c) reviewing and assessing concerns or recommendations about specific PRPD policing tactics and initiatives;*

*d) providing information to the community and conveying feedback from the community to PRPD;*

*e) advising the Superintendent on recruiting a qualified, diverse workforce; and*

*f) advising the Superintendent on ways to provide data and information, including information about PRPD's compliance with this Agreement, to the public in a transparent and public-friendly format, to the greatest extent allowable by law.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2020 – September 2021 |
| Policy: | Not Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | | | |
|---|---|---|---|
| 1. PRPB developed a community policing approach working closely with CIC as per the requirements of the paragraph. | ☐ Met | ☑ Missed |
| 2. PRPB protects confidential and law enforcement sensitive information in documents and information it shares with the CICs.. | ☐ Met | ☑ Missed |
| 3. Every six months, PRPB sought assistance, counsel, recommendations or participation from the CICs, collectively, at least once in all areas specified by the Paragraph. | ☐ Met | ☑ Missed |

### *Compliance Assessment*

PRPB has not provided any substantial evidence in support of their development of a comprehensive community policing strategy in collaboration with the CICs. Beyond some recommendations on policies shared by the CICs throughout the 13 police areas, little to no collaborative work has been done towards identifying and implementing strategies to address crime and safety issues. A total of 19 policies were submitted for review by PRPB during this assessment period, as verified through the Monitor's Office.

219

Twelve police areas submitted evidence of policies shared with the CICs. Some CIC members noted that the policy review response timeframe (a week and a half) was inadequate to render sound recommendations.

SAEA, SARP, and SAIC reported that they did not actively seek recommendations, input, or assistance from CICs. SAEA also certified that no recommendations were received from CICs or the Executive Directors for workshops or training interests. The Monitor notes that trainings and workshops in policy, directives, and procedures is SAEA's sphere of competence, and SAEA bears ultimate responsibility for ensuring competence in these areas, as well as facilitating the necessary training for CICs to fulfill their mission and comply with the Agreement.

Documents reviewed for the police areas of Aguadilla, Aibonito, Mayaguez, Ponce, San Juan, and Utuado produced no evidence of recommendations made by the CICs. Guayama similarly reported no recommendations, and the Arecibo police area failed to submit any documents for the Monitor's assessment. No work plans or structured initiatives were submitted for assessment on the effective and adequate implementation of strategies to address crime, disorder, and safety concerns in collaboration with the CICs. Nor were any submitted in support of the development of a comprehensive approach to community policing, beyond policies submitted by PRPB for CIC review. The Monitor is unable to determine substantial compliance with the requirements per policy or with the Agreement on PRPB's adequate safeguards in the disclosure of confidential or sensitive information because any documentation to demonstrate this was not submitted. Additionally, evidence was not submitted in support of CIC advisement to the Commissioner on means to inform the public about recruitment. Finally, evidence was not submitted regarding PRPB's efforts to inform the CICs about PRPB's compliance with the Agreement or the opportunity to share concerns and obtain feedback.

*Pathway Forward*

The Monitor recommends that PRPB demonstrate and document involvement and participation from the area commanders in creating initiatives and developing strategies to address crime and safety concerns in collaboration, consultation, and input with the CICs. This should include developing work plans. The CICs have first-hand knowledge of the specific concerns of the community, and PRPB has information on crime trends and crime statistics. Together they must advance efforts on behalf of the community.

### Paragraph 213: Community Engagement and Public Information - Community Interaction Councils

*CICs shall memorialize their recommendations in an annual public report that shall be available in PRPD facilities and on the official web pages of the Commonwealth of Puerto Rico and PRPD. The report shall include appropriate safeguards not to disclose confidential or otherwise law enforcement sensitive information and to protect sensitive personal or private information.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2020 – September 2021 |
| Policy: | Implemented | | |

220

| Training: | N/A | Assessment Frequency | Annually |
|---|---|---|---|
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. PRPB published 100% of CICs annual public report with recommendations included are available on web pages of the Commonwealth of Puerto Rico and the PRPB. | ☐ Met | ☑ Missed |
| 2. All CICs annual reports do not disclose confidential or otherwise law enforcement sensitive information and it protects sensitive personal or private information. | ☐ Met | ☑ Missed |

### Compliance Assessment

Pursuant to GO 800-801, CICs, and the Agreement, the annual report is the compilation of all CIC activities and recommendations by police area. It captures all efforts conducted throughout the year and must be made available for publication on or before January 31 of each year. However, during prior assessments, it had been CIC practice to compile their recommendations in a semester report (January through June) in preparation for their final report. Based on the documents submitted for review, the police area of Aguadilla, Aibonito, Bayamon, Carolina, and Caguas CIC submitted their semester report along with their recommendations. The Community Relations Bureau certified that the report for this assessment period was submitted on July 29, 2021; this is evidently an error on their part. No other police areas submitted a semester report. The Central CIC failed to render their semester report (June), as required in the General Order. Because the compilation of the CIC's recommendations from the 13 areas is not required until the end of the year, compliance with this paragraph is deferred, subject to assessment during the CMR-6 reporting period. However, the practice of compiling a semester report, per policy, stands. The Monitor's Office notes that no annual reports have been publicized in more than five years. The Monitor also notes that these reports differ from reports released by the Community Relations Bureau.

### Pathway Forward

The Monitor recommends that the policy of compiling semester reports be followed. It is also recommended that PRPB develop a mechanism to assist CICs in the publication of their annual report; including the availability of technological resources to complete the process.

## 3. Public Information

Informing the public is an essential way for PRPB to develop the community's trust and demonstrate accountability. This objective includes keeping the community abreast of PRPB's directives and new policies, and providing accessible and transparent statistics on crime, including hate crimes. This objective continues to be among the Monitor's chief concerns, as noted in previous reports, and an area requiring substantial work by PRPB. The Agreement is very specific and requires public dissemination of accurate and updated crime statistics including monthly hate crimes, which have yet to occur.

