```
 1                   UNITED STATES DISTRICT COURT

 2                    DISTRICT OF PUERTO RICO

 3
     UNITED STATES OF AMERICA,
 4
                    Plaintiff,
 5   v.                                  Docket No. 12-2039-FAB

 6                                        San Juan, Puerto Rico
     THE COMMONWEALTH OF
 7   PUERTO RICO, et al.,                  January 14, 2022

 8                  Defendants.

 9   _____

10                      STATUS CONFERENCE

11       BEFORE THE HONORABLE JUDGE FRANCISCO A. BESOSA,

12              UNITED STATES DISTRICT JUDGE.

13   _____

14   APPEARANCES:

15   For the United States
     of America:           Mr. Luis E. Saucedo, Esq.
16                         U.S. Department of Justice
                           950 Pennsylvania Ave., NW
17                         Washington, DC 20530

18   For the Commonwealth
     of Puerto Rico and the
19   Puerto Rico Police
     Department:           Mr. Gabriel A. Penagaricano, Esq.
20                         Mr. Rafael Barreto-Sola, Esq.
                           Cancio, Nadal & Rivera, LLC
21                         403 Munoz Rivera Avenue
                           San Juan, PR 00918
22
     ALSO PRESENT:
23
               Mr. Alexis Torres-Rios, Secretary
24                 Department of Public Safety

25             Mr. Rafael Riviere-Vazquez, Sub-Secretary
                   Department of Public Safety
```

```
 1  APPEARANCES, Continued:

 2          Mr. Arturo Garferr-Croly, Special Assistant to
                Secretary, Department of Public Safety
 3
            Mr. Miguel Candelario-Piniero, In-house Counsel
 4              Department of Public Safety

 5          Ms. Maria Del Mar Ortiz-Rivera, Esq.
                Governor's Representative
 6
            Colonel Antonio Lopez-Figueroa, Commissioner
 7              Puerto Rico Police Bureau

 8          Colonel Juan Rodriguez-Davila, Associate
                Commissioner, Puerto Rico Police Bureau
 9
            Captain Carlos Figueroa-Ortolaza, Director, Reform
10              Office, Puerto Rico Police Bureau

11          Mr. Jose Vazquez-Rivera, In-house Counsel
                Puerto Rico Police Bureau
12
            Dr. Juan Carlos Rivera-Vazquez, Director, Technology
13              and Communications Bureau
                Puerto Rico Police Bureau
14
            Mr. John Romero, Monitoring Team
15
            Ms. Denise Rodriguez, Monitoring Team
16
            Mr. Scott Cragg, Monitoring Team
17
            Mr. Hipolito Castro, Jr., Monitoring Team
18
            Ms. Merangelie Serrano, Monitoring Team
19
            Mr. Donald Gosselin, Monitoring Team
20
            Mr. Luis Hidalgo, Monitoring Team
21
            Mr. Al Youngs, Monitoring Team
22
            Mr. Roberto Abesad-Aguet, Esq.
23
            Mr. Rafael Ruiz, Monitoring Team
24
            Mr. Javier Gonzalez, Monitoring Team
25
            Ms. Rita Watkins, Monitoring Team
```

```
 1    APPEARANCES, Continued:

 2              Dr. Alejandro Del Carmen, Special Master

 3              Mr. Thomas Petrowski, Assistant Special Master

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Proceedings recorded by stenography.  Transcript produced by
      CAT.
```

```
 1                           I N D E X

 2   WITNESSES:                                    PAGE

 3        None offered.

 4

 5   EXHIBITS:

 6        None offered.

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                                    San Juan, Puerto Rico
 2                                    January 14, 2022
 3                                    At or about 9:30 AM
 4                      *      *      *
 5          COURTROOM DEPUTY:  Civil case 12-2039, United States
 6   of America v. The Commonwealth of Puerto Rico.  This is a
 7   civil hearing, status conference.
 8          Representing the government, Luis Saucedo.
 9   Representing the defendants, Gabriel Penagaricano and Rafael
10   Barreto-Sola.
11          THE COURT:  Good morning to everyone, and thank you
12   for coming.  I just want to go through the list of people who
13   the Commonwealth has indicated are here.
14          Mr. Torres, Secretary Torres, are you here?  Would
15   you please stand?
16          SECRETARY TORRES-RIOS:  (Raised hand.)
17          THE COURT:  Thank you.
18          Mr. Riviere, are you here?
19          MR. RIVIERE-VAZQUEZ:  (Raised hand.)
20          THE COURT:  Thank you.
21          Mr. Garffer, are you here?
22          MR. GARFFER-CROLY:  Present, Your Honor.
23          THE COURT:  Thank you.
24          Mr. Candelario?
25          MR. CANDELARIO-PINEIRO:  Present.
```

```
1              THE COURT:  Thank you.

2              Ms. Ortiz?

3              MS. ORTIZ-RIVERA:  (Raised hand.)

4              THE COURT:  Welcome back.

5              MS. ORTIZ-RIVERA:  Good morning.  Yes.  Thank you.

6              THE COURT:  Colonel Lopez, Commissioner Lopez?

7              COMMISSIONER LOPEZ-FIGUEROA:  (Raised hand.)

8              THE COURT:  Thank you.

9              Colonel Rodriguez-Davila.

10             COLONEL RODRIGUEZ-DAVILA:  (Raised hand.)

11             THE COURT:  Thank you.

12             Captain Figueroa, Carlos Figueroa.

13             CAPTAIN FIGUEROA-ORTOLAZA:  (Raised hand.)

14             THE COURT:  Thank you.

15             Attorney Jose Vazquez.

16             MR. VAZQUEZ-RIVERA:  (Raised hand.)

17             THE COURT:  Thank you.

18             And Dr. Juan Carlos Rivera.

19             DR. RIVERA-VAZQUEZ:  Here.

20             THE COURT:  Thank you.

21             Okay.  Anybody that I missed?

22             Okay.  Thank you.

23             Representatives for the monitor.  Mr. Romero, are you

24   here?

25             MR. ROMERO:  Yes, Your Honor.
```

```
 1              THE COURT:  Ms. Rodriguez, Denise?
 2              MS. RODRIGUEZ:  (Raised hand.)
 3              THE COURT:  Mr. Cragg?
 4              MR. CRAGG:  Yes, Your Honor.
 5              THE COURT:  Mr. Hidalgo?
 6              MR. HIDALGO: (Raised hand.)
 7              THE COURT:  Mr. Youngs?
 8              MR. YOUNGS:  Yes, Your Honor.
 9              THE COURT:  Mr. Castro, Hipolito Castro, are you
10      here?
11              MR. CASTRO:  (Raised hand.)
12              THE COURT:  Ms. Serrano?
13              MS. SERRANO:  Good morning, Your Honor.
14              THE COURT:  Mr. Gosselin?
15              MR. GOSSELIN:  Good morning, Your Honor.
16              THE COURT:  Attorney Abesada?
17              MR. ABESADA-AGUET:  Good morning, Your Honor.
18              THE COURT:  Mr. Rafael Ruiz?
19              MR. RUIZ:  Good morning, Your Honor.
20              THE COURT:  Mr. Javier Gonzalez?
21              MR. GONZALEZ:  Good morning, Your Honor.
22              THE COURT:  Am I missing anyone from the Monitor's
23      Office?  Yes, ma'am.
24              MS. WATKINS:  Rita Watkins.
25              THE COURT:  Oh, Rita.  Thank you.
```

1      MS. WATKINS:  Thank you, Your Honor.

2      THE COURT:  And the Special Master's Office, Mr. Del

3  Carmen?

4      MR. DEL CARMEN:  Good morning, Your Honor.

5      THE COURT:  And Mr. Petrowski?

6      MR. PETROWSKI:  Good morning, Your Honor.

7      THE COURT:  Thank you.  Everybody's here.

8      Well, I called this hearing, because, as you know,

9  this case -- when Judge Gelpi was appointed to the Circuit,

10 this case fell in my lap, and the juvenile institutions case.

11 And I just wanted you to see who I was, and get a status

12 conference of where we are today in the case.

13     There's one thing that I'd like to get out of the

14 way, and that is the Commonwealth's request that the Special

15 Master's invoices be filed publicly.  Am I correct,

16 Mr. Penagaricano?

17     MR. PENAGARICANO:  Yes, Your Honor.  That is correct.

18     THE COURT:  Mr. Del Carmen, do you have any problem

19 with that?

20     MR. DEL CARMEN:  No, Your Honor.  No objection.

21     THE COURT:  Your invoices will be filed publicly, and

22 I will ask the clerk to remove the restrictions of those that

23 had been filed with restrictions recently.

24     Okay.  The other thing that I'd like to get out of

25 the way is a matter that concerns me.

1          Mr. Garffer, are you here?

2          MR. GARFFER-CROLY:  Yes, Your Honor.

3          THE COURT:  Please approach the podium.

4          Now, the first thing that Judge Gelpi told me when

5   this case fell in my lap was that you said that you knew me,

6   and that you had worked for me.

7          MR. GARFFER-CROLY:  (Nodding head up and down.)

8          THE COURT:  Did you say that?

9          MR. GARFFER-CROLY:  Yes, Your Honor.  I mentioned in

10  the past I did work for you, about 32 years ago.

11         THE COURT:  About what?

12         MR. GARFFER-CROLY:  About 32 years ago at Adsuar,

13  Muniz & Goyco.  I worked as a paralegal.

14         THE COURT:  Thirty-two years ago.

15         MR. GARFFER-CROLY:  Yes, sir, give or take.

16         THE COURT:  I don't remember that at all.

17         MR. GARFFER-CROLY:  Yes, Your Honor.

18         THE COURT:  Okay.  But your -- I don't think you

19  mentioned that when you said that you had worked for me, that

20  it was 32 years ago.  To the extent --

21         And, Mr. Saucedo, are you here?

22         MR. SAUCEDO:  Yes, Your Honor.

23         THE COURT:  That Mr. Saucedo thought about asking me

24  to recuse myself.  Is that correct, Mr. Saucedo?  That's what

25  Judge Gelpi told me.

1          MR. SAUCEDO:  Your Honor, I think at the time we --

2     when we were meeting the new Commonwealth administration, I

3     think in one of the --

4          THE COURT:  Excuse me, Mr. Saucedo.

5          MR. SAUCEDO:  Yes, sir.

6          THE COURT:  The use of the mask makes it difficult to

7     understand what you're saying unless you stand -- bring the

8     microphone closer to you.

9          MR. SAUCEDO:  Your Honor, when we met the

10    Commonwealth -- the new administration last year, that remark

11    was made at one of our meetings.  I think when we're meeting

12    new counsel and there's new personnel, I think we're always

13    looking for potential conflicts, and trying to resolve those

14    as quickly as possible.

15         In this case, we did not see a need for that.  We saw

16    it as just a passing remark for Mr. Garffer.

17         THE COURT:  Okay.  Thank you, Mr. Garffer.

18         MR. GARFFER-CROLY:  Yes, Your Honor.

19         THE COURT:  I'm sorry, but I don't remember you

20    working for the firm that I worked for before I became a

21    judge.

22         All right.  The way I was thinking of proceeding with

23    this hearing was to allow the monitor, Mr. Romero, or whoever

24    he designates on his staff, to give a narrative of where we

25    stand on issues that he has indicated he should talk about.

1   Once Mr. Romero finishes, we will do this issue by issue, and

2   we will allow the Commonwealth, through Mr. Penagaricano, to

3   respond.  And I would request Mr. Saucedo to respond on behalf

4   of the United States, and I will ask Mr. Del Carmen if he has

5   anything to add.

6          So, Mr. Romero, the floor is yours.

7          MR. ROMERO:  Thank you, Judge.

8          MR. PENAGARICANO:  Your Honor, if I may?

9          THE COURT:  Yes.

10         MR. PENAGARICANO:  Just before we go into that --

11         THE COURT:  Microphone, please.

12         MR. PENAGARICANO:  Thank you.

13         Just before we go into the issue-by-issue part of the

14  hearing, we request permission from Your Honor if you would

15  allow the secretary of the Department of Public Safety to

16  address the Court briefly, and also the commissioner of the

17  Police Bureau to do the same as well in some brief

18  introductory remarks to the Court.

19         THE COURT:  Not right now.

20         MR. PENAGARICANO:  Okay.  Thank you.

21         THE COURT:  Mr. Romero, go ahead.

22         MR. ROMERO:  Good morning, Your Honor.  Good morning,

23  Your Honor, and those present today.  On Monday, December 20,

24  2021, the office of the Monitor submitted its fifth report,

25  CMR-5, to the Federal Court.  During the period covered in the

1  report, April through September of 2021, the monitor
2  determined that PRPB had made some measurable progress towards
3  complying with the mandates of the agreement along with
4  reaching various levels of compliance in some areas.  However
5  --
6          THE COURT:  Please speak a little slower for the
7  court reporter's benefit.
8          MR. ROMERO:  Yes, Your Honor.  Sure.
9          However, a numbers of areas continue to lag behind.
10  Your Honor, if I may, I would like to briefly identify those
11  areas that are lagging in identifying what should be PRPB's
12  pathway forward.
13          The general area of use of force, PRPB's inability to
14  validate its use of force numbers has been a recurring problem
15  that has been identified in all the monitor's previous
16  reports.  The CMR-5 reporting period, PRPB continues to lack a
17  mechanism to validate its report of use-of-force incidents,
18  and the number of use of force in those incidents.
19          Midway through the reporting period, PRPB IT division
20  developed and introduced a protocol that requires officers'
21  input use of force information directly into the Global
22  Technology Enterprise, GTE, system, thereby eliminating the
23  handwritten use-of-force reports.  PRPB expectations were that
24  the system would produce accurate use-of-force numbers.
25  However, as of yet, PRPB has not reached its objective.  The

1  technology is functional, but the process needs to be refined

2  through additional training and improvement of accountability.

3  And as of now, PRPB utilizes multiple sources to track

4  use-of-force incidents.  However, in many cases, the

5  information is inconsistent.

6       PRPB's IT unit reports it is working with the Bureau

7  force investigation unit to rectify the issue, the latter

8  having been designated as the official source for reporting

9  use-of-force numbers to the Bureau.  Until that time, PRPB

10  still lacks a mechanism to verify the accuracy of reported

11  use-of-force numbers to the public.

12       Another area of concern is the Force Investigation

13  Unit, FIU, and the Commissioner's Force Review Board.  Given

14  the workload, the monitor implied the FIU unit is understaffed

15  and lacking in some necessary training.  While PRPB has

16  provided additional training to FIU investigators in the areas

17  of force investigation, its investigators lack sufficient

18  training in investigating intentional firearm discharges by

19  its members.

20       This was brought to PRPB's attention by the Monitor's

21  office in our previous reports.  Nevertheless, the development

22  of the training continued to lag.

23       Another area of concern is the failure of FIU to

24  complete their investigation in a 45-day time frame, as

25  outlined in the agreement and Bureau policy.  In the period

1    covered by our latest report, FIU completed only 11 percent of

2    their investigation in the prescribed time frame.  However, it

3    should be noted there are some external issues outside of the

4    control of FIU, which the monitor identified in its report,

5    which contributed to delay of completion.  The CFR Review

6    Board, which is Commissioner's Force Review Board, which

7    evaluates investigations conducted by FIU, have also failed to

8    complete their investigations in the time frame outlined in

9    the agreement and Bureau policy.

10           Responding to behavioral mental crisis issues --

11           THE COURT:  Well, wait.  Wait.  Wait.

12           MR. ROMERO:  Okay.

13           THE COURT:  Wait.  Let's allow Mr. Penagaricano to

14    respond to your statements as to use of force.

15           Mr. Penagaricano.

16           MR. PENAGARICANO:  From here is okay?

17           THE COURT:  Yes.  Bring the microphone close.

18           MR. PENAGARICANO:  Thank you, Your Honor.

19           As Mr. Romero indicated there is a new system

20    implemented.  It was implemented in the middle of the period

21    corresponding to the CMR filing, which is the last report.

22    That new process, new protocol, which is web based as opposed

23    to manual, culminated in August of last year, the period that

24    the CMR-5 finished in September.  CMR-5 recognizes that, in

25    that period, the monitor couldn't comprehensively evaluate the

1  new system, but that it did spot checks.

2          It tried to verify the new system, and use different

3  streams of data to see whether the new system was providing

4  reliable data.  The results of those spot checks, as the CMR-5

5  reveals, is that there were inconsistencies.  Later in the

6  year, the reform office has been working through those

7  glitches, and, also, I know that the DOJ, through Mr. Saucedo,

8  also pointed in a recent visit to the island that he also

9  found some inconsistencies, and that they were pointed out to

10  the reform office.  And the reform office is actively working

11  to solve those issues.

12          The path forward is that we believe that it's getting

13  better, because we're addressing the inconsistencies, and that

14  probably by the time of the CMR, the period -- the CMR-7

15  period, which starts in March or April of next year -- of this

16  year, I'm sorry, the results will really start to kick in.  So

17  we believe in the new plan, and we feel that is a good path

18  forward to consistent, reliable reporting of use-of-force

19  incidents.

20          THE COURT:  Has the Monitor seen this plan?

21          MR. PENAGARICANO:  I'm sorry?

22          THE COURT:  Has the Monitor seen this plan?

23          MR. PENAGARICANO:  Yes.  I mean, there has been

24  presentations on the plan, and the communication between the

25  parties is daily as to what's being done in the reform

1  office.

2         THE COURT:  Communications, daily communications, but

3  is there a plan in writing that the monitor has seen?

4         MR. ROMERO:  Your Honor, we've worked with the IT

5  section.  They've made presentations relating to the new

6  program, and its effect.  However, at this point it's not up

7  and running yet.  At this point, we are the accurate -- PRPB

8  received validated use-of-force numbers, but they haven't

9  presented how they're going to roll out this plan in terms of

10 the program.

11        THE COURT:  Okay.  Mr. Saucedo.

12        MR. SAUCEDO:  Yes, Your Honor.  It's a major concern

13 that the Commonwealth has consistently provided inaccurate

14 information on use of force to the Monitor.  At this point, in

15 this case, that should be something that's very basic, and I

16 think part of --

17        THE COURT:  Inaccurate information in what sense?

18        MR. SAUCEDO:  The Commonwealth is unable to provide

19 an accurate number of use of force to determine the universe

20 of cases that the Monitor must sample to determine whether

21 something is in compliance.  So the Monitor's not looking at

22 100 percent of the incidents.  He's trying to draw a

23 representative sample.

24        THE COURT:  I don't think he has time to look at a

25 hundred percent of the incidents.  That's why he has to cherry

```
 1   pick, you know, to see -- take from here, pick from there, to
 2   see if the system is in some sort of compliance.
 3          MR. SAUCEDO:  Yes, Your Honor.  The Monitor's not
 4   looking at 100 percent of the incidents.  He needs to draw a
 5   representative sample, a random sample, but for that the
 6   original data set needs to be reliable.  If there are cases
 7   that are missing from that, the Monitor's not going to draw a
 8   representative sample, and we're not going to know whether,
 9   when he looks at ten percent, that that really is
10   representative of the entire use of force.
11          The problem we've seen is that the agency has put the
12   solution for force reporting mostly on the force -- IT bureau.
13   There is a big part that the IT bureau plays.  They designed
14   the information system, but it's not an IT bureau problem.
15   This is a supervision problem.
16          The Commonwealth has indicated that there is a crisis
17   in the number of supervisors in the field.  You can have the
18   best system out there that's designed and ready to be
19   implemented, but if you don't have the resources, the
20   equipment, and the supervision, that's a huge problem.  That
21   needs to be part of the solution.  Not just the IT
22   applications that are being developed, but also the
23   supervision and training that goes along with that.
24          THE COURT:  I believe Mr. Romero is going to cover
25   supervision and management and IT.  I believe Mr. Cragg is
```

 1  going to cover the IT.

 2         Mr. Del Carmen, do you have anything to add?

 3         MR. DEL CARMEN:  Just a brief comment, Your Honor.

 4  We share those concerns as well, and at the end of the day, if

 5  the data is not present, if it's not reliable, if it's not

 6  valid, really no conclusions can be made from it.

 7         So I think at the end of the day our position will be

 8  as it was before, that the focus should be and will continue

 9  to be IT/data for this to advance.  So we concur, Your Honor,

10  and you'll hear throughout the day today some of our

11  observations.

12         THE COURT:  Okay.  Thank you, Mr. Romero.

13         What would you suggest at this time that can be done

14  by the Commonwealth within the next 30, 60, or 90 days?

15         MR. ROMERO:  Well, Your Honor, I think that they need

16  to develop a plan.  The system can work.  They've made

17  demonstrations to us, but there needs to be another layer put

18  in there where there has to be someone responsible for

19  validating those numbers by comparing them and ensuring that

20  they match the other information.

21         Right now, currently, PRPB provides the use-of-force

22  numbers by going out to four different locations from radio

23  control, from the operations, field operations, from FIU, and

24  they're using four different sources.  It should be one source

25  for use-of-force numbers.

1              Now, you may want to cross-check that with other

2    sources of information to verify that it's accurate, but it

3    should be one source of information.  It should be the GTE

4    system.  Currently, all use-of-force systems have to be --

5              THE COURT:  Just to make the record clear, would you

6    state what GTE stands for?

7              MR. ROMERO:  General -- it stands for the -- it's

8    part of the CAD system, where all the reports --

9              COURT REPORTER:  I'm sorry, Counsel.  Part of the

10   what system?

11             MR. ROMERO:  It's part of the CAD system.  It's

12   called Global Technology, but it's part of the CAD system.

13             Correct?

14             MR. CRAGG:  Generally speaking, it's a database.

15             MR. ROMERO:  The database.  So that information, no

16   longer are reports being generated handwritten, where they can

17   be lost, be misplaced.  The information is in the system, so

18   that is the way to go, but PRPB needs to ensure it's utilizing

19   one system to validate its use-of-force numbers.

20             You can crosscheck it with other information to make

21   sure that you're not missing anything, but that should be the

22   source of information for PRPB.  And it should be somebody

23   responsible to make sure on a daily basis that use of force

24   that takes place throughout the island, Bureau wide, is in

25   that system and it's accurate.

1          The issue becomes a problem, for instance, if there's

2     a use of force, there may be one or more officers who used

3     force in that incident.  And in many cases, what we're seeing,

4     use of force indicates one officer, but later on we find out

5     in that incident there were several officers who used force,

6     so the numbers are not consistent with the force that is in

7     the report.

8          THE COURT:  So what do you suggest that I do?

9          MR. ROMERO:  I think, Your Honor, that we assign a

10    proposal for PRPB to develop a plan to address the

11    discrepancies in tracking and reporting of use of force, and

12    submit it to the Court within 30 days.  The plan should

13    outline both interim and long-term changes, improvements to

14    address this issue, implementation, training, new policies

15    related to the reforms, and adjustment to the technology, and

16    application to reconcile the different sources of data.

17         THE COURT:  Mr. Penagaricano, can you do that in 30

18    days, present that plan?  I'm not saying you have to resolve

19    everything that Mr. Romero has stated, but we need a plan.

20         MR. PENAGARICANO:  Yes, Your Honor.  Within 30 days,

21    we will provide --

22         THE COURT:  Okay.  All right.  So within 30 days, the

23    Commonwealth will develop a plan to address the discrepancy in

24    tracking and reporting of use of force, as Mr. Romero has

25    indicated.  The plan should outline both interim and long-term

1  changes, improvements to address the issue.  In other words,

2  implementation of training on the new policies, and related

3  forms and adjustments to the technological applications to

4  reconcile the different sources of data which Mr. Romero has

5  indicated exist.

6          Now, what I would like you to do, Mr. Penagaricano,

7  is to send a proposed plan for Mr. Romero and Mr. Del Carmen.

8  They will take a look at and meet with you and whoever you

9  think they should meet with, Mr. Torres, Colonel Lopez,

10  whoever, and make whatever changes need to be made, if any, to

11  your plan.  And provide it to the Court by the end of -- by

12  February 28, okay?

13          MR. PENAGARICANO:  Okay.

14          THE COURT:  That way everybody has seen it,

15  everybody's happy with it.  And prepare a plan and a proposed

16  order to that effect, okay?

17          MR. PENAGARICANO:  Yes.

18          THE COURT:  All right.  Thank you.  First, one,

19  within 30 days present to Mr. --

20          MR. PENAGARICANO:  Right.

21          THE COURT:  You know, discuss it among yourselves

22  with Colonel Lopez, with Secretary Torres, with Deputy

23  Secretary Riviere, whoever you want to discuss it with,

24  Ms. Ortiz.  Present that proposal to Mr. Romero and Mr. Del

25  Carmen for their comments.  You both should meet then, and

 1  come to an agreement as to what you're going to present to the

 2  Court by the end of February.  Okay?  Is that okay?  In a

 3  proposed order.  All right?

 4          MR. PENAGARICANO:  We will do that, Your Honor.

 5  Thank you.

 6          THE COURT:  All right.  Thank you very much.

 7          MR. SAUCEDO:  Your Honor, if I may, there's another

 8  part of use of force.

 9          THE COURT:  Wait a minute.  Wait a minute.

10          Mr. Saucedo also may have some comment on that.

11          MR. PENAGARICANO:  We will include him as well.

12          THE COURT:  And you all can meet however you want to

13  meet, whether personally, by Zoom, by video telephone

14  conference, however you want to meet, to present a plan that

15  everybody agrees to to the Court by the end of February.

16  Okay?

17          MR. PENAGARICANO:  Yes.

18          THE COURT:  All right.  Thank you very much.

19          Mr. Romero.

20          MR. ROMERO:  Your Honor, another section of the use

21  of force is responding to behavioral and mental health crises.

22  Currently, the PRPB has only certified crisis intervention

23  officers in the area of command of Arecibo, where it conducted

24  a pilot project that concluded in November of 2020.  The

25  project was deemed to have been successful.  However, the

1    expansion to other area commands has not taken place.

2          PRPB reports they have assigned a CIT coordinator to

3    each of the 13 areas, and subcommand identified prospective

4    CIT officers.  However, to date, no additional CIT officers

5    have been trained and certified.

6          The Monitor's office took a strong position on this

7    issue due in part because of the relatively high number of

8    cases involving Ley 408 court orders, which is involuntary

9    commitment.  In many of these cases, officers resorted to

10   using tasers or other non-lethal weapons to bring the person

11   under control.  This is not to say that if a CIT officer was

12   placed in that situation, they would not need to resort to

13   using force to bring the person in crisis under control.

14   However, given their advanced training, it's likely in some of

15   these situations the officer could minimize the force needed

16   to bring the person under control.

17          And, Your Honor, that concludes the comments on use

18   of force.

19          THE COURT:  Okay.  All right.  So let's -- this is a

20   subtopic of use of force --

21          MR. ROMERO:  Yes.

22          THE COURT:  -- having to do with behavior and mental

23   health crisis issues.  Mr. Penagaricano?

24          MR. PENAGARICANO:  Yes, Your Honor.

25          THE COURT:  I mean, there's a pilot project program

1   in -- that has been very successful in Arecibo, and I think

2   what the monitor is saying is that it should -- it should

3   start with the other regions.

4           I mean, there are CIT officers in each region, are

5   there not, Mr. Romero?

6           MR. ROMERO:  There are coordinators assigned to the

7   13 areas.  However, in some of the area commands, they've

8   identified prospective CIT officers.

9           THE COURT:  Have they been trained?

10          MR. ROMERO:  They have not been trained as of yet,

11  no.

12          THE COURT:  Okay.  Again, for the record, what is

13  CIT?

14          MR. ROMERO:  Crisis intervention teams.

15          THE COURT:  Okay.  All right.  So, Mr. Penagaricano.

16          MR. PENAGARICANO:   Your Honor, there is no

17  controversy about the expansion program.  The intention has

18  always been to do, I'm sorry, the expansion towards all of the

19  areas of the island.  Now, the process is complicated.  You

20  need to do the calling, then the training, and it has taken

21  definitely much longer than expected; but the plan remains the

22  same, full expansion, and it's in the process.

23          THE COURT:  All right.  What I'm -- have you seen

24  this plan, Mr. Romero?

25          MR. ROMERO:  Yes, I have, Your Honor.  In fact, I've

1    had conversations with Captain Figueroa and the Commissioner

2    as well.  And, initially, the plan was to roll it out over the

3    course of two years.  Once we indicated this should be rolled

4    out island wide, PRPB agreed.  And we've been working together

5    on that, but we just need to move it faster.  But it is going

6    to be island wide in a two-year period of coverage, having it

7    rolled out.

8             THE COURT:  As part of the plan that you -- I'm

9    sorry.  Mr. Saucedo, anything?

10            MR. SAUCEDO:  Yes, Your Honor.  I agree with Mr.

11   Penagaricano that there is -- that the Commonwealth has

12   indicated that it plans to expand CIT, the crisis intervention

13   team, to all areas.  It's important to have that resource.

14   These are your first responders who should be --

15            THE COURT:  Have they provided you a date when they

16   will expand this?

17            MR. SAUCEDO:  Well, we have not seen a plan that

18   would include dates with timelines.  And what we would ask,

19   Your Honor, that would be included as part of this plan is an

20   actual evaluation of the pilot program that took place in

21   Arecibo.  That has not been done.  I think anecdotally we know

22   it was a success, because people were selected as CIT officers

23   and trained.  But we don't know whether we improved outcomes.

24            The whole purpose of crisis intervention, of having a

25   specialized team of first responders, is to decrease injuries

1    to officers and to people in crisis, to improve outcomes, to

2    connect them to services, to not resort to use of force, to

3    try and deescalate.  Those goals have not been evaluated so

4    that we know it worked or did not work in Arecibo, and we

5    learn from those lessons, and take them and apply them to

6    other areas.

7           So we know that the Commonwealth has agreed to put

8    out a call for more officers and to train them, but do we

9    really know that the way that it worked in Arecibo is the way

10   it should be modeled in other areas or expanded to other

11   areas?

12          So, Your Honor, we would respectfully ask that the

13   plan that the Commonwealth develops on this, that would

14   include timelines, also would include evaluation of the

15   program, the pilot program that took place in Arecibo.

16          THE COURT:  Who would conduct this investigation?

17          MR. SAUCEDO:  Well, Your Honor, that is a good

18   question, because the -- it has not already been done, because

19   the Commonwealth lacks that capacity.

20          THE COURT:  Well, that's why I asked.

21          MR. SAUCEDO:  Yes, Your Honor.  We could come up with

22   a plan working with the Monitor to work with them to identify

23   that.  We --

24          THE COURT:  You're saying that the Monitor and its

25   staff would do the evaluation?

1          MR. SAUCEDO:  I think the Monitor could help in

2    putting together the evaluation and the plan, but it should be

3    done by the Commonwealth.

4          THE COURT:  No.  I understand that.  I understand

5    that, but you indicate that they don't have the wherewithal to

6    do it.

7          MR. SAUCEDO:  Yes, Your Honor.

8          THE COURT:  So who's going to do this evaluation?

9    Will they have to hire someone?

10         MR. SAUCEDO:  I think that needs to be part of the

11   plan.  If they can identify resources that they have to do

12   this evaluation, then they should go with that.  If they don't

13   have them, then they should bring those resources in.  This

14   should be an independent evaluation of whether this program

15   worked or not.

16         THE COURT:  Well, if it's independent, it can't be

17   in-house.

18         MR. SAUCEDO:  Well, Your Honor, if it's -- if it's

19   contracted, that's one possibility.  Perhaps there are --

20   there are other law enforcement agencies that have crisis

21   intervention teams that are community advocates who push for

22   these types of interventions.  There are people who can help

23   and assist PRPB in accomplishing this.  We have brought an

24   expert on CIT to help in developing the curriculum.  We could

25   bring that resource to help put together a team that would

1  evaluate, not even doing a deep dive into CIT, but at least

2  knowing what worked and what didn't.  Let's get some good take

3  aways from what the experience was in Arecibo, and apply them

4  in other areas.  We're committed, Your Honor, to bring an

5  expert to assist the Commonwealth in getting that done.

6          THE COURT:  Mr. Del Carmen, anything on this issue?

7          MR. DEL CARMEN:  Your Honor, this is a clear example

8  of how data affects the lives of the every day citizen.  And I

9  will just simply say that in the United States right now,

10  across the U.S., we're finding that the CIT trained police

11  officers are not only necessary, but they're critical.  But

12  there are other cities across the U.S. that are actually

13  training all personnel, not just a few, but all police

14  personnel on CIT-related services.  In fact, Mr. Penagaricano

15  and I worked on another project recently evaluating the CIT

16  component.  So, you know, I think we are not months but years

17  behind in this process.

18          My suggestion to Your Honor is -- and we'll be happy

19  as special masters to also facilitate, you know, not only the

20  component of the evaluation, but also help out as best as we

21  can, as I know that that's been part of our original charge as

22  well.  Thank you, Your Honor.

23          THE COURT:  All right.  Mr. Penagaricano, let me know

24  if this is possible.

25          MR. PENAGARICANO:  Your Honor, if I may?

```
 1              THE COURT:  Wait a minute.  Wait a minute.

 2              MR. PENAGARICANO:  Sorry, Your Honor.

 3              THE COURT:  Let me tell you what I think.

 4              MR. PENAGARICANO:  Yes, sir.

 5              THE COURT:  Would it be possible to identify persons

 6   within the police bureau, maybe persons from Arecibo who've

 7   already been trained, or external persons who, along with the

 8   expert that Mr. Saucedo has indicated, and the expertise that

 9   the special master indicates that he can -- that he can grab

10   onto, provide an evaluation of the Arecibo pilot program; and

11   can that be done in 30 days?

12              You tell me.  I'm open to other suggestions, but I

13   think that what Mr. Del Carmen says, that we are lagging in

14   this, is true.

15              MR. PENAGARICANO:  Your Honor, we'd be happy to try

16   to identify those resources.  I don't know the answer right

17   now to the question, but we will be, as always, more than

18   happy to sit down with all parties and try to come to a

19   solution.

20              THE COURT:  Okay.

21              MR. PENAGARICANO:  I was going to say, Your Honor, as

22   you know, to my right side is Captain Figueroa, who is an

23   officer of the Bureau, he is the director of the reform

24   office, and just a minute ago he asked me whether he can

25   address this Court on this very same issue and provide some
```

1    feedback.

2              THE COURT:  Okay.  Sure.  Captain Figueroa, go ahead.

3              CAPTAIN FIGUEROA-ORTOLAZA:  Good morning, Your Honor.

4    I want to start with the use of force and the --

5              THE COURT:  Wait.  Captain, please remember your

6    comments are being translated for the record, so the

7    interpreter -- you may have to go slower so that the

8    interpreter can get everything on the record.  Okay?  Go

9    ahead.

10             CAPTAIN FIGUEROA-ORTOLAZA:  We want to address the

11   matter of the use of force and the quality of the data.  As

12   soon as the Commissioner arrived at the Puerto Rico Police, he

13   met with the Federal Monitor, with yours truly, and the

14   technology bureau.  As a result of that meeting, the

15   Commissioner immediately ordered to develop the complaints

16   card, which is the one that commences any incident in the

17   Puerto Rico Police, and the understanding is that, from now

18   on, the Monitor would verify the use of force through the

19   complaints card.

20             When the Monitor makes the visits, he's checking the

21   complaint cards at the command center, which is the one that

22   was agreed with us, but he also tends to radio control, to

23   check on a system that had been done temporarily and that

24   needs to be eliminated.  When he visits the other unit, which

25   is the one on investigations of use of force, he's arriving to

1   investigate -- to review a module that's on investigation of
2   the incidents of use of force with a limited jurisdiction.

3        And, to explain, that division investigates within
4   the Puerto Rico Police level fours, abuse of force, which is
5   the highest level of classification for use of force or use of
6   force performed by an officer who has a rank of lieutenant or
7   higher.  And so we're talking about that the quality of the
8   data is not reliable.  However, when we look at the
9   discrepancy, the Monitor talked about 11 cases.  Out of those
10  11 cases, we need to be clear on the following:   The
11  complaints card is the first thing that has to be filled in in
12  order to continue with the process.  Therefore, it is a place
13  where there will be a certain assured quality of data.  When
14  he visits the divisions of use-of-force investigation, the
15  quality of the data will not be reliable because of the
16  following:

17        As I said, that jurisdiction is limited, and he needs
18  to wait for the investigations of level force that are not
19  level one, that are level two and three, to reach the office
20  of investigation of use of force, so that they can account for
21  that.  And so what I want to clarify with this is that we do
22  acknowledge that there have been discrepancies, but we have
23  identified the problem and we are working to seek solutions;
24  and that the Monitor, as well as the United States Department
25  of Justice, need to take in consideration that changes in

1    technology do not happen one day after another.

2          The United States Department of Justice very

3    responsibly, as they've always done, retained an expert who

4    visited us from the Los Angeles police.  The Los Angeles

5    police is a body that has over nine thousand police officers.

6    So if we look in the United States jurisdictions, aside from

7    New York and Chicago, it's the third largest, setting Puerto

8    Rico aside.  Their technology unit has more than 200

9    employees.  The Puerto Rico Police Bureau technology division

10   has 11 employees and two contractors, and, as opposed to Los

11   Angeles, where there are nine thousand, in the Puerto Rico

12   Police, there are 12,000 employees.

13         THE COURT:  When you -- excuse me.  Excuse me,

14   Captain Figueroa.

15         CAPTAIN FIGUEROA-ORTOLAZA:  And they know --

16         THE COURT:  When you say nine thousand employees in

17   Los Angeles and 12,000 employees in Puerto Rico, are you

18   talking about sworn officers?

19         CAPTAIN FIGUEROA-ORTOLAZA:  Sworn officers in Puerto

20   Rico would be approximately about 11,386, more or less.

21         THE COURT:  So what you're saying is that there are

22   over 2,000 more sworn officers in Puerto Rico than there are

23   in Los Angeles, and yet Los Angeles has 200 individuals who

24   work with this and you only have 11?

25         CAPTAIN FIGUEROA-ORTOLAZA:  That's correct.

1           THE COURT:  Okay.

2           CAPTAIN FIGUEROA-ORTOLAZA:  So as to the second

3   subject --

4           THE COURT:  Wait a minute.  Before you go into that

5   second item, it would seem to me, Captain Figueroa, that

6   everything that you said should be part of what you discuss

7   with the Monitor and with Mr. -- with the Special Master as

8   part of the development of this plan, this plan that I have

9   requested, that you meet with the Monitor and with the Special

10  Master, and whoever else you think is necessary, to develop a

11  proposal, so that everyone can be on board with this plan, so

12  that it can be presented to the Court by the end of February.

13          Is that okay, Mr. Penagaricano?

14          MR. PENAGARICANO:  It will be, Your Honor.

15          THE COURT:  All right.  Thank you.  And thank you,

16  Captain, for what you indicated.

17          Now, what about the other item on behavioral and

18  mental health crisis?

19          CAPTAIN FIGUEROA-ORTOLAZA:  Yes.  I want to state

20  clearly that the finding that the Monitor makes as to the two

21  years for the expansion of the CIT program was a draft that

22  was in the document 628 that is --

23          THE COURT:  General Order number --

24          CAPTAIN FIGUEROA-ORTOLAZA:  General Order No. 628,

25  which is the one that establishes the crisis intervention

1   system.  But in conversations with the Federal Department of

2   Justice and the Monitor, we changed it to one year, but we

3   want to state for the record the following:   The challenge of

4   the expansion of the crisis intervention team is that in order

5   for policemen to be part of the crisis intervention team, it

6   is done through a job posting notice, and they need to comply

7   with certain specific requirements.

8            THE COURT:  You mean the officer has to?

9            CAPTAIN FIGUEROA-ORTOLAZA:   (Remarks in Spanish.)

10           THE COURT:  I understand, of course.

11           CAPTAIN FIGUEROA-ORTOLAZA:  He needs to meet some

12   requirements, and even after applying, he needs to go through

13   an interview, because not everyone qualifies.

14           THE COURT:  Of course.  I understand that perfectly.

15           CAPTAIN FIGUEROA-ORTOLAZA:  So the two job posting

16   notices that have been issued to be able to fill in the

17   positions in the 13 police areas, the Monitor has knowledge

18   of, just like the United States Department of Justice.  And

19   we've informed that we have first selected the coordinators in

20   the 13 areas, the applications of the candidates have been

21   received.  We have some challenges in some areas where the

22   amount of candidates is not enough.  Without counting on that

23   -- now we're going to start with the interview process, in

24   order to then go through a 40-hour training period.  And that

25   is being done, and it takes time.

1           THE COURT:  All right.  So right now I am not
2    immediately concerned with the timeline.  What I am concerned
3    is with the evaluation of the pilot program in Arecibo.  I
4    mean, the evaluation may pass with flying colors, or there may
5    be areas which either you yourself, the Police Bureau, or the
6    Monitor, or the Special Master may think should be addressed.
7    So what I was trying to tell Mr. Penagaricano is that along
8    with the plan to address the discrepancy of use of force, meet
9    with the Monitor, meet with Mr. Saucedo, meet with the Special
10   Master, identify within the Police Bureau who in your view is
11   capable of conducting an independent evaluation of the Arecibo
12   pilot program.

13           And Mr. Saucedo indicates that he has an expert as to
14   this.  The Special Master has indicated that he has -- he can
15   have personnel available to assist in this evaluation.  So,
16   Mr. Penagaricano, meet, have everybody meet, and provide the
17   names of persons with their expertise that could be members of
18   this evaluation program.  That's all I need.  That's all I
19   want right now.

20           MR. PENAGARICANO:  We will do that.

21           THE COURT:  And once you have that, you agree on who
22   will be on this evaluation team, then provide it to the Court
23   by the end of February.  Is that okay, Mr. Romero?

24           MR. ROMERO:  Yes, it is, Your Honor.

25           THE COURT:  All right.  Mr. Saucedo, is that okay

1  with you?

2          MR. SAUCEDO:  Yes, Your Honor.

3          THE COURT:  Mr. Del Carmen?

4          MR. DEL CARMEN:  Yes, Your Honor.

5          THE COURT:  All right.  So let's do that.

6          So I am sure that talking with Captain Figueroa, or

7  talking with Colonel Lopez, you already know, in Arecibo, who

8  is a person or the persons who are -- who appear to be

9  qualified to participate in this evaluation team, all right?

10  Once I get that from you, I will set a timetable to complete

11  the evaluation, and, based on that, we will act.

12          Is that okay with you, Mr. Penagaricano?

13          MR. PENAGARICANO:  Yes, it is, Your Honor.

14          THE COURT:  Okay.  Thank you.

15          MR. ROMERO:  Your Honor, if I may just add a point?

16  There is a -- Dr. Del Carmen brought up a training for all

17  officers on CIT.  PRPB does have a course that they provide to

18  all their officers, an eight-hour course, so it's a modified

19  course, but all officers are to receive training on CIT in the

20  eight-hour course.

21          THE COURT:  All right.  So -- yes.

22          MR. SAUCEDO:  Your Honor, could I clarify that?

23          THE COURT:  Excuse me.  Mr. Saucedo, when you say all

24  officers, all 11 thousand officers?

25          MR. ROMERO:  They haven't got to that number yet, but

```
1    they are training people on an eight-hour course.
2              THE COURT:  Eight-hour course.  But the CIT officers
3    will go through a 40-hour course.
4              MR. ROMERO:  Correct, to be certified as CIT
5    officers.
6              THE COURT:  So how many do you think -- well, I don't
7    know the size of each one of these regions, but how many do
8    you think, how many coordinators do you think should be in
9    each region?
10             MR. ROMERO:  Depending on the size, Your Honor, if
11   you use Arecibo as the program, they have 15 CIT officers.
12             THE COURT:  No coordinators?
13             MR. ROMERO:  One coordinator for each area, yes.
14             THE COURT:  Okay.  Now, Captain Figueroa I think
15   makes a good point.  These people have to be initially
16   evaluated to see if they have the wherewithal to be CIT
17   officers.
18             MR. ROMERO:  Correct.  I agree, Your Honor.
19             THE COURT:  Not everybody can be a CIT officer.  I
20   think all police officers can be --
21             MR. ROMERO:  Trained.
22             THE COURT:  -- trained, as you indicated, in this
23   eight-hour training, but I don't think everybody is going to
24   be qualified to be a CIT officer and receive the 40-hour
25   training.  Do you agree?
```

1          MR. ROMERO:  Yes.

2          THE COURT:  So one thing that you may want to do,

3   Captain Figueroa, and Mr. Penagaricano, is start identifying

4   which officers, once you start your interviews, are available,

5   are qualified to be CIT officers and receive this 40-hour

6   training.

7          Captain Figueroa, how many have applied?

8          CAPTAIN FIGUEROA-ORTOLAZA:  I can get that number for

9   you, to be responsible.

10         THE COURT:  Okay.  All right.  Are you satisfied with

11  the amount of applications?

12         CAPTAIN FIGUEROA-ORTOLAZA:  Well, I assume that there

13  are some areas that, to start with, they just have three or

14  four, which are few, but there are areas like Mayaguez I have

15  -- I understand Mayaguez has around 18.

16         THE COURT:  Okay.  So that's one thing that you may

17  want to coordinate with the Monitor, and Mr. Saucedo, and

18  Mr. Del Carmen as to how many applications you have.  Let me

19  ask this, just for my knowledge.  How long -- assuming that

20  you have however many applications you have right now, how

21  long will it take you to interview these people, determine

22  that they can be -- and just determine that they can be CIT

23  officers?

24         I'm not counting the 40 hours of training.  I'm just

25  saying, okay, this gentleman here, Juan Perez, or whatever his

1  name is, is qualified to be a CIT officer and is interested in

2  being a CIT officer.

3       CAPTAIN FIGUEROA-ORTOLAZA:  Well, I would have to

4  check that number for you, because it all depends, first, on

5  the amount of applications that there are, and also the

6  committee, evaluating committee, they have other duties that

7  they need to perform.  And also they are moving to the

8  different areas so that the officers don't have to move

9  themselves.

10       THE COURT:  Okay.  All right.

11       MR. SAUCEDO:  Your Honor.

12       THE COURT:  Yes, sir.

13       MR. SAUCEDO:  If I may just address crisis

14  intervention teams, the Consent Decree does require that every

15  officer get this basic eight-hour course on recognizing signs

16  and symptoms.  It's basically "what is mental illness."  But

17  the specialized unit of CIT officers is -- part of their --

18  part of why they work is because they're the dedicated unit

19  that should be called when you know that someone's in crisis.

20  Sometimes we don't know, and an officer arrives and needs to

21  be able to at least tell signs and symptoms.  But once -- you

22  know, you should be calling that CIT-trained officer to handle

23  the situation.

24       And these are people who develop expertise over time.

25  These are some of the most difficult cases that officers

1   encounter, people who are seeing things, or might be

2   threatening suicide, or threatening harm to themselves, and

3   you really do want the right people who are interested in

4   being in this difficult situation to be called out for these

5   situations.  So we know and understand the importance of

6   selecting the right people to do this.

7          In some cases you need to provide some level of

8   incentive, because people are being called to take some of

9   these more difficult cases.  I think that might be a

10  recruitment issue that PRPB might be facing and should

11  consider.  I think, again, that's something we could get from

12  the CIT people in Arecibo, to find out how that worked out for

13  them, and whether the experience met their explanations.  And

14  if we can incentivize this and see other officers who have

15  this skill -- not everybody is cut out to be a CIT officer.

16          THE COURT:  No, I understand.

17          MR. SAUCEDO:  But whoever has the interest and skill

18  to be in the group.

19          MR. ROMERO:  Your Honor, may I add to what

20  Mr. Saucedo said?

21          THE COURT:  Wait a minute.

22          MR. ROMERO:  Sure.

23          THE COURT:  You make a good point, and that should be

24  part of your meeting to establish this team or commission or

25  whatever you want to call it that would conduct the evaluation

1    of the Arecibo program.  Okay?

2              MR. SAUCEDO:  Yes, Your Honor.

3              THE COURT:  Mr. Romero.

4              MR. ROMERO:  Your Honor, I agree with Mr. Saucedo, a

5    point that we saw in doing our evaluations with CMR-5, we

6    looked at a number of abuse of force -- it was a random sample

7    of the entire six-month period, and in many of those cases,

8    they were Ley 408, which is an involuntary surrender.  And we

9    think those are the cases that would -- PRPB is aware of that

10   case, and someone has to be taken into custody, involuntary

11   surrender, that should be assigned to a CIT officer.  And

12   that's why we see the need to have the CIT officers trained

13   throughout the entire island, so that they work each bureau.

14             THE COURT:  Okay.  Well, I know that, and I think

15   that's what everybody has said.

16             MR. ROMERO:  Right.

17             THE COURT:  But right now what I need is the

18   evaluation of the Arecibo program.

19             MR. ROMERO:  Exactly, Your Honor.

20             THE COURT:  All right.  Next topic, please,

21   Mr. Romero.

22             MR. ROMERO:  The next topic would be IT, and I defer

23   to our subject matter expert, Scott Cragg, to address the

24   Court and provide an update based on CMR-5.

25             THE COURT:  Okay.  Mr. Cragg, please -- okay.  Before

1   you -- so what I will need is once you have an evaluation team

2   ready, present it to the Court with a proposed order to

3   appoint the team.  Okay.

4          Mr. Cragg, please.  Are you going to use slides?

5          MR. CRAGG:  I can talk through the slides, Judge, if

6   we --

7          THE COURT:  Can we, Mr. -- can we get the slides on

8   the monitor?

9          COURTROOM DEPUTY:  Yes, Judge, but he needs to hook

10  up the computer with our system.

11         THE COURT:  I'm sorry.

12         COURTROOM DEPUTY:  He needs to hook up the computer

13  with our system.

14         THE COURT:  Okay.  See if we can do that.

15         COURTROOM DEPUTY:  Yes, Judge, but I'm going to call

16  the expert.

17         THE COURT:  Let's do this.  We're going to call our

18  IT person, so before we go through -- until we receive this,

19  we get this guy to be able to put your computer onto our

20  system, Mr. Romero, could you address supervision and

21  management?

22         MR. ROMERO:  Sure, Your Honor.

23         THE COURT:  Ah, here.  He came quickly.

24         Mr. Cragg.

25         MR. CRAGG:  Good morning, Your Honor, Scott Cragg, to

1  talk to you about information technology and provide you with

2  a status update.

3         THE COURT:  Wait a minute, Mr. Cragg.  I just want to

4  know whether it's on every monitor.

5         All right.  Go ahead, Mr. Cragg.

6         MR. CRAGG:  Again, good morning, Your Honor.

7         THE COURT:  Please speak loudly and into the

8  microphone.

9         MR. CRAGG:  What I would like to do for you today,

10 Your Honor, is provide you with a status update since our last

11 update to you on the 8th of November.  I'd also like to add

12 additional comments.

13        THE COURT:  Bring the microphone a little closer to

14 you.

15        MR. CRAGG:  I'd like to add additional comments with

16 regard to topics raised with regard to the action plan, as

17 well as the data remarked on by Captain Figueroa.  And I'll

18 get to those while I go through these slides.

19        Just reminding everyone, in addition to the

20 information technology itself, what the Consent Decree also

21 requires is the collection and maintenance of data,

22 documentation, and implementation of compliance with the

23 agreement requires performing ongoing performance improvement,

24 and that takes the use of the data.  So when we talk about

25 information technology, it's one piece of a larger mosaic, if

1   you will, that leads to compliance.

2       Information technology is a foundation on which
3   compliance can be achieved, but it's only one part.  This is
4   in addition to the scope of the paragraphs in the Consent
5   Decree, 218 through 223.  That first bullet, "shall develop
6   protocols for selecting and analyzing information," we heard a
7   little bit about that today just recently with regard to the
8   discussion between -- about the use of force data, and also
9   referring to Captain Figueroa's comments, which I'll get to.
10  But first the update I wanted to provide you with.

11      Since the 8th of November, PRPB has continued to
12  provide coordinated demonstrations, and "coordinated" is the
13  key word there.  Through a collaboration with the monitors,
14  we've been able to target specific demonstrations.  What's
15  very important about this is technology exposes the processes
16  in play.  Technology is only responsive to the behaviors that
17  we exhibit.

18      The good news, there are still three substantially
19  compliant technology systems that we've observed.  This
20  represents a revision to the data provided to you in November,
21  which now includes Kronos.  It's not a trend upwards.  It's a
22  level trend, because Kronos was missed at that time.  The good
23  news is, to the credit of the bureau of technology, there is
24  some substantially compliant technology available at PRPB
25  today.  There's also partial compliance with some of the

1   systems.  The trend is from five to ten.  The key of that is

2   to acknowledge and recognize that the criteria changed between

3   November and this day such that we've applied a more liberal

4   criteria for partial compliance, thereby raising from five

5   systems in November to ten systems as of today.  But that

6   is -- it's critical to note that it's because of a change in

7   the criteria.  All right?

8           What's important here is, in the next bullet, under

9   terminology, the key word is adequate.  While there is

10  technology available today in the PRPB, the question remains

11  as to its fullest adequacy.  An example of that is the last

12  bullet on this page, the police training and management

13  system.

14          In November, we acknowledged that PTMS was partially

15  compliant, and encouraged by what we were told and began to

16  see.  Yet this month, just two days ago, while in Aibonito,

17  one of the monitors had the opportunity to evaluate PTMS in an

18  operational setting.  During that demonstration, which was

19  very important, we realized that sufficient content is missing

20  from PTMS.  So while it is partially usable, and that's the

21  good news, agents can see some of their records, the

22  transcripts of the training that they've been able to receive,

23  the content of training materials does not exist at this time.

24  So the demonstrations are critical, and they must continue.

25          What's unfortunate about this case with PTMS is we've

1  now been able to find out, seeing an operational demonstration

2  in the field rather than a demonstration at headquarters, that

3  it is not as accomplished as we thought it was in November.

4  End-to-end compliance, the first sub-bullet underneath has not

5  yet demonstrated --

6         THE COURT:  What is end-to-end compliance?

7         MR. CRAGG:  Thank you, Judge.  I will explain.

8         Operational implementation in policing situations

9  that we have observed during these demonstrations is not in

10 control.  Comments made this morning about use of force points

11 to that.  What we know is that while there is technology

12 available today, the bureau of technology has provided systems

13 and applications for use.  Data that should be extracted and

14 should be inputted and then extracted into those systems is

15 not consistent.  And we've heard that from Monitor Romero.

16 We've also heard that from Captain Figueroa.

17        And on that point, I acknowledge that the data that

18 exists in form 126.2 is not the same as the data that we see

19 in radio control, but critical in this, as monitors, we do not

20 generate the data.  Only PRPB does that.  And when that

21 occurs, that by definition points to the fact that there is

22 inconsistency in the data.  That data is produced by PRPB, and

23 if the data is consistent -- inconsistent, you risk data

24 corruption.

25        And so when I say end-to-end compliance, while you

1   have technology, what is also required is collection of data,

2   the analysis of that data, and the transformation that stems

3   from understanding that data.  Where there is inconsistent

4   data, you cannot be on the path to the truest transformation

5   whereby you use that path to make change.

6          With regard to the last bullet on the page, Your

7   Honor, PRPB has achieved some technological success, and it

8   continues to be more promising than it had been a year ago or

9   24 months ago; but, unfortunately, PRPB will continue to

10  struggle due to the lack of resources they have.  Again,

11  pointing to Captain Figueroa's comments, we've seen in the

12  seven years, nearly seven years that I've been in Puerto Rico

13  on this Consent Decree, continuous lack of resources available

14  to complete technology, design technology and adapt

15  technology.  We know that to be true.  And, in fact, his

16  comments this morning agree with that.

17         Now, I recognize that there are law enforcement

18  agencies across the United States and in other countries with

19  as many or more agents, and with larger IT divisions.  That,

20  to me, points more to the investment at PRPB in its assets and

21  its resources than it does the comparison of Los Angeles,

22  Chicago, and New York, and other agencies with PRPB.  The

23  investment resources to proper technology and capabilities

24  sits solely with PRPB, and we've seen continuously that the

25  bureau of technology does not have enough financial resources,

1  does not have access to program managers, does not have access
2  to subject matter experts in sufficient quantities to make
3  strides in technology adaptation.  That solely resides with
4  PRPB.
5           So with regard to Captain Figueroa's comments, I
6  cannot disagree.  He's accurate, they do not have the
7  resources, and have not applied the resources to achieve this
8  compliance with the Consent Decree.
9           With regard to the last bullet on the bottom, I think
10 it's very important, building backwards instead of forward.
11 The bureau of technology is doing the best that they can to
12 build systems and tools that reflect who they were, but as
13 transformation proceeds, they must build forward to who they
14 want to be.  As long as they are building what they have
15 known, not what they need to be, they will struggle with what
16 is called technology debt.  And that means technology proceeds
17 forward, threats proceed forward, and that debt, that distance
18 between what they are capable of achieving today versus what
19 is necessary in the future will continue to accrue.  They must
20 have the resources that they need to make progress.
21          This highlighted area here is another key area.  We
22 tend to focus on the bureau of technology when we talk about
23 the availability of technology and those solutions.  The best
24 of technology solutions reflect the processes in place that
25 are being executed.  While the bureau of technology continues

1    to provide technical solutions, what we are seeing in the

2    demonstrations now is that there is inadequate process

3    reengineering that involves the way PRPB does its policing

4    functions.  Again, building backwards instead of building

5    forwards.

6            And the United States Federal space, the requirement

7    before spending information -- spending resources funding on

8    information technology systems requires that processes be

9    reengineered to what they should be, rather than what they

10   are, so that investments are made looking forward, not

11   backward.  I see no evidence at this point in time whereby

12   PRPB has had access to reengineering experts to help them

13   optimize their processes.  Again, a deficit that they have in

14   their skill mix.

15           On the subject of the action plan that was raised, I

16   give kudos to Puerto Rico for making the effort to develop

17   action plans, but I would ask the following, Your Honor:

18   Based on the action plans that I've seen in the past, some of

19   which I have commented on, and I have commented on this in the

20   past, in their action plan, as they deliver by the 28th of

21   February, as you've indicated, the action plan must have costs

22   identified, schedule and performance identified.  What will be

23   the cost to execute that plan?  What will be the schedule for

24   them to achieve and accomplish successful ends, and the

25   performance points to the tasks required to execute that plan?

1        Your Honor, without resources, without that

2   definition, without those distinctions, a plan is just an

3   illusion.  Without an end state, without a goal, without

4   parameters, it's an idea.  An action plan must have, at

5   minimum, cost, schedule and performance, so that their

6   progress can be measured against the plan.  Otherwise, it's an

7   idea.

8        My commitment to you, sir, is to contribute to their

9   efforts to develop this plan, and provide my comments through

10  the Monitor to the Court by the end of January to assist

11  Puerto Rico in development of that plan.

12       THE COURT:  So what you're saying is that you want to

13  be a part of the meeting that's going to take place between

14  the Commonwealth, the Monitor, the Department of Justice, and

15  the Special Master in order to develop what I have requested?

16       MR. CRAGG:  Yes, sir.  I feel that's my obligation.

17  I make that commitment to the Court.

18       THE COURT:  All right.  I think that's as far as we

19  can go now.  Do you agree?

20       MR. CRAGG:  Yes, sir.  I do.

21       THE COURT:  Okay.

22       MR. CRAGG:  With those -- at this point, sir, those

23  are the end of my comments, and I'm available for questions.

24       THE COURT:  Mr. Penagaricano, can Mr. Cragg be added

25  to this group that you're going to establish in order to

1  present a plan by the end of January?

2          MR. PENAGARICANO:  Yes, Your Honor.

3          THE COURT:  Let me ask Mr. Cragg this.

4          MR. PENAGARICANO:  Yes.

5          THE COURT:  It seems to me, and I think Captain

6  Figueroa will agree, that your area, IT, is the lynchpin --

7          MR. CRAGG:  Yes, sir.

8          THE COURT:  -- to go forward in this case, and the

9  reform.  Am I correct?

10          MR. CRAGG:  I would agree with that, sir, yes.

11          THE COURT:  Without IT, and without the information

12  that IT can provide, the officers, like you said, we're not

13  going forward.  Am I -- is that what I understood from your

14  presentation?

15          MR. CRAGG:  Yes, sir.  With technology, all of the

16  members of PRPB can become more effective.  Their time can be

17  made more useful.  In addition, the consistency of

18  information, knowledge, and data that comes from these

19  technology systems, when available, when correct, establishes

20  credibility and understanding of the situation, the

21  environment that exists.  Technology can greatly improve

22  effectiveness, efficiency, and credibility.  I believe that as

23  an IT professional today.

24          THE COURT:  Okay.  So, Mr. Penagaricano, what

25  Mr. Cragg there indicated, and what his submission will be

1   when you meet, what his proposal would be is to include in

2   this plan cost, if that can be determined --

3          MR. CRAGG:  Yes.

4          THE COURT:  -- schedule and performance.

5          MR. CRAGG:  Yes, Your Honor.

6          THE COURT:  Now, I am extremely concerned with what

7   Captain Figueroa said, that the Bureau only has 11 people

8   working in information technology and two contractors, whereas

9   other police departments of similar size have, you know, ten

10  times as many, and more.  I know that there's a problem with

11  budget, and that's true throughout, but there's one thing that

12  you have to remember, Ms. Ortiz has already heard this.  The

13  defendant in this case is the Commonwealth.  That means that

14  every single agency in the Commonwealth has to assist the

15  Police Bureau in getting this police reform done, and that

16  includes budget.

17         So you may want to include in this group someone from

18  the Office of Management and Budget, and someone from the

19  Fiscal Oversight Management Board.  I know that Ms. Ortiz can

20  knows that there is a person within the fiscal overseeing --

21  Oversight Management Board that deals with the juvenile

22  institutions.  I don't know if they have someone there that

23  deals with the police reform.

24         So it may be a good idea, and maybe, Ms. Ortiz, you

25  can bring this up, to have the Fiscal Board identify someone

1   who would help getting the funds necessary, not only for IT,

2   but for other matters.  And we will get to those other

3   matters, because I don't -- without funding, no reform can go

4   forward, so you have to get the help from these people.

5          If they give you any problem, let me know, because

6   the Monitor is here to help, Mr. Del Carmen is here to help,

7   the Monitor's staff, including Mr. Cragg, is here to help, and

8   I'm here to help get this thing going forward.  If you feel

9   that any agency is putting road blocks before you, you let me

10  know, especially with budgetary issues.

11         I feel that the safety and security of this island is

12  the most important thing that the government has in its hands.

13  Without safety or security, you can't have anything else.  And

14  I -- you know, that's my opinion.  Other people may have other

15  opinions.

16         But, Commissioner Lopez, do you agree that safety and

17  security is the primary function of the government?

18         COMMISSIONER LOPEZ-FIGUEROA:  That's right, Your

19  Honor.

20         THE COURT:  See what I mean.  Captain Figueroa, do

21  you agree?

22         CAPTAIN FIGUEROA-ORTOLAZA:  Yes.

23         THE COURT:  I'm sure Mr. Torres also agrees.

24  Mr. Torres?

25         MR. TORRES-RIOS:  Yes, Your Honor.

1        THE COURT:  Safety and security is the primary goal

2   of any government, and so that's why I think that you should

3   get someone from the Office of Management and Budget, and not

4   someone who can just say, oh, yeah, I've got to go upstairs to

5   see what's going on.  You know, someone who can make

6   decisions.  Could be Mr. Blanco himself.  I don't know.  Or

7   someone that he can delegate to help you get the money

8   necessary to get this -- right now we are talking about IT.  I

9   mean, I know that the Bureau, Captain Figueroa, has been very

10  clear on this.  You cannot deal with just 11 people.  You need

11  probably a whole lot more to get -- you know, qualified and

12  trained people to get this thing running.

13       So, Mr. Cragg, and I don't know who else Mr. Romero

14  wants to include in this team, I don't know who you want to

15  include in this team to get something done, that everybody's

16  on board, including Mr. Saucedo, by the end of January.

17       Mr. Saucedo, anything on IT?

18       MR. SAUCEDO:  Thank you.

19       THE COURT:  Thank you, Mr. Penagaricano.

20       MR. SAUCEDO:  Yes, Your Honor.  I think we've been

21  able to have a productive relationship with the Commonwealth

22  throughout this process, because there's a shared view of what

23  constitutional reform is.  It's not just the Commissioner

24  issuing an edict and just expecting that everyone's just going

25  to follow it.  It's giving the personnel the tools, equipment,

1    guidance and training that they need to be successful.  But

2    it's also about implementing systems of accountability, so

3    that PRPB can detect problems early and fix them, and not rely

4    on the Monitor, who looks at a sample six months later, to

5    come back and tell the PRPB, you have this problem.  You need

6    to fix it.  Your arrest reports are going --

7         THE COURT:  In other words, you have to be proactive

8    instead of reactive.

9         MR. SAUCEDO:  That's exactly right, Your Honor.

10        And data is the way that PRPB becomes -- using data

11   to manage is what PRPB needs in order to be successful in this

12   process.  They need to -- the Monitor's doing six-month

13   evaluations the same way every six months.  And what we expect

14   is that every snapshot we see compliance moving incrementally,

15   30 percent, 40 percent, but for that you need to be able to

16   measure progress.  And if PRPB doesn't have the tools to be

17   able to measure, not for the Monitor, but for itself, that's a

18   big problem.

19        The Commonwealth recognized this, and brought in --

20        THE COURT:  Well, let's put it this way.  Let's put

21   it this way.  The Bureau recognizes it.  I'm not exactly sure

22   whether other agencies in the Commonwealth recognize it for

23   whatever reason.

24        MR. SAUCEDO:  Yes, Your Honor.  I mention that

25   because the Police Bureau hired --

1          THE COURT:  I'm sorry.  Mr. Torres, I'm including you

2   as someone who recognizes what has to be done.

3          MR. TORRES-RIOS:  (Nodding head up and down.)

4          THE COURT:  Go ahead.

5          MR. SAUCEDO:  The New Orleans Police Department has

6   been successful in moving its reform process along, because it

7   learned that they need to know what the Monitor wants to know

8   to determine compliance.  Because PRPB's in a position to fix

9   it first, not the Monitor when he looks at it afterwards, so

10  that's why it's just such a key part of that.

11         The United States brought the chief information

12  officer of the City of Los Angeles, who also oversaw the

13  reform, technology reform at the Los Angeles Police

14  Department.  We also brought on the retired chief operations

15  officer, a lieutenant who knows how these systems need to

16  work.  The Los Angeles Police Department went through a

17  Consent Decree process just like this.  It took them 12 years,

18  but the CIO came in --

19         THE COURT:  Well, we have two years to go.

20         MR. SAUCEDO:  We're hoping to make as much progress

21  as we can.  The reason we brought these people in is because

22  they encountered the same problems PRPB encountered.  They

23  came halfway through and found it was a Frankenstein of IT

24  modules and systems and databases that people kept.  Someone

25  needed to stop what was happening, take a time out, develop a

 1   plan, get the right people on board, and then start to

 2   implement, because that is what's going to happen, it is --

 3   PRPB is going to be in the same situation two years from

 4   now.

 5           THE COURT:  Can that be done in the next 30 days?

 6           MR. SAUCEDO:  I think, Your Honor, with the

 7   assistance --

 8           THE COURT:  Let's put it this way.  What can you do

 9   in 30 days?

10           MR. SAUCEDO:  I think what we can do in 30 days is we

11   can plan -- PRPB does not have right now the capacity to build

12   a plan.  They -- we were going to brief the Court at side bar

13   of three critical issues that are happening, Your Honor.

14           THE COURT:  Okay.

15           MR. SAUCEDO:  And that's because there's a skeletal

16   crew at the IT bureau, with 11 people who have to try to keep

17   the lights on and manage at least ten systems that are going

18   to transform the agency.  It's impossible.  We've hit a wall,

19   Your Honor, with IT, and something needs to change.  And I'm

20   worried if we just develop a plan with the existing resources

21   available at PRPB, we're not going to be successful.

22           So the plan should at least identify what PRPB needs,

23   the expertise it needs to be able to develop a plan and move

24   forward.

25           THE COURT:  Okay.  Can you do that, Mr. Penagaricano?

1        MR. PENAGARICANO:  I'd like to make some remarks

2   briefly.

3        THE COURT:  Of course.

4        MR. PENAGARICANO:  The IT discussion we're having

5   today, Your Honor, has been the object of very similar

6   discussions in all of the hearings that we had last year, in

7   May --

8        THE COURT:  I know.

9        MR. PENAGARICANO:  -- July, September.  And we agreed

10  with the deficiencies, and it is a challenge.  And in the

11  first part of last year, there was a data gap analysis

12  prepared, a comprehensive report addressing IT deficiencies

13  which everybody agreed with.  And the Commonwealth started the

14  process to -- the contracting process of the experts, of the

15  company that will come and implement all of these systems.

16        THE COURT:  So you're ahead of the game.

17        MR. PENAGARICANO:  So -- and we are here to inform

18  the Court and the parties that even though obviously we

19  recognize that the contracting process has taken longer than

20  everybody expected, it is virtually going to be concluded.

21        THE COURT:  Okay.

22        MR. PENAGARICANO:  That process.  And that is a

23  fundamental change in the entire reform process regarding

24  IT.

25        THE COURT:  Okay.  All right.  Well, it seems to me

1   that you have a lot to contribute when you meet.

2           MR. PENAGARICANO:  Yes.

3           THE COURT:  Okay.  Now, Mr. Saucedo, you wanted

4   something to be at side bar.

5           MR. SAUCEDO:  Yes, Your Honor.

6           THE COURT:  We can do that now.

7           MR. SAUCEDO:  Yes, Your Honor.

8           THE COURT:  Okay.  I would like Captain Figueroa --

9           MR. PENAGARICANO:  Yes.

10          THE COURT:  -- and Commissioner Lopez to come

11  forward, also.

12          (Bench conference held.)

13          THE COURT:  All right.  Mr. Lao, Ms. Solis, this is

14  just for these people.  Okay.

15          THE INTERPRETER:  Yes.

16          THE COURT:  Okay.  First of all, (Remarks in

17  Spanish.) Mr. Saucedo, go ahead.

18          MR. SAUCEDO:  Yes, of course.

19          THE COURT:  Wait a minute.  What is the best way to

20  do this?  We'll have someone here?

21          THE INTERPRETER:  They won't be able to hear at side

22  bar, but we need to get the feed here.

23          THE INTERPRETER:  We can hear it.

24          THE INTERPRETER:  The only problem is we need other

25  people who have the other headsets --

 1          THE COURT:  That's what I mean.  Let's not have the

 2   headsets.  Let's have someone here who can translate, okay,

 3   for Captain Figueroa's benefit, and anybody else who needs

 4   translation.

 5          Go ahead.

 6          MR. SAUCEDO:  In the course of visiting the police

 7   precincts with our IT expert, we found three significant

 8   critical needs in the field.  The first is a lack of radios.

 9   It's unacceptable that officers are going out on patrol

10   without radios.

11          THE COURT:  Ms. Ortiz.  Ms. Ortiz, come forward.

12          (Whereupon Ms. Ortiz-Rivera joined the bench

13   conference.)

14          MS. ORTIZ-RIVERA:  Yes.

15          THE COURT:  Thank you.

16          Start again.

17          MR. SAUCEDO:  Yes, Your Honor.

18          THE COURT:  Because I know Ms. Ortiz knows about

19   this.

20          MR. SAUCEDO:  We brought an IT expert from the Los

21   Angeles Police Department to tour the precincts here in

22   October and November, and in the course of asking about

23   whether there were computers to access forms, we learned that

24   officers didn't even have a radio to go out on patrol.

25          MS. ORTIZ-RIVERA:  Okay.

1          MR. SAUCEDO:  It's unacceptable at this point that

2     officers are having to go out on patrol without a way to

3     communicate if they need help.  In some cases, officers have a

4     radio in their car, but when they're going together, or if

5     they need to get out for foot pursuit, they just lose police

6     communications.  They have to many times rely on their

7     personal cell phone to communicate.  So this goes back to, you

8     know, we're trying to build a vision for the future in IT, but

9     we can barely keep the lights on.

10          So that's one issue, just the lack of radios.  And I

11    think the contract and procurement process, I think it's all

12    getting in the way, and I think it just needs to be a priority

13    goal for all of us, everyone has access to a radio.  Not

14    everyone needs a radio.  Access to a radio.

15          THE COURT:  Okay.  Now, I indicated the defendant

16    here is the Commonwealth, and I mentioned OMB and the Fiscal

17    Board.  Now, what Mr. Saucedo says I think we'll also get --

18    Ms. Ortiz, this is why I brought you here.  You should also

19    get your human resources person. (Remarks in Spanish.)

20          MS. ORTIZ-RIVERA:  (Remarks in Spanish.)

21          THE COURT:  Whatever the -- the name is long.

22          MS. ORTIZ-RIVERA:  Well, it's very difficult to

23    pronounce.

24          CAPTAIN FIGUEROA-ORTOLAZA:  (Remarks in Spanish.)

25          MS. ORTIZ-RIVERA:  I always mistake --

1    THE COURT:  And the General Services Administration,

2    because they're the one who purchased.  And I think you have

3    to get them involved in this process, and I think you have to

4    tell them that the Court has already indicated Commissioner

5    Lopez is in agreement, Captain Figueroa is in agreement,

6    Secretary Torres is in agreement that the primary purpose of

7    government is to provide safety and security to its people.

8    And one of the things that officers need in the field are

9    radios, and I think that everything has to be -- you have to

10   do everything possible to get these radios as soon as

11   possible.

12    How many radios are we talking about?  You don't

13   know?

14    MR. SAUCEDO:  (Shaking head from side to side.)

15    THE COURT:  Because I know --

16    MR. SAUCEDO:  They had a purchase order for 2,000.

17    MS. ORTIZ-RIVERA:  Recently it was approved.

18    MR. SAUCEDO:  2,000 --

19    MR. PENAGARICANO:  There are many, many radios --

20    CAPTAIN FIGUEROA-ORTOLAZA:  There are 2,000, and

21   there are three purchases that are being done --

22    THE COURT:  Okay.

23    CAPTAIN FIGUEROA-ORTOLAZA:  -- that are being worked

24   on.

25    MS. ORTIZ-RIVERA:  Including with batons, also.

1          THE COURT:  Is batons part of it?

2          MR. SAUCEDO:  Well, it's really more the radios.

3          MS. ORTIZ-RIVERA:  But the whole --

4          THE COURT:  Include the batons.  Fine.  But what I

5     need for you is to get -- put the fear of God into these

6     people.

7          MS. ORTIZ-RIVERA:  Yes, Your Honor.  We already have

8     started that, yes.

9          THE COURT:  Because it's important, like Mr. Saucedo

10    says, if the police are in their patrol cars, and they come to

11    a situation that both have to leave the patrol car, they don't

12    have any communication, and they need it.  They have to have

13    that.  So you have to impress upon the Office of Management

14    and Budget, the Fiscal Board, the General Services

15    Administration, and your -- maybe not human resources for this

16    particular thing, to get the ball rolling.  I think it's --

17    and I think Secretary Torres and Commissioner Lopez and

18    Captain Figueroa agree, you've got to get this thing -- these

19    radios to the -- into the field as soon as possible.

20          All right.  Can you do that?

21          MS. ORTIZ-RIVERA:  Your Honor, we already have been

22    making inroads in that.  Isaias Sanchez, the General Counsel,

23    has contacted both Karla Mercado and Blanco to tell them that

24    is what's going on.

25          THE COURT:  Can you hear her?

```
 1              COURT REPORTER:  (Nodding head up and down.)

 2              THE COURT:  Okay.

 3              MS. ORTIZ-RIVERA:  And to coordinate a meeting with

 4   them to request the two people for Correction with the other

 5   case.  But I told them also, with the police reform, we would

 6   also need help, so that's in the works.

 7              THE COURT:  But --

 8              MS. ORTIZ-RIVERA:  And --

 9              THE COURT:  -- not only does it have to be in the

10   works, it has to be critical.

11              MS. ORTIZ-RIVERA:  Yes.  We need names of people who

12   can explain the process and can --

13              THE COURT:  All right.

14              MR. SAUCEDO:  Your Honor, there are two quick issues

15   in addition to that.  PRPB stores all of its critical data of

16   complaints on a server in headquarters.  It needs to be cooled

17   or the equipment will melt, the hardware will melt.  They have

18   two cooling units.  One is broken.  The other is hanging by a

19   string.  If that cooling system breaks down, a lot of the

20   Commonwealth -- PRPB's critical information will be subject to

21   loss.

22              This was brought to the Commonwealth's attention

23   months ago.  I visited Tuesday, and it's still the same way.

24   There are fans -- the IT bureau isn't -- they don't do the

25   purchases, so they have -- they brought in some cooling fans,
```

1    but that is not appropriate for the critical data that the

2    police has in these systems.  So that's the other issue.

3           The third issue, Your Honor, is that PRPB's hardware

4    and software for its firewalls will expire January 17, in four

5    days -- in three days.  This means that PRPB's data will be

6    open to the public, and the firewalls that are set up

7    internally to keep people from accessing critical information

8    will be gone.  We raised this with the Commonwealth also

9    months ago.  And this is why we are saying I think we need to

10   at least keep the lights on.  Right?  We are talking about

11   creating a vision for the future, but these are critical needs

12   that just cannot wait.

13          THE COURT:  What do you suggest?

14          MR. SAUCEDO:  Your Honor, I think there is a plan

15   that we're talking about, but these need to be in the front

16   burner.  I think in ten days -- and I spoke to Mr. Garffer,

17   who did say to me that they're fixing this, but there is no

18   plan B for the firewall.  And so I think within ten days the

19   Commonwealth should indicate where it is in terms of providing

20   the security needs to this critical data.

21          MR. PENAGARICANO:  And, Your Honor, it is in the

22   front burner, and it has been in the front burner the minute

23   Mr. Saucedo informed the Commonwealth for the first time a

24   couple months ago as being -- as a result of the items.  The

25   three items are in the same category.  They have been

```
 1   addressed, followed up incessantly to try to get the radios
 2   purchased, the firewall purchased, and the cooling units
 3   purchased.
 4          THE COURT:  Well, that's what I mean, because it's
 5   been on the front burners so long, they're probably burned.
 6          MR. PENAGARICANO:  We understand the problem.
 7          THE COURT:  (Remarks in Spanish.)
 8          MR. PENAGARICANO:  And we have been in communication
 9   even last night about this, and about pushing and pushing to
10   try to get that out.
11          THE COURT:  Ms. Ortiz.
12          MS. ORTIZ-RIVERA:  Yes.
13          CAPTAIN FIGUEROA-ORTOLAZA:  Yes.
14          THE COURT:  Excuse me, Captain Figueroa.
15          I don't mean the radios, but the cooling unit and the
16   firewall.
17          MS. ORTIZ-RIVERA:  I think those were approved last
18   week.
19          THE COURT:  But you need that quick.
20          Captain.
21          CAPTAIN FIGUEROA-ORTOLAZA:  The purchase order for
22   the firewall came out yesterday.  The buyer was sent the
23   purchase order, so there's no problem.
24          THE COURT:  Okay.  Great.
25          CAPTAIN FIGUEROA-ORTOLAZA:  We're expecting it to be
```

1   installed this weekend.

2           THE COURT:  Now, Monday's a holiday, so --

3           MR. SAUCEDO:  Your Honor, there is no room for

4   slippage.  What we have heard is that there's a drop dead

5   expiration date when these systems will shut down, which is

6   January 17th.

7           THE COURT:  Which is Monday, which is a holiday.

8           MR. SAUCEDO:  Opening up the systems to

9   vulnerability.

10          MR. TORRES-RIOS:  If I may?

11          THE COURT:  Yes, sir.

12          MR. TORRES-RIOS:  Once we go out and this is done, I

13  will make sure Commissioner Lopez will get --

14          THE COURT:  Okay.  Get it done by Monday, because not

15  everybody will know what you're doing.

16          MR. SAUCEDO:  Or you'll have to shut down your

17  systems.

18          THE COURT:  And your firewall.  You need to fix the

19  air conditioner.  You've got someone to get the firewall done.

20  And you need these radios.  Okay?

21          MR. TORRES-RIOS:  Yes, sir.

22          THE COURT:  All right.  Thank you.

23          MR. SAUCEDO:  Thank you, Your Honor.

24          (Bench conference concluded.)

25          THE COURT:  Okay.  Thank you, gentlemen, and

1   Ms. Ortiz.  It seems that what Mr. Saucedo has brought to the

2   attention of the Court will be resolved relatively quickly.

3         Mr. Romero, supervision and management, please.

4         MR. ROMERO:  Your Honor, supervision and management

5   is one of the most important areas in the agreement.  How to

6   provide the link between PRPB's leadership and the rank and

7   file, first line supervisors that are key to instituting

8   reform and changing the culture of the Bureau.  Currently,

9   PRPB's reporting a serious shortage of first-line supervisors,

10  sergeants, and no greater has an impact been felt than in the

11  area of patrol supervision.

12        During a site visit conducted by the monitor's

13  office, we have found many precincts and districts where there

14  were no patrol supervisors.  This lack of supervision has put

15  PRPB in noncompliance with the agreement, which requires a

16  ratio of one sergeant to every eight agents.  With no

17  promotions to the sergeant's list in place, PRPB will be faced

18  with the task of having to take steps to reshuffle supervisory

19  assignments in order to mitigate the problem.  And this has an

20  impact on morale in the department as well.

21        Another area of concern, during the pandemic, and a

22  temporary suspension of virtual training, many supervisors

23  have not received their 40 hours of in-service training.

24  Further, PRPB needs to ensure that its training addresses

25  issues raised relating to supervisory duties and performance.

1          PRPB's inability to complete its early intervention

2    system has also significantly impacted its usefulness to the

3    supervisor as it relates to personnel under their supervision.

4    PRPB currently is using an EIS application, seemingly as a

5    case management system, rather than intervention system,

6    enacted to improve supervision and accountability.

7          Currently, EIS is under development, and is not

8    available for use by supervisors in the field.  PRPB should

9    continue to develop the platform, so that supervisors can

10   utilize information stored in the EIS.  This will make EIS an

11   effective supervisory tool that addresses potential

12   problematic behavior in a timely, non-punitive manner.

13         Again, while PRPB has demonstrated progress in CMR-5,

14   this report also represents a turning point for PRPB.

15   Continued progress is contingent on PRPB implementing

16   necessary steps outlined in our report to achieve compliance.

17   Your Honor, we proposed a timeline for PRPB to develop a plan

18   to address staffing shortages and a staffing allocation issue

19   within 30 days.  The plan should include initial steps to --

20         THE INTERPRETER:  Your Honor, may the interpreter

21   request that counsel slow down for the interpreter?

22         MR. ROMERO:  Okay.  Do I need to repeat any part of

23   this?

24         THE INTERPRETER:  Yes, please.  A few words back.

25         MR. ROMERO:  All right.  Since the last part?  I'm

```
 1    sorry.
 2            THE INTERPRETER:  Yes, Counsel.
 3            MR. ROMERO:  Okay.  The monitor's office proposes a
 4    timeline for PRPB to develop a plan to address staffing
 5    shortages and staffing allocations issued within 30 days.  The
 6    plan should include an initial step of updating the V2A study
 7    on staffing allocation.  The plan should also include the
 8    necessary steps PRPB will take to move forward with
 9    promotions, especially the rank of sergeant.
10            THE COURT:  Again, what is -- would you indicate what
11    V2A stands for?
12            MR. ROMERO:  V2A is a study that was conducted.  It
13    determined that PRPB had the right personnel and -- throughout
14    the department.  It was an extensive study, and it provided an
15    -- issued a report that PRPB was to follow.  In that report,
16    it indicated for the first five years the ratio of sergeant to
17    police officers was one to ten, but after five years, and
18    we're beyond the five-year mark obviously, it should be one to
19    eight.
20            PRPB, I know they've had a lot of mitigating
21    circumstances regarding retirements and people leaving, but
22    that is a critical role in the Police Department at the rank
23    of sergeant.  It is the person who has most interaction with
24    those officers out in patrol, and it's critical that that
25    position, that supervisory position be filled and there's
```

1   someone out there in that capacity.

2           THE COURT:  Now, I understand that there's been a

3   problem in providing or giving the exam, the promotional exams

4   for officers to become sergeants, especially during the

5   pandemic, when it was given virtually, when there was cheating

6   involved.  Correct?

7           MR. ROMERO:  I'm sorry, Your Honor?

8           THE COURT:  I understand that there's been problems

9   in giving the promotional exam, especially for officers to

10  become sergeants, and that that was complicated by the

11  pandemic, when the exam was attempted to be given virtually

12  and there was cheating involved.

13          MR. ROMERO:  Your Honor, the problem with the issue

14  of virtual training, Your Honor, didn't have anything to do

15  with those.

16          THE COURT:  All right.  I misunderstood that.

17          Mr. Penagaricano.

18          MR. PENAGARICANO:  Yes, Your Honor.  By the way, V to

19  A is the name of the company that did the studies.  Vision to

20  Action.

21          THE COURT:  Vision to Action.

22          MR. PENAGARICANO:  Correct.

23          Your Honor, this topic of supervision, it's -- in our

24  humble opinion is one of the other key components of the --

25          THE COURT:  Bring the microphone closer to you,

 1   please.

 2        MR. PENAGARICANO:  This topic of supervision and

 3   management, in our humble opinion, is, together with IT, some

 4   of the most important topics in the entire reform process,

 5   because the same as with IT, it touches the different -- all

 6   the other areas.  In other words, trying to get better at this

 7   topic will help improve, at the same time, in the other areas.

 8        And we've been discussing this issue about the

 9   supervision deficiencies and shortages within the Bureau for a

10   period of time.  Even so, that -- in the hearing last

11   September, both plaintiffs and defendants met to file a joint

12   motion on another issue that had a bearing on the supervision

13   deficiencies within the agency, and there were motions written

14   about it for both sides, so this is a well-briefed issue about

15   the deficiencies in supervision within the agency.

16        The path forward, as we envision, I think we'd like

17   to inform the Court about two -- I would say two key

18   developments.  One of the developments is that like a week

19   ago, on January I think the 3rd of this year, there was an

20   internal communication finally designating the members of the

21   new board that will oversee the identification, testing, et

22   cetera, of all the officials, from agents to different ranks,

23   up to sergeant.  So that board had not been composed.  It has

24   been composed.

25        The Bureau, Captain Figueroa and his team are working

1    on the manuals, the regulations of that board, how they will

2    actually execute these promotions, and it will be submitted to

3    the Monitor, and the Special Master, and plaintiffs for review

4    and final approval.  I think the implementation of that board

5    after it's finally approved in this case will have a direct

6    impact, at least to begin solving this deficiency problem

7    within the agency.

8             THE COURT:  When can that be done?

9             MR. PENAGARICANO:  I think, by earlier conversations

10   with Captain Figueroa, I think that as soon as early February

11   all of the documentation about this board and how it will

12   operate, the regulations about it, will be submitted under

13   paragraph 229 for the parties for review and comment.

14            THE COURT:  Is that okay with you, Mr. Romero?

15            MR. ROMERO:  Yes, Your Honor.

16            THE COURT:  All right.

17            MR. PENAGARICANO:  The only other thing I want to

18   state --

19            THE COURT:  Wait a minute.

20            MR. PENAGARICANO:  I'm sorry.

21            THE COURT:  I think that's a good idea, to get this

22   plan done and submitted to the Monitor and whoever else by

23   early February.  Let's say February 10th.  Okay?

24            MR. PENAGARICANO:  Yes, sir.

25            THE COURT:  All right.  Mr. Saucedo, anything?  Does

1    that sound like something that can get this ball rolling?

2         MR. SAUCEDO:  Yes, Your Honor, although I do want to

3    provide a little bit of background here in that the Vision to

4    Action staffing study that was done under the Consent Decree

5    was an important part of making this reform palatable to the

6    rank and file, because their point of view was why are we

7    going to get all these additional responsibilities when

8    there's not enough of us to do this.

9         The Vision to Action staffing studies was the first

10   time that PRPB ever did a workload allocation staffing study.

11   In other words, you're not just allocating resources where you

12   think you need them.  It's where you have a need based on the

13   workload for each of those units.

14        THE COURT:  Now, that was done 12 years ago.  Is it

15   still good today?

16        MR. SAUCEDO:  Well, Your Honor, the staffing study

17   was done and issued in 2018.

18        THE COURT:  Oh, I see.

19        MR. SAUCEDO:  Yes, Your Honor.  And what the

20   contractor did for PRPB was create a staffing model, so that

21   they could keep up with it.  So what the contractor did was

22   identify those units that lacked officers, and those that

23   needed more, so that you can redistribute on an ongoing basis.

24   They created this model.  They trained personnel at PRPB to

25   maintain it, so that when people left, you subtracted them.

1 │ When people came in, you added them.

2 │      That was not maintained, so the human resources

3 │ crisis that the Commonwealth told this Court in a filing is

4 │ true, but it was known since at least 2018.  And not only was

5 │ a study done, there was a staffing plan based on that study.

6 │ And what PRPB committed to do was to use that staffing model.

7 │ They committed to promote new officers, because they knew that

8 │ they were going to be short supervisors.  They committed to

9 │ civilianize the police officers -- there are many police

10 │ officers doing clerical work.  They're mechanics, they drive

11 │ tow trucks, you know.  You cannot --

12 │      THE COURT:  Well --

13 │      MR. SAUCEDO:  Well, Your Honor, part of the strategy

14 │ to address the staffing needs --

15 │      THE COURT:  To that extent --

16 │      MR. SAUCEDO:  Yes, sir, Your Honor.

17 │      THE COURT:  To that extent, it's much easier to

18 │ have -- to have and train a civilian to do clerical work.

19 │ Well, mechanical -- being a mechanic, it would cost to train a

20 │ sworn officer.

21 │      MR. SAUCEDO:  That's correct, Your Honor.  The cost

22 │ of training and equipping a sworn officer, versus a civilian

23 │ who could check data, do quality control, prepare reports -- a

24 │ lot of that work is being done at the field level by sworn

25 │ officers, and so part of the strategy that PRPB told us in

1  2018 was that they were going to civilianize and bring in more

2  civilians to take over those administrative duties.

3          Finally, Your Honor, improve technology to make work

4  more efficient.  So all of these do go hand in hand.  So where

5  are we?  We understand the Commonwealth committed to

6  reintroduce this staffing model, and so that's a good step.

7  And I think that could be included in the implementation plan

8  that's due.

9          The other thing is promotions.  The Commonwealth told

10  us they need to identify funding to promote these officers.

11  It's hard for us to believe that there's so many -- that

12  they're counting hundreds of vacancies, but we don't

13  understand how they could be called vacancies if they don't

14  have the funds.  These are supposed to be funded positions

15  that need to be filled.

16          So there may be a resource issue at play here that

17  needs to be resolved, but, Your Honor, I think that the plan

18  is the first step, I think, in trying to figure out where we

19  are right now and where we need to go with this.

20          THE COURT:  Would what you suggest be part of the

21  plan that Mr. Penagaricano says can be proposed by February

22  10th?

23          MR. SAUCEDO:  I think yes, Your Honor.  I think the

24  Commonwealth can tell us by February 10th which of the 2018

25  strategies they were going to implement are continuing to be

1  pursued and which they've abandoned.  And if they've abandoned

2  one of these strategies, what else they're going to do to try

3  to fix this problem.

4          THE COURT:  Can you do that, Mr. Penagaricano?  Can

5  you do that, what Mr. Saucedo said?

6          MR. PENAGARICANO:  Yes, Your Honor.

7          THE COURT:  Okay.  By February 10th.

8          Mr. Del Carmen, is there anything you have to add on

9  this issue of promotions?

10          MR. DEL CARMEN:  Yes, Your Honor, we do.  I wanted to

11  bring to the Court's attention the fact that some months ago,

12  the Court ordered the special master's office to work on what

13  we call a career path.  A career path is simply a way to

14  advance police officers to the next rank.  Oftentimes in

15  policing we have found in the academic literature that across

16  the board we promote good patrol officers to not be so

17  effective sergeants, because they lack the training, they lack

18  the mentoring, they lack the ability to grow.  And so the

19  Court recognized that and asked us to put together, with the

20  input of U.S. DOJ, the Monitor's office, and PRPB, a career

21  path for them to adopt, put into place, so that the officers

22  that would be subsequently promoted would actually have the

23  right training, would have the right mentorship.

24          We provided that document to Mr. Garffer back in

25  October.  That document that we produced was produced with the

1   input from DOJ, as well as the Monitor's office.  He informed

2   us recently that they're working through this right now, and

3   that they will have it to us very soon in order for us to

4   review and to provide further input, to be implemented.

5        And just to give you a sense, Your Honor, when those

6   plans are put together in other parts of the United States,

7   such as my home state of Texas, they have something called the

8   leadership command college, which is a nine month process by

9   which they train the individual in conjunction with

10  universities, with leadership schools, so that they can bring

11  the person up to the next level.  And so our hope is that they

12  do follow up on this, and that we do have a solid career path,

13  because these are the people that they're going to be

14  promoting five, ten years from now, Your Honor.

15       THE COURT:  Okay.  So that plan that you were

16  promised to be produced to you soon will be produced by

17  February 10, along with what, the plan to address staffing

18  shortages and staffing allocation, which Mr. Romero has

19  indicated should be done, as far as the issue of supervision

20  and management.

21       MR. DEL CARMEN:  Yes, Your Honor.

22       THE COURT:  In this sense, Ms. Ortiz, you may want to

23  get HR people involved also in addition to Management and

24  Budget and the Fiscal Board.

25       MS. ORTIZ-RIVERA:  (Nodding head up and down.)

 1              THE COURT:  Any further comments on this,
 2    Mr. Penagaricano?
 3              MR. PENAGARICANO:  Your Honor, just to -- just to
 4    emphasize that the Special Master is right, he did submit
 5    that, and in this last couple of three months, the
 6    Commonwealth, the Bureau has been working and has enhanced
 7    that draft submitted.
 8              THE COURT:  Okay.  Good.
 9              MR. PENAGARICANO:  And will produce I think a more
10    comprehensive document in February.
11              THE COURT:  Great.
12              Okay.  So we have one more -- two more issues to
13    discuss.
14              MR. SAUCEDO:  Your Honor, could I just --
15              THE COURT:  Yes.  I'm sorry.  Mr. Saucedo, anything
16    else on supervision and budget -- I mean and management?
17              MR. SAUCEDO:  Yes, Your Honor.
18              Paragraph 21 is the paragraph that requires a
19    developmental career path.  The reason we designed the consent
20    decree to include that was because it's about creating the
21    future leaders of the police force, right?
22              This is the sustainable reform of the Puerto Rico
23    Police, and we knew that besides the promotion process,
24    because an officer can know what -- you know, what you need to
25    study to become a sergeant and a lieutenant, but are there the

1    opportunities to advance within this agency, and what can the
2    agency do to promote and facilitate that.  You know, sometimes
3    in other jurisdictions it's changing work schedules, so that
4    you can go to school and get a master's degree.  Sometimes
5    it's developing partnerships or relationships with law
6    enforcement agencies, having people go to the law enforcement
7    academy.  This is all about taking that new recruit who comes
8    in and harnessing that interest to create a career police
9    officer, and showing him or her the path to becoming a leader
10   in the Police Department.
11          THE COURT:  Do you think that should be included in
12   this report?
13          MR. SAUCEDO:  Yes, Your Honor.
14          My understanding is the career path program that is
15   being developed is what DPS and PRPB are working on.  And I do
16   want to say, Your Honor, that the promotion process up to the
17   rank of captain, that's based on exams, has actually been
18   exemplary.  The Monitor looked and reviewed that process step
19   by step, and it actually is a bright spot.  And I want to make
20   sure I commend the Commonwealth on it.  The problem is they
21   haven't had the opportunity to promote as many people as they
22   want.  The process is one that's been approved, it's tried,
23   and it's worked.
24          THE COURT:  All right.  So, again, meet among
25   yourselves, develop this plan, including everything that we've

1   discussed today, to be submitted -- you know, develop it by

2   February 10, and it can be submitted by the end of February.

3   Is that okay with everyone?  Mr. Penagaricano.

4           MR. PENAGARICANO:  Yes, Your Honor.  Yes.

5           MR. SAUCEDO:  Yes, Your Honor.

6           THE COURT:  Mr. Romero, is that okay with you?

7           MR. ROMERO:  Yes, Your Honor.

8           THE COURT:  Mr. Del Carmen?

9           MR. DEL CARMEN:  Yes, Your Honor.

10          THE COURT:  All right.  The next topic that we need

11  to discuss deals with a brand new statute, which is the cadet

12  program.  Mr. Romero?

13          MR. ROMERO:  Your Honor, briefly, recently the

14  Governor signed Act 65-2020, which is a bill submitted -- bill

15  578, and it talked about bringing people as young as 18 years

16  old into the fold of the PRPB.  When we heard about this cadet

17  program, they were called cadets, we provided PRPB with

18  various examples of cadet programs across the country.

19          Your Honor, I'm a product of the cadet program in the

20  NYPD when I started.  I started as a trainee, and I was

21  assigned clerical duties.  I had no police powers, but I was

22  working within the department in capacities in different

23  organiza -- records section, or other locations throughout the

24  department conducting civilian jobs.

25          We provided -- we stressed to the Commonwealth the

1  importance to further define the roles of cadets, so, at this
2  point, it doesn't say what a cadet does.  It does say the
3  cadet is sworn.  In most jurisdictions, the cadets are not
4  sworn.  They are civilians.  Sworn gives reference to police
5  powers in a sense.
6         THE COURT:  Mr. -- don't stand so close to the
7  microphone, because we're getting some feedback.
8         MR. ROMERO:  Okay.  Further, so we're asking PRPB to
9  define the role of cadet and their duties prior to obtaining
10 an associate's degree.  We understand, as per the agreement --
11 we have no issue as to the age.  We're saying the agreement
12 requires that an individual who is considered for the position
13 of police officer within the PRPB have an associate's degree,
14 which normally takes them approximately two years, or longer.
15        So what we're saying, we're not in any way
16 questioning the age issue as we're saying that before
17 somebody can do any police-related work, and when I say
18 police-related, sworn police work, doesn't require police
19 officer status, that individual needs to have completed the
20 associate's degree.
21        So we're ask -- examples include limiting -- so we're
22 asking cadets that they submit a role and responsibility to
23 non-traditional police patrol enforcement functions.  We know
24 there are some departments that like to bring cadets in while
25 they're getting their degree.  They work a number of hours

1    during the course of the month, understanding they're in

2    college getting their educational levels, and performing hours

3    when they're not in school.  The hours are increased in the

4    summer time or when they're outside of school.  Other

5    departments may elect to bring people in and give them jobs

6    that don't require police power.  For instance, traffic

7    control could be providing assistance at a police facility,

8    provide -- even security, as long as it's not requiring police

9    powers.

10           And so our concern is it's more of an administrative

11   position.  We understand the importance of trying to get

12   people as soon as possible into the fold, because if you wait,

13   perhaps they're in college, and beyond that, they may not

14   consider the role of police; but if you get them young enough,

15   expose them to what a police officer does, which is a very

16   challenging, interesting job, I think -- so I credit PRPB with

17   the idea of getting them in at a younger age.  It certainly

18   helps.

19           It helps in the sense that you're bringing them into

20   the fold.  They can learn in their capacity, whatever

21   administrative position they're doing, a civilian position,

22   and then be ready with the completion of the education level

23   to then proceed on to the next level of becoming an agent.

24   They can also work with the community.  So there's so many

25   things they can do that are police related, but, again, are

1   not within the duties or responsibilities of a sworn police

2   officer.

3            So we recommend -- we look forward to working with

4   PRPB.  We provided ten different jurisdictions, including the

5   NYPD, we would work with them to develop a career -- discussed

6   with them, as well as DOJ, developing what -- duties and

7   responsibilities of a cadet.  We first would have to know what

8   PRPB intends to do in that capacity, whether it's to give them

9   full-time employment, or whether it is while they're in

10   school.  They'd have to explain that part of it, and then we'd

11   develop a plan and look forward to working with them on that.

12            We propose, for PRPB to demonstrate continued

13   progress towards compliance, within 45 days the PRPB needs to

14   develop a plan regarding the distinct and clear

15   responsibilities and duties of a cadet at the PRPB.

16            THE COURT:  Mr. Penagaricano, there's a statute for

17   this.  Do regulations have to be prepared to put the statute

18   in place?

19            MR. PENAGARICANO:  Your Honor, this Act 65, it's a

20   fairly new act.  It's December, 2021.

21            THE COURT:  I know.

22            MR. PENAGARICANO:  So -- and this is a topic also

23   that has been discussed many times last year, but then the Act

24   came into play in December.  I think it's -- everybody is in

25   agreement the Act is not -- no disposition of the Act violates

1    the agreement in this case.  It just provides tools to the

2    agency to recruit.

3              THE COURT:  Well, that's what I mean.  You're going

4    to need to have some sort of regulation --

5              MR. PENAGARICANO:  Right.

6              THE COURT:  -- that will comply --

7              MR. PENAGARICANO:  A plan.

8              THE COURT:  -- with the agreement.

9              MR. PENAGARICANO:   Right.  And as early as two days

10   ago, in one of the meetings that -- many meetings that the

11   parties have had in this case, this was discussed.  And we

12   were clear, and everybody was in agreement as well that it's

13   early, and the agency is working hard on a plan, according to

14   the law, that does not violate the agreement.  But it is a

15   process that takes time, because you have to talk to

16   universities.  It's just many agencies involved, entities.

17             So we are eager to present the plan, but we are

18   nowhere near that.  Forty-five days, respectfully, I think

19   it's too short of a period, and we respectfully ask to give an

20   opportunity to the Bureau to really develop a productive

21   recruitment plan within the law of a more longer period of

22   time.

23             THE COURT:  Well, let's put it this way.  The plan

24   can include something to the effect that you will have the

25   participation of universities, or the FBI Academy, for

1   example, but does not necessarily have to, at this time, have

2   an agreement with an university or with the Federal Government

3   to have officers be trained at the FBI Academy or any other

4   law enforcement academy.

5          I believe that everybody goes to Quantico.  Is that

6   correct, Mr. Torres?  Everybody is trained at Quantico, all

7   the agencies?

8          MR. TORRES-RIOS:  We have one in -- FLETC in Glynco,

9   Georgia, for the Department of Homeland Security, the FBI, and

10  the DEA they will go --

11         THE COURT:  Okay.  Speak with Mr. Torres.  Maybe he

12  has ideas.

13         So I think what Mr. Romero is requesting is not -- is

14  not a plan that would already include an agreement or

15  agreements with universities, or colleges, or junior colleges,

16  or the Federal Government, but at least a plan that would say,

17  that would indicate that that is something that will be done.

18         MR. PENAGARICANO:  Understood, Your Honor.

19         THE COURT:  Okay.  All right.  Mr. Saucedo.

20         MR. SAUCEDO:  Yes, Your Honor.

21         We were aware last year that this bill was working

22  its way through the legislature, and at that time reserved any

23  comment on the specifics, because we didn't want to influence

24  that.  And we knew that the executive was going to have a

25  chance to weigh in and ensure that the bill would not conflict

```
 1   with its obligations in this case.  That has been what we have

 2   seen, that the bill that was signed on its face does not

 3   conflict.

 4          The only concern that we have is -- and we applaud

 5   that the legislature has validated that, to be an officer, you

 6   need at least an associate's degree or its equivalent.  That's

 7   a plus.

 8          THE COURT:  Is there a grandfather clause, or what

 9   about current officers that do not have an associate's degree?

10          MR. SAUCEDO:  Your Honor, my -- the Commonwealth has

11   been including --

12          THE COURT:  Are they grandfathered in?

13          MR. SAUCEDO:  Since the Consent Decree's in place,

14   the Commonwealth has been recruiting candidates with an

15   associate's degree, and that's what we have today.  At one

16   point in PRPB's history --

17          THE COURT:  But there are officers that do not --

18          MR. SAUCEDO:  There were waivers, yes.  That's

19   correct.

20          THE COURT:  Okay.  That's my question.

21          MR. SAUCEDO:  Since the Consent Decree, the

22   Commonwealth has recruited only candidates that have an

23   associate's degree.  And the only question we have is the law

24   providing a candidate three years to complete the associate's

25   degree.  And the question is, until they complete the Consent
```

1   Decree, they shouldn't -- or, excuse me, the associate's

2   degree, they shouldn't become officers.  They can do other

3   things, as Mr. Romero said, and other departments use cadets

4   for other purposes, but what we're talking about -- these are

5   people who need sound judgment.  These are people who need to

6   know how to interact with the public and peers in a work

7   environment.  They are forced to use force, including deadly

8   force, and they need to be able to justify why they did that.

9        An associate's degree provides at least some level,

10   that the candidate has some ability to be able to express

11   that.  It is true that the Consent Decree does not have a

12   minimum age requirement, and so, in that sense, there's no

13   problem with recruits coming in as cadets at 18.  It's when

14   they become sworn officers that we await to see, as part of

15   the plan and regulations that need to be developed, to see

16   whether there is any potential conflict here.

17        The Commonwealth has pledged to share that plan with

18   us as it works its way through, and we appreciate that

19   commitment.

20        THE COURT:  Well, that's important, because of what

21   you say.  I mean, I don't -- you know, some people who are

22   hired as cadets may need -- may finish their associate's

23   degree in less than three years, and some may need more, so

24   does that mean, because the statute says three years, that

25   they're -- they have to be let go?

1          MR. SAUCEDO:  Your Honor, my understanding is that

2    that is what the law says, that if you do not reach your

3    associate's degree, as of the date you're recruited as a

4    cadet, that you would be separated.  Now, the Commonwealth

5    could confirm that, but that's our reading of the statute.

6          MR. ROMERO:  Right.  It says, within two years, show

7    proof of working towards that, and within three years have

8    that.

9          THE COURT:  Mr. Penagaricano, is that -- I mean, the

10   statute says, if a cadet doesn't complete his or her

11   associate's degree in three years, it seems to me that they

12   would have to be separated.  And you've spent a whole lot of

13   money on a particular cadet, and then you have to let him go.

14   Is that the way it works?

15         MR. PENAGARICANO:  No.  The plan that has been

16   developed, as I was just told by Attorney Vazquez, it does not

17   go in that direction.  That will not be what's going to be

18   presented in the plan.

19         THE COURT:  Okay.

20         MR. ROMERO:  Your Honor, the bill states after two

21   years enrollment at the PRPB, must show proof of his or her

22   status regarding obtainance of an associate's degree.  That's

23   what it says, two years, has to show proof, and by three

24   years, has it.  But we'll work with PRPB, and -- obviously to

25   develop the cadet program.

1          THE COURT:  All right.  Mr. Del Carmen, any comments

2     on the cadet program?

3          MR. DEL CARMEN:  Yes, Your Honor.  I actually teach

4     at the FBI Academy as a guest instructor at Quantico, and I'll

5     be there in two weeks.  And I can tell you, as a college

6     professor of 25 years, and someone that teaches at the NA, the

7     critical issue I think is, is it reasonable for a human to

8     attain an associate's degree, which typically requires 60

9     hours, 60 academic hours in three years time.  And they may,

10    in fact, be able to do it.  I would actually say that

11    currently about 50 percent of our college body around the

12    United States, they're able to attain that, but they're

13    working toward it full-time.

14         And so the question really becomes, and I think I'm

15    pretty sure the Commonwealth is going to provide this, is what

16    is the definition of a cadet, and what are the dos and don'ts

17    of that cadet before that individual can attain that

18    bachelor's degree, and how aggressive --

19         THE COURT:  Associate's degree.

20         MR. DEL CARMEN:  I'm sorry.  Associate's degree.  And

21    how aggressive would that person be in attaining those 60

22    academic hours typically of an associate's degree.

23         THE COURT:  Because if a person is working as a

24    cadet, he would not be taking courses full-time.

25         MR. DEL CARMEN:  That -- and, again, they may have a

1  way of doing it, Your Honor, but as an university professor of

2  25 years, I can tell you I worked full-time and went to school

3  full-time, and it's very difficult to advance beyond 12

4  academic hours per semester.

5       And also, Your Honor, just for the record, because I

6  think it's noteworthy to say it, although we have -- you know,

7  my personal opinion is just that, but as an academic that's

8  been studying policing for 25 years, there's an overwhelming

9  amount of findings in the academic literature that correlate

10  not only a degree, but also age with less instances of use of

11  force.

12       And so, to Mr. Saucedo's point where he was talking

13  about an associate's degree, we have learned that there's a

14  correlation between critical thinking, and less excessive use

15  of force, and more professional endeavors.

16       In the City of Arlington, Texas, right between Dallas

17  and Fort Worth, where I reside, they have had in place for

18  over 15 years, maybe even 20, a bachelor's degree requirement

19  among officers.  And although you still find excessive force

20  instances there, in other words, they're not immune from

21  having them, but there is a lower rate there than other parts

22  of the United States, at the time when those were not

23  required.

24       So I just wanted the Court to know that, even though

25  obviously we --

1          THE COURT:  Well, I think that's why the agreement

2    calls for at least an associate's degree.

3          MR. DEL CARMEN:  Exactly, Your Honor.

4          THE COURT:  Okay.  So, Mr. Penagaricano, can you meet

5    with -- all of these things mean that you meet with the

6    Monitor, with Mr. -- or his staff, with Mr. Del Carmen, or his

7    staff, and Mr. Saucedo, to try to come up with something that

8    you all agree on.  And can you, within the next 45 days,

9    prepare a plan?  I'm not saying that you have to go out

10   running to all the universities.

11         MR. PENAGARICANO:  Sure.

12         THE COURT:  Which university has a criminal justice

13   degree here in Puerto Rico?

14         MR. PENAGARICANO:  I do not know the answer to that,

15   Your Honor.

16         THE COURT:  Does anybody?  Does anybody?  UPR?

17         Yes.  Ms. Serrano.

18         MS. SERRANO:  Good morning, Your Honor.

19         The Interamerican University of Puerto Rico offers a

20   complete degree in criminal justice, so does the University of

21   Puerto Rico, and there are several other colleges that would

22   be conducive toward a degree -- an associate's degree in

23   criminal justice.

24         THE COURT:  Okay.  All right.  So there you go.  You

25   have at least two, maybe more.

1    MR. PENAGARICANO:  Right.

2    THE COURT:  And you may want to get agreements with

3  more than one.

4    MR. PENAGARICANO:  Right.

5    THE COURT:  Okay.

6    MR. PENAGARICANO:  Thank you, Judge.

7    THE COURT:  But for now I don't need for you to do

8  that.  I need for you to say that you will contact or make

9  arrangements or agreements with universities who can assist in

10  getting these cadets, or anybody else in the system, to get

11  their associate degrees.  Okay?

12    MR. PENAGARICANO:  Yes, Your Honor.  Thank you.

13    THE COURT:  All right.  That -- if you want to put it

14  as something, a proposal, or if you want to present a proposed

15  regulation, whichever is easier for you.

16    MR. PENAGARICANO:  Thank you, Your Honor.  Yes.

17    THE COURT:  By February 10.  And I will take a look

18  at it by the end of February, February 28.

19    MR. PENAGARICANO:  (Nodding head up and down.)

20    THE COURT:  Which is a Monday.  All right?

21    MR. PENAGARICANO:  Yes.

22    THE COURT:  Okay.  Thank you.

23    All right.  Mr. Romero, the last issue that I see in

24  your notes is budget.

25    Pay attention, Ms. Ortiz.

```
 1            MS. ORTIZ-RIVERA:  (Nodding head up and down.)
 2            THE COURT:  Go ahead, Mr. Romero, please.
 3            MR. ROMERO:  Your Honor, the Commonwealth confirms
 4   whether -- we were provided information about the budget as
 5   requested by the Court, and we looked at it along with the
 6   special master's office and U.S. DOJ.  Our comments are brief.
 7            We believe the Commonwealth should confirm whether
 8   unspent funds in fiscal year 2021 and prior years can be used
 9   in fiscal year 2022, carried over.  We also believe the
10   Commonwealth should subscribe -- describe the process it uses
11   to determine whether expenses are related to reform.  The
12   Commonwealth should have appropriate procedure in place to
13   ensure that expenses advance the reform process.
14            And, lastly, the Commonwealth should explain why a
15   significant amount of funds are unspent each year.  We believe
16   if 20 million dollars is allocated, it should be spent,
17   because there are a number of needs.  You indicated radios and
18   other issues.  These are legitimate expenditures.  And we
19   think that, in any given year, the 20 million dollars should
20   be spent, and if it's not for whatever reason, it should be
21   carried over, because there are a number of expenses PRPB is
22   going to need as it relates to the reform.
23            Those are our comments, Your Honor.
24            THE COURT:  All right.  Mr. Penagaricano, I would
25   hope that you agree that any funds that are not spent during a
```

1  particular fiscal year can and should be carried over to the

2  next fiscal year.  So is that something that would help?

3          MR. PENAGARICANO:  Yes, Your Honor, and I think in

4  some instances, it does.  But if I may comment briefly?

5          THE COURT:  Yes.

6          MR. PENAGARICANO:  I heard the comments to the budget

7  report submitted.  We are hearing them for the first time.  No

8  problem.  I know when we submitted them originally on December

9  17, the Court ordered the parties to let the Commonwealth know

10  their comments, so we could work on them, provide answers, dig

11  into it, and we will.  We took note of the three comments, and

12  we will, but today's the first time we hear them.

13          THE COURT:  Okay.  Sure.

14          MR. PENAGARICANO:  Thank you.

15          THE COURT:  All right.  So does -- I have heard, or

16  the Monitor has indicated to me, that for fiscal years 2019,

17  2020, and 2021, over 12 million dollars remain unspent.  Am I

18  correct?  Total?

19          MR. ROMERO:  That's what we understand is correct,

20  Your Honor.

21          THE COURT:  I'm sorry --

22          MR. DEL CARMEN:  May I address the --

23          THE COURT:  Thank you, Mr. Del Carmen.

24          MR. DEL CARMEN:  So, Your Honor, I want to remind the

25  Court that in December, or soon before that, the Court asked

1    the special master's office to review the documents that were
2    submitted by the Commonwealth related to budget expenditures
3    in conjunction with U.S. DOJ and the Federal Monitor.  So as
4    the Commonwealth just noted, they submitted the budget items,
5    and U.S. DOJ provided their comments, their feedback, and the
6    Federal Monitor provided their feedback, and we also provided
7    some input.

8         Collectively, what we found is that there is a
9    pattern for the past three years, in 2019, 2020, and 2021 of
10   unspent funding.  In fact, if you add it up and you do the
11   math, it's a little bit over 12 million dollars.  In addition
12   to that, just recently, we went back to some of the
13   transcripts related to the court, and on 8-20-18, in that
14   particular hearing that took place, Judge Gelpi noted that
15   there were almost 20 million dollars that had not been spent
16   in a five-year period.

17        In addition to that, we really have questions about
18   some of the expenditures, and some of the items that were
19   actually provided on the actual budget line were not clear.  I
20   want to be careful in noting that we're not accusing or
21   raising any innuendoes that would suggest anything but the
22   appropriate expenditure of these funds.  But I do want to say
23   that we found collectively, again, this is not just my office,
24   but U.S. DOJ, special master's office, as well as the
25   monitor's office, we found more questions than answers, Your

1    Honor.

2           And one final note that I wanted to make you aware is

3    that we did not see, and I think Counsel Saucedo may provide

4    some additional comments here, but we did not see the budget

5    or the expenditures for '18.  I think the counsel had

6    communicated, the Commonwealth, that they were trying to find

7    those items, but -- you know, relevant to the budget, but they

8    were not given to us at the time that this was submitted.  So

9    I just wanted to inform the Court of that, and take that full

10   consideration, Your Honor.

11          THE COURT:  Okay.  Mr. Saucedo.  Wait a minute,

12   Mr. -- you'll get another turn.

13          MR. PENAGARICANO:  Thank you.

14          MR. SAUCEDO:  Yes, Your Honor.

15          The United States did share its comments with the

16   Commonwealth at a biweekly meeting on Tuesday.  We did

17   indicate that there was a significant amount of unspent funds

18   during this three-year period, but, Your Honor, if I may, I

19   was involved in this case, I have negotiated the Consent

20   Decree, and was with two administrations, and this was in

21   2012, and it was unclear to us at that time what funds would

22   be available for the Commonwealth to use to reform the Police

23   Bureau.  The bottom had not hit at that point in 2012.

24          And so, Judge Gelpi asked us if all we have are fumes

25   to get this going.  Like, what are we going to use to pay for

1   reform.  And the only thing available at that point were

2   equitable sharing funds.  These are funds the Commonwealth

3   gets from the Federal Government when they assist or support

4   in confiscating property.  However, the Commonwealth did

5   pledge 20 million dollars every year towards reform, and the

6   importance of that is monumental in this case, because for so

7   long, PRPB had only, through its operating budget, been able

8   to pay for payroll.  There was very little left over to

9   address growing and modernizing.

10          So, in many ways, this 20 million dollars that was

11  pledged by the Commonwealth was a way to reinvest back for all

12  the time that those investments were not made.  So it's of

13  vital importance, and we appreciate that every single year

14  since this case was entered in 2013, the Consent Decree, the

15  Commonwealth has allocated 20 million dollars.

16          The problem, as Dr. Del Carmen mentioned, in 2018 --

17  is we discovered that a large portion of that funding had gone

18  unspent, and it went to the General Fund.  It was not

19  available for use anymore.  That's why Judge Gelpi directed

20  the Commonwealth to do monthly reporting, so we can avoid the

21  situation where, when we lack critical equipment, that we

22  don't have -- you know, in the case of 2019, 2.8 million

23  dollars going back; 2020, it was 4.2; and in 2021, that's 5.3

24  million dollars lost.

25          And so we appreciate the Court's Order.  The

1   Commonwealth has committed to providing monthly reports on

2   this, and I think going forward, with more eyes on this, it's

3   helpful.

4           THE COURT:  They've already provided the first

5   report.

6           MR. SAUCEDO:  Yes, Your Honor.  The Commonwealth has

7   filed its first report for December of 2021 on that, but I

8   just want to emphasize how important it is -- and it's not

9   just 20 million dollars.  The Commonwealth has received other

10  funding for PRPB for capital expenditures and for other human

11  resources needs related to the agreement, so all of that

12  should be included as part of future monthly reports, not just

13  the 20 million dollars.  That's a positive step, but there are

14  other allocated, earmarked funds that should be going to

15  reform that should be part of the Commonwealth's monthly

16  report.

17          THE COURT:  Is that in addition to the ones that were

18  not spent in previous years?

19          MR. SAUCEDO:  This is in addition to those that were

20  unspent, Your Honor.

21          THE COURT:  Okay.  How much -- how much are you

22  talking about?

23          MR. SAUCEDO:  Well, I know that, for example, in

24  2020, I think the Commonwealth received an extra infusion of

25  11 million dollars for technology, so those special

1  allocations should be included as part of the 20 million

2  dollars that's infused for reform.

3            THE COURT:  Mr. Penagaricano, please.

4            MR. PENAGARICANO:  Thank you, Your Honor.  Your

5  Honor, just a few things.  First, Counsel Saucedo is right.

6  He did share that comment of unspent funds this past week

7  after the report was submitted.  However, we never heard other

8  comments from the Monitor or the Special Master before today,

9  and we will address them after today, after speaking with the

10 entire team.

11           And regarding budget, the entire team goes beyond the

12 reform office, because it's the budget office of the police,

13 the entire Police Bureau, and not only devoted to the reform

14 process.  So it's a larger conversation.

15           THE COURT:  Is the 20 million dollars that have

16 been -- that you indicated will be for the reform, is that

17 separate from the overall budget of the Bureau?

18           MR. PENAGARICANO:  We believe it is, yes.

19           THE COURT:  All right.  Good.  Go ahead.

20           MR. PENAGARICANO:  So, Your Honor, you ordered on

21 November 15 to submit the monthly reports dating back to 2018.

22 We -- and ordered the other parties to provide comments to us,

23 questions, recommendations, and we welcome all of them.  Now,

24 on December 17th, we submitted whatever we were able to

25 collect up to December 17, which was the vast majority of the

1  reports, but we were unable to locate by then, by December 17,

2  we weren't able to locate the 2018 reports, which Dr. Del

3  Carmen mentioned a few minutes ago.  Very recently we did

4  locate those reports, and we will submit them very shortly.

5  The entire fiscal year 2018, and some other reports of fiscal

6  year 2019 that were also missing in our December 17 filing, we

7  will also submit them.

8        And it is completely understandable if plaintiff has

9  questions about it, and the Special Master, and the Monitor.

10  And just as directed by the Court, I think, because this is so

11  recent, I think we should afford a process whereby they can

12  formulate whatever comments, or initiate a process of them

13  letting us know their comments, and we can address them with

14  our entire team, because it is a complex issue that goes

15  beyond Captain Figueroa's team.  It goes beyond his team.  It

16  goes to the budget office of the entire Police Department.

17        So we would welcome that process, because certainly

18  we're not going to have answers to other questions today.  The

19  numbers that Counsel Saucedo provided of unspent funds, very

20  respectfully, I'm not sure those are correct figures of

21  unspent funds, but at the same time, we have to admit, Your

22  Honor, that we cannot tell you right now an exact figure of

23  unspent funds, precisely because it's part of a larger

24  conversation.  And we're not -- we don't have that

25  information.  Captain Figueroa doesn't have that information

1  right now.

2          So we welcome the process to try to get to the bottom

3  of it, and -- together with all the parties, and try to get

4  the answers in the process, and try to get all those numbers

5  straight, so the 20 million dollars are, as they were intended

6  to, properly spent in the development of the reform process.

7          THE COURT:  All right.  So --

8          MR. SAUCEDO:  Your Honor, just --

9          THE COURT:  Yes.

10          MR. SAUCEDO:  The way we figured out the unspent

11  funds is from the information submitted by the Commonwealth,

12  which was you take the 20 million dollars, those funds that

13  were paid out, and those funds that were obligated, and we

14  subtracted those from the 20 million dollars, which their

15  data, their tables showed were unobligated at the end of the

16  fiscal year.

17          I want to be clear, Your Honor, that the United

18  States is not -- was not in a position to know whether a

19  certain fund, a certain expenditure, whether the Commonwealth

20  got what it paid for, whether it was related to reform.  I

21  agree with Counsel Penagaricano that that should be part of

22  the ongoing monitoring.  The Monitor and the United States,

23  the parties will have access to that information on an ongoing

24  basis.  It's important for Mr. Cragg, Ms. Serrano, the experts

25  that are looking at particular areas of the Consent Decree to

1  know that specific purchases are being made to advance reform,

2  purchase equipment.  It's important for the monitoring team to

3  be aware of that.

4          So we anticipate it's really an ongoing discussion,

5  if there's a question about a particular expense, that we're

6  getting these monthly reports to be able to have that dialogue

7  and that back and forth.

8          MR. PENAGARICANO:  Yes.

9          THE COURT:  So, as I see it, there are two issues

10  here.  One is reports to be provided by the Bureau, of which

11  they've already provided the first report.  The other issue is

12  what to do with these unspent funds.  And my -- I think that

13  those unspent funds, if they were what -- when they're -- let

14  me ask Mr. Penagaricano, if they're not used, where do they

15  go?

16          MR. PENAGARICANO:  As we understand, unused funds go

17  back to the Treasury.

18          THE COURT:  Okay.

19          MR. PENAGARICANO:  To the General Fund account.

20          THE COURT:  Well, I think you should do everything

21  possible to get them back, because, you know, all through this

22  morning, all I've heard is the need for funds.  So what I -- I

23  don't know, and Mr. Saucedo has indicated an amount.  You say

24  you don't know what the amount is.  I think you should meet,

25  try to come up with an amount.

1          Let's just start with fiscal years 2019, 2020, and

2    2021.  Mr. Saucedo says it's over 12 million dollars.  It may

3    be more.  It may be less.  I don't know.  But I'd like to have

4    an amount, so I can issue an order to the Commonwealth saying

5    that those funds that were unspent during those fiscal years

6    be returned to the Bureau for use in the reform.

7          Whether all of them would be used in this current

8    fiscal year, or spread out between this fiscal year and future

9    fiscal years, I don't know, but I think you need that money.

10   And I think the reason for these future reports is to make

11   sure that the 20 million dollars are spent.

12         Now, Mr. Saucedo also mentioned some other monies

13   that are available, and I would like to know the amount of

14   that money, and where it comes from, because that's another --

15   that's more money that you can use for reform.  I think he

16   mentioned 11 million dollars for IT, and from what I hear from

17   Captain Figueroa, he would love to have 11 million dollars for

18   IT.

19         So when can you -- you know, can you meet and

20   determine how much unspent funds were -- how much funds were

21   not spent during those three fiscal years, 2019, 2020, and

22   2021; how much other monies are available for you; and let me

23   know by the end of the month?  Can you do that?  Because what

24   I want to do is to get that money back to you.

25         MR. PENAGARICANO:   (Nodding head up and down.)

1          THE COURT:  Can that be done, Mr. Penagaricano?

2          MR. PENAGARICANO:  Yes, Your Honor.  We will meet

3   with the appropriate --

4          THE COURT:  All right.

5          MR. PENAGARICANO:   -- entities within the agency.

6          THE COURT:  I don't know what the -- how to go about

7   it.  I mean, maybe your people at OMB can tell you, because

8   that's -- well, it's money that was yours, and if they were --

9   if someone else is using it for something else, that's too

10  bad, really.  It's your money, and you should have it back.

11         MR. PENAGARICANO:  Perhaps, Your Honor, can we be

12  afforded a period of 30 days?

13         THE COURT:  Okay.  Sure.  Let's do it again, by

14  February 10, just like the other one, okay?

15         MR. PENAGARICANO:  Yes.

16         THE COURT:  Is that okay, Mr. Saucedo?

17         MR. SAUCEDO:  Yes, Your Honor.

18         THE COURT:  Mr. Del Carmen?

19         MR. DEL CARMEN:  Yes, Your Honor.

20         THE COURT:  Mr. Romero?

21         MR. ROMERO:  Yes, Your Honor.

22         THE COURT:  All right.  And we'll move from there,

23  and when you have all that money, then you can start making

24  your future filings, including that money and what you -- what

25  you agree should be -- on which it would be spent.

1      So that's all I have.  Is there anything else that

2 you would like to bring to the attention of the Court?

3 Mr. Penagaricano?

4      MR. PENAGARICANO:  Not on our end, Your Honor.  Thank

5 you.

6      THE COURT:  Mr. Saucedo?

7      MR. SAUCEDO:  Your Honor, we did have one issue we

8 wanted to bring to the Court's attention, and that is that

9 under the agreement, the Commonwealth and PRPB is supposed to

10 participate in the FBI's National Incident Based --

11      THE COURT:  Oh, NIBRS.

12      MR. SAUCEDO:  -- Reporting System.  Yes, Your Honor.

13 So that the law enforcement agencies submit crime information

14 to the FBI, and it needs to be submitted in a uniform way, so

15 that the FBI can crunch and analyze that data, and be able to

16 compare and be able to analyze crime trends around the country

17 over time.  The FBI has updated that system, the NIBRS.  It's

18 refers to as NIBRS, National Incident Based Reporting System.

19 That is the new way of reporting crime, and it's contemporary.

20      The old way of reporting crime was that there

21 was a -- the highest offense rule, that only one -- if there

22 were multiple crimes in an incident, that only the highest,

23 the more serious one would be reported.  Now all of the other

24 crimes that are part of an incident get reported.  There's a

25 lot more data.

 1          THE COURT:  So if there's a carjacking with a murder,

 2     you report both.

 3          MR. SAUCEDO:  That's correct, Your Honor.

 4          THE COURT:  Not just the murder.

 5          MR. SAUCEDO:  That's correct, Your Honor.  There is a

 6     reason that it's taken time for the FBI to implement and roll

 7     this out to all participating law enforcement agencies.  The

 8     Commonwealth agreed to participate and to submit data to the

 9     FBI in a NIBRS-compliant manner, as part of this case.  The

10     problem we learned about, Your Honor, is that the FBI needs to

11     certify that PRPB has the controls in place to be able to

12     report data the way that it needs to be reported.  And our

13     understanding was that if the Commonwealth was not certified

14     by the end of 2021, that they would not be able to make the

15     submission, the first submission by March of 2022.  So in the

16     next couple of months.  And that could set PRPB back for an

17     entire year.

18          So we wanted to bring this to the Court's attention,

19     because the FBI has done a lot to train PRPB, but PRPB needs

20     to carry the weight to train its officers on the new way of

21     reporting crime.  And the community needs to be prepared about

22     how crime will be reported.  People might see that what used

23     to be, you know, ten murders, you know, or whatever the number

24     of offenses were, multiplies.  It's not that the level of

25     crime has risen.  It's just the way of counting and reporting

1   crimes has changed.

2          So there's a lot of work that needs to be done to

3   share this with the community, to partner with them to know

4   it's coming.  Researchers rely on this information.  Budget

5   people rely on this information.  Agencies rely on it to

6   figure out what resources they need.  So we are concerned that

7   the Commonwealth may not be certified in time to make its

8   first compliance submission to the FBI, and wanted to bring

9   this to the Court's attention.  I know that the PRPB has been

10  working on it, but that window has just, over time, over years

11  since we entered into this agreement, has been closing.

12         THE COURT:  What you're saying is they won't be able

13  to do it by Monday --

14         MR. SAUCEDO:  That's correct, Your Honor.  Our

15  understanding is they will not be certified in time to make

16  the first submission this year.

17         THE COURT:  So when will you be able to do it,

18  Mr. Penagaricano?

19         MR. PENAGARICANO:  Your Honor, as Mr. Saucedo pointed

20  out, it's a work in progress.  And there was a manual

21  submitted to the parties, approved, but it has to be amended

22  after FBI validation.  And it's in the process of being

23  resubmitted with the amendments.  So as to a time frame, I'll

24  ask the Court to allow me to ask Captain Figueroa.  He'll have

25  a better idea of when that can be --

1          THE COURT:  Okay.  Captain Figueroa, please.

2          CAPTAIN FIGUEROA-ORTOLAZA:  Yes.  With regard to the

3     process, next Tuesday I have a meeting with technology, which

4     is the final validation of the incident report that is

5     already -- that has already been submitted to test it with the

6     FBI, certification under the FBI.  And it's as a result of the

7     findings made by the FBI we are making corrections, and we are

8     expecting to submit it by this Tuesday.  When we finish it on

9     Tuesday, we will submit it again to the FBI, and that may take

10    approximately a month.  Until -- once the changes are

11    approved, it would be to update the technology system, to be

12    able to update it and put all the updated information.

13         The manual was approved by the parties.  However,

14    because of these changes, we will send them with the

15    additional changes to have it finally approved, and to also

16    begin with the training.  And that will, as Mr. Saucedo very

17    well stated, entail orientation to the community as to what

18    the processes entail.  That would be all.

19         THE COURT:  So you mentioned that it would be

20    submitted to whom?

21         CAPTAIN FIGUEROA-ORTOLAZA:  Well, the FBI has a large

22    enough error that it should be less than four percent, so in

23    terms of what we were submitting, it depended on what the

24    controlled substances would be, whether it's grams or pound.

25    So that's what we have been correcting lately, for them to

1  finally approve it.

2        THE COURT:  Before you submit it to the FBI, will you

3  have to submit it to the Monitor?

4        CAPTAIN FIGUEROA-ORTOLAZA:  That was already

5  submitted to the Monitor, so these are things that the FBI

6  requires.  I understand that this has all been already

7  included in the manual.  The processes can run parallel.

8        THE COURT:  So when would you finally submit this,

9  submit it to the FBI?  No.  When?  When?

10       CAPTAIN FIGUEROA-ORTOLAZA:  We expect that if we are

11  done with it on Tuesday, and the -- in the following week,

12  this week or the following week we'll be submitting it to the

13  FBI completely.

14       THE COURT:  Would that be for their comments from the

15  FBI?

16       CAPTAIN FIGUEROA-ORTOLAZA:  What the FBI does is it's

17  a system that we submit it and it validates it to make sure

18  that it complies with what they require.

19       THE COURT:  All right.  So what I would like you to

20  do, Captain Figueroa, is when you submit it directly to the

21  FBI, please give a copy to Mr. Romero and Mr. -- and Mr. Del

22  Carmen and Mr. Saucedo.  And when you get whatever comments

23  you may receive from the FBI, submit it to them, also.  Can

24  you do that?

25       CAPTAIN FIGUEROA-ORTOLAZA:  Yes.

1           THE COURT:  Okay.  Very well.  Anything else?

2           MR. SAUCEDO:  No, Your Honor.  The United States, we

3    don't have any other issues.

4           THE COURT:  Okay.  All right.  I mean, we've been at

5    it for three hours.  What I'm going to ask my courtroom deputy

6    clerk is that once he prepares the minutes, before they're

7    filed, I will have them -- I will have him provide them to

8    you, Mr. Saucedo, Mr. Del Carmen, Mr. Romero, Mr. Cragg,

9    Mr. Penagaricano, Mr. -- and you can discuss it with Captain

10   Figueroa, Mr. Torres, and commissioner -- Secretary Torres,

11   and Commissioner Lopez to make sure that everything that you

12   understood was discussed today is in the minutes.  I want

13   these minutes to be as complete as possible.  Okay?

14          MR. PENAGARICANO:  Yes.

15          THE COURT:  Okay.  One last thing.  We've been

16   talking about budget and money.  If anybody remembers the

17   *Morales Feliciano* case, the last judge who had it, was in

18   charge of that case was Judge Barbadoro from New Hampshire,

19   who was assigned by the First Circuit to wrap up the case.

20   Before then, Judge Perez-Gimenez had the case.  And I can't

21   remember who had it before Judge Perez-Gimenez.  But the way

22   that -- at least I know that the way Judge Perez-Gimenez

23   handled things that were not done was to impose fines, and, to

24   me, it didn't work.  It didn't work.

25          And I'm -- what I gather from all of you, from you,

```
1    Mr. Penagaricano, from Captain Figueroa, from Secretary
2    Torres, from Commissioner Lopez, from Mr. Saucedo, from
3    Mr. Romero, from Mr. Del Carmen is that everybody is on board
4    to get this thing done.  And I don't -- I don't foresee any
5    problem in the future, except perhaps, except perhaps with
6    other agencies of the government, which may put road blocks in
7    your way.  I want to know about that, because although OMB and
8    FOMB have the power of the purse, I have contempt power, so
9    you better tell them that I don't mince any words.
10           There's an old joke that when Sigmund Freud died and
11   went to heaven, St. Peter told him that they were glad to
12   receive him in heaven.  And St. Peter -- and Sigmund Freud was
13   taken aback.  He said, you need a psychiatrist in heaven?
14   What for? And St. Peter says, it's him.  It's the Lord.  He
15   says, what's wrong with the Lord?  He thinks he's a Federal
16   District Judge.
17           So with that, I'll leave you, and thank you very much
18   for coming.  And, you know what, I will want to see you often.
19   Not too often, but often.
20           And, Ms. Ortiz, please tell the people from OMB, from
21   FOMB, from the General Services Administration, and from the
22   Human Resources Agency, which has that long name, that I may
23   want them here in court.
24           MS. ORTIZ-RIVERA:  I will, Your Honor.
25           THE COURT:  So they can hear what's going on.
```

1      MS. ORTIZ-RIVERA:  (Nodding head up and down.)

2      THE COURT:  Because the Bureau needs help in getting

3  these things done.

4      MS. ORTIZ-RIVERA:  (Nodding head up and down.)

5      THE COURT:  All right.

6      MS. ORTIZ-RIVERA:  (Nodding head up and down.)

7      THE COURT:  Anything else?

8      (No response.)

9      THE COURT:  Thank you very much.

10     MR. PENAGARICANO:  Thank you.

11     MR. SAUCEDO:  Thank you.

12     COURTROOM DEPUTY:  All rise.

13     THE COURT:  And, Mr. Torres, Captain Figueroa,

14  Commissioner Lopez, remember what we talked about at side bar.

15  Get that done.

16     All right.  Thank you.  You're excused.

17     (At 12:34 PM, proceedings concluded.)

18                    *     *     *

19

20

21

22

23

24

25

1  U.S. DISTRICT COURT    )

2  DISTRICT OF PUERTO RICO)

3

4      I certify that this transcript consisting of 114 pages is

5  a true and accurate transcription to the best of my ability of

6  the proceedings in this case before the Honorable United

7  States District Court Judge Francisco A. Besosa on January 14,

8  2022.

9

10

11

12

13  S/ Amy Walker

14  Amy Walker, CSR 3799

15  Official Court Reporter

16

17

18

19

20

21

22

23

24

25