June 2022

# 6th Report of the Federal Monitor

Covering the Period from October 2021 through March 2022

Compliance status of the Puerto Rico Police Bureau in accordance with the Federal Court approved Settlement Agreement between the United States Department of Justice and the Commonwealth of Puerto Rico

John Romero
Federal Monitor

## Table of Contents

INTRODUCTION ........................................................................................................................... 4

    General Background on the Agreement and Monitoring Process ........................................... 4
    Scope and Methodology ...................................................................................................... 5
    Monitoring Activities During CMR-6 .................................................................................... 6
    Key Findings of the Monitor's 6th Report ............................................................................ 7

I. PROFESSIONALIZATION .......................................................................................................... 9

II. USE OF FORCE ...................................................................................................................... 10

    1. General Provision ........................................................................................................... 13
    2. Specialized Tactical Units .............................................................................................. 17
    3. Crowd Control Policies and Performance ....................................................................... 24
    4. Force Reporting ............................................................................................................. 30
    5. Force Review, Investigation, and Analysis ...................................................................... 36
    6. Supervisory and FRB Reviews ........................................................................................ 39
    7. FIU Investigations and Force Reviews by SFRB ............................................................... 46
    8. Use of Force Training ..................................................................................................... 53
    9. Responding to Behavioral/Mental Health Crisis ............................................................. 57

III. SEARCHES AND SEIZURES: INTERNAL CONTROLS AND ACCOUNTABILITY ........................... 63

    1. Stops, Searches, and Seizures ........................................................................................ 65
    2. Investigatory Stops and Searches .................................................................................. 65
    3. Arrests .......................................................................................................................... 70
    4. Searches ........................................................................................................................ 80
    5. Training on Stops, Searches, and Seizures ...................................................................... 83

IV. EQUAL PROTECTION AND NON-DISCRIMINATION ................................................................ 84

    1. General Provisions ......................................................................................................... 84
    2. Discriminatory Policing .................................................................................................. 89
    3. Sexual Assault and Domestic Violence ........................................................................... 94

V. RECRUITMENT, SELECTION, AND HIRING .............................................................................. 99

    1. Recruitment Plan ......................................................................................................... 102
    2. Hiring Reforms ............................................................................................................ 105

VI. POLICIES AND PROCEDURES .............................................................................................. 111

VII. TRAINING ......................................................................................................................... 112

    1. Pre-Service Education and Training .............................................................................. 114
    2. Field Training Program ................................................................................................. 120
    3. In-Service Training ....................................................................................................... 127
    4. Training Records .......................................................................................................... 133

VIII. SUPERVISION AND MANAGEMENT ................................................................................... 137

    1. Duties of Supervisors ................................................................................................... 139
    2. Supervisor Training ..................................................................................................... 148
    3. Performance Evaluation ............................................................................................... 152
    4. Early Identification System ........................................................................................... 154
    5. Internal Audits and Interagency Feedback .................................................................... 161

IX. CIVILIAN COMPLAINTS, INTERNAL INVESTIGATIONS, AND DISCIPLINE ................................ 167

1. Civilian Complaints ................................................................................................ 169
2. Internal Investigations .......................................................................................... 172
3. Complaint Intake, Classification, Assignment, and Tracking ............................... 176
4. Investigation of Complaints ................................................................................. 186
5. Staffing, Selection, and Training Requirements .................................................. 203
6. Preventing Retaliation ......................................................................................... 206
7. Discipline ............................................................................................................. 207
8. Officer Assistance and Support ........................................................................... 210

**X. COMMUNITY ENGAGEMENT AND PUBLIC INFORMATION** ..................................... **215**
1. Community Oriented Policing ............................................................................... 220
2. Community Interaction Councils .......................................................................... 227
3. Public Information ............................................................................................... 235

**XI. INFORMATION SYSTEMS AND TECHNOLOGY** ...................................................... **242**

**APPENDIX A: BACKGROUND TO PRPB MONITORING MISSION** ................................... **251**

**APPENDIX B: METHODOLOGY** ................................................................................... **253**

**APPENDIX C: COMPLIANCE STATUS BY PARAGRAPH AND SUB-SECTION** ................... **257**

**APPENDIX D: CADET PROGRAM MEMORANDUM** ......................................................... **260**

## Introduction

This report will outline the current compliance status of the Puerto Rico Police Bureau (hereafter, "PRPB" and at other times "the Bureau") with the federal court approved Settlement Agreement (hereafter, the "Agreement" and/or "Consent Decree"). It was prepared by the Technical Compliance Advisor (hereafter, "the Monitor") pursuant to paragraphs 242, 251, and 252 of the Agreement to inform the court, the parties, and residents of the Commonwealth of Puerto Rico ("Commonwealth") about the status of the implementation and the level of compliance with the Agreement. The Monitor's Office (or "Monitoring Team") will make itself available to the Court, the Parties, and community groups to explain the Monitor's findings and the compliance assessments presented in the report.

### General Background on the Agreement and Monitoring Process

The Agreement was fashioned to provide PRPB officers with the tools, guidance, and resources that they need to reform unconstitutional policing practices and to bring the Bureau into line with generally accepted practices of constitutional policing and effective law enforcement. The Parties recognize that constitutional policing, effective law enforcement, and the community's trust in its police force are interdependent. Accordingly, the full and sustained implementation of the Agreement will guarantee constitutional rights and will consequently increase public confidence in PRPB and its officers. In addition, and perhaps most importantly, the Agreement also aspires to develop on the part of PRPB dynamic leadership and management skills aimed at transforming the Bureau for the benefit of the Commonwealth and its residents.

In a joint effort, the parties identified each of the following areas for improvement, enhancement, or reform in PRPB:

1. Professionalization;
2. Use of Force;
3. Searches and Seizures;
4. Equal Protection and Non-Discrimination;
5. Recruitment, Selection and Hiring;
6. Policies and Procedures;
7. Training;
8. Supervision and Management;
9. Civilian Complaints, Internal Investigations, and Discipline;
10. Community Engagement and Public Information; and
11. Information Systems and Technology.

To carry out necessary reforms in the above-mentioned areas, PRPB developed Action Plans for each of the named substantive areas. These Action Plans set forth in detail the steps agreed upon to execute and implement the reforms and achieve the desired outcomes in each area. Moreover, the above reforms also require the implementation of new or amended policies, practices, training, corresponding documentation, and internal review. All such activities, together with the monitoring of sustainable compliance, fall within the scope of objective oversight, analysis, and reporting of the Monitor.

4

During the capacity-building period, the Monitor assessed compliance based on the Commonwealth's own Action Plans, pursuant to Paragraph 240 of the Agreement. However, with the end of the capacity-building period, the mission of the Monitor's Office has changed. Beginning with CMR-1 and since October 2018, the Monitor has been assessing PRPB compliance in relation to the Agreement.

## Scope and Methodology

The Chief Monitor's Sixth Report covers the period between October 2021 and March 2022. CMR-6 covers nine of the eleven performance areas of the Agreement: 1) Use of Force (UOF), 2) Searches and Seizures, 3) Equal Protection and Non-Discrimination, 4) Recruitment, Selection, and Hiring, 5) Training, 6) Supervision and Management, 7) Civilian Complaints, Internal Investigations, and Discipline, 8) Community Engagement and Public Information, and 9) Information Systems and Technology. Per the monitoring methodology agreed on by the Parties, 179 paragraphs were scheduled for assessment in CMR-6, out of 212 total paragraphs which the Monitor's Office is tasked to assess. This report excludes the sections of the Agreement covering Professionalization and Policies and Procedures as well as specific paragraphs throughout the other sections that are assessed on an annual basis and were covered in CMR-5.

For each of these areas, the Monitor's Office presents its assessments based on the desk review of data that was provided by PRPB, as well as interviews, questionnaires, site visits, observations, and the current state of IT (see below for more details on the activities conducting during CMR-6). The collection, analysis, reporting, and public dissemination of data regarding the ongoing PRPB sustainable reform efforts were designed to strengthen and ultimately ensure public accountability and trust in PRPB. Therefore, the Agreement requires: a) that the Monitor's Office submit timely assessments as to compliance, as well as to PRPB achievements and impediments that the Bureau might be encountering; and b) that the Monitor's Office assist PRPB in finding solutions to all impediments to compliance until sustainable compliance is reached.

In agreement with the approved methodology, the Monitoring Team uses a combination of quantitative and qualitative methods to assess PRPB's compliance with the Agreement in the three areas of performance (policy, training, and implementation) selected for this report. Each paragraph in the Agreement has been assigned a methodology that was agreed on by the Parties and approved by the court. These methodologies include information on the data source, sampling method (if relevant), and compliance target. The compliance targets provided for each paragraph outline the objectives and thresholds PRPB must meet to reach full compliance with the paragraph. Further, if applicable, the compliance targets outline whether PRPB has incorporated the requirement into an implemented policy; trained all relevant personnel in the requirement and policy; and fully implemented the requirement in practice. As such, the compliance targets provide PRPB with a detailed pathway toward achieving full compliance.

Definitions for each of the compliance ratings used in the Monitor's assessment as well as additional detail on the assessment and sampling methodologies are provided in Appendix B.

## Monitoring Activities During CMR-6

Over the past six months the Monitor and his team conducted six field visits to PRPB's headquarters as well as various regions of the island including Ponce, Carolina, Fajardo, Aibonito, Mayagüez, and Humacao. At each of these field visits the Monitor visited the Area Command, District(s) within each Area, Highway Patrol Units, and other units at each location. At each location the Monitor met with Executive Command and PRPB personnel leading and/or involved in various units such as Centro de Mando, Radio Control, Community Interaction Councils (CICs,) Community Relations, and UOF.

These field visits provided an opportunity for the Monitoring Team to hear directly from supervisors and officers on the front line, speak with members of the Puerto Rican community, observe operations, receive system demonstrations, and validate the assessments they made as part of their review of the nearly four thousand policies, documents, certifications, audio recordings, and case files and reports provided for review during the CMR-6 reporting period. While on site, team members also participated in six system demonstrations on the Auxiliary Superintendency of Professional Responsibility (SARP) investigation module, Report Application, the Sexual Assault Module, the Domestic Violence Module, PTMS, and the UOF Module.

During this reporting period, the Monitoring Team also reviewed over 100 policies, forms (PPRs), and protocols under paragraph 229 of the Agreement. The policies included special tactics (General Order (GO) 112), recruitment (Recruitment Regulation), performance evaluation (GO 310), interactions with the community (GO 804 and 805), and interventions with minors (GO 633), among others.

Members of the team also observed a handful of PRPB community engagement efforts such as a Community Encounter conducted in San Juan, and a Public Safety Fair conducted in coordination with other public safety agencies on the island. The Monitoring Team also observed several training sessions conducted by the Auxiliary Superintendency for Education and Training (SAEA) and/or the Reform Unit including Field Training Officer (FTO) Training, Ethics (EA604), and the Expansion of Community Policing technical assistance training conducted in Bayamon. Team members were also present at various demonstrations and protests during this reporting period. These demonstrations provided another avenue with which to assess PRPB's operations and practices to ensure that they are in line with the Agreement.

During this reporting period, the Monitor, U.S. Department of Justice (USDOJ), the Office of the Special Master, PRPB, and IPSOS worked collaboratively to finalize the survey instruments for the community, PRPB personnel, and detainees. These three surveys are required to be conducted per paragraph 241 of the Agreement. IPSOS, the third-party service provider conducting these surveys, distributed the Community Survey and PRPB personnel survey during the CMR-6 reporting period. The survey on detainees is expected to be conducted during the CMR-7 reporting period. Analysis and reports presenting the survey results will be developed by IPSOS and are expected to be completed before the end of the 2022 calendar year.

In addition, during this reporting period, the Monitor and his team participated in two Status conferences. After the appointment of Honorable Gustavo A. Gelpi to the U.S. Court of Appeals for the First Circuit, the case was transferred to Honorable Francisco A. Besosa, Senior U.S. District Judge, on

6

October 18, 2021. The Status conferences held in January and March of 2022 renewed focus on the issues stalling progress in PRPB's reform, specifically in the areas Information Systems and Technology, UOF, and Supervision and Management. The district court made clear that the responsibility for reform of PRPB does not fall squarely on the Bureau but also rests on the shoulders of the broader Puerto Rican government and its leaders. Court orders for PRPB to work with the Monitor, the U.S. Department of Justice (USDOJ), and the Special Master on the development of plans for UOF, supervision, and IT subsequently followed these Status conferences. In the following months, the Monitor and his team worked closely with the parties to develop the plans to address the issues discussed in the Status conferences. As the reporting period ended, a joint stipulation on IT, an Agreement in Principle on Supervision, and a provisional plan to address the inconsistencies in UOF reporting were filed with the Court.

## Key Findings of the Monitor's 6th Report

During this reporting period, PRPB's efforts towards partial and/or substantial compliance with many of the paragraphs remained the same. The development and conduct of training on several of the revised policies and procedures continues to lag and be affected by the lack of a virtual training platform and COVID-19 related restrictions. Further, repeated issues like poor documentation of probable cause and the use of boiler plate language on arrest reports, failures in supervision to issue corrective actions, and exceeding timelines in Force Investigation Unit (FIU) investigations and Commissioner's Force Review Board (CFRB) evaluations of UOFs are just a few examples of issues continuously raised by the Monitor in his reports.

Overall, the compliance assessment in this report demonstrates stalled progress. Although PRPB has improved in the development of its policies and procedures, as was the case in CMR-5, significant progress needs to be made in the training and practical application of these policies and procedures, see figure one. Further, when examining the total paragraphs assessed in this report (N=179) in comparison to the previous report in which these sections and paragraphs were assessed (CMR-4; N=178), the Monitor notes PRPB's progress has remained relatively the same during this reporting period. For example, 66 paragraphs met partial compliance and 63 paragraphs were rated not compliant during this reporting period, in comparison to 63 paragraphs rated as partially compliant and 83 as not complaint in CMR-4. Further, when reviewed comprehensively, over 50 percent (N=93) of the paragraphs meet either partial or substantial compliance in CMR-6 in comparison to 48 percent (N=86) in CMR-4.



*Figure 1. Rate of Compliance Over Time*

Despite these challenges, the Monitor is encouraged by PRPB's progress with some paragraphs, particularly in internal audits or inspections, the FTO Program, and the Reform Unit's efforts on the expansion of community policing technical assistance in the various PRPB Area Commands across the island. During this reporting period, PRPB also begun its work on the data gap analysis and assessment. The efforts made by PRPB, particularly in the FTO Program and the community policing technical assistance across the Bureau represent areas in which PRPB is excelling and in line with best policing practices.

Further, the effect of the Court's increased focus on the continuing issues in UOF, supervision and management, promotions, and IT remains to be seen. If the plans, agreements, and stipulations are carried out as documented, progress in these areas will occur during the CMR-7 reporting period.

Over the next six months, the Monitor looks forward to assessing PRPB's progress on its implementation of the Provisional UOF Plan, collaborating with PRPB and USDOJ on the IT Needs Assessment, developing the IT Action Plan, and working with PRPB as it updates and implements its 2018 Staffing Plan to address its shortages of supervisors. The Monitor also stresses to PRPB to actively address or demonstrate actions taken to address the other issues raised in this report. Adequate resources and increased commitment and action to implement the reform is imperative to complying with the Agreement.

In the forthcoming report sections, the Monitor provides the assessment and analysis produced by the subject matter experts. All recommendations and assessments are offered in the spirit of collaboration with the sole objective of assisting PRPB in achieving a pathway to compliance.

8

# I. Professionalization

Professionalization is assessed on an annual basis. Paragraphs 12 – 21 were assessed in CMR-5 and will be assessed again in CMR-7.

## II. Use of Force

PRPB's inability to validate its UOF numbers has been a recurring problem identified in the Monitor's previous CMRs. For the CMR-6 period, PRPB continued to lack a mechanism to validate its reporting of UOF incidents, and the number of UOFs in those incidents. To address this issue PRPB revised its form PPR-126.2 (Complaint Card) to include additional fields that would capture the number and levels of force used by officers. PRPB also developed a Use of Force Dashboard to display the number of UOF incidents in real time.

In addition to the changes to PPR-126.2, PRPB also began requiring that all forms related to UOF reporting (PPR-605.1) and supervisor notification (PPR-605.3) be completed in the Global Technology Enterprise (GTE) System, thereby eliminating any handwritten paper copies of these reports. Although PRPB made an effort to address the inaccuracies in UOF reporting with the changes to PPR-126.2, the Monitor found that these changes further highlighted the procedural issues in the entire UOF reporting process and brought to light the inconsistences between the information documented in the initial complaint card (PPR-126.2), the officer's UOF report (PPR-605.1), and the Supervisor's Notification of UOF (PPR-605.3). In addition, in some instances, the Monitor also found that personnel were not completing these reports in GTE and continuing to use paper copies and/or were not completing these reports in a timely manner, as required by policy.

In January 2022, the Court held a status conference where the issues related to UOF, Supervision and Management, and IT were brought forth by the Monitor. As a result, the Court ordered PRPB to work with USDOJ, and the Monitor to develop a plan to address the inconsistencies in the UOF data. Over the proceeding months, the parties and the Monitor worked together to develop a provisional plan to address the issues with the UOF data in the immediate and noted that in the long term these issues would be assessed as part of the IT needs assessment.[1] A Provisional Plan for UOF Data was filled with the Court on April 13, 2022. The Provisional Plan establishes a revised process for validating information captured in the related UOF forms, increased accountability, and if implemented successfully, increased validity in the UOF reporting process.

Although the inconsistencies in the UOF data largely affect many of the paragraphs in this section, other topics such as FIU, Force Review Boards (FRBs), Crisis Intervention Training (CIT), SWAT, and crowd control procedures also affect PRPB's overall compliance with this section. As it relates to FIU, the Monitor's Office continues to remain concerned regarding the amount of time FIU is taking to complete its investigations. In almost all cases reviewed, the investigations were not completed within the 45-day requirement. Similarly, in the Monitor's review of CFRB evaluations, while the evaluations were objective, they also were not timely.

CIT, as like UOF, was also discussed during the January 14, 2022, Status conference. As PRPB expands its CIT program it should use the feedback and analysis of the pilot conducted in Arecibo to inform its approach and implementation of CIT in the other areas of the island. In response to the January 14, 2022, Status conference, the Court ordered PRPB to establish an evaluation committee tasked with conducting

---

[1] See Section XI. for more information on the IT Needs Assessment and Action Plan.

an evaluation of the CIT pilot in Arecibo. Since this time, PRPB has worked with USDOJ and the Monitor to establish this committee and identify potential evaluation methods and performance measures to gauge the impact of this program and inform the implementation of CIT Bureau-wide.

Overall, PRPB's compliance with the 36 paragraphs assessed during this reporting period within Use of Force reflect similar levels of compliance to what was noted in previous reports. In CMR-5, 53% of paragraphs (19 paragraphs) were assessed as partially compliant and 8% (3 paragraphs) were assessed as substantially compliant, in comparison to the current reporting period, where 53% of paragraphs (19 paragraphs) were found to be partially compliant and 17% (5 paragraphs) were found to be substantially compliant. The increased number of paragraphs in substantial compliance directly relate to the improved training, operations, and documentation related to STU units. Six of the thirty-six paragraphs (17%) were also noted as deferred in CMR-6, as a result of PRPB's recent efforts to address the inconsistency in UOF reporting. See figure 2.



*Figure 2. Use of Force: Paragraph Compliance Status*

## Paragraph 22: Use of Force - General Provisions

*PRPD officers shall use force in accordance with the rights, privileges, and immunities secured or protected by the Constitution or laws of the United States and the Commonwealth of Puerto Rico, and shall prohibit the use of unreasonable force. PRPD shall develop policies and procedures that enable officers to rely primarily on non-force techniques to effectively police; use force only when necessary; and de-escalate the use of force at the earliest possible moment.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | N/A | | Bi-annually |

|  Practice: | Not Implemented | Assessment Frequency | |
|---|---|---|---|

### Compliance Targets

Note: Compliance will be determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 23-57, and (2) the results of outcome assessments, pursuant to Paragraph 243.

### Compliance Assessment

As in previous reports, the Monitor's Office requested the following information: 1) number of incidents in which force was used and 2) how many officers used force in each incident. In response, PRPB provided information attesting that force was used 684 times in 404 incidents during the reporting period.

As previously stated PRPB's inability to validate its UOF numbers has been a recurring problem that has been identified in the Monitor's previous reports. For the CMR-6 period, PRPB continued to lack a reliable mechanism to validate its reporting of UOF incidents and the number of UOFs in those incidents.

To address this issue PRPB revised Form PPR-126.2 (Complaint Card) to establish the data elements necessary to collect the number of UOF incidents on a regular basis. Using the information collected in the PPR-126.2, PRPB also developed a Use of Force Dashboard to display the number of UOF incidents in real time.

Beginning in August 2021, PRPB required all UOF reports (PPR-605.1) to be entered into the GTE System thus eliminating paper copies of the report. In addition, field supervisors investigating UOF incidents were required to complete PPR-605.3 (Notification of Use of Force) in the GTE system.

To determine if this new process has produced accurate UOF numbers in comparison to what was globally reported by PRPB, the Monitor conducted several *spot checks*. For the first spot check, the Monitor's Office requested PPR-126.2 forms (Complaint Card) for all incidents in which force was reported for the months of October through December 2021, PPR-605.1 (UOF Reports), PPR-605.3 (Notification of Use of Force), and PRPB's global list of UOF for the same period. From that list a random sample of 25 UOF incidents was selected. Of the 25 case files reviewed, 13 (52%) had inconsistencies regarding the number of officers that used force across PPR -126.2, PPR-605.3, and the global list.

For the second spot check, the Monitor conducted a site visit to SWAT in January 2022 to review their UOF data. A review of the data revealed that the SWAT Unit was activated 29 times during the October to December 2021 period. During those activations, SWAT used force 15 times (pointing of a firearm, Level 3 UOF) while conducting entries which is standard operating procedure. However, only one UOF incident was reported in PRPB's global list or in the GTE system.

From these spot tests, the Monitor's Office concluded that the new system was not yet producing sufficiently reliable or valid UOF data. During the Monitor's subsequent site visits and zoom meetings with the Reform Unit, the Monitor discussed this topic with PRPB, who responded that it is working to resolve the discrepancy in UOF reporting and have prepared a draft "Work Plan Quality Report."

In February 2022, PRPB provided the Monitor's Office and USDOJ with a draft work plan addressing short-term, mid-term, and long-term goals for developing a verifiable UOF tracking system. The Monitor's Office and USDOJ reviewed the UOF Plan and recommended that PRPB consider implementing the plan on an interim or provisional basis as the IT Needs Assessment would also be examining this issue and related systems. The Monitor and USDOJ also recommended that PRPB combine the three phases proposed into one and use the UOF Report (PPR-605.1) as the source for determining the UOF numbers. Additional accountability measures were also proposed as part of the feedback provided.

Subsequent discussions with PRPB involved additional revisions to the provisional plan and eventually PRPB submitted a revised provisional plan to address the issues with the UOF tracking system to the Court on April 13, 2022. Nevertheless, at the conclusion of the CMR-6 reporting period PRPB's discrepancies in its UOF data continue.

*Pathway Forward*

The Monitor will reassess PRPB's progress in this area in CMR-7 and remains hopeful that PRPB will be able to produce more reliable data because of the implementation of its provisional plan.

## 1. General Provision

PRPB complies with applicable law and comports with generally accepted policing practices in its policy and training related to UOF, including training on less lethal weapons. The comprehensive UOF policy requires that PRPB categorize all reportable UOFs into multiple levels, grouped by degree of seriousness, and identify all force techniques used by officers. PRPB has provided the Monitor's Office with the requested case files for review under the applicable paragraphs. However, due to data validity issues, the Monitor's Office cannot verify that the UOF reports and investigations provided to the Monitor's Office reflect the total number of UOF incidents that occurred during the reporting period. Thus, we are unable to state that our assessments of these incidents are representative of all the UOFs during the reporting period.

PRPB continues to prohibit the use of CN gas as verified through on-site inspections. In addition, PRPB continues to qualify personnel in the use of firearms. However, a Global List noting all qualification trainings hours for all PRPB officers was not provided. Because of these continued shortfalls, PRPB remains in partial compliance with many of the paragraphs in this section.

### Paragraph 23: Use of Force - General Provisions

*PRPB complies with applicable law and comports with generally accepted policing practices. The comprehensive use of force policy shall categorize all reportable uses of force into multiple levels, grouped by degree of seriousness, and shall include all force techniques, technologies develop a comprehensive and agency- PRPD shall wide use of force policy that, and weapons, both lethal and less-lethal, that are available to PRPD officers, including officers assigned to specialized tactical units. The comprehensive use of force policy shall clearly define and describe each force level option and the circumstances under which each force level is appropriate. The highest level of force described by the policy shall include all serious uses of force, as defined in this Agreement.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| 1. Policies incorporate all of the requirements of Paragraphs 22-24. | ☑ Met   ☐ Missed |
|---|---|

*Compliance Assessment*

The Monitor's office reviewed 53 UOF incidents and determined that the force used by officers were accurately categorized into levels grouped by the degree of seriousness. However, due to the data validity issues noted above, the Monitor's Office cannot verify that the UOF reports, and investigations provided to the Monitor's Office reflect the total number of UOF incidents that occurred during the reporting period. Thus, we are unable to state that our assessment of these incidents is representative of all the UOFs during the reporting period.

*Pathway Forward*

The Monitor looks forward to assessing PRPB's progress as it implements the provisional UOF Plan and begins its work on the IT needs assessment and subsequent IT Action Plan.

## Paragraph 24: Use of Force - General Provisions

*PRPD shall develop comprehensive and agency-wide policies that comply with applicable law and comport with generally accepted policing practices concerning the use of: (a) lethal force; (b) firearms; (c) canines; (d) ECWs; (e) chemical agents; (f) less lethal munitions; (g) batons and impact weapons; and (h) any other force technology, weapon, or implement authorized by PRPD during the life of this Agreement. PRPD shall also develop a policy on sharing information with the public regarding serious uses of force and the dissemination of information to family members of civilians involved in a use of force incident.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Implemented | | Annually |

14

| Practice: | Not Implemented | Assessment Frequency | |
|---|---|---|---|

### Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of Paragraphs 22-24. | ☑ Met | ☐ Missed |

### Compliance Assessment

PRPB has prepared comprehensive policies and revised them periodically as outlined in the Agreement. The policies are consistent with generally accepted police practices relating to UOF. However, for the CMR-6 period, PRPB continues to provide unverifiable UOF information to the public. As noted above, while PRPB has incorporated the paragraph requirements into a policy and trained all relevant personnel on the requirements and policy, implementation of this policy in practice is still lacking.

### Pathway Forward

Substantial compliance with this paragraph hinges on PRPB's ability to demonstrate reliable and valid UOF data collection. The Monitor is hopeful that with the implementation of the provisional UOF Plan, PRPB will be able to accurately track its UOFs. To accomplish this, PRPB must ensure integration and accuracy of the information in its GTE System that feeds data on UOFs into PRPB's global list. The accuracy of this data is not only integral to PRPB's compliance with the Agreement, but also to PRPB's efforts to report accurately on UOFs externally to the community, and internally so that PRPB leadership can respond rapidly and effectively to issues involving UOF policy, training, and practice.

## Paragraph 25: Use of Force - General Provisions

*PRPD shall continue to prohibit the use of Chloroacetophenone (commonly referred to as "CN gas").*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Policy prohibits use of CN gas. | ☑ Met | ☐ Missed |
| 2. No supply of CN gas is identified in armories or other locations through unannounced site visits. | ☑ Met | ☐ Missed |
| 3. No supply of CN gas is identified in armories or other locations through inspections. | ☑ Met | ☐ Missed |
| 4. CN gas is never used by STUs. | ☑ Met | ☐ Missed |

15

*Compliance Assessment*

As per the Agreement, PRPB continues to prohibit the use of CN gas. The Monitor's site visits and observations of PRPB equipment rooms and documentation of its armory inspection reports submitted by PRPB continue to demonstrate PRPB's compliance with this paragraph. PRPB's substantial compliance is reflective of its efforts to meet the policy, training, and implementation requirements of this paragraph.

*Pathway Forward*

The Monitor commends PRPB for its work on this paragraph and will continue to monitor PRPB's sustained compliance.

## Paragraph 26: Use of Force - General Provisions

*PRPD shall maintain an accurate, current list of officers who successfully qualify with their regulation firearm, including any other firearm that officers are authorized to use or carry. Officers who fail to re-qualify shall be relieved of police powers and immediately relinquish all firearms, including personal firearms. Those officers who fail to re-qualify after remedial training within a reasonable time shall be subject to disciplinary action.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. All officers on the qualification list are qualified and certified on the use of firearms in accordance with policy. | ☑ Met | ☐ Missed |
| 3. All officers who fail the qualification re-test on the same day are relieved of operational duty, disarmed, and summoned for re-training before leaving the Academy. | ☑ Met | ☐ Missed |
| 4. All officers who fail to qualify after re-training remain relieved of operational duty, remain disarmed, and are referred for disciplinary action. | ☑ Met | ☐ Missed |
| 5. All officers are disciplined for failing to qualify after re-training or have a valid justification for not qualifying in accordance with policy. | ☐ Met | ☑ Missed |
| 6. All officers with more than one regulation firearm are qualified in all authorized firearms. | ☐ Met | ☑ Missed |

*Compliance Assessment*

The Monitor found that PRPB's policies relating to firearms qualification incorporate all the requirements of the paragraph and that all officers on the qualification list (9,893 on "reduced light")[2] were qualified and certified on the use of firearms in accordance with the policy. Only "reduced light" qualifications were conducted during this CMR period. Daytime firing qualifications will be conducted by PRPB in CMR-7. Further, the Monitor also noted that no officers failed the qualification re-test or were relieved of operational duty according to PRPB documentation. However, a Global Report noting all qualification trainings hours for all PRPB officers is not available. Information to document that officers with more than one regulation firearm are qualified on all firearms was not provided.

*Pathway Forward*

PRPB needs to continue qualifying personnel on firearms and maintain records of this training in its Global Report.

## 2. Specialized Tactical Units

In relation to paragraphs 27-31, the Monitor's Office has concluded that PRPB has developed UOF policies for specialized tactical units (STUs) and that these policies are consistent with PRPB's Bureau-wide UOF policy. PRPB has also completed training related to these policies. A review of the tactical unit's (DOT) roll call documents verifies continued compliance with policies. The Monitor's Office has verified through document review that specialized units are not conducting general policing functions except for non-specialized preventive patrols in high crime areas. The Monitor's Office had noted in previous reports that some DOTs have provided documentation that officers assigned to preventive patrol do so in regular uniform and not in full tactical attire. It should be noted that PRPB revised form PPR-112.2, (Record of Mobilization of STU) in July 2021 to include this information for the purpose of memorialization.

During the CMR-6 reporting period, the Monitor reviewed documents and case files that attested to DOT conducting preventative patrol and other policing activities as outlined in the appropriate policies. In addition, DOT is appropriately documenting its activities and having supervisors review those activities and documentations.

As noted in previous CMRs, PRPB does not have a centralized database that captures all STU deployments island wide. This centralized database would help PRPB command staff determine DOT needs Bureau-wide.

---

[2] This refers to nighttime or reduced lighting firing conditions. PRPB officers must be qualified in both daytime and reduced lighting conditions.

## Paragraph 27: Use of Force - Specialized Tactical Units

*PRPD shall develop policies on the use of force by members of specialized tactical units ("STUs"). This policy shall be consistent with PRPD's agency-wide use of force policy. tactical units ("STUs"). This policy shall be consistent with PRPD's agency-wide use of force policy.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. All use of force training involving STUs is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of officers are trained and certified in all use of force policies involving STUs (or scheduled for training, in the case of mid-year reviews) | ☑ Met | ☐ Missed |
| 4. 95% of uses of force by STU officers are within policy. | ☑ Met | ☐ Missed |

### Compliance Assessment

PRPB has developed policies on the UOFs by STU members. These policies are consistent with PRPB's Bureau-wide policy. A review of STU personnel training and UOF has determined that it is consistent with PRPB policy. There were no instances in which DOT was activated during the CMR-6 period other than for "standby" status. As such, no DOT units used less-than-lethal force to disperse unruly protesters during the period. While the Monitor's Office can attest to the consistency of policies relating to UOF by specialized units, there were no instances of DOT using less-than-lethal weapons at demonstrations or protests during the report period.

### Pathway Forward

The Monitor's Office will continue to monitor UOFs by specialized units at demonstrations and protests to verify compliance with this paragraph.

## Paragraph 28: Use of Force - Specialized Tactical Units

*PRPD shall prohibit STUs from conducting general patrol and policing functions.*

| Compliance Status | Assessment Schedule | |
|---|---|---|
| Substantially Compliant | Review | October 2021 – March 2022 |

18

| | | | |
|---|---|---|---|
| Policy: | Implemented | Period | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Training involving STUs is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of STU officers are trained and certified in STU policies (or scheduled for training, in the case of mid-year reviews). | ☑ Met | ☐ Missed |
| 4. Presentation of data on STU deployments and activations. | ☑ Met | ☐ Missed |
| 5. 95% of all STU deployments/activations for general patrol and policing functions are justified within policy. | ☑ Met | ☐ Missed |
| 6. 95% of all assignments of individual STU officers to general patrol and policing functions are justified and carried out within policy. | ☑ Met | ☐ Missed |

*Compliance Assessment*

In relation to the policy requirements of paragraph 28, PRPB GO 100-11 (Tactical Operations Divisions) allows DOT officers to be assigned to preventive patrol but precludes DOT from operating as a specialized unit or equipping tactical gear when conducting patrol functions. GO 100-112 also requires that DOT members always keep specialized weapons and tactical equipment accessible in the event their unit is activated to respond to an authorized DOT event. During the Monitor's March 2022 site visit to Metro DOT, the Inspector in charge informed the Monitor's Office that DOT officers assigned to preventive patrol keep their specialized equipment in the trunk of their vehicle, accessible to the officers in the event they are mobilized. In addition, during the March 2022 site visit, the Director of the Reform Unit informed the Monitor's Office that PRPB has modified PPR-112.2 (Record of Mobilization of STU) to capture this information as well as wearing the proper uniform. Verification of the changes to PPR-112.2 were confirmed. The Monitor's Office has also confirmed that officers are using the modified PPR-112.2.

In relation to daily assignments, the Monitor's Office has verified that specialized units are properly documenting their assignments in compliance with the Agreement. Specialized units are not conducting general policing functions apart from preventive patrols in high crime areas. During the period of October 2021 through March 2022, PRPB submitted documentation that the Bureau's DOT Units conducted over 836 preventive patrols. From that number the Monitor's Office requested a random sample of 61 records of preventive patrol. Upon review of the deployment records, the Monitor's Office determined that deployments were consistent with the Agreement and PRPB policy.

*Pathway Forward*

As a result of the PPR-112.2 modifications, the Monitor will be able to ensure implementation of the revised form through case reviews and STU observations. These reviews and observations will ensure PRPB's continued compliance with the practice elements of this paragraph.

## Paragraph 29: Use of Force - Specialized Tactical Units

*PRPD shall develop eligibility criteria and selection devices for assignment to STUs that emphasize demonstrated capacity to carry out the mission of STU in a constitutional manner. Officers assigned to STUs who are unable to maintain eligibility shall be removed from STUs. Assignments to STUs shall be for a determined period, as specified by PRPD policy, unless there are extenuating circumstances that justify an extended assignment.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Training for evaluation boards is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of evaluation board members are trained. | ☑ Met | ☐ Missed |
| 4. All officers selected to STUs meet eligibility requirements. | ☑ Met | ☐ Missed |
| 5. All officers assigned to STUs who do not maintain eligibility are removed from STUs. | ☑ Met | ☐ Missed |
| 6. 95% of all extensions of STU assignments are justified as extenuating circumstances within policy. | ☐ Met | ☑ Missed |

*Compliance Assessment*

PRPB provided documentation that there are currently 130 personnel assigned to DOT units throughout PRPB. The breakdown of those personnel by rank is as follows:

- 1 Inspector
- 1 Captain
- 3 First Lieutenants
- 5 Second Lieutenants
- 12 Sergeants
- 108 Agents

It should be noted that, according to PRPB, 85% of the officers in DOT and 83% of officers assigned to SWAT completed their six-year assignments in January 2022. Therefore, if PRPB retained these officers in their existing position the retention process as outlined in GOs 100-112 (Tactical Operations Divisions) and 100- 117 (Specialized Weapons and Tactics Division) should have been completed. Twenty officers assigned to SWAT completed their six-year assignments in January 2022 as outlined in GO 100-117 (SWAT). Having reached the six-year mark, the officers' assignment to SWAT was re-evaluated and all were retained. The process of retaining all personnel as per GO 100-117 (SWAT), has been completed. This was verified by the Monitor during the March 2022 site visit.

During the March 2022 site visit to DOT Metro, it was noted that the process for retention within DOT has already begun, but not been completed. Documentation confirming this statement was provided. SWAT has completed its retention process, but DOT has not, which causes compliance target 6 to be missed.

PRPB has developed a GO which identifies eligibility criteria and selection processes for specialized units. During the CMR-6 period four additional officers were assigned to SWAT. The Monitor's Office reviewed the officers' personnel files and confirmed that the officers met the requirements for assignment to SWAT and completed the appropriate training during the January 2022 site visit.

PRPB provided written documentation that three officers were transferred out of DOT, in some cases due to no longer meeting the eligibility requirements, and that five officers were transferred into DOT units during the period. A review of the personnel files of those officers revealed that they were qualified for transfer to DOT, meeting requirements as outlined in PRPB policy and the Agreement. On April 15, 2022, the Monitor's Office conducted a site visit to DOT Metro for the purpose of reviewing the files of members recently assigned to DOT units throughout the Bureau. A review of the officers' files verified that the officers selected were eligible for assignment, as stipulated in GO 100-112 (Tactical Operations Divisions) to DOT and that they passed all requirements necessary for selection.

PRPB has met the policy and training requirements of this paragraph. As it relates to the retention or removal of officers who have reached the six-year tenure, the Monitor is unable to assess PRPB's compliance with the application of these requirements in practice, as no officers assigned to DOT units has been officially retained (in process) or removed due to expiration of time.

*Pathway Forward*

As noted above, the tenure limit of six years expired in January 2022 for most of the officers in STUs. The Monitor assesses that PRPB should have already completed the retention process for those DOT officers it wished to retain. Moving forward, PRPB needs to complete this task in a timelier manner.

## Paragraph 30: Use of Force - Specialized Tactical Units

*PRPD shall require STUs to document in writing all law enforcement activities to include operational plans and after-action reports prepared in consistent formats for all call-outs and deployments. Supervisors shall review the law enforcement activities of STUs periodically to ensure compliance with applicable laws and PRPD policies and procedures.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Training for STUs is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of law enforcement activities by STUs, including deployments and activations, are documented within policy. | ☑ Met | ☐ Missed |
| 4. 95% of law enforcement activities by STUs, including deployments and activations, are reviewed by supervisors. | ☑ Met | ☐ Missed |

### Compliance Assessment

The Monitor's Office has reviewed the STU policies and trainings and found that they meet the requirements of the Agreement, and that training follows approved policies. A review of PRPB DOT operational plans indicated that in situations where the unit was given prior assignment notification, an operational plan was prepared as required by PRPB policy.

PRPB reported that during the CMR-6 period there were 281 demonstrations or protests. Of the 281 demonstrations or protests, according to PRPB documentation, 162 were unplanned, 75 were planned, and 44 provided no indication if they were planned or unplanned.

PRPB reported that DOT units participated in 26 demonstrations or protests that occurred during the CMR-6 reporting period. According to PRPB SWAT did not participate in any demonstrations or protests during the period. The Monitor verified this through documentation provided by the Reform Unit.

PRPB provided documentation that there are currently 24 personnel assigned to SWAT. The breakdown of those personnel by rank is as follows:[3]

- 1 First Lieutenant
- 1 Second Lieutenant
- 3 Sergeants
- 19 Agents

---

[3] SWAT has one agent in the capacity of fleet maintenance. This officer is a member of FURA, not SWAT, and is not trained for tactical operations.

SWAT was activated 49 times during the CMR-6 period. The Monitor's Office conducted a site visit to SWAT to review documents and conduct visual inspections of equipment in January and March 2022.

In all the cases reviewed, SWAT prepared a Mobilization Report (PPR-112.2) and After-Action Report (PPR-112.3). As noted in previous CMR reports, SWAT's commanding officer reported that, in many instances relating to mobilization, no advance warning was received following the request to "back up" federal task forces or specialized units operationally. Therefore, no operational plans were prepared during the period for those events.

In CMR-5 the Monitor noted that the after-action reports prepared by SWAT lacked evaluation and analysis of the unit's performance. For the CMR-6 period, SWAT developed an internal form titled "Mission Evaluation." This internal form captures all aspects of the mission including what needs to be maintained, what could be done better, and final comments. The Monitor's Office commends the Commanding Officer of SWAT in the development, implementation, and use of the Mission Evaluation Form and emphasizes that self-reflective evaluation is essential to promoting improvements in the unit's performance and overall safety and is also consistent with generally accepted policing practices.

Additional observations made by the Monitor during the CMR-6 reporting period include the following:

- In the 49 cases reviewed by the Monitor's Office, SWAT reported using force in 30 incidents. In 29 cases force consisted of pointing a firearm, a Level 3 UOF.
  - It was emphasized that SWAT must use the Complaint Number of the incident and not request a separate number when reporting UOF.
- In one UOF incident a SWAT officer engaged in the exchange of gunfire with a barricaded subject during entry where both sustained injuries.
- The information provided by SWAT was cross-checked and verified with PPRs-112.2 (Mobilization Report) and PRPB's SWAT's Global List for accuracy.
- In all instances, SWAT used the updated form PPR-112.2
- During a site visit to SWAT, no CN gas was present in the unit's arsenal (see assessment for paragraph 25). Moreover, the Monitor verified that supervisors conduct a daily weapon inventory check and submit a quarterly report (documentation provided).
- Based on analysis of data provided by PRPB, 95% of law enforcement activities by STUs, including employments and activations, are reviewed by supervisors.

*Pathway Forward*

The Monitor's Office concludes that SWAT has taken the necessary steps to comply with the Agreement, however, DOT's failure to complete its retention process for members it intended to keep needs improvement.

## Paragraph 31: Use of Force - Specialized Tactical Units

*PRPD shall track the number of STU deployments, the reason for each activation and deployment of STU, the legal authority, including type of warrant, if any, for each activation and deployment of STU, and the result of each activation and deployment of STU, including: (a) the approximate location of the STU deployment; (b) the*

23

*number of arrests made; (c) the type of evidence or property seized; (d) whether a forcible entry was made; (e) whether force was used by an STU member or other officer; and (f) whether a person was injured or killed by an STU member.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. The STU tracking system accounts for all elements in the paragraph and outcome measures as required by Paragraph 243. | ☐ Met | ☑ Missed |
| 2. The STU tracking system is accurate and current; all deployments are tracked. | ☐ Met | ☑ Missed |

*Compliance Assessment*

As stated in previous CMRs, PRPB does not have a tracking system that captures all STU deployment data throughout PRPB. Individual STUs confirmed that PRPB is not compiling the information in one central database, which would assist PRPB's command staff in determining Bureau-wide needs as it relates to DOT. While PRPB is collecting the deployment data at the unit level, it appears that PRPB does not collect the data at the Bureau level. Therefore, PRPB has not implemented this paragraph in practice.

*Pathway Forward*

To progress in compliance with this paragraph, PRPB must implement a Bureau-wide tracking system. The development of the tracking system is the responsibility of field operations who oversee STU operations. Furthermore, the data and report outputs of this system should be used to inform Bureau-wide DOT strategies and address gaps in resources and potential officer safety issues.

## 3. Crowd Control Policies and Performance

In general, PRPB has made significant progress in how it prepares for and operates during demonstrations and protests. The Monitor's Office has had the opportunity to witness PRPB providing strategic policing coverage at demonstrations and protests over the course of the compliance period. As reported in the Monitor's previous report, PRPB's actions in response to demonstrations and protests have become increasingly consistent with generally accepted policing practices.

In response to all demonstrations or protests during the CMR-6 period, DOT units were only activated in a stand-by capacity. This is a significant finding given the number of demonstrations and protests

responded to during the period. Given that DOT units did not actually engage with demonstrators or protestors, after-action and self-assessments reports were not completed, except for PPR-112.2 (Mobilization of Specialized Tactics).

## Paragraph 32: Use of Force - Crowd Control and Incident Management

*PRPD shall develop crowd control and incident management policies that comply with applicable law and comport with generally accepted policing practices.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☒ Met | ☐ Missed |
| 2. Training on crowd control and incident management is consistent with approved policies. | ☒ Met | ☐ Missed |
| 3. 95% of STU officers, supervisors, and other officers are trained and certified in crowd control (or scheduled for training, in the case of mid-year reviews); 95% of all supervisors are trained in incident management (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☒ Missed |
| 4. 95% of police responses to unplanned events are within policy. | ☐ Met | ☒ Missed |
| 5. 95% of police responses to planned events are within policy. | ☒ Met | ☐ Missed |
| 6. 95% of armories inspected by STU supervisors indicate that less lethal weapons and ammunition are controlled and maintained in accordance with policy. | ☒ Met | ☐ Missed |
| 7. 95% of armories indicate that less lethal weapons and ammunition are controlled and maintained in accordance with policy. | ☒ Met | ☐ Missed |

### *Compliance Assessment*

The Monitor's Office has reviewed the crowd control and management policies and trainings and found that they meet the requirements of the Agreement, and that training follows approved policies. After reviewing a random sample of training personnel records, the Monitor's Office determined that PRPB has not met the 95% threshold for the training of STU officers and others on the relevant crowd control training (REA 625).

The Monitor's Office requested a list of all demonstrations and protests Bureau-wide. PRPB provided a list of 281 protests (159 unplanned, 78 planned, and the remaining 44 gave no indication) island-wide in

response to the Monitor's request. Upon review, however, it was evident as reported in previous reports, that the data was not aggregated, but rather provided for each area. PRPB has made progress in properly identifying demonstrations and protests (84%) as planned or unplanned.

PRPB should aggregate its data on planned and unplanned crowd control events Bureau-wide for the purpose of analyzing and identifying possible training needs as well as the distribution of personnel and resources.

The Monitor's Office selected a random sample of 50 crowd control events to review operational plans, after-action reports, and self-assessment reports as outlined in GO 600-625 (Management and Crowd Control). In response to the request, PRPB provided the 50 requested files. PRPB's responses to the demonstrations were generally consistent with PRPB policy. However, despite its compliance with policy, in 16% of the demonstrations or protests PRPB did not identify if the demonstration or protest was planned or unplanned. This inconsistency presents obstacles to the practical application of the policy and other requirements of this paragraph.

Regarding training on the relevant crowd control policies, PRPB provided documentation on DOT officers current certification in these courses. The Monitor's Office selected a random sample of 45 DOT members (from the list of 130) to verify training records relative to their assignment. In all instances, officers received required training, however 3 officers had no documentation in their training files indicating they had been trained on GO 600-625 (Crowd Control).

PRPB submitted the quarterly reports (PPR-618.1) of STU supervisors who conducted inspections of armories as required by the Agreement. In review of these quarterly reports, the Monitor found them to be within policy and inspections conducted were documented.

*Pathway Forward*

Although PRPB is partially compliant in this area, the Bureau must maintain an aggregated list of all demonstrations, both planned and unplanned, and classify them as such. Although maintaining an aggregated list is not required by the Agreement, such a list will assist PRPB in maintaining greater awareness of related operations and determining resources needed throughout the island.

The Monitor's Office will continue to assess training compliance with target three through random training record reviews.

## Paragraph 33: Use of Force - Crowd Control and Incident Management

*The incident management policy shall provide that a ranking officer or other higher-level PRPD official at the scene of a mass demonstration, civil disturbance, or other crowd situation assume command and control and provide approval prior to deploying force as a crowd dispersal technique.*

| Compliance Status | Assessment Schedule | |
|---|---|---|
| Substantially Compliant | Review | October 2021 – March 2022 |

26

| Policy: | Implemented | Period | |
|---|---|---|---|
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

Note: Compliance will be determined on two separate but inter-dependent bases: (1) the implementation of paragraphs 13-21, and (2) the results of outcome assessments, pursuant to Paragraph 243 of the Agreement.

*Compliance Assessment*

The Monitor's Office confirmed that almost all members of DOT have been trained on GO 625 (Management and Crowd Control) and that the policy meets Agreement requirements. In addition, the Commanding Officer of Metro DOT has received training on Incident Command.

During a site visit to Metro DOT and a review of data provided by the Reform Unit, the Monitor's Office reviewed reports relating to personnel deployment to demonstrations and protests where DOT was mobilized. The Monitor's Office learned that in instances where PRPB had determined in advance that the DOT Unit would be activated, an operations plan was developed by the unit. However, in instances where the determination to mobilize the unit was made at the time of the event, the DOT prepared no such plan. The Monitor verified this data via documentation provided by the Reform Unit.

In all incidents of demonstrations or protests a high-ranking member of PRPB was identified as incident commander. Crowd dispersal techniques were used during one protest and/or demonstration. The incident commander was informed and approved of the use of these techniques prior to use.

*Pathway Forward*

The Monitor's Office commends PRPB for its work on this paragraph and will continue to assess this paragraph in line with the requirements of paragraphs 13-21 to ensure PRPB's continued substantial compliance.

## Paragraph 34: Use of Force - Crowd Control and Incident Management

*The crowd control policy shall require the use of crowd control techniques and tactics that respect protected speech and the right to lawful assembly.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |

| Training: | Implemented | Assessment Frequency | Bi-annually |
|---|---|---|---|
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: Compliance will be determined on two separate but inter-dependent bases: (1) the implementation of paragraphs 13-21, and (2) the results of outcome assessments, pursuant to Paragraph 243 of the Agreement.

*Compliance Assessment*

The Monitor has previously reviewed GO 625 (Management and Crowd Control) and found it be in compliance with the Agreement and general policing practices. PRPB used minimal force while responding to demonstrations and protests during the period. This force was only used in instances were demonstrators or protestors were impeding traffic or blocking entrances. If this was not the case, they were allowed to assemble peacefully and lawfully. For this reporting period, PRPB did not deploy or use DOT in response to any demonstrations or protests. DOT Units were only mobilized in a stand-by capacity in response to potential needs for crowd control activities. The Monitor considers this a significant finding, especially since PRPB addressed a substantial number of unplanned demonstrations and protests during the CMR-6 period. In all instances during the period, DOT was ultimately kept in reserve and never interacted with demonstrators or protesters. The use of other crowd control techniques was within policy.

*Pathway Forward*

The Monitor will continue to assess PRPB's progress and compliance with policy, crowd control resource deployment, and training in CMR-7 through policy reviews and on-site observations.

## Paragraph 35: Use of Force - Crowd Control and Incident Management

*PRPD policy shall require the assessment of law enforcement activities following each response to a mass demonstration, civil disturbance, or other crowd situation to ensure compliance with applicable laws and PRPD policies and procedures.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

28

Note: Compliance will be determined on two separate but inter-dependent bases: (1) the implementation of paragraphs 13-21, and (2) the results of outcome assessments, pursuant to Paragraph 243 of the Agreement.

*Compliance Assessment*

The Monitor reviewed numerous documents to reach a conclusion as to PRPB's level of compliance with the Agreement as it applies to mass demonstrations. These documents included a review of PRPB's work plans for the demonstrations as well as its completion of PPR-112.1 (Request for Activation of the STU), PPR-112.2 (Record of Mobilizations of STU), and PPR-112.3 (Evaluation of Strategies of the STU). The Monitor's Office found that the STUs did not prepare any after-action reports when activated. However, as previously noted, the unit did not actively engage in any crowd control activities during these events and were merely placed on standby.

The Monitor's Office concludes that PRPB's actions during demonstrations and protests (planned and unplanned) in the CMR-6 period were consistent with generally accepted policing practices and PRPB policy. PRPB provided the Monitor's Office with Operation Plans (PPR-625.2) for the various planned demonstrations and protests that occurred in the reporting period, as well as Crowd Management and Control Reports (PPR-625.3), which provided basic details of each event.

For the CMR-6 period PRPB reported that it responded to 281 demonstrations and/or protests (planned and unplanned). The Monitor's Office requested a random sample of 50 cases for review. PRPB provided 40 files that had information related to the specific requested demonstrations and/or protests. The remaining files included nine certifications from Area Commands identifying demonstrations and/or protests that occurred in their area and one accident report (unrelated to a demonstration or protest) that was misidentified as a protest.

The following observations are put forth regarding the reviewed files:

- 20 (50%) of demonstrations and/or protests were planned events and 20 (50%) of demonstrations and/or protests were unplanned events.
- Force was only used in one incident. This incident involved seven instances of Level One UOFs involving five protesters.
- In 25 cases (63%) a self-assessment was prepared (PPR-625.6 "Evaluation of Crowd Management and Control Strategies"), but these self-assessments generally only documented what occurred during the demonstration and/or protest and did little to identify what was done correctly and should potentially be repeated in future demonstrations and/or protests as well as what was not done well and how that can be rectified during future demonstrations and/or protests.
- In 25 cases (63%) an Operations Plan was prepared.
- In some instances, the operations plan was limited, which is understandable as PRPB had to respond to an unplanned demonstration and/or protest without any prior notice.

Area commanders did not produce self-assessment reports for all demonstrations and/or protests which occurred in their geographic areas of responsibility, irrespective of whether the event was planned or unplanned, and whether DOT or regular police deployed to the incident. Much can be learned by preparing an in-depth report that provides a frank assessment of what occurred, and, in many cases, what can be improved upon. In addition, GO 625 (Management and Crowd Control) specifically states

that PRPB will conduct a self-assessment exercise of the operations. Going forward, the Monitor's Office recommends that PRPB prepare more detailed self-assessment reports.

*Pathway Forward*

To achieve compliance, PRPB must ensure that DOT supervisors and area commanders thoroughly assess all law enforcement activities following each response to a mass demonstration, civil disturbance, or other crowd situation to ensure compliance with applicable laws and PRPB policies and procedures. It should be noted that area commanders, in the areas where demonstrations and protests took place, did provide self-assessment reports (PPR-625.6) with varying degrees of thoroughness assessing the police response. Overall, however, PRPB did not prepare a self-assessment for all demonstrations and/or protests for the reporting period. In total, 25 self-assessments were prepared for the 40 demonstrations and protests reviewed by the Monitor's Office.

This issue has been discussed with the PRPB Reform Unit previously. A variety of recommendations were provided including, criteria to be assessed, debriefings with officers and the demonstrators and/or protestors, and the development of after-action and self-assessment reports. Additionally, reference resources were provided.

## 4. Force Reporting

The Monitor's assessment of PRPB's compliance with force reporting policies and procedures was based on the UOF reports provided. PRPB still lacks a mechanism to verify the accuracy of UOF incidents, as well as the number of UOFs per incident.

As stated earlier in this report, during the CMR-6 period, PRPB continued to lack a mechanism to validate its reporting of UOF incidents, and the number of UOFs in those incidents. To address this issue PRPB revised form PPR-126.2 (Complaint Card) to establish the data elements necessary to collect the number of UOF incidents on a regular basis. PRPB also developed a Use of Force Dashboard to display the number of UOF incidents in real time.

In addition to the changes to PPR-126.2, PRPB also began requiring that all forms related to UOF reporting (PPR-605.1) and supervisor notification (PPR-605.3) be completed in GTE, thereby eliminating any handwritten paper copies of these reports. Although PRPB made efforts to address the inaccuracies in UOF reporting with the changes to PPR-126.2, the Monitor found that these changes further highlighted the procedural issues in the entire UOF reporting process and brought to light the inconsistencies between the information documented in the initial complaint card (PPR-126.2), the officer's UOF report (PPR-605.1), and the Supervisor's UOF Investigation (PPR-605.3). In addition, in some instances, the Monitor also found that personnel were not completing these reports in GTE and continuing to use paper copies and/or were not completing these reports in a timely manner, as required by policy.

In January 2022, the Court held a Status conference where the issues related to UOF, Supervision and Management, and IT were brought forth by the Monitor. As a result, the Court ordered PRPB to work with USDOJ, and the Monitor to develop a plan to address the inconsistencies in the UOF data. Over the

proceeding months, the parties and the Monitor worked together to develop a provisional plan to address the issues with the UOF data in the immediate and noted that in the long term these issues would be assessed as part of the IT needs assessment.[4] A Provisional Plan for UOF Data was filled to the Court on April 13, 2022. The Provisional Plan establishes a revised process for validating information captured in the related UOF forms, increased accountability, and if implemented successfully, increased validity in the UOF reporting process.

## Paragraph 36: Use of Force - Force Reporting

*PRPD shall develop a Use of Force Reporting Policy and Use of Force Report Form that comply with applicable law and comport with generally accepted policing practices. The Use of Force Reporting Policy will require officers to notify their immediate supervisor following any use of force, prisoner injury, or allegation of excessive force. In cases involving a serious use of force, notification will be within one hour, absent exigent circumstances.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Polices and forms incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Training on force reporting is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of officers are trained and certified in force reporting policies (or are scheduled for training, in the case of mid-year reviews) | ☑ Met | ☐ Missed |
| 4a. 95% of use of force incidents are notified to immediate supervisors or adequately justified as an exigent circumstance in accordance with policy. | ☑ Met | ☐ Missed |
| 4b. 95% of use of force reports are completed within prescribed periods and are documented in accordance with policy. | ☐ Met | ☑ Missed |
| 4c. All failures to report use of force are referred to SARP for investigation. | ☐ Met | ☑ Missed |
| 4d. 95% of requests for medical services in connection with a use of force are within policy. | ☐ Met | ☑ Missed |
| 4e. 95% of force incidents where a civilian is transported to a medical facility indicate that the officer notified the vehicle mileage and that the mileage was recorded. Mileage discrepancies are identified and addressed by supervisors as required by policy. | ☐ Met | ☑ Missed |
| 4f. 95% of all use of force reports are submitted to supervisors and SARP within prescribed time frames as required by policy. | ☐ Met | ☑ Missed |

---

[4] See Section XI for more information on the IT Needs Assessment and Action Plan.

| 4g. All use of force reports are stored and maintained by SARP as required by policy. | ☐ Met | ☑ Missed |
| --- | --- | --- |

*Compliance Assessment*

The Monitor's Office has reviewed the UOF policies and trainings and found that they meet the requirements of the Agreement, and that training follows approved policies.

Based on a case review of a random sample of UOF Reports (PPR-605.1) covering the CMR-6 period, the Monitor has made the following key observations:

- In 50 of the 53 (94%) cases reviewed the Monitor's Office determined that the level of force reported was consistent with the force used.
- Of the reports reviewed, five had missing, incorrect, and/or incomplete information. i.e., fields in the forms not being checked
- As of August 31, 2021, PRPB policy requires that all UOF Reports be entered into GTE before the end of shift. Only 21 of the 53 cases (40%) reviewed were entered by the end of shift – Target 4B (the Monitor's Office counted submission within two days as compliant with policy for this CMR).
- In all instances where medical aid was warranted, it was provided – Target 4D.
- In all cases the UOF Report was submitted to a supervisor, however the majority were not in accordance with Bureau policy (before the end of shift). Most reports were submitted three to twelve days later – Target 4A.
  - One officer noted the delay in preparing his UOF report before the end of shift was due to problems with GTE.
- Eighteen reports (34%) were not reviewed by a supervisor within five business days, as outlined in the Agreement – Target 4F.
- Supervisors responded to all serious UOFs.
- In three cases, documentation relating to FIU investigations of UOF was not provided in the case file.
- In one case the supervisor conducting the investigation determined that force was not within Bureau policy and referred the case to FIU for further investigation.
- In one case the supervisor determined the force used was justified, however, the supervisor recommended the officer be retrained on use of Electronic Control Devices.
- In reviewing these cases the Monitor found variations in the levels of force and the number of officers involved between what appears in the Complaint Card (PPR-126.2) and the UOF Report (PPR-605.1)
- In six of the reviewed cases, the Complaint Card (PPR-126.2) indicated no UOF.
- SWAT using force during an entry (Level 3: pointing a firearm) is still not being captured in the PPR-126.2

Though the sample of reviewed UOF reports demonstrated numerous areas of compliance in which PRPB practice corresponded to Agreement stipulations, there are still sufficient shortcomings in addition to the issues with the validity of the UOF data, such that PRPB cannot be considered in substantial compliance with this paragraph. Despite those issues, the Monitor was informed of several proactive measures that PRPB is taking to ensure greater compliance moving forward.

PRPB's inability to validate its UOF numbers has been a recurring problem, and one which the Chief Monitor has identified in all previous reports. PRPB has taken a positive first step to addressing this issue by taking the initiative to develop a Provisional UOF Plan. This plan, when implemented, places PRPB on track to having a reliable system to report valid UOF numbers, provided that all steps in the system are completed when reporting and investigating each incident and that the safeguards recommended by the Monitor's Office and USDOJ are adhered to.

At the time of this writing, however, this plan has not been implemented and the Monitor's Office cannot verify UOF reporting. Therefore, the Monitor's Office will defer compliance of the paragraph and reassess in CMR-7.

*Pathway Forward*

PRPB's compliance with this paragraph hinges on its ability to demonstrate consistent and valid UOF data collection. Therefore, the Monitor's Office will defer compliance of the paragraph and reassess in CMR-7. The Monitor is hopeful that with the implementation of the new process, PRPB will be able to accurately track its UOFs. To accomplish this, PRPB must ensure integration of the information systems that feed data on UOFs to the Bureau's Global List. The accuracy of this data is not only integral to PRPB's compliance with the Agreement, but also ensures that PRPB is able to operationally respond to and quickly address issues with UOF policy, training, and practice as well as accurately reporting on UOFs, both internally and externally to its community.

PRPB must hold officers and supervisors accountable for entering UOF reports in the timeframes established by policy.

## Paragraph 37: Use of Force - Force Reporting

*The Use of Force Reporting Policy shall require all officers to report any use of force in writing in a Use of Force Report Form before the end of the shift. The Use of Force Report shall include: (a) a detailed account of the incident from the officer's perspective; (b) the reason for the initial police presence; (c) a specific description of the acts that led to the use of force, including the subject(s)' behavior; (d) the level of resistance encountered; and (e) a description of every type of force used. The Use of Force Reporting Policy shall explicitly prohibit the use of boilerplate or conclusory language in all reports documenting use of force. Failure to report a use of force or prisoner injury by a PRPD officer shall subject an officer, including supervisors and commanders, to disciplinary action.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

33

*Compliance Targets*

Note: This paragraph is assessed with paragraph 36.

*Compliance Assessment*

PRPB has taken several positive steps towards reaching compliance with this paragraph, including:

- As a result of a June 2021 directive from the commissioner, PRPB implemented the following changes to UOF reporting during the CMR-6 period:  1) when a member of PRPB assigned to any specialized unit is involved in a UOF incident, the officer will request a complaint number from the district or precinct corresponding to the jurisdiction where the incident occurred; 2) PRPB has prohibited the use of complaint numbers with the prefix of the specialized unit in UOF incidents; and 3) PRPB's IT Bureau will take the corresponding steps to support compliance with the Commissioner's Directive. This will ensure that the Area Commands are aware of each UOF incident in their jurisdiction.
- As a result of an August 2021 directive, PRPB has implemented into practice that all UOF reports (PPR-605.1) and PPR-605.3 (Notification of Use of Force) be entered electronically into GTE.
- In March 2022 PRPB submitted a draft of the Provisional UOF Plan with input from the Monitor's Office and USDOJ to the Court.
- In March 2022 the Parties, in a joint stipulation to the Court, agreed to conduct an IT Needs Assessment.

The Monitor's Office sees these actions by PRPB as positive first steps toward developing a mechanism by which PRPB can validate its UOF incident numbers.

*Pathway Forward*

PRPB's compliance with this paragraph hinges on its ability to demonstrate consistent and valid UOF data collection. Therefore, the Monitor's Office will defer compliance of the paragraph and reassess in CMR-7. The Monitor is hopeful that with the implementation of the new process, PRPB will be able to accurately track its UOFs. To accomplish this, PRPB must ensure integration of the information systems that feed data on UOFs to the Bureau's Global List. The accuracy of this data is not only integral to PRPB's compliance with the Agreement, but also ensures that PRPB is able to operationally respond to and quickly address issues with UOF policy, training, and practice as well as accurately reporting on UOFs, both internally and externally to its community.

## Paragraph 38: Use of Force - Force Reporting

*PRPD policy shall require officers to request medical services immediately when an individual is injured or complains of injury following a use of force. The policy shall also require officers who transport a civilian to a medical facility for treatment to take the safest and most direct route to the medical facility. The policy shall further require that officers notify the communications command center of the starting and ending mileage on the transporting vehicle.*

| Compliance Status | Assessment Schedule |
|---|---|

| Deferred | | Review Period | October 2021 – March 2022 |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This paragraph is assessed with paragraph 36.

*Compliance Assessment*

In all UOF reports (PPR-605.1) reviewed by the Monitor's Office, whenever medical aid was warranted, it was received. However, without a valid list of UOF reports, the Monitor is unable to determine whether this finding is representative of all UOF incidents. Therefore, the Monitor's Office will defer compliance of the paragraph and reassess in CMR-7.

*Pathway Forward*

As previously stated, PRPB's compliance with this paragraph hinges on its ability to demonstrate consistent and valid data collection of its UOFs. The Monitor will assess the implementation of the new process and examine if PRPB is able to accurately track its UOFs in CMR-7. The Monitor will also assess compliance regarding transportation and communication for medical aid in CMR-7.

## Paragraph 39: Use of Force - Force Reporting

*PRPD's Use of Force Reporting Policy shall require that officers submit copies of Use of Force Reports to their immediate supervisor and to SPR for tracking and analysis. SPR shall maintain master copies of these reports in a central location.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This paragraph is assessed with paragraph 36.

*Compliance Assessment*

In all UOF reports (PPR-605.1) reviewed by the Monitor's Office, a UOF report was submitted to the officer's immediate supervisor, however, there were considerable delays in the submission of the UOF reports. In addition, most of the UOF Reports were not completed in GTE by the end of the officer's shift, as required by PRPB policy (GO 605), in most instances it was entered three to twelve days later.

In relation to submitting to SARP for the tracking and analysis of these UOF reports, PRPB has not demonstrated that it has the capabilities to provide these functions. The Monitor acknowledges PRPB's efforts towards addressing this issue with its new proposed Provisional UOF Plan which is expected to be implemented in the CMR-7 reporting period. Therefore, the Monitor's Office will defer compliance of the paragraph and reassess in CMR-7.

*Pathway Forward*

All officers must submit a copy of their UOF Reports to their immediate supervisor and SARP for tracking and analysis. SARP must maintain the data in a central location. PRPB has identified FIU to be the custodian of the UOF data.

## 5. Force Review, Investigation, and Analysis

Although PRPB meets the policy and training requirements for these paragraphs, PRPB's implementation of these paragraphs in practice is hampered by persistent issues with its ability to track UOF reports properly. In reviewing and determining levels of compliance with the Agreement, the Monitor's Office must look at the reports when they are deemed complete and accurate by PRPB, which is when FIU makes that determination. Of the 53 UOF reports (PPR-605.1) reviewed by the Monitor's Office, only two appear to have not been properly investigated.

PRPB still has not demonstrated that it has reliable mechanisms in place for tracking officers' UOF, or for reviewing the quality of force investigations when evaluating the performance of investigators.

### Paragraph 40: Use of Force - Force Review, Investigation, and Analysis

*PRPD policy shall specify that the conduct of all force reviews and investigations comply with applicable law and comport with generally accepted policing practices. All force reviews and investigations shall, to the extent reasonably possible, determine whether the officers' conduct was justified and within PRPD policy.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Implemented | | |

| Practice: | Not Implemented | Assessment Frequency | Annually for Compliance Target #1 and bi-annually for all other Compliance Targets |
|---|---|---|---|

*Compliance Targets*

| | |
|---|---|
| 1. The policy incorporates all of the requirements of the policy. | ☑ Met   ☐ Missed |
| 2. Training on force reviews and investigations is consistent with approved policies. | ☑ Met   ☐ Missed |
| 3. 95% of officers are trained and certified in force reviews and investigation policies in accordance with their rank or assignment to FIU (or are scheduled for training, in the case of mid-year reviews) | ☑ Met   ☐ Missed |

Note: Implementation of the requirements of this paragraph is assessed with Paragraphs 43-47 for level 1-3 uses of force.

Note: Implementation of the requirements of this paragraph is assessed with Paragraphs 48-52 for level 4 uses of force.

*Compliance Assessment*

In the files provided to the Monitor's Office, there were several reports with minor errors, which included fields not being completed. These minor errors do not appear to have affected the outcome of the investigation relating to its compliance with the Agreement and PRPB policy. Most of the reports, in substance, had been properly prepared and the required actions relating to UOF incidents had been carried out as per the Agreement.

*Pathway Forward*

As stated in previous CMR reports, UOF reports (PPR-605.1) should be consistently reviewed by SARP's FIU for completeness and accuracy as a matter of general practice. UOF reports should be closely scrutinized during the review process, given the past observations of the Monitor's Office regarding errors and omissions.

## Paragraph 41: Use of Force - Force Review, Investigation, and Analysis

*PRPD shall be responsible for maintaining a reliable and accurate tracking system on all officers' use of force; all force reviews carried out by supervisors; all force investigations carried out by Force Investigation Units ("FIU"); and all force reviews conducted by Force Review Boards ("FRB") and the Superintendent's Force Review Board ("SFRB"). At least annually, PRPD shall analyze data on officers' use of force to determine significant trends, identify and correct deficiencies revealed by this analysis, and document its findings in a public report.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |

37

| | | | |
|---|---|---|---|
| Training: | N/A | Assessment Frequency | Bi-annually for Compliance Targets #1 and #2; annually for Compliance Target #3; and quarterly for Compliance Target #4 |
| Practice: | Not Implemented | | |

## Compliance Targets

| | | |
|---|---|---|
| 1. Tracking system accounts for all of the elements in the paragraph and outcome measures as required by Paragraph 243. | ☐ Met | ☒ Missed |
| 2. All uses of force are tracked in the tracking system. | ☐ Met | ☒ Missed |
| 3. Annual use of force reports provide meaningful data analysis, identify significant trends, discuss corrective action (if necessary), and present supportable findings based on accurate and current data, as required by policy. | ☐ Met | ☒ Missed |
| 4. Records maintained by the Radio Control Center on use of force are consistent with data in the use of force tracking system. | ☐ Met | ☒ Missed |

## Compliance Assessment

As previously stated, PRPB has not demonstrated to the Monitor's Office that it has a reliable tracking system, nor has it provided the public with accurate information relating to UOF trends through an annual report. The Monitor acknowledges PRPB's efforts towards addressing this issue with the new Provisional UOF Plan. Although PRPB has demonstrated efforts towards addressing this issue, because of its lack of public reporting on UOF trends coupled with the current inability to analyze and reliably track UOFs, this paragraph is rated at not compliant.

## Pathway Forward

PRPB's compliance with this paragraph hinges on its ability to demonstrate consistent and valid UOF data collection. The Monitor will assess the implementation of the new process and examine if PRPB is able to accurately track its UOFs in CMR-7.

## Paragraph 42: Use of Force - Force Review, Investigation, and Analysis

*The quality of force reviews, force investigations, and investigation reviews shall be taken into account in the performance evaluations of the officers performing such investigations and reviews.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | N/A | | Bi-annually |

|  Practice: | Not Implemented | Assessment Frequency | |
|---|---|---|---|

*Compliance Targets*

Note: This Paragraph is assessed with Paragraphs 145-146 on Performance Evaluations.

*Compliance Assessment*

PRPB recently revised, but has not implemented, its "Annual Performance Evaluation of the Rank System" (PPR-310.1) form to include criteria for evaluating supervisory reviews of UOF by members under their command. The **"UOF Section"** of the evaluation (Supervisors Section) addresses what is required in the Agreement, as per paragraph 42.

Given that this revised evaluation has yet to be implemented, PRPB is still not in compliance. Further, PRPB must also revise GO 310 (Performance Evaluations) to reflect the new policies and procedures associated with the revisions made to PPR-310.1.

*Pathway Forward*

This performance evaluation process must be outlined in the evaluation policy and procedures and incorporated into supervisory training. Doing so reiterates the value of such work in officer performance, encourages higher quality investigative work, and identifies ways in which investigators can seek to improve year to year. The Monitor's Office looks forward to reviewing this policy.

## 6. Supervisory and FRB Reviews

Through its review the Monitor's Office concluded that PRPB supervisors properly responded to serious UOF incidents by officers under their supervision. In cases where FIU presence was needed, proper notification was made to FIU. During this review period, FIU reports that it referred two cases to the Puerto Rico Department of Justice (PRDOJ) and its investigative arm, Criminal Investigations (NIE), due to apparent misconduct or criminal conduct. The Monitor's Office concludes that the mechanism to report such conduct is in place.

### Paragraph 43: Use of Force - Supervisory and FRB Reviews

*A supervisor shall respond to the scene of a serious use of force or allegation of excessive force involving an officer under his/her command upon notification of the incident.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |

| Training: | N/A | Assessment Frequency | Bi-annually |
|---|---|---|---|
| Practice: | Not Implemented | | |

## *Compliance Targets*

Note: This Paragraph is assessed with Paragraphs 48-52.

## *Compliance Assessment*

Of the 53 UOF reports (PPR-605.1) reviewed by the Monitor's Office, the Monitor found no instance in which a supervisor failed to respond to a serious UOF. However, the Monitor's Office cannot verify the accuracy of the information related to UOFs provided by PRPB. The Monitor acknowledges PRPB's efforts towards addressing this issue with the Provisional UOF Plan. Therefore, the Monitor's Office will defer compliance of the paragraph and reassess in CMR-7.

## *Pathway Forward*

PRPB should continue to document that a supervisor responds to the scene of a serious UOF or allegation of excessive force involving an officer under his/her command upon notification of the incident. Furthermore, as previously stated, PRPB's compliance with this paragraph hinges on its ability to demonstrate reliable and valid UOF data collection. The Monitor will continue to assess PRPB's ability to track UOFs accurately in future reports.

## Paragraph 44: Use of Force - Supervisory and FRB Reviews

*The supervisor shall conduct a supervisory review of all uses of force, prisoner injuries, or allegations of excessive force, except those incidents involving a serious use of force or force indicating apparent criminal conduct by an officer, which shall be investigated by FIU, SPR, and/or PRDOJ. No supervisor who was involved in the incident, including by participating in, ordering, or authorizing the force being investigated, shall be responsible for the review of the incident.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

## *Compliance Targets*

| | |
|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met   ☐ Missed |

40

| | | |
|---|---|---|
| 2. Training on force reviews and investigations for supervisors is consistent with approved policies. | ☒ Met | ☐ Missed |
| 3. 95% of supervisors are trained and certified in force reviews and investigation policies (or are scheduled for training, in the case of mid-year reviews) | ☒ Met | ☐ Missed |
| 4a. 95% of use of force incidents classified as Level 1-3 are reported, reviewed, and investigated by supervisors and commanders within policy. | ☐ Met | ☒ Missed |
| 4b. 95% of supervisory force reviews are completed within five business days or have valid justifications for longer periods, based on exceptional circumstances. | ☐ Met | ☒ Missed |
| 4c. All use of force reviews and investigations by supervisors reach reasonably justified conclusions on officers' conduct and recommend disciplinary or corrective action, as necessary, in accordance with policy. | ☐ Met | ☒ Missed |
| 5a. 95% of reviews by Force Review Boards are within policy. | ☐ Met | ☒ Missed |
| 5b. The use of force tracking system accounts for all Force Review Board reports and underlying documents. | ☐ Met | ☒ Missed |
| 5c. Force Review Board determinations and recommendations are tracked and analyzed by SPR. | ☐ Met | ☒ Missed |

*Compliance Assessment*

Policies incorporate all requirements of the paragraph. Training on force reviews and investigations for supervisors is also consistent with approved policies. Supervisors are trained and certified in force reviews and investigation policies (or are scheduled for training, in the case of mid-year reviews).

Of the 53 UOF reports (PPR-605.1) reviewed by the Monitor's Office, the Monitor found no instances in which a supervisor failed to conform to what was required by policy other than not completing their investigation of the UOF in five business days. The Monitor's Office cannot confirm that supervisors reached reasonable and justified conclusions on officers' conduct and recommend disciplinary or corrective action, as necessary, in accordance with policy nor can the Monitor's Office confirm that 95% of FRB reviews are within policy. Despite the high level of compliance in properly assessing level of force and the review of force by supervisor in the sampled investigations reviewed, the Monitor's Office cannot verify the accuracy of the information related to UOF provided by PRPB, and therefore defers compliance of the paragraph and will reassess in CMR-7.

*Pathway Forward*

As noted in other related paragraphs, compliance with this paragraph is largely contingent on PRPB's ability to accurately track all UOFs, ensuring that the Monitor's review of UOFs is representative. As such, the Monitor will re-assess compliance with this paragraph in CMR-7. The Monitor will also continue to assess PRPB's compliance with UOF review procedures (meeting the five-business day review period) and ensuring that contain the appropriate information and justifications.

## Paragraph 45: Use of Force - Supervisory and FRB Reviews

*Supervisors shall complete use of force reviews within 5 business days of receiving the officer's use of force report. The reviewing supervisor shall: (a) determine whether the use of force was consistent with PRPD policy and/or raises any policy or operational concerns; (b) review all Use of Force Reports and ensure that all reports include the information required by this Agreement and PRPD policy; (c) document each use of force review*

*promptly using a Supervisor's Force Review Report; and (d) consider whether there are non-punitive corrective actions or training needs. A higher ranking officer within the investigating supervisor's chain-of-command shall review the Supervisor's Force Review Report for completeness and conformance with PRPD policy. The reviewing officer shall evaluate the investigating supervisor's conclusions and document whether the reviewing officer concurs, disagrees (with an explanation of the disagreement and the alternate conclusion), or defers until further investigation is completed.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 44.

*Compliance Assessment*

In 18 of the 53 UOF (34%) cases reviewed by the Monitor's Office the supervisor did not complete his or her review within 5 business days per the Agreement. This represents a large percentage of the total sample and is significant enough to bring PRPB well below the 95% target for compliance. While the report review is not conducted within the identified timeline, the report content does align with PRPB policy and Agreement language in that the UOF was consistent with PRPB policy and the UOF reports included the information required by the Agreement, such as identifying training or corrections as needed and providing justifications for conclusions. Where training needs were identified they were acted upon. Thus, this paragraph is rated as not compliant due to supervisors not completing their reports in five business days.

*Pathway Forward*

PRPB must ensure all UOF incidents are investigated in the time allotted as required by GO 605 (Report and Investigation of UOF Incidents). As noted in previous paragraphs, the Monitor is aware of the Provisional UOF Plan to address this issue and therefore will reassess this paragraph and the accuracy of UOF reporting in CMR-7.

## Paragraph 46: Use of Force - Supervisory and FRB Reviews

*A Force Review Board shall evaluate supervisory reviews, including Supervisor's Force Review Reports and reviewing officers' determinations. FRBs shall be composed of command staff from varying assignments. PRPD policies shall specify the conduct and requirements of FRB proceedings to ensure thorough, timely, and objective reviews. PRPD policy shall establish objective criteria that identify the force levels below serious uses of force*

*that shall be reviewed by FRBs. FRBs shall review supervisory review for completeness, evidentiary support, and compliance with PRPD policy. FRB shall document each FRB proceeding, which shall include findings and recommendations to the regional commander. FRB may also return force reviews to supervisors for additional review, as necessary, to ensure thorough and complete reviews. Copies of all Force Review Reports and underlying documents shall be submitted to SPR for tracking and analysis.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 44.

*Compliance Assessment*

PRPB provided the Monitor's Office a list of 77 officers assigned to 13 Area Command FRBs. The Monitor's Office requested the training and certification records of 22 randomly selected officers from this list to determine if they are qualified to serve on these boards as outlined in GO 502 (Evaluation Boards of Incidents of UOF).

As outlined in the Agreement language, FRB members are of varying assignments and rank, including 5 captains, 3 first lieutenants, 13 second lieutenants, and 1 commander. For this period the Monitor's Office reviewed the 22 training records of FRB members provided by PRPB. In 50% of the training files, FRB members had not been trained on GO 502 (Training for the Evaluation Boards of UOF Incidents). In addition, the PRPB Academy has not finalized the training curriculum for FRB members. It is expected that the training will be available in the latter half of the CMR-7 reporting period. This training is needed to ensure that FRB members are conducting reviews and evaluations as outlined in PRPB policy.

For the purposes of determining compliance with this paragraph, the Monitor's Office requested a list of all FRB investigations conducted by the 13 Area Command FRBs from October 2021 through March 2022. PRPB provided a list of 134 cases of UOF incidents evaluated by FRBs, of which the Monitor randomly selected 32 cases for review. PRPB provided information on 31 of the selected cases. In the remaining case PRPB provided signed documents from the FIU Commanding Officer and the Auxiliary Commissioner of SARP indicating that the incident did not involve a UOF. In addition, six of the provided files were for Level 1 and 2 UOFs with no injuries. Area Command FRBs only evaluate Level 2 and 3 UOFs with injuries. Another file provided involved a firearm discharge (Level 4) that would have been evaluated by the CFRB - not FRB. Therefore, these cases were incorrectly identified as FRB cases and, understandably, there was no indication they were ever evaluated by the Board. In one of the files

provided, a Level 3 UOF (use of an Electronic Control Device) occurred, which should have been reviewed by the Board, but the file contained no information to that effect. As a result of the above noted inaccurately labeled cases, only 18 case files were reviewed.

Ultimately, the Monitor wants to better understand how cases not required to be evaluated by the FRB made it into the list submitted and what source of data was used to compile the list. PRPB has yet to develop a single source database for all UOF cases that are evaluated by the 13 Area Command FRBs.

In the 18 cases provided for evaluation; the FRB determined that the level of force was consistent with Bureau policy. The Monitor's Office determined that the Board took appropriate measures as it relates to verifying the actions of officers involved in those incidents submitted to the Board for evaluation.

The Monitor offers the following additional assessments of the information provided:

- In one case, only the Board President signed the PPR-502.1
- In one case, PPR-502.1 was missing
- All eighteen cases provided documentation that the FRB reviewed the case
- In two cases the Board ordered retraining
- In cases where the Board completed PPR-502.1 the Boards' evaluations were unanimous
- No case files were returned by the Board due to missing or incomplete information
- No outdated forms were used.

Based on the review of the randomly selected Area Command FRB files, there were no reported referrals, nor was any such need uncovered. It should be noted that the Monitor's Office has seen significant improvement in the Area Command FRBs relative to proper UOF evaluation. However, as stated above, the record keeping of evaluated cases continues to be deficient.

## Pathway Forward

The Monitor will review PRPB's updated training for FRB members and observe training once conducted to ensure that it adheres to the Agreement. Further, the Monitor notes that compliance with this paragraph is also affected by PRPB's inability to accurately track and report on UOFs, as with many of the paragraphs in this section. PRPB needs to ensure that its record keeping relating to UOF evaluations by the FRB is complete and accurate.

## Paragraph 47: Use of Force - Supervisory and FRB Reviews

*Whenever a reviewing supervisor, FRB, or other reviewing officer finds evidence of a use of force indicating apparent misconduct or apparent criminal conduct by an officer, he or she shall immediately notify his or her supervisor for referral to the appropriate investigating unit or the PRDOJ. The Superintendent shall be notified of the referral.*

| Compliance Status | Assessment Schedule |
|---|---|

| Partially Compliant | | Review Period | October 2021 – March 2022 |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 44.

*Compliance Assessment*

PRPB policy clearly dictates the actions that the Board and FIU must take when reporting misconduct to the appropriate investigative unit or to PRDOJ. During the CMR-6 period FIU referred two cases to the PRDOJ and its investigative arm, NIE.

It should be noted that for CMR-6 the Monitor's Office reviewed three cases involving an accidental discharge which resulted in an officer sustaining an injury in one case. In all these cases FIU recommended that an administrative investigation be conducted and forwarded the cases to SARP for an investigation. These cases when investigated by FIU are categorized as non-use of force.

In the recent draft of GO 618 (Use and Handling of Firearms) provided to the Monitor's Office for review, PRPB had modified the policy to include the following:

> **General Provision Section V, subsection B, 9.** *Any negligent critical discharge incident that causes or does not cause injury to a person or animal, or where the PRPB member is inflicted harm, shall not be considered a use of force.*
>
> *These incidents will be investigated by Force Investigations Unit (FIU) and referred to SARP for corresponding investigation.*

This change was prompted by comments provided by the Monitor's Office. It should be noted that the above GO was to be revised in February 2022, however, to date it has not been revised or released. The assigning of a UOF designation in the above situations has been an ongoing discussion between the Monitor's Office, PRPB, and USDOJ.

*Pathway Forward*

In the instances where FIU investigates a UOF and determines that it was an accidental discharge and not a UOF, the case must be immediately forwarded to SARP upon completion of investigation, and the eventual disposition should be included in the FIU file. The designation of UOF should then be removed. The Monitor's Office also recommends that FIU document all such cases.

45

## 7. FIU Investigations and Force Reviews by SFRB

As indicated in previous CMRs, FIU is required to investigate all serious UOF incidents, among other investigations, across Puerto Rico, including both intentional and accidental firearm discharges involving PRPB personnel. In previous reports, the Monitor's Office has voiced concerns about the thoroughness of FIU investigations and the accuracy of their conclusions. In reviewing FIU investigations for CMR-6, the Monitor's Office has seen significant improvement in this area. Nevertheless, the Monitor's Office remains concerned regarding the amount of time FIU is taking to complete its investigations. Documentation provided by PRPB indicates that no cases during the period under review were completed in the 45-day deadline as required in GO 100-113 (FIU).

In past CMRs, these delays in concluding FIU investigations have prevented the Monitor's Office from reviewing sufficient FIU investigations to reach a compliance assessment. FIU investigations tended to overrun the 45-day deadline, and thus were not closed in sufficient time to provide to the Monitor's Office for review during the same reporting period that the incident occurred. To address this issue, and to better determine if FIU was properly investigating serious UOFs, as outlined in the Agreement, the Monitor's Office pivoted to requesting FIU investigations that were closed during the CMR-6 reporting period, rather than investigations that were opened during the period. The Monitor's Office thus requested a list of all FIU investigations that were completed in the CMR-6 period, irrespective of when the incident occurred that prompted the opening of the investigation. As previously noted, none of the cases reviewed were completed within 45 days, and some dated back over a year to 2020.

As it relates to the CFRB the Monitor's Office has seen some improvement in the Board's ability to complete its UOF evaluation in the timelines required in GO 502 (42%); however, the improvement, is minimal. PRPB needs to ensure that all UOF evaluations are completed in a timely manner as per policy.

### Paragraph 48: Use of Force - FIU Investigations and Force Reviews by SFRB

*PRPD shall ensure that all serious uses of force and allegations of excessive force are investigated fully and fairly by individuals with appropriate expertise, independence, and investigative skills to ensure that uses of force that are contrary to law or policy are identified and appropriately resolved and that policy or operational deficiencies related to the use of force are identified and corrected. To this end, PRPD shall create FIUs to conduct investigations of serious uses of force, uses of force indicating apparent criminal conduct by an officer, uses of force by PRPD personnel of a rank higher than sergeant, or uses of force reassigned to FIU by the Superintendent, his or her designee, SPR, or FRB. PRPD policies shall specify the membership requirements, conduct of investigations, and operational procedures of FIUs.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Implemented | | Bi-annually |

| Practice: | Implemented | Assessment Frequency | |
|---|---|---|---|

### Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Training for FIU officers is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of FIU officers are trained and certified in force reporting and investigation policies (or are scheduled for training, in the case of mid-year reviews) | ☑ Met | ☐ Missed |
| 4. All officers assigned to FIU meet eligibility requirements. | ☑ Met | ☐ Missed |

### Compliance Assessment

The Monitor's Office has reviewed the UOF policies and found that they meet the requirements of the Agreement. Regarding FIU training, the Monitor conducted a site visit to PRPB's FIU in March 2022 and verified that the training materials employed by PRPB are consistent with policy and generally accepted policing practices. FIU is responsible for investigating serious UOFs, including a) accidental and intentional firearm discharges, b) UOF by supervisors above the rank of sergeant, c) UOF at protests, and d) any other UOF deemed appropriate by the commissioner. The Monitor determined that additional training pertaining to investigating intentional and accidental firearm discharges, previously recommended by the Monitor's Office had been developed, and the training had commenced. This was verified by documentation provided by the FIU Commanding Officer. To date all but three members of FIU have been trained.

### Pathway Forward

PRPB should ensure that all FIU members are trained in a timely manner. The Monitor will review training records in CMR-7 to determine if PRPB has trained all FIU members in investigating intentional and accidental firearm discharges.

## Paragraph 49: Use of Force - FIU Investigations and Force Reviews by SFRB

*A supervisor responding to a serious use of force or allegation of excessive force shall immediately notify FIU. FIU shall respond to the scene and commence an investigation. FIU may decline to respond to the scene following consultation and approval by the FIU supervisor. Declinations shall be documented in writing.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

47

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2a. 95% of use of force incidents classified as Level 4 are reported, reviewed, and investigated by officers, supervisors, commanders, and FIU officers within policy. | ☑ Met | ☐ Missed |
| 2b. 95% of FIU investigations are completed within 45 days of the use of force or have valid justifications for longer periods based on exceptional circumstances. | ☐ Met | ☑ Missed |
| 2c. All use of force reviews and investigations by FIU reach reasonably justified conclusions on officers' conduct and recommend disciplinary or corrective action, as necessary, in accordance with policy. | ☑ Met | ☐ Missed |
| 3a. 95% of reviews by the Commissioner's Force Review Boards are within policy. | ☐ Met | ☑ Missed |
| 3b. The use of force tracking system includes all Commissioner's Force Review Board reports and underlying documents. | ☐ Met | ☑ Missed |
| 3c. Commissioner's Force Review Board determinations and recommendations are tracked and analyzed by SPR. | ☐ Met | ☑ Missed |

*Compliance Assessment*

PRPB provided a list of 121 cases closed by FIU during the reporting period, none of which occurred in the CMR-6 reporting period. PRPB included cases involving a) accidental firearm discharges, b) force by supervisors above the rank of sergeant, c) intentional firearm discharges, and d) non-firearm incidents.

The Monitor's Office's selected a random sample of 32 investigations that were completed during the months of October 2021 through March 2022 for the purpose of assessing FIU's compliance with the Agreement and with PRPB policies relevant to investigations. PRPB provided investigations files on the 32 cases drawn in the sample.

The following are general observations of the cases reviewed:

- In no case was the FIU investigation completed within 45 days as outlined in policy.
- There was a marked improvement in how the investigations are conducted. FIU investigators made numerous efforts to locate cameras in the area and possible witnesses. In addition, sketches were provided on all firearm discharges.
- Sketches are not always necessary in incidents where the only reason that FIU is investigating is that the force (non-serious) was used by a member of the service above the rank of sergeant. FIU should consider not requiring a sketch in these circumstances as it takes time to prepare.
- PRPB uses caricatures in some sketches that do not reflect what happened.
- Accidental discharge is no longer categorized as a UOF by PRPB once investigated. The Monitor's Office concurs but recommends that once SARP completes their investigation and concurs with FIU findings that the determination of force be made at that time.
- All FIU UOF reviews and investigations reach reasonably justified conclusions on an officers' conduct and recommend disciplinary or corrective action, as necessary, in accordance with policy.

- In addition to the accidental discharge cases, one other case was forwarded to SARP for administrative investigation relating to failure to investigate. As a result, a member of FIU was transferred out of the unit.
- Four investigations that involved intentional firearm discharge (Level 4) were reviewed by the Monitor's Office, the investigations were found to be consistent with Bureau policy and all required documents were in the files.
- PRPB should make it a practice that when an officer discharges their weapon at a suspect who is not apprehended that they state the following in their reports: "there are no injuries reported at this time as a result of the officer's discharge."

The fact that all the cases requested for review by the Monitor were not completed in the 45 days as outlined in GO 113 (FIU) is a concern to the Monitor's Office. The lack of files for the Monitor to review relating to UOF cases that occurred during the reporting period also impacts the compliance ratings of paragraphs 49-51.

As it relates to CFRB meetings, many of the cases evaluated by the Board involve serious UOF. PRPB needs to outline the protocol as to how these meetings should be conducted. It is recommended by the Monitor's Office that each Board member should be fully versed in the details of the incident prior to the board meeting. This will allow for healthy discussion between the Board members. To that end, all Board members should simultaneously receive a copy or have online access to the UOF file for purposes of review. The Monitor's Office has been informed by PRPB members that in the past the files where shared among the Board members adding considerable time to how long it took the board to conclude its evaluation.

In addition, PRPB should consider having either the FIU Commanding Officer or the FIU Executive Officer attend all CFRB meetings for the purpose of presenting the case to the Board members and to answer any questions members may have regarding the cases to be discussed. The Monitor's Office understands that the above recommendation may require a change to GO 502 (Evaluation Board of Incidents of Use of Force). However, the change to the policy would be appropriate.

The Monitor's Office also acknowledges that the current president of the CFRB has made considerable efforts to accelerate the rate of cases evaluated by the Board in the timeframe outlined in GO 502 (30 days). This is evident based on the increase in cases evaluated by the Board towards the end of the period covered by this report.

However, the UOF tracking system which is to include all CFRB reports, and underlying documents cannot be verified as accurate. In addition, PRPB has not provided documentation that CFRB determinations and recommendations are tracked an analyzed by SARP.

*Pathway Forward*

PRPB must ensure that prompt notification is made to FIU in cases regarding their involvement. For the most part, this was the case. FIU must complete its UOF investigations within the 45-day time outlined in GO 100-113. PRPB must also ensure that FIU has adequate personnel to conduct its investigations and

that all personnel have completed all necessary training to meet timelines relating to investigating serious UOFs.

CFRB must complete its reviews within the time allotted in GO 502 (Evaluation Boards of Incidents of Use of Force).

## Paragraph 50: Use of Force - FIU Investigations and Force Reviews by SFRB

*FIU shall immediately notify and consult with PRDOJ regarding any use of force indicating apparent criminal conduct by an officer. If PRDOJ indicates that it may proceed criminally, or PRPD requests a criminal prosecution, any compelled interview of the subject officers shall be delayed until after consultation with PRDOJ or expressly permitted by the Superintendent. No other part of the investigation shall be held in abeyance unless specifically authorized by the Superintendent in consultation with PRDOJ.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: These Paragraphs is assessed with Paragraph 48.

*Compliance Assessment*

In all cases where FIU determined that the UOF may involve criminal conduct by an officer, PRDOJ was notified along with its investigative arm, NIE. The Monitor's Office confirmed through a review of FIU data that there were two such referrals.

*Pathway Forward*

The Monitor will continue to assess this paragraph in CMR-7. The review of the two referrals demonstrate compliance, however, the Monitor would like for PRPB to demonstrate continued compliance with this paragraph. Further, the Monitor will continue to review such cases to assess consistency in PRPB practice.

## Paragraph 51: Use of Force - FIU Investigations and Force Reviews by SFRB

*FIU shall complete its administrative use of force investigation within 45 days of the use of force, absent exceptional circumstances. At the conclusion of each use of force investigation, FIU shall prepare a report on the investigation and shall forward the report to SFRB for review and to SPR for tracking and analysis.*

| Compliance Status | Assessment Schedule |
|---|---|

| Not Compliant | | Review Period | October 2021 – March 2022 |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: These Paragraphs is assessed with Paragraph 48.

### Compliance Assessment

For the CMR-6 reporting period PRPB reported that FIU completed 121 investigations of UOF. In none of those cases had FIU completed its investigation in the 45-day timeline established by policy. Given the lack of completed investigations that occurred in the period, the Monitor's Office can determine that FIU is not in compliance with this paragraph.

In further discussions with FIU, investigators noted that the root cause for failing to complete the investigation in the allotted time continues to be a delay in receiving the results of forensic and evidentiary material, e.g., video, photographs, and other evidence recovered at the scene of serious UOFs in a timely manner. This is information FIU needs to make its determination. In these cases, FIU must rely on other PRPB units and DSP to complete their task before the investigation can be closed. In past reviews of FIU cases, the Monitor has noted that FIU does make multiple requests for this information. This low level of data provision is of major concern to the Monitor's Office. The fact that 97% of cases investigated by FIU for the CMR-6 period remain open clearly indicates that PRPB is not in compliance with this paragraph. Once an investigation is complete, FIU does prepare the required report for the CFRB for review and analysis.

### Pathway Forward

PRPB should ensure that all FIU investigations are completed in 45 days, as outlined in GO 113 (FIU). PRPB must ensure that FIU has the adequate staff and resources to complete these investigations. Further PRPB must work with internal units within DSP and external stakeholders to address FIU's inability to receive forensic data in sufficient time to complete its investigations in the 45 days as required by policy.

It should be noted that this issue has been ongoing since CMR-1 and PRPB continues to lag in the timeliness of its FIU investigations. As noted in the January 14, 2022, status conference, compliance with the Agreement is not solely the responsibility of PRPB and falls on the shoulders of the entire Commonwealth and its governmental entities. The Commonwealth should examine the issues stemming from FIU's inability to close an investigation within 45 days and develop a plan to address such issues in the near term. This plan should be shared with the Monitor. Failure to address this issue negatively

51

affects compliance with various paragraphs in this subsection of the Agreement and will continue to stall PRPB's progress.

## Paragraph 52: Use of Force - FIU Investigations and Force Reviews by SFRB

*The Superintendent's Force Review Board shall evaluate all FIU investigations, including FIU reports and determinations. SFRB shall be composed of senior command staff from varying units. PRPD policies shall specify the conduct and requirements of SFRB proceedings to ensure thorough, timely, and objective reviews. SFRB shall review each FIU investigation for completeness, evidentiary support, and compliance with PRPD policy. SFRB shall document each force review proceeding, which shall include findings and recommendations, to the Superintendent. SFRB may also return force investigations to FIU for additional investigation, as necessary, to ensure thorough and complete investigations. Copies of all Force Review Reports completed by SFRB and underlying documents shall be submitted to SPR for tracking and analysis.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: These Paragraphs is assessed with Paragraph 48.

### Compliance Assessment

All CFRB members have received training on the current curriculum; however, this curriculum will be updated based on the revised policy. The Monitor's Office looks forward to reviewing the revised policy and training curriculum.

PRPB provided the Monitor's Office with documentation that the CFRB evaluated 45 FIU UOF investigations during the CMR-6 reporting period. The Monitor's Office requested a random sample of 19 cases for review, and generally found that CFRB reviews are objective, but not timely.

The following observations are put forth as a result of the review:

- In relation to CFRB:
  - 5 evaluations (26%) exceeded the 30-day timeline for evaluation identified in GO 502 (Evaluation Boards of Incidents of UOF). In CMR-5, 100% of cases exceeded the 30-day timeline.
  - 8 evaluations (42%) were concluded within the 30-day timeline.

- o 6 evaluations (32%) requiring CFRB reports (PPR-502.1 and PPR 502.2) were not provided by PRPB therefore a determination of compliance with policy timelines cannot be determined.
- In the cases reviewed by the Monitor's Office the findings were unanimous by board members.
- There were no instances in which the CFRB directed re-training as in CMR-5.
- In 13 cases (68%) PRPB provided the necessary documentation for CFRB evaluation.
- All PPR-502.1 were signed by board members.
- No reports were returned due to incorrect or incomplete and/or missing information as in CMR-5.
- One case (5%) was referred to SARP for an administrative investigation.
- One case (5%) is under investigation by NIE.

In addition, the Monitor's Office requested the training certification records of the three members of the CFRB, as well as any other person who may have served on the CFRB during the CMR-6 period. This information serves to determine whether CFRB members are qualified to serve on the board, as outlined in GO 502. During the April 2022 site visit the Monitor was informed by Academy personnel that the information provided to the Monitor's Office for the FRB members also applies to CFRB members.

In conversations with the Monitor's Office, PRPB has acknowledged its shortfalls in the evaluation of cases investigated by FIU. In a move forward, the CFRB Chairman reported that he was appointed by the Commissioner and instructed that the priority of PRPB is to focus all efforts to comply with the Agreement. Since his appointment to the position, the Monitor's Office has seen improvement in the number of cases being evaluated by the CFRB.

*Pathway Forward*

Issues with the timeliness of these evaluations do not appear to be a result of staffing shortages. It is imperative that PRPB and the CFRB members commit to completing these evaluations in the timelines established in policy. PRPB should also ensure that all officers serving on the CFRB have training certifications. The Monitor will review the training curriculum developed because of the revised policy.

## 8. Use of Force Training

The Monitor's Office finds that PRPB is partially compliant with the paragraphs of the Agreement in this subsection which stipulates that all trainings must be consistent with policies and the Agreement and that all personnel must be trained and certified on UOF policies. While all training curriculums are consistent with policies and the Agreement, PRPB has not provided ample documentation to support that the training compliance thresholds have been met. PRPB has provided ample documentation noting that nighttime firing has been conducted; however, paragraph 54 establishes an extremely high bar for compliance, which requires access to all firearm data. As of the CMR-6 reporting period, PRPB does not maintain a master list of all firearm qualification data, so the Monitor is unable to fully assess this paragraph. Regarding other training requirements, such as those noted in paragraphs 53 and 55, PRPB has not yet reached the 95% compliance threshold in the review of the random sample provided by PRPB.

## Paragraph 53: Use of Force - Use of Force Training

*PRPD shall train all PRPD officers on PRPD's use of force policies. Thereafter, PRPD shall provide all PRPD officers with use of force training at least every two years for the first four years of this Agreement, and annually thereafter. PRPD shall also provide training on use of force as necessary, based on developments in applicable law and PRPD policy. At least annually, PRPD shall assess all use of force policies and training. PRPD's use of force training program shall include the following topics:*

*a) legal standards for reasonable force;*

*b) PRPD's use of force policy;*

*c) reporting use of force, requesting medical service, and preserving evidence;*

*d) scenario-based training and interactive exercises that illustrate proper use of force decision-making;*

*e) the proper deployment and use of all weapons or technologies, including firearms, batons, chemical agents, and ECWs;*

*f) threat assessment and de-escalation techniques that encourage officers to make arrests without using force, and instruction that disengagement, area containment, surveillance, waiting out a subject, summoning*

*reinforcements, calling in specialized units, or delaying arrest may be the appropriate response to a situation, even when the use of force would be legally justified;*

*g) crisis intervention and interacting with people with mental illnesses, including instruction by mental health practitioners and an emphasis on de-escalation strategies;*

*h) factors to consider in initiating or continuing a foot pursuit; and*

*i) appropriate training on conflict management.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### *Compliance Targets*

| | |
|---|---|
| 1. Training on use of force is consistent with approved policies and the requirements of the paragraph. | ☑ Met   ☐ Missed |
| 2. 95% of officers are trained and certified in use of force (or scheduled for training, in the case of mid-year reviews). | ☐ Met   ☑ Missed |

### *Compliance Assessment*

PRPB recently updated all UOF policies and, as a result, developed new UOF training curriculums on these policies. After reviewing a random sample of training personnel records, the Monitor's Office determined that PRPB has not met the 95% threshold for the training of officers on the relevant UOF trainings (REA 601 and REA 605). REA 605 was not noted in any training records that the Monitor's Office

reviewed. However, the additional training on intentional firearm discharge investigations has been completed.

*Pathway Forward*

The Monitor will review the updated UOF training curriculums and ensure continued compliance with this paragraph. The Monitor's Office will continue to assess training compliance with target two through random training record reviews. The Monitor also notes that PRPB should ensure that this training is not conducted solely using its Virtual Training System. Training on UOF, specifically the topics noted in this paragraph, should also be incorporated into in-person scenario-based training to ensure that officers understand the policy requirements and the practical application of such procedures.

## Paragraph 54: Use of Force - Use of Force Training

*PRPD shall provide an appropriate firearm training program that:*

*a) requires officers to complete and satisfactorily pass firearm training and qualify on each firearm the officer is required or authorized to carry on an annual basis;*

*b) requires cadets, officers in probationary periods, and officers who return from unarmed status or extended leave to complete and satisfactorily pass firearm training and qualify on each firearm the officer is required or authorized to carry before such personnel are permitted to carry and use firearms;*

*c) incorporates night training, stress training (i.e., training in using a firearm after undergoing physical exertion), and proper use of force decision- making training, including continuous threat assessment techniques, in the annual in-service training program;*

*d) ensures that firearm instructors critically observe students and provide corrective instruction regarding deficient firearm techniques and failure to utilize safe gun handling procedures at all times; and*

*e) requires comprehensive testing that shows complete understanding of rules, regulations, and skills regarding firearm use.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Training on the use of firearms is consistent with approved policies and the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. 100% of officers are trained, certified, and qualified in use of firearms or have a valid justification for not qualifying in accordance with policies. | ☐ Met | ☑ Missed |

*Compliance Assessment*

PRPB provided evidence that it conducted training on nighttime (reduced lighting) firing during the CMR-6 period. The Monitor received sufficient evidence to conclude that all officers are currently certified in reduced light. Only "reduced light" qualifications were conducted during this CMR period. Daytime firing qualifications will be conducted by PRPB in CMR-7. The Monitor notes that paragraph 54 establishes an extremely high bar for compliance, and therefore requires full access to data on firearms training. The number of officers trained does not suffice to demonstrate that 100% of officers are trained and certified in the use of firearms or have a valid justification for not qualifying.

*Pathway Forward*

PRPB must create and maintain a "master list" which includes all sworn personnel and their status as it relates to firearm training. PRPB must work with the Monitor's Office to grant the Monitor direct access to the Police Training Management System (PTMS) or other structured data sources so that the Monitor can directly verify rates of firearm certification and justifications for all officers that are not currently certified.

## Paragraph 55: Use of Force - Use of Force Training

*PRPD shall train all supervisors, FIU members, and command officers on PRPD's use of force policies. Thereafter, PRPD shall provide all supervisors, FIU members, and command officers with training on use of force, force investigations, and force investigation reviews at least annually and, as necessary, based on developments in applicable law and PRPD policy. PRPD's use of force training for supervisors, FIU members, and command officers shall include the following topics:*

*a) requesting medical services and determining the appropriate use of force reporting levels;*

*b) identifying and interviewing involved officers, witness personnel, subjects upon whom force was used, and civilian witnesses;*

*c) ensuring proper collection of evidence;*

*d) reviewing use of force and supplemental reports for completeness, accuracy, and quality, including recognizing boilerplate language and document discrepancies;*

*e) assessing the legality and appropriateness of a detention and subsequent arrest;*

*f) legal standards governing the use of reasonable force, including legal standards and requirements for criminal accountability, administrative*

*accountability, and performance improvement related to tactics, training, equipment, and policy sufficiency;*

*g) recommending and administering proper discipline and non-punitive corrective action related to use of force; and*

*h) report writing.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – March 2022 |
| Policy: | Implemented | | |

56

| Training: | Not Implemented | Assessment Frequency | Annually |
|---|---|---|---|
| Practice: | Not Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. Training on the use of force, force investigations, and force investigation reviews is consistent with approved policies and the requirements of the paragraph. | ☑ Met   ☐ Missed |
| 2. 95% of supervisors, FIU officers, and commanders are trained and certified in use of force, force investigations, and force investigation reviews (or scheduled for training, in the case of mid-year reviews). | ☐ Met   ☑ Missed |

### Compliance Assessment

The Monitor's Office verified that 95% of supervisors, FIU personnel, and command personnel have not been trained on the relevant courses (REA 601 and 605). They have completed the advanced training for FIU personnel related to investigating intentional firearm discharges (Level 4 UOF). The FIU Commanding Officer informed the Monitor's Office that only three members have not received the additional training. The lieutenant further reported that those members will complete the training during the CMR-7 period. This additional training was in response to the Monitor's previous reports, which identified significant deficiencies in FIU's firearm discharge investigations (Level 4 UOF).

### Pathway Forward

Given the nature of the important work conducted by FIU, it is imperative that that they receive all required training and that this training is periodically updated as needed. The work of the CFRB plays a pivotal role in identifying the training needs of FIU as they evaluate all FIU investigations and are in the best position to uncover deficiencies in their training. The Monitor's Office will continue to assess training compliance with target two through random training record reviews.

## 9. Responding to Behavioral/Mental Health Crisis

As stated in previous CMRs, it is critically important to have Crisis Intervention Team (CIT) trained officers throughout the 13 Area Commands. Since the conclusion of the pilot project, PRPB has yet to expand CIT coverage outside of Arecibo. Issues with garnering personnel interest in the position has presented difficulties in creating CIT programs in other areas.

CIT was also discussed during the January 14, 2022, status conference. As PRPB expands its CIT program it should use the feedback and analysis of the pilot conducted in Arecibo to inform its approach and implementation of CIT in the other areas of the island. In response to the January 14, 2022, status conference, the Court ordered PRPB to establish an evaluation committee tasked with conducting an evaluation of the CIT pilot in Arecibo. Since this time, PRPB has worked with USDOJ and the Monitor to establish this committee and identify potential evaluation methods and performance measures to gauge the impact of this program and inform the implementation of CIT Bureau-wide.

The expansion of CIT officers to the other Area Commands and the presence of CIT trained officers, Bureau-wide will enhance PRPB's ability to handle calls for service involving persons in crisis, especially those related to "Ley 408" (court ordered involuntary commitment).

## Paragraph 56: Use of Force - Responding to Behavioral/Mental Health Crisis

*PRPD shall develop policies and procedures to improve its response to individuals in behavioral or mental health crisis, and to minimize the use of unnecessary force against such individuals. To achieve this outcome, PRPD shall, in addition to providing all officers with basic training on responding to persons in behavioral or mental health crisis, implement and train a comprehensive first responder Crisis Intervention Team ("CIT") to develop and maintain specially-trained CIT officers. The CIT shall incorporate the following requirements:*

*a) The CIT shall develop policies and procedures for the transfer of custody or voluntary referral of individuals between PRPD, receiving facilities, and local mental health and social service agencies.*

*b) The CIT policies and procedures shall require that whenever officers encounter juveniles in mental health crisis that officers refer them to appropriate mental health services located in the community.*

*c) The CIT officers shall be assigned to field operations units and maintain their standard patrol duties, except when called to respond to potential behavioral or mental health crisis events where the officers may be required to respond outside of their assigned patrol district.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☒ Met | ☐ Missed |
| 2. Training on basic behavioral health is consistent with approved policies and includes general instruction on the CIT program. | ☒ Met | ☐ Missed |
| 3. 95% of officers are trained and certified in basic behavioral health (or are scheduled for training, in the case of mid-year reviews) | ☐ Met | ☒ Missed |
| 4. Training on crisis intervention for CIT officers is consistent with approved policies. | ☒ Met | ☐ Missed |
| 5. 100% of officers assigned to CIT are trained and certified in crisis intervention. | ☒ Met | ☐ Missed |
| 6. 100% of all officers assigned to CIT meet eligibility requirements. | ☒ Met | ☐ Missed |
| 7. 95% of responses to incidents involving persons in mental health crisis are within policy. | ☐ Met | ☒ Missed |
| 8. The incident tracking system tracks all incidents involving persons in mental health crisis and the disposition of the incident. Data analyzed as part of PRPB's annual report on use of force as required by policy. | ☐ Met | ☒ Missed |

58

*Compliance Assessment*

The Monitor's Office has reviewed the CIT policies and trainings and found that they meet the requirements of the Agreement, and that training follows approved policies. The Monitor's Office understands that establishing CIT teams in all areas in an expedited manner may be difficult initially, but it is also vital. Those officers selected to be certified as CIT officers (40 hours of training) will continue in their normal capacity as patrol officers. PRPB expects that approximately 180 additional officers will be selected and trained.

PRPB provided documentation that no training of officers on the basic "Intervention with Persons in Crisis" course took place during the CMR-6 period. The PRPB Academy similarly reports that all PRPB officers who have not yet received the eight-hour basic CIT training, will do so virtually starting in 2022. As noted in various sections of this report, virtual training was halted when issues relating to the integrity of the training were brought forth. As such, no virtual trainings were conducted during the reporting period.

For the CMR-6 period, PRPB reported 353 cases of interactions with persons in crisis, however initially, PRPB provided no source of data other than to say that is what appears in GTE. It was unclear what form or report this data was pulled from. This is of significance to the Monitor's Office. In past reports the Monitor's Office reported that PRPB was not adequately capturing the number of interactions with "persons in crisis". The number of persons in crisis provided in previous reports were extremely low given the size of the agency and the population of the island, i.e., in CMR- 5 PRPB reported 16 interactions involving persons in crisis. The stark increase to 353 interactions needs to be better explained.

Of the 353 interactions, the Monitor's Office requested a random sample of 54 cases for purposes of review. The following is breakdown of those cases:

- 24 involved Ley 408 (Court Ordered "Involuntary Commitment")
- 4 involved a threat of suicide
- 3 wanted to go to the hospital due to their stress level
- 6 reported various level of stress
- 14 cases did not involve a person in stress
- 3 provided no information

Additional Observations

- Of the 37 cases identified as "person in crisis" 65% involved Ley 408
- The data source for the information in 35 of the 37 cases was PPR- 621.2 (Other Report)
- 2 remaining were reported on PPR- 621.1 (Incident Report) & PPR-126.2 (Complaint Card)

*Pathway Forward*

The Monitor's Office looks forward to working with PRPB as it continues to evaluate the Arecibo CIT Pilot Program and expand the CIT program to the remaining areas. The Monitor's Office requests that PRPB

59

provide documentation that cadets are being trained in CIT at the Academy. As previously stated, PRPB's policy to send district/precinct officers to ACT 408 orders (involuntary admission to a hospital for psychiatric evaluation) by the court should be reviewed. In the random sample for the CMR-6 period, 65% involved such orders and many have resulted in an electronic control device, or some other non-lethal weapon being used against the subject. Using a trained CIT officer in these circumstances may result in less UOF. The Monitor's Office recommends that once the CIT program has been expanded to other Area Commands, a protocol should be established that calls for service relating to involuntary committal (Ley 408) be handled by on-duty CIT officers, when possible.

PRPB currently has an insufficient number of CIT trained officers or applicants to expand the CIT program to the remaining 12 Area Commands. To address this issue PRPB should consider adding a transfer component that would allow officers that agree to participate in the program, are subsequently accepted and successfully complete the training, to select their choice of Area Command.

PRPB has not provided documentation that dispatchers have received specific training related to dispatching officers to "persons in crisis". In fact, to this point, the only training provided to dispatchers is the 8-hour course provided to field personnel. PRPB needs to develop a course specific to dispatchers regarding how to route crisis calls to CIT officers on duty.

In addition, with the significant increase in reported interactions with persons in crisis for this period, PRPB needs to do a deep analysis to determine if the number of interactions had indeed increased or PRPB has just done a better job at capturing the information.

## Paragraph 57: Use of Force - Responding to Behavioral/Mental Health Crisis

*PRPD shall train PRPD field operations unit officers in the CIT program and shall ensure that CIT-trained officers are assigned to each shift in each police region. PRPD shall provide crisis intervention training to all dispatchers to enable them to identify calls for service that involve behavioral or mental health crisis events.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. 95% of shifts have at least one CIT-trained and certified officer. | ☐ Met  ☑ Missed |
| 2. Training on crisis intervention for call dispatchers is consistent with approved policies. | ☐ Met  ☑ Missed |
| 3. 95% of call takers are trained and certified in crisis intervention (or are scheduled for training, in the case of mid-year reviews) | ☐ Met  ☑ Missed |

60

Note: Training on the CIT program for field operations officers is evaluated as part of the basic behavioral health training in Paragraph 56.

*Compliance Assessment*

As determined in previous CMRs, PRPB implemented a CIT pilot project in the Arecibo Area Command which concluded in November 2020. Fifteen officers from the Arecibo Area Command participated in the training as CIT First Response Officers. The training for CIT officers took place at the PRPB Academy during a previous reporting period. Officers were required to pass a written exam at which point they could proceed to the Scenario Based Training segment. The course, Intervention Team in Crisis (CITE 8061), consisted of 40 hours of training. PRPB provided the course curriculum as well as a certified list of those who were trained to the Monitor's Office.

PRPB has also selected CIT Coordinators with a minimum rank of sergeant in all Area Commands who are currently identifying prospective CIT officers. PRPB provided the Monitor's Office with the rating form that PRPB will use for prospective candidates to the program. In addition, the PRPB Commissioner issued a job posting for uniformed agents from the precinct and districts of the 13 police areas who may be interested in belonging to CIT. The job posting provides a job description, eligibility requirements, training description, and application instructions. The job posting was open until April 15, 2022.

The Monitor's Office is supportive of PRPB's intention of expanding the program to all areas, however, to date, little progress has been made. The Monitor's Office understands that establishing CIT teams in all areas in an expedited manner may be difficult initially given that support services may not be available in the early stage in some areas. However, the presence of CIT trained officers Bureau-wide, will enhance PRPB's ability to handle calls for service involving persons in crisis, especially those related to Ley 408 (Involuntary Commitment Orders). Therefore, the Bureau most make a concerted effort to complete this task. Because this program has not been expanded Bureau-wide, PRPB has not met target one.

PRPB has provided training to field personnel and dispatchers relating to CIT. The training for dispatchers has not been specific to their work assignment. This training should be more in-line with the daily responsibilities of a dispatcher, including how to collect the appropriate information from the caller to provide to the responding officer.

In relation to the eight-hour basic training course which all field members of PRPB are to receive, PRPB provided the Monitor's Office with the four new training modules used in officer training as well as the exam used to determine the level of proficiency in the material presented. To that end, PRPB provided information that no PRPB officers were trained during the months of October 2021 through March 2022. PRPB indicated that virtual training would resume in the latter part of 2022.

*Pathway Forward*

As noted above, PRPB must accelerate the expansion and subsequent training of CIT to the 13 Area Commands. The Monitor is aware that PRPB is in the process of developing and reinstating its virtual training and expects that once completed, it will resume the virtual eight-hour basic CIT training course. Having developed a curriculum and training for the CIT program and having tested it in the field in

61

Arecibo, the Monitor's Office expects PRPB to make substantial progress in implementing the program Bureau-wide. The training of officers to handle individuals with mental health issues so that such incidents do not escalate into confrontations in which PRPB members use force is paramount.

The Monitor understands that the implementation of the eight-hour in-person Bureau-wide training was significantly impacted by the COVID-19 pandemic and difficulties with the virtual training platform. Nevertheless, the Monitor's Office expects to see significant progress in training all PRPB personnel in crisis intervention as the CIT pilot project is expanded to all Area Commands.

As previously stated, PRPB has not provided documentation that dispatchers have received specific training related to dispatching officers to "persons in crisis". In fact, to this point, the only training provided to dispatchers is the 8-hour course provided to field personnel. PRPB needs to develop a course specific to dispatchers regarding routing crisis calls to on-duty CIT officers. All dispatchers should receive this training.

The Monitor's Office also recommends that a training course specific to dispatchers and their daily responsibilities be developed. Until this training is developed and conducted, PRPB will not be compliance with targets two or three.

## III. Searches and Seizures: Internal Controls and Accountability

PRPB provided the Monitor's Office with spreadsheets containing data on 9,159 arrests and 684 searches conducted during the CMR-6 assessment period. The Monitor's Office used random decimal generation in excel to randomize the order of this data to draw a random sample of 94 arrests and 67 searches.[5] The Monitor received 94 randomly selected arrest files and 67 search warrant files from PRPB to review and analyze, including 3 arrests conducted by Municipal Police Departments. The Monitor, as in the past, rated a high number of arrest files as partially compliant or not compliant due to missing required PPR forms and lack of appropriate documentation of probable cause. Upon reviewing the search and seizure files, 41 were rated as partially or not compliant, also mostly due to the lack of required forms.

Further, the Highway Patrol Division continues to submit incomplete arrest files which lack proper probable cause documentation and include repetitive and boilerplate language.

Of the 29 consent searches reviewed, most were properly documented on PPR-612.1 (Consent Search), but a few were not documented (or forms were not submitted) and others lacked detailed information as required by the form.

All the above shortcomings have been outlined by the Monitor in prior reports but continue to persist. This continued inconsistency in addressing these issues is of concern to the Monitor. Progress with many of the paragraphs will continue to stagnate if these issues persist.

PRPB's virtual training system has not been reinstated since it was compromised in 2021. In-person training is slowly coming back after being delayed due to the COVID-19 pandemic.

In addition to reviewing arrest and search warrant files, the Monitor also conducted field visits to various area commands, Criminal Investigation Corps (CICs), centro de mandos, the Radio Communication Division, and highway patrol units, as well as police districts and precincts, and conducted interviews with PRPB personnel at each of these locations.

Overall, PRPB's compliance with the 18 paragraphs assessed during this reporting period within Searches and Seizures reflect a regression in levels of compliance to what was noted in previous reports. In CMR-5, 36% of paragraphs (8 paragraphs) were assessed as partially compliant, in comparison to the current reporting period, where 17% of paragraphs (3 paragraphs) assessed were found to be partially compliant. See figure 3. Much of this regression is due to the continued inaction on the part of PRPB to address or demonstrate that Bureau is working to address the issues raised by the Monitor in previous reports.

---

[5] These relatively small sample sizes reflect the sampling strategy agreed to by the Parties to make the most efficient use of the Monitor's Office's limited resources - in this case having only one Monitor responsible for reviewing dozens of arrest and search files with very tight deadlines. The samples from four consecutive CMRs represent a stratified random sample covering a two-year period, which corresponds to the period for which PRPB must consistently demonstrate substantial compliance in order to achieve full compliance. This rolling sampling strategy was derived from the U.S. Census Bureau's American Community Survey and ensures that the Monitor's Office has reviewed sufficient data to draw conclusions regarding full compliance with a high confidence level and a low margin of error. For further details refer to Appendix B.



*Figure 3. Searches and Seizures: Paragraph Compliance Status*

## Paragraph 58: Searches and Seizures - General Provisions

*PRPD shall ensure that all investigatory stops, searches, and arrests are conducted in accordance with the rights, privileges, or immunities secured or protected by the Constitution and laws of the United States and the Commonwealth of Puerto Rico. PRPD shall ensure that investigatory stops, searches, and arrests are conducted as part of effective crime prevention strategies that are consistent with community priorities for enforcement.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

Note: Compliance will be determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 59-79, and (2) the results of outcome assessments, pursuant to Paragraph 243.

### *Compliance Assessment*

GOs 612 (Searches and Seizures) and 615 (Arrests and Summons) provide guidance to officers on properly applying probable cause for arrests and searches. These policies are routinely kept up to date by PRPB, with 612 updated in 2022, and 615 in 2018 (presently under review). However, a high number of PRPB arrests, 37 out of 94 (39%), lacked proper documentation of probable cause. In addition, officers and supervisors failed to submit properly completed arrest files with all the required forms, as per policy, in 58 of the 94 (62%) arrest files. This was also the case in 34 of the 67 (51%) search and seizure files.

PRPB does not currently document investigatory stops, other than motor vehicle traffic interventions (motor vehicle stops). These stops are only documented when there is an arrest, or a citation is issued. In addition, arrest forms and citations capture only minimal demographic data insufficient to comply with Paragraph 243; and even in these cases, PRPB does not conduct tracking and analysis of this limited data.

As a result, PRPB has not submitted any analysis on investigatory stops data to the Monitor to comply with paragraph 243, Outcome Assessments. PRPB has not provided the Monitor with any evidence that these investigatory stops were conducted as a part of any given strategy or whether they were prioritizing community needs.

*Pathway Forward*

PRPB must ensure officers and supervisors properly document probable cause and submit complete arrest files containing all required forms, both requirements under GO 615 and the Agreement. PRPB must also create a demographic and geographic tracking and analysis system for investigatory stops and arrests, as required by paragraph 243 of the Agreement.

## 1. Stops, Searches, and Seizures

*Paragraph 59 is assessed annually and will be reviewed in CMR-7.*

## 2. Investigatory Stops and Searches

GO 612 on searches and seizures guides officers on all types of searches, including consent searches. This GO was reviewed and updated in March 2022. PRPB only allows investigatory stops of motor vehicles based on probable cause, which is clearly stated in GO 612. The Monitor reviewed 11 randomly selected cases of motor vehicle stops by the Highway Patrol Division and found that most of the arrest files failed to document probable cause and continually used repetitive and boilerplate language. In addition, supervisors and commanders failed to take corrective action in these cases.

PRPB does not currently collect or track data on any type of stops. The Monitor is awaiting revisions to current forms and the systems meant to track and analyze traffic stops. The Monitor interviewed several directors of the Highway Patrol Division during this period and was informed that PRPB is using an electronic ticketing device that captures certain information about the driver and the vehicle. However, it does not capture all the demographic data required by the Agreement, such as perceived race and ethnicity. In addition, the deployment of this device is partial.

### Paragraph 60: Searches and Seizures - Investigatory Stops and Searches

*PRPD shall develop an Investigatory Stops and Searches Reporting Policy and a system to collect data on all investigatory stops and searches, whether or not they result in an arrest or issuance of a citation. PRPD's stop data collection system shall be subject to the review and approval of the TCA, and shall require officers to document the following: (a) the date, time, location, and duration of the stop and/or search; (b) the reason for the stop and/or search; (c) the subject's apparent race, color, ethnicity or national origin, gender, and age; (d) whether any contraband or evidence was seized, and the nature of the contraband or evidence; and (e) the disposition of the stop, including whether a citation was issued or an arrest made. PRPD shall require that officers*

*submit written reports regarding investigatory stops and searches to their supervisor by end of shift for review. A copy of these reports shall be forwarded to SPR and the Reform Unit for tracking and analysis.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

1. 100% of stops and searches are justified based on probable cause. For stops and searches based on a lesser standard or that are otherwise unjustified, PRPB takes corrective and/or disciplinary action. ☐ Met ☑ Missed

2. 100% of stops and searches reviewed as part of other areas of the Agreement are based on probable cause. For stops and searches based on a lesser standard or that otherwise unjustified, PRPB takes corrective and/or disciplinary action. ☐ Met ☑ Missed

Note: PRPB has not authorized investigatory or Terry stops based on reasonable suspicion. For Paragraphs 60-64, the Monitor's Office will assess the basis for stops and arrests based on probable cause.

*Compliance Assessment*

Many arrests (37 out of 94, or 39%) and stops (8 out of 11 Highway Patrol cases, or 73%) failed to properly document probable cause. PRPB has failed to submit to the Monitor any cases where corrective or disciplinary action was taken to address these issues. As of this report, PRPB has not provided the Monitor with a tracking and analysis system for stops and searches, although it has stated it is in the process of developing such a system.

*Pathway Forward*

PRPB must ensure officers and supervisors properly document probable cause and submit complete arrest files containing all required forms, both requirements under GO 615 and the Agreement. PRPB must also create a demographic and geographic tracking and analysis system for investigatory stops and arrests, as required by paragraph 243 of the Agreement.

## Paragraph 61: Searches and Seizures - Investigatory Stops and Searches

*PRPD's Investigatory Stops and Searches Reporting Policy shall explicitly prohibit the use of boilerplate or conclusory language in all reports. PRPD policies shall also expressly prohibit officers from knowingly using or relying on information known to be materially false or incorrect in effectuating an investigatory stop or detention.*

| Compliance Status | Assessment Schedule |
|---|---|

66

| Not Compliant | | Review Period | October 2021 – March 2022 |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 60.

*Compliance Assessment*

Search and Seizure policy (GO 612) complies with the Agreement in that it prohibits conclusory or boilerplate language and prohibits officers from using false or incorrect information. This policy was last updated in March 2022. Despite the Monitor's documentation of these issues in previous reports and discussions with PRPB personnel stressing the need to address these issues, invariably, officers continue to use boilerplate and conclusory language in their reports. For example, when making an arrest that falls under the Domestic Violence Statute 54, most officers write that the subject was "arrested for violating law 54", instead of citing the actual crime for which the person was arrested, such as "assault and battery under Statute 54, Section...".  Similarly, most Highway Patrol Division officers, in cases of Operating Under the Influence, continue to write that the subject was "arrested for Operating Under the Influence, taken to a police facility where he/she was given the Intoxilizer test and failed with a --%", instead of stating the facts of each case that led them to establish probable cause for the arrest or detention. This was the case in 7 out of 11 (64%) Highway Patrol Division cases reviewed.

PRPB does not currently document investigatory stops, other than motor vehicle traffic interventions (motor vehicle stops). These stops are only documented when there is an arrest, or a citation is issued. In addition, arrest forms and citations capture only minimal demographic data insufficient to comply with Paragraph 243; and even in these cases, PRPB does not conduct tracking and analysis of this limited data.

As a result, PRPB has not submitted any analysis on investigatory stops data to the Monitor to comply with paragraph 243, Outcome Assessments. PRPB has not provided the Monitor with any evidence that these investigatory stops were conducted as a part of any given strategy or whether they were prioritizing community needs.

*Pathway Forward*

For compliance, the Monitor reiterates that PRPB must provide additional training to officers and supervisors in establishing and properly documenting probable cause in their reports. This will help officers avoid repetitive and boilerplate language. Supervisors and commanders must also be held accountable for the actions or non-actions of their subordinates.

## Paragraph 62: Searches and Seizures - Investigatory Stops and Searches

*A supervisor shall review each report on Investigatory Stops and Searches to determine whether the stop or search was within PRPD policy and this Agreement. For any investigatory stop or search deemed to be outside of PRPD policy or this Agreement, the supervisor shall determine if the stop or search: (a) should result in an internal investigation by SPR; (b) indicates a need for additional training, counseling, or any other non-punitive corrective measure for the involved officer; and (c) suggests the need for revising or reformulating agency policy, strategy, tactics, or training. The supervisor shall document on an auditable form those investigatory stops and searches that are unsupported by reasonable suspicion; are in violation of PRPD policy or this Agreement; or that indicate a need for corrective action or review of agency policy, strategy, tactics, or training. The quality of these supervisory reviews shall be taken into account in the supervisor's performance evaluations.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: This Paragraph is assessed with Paragraph 60.

### Compliance Assessment

The Monitor has found that Highway Patrol Division officers fail to document probable cause for stops and/or arrests in most cases. In 11 randomly reviewed cases, officers failed to document probable cause in 7 of the police reports. Police reports for traffic stops are vague and lack details. Moreover, out of 10 supervisory arrest reviews (PPR-615.8) 7 were rated fair to poor for lack of detailed probable cause. One other case contained no supervisory review form. The Monitor did not receive any indication that supervisors had taken any corrective actions in these cases.

### Pathway Forward

Supervisors and commanders must be held accountable for the actions or non-actions of their subordinates. To reach substantial compliance, PRPB must address these issues through training, including virtual, in-person, and roll call or monthly training.

## Paragraph 63: Searches and Seizures - Investigatory Stops and Searches

*A command-level officer or official shall review, in writing, all supervisory auditable forms related to investigatory stops and detentions. The commander's review shall be completed within three business days of receiving the document reporting the event. The commander shall evaluate the corrective action and recommendations in the supervisor's written report and ensure that all appropriate corrective action is taken, including referring the incident for administrative or criminal investigation.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 60.

*Compliance Assessment*

The Monitor reviewed 11 randomly selected investigatory stops/detentions by the Highway Patrol Division. There were 10 PPR-615.8 arrest reviews by command-level officers (Unit Directors). Seven out of ten were rated fair or poor for lack of detailed basis for probable cause. Most commanders simply stated that they agreed with the supervisor's evaluation of the arrest, which were also rated fair to poor by the Monitor. Further, the Monitor noted that there were no indications that supervisors or commanders had taken any corrective action in these cases.

*Pathway Forward*

Supervisors and commanders must do a better job when reviewing and approving their officers' work. When deficiencies are found, corrective action must be taken. The Monitor believes that additional training and holding supervisors accountable is the best path forward to improving supervisory reviews and overall compliance.

## Paragraph 64: Searches and Seizures - Investigatory Stops and Searches

*At least annually, PRPD shall analyze investigatory stop and search data to determine significant trends, identify and correct deficiencies revealed by this analysis, and document its findings in a public report.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

69

Note: This Paragraph is assessed with Paragraph 60.

*Compliance Assessment*

The Monitor is not aware of PRPB's use of any system to collect or track investigatory stop and search data or even motor vehicle traffic stops or detentions. As such, PRPB does not conduct any annual analysis of such data.

*Pathway Forward*

The Monitor stresses the importance of developing a system to collect, track, and analyze such data. This is not only imperative to PRPB's compliance with this paragraph, but also necessary for the conduct of the outcome assessments as part of paragraph 243.

## 3. Arrests

PRPB arrest policy (GO 615), last updated in July 2018, complies with applicable laws and the Agreement. In October 2021, PRPB submitted a revised draft of GO 615 to the Monitor for review. The Monitor submitted proposed revisions and comments on the policy. The policy warns officers not to engage in any action in violation of PRRB policies or any criminal activity and outlines the consequences they may face if they do. PRPB's virtual training system has not been activated since it was compromised in 2021. Lack of documented probable cause in police reports as required by policy and the Agreement continues unabated and many arrest files are submitted in an incomplete format, in violation of PRPB policies. There is no indication that supervisors and commanders are addressing these shortcomings when they review and approve arrest reports.

### Paragraph 65: Searches and Seizures - Arrests

*PRPD shall revise its policies on arrests to ensure that they comply with applicable law and comport with generally accepted policing practices.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all others. |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies and forms incorporate all of the requirements of Paragraphs 59, 65-71. | ☑ Met | ☐ Missed |
| 2. 95% of selected arrests are notified and reviewed by supervisors in accordance with approved policies. | ☐ Met | ☑ Missed |

70

| | |
|---|---|
| 3. Officers transport arrestees and complete required arrest documentation in accordance with approved policies in 95% of selected arrests. | ☐ Met ☑ Missed |
| 4a. Supervisors respond to injuries and complaints of pain by detainees or arrestees in accordance with approved policies in 95% of selected arrests. | ☐ Met ☑ Missed |
| 4b-e. Supervisors review, document, and take corrective action, including making referrals when necessary, as required by approved policies in 95% of selected arrests. | ☐ Met ☑ Missed |
| 5. Unit commanders review, document, and take corrective action, including making referrals when necessary, as required by approved policies in 95% of selected arrests. | ☐ Met ☑ Missed |
| Note: Training is assessed as part of Section E (Paragraphs 78-79) regarding Training on Stops, Searches, and Seizures. | |

*Compliance Assessment*

PRPB GO 615 (Arrests and Summons), last updated in 2018, and all related forms comply with Agreement requirements. In October 2021, PRPB submitted a revised version of this policy to the Monitor for review under paragraph 229. The Monitor submitted revisions and comments on the policy to PRPB. Police incident reports reviewed show that officers duly transport arrestees to the police station or detention facility, but an examination of arrest files show that officers only complete all required arrest forms in some cases. Of the 94 arrest cases reviewed, the Monitor noted that 58 (62%) arrest files did not meet compliance with this requirement because they were missing some or most of the applicable arrest forms.

The Monitor noted that supervisors do check arrestees for injuries and provide medical assistance, when necessary, when the Egress/Ingress form (631.1) is included in the file. However, there were several files that failed to include this necessary form. Out of the 94 arrest files reviewed, 40 (43%) did not include the form, and 26 of 67 search warrant files (39%) with an arrest failed to include it.

PRPB explained that when PPR-631.1 (Egress/Ingress) is not completed and included in the file it is because officers did not place the arrestee in a cell, and instead held the person handcuffed in an office under the watch of an officer until taken to court or released on bail. However, without the form in the file, the Monitor has no way of verifying whether supervisors inspected the detainee for injuries, a requirement under the Agreement and PRPB policy (GO 615). In addition, this practice unnecessarily places officer safety in serious jeopardy, and goes against generally accepted policing practice, as some people, handcuffed in the back, can bring their hands to the front, which could lead to an avoidable tragedy. Also, how long the detainee was held outside a cell is not documented in any of the police reports submitted.

Supervisors are failing to review arrest reports properly per policy. The Monitor reviewed 94 arrest files, which contained 50 arrest reviews (PPR-615.8) by supervisors where they stated the officers had justified probable cause for the arrest. However, 26 (52%) failed to establish the facts for probable cause or the form was not included in the file. Yet, supervisors and unit commanders took no corrective measures in any of these cases. No referrals were made to re-train or counsel the officers or supervisors.

The Monitor requested any administrative complaint investigation files regarding misconduct during an arrest from SARP but received none (CMR-6 Request 3.2).

71

As is noted in paragraphs 78-79 in CMR-5, virtual training has been delayed since 2021 due to issues with the integrity of the virtual training system and COVD-19 restrictions have delayed in-person training.

*Pathway Forward*

Officers, supervisors, and commanders need additional training and/or counseling on how to write detailed police arrest reports so that any reasonable person reading it can reasonably conclude that the officer had enough justification for the arrest. In many reviewed cases the Monitor noted that officers were acting on probable cause when making arrests, as District Attorneys approved several of the arrests to be presented to a judge, but justifications were not being recorded as part of the arrest report. Also, PRPB must ensure that all applicable forms be included in each arrest file, as required by PRPB policy (GO 615). In instances in which the above is not completed, PRPB must also ensure that officers and supervisors are being held accountable.

## Paragraph 66: Searches and Seizures - Arrests

*PRPD shall require that officers notify the communications command center and a supervisor immediately after an arrest, or as soon as practicable. For felony arrests, or an arrest for obstructing or resisting an officer, PRPD shall require a field supervisor to respond to the scene of the incident and approve the officer's arrest determination, based on the existence of probable cause. If an officer's arrest determination is insufficient, or otherwise unjustified, the supervisor may, if necessary, interview the subject. The supervisor shall take appropriate action to address violations or deficiencies in an officer's arrest determination, including releasing the subject, recommending non-punitive corrective action for the involved officer, or referring the incident for administrative or criminal investigation. If a supervisor is unavailable to respond to the scene or there are exigent circumstances, the officer shall notify his or her immediate supervisor over a recorded channel of the elements of probable cause for the felony arrest or arrest for obstructing or resisting an officer. If the officer's immediate supervisor is unavailable, the officer shall notify any field supervisor over a recorded channel of the elements of probable cause for the felony arrest or arrest for obstructing or resisting an officer.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all others. |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 65.

*Compliance Assessment*

Officers routinely notify the Command Center when an arrest is made. The Monitor requested 19 recordings of radio communications between officers and supervisors regarding arrests for obstruction

of justice or resisting arrest. PRPB provided records for 11 of the 19 cases. According to PRPB, communication on the remaining eight cases were conducted on non-recorded analog lines. A review of the 11 cases provided revealed that in 8 cases there was no request for a supervisor; in 1 case a supervisor responded, in another a supervisor was heard inquiring about the arrest, but it was not clear whether he responded to the scene; 1 other case was not applicable because PRPB sent the wrong file (Monitor requested complaint #2021-04-044-003634, but received complaint #2021-06-021-003634). Supervisors many times fail to review arrest reports for probable cause as per policy. The Monitor reviewed 94 arrest files, which contained 50 arrest reviews by supervisors, where they stated the officers had justified probable cause for the arrest. However, 26 cases (52%) failed to establish the facts for probable cause. Yet, supervisors and unit commanders took no corrective measures in any of these cases. No referrals were made to re-train or counsel the officers or supervisors.

The Monitor interviewed SARP personnel regarding administrative complaints filed by supervisors against officers for unjustified arrests during the CMR-6 assessment period, but none were found in the file system. Also, a formal request for these files was made in the CMR-6 Data Request 3.2.

*Pathway Forward*

PRPB must ensure that all operational radio communications involving officers, supervisors, and Communication Command Centers (Centro De Mando) happen on a recorded channel for compliance with the Agreement, which requires that all radio communications be transmitted on a recorded line. PRPB must also ensure that all units use specifically assigned call signs for better coordinated communications and officer safety. Officers, supervisors, and commanders need additional training and/or counseling in how to write detailed police arrest reports so that any reasonable person reading them can conclude from the facts that the officer had enough information to conduct the arrest. It is obvious in many cases that officers were acting on probable cause when making arrests, as the Monitor noted that in many cases the District Attorney gave the approval to go forward before a judge.

## Paragraph 67: Searches and Seizures - Arrests

*When transporting an arrestee, officers shall take the safest and most direct route to the booking location. PRPD policy shall require that officers notify the communications command center of the starting and ending mileage on the transporting vehicle, as well as the gender, race, ethnicity, national origin, and apparent age of the arrestee. The officer shall complete all written arrest forms and booking recommendations at the time an arrestee is presented at any PRPD precinct, station, or specialized unit for booking.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all others. |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 65.

*Compliance Assessment*

PRPB has not provided the Monitor access to any data system or mapping software that tracks officers' route of travel when transporting arrestees. The Monitor found that mileage was given in only 4 arrest cases in 11 radio recordings between officers and the Command Center (Centro de Mando). In three cases, officers were heard stating on air the name of the arrestee, but they never stated the race, gender, ethnicity, age, or nationality of the arrestee, as required by the Agreement.

Only 21 of the 94 arrest files reviewed had a PPR-126.2 (Centro de Mando dispatch form) where demographic information is to be recorded. However, upon further examination, only a few gave information about the arrestee, and in most cases the information was only partially complete.

As a result of missing information, the Monitor was unable to determine whether officers had properly completed all arrest forms in a timely manner when processing arrestees at police facilities. As reported previously, of the 94 arrest cases reviewed, the Monitor noted that 58 arrest files (62%) were missing some or most of the applicable arrest forms, including the booking sheet (PPR-631.1).

*Pathway Forward*

PRPB must ensure that officers provide all pertinent demographic information of arrestees to Centro de Mando, and that Centro de Mando records such information on the dispatch form (PPR-126.2) when available. Officers and supervisors should also ensure this information, as well as mileage, is recorded on the police report (PPR-621.1). The Monitor recommends that the name of the arrestee not be aired on police channels due to privacy issues.

## Paragraph 68: Searches and Seizures - Arrests

*At the time of presentment at a PRPD precinct, station, or specialized unit, a watch commander or supervisor shall visually inspect each detainee or arrestee for injury, interview the detainee or arrestee for complaints of pain, and ensure that the detainee or arrestee receives medical attention from an appropriate medical provider, as necessary.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all others. |
| Practice: | Not Implemented | | |

*Compliance Targets*

74

Note: This Paragraph is assessed with Paragraph 65.

*Compliance Assessment*

The Monitor noted that in the included Egress/Ingress form (PPR 631.1), supervisors routinely do check arrestees for injuries and provide medical assistance, when necessary. However, there were several files that failed to include this necessary form. Out of the 94 arrest files reviewed, 40 (43%) did not include the form, and 26 of 67 search warrant files (39%) with an arrest failed to include it. PRPB has stated to the Monitor that when the form is not completed and included in the file it is because officers did not place the arrestee in a cell, and instead held the person handcuffed in an office under the watch of an officer until taken to court or released on bail. However, without the form in the file, the Monitor has no way of verifying whether supervisors inspected the detainee for injuries, a requirement under the Agreement and PRPB policy (GO 615). In addition, this practice unnecessarily places officer safety in serious jeopardy and goes against generally accepted policing practices. It is well known that some people while handcuffed in the back, can contort their body, and bring their hands to the front to attempt escape, which could lead to a confrontation and an avoidable potential tragedy. Also, how long the detainee was held outside a cell is not documented in any police report.

*Pathway Forward*

Officers and supervisors should ensure the Egress/Ingress Form (the Booking Sheet, PPR-631.1) is properly completed and included in all arrest files. However, by not including the form in these cases, supervisors have no way of documenting that they inspected the arrestee for injuries, and whether assistance was given, as required by the Agreement and PRPB policy. PRPB has informed the Monitor that this form will be re-designed or re-named so that it is completed in all arrest cases, regardless of whether an arrestee is placed in a cell. The Monitor encourages PRPB to make this change as soon as practical and provide officers with roll call or monthly meeting training in a timely manner.

## Paragraph 69: Searches and Seizures - Arrests

*PRPD shall require that all booking recommendations be personally reviewed and approved in writing in an auditable form by a supervisor as to appropriateness, legality, and conformance with PRPD policies within 12 hours of the arrest, absent exceptional circumstances. Supervisors shall also examine arrest reports and forms related to the arrest for boilerplate or conclusory language, inconsistent information, lack of articulation of the legal basis for the action, or other indicia that the information in the reports or forms is not authentic or correct. Supervisors shall evaluate each incident in which a person is arrested for interfering with a police officer, resisting arrest, assault on a police officer, or other similar charge to determine whether the incident raises any issue or concern regarding the basis for the arrest or implications on training, policies, or tactics.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |

| Training: | N/A | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all others. |
|---|---|---|---|
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 65.

*Compliance Assessment*

As stated above, the Monitor noted that in the included Egress/Ingress form (PPR-631.1), supervisors routinely do check arrestees for injuries and provide medical assistance, when necessary. However, there were several files that failed to include this necessary form, therefore there was no way of knowing whether the supervisor inspected the arrestee for injuries. Out of the 94 arrest files reviewed, 40 (43%) did not include the form, and 26 of 67 search warrant files (39%) with an arrest failed to include it.

Officers continue to use boilerplate and conclusory language in their reports. For example, when making an arrest that falls under the Domestic Violence Statute 54, most officers write that the subject was "arrested for violating law 54", instead of citing the actual crime for which the person was arrested, such as "assault and battery under Statute 54, Section..." and noting the details of the case. Similarly, in cases of Operating Under the Influence most Highway Patrol Division officers continue to write that the subject was "arrested for Operating Under the Influence, taken to a police facility where he/she was given the Intoxilizer test and failed with a --%", instead of stating the facts of each case that led them to establish probable cause for the arrest or detention. This was the case in 7 out of 11 (64%) Highway Patrol Division cases reviewed.

Supervisors are also failing to review arrest reports properly per policy. The Monitor reviewed 94 arrest files, which contained 50 arrest reviews (PPR-615.8) by supervisors where they stated the officers had justified probable cause for the arrest. However, 26 (52%) failed to document the facts for probable cause or the form was not included in the file. Supervisors also failed to point out boiler plate and repetitive language in police reports.

*Pathway Forward*

PRPB should hold officers and supervisors accountable for properly completing arrest forms and ensuring probable cause is clearly detailed on the police report (PPR-621.1) as required by policy and the Agreement. In addition to refresher training, additional directives and increased disciplinary measures should be assessed as methods for which PRPB can increase accountability for failures to abide by policy. Accountability is important in ensuring compliance with this policy. As noted throughout this section, added supervisory training would assist in reinforcing these requirements, whether conducted in person, virtually, or via roll call.

## Paragraph 70: Searches and Seizures - Arrests

*As part of the supervisory review, the supervisor shall document on an auditable form those arrests that are unsupported by probable cause, are in violation of PRPD policy or this Agreement, or that indicate a need for*

76

*corrective action or review of agency policy, strategy, tactics, or training. The quality of these supervisory reviews shall be taken into account in the supervisor's performance evaluations.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all others. |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: This Paragraph is assessed with Paragraph 65.

### Compliance Assessment

As noted throughout this section, supervisors are failing to properly review arrest reports per policy. The Monitor reviewed 94 arrest files, which contained 50 arrest reviews (PPR-615.8) by supervisors where they stated the officers had justified probable cause for the arrest. However, 26 supervisory reviews (52%) failed to document the facts for probable cause, or the form was not included in the file. There is no indication that supervisors or commanders are taking corrective action in these cases.

### Pathway Forward

As noted throughout this section, additional training for supervisors is needed. Supervisors and commanders must be held accountable for the proper supervision of their officers as required by PRPB policy. It is essential for PRPB to demonstrate compliance with this paragraph. PRPB must stop the practice of allowing officers to write details of a case (probable cause) in personal notebooks that they carry. These are not official PRPB documents and cannot be tracked. Probable cause should be recorded in the police report (PPR-621.1).

## Paragraph 71: Searches and Seizures - Arrests

*A command-level officer or official shall review, in writing, all auditable forms related to arrests. The commander's review shall be completed within seven days of receiving the document reporting the event. The commander shall evaluate the corrective action and recommendations in the supervisor's written report and ensure that all appropriate corrective action is taken. Whenever a reviewing supervisor or command-level officer finds evidence of an arrest indicating apparent misconduct or apparent criminal conduct by an officer, he or she shall immediately notify his or her supervisor for referral to the appropriate investigating unit or the PRDOJ. The Superintendent shall be notified of the referral.*

| Compliance Status | Assessment Schedule |
|---|---|
|  |  |

| Not Compliant | | Review Period | October 2021 – March 2022 |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all others. |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 65.

*Compliance Assessment*

The Monitor reviewed 94 arrest files, which contained 50 arrest reviews (PPR-615.8) by commanders where supervisors stated the officers had justified probable cause for the arrest. In 26 (52%) of these reviews, supervisors failed to document the facts officers had for probable cause. However, commanders agreed with the supervisors' faulty reviews. In addition, the District Attorney dropped charges in several cases (Complaint #2022-2-400-000134, #2022-13-023-000245, #2021-12-400-00308, #2021-13-401-00129, #2022-7-400-00066, and #2022-5-700-0057) due to lack of probable cause and other reasons. There is no evidence that commanders investigated these cases or took any corrective measures nor were referrals made to re-train or counsel the officers and supervisors involved. The Monitor interviewed SARP personnel regarding administrative complaints filed by supervisors against officers for unjustified arrests during the CMR-6 assessment period, but none were found in the file system. Also, a formal request for these files was made in the CMR-6 Data Request 3.2.

*Pathway Forward*

As stated throughout this section, additional training is required for supervisors and commanders. Supervisors and commanders must be held accountable for the proper supervision of their officers as required by PRPB policy and the Agreement.

## Paragraph 72: Searches and Seizures - Arrests

*PRPD shall require officers to provide written receipts to individuals whenever property is seized from the individuals. PRPD shall establish procedures that are based on generally accepted policing practices to ensure that all seized property is properly stored and returned, as appropriate.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |

| | | | |
|---|---|---|---|
| Training: | N/A | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all others. |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. Polices incorporate all of the requirements of Paragraphs 59 and 72. | ☑ Met   ☐ Missed |
| 2. Property is seized, stored, and returned, as appropriate, in accordance with approved policies in 95% of selected arrests. | ☐ Met   ☑ Missed |
| 3. PRPB takes disciplinary and/or corrective action in response to all sustained complaints where an officer fails to issue a receipt, store, or return seized property in accordance with approved policies. | ☐ Met   ☑ Missed |

Note: Training is assessed as part of Section E (Paragraphs 78-79) regarding Training on Stops, Searches, and Seizures.

*Compliance Assessment*

PRPB created PPR-636.1 for recording seized property. However, in 94 arrest files and 67 search and seizure files reviewed, the Monitor found that the property inventory form was missing in 57 files (35%), thus it is unknown whether property was seized in these cases. The Monitor met with SARP personnel to inquire whether there were any cases pending or closed regarding officers failing to issue a receipt, store, or return property, but none were found.

PRPB has stated to the Monitor that seized property forms are not tracked individually but are part of arrest and search files when applicable. Therefore, the Monitor analyzed all PPR-636.1 forms submitted with arrest and search files. All PPR-636.1 forms were rated compliant as they were properly completed. However, the files did not include a return receipt for the property. The Monitor's Office has requested that PRPB develop a way to track all arrests and searches involving seized property within the incident tracking system (GTE), and to query the system for such incidents. Until such a system is developed, however, PRPB will not be able to provide the Monitor's Office with a structured list of all seized property incidents so that the Monitor's Office can draw a representative sample.

The Monitor noted that officers listed seized evidence to be used against the arrestee on many of the PPRs-636.1 and had the arrestee sign the form, confirming they owned the evidence before they had legal counsel and/or were presented before a judge. This could potentially be a violation of the person's 5th Amendment rights against self-incrimination.

*Pathway Forward*

PRPB must ensure that officers properly complete PPR-636.1 for all personal property seized from arrestees or detained persons and hold supervisors accountable for not properly reviewing the forms completed by the officers under their charge, as per policy. The Monitor recommends that all seized evidence should be listed on the PRPB police report (PPR-621.1) instead of on PPR-636.1 to avoid the appearance of violating the arrestee's 5th Amendment rights. Only returnable personal property should be listed on PPR-636.1, or another form. PRPB and USDOJ were made aware of this issue during the April 2022 253 Meeting.

## Paragraph 73: Searches and Seizures - Arrests

*Paragraph 73 is assessed annually and will be reviewed in CMR-7.*

## 4. Searches

PRPB updated GO 612 (Searches and Seizures) in March 2022. This policy guides officers in matters of constitutional issues regarding searches and seizures, stops, detentions, and arrests. It also guides officers in the proper way to record and take custody of seized evidence. However, weak reviews by supervisors and commanders, incomplete arrest files, and incomplete search and seizure files are affecting compliance with the Agreement and are a violation of PRPB's own policies on arrests and searches. PRPB has not provided the Monitor evidence of a working search warrant tracking system, although it has stated that it is working on such a system. The Monitor has interviewed several unit commanders that handle the vast majority of PRPB search warrants who have stated they are not aware of any electronic system to track search warrants, and that they usually file them in cabinets in alphabetical order and enter them into a unit-based spreadsheet that provides only basic search capabilities. Further, these unit-based spreadsheets are not aggregated at the Bureau level, limiting the agency's ability to analyze the data Bureau-wide or maintain an accurate operational record of search warrants conducted by each unit.

## Paragraph 74: Searches and Seizures - Searches

*PRPD shall revise its policies on searches to ensure that they comply with applicable law and comport with generally accepted policing practices. PRPD policies shall define all terms clearly and specify procedures for executing search warrants and warrantless searches, including handling, recording, and taking custody of seized property or evidence.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all others. |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies and forms incorporate all of the requirements of Paragraphs 59, 74-77. | ☑ Met | ☐ Missed |
| 2. Searches are conducted and reviewed by supervisors in accordance with approved policies in 95% of selected searches. | ☐ Met | ☑ Missed |

Note: Training is assessed as part of Section E (Paragraphs 78-79) regarding Training on Stops, Searches, and Seizures.

*Compliance Assessment*

PRPB updated GO 612 (Searches and Seizures) in March 2022. This policy guides officers in matters of constitutional issues regarding searches and seizures, stops, detentions, and arrests. It also guides officers in the proper way to record and take custody of seized evidence. However, weak reviews by supervisors and commanders, incomplete arrest files, and incomplete search and seizure files are affecting compliance with the Agreement and are a violation of PRPB's own policies on arrests and searches. Further, as noted throughout this section, searches are not always reviewed by supervisors. For example, in a review of 29 random consent searches, the Monitor found that in 9 cases the supervisor did not review the search or did not document the review as required by paragraph 62.

*Pathway Forward*

PRPB should train and require supervisors to respond to all searches, including consent searches, and complete, on a separate form, their approval/non-approval, of the search, whether conducted by search warrant or warrantless, regardless of whether the search results in an arrest. As noted in previous reports by the Monitor, the completion of this form is imperative to demonstrating that searches are conducted and reviewed in accordance with policy and in moving compliance forward.

## Paragraph 75: Searches and Seizures - Searches

*PRPD shall require that a supervisor review and approve in writing each request for a search or arrest warrant, including each affidavit or declaration before it is filed by an officer in support of a warrant application, for appropriateness, legality, and conformance with PRPD policy.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 74.

*Compliance Assessment*

PRPB submitted 67 search files to the Monitor which contained 45 search warrants authorized by the District Attorney, and a Judge. Forty-one of those search warrants had approval from a supervisor and four were either unknown or not applicable. However, in more than ¾ of search warrant cases, approvals were documented on the Operational Plan (PPR-615.7).

*Pathway Forward*

As noted in paragraph 74, PRPB must ensure that supervisors review and approve each request for a search or arrest warrant in writing on a separate document. Periodic reviews that this is being completed in accordance with policy should be regularly conducted on the Bureau's own initiative and any instances identified in which supervisors are failing to do so should result in corrective actions.

## Paragraph 76: Searches and Seizures - Searches

*PRPD shall track each search warrant, the case file where a copy of such warrant is maintained, the officer who applied for the warrant, and each supervisor who reviewed the application for a search warrant.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually for Compliance Target #2. Annually for all others. |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. Tracking system accounts for all of the elements in the paragraph and outcome measures as required by Paragraph 243. | ☐ Met   ☑ Missed |
| 2. All search warrants are tracked in the tracking system. | ☐ Met   ☑ Missed |
| 3. Documentation on search warrants is maintained in accordance with approved policies in 95% of precincts and units visited. | ☐ Met   ☑ Missed |

Note: Policy content is assessed as part of Paragraph 74. Training is assessed as part of Section E 78-79) regarding Training on Stops, Searches, and Seizures.

*Compliance Assessment*

PRPB has no working search warrant tracking system as of this CMR. The Monitor has conducted visits to various CICs, where most search warrant files are held and has observed that search warrant files are kept in folders in file cabinets. When asked about a tracking system, unit directors stated they are not aware of any Bureau-wide system to track search warrants. All units interviewed stated that they keep an in-unit spreadsheet to record all search warrants of the unit, but that there is no Bureau-wide central system that documents and analyzes search warrants as required by GO 612, Section V.B.

*Pathway Forward*

As noted in previous CMRs, PRPB should develop a centralized, electronic tracking system to collect and analyze search warrant data to detect deficiencies or training issues (see PRPB GO 612, Section V.B).

## Paragraph 77: Searches and Seizures - Searches

*PRPD shall require officers to obtain and document consent from an individual who consents to a voluntary search of his/her person or vehicle when the search is conducted as part of a routine pedestrian or vehicle stop, unless a non-consensual search is otherwise legally permissible.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 74.

*Compliance Assessment*

The Monitor found that of the 67 search files and 94 arrest files submitted by PRPB, 29 were consent searches. Twenty-five were properly documented on PPR-612.1 (Consent Search), two were rated fair because they lacked some detail, and two files did not contain the form. To reach compliance PRPB must demonstrate a 95% compliance rate in this area. However, 25 of 29 only represents an 86% rate of compliance, thus making PRPB partially compliant.

*Pathway Forward*

PRPB should train supervisors and officers to properly complete PPR-612.1 in all cases of consent searches to comply with the Agreement and PRPB policy. The Monitor will continue to assess compliance with the completion of such forms.

## 5. Training on Stops, Searches, and Seizures

*Paragraphs 78 and 79 are assessed annually and will be reviewed in CMR-7.*

# IV. Equal Protection and Non-Discrimination

The Equal Protection and Non-Discrimination section reviews an array of cases specifically related to sexual assault, domestic violence, and related cases that entail any abusive behavior by one person to maintain power over another in a close relationship. Non-discrimination is also a compliance target in this section. PRPB must ensure through its policies and practices that it does not discriminate in any manner towards its own officers or the community members of Puerto Rico.

As noted in previous reports, much of PRPB's progress in this area remains at partial or non-compliance. Of the 21 paragraphs within Equal Protection and Non-Discrimination, a limited number are assessed every six months. A comprehensive review of this entire section was provided in CMR-5 and will be provided again in CMR-7. For CMR-6, only 10 paragraphs (paragraphs 84 - 86, 88 - 90, 92 - 93, 96, and 99) are assessed in this report and, in most instances, only specific targets within these paragraphs are assessed biannually. The compliance targets assessed in this reporting period are bolded in the paragraphs identified above.

The paragraph compliance targets assessed in this reporting period primarily focus on PRPB's efforts to demonstrate implementation of processes related to hiring, the civilian complaint system, performance evaluations, juvenile case management reporting, hate crime reporting, and bias-free policing training. There are no significant changes in PRPB's progress in meeting the compliance targets assessed in this reporting period.

## Paragraph 80: Equal Protection and Non-Discrimination - General Provisions

*Paragraph 80 is assessed annually and will be reviewed in CMR-7.*

## 1. General Provisions

PRPB must document that officers are selected and hired in a manner consistent with approved policies regarding bias-free policing and equal protection. Documentation that officers have received training on civilian interactions, performance evaluation processes, and promotion assessment processes was submitted to demonstrate achievement of paragraph 84 targets 3, 4, and 11. PRPB is not compliant with target 3 - 95% of sampled personnel are trained and certified in all policies related to the civilian complaint program.

PRPB must work to improve its hate crime reporting methods, supervisor to officer ratios, and provide additional training to its supervisors to ensure more substantive performance evaluations. PRPB supervisors must ensure that hate crime data is collected accurately and reliably. PRPB should then submit the data to the Federal Bureau of Investigation (FBI) for analysis and publication in the FBI's Hate Crimes Statistics report in accordance with FBI submission requirements. Documentation of such practices and training was not received by the Monitors Office for review.

## Paragraphs 81-83: Equal Protection and Non-Discrimination - General Provisions

*Paragraphs 81-83 are assessed annually and will be reviewed in CMR-7.*

## Paragraph 84: Equal Protection and Non-Discrimination - General Provisions

*PRPD shall incorporate concrete requirements regarding bias-free policing and equal protection into its hiring, promotion, and performance assessment processes, including giving significant weight to an individual's documented history of bias-free policing. PRPD will comply with the non-discrimination requirements of Title VII of the Civil Rights Act of 1964, as amended.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually for Compliance Targets #3, #4, and #11. Annually for all other Compliance Targets. |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | Met | Missed |
|---|---|---|
| 1. PRPB policies and procedures regarding hiring process comply with the requirements of the Paragraph. | ☑ Met | ☐ Missed |
| 2. Hiring process trainings are consistent with bias-free policing and equal protection provisions of approved policies. | ☐ Met | ☑ Missed |
| **3. 95% of sampled personnel are trained and certified in all policies related to the civilian complaint program (or scheduled for training, in the case of mid-year reviews).** | ☐ **Met** | ☑ **Missed** |
| **4. 95% of reviewed candidates were selected consistent with approved policies regarding bias-free policing and equal protection.** | ☐ **Met** | ☑ **Missed** |
| 5. PRPB policies and procedures regarding promotion assessment process comply with the requirements of the Paragraph. | ☐ Met | ☑ Missed |
| 6. Promotion assessment trainings are consistent with bias-free policing and equal protection provisions of approved policies. | ☐ Met | ☑ Missed |
| 7. 95% of sampled personnel are trained and certified in all policies related to the civilian complaint program (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 8. 95% of the reviewed promotions were awarded consistent with approved policies regarding bias-free policing and equal protection. | ☐ Met | ☑ Missed |
| 9. PRPB policies and procedures regarding performance assessment comply with the requirements of the Paragraph. | ☐ Met | ☑ Missed |
| 10. Performance assessment trainings are consistent with bias-free policing and equal protection provisions of approved policies. | ☐ Met | ☑ Missed |

| | | |
|---|---|---|
| **11. 95% of sampled personnel are trained and certified in all policies related to performance evaluations (or scheduled for training, in the case of mid-year reviews).** | ☐ **Met** | ☒ **Missed** |
| 12. 95% of performance evaluations reviewed are consistent with approved policies regarding bias-free policing and equal protection. | ☐ Met | ☒ Missed |

Note: The requirement of this Paragraph that require PRPB to incorporate bias-free policing and equal protection into its hiring practices is assessed together with Paragraph 104 (Hiring Reforms).

Note: The requirement of this Paragraph that requires PRPB to incorporate bias-free policing and equal protection in its performance assessment process is assessed together with Paragraph 145 (Performance Evaluation).

Note: The requirement of this Paragraph that requires PRPB to incorporate bias-free policing and equal protection in its promotion assessment process is assessed together with Paragraph 14 (Promotions).

## *Compliance Assessment*

Of the 12 targets within this paragraph, only 3 are assessed biannually and thus, assessed in this report. In review of compliance targets 3, 4, and 11, the Monitor found these targets were not met. All other targets are assessed on an annual basis and will be evaluated in CMR-7. Because of the varying assessment frequencies of the targets, the overall compliance rating is deferred until CMR-7 when all targets will be assessed. The compliance rating above is moved forward from the previous CMR.

In assessing whether sampled personnel are trained and certified in all policies related to the civilian complaint program (or scheduled for training, in the case of mid-year reviews), the Monitor noted that of the sampled personnel, only 18% had completed the related training. PRPB personnel are also not trained and certified in all policies related to performance evaluations. Originally, when PRPB adopted the Pro-Media platform for performance evaluations, Pro-Media produced and delivered a training to supervisors. PRPB has not developed an updated training on ProMedia performance evaluations since the recent modification to the form and materials.

As a part of PRPB's eligibility criteria, applicants are initially screened for bias by the police psychological assessment. The agency psychologist in their assessment determines the candidate's bias level.

## *Pathway Forward*

PRPB must continue to document that officers are selected and hired in a manner that is consistent with approved policies regarding bias-free policing and equal protection. Officers should receive training on civilian interactions, performance evaluation processes, and promotion assessment processes. This training should be thoroughly documented.

PRPB should continue to submit documentation that certifies personnel have been trained on all policies related to performance evaluations, as well as how it conducts candidate selections consistent with approved policies regarding bias-free policing and equal protection. PRPB should define the parameters of how it assesses a candidate free of bias in the initial screening.

PRPB should continue delivering trainings and certifications on all policies related to the civilian complaint program. Curriculum reviews should be in conjunction with policy reviews when revisions are applicable. This is essential to ensuring that PRPB administers a transparent and accountable process.

## Paragraph 85: Equal Protection and Non-Discrimination - General Provisions

*PRPD shall use the National Incident Based Reporting System ("NIBRS") to collect and report crime data.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually for Compliance Targets #1, #2, and #4. Bi-annually for all other Compliance Targets. |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Policies, procedures, and forms/modules incorporate the requirements of the Paragraph. | ☑ Met | ☐ Missed |
| 2. NIBRS training are consistent with approved policies and procedures. | ☐ Met | ☑ Missed |
| **3. 95% of sampled PRPB members are trained and certified in NIBRS.** | ☐ **Met** | ☑ **Missed** |
| 4. PRPB is using the NIBRS to collect and report crime data. | ☐ Met | ☑ Missed |

### Compliance Assessment

Of the four compliance targets within this paragraph, only one is assessed biannually and, thus, assessed in this report. In review of compliance target 3, the Monitor found this target was not met. PRPB has neither instituted National Incident Based Reporting (NIBRS) reporting nor has it submitted any documentation demonstrating that PRPB personnel are trained or certified in NIBRS. The Monitor did review a revised NIBRS Manual during the reporting period and provided PRPB with revisions. Training on the updated NIBRS Manual has not been developed.

All other targets are assessed on an annual basis and will be evaluated in CMR-7. Because of the varying assessment frequencies of the targets, the overall compliance rating is deferred until CMR-7 when all targets will be assessed. The compliance rating above is moved forward from the previous CMR.

### Pathway Forward
PRPB must continue the development of the NIBRS system. The associated NIBRS training and certification of personnel, and demonstration on the collection and use of the reported crime data should be submitted to the Monitor for review.

## Paragraph 86: Equal Protection and Non-Discrimination - General Provisions

*PRPD shall collect accurate and reliable data on hate crimes on an ongoing basis and shall submit the data to the Federal Bureau of Investigation ("FBI") for analysis and publication in the FBI's Hate Crimes Statistics report in accordance with FBI submission requirements.*

87

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually for Compliance Target #3. Annually for all other Compliance Targets. |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies on criminal investigations incorporate all of the requirements of this Paragraph. | ☑ Met | ☐ Missed |
| 2. Criminal investigation trainings are consistent with approved policies. | ☐ Met | ☑ Missed |
| **3. 95% of sampled personnel are trained and certified in all policies related to identifying, collecting, and reporting hate crimes (or scheduled for training, in the case of mid-year reviews).** | ☐ **Met** | ☑ **Missed** |
| 4. PRPB notifies the FBI of all identified instances of hate crimes. | ☐ Met | ☑ Missed |
| 5. 95% of investigations of hate crimes accurately identify and report hate crimes. | ☐ Met | ☑ Missed |
| Note: The requirement of this Paragraph that requires PRPB to track hate crimes on an ongoing basis is assessed together with Paragraph 85. | | |

*Compliance Assessment*

Of the five targets within this paragraph, only one is assessed biannually, and thus, assessed in this report. In review of compliance target 3, the Monitor found this target was not met.

In assessing whether 95% of sampled personnel are trained and certified on all policies related to identifying, collecting, and reporting hate crimes (or scheduled for training, in the case of mid-year reviews), the Monitor found that PRPB had only trained 65% of its officers in VICO 3081, Hate Crime Training, during this reporting period. No documentation was received on criminal investigation trainings, and no documentation of hate crime notification to the FBI was received. PRPB continues to be slow in this area of the Agreement. PRPB has a policy (GO 630 Identification of Hate Crimes and/or Incidents) and manual on hate crime classification, which the Monitor reviewed in March 2022. This policy contains the indicators of a hate crime and provides the officers with the elements of how to classify a hate crime. Training and implementation of this policy has not been conducted or executed.

All other targets are assessed on an annual basis and will be evaluated in CMR-7. Because of the varying assessment frequencies of the targets, the overall compliance rating is deferred until CMR-7 when all targets will be assessed. The compliance rating above is moved forward from the previous CMR.

*Pathway Forward*

It is imperative that the Monitor receive and review the curriculum for VICO – 3081, Hate Crime Training. This will help ensure that officers are trained to accurately assess cases to determine if the matter is a

hate crime. Additionally, it is essential that supervisors attend trainings to assist officers in hate crime investigations and assessments. Officers without thorough hate crime investigation training can miss the details of a hate crime case and may misreport the matter. Supervisors are the next level of assessment and accountability in these matters and should also receive training on hate crime investigations.

## 2. Discriminatory Policing

Building trust with the community is fundamental to effective policing. PRPB through its community services programs, initiatives, and activities is building trusting relationships. Bias-free policing in hiring practices, promotional processes and training is essential to trust. PRPB must develop systems to assess these programs with accurate, complete, and reliable data. PRPB must continue to analyze police conduct. These types of analyses will then demonstrate effectiveness and reliability.

Sound conduct by police improves community interactions, enhances communication, and promotes shared responsibility for addressing crime and disorder. PRPB must continue to exhibit engagement and partnership in its interactions with transgender and transexual individuals. Investigations of cases in juvenile facilitates must be thorough, timely, and in partnership with other governmental agencies. PRPB must continue to improve in these areas.

### Paragraph 87: Equal Protection and Non-Discrimination - Discriminatory Policing

*Paragraph 87 is assessed annually and will be reviewed in CMR-7.*

### Paragraph 88: Equal Protection and Non-Discrimination - Discriminatory Policing

*PRPD shall develop policies to provide all individuals within the Commonwealth with police services in a non-discriminatory fashion in order to build and preserve trust among community members and more effectively prevent and solve crime. As part of these efforts, PRPD shall seek the assistance of community advocates in widely disseminating to the public its written policies on immigration-related laws.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually for Compliance Targets #1, #2, and #4. Bi-annually for all other Compliance Targets. |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | Met | Missed |
|---|---|---|
| 1. PRPB policies complied with the requirements of the Paragraph. | ☑ Met | ☐ Missed |
| 2. Trainings on discrimination free policing are consistent with approved policies. | ☐ Met | ☑ Missed |
| **3. 95% of sampled PRPB members are trained and certified in discrimination free policing.** | ☐ **Met** | ☑ **Missed** |

89

| 4. Pertinent policies on pertinent immigration-related law were widely disseminated to the public. | ☐ Met | ☑ Missed |
|---|---|---|

| Note: This Paragraph is assessed together with Paragraphs 81, 87, and 109 (Policies and Procedures). |
|---|

## Compliance Assessment

Of the four targets within this paragraph, only one is assessed biannually and, thus, assessed in this report. In review of compliance target 3, the Monitor found it not to be met. In the analysis of training course IGPD – 5011, Multi-themed Equal Protection and Non-Discrimination, the Monitor found that only 28% of the sampled members had completed this course.

All other targets are assessed on an annual basis and will be evaluated in CMR-7. Because of the varying assessment frequencies of the targets, the overall compliance rating is deferred until CMR-7 when all targets will be assessed. The compliance rating above is moved forward from the previous CMR.

## Pathway Forward

PRPB should update training schedules in all areas to achieve the delivery of course IGPD – 5011 to 95% of officers.

## Paragraph 89: Equal Protection and Non-Discrimination - Discriminatory Policing

*PRPD shall develop a specific policy to guide officers' interactions with transgender or transsexual individuals that addresses gender identification, gender expression, transportation, processing, housing, and medical treatment.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually for Compliance Targets #1 and #2. Bi-annually for all other Compliance Targets. |
| Practice: | Implemented | | |

## Compliance Targets

| 1. PRPB policies guide officer interactions with transgender or transsexual individuals as required by the Paragraph. | ☑ Met | ☐ Missed |
|---|---|---|
| 2. PRPB trainings on interactions with transgender or transsexual individuals are consistent with approved policies. | ☐ Met | ☑ Missed |
| **3. 95% of sampled PRPB members are trained and certified in policies regarding interactions with transgender or transsexual individuals.** | ☑ Met | ☐ Missed |
| **4. 95% of reviewed PRPB reports suggest compliance with PRPB policies regarding interactions with transgender or transsexual individuals.** | ☑ Met | ☐ Missed |

90

*Compliance Assessment*

Of the four targets within this paragraph, only two are assessed biannually and, thus, assessed in this report. In review of compliance target 3, the Monitor found it to be met. In the analysis of training course REA 624, Interactions with Transgender and Transsexual Individuals, the Monitor found that 98% of the sampled personnel had completed this course. In review of compliance target 4, the Monitor reviewed 18 PRPB reports and found it to be met. Interactions between PRPB personnel and transgender or transexual individuals is compliant in this required paragraph. For example, in arrest reporting of a transgender individual, the Prison Rape Elimination Act (PREA) assessment form and the PREA guidance sheet that explains how the arrestee can report sexual misconduct, were found in the reports. In another case review the Monitor found the required forms in a domestic violence case of a transgender individual, the domestic violence services document, Form C, the escape plan document, Form D, and the Counseling for Victim of Domestic Violence forms in the file. Each form was signed by a PRPB member and the victim. The additional police report reviews of car thefts, vandalism, and intimidation cases found that the categories of the sexual orientation information and gender identity of the individual were collected and noted on the report.

All other targets are assessed on an annual basis and will be evaluated in CMR-7. Because of the varying assessment frequencies of the targets, the overall compliance rating is deferred until CMR-7 when all targets will be assessed. The compliance rating above is moved forward from the previous CMR.

*Pathway Forward*

PRPB should continue interacting with transgender and transexual individuals in the manner required by policy, GO 624 (Interactions with Transgender and Transsexual Individuals). For PRPB to measure policy quality and member interactions, the collection of gender identification, gender expression, transportation, processing, housing, and medical treatment are important performance measures to collect and analyze.

## Paragraph 90: Equal Protection and Non-Discrimination - Discriminatory Policing

*PRPD shall provide all PRPD officers with training on biased-free policing at least every two years for the first four years of this Agreement, and annually thereafter. PRPD shall also provide training on biased-free policing as necessary, based on developments in applicable law and PRPD policy. PRPD's training program shall include the following topics:*

*a) PRPD policies and requirements in this Agreement regarding biased-free policing;*

*b) community perspectives of discriminatory policing;*

*c) constitutional and other legal requirements related to equal protection and unlawful discrimination;*

*d) the protection of civil rights as a central part of the police mission;*

*e) arbitrary classifications and stereotyping based on age, race, color, ethnicity, national origin, religion, gender, disability, sexual orientation, gender identity, gender expression and political ideology or affiliation;*

*f) interacting with diverse populations, including persons who are homeless and economically disadvantaged;*

*g) identification of key decision points where prohibited discrimination can take effect at both the incident and operational planning levels;*

*h) methods, strategies, and techniques to reduce misunderstanding, conflict, and complaints due to perceived bias or discrimination, including community-oriented policing strategies; and*

91

*i) comprehensive testing that shows complete understanding of rules and regulations.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually for Compliance Target #5. Annually for all other Compliance Targets. |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. PRPB trainings on discrimination free policing are consistent with the requirements of the Paragraph. | ☐ Met  ☑ Missed |
| 2. 95% of reviewed training records complied with the training frequency requirements of the Paragraph. | ☐ Met  ☑ Missed |
| 3. 95% of reviewed training curriculums complied with the content requirements of the Paragraph. | ☐ Met  ☑ Missed |
| 4. Tests accurately assess an understanding of rules and regulations related biased-free policing. | ☐ Met  ☑ Missed |
| **5. 95% of sampled PRPB members are trained and certified in bias-free policing.** | ☐ **Met**  ☑ **Missed** |
| Note: This Paragraph is assessed together with Paragraph 81 and 117 (Training). | |

## Compliance Assessment

Of the five targets within this paragraph, only one is assessed biannually and, thus, assessed in this report. In review of compliance target 5, the Monitor found it not to be met. In assessing whether 95% of sampled PRPB members are trained and certified in bias-free policing, the Monitor found that PRPB did not submit the data necessary to the Monitor's Office to determine whether PRPB members are trained and certified. The Monitor has previously asked that PRPB identify the training course(s) it provides specific to bias-free policing. The Monitor has not received any information that PRPB is developing training sessions on bias-free policing. The Monitor continues to receive a course listing of training administered to PRPB titled: Interactions with Transgender Persons, VITT 3082. Bias-free policing training is much more expansive and includes this community as well as all people PRPB serves.

All other targets are assessed on an annual basis and will be evaluated in CMR-7. Because of the varying assessment frequencies of the targets, the overall compliance rating is deferred until CMR-7 when all targets will be assessed. The compliance rating above is moved forward from the previous CMR.

## Pathway Forward

Bias-free training is essential in certifying that PRPB officers understand all points associated with this paragraph. The policy is only one piece. Training is essential to implementation of bias-free policing

practices and processes. Training on implicit bias, racial profiling, de-escalation, and communication skills are some of the topics that PRPB should develop coursework for to ensure that PRPB officers are equipped in their engagements with diverse communities. If not already developed, PRPB should create a specific course on bias-free policing with emphasis on PRPB's commitment to fair and bias-free treatment of all people.[6]

## Paragraph 91: Equal Protection and Non-Discrimination – Discriminatory Policing

*Paragraph 91 is assessed annually and will be reviewed in CMR-7.*

## Paragraph 92: Equal Protection and Non-Discrimination - Discriminatory Policing

*Within five business days, PRPD shall prepare and provide to PRDOJ and the Puerto Rico Department of the Family the preliminary investigation report prepared in response to each allegation of abuse and mistreatment originating in secure juvenile correctional facilities. Such allegations include physical and mental abuse, juvenile on juvenile assaults, staff on juvenile abuse, and excessive use of force by staff.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | |
|---|---|
| 1. All allegations of abuse and mistreatment originating in secure correctional facilities are timely reported to the PRDOJ and the PR Department of the Family. | ☐ Met   ☑ Missed |

### *Compliance Assessment*

PRPB submitted six cases to the Monitor's Office for review to determine if PRPB reports the case to PRDOJ and the Puerto Rico Department of Family (PRDoF) within five business days as required. PRPB police reports categorized these reports as two Institutional Abuse cases, one Aggravated Sexual Assault case, and three Sexual Assault cases. The report used to document the date of referral to PRDOJ and PRDoF is PPR-622.1 (Investigative Report), which is in the investigative file. There are specific fields within the report to document the proper referral. In five reports, these fields were crossed out and no information or referral date was noted. In one report PRPB used PPR-621.1, and no notation was made with a date on referral to PRDOJ and PRDoF.

PRPB did submit a listing of six incidents that occurred from October 1, 2021, through March 31, 2022. This list included the following indicators: date, case number, crime, correctional facility location, and investigating district. This listing does not include any information on timely reporting to the PRDOJ and

---

[6] https://www.theiacp.org/sites/default/files/2020-06/Bias-Free%20Policing%20January%202020.pdf

the PRDoF. Therefore, PRPB has not met this target. PRPB must prioritize and complete this critical assessment process with accuracy within the outlined timeframes to meet the specific indicators of this paragraph.

*Pathway Forward*

As noted in CMR-5, PRPB must certify the total number of cases and validate that report fields noting date and time the case has been referred to PRDOJ and PRDoF, are completed. PRPB documentation of cases forwarded to other agencies and departments is important to the procedural processes of the juvenile system.

It is recommended that a category noting date of referral of the case to PRDOJ and PRDoF be added to the body of the monthly statistical report titled Preliminary Investigations of Complaints of Institutional Abuse. It is also important PRPB follow specific timelines in the investigative processes of these types of cases. All cases should have status updates on the progress of the investigation. These updates should be completed every 30 days and included in the file to acknowledge how the investigation is progressing and to assist with identification of any backlog. This is a generally accepted policing practice. Regular status updates identify the promptness of the investigation and any barriers that need to be addressed. PRPB could benefit in establishing recurring meetings between PRPB and the Juvenile Facilities Director. Professional and transparent communication lines are essential to consultation, especially on the status of cases. Further, it is recommended that an agenda and meeting notes between the stakeholders be maintained. This will assist with information sharing, timelines, and responsiveness and be informative to both the Monitors in the police reform and the Monitors on the Juvenile Facilities reform.

## 3. Sexual Assault and Domestic Violence

PRPB must improve all its processes relating to protecting victims of sexual assault and domestic violence. PRPB must improve investigations of reported crimes of sexual assault and domestic violence. While this is a mid-year review of the processes related to training of personnel, 24-hotline management, reporting of crimes within the juvenile facilities to PRDOJ and PRDoF, PRPB still lags largely in both the training and implementation of procedures.

PRPB must ensure that sexual assault and domestic violence victims use the legal system in a manner that provides for their safety and security. PRPB must work proactively to outline consistent procedures, training, and accountability measures related to sexual assault and domestic violence cases. The targets assessed in this reporting period continue not to be met and are vital to addressing the systemic causes of gender-based violence.

### Paragraph 93: Equal Protection and Non-Discrimination - Sexual Assault and Domestic Violence

*PRPD shall respond to and investigate reports of sexual assault and domestic violence professionally, effectively, and in a manner free of gender-based bias. PRPD shall appropriately classify and investigate reports of sexual assault and domestic violence, collaborate closely with community stakeholders, and apply a victim-centered approach at every stage of its response. PRPD shall develop policies and procedures on responding to sexual*

94

*assault and domestic violence, including incidents involving PRPD officers, that comply with applicable law and comport with generally accepted policing practices.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually for Compliance Targets #1, #2, and #4. Bi-annually for the remaining Compliance Targets. |
| Practice: | Not Implemented | | |

### Compliance Targets

| | Met | Missed |
|---|---|---|
| 1. Reviewed policies and procedures on responding to sexual assault and domestic violence comply with applicable law and generally accepted policing practices. | ☑ Met | ☐ Missed |
| 2. Trainings on responding to sexual assault and domestic violence are consistent with approved policies. | ☐ Met | ☑ Missed |
| **3. 95% of sampled PRPB members are trained and certified in responding to sexual assault and domestic violence consistent with approved policies.** | ☐ **Met** | ☑ **Missed** |
| 4. 95% of reviewed sexual assault and domestic violence investigations complied with requirements of the Paragraph. | ☐ Met | ☑ Missed |

Note: This Paragraph is assessed together with Paragraphs 94, 98 and 99.

### Compliance Assessment

Of the four targets within this paragraph, only one is to be assessed biannually, and thus, assessed in this report. In review of compliance target 3, the Monitor found it not to be met. The Monitor reviewed personnel training records to determine training compliance on three domestic violence training courses:

- REA 627, Domestic Violence Incident Investigations - 91% of sampled PRPB members have received the training
- REA 627PM, Domestic Violence Involving Police Personnel - None of the sampled PRPB members have received this training; and
- REA 627R, Domestic Violence Incident Investigations - 30% of sampled PRPB members have received this training.

Further, the Monitor also reviewed personnel training records for REA 622, Sexual Crimes Training, and found that 89% of the sampled PRPB personnel had received this training. PRPB has not reached the 95% compliance target during this reporting period on training related to sexual assault and domestic violence investigations.

All other targets are assessed on an annual basis and will be evaluated in CMR-7. Because of the varying assessment frequencies of the targets, the overall compliance rating is deferred until CMR-7 when all targets will be assessed. The compliance rating above is moved forward from the previous CMR.

*Pathway Forward*

PRPB must continue to make progress in the delivery of its sexual assault and domestic violence training to PRPB personnel. This provides for steadiness and competence in the initial response to such calls for service. PRPB must continue to deliver the training opportunities, resources, and support needed to effectively address these crimes.

## Paragraphs 94-95: Equal Protection and Non-Discrimination – Sexual Assault and Domestic Violence

*Paragraphs 94-95 are assessed annually and will be reviewed in CMR-7.*

## Paragraph 96: Equal Protection and Non-Discrimination - Sexual Assault and Domestic Violence

*PRPD shall ensure that its Sex Crimes Investigation Unit is accessible through a hotline that is staffed 24-hours a day with trained responders.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually for Compliance Targets #1 and #2. Bi-annually for the remaining Compliance Targets. |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. Policy on Sex Crimes Investigation Unit incorporates the requirements of the Paragraph. | ☒ Met   ☐ Missed |
| 2. Training on response to sex crimes related calls is in accordance with approved policy. | ☐ Met   ☒ Missed |
| **3. 100% of sampled 24-hour hotline PRPB personnel are trained and certified in responding to sex crimes related calls.** | ☐ Met   ☒ Missed |
| **4. PRPB maintains a staffed 24-hour a day hotline with trained responders for sex crimes.** | ☐ Met   ☒ Missed |
| **5. The manned hotline provides the public access to the Sex Crimes Investigation Unit.** | ☐ Met   ☒ Missed |

*Compliance Assessment*

Of the five targets within this paragraph, only three are to be assessed biannually, and thus, assessed in this report. In review of compliance target 3, the Monitor neither received a list of all personnel assigned to the 24-hour hotline nor their training and certification records. Therefore this target is not met. For target 4, PRPB is to staff a 24-hour a day hotline. In response to the Monitor's request, PRPB submitted a 12-page log with dates from October 1, 2021, to March 21, 2022. The log indicates the date, type of

96

incident, call taker, assigned investigator, district, case number, and the supervising agent. The log, however, does not have a time category for when the call was received. Unfortunately, while it is clear that the hotline is operational without notations of time, the Monitor is unable to determine if the hotline is operating 24-hours per day as per the Agreement. For target 5, while the Monitor has visited the hotline's offices in previous reporting periods and noted that the office is accessible to the public, PRPB's constraints as far as equipment (as noted in previous reports) such as a telephonic computer system and call center, limit its ability to always provide access to the Sex Crimes Unit. Further, as noted in target 4, without proper documentation on the time of day in which calls are received, the Monitor is unable to comprehensively discern whether this resource is fully accessible to the public.

All other targets are assessed on an annual basis and will be evaluated in CMR-7. Because of the varying assessment frequencies of the targets, the overall compliance rating is deferred until CMR-7 when all targets will be assessed. The compliance rating above is moved forward from the previous CMR.

### *Pathway Forward*
PRPB must continue to make progress in the operations of the 24-hour hotline to ensure public access to the Sexual Assault Crime Unit. The related training is very important because it certifies call takers. These training records and certifications must be provided to the Monitor to demonstrate compliance. Further, as noted above, improved record keeping and documentation of time of day in which the calls are received is necessary to demonstrate compliance with the related targets. Alternatively, PRPB may submit to the Monitor documentation of its own internal audits of the 24-hour accessibility of the hotline and/or call logs from the hotline service provider/company to demonstrate compliance. Further, public access through a 24-hour hotline can provide the community with immediate crisis intervention, help the victim create a safety plan, find emergency shelter, find access to medical attention, and even provide referrals to other resources in the community.

### Paragraphs 97-98: Equal Protection and Non-Discrimination – Sexual Assault and Domestic Violence
*Paragraphs 97-98 are assessed annually and will be reviewed in CMR-7.*

### Paragraph 99: Equal Protection and Non-Discrimination - Sexual Assault and Domestic Violence
*PRPD shall implement measures to respond to reports of domestic violence and sexual assault involving PRPD officers, including disarming officers and assessing their fitness for duty.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | N/A | | |

97

|  Practice: | Not Implemented | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all other Compliance Targets. |
|---|---|---|---|

### Compliance Targets

| | |
|---|---|
| 1. PRPB policies and procedures implement measures to respond to reports of domestic violence and sexual assault involving PRPB officers, including disarming officers and assessing their fitness for duty. | ☑ Met   ☐ Missed |
| **2. 95% of reviewed investigations of domestic violence and sexual assault involving a PRPB officers complied with requirements of the Paragraph.** | ☐ **Met**   ☑ **Missed** |

Note: This Paragraph is assessed with Paragraphs 93, 94, and 98. The conduct envisioned by this Paragraph may also fall within the purview of Paragraph 184.

### Compliance Assessment

Of the two compliance targets associated with this paragraph, only one, is assessed every reporting period. Unfortunately, due to an oversight, the Monitor failed to request a sample of domestic violence and sexual assault investigations involving PRPB officers and PRPB did not bring to the attention of the Monitor the missing sample request.

### Pathway Forward

Both targets associated with this paragraph will be assessed as part of a comprehensive review conducted in CMR-7.

## Paragraph 100: Equal Protection and Non-Discrimination – Sexual Assault and Domestic Violence

*Paragraph 100 is assessed annually and will be reviewed in CMR-7.*

98

# V. Recruitment, Selection, and Hiring

Police recruitment, selection, and retention are critical to the advancement of community policing and of the policing profession in general. However, recruitment and staffing shortfalls continue to plague law enforcement agencies across the United States. COVID-19 has also had a detrimental impact on PRPB's recruiting efforts. Nevertheless, PRPB provided data that demonstrates a concerted effort both to recruit qualified candidates, and to vet them thoroughly.

The goal of police recruitment is and always has been to hire not merely enough people but the right people. Police executives' notions of what constitutes the right people is changing. They are now more likely to seek to increase the diversity of their departments across the spectrums of race, ethnicity, gender, age, and sexual orientation.

Overall, PRPB has put a tremendous effort into addressing these challenges with a comprehensive recruitment plan and effective recruitment programs that solicit recruits from a broad cross-section of the Puerto Rican community. However, important gaps remain in the training of recruitment officers and the implementation of the recruitment plan in practice. Furthermore, proposed updates to PRPB's recruitment policy raise key questions, though this policy did not take effect during the CMR-6 reporting period.

During this reporting period, the Monitor's Office reviewed proposed updates to PRPB's recruitment policy and submitted comments to PRPB. The Monitor's Office has also interviewed members of the Recruitment Division and reviewed all pertinent forms and recruiting materials that are currently being used by the division.

The Monitor finds that PRPB is in partial compliance with the Agreement regarding recruitment, selection, and hiring policies and procedures. PRPB has tried to recruit and hire qualified personnel and develop recruitment strategies that promote inclusive selection practices that better reflect a diverse cross-section of the Puerto Rican community. PRPB still needs to improve in certain areas as well as institutionalize many of these practices to achieve substantial compliance.

It should be noted that the Recruitment Division is working with INTERBORO in the development of a platform that will expedite the recruitment process. PRPB should also ensure that members of each area in Puerto Rico are trained in the use of the INTERBORO platform to help achieve PRPB's goals in recruitment numbers. The INTERBORO system will make PRPB more effective and efficient in recruitment and automate valuable information and statistics.

Overall, PRPB's compliance with the eight Recruitment, Selection, and Hiring paragraphs assessed during this reporting period reflect the same levels of compliance to what was noted in previous reports. In CMR-2, CMR-4, and CMR-6 all paragraphs were assessed as partially compliant. See figure 4.



*Figure 4. Recruitment, Selection, and Hiring: Paragraph Compliance Status*

## Paragraph 101: Recruitment, Selection, and Hiring - General Provisions

*PRPD shall develop a comprehensive recruitment and hiring program that successfully attracts and hires qualified individuals. PRPD shall develop a recruitment policy and program that establishes clear guidance and objectives for recruiting police officers and clearly and transparently allocates responsibilities for recruitment efforts.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

Note: Compliance will be determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 102-108, and (2) the results of outcome assessments, pursuant to Paragraph 243.

### *Compliance Assessment*

PRPB provided pertinent documents and data on recruitment to the Monitor's Office, including regulations and GOs, data on the number of prospective cadets who were recruited and vetted, and the gender and education composition of PRPB Academy Classes 229 to 234. Summaries of this data are provided in table 1 below. PRPB noted that it expects to combine classes 233 and 234 and begin these recruit classes in 2022.

## Education Level of Entering Cadets for Academy Classes

PRPB accepted 134 candidates into Class 229 and 126 into Class 230. Class 231 had 136 cadets. Classes 232 and 233 had 144 cadets each. Class 234 currently has 41 cadets but is expected to reach 135 cadets. It should be noted that PRPB was affected by health regulations established under the COVID-19 pandemic.

| Class Number | Gender | Highest Education Level Achieved | | | | |
|---|---|---|---|---|---|---|
| | | Associate's Degree | Bachelor's Degree | Master's Degree | Doctor's Degree | Total |
| Class 229 | Women | 10 | 22 | 3 | 0 | 35 |
| | Men | 41 | 56 | 2 | 0 | 99 |
| Class 230 | Women | 8 | 25 | 2 | 0 | 35 |
| | Men | 39 | 49 | 3 | 0 | 91 |
| Class 231 | Women | 15 | 34 | 5 | 0 | 54 |
| | Men | 38 | 41 | 2 | 1 | 82 |
| Class 232 | Women | 16 | 38 | 3 | 0 | 57 |
| | Men | 42 | 40 | 5 | 0 | 87 |
| Class 233 | Women | 15 | 33 | 6 | 0 | 54 |
| | Men | 36 | 52 | 2 | 0 | 90 |
| Class 234 | Women | 6 | 11 | 1 | 0 | 18 |
| | Men | 4 | 17 | 2 | 0 | 23 |
| Total | Women | 70 | 163 | 20 | 0 | 253 |
| | Men | 200 | 255 | 16 | 1 | 472 |

*Table 1. Gender and Education Breakdown of Cadets*

The Monitor supports the efforts of PRPB to recruit qualified applicants from a broad cross-section of the Puerto Rican community, and to track recruitment performance thoroughly and provide that data to the Monitor's Office.

On December 23, 2021, Honorable Pedro Pierluisi, Governor of the Commonwealth of Puerto Rico, signed into law an amendment to articles 1.02, 1.11, and 2.07 of Act 20-2017 (Department of Public Safety Act) changing the hiring age for PRPB officers from 21 to 18. Although applicants are still required to obtain an associate degree, per the Agreement, this change in applicant age presents an opportunity for PRPB to establish a cadet program. The Monitor's Office provided PRPB with examples of cadet programs from police agencies across the country. This guidance included the various responsibilities and tasks provided to cadets prior to becoming commissioned as officers (See Appendix D). The Monitor's Office also notes that it is a widely accepted policing practice to accept cadets from the age of 18, with key restrictions on the functions they are allowed to perform and specific requirements they must meet on the pathway toward full police officer status.

PRPB's efforts towards establishing a cadet program have been recurring topics at the January 14, 2022, and March 24, 2022 status conferences.

101

*Pathway Forward*

The Monitor recommends that PRPB review the cadet program guidance and overview materials provided. These materials highlight best and promising practices for cadet programs used by law enforcement agencies across the country. The Monitor looks forward to further collaborating with PRPB in the development of the cadet program.

## 1. Recruitment Plan

The Agreement establishes inclusive selection practices as a clear goal for hiring reform, with the intention of promoting greater representation among PRPB personnel for the diversity of the Puerto Rican community. The Recruitment Division has been conducting outreach to the female and LGBTQIA+ communities to attract more interest in the profession within these communities. PRPB has taken steps to make recruitment and selection practices more inclusive, and these steps are beginning to produce positive results in terms of more diversity in the hiring pool. PRPB has been authorized to hire 400 new cadets in 2022, hopefully continuing this trend of increasing representation to a broad cross section of the Puerto Rican community. The Monitor's Office also encourages PRPB to reach out to the underrepresented communities, such as the Chinese community, in its increased recruitment efforts.

### Paragraph 102: Recruitment, Selection, and Hiring - Recruitment Plan

*PRPD shall develop a recruitment plan that includes clear goals, objectives, and action steps for attracting qualified applicants from a broad cross-section of the community. PRPD's recruitment plan shall establish and clearly identify the goals of PRPD's recruitment efforts and the duties of officers and staff implementing the plan.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies and recruitment plans incorporate all of the requirements of Paragraphs 101-103. | ☑ Met | ☐ Missed |
| 2. Training on recruitment is consistent with approved policies. | ☐ Met | ☑ Missed |
| 3. 95% of sampled personnel are trained and certified in recruitment policies and plans (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 4a-d, f. PRPB's recruitment plan was developed, implemented, and evaluated in accordance with approved policies on recruitment. | ☑ Met | ☐ Missed |

| 4e. 85% of activities required by the recruitment plan and directed at recruiting underrepresented groups were implemented, including any missed activities that are reasonably justified. | ☑ Met | ☐ Missed |
|---|---|---|

*Compliance Assessment*

The Monitor's Office has determined through interviews and document reviews that PRPB has been using the following documents as working tools in the recruitment process: GOs 310 (Performance Evaluations), 501 (Recruitment), and 702 (Pre-Service Training Program), Recruitment Regulation 9050, the Recruitment and Hiring Strategic Plan, and the recruitment flowchart. These documents establish clear objectives for the recruitment of police officers and assign responsibilities to each of the parties in the recruitment process. However, the regulations and GOs are currently undergoing revisions that may have an impact on PRPB's recruitment practices. The revised Recruitment Regulation was reviewed under Paragraph 229 and the Monitor provided comments. GOs 501 and 702 will be reviewed in 2022 and GO 301 was submitted under Paragraph 229 for review in April 2022 and comments were provided by the Monitor's Office. The Monitor's Office reviewed and approved recruitment training policies during the capacity-building period and CMR-4. It is expected that a new training curriculum will be available soon after the final approval of GO 501(Recruitment).

PRPB provided the Monitor with a current copy of the Strategic Recruitment Plan for 2022, which notes that one of the division's priorities is to train members of the Community Relations Bureau of the 13 police areas as recruiters. Though PRPB noted that its goal is to fully train recruiting officers throughout Puerto Rico in the future, gaps in training remain for the present reporting period. SAEA has not had a class on *How to be a Recruiter*, and PRPB did not provide sufficient evidence for the Monitor to verify that 95% of sampled personnel have been trained and certified in recruitment policies and plans.

The Agreement states that PRPB must develop a recruitment plan that solicits and considers stakeholder suggestions in good faith, identifies barriers to recruiting under-represented groups, and include initiatives to overcome those barriers. The Monitor's Office has determined that PRPB has developed a recruitment plan and recruiter positions that meet these requirements, and that outreach has been conducted to foreign consulates and among the Dominican, LGBTQIA+, and Chinese communities to further improve the pool of candidates for PRPB. Furthermore, the current Director of Recruitment has indicated that he and the Reform Unit are working on a series of community policing initiatives to improve the recruitment process.

Nevertheless, the Monitor's Office concludes that the Strategic Recruitment Plan requires further modifications to include clear advertisement guidelines in alignment with community policing standards. The plan must highlight potential candidates' demonstrated qualifications or combination of skills in problem solving, critical thinking, leadership, interpersonal skills, mature judgment, communication, and strong ethics. Such modifications would lead to a higher assessment rating. Additionally, the Monitor's Office recommends that PRPB work closely with INTERBORO to facilitate the inclusion of a community policing questionnaire within its recruitment system. Finally, the Monitor notes that there was a gap in outreach to CIC members and the Puerto Rican community for their assistance during the present assessment period. The recruitment plan should include provisions that PRPB consult with community stakeholders and obtain recommendations to ensure a diverse

candidate pool, including underrepresented communities in addition to women and Dominican nationals.

*Pathway Forward*

As noted above, PRPB should involve members of diverse communities to better define what characteristics they value in the hiring of new recruits and provide input in its recruitment plan and strategies. Leveraging the CICs for this input is one avenue to easily engage the community for this purpose.

## Paragraph 103: Recruitment, Selection, and Hiring - Recruitment Plan

*The recruitment plan shall include specific strategies for attracting a diverse pool of applicants including members of groups that have been historically underrepresented in PRPD. A "Recruitment Officer" will be responsible for the development of the plan, together with a working group that includes officers from diverse backgrounds. The working group will also consult with community stakeholders to receive recommended strategies to attract a diverse pool of applicants. The plan will include both outreach to the general population and targeted outreach to populations currently underrepresented on the PRPD force including, but not limited to, women and the Dominican population, through media outlets, universities, community colleges, advocacy groups, and other community groups that serve or are likely to reach such populations. The "Recruitment Officer" and his or her staff, as determined by the Superintendent, will be responsible for the implementation of the plan.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed together with Paragraph 102.

*Compliance Assessment*

PRPB provided examples of ways in which their offices have attempted to be inclusive and to reach out to the groups currently underrepresented in PRPB, including, women and people of Dominican descent. As an example, the Monitor's Office received a copy of recruiting promotion that had been shared with the Consulates of Mexico, Colombia, El Salvador, the Dominican Republic, and Uruguay. Documentation was also provided to the Monitor's Office demonstrating work with CIC members and staff of various local universities to recruit from a wide range of Puerto Rican society.

Nevertheless, the Monitor assesses that PRPB should make more of an effort to obtain input from CIC members island wide and working groups. For example, the LGTBQIA+ community has a working group assisted by members of the Recruitment Division.

*Pathway Forward*

PRPB should continue to hold conferences for the varied groups to whom it provides verbal and written information to promote the recruitment of candidates of diverse backgrounds. It should also continue to work with the Counsel of the Dominican Republic and representatives of the LGTBQIA+ community to help promote recruitment in these communities. The PRPB Recruiting Team should be representative of the agency and be comprised of sworn and non-sworn members. Recruiting at PRPB should be creative and constantly evaluate which strategies are working and which are not.

## 2. Hiring Reforms

Hiring decisions are among the most important responsibilities of PRPB. PRPB is selecting the face that the agency will present to the community and determine PRPB's future goals and values. Favoritism, bias, discrimination, and nepotism should not be factors in the hiring of new police recruits.

The Monitor concludes that PRPB has developed and implemented a recruitment selection system that meets most of the policy and practice requirements of paragraphs 104-107. Nevertheless, PRPB receives only partial compliance on paragraphs 104-107 due to lack of adequate training for recruitment officers. PRPB did not provide evidence demonstrating that SAEA has conducted trainings on *How to be a Recruiter*, nor could the Monitor determine that 95% of sampled personnel had been trained and certified in recruitment policies and plans.

### Paragraph 104: Recruitment, Selection, and Hiring - Hiring Reforms

*PRPD shall develop an objective system to select recruits to enter into UCCJ. The system will establish minimum standards for recruiting and an objective process for selection that employs reliable and valid selection devices that comport with generally accepted policing practice and anti-discrimination laws.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 104-07. | ☑ Met | ☐ Missed |
| 2. Training on the recruit selection process is consistent with approved policies. | ☑ Met | ☐ Missed |

105

| | |
|---|---|
| 3. 95% of sampled personnel are trained and certified in all recruit selection process policies (or scheduled for training, in the case of mid-year reviews). | ☐ Met  ☑ Missed |
| 4a. 100% of recruits meet qualifications required by policy. | ☑ Met  ☐ Missed |
| 4b. the recruit selection process was implemented in accordance with approved policies. | ☑ Met  ☐ Missed |

*Compliance Assessment*

The Monitor's Office has reviewed numerous tools that PRPB uses to attract qualified applicants from a broad section of the community, including GOs 310 (Performance Evaluation), 501 (Recruitment), 702 (Pre-Service Training Program), Recruitment Regulation 9050, the current hiring brochure, and the Strategic Plan for Recruitment and Hiring. The Monitor's Office concluded that the 2022 Monthly Strategic Plan sets adequate goals and objectives for hiring qualified individuals.

PRPB provided lists of cadets for Academy Classes 228-234 and data on the acceptance rate for incoming Classes 233 and 234 (shown in table 2 below). The Monitor's Office drew a sample of 50 cadets from the 390 cadets in Classes 228-230, to review personnel files for sampled recruits as well as the data on acceptance rates for the incoming classes. Based on this data, the Monitor concludes that recruits accepted during the assessment period meet minimum recruitment standards required by Paragraphs 104 and 105, and that the selection process meets requirements of Paragraph 104, 106, and 107.

PRPB provided documentation demonstrating that the Bureau continued to recruit adequate numbers of applicants for Academy Class 233 and the upcoming Class 234. The documentation provided also demonstrated that candidates undergo a rigorous assessment ahead of appointment, and that unqualified applicants are rejected. The current PRPB system establishes minimum standards for recruiting and an objective process for selection that comports with generally accepted policing practices and antidiscrimination laws.

| | Requests Received | Declined | Did not Qualify | Did not Appear |
|---|---|---|---|---|
| Aspiring Cadets | 333 | 15 | 48 | 11 |

| | Referred | Favorable | Unfavorable | Pending |
|---|---|---|---|---|
| Entrance examination | 259 | 218 | 41 | |
| Polygraph | 198 | 150 | 15 | 4 |
| Psychologist | 194 | 156 | 15 | |
| Physical exam | 137 | 99 | 4 | 16 |
| Physical fitness test | 133 | 118 | 6 | |
| Doping | 149 | 148 | 1 | |
| Appointment | 152 | | | |

*Table 2. Recruitment Data from October 2021 - March 2022 - Classes 233 and 234*

106

*Pathway Forward*

PRPB should continue to ensure that their selection processes are consistent with generally accepted policing practices and continue their efforts in anti-bias and anti-discrimination policies. Though recruitment remains strong, PRPB must ensure continued compliance with the requirements of the Agreement by training all personnel on recruitment policies, especially recruitment officers. The Monitor is optimistic that when relevant PRPB personnel are fully trained and operating the INTERBORO platform, their work through INTERBORO will allow PRPB to better track information and outcomes for the recruitment process.

## Paragraph 105: Recruitment, Selection, and Hiring - Hiring Reforms

*PRPD shall establish and publish qualifications for sworn personnel that are consistent with generally accepted policing practice. PRPD shall continue to require a two-year post-secondary degree, or its equivalent, as part of the requirements for sworn personnel.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed together with Paragraph 104.

*Compliance Assessment*

The 2022 hiring announcement brochure features a QR Code so that those seeking to enter the police service can easily access the relevant resources on PRPB's website, including a full list of the qualifications required of recruits. The Interim Director of the Recruitment Division has further indicated that the INTERBORO platform will be complete in April 2022 and will include the recruitment qualifications. However, the Monitor's Office has determined that PRPB should make a greater effort to incorporate the principles of community policing into the recruitment process, such as using a community policing questionnaire. Further details are provided in the Community Engagement and Public Information section of CMR-6.

*Pathway Forward*

PRPB should continue to use the following INTERBORO documents: *Steps to Complete Recruitment Application, Recruiting Range for Examiners,* and *Recruitment and Rank for Administrators*. PRPB should ensure that members of each area in Puerto Rico are trained on the use of the INTERBORO platform to

help achieve PRPB's goals in recruitment numbers. The Monitor' Office further recommends the use of a community policing questionnaire in the recruitment process.

## Paragraph 106: Recruitment, Selection, and Hiring - Hiring Reforms

*PRPD shall require all candidates for sworn personnel positions to undergo a psychological, medical, and polygraph examination to assess their fitness for employment with PRPD.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: This Paragraph is assessed together with Paragraph 104.

### Compliance Assessment

As demonstrated in table 2 above and corroborated by interviews with the Human Resources Interim Director and the Recruitment Director Interim Director, PRPB requires that all candidates applying to become a PRPB officer undergo psychological, medical, and polygraph examinations to assess their fitness for employment. The Monitor's Office concludes that these examinations are consistent with policy and with the Agreement after conducting a variety of document reviews and personnel interviews.

The Monitor reviewed exemplars of the documents used in these assessments and concluded that these materials meet the requirements of the Agreement. The Monitor also interviewed a psychologist that conducts the psychological examination to assess fitness for employment, and an investigator who does background investigations on the recruit candidates and verified that these assessments comport with widely accepted policing practices. Finally, PRPB provided recruitment files for a representative sample of 50 recruits drawn by the Monitor's Office. A review by the Monitor's Office shows that 95% of the recruitment files comply with policy and meet the relevant targets of paragraphs 104-107.

### Pathway Forward

PRPB should continue with the current system, as the representative sample of recruitment files appear to comply with policy. The INTERBORO platform should also be used to provide automated data collection.

## Paragraph 107: Recruitment, Selection, and Hiring - Hiring Reforms

*PRPD shall assess and revise its policies and practices to ensure thorough, objective, and timely background investigations of candidates for sworn personnel positions based on generally accepted policing practice. PRPD's*

*suitability determination shall include an assessment of a candidate's credit history, criminal history, employment history, use and abuse of controlled substances, and ability to work with diverse communities and act without impermissible bias. Favorable suitability determinations shall expire six months after the determination.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

## Compliance Targets

Note: This Paragraph is assessed together with Paragraph 104.

## Compliance Assessment

The Office of Safety and Protection performs the background investigation of each candidate. This includes an evaluation of each candidate's credit history, criminal history, employment history, use and abuse of controlled substances, and ability to work with various communities and to carry out duties without prejudice. The USDOJ and the Monitor's Office recently reviewed the manual used by the Office of Safety and Protection and recommended changes to the manual, which will help ensure that PRPB complies with generally accepted policing practices. Among these recommendations, USDOJ and the Monitor's Office suggested that PRPB should request key records from national databases including the Criminal Record Returns from the USDOJ's Bureau of Criminal Identification and Investigation, the FBI Criminal Record Return document, and the USDOJ Firearms Eligibility Clearance Return in a timely manner. A review of the data from candidates' files demonstrate that background investigations are currently being completed in approximately two months. Though this timeframe complies with policy, the Recruitment Division Interim Director would like to see all background investigations expedited.

## Pathway Forward

The Monitor recommends that PRPB work with the Office of Safety and Protection to implement the recommended revisions to the manual used in conducting background investigations on candidates. The Office of Safety and Protection should establish an information system that would allow it to efficiently request and review Criminal Record Returns from USDOJ's Bureau of Criminal Identification and Investigation, the FBI Criminal Record Return document, and the USDOJ Firearms Eligibility Clearance Return. Once these data sources are accessible, their usage should be standardized in the revised manual.

## Paragraph 108: Recruitment, Selection, and Hiring - Hiring Reforms

*PRPD and the UCCJ shall revise and implement policies and practices related to hiring to ensure that PRPD recruits and cadets do not qualify for civil service employment protections until their aptitude and abilities are properly assessed.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met   ☐ Missed |
|---|---|
| Note: This Paragraph is assessed, in part, with Paragraph 119. | |

### Compliance Assessment

The Monitor verified that PRPB has reviewed and implemented hiring-related policies and practices to ensure that PRPB recruits and cadets qualify for public service employment protections. These protections are only granted after a thorough evaluation of the candidate's skills and abilities. The Monitor's Office has previously reviewed the 9050 Recruitment Regulation and found it to comply with the stipulations of the Agreement and with widely accepted policing practice. The Monitor further verified that the regulation has been implemented in training and practice.

PRPB confirmed that the current policy ensures that recruits qualify for public service employment protections before granting those protections and noted that this practice has been instituted. PRPB has also stated that candidates are subject to a probation period, which is required by the GO and associated regulations. In the past, PRPB specialists reviewed the rights of candidates during the probation period.

The Monitor notes that in March 2022, an updated Recruitment Regulation was provided for review and the Monitor provided comments for revision.

### Pathway Forward

The Monitor's Office looks forward to receiving an updated Recruitment Regulation in response to the submitted comments.

110

## VI. Policies and Procedures

Policies and Procedures is assessed on an annual basis. Paragraphs 109 – 116 were assessed in CMR-5 and will be assessed again in CMR-7.

# VII. Training

The Training area of the Agreement is assessed annually and, in this report, covers the review period of April 2021 through March 2022. The Monitor's assessment of PRPB's compliance with training is based on the training documents submitted by PRPB, interviews with staff assigned to the Training Academy, Field Training Officers (FTOs), FTO Coordinators, and others involved in the development and conduct of academy, in-service, and FTO training.

Over the last year, PRPB has had to adjust its training delivery for several courses due to COVID-19 restrictions and compromises in the integrity of the virtual training system. As noted in previous reports and shown in other related areas of the Agreement, much work remains for PRPB to achieve preliminary compliance with several of the paragraphs within this section. Specifically, the sections of pre-service training, in-service training, and training record management still need work to attain compliance. Areas that need improvement are the provision of additional equipment to support training instructors in the delivery of scenario-based training and full use of the Police Training Management System (PTMS) to register, record, and evaluate training courses provided by PRPB.

Although the Monitor was able to meet with and interview various staff involved in the development and conduct of training, PRPB failed to submit the data and documentation necessary for the Monitor to assess this area in a comprehensive manner. Documentation such as projected training calendars/schedules and course curriculum files were not provided. Additionally, despite the Monitor's several requests for training calendars and schedules, none were provided in advance of the conduct of these trainings, and the Monitor was limited to observing one FTO training course during one of the Monitor's site visits. Further, the Monitor has yet to receive any related course materials for review and evaluation, limiting our ability to assess the conduct of training in the Training Section as well many of the other areas of the Agreement.

Despite the challenges and issues noted above, PRPB has demonstrated progress in the conduct and delivery of its FTO program. The FTO training program is modeled after national best practices and PRPB has demonstrated progress in the development, delivery, and practice of all aspects of this training program.

Training, like policy, is a foundational pillar to the success of any police agency. Policing agencies must have the ability to provide services to the community in a safe and equitable manner and establish a culture of continual learning and reform. PRPB must prioritize its training efforts to advance its progress towards compliance. Training is woven in and across all areas of the Agreement and is the cornerstone to the Bureau's progress from non-compliance to partial compliance. While PRPB recognizes that training is important, it must prioritize it's training capacities.

Overall, PRPB's compliance with the 18 Training paragraphs assessed during this reporting period reflect substantial improvement in levels of compliance compared to what was noted in previous reports. In CMR-4, 94% of paragraphs (16 paragraphs) were assessed as not compliant, in comparison to the current reporting period, where 61% of paragraphs (11 paragraphs) were found to be partially or substantially compliant; all other paragraphs are noted as not compliant. See figure 5.



*Figure 5. Training: Paragraph Compliance Status*

## Paragraph 117: Training - General Provisions

*PRPD shall ensure that every PRPD officer and employee receives effective and comprehensive training that ensures they understand their responsibilities, the scope of their authority, and PRPD policy, and are able to fulfill these responsibilities and police effectively. Qualified trainers and instructors shall deliver instruction through generally accepted methods and techniques that are approved by UCCJ and are designed to achieve clear and articulated learning objectives. Trainers and instructors shall utilize generally accepted evaluation methods approved by UCCJ to assess proficiency and competency.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph related to qualified instructors, instruction delivery, and evaluation methods. | ☑ Met | ☐ Missed |
| 2. Training for trainers and instructors is consistent with approved policies. | ☐ Met | ☑ Missed |
| 3. Instructors and trainers are qualified and certified as required by policy in 95% of selected training courses. | ☐ Met | ☑ Missed |
| 4. Instruction is delivered in accordance with policy in 95% of selected training classes. | ☐ Met | ☑ Missed |
| 5. Evaluation methods are used and documented in accordance with policy in 95% of selected training course files. | ☐ Met | ☑ Missed |

Note: Compliance will be determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 117-134, and (2) the results of outcome assessments, pursuant to Paragraph 243.

113

*Compliance Assessment*

Through its appointment of new training academy leadership, PRPB is working to strengthen training and establish a continual training process. Although PRPB no longer operates as part of the University College of Criminal Justice (UCCJ), it continues to deliver training and certify its trainers through its Academy. Although copies of these training certifications were requested as part of this reporting period, PRPB provided a memo stating that because PTMS is still under development, it is unable to produce copies of such certificates. During this reporting period, the Monitor was provided a directory of all 209 internal and external instructors. No information on how instructional certification is achieved was received by the Monitor. Further, there was no information on the number of hours the instructors received in subject matter training.  PRPB self-reports that it does not report the full extent of evaluations and qualifications of its instructional staff due to PTMS still being under development.

The Monitor was provided with the instructor's training course materials for two courses - Control Tactics (MACM 3041) and the FTO Program. In review of the course materials, the Monitor found them to be compliant with the requirements of the paragraph related to qualified instructors, instruction delivery, and evaluation methods. The Monitor did request instructional materials on supervision and investigative techniques, but neither were provided for review.

*Pathway Forward*

The PRPB Police Academy staff must continue to give more attention to the assessment of instructors, full use of PTMS for centralized training records, use of technology, use of appropriate equipment, and learning comprehension assessments.

PRPB must use PTMS to adequately document the certifications and qualifications of all its instructional staff. Supplementary to the list of 209 names of agency and civilian staff assigned to work and teach at the academy, the list should also state the topics that the instructors are assigned to teach. PRPB must identify the underlying expertise of its instructors to determine that its new agents receive a focused education on tactics and techniques. PTMS should house the credentials, however PRPB must also submit documentation validating the instructors credentialling to the Monitor for review.

# 1. Pre-Service Education and Training

Pre-service training has often been cited as one of the most important responsibilities in any law enforcement agency. PRPB's Police Academy is currently the sole training provider for PRPB personnel. The PRPB Police Academy's role is to provide foundational police training to apprentice agents. The initial basic learning objectives delivered to apprentice agents is delivered only at the Academy located in San Juan. The Academy provides the pre-service curriculum to the apprentice officers for them to comply with the mandatory training to become a PRPB police officer. The basic pre-service training currently exceeds the mandatory 900 hours at 1,310 hours. To assist and deliver the pre-service training, PRPB must build a foundation with qualified instructors to effectively support the integrity and success of the entire department. This must include training on policy, procedures and directives, standards, and assessment tools as well as centralized training records, core curriculum, appropriate equipment, and guidelines on the use of technology.

A site visit conducted during this reporting period presented an opportunity for the Monitor to tour the Academy grounds and meet Academy leadership. During a previous site visit the Monitor found the grounds to be in poor shape, largely due to major storm damage, but since the appointment of new leadership, the infrastructure and grounds of the Academy have improved. The instructional and public buildings have been repaired and painted. However, the dorm buildings are still in need of facilities management and upgrading. The Academy leadership recognizes this and states they have budgeted for the repairs and are awaiting approval to move forward.

It should be noted that PRPB operates the Police Academy through SAEA, which is tasked with providing the necessary trainings. Subsequently, PRPB has taken over all implementation and compliance responsibilities previously assigned to UCCJ. PRPB does self-report that it is currently in the discussion phase with the University of Puerto Rico to assist with the academic delivery of training.

## Paragraph 118: Training - Pre-Service Education and Training

*UCCJ shall provide pre-service education and training to candidates for sworn personnel positions in PRPD in accordance with its enabling statute and regulations. To the extent that UCCJ will confer Associate or equivalent degrees recognized by nationally or regionally accredited institutions of higher learning in the continental United States, UCCJ shall maintain its license in good standing from the Puerto Rico Council on Education and attain full accreditation from the Middle States Association of Colleges and Schools within two years of the decision to confer such degrees.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of Paragraphs 118-121. | ☑ Met | ☐ Missed |
| 2. The pre-service training program, including curriculum and related training materials, is consistent with approved policies. | ☐ Met | ☑ Missed |
| 3. Training plans and standards are consistent with approved policies. | ☐ Met | ☑ Missed |
| 4. 95% of personnel who complete the pre-service training program are trained and certified (or scheduled for training, in the case of mid-year reviews) in accordance with training plans, standards, and policy. | ☐ Met | ☑ Missed |
| 5. The pre-service training curriculum is reviewed and revised in accordance with policy. | ☐ Met | ☑ Missed |
| 6. Findings and recommendations of bi-annual reviews of the pre-service training curriculum are submitted to the Commissioner in written reports. | ☑ Met | ☐ Missed |
| 7. Needs assessments are conducted in accordance with policy. | ☐ Met | ☑ Missed |

115

*Compliance Assessment*

PRPB no longer has a Memorandum of Understanding (MOU) with UCCJ. PRPB is delivering the pre-service training to candidates for sworn personnel training internally. PRPB is initiating an academic process to confer Associates or equivalent degrees, but no university has been officially determined. Course materials for only one course were received and observed by the Monitor to assess the pre-service training program, Applied Ethical Introductory Workshop (EA 604). The Monitor determined that this course is consistent with approved policies. However, no other course documents were received. PRPB self-reports that it did not conduct the necessary needs assessment for training.

PRPB complied with the reporting of curriculum changes during this reporting period. It is reported and recommended to the Police Commissioner in the annual report (dated July 19, 2021) that no changes were made to any courses in the Pre-service Academy. The academy staff waits for approved policy or procedural changes before implementing any curriculum changes. During this time no policy or procedural changes were reported to the Academy to require curriculum modifications.

*Pathway Forward*

PRPB must develop a training plan which includes a needs assessment to identify training gaps between organizational and individual performance goals. The annual assessment must also include a measurement on current skill and knowledge levels for pre-service and in-service training. Possible identified gaps may include changes in laws or policy, the need for new equipment, and/or lack of awareness of information on non-discrimination practices. The goal is to assess training needs more accurately, and efficiently provide the clarifications and skills needed by PRPB officers.

## Paragraph 119: Training - Pre-Service Education and Training

*Once candidates meet all educational requirements and eligibility criteria, UCCJ shall establish and provide a pre-service training program for PRPD cadets consisting of at least 900 hours of instruction that comports with generally accepted policing practice with respect to quality and content, and that reflects the requirements of this Agreement.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed together with Paragraph 118.

116

*Compliance Assessment*

The Recruitment, Selection, and Hiring Committee provided information on eligibility qualifications for PRPB cadets in the CMR-4 reporting period for Class 230 (119 apprentice officers), and Class 231 (136 apprentice officers). For Class 232 the candidates were approved by the Recruitment, Selection, and Hiring Committee, allowing the cadets eligibility for attendance in the Pre-Training Program. The Monitor also reviewed the files for Class 232 and found that the candidates met the eligibility requirements. However, as of the end of this reporting period, the training had not yet started. The pre-service training curriculum and related training materials were not received by the Monitor; therefore, no review was conducted. Only one course was observed, and its related curriculum reviewed, Ethics (EA 604). This course was found to be consistent with generally accepted policing practices with respect to quality and content. However, the entire pre-service curriculum is still in need of review by the Monitor.

In terms of the quality and content of the training, PRPB must purchase and make available training resources and equipment to achieve a quality standing. For example, both in the pre-service and in-service training the training instructors are personally purchasing equipment to demonstrate policing techniques.

*Pathway Forward*

PRPB provided the Monitor with a training schedule for Class 232 through March 5, 2022. No other documentation was provided. For PRPB to meet compliance reporting requirements, the entire training schedule and related curriculum for the pre-service training academy must be submitted to the Monitor's Office for review. PRPB reports that the pre-service training exceeds the 900 required hours. Both the 900 hours of pre-service training and the expanded curriculum totaling 1,310 hours still needs to be reviewed by the Monitor to ensure it is compliant with the Agreement.

## Paragraph 120: Training - Pre-Service Education and Training

*PRPD and UCCJ shall review and revise its pre-service training curriculum to ensure quality, consistency, and compliance with applicable law, PRPD policy, and this Agreement. PRPD and UCCJ shall conduct regular subsequent reviews, at least semi-annually, and submit their findings and recommendations in written reports to the Superintendent.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed together with Paragraph 118.

117

*Compliance Assessment*

PRPB complies with the required reporting of curriculum changes in this reporting period. It is reported and recommended to the police commissioner in the annual report prepared by the Academy (dated July 19, 2021) that no changes were made to any courses in the Pre-Service Academy. The Academy staff waits for approved policy or procedural changes before implementing any curriculum changes. During this time PRPB self-reports that no policy or procedural changes were made that would require curriculum changes. The report to the commissioner identifies each training topic of the Pre-Service Academy, and reports per topic that there were no changes to the curriculum in this reporting period. The Monitor also found that PRPB does not have a current academic research relationship with an institution of higher education to assist in reviewing and revising its curriculums to ensure training quality and consistency.

*Pathway Forward*

To achieve full implementation PRPB must establish an academic oversight relationship with an institution of higher education. Since PRPB no longer has an affiliation with UCCJ there is no outside review process. This is important because an institution of higher education can provide a research foundation to improve the lawfulness and legitimacy of policing activities. At the Pre-Service Academy level this is essential to the development of an officer's ability and authority to perform effectively with community members.

## Paragraph 121: Training - Pre-Service Education and Training

*PRPD and UCCJ shall develop an appropriate training plan and standards including, but not limited to, establishing appropriate passing criteria, attendance, and participation requirements, and valid evaluation methods, to ensure that cadets and officers attain necessary knowledge, skills, and competencies to implement all requirements in this Agreement. PRPD and UCCJ shall conduct regular needs assessments to ensure that training related to the implementation of this Agreement is responsive to the knowledge, skills, and abilities of the cadets and officers being trained.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed together with Paragraph 118.

*Compliance Assessment*

PRPB self-reports that a training needs assessment was not conducted during this reporting period. The Monitor has continually requested a copy of the Academy Training Plan for both the pre-service and in-service training. This has not been received by the Monitor. The Monitor's site visits provided an opportunity to meet with Academy leadership, who advised that the training plan was still in development. Academy leadership emphasized that they understood how having an annual training plan for both pre-service and in-service would provide improved logistics planning and timely topic development. The planning process should include community stakeholders which would provide transparency and relevancy to officer training. Academy leadership agreed that community participation is an essential part to training development and would include it. Academy leadership advised that they would provide the training plan to the Monitor for review when completed.

*Pathway Forward*

PRPB must conduct a training needs assessment to identify where gaps exist between organizational and individual performance goals. The assessment must include a measurement on current skill and knowledge levels for pre-service and in-service training. Assessments of police training needs can provide information on the practical tools and curriculum needed for PRPB officers to be most responsive to PRPB citizens. The goal is to assess training needs more accurately and efficiently provide the certifications and skills needed by PRPB officers.

## Paragraph 122: Training - Pre-Service Education and Training

*PRPD and UCCJ shall select and train qualified officer and academic instructors and shall ensure that only mandated objectives and approved lesson plans are taught by instructors. Instructors shall engage students in meaningful dialogue, role playing, and test taking, as appropriate, regarding particular scenarios, preferably taken from actual incidents involving PRPD officers, with the goal of educating students regarding the legal and tactical issues raised by the scenarios.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph related to qualified instructors, instruction delivery, and evaluation methods. | ☑ Met | ☐ Missed |
| 2. Training for trainers and instructors is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. Instructors and trainers are qualified and certified as required by policy in 95% of selected training courses. | ☐ Met | ☑ Missed |

119

| | | |
|---|---|---|
| 4. Instruction is delivered in accordance with policy in 95% of selected training classes. | ☐ Met | ☑ Missed |

*Compliance Assessment*

The Monitor interviewed three police trainers during the reporting period. The three trainer's teaching topics are: FTO, Control Tactics (MACM 3041), and Pre-Service Ethics. From these interviews and document reviews the Monitor finds that PRPB meets the selection process and supports qualified well-suited instructors for their specific teaching topic. The three trainers consistently shared that as a prospective training instructor, they applied to the training academy administration, were interviewed, and given an opportunity to demonstrate their teaching proficiency. After reviewing all the information together, the Academy Training Selection Committee notified them that they were suitable for the instructor position. These trainers explained that they initially attended a train-the-trainer course on a specific assigned course. After that training, they were then re-assessed and evaluated to determine if they should continue teaching that topic. Upon completion, they received a training certificate. These three trainers are certified to teach the following topics: criminology, community relations, laws (juvenile and special), ethics, interactions with transsexual and transgender persons, UOF (Taser, baton), CIT training, FTO, mentoring, vehicle driving, mechanics of arrest, and de-escalation. While the information gathered for these three trainers is informative, additional instructor certifications and qualifications are needed for review to determine if the 95% compliance target for target 3 is met.

While the instructor development process is being achieved, PRPB self-reports that documentation on the instructor qualifications and certifications are not available since PTMS is still in development. The documentation should include folders for each instructor containing the application, instructor credentials, the selection review process, and any certifications the instructor has attained. The files should also include the topics of instruction and copies of teaching evaluations for each instructor.

*Pathway Forward*

The Monitor must receive and review instructor qualifications folders to ensure that trainings meet mandated objectives and follow approved lesson plans. PRPB must submit the instructor qualifications folder in its entirety to show evidence that instructors are qualified and have a good instructional delivery method such as meaningful dialogue, role playing, and/or test taking. Role playing scenarios should be based on actual incidents involving PRPB officers, with the goal of educating students regarding the legal and tactical issues raised by such scenarios. PRPB must use PTMS to record and show evidence that qualified and certified instructors teach the pre-service and in-service trainings within PRPB.

## 2. Field Training Program

FTOs are often described as the most pivotal part of a training program for an agency. This program allows for the apprentice agent to put into practice what they learned at the Academy, under close supervision and guidance by a more senior officer. A successful FTO Program can lead to a transformational change from within and create a department that is professional, ethical, and oriented to meet the common good of society. PRPB understands that the FTO Program is important, and it is supporting the operation of the program. The FTO Program was initially started in 2019. Prior to this

specific training program, very little existed to teach the policing practice to apprentice agents. The PRPB Code of Ethics (GO 617) is the foundation for the program.

The PRPB FTO Program has been designed to improve the overall quality of police officers. The program provides evaluation of and training to probationary officers. It provides a measure of the performance level of probationary officers and documentation for the decision regarding their retention to the department. As part of this process, the FTO is authorized to train the apprentice agent placing maximum emphasis on post-academy and on-the-job training. The program provides a standardized guide to the department's FTOs in the initial orientation and field training of newly assigned apprentice agents.

The FTO program curriculum is devised to assist FTOs in teaching apprentice officers to transition what they learned in the Academy to in-the-field patrol duties. The FTO curriculum also considers management responsibilities, weighing the legal issues raised by the courts. Court decisions regarding the negligent appointment and/or retention of employees and vicarious liability of the department mandates that management make every effort to hire and retain only qualified employees. To this end, PRPB has developed a valid job-related FTO Program.

FTOs are designated following the selection process outlined in GO 701 (FTO Program). The FTO is assigned an apprentice to train and is compensated for their time teaching and mentoring the new agent. According to policy, the FTO is compensated $150.00 per phase. There are four phases in the FTO program. The FTO is compensated only when they are in actual mentoring mode. The compensation can be between $150 to $600 for the training. It is important to report that at this time, no compensation has been administered to any FTO. The Monitor did receive a certification, dated March 16, 2021, from Interim Director Michelle M. Moure Torres stating and certifying that the human resources database of the Appointments and Changes Division does not reflect any type of compensation and/or additional bonus to the salary of officials who serve as mentors to PRPB cadet staff. This is a major concern for the soundness of the program. FTOs should receive compensation for their time, attention, accountability, and responsibilities of mentoring the apprentice agent.

Aside from the lack of compensation for FTOs, PRPB has achieved substantial compliance with the paragraphs in this subsection.

## Paragraph 123: Training - Field Training Program

*PRPD shall develop a field training program that consists of at least 800 hours and that comports with generally accepted policing practice with respect to quality and content, and that reflects the substantive requirements of this Agreement.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Implemented | | Annually |

121

| Practice: | Implemented | Assessment Frequency | |
|---|---|---|---|

### Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of Paragraphs 123, 126. | ☑ Met | ☐ Missed |
| 2. The field training program, including curriculum and related training materials, is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of personnel who complete the field training program are trained and certified (or scheduled for training, in the case of mid-year reviews) in accordance with approved policies. | ☑ Met | ☐ Missed |

### Compliance Assessment

PRPB has developed and is currently implementing the FTO Program in accordance with the requirements of the Agreement. The Monitor reviewed the FTO Program curriculum and found it to be reflective of generally accepted policing practices. PRPB has developed its own FTO Program; however, there are parts of the program that are like the San Jose Field Training Program, which is considered a national standard for field training. It is not uncommon for many agencies to adopt some modified version of the San Jose model. PRPB's model adequately assesses apprentice agents' safety, professionalism, and performance.

### Pathway Forward

PRPB must continually enhance the professionalism of its officers and ensure that the FTO Program receives the resources necessary to support the mission of PRPB. It is promising that in three years (since starting in 2019) PRPB has established this level of validity to its police field training practices.

## Paragraph 124: Training - Field Training Program

*PRPD's policies and procedures on field training shall delineate the criteria and methodology for selecting Field Training Officers ("FTOs"). PRPD shall permit only qualified officers to serve as FTOs. To determine qualifications, PRPD shall consider officer experience, disciplinary history, and demonstrated leadership skills, among other factors. PRPD shall strive to assemble FTOs that represent a broad cross-section of the community.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |

122

| | | |
|---|---|---|
| 2. Selection devices used by the FTO evaluation boards are consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. Selected FTOs meet eligibility requirements. | ☑ Met | ☐ Missed |
| 4. All FTOs who do not maintain eligibility are removed as FTOs in accordance with approved policies. | ☑ Met | ☐ Missed |

*Compliance Assessment*

The Monitor found that PRPB's FTO selection processes follow policy. Documentation review of personnel folders contained eligibility documentation of officers selected to serve in the FTO Program. After selection they are trained with a 40-hour FTO curriculum. It is upon completion of that training that they are assigned an apprentice agent. There is a system in place to remove an FTO if needed. The removal process is initiated at the supervisory level and is then moved up to the commander rank. The Police Commissioner has final decision authority on the removal of an FTO from service. According to the documentation provided and a review of the FTO files, all FTOs meet eligibility requirements and PRPB has had no incidences in which FTOs needed to be removed from the program.

*Pathway Forward*

PRPB should continue the FTO processes in accordance with policy and practice. Moving forward it would be beneficial for PRPB to continue to use the monthly FTO meetings for information exchange between ranks. The Monitor's review of the monthly meetings found the dissemination of department changes in policy and procedures. FTO leadership should make sure these important meetings continue. These monthly meetings also captured the concerns on FTO service compensation. The Monitor stresses the importance for PRPB to resolve the issue around FTO compensation. Not addressing this issue can impact morale, staffing, and potentially negatively affect the effectiveness and success that PRPB has seen in its FTO Program.

## Paragraph 125: Training - Field Training Program

*PRPD shall ensure that all FTOs receive training in the following areas: management and supervision; community-oriented policing; effective problem solving techniques; and field communication, among others. FTOs shall be required to maintain, and demonstrate on a regular basis, their proficiency in managing recruits and subordinates, practicing community-oriented policing, and solving problems effectively.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually |
| Practice: | Implemented | | |

123

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of this Paragraph. | ☑ Met | ☐ Missed |
| 2. Training for FTOs is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of personnel who complete the training for FTOs are certified (or scheduled for training, in the case of mid-year reviews) in accordance with approved policies | ☑ Met | ☐ Missed |

*Compliance Assessment*

Review of the FTO Program curriculum and processes associated with the FTO Program are found to be compliant with the Agreement. The FTO curriculum follows generally accepted policing practices. PRPB is making sure that the FTOs are receiving the necessary training on topics to properly train and mentor apprentice agents. Interviewed FTOs stated that they believe the apprentice agent is academically knowledgeable and the FTO Program allows the apprentice agent to apply their knowledge and develop an associated skillset. Document and file folder review of FTOs assigned in Bayamon, San Juan, Carolina, Fajardo, and Humacao found that training on management/supervision, community-oriented policing, problem solving, and field communications were completed. Additionally, during an on-site visit to the FTO administrative office in Centro Mando, the Monitor reviewed FTO files. The FTO files reviewed contained the certification of completion of FTO training, which meet the requirements of the Agreement.

*Pathway Forward*

PRPB should continue to reassess FTO training best practices. FTO adaptations to training processes and implementation should continuously be reviewed to maintain compliance in FTO programming. It is important that PRPB maintain the FTO refresher course, as they are the critical link between the pre-service training program and the policing practice and must stay apprised of all new FTO training practices.

## Paragraph 126: Training - Field Training Program

*PRPD shall ensure that recruits in the field training program are trained in a variety of geographic areas within Puerto Rico; in a variety of shifts; and with several FTOs.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually |
| Practice: | Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 123.

124

*Compliance Assessment*

PRPB recognizes the significance of apprentice agents training by following the FTO policy. PRPB submitted evidence that demonstrates that the FTO Program is currently conducted in the five districts of Bayamon, San Juan, Carolina, Fajardo, and Humacao. The commissioner has modified the policy to clarify that FTO training can be coordinated in each district of PRPB if there are enough trained FTOs in the district to conduct apprentice agent training. In interviewing FTOs and FTO supervisors, it is clearly understood that during any phase of the program one apprentice agent is assigned to one FTO. There are no multiple apprentices assigned to a single FTO. If a FTO is on vacation, sick leave, or any personal leave, the apprentice agent is assigned to the district office to assist in clerical or department duties. The apprentice agents are trained in different shifts and in a variety of geographic areas. Document and file folder reviews of apprentice officers found PRPB compliant in its policy and procedures.

PRPB provided meeting notes of all monthly meeting for FTOs and FTO coordinators. The meetings covered numerous topics, such as uniform patches, the number of apprentice agents assigned to each area, and requests to SAEA to provide certificates of completion for those apprentices in Class 229. As previously mentioned, there is the issue that no compensation has been made to working FTOs. These monthly meetings help identify any issues and build sustainability of the FTO Program.

*Pathway Forward*

PRPB should continue to follow the FTO policy and procedures in place to maintain compliance with the targets in this paragraph. It was recommended and encouraging to see documentation that all FTOs meet after apprentice agents complete the FTO Program. This specific meeting provides invaluable information by which to maintain and sustain the educational training benefits for PRPB personnel.

## Paragraph 127: Training - Field Training Program

*PRPD shall develop a program to assess FTO performance using appropriate evaluation tools. PRPD shall review and evaluate the performance of FTOs, with re-certification dependent on strong prior performance and feedback from other staff. Any recommendation from a FTO to terminate a trainee during their field training program shall be reviewed and evaluated by the chain of command.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. The FTO performance assessment program incorporates all of the requirements of the paragraph. | ☑ Met  ☐ Missed |

125

| | | |
|---|---|---|
| 2. Training for supervisors evaluating the performance of FTOs is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of performance assessments for selected FTOs are within policy. | ☑ Met | ☐ Missed |
| 4. 95% of personnel files for selected FTOs who were recertified to serve as FTOs are within policy. | ☑ Met | ☐ Missed |
| 5. 95% of recommendations by FTOs to terminate a trainee from the field training program are reviewed and evaluated by the chain of command. | ☐ Met | ☑ Missed |

### Compliance Assessment

PRPB does assess its FTOs through supervisory evaluations. The Monitor's review of FTO file folders upon completion of a phase contain form PPR-701.8 (Progress FTO Performance), which is completed by a supervisor. Re-certification is conducted after comprehensive review by supervisors. To comply with FTO eligibility criteria the FTO must be re-certified and attend an annual 8-hour FTO refresher course. The 8-hour course contains information on communication skills, management, law, policy updates, and problem-solving. Review of FTO evaluations finds that the FTOs are selected, and re-certified appropriately as proper documentation was found in all FTO folders reviewed, meeting the 95% compliance threshold. The Monitor found the evaluation documentation in proper order in the FTO files.

In this reporting period PRPB has either not had an issue with an apprentice needing to be terminated or no documentation was presented. However, PRPB has the proper policies in place should this issue arise. According to PRPB, the review process for any remedial or termination of an agent follows the chain of command to the FTO Program Commander, who would then forward his/her recommendation to the Police Commissioner for final ruling. Because there has been no need to terminate an apprentice, the Monitor is unable to determine if such practice meets the compliance target.

### Pathway Forward

Moving forward PRPB should sustain its work of conducting thorough evaluations of current FTOs to the same level it currently does. This is important to maintain the credibility of the FTO Program and to ensure that the appropriate qualified FTOs are in place to train and mentor future agents.

## Paragraph 128: Training - Field Training Program

*PRPD shall create a mechanism for recruits to provide confidential feedback regarding the quality of their field training and their FTO, including the extent to which their field training was consistent with what they learned, and suggestions for changes to training based upon their experience in the FTO program.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Implemented | | Annually |

126

| Practice: | Implemented | Assessment Frequency | |
|---|---|---|---|

### Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Training for relevant personnel includes training on the feedback mechanism. | ☑ Met | ☐ Missed |
| 3. All relevant personnel are trained on the feedback mechanism. | ☑ Met | ☐ Missed |
| 4. Feedback and suggestions of recruits is considered when reviewing and revising the field training program. | ☑ Met | ☐ Missed |

### Compliance Assessment

In GO 701 (FTO Program) PRPB specifically states that upon completion of the FTO Program the apprentice agent should fill out form PPR-701.5 (Evaluation by Apprentice Agent) on their assigned FTO to provide confidential feedback on what they learned during their FTO experience. It requests information related to training consistency between what was learned in the Academy and during the FTO Program. They are to provide any recommendations based on their personal experiences in the FTO Program. The Monitor's review of the FTO files requested found this document consistently filled out in each FTO folder. The feedback was generally positive.

The Monitor's site visit and interview with the FTO Program commander found that the feedback is used in conjunction with any additional sources of information to review and improve the program. For example, it was recommended that there be a uniform distinction between the FTO and the apprentice agent. This resulted in the department designing a new patch for all FTOs. It is a patch that states "Operational Oversight Officer" which is sewn over the department patch. This helps make the distinction between the apprentice agent and the FTO while serving the public.

### Pathway Forward

PRPB should continue to use the feedback mechanism in its consideration of FTO training. This information is valuable for FTOs and the agency to gather information. It helps identify the program's strengths and areas of improvement. Obtaining this type of feedback can sometimes be challenging as it may be biased by the fear of potentially being identified. Therefore, confidentially must continue to be safeguarded. The aim is to gather this information to support effective training goals.

## 3. In-Service Training

PRPB requires annual in-service training of at least 40 hours. During the CMR-6 period PRPB still presented various training pauses due to COVID-19. Pre-service training was paused to mitigate illnesses. However, PRPB recognized the challenge and moved to an online in-service training model for one course offering. The course is Use and Handling of Firearms (VUAR 3083). This course was developed internally by SAEA. It is reported that this is the only online course developed for PRPB personnel during the reporting period, however, this course material was not submitted to the Monitor for review.

As noted in CMR-5, PRPB's virtual training program was halted due to compromises in the integrity of the training. During this reporting period, PRPB self-reports it is still in the negotiation and development phase of the virtual online training program with the University of Puerto Rico. The training should be conducive to a 24-hour a day 7-day a week availability. Once the virtual training is established it will greatly assist in achieving compliance.

Completed training documentation, annual in-service training plans, instructor evaluations, and a substantive curriculum development process, with stakeholder feedback, are all still at a critical juncture for PRPB in its delivery of in-service training. PRPB must expand its pedagogical process to include these important points to ensure the quality, liability, and accountability measures are in accordance with the Agreement.

## Paragraph 129: Training - In-Service Training

*PRPD shall establish a mandatory annual in-service training program that consists of at least 40 hours and that comports with generally accepted policing practice with respect to quality and content, and that reflects the requirements of this Agreement.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of Paragraphs 129-131. | ☑ Met | ☐ Missed |
| 2. The in-service training program, including curriculum and related training materials, is consistent with approved policies. | ☐ Met | ☑ Missed |
| 3. 95% of personnel who complete the in-service training program are trained and certified (or scheduled for training, in the case of mid-year reviews) in accordance with approved policies. | ☐ Met | ☑ Missed |
| 4. The in-service training program includes training tracks in accordance with approved policies and the Agreement. | ☐ Met | ☑ Missed |
| 5. Reviews and revisions of the in-service training program are based on multiple factors in accordance with approved policies and the Agreement. | ☐ Met | ☑ Missed |

*Compliance Assessment*

The Monitor reviewed curriculum and related training materials for the following courses: FTO Program, Control Tactics, and pre-service Ethics. These course files do contain the necessary components consistent with training standards, such as learning objectives, lesson plans, teaching materials,

128

facilitators guides, testing/assessment materials, and evaluations. While these course curriculums do meet and are consistent with approved PRPB policies, this was not enough of a curriculum review to comprehensively determine compliance. Additional curriculum reviews need to be conducted.

The Monitor did receive and review PRPB's listing of compliance with in-service training on topics such as Interactions with Transgender and Transsexual Persons (VITT 3082) and Harassment, Discrimination, Retaliation and Sexual Misconduct (VREG 3081). However, currently PRPB does not reach the 95% compliance for in-service training, as the Monitor is unable to determine what courses are mandatory for PRPB personnel. PRPB did provide a non-compliance certification memo listing agents who did not receive required training. There were 63 agents who were in non-compliance for in-serve training. This was a certified list of personnel who have no documentation (digital or manual) of a training history. There were four cadets who had not completed training courses. The non-compliance document was signed April 22, 2021. There was no documentation to support what training these PRPB personnel did receive for compliance.

As for the quality of the training delivery, the Monitor was able to observe a training session during a site visit and found that training equipment is not sufficient in the administration of training programs. For example, in the Control Tactics course for the OC Spray section, rather than purchasing the smoke simulator equipment to simulate that environment, training officers brought in their own smoke simulators for simulation training. Further, the vehicles used to in pursuit driving are not satisfactory and in such bad condition that the driving training is negligible and not conducive to replication. While PRPB has started to purchase and install training equipment in the classrooms, such as a big screen and camera remote systems, it is recommended that simulator equipment also be included in the training area. Simulators can provide trainees with scenarios that provide a unique mix of hands-on training that helps officers learn how to stay focused and respond appropriately to high-stress situations in ways that cannot be replicated with static forms of trainings.

PRPB has not yet submitted a training track for its field agents that would assist in the identification and monitoring of the 40-hour in-service training requirement. What was provided was a generalization of courses not attributed to rank, unit assignment, or even refresher courses. PRPB did not submit documentation in support of specific courses and training tracks established for specific PRPB personnel. The Monitor did receive a document with three indicators of future training. However, it did not sufficiently identify the training track process. It is not sufficient to state "this course will be incorporated prior to different licenses" within PRPB as a training track or that the course will be offered between January 3 and December 30, 2022.

PRPB did not submit any documentation on how it conducts its reviews or revisions to in-service training curriculum. They informed the Monitor that the review and revisions to in-service training is based on any new or updated policy. The Academy leadership has advised that since the Academy staff have not received any policies there has been no changes to the training program. Further, the Monitor found that the PRPB Academy has also not used the Superintendent's Community Interaction Council (CIC) and members of the community in its review or revisions of curriculum.

*Pathway Forward*

PRPB must build a detailed training track process for its personnel. This process helps keep officers in compliance with agency and state regulations. Any specialized training helps officers develop a knowledge or skillset based on prevailing trends specific to their role within the agency. A training track process is aimed at identifying and meeting the needs of PRPB personnel. The failure to train in essential areas of a job scope is a liability issue. However, problems can be addressed through a model of professional development in the form of specific in-service training programs, prior to an issue presenting itself. In-service training models should be individually created based on the officer, rank, job scope, and experience. Training track processes should include any mandated training as well as relevant training objectives to the officer's current assignment or role.

PRPB must develop a process to review and revise training curriculum. The process must be an effort to establish an analysis that addresses the most effective pedagogical content for PRPB police officers. The review identifies any related theory, demonstration, or practice. It assesses the learning objectives to make sure they appropriately fit the course. Competence skillsets should be created for the training. Training should not be viewed as a cycle that rolls towards the attainment of specific goals, but a continuous learning interaction promoting effective skill acquisition. The Agreement states that PRPB should collaborate with stakeholders, community members, and/or specialized organizations in the review processes. Some of the work can be accomplished through curriculum analysis and interviews and focus group discussions. Findings then support any modifications to curriculums that will make it relevant to all stakeholders, internal and external to PRPB.

One example is the development of the CIT Program and the handling of individuals with behavioral issues and intellectual impairments. CIT is a police mental health collaborative program. A community task force comprised of law enforcement, mental health, addiction professionals, and mental health advocates should work together to develop the CIT model, and any subsequent revisions to training. PRPB gains a keener comprehension from those directly impacted and knowledgeable of ways to divert persons with mental illnesses from the criminal justice system to mental health treatment, thereby increasing officer safety in these encounters. Once PRPB establishes a procedure of curriculum revisions that includes various stakeholders, this process can be used in all curriculum reviews.

## Paragraph 130: Training - In-Service Training

*PRPD shall create in-service training tracks for the following groups, including, but not limited to, command staff; lieutenants and sergeants; detectives; narcotics and vice investigators; specialized units; and professional responsibility investigators.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2021 – March 2022 |
| Policy: | Implemented | | |

| | | | |
|---|---|---|---|
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed together with Paragraph 129.

*Compliance Assessment*

PRPB did not provide detailed documentation of in-service training tracks for any specific policing groups or units. PRPB did provide a document with information aimed at the 2022 training period that is titled "Training Tracks for PRPB Groupings". However, PRPB only noted that the training course will be provided to the "different licenses" within PRPB and conducted between January 3 through December 30, 2022. There was no detailed classification of what personnel ranks would receive the training. Indicating that the "different licenses" would receive training is not a sufficient training track process.

*Pathway Forward*

The training track document needs additional details and information, such as the specific units and personal by rank that are required to train. A more formalized decision-making training track practice referencing what topics will be taught at the in-service training level is recommended. Other cities under consent decrees emphasize a wide array of issues that deserve regular training for department personnel. These can include community policing, anti-bias, de-escalation, and domestic violence for all ranks. For specialized units, training tracks may include investigative techniques for investigators, tactical procedures for SWAT, or warrant service training for warrant officers. The objective of these tracks is to ensure that the appropriate training requirements are aligned for each officer.

## Paragraph 131: Training - In-Service Training

*PRPD shall identify critical in-service training topic areas based on an analysis of factors that include but are not limited to officer safety issues, community concerns, use-of-force statistics, internal affairs statistics, court decisions, research reflecting the latest law enforcement trends, individual precinct needs, and input from members at all levels of the Department, the Superintendent's Citizens' Interaction Committee ("CIC") and members of the community.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

131

*Compliance Targets*

Note: This Paragraph is assessed together with Paragraph 129.

*Compliance Assessment*

PRPB did not provide a training factor analysis report to identify critical in-service training topics nor was documentation on the interaction with the CICs or any members of the community received. PRPB did not interact or engage with any stakeholders in identifying training needs. The on-site visit with Academy leadership revealed that they did fully understand the importance of such a practice. They stated that they will use this process in the future to help them identify relevant and timely training topics. The Monitor provided Academy leadership with the City of Houston Policing Reform Report which includes identified training topics and the methods that they used to identify this information.[7]  Additionally, the Monitor provided templates and examples of training file documentation such as lesson plans, learning objectives, teaching materials, testing examples, assessment examples, and instructor evaluations.

*Pathway Forward*

PRPB should conduct a training needs analysis. This process will assist the agency in determining the trainings that need to be completed in a certain period to allow their members to complete their job as effectively as possible, as well as ensure progress and growth. The career development of agents should also be identified as a part of this analysis. Keeping in mind that career development plans should be customized for each agent. A training factor analysis should assess factors such as communication, decision-making, knowledge transfer, knowledge impact, career development, supervision, and management. The target groups should include both internal and external communities and partnerships. The outcome findings will assist PRPB with improving training methodologies, training resource allocations, and accountability. PRPB can then identify high-quality training to conduct to ensure that officers are equipped to address demanding situations. Training development should have a starting point and a factor analysis can provide foundational information on training program development for agents which can make them more effective in facing difficult issues.

## Paragraph 132: Training - In-Service Training

*PRPD shall develop a comprehensive training program to supplement the 40-hour formal in-service training that is delivered at the beginning of shifts or tours of duty for all officers. Training may include special topics selected by UCCJ and precinct or unit Commanders that address constitutional policing, officer safety, readiness, community concerns, or departmental procedural matters.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2021 – March 2022 |
| Policy: | Implemented | | |

---

[7] https://www.houstontx.gov/boards/policing-reform-report.pdf

| Training: | N/A | Assessment Frequency | Annually |
|---|---|---|---|
| Practice: | Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Monthly meetings are consistent with approved policies and the Agreement. | ☑ Met | ☐ Missed |
| 3. 95% of selected monthly meetings comply with approved policies. | ☑ Met | ☐ Missed |

### *Compliance Assessment*

Policies related to in-service training incorporate all requirements of this paragraph and PRPB is conducting monthly meetings in accordance with the Agreement. Although the Bureau conducts these monthly meetings, it does not deliver training at the beginning of shifts or tours of duty, i.e., roll call training. This is a missed opportunity and may produce a lag in timely dissemination of information or teaching opportunities. Roll call meetings leverage a short timeframe where precinct or unit commanders can address issues or concerns. In teaching terms, using a 5–15-minute session to communicate key concepts is suited to drive officer engagement and retention.

The monthly meetings are held once a month for approximately one hour at the beginning of each shift. The agenda and sign in sheets for such meetings document the various topics that are taught and discussed in these sessions. These types of meetings are an efficient way of keeping the officers informed of timely and current agency and policing practice issues. The meeting documents show that PRPB has a method whereby patrol personnel are routinely being briefed on information regarding patrol activity, crime patterns, particular attention to unusual situations, and organizational changes. The only concerning notation highlighted by the Monitor is there is no evidence that the monthly meetings are submitted as training credit for the officers. Therefore, it is not known to the Monitor if the officer receives credit for monthly meeting attendance.

### *Pathway Forward*

PRPB should continue its monthly information dissemination process with the main purpose of ensuring an effective means of communication and exchange of information between agents assigned to a particular shift and their shift commanders and sergeants. The meeting is used as a training device to disseminate information, directives, and documents; issue patrol assignments; and encourage constructive feedback from patrol officers regarding department policy and activity. PRPB should also consider the benefits of conducting additional roll call sessions at the beginning of each tour to share information in a timelier manner.

## 4. Training Records

PRPR has started using an electronic PTMS to maintain related training records in a centralized system. The system is still being developed and information on training records and certificates is still being migrated over. The integration of training information between PTMS and the old computer system has

not been completed as of this reporting period. However, there have been some positive steps regarding integration. For example, a review of documents within PTMS showed some records, including an agent's training history from 2018 through 2020.

## Paragraph 133: Training - Training Records

*PRPD shall electronically maintain complete and accurate records of current curricula, lesson plans, and other training materials in a central, commonly-accessible, and organized file system.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☒ Met | ☐ Missed |
| 2. Training on the storage and preservation of training records and materials is consistent with approved policies. | ☐ Met | ☒ Missed |
| 3. Training records and materials are stored and preserved in accordance with approved policies in 95% of selected courses. | ☐ Met | ☒ Missed |

*Compliance Assessment*

PRPB uses PTMS to maintain training records. Full use of the system is still being implemented. PRPB is still in the process of integrating training curricula/materials into the system. On a site visit the Monitor had the opportunity to access PTMS. The Monitor found some training hours for some officers, but not complete records for all officers. The full integration of training records is still not complete, as two training record management systems are being used. The Academy registrar has its own record files and the various field training coordinators maintain the district's training records in Excel documents. Ultimately, as of this reporting period, PTMS does not completely record, maintain, or store training course materials.

The implementation of this system is important to report what training has been accomplished and what training is still needed. For example, PRPB's 2021 global training report submits it delivered 4,304 training course deliverables to 4,210 officers. While this is a considerable amount of training hours, the report is missing important data points. Further breakdown of categories would be useful in this global report. For example, was the course traditional or virtual, what rank was the course delivered to, when was the course delivered, and the location or region the training was administered is valuable information for training leadership to understand. Effective police training records can protect an agency

by ensuring that all officers have completed the required training, reduce training costs, and demonstrate compliance with the Agreement.

*Pathway Forward*

PRPB must proceed with full implementation of PTMS. PTMS should include a configuration and customization which includes the integrated training applications and the tracking of training, classes, seminars, and courses both internal and external, such as the FBI National Academy, that a PRPB member has attended or participated in. PTMS should also be able to recall this information accurately and in real time allowing the Bureau to effectively discern any potential training gaps or needs.  Further, all PRPB personnel should be trained on the use of PTMS prior to its complete implementation.

## Paragraph 134: Training - Training Records

*PRPD shall track, maintain, and report detailed, real-time training records and statistics. PRPD shall develop an electronic database to create and maintain records for each recruit and each sworn and unsworn member of the PRPD, including a standard electronic training record and electronic copies of certificates and other materials. The training records shall include the following information: the course description and duration, curriculum, location of training, and name of instructor. PRPD will provide the Superintendent with annual reports, or more often as needed, on training attendance and testing results.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. The electronic database accounts for all of the elements in the paragraph and outcome measures as required by Paragraph 243. | ☐ Met | ☒ Missed |
| 2. All training records and statistics are tracked in the electronic database. | ☐ Met | ☒ Missed |
| 3. Training reports provide current and accurate information to the Commissioner. | ☐ Met | ☒ Missed |

*Compliance Assessment*

PRPB is in the process of developing and implementing PTMS to maintain training records. Some training certifications were submitted to the Monitor; however, these were individual certifications and did not reflect the full training record for these officers. The integration of training information between PTMS and the previous training records system has not been completed as of this reporting period. There have been some positive steps regarding integration. For example, a review of documents within PTMS showed some records to include an agent's training history from 2018 through 2020.

135

The Monitor found that the global training report to the commissioner is aggregated reporting and provides no specific details on the courses attended. The accuracy of the training is problematic. For example, the report states that in 2021 there were 17 Glock courses delivered. It is unknown where or how many hours the courses titled: Glock 09, 02, 18, 19 contained. However, the report indicates that only two participants attended. This is a notable reporting question that is indicative of not adequately using a training reporting system to best identify training allocations.

*Pathway Forward*

The compilation of training information in an electronic database is essential. PRPB must work towards full application of PTMS. It will also provide an overall view of training requirements. Training greatly influences and shapes the knowledge and skills of officers, units, and ranks. Training records should accurately document every policing function in the organization. Therefore, the data found in a training database such as PTMS will be beneficial for budgeting, training forecasting, training records documentation, and delivery. These records should provide for officer training accountability and can also assist in training liability questions.

## VIII. Supervision and Management

Supervision and Management is one of the most important areas of the Agreement, as supervision provides the link between PRPB leadership, and the officers engaged in law enforcement operations. Supervisors are essential for bringing PRPB in alignment with generally accepted policing practices throughout the Agreement. Supervisors serve as a two-way conduit of information between PRPB leadership and the rank and file, making it essential for supervisors to spend adequate time in the field with their supervisees to evaluate their performance.

Nevertheless, PRPB is still plagued by inadequacies in both the quantity and quality of supervision. In terms of sheer numbers, PRPB is struggling to deploy an adequate number of supervisors in the field. The Monitor has determined that PRPB has not successfully implemented its 2018 Staffing Plan[8] or maintained accurate records of its staffing allocations and needs.

The deficit of first-line supervisors makes it even more essential that current supervisors use effective supervision principles. In the CMR-6 reporting period, the Monitor determined that there are still gaps in how PRPB supervisors understand and apply management principles. More work is required to bring Bureau-wide supervision into alignment with PRPB's policies, procedures, rules, administrative processes, management systems, generally accepted policing practices, and the Agreement. To note one example, managers continue to transfer officers under their supervision without adequate explanation, such as noting whether the transfer was motivated by disciplinary issues. This lack of communication about these processes results in internal procedural justice issues and can lead to diminished morale among officers. PRPB has not provided the requested greater detail about these transfers in the documents requested. The documents provided tracked employees' locations and transfers but failed to explain the factors that determined why employees were transferred. To help obtain compliance, PRPB should develop and implement an automated system to document which employees have been transferred and why.

Due to ongoing issues with supervision, the Federal Court has increased its attention to this area at recent status conferences. During the January 14, 2022, status conference, the Federal Court called for increased participation and oversight by other government entities in Puerto Rico in support of PRPB reform and compliance with the Agreement. In response, PRPB began developing a proposal to implement the 2018 Staffing Plan and worked with the Monitor's Office and USDOJ to submit an Agreement in Principle regarding PRPB's efforts to address the ongoing issues with supervision.

The assessment presented below represents the Monitor's determinations based on the review of a variety of data sources, including surveys, policies, interviews, document reviews, and field visits. The Monitor's Office conducted interviews with a random sample of approximately 70 supervisors and supervisees during the CMR-6 period. In addition, the Monitor's Office conducted an anonymous survey among sworn personnel for the first time and received approximately 100 responses. The survey asked a series of questions of supervisors and supervisees regarding their perception of how effective supervision is in PRPB. Details of the findings from interviews and the survey are presented below under the relevant paragraphs.

---

[8] Plan de Implementación Requerimiento 13 20180927 Final FIRMADO (Publico) (002).pdf - Google Drive

Overall, PRPB's compliance with the 24 Supervision and Management paragraphs assessed during this reporting period reflect similar levels of compliance to what was noted in previous reports. In CMR-5, 21% of the 19 paragraphs (4 paragraphs) were assessed as partially compliant, in comparison to the current reporting period, where 29% of the 24 paragraphs (7 paragraphs) were found to be partially compliant. See figure 6.



*Figure 6. Supervision and Management: Paragraph Compliance Status*

## Paragraph 135: Supervision and Management - General Provisions

*PRPD shall ensure that an adequate number of qualified first-line supervisors are deployed in the field to allow supervisors to provide close and effective supervision to each officer under the supervisor's direct command, to provide officers with the direction and guidance necessary to improve and develop as police officers, and to identify, correct, and prevent misconduct. PRPD shall develop policies for supervision that set out clear requirements for supervisors and are consistent with generally accepted policing practices.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: Compliance will be determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 136-158, and (2) the results of outcome assessments, pursuant to Paragraph 243.

138

*Compliance Assessment*

The Monitor's Office drew a random sample of 44 precincts and units from across PRPB's 13 area commands on December 3rd, 2021 and requested staffing documents for the preceding two months of October and November. PRPB provided the Monitor's Office with PPR-373 (Distribution of Personnel) for two months for all units and precincts in the sample. The PPR-373s, many of which were completed by hand, indicate that supervisors do not have more than 10 individuals under their command. However, in interviews and in response to a survey conducted among a random sample of sworn personnel, supervisors and supervisees indicated that supervision loads are unequal across the Bureau, and that supervisors are regularly assigned to supervise more than 10 personnel. Further, as of this reporting period, PRPB had not yet implemented its 2018 Staffing Plan and the issues in the lack of supervisors in the field reported in CMR-5 continue. As a result of the status conferences held in January and March 2022, PRPB has worked with the parties to develop an Agreement in Principle for PRPB to implement the 2018 Staffing Plan and address the shortages of supervisors.

The Monitor also reviewed staffing documents during field visits.

*Pathway Forward*

The Monitor looks forward to working with PRPB as it implements its 2018 Staffing Plan in accordance with the Agreement in Principle filed with the Court during this reporting period. Further, the Monitor stresses the importance for PRPB to develop a more accurate method to track staffing allocations in the field. Handwritten forms limit PRPB's ability to maintain an accurate and real-time understanding of operational activities and staffing challenges across the organization.

## 1. Duties of Supervisors

As part of their responsibility, supervisors must thoroughly, objectively, and routinely review all aspects of officer conduct, including a review of all UOFs, probable cause for arrests, appropriateness of charges filed, and reasonable suspicion for stops and searches that do not result in an arrest. Additional responsibilities should include a thorough knowledge of the requirements of the Agreement, de-escalation, and community policing. PRPB supervisors are broadly in compliance with these training obligations, though training gaps exist due to PRPB's pivot to virtual training during the COVID-19 pandemic. Beyond training gaps, however, PRPB continues to struggle with maintaining sufficient numbers of first-line supervisors to exercise adequate management over agents in the field across all shifts in all command areas.

The Monitor's Office has not yet been provided with information to verify that officer and supervisor's schedules, assignments, and ratios are consistent with supervision policies.

### Paragraph 136: Supervision and Management - Duties of Supervisors

*All operational field officers shall be assigned to a single, consistent, and clearly identified supervisor. Supervisors shall be assigned to and shall substantially work the same days and hours as the officers they are assigned to supervise, absent exceptional circumstances. Scheduled leave (such as vacation time), unscheduled leave (such*

*as sick leave due to illness or injury) and other routine absences (such as court appearances and training obligations) shall not be deemed noncompliance with this provision.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Not Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | Met | Missed |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 136-140. | ☐ Met | ☒ Missed |
| 2. Supervision trainings are consistent with approved policies. | ☒ Met | ☐ Missed |
| 3. 95% of sampled supervisors are trained and certified in all policies related to supervision (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☒ Missed |
| 4. Officer and supervisor schedules, assignments, and ratios are consistent with supervision policies. | ☐ Met | ☒ Missed |
| 5. Supervisors are assigned and deployed in accordance with approved supervision policies. | ☐ Met | ☒ Missed |
| 6. 95% of interviewed personnel perceive that supervision is close and effective. | ☐ Met | ☒ Missed |
| 7. 95% of sampled referrals indicate proactive observation and intervention to ensure adherence to policies, law, and the Agreement. | ☐ Met | ☒ Missed |

*Compliance Assessment*

Currently, policies do not incorporate all requirements of paragraphs 136-140. This was confirmed in interviews with a random sample of PRPB supervisors. Supervision trainings are consistent with approved policies; however, the recent changes involving virtual training has impacted the ability of PRPB to offer in-service training. Many of the interviewed supervisors reported that it was difficult or impossible to obtain their 40 hours of in-service training. In-service training was clearly impacted by COVID-19. The Agreement stipulates that supervisors must receive approved training before they are allowed to assume their position in PRPB. This has been reviewed by the Monitor's Office and has been implemented by PRPB.

Officer and supervisor schedules, assignments, and ratios are not consistent with supervision policies, as was reported during interviews with supervisors. Supervisors are also not currently assigned and deployed in accordance with the approved supervision policies, as was noted in interviews. This has caused morale problems with PRPB members. Fewer than 95% of interviewed personnel believe that supervision is close and effective, though some supervisor interviewees disagreed. Similarly, fewer than 95% of interviewed personnel felt that supervisors engaged in proactive observation and intervention of supervisees to ensure adherence to policies, law, and the Agreement.

PRPB is currently not compliant mainly due to the lack of personnel and supervisors.

*Pathway Forward*

PRPB leadership must make a concerted effort to address the current shortfalls in supervisor staffing to lay the groundwork for achieving the other compliance targets associated with paragraphs 136-140. The Monitor looks forward to working with PRPB as it implements the items in the Agreement in Principle that was submitted to the Court and as it implements its 2018 Staffing Plan.

## Paragraph 137: Supervision and Management - Duties of Supervisors

*First-line field supervisors shall be assigned to supervise no more than ten officers for the first five years of this Agreement. After considering the results of the staffing study required by Paragraph 13 and whether the first-line supervisors are meeting all of the supervisory requirements of this Agreement at the current officer to supervisor ratios, the TCA and the Parties shall determine whether to lower the number of officers supervised by each first-line field supervisor. On-duty field supervisors shall be available throughout their shift to respond to the field to provide supervision to officers under their direct command and, as needed, to provide supervisory assistance to other units.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 136.

*Compliance Assessment*

It should be noted that PRPB is currently revisiting the staffing study required by paragraph 13 as part of its efforts to implement the Staffing Plan.

The Monitor's Office has requested that PRPB provide documentation to demonstrate that 1 supervisor oversees no more than 10 individuals. The Monitor's Office has been provided with PPR-373 (Distribution of Personnel) for two months for all 13 areas. The PPR-373s, many of which are completed by hand, indicate that supervisors do not have more than 10 individuals under their command. However, in interviews and in response to a survey conducted among a random sample of sworn personnel, supervisors and supervisees indicated that supervision loads are unequal across the Bureau, and that supervisors are regularly assigned to supervise more than 10 personnel. It was also reported that supervisors may be forced to supervise individuals in as many as three different area commands.

| Possible Responses to the Question: "How many officers do you supervise?" | Response Frequency | Response Percentage |
|---|---|---|
| Less than 5 | 10 | 31.25% |
| 5 to 8 | 6 | 18.75% |
| 9 to 11 | 4 | 12.50% |
| 12 to 15 | 2 | 6.25% |
| More than 15 | 10 | 31.25% |
| Total | 32 | 100.00% |

*Figure 7. Survey Response: Supervisor to Supervisee Ratio*

Supervisors also noted that they do not consistently work the same shift as the personnel they supervise. In some cases, interviewees noted that supervisors even work shifts in multiple precincts to make up for the supervisor shortfall. The discrepancy between the PPR-373s and the information obtained in the interviews and surveys are indicative of the need to investigate this further and reconcile. Considering this and issues with the training and policies, the Monitor notes that PRPB is currently not compliant with paragraph 137.

*Pathway Forward*

PRPB needs to improve its data systems so it can provide the Monitor's Office with the requested data in a more efficient manner. This will also make PRPB more effective and efficient at monitoring supervision practices and loads for the sake of its own management. Once an automated system is in effect, it should be easy for PRPB to generate data from the 13 areas that shows each supervisor and assigned subordinates. To demonstrate compliance, the Monitor's Office requests that this information be provided in preparation for CMR-7.

## Paragraph 138: Supervision and Management - Duties of Supervisors

*PRPD shall develop a program to ensure consistent field supervision when assigned supervisors are absent or otherwise unavailable for their tour of duty.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 136.

142

*Compliance Assessment*

The Monitor's Office has not received additional information about compliance with paragraph 138, which requires a program to ensure consistent field supervision when assigned supervisors are absent or otherwise unavailable. The Monitor's Office has not received clear and convincing evidence that a program is in effect to substitute supervisors when there is a need due to absence. Given the current shortage of first-line supervisors within PRPB, this policy gap represents a significant issue that should be addressed expediently.

*Pathway Forward*

A platform and automated system must be developed to capture information, reference individual statistics, workload, and crime analysis data for the patrol division. PRPB should develop a more complete information management system using CRONOS, CITA, Computer-Aided Dispatch (CAD), and Radio Control systems. An automated system will make the patrol division more effective. PRPB should be able generate data from the 13 areas that lists each supervisor and his or her assigned subordinates.

The Monitor's Office has recommended that PRPB should review the 2018 V2A Staffing Study to ensure that the study's recommendations remain pertinent as population and crime dynamics change, and to ensure that proper deployment is used accordingly. The Monitor's Office continues to question whether any redeployment of assets has been made based on the staffing study. Redeploying to bring staffing in line with the study would serve to make PRPB more effective and efficient.

The supervisors who were interviewed reported that in some cases supervisors only have 3-4 officers as part of their team because of lack of staffing, but other supervisors report having more than 10 officers assigned to them.

The Monitor looks forward to working with PRPB as it implements the 2018 Staffing Plan and progresses through the activities noted in the Supervision Agreement in Principle.

## Paragraph 139: Supervision and Management - Duties of Supervisors

*Precinct and unit commanders shall closely and effectively supervise the officers under their command.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 136.

143

## Compliance Assessment

During the CMR-6 reporting period, the Monitor's Office interviewed a random sample of approximately 70 supervisors and supervisees and received approximately 100 responses (32 supervisors; 74 supervisees) to a survey of sworn personnel conducted by the Monitor's Office. The following key themes emerged from interviews with supervisors and the survey responses:

### The Agreement

No officer interviewed was completely familiar with the Agreement. None of the officers and supervisors had read all the Agreement. However, many respondents expressed favorable attitudes regarding the impact of the Agreement, such as the following statement from a sergeant:

> *The Agreement is very positive for PRPB - best thing that ever happened. The Agreement provided better equipment and training both virtually and in-person. It has made the Bureau more professional and aware of better decision making. Some sections of the Agreement like the UOF are discussed during the monthly meetings known as Academia.*

### Consistent Supervision

PRPB has acknowledged that they do not have enough trained, first-line supervisors. However, supervisors themselves are hesitant to admit the problem directly during interviews about their own supervision practices. During interviews, most sergeants assert that they supervise 10 or less officers, with only a few acknowledging that they supervise more due to retirements or lack of personnel. However, these statements are inconsistent with the findings of the anonymous supervision survey, as demonstrated in the table above.

Though the survey was hampered by a low response rate, responses from supervisors were skewed at both the low and high ends of the spectrum, indicating significant inconsistencies in the number of personnel supervised. Approximately 70% of supervisors indicated that they supervised either less than 5 supervisees or more than 11, while only 30% indicated that they supervised between 5 and 10 supervisees. Thus, most respondents indicated that supervision loads are highly inconsistent, which negatively impacts the quality of supervision Bureau-wide.

Most sergeants state that they work largely on the streets with officers providing proper guidance, while their units are led by lieutenants. Due to lack of sergeants; however, experienced agents sometimes serve as acting supervisors in the field. It was reported that there is a lack of communication among the high-ranking officers. Most of the time information is not distributed properly and officers are left out of the information-sharing process.

Some officers stated that too many officers have been disarmed and are doing civilian work but are getting paid as a regular officer. Some respondents even noted cases of officers doing work as janitors, handymen, car mechanics, etc., and getting paid as a sworn officer without having to do police work on the streets. One respondent mentioned that some officers will report having emotional or personal

problems to get disarmed and be put on light duty, sometimes for years, while getting paid as a regular officer. The Monitor's Office feels that this system is fundamentally unfair for all concerned.

## Promotions

Most officers interviewed noted a lack of interest in being promoted. The reasons for this disinterest include the lack of testing, lack of a significant salary increase that would come with promotion, and fear of being transferred out of their current region.

## Equipment

All survey respondents seem pleased with new equipment that they received, such as tasers, bullet-proof vests, flashlights, etc.  However, many respondents expressed a need for more and better cars. In some locations, officers need SUVs due to the terrain. Officers noted that no cars contain computers, so officers must go back to the office to complete reports. Similarly, officers noted insufficient numbers of computers at the office, forcing them to wait frequently for an available one.

Respondents noted difficulty accessing records during vehicle stops, forcing them to call the office and wait. Sometimes, even after issuing a ticket, officers do not know if the person has a warrant. It was also noted that officers need better handheld radios for communication. Most officers use their personal cell phones to communicate. Some officers reported not having enough speed radar equipment, and that it is highly difficult to justify a ticket for speeding without a radar.

One of the largest issues noted is that officers must use their own money to repair a vehicle, such as buying a tire. The Bureau's budget is so low that many vehicles cannot be used and are disabled.

## Evaluations

Most officers place little importance on evaluations, even when they agree with their evaluation results. Most supervisors will not discuss the evaluation unless they are challenged by the officers. The vast majority of officers interviewed stated that they received evaluations between 4 and 5 out of 5, which speaks to significant score inflation. The perception of the officers is that supervisors will evaluate officers high, so they do not have to deal with complaints. In many cases, supervisors simply email evaluations to officers for their signature and never meet with their supervisees. In one case an officer was evaluated by someone they had not served under.

## Transfers

Respondents complained that transfers take too long, and are widely regarded to be influenced by friendships, connections, and politics. Transfers to another region can take from 2 years to over 15 years. Some respondents advised that they know from first-hand observations that some officers are being transferred from the bottom of the seniority list.

## Community Relations

Most officers advise that each unit will have a designated officer to represent the department within the community. Aside from that one designated representative, other officers will not engage much with the community. Respondents pointed to factors such as having too many responsibilities, which does not allow them to have enough time to relate with the community.

## General Observations

- Positive areas that were mentioned:
  - The Agreement is generally seen as a positive development for PRPB;
  - Oral communication within PRPB between officers;
  - In many cases, supervisors are professional and committed;
  - Supervisors are empathetic;
  - Supervisors are open to new ideas and change;
  - All interviewed supervisors expressed approval of the Commissioner. They believe that he has done positive things for PRPB; and
  - Steps to get better pay have improved in PRPB.
- Areas needing improvement that were mentioned:
  - Increase the number of front-line supervisors and personnel;
  - Written communication: Several respondents noted that communication was primarily verbal. A few noted that they think supervisors fear investigation if communication is put in writing;
  - More expansive training, including virtual training, which is currently not being offered;
  - More recruitment and retention to help with the lack of personnel;
  - Removal of political influence from PRPB, especially relating to transfers;
  - Improvement of the pension plan and benefits, which will in turn attract better candidates;
  - Some of those interviewed stated that cars and equipment are acceptable, but PRPB needs to continue upgrading equipment and replacing tires, brakes, etc.;
  - Shortage of qualified police candidates. Good incentives have to be in place to attract better candidates;
  - Supervisors believe the promotion tests are difficult and personnel need more time to study and prepare;
  - Supervisors are supportive of virtual training, but feel that obtaining 40 hours of in-service training can be a challenge;
  - Many officers reported working additional shifts to cover the lack of officers. In many cases, the lack of officers is causing PRPB members to be overworked, affecting morale and causing burnout;
  - Supervisors complained about the Judicial System, which they feel needs to be more consistent in the application of the law;
  - Supervisors feel that there is too much time spent on lethal weapons training when other training is just as valuable, such as taser and baton training; and
  - Recognition of outstanding work sometimes does not occur.

146

*Pathway Forward*

The command staff should capitalize on the strengths and attempt to improve those deficiencies mentioned by the officers under their command. Ultimately, however, the single most significant factor that would help to address many of the issues raised would be to deploy an adequate number of first-line supervisors.

PRPB should consider whether the shortfall in supervisors can be addressed while also closing the gender gap in supervision through promoting female officers into supervision roles. Please refer to CMR-5 for additional details and resources on this issue.

### Paragraph 140: Supervision and Management - Duties of Supervisors

*All PRPD commanders and supervisors shall ensure that all supervisors and officers under their command comply with PRPD policy, Commonwealth of Puerto Rico and federal law, and the requirements of this Agreement.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Not Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 136.

*Compliance Assessment*

The Monitor's Office has reviewed examples of staffing documents submitted electronically and during several on-site visits, such as to Bayamon, Ponce, and Carolina. These documents corroborate the findings of interviews and the survey regarding the low number of first-line supervisors. PRPB must ensure that an adequate number of qualified first-line supervisors are deployed in the field to provide the close and effective supervision necessary for officers to 1) improve and grow professionally, 2) police actively and effectively, 3) prioritize community policing and problem solving, and 4) identify, correct, and prevent misconduct. The Monitor's Office also encourages PRPB to complete the development and implementation of Early Intervention System (EIS), conduct personnel integrity audits, and ensure the implementation of inter-agency feedback systems.

*Pathway Forward*

Commanders and supervisors have greater responsibilities based on their positions, specifically to ensure that officers under their command comply with Bureau policy and law. Although many of the PRPB personnel interviewed were supportive of their supervisors and felt that they help them comply with Bureau policy and law, some of those interviewed indicated that their supervisors could perform better

in their position if they had more training. Evaluations were mentioned as an area in which supervisors should spend more time meeting with their subordinates instead of simply sending evaluations by email.

## 2. Supervisor Training

A review of supervisor training indicates that PRPB is delivering trainings that comply with generally accepted policing practices in leadership and management when promoting personnel. However, PRPB must renew its efforts to ensure that all supervisors receive 40 hours of in-service training to keep pace with the changing profession.

### Paragraph 141: Supervision and Management - Supervisor Training

*Each supervisor shall receive mandatory management, supervisory, leadership, and command accountability training, tailored to each level of supervision and command, of no fewer than 40 hours in duration, prior to assuming supervisory responsibilities. Each supervisor shall receive no fewer than 40 hours of in-service training annually thereafter.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 141-143. | ☑ Met | ☐ Missed |
| 2. Supervisor trainings are consistent with Paragraphs 141-143. | ☐ Met | ☑ Missed |
| 3. 95% of sampled supervisors are trained and certified in supervision requirements (or scheduled for training, in the case of mid-year reviews). With respect to Paragraph 142, 100% of PRPB personnel serving as supervisors on or before July 17, 2013, were trained and certified in supervision requirements by October 8, 2018. | ☐ Met | ☑ Missed |

### *Compliance Assessment*

The Monitor's Office performed a content analysis of policies related to supervisor training and verified that the training materials currently employed by PRPB are consistent with policy and generally accepted policing practices. All current PRPB supervisors sampled have received the supervisor training developed pursuant to the Agreement. All interviewees during CMR-6 confirmed that officers are not permitted to take on new supervisory roles until they have completed all required trainings, but promotional exams have not been administered for six years and currently there is a lack of supervisors.

## Pathway Forward

Additional interviews will be conducted to verify that the policies and training previously conducted are implemented accordingly. Acting supervisors should not be placed by PRPB without proper training.

## Paragraph 142: Supervision and Management - Supervisor Training

*All current PRPD supervisors shall receive the supervisor training developed pursuant to this Agreement within 18 months after it is developed and first implemented.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | One-Time Compliance |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: This Paragraph is assessed with Paragraph 141.

### Compliance Assessment

Because there have been no promotions for supervisory positions in the last six years, the Monitor is basing his assessment on the review of training records for current supervisors. As noted in previous CMRs, the Monitor continues to find that all supervisors have received the supervisory training as required by this paragraph.

### Pathway Forward

As PRPB begins to implement the 2018 Staffing Plan and processes to promote new supervisors, the Monitor will review updated training curricula and assess training records to ensure that all supervisors receive the required training.

## Paragraph 143: Supervision and Management - Supervisor Training

*The supervisory training program shall include, but not be limited to, instruction in the following topics:*

*a) techniques for effectively guiding and directing officers and promoting effective and ethical police practices;*

*b) de-escalating conflict;*

*c) evaluation of written reports;*

*d) investigating officer uses of force;*

*e) responding to and investigating allegations of officer misconduct;*

*f) risk assessment and risk management;*

149

g) evaluating officer performance;

h) appropriate disciplinary sanctions and non-punitive corrective action; and

i) using EIS to facilitate close and effective supervision.

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 141.

*Compliance Assessment*

Currently supervisors have received training in all the above listed topics except the use of EIS to facilitate close and effective supervision.

*Pathway Forward*

As soon as EIS is fully developed, supervisors will need to be trained on related policies and use of the system. The Monitor looks forward to reviewing this training and providing input to PRPB as it is developed.

## Paragraph 144: Supervision and Management - Supervisor Training

*Officers appointed to the rank of Lieutenant Colonel, Colonel, commanding officer to a PRPD superintendency or unit, and any other supervisors must receive Equal Employment Opportunity ("EEO") training on PRPD's policies and federal and Commonwealth anti-discrimination laws. This training shall include protocols for supervisors to follow in the event they are made aware of complaints involving discrimination and/or harassment. The training shall also include instruction on PRPD policies prohibiting retaliation against any individual opposing the alleged discrimination or harassment and/or participating in a proceeding or investigation of discrimination or harassment. Supervisors receiving the EEO training shall be evaluated in part based on their knowledge and implementation of the policies, guidance, and laws covered in that training.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2021 – March 2022 |
| Policy: | Implemented | | |

| | | | |
|---|---|---|---|
| Training: | Implemented | Assessment Frequency | Annually |
| Practice: | Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. Policies incorporate all the requirements of this Paragraph. | ☑ Met ☐ Missed |
| 2. Supervision trainings are consistent with approved policies. | ☑ Met ☐ Missed |
| 3. 95% of sampled personnel are trained and certified in EEO and anti-discrimination laws (or scheduled for training, in the case of mid-year reviews). | ☑ Met ☐ Missed |
| 4. Supervisor evaluations and SARP investigations indicate that supervisors are implementing policies and training on EEO and anti-discrimination laws in 95% of selected personnel files. | ☑ Met ☐ Missed |

### Compliance Assessment

The Monitor reviewed related policies, training curricula, and training certificates for trainings specifically related to supervision. The Monitor's Office drew a proportional random sample of 92 sworn personnel, with slight over-representation of the higher ranks that have significantly lower frequencies in the population. Table 3 shows the full breakdown of the random sample by rank:

| Rank | Number | % of Sworn Personnel | Proportional Sample Size |
|---|---|---|---|
| Coronel | 6 | 0.05% | 0 |
| Teniente Coronel | 26 | 0.22% | 1 |
| Comandante | 29 | 0.24% | 1 |
| Inspector | 43 | 0.36% | 1 |
| Capitan | 75 | 0.63% | 2 |
| Teniente I | 140 | 1.18% | 3 |
| Teniente II | 573 | 4.83% | 5 |
| Sargento | 1055 | 8.90% | 8 |
| Agente | 9158 | 77.26% | 71 |

The Monitor's Office requested all training and disciplinary records for the sampled officers, as well as personnel evaluations covering the reporting period. Information on the sampling frame used can be found in Appendix B.

The Monitor found that all related policies incorporate all requirements of this paragraph, and that supervisory trainings are consistent with approved policies Further, after reviewing personnel records and documentation provided by PRPB, the Monitor found that 95% of sampled personnel are trained and certified in equal employment opportunity (EEO) and anti-discrimination laws. Finally, PRPB provided documentation related to supervisory evaluations and SARP investigations, which indicate that

supervisors are implementing policies and training on EEO and anti-discrimination laws in 95% of selected personnel files.

*Pathway Forward*

PRPB should continue to emphasize EEO training and update anti-discrimination laws.

## 3. Performance Evaluation

As noted in CMR-5, the purpose of the ProMedia Project is to establish an effective evaluation system that allows a greater degree of uniformity and objectivity in establishing the criteria for measuring the performance of PRPB members in their functions. The supervisors who were interviewed by the Monitor's Office were very supportive of the ProMedia Project. The Monitor's Office is currently reviewing a new evaluation policy, which is more complete than the present one and discusses goal setting and documenting strengths and weaknesses of the employee.

### Paragraph 145: Supervision and Management - Performance Evaluation

*PRPD shall develop and implement a specific system to accurately evaluate the qualifications and performance of all PRPD officers in areas that include, but are not limited to, constitutional policing, integrity, community policing, and critical police functions on both an ongoing and annual basis. PRPD shall develop objective criteria to assess whether officers meet minimum qualifications and performance standards, including officers in inactive status, where appropriate. The evaluation system shall provide for appropriate remedial or disciplinary action.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 145-146. | ☒ Met | ☐ Missed |
| 2. Training on performance evaluations is consistent with approved policies. | ☒ Met | ☐ Missed |
| 3. 95% of sampled personnel files indicate that supervisors are trained and certified on policies regarding performance evaluations (or scheduled for training, in the case of mid-year reviews). | ☒ Met | ☐ Missed |
| 4. 95% of sampled officers meet minimum qualifications and eligibility criteria. | ☒ Met | ☐ Missed |
| 5. 95% of sampled performance evaluations adhere to approved policies. | ☒ Met | ☐ Missed |

152

*Compliance Assessment*

In CMR-5, the Monitor found that all related policies incorporated all requirements of Agreement paragraphs 145 and 146, and that supervisory trainings were consistent with approved policies. However, the Monitor noted that many supervisors and supervisees reported providing/receiving performance evaluations via email, which is inconsistent with the widely accepted policing practice of holding in-person evaluations during which supervisors and supervisees discuss their respective goals and outline a collective path to improvement.

In discussions since CMR-5, the Monitor has determined that PRPB policy does not explicitly prohibit the practice of providing performance evaluations via email. PRPB has responded to the Monitor's comments and has submitted a revised policy on annual performance evaluations, which is currently under review, and would require every supervisor in PRPB to meet with their employees to discuss their evaluation.

*Pathway Forward*

The revised performance evaluation policy has been reviewed by the Monitor's Office and USDOJ. The Monitor's Office is waiting for PRPB's responses. This policy addresses the Monitor's concerns by requiring supervisors to meet and discuss the evaluation with their employees. The performance evaluation system should continue to be developed and additional ProMedia training provided on working with employees on goals, objectives, and mentoring to strengthen the system.

### Paragraph 146: Supervision and Management - Performance Evaluation

*As part of this system, PRPD shall establish a formalized system documenting annual performance evaluations of each officer by the officer's direct supervisor. PRPD shall hold supervisors accountable for completing timely, accurate, and complete performance evaluations of their subordinates.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 145.

*Compliance Assessment*

The Monitor's Office received sufficient information to demonstrate the establishment of a formalized system documenting annual performance evaluations of each officer by the officer's direct supervisor. However, PRPB should develop an automated system to compile a list of all supervisors who have

153

completed timely and accurate performance evaluations of their subordinates and provide samples to the Monitor's Office to improve the compliance rating with this paragraph.

*Pathway Forward*

PRPB should develop an automated system to compile a list of all supervisors who have completed timely and accurate performance evaluations of their subordinates and provide samples to the Monitor's Office for future CMRs.

## 4. Early Identification System

PRPB has developed various modules within its EIS. However, upon examination of these modules and further discussion with PRPB personnel, the Monitor noted that the current EIS in use by PRPB is being used as a case management system and not as an early intervention system.

PRPB can only be considered in compliance with paragraphs 147-153 when EIS is developed to the point where 1) supervisors are readily and consistently able to access the system to enter and retrieve all datapoints required by the Agreement and PRPB policy, and 2) PRPB leadership and third-party overseers are able to conduct data analysis of policing practices and outcomes using EIS.

As a result of the additional work needed to improve its EIS and PRPB's inability to demonstrate the accurate use of EIS in a comprehensive manner, the Monitor must rate the below related paragraphs as not compliant.

### Paragraph 147: Supervision and Management - Early Identification System

*PRPD shall develop, implement, and maintain an early identification system ("EIS") to support the effective supervision and management of PRPD officers and employees, including the identification of and response to problematic behaviors as early as possible. PRPD shall regularly use EIS data to promote ethical and professional police practices; to manage risk and liability; and to evaluate the performance of PRPD employees across all ranks, units, shifts, commands, and organization components.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Not Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 147-153. | ☐ Met | ☑ Missed |
| 2. Training on EIS is consistent with approved policies. | ☐ Met | ☑ Missed |

154

| | | |
|---|---|---|
| 3. 95% of sampled supervisors and personnel administering EIS are trained and certified in EIS policies (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 4. EIS data and records demonstrate compliance with EIS policy for 95% of selected officers who trigger EIS and officers who do not trigger EIS. | ☐ Met | ☑ Missed |
| 5. 95% of interviewed officers, supervisors, SARP personnel, and IT staff perceive EIS as an effective supervisory tool that addresses potential problematic behavior in a non-punitive manner. | ☐ Met | ☑ Missed |
| 6. EIS is functioning as designed, equipment is in good working order, and information is secure in 95% of selected units. | ☐ Met | ☑ Missed |

*Compliance Assessment*

There currently is no EIS in use by PRPB. PRPB is misapplying the acronym EIS to a system that is primarily used as a case management system. PRPB does not have an early intervention system that comports with generally accepted policing principles and practices related to early intervention. As such, the Monitor's Office concludes that there is no related policy and no related system, and PRPB cannot be considered in compliance with any paragraphs related to EIS.

*Pathway Forward*

The Monitor notes that PRPB is working to develop EIS related protocols and procedures. In 2021 AH Datalytics produced a gap analysis assessing PRPB's data systems and processes and its ability to comply with the Consent Decree. AH Datalytics is collaborating with PRPB to implement the recommendations identified in its gap analysis. In addition to the gap analysis, AH Datalytics is currently reviewing PRPB's administrative complaints and UOF data systems to determine if these systems are well structured to feed into EIS. This data systems update will be reviewed with the parties during a scheduled June 2022 meeting. The Monitor looks forward to assessing the developments of this work in its upcoming reports.

## Paragraph 148: Supervision and Management - Early Identification System

*The EIS shall include a computerized relational database which shall be used to collect, maintain, integrate, and retrieve detailed data department-wide and for each officer regarding:*

*a) all uses of force;*

*b) injuries to and deaths of persons in custody;*

*c) all complaints and their dispositions;*

*d) data compiled under the stop data collection mechanism;*

*e) all criminal proceedings initiated, as well as all civil or administrative*

*claims filed, that bear upon an officer's performance or fitness including, but not limited to, domestic violence and protective orders;*

*f) all judicial proceedings involving domestic violence, protective orders, and any other judicial proceedings which may be related to an officer's performance;*

*g) all instances in which PRPD is informed by a prosecuting authority that a declination to prosecute any crime was based, in whole or in part, upon concerns about the credibility of a PRPD employee or that a motion to suppress evidence was granted on the grounds of a constitutional violation by a PRPD employee;*

*h) all disciplinary action taken against employees;*

*i) all non-punitive corrective action required of employees;*

155

*j) all awards and commendations received by employees;*

*k) training history for each employee; and*

*l) identifying information for each PRPD officer and employee and;*

*m) demographic data for each civilian involved in a use of force or search and seizure incident sufficient to assess bias.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Not Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 147.

*Compliance Assessment*

There currently is no EIS in use by PRPB. PRPB is misapplying the acronym EIS to a system that is primarily used as a case management system. PRPB does not have an early intervention system that comports with generally accepted policing principles and practices related to early intervention. As such, the Monitor's Office concludes that there is no related policy and no related system, and PRPB cannot be considered in compliance with any paragraphs related to EIS.

*Pathway Forward*

The Monitor notes that PRPB is working to develop EIS related protocols and procedures. In 2021 AH Datalytics produced a gap analysis assessing PRPB's data systems and processes and its ability to comply with the Consent Decree. AH Datalytics is collaborating with PRPB to implement the recommendations identified in its gap analysis. In addition to the gap analysis, AH Datalytics is currently reviewing PRPB's administrative complaints and UOF data systems to determine if these systems are well structured to feed into EIS. This data systems update will be reviewed with the parties during a scheduled June 2022 meeting. The Monitor looks forward to assessing the developments of this work in its upcoming reports.

## Paragraph 149: Supervision and Management - Early Identification System

*PRPD shall establish a unit to develop, implement, and maintain the EIS with sufficient resources to facilitate data input and provide training and assistance to EIS users.*

| Compliance Status | Assessment Schedule | |
|---|---|---|
| Not Compliant | Review | October 2021 – March 2022 |

| | | | |
|---|---|---|---|
| Policy: | Not Implemented | Period | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 147.

*Compliance Assessment*

There currently is no EIS in use by PRPB. PRPB is misapplying the acronym EIS to a system that is primarily used as a case management system. PRPB does not have an early intervention system that comports with generally accepted policing principles and practices related to early intervention. As such, the Monitor's Office concludes that there is no related policy and no related system, and PRPB cannot be considered in compliance with any paragraphs related to EIS.

*Pathway Forward*

The Monitor notes that PRPB is working to develop EIS related protocols and procedures. In 2021 AH Datalytics produced a gap analysis assessing PRPB's data systems and processes and its ability to comply with the Consent Decree. AH Datalytics is collaborating with PRPB to implement the recommendations identified in its gap analysis. In addition to the gap analysis, AH Datalytics is currently reviewing PRPB's administrative complaints and UOF data systems to determine if these systems are well structured to feed into EIS. This data systems update will be reviewed with the parties during a scheduled June 2022 meeting. The Monitor looks forward to assessing the developments of this work in its upcoming reports.

## Paragraph 150: Supervision and Management - Early Identification System

*PRPD shall maintain necessary equipment, in sufficient amount and in good working order, to permit appropriate personnel, including supervisors and commanders, ready and secure access to the EIS system to allow for timely input and review of EIS data.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Not Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 147.

*Compliance Assessment*

There currently is no EIS in use by PRPB. PRPB is misapplying the acronym EIS to a system that is primarily used as a case management system. PRPB does not have an early intervention system that comports with generally accepted policing principles and practices related to early intervention. As such, the Monitor's Office concludes that there is no related policy and no related system, and PRPB cannot be considered in compliance with any paragraphs related to EIS.

*Pathway Forward*

The Monitor notes that PRPB is working to develop EIS related protocols and procedures. In 2021 AH Datalytics produced a gap analysis assessing PRPB's data systems and processes and its ability to comply with the Consent Decree. AH Datalytics is collaborating with PRPB to implement the recommendations identified in its gap analysis. In addition to the gap analysis, AH Datalytics is currently reviewing PRPB's administrative complaints and UOF data systems to determine if these systems are well structured to feed into EIS. This data systems update will be reviewed with the parties during a scheduled June 2022 meeting. The Monitor looks forward to assessing the developments of this work in its upcoming reports.

## Paragraph 151: Supervision and Management - Early Identification System

*PRPD shall develop a protocol for using the EIS and information obtained from it. The protocol for using the EIS shall address data storage, data retrieval, reporting, data analysis, pattern identification, supervisory use, supervisory/departmental intervention, documentation and audits, access to the system, and confidentiality of personally identifiable information. The protocol shall also require unit supervisors to periodically review EIS data for officers under their command, including upon transfer between PRPD units or regions.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Not Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 147.

*Compliance Assessment*

There currently is no EIS in use by PRPB. PRPB is misapplying the acronym EIS to a system that is primarily used as a case management system. PRPB does not have an early intervention system that comports with generally accepted policing principles and practices related to early intervention. As such, the

158

Monitor's Office concludes that there is no related policy and no related system, and PRPB cannot be considered in compliance with any paragraphs related to EIS.

*Pathway Forward*

The Monitor notes that PRPB is working to develop EIS related protocols and procedures. In 2021 AH Datalytics produced a gap analysis assessing PRPB's data systems and processes and its ability to comply with the Consent Decree. AH Datalytics is collaborating with PRPB to implement the recommendations identified in its gap analysis. In addition to the gap analysis, AH Datalytics is currently reviewing PRPB's administrative complaints and UOF data systems to determine if these systems are well structured to feed into EIS. This data systems update will be reviewed with the parties during a scheduled June 2022 meeting. The Monitor looks forward to assessing the developments of this work in its upcoming reports.

### Paragraph 152: Supervision and Management - Early Identification System

*PRPD shall maintain all personally identifiable information about officers and employees included in the EIS for at least five years following their separation from the agency. Information necessary for aggregate statistical analysis shall be maintained indefinitely in the EIS. On an ongoing basis, PRPD will enter information into the EIS in a timely, accurate, and complete manner, and shall maintain the data in a secure and confidential manner.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Not Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 147.

*Compliance Assessment*

There currently is no EIS in use by PRPB. PRPB is misapplying the acronym EIS to a system that is primarily used as a case management system. PRPB does not have an early intervention system that comports with generally accepted policing principles and practices related to early intervention. As such, the Monitor's Office concludes that there is no related policy and no related system, and PRPB cannot be considered in compliance with any paragraphs related to EIS.

*Pathway Forward*

The Monitor notes that PRPB is working to develop EIS related protocols and procedures. In 2021 AH Datalytics produced a gap analysis assessing PRPB's data systems and processes and its ability to comply with the Consent Decree. AH Datalytics is collaborating with PRPB to implement the recommendations identified in its gap analysis. In addition to the gap analysis, AH Datalytics is currently reviewing PRPB's

159

administrative complaints and UOF data systems to determine if these systems are well structured to feed into EIS. This data systems update will be reviewed with the parties during a scheduled June 2022 meeting. The Monitor looks forward to assessing the developments of this work in its upcoming reports.

## Paragraph 153: Supervision and Management - Early Identification System

*Following the initial implementation of the EIS, and as experience and the availability of new technology may warrant, PRPD may propose to add, subtract, or modify data tables and fields, modify the list of documents scanned or electronically attached, and add, subtract, or modify standardized reports and queries. PRPD will submit all such proposals for review and approval as set forth in Paragraph 229.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Not Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 147.

### Compliance Assessment

There currently is no EIS in use by PRPB. PRPB is misapplying the acronym EIS to a system that is primarily used as a case management system. PRPB does not have an early intervention system that comports with generally accepted policing principles and practices related to early intervention. As such, the Monitor's Office concludes that there is no related policy and no related system, and PRPB cannot be considered in compliance with any paragraphs related to EIS.

### Pathway Forward

The Monitor notes that PRPB is working to develop EIS related protocols and procedures. In 2021 AH Datalytics produced a gap analysis assessing PRPB's data systems and processes and its ability to comply with the Consent Decree. AH Datalytics is collaborating with PRPB to implement the recommendations identified in its gap analysis. In addition to the gap analysis, AH Datalytics is currently reviewing PRPB's administrative complaints and UOF data systems to determine if these systems are well structured to feed into EIS. This data systems update will be reviewed with the parties during a scheduled June 2022 meeting. The Monitor looks forward to assessing the developments of this work in its upcoming reports.

## 5. Internal Audits and Interagency Feedback

PRPB has established an auditing system that identifies operational deficiencies, analyzes casual and contributing factors, and implements effective remedial action. The auditing protocols are based on generally accepted policing practices.

### Paragraph 154: Supervision and Management - Internal Audits and Interagency Feedback

*As part of PRPD's continuous improvement efforts and to ensure compliance with this Agreement, PRPD shall establish an auditing system that identifies operational deficiencies, analyzes causal and contributing factors, and implements effective remedial action. To effectuate the system, PRPD shall develop and implement auditing protocols that are based on generally accepted policing practices. The protocols shall provide the audited unit an opportunity to respond to preliminary findings and recommendations, as appropriate, to foster a culture of accountability and continuous improvement among all PRPD units and personnel.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

#### Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 154-156. | ☑ Met | ☐ Missed |
| 2. Training on internal audits and inspections are consistent with approved policies. | ☐ Met | ☑ Missed |
| 3. 95% of sampled personnel are trained and certified on the auditing and inspections system (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 4. 95% of selected internal audits and inspections comply with policy. | ☑ Met | ☐ Missed |
| 5. Internal audits and inspections are scheduled regularly for all PRPB units, locations, and personnel. | ☑ Met | ☐ Missed |
| 6. PRPB prepares an annual report that (a) includes the conclusions and recommendations of internal audits and inspections conducted for the covered period and (b) is reviewed by the Commissioner and unit commanders to guide corrective action, as appropriate. | ☐ Met | ☑ Missed |

#### Compliance Assessment

In assessing PRPB's compliance with this paragraph, the Monitor found that all related policies incorporate the requirements of paragraphs 154-156. Training on internal audits and inspections are consistent with approved policies, and 95% of sampled personnel are trained and certified on the auditing and inspections system (or scheduled for training, in the case of mid-year reviews).

161

Furthermore, the Monitor also notes that 95% of selected internal audits and inspections complied with policy. PRPB provided a list of 36 operational audits conducted during the assessment period, from which the Monitor's Office drew a sample of 17 audits and requested reports for each of the sampled audits. Internal audits and inspections were scheduled regularly for all PRPB units, locations, and personnel, and PRPB was to prepare an annual report on these inspections. The Monitor was unable to confirm in CMR-6 that the last version of this annual report included the conclusions and recommendations of internal audits and inspections conducted for the covered period and was reviewed by the unit commanders to guide corrective action, as appropriate.

PRPB has certified that inspections were conducted between October 2021 and March 2022, and the Monitor has verified these inspections. Based on this review, PRPB is found to be using the auditing system to identify operational deficiencies and their causes and contributing factors so that effective remedial action may be implemented. The investigations manual is comprehensive and well received by PRPB supervisors.

### *Pathway Forward*

The Monitor's Office commends PRPB for its work on this paragraph and will continue to assess PRPB's compliance with this paragraph. The Monitor stresses the importance of including conclusions and recommendations of internal audits and inspections in its annual reports.

### Paragraph 155: Supervision and Management - Internal Audits and Interagency Feedback

*PRPD shall develop a protocol for conducting operational audits related to the material terms of this Agreement. The protocol shall establish a regular and fixed schedule to ensure that such audits occur with sufficient frequency and cover all PRPD units and Command Areas. Audits shall assess, where appropriate, operational consistency among similar units throughout PRPD to ensure that all geographic areas are provided with appropriate levels of service delivery. PRPD shall summarize in an annual report the conclusions and recommendations of audits conducted during the time period covered by the report.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually |
| Practice: | Implemented | | |

### *Compliance Targets*

Note: This Paragraph is assessed with Paragraph 154.

*Compliance Assessment*

As noted above, PRPB provided information to the Monitor's Office regarding the results of all audits completed during the reporting period. They also provided the schedule of audits for CMR-6 and as noted above, the audits are scheduled regularly for all PRPB units, locations, and personnel.

*Pathway Forward*

Although PRPB has demonstrated partial compliance with this paragraph, and relatedly with paragraph 154, the Monitor's Office awaits the upcoming annual report, published by SARP, which will document the conclusions and recommendations of all audits conducted. This will help other areas prepare for their audit and make use of the data that comes from previous audits. This information will also help other supervisors review management, supervisory, and other practices to ensure they follow PRPB policies and goals.

## Paragraph 156: Supervision and Management - Internal Audits and Interagency Feedback

*PRPD auditors shall issue a report to the Superintendent on the result of each audit. The Superintendent will review each audit for appropriate policy, disciplinary, and/or non-punitive corrective action. The commander of each precinct or specialized unit shall review all audit reports regarding employees under their command and, if appropriate, shall take non- punitive corrective action or disciplinary action.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 154.

*Compliance Assessment*

Although the Monitor's Office has received information from SARP indicating that audits are consistently planned and conducted, it was not provided with documentation to demonstrate that the Commissioner reviews each audit for appropriate policy, disciplinary, and/or non-punitive corrective action. Further, no documentation was provided to demonstrate that the commander of each precinct or specialized unit reviewed all audit reports regarding employees under their command and, if appropriate, took non-punitive corrective action or disciplinary action.

163

*Pathway Forward*

PRPB should work on developing a formal system whereby the Commissioner and key commanders produce memos or other evidence that they have thoroughly read relevant audits and have developed strategies and corrective actions based on the results of those audits.

## Paragraph 157: Supervision and Management - Internal Audits and Interagency Feedback

*PRPD shall develop and implement a plan for organizing and executing regular, targeted, and random integrity audits. The integrity audits will be used to identify and investigate officers engaging in misconduct including, but not limited to, unlawful stops, searches, seizures (including false arrests), excessive uses of force, potential criminal behavior, racial or ethnic profiling, and bias against lesbian, gay, bisexual, and transgendered persons, or any other form of misconduct. These operations shall also seek to identify officers who discourage the filing of a complaint, fail to report misconduct or complaints, or otherwise undermine PRPD's integrity and accountability systems. SPR shall have the oversight responsibility within PRPD for these operations. SPR shall use relevant EIS data and other relevant information in selecting targets for integrity audits.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of this Paragraph. | ☑ Met | ☐ Missed |
| 2. Training on integrity audits is consistent with approved policies. | ☐ Met | ☑ Missed |
| 3. 95% of sampled personnel are trained and certified on integrity audits (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 4. 95% of selected integrity audits are designed effectively and comply with approved policies. | ☐ Met | ☑ Missed |
| 5. EIS and other relevant information is considered when selecting targets for integrity audits in 95% of selected integrity audits. | ☐ Met | ☑ Missed |

*Compliance Assessment*

PRPB has developed a plan for organizing and executing regular, targeted, and random integrity audits as documented by a certification from PRPB for the given reporting period (the protocol to perform integrity tests). PRPB has not begun training relevant personnel and conducting integrity audits based on the associated policy and protocol.

*Pathway Forward*

The Monitor's Office looks forward to reviewing the related training materials as they are developed.

164

## Paragraph 158: Supervision and Management - Internal Audits and Interagency Feedback

*PRPD shall establish an executive-level liaison committee consisting of high- level command officers of the PRPD who communicate, on at least a quarterly basis, with representatives of federal and local criminal justice components in all regions in Puerto Rico, including judicial courts, prosecutors, the University College, and municipal police departments. The committee shall seek mutual feedback and information on improving Puerto Rico's criminal justice system, including performance issues or concerns related to PRPD, its officers, employees, or units. All PRPD high-level commanders who participate in the executive-level liaison committee shall ensure that all allegations of misconduct or potential criminal activity are referred to SPR and/or PRDOJ for investigation, as appropriate.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Quarterly |
| Practice: | Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Agreements and protocols incorporate all the requirements of this Paragraph. | ☑ Met | ☐ Missed |
| 2. PRPB solicits feedback and shares information with criminal justice components, and refers allegations of misconduct or potential criminal activity it obtains from such components to SARP for investigation. | ☑ Met | ☐ Missed |

### Compliance Assessment

The Monitor has determined that the relevant agreements and protocols incorporate all the requirements of this paragraph. Furthermore, based on the Monitor's assessment of paragraphs related to civilian complaints and internal investigations, the Monitor has determined that other members of the criminal justice system have stepped forward and become part of the local criminal justice meetings. PRPB has implemented the referral of allegations of misconduct or potential criminal activity it obtains from such components to SARP for investigation.

Documentation on the work of the feedback committees provided by PRPB illustrated that the committees are following the requirements of the paragraph consistently in the areas of Bayamon, Ponce, Fajardo, and Mayaguez, but less consistently in other areas. The documentation provided included meeting agendas, attendee lists, and minutes, all of which provided evidence of participation by representatives of federal and local criminal justice components in all regions of Puerto Rico, including judicial courts, prosecutors, universities, and the municipal police department. The Monitor's Office thus deems PRPB as being partially compliant with the paragraph due to the strong performance of the feedback committees in the aforementioned police areas but requires further evidence of consistent performance across all police areas to assess PRPB as being substantially compliant.

165

*Pathway Forward*

The Monitor notes that the area meetings conducted in Bayamon, Ponce, Fajardo, and Mayagüez should be used as examples for other areas. The committee meetings in these areas had broad participation with representatives of federal and local criminal justice components, a purposeful agenda and related discussion topics, and noted recommendations for action items and next steps to improving police services and the quality of investigations.

Furthermore, the Monitor recommends that PRPB use protocols for maintaining related documentation not only as a means of demonstrating compliance with the Agreement, but more broadly to document the outcomes and action items from these meetings to ensure follow through and accountability.

## IX. Civilian Complaints, Internal Investigations, and Discipline

To determine compliance with the paragraphs of this section, the Monitor reviewed 78 internal investigative files, civil lawsuits involving PRPB personnel, and interviewed over two dozen SARP investigators from each subunit within internal investigations. PRPB also supplied documentation on most related areas in a timely manner in response to the Monitor's requests.

While most SARP investigator interviews indicated a persistent lack of resources and training, the Monitor is aware of formal written requests made by the SARP commander to help address these needs. To achieve substantial compliance with the Agreement, PRPB must align resources with the needs of this critical unit. The Monitor will closely follow developments in the procurement and delivery of requested training, equipment, and manpower.

In CMR-6, the Monitor requested only SARP investigations *closed*[9] during the reporting period. On one hand, this provided the Monitor a wider cross-section of criminal and administrative cases from which to base his findings upon. On the other hand, most of the underlying investigations were conducted well outside of the reporting period. In past reports, the Monitor has pointed out issues with the way that SARP interviews are conducted, recorded, and certified. Due to the age of the investigative files reviewed in this reporting period, it was not possible to fairly determine whether PRPB had modified some of these practices over the course of the CMR-6 reporting period.[10]

At least internally, PRPB has made efforts to inform citizens of the Commonwealth of their right to address the perceived failings of PRPB officers by filing a complaint in person or digitally either as a named person or anonymously. Judging by the volume of complaints received and the diverse manners in which they were forwarded to SARP, the Monitor remains convinced that little or no actual impediment exists for a citizen to make such a complaint. From a citizen perceptive, however, the Monitor has been informed by a fellow Monitor that PRPB could perform better in advising citizens at open community meetings as to how to file a complaint or a commendation and explain in layperson's terms how the internal investigative system ought to work. Overall, the Monitor believes that the breadth and diversity of the complaints received supplies ample proof that the system is working; however, PRPB should continue its community outreach to ensure that civilians understand the process.

In the latest examination of case files, the Monitor has seen several examples of employees involved in more than one allegation of misconduct over the course of relatively short time periods. In viewing the complaint histories of said employees, there is abundant evidence of prior accusations of misconduct of a remarkably similar nature, which often pre-date the Agreement. What is lacking however are records indicating findings and outcomes of these investigations. The Monitor uses this to illustrate the

---

[9] "Closed" refers to the case having received a 'Final Resolution' signed by the Police Commissioner, which connotates that the case, at least as far as PRPB is concerned (and more importantly, for compliance assessment purposes of the Agreement), is deemed closed. At that point, parties to the case who object to the findings and discipline imposed – if any – may only appeal the finding to authorities outside PRPB, e.g., CIPA. Outside adjudications such as those made by CIPA fall outside the purview of the Agreement.

[10] The Monitor will work with the Parties to develop alternative document production requests to address this issue in future reviews of SARP Investigations. Please refer to notations made in the corresponding paragraphs.

importance of having an effective employee intervention system and proactively using it to help correct or assist these problem employees before, yet another similar incident is alleged.

Overall, PRPB's compliance with the 46 paragraphs assessed during this reporting period within Civilian Complaints, Internal Investigations, and Discipline reflect a regression in compliance to what was noted in previous reports. In CMR-5, 46% of paragraphs (21 paragraphs) were assessed as partially compliant and 43% (20 paragraphs) were assessed as substantially compliant, in comparison to the current reporting period, where 28% of paragraphs (13 paragraphs) were found to be partially compliant and 28% (13 paragraphs) were found to be substantially compliant. Much of the regression in this area is due to issues in the provision of training for newly assigned SARP investigators. Seventeen of the forty-six (37%) paragraphs were also noted as Deferred in CMR-6. See figure 8.



*Figure 8. Civilian Complaints, Internal Investigations, and Discipline: Paragraph Compliance Status*

### Paragraph 159: Civilian Complaints, Internal Investigations, and Discipline - General Provisions

*PRPD shall ensure that all allegations of officer misconduct are received and are fully and fairly investigated; that all investigative findings are supported by a preponderance of the evidence; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair and consistent. PRPD shall develop policies and practices for the intake, investigation, and adjudication of misconduct complaints against PRPD officers. These policies and practices shall comply with applicable law and comport with generally accepted policing practices, and shall include the requirements set out below.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

168

*Compliance Targets*

Note: Compliance will be determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 160-204, and (2) the results of outcome assessments, pursuant to Paragraph 243.

*Compliance Assessment*

During this reporting period, the Monitor reviewed 78 investigations files. PRPB continues to make efforts in improving internal investigations and ensuring that well-equipped and well-trained officers can carry out that important mission. However, as will be pointed out in later paragraphs, PRPB needs to align needed resources with internal investigations to reach a level of substantial compliance. Further, PRPB should also ensure that SARP investigators new to the unit are appropriately trained.

*Pathway Forward*

As noted below and throughout this section, PRPB must ensure that those investigators new to SARP are trained and that the veteran SARP investigators receive refresher training. Further, PRPB must invest in the resources SARP needs to conduct its investigations in a thorough and timely manner.

# 1. Civilian Complaints

While there have been no changes to PRPB's compliance with paragraphs 161 and 162 as it continues to use and distribute PPR-311.1 (Master Complaint Form), the Monitor does note that training on the program was not provided to the officers newly assigned to SARP during the CMR-6 reporting period.

## Paragraph 160: Civilian Complaints, Internal Investigations, and Discipline - Civilian Complaints

*PRPD will develop and implement a program to inform persons that they may make complaints regarding the performance of any officer.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of Paragraphs 160-162. | ☒ Met | ☐ Missed |
| 2. Civilian complaint program trainings are consistent with approved policies. | ☒ Met | ☐ Missed |
| 3. 95% of sampled press, office and SARP personnel are trained and certified in all policies related to the civilian complaint program (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☒ Missed |

169

| | |
|---|---|
| 4. PRPB has developed and implements a program to inform persons that they may make complaints regarding the performance of any officer. | ☒ Met   ☐ Missed |

*Compliance Assessment*

PRPB policy on civilian complaints, internal complaints, and discipline has not changed since the Monitor's last review where it was found to be compliant with the Agreement. The Monitor has reviewed the corresponding training components and is impressed not only by their content, but by the fact that a comprehensive written examination is required to pass the course. Since the COVID-19 pandemic; however, presential training including training new SARP investigators has been lacking. The Monitor's interviews with SARP investigators indicates that they assume the responsibility to proactively communicate awareness of the right to register a complaint as well as the corresponding mechanisms used to register such a complaint.

*Pathway Forward*

SARP must work with SAEA to execute presential formative training for each of its new investigators as well as design and schedule retraining sessions for its veteran investigators.

## Paragraph 161: Civilian Complaints, Internal Investigations, and Discipline - Civilian Complaints

*Pre-printed complaint forms shall not include any language that can be construed as discouraging civilians from submitting complaints, including warnings regarding potential criminal prosecution for false or untrue complaints. PRPD shall require all officers to carry complaint forms in their official vehicles at all times or on their person, if feasible.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. Content of complaint forms is consistent with civilian complaint program policies. | ☒ Met   ☐ Missed |

Note: Policies and Trainings is assessed with Paragraph 160.

*Compliance Assessment*

PPR-311.1 (Master Complaint Form) has not been amended since CMR-5, where it was found to be substantially compliant with the Agreement.

170

*Pathway Forward*

The Monitor will continue to assess this paragraph for continued compliance.

## Paragraph 162: Civilian Complaints, Internal Investigations, and Discipline - Civilian Complaints

*PRPD shall make complaint forms and informational materials, including brochures and posters, available at all police facilities and on the PRPD website. Information shall be posted in Spanish and English. PRPD shall post and maintain a permanent placard describing the external complaint process at appropriate government buildings where public services are provided. The placard shall include relevant contact information, such as telephone numbers, email addresses, and websites. PRPD shall also post and maintain a placard explaining an individual's right to be free from involuntary searches and seizures and thus to decline consent to voluntary searches.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Content of complaint forms and informational materials is consistent with civilian complaint program policies. | ☑ Met | ☐ Missed |
| 2. The PRPB website and 95% of PRPB facilities and patrol vehicles have required civilian complaint materials. | ☑ Met | ☐ Missed |
| 3. Placards as described in Par. 162 are displayed in 95% of all PRPD and DPS buildings, plus eleven regional judicial centers across the Island. | ☑ Met | ☐ Missed |
| Note: Policies and Trainings is assessed with Paragraph 160. | | |

*Compliance Assessment*

Continued spot checking of PRPB facilities have indicated, with only one observed exception, the appropriate signage instructing people of their ability to file a complaint against an officer. Spot checking of officers on patrol has indicated an acceptable level of compliance with officers carrying PPR-311.1 (Master Complaint Form) with them or in their vehicle. PPR-311.1 is also located on PRPB's website. Further during the reporting period, the Monitor was provided with a system demonstration of the SARP Module in which complaints submitted via the website were found to also be included in its tracking system.

171

*Pathway Forward*

PRPB should examine its facilities in Ponce and all Area Commands to ensure that proper complaint information signage is posted in a position where members of the public may view it. The Monitor will continue to make observations of whether these forms are posted within both PRPB and DPS facilitates.

## 2. Internal Investigations

Since the inception of the monitoring phase of the Agreement, PRPB has made some improvements in the way it conducts internal investigations. Moving forward, PRPB must hold members accountable for impeding a complaint or internal investigation either actively or passively by withholding their full cooperation in the investigative process. Non-punitive discipline could be more frequently used to enhance morale and esprit de corps, particularly in smaller units or outposts. Lastly, SARP should look at every single complaint, *irrespective of its ultimate adjudication*, as an opportunity to learn of potential gaps or faults in PRPB policy, training, tactics, and supervision.[11] System errors identified through this phase of the investigative process should be appropriately addressed and documented as lessons learned by PRPB. These lessons learned should be included in future training sessions.

### Paragraph 163: Civilian Complaints, Internal Investigations, and Discipline - Internal Investigations

*PRPD shall require that all officers and employees report misconduct, including apparent, alleged, or perceived misconduct, by another PRPD officer or employee to a supervisor or directly to SPR for review and investigation. Where apparent misconduct is reported to a supervisor, the supervisor shall immediately document and report this information to SPR. Failure to report or document apparent or alleged misconduct or criminal behavior shall be grounds for discipline, up to and including termination of employment. The presumptive discipline for a failure to report apparent or alleged misconduct or criminal behavior shall be commensurate to the presumptive discipline for the underlying apparent or alleged conduct not reported.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Implemented | | |

*Compliance Targets*

---

[11] It is not uncommon for progressive public safety agencies on the mainland to have periodic discussions between their internal investigative branches and their learning institutions to help further diagnose and address training gaps that manifest themselves in these complaints. One such example from the Boston Police Department in the mid-1990s led to changes in its vehicle intervention policy and related training. These changes in policy and training led to a dramatic decrease in citizen driver complaints lodged against Boston police officers involved in traffic stops over the following year.

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of the paragraph. | ☒ Met | ☐ Missed |
| 2. Training on internal reporting of misconduct and investigations is consistent with approved policies. | ☒ Met | ☐ Missed |
| 3. 95% of sampled personnel are trained and certified in relevant policies related to reporting and internal investigations (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☒ Missed |
| 4. All reports of alleged or perceived misconduct are reviewed and investigated, as appropriate, by supervisors or SARP. | ☒ Met | ☐ Missed |

Note: Implementation of the portion of this Paragraph regarding discipline is assessed with Paragraphs 177 (Data Source #4), 198, and 199.

### Compliance Assessment

As mentioned previously, PRPB has not yet achieved the required 95% training compliance threshold for its current SARP investigators. This is likely due to several factors: the effect of COVID-19 on presential learning[12] and the pending rewrite of the SARP Investigator's formative curriculum (REA 114) based on previous Monitor input. In addition, with respect to training its members on policy regarding complaint reporting procedures, the random sample of personnel files requested by the Monitor indicated that less than 95% of PRPB personnel have been trained on REA 617 or REA 617R (Code of Ethics) within the past two years.

In the current reporting data, the Monitor has seen no evidence of a failure to report or document PRPB misconduct of a criminal or administrative nature. The Monitor must point out that PRPB IAD (criminal internal investigators) are still located within PRPB facilities, which is an impediment for a person to allege criminal misconduct on the part of a member – especially if the installation in question is the base of operation for the complained-against member.

Also as previously noted, all policies related to this section of the Agreement were previously reviewed by the Monitor and found to incorporate the requirements of the paragraph.

### Pathway Forward

PRPB SAEA and SARP must work together to address institutional training deficiencies and reach the 95th percentile of the entire sworn membership with respect to complaint handling (REA 617 or REA 617R – Ethics) and new SARP investigators in conducting internal investigations (REA 114 – SARP Investigator Formative Training). One possible solution regarding REA617 would be for PRPB to create an asynchronous eLearning solution with the existing curriculum and deliver the training to the entire PRPB virtually.

The Monitor further recommends that PRPB plan and execute specialized refresher training for all SARP investigators on an annual basis. The Monitor has made it clear to all Parties that he would assist PRPB with a rewrite of REA 114 as well as offer valuable insight into in-service SARP refresher training.

---

[12] REA-114, SARP Investigator's Course, as originally designed is somewhat practical in nature. The Monitor has recommended a dramatic increase to the practical pedagogical elements of the course. That said, neither the present version nor the recommended version of this course would effectively lend itself to eLearning pedagogy and therefore neither could be delivered remotely in an effective manner.

## Paragraph 164: Civilian Complaints, Internal Investigations, and Discipline - Internal Investigations

*PRPD shall develop protocols requiring supervisors to investigate and take appropriate disciplinary or non-punitive corrective action when the supervisor becomes aware of minor misconduct or policy infractions by an officer that do not merit an SPR notification. The incident of misconduct and the supervisor's response shall be reported to SPR within five business days for SPR's review. Where the officer disputes the misconduct allegation, the allegation shall be referred to SPR for investigation.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 164 and 165. | ☑ Met | ☐ Missed |
| 2. Training on supervisory review of minor policy violations is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled supervisors are trained and certified in policies related to supervisory review of minor policy violations (or scheduled for training, in the case of mid-year reviews). | ☑ Met | ☐ Missed |
| 4. 95% of selected supervisory reviews and responses comply with approved policies. | ☑ Met | ☐ Missed |
| 5. 95% of selected supervisory reviews and investigations are reviewed and evaluated by unit commanders and the commanders identify needs, as appropriate, in accordance with Paragraphs 164 and 165. | ☑ Met | ☐ Missed |
| 6. 95% of selected supervisory reviews and investigations are sent to SARP and assessed according to approved policies. | ☑ Met | ☐ Missed |

### Compliance Assessment

The Monitor's review of non-punitive or corrective discipline records reveal that cases are being generated and often involve appropriately minor infractions, i.e., officers not wearing the proper uniform of the day or reporting late. The Monitor found no cases where the subject officer disagreed with the non-punitive discipline, which under PRPB policy would mandate that the case be forwarded to SARP for registry and further investigation.

As noted above and in previous CMRs, the policies incorporate all the requirements of paragraphs 164 and 165, further the training on supervisory review of minor policy violations has been reviewed and approved by the Monitor and was consistent with approved policies. In reviewing the training records for the sampled supervisors, the Monitor also found that 95% are trained and certified in this training.

174

*Pathway Forward*

PRPB should ensure continued compliance with this paragraph.

## Paragraph 165: Civilian Complaints, Internal Investigations, and Discipline - Internal Investigations

*The results of unit investigations, be they minor misconduct allegations, policy infractions, or SPR referrals, shall each be referred to and evaluated by unit commanders for underlying problems including supervisory, training, or other deficiencies. Unit evaluations shall be sent to SPR for further assessment of trends and potential deficiencies in tactics or training, among other considerations.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 164.

*Compliance Assessment*

While the Monitor observed multiple examples of unit-generated disciplinary cases, the Monitor has not yet observed cases where supervisory oversight was mentioned as a possible cause or contributing factor, when in certain cases this seems to have been a causal factor.[13]

*Pathway Forward*

In fairness to PRPB, the Monitor is quick to admit that the latest case review contains a very limited number of cases that were investigated since CMR-5, wherein a recommendation was made for each SARP investigative report to conduct an obligatory analysis in his/her report to include the possible existence of a training or supervisory deficiency as a proximate or contributing cause of the underlying incident.

As a result of the lengthy timeline in which SARP investigations are initiated, conducted, reviewed, adjudicated, internally appealed, and culminated in the Commissioner's final resolution effectively limits the ability to offer a contemporary assessment of PRPB's compliance with most aspects of the

---

[13] Case 2020-0581 involved a police officer accusing a peer of shirking his responsibility to file a crime report, the intervention of a field supervisor could have prevented this from occurring. Case 2020-0232 involved a negligence allegation against two PRPB police officers. The allegations against the junior officer were not sustained, while the allegation against the more senior officer was sustained. The senior officer received a 40-day suspension of duty and salary.  The timely intervention of a field supervisor might have mitigated this infraction or even have prevented this incident from occurring.

investigatory component of any given SARP investigation. A revised and bifurcated approach to the request to produce these investigations during each CMR will allow the Monitor to separately assess both the SARP investigatory process as well as the due process, adjudication, and disciplinary aspects of each case with timeliness and greater accuracy. The Monitor looks forward to working with the Parties to reassess the approach to the requests and production of data related to SARP internal investigations.

## 3. Complaint Intake, Classification, Assignment, and Tracking

Perhaps owing to COVID-19, SAEA has not yet attained compliance with certain training requirements mandated by the Agreement. The Monitor expects to see better performance in the next reporting cycle as the pandemic continues to wane. As some of the data collected was rather aged, the Monitor looks forward to working with the Parties to bifurcate his analysis into two phases, thus ensuring that future inquiries are reliant upon both historical and recent data. This should be a more reliable indicator of true progress in meeting the requirements of the Agreement.

### Paragraph 166: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*PRPD shall train all officers in how to properly handle complaint intake.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 166-176. | ☑ Met | ☐ Missed |
| 2. Complaint intake, classification, assignment, and tracking trainings are consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled officers are trained and certified in relevant policies related to complaint intake, classification, assignment, and tracking (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |

### *Compliance Assessment*

Records clearly show that accepted policies are unchanged from previous reports, and training is consistent with policy. In addition, the training content on complaint intake, classification, assignment, and tracking as previously approved by the Monitor, continues to be consistent with approved policies. Unfortunately, as confirmed by PRPB, it indicates that only 65% of PRPB has been trained within the period required.

176

*Pathway Forward*

Now that the COVID-19 pandemic is waning, it is incumbent upon PRPB to ensure that all members are trained under this paragraph.

## Paragraph 167: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*The refusal to accept a misconduct complaint, discouraging the filing of a misconduct complaint, or providing false or misleading information about filing a misconduct complaint, shall be grounds for discipline.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually as to Compliance Target #1. Bi-annually as to Compliance Target #2. |
| Practice: | Implemented | | |

### Compliance Targets

Note: Implementation is assessed with Paragraphs 177 (Data Source #4), 198 and199.

Note: Policies and trainings are assessed as part of Paragraph 166.

### Compliance Assessment

In the CMR-6 reporting period, the Monitor has not seen any case that alleged that a complaint was discouraged or turned away by a PRPB member.

### Pathway Forward

As noted above, to move this paragraph forward in compliance, PRPB must bring its training cycle up to date in the near term.

Further, the Monitor will continue to engage in discussions with the community to gather perspectives on the complaint intake process. Results from the community survey, which was recently conducted by IPSOS on behalf of the Monitor, will also be used to inform future assessments of this paragraph.

## Paragraph 168: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*PRPD shall accept all misconduct complaints, including anonymous and third- party complaints, for review and investigation. Complaints may be made in writing or verbally, in person or by mail, telephone (or TDD), facsimile, electronic mail, or any other appropriate electronic means.*

| Compliance Status | Assessment Schedule |
|---|---|

177

| Deferred | | Review Period | October 2021 – March 2022 |
|---|---|---|---|
| Policy: | Implemented | Review Period | October 2021 – March 2022 |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Deferred | Assessment Frequency | Bi-annually |

### Compliance Targets

| 1. PRPB accepts, reviews, and investigates complaints, as appropriate, in accordance with approved policies. | ☐ Met  ☐ Missed |
|---|---|
| Note: Policies and trainings are assessed as part of Paragraph 166. | |

### Compliance Assessment

The Monitor has noticed that the samples solicited for CMR-6 contain a dearth of cases containing anonymous or third-party complaints as had been encountered in previous document reviews. Due to the lack of these types of complaints, as well as serious problems previously noted in these sort of complaint investigations – in particular, those involving anonymous internal complaints – the Monitor is unable to fairly determine whether these complaints are presently being handled in accordance with the Agreement.

### Pathway Forward

As mentioned previously, the lengthy timeline in which SARP investigations are initiated, conducted, reviewed, adjudicated, internally appealed, and culminated in the Commissioner's final resolution effectively limits the ability to offer a contemporary assessment of PRPB's compliance with most aspects of the investigatory component of any given SARP investigation. A revised and bifurcated approach to the request to produce these investigations during each CMR will allow the Monitor to separately assess both the SARP investigatory process as well as the due process, adjudication, and disciplinary aspects of each case with timeliness and greater accuracy. The Monitor looks forward to working with the Parties to reassess the approach to the requests and production of data related to SARP internal investigations.

The Monitor will also specifically request a list of anonymous or third-party complaints cases investigated during the reporting period and then draw a purposive sample for review.

### Paragraph 169: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*PRPD will establish a protocol that provides procedures to be followed when an individual objects to an officer's conduct. The protocol shall provide that, absent exceptional circumstances, the officer will inform the individual of his or her right to make a complaint and shall provide the complaint form and the officer's name and identification number. If the individual indicates that he or she would like to make a complaint on the scene, the officer shall immediately inform his or her supervisor, who shall immediately respond to the scene and initiate the complaint process. In the absence of the officer's immediate supervisor, any supervisor may respond to the*

*scene. All misconduct complaints received outside of SPR shall be forwarded to SPR before the end of the shift in which they were received.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Deferred | | |

### Compliance Targets

| | |
|---|---|
| 1. Intake protocol was followed in 95% of sampled investigations. | ☐ Met   ☐ Missed |
| 2. Intake protocol was followed in 95% of sampled complaints received by officers in the field. | ☐ Met   ☐ Missed |
| Note: Policies and trainings are assessed as part of Paragraph 166. | |

### Compliance Assessment

The Monitor has noticed that the case samples solicited for CMR-6 contain a dearth of cases containing "immediate reaction" complaints – whether received by an officer involved in the underlying incident or by the officer's supervisor. Due to the lack of these types of complaints in the requested sample, the Monitor is unable to fairly determine whether these complaints are presently being handled in accordance with the Agreement.

### Pathway Forward

The Monitor notes that in all cases reviewed, appropriate intake, classification, assignment, and tracking protocols seemed to be compliant with the Agreement. As pointed out above, the sample lacked sufficient "immediate reaction" complaints from which to draw any meaningful conclusions.

In CMR-7, the Monitor may consider requesting a list of all "immediate reaction" complaints from which to draw a sample for analysis to determine a compliance level for this paragraph.

### Paragraph 170: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*PRPD shall develop a system to ensure that allegations of officer misconduct made during criminal prosecutions or civil lawsuits are identified and assessed for further investigation. Any decision to decline an investigation shall be documented.*

| Compliance Status | Assessment Schedule | |
|---|---|---|
| Not Compliant | Review | October 2021 – March 2022 |

| | | | |
|---|---|---|---|
| Policy: | Implemented | Period | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

## Compliance Targets

| | |
|---|---|
| 1. PRPB has a system to identify and assess civil lawsuits and criminal proceedings filed involving allegations of officer misconduct. | ☑ Met  ☐ Missed |
| 2a. SARP reviews all allegations involving PRPB personnel to assess the need to investigation by PRPB. | ☐ Met  ☑ Missed |
| 2b. 95% of such SARP reviews are documented in accordance with approved policies. | ☐ Met  ☑ Missed |

Note: Policies and trainings are assessed as part of Paragraph 166. Implementation is assessed, in part, with Paragraph 158.

## Compliance Assessment

PRPB has both a policy and procedure under which both torts and alleged criminal acts committed by PRPB members are brought to the immediate attention of SARP. In the case of a civil action, the Office of Legal Affairs (OAL) informs SARP upon receipt of service of process. In the case of a criminal allegation involving a PRPB member, the Superintendency of Crime Investigations (SAIC) investigator is obligated to inform SARP of potential criminal wrongdoing, whereupon SARP investigations of both possible criminal and administrative wrongdoing may proceed. The Monitor received a list of 47 cases of alleged civil causes of action, all of which have been received by SARP from OAL for assessment. PRPB did not provide a list of criminal cases referred to SARP either internally via PRPB criminal investigators or externally via PRDOJ or federal law enforcement. As a result, PRPB is unable to demonstrate that they are reviewing all allegations involving PRPB personnel to assess the need to investigate by PRPB and that the SARP reviews are documented in accordance with approved policies.

## Pathway Forward

While the Monitor has seen sufficient evidence of SARP assessing allegations against PRPB members of a civil nature only, SARP must take measures to ensure that appropriate administrative and criminal investigations are being conducted simultaneously and that information is being shared between investigators in conformance with Garrity v. New Jersey.

As mentioned previously, the lengthy timeline in which SARP investigations are initiated, conducted, reviewed, adjudicated, internally appealed, and culminated in the Commissioner's final resolution effectively limits the ability to offer a contemporary assessment of PRPB's compliance with most aspects of the investigatory component of any given SARP investigation. A revised and bifurcated approach to the request to produce these investigations during each CMR will allow the Monitor to separately assess both the SARP investigatory process as well as the due process, adjudication, and disciplinary aspects of each case with timeliness and greater accuracy. The Monitor looks forward to working with the Parties to reassess the approach to the requests and production of data related to SARP internal investigations.

Lastly, the Monitor continues to reserve the right to request a list of all criminal complaints received against officers both internally and externally during the reporting period from which to draw a sample for analysis under this specific paragraph.

## Paragraph 171: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*SPR shall maintain a centralized numbering and tracking system for all misconduct complaints. Upon the receipt of a complaint, SPR shall promptly assign a unique numerical identifier to the complaint, which shall be provided to the complainant as soon as practicable.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. SARP administers a centralized numbering and tracking system for all misconduct complaints. | ☑ Met   ☐ Missed |

Note: Policies and trainings are assessed as part of Paragraph 166. Implementation is assessed, in part, with Paragraph 178.

### Compliance Assessment

The Monitor has examined the SARP Module (also referred internally as EIS) and has concluded that it functions as a centralized numbering and tracking system as mandated by the Agreement.

### Pathway Forward

The Monitor will continue to assess this paragraph for continued compliance and request reports from the SARP Module to further determine and substantiate its operational accuracy.

## Paragraph 172: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*Where a supervisor receives a misconduct complaint in the field alleging that misconduct has occurred, other than those incidents covered by Paragraph 44 of this Agreement, the supervisor shall gather all relevant information and evidence and provide these to SPR. All complaints should be referred to SPR by the end of tour of duty, absent exceptional circumstances.*

| Compliance Status | Assessment Schedule |
|---|---|

181

| Partially Compliant | | Review Period | October 2021 – March 2022 |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

## Compliance Targets

| | |
|---|---|
| 1a. 95% of sampled complaints were forwarded to SARP by the end of the relevant tour of duty or articulated exceptional circumstances. | ☑ Met   ☐ Missed |
| 1b. 95% of sampled complaints document what information and evidence is collected by the PRPB supervisor. | ☑ Met   ☐ Missed |
| Note: Policies and trainings are assessed as part of Paragraph 166. Implementation is assessed, in part, with Paragraph 136, Data Sources #6 and #7. | |

## Compliance Assessment

The analysis of case files shows that PRPB regularly forwards complaints to SARP within the prescribed timeframe.[14] Cases generated by field supervisors were included in the investigative files received during the reporting period. In these cases, supervisors forwarded relevant information and evidence to SARP in a timely manner.

## Pathway Forward

The Monitor continues to urge PRPB to make changes to Rule 9088 as mentioned in CMR-5 and to update the internal interview technique where subjects choose whether to make a narrative declaration and then submit to questions posed by the SARP investigator. Rather than using a narrative declaration, the subject should be asked to reaffirm the previously submitted contemporaneous written declaration and then submit to follow on questioning. Any deviation noted between the original written declaration and the answers to questions posed by the investigator should be closely analyzed to detect prevarication or attempts to mislead or obstruct the investigation.

As mentioned previously, the lengthy timeline in which SARP investigations are initiated, conducted, reviewed, adjudicated, internally appealed, and culminate in the Commissioner's final resolution effectively limits the ability to offer a contemporary assessment of PRPB's compliance with most aspects of the investigative component of any given SARP investigation. A revised and bifurcated approach to the request to produce these investigations during each CMR will allow the Monitor to separately assess both the SARP investigatory process as well as the due process, adjudication, and disciplinary aspects of each case with timeliness and greater accuracy. The Monitor looks forward to working with the Parties to refine the approach to the requests and production of data related to SARP internal investigations.

---

[14] The sample of cases requested and reviewed by the Monitor contained very few cases that were received or investigated during the reporting period. The Monitor can say conclusively that all cases reviewed were forwarded to SARP within the prescribed timeframe.

## Paragraph 173: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*Within five business days of the receipt of a misconduct complaint, SPR shall determine whether the complaint will be assigned to a supervisor for a Supervisory Investigation, retained by SPR for investigation, and whether it will be investigated criminally by PRPD, PRDOJ, or both.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. 95% of sampled SARP investigation files are assigned for investigation in accordance with approved policies. | ☑ Met   ☐ Missed |

Note: Policies and trainings are assessed as part of Paragraph 166.

### Compliance Assessment

The Monitor has consistently seen evidence showing that SARP is taking the action indicated in the Agreement within the prescribed timeframe. Of the investigations reviewed by the Monitor 95% of the files are assigned for investigation in accordance with approved policies.

### Pathway Forward

All newly promoted supervisors must be trained in this policy prior to taking supervisory assignments.

## Paragraph 174: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*PRPD shall develop a complaint classification protocol that is allegation-based rather than outcome-based to guide SPR in determining where a complaint should be assigned.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | N/A | | Bi-annually |

|  Practice: | Deferred | Assessment Frequency | |
|---|---|---|---|

### Compliance Targets

| 1. SARP classifies complaints in accordance with policy. | ☐ Met   ☐ Missed |
|---|---|
| Note: Policies and trainings are assessed as part of Paragraph 166. | |

### Compliance Assessment

In the past, the Monitor has seen administrative SARP cases that could possibly contemplate criminal liability on the part of the accused officer(s). The most common scenario where this occurs is in a whistleblower complaint, where allegations of misconduct could possibly be examined simultaneously in both an administrative as well as criminal dimension. However, in the review of investigation files during the reporting period, no such case was included in the sample and thus not reviewed by the Monitor. The Monitor is therefore unable to fairly assess compliance with this paragraph for the CMR-6 reporting period.

### Pathway Forward

As mentioned previously, the lengthy timeline in which SARP investigations are initiated, conducted, reviewed, adjudicated, internally appealed, and culminated in the Commissioner's final resolution effectively limits the ability to offer a contemporary assessment of PRPB's compliance with most aspects of the investigatory component of any given SARP investigation. A revised and bifurcated approach to the request to produce these investigations during each CMR will allow the Monitor to separately assess both the SARP investigatory process as well as the due process, adjudication, and disciplinary aspects of each case with timeliness and greater accuracy. The Monitor looks forward to working with the Parties to reassess the approach to the requests and production of data related to SARP internal investigations.

### Paragraph 175: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*A misconduct complaint investigation may not be conducted by any supervisor who used force during the incident; whose conduct led to the injury to a person; who authorized the conduct that led to the reported incident or complaint; who was on the scene at the time of the incident leading to the allegation of misconduct; or by any officer or supervisor who has a conflict of interest as defined by PRPD policy.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – March 2022 |
|  Policy: | Implemented | | |
|  Training: | N/A | Assessment Frequency | Bi-annually |
|  Practice: | Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. All misconduct complaint investigations are conducted by persons not prohibited from doing so, as required by the Paragraph. | ☑ Met   ☐ Missed |

Note: Policies and trainings are assessed as part of Paragraph 166.

*Compliance Assessment*

The Monitor has seen ample evidence in case file documentation that demonstrates that a PRPB member alleged to have been involved in misconduct is excluded from participating as an investigator in that same underlying inquiry.

*Pathway Forward*

All newly promoted supervisors must be trained in this policy prior to taking supervisory assignments.

## Paragraph 176: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*PRPD's centralized numbering and tracking system shall maintain accurate and reliable data regarding the number, nature, and status of all misconduct complaints, from initial intake to final disposition, including investigation timeliness and notification to the complainant of the interim status and final disposition of the investigation. This system shall be used for periodic assessment of compliance with PRPD policies and procedures and this Agreement.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. SARP's record management system maintains accurate and reliable data for operational and internal compliance purposes. | ☑ Met   ☐ Missed |

Note: Policies and trainings are assessed as part of Paragraph 166.

*Compliance Assessment*

Having personally viewed the SARP Module (internally referred to as the EIS system)[15] on multiple occasions and having viewed countless documents extracted from this system in response to its requests

---

[15] Refer to the IT section of CMR-6 for a detailed discussion of EIS.

for production of these documents, the Monitor is satisfied that this tracking system maintains accurate and reliable data on SARP cases from start to finish.

*Pathway Forward*

The Monitor will continue to assess this paragraph for continued compliance and request reports from the SARP Module to further determine and substantiate its operational accuracy.

## 4. Investigation of Complaints

The Monitor's review of 78 SARP investigations revealed a wide array of alleged misconduct ranging from mere negligence in duty, to illicit drug use proven by laboratory testing, to serious rules violations resulting in lengthy suspensions. Many of these investigations were professionally conducted with ample details supporting their conclusions. Unfortunately, most of these investigations were conducted outside of the reporting period for reasons previously explained. Therefore, the Monitor is unable to determine whether changes have been made in accordance with suggestions made in previous reports.

### Paragraph 177: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*PRPD shall ensure that policies and procedures regarding the investigation of complaints clearly establish that complaints are adjudicated on the basis of the preponderance of the evidence. This standard should be clearly delineated in policies and procedures and accompanied by extensive examples to ensure proper application by investigators.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Deferred | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 177-193. | ☒ Met | ☐ Missed |
| 2. Investigation of complaints trainings are consistent with approved policies. | ☐ Met | ☒ Missed |
| 3. 95% of sampled personnel are trained and certified in relevant policies related to investigation of complaints (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☒ Missed |
| 4. 100% of sampled investigation files were adjudicated using a preponderance of the evidence standard. | ☐ Met | ☒ Missed |

186

*Compliance Assessment*

The policies previously reviewed by the Monitor incorporate all the requirements of paragraphs 177-193. PRPB is currently rewriting its SARP investigator's course (REA 114) as recommended previously by the Monitor. Secondly, through interviews with dozens of SARP investigators, it is apparent that the accused officer's complaint history is rarely analyzed or even taken into consideration during the investigative process. To turn a blind eye to nearly identical accusations of misconduct in the past is a misunderstanding of the "preponderance of evidence" burden of proof.

*Pathway Forward*

As noted throughout this section, PRPB must bring its training cycle up to date in the near term. The Monitor looks forward to reviewing the revised course curricula for REA 114 once it has been drafted by PRPB.

PRPB SARP investigators must also become more familiar with the legal term "preponderance of evidence," to include situations where an officer has repeatedly been accused of nearly the same fact patterns[16] of misconduct in the past. This must be included in the revised REA 114 training curricula.

PRPB should consider the importance of EIS in tracking an officer's history of complaints and as a mechanism for intervention.

As mentioned previously, the lengthy timeline in which SARP investigations are initiated, conducted, reviewed, adjudicated, internally appealed, and culminated in the Commissioner's final resolution effectively limits the ability to offer a contemporary assessment of PRPB's compliance with most aspects of the investigatory component of any given SARP investigation. A revised and bifurcated approach to the request to produce these investigations during each CMR will allow the Monitor to separately assess both the SARP investigatory process as well as the due process, adjudication, and disciplinary aspects of each case with timeliness and greater accuracy. The Monitor looks forward to working with the Parties to reassess the approach to the requests and production of data related to SARP internal investigations.

## Paragraph 178: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*PRPD shall investigate all misconduct complaints and document the investigation and its findings and conclusions in writing. PRPD shall develop and implement a policy that specifies those complaints that may be resolved via administrative closing or informal resolution. Administrative closing shall be used for minor policy violations that do not constitute a pattern of misconduct, duplicate allegations, or allegations that even if true would not constitute misconduct, among others.*

| Compliance Status | Assessment Schedule | |
|---|---|---|
| Deferred | Review | October 2021 – March 2022 |

---

[16] The mere accusation of similar conduct is noteworthy, but not in itself highly dispositive in terms of a preponderance of evidence standard of burden of proof. However, previous accusations of similar conduct involving nearly identical situations, i.e., same victimology (race, gender, etc.), same setting, same words alleged to have been used repeatedly in past allegations may push a case from "not sustained" to "sustained" under a preponderance of evidence standard.

| | | | |
|---|---|---|---|
| Policy: | Implemented | Period | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Deferred | | |

*Compliance Targets*

| 1. 95% of sampled complaints are investigated, documented, and resolved, and relevant PRPB personnel were so advised, in accordance with approved policies. | ☐ Met   ☐ Missed |
|---|---|

Note: Policies and trainings are assessed as part of Paragraph 177.

*Compliance Assessment*

Of the cases reviewed by the Monitor during this reporting period, only one contained an administrative closure. The Monitor confirmed that the closure was indicated given the circumstances. Because this sample of such cases is too few to provide a comprehensive assessment, the Monitor defers its assessment of compliance until the next reporting period.

*Pathway Forward*

As mentioned previously, the lengthy timeline in which SARP investigations are initiated, conducted, reviewed, adjudicated, internally appealed, and culminated in the Commissioner's final resolution effectively limits the ability to offer a contemporary assessment of PRPB's compliance with most aspects of the investigatory component of any given SARP investigation. A revised and bifurcated approach to the request to produce these investigations during each CMR will allow the Monitor to separately assess both the SARP investigatory process as well as the due process, adjudication, and disciplinary aspects of each case with timeliness and greater accuracy. The Monitor looks forward to working with the Parties to reassess the approach to the requests and production of data related to SARP internal investigations.

## Paragraph 179: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*PRPD shall ensure that all administrative investigations conducted by SPR shall be completed within 90 days of the receipt of the complaint, including assignment, investigation, review, and final approval. The SPR commander is authorized to grant additional 30 day extensions, for up to 90 additional days in the aggregate, for justifiable circumstances, which shall be documented in writing. For purposes of these extensions, workload shall not constitute justification for extensions. Where an allegation is sustained, PRPD shall have 30 days to determine and notify the officer of the appropriate discipline. The appropriate discipline shall be imposed as soon as practicable, consistent with PRPD's disciplinary procedures. All administrative investigations shall be subject to appropriate tolling periods as necessary to conduct a parallel criminal investigation or as provided by law.*

| Compliance Status | Assessment Schedule | |
|---|---|---|
| Substantially Compliant | Review | October 2021 – March 2022 |

188

| Policy: | Implemented | Period | |
|---|---|---|---|
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1a. 95% of sampled investigations were adjudicated and notified within authorized timeframes in accordance with approved policies. | ☑ Met   ☐ Missed |
| 1b. 95% of disciplinary actions were imposed within authorized timeframes in accordance with approved policies. | ☑ Met   ☐ Missed |
| 2. 95% of SARP investigations that were not completed within prescribed timeframes have justified extension approvals as required by approved policies. | ☑ Met   ☐ Missed |
| Note: Policies and trainings are assessed as part of Paragraph 177. | |

### Compliance Assessment

The Monitor finds an abundance of evidence that SARP investigators are held to the 90-day rule and that exceptions to the rule are granted upon a demonstration to SARP command that more time is needed for a legitimate investigative reason. The most common reason for extensions cited among the cases reviewed was due to the COVID-19 pandemic, which is certainly understandable, given the unprecedented circumstances. The Monitor also finds that disciplinary actions are timely and occur at various stages during the process, e.g., an agreement for disciplinary action after review by SARP and OAL, or post-Vista Administrativa, if one is sought by the accused.

### Pathway Forward

The Monitor will continue to assess this paragraph for continued compliance.

## Paragraph 180: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*PRPD shall ensure that investigations of officer misconduct are thorough and the findings are consistent with the facts.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Deferred | | |

189

## Compliance Targets

| 1. 95% of selected investigations are thorough and findings are consistent with the facts | ☐ Met   ☐ Missed |
|---|---|

Note: Policies and trainings are assessed as part of Paragraph 177.

### Compliance Assessment

The majority of the cases contained within the sample and reviewed by the Monitor showed that most cases were fairly well investigated.  There remains the lingering issue of interview techniques employed by SARP investigators, which has been mentioned in past CMRs.[17]  However, it must be mentioned that the sample requested by the Monitor did not contain a sufficient number of investigations conducted within the reporting period. Therefore, it would be unfair for the Monitor to assess a compliance rating based upon a lack of timely data.

### Pathway Forward

As mentioned previously, the lengthy timeline in which SARP investigations are initiated, conducted, reviewed, adjudicated, internally appealed, and culminated in the Commissioner's final resolution effectively limits the ability to offer a contemporary assessment of PRPB's compliance with most aspects of the investigatory component of any given SARP investigation. A revised and bifurcated approach to the request to produce these investigations during each CMR will allow the Monitor to separately assess both the SARP investigatory process as well as the due process, adjudication, and disciplinary aspects of each case with timeliness and greater accuracy. The Monitor looks forward to working with the Parties to reassess the approach to the requests and production of data related to SARP internal investigations.

## Paragraph 181: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*PRPD shall require officers to cooperate with administrative investigations, including appearing for an interview when requested by a PRPD or Commonwealth investigator and providing all requested documents and evidence. Supervisors shall be notified when an officer under their supervision is summoned as part of an administrative investigation and shall facilitate the officer's appearance, unless such notification would compromise the integrity of the investigation.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | N/A | | Bi-annually |

---

[17] The Monitor has pointed out the lack of open-ended questioning by SARP investigators during their interviews in the past. As REA 114 (SARP Investigator Formative Training) has yet to be redesigned, the Monitor expects that this practice will continue, as it seems apparent that this practice is reinforced by REA 114. The Monitor will work with SAEA and SARP in August 2022 to provide meaningful feedback on the content of REA-114 to address this defect.

| Practice: | Deferred | Assessment Frequency | |
|---|---|---|---|

### Compliance Targets

| | | |
|---|---|---|
| 1. Officers cooperate and supervisors are notified about SARP summons, as required by approved policies, in 95% of selected investigations. | ☐ Met | ☐ Missed |
| 2. SARP personnel indicate that the level of cooperation of officers and supervisors with SARP investigations is acceptable in accordance with generally accepted practices. | ☑ Met | ☐ Missed |

Note: Policies and trainings are assessed as part of Paragraph 177.

### Compliance Assessment

The cases contained within the sample did not contain a sufficient number of investigations conducted within the reporting period. Therefore, it would be unfair for the Monitor to assess a compliance rating based upon insignificant data.

It is important to note that interviews conducted with SARP investigators indicated that summonsing officers to appear and be interviewed is not an issue. Furthermore, no SARP investigator could recall a case during the reporting period where a PRPB member refused to show up for an interview or otherwise failed to cooperate.

### Pathway Forward

As mentioned previously, the lengthy timeline in which SARP investigations are initiated, conducted, reviewed, adjudicated, internally appealed, and culminated in the Commissioner's final resolution effectively limits the ability to offer a contemporary assessment of PRPB's compliance with most aspects of the investigatory component of any given SARP investigation. A revised and bifurcated approach to the request to produce these investigations during each CMR will allow the Monitor to separately assess both the SARP investigatory process as well as the due process, adjudication, and disciplinary aspects of each case with timeliness and greater accuracy. The Monitor looks forward to working with the Parties to reassess the approach to the requests and production of data related to SARP internal investigations.

### Paragraph 182: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*The subject officer of an administrative investigation shall not be compelled to provide a statement to administrative investigators where there is a potential criminal investigation or prosecution of the officer until the remainder of the investigation has been completed, and after the administrative investigators have consulted with the prosecutor's office and the SPR commander, except where the taking of such a statement is authorized by the Superintendent after consulting with the prosecutor's office.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |

191

| | | | |
|---|---|---|---|
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Deferred | | |

*Compliance Targets*

| | |
|---|---|
| 1. Compelled statements are taken in accordance with approved policies and officers' constitutional rights. | ☐ Met   ☐ Missed |

Note: Policies and trainings are assessed as part of Paragraph 177.

*Compliance Assessment*

In four separate reviews (CMR-3, CMR-4, CMR-5, and CMR-6) the Monitor has yet to encounter a solitary use of a <u>Garrity</u> warning to compel an officer to make an administrative account of his conduct while simultaneously being subjected to a related criminal investigation for the same incident.

The Monitor is pleased at PRPB's representation of excluding internal criminal investigators from performing administrative investigations on the same case.

*Pathway Forward*

As mentioned previously, the lengthy timeline in which SARP investigations are initiated, conducted, reviewed, adjudicated, internally appealed, and culminated in the Commissioner's final resolution effectively limits the ability to offer a contemporary assessment of PRPB's compliance with most aspects of the investigatory component of any given SARP investigation. A revised and bifurcated approach to the request to produce these investigations during each CMR will allow the Monitor to separately assess both the SARP investigatory process as well as the due process, adjudication, and disciplinary aspects of each case with timeliness and greater accuracy. The Monitor looks forward to working with the Parties to reassess the approach to the requests and production of data related to SARP internal investigations.

## Paragraph 183: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*Where there is no potential criminal investigation or prosecution of the subject officer, SPR investigators shall not warn the subject officer that he or she has a right not to provide a statement that may be self-incriminating.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Deferred | | |

*Compliance Targets*

192

| 1. Subject officers are not given Miranda warnings where there is no potential for criminal investigation or prosecution. | ☐ Met   ☐ Missed |
|---|---|
| Note: Policies and trainings are assessed as part of Paragraph 177. | |

### Compliance Assessment

In the 78 investigations sampled for review this reporting period, the Monitor has not found a single instance of a PRPB member being Mirandized where no possible criminal jeopardy could have arisen from the facts as alleged.

### Pathway Forward

As mentioned previously, the lengthy timeline in which SARP investigations are initiated, conducted, reviewed, adjudicated, internally appealed, and culminated in the Commissioner's final resolution effectively limits the ability to offer a contemporary assessment of PRPB's compliance with most aspects of the investigatory component of any given SARP investigation. A revised and bifurcated approach to the request to produce these investigations during each CMR will allow the Monitor to separately assess both the SARP investigatory process as well as the due process, adjudication, and disciplinary aspects of each case with timeliness and greater accuracy. The Monitor looks forward to working with the Parties to reassess the approach to the requests and production of data related to SARP internal investigations.

## Paragraph 184: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*If at any time during complaint intake or investigation the investigator determines that there may have been criminal conduct on the part of any officer or employee, the investigator shall immediately notify the SPR commander. The SPR commander shall immediately notify the Superintendent and shall consult with the prosecutor's office regarding the initiation of a criminal investigation. Where an allegation is investigated criminally, SPR shall continue with the administrative investigation of the allegation, except that it may delay or decline to conduct an interview of the subject officer(s) or other witnesses until completion of the criminal investigation unless, after consultation with the prosecutor's office and PRPD Superintendent, such interviews are deemed appropriate.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Deferred | | |

### Compliance Targets

| 1a. Investigators notify SARP and SARP consults with prosecutors in accordance with approved policies when an investigator determines that there may have been criminal conduct on the part of any officer or employee. | ☑ Met   ☐ Missed |
|---|---|

193

| | | |
|---|---|---|
| 1b. Administrative investigations continue when a parallel criminal investigation is also ongoing in accordance with approved policies. | ☐ Met | ☑ Missed |

Note: Policies and trainings are assessed as part of Paragraph 177.

### Compliance Assessment

Because of the way these cases were sampled, the Monitor did not see evidence that an internal case was investigated criminally and administratively at the same time in the 78 investigations reviewed. However, in the Monitor's review of the files involving criminal investigations, the Monitor did find that investigators notified SARP and SARP consulted with prosecutors in accordance with approved policies when an investigator determined that there may have been criminal conduct on the part of any officer or employee. The Monitor will also consider findings from previous CMRs as he continues to review investigations for compliance with this paragraph.

### Pathway Forward

As mentioned previously, the lengthy timeline in which SARP investigations are initiated, conducted, reviewed, adjudicated, internally appealed, and culminate in the Commissioner's final resolution effectively limits the ability to offer a contemporary assessment of PRPB's compliance with most aspects of the investigatory component of any given SARP investigation. A revised and bifurcated approach to the request to produce these investigations during each CMR will allow the Monitor to separately assess both the SARP investigatory process as well as the due process, adjudication, and disciplinary aspects of each case with timeliness and greater accuracy. The Monitor looks forward to working with the Parties to reassess the approach to the requests and production of data related to SARP internal investigations.

## Paragraph 185: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*PRPD, PRDOJ, and the prosecutor's office shall develop protocols to ensure that the criminal and administrative investigations are kept appropriately separate after a subject officer has provided a compelled statement. Nothing in this Agreement or PRPD policy shall hamper an officer's obligation to provide a public safety statement regarding a work related incident or activity.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Deferred | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Administrative and criminal investigations are conducted separately as required by approved policies after a subject officer has provided a compelled statement. | ☐ Met | ☐ Missed |

194

Note: Policies and trainings are assessed as part of Paragraph 177.

*Compliance Assessment*

Throughout all reports to date, the Monitor has yet to see a case where an officer has been compelled to make a statement under <u>Garrity</u>. Additionally, PRPB has reported that criminal internal investigators are no longer assigned to conduct an administrative investigation of the same case file. Because of the methodology used to sample cases for review, most of the cases reviewed for this report fell outside the CMR-6 reporting period, and therefore cannot be relied upon to assess compliance for this reporting period. The Monitor has been informed by PRPB that an appropriate "Garrity Warning" document is being drafted and will be circulated to the Parties for approval.

*Pathway Forward*

As mentioned previously, the lengthy timeline in which SARP investigations are initiated, conducted, reviewed, adjudicated, internally appealed, and culminate in the Commissioner's final resolution effectively limits the ability to offer a contemporary assessment of PRPB's compliance with most aspects of the investigatory component of any given SARP investigation. A revised and bifurcated approach to the request to produce these investigations during each CMR will allow the Monitor to separately assess both the SARP investigatory process as well as the due process, adjudication, and disciplinary aspects of each case with timeliness and greater accuracy. The Monitor looks forward to working with the Parties to reassess the approach to the requests and production of data related to SARP internal investigations.

The Monitor may also consider requesting a sample of all cases where a police officer has been compelled to make a <u>Garrity</u> statement during the next reporting period to be able to assess a level of compliance with this paragraph.

## Paragraph 186: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*In each investigation, PRPD shall consider all relevant evidence, including circumstantial, direct, and physical evidence. There will be no automatic preference for an officer's statement over a non-officer's statement, nor will PRPD disregard a witness' statement merely because the witness has some connection to the complainant or because of any criminal history. PRPD shall make efforts to resolve material inconsistencies between witness statements.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Deferred | | |

*Compliance Targets*

| 1. 95% of sampled investigations considered all relevant evidence in a manner consistent with this Paragraph, and tried to resolve material inconsistencies between witness statements. | ☐ Met   ☐ Missed |
|---|---|

Note: Policies and trainings are assessed as part of Paragraph 177.

### Compliance Assessment

The Monitor reviewed the requested sample of 78 cases for the CMR-6 reporting period, few if any were investigated during the reporting period itself. The Monitor remains convinced, based upon his multiple interviews of SARP investigators and analysis of their work product, that circumstantial evidence - particularly that of remarkably similar prior allegations of wrongdoing contained within the accused officer's SARP record are not being considered as evidence or mentioned in the investigative report.  However, due to the lack of contemporaneously investigated cases in the sample, the Monitor is unable to fairly assess a compliance level for CMR-6.

### Pathway Forward

As mentioned previously, the lengthy timeline in which SARP investigations are initiated, conducted, reviewed, adjudicated, internally appealed, and culminate in the Commissioner's final resolution effectively limits the ability to offer a contemporary assessment of PRPB's compliance with most aspects of the investigatory component of any given SARP investigation. A revised and bifurcated approach to the request to produce these investigations during each CMR will allow the Monitor to separately assess both the SARP investigatory process as well as the due process, adjudication, and disciplinary aspects of each case with timeliness and greater accuracy. The Monitor looks forward to working with the Parties to reassess the approach to the requests and production of data related to SARP internal investigations.

### Paragraph 187: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*A misconduct investigation shall not be closed simply because the complaint is withdrawn or the alleged victim is unwilling or unable to provide additional information beyond the initial complaint, or because the complainant pled guilty or was found guilty of an offense.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Deferred | | |

### Compliance Targets

| 1. 95% of sampled investigations were not closed simply because the complaint is withdrawn or the alleged victim is unwilling or unable to provide additional | ☐ Met   ☐ Missed |
|---|---|

196

information beyond the initial complaint, or because the complainant pled guilty or
was found guilty of an offense.

Note: Policies and trainings are assessed as part of Paragraph 177.

### Compliance Assessment

In the last 18 months, the Monitor has yet to observe a case that had been closed because the complaint was withdrawn, the alleged victim failed to cooperate, or the complainant was found guilty of any offense. Unfortunately, due to the sample collected and studied by the Monitor for this report, few if any of the investigations conducted coincided with the reporting period. As such, the Monitor must defer his assessment of compliance until he is able to review a sample of cases that were investigated within the reporting period.

### Pathway Forward

As mentioned previously, the lengthy timeline in which SARP investigations are initiated, conducted, reviewed, adjudicated, internally appealed, and culminate in the Commissioner's final resolution effectively limits the ability to offer a contemporary assessment of PRPB's compliance with most aspects of the investigatory component of any given SARP investigation. A revised and bifurcated approach to the request to produce these investigations during each CMR will allow the Monitor to separately assess both the SARP investigatory process as well as the due process, adjudication, and disciplinary aspects of each case with timeliness and greater accuracy. The Monitor looks forward to working with the Parties to reassess the approach to the requests and production of data related to SARP internal investigations.

## Paragraph 188: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*The misconduct investigator shall explicitly identify and recommend one of the following dispositions for each allegation of misconduct in an administrative investigation:*

a) *"Unfounded," where the investigation determines by clear and convincing evidence that the alleged misconduct did not occur or did not involve the subject officer;*

b) *"Sustained," where the investigation determines, by a preponderance of the evidence, that the alleged misconduct did occur;*

c) *"Not Sustained," where the investigation is unable to determine, by a preponderance of the evidence, whether the alleged misconduct occurred; or*

d) *"Exonerated," where the investigation determines by clear and convincing evidence that the alleged conduct did occur but did not violate PRPD policies, procedures, or training.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | N/A | | Bi-annually |

197

| Practice: | Deferred | Assessment Frequency | |
|---|---|---|---|

### Compliance Targets

| 1. Misconduct investigators identify and recommend one of the listed dispositions for each allegation of misconduct in an administrative investigation. | ☐ Met   ☐ Missed |
|---|---|
| Note: Policies and trainings are assessed as part of Paragraph 177. | |

### Compliance Assessment

The Monitor lacks timely data indicating that the investigator used the appropriate terminology to conclude any given case during the reporting period. The Monitor does find that OAL and OPC are now using the correct terminology in closed cases.

### Pathway Forward

As mentioned previously, the lengthy timeline in which SARP investigations are initiated, conducted, reviewed, adjudicated, internally appealed, and culminate in the Commissioner's final resolution effectively limits the ability to offer a contemporary assessment of PRPB's compliance with most aspects of the investigatory component of any given SARP investigation. A revised and bifurcated approach to the request to produce these investigations during each CMR will allow the Monitor to separately assess both the SARP investigatory process as well as the due process, adjudication, and disciplinary aspects of each case with timeliness and greater accuracy. The Monitor looks forward to working with the Parties to reassess the approach to the requests and production of data related to SARP internal investigations.

### Paragraph 189: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*The unit commander of the investigating supervisor shall review the supervisor's recommended disposition and accept, reject, or modify it. The unit commander shall document rejected or modified recommendations from supervisors in writing. Supervisory investigation reports and all related documentation and evidence shall be provided to SPR immediately upon completion of the investigation, but no later than within three business days. SPR shall review disposition recommendations made by unit commanders to ensure that investigative standards are met. SPR shall retain misconduct investigation reports and related records.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Deferred | | |

### Compliance Targets

198

| | |
|---|---|
| 1. The unit commanders complied with the requirements of this Paragraph in 95% of selected investigations. | ☐ Met  ☐ Missed |

Note: Policies and trainings are assessed as part of Paragraph 177.

## Compliance Assessment

In the past the Monitor has found that SARP supervisors' universal approval of their subordinates' case files are logical given that, if the supervisor were to disagree with a subordinate's findings or underlying investigation, then the case would be sent back to the investigator until such time as the supervisor signs off and approves the case. The Monitor's interviews with SARP personnel have indicated the presence of this informal process as part of SARP field investigations.

## Pathway Forward

The Monitor recommends that all supervisory case approvals be dated to indicate the date of their approval. Any changes made to a recommended case finding at SARP should be explained by SARP command and shared with the original investigator.

## Paragraph 190: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*The SPR commander shall review the investigator's recommended disposition and accept, reject, or modify it. The SPR commander shall document rejected or modified recommendations from investigators in writing. The Superintendent, or his or her designee(s), shall review the SPR commander's recommended disposition and accept, reject, or modify it. The Superintendent, or his or her designee(s), shall document rejected or modified recommendations from SPR.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

## Compliance Targets

| | |
|---|---|
| 1a. The SARP commander reviews and resolves the complaint in accordance with the paragraph in 95% of selected investigations. | ☑ Met  ☐ Missed |
| 1b. The Commissioner reviews and resolves the complaint in accordance with the paragraph in 95% of selected investigations. | ☑ Met  ☐ Missed |

Note: Policies and trainings are assessed as part of Paragraph 177.

*Compliance Assessment*

The Monitor finds that the OPC reviews and resolves complaints in tenor with the paragraph in at least 95% of the cases examined. Further the Monitor also found that the SARP commander reviews and resolves the complaint in accordance with the paragraph.

*Pathway Forward*

The Monitor recommends that, when a finding is changed at the SARP command, OAL, or the OPC levels, that the initial investigator be informed of such a change as well as a brief rationale for said change.

## Paragraph 191: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*In addition to determining whether the officer committed the alleged misconduct, administrative investigations shall assess and document whether: (a) the action was in compliance with training and legal standards; (b) the use of different procedures should or could have been employed to achieve a potentially better outcome; (c) the incident indicates a need for additional training, counseling or other non-punitive corrective action; and (d) the incident suggests that PRPD should revise its policies, strategies, tactics, or training. This information shall be shared with the relevant commander(s).*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Deferred | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 178.

*Compliance Assessment*

In the future, the Monitor will examine cases investigated during the reporting period for the inclusion of the following observations on the part of the investigator:

(a) Compliance with training and legal standards;

(b) Whether the use of different procedures should or could have been employed to achieve a potentially better outcome;

(c) Whether the incident indicates a need for additional training, counseling, or other non-punitive corrective action; or

(d) Whether the incident suggests that PRPB should revise its policies, strategies, tactics, or training.

*Pathway Forward*

PRPB must bring its training cycle up to date in the near term. REA 114 must be rewritten to emphasize the inclusion of observations (a) through (d) as noted above.

In addition, as mentioned previously, the lengthy timeline in which SARP investigations are initiated, conducted, reviewed, adjudicated, internally appealed, and culminate in the Commissioner's final resolution effectively limits the ability to offer a contemporary assessment of PRPB's compliance with most aspects of the investigatory component of any given SARP investigation. A revised and bifurcated approach to the request to produce these investigations during each CMR will allow the Monitor to separately assess both the SARP investigatory process as well as the due process, adjudication, and disciplinary aspects of each case with timeliness and greater accuracy. The Monitor looks forward to working with the Parties to reassess the approach to the requests and production of data related to SARP internal investigations.

## Paragraph 192: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*Each misconduct complainant will be notified in writing regarding the initiation of an investigation, the final disposition of the investigation, any disciplinary or non-punitive action taken, and the right to seek further review of the final disposition under applicable law. If an investigation goes beyond the 90 day limit, the complainant will be notified that an extension has been granted. PRPD shall establish procedures for complainants dissatisfied with the outcome to discuss their concerns with SPR commanders.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Complainants are notified about the status of the investigation and outcome in accordance with approved policies in 95% of selected investigations. | ☑ Met | ☐ Missed |
| 2. Complainants are given the opportunity to appeal the determination before the Investigation, Processing and Appeals Commission. | ☑ Met | ☐ Missed |
| Note: Policies and trainings are assessed as part of Paragraph 177. | | |

201

*Compliance Assessment*

In all closed cases reviewed with a known complainant, the complainant received timely notification of the status and outcome of the SARP investigation. Additionally in these same cases, all complainants were notified of their ability to appeal a finding to CIPA.

*Pathway Forward*

PRPB has achieved substantial compliance with this paragraph. The Monitor will continue to reassess PRPB's continued compliance in future reports.

## Paragraph 193: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*SPR shall retain all misconduct investigation records for at least five years after the officer's separation from the agency. This obligation shall apply to records regarding officers' credibility that come to the attention of SPR and that may be subject to disclosure under Brady v. Maryland, 373 U.S. 83 (1963), and its progeny.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. SARP retains at least 95% of investigation files for persons who have separated from PRPB less than five years ago. | ☑ Met ☐ Missed |
| 2. PRPB's document retention practices comply with approved policies. | ☑ Met ☐ Missed |

Note: Policies and trainings are assessed as part of Paragraph 177.

*Compliance Assessment*

On-site document reviews conducted by the Monitor indicate disciplinary files relating to officers separated from service are maintained by PRPB and that PRPB's document retention practices comply with approved policies.

*Pathway Forward*

The Monitor will continue to assess PRPB's compliance with this paragraph and conduct additional on-site reviews to ensure that this practice continues.

## 5. Staffing, Selection, and Training Requirements

Some of the investigators interviewed during this reporting cycle had completed their three-year period of service and described several different interactions with superiors as to whether they would continue in this role. Some described no interview at all, merely that they continued to work as a SARP investigator beyond the three years of service. Others were merely asked if they would care to continue in this role. Still others asked to be transferred to a different part of PRPB. There seems to be no set pattern to formally recognize SARP investigator performance or to base service extensions upon that performance. While the Monitor may assume that PRPB is making the right decision in extending service to SARP investigators, there needs to be empirical proof that these decisions are being made based upon the person's past performance.

All SARP investigators past and present described receiving an assessment of their performance, which generally occurred near the end or beginning of the calendar year and was delivered to them digitally. Most report receiving very high assessments in this process, with many claiming to have received assessments ranging between 4.5 and 5.0 in multiple categories. Very few received any advice from their supervisor as to how they might improve their performance, which is a key area of any assessment.  Few described any in-person conversation with their immediate superior at all. Providing a subordinate with an assessment of 5 out of 5 across more than one category is unrealistic and leaves no room for employee development. The lack of supervisory feedback is a missed opportunity to improve employee performance. Additionally, inflated assessments must be addressed in future supervisor training. While any organization will certainly have a small percentage of performance outliers within their ranks, this should be the exception and not the rule.

### Paragraph 194: Civilian Complaints, Internal Investigations, and Discipline - Staffing, Selection, and Training Requirements

*PRPD shall ensure that a sufficient number of well-trained staff are assigned and available to thoroughly complete and review misconduct investigations in a timely manner and in accordance with the requirements of this Agreement. PRPD further shall ensure it provides sufficient resources and equipment to conduct adequate criminal and administrative misconduct investigations.*

| Compliance Status | | | Assessment Schedule | |
|---|---|---|---|---|
| Partially Compliant | | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | | |
| Training: | Not Implemented | | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Not Implemented | | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 177-193. | ☑ Met | ☐ Missed |
| 2. Trainings for the internal investigation unit are consistent with approved policies. | ☑ Met | ☐ Missed |

203

| | | |
|---|---|---|
| 3. All internal investigation unit personnel are trained and certified in relevant policies (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 4. The internal investigation unit has sufficient resources and equipment, or is in the process of procuring needed resources and equipment. | ☑ Met | ☐ Missed |
| 5a. Internal investigation unit personnel serve three-year terms. | ☑ Met | ☐ Missed |
| 5b. Retained internal investigation unit personnel have demonstrated effective performance. | ☐ Met | ☑ Missed |

## Compliance Assessment

Only approximately 65% of the sample of SARP investigators have been formatively trained. The decision process to extend an investigator's service period appears to be *ad hoc* in practice. The evaluation process is flawed and in need of adjustment. While SARP is lacking staff and other resources, its commanding officer has made written requests to the Commissioner for additional resources to achieve its mission. The Monitor expects the Police Commissioner to give this request his highest priority. In particular, the Monitor has seen procurement requests from SARP Command asking for more vehicles, technology, and manpower, all of which are desperately needed.  What the Monitor has yet to see is a request for off-site IAD office space to avoid the possible situation where a citizen accusing a police officer of criminal wrongdoing might have to go to the precinct of that officer to make a report to IAD. Internal investigations are the foundation to an effective accountability system for any police agency and PRPB must ensure that appropriate resources are provided to SARP to ensure its ability to conduct thorough and timely investigations.

## Pathway Forward

PRPB must procure needed resources for SARP, remedy existing training deficiencies, and execute a uniform and transparent evaluation process for SARP members that includes mandatory supervisory feedback for every member at the end of every evaluation period.

### Paragraph 195: Civilian Complaints, Internal Investigations, and Discipline - Staffing, Selection, and Training Requirements

*PRPD shall establish a term of duty of up to three years for SPR officers and supervisors who conduct investigations and may reappoint an officer to successive terms of duty if that officer has demonstrated effective performance based on an appropriate annual performance evaluation.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Not Implemented | | |

## Compliance Targets

Note: This Paragraph is assessed with Paragraph 194.

*Compliance Assessment*

SARP investigators all describe a rigorous and competitive process to join the unit and all who were extended in their service described having received exceptional (if not inflated) reviews by their superiors. Similar assessments are provided in the supervision section of this report. The Monitor is aware of the changes it is making to its performance evaluation process. During the CMR-6 reporting period, the Monitor reviewed and provided comments on the revised PPR-310.1 form (Performance Evaluation).

*Pathway Forward*

As noted above, PRPB must procure needed resources for SARP, remedy existing training deficiencies, and execute a uniform and transparent evaluation process for SARP members that includes mandatory supervisory feedback for every member at the end of every evaluation period. Further, the Monitor looks forward to reviewing the Performance Evaluation policy (GO 310) which is expected to document the procedures related to the revisions depicted in PPR-310.1.

## Paragraph 196: Civilian Complaints, Internal Investigations, and Discipline - Staffing, Selection, and Training Requirements

*All SPR personnel conducting officer misconduct investigations shall receive at least 40 hours of initial training in conducting officer misconduct investigations and shall receive additional in-service training each year.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 194.

*Compliance Assessment*

PRPB has long reported that the SARP basic formative and annual specialized trainings are under careful review for modification. The Monitor has yet to see recommendations from either SAEA or SARP for the modified formative (REA 114) and annual specialized re-training of SARP investigators.

205

*Pathway Forward*

PRPB must ensure that all SARP investigators are formatively trained and later receive an annual retraining to refamiliarize themselves with all issues relevant to their duties, including updates on any changes to SARP policy, protocol, and especially, investigative methodology.

## 6. Preventing Retaliation

During this reporting period, no significant cases of retaliation were contained within the sample requested. Furthermore, most of the case investigations were terminated long before the reporting period.

### Paragraph 197: Civilian Complaints, Internal Investigations, and Discipline - Preventing Retaliation

*PRPD policy shall expressly prohibit all forms of retaliation, whether subtle or direct, including discouragement, intimidation, coercion, duty-station reassignment, or adverse action, against any person, civilian or officer, who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct. Retaliation shall be considered a serious policy violation and shall subject an officer to serious disciplinary action, up to and including termination.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Deferred | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of this Paragraph. | ☑ Met | ☐ Missed |
| 2. Retaliation trainings are consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled personnel are trained and certified in retaliation policies (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 4. Complaints involving alleged retaliation are investigated and adjudicated in accordance with approved policies and agency standards in 95% of selected complaints. | ☐ Met | ☐ Missed |
| 5. 95% of interviewed personnel perceive retaliation for participating in an investigation of misconduct is not tolerated and leads to serious disciplinary action. | ☐ Met | ☐ Missed |

*Compliance Assessment*

During CMR-6 the Monitor attempted to collect data via an anonymous survey instrument concerning retaliation, which resulted in insignificant information upon which to base any conclusion. Furthermore,

206

the document sample requested from PRPB contained a dearth of contemporary cases involving an allegation of retaliation.

*Pathway Forward*

As mentioned previously, the lengthy timeline in which SARP investigations are initiated, conducted, reviewed, adjudicated, internally appealed, and culminated in the Commissioner's final resolution effectively limits the ability to offer a contemporary assessment of PRPB's compliance with most aspects of the investigatory component of any given SARP investigation. A revised and bifurcated approach to the request to produce these investigations during each CMR will allow the Monitor to separately assess both the SARP investigatory process as well as the due process, adjudication, and disciplinary aspects of each case with timeliness and greater accuracy. The Monitor looks forward to working with the Parties to reassess the approach to the requests and production of data related to SARP internal investigations.

Lastly, the Monitor reserves the right to request a special purposive sample of cases investigated during the reporting period involving an allegation of retaliation to make an adequately informed determination of compliance.

## 7. Discipline

The Monitor's investigation of PRPB discipline indicates a continued trend towards substantial compliance. Overall, PRPB officers are corrected by supervisors in the field for minor infractions, investigated for more serious infractions, and when the preponderance of evidence indicates a sustained finding of misconduct, disciplined according to a progressive matrix. It is also important to note that all officers are seasonally advised of their right to due process, which operates effectively via an informal hearing wherein an officer or their legal representative can present facts or arguments to sway the hearing officer. Most of these informal hearings result in the same finding reached; however, the Monitor has seen multiple circumstances where the officer has successfully challenged the finding by either having the disposition reversed or the disciplinary sanction lowered.

### Paragraph 198: Civilian Complaints, Internal Investigations, and Discipline - Discipline

*PRPD shall ensure that discipline for sustained allegations of misconduct is fair, consistent, based on the nature of the allegation, and that mitigating and aggravating factors are set out and applied consistently. Discipline shall be based on objective criteria and shall not depend on or be influenced by rank or external considerations.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Implemented | | |

207

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 198-199. | ☑ Met | ☐ Missed |
| 2. Discipline trainings are consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled personnel are trained and certified in discipline policies (or scheduled for training, in the case of mid-year reviews). | ☑ Met | ☐ Missed |
| 4. Discipline is taken and documented in response to sustained misconduct complaints in accordance with approved policies in 95% of selected complaints. | ☑ Met | ☐ Missed |
| 5. Disciplinary matrix employs objective criteria to apply to sustained findings to assess the appropriate level of discipline. | ☑ Met | ☐ Missed |

*Compliance Assessment*

The Monitor bases this assessment upon the examination of multiple closed cases that have worked their way through the entire disciplinary matrix. The Monitor remains impressed with PRPB's application of its progressive disciplinary matrix. In 95% of the cases reviewed, discipline is taken and documented in response to sustained misconduct complaints. Additionally, the Monitor is by and large impressed with PRPB's due process mechanism and functionality (*Vista Administrativa*), which provides the employee with the right to be heard, dispute findings, and seek a different outcome from a neutral decision maker. The Monitor finds that PRPB generally acts within the scope of its progressive disciplinary matrix in meting out discipline.

*Pathway Forward*

PRPB should continue these practices. The Monitor will continue to assess PRPB's compliance with this paragraph to determine sustained substantial compliance.

## Paragraph 199: Civilian Complaints, Internal Investigations, and Discipline - Discipline

*PRPD shall establish a disciplinary matrix for reviewing sustained findings and assessing the appropriate level of discipline to facilitate consistency in the imposition of discipline. All disciplinary decisions shall be documented, including the rationale behind any decision to deviate from the level of discipline set out in the disciplinary procedures.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 198.

208

*Compliance Assessment*

The Monitor's review of cases deemed closed within the reporting period reveals a complete review of alleged infractions of laws as well as PRPB rules and procedures. The Monitor continues to find abundant evidence that PRPB's progressive disciplinary matrix is being used as it was designed. Secondly, the Monitor sees ample evidence that officers are taking advantage of the *vista informal*, or due process hearing phase to question findings that they may disagree with. The Monitor finds both the vista informal and OAL's reviews to be generally well-documented and legally reasoned.

*Pathway Forward*

When diverging from the original case recommendation of the investigator, SARP commanders should indicate the reason behind such a diversion and share these changes with the original investigator.

## Paragraph 200: Civilian Complaints, Internal Investigations, and Discipline - Discipline

*PRPD shall review its drug testing program on an ongoing basis to ensure that pre-service testing for new officers and random testing for existing officers is reliable and valid. The program shall be designed to detect use of banned or illegal substances, including steroids.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of this Paragraph. | ☑ Met | ☐ Missed |
| 2. PRPB's drug testing program trainings are consistent with approved policies. | ☐ Met | ☑ Missed |
| 3. 95% of sampled personnel are trained and certified in PRPB's drug testing program policies (or scheduled for training, in the case of mid-year reviews). | ☑ Met | ☐ Missed |
| 4. Drug tests are reliable, valid, and administered to new officers and a random selection of existing officers in accordance with the Paragraph. | ☐ Met | ☑ Missed |

*Compliance Assessment*

The Monitor has previously expressed some concerns about PRPB's controlled substance testing program, mostly relating to the aggregate number of persons annually tested, the portion of PRPB sworn workforce who has not been tested in years, and the overall number of positive test results. The Monitor has received anecdotal evidence of persons being tested repeatedly (without cause or randomly), and others not having been tested at all for a period that often exceeds five years.

209

The Monitor has expressed concern that those who had not been tested in over five years be prioritized for random drug screening and that the aggregate number of tests conducted annually be increased. Clearly, this would require PRPB to invest more capital in organizing, collecting, and partnering with ICF to test collected samples. To test an increased volume of members each year would require additional personnel to organize, target, and facilitate these collections in the field. The Monitor is certainly open to suggestions from PRPB to make this process more innovative, efficient, and effective.

The Monitor did encounter one positive test for cocaine metabolites that had been conducted on a police cadet at the academy during his random review of SARP files. The Monitor finds that the cadet's rights were stridently protected, the test administered appropriately, and to ensure the highest level of accuracy, the results were confirmed by a laboratory on the mainland.[18]  The cadet was summarily dismissed as was appropriate for such circumstances.

*Pathway Forward*

The Monitor notes that 700 men and women were subjected to random urinalysis screening during a three-month period between October and December 2021. If the Monitor were to assume that PRPB tests the same number of members each quarter – thereby extrapolating these figures to an annual basis - PRPB would be testing approximately 23% of its workforce each year, bringing it closer to the goal of reaching a third of its workforce each year. The Monitor urges PRPB to continue moving in this direction to help ensure a safe and productive workforce.

## 8. Officer Assistance and Support

The Monitor finds that PRPB offers mental health and wellbeing services to all members, which is staffed by highly credentialed professionals, many of whom possess advance degrees in clinical or forensic psychology and related mental health disciplines. During his many interviews with sampled representatives, the Monitor heard anecdotal (and anonymous) accounts of PRPB members who sought help from these caregivers for a variety of reasons.

### Paragraph 201: Civilian Complaints, Internal Investigations, and Discipline - Officer Assistance and Support

*PRPD shall provide officers and employees with a range of non-punitive supports and services to address and correct problem behavior, as part of PRPD's disciplinary and performance improvement systems. These supports and services shall include a comprehensive range of mental health services that include, but are not limited to: readily accessible confidential counseling services; critical incident debriefings and crisis counseling; mental health evaluations; and stress management training that comport with generally accepted practices.*

| Compliance Status | Assessment Schedule | |
|---|---|---|
| Partially Compliant | Review | October 2021 – March 2022 |

---

[18] Out of an apparent abundance of caution, the positive sample for cocaine metabolites was sent to a laboratory on the mainland for independent confirmation.

| Policy: | Implemented | Period | |
|---|---|---|---|
| Training: | Not Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 201-204. | ☑ Met | ☐ Missed |
| 2. Officer assistance and support trainings are consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled personnel are trained and certified in officer assistance and support policies (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 4. A variety of non-punitive supports and services that comport with generally accepted practices are available to officers and their families as required by approved policies. | ☑ Met | ☐ Missed |
| 5. Mental health professionals are involved in developing and providing in-service training on mental health stressors related to law enforcement and the mental health services available to officers and their families. | ☑ Met | ☐ Missed |
| 6. Mental health counseling provided to PRPB employees is confidential, pursuant to approved policies. | ☐ Met | ☑ Missed |

### Compliance Assessment

The Monitor conducted multiple individual in-person and remote interviews of a diverse array of professionals assigned to provide PRPB officers with assistance and support. The Monitor was very impressed by the credentials of these talented caregivers. All had multiple years of experience as well as impressive academic credentials including many holding doctorate degrees in forensic or industrial psychology. All reported seeing both obligatory patients – those who were referred to them by PRPB itself, as well as those self-referred – those who were experiencing mental health issues and seeking support on their own initiative. These self-referred patients were not limited to PRPB members. The Monitor heard multiple examples of spouses and dependents of PRPB members seeking assistance from the Employee Assistance Program (PAE), which is commendable.

Regarding those who are self-referred, the Monitor continues to see a limiting factor to voluntary participation by PRPB members and their families – the location of the PAE office. Almost invariably, the PAE office is located within a PRPB facility, and in many cases, the office is located near the commander's office. Some of the professionals interviewed cited the location of the office as creating some disincentive for self-referred PRPB dependents, and especially PRPB members themselves, from taking better advantage of the program. It is worth mentioning that many agencies on the mainland intentionally locate their psychological services in off-site locations to help foster the perception of strict confidentiality for those who voluntarily seek these vital services.

### Pathway Forward

The PAE provides a good example of PRPB taking a firm step in the direction of promoting mental health wellness for both their members and dependents. As in any initiative of this kind, there is often room for

improvement. The Monitor suggests that PRPB consider using technology to eliminate the perceived stigma associated with going to a police facility, where one may be observed going to the PAE office for help. Over the past two years, the COVID-19 pandemic has generally allowed mental health providers to expand upon their experimental usage of secure, online videoconference solutions to create remote access to mental health services.[19]  By fashioning such a capability, PRPB avoids the additional cost of providing off-site office space for PAE, while at the same time, allowing the self-referred to access it in a highly confidential manner.

## Paragraph 202: Civilian Complaints, Internal Investigations, and Discipline - Officer Assistance and Support

*PRPD shall train management and supervisory personnel in officer support services protocols to ensure wide availability and use of officer support services.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Not Implemented | | |

### *Compliance Targets*

Note: This Paragraph is assessed with Paragraph 201.

### *Compliance Assessment*

In the review of training records for the sample of personnel pulled for this reporting period, the Monitor found that only 76% have completed the Symptoms of Professional Burnout and Risks to Wellness course (TSDP). As this paragraph is assessed with paragraph 201, which stipulates that 95% of personnel have been trained and certified in officer assistance and support policies, the 76% trained does not meet this threshold, thus PRPB is found to not be compliant with this paragraph.

### *Pathway Forward*

PRPB must bring its training cycle up to date in the near term.

---

[19] According to many of the professionals interviewed, changes were made to mental health delivery protocols in the Commonwealth, which now allow these services to be delivered via remote, secure teleconference platforms, e.g., Zoom, among others. Zoom sessions would not incur costs for connectivity, as a free account presently allows for online meetings up to 40 minutes in length – about enough to accommodate a talk therapy session. The addition of remote capability would increase the reach of these services, create efficiency in their delivery, and at the same time, remove a key barrier to access – the physical location of the current PAE offices. Using technology, a PRPB member, their spouse/partner, or dependent would be able to privately access a mental health counselor from virtually any location on the island via portable computer or mobile device.

## Paragraph 203: Civilian Complaints, Internal Investigations, and Discipline - Officer Assistance and Support

*PRPD shall involve mental health professionals in developing and providing in- service training on mental health stressors related to law enforcement and the mental health services available to officers and their families.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Implemented | | |

### Compliance Targets

Note: This Paragraph is assessed with Paragraph 201.

### Compliance Assessment

The Monitor personally interviewed a random sample of mental health professionals affiliated with PAE. Every single person interviewed was highly credentialed and objectively capable of performing their assigned duties. The Monitor also reviewed the training product of these professionals and found it to be comprehensive in nature.

### Pathway Forward

The Monitor will continue to assess this paragraph to ensure that it meets the requirements of this paragraph.

## Paragraph 204: Civilian Complaints, Internal Investigations, and Discipline - Officer Assistance and Support

*PRPD shall ensure that any mental health counseling services provided to PRPD employees remain confidential as consistent with generally accepted practices in the field of mental health care.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Not Implemented | | |

213

## Compliance Targets

Note: This Paragraph is assessed with Paragraph 201.

## Compliance Assessment

The Monitor has found no evidence suggesting that PAE is not Health Insurance Portability and Accountability Act (HIPAA) compliant. All PAE professionals interviewed described scrupulous efforts to maintain patient record confidentiality.

## Pathway Forward

The Monitor refers to the comments above regarding creating virtual access to PAE services, which should combat the strong perceived disincentive among the self-referred to physically visit a PRPB facility for assistance.

# X. Community Engagement and Public Information

During this reporting period, PRPB has continued training on the community policing philosophy through the Reform Unit. The Monitor found that 1 out of the 13 police areas (8%) has fully completed the three training cycles for this program. Additionally, 12 out of the 13 police areas (92%) have completed their first training cycle (Cycle I), while 6 police areas (46%) have completed their second training cycle (Cycle II). Because this training is being conducted by the Reform Unit, it is unclear to the Monitor how this training, while reflective of best practices in community policing training, relates to the Academy's efforts to conduct training on community policing Bureau-wide. It is also unclear to the Monitor how many PRPB personnel have received the Reform Unit's training. Further, it was apparent to the Monitor that while PRPB has made efforts to revise its related policy (GO 805, Encuentros Comunitarios).

PRPB also demonstrated improvement in community outreach through incremental frequency during this reporting period. However, the Monitor notes that additional outreach efforts must be purposefully geared towards education and prevention and must employ multiple educational resources including audio-visual materials to reach broader community sectors. Meaningful outreach endeavors under the SAIC for the police areas of Guayama, Fajardo, Mayaguez, Utuado, San Juan, and Ponce were conducted during this reporting period and can serve as examples of successful outreach efforts for other areas and units. The SAIC outreach efforts in these areas focused on gender-based violence, legal aspects of domestic violence, female self-defense, domestic violence during courtship, and safety within the home. The Monitor's Office further notes that PRPB must expand its outreach efforts by proactively demonstrating its ability to address LGBTQIA+ concerns and recent crime trends to engage stakeholders in prevention and education efforts. PRPB must also work towards further developing and implementing its Community Engagement Module to efficiently document such initiatives and measure their effectiveness.

As in CMR-5, the Monitor reports that the institutionalization of community policing must begin with PRPB's recruitment practices to ensure securing a diverse workforce - one that embodies the values and characteristics of community policing. Full implementation of community policing must take place through redeployment of personnel, including personnel in specialized units, to ensure that core PRPB operations support community policing and problem-solving strategies. This should be done in partnership with external agencies, community advocates, and stakeholders for more effective crime prevention. These practices should also be captured in PRPB's personnel evaluation system, which is currently under evaluation by PRPB to solidify processes.

The Monitor confirmed that CICs, volunteer-based groups of the community which represent the 13 police areas, continue to experience challenges in securing full community representation as required in the Agreement and PRPB policy. Currently there are only three police areas that have obtained full community cross section representation. Two areas are missing two community members, while the remaining eight are missing five to nine representatives. This is concerning to the Monitor's Office because the CICs advise, review, and offer recommendations to PRPB on policies, recruitment, and the implementation of strategies, including advising the Commissioner on ways to make information readily available to the public and increase transparency.

PRPB made progress in CMR-6 by expanding its use of social media and other platforms to keep the public informed. It shared gender inclusive workforce and leadership milestones with the public, which should be replicated moving forward. However, providing information to the public in a meaningful, engaging, transparent, and understandable way is fundamental for PRPB to develop the community's trust and demonstrate accountability. This includes keeping the community abreast of PRPB's directives and new policies, as well as providing straightforward statistics on crimes, including hate crimes and domestic violence, monthly as required by the Agreement. These objectives remain among the Monitor's longstanding concerns, as noted in previous reports. Finally, PRPB must work on its technological deficiencies to keep the public informed of its community-oriented policing initiatives, new policies, and progress towards a sustainable reform. PRPB has yet to comply with most of these requirements.

During this reporting period, the Monitor met with and interviewed various PRPB personnel involved in community engagement and outreach efforts at both the district and area command levels in San Juan, Carolina, Caguas, Humacao, Aibonito, Ponce, Mayaguez, Bayamon, and Aguadilla. Further, the Monitor also observed related trainings, conducted by the Reform Unit, and attended various community events hosted by PRPB.

Community engagement is most effective when the police develop strong ties with communities and their residents and empowers people to seek their assistance as necessary. The police can encourage community members to take an active role in preventing crime through public information and educational initiatives emphasizing preventive measures that can reduce crime and disorder.

Overall, PRPB's compliance with the 13 Community Engagement and Public Information paragraphs assessed during this reporting period reflect similar levels of compliance to what was noted in previous reports. In CMR-5, 38% paragraphs (5 paragraphs) were assessed as partially compliant, in comparison to the current reporting period, where 46% of paragraphs (6 paragraphs) were found to be partially compliant; all other paragraphs are noted as not compliant. See figure 9.



*Figure 9. Community Engagement and Public Information: Paragraph Compliance Status*

## Paragraph 205: Community Engagement and Public Information - General Provisions

*PRPD shall create robust community relationships and engage constructively with the community to ensure collaborative problem-solving, ethical and bias-free policing, and more effective crime prevention. PRPD shall integrate community and problem oriented policing principles into its management, policies and procedures, recruitment, training, personnel evaluations, tactics, deployment of resources, and systems of accountability. PRPD shall engage the public in the reform process through the dissemination of public information on a regular basis.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: Compliance will be determined on two separate but inter-dependent bases: (1) the implementation of paragraphs 206 - 217, and (2) the results of outcome assessments, pursuant to Paragraph 243 of the Agreement.

*Compliance Assessment*

PRPB's policy for community policing (GO 803) under revision during CMR-5, was finalized and approved during this reporting period (October 31, 2021). The Agreement requires the review of this paragraph every six months to determine whether all PRPB members are certified in community policing and problem solving including the S.A.R.A. Model and alliance development.

The Monitor's Office received no evidence in support of a revised curriculum for training developed through SAEA in line with the new GO. PRPB did not provide any supporting documents to prove meeting the 95% threshold of trained personnel during this reporting period.

The Reform Office has been providing training and technical assistance to PRPB through their in-house program, Expansion y Fortalecimiento en la Filosofia de Policia Comunitaria: Adiestramiento y asistencia tecnica (Expansion and Strengthening in Community Policing: Training and Technical Assistance). The training focuses on assistance and support of problem-solving strategies and the development of community alliances. This training also aims to facilitate the application of the S.A.R.A. Model in the field and to increase collaboration between PRPB, the CICs, and Community Safety Councils. It is not clear whether this training substitutes the training through SAEA, which is responsible for the professional development of PRPB. Additionally, the percentage of trained personnel remains unknown to the Monitor's Office.

217

PRPB's recruitment practices require further improvement targeted at securing a diverse workforce, including one that embodies community policing values. PRPB's current strategic plan for recruitment is not in alignment with the philosophy of community policing, as noted in previous reports. The Recruitment Regulation was under review as of the writing of this report. However, the Monitor finds that PRPB's efforts employing diverse recruitment activities within communities have yielded some positive results. The Office of Recruitment carried out recruitment through an open public process in rural municipalities across several wards on the island. While a welcome change, the recruitment plan requires further modifications, including clear advertisement guidelines that are in line with community policing standards. The plan must highlight potential candidates' demonstrated qualifications or skillsets in problem solving, critical thinking, leadership, interpersonal skills, mature judgment, communication skills, and strong ethics. The plan should also include evidence that PRPB consulted with community stakeholders and obtained recommendations to ensure a diverse candidate pool, including underrepresented communities, women, and Dominican nationals.

PRPB's employee performance is documented in ProMedia. ProMedia provides a uniform method to objectively evaluate PRPB members' performance. The Monitor's Office strongly recommends adding additional criteria to better measure employee performance related to community policing activities, work assignments, implementation of the S.A.R.A. Model, and any other tasks or notable work performed in support of community policing. The performance evaluation should include mutually established goals and objectives resulting from prior discussions about professional development between the supervisor and the employee. As mentioned during previous reporting periods, PRPB continues to fall short in this area. Under the current performance appraisal, supervisors may opt to capture community policing endeavors under "other extraordinary work performed". This practice does not support objective and uniform performance measurements. The Monitor notes that a revised Performance Evaluation form was submitted for review under paragraph 229 in November of 2021. The Monitor is currently reviewing the revised related policy, GO 310.

Despite best efforts to recruit new community members, the 13 CICs shared that they are still lacking representation in most police areas. While citizen participation and involvement does vary among the different police areas, the Monitor confirmed a substantial decrease in CIC representation. Committees in some police areas have six to nine open membership opportunities. The Central CIC, although fully constituted, has representation from only 7 out of 11 (63%) community sectors.

PRPB demonstrated improvement in community outreach during the CMR-6 period. The Monitor notes that further outreach efforts must be purposefully geared towards education and prevention and employ diverse educational material (including audio-visual material), which will make information accessible to a broader community base.

The Agreement and related policy (G0 805) requires at least one open meeting (Encuentros Comunitarios) per year to inform the public of their rights regarding a) unreasonable searches and seizures, b) UOF, c) filing civilian complaints, d) reporting allegations of police misconduct or discrimination, and e) commending officers in the performance of their duties. There has been some improvement in this area compared to the CMR-5 reporting period. This reporting period, PRPB held three Encounters in the police areas of San Juan, Aguadilla, and Carolina. To reach substantial

compliance, however, Community Encounters must be held in all 13 police areas, and the events must be widely publicized to ensure broader community representation. Further, to be compliant, PRPB should also publish a calendar of scheduled Encounters.

PRPB also made progress in public communication as it increased use of social media to keep the public informed. PRPB shared some milestones with the public and has shown that their workforce and leadership is gender inclusive. However, PRPB is still unable to report crime statistics adequately or provide this information to the public in an efficient manner. The Agreement requires communication of accurate crime statistics, including those related to hate crimes, monthly. A review of PRPB's website revealed that data for Type I crimes for each police area were available for January 2022, along with a crime comparison. However, no monthly statistics for the following months are available to the public. The Monitor's Office notes that the lack of publicly available information on hate crimes is a longstanding issue.

During the CMR-5 reporting period, the Crime Statistics Division reported that statistics were collected, but were not publicly available due to IT limitations. The Superintendency of Managerial Services (SASG) assured that they were working on rectifying the issue through IT solutions. During this reporting period, however, the Monitor did not receive any documentation from PRPB's Crime Statistics Division that would indicate that they resolved the issue and made hate crimes statistics publicly available.

PRPB relies on two systems to officially inform the public - the Virtual Library and its website. The Monitor found discrepancies between the information on PRPB's website and the Virtual Library, such as repealed GOs on one site and superseded ones on the other.[20] PRPB's Virtual Library, partially launched during CMR-5, provides limited resources to keep the public informed beyond PRPB's GOs. There is no information on crime statistics and crime trends or on the Police Reform. The library has minimal operational availability, and documents are available only in Spanish. The Monitor further notes that the Virtual Library does not have the capability to allow members of the public to comment on PRPB policies or review calendars of community events including Community Encounters (open meetings), outreach activities, CIC meetings, and open recruitment announcements.

PRPB made more progress on GO 311 (Public Information Program on Complaints and Acknowledgments) in facilitating how administrative complaints are filed as well as how PRPB are commended for outstanding work. The Press Office, in coordination with SARP, now develops strategies for effective broadcasting to inform the public about their rights to report any illegal, arbitrary, and/or discriminatory practices or alleged misconduct by PRPB. The Press Office in coordination with the SASG, developed mechanisms through which community members can recognize and commend PRPB for outstanding performance. Such recognition, once filed, becomes part of the PRPB's personnel file and is kept in the record for five years, according to the GO. However, no evidence of implementing these efforts were shared with the Monitor's Office.

*Pathway Forward*

The institutionalization of community policing must begin with PRPB's recruitment processes; its practices must ensure a diverse workforce, one that embodies community policing values. Such practices

---

[20] See GO 803, GO 624, GO 605 on both sites as examples.

should be captured in PRPB's evaluation system. PRPB's efforts in successful implementation of the policy should be done in partnership with external agencies, community advocates, and stakeholders. Through such partnerships, PRPB can develop organized strategies to promote problem-solving and enhance professional competencies for more effective crime prevention. The implementation and delivery of training and documentation in alignment with PRPB's current policy is critical to provide PRPB with the necessary tools for consistent and appropriate services. PRPB must reassess its staffing allocation and deployment of personnel, including personnel in specialized units, to ensure that core operations support community policing and problem-solving strategies. Finally, PRPB must work on its technological deficiencies to keep the public informed of its community-oriented policing initiatives, new policies, and progress towards a sustainable reform.

## 1. Community Oriented Policing

Progress in improving compliance with paragraphs 206 and 207 remain the same as was noted in CMR-5. Although PRPB has implemented its community policing policy, GO 803, it has yet to develop the related training (and retraining) courses. Further, PRPB has also not yet implemented its 2018 Staffing Plan and as a result has not demonstrated that it has successfully reassessed its staffing allocation and personnel deployment to support the Bureau-wide community policing and problem-solving goals. Despite this, some work in the practice and use of the S.A.R.A Model at the district and precinct levels was documented and reviewed by the Monitor.

### Paragraph 206: Community Engagement and Public Information - Community Oriented Policing

*PRPD shall reassess its staffing allocation and personnel deployment to ensure that they support community policing and problem-solving goals. PRPD shall employ a Scanning, Analysis, Response, and Assessment ("SARA") model to structure its problem-solving approach.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | Met | Missed |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraph 206. | ☒ Met | ☐ Missed |
| 2. Community policing and problem solving trainings are consistent with approved policies. | ☐ Met | ☒ Missed |
| 3. 95% of sampled PRPB members are trained and certified in community policing and problem solving, including the SARA Model. | ☐ Met | ☒ Missed |

220

| | | |
|---|---|---|
| 4. Staff allocation and personnel deployment plan are aligned with community policing and problem solving. | ☐ Met | ☑ Missed |
| 5. 95% of sampled PRPB precincts, districts, and units implement the SARA Model. | ☐ Met | ☑ Missed |
| Note: This paragraph is assessed together with Paragraph 13 of the Agreement. | | |

*Compliance Assessment*

During CMR-6, PRPB updated and approved its Community Policing policy (GO 803) on October 31, 2021. However, the Monitor did not receive any documentation to show that the training associated with this policy has been developed and/or conducted during this assessment period. The Monitor's Office gives credit to the Reform Unit on its community policing training, Expansion y Fortalecimiento en la Filosofia de Policia Comunitaria: Adiestramiento y asistencia tecnica (Expansion and Strengthening in Community Policing: Training and Technical Assistance). The Monitor has reviewed the training curriculum offered through the Reform Unit and found that it offers a comprehensive didactic program. It is in alignment with adult-learning methodologies, and there is an appropriate balance between the traditional lecture structure, case-scenarios, and interactive exercises, including field experiences and practice. This training program targets area commanders, zone commanders, district/precinct directors, and alliance facilitators. It also offers an opportunity to enhance leadership and contribute toward professionalization and organizational transformation.

Evidence in support of continued training through the Reform Unit revealed that 1 out of the 13 police areas (8%) has fully completed three training cycles of the program. Additionally, 12 out of the 13 (92%) police areas completed their first training cycle (Cycle I), while 6 (46%) police areas have completed their second training cycle (Cycle II) during the reporting period. Other police areas are scheduled for additional training subject to assessment during CMR-7.

PRPB's resources and personnel assigned to support community policing will need to be reassessed. Proper deployment of personnel must not be limited to one or two officers per district/precinct given that crime trends and factors influencing delinquent behaviors constantly change. Deployment practices must be responsive to community needs and extended to officers within their residential community. The Monitor's Office finds that the information provided by PRPB does not indicate a robust staffing allocation strategy for the purpose of enhancing community policing efforts.

The Monitor's Office found a significant increase in the use of the S.A.R.A Model at the district and precinct levels. However, the deficiencies outlined during CMR-5 still hold true for CMR-6. Most of the reviewed documents indicate significant deficiency in the analysis and specificity of the problem.[21] These deficiencies signify the need to develop full competencies in concept integration to draw appropriate responses and ultimately, assess effectiveness. The Monitor also notes that PPR-803.4 (Implementation of the Model) was modified, but personnel in the districts and precincts continue to use the old and new form interchangeably. Additionally, PRPB's submitted documents during this reporting period failed to consistently include PPRs-801.1 (Referral) and PPRs-803.2 (Monthly Registry). While most PPRs-803.4

---

[21] CMR-6 CO-64, 221, 228, 359, 404-412, 442, 1616, 1711.

were completed, they centered on quality-of-life issues, such as vehicle scraps and clandestine or illegal landfills.

Notably, the Monitor's Office found that the Barceloneta district of Arecibo submitted an incomplete PPR-803.4 and that the districts of Orocovis and Culebra did not engage in the implementation of the model during this assessment period despite training. Additionally, PRPB failed to provide information on the implementation of the S.A.R.A. Model for the unit at La Fortaleza. As in previous reports, SARP and SAEA also did not implement the model.[22]

*Pathway Forward*

The Monitor recommends that PRPB consider crime trends and community needs when deploying personnel and that PRPB readily assess these trends and needs on a continual basis. Further, PRPB should implement its 2018 Staffing Plan and determine if personnel allocation recommendations remain relevant. The Monitor also recommends that the implementation of the S.A.R.A. Model include addressing crime and disorder and not be limited to addressing quality of life issues broadly.

Although the Monitor is aware of the substantial implications that PRPB is encountering due to supervisory shortages, supervisors need to assist in the analytical process of the S.A.R.A. Model to facilitate its implementation and substantiate the process as it continues to strengthen its community engagement efforts. Skill development is an integral part of training. As a result, the training curricula must consider human behavioral aspects, such as why people react in certain situations or circumstances, environmental stressors, and focus the development of problem-solving competencies to facilitate achieving the goals of community policing on a behavioral level.[23]

## Paragraph 207: Community Engagement and Public Information - Community Oriented Policing

*PRPD shall continue to conduct outreach to a broad cross-section of community stakeholders to establish extensive problem-solving partnerships and develop cooperative strategies that build mutual respect and trusting relationships.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually for Compliance Targets #1 and #2. Bi-annually for all other Compliance Targets. |
| Practice: | Not Implemented | | |

*Compliance Targets*

---

[22] This is critical to improve administrative and operational practices; GO 803§IV(C)(3)(a).
[23] Engel & Worden, 2003; Glenn et al., 2003; Haarr, 2001

222

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraph 207. | ☑ Met | ☐ Missed |
| 2. Community partnerships and problem-solving strategies trainings are consistent with approved policies. | ☐ Met | ☑ Missed |
| 3. 95% of sampled PRPB members are trained and certified in community partnerships and problem-solving strategies. | ☐ Met | ☑ Missed |
| 4. 95% of sampled districts, precincts, and units conduct outreach to a broad cross-section of community stakeholders. | ☐ Met | ☑ Missed |

*Compliance Assessment*

PRPB's alliances, partnerships, and outreach endeavors fall under GO 803 (Community Policing), which was updated and approved during this reporting period.

PRPB did not submit SAEA's training curriculum and certificates in support of the revised policy for assessment compliance. For the Monitor to assess compliance, PRPB needs to demonstrate how alliances and meaningful partnerships are being developed, along with certifications for trained personnel.

Under the current policy, alliances and partnerships should be developed through PRPB and their outreach in public/private sectors, faith-based groups, the academia, and the media to: a) improve its relationship with the community, b) strengthen support and social networks, c) consolidate initiatives to improve quality of life, d) reduce criminal activity, and e) increase crime solve rates. The Agreement requires reaching out to stakeholders to establish problem-solving partnerships and develop collaborative strategies that facilitate mutual respect and trusting relationships.

To reach these objectives during this reporting period, PRPB engaged in a myriad of activities, some geared towards crime prevention, school orientations, workshops, and community interactions civic in nature through interagency efforts and through health and safety fairs. The Monitor attended the Health and Safety Fair held at Plaza Las Americas during the week of February 21, 2022. This was a state and federal interagency effort with coordination from the FBI, Drug Enforcement Agency (DEA), and the Department of Public Safety (DPS) represented by the Fire Department, Bureau, EMS, and the Disaster Relief Bureau. PRPB was represented through FURA, the Canine Division, Drugs, Animal Control, SAIC-Domestic Violence Unit, Auxiliary Superintendency of Field Operation (SAOC) through NIE, and Cyber Crime Unit, along with the Office of the Reform.  Information tables and displayed written material were available to the public on demand. The Monitor noted a lack of audio-visual materials, such as on-going video/audio recordings, focusing on education, awareness, and prevention topics, and aiming to reach broader community sectors and appeal to diverse groups. The Monitor recommends additional outreach strategies to supplement the information tables, including scheduled live briefs on safety, crime prevention, gender violence, K-9 demonstrations, UOF discussions, equal protection and non-discrimination, administrative complaints/commendations walk-throughs, tips on avoiding fraud, and the police reform, among other topics. By evaluating the effectiveness of specific outreach methods, PRPB can target its resources toward the best strategies.

The Monitor's Office found meaningful outreach endeavors under SAIC for the police areas of Guayama, Fajardo, Mayaguez, Utuado, San Juan, and Ponce. The Monitor reviewed activities focused on gender-

based violence, the legal aspects of domestic violence, female self-defense, domestic violence during courtship, safety within the home, domestic violence issues for school personnel, child abuse, and stolen vehicles, among other topics of relevancy to the community. Most workshops, activities, or initiatives did not include a work plan encompassing the scope of the endeavor/topic, content material, attendance sheets, and/or outcome reports. The only well-supported effort was the workshop held on the legal aspects of domestic violence.

The Monitor also reviewed Bureau of Community Relations (BCR)'s awareness, prevention, and education outreach activities under the Athletic League (LAP), "Somos Parte de Tu Gente" (We are part of your People), which is geared towards community empowerment, awareness, prevention education, and recreation as part of the "Plan Integral de Seguridad" (Comprehensive Safety Plan). Under this plan, school drug prevention workshops in Fajardo and youth programming in Vieques, Culebra, Bayamon, San Juan, and Caguas were conducted. The Monitor is encouraged by the community safety councils' involvement and participation in some of these outreach activities.

The Monitor's Office also notes that contrary to GO 803 directives, some police areas have continued to document orientations and workshops under PPR-621.2. (Other Incidents or Services). This is perhaps due to the lack of an organized process to address, and record implemented strategies. In the area of alliances development, the Monitor is also encouraged by SAEA's engagement and participation in developing an alliance with MOSPBA (Movimiento Social Pro Bienestar Animal) for awareness, prevention, and education against animal cruelty, therein establishing the exchange of knowledge and resources in support of GO 641 (Animal Protection and Wellbeing) and Law 154. The agreement which is supported by a MOU is in effect for a year.

Formalizing meaningful and significant alliances must be expanded through all auxiliary superintendencies, while still placing value on informal alliances, for presence, community integration, credibility, and trust, in alignment with organizational transformation. Further review of submitted documents indicate that the district of Cidra in Caguas sustained its alliance with UBUNTU, which is responsible for the implementation of community self-development and empowerment. Arecibo developed an alliance with Accion Social for community leadership development and self-sufficiency, operating in partnership with other organizations. However, none of these alliances were supported by a collaborative agreement or MOU in compliance with policy. Additionally, the Monitor reviewed a submitted memorandum from the P.A.R.E. (Prevencion, Apoyo, Rescate, Educacion) Committee against gender violence, which is engaged in the investigation of feminicides and trans-feminicides per local public policy. The extent of PRPB's participation in this alliance is unknown to the Monitor's Office because no supporting documents were included in the memorandum.

The Monitor also notes that during site visits and field interviews, PRPB attested to the development of alliances in the police areas of Aibonito, Carolina, and Aguadilla, but documentation to validate these assertions such as corresponding PPRs (803.5 to document formal alliances, MOUs; PPR-803.6 for informal alliance and public reports) was not submitted by PRPB during the reporting period. Additionally, during CMR-5, the Monitor reviewed alliances with Proyecto Escudo for victims of gender violence in Fajardo, Mano Amiga in Comerio, Desarrollo Local de la Montana in Aibonito, and Solo por Hoy in San Juan among other alliances. PRPB failed to submit documentation in support of their

224

sustainability or expiration as part of CMR-6. Interviewed PRPB personnel in Humacao, Ponce, and Mayaguez reported not having developed any alliances during this reporting period. The Monitor's Office finds that PRPB's reported alliances during this assessment period is limited, if not minimal, which is not a strong indicator of successful alliance development strategies with the community.

Per GO 803 (Community Policing), all outreach activities and alliances, formal and informal, as well as the implementation of the S.AR.A. Model and all PPRs, are to be captured in an electronic module developed by PRPB. The Monitor finds that none of these activities have been recorded through the module thus far. During CMR-5, the Monitor's Office attended and observed an orientation session held by the Reform Unit where this application was introduced to pre-selected PRPB personnel. The selected personnel were a representative group from different superintendencies who agreed to participate on a trial basis. Under the trial stages, PRPB members were to perform mock exercises for a period of two weeks and provide feedback to the Reform Unit for final implementation. The Reform Unit certified that the application was undergoing internal evaluation before its adoption into the operational program. Field interviews randomly conducted by the Monitor's Office revealed that the modules are not operational. One agent reported that the module does not have the capacity to upload formal alliances, while most of the respondents stated having no knowledge about the availability or existence of the modules.

On March 31, 2022, the Reform Unit submitted a memorandum to the Monitor's Office where it reported that the Bureau of Technology (BT) developed seven modules under Sistema de Policia Comunitaria (Community Policing System) that were available to all PRPB members, including commissioners and auxiliary superintendencies. These modules are meant to serve as tools to plan, direct, and evaluate initiatives and programming with efficiency and effectiveness and to capture: 1) formal alliances, 2) orientations and outreach, 3) quality of life issues, 4) informal alliance reports, 5) problem-solving under the S.A.R.A. Model, 6) S.A.R.A. Model evaluation, and 7) S.A.R.A Model self-study. After seven months of trial, the system remains in its initial stages of development. According to the timeline in the memorandum, the system was expected to be available and fully implemented by May 2022. Unless this system becomes fully operational, PRPB will be unable to effectively demonstrate proactive efforts at mobilizing resources to transform relationships and develop networks to collectively solve the problems expected to be solved by the police, prevent delinquency, and improve the quality of life within communities.

*Pathway Forward*

PRPB must actively reach out to the public through community organizations, the private and public sector, and other key stakeholders to build relationships and work on organized strategies. Such efforts must focus on problem-solving and enhancing professional competencies to encourage and sustain community engagement. The Monitor urgently recommends streamlining the reporting of outreach activities and developing partnerships to facilitate uniform and effective outcome measurements. The Monitor reiterates the need to review the University of Kansas Community Toolbox for additional guidance and support.[24]

---

[24] https://www.ctb.ku.edu A framework for Collaboration among Community Partnerships.

PRPB must proactively demonstrate its ability to address LGBTQIA+ issues and consider recent crime trends to engage stakeholders in prevention and education efforts, and efficiently document such initiatives. The Monitor also recommends the development of structured workplans to support outreach activities, including involving community advocates among stakeholders for joint strategies and extensive problem-solving alliances. Community outreach must include strategies to respond to quality-of-life issues specific to target communities and consider roadblocks that interfere with the development of respectful and trusting relationships. Further, the Monitor also looks forward to reviewing PRPB's development and implementation of the related trainings and deployment of the community policing system.

## Paragraph 208: Community Engagement and Public Information - Community Oriented Policing

*PRPD shall develop and implement mechanisms to measure its community partnerships and problem-solving strategies and assess their effectiveness. PRPD shall prepare a publicly available report on at least an annual basis that details its community partnerships, meetings, and problem-solving activities, including specific problems addressed and steps taken by PRPD and the community toward their resolution. The report also shall identify obstacles faced and recommendations for future improvement.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2020 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Formal Community Partnership module incorporates all the requirements of Paragraph 208. | ☐ Met | ☑ Missed |
| 2. 100% of PRPB annual reports are made publicly available. | ☐ Met | ☑ Missed |
| 3. Annual report incorporates all the requirements of Paragraph 208. | ☐ Met | ☑ Missed |

*Compliance Assessment*

GO 803 (Community Policing) establishes community partnerships and alliance development as core elements in community policing and requires documenting and capturing all outreach activities electronically, developing formal and informal alliances, and implementing the S.AR.A. Model. The Agreement also requires mechanisms that measure community partnerships and problem-solving strategies and assess their effectiveness. During CMR-5, PRPB reported being in the process of implementing an electronic platform, Community Policing System, to capture and measure this requirement. The Monitor notes there has been little to no progress in launching this system. As verified

226

by PRPB, this system is still in the development stages. Its successful launch and continued technological support will assist PRPB in reaching substantial compliance moving forward.

A review of PRPB's annual report regarding developed alliances through various state, local, and community-based organizations indicate that the last report was rendered by the Bureau of Community Relations on January 10, 2020. This report excluded key components, such as meetings and activities conducted, problems addressed, obstacles encountered, steps taken toward resolution of problems, and recommendations for improvement. Per policy, the annual report is due to the Assistant Commissioner's Office on or before January 31st of each year. PRPB did not provide any evidence of having developed a report for 2021. The Monitor reiterates that the annual reports must include meetings and activities conducted, problems addressed, obstacles encountered, steps taken toward resolution of problems, and recommendations for improvement as outlined in the Agreement. The Monitor concludes that PRPB is not compliant with this paragraph.

*Pathway Forward*

The Monitor's Office maintains its recommendation that PRPB's Community Policing System must be fully operational to document all outreach efforts, alliance development, and the implementation of the S.A.R.A. Model before PRPB can reach substantial compliance. PRPB personnel must be proficient in using the system with the help of expedited training. The training should ensure the reliability and validity of the model and stress the importance of consistency in compiling meetings and activities conducted, problems addressed, obstacles encountered, steps taken toward resolution of problems, and recommendations gathered for improvement in the process.

## 2. Community Interaction Councils

The CICs are volunteers, most of them professionals in a variety of fields, representing diverse members of the community within the 13 police areas. Per GO 803 (Community Policing), the CICs advise, review, and provide recommendations to PRPB on policies, recruitment, and implemented strategies, among other initiatives. Their recommendations are based on the experiences and priorities of communities that they represent and are developed in collaboration with community leaders and safety councils with whom they engage. Per policy, the CICs also advise the Commissioner on ways to inform the public and increase transparency.

The CICs have a spokesperson, who represents the 13 police areas at the central level. Those spokespersons, together with the Community Safety Council's president, the Executive Director, and a representative from a civil rights organization, who is appointed by the Commissioner, constitute the Central CIC.

### Paragraph 209: Community Engagement and Public Information - Community Interaction Councils

*PRPD shall continue to maintain Community Interaction Councils ("CICs") jointly with community representatives to facilitate regular communication and cooperation between PRPD and community leaders at the local level. CICs shall meet, at a minimum, every three months.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2020 – September 2021 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

## Compliance Targets

| | | |
|---|---|---|
| 1. PPRB policies require it maintain the CIC and they meet at least every three months. | ☒ Met | ☐ Missed |
| 2. PRPB maintains CICs as required by this Paragraph. | ☐ Met | ☒ Missed |

## Compliance Assessment

The CIC policy (GO 801) was finalized and approved during this reporting period along with their Internal Manual of Regulations. The policy requires monthly meetings to be held to discuss initiatives and work plans for relevant police areas. However, for compliance purposes, only three meetings for each committee, per police area, are required to be held in one semester. Based on the documents submitted by PRPB, the Monitor's Office finds that the police areas of Aguadilla, Bayamon, Humacao, and Mayaguez held the minimum number of meetings required during this reporting period. The police areas of Aguadilla and Humacao were most successful at delivering meeting continuity throughout the reporting period. Aibonito held two meetings. Aguadilla, Humacao, and Aibonito were effective in coordinating, delivering, and facilitating their "Conversatorios". The Humacao and Aguadilla CICs were most successful in substantiating efforts through minutes, Conversatorios' publicity, work plans, and outcome results. The Humacao CIC held two "Conversatorios" through Radio Victoria 840, a local radio station with simultaneous transmission through Facebook live.

Based on the Monitor's interviews with San Juan and Ponce CIC members it was reported that at least three required meetings were held in a hybrid format, considering the COVID-19 pandemic. Documentation of these meetings were not submitted to the Monitor for review. Carolina reported having held two informational meetings due to lack of quorum but failed to submit evidence in support of these meetings. The Utuado CIC spokesperson reported that they attempted to hold the three required meetings, but two of them were cancelled due to lack of quorum and the third one was cancelled due to a committee member's relative passing.

Interviews with CIC agent facilitators and members indicated that the topics covered by "Conversatorios" included fraud, Law 408-Police Role, child pornography, protective orders, functional diversity, illegal appropriations, mental health issues, and CIC recruitment. Interviewees noted that most of their scheduled Conversatorio will be held during the late spring and early summer months, which corresponds with the CMR-7 reporting period.  The Monitor did not receive any documents for the CICs in Mayaguez, Arecibo, Guayama, Bayamon, Carolina, San Juan, Fajardo, Caguas, or Ponce and thus, could

228

not verify the reported topics during interviews. The Monitor's Office notes its concern with such marked inconsistencies across police areas and the substantial decrease in CIC participation. PRPB must undertake preemptive measures and resolve this noncompliance by reengaging and reconnecting with the community through the CICs.

There is a continued challenge to secure full community representation within the CICs, as required in the Agreement and outlined in PRPB policy. The police areas of Aibonito, Humacao, and Mayaguez are the only areas with fully representative CICs. The Central CIC, although fully constituted, only has representation from 7 out of 11 (64%) community sectors, as required in the policy. As in the past, the Monitor is concerned about the police areas of Guayama, Utuado, and Aguadilla, which are missing six to nine members, while Bayamon, Caguas, Carolina, Ponce, and Fajardo are missing three to five members each. Arecibo and San Juan are in a better position, missing one and two members, respectively. No referrals for new candidates were submitted for the Monitor's review for any of the referenced areas.

Interviews conducted with some CIC members, area commanders, executive directors, and facilitators in the areas of Humacao, Mayaguez, Aibonito, Aguadilla, San Juan, and Bayamon revealed a common concern in securing full committee representation. Most of them reported multiple efforts and initiatives to recruit new members of the community for collaborative efforts. Recruitment was carried out during "Conversatorios," through public service broadcasting, local shopping malls, informational tables during outreach, direct contact, and cold-calling through faith-based organizations. However, most potential candidates cited other commitments, job responsibilities, or lack of motivation to take on the responsibilities of community representation. Insufficient documentation signals that there are significant disparities in efforts to secure full CIC representation. The Monitor's Office notes that Ponce, Humacao, and Aguadilla are under new leadership and the transition might have caused an impact on the organizational operations of the CICs. Area commanders and CICs need to develop innovative and proactive strategies to secure potential candidates. The Monitor's Office recognizes the support and active participation given to the CICs by the area commanders and representatives for Bayamon, Humacao, and Aguadilla. The Monitor is also encouraged by the participation and insertion of the Community Safety Councils within the CICs activities as promulgated in their Internal Rules and Regulations.

*Pathway Forward*

PRPB must help committees overcome the common challenge of securing a representative cross-section of the community. The Monitor's Office notes that area commanders, agent facilitators, and CICs must jointly develop innovative strategies to attract community members in joining efforts to meet the needs of their representative groups. Proactive measures must be taken to ensure organizational commitment at all levels for motivational transformation. Strategies and work plans must be jointly developed that focus on the specific needs of the police areas while also documenting all efforts. The Monitor also recommends securing potential candidates through local groups, community organizations, referrals, school personnel, parents/guardians, and faith-based groups.

229

## Paragraph 210: Community Engagement and Public Information - Community Interaction Councils

*In conjunction with community representatives, PRPD shall develop a mechanism to select the members of CICs, which shall include a representative cross section of community members and PRPD officers.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2020 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. PPRB has developed a mechanism to select the members of the CICs in accordance with this Paragraph. | ☑ Met | ☐ Missed |
| 2. Selection process for CIC members complies with Paragraph 210 and relevant policies. | ☑ Met | ☐ Missed |

### Compliance Assessment

GO 801 (CICs) outlines mechanisms for selecting CIC members in accordance with the requirements of the paragraph. The Monitor did not receive any documents for review in relation to CIC candidates who applied during the reporting period. Under the existing policy, PRPB must announce calls for application to serve on CICs and specify that the positions are open to all residents of Puerto Rico. The announcements are published and advertised through the press, mass media, and social media platforms during June of the corresponding year and remain open for 30 consecutive days. Subsequent announcements are published every two years from the date of the last announcement. Interviewed CIC members, facilitators, and area commanders in Bayamon, Carolina, Aibonito, Caguas, Mayaguez, Ponce, San Juan, Humacao, and Aguadilla noted that the outlined procedure presents challenges. Biennial recruitment means that open recruitment is not available to fill vacancies as the need arises, forcing the committees to opt for alternate options.

### Pathway Forward

The Monitor's Office recommends revising the policy to allow for open recruitment based on the needs and demands of each police area rather than on a fixed two-year term. This flexibility would allow CICs to bridge the gap in securing full community representation and provide other alternatives, such as the use of potential candidate referrals. PRPB must proactively assist and support the committees in seeking new candidates to fill representative vacancies through their own resources, including the assistance of their respective agent facilitators and area commanders.

230

## Paragraph 211: Community Engagement and Public Information - Community Interaction Councils

*PRPD shall allocate sufficient resources and authority to ensure that CICs possess the means, staffing, access, training, and mandate necessary to fulfill their mission and the requirements of this Agreement. The operating budget shall be revisited on an annual basis in consultation with the CICs.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually for Compliance Targets #1 and #2. Bi-annually for all other Compliance Targets. |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Policies related to CICs incorporate the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. CIC orientation course is consistent with approved policies. | ☐ Met | ☑ Missed |
| 3. PRPB makes CIC orientation available to all members of the CICs. | ☐ Met | ☑ Missed |
| 4. 85% of CICs possess the means, staffing, and access necessary to fulfill their mission and the requirements of this Agreement. | ☐ Met | ☑ Missed |

### Compliance Assessment

The Monitor has reviewed GO 801 (CICs) and finds it meets the requirements of this paragraph. The Monitor finds that the CICs for Utuado, Aguadilla, Aibonito, Mayaguez, and Humacao were the only areas attesting to possessing the means and access necessary to fulfill their mission. CIC members interviewed in Mayaguez and Aguadilla stated that not all committee members have obtained identification cards to facilitate their service, though the CICs generally possess satisfactory means and resources. The Monitor notes that the identification cards are imperative for conducting official business and legitimate processes. The Bayamon CIC submitted documentation in support of needs for equipment and supplies to fulfill their mission. During the Monitor's interviews, San Juan and Ponce CIC members attested to the need for an available and reliable vehicle to fulfill their mission (the Monitor reviewed a photograph from one of the CIC members demonstrating that the present vehicle lacks a working seatbelt, compromising the safety of its occupant).

PRPB provided no documentation for the Fajardo, Guayama, Carolina, Caguas, and Arecibo CICs to determine resource needs. PRPB is encouraged to revisit its operating budget to address the needs of all CICs.

During CIC interviews, members reported that training and retraining orientation (multi-themed workshops) were limited to one training: crowd control, facilitated through SAEA. Based on the feedback received by the Monitor, the CICs were very pleased with the delivery and quality of the training. The

231

Monitor reviewed the contents of the training and instructional material submitted by SAEA, finding it adequate and appropriate for the CICs. The Monitor recommends this training as a requirement within the multi-themed workshops in compliance with GO 801. At the central level, however, the Community Relations Bureau certified that no trainings were available to the CICs during this reporting period, as the workshops are undergoing revision by SAEA. This certification contradicts the reports from the CICs, and the documents submitted by SAEA.

As in CMR-5, the Monitor notes that until CIC candidates complete the multi-themed workshops per policy, they cannot be confirmed as CIC members. This issue requires expedited attention, considering the need for full CIC representation in most police areas. The Monitor reiterates that such inefficiency hinders CIC motivation and hampers their valuable and continued contributions to PRPB. The Monitor further notes that training and workshops for policy, directives, and procedures is SAEA's sphere of competency. SAEA bears ultimate responsibility for ensuring competence and facilitating the necessary access to training for CICs to fulfill their mission and comply with the Agreement.

*Pathway Forward*

The Monitor's Office recommends that PRPB conduct an expedited needs assessment for training to develop a complete instructional program for the CICs in support of the GO and compliance with the Agreement. The Monitor's Office reiterates its recommendation of facilitating CIC training through other police areas for efficacy, productivity, and efficiency.

## Paragraph 212: Community Engagement and Public Information - Community Interaction Councils

*PRPD shall work closely with CICs to develop a comprehensive community policing approach that collaboratively identifies and implements strategies to address crime and safety issues. In order to foster this collaboration, PRPD shall share appropriate information and documents with CICs, provided adequate safeguards are taken not to disclose confidential or otherwise law enforcement sensitive information. PRPD shall seek CIC assistance, counsel, recommendations, or participation in areas including:*

*a) reviewing and assessing the propriety and effectiveness of law enforcement priorities and related community policing strategies, materials, and training;*

*b) reviewing and assessing the propriety and effectiveness of PRPD policies on matters such as discriminatory policing, search and seizure, use of force, the civilian complaint process, and victim services;*

*c) reviewing and assessing concerns or recommendations about specific PRPD policing tactics and initiatives;*

*d) providing information to the community and conveying feedback from the community to PRPD;*

*e) advising the Superintendent on recruiting a qualified, diverse workforce; and*

*f) advising the Superintendent on ways to provide data and information, including information about PRPD's compliance with this Agreement, to the public in a transparent and public-friendly format, to the greatest extent allowable by law.*

| Compliance Status | Assessment Schedule | |
|---|---|---|
| Not Compliant | Review | October 2020 – September 2021 |

| | | | |
|---|---|---|---|
| Policy: | Not Implemented | Period | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. PRPB developed a community policing approach working closely with CIC as per the requirements of the paragraph. | ☐ Met | ☑ Missed |
| 2. PRPB protects confidential and law enforcement sensitive information in documents and information it shares with the CICs.. | ☐ Met | ☑ Missed |
| 3. Every six months, PRPB sought assistance, counsel, recommendations or participation from the CICs, collectively, at least once in all areas specified by the Paragraph. | ☐ Met | ☑ Missed |

### Compliance Assessment

As in CMR-5, PRPB failed to provide evidence supporting the development of comprehensive community policing methods in collaboration with the CICs. The documents reviewed by the Monitor, along with interviews of randomly selected CIC members and agent facilitators, revealed that only one policy was shared with the CICs to gather their recommendations and revisions (GO 623 Hate Crimes). A Ponce CIC member reported that the committee reached consensus on recommendations and submitted them to PRPB but received no feedback. CIC members from Mayaguez, San Juan, Carolina, and Utuado reported not receiving any policies from PRPB to review during this reporting period. Feedback received from interviewed CIC members revealed perceptions that PRPB disregards the committees' resourcefulness, expertise, and availability to bridge the gap between the police and the community and to work constructively towards the institutionalization and sustainability of the police reform.

The Monitor notes that little, if any, collaborative work has been sought or conducted towards identifying and implementing strategies to address crime and safety issues. No work plans or structured initiatives were available for the Monitor's review on effective and adequate implementation of strategies to address safety concerns, crime, and disorder in collaboration with CICs. No evidence was found in support of CIC's advisement or recommendations to the Commissioner on recruitment or public outreach and information nor did the Monitor receive evidence of PRPB's compliance with the requirements per policy or with the Agreement related to the enactment of adequate safeguards against the disclosure of confidential or sensitive information in CIC reports. PRPB also did not make adequate effort to inform CICs about PRPB's compliance with the Agreement or provide CICs with the opportunity to share concerns and feedback on compliance. Therefore, the Monitor finds PRPB non-compliant with this paragraph.

### Pathway Forward

The Monitor reiterates the recommendation that PRPB document involvement from the area commanders with CICs, and their participation in creating initiatives and developing strategies and work

plans to address crime and safety concerns in collaboration and consultation with CICs. CICs are community members who have first-hand knowledge of specific needs and concerns from the community, while PRPB has information on crime statistics and trends. Both can join efforts and work towards a common goal that benefits the community.

## Paragraph 213: Community Engagement and Public Information - Community Interaction Councils

*CICs shall memorialize their recommendations in an annual public report that shall be available in PRPD facilities and on the official web pages of the Commonwealth of Puerto Rico and PRPD. The report shall include appropriate safeguards not to disclose confidential or otherwise law enforcement sensitive information and to protect sensitive personal or private information.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2020 – September 2021 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. PRPB published 100% of CICs annual public report with recommendations included are available on web pages of the Commonwealth of Puerto Rico and the PRPB. | ☐ Met | ☑ Missed |
| 2. All CICs annual reports do not disclose confidential or otherwise law enforcement sensitive information and it protects sensitive personal or private information. | ☐ Met | ☑ Missed |

### Compliance Assessment

Pursuant to GO 801 (CICs) and the Agreement, CICs must compile all activities and recommendations made per police area in a semiannual assessment period and capture all efforts through the year in an annual report. This report must be made available for publication on or before January 31st annually. During prior assessments, CICs compiled their recommendations in a semiannual report in preparation for their final report. PRPB failed to submit any documents in support of this paragraph to determine compliance. Some of the CIC members interviewed asserted having submitted their semiannual reports, but there were no documents available for the Monitor's review in support of this assertion.

A search of PRPB's Virtual Library revealed that the CIC's report for 2020 was filed on January 31, 2021, as required. However, no other report has been filed in compliance with 2021 annual report requirements. The Central CIC failed to render their semiannual report for the period of July-December, as required in the GO. As a result, PRPB is not compliant with this paragraph.

234

*Pathway Forward*

The Monitor reiterates the need for PRPB to comply with the policy requirement of compiling semiannual CIC reports that contribute to their annual report. The Monitor recommends seeking assistance from BT to bridge any possible gaps within the mechanisms for annual publications.

## 3. Public Information

Providing information to the public in a meaningful, engaging, transparent, and understandable way is fundamental for PRPB to develop the community's trust and demonstrate accountability. This includes keeping the community abreast of PRPB's directives and new policies, as well as providing straightforward statistics on crime, including hate crimes. These objectives remain among the Monitor's chief concerns, as noted in previous reports. The Agreement is very specific and requires monthly public dissemination of accurate and updated crime statistics, including statistics on hate crimes and domestic violence. PRPB has yet to comply with this requirement.

PRPB is relying on two systems to inform the public officially and formally - the Virtual Library and its website. These two systems are managed by the Press Office and BT. Informing the public is a responsibility PRPB has discharged onto the Press Office under GO 125 (Press Office). The Press Office is responsible for organizing, directing, and controlling the efforts of disseminating information to the public through public broadcasts, social media platforms, PRPB's website, mass media, press releases, and conferences. The BT supports the Virtual Library, an additional tool available to the public for information. The systems are not interconnected for easy access, which generates user confusion. The Monitor found discrepancies between the information on PRPB's website and the Virtual Library, such as repealed GOs in one site and superseded ones on the other.[25] No notice or alert was found to direct the user or clarify the results of searches for relevant information.

PRPB launched its Virtual Library in October 2021. The Virtual Library is intended to provide a central location for all policies and procedures, including general and administrative orders, internal rules and regulations, the Agreement, compliance methodologies, action plans, public reports such as UOF reports, community alliance and CIC reports, the Monitor's reports, and a calendar of community events and activities per police area. During this assessment period, the Monitor found that only a minimal number of policies were currently available. Further, no progress reports on the reform are available in the Virtual Library nor any reports from the Monitor. PRPB does have a webpage dedicated to the reform. However, under current operational stages, the Virtual Library does not have the capability to allow members of the public to comment on PRPB policies or review a calendar of community events including Community Encounters (open meetings), outreach activities, CIC meetings, and open recruitment announcements.

PRPB has implemented additional methods for informing the public about processes to file administrative complaints or commend PRPB for any outstanding performance of their duties (GO 311). For this purpose, the Press Office has coordinated with SARP to develop methods for effective broadcasting mechanisms to inform the public about their rights to report any illegal, arbitrary, and/or

---

[25] See GO 803, GO 624, GO 605 on both the PRPB website and the Virtual Library as examples.

discriminatory practices or alleged misconduct by PRPB. The Press Office has coordinated with the SASG to develop methods for community members to recognize and commend PRPB for outstanding performance and general excellence. However, the Monitor is unaware of the extent to which such mechanisms are operational because no evidence was provided.

PRPB continues its longstanding struggles to implement an outreach and public information program in all 13 police areas. PRPB has yet to fulfil the requirements of the Agreement to inform the public of their progress in the reform and address issues of community concerns through a minimum of two annual public meetings. These meetings or Encuentros Comunitarios (Community Encounters) are intended to address an array of informational needs.

PRPB has begun to report basic crime statistics (Type I), but its crime reports are not updated monthly, as required. The last available report, as corroborated by the Monitor, was for January 2022. Hate crimes have not been included within the statistical reports; reports on sexual offenses and domestic violence are dated and only captured through December 2021.

## Paragraph 214: Community Engagement and Public Information - Public Information

*PRPD shall develop a Community Outreach and Public Information program in each of the former thirteen police regions or in other operational subdivisions with comparable geographic coverage.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Not Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. Community Outreach and Public Information program was developed in each of the former thirteen police regions or geographic equivalent. | ☐ Met  ☑ Missed |
| 2. At least bi-annual open meetings were held during the first two years of the Agreement. Then annually until the end of the Agreement. | ☐ Met  ☑ Missed |
| 3. 95% of the meetings were widely publicized at least one week before such meeting. | ☐ Met  ☑ Missed |
| 4. During 95% of the meetings reviewed the public was informed of the requirements of this Agreement, PRPB's progress meeting these requirements, and addressed areas of community concern. | ☐ Met  ☑ Missed |
| 5. 95% of the Outcome Reports of open meetings reviewed comply with the parameters established by this Paragraph. | ☐ Met  ☑ Missed |
| 6. 95% of the meetings reviewed included public education on an individual's right to decline consent to voluntary searches, consistent with Paragraph 77 of this Agreement. | ☐ Met  ☑ Missed |

236

| 7. Community Outreach and Public Information program meetings comply with Paragraphs 214-216 and parameters established in Worksheets # 3. | ☐ Met  ☑ Missed |
| --- | --- |

*Compliance Assessment*

PRPB has a policy for Community Encounters and Outreach (GO 805) which has been in effect since June 20, 2018. During the CMR-5 reporting period, the Monitor made recommendations to the revised policy submitted through paragraph 229 to include audio-visual presentations within the Encounters for individuals with functional diversity, along with sign language interpreters, consistent with equal rights and non-discrimination practices, and that the audio-visual material contain open captions or subtitles to meet the needs of the deaf community in compliance with public policy (Law 22-2021). The Monitor also recommended that printed material for attendees include information on a) victims' advocacy services, b) immigration rights brochures, c) Community Safety Council and CIC information (including meeting dates and locations), d) diverse functionality information, e) children and family services programs, f) community mental health resources, g) addiction and rehabilitation services, and h) advocacy for a broader community outreach. The policy's revision and approval remain past due. Training related to community policing has not been provided to PRPB members in more than four years.

The Monitor reviewed documentation submitted in support of the police areas Community Encounters that were held, to find that only 4 out of 13 (31%) of police areas held the required open meetings (San Juan, Carolina, Aguadilla, and Fajardo). The Monitor found that Aguadilla thoroughly addressed all meeting requirements outlined in the GO and the Agreement. Documentation included publicity, work plans, agenda, crime and administrative complaint statistics, attendance sheets, Q&A sessions, written material, and outcome reports. Seventy-two community members attended along with twenty-five PRPB members. The Encounter was held in coordination and participation from the Community Safety Councils and the CIC. Aguadilla thus stands as a model for other command areas, and the Monitor's Office recommends that PRPB coordinate to replicate the good practices of this command area elsewhere.

Carolina held its encounter in Loiza on November 30, 2021. Based on the documents reviewed by the Monitor, no publicity material was included for the Monitor to review, and attendance sheets were missing. The documents reviewed by the Monitor included work plans, agenda, written materials including administrative complaints and commendation forms, investigated administrative complaints in the area, and UOF reports. SARP's participation was lecture-based and lacked a PowerPoint presentation to address the needs of diverse functionality groups, as reported by a community member who attended. The Encounter was held in coordination and participation with the CIC, as confirmed through the Monitor's interviews.

The Monitor observed the Community Encounter held in the Condado area of San Juan. The Encounter was well attended (90 community members) and was supported by the area Community Safety Councils. Documents submitted in support of the Encounter included work plans, agenda, promotion material, attendance sheets, and outcome reports. The Monitor observed the need of a representative from SARP to provide a walk-through of the complaints and commendation process beyond distributing written material. The Monitor recommends that the audio-visual presentations contain open captions or

237

subtitles to meet the needs of the deaf community and engage the support of a sign language interpreter in compliance with public policy (Law 22-2021).

Fajardo held its Encounter through a local radio channel. The encounters are intended to be meetings open to public participation. The Monitor's Office finds that Fajardo did not meet the requirement of the Agreement or the policy. PRPB did not submit any additional information or certificates from other police areas as in prior reporting periods.

PRPB also reported that the police areas of Mayaguez and Caguas held their respective Community Encounters (Encuentros Comunitarios) but failed to submit evidence in support. Other areas mentioned in the documents submitted by PRPB were the police areas of Humacao, Arecibo, Ponce, Bayamon, Guayama, Aguadilla, Fajardo, and Aibonito, however, no evidence in support of work plans, promotions, and other requirements were submitted.

*Pathway Forward*

During this reporting period, PRPB submitted evidence to demonstrate efforts to be compliant with the Agreement. However, incomplete documentation demonstrates PRPB's inability to fulfill this paragraph's requirements in the Agreement or the GO. PRPB is taking steps to implement practice, but without the required training and institutionalization, the efforts are not sufficient. The Monitor reiterates prior recommendations for PRPB to take advantage of the structured policy in place to implement the Encounters and reach out to the community as required in the Agreement. The policy provides a roadmap to implementation and responsibilities for execution.

## Paragraph 215: Community Engagement and Public Information - Public Information

*The Community Outreach and Public Information program shall require at least bi-annual open meetings for the first two years of this Agreement. During the meetings, PRPD officers from the police region and/or the Reform Unit shall inform the public about the requirements of this Agreement, PRPD's progress meeting these requirements, and address areas of community concern. At least one week before such meetings, PRPD shall widely publicize the meetings using print media, the Internet, and public service announcements on television or radio.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 214.

238

*Compliance Assessment*

As noted in paragraph 214, only four police areas held the required Community Encounters during the reporting period, and one did not meet the requirements for compliance within this paragraph of the Agreement. PRPB did not submit any evidence of open meetings held in any other police areas or a calendar with Encounters' programming to inform the public on these events.

*Pathway Forward*

The Monitor's Office reiterates its prior recommendation for PRPB to develop a calendar with proposed dates for the Encounters per police area, including date, time, place, and discussion topics along with an outlined work plan three months prior to the activity. The calendar should be made easily accessible and available to the public within PRPB's Virtual Library.

## Paragraph 216: Community Engagement and Public Information - Public Information

*The Community Outreach and Public Information meetings shall, with appropriate safeguards to protect sensitive information, include summaries of all audits and reports completed pursuant to this Agreement and any policy changes made and other significant action taken as a result of this Agreement. The meetings shall also include public education on an individual's right to decline consent to voluntary searches, consistent with Paragraph 77 of this Agreement.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 214.

*Compliance Assessment*

Based on the documents reviewed by the Monitor for this assessment period, the three police areas that held the Community Encounters took appropriate safeguards to protect sensitive information and included written information on individuals' right to decline consent to voluntary searches.

*Pathway Forward*

The Monitor will continue to assess PRPB's compliance with this paragraph and recommends that PRPB actively participate, consult, and collaborate with CICs, Community Safety Councils, and leaders and organizations with whom it has developed alliances.

239

## Paragraph 217: Community Engagement and Public Information - Public Information

*PRPD shall maintain and publicly disseminate accurate and updated crime statistics, including those related to hate crimes, on a monthly basis.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Not Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. PRPB disseminates crime statistics on a monthly basis. | ☐ Met | ☑ Missed |
| 2. 95% of reviewed crime statistics were publicly disseminated on a monthly basis. | ☐ Met | ☑ Missed |
| 3. 100% of hate crimes were publicly disseminated once they occurred. | ☐ Met | ☑ Missed |
| 4. PRPB communicated hate crimes statistics to the public in a clear and easily accessible way. | ☐ Met | ☑ Missed |

Note: The portion of this paragraph that requires that PRPB maintain updated crime statistics is assessed together with Paragraph 219 of the Agreement (Information Systems and Technology), and Paragraph 148 (Early Identification System).

*Compliance Assessment*

The established policy to record incidents of crime is (GO 621). Per policy, incident reports are of public domain, except for victim information, sexual assaults, and if individuals involved have mental health issues, and/or are juveniles. The incidents are recorded on forms PPR 621.1 and PPR 615.8, as applicable. The SASG administers the information system based on the incidents recorded in NIBRS, which results in the management and production of crime statistics. During previous assessment periods, the Crime Statistics Division reported that statistics were collected and recorded but were not publicly available. SASG assured that they were working on rectifying the issue through IT. During this reporting period, the Monitor did not receive any documentation from PRPB's Crime Statistics Division that would indicate that they resolved the issue and made hate crimes statistics publicly available.

The review of PRPB's website revealed that Type I crimes for each police area were available for January 2022, along with a crime comparison. However, no monthly statistics for the following months are available to the public. The Monitor's Office notes this longstanding issue of lack of information on hate crimes. The Monitor's further review of PRPB's website for the period of January-December 2021 found only outdated statistics for domestic violence and sexual offenses with no additional information.

240

The implementation of data driven processes to collect and analyze incidents remains under development. PRPB should provide relevant documentation to the Monitor's Office for assessment, including complete investigation reports, NIBRS statistical reports, hate crime documentation with reporting to the FBI, and documentation of interactions with transexual or transgender individuals.

*Pathway Forward*

PRPB must resolve the above-mentioned limitations in informing the public, to comply with the Agreement. PRPB is strongly recommended to deploy social media accounts, Press Office, and public service announcements to report crime statistics and to communicate the Bureau's progress on the Reform to the public. These channels of communication should be used to relay other important issues, such as strategies to fight crime, crime trends, and quality of life concerns, for the purposes of education, awareness, and prevention.

# XI. Information Systems and Technology

During the CMR-6 reporting period PRPB neither made nor lost ground regarding implementing its IT solutions. This status bore itself out during the many on-site demonstrations of process and technology that were held at PRPB. For example, collectively focused on UOF data recorded in GTE and the UOF Dashboard, it became clear to the Monitors that the procedures used by agents and supervisors were not reliable enough to ensure that factual and complete data was being generated and stored. More succinctly, the data in the dashboard did not match the sorted data provided to the Monitor's Office. This condition was exacerbated in the field because the procedures from precinct to precinct were observed to be inconsistent. Monitors were told, for example, that handwritten reports were being generated in the field as opposed to being done in CAD/GTE, contrary to Commissioners guidance and directives established in policy. These issues raise concerns over the validity of PRPB's UOF data. For more details on the validity issues of UOF data, please see Section II. Use of Force.

Additionally, procedural differences and breakdowns in the field were recorded in November and December 2021 at Vieques, Culebra, Sabana Hoyos, Arecibo, and Ponce. Complicating the situation further, agents in the field remarked that data entry could not be completed because supervisors did not or were not available to signoff in GTE in a timely fashion, CAD versions differed, and revisions requested had not been incorporated which led to errors and inconsistencies depending on the timing of the sorts. Ultimately, although varying levels of technology functionality are available, PRPB has been unable to consistently and routinely employ standardized practices to record critical data such as UOFs.

Furthermore, as observed previously, the status of pervasive and effective enterprise training of CAD by SAEA is unclear. It is reasonable to draw from the above that the inconsistencies and unrepeatability of the processes cited are to some degree attributable to the lack of uniform and consistent training by SAEA.

Also impacted, EIS suffers from the ripple effects of the lack of progress noted herein. To which, although some of the EIS modules appear to be available, the opinion of the Monitors is that without credible UOF data the validity of EIS content cannot be effectively assessed or ultimately established. Further, in its current form, EIS appears to be more of a case management system than an early warning system.

Although PRPB moved forward with retaining a contractor to assist with the establishment of its analytic capacity during this reporting period, their work will need to be a part of PRPB's efforts related to the IT Needs Assessment and IT Strategic Plan. As of the end of this reporting period, PRPB has not yet contracted with a source for the IT Needs Assessment, though it has submitted a Stipulation Order and related timeline to the Court. The Monitor will continue to engage and assess PRPB's efforts related to the Order and progress on the analytic capacity work.

Ultimately, the progress of IT implementation can only be considered unchanged and stalled from what was already not compliant.

Finally, concerning PRPB's capacity to perform analysis of data and metrics, complete an IT Needs Assessment, and prepare an executable IT Plan, there has been no appreciable progress or change during

periods CMRs-4, 5, or 6. For this reason, the Federal Court's insistence that the Commonwealth support PRPB (and the Bureau of Technology (BT)) with resources to establish an analytic tradecraft is timely and necessary. It remains to be seen if PRPB will be able to effectively adapt and follow through with procurement of capable contractor support.

Overall, PRPB's compliance with the six Information Systems and Technology paragraphs assessed during this reporting period reflect the same levels of compliance to what was noted in previous reports. See figure 10.



*Figure 10. Information Systems and Technology: Paragraph Compliance Status*

## Paragraph 218: Information Systems and Technology

*PRPD shall establish information systems and utilize technology to support the implementation of this Agreement in an efficient and effective manner.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: Compliance will be determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 219 – 224 in tandem with applicable Paragraphs in sections III through XII and (2) the results of outcome assessments, pursuant to Paragraph 243.

243

## Compliance Assessment

Maintaining a consistent tempo, the Monitor's Office continued extensive on-site engagements with PRPB and technology demonstrations, mostly in the UOF area. Continuous dialog between the Monitors, PRPB, USDOJ, and the Special Master's Office during the targeted demonstrations, uncovered procedural inconsistencies between supervisors and agents regarding review, editing, and acceptance of reported UOFs. As such, PRPB has yet to achieve effective CAD <u>procedural</u> compliance in both technology and missionization.

It is essential to highlight that although PRPB is assessed as partially compliant at this stage of compliance monitoring, this is largely <u>based on technical sufficiency</u>. If PRPB were to be assessed definitively against the prevailing methodology criteria that includes procedural, data gathering, analytical, and transformational requirements, PRPB would be rated as not compliant.

| System | Technology Compliance | Compliance Targets Filed 10/30/19 |
|---|---|---|
| Project Management System | Substantial | Substantial |
| CAD/CAD Mobile | Partial | Partial |
| NIBRS | Minimally Partial | Not Compliant |
| NCIC – National Crime Information Center | Minimally Partial | Not Compliant |
| Forms in GTE | Partial | Partial |
| Promedia (Performance Evaluation System) | Partial | Partial |
| PTMS - Store digitized files, records, curricula and Teaching Plans | Partial | Not Compliant |
| Formal Community Partnerships / Alliances – distribute data and information | Partial | Not Compliant |
| EIS | Not Compliant | Not Compliant |
| Supervisory Module | Not Compliant | Not Compliant |
| Domestic Violence and Sex Crimes | Partial | Partial |
| Inspections – Operational, Investigative & Administrative | Substantial | Deferred |
| Virtual Library – publish policies, procedures, forms, implement n PRPB Website | Partial | Partial |
| Use of Force | Not Compliant | Not Compliant |

*Figure 11. Information Systems and Technology Systems Reviewed During the Reporting Period*

## Pathway Forward

PRPB must adhere to the agreements made between the parties and the Court and work deliberately with AH Datalytics to establish robust analytic skills and to implement an organizational process to perform analyses. Second, PRPB must acquire consulting skills to help them conduct a requirements analysis. Although assessed in the CMR-5 report, unfortunately, insufficient progress was made during CMR-6 and so the recommendations found in CMR-5 carry forward into CMR-6 and are as follows:

*"PRPB must continue to develop solutions and accelerate its current pace of provisioning for its needed solutions and aggressively ensure procedural commitment to implementing sound technical capabilities coincident with viable procedures in the other 10 areas of the Decree. To do this, the shortage of resources, both people and funding must be overcome.  If not, PRPB will continue to accrue technical "debt" ultimately leaving the BT in a continuous spiral of trailing development. Looking even further*

244

*ahead, PRPB must commence with institutionalizing its analytic capacity as recommended by both the Monitor and the AH Datalytics Assessment. Until this is achieved substantial compliance is not possible."*

## Paragraph 219: Information Systems and Technology

*PRPD shall collect and maintain all data and records necessary to: (a) document implementation of and compliance with this Agreement, including assisting the TCA's outcome assessments and the data collection and reporting required by this Agreement; (b) perform ongoing performance improvement activities in each of the areas addressed by this Agreement; (c) facilitate and ensure transparency and wide public access to information related to PRPD decision making and activities, as permitted by law; and (d) promote officer and civilian safety.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. Data dictionary includes all data sets necessary to access compliance with the Agreement. | ☑ Met | ☐ Missed |
| 2. The data systems permit PRPB to engage in ongoing performance improvement activities in each of the areas addressed by this Agreement. | ☐ Met | ☑ Missed |
| 3. PRPB makes publicly available all data that the Agreement requires be published, in accordance with PRPB policy and applicable laws. | ☐ Met | ☑ Missed |
| 4. PRPB collects and maintains data that is relevant, useful, and applicable to officer and civilian safety. | ☐ Met | ☑ Missed |
| 5. PRPB maintains data and records in compliance with the Agreement and applicable laws. | ☐ Met | ☑ Missed |
| Note: Review frequency, consistent with the periodicity of assessments in areas III through XII and XIV. | | |

### *Compliance Assessment*

Valuable exchanges between the Monitors, PRPB, USDOJ, and the Special Master's Office during the demonstrations and field visits occurred uncovering both progress and setbacks. Overall PRPB has yet to demonstrate adequate and accurate data and records use in GTE given its integration with CAD.

1. The Data Dictionary was assessed in August 2019. However, along with the many recommendations made to improve PRPB's system functionality, the Data Dictionary is due for review to ensure currency and alignment with systems. This process is never ending and should be repeated every two to three years or with major systems releases.

2. Meaningful assessment of performance improvement cannot be completed until PRPB has achieved a level of mastery of the data and are able to analyze it. This is known not to be possible give the Form 126 issues currently at hand.
3. Given the second item listed, there is no reliable data published. Review of the UOF Dashboard supports the rating.

*Pathway Forward*

PRPB must make maximum and effective use of contractor subject matter experts to address analytics, the IT Needs Assessment, and the IT Action Plan. PRPB should also acquire subject matter experts who excel at process re-engineering and workflow mapping to better understand how to optimize its current operational workflows. In the ideal situation, workflow mapping precedes any development and follows a needs assessment. Further, the Monitor would like to note that it is incumbent of PRPB to proactively demonstrate compliance. If there are systems/applications in place that it feels fulfill the requirements of the Agreement, it should take initiative and propose demonstrations of said systems/applications.

Note that the following from CMR-5 is again relevant:

*"PRPB and the Bureau of Technology must continue to develop data management and analytical solutions while accelerating its current pace of provisioning for its needed solutions. To do this the shortage of resources, both people and funding must be overcome and if not, will continue to prolong accrual of technical "debt" ultimately leaving the BT in a continuous spiral of trailing development. PRPB must institutionalize its analytic capacity as recommended by both the Monitor and the AH Datalytics Assessment. Until this is achieved substantial compliance is not possible."*

## Paragraph 220: Information Systems and Technology

*PRPD shall develop protocols for collecting, analyzing, and reporting the information required by this Agreement. These protocols shall be developed and implemented in coordination with the TCA and shall be approved by the DOJ prior to implementation.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 219.

246

*Compliance Assessment*

The assessment during CMR-6 is largely unchanged. PRPB has not yet demonstrated effective publishing of its information, especially data. This is complicated by the fact that the accuracy of data in both CAD and GTE is, as noted above in paragraphs 218 and 219, questionable as seen in the discrepancies concerning UOF data. This must be a significant recurring focus of the Parties as PRPB's ability to successfully evaluate operational data and performance leading to transformation remains suspect. To establish their independent legitimacy, this capacity must change and be beyond reproach. Data accuracy is essential.

*Pathway Forward*

CMR-6 recommendations are unchanged from CMR-5 and include that external subject matter experts are required to buttress PRPB skills to make progress in establishing analytic capacity, conducting an IT Needs Assessment, and developing an IT Action Plan. PRPB must adhere to the direction from the Court, specifically the January 14, 2022, status conference and the initiatives that flowed from those decisions.

Recalling from CMR-5, PRPB and the BT must continue to develop solutions and accelerate its current pace of provisioning for its needed solutions. To do this, the shortage of resources, both people and funding, must be overcome and if not, will continue to prolong accrual of technical "debt". Until this is achieved substantial compliance is not possible.

As important, leadership support, advocacy, prioritization, and forward leaning visibility must be obvious to all organizational elements within the Bureau. Without it, the BT will continue to struggle sub-optimally. The Monitors continued to observe this lack of support and presence from operational chain of command leaders during the numerous ongoing technology demonstrations conducted where no accountable single senior leader at the command level were present to advocate for requirements or functionality.

## Paragraph 221: Information Systems and Technology

*PRPD shall develop and maintain an automated record management system and electronic files as part of the Action Plans developed for each subsection above.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| 1. A record management system accounts for all the elements of the Paragraph and outcome measures as required by Paragraph 243. | ☐ Met ☑ Missed |
|---|---|

*Compliance Assessment*

The assessment is unchanged from CMR-5:

*"Although the technology is available, PRPB has not yet demonstrated effective availability and integration of GTE with its operational systems which has been seen in the discrepancies regarding Use of Force data and the inconsistency of processes from precinct to precinct."*

*Pathway Forward*

The recommendation is unchanged from CMR-5:

*"PRPB and the Bureau of Technology (BT) must continue to develop GTE, especially its broad use as an analytical tool.  Until this is achieved substantial compliance is not possible."*

## Paragraph 222: Information Systems and Technology

*PRPD shall provide each supervisor with handheld recording devices and require that supervisors use these devices to record complainant and witness statements taken as part of use of force or misconduct complaint investigations.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| 1. Policies incorporate all the requirements of this Paragraph. | ☐ Met ☑ Missed |
|---|---|
| 2. Handheld recording device trainings are consistent with approved policies. | ☐ Met ☑ Missed |
| 3. 95% of sampled personnel are trained and certified in relevant policies related to handheld recording devices (or scheduled for training, in the case of mid-year reviews). | ☐ Met ☑ Missed |
| 4. Complaint and witness statements are recorded in 95% of use of force reviews. | ☐ Met ☑ Missed |
| 5. Complaint and witness statements are recorded in 95% of misconduct complaint investigations. | ☐ Met ☑ Missed |
| 6. All sampled units had access to functional handheld recording equipment. | ☐ Met ☑ Missed |

*Compliance Assessment*

This assessment is unchanged from CMR-5.

*"PRPB is assessed as not complaint. To this point neither a briefing nor demonstration has been provided or offered."*

*Pathway Forward*

The recommendation is unchanged from CMR-5.

*"PRPB must provide evidence of their efforts to comply with the Agreement. PRPB should prepare for and brief its plan for development, operations, and support to the Monitor."*

## Paragraph 223: Information Systems and Technology

*All officers shall have access to National Crime Information Center ("NCIC") data for valid law enforcement purposes only. PRPD shall develop a protocol for the handling and use of NCIC data.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2021 – March 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of this Paragraph. | ☑ Met | ☐ Missed |
| 2. NCIC data trainings are consistent with approved policies. | ☐ Met | ☑ Missed |
| 3. 95% of sampled personnel are trained and certified in relevant policies related to handling and use of NCIC data (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 4. NCIC data is considered in 95% of patrol interventions and investigations. | ☐ Met | ☑ Missed |
| 5. All sampled units had access to NCIC data. | ☐ Met | ☑ Missed |
| 6. PRPB safeguards appropriately protect sensitive data. | ☐ Met | ☑ Missed |

*Compliance Assessment*

This assessment is largely unchanged from CMR-5. Although demonstrated to the Monitors in July 2021, National Crime Information Center (NCIC) access and use is limited to headquarters and Central Commands, but it is not available at the agent level. PRPB acknowledged that the longer-term implementation will be to all officers in the field. Although technical compliance is rated as partial, NCIC procedural access is extremely limited and therefore the compliance level must be considered not complaint.

249

*Pathway Forward*

This recommendation is largely unchanged from CMR-5. PRPB must continue integrating and implementing NCIC to ensure roll out beyond headquarters. Availability to all authorized and trained officers must be achieved and be in alignment with NCIC operational use criteria. Additionally, effective training throughout PRPB is required from SAEA and BT. Training has not been extensively observed at this stage.

## Paragraph 224: Information Systems and Technology

Nothing in this Agreement shall be construed as prohibiting PRPD from contracting services related to technology and data collection, entry, and analysis.

*Compliance Assessment*

BT continued to lack adequate access to funding and subject matter expert resources until the Court definitively expressed its expectations concerning the necessary required responsiveness and support from the Commonwealth to overcome PRPB limitations. Although paragraph 224 provides for contracting to acquire necessary resources and experts, PRPB and the Commonwealth did not effectively secure the support it needed until compelled by the Court. PRPB was finally able to contract with AH Datalytics to assist with building out its analytic capacity and must follow through on contracting for an IT Needs Assessment and IT Action Plan.

## Appendix A: Background to PRPB Monitoring Mission

In 2008, USDOJ initiated an investigation of PRPB into an alleged pattern or practice of using excessive force, conducting unlawful searches and seizures, and unlawful discrimination, all of which are proscribed by the United States Constitution. USDOJ conducted their investigation pursuant to the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141, and the anti-discrimination provisions of the Omnibus Crime Control and Safe Streets Act, 42 U.S.C. § 3789d. PRPB accepted the grounds for the investigation and pledged cooperation and has worked in partnership with USDOJ to establish the reforms outlined in this Agreement.

As part of its investigation, USDOJ and its police practices expert consultants conducted a detailed fact-finding review with the assistance and full cooperation of PRPB, including: a) tours of police areas; b) interviews with PRPB officers, supervisors, command staff, Commonwealth officials, members of the public, and other stakeholders; c) review of many thousands of documents, including policies and procedures, incident reports, internal investigation of civilian complaint records, external audit reports, and legislative materials; and d) accompanying line officers and supervisors during their respective tours of duty. PRPB's Superintendent and command staff officials met personally with USDOJ representatives and consultants on multiple occasions and pledged their full support and cooperation.

In response to the concerns raised by USDOJ during its practice investigation of PRPB, and in recognition of the need to modernize and professionalize its operations, PRPB undertook its own internal reform efforts. These efforts culminated in the issuance in March 2011 of PRPB's own internal reform plan. The plan included: 1) the development and implementation of new policies regarding UOF and a wide range of other substantive areas; 2) the training of all appropriate officers in the new UOF policies through "train-the-trainer" pedagogy; 3) the adoption of a reformed disciplinary system; 4) the improvement of citizen complaint procedures; 5) the strengthening of community outreach efforts through Citizen Interaction Committees; and 6) a staffing review to improve supervisor to officer ratios.

In September 2011, USDOJ issued a written report of its investigative findings ("the Report"). The Report presented USDOJ's findings related to UOF, UOF to suppress the exercise of First Amendment rights, and searches and seizures. The Report identified several additional areas of serious concern, including discriminatory policing and the insufficient quality of investigation into sex crimes and domestic violence. Finally, the Report outlined a series of other performance issues: 1) systemic deficiencies in PRPB's policies and procedures; 2) conduct of specialized units; 3) formative and in-service training; 4) supervision; 5) intake, internal investigation, and institutional adjudication of administrative misconduct complaints; 6) corrupt acts and other crimes committed by PRPB officers; 7) substandard processes for promotion in rank; 8) lack of risk management; 9) poor external oversight and accountability; and 10) a lack of sufficient community engagement. The Report concludes that the performance of PRPB was undermined by several entrenched and long-standing problems, which in the estimation of USDOJ called for a systemic remedy.

While PRPB did not concur with all the findings and conclusions in the Report, the Parties met throughout 2012 to exchange ideas and proposals for modernizing and professionalizing PRPB and to discuss numerous reforms already underway at PRPB's own initiative. Once the newly elected Commonwealth administration took office in January 2013, the administration familiarized itself with the Agreement and continued negotiating to reach a final Agreement. The Agreement is the product of these good faith

negotiations. In July 2013, the draft Agreement was presented to the Honorable Gustavo A. Gelpi, Chief Judge of the U.S. District Court for the District of Puerto Rico, who approved the draft, formalizing the Agreement.

On June 5, 2014, the Court approved the selection and hiring of an independent monitor to help PRPB during the capacity building phase and thereafter monitoring the compliance period of the Agreement.

Unlike other consent decrees throughout the United States and its territories and owing to the unique institutional development and needs of the Commonwealth, the Agreement between the USDOJ and Commonwealth of Puerto Rico included a four-year "capacity-building" phase. During that phase, PRPB was expected to develop policies, procedures, and technologies to address serious deficiencies within the Bureau. The Monitoring Team, which is comprised of subject matter experts, was expected to provide substantive expertise and technical assistance to guide PRPB in its implementation and development efforts, while at the same time providing the public with assurance that PRPB's progress would be evaluated in a reliable, independent, and transparent manner.

The capacity-building period concluded on October 8, 2018, at which time the "monitoring phase" was to commence according to the Agreement. However, at that time the Monitor and Parties were unable to come to a consensus on the methodology matrices that the Monitor's Office proposed to use to measure PRPB's compliance with the Agreement. This resulted in a delay in the start of the monitoring phase, and the Court subsequently suspended monitoring measures pending the finalization and acceptance of a compliance assessment methodology agreeable to the Parties. PRPB, legal counsel, and the USDOJ conferred with the Monitoring Team over the course of six months to develop methodology matrices necessary to measure compliance for the 11 performance areas outlined in the Agreement. After review, and with the assent of the Parties, the Court accepted the objective methodologies put forth by the Monitor's Office.

In March 2020, the court approved and published the First Report of the Federal Monitor, which focused primarily on policies and procedures, UOF, and IT. CMR-1 found broad compliance on policy and procedure and certain areas of UOF, but nevertheless found a series of key lapses in UOF investigations and IT infrastructure. Later that same year, CMR-2 provided a more comprehensive overview of PRPB's performance, covering a significantly larger number of Consent Decree paragraphs. The format and comprehensiveness of our CMRs has evolved with each report. CMR-5 represents the first full comprehensive assessment and report and the first report in which PRPB's status in the implementation of policy, training, and practice was documented. As such, CMR-5 provided a model for Monitor's reports going forward. As some areas, and paragraphs, of the agreement are only assessed biannually, CMR-6 along with CMR-5 jointly provide the most comprehensive assessment provided by the Monitor thus far.

## Appendix B: Methodology

In agreement with the approved methodology, the Monitoring Team uses a combination of quantitative and qualitative research methods to assess PRPB's compliance with the Agreement in the areas of performance selected for this report. These methods include but are not limited to 1) document reviews of forms that PRPB uses in the daily conduct of its activities; 2) content analysis of policies, training materials, internal investigation files, and other documents the provide detailed evidence of PRPB's efforts to comply with the Agreement; 3) interviews with sworn and civilian PRPB personnel, members of the public who can directly verify PRPB's community outreach and public information activities, personnel from other criminal justice components with Puerto Rico, and additional stakeholders in the reform process; 4) site visits to PRPB facilities, patrol locations, crowd control incidents, CIC meetings, and public information sessions; and 5) analysis of PRPB's data systems and the knowledge management practices that make use of these systems.[26]

## Compliance Levels

Each paragraph in the Agreement has been assigned a methodology that was agreed on by the Parties and approved by the court. These methodologies include information on the data source, sampling method (if relevant), and compliance target. The compliance targets provided for each paragraph outline the objectives and thresholds PRPB must meet to reach full compliance with the paragraph. Further, if applicable, the compliance targets outline whether PRPB has incorporated the requirement into an implemented policy; trained all relevant personnel in the requirement and policy; and fully implemented the requirement in practice. PRPB's status in the implementation of policy, training, and practice are noted for each paragraph assessed, see figure B.1. For those paragraphs where training is not a requirement of the paragraph training is listed as not applicable (N/A).

*Figure B.1 Implementation Status: Policy, Training, Practice*



The compliance levels are defined as follows:

- **Fully Compliant**: Where PRPB has objectively demonstrated substantial compliance with the cited portion of the Agreement for a period of more than two years;
- **Substantially Compliant**: Where PRPB has objectively demonstrated extensive compliance with the cited portion of the Agreement (as defined by the compliance targets for a given paragraph) for a period of less than two years;

---

[26] The full methodology can be accessed at the Monitor's website at https://www.fpmpr.org.

- **Partially Compliant**: Where PRPB has objectively demonstrated a sub-optimal level of compliance with the cited portion of the Agreement, as defined by the compliance targets for a given paragraph;
- **Not Compliant**: Where PRPB has not objectively demonstrated compliance with the cited portion of the Agreement, either due to a lack of evidence, or due to evidence of significant shortfalls in compliance relative to the targets outlined for a given paragraph;
- **Rating Deferred**: Where the Monitoring Team has not obtained sufficient evidence to reach a determination as to compliance status with a given paragraph, due to no fault on the part of PRPB.

The Court draws a clear distinction between a deferred rating and a rating of non-compliance due to lack of information. In the latter case, the Monitor's Office is unable to reach a determination of compliance because PRPB failed to provide the Monitor's Office with requested data, and thus failed to provide evidence of compliance. In the former case, the Monitor's Office could not obtain sufficient data to reach a determination of compliance due to no fault on the part of PRPB, e.g., travel restrictions prevented the Monitor's Office from conducting required site visits.

## Sampling Methodology

The Monitor's Office uses a variety of sampling methods to draw valid and representative samples for the data sources noted above. These sampling methods include the following:

1. Simple random sampling: Used for large datasets such as arrest reports and search/seizure incidents that occur in very large volumes each reporting period.
2. Stratified random sampling: Used for large but varied datasets such as training, performance, and disciplinary records for sworn PRPB personnel who are stratified by rank.
3. Purposive sampling: Used for datasets that require intentional selection to investigate key topics and cover all stakeholders over the course of successive CMRs, such as interviews with CIC members, training and counseling staff, and PRPB personnel assigned to specialized units.
4. Full enumeration: Used for sources that monitors must review exhaustively, such as revisions to policies and training curricula, exemplars of forms that PRPB uses to interact with the public, and records for critical incidents such as deployment of chemical agents to disperse crowds.

In addition, the Monitor's Office uses a rolling sampling method for key data sources that require analyzing significant amounts of data on a tight deadline, such as arrests and searches, internal investigations, UOF incidents, etc. These data sources present a significant workload for the Monitor's Office, and for PRPB, because the relevant incidents either occur in large volumes during each reporting period or involve large amounts of documentation per incident. The Monitor's Office has addressed the tradeoff between sample frequency, sample size, and margin of error, by adapting a "rolling" sampling method that the U.S. Census Bureau has developed for the American Community Survey.[27]

Using this method, the Monitor's Office draws quarterly samples for large data sources that are reviewed biannually. Sample sizes are calculated for each quarter by examining the past six months of incidents

---

[27] United States Census Bureau, American Community Survey Design and Methodology, January 2014, https://www.census.gov/history/pdf/acsdesign-methodology2014.pdf

and drawing a proportional number of cases for the present quarter. Sample size is determined so that the margin of error for two years of combined data (consistent with the above definition of full compliance) is under 5%, allowing the Monitor's Office to state confidently whether PRPB has maintained substantial compliance on a given paragraph for the past two years and has therefore achieved full compliance.

## CMR-6 Samples

The Monitor's Office requested the following samples from PRPB for CMR-6:

| Relevant Paragraph(s) | Sample |
|---|---|
| **Common** | Training (including weapons training), performance, and disciplinary records for a random sample of 92 sworn PRPB personnel; interviews with purposive samples of sworn personnel drawn from this master personnel sample |
| **Common** | Training and performance random sample of 66 civilian PRPB personnel |
| **23-24, 36-39** | Incident reports for a random sample of 66 UOF incidents |
| **25** | Inspection reports for a purposive sample of 5 STU armory inspections |
| **28** | Deployment records for a random sample of 61 STU officers assigned to general patrol |
| **29** | Training, performance, and disciplinary records for a random sample of 45 STU officers |
| **30** | Activation/deployment records for a random sample of 39 STU activations |
| **32-35** | Incident reports and after-action reports for a random sample of 50 planned and unplanned incidents involving crowds. |
| **44-47** | Review files for a random sample of 16 FRB reviews |
| **46** | Training records for a purposive sample of 22 FRB reviewers |
| **49** | Investigation files for a random sample of 44 FIU investigations |
| **49** | Review files for a random sample of 19 CFRB reviews |
| **56** | Reports for a random sample of 54 incidents involving persons in mental health crisis |
| **57** | Training records for a purposive sample of 3 dispatchers trained in CIT |
| **65-72** | Arrest files for a random sample of 92 arrests |
| **74-75** | Search and seizure files for a random sample of 69 searches |
| **89** | Reports for a random sample of 18 reported PRPB interactions with transgender or transsexual individuals |
| **92** | Investigation files for a purposive sample of 6 incidents involving allegations of abuse and mistreatment originating in secure correctional facilities |
| **96** | Call records for a random sample of 20 hotline complaints |
| **104-107** | Recruitment office files for a random sample of 50 recruited candidates |
| **124, 127, and 160** | Training, performance, and disciplinary records for a random sample of 63 FTOs |
| **124, 127, and 160** | Training, performance, and disciplinary records for a random sample of 33 FTO candidates |
| **129-131** | Electronic records and materials for a purposive sample of 8 in-service trainings provided during the evaluation period |
| **129-131** | Test results and completed course evaluations from the most recent session of the 8 sampled in-service trainings for a random sample of 64 sworn personnel |
| **136-140, 147-153, and 162** | Staffing documents for a random sample of 44 PRPB precincts and units |

255

| | |
|---|---|
| **154-157** | Records and reports for a random sample of 17 operational audits and inspections |
| **170** | Investigation files and related communications for a purposive sample of civil lawsuits and criminal prosecutions filed involving PRPB personnel |
| **179-188** | Investigation files for a random sample of 53 closed internal investigations |
| **181** | Training, performance, and disciplinary records for a purposive sample of 39 SARP investigators and supervisors |
| **206 and 214-216** | Public outreach and community policing materials for a random sample of 20 PRPB units |

## Appendix C: Compliance Status by Paragraph and Sub-Section

The following sections were assessed in this report:

### I. Use of Force

| Use of Force Sub-Section | Count of Paragraphs per Section by Compliance Status | | | |
|---|---|---|---|---|
| | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 1 | 4 | 0 | 0 |
| Specialized Tactical Units | 3 | 2 | 0 | 0 |
| Crowd Control | 1 | 3 | 0 | 0 |
| Force Reporting | 0 | 0 | 0 | 4 |
| Force Review & Investigation | 0 | 1 | 2 | 0 |
| Supervisory and FRB Reviews | 0 | 2 | 1 | 2 |
| FIU Investigations & SFRB Reviews | 0 | 3 | 2 | 0 |
| Use of Force Training | 0 | 3 | 0 | 0 |
| Responding to Mental Health Crisis | 0 | 1 | 1 | 0 |
| **Total** | **5** | **19** | **6** | **6** |

### II. Searches & Seizures

| Searches and Seizures Sub-Section | Count of Paragraphs per Section by Compliance Status | | | |
|---|---|---|---|---|
| | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 0 | 1 | 0 | 0 |
| Investigatory Stops and Searches | 0 | 0 | 5 | 0 |
| Arrests | 0 | 0 | 8 | 0 |
| Searches | 0 | 2 | 2 | 0 |
| Training on Stops, Searches, and Seizures | 0 | 0 | 0 | 0 |
| **Total** | **0** | **3** | **15** | **0** |

### III. Equal Protection and Non-Discrimination

| Equal Protection and Non-Discrimination Sub-Section | Count of Paragraphs per Section by Compliance Status | | | |
|---|---|---|---|---|
| | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 0 | 1 | 2 | 0 |
| Discriminatory Policing | 0 | 1 | 3 | 0 |
| Sexual Assault and Domestic Violence | 0 | 2 | 1 | 0 |
| **Total** | **0** | **4** | **6** | **0** |

## IV.  Recruitment, Selection, and Hiring

| Consent Decree Section/Sub-Section | Count of Paragraphs per Section by Compliance Status | | | |
|---|---|---|---|---|
| | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 0 | 1 | 0 | 0 |
| Recruitment Plan | 0 | 2 | 0 | 0 |
| Hiring Reforms | 0 | 5 | 0 | 0 |
| **Total** | **0** | **8** | **0** | **0** |

## V.   Training

| Training Sub-Section | Count of Paragraphs per Section by Compliance Status | | | |
|---|---|---|---|---|
| | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 0 | 0 | 1 | 0 |
| Pre-Service Education and Training | 0 | 4 | 1 | 0 |
| Field Training Program | 6 | 0 | 0 | 0 |
| In-Service Training | 1 | 0 | 3 | 0 |
| Training Records | 0 | 0 | 2 | 0 |
| **Total** | **7** | **4** | **7** | **0** |

## VI.  Supervision and Management

| Supervision and Management Sub-Section | Count of Paragraphs per Section by Compliance Status | | | |
|---|---|---|---|---|
| | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 0 | 0 | 1 | 0 |
| Duties of Supervisors | 0 | 0 | 5 | 0 |
| Supervisor Training | 1 | 3 | 0 | 0 |
| Performance Evaluation | 1 | 1 | 0 | 0 |
| Early Identification System | 0 | 0 | 7 | 0 |
| Internal Audits and Interagency Feedback | 0 | 3 | 2 | 0 |
| **Total** | **2** | **7** | **15** | **0** |

## VII.  Civilian Complaints, Internal Investigations, and Discipline

| Civilian Complaints, Internal Investigations, and Discipline Sub-Section | Count of Paragraphs per Section by Compliance Status | | | |
|---|---|---|---|---|
| | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 0 | 2 | 0 | 0 |
| Civilian Complaints | 2 | 0 | 0 | 0 |
| Internal Investigations | 1 | 2 | 0 | 0 |

| | | | | |
|---|---|---|---|---|
| Complaint Intake & Handling | 3 | 4 | 1 | 3 |
| Investigation of Complaints | 4 | 0 | 0 | 13 |
| Staffing, Selection, & Training Requirements | 0 | 2 | 1 | 0 |
| Preventing Retaliation | 0 | 0 | O | 1 |
| Discipline | 2 | 1 | 0 | 0 |
| Officer Assistance and Support | 1 | 2 | 1 | 0 |
| **Total** | **13** | **13** | **3** | **17** |

## VIII.  Community Engagement and Public Information

| Community Engagement and Public Information Sub-Section | Count of Paragraphs per Section by Compliance Status | | | |
|---|---|---|---|---|
| | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 0 | 1 | 0 | 0 |
| Community Oriented Policing | 0 | 2 | 1 | 0 |
| Community Interaction Councils | 0 | 3 | 2 | 0 |
| Public Information | 0 | 0 | 4 | 0 |
| **Total** | **0** | **6** | **7** | **0** |

## IX.  Information Systems and Technology

| Information Technology Sub-Section | Count of Paragraphs per Section by Compliance Status | | | |
|---|---|---|---|---|
| | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 0 | 2 | 4 | 0 |

# Appendix D: Cadet Program Memorandum



## Cadet Program Overview

The following document highlights best and promising cadet programs practices used by law enforcement agencies on the mainland.

### New York Police Department (NYPD)

- To join the Cadet Corps Internship Program, individuals must meet the below requirements:
  - Must be at least 18 years of age
  - Must be a New York City (NYC) resident
  - Must be free of any felony convictions
  - Must have a minimum of 45 college credits (if the Cadet candidate resides in a NYC housing development the minimum requirement is 15 credits)
  - Must be enrolled in a four-year college
  - Must be registered for at least 12 credits per semester
  - Must maintain a minimum of 2.0 GPA per semester
- Upon acceptance into the Cadet Program, candidates must complete a four-week training academy with Cadet Program Staff. Upon successful completion of the academy, the Cadet will be deemed a civilian employee of the NYPD.
- Cadet requirements include:
  - Work 21 hours per month during the school year and 34 hours per week during summer sessions
  - Performs administrative duties only. Cadets can be assigned to police precincts/districts and specialized units, but they are not permitted to perform enforcement activities.
- During their time as a Cadet, they will be notified as to when they will take the "promotional exam". This exam is the same exam as the open competitive exam offered to persons wishing to becoming NYC police officers; however, for a person enrolled in the Cadet Corp, it is considered a promotional exam. Upon completion of their bachelor's degree, the candidate will be eligible for appointment to the NYPD as a police officer. The Cadet will be subject to a background check and will be required to pass all pre-requisite conditions.

### Fairfax County, Virginia, Police Department

- Information on this Cadet Program can be found here.

- To join the Police Cadet Program, individuals must meet the below requirements:
  - Be between the ages of 17.5 and 20 years old
  - Any combination of education, experience, and training equivalent to a high school diploma or a GED Certificate issued by a Board of Education and recognized by the Commonwealth of Virginia
  - Possess a valid driver's license at the time of appointment
  - Be a citizen of the United States; or a permanent resident alien with an application for naturalization filed and pending with the U.S. Citizenship and Immigration Services may be considered
  - Successfully complete a criminal background investigation, a polygraph examination, a psychological examination, and a physical ability test prior to appointment. If under age 18, applicants will need parental consent to participate in some phases of the application and screening process
  - Must be free of any felony convictions
  - Have a stable work record
  - Refrain from using tobacco products
  - Successfully pass a comprehensive medical exam, including drug testing and vision
- Cadet assignments may include:
- Police patrol (assigned to a police district station)
- Property room
- Criminal investigations
- Crime scene investigation section
- Central records
- Operations support bureau (traffic, special operations, helicopter)
- Criminal Justice Academy
- Public Information Office

## Santa Monica Police Department

- Information on this Cadet Program can be found here.
- To join the Police Cadet Program, individuals must meet the below requirements:
    - Enrolled in an accredited college or university maintaining a minimum of 9 semester units or the equivalent
    - Be at least 18 years of age
    - Maintain high morals, excel academically, use sound judgment, and remain active in the community.
- Cadet assignments may include:
    - Patrol
    - Records Unit
    - Property Unit
    - Criminal Investigations
    - Traffic Services
    - Administrative Services
- Duties may include:
    - Perform clerical duties such as ordering, receiving, and distributing supplies, processing mail, preparing reports, indexing and filing criminal records and correspondences
    - Provide directions and other information to persons entering public buildings
    - Provide first aid and CPR in case of life-threatening emergencies
    - Participates in crime prevention activities such as neighborhood watch meetings, school and community group presentations, and Police Department building tours
    - Maintains records and retrieves information
    - Attends weekend and/or evening training sessions
    - Performs other related duties and responsibilities not requiring Peace Officer powers

## Anne Arundel County, Maryland Police Department

- Information on this Cadet Program can be found here.
- To join the Police Cadet Program, individuals must meet the below requirements:
    - Be between the ages of 18 and 21 years old
    - Be a United States citizen
    - Posses a valid driver's license
    - Possess a high school diploma or GED
    - Must be free of any felony convictions
- Police cadets are uniformed civilian employees who work approximately 24-40 hours per week in a variety of assignments around the department. Police Cadets provide support to the units they work in by assisting with criminal data collection, traffic direction, evidence grid searches, attend training, ride-a-longs, etc.

Page 3 of 7

### Delaware State Police

- Information on this Cadet Program can be found here.
- To join the Police Cadet Program, individuals must meet the below requirements:
  - Be between the ages of 18 and 21 years old
  - Be a citizen of the United States and Delaware
  - Be enrolled in a Delaware accredited university or college in an undergraduate program
  - Possess a valid driver's license
  - Successfully complete a physical fitness test, oral board review, polygraph examination, background investigation, and medical testing
- Duties may include:
  - Enforcement of Handicapped Parking
  - Enforcement of Fire Lane Parking
  - Assisting with targeted enforcement efforts (i.e., red light enforcement)
  - Assisting with traffic control at Division-sponsored events. (i.e., Delaware State Police graduations, promotional ceremonies, etc.)
  - Assignment of various administrative tasks at troop/section level

### Clark County, Washington Sheriff's Office

- Information on this Cadet Program can be found here.
- To join the Police Cadet Program, individuals must meet the below requirements:
  - Be a minimum of 18 years old at time of application
  - Be a high school graduate or have a valid GED certificate
  - Be enrolled in an accredited college or university
  - Declare and maintain a major in a criminal justice or related field
  - Maintain a minimum of 9 credit hours
  - Maintain a minimum of 2.5 GPA
  - Maintain a valid driver license
  - Not have been convicted of a felony. Repetitive misdemeanors and/or traffic offenses may also be disqualifying
  - Pass a multi-phase examination consisting of written test, oral board, background investigation, and polygraph
  - Be able to type 30 words per minute
  - Provide a letter of recommendation
- Duties may include:
  - Reception desk: issues Concealed Pistol Licenses, performs fingerprinting for the public, coordinates jail visiting, and involves public contact.
  - Civil Unit: serves civil papers such as eviction notices and restraining orders and allows the Cadet to become familiar with the County
  - Property Evidence: assists with the logistics, distribution, and operational needs of the unit.

Page 4 of 7

- o  Unit rotation is based on seniority and the needs of the agency
- o  Cadets may also participate in ridealongs with a Deputy Sheriff
- Cadets may serve a maximum of 4.5 years as a Cadet or three months after graduation from a two-year or four-year institution of higher learning. Cadets work approximately 20 hours per week.

## Portland, Oregon Police Bureau

- Information on this Cadet Program can be found here.
- To join the Police Cadet Program, individuals must meet the below requirements:
  - o  Be between the ages of 16 – 20 years old
  - o  Be a high school or GED program graduate or be a student maintaining a 2.0 GPA or higher
  - o  No arrests or convictions which would prohibit employment as a police officer
  - o  Possess or can immediately obtain a valid driver's license or instructional permit and maintain a good driving record.
  - o  Pass a background investigations and interview
- Once accepted into the program, Cadets will be assigned to either North, East, or Central precinct posts. Recruit Cadets must attend the Portland Police Bureau Cadet Academy. Academy graduates will then transition to their individual posts for completion of the probationary process and regularly scheduled meetings. All posts provide training meetings on Sundays.
  - o  The Cadet Academy is largely based on class content provided for full time Officers at the State of Oregon Police Academy (DPSST) and Portland Police Bureau Advanced Academy. Many of the classes are targeted to develop an understanding and appreciation of the criminal justice system, Oregon laws, and the professional ethics and skills applied to law enforcement. Classes typically run for 12 consecutive weeks and are held on Sundays.
- Duties may include:
  - o  Uniformed details
  - o  Fundraisers
  - o  Ride-alongs
  - o  Community engagement events
- Upon completing the program, Cadets are encouraged to apply for the Portland Police Bureau testing process.

## San Diego, California Police Department

- Information on this Cadet Program can be found here.
- The Cadet Program is a voluntary, non-enforcement entry level position with the San Diego Police Department.
- To join the Police Cadet Program, individuals must meet the below requirements:
  - o  Be between 16 – 21 years of age
  - o  Have graduated high school or have a minimum 2.0 GPA if still enrolled in school

- o Successfully complete a written exam, character interview, and background check
- o Successfully complete the Cadet Academy
  - ▪ The training academy includes courses on CPR, Criminal Law, Arrest Procedures, Search and Seizures, Ethics, Law and Arrest, Map Book Reading, Narcotics, Report Writing, Policy and Procedures, Field Training, Defensive Tactics, and Patrol Procedures.
- After completion of the academy, Cadets are required to attend two meetings a month. It is highly recommended that Cadets also participate in other activities, but it is not mandatory. Therefore, time commitment with the Cadet program can range from the minimum of four hours a month to over 40.
- Duties my include:
  - o Ride-alongs
  - o Traffic control
  - o Vice – Shoulder Tap Operations and Minor Decoy Operations
  - o Security
  - o Community events

City and County of Denver, Colorado
- Information on this Cadet Program can be found here.
- The Denver Public Safety Cadet Program is a specialized training and education program designed to help strengthen and diversify the future workforce of the Denver Police, Fire, and Sheriff Departments.
- To join the Cadet Program, individuals must meet the below requirements:
  - o Have a high school diploma or GED
  - o Possess a valid Colorado driver's license
  - o Be a Colorado resident and be able to qualify for in-state tuition at MSU or UCD
  - o Meet strict background standards (criminal history, drug use, driving record)
  - o Ability to be admitted as a student to UCD or MSU
  - o Have no more than 60 college credit hours completed at the close of the application process
  - o Acceptance into the Cadet Program is highly competitive. Beyond meeting the minimum qualifications, an emphasis is placed on applications that can demonstrate a strong academic record of achievement and community service. Professional certifications and bilingual skills are a plus.
- On average, Cadets work three days per week and attend school two days per week. Cadets are sometimes required to work nights, weekends, or holidays.
- Every Cadet will participate in a monthly training that teaches skills essential to pursuing a career in public safety.

Page 6 of 7

265

- ○ Some of the trainings include self-defense tactics, radio communications, firearms training, defensive driving, and conflict resolution.
- ○ Cadets will also have the opportunity to participate in annual mini academies for Denver Fire, Denver Police, and Denver Sheriffs. These are longer training sessions that incorporate all aspects of the jobs and expose Cadets to how the safety academy classes are conducted.

## Go Law Enforcement Police Cadet Programs

Go Law Enforcement is an online law enforcement resource center that assists agencies and those looking to pursue a career in law enforcement. Go Law Enforcement provides an article that outlines what a typical cadet program for individuals aged 18 – 21 would entail.

- • Cadet Programs are typically an enforcement apprenticeship program that offers training and varied work assignments to persons between the ages of 18 and 21 (although age requirements may vary from department to department.) The Cadet Program provides qualified men and women with a chance to experience the challenges and personal rewards of a police career.
- • Cadets receive training and may work in the following assignments:
    - ○ Automobile removal
    - ○ Communications
    - ○ Community policing
    - ○ Fingerprinting
    - ○ Photo lab
    - ○ Recruitment and training
    - ○ Traffic
    - ○ Youth services
- • Upon completion of a Cadet Program, with additional testing, some programs elevate Cadets into the role of police officer; others may prepare graduates for testing for the position of police officer.