<pre>
 1                    UNITED STATES DISTRICT COURT

 2                      DISTRICT OF PUERTO RICO

 3
      UNITED STATES OF AMERICA,
 4
                     Plaintiff,
 5     v.                                     Docket No. 12-2039-FAB

 6                                            San Juan, Puerto Rico
      THE COMMONWEALTH OF
 7    PUERTO RICO, et al.,                    May 20, 2022

 8                 Defendants.

 9     _____

10                         STATUS CONFERENCE

11         BEFORE THE HONORABLE JUDGE FRANCISCO A. BESOSA,

12                    UNITED STATES DISTRICT JUDGE.

13     _____

14    APPEARANCES:

15    For the United States
      of America:                Mr. Luis E. Saucedo, Esq.
16                               Mr. Jorge M. Castillo, Esq.
                                 U.S. Department of Justice
17                               950 Pennsylvania Ave., NW
                                 Washington, DC 20530
18
      For the Commonwealth
19    of Puerto Rico and the
      Puerto Rico Police
20    Department:                Mr. Gabriel A. Penagaricano, Esq.
                                 Mr. Rafael Barreto-Sola, Esq.
21                               Cancio, Nadal & Rivera, LLC
                                 403 Munoz Rivera Avenue
22                               San Juan, PR 00918

23    ALSO PRESENT:

24            Mr. Alexis Torres-Rios, Secretary
                 Department of Public Safety
25
</pre>

```
 1 ‖ APPEARANCES, Continued:

 2 ‖           Mr. Rafael Riviere-Vazquez, Sub-Secretary
   ‖                Department of Public Safety
 3 ‖
   ‖           Mr. Arturo Garferr-Croly, Special Assistant to
 4 ‖                Secretary, Department of Public Safety

 5 ‖           Mr. Carlos Colon, Director, IT Office
   ‖                Department of Public Safety
 6 ‖
   ‖           Mr. Miguel Candelario-Piniero, In-house Counsel
 7 ‖                Department of Public Safety

 8 ‖           Ms. Maria Del Mar Ortiz-Rivera, Esq.
   ‖                Governor's Representative
 9 ‖
   ‖           Mr. Pedro De Jesus, Esq.
10 ‖                Chief Counsel, Office of Management and Budget

11 ‖           Ms. Zulma Canales, Director of Fiscal Compliance
   ‖                Office of Management and Budget
12 ‖
   ‖           Mr. Enrique Volckers, Innovation Chief
13 ‖                Puerto Rico Innovation and Technology Service

14 ‖           Ms. Nannette Martinez-Ortiz, Acting Information and
   ‖                Technology Officer
15 ‖
   ‖           Mr. Edgardo Gonzalez, Assistant Administrator
16 ‖                Government Services Administration

17 ‖           Mr. Gustavo Cartagena, Director
   ‖                Office for the Administration and
18 ‖                Transformation of Human Resources

19 ‖           Colonel Antonio Lopez-Figueroa, Commissioner
   ‖                Puerto Rico Police Bureau
20 ‖
   ‖           Captain Carlos Figueroa-Ortolaza, Director, Reform
21 ‖                Office, Puerto Rico Police Bureau

22 ‖           Mr. Jose Vazquez-Rivera, In-house Counsel
   ‖                Puerto Rico Police Bureau
23 ‖
   ‖           Mr. Caonabo Vicente, Director of Information
24 ‖                Technology, Puerto Rico Police Bureau

25 ‖           Mr. Angel Diaz, Director, Consultant IT Bureau
   ‖                Puerto Rico Police Bureau
```

```
1                    Mr. Pedro Santiago, Counsel to the Commissioner
2                         Puerto Rico Police Bureau

3                    Mr. Amaury Rodriguez, Analyst on Public Safety
                          Financial Oversight & Management Board
4
                     Ms. Elisa Guardiola, Budget Manager
5                         Financial Oversight & Management Board

6                    Mr. John Romero, Monitoring Team

7                    Ms. Denise Rodriguez, Monitoring Team

8                    Mr. Scott Cragg, Monitoring Team

9                    Mr. Hipolito Castro, Jr., Monitoring Team

10                   Ms. Merangelie Serrano, Monitoring Team

11                   Mr. Alan Youngs, Monitoring Team

12                   Mr. Roberto Abesada-Aguet, Esq.

13                   Mr. Javier Gonzalez, Monitoring Team

14                   Dr. Alejandro Del Carmen, Special Master

15                   Mr. Thomas Petrowski, Assistant Special Master

16                   Mr. Gary Loeffert, Second Assistant Special Master

17

18

19

20

21

22

23

24   Proceedings recorded by stenography.   Transcript produced by
     CAT.
25
```

```
 1                          I N D E X

 2   WITNESSES:                                      PAGE

 3        None offered.

 4

 5   EXHIBITS:

 6        None offered.

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                                      San Juan, Puerto Rico

2                                      May 20, 2022

3                                      At or about 1:50 PM

4                          *     *     *

5          THE COURT:  Please call the case.

6          COURTROOM DEPUTY:  Yes, Judge.  Civil case 12-2039,

7    *United States of America v. the Commonwealth of Puerto Rico.*

8    This is a status conference held in the courtroom.

9          We're ready to proceed, Judge.

10         THE COURT:  Okay.  Who are the attorneys present?

11         COURTROOM DEPUTY:  Judge, yes, sorry.  On behalf of

12   the United States, Jorge Castillo and Luis Saucedo.  And on

13   behalf of the Commonwealth, Gabriel Penagaricano and Rafael

14   Barreto-Sola.

15         THE COURT:  Thank you.

16         Certain individuals that I requested be present, if

17   they're not here and there's someone who is here for them,

18   please let me know.

19         From the Office of the Governor, Ms. Maria Del Mar

20   Ortiz.  Are you here?

21         MS. ORTIZ:  Yes.

22         THE COURT:  Thank you.

23         Mr. Volckers, are you here?

24         MR. VOLCKERS:  Present.

25         THE COURT:  Thank you.

```
 1            From the Office of Management and Budget, Mr. De
 2   Jesus, are you here?
 3            MR. DE JESUS:  Good afternoon, Judge.
 4            THE COURT:  Thank you.
 5            Ms. Canales?
 6            MS. CANALES:  Here, Your Honor.
 7            THE COURT:  Thank you.
 8            From the Financial Oversight and Management Board,
 9   Mr. Amaury Rodriguez, are you here?
10            MR. RODRIGUEZ:  Yes, Your Honor.
11            THE COURT:  From PRITS, the Puerto Rico Innovation
12   and Technology Service, Ms. Martinez-Ortiz, are you here?
13            MS. MARTINEZ-ORTIZ:  Present, Your Honor.
14            THE COURT:  Thank you.
15            From the General Services Administration, Mr. Edgardo
16   Gonzalez.  Are you here?
17            MR. GONZALEZ:  Present.
18            THE COURT:  Thank you.
19            From the Office for the Administration and
20   Transformation of Human Resources, Mr. Cartagena.  Are you
21   here?
22            MR. CARTAGENA:  Present, Your Honor.
23            THE COURT:  Thank you.
24            From the Department of Public Safety, Secretary
25   Torres?
```

1          SECRETARY TORRES:  Here, Your Honor.

2          THE COURT:  Thank you.

3          Mr. Riviere.

4          MR. RIVIERE:  Good afternoon, Judge.

5          THE COURT:  Thank you.

6          Mr. Garffer, are you here?

7          MR. GARFFER-CROLY:  Present, Your Honor.

8          THE COURT:  Thank you.

9          Mr. Colon, the IT Office director?

10          MR. COLON:  Present.

11          THE COURT:  Thank you.

12          Mr. Puig?  Is there anyone here for Mr. Puig?

13          (No response.)

14          THE COURT:  I guess the others can cover for him.

15          From the Puerto Rico Police Bureau, Commissioner --

16  Antonio Lopez, Colonel Lopez.

17          COLONEL LOPEZ:  (Stood up and raised hand.)

18          THE COURT:  Thank you.

19          Captain Figueroa?

20          CAPTAIN FIGUEROA:  (Stood up and raised hand.)

21          THE COURT:  Thank you.

22          Mr. Jose Vazquez of the Office of the Reform Counsel?

23          MR. VAZQUEZ:  Here, Your Honor.

24          THE COURT:  Thank you.

25          Mr. Juan Carlos Rivera, IT Bureau director?

1      MR. PENAGARICANO:  Your Honor, Juan Carlos Rivera was

2  --

3      THE COURT:  You may remove your mask, Mr.

4  Penagaricano.

5      MR. PENAGARICANO:  Thank you, Your Honor.

6      We filed a motion regarding Mr. Juan Carlos Rivera,

7  the IT director for the Bureau.  He is at his daughter's

8  graduation.

9      THE COURT:  That's right.  I remember now.

10      Is there anybody here instead of him?

11      MR. PENAGARICANO:  Mr. Vicente.

12      MR. VICENTE:  Caonabo Vicente, present.

13      THE COURT:  Your full name, please.

14      MR. VICENTE:  Caonabo Vicente.

15      THE COURT:  Thank you.

16      Mr. Diaz, the Deputy Director?

17      MR. DIAZ:  (Stood up.)

18      THE COURT:  Thank you.

19      And from the Federal Monitor's Office, Mr. Romero.

20      MR. ROMERO:  Here, Your Honor.

21      THE COURT:  Ms. Rodriguez?  Denise, are you here?

22      MS. RODRIGUEZ:  (Stood up and raised hand.)

23      THE COURT:  Counsel Abesada?

24      MR. ABESADA-AGUET:  Good afternoon, Judge.

25      THE COURT:  Thank you.

 1              From the Office of the Special Master, Dr. Del
 2   Carmen, are you here?
 3              DR. DEL CARMEN:  Good afternoon, Your Honor.
 4              THE COURT:  Thank you.
 5              Mr. Petrowski?
 6              MR. PETROWSKI:  (Stood up.)
 7              THE COURT:  And Mr. Loeffert?
 8              MR. LOEFFERT:  Good afternoon, Your Honor.
 9              THE COURT:  Okay.  Thank you.
10              Anybody here that I did not mention?
11              MR. BARRETO-SOLA:  Yes, Your Honor.
12              THE COURT:  You may remove your mask.
13              MR. BARRETO-SOLA:  Pedro Santiago, he is the legal
14   advisor to the Commissioner, Police Commissioner; and also
15   Miguel Candelario, who is the head of the legal division of
16   the Department of Public Safety.
17              THE COURT:  Thank you.
18              Okay.  All right.  I think we should go through how
19   we have done this in the previous status conferences.  I
20   understand -- Mr. Romero, I understand that you have shared
21   your notes of what will be discussed today with the parties.
22   Mr. Romero.
23              MR. ROMERO:  That's correct, Your Honor.
24              THE COURT:  Please approach the podium.
25              Now, when I said "the parties," did you share with

1   only the attorneys or with anybody else?

2         MR. ROMERO:  With the attorneys, who provided -- they

3   provided to PRPB as well.

4         THE COURT:  Okay.  All right.  The first item that

5   should be discussed is an item that I think is extremely

6   important, is information technology.  There's a stipulation

7   as to that that I approved on April 18.

8         Go ahead, Mr. Romero.

9         MR. ROMERO:  On April 12, 2022, the United States

10  Department of Justice and the Commonwealth of Puerto Rico

11  filed an amended joint stipulation with the court.

12        THE COURT:  That was the one that was approved on

13  April 18.

14        MR. ROMERO:  Correct.

15        This stipulation provided the framework to support

16  PRPB in conducting an information technology needs assessment

17  and action plan.  The monitor's office, along with the special

18  master, concurred with the stipulation.

19        The stipulation was filed at the direction of the

20  Court and required that a plan be developed which would assist

21  PRPB in implementation of an information technology system as

22  required by the agreement.  The stipulation identified

23  timeline requirements, and, for some, the deadlines had

24  passed.  One relates to the establishment of an executive

25  level IT planning committee.  The other relates to the parties

1  and monitor discussing and reaching agreement on a process,

2  methodology, and approach by April 15 of 2022, or 20 days from

3  the Court's approval of the amended joint stipulation, and the

4  Commonwealth selection of a vendor to conduct the IT needs

5  assessment by May 15 of 2022.

6          In addition, Your Honor --

7          THE COURT:  Well, wait a minute.  Has the executive

8  level IT Planning Committee been formed?

9          MR. ROMERO:  Yes, Your Honor.

10         THE COURT:  Are they -- are they operational?

11         MR. ROMERO:  Yes.  I think the PRPB was prepared to

12  speak on that issue.

13         THE COURT:  Okay.

14         MR. ROMERO:  In addition, Your Honor, there are

15  future timelines that will need to be met for the Commonwealth

16  to be in compliance with the approved court stipulation.  They

17  include the Commonwealth conducting an IT needs assessment and

18  completing a draft report by October 1st of 2022; the

19  collaboration period to finalize the needs assessment and

20  provide framework for acts -- to the action plan by November

21  1st of 2022; the parties and the monitor to approve the IT

22  needs assessment by November 15 of 2022; the Commonwealth to

23  develop a draft IT action plan for review by January 15 of

24  2023; a collaboration period to finalize IT action plan by

25  February 15 of 2023; the parties and the monitor to approve

 1    the IT action plan by March 15 of 2023.

 2            Your Honor, the monitor's office respectfully

 3    requests the Court allow the parties an opportunity to comment

 4    on these requirements and timeframes.

 5            THE COURT:  Okay.  I'll hear from Mr. Penagaricano or

 6    Mr. Barreto first.

 7            MR. PENAGARICANO:  Thank you, Your Honor.

 8            Well, yes, we concur with the statement from the

 9    monitor.  So far all of the timelines that have occurred so

10    far of the stipulation and the Order which incorporates the

11    stipulation have been fully met.

12            THE COURT:  Well, the monitor just said that some of

13    the deadlines have passed.  Does that mean that those

14    deadlines have been complied with?

15            MR. PENAGARICANO:  Yes.  They have been complied

16    with.  I don't think there's anything outstanding regarding

17    the IT Order.

18            Currently, Your Honor, the parties, not only the

19    Commonwealth, but together with the monitor, the special

20    master, and the plaintiff, the U.S. DOJ, were currently

21    exchanging drafts with this vendor, which is Gartner, which is

22    to complete the needs assessment plan by October the 1st.  I

23    think contracts are in a fairly advanced stage.  They should

24    be finalized within maybe a week, maybe ten days, and they

25    will get right to work.  And they have until October to

1   complete that process.

2         The idea, Your Honor, is that all parties in this

3   case, not only the Commonwealth, will be fully working

4   together with the vendor towards that needs assessment plan,

5   including the executive IT Committee that was referred.

6         THE COURT:  Okay.  The monies that are needed for --

7   to complete an information technology plan and put it into

8   effect is going to cost a lot of money.  Are there funds for

9   that?

10        MR. PENAGARICANO:  Well, as part of the negotiation

11  with this vendor, Gartner, we don't know yet what's going to

12  be the fee for this needs assessment plan that needs to be

13  ready for October.  I think we will know that at some time

14  next week.  But the idea, Your Honor, as I think you have been

15  made aware, is that the contracting of this vendor will occur

16  through the office of the monitor.

17        THE COURT:  Yes.  And the money -- the monitor's

18  budget is being used for this.

19        MR. PENAGARICANO:  Correct.  And the idea for this

20  next fiscal year is that whatever the fee is going to be for

21  this vendor will be added to the monies that are going to be

22  deposited for the next fiscal year.  And regarding the work

23  that will occur by this vendor before the commencement of the

24  next fiscal year, as we have discussed with the monitor, I

25  think funds are already available for them to be deployed

1   towards the work from this vendor even before the next fiscal

2   year starts.

3         THE COURT:  So I can expect that sufficient funds

4   will be available during the next fiscal year to pay for

5   whatever the -- Mr. Gartner has -- whatever his contract fee

6   is?

7         MR. PENAGARICANO:  That is correct.

8         THE COURT:  And that has to be done by March 2023,

9   which is two and a half months --

10        MR. PENAGARICANO:  Well --

11        THE COURT:  Almost at -- fiscal year 2023 starts on

12  June 1st.

13        MR. PENAGARICANO:  July 1st.

14        THE COURT:  July 1st.  So this would be done two and

15  a half months before the end of next fiscal year?

16        MR. PENAGARICANO:  Right.  By March, 2023, Your

17  Honor, is -- not only the needs assessment plan that needs to

18  be ready by October, but the actual action plan, to

19  actually -- the plan to implement what needs to be done to fix

20  the problem.  That has to be ready by March, 2023.

21        THE COURT:  Okay.  That's the action plan.

22        MR. PENAGARICANO:  Right.

23        THE COURT:  But the -- putting that plan into

24  operation, have you discussed with Mr. Gartner or with anybody

25  else as to how long it will take to put that plan into

1  operation until we have, you know, what everybody wants with

2  information technology?

3          MR. PENAGARICANO:  Yeah.  No.  No, Your Honor.  We

4  have not gone to that part yet, as we are dealing with the

5  needs assessment part first, but it's certainly a conversation

6  that will ensue soon.

7          THE COURT:  In my view, and I think the view of just

8  about everybody else here, if -- moving this case forward,

9  this reform case forward is going to depend on information

10  technology for -- you know, everything that has to be done for

11  information technology, so that reports can be done correctly,

12  and in the correct manner, with technology and the like.

13          All right.  Mr. Saucedo, anything on behalf of the

14  United States on this issue?

15          MR. SAUCEDO:  Yes, Your Honor.  Good afternoon.

16          Since the last status conference in March -- on March

17  24th, the parties have been engaged in discussions with the

18  monitor to determine the scope of this project.  And what

19  we've decided is that this would have -- this would be a

20  three-phased project with five steps.  And, Your Honor, the

21  items you've raised are contemplated in that planning.

22          So the three phases are the diagnostic and directions

23  phase, and that's where we're currently in.  And that needs to

24  be completed by October 1st, 2022.  That should include the IT

25  needs assessment, and that includes the initial project

management and the current state assessment of where PRPB is

today with its information technology systems.

The second phase of the project is the strategic

action planning.  That responsibility will fall on the

Commonwealth, because they will need to then take the IT needs

assessment and develop an action plan.  They need to identify

priorities.  We know that this is going to be a huge cost and

a huge undertaking, and that it cannot all be done at once,

but part of the IT needs assessment is to first identify

critical needs, things like radios, critical infrastructure

dealing with servers that we've talked about before.  So the

Commonwealth will need to prioritize those needs, ensure that

there's sufficient funding to address those needs, but then

there's going to be a long term planning that's going to be

needed to make the IT systems work.  That second phase should

be completed by March of 2023, in accordance with the Court's

approval of the stipulation.

Your Honor rightly talked about execution.  That is

the third phase.  Execution of that strategic plan with the

priorities built in and with funding and people responsible

for overseeing implementation.  It is true, Your Honor, and we

agree with Mr. Penagaricano that those details need to be

worked out, but we do need to get the IT assessment done.  We

have those steps outlined.  We do need to move on to the

strategic planning.  We have details of how we're going to

1    work through that, Gartner, or the vendor we select.

2            Tentatively, we selected Gartner jointly.  They will

3    conduct the IT needs assessment, and they will stay on board

4    to help develop the IT strategic and action plan.

5            THE COURT:  Will they be on board for the execution

6    or is that something else?

7            MR. SAUCEDO:  I think we need to build ourselves some

8    flexibility.  I'm hopeful, in the next year, PRPB is able to

9    build its own capacity to manage these programs.  We did talk

10   last time.  We talked in January that PRPB counts on 11 IT

11   people, right, and a comparable police department, Los Angeles

12   Police Department, has about 400.

13           So what we're hopeful is that while the IT needs

14   assessment is done, and the strategic planning, that PRPB is

15   also building its own capacity to be able to manage this

16   process going forward, and that's ultimately the hallmark of

17   trying to make this sustainable reform.

18           THE COURT:  Mr. Penagaricano, do you think PR --

19   during the execution plan or -- well, actually, with the --

20   during any of these stages, will the Puerto Rico Police Bureau

21   need any assistance?

22           MR. PENAGARICANO:  Well, sure, Your Honor, but the

23   stipulation agreed by the parties and object of the Order of

24   the Court covers this process all the way till March, just

25   before the execution.  The stipulation does not cover the

1 execution yet, but for sure the idea that design of this

2 process is -- it was going to be an effort of all parties in

3 this case and the monitor to go through the process up to

4 March together in order to be successful.

5        So that's the original idea.  That's why everybody's

6 involved.

7        THE COURT:  When you say "all parties," including the

8 monitor, are you including the special master?

9        MR. PENAGARICANO:  Yes.

10       THE COURT:  Okay.  All right.

11       Okay.  So, Mr. Romero, any comments on what we've

12 heard from -- well, wait a minute.

13       Mr. Saucedo, you said there were three stages and

14 five steps.  What are the steps and where in the stages do

15 they belong?

16       MR. SAUCEDO:  Yes, Your Honor.  So the three phases

17 are diagnostics and direction --

18       THE COURT:  Yes, diagnostics and direction, strategic

19 action plan, and execution.

20       MR. SAUCEDO:  That's correct.  The five steps -- the

21 first step is initiation and project management, and those are

22 the details that we're working out now with the vendor.  The

23 vendor did provide worksheets for all of the interviews they

24 need to conduct, the systems they need to review, the units

25 they need to go visit.  That all is being compiled currently,

1   and it's a joint effort by PRPB, the United States, and the

2   monitor to combine that information.

3        The vendor will then use that to scope out the

4   project, finish the estimate, the cost estimate that needs to

5   be submitted.  And then the only difference, Your Honor, from

6   our original planning is that the oversight -- the contract

7   will be managed through the monitor's office rather than

8   through the Commonwealth, for the IT needs assessment part

9   only.  We think --

10        THE COURT:  Well, is that because the money's coming

11   from the monitor?

12        MR. SAUCEDO:  Well, Your Honor, it's in part due to

13   making this fly faster, so that we can meet the timeframes

14   that are in the stipulation, but, Your Honor, it would

15   facilitate payment.  There is -- the monitor has notified us

16   that there is surplus funding that could be used right away to

17   get them started in June.  Once they're on board and there's a

18   contract in place, they can get started this fiscal year.  And

19   the monitor would then have to reflect in its next fiscal year

20   budget whatever additional cost is needed to complete that

21   project.

22        THE COURT:  Okay.  Mr. Romero, any further comment on

23   this?

24        MR. ROMERO:  Your Honor, we're working with the --

25        THE COURT:  Please, we need for you to approach the

1   microphone.

2          MR. ROMERO:  Sure.  Your Honor, all I have to do at

3   this point regarding that issue is we're working with the

4   parties to move this process forward.

5          THE COURT:  Okay.  All right.

6          Dr. Del Carmen, your comments on this, and especially

7   if you and your team can assist in any way to comply with the

8   stipulation that has been approved by the Court.

9          DR. DEL CARMEN:  Good afternoon, Your Honor, and

10  thanks for the opportunity to offer our comments.

11         THE COURT:  Mr. Penagaricano has already said that

12  you may -- that when he says parties, it includes the special

13  master, but I want to know how can you -- if knowing that

14  Mr. Gartner is on board, how can you assist in any way in

15  getting this stipulation done with the deadlines that there

16  are?

17         DR. DEL CARMEN:  Your Honor, I hate to be the spoiler

18  of good news, but we have not been involved in this process.

19  I'm afraid that's not accurate.  My office, our office, and I

20  just conferred with my colleagues, have not been privy to some

21  of the components that are taking place right now.

22         We did see the draft before it was submitted to the

23  Court.  We offered our opinion.  We believe it is a strong

24  draft.  But since then we have not been in communications, nor

25  have we been invited nor privy to any of the meetings.

1            I will tell you, however, that this particular IT

2    component, it reminds me of the fact that this case is unique

3    in the United States in the sense that it had four years of

4    capacity building, which was actually extended.  During those

5    four and a half years or five years, I think many of us

6    believe that not enough was done to have the capacity that it

7    should have.  In other words, these conversations about the

8    lack of IT, lack of personnel, lack of data, should not be

9    taking place given those years that took place.  I'm afraid

10   this may happen again with regard to this plan.

11           The way my office can help, and we can help, is by

12   helping out the Police Department right now begin the process

13   of that capacity building that the government alluded to or

14   attested to, because we believe that that needs to happen

15   almost immediately, as soon as all of these phases end.

16           THE COURT:  Would that entail coordinating with

17   Mr. Gartner?

18           DR. DEL CARMEN:  Yes, sir, absolutely, and the

19   parties as well, and the monitor.

20           THE COURT:  No, I understand, but because Mr. Gartner

21   is like the number one guy in this, I was just wondering if

22   you and your team would be able to assist Mr. Gartner in

23   whatever it is that he has to do.

24           DR. DEL CARMEN:  Yes, sir.

25           THE COURT:  Throughout?

 1             DR. DEL CARMEN:  Absolutely.

 2             THE COURT:  All right.

 3             MR. SAUCEDO:  Your Honor, if I may be heard on this

 4   issue?

 5             THE COURT:  Yes.

 6             MR. SAUCEDO:  I do want to point out, and Dr. Del

 7   Carmen is correct, that we did share with him the draft

 8   stipulation on IT planning.  He did have a chance to review it

 9   and okay it before it was filed with the Court.

10             I do note, Your Honor, that -- and the Order the

11   Judge issued on the stipulation specifically indicates that

12   the Commonwealth, PRPB, the United States, and the monitor are

13   going to reach agreement on the scope of work, on the

14   selection of the vendor, and on the implementation of the

15   plan.  So we've complied with Your Honor's Order.

16             THE COURT:  What do you want?  You don't want Dr. Del

17   Carmen around?

18             MR. SAUCEDO:  I'm not saying that we don't want Dr.

19   Del Carmen around.  We do.  We do need his assistance in this

20   case.

21             THE COURT:  Well, that's what I'm saying.

22             MR. SAUCEDO:  But, Your Honor, we do want to avoid

23   duplicity.

24             THE COURT:  There's not going to be any duplicity,

25   and I'm sure that Dr. Del Carmen is not going to do things

1   that are already done.  But if there's something in which he

2   can assist, then he'll be there.

3          MR. SAUCEDO:  Yes, Your Honor.

4          THE COURT:  I don't -- obviously there's no room for

5   any duplicity in any of this, but if Dr. Del Carmen and his

6   team can assist Mr. Gartner, the Police Bureau, or the

7   monitor, I'm going -- I want him to do that.  We've got to

8   move this thing forward.

9          MR. SAUCEDO:  (Nodding head up and down.)

10          THE COURT:  Okay.  Anything else on information

11  technology?

12          MR. SAUCEDO:  No, Your Honor.

13          THE COURT:  All right.  How about, Mr. Romero, use of

14  force?

15          MR. ROMERO:  The next area, Your Honor, is interim

16  use of force planning.  On April 13 of 2022, the Commonwealth

17  admitted to the Court the PRPB provisional use of force plan.

18  This plan was developed by PRPB, and provided to the U.S. DOJ

19  and the monitor's office for comments and recommendation prior

20  to submission.

21          Your Honor, this was a plan that was developed in the

22  interim after the needs assessment.  We believe that a more --

23  a permanent plan will be developed as to how use of force is

24  captured, the information and the data, but, in the interim,

25  we needed a plan in order for US -- for PRPB to be able to

1  provide the monitor's office with valid use of force numbers

2  for purposes of compliance and review.

3        In its submission, the Commonwealth agrees to the

4  following:  To provide a status update to US DOJ and the

5  monitor's office on implementation on the provisional use of

6  force data plan every 30 days.

7        THE COURT:  Has that happened?

8        MR. ROMERO:  Yes.  We've been in touch with them as

9  to where we are with the plan, and that has happened.

10        THE COURT:  Are you satisfied with what they

11  provided?

12        MR. ROMERO:  Yes, Your Honor.  We worked with DOJ on

13  the plan.  We made a number of recommendations to the interim

14  plan, and that was adopted into the plan.  The Commonwealth

15  agreed to the following:  To provide a status update every 30

16  days.  PRPB also agreed to provide both the US DOJ and the

17  monitor's office copies of any directed issue.  We know, in

18  connection with the use of force plan, there will be

19  directives, and we want them provided to us so we can review

20  them as well before they go out.  Implementation of the

21  provisional use of force data plan within ten days of being

22  issued.  PRPB also agreed to submit to the US DOJ and the

23  monitor any proposed directives related to use of force plan

24  for review and approval.  We all agreed that if the directive

25  needed -- in order to make this plan work, we needed to look

1   them over, as well as DOJ, and come to a consensus that in

2   fact, within the directive, it's consistent with what is

3   needed.

4        Your Honor, the monitor's office respectfully

5   requests the Court allow the parties an opportunity to comment

6   on the implementation status on the use of force plan as

7   submitted to the Court.

8        THE COURT:  Have you provided the comments to the use

9   of force plan?

10       MR. ROMERO:  Excuse me.  We have --

11       THE COURT:  You have?

12       MR. ROMERO:  When the plan was submitted, yes, we

13  commented and made recommendations.

14       THE COURT:  Was that the subject of the stipulation?

15       MR. ROMERO:  Stipulation -- we'd work on a plan to

16  develop a plan, yes.

17       THE COURT:  Is the exculpatory data you're receiving

18  reliable?

19       MR. ROMERO:  Well, that was the issue, Your Honor.

20  PRPB needed to develop a plan that would provide with

21  reliable, valid use of force numbers.  That has not occurred

22  yet.  But the plan is not fully implemented as well.  Once it

23  is in the period of CRM-7, then we will look to see if that,

24  in fact, is providing reliable use of force numbers.  But it's

25  going to be a work in progress, Your Honor.

1          THE COURT:  Without reliable information, the use of

2     force plan would not be good.

3          MR. ROMERO:  What we're seeing, Your Honor, in

4     reviewing, and I've been -- the use of force -- I'm the

5     subject matter expert for use of force as well.  What we're

6     seeing is PRPB is correctly investigating use of force.

7          THE COURT:  Incorrectly?

8          MR. ROMERO:  No, correctly.  They are.  Supervisors

9     are responding to the scenes.  Supervisors are taking

10    appropriate action.  This is in general, but what we're seeing

11    -- and, at the same time, the level of force used is

12    consistent with policy, but at this point they don't have the

13    ability to provide that every use of force is being presented

14    to us, because they have no system to ensure that these

15    numbers are accurate.

16         In the absence of that information, that's what's

17    resulting in compliance levels that are less than substantial.

18    But developing a plan to capture use of force numbers, once we

19    know we have the entire universe, we can look at it and make

20    determinations of compliance.

21         THE COURT:  So what assistance, if any, does the

22    Bureau need to be able to provide what you need -- what you

23    need?

24         MR. ROMERO:  Well, at this point they're implementing

25    the plan.  We need to make sure there are steps within the

1   plan to verify certain steps.  For instance, everything now is

2   digitized in the sense that all use of force reports since

3   August of last year are, you know, generated into a statement.

4   There's no more paper written.

5        They need to verify that all use of force information

6   is going into the GT system under a reformed PPR 605 1; that

7   the complaint card, which is the initial call as to the

8   incident, the 126 2, is being prepared, and as well as the 605

9   3, which is the supervisor notifying that use of force took

10  place and by how many officers.

11       PRPB needs to develop that all of those fields have

12  consistent information that's consistent with the three, and

13  they are in the process of doing that now.

14       THE COURT:  Do they have the sufficient personnel to

15  do that?

16       MR. ROMERO:  They do.  It's -- quite frankly, the

17  plan now is kind of labor intensive in the sense that it

18  requires certain levels at the central monitor level, at the

19  field level, but we -- the plan, it can work if it's

20  implemented and followed by PRPB.  And we can check that, Your

21  Honor.  We do that during the course of the reviews for the

22  CMR reports.

23       THE COURT:  Mr. Penagaricano, please.

24       MR. PENAGARICANO:  Thank you, Your Honor.

25       Led and guided by this Court in January, in the

1   hearing that we had before you, the problem with the

2   reliability of data, of the use of force data was identified,

3   and the Court ordered the parties to sit down and, to the

4   Commonwealth, to come up with a plan to fix that, and to

5   submit it to the parties for approval.  And that occurred.  It

6   was thoroughly discussed, the plan, and it was conditionally

7   approved by the parties.  It was filed on April the 13th, and

8   the conditions of that approval are stated in the

9   corresponding motion, which is basically to be completely

10  transparent and to involve the parties every step of the way

11  in implementing that plan.

12          That plan, as we sit here today, is completely on

13  pace to fix the problem.  There are some directives that had

14  to be issued to all of the parties of the force, meetings with

15  the specialized units, the SWAT, and others.  All of that is

16  occurring.  The directives were submitted to the parties.

17  Comments were sent back.  There are drafts being circulated as

18  we speak.  In fact, this morning the latest draft of those

19  directives was circulated to the parties.

20          In other words, what I'm trying to say is that we

21  believe that the Commonwealth is on pace to comply with the

22  conditional plan that has been agreed to by the parties.

23          THE COURT:  Captain Figueroa, do you have sufficient

24  personnel to execute this plan?

25          CAPTAIN FIGUEROA:  Yes.

1          THE COURT:  You do?

2          CAPTAIN FIGUEROA:  Yes.

3          THE COURT:  Within the time limits imposed by the

4   Court?

5          CAPTAIN FIGUEROA:  Yes.

6          THE COURT:  All right.  Okay.

7          All right.  Mr. Saucedo.

8          MR. SAUCEDO:  Yes, Your Honor.  From the United

9   States' point of view, the policy and the training at PRPB is

10  clear, it is consistent with the consent decree, and that is

11  any time an officer uses force, it must be reported.  And

12  force is clearly defined so that there's no question about

13  what force is and is not.  And the steps to report that are

14  also laid out in PRPB policy.

15         The problem has been in validating reports coming in

16  directly from the officers, and we're facing two huge

17  challenges.

18         THE COURT:  Validated by whom?

19         MR. SAUCEDO:  They should be validated -- there

20  should be multiple layers of validation, but the first

21  validation needs to be the first line supervisor.  A first

22  line supervisor shows up --

23         THE COURT:  Of which we need a whole bunch.

24         MR. SAUCEDO:  That's correct, Your Honor.  That's

25  correct.

1            The first step in the review of use of force should

2    be the first line supervisor, who goes to the scene and can

3    ask how many officers were present in this incident; how many

4    used force; how many subjects did you use force on?

5    Otherwise, officers will report their use of force, but we

6    want to make -- PRPD needs to make sure that, as an agency,

7    they're correctly counting uses of force and reporting that to

8    the monitor.

9            So the problem has been one of validating the

10   officers' reports that are coming in from the field.  So

11   challenge number one, the dearth of first line supervisors.

12   The second challenge is the IT systems have not been set up --

13            THE COURT:  Well, let me ask you this.

14            MR. SAUCEDO:  Yes, Your Honor.

15            THE COURT:  Are you satisfied with the way these

16   reports are being validated?

17            MR. SAUCEDO:  Your Honor, we conditionally approved

18   the Commonwealth's plan.

19            THE COURT:  Well, forget about the plan.  I want to

20   know whether -- I mean, the plan I think is well set out and

21   well written.  I mean, it's a good plan, but you have just

22   mentioned that there is a situation or a problem with

23   validating, and what I want to know is that -- if you are

24   satisfied with the way the validating is being done?

25            MR. SAUCEDO:  Your Honor, we are satisfied, because

1   PRPB will be using existing resources in its command centers

2   to validate the field reports coming in every day.  In

3   addition, they've told us that they are going to require that

4   their statistics division, of which -- that belongs to the

5   field operations is also going to have a role in validating

6   the use of force numbers that are coming in.

7           There's always going to be a lack --

8           THE COURT:  Well, that concerns me.  If there's no

9   one -- if there are no -- if there are no sufficient front

10  line, first line supervisors to do what you just said that

11  they should be doing, how is this going to be reflected all

12  the way up at the command center?

13          MR. SAUCEDO:  Well, Your Honor, this is precisely our

14  concern, and why we couldn't agree to this plan as the plan.

15  It's a provisional use of force data plan, because we're at

16  the same time trying to fix the IT systems.  We just talked

17  about that.

18          The next item we're going to talk about is

19  supervision.  So while we try to fix those things, we've put

20  together a provisional plan in place that relies on

21  existing -- other supervisors to fill in to then validate

22  those numbers.  There are some supervisors --

23          THE COURT:  That's why I'm concerned as to whether

24  this validation system is satisfactory to you.  I mean the

25  execution of it.

1      MR. SAUCEDO:  Your Honor, we conditionally approved

2  this, and one of the conditions is that we get monthly

3  briefings.  And we did get one this week.  The monitor team

4  and DOJ visited Arecibo, the area command in Arecibo to look

5  at how the reports are coming in and who's validating those

6  reports.

7      There's still some discrepancies.  Directives still

8  need to be issued.

9      THE COURT:  But when is that going to be done?  I

10 mean, this business of use of force has been going on for

11 years.

12     MR. SAUCEDO:  We agree, Your Honor.

13     THE COURT:  For years.

14     MR. SAUCEDO:  We agree, Your Honor.

15     I think the Commonwealth might be able to address

16 when they're going to issue the directives.  We did get the

17 revised directives that we commented on back today.  Those

18 need to be issued.

19     People -- our concern was that the Commonwealth not

20 simply order people to report and validate the way it's

21 supposed to be, that the agency provide the resources that are

22 needed to be able to make that happen.

23     THE COURT:  Well, Captain Figueroa said he had enough

24 resources.  Do you agree?

25     MR. SAUCEDO:  I believe that what is needed -- that

1  they do have the resources, for example, to provide the job

2  aides that officers need to be able to report force directly.

3  Command Center supervisors are going to take on new

4  responsibilities in validating use of force, so they need

5  clear directions and job aides to help them get that done.

6  And part of the documents we asked the Commonwealth

7  to provide, which they did this morning, were those

8  supplemental materials that are going to be used to train

9  people to make sure this plan gets implemented.

10  THE COURT:  All right.  With the lack of first line

11  supervisors, I am really concerned that these validations are

12  being done up at the Command Center level, so I need for the

13  Bureau, and the Monitor, and you to provide me all validations

14  -- all validations during the month of June.  I want to see

15  what those validations look like.

16  All right.  Now, you mentioned statistics.

17  Statistics --

18  MR. SAUCEDO:  Your Honor, there is a statistics

19  division.

20  THE COURT:  There are lies, there are damn lies, and

21  there are statistics.  So go ahead.

22  MR. SAUCEDO:  Your Honor, the plan that was provided

23  by the Commonwealth includes not just validation from the

24  Command Center supervisors, but also the force -- the

25  statistics division that's assigned to the field operations

1    superintendency.  Again, this is a provisional plan.  We know

2    that it is not going to be perfect.

3              THE COURT:  Well, that's why I want to see it.  I

4    want to see how the provisional plan is working.

5              MR. SAUCEDO:  Yes, Your Honor.  So do we.  And the

6    monitor has also played a role in doing field visits this week

7    while we're on the ground to look and see how this is actually

8    being implemented.

9              THE COURT:  Okay.  So what is the function of these

10   statistics vis-a-vis the validation?

11             MR. SAUCEDO:  Your Honor, I would defer to the

12   Commonwealth to provide an explanation of their role in this

13   process.

14             THE COURT:  Mr. Penagaricano.

15             MR. PENAGARICANO:  Well, as to this specific detail,

16   I would ask Captain Figueroa to provide input.

17             THE COURT:  Right, because if I want validations --

18   every validation in June to be provided to me by the end of --

19   let's say by July 15, for the month of June, what role do

20   statistics have in this validation, if any?

21             Captain Figueroa, please.

22             CAPTAIN FIGUEROA:  Your Honor, if I may be allowed to

23   explain the process briefly?

24             THE COURT:  Yes, please.

25             CAPTAIN FIGUEROA:  Once the use of force report is

1   done, which is done by the agent who is in the precinct or the

2   station, what begins that report is a complaint card.  And

3   what does that complaint card entail?  It has a field that

4   indicates:  Was there use of force?  Yes or no.

5          And the problem that we've had in the process is

6   there may be an agent who will indicate that there was no use

7   of force, however, two minutes later, he's completing an use

8   of force report.  So that brings a difficulty that the

9   dashboard that was done on the realtime statistics will not

10  identify that use of force, because on the complaint card, it

11  was identified that there was no use of force.  And so that's

12  where it comes to play.

13         And I do acknowledge your concern that -- we are

14  aware, and so we are aware and the Department of Justice is

15  also aware that we do have a problem, and it entails a lack of

16  supervision, supervisory personnel, and that's why we have a

17  provisional plan.  And how does this provisional plan address

18  these statistics?  The Command Center supervisor is the one

19  who's going to identify through the systems these deficiencies

20  they have just identified that have been -- that I just

21  explained that have been identified by them.

22         So every day not only the Command Center supervisor

23  will verify them, but also the field statistics personnel will

24  identify them -- verify them.  Correction.  That allows us to

25  take action towards that agent who did not correctly identify

1   the use of force on the complaint card, and that would allow

2   us daily to observe truly how much use of force there had been

3   during a work shift.

4           And it is provisional, because the ideal thing is for

5   the sergeant who is at the district or the precinct to do so.

6   And so if -- to comply with the request, it would be to look

7   at the month of June, see how many there were, and how they

8   were corrected, to make sure that the plan is working.

9           THE COURT:  All right.  Thank you.  That's exactly

10  what I need.

11          CAPTAIN FIGUEROA:  (Nodding head up and down.)

12          THE COURT:  The validation and what the Command

13  Center supervisor and the statistician, what their role is,

14  and what they have done with each report of use of force.

15          CAPTAIN FIGUEROA:  (Nodding head up and down.)

16          THE COURT:  Can that be done, Captain Figueroa?

17          CAPTAIN FIGUEROA:  Yes.

18          THE COURT:  All right.  Let's do it for the month of

19  June, just to see how this provisional system is working, and

20  see if we have -- you know, if you -- if you or anybody else

21  notice that the provisional plan has to be amended or changed

22  in any way, however little, please include it in your report

23  for June, okay?

24          CAPTAIN FIGUEROA:  We will do so.

25          MR. PENAGARICANO:  We will submit it.

1          THE COURT:  Okay.  Thank you.

2          Dr. Del Carmen, anything on use of force?

3          DR. DEL CARMEN:  Just a brief comment, Your Honor.

4     We obviously feel that data is important and that validation

5     of data is even more important.  Generally, when we approach

6     these type of components in place in reform agreements and

7     also across the U.S. on research, we always come up with a

8     plan, which it sounds like they've done.

9          We always look for resources.  We look for personnel.

10    We also make sure that the personnel is well trained.  We also

11    -- and it seems to me like, aside from the technological

12    challenges, the challenge here may be something related to

13    accountability and oversight, both of which are directly

14    related to the presence of supervisors, as per Your Honor's

15    comments.

16         So it would be interesting to see what the month of

17    June produces in terms of data, but I will tell you, Your

18    Honor, that nothing is valid until the data is validated.  We

19    often use the comment in lay terms "garbage in, garbage out."

20    If your data is not accurate, none of the implications, none

21    of the stipulations are ever going to be accurate.  So thank

22    you, Your Honor.

23         THE COURT:  All right.  Okay.

24         All right.  Once this report that I want for the

25    month of June is prepared, I would like, Mr. Saucedo, your

```
 1   people --
 2             MR. SAUCEDO:  Yes, sir.
 3             THE COURT:  I want the monitor and I want Dr. Del
 4   Carmen to take a look at it and provide whatever comments you
 5   may have.  After -- obviously you have to discuss it with
 6   Captain Figueroa or whatever once it is received.
 7             MR. SAUCEDO:  (Nodding head up and down.)
 8             THE COURT:  And if you have any suggestions on what
 9   to do after you see a month's worth of use of force
10   submissions, and you see the validations for each of those
11   submissions, then you will be in a better position to --
12   everybody, I mean, Mr. Romero, you, Dr. Del Carmen, will be
13   able to -- and Sergeant -- and Captain Figueroa himself, will
14   be able to see if this provisional plan is working to
15   everybody's liking, or whether it needs some sort of tweaking
16   here and there.
17             Is that okay?
18             MR. SAUCEDO:  Yes, Your Honor.
19             THE COURT:  Okay.  Captain Figueroa, is that okay
20   with you?
21             CAPTAIN FIGUEROA:  Yes.
22             THE COURT:  Mr. Penagaricano?
23             MR. PENAGARICANO:  Just a brief comment.  Your Honor,
24   I think -- respectfully request, instead of 15 days after the
25   end of June to submit that, maybe afford the Commonwealth 30
```

```
 1   days, only because I've been told that in order to provide all
 2   validations covering until June 30th, there are some timelines
 3   of the validation, five days, three days, et cetera, so it's
 4   going to be too short to actually --
 5           THE COURT:  Okay.  Any problem with that, Mr. Romero?
 6           MR. ROMERO:  No, Your Honor.
 7           THE COURT:  Dr. Del Carmen?
 8           DR. DEL CARMEN:  No, Your Honor.
 9           THE COURT:  Mr. Saucedo?
10           MR. SAUCEDO:  No, Your Honor.
11           THE COURT:  All right.  Then by the last --
12           MR. PENAGARICANO:   July 31st.
13           THE COURT:  Well, July 31st I think is a Sunday.
14           MR. PENAGARICANO:   Okay.
15           THE COURT:  So by the last duty day in July.
16           MR. PENAGARICANO:   Will do.  Okay.  Thank you.
17           THE COURT:  All right.
18           MR. ROMERO:  Your Honor, if I may, CRM-6, what we did
19   during the mid period, three months into the year, into the
20   fiscal -- the period for CMR-6, we did just that.  We wanted
21   to test the system.  We looked at the GT system, and we pulled
22   out what was on the complaint card, what was on the use of
23   force report submitted into the system, as well as the
24   notification of use of force.  And we had conversations with
25   the Captain and Jose about the issues that we observed.
```

1        From that -- from that, we were able to then develop

2   this interim use of force plan and, as correctly stated by

3   Attorney Saucedo, we said, this needs to be a temporary plan,

4   because two years from now your use of force plan will be

5   totally different than it is now.  But we have to make sure

6   this works now.  We have to provide to the public numbers that

7   are consistently accurate as it relates to use of force.

8        That being said, this system can work.  It's labor

9   intensive, but I say when -- there are so many layers of

10  people that have to look at it to make it work, but it can

11  work, so if you would order -- which is something we would

12  have done anyway, mid period of CRM-7, is take a particular

13  month, which is exactly what you did, is something we would

14  have done as well, and that would give us an indicator just

15  where -- is the plan working, and we'll know what we should do

16  by then.

17        THE COURT:  Well, I'm glad, because that tells me

18  exactly what I should know.

19        MR. ROMERO:  Thank you, Your Honor.  Thank you very

20  much.

21        THE COURT:  All right.  The next topic is a topic

22  that everybody is -- everybody is concerned with, and it's

23  staffing and supervision.

24        MR. ROMERO:  Yes, Your Honor.

25        THE COURT:  Mr. Romero?

1            MR. ROMERO:  Your Honor, on April 13 of 2022, the
2   United States Department of Justice and the Commonwealth of
3   Puerto Rico filed a joint stipulation on the issue of staffing
4   and supervision within the Puerto Rico Police Bureau with the
5   Court.  This stipulation provided a framework for
6   implementation of paragraph 13 of the agreement regarding the
7   allocation of sworn personnel at PRPB, and paragraphs 135
8   through 140 regarding the deployment of supervisors to ensure
9   close and effective supervision in the field.

10           The monitor's office, along with the special master,
11  concurred with the stipulation.  The stipulation was filed at
12  the direction of the Court, and required that a plan be
13  developed which would assist PRPB in its endeavor.  The staff
14  included the following:  The Commonwealth would submit a
15  proposal to the monitor and U.S. DOJ for any updates it
16  intends to make to the 2018 staffing plan, a timeline,
17  including dates for completing any updates to the 2018
18  staffing plan, and providing that information within 90 days
19  of the Court approval of this joint stipulation, implementing
20  any aspects of the 2018 staffing plan, the names and roles of
21  individuals responsible for implementing any aspect of the
22  2018 staffing plan, the establishment of executive level
23  implementation committee, Commonwealth compliance with the --
24  I'm sorry.  Let me just -- establishment of an executive level
25  implementation committee, Commonwealth compliance with its

1    requirement to file a staffing plan update proposal with the

2    Court by May 4th, 2022.  Going forward, other stipulations

3    related to relevant future dates and obligations, which

4    include every 90 days the Commonwealth shall submit to the

5    Court a status report on whether they have met the deadline

6    and benchmark set forth in the staffing plan, availability for

7    inspection of supporting documentation to verify compliance, a

8    timeline for the next 90 days, which must be submitted to U.S.

9    DOJ, the monitor for approval, identifying when the steps

10   outlined in its staffing plan will be completed.

11           In addition, the topic of the supervision plan

12   includes updates on the following:   What is the status of the

13   promotional exams; what is the plan to redeploy sergeants to

14   the field due to staffing shortages; what is the plan for

15   civilianizing positions within the PRPB; what is the status of

16   the regulation law permitting 18 years olds to become members

17   of the PRPB; what is the status of PRPB coordinating with

18   universities to offer courses leading to associate's degrees

19   required by the agreement; what is the status of the career

20   path policy; what is the status of promotional protocol

21   implementation?

22           Your Honor, the monitor's office respectfully

23   requests that the Court allow the parties an opportunity to

24   comment on status of the supervision plan as submitted to the

25   Court.

1          THE COURT:  Okay.  I have the stipulation, the Order

2    approving the stipulation on staffing and supervision, and it

3    says by April 20, the Commonwealth shall submit a proposal to

4    Monitor and the United States Department of Justice for any

5    update it intends to make to the 2018 staffing plan to ensure

6    compliance with paragraphs 135 to 140 of the agreement in

7    accordance with the approved monitoring methodology.  The

8    staffing plan update proposal shall include a timeline for

9    completing any update to the 2018 staffing plan within 90 days

10   of the Court's approval of this joint stipulation, including

11   several matters here.

12          Now, was that submitted to you on April 20,

13   Mr. Romero?

14          MR. ROMERO:  The plan?

15          MR. SAUCEDO:  Proposal.

16          MR. ROMERO:  The proposal was submitted.  Yes, Your

17   Honor.

18          THE COURT:  Okay.  All right.  And was the staffing

19   plan update proposal filed with the Court, with the Department

20   of Justice, and the Monitor's approval by May 4?

21          MR. PENAGARICANO:  Yes, it was, Your Honor.

22          THE COURT:  It was?

23          MR. PENAGARICANO:  Yes.

24          MR. SAUCEDO:  Your Honor, if I could just address the

25   proposal?  What we asked the Commonwealth to provide to both

```
 1   the monitor and DOJ was its proposal to update the 2018
 2   staffing plan.
 3              THE COURT:  Right.
 4              MR. SAUCEDO:  And that was due on April 20th.  That
 5   proposal was not submitted on April 20th.
 6              THE COURT:  No.  No.  I know.
 7              MR. SAUCEDO:  Yes.
 8              THE COURT:  It was supposed to be submitted by May
 9   4.
10              MR. SAUCEDO:  Well, Your Honor, the proposal was
11   supposed to be submitted to the monitor and DOJ first for
12   comments.
13              THE COURT:  Correct.
14              MR. SAUCEDO:  And then the final version filed with
15   the Court May 4.
16              THE COURT:  Correct.  My question is, was it?
17              MR. SAUCEDO:  Well, the proposal was not submitted on
18   April 20th.  It was submitted a few days later.  We did notify
19   the Commonwealth that it had missed that deadline Your Honor
20   referenced in the stipulated order.  However, the parties and
21   the monitor did work very hard, and we were still able to work
22   very hard to meet the Court's deadline of May 4th, to meet
23   that proposal.  That proposal is supposed to set out the steps
24   the Commonwealth will take over the next 90 days to update the
25   staffing plan.
```

```
 1              THE COURT:  Okay.  All right.
 2              Dr. Del Carmen, please --
 3              DR. DEL CARMEN:  No additional comments, Your Honor.
 4              THE COURT:  I'm sorry?
 5              DR. DEL CARMEN:  No additional comments, Your Honor.
 6              THE COURT:  All right.  Thank you.
 7              MR. SAUCEDO:  Your Honor.
 8              THE COURT:  Yes.
 9              MR. SAUCEDO:  I just -- I want to emphasize how
10  important it is that we get this right, Your Honor, the
11  staffing allocation.  The exercise we want to go through is
12  not just hiring more people, hiring more people.
13              THE COURT:  No.  You can't do that.
14              MR. SAUCEDO:  Yes, Your Honor.  That's correct.
15              THE COURT:  You have to hire the right people.
16              MR. SAUCEDO:  Exactly, Your Honor.  We want to make
17  sure that you hire the right people, and that you deploy them
18  where you need them.
19              So the problem, Your Honor, is that the 2018 staffing
20  plan did just that.  The Commonwealth made a series of
21  commitments on how it was going to hire, promote, train, and
22  deploy staff to the places where they're needed.  Now, that
23  plan wasn't implemented.  We now have reached this new
24  stipulation, and we've asked the Court to closely supervise
25  it.  And here are talking about what progress we've made.
```

1          The first step is to get the staffing plan updated by

2    July of this year.  The Commonwealth has reported to us that

3    they've -- that they've instructed each of the division heads

4    to identify current staffing needs, to make sure that those

5    needs are updated.  Once they're updated, there is an internal

6    resource committee that is supposed to balance out where you

7    have more people and where you have less people, to try and

8    make up for the disparities that currently exist.  So that's

9    the first step.

10          The second step is to then develop a long-term plan.

11   How are we going to hire, promote, and civilianize to fill

12   these positions with competent civil servants who can take the

13   place of officers who are doing administrative work, and to

14   help with the fieldwork that officers do.  So that is where we

15   are right now.  We are in this 90-day period where the

16   Commonwealth's updating it's 2018 staffing plan.

17          THE COURT:  Okay.  So I can expect a report on that

18   90 days from May 4th.

19          MR. PENAGARICANO:  (Nodding head up and down.)

20          MR. SAUCEDO:  That's correct, Your Honor.  The

21   staffing -- the final updated staffing plan is to be completed

22   by July 15, 2022, and that will then be filed with the Court

23   for the record.

24          THE COURT:  Okay.  All right.

25          And Mr. Romero has brought up certain matters under

1    the topic of the supervision plan, and the first one is what

2    is the status of promotional exams.

3                  Mr. Penagaricano.

4                  MR. PENAGARICANO:  Your Honor --

5                  THE COURT:  And I -- and I want you to focus on

6    promotional exams to the rank of sergeant.

7                  MR. PENAGARICANO:  Right.  Your Honor, of course.

8    Well, the status of promotional exams to the rank of sergeant

9    is explicitly stated in this plan.  It is -- on the plan filed

10   on May 14th, docket 2023.  There is a timeline, a calendar for

11   sergeant promotions there all the way until December 2022.

12   That was submitted to the parties and approved, and it calls

13   for the promotion of 506 sergeants by the end of this year.

14                  THE COURT:  The end of this year.

15                  MR. PENAGARICANO:  That is correct.

16                  THE COURT:  506 sergeants in six months.

17                  MR. PENAGARICANO:  Well, the calendar -- it's right

18   there, Your Honor, in the plan submitted on May 4th.  It has

19   several items that have to be complied chronologically for

20   each item all the way up until December.

21                  THE COURT:  Assuming that you are able to promote 506

22   agents to the rank of sergeant, how will that affect your

23   budget?

24                  MR. PENAGARICANO:  Well, as recent as the past few

25   weeks, there has been meetings involving the commissioner of

1   the Bureau with the pertinent agencies of the Commonwealth to

2   cover that topic.  That's as far as the information we know,

3   but it's been discussed on how -- what is the budget needed in

4   order for this to happen.

5          THE COURT:  This is the current budget.  If you want

6   to promote people by the end of this fiscal year, you're going

7   to have money in this budget.

8          MR. PENAGARICANO:  Not for this fiscal year, Your

9   Honor, but by December, which is the next fiscal year.

10          THE COURT:  All right.  Okay.  All right.  So let's

11  assume that -- so you're going to have to find money for the

12  next fiscal year, so that's going to happen for the first six

13  months of the fiscal year.

14          MR. PENAGARICANO:  That is correct.  We know it's an

15  aggressive plan, but I can assure the Court there are so many

16  things in motion with different agencies and --

17          THE COURT:  Well, let me hear from the Office of

18  Management and Budget.

19          MR. PENAGARICANO:  Yes.  Sure.

20          MR. DE JESUS:  Good afternoon, Your Honor.

21          THE COURT:  Thank you.

22          MR. DE JESUS:  Pedro De Jesus on behalf of the OMB.

23          We started these meetings regarding staffing

24  positions for sergeants in the PRPB.  We had a meeting last

25  week with the Fiscal Oversight Management Board regarding

1  previous budgets that will be -- bring out to the budget of

2  the PRPB, the numbers that we are trying to see.  It's how

3  we're going to be saving and making those positions.  But,

4  nevertheless, the information that we have been provided with

5  is that information has to be confirmed with the FOMB, that --

6  they are present here in this meeting today, on this hearing

7  today.

8          And being that said, the other thing that we're

9  waiting for is for the approval of this Court for the

10 proceedings that the PRPB is going to be making for doing

11 those -- for taking those new positions as sergeant.  So in

12 case of the budget, there are conversations right now being

13 made with the FOMB, and in case of the proceedings, we're

14 waiting for the approval of this Honorable Court on the

15 proceedings that the PRPB are going to be doing for those

16 staffing positions.

17         THE COURT:  What proceedings?

18         MR. DE JESUS:  The proceedings that they're going to

19 be making in six months, taking the time down from the usual

20 time it takes to do those staffings in the PRPB.

21         THE COURT:  Okay.  So --

22         MR. DE JESUS:  So we have to wait for the process,

23 that we, the OMB, only do with the budget, so right now we

24 access that -- maybe FOMB could explain --

25         THE COURT:  So what you're looking for is the Court

1   to get involved in reducing the amount of time normally

2   necessary to make these promotions?

3            MR. DE JESUS:  There are many situations that have to

4   be addressed, as the consent decree established, so the

5   staffing positions that are going to be made, they have to

6   have the qualifications that Your Honor has mentioned today.

7            THE COURT:  Of course.

8            MR. DE JESUS:  And those are internal affairs that

9   the PRPB has to address through their attorneys in the process

10  of these hearings, Your Honor.

11           THE COURT:  Okay.  Thank you.

12           MR. DE JESUS:  You're welcome.

13           THE COURT:  Who is present here for the Fiscal Board?

14  Fiscal Board.

15           COURTROOM DEPUTY:  Yes, Judge.  It should be --

16           MS. GUARDIOLA:  Good afternoon, Your Honor.

17           THE COURT:  You may remove your mask.

18           MS. GUARDIOLA:  Elisa Guardiola, budget manager for

19  the Oversight Board.

20           So what we can say is that we received, as part of

21  the fiscal year '23 budget process, a request through the

22  Office of the Management Board, a request for 250 promotions

23  to sergeant, which has an impact of 345,000 dollars for the

24  entire year.

25           THE COURT:  They said 506.

1          MS. GUARDIOLA:  Right.  So I guess that you're

2    missing an additional 250.  They are planning on doing the

3    process, the promotion process by the end of December as they

4    have mentioned.  So we have to meet and discuss additional

5    funding they need.  Certainly use -- around 345,000 dollars.

6          THE COURT:  All right.  You're probably aware that

7    the PROMESA Statute indicates that the Board cannot exercise

8    authority to impede any territorial action to comply with a

9    Court-issued consent decree.

10         MS. GUARDIOLA:  You are right.  You're right, Your

11   Honor.

12         THE COURT:  I can think of no other way of impeding

13   this consent decree than not funding the police.  Am I

14   correct?

15         MS. GUARDIOLA:  Yes.  You're correct.  Yes.

16         THE COURT:  Okay.  So I think you and the Office of

17   Management and Budget should always be aware that Congress has

18   indicated that you cannot impede a Court-issued consent

19   decree, and for me the only way you can impede it is to not

20   provide the necessary funds to move the consent decree

21   forward.

22         And I think everybody is concerned about the

23   immediate need of sergeants.

24         MS. GUARDIOLA:  Yes.  We totally understand.  And let

25   me explain.  We -- and the reason I mention that we have to go

1    back and revisit this is because we act upon their requests.

2    So certainly if they need 500 instead of 250, which was the

3    amount that we were notified during the review process of

4    2023, so definitely now if that's their need, we can sit down

5    and identify --

6              THE COURT:  Let's not be timid.  If you need 500, ask

7    for it.

8              MS. GUARDIOLA:  Right.  That's the first thing that

9    needs to happen.  We need to understand their needs.  If their

10   need is 500, we need to receive the request through the OMB.

11   And we're definitely going to sit down and look for the

12   appropriation.

13             THE COURT:  I've heard that figure, 500, for some

14   time.  Indeed, I thought -- I think that during the last

15   graduation at the academy, Colonel Lopez mentioned that

16   precise number, that he needed 500 or so more sergeants.  And

17   you've heard this -- use of force, the necessity for

18   validating the use of force, and that the first person who

19   should be involved is a sergeant.  Now, we have this

20   provisional thing, provisional order, because there aren't

21   enough sergeants, and I understand that not everybody can be a

22   sergeant.  You can have an agent who's been around 15, 20

23   years, who perhaps is not someone who you would want as a

24   sergeant, or you can have an agent who's been on the force

25   maybe two or three years that has been already not identified

1  but can be identified as someone who is eligible to be

2  promoted to sergeant.

3          So let me ask you this, because this is something

4  that came up yesterday when I met with the monitor and the

5  special master.  There have been at least three fiscal years,

6  2019, 2020, and 2021 where apparently the PRPB has not spent

7  the entire amount of their 20 million dollar budget in each

8  one of those fiscal years.

9          Now, I heard, I don't know if it was you or someone

10  else within the Board, that you have already identified 25

11  million dollars that would be, quote, returned to the police,

12  you know, to -- because some of that money was not spent and

13  maybe was spent by the Commonwealth on something else.

14          MS. GUARDIOLA:  Okay.  So let me clarify the years.

15  It's fiscal year '18 --

16          THE COURT:  Well, wait a minute.  Wait a minute.

17  Wait a minute.  Because what I've heard is that no one knows

18  what happened to the funds in 2018.

19          MS. GUARDIOLA:  No.  We -- well, we do.

20          THE COURT:  Okay.

21          MS. GUARDIOLA:  And I think that the documents that

22  were filed by the Police Department previously that are a part

23  of your orders, it's fiscal year '18, so that's '18 -- well,

24  yeah, '19 -- no.

25          THE COURT:  Fiscal year '19 is from July 1, 2018, to

1 | June 30, 2019.

2 |     MS. GUARDIOLA:  So it's fiscal year ending '18.  So

3 | that's June 18.  And the remaining funds is 1.9 million, which

4 | is exactly the same figure that has been represented by the

5 | Police Bureau.

6 |     During yesterday's call that we had with them, we

7 | also clarified that there are an additional 663,000 dollars

8 | that were not used and they are going to ask to be returned

9 | back to the police reform appropriation.  Then they used all

10 | their funding, the 20 million, in fiscal year 2019, ending on

11 | the '19.  And there are some remaining for fiscal year '20,

12 | five point -- around 5.1 million.  They're also going to ask

13 | for those funds to be made available and returned back to the

14 | police reform appropriation.

15 |     So then --

16 |     THE COURT:  So how much in total?

17 |     MS. GUARDIOLA:  And they have '21 and '22 that they

18 | asked to be extended.  And the letter was issued on the 17th

19 | of this week approving their extension, so they will have a

20 | total of 25 -- around 25 million available.

21 |     THE COURT:  That would be returned to them.

22 |     MS. GUARDIOLA:  That will be made available to them,

23 | because some are available at this point, because they were

24 | extended.  Seven million are going to be returned back to the

25 | police reform appropriation, so they're going to be

1    available.

2         THE COURT:  Okay.  Do you think, because one of the

3    things that we discussed is whether those 25 million should be

4    used in the next -- all of it in the next fiscal year or

5    staggered throughout, what would be your recommendation?

6         MS. GUARDIOLA:  I'm -- what we discussed yesterday is

7    it's up to the Police Bureau how they would like to request

8    them.  The seven million, which is the total sum of the '18

9    and '20, are available, and they can ask either as a one time

10   -- right now, they can divide it in three, as it was mentioned

11   at some point.  So it's up to them.

12        THE COURT:  Okay.  All right.

13        MS. GUARDIOLA:  The '21 and '22 are already

14   available, and have been extended, so they have the funds.

15        THE COURT:  All right.  Now, I tasked the special

16   master to go through some expenses that the Police Bureau has

17   been making that appear to be recurrent expenses that may or

18   may not be part of the Police Reform budget, and it's quite a

19   bit of money.  For example, over five million dollars in

20   expended disbursed funds, and over 625 million dollars in

21   obligated funds for fiscal year 2019; 2.6 million dollars in

22   expended or disbursed funds; and 1.8 million -- almost 1.9

23   million for fiscal year 2020; two point -- almost 2.8 million

24   and 420 million in obligated funds -- well, 2.8 million in

25   expended disbursed funds, and 400 -- about a little over

1  420,000 dollars in obligated funds for 2021 that appear to

2  have no connection to the police reform case.

3          Have you heard anything about that?

4          MS. GUARDIOLA:  Not that I can recall, no.

5          THE COURT:  Okay.  All right.

6          MS. GUARDIOLA:  Or --

7          THE COURT:  Yes, ma'am.

8          MS. GUARDIOLA:  Or if you have additional information

9  that we can take a look at --

10          THE COURT:  Of course you will --

11          MS. GUARDIOLA:  Okay.  Thank you.

12          THE COURT:  You will have, because I've been

13  preparing an Order as to this.  And obviously the police are

14  going to have to review each one of these line items --

15          MS. GUARDIOLA:  Right.

16          THE COURT:  -- and determine whether they are for the

17  police reform or they were -- or they are reoccurring funds or

18  funds that they have to do normally.

19          MS. GUARDIOLA:  Okay.

20          THE COURT:  I'll give you a -- I'll give you an

21  example.  Anibal Bonilla Molina, d/b/a Ana's Catering Service,

22  for lunch and snacks for 90 people, 3,870 dollars budgeted,

23  and the same amount expended or disbursed.  Five large size

24  kennels, five health certificates, five air transportation.  I

25  guess for canines.  5,900 dollars budgeted and obligated.

1          Those are things that may or may not be appropriate

2     for the use of the reform budget, but what -- I'm going to

3     issue an order as to this, and the police are going to have to

4     go through each one of these line items and let everybody

5     know, Mr. Saucedo, the monitor, Mr. -- Dr. Del Carmen, who

6     prepared -- whose team prepared this, as to whether some of

7     this stuff, because that's what it is, should have come out of

8     the police reform budget.

9          Here's one.  Commercial Berrios, Inc., sacks of

10    cement, blocks, stopcocks, nuts, automatic gate closing,

11    Toledo locks, meters of stone, meters of sand, Allure paint,

12    copper rolls, adapters, propane gas, PVC pipes and elbows,

13    budgeted for 34,476 and obligated for that much.

14         El Cometa Hardware Store, versatile screws and white

15    glue.  I don't know.  I don't know whether that came out of --

16    is necessary for the police reform or not.

17         And what I wanted the police -- is for the police

18    department to tell everybody, because that may be more money

19    that, you know, that they can get, because seeing -- in the

20    precarious financial situation that the Commonwealth is in, we

21    have to look for money under every rock.  And I think that --

22    I mean, you've already said, you've got 20 -- you found 25

23    million dollars.  That's great.  It's up to the police to see

24    how they can -- how they should spend that money, whether all

25    at once in one fiscal year or staggered, whatever they want.

1          And now we're talking about quite a bit of money

2    here, also, so maybe -- I'm giving the police about 90 days to

3    do this.  It's a lot.  I'm telling you right now,

4    Mr. Penagaricano, it's a lot, a lot of line items.  So you're

5    going to -- you know, your people are going to have to meet,

6    and by the end of July, let everybody know whether some of

7    that money can be, quote, returned to the police, especially

8    OMB and the Fiscal Board.

9          MR. PENAGARICANO:  If I may, briefly?

10         THE COURT:  Yes, sir.  Of course.

11         MR. PENAGARICANO:  Thank you.

12         Your Honor, the -- I think it's very pertinent,

13   because of Ms. Guardiola's statements regarding the unused

14   funds and the explanations that she gave, to tell the Court

15   that -- the parties have been working in the Court's Order,

16   initially the February 28 Order that gave -- that made time

17   for the filing of March 15, which made the certifications

18   regarding the unused funds, and then the subsequent order

19   after the March 24th hearing that gave 90 days to the parties

20   to actually come up with a final certification under the

21   penalty of perjury as Your Honor requested.

22         THE COURT:  Okay.  But --

23         MR. PENAGARICANO:  And we wanted to convey to the

24   Court that everybody has been working hard to make that

25   happen.

1        THE COURT:  I understand.

2        MR. PENAGARICANO:  And we will make that filing, and

3   we appreciate the Court's intervention, the budget office, and

4   everybody involved to make that happen.

5        THE COURT:  Okay.  Because -- and I don't know if it

6   is going to work this way, but, ma'am, you may be able to tell

7   me, this -- what I ordered is for the police to let us know

8   how much monies were not spent during those fiscal years.  I

9   don't know if these 25 million will include all that or not,

10  but it may.  I don't know.

11       MR. BARRETO-SOLA:  Your Honor, if I may please the

12  Court just one second.  As a matter of fact, on May 16, a few

13  days ago, we had a very long meeting at our office with

14  personnel from the reform office, specifically with Attorney

15  Luis Hidalgo and Attorney Roberto Abesada in conjunction with

16  Pedro De Jesus, Zulma Canales, Carlos Vazquez, Art Garrfer,

17  Lumari Ojeda, Maritza Torres, Carlos Figueroa, and Pedro

18  Santiago, in addition to both Gabriel Penagaricano and myself.

19  And the purpose for that meeting was actually have the

20  monitor's office go over the documents that have been provided

21  to them, and to ask any questions that they had regarding

22  those documents, specifically about the Order that was issued

23  by the Court about the moneys that had not been spent within

24  the periods delineated by the Court.

25       I have spoken a couple of times with Mr. Hidalgo, who

1   has been very helpful in this matter.  And, as a matter of

2   fact, we spoke to him this morning.  He was still looking at

3   documents prepared and submitted to him.  And we agreed we're

4   going to meet again this week to continue over that process.

5         THE COURT:  Okay.  When you meet again next week, you

6   will have before you my order as to all these line items, and

7   so whoever you think should be at that meeting, should be at

8   that meeting.

9         Thank you very much.

10         MS. GUARDIOLA:  You're welcome.

11         THE COURT:  All right.  Perhaps we've discussed this

12   already, but the next topic that Mr. Romero has brought up is

13   what is the plan to redeploy sergeants to the field due to

14   staffing shortages.

15         Mr. Penagaricano.

16         MR. PENAGARICANO:  Thank you.

17         THE COURT:  We have discussed this already, but --

18         MR. PENAGARICANO:  Yeah, I think we did.  I think

19   Mr. Saucedo explained the logistics of the plan that was

20   submitted on May 4th.  But yes, the redeployment of sergeants

21   is explicitly provided for in the plan.  To do that, of

22   course, it's there in the plan.  Also, if I may touch on the

23   next item, the civilianizing positions, that is also stated

24   there, you know.

25         In sum, the Bureau is actively working on the actual

1   plan to make those redeployments and to have those positions

2   available.

3         THE COURT:  Well, let me ask you this.  As long as

4   you're on that topic of civilianizing positions, are job

5   descriptions -- do job descriptions have to be established for

6   these positions?

7         MR. PENAGARICANO:  I believe so, Your Honor, but I'm

8   going to ask Captain Figueroa to explain.

9         THE COURT:  Right.  I wanted to hear from him.

10        MR. PENAGARICANO:  Because the stipulation requires

11  to have a specific plan by July, and they are working on that

12  both on the redeployment of sergeants with a goal by December

13  and June of next year, and also regarding dispositions, and

14  maybe he can explain in detail what's going on right now.

15        THE COURT:  Yes, because it's unclear to me -- for

16  example, you have a sworn officer who is working as a

17  mechanic, just an example, and you want that sworn officer

18  back on the street.  Will that position of -- that mechanic's

19  position need to have another job description or is there a

20  job description already present?

21        Who's here with Human Resources?  Don't be shy.

22        MR. PENAGARICANO:  If we may ask before, have Captain

23  Figueroa briefly explain the process, Your Honor?

24        THE COURT:  Okay.  Well, what I wanted to hear was

25  from Mr. Cartagena, but Captain Figueroa, go ahead.

1    CAPTAIN FIGUEROA:  Yes.  With regard to the job

2  description, under Law Eight of 2018, under OATH, which are

3  the civilian employees, it regulates the positions of every --

4  the job descriptions of every position in the government,

5  either civilian -- before the reform process, there was no job

6  description for the system of rank.  That changed in 2018 when

7  a manual of job descriptions was established for the ranks of

8  sergeant through colonel.

9    Under the civilian system, there did exist in the

10  police a list under the classification of civilian positions

11  by 2002, and it had a description of duties for all of those

12  positions.  Upon the enactment of Law Eight of 2017, the

13  jurisdiction of the job descriptions, all of the government

14  employees, falls below the OATH.

15    And I understand that they developed a job

16  description taking into consideration all of the positions in

17  the government agencies, and if it does not exist in that

18  manual, well, then it needs to be created, because a job

19  description needs to be created for each of the positions.

20    THE COURT:  All right.  Mr. Cartagena, are you here?

21  You may remove your mask.

22    MR. CARTAGENA:  Good afternoon, Your Honor.

23    THE COURT:  Good afternoon.

24    Now, Captain Figueroa has said that you have or your

25  office --

1          MR. CARTAGENA:  Yes.

2          THE COURT:  -- has prepared a manual for positions in

3     the -- civilian positions in the government.  Does that

4     include the police?

5          MR. CARTAGENA:  Yes, Your Honor.  Under the

6     classification and pay plans in the central administration,

7     the ranks system is out of the jurisdiction of our office.

8     However, the civilian positions, we have those classification

9     plans.  And to answer your question, yes, they have job

10    descriptions.  If those positions are not contemplated in our

11    plan, the police department would submit an application for us

12    to create those positions and those descriptions.

13         THE COURT:  So you don't know whether they have

14    submitted whatever it is that has to be submitted for

15    civilian -- what could be a civilian position that is now held

16    by a sworn officer?

17         MR. CARTAGENA: Right now we don't know that.  I can

18    talk to the people in my office for further investigation.

19         THE COURT:  Okay.  Well, what I want you to do are --

20    or not you, but your office.

21         MR. CARTAGENA:  Yes.

22         THE COURT:  -- is to meet with the Police Bureau,

23    either Captain Figueroa or whoever it is, to go through those

24    positions that could be civilianized in order to have sworn

25    officers that are holding these positions to do what they're

1   trained to do.

2           MR. CARTAGENA:  Okay.

3           THE COURT:  I think it's important that you meet.

4   And so what I would want is after you meet, I would like --

5   and obviously the monitor can be involved, Mr. Saucedo can be

6   involved.

7           Dr. Del Carmen, is this something that your team can

8   help with?

9           DR. DEL CARMEN:  Yes, Your Honor.

10          THE COURT:  Okay.  And Dr. Del Carmen's special

11  master team can also assist to be able to identify, let's say

12  in the next 90 days, those positions that you haven't already

13  for which you don't have already a description.  At least

14  identify those positions, and to the extent that you can,

15  prepare a job description, if needed.  I don't know.  Maybe

16  the job description exists, and all you have to do is remove

17  the sworn officer and put in -- and put in a civilian.  I just

18  don't know, but I'd like to know.

19          Do you understand?

20          MR. CARTAGENA:  Yes.  Yes, I do.

21          THE COURT:  Okay.  Mr. Penagaricano?

22          MR. PENAGARICANO:  Yes.  Well, Your Honor, I do

23  understand, but I respectfully think that we might be getting

24  a little bit ahead of the plan that was submitted, because --

25  because this topic, together with many others on how we are

1   going to fill these civilianizing positions, will -- it's

2   going to be part of the submittal that, under the plan, has to

3   be made by July, so perhaps -- perhaps we should wait until

4   that filing.

5        THE COURT:  Include it -- no.  Include it.

6        MR. PENAGARICANO:  Right.  That's what I'm saying.

7        THE COURT:  Include it in your July plan.  You know,

8   that's -- that's less than 90 days.

9        MR. PENAGARICANO:  Right.

10        THE COURT:  So if you can -- now, because it's

11   important to know, at least for the time being, what the plan

12   is for civilianizing positions.  I'm not saying that you have

13   to civilianize every position by July, but at least please

14   find out what -- what the plan is and what positions are --

15   that are now held by sworn officers can be civilianized.  I'm

16   not saying, I'm not saying that you have to go out and start

17   looking for civilians to occupy those positions, but at least

18   we need -- at least I need an idea of, you know, how many

19   positions there are that are being held by sworn officers that

20   could be civilianized, how many of those positions already

21   have some sort of job description, that don't need to be

22   changed, how many of those job descriptions do have to be

23   changed, and how many job descriptions -- new job descriptions

24   do have to be prepared.

25        That's what I need right now, or within -- by July

1   22nd.  All right?

2            MR. PENAGARICANO:  Thank you.  Yes.

3            THE COURT:  Okay.  Thank you very much.

4            Mr. Cartagena.  Mr. Saucedo, yes.

5            MR. SAUCEDO:  Yes, Your Honor.  Just very briefly,

6   the 2018 staffing plan that was done after the staffing study

7   did review the current -- the number at that time of officers

8   performing purely administrative work or non-police work, and

9   there was a figure that was provided.  I believe it was about

10  400 -- a need of 400 civilians at the time.

11           So Mr. Penagaricano is correct that the plan that

12  we've submitted does contemplate for precisely that update

13  that you're looking for, Your Honor.  The Commonwealth has a

14  number that was given to them by an outside consultant that

15  looked at this.  They should update it, and it should be part

16  of the July submission.

17           THE COURT:  All right.  But that's a number.  That's

18  a number.  What I -- I need more than that.

19           MR. SAUCEDO:  Well, it's a number based on the

20  positions that were identified.

21           THE COURT:  I need the -- you know, for you to

22  identify the positions to -- to see what -- if there's already

23  a job description for that position that can be just changed

24  from the sworn officer who's holding it to a civilian, whether

25  that job description has to be changed in any way or whether a

1   new job description has to be prepared.

2          MR. SAUCEDO:  (Nodding head up and down.)

3          THE COURT:  Because, you know, I just don't know, and

4   I'd like to know.

5          MR. SAUCEDO:  Yes, Your Honor.

6          THE COURT:  Okay?

7          MR. SAUCEDO:  Yes, Your Honor.

8          THE COURT:  Okay.  Mr. Romero, any further comment on

9   this?

10          MR. ROMERO:  I have no further comment, Your Honor.

11          THE COURT:  Dr. Del Carmen.

12          DR. DEL CARMEN:  No further comments, Your Honor.

13          THE COURT:  Okay.  Thank you.

14          The next topic -- well, the next two topics, the

15   status of the regulation to implement the law permitting 18

16   year olds to become members of the Bureau, and status of the

17   Bureau coordinating with universities to offer courses leading

18   to the Associate's Degree required by the agreement.

19          Now, has a regulation or at least in draft form been

20   prepared, Mr. Penagaricano?

21          MR. PENAGARICANO:  Yes, it has, Your Honor.  Yes, it

22   has been worked by the parties.  We were discussing that as

23   soon as yesterday.  There is a submittal that has to be done

24   as soon as next week pursuant to previous order of the Court

25   regarding that regulation.

1              THE COURT:  Submittal to whom?  To the monitor?

2              MR. PENAGARICANO:  To the Court.  Not -- the monitor

3      has been involved in the revision of that regulation as

4      well.

5              THE COURT:  All right.

6              MR. PENAGARICANO:  And there is a meeting we planned

7      actually yesterday, we scheduled for Monday morning to have a

8      final revision for that document in order to be ready to

9      submit it to the Court.

10             THE COURT:  Okay.  Mr. Abesada, do you have any

11     comment?  Have you seen this regulation?

12             MR. ABESADA-AGUET:  Yes, Your Honor.  We have seen

13     that regulation.

14             THE COURT:  And?

15             MR. ABESADA-AGUET:  And we have made comments, and

16     our comments are that it complies with the reform agreement

17     requiring 18 year olds to have an Associate Degree, which is

18     going to be an exception to what's -- what could be

19     practical --

20             THE COURT:  How can a high school graduate at 18 have

21     an Associate's Degree?  That's -- there's no way.  There's no

22     way.

23             Mr. Castillo, if you want to say something, go ahead.

24             MR. CASTILLO:  I just want to clarify that the

25     consent decree requires that before a candidate becomes a

1   sworn officer, that they have an Associate's Degree.

2          THE COURT:  I know that.  I know that.  Everybody

3   knows that.  My question is how does that compaginate with the

4   new law?  There's no way to have an 18 year old join the force

5   and already have an Associate's Degree.  So what is your plan

6   or what do you suggest be a plan if an 18 year old goes to

7   Captain Figueroa and says, "I don't want to be a -- I want to

8   join the force; I just graduated from high school?"

9          MR. CASTILLO:  Yes, Your Honor.  You know, that plan

10  is for the Commonwealth to describe a little bit more.  And as

11  you noted, it's -- it appears to be related to the next

12  talking point.  And from our position, we need to just ensure

13  that that plan, whatever it may be, also complies with this

14  Court's Order and the consent decree.

15         THE COURT:  Well, let me ask this.  Mr. Penagaricano,

16  to -- in order for someone to join the force and be scheduled

17  to go to the academy, does that person have to have an

18  Associate Degree before he can enroll in the academy?

19         MR. PENAGARICANO:  Yes.  Yes, Your Honor.  It's

20  required by the consent decree in this case.  Yes.  Yes.

21         THE COURT:  So you have to have an Associate's Degree

22  before you can even be --

23         MR. PENAGARICANO:  A cadet.

24         THE COURT:  -- you can -- you have to enroll in the

25  police academy.

1          MR. PENAGARICANO:  Correct.

2          THE COURT:  Then what are you going to do with these

3   18 years olds?

4          MR. PENAGARICANO:  Well, Your Honor, I think -- this

5   has been discussion for a month.

6          THE COURT:  Yes, but I haven't had an answer.

7          MR. PENAGARICANO:  Right.  Well, the straight forward

8   answer is that the Commonwealth is going to comply with the

9   consent decree.  No cadet will be recruited unless he has an

10  Associate Degree, period.

11         THE COURT:  Well, then what's the use of this law?

12         MR. PENAGARICANO:  Well, we designed a process, Your

13  Honor, to enter a regulation and enter into agreements as an

14  exploratory measure to see if there are ways with the

15  agreement of all the parties and the Court to try to make

16  sense of the law and maybe try to involve the universities,

17  develop programs.

18         THE COURT:  Well, that was my suggestion.

19         MR. PENAGARICANO:  And it's in motion.  It's in

20  process.  But until that is fully developed and agreed by all

21  parties here and the Court, that will not happen.

22         THE COURT:  You will not accept any 18 year old to

23  become part of the police until this -- well, I don't know.  I

24  mean, the way the statute reads, you may have to ask that the

25  statute be amended.

1          MR. PENAGARICANO:  Yeah.  I mean -- yes.  I
2    suggest --
3          THE COURT:  Because it's one thing, it says, oh,
4    okay, we need -- we're short of police officers, not just
5    sergeants.  We're short of police officers.  A lot of them are
6    leaving.  I just saw in the paper the other day, three are
7    going to Charleston, North Carolina, and they expect to hire
8    six more during this month.  And that's going to continue to
9    happen for whatever reason.
10          So if the purpose of the law was to say, okay, we're
11    going to have to have these 18 year olds become members of the
12    police force in order to be able to say that we're getting
13    more police officers, it's not going to work.  It's not going
14    to work.
15          MR. PENAGARICANO:  Well -- right, Your Honor, and we
16    understand.
17          THE COURT:  Especially if you have to have an
18    Associate's Degree in order to even start at the academy.
19          MR. PENAGARICANO:  Right.  And that's why, Your
20    Honor, that the Court devised this process to enact a
21    regulation that has been discussed by the parties, go out and
22    talk to universities, and that process is in motion.
23          THE COURT:  So wait a minute.
24          MR. PENAGARICANO:  And we will report to the Court --
25          THE COURT:  So wait a minute.  So you would -- I

1   just -- the way I saw it, and perhaps I was wrong, the way I

2   saw it is that you accept an 18 year old to be a member of the

3   Bureau.  Not a sworn police officer.  A member of the Bureau.

4   I think the statute says that any 18 year old who joins the

5   Bureau has three years to complete an Associate's Degree.

6           MR. PENAGARICANO:  (Nodding head up and down.)

7           THE COURT:  Three years to complete an Associate's

8   Degree.

9           MR. PENAGARICANO:  Right.  (Nodding head up and

10  down.)

11          THE COURT:  So how can they complete an Associate's

12  Degree in three years while being in the Bureau?  I don't know

13  what jobs you would give them unless they can do jobs that a

14  sworn officer that -- that they cannot do, because they're not

15  sworn officers.  Maybe there's a way of doing, you know,

16  civilian type work or other types --

17          Mr. Romero, what type of jobs can someone who is not

18  a sworn police officer, who may be a member of the police

19  force do?

20          MR. ROMERO:  Your Honor, it's not uncommon for police

21  departments throughout the country to reach out to individuals

22  under the age of 21, but they do it in a different format.

23  The format is they are brought out as police explorers while

24  they continue their education, and they're brought on during

25  the course of the school year.

1      Their hours are very limited.  During the summertime

2  when they're off from school, they spend more hours, they

3  perform assignments, for instance, dispatching; they perform

4  assignments within the department, perhaps even giving

5  tickets.  There are different -- they're used in different

6  ways depending on the agency.  New York City, for instance,

7  they just use them for security in some locations, police

8  facilities.

9      There are two ways to go here.  PRPB could hire

10 people at the age of 18 for non-police functions, and when I

11 say non-police functions, I'm talking about traffic control,

12 I'm talking about dispatching.  Something that's not requiring

13 a sworn officer to perform that task.  That's one way.  But

14 that would also at the same time put -- maybe make it

15 incumbent on that individual to get that education, either at

16 night or something.  That's one option.  Or one option is to

17 make it more related to a school in conjunction with a school

18 that they're attending, getting their education and the

19 Associate's Degree they need to be a police officer within

20 PRPB and perform functions within the Police Department that

21 are non-sworn functions, and be modified obviously based on

22 the schedule of the individual.

23     Also, take a look at work with -- something like you

24 indicated, some of the colleges, if some of the courses, PRPB

25 can provide some courses that could be giving credit at the

1    college level as well.  So there's a number of ways they can

2    look at this issue.

3         THE COURT:  Well, courses -- from what

4    Mr. Penagaricano said, and what -- apparently what the

5    agreement says, because I was thinking of whether the

6    universities would be able to offer credit for the -- for the

7    time spent at the academy, but now I'm told that you can't get

8    into the academy unless you have an Associate's Degree.

9         MR. ROMERO:  Right.  I wouldn't say going to the

10   academy.  I would say taking courses.  I wouldn't call it the

11   program that you're going to go to the academy to actually get

12   to be a police officer.  It would be courses that could be

13   provided at the police level for these people who are

14   employees that could receive credit towards a degree, but not

15   be related to police training, per se.

16        THE COURT:  Such as?

17        MR. ROMERO:  Training in the -- in terms of criminal

18   justice, things like that, courses, law courses that could be

19   given that perhaps credit would be provided?  It wouldn't be

20   part of the training towards becoming a police officer, but it

21   would provide credit for those individuals towards getting

22   their Associate's Degree, which would then allow them once

23   they have to get through the academy --

24        THE COURT:  Well, I think, I think this regulation

25   has to be -- you know, it's got to be a very specific type

1  regulation, because, first of all, I just can't -- I mean, it

2  appears that the police, from what Mr. Penagaricano said, they

3  won't even consider getting an 18 year old on the force --

4          MR. ROMERO:  I agree, Your Honor.

5          THE COURT:  -- without an Associate's Degree.

6          MR. ROMERO:  I agree, Your Honor.  I think it needs

7  to be, I mean, better explained.  The PRPB has indicated and

8  U.S. DOJ confirmed that no one would be promoted.  No one

9  would be -- who doesn't have an Associate's degree as per the

10  agreement will become a police officer.  And they said they're

11  going to comply with that.

12          THE COURT:  Well, one thing is that, but now they're

13  telling me you can't even go to the academy unless you have an

14  Associate's Degree.

15          MR. ROMERO:  Well, I think, correct me if I'm wrong,

16  I think they're talking about the actual training for the

17  police officer, that no one can participate in that training

18  without an Associate's Degree, and I concur.  I think that's

19  what they're meaning there.

20          If they have employees performing dispatch or traffic

21  control or something like that, perhaps they offer some

22  courses that are not related to what's required of a police

23  officer, but courses that may give them credit with some

24  college that if it's determined that the college will accept

25  that, that could be helpful to them as well.

1              THE COURT:  Mr. Penagaricano.

2              MR. PENAGARICANO:  Yes.  I was going to ask

3    permission from the Court to hear Mr. Pedro Santiago.  He's

4    inhouse from the commissioner, and he's been directly involved

5    in some of these initiatives.  And perhaps he can shed light

6    to the Court.  Thank you.

7              THE COURT:  Of course.

8              Mr. Santiago, please.

9              MR. SANTIAGO:  Good afternoon, Your Honor.

10             THE COURT:  You may remove your mask.  Go ahead,

11   please.

12             MR. SANTIAGO:  Okay.  We need to be clear about the

13   process right now.  Right now the candidates or the cadets for

14   law enforcement don't work as a law -- as a sworn officer.

15   They are students.  What we are thinking about is we are

16   talking about with the principal academic institutions in

17   Puerto Rico, like three institutions, and they are able to

18   provide the credits for the 1900 hours for the police service

19   courses and provide the Associate Degree.

20             THE COURT:  That's -- is that possible in three years

21   if --

22             MR. SANTIAGO:  No.  They will be possible in the 1900

23   hours.

24             THE COURT:  Because if you read the statute, if they

25   don't complete an Associate's Degree in three years, they're

1    out.

2         MR. SANTIAGO:  No.  All the students, when -- all the

3    candidates will be passed through the 1900 hours.

4         THE COURT:  However many years it will take them.

5         MR. SANTIAGO:  One year and a half.

6         THE COURT:  A year and a half?

7         MR. SANTIAGO:  Year and a half.

8         THE COURT:  Where?  Where would they get all these

9    hours?

10        MR. SANTIAGO:  Okay.  We divide the preservice

11   courses into the operational courses and the academic courses.

12   The institution will provide credits for those operational

13   courses, and they will be bringing the academic courses.  And

14   then it will be like intensive courses in the summer.

15        THE COURT:  I see.

16        MR. SANTIAGO:  Will not stop for that year and a

17   half.

18        THE COURT:  And that -- and that would be before they

19   enter the academy?

20        MR. SANTIAGO:  No.  That will be the process of that

21   -- of the academy.

22        THE COURT:  Okay.  So these people still don't have

23   an Associate's Degree.

24        MR. SANTIAGO:  They don't have an Associate's

25   Degree.

```
 1              THE COURT:  But they will be eligible to go to the
 2   academy to take these particular courses?
 3              MR. SANTIAGO:  Yes.  And because -- before they
 4   become a sworn officer, they will have an Associate Degree.
 5              THE COURT:  All right.  That I understand.  But from
 6   -- what I heard was that they needed an Associate's Degree
 7   just to get into the academy.
 8              MR. SANTIAGO:  Well, that is something that we have
 9   to discuss.  Mr. Penagaricano says that we need the agreement
10   of all the parts of this in -- for that to work.  And there
11   --
12              THE COURT:  All right.  Thank you.
13              Mr. Saucedo, any comments from you?
14              MR. SAUCEDO:  Yes, Your Honor.  Just briefly.
15              My understanding is that right now you need an
16   Associate's Degree to become a cadet, because this new law
17   hasn't been implemented, and it's the purpose for the
18   regulation being developed.  So currently, to become a cadet,
19   to go through the police academy in the preservice program,
20   you need to have an Associate's Degree.
21              Now, our position, Your Honor, has always been the
22   Consent Decree requires good judgment, writing abilities to be
23   used -- able to write a use of force report and explain why
24   you used force, why you arrested someone.  All of that.
25              We didn't include an age requirement in the
```

1    agreement, but we required an educational requirement.  So

2    that is steadfast.  We need to make sure whatever regulation

3    is required as part of implementing a new law, that before a

4    cadet becomes a sworn member of the force, that they have that

5    Associate's Degree.

6         Our understanding, Your Honor, one of the goals we

7    understood the Commonwealth wanted to achieve through all of

8    this was not to leave good candidates that were between 18 and

9    20 years old.  And as Mr. Romero mentioned, and he mentioned

10   this in the January status conference, that other police

11   departments seize on an opportunity to take someone who is

12   motivated, who wants a career in law enforcement, and support

13   them in meeting those educational requirements in eventually

14   becoming a police officer.

15        So part of that is the exposure you would get doing

16   this type of work to public service, to law enforcement.  I

17   think there are a lot of needs at the Police Bureau that could

18   be met through a very, you know, coordinated, carefully

19   planned program.  We're not saying just send these people off

20   to just, you know, provide security in a police station.  They

21   need to have some training and an opportunity to advance in

22   their careers.  But, Your Honor, we did get a draft

23   regulation.  Our purpose in reviewing it is to make sure that

24   it complies with the agreement.  It's the Commonwealth's law.

25   They need to advance it, and they need to advance it in a way

1   that complies with the agreement.  And that's what we're

2   looking for, Your Honor.

3          THE COURT:  Okay.  All right.

4          Mr. Abesada, or Mr. Romero, when do you think you

5   will have comments to the draft regulation that I'm told is

6   already ready, is already being provided.

7          MR. ABESADA-AGUET:  Roberto Abesada, Your Honor.

8          We did have a discussion yesterday, and I believe we

9   have another video conference on Monday at 9:00 AM to

10  finalize.  And hopefully by then --

11         THE COURT:  But when can the regulation be provided

12  to me with analysis of the regulation vis-a-vis the statute?

13  You know what I mean.

14         MR. ABESADA-AGUET:  Yes.  I understand, Your Honor.

15         THE COURT:  When can that be done?

16         MR. ABESADA-AGUET:  We can provide, once we have that

17  conference call on Monday, I believe we can probably have

18  something ten days after that.

19         MR. SAUCEDO:  That sounds doable.

20         THE COURT:  Something to me?

21         MR. ABESADA-AGUET:  Yes.

22         THE COURT:  Okay.  But remember, I just don't want

23  the regulation.  I want the regulation with an analysis of how

24  it -- I want an analysis of how it complies or comports with a

25  statute.

1          MR. ABESADA-AGUET:  And that will be so.

2          THE COURT:  All right.  So by the end of this

3  month.

4          MR. ABESADA-AGUET:  Yes, Your Honor.

5          THE COURT:  So the 30th is a Monday.  So the 31st,

6  Mr. Saucedo.

7          MR. SAUCEDO:  Your Honor, just briefly, there is no

8  way that the parties are going to reach a final Commonwealth

9  regulation, right?  So the parties can review the draft that

10  the Police Bureau signs off on to submit for the -- this

11  regulation needs to go through the Commonwealth's

12  administrative act process.  And in that process, maybe there

13  are changes to it, that are made to it.  But the United States

14  in this process cannot review the regulation for -- to make

15  sure that it's in conformance with the Commonwealth law.

16  That's up to the Commonwealth to do through its Administrative

17  Procedures Act.

18          We're looking at the draft regulation to make sure it

19  does not violate the consent decree, that it's going to

20  further its goals.  That is what we are doing now.  And we

21  have a meeting, as Mr. Abesada said, on Monday.  But once that

22  document is reviewed by us, it still needs to go through an

23  entire procedure.

24          THE COURT:  I know.

25          MR. SAUCEDO:  Process.

1           THE COURT:  But before it goes through that process,

2     I want to see it.

3           MR. SAUCEDO:  Yes, Your Honor.

4           THE COURT:  Because I may have some comments on it,

5     because I'm in charge of this consent decree.

6           MR. SAUCEDO:  Yes, Your Honor.  And that was

7     contemplated that once it was reviewed for comment by the

8     parties and monitor, that it would be filed with the Court.

9           THE COURT:  All right.  Okay.

10           Dr. Del Carmen, is there any way your team can help

11     with this?

12           DR. DEL CARMEN:  Yes, Your Honor.  We can.  I haven't

13     seen the draft yet, but I can tell you that, as you know, I

14     just got back from the Czech Republic on a Fulbright

15     assignment.  One of the things that is common in Europe in a

16     lot of police academies, they have both an academic component

17     and a training component.

18           The issue here that I think is going to be a

19     challenge on the implementation phase on this, whether or not

20     the 60 hours, academic hours that are going to be required for

21     an Associate's Degree to be granted are in fact in accordance

22     with a certification with other universities across the United

23     States.

24           People today, there are a lot of universities that

25     offer a Ph.D. in three weeks online.  People pay a lot of

1    money, they get those, but the issue here is whether or not

2    the Southern Association of Colleges and Universities, SACS,

3    and various other components would actually accept this

4    degree.  And whether or not the degree, as noted by the U.S.

5    Government, and as noted by the Commonwealth, that advancement

6    of knowledge in the development of critical thinking skills,

7    which is correlated with less use of force, with less

8    corruption in policing, can in fact come into effect.

9              We can certainly help, Your Honor.

10             THE COURT:  Well, if there is coordination with the

11   local universities to offer courses leading to the Associate's

12   Degree, I would imagine that that -- that those courses would

13   comply with this entity that you mentioned.

14             DR. DEL CARMEN:  Yeah, they would in nature, Your

15   Honor.  However, the instructors have to be vetted and

16   certified by the University.  We have these debates in my

17   other job all the time, which is, is the instructor of record

18   certified to teach; does that person have a terminal degree;

19   is that person qualified to teach.  And they become --

20             THE COURT:  For that particular subject.

21             DR. DEL CARMEN:  For that particular subject, for

22   that subject to be counted and be credited.

23             So my point is it's a little more complicated than

24   that, but obviously we'd be happy to help out.

25             THE COURT:  Okay.  Please do.

1          DR. DEL CARMEN:  Yes, sir.

2          MR. ABESADA-AGUET:  Your Honor, if I may?

3          THE COURT:  Yes.  Mr. Abesada.

4          MR. ABESADA-AGUET:  I also wanted to inform the Court

5     the monitor's office provided PRPB the best practice memo on

6     this program, and we will be happy to share that memo with the

7     Court.

8          THE COURT:  Okay.  Has Dr. Del Carmen seen it?

9          MR. ABESADA-AGUET:  No.  We'll share it with him.

10         THE COURT:  And has Mr. Saucedo seen it?

11         MR. ABESADA-AGUET:  It was part of the CRM-6 draft

12    report.

13         THE COURT:  Okay.  All right.

14         All right.  Okay.  I'm telling you, the drafting of

15    this regulation is going to take a lot of brain power,

16    because, like Mr. Saucedo said, it has to comply with the

17    consent decree, and I'm really not sure whether the statute --

18    the way the statute is written, whether the statute complies

19    with the consent decree.  I'm really not sure.  And so that's

20    why I want an analysis of the regulation, whatever it is that

21    you come up with, with the statute, because that's --

22    that's -- I think that's going to help everybody, including

23    the entities that have to take a look at this under the

24    Administrative Procedures Act, really, I think so.

25         All right.  So by the end of this month, by the 31st,

1    I want that analysis.  I want everybody involved, the monitor,

2    Mr. Abaseda, as counsel, Mr. Saucedo, PRPB, Mr. Penagaricano,

3    any other person involved that you want to get involved in

4    this from the PRPB in order to present to me a regulation that

5    you feel is in compliance with the statute.

6            MR. PENAGARICANO:  Yes.

7            THE COURT:  All right?

8            MR. PENAGARICANO:  Yes, Your Honor.  Thank you.

9            THE COURT:  The next item is the status of the career

10   path policy.  Anything on that?  Mr. Penagaricano.

11           MR. PENAGARICANO:  Yes.  Your Honor, the career path

12   policy was developed by PRPB, was submitted to the parties I

13   think in February, and it has been subject again, like other

14   policies back and forth from the parties, all the way until I

15   think the special master commented on it on May the 1st.  I

16   think that was the last party to comment on it.  And it's been

17   revised as per the comments of all parties.  And I think, in

18   discussions with both Counsel Vazquez and Captain Figueroa,

19   that it's on the verge of being submitted incorporating

20   everybody's input I think by next week.

21           THE COURT:  Okay.

22           MR. PENAGARICANO:  So it's definitely in good shape,

23   and a process is --

24           THE COURT:  All right.  And, Mr. Saucedo, any

25   comment?

1    MR. SAUCEDO:  Your Honor, only that this pertains to
2    paragraph 21 of the consent decree, and this is an important
3    provision, because it's the agency's commitment to support an
4    officer in -- growing within the police profession, and within
5    PRPB.  This is an important step, because it leads to
6    succession, right, leadership succession.  This is about
7    developing new leaders within the Police Bureau to make
8    reforms sustainable.

9    We know that there are many command staff and
10   supervisors who have more than 25 years on the force and are
11   about to retire, so it's really important that we develop that
12   new leadership and that new talent be able not just to lead
13   the police but to manage it with all of the data components
14   that we expected to have, and to be able to make decisions
15   based on those new information systems.

16   So this career path policy is not just about
17   promotions.  It's not just about this is what you need to be a
18   sergeant or lieutenant.  This is what the Commonwealth will be
19   offering to help facilitate growth, professional growth within
20   the PRPB.  It doesn't have to all cost money.  This could be
21   offering different schedules or flexible schedules to allow
22   people to go to school at night, obtain their Bachelor's
23   Degree, their Master's Degree, whatever it is that they need.

24   But this is -- this is an important part of the
25   agreement, and we look forward to receiving the revision of

1  that policy.

2        THE COURT:  All right.  And so you will receive it,

3  the monitor will receive it, and Dr. Del Carmen will receive

4  it for comments.

5        What about the last item on the -- Mr. Romero's

6  agenda is the status of the promotional protocol

7  implementation.

8        MR. PENAGARICANO:  Yes, Your Honor.  That protocol

9  was approved in open court last year.

10        THE COURT:  Well --

11        MR. PENAGARICANO:  I'm sorry.

12        THE COURT:  What Mr. Romero wants is the status of

13  its implementation.

14        MR. PENAGARICANO:  Yes.  So I was going to mention,

15  Your Honor, that granted it -- that the implementation of that

16  protocol has taken quite a bit of time.  We had a meeting with

17  the Secretary of Public Safety this morning, and he assured me

18  that -- the amount of public announcement, convocatoria (ph),

19  will go out on July the 1st.

20        THE COURT:  Okay.

21        MR. PENAGARICANO:  That's the most updated

22  information we can provide for the Court.

23        THE COURT:  Is that for all promotions, all ranks?

24        MR. PENAGARICANO:  No.  From inspector to colonel.

25        THE COURT:  So from high up?

```
 1                MR. PENAGARICANO:  Right.

 2                THE COURT:  Mr. Saucedo, anything?

 3                MR. SAUCEDO:  No, Your Honor.  Nothing on this

 4    item.

 5                THE COURT:  Okay.  Dr. Del Carmen.

 6                DR. DEL CARMEN:  Nothing on this item, Your Honor.

 7                THE COURT:  All right.  Thank you.

 8                All right.  There's a lot to do here, and there are a

 9    lot of people to help.  Obviously the Bureau and it's

10    personnel, Mr. Saucedo and the Department of Justice, the

11    monitor and his team, and the special master and his team, I

12    want everyone involved in pushing this consent decree forward.

13                This is its 10th year, and I'd like to at least see

14    some real, real, real progress.  And what I hear from everyone

15    is that everyone's on board to make this consent decree go

16    forward as quickly as possible to its completion.

17                All right.  Thank you very much.

18                I would like to see --

19                Oh, first of all, Secretary Torres, is there anything

20    you would like to add?

21                SECRETARY TORRES:  No, sir.

22                THE COURT:  Okay.  I would like to see --

23                MR. SAUCEDO:  Your Honor, just real quick.  It's

24    important to see all the Commonwealth officials who are here

25    listening to all the details in this case.  I do want to
```

1   mention we do have some members of the community who are

2   here.

3          THE COURT:  Oh, wonderful.

4          MR. SAUCEDO:  For example, I saw Mr. Jose Rodriguez

5   here from the Dominican Committee on Human Rights.  I know

6   there are other members of the community who wanted to be

7   here.  I know one had a family emergency.  But it's important

8   we continue to include the community.

9          But I know the monitor is working on a survey of the

10  community, and that work has been very collaborative.  But

11  it's trying to get a snapshot of the views of the community

12  and police officers and people, recent -- and interactions

13  with the police to hear this, also.

14         Now, you know, it's hard to predict where the

15  pandemic will go, but we have been entailed in the amount of

16  community engagement we've been able to do, so we're hopeful

17  we can be, with the monitor's office and others involved, to

18  continue to work with the members of the community so they

19  continue to know what's happening and what their resources and

20  the money that they put into their government is -- how it's

21  being used and how it's having an impact on police reform.

22         THE COURT:  Okay.  Who's here from the community?

23  Please stand up.

24         Okay.  All right.  Thank you.

25         All right.  Well, I hope that from what you've heard

1   today, you can gather that we are working hard to make the

2   police officers as professional a police force as can be?

3   That is the -- that's what everybody is working for, and I

4   think that's what we will eventually have.

5           I know that your community especially has a -- has

6   several issues with the police.  And what this consent decree

7   does is to limit, if not eliminate whatever issues are still

8   out there between the police, your community, and every other

9   community on the island.  Okay?

10          MR. SAUCEDO:  Thank you, Your Honor.

11          THE COURT:  You're welcome.

12          Now, I would like to see Secretary Torres,

13  Mr. Romero, and Dr. Del Carmen in my chambers.

14          COURTROOM DEPUTY:  Are we done, Judge?

15          THE COURT:  You're all excused.

16          (At 4:07 PM, proceedings concluded.)

17                          *     *     *

18

19

20

21

22

23

24

25

```
 1   U.S. DISTRICT COURT    )

 2   DISTRICT OF PUERTO RICO)

 3

 4        I certify that this transcript consisting of 91 pages is

 5   a true and accurate transcription to the best of my ability of

 6   the proceedings in this case before the Honorable United

 7   States District Court Judge Francisco A. Besosa on May 20,

 8   2022.

 9

10

11

12

13   S/ Amy Walker

14   Amy Walker, CSR 3799

15   Official Court Reporter

16

17

18

19

20

21

22

23

24

25
```