221

Although PRPB does not have a Public Information Policy, it has delegated responsibility to the Press Office through GO 100-125, Press Office. The Press Office is responsible for organizing, directing, and controlling the efforts of disseminating information to the public through public broadcasts, social media platforms, PRPB's web page, mass media, press releases, and conferences. These media channels should be more than adequate for PRPB to communicate any activities or information to the public. PRPB submitted amendments to the Press Office Policy under paragraph 229 of the Agreement during the CMR-4 reporting period. The Monitor offered recommendations to adopt and include community-oriented policing and its philosophy into the operational policy.

PRPB has struggled to implement an outreach and public information program in all 13 police areas and has not fulfilled the requirements in the Agreement to inform the public of their progress and address issues of community concerns through at least two annual public meetings. These meetings, namely *Encuentros Comunitarios* (Community Encounters), are intended to address a wide variety of informational needs, including educating the public on individuals' right to decline consent to voluntary searches, consistent with Paragraph 77 of the Agreement. On the other hand, PRPB has marginally begun to report their crime statistics (Type I), but its crime reports are not reported monthly, as required. Additionally, hate crimes are not included within the statistical reports and sexual and domestic violence reports are dated (only captured through December 2020).

PRPB has developed a Virtual Library where all policies and procedures are centralized, as a resource of information to the public. It includes a calendar of community events and activities for each police area. The Monitor's Office received the system demonstration during a recent site visit. PRPB publicly launched the system October 1, 2021. However, as the Monitor previously noted in Section VI on Policies and Procedures, only a minimal number of policies are currently available to the public via the Virtual Library.

## Paragraph 214: Community Engagement and Public Information - Public Information

*PRPD shall develop a Community Outreach and Public Information program in each of the former thirteen police regions or in other operational subdivisions with comparable geographic coverage.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Community Outreach and Public Information program was developed in each of the former thirteen police regions or geographic equivalent. | ☐ Met | ☑ Missed |

| | | |
|---|---|---|
| 2. At least bi-annual open meetings were held during the first two years of the Agreement. Then annually until the end of the Agreement. | ☐ Met | ☑ Missed |
| 3. 95% of the meetings were widely publicized at least one week before such meeting. | ☐ Met | ☑ Missed |
| 4. During 95% of the meetings reviewed the public was informed of the requirements of this Agreement, PRPB's progress meeting these requirements, and addressed areas of community concern. | ☐ Met | ☑ Missed |
| 5. 95% of the Outcome Reports of open meetings reviewed comply with the parameters established by this Paragraph. | ☐ Met | ☑ Missed |
| 6. 95% of the meetings reviewed included public education on an individual's right to decline consent to voluntary searches, consistent with Paragraph 77 of this Agreement. | ☐ Met | ☑ Missed |
| 7. Community Outreach and Public Information program meetings comply with Paragraphs 214-216 and parameters established in Worksheets # 3. | ☐ Met | ☑ Missed |

*Compliance Assessment*

PRPB has a policy for Community Encounters and Outreach under GO 800-805, which has been in effect since June 20, 2018. Its purpose is to promote interaction between PRPB and the community through the implementation of community encounters, outreach, and public information throughout the 13 police areas. The policy requires that PRPB and the community meet a) to discuss community concerns and quality of life issues, b) to strengthen ties, c) to discuss policies and new police directives; d) to identify strategies and mechanisms to address crime and disorder, e) to focus on awareness prevention, and to educate the public on their rights to decline consent to voluntary searches, and f) to inform the public of PRPB's progress on the reform. The policy also requires assistance from SAOC and the involvement of SARP and SAIC for execution of the related activities; outlines rights and responsibilities; and provides the structure for implementing the endeavor.

Interviews conducted with area commanders for Arecibo, Carolina, Bayamon, Aibonito, Fajardo, San Juan, and Caguas verified that no community encounters took place in their areas during this assessment period. The Monitor's Office is aware, to PRPB's credit, that some police areas engaged in other initiatives for awareness, prevention, and education, such as suicide prevention, "Saying no to violence", and domestic violence. Nevertheless, such efforts do not meet the requirements for compliance determination within this paragraph of the Agreement. PRPB certified that open meetings were not held, as a result all other compliance criterion for assessment were not met.

*Pathway Forward*

The Monitor advises PRPB to take advantage of the structured policy in place to implement the required encounters and to reach out to the community. The policy provides a roadmap to implementation and responsibilities for execution.

## Paragraph 215: Community Engagement and Public Information - Public Information

*The Community Outreach and Public Information program shall require at least bi-annual open meetings for the first two years of this Agreement. During the meetings, PRPD officers from the police region and/or the Reform Unit shall inform the public about the requirements of this Agreement, PRPD's progress meeting these requirements, and address areas of community concern. At least one week before such meetings, PRPD shall*

*widely publicize the meetings using print media, the Internet, and public service announcements on television or radio.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: This Paragraph is assessed with Paragraph 214.

### Compliance Assessment

As noted in paragraph 214, PRPB failed to conduct any Encuentros Comunitarios, or open community meetings, during the reporting period, and those that were held were not on topics required by the Agreement. PRPB also certified that no encounters took place in any of the 13 police areas.

### Pathway Forward

The Monitor recommends that PRPB develop a calendar with proposed dates for the encounters for each police area, including the date, time, location, and discussion topics and an outlined work plan drafted three months prior to the activity. The calendar should be made easily accessible and available to the public within PRPB's Virtual Library.

### Paragraph 216: Community Engagement and Public Information - Public Information

*The Community Outreach and Public Information meetings shall, with appropriate safeguards to protect sensitive information, include summaries of all audits and reports completed pursuant to this Agreement and any policy changes made and other significant action taken as a result of this Agreement. The meetings shall also include public education on an individual's right to decline consent to voluntary searches, consistent with Paragraph 77 of this Agreement.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

224

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 214.

*Compliance Assessment*

As noted in paragraph 214, PRPB failed to conduct any community meetings during the reporting period, and those that were held were not on topics required by the Agreement. PRPB also certified that no encounters took place in any of the 13 police areas.

*Pathway Forward*

The Monitor will continue to assess PRPB's compliance with this paragraph and recommends that PRPB actively participate, consult, and collaborate with the CICs, Community Safety Councils, and leaders and organizations with whom alliances have been developed.

## Paragraph 217: Community Engagement and Public Information - Public Information

*PRPD shall maintain and publicly disseminate accurate and updated crime statistics, including those related to hate crimes, on a monthly basis.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Not Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. PRPB disseminates crime statistics on a monthly basis. | ☐ Met | ☑ Missed |
| 2. 95% of reviewed crime statistics were publicly disseminated on a monthly basis. | ☐ Met | ☑ Missed |
| 3. 100% of hate crimes were publicly disseminated once they occurred. | ☐ Met | ☑ Missed |
| 4. PRPB communicated hate crimes statistics to the public in a clear and easily accessible way. | ☐ Met | ☑ Missed |

Note: The portion of this paragraph that requires that PRPB maintain updated crime statistics is assessed together with Paragraph 219 of the Agreement (Information Systems and Technology), and Paragraph 148 (Early Identification System).

*Compliance Assessment*

PRPB has an established policy to record incidents of crime (GO 600-623). Per policy, the incident reports are of public domain, except for victim information, sexual assaults, individuals with mental health issues, and juveniles. The incidents are recorded on forms PPR 621.1 and PPR 615.8, as applicable. The

Statistical Division, under the Superintendency of Managerial Services (SASG), administers and maintains the information system based on incidents recorded in NIBRS.

A review of PRPB's website revealed type I crimes for each police area were available for the month of September 2020 and September 2021, along with a crime comparison. However, no monthly statistics for earlier months were found. Moreover, PRPB failed to include statistical information on hate crimes, an issue of serious concern to the Monitor's Office. According to the website, the latest reports on domestic violence and sexual offenses, are from 2020. No 2021 statistical information is available to the public as of this report.

PRPB certified through its Crime Statistics Division, under the SASG, that hate crimes statistics are collected and recorded, but not publicly available. They are awaiting IT support and assistance to make publishing possible. [37]

*Pathway Forward*

PRPB must seek resolution to these technological deficiencies; not only to comply with the stipulations of the Agreement to inform the public, but to obtain the necessary data to develop work plans, deploy resources, and strengthen officer and community safety, among other operational purposes. Until these deficiencies are rectified, PRPB is strongly directed to use its social media accounts, public service announcements, and internal resources to keep the public informed, report crime statistics, and relay PRPB's progress on the reform. Media should also be leveraged to share other issues relevant to the public, such as crime trends, strategies to fight crime, and quality of life matters for awareness, prevention, and education.


# IX. Information Systems and Technology

During the CMR-5 reporting period PRPB continued to make progress toward partial compliance for technology but incrementally and at a slow pace. For example, apart from many of the applications of lesser day to day operational significance (i.e., Project Management and Virtual Library), CAD is still without formal training from SAEA, and EIS, as a conduct intervention system, continues to languish in development and is not implementable. As a reminder, during the CMR-4 development of CAD Form PPR 126.6 continued to iterate and as of this writing has not been operationally finalized.

Positively, the Bureau of Technology (BT) has had some limited progress technologically but as a whole at the agency level, PRPB continues to fall short of procedural implementation that must include not only application and system use in the field but also analytic capacity using data from across the whole of the Department. It is very important to cite that these are not solely BT obligations but rather greater operational policing responsibilities to integrate the technology with operational processes in the field and at headquarters. For these reasons, and while some technology is partially available, continuing adaptations are needed, as is formal training and analytics which are not yet available. Therefore, PRPB cannot be considered to be anything other than partially compliant in many areas for technology and not "substantially" for implementation or analytics as is cited in the methodologies and

---

[37] CMR5-CO-3346

criteria for monitoring. To achieve a substantial rating PRPB must meet all methodology assessment criteria.

Regarding EIS, its operational status continues to be unvalidated. Throughout multiple reviews and demonstrations numerous issues were uncovered and not mitigated. Further, the Monitors, Special Master, and especially USDOJ expressed significant concern that PRPB's messaging concerning the use of EIS and its "branding" indicate that EIS may be considered by PRPB rank-and-file to be a punitive tool rather than a diagnostic means to assist and support its agents. This overarching dilemma overshadows the positive partial technology compliance achieved in the Sexual Assault and Domestic Violence modules.

The following observation is unchanged from the CMR-4 period. *"As for PRPB's analytic capabilities, PRPB has yet to demonstrate that it possesses substantive acumen coupled with a mastery of its data resources such that it can measurably exploit its information and data resources to advance the transformation and Decree. This is of continuing concern because while operational staff can query data and generate reports, there is no explicit measurable proof of PRPB using analytic outputs to address the expected transformation within the Decree."*

Finally, the BT continues to lack access to adequate funding and subject matter expert resources. Whether hampered by funding, contracting, or the many other issues the Bureau encounters, PRPB has yet to be able to prove an appreciable level of effective process acumen consistent with technology development and implementation best practices found in the IT industry today. This must change. As an example, repeated requests that operational advocates, sponsors, and process owners attend ongoing demonstrations have gone unmet. Best practices insist that ensuring access to identified authoritative process owners who represent operational use of any application, system, technology tool, or process is essential to effective development and implementation. This experience itself demonstrates that accountability for outcomes is unclear but seemingly left solely on the BT's shoulders.

Overall, PRPB's compliance with the six paragraphs assessed during this reporting period within Information Systems and Technology reflect slightly increased levels of compliance to what was noted in previous reports. In CMR-4, 83% of paragraph were assessed as Not Compliant, in comparison to the current reporting period, where 67% of paragraphs were found to be Not Compliant. See figure 10.

Ultimately, PRPB must be aware that irrespective of progress made so far, if PRPB is unable to sustain advances and transformation, it is possible for PRPB to back slide to non-compliance.



*Figure 10. Information Systems and Technology: Paragraph Compliance Status*

## Paragraph 218: Information Systems and Technology

*PRPD shall establish information systems and utilize technology to support the implementation of this Agreement in an efficient and effective manner.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2020 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

Note: Compliance will be determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 219 – 224 in tandem with applicable Paragraphs in sections III through XII and (2) the results of outcome assessments, pursuant to Paragraph 243.

### *Compliance Assessment*

Able to finally return to Puerto Rico in June 2021 since the onset of COVID-19, the Monitoring Team committed to intensive on-site and deliberate engagements with PRPB to participate in technology demonstrations. The conduct of the demonstrations was specifically intended to focus on high visibility IT applications and systems such as CAD and EIS. Extremely valuable exchanges between the Monitors, PRPB, USDOJ, and the Special Master's Office occurred uncovering both progress and setbacks. Overall PRPB has yet to achieve adequate CAD procedural compliance enough to fully and operationally leverage the technology and its integration with GTE. However, the BT has continued to make strides with regard to technology advancements achieving minimal or partial compliance as noted as follows below.

228

| System | Demonstration Date | Technology Compliance | Compliance Targets Filed 10/30/19 |
|---|---|---|---|
| Project Management System | 7/14/21 | Substantial | Substantial |
| CAD/CAD Mobile | 6/7/21 | Partial | Partial |
| NIBRS | 7/12/21 | Minimally Partial | Not Compliant |
| NCIC – National Crime Information Center | 7/12/21 | Minimally Partial **Headquarters only | Not Compliant |
| Forms in GTE | 9/22/21 | Partial | Partial |
| Promedia (Performance Evaluation System) | 9/29/21 | Partial | Deferred |
| PTMS - Store digitized files, records, curricula, and Teaching Plans | 6/7/21 | Partial | Deferred |
| Formal Community Partnerships/Alliances – distribute data and information | 7/13/21 | Partial | Not Compliant |
| EIS | 8/18/21 | Not Compliant | Not Compliant |
| Supervisory Module | 9/8/21 | Not Compliant | Not Compliant |
| Domestic Violence and Sex Crimes | 6/8/21 | Partial | Partial |
| Inspections – Operational, Investigative & Administrative | 8/17/21 | Substantial | Deferred |
| Virtual Library – publish policies, procedures, forms, implement on PRPB Website | 9/7/21 | Partial | Partial |
| Use of Force | 9/7/21 9/24/21 | Not Compliant **due to data inconsistencies | Not Compliant |

*Figure 11. Information Systems and Technology Systems Reviewed During the Reporting Period*

## Pathway Forward

Looking forward one must keep in mind that although PRPB is assessed as Partially Compliant it is mostly based on technical sufficiency. Adequate progress has yet to be achieved in data gathering and analytics. Therefore, PRPB must continue to develop solutions and accelerate the current pace of provisioning for its needed solutions and aggressively ensure commitment to implementing sound technical capabilities coincident with viable procedures in the other areas of the Agreement. To do this, the shortage of resources, both people and funding must be overcome. If not, PRPB will continue to accrue of technical "debt" ultimately leaving the BT in a continuous spiral of trailing development. Looking even further ahead, PRPB must commence with institutionalizing its analytic capacity as recommended by both the Monitor and the AH Datalytics Assessment. Until this is achieved substantial compliance is not possible.

To increase the probability that the BT will succeed, leadership support, advocacy, prioritization, and visibility must be obvious to all operational elements within the Department. Without it, the BT will continue to struggle sub-optimally to provide needed IT platforms without the committed support and involvement it needs from operational units and leaders. The Monitors have observed this dilemma often in the absence of authoritative operational stakeholders/leaders during the numerous ongoing technology demonstrations that have been conducted.

## Paragraph 219: Information Systems and Technology

*PRPD shall collect and maintain all data and records necessary to: (a) document implementation of and compliance with this Agreement, including assisting the TCA's outcome assessments and the data collection and reporting required by this Agreement; (b) perform ongoing performance improvement activities in each of the areas addressed by this Agreement; (c) facilitate and ensure transparency and wide public access to information related to PRPD decision making and activities, as permitted by law; and (d) promote officer and civilian safety.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. Data dictionary includes all data sets necessary to access compliance with the Agreement. | ☑ Met  ☐ Missed |
| 2. The data systems permit PRPB to engage in ongoing performance improvement activities in each of the areas addressed by this Agreement. | ☐ Met  ☑ Missed |
| 3. PRPB makes publicly available all data that the Agreement requires be published, in accordance with PRPB policy and applicable laws. | ☐ Met  ☑ Missed |
| 4. PRPB collects and maintains data that is relevant, useful, and applicable to officer and civilian safety. | ☐ Met  ☑ Missed |
| 5. PRPB maintains data and records in compliance with the Agreement and applicable laws. | ☐ Met  ☑ Missed |

Note: Review frequency, consistent with the periodicity of assessments in areas III through XII and XIV.

*Compliance Assessment*

Extremely valuable exchanges between the Monitors, PRPB, USDOJ, and the Special Master's Office occurred uncovering both progress and setbacks. Overall PRPB has yet to demonstrate adequate and accurate data and records use in GTE given its integration with CAD.

*Pathway Forward*

PRPB and the BT must continue to develop data management and analytical solutions while accelerating its current pace of provisioning for its needed solutions. To do this the shortage of resources, both people and funding must be overcome and if not, will continue to prolong accrual of technical "debt" ultimately leaving the BT in a continuous spiral of trailing development. PRPB must institutionalize its analytic capacity as recommended by both the Monitor and the AH Datalytics Assessment. Until this is achieved substantial compliance is not possible.

230

## Paragraph 220: Information Systems and Technology

*PRPD shall develop protocols for collecting, analyzing, and reporting the information required by this Agreement. These protocols shall be developed and implemented in coordination with the TCA and shall be approved by the DOJ prior to implementation.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2021 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: This Paragraph is assessed with Paragraph 219.

### Compliance Assessment

PRPB has not yet demonstrated effective publishing of its information, especially data. This is further complicated by the fact that the accuracy of data in both CAD and GTE is questionable as has been seen in the discrepancies concerning data. This must be of significant recurring focus to the Parties as PRPB's ability to successfully evaluate operational data and performance leading to transformation remains suspect.  To establish their independent legitimacy, this capacity must change and be beyond reproach.

### Pathway Forward

As noted above, PRPB and the BT must continue to develop solutions and accelerate its current pace of provisioning for its needed solutions. To do this the shortage of resources, both people and funding must be overcome and if not, will continue to prolong accrual of technical "debt" ultimately leaving the BT in a continuous spiral of trailing development. Until this is achieved substantial compliance is not possible.

As importantly and a best practice in the information technology community, leadership support, advocacy, prioritization, and forward leaning visibility must be obvious to all organizational elements within the Department. Without it, the BT will continue to struggle sub-optimally to provide needed IT platforms without the committed support and involvement it needs from operational units. The Monitors have observed this dilemma which has been often noticed by the absence of authoritative stakeholders holding operational chain of command during the numerous ongoing technology demonstrations that have been conducted.

## Paragraph 221: Information Systems and Technology

*PRPD shall develop and maintain an automated record management system and electronic files as part of the Action Plans developed for each subsection above.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2020 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. A record management system accounts for all the elements of the Paragraph and outcome measures as required by Paragraph 243. | ☐ Met  ☑ Missed |

### Compliance Assessment

Although the technology is available, PRPB has not yet demonstrated effective availability and integration of GTE with its operational systems which has been seen in the discrepancies regarding UOF data and the inconsistency of processes from precinct to precinct.

### Pathway Forward

PRPB and the BT must continue to develop GTE, especially its broad use as an analytical tool. Until this is achieved substantial compliance is not possible.

## Paragraph 222: Information Systems and Technology

*PRPD shall provide each supervisor with handheld recording devices and require that supervisors use these devices to record complainant and witness statements taken as part of use of force or misconduct complaint investigations.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2020 – September 2021 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

232

## Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of this Paragraph. | ☐ Met | ☑ Missed |
| 2. Handheld recording device trainings are consistent with approved policies. | ☐ Met | ☑ Missed |
| 3. 95% of sampled personnel are trained and certified in relevant policies related to handheld recording devices (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 4. Complaint and witness statements are recorded in 95% of use of force reviews. | ☐ Met | ☑ Missed |
| 5. Complaint and witness statements are recorded in 95% of misconduct complaint investigations. | ☐ Met | ☑ Missed |
| 6. All sampled units had access to functional handheld recording equipment. | ☐ Met | ☑ Missed |

## Compliance Assessment

PRPB is assessed as not complaint. To this point neither a briefing nor demonstration has been provided or offered.

## Pathway Forward

PRPB must provide evidence of their efforts to comply with the Agreement. PRPB should prepare for and brief its plan for development, operations, and support to the Monitor.

## Paragraph 223: Information Systems and Technology

*All officers shall have access to National Crime Information Center ("NCIC") data for valid law enforcement purposes only. PRPD shall develop a protocol for the handling and use of NCIC data.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2020 – September 2021 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

## Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of this Paragraph. | ☑ Met | ☐ Missed |
| 2. NCIC data trainings are consistent with approved policies. | ☐ Met | ☑ Missed |
| 3. 95% of sampled personnel are trained and certified in relevant policies related to handling and use of NCIC data (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 4. NCIC data is considered in 95% of patrol interventions and investigations. | ☐ Met | ☑ Missed |
| 5. All sampled units had access to NCIC data. | ☐ Met | ☑ Missed |

| 6. PRPB safeguards appropriately protect sensitive data. | ☐ Met   ☑ Missed |
| --- | --- |

### Compliance Assessment

Although demonstrated to the Monitors in July 2021, NCIC access and use is limited to only headquarters. PRPB acknowledged that the longer-term implementation will be to all officers in the field. Although technical compliance is rated as "Partial", NCIC procedural access is extremely limited and therefore the compliance level must be considered as Not Complaint.

### Pathway Forward

PRPB must continue integration and implementation to ensure roll out beyond headquarters. Availability to all authorized and trained officers must be achieved and be in alignment with NCIC operational use criteria. Additionally, effective training throughout PRPB is required from SAEA and the BT. Training has not been reviewed at this stage.

## Paragraph 224: Information Systems and Technology

*Nothing in this Agreement will be construed as prohibiting PRPD from contracting services related to technology and data collection, entry, and analysis.*

### Comment from the Monitor

Paragraph 224 provides no established methodology for which the Monitor to assess compliance. However, the Monitor offers the following commentary to provide context on some of the underlying issues noted in the previous paragraph assessment.

The BT continues to lack access to adequate funding and subject matter experts. Although Paragraph 224 provides for contracting to acquire necessary resources and experts, the BT has indicated repeatedly that the government contracting process is difficult to navigate and not timely nor responsive.  So, whether hampered by funding, contracting, or the many other administrative issues the Bureau encounters, PRPB has yet to be able to prove an appreciable level of effective process acumen consistent with technology development and implementation of best practices found in the IT industry today. This must change. As a final example, repeated requests that operational advocates, sponsors, and process owners attend ongoing demonstrations have gone unmet. Best practices insist that ensuring access to and involvement from identified authoritative process owners who represent operational use of any application, system, technology tool, or process is essential to effective development and implementation. This experience demonstrates that accountability for outcomes is ambiguous and seemingly left solely on the BT's shoulders.

## Appendix A: Background to PRPB Monitoring Mission

In 2008, USDOJ initiated an investigation of PRPB into an alleged pattern or practice of using excessive force, conducting unlawful searches and seizures, and unlawful discrimination, all of which are proscribed by the United States Constitution. USDOJ conducted their investigation pursuant to the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141, and the anti-discrimination provisions of the Omnibus Crime Control and Safe Streets Act, 42 U.S.C. § 3789d. PRPB accepted the grounds for the investigation and pledged cooperation and has worked in partnership with USDOJ to establish the reforms outlined in this Agreement.

As part of its investigation, USDOJ and its police practices expert consultants conducted a detailed fact-finding review with the assistance and full cooperation of PRPB, including: a) tours of police areas; b) interviews with PRPB officers, supervisors, command staff, Commonwealth officials, members of the public, and other stakeholders; c) review of many thousands of documents, including policies and procedures, incident reports, internal investigation of civilian complaint records, external audit reports, and legislative materials; and d) accompanying line officers and supervisors during their respective tours of duty. PRPB's Superintendent and command staff officials met personally with USDOJ representatives and consultants on multiple occasions and pledged their full support and cooperation.

In response to the concerns raised by USDOJ during its practice investigation of PRPB, and in recognition of the need to modernize and professionalize its operations, PRPB undertook its own internal reform efforts. These efforts culminated in the issuance in March 2011 of PRPB's own internal reform plan. The plan included: 1) the development and implementation of new policies regarding UOF and a wide range of other substantive areas; 2) the training of all appropriate officers in the new UOF policies through "train-the-trainer" pedagogy; 3) the adoption of a reformed disciplinary system; 4) the improvement of citizen complaint procedures; 5) the strengthening of community outreach efforts through Citizen Interaction Committees; and 6) a staffing review to improve supervisor to officer ratios.

In September 2011, USDOJ issued a written report of its investigative findings ("the Report"). The Report presented USDOJ's findings related to UOF, UOF to suppress the exercise of First Amendment rights, and searches and seizures. The Report identified several additional areas of serious concern, including discriminatory policing and the insufficient quality of investigation into sex crimes and domestic violence. Finally, the Report outlined a series of other performance issues: 1) systemic deficiencies in PRPB's policies and procedures; 2) conduct of specialized units; 3) formative and in-service training; 4) supervision; 5) intake, internal investigation, and institutional adjudication of administrative misconduct complaints; 6) corrupt acts and other crimes committed by PRPB officers; 7) substandard processes for promotion in rank; 8) lack of risk management; 9) poor external oversight and accountability; and 10) a lack of sufficient community engagement. The Report concludes that the performance of PRPB was undermined by several entrenched and long-standing problems, which in the estimation of USDOJ called for a systemic remedy.

While PRPB did not concur with all the findings and conclusions in the Report, the Parties met throughout 2012 to exchange ideas and proposals for modernizing and professionalizing PRPB and to discuss numerous reforms already underway at PRPB's own initiative. Once the newly elected Commonwealth administration took office in January 2013, the administration familiarized itself with the Agreement and continued negotiating to reach a final Agreement. The Agreement is the product of these good faith

negotiations. In July 2013, the draft Agreement was presented to the Honorable Gustavo A. Gelpi, Chief Judge of the U.S. District Court for the District of Puerto Rico, who approved the draft, formalizing the Agreement.

On June 5, 2014, the Court approved the selection and hiring of an independent monitor to help PRPB during the capacity building phase and thereafter monitoring the compliance period of the Agreement.

Unlike other consent decrees throughout the United States and its territories and owing to the unique institutional development and needs of the Commonwealth, the Agreement between the USDOJ and Commonwealth of Puerto Rico included a four-year "capacity-building" phase. During that phase, PRPB was expected to develop policies, procedures, and technologies to address serious deficiencies within the Bureau. The Monitoring Team, which is comprised of subject matter experts, was expected to provide substantive expertise and technical assistance to guide PRPB in its implementation and development efforts, while at the same time providing the public with assurance that PRPB's progress would be evaluated in a reliable, independent, and transparent manner.

The capacity-building period concluded on October 8, 2018, at which time the "monitoring phase" was to commence according to the Agreement. However, at that time the Monitor and Parties were unable to come to a consensus on the methodology matrices that the Monitor's Office proposed to use to measure PRPB's compliance with the Agreement. This resulted in a delay in the start of the monitoring phase, and the Court subsequently suspended monitoring measures pending the finalization and acceptance of a compliance assessment methodology agreeable to the Parties. PRPB, legal counsel, and the USDOJ conferred with the Monitoring Team over the course of six months to develop methodology matrices necessary to measure compliance for the 11 performance areas outlined in the Agreement. After review, and with the assent of the Parties, the Court accepted the objective methodologies put forth by the Monitor's Office.

In March 2020, the court approved and published the First Report of the Federal Monitor, which focused primarily on policy and procedures, UOF, and IT. CMR-1 found broad compliance on policy and procedure and certain areas of UOF, but nevertheless found a series of key lapses in UOF investigations and IT infrastructure. Later that same year, CMR-2 provided a more comprehensive overview of PRPB's performance, covering a significantly larger number of Consent Decree paragraphs. As such, CMR-2 provided a model for Monitor's reports going forward. CMRs 3 and 4 have continued assessing PRPB on all paragraphs that require biannual evaluation, and approximately half of the paragraphs that require annual evaluation.

# Appendix B: Methodology

In agreement with the approved methodology, the Monitoring Team uses a combination of quantitative and qualitative methods to assess PRPB's compliance with the Agreement in the areas of performance selected for this report. Each paragraph in the Agreement has been assigned a methodology that was agreed on by the Parties and approved by the court. These methodologies include information on the data source, sampling method (if relevant), and compliance targets. The compliance targets provided for each paragraph outline the objectives and thresholds PRPB must meet to reach full compliance with the paragraph. Further, if applicable, the compliance targets outline whether PRPB has incorporated the requirement into an implemented policy; trained all relevant personnel in the requirement and policy; and fully implemented the requirement in practice. PRPB's status in the implementation of policy, training, and practice are noted for each paragraph assessed, see figure 12.



*Figure 12. Implementation Status: Policy, Training, Practice*

The full methodology can be accessed at the Monitor's website at https://www.fpmpr.org.

The compliance levels are defined as follows:

- **Fully Compliant**: Where PRPB has objectively demonstrated substantial compliance with the cited portion of the Agreement for a period of more than two years;
- **Substantially Compliant**: Where PRPB has objectively demonstrated extensive compliance with the cited portion of the Agreement (as defined by the compliance targets for a given paragraph) for a period of less than two years;
- **Partially Compliant**: Where PRPB has objectively demonstrated a sub-optimal level of compliance with the cited portion of the Agreement, as defined by the compliance targets for a given paragraph;
- **Not Compliant**: Where PRPB has not objectively demonstrated compliance with the cited portion of the Agreement, either due to a lack of evidence, or due to evidence of significant shortfalls in compliance relative to the targets outlined for a given paragraph;
- **Deferred**: Where the Monitoring Team has not obtained sufficient evidence to reach a determination as to compliance status with the cited portion of the Agreement, due to no fault on the part of PRPB.

The Court draws a clear distinction between a Deferred rating and a rating of non-compliance due to lack of information. In the latter case, the Monitor's Office is unable to reach a determination of compliance because PRPB failed to provide the Monitor's Office with requested data, and thus failed to provide evidence of compliance. In the former case, the Monitor's Office could not obtain sufficient data

to reach a determination of compliance due to no fault on the part of PRPB, e.g., travel restrictions prevented the Monitor's Office from conducting required site visits.

# Appendix C: Compliance Status by Paragraph and Sub-Section

The following Sections were assessed in this report.

## I. Professionalization

| Professionalization Sub-Section | Count of Paragraphs per Section by Compliance Status | | | |
| --- | --- | --- | --- | --- |
| | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 0 | 1 | 0 | 0 |
| Staffing & Community Policing | 0 | 1 | 0 | 0 |
| Promotions | 1 | 1 | 0 | 5 |
| Commander Corps | 0 | 0 | 1 | 0 |
| **Total** | **1** | **3** | **1** | **5** |

## II. Use of Force

| Use of Force Sub-Section | Count of Paragraphs per Section by Compliance Status | | | |
| --- | --- | --- | --- | --- |
| | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 1 | 4 | 0 | 0 |
| Specialized Tactical Units | 0 | 4 | 0 | 1 |
| Crowd Control | 1 | 3 | 0 | 0 |
| Force Reporting | 0 | 0 | 0 | 4 |
| Force Review & Investigation | 0 | 1 | 2 | 0 |
| Supervisory and FRB Reviews | 0 | 2 | 1 | 2 |
| FIU Investigations & SFRB Reviews | 0 | 1 | 3 | 1 |
| Use of Force Training | 1 | 2 | 0 | 0 |
| Responding to Mental Health Crisis | 0 | 2 | 0 | 0 |
| **Total** | **3** | **19** | **6** | **8** |

## III. Search & Seizures

| Searches and Seizures Sub-Section | Count of Paragraphs per Section by Compliance Status | | | |
| --- | --- | --- | --- | --- |
| | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 0 | 2 | 0 | 0 |
| Investigatory Stops and Searches | 0 | 0 | 5 | 0 |
| Arrests | 0 | 3 | 6 | 0 |
| Searches | 0 | 3 | 1 | 0 |
| Training on Stops, Searches, and Seizures | 0 | 0 | 2 | 0 |
| **Total** | **0** | **8** | **14** | **0** |

## IV. Equal Protection and Non-Discrimination

| Equal Protection and Non-Discrimination Sub-Section | Count of Paragraphs per Section by Compliance Status | | | |
|---|---|---|---|---|
| | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 0 | 2 | 4 | 1 |
| Discriminatory Policing | 0 | 1 | 5 | 0 |
| Sexual Assault and Domestic Violence | 1 | 4 | 3 | 0 |
| **Total** | **1** | **7** | **12** | **1** |

## V. Policies and Procedures

| Policies and Procedures Sub-Section | Count of Paragraphs per Section by Compliance Status | | | |
|---|---|---|---|---|
| | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 0 | 8 | 0 | 0 |

## VI. Supervision and Management

| Supervision and Management Sub-Section | Count of Paragraphs per Section by Compliance Status | | | |
|---|---|---|---|---|
| | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 0 | 0 | 0 | 1 |
| Duties of Supervisors | 0 | 0 | 5 | 0 |
| Performance Evaluation | 0 | 2 | 0 | 0 |
| Early Identification System | 0 | 0 | 7 | 0 |
| Internal Audits and Interagency Feedback | 0 | 2 | 1 | 1 |
| **Total** | **0** | **4** | **13** | **2** |

## VII. Civilian Complaints, Internal Investigations, and Discipline

| Civilian Complaints, Internal Investigations, and Discipline Sub-Section | Count of Paragraphs per Section by Compliance Status | | | |
|---|---|---|---|---|
| | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 0 | 2 | 0 | 0 |
| Civilian Complaints | 2 | 0 | 0 | 0 |
| Internal Investigations | 1 | 2 | 0 | 0 |
| Complaint Intake & Handling | 8 | 3 | 0 | 0 |
| Investigation of Complaints | 6 | 7 | 4 | 0 |
| Staffing, Selection, & Training Requirements | 0 | 3 | 0 | 0 |
| Preventing Retaliation | 0 | 1 | 0 | 0 |
| Discipline | 2 | 1 | 0 | 0 |
| Officer Assistance and Support | 1 | 2 | 1 | 0 |
| **Total** | **20** | **21** | **5** | **0** |

240

## VIII.    Community Engagement and Public Information

| Community Engagement and Public Information Sub-Section | Count of Paragraphs per Section by Compliance Status | | | |
|---|---|---|---|---|
| | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 0 | 1 | 0 | 0 |
| Community Oriented Policing | 0 | 2 | 1 | 0 |
| Community Interaction Councils | 0 | 2 | 3 | 0 |
| Public Information | 0 | 0 | 4 | 0 |
| **Total** | **0** | **5** | **8** | **0** |

## IX. Information Systems and Technology

| Information Technology Sub-Section | Count of Paragraphs per Section by Compliance Status | | | |
|---|---|---|---|---|
| | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 0 | 2 | 4 | 0 |

## Appendix D: Monitor's Review of Transfers

The following documents the Monitoring Team's review into the newspaper allegations of transfers based upon suspect class. This document was drafted on June 26, 2021.

On May 18, 2021, newspaper journalist Brandon Cruz from *El Vocero* published an article asserting that eight high-ranking female officers were removed from their employment positions, transferred to other positions, and substituted by male officers with a lesser rank. That same day, the Federal Monitor decided to immediately investigate if these changes against the Puerto Rico Police Bureau (PRPB) conformed with the professionalization requirements of the *Agreement for the Sustainable Reform of the Puerto Rico Police Department* (Agreement).  Accordingly, the Federal Monitor notified a memorandum to PRPB's counsel requesting the following documents: (i) employment file of each of the eight female and male officers subject of the news article; (ii) policies, protocols, and/or internal memoranda authorizing such employment changes and reasons thereof; (iii) written job descriptions of the positions these officers had within the last year; and (iv) most recent statistics showing the number of female officers in PRPB and the positions occupied. Based on the documents received from PRPB, the Commissioner's decision to transfer several people from "positions of trust" is consistent with the Agreement. There is no evidence of discrimination.  There is no evidence the persons suffered economic harm. Indeed, several of the women mentioned were given assignments of even greater responsibility within PRPB.

## Appendix E:  Monitor's Review of April 7, 2021 Intervention



# **MEMORANDUM**

**To**   :   Rafael Barreto, Esq., counsel for PRPB
              Gabriel Peñagarícano, Esq., counsel for PRPB

**CC**   :   Luis E. Saucedo, Esq., U.S. Department of Justice
              Jorge Castillo, Esq., U.S. Department of Justice
              Dr. Alejandro del Carmen, Special Master
              Thomas Petrowski, Assistant Special Master
              Gary Loeffert, Assistant Special Master

**From** :   John Romero, Federal Monitor
              Denise Rodríguez, Deputy Federal Monitor
              Roberto Abesada-Agüet, General Counsel

**Date**  :   June 14, 2021

**Re**   :   *United States of America v. Commonwealth of Puerto Rico,*
              Civil No. 12-2039 (GAG)

       On May 19, 2021, the Monitor's Office learned through the press that PRPB had arrested five individuals suspected to have entered the United States (Puerto Rico) illegally.  The Monitor's Office then notified PRPB with a memorandum that stated:

       Enclosed please kindly find a press release report issued April 7, 2021, from PRPB's press officer, Yaira Rodríguez-González regarding an intervention with individuals with undefined immigration status which were inside a motor vehicle stopped for a speeding violation. We understand that PRPB completed its investigation and turned over these individuals to the federal customs and/or border patrol officials.

1

Under PRPB's General Order 600-626, in the "Prohibitive Act" section, it states that PRPB will not detain or arrest a person for the sole purpose of determining their immigration status.

The Federal Monitor's office hereby discloses its intention to review the incident and ascertain compliance with General Order 600-626. Accordingly, we hereby request that by **Tuesday, May 25th**, PRPB produce all documents secondary to this intervention and investigation.

On May 25, 2021, PRPB produced the documents related to the April 7, 2021, intervention.

After reviewing the documents produced, on May 31, 2021, the Monitor's Office requested PRPB to provide, by June 11th, additional information relating to the foregoing arrests. In the memo, the Monitor's Office preliminary considered that these arrests may have been violation of General Order 600-626.

On June 11, 2021, PRPB provided the information requested, including a memo from the Commanding Officer of the Reform Unit.

The following are some observations and comments on the information provided:

- PRPB identified speeding as the probable cause for the arrests. However, the vehicle was traveling 15 miles over the speed limit, which would not result in an arrest. Nevertheless, the five passengers who were simply traveling in the vehicle should not have been subject to arrest on that premise.

- The Commanding Officer states in the memo that PRPB conducted a case analysis of this incident and part of that analysis included an informal interview of the officer who made the arrest (note: it is the Monitor's understanding that Captain Figueroa conducted that interview). The Monitor's Office concludes that a supervisor questioning an officer regarding details of an arrest cannot be informal, as the statements of the officer, in some cases, potentially could result in administrative charges against the member.

- The Memo from the Captain clearly admits that matters were not properly documented in the report.

- According to the memo the driver voluntarily told the officers he was hired/paid by someone to transport his Dominican passengers who arrived in Puerto Rico that morning to a location. The officer surmised the passengers had entered the country illegally. Based on that suspicion, he arrested the individuals including the driver. However, these alleged facts are not included in the incident report PPR-621.1.

- It should be noted that the officer, according to the captain's memo, states that he believed that the driver may have been under the influence of an intoxicating beverage, however, this and other pertinent information identified in the memo were written in the officer's personal notebook, which admittedly was not in the incident report PPR-621.1.

2

- PRPB provided the information requested in the Monitor's May 31st memo, but in some instances made it clear that PRPB either does not have a system or does not collect the information. For example:

  1) PRPB does not currently have an official mechanism to monitor traffic interventions where there is no arrest or ticket issued.

  2) Currently PRPB does not have a statistical system to monitor interventions with foreign persons, or for that fact, any interventions.

  3) Currently PRPB has not officially begun program evaluation under paragraph 91.

- The officer who made the arrests, as well as the supervisors who reviewed the officer's actions, did not follow GO 600-626.

- In effect PRPB states the same by acknowledging that there is a deficiency in the training related to the arrest, identification of substantiated grounds, the effective documentation of the same and in the corresponding reports, and the proper evaluation of the supervisors on the grounds on which they are based.

- Based on the above, the Monitor's Office recommends that this case be reopened, and the actions of the officer be reviewed. Also, the supervisor's actions relating to their evaluations of the officer's actions should come under review.