December 2022

# Seventh Report of the Federal Monitor

Covering the Period from April 2022 through September 2022

Compliance status of the Puerto Rico Police Bureau in accordance with the Federal Court approved Settlement Agreement between the United States Department of Justice and the Commonwealth of Puerto Rico

John Romero
Federal Monitor

## Table of Contents

INTRODUCTION ...................................................................................................................................... 4

General Background on the Agreement and Monitoring Process ...................................................... 4
Scope and Methodology ................................................................................................................... 5
Monitoring Activities During CMR-7 ................................................................................................. 6
Key Findings of the Monitor's Seventh Report ................................................................................. 7

I.      PROFESSIONALIZATION .......................................................................................................... 9

1. Staffing and Community Policing .......................................................................................... 11
2. Promotions ............................................................................................................................ 13
3. Commander Corps ................................................................................................................ 19

II. USE OF FORCE .......................................................................................................................... 21

1. General Provisions ................................................................................................................ 23
2. Specialized Tactical Units ..................................................................................................... 27
3. Crowd Control Policies and Performance ............................................................................. 34
4. Force Reporting ..................................................................................................................... 40
5. Force Review, Investigation, and Analysis ........................................................................... 48
6. Supervisory and FRB Reviews ............................................................................................. 52
7. FIU Investigations and Force Reviews by SFRB .................................................................. 58
8. Use of Force Training ............................................................................................................ 66
9. Responding to Behavioral/Mental Health Crisis .................................................................. 71

III. SEARCHES AND SEIZURES: INTERNAL CONTROLS AND ACCOUNTABILITY .................. 78

1. Stops, Searches, and Seizures ............................................................................................ 81
2. Investigatory Stops and Searches ........................................................................................ 83
3. Arrests ................................................................................................................................... 89
4. Searches .............................................................................................................................. 101
5. Training on Stops, Searches, and Seizures ........................................................................ 105

IV. EQUAL PROTECTION AND NON-DISCRIMINATION ............................................................. 109

1. General Provisions .............................................................................................................. 111
2. Discriminatory Policing ........................................................................................................ 119
3. Sexual Assault and Domestic Violence .............................................................................. 127

V. RECRUITMENT, SELECTION, AND HIRING .......................................................................... 141

VI. POLICIES AND PROCEDURES .............................................................................................. 142

VII. TRAINING ............................................................................................................................... 153

VIII. SUPERVISION AND MANAGEMENT .................................................................................... 154

1. Duties of Supervisors .......................................................................................................... 156
2. Supervisor Training ............................................................................................................. 166
3. Performance Evaluation ...................................................................................................... 166
4. Early Identification System .................................................................................................. 169
5. Internal Audits and Interagency Feedback ......................................................................... 175

IX. CIVILIAN COMPLAINTS, INTERNAL INVESTIGATIONS, AND DISCIPLINE ....................... 181

1. Civilian Complaints ............................................................................................................. 184
2. Internal Investigations ......................................................................................................... 186
3. Complaint Intake, Classification, Assignment, and Tracking .............................................. 191
4. Investigation of Complaints ................................................................................................. 202

2

5. Staffing, Selection, and Training Requirements ........................................................................... 221
6. Preventing Retaliation ................................................................................................................... 225
7. Discipline ........................................................................................................................................ 227
8. Officer Assistance and Support ..................................................................................................... 230

**X. COMMUNITY ENGAGEMENT AND PUBLIC INFORMATION** ................................................................ 235

1. Community Oriented Policing ........................................................................................................ 241
2. Community Interaction Councils .................................................................................................... 248
3. Public Information ......................................................................................................................... 253

**XI. INFORMATION SYSTEMS AND TECHNOLOGY** .................................................................................. 261

**APPENDIX A: BACKGROUND TO PRPB MONITORING MISSION** ............................................................. 270

**APPENDIX B: METHODOLOGY** .............................................................................................................. 272

Compliance Levels ............................................................................................................................. 272
Sampling Methodology ...................................................................................................................... 273
CMR-7 Samples .................................................................................................................................. 274

**APPENDIX C: COMPLIANCE STATUS BY PARAGRAPH AND SUB-SECTION** ............................................ 280

**APPENDIX D: AFTER-ACTION REPORT OF THE AUGUST 25, 2022 DEMONSTRATION/PROTEST IN FORTALEZA** ................ 283

**APPENDIX E: AFTER-ACTION REPORT OF THE SEPTEMBER 29, 2022 DEMONSTRATION/PROTEST IN FORTALEZA** ........... 285

**APPENDIX F: REA 114 TRAINING OBSERVATIONS** .................................................................................. 286

## Introduction

This report will outline the current compliance status of the Commonwealth of Puerto Rico (hereafter, the "Commonwealth") and the Puerto Rico Police Bureau (hereafter, "PRPB" and at other times "the Bureau") with the federal court approved Settlement Agreement (hereafter, the "Agreement" and/or "Consent Decree"). It was prepared by the Technical Compliance Advisor (hereafter, "the Monitor") pursuant to paragraphs 242, 251, and 252 of the Agreement to inform the court, Parties, and residents of the Commonwealth about implementation status and levels of compliance with the Agreement. The Monitor's Office (or "Monitoring Team") will make itself available to the Court, the Parties, and community groups to explain the Monitor's findings and the compliance assessments presented in the report.

### General Background on the Agreement and Monitoring Process

The Agreement was fashioned to provide PRPB officers with the tools, guidance, and resources needed to reform unconstitutional policing practices and bring the Bureau into line with generally accepted practices of constitutional policing and effective law enforcement. The Parties recognize that constitutional policing, effective law enforcement, and the community's trust in its police force are interdependent. Accordingly, full and sustained implementation of the Agreement will guarantee constitutional rights and will consequently increase public confidence in PRPB and its officers. In addition, and perhaps most importantly, the Agreement also aspires to develop dynamic leadership and management skills within PRPB aimed at transforming the Bureau for the benefit of the Commonwealth and its residents.

In a joint effort, the Parties identified each of the following areas for improvement, enhancement, or reform in PRPB:

1. Professionalization;
2. Use of Force (UOF);
3. Searches and Seizures;
4. Equal Protection and Non-Discrimination;
5. Recruitment, Selection and Hiring;
6. Policies and Procedures;
7. Training;
8. Supervision and Management;
9. Civilian Complaints, Internal Investigations, and Discipline;
10. Community Engagement and Public Information; and
11. Information Systems and Technology.

To carry out necessary reforms in the above-mentioned areas, the Commonwealth developed Action Plans for each of the named substantive areas. These Action Plans set forth in detail the steps agreed upon to execute and implement the reforms and achieve the desired outcomes in each area. Moreover, the above reforms also require the implementation of new or amended policies, practices, training, corresponding documentation, and internal review. All such activities, together with the monitoring of sustainable compliance, fall within the scope of objective oversight, analysis, and reporting of the Monitor's Office.

4

During the capacity-building period, the Monitor's Office assessed compliance based on the Commonwealth's own Action Plans, pursuant to Paragraph 240 of the Agreement. However, with the end of the capacity-building period, the mission of the Monitor's Office has changed. Beginning with CMR-1 and since October 2018, the Monitor's Office has been assessing PRPB's compliance with the Agreement.

## Scope and Methodology

The Chief Monitor's Seventh Report covers the period between April and September 2022. CMR-7 covers nine of the eleven performance areas of the Agreement: 1) Professionalization, 2) Use of Force (UOF), 3) Searches and Seizures, 4) Equal Protection and Non-Discrimination, 5) Policies and Procedures, 6) Supervision and Management, 7) Civilian Complaints, Internal Investigations, and Discipline, 8) Community Engagement and Public Information, and 9) Information Systems and Technology. Per the monitoring methodology agreed on by the Parties, 177 paragraphs were scheduled for assessment in CMR-7, out of 212 total paragraphs which the Monitor's Office is tasked to assess. This report excludes the sections of the Agreement covering Recruitment, Selection, and Hiring and Training as well as specific paragraphs throughout other sections that are assessed on an annual basis and were covered in CMR-6.

For each of these areas, the Monitor's Office presents its assessments based on the desk review of data that was provided by the Commonwealth, as well as interviews, questionnaires, site visits, observations, and the current state of IT (see below for more details on the activities conducted during CMR-7). The collection, analysis, reporting, and public dissemination of data regarding the ongoing PRPB sustainable reform efforts were designed to strengthen and ultimately ensure public accountability and trust in PRPB. Therefore, the Agreement requires: a) that the Monitor's Office submit timely assessments as to compliance, as well as achievements and impediments that the Bureau might be encountering; and b) that the Monitor's Office assist the Commonwealth in finding solutions to all impediments to compliance until sustainable compliance is reached.

In agreement with the approved methodology, the Monitoring Team uses a combination of quantitative and qualitative methods to assess the Commonwealth's compliance with the Agreement in the three areas of performance (policy, training, and implementation) selected for this report. Each paragraph in the Agreement has been assigned a methodology that was agreed on by the Parties and approved by the court. These methodologies include information on the data source, sampling method (if relevant), and compliance target. The compliance targets provided for each paragraph outline the objectives and thresholds the Commonwealth must meet to reach full compliance with the paragraph. Further, if applicable, the compliance targets outline whether the Commonwealth and PRPB have incorporated the requirement into an implemented policy; trained all relevant personnel on the requirement and policy; and fully implemented the requirement in practice. As such, the compliance targets provide the Commonwealth with a detailed pathway towards achieving full compliance.

Definitions for each of the compliance ratings used in the Monitor's assessment as well as additional detail on the assessment and sampling methodologies are provided in Appendix B.

## Monitoring Activities During CMR-7

Over the past six months the Monitor's Office conducted six site visits to PRPB headquarters as well as various regions of the island including Arecibo, Aguadilla, Caguas, Bayamon, and Guayama. At each of these field visits the Monitor's Office visited the area command, district(s) within each area, Highway Patrol Units, and other units at each location. At each location the Monitor's Office met with executive command and PRPB personnel leading and/or involved in various units such as Centro de Mando, Radio Control, Community Interaction Councils (CICs,) Community Relations, and UOF. It should be noted that the impact of Hurricane Fiona affected the Monitor's ability to conduct its September site visit, proceed with visits to Utuado, and conduct various interviews of PRPB personnel.

These field visits provided an opportunity for the Monitor's Office to hear directly from supervisors and officers on the front line, speak with members of the Commonwealth community, observe operations, receive system demonstrations, and validate the assessments they made as part of their review of over four thousand policies, documents, certifications, audio recordings, and case files and reports provided for review during the CMR-7 reporting period. While on site, team members also participated in five system demonstrations on ProMedia, STU/DOT Global Tracking, Computer-Aided Dispatch (CAD)/Global Technology Enterprise (GTE), Non-Punitive Offenses module, and the Supervision Module.

During the CMR-7 reporting period, the Monitor's Office also reviewed 93 policies, forms (PPRs), and protocols under paragraph 229 of the Agreement. The policies included domestic violence (General Order (GO) 118), technology (GO 123), performance evaluation (GO 310), interactions with the community (GO 804 and 805), and interventions with minors (GO 633), among others.

Members of the team also observed a handful of PRPB community engagement efforts such as a Community Encounter conducted in San Juan on body-worn cameras, a Community Encounter held in Caguas, and Conversatorios held in Guayama and Humacao. The Monitor's Office also observed several training sessions conducted by the Auxiliary Superintendency for Education and Training (SAEA) including UOF, sexual assault investigations, internal investigations, motor vehicle interventions, and domestic violence investigations refresher training. Team members were also present at various demonstrations and protests during the CMR-7 reporting period. These demonstrations provided another avenue with which to assess PRPB's operations and practices to ensure that they are in line with the Agreement.

During the CMR-7 reporting period, IPSOS, the third-party service provider conducting surveys of the community, PRPB personnel, and detainees, as required by paragraph 241 of the Agreement, distributed the survey on detainees. Surveys of the community and PRPB Personnel were conducted during the CMR-6 reporting period. Analysis and reports presenting the results of the detainee, community member, and PRPB personnel surveys will be developed by IPSOS and are expected to be completed before the spring of 2023.

In addition, during the CMR-7 reporting period, the Monitor's Office participated in two status conferences. The status conferences held in May and August 2022 focused on updates related to the Provisional UOF Plan, the IT Joint Stipulation Order, and the Supervision and Staffing Plan. The Monitor's Office has continued to work closely with the Parties to finalize the plans and begin monitoring the

Commonwealth's progress with implementing the three Plans filed with the court. An updated Joint Stipulation on IT with amended timelines for the IT Needs Assessment and development of the IT Action Plan was also filed with the court during this reporting period. Further, updates to the Provisional UOF Plan were also made and submitted to the court. These updates were drafted in collaboration with the Parties and informed by the Monitor's work in reviewing UOF mid period data (April – June 2022).

## Key Findings of the Monitor's Seventh Report

During the CMR-7 reporting period, the Commonwealth's achievements towards partial and/or substantial compliance with many of the paragraphs remained the same, although the conduct of training on the requirements of the paragraphs assessed has regressed. As a result of the previously noted lack of a virtual training platform, COVID-19 related restrictions, and limited staffing and poor management of training priorities and schedules, little to no training for current PRPB personnel was conducted during this reporting period. Further, repeated issues like poor documentation of probable cause and the use of boiler plate language on arrest reports, failures in supervision to issue corrective actions, and exceeding timelines in Force Investigation Unit (FIU) investigations and Commissioner's Force Review Board (CFRB) evaluations of UOFs are just a few examples of issues continuously raised by the Monitor's Office in previous CMRs and noted again in this report.

Despite these challenges and continued stalled progress in compliance, the Monitor's Office is encouraged by the Commonwealth and PRPB's initial progress with implementing the Provisional UOF Plan and the production of improved data for the months of July through September 2022,[1] the formation of promotional boards and committees and finalization of related policies and protocols, the work of Gartner, Inc. and PRPB in conducting the IT Needs Assessment, and in the development of compliance management dashboards by AHDatalytics, the Commonwealth's contractor.

Supervisory promotions, the production of consistently accurate UOF data, the completion of the IT Needs Assessment, development of the IT Action Plan, and implementation of a ReformStat process, if continued, will all have the potential to shift progress forward in CMR-8 and in future CMRs.

However, the Monitor's Office stresses to PRPB and the Commonwealth that it must also address the issues raised related to training. Training is an integral component of reform. It is important to note that PRPB's regression in conducting training cannot only be attributed to restrictions because of the COVID-19 pandemic. As noted in previous CMRs, shortages in staffing, poor management of training schedules, and a lack of prioritization of training courses has resulted in the lack of training provided to current PRPB officers, most of which were not able to attain their 40-hour in-service training requirement, or unit specific training requirements during this reporting period. The provision of resources, staffing, and increased commitment and action by leadership to implement the reform is imperative to complying with the Agreement. On August 18, 2022, the Commonwealth shared with the Monitor's Office and the Parties a document titled, "DPS Training and Development Center Concept Brief," prior to the court's visit to the Academy. However, this brief did not address implementation of the Agreement. The Commonwealth committed subsequently to develop an implementation plan to address the

---

[1] PRPB retroactively reviewed and reconciled UOF reports starting January 2022. However, because these corrections were made retroactively, the Monitor's Office was unable to assess compliance with UOF reporting for the entire CMR-7 reporting period.

Agreement's training requirements and the Monitor's findings, which is due in draft to the Parties and the Monitor's Office in December 2022.[2]

Further, the Monitor's Office uses this opportunity to stress to the Commonwealth that it is integral that PRPB and the Department of Public Safety (DSP) work collaboratively to move compliance forward. Collaboration and cooperation between these entities is key to improved communication and in ensuring that both are working towards a common goal of improved compliance with the Agreement and ultimately sustainable reform.

Overall, the compliance assessment in this report demonstrates continued stalled progress and in the conduct of training, regression. Although PRPB continued to develop and/or revise various policies, procedures, manuals, and related forms, significant progress needs to be made in the training and practical application of these policies and procedures, see figure one. Further, when examining the total paragraphs assessed in this report (N=177) in comparison to the previous report in which these sections and paragraphs were assessed (CMR-5; N=181), the Monitor's Office notes PRPB has achieved some progress during this reporting period. For example, 77 paragraphs met partial compliance and 61 paragraphs were rated not compliant during this reporting period, in comparison to 77 paragraphs rated as partially compliant and 63 as not complaint in CMR-5. Further, when reviewed comprehensively, over 58 percent (N=102) of the paragraphs meet either partial or substantial compliance in CMR-7 in comparison to 56 percent (N=102) in CMR-5.



*Figure 1. Rate of Compliance Over Time*

In the forthcoming report sections, the Monitor's Office provides the assessment and analysis produced by the subject matter experts. All recommendations and assessments are offered in the spirit of collaboration with the sole objective of assisting the Commonwealth in achieving a pathway to compliance.

---

[2] See Order, Dkt. No. 2229 (Oct. 24, 2022).

## I.  Professionalization

With respect to Professionalization, the Monitor's Office concludes that the Commonwealth has made minimal progress towards compliance since CMR-5. The development of policies for promotions, staffing, career development, performance evaluations, and integrity audits have been completed or are in progress. Those policies that have been implemented and/or recently finalized incorporate the requirements of the paragraph(s). Further, although training in many of the areas of the Agreement have regressed during the CMR-7 reporting period, training on the Code of Ethics and Conduct is consistent with approved policies and has been delivered, as noted by the Monitor's Office review of training records. While the Commonwealth has begun implementing many paragraphs of the Agreement in policy and training, the Bureau has not yet consistently demonstrated the application of these policies and training in practice with respect to Professionalization.

On April 13, 2022, the Parties filed a joint stipulation and proposed order on staffing and supervision with the court, which was approved by the court on April 18, 2022. Subsequently, on August 31, 2022, the Commonwealth provided to the Parties the *Plan Actualizado para la Implementación del Requerimiento 13 para la Reforma Sostenible del NPPR* (the Plan). The Plan outlines the activities and timelines associated with its prospective efforts to implement the six initiatives in the 2018 Staffing Plan. Although filed in August, late in the CMR-7 reporting period, PRPB's plan to implement the 2018 Staffing Plan reflects more deliberate planning and resources devoted to the issue, which if continued and implemented as intended should result in increased staffing, improved allocation of resources, and improved supervision and management of personnel. The Monitor's Office remains hopeful that the Commonwealth will carry out the activities and timelines noted in the Plan as agreed and will continue to monitor the Commonwealth's progress in future CMRs.

Overall, the Commonwealth's compliance with the 10 paragraphs within Professionalization reflect minimal progress to what was noted in previous CMRs. In CMR-5 40% of paragraphs were found to be partially and substantially compliant, where 50% of paragraphs were found to be partially and substantially compliant in the current reporting period. See figure 2.



*Figure 2. Professionalization: Paragraph Compliance Status*

## Paragraph 12: Professionalization - General Provisions

*PRPD shall develop processes and mechanisms that promote professional, ethical, and respectful policing services to effectively address Puerto Rico's public safety challenges; consistently and uniformly apply constitutional police practices; build public confidence; and strengthen its institutional structures. PRPD shall promote continuous performance improvement among all PRPD personnel that regularly identifies problems or challenges, assesses causal or contributing factors, and takes reasonable measures to achieve performance expectations in areas related to this Agreement.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – September 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Training on the code of ethics and conduct is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled officers are trained and certified in the code of ethics and conduct (or scheduled for training, in the case of mid-year reviews). | ☑ Met | ☐ Missed |
| 4. 95% of sampled administrative investigation outcomes are within policy. | ☐ Met | ☑ Missed |
| 5. 95% of sampled integrity audit outcomes are within policy. | ☐ Met | ☑ Missed |

Note: Compliance will be determined on two separate but inter-dependent bases: (1) the implementation of paragraphs 13-21, and (2) the results of outcome assessments, pursuant to Paragraph 243 of the Agreement.

### *Compliance Assessment*

PRPB policies related to this paragraph have been revised since the Monitor's Office last assessment. However, despite these revisions, PRPB continues to incorporate the requirements of paragraph 12 and has supplied documentation that indicates over 95% of its workforce is currently trained on the Code of Ethics and Conduct. Regarding administrative investigations, the Monitor's Office noted several areas where PRPB uses the findings of investigations in relation to professional advancement. However, the Monitor's Office found that less than 95% of sampled administrative investigation outcomes complied with GO 617 (Code of Ethics for Members of the Puerto Rico Police Bureau), and no integrity audits have been conducted. Of the 29 administrative investigations reviewed by the Monitor's Office, 11 fully complied with policy (38%), 11 partially complied (38%), and 7 were determined to be not compliant (24%) with the stipulations of GO 617. Non-compliance generally resulted from evidence that PRPB is not following through or providing evidence of the actions and discipline noted in these investigations. Further, as noted in previous CMRs, PRPB continues to work on developing its policies and procedures

related to integrity audits. As such there are no integrity audits for the Monitor's Office to assess for compliance with target 5.[3]

*Pathway Forward*

PRPB must create an automated system or revise its current Auxiliary Superintendency of Professional Responsibility (SARP) system to allow the Monitor's Office the ability to verify what discipline was imposed and when it was completed or produce documentation that provides this information for the administrative investigations requested. Similarly, once developed, the integrity audit process should include a review process that would allow PRPB and the Monitor's Office the ability to review audit outcomes in a comprehensive manner.

The Monitor's Office will continue to assess PRPB's progress in developing an Integrity Unit and its related policies and procedures. Specific recommendations and feedback on the preliminary drafts of the policy submitted at the end of the CMR-7 reporting period are provided in the pathway forward for paragraph 157.

## 1. Staffing and Community Policing

As noted above, PRPB recently submitted its plan to implement the 2018 Staffing Plan and has begun implementing a variety of the initial activities associated with the Plan. The Plan includes initiatives associated with promotions, recruitment, and the civilianization of various roles within the department. During the CMR-7 reporting period, PRPB established related committees and assigned project leads to each of the initiatives noted in the Plan. Evaluations of the implementation of paragraph 13 will seek to determine if the staffing and resource allocation plan is consistent with community oriented policing principles and supports the systematic use of partnerships and problem-solving techniques. The Monitor's Office is hopeful that this will also offer agents the opportunity to more substantively serve the communities in which they live.

### Paragraph 13: Professionalization – Staffing and Community Policing

*PRPD shall assess the appropriate number of sworn and civilian personnel to perform the different department functions necessary to fulfill its mission. To do so, PRPD shall conduct a staffing allocation and resource study. The study shall form the basis for a staffing and resource allocation plan that is consistent with community-oriented policing principles and supports the systematic use of partnerships and problem-solving techniques. To foster community-oriented policing, the plan shall consider deployment practices that offer officers opportunities to serve the communities in which they reside.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – September 2022 |
| Policy: | Implemented | | |

---

[3] See Paragraph 157 for additional information.

| | | | |
|---|---|---|---|
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. PRPD conducted a Staffing Allocation and Resource Study to assess appropriate number of personnel. | ☑ Met   ☐ Missed |
| 2. The Staffing and Resource Allocation Plan is consistent with the requirements of the paragraph and the Staffing Allocation and Resource Study. | ☑ Met   ☐ Missed |
| 3. 95% of sampled units are staffed consistent with the Agreement and the Staffing and Resource Allocation Plan. | ☐ Met   ☑ Missed |
| 4. 85% of the initiatives in the Staffing and Resource Allocation Plan are implemented. | ☐ Met   ☑ Missed |

### Compliance Assessment

In 2018, PRPB conducted a staffing and resource allocation study and developed a Staffing Plan. This plan was consistent with the requirements of the paragraph. Unfortunately, any planned activities associated with this 2018 Staffing Plan were not implemented. In April 2022, the Parties entered a joint stipulation that noted this failure and made efforts to implement the 2018 Staffing Plan's key recommendations. On August 31, 2022, PRPB released an updated Staffing Allocation and Resource Study as part of the updated Plan it submitted to the Monitor's Office. This Plan outlines the tasks, activities, committee, and project leads associated with the implementation of each initiative noted in the 2018 Staffing Plan. Upon review of the Plan, the Monitor's Office found that it meets the requirements of this paragraph. However, PRPB only begun to implement this Plan in September 2022, and as such has not met the requirements of target 4 for paragraph 13.

The updated Plan has been designed to comply with paragraphs 13 and 135-140 of the Agreement regarding staffing and supervision. The proposed Plan is in accordance with the Stipulated Order entered by the Federal Court on April 18, 2022.

The initiatives in the updated Staffing Plan include redistributing personnel, making promotions and process improvements, consolidating, and eliminating units, evaluating sworn positions and civilianization of various positions within PRPB, increasing recruitment efforts for aspiring new agents, and assigning a certified Project Manager to oversee implementation.

PRPB has provided evidence to the Monitor's Office that indicates PRPB has assigned an IT developer (Interboro) to design a digital solution for the analysis of every PRPB bureau through the lens of the Plan. This solution, when available, should assist the Monitor's Office in accurately determining PRPB's compliance with the 2018 Staffing Plan. Meanwhile, the Monitor's Office has requested a breakdown of deployments throughout PRPB along with staffing levels required by the Plan. Without data to support the implementation of this paragraph, the Monitor's Office must therefore conclude partial compliance.

### Pathway Forward

PRPB should continue to implement its Plan to implement the 2018 Staffing Plan. In October 2022, PRPB submitted its draft 90-status report on the implementation of the Plan. This progress and status update occurred outside of the CMR-7 reporting period and will be reviewed as part of the next CMR under

Supervision and Management. PRPB's compliance with paragraph 13 and Professionalization will be reviewed again in CMR-9.

The Monitor's Office continues to stress the importance of allocating resources and project management staff to this effort. Implementing the updated Plan will not only improve PRPB's compliance with paragraph 13 but will garner progress in several of the paragraphs related to supervision and management. Further, not only will this achieve compliance, but also improve PRPB's management of personnel and resources, and improve operations and place PRPB on a path towards sustainable reform.

## 2. Promotions

The Monitor's Office acknowledges PRPB's improvement in the selection of mid-level management officers. It is hopeful that PRPB will continue to ensure transparent, fair, and merit-based promotions at all ranks. The Monitor's Office will remain vigilant, along with the Puerto Rico Human Resources Department, to ensure that this process of fair and merit-based promotions will continue to be the standard for all ranks.

Much of PRPB's progress associated with the paragraphs in this subsection remain to be seen. Although PRPB has begun taking steps towards improving compliance with these paragraphs, it is still very much in the initial and planning stages of establishing a promotional process and conducting promotions. PRPB's efforts to establish related committees, identify project leads, and begin working on related materials and protocols have begun and will continue to be assessed. The Monitor's Office looks forward to PRPB's continued progress and in working with PRPB as it develops the related promotional tools. Due to the current state of activities, the Monitor's Office does not expect demonstratable progress in this subsection until the next reporting period.

### Paragraph 14: Professionalization – Promotions

*PRPD's promotion practices shall be merit-based and comply with equal opportunity employment principles.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This paragraph is assessed with Paragraph 16.

*Compliance Assessment*

As noted in paragraph 16, promotion policies incorporate the requirements of paragraphs 14 and 16-20. The promotion trainings are consistent with approved policies.

The Monitor's Office reviewed and subsequently approved GO 504 (Promotion Examinations Board), a policy on the promotions examination board governing promotions through the rank of captain during the CMR-7 reporting period. The Monitor's comments on this policy included specifying a designee for the Commissioner, assigning a Vice Chair to the board, extending the 10-working days call deadline, and including test development experts along with subject matter experts in the development of promotional tests. Revisions to this GO were made by PRPB as part of its efforts to implement the updated Plan. The policy was approved by the Monitor's Office on October 11, 2022.

*Pathway Forward*

Although PRPB has completed the policy aspect of this paragraph and achieved partial compliance, substantial compliance can only be achieved with the practical application of the policy which cannot be assessed until the promotions process has been completed.

## Paragraph 15: Professionalization – Promotions

*PRPD shall publish detailed job descriptions for each rank among sworn personnel, specifying the duties, responsibilities, and minimum qualifications for each position. PRPD shall develop the job descriptions in consultation with the TCA based on generally accepted policing practices.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2021 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Job descriptions for each rank among sworn personnel are: (a) based on generally accepted policing practices and (b) are detailed, specify duties, responsibilities, and minimum qualifications | ☑ Met | ☐ Missed |
| 2. Job descriptions for each rank among sworn personnel are published. | ☑ Met | ☐ Missed |

*Compliance Assessment*

In review of this paragraph, PRPB provided a copy of its Rank Structure: Functions, Duties, and Responsibilities to the Monitor's Office, which has not changed since the Monitor's Office last review in 2021.

During the CMR-7 reporting period, the Monitor's Office reviewed and subsequently approved PRPB's GO 213 (Professional Career Development Program). The Monitor's Office also expects that revisions to

14

the previously approved job descriptions may be required as part of PRPB's efforts to implement the updated Plan.

*Pathway Forward*

Although the current copy of the Rank Structure policy meets compliance for this paragraph, the Monitor's Office recommends that PRPB update the Rank Structure policy and specific job descriptions as needed once PRPB has implemented a career path policy. Substantial compliance with this paragraph will be contingent on PRPB's practical application of the career path and related job descriptions.

### Paragraph 16: Professionalization – Promotions

*PRPD shall ensure that its supervisor selection process is lawful, fair, and consistent with generally accepted policing practices and anti-discrimination laws. PRPD shall develop objective selection criteria to ensure promotions are based on knowledge, skills, and abilities that are required to perform supervisory and management duties successfully in core substantive areas. PRPD shall provide clear guidance on promotional criteria, and prioritize effective, ethical, and community-oriented policing as criteria for promotion. These criteria should account for experience, civil rights and discipline record, training, and skills.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | October 2021 – September 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Deferred | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Promotion policies incorporate the requirements of Paragraphs 14, 16-20. | ☑ Met | ☐ Missed |
| 2. All promotion trainings are consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled promotions committee personnel are trained and certified in all promotions policies (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☐ Missed |
| 4. Selection devices comply with promotion policies. | ☐ Met | ☐ Missed |
| 5. 95% of selected promotion files comply with policy. | ☐ Met | ☐ Missed |
| 6. 95% of interviewed candidates perceive the promotion process as merit-based, fair, non-discriminatory and objective. | ☐ Met | ☐ Missed |

*Compliance Assessment*

PRPB indicated to the Monitor's Office that no promotional exams or promotions have been executed between October 2021 and September 2022. As such the Monitor's determination of compliance is deferred. Though PRPB has taken steps recently to begin promotions in accordance with the updated Plan, the promotions committee personnel began to undergo training on updated selection devices

during the period. Compliance with training requirements for the promotions committee could therefore not be determined for the CMR-7 reporting period.

The Monitor's Office is hopeful that the promotional exam, which is expected to be conducted in December 2022 per the Plan, and other related promotional processes, will show no discrimination or political interference during the examination. In addition to reviewing the operational implementation of the exams and documents produced as part of the promotional process, the Monitor's Office will also conduct interviews with successful and non-successful candidates after the promotional process is completed to understand officer perceptions of the process. Review of related candidate file documentation, selected and not selected, will also be conducted by the Monitor's Office.

*Pathway Forward*

Compliance with this paragraph will be contingent on PRPB's ability to train and certify the personnel assigned to the promotions committee and ensure that the selection complies with the policy. Further compliance is also contingent on the perceptions of this process offered by the candidates. The promotions process must be merit-based, fair, non-discriminatory, and objective. The Monitor's Office looks forward to assessing PRPB's implementation of the promotional process as it works towards the promotion of sergeants and leadership ranks over the next few months.

## Paragraph 17: Professionalization – Promotions

*PRPD shall utilize competitive written examinations as a component of the selection process to award promotions through the rank of Captain. Written promotion examinations shall conform to generally-accepted professional standards for test validity and security and be designed to evaluate qualifications that are job related and consistent with business necessity. PRPD shall develop these examinations in consultation with the TCA based on generally accepted policing practices and in compliance with anti-discrimination laws.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | October 2021 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Deferred | | |

*Compliance Targets*

Note: This paragraph is assessed with Paragraph 16.

*Compliance Assessment*

As noted above, promotion policies incorporate the requirements of paragraphs 14 and 16-20, and all promotion trainings are consistent with approved policies. However, PRPB indicated to the Monitor's Office that from the period of October 2021 through September 2022, there were no promotional exams administered or promotions made within PRPB. As such, the Monitor's Office is unable to assess the

16

implementation of such policies and trainings in practice. Further, because the written exams have not been developed and/or are in the initial stages of development, the Monitor's Office has yet to review the materials. According to PRPB's Plan, these examination materials will be provided to the Monitor's Office for review by November 2022.

*Pathway Forward*

The Monitor's Office will work with PRPB to review and revise, if needed, its promotional exams as required by this paragraph. Further, the Monitor's Office will assess PRPB's substantial compliance with this paragraph once it has completed a full cycle of test preparation, written testing, interviews, promotional trainings, and promotions through the rank of captain.

## Paragraph 18: Professionalization - Promotions

*All appointments to ranks above Captain shall be based on objective criteria that account for the knowledge, skills, and abilities to perform core management, supervisory, and leadership duties.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | October 2021 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Deferred | | |

*Compliance Targets*

Note: This paragraph is assessed with Paragraph 16.

*Compliance Assessment*

As noted above, PRPB reported to the Monitor's Office that from the period of October 2021 through September 2022 that there were no promotional exams administered or promotions made, including promotions above the rank of captain. In September 2022, PRPB circulated the draft of a new policy governing promotions to command staff ranks (Special Protocol for Promotions to the Ranks from Inspector to Colonel, dated August 19, 2022). This policy adequately addresses the knowledge, skills, abilities to perform core management, supervisory, and leadership duties. Feedback from the Monitor's Office included that candidates should demonstrate knowledge of the Reform Agreement, its programs, training, and management in their implementation. Also, candidates should demonstrate knowledge of PRPB's policies and procedures. The document was reviewed and subsequently approved by the Monitor's Office in September 2022.

*Pathway Forward*

PRPB's substantial compliance with this paragraph is contingent on its ability to operationalize the policy. As such, the Monitor's Office will continue to assess PRPB's compliance with this paragraph after the

17

policy is implemented. The Monitor's Office will also seek to review candidate files, selected and not selected, to determine if the appointments were based on objective criteria that account for the knowledge, skills, and abilities to perform core management, supervisory, and leadership duties.

## Paragraph 19: Professionalization – Promotions

*PRPD shall establish procedures that govern the removal of officers from consideration for promotion for disciplinary action related to serious misconduct.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | October 2021 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Deferred | | |

### *Compliance Targets*

Note: This paragraph is assessed with Paragraph 16.

### *Compliance Assessment*

As was noted in paragraph 16, PRPB has met the related policy compliance targets. In review of this paragraph, PRPB submitted a copy of Rule 4216 (Puerto Rico Police Personnel Regulations) in 2022. This rule provides for the disqualification of a candidate for promotion based upon relevant and objective data relating to misconduct. Specifically, a promotion candidate is disqualified from promotion for a sustained finding of a serious administrative misconduct for one year after that finding. In cases of minor misconduct, the disqualification period is six months. Because PRPB indicated that there have been no promotional exams or promotions made within the organization during the CMR-7 reporting period, the Monitor's Office is unable to assess PRPB's compliance with the application and practice of this policy.

### *Pathway Forward*

PRPB's substantial compliance with this paragraph is contingent on its ability to operationalize the policy. The Monitor's Office will continue to assess PRPB's compliance with this paragraph after the policy is implemented.

## Paragraph 20: Professionalization – Promotions

*PRPD shall establish specific criteria for the promotion of officers in direct supervisory roles. Officers in supervisory roles shall not be rendered ineligible for promotion based solely on the number of civil complaints filed against officers under their supervision. The nature and type of civil complaints, particularly those complaints that are investigated and substantiated by evidence, shall also be weighed when considering an officer for promotion. Promotions of officers with pending investigations or disciplinary action in a matter alleging serious misconduct shall be held in abeyance until the investigation or disciplinary action is resolved.*

18

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | October 2021 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Deferred | | |

*Compliance Targets*

Note: This paragraph is assessed with Paragraph 16.

*Compliance Assessment*

As noted in the assessment of paragraph 19, PRPB submitted a copy of Rule 4216 (Puerto Rico Police Personnel Regulations). This rule provides for the disqualification of a candidate for promotion based upon relevant and objective data relating to misconduct. Specifically, a promotion candidate may not receive a promotion if s/he has a case pending in SARP. If and only if a case is concluded in favor of the accused officer may such an officer be promoted. In addition to this related policy, PRPB is working on establishing its Early Intervention System (EIS), which will allow PRPB to review the nature and type of civilian complaints and any related disciplinary action more effectively as part of the promotional consideration process. Training and practical application on the related promotional policies has yet to be completed because PRPB has not initiated any promotions. As noted above, the Monitor's Office is unable to assess PRPB's compliance with this paragraph.

*Pathway Forward*

The Monitor's Office looks forward to assessing the practical application of Rule 4216 (Puerto Rico Police Personnel Regulations), as well as further EIS developments. The training, use, and practice of such policies and systems will allow the Monitor's Office to assess PRPB's compliance with this paragraph more comprehensively.

## 3. Commander Corps

As mentioned previously, the policies related to career paths reflect that they are fair, transparent, and free of bias or political interference which is essential to the creation of a credible, effective, and competent command staff. During the CMR-7 reporting period, the Monitor's Office reviewed and approved GO 213 (Professional Career Development Program). PRPB's substantial compliance with this paragraph is contingent upon its ability to apply its policy into practice.

### Paragraph 21: Professionalization - Commander Corps

*PRPD shall provide a developmental career path for officers aspiring to the command ranks that emphasizes leadership, ethics, community-oriented policing, educational achievement, and constitutional policing.*

19

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: Deferred. See Jt. Mot., ECF No. 1095 at 9 (proposing Special Master assist developing plan in accordance with Paragraph 21); Order, ECF No. 1102 at 2 (approving same).

*Compliance Assessment*

The Monitor's Office reviewed and subsequently approved GO 213 (Professional Career Development Program) in September 2022. Once the policy is signed by the Commissioner, PRPB must work on reviewing and/or developing the associated training to incorporate aspects of this policy into supervisor training and any training related to performance evaluations.

More broadly, as part of its review of GO 213, the Monitor's Office provided additional considerations for PRPB related to implementing the new policy. Substantial compliance is dependent on PRPB's development of related training and practical application of the policy and procedures established.

*Pathway Forward*

The Monitor's Office stresses the importance of implementing GO 213 (Professional Career Development Program) once signed by the Commissioner and incorporating this policy and the requirements of this paragraph into training, specifically training related to supervision and performance evaluations. The considerations provided by the Monitor's Office during the policy review process include noting that GO 213 should be implemented together with GO 310 (Performance Evaluations). The Monitor's Office acknowledges the planned changes to performance evaluations as noted in the most recently revised GO 310 and its related forms. If not implemented in conjunction with GO 310, PRPB will face difficulty operationalizing GO 213 due to the need to improve the current performance evaluation program. As noted by the Monitor's Office in previous CMRs, performance evaluations as currently conducted do not provide a good foundation for promotional decisions. Additional considerations for implementation include developing a feedback process that includes SAEA, auditing the performance evaluation process, and retraining current supervisors and training newly promoted supervisors.

## II. Use of Force

A primary hinderance in the Commonwealth's progress towards achieving compliance with UOF has been its inability to validate its UOF numbers. This issue has been raised by the Monitor's Office in previous CMRs as compliance assessments of many of the paragraphs within this section of the Agreement require a comprehensive review of UOFs. In response to court orders provided in the spring of 2022, the Commonwealth and PRPB, working with USDOJ and the Monitor's Office, developed a Provisional UOF Plan to address the inconsistences in its UOF tracking.

The Provisional UOF Plan was formally implemented by PRPB on July 1, 2022 and involved increased supervisory layers of review to identify and correct errors and/or discrepancies in the data entered into UOF reporting forms within PRPB's GTE system. PRPB's review of its June 2022 UOFs and implementation of the plan, identified adjustments that needed to be made to ensure proper implementation of the Provisional UOF Plan. A similar review of the June 2022 UOF reports conducted by the Monitor's Office resulted in the identification of issues in tracking, reporting, and the timely completion of these reports. A revised Provisional UOF Plan, which was reviewed and commented on by the Monitor's Office and USDOJ, was later submitted by the Commonwealth to the Court on September 22, 2022. In regard to improving UOF reporting, PRPB has also worked with AHDatalytics, the Commonwealth's contractor, in the development of UOF dashboards which provide the Reform Unit with the ability to comprehensively review whether certain procedural or documentary steps were taken as part of the force reporting process in the field.

Although the inconsistencies in the UOF data largely affect many of the paragraphs in this section, other topics such as FIU, Force Review Boards (FRBs), Crisis Intervention Training (CIT), SWAT, and crowd control procedures also impact PRPB's overall compliance with this section. As it relates to FIU, the Monitor's Office continues to remain concerned regarding the length of time FIU is taking to complete its investigations. In almost all cases reviewed, the investigations were not completed within the 45-day requirement. Similarly, in the Monitor's review of CFRB evaluations, while the evaluations were objective, they also were not timely.

CIT, like UOF, has also been an area of discussion and focus for the court in the past few months. Despite the completion of PRPB's CIT pilot program in November 2020, the Bureau has lagged in its effort to complete an evaluation of the pilot and expand the program to other areas of the island. Due to these issues, the court, in January 2022, requested that PRPB work with USDOJ and the Monitor's Office to establish an evaluation committee and move progress forward with expanding the program. While PRPB has made some progress in these efforts, by producing a draft evaluation and interviewing potential CIT coordinators, its progress continues to lag due to recruitment and training challenges.

Notwithstanding the issues noted above, the Commonwealth has demonstrated progress in many of the UOF paragraphs. Much of the efforts made in CMR-7, such as PRPB's work on the Provisional UOF Plan, collaboration with AHDatalytics, the Commonwealth's contractor, in the development of improved UOF dashboards, and increased accountability among leadership at the area commands, represent the initial steps towards reaching increased compliance. The ripple effect of the initial efforts made in CMR-7 will, if continued, prove fruitful in subsequent reporting periods.

Overall, the Commonwealth's compliance with the 36 paragraphs assessed during this reporting period within UOF reflect similar levels of compliance to what was noted in previous reports. In CMR-6, 53% of paragraphs (19 paragraphs) were assessed as partially compliant and 22% (5 paragraphs) were assessed as substantially compliant, in comparison to the current reporting period, where 56% of paragraphs (20 paragraphs) were found to be partially compliant and 8% (3 paragraphs) were found to be substantially compliant (paragraph 25 moved to fully compliant). The similar levels of compliance show a stall in progress. In many cases, the Commonwealth regressed in the provision of training. Six of the thirty-six paragraphs (17%) were also noted as deferred in CMR-7, because of the Commonwealth's recent efforts to address the inconsistency in UOF reporting. See figure 3.



*Figure 3. Use of Force: Paragraph Compliance Status*

## Paragraph 22: Use of Force - General Provisions

*PRPD officers shall use force in accordance with the rights, privileges, and immunities secured or protected by the Constitution or laws of the United States and the Commonwealth of Puerto Rico, and shall prohibit the use of unreasonable force. PRPD shall develop policies and procedures that enable officers to rely primarily on non-force techniques to effectively police; use force only when necessary; and de-escalate the use of force at the earliest possible moment.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

22

Note: Compliance will be determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 23-57, and (2) the results of outcome assessments, pursuant to Paragraph 243.

*Compliance Assessment*

As in previous CMRs, the Monitor's Office requested the following information: 1) number of incidents in which force was used and 2) how many officers used force in each incident. In response, PRPB provided information attesting that force was used 861 times in 424 incidents during the CMR-7 reporting period.

Of the 861 UOF applications that occurred in the CMR-7 reporting period, the Monitor's Office randomly sampled and reviewed 70 UOF reports. As noted above, due to PRPB's inability to accurately track UOFs, the Monitor's Office is unable to offer a comprehensive assessment of UOFs.

Further, during the CMR-7 reporting period, the Monitor's Office reviewed various policies and procedures related to UOF reporting. As previously noted, the Monitor's Office finds that PRPB's policies and procedures on UOF enable officers to rely primarily on non-force techniques to effectively police, use force only when necessary, and de-escalate the UOF at the earliest possible moment. Adherence to the policies in practice are also reflected in the Monitor's review of UOF reports.

Again, due to the inaccuracy of UOF reporting by PRPB, the Monitor's findings cannot be said to be representative of all UOFs that occurred during the CMR-7 reporting period. Until this is addressed, the Monitor's Office can only assess this paragraph as partially compliant.

*Pathway Forward*

The Monitor's Office will reassess PRPB's progress in this area in CMR-8 and remains hopeful that PRPB will be able to produce reliable data due to its work on the Provisional UOF Plan. While the Monitor's Office is not able to determine that the UOFs comply with this paragraph in a comprehensive manner, PRPB's efforts to produce accurate data, will allow the Monitor's Office to provide a thorough analysis in the future.

## 1. General Provisions

PRPB complies with applicable law and comports with generally accepted policing practices in its policy and training related to UOF, including training on less lethal weapons. The comprehensive UOF policy requires that PRPB categorize all reportable UOFs into multiple levels, grouped by degree of seriousness, and identify all force techniques used by officers. PRPB has provided the Monitor's Office with the requested case files for review under the applicable paragraphs. However, due to data validity issues, PRPB has yet to demonstrate its ability to accurately track UOFs. Although these issues were resolved, by way of the Provisional UOF Plan near the end of the reporting period, issues surrounding data accuracy were present for over four of the six months in the reporting period.

Despite the recurring issues in accuracy of the UOF data, PRPB has demonstrated continued compliance with several paragraphs in this subsection including the continued prohibition of CN gas, and qualifying personnel on the use of firearms.

## Paragraph 23: Use of Force - General Provisions

*PRPB complies with applicable law and comports with generally accepted policing practices. The comprehensive use of force policy shall categorize all reportable uses of force into multiple levels, grouped by degree of seriousness, and shall include all force techniques, technologies develop a comprehensive and agency- PRPD shall wide use of force policy that, and weapons, both lethal and less-lethal, that are available to PRPD officers, including officers assigned to specialized tactical units. The comprehensive use of force policy shall clearly define and describe each force level option and the circumstances under which each force level is appropriate. The highest level of force described by the policy shall include all serious uses of force, as defined in this Agreement.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| 1. Policies incorporate all of the requirements of Paragraphs 22-24. | ☑ Met   ☐ Missed |
|---|---|

### Compliance Assessment

PRPB has prepared comprehensive policies that categorize UOFs into multiple levels, grouped by degree of seriousness and describes each force level and the options available to officers as outlined in the Agreement. The policies are consistent with generally accepted police practices relating to UOF. The Monitor's Office reviewed 70 UOF incidents during the CMR-7 reporting period and determined that the force used by officers were accurately categorized into levels grouped by the degree of seriousness. During the CMR-7 reporting period, there were 861 UOF applications; of these instances, 252 were level 1, 218 were level 2, 306 were level 3, and 77 were level 4 UOFs.

Due to the data validity issues noted above, the Monitor's Office cannot verify that the UOF reports and investigations provided to the Monitor's Office reflect the total number of UOF incidents that occurred during the reporting period. Thus, we are unable to state that our assessment of these incidents is representative of all the UOFs during the reporting period.

### Pathway Forward

The Monitor's Office looks forward to assessing PRPB's progress with improving data accuracy as it implements the Provisional UOF Plan and continues its work on the IT Needs Assessment and subsequent IT Action Plan.

## Paragraph 24: Use of Force - General Provisions

*PRPD shall develop comprehensive and agency-wide policies that comply with applicable law and comport with generally accepted policing practices concerning the use of: (a) lethal force; (b) firearms; (c) canines; (d) ECWs; (e) chemical agents; (f) less lethal munitions; (g) batons and impact weapons; and (h) any other force technology, weapon, or implement authorized by PRPD during the life of this Agreement. PRPD shall also develop a policy on sharing information with the public regarding serious uses of force and the dissemination of information to family members of civilians involved in a use of force incident.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | |
|---|---|
| 1. Policies incorporate all of the requirements of Paragraphs 22-24. | ☑ Met   ☐ Missed |

### *Compliance Assessment*

PRPB has prepared comprehensive policies and revised them periodically as outlined in the Agreement. The policies are consistent with generally accepted policing practices relating to UOF. As noted above, while PRPB has incorporated the paragraph requirements into policy, all relevant personnel have not been trained on the requirements and policy and implementation of this policy in practice is still lacking.

### *Pathway Forward*

Substantial compliance with this paragraph hinges on PRPB's ability to demonstrate its practical application of UOF policies. Because of issues noted with PRPB's ability to accurately track UOFs, the Monitor's Office is unable to make a comprehensive assessment to determine if the UOF policies are in fact adhered to in practice. The Monitor's Office looks forward to reviewing PRPB's compliance with this paragraph and is hopeful that the implementation of the Provisional UOF Plan and IT Needs Assessment will improve PRPB's ability to accurately report and track UOFs.

## Paragraph 25: Use of Force - General Provisions

*PRPD shall continue to prohibit the use of Chloroacetophenone (commonly referred to as "CN gas").*

| Compliance Status | Assessment Schedule | |
|---|---|---|
| Fully Compliant | Review | April 2022– September 2022 |

25

| | Policy: | Implemented | Period | |
|---|---|---|---|---|
| | Training: | N/A | Assessment Frequency | Bi-annually |
| | Practice: | Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. Policy prohibits use of CN gas. | ☑ Met  ☐ Missed |
| 2. No supply of CN gas is identified in armories or other locations through unannounced site visits. | ☑ Met  ☐ Missed |
| 3. No supply of CN gas is identified in armories or other locations through inspections. | ☑ Met  ☐ Missed |
| 4. CN gas is never used by STUs. | ☑ Met  ☐ Missed |

*Compliance Assessment*

As per the Agreement, PRPB continues to prohibit the use of CN gas. The Monitor's site visits and observations of PRPB equipment rooms and documentation of its armory inspection reports submitted by PRPB continue to demonstrate PRPB's compliance with this paragraph. During the July 2022 site visit to SWAT, no CN gas was present in the unit's arsenal. Moreover, the Monitor's Office verified that supervisors conduct a daily weapons inventory check and submit a quarterly report (documentation provided).

PRPB's full compliance is reflective of its efforts to meet the policy and implementation requirements of this paragraph.

## Paragraph 26: Use of Force - General Provisions

*PRPD shall maintain an accurate, current list of officers who successfully qualify with their regulation firearm, including any other firearm that officers are authorized to use or carry. Officers who fail to re-qualify shall be relieved of police powers and immediately relinquish all firearms, including personal firearms. Those officers who fail to re-qualify after remedial training within a reasonable time shall be subject to disciplinary action.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met  ☐ Missed |

| | | |
|---|---|---|
| 2. All officers on the qualification list are qualified and certified on the use of firearms in accordance with policy. | ☑ Met | ☐ Missed |
| 3. All officers who fail the qualification re-test on the same day are relieved of operational duty, disarmed, and summoned for re-training before leaving the Academy. | ☑ Met | ☐ Missed |
| 4. All officers who fail to qualify after re-training remain relieved of operational duty, remain disarmed, and are referred for disciplinary action. | ☑ Met | ☐ Missed |
| 5. All officers are disciplined for failing to qualify after re-training or have a valid justification for not qualifying in accordance with policy. | ☐ Met | ☐ Missed |
| 6. All officers with more than one regulation firearm are qualified in all authorized firearms. | ☑ Met | ☐ Missed |

*Compliance Assessment*

The Monitor's Office found that PRPB's policies relating to firearms qualifications incorporate all requirements of the paragraph. The Monitor's Office re-reviewed and approved GO 618 (Use and Handling of Regulation Weapons) during the CMR-7 reporting period. PRPB also provided a list of 10,421 personnel who qualified with their service weapon. These nighttime firing qualifications were conducted from September 2021 to January 2022. Daytime firing qualifications will be conducted in CMR-8; however, the Monitor's Office notes that PRPB has yet to schedule these qualifications.

The Monitor's Office selected a random sample of 91 officers and requested their certified training records to verify that officers were qualified with their service weapon for the CMR-7 reporting period. A review of the training files confirmed that all officers were qualified. The Monitor's Office also noted that 30 officers required re-training to be certified and that no officer failed the qualification re-test or was relieved of operational duty according to PRPB documentation. SARP also provided documentation that there were no investigations conducted relating to officers failing to qualify on their weapons. All officers with more than one regulation firearm were qualified on all firearms.

PRPB's Technology Bureau and SAEA are developing a Shooter Module, which will general global reports; however as of the end of this reporting period, the module was not yet operational and has not been demonstrated to the Monitor's Office.

*Pathway Forward*

PRPB needs to continue qualifying personnel on firearms and maintaining records of this training in its Global Report. Further, the Monitor's Office stresses the importance of scheduling the daytime firing qualifications. Doing so will ensure that all officers are qualified every 12 months. Failing to do so will result in a regression in compliance in the next reporting period.

## 2. Specialized Tactical Units

In relation to paragraphs 27-31, the Monitor's Office has concluded that PRPB has developed UOF policies for specialized tactical units (STUs) and that these policies are consistent with PRPB's Bureau-wide UOF policy. A review of the tactical unit's (DOT) roll call documents verifies continued compliance with policies. Related to training on policy, PRPB DOT has also completed training; however, re-training for some DOT members has not been provided within the last 12 months as required. PRPB reports that

this is because the Academy has not scheduled the training. In practice, the Monitor's Office has verified that all STU officers meet eligibility requirements and that specialized units are not conducting general policing functions except for non-specialized preventive patrols in high crime areas. For these preventive patrols PRPB DOT must provide documentation that officers assigned to preventive patrol do so in regular uniform and not in full tactical attire.

During the CMR-7 reporting period, the Monitor's Office reviewed documents and case files that attested to DOT conducting preventative patrols and other policing activities as outlined in the appropriate policies. In addition, DOT is appropriately documenting its activities and having supervisors review those activities and documentations. To that end, the Monitor's Office requested a random sample of 68 DOT Mobilizations (PPR 112.2 Record of Mobilization of STU) during the CMR-7 reporting period. A review of the files verified DOT's compliance with policy.

As noted in previous CMRs, PRPB does not have a centralized database that captures all STU deployments island-wide. This centralized database would help PRPB command staff determine DOT needs Bureau-wide.

## Paragraph 27: Use of Force - Specialized Tactical Units

*PRPD shall develop policies on the use of force by members of specialized tactical units ("STUs"). This policy shall be consistent with PRPD's agency-wide use of force policy. tactical units ("STUs"). This policy shall be consistent with PRPD's agency-wide use of force policy.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☒ Met | ☐ Missed |
| 2. All use of force training involving STUs is consistent with approved policies. | ☒ Met | ☐ Missed |
| 3. 95% of officers are trained and certified in all use of force policies involving STUs (or scheduled for training, in the case of mid-year reviews) | ☐ Met | ☒ Missed |
| 4. 95% of uses of force by STU officers are within policy. | ☒ Met | ☐ Missed |

*Compliance Assessment*

PRPB has developed policies on UOF by STU members. These policies are consistent with PRPB's Bureau-wide policy. A review of UOF training involving STUs has determined that it is consistent with PRPB policy. No updates to this policy were conducted during this review period. Further a review of training records

28

found that 95% of sampled officers have not completed training on UOF policies involving STUs in the required timeframe. The target was missed because required retraining was not conducted within 12 months for most DOT personnel and at the conclusion of this reporting period, had not been scheduled.

There were three instances in which DOT was activated during the CMR-7 reporting period other than for "standby" status or as preventive patrol. Those instances involved a demonstration outside of the Offices of the Puerto Rico Aqueduct and Sewer Authority (PRASA) - DOT units used less-than-lethal force (tear gas) to disperse unruly protesters, the second and third involved demonstrations/protests at the Fortaleza against LUMA where DOT used less-than-lethal chemical agents against unruly protesters. These deployments and UOFs were consistent with policies relating to UOF by specialized units.[4]

### Pathway Forward
The Monitor's Office will continue to monitor UOFs by specialized units at demonstrations and protests to verify compliance with this paragraph. The Monitor's Office also notes that PRPB must schedule and conduct training for all officers on UOFs involving STUs to move compliance forward.

## Paragraph 28: Use of Force - Specialized Tactical Units

*PRPD shall prohibit STUs from conducting general patrol and policing functions.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Training involving STUs is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of STU officers are trained and certified in STU policies (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 4. Presentation of data on STU deployments and activations. | ☑ Met | ☐ Missed |
| 5. 95% of all STU deployments/activations for general patrol and policing functions are justified within policy. | ☑ Met | ☐ Missed |
| 6. 95% of all assignments of individual STU officers to general patrol and policing functions are justified and carried out within policy. | ☑ Met | ☐ Missed |

---

[4] See Appendices D and E for a summary of these events.

*Compliance Assessment*

The Monitor's Office has reviewed the STU policies and trainings and found that they meet the requirements of the Agreement, and that training follows approved policies. In addition, 95% of STU officers are trained and certified on STU policies; however as previously stated, some re-training for DOT personnel has not taken place in the required yearly timeframe. In addition, the Police Training Management System (PTMS) does not allow supervisors to easily track which officers have received which training courses, so DOT supervisors have been maintaining their own internal tracking, which is not conducive to tracking long-term and on-going training requirements.

In relation to the policy requirements of paragraph 28, PRPB GO 112 (Tactical Operations Divisions) allows DOT officers to be assigned to preventive patrol but precludes DOT from operating as a specialized unit or equipping tactical gear when conducting patrol functions. GO 112 also requires that DOT members always keep specialized weapons and tactical equipment accessible in the event their unit is activated to respond to an authorized DOT event. During the Monitor's May 2022 site visit to Metro DOT, the Monitor's Office was informed that officers assigned to preventive patrol keep their specialized equipment in the trunk of their vehicle, accessible to the officers in the event they are mobilized. In addition, during the March 2022 site visit, the Director of the Reform Unit informed the Monitor's Office that PRPB has modified PPR 112.2 (Record of Mobilization of STU) to capture this information as well as wearing the proper uniform. Verification of the changes to PPR 112.2 were confirmed by the Monitor's Office. The Monitor's Office has also confirmed that officers are using the modified PPR 112.2 as part of its review of the related case files and during site visits.

The Monitor's Office has verified in its review of related documents that specialized units are properly documenting their daily assignments in compliance with the Agreement. Specialized units are not conducting general policing functions apart from preventive patrols in high crime areas or at special events. During the CMR-7 reporting period over 711 preventive patrols were conducted. From that number the Monitor's Office requested a random sample of 55 records. Upon review of the deployment records, the Monitor's Office determined that deployments were consistent with the Agreement and PRPB policy.

*Pathway Forward*

The Monitor's Office will be able to ensure implementation of the revised PPR 112.2 (Record of Mobilization of STU) through case reviews and STU observations. These reviews and observations will ensure PRPB's continued compliance with the practical elements of this paragraph.

The Monitor's Office will continue to evaluate training records to ensure that required trainings are being delivered on time and in adherence with the Agreement.

## Paragraph 29: Use of Force - Specialized Tactical Units

*PRPD shall develop eligibility criteria and selection devices for assignment to STUs that emphasize demonstrated capacity to carry out the mission of STU in a constitutional manner. Officers assigned to STUs who are unable to maintain eligibility shall be removed from STUs. Assignments to STUs shall be for a determined period, as specified by PRPD policy, unless there are extenuating circumstances that justify an extended assignment.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2021 – September 2022 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually |
| Practice: | Implemented | | |

### Compliance Targets

| | Met | Missed |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Training for evaluation boards is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of evaluation board members are trained. | ☑ Met | ☐ Missed |
| 4. All officers selected to STUs meet eligibility requirements. | ☑ Met | ☐ Missed |
| 5. All officers assigned to STUs who do not maintain eligibility are removed from STUs. | ☑ Met | ☐ Missed |
| 6. 95% of all extensions of STU assignments are justified as extenuating circumstances within policy. | ☑ Met | ☐ Missed |

### Compliance Assessment

The Monitor's Office has reviewed the STU policies and trainings and found that they meet the requirements of the Agreement, and that training follows approved policies.

PRPB provided documentation that there are currently 185 personnel assigned to DOT units throughout PRPB. The breakdown of those personnel by rank is as follows:

- 1 Inspector
- 1 Captain
- 3 First Lieutenants
- 7 Second Lieutenants
- 16 Sergeants
- 157 Agents

PRPB has developed GO 112 (Tactical Operations Divisions) and 117 (Specialized Weapons and Tactics Division) which identify eligibility criteria and selection processes for specialized units. During the CMR-7 reporting period no additional officers were assigned to SWAT or DOT. The Monitor's Office reviewed DOT and SWAT personnel files for existing members and confirmed that the officers meet the requirements for assignment and have the required training.

It should be noted that, according to PRPB, 85% of the officers in DOT completed their six-year assignments in January 2022. Therefore, the retention process for these officers to remain in their existing position as outlined in GO 112 (Tactical Operations Divisions) should have been completed. Upon review of documents during the August 2022 site visit, it was determined that all but four

31

officers who have filed for retirement and two members who have just recently returned to active duty, have completed the retention process, meeting the 95% compliance threshold. The SWAT retention process was completed during the CMR-6 reporting period.

It should be noted that during the reporting period two officers requested transfer from DOT to other assignments. In neither case was eligibility nor discipline a factor.

As it relates to the retention or removal of officers who have reached the six-year tenure, the Monitor's Office is able to assess that PRPB has complied with Bureau policy.

### Pathway Forward

As noted above, the tenure limit of six years expired in January 2022 for most of the STU officers. The Monitor's Office assesses that PRPB has completed the retention process for those DOT officers it wished to retain. Moving forward, PRPB needs to complete this task as necessary and in a timely manner.

## Paragraph 30: Use of Force - Specialized Tactical Units

*PRPD shall require STUs to document in writing all law enforcement activities to include operational plans and after-action reports prepared in consistent formats for all call-outs and deployments. Supervisors shall review the law enforcement activities of STUs periodically to ensure compliance with applicable laws and PRPD policies and procedures.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Training for STUs is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of law enforcement activities by STUs, including deployments and activations, are documented within policy. | ☑ Met | ☐ Missed |
| 4. 95% of law enforcement activities by STUs, including deployments and activations, are reviewed by supervisors. | ☑ Met | ☐ Missed |

### Compliance Assessment

The Monitor's Office has reviewed the STU policies and trainings and found that they meet the requirements of the Agreement, and that training follows approved policies. A review of PRPB DOT operational plans indicated that in situations where the unit was given prior assignment notification, an operational plan was prepared as required by PRPB policy.

32

PRPB reported that during the CMR-7 mid-period (April through June 2022) there were 69 demonstrations or protests. Of the 69 demonstrations or protests, according to PRPB documentation, 42 were unplanned, 17 were planned, and 10 provided no indication if they were planned or unplanned.

PRPB reported that DOT units participated in eight demonstrations or protests that occurred during the CMR-7 reporting period; however, in all but three, DOT participated in a "standby" role. According to PRPB, SWAT did not participate in any demonstrations or protests during the reporting period. The Monitor's Office verified this through documentation provided by the Reform Unit.

PRPB provided documentation that there are currently 24 personnel assigned to SWAT. The breakdown of those personnel by rank is as follows:

- 1 First Lieutenant
- 1 Second Lieutenant
- 3 Sergeants
- 19 Agents

SWAT was activated 61 times during the CMR-7 reporting period. The Monitor's Office conducted site visits to SWAT to review documents and conduct visual inspections of equipment in July and October 2022.

In all cases reviewed, SWAT prepared a Mobilization Report (PPR 112.2) and After-Action Report (PPR 112.3). As noted in previous CMRs, SWAT's commanding officer reported that, in many instances relating to mobilization, no advance warning was received following the request to "back up" federal task forces or specialized units operationally. Therefore, no operational plans were prepared during the period for those events.

As previously stated for the CMR-6 reporting period, SWAT developed an internal form titled "Mission Evaluation". This internal form captures all aspects of the mission including what needs to be maintained, what could be done better, and final comments. The Monitor's Office commended the Commanding Officer of SWAT in the development, implementation, and use of the Mission Evaluation Form and emphasizes that self-reflective evaluation is essential to promoting improvements in the unit's performance and overall safety. This practice is also consistent with generally accepted policing practices. PRPB has now memorialized the form and assigned it Bureau Report PPR 117.3. The Monitor's Office reviewed and approved this PPR in July 2022.

Additional observations made by the Monitor's Office during the CMR-7 reporting period include the following:

- In the 61 cases reviewed by the Monitor's Office, SWAT reported using force in 36 incidents (54%). In all cases force consisted of pointing a firearm, a Level 3 UOF.
- A comparison of reported UOFs by SWAT to PRPB's Global List revealed that 6 (17%) of the reported UOFs did not appear in the Bureau's UOF records at the mid-period; however, they were retroactively added by the end of the CMR-7 reporting period.

- The information provided by SWAT was cross-checked and verified with PPRs 112.2 (Mobilization Report) and SWAT's Global List for accuracy.
- In all instances, SWAT used the updated PPR 112.2.
- Based on data provided by PRPB, 95% of law enforcement activities by STUs, including deployments and activations, are reviewed by supervisors.

*Pathway Forward*

The Monitor's Office concludes that SWAT/DOT has taken the necessary steps to comply with the Agreement. Specialized units need to maintain current levels of compliance. The Monitor's Office will continue to assess compliance with this paragraph in CMR-8.

## Paragraph 31: Use of Force - Specialized Tactical Units

*PRPD shall track the number of STU deployments, the reason for each activation and deployment of STU, the legal authority, including type of warrant, if any, for each activation and deployment of STU, and the result of each activation and deployment of STU, including: (a) the approximate location of the STU deployment; (b) the number of arrests made; (c) the type of evidence or property seized; (d) whether a forcible entry was made; (e) whether force was used by an STU member or other officer; and (f) whether a person was injured or killed by an STU member.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. The STU tracking system accounts for all elements in the paragraph and outcome measures as required by Paragraph 243. | ☐ Met  ☑ Missed |
| 2. The STU tracking system is accurate and current; all deployments are tracked. | ☐ Met  ☑ Missed |

*Compliance Assessment*

As stated in previous CMRs, PRPB does not have a tracking system that captures all STU deployment data throughout PRPB. Individual STUs and area commands confirmed that PRPB is not compiling the information in one central database, which would assist PRPB's command staff in determining Bureau-wide DOT needs. While PRPB is collecting the deployment data at the unit level in alignment with the Agreement, it appears that PRPB does not collect the data at the Bureau level. Therefore, PRPB has not implemented this paragraph in practice and the paragraph is assessed to be partially compliant.

It should be noted that near the end of the CMR-7 reporting period, AHDatalytics, the Commonwealth's contractor, began working with the PRPB Reform Unit to develop a dashboard that

would centralize STU deployment data. The Monitor's Office reviewed a preliminary draft of this dashboard, which is expected to be completed during the CMR-8 reporting period.

*Pathway Forward*

To progress in compliance with this paragraph, PRPB must implement a Bureau-wide tracking system. The development of the tracking system is the responsibility of the field operations unit that oversees STU operations. Furthermore, the data and report outputs of this system should be used to inform Bureau-wide DOT strategies and address gaps in resources and potential officer safety issues.

## 3. Crowd Control Policies and Performance

In general, PRPB has made significant progress in how it prepares for and operates during demonstrations and protests. The Monitor's Office has had the opportunity to observe PRPB providing strategic policing coverage at demonstrations and protests over the course of the CMR-7 reporting period, see appendices D and E. As reported in previous CMRs, PRPB's actions in response to demonstrations and protests have become increasingly consistent with generally accepted policing practices.

In response to all demonstrations or protests during the CMR-7 reporting period that DOT units were activated for – all were in a stand-by capacity except for three instances. Those instances involved a demonstration outside of PRASA - DOT units used less-than-lethal force (tear gas) to disperse unruly protesters, the second and third involved demonstration/protests at the Fortaleza against LUMA where DOT used less-than-lethal chemical agents against protesters who failed to comply with disbursement orders. This is a significant finding given the number of demonstrations and protests responded to during the reporting period. In those instances where DOT units did not actively engage with demonstrators or protestors, after-action and self-assessments reports were not completed, except for PPR 112.2 (Mobilization of Specialized Tactics). Further, the Monitor's Office found that an incident commander was identified at every demonstration/protest regardless of STU activation status.

### Paragraph 32: Use of Force - Crowd Control and Incident Management

*PRPD shall develop crowd control and incident management policies that comply with applicable law and comport with generally accepted policing practices.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

35

*Compliance Targets*

| | |
|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met   ☐ Missed |
| 2. Training on crowd control and incident management is consistent with approved policies. | ☑ Met   ☐ Missed |
| 3. 95% of STU officers, supervisors, and other officers are trained and certified in crowd control (or scheduled for training, in the case of mid-year reviews); 95% of all supervisors are trained in incident management (or scheduled for training, in the case of mid-year reviews). | ☐ Met   ☑ Missed |
| 4. 95% of police responses to unplanned events are within policy. | ☑ Met   ☐ Missed |
| 5. 95% of police responses to planned events are within policy. | ☑ Met   ☐ Missed |
| 6. 95% of armories inspected by STU supervisors indicate that less lethal weapons and ammunition are controlled and maintained in accordance with policy. | ☑ Met   ☐ Missed |
| 7. 95% of armories indicate that less lethal weapons and ammunition are controlled and maintained in accordance with policy. | ☑ Met   ☐ Missed |

*Compliance Assessment*

The Monitor's Office has reviewed the crowd control and management policies and trainings and found that they meet the requirements of the Agreement, and that training follows approved policies. After reviewing a random sample of training personnel records, the Monitor's Office determined that PRPB has met the 95% threshold for the training of STU officers and others on the relevant crowd control training (REA 625); however only approximately 23% are up to date on re-training. The remaining officers have completed the initial training but have not completed yearly re-training as required.

The Monitor's Office requested a list of all demonstrations and protests Bureau-wide for the CMR-7 reporting period. PRPB provided a list of 157 protests (82 unplanned, 35 planned, and the remaining 40 provided no indication) island-wide in response to the Monitor's request. Upon review and as previously reported, it was evident that the data was not aggregated, but rather provided for each area.

PRPB should aggregate its data on planned and unplanned crowd control events Bureau-wide for the purpose of analyzing and identifying possible training needs as well as the distribution of personnel and resources.

PRPB has identified demonstrations and protests in 117 cases (75%) as planned or unplanned. However, despite its compliance with policy, in 40 demonstrations or protests (25%) PRPB did not identify if the demonstration or protest was planned or unplanned. This inconsistency presents obstacles to the practical application of the policy and other requirements of this paragraph.

During a site visit to Metro DOT and a review of data provided by the Reform Unit, the Monitor's Office reviewed reports relating to personnel deployments to demonstrations and protests where DOT was mobilized. The Monitor's Office learned that in instances where PRPB had determined in advance that the DOT Unit would be activated, an operations plan was developed by the unit. However, in instances where the determination to mobilize the unit was made at the time of the event, the DOT prepared no such plan.

The Monitor's Office selected a random sample of 26 crowd control events to review operational plans, after-action reports, and self-assessment reports as outlined in GO 625 (Management and Crowd Control). PRPB's responses to the demonstrations were generally consistent with PRPB policy. Some observations are as follows:

- Of the 26 files provided, PRPB reported that 17 (65%) were identified as unplanned. The operations plans (PPR 625.2) prepared understandably had minimal information, given their unplanned status; however, the seven demonstrations/protests (27%) that were planned also had minimal information.
- In two instances (8%) the demonstrations did not have a designation of planned or unplanned.
- The Monitor's Office observed an improvement in PRPB's preparation of PPR 625.6 (Evaluation of Strategies for the Management or Control of Crowds) especially in the latter CMR-7 period (July through September 2022); however, approximately 23% of the reports continued to summarize what took place during the event instead of conducting a self-assessment.

Regarding training on the relevant crowd control policies, PRPB provided documentation on DOT officers and supervisors current certification in these courses. The Monitor's Office reviewed the documentation provided by Metro DOT which verified that of the 185 members assigned to various DOTs throughout the Bureau all are trained on crowd control policies; however, this training requires yearly re-training and only 23% are up-to-date. It should be noted that four officers are currently on workmen's compensation and two have just returned to work and will be scheduled for training. It should also be noted that the scheduling of officers for re-training is the responsibility of the Academy. In addition, the Commanding Officer of Metro DOT has received training on Incident Command.

PRPB submitted the quarterly reports (PPR 618.1) of STU supervisors who conducted inspections of armories as required by the Agreement. In a review of these quarterly reports, the Monitor's Office found them to be within policy and documented.

*Pathway Forward*
Although PRPB is partially compliant, the Bureau must maintain an aggregated list of all demonstrations, both planned and unplanned, and classify them as such. Maintaining such a list will assist PRPB in maintaining greater awareness of related operations and determining needed resources throughout the island.

Further, the Monitor's Office notes that the failure to conduct training as required is holding PRPB back from achieving substantial compliance. Conducting this training in the next reporting period is imperative to achieving greater levels of compliance. The Monitor's Office will continue to assess training compliance with target three through random training record reviews.

## Paragraph 33: Use of Force - Crowd Control and Incident Management

*The incident management policy shall provide that a ranking officer or other higher-level PRPD official at the scene of a mass demonstration, civil disturbance, or other crowd situation assume command and control and provide approval prior to deploying force as a crowd dispersal technique.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

Note: Compliance will be determined on two separate but inter-dependent bases: (1) the implementation of paragraphs 13-21, and (2) the results of outcome assessments, pursuant to Paragraph 243 of the Agreement.

*Compliance Assessment*

GO 625 (Crowd Management and Control) annotates that a ranking officer or other higher-level PRPB official at the scene of a mass demonstration, civil disturbance, or other crowd situation assume command, control, and provide approval prior to deploying force as a crowd dispersal technique. This policy was last submitted to the Monitor's Office for review just after the CMR-7 reporting period. As of the writing of this report, the Monitor's Office is still reviewing this policy. In review of the demonstrations and STU activations, the Monitor's Office found that in all incidents of demonstrations or protests, a high-ranking member of PRPB was identified as incident commander. Crowd dispersal techniques (tear gas and pepper spray) were used during three protests and/or demonstrations. The Incident Commander was informed and approved of the use of these techniques prior to use.

*Pathway Forward*

The Monitor's Office commends PRPB for its work on this paragraph and will continue to assess this paragraph in line with the requirements of paragraphs 13-21 to ensure PRPB's continued substantial compliance.

## Paragraph 34: Use of Force - Crowd Control and Incident Management

*The crowd control policy shall require the use of crowd control techniques and tactics that respect protected speech and the right to lawful assembly.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | | Bi-annually |

|  Practice: | Not Implemented | Assessment Frequency | |
|---|---|---|---|

## *Compliance Targets*

Note: Compliance will be determined on two separate but inter-dependent bases: (1) the implementation of paragraphs 13-21, and (2) the results of outcome assessments, pursuant to Paragraph 243 of the Agreement.

## *Compliance Assessment*

The Monitor's Office has previously reviewed GO 625 (Management and Crowd Control) and found it to be compliant with the Agreement and general policing practices. PRPB used minimal force while responding to demonstrations and protests during the CMR-7 period. Force was only used in instances were demonstrators or protestors were impeding traffic, blocking entrances, or while dispersing unruly crowds who had thrown projectiles at officers. Otherwise, demonstrators were allowed to assemble peacefully and lawfully.

For the CMR-7 reporting period, PRPB used DOT in response to demonstrations or protests in several instances, including a demonstration outside of the Offices of PRASA and at two demonstrations against LUMA. Aside from these incidents, DOT units were only mobilized in a stand-by capacity or preventive patrol in response to potential needs for crowd control activities.

The Monitor's Office considers this a significant finding, especially since PRPB responded to a substantial number of planned and unplanned demonstrations and protests during the CMR-7 reporting period. In all but the three events mentioned above, DOT was ultimately kept in reserve and never interacted with demonstrators or protesters. The use of other crowd control techniques was within policy.

It is also important to note during a demonstration/protest at the Fortaleza in August 2022 PRPB's DOT, at the direction of the Incident Commander, used gas to disperse unruly protesters who were hurling projectiles at PRPB officers stationed at the police line, injuring several officers. At the direction of the Incident Commander, officers who were positioned on the line, then proceeded to cross the police line for the purpose of continuing to disperse the protesters. The officers on the line were not DOT officers but instead members of the "Contingency Unit" who do not have the same level of training as DOT. As a result, during this incident, officers positioned on the line used force against a journalist; this incident is currently under investigation by FIU. Moving forward, the Monitor's Office recommends, where possible, that the dispersing of unruly protesters be conducted solely by DOT personnel or additional training be provided to officers of the Contingency Unit.

In reviewing the above demonstration data, the Monitor's Office observed that PRPB identified the need to provide additional training for the Contingency Unit in PPR 625.6 (The Evaluation of Strategies for Crowd Management and Control). While it is noted that contention officers were used in this instance without the proper training, it is encouraging that PRPB quickly identified the need and is taking the necessary steps to address the issue.

*Pathway Forward*

To achieve substantial compliance, PRPB needs to categorize all demonstrations and/or protests as planned or unplanned. The Monitor's Office recommends, where possible, that the dispersing of unruly protesters be conducted solely by DOT personnel or that additional training be provided to officers of the Contingency Unit. The Monitor's Office will continue to assess PRPB's progress and compliance with policy, crowd control resource deployment, and training in CMR-8 through policy reviews and on-site observations.

## Paragraph 35: Use of Force - Crowd Control and Incident Management

*PRPD policy shall require the assessment of law enforcement activities following each response to a mass demonstration, civil disturbance, or other crowd situation to ensure compliance with applicable laws and PRPD policies and procedures.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: Compliance will be determined on two separate but inter-dependent bases: (1) the implementation of paragraphs 13-21, and (2) the results of outcome assessments, pursuant to Paragraph 243 of the Agreement.

*Compliance Assessment*

The Monitor's Office reviewed numerous documents relating to mass demonstrations. These documents included a review of PRPB's work plans for demonstrations as well as its completion of PPR 112.1 (Request for Activation of the STU), PPR 112.2 (Record of Mobilizations of STU), and PPR 112.3 (Evaluation of Strategies of the STU). The Monitor's Office found that the STUs did not prepare any after-action reports when activated other than in those where they actively participated in crowd control.

The Monitor's Office concludes that PRPB's actions during demonstrations and protests (planned and unplanned) in the CMR-7 reporting period were consistent with generally accepted policing practices and PRPB policy with the only possible exception being the encounter with the journalist at the Fortaleza protest in August 2022 which is still under investigation. PRPB provided the Monitor's Office with Operation Plans (PPR 625.2) for the various planned demonstrations and protests that occurred in the reporting period, as well as Crowd Management and Control Reports (PPR 625.3), which provided basic details of each event.

For the CMR-7 reporting period PRPB reported that it responded to 157 demonstrations and/or protests (planned and unplanned). The Monitor's Office requested a random sample of 26 cases for review.

The following observations are put forth regarding the reviewed files:

- Of the 26 files provided, PRPB reported that 17 (65%) were identified as unplanned. The operations plans (PPR 625.2) prepared understandably had minimal information, given their unplanned status; however, the 7 demonstrations/protests (27%) that were planned, either had no operations plan or the plan provided minimal information.
- In two instances (8%) the demonstrations did not have a designation of planned or unplanned.

It should be noted that area commanders, in the areas where demonstrations and protests took place, did provide self-assessment reports (PPR 625.6) with varying degrees of thoroughness assessing the police response. Overall; however, PRPB did not prepare a self-assessment for all demonstrations and/or protests for the reporting period. In total, 23 self-assessments (88%) were prepared for the 26 demonstrations and protests reviewed by the Monitor's Office.

The Monitor's Office observed an improvement in PRPB's preparation of PPR 625.6 (Evaluation of Strategies for the Management or Control of Crowds) especially in the latter CMR-7 reporting period (July through September 2022); however, approximately 23% of the reports continued to summarize what took place during the event instead of conducting a self-assessment noting areas for improvement and successes.

### Pathway Forward

To achieve compliance, PRPB must ensure that DOT supervisors and area commanders thoroughly assess all law enforcement activities following each response to a mass demonstration, civil disturbance, or other crowd situation to ensure compliance with applicable laws and PRPB policies and procedures.

This issue has been discussed with the Reform Unit previously. A variety of recommendations were provided including, criteria to be assessed, debriefings with officers and the demonstrators and/or protestors, and the development of after-action and self-assessment reports. Additionally, reference resources were also previously provided by the Monitor's Office.

## 4. Force Reporting

During the CMR-7 reporting period, PRPB reported a total of 861 UOFs. The Monitor's assessment of PRPB's compliance with force reporting policies and procedures was based on the review of the 70 randomly sampled UOF reports provided.

In January 2022, the court held a status conference where ongoing issues related to PRPB's inability to accurately track UOFs were brought forth by the Monitor's Office. As a result, the court ordered PRPB to work with USDOJ and the Monitor's Office to develop a plan to address the inconsistencies in the UOF data. Over the following months, the Parties and the Monitor's Office worked together to develop a Provisional UOF Plan to address the issues with UOF data in the short term. It was agreed by the Parties that long term resolutions to the issue would have to be crafted after the IT Needs Assessment and AHDatalytics, the Commonwealth's contractor, work were complete as both these projects would have implications on the systems and processes used to track UOFs.

The Provisional UOF Plan was filed with the court on April 13, 2022 and established a revised process for validating information captured in the related UOF forms, increased accountability, and if implemented successfully, increased validity in the UOF reporting process. Subsequent court orders required that PRPB test its Provisional UOF Plan in June 2022 and produce a report documenting its findings to the court in July 2022. This process was also informative to necessary adjustments to the Provisional UOF Plan. The Monitor's review of the June 2022 UOF data continued to find inconsistencies in the reporting of UOFs, failures to meet timelines established by policy, and missing forms and/or fields within the forms due to inefficiencies in GTE. An updated Provisional UOF Plan was filed with the court on September 22, 2022.

Further, PRPB began substantively working with AHDatalytics, the Commonwealth's contractor, during the CMR-7 reporting period and have developed various dashboards, including UOF, to assist the Reform Unit in tracking compliance with UOF reporting. As reviewed by the Monitor's Office, this dashboard has helped PRPB's Reform Unit obtain a comprehensive review of whether certain procedural or documentary steps were taken as part of the force reporting process across the island and easily identify areas where the quality of UOF reporting is lacking.

Much of PRPB's languish in compliance in this subsection is directly tied to its inability to accurately track UOFs. Further, the Monitor's Office continues to stress that adherence to reporting timelines, as established by policy, and proper report writing, are also important to ensuring PRPB moves forward with compliance. Increased staffing and supervision along with increased accountability for failing to adhere to policies, are integral to increased compliance with the paragraphs in this subsection.

## Paragraph 36: Use of Force - Force Reporting

*PRPD shall develop a Use of Force Reporting Policy and Use of Force Report Form that comply with applicable law and comport with generally accepted policing practices. The Use of Force Reporting Policy will require officers to notify their immediate supervisor following any use of force, prisoner injury, or allegation of excessive force. In cases involving a serious use of force, notification will be within one hour, absent exigent circumstances.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. Polices and forms incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Training on force reporting is consistent with approved policies. | ☑ Met | ☐ Missed |

42

| | | |
|---|---|---|
| 3. 95% of officers are trained and certified in force reporting policies (or are scheduled for training, in the case of mid-year reviews) | ☐ Met | ☒ Missed |
| 4a. 95% of use of force incidents are notified to immediate supervisors or adequately justified as an exigent circumstance in accordance with policy. | ☒ Met | ☐ Missed |
| 4b. 95% of use of force reports are completed within prescribed periods and are documented in accordance with policy. | ☐ Met | ☒ Missed |
| 4c. All failures to report use of force are referred to SARP for investigation. | ☐ Met | ☒ Missed |
| 4d. 95% of requests for medical services in connection with a use of force are within policy. | ☐ Met | ☒ Missed |
| 4e. 95% of force incidents where a civilian is transported to a medical facility indicate that the officer notified the vehicle mileage and that the mileage was recorded. Mileage discrepancies are identified and addressed by supervisors as required by policy. | ☐ Met | ☒ Missed |
| 4f. 95% of all use of force reports are submitted to supervisors and SARP within prescribed time frames as required by policy. | ☐ Met | ☒ Missed |
| 4g. All use of force reports are stored and maintained by SARP as required by policy. | ☐ Met | ☒ Missed |

*Compliance Assessment*

The Monitor's Office has reviewed the UOF policies and trainings and found that they meet the requirements of the Agreement, and that training follows approved policies.

The Monitor's Office reviewed UOF data in two phases. The first data set reviewed (34 reports) was from April through June 2022, before the implementation of the Provisional UOF Plan. The second data set reviewed (35 cases) was from July through September 2022. This was done to examine the extent to which the Provisional UOF Plan resulted in improved progress. The analysis for each data set is presented below.

### Use of Force Review, April – June 2022

The Monitor's Office conducted a review of 34 UOF Reports (PPR 605.1) covering the CMR-7 mid-period (April through June 2022). In 31 of the 34 cases (91%) reviewed, the Monitor's Office determined that the level of force reported was consistent with the force used. Two reports had missing information which prevented the Monitor's Office from making a determination. The following observations were made as a result of this review:

- All the reports reviewed, had missing, incorrect, and/or incomplete information, i.e., fields in the forms not being checked, such as boxes related to medical treatment, boxes relating to supervisors (67, 71, and 72), dates and times, etc.
- It is apparent to the Monitor's Office that only the bare minimum of information was entered into GTE to establish the UOF incident.
- In all cases officers notified supervisors of a UOF in accordance with policy.
- One commanding officer noted the delay in preparing the UOF report before the end of shift was due to an administrative problem.
- As of August 31, 2021, PRPB policy requires that all UOF Reports be entered into GTE before the end of shift. Only 6 of the 34 cases (18%) reviewed were entered by the end of shift. The average time for the reports not submitted before the end of shift was six days.

- All failures to report UOFs are reported to SARP for investigation.
- In all instances where medical aid was warranted, it was provided.
- The Monitor's Office can confirm that only one report (3%) was reviewed by a supervisor within five business days, as outlined in the Agreement. The Monitor's Office was unable to determine when the investigation was completed in the remaining reports.
- Supervisors responded to all serious UOFs.
- In two cases (6%), documentation relating to FIU investigations of UOF was not provided in the case file.

Though the sample of reviewed UOF reports demonstrates that PRPB is now entering all UOF reports (PPR 605.1) into GTE, the lack of information being entered into reports is of serious concern to the Monitor's Office. After reviewing the reports, it is apparent to the Monitor's Office that only the minimum amount of information is being entered into GTE to establish the UOF incident.

In addition to the above shortcomings, additional areas of concern are present, such as the validity of the UOF data and lack of training in force reporting policies.

## Use of Force Review, July - September 2022

The below observations are made by the Monitor's Office, as a result of the review of UOFs from July to September 2022.

- In 24 of the 35 cases reviewed (69%), the Monitor's Office determined that the level of force reported was consistent with the force used. In 11 of the cases (31%) FIU has yet to compete its investigation.
- Unlike the mid-period review, most of the information in the UOF reports were complete.
- In all cases officers notified supervisors of a UOF in accordance with policy.
- As of August 31, 2021, PRPB policy requires that all UOF Reports be entered into GTE before the end of shift. Only 13 of the 35 cases reviewed (37%) were entered by the end of shift. The average time for the reports not submitted before the end of shift was six days.
- All failures to report UOFs are reported to SARP for investigation.
- In all instances where medical aid was warranted, it was provided.
- In 16 of 24 cases reviewed (cases not reviewed by FIU) (67%) the Monitor's Office confirmed that the UOF was reviewed by a supervisor within five business days, as outlined in the Agreement. Five were not reviewed within the five business days and three were not dated.
- 11 cases were correctly referred to FIU for investigation.
- Supervisors responded to all serious UOFs.
- In one case, based on the narrative, the UOF report should have been referred to FIU since a firearm discharge took place. In this case the field supervisor completed the investigative section of the report (boxes 67-72). While the case may have been referred to FIU, that is not evident from the report.[5]
- In several other cases reviewed by the Monitor's Office, supervisors completed boxes 67-72 even though the case was referred to FIU for investigation.

---

[5] Complaint # 2022-08-116-006900

- In one case it is not evident, based on the report, that FIU took over the investigation.

The Monitor's Office and USDOJ have continuously worked with PRPB to develop proactive measures that PRPB can undertake to ensure greater compliance moving forward.

PRPB's inability to validate its UOF numbers has been a recurring problem, and one which the Monitor's Office has identified in all previous CMRs. PRPB has taken a positive first step to addressing this issue by taking the initiative, with the assistance of the Monitor's Office and USDOJ, to develop a Provisional UOF Plan. This plan, now implemented, places PRPB on track to having a reliable system to report valid UOF numbers, provided that all steps in the system and the layers of review built into the plan are followed.

In the brief filed with the court in July 2022, PRPB noted several discrepancies and errors that were found in the UOF data with the Provisional UOF Plan only in place for short period of time. In this brief, PRPB also identified several lessons learned to help remedy these errors and prevent them from occurring in the future, including:

- Holding bi-weekly meetings with the Auxiliary Superintendency of Field Operations (SAOC), Technology and Communications Bureau (NTC), the Reform Unit, FIU, and Command Center Directors.
- Providing guidance on how to complete PPR 126.2 (Complaint Card).
- Developing guidelines for when more than one unit is involved in a UOF incident.
- Continuing to improve GTE.
- Incorporating dashboards created by AHDatalytics, the Commonwealth's contractor.

It is clear from the Monitor's review of the quality of the force reporting in the two phases as described above that PRPB's implementation of the Provisional UOF Plan has resulted in some improvements; however, continued work in this area along with improved data systems and increased supervision and accountability are necessary to address many of the issues noted by the Monitor's Office.

*Pathway Forward*

PRPB's compliance with this paragraph hinges on its ability to demonstrate consistent and valid UOF data collection. Therefore, the Monitor's Office will defer compliance of the paragraph and reassess in CMR-8. The Monitor's Office is hopeful that with the implementation of the Provisional UOF Plan, PRPB will be able to accurately track its UOFs. To accomplish this, PRPB must ensure integration of the information systems that feed data on UOFs to the Bureau's Global List. The accuracy of this data is not only integral to PRPB's compliance with the Agreement, but also ensures that PRPB is able to operationally respond to and quickly address issues with UOF policy, training, and practice as well as accurately report on UOFs, both internally and externally to its community.

While the above areas for improvement are noted in the Provisional UOF Plan Brief by PRPB are positive steps in identifying next steps, PRPB also needs to identify ways to correct incorrect numbers and reporting in the IT system that were identified in the brief. This has been outlined in the amended Provisional UOF Plan as well as the additional recommendations provided by USDOJ and the Monitor's Office, including entering PPR 112.2 (Registration of Mobilizations of Specialized Tactics) into GTE and

addressing the issue of delayed signing and facilitation of UOF paperwork when a shift supervisor is not present.

PRPB must also hold officers and supervisors accountable for entering UOF reports in the timeframes established by policy.

## Paragraph 37: Use of Force - Force Reporting

*The Use of Force Reporting Policy shall require all officers to report any use of force in writing in a Use of Force Report Form before the end of the shift. The Use of Force Report shall include: (a) a detailed account of the incident from the officer's perspective; (b) the reason for the initial police presence; (c) a specific description of the acts that led to the use of force, including the subject(s)' behavior; (d) the level of resistance encountered; and (e) a description of every type of force used. The Use of Force Reporting Policy shall explicitly prohibit the use of boilerplate or conclusory language in all reports documenting use of force. Failure to report a use of force or prisoner injury by a PRPD officer shall subject an officer, including supervisors and commanders, to disciplinary action.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This paragraph is assessed with paragraph 36.

*Compliance Assessment*

PRPB policy requires all officers complete a UOF Report (PPR 605.1) in writing before the end of the shift. While PRPB has made progress in ensuring that UOF incidents are entered into GTE, the reports are often lacking detail. It is apparent to the Monitor's Office that the bare minimum of information is being entered into the system to establish the UOF incident.

PRPB has taken several positive steps towards reaching compliance with this paragraph, including:

- Implemented the following changes to UOF reporting during the CMR-6 reporting period as a result of the June 2021 Commissioner Directive: 1) when a member of PRPB assigned to any specialized unit is involved in a UOF incident, the officer will request a complaint number from the district or precinct corresponding to the jurisdiction where the incident occurred; 2) PRPB has prohibited the use of complaint numbers with the prefix of the specialized unit in UOF incidents; and 3) PRPB's IT Bureau will take the corresponding steps to support compliance with

the Commissioner's Directive. This will ensure that area commands are aware of each UOF incident in their jurisdiction.

- Implemented into practice that all UOF Reports (PPR 605.1) and Notification of UOF (PPR 605.3) be entered electronically into GTE as a result of the August 2021 directive.
- Submitted a draft of the Provisional UOF Plan with input from the Monitor's Office and USDOJ to the court in March 2022.
- Agreed to conduct an IT Needs Assessment in a joint stipulation to the court in March 2022.
- Hired AHDatalytics to carry out the implementation of the necessary structure identified in the Gap Analysis conducted in May 2021, as part of the PRPB reform process.

The Monitor's Office recognizes these actions by PRPB as positive first steps toward developing a mechanism by which PRPB can validate its UOF incident numbers.

*Pathway Forward*

PRPB's compliance with this paragraph hinges on its ability to demonstrate consistent and valid UOF data collection. Therefore, the Monitor's Office will defer compliance of the paragraph and reassess in CMR-8. The Monitor's Office is hopeful that with the implementation of the Provisional UOF Plan, PRPB will be able to accurately track its UOFs. To accomplish this, PRPB must ensure integration of the information systems that feed data on UOFs to the Bureau's Global List. The accuracy of this data is not only integral to PRPB's compliance with the Agreement, but also ensures that PRPB is able to operationally respond to and quickly address issues with UOF policy, training, and practice as well as accurately report on UOFs, both internally and externally to its community.

## Paragraph 38: Use of Force - Force Reporting

*PRPD policy shall require officers to request medical services immediately when an individual is injured or complains of injury following a use of force. The policy shall also require officers who transport a civilian to a medical facility for treatment to take the safest and most direct route to the medical facility. The policy shall further require that officers notify the communications command center of the starting and ending mileage on the transporting vehicle.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This paragraph is assessed with paragraph 36.

*Compliance Assessment*

In all UOF Reports (PPR 605.1) reviewed by the Monitor's Office, whenever medical aid was warranted, it was received. However, without a valid list of UOF reports, the Monitor's Office is unable to determine whether this finding is representative of all UOF incidents. Therefore, the Monitor's Office will defer compliance of the paragraph and reassess in CMR-8.

*Pathway Forward*

As previously stated, PRPB's compliance with this paragraph hinges on its ability to demonstrate consistent and valid UOF data collection. The Monitor's Office will assess the accuracy of the Provisional UOF Plan and examine if PRPB is able to accurately track its UOFs in CMR-8. The Monitor's Office will also assess compliance regarding transportation and communication for medical aid in CMR-8.

## Paragraph 39: Use of Force - Force Reporting

*PRPD's Use of Force Reporting Policy shall require that officers submit copies of Use of Force Reports to their immediate supervisor and to SPR for tracking and analysis. SPR shall maintain master copies of these reports in a central location.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This paragraph is assessed with paragraph 36.

*Compliance Assessment*

In all UOF Reports (PPR 605.1) reviewed by the Monitor's Office, a UOF report was submitted to the officer's immediate supervisor; however, there were considerable delays in the submission of the UOF reports - most of the UOF reports were not completed in GTE by the end of the officer's shift, as required by PRPB policy (GO 605). In most instances it was entered 3 to 14 days later.

Regarding submission to SARP for the tracking and analysis of these UOF reports, PRPB has not demonstrated that it has the capabilities to provide these functions. The Monitor's Office acknowledges PRPB's efforts towards addressing this issue with its new proposed Provisional UOF Plan which it implemented in July 2022, well into the CMR-7 reporting period, and the work of AHDatalytics, the Commonwealth's contractor. Therefore, the Monitor's Office will defer compliance of the paragraph and reassess in CMR-8 when the Monitor's Office will have an entire period to verify PRPB's UOF reporting using the Bureau's Provisional UOF Plan.

*Pathway Forward*

All officers must submit a copy of their UOF Reports (PPR 605.1) to their immediate supervisor and SARP for tracking and analysis. SARP must maintain the data in a central location. PRPB has identified FIU to be the custodian of the UOF data.

## 5. Force Review, Investigation, and Analysis

Although PRPB meets the policy requirements for these paragraphs, PRPB's implementation in training and practice is hampered by persistent issues with its ability to track and deliver training and track UOF reports properly. In reviewing and determining levels of compliance with the Agreement, the Monitor's Office must look at the reports when they are deemed accurate by PRPB, which is when FIU makes a determination and enters them into the Global List.

### Paragraph 40: Use of Force - Force Review, Investigation, and Analysis

*PRPD policy shall specify that the conduct of all force reviews and investigations comply with applicable law and comport with generally accepted policing practices. All force reviews and investigations shall, to the extent reasonably possible, determine whether the officers' conduct was justified and within PRPD policy.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually for Compliance Target #1 and bi-annually for all other Compliance Targets |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. The policy incorporates all of the requirements of the policy. | ☑ Met | ☐ Missed |
| 2. Training on force reviews and investigations is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of officers are trained and certified in force reviews and investigation policies in accordance with their rank or assignment to FIU (or are scheduled for training, in the case of mid-year reviews) | ☐ Met | ☑ Missed |

Note: Implementation of the requirements of this paragraph is assessed with Paragraphs 43-47 for level 1-3 uses of force.

Note: Implementation of the requirements of this paragraph is assessed with Paragraphs 48-52 for level 4 uses of force.

*Compliance Assessment*

The Monitor's Office has reviewed the policies and trainings and found that they meet the requirements of the Agreement, and that training follows approved policies. While training follows approved policies, 95% of officers have not been trained and certified (or are scheduled for training) in force review and

49

investigation policies in the prescribed timeframe. In the UOF files provided to the Monitor's Office for review, there were many reports with errors and omissions, specifically in those reviewed for the first three months of the CMR-7 reporting period. These include missing narratives describing the need to use force and the marking of incorrect boxes on the UOF report (PPR 605.1). Most of the reports in the last three months of the CMR-7 reporting period, in substance, had been properly prepared and the required actions relating to UOF incidents had been carried out as per the Agreement. In these reports, pertinent information was included, fields were checked, and the reports were signed.

*Pathway Forward*

As stated in previous CMRs, UOF reports (PPR 605.1) should be consistently reviewed by SARP's FIU for completeness and accuracy as a matter of general practice. UOF reports should be closely scrutinized during the review process, given the past observations of the Monitor's Office regarding errors and omissions. Staffing has been a continued problem within FIU. With 18 investigators managing a substantial caseload, it is often difficult for this unit to also serve as a report review unit. PRPB should include in its efforts to implement the 2018 Staffing Plan an assessment of staffing within FIU to ensure it has the adequate staffing needed to conduct level 4 UOF investigations and properly conduct quality UOF reviews.

## Paragraph 41: Use of Force - Force Review, Investigation, and Analysis

*PRPD shall be responsible for maintaining a reliable and accurate tracking system on all officers' use of force; all force reviews carried out by supervisors; all force investigations carried out by Force Investigation Units ("FIU"); and all force reviews conducted by Force Review Boards ("FRB") and the Superintendent's Force Review Board ("SFRB"). At least annually, PRPD shall analyze data on officers' use of force to determine significant trends, identify and correct deficiencies revealed by this analysis, and document its findings in a public report.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually for Compliance Targets #1 and #2; annually for Compliance Target #3; and quarterly for Compliance Target #4 |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Tracking system accounts for all of the elements in the paragraph and outcome measures as required by Paragraph 243. | ☐ Met | ☑ Missed |
| 2. All uses of force are tracked in the tracking system. | ☐ Met | ☑ Missed |
| 3. Annual use of force reports provide meaningful data analysis, identify significant trends, discuss corrective action (if necessary), and present supportable findings based on accurate and current data, as required by policy. | ☐ Met | ☑ Missed |

| | |
|---|---|
| 4. Records maintained by the Radio Control Center on use of force are consistent with data in the use of force tracking system. | ☐ Met  ☑ Missed |

*Compliance Assessment*

Given that PRPB's Provisional UOF Plan was not implemented until July 2022, PRPB has not demonstrated to the Monitor's Office that it has a reliable tracking system for the entire CMR-7 reporting period, nor has it provided the public with accurate information relating to UOF trends through an annual report. Although PRPB has demonstrated efforts towards addressing this issue, because of its lack of public reporting on UOF trends coupled with its inability to analyze and reliably track UOFs for the entire reporting period, this paragraph is rated as not compliant.

The Monitor's Office notes that during the CMR-7 reporting period, PRPB began working with AHDatalytics, the Commonwealth's contractor, to develop dashboards, including a UOF dashboard. The Monitor's Office has reviewed early drafts of the internal UOF tracking dashboard and is hopeful that once fully developed, public facing dashboards will also be released.

*Pathway Forward*

PRPB's compliance with this paragraph hinges on its ability to demonstrate consistent and valid UOF data collection. The Monitor's Office will assess PRPB's compliance and implementation of the Provisional UOF Plan in CMR-8.

The Monitor's Office also continues to stress the importance for PRPB to aggregate its data in a comprehensive and transparent manner. Once the issues with tracking and accuracy of UOF data are resolved, PRPB must ensure that analysis of the data is shared with the public.

## Paragraph 42: Use of Force - Force Review, Investigation, and Analysis

*The quality of force reviews, force investigations, and investigation reviews shall be taken into account in the performance evaluations of the officers performing such investigations and reviews.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraphs 145-146 on Performance Evaluations.

*Compliance Assessment*

51

As stated in CMR-6 PRPB revised, but has not implemented, its Annual Performance Evaluation of the Rank System (PPR 310.1) form to include criteria for evaluating supervisory reviews of UOFs by members under their command. The UOF Section of the evaluation (Supervisors Section) addresses what is required in the Agreement per paragraph 42.

PRPB must also revise GO 310 (Performance Evaluations) to reflect the new policies and procedures associated with the revisions made to PPR 310.1. Given that the revised policy is currently under review, this evaluation system has yet to be implemented, and therefore PRPB is not compliant.

*Pathway Forward*

This performance evaluation process must be outlined in the evaluation policy and procedures and incorporated into supervisory training. Doing so reiterates the value of such work in officer performance, encourages higher quality investigative work, and identifies ways in which investigators can seek to improve year to year.

## 6. Supervisory and FRB Reviews

The Monitor's Office concluded that PRPB supervisors properly responded to serious UOF incidents by officers under their supervision. In cases where FIU presence was needed, proper notification was made to FIU. During the CMR-7 reporting period, FIU reported that it referred two cases to the Puerto Rico Department of Justice (PRDOJ) and its investigative arm, Criminal Investigations (NIE), due to apparent misconduct or criminal conduct. The Monitor's Office concludes that the mechanism to report such conduct is in place.

### Paragraph 43: Use of Force - Supervisory and FRB Reviews

*A supervisor shall respond to the scene of a serious use of force or allegation of excessive force involving an officer under his/her command upon notification of the incident.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraphs 48-52.

52

*Compliance Assessment*

Of the 69 UOF reports (PPR 605.1) reviewed by the Monitor's Office, the Monitor found no instances in which a supervisor failed to respond to a serious UOF. However, the Monitor's Office cannot verify the accuracy of the information related to UOFs provided by PRPB due to unreliable reporting mechanisms. The Monitor's Office acknowledges PRPB's efforts towards addressing this issue with the Provisional UOF Plan. Therefore, the Monitor's Office will defer compliance of the paragraph and reassess in CMR-8.

*Pathway Forward*

PRPB should continue to document that a supervisor responds to the scene of a serious UOF or allegation of excessive force involving an officer under his/her command upon notification of the incident. Furthermore, as previously stated, PRPB's compliance with this paragraph hinges on its ability to demonstrate reliable and valid UOF data collection. The Monitor's Office will continue to assess PRPB's ability to track UOFs accurately in future CMRs.

## Paragraph 44: Use of Force - Supervisory and FRB Reviews

*The supervisor shall conduct a supervisory review of all uses of force, prisoner injuries, or allegations of excessive force, except those incidents involving a serious use of force or force indicating apparent criminal conduct by an officer, which shall be investigated by FIU, SPR, and/or PRDOJ. No supervisor who was involved in the incident, including by participating in, ordering, or authorizing the force being investigated, shall be responsible for the review of the incident.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Training on force reviews and investigations for supervisors is consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of supervisors are trained and certified in force reviews and investigation policies (or are scheduled for training, in the case of mid-year reviews) | ☐ Met | ☑ Missed |
| 4a. 95% of use of force incidents classified as Level 1-3 are reported, reviewed, and investigated by supervisors and commanders within policy. | ☐ Met | ☑ Missed |
| 4b. 95% of supervisory force reviews are completed within five business days or have valid justifications for longer periods, based on exceptional circumstances. | ☐ Met | ☑ Missed |

| | | |
|---|---|---|
| 4c. All use of force reviews and investigations by supervisors reach reasonably justified conclusions on officers' conduct and recommend disciplinary or corrective action, as necessary, in accordance with policy. | ☐ Met | ☑ Missed |
| 5a. 95% of reviews by Force Review Boards are within policy. | ☐ Met | ☑ Missed |
| 5b. The use of force tracking system accounts for all Force Review Board reports and underlying documents. | ☐ Met | ☑ Missed |
| 5c. Force Review Board determinations and recommendations are tracked and analyzed by SPR. | ☐ Met | ☑ Missed |

### Compliance Assessment

Policies incorporate all requirements of the paragraph. Training on force reviews and investigations for supervisors is also consistent with approved policies. 95% of supervisors are trained and certified in force reviews and investigation policies but have not been re-trained as outlined in the Agreement.

Of the 69 UOF reports (PPR 605.1) reviewed by the Monitor's Office, the Monitor found no instances in which a supervisor failed to conform to what was required by policy other than not completing their investigation of the UOF in five business days. Due to the inaccuracy with UOF reporting, the Monitor's Office cannot confirm that supervisors reached reasonable and justified conclusions on officers' conduct and recommended disciplinary or corrective action, as necessary, in accordance with policy nor can the Monitor's Office confirm that 95% of FRB reviews are within policy. Despite the high level of compliance in properly assessing level of force and the review of force by supervisors in the sampled investigations reviewed, the Monitor's Office cannot verify the accuracy of the information related to UOFs provided by PRPB, and therefore defers compliance of the paragraph and will reassess in CMR-8.

### Pathway Forward

As noted in other related paragraphs, compliance with this paragraph is largely contingent on PRPB's ability to accurately track all UOFs, ensuring that the Monitor's review of UOFs is representative. As such, the Monitor's Office will reassess compliance with this paragraph in CMR-8. The Monitor's Office will also continue to assess PRPB's compliance with UOF review procedures (meeting the five-business day review period) and ensuring that they contain the appropriate information and justifications.

## Paragraph 45: Use of Force - Supervisory and FRB Reviews

*Supervisors shall complete use of force reviews within 5 business days of receiving the officer's use of force report. The reviewing supervisor shall: (a) determine whether the use of force was consistent with PRPD policy and/or raises any policy or operational concerns; (b) review all Use of Force Reports and ensure that all reports include the information required by this Agreement and PRPD policy; (c) document each use of force review promptly using a Supervisor's Force Review Report; and (d) consider whether there are non-punitive corrective actions or training needs. A higher ranking officer within the investigating supervisor's chain-of-command shall review the Supervisor's Force Review Report for completeness and conformance with PRPD policy. The reviewing officer shall evaluate the investigating supervisor's conclusions and document whether the reviewing officer concurs, disagrees (with an explanation of the disagreement and the alternate conclusion), or defers until further investigation is completed.*

| Compliance Status | Assessment Schedule |
|---|---|

| Not Compliant | | Review Period | April 2022 – September 2022 |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

## Compliance Targets

Note: This Paragraph is assessed with Paragraph 44.

## Compliance Assessment

In 17 of the 70 UOF cases reviewed (24%) by the Monitor's Office the supervisor did not complete his or her review within 5 business days per the Agreement. In another 15 cases (21%), the Monitor's Office is unable to determine when the force investigation was completed because the PPR 605.1 (UOF Report) area pertaining to the investigation was not completed. In 13 cases (19%) the investigation was conducted by FIU who have 45 days to compete the investigation. This along with the low number of on-time reviews represents a large percentage of the total sample and is significant enough to bring PRPB well below the 95% target for compliance. While the report review is not conducted within the identified timeline, the report content does align with PRPB policy and Agreement language in that the UOF was consistent with PRPB policy and the UOF Reports (PPR 605.1) included the information required by the Agreement; however, this paragraph is rated as not compliant due to supervisors not completing their reports in five business days.

## Pathway Forward

PRPB must ensure all UOF incidents are investigated in the time allotted as required by GO 605 (Report and Investigation of UOF Incidents). As noted in previous paragraphs, the Monitor's Office is aware of the Provisional UOF Plan to address this issue and will reassess this paragraph and the accuracy of UOF reporting in CMR-8.

The Monitor's Office continues to stress the importance of re-training supervisors on their roles and responsibilities in conducting UOF reviews and increased accountability for failing to adhere to the policy.

## Paragraph 46: Use of Force - Supervisory and FRB Reviews

*A Force Review Board shall evaluate supervisory reviews, including Supervisor's Force Review Reports and reviewing officers' determinations. FRBs shall be composed of command staff from varying assignments. PRPD policies shall specify the conduct and requirements of FRB proceedings to ensure thorough, timely, and objective reviews. PRPD policy shall establish objective criteria that identify the force levels below serious uses of force that shall be reviewed by FRBs. FRBs shall review supervisory review for completeness, evidentiary support, and compliance with PRPD policy. FRB shall document each FRB proceeding, which shall include findings and recommendations to the regional commander. FRB may also return force reviews to supervisors for additional*

55

*review, as necessary, to ensure thorough and complete reviews. Copies of all Force Review Reports and underlying documents shall be submitted to SPR for tracking and analysis.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 44.

*Compliance Assessment*

PRPB provided the Monitor's Office a list of 75 officers assigned to the 13 Area Command FRBs. As required by the Agreement, FRB members are of varying assignments and rank. The random sample included 1 commander, 1 inspector, 3 captains, 6 first lieutenants, and 11 second lieutenants. The Monitor's Office requested the training and certification records of 22 randomly selected officers from this list to determine if they are qualified to serve on these boards as outlined in GO 502 (Evaluation Boards of Incidents of UOF).  In 8 (36%) of the training files, FRB members had not been trained on GO 502. It should be noted that a review of the records of those who had training, and in some cases re-training, revealed that the training took place over three years ago.

In addition, the Academy has not finalized the training curriculum for FRB members. It is expected that the training will be available in the latter part of 2022. This training is needed to ensure that FRB members are conducting reviews and evaluations as outlined in PRPB policy.

For the purposes of determining compliance with this paragraph, the Monitor's Office requested a list of all FRB investigations conducted by the 13 Area Command FRBs for the CMR-7 reporting period. PRPB provided a list of 88 UOF cases evaluated by FRBs, of which the Monitor's Office randomly selected 22 cases for review.

The Monitor's Office emphasizes that PRPB needs to develop a single source database for all UOF cases that are evaluated by the 13 Area Command FRBs. Currently global information on FRB evaluations is prepared upon request of the Monitor's Office for its CMRs.

In 21 of the 22 cases (95%) provided for evaluation, the FRB determined that the level of force was consistent with Bureau policy. In the remaining case (#2022-8-216-000549) no information was provided in the file that the Board evaluated the case. In all other cases the Monitor's Office determined that the Board took appropriate measures as it relates to verifying the actions of officers involved in those incidents submitted to the Board for evaluation.

The Monitor's Office offers the following additional assessments of the information provided:

- In one case (5%) the Board ordered re-training.
- In cases where the Board completed PPR 502.1 (Assessment of Incident of UOF) the Board's evaluations were unanimous.
- Four case files (18%) were returned by the Board due to missing or incomplete information.
- In one case (5%) PPR 502.1 was not provided.
- In three cases (14%) the second page of PPR 502.1 was missing.
- No outdated forms were used.

Based on the review of the randomly selected Area Command FRB files, there were no reported referrals, nor was any such need uncovered. It should be noted that the Monitor's Office has seen improvement in the Area Command FRB's UOF evaluations. However, the record keeping of evaluated cases continued to be deficient throughout the CMR-7 mid-period. With the digitizing of files during the end period of CMR-7, the information and data provided by PRPB, and its FRBs was very precise.

It should also be noted as per GO 502 (Evaluation Boards) that the FRB has 15 days, once the meeting convenes, to complete their evaluation. This period can be extended 15 days if the report is returned. The Monitor's Office is unable, based on the documents provided, to verify compliance. PRPB should consider having the Area Command FRBs document compliance with GO 502 timelines in each evaluation.

### Pathway Forward

The Monitor's Office will review PRPB's updated training for FRB members and observe training once conducted to ensure that it adheres to the Agreement. Further, the Monitor's Office notes that compliance with this paragraph is also affected by PRPB's inability to accurately track and report on UOFs, as with many of the paragraphs in this section. PRPB needs to ensure that its record keeping relating to UOF evaluations by the FRB is complete and accurate.

### Paragraph 47: Use of Force - Supervisory and FRB Reviews

*Whenever a reviewing supervisor, FRB, or other reviewing officer finds evidence of a use of force indicating apparent misconduct or apparent criminal conduct by an officer, he or she shall immediately notify his or her supervisor for referral to the appropriate investigating unit or the PRDOJ. The Superintendent shall be notified of the referral.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | Implemented | | Bi-annually |

57

|  Practice: | Not Implemented | Assessment Frequency | |
|---|---|---|---|

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 44.

*Compliance Assessment*

PRPB policy clearly dictates the actions the Board and FIU must take when reporting misconduct to the appropriate investigative unit or to PRDOJ. During the CMR-7 reporting period FIU referred two cases to PRDOJ and its investigative arm, NIE. The Superintendent is being made aware of referrals as outlined in the Agreement.

The Monitor's Office reviewed 15 cases involving an accidental discharge – 8 of which (53%) resulted in an officer sustaining an injury during the CMR-7 reporting period. In all these cases FIU recommended that an administrative investigation be conducted and forwarded the cases to SARP. These cases, when investigated by FIU, are categorized as non-use of force.[6]

*Pathway Forward*

In the instances where FIU investigates a UOF and determines that it was an accidental discharge and not a UOF, the case must be immediately forwarded to SARP upon completion of the investigation, and the eventual disposition should be included in the FIU file. The designation of UOF should not be applied. The Monitor's Office also recommends that FIU continue to document all such cases.

## 7. FIU Investigations and Force Reviews by SFRB

As indicated in previous CMRs, FIU is required to investigate all serious UOF incidents, among other investigations, across Puerto Rico, including both intentional and accidental firearm discharges involving PRPB personnel. During the CMR-7 reporting period there were 77 UOF cases that were investigated by FIU.

In previous CMRs, the Monitor's Office has voiced concerns about the thoroughness of FIU investigations and the accuracy of their conclusions. In reviewing FIU investigations for CMR-7, the Monitor's Office has seen continued improvement in this area, including locating civilian witnesses, camera evidence and using this evidence to make a determination. In addition, FIU, upon completion of their investigation into an accidental discharge, now immediately forwards the case to SARP for administrative investigation. Nevertheless, the Monitor's Office remains concerned regarding the amount of time FIU is taking to complete its investigations. Documentation provided by PRPB indicates that only 7 cases (9%) under investigation during the CMR-7 reporting period were completed in the 45-day deadline as required in GO 113 (FIU).

In past CMRs, these delays in concluding FIU investigations have prevented the Monitor's Office from reviewing sufficient FIU investigations to reach a compliance assessment. FIU investigations tended to

---

[6] Additional detail can be found in Section IX: Civilian Complaints, Internal Investigations, and Discipline

overrun the 45-day deadline, and thus were not closed in sufficient time to provide to the Monitor's Office for review during the same reporting period that the incident occurred. To address this issue, and to better determine if FIU was properly investigating serious UOFs, as outlined in the Agreement, the Monitor's Office pivoted to requesting FIU investigations that were closed during the reporting period, rather than investigations that were opened during the period. The Monitor's Office thus requested a list of all FIU investigations that were completed in the CMR-7 reporting period, irrespective of when the incident occurred that prompted the opening of the investigation. As previously noted, none of the cases reviewed were completed within 45 days, and some dated back over two years to 2020. Limited staffing, along with reliance on external stakeholders to process evidence have been noted as contributing factors to the timeliness of these investigations.

As it relates to the CFRB, the Monitor's Office has seen some improvement in the Board's ability to complete its UOF evaluations in the timelines required in GO 502 (Evaluation Boards of Incidents of UOF); however, the improvement is minimal. PRPB needs to ensure that all UOF evaluations are completed in a timely manner as per policy.

## Paragraph 48: Use of Force - FIU Investigations and Force Reviews by SFRB

*PRPD shall ensure that all serious uses of force and allegations of excessive force are investigated fully and fairly by individuals with appropriate expertise, independence, and investigative skills to ensure that uses of force that are contrary to law or policy are identified and appropriately resolved and that policy or operational deficiencies related to the use of force are identified and corrected. To this end, PRPD shall create FIUs to conduct investigations of serious uses of force, uses of force indicating apparent criminal conduct by an officer, uses of force by PRPD personnel of a rank higher than sergeant, or uses of force reassigned to FIU by the Superintendent, his or her designee, SPR, or FRB. PRPD policies shall specify the membership requirements, conduct of investigations, and operational procedures of FIUs.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☒ Met | ☐ Missed |
| 2. Training for FIU officers is consistent with approved policies. | ☒ Met | ☐ Missed |
| 3. 95% of FIU officers are trained and certified in force reporting and investigation policies (or are scheduled for training, in the case of mid-year reviews) | ☐ Met | ☒ Missed |
| 4. All officers assigned to FIU meet eligibility requirements. | ☒ Met | ☐ Missed |

*Compliance Assessment*

The Monitor's Office has reviewed the UOF policies and found that they meet the requirements of the Agreement. Regarding FIU training, the Monitor's Office conducted a site visit to FIU in July 2022 and verified that the training materials employed by PRPB are consistent with policy and generally accepted policing practices.

FIU is responsible for investigating serious UOFs, including a) accidental and intentional firearm discharges, b) UOF by supervisors above the rank of sergeant, c) UOF at protests, and d) any other UOF deemed appropriate by the Commissioner. The Monitor's Office confirmed that previously recommended additional training on intentional and accidental firearm discharge investigations, had been developed and commenced. This was verified by documentation provided by the FIU Commanding Officer. To date all but four members of FIU have been trained, which places PRPB below the 95% threshold. All officers assigned to FIU meet appropriate eligibility requirements.

*Pathway Forward*

PRPB should ensure that all FIU members are trained in a timely manner. The Monitor's Office will continue to review training records of newly assigned personnel to FIU to ensure that PRPB has trained all members on investigating intentional and accidental firearm discharges and all other required training and re-training.

## Paragraph 49: Use of Force - FIU Investigations and Force Reviews by SFRB

*A supervisor responding to a serious use of force or allegation of excessive force shall immediately notify FIU. FIU shall respond to the scene and commence an investigation. FIU may decline to respond to the scene following consultation and approval by the FIU supervisor. Declinations shall be documented in writing.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☒ Met | ☐ Missed |
| 2a. 95% of use of force incidents classified as Level 4 are reported, reviewed, and investigated by officers, supervisors, commanders, and FIU officers within policy. | ☒ Met | ☐ Missed |
| 2b. 95% of FIU investigations are completed within 45 days of the use of force or have valid justifications for longer periods based on exceptional circumstances. | ☐ Met | ☒ Missed |
| 2c. All use of force reviews and investigations by FIU reach reasonably justified conclusions on officers' conduct and recommend disciplinary or corrective action, as necessary, in accordance with policy. | ☒ Met | ☐ Missed |

| 3a. 95% of reviews by the Commissioner's Force Review Boards are within policy. | ☑ Met   ☐ Missed |
|---|---|
| 3b. The use of force tracking system includes all Commissioner's Force Review Board reports and underlying documents. | ☐ Met   ☑ Missed |
| 3c. Commissioner's Force Review Board determinations and recommendations are tracked and analyzed by SPR. | ☐ Met   ☑ Missed |

*Compliance Assessment*

During the CMR-7 reporting period, FIU reported conducting 77 investigations of which only 7 (9%) were completed within the 45 days as prescribed by policy. The investigation breakdown is as follows:

- 26 firearm discharges
- 5 electronic control devices
- 8 demonstrations/protests
- 21 forces by a supervisor above the rank of sergeant
- 15 accidental discharges
- 1 canine bite
- 1 Strike Force level

### Accidental Discharge Investigations

The Monitor's Office conducted site visits to FIU during the months of August and September 2022. During the visits, 15 accidental discharge files were reviewed. The following is a breakdown of the incidents:

- In eight of the incidents (53%) the officer suffered self-inflicted wounds.
- In three incidents (15%) the officer was carrying their weapon unholstered.
- Three incidents (15%) involved the use of an unapproved holster, or as a result of carrying weapon improperly as in a girlfriend's handbag or fanny pack.
- Nine incidents (60%) took place in a police facility.
- One incident (7%) took place in a police facility parking area.
- In ten incidents (67%) the officer was on-duty.
- In all completed investigations (7), FIU determined negligence on the part of the officer (violation of GOs 204 and 618). In eight cases (53%) the investigation by FIU has not been completed.
- All completed investigations were referred to SARP by FIU for an administrative investigation.

The issue of accidental/negligent discharges has been a reoccurring problem identified in previous CMRs. While PRPB has taken appropriate actions in these cases it does not appear that it has looked at the underlining issues that contribute to the problem, such as training. It should also be noted that one of the incidents was in direct violation of Bureau policy and involved the carrying of a weapon unholstered by a ranking member of the Bureau, an inspector.

The Monitor's Office also reviewed nine incidents involving the discharging of a firearm at vehicles during CMR-7. The following is a breakdown of those incidents:

- In eight incidents (89%) the officers were on-duty.

- In five incidents (56%) the subjects were armed with firearms.
- In four incidents (44%) the subjects fired their weapon.
- In two incidents (22%) officers were injured, one by firearm discharge, one by subject's vehicle, and one by broken glass.
- In four incidents (44%) subjects were injured by firearm discharge of the officers.

At the time of report writing the above incidents are in the preliminary stage of investigation by FIU; therefore, no final determination has been made.

## Closed FIU Investigations

To review cases closed by FIU, the Monitor's Office requested and PRPB provided files of the 38 cases closed by FIU during the CMR-7 reporting period, 9 (24%) of which occurred in the CMR-7 reporting period. PRPB included cases involving a) intentional firearm discharges, b) force by supervisors above the rank of sergeant, c) force during demonstrations/protests, d) accidental/negligent discharges, and e) cases involving use of taser not in accordance with Bureau policy.

The Monitor's Office reviewed the 38 investigations that were completed for the purpose of assessing FIU's compliance with the Agreement and with PRPB policies relevant to investigations.

The following are general observations of the cases reviewed:

- In no case was the FIU investigation completed within 45 days as outlined in policy.
- FIU continues to show improvement in how it conducts its investigations. FIU investigators made numerous efforts to locate cameras in the area and possible witnesses. In addition, sketches were provided on all firearm discharges.
- Accidental discharges are no longer categorized as a UOF by PRPB once investigated. The Monitor's Office concurs but recommends that once SARP completes their investigation and concurs with FIU findings that the determination of force be made at that time.
- All FIU UOF reviews and investigations reached reasonably justified conclusions on officer's conduct in accordance with policy.
- The five intentional firearm discharge (Level 4) investigations reviewed by the Monitor's Office were found to be within Bureau policy and all required documents were in the files. In one of the intentional firearm discharges, one officer accidently discharged his weapon.
- There were seven incidents of accidental/negligent discharges. These cases were properly investigated and forwarded to SARP for administrative investigation.
- Two of the cases reviewed took place in 2020.
- As it relates to taser use, 1 incident involved 2 officers simultaneously using their taser against a suspect for a total of 37 seconds. The taser use was not in accordance with Bureau policy and the case was referred to SARP for an administrative investigation.
- There was one instance where a sergeant used force effecting an arrest but failed to report the UOF and the injuries to the subject. This case was referred to SARP for an administrative investigation.

As previously stated, the fact that all of the cases requested for review by the Monitor's Office were not completed in the 45 days as outlined in GO 113 (FIU) is a concern to the Monitor's Office. The lack of files for the Monitor's Office to review relating to UOF cases that occurred during the reporting period also impacts the compliance ratings of paragraphs 49-51.

## CFRB Investigations

As it relates to CFRB meetings, many of the cases evaluated by the Board involve serious UOFs. PRPB needs to outline the protocol as to how these meetings should be conducted. The Monitor's Office recommends that each Board member should be fully versed in the details of the incident prior to the board meeting. This will allow for healthy discussion between the Board members. To that end, all Board members now have access to FIU investigation files which have been digitized for review purposes.

However, as it relates to the above, there continue to be challenges. While the files have been downloaded into PRPB's data system, the CFRB members are having trouble accessing the files. During the September 2022 site visit, the Board experienced lengthy delays in accessing the files, thereby severely reducing the number of cases that the Board could review during the scheduled meeting. This was also the case when the Monitor's Office conducted a follow up visit with the president of the Board to review cases. This issue was brought to the attention of PRPB personnel who stated they would address the issue. One explanation, according to PRPB, is the age of the computers at the CFRB.

Another area of concern relating to FIU, involves the investigation of UOF by members of the Bureau above the rank of sergeant, which by policy, require FIU to conduct the investigation. With the lack of supervisors, specifically sergeants in the field, lieutenants, to some degree, are carrying out the functions of a sergeant, one of which is assisting officers effecting arrest, and in doing so in some instances using lower levels of force. In 2021 FIU investigated 46 cases where supervisors above the rank of sergeant used lower levels of force to effect an arrest, for 2022 to-date the number of incidents is 21.

PRPB has not provided documentation that CFRB determinations and recommendations are tracked and analyzed by SARP.

### *Pathway Forward*

PRPB must ensure that prompt notification is made to FIU in cases regarding their involvement. For the most part, this was the case. FIU must complete its UOF investigations within the 45-day time outlined in GO 113 (FIU). PRPB must also ensure that FIU has adequate personnel to conduct its investigations and that all personnel have completed all necessary training to meet timelines relating to investigating serious UOFs.

FIU has limited personnel (18) to respond and investigate serious force by PRPB members throughout the Bureau, a possible option would be that PRPB temporarily modifies its policy until there are sufficient sergeants in the field, to allow supervisors of a higher rank from the respective area commands to investigate lower levels of force by supervisors above the rank of sergeant. This would require a change to GO 605 (Reporting and Investigating UOF by PRPB Members).

CFRB must complete its reviews within the time allotted in GO 502 (Evaluation Boards of Incidents of UOF). PRPB should also consider having either the FIU Commanding Officer or the FIU Executive Officer

attend all CFRB meetings for the purpose of presenting the case to the Board members and to answer any questions members may have regarding the cases to be discussed.

## Paragraph 50: Use of Force - FIU Investigations and Force Reviews by SFRB

*FIU shall immediately notify and consult with PRDOJ regarding any use of force indicating apparent criminal conduct by an officer. If PRDOJ indicates that it may proceed criminally, or PRPD requests a criminal prosecution, any compelled interview of the subject officers shall be delayed until after consultation with PRDOJ or expressly permitted by the Superintendent. No other part of the investigation shall be held in abeyance unless specifically authorized by the Superintendent in consultation with PRDOJ.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: These Paragraphs is assessed with Paragraph 48.

### Compliance Assessment

In all cases where FIU determined that the UOF may involve criminal conduct by an officer, PRDOJ was notified along with its investigative arm, NIE. The Monitor's Office confirmed through a review of FIU data that there were two such referrals.

### Pathway Forward

The Monitor's Office will continue to assess this paragraph in CMR-8. The review of referrals demonstrates compliance; however, the Monitor's Office would like for PRPB to demonstrate continued compliance with this paragraph. Further, the Monitor's Office will continue to review such cases to assess consistency in PRPB practice.

## Paragraph 51: Use of Force - FIU Investigations and Force Reviews by SFRB

*FIU shall complete its administrative use of force investigation within 45 days of the use of force, absent exceptional circumstances. At the conclusion of each use of force investigation, FIU shall prepare a report on the investigation and shall forward the report to SFRB for review and to SPR for tracking and analysis.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review | April 2022 – September 2022 |

| | | | |
|---|---|---|---|
| Policy: | Implemented | Period | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

## Compliance Targets

Note: These Paragraphs is assessed with Paragraph 48.

## Compliance Assessment

For the CMR-7 reporting period PRPB reported that FIU conducted 77 UOF investigations. In only 7 of those cases (9%) had FIU completed its investigation in the 45-day timeline established by policy. Given the lack of completed investigations that occurred in the reporting period, the Monitor's Office can determine that FIU is not compliant with this paragraph.

In further discussions with FIU, investigators noted that the root cause for failing to complete the investigation in the allotted time continues to be a delay in receiving the results of forensic and evidentiary material, e.g., video, photographs, and other evidence recovered at the scene of serious UOFs in a timely manner. This is information FIU needs to make its determination. In these cases, FIU must rely on other PRPB units and DSP to complete their task before the investigation can be closed. In past reviews of FIU cases, the Monitor's Office has noted that FIU does make multiple requests for this information. This low level of data provision is of major concern to the Monitor's Office. The fact that 91% of cases investigated by FIU for the CMR-7 reporting period remain open clearly indicates that PRPB is not compliant with this paragraph. Once an investigation is complete, FIU does prepare the required report for CFRB review and analysis. To address this issue PRPB may want to consider providing FIU the ability to make preliminary findings in those cases where the forensic results will not be pertinent in determining FIU's conclusion. These findings could have a statement attached indicating that it is preliminary and may change as information and analysis of evidence is completed.

## Pathway Forward

PRPB should ensure that all FIU investigations are completed in 45 days, as outlined in GO 113 (FIU). PRPB must ensure that FIU has the adequate staff and resources to complete these investigations. Further PRPB must work with internal DSP units and external stakeholders to address FIU's inability to receive forensic data in sufficient time to complete its investigations in 45 days as required by policy.

It should be noted that this issue has been ongoing since CMR-1 and PRPB continues to lag in the timeliness of its FIU investigations. As noted in the January 2022 status conference, compliance with the Agreement is not solely the responsibility of PRPB and falls on the shoulders of the entire Commonwealth and its government entities. The Commonwealth should examine the issues stemming from FIU's inability to close an investigation within 45 days and develop a plan to address such issues in the near term. This plan should be shared with the Monitor's Office and USDOJ. Failure to address this issue negatively affects compliance with various paragraphs in this subsection of the Agreement and will continue to stall PRPB's progress.

## Paragraph 52: Use of Force - FIU Investigations and Force Reviews by SFRB

*The Superintendent's Force Review Board shall evaluate all FIU investigations, including FIU reports and determinations. SFRB shall be composed of senior command staff from varying units. PRPD policies shall specify the conduct and requirements of SFRB proceedings to ensure thorough, timely, and objective reviews. SFRB shall review each FIU investigation for completeness, evidentiary support, and compliance with PRPD policy. SFRB shall document each force review proceeding, which shall include findings and recommendations, to the Superintendent. SFRB may also return force investigations to FIU for additional investigation, as necessary, to ensure thorough and complete investigations. Copies of all Force Review Reports completed by SFRB and underlying documents shall be submitted to SPR for tracking and analysis.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: These Paragraphs is assessed with Paragraph 48.

### Compliance Assessment

CFRB members are eligible PRPB members that have some training, but it is not current. SAEA has not updated the curriculum based on the revised GO 502 (Evaluation Boards). The Monitor's Office looks forward to reviewing the updated training curriculum and notes that the development of this updated curriculum has lagged substantially.

PRPB provided the Monitor's Office with documentation that the CFRB evaluated 27 FIU UOF investigations during the CMR-7 reporting period. The Monitor's Office requested a random sample of 17 cases for review. PRPB provided the case files for all cases; however, only 12 (71%) contained documentation that the Board had evaluated the incident and completed their evaluation. Of those 12, only 4 (33%) were within the 30 days as outlined in Bureau policy. Based on documentation submitted for the remaining 13 cases (47%), the CFRB has not completed their evaluation. In all cases evaluated, the CFRB reviews were objective.

The following observations are put forth as a result of the review:

- Thirteen evaluations (76%) exceeded the 30-day timeline for evaluation identified in GO 502 (Evaluation Boards of Incidents of UOF).
- Four evaluations (24%) were concluded within the 30-day timeline.
- Five cases (29%) requiring evaluation reports PPR 502.1 (Assessment of Incident of UOF) and PPR 502.2 (Determination of Incident of UOF) did not include the reports, and by all indication had

not yet been reviewed by the Board; therefore, a determination as to whether the cases had been discussed is not possible.

- In the 12 cases (71%) reviewed by the Monitor's Office the Board's findings were unanimous.
- There were 4 instances (24%) in which the CFRB directed re-training.
- In all 17 cases FIUs provided a complete investigative file to CFRB for evaluation.
- Twelve cases (71%) had signed PPR 502.1.
- One report (6%) was returned due to incorrect or incomplete and/or missing information.
- One case (6%) was referred to SARP for an administrative investigation.

The Monitor's Office also attended a CFRB meeting in September 2022. The purpose of the meeting was for board members to evaluate UOF investigations by FIU. During the board meeting six FIU investigations of UOF were evaluated. It should be noted that all documents related to the cases were digitized. However, the Board was unable to open the files in a timely manner due to technological and network issues, which caused substantial time management issues. On average it took over 20 minutes for board members to access and review the file. If photographic material had to be reviewed, it took even longer.

In addition, the Monitor's Office requested the training certification records of the three CFRB members, as well as any other person who may have served on the CFRB during the CMR-7 reporting period. This information serves to determine whether CFRB members are qualified to serve on the Board, as outlined in GO 502. During the April 2022 site visit the Monitor's Office was informed by Academy personnel that the information provided to the Monitor's Office for the FRB members also applies to CFRB members which is that the training is still in development.

In conversations with the Monitor's Office, PRPB has acknowledged its shortfalls in the evaluation of cases investigated by FIU. The Monitor's Office has also not received documentation that the CFRB is submitting completed evaluations to SARP for tracking and analysis.

*Pathway Forward*

Issues with the timeliness of these evaluations do not appear to be a result of staffing shortages. It is imperative that PRPB and CFRB members commit to completing these evaluations in the timelines established in policy. PRPB should also ensure that all officers serving on the CFRB have training certifications. The Monitor's Office will review the training curriculum developed based on the revised policy.

## 8. Use of Force Training

The Monitor's Office finds that PRPB is partially compliant with the paragraphs of this subsection of the Agreement which stipulates that all trainings must be consistent with policies and the Agreement and that all personnel must be trained and certified on UOF policies. While all training curriculums are consistent with policies and the Agreement, PRPB has not provided ample documentation to show that the training delivery compliance thresholds have been met. Regarding other training requirements, such as those noted in paragraphs 53 and 55, PRPB has not yet reached the 95% compliance threshold in the review of the random sample provided by PRPB.

## Paragraph 53: Use of Force - Use of Force Training

*PRPD shall train all PRPD officers on PRPD's use of force policies. Thereafter, PRPD shall provide all PRPD officers with use of force training at least every two years for the first four years of this Agreement, and annually thereafter. PRPD shall also provide training on use of force as necessary, based on developments in applicable law and PRPD policy. At least annually, PRPD shall assess all use of force policies and training. PRPD's use of force training program shall include the following topics:*

*a) legal standards for reasonable force;*

*b) PRPD's use of force policy;*

*c) reporting use of force, requesting medical service, and preserving evidence;*

*d) scenario-based training and interactive exercises that illustrate proper use of force decision-making;*

*e) the proper deployment and use of all weapons or technologies, including firearms, batons, chemical agents, and ECWs;*

*f) threat assessment and de-escalation techniques that encourage officers to make arrests without using force, and instruction that disengagement, area containment, surveillance, waiting out a subject, summoning*

*reinforcements, calling in specialized units, or delaying arrest may be the appropriate response to a situation, even when the use of force would be legally justified;*

*g) crisis intervention and interacting with people with mental illnesses, including instruction by mental health practitioners and an emphasis on de-escalation strategies;*

*h) factors to consider in initiating or continuing a foot pursuit; and*

*i) appropriate training on conflict management.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Training on use of force is consistent with approved policies and the requirements of the paragraph. | ☒ Met | ☐ Missed |
| 2. 95% of officers are trained and certified in use of force (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☒ Missed |

*Compliance Assessment*

PRPB recently updated all UOF policies and, as a result, developed new UOF training curriculums on these policies. The Monitor's previous review of related training on UOF was found to be consistent with approved policies and requirements of the paragraph. After reviewing a random sample of training personnel records, the Monitor's Office determined that PRPB has not met the 95% threshold for the re-training of officers on the relevant UOF policies (REA 601 Rules for UOF and REA 605 Report

68

and Investigation of UOF). The Agreement states that PRPB must re-train it's officers every year. While there are areas for improvement in training delivery, PRPB has provided the additional training on intentional firearm discharge investigations for FIU personnel.

*Pathway Forward*

The Monitor's Office will review the updated UOF training curriculums and ensure continued compliance with this paragraph. The training on UOF, specifically the topics noted in this paragraph, should also be incorporated into in-person scenario-based training to ensure that officers understand the policy requirements and the practical application of such procedures.

## Paragraph 54: Use of Force - Use of Force Training

*PRPD shall provide an appropriate firearm training program that:*

*a) requires officers to complete and satisfactorily pass firearm training and qualify on each firearm the officer is required or authorized to carry on an annual basis;*

*b) requires cadets, officers in probationary periods, and officers who return from unarmed status or extended leave to complete and satisfactorily pass firearm training and qualify on each firearm the officer is required or authorized to carry before such personnel are permitted to carry and use firearms;*

*c) incorporates night training, stress training (i.e., training in using a firearm after undergoing physical exertion), and proper use of force decision- making training, including continuous threat assessment techniques, in the annual in-service training program;*

*d) ensures that firearm instructors critically observe students and provide corrective instruction regarding deficient firearm techniques and failure to utilize safe gun handling procedures at all times; and*

*e) requires comprehensive testing that shows complete understanding of rules, regulations, and skills regarding firearm use.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Training on the use of firearms is consistent with approved policies and the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. 100% of officers are trained, certified, and qualified in use of firearms or have a valid justification for not qualifying in accordance with policies. | ☐ Met | ☑ Missed |

69

*Compliance Assessment*

The Monitor's Office found that PRPB's policies relating to firearms qualification incorporate all requirements of the paragraph. PRPB also provided a list of 10,421 personnel who qualified with their service weapon. Nighttime firing qualifications were conducted from September 2021 through January 2022. The Monitor's Office selected a random sample of 91 officers and requested their certified training records to verify that officers were qualified with their service weapon for the CMR-7 reporting period. A review of the training files confirmed that all officers were qualified. The Monitor's Office also noted 30 officers required re-training to be certified and that no officer failed the qualification re-test or was relieved of operational duty according to PRPB documentation. SARP also provided documentation that there were no investigations conducted relating to officers failing to qualify.

As stated above, only nighttime ("reduced light") qualifications were conducted during the period. PRPB is also required to train all personnel on day firing; however, that training has yet to commence.

The Monitor's Office notes that paragraph 54 establishes an extremely high bar for compliance, and therefore requires full access to data on firearms training. The number of officers trained does suffice to demonstrate that 100% of officers are trained and certified in the use of firearms or have a valid justification for not qualifying.

*Pathway Forward*

PRPB must create and maintain a "master list" which includes all sworn personnel and their status as it relates to firearm training. PRPB must work with the Monitor's Office to grant the Monitor direct access to PTMS or other structured data sources so that the Monitor's Office can directly verify rates of firearm certification and justifications for all officers that are not currently certified.

## Paragraph 55: Use of Force - Use of Force Training

*PRPD shall train all supervisors, FIU members, and command officers on PRPD's use of force policies. Thereafter, PRPD shall provide all supervisors, FIU members, and command officers with training on use of force, force investigations, and force investigation reviews at least annually and, as necessary, based on developments in applicable law and PRPD policy. PRPD's use of force training for supervisors, FIU members, and command officers shall include the following topics:*

*a) requesting medical services and determining the appropriate use of force reporting levels;*

*b) identifying and interviewing involved officers, witness personnel, subjects upon whom force was used, and civilian witnesses;*

*c) ensuring proper collection of evidence;*

*d) reviewing use of force and supplemental reports for completeness, accuracy, and quality, including recognizing boilerplate language and document discrepancies;*

*e) assessing the legality and appropriateness of a detention and subsequent arrest;*

*f) legal standards governing the use of reasonable force, including legal standards and requirements for criminal accountability, administrative*

*accountability, and performance improvement related to tactics, training, equipment, and policy sufficiency;*

*g) recommending and administering proper discipline and non-punitive corrective action related to use of force; and*

*h) report writing.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – September 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. Training on the use of force, force investigations, and force investigation reviews is consistent with approved policies and the requirements of the paragraph. | ☒ Met   ☐ Missed |
| 2. 95% of supervisors, FIU officers, and commanders are trained and certified in use of force, force investigations, and force investigation reviews (or scheduled for training, in the case of mid-year reviews). | ☐ Met   ☒ Missed |

### Compliance Assessment

The Monitor's Office verified that 95% of supervisors, FIU personnel, and command personnel have not been re-trained on the relevant courses (REA 601 Rules for UOF and REA 605 Report and Investigation of UOF) within the last year as required by the Agreement.

Most FIU personnel have completed the advanced training related to investigating intentional firearm discharges (Level 4 UOF). The FIU Commanding Officer informed the Monitor's Office that only four members have not received the additional training. The lieutenant further reported that to complete the training a request was made through SARP dated July 14, 2022 (SARP-NIA-DIIUF-ASJ-1-191) for the training. SARP in turn made a request to the Academy (SAEA) on July 19, 2022 (SARP-9-233). This was verified by the Monitor's Office.

This additional training was in response to the Monitor's previous CMRs and recommendations, which identified significant deficiencies in FIU's firearm discharge investigations (Level 4 UOF).

### Pathway Forward

Given the nature of the important work conducted by FIU, it is imperative that that they receive all required training and that this training is periodically updated as needed. The work of the CFRB plays a pivotal role in identifying the training needs of FIU as they evaluate all FIU investigations and are in the best position to uncover deficiencies in their training. The Monitor's Office will continue to assess training compliance with target two through random training record reviews.

## 9. Responding to Behavioral/Mental Health Crisis

As stated in previous CMRs, it is critically important to have Crisis Intervention Team (CIT) trained officers throughout the 13 area commands. Since the conclusion of the pilot project, PRPB has yet to expand CIT coverage outside of Arecibo. Issues with garnering personnel interest in the position has presented difficulties in creating CIT programs in other areas. One of the challenges is that currently the training (40 hours) for CIT certification is only conducted at the Academy, which may discourage potential volunteers from the outlying area commands. Officers from those commands may have as much as a two hour daily commute each way to complete the required training. PRPB has informed the Monitor's Office that it is considering offering the training program in the field across different parts of the island. To date, PRPB reports that 82 agents have been interviewed for the CIT officer position.

CIT was also discussed during the January 2022 status conference. As PRPB expands its CIT program it should use the feedback and analysis of the pilot conducted in Arecibo to form its approach and implementation of CIT in other areas. In response to the January 2022 status conference, the Court ordered PRPB to establish an evaluation committee tasked with conducting an evaluation of the CIT pilot in Arecibo.

The expansion of CIT officers to other area commands and the presence of CIT trained officers Bureau-wide will enhance PRPB's ability to handle calls for service involving individuals in crisis, especially those related to "Ley 408" (court ordered involuntary commitment).

Another concern is the reporting of interactions with individuals in crisis, specifically those involving Ley 408. During the CMR-6 reporting period PRPB relied almost entirely on information provided in PPR 621.2 (Report of Other Incident of Services), which has continued in CMR-7. PRPB needs to ensure that PPR 628.1 (Crisis Intervention Incident Report) is prepared by all officers in incidents involving individuals in crisis. During the CMR-7 reporting period PRPB worked with AHDatalytics, the Commonwealth's contractor, to create an audit verifying whether a crisis intervention incident report (PPR 628.1) was created for any incident with a corresponding UOF report that had identified the subject as having a "mental/psychiatric history". The dashboard once implemented will provide the Reform Office with 24/7 access to this information which is automatically updated daily and is broken down by area command, zone, precinct, and district.

The Monitor's Office also reviewed GO 621 (Management of Incident Reports or Police Services) during the CMR-7 reporting period and provided comments and recommendations to PRPB.

### Paragraph 56: Use of Force - Responding to Behavioral/Mental Health Crisis

*PRPD shall develop policies and procedures to improve its response to individuals in behavioral or mental health crisis, and to minimize the use of unnecessary force against such individuals. To achieve this outcome, PRPD shall, in addition to providing all officers with basic training on responding to persons in behavioral or mental health crisis, implement and train a comprehensive first responder Crisis Intervention Team ("CIT") to develop and maintain specially-trained CIT officers. The CIT shall incorporate the following requirements:*

*a) The CIT shall develop policies and procedures for the transfer of custody or voluntary referral of individuals between PRPD, receiving facilities, and local mental health and social service agencies.*

72

*b) The CIT policies and procedures shall require that whenever officers encounter juveniles in mental health crisis that officers refer them to appropriate mental health services located in the community.*

*c) The CIT officers shall be assigned to field operations units and maintain their standard patrol duties, except when called to respond to potential behavioral or mental health crisis events where the officers may be required to respond outside of their assigned patrol district.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. Training on basic behavioral health is consistent with approved policies and includes general instruction on the CIT program. | ☑ Met | ☐ Missed |
| 3. 95% of officers are trained and certified in basic behavioral health (or are scheduled for training, in the case of mid-year reviews) | ☐ Met | ☑ Missed |
| 4. Training on crisis intervention for CIT officers is consistent with approved policies. | ☑ Met | ☐ Missed |
| 5. 100% of officers assigned to CIT are trained and certified in crisis intervention. | ☑ Met | ☐ Missed |
| 6. 100% of all officers assigned to CIT meet eligibility requirements. | ☑ Met | ☐ Missed |
| 7. 95% of responses to incidents involving persons in mental health crisis are within policy. | ☐ Met | ☑ Missed |
| 8. The incident tracking system tracks all incidents involving persons in mental health crisis and the disposition of the incident. Data analyzed as part of PRPB's annual report on use of force as required by policy. | ☐ Met | ☑ Missed |

*Compliance Assessment*

The Monitor's Office has reviewed the CIT policies and trainings and found that they meet the requirements of the Agreement. The Monitor's Office understands that establishing CIT teams in all areas in an expedited manner may be difficult initially, but it is also vital. Those officers selected to be certified as CIT officers (40 hours of training) will continue in their normal capacity as patrol officers. PRPB expects that approximately 180 additional officers will be selected and trained.

During the CMR-7 reporting period, USDOJ and the Monitor's Office observed a portion of the REA 628 (CIT) training. The Monitor's Office found the training to be dynamic, knowledge-based, and employed several adult learning techniques, including participation through questions and exercises. While the training has a strong foundation, USDOJ and the Monitor's Office did provide some recommendations

to further strengthen the training, such as incorporating more experiences and scenarios from Puerto Rico and providing attendees with hardcopies of the PowerPoint presentation for note taking.

PRPB provided documentation that no training of officers on the basic "Intervention with Persons in Crisis" course took place during the CMR-7 reporting period. The Academy similarly reports that all PRPB officers have not yet received the eight-hour basic CIT training. As noted in various sections of this CMR, virtual training was halted when issues relating to the integrity of the training were brought forth. As such, no virtual trainings were conducted during the CMR-7 reporting period.

In February 2022 at a meeting with PRPB, facilitated by USDOJ, several aspects were discussed that needed to be part of the evaluation of the pilot project, including restatement of the objectives of the program, identification of the necessary skills of CIT officers, and the goals with which to evaluate the program.

PRPB worked with USDOJ and the Monitor's Office to establish an evaluation committee as ordered by the court for the purpose of identifying potential evaluation methods and performance measures to gauge the impact of the Arecibo Pilot Program and to assist in the implementation of CIT Bureau-wide. The evaluation committee is made up of members from PRPB along with outside personnel with experience in the mental health field. The Monitor's Office as well as USDOJ have participated in evaluation committee meetings.

In August 2022 PRPB provided the Monitor's Office and USDOJ with a draft prepared plan, Methodology and Evaluation of the Crisis Intervention Team, that outlines PRPB's efforts in developing crisis intervention teams within PRPB and the need for such services. Also discussed in the document was the Arecibo Pilot Program, which included the sections, Internal Analysis of Weakness of the CIT Pilot Program and Internal Analysis of Strengths of the CIT Pilot Program. While the Monitor's Office appreciates PRPB's efforts in developing the document, as it relates to the Arecibo Pilot Program, the information is not supported by data collected during the project, which the Monitor's Office considers to be a key requirement in identifying needs and expectations when the project is expanded to other area commands throughout the Bureau. USDOJ also provided several recommendations on the draft plan including more clearly articulating CIT goals, including external team members in CIT, and setting timelines, which the Monitor's Office concurred with. PRPB will submit a more finalized version of the plan in October 2022. The submission of this document was delayed by Hurricane Fiona.

While the CIT Pilot Program has not been expanded yet, the Monitor's Office has confirmed that all officers currently in a CIT role are trained in CIT and meet eligibility requirements.

For the CMR-7 reporting period, PRPB reported 174 cases of interactions with persons in crisis. A random sample of 36 cases was selected by the Monitor's Office for review. The predominant source of data for documenting the Bureau's interactions with persons in crisis consisted of PPR 628.1 (Crisis Intervention Incident Report). In some instances, the interaction was reported on PPR 621.2 (Other Action). During the CMR-6 reporting period PRPB reported 353 interactions with persons in crisis, which is a 51% increase compared to CMR-7. PRPB needs to review its data relating to interactions with persons in crisis to ensure accurate reporting. As a result of this case review, the Monitor's Office makes the below observations:

- Nineteen cases (53%) involved Ley 408 (Court Ordered "Involuntary Commitment").
  - In four cases (21%), PPR 628.1 (Crisis Intervention Incident Report) was not prepared.
- Nine cases (25%) involved a threat and/or attempt of suicide.
- Four cases (11%) reported various level of stress.
- Four cases (11%) did not involve a person in stress. In two of those cases a PPR 628.1 (Crisis Intervention Incident Report) was incorrectly prepared.
- In 30 cases (83%) the PPR 628.1 was prepared along with PPR 621.2 (Other Action).
- In the above 30 cases, 23 (77%) were handled by officers who were not certified CIT officers. In 6 cases (20%) there was no indication.

*Pathway Forward*

The Monitor's Office looks forward to working with PRPB as it continues to evaluate the Arecibo CIT Pilot Program and expand the CIT program to the remaining areas. The Monitor's Office requests that PRPB provide documentation that cadets are being trained in CIT at the Academy as reported and that future classes will receive the 40-hour CIT training as part of required training to graduate.

As previously stated, PRPB's policy to send district/precinct officers to comply with Act 408-2000 orders (involuntary admission to a hospital for psychiatric evaluation) by the court should be reviewed. In the random sample for the CMR-7 reporting period, 53% of calls for persons in crisis involved such orders and many resulted in an electronic control device, or some other non-lethal weapon being used against the subject. Using a trained CIT officer in these circumstances may result in less UOF. The Monitor's Office recommends that once the CIT program has been expanded to other area commands, a protocol should be established that calls for service relating to involuntary committal (Ley 408) be handled by on-duty CIT officers, when possible.

PRPB currently has an insufficient number of CIT trained officers or applicants to expand the CIT program to the remaining 12 area commands. To address this issue PRPB should consider adding a transfer component that would allow officers that agree to participate in the program, are subsequently accepted, and successfully complete the training, to select their area command of choice.

PRPB provided documentation/certification that three dispatchers during the CMR-7 reporting period received training on "Crisis Intervention Team"; however, the documentation does not specify if this was training related to dispatching officers to "persons in crisis" incidents. In fact, to this point, the only training provided to dispatchers is the 8-hour course provided to field personnel. PRPB needs to specify if it has developed a course specific to dispatchers regarding how to route crisis calls to CIT officers on duty.

In addition, with the significant numbers of reported interactions with persons in crisis for this reporting period, PRPB needs to conduct an in-depth analysis to determine if the number of interactions had indeed decreased.

## Paragraph 57: Use of Force - Responding to Behavioral/Mental Health Crisis

*PRPD shall train PRPD field operations unit officers in the CIT program and shall ensure that CIT-trained officers are assigned to each shift in each police region. PRPD shall provide crisis intervention training to all dispatchers to enable them to identify calls for service that involve behavioral or mental health crisis events.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. 95% of shifts have at least one CIT-trained and certified officer. | ☐ Met | ☑ Missed |
| 2. Training on crisis intervention for call dispatchers is consistent with approved policies. | ☐ Met | ☑ Missed |
| 3. 95% of call takers are trained and certified in crisis intervention (or are scheduled for training, in the case of mid-year reviews) | ☐ Met | ☑ Missed |

Note: Training on the CIT program for field operations officers is evaluated as part of the basic behavioral health training in Paragraph 56.

### Compliance Assessment

As determined in previous CMRs, PRPB implemented a CIT pilot project in Arecibo which concluded in November 2020. Fifteen officers from Arecibo participated in the training as CIT First Response Officers. The training for CIT officers took place at the Academy during a previous reporting period. Officers were required to pass a written exam at which point they could proceed to the Scenario Based Training segment. The course, Intervention Team in Crisis (CITE 8061), consisted of 40 hours of training. PRPB provided the course curriculum as well as a certified list of those who were trained to the Monitor's Office.

PRPB has also selected CIT coordinators with a minimum rank of sergeant in all area commands who are currently identifying prospective CIT officers. PRPB provided the Monitor's Office with the rating form that PRPB will use for prospective candidates to the program. In addition, the PRPB Commissioner issued a job posting for uniformed agents from the precincts and districts of the 13 police areas who may be interested in becoming a CIT officer. The job posting provides a job description, eligibility requirements, training description, and application instructions. The job posting was open until April 15, 2022. To date, only 82 officers have interviewed for the position, while PRPB estimates that 180 officers will be needed.

The Monitor's Office is supportive of PRPB's intention of expanding the program to all areas; however, to date, little progress has been made. The Monitor's Office understands that establishing CIT teams in

all areas in an expedited manner may be difficult initially given that support services may not be available in the early stage in some areas. However, the presence of CIT trained officers Bureau-wide will enhance PRPB's ability to handle calls for service involving persons in crisis, especially those related to Ley 408 (Involuntary Commitment Orders). Therefore, the Bureau must make a concerted effort to complete this task. Because this program has not been expanded Bureau-wide, PRPB has not met target one.

PRPB has provided training to field personnel and dispatchers related to CIT; however, the training for dispatchers has not been specific to their work assignment. This training should be more in-line with the daily responsibilities of a dispatcher, including how to collect the appropriate information from the caller to provide to the responding officer.

In relation to the eight-hour basic training course which all PRPB field members are to receive, PRPB provided the Monitor's Office with the four new training modules and the exam used to determine the level of proficiency in the material presented for review. To that end, PRPB provided information that no PRPB officers were trained during the CMR-7 reporting period. PRPB indicated that virtual training would resume in 2023, which is outside of the CMR-7 reporting period. Current CIT trained personnel did receive re-training during the CMR-7 reporting period.

*Pathway Forward*

As noted above, PRPB must accelerate the expansion and subsequent training of CIT to the 13 area commands. The Monitor's Office is aware that PRPB is in the process of developing and reinstating its virtual training and expects that once completed, it will resume the virtual eight-hour basic CIT training course. Having developed a curriculum and training for the CIT program and having tested it in the field in Arecibo, the Monitor's Office expects PRPB to make substantial progress in implementing the program Bureau-wide. The training of officers to handle individuals with mental health issues so that such incidents do not escalate into confrontations in which PRPB members use force is paramount.

The Monitor's Office understands that the implementation of the eight-hour in-person Bureau-wide training was significantly impacted by the COVID-19 pandemic and difficulties with the virtual training platform. Nevertheless, the Monitor's Office expects to see significant progress in training all PRPB personnel in crisis intervention as the CIT pilot program is expanded to all area commands.

As previously stated, PRPB has not provided documentation that dispatchers have received specific training related to dispatching officers to "persons in crisis". In fact, to this point, the only training provided to dispatchers is the 8-hour course provided to field personnel. PRPB needs to develop a course specific to dispatchers regarding routing crisis calls to on-duty CIT officers. All dispatchers should receive this training. Until this training is developed and conducted, PRPB will not be compliant with targets two or three.

## III. Searches and Seizures: Internal Controls and Accountability

Despite continual assessments of lack of compliance with many of the paragraphs within this section, the Commonwealth continues to produce arrest and search files that are incomplete and fail to contain enough information to reach a determination of probable cause. Further, the Commonwealth provided little evidence that supervisors are taking corrective actions to address these issues before approving these reports. During the CMR-7 reporting period, the PRPB Reform Unit proactively reviewed some arrest reports, many of which were corrected and improved. Though this corrective action was reflected in the reports taken from April to June 2022, similar remedies or corrective actions were not taken to address the arrest reports from July to September 2022. Further, during the CMR-7 reporting period, the PRPB Reform Unit also conducted training with various supervisors and officers within the Highway Patrol Division (HPD) across the island and reviewed the issues and corrective actions. Notwithstanding, many of the reports entered after said training continued to contain the issues noted by the Monitor's Office. Further, limitations with GTE have also presented issues in being able to correct or amend reports within the system.

Search warrant files do better in this regard because officers' affidavits and warrant applications are first reviewed and approved by a supervisor and a District Attorney before being submitted to a judge for approval. However, there is a serious issue pertaining to consent searches. Consent searches are delicate matters. PRPB's PPR 612.1 is a form created to record a person's consent to a search. However, in several cases, agents are not completing this form and supervisors are not addressing it but are instead approving these reports. The Monitor's Office also found that PRPB is using a new category of searches, called "Propio Conocimiento," or Personal Knowledge. The Monitor's Office is not aware of this type of search nor is it authorized under PRPB's search policy (GO 612). These searches were done without a search warrant and without a signed consent search form (PPR 612.1). PRPB must investigate this issue to determine its legality and report back to the Monitor's Office.

Overall, the Commonwealth's compliance with the 22 paragraphs assessed during this reporting period within Searches and Seizures reflect a regression in levels of compliance to what was noted in previous CMRs. In CMR-5, 36% of paragraphs (8 paragraphs) were assessed as partially compliant, in comparison to the current reporting period, where 23% of paragraphs (5 paragraphs) assessed were found to be partially compliant.[7] See figure 4. Much of this regression is due to the continued inaction on the part of PRPB to address or demonstrate that the Commonwealth is working to address the issues raised by the Monitor's Office in previous CMRs.

---

[7] Comparison is to CMR-5 since that is the last CMR that all paragraphs were assessed.



*Figure 4. Searches and Seizures: Paragraph Compliance Status*

## Paragraph 58: Searches and Seizures - General Provisions

*PRPD shall ensure that all investigatory stops, searches, and arrests are conducted in accordance with the rights, privileges, or immunities secured or protected by the Constitution and laws of the United States and the Commonwealth of Puerto Rico. PRPD shall ensure that investigatory stops, searches, and arrests are conducted as part of effective crime prevention strategies that are consistent with community priorities for enforcement.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

Note: Compliance will be determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 59-79, and (2) the results of outcome assessments, pursuant to Paragraph 243.

### *Compliance Assessment*

For CMR-7, the Monitor's Office requested 87 randomly selected arrest files and received 84 files. Three files were not submitted for review (Complaint #'s2022:10-400:000009, 2022-6-013-006534, and 2022-7-199-1611).[8] In addition, one file was a duplicate file (Complaint #2022-11-038-00654) and one was an arrest by a municipal police department, which is not eligible for review (Complaint #2022-7-132-2366).

---

[8] Complaint 2022-10-400-00009 was reported as a case of an active undercover agent and was rescinded.

The Monitor's Office proceeded to analyze the 82 remaining sample arrest files. In 45 files (55%), police reports (PPR 621.1 and 621.2) did not contain enough detail to determine probable cause, or there was no police report submitted with the file (9 cases). Eight reports (10%) were rated as fair, and one was rated poor (Complaint #2022-4-400-000047). In addition, in eight cases (10%) the District Attorney dropped charges for several reasons, including lack of probable cause in one case (Complaint #2022-10-203-2175). In the remaining seven cases, charges were dropped for undetermined reasons. In 23 cases (28%), the Monitor's Office was unable to determine whether charges were filed due to lack of information in police reports. This is a persistent problem in PRPB, and the Monitor's Office has brought this issue to the attention of PRPB dating back to CMR-2. The 55% of files lacking probable cause compares negatively to arrest data from CMR-6, which showed that 37% of arrest reports had no probable cause documented.

The Monitor's Office is aware that PRPB is addressing the lack of probable cause documentation in reports by stressing the importance of this issue in the review of the updated GO 615 (Arrests and Summons), which was just reviewed and approved in October 2022. PRPB has also tried to address this issue through the Reform Unit when it proactively reviewed some arrest reports, many of which were corrected and improved. The corrective action was reflected in reports submitted from April to June 2022. However, similar remedies or corrective actions were not taken to address the arrest reports from July to September 2022, resulting in the high percentage of arrest reports lacking detailed probable cause.

The Monitor's Office also requested 64 randomly selected search and seizure files. Searches and seizures are regulated under GO 612, which was revised and approved in March 2022. Three of the files (5%) submitted by PRPB did not qualify for analysis, as one file was a consent search that contained no police reports (Complaint #2022-13-700-114), another was a report for lost property, in which there was no search or arrest conducted (Complaint #2022-3-758-5574), and the third one contained a police report about PRPB officers rendering assistance after Hurricane Fiona struck the island (Complaint #2022-7-171-003867).

An analysis of the remaining 61 files revealed 14 (23%) were consent searches and 5 (8%) were "Propio Conocimiento" (or personal knowledge) searches. The remaining 42 (69%) searches were based on affidavits and authorized search warrants. Most files (58 of 61) included basic demographic data, such as age, gender, and race. However, ethnicity other than Hispanic was not indicated. The searches called "personal knowledge", where the subjects are apparently volunteering to a search, are a new category the Monitor's Office had not seen in past analysis of selected PRPB search files. A review of GO 612 (Searches and Seizures), Section lll.B., "Compliance with Constitutional Requirements", failed to reveal authorization for this type of search. However, these searches appear to be very similar to consent searches, and if they are, officers are failing to complete the PRPB mandated consent form and may be in violation of policy. The Monitor's Office advises that PRPB should pay attention to this trend going forward and have officers properly fill out the consent form in these cases.

Seven of those consent and "personal knowledge" searches (37%) resulted in no arrest, and no explanation was provided. Including the personal knowledge search cases, eight reports (42%) did not include the required PPR 612.1 for consent searches. Among the units not completing consent

searches were: Vehículos Hurtados (Motor Vehicle Theft), Sexual Assault Unit, and Plan Zona- Ponce Area Command.

Four of the sixty-one police search reports (7%) lacked enough information to establish probable cause, and two files (3%) contained no police reports (Complaint #2022-6-013-009722 and #2022-10-068-3245). Overall, 25 (41%) of the 61 search cases resulted in no arrest. The Monitor's Office recognizes that among those "no arrests" files are searches for evidence only to be used in building criminal cases (six cases or 24%) or the search resulted in no contraband found (seven cases or 28%).

PRPB has not yet devised a way to collect, track, and analyze investigatory stops data; and therefore, is unable to comprehensively collect and analyze demographic and geographic data.

Due to the issues noted above, this paragraph is rated as partially compliant. Many of the issues raised make it difficult for the Monitor's Office to discern if PRPB is ensuring that all investigatory stops, searches, and arrests are conducted in accordance with the rights, privileges, or immunities secured or protected by the Constitution, laws of the United States, and the Commonwealth of Puerto Rico. Further, it is difficult to determine if PRPB is ensuring that investigatory stops, searches, and arrests are conducted as part of effective crime prevention strategies that are consistent with community priorities for enforcement.

*Pathway Forward*

PRPB is in dire need of properly trained officers and supervisors in recognizing and documenting probable cause for an arrest or search. The Monitor's Office has been advising this since CMR-2. Further, the Monitor's Office noted that continual training, increased accountability, and leadership involvement are integral to increasing levels of compliance with this and other related paragraphs. The Monitor's Office advises that PRPB should pay attention to the trend of searching people, places, and things by obtaining "Propio Conocimiento" or personal knowledge, moving forward. These searches appear to be consent searches and may be in violation of GO 612 (Searches and Seizures), Section lll.B.15, which calls for consent search form PPR 612.1 to be completed when someone volunteers to a search.

## 1. Stops, Searches, and Seizures

PRPB duly updates its policies on arrests and searches and seizures, with these policies having last been updated in March 2022. However, the practical application of these policies, along with training, is missing. Notwithstanding the Monitor's previous notations of arrest reports being submitted without appropriate probable cause language and missing important arrest forms, officers continue to do so without abatement and without supervisory direction. Also, commanders have not attempted to address this serious issue in any form. Besides re-training, returning incomplete, poorly written reports back to officers is the quickest and most effective way to correct this fault.

### Paragraph 59: Searches and Seizures - General Provisions

*PRPD shall develop policies and procedures that comply with applicable law and comport with generally accepted policing practices on stops, searches, and arrests; provide training; ensure consistent supervision; and*

*hold officers accountable for complying with applicable law and policy. PRPD policies shall define all terms clearly and provide guidance on the facts and circumstances that should be considered in initiating, conducting, terminating, and expanding an investigatory stop, detention, or search.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: Implementation is assessed as part of the compliance reviews for Sections B (Paragraphs 60-64), C (Paragraphs 65-73), and D (Paragraphs 74-77) on Investigatory Stops and Searches, Arrests, and Searches, respectively.

Note: The policy requirements of this paragraph is assessed with Paragraphs 65, 72, 74, and 78.

Note: Training is assessed as part of Section E (Paragraphs 78-79) on Training on Stops, Searches, and Seizures.

*Compliance Assessment*

In March 2022, PRPB revised and approved GO 612 which covers searches and seizures and GO 615 for arrest and summons, which was approved in October 2022. These policies cover all the legal and procedural topics on arrests and searches for PRPB personnel to follow. However, full training on these policies is behind schedule due to many factors, one of which was the response to the COVID-19 pandemic, poor prioritization and management of training, and issues with the integrity of the virtual training system.

All PRPB officers and supervisory personnel received basic training when they went through the police academy, and most have received re-retraining on the subjects about arrests and searches in the past few years and should, at a minimum, know the basic requirements for recognizing, establishing, and documenting probable cause. Unfortunately, that is not reflective in many of the arrest and search files reviewed this reporting period. For CMR-7, the Monitor's Office reviewed a total of 143 randomly selected arrest and search files (61 search files and 82 arrest files) and found that 49 files (34%) did not document probable cause properly on the police report. In addition, 25 (41%) of the 61 search files resulted in no arrest, and 8 arrest cases (10%) the District Attorney dropped charges for several reasons, including lack of probable cause (Complaint #2022-10-203-2175), while in 23 other cases the Monitor's Office was unable to determine whether charges were forwarded due to lack of information.

What is of more concern to the Monitor's Office is that supervisors and commanders are not aware or mindful of these on-going serious issues and PRPB leadership has not taken steps to remedy the situation by holding supervisors and/or officers accountable.

*Pathway Forward*

Re-training officers and holding supervisory personnel accountable for their subordinates may be the most effective way of dealing with arrest reports lacking probable cause. When arrest reports are found to be lacking or are weak, supervisors must return the reports to officers with instructions for correction. This strategy works well, as was evident when, before submitting HPD arrest reports to the Monitor's Office, a commander in the PRPB Reform Unit reviewed them and, when the commander realized how much the reports lacked probable cause detail, he returned them to officers for correction. Officers promptly added the specific facts of each individual case, clearly and properly establishing probable cause. PRPB must take this example and require that all supervisors do the same when reviewing arrest cases or be subject to discipline. PRPB officers tend to write details of arrests in personal notebooks that they take home, but many times fail to include that information in the official PRPB incident report (PPR 621.1). In arrest cases, if a supervisor determines the police report lacks probable cause detail, the supervisor should consider inspecting that notebook and seize it if necessary to extract information on the arrest. However, if a supervisor determines that an officer absolutely lacks probable cause for the arrest, he or she must release the arrestee immediately and evaluate whether the arresting officer needs re-training or if discipline is in order.

## 2. Investigatory Stops and Searches

PRPB does not allow its officers to conduct investigatory stops (or Terry stops) based solely on reasonable suspicion. Instead, all investigatory stops must be based on probable cause per PRPB policy. The HPD continues to violate investigatory stops and searches policies. The HPD submitted 27 arrest files. The Monitor's Office rated 17 (63%) as not compliant for lack of probable cause language and use of boilerplate language. Again, supervisors and commanders are not taking notice, and are not addressing it.

PRPB deployed electronic wi-fi based devices to the HPD to automatically write up traffic citations by reading the vehicle registration number. This device collects minimal demographic data that could be used to begin to track and analyze investigatory stops and searches as required by the Agreement. Although the data now collected by this device is not enough to satisfy the Agreement, PRPB should look at its potential to add more capabilities that could bring it into compliance with the Agreement.

### Paragraph 60: Searches and Seizures - Investigatory Stops and Searches

*PRPD shall develop an Investigatory Stops and Searches Reporting Policy and a system to collect data on all investigatory stops and searches, whether or not they result in an arrest or issuance of a citation. PRPD's stop data collection system shall be subject to the review and approval of the TCA, and shall require officers to document the following: (a) the date, time, location, and duration of the stop and/or search; (b) the reason for the stop and/or search; (c) the subject's apparent race, color, ethnicity or national origin, gender, and age; (d) whether any contraband or evidence was seized, and the nature of the contraband or evidence; and (e) the disposition of the stop, including whether a citation was issued or an arrest made. PRPD shall require that officers submit written reports regarding investigatory stops and searches to their supervisor by end of shift for review. A copy of these reports shall be forwarded to SPR and the Reform Unit for tracking and analysis.*

| Compliance Status | Assessment Schedule |
|---|---|

83

| Not Compliant | | Review Period | April 2022 – September 2022 |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

1. 100% of stops and searches are justified based on probable cause. For stops and searches based on a lesser standard or that are otherwise unjustified, PRPB takes corrective and/or disciplinary action.   ☐ Met   ☒ Missed

2. 100% of stops and searches reviewed as part of other areas of the Agreement are based on probable cause. For stops and searches based on a lesser standard or that otherwise unjustified, PRPB takes corrective and/or disciplinary action.   ☐ Met   ☒ Missed

Note: PRPB has not authorized investigatory or Terry stops based on reasonable suspicion. For Paragraphs 60-64, the Monitor's Office will assess the basis for stops and arrests based on probable cause.

### Compliance Assessment

PRPB does not record stops and searches that do not result in arrest or issuance of a citation. As of this writing, PRPB issues most traffic citations in paper form that are not collected, tracked, or analyzed to any extent. As a result, the Monitor's Office is unable to make a comprehensive analysis of PRPB's compliance with this paragraph. Despite this, the Monitor's Office did review stops and searches that resulted in arrest for compliance. However, almost all those arrests were conducted by the HPD, which has constantly been cited by the Monitor's Office in past CMRs for having the highest percentage of arrest reports lacking proper detail of probable cause. The Monitor's Office reviewed a total of 27 arrest files submitted by HPD for CMR-7 and found that 17 (63%) lacked appropriate language to determine probable cause (3 files (18%) lacked a police report and 3 (18%) contained very vague language). This unit also tends to use boilerplate language when writing reports.

However, the solution is within PRPB's grasp, as evidenced by the actions of the Reform Unit when it took the initiative, during the mid-term data submission to the Monitor's Office in April 2022, to return 12 poorly written arrest reports from the HPD back to the supervisors for re-review and correction. As officers added specific details of the incident to the reports, 8 of those 12 files (67%) were rated compliant by the Monitor's Office. Unfortunately, PRPB did not follow up on this directive with the final data submission, resulting in the 63% overall failure rate cited above.

The HPD is also the unit that conducts the most investigative stops and searches via motor vehicle traffic stops, and thus have the best opportunity to collect demographic and geographic data as required by the Agreement. But, as noted above, PRPB has not yet required its officers to collect this data, nor has it provided its officers with the ability or a system to do so.

*Pathway Forward*

PRPB must ensure officers and supervisors properly document probable cause and submit complete arrest files containing all required forms, both requirements under GOs 612 (Searches and Seizures) and 615 (Arrests and Summons) and the Agreement, by insisting that supervisory personnel follow the initiative of the commander from the Reform Unit to ensure officers properly document probable cause and submit complete arrest files containing all applicable forms.

PRPB must also create a system to collect and track demographic, geographic, and other data for analysis, as required by paragraph 243 of the Agreement. The Monitor's Office is also aware of PRPB's efforts to create a module and database to better capture data from these reports and looks forward to reviewing these efforts as they further materialize.

## Paragraph 61: Searches and Seizures - Investigatory Stops and Searches

*PRPD's Investigatory Stops and Searches Reporting Policy shall explicitly prohibit the use of boilerplate or conclusory language in all reports. PRPD policies shall also expressly prohibit officers from knowingly using or relying on information known to be materially false or incorrect in effectuating an investigatory stop or detention.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 60.

*Compliance Assessment*

GO 615 (Arrests and Summons) complies with the Agreement in that it prohibits conclusory or boilerplate language and prohibits officers from using materially false or incorrect information.[9] This policy was reviewed and approved by the Monitor's Office and signed by PRPB on October 3, 2022.

For a short period PRPB addressed the issue of boilerplate or conclusory language by returning arrest files to officers for correction. Before submitting mid-term data to the Monitor's Office, PRPB sent back 12 arrest reports to the HPD that were lacking specific facts of the case and most, if not all, employed very similar or boilerplate language. As a result, 8 of the 12 reports (67%) were rated substantially compliant as the facts in each report were unique to the case, easily established probable cause, and avoided boilerplate language. The trend did not continue with the submission of the final investigatory

---

[9] See Section lll.D.4.g.xxviii.d. on page 22, and Section lll.D.5.f.ii on page 24.

stops data, as 13 of 15 arrest files (87%) submitted by the HPD were rated not compliant due to the lack of probable cause details and use of boilerplate language. Overall, 17 of the 27 arrest files (63%) were rated not compliant.

Investigatory stops in PRPB are still not documented unless it's a motor vehicle traffic stop resulting in an arrest or citation. The data captured during these stops are minimal, not tracked by PRPB, and insufficient to conduct outcome assessments as required by paragraph 243 of the Agreement, which calls for the collection, tracking, and analysis of specific demographic and geographic data, as well as other information.

### Pathway Forward

PRPB must ensure that supervisory personnel Bureau-wide follow the initiative of the Reform Unit who sent back poorly written reports to ensure officers properly document probable cause by detailing the specifics of each case, thus also avoiding boilerplate language. Further, increased accountability mechanisms and involvement of leadership to address these issues either through re-training, improved technology systems, or discipline are necessary to move compliance forward. Without such corrective actions, PRPB will continue to lag in compliance.

## Paragraph 62: Searches and Seizures - Investigatory Stops and Searches

*A supervisor shall review each report on Investigatory Stops and Searches to determine whether the stop or search was within PRPD policy and this Agreement. For any investigatory stop or search deemed to be outside of PRPD policy or this Agreement, the supervisor shall determine if the stop or search: (a) should result in an internal investigation by SPR; (b) indicates a need for additional training, counseling, or any other non-punitive corrective measure for the involved officer; and (c) suggests the need for revising or reformulating agency policy, strategy, tactics, or training. The supervisor shall document on an auditable form those investigatory stops and searches that are unsupported by reasonable suspicion; are in violation of PRPD policy or this Agreement; or that indicate a need for corrective action or review of agency policy, strategy, tactics, or training. The quality of these supervisory reviews shall be taken into account in the supervisor's performance evaluations.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: This Paragraph is assessed with Paragraph 60.

*Compliance Assessment*

In CMR-6, the Monitor's Office found that HPD officers failed to document probable cause for stops and/or arrests and used boilerplate language in most cases, with 7 out of 11 (64%) falling in this category. When the Monitor's Office received investigatory stops data for the midterm period of the CMR-7 reporting period, there were 12 cases submitted by the HPD and 8 (67%) were rated as being substantially compliant. The difference was that these 12 cases were returned to officers for correction, which resulted in officers including more detailed facts in each case, thereby establishing probable cause, and avoiding boilerplate language. However, with the submission of the second part of the data for the CMR-7 reporting period, the HPD had regressed, and the failure rate went back up. An additional 15 reports were submitted and 13 (87%) did not contain enough information to determine probable cause or police reports were missing all together.

Not documenting probable cause in the cases mentioned above is a violation of PRPB policies and the Agreement, yet supervisors continue to approve and submit these reports without taking steps to correct them or discipline officers. The supervisory review (PPR 615.8) in 17 cases out of 27 HPD investigatory stops (63%) failed to address the shortcomings in officers' reports, as did the commanders in their reviews. There was no indication included in the files that pointed to a need for corrective action, nor that any type of measure was recommended.

*Pathway Forward*

PRPB must ensure that supervisory personnel follow the initiative of the commander from the Reform Office to ensure officers properly document probable cause and write the specific facts in each case, thus also avoiding boilerplate language. Supervisors must be encouraged to send reports back to officers that do not meet policy standards, and they must be held accountable for failing to do so.

## Paragraph 63: Searches and Seizures - Investigatory Stops and Searches

*A command-level officer or official shall review, in writing, all supervisory auditable forms related to investigatory stops and detentions. The commander's review shall be completed within three business days of receiving the document reporting the event. The commander shall evaluate the corrective action and recommendations in the supervisor's written report and ensure that all appropriate corrective action is taken, including referring the incident for administrative or criminal investigation.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

87

Note: This Paragraph is assessed with Paragraph 60.

*Compliance Assessment*

In CMR-6, the Monitor's Office reported that HPD officers failed to document probable cause for stops and/or arrests and used boilerplate language in most cases, with 7 of 11 (64%) falling into this category. During the CMR-6 analysis, the Monitor's Office saw no effort from PRPB supervisors and commanders to address these shortcomings. For the CMR-7 reporting period, the Monitor's Office reviewed 27 arrest/investigatory stop files by PRPB HPD. Seventeen of those files were rated not compliant (63%) due to lack of probable cause and the use of boilerplate language. The supervisory reviews (PPR 615.8) in all 17 cases failed to address the shortcomings in officers' reports. Additionally, commanders (district and unit directors) failed to complete their evaluations of arrest reports within the allotted time, three days after the arrest. Fifteen of the sixty-eight supervisory and commander reviews (22%) revealed that the review did not occur within the time required by this paragraph; some reviews were conducted as much as weeks after the arrest.[10]

Supervisors and commanders also failed to note any issues with the reports and there was no indication included in the files that would signal corrective action was recommended by anyone. As the Monitor's Office reported above, the issue can easily be addressed by supervisory personnel simply by following the example of the Reform Unit who returned weak arrest reports for re-review and correction, resulting in 8 of 12 such reports (67%) being rated as compliant by the Monitor's Office.

*Pathway Forward*

Supervisors must be encouraged to send back reports to officers that do not meet policy standards, and those supervisors who fail to do so must be held accountable by PRPB. The sample given above involving the Reform Unit is strong evidence that rejecting poorly written arrest reports and having officers correct them is an effective strategy that requires very little effort.

## Paragraph 64: Searches and Seizures - Investigatory Stops and Searches

*At least annually, PRPD shall analyze investigatory stop and search data to determine significant trends, identify and correct deficiencies revealed by this analysis, and document its findings in a public report.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

---

[10] See complaint #2022-01-199-004092 as an example.

Note: This Paragraph is assessed with Paragraph 60.

*Compliance Assessment*

All investigatory stops are supposed to be based on probable cause per PRPB policy, which in most cases involves traffic stops or detentions. However, PRPB still does not have a system to collect or track any type of investigatory stop and search data, whether because of an arrest or citation, nor from traffic stops or detentions that do not result in an arrest or citation. As such, PRPB does not conduct any annual analysis of such data, thus the Monitor's Office is unable to make a comprehensive analysis of PRPB's compliance with this paragraph. The Agreement clearly requires that PRPB develop a system to collect and analyze all such data to comply with paragraph 243.

PRPB has a device that could potentially be used to collect the necessary data for analysis. During site visits and interviews with several HPD units in May 2022, the Monitor's Office was shown an electronic wi-fi connected device employed to write up motor vehicle traffic citations. This device automatically captures some demographic data, such as name and address of the registered owner when the officer scans the registration number with the device. Although this is not enough to comply with outcome assessments required by paragraph 243, it may possibly provide an opportunity for PRPB to use it as an investigatory stops data collecting and tracking system by adding additional data-capturing functions.

*Pathway Forward*

The Monitor's Office stresses the importance of developing a system to collect, track, and analyze investigatory stops data. This is not only imperative to PRPB's compliance with this paragraph, but also necessary for the conduct of outcome assessments as part of paragraph 243. If PRPB is not presently working on an investigatory stop collection and tracking system, the Monitor's Office strongly recommends that if it is technically possible, it considers the motor vehicle traffic citation electronic device presently in use by some HPD officers for this purpose. However, to be maximally effective, the device must be issued to all field officers so that a wide sample of statistically valid data can be obtained for analysis. Also, demographic and geographic data resulting from traffic stops not involving a citation or arrest, must be called in to Centro De Mando and recorded on PPR 126.2 (Complaint Card) for future collection and analysis.

## 3. Arrests

Although, PRPB faithfully updates its policies on arrests and searches, officers continue to submit incomplete files that are missing important arrest forms, such as the personal property inventory form, and the egress/ingress form, as well as the motor vehicle inventory form. This was the case in 75 of 82 arrest files (91%) reviewed this reporting period. Returning incomplete reports to officers for correction is the most effective way of dealing with this issue. This was done by the Reform Unit who returned several poorly written reports and got them back corrected and in compliance.

### Paragraph 65: Searches and Seizures - Arrests

*PRPD shall revise its policies on arrests to ensure that they comply with applicable law and comport with generally accepted policing practices.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all others. |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Polices and forms incorporate all of the requirements of Paragraphs 59, 65-71. | ☑ Met | ☐ Missed |
| 2. 95% of selected arrests are notified and reviewed by supervisors in accordance with approved policies. | ☐ Met | ☑ Missed |
| 3. Officers transport arrestees and complete required arrest documentation in accordance with approved policies in 95% of selected arrests. | ☐ Met | ☑ Missed |
| 4a. Supervisors respond to injuries and complaints of pain by detainees or arrestees in accordance with approved policies in 95% of selected arrests. | ☐ Met | ☑ Missed |
| 4b-e. Supervisors review, document, and take corrective action, including making referrals when necessary, as required by approved policies in 95% of selected arrests. | ☐ Met | ☑ Missed |
| 5. Unit commanders review, document, and take corrective action, including making referrals when necessary, as required by approved policies in 95% of selected arrests. | ☐ Met | ☑ Missed |

Note: Training is assessed as part of Section E (Paragraphs 78-79) regarding Training on Stops, Searches, and Seizures.

### Compliance Assessment

GO 615 (Arrests and Summons) was reviewed by the Monitor's Office earlier this year and was approved and signed by the PRPB Commissioner on October 3, 2022. This policy conforms to generally accepted policing practices and complies with applicable laws.

The Monitor's Office randomly sampled 82 arrests for review during the CMR-7 reporting period. Two arrest files (2%) reviewed involved either obstruction of justice, assaulting an officer, and/or resisting arrest. In addition, the Monitor's Office requested and received five radio communications recorded during alleged incidents of the nature described above. The Agreement requires that a supervisor be notified and respond in these cases. A supervisor was requested and responded in one of the two cases reviewed, but the Monitor's Office was unable to determine from the five recordings whether a supervisor was requested and/or responded due mostly to uncoordinated and uncontrolled back and forth communication between dispatchers and officers.

Although arrest reports indicate that officers apparently transport arrestees directly to police facilities, the issue of missing arrest forms persists without abatement in PRPB even though the Monitor's Office has advised PRPB about this issue in every CMR over the past few years. For example, out of the 82

90

arrest files reviewed, only 7 (9%) included all required arrest forms. The remaining 75 lacked, at a minimum, the inclusion of PPR 631.1 (Ingress/Egress) and 636.1 (Property Inventory) forms, among others. These two forms are essential for PRPB to reach compliance because on the Ingress/Egress form supervisors must indicate whether they examined the arrestee for injuries and whether medical assistance was provided, a requirement under this paragraph and paragraph 68. Additionally, of the 61 search and seizure files, 9 (15%) were missing this form. Without this form the Monitor's Office is unable to determine whether supervisors complied with the Agreement. The property inventory form is necessary for tracking how personal property is handled and tracked by PRPB, a requirement under paragraph 72.

Another very important form that is often missing from files is the Motor Vehicle Inventory form (PPR 128). HPD, a unit that deals almost exclusively with motor vehicle incidents, is frequently missing this PPR. The Monitor's Office received 27 arrest reports from HPD that involved the arrest of drivers for driving under the influence (DUI), among other violations. Twenty-four files (89%) were missing PPR 128 (Motor Vehicle Inventory), and what is more concerning, police reports did not make any reference as to the disposition of the vehicles (towed, left at scene, driven away by an authorized person, etc.).

Supervisors continually do not address the issue of police reports lacking enough information to determine probable cause. As stated in previous paragraphs in this CMR, the Monitor's Office reviewed a total of 143 randomly selected arrest and search files and found that 34% (49 files) did not document probable cause properly on the police report and 9 arrest files (6%) had only fairly or poorly documented probable cause. In all cases, supervisors and commanders did not make any referrals in their evaluation (PPR 615.8) nor was there any indication in the files that any corrective action was taken or recommended by anyone within PRPB.

The Monitor's Office requested any administrative complaint investigation files regarding misconduct during an arrest from SARP but received none.

Further, as noted previously, training with respect to this paragraph is not implemented.

### Pathway Forward

The Monitor's Office must insist that training and/or counseling be provided to all officers of all ranks on how to write detailed arrest reports. Again, as reported in CMR-6, the issue may not be that officers do not have justification to make the arrest. It appears, in most cases, that they simply do not document all the pertinent facts that led to probable cause. In 6 of 12 cases (50%) approved by the District Attorney, the Monitor's Office had determined the police reports did not provide enough information for probable cause determination, yet they were authorized by the District Attorney to go forward. Eleven of the twelve cases (92%) that went before a judge were approved by the judge for further adjudication, with only one dismissed for lack of probable cause (Complaint #2022-4-199-000540). This has led the Monitor's Office to believe that in these cases, officers had information detailing probable cause written in their personal notebooks but did not transfer that information to the official incident report, as they should - a practice that persists in the Bureau despite the Monitor's warnings against it. As stated in prior paragraphs, supervisors must take note of this and inspect and seize these notebooks, if necessary, upon determining officers failed to include information in PRPB official reports. This information is necessary

not only to comply with judicial procedures, but also to comply with the Agreement. Once re-trained and/or counseled, if supervisors and commanders fail to address poorly written reports, PRPB must hold them accountable for dereliction of duty.

Also, PRPB must ensure that all applicable forms be included in each arrest file, as required by PRPB policy (GO 615).

## Paragraph 66: Searches and Seizures - Arrests

*PRPD shall require that officers notify the communications command center and a supervisor immediately after an arrest, or as soon as practicable. For felony arrests, or an arrest for obstructing or resisting an officer, PRPD shall require a field supervisor to respond to the scene of the incident and approve the officer's arrest determination, based on the existence of probable cause. If an officer's arrest determination is insufficient, or otherwise unjustified, the supervisor may, if necessary, interview the subject. The supervisor shall take appropriate action to address violations or deficiencies in an officer's arrest determination, including releasing the subject, recommending non-punitive corrective action for the involved officer, or referring the incident for administrative or criminal investigation. If a supervisor is unavailable to respond to the scene or there are exigent circumstances, the officer shall notify his or her immediate supervisor over a recorded channel of the elements of probable cause for the felony arrest or arrest for obstructing or resisting an officer. If the officer's immediate supervisor is unavailable, the officer shall notify any field supervisor over a recorded channel of the elements of probable cause for the felony arrest or arrest for obstructing or resisting an officer.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all others. |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 65.

*Compliance Assessment*

Dispatch form (PPR 126.2) is used by PRPB's Command Center (Centro de Mando) to record all incidents, including arrests by officers. Fifty-two of the eighty-two arrest files (63%) reviewed did not contain this form, so the Monitor's Office was unable to determine whether the Command Center was notified of arrests in these cases.

Included in the Monitor's 82 arrest file request were 2 arrests (2%) for resisting arrest/obstruction of justice. A supervisor responded to one but not the other. In addition, the Monitor's Office requested radio communications between officers and supervisors involving 13 randomly selected incidents of resisting arrest, obstruction of justice, and/or assaulting an officer. PRPB was able to provide only 5

recordings of the 13 requested (38%). PRPB stated it was unable to locate the other 8 (62%) due to several reasons, including, that the communication may have occurred using the analog system, which does not record, or other type of communication was used.[11]

The Monitor's Office attempted to listen to the five recordings but had great difficulty discerning with any kind of certainty which unit said what. In one case (Complaint #2022-1-366-002663) officers are heard asking for the supervisor to respond for a UOF and arrest. The arrest, officers stated is for threat with a weapon, but who the threat was against is not clear. In another case officers are heard asking for an ambulance for an injured officer and no supervisor request is heard. The other cases were hard to monitor as dispatchers did not appear to control the flow of communication, as officers sometimes talked over each other or began a communication without identifying themselves.

Further, as noted previously, officers routinely submit arrest reports that lack enough detail to reach a conclusion of probable cause, and supervisors do not address the issue in their evaluation. Instead, in most cases, they approve the arrest and allow it to go forward. That was the case in 49 of 143 randomly selected arrest and search and seizure files, for a 34% overall failure rate. Also, supervisors submitted reviews and approval of arrest in 68 of those arrest and search and seizure files, yet 27 reports in those files were found to have no detailed facts to reach a decision on probable cause, for a 40% failure rate. That compares favorably with the 52% failure rate in CMR-6 but is still too high for compliance.

### Pathway Forward

The Agreement requires that all radio communications be transmitted on a recorded line for tracking purposes. Although PRPB has been installing the P-25 radio system, which records all communications, it is still behind in the widespread use of this technology. Moreover, PRPB must provide dispatchers and officers with radio communications protocol to have well-coordinated and clear communication. Well-controlled and organized radio communication is essential to officer safety, especially during emergency and stressful situations. One key to maintaining good and effective communication is by using specific call signs assigned to each unit for easy identification. In the review of radio communications, specifically in one case (Complaint #2022-1-282-002586), the Monitor's Office did not detect the use of unit call signs during an incident in which officers exchanged gun fire with an individual, which resulted in an officer being injured. In this case, it was almost impossible to know who was speaking, as many officers screamed for help and the dispatcher did not seem to have control of the situation.

Supervisors must always evaluate arrest reports, especially those required by the Agreement, such as felonies, resisting arrest, obstruction of justice, and assault of officers. They must also carefully review officers' determination of probable cause and return unsatisfactory arrest reports to officers for corrective action and discipline those who do not conform. Likewise, PRPB must take disciplinary action against supervisors and commanders who do not adhere to these policies.

### Paragraph 67: Searches and Seizures - Arrests

*When transporting an arrestee, officers shall take the safest and most direct route to the booking location. PRPD policy shall require that officers notify the communications command center of the starting and ending mileage*

---

[11] See PRPB document #SASG-NTC-DC-6-0153.

*on the transporting vehicle, as well as the gender, race, ethnicity, national origin, and apparent age of the arrestee. The officer shall complete all written arrest forms and booking recommendations at the time an arrestee is presented at any PRPD precinct, station, or specialized unit for booking.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all others. |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 65.

*Compliance Assessment*

PRPB does not appear to have a data system or mapping software that tracks officers' route of travel when transporting arrestees, thus the Monitor's Office is unable to determine compliance in this area. During the review of five radio recordings, the Monitor's Office heard mileage being given to Centro de Mando in some unidentifiable arrest cases. The 143 arrest and search files submitted to the Monitor's Office included 46 dispatch cards (PPR 126.2), on which mileage should be recorded. All cards failed to report the mileage given by arresting officers; another 62 files did not include the card. The remaining files were not applicable because there were no arrests made or an arrest was made on an active arrest warrant. Those same dispatch forms only contained minimum, and sometimes no, demographic data on the arrestees. Again, as reported in previous paragraphs, officers continually fail to include all required appropriate forms in the arrest files. However, it is unclear to the Monitor's Office whether this is a result of the limitations of GTE as the Reform Unit downloads the reports or if the files simply fail to include such forms.

*Pathway Forward*

PRPB must ensure that officers provide all pertinent demographic information of arrestees and mileage to Centro de Mando, and that Centro de Mando records such information on the dispatch form (PPR 126.2). Officers and supervisors should also ensure that all this information is recorded on the police report (PPR 621.1 or 621.2). Further, the Monitor's Office recommends that the name of the arrestee not be aired on police channels due to privacy issues. The Monitor's Office will also audit GTE to determine if the arrest files within the system contain all required information.

## Paragraph 68: Searches and Seizures - Arrests

*At the time of presentment at a PRPD precinct, station, or specialized unit, a watch commander or supervisor shall visually inspect each detainee or arrestee for injury, interview the detainee or arrestee for complaints of pain, and ensure that the detainee or arrestee receives medical attention from an appropriate medical provider, as necessary.*

94

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all others. |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 65.

*Compliance Assessment*

Only 7 of the 82 arrest files (9%) reviewed this reporting period included all required arrest forms. The remaining 75 (91%) lacked, at a minimum, inclusion of PPR's 631.1 (Ingress/Egress) and 636.1 (Property Inventory) forms, among others. The Ingress/Egress form is essential for PRPB to reach compliance because supervisors must indicate whether they examined the arrestee for injuries and whether medical assistance was provided, a requirement under this paragraph. Additionally, of the 61 search and seizure files, 9 (15%) were also missing PPR 631.1. To reach compliance, PRPB officers must properly complete and include these forms in all arrest files.

*Pathway Forward*

Officers and supervisors should ensure the Egress/Ingress Form (PPR 631.1) is properly completed and included in all arrest files whether the arrestee is placed in a cell. PRPB revised this form to avoid the confusion that it was to be completed only when a person was placed in a cell. The Monitor's Office reviewed and approved the form, and it has been posted to the Virtual Library as of September 2022. PRPB must ensure that officers put it into use.

## Paragraph 69: Searches and Seizures - Arrests

*PRPD shall require that all booking recommendations be personally reviewed and approved in writing in an auditable form by a supervisor as to appropriateness, legality, and conformance with PRPD policies within 12 hours of the arrest, absent exceptional circumstances. Supervisors shall also examine arrest reports and forms related to the arrest for boilerplate or conclusory language, inconsistent information, lack of articulation of the legal basis for the action, or other indicia that the information in the reports or forms is not authentic or correct. Supervisors shall evaluate each incident in which a person is arrested for interfering with a police officer, resisting arrest, assault on a police officer, or other similar charge to determine whether the incident raises any issue or concern regarding the basis for the arrest or implications on training, policies, or tactics.*

| Compliance Status | Assessment Schedule | |
|---|---|---|
| Not Compliant | Review | April 2022 – September 2022 |

| | | | |
|---|---|---|---|
| Policy: | Implemented | Period | |
| Training: | N/A | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all others. |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 65.

*Compliance Assessment*

Supervisors submitted reviews and approvals of arrest in 68 of 143 arrest and search files (48%), yet 27 police reports in the 68 approvals (40%) were found to lack detailed facts to reach a decision on probable cause. That compares favorably with the 52% failure rate in CMR-6 for the same statistics but is still too high to qualify for compliance. Use of boilerplate language is another issue that has been pointed out by the Monitor's Office to no avail. Thirteen of fifteen arrest files (87%) submitted by the HPD were rated not compliant due to the lack of probable cause details and use of boilerplate language. Yet supervisors, as has been reported by the Monitor's Office in several CMRs, ignored these shortcomings, approved the reports, and did not take corrective action.

Fifteen of the sixty-eight supervisory reviews (22%) revealed that the review did not occur within the twelve hours required by this paragraph; some reviews were conducted days later, and as much as weeks after the arrest (see Complaint #2022-01-199-004092). This lack of supervisory review carried over to arrests for obstruction of justice or resisting arrest.

Included in the Monitor's 82 arrest file request were 2 arrests for resisting arrest/obstruction of justice (2%). A supervisor responded to one but not the other. In addition, the Monitor's Office requested recorded radio communications between officers and supervisors involving 13 randomly selected incidents of resisting arrest, obstruction of justice, and/or assaulting an officer to check whether supervisors responded. The Monitor's Office received only five files and was unable to obtain enough information from the recordings to determine whether a supervisor was requested and responded due to lack of communication protocols being adhered to.

*Pathway Forward*

As has been reported throughout this section, supervisory training and/or counseling would greatly assist in reinforcing these requirements, whether conducted in person, virtually, or via roll call. The solution to this issue is not difficult. As stated earlier, a commander in the Reform Unit took it upon himself to return poorly written arrest reports and had officers rewrite them. As a result, most of those reports were rated compliant. But, without action, this is going to keep happening until PRPB holds supervisors accountable for their responsibilities.

Supervisors and commanders must adhere to the arrest review requirements of the Agreement if PRPB is to move forward with compliance. This is especially important during arrests for obstruction of justice, resisting arrest, and/or assaulting an officer, as delineated in this paragraph.

## Paragraph 70: Searches and Seizures - Arrests

*As part of the supervisory review, the supervisor shall document on an auditable form those arrests that are unsupported by probable cause, are in violation of PRPD policy or this Agreement, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or training. The quality of these supervisory reviews shall be taken into account in the supervisor's performance evaluations.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all others. |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 65.

*Compliance Assessment*

PRPB supervisors continually fail to address shortcomings in arrest reports they review. Commonly, they agree with whatever the officers write in their reports and state that they believed the officers had sufficiently proved probable cause, when, in fact, several reports did not state the specific facts of the case. In the 143 arrest and search files reviewed, supervisors reviewed and agreed with officers in 68 cases (the remaining files had no supervisory reviews). Further, 27 of the 68 cases (40%) were found to lack sufficient probable cause language. District and unit commanders also went along with the supervisors' evaluation of the arrests and did not point out any insufficiencies. Because commanders summarily and blindly agree with supervisors' arrest evaluations, the Monitor's Office has never encountered any indications from commanders questioning the quality of these reviews. Therefore, these obviously weak reviews are not being forwarded to be considered as part of supervisors' performance evaluations.

*Pathway Forward*

As has been reported throughout this section, supervisory training and/or counseling would assist in reinforcing these requirements, whether conducted in person, virtually, or via roll call. The solution to this issue is not difficult. As stated earlier, the Reform Unit returned poorly written arrest reports and had officers rewrite them. As a result, most of those reports were rated compliant. Failures to achieve compliance will continue until PRPB starts holding supervisors accountable for their responsibilities.

## Paragraph 71: Searches and Seizures - Arrests

*A command-level officer or official shall review, in writing, all auditable forms related to arrests. The commander's review shall be completed within seven days of receiving the document reporting the event. The commander shall evaluate the corrective action and recommendations in the supervisor's written report and*

*ensure that all appropriate corrective action is taken. Whenever a reviewing supervisor or command-level officer finds evidence of an arrest indicating apparent misconduct or apparent criminal conduct by an officer, he or she shall immediately notify his or her supervisor for referral to the appropriate investigating unit or the PRDOJ. The Superintendent shall be notified of the referral.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all others. |
| Practice: | Not Implemented | | |

## *Compliance Targets*

Note: This Paragraph is assessed with Paragraph 65.

## *Compliance Assessment*

PRPB supervisors continually fail to address shortcomings in arrest reports they review. Commonly, they agree with whatever the officers write in their reports and state that they believed the officers had sufficiently proved probable cause, when, in fact, several reports did not state the specific facts of the case, leaving the reader to his/her imagination. In 143 arrest and search files reviewed, supervisors reviewed and agreed with officers in 68 cases (the remaining files had no supervisory reviews). However, 27 of the 68 cases (40%) were found to lack sufficient probable cause language. In all cases, district and unit commanders readily agreed with the supervisors' evaluation and did not question the validity of their findings. Furthermore, besides failing to review most arrests (only 68 out of 143 were reviewed), when the Monitor's Office checked for adherence to the timeline within those 68 reports, PRPB did not attain the threshold of 95% of selected reviews. The Monitor's Office is not aware of any SARP investigations referred by command-level officers following an arrest indicating apparent misconduct or criminal conduct by an officer. To this end, the Monitor's Office requested any administrative complaint investigation files regarding misconduct during an arrest from SARP but received none.

## *Pathway Forward*

As has been reported throughout this section, supervisory training and/or counseling would assist in reinforcing these requirements, whether conducted in person, virtually, or via roll call. The solution to this issue is not difficult. As stated earlier, a commander in the Reform Unit took it upon himself to return poorly written arrest reports and had officers rewrite them. As a result, most of those reports were rated compliant. But, without action, this is going to keep happening until PRPB starts holding supervisors and commanders accountable for their responsibilities.

## Paragraph 72: Searches and Seizures - Arrests

*PRPD shall require officers to provide written receipts to individuals whenever property is seized from the individuals. PRPD shall establish procedures that are based on generally accepted policing practices to ensure that all seized property is properly stored and returned, as appropriate.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all others. |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Polices incorporate all of the requirements of Paragraphs 59 and 72. | ☑ Met | ☐ Missed |
| 2. Property is seized, stored, and returned, as appropriate, in accordance with approved policies in 95% of selected arrests. | ☐ Met | ☑ Missed |
| 3. PRPB takes disciplinary and/or corrective action in response to all sustained complaints where an officer fails to issue a receipt, store, or return seized property in accordance with approved policies. | ☐ Met | ☑ Missed |

Note: Training is assessed as part of Section E (Paragraphs 78-79) regarding Training on Stops, Searches, and Seizures.

### Compliance Assessment

PPR 636.1 is the form used by officers to record seized property. These forms are not part of any property tracking system but are supposed to be included in all arrest files. However, officers routinely fail to complete and store these forms in arrest file folders. In 143 arrest and search files submitted by PRPB, PPR 636.1 was missing in 77 files (73 out of 82 arrest files and 4 out of 61 search files). The property inventory form is necessary for tracking how personal property is handled and tracked by PRPB, a requirement under this paragraph.

The Monitor's Office noted in past CMRs that officers listed seized evidence on PPR 636.1 to be used in criminal cases against the arrestee and had the arrestee sign the form to confirm they owned the evidence. This would happen before the person arrested conferred with a lawyer and/or was presented before a judge.[12] This could potentially be a violation of the person's 5th Amendment rights against self-incrimination and PRPB should address it immediately. PRPB stated they have taken steps to remedy this situation by eliminating the requirement for arrestees' signature. However, the Monitor's Office has not observed this modified form in its recent analysis. In addition, the Monitor's Office checked PRPB's Virtual Library and found that the modified form is not yet available (the original form is listed).

---

[12] See Complaint #s 2022-3-400-000190, 2022-13-401-000104, and 2022-10-400-000179 as examples.

During site visits to SARP, the Monitor's Office viewed four administrative complaints against officers involving seized property. A commander in SARP stated that these administrative investigations were in progress and had not yet been completed. The Monitor's Office requested that they be forwarded once completed to be included in the CMR.[13] SARP's documents indicated that the investigations were completed in June and July and sent to SARP Central and are still "pending analysis". The Monitor's Office will continue to follow up on these investigations and report in future CMRs.

### Pathway Forward

PRPB must hold supervisors accountable for failing to ensure that arrest files contain all required forms, including seized property and egress/ingress forms, among others. Evidence should be listed on the police report section titled "Bienes", which is designed for that purpose, and not on the personal property form (PPR 636.1), which should be used for personal property that is to be returned to the owner upon release. Further, PRPB should review and potentially revise GO 636 (Evidence Rooms) to ensure that the issues raised above regarding documentation of criminally seized property and signatures are resolved.

### Paragraph 73: Searches and Seizures – Arrests

*PRPD shall develop a protocol to seek formal feedback from the prosecutor's office, the public defender's office, and Commonwealth judges on a regular basis regarding the quality of PRPD investigations, arrests, court testimony, and indicia of misconduct and to make operational and policy changes based upon this feedback. In addition, PRPD shall refer to SPR for investigation any information regarding specific incidents of possible officer misconduct received through this protocol.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partial Compliant | | Review Period | October 2021 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Interagency agreements and policies incorporate the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. PRPB officers seek and obtain feedback from criminal justice agencies and entities as required by approved agreements and policies. | ☐ Met | ☑ Missed |
| 3. 100% of alleged misconduct noted in protocol documentation corresponds with a SARP investigation. | ☐ Met | ☑ Missed |

---

[13] See PRPB Documents #'s CMR7-2.2-3-agosto-22-QA-004329, CMR7-2.2-3-agosto-22-QA-004490, CMR7-2.2-3-agosto-22-QA-004579, and CMR7-2.2-3-agosto-22-QA-004686.

*Compliance Assessment*

PRPB's Reform Office submitted documents #CMR7-1.1-29-SW-68 through 77, which lists the Feedback Committee Protocol. Together with this protocol, PRPB created a form for the participating agencies to complete when and if they want to file a complaint against an officer. This protocol fulfills the requirements of the Agreement. Committees from the following police areas and the Central Committee submitted documents about the meetings held this reporting period: Central Committee presided by the Director of the Auxiliary Superintendency for Criminal Investigation (SAIC), Aguadilla, Arecibo, Bayamon, Caguas, Carolina, Fajardo, Humacao, Mayagüez, Ponce, and Utuado.

The Central Committee, Bayamon, and Arecibo did not submit minutes of the meetings. No complaints were brought up during these meetings by participating parties according to documents submitted. The Monitor's Office was unable to determine whether a member of the Public Defender's Office was present as required by the Agreement. In some meetings the presence of a "Licenciado" or an Attorney is noted, but no affiliation is given. The Monitor's Office suggests that each attending member be specifically identified with his/her affiliation for compliance with the Agreement. However, the Monitor's Office can attest that the Feedback Committees have made some progress in organizing and conducting these meetings compared to the CMR-6 reporting period. The Monitor's Office plans to personally interview committee members during future site visits.

*Pathway Forward*

The Monitor's Office suggests that each attending member be specifically identified, including his/her affiliation, for compliance with the Agreement. Also, all areas should submit minutes of meetings, and when or if complaints are filed, that they be included in the files submitted to the Monitor's Office, along with dispositions if available.

## 4. Searches

GO 612 (Searches and Seizures) conforms to generally accepted policing practices and constitutional issues and has been updated as of March 2022. Poor arrest evaluations by supervisors continue to be a serious issue in PRPB, with search and arrest files lacking properly completed forms, and containing weak probable cause language in some cases, especially those conducted as a result of voluntary consent. Another serious issue that has come up is the use of "Propio Conocimiento", or "Self-Recognizance", searches that do not appear to be authorized by PRPB policies. These searches appear to fall under the consent search category but are not being treated that way by officers who must complete PPR 612.1 (Consent Form) per GO 612. PRPB is urged to investigate this matter promptly, as these may be in violation of policy.

Overall, PRPB's compliance with this section continues to lag because of its lack of practical implementation of the policies associated with these paragraphs.

### Paragraph 74: Searches and Seizures - Searches

*PRPD shall revise its policies on searches to ensure that they comply with applicable law and comport with generally accepted policing practices. PRPD policies shall define all terms clearly and specify procedures for*

*executing search warrants and warrantless searches, including handling, recording, and taking custody of seized property or evidence.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all others. |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Polices and forms incorporate all of the requirements of Paragraphs 59, 74-77. | ☒ Met | ☐ Missed |
| 2. Searches are conducted and reviewed by supervisors in accordance with approved policies in 95% of selected searches. | ☐ Met | ☒ Missed |

Note: Training is assessed as part of Section E (Paragraphs 78-79) regarding Training on Stops, Searches, and Seizures.

### Compliance Assessment

GO 612 (Searches and Seizures) was reviewed by the Monitor's Office in early 2022, and PRPB approved and signed it on March 25, 2022. It conforms to generally accepted policing practices and constitutional issues. Poor arrest evaluations by supervisors continues to be a serious issue, with search and arrest files lacking properly completed forms, and containing weak probable cause language in some cases, especially those conducted as a result of voluntary consent.

During the CMR-7 reporting period, PRPB reported having conducted 718 searches. Of these 718, the Monitor's Office randomly sampled and reviewed 61 searches (8%). Further, of the 61 searches, 14 were consent searches (23%), 42 were search warrants (69%), and 5 (8%) were categorized as "Propio Conocimiento" searches. Since there is no such category as "Propio Conocimiento" authorized by GO 612 and they do not seem to have been authorized by any judicial authority, the Monitor's Office considers these consent searches, for a total of 19 consent searches (31%). Eight of the nineteen search files (42%) did not contain the mandatory consent form (PPR 612.1); ten of those searches resulted in no arrest (53%); and two arrests were not evaluated by the supervisor (Complaint #'s 2022-9-008-001797 and 2022-3-858-005437). Four search files involving arrests lacked the property inventory form (PPR 636.1), and nine arrests lacked the Egress/Ingress form (PPR 631.1); another six files that involved the seizure of motor vehicles lacked the Motor Vehicle Inventory form (PPR 128). In the arrests that were evaluated, supervisors failed to address the important issue of the missing forms in the files or explain what "Propio Conocimiento" is and which policy authorizes its use.

### Pathway Forward

The Monitor's Office urgently recommends that PRPB investigate the issue of consent search files containing no Consent Search form (PPR 612.1), and especially those searches newly categorized as

*personal knowledge* or "Propio Conocimiento" searches. PRPB must explain what this is and whether and how it is authorized.  If it is determined not to be authorized, then PRPB must issue an immediate cease and desist order. Supervisors must always evaluate searches, especially those conducted via consent and take necessary corrective steps.

## Paragraph 75: Searches and Seizures - Searches

*PRPD shall require that a supervisor review and approve in writing each request for a search or arrest warrant, including each affidavit or declaration before it is filed by an officer in support of a warrant application, for appropriateness, legality, and conformance with PRPD policy.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

Note: This Paragraph is assessed with Paragraph 74.

### *Compliance Assessment*

Supervisors submitted approval of 42 search warrants and affidavits out of the 61 search files received (69%). The remaining 19 files are consent searches. Approvals were documented on the Operational Plan and/or PPR 612.3 (Approval of Request Orders of Search or Arrest). PPR 612.3 was created on July 27, 2022 and reviewed and approved by the Monitor's Office. The Monitor's Office noted that the form was included in all 12 search warrant files dated after July 2022. The Monitor's Office is not aware whether training or a directive on the use of such form has been provided.

### *Pathway Forward*

As recommended by the Monitor's Office in the last CMR, PRPB has created PPR 612.3 (Approval of Request Orders of Search or Arrest) for supervisors to document their review and approval of search warrant applications and related affidavits. So far, it appears supervisors began to use the form at its inception. PRPB should ensure that the form is included in all search warrant files going forward. Periodic reviews to ensure this is being completed in accordance with policy should be regularly conducted on PRPB's own initiative and any failure to do so should result in disciplinary action.

## Paragraph 76: Searches and Seizures - Searches

*PRPD shall track each search warrant, the case file where a copy of such warrant is maintained, the officer who applied for the warrant, and each supervisor who reviewed the application for a search warrant.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually for Compliance Target #2. Annually for all others. |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. Tracking system accounts for all of the elements in the paragraph and outcome measures as required by Paragraph 243. | ☐ Met  ☒ Missed |
| 2. All search warrants are tracked in the tracking system. | ☐ Met  ☒ Missed |
| 3. Documentation on search warrants is maintained in accordance with approved policies in 95% of precincts and units visited. | ☐ Met  ☒ Missed |

Note: Policy content is assessed as part of Paragraph 74. Training is assessed as part of Section E 78-79) regarding Training on Stops, Searches, and Seizures.

*Compliance Assessment*

PRPB still has no working search warrant tracking system as of this CMR. The Monitor's Office has conducted visits to various CICs in the past, as well as during this period and has been told that search warrant files are kept in folders in file cabinets. CIC and Bureau directors are not aware of any Bureau-wide system to track search warrants and instead keep in-unit spreadsheets to record all search warrants which they then send to SAIC monthly. SAIC does not have a Bureau-wide system that documents and analyzes search warrants as required by GO 612, Section V.B. The Monitor's Office has been in contact with PRPB's Bureau of Technology and has been told they are working to develop a system.

*Pathway Forward*

As noted in previous CMRs, PRPB should develop a centralized, electronic tracking system to collect and analyze search warrant data to detect deficiencies or training issues (see PRPB GO 612, Section V.B) and to comply with the Agreement. The Monitor's Office has been in contact with the PRPB's Bureau of Technology and has been told they are working on it.

## Paragraph 77: Searches and Seizures - Searches

*PRPD shall require officers to obtain and document consent from an individual who consents to a voluntary search of his/her person or vehicle when the search is conducted as part of a routine pedestrian or vehicle stop, unless a non-consensual search is otherwise legally permissible.*

| Compliance Status | Assessment Schedule | |
|---|---|---|
| Partially Compliant | Review | April 2022 – September 2022 |

| | | | |
|---|---|---|---|
| Policy: | Implemented | Period | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 74.

*Compliance Assessment*

Among the 61 randomly selected search files, there were 14 consent searches and 5 searches categorized as *personal knowledge* or "Propio Conocimiento" searches. Since there is no such category as "Propio Conocimiento" authorized under GO 612 (Searches and Seizures), the Monitor's Office is including these in the count of consent searches, for a total of 19 consent searches. Six of those nineteen files (32%) did not contain the mandatory consent form (PPR 612.1); ten of those searches resulted in no arrest; and two arrests were not evaluated by the supervisor (Complaint #'s 2022-9-008-001797 and 2022-3-858-005437). Of the arrests that were evaluated, supervisors failed to address the important issue of the missing forms or explain what "Propio Conocimiento" is and how it is authorized.

*Pathway Forward*

As stated in other paragraphs, the Monitor's Office urgently recommends that PRPB investigate the issue of consent search files containing no Consent Search forms (PPR 612.1), and especially those searches newly categorized as "Propio Conocimiento" searches. PRPB must explain what this is and whether and how it is authorized; and if it is determined not to be authorized, then PRPB must issue an immediate cease and desist order to all officers and supervisors. Supervisors must always evaluate all searches, especially those conducted via consent and take appropriate measures when necessary.

## 5. Training on Stops, Searches, and Seizures

Although search and seizure and arrest policies are up to date, PRPB is behind schedule on training on those policies. In-service and in-person training is also lagging, as is virtual training. Diminished compliance with training is an issue across all areas of the Agreement that arose during the CMR-7 reporting period. As noted previously, much of this regression is due to poor management of training priorities and schedules, limited staff, and delays due to the COVID-19 pandemic. The Monitor's Office notes that much of the issues presented in this section are further exacerbated by the lack of training for both officers and supervisors. Re-training or new training on the issues noted throughout, proper documentation, conducting searches and seizures, traffic stops, etc. are necessary to move compliance forward with the paragraphs in this section.

## Paragraph 78: Searches and Seizures - Training on Stops, Searches, and Seizures

*PRPD shall train all PRPD officers on PRPD's stop, search, and seizure policies. Thereafter, PRPD shall provide all PRPD officers with training at least every two years for the first four years of this Agreement, and annually thereafter. PRPD shall also provide training on stops, searches, and seizures as necessary, based on developments in applicable law and PRPD policy. PRPD shall coordinate and review all policies and training on stops, searches, and seizures to ensure quality, consistency, and compliance with the Constitution and laws of the*

*United States and the Commonwealth of Puerto Rico, this Agreement, and PRPD policy. PRPD shall conduct regular subsequent reviews of this training at least annually, and report its findings. PRPD's training program shall include the following topics:*

*a) PRPD policies and requirements in this Agreement regarding stops, searches, and seizures;*

*b) the Fourth Amendment and related law;*

*c) examples of scenarios faced by PRPD officers and interactive exercises that illustrate proper police practices, methods, and tactics in conducting consensual field interviews, investigatory stops, consent and non-consent searches, and arrests. These training scenarios shall address the difference between various police contacts by the scope and level of police intrusion; between probable cause, reasonable suspicion and mere speculation; and voluntary consent from mere acquiescence to police authority; and*

*d) comprehensive testing that shows complete understanding of rules and regulations.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2020 – September 2021 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Training on stops, searches and seizures is consistent with approved policies and the requirements of Paragraphs 59, 65-78. | ☐ Met | ☒ Missed |
| 2. 95% of officers are trained and certified in stops, searches, and seizures (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☒ Missed |
| 3. 95% of relevant trainings are reviewed at least once a year. | ☐ Met | ☒ Missed |

### Compliance Assessment

Policies for training on stops and searches and seizures (GOs 612 and 615) were reviewed and approved by the Monitor's Office and PRPB approved and signed them into effect in March and October 2022, respectively. These policies conform with generally accepted policing practices and constitutional mandates. However, the training materials related to these policies have not yet been updated and as noted throughout, training is still behind schedule and has not been completed. PRPB has conducted training on stops and searches only for newly hired officers (Class 232), but no annual in-service training

has been conducted in the last two years. The training materials previously reviewed by the Monitor's Office were found to be consistent with the approved policies and requirements of paragraphs 59 and 65-78. Updates to these training materials to align with the revised policies are necessary. Further, it is unclear to the Monitor's Office whether these training materials have been reviewed in the past year.

*Pathway Forward*

In-person scenario-based training is required by this paragraph and PRPB must ensure that officers of all ranks receive this training so that they understand policy requirements and the practical application of such procedures. The Monitor's Office looks forward to reviewing the revised training materials and observing such training once conducted.

## Paragraph 79: Searches and Seizures - Training on Stops, Searches, and Seizures

*PRPD shall train all supervisors and command officers on PRPD's stop, search, and seizure policies. Thereafter, PRPD shall provide all supervisors and command officers with training on reviewing subordinates' stops, searches, and seizures at least annually and, as necessary, based on developments in applicable law and PRPD policy. PRPD shall coordinate and review all policies and training on stops, searches, and seizures to ensure quality, consistency, and compliance with the Constitution and laws of the United States and the Commonwealth of Puerto Rico, this Agreement, and PRPD policy. PRPD shall conduct regular subsequent reviews of this training at least annually, and report its findings. PRPD's training on stops, searches, and seizures for supervisors and command officers shall include the following topics:*

*a) requesting medical services and questioning detainees and arrestees for pain or injury;*

*b) report writing, including reviewing reports on stops, searches, and seizures for completeness, accuracy, and quality, including recognizing boilerplate language and how to document discrepancies;*

*c) assessing the legality and appropriateness of a stop, search, or seizure;*

*d) legal standards governing searches and seizures, including legal standards and requirements for criminal accountability, administrative accountability, and performance improvement related to tactics, training, equipment, and policy sufficiency; and*

*e) recommending and administering proper discipline and non-punitive corrective action related to searches and seizures.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2020 – September 2021 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Training on stops, searches, and seizures is consistent with approved policies and the requirements of Paragraphs 59, 65-77, and 79. | ☐ Met | ☑ Missed |

| | |
|---|---|
| 2. 95% of supervisors and commanders are trained and certified in stops, searches, and seizures (or scheduled for training, in the case of mid-year reviews). | ☐ Met  ☑ Missed |
| 3. 95% of relevant trainings are reviewed at least once a year. | ☐ Met  ☑ Missed |

*Compliance Assessment*

Policies for training on stops and searches and seizures (GOs 612 and 615) were reviewed and approved by the Monitor's Office and signed into effect by PRPB in March and October 2022, respectively. These policies conform with generally accepted policing practices and constitutional mandates. However, as noted above, training is still behind schedule. PRPB has conducted training on stops and searches only for newly hired officers (Class 232), but no annual in-service training has been conducted in the last two years.

The Monitor's Office has pointed out in paragraphs 62, 63, and 64, that supervisors and commanders have demonstrated a need for training, as they fail to detect and correct arrest reports that lack probable cause documentation and fail to ensure that officers complete all required arrest and search forms, mainly Egress/Ingress (PPR 631.1), Inventory Property (PPR 636.1), Motor Vehicle Inventory (PPR 128), and Consent Search (PPR 612.1).

*Pathway Forward*

In-person scenario-based training is required by paragraph 78, as well as other paragraphs throughout the Agreement. PRPB must ensure that officers of all ranks receive this training so that they understand policy requirements and the practical application of such procedures. PRPB has notified the Monitor's Office that the virtual training system is being evaluated by a private agency and it hopes to re-instate it soon.

# IV. Equal Protection and Non-Discrimination

The review of the documents and data provided to the Monitor's Office during the CMR-7 reporting period continued to demonstrate issues raised by the Monitor's Office in previous CMRs. A review of 79 domestic violence investigations and 45 sexual assault investigations found that PRPB does not document the use of a trauma informed response method, consistently provide domestic violence victims with available resources on support or safety, or follow-up in a timely manner with the victim. The Monitor's Office notes that changes to the manner that police reports are written, use of an investigative checklist, supervisor accountability, and increased training will improve the Commonwealth's compliance with related paragraphs.

Several high-profile events and incidents occurred during the CMR-7 reporting period that have renewed the focus on domestic violence and sexual assault cases, including those involving PRPB members. The Monitor's Office reviewed five related cases and found that PRPB does not follow its policy related to seizing officer weapons and referring the employee to the employee assistance program when a PRPB member is involved. The Monitor's Office also continues to stress that PRPB must be consistent with policy in how it investigates cases involving PRPB members. PRPB should also consider how it assists its officers with dealing with the stressors of the job. The Monitor's Office emphasizes that cases must be accurately investigated and processed in a timely manner to provide transparency and accountability for all parties. The Monitor's Office also recommends that the Commonwealth develop a comprehensive response plan addressing the manner in how it deals with cases involving PRPB members.

Overall, the Commonwealth's compliance with the 21 Equal Protection and Non-Discrimination paragraphs reflect marginal progress in levels of compliance to what was noted in previous CMRs. In CMR-5 29% (7 paragraphs) of the 21 paragraphs assessed were partially compliant and 5% (1 paragraph) was assessed as substantially compliant, in comparison to the current reporting period, where 52% of the 21 paragraphs (11 paragraphs) were found to be partially compliant and 10% (2 paragraphs) were found to be substantially compliant. See figure 5.



*Figure 5. Equal Protection and Non-Discrimination Paragraph Compliance Status*

## Paragraph 80: Equal Protection and Non-Discrimination – General Provisions

*PRPD shall ensure that police services are delivered equitably, respectfully, and free of unlawful bias, in a manner that promotes broad community engagement and supports effective crime prevention. In conducting its activities, PRPD shall ensure that members of the public receive equal protection of the law, without bias based on race, color, ethnicity, national origin, religion, gender, disability, sexual orientation, gender identity, gender expression, or political ideology or affiliation, and in accordance with the rights, privileges, or immunities secured or protected by the Constitution and laws of the United States and the Commonwealth of Puerto Rico.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2021 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: Compliance will be determined on two separate but inter-dependent bases: (1) the implementation of Paragraphs 81 – 100, and (2) the results of outcome assessments, pursuant to Paragraph 243 of the Agreement.

*Compliance Assessment*

In assessing data and documents provided by PRPB, the Monitor's Office noted several areas with significant room for improvement, each of which comes with its own unique challenges. Data and documentation received included case files, staffing logs, regional site visits, and interviews of PRPB personnel. In review of PRPB's compliance with training for the various topics related to this section, the Monitor's Office found that PRPB failed to achieve its training compliance levels at the 95% threshold established by the Agreement. This regression is a result of continued mismanagement of training schedules and priorities, delays in virtual training development, and schedule changes due to the COVID-19 pandemic.

Further, the National Incident Based Reporting System (NIBRS) reporting, hate crime management, and performance evaluations do not have sustaining systems in place to adequately support these processes. However, PRPB has made strides in community outreach regarding immigrant law education. The production and dissemination of a document titled: Foreign Nationals Rights, was distributed during the CMR-7 reporting period and represents a good informational and educational pamphlet for both residents and visitors to Puerto Rico.

When examining PRPB's sexual assault and domestic violence processes, the Monitor's Office found that these processes are not procedurally consistent. While every case is unique, procedures are also noted as unique to the region where it is being reported. For example, varying police report forms are used throughout Puerto Rico. However, PRPB has made great strides with the use of SAFEKIT,

which is a tracking system that allows a victim to check the status of forensic analysis giving the victim some timely information on their case.

*Pathway Forward*

PRPB submitted documents that show its efforts towards compliance. However, due to incomplete documentation, PRPB has not fully demonstrated its capacity to effectively deliver important police responses. PRPB is making the strides needed to develop training and implement practice. Training in both a virtual and face-to-face format is still in development. The implementation of data driven processes to collect and analyze incidents is also in development. Complete investigation reports, program evaluations with documentation of community engagement, NIBRS reporting, hate crime documentation with reporting to the Federal Bureau of Investigation (FBI), and documentation of interactions with transexual or transgender individuals is information that PRPB should provide for assessment to measure compliance.

## 1. General Provisions

PRPB has developed and is continuously updating policies and procedures to better provide direction and accountability. The ability to practice the policies and procedures is directly related to the systems that PRPB must still work on. Systems such as NIBRS reporting, hate crime management, and consistent collection of demographic information, are still in a holding pattern which counteracts PRPB's level of responsibility and effectiveness. PRPB must work on its systems to fully achieve and accurately evaluate its efficacy and demonstrate compliance.

### Paragraph 81: Equal Protection and Non-Discrimination – General Provisions

*PRPD shall develop policies and procedures that comply with applicable law and comport with generally accepted policing practices on bias-free policing; provide training as described in this Agreement; ensure consistent supervision; and hold officers accountable for complying with applicable law and policy.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – September 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies and procedures comply with applicable law and comport with generally accepted policing practices on bias-free policing. | ☑ Met | ☐ Missed |
| 2. Trainings comply with applicable law and comport with generally accepted policing practices on bias- free policing. | ☐ Met | ☑ Missed |

| 3. 95% of reviewed supervisory and field records indicate that officers are supervised consistently. | ☐ Met  ☑ Missed |
|---|---|

Note: The requirement of this Paragraph regarding PRPB's development of policies and procedures that comply with applicable law and comport with generally accepted policing practices on bias-free policing, is assessed together with Paragraphs 87, 88 and 109 of the Agreement.

Note: The requirement of this Paragraph that relates consistent supervision is assessed together with Paragraphs 135 (Supervision and Management), and 140 (Duties of Supervisors).

Note: The requirement of this Paragraph that relates to holding officers accountable for complying with applicable law and policy is assessed together with Paragraph 159 (Civilian Complaints, Internal Investigations, and Discipline).

Note: The requirement of this Paragraph that requires training as described in this Agreement is assessed together with Paragraphs 90, 117 (Training), 118 (Pre- Service Training), 123 (Field Service Training), and 129 (In- Service Training).

## Compliance Assessment

During the CMR-7 reporting period, PRPB provided the Monitor's Office with various policies and procedures related to this paragraph for review, including GO 626 (Interactions with Foreign Nationals), which the Monitor's Office subsequently approved on June 4, 2022. This policy is now available for public dissemination on the PRPB website.

Although PRPB has continued to demonstrate policy compliance, the implementation of these policies has not been fulfilled. Further, training on the courses related to this paragraph and bias-free policing have not been provided to officers during the CMR-7 reporting period and/or during the required training timeframes.

## Pathway Forward

PRPB should identify and mandate the training of all personnel on topics that span a spectrum of generally accepted policing practices on bias-free policing, such as implicit bias and racial profiling. Documents that supervisors are accurately supervising their personnel, such as field notes and fully executed performance evaluation assessments, should also be provided to demonstrate compliance with the implementation of said policies and training.

## Paragraph 82: Equal Protection and Non-Discrimination – General Provisions

*PRPD shall revise its complaint classification policies to effectively capture and track civilian complaints alleging discriminatory policing, even if the complainant does not specifically label the misconduct as such.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2021 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. PRPB classification policies comply with the requirements of the Paragraph. | ☒ Met  ☐ Missed |
| 2. PRPB classifies and tracks allegations of discriminatory policing in accordance with policy and this Paragraph. | ☒ Met  ☐ Missed |
| Note: This Paragraph is assessed with Paragraph 160 (Civilian Complaints) and Paragraph 174 of the Agreement (Complaint Intake, Classification, Assignment, and Tracking). | |

*Compliance Assessment*

PRPB provided documents and evidence, through SARP, that demonstrate how PRPB classifies and maintains a record of discrimination allegations, according to current regulations and policy. PRPB provided a tracking report covering October 2021 through April 2022, which noted a total of 29 cases with discrimination allegations. These reports had the following case data fields: case number, type, date, status date, investigation start date, assigned investigator, disposition, missing information, and source of complaint. This data collection and reporting demonstrates that PRPB properly classifies and tracks allegations of discriminatory policing.

*Pathway Forward*

PRPB should continue to maintain the same level of documentation, which classifies and tracks allegations of discriminatory policing. The Monitor's Office will continue to assess this paragraph to determine if PRPB is correctly classifying and recording discrimination allegations in a comprehensive manner.

## Paragraph 83: Equal Protection and Non-Discrimination – General Provisions

*PRPD shall revise all documentation produced in relation to officer and civilian interactions, including documentation related to arrests, traffic stops, investigatory stops and detentions, searches, property seizures, and civilian complaints, so that it permits officers to accurately record the demographic information of all involved persons, including alleged subjects and victims.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. All documentation produced in relation to officer and civilian interactions permits officers to accurately record the demographic information of all involved persons | ☐ Met  ☒ Missed |
| Note: This Paragraph is assessed with Paragraph 160 (Civilian Complaints) and Paragraph 174 of the Agreement (Complaint Intake, Classification, Assignment, and Tracking). | |

Case 3:12-cv-02039-FAB   Document 2264-1   Filed 12/15/22   Page 114 of 287
*Compliance Assessment*

To demonstrate compliance with this paragraph, PRPB provided the Monitor's Office with a list of forms in GTE, with noted revision dates from May 2015 (Bite Evaluation) to September 2021 (Request for Activations of the Specialized Tactical Divisions). During the CMR-7 reporting period, PRPB submitted an updated traffic stop card for review, which included categories for capturing demographic data. In most of the forms, demographic data is collected in the following manner: last name, mother's last name, legal name, initial, preferred name, age, gender, race, and nationality.

Although, PRPB revised the PPR 126.2 (Compliant Card) to include ethnicity in 2021, PRPB noted that issues with GTE prevented officers from being able to accurately document an individual's race within the form. Subsequent revisions to GTE were made in late summer of 2022 to address this issue and a directive was issued to officers.

For paragraph compliance there is a need for consistency in the collection of demographic data. The Monitor's Office notes that PRPB continues to work on addressing remaining issues in the consistent capture of demographic data, which is reflected in revisions made to the arrest reports and the most recent iteration of the traffic stop card. A review of search warrants and arrests does find that PRPB is capturing demographic data in most cases. However, due to GTE limitations, the data is not searchable. This means that a person must read each report and look for specific data points. Therefore, the use of demographic data for public information purposes is not producible.

The IT Needs Assessment and the work conducted by AHDatalytics, the Commonwealth's contractor, will be helpful in addressing issues in the consistent capturing of this data and the Bureau's ability to aggregate and conduct data analysis.

*Pathway Forward*

To accurately reflect all activity and interactions, PRPB must produce documentation on officer and civilian interactions, arrest documentation, traffic stops, investigatory stops and detentions, searches, property seizures, and civilian complaints, in a way that permits officers to accurately record the demographic information of all involved persons, including alleged subjects and victims. These data fields should include name, age, gender, race, nationality, and ethnicity. Further, PRPB must establish systems that will allow it to aggregate and conduct data analysis. The ability to conduct such analysis will not only be imperative to informing and improving operations, but also serve to improve transparency with the public.

## Paragraph 84: Equal Protection and Non-Discrimination – General Provisions

*PRPD shall incorporate concrete requirements regarding bias-free policing and equal protection into its hiring, promotion, and performance assessment processes, including giving significant weight to an individual's documented history of bias-free policing. PRPD will comply with the non-discrimination requirements of Title VII of the Civil Rights Act of 1964, as amended.*

| Compliance Status | Assessment Schedule |
|---|---|

| Partially Compliant | | Review Period | April 2022 – September 2022 |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually for Data Sources #3, #4, and #11. Annually for the other Data Sources. |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. PRPB policies and procedures regarding hiring process comply with the requirements of the Paragraph. | ☑ Met   ☐ Missed |
| 2. Hiring process trainings are consistent with bias-free policing and equal protection provisions of approved policies. | ☐ Met   ☑ Missed |
| 3. 95% of sampled personnel are trained and certified in all policies related to the civilian complaint program (or scheduled for training, in the case of mid-year reviews). | ☐ Met   ☑ Missed |
| 4. 95% of reviewed candidates were selected consistent with approved policies regarding bias-free policing and equal protection. | ☐ Met   ☑ Missed |
| 5. PRPB policies and procedures regarding promotion assessment process comply with the requirements of the Paragraph. | ☑ Met   ☐ Missed |
| 6. Promotion assessment trainings are consistent with bias-free policing and equal protection provisions of approved policies. | ☐ Met   ☐ Missed |
| 7. 95% of sampled personnel are trained and certified in all policies related to the civilian complaint program (or scheduled for training, in the case of mid-year reviews). | ☐ Met   ☑ Missed |
| 8. 95% of the reviewed promotions were awarded consistent with approved policies regarding bias-free policing and equal protection. | ☐ Met   ☐ Missed |
| 9. PRPB policies and procedures regarding performance assessment comply with the requirements of the Paragraph. | ☐ Met   ☑ Missed |
| 10. Performance assessment trainings are consistent with bias-free policing and equal protection provisions of approved policies. | ☐ Met   ☑ Missed |
| 11. 95% of sampled personnel are trained and certified in all policies related to performance evaluations (or scheduled for training, in the case of mid-year reviews). | ☐ Met   ☑ Missed |
| 12. 95% of performance evaluations reviewed are consistent with approved policies regarding bias-free policing and equal protection. | ☐ Met   ☑ Missed |
| Note: The requirement of this Paragraph that require PRPB to incorporate bias-free policing and equal protection into its hiring practices is assessed together with Paragraph 104 (Hiring Reforms). | |
| Note: The requirement of this Paragraph that requires PRPB to incorporate bias-free policing and equal protection in its performance assessment process is assessed together with Paragraph 145 (Performance Evaluation). | |
| Note: The requirement of this Paragraph that requires PRPB to incorporate bias-free policing and equal protection in its promotion assessment process is assessed together with Paragraph 14 (Promotions). | |

*Compliance Assessment*

As noted in previous CMRs, the Monitor's Office finds that the policies and procedures last approved comply with the requirements of this paragraph. PRPB has since revised various policies, such as GO 310 (Performance Evaluations) and those related to promotions, both of which are still in the development process. Further, training on these revised policies needs to be updated to incorporate revisions. After reviewing performance evaluations conducted during the CMR-7 reporting period, the Monitor's Office cannot report that personnel evaluations are conducted in a manner consistent with approved policies regarding bias-free policing and equal protection.

Training and refresher training on the requirements of this paragraph and its related compliance targets is not compliant due to poor management of training schedules and residual delays because of the COVID-19 pandemic.

The Plan to implement the 2018 Staffing Plan is also underway, which will affect promotions, and as such the related promotional processes have not yet been conducted. Because of this, compliance targets 6 and 8 are deferred. During the CMR-7 reporting period, PRPB produced various policies related to promotions such as, GO 504 (Board of Promotional Assessments), which were approved by the Monitor's Office. In previously conducted reviews of the promotion assessment trainings provided to personnel involved in the boards or committees evaluating candidates for promotion, the Monitor's Office found that such trainings are consistent with bias-free policing and equal protection provisions of approved policies.

In review of the hiring process, the Monitor's Office found that hiring process trainings previously reviewed and approved are consistent with bias-free policing and equal protection provisions of approved policies. In examining candidate files for those that were selected, the Monitor's Office found that the selection process was consistent with approved policies regarding bias-free policing and equal protection.

*Pathway Forward*

PRPB must conduct timely training on the topics required by this paragraph; continued failure in conducting this training will stall PRPB's compliance. The Monitor's Office looks forward to reviewing the implemented promotional processes as part of the Plan and the finalization of policies related to the performance evaluation process. Supervisory training on the revised performance evaluation process will be key to the implementation of these policies and improved evaluation quality.

## Paragraph 85: Equal Protection and Non-Discrimination - General Provisions

*PRPD shall use the National Incident Based Reporting System ("NIBRS") to collect and report crime data.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |

| Training: | Not Implemented | Assessment Frequency | Annually for Compliance Targets #1, #2, and #4. Bi-annually for all other Compliance Targets. |
|---|---|---|---|
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies, procedures, and forms/modules incorporate the requirements of the Paragraph. | ☐ Met | ☑ Missed |
| 2. NIBRS training are consistent with approved policies and procedures. | ☐ Met | ☑ Missed |
| 3. 95% of sampled PRPB members are trained and certified in NIBRS. | ☐ Met | ☑ Missed |
| 4. PRPB is using the NIBRS to collect and report crime data. | ☐ Met | ☑ Missed |

*Compliance Assessment*

For target 1, PRPB reports it is still working on the procedures and forms/modules of NIBRS. PRPB reports that they are making changes to PPR 621.1 (Complaint Card) to match the requirements of the NIBRS technical manual and that the updated version will be provided to the Monitor's Office for review. PRPB is also working with the FBI to confirm that the changes they are making to the form are correct. For target 2, the Monitor's Office requested the NIBRS training curriculum but did not receive it. In review of compliance target 3, the Monitor's Office found that PRPB provides NIBRS training to cadets at the Academy; however, the entire organization has not received NIBRS training. The in-service REA training was on the schedule for this year but has not been conducted. Training coordinators in the field note that they were still waiting on the training material from the Academy to start this training.

PRPB has neither instituted NIBRS reporting nor submitted any documentation demonstrating that PRPB personnel are trained or certified in NIBRS. The Monitor's Office did review a revised NIBRS Manual during the CMR-7 reporting period and provided PRPB with revisions. Training on the updated NIBRS Manual has not been developed.

*Pathway Forward*

PRPB must continue to develop the NIBRS system, including training: one-time initial training for existing personnel, continuing training for each class of recruits, and periodic training when Commonwealth law or NIBRS is modified. PRPB must provide the budget and staff allocation for the associated NIBRS training and certification of personnel, and support to sustain NIBRS reporting. PRPB must address the staffing shortages that have extended the timeline to make changes to the forms and necessary changes to the systems, including CAD and GTE. Further, the Monitor's Office also recommends that the Commonwealth conduct public outreach to inform the public about changes that are forthcoming in PRPB's transition to NIBRS.

## Paragraph 86: Equal Protection and Non-Discrimination - General Provisions

*PRPD shall collect accurate and reliable data on hate crimes on an ongoing basis and shall submit the data to the Federal Bureau of Investigation ("FBI") for analysis and publication in the FBI's Hate Crimes Statistics report in accordance with FBI submission requirements.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | Assessment Frequency | Bi-annually for Compliance Target #3. Annually for all other Compliance Targets. |
| Training: | Not Implemented | | |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies on criminal investigations incorporate all of the requirements of this Paragraph. | ☑ Met | ☐ Missed |
| 2. Criminal investigation trainings are consistent with approved policies. | ☐ Met | ☑ Missed |
| 3. 95% of sampled personnel are trained and certified in all policies related to identifying, collecting, and reporting hate crimes (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 4. PRPB notifies the FBI of all identified instances of hate crimes. | ☐ Met | ☑ Missed |
| 5. 95% of investigations of hate crimes accurately identify and report hate crimes. | ☐ Met | ☑ Missed |

Note: The requirement of this Paragraph that requires PRPB to track hate crimes on an ongoing basis is assessed together with Paragraph 85.

*Compliance Assessment*

PRPB has not demonstrated training compliance at the 95% threshold during the CMR-7 reporting period. In assessing whether 95% of sampled personnel are trained and certified on all policies related to identifying, collecting, and reporting hate crimes (or scheduled for training, in the case of mid-year reviews), PRPB did not provide information for VICO 3081 (Hate Crime Training) so the Monitor's Office was unable to evaluate training compliance for the CMR-7 reporting period. No documentation was received on criminal investigation trainings, and no documentation of hate crime notification to the FBI was received. PRPB continues to lag in this area of the Agreement. PRPB has a policy (GO 630 Identification of Hate Crimes and/or Incidents) and Manual on Hate Crime Classification, which the Monitor's Office reviewed in March 2022. This policy contains the indicators of a hate crime and provides officers with the elements of how to classify a hate crime. Training and implementation of this policy has not been conducted or executed.

PRPB submitted a memo reporting that between October 1, 2021, through March 31, 2022, that PRPB had no crimes classified as hate crimes. The Monitor's Office questions whether this is accurate given that training has not been delivered. It is not clear if there really were no crimes to report, or if there is a lack of awareness, understanding, and subsequent supervisor responsibility of reporting such crimes. This is an area of significant development PRPB must undertake to fully understand hate crime reporting, investigations, and appropriate response.

118

*Pathway Forward*

PRPB remains stagnant in progress regarding hate crime management. It is imperative that the Monitor's Office receive and review the curriculum for VICO 3081 (Hate Crime Training). This will help ensure that officers are trained to accurately assess cases to determine if the matter is a hate crime. Additionally, it is essential that supervisors attend trainings to assist officers in hate crime investigations and assessments. Officers without thorough hate crime investigation training can miss the details of a hate crime case and may misreport the matter. Supervisors are the next level of assessment and accountability in these matters and should also receive training on hate crime investigations. PRPB has a responsibility to better manage hate crimes, and it starts with training. With training, PRPB personnel will better understand the specific tenets of hate crimes and will classify crimes as such.

## 2. Discriminatory Policing

PRPB is making progress in this area and is now demonstrating its achievement in the delivery of programs, initiatives, and activities in a nondiscriminatory manner. Areas that PRPB still needs to address are the assessment of programs, delivery of training requirements to personnel, and juvenile institution cases. A notable step forward during the CMR-7 reporting period is PRPB's brochure for Foreign Nationals Rights, which contains helpful information for non-residents of Puerto Rico. This resource is available for public dissemination.

### Paragraph 87: Equal Protection and Non-Discrimination – Discriminatory Policing

*PRPD shall apply and administer all programs, initiatives, and activities without discriminating based on race, color, ethnicity, national origin, religion, gender, disability, sexual orientation, gender identity, gender expression, or political ideology or affiliation. PRPD shall develop policies and practices to prohibit selective enforcement or non-enforcement of the law based on these characteristics. These policies and practices shall comply with applicable law and comport with generally accepted policing practice.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. 95% of PRPB programs, initiatives, and activities conform to the requirements of the Paragraph. | ☐ Met | ☒ Missed |
| 2. 95% of selected PRPB programs, initiatives, and activities are consistent with approved policies regarding bias-free policing and equal protection. | ☒ Met | ☐ Missed |

119

Note: The section of this Paragraph that requires PRPB to develop policies and practices to conform to the requirements of this Paragraph is assessed together with Paragraphs 81, 88, and 109 (Policies and Procedures).

*Compliance Assessment*

PRPB submitted documentation of 127 programs, initiatives, and activities related to this paragraph for review compared to 58 in CMR-5. The work plans covered 11 regions of Puerto Rico. The nature of the programs submitted for review were business inspections, weekend workplans, workplans for recruiting diverse workforce, and security measures in the home. The supporting documentation of program activities included a detailed report of the purpose/mission, execution, external coordination, methodology of actions, general provisions, special provisions, specific provisions, and findings of the inspections. PRPB provided agendas, sign-in sheets, and photographs of events, which verifies PRPB's community outreach and services in a non-discriminatory manner.

A great accomplishment noted in CMR-7 is PRPB's publication of the brochure for Foreign Nationals Rights. The brochure is a tremendous publication providing information on rights of visitors to Puerto Rico, sexual assault, and domestic violence resources.

Although these efforts are laudable, further work is needed to demonstrate that all PRPB programs conform to the requirements of this paragraph. Data on programs, activities, and initiatives such as stops that do not result in citations and arrests and interactions with persons in crisis, are not being comprehensively collected.[14] As such it is difficult for the Monitor's Office to comprehensively assess that PRPB is applying and administering all programs, initiatives, and activities without discriminating based on race, color, ethnicity, national origin, religion, gender, disability, sexual orientation, gender identity, gender expression, or political ideology or affiliation.

*Pathway Forward*

PRPB is making great strides on bias-free policing and equal protection programs, initiatives, and activities as created and coordinated by the Community Engagement Division. As noted above, further work is needed to improve PRPB's data quality and capacity to conduct analysis. These improvements will allow PRPB and the Monitor's Office to assess whether its activities are being carried out in accordance with this paragraph and other related paragraphs, i.e., paragraph 91. A review of a diverse sampling of programs will be conducted in future CMRs to determine continued compliance with this paragraph. The Monitor's Office will also work with PRPB to determine what programs, initiatives, and activities should be assessed as part of this paragraph.

## Paragraph 88: Equal Protection and Non-Discrimination – Discriminatory Policing

*PRPD shall develop policies to provide all individuals within the Commonwealth with police services in a non-discriminatory fashion to build and preserve trust among community members and more effectively prevent and solve crime. As part of these efforts, PRPD shall seek the assistance of community advocates in widely disseminating to the public its written policies on immigration-related laws.*

| Compliance Status | Assessment Schedule |
|---|---|

---

[14] See the UOF and Searches and Seizures sections for additional detail.

| Partially Compliant | | Review Period | April 2022 – September 2022 |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually as to Data Sources #1, #2 and #4. Bi-annually for the remaining Data |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. PRPB policies complied with the requirements of the Paragraph. | ☒ Met | ☐ Missed |
| 2. Trainings on discrimination free policing are consistent with approved policies. | ☐ Met | ☒ Missed |
| 3. 95% of sampled PRPB members are trained and certified in discrimination free policing. | ☐ Met | ☒ Missed |
| 4. Pertinent policies on pertinent immigration-related law were widely disseminated to the public. | ☒ Met | ☐ Missed |
| Note: This Paragraph is assessed together with Paragraphs 81, 87, and 109 (Policies and Procedures). | | |

### Compliance Assessment

PRPB has a community-oriented policy that addresses the components of this paragraph; however, full implementation has not been achieved. Training has yet to be delivered. In reviewing IGPD 5011 (Multi-themed Equal Protection and Non-Discrimination) PRPB dipped below the 95% training threshold.

The Monitor's Office held meetings with consulates of the Dominican Republic and Mexico to discuss policies on pertinent immigration related laws. The Dominican Republic consulate expressed that the relationship with PRPB has generally been positive. Approximately 10% of the Puerto Rican population is from the Dominican Republic, and the consulate is participating in meetings to discuss recruitment of officers from the Dominican community. PRPB has reached out to the consulate to establish a better relationship with the community resulting in improved police interactions. One issue to address is the process of calling the consulate when a detainee is a person of Dominican nationality. Per GO 626 (Intervention with Foreign Persons), PRPB is to notify the consulate within 36-hours. Most often it is still the family member of those detained that call the consulate.

The Mexico consulate reports that between 8,000-10,000 Mexican nationals live in Puerto Rico. It is requested that PRPB conduct a more inclusive and diverse recruitment of police officers, (with hopefully some representation of the migrant community), and to better train its officers to avoid any violation of civil rights of Mexican community members in Puerto Rico. The Consular Corps in Puerto Rico has been working closely with Commissioner López and Secretary Torres to develop a better relationship with PRPB. They have even been invited to address cadets at the Academy to present the needs and concerns of those communities they represent. Overall, a cooperative relationship exists between the Consulate Corp and PRPB, with includes dissemination of immigrant related law updates, such as the meeting that took place Thursday, June 9, 2022, at the Casa Dominicana. The goal was to fulfill the Agreement of PRPB through the dissemination of policies on immigration matters and the progress of the Reform. The

121

agenda and sign-in sheet with names and contact information of the attendees were submitted and reviewed by the Monitor's Office.

PRPB has posted four immigration law related policies on the Virtual Library, including the criteria for when a PRPB member intervenes with a foreign person with limited command of Spanish, the countries compulsory notification list, consulate notification process, and PPR 626.1 (Notice to Consulate for Reason for Arrest or Detention). These forms are available in 21 different languages.

### Pathway Forward

PRPB should update training schedules in all areas to achieve the delivery of course IGPD 5011 (Multi-themed Equal Protection and Non-Discrimination) at the 95% threshold. To achieve substantial compliance PRPB should continue the educational effort regarding the Reform and its implications to the community. This can be achieved with expanding its community outreach efforts. PRPB officers should also have knowledge regarding laws involving foreign nationals and diplomatic matters. PRPB should actively recruit a diverse workforce to better serve Puerto Rico.

### Paragraph 89: Equal Protection and Non-Discrimination - Discriminatory Policing

*PRPD shall develop a specific policy to guide officers' interactions with transgender or transsexual individuals that addresses gender identification, gender expression, transportation, processing, housing, and medical treatment.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually for Compliance Targets #1 and #2. Bi-annually for all other Compliance Targets. |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. PRPB policies guide officer interactions with transgender or transsexual individuals as required by the Paragraph. | ☑ Met | ☐ Missed |
| 2. PRPB trainings on interactions with transgender or transsexual individuals are consistent with approved policies. | ☐ Met | ☑ Missed |
| 3. 95% of sampled PRPB members are trained and certified in policies regarding interactions with transgender or transsexual individuals. | ☐ Met | ☑ Missed |
| 4. 95% of reviewed PRPB reports suggest compliance with PRPB policies regarding interactions with transgender or transsexual individuals. | ☑ Met | ☐ Missed |

### Compliance Assessment

The Monitor's Office reviewed and approved GO 624 (Interactions with Transgender and Transexual Persons). The Monitor's Office has yet to receive the REA 624 (Interactions with Transgender and

122

Transsexual Individuals) training curriculum for review and PRPB has yet to achieve the 95% training threshold.

The Monitor's Office only received 3 cases for review regarding PRPB's interactions with transgender or transsexual individuals, which met the compliance standard, in comparison to CMR-6 where 18 PRPB reports were reviewed and met the compliance standard. For example, an arrest of a transgender individual, the Prison Rape Elimination Act (PREA) assessment form and the PREA guidance sheet that explains how the arrestee can report sexual misconduct, were found in the reports. The Monitor's Office also found the required forms in a domestic violence case of a transgender individual, including the domestic violence services document, Form C, the escape plan document, Form D, and the Counseling for Victim of Domestic Violence form. Each form was signed by a PRPB member and the victim.

*Pathway Forward*

PRPB should continue interacting with transgender and transexual individuals in the manner required by GO 624 (Interactions with Transgender and Transexual Individuals). For PRPB to measure policy quality and member interactions, the collection of gender identification, gender expression, transportation, processing, housing, and medical treatment are important performance measures to collect and analyze. These data fields are usually collected on the police report and should be analyzed to measure effectiveness and address any policy updates.

PRPB must also provide the training curricula to the Monitor's Office for review and move forward with conducting training after this curriculum has been reviewed and approved.

## Paragraph 90: Equal Protection and Non-Discrimination - Discriminatory Policing

*PRPD shall provide all PRPD officers with training on biased-free policing at least every two years for the first four years of this Agreement, and annually thereafter. PRPD shall also provide training on biased-free policing as necessary, based on developments in applicable law and PRPD policy. PRPD's training program shall include the following topics:*

*a) PRPD policies and requirements in this Agreement regarding biased-free policing;*

*b) community perspectives of discriminatory policing;*

*c) constitutional and other legal requirements related to equal protection and unlawful discrimination;*

*d) the protection of civil rights as a central part of the police mission;*

*e) arbitrary classifications and stereotyping based on age, race, color, ethnicity, national origin, religion, gender, disability, sexual orientation, gender identity, gender expression and political ideology or affiliation;*

*f) interacting with diverse populations, including persons who are homeless and economically disadvantaged;*

*g) identification of key decision points where prohibited discrimination can take effect at both the incident and operational planning levels;*

*h) methods, strategies, and techniques to reduce misunderstanding, conflict, and complaints due to perceived bias or discrimination, including community-oriented policing strategies; and*

*i) comprehensive testing that shows complete understanding of rules and regulations.*

| Compliance Status | Assessment Schedule |
|---|---|

| Not Compliant | | Review Period | April 2022 – September 2022 |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually for Compliance Target #5. Annually for all other Compliance Targets. |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. PRPB trainings on discrimination free policing are consistent with the requirements of the Paragraph. | ☐ Met | ☑ Missed |
| 2. 95% of reviewed training records complied with the training frequency requirements of the Paragraph. | ☐ Met | ☑ Missed |
| 3. 95% of reviewed training curriculums complied with the content requirements of the Paragraph. | ☐ Met | ☑ Missed |
| 4. Tests accurately assess an understanding of rules and regulations related biased-free policing. | ☐ Met | ☑ Missed |
| 5. 95% of sampled PRPB members are trained and certified in bias-free policing. | ☐ Met | ☑ Missed |

Note: This Paragraph is assessed together with Paragraph 81 and 117 (Training).

### Compliance Assessment

In June 2022, the Monitor's Office observed the delivery of IGDP 5011 (Multi-thematic Equal Protection and Non-Discrimination) in Aguadilla, and found the training to follow policy, guided with learning objectives, and engaging; however, the Monitor's Office found that PRPB did not achieve the 95% training threshold. The Monitor's Office found target 3 to be missed. The Monitor's Office has previously asked that PRPB identify the training course(s) it provides specific to bias-free policing but has yet to receive it other than the course noted above. Bias-free policing training is much more expansive and includes aspects and principles related to community engagement, procedural justice, and impartial policing. PRPB has not identified, or developed, any additional courses to formulate a bias-free policing curriculum block.

### Pathway Forward

PRPB must develop initial bias-free training, which is essential in certifying that PRPB officers understand all points associated with this paragraph. The policy is one piece and associated follow up training is essential to implementation of bias-free policing practices and processes. Training on implicit bias, racial profiling, de-escalation, and communication skills are some course development topics that PRPB should design for officers to be better equipped in their engagement with diverse communities.

## Paragraph 91: Equal Protection and Non-Discrimination – Discriminatory Policing

*PRPD shall assess its operational programs, initiatives, and activities at least every two years to ensure that they are applied or administered in a manner that guarantees equal protection. As part of its assessment, PRPD shall specifically include an assessment of use of force, motor vehicle and pedestrian stops, arrests, and deployment of STUs. PRPD shall also assess its operations and tactics as part of regulatory inspections, assistance to*

124

*regulatory agencies, and covert vice activities. PRPD shall base its assessment of programs, initiatives, and activities on accurate, complete, and reliable data, including data contained in the EIS, stop and detention data, use of force analyses, and operational planning and after-action reports. PRPD shall make this assessment publicly available.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2021 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. 95% of reviewed programs, initiatives, and activities were assessed by PRPB at least every two years. | ☐ Met | ☑ Missed |
| 2. 95% of reviewed assessments conducted by PRPB included an assessment of use of force, motor vehicle and pedestrian stops, arrests, and deployment of STUs, operations and tactics as part of regulatory inspections, assistance to regulatory agencies, and covert vice activities. | ☐ Met | ☑ Missed |
| 3. 95% of reviewed assessments of program initiatives and activities were based on accurate, complete, and reliable data, as required by the Paragraph. | ☐ Met | ☑ Missed |
| 4. 95% of reviewed assessments were made publicly available by PRPB. | ☐ Met | ☑ Missed |

Note: The section of this Paragraph that requires reliance on PRPB assessment of programs, initiatives, and activities on accurate, complete, and reliable data is assessed together with Paragraph 219 (Information Systems and Technology) and 148 (Early Intervention System) as to Use of Force.

Note: The section of this Paragraph that requires that operational programs, initiatives, and activities be reviewed every two years and be made publicly available, shall be assessed together with Paragraph 113 (Policies and Procedures).

### Compliance Assessment

This paragraph did not achieve any progress during the CMR-7 reporting period. The last noted update to this paragraph was a PRPB memo dated September 30, 2021, which noted that it is working on the above requirements of this paragraph and will be working with OSM on an assessment work plan. PRPB has been modifying forms to include demographic data that paragraph 91 requires for the evaluation of PRPB programs. This will allow all forms used by police officers to document and collect demographic data of the person who received the service. Additionally, PRPB will use this information to evaluate and monitor that services are not offered in a discriminatory manner.

PRPB has also prepared a form so that every PRPB member documents a police interaction and collects the person's demographic information. PRPB is working with the Department of Transportation and Public Works (DTOP) to use the demographic information it collects in traffic related police interactions. PRPB plans for the form to be completed electronically.

During the CMR-7 reporting period PRPB provided documentation on 26 programs/activities. These programs and activities included *Café Con Mis Policias* (Coffee with My Cop), memorials and ceremonies, community meetings, and health fairs. While these activities are to be applauded, more data is needed to assess compliance. Further, this paragraph requires that PRPB assess the effectiveness of these activities by conducting an analysis of the data. This was not completed nor was the two-year program assessment report; therefore, PRPB is not compliant.

*Pathway Forward*

PRPB should continue the development of this process to avail itself of evaluation data to ensure that all police activities and interactions with citizens are applied or administered in a manner that guarantees equal protection. The data must be accurate, complete, and reliable. The effectiveness of programs can be measured with program surveys, follow-up interviews, or focus groups. The goal of delivering programs is commended; however, if PRPB does not assess whether the systems met the needs, the program cannot sustain service demands. This paragraph requires the assessment of relevant programs, initiatives, and activities to be conducted every two years. This is more than just reporting the activities that have been delivered. After each event, a delivery assessment should be conducted to evaluate the quality of the work completed.

### Paragraph 92: Equal Protection and Non-Discrimination - Discriminatory Policing

*Within five business days, PRPD shall prepare and provide to PRDOJ and the Puerto Rico Department of the Family the preliminary investigation report prepared in response to each allegation of abuse and mistreatment originating in secure juvenile correctional facilities. Such allegations include physical and mental abuse, juvenile on juvenile assaults, staff on juvenile abuse, and excessive use of force by staff.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. All allegations of abuse and mistreatment originating in secure correctional facilities are timely reported to the PRDOJ and the PR Department of the Family. | ☐ Met | ☑ Missed |

*Compliance Assessment*

PRPB submitted three cases to the Monitor's Office for review during the CMR-7 reporting period to determine if PRPB reports cases to PRDOJ and the Puerto Rico Department of Family (PRDoF) within five business days as required. PRPB reports categorized these reports as attempted suicide, assault, and intimidation. The report used to document the date of referral to PRDOJ and PRDoF is PPR 622.1 (Investigative Report), which is in the investigative file. There are specific fields within the report to

126

document the proper referral. In three reports, these fields were crossed out and no information or referral date was noted. No notation was made with a date on referral to PRDOJ and PRDoF; therefore, PRPB is not compliant. PRPB must prioritize and complete this critical assessment process with accuracy within the outlined timeframes to meet the specific targets of this paragraph.
PRPB submitted documentation that does not appear to be related to the specifics of this paragraph. As a training note, the PowerPoint highlights this paragraph as the reason for the use of homicide investigation forms, which should be corrected.

*Pathway Forward*
PRPB is reminded again, as noted previously in CMR-5, that it must certify the total number of cases and validate that report fields noting date and time of case referral to PRDOJ and PRDoF are completed. PRPB documentation of cases forwarded to other agencies and departments is important to the procedural processes of the juvenile system. It is recommended that a category noting referral date to PRDOJ and PRDoF be added to the body of the monthly statistical report (Preliminary Investigations of Complaints of Institutional Abuse). It is also important that PRPB follow specific timelines in the investigative processes of these types of cases. All cases should have status updates on the progress of the investigation. These updates should be completed every 30 days and included in the file to acknowledge how the investigation is progressing and to assist with identification of any backlog. This is a generally accepted policing practice. Regular status updates identify the promptness of the investigation and any barriers that need to be addressed. PRPB could benefit in establishing recurring meetings between PRPB and the Juvenile Facilities Director. Professional and transparent communication lines are essential to consultation, especially on the status of cases. Further, it is recommended that an agenda and meeting notes between the stakeholders be maintained. This will assist with information sharing, timelines, and responsiveness and be informative to both the Monitors in the police reform and the Monitors on the Juvenile Facilities reform.

## 3. Sexual Assault and Domestic Violence

PRPB's compliance with the paragraphs in this subsection remain the same as was reported in prior CMRs. Improvements to its processes relating to protecting victims of sexual assault and domestic violence, systems to track and collect dispositions, and the application of a victim centered approach in investigations, are necessary. Further, as was noted in other sections, many of the personnel, unit specific included, are lacking the required training. Shortages in staff have also resulted in high caseloads among investigators, which has impacted the overall way investigations are conducted and in inconsistences in the investigatory files and folders. Turnover of leadership in both the Domestic Violence and Sexual Assault Investigation Units have also resulted in knowledge and process gaps. With no transition period between leadership, little to no information, including the initiatives and recommendations shared by USDOJ and the Monitor's Office to improve processes, appears to have been shared with new leadership. Irrespective, it is unclear the extent to which these recommendations were seriously considered prior to the leadership change.

PRPB and the Commonwealth need to increase their commitment to addressing the issues continuously noted in these CMRs. As highlighted by recent high-profile incidents of gender-based

violence and domestic violence incidents involving PRPB personnel, addressing the improvements noted within the following paragraphs is even more imperative.

## Paragraph 93: Equal Protection and Non-Discrimination - Sexual Assault and Domestic Violence

*PRPD shall respond to and investigate reports of sexual assault and domestic violence professionally, effectively, and in a manner free of gender-based bias. PRPD shall appropriately classify and investigate reports of sexual assault and domestic violence, collaborate closely with community stakeholders, and apply a victim-centered approach at every stage of its response. PRPD shall develop policies and procedures on responding to sexual assault and domestic violence, including incidents involving PRPD officers, that comply with applicable law and comport with generally accepted policing practices.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually for Compliance Targets #1, #2, and #4. Bi-annually for the remaining Compliance Targets. |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | Met | Missed |
|---|---|---|
| 1. Reviewed policies and procedures on responding to sexual assault and domestic violence comply with applicable law and generally accepted policing practices. | ☑ Met | ☐ Missed |
| 2. Trainings on responding to sexual assault and domestic violence are consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled PRPB members are trained and certified in responding to sexual assault and domestic violence consistent with approved policies. | ☐ Met | ☑ Missed |
| 4. 95% of reviewed sexual assault and domestic violence investigations complied with requirements of the Paragraph. | ☐ Met | ☑ Missed |

Note: This Paragraph is assessed together with Paragraphs 94, 98 and 99.

### *Compliance Assessment*

The Monitor's Office reviewed and approved GO 118 (Domestic Violence Division) in August 2021. The Monitor's Office also observed REA 627R (Domestic Violence re-training) and found the course delivered substantive learning objectives on domestic violence, such as identification, reporting, interviewing techniques, supporting resources/agency assistance, and follow-up techniques. The course was found to be consistent with the approved policy; however, the Monitor's Office found that 95% of sampled PRPB members are not trained and certified in responding to sexual assault and domestic violence, including REA 627 (Domestic Violence Incident Investigations), REA 627R (Domestic Violence Incident Investigations re-training), and REA 622 (Sexual Crimes Training). Training on REA 627R is scheduled through February 2023 and PRPB's compliance with this re-training and others will be assessed again during the next reporting period.

Interviews conducted with sexual assault and domestic violence investigators signified that agents understand the importance of a trauma informed, victim-centered approach in investigative processes and procedures. Supervisors of the units interviewed stated that there are two main issues of concern: lack of adequate office space to conduct confidential interviewing and the unilateral decision by commanders to not allow civilian clothing to be worn by investigative officers. Due to the lack of interview rooms the victim is sometimes interviewed in an area that is not conducive to gathering personal or case supporting information. In regard to the uniform change, lieutenants stated that there are some occasions where it is helpful to interview a victim while the officer wears civilian clothing. It helps establish a better interviewing experience for the victim and civilian clothing presents the officer in a neutral position.

PRPB officers assigned to units like sexual assault and domestic violence should understand the complexities of such investigations. PRPB officers need to improve investigation procedures.

During the CMR-7 reporting period, there were 1,054 domestic violence investigations and 149 sexual assault investigations. Of these the Monitor's Office randomly selected and reviewed 79 and 45 cases respectively. In the review of the 79 domestic violence cases, PRPB has a 52% compliance level in the overall manner it investigates domestic violence cases as required by the Agreement. A contributing factor to this outcome is the high caseloads for investigators. The average caseload as reported by supervisors is 40 to 50 cases per month. Specifically, less than 30% have a documented victim centered approach. Only 40% provided the victim with next step information or resources. However, in 91% of cases, PRPB does initially take the case report information in a sufficient manner that provides the investigative unit key information.

In review of sexual assault cases, PRPB has a 57% level of compliance in the overall manner it investigates sexual assault cases. Again, it is noted that a contributing factor is the high caseload. Investigators average 25-30 sexual assault cases per month. Specifically, 88% of the cases did not document a victim centered approach. However, in 91% of cases PRPB did provide the victim with next steps and resource information.

PRPB could benefit greatly in examining guidelines from The International Association of Chiefs of Police (IACP) case management recommendations for sexual assault and domestic violence cases.[15]

*Pathway Forward*
It is re-emphasized that PRPB must continue to make progress in the delivery of its domestic violence and sexual assault training to PRPB personnel. This provides for steadiness and competence in the initial response to such calls for service. PRPB must continue to deliver the training opportunities, resources, and support needed to effectively respond to these types of crimes. The authorization of investigative techniques, such as civilian clothing, should be sanctioned on an as needed basis by the unit supervisor. Supervisor review of domestic violence cases is essential to making sure that call takers and reporting officers are accurately taking the information needed in each case. Additional investigative personnel would also help with high caseloads. Assessment of the appropriate staffing levels according to the

---

[15] https://www.theiacp.org/sites/default/files/all/s/SexualAssaultGuidelines.pdf

caseloads should be included as part of PRPB's efforts to implement the Plan. Additionally, following an accurate case management process could assist in the timelines on these cases.

## Paragraph 94: Equal Protection and Non-Discrimination - Sexual Assault and Domestic Violence

*PRPD's sexual assault policies and procedures shall provide clear and detailed guidelines for each stage of PRPD's response to a reported sexual assault, including (a) dispatch response; (b) initial officer response; (c) initial and follow-up victim interviews; and (d) on-scene and follow-up investigation. These protocols shall be based on recognized models and guidelines on forensic examinations, such as, for example, the National Protocol for Sexual Assault Medical Forensic Examinations issued by DOJ's Office of Violence Against Women.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2021 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. PRPD's sexual assault policies and procedures comply with the requirements of the Paragraph. | ☑ Met | ☐ Missed |
| 2. 95% of reviewed sexual assault investigations complied with requirements of the Paragraph. | ☐ Met | ☑ Missed |

Note: This Paragraph is assessed together with Paragraphs 93, 98 and 99.

### *Compliance Assessment*

In the CMR-7 reporting period, a review of case files found inconsistent file folders and forms. The files were disorganized and randomly put together. The depth of detail and interview techniques in cases was inconsistent. Some interviews were handwritten by the victim and others were transcribed by the officer. There was no noted follow-up on corroborating evidence when the victim stated being stalked or harassed. Even when the victim shared additional crimes, there appeared to be no follow-up. The case was investigated only on the case elements that were reported. If the victim did not cooperate with the officer and did not express wanting to file charges, the case was immediately closed, and no follow-up was conducted. These are issues that have been continuously noted by the Monitor's Office in previous CMRs.

Further, the Monitor's Office was made aware that when the case is ready to be presented to the prosecutor, a meeting is scheduled for the victim and the investigator to meet with the prosecutor. If the victim does not show up, the case is dismissed, which is highly concerning. The Monitor's Office will follow up to fully understand the implications of such a determination, but this is concerning due to the nature of these cases.

130

The interview techniques used by PRPB in these cases is also in need of a victim-centered approach. This includes aiding the victim with the support of an advocate, which is not currently noted in PRPB case files. Training on how to interview the victim, suspect(s), and outcry witnesses was not submitted to the Monitor's Office for review.

Some files had supervisor approval and signed documentation that the supervisor approved the report. This is a good measure to keep in place and provides accountability to supervisors for follow-up and report thoroughness.

During the CMR-7 reporting period PRPB did make strides with the use of SAFEKIT, which is a rape kit tracking system. The victim can follow the stages of the kit analysis online from collection at the hospital, to pick up by law enforcement, to delivery to the crime lab for analysis, and back to law enforcement. The sexual assault supervisors interviewed during this reporting period stated that this new process helps build trust and provides transparency in sexual assault investigations.

Interviews and meetings with PRPB sergeants and lieutenants in the domestic violence and sexual assault units found that they were not aware of an investigative process assessment conducted by USDOJ's subject matter expert. A report of findings and recommendations was provided to PRPB on February 21, 2022. This report included an investigative checklist and processing recommendations. Recent changes to the leadership of the units have resulted in lack of information sharing. This lack of communication amongst leadership in the units and investigators is concerning to the Monitor's Office as it demonstrates issues in the sustainability of the recommended reforms made by USDOJ's expert.

### Pathway Forward

The Monitor's Office continues to recommend, as specified in the Agreement, that PRPB closely collaborate with community advocates. PRPB could benefit from creating a multi-disciplinary group on how a sexual assault case should the handled. The group should consist of police, prosecutors, medical staff, and community advocates. These groups all handle a portion of the case, and the collaboration can help establish protocols. The group can aid in the development of protocols and training focused on victim-centered service delivery, as well as expanding on other victim service initiatives.

Training should provide PRPB with the necessary tools for providing consistent and appropriate services to crime victims, working collaboratively with partner agencies when serving victims, and providing a model of professionalism for victim-centered service. There are numerous training programs and associations tied to interviewing techniques and case management. It would suit PRPB to conduct multidisciplinary collaborations between professionals, allies, subject matter experts, and the public in its initiatives and investigative efforts. One of those organizations as suggested previously is End Violence Against Women International (EVAWI).[16] This international association's mission is to train those who respond to gender-based violence, equipping them with the knowledge and tools they need to support victims and hold perpetrators accountable. EVAWI holds annual conferences and has an online academy of training sessions available to assist PRPB.

---

[16] https://evawintl.org/

Moreover, PRPB should implement the recommendations provided by the USDOJ expert. These recommendations were provided to PRPB via email by USDOJ on February 21, 2022. The Monitor's Office is including these recommendations here to ensure that they are shared and available to the newly appointed leadership in the Sexual Assault Investigation Unit.

*"**First and foremost**, the level of collaboration put into crafting PRPB's Protocolo para la Investigación de Muertes Violentas de Mujeres y Personas Trans, Por Razones de Género (Feminicidios y Transfeminicidios) ("Femicide Protocol") should serve as a model for the sex crimes unit (and the domestic violence unit, among others).  It includes, by and large, all the governmental agencies that are stakeholders and partners with PRPB in investigating and prosecuting sex crimes.  While there may be fewer formal avenues of collaboration, PRPB's investigators can be most successful when they are working hand in hand with their intergovernmental and community partners.  The Femicide Protocol has created avenues to achieve that collaboration and PRPB's sex crimes unit should take advantage.*

*PRPB should proactively engage these partners in the current policy, manual, and training review process.  It is also a chance to develop informal work plans or formal MOUs that address of the procedural inefficiencies that investigators told us are hurdles to prosecuting sex crimes, including ensuring adult victims are directly connected to (not just oriented on) victim services and avoiding unnecessarily repeated interviews of victims.*

***Second**, to strengthen PRPB's current policy or manual, a checklist should be created. A checklist appended to the policy and used in every investigative case file is a good practice.  For investigators, it gives a short reminder of the steps they need to be taking or explaining in the investigative file why it is not practical or necessary in a particular case.  It might also serve as a tool to organize case files so there is consistency in both content and order across the agency.  Supervisors, too, benefit, from a framework from which to review the work of their specialized agents.  It also may help in performance reviews—investigators may excel in certain aspects of investigation while have growth opportunities in others.  There are several example checklists available, including from IACP, Tu Casa, Inc., the University of Texas System, and Kings County (WA) Prosecutor's Office.  Utilization of the draft checklist that was provided to PRPB could be a place to start.  PRPB should solicit input from the prosecutors' office and service providers.*

*Second, Expanded List of Victim Services/Supports: The appendix to OG 622 includes a helpful list of supports for victims of sexual assault.  However, compared to the list at Attachment 3 of the Femicide Protocol, it seems incomplete.  Victims of sexual assault may need general supports like those offered by CAVV and the Women's Advocate and help with specific needs like access to medical care, shelter, food, childcare, and others.  Investigators should have easy access to those resources, both in the appendix to the policy and in things like brochures or direct contacts.*

***Third**, below are some resources that are generally focused on effective responses and investigations of sexual assaults and dealing with vicarious trauma that your officers may face.  There is no endorsement on any of these, but rather are shared as resources that PRPB consider and evaluate.  In general, investigators and those that train them should regularly review developments in the field, including by*

*sending agents to seminars or review updated models and presenting to their colleagues upon return from such training.*

- o  *IACP (language translation function)*
- o  <u>*Police Response to Violence Against Women*</u>
- o  <u>*Related police response checklists*</u> *(domestic violence, strangulation, protective orders)*
- o  <u>*Trauma-Informed Law Enforcement Supervision*</u> *presentation*
- o  <u>*Sexual Assault Kit Initiative: Core Standards for Sexual Assault Investigations*</u> *(English)*
- o  <u>DOJ Office of Victims of Crime: Vicarious Trauma Toolkit</u> (English)

## Paragraph 95: Equal Protection and Non-Discrimination - Sexual Assault and Domestic Violence

*PRPD shall re-assess and revise, where needed, its classification protocols for crimes involving sexual assaults. PRPD shall track all reports of felony sexual assault based on the UCR definitions.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. PRPB is appropriately classifying crimes involving sexual assault as required by the Paragraph. | ☑ Met | ☐ Missed |
| 2. PRPB's classification and tracking of felony sexual assault crimes comply with the Paragraph. | ☐ Met | ☑ Missed |

Note: This Paragraph is assessed together with Paragraph 82.

### Compliance Assessment

The Monitor's Office reviewed 45 sexual assault cases and found the classification of these cases appropriate as required by the Agreement. However, as noted in CMR-5, PRPB submitted two documents as evidence of classifying and tracking sexual assault cases from EIS. No such report was received for the CMR-7 reporting period. What was seen previously in CMR-5 was the requirement that the investigating agents, and the supervisors of the respective division, periodically verify the status of the case. Follow-up of the cases includes giving emphasis and attention to the alerts that the system generates through the official mail. PRPB was starting to use a different statistical report as ordered by GO 115 (Division of Sexual Crimes and Abuse of Minors) to track the status of these cases. This report was not submitted for review and assessment.

The Monitor's Office received a memo from PRPB with a list of active employees who have knowledge, responsibility, and/or have participated in the evaluation and review of protocols related to sexual assaults, evaluations, and reviews of sexual assaults according to Uniform Crime Reporting (UCR) definitions, monitoring, and analysis of the results of investigations of sexual assaults. However, no UCR report documentation to verify the reporting classification and tracking of sexual assault crimes was received.

### *Pathway Forward*

The plan to use EIS as the record and report management system means that the system should be designed to capture classification protocols of crimes involving sexual assaults. The system should have the ability to track all reports of felony sexual assaults based on UCR definitions. The statistical accuracy is important because of the relevancy to public reporting. PRPB's transparency is only assisted with the accuracy of data. PRPB must strive to make sure these reporting numbers are precise. The UCR reporting method provides the clarity needed, and what the public should expect on this very important matter.

### Paragraph 96: Equal Protection and Non-Discrimination - Sexual Assault and Domestic Violence

*PRPD shall ensure that its Sex Crimes Investigation Unit is accessible through a hotline that is staffed 24-hours a day with trained responders.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually as to Data Sources #1 and #2. Bi-annually for the remaining Data Sources. |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. Policy on Sex Crimes Investigation Unit incorporates the requirements of the Paragraph. | ☑ Met | ☐ Missed |
| 2. Training on response to sex crimes related calls is in accordance with approved policy. | ☐ Met | ☑ Missed |
| 3. 100% of sampled 24-hour hotline PRPB personnel are trained and certified in responding to sex crimes related calls. | ☐ Met | ☑ Missed |
| 4. PRPB maintains a staffed 24-hour a day hotline with trained responders for sex crimes. | ☑ Met | ☐ Missed |
| 5. The manned hotline provides the public access to the Sex Crimes Investigation Unit. | ☑ Met | ☐ Missed |

### *Compliance Assessment*

The compliance assessment remains the same as in CMR-6 due to the lack of training. PRPB has not submitted training documentation of hotline staff; therefore, the Monitor's Office is not able to certify

that the 24-hour hotline personnel are qualified to maintain the hotline. The Monitor's Office has also not received a list of all personnel assigned to the 24-hour hotline. PRPB submitted a hotline report (April-September 2022) reporting that 738 calls were received, and all necessary information was collected. Additionally, the Monitor's Office randomly reviewed 35 cases to confirm that documents noted the date, time, type of incident, call taker, assigned investigator, district, case number, and supervising agent. PRPB is using PPR 115.1 (Record of Calls Orientation Line Victims of Sexual Crimes) to collect the required information from the caller and consequently initiate an investigation report/file. This is a good indicator that the resource is accessible to the public. The Monitor's Office has visited the hotline's offices in previous reporting periods and noted that the office is accessible to the public. PRPB's equipment constraints such as a telephonic computer system and call center, limits its ability to always provide private confidential call processing.

*Pathway Forward*

PRPB has made strides in its operations of the 24-hour hotline to ensure public access to the Sexual Assault Crime Unit. The related training is very important because it certifies call takers. These training records and certifications must be provided to the Monitor's Office to demonstrate compliance. Further, public access through a 24-hour hotline can provide the community with immediate crisis intervention, help the victim create a safety plan, find emergency shelter, find access to medical attention, and even provide referrals to other resources in the community. This is such a critical resource for the citizens of Puerto Rico and PRPB must continue to work diligently on this service.

## Paragraph 97: Equal Protection and Non-Discrimination - Sexual Assault and Domestic Violence

*PRPD shall track dispositions of sexual assault investigations, including arrests, whether the prosecutor charged the suspect, and whether a conviction resulted. PRPD shall also track sexual assaults by gender and incidents in which more than one participant is arrested. PRPD shall report this data as part of its annual report.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. PRPB is tracking dispositions of sexual assault investigations based on the requirements of the Paragraph. | ☐ Met | ☑ Missed |
| 2. PRPB is reporting the sexual assault disposition data in its annual report. | ☑ Met | ☐ Missed |

*Compliance Assessment*

PRPB produces a system report from the EIS Sexual Assault Module, indicating a) the status of all sexual assault investigations open at any point during the reporting period, irrespective of when the initial incident occurred or when the investigation started, and b) the disposition of all completed investigations. There are no gender indicators or arrest data points collected in this module.

The domestic violence status report received for the reporting period of January 1, 2021, through March 3, 2022 reports a total of 3,520 cases. This report categorizes incidents by region and disposition. This report appears to be module prepared. The sexual assault cases report is dated October 1, 2021, through March 31, 2022, and notes a total of 218 cases with case status included. This is partial compliance, as there are no indicators of sexual assaults by gender and whether more than one participant is arrested.

*Pathway Forward*

PRPB should fully expand its incident tracking system to collect disposition tracking data in its records management system. This would isolate and collect final disposition information. Next steps could result in public dissemination of the sexual assault dispositions, which is included in the annual report and includes dispositions of sexual assault investigations, gender information, including arrests, whether the prosecutor charged the suspect, and whether a conviction resulted. PRPB could benefit greatly from expanding this report to include analysis of data, which could provide strategies to address any changes or issues. For example, the allocation of resources in particularly high crime areas or the development of advocacy outreach in areas with higher reporting numbers.

## Paragraph 98: Equal Protection and Non-Discrimination - Sexual Assault and Domestic Violence

*PRPD's domestic violence policies and procedures shall clearly delineate the duties of all PRPD officers and staff and provide clear and detailed guidelines for each stage of PRPD's response to a report of domestic violence.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2021 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. PRPB's policies and procedures regarding domestic violence meet the requirements of the Paragraph. | ☒ Met | ☐ Missed |
| 2. 95% of reviewed domestic violence investigations complied with requirements of the Paragraph. | ☐ Met | ☒ Missed |
| Note: This Paragraph is assessed with Paragraphs 93, 94 and 99. | | |

136

*Compliance Assessment*

In the CMR-7 reporting period the Monitor's Office reviewed and approved GO 644 (Domestic Violence Investigations Involving Employees), GO 627 (Domestic Violence Incident Investigations), and GO 118 (Domestic Violence Division). These policies meet the requirements of the paragraph and follow generally accepted policing practices.

Case reviews continue to render the same findings as found in previous CMRs. The Monitor's summary assessment of findings from the domestic violence case review is the same as it was for sexual assault investigations. PRPB needs to manage the quality, content, and accuracy about the crime or incident. Review of case files in the CMR-7 reporting period found inconsistent file folders and forms. The files are disorganized and randomly put together. The depth of detail and interview techniques in cases is inconsistent. Some interviews with victims were handwritten by the victim and others were transcribed by the officer. The case was investigated only on the case elements that were reported. If the victim did not cooperate with the officer and did not want to file charges the case was immediately closed, and no follow-up was conducted.

Domestic violence advocacy referrals were not provided to victims consistently. Some cases noted that the investigator did provide victims with next step information, which is a form used by PRPB to advise the victim on how to find a safe place away from the abuser, but not all cases contained the advocacy referral documentation.

The interview techniques used by PRPB in these types of cases is also in need of attention – they currently do not use a victim-centered approach. This includes assigning the victim an advocate. If PRPB is conducting this element in the investigative process it is not noted in the case file. Trainings on how to interview the victim, suspect(s), and outcry witnesses were not submitted for review.

Review of domestic violence reports found that each region of the island has its own police report template. Four different report styles were reviewed - Aibonito, Arecibo, Bayamon, and Fajardo. Some of the reports were computer generated but most were handwritten. This made the reports difficult to read and comprehend.

Some files had supervisor approval with signed documentation that the supervisor approved the report. This is a good measure to keep in place and provides accountability to supervisors for follow-up and report thoroughness.

As noted above, USDOJ has provided PRPB with technical assistance on these topics. On November 17, 2021, USDOJ provided PRPB with a checklist and resources. This information was submitted to assist in the investigative process on sexual assault cases.  However, changes in leadership in the domestic violence and sexual assault units have caused issues in the transfer of knowledge and efforts related to this work.

*Pathway Forward*

As previously suggested in CMR-5, and in some mid-year recommendations of CMR-6, training should provide PRPB with the necessary tools for providing consistent and appropriate services to domestic violence crime victims. Working collaboratively with partner agencies when serving victims and

providing a model of professionalism for victim-centered service should be the objective of the police response. Educating officers on the techniques and available resources should also be included in the initial police response. Currently, PRPB police reports document two special processes- the first is an orientation notification, which explains to the victim or reporting party that the questions asked during the calls will not delay PRPB's response and/or delay the help they will receive and the second is a victim escape plan. While these are important notations in a police report, these do not qualify PRPB's role and interactions with victims as a victim-centered approach.

Additional information on shelters and local programs that provide support, counseling, safety planning, and other services to victims of abuse should be provided to the victim. Initial and follow-up investigators should provide the victim with advocacy support and document that support. Documentation of advocacy referrals should be noted in police reports. A list of resources in Puerto Rico can be found at:

https://www.womenslaw.org/find-help/pr/advocates-and-shelters/local-programs

A standardized reporting template should be used throughout PRPB. PRPB has a records management system for generating a police report. Uniformity in police reporting will ensure that the information is collected accurately and that all key components of the case are provided. For example, in the computer-generated report there is a category of services provided to the victim. This information is not captured in other report templates. Having this information will provide for continuity of services for the victim. As importantly, it will also provide the investigative officer with a document that details all the facts, circumstances, and timelines of the events surrounding the incident.

PRPB should refer to the expert technical assistance provided by USDOJ, as much of what was provided would assist PRPB in achieving greater levels of compliance with this paragraph.

## Paragraph 99: Equal Protection and Non-Discrimination - Sexual Assault and Domestic Violence

*PRPD shall implement measures to respond to reports of domestic violence and sexual assault involving PRPD officers, including disarming officers and assessing their fitness for duty.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually for Compliance Target #1. Bi-annually for all other Compliance Targets. |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. PRPB policies and procedures implement measures to respond to reports of domestic violence and sexual assault involving PRPB officers, including disarming officers and assessing their fitness for duty. | ☒ Met  ☐ Missed |
| 2. 95% of reviewed investigations of domestic violence and sexual assault involving a PRPB officers complied with requirements of the Paragraph. | ☐ Met  ☒ Missed |

Note: This Paragraph is assessed with Paragraphs 93, 94, and 98. The conduct envisioned by this Paragraph may also fall within the purview of Paragraph 184.

### Compliance Assessment

In the CMR-7 reporting period the Monitor's Office reviewed and approved GO 644 (Domestic Violence Investigations Involving Employees). The policy provides the procedures for responding to reports of domestic violence and sexual assault involving PRPB officers, including disarming officers and assessing their fitness for duty. Training on this policy has not been revised and/or conducted during the reporting period.

The Monitor's Office did review five cases involving PRPB officers. Only one domestic violence case (20%) provided documentation that a weapon had been seized and that a psychological fit for duty was conducted. The remaining four cases (80%) had no documentation of a weapon seizure or a fit for duty assessment. PRPB is required to provide a receipt of occupation of less lethal weapons, PPR 618.2 (Receipt for Loaded Regulation Weapons and Ammunition), and EIS Early Warning transaction sheet change status of complaint by assigned division. Consequently, PRPB is not compliant with this paragraph.

### Pathway Forward

It is imperative that PRPB establish a rigorous accountability system on the investigative management of criminal cases involving PRPB personnel. No person is above the law and while PRPB has both a duty and responsibility to assist the public, it must also follow the policy and procedures it outlines to policing its own. Both targets associated with this paragraph are assessed as part of a comprehensive review of how PRPB regulates itself and this is an area that PRPB can improve upon; with achieving its training requirements, full reporting documentation, and supervisor's organizing the investigative workflow ensuring that agents understand their duties.

The Monitor's Office plans on reviewing the revised training materials and observing PRPB's related in-service training. When PRPB officers commit acts of domestic violence, it diminishes the standards of the organization. Training is closely associated with the way PRPB should respond to these types of cases.

PRPB must consider the development of a comprehensive approach when investigations on their own members occur. The comprehensive approach should include effective leadership, straight forward policies and regulations, applicable training, efficient violation investigations, appropriate violation responses, and offer officer assistance on job related stresses. Additionally, as noted above, the Monitor's Office will work with PRPB to determine the appropriate methodology for sampling these cases and request closed investigations for review in upcoming CMRs. Similar methodological approaches are used in internal investigations and FIU reviews.

## Paragraph 100: Equal Protection and Non-Discrimination - Sexual Assault and Domestic Violence

*PRPD shall track dispositions of domestic violence investigations, including arrests, whether the prosecutor charged the suspect, and whether a conviction resulted. PRPD shall also track domestic violence arrests by gender and incidents in which more than one participant is arrested. PRPD shall report this data as part of its annual report.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2021 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. PRPB is tracking dispositions of sexual assault investigations based on the requirements of the Paragraph. | ☑ Met  ☐ Missed |
| 2. PRPB is reporting the sexual assault disposition data in its annual report. | ☑ Met  ☐ Missed |

### Compliance Assessment

PRPB submits a document that reports the details of victims by gender, the number of arrests and convictions, the number of cases where an investigation produced an arrest, the number of cases that a prosecutor ratified a charge, and the number of convictions as a part of its annual report. PRPB submitted this report for the 2021 reporting period for domestic violence and sexual assaults.

### Pathway Forward

PRPB should continue the publication of this disposition tracking system which contains the collection and final disposition information. Public dissemination of the domestic violence dispositions should be included in the annual report, including arrests, whether the prosecutor charged the suspect, and whether a conviction resulted. Additionally, the annual report should include information about domestic violence assaults by gender and incidents in which more than one participant is arrested.

## V. Recruitment, Selection, and Hiring

Recruitment, Selection, and Hiring is assessed on an annual basis. Paragraphs 101 – 108 were assessed in CMR-6 and will be assessed again in CMR-8.

## VI. Policies and Procedures

The Monitor's Office reviewed approximately 93 policies and manuals during the CMR-7 reporting period and either provided comments or approved the policies in compliance with the Agreement. Those policies routinely warn its personnel of the need to abide by the Bureau's rules and regulations, as well as Commonwealth laws and constitutional guarantees. Personnel are also warned to report any violation of policy they observe or are aware of as well as details the consequences for failing to do so.

The Virtual Library, created in late 2021, provides easy access to policies and manuals to all officers and the public using an internet connection. The Virtual Library, as reviewed by the Monitor's Office during the current reporting period, includes PRPB policies, manuals, and other administrative documents and is easily searchable by subject, title, or keyword. PRPB provides new and revised policies to officers through the Bureau's Policia Informa email system.

However, PRPB is not yet able to verify or confirm that officers open and read the messages sent via Policia Informa. To this end, in May 2022, the Monitor's Office interviewed officials at the Reform Unit in charge of policy development, as well as several field commanders regarding how they ensure that officers learn of new and revised policies. These officials stated that once they receive the documents via Policia Informa and Outlook emails, they hold monthly academies to ensure personnel are informed. They also inform officers of urgent matters during roll calls before each shift. However, policy training and implementation has stubbornly remained at a rate that is less than desirable, and PRPB has failed to hold officers and supervisors accountable.

Not holding its personnel accountable, especially supervisors and commanders, has been evident in many arrest reports, as officers continually fail to document proper probable cause and submit complete reports, as required by PRPB's own policies and the Agreement. Supervisors and commanders also routinely fail to correct these reports before submitting them into the system. Nonetheless, despite several advisories from the Monitor's Office, PRPB has not provided any evidence that it is or will address the issue by employing its current disciplinary system, which can include counseling and remedial training.

Training on policies is very much behind schedule, as PRPB has achieved the required 95% training compliance on only one policy, Code of Ethics and Conduct. Further delays have been experienced in the full re-implementation of the Bureau's virtual training system. The Commonwealth and PRPB have informed the Monitor's Office that it has started working on developing its own virtual training system.

Overall, the Commonwealth's compliance with the eight paragraphs within Policies and Procedures reflect improved progress to what was noted in previous reports. In CMR-5, all paragraphs were assessed as partially compliant, in comparison to the current reporting period, where 75% of paragraphs (6 paragraphs) were found to be partially compliant and 25% of paragraphs (2 paragraphs) were found to be substantially compliant. See figure 6. This progress is attributed to the implementation of the Virtual Library.



*Figure 6. Policies and Procedures: Paragraph Compliance Status*

## Paragraph 109: Policies and Procedures – General Provisions

*Policies and procedures shall reflect and express PRPD's core values and priorities, and provide clear guidance to ensure that officers and civilian employees lawfully, effectively, and ethically serve the community. PRPD shall develop comprehensive and agency- wide policies and procedures to ensure consistency with, and full implementation of, each requirement of this Agreement. These policies and procedures shall define terms clearly, comply with applicable law, and comport with generally accepted policing practice. PRPD shall apply policies uniformly and hold officers accountable for complying with policies and advancing PRPD's core values and priorities.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

Note: Compliance will be determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 110-116, and (2) the results of outcome assessments, pursuant to Paragraph 243.

### *Compliance Assessment*

PRPB has created policies that comply with the Agreement. To achieve full compliance; however, PRPB must ensure that the policies are implemented with proper training and verification of policy compliance in the field. PRPB is having difficulties complying in both areas.

PRPB's 2021 virtual training system was placed on hold due to it having been compromised by several officers. As a result, most in-service trainings have not been held or have been delayed. Practical in-

person exercises required under PRPB policies are also lagging. Training compliance requires that PRPB reach a 95% threshold on all policies. PRPB has reached that goal on only one course, REA 617/VCEP 3081(Code of Ethics). Since policy training is seriously lacking, implementation is also not compliant.

PRPB time after time has failed to hold personnel accountable for the implementation of existing policies. This is most evident in arrest reports the Monitor's Office has analyzed over many years. A great number of officers' arrest reports reviewed this period, approximately 34%, fail to properly document probable cause, a requirement under GO 615 (Arrests and Summons) and the Agreement. Supervisors at all levels continually fail to take steps to address this policy violation, and the Bureau does not appear to hold them accountable. As a result, the Monitor's Office has been observing the same behavior dating back to CMR-2. The Monitor's Office has provided recommendations on how to deal with this shortcoming, such as re-training and counseling, but has not seen progress in this area.

One area where PRPB has performed well is in giving easy access to their new and newly revised policies and manuals. PRPB implemented the Virtual Library (GO 409), which has been up and running since late 2021, and is listed on the PRPB website, giving easy access to officers and the public using a computer or smartphone with internet service. The Monitor's Office has accessed the Virtual Library - a tool that provides PRPB manuals, procedures, and other documents in a searchable format by subject, keyword, and title.

### *Pathway Forward*

PRPB should continue to develop the virtual training system and re-start much needed in-service training to obtain compliance with the Agreement. A 34% failure rate of improperly completed arrest reports is unacceptable and PRPB must find an effective way to address it. The Monitor's Office believes this is an achievable goal easily within PRPB's grasp.

### Paragraph 110: Policies and Procedures - General Provisions

*PRPD shall develop and publish a department-wide policy and procedure manual that will include all policies, procedures, and regulations governing all administrative and operational aspects of PRPD. The manual shall be organized by subject-matter and indexed for reference.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2021 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Implemented | | |

### *Compliance Targets*

| | |
|---|---|
| 1. The Policy and Procedures Manual is complete, organized, and indexed, as required by the Agreement. | ☑ Met   ☐ Missed |

144

| 2. The current Policy and Procedures Manual is accessible to officers in 95% of selected precincts and units. | ☑ Met    ☐ Missed |
|---|---|

*Compliance Assessment*

PRPB's Virtual Library (GO 409) has been deployed since late 2021 and is listed on the PRPB website for easy access by officers and the public using a computer or smartphone. It appears to be a complete listing of all PRPB effective and approved policies, manuals, procedures, and other documents which are searchable by subject, keyword, and title. All required manuals and policies, as per the Agreement, are listed, organized, and indexed. In addition to the Virtual Library, PRPB is creating a paper form of the Policies and Procedures Manual, which the Monitor's Office has reviewed and is being revised by the Reform Office.

*Pathway Forward*

PRPB has established an easily accessible Virtual Library with a comprehensive list of its policies, procedures, and manuals. With this electronic system in place, PRPB is well on its way to compliance with this paragraph of the Agreement, if it ensures that all policies, procedures, and manuals are reviewed periodically and kept up to date. In addition, PRPB must find a way to demonstrate that officers open their departmental email messages and read them; software systems like PowerDMS and others can assist PRPB in achieving this.

## Paragraph 111: Policies and Procedures - General Provisions

*PRPD's unit-wide policies and procedures shall be collected in unit-level policy and procedure manuals. PRPD shall develop unit-level policy and procedure manuals for, at a minimum, the following PRPD units or functions:*

*a) Field operations, including patrol, special and tactical operations, field support, special weapons and tactics, canines, supervision task forces, and mass demonstration or event policing;*

*b) SPR, including case and records management, administrative investigations, confidential investigations, parallel criminal and administrative investigations, FIU investigations, audits, and officer drug testing;*

*c) Use of Force Reporting, Investigation, and Review, including both Supervisory and Serious Use of Force Investigations and Review; and In- Custody Death Reviews;*

*d) Criminal investigations, including sub-units assigned to investigate homicides, sexual assaults, domestic violence, narcotics, vice, and illegal firearms; and*

*e) Recruitment and Training, including training provided by UCCJ and in- service training.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | October 2021 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Implemented | | |

*Compliance Targets*

145

| | | |
|---|---|---|
| 1. Unit-wide policies and procedures are collected in manuals for each of the five areas specified in the Agreement. | ☑ Met | ☐ Missed |
| 2. The current unit-level policy and procedures manual is accessible to officers in 95% of selected precincts and units. | ☑ Met | ☐ Missed |

### *Compliance Assessment*

By implementing a Virtual Library (GO 409) that is available to all through its website, in addition to a paper policy and procedure manual, PRPB has accomplished two goals of the Agreement. First, it has made policies, procedures, and manuals easily accessible to all PRPB personnel no matter where they may be stationed, and to the public throughout every corner of the island with an internet connection. Second, PRPB created a digitized system that makes searching documents by subject, keyword, and/or title a painless process. The Monitor's Office tested the system using a computer from the continental United States in October 2022 and searched for manuals and policies for the following PRPB units: Auxiliary Superintendency of Crime Investigations (SAIC), SAOC, Auxiliary Superintendency of Professional Responsibility (SARP), SAOE, SAEA, FIU, Citizen Interaction Committee (CIC), and Field Training Officers (FTO). The Monitor's Office also searched various other units that fall under superintendencies or bureaus, such as the Sexual Assault Investigation and Domestic Violence Units. The search was made using subjects, keywords, and titles of policies and manuals. The system returned quick results without issue.

### *Pathway Forward*

PRPB's Virtual Library is a useful tool that provides easy access to policies, procedures, and manuals via the PRPB website to anyone with internet service. It is easily searchable by subject, keyword, or title and includes all manuals and policies required by the Agreement. Moving forward, PRPB must ensure that all policies, procedures, and manuals are reviewed periodically as per the Agreement, kept up to date, and published accordingly.

### Paragraph 112: Policies and Procedures - General Provisions

*PRPD shall review each newly developed policy after it is issued and revise the policy as necessary to ensure that it provides effective guidance to PRPD personnel.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. Policies on policy development incorporate the requirements of the paragraphs. | ☑ Met | ☐ Missed |

146

| | |
|---|---|
| 2. Orientation on policy development protocols is consistent with approved protocols. | ☑ Met  ☐ Missed |
| 3. 95% of policies and procedures due for review during the evaluation period are reviewed and, as necessary, revised. | ☐ Met  ☑ Missed |
| 4. Stakeholder comments are reviewed and considered as part of the policy review process. | ☐ Met  ☑ Missed |
| 5. Internal comments and recommendations are reviewed and considered as part of the policy review process. | ☐ Met  ☑ Missed |
| 6. Policies are posted online in a timely manner or otherwise made available to the public as required by approved policies. | ☐ Met  ☑ Missed |

*Compliance Assessment*

PRPB uses Appendix A (Policy and Procedure Development Process) of the approved Action Plans dated June 22, 2017[17] as a policy development protocol that aids in developing policies that comport to generally accepted policing practices, laws of the Commonwealth, and constitutional guarantees. A calendar of 31 policies due for review this period was submitted; however, this calendar is somewhat vague, lacking specific details, such as exactly when a policy was due for review and when and if it was reviewed. For example, under the column for "Status", only a month is given, but no day or year, nor what step of the development/review process it is in. Out of 31 policies due for review this period, PRPB reviewed/revised only 10 policies (32%) (GOs 109, 140, 147, 208, 309, 413, 642, and 643). Only 2 of the 10 updated policies (20%) are posted on the Virtual Library (GOs 606 – Criminal Photography and 402 - Disclosure of the Recordings of the Radio Communication System).

PRPB submitted a certificate certifying that all policies are developed by the Policies and Procedures Section of the Reform Office, which is composed of five members, including three attorneys. The certifications state that during the CMR-7 period, members of the relevant units were interviewed and asked for their input, comments are normally received via email and comments and recommendations were sought from third parties and recommendations received via the Virtual Library are considered.

Document #CMR7-1.1-26-abr-PP-1804 lists recommendations from the Fajardo CIC regarding how to handle protests at sea (they cited an incident involving the ferry to/from Vieques and Culebra islands); Document #'s CMR7-1.1-26-abr-PP-1806, CMR7-1.1-26-abr-PP-1807, and CMR7-1.1-26-abr-PP-1808 are letters with comments and recommendations from the Mayaguez CIC and their representative of the foreign community on an unspecified GO. Other documents were submitted confirming comments and recommendations received on GO 615 (Arrests and Summons), 625 (Crowd Management and Control), PPR 615.8 (Arrest Evaluation) and PPR 621.1 (Complaint Card). However, it was difficult for the Monitor's Office to determine which GO they were commenting on due to the lack of specific information.

*Pathway Forward*

PRPB submitted various documents to the Monitor's Office as evidence of proper policy development and to confirm that it seeks input from PRPB personnel as well as from stakeholders, such as CICs. PRPB also submitted copies of the GOs and PPR forms that were sent out for third party comments. By submitting the GOs and forms separately from comments, it made it somewhat difficult in some cases to match the comments to the GO or form being commented on because some comments did not specify which document they were commenting on. The Monitor's Office recommends that PRPB should include

---

[17] (Case 3:12-cv-02039-GAG, Document 550-1, pages 295-296)

an introductory page or paragraph with each GO and/or PPR form detailing who it was sent to, who submitted comments, and whether comments/recommendations were implemented or rejected. Each GO or form sent for comments should be submitted to the Monitor's Office as a separate package for easier review and tracking. A calendar specifying the dates policy reviews are due, who is responsible for the review, and exact status in the process would be beneficial.

## Paragraph 113: Policies and Procedures - General Provisions

*PRPD shall review each policy or procedure created or revised pursuant to this Agreement on an annual basis for the first three years from the Appointment Date or upon notice of a policy deficiency, and biannually thereafter. PRPD will develop a schedule for the biannual review. PRPD shall make revisions as necessary to ensure that policies and procedures remain consistent with this Agreement, generally accepted policing practice, and current law. All PRPD policies, including but not limited to those created pursuant to this Agreement, shall be posted online and otherwise made publicly available in a timely manner. Reasonable exceptions shall apply to policies and procedures that are law enforcement sensitive.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed together with Paragraph 112.

*Compliance Assessment*

A calendar of 31 policies due for review this period was submitted; however, this calendar is somewhat vague and lacks specific details, such as exactly when a policy was due for review and when and if it was reviewed. For example, under the column for "Status," only a month is given, but no day or year, nor what step of the development/review process it is in. Out of 31 policies due for review this period, PRPB reviewed/revised only 10 policies (32%) (GOs 109, 140, 147, 208, 309, 402, 413, 606, 642, and 643). Only 2 of the 10 updated policies (20%) are posted on the Virtual Library (GOs 606 – Criminal Photography and 402 - Disclosure of the Recordings of the Radio Communication System).

For the CMR-7 period, the Monitor's Office reviewed various policies including: 105, 107, 109, 114, 116, 122, 123, 124, 127, 131, 140, 143, 147, 202, 208, 209, 309, 310, 402, 504, 604, 606, 612, 619, 620, 621, 623, 626, 627, 630, 631, 633, 639, 642, 643, 644, 704, 804, 805, and various PPR forms related to these policies, as well as manuals for SARP, Motor Vehicle Theft Bureau (Vehiculos Hurtados), and Hate Crimes. Fifteen of these policies are posted on the Virtual Library as of this writing. The Monitor's Office provided comments/recommendations ranging from operational procedures and clarifying terms, to simplifying instructions for easier understanding.

PRPB's Virtual Library is now fully available to the public and anyone with a computer or smartphone and internet service. The Virtual Library can be searched by subject, title, or keyword. The Monitor's Office tested the system using a computer to access PRPB's website and experienced no difficulties opening various policies and manuals using titles, subjects, and keywords. This shows progress toward compliance in this section.

### *Pathway Forward*

PRPB is on the path to compliance with this paragraph, as evidenced by the creation of the Virtual Library which includes all policies and manuals for all personnel in the Bureau and the public through the PRPB website. The Monitor's Office will continue to assess PRPB's efforts regarding the Virtual Library and the implementation of such policies in training and practice. Also, PRPB must create and maintain a policy calendar listing all the necessary details, such as when a policy is due for review, whether it has been reviewed and approved, and when it is posted to the Virtual Library. PRPB should consider adding a field to the Virtual Library that denotes when the policy was uploaded.

### Paragraph 114: Policies and Procedures - General Provisions

*Within a reasonable period of time, PRPD shall ensure that all relevant PRPD personnel have received, read, and been trained on all new or amended policies or procedures as necessary to fulfill their role as required by policies and procedures, including the obligation to report any policy or procedure violation.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – September 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | Met | Missed |
|---|---|---|
| 1. Policies incorporate the requirements of the paragraphs. | ☒ Met | ☐ Missed |
| 2. Training on information systems and agency communications is consistent with approved policies. | ☐ Met | ☒ Missed |
| 3. 95% of selected officers received and opened all agency transmittals with policies that were approved and issued during the evaluation period. | ☐ Met | ☒ Missed |
| 4. 95% of selected precincts or units notified personnel of new or revised policies related to the Agreement that were approved and issued during the evaluation period through monthly academies. | ☒ Met | ☐ Missed |
| 5. 95% of selected personnel received notification of policies advising that they may be subject to discipline, possible criminal prosecution, and/or civil liability for violating PRPB policy. | ☒ Met | ☐ Missed |

Note: Compliance with the training requirements in Paragraphs 114-115 will be based on the assessments for Paragraph 119 regarding pre-service training for new recruits and Paragraph 129 regarding in-service training for existing personnel.

## Compliance Assessment

The Monitor's Office reviewed approximately 39 policies and several manuals (see paragraph 113) during the CMR-7 reporting period. PRPB routinely adds language to these policies warning officers of the consequences of violating Bureau policy or failing to report a violation of policy by others. Although PRPB has done a good job of developing, reviewing, and publishing these policies, training on these policies continues to be a recurring issue. During the CMR-7 reporting period, PRPB only achieved the required 95% training threshold (i.e., 95% of the personnel sampled completed training) on one policy: Code of Ethics (REA 617/VCEP 3081). These issues are noted throughout the CMR and span all areas of the Agreement. During site visits to units and districts, the Monitor's Office learned from several PRPB officers that they lack training on the Bureau's information systems, such as GTE and CAD. Some say they learn to use the system on their own by trial and error. For example, the Monitor's Office visited Bayamon's CIC Unit and interviewed the Assistant Director on many issues, including GTE and CAD. He stated that his personnel sometimes must wait weeks to supplement reports due to the lack of supervisors and the fact that many officers do not know how to use the technology. Another officer at the Bayamon Oeste Precinct stated he learned to use GTE on his own because he had not received any training from the Bureau. They both added that both systems, GTE and CAD, are very slow and cause long delays in processing reports.

In May 2022, the Monitor's Office interviewed command personnel and directors at SAIC, SARP, SAOC, and the Reform Unit regarding how PRPB ensures that officers receive and read all newly created or revised policies. The Policy Development Director at the Reform Office stated that PRPB informs officers and personnel about new or revised policies through the Bureau's "Policia Informa" system, via email, the Virtual Library, Bulletin, and the Monthly Academy held at each Command Area. He stated that urgent matters are discussed by supervisors during roll calls before each shift. A visit to SAIC and SAOC command personnel confirmed that PRPB uses "Policia Informa" to alert officers of newly revised policies and that all directors receive urgent changes through their Outlook email accounts. These urgent changes are then relayed to officers in the field during roll calls. As evidence, the SAIC commander showed the Monitor's Office PPR 704.1 (Agenda for Monthly Meetings) dated March 23, 2022, along with PPR 704.2 (Attendance Sheet). The agenda listed multiple topics to be discussed, including policies, and the attendance sheet listed the names and signatures of several officers from the rank of sergeant to colonel. These command officers, he stated, then hold their own monthly academy and roll calls to keep their personnel informed. However, PRPB is still not able to verify whether officers opened their email messages and read the new or revised policies. The Policy Development Director explained to the Monitor's Office that they presently do not have the capability to detect when officers open their email messages. The Monitor's Office informed him that there is technology capable of doing this and suggested he speak to PRPB's Information Technology (IT) Division about this issue. Obviously, officers cannot be forced to read messages, but PRPB must at least make all efforts possible to ensure they acknowledge receiving and opening important messages.

150

*Pathway Forward*

PRPB must ensure it provides the required training (virtual and in-person) to comply with the Agreement. Compliance with this paragraph and all areas of the Agreement will continue to lag until this is addressed. Further, PRPB must verify that all officers are opening and reviewing the revised or new policies sent to them. The absence of a verification system can leave the agency open to potential legal liability. PRPB should consider either developing and/or changing its current system or purchase an external system, such as PowerDMS, to assist in its policy management.

## Paragraph 115: Policies and Procedures - General Provisions

*PRPD shall document that each relevant PRPD officer or other employee has received, read, and been trained appropriately regarding PRPD's policies and procedures.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – September 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed together with Paragraph 114.

*Compliance Assessment*

As stated in paragraph 114 above, the Director of the Policy Development Office and command officers at various Area Commands can only guarantee that PRPB personnel are notified of new or revised policies through their "Policia Informa" system, emails, roll calls, and monthly academies. However, they have no way of ensuring that all personnel open their emails, read their messages, and review the policies. Many agencies use a policy management system, like PowerDMS, to manage the distribution of policies. Such systems provide alerts to their officers when new or revised policies are available, require the officers provide a virtual signature to demonstrate that they reviewed the policy, provide an internal platform for officers to review policies, and track an officer's compliance with these reviews. The Monitor's Office has suggested that PRPB discuss this issue with its IT Department to find a solution.

*Pathway Forward*

Compliance with this paragraph is assessed together with paragraph 114, and as noted above, the Monitor's Office stresses the importance for PRPB to either develop or procure a policy management system, such as Power DMS, to demonstrate compliance with this paragraph. PRPB must also promptly address the lack of policy training and implementation.

## Paragraph 116: Policies and Procedures - General Provisions

*PRPD shall advise all officers that taking police action in violation of PRPD policy may subject officers to discipline, possible criminal prosecution, and/or civil liability.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | October 2021 – September 2022 |
| Policy: | Implemented | | |
| Training: | NA | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

Note: This Paragraph is assessed together with Paragraph 114.

### *Compliance Assessment*

PRPB routinely adds language to policies warning officers of the consequences of violating Bureau policy or failing to report a violation of policy by others. The Monitor's Office reviewed approximately 39 policies and several manuals (see paragraph 113) during the CMR-7 reporting period and noted that all the above policies included this language as has been the case in previous CMRs. Nevertheless, PRPB consistently fails to comply with its policies and rules, especially when it comes to maintaining timelines and providing training. For example, the Monitor's Office reports in the Civilian Complaints, Internal Investigations and Discipline section, paragraph 179, that PRPB failed to follow its own 5-day assignment rule, the 90-day investigative deadline, and the 30-day extension rule. Monitors in other areas of the Agreement also reported similar failures, including lack of adherence to policies and training in IT development (Information Systems and Technology) and the Equal Protection and Non-Discrimination section, as well as absence of training and implementation of policies in sections for Professionalization, Supervision and Management, and Community Engagement and Public Information.

### *Pathway Forward*

Compliance with this paragraph is assessed together with paragraph 114. PRPB must adhere to the requirements of its own policies, rules, and guidelines in order to re-establish the road to compliance. PRPB must also re-instate its full training curriculum at the Police Academy, especially for in-service, presential training, and the virtual training.

## VII. Training

Training is assessed on an annual basis. Paragraphs 117 – 134 were assessed in CMR-6 and will be assessed again in CMR-8.

## VIII. Supervision and Management

As has been the case in previous CMRs, the Commonwealth continues to struggle with achieving compliance with the Agreement, not only in this area, but in others as well, due to the quantity and quality of its first-line supervisors, inconsistent supervision, poor management of its promotional process, failure to develop and institutionalize adequate information technology systems to support supervision (i.e., Early Intervention System (EIS)), and lagging efforts to develop a comprehensive performance evaluation system. Despite these challenges, the Monitor's Office has seen some progress, most notably in the Commonwealth's efforts to comply with the related court order to implement the Staffing Plan, and initial work on development of the Integrity Unit policies and procedures. If the Commonwealth continues with this implementation and the promotion of sergeants, progress in moving compliance forward will begin to be realized in CMR-8.

Although PRPB has identified the number of first-line supervisors needed, it has not been able to achieve its goal due to past poor management and implementation of its promotional processes. As part of the Plan described in paragraph 13, PRPB advised that 740 supervisors for 110 precincts are needed based on a ratio of 6 first-line supervisors and a relief per unit. However, so far only 103 officers have been promoted to sergeant and only 10 sergeants have been promoted to lieutenant, leaving a shortage of 627 supervisors. Furthermore, in this Plan, the Commonwealth identified the need for 68 positions within the ranks of inspectors and coronels. PRPB reported that for Fiscal Year (FY) 2022-2023, no budget has been identified for these positions. The Commonwealth is currently moving forward with a plan to promote 506 sergeants under the Order of Merit List (OML) during FY 2023.

In addition to the issues with the promotion process, as reported in the past, officers interviewed continue to note issues with PRPB's transfer policy, GO 305 (Rank System Transfer Transactions). The Commonwealth has made some progress by naming a Board responsible for designing a promotion system, which includes the administration of examinations and other more objective measures.

Overall, the Commonwealth's compliance with the 19 Supervision and Management paragraphs assessed during this reporting period reflect similar levels of compliance to what was noted in previous CMRs. In CMR-6, 21% of the 24 paragraphs (4 paragraphs) were assessed as partially compliant, in

comparison to the current reporting period, where 16% of the 19 paragraphs (3 paragraphs) were found to be partially compliant. See figure 7.



*Figure 7. Supervision and Management: Paragraph Compliance Status*

## Paragraph 135: Supervision and Management - General Provisions

*PRPD shall ensure that an adequate number of qualified first-line supervisors are deployed in the field to allow supervisors to provide close and effective supervision to each officer under the supervisor's direct command, to provide officers with the direction and guidance necessary to improve and develop as police officers, and to identify, correct, and prevent misconduct. PRPD shall develop policies for supervision that set out clear requirements for supervisors and are consistent with generally accepted policing practices.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

Note: Compliance will be determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 136-158, and (2) the results of outcome assessments, pursuant to Paragraph 243.

### *Compliance Assessment*

During the CMR-7 reporting period, the Monitor's Office drew random samples of staffing documents for precincts and units within eight PRPB areas. Further, PRPB provided the Monitor's Office with PPR 373 (Distribution of Personnel) for all units and precincts. The PPR 373s, as seen and reported in the past, are still completed by hand in some instances. Handwritten forms, which are still being used, limit PRPB's ability to maintain an accurate and real-time understanding of operational activities and staffing

challenges across the organization. This is putting PRPB at a disadvantage compared to other Puerto Rican government agencies and creating a negative perception that the entire organization is not able to account for its personnel.

The Agreement also stipulates that supervisors are not to supervise more than 8 officers. However, during the interviews conducted with personnel, supervisors and supervisees indicated that supervision loads continue to be unequal across the Bureau and that supervisors are regularly assigned to supervise more than 8 officers due to the shortage of supervisors. A joint stipulation on staffing and supervision was entered at the Court by the Parties on April 18, 2022, the same was approved by the Court. The stipulation requires a 90-day status reports on the implementation of the Updated Staffing Plan be submitted.

*Pathway Forward*

The Parties and the Monitor continues to work on the implementation of the Updated Staffing Plan, dated August 31, 2022, including the review of the 90-day status reports to assess the Commonwealths progress to achieve compliance with the staffing and supervision requirements of the agreement.

As stated in CMRs 5 and 6, the Monitor's Office continues to look forward to working and assisting PRPB as it implements the updated Staffing Plan in accordance with the Staffing Plan filed with the Court. Furthermore, as advised during prior CMRs, the Monitor's Office continues to stress the importance for PRPB to develop a more accurate method to track staffing allocations in the field.

## 1. Duties of Supervisors

Supervisors must lead by example and have direct engagement with subordinates under their command to provide effective supervision so that officers will perform their duties lawfully, safely, and effectively. During CMRs 5 and 6, training was limited mainly due to COVID-19 and detected administrative violations with the virtual training that prevented the continuation of the same. However, PRPB continues to struggle to maintain enough first-line supervisors to provide effective management over officers in the field across all shifts in all command areas, leaving supervision still beyond compliance. As reported above, the Commonwealth, as part of its compliance with the Staffing Plan, are currently working to promote 506 sergeants during FY 2023. While these additional sergeants will help ease the shortage, PRPB will need to continue to work on establishing recurring promotional cycles to achieve and maintain greater levels of compliance.

Further, as noted throughout this subsection, PRPB has not provided the Monitor's Office with accurate, updated, and consistent reports manually or electronically to confirm that officers and supervisors are receiving schedules and assignments consistent with the supervision policies as well as the ratios of officers and supervisors per units.

### Paragraph 136: Supervision and Management - Duties of Supervisors

*All operational field officers shall be assigned to a single, consistent, and clearly identified supervisor. Supervisors shall be assigned to and shall substantially work the same days and hours as the officers they are assigned to supervise, absent exceptional circumstances. Scheduled leave (such as vacation time), unscheduled leave (such*

*as sick leave due to illness or injury) and other routine absences (such as court appearances and training obligations) shall not be deemed noncompliance with this provision.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Not Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 136-140. | ☐ Met | ☑ Missed |
| 2. Supervision trainings are consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled supervisors are trained and certified in all policies related to supervision (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 4. Officer and supervisor schedules, assignments, and ratios are consistent with supervision policies. | ☐ Met | ☑ Missed |
| 5. Supervisors are assigned and deployed in accordance with approved supervision policies. | ☐ Met | ☑ Missed |
| 6. 95% of interviewed personnel perceive that supervision is close and effective. | ☐ Met | ☑ Missed |
| 7. 95% of sampled referrals indicate proactive observation and intervention to ensure adherence to policies, law, and the Agreement. | ☐ Met | ☑ Missed |

*Compliance Assessment*

As stated in CMRs 5 and 6, current policies still do not incorporate all requirements established in paragraphs 136-140. This was confirmed in interviews with a random sample of PRPB supervisors. Supervision trainings are consistent with approved policies. Scheduling the required supervision trainings not only to comply with the policies, but also to improve the department's quality of supervision must be made a priority. The Agreement stipulates that supervisors must receive approved training before they are allowed to assume their positions in PRPB. This has been reviewed by the Monitor's Office and has been implemented by PRPB. The aggressive program to promote 506 sergeants during FY 2023 has been reviewed, and the training requirement remains the same.

Officer and supervisor schedules, assignments, and ratios are still not consistent with supervision policies, as was reported during interviews with supervisors. Supervisors are also not currently assigned and deployed in accordance with the approved supervision policies. This has caused morale problems with PRPB members, units, and precincts. Approximately 50% of interviewed personnel believe that supervision is close and effective, though some supervisor interviewees disagreed. Similarly, approximately 50% of interviewed personnel felt that supervisors engaged in proactive observation and intervention of supervisees to ensure adherence to policies, law, and the Agreement.

157

PRPB as reported in the past continues to not be compliant mainly due to the lack of personnel and supervisors. In the Paragraph 13 Implementation Plan report dated August 31, 2022, PRPB reported identifying the need for an additional 740 supervisors for 110 precincts. The report also noted that only 103 officers have been promoted to sergeants and 10 sergeants have been promoted to lieutenant during 2022, which places PRPB behind the established proposed goal. Furthermore, in another August 2022 report, it was reported that 68 needed positions for the ranks of inspectors and coronels were identified, but due to a lack of budget, had not taken place.

### Pathway Forward

DSP and PRPB leadership must make supervision staffing the highest priority to address the current shortfalls in supervision and to lay the groundwork for achieving the other compliance targets associated with paragraphs 136-140.

### Paragraph 137: Supervision and Management - Duties of Supervisors

*First-line field supervisors shall be assigned to supervise no more than ten officers for the first five years of this Agreement. After considering the results of the staffing study required by Paragraph 13 and whether the first-line supervisors are meeting all of the supervisory requirements of this Agreement at the current officer to supervisor ratios, the TCA and the Parties shall determine whether to lower the number of officers supervised by each first-line field supervisor. On-duty field supervisors shall be available throughout their shift to respond to the field to provide supervision to officers under their direct command and, as needed, to provide supervisory assistance to other units.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: This Paragraph is assessed with Paragraph 136.

### Compliance Assessment

PRPB is currently and aggressively revisiting the staffing study required by paragraph 13 as part of its efforts to implement the Staffing Plan. PRPB has recognized the need for and importance of compliance with this requirement not only for the Agreement, but for the benefit of the department. Thus far in 2022, PRPB self-reported that 103 officers have been promoted to sergeant out of the 609 needed for every precinct at a minimum rate of 6 sergeants per precinct. This is still a deficit of 506 promotions. PRPB has also self-reported that they are currently in the process of promoting another 250 officers to sergeant, which is still short of the identified goal. In addition, PRPB reported the promotion of 10 sergeants to lieutenant.

The Monitor's Office has requested that PRPB provide documentation to demonstrate that 1 supervisor oversees no more than 8 individuals. The Monitor's Office has been provided with PPR 373s (Distribution of Personnel) for all 13 areas. The PPR 373s, many of which are still completed by hand, indicate that supervisors do not have more than 8 individuals under their command. However, during interviews, supervisors and supervisees indicated that supervision loads are unequal across the Bureau, and that supervisors are regularly assigned to supervise more than 8 officers. It was also reported that supervisors may supervise officers in as many as three different area commands due to the shortage of first-line supervisors.

The supervisors who were interviewed reported inequality in assigned supervisees. Any given supervisor can supervise only 2-4 officers as part of their team, when others can have over 8 officers to supervise due to the lack of staffing as well as the shortage of supervisors. Similar ratios were also reported in the past. Due to the identified lack of first-line supervisors, PRPB has a clear deficiency with the assignment of supervisors. Also, it was reported that sometimes more than one lieutenant or captain are assigned to the same unit when other units have none assigned, also an indication of a deficiency with assignments.

As reported in the past, most sergeants still do not consistently work the same shift as the officers they supervise. In several units within the 13 precincts, interviewees noted that sergeants even work shifts in multiple precincts or units to make up for the supervisor shortage. The discrepancy between the PPR 373s and the information obtained in interviews is concerning. PRPB recognizes the need for additional first-line supervisors, so there is no reason to continue to report not having issues with assignments. It should be noted that during the paragraph 13 update, PRPB reported an aggressive proposal to promote 506 sergeants during FY 2023, that will help with future assignments of supervisors to the same shift as the officers they supervise. Considering this and issues with trainings and policies, the Monitor's Office finds that PRPB is currently not compliant with paragraph 137.

### Pathway Forward

Even after the Monitor's Office identified minimal improvements in the IT system, PRPB continues to need extreme improvements in its data systems so it can provide the Monitor's Office with accurate, requested staffing data in a more efficient manner. This will also make PRPB more effective and efficient at monitoring supervision practices and workloads and improve management and supervision within the organization. As soon as an automated system is correctly implemented and in effect, it should be effortless for PRPB to generate data from the 13 command areas to account for each supervisor and assigned subordinates.

### Paragraph 138: Supervision and Management - Duties of Supervisors

*PRPD shall develop a program to ensure consistent field supervision when assigned supervisors are absent or otherwise unavailable for their tour of duty.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |

159

| | | | |
|---|---|---|---|
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 136.

*Compliance Assessment*

PRPB has not met compliance with paragraph 138 due to the lack of promotion of first-line supervisors. The current proposal of promoting 506 sergeants by the end of FY 2023 will provide relief to the field but will not be enough to comply with paragraph 138 or satisfy the needs of the department. During meetings with PRPB commanders and deputy commanders it was advised that the lack of first-line supervisors is a challenge to cover supervisory absentees. Acting supervisors are frequently used to cover as well as lieutenants and captains actively participating in the field, providing guidance, supervision, and support to field officers. PRPB has not been able to satisfy this requirement or provide clear and convincing evidence that an effective plan to substitute supervisors is in place when there is a need due to absence. PRPB must make implementing its Staffing Plan a high priority.

As noted in the latest draft of the Staffing Plan, PRPB has been able to identify and determine staffing needs, especially in supervision. They concluded that 740 supervisors are needed to supervise in 110 precincts, with 6 supervisors per unit to cover 3 shifts with an additional relief. PRPB also advised that since 2018, they have lost 2,617 members. PRPB also reported that so far in 2022, they have promoted 103 sergeants and 10 lieutenants. Currently, PRPB is expected to promote an additional 506 sergeants during FY 2023. The Monitor's Office recognizes PRPB's current commitment and determination to remedy the identified deficit of first-line supervisors. Bringing the supervisory staff up to the identified level needed will make PRPB more effective, efficient, and credible.

*Pathway Forward*

As stated in the past, the lack of an automated system continues to affect PRPB's ability to capture statistics that will help the department to keep track of personnel and information. It is important for PRPB to have an automated platform and system in place. As reported above in this report, the Monitor's Office, DSP, and PRPB are currently working with Gartner Inc. to conduct an IT Needs Assessment. PRPB must capture information, statistics, workload, and crime analysis data for all investigative divisions. Having this automated system will make the department more effective, efficient, and credible in addition to complying with the Agreement.

Further, PRPB's efforts as outlined in the Staffing Plan suggest that by the end of FY 2023 it will have achieved the adequate number of supervisors needed to address this issue. In the interim, PRPB has also made adjustments to how it captures and tracks UOF reporting, which as noted above is also impacted by the lack of supervisors to review such reports. The Monitor's Office looks forward to working with PRPB as it implements the related initiatives outlined in its Staffing Plan.

## Paragraph 139: Supervision and Management - Duties of Supervisors

*Precinct and unit commanders shall closely and effectively supervise the officers under their command.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 136.

*Compliance Assessment*

During the CMR-7 reporting period, the Monitor's Office interviewed a random sample of approximately 9 supervisors and 40 supervisees. The Monitor's Office notes that Hurricane Fiona impacted its ability to conduct interviews with the full sample of agents during the reporting period. Although information gathered from these interviews is noted throughout this report, the Monitor's Office also acknowledges the limitations in our ability to provide a comprehensive analysis based on these interviews. Common themes in feedback gained from these interviews were very similar to what has been reported in past CMRs, the following comments were also made or repeated by the interviewees:

*The Agreement*

As reported in the past, officers interviewed were familiar with the Agreement. However, none of the officers or supervisors had completely read the Agreement, they advised that the main reason for not completely reading the Agreement was due to having many assignments and responsibilities. It should be highlighted that they all reported reading the UOF section. Furthermore, it should be noted that over 95% of respondents expressed favorable attitudes regarding the impact of the Agreement. Consistent statements made by officers as well as supervisors were:

> *"The Agreement provided guidance for management as well as for officers, community civilians have a better understanding of our responsibilities, created awareness of our responsibilities, is great for PRPB, it was necessary, the best thing that ever happened, made PRPB more professional, provided awareness during decision making situations, provided better equipment and training both virtually and in-person. Some sections of the Agreement like the UOF are discussed during the monthly meetings known as Academia."*

However, several officers, mainly the well experienced, stated that:

161

*"The Agreement at times, has limited officers, specifically during UOF decision making situations that can cost them their life, as well as their partners' or victims' lives."*

## Consistent Supervision

As reported in the past, PRPB has acknowledged that they do not have enough well trained, first-line supervisors. During the CMR-7 period, interviewed supervisors stated that they have been able to do their jobs, usually while supervising and evaluating 10 or less officers, but acknowledged that on several occasions, when supervisors either retired, transferred, or were on sick leave or vacation leave, they have been called on to evaluate officers that they do not directly supervise. During interviews, supervisors stated that sometimes lieutenants will help supervise and evaluate officers due to the shortage of first-line supervisors. Also, it was stated that due to the shortage of first-line supervisors, senior agents are tasked with providing supervision in the field. However, these acting supervisors do not write their evaluations.

Three of the nine supervisors interviewed (33%) indicated that they supervised less than 5 supervisees, another three (33%) indicated that they supervised between 5 and 10 supervisees, and the remaining three (33%) indicated that they supervised 10 or more. Most interviewees indicated that supervision loads are highly inconsistent, negatively impacting the quality of supervision Bureau-wide.

As in the past, most sergeants advised working long hours on the streets, providing officers with proper and effective supervision. Further, due to the lack of personnel, sergeants are called on to perform duties normally part of an officer's responsibilities, while their units are led by lieutenants. Due to the lack of sergeants, experienced agents sometimes serve as acting supervisors in the field. It was reported that the lack of communication among high-ranking officers continues. Often, information is not distributed properly, correctly, or on time, prompting officers to make mistakes or not complying with given orders due to constant miscommunication.

Interviewees during the CMR-7 reporting period continue to advise that many officers have been disarmed and are conducting civilian administrative work, but getting paid their regular officer's salary. The interviewees even reported officers working for years as janitors, handymen, car mechanics, etc., while still getting paid as a sworn officer. Several stated that several officers will report having emotional or personal problems to purposely get disarmed and be put on light duty, sometimes for years, while still getting their regular pay. The Monitor's Office understands that this system needs to be reviewed and managed in a way that officers abusing the system can be correctly identified and medically assessed to determine when they can return to duty or if not capable of performing law enforcement duties, be demoted to a civilian capacity and get paid accordingly. The Monitor's Office believe this is fundamentally unfair for all concerned and is a significant issue for the morale and professionalism within the organization.

## Promotions

During the CMR-7 reporting period, as reported in the past, a significant number of officers interviewed continued to report no interest in being promoted. Some of the reasons for this disinterest include the longevity of PRPB not providing a fair test and enough time to prepare for it, supervisors not motivating personnel, a significant low salary increase with many more responsibilities, and the unclear transfer policy provoking fear of being transferred out of their current region.

162

## Equipment

All interviewees continued to report that they are pleased with the new equipment they received, such as tasers, bullet-proof vests, flashlights, etc.  However, they continued to express a need for more, better, and proper vehicles. They advised that sometimes officers are assigned to locations where they need SUVs due to the terrain but will get regular vehicles assigned, making it very difficult to cover their territories. Furthermore, officers advised that most of the cars contain no computers, or if they have computers they do not work, so officers must go back to the office to complete reports. Similarly, officers noted insufficient numbers of computers at the office, forcing them to wait frequently for an available one and waste time at an office instead of going back to their duties.

Officers reported difficulty accessing vehicle or personal records during vehicle stops. The system in place forces them to call the office or "Centro de Mando" and wait until someone is available to run the requested records. They advised that sometimes the entire procedure, starting from when they stopped the vehicle to when they end the intervention, could take between 20 to 30 minutes. Furthermore, they advised that on several occasions, even after issuing a ticket, officers do not know if the driver or passengers have an arrest warrant or a criminal history, which is a security risk. It was also noted that officers need better handheld radios for communication. Officers have identified their personal cell phones as the best way of communication. Officers patrolling highways and main roads reported not having enough or good speed radar equipment, and that it is highly difficult to justify a ticket for speeding without a radar. They advised that most tickets are for reckless driving and illegal use of cellphones. Another pressing issue noted is that officers use their own money to repair official vehicles, such as replacing brake pads, repairing air conditioning systems, replacing tires or any other repairs and on a few occasions, repairing the vehicle themselves. It was reported that the Bureau's budget for repairs is so low that many vehicles cannot be used and are disabled for months, years, or sometimes forever.

## Evaluations

As in the past, 99% of interviewed officers placed little to no importance on evaluations, even when they agree with their evaluation results. There is a general perception by officers that their evaluations have no relevance to their careers. Again, it was reported that most supervisors will not discuss evaluations with officers unless the officers challenge them. Most officers interviewed stated that they received evaluation ratings ranging between 4 and 5 out of 5, demonstrating a significant score inflation. Interviewed officers believe that supervisors will evaluate officers high, so they do not have to deal with complaints or challenges or meet in person. It should be noted that the updated policy, GO 310 (Performance Evaluations), requires supervisors to meet and discuss evaluations with their officers in-person. Most of the officers advised that supervisors would email them their evaluations for signature and never meet to discuss performance or career advances. In a few cases, officers were evaluated by someone they had not served under. Several officers stated that the inflation of scores is demoralizing for officers performing well and legitimately earning high scores.

## Transfers

During the CMR-7 reporting period, all interviewed officers again advised that the transfer system does not work. According to officers, transfers take too long and are widely regarded to be influenced by friendships, connections, and politics. Even officers not using the transfer program agreed that it is not a fair system. Interviewees stated that it is a common topic of conversation among officers trying to

move closer to their homes. Transfers to another region can take up to 15 years and sometimes longer. Several officers advised that they know from first-hand observations that some officers are being transferred from the bottom of the seniority list, which is very unfair for officers using the system as designed. Over 95% of the officers believe that the transfer policies and system does not work fairly and that it is a well-known problem within the administration even though the department will not admit it.

## Community Relations

As reported in the past, all interviewed officers advised that each department or precinct has a designated officer or unit to represent the department within the community. They stated that it is solely the designated representative's responsibility and that other officers will not engage much with the community. Officers advised that due to having too many responsibilities and assignments, they do not have enough time to engage with community members and/or their organizations. They also advised that community engagement is not commonly encouraged by supervisors, again due to lack of personnel and many assignments.

## General Observations

- Positive areas that were mentioned:
  - The Agreement is generally seen as a positive and a necessity;
  - Communication amongst officers;
  - Younger supervisors are becoming more professional and committed;
  - Payment for over-time hours has improved;
  - Steps to get better pay has improved;
  - Supervisors are open to considering new ideas and change;
  - All interviewed supervisors as well as officers expressed approval of the Commissioner;
  - More and better professional instruction from supervisors;
  - Working conditions, training, and equipment have improved.
- Areas needing improvement that were mentioned:
  - Increase the number of front-line supervisors and personnel;
  - Written communication: Most interviewees stated that communication was primarily verbal. The perception is that written communications can be an issue for supervisors;
  - Supply shortages were not only reported but noted within the precinct visits;
  - More and better recruitment and retention programs to help with the lack of personnel;
  - Removal of political influence from PRPB, especially relating to transfers;
  - Improvement of the pension plan and benefits, which will in turn attract better candidates;
  - Some of those interviewed stated that cars and equipment are somewhat accessible, but PRPB needs to increase the budget for the purchasing of equipment, car parts, and the ability of repairing cars as quick as possible to better equip officers;
  - Shortage of qualified police candidates. Good incentives have to be in place to attract better candidates;
  - Supervisors believe the promotion tests are difficult and personnel need more time to study and prepare. In addition, it has taken too long to offer the promotion tests;

o Supervisors are supportive of virtual training but believe that in-person training is needed and more effective. It was also stated that obtaining 40 hours of in-service training can be a challenge;

o Officers reported working additional shifts or hours to cover the lack of officers. In many cases, the lack of officers is causing PRPB members to be overworked, affecting morale and causing burnout;

o Supervisors and officers complained about the Judicial System, which they feel needs to be more consistent and effective in the application of the law;

o Supervisors feel that there is too much time spent on lethal weapons training when other training is just as valuable, such as taser and baton training; and

o Recognition of outstanding work sometimes does not occur.

*Pathway Forward*

Commanders and those in executive leadership positions should pay more attention to officers' feedback and take advantage of the identified strengths. Furthermore, they should recognize and work to improve the deficiencies mentioned by the officers under their command without any type of retaliation. As seen in the past, too many officers and personnel have reported the same or similar issues regardless of the administration. Obviously, the single most significant factor that would help address many of the issues raised by officers would be to promote and deploy the identified needed number of first-line supervisors. Further, PRPB must promptly address issues in supervisory staffing shortages. Limited supervision not only presents issues in accountability, but greatly affects officer morale, as evidenced by the feedback gathered by the Monitor's Office. The Monitor's Office will continue to assess progress as PRPB works to implement the updated staffing plan and address these staffing shortages, per paragraph 13.

## Paragraph 140: Supervision and Management - Duties of Supervisors

*All PRPD commanders and supervisors shall ensure that all supervisors and officers under their command comply with PRPD policy, Commonwealth of Puerto Rico and federal law, and the requirements of this Agreement.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Not Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 136.

165

*Compliance Assessment*

The Monitor's Office has reviewed examples of staffing documents submitted electronically and shown during several on-site visits, such as to Bayamon, Ponce, Arecibo, Aguadilla, Fajardo, Guayama, Humacao, and Mayaguez. As in the past, the documents and interviews continue to confirm the necessity for first-line supervisors. DSP and PRPB outline the work that they will undertake to promote 506 sergeants by early next year in the updated staffing plan. By accomplishing this number of assignments, the sergeants will be able to provide more close, active, and effective supervision, guide and promote professionalism, prioritize community policing and problem solving, and most importantly, identify, correct, and prevent misconduct. As recommended in the past, the Monitor's Office determined that PRPB also needs to work towards developing its EIS, conducting personnel integrity audits, and ensuring the implementation of inter-agency feedback systems. These steps are also essential in achieving compliance with this paragraph. Regardless of the level of supervision, a greater responsibility is expected of supervisors based on their positions, specifically to ensure that officers under their command comply with Bureau policy, the Agreement, and the law. Most of the personnel interviewed were supportive of their supervisors and felt that they provided the necessary supervision, guidance, and support to comply with Bureau policy, the Agreement, and the law. However, some of those interviewed indicated that their supervisors could improve their performance if they had more and better training as well as greater support from the next level of supervision.

*Pathway Forward*

As in the past, evaluations were mentioned as an area in which supervisors can improve. The interviewees did not oppose receiving evaluations via email for review but advised that supervisors should spend time meeting with their supervisees to discuss their performances, goals, and objectives, as well as their careers within PRPB. Improved performance evaluations are an important aspect for ensuring that supervisors are ensuring that officers under their command comply with the policy.

Further, as noted throughout, increased supervision and staffing levels will also work towards ensuring greater and more effective supervision.

## 2. Supervisor Training

*Paragraphs 141 - 144 are assessed annually and will be reviewed in CMR-8.*

## 3. Performance Evaluation

PRPB has been using ProMedia to document its performance evaluations. During the CMR-7 reporting period, PRPB also made considerable revisions to its policies and procedures related to performance evaluations, specifically GO 310. These modifications not only expand the performance categories measured (i.e., quality of reports) but they also require that supervisors meet with supervisees in person and provide written detailed annotations in their assessments. The Monitor's Office notes that during performance evaluation meetings, supervisors should be clear, detailed, and well documented in justifying their evaluations. They should be specific and provide simple and direct strategies to help employees improve. In addition, supervisors should have plans to follow through with their guidance. Interviewed supervisors were supportive of ProMedia but based on their responses and a review of

training records, they need additional training. Once supervisors develop expertise with this system, they will be able to better serve their subordinates and PRPB.

## Paragraph 145: Supervision and Management - Performance Evaluation

*PRPD shall develop and implement a specific system to accurately evaluate the qualifications and performance of all PRPD officers in areas that include, but are not limited to, constitutional policing, integrity, community policing, and critical police functions on both an ongoing and annual basis. PRPD shall develop objective criteria to assess whether officers meet minimum qualifications and performance standards, including officers in inactive status, where appropriate. The evaluation system shall provide for appropriate remedial or disciplinary action.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 145-146. | ☒ Met | ☐ Missed |
| 2. Training on performance evaluations is consistent with approved policies. | ☒ Met | ☐ Missed |
| 3. 95% of sampled personnel files indicate that supervisors are trained and certified on policies regarding performance evaluations (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☒ Missed |
| 4. 95% of sampled officers meet minimum qualifications and eligibility criteria. | ☒ Met | ☐ Missed |
| 5. 95% of sampled performance evaluations adhere to approved policies. | ☐ Met | ☒ Missed |

*Compliance Assessment*

During CMRs-5 and 6 as well as for CMR-7, the Monitor's Office determined that all related policies incorporated all requirements of the Agreement, paragraphs 145 and 146, and that supervisory trainings were consistent with approved policies. However, again during the officers and supervisors' interviews, it was still reported that performance evaluations are still being provided and received via email and that unless the evaluations are challenged, no in-person discussions take place. Further, in review of the performance evaluations conducted during the CMR-7 reporting period, the Monitor's Office continues to have concerns over the seemingly inflated ratings being provided to officers.

In response to the Monitor's previous comments on performance evaluations, GO 310 was revised and requires that every PRPB supervisor meets with their supervisees in-person to discuss their evaluations regardless of the outcome. During the meetings, the supervisors and supervisees will discuss performances, expectations, respective goals, and career path. Additional comments from the Monitor's Office on GO 310 and its accompanying forms were included.

167

As of the completion of this reporting period, GO 310 has not been finalized. Further, additional training once the policy is finalized will need to be developed and delivered.

### Pathway Forward

The Monitor's Office looks forward to the finalization of GO 310 and related forms. Training, for both supervisors and supervisees, on these revised policies and procedures will also be imperative to the implementation of this paragraph. Further, the Monitor's Office also recommends that PRPB adjust ProMedia as needed to accommodate for revisions to the process and in further streamlining the system's ability for executives and HR management officials to review and audit evaluations to ensure that the performance evaluations are being carried out according to policy.

### Paragraph 146: Supervision and Management - Performance Evaluation

*As part of this system, PRPD shall establish a formalized system documenting annual performance evaluations of each officer by the officer's direct supervisor. PRPD shall hold supervisors accountable for completing timely, accurate, and complete performance evaluations of their subordinates.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: This Paragraph is assessed with Paragraph 145.

### Compliance Assessment

The Monitor's Office reviewed performance evaluations for the officers sampled which revealed that the performance evaluation system is formulized but not completely automated. The random sample of performance evaluations shows that most evaluations are completed on time. However, there is systemic inflation of ratings on most of the evaluations. One possible explanation for the inflated ratings is that supervisors do not want to confront bad performance by their employees. The new performance evaluation system and policy, which is still undergoing revisions, will require supervisors to meet one-on-one with their employees and discuss career goals and objectives.

Further, in interviews with officers, many members reported that they have been given their evaluations via email instead of in a one-on-one meeting. As noted by the Monitor's Office in previous CMRs, conducting evaluations via email is not conducive of proper supervision or management of personnel. Shortages of supervisors have been noted as a contributing factor to the abridged version of performance evaluations being conducted over email.

168

As noted in paragraph 145, the Monitor's Office has recently reviewed the related policy GO 310 (Performance Evaluations), which is currently under revision.

*Pathway Forward*

Although this process is formalized and managed using ProMedia, the Monitor's Office recommends that PRPB revise this system to make it more automated and institute tracking mechanisms for supervisory reviews of their subordinates. The system should alert both supervisees and supervisors when evaluations are due. It is also recommended that supervisors meet with their subordinates on an on-going basis to discuss performance and that supervisors should document their communications regarding goals, objectives, performance challenges, and areas for growth.

## 4. Early Identification System

As noted in previous reports, PRPB has developed various modules within its EIS. However, upon examination of these modules and further discussion with PRPB personnel, the Monitor's Office noted that the current EIS in use by PRPB requires further development to ensure it serves as a non-punitive, proactive method for identifying agents that may need training, counseling, or other intervention before issues arise involving agent misconduct. The modules within EIS, as referred to by PRPB, serve as case management for complaints, sexual assault investigations, domestic violence investigations, and is not used as an EIS, in the traditional sense, to track officer performance and conduct.

On August 22, 2022, the Monitor's Office participated in an operational system demonstration of the Supervision Module and the No Punitive Fouls Module. These two modules were shown to be operational, and PRPB is awaiting authorization to initiate these systems, which they hope to receive in October 2022. When EIS is operational, the Punitive Fouls Module will be used for referrals to EIS.

Although PRPB has participated in some virtual meetings to discuss EIS, much of the work in this area is being tabled until the IT Needs Assessment and AHDatalytics' work has been completed. Both projects will inform the state and quality of the data that will be used to develop EIS. PRPB can only be considered compliant with paragraphs 147-153 when EIS is developed to the point where 1) supervisors are readily and consistently able to access the system to enter and retrieve all datapoints required by the Agreement and PRPB policy, and 2) PRPB leadership and third-party overseers are able to conduct data analysis of policing practices and outcomes using EIS.

As a result of further work needed to improve its EIS and PRPB's inability to demonstrate an operational use of EIS in a comprehensive manner, the Monitor's Office must rate the below related paragraphs as not compliant.

Because much of the work in this area is contingent on other projects, PRPB has also not developed the related policies and procedures related to EIS. The Monitor's Office looks forward to assessing PRPB's progress in this area after the completion of the IT Needs Assessment and AHDatalytics' work, both of which are expected to be completed by the end of 2022.

### Paragraph 147: Supervision and Management - Early Identification System

*PRPD shall develop, implement, and maintain an early identification system ("EIS") to support the effective supervision and management of PRPD officers and employees, including the identification of and response to*

*problematic behaviors as early as possible. PRPD shall regularly use EIS data to promote ethical and professional police practices; to manage risk and liability; and to evaluate the performance of PRPD employees across all ranks, units, shifts, commands, and organization components.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Not Implemented | Review Period | April 2022 – September 2022 |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | Assessment Frequency | Bi-annually |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 147-153. | ☐ Met | ☑ Missed |
| 2. Training on EIS is consistent with approved policies. | ☐ Met | ☑ Missed |
| 3. 95% of sampled supervisors and personnel administering EIS are trained and certified in EIS policies (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 4. EIS data and records demonstrate compliance with EIS policy for 95% of selected officers who trigger EIS and officers who do not trigger EIS. | ☐ Met | ☑ Missed |
| 5. 95% of interviewed officers, supervisors, SARP personnel, and IT staff perceive EIS as an effective supervisory tool that addresses potential problematic behavior in a non-punitive manner. | ☐ Met | ☑ Missed |
| 6. EIS is functioning as designed, equipment is in good working order, and information is secure in 95% of selected units. | ☐ Met | ☑ Missed |

## Compliance Assessment

As noted above and in previous CMRs, there currently is no EIS developed and/or in use by PRPB. PRPB is misapplying the acronym EIS to a system that is primarily used as a case management system. PRPB has noted that it is awaiting recommendations from the IT Needs Assessment and results of AHDatalytics' work to begin developing EIS. EIS will be heavily reliant on the data and modules that are currently being reviewed and/or developed as part of these two projects. As such, it is most efficient for PRPB to wait until these projects have been completed until it begins delving into EIS development.

## Pathway Forward

The Monitor's Office looks forward to assessing PRPB's progress in this area after the completion of the IT Needs Assessment and AHDatalytics' work, both of which are expected to be completed by the end of 2022.

## Paragraph 148: Supervision and Management - Early Identification System

*The EIS shall include a computerized relational database which shall be used to collect, maintain, integrate, and retrieve detailed data department-wide and for each officer regarding:*

*a) all uses of force;*

b) injuries to and deaths of persons in custody;

c) all complaints and their dispositions;

d) data compiled under the stop data collection mechanism;

e) all criminal proceedings initiated, as well as all civil or administrative

claims filed, that bear upon an officer's performance or fitness including, but not limited to, domestic violence and protective orders;

f) all judicial proceedings involving domestic violence, protective orders, and any other judicial proceedings which may be related to an officer's performance;

g) all instances in which PRPD is informed by a prosecuting authority that a declination to prosecute any crime was based, in whole or in part, upon concerns about the credibility of a PRPD employee or that a motion to

suppress evidence was granted on the grounds of a constitutional violation by a PRPD employee;

h) all disciplinary action taken against employees;

i) all non-punitive corrective action required of employees;

j) all awards and commendations received by employees;

k) training history for each employee; and

l) identifying information for each PRPD officer and employee and;

m) demographic data for each civilian involved in a use of force or search and seizure incident sufficient to assess bias.

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Not Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 147.

*Compliance Assessment*

There currently is no EIS in use by PRPB. PRPB is misapplying the acronym EIS to a system that is primarily used as a case management system. PRPB does not have an early intervention system that comports with generally accepted policing principles and practices related to early intervention. As such, the Monitor's Office concludes that there is no related policy and no related system, and PRPB cannot be considered in compliance with any paragraphs related to EIS.

*Pathway Forward*

The Monitor's Office looks forward to assessing the developments of this work in its upcoming reports and stresses to PRPB the importance of ensuring that EIS, once developed, captures the requirements of this paragraph.

## Paragraph 149: Supervision and Management - Early Identification System

*PRPD shall establish a unit to develop, implement, and maintain the EIS with sufficient resources to facilitate data input and provide training and assistance to EIS users.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Not Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 147.

*Compliance Assessment*

As noted above, there currently is no EIS developed and/or in use by PRPB. Although PRPB has identified personnel that will lead EIS development efforts and its related policies and procedures, as noted above, any work related to this has been placed on hold until the IT Needs Assessment and AHDatalytics' work is completed. The results and recommendations from these two projects will be used to inform EIS development.

*Pathway Forward*

The Monitor's Office looks forward to assessing PRPB's progress in this area after the completion of the IT Needs Assessment and AHDatalytics' work, both of which are expected to be completed by the end of 2022.

## Paragraph 150: Supervision and Management - Early Identification System

*PRPD shall maintain necessary equipment, in sufficient amount and in good working order, to permit appropriate personnel, including supervisors and commanders, ready and secure access to the EIS system to allow for timely input and review of EIS data.*

| Compliance Status | Assessment Schedule | |
|---|---|---|
| Not Compliant | Review | April 2022 – September 2022 |

172

| | | | |
|---|---|---|---|
| Policy: | Not Implemented | Period | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 147.

*Compliance Assessment*

PRPB has not made significant progress in the development of an EIS, and most of the supervisors and agents who were interviewed were unaware of what constitutes an EIS. Those that know how to use EIS nevertheless report not being able to access the system. The Monitor's Office has been told in interviews that equipment such as logbooks, administrative supplies, laptops/iPads, and computers, are not available for PRPB supervisors to use to access and review EIS data. The Monitor's Office notes that investment in such equipment is a prerequisite for providing supervisors with a mechanism for accessing and reviewing EIS once its development is completed.

*Pathway Forward*

The Monitor's Office notes that PRPB must take equipment needs into consideration as it works towards promoting new supervisors in the coming months. Further, PRPB should leverage the IT Needs Assessment to inform the status of its ability to provide supervisors and commanders with the equipment necessary to access supervisory and management systems like EIS. A future meeting will be held to discuss EIS and integrity audits. This meeting will be hosted by the Office of the Special Master (OSM).

## Paragraph 151: Supervision and Management - Early Identification System

*PRPD shall develop a protocol for using the EIS and information obtained from it. The protocol for using the EIS shall address data storage, data retrieval, reporting, data analysis, pattern identification, supervisory use, supervisory/departmental intervention, documentation and audits, access to the system, and confidentiality of personally identifiable information. The protocol shall also require unit supervisors to periodically review EIS data for officers under their command, including upon transfer between PRPD units or regions.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Not Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

173

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 147.

*Compliance Assessment*

There currently is no EIS in use by PRPB. PRPB is misapplying the acronym EIS to a system that is primarily used as a case management system. PRPB does not have an early intervention system that comports with generally accepted policing principles and practices related to early intervention. As such, the Monitor's Office concludes that there is no related policy and no related system, and PRPB cannot be considered in compliance with any paragraphs related to EIS.

*Pathway Forward*

The Monitor's Office looks forward to assessing the developments of this work in its upcoming CMRs.

## Paragraph 152: Supervision and Management - Early Identification System

*PRPD shall maintain all personally identifiable information about officers and employees included in the EIS for at least five years following their separation from the agency. Information necessary for aggregate statistical analysis shall be maintained indefinitely in the EIS. On an ongoing basis, PRPD will enter information into the EIS in a timely, accurate, and complete manner, and shall maintain the data in a secure and confidential manner.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Not Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 147.

*Compliance Assessment*

There currently is no EIS in use by PRPB. PRPB is misapplying the acronym EIS to a system that is primarily used as a case management system. PRPB does not have an early intervention system that comports with generally accepted policing principles and practices related to early intervention. As such, the Monitor's Office concludes that there is no related policy and no related system, and PRPB cannot be considered in compliance with any paragraphs related to EIS.

*Pathway Forward*

The Monitor's Office looks forward to assessing the developments of this work in its upcoming CMRs.

## Paragraph 153: Supervision and Management - Early Identification System

*Following the initial implementation of the EIS, and as experience and the availability of new technology may warrant, PRPD may propose to add, subtract, or modify data tables and fields, modify the list of documents scanned or electronically attached, and add, subtract, or modify standardized reports and queries. PRPD will submit all such proposals for review and approval as set forth in Paragraph 229.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Not Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

Note: This Paragraph is assessed with Paragraph 147.

### *Compliance Assessment*

There currently is no EIS in use by PRPB. PRPB is misapplying the acronym EIS to a system that is primarily used as a case management system. PRPB does not have an early intervention system that comports with generally accepted policing principles and practices related to early intervention. As such, the Monitor's Office concludes that there is no related policy and no related system, and PRPB cannot be considered in compliance with any paragraphs related to EIS.

### *Pathway Forward*

The Monitor's Office looks forward to assessing the developments of this work in its upcoming CMRs.

## 5. Internal Audits and Interagency Feedback

PRPB ensures that audit work is conducted in a consistent, fair, and professional manner. The PRPB Audit Division provides transparency and gains public trust through accountability, quality, and continuous improvement. The audit system identifies operational deficiencies, analyzes the causes and contributing factors, and implements effective corrective measures. These audits help ensure that all areas of Puerto Rico receive adequate levels of service delivery. Policies reviewed by the Monitor's Office related to this subsection meet paragraph requirements. The internal audits reviewed by the Monitor's Office demonstrate that commanders are developing a plan of action for the deficiencies identified by the Audit Division.

## Paragraph 154: Supervision and Management - Internal Audits and Interagency Feedback

*As part of PRPD's continuous improvement efforts and to ensure compliance with this Agreement, PRPD shall establish an auditing system that identifies operational deficiencies, analyzes causal and contributing factors,*

*and implements effective remedial action. To effectuate the system, PRPD shall develop and implement auditing protocols that are based on generally accepted policing practices. The protocols shall provide the audited unit an opportunity to respond to preliminary findings and recommendations, as appropriate, to foster a culture of accountability and continuous improvement among all PRPD units and personnel.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 154-156. | ☑ Met | ☐ Missed |
| 2. Training on internal audits and inspections are consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled personnel are trained and certified on the auditing and inspections system (or scheduled for training, in the case of mid-year reviews). | ☑ Met | ☐ Missed |
| 4. 95% of selected internal audits and inspections comply with policy. | ☑ Met | ☐ Missed |
| 5. Internal audits and inspections are scheduled regularly for all PRPB units, locations, and personnel. | ☑ Met | ☐ Missed |
| 6. PRPB prepares an annual report that (a) includes the conclusions and recommendations of internal audits and inspections conducted for the covered period and (b) is reviewed by the Commissioner and unit commanders to guide corrective action, as appropriate. | ☑ Met | ☐ Missed |

*Compliance Assessment*

In assessing PRPB's compliance with this paragraph, the Monitor's Office finds that related policies incorporate the requirements of paragraphs 154-156. Trainings on internal audits and inspections are consistent with approved policies. The Monitor's Office found that 95% of sampled personnel have completed or will complete the required training and certification on the auditing and inspections system in the required timeframe.

Based on conversations with members of the inspection division, PRPB is apparently using the auditing system to identify operational deficiencies and their causes and contributing factors so that effective remedial action may be implemented. It is noted by the Monitor's Office that the Inspection Manual is comprehensive and has been well received by PRPB supervisors.

The January 2022 Annual Report of SARP Audits, which covered the period of January 1, 2021, to December 31, 2021, was provided to the Monitor's Office. The Scope of Operational Audits included Administration, Retén, Human Resources (MNPPR), Official Vehicles, and Physical Plant. During 2021, the Inspections Division conducted 95 island-level inspections. These audits identified countless findings that are not consistent with the policies, procedures, regulations, and guidelines issued by PRPB. In the

future the Monitor's Office expects PRPB to also demonstrate that the Commissioner has reviewed the annual report and/or provide a signature on the Annual Report.

*Pathway Forward*

The Monitor's Office stresses the importance of providing all requested data for review but acknowledges PRPB's preference for only submitting completed audit and inspection reports. The Monitor's Office will request a global list of all audits and inspections ongoing and completed during the CMR-8 reporting period and will draw a sample based on the inspections that were completed during the period. Regarding training, PRPB should provide the Monitor's Office with lists for CMR-8 that, in conjunction with those provided for CMR-7, demonstrate that all auditing and inspection personnel have up-to-date certifications, and that PRPB continues to provide training to personnel on the auditing and inspections system.

Finally, though paragraph 155 was not due for review in CMR-7, for CMR-8 PRPB should produce evidence that the Commissioner's Office reviews its upcoming annual audit and inspection report per compliance target 6. The Monitor's Office encourages PRPB to include some sort of cover letter on annual reports that would provide evidence that the Commissioner read the report and offered recommendations. Such a cover letter or similar document will be critical to obtaining substantial compliance in the Monitor's Office's upcoming assessment of Paragraph 155 in CMR-8.

## Paragraph 155: Supervision and Management – Internal Audits and Interagency Feedback

*Paragraph 155 is assessed annually and will be reviewed in CMR-8.*

## Paragraph 156: Supervision and Management - Internal Audits and Interagency Feedback

*PRPD auditors shall issue a report to the Superintendent on the result of each audit. The Superintendent will review each audit for appropriate policy, disciplinary, and/or non-punitive corrective action. The commander of each precinct or specialized unit shall review all audit reports regarding employees under their command and, if appropriate, shall take non- punitive corrective action or disciplinary action.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 154.

177

*Compliance Assessment*

Although the Monitor's Office has received information from SARP indicating that audits are consistently planned and conducted, the Monitor's Office was not provided with documentation to demonstrate that the Commissioner reviews each audit for appropriate policy, disciplinary, and/or non-punitive corrective action. However, documentation was provided to demonstrate that the commander of each precinct or specialized unit reviewed all audit reports regarding employees under their command and, if appropriate, took non-punitive corrective or disciplinary action.

According to interviewed members of the Inspection Division, the problem with the annual report is a system/process and technology issue. The current auditing process is manual and slow, which delays the aggregation of data for the annual report. However, auditors report that a form is being developed to help address this issue. To assist, the Monitor's Office provided a copy of the Policy and Procedures for Audits within an Inspection Division of a large agency. It should be noted that per the paragraph requirements, the Superintendent, or Police Commissioner, is required to review each audit report.

PRPB did provide a list of 16 operational audits conducted during the reporting period, 8 of which had been completed (50%). The remaining eight (50%) are still in process and as such the Monitor's Office was only able to verify that the eight completed audits and inspections conducted for the covered period have been reviewed by unit commanders to guide corrective action, as appropriate.

During a site visit to Guayama in August 2022, the Monitor's Office received a Random Inspection Certification form that is being used by supervisors. The form included an inspection of drivers' licenses, lethal and less lethal weapons, gun belts, ammunition, magazines, tasers, batons, and gas. This form if used consistently across the Bureau would assist in the documentation requirements to achieve compliance with this paragraph.

*Pathway Forward*

PRPB should work on developing a formal system whereby the Commissioner and commanders produce memos or other evidence to track and demonstrate that they have thoroughly read relevant audits and have developed strategies and corrective actions based on the results of those audits. These strategies and corrective actions should be published so that other commanders can see successful resolutions. The Monitor's Office expects that the next annual Audit Report will be issued in January 2023 during the CMR-8 period.

## Paragraph 157: Supervision and Management - Internal Audits and Interagency Feedback

*PRPD shall develop and implement a plan for organizing and executing regular, targeted, and random integrity audits. The integrity audits will be used to identify and investigate officers engaging in misconduct including, but not limited to, unlawful stops, searches, seizures (including false arrests), excessive uses of force, potential criminal behavior, racial or ethnic profiling, and bias against lesbian, gay, bisexual, and transgendered persons, or any other form of misconduct. These operations shall also seek to identify officers who discourage the filing of a complaint, fail to report misconduct or complaints, or otherwise undermine PRPD's integrity and accountability systems. SPR shall have the oversight responsibility within PRPD for these operations. SPR shall use relevant EIS data and other relevant information in selecting targets for integrity audits.*

| Compliance Status | Assessment Schedule |
|---|---|

| Not Compliant | | Review Period | April 2022 – September 2022 |
|---|---|---|---|
| Policy: | Not Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | Met | Missed |
|---|---|---|
| 1. Policies incorporate all the requirements of this Paragraph. | ☐ Met | ☑ Missed |
| 2. Training on integrity audits is consistent with approved policies. | ☐ Met | ☑ Missed |
| 3. 95% of sampled personnel are trained and certified on integrity audits (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 4. 95% of selected integrity audits are designed effectively and comply with approved policies. | ☐ Met | ☑ Missed |
| 5. EIS and other relevant information is considered when selecting targets for integrity audits in 95% of selected integrity audits. | ☐ Met | ☑ Missed |

### Compliance Assessment

PRPB is developing a plan for organizing and executing regular, targeted, and random integrity audits as documented by a certification provided by PRPB in the CMR-7 reporting period (the protocol to perform integrity tests). On September 8, 2022, PRPB submitted a preliminary draft of its Integrity Audit policy and Protocol and participated in a meeting with the Parties to discuss the drafts and assistance from the OSM on September 23, 2022. As such, PRPB has not begun training relevant personnel and conducting integrity audits based on the associated policy and protocol. The Monitor's Office looks forward to reviewing the policy and protocol for the integrity audits when formally submitted.

### Pathway Forward

The Monitor's Office looks forward to the implementation of these materials during CMR-8.

## Paragraph 158: Supervision and Management - Internal Audits and Interagency Feedback

*PRPD shall establish an executive-level liaison committee consisting of high- level command officers of the PRPD who communicate, on at least a quarterly basis, with representatives of federal and local criminal justice components in all regions in Puerto Rico, including judicial courts, prosecutors, the University College, and municipal police departments. The committee shall seek mutual feedback and information on improving Puerto Rico's criminal justice system, including performance issues or concerns related to PRPD, its officers, employees, or units. All PRPD high-level commanders who participate in the executive-level liaison committee shall ensure that all allegations of misconduct or potential criminal activity are referred to SPR and/or PRDOJ for investigation, as appropriate.*

| Compliance Status | Assessment Schedule | |
|---|---|---|
| Partially Compliant | Review | April 2022 – September 2022 |

| | | | |
|---|---|---|---|
| Policy: | Implemented | Period | |
| Training: | N/A | Assessment Frequency | Quarterly |
| Practice: | Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. Agreements and protocols incorporate all the requirements of this Paragraph. | ☑ Met   ☐ Missed |
| 2. PRPB solicits feedback and shares information with criminal justice components, and refers allegations of misconduct or potential criminal activity it obtains from such components to SARP for investigation. | ☑ Met   ☐ Missed |

*Compliance Assessment*

The Monitor's Office has determined that the relevant agreements and protocols incorporate all the requirements of this paragraph. Furthermore, based on the Monitor's assessment of paragraphs related to civilian complaints and internal investigations, the Monitor's Office has determined that other members of the criminal justice system have stepped forward and become part of the local criminal justice meetings. PRPB refers of allegations of misconduct or potential criminal activity it obtains from such components to SARP for investigation.

Documentation on the work of the feedback committees provided by PRPB illustrated that the committees are following the requirements of the paragraph consistently in the areas of San Juan, Ponce, and Bayamon, but less consistently in other areas. The documentation provided included meeting agendas, attendee lists, and minutes, all of which provided evidence of participation by representatives of federal and local criminal justice components in all regions of Puerto Rico, including judicial courts, prosecutors, universities, and the municipal police department. The Monitor's Office thus deems PRPB as being partially compliant with the paragraph due to the strong performance of the feedback committees in the aforementioned police areas but requires further evidence of consistent performance across all police areas to assess PRPB as being substantially compliant.

*Pathway Forward*

The Monitor's Office notes that the area meetings conducted in San Juan, Ponce, and Bayamon should be used as examples for other areas. The committee meetings in these areas had broad participation with representatives of federal and local criminal justice components, a purposeful agenda and related discussion topics, and noted recommendations for action items and next steps for improving police services and the quality of investigations.

Furthermore, the Monitor's Office recommends that PRPB use protocols for maintaining related documentation not only as a means of demonstrating compliance with the Agreement, but more broadly to document the outcomes and action items from these meetings to ensure follow through and accountability.

180

# IX. Civilian Complaints, Internal Investigations, and Discipline

Beginning with this reporting period, the Monitor's Office bifurcated the analysis of SARP investigations files into two phases, Phase I and Phase II. The former is the Monitor's contemporary assessment of PRPB compliance with respect to the internal investigation phase of PRPB members, while the latter is the Monitor's assessment of the ensuing adjudication phase of the case.

The Monitor's Office reviewed 53 internal disciplinary cases. Half of these cases contained investigations that concluded during the CMR-7 reporting period, and thereby were given a Phase I analysis.  The remaining half were cases containing a Final Resolution and was signed by the Police Commissioner during the CMR-7 reporting period. Accordingly, the Monitor's Office subjected these cases to both Phase I and Phase II analysis. Each tranche of cases contained an array of alleged police misfeasance, malfeasance, and non-feasance including allegations of domestic violence, corruption, and reprisal.

The Monitor's Office finds that overall, internal investigations were conducted well and were eventually adjudicated in accordance with the facts. One common lagging area concerns documenting case milestones, including investigative assignment date, conclusion date, supervisory review date, area command review date, and overall SARP review date.  Many supervisory review forms are submitted without a date. Some cases are missing documents that would prove that the case met all the deadlines prescribed within the Agreement. Simply by being more vigilant in the future, PRPB could improve its compliance level drastically.

Training continues to be another area of subpar performance. The Monitor's Office acknowledges that the COVID-19 pandemic had a devastating impact on presential training. That said, PRPB must redouble its efforts to eliminate the backlog in training areas. Present documentation indicates that PRPB officers lack training in many topics related to this section, such as the civilian complaint program. Investigative training and professional development are also a key concern.

As has been highlighted by the Monitor's Office in previous CMRs, and despite SARP command efforts to request procurement, overall resources, staffing, and equipment continue to be of some concern. While the Monitor has seen some positive developments regarding the SARP vehicular fleet and the delivery of some requested hardware, the continuing lack of adequate resources affects the quality and timeliness of investigations and has an even greater negative impact on the adjudicative phase of an internal investigation.  The Commonwealth must quickly connect SARP to essential resources it requires to perform its mission.

Although much remains to be done, the Monitor's Office has seen continued success in various paragraphs, including paragraph 161, which covers civilian complaint forms design, paragraph 169, covering complaint intake protocol, paragraph 170, covering complaint classification and assignment, paragraph 172, covering supervisory handling of complaints against a PRPB member, paragraph 187, covering scenarios involving a reluctant complainant, and  paragraph 190, covering SARP command and OPC review of SARP investigations.

Overall, the Commonwealth's compliance with the 46 paragraphs assessed during this reporting period within Civilian Complaints, Internal Investigations, and Discipline reflect a progression in compliance to

what was noted in previous reports, largely because many paragraphs assessed in CMR-6 were deferred by the Monitor's Office due to incomplete datasets. In CMR-6, 28% of paragraphs (13 paragraphs) were assessed as partially compliant and 28% (13 paragraphs) were assessed as substantially compliant, in comparison to the current reporting period, where 48% of paragraphs (28 paragraphs) were found to be partially compliant and 35% (16 paragraphs) were found to be substantially compliant. One paragraph (2%) was noted as deferred in CMR-7. See figure 8.



*Figure 8. Civilian Complaints, Internal Investigations, and Discipline: Paragraph Compliance Status*

## Paragraph 159: Civilian Complaints, Internal Investigations, and Discipline - General Provisions

*PRPD shall ensure that all allegations of officer misconduct are received and are fully and fairly investigated; that all investigative findings are supported by a preponderance of the evidence; and that all officers who commit misconduct are held accountable pursuant to a disciplinary system that is fair and consistent. PRPD shall develop policies and practices for the intake, investigation, and adjudication of misconduct complaints against PRPD officers. These policies and practices shall comply with applicable law and comport with generally accepted policing practices, and shall include the requirements set out below.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: Compliance will be determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 160-204, and (2) the results of outcome assessments, pursuant to Paragraph 243.

182

*Compliance Assessment*

Beginning with this reporting period, the Monitor bifurcated his analysis of SARP investigations files into two phases, Phase I and Phase II.  The former is the Monitor's assessment of PRPB compliance with respect to the internal investigation phase of PRPB members, while the latter is the Monitor's assessment of the ensuing adjudication phase of the case.  It bears mentioning that Phase II cases were also subjected to a Phase I analysis to determine whether they were properly investigated in the first place.

The main reason for this bifurcated design concerns the timeliness of the Monitor's assessment.  Cases in CMR-7 for Phase I Analysis featured an investigation that concluded during the reporting period and, therefore, that investigative component was recent.  On the other hand, cases subjected to a Phase II Analysis were often investigated months, if not years prior to the case reaching a Final Resolution[18] during the reporting period.  The bifurcated sample model allows the Monitor to assess any recent improvements more effectively in SARP investigations in close to real time, while also allowing the Monitor to contrast SARP performance in much older investigations.[19]  Lastly, the Phase II Analysis allows the Monitor to assess the adjudicative process from the end of an investigation, through various levels of internal management and legal review, up to its Final Resolution.

The Monitor notes that SARP leadership has been quite diligent in requesting equipment, vehicles, tools, and human resources from the PRPB to cure deficiencies previously mentioned by the Monitor.  The Monitor has examined formal, written requests for procurement of said resources beginning in October of 2021 and continuing in earnest through April of 2022.  The Monitor has no evidence as to what, if anything, has been delivered in response to these procurement requests.

*Pathway Forward*

The Monitor certainly understands that exceptional circumstances such as the COVID pandemic may disrupt presential training or make it impossible for some period. However, now that this pandemic is on the wane, the PRPB must ensure that SARP investigators both new to the unit as well as veterans are adequately trained.  The former should be formatively trained prior to joining the unit and the latter trained for at least 8 hours in a high-quality in-service training component that is presential and not online. The PRPB should adopt procedural changes recommended in prior CMRs, by amending its rules and procedures with respect to SARP investigations, followed by modified training curricula both formative and in-service.

The PRPB must also procure and deliver the resources SARP needs to conduct its investigations in a thorough and timely manner.

---

[18] "Final Resolution" is the last stage of PRPB action in any given internal disciplinary matter, where the Police Commissioner considers the facts and circumstances of a given case and then assesses appropriate disciplinary measures in accordance with Puerto Rico Statute (see Ley 20 de 2017, Artículo 2.20, Medidas Disciplinarias).  Once a Final Resolution has been executed, the Parties to such a case may only rely upon C.I.P.A. or Court review of the facts and findings for purposes of appeal.

[19]  In CMR-6, the Monitor reviewed only cases that had reached a Final Resolution.  These cases were nearly all investigated years prior and therefore, the Monitor could not determine with specificity whether the PRPP/SARP's investigative process and execution was improving over the 12-18 months preceding CMR-6.

## 1. Civilian Complaints

Almost invariably, where a specific paragraph under this heading has called for a training component to be delivered, the PRPB has either not forwarded the evidence required or, in the alternative, the document produced indicated a subpar level of training compliance.  Insufficiency of this documentation has been a contributing factor in the Monitor's assessment of Partial Compliance in areas where training and certification are required.

Public awareness of the ability to lodge a complaint concerning a PRPB member, the complaint form itself, and the multiple mechanisms by which a complaint is received by the PRPB continue to be adequate and in accordance with the Agreement

### Paragraph 160: Civilian Complaints, Internal Investigations, and Discipline - Civilian Complaints

*PRPD will develop and implement a program to inform persons that they may make complaints regarding the performance of any officer.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all of the requirements of Paragraphs 160-162. | ☑ Met | ☐ Missed |
| 2. Civilian complaint program trainings are consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled press, office and SARP personnel are trained and certified in all policies related to the civilian complaint program (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 4. PRPB has developed and implements a program to inform persons that they may make complaints regarding the performance of any officer. | ☑ Met | ☐ Missed |

### *Compliance Assessment*

PRPB policy on receiving civilian complaints and internal complaints as well as its implementation have not changed since the Monitor's last review where it was found to be compliant with the spirit and letter of the Agreement.

PRPB training on receiving civilian complaints and internal complaints has not changed since the Monitor's last review where it was found to be compliant with the spirit of the Agreement. The PRPB however, has not reached the required 95th percentile of training and certification of press office and SARP personnel as called for in this paragraph.

184

As abundantly evidenced by results in the form of actual complaints received, PRPB's use of a variety of mechanisms to inform members of the public about their ability to complain against a member, either as a named person or anonymously, continues to be successful.  The Monitor observed informational material about the complaint program posted at each of the area commands and precincts visited. The Monitor urges the PRPB to continue to proactively emphasize this accessibility in its open community meetings held across the island.

The Monitor's ongoing conversations with the majority of SARP investigators reveals a predominant awareness of their shared responsibility to educate and otherwise proactively communicate the existence of PRPB civilian complaints program to members of the communities that they serve.

### *Pathway Forward*

PRPB must demonstrate that it has provided its Press Office and SARP personnel with training and certification in all policies related to the civilian complaint program.

### Paragraph 161: Civilian Complaints, Internal Investigations, and Discipline - Civilian Complaints

*Pre-printed complaint forms shall not include any language that can be construed as discouraging civilians from submitting complaints, including warnings regarding potential criminal prosecution for false or untrue complaints. PRPD shall require all officers to carry complaint forms in their official vehicles at all times or on their person, if feasible.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. Content of complaint forms is consistent with civilian complaint program policies. | ☑ Met | ☐ Missed |
| Note: Policies and Trainings is assessed with Paragraph 160. | | |

### *Compliance Assessment*

PPR-311.1 (Master Complaint Form) has not been amended since CMR-6, where it was found to be substantially compliant with the Agreement.

### *Pathway Forward*

The Monitor's Office recommends that SARP Inspectorate officers performing site inspections of PRPB facilities ensure that deployed police officers are carrying Form 311.1 with them. PRPB should follow its internal discipline procedure when learning that an officer is not using form 311.1.

## Paragraph 162: Civilian Complaints, Internal Investigations, and Discipline - Civilian Complaints

*PRPD shall make complaint forms and informational materials, including brochures and posters, available at all police facilities and on the PRPD website. Information shall be posted in Spanish and English. PRPD shall post and maintain a permanent placard describing the external complaint process at appropriate government buildings where public services are provided. The placard shall include relevant contact information, such as telephone numbers, email addresses, and websites. PRPD shall also post and maintain a placard explaining an individual's right to be free from involuntary searches and seizures and thus to decline consent to voluntary searches.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Content of complaint forms and informational materials is consistent with civilian complaint program policies. | ☑ Met | ☐ Missed |
| 2. The PRPB website and 95% of PRPB facilities and patrol vehicles have required civilian complaint materials. | ☑ Met | ☐ Missed |
| 3. Placards as described in Par. 162 are displayed in 95% of all PRPD and DPS buildings, plus eleven regional judicial centers across the Island. | ☑ Met | ☐ Missed |

Note: Policies and Trainings is assessed with Paragraph 160.

### Compliance Assessment

Continued spot checking of PRPB facilities have shown the indicated level of appropriate signage instructing people of their ability to file a complaint against an officer. Spot checking of officers on patrol has indicated an acceptable level of compliance with officers carrying PPR-311.1 (Master Complaint Form) with them or in their vehicle.

Where pointed out previously, the PRPB has been quick to address sporadic reports of missing signage.

### Pathway Forward

The Monitor recommends that SARP Inspectorate officers performing a site inspection of a PRPB facility check to ensure that each public reception area has an accessible and legible copy of the PRPB Complaint Policy prominently displayed in both Spanish and English. The addition of this component to the SARP inspection should be added to the checklists used by inspectorate officers. Cases where a PRPB facility is found without these postings or cases where postings are not legible by a member of the public or are not plainly visible must be documented as part of the inspection and seasonally

186

reported to the PRPB itself as well as to the Monitor's Office on a quarterly basis. Local commanders should be held accountable in cases where this rule is not being followed.

## 2. Internal Investigations

SARP leadership has been paying close attention to areas where the Monitor has made recommendations of training, policy, and procedural changes.  This spirit of collaboration and collegiality permeates SARP leadership from its top commander down and across its command staff.  Overall, there is an eagerness to achieve a level of substantial compliance across the broad spectrum of 78 targets spread across 46 paragraphs.

Despite this willingness on the part of SARP leadership, they cannot possibly reach this goal on their own as additional staff and equipment are still needed. The Monitor's Office has seen procurement requests for needed equipment and human resources from SARP command dated in the last quarter of 2021 and limited corresponding deliveries of both equipment and human resources during the reporting period.[20]

In addition to procurement, SARP NIA is also hampered by having its internal criminal investigation divisions located within police facilities, which creates a strong impediment for a citizen to report a crime alleged to have been committed by a police officer, who may work out of that very same facility.

SARP's adjudicative process for serious violations of the code of conduct relies upon the Office of the Legal Advisor (OAL), which not only performs this key legal analysis of the facts and conclusions of a given case, but also assists the Police Commissioner in making final disciplinary decisions.[21] Over the entire course of this reporting period, the Monitor's Office has heard multiple accounts of already scarce OAL lawyers being unilaterally transferred from OAL to the Department of Public Safety (DSP). This depletion of OAL legal staff compromises the Police Commissioner's ability to adjudicate allegations of misconduct in a timely manner, which may then result in a failure of due process for the accused officers. The present Director of OAL assumed her position in June of 2021, and since that time 5 members of her legal staff have been transferred to DSP. Several other OAL lawyers have voluntarily left for other better-paying opportunities, with still others threatening to do so. Every one of these lawyers has mentioned the inadequate salary and lack of benefits as a contractual employee as the key push factor for leaving OAL.

This significant decrease in legal staff, as well as a poor retention rate place the Director of OAL in an untenable position regarding her mission, which is essential to achieving substantial compliance in many areas. Left unremedied, OAL's lack of resources may ensure the inability of PRPB to achieve anything

---

[20] PRPB no longer has control over its equipment procurement process.  Rather, that process in addition to others such as Human Resources and Recruit Investigations, has been absorbed by the Department of Public Safety ("DSP"), an entity that did not exist at the time the Agreement was executed by the Parties.  A specific request was made to the PRPB to provide a list of resources delivered to SARP in response to their multiple procurement requests. The Monitor's Office was pleased to note the assignment of 13 additional new vehicles to SARP along with some hardware and surveillance gear. There was no indication provided as to whether SARP reached its full human resources needs across all of its entities.

[21] The Police Commissioner has the sole statutory authority to impose a summary suspension, or for that matter any form of internal discipline within PRPB, (See 25 L.P.R.A. s.3550, *Ley del Departamento de Seguridad Publica de Puerto Rico*, amended.)

above partial compliance with the Agreement in areas related to the timeliness and validity of the adjudication of complaints and the assessment of discipline.

## Paragraph 163: Civilian Complaints, Internal Investigations, and Discipline - Internal Investigations

*PRPD shall require that all officers and employees report misconduct, including apparent, alleged, or perceived misconduct, by another PRPD officer or employee to a supervisor or directly to SPR for review and investigation. Where apparent misconduct is reported to a supervisor, the supervisor shall immediately document and report this information to SPR. Failure to report or document apparent or alleged misconduct or criminal behavior shall be grounds for discipline, up to and including termination of employment. The presumptive discipline for a failure to report apparent or alleged misconduct or criminal behavior shall be commensurate to the presumptive discipline for the underlying apparent or alleged conduct not reported.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. Policies incorporate all the requirements of the paragraph. | ☑ Met ☐ Missed |
| 2. Training on internal reporting of misconduct and investigations is consistent with approved policies. | ☑ Met ☐ Missed |
| 3. 95% of sampled personnel are trained and certified in relevant policies related to reporting and internal investigations (or scheduled for training, in the case of mid-year reviews). | ☐ Met ☑ Missed |
| 4. All reports of alleged or perceived misconduct are reviewed and investigated, as appropriate, by supervisors or SARP. | ☑ Met ☐ Missed |

Note: Implementation of the portion of this Paragraph regarding discipline is assessed with Paragraphs 177 (Data Source #4), 198, and 199.

### Compliance Assessment

Universal training components for sworn members of the PRPB as well as underlying policy regarding complaint reporting procedures have not changed from PRPB's previously substantially compliant versions.

The PRPB has failed to reach the 95th percentile in training and certification of its personnel concerning relevant policies and procedures.

The Monitor finds that the PRPB has met the burden of showing that reports of alleged or perceived misconduct are reviewed and investigated, as appropriate, by supervisors or SARP and, therefore, also remain within target.

## Pathway Forward

To move compliance forward, PRPB must ensure that its personnel are trained and certified in relevant policies related to reporting and internal investigations.

## Paragraph 164: Civilian Complaints, Internal Investigations, and Discipline - Internal Investigations

*PRPD shall develop protocols requiring supervisors to investigate and take appropriate disciplinary or non-punitive corrective action when the supervisor becomes aware of minor misconduct or policy infractions by an officer that do not merit an SPR notification. The incident of misconduct and the supervisor's response shall be reported to SPR within five business days for SPR's review. Where the officer disputes the misconduct allegation, the allegation shall be referred to SPR for investigation.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Implemented | | |

## Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 164 and 165. | ☒ Met | ☐ Missed |
| 2. Training on supervisory review of minor policy violations is consistent with approved policies. | ☒ Met | ☐ Missed |
| 3. 95% of sampled supervisors are trained and certified in policies related to supervisory review of minor policy violations (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☒ Missed |
| 4. 95% of selected supervisory reviews and responses comply with approved policies. | ☒ Met | ☐ Missed |
| 5. 95% of selected supervisory reviews and investigations are reviewed and evaluated by unit commanders and the commanders identify needs, as appropriate, in accordance with Paragraphs 164 and 165. | ☒ Met | ☐ Missed |
| 6. 95% of selected supervisory reviews and investigations are sent to SARP and assessed according to approved policies. | ☒ Met | ☐ Missed |

## Compliance Assessment

The Monitor's previous reviews of non-punitive or corrective discipline records required him to visit different PRPB installations throughout the island. Those reviews, which continued through this reporting period, reveal that cases are being generated and often involve appropriately minor infractions, e.g., officers not wearing the proper uniform of the day or reporting late. The Monitor

found one case where the subject officer disagreed with the non-punitive discipline, which under PRPB policy would mandate that the case be forwarded to SARP for registry and further investigation.[22]

The Monitor's Office recently reviewed a change in the corrective discipline recording procedure, GO 639 (Medidas Correctivas No Punitivas) wherein the supervising officer will use a digital system to write and record these events, which will make it far easier for the Monitor's Office to locate and review these records for the purposes of measuring compliance.

As noted above and in previous CMRs, the policies incorporate all the requirements of paragraphs 164 and 165, further the training on supervisory review of minor policy violations has been reviewed and approved by the Monitor and was consistent with approved policies.

In reviewing the training records for the sampled supervisors, the Monitor also found under 95% of these supervisors are trained and certified in this training.

*Pathway Forward*

PRPB should ensure that supervisors are trained and certified in policies related to supervisory review of minor policy violations.

## Paragraph 165: Civilian Complaints, Internal Investigations, and Discipline - Internal Investigations

*The results of unit investigations, be they minor misconduct allegations, policy infractions, or SPR referrals, shall each be referred to and evaluated by unit commanders for underlying problems including supervisory, training, or other deficiencies. Unit evaluations shall be sent to SPR for further assessment of trends and potential deficiencies in tactics or training, among other considerations.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 164.

---

[22] Case 2019-1065 concerned a dispute between PRPB officers and a lieutenant over the functionality of a walkie talkie and foreknowledge of this defect. When some agents refused to sign a non-disciplinary warning, they alleged that they were retaliated against by the lieutenant. For purposes of Paragraph 164, the Monitor found that this case was reported correctly to SARP under the existing rule concerning officers who disagree with a non-punitive disciplinary note. The Monitor did however find multiple problems within the ensuing SARP investigation.

*Compliance Assessment*

The Monitor's review of all cases for this current report has not revealed a SARP case where tactical, training, or procedural deficiencies have been identified, either at the unit, area, or SARP Command level.

In CMR-5, the Monitor's Office made a recommendation for each SARP investigative report to include an obligatory analysis and mention of identified inadequacies in training, policy, or supervision, which may have been a proximate or contributory cause of the incident at hand.  The Monitor's bifurcated analysis conducted in this latest report reaffirms that this recommendation is still not being followed.[23]

*Pathway Forward*

The PRPB must rewrite its investigative policy as well as its SARP Investigator's Manual. Once this is rewritten, all SARP investigators will require new training to identify and document any or all these deficiencies that are identified in their investigations.  Once they are identified, then it is incumbent upon SARP to share these findings with parts of the PRPB (e.g., SAEA).  PRPB would then be expected to amend its training and/or policies and procedures to specifically address the identified issue.[24]

## 3. Complaint Intake, Classification, Assignment, and Tracking

Complaint intake, classification, assignment, and tracking continues to be one of the better areas of SARP performance.  An IT solution, in which the complaint is captured and tracked, has been in broad use for some time. This same system allows the SARP Commander (as well as the Monitor) to determine when extensions to cases are granted and if any given case is overdue for completion.

### Paragraph 166: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*PRPD shall train all officers in how to properly handle complaint intake.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | | |

---

[23] The investigator's analysis may be rudimentary in nature, especially in cases where the complained of behavior or activity has no obvious nexus to training, policy, or supervision. In these cases, a check box form would suffice. In other cases; however, the Monitor's Office has noticed that training, policy, or supervisory deficiencies were either a proximate or contributing cause to alleged misconduct. In these cases, the investigator would check the box in the affirmative category and then elaborate specifically in his/her report concerning the proximate or contributing cause in terms of training, policy, or supervision.

[24] In 1994, the Boston Police Department's Internal Affairs Bureau conducted a proactive analysis of all allegations of misconduct involving motor vehicle stops, which accounted for a relatively large percentage of overall civilian complaints.  As a result of this identification, a team of IAD investigators, including the Monitor, collaborated with fellow commanders and the curriculum developers at the Boston Police Academy.  A new policy and training component was launched to mitigate this specific issue.  As a result, civilian complaints relating to motor vehicle stops decreased 35% in the following year.

|  Practice: | Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
|---|---|---|---|

### Compliance Targets

| | |
|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 166-176. | ☑ Met  ☐ Missed |
| 2. Complaint intake, classification, assignment, and tracking trainings are consistent with approved policies. | ☑ Met  ☐ Missed |
| 3. 95% of sampled officers are trained and certified in relevant policies related to complaint intake, classification, assignment, and tracking (or scheduled for training, in the case of mid-year reviews). | ☐ Met  ☑ Missed |

### Compliance Assessment

Records clearly indicate that accepted policies and related training curriculum are unchanged from previous reports. The training content on complaint intake, classification, assignment, and tracking as previously approved by the Monitor continues to be consistent with policies.

PRPB has not met the 95th percentile threshold for training related to this paragraph.

### Pathway Forward

PRPB must ensure that officers are trained and certified in relevant policies related to complaint intake, classification, assignment, and tracking.

### Paragraph 167: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*The refusal to accept a misconduct complaint, discouraging the filing of a misconduct complaint, or providing false or misleading information about filing a misconduct complaint, shall be grounds for discipline.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Annually as to Compliance Target #1. Bi-annually as to Compliance Target #2. |
| Practice: | Implemented | | |

### Compliance Targets

| |
|---|
| Note: Implementation is assessed with Paragraphs 177 (Data Source #4), 198 and199. |
| Note: Policies and trainings are assessed as part of Paragraph 166. |

192

*Compliance Assessment*

In the Monitor's Office review of 57 SARP investigations, only one case was found where the complainant alleged that he was discouraged from filing a SARP complaint.

The Monitor has noticed infrequent allegations of PRPB members who either refuse to accept or attempt to discourage the filing of a SARP complaint by a civilian. While these cases appear to be the exception, PRPB must recognize that allegations of this nature tend to strongly undermine public confidence at a PRPB facility.[25]

*Pathway Forward*

PRPB must identify all cases where a complainant has alleged that his/her complaint was either refused or discouraged by a member and then thoroughly investigate the allegation. Investigators who encounter this accusation from any source should be directed to either address the allegation directly in their investigative report or refer the allegation to a separate investigator for a thorough investigation.

Members who have been found, based upon a preponderance of evidence, to have discouraged a complainant from filing a complaint or to have refused to accept a complaint must be disciplined. Furthermore, the Monitor strongly recommends that SARP investigators proactively ask each complainant at the beginning of their interview, "Did any member of the PRPB try to dissuade you from filing this complaint?" and "Did any member of the PRPB refuse to accept this complaint?"

## Paragraph 168: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*PRPD shall accept all misconduct complaints, including anonymous and third- party complaints, for review and investigation. Complaints may be made in writing or verbally, in person or by mail, telephone (or TDD), facsimile, electronic mail, or any other appropriate electronic means.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. PRPB accepts, reviews, and investigates complaints, as appropriate, in accordance with approved policies. | ☐ Met  ☑ Missed |

Note: Policies and trainings are assessed as part of Paragraph 166.

---

[25] Case 2020-0483, a complainant alleged that he was mistreated by highway patrol officer and was sanctioned without cause. According to the complainant, the front desk sergeant allegedly told him that filing a 311.1 complaint was a "waste of time." From the case record, it appears that the complaint of the sergeant's alleged activity was never investigated, and that the investigator focused solely on the interaction between the highway patrol officer and the complainant.

*Compliance Assessment*

In previous reports, the Monitor's Office had detected a pattern or practice as it relates to anonymous complaints of serious misconduct, which are predominantly received from internal sources and occasionally from those outside of the institution. These cases usually have a criminal dimension in addition to an administrative one.  The identified practice involves the peculiar way these investigations are conducted.  Rather than call in witnesses as well as the accused for an in-person interview, SARP investigators frequently resort to having these individuals, including the accused, fill out an "hoja de entrevista," which is merely a unilateral written declaration of the person's version of the events in question. These declarations are neither tested nor followed up upon in a face-to-face interview setting.  They are often accepted at face value, and unsurprisingly, the case is often administratively closed and filed without any further inquiry, notwithstanding the possibility that a PRPB member may have committed a crime, or at the very least an administrative infraction.

While the Monitor's Office has seen some improvement via the number of these cases found in the sample, the fact that this is still occurring in the recent past is disconcerting.[26]

*Pathway Forward*

In all cases where the identity of the complainant is unknown and the alleged conduct involves either potential criminal and/or serious administrative violations, SARP investigators from their respective Bureaus - Internal Affairs, Anti-Discrimination, and Administrative Affairs must conduct in-person, face-to-face interviews of all parties involved, including PRPB members who are under accusation and all members who may have witnessed the alleged conduct. The use of an "hoja de entrevista," by itself, is not an acceptable investigative tool in this category of internal investigation.   Furthermore, cases of a purported criminal nature must be investigated simultaneously by both NIA and NAI.    Under no circumstances should an NIA investigator be assigned to investigate a case administratively once his/her criminal investigation into the same incident has concluded.

## Paragraph 169: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*PRPD will establish a protocol that provides procedures to be followed when an individual objects to an officer's conduct. The protocol shall provide that, absent exceptional circumstances, the officer will inform the individual of his or her right to make a complaint and shall provide the complaint form and the officer's name and identification number. If the individual indicates that he or she would like to make a complaint on the scene, the officer shall immediately inform his or her supervisor, who shall immediately respond to the scene and initiate the complaint process. In the absence of the officer's immediate supervisor, any supervisor may respond to the scene. All misconduct complaints received outside of SPR shall be forwarded to SPR before the end of the shift in which they were received.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Complaint | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |

---

[26] See SARP Case 2022-0433, 2021-0284 and 2021-0104.

| Training: | N/A | Assessment Frequency | Bi-annually |
|---|---|---|---|
| Practice: | Implemented | | |

*Compliance Targets*

| 1. Intake protocol was followed in 95% of sampled investigations. | ☑ Met  ☐ Missed |
|---|---|
| 2. Intake protocol was followed in 95% of sampled complaints received by officers in the field. | ☑ Met  ☐ Missed |
| Note: Policies and trainings are assessed as part of Paragraph 166. | |

*Compliance Assessment*

As previously mentioned in Paragraph 167, only one incident was uncovered in the CMR-7 case file analysis where a complainant had alleged that a PRPB member tried to dissuade him from filing a complaint.  Given the volume of cases analyzed from the sample, the existence of this sole case does not reach the >5% threshold target established by the Agreement's methodology.  This is a close call based upon statistical evidence.

*Pathway Forward*

The finding of substantial compliance in this paragraph should not be taken by the PRPB as a sign that its work has completed in terms of complaint intake protocol.  Ongoing efforts must be taken to ensure that no member of the PRPB either outrightly refuses to accept a complaint or attempts to dissuade a person from filing a complaint. Even though the PRPB member allegedly involved in dissuasion has not been cited by the complainant as one of the parties complained against, in all cases where this activity is alleged to have occurred by any individual, the investigator must amplify and amend the case to include the alleged PRPB dissuader as an accused party in the complaint.

The Monitor has recommended a measure in Paragraph 167, which is designed to proactively identify any case where a PRPB officer has either allegedly refused to accept a complaint or attempted to dissuade a person from filing a complaint. If that conduct has been proven to have occurred based upon a preponderance of evidence, then the officer(s) involved should be disciplined accordingly.

## Paragraph 170: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*PRPD shall develop a system to ensure that allegations of officer misconduct made during criminal prosecutions or civil lawsuits are identified and assessed for further investigation. Any decision to decline an investigation shall be documented.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |

| Training: | N/A | Assessment Frequency | Bi-annually |
|---|---|---|---|
| Practice: | Implemented | | |

## Compliance Targets

| | |
|---|---|
| 1. PRPB has a system to identify and assess civil lawsuits and criminal proceedings filed involving allegations of officer misconduct. | ☑ Met   ☐ Missed |
| 2a. SARP reviews all allegations involving PRPB personnel to assess the need to investigation by PRPB. | ☑ Met   ☐ Missed |
| 2b. 95% of such SARP reviews are documented in accordance with approved policies. | ☑ Met   ☐ Missed |

Note: Policies and trainings are assessed as part of Paragraph 166. Implementation is assessed, in part, with Paragraph 158.

## Compliance Assessment

Documents submitted to the Monitor support the conclusion that the PRPB is now employing its policy and procedure under which both torts and alleged criminal acts committed by PRPB members are brought to the immediate attention of SARP for appropriate action. In the case of a civil cause of action, the Office of Legal Affairs (OAL) appears to be informing SARP upon receipt of service of process. In the case of a criminal allegation involving a PRPB member, the Superintendency of Crime Investigations (SAIC) investigator also appears to be informing SARP of potential criminal wrongdoing, which would allow a corresponding SARP investigation of administrative misconduct to proceed without delay.

The Monitor received a list of 214 cases including both civil causes of action and potential acts of criminality allegedly committed by PRPB members, all of which have been referred to SARP from either OAL or SAIC for assessment.

## Pathway Forward

While the Monitor has seen sufficient evidence to indicate that SARP is being seasonally informed of alleged administrative and criminal allegations from OAL, PRDOJ and SAIC, it remains to be seen whether SARP criminal and administrative investigations are being conducted simultaneously[27] and that information is being shared between investigators.

---

[27] The Monitor's Office proposes one exception to this general rule. In cases where a PRDOJ or USDOJ prosecutor has requested a delay in a signed writing, a limited delay for the concurrent administrative investigation of criminal conduct is acceptable. The Monitor's Office envisions a 180-day pause, which could be granted upon written application signed by a state or federal prosecutor or the Federal Grand Jury, with one possible additional written extension for another 180 days (a total of 360 days in the aggregate). After discussion among the Parties, consensus is beginning to form around recommending a 90-day pause after a prosecutor's written and signed application is received, with up to 3 additional 90 day written pauses for a total of 360 days maximum. For purposes of compliance, the Monitor's Office would be satisfied with either of these two scenarios.

## Paragraph 171: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*SPR shall maintain a centralized numbering and tracking system for all misconduct complaints. Upon the receipt of a complaint, SPR shall promptly assign a unique numerical identifier to the complaint, which shall be provided to the complainant as soon as practicable.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. SARP administers a centralized numbering and tracking system for all misconduct complaints. | ☑ Met   ☐ Missed |

Note: Policies and trainings are assessed as part of Paragraph 166. Implementation is assessed, in part, with Paragraph 178.

### Compliance Assessment

The Monitor has examined the SARP Module (referred to internally as EIS) and has concluded that it functions as a centralized numbering and tracking system as mandated by the Agreement.

### Pathway Forward

The Monitor is encouraged by the continuing collaboration between PRPB IT development and SARP. In the Monitor's view, the latest and most encouraging development from this partnership is the digitalization of non-punitive disciplinary files, which could improve prophylactic intervention.   The impending capability of an "early warning" system not only benefits the PRPB collectively, but each individual member as well.

## Paragraph 172: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*Where a supervisor receives a misconduct complaint in the field alleging that misconduct has occurred, other than those incidents covered by Paragraph 44 of this Agreement, the supervisor shall gather all relevant information and evidence and provide these to SPR. All complaints should be referred to SPR by the end of tour of duty, absent exceptional circumstances.*

| Compliance Status | Assessment Schedule | |
|---|---|---|
| Substantially Compliant | Review | April 2022 – September 2022 |

197

| Policy: | Implemented | Period | |
|---|---|---|---|
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1a. 95% of sampled complaints were forwarded to SARP by the end of the relevant tour of duty or articulated exceptional circumstances. | ☑ Met  ☐ Missed |
| 1b. 95% of sampled complaints document what information and evidence is collected by the PRPB supervisor. | ☑ Met  ☐ Missed |

Note: Policies and trainings are assessed as part of Paragraph 166. Implementation is assessed, in part, with Paragraph 136, Data Sources #6 and #7.

### Compliance Assessment

The analysis of case files shows that PRPB regularly forwards complaints to SARP within the prescribed timeframe. Cases generated by field supervisors were included in the investigative files received during the reporting period. In these cases, supervisors forwarded relevant information and evidence to SARP in a timely manner.

### Pathway Forward

PRPB has achieved substantial compliance with this paragraph. The Monitor will continue to reassess PRPB's continued compliance in future reports.

## Paragraph 173: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*Within five business days of the receipt of a misconduct complaint, SPR shall determine whether the complaint will be assigned to a supervisor for a Supervisory Investigation, retained by SPR for investigation, and whether it will be investigated criminally by PRPD, PRDOJ, or both.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. 95% of sampled SARP investigation files are assigned for investigation in accordance with approved policies. | ☐ Met  ☑ Missed |

198

Note: Policies and trainings are assessed as part of Paragraph 166.

*Compliance Assessment*

By using a bifurcated model of case analysis mentioned previously in this report, the Monitor is now seeing an extraordinary percentage of complaints that were not assigned to respective components of SARP for investigation within the 5-Day Rule.[28] Some of these cases exceeded the 5-Day Rule by a matter of days, others for weeks and at least one for months.

Most of these cases tend to fall into one of three categories: cases occurring during a period when the COVID19 pandemic was raging in Puerto Rico, cases of a criminal nature being investigated solely by Internal Affairs ("NIA") and not referred to an Administrative investigator ("NIA") for concurrent investigation until the criminal investigation reached its conclusion, or cases where the same NIA investigator opened the administrative case only after having concluded the criminal investigation.

To begin with, it is certainly reasonable that the unprecedented pandemic would have a detrimental effect on the PRPB, with SARP being no exception.  That may absolve or at least explain a portion of these case delays.   However, there is generally no justification for delaying the assignment of any allegation of criminal wrongdoing on the part of a PRPB member for a separate concurrent investigation conducted by an administrative investigator.

By waiting for weeks, and in some cases many months, for an internal criminal investigation to conclude ensures that the ensuing administrative investigation will inevitably be hamstrung by this long delay.  The results are predictable, over time memories fade, the willingness of witnesses to talk may diminish, physical evidence may be lost, and percipient witnesses may prove to be harder or even impossible to locate.

*Pathway Forward*

Cases of a criminal nature involving possible misconduct by a PRPB member, which come to the attention of the PRPB through *any* source, including but not limited to, PRDOJ, USDOJ, civilian complainants, witnesses, anonymous sources, whistleblowers, media accounts, NAI investigators, etc., must be concurrently assigned to a SARP administrative investigator for administrative investigation within 5 days of receiving this information, unless the prosecution requests to hold the investigation in abeyance.[29]

Lastly, the Monitor recommends that the PRPB develop some capability to electronically file both internal administrative and internal criminal investigations under the same case number, perhaps with a letter variant that indicates whether the file concerns the NIA investigation or the corresponding NAI investigation.  If the possibility of creating case files with the same number investigated concurrently by NAI and NIA is not attainable, the Monitor is open to other possible solutions that would allow him to quickly locate, analyze and comment on both the concurrent criminal and administrative investigations.

---

[28] See Cases 2019-0740, 2019-1358, 2019-1607, 2020-0673, 2020-0815, 2020-0937, 2020-1184, 2021-0284, 2021-0724, 2021-0786, 2021-0925, 2021-0998, 2021-1152, 2021-1190, 2022-0114, 2022-0403, 2022-0424, 2022-0483.
[29] See Paragraph 170, *supra*.

## Paragraph 174: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*PRPD shall develop a complaint classification protocol that is allegation-based rather than outcome-based to guide SPR in determining where a complaint should be assigned.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. SARP classifies complaints in accordance with policy. | ☐ Met | ☑ Missed |

Note: Policies and trainings are assessed as part of Paragraph 166.

### Compliance Assessment

As mentioned previously, the Monitor's Phase I and Phase II analyses allowed the Monitor to assess a larger group of more recent SARP investigations beginning the date the incident allegedly occurred, through corresponding SARP investigation(s), and then continuing in a Phase II analysis measuring legal adjudication, possible due process appeal, and finally culminating in the Police Commissioner's Final Resolution. The Monitor's Office continues to see cases in which alleged criminal misconduct is classified first for internal criminal investigation and, only after that criminal investigation has concluded, are assigned for administrative investigation. This must change. All cases involving both criminal and administrative violations, irrespective of the source of the complaint, should be classified and investigated concurrently from both a criminal and rules violation perspective by two separate branches of SARP – NAI and NIA.

### Pathway Forward

Any case concerning a PRPB member that alleges misconduct that could be classified as both criminal and administrative in nature must be assigned for separate and concurrent criminal and administrative investigation within five days of its receipt.

## Paragraph 175: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*A misconduct complaint investigation may not be conducted by any supervisor who used force during the incident; whose conduct led to the injury to a person; who authorized the conduct that led to the reported incident or complaint; who was on the scene at the time of the incident leading to the allegation of misconduct; or by any officer or supervisor who has a conflict of interest as defined by PRPD policy.*

| Compliance Status | Assessment Schedule |
|---|---|

| Substantially Compliant | | Review Period | April 2022 – September 2022 |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. All misconduct complaint investigations are conducted by persons not prohibited from doing so, as required by the Paragraph. | ☑ Met  ☐ Missed |
| Note: Policies and trainings are assessed as part of Paragraph 166. | |

### Compliance Assessment

Using the Phase I/Phase II analysis, the Monitor has had the opportunity to look at recent cases, as well as reach back into older SARP investigations and has not found a case where a PRPB member alleged to have been involved in misconduct has taken any role in the corresponding internal investigations.

### Pathway Forward

The Monitor will review this area for continued substantial compliance.

## Paragraph 176: Civilian Complaints, Internal Investigations, and Discipline - Complaint Intake, Classification, Assignment, and Tracking

*PRPD's centralized numbering and tracking system shall maintain accurate and reliable data regarding the number, nature, and status of all misconduct complaints, from initial intake to final disposition, including investigation timeliness and notification to the complainant of the interim status and final disposition of the investigation. This system shall be used for periodic assessment of compliance with PRPD policies and procedures and this Agreement.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. SARP's record management system maintains accurate and reliable data for operational and internal compliance purposes. | ☑ Met  ☐ Missed |

Note: Policies and trainings are assessed as part of Paragraph 166.

*Compliance Assessment*

The Monitor has personally viewed the SARP Module (internally referred to as the EIS system)[30] on multiple occasions and having viewed countless documents extracted from this system in response to its requests for document production, the Monitor is satisfied that this tracking system maintains accurate and reliable data on SARP cases from start to finish.

While the system itself is both capable and functional, the Monitor has noticed that the system is not being exploited to its full potential to track the timing of certain crucial events.  The Monitor case file analysis has revealed multiple exceptions to the 5-Day Rule, as well as some cases that exceed the 90-Day Investigative Rule without having a written extension in place.  Even in cases where the investigator has requested either one or multiple 30-day extensions, there is often a lag of multiple days between the date of the request and the date the extension was granted.  These lags add up and create further case delays.  Because some of these "lagged" extensions occurred recently, the global pandemic cannot be blamed.

*Pathway Forward*

First, the Monitor recommends that each SARP Area Commander have a digital dashboard of cases that fall under his/her purview.  In that dashboard, each Commander should have a display of cases that are nearing investigative deadlines.  The Area Commander or a responsible delegate should have the authority to grant 30-day investigative extensions for cause.  Under no circumstances should the Area Commander take any leave or days off without leaving a responsible delegate to review and grant applications for investigative extensions without delay.

To assist the Monitor's Office with tracking SARP deadlines, every case file submitted for the Monitor's examination must contain a copy of the "*hoja de transacciones*," which denotes every step taken in a SARP case from receipt of the complaint up to its final resolution along with corresponding dates.

## 4. Investigation of Complaints

Through the Phase I/Phase II analysis of historical and more recent complaints, the Monitor has had the opportunity to measure SARP investigative performance trends over time.  While there have been some positive developments, there remains work to be done to achieve substantial compliance.

Over the course of the current reporting period and previous CMRs, the Monitor's Office has consistently encountered SARP cases that were closed with minimal, if any, effort to resolve direct and material contradictions in members' versions of the same incident. No allegation of serious police misconduct should be closed without exhaustive attempts on the part of the investigator to reconcile this category of discrepancy involving material fact. PRPB members who are found, based upon a preponderance of evidence, to have been untruthful during a SARP investigation must be held accountable irrespective of whether the member was originally cited as a subject to the original complaint.

---

[30] Refer to the IT section of CMR-6 for a detailed discussion of EIS.

There also appears to be lingering confusion regarding the 'preponderance of evidence' standard of proof, which under the Agreement is required to be applied in 100% of SARP cases. During innumerable interviews of SARP investigators from all three bureaus, an overwhelming number of said that they declined to look at an officer's disciplinary history until *after* their investigation had concluded. When asked why, most responded that they wanted to avoid prejudicing themselves against the officer.

An officer's previous record of misbehavior accusations – both sustained and not sustained – can offer important evidence, especially in closely decided cases.  PRPB must work with SARP, SAEA, and OAL to make it clear how and when this sort of evidence should be used. Practical examples of cases where this evidence proved to be pivotal should be provided to investigators through both formative and in-service training.

In fairness to SARP, the process of modifying its rules of operation is ongoing.  The Monitor expects to see a modified Investigator's Manual, corresponding redesigned formative training (REA-114) and a roll out of the annual re-trainer consisting of at least 8 hours of updates for all active investigators.[31]  The Monitor hopes that the PRPB takes heed of his suggestions to enhance that course.

## Paragraph 177: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*PRPD shall ensure that policies and procedures regarding the investigation of complaints clearly establish that complaints are adjudicated on the basis of the preponderance of the evidence. This standard should be clearly delineated in policies and procedures and accompanied by extensive examples to ensure proper application by investigators.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Complaint | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Deferred | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 177-193. | ☒ Met | ☐ Missed |
| 2. Investigation of complaints trainings are consistent with approved policies. | ☐ Met | ☒ Missed |
| 3. 95% of sampled personnel are trained and certified in relevant policies related to investigation of complaints (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☒ Missed |

---

[31] With so many changes in procedure and technique, SARP investigators will most likely need more than 8 hours of in-service training to adequately grasp and employ them.  Once that is goal has been reached, ideally in the first iteration, then the annual re-trainer could be reduced to the original 8-hour timeframe.

| 4. 100% of sampled investigation files were adjudicated using a preponderance of the evidence standard. | ☐ Met   ☑ Missed |
|---|---|

*Compliance Assessment*

Except for a SARP Internal Affairs (criminal) case, the standard of proof to be applied to any given case is that of a "preponderance of evidence." This standard is delineated throughout SARP formative training as well as the Instructor's Manual.   Despite the frequent mention of this standard, there remains a persistent level of confusion among SARP investigators over the practical application of a concept that is basic and yet somewhat difficult for police officers to grasp.

*Pathway Forward*

In any updated version of REA-114 and in all in-service training to current investigators, PRPB must employ multiple practical examples of how to reach the 'preponderance of evidence' standard of proof in its investigations through formative and in-service training as well as within the Investigator's Manual.  Special attention should be given by the curriculum designer as well as the faculty member to define and distinguish "preponderance of evidence," with other commonly used standards of proof used by PRPB including, "probable cause" and "guilt beyond a reasonable doubt." Actual case examples should be used to illustrate and delineate these important differences.[32]

It also bears mentioning that the PRPB should rely upon EIS, when fully implemented, to both track an officer's history of complaints and as a mechanism for proactive intervention.

Further, PRPB must provide training to all personnel on policies related to investigation of complaints.

## Paragraph 178: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*PRPD shall investigate all misconduct complaints and document the investigation and its findings and conclusions in writing. PRPD shall develop and implement a policy that specifies those complaints that may be resolved via administrative closing or informal resolution. Administrative closing shall be used for minor policy violations that do not constitute a pattern of misconduct, duplicate allegations, or allegations that even if true would not constitute misconduct, among others.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

---

[32] Of particular interest are cases where there are no witnesses other than the complainant and the accused, and where the PRPB member involved had been accused of strikingly similar misconduct and/or *modus operandi* in the past.

| 1. 95% of sampled complaints are investigated, documented, and resolved, and relevant PRPB personnel were so advised, in accordance with approved policies. | ☐ Met  ☑ Missed |
|---|---|

Note: Policies and trainings are assessed as part of Paragraph 177.

*Compliance Assessment*

The Monitor identified several Internal Affairs investigations in the current sample that have resulted in administrative closure.  The reader should not necessarily infer that these cases were not investigated properly from a criminal standpoint, rather the question remains over whether the alleged misconduct was ever investigated and adjudicated from an administrative standpoint and by an NIA investigator.  The NIA case files contain no information that this is indeed occurring or has occurred.

Administrative closure in the context of an administrative investigation must be reserved for cases of conduct that – even if proven - could not possibly rise to the level of an administrative violation, cases that are duplicated within the system or cases that do not involve a member of the PRPB in any way.

*Pathway Forward*

To cure the situation of NAI cases (and NAA cases involving alleged crimes, e.g., domestic violence) being administratively closed with no indication of an ensuing administrative investigation of the underlying incident, the PRPB must conduct concurrent criminal and administrative investigations of all allegations of misconduct against its members that could possibly be considered criminal in nature.  The Monitor has recommended a formal mechanism to be employed by prosecutors to delay such an administrative investigation in highly specialized circumstances.

Administrative closure may only be used in administrative investigations where the conduct alleged – even if proven to be true - could not possibly rise to the level of an administrative violation, in cases that are duplicated within the system or in cases that do not involve a member of the PRPB in any way.

PRPB must show that SARP module (internally referred to as EIS) has a relational tracking capability to allow both SARP and the Monitor to follow concurrent NAI (including criminal NAA) cases as well NIA cases that relate to the same alleged incident.

## Paragraph 179: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*PRPD shall ensure that all administrative investigations conducted by SPR shall be completed within 90 days of the receipt of the complaint, including assignment, investigation, review, and final approval. The SPR commander is authorized to grant additional 30 day extensions, for up to 90 additional days in the aggregate, for justifiable circumstances, which shall be documented in writing. For purposes of these extensions, workload shall not constitute justification for extensions. Where an allegation is sustained, PRPD shall have 30 days to determine and notify the officer of the appropriate discipline. The appropriate discipline shall be imposed as soon as practicable, consistent with PRPD's disciplinary procedures. All administrative investigations shall be subject to appropriate tolling periods as necessary to conduct a parallel criminal investigation or as provided by law.*

| Compliance Status | Assessment Schedule |
|---|---|

| Partially Compliant | | Review Period | April 2022 – September 2022 |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

| | Met | Missed |
|---|---|---|
| 1a. 95% of sampled investigations were adjudicated and notified within authorized timeframes in accordance with approved policies. | ☐ Met | ☑ Missed |
| 1b. 95% of disciplinary actions were imposed within authorized timeframes in accordance with approved policies. | ☑ Met | ☐ Missed |
| 2. 95% of SARP investigations that were not completed within prescribed timeframes have justified extension approvals as required by approved policies. | ☑ Met | ☐ Missed |
| Note: Policies and trainings are assessed as part of Paragraph 177. | | |

### Compliance Assessment

The Phase I/Phase II analysis now allows the Monitor to accurately assess, in close to real time, SARP's investigative deadlines and adherence thereto.

The Monitor found several cases where the 5-day assignment rule, the 90-day investigative deadline rule and the 30-day extension rule were not appropriately followed.  The Monitor expected to see post-pandemic improvement to meet the 95th percentile.  This was not the case.

To begin with, there were multiple cases reviewed by the Monitor where the 5-day rule had not been followed.[33]

As for the 90-day rule and the extension mechanism, the record shows that the majority of SARP investigators are cognizant of these deadlines and most proactively seek extensions where indicated. Notwithstanding this, there have been multiple incidents of repeated, legitimate requests for extensions that were delayed prior to eventual approval by the SARP Command.  These repeated delays ranged from a matter of days to over a week.

There were often troubling delays in the adjudicative phase of serious complaints, which must be conducted by OAL as prescribed in PRPB Rule 9088.[34] The rule assigns a period of 30 days to complete the process of adjudicating a SARP administrative finding after the case file has been forwarded by the investigator to either the Auxiliary Commissioner of Professional Responsibility (CARP, the overall director of SARP) or the OAL. Not only are these authorities limited to thirty days to adjudicate, the

---

[33] See Paragraph 173, *supra*.
[34] See PRPB Rule 9088, Article XII, s.5

thirty days also contemplates notification of the parties to the underlying complaint of the outcome.[35] Compliance with these self-imposed deadlines is far more the exception than the rule.

In conversations with a variety of figures among the PRPB, it has come to the Monitor's attention just how vulnerable the Office of Legal Affairs has become.  OAL finds itself on the horns of a dilemma - facing a 30-day deadline for written adjudication with an ever-decreasing number of competent lawyers or those who have received advanced legal training.[36] Within the past 16 months, as mentioned previously in this report, OAL has lost five lawyers who were unilaterally reassigned to the Department of Public Safety ("DSP").  Four others have since resigned from OAL due to their status as transitory contractors,[37] rather than as regular employees with benefits.  Three additional OAL lawyers are also threatening to seek employment elsewhere.  Meager pay is frequently cited as a push factor by individuals who have either left OAL or are threatening to do so.

*Pathway Forward*

SARP investigators facing a 90-day deadline must receive a decision concerning their request within 24 hours.  This means that the power to grant such an extension may have to be delegated to Area Command, or perhaps to the supervisory level.  A simple check and balance system for *post facto* review may be employed to ensure the ongoing integrity of this extension process.

PRPB must adequately staff both OAL and SARP to ensure that the self-imposed 30 day limit for adjudication and notification is met. Remuneration of OAL lawyers and paralegals must be commensurate with and reflect their level of professional and academic achievements.

The Monitor recommends that the PRPB draft a strategic plan to increase OAL hiring, retain OAL staff through adequate remuneration and develop a timeline to bring the PRPB into compliance with its own 30-day adjudicative deadline.

Further, the Monitor's Office also recommends that PRPB consider documenting requests for any extensions in its digital case management system and that the system record when such an extension has not been reviewed by the appropriate granting authority within 24 hours. This could be accomplished using a "push" feature to alert the granting authority via email or text of the pending review.

## Paragraph 180: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*PRPD shall ensure that investigations of officer misconduct are thorough and the findings are consistent with the facts.*

| Compliance Status | Assessment Schedule |
|---|---|

---

[35] ibid, Article XII, s.2

[36] Some attached to OAL and assigned to the adjudicative process are PRPB officers who have either completed their juris doctorate or are in the process of doing so.  While not members of the bar *per se*, they appear to have the proper background to adjudicate these cases.

[37] A transitory or contract lawyer with OAL is paid $3,200 monthly, which nets to approximately $2,400 a month after taxes and fees are paid to the Commonwealth.  In addition, the contract lawyers are responsible for covering their own biannual bar association and notary public dues.  A starting PRPB Agent receives approximately $2,800, not including overtime income and substantial benefits.

| Partially Compliant | | Review Period | April 2022 – September 2022 |
|---|---|---|---|
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| 1. 95% of selected investigations are thorough and findings are consistent with the facts | ☐ Met   ☑ Missed |
|---|---|

Note: Policies and trainings are assessed as part of Paragraph 177.

*Compliance Assessment*

While the vast majority of SARP case findings are in tenor with the facts revealed in an investigation, the Monitor continues to call into question the SARP investigative methodology as it is both taught and utilized. As such, the investigative findings upon which the ultimate finding is based upon may be less than thorough. This appears throughout the sample submitted for the Monitor's evaluation.  SARP investigators continue to create their own "official" transcripts based evidently upon their notes taken during an interview. This has the unintended result of not capturing, word-for-word, the declaration of any party to the investigation.  Relying upon notetaking as opposed to an audio recording to create a permanent record upon which a determination is to be made, especially in such a highly consequential setting, is at best unreliable.

The Monitor has previously criticized the interviewing techniques employed by most SARP investigators, specifically as they relate to establishing a conversational rather than legalistic tone.  The latter usually results in abrupt and often short, self-serving answers to interview questions, while the former is designed to place the interviewee somewhat at ease and thereby extract more information – effectively generating more investigative leads.   Especially at the beginning stages of an interview, conversational interviewing should be used in all SARP cases.[38]  Near the end of an interview, direct questioning should be employed to directly confront a witness with contravening evidence, or for tying up any other loose ends.

Concerning any investigation, the Monitor continues to question the use of "hojas de entrevista" as a stand-alone tool for conducting an interview.  These one-sided and unchallenged declarations by any party to an internal investigation are of limited use and are often self-serving.

---

[38] The practice of asking the interviewee at the outset of the interview whether they would like to give a narrative version of the facts can be disposed of.  To establish a conversational tone, the Monitor recommends that the interviewer begin with, "Why don't we start with your version of what happened…," and letting the interviewee elaborate as to what happened from their individual perspective. Additionally, the interviewee should no longer have the ability to choose between a narrative and a Q&A form of interview, as each interview will now effectively contain both forms.

*Pathway Forward*

SARP at present should be rewriting its rules and procedures with an eye towards addressing these deficiencies.  Training course, REA-114 should also be rewritten to reflect changes in policy as well as practice.  Current SARP members will also require substantive in-service training on the policy and practice changes made.

Regarding recommended changes, the Monitor strongly recommends that:

1. The use of *hojas de entrevista* only to "lock in" and memorialize the version of a PRPB member at any time before an actual in-person interview of the same subject.  The interviewed should use the hoja de entrevista prior to and during the in-person interview to ask questions and to clear up any areas left unclear.
2. All SARP interviews are digitally recorded upon written consent of the interviewee.  Said recordings to be transcribed by a professional transcriber and not the investigator.
3. SARP interview practice must shift away from the legalistic style and focus more on a conversational style.  Open-ended questioning must predominate, especially in the first part of the interview, to place the subject at ease. The words, *le pregunto*, should be avoided as part of the conversational interview style, but may be employed later in the interview to clarify answers and eliminate ambiguity.
4. In cases where there is a preponderance of evidence that a PRPB member, whether complainant, witness or accused, has attempted to deceive a SARP investigator, that member must receive a 'sustained' finding for untruthfulness, irrespective of whether the PRPB member was involved in the misconduct alleged in the complaint.
5. Anonymous whistleblower complaints must be investigated as if the person making the complaint is both known and reliable, at least until such time as the complainant's reliability has been substantially called into question by facts.

## Paragraph 181: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*PRPD shall require officers to cooperate with administrative investigations, including appearing for an interview when requested by a PRPD or Commonwealth investigator and providing all requested documents and evidence. Supervisors shall be notified when an officer under their supervision is summoned as part of an administrative investigation and shall facilitate the officer's appearance, unless such notification would compromise the integrity of the investigation.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Officers cooperate and supervisors are notified about SARP summons, as required by approved policies, in 95% of selected investigations. | ☑ Met | ☐ Missed |
| 2. SARP personnel indicate that the level of cooperation of officers and supervisors with SARP investigations is acceptable in accordance with generally accepted practices. | ☐ Met | ☑ Missed |
| Note: Policies and trainings are assessed as part of Paragraph 177. | | |

## Compliance Assessment

Summonsing PRPB officers to appear before a SARP investigator of any kind has yet to be shown as problematic during the compliance monitoring phase of this agreement.  Officers invariably appear and sit for interviews.  The content of these interviews, however, may vary in terms of quality.  Occasionally, when asked direct questions that go to the heart of an allegation of wrongdoing by another officer, some officers may claim a faulty memory of the event itself, seemingly to avoid implicating that officer in alleged misconduct.  "I don't recall," is perhaps the most common contemporary manifestation of the code of silence, as the officer feels as if s/he has neither lied to the investigator nor implicated a fellow officer in misconduct.

## Pathway Forward

The Monitor recommends that no case be closed when one officer directly contradicts another concerning a material fact in a serious internal misconduct case.  In the case of those officers whose memory allegedly fails when asked a direct question over their observations of another officers' alleged misconduct, the SARP investigator should employ some additional questioning to test just how poor the officers' memory is concerning other events that happened contemporaneously.  In nearly all the cases involving memory examined by the Monitor, including several more recent cases, this "poor memory" assertion by an officer is left untested by the investigator.  These declarations must not be allowed to remain on the record without a proper challenge, e.g., "Officer, you remember handcuffing the man, so how could you not remember your partner removing the man's watch at the same time?"   Additional follow up questions may include, "Why don't you remember?" "Is there anything that would refresh your memory on this?" "Are there any documents that could help you remember?" "Who might know the answer?" "How would you get the answer to this question?" "Do you have any reason to dispute the version of the complainant?" Negative answers to some or all these questions may be used by the investigator to determine the declarant's level of veracity when claiming a lack of memory to answer certain questions and not others that may be exculpatory to the officer or his/her peer(s).

Where two or more PRPB officers provide statements that are diametrically opposed over a material fact in an investigation involving serious misconduct, the investigator may request a polygraph interview and examination to help further indicate the reliability of an officer's statement of material fact. Once any declarant's veracity has been effectively called into question on any question of material fact, then the declarant's version of the event in question is effectively undermined.

## Paragraph 182: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*The subject officer of an administrative investigation shall not be compelled to provide a statement to administrative investigators where there is a potential criminal investigation or prosecution of the officer until the remainder of the investigation has been completed, and after the administrative investigators have consulted with the prosecutor's office and the SPR commander, except where the taking of such a statement is authorized by the Superintendent after consulting with the prosecutor's office.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. Compelled statements are taken in accordance with approved policies and officers' constitutional rights. | ☐ Met  ☑ Missed |

Note: Policies and trainings are assessed as part of Paragraph 177.

### Compliance Assessment

PRPB has been placed on notice in multiple CMRs that it must create and enact a policy that follows the rule established in <u>Garrity</u>.  For this reporting period, the Monitor has not found any use of a <u>Garrity</u> warning to compel an officer to make an administrative account of his conduct while simultaneously being subjected to a related criminal investigation for the same incident.

The Monitor's Office has previously seen several cases where an NIA officer had been assigned to conduct a subsequent administrative investigation of the criminal investigation that they had just concluded. The Monitor now sees fewer cases where the PRPB has inappropriately tasked an NAI criminal investigator with both investigative roles.  The Monitor will follow this in future CMRs to ensure that this trend continues, and that both forms of internal investigation are conducted concurrently.

### Pathway Forward

PRPB/SARP has indicated to the Monitor that they are working on a policy change concerning <u>Garrity</u>. The Monitor's Office urges PRPB to expedite and forward said policy change to the Monitor's Office for review.

The Monitor's Office also urges application of the separate and simultaneous investigations by NAI and NIA (or NAA, depending upon the nature of the criminal investigation) and a policy precluding a criminal internal investigation from being investigated administratively by the same investigator.

211

## Paragraph 183: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*Where there is no potential criminal investigation or prosecution of the subject officer, SPR investigators shall not warn the subject officer that he or she has a right not to provide a statement that may be self-incriminating.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. Subject officers are not given Miranda warnings where there is no potential for criminal investigation or prosecution. | ☑ Met   ☐ Missed |

Note: Policies and trainings are assessed as part of Paragraph 177.

### Compliance Assessment

In all the investigations sampled for review this reporting period, the Monitor has not found a single instance of a PRPB member being Mirandized where no possible criminal jeopardy could have arisen from the facts as alleged.

### Pathway Forward

PRPB has achieved substantial compliance with this paragraph. The Monitor will continue to reassess PRPB's continued compliance in future reports.

## Paragraph 184: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*If at any time during complaint intake or investigation the investigator determines that there may have been criminal conduct on the part of any officer or employee, the investigator shall immediately notify the SPR commander. The SPR commander shall immediately notify the Superintendent and shall consult with the prosecutor's office regarding the initiation of a criminal investigation. Where an allegation is investigated criminally, SPR shall continue with the administrative investigation of the allegation, except that it may delay or decline to conduct an interview of the subject officer(s) or other witnesses until completion of the criminal investigation unless, after consultation with the prosecutor's office and PRPD Superintendent, such interviews are deemed appropriate.*

| Compliance Status | Assessment Schedule | |
|---|---|---|
| Partially Compliant | Review | April 2022 – September 2022 |

212

| | | | |
|---|---|---|---|
| Policy: | Implemented | Period | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1a. Investigators notify SARP and SARP consults with prosecutors in accordance with approved policies when an investigator determines that there may have been criminal conduct on the part of any officer or employee. | ☑ Met   ☐ Missed |
| 1b. Administrative investigations continue when a parallel criminal investigation is also ongoing in accordance with approved policies. | ☐ Met   ☑ Missed |
| Note: Policies and trainings are assessed as part of Paragraph 177. | |

### Compliance Assessment

In all the cases reviewed for this report, the Monitor saw no evidence that an internal case was investigated criminally and administratively at the same time (and by different investigators), despite the Agreement's provision. The Monitor's review of the files involving criminal investigations indicates that investigators notified SARP and that SARP consulted with prosecutors when a determination was made of possible criminal conduct on the part of any officer or employee. The Monitor will also consider findings from previous CMRs as he continues to review investigations for compliance with this paragraph.

### Pathway Forward

Internal criminal and administrative case investigations must be conducted concurrently and by separate corresponding branches of SARP, e.g., NAI and NIA.

## Paragraph 185: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*PRPD, PRDOJ, and the prosecutor's office shall develop protocols to ensure that the criminal and administrative investigations are kept appropriately separate after a subject officer has provided a compelled statement. Nothing in this Agreement or PRPD policy shall hamper an officer's obligation to provide a public safety statement regarding a work related incident or activity.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Deferred | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Deferred | | |

213

### Compliance Targets

| | |
|---|---|
| 1. Administrative and criminal investigations are conducted separately as required by approved policies after a subject officer has provided a compelled statement. | ☐ Met   ☐ Missed |

Note: Policies and trainings are assessed as part of Paragraph 177.

### Compliance Assessment

PRPB/SARP has indicated that it is in the process of developing policy to create a Garrity rule. As of this writing, however, no draft policy has been forwarded to the Monitor. A well-crafted policy is a condition precedent to substantial compliance with this paragraph.

### Pathway Forward

PRPB must develop a Garrity rule for SARP administrative investigations.

## Paragraph 186: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*In each investigation, PRPD shall consider all relevant evidence, including circumstantial, direct, and physical evidence. There will be no automatic preference for an officer's statement over a non-officer's statement, nor will PRPD disregard a witness' statement merely because the witness has some connection to the complainant or because of any criminal history. PRPD shall make efforts to resolve material inconsistencies between witness statements.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. 95% of sampled investigations considered all relevant evidence in a manner consistent with this Paragraph, and tried to resolve material inconsistencies between witness statements. | ☐ Met   ☑ Missed |

Note: Policies and trainings are assessed as part of Paragraph 177.

### Compliance Assessment

The Monitor remains convinced, based upon his multiple interviews of SARP investigators and analysis of case samples, that circumstantial evidence is not being considered and has not been mentioned in any investigative report.

Secondly, as pointed out in paragraph 181, most SARP investigators accept an officer's assertion of a memory lapse in their internal investigations, without further questioning.

214

*Pathway Forward*

SARP investigators must be trained to analyze a member's *historial* in a closely decided case to determine whether the accused's alleged misconduct in the past is uncannily like the case under investigation, and especially where this evidence may effectively push the probability of occurrence from 50-50 to 51-49 or higher, which may then result in a sustained finding against the member.

A SARP investigator must not hear the response of, "I do not recall," from a PRPB member in response to a question of a material fact in a SARP investigation without challenging that member's level of recall.[39]

### Paragraph 187: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*A misconduct investigation shall not be closed simply because the complaint is withdrawn or the alleged victim is unwilling or unable to provide additional information beyond the initial complaint, or because the complainant pled guilty or was found guilty of an offense.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

*Compliance Targets*

| | |
|---|---|
| 1. 95% of sampled investigations were not closed simply because the complaint is withdrawn or the alleged victim is unwilling or unable to provide additional information beyond the initial complaint, or because the complainant pled guilty or was found guilty of an offense. | ☑ Met   ☐ Missed |

Note: Policies and trainings are assessed as part of Paragraph 177.

*Compliance Assessment*

The Monitor has yet to observe a case that had been closed because a complaint was withdrawn, the alleged victim failed to cooperate, or the complainant was found guilty of any offense.

*Pathway Forward*

PRPB has achieved substantial compliance with this paragraph. The Monitor will continue to reassess PRPB's continued compliance in future reports.

---

[39] See Paragraph 181, *supra*.

## Paragraph 188: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*The misconduct investigator shall explicitly identify and recommend one of the following dispositions for each allegation of misconduct in an administrative investigation:*

*a) "Unfounded," where the investigation determines by clear and convincing evidence that the alleged misconduct did not occur or did not involve the subject officer;*

*b) "Sustained," where the investigation determines, by a preponderance of the evidence, that the alleged misconduct did occur;*

*c) "Not Sustained," where the investigation is unable to determine, by a preponderance of the evidence, whether the alleged misconduct occurred; or*

*d) "Exonerated," where the investigation determines by clear and convincing evidence that the alleged conduct did occur but did not violate PRPD policies, procedures, or training.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. Misconduct investigators identify and recommend one of the listed dispositions for each allegation of misconduct in an administrative investigation. | ☑ Met   ☐ Missed |

Note: Policies and trainings are assessed as part of Paragraph 177.

### Compliance Assessment

In each of the cases reviewed by the Monitor for this reporting period, the investigator has used the appropriate terminology to conclude any given case.

### Pathway Forward

PRPB has achieved substantial compliance with this paragraph. The Monitor will continue to reassess PRPB's continued compliance in future reports.

## Paragraph 189: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*The unit commander of the investigating supervisor shall review the supervisor's recommended disposition and accept, reject, or modify it. The unit commander shall document rejected or modified recommendations from supervisors in writing. Supervisory investigation reports and all related documentation and evidence shall be provided to SPR immediately upon completion of the investigation, but no later than within three business days.*

216

*SPR shall review disposition recommendations made by unit commanders to ensure that investigative standards are met. SPR shall retain misconduct investigation reports and related records.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. The unit commanders complied with the requirements of this Paragraph in 95% of selected investigations. | ☐ Met | ☑ Missed |
| Note: Policies and trainings are assessed as part of Paragraph 177. | | |

### Compliance Assessment

The Monitor's chief concern regarding supervisory and Area Command oversight concerns the signed form developed by the PRPB for such written approval.  In most case files examined, there is no date attached to this approval form, thus the reader is left to question exactly when the supervisor and area commander approved the file for submission to SARP.  The lack of this date makes it impossible for the Monitor to reach a conclusion as to whether the 3-day rule established by the PRPB is being followed.

It may certainly be the case that supervisors and area commanders are submitting approved cases in tenor with the Agreement concerning timeliness.  The absence of this date on the correspondence, however, does not allow the Monitor to infer such timeliness.

### Pathway Forward

The Monitor recommends that all supervisory and area command case approval forms be dated to indicate the date of their approval. Any changes made to a recommended case finding at SARP should be explained by SARP command and shared with the original investigator.

### Paragraph 190: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*The SPR commander shall review the investigator's recommended disposition and accept, reject, or modify it. The SPR commander shall document rejected or modified recommendations from investigators in writing. The Superintendent, or his or her designee(s), shall review the SPR commander's recommended disposition and accept, reject, or modify it. The Superintendent, or his or her designee(s), shall document rejected or modified recommendations from SPR.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review | April 2022 – September 2022 |

217

| Policy: | Implemented | Period | |
|---|---|---|---|
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1a. The SARP commander reviews and resolves the complaint in accordance with the paragraph in 95% of selected investigations. | ☑ Met  ☐ Missed |
| 1b. The Commissioner reviews and resolves the complaint in accordance with the paragraph in 95% of selected investigations. | ☑ Met  ☐ Missed |
| Note: Policies and trainings are assessed as part of Paragraph 177. | |

### Compliance Assessment

The Monitor finds that the Office of the Police Commissioner (OPC)reviews and resolves complaints in tenor with the paragraph in at least 95% of the cases examined. Further the Monitor also found that the SARP commander reviews and resolves the complaint in accordance with the paragraph.

### Pathway Forward

The Monitor recommends that, when a finding is changed at the SARP command, OAL, or the OPC levels, that the initial investigator not only be informed of such a change, but also receive a brief rationale for said change.

## Paragraph 191: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*In addition to determining whether the officer committed the alleged misconduct, administrative investigations shall assess and document whether: (a) the action was in compliance with training and legal standards; (b) the use of different procedures should or could have been employed to achieve a potentially better outcome; (c) the incident indicates a need for additional training, counseling or other non-punitive corrective action; and (d) the incident suggests that PRPD should revise its policies, strategies, tactics, or training. This information shall be shared with the relevant commander(s).*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

218

Note: This Paragraph is assessed with Paragraph 178.

*Compliance Assessment*

The Monitor has examined cases investigated during the reporting period for the inclusion of the following observations on the part of the investigator:

(a) Compliance with training and legal standards;

(b) Whether the use of different procedures should or could have been employed to achieve a potentially better outcome;

(c) Whether the incident indicates a need for additional training, counseling, or other non-punitive corrective action; or

(d) Whether the incident suggests that PRPB should revise its policies, strategies, tactics, or training.

The results of this analysis are clear.  In the overwhelming majority of SARP cases reviewed for this period, the investigator has not mentioned any of these observations in their final report.

*Pathway Forward*

In its rewrite of REA114, (SARP Investigator's Formative Training Course), the Investigator's Manual and any related policy, the PRPB must emphasize the inclusion of observations (a) through (d) as noted above in every case file. The mention itself may start as a checked box to inform that the analysis was made and was concluded as "negative" or "not applicable."  In the case where the observation was made in the investigation, the investigator must elaborate on the observation at the end of his/her report.

To reach the current body of SARP investigators, the Monitor recommends the use of in-service training to ensure that all understand the new policy and procedures.

## Paragraph 192: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*Each misconduct complainant will be notified in writing regarding the initiation of an investigation, the final disposition of the investigation, any disciplinary or non-punitive action taken, and the right to seek further review of the final disposition under applicable law. If an investigation goes beyond the 90 day limit, the complainant will be notified that an extension has been granted. PRPD shall establish procedures for complainants dissatisfied with the outcome to discuss their concerns with SPR commanders.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Fully Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | | Bi-annually |

| Practice: | Implemented | Assessment Frequency | |
|---|---|---|---|

### Compliance Targets

| | |
|---|---|
| 1. Complainants are notified about the status of the investigation and outcome in accordance with approved policies in 95% of selected investigations. | ☑ Met ☐ Missed |
| 2. Complainants are given the opportunity to appeal the determination before the Investigation, Processing and Appeals Commission. | ☑ Met ☐ Missed |
| Note: Policies and trainings are assessed as part of Paragraph 177. | |

### Compliance Assessment

In all closed cases reviewed with a known complainant, the complainant received timely notification of the status and outcome of the SARP investigation. Additionally in these same cases, all complainants were notified of their ability to appeal a finding to CIPA.

## Paragraph 193: Civilian Complaints, Internal Investigations, and Discipline - Investigation of Complaints

*SPR shall retain all misconduct investigation records for at least five years after the officer's separation from the agency. This obligation shall apply to records regarding officers' credibility that come to the attention of SPR and that may be subject to disclosure under Brady v. Maryland, 373 U.S. 83 (1963), and its progeny.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. SARP retains at least 95% of investigation files for persons who have separated from PRPB less than five years ago. | ☑ Met ☐ Missed |
| 2. PRPB's document retention practices comply with approved policies. | ☑ Met ☐ Missed |
| Note: Policies and trainings are assessed as part of Paragraph 177. | |

### Compliance Assessment

On-site document reviews conducted by the Monitor indicate disciplinary files relating to officers separated from service are maintained by PRPB and that PRPB's document retention practices comply with approved policies.

220

*Pathway Forward*

The Monitor will continue to assess PRPB's compliance with this paragraph and conduct additional on-site reviews to ensure that this practice continues.

## 5. Staffing, Selection, and Training Requirements

Owing in part to the COVID19 pandemic, PRPB has had difficulty ensuring that all its investigators have been formatively trained and certified. Now that the pandemic has subsided enough to allow presential learning, the PRPB must continue to focus on ensuring that all its investigators are formatively trained.

As policies and investigative techniques continue to change, PRPB must ensure that all current investigators are familiar with and can demonstrate their familiarity with these new procedures.

Assessments in general, and those involving SARP investigators and staff, should contain a presential component. Supervisors should meet with subordinates to privately discuss areas where the subordinate is excelling, and areas where a subordinate may improve their performance. Specific advice or coaching should be given to the subordinate.

Performance assessments between the 4.8 and 5.0 level should be a relatively rare occurrence, and an added explanation of such exceptional performance level should be included in the record.

### Paragraph 194: Civilian Complaints, Internal Investigations, and Discipline - Staffing, Selection, and Training Requirements

*PRPD shall ensure that a sufficient number of well-trained staff are assigned and available to thoroughly complete and review misconduct investigations in a timely manner and in accordance with the requirements of this Agreement. PRPD further shall ensure it provides sufficient resources and equipment to conduct adequate criminal and administrative misconduct investigations.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 177-193. | ☒ Met | ☐ Missed |
| 2. Trainings for the internal investigation unit are consistent with approved policies. | ☒ Met | ☐ Missed |
| 3. All internal investigation unit personnel are trained and certified in relevant policies (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☒ Missed |

221

| | | |
|---|---|---|
| 4. The internal investigation unit has sufficient resources and equipment, or is in the process of procuring needed resources and equipment. | ☐ Met | ☑ Missed |
| 5a. Internal investigation unit personnel serve three-year terms. | ☑ Met | ☐ Missed |
| 5b. Retained internal investigation unit personnel have demonstrated effective performance. | ☑ Met | ☐ Missed |

*Compliance Assessment*

In the Monitor's last report, he discovered that only approximately 65% of the sample of SARP investigators have been formatively trained. Since that time, a group of men and women received their formative training course (REA-114) in its current iteration. The Monitor received no documentation indicating that all its members have been formatively trained.

Similarly, the Monitor has no document indicating that any member of SARP had received in-service training over the past year that specifically relates to their duties as SARP investigators.

From his extensive interviews with SARP members, the Monitor continues to find that the decision process to extend an investigator's service period appears to be *ad hoc* in practice. The evaluation process in general, and as it relates to SARP investigators is flawed and in need of adjustment.[40]

The Monitor has reviewed procurement requests from SARP Command from October of 2021 through April of 2022 asking for more vehicles, technology, and manpower, all of which are desperately needed. No record of PRPB or DSP responses to these multiple requests was ever received.

The Monitor has still yet to see any a request for off-site NAI office space to avoid the likely situation of a citizen accusing a police officer of criminal wrongdoing, then having to go to the precinct of that officer to report that alleged crime to NAI.

*Pathway Forward*

The Monitor's Office expects the Police Commissioner and DSP[41] to give SARP requests for human resources, equipment, and office space their highest priority and to deliver these resources without unnecessary delay.

PRPB must move their NAI delegations out of PRPB facilities and into facilities that are not directly police related.

PRPB must remedy existing training deficiencies and execute a uniform and transparent evaluation process for SARP members that includes mandatory supervisory feedback for every member at the end of every evaluation period.

---

[40] It is the Monitor's expert opinion that employee evaluations ranging from 4.8 to 5.0 out of 5 possible points ought to be a rare occurrence, especially the closer that an evaluation approaches a perfect score of 5.0. Evaluations should always be conducted with an eye towards improving the subordinate and their performance. Additionally, the PRPB in general and SARP in particular should promote private face-to-face delivery of these evaluations in the hopes of beginning a dialogue that will effectively improve communication between supervisor and subordinate and to help the subordinate work on performance areas that are less than perfect. While acceptance of a member's review can still remain "digital," the discussion of said performance assessment should be in person.

[41] The Monitor has learned, through a variety of sources, that the DSP has absorbed the PRPB's procurement office, and is thus responsible for purchase and delivery of goods and services pertaining to the PRPB, including SARP.

## Paragraph 195: Civilian Complaints, Internal Investigations, and Discipline - Staffing, Selection, and Training Requirements

*PRPD shall establish a term of duty of up to three years for SPR officers and supervisors who conduct investigations and may reappoint an officer to successive terms of duty if that officer has demonstrated effective performance based on an appropriate annual performance evaluation.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 194.

*Compliance Assessment*

Most SARP investigators describe a rigorous and competitive process to join the unit and all who were extended in their service described having received exceptional (if not inflated) reviews by their superiors.[42] During the CMR-6 reporting period, the Monitor reviewed and provided comments on the revised PPR-310.1 form (Performance Evaluation). The revised form and policy will seek to address this issue among other improvements to the performance evaluation system. The Monitor is awaiting review of the next iteration of the revised PPR and related policy.

*Pathway Forward*

Re-appointment of SARP investigators for additional 3-year terms should not be an automatic practice, but rather one based upon a series of objective performance reviews. PRPB should execute a uniform and transparent evaluation process for SARP members that includes mandatory supervisory feedback for every member delivered in person at the end of every evaluation period. SARP members who, on their own volition, unilaterally transfer out of SARP should do so via an exit interview conducted by the Area Commander. This interview may help SARP determine what, if anything, led up to the investigator's decision to voluntarily leave the unit. This may prove to be invaluable in terms of retention of investigators.

## Paragraph 196: Civilian Complaints, Internal Investigations, and Discipline - Staffing, Selection, and Training Requirements

*All SPR personnel conducting officer misconduct investigations shall receive at least 40 hours of initial training in conducting officer misconduct investigations and shall receive additional in-service training each year.*

---

[42] See Paragraph 194, *supra*.

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 194.

*Compliance Assessment*

While the Monitor has seen some previously untrained SARP investigators receiving REA114, the Monitor possesses no documentary proof that all its investigators have been formatively trained. Similarly, the Monitor has seen no documentary proof that all SARP investigators have received required annual in-service training specially related to SARP investigations.

While the PRPB has reported that SARP basic formative and annual specialized trainings are under careful review for modification, the Monitor has yet to see recommendations from either SAEA or SARP for curricula changes.

After the COVID-19 pandemic, PRPB realized that it faced a dilemma concerning the training of new SARP investigators. PRPB understands from past CMRs that it had to modify its flagship SARP investigator's formative training course (REA 114) to accommodate forthcoming changes in SARP administrative investigative methodology in accordance with the <u>Garrity</u> case, among other issues. They also realized that, out of a sense of urgency, new investigators had been deployed to the field with no specialized SARP training at all, perhaps relying upon "on the job training" along with close immediate supervision to help produce the best investigative results from inexperienced investigators.

Rather than to continue to delay formative training, which contains many beneficial components for new investigators unrelated to imminent changes to the rules, PRPB SAEA and SARP decided to train several dozen of its new investigators using the unchanged model and lesson plan of REA-114 during the last week of August of 2022. This seemed to have been a reasoned decision by PRPB. The Monitor personally audited the course at the Police Academy during that time.

In large part, the Monitor found that the course was well-designed and competently delivered, but that there were areas that could be improved upon. Additionally, once PRPB completes its rules and procedures changes, SARP and SAEA will have to partner with two objectives in mind: 1) amend REA 114 to reflect the policy and rules changes and 2) address the training gap created by the new policy with a vigorous in-service training component for previously trained SARP investigators. This latter component should be delivered shortly after the new policy has been approved.

*Pathway Forward*

PRPB must show conclusive evidence that all SARP investigators have been formatively trained.

In the case of veteran SARP investigators, PRPB must show conclusive evidence that all SARP investigators have received annual specialized SARP in-service training.

Proposed modifications for any SARP training must be forwarded to the Monitor for analysis and approval.

As recommended in CMR-6, PRPB SARP and SAEA are working together towards a goal of formatively training and certifying SARP investigators. This conclusion is based upon his conversations with key interlocutors and first-hand observations of their resulting work product.  The Monitor is very pleased to report that his audit of REA-114 effectively demonstrated that SAEA and SARP instructors are very highly competent as both subject matter experts and skilled instructors. Additional recommendations for REA 114 are provided in Appendix F.

## 6. Preventing Retaliation

Due to the present configuration of the Monitor's SARP file sample requests, complaints specifically involving retaliation usually comprise a small percentage of cases within any given sample.  While the Monitor is confident in his assessment of these cases in this sample, he reserves the right in the future to draw a purposive sample of SARP cases that specifically feature such an allegation to ensure a statistically relevant assessment.

In the present sample of SARP cases reviewed by the Monitor, four specifically alleged retaliation.[43]

### Paragraph 197: Civilian Complaints, Internal Investigations, and Discipline - Preventing Retaliation

*PRPD policy shall expressly prohibit all forms of retaliation, whether subtle or direct, including discouragement, intimidation, coercion, duty-station reassignment, or adverse action, against any person, civilian or officer, who reports misconduct, makes a misconduct complaint, or cooperates with an investigation of misconduct. Retaliation shall be considered a serious policy violation and shall subject an officer to serious disciplinary action, up to and including termination.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Not Implemented | | |

---

[43] 2019-1065, 2021-0725, 2022-0228, 2022-0264 all allege retaliation by one PRPB member against another.

225

## Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of this Paragraph. | ☑ Met | ☐ Missed |
| 2. Retaliation trainings are consistent with approved policies. | ☑ Met | ☐ Missed |
| 3. 95% of sampled personnel are trained and certified in retaliation policies (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 4. Complaints involving alleged retaliation are investigated and adjudicated in accordance with approved policies and agency standards in 95% of selected complaints. | ☐ Met | ☑ Missed |
| 5. 95% of interviewed personnel perceive retaliation for participating in an investigation of misconduct is not tolerated and leads to serious disciplinary action. | ☑ Met | ☐ Missed |

## Compliance Assessment

In the four cases specifically alleging retaliation, the Monitor has concluded that the SARP investigator reached the appropriate finding considering the evidence revealed in the investigation. Lastly, the Monitor reserves the right to request a special purposive sample of cases investigated during the reporting period involving an allegation of retaliation to make an adequately informed determination of compliance.

The Monitor provides an overview of these cases below.

In Case 2022-0264, which is one of the more recent cases analyzed, the case was well-investigated but lacked any documentary evidence of review by the SARP Area Commander.

Case 2022-0228 is the culmination of nearly three years of back-and-forth complaints concerning a sergeant and a female subordinate.  While the Monitor found the investigator's conclusion to be valid based upon the evidence uncovered, the investigator appears to have ignored the sergeant's *historial*, which indicated that the sergeant had a lengthy history of allegations of creating a hostile work environment or discrimination against women.  While this history would not have necessarily changed the eventual outcome of the instant case, it does bear mentioning in the investigative report.  This history should also have been flagged for possible early intervention and/or retraining.

Case 2019-1065 involved alleged retaliation against PRPB members for failing to sign a non-punitive disciplinary notice. While this case is far more dated than the previous, it should be noted that the case lacks SARP Area Command and SARP Command reviews indicating that it was reviewed and approved at both levels.

Lastly, in Case 2021-0725, a subordinate who reported that his lieutenant had contracted COVID19 and had failed to follow established protocol, alleged that he was subjected to reprisal from both the lieutenant and his sergeant.  This case contains glaring oversights that a skilled investigator should have followed up upon.[44]

---

[44] No attendance records of other officers on the same shift were analyzed and cited in the report to ensure that the complainant wasn't being singled out for "split shift" days off.  Neither were other officers on that shift interviewed to determine whether they were told by their superiors to neither eat nor use the restroom while out on patrol.  Both of these allegations go to the heart of the complainant's serious allegations of retaliation.

*Pathway Forward*

PRPB must ensure that every single one of its investigators has both successfully completed REA114 as well as an annual re-trainer specifically designed for active SARP investigators.

SARP investigators must analyze the accused officer's historial in every case, especially those cases that involve repeated allegations of the same nature and from similar complainants.  Irrespective of whether the facts support a finding of *sustained* or *not sustained*, the investigator should mention the accused's past record of having been accused of remarkably similar conduct by remarkably similar types of people.

Every single SARP case file must contain written evidence indicating who approved of the investigator's work and when that approval was made.

As retaliation cases often have an acutely negative impact on morale at all levels of the organization, SARP investigators must exhaustively investigate these allegations.

## 7. Discipline

The use of a Phase I/Phase II analysis has assisted the Monitor in focusing in on the adjudicative and resulting disciplinary process of many types of complaints.

The Monitor continues to see that discipline is applied in accordance with the PRPB Code of Conduct and related disciplinary matrix.

As is the case with many other areas contained within this Section and mentioned previously, training records must be provided to the Monitor to show proof that the requisite number of PRPB have been appropriately trained.

### Paragraph 198: Civilian Complaints, Internal Investigations, and Discipline - Discipline

*PRPD shall ensure that discipline for sustained allegations of misconduct is fair, consistent, based on the nature of the allegation, and that mitigating and aggravating factors are set out and applied consistently. Discipline shall be based on objective criteria and shall not depend on or be influenced by rank or external considerations.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 198-199. | ☒ Met | ☐ Missed |
| 2. Discipline trainings are consistent with approved policies. | ☒ Met | ☐ Missed |

227

| 3. 95% of sampled personnel are trained and certified in discipline policies (or scheduled for training, in the case of mid-year reviews). | ☐ Met  ☑ Missed |
| 4. Discipline is taken and documented in response to sustained misconduct complaints in accordance with approved policies in 95% of selected complaints. | ☑ Met  ☐ Missed |
| 5. Disciplinary matrix employs objective criteria to apply to sustained findings to assess the appropriate level of discipline. | ☑ Met  ☐ Missed |

*Compliance Assessment*

The Monitor bases his assessment upon a Phase II examination of multiple closed cases, each of which received a Final Resolution during the reporting period.   While this group of cases was far more dated than those subjected to a Phase I analysis, the Monitor may conclude that PRPB is using its disciplinary matrix as it was designed to be used.

The Monitor remains impressed with PRPB's application of its progressive disciplinary matrix. In 95% of the cases reviewed, discipline is taken and documented in response to sustained misconduct complaints.

The Monitor finds that PRPB acts within the scope of its progressive disciplinary matrix in meting out discipline.

*Pathway Forward*

PRPB must show that all relevant members have been trained and certified in discipline policies to reach substantial compliance.

## Paragraph 199: Civilian Complaints, Internal Investigations, and Discipline - Discipline

*PRPD shall establish a disciplinary matrix for reviewing sustained findings and assessing the appropriate level of discipline to facilitate consistency in the imposition of discipline. All disciplinary decisions shall be documented, including the rationale behind any decision to deviate from the level of discipline set out in the disciplinary procedures.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 198.

*Compliance Assessment*

The Monitor's Phase II review of cases deemed closed within the reporting period reveals a complete review of alleged infractions of laws as well as PRPB rules and procedures. The Monitor continues to find abundant evidence that PRPB's progressive disciplinary matrix is being used as it was designed.

228

*Pathway Forward*

As a matter of fostering transparency and enhancing good investigative practices, when SARP, OAL, or OPC departs from or modifies the original investigator's recommended finding, that investigator should be made aware of and understand the justification for this departure.

## Paragraph 200: Civilian Complaints, Internal Investigations, and Discipline - Discipline

*PRPD shall review its drug testing program on an ongoing basis to ensure that pre-service testing for new officers and random testing for existing officers is reliable and valid. The program shall be designed to detect use of banned or illegal substances, including steroids.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | Met/Missed |
|---|---|
| 1. Policies incorporate all the requirements of this Paragraph. | ☒ Met  ☐ Missed |
| 2. PRPB's drug testing program trainings are consistent with approved policies. | ☐ Met  ☒ Missed |
| 3. 95% of sampled personnel are trained and certified in PRPB's drug testing program policies (or scheduled for training, in the case of mid-year reviews). | ☐ Met  ☒ Missed |
| 4. Drug tests are reliable, valid, and administered to new officers and a random selection of existing officers in accordance with the Paragraph. | ☒ Met  ☐ Missed |

*Compliance Assessment*

There has been some positive movement demonstrated by the PRPB to address the shortcomings of its controlled substance testing program.  This improvement is incremental and mostly concerns the number of random drug screening test performed on active members. For the period of August 12, 2022 to September 14, 2022, PRPB performed screenings of 439 persons, both active as well as cadets, for drug screening, which is a considerable undertaking.  The PRPB's ability to screen 439 people in a period of 32 days begs the question as to why the PRPB cannot reach an aggregate of 4,000 drug tests delivered each year.  Performing 4,000 random screening a year could ensure that every active PRPB is screened at random at least once every three years, which is the ideal.

The Monitor sees no PRPB document indicating how many officers tested positive for controlled substances during the reporting period.

There were also no training records forwarded to the Monitor concerning drug testing.

229

*Pathway Forward*

The Monitor reaffirms his concerns about PRPB's controlled substance testing program, mostly relating to the aggregate number of persons annually tested, the portion of PRPB sworn workforce who has not been tested in years, and the overall number of positive test results.

The Monitor also reaffirms his concern that those who had not been tested in over five years be prioritized for random drug screening and that the aggregate number of tests conducted annually be increased to ~4,000 members both active as well as incoming cadets. The Monitor remains open to suggestions from PRPB to make this process more innovative, efficient, and effective.

PRPB must forward aggregate training records for any given reporting period to indicate personnel are trained and certified in PRPB's drug testing program policies.

## 8. Officer Assistance and Support

If there is any portion of Section IX that has been well-designed, clearly codified within PRPB rules and well-executed by the corresponding branch of the PRPB, then Officer Assistance and Support ("PAE") is such an example.

While the Monitor had previously expressed some concern in the past regarding the placement of PAE Offices (all of which are located either in Headquarters or in Area Commands), that concern has been alleviated through multiple interviews with actual PAE service providers.  These providers describe a growing caseload of officers who are self-referred for a variety of mental health or wellness issues. While there is still a sizeable percentage of PRPB members who have been referred to PAE for mental wellness assessments focusing on their ability to performed as an armed police officer, that percentage of patients has remained static.  On the other hand, most PAE service providers describe a growing number of self-referred sworn officers, spouses, domestic partners, and family members.  While the location of these treatment officers is still of some concern to the Monitor, it is of less concern at the present.

### Paragraph 201: Civilian Complaints, Internal Investigations, and Discipline - Officer Assistance and Support

*PRPD shall provide officers and employees with a range of non-punitive supports and services to address and correct problem behavior, as part of PRPD's disciplinary and performance improvement systems. These supports and services shall include a comprehensive range of mental health services that include, but are not limited to: readily accessible confidential counseling services; critical incident debriefings and crisis counseling; mental health evaluations; and stress management training that comport with generally accepted practices.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |

230

| | | | |
|---|---|---|---|
| **Training:** | Not Implemented | **Assessment Frequency** | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| **Practice:** | Implemented | | |

### Compliance Targets

| | |
|---|---|
| 1. Policies incorporate all the requirements of Paragraphs 201-204. | ☒ Met  ☐ Missed |
| 2. Officer assistance and support trainings are consistent with approved policies. | ☒ Met  ☐ Missed |
| 3. 95% of sampled personnel are trained and certified in officer assistance and support policies (or scheduled for training, in the case of mid-year reviews). | ☐ Met  ☒ Missed |
| 4. A variety of non-punitive supports and services that comport with generally accepted practices are available to officers and their families as required by approved policies. | ☒ Met  ☐ Missed |
| 5. Mental health professionals are involved in developing and providing in-service training on mental health stressors related to law enforcement and the mental health services available to officers and their families. | ☒ Met  ☐ Missed |
| 6. Mental health counseling provided to PRPB employees is confidential, pursuant to approved policies. | ☒ Met  ☐ Missed |

### Compliance Assessment

The Monitor has conducted multiple in-person and remote interviews of those assigned to provide PRPB officers with mental health and wellness assistance and support.  The Monitor continues to find that PAE service providers are both objectively competent and highly credentialed. All are conscious of their duty to respect patient confidentiality and HIPAA requirements.

The Monitor is pleased to see an increasing number of patients who seek assistance for mental health and wellness issues on their own initiative. These self-referred patients were not limited to PRPB members. The Monitor heard multiple examples of spouses and dependents of PRPB members seeking assistance from the Employee Assistance Program (PAE), which is also commendable.

A host of motivations for PRPB officers to self-refer have been cited by PAE providers for this growing segment of clients. These motivations include, but certainly are not limited to, stress, anxiety, panic, and related mood disorders, which often relate directly to vicarious trauma caused by shocking or emotionally perturbing observations made by officers during their duties. It bears mentioning that PAE professionals also treat a multitude of other wellness issues that are not necessarily work-related. For example, PAE treats for family-related issues that may extend to the PRPB member and members of their family, PAE also either treats or makes professional referrals for chemical abuse or self-medication issues (drugs and/or alcohol), depending upon the circumstances of the misuse.

The Monitor's Office remains conscious of the fact the location of these offices may create some disincentive for these self-referred PRPB dependents, and especially PRPB members themselves, from taking better advantage of the program. While many agencies on the mainland intentionally locate their psychological services in off-site locations to help foster the perception of strict confidentiality for those who voluntarily seek these services, the PRPB could achieve a similar result by specifically authorizing remote sessions with PAE professionals via a videoconference platform such as Zoom.

A substantially compliant rating for this reporting period would have been given, provided that the PRPB supplied training and certification records for officer assistance and support policies.

*Pathway Forward*

PRPB must include documentary proof that personnel are trained and certified in officer assistance and support policies.

## Paragraph 202: Civilian Complaints, Internal Investigations, and Discipline - Officer Assistance and Support

*PRPD shall train management and supervisory personnel in officer support services protocols to ensure wide availability and use of officer support services.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 201.

*Compliance Assessment*

The Monitor was provided with no documentary evidence that demonstrates that that an appropriate level of PRPB officers have taken the Symptoms of Professional Burnout and Risks to Wellness course (TSDP).

*Pathway Forward*

PRPB must ensure that all who are required to take the TSDP Course have taken it for the next reporting period.

## Paragraph 203: Civilian Complaints, Internal Investigations, and Discipline - Officer Assistance and Support

*PRPD shall involve mental health professionals in developing and providing in- service training on mental health stressors related to law enforcement and the mental health services available to officers and their families.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |

| Training: | Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
|---|---|---|---|
| Practice: | Implemented | | |

### Compliance Targets

Note: This Paragraph is assessed with Paragraph 201.

### Compliance Assessment

This is an area that has never proven problematic since beginning the monitoring phase of the Agreement.  The Monitor continues to find PAE providers as highly credentialed and objectively capable of performing their assigned duties. The Monitor has also reviewed the training product of these professionals and found it to be comprehensive in nature.  It has not changed since the Monitor's last report.

### Pathway Forward

The Monitor will continue to assess this paragraph to ensure that it meets the requirements of this paragraph.

## Paragraph 204: Civilian Complaints, Internal Investigations, and Discipline - Officer Assistance and Support

*PRPD shall ensure that any mental health counseling services provided to PRPD employees remain confidential as consistent with generally accepted practices in the field of mental health care.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Substantially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Implemented | | |

### Compliance Targets

Note: This Paragraph is assessed with Paragraph 201.

### Compliance Assessment

The Monitor continues to find no evidence suggesting that PAE is not Health Insurance Portability and Accountability Act (HIPAA) compliant. All PAE professionals interviewed described scrupulous efforts to maintain patient record confidentiality.

233

*Pathway Forward*

The Monitor will continue to assess this paragraph to ensure that it meets the requirements of this paragraph.

# X. Community Engagement and Public Information

Community Policing and Public Information includes 13 paragraphs in the Agreement - 4 of which are assessed annually (Paragraphs 208-210 and 213). A complete review of all 13 paragraphs was captured in CMR-6 and will be provided again in CMR-8. This report assesses compliance with nine paragraphs: 205-207, 211-212, and 214-217.

The paragraphs assessed during the CMR-7 reporting period primarily focused on the Commonwealth and PRPB's efforts to demonstrate the implementation of community policing, including: recruitment practices focused on community policing; performance appraisals; deployment of personnel responsible for community engagement efforts; collaborative problem-solving activities under the SARA Model; community outreach activities purposely focused on education and prevention; and improving citizen's quality of life through strategic planning and vested community interactions.

As noted in previous CMRs, most of the Commonwealth's progress in this section is rated at partial or not compliant. Much of this is the result of the ineffective execution of a comprehensive approach to community policing; limited and deficient implementation of the SARA Model, lack of training in community policing, staffing challenges resulting in inadequate supervision, inconsistencies in community policing approaches, strategic follow through on community engagement, insufficient communication and  public transparency around data, such as UOF and crime statistics, and purposeful community outreach activities.

During the CMR-7 reporting period, the Monitor's Office met and interviewed various members of PRPB directly involved in community engagement, community policing, and outreach at the district, precinct, and area command levels in 11 police areas. Additionally, the Monitor's Office attended and observed several community events hosted by PRPB, including an open meeting (Encuentro Comunitario) in Caguas, a community discussion (Conversatorio) held by the Guayama CIC, a CIC spokesperson meeting at the central level held at PRPB headquarters, and a public meeting hosted by PRPB in San Juan.

In addition to these on-site activities and observations, the Monitor's Office also reviewed several related policies and manuals and informally reviewed the training curriculum for Community Policing developed by the Reform Office for training implementation through SAEA.

Despite these efforts, the documents submitted to the Monitor's Office by PRPB in demonstration of compliance failed to show an operational implementation towards the institutionalization of community policing beyond the PRPB Community Relations Bureau, as required by the Agreement in paragraphs 21, 103, 145, and 205 through 208.

Community policing at the district and precinct levels denotes limited, if not, null implementation of purposeful and meaningful outreach activities for education, awareness, and prevention. Although some police areas certified having engaged in outreach activities, PRPB failed to provide comprehensive documentation to support these certifications. The deficiencies outlined during CMR-6 regarding the implementation of problem-solving through use of the SARA Model remain unimproved. The Monitor's Office noted that despite technical assistance received from the Reform Office, some police areas confirmed not implementing the model for problem-solving and/or failed to use the appropriate PPRs in

support of operational processes. Among salient deficiencies, the Monitor's Office found failure to implement effective responses, resulting from insufficient analysis (problems lacking definition or left blank) and/or insufficient community involvement from government agencies or other entities, and the use of the module to report quality of life situations, (i.e., "Caravana no balas al aire" and escort services to community members in support of an outreach activity). The Monitor's Office further noted that although a community policing module to record community policing activities throughout the entire Bureau, was launched on July 1, 2022, and is in its initial stages of implementation, the documents reviewed reflect that not all areas are consistently using the module and not all activities have been appropriately recorded within the module, which highlights the need to establish standard operating procedures including data quality validation and protocols for effective use of the module.

PRPB's continued failure to conduct community policing training has also prevented it from reaching substantial compliance with this section.

As is the case with the other sections in this CMR, PRPB did not provide projected timelines or training schedules for community policing related training courses. The issues with training are also exacerbated by staffing challenges, particularly among supervisors. Inadequate supervision and frequent changes to leadership, compromise the Bureau's efforts to ensure agents are performing effectively and consistently in how each police area at the precinct and district levels engage with their communities.

Finally, although PRPB's efforts to share information through social and mass media have increased and it is reporting on police activities, criminal interventions, and efforts to solve crime more frequently, it is still deficient at using the media and its internal resources to educate, clarify, and demystify public misconceptions about UOF, non-discriminatory practices, and rights to file administrative complaints and investigation processes, particularly during public manifestations. The Monitor's Office also finds that PRPB continues to struggle to share crime statistics with the public in an adequate, accurate, and efficient manner to meet compliance with the Agreement.

Overall, the Commonwealth's compliance with the nine Community Engagement and Public Information paragraphs assessed during this reporting period, reflect similar levels of compliance noted in CMR-6. In CMR-6, 46% paragraphs (6 paragraphs) were assessed as partially compliant, in comparison to the current reporting period, where 44% of paragraphs (4 paragraphs) were found to be partially compliant; all other paragraphs are noted as not compliant. See figure 9.



*Figure 9. Community Engagement and Public Information: Paragraph Compliance Status*

## Paragraph 205: Community Engagement and Public Information - General Provisions

*PRPD shall create robust community relationships and engage constructively with the community to ensure collaborative problem-solving, ethical and bias-free policing, and more effective crime prevention. PRPD shall integrate community and problem oriented policing principles into its management, policies and procedures, recruitment, training, personnel evaluations, tactics, deployment of resources, and systems of accountability. PRPD shall engage the public in the reform process through the dissemination of public information on a regular basis.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: Compliance will be determined on two separate but inter-dependent bases: (1) the implementation of paragraphs 206 - 217, and (2) the results of outcome assessments, pursuant to Paragraph 243 of the Agreement.

*Compliance Assessment*

Community Policing in Policy

PRPB's policy for community policing (GO 803) was finalized and approved by the Commissioner on October 31, 2021.

Community Policing Training

During this reporting period, as in CMR-6, the Monitor's Office received no supporting evidence complying with the 95% threshold of trained personnel, under the newly approved policy in community policing. Most recently, the Monitor's Office learned that SAEA has not developed a training curriculum nor provided a timeline for when this training will be conducted.

During a meeting with the Reform Office in August 2022, the Monitor informally reviewed a training program developed by the Reform Office for Community Policing. The reviewed training provided a comprehensive and adequate curriculum, satisfying the requirements of the most recent approved policy in Community Policing.  The Monitor learned that the same was forwarded to SAEA for Implementation. However, SAEA has yet to  implement and deliver such training.

During CMR-6 and partially during CMR-7, the Reform Office embarked in a training and technical assistance program, "Expansion y Fortalecimiento en la Filosofia de Policia Comunitaria: Adiestramiento

y asistencia tecnica" (Expansion and Strengthening in Community Policing: Training and Technical Assistance). The training, a three-cycle program, focuses on assistance and support for strategies in problem-solving and the development of community alliances, targeting the implementation of the S.A.R.A. Model in the field and to increase collaboration between PRPB, the CICs, and Community Safety Councils. The Monitor learned, that during this assessment period, the training Program was postponed throughout the thirteen police areas to focus on training instructors at SAEA.  The instructors' training concluded in June 2022. Additional information, received through the Office of the Reform, indicated that the Technical Assistance Program resumed in mid-August.

## Community Policing in Recruitment

PRPB has been concentrating efforts at improving its recruitment practices to secure a diverse workforce, including a force that embodies community policing values. During the CMR-7 reporting period, PRPB worked with its psychology department and INTERBORO to develop strategies and streamlined processes to secure potential candidates who have demonstrated qualifications and competencies in problem solving, critical thinking, leadership, interpersonal skills, sound judgment, communication skills, and strong ethics. The Monitor's Office finds that PRPB's efforts at engaging in diverse recruitment activities within the community, as reported during CMR-6, yielded some positive results. However, other than seeking potential candidates from referrals through the various consulates, and job fairs extended to rural communities through the island, the Monitor's Office received no evidence of additional strategies or structured plans to meet substantial compliance. The recruitment plan must reflect consistent guidelines in alignment with community policing standards and must include community stakeholders' participation and recommendations geared towards securing a cross-sectional community representation. Based on the Monitor's interviews conducted with CIC members, representatives of the 13 police areas, such consultation and active participation in PRPB's recruitment processes, has yet to materialize. PRPB must include assessment compliance evidence and strategies developed in support of those efforts.

## Community Policing in Management and Performance Evaluations

PRPB's employee performance, documented in ProMedia, a uniform method to objectively evaluate PRPB members' performance, is flawed and remains in need of re-design. During the CMR-7 reporting period, the Monitor's Office provided a review of PRPB's revised GO 310 (Performance Evaluation). The revised GO included revisions to the policy and related performance evaluation forms. These revisions included added performance measures related to UOF, arrests, report writing, and community engagement. As of this reporting period, GO 310 was still undergoing revisions and in the process of being finalized.

## Community Interaction Committees

The Monitor found some improvement with CICs efforts to recruit new community members for its 13 police areas. However, most CICs still lack full community representation and the confirmation of new members remain outstanding. Interviews conducted by the Monitor with CIC facilitators and committee members reveal that, although some new members have been secured and the background investigation process has favorably concluded, those members remain pending confirmation due to the lack of required multi-theme workshops to perform their duties. Through those interviews, the Monitor's Office also learned that insufficient training discourages and precludes new members from committee

participation, leading to the candidates' withdrawal. It should be noted that per policy, confirmation is contingent upon members' completion of the multi-themed workshops, facilitated through SAEA. As in CMR-6, it remains outstanding.

## Community Policing and Collaborative Problem Solving

During CMR-6, PRPB demonstrated improvement in community outreach. However, during the CMR-7 reporting period, such efforts, decreased. Most police areas failed to engage in any outreach activities, as certified, while others allocated their efforts to police services during COVID vaccination events and/or distribution of flyers at traffic lights or local neighborhoods within the metropolitan areas. Reported activities reviewed failed to meet meaningful outreach requirements for the most part. Supporting documents such as the scope and nature of the activity, topic or theme, targeted audience, attendance sheets, and outcome reports were not included for the Monitor's assessment. The Monitor's Office notes that outreach activities must be purposefully geared towards education, awareness, and prevention and must employ diverse educational material (including audio-visual material, short presentations, and focus groups), making information readily accessible to a broader community.

The Agreement and related policy (G0 805) require at least one open meeting (Encuentros Comunitarios) per police area. The districts and precincts must inform the public yearly of their rights regarding: unreasonable searches and seizures; UOF; filing civilian complaints; reporting allegations of police misconduct or discrimination; and commending officers in the performance of their duties, among other topics. The policy, revised in 2018, remains past due. The Monitor's Office rendered recommendations began in April 2021, which were superseded by additional recommendations. Such recommendations included Community Safety Councils' inclusion and CIC participation for consultation and coordination. The Monitor's Office also recommended the availability of sign language interpreters at all encounters, in alignment with Law 22-2021 (Office of the Deaf Community Law) and public policy. Based on PRPB's submitted documents for compliance assessment during the CMR-7 reporting period, the Monitor's Office found that only two police areas (Caguas and Humacao) held their respective Community Encounters.

The Monitor's Office attended and observed the Community Encounter in Caguas. However, other than the advertisement for the event, PRPB failed to submit supporting evidence as required, including work plans and outcome reports. Humacao certified having held its Encounter but failed to submit comprehensive supporting evidence. Additional documents revealed that Utuado scheduled its Encounter for August 11, 2022. However, no supporting documents regarding topic or advertisement were submitted. San Juan and Bayamon certified their Community Encounters are scheduled for October and November, respectively - subject to compliance assessment during CMR-8.

The Monitor's Office found that it is critical, if not imperative, for policy compliance and substantial compliance with the Agreement, that Community Encounters must be held in all 13 police areas, yearly. These events must be scheduled in advance and broadly publicized to ensure ample and diverse community representation. Although required per the agreement to hold one open meeting (Encuentros Comunitarios) per police area, per year, from CMR-6 (October 2021 through March 2022) to this reporting period (April through September 2022), PRPB has not done so and is deemed to be not in compliance.

Public information

PRPB's information directed to the public has increased through social and mass media, including police activities, criminal interventions, and efforts to solve crime frequently. However, its practice is deficient at using the media and its internal resources to educate, clarify, and demystify public misconceptions about UOF, non-discriminatory practices, and rights to file administrative complaints and investigation processes, especially during public manifestations. The Monitor's Office further finds that PRPB's continued struggles and inability to report crime statistics to the public adequately and efficiently, is longstanding. Type I crimes for each police area is only available globally and cumulative and is not up to date. There are no monthly statistics reported or available to the public on domestic and gender-based violence, sexual offenses, or child abuse, or hate crimes, as required by the Agreement. The Monitor's Office has made multiple recommendations to help improve the system; however, minimal progress has been made.

PRPB has two electronic systems to officially inform the public: the Virtual Library and its website. Under optimal operational capabilities, the Virtual Library is intended to provide a central location for all policies and procedures, including general and administrative orders, internal rules and regulations, the Agreement, methodologies to meet compliance, action plans, public reports such as UOF, community alliances, CIC reports, the Monitor's reports, a calendar of community events, activities of community interest per police area, and open recruitment announcements, among others.

Most policies and internal procedural manuals are primarily available, including PRPB's semester public reports, the 2020 Annual Community Alliances' Report, and the Monitor's Compliance Status Reports (all in the English language only). No information was readily available on protocols, open recruitment announcements, or documents from the Academy, including curriculum materials. The action plans on the Reform date to 2016, and there is no information on crime statistics or an available link directing the user to relevant information or data source, such as PRPB's website.

The Virtual Library currently offers a limited selection of resources to the public and does not have the capability to allow members of the public to comment on PRPB policies or review a functional calendar of community events, including Community Encounters (open meetings).

*Pathway Forward*

The Monitor's Office continues to stress that community policing must begin at PRPB's recruitment of new officers, and its recruitment plan must ensure that potential candidates demonstrate core values in community policing. The recruitment plan must also include community stakeholders' participation and recommendations including evidence of strategies developed in support of those efforts. Further, the Monitor's Office reiterates the importance of implementing training, in a manner consistent with policy and the Agreement, to facilitate competency development, meet certifying requirements through SAEA, and minimize potential liabilities. The Monitor's Office looks forward to the completion and implementation of the revised GO 310 (Performance Evaluation) policy and related forms, including revisions to the performance evaluation system in ProMedia. The Monitor's Office also continues to note the importance of a comprehensive, Bureau-wide approach to community policing and personnel deployment. Such activities must extend beyond the Community Relations Bureau and become a responsibility of all personnel, including those at the precinct and district levels to ensure that

240

core operations support community policing and problem-solving strategies throughout. The Monitor's Office is optimistic that the added training, revisions to the performance evaluation system, improved recruitment efforts, along with increased staffing, supervision, and resources, outlined in the updated staffing implementation plan, will address the issues highlighted throughout this section.

Finally, while PRPB's efforts regarding the Virtual Library and information sharing via social media have improved, PRPB must be more deliberate about updating the website and maintaining accurate records and reports of its statistics to share with the community.

## 1. Community Oriented Policing

Compliance with community-oriented policing, assessed by paragraphs 206 and 207, continues to need improvement as noted during CMR-6. The policy for Community Policing (GO 803) was reviewed and approved during CMR-6; however, associated training through SAEA remains pending. The Monitor finds that policy is only effective and enforceable if accompanied by the necessary training and competency development - both fundamentally critical to ensuring community policing's successful implementation and institutionalization. Projected timelines must be carried through, delivered, documented, and available for the Monitor's review. PRPB must ensure the development of the necessary community policing competencies for its workforce, through pre- and in-service training. It must allocate the necessary resources and deploy personnel to achieve the objectives of problem solving and constructively develop partnerships to engage in improving the quality of life of community residents.

### Paragraph 206: Community Engagement and Public Information - Community Oriented Policing

*PRPD shall reassess its staffing allocation and personnel deployment to ensure that they support community policing and problem-solving goals. PRPD shall employ a Scanning, Analysis, Response, and Assessment ("SARA") model to structure its problem- solving approach.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually as to Compliance Targets #1 and #2. Bi-annually as to all other Compliance Targets. |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraph 206. | ☑ Met | ☐ Missed |
| 2. Community policing and problem solving trainings are consistent with approved policies. | ☐ Met | ☑ Missed |
| 3. 95% of sampled PRPB members are trained and certified in community policing and problem solving, including the SARA Model. | ☐ Met | ☑ Missed |

241

| 4. Staff allocation and personnel deployment plan are aligned with community policing and problem solving. | ☐ Met | ☑ Missed |
|---|---|---|
| 5. 95% of sampled PRPB precincts, districts, and units implement the SARA Model. | ☐ Met | ☑ Missed |
| Note: This paragraph is assessed together with Paragraph 13 of the Agreement. | | |

## Compliance Assessment

During CMR-6, PRPB updated and approved its Community Policing policy (GO 803). The Monitor's Office reviewed GO 803 and found it satisfied the requirements of this paragraph.

This paragraph also requires that all PRPB members are certified in community policing and problem solving including the SARA Model and alliance development. During this reporting period, as in CMR-6, the Monitor's Office received no supporting evidence complying with the 95% threshold of trained personnel under the newly approved policy in community policing through SAEA. The Monitor's Office learned that SAEA has yet to develop a training curriculum or provide a completion timeline to the Monitor's Office. During the CMR-7 reporting period, the Monitor's Office reviewed a comprehensive community policing training program developed by the Reform Office that is appropriate and meets the requirements of the newly approved policy. The Reform Office forwarded it to SAEA for implementation; however, SAEA has yet to move forward.

During CMR-6, the Reform Office embarked on a training and technical assistance program "Expansion y Fortalecimiento en la Filosofia de Policia Comunitaria: Adiestramiento y asistencia tecnica" (Expansion and Strengthening in Community Policing: Training and Technical Assistance). The three-cycle program focuses on assistance and support for strategies in problem-solving and the development of community alliances targeting the implementation of the SARA Model in the field, and to increase collaboration between PRPB, the CICs, and Community Safety Councils. During the CMR-7 reporting period, the program shifted focus to train SAEA instructors. The instructors' training concluded in June 2022. Most recently, the Reform Office informed the Monitor's Office that the technical program resumed throughout the police areas by mid-August. During the CMR-7 reporting period an additional police area completed Cycle I, resulting in all 13 police areas completion of Cycle I. Cycles II and III resumed in late August 2022. An updated timeline has yet to be submitted to the Monitor's Office for review.

During the CMR-7 reporting period, the Monitor's Office interviewed PRPB personnel from the police areas of Arecibo, San Juan, Bayamon, Aguadilla, Caguas, Fajardo, Guayama, and Mayaguez. In most cases, the agents revealed that there are only one or two officers assigned to community policing. These officers are designated as facilitators, some within districts and precincts, but primarily from the Community Relations Bureau, resulting in insufficient resources to carryout programming. Most conveyed that personnel redeployment to other duties or reassignment to post, limit their ability and availability to engage in community initiatives for problem solving or provide continuity to implemented efforts, resulting in discouraged community stakeholders and disengaged participants. A robust staffing allocation strategy must be in place to enhance community policing and support its institutionalization.

During the CMR-7 reporting period the Monitor's Office also reviewed SARA Model implementation for the police areas of Arecibo, Utuado, Humacao, Mayaguez, Aibonito, Fajardo, Aguadilla, Ponce, San Juan-Hato Rey Oeste precinct, Tourism Unit, Cupey precinct, Plaza Las Americas, and Bayamon; both at the

district and precinct levels. The Monitor's Office found that the deficiencies outlined in the implementation of problem-solving using the SARA Model during CMR-6, remain markedly and largely unimproved. PRPB did not submit any implementation of the SARA Model for its auxiliary superintendencies,[45] including La Fortaleza likely because SARA Model implementation did not take place.

The Monitor's Office notes that despite technical assistance received from the Reform Office, at least for Cycle I, the field practical directive to engage in the implementation of the SARA Model per district/precinct has not been fully effective.  Some police areas certified not having implemented the SARA Model for problem-solving at either level. Reviewed documents reveal that despite policy directives, some police areas chose their own methods to report problem-solving activities ignoring the required use of the appropriate PPRs. Other salient deficiencies were notably at the failure to implement effective responses, resulting from the lack of thorough analysis, problems lacking definition or left in blank, and/or failure to involve/indicate the community, including government agencies and other entities as resources for efficient and effective processes. The Monitor's Office also found the use of the SARA Model to report quality of life situations, ("Caravana no balas al aire", "Community Christmas lighting"), and dated forms, not subject to compliance determination for this reporting period. Documents submitted for review during the CMR-7 reporting period were handwritten (indecipherable), and very few were electronically recorded. Moreover, some documents were missing supervisory or approving officer's signatures likely because most of these activities were not thoroughly discussed and analyzed before implementing them in the field, nor were they reviewed upon completion. Outcomes were not recorded, and follow-ups are inexistent. The Monitor's Office finds that such marked deficiencies are strongly associated with the need of full competency development, coaching practices, and mentoring support.

On July 1, 2022, PRPB launched its community policing module: Sistema de Policia Comunitaria (Community Policing System); available to all PRPB members, including commissioners and auxiliary superintendencies. These modules are intended to record and evaluate direct initiatives and programming by capturing formal alliances; orientations and outreach; quality of life issues; informal alliance reports; problem-solving under the SARA Model; SARA Model evaluation; and SARA Model self-study, as a mechanism to record and ultimately measure its effectiveness in problem solving, outreach, partnership development and sustainability. PRPB has begun to record its efforts and has provided an orientation for agent facilitators directly involved. PRPB has begun recording and uploading activities in support of outreach, problem solving, and alliance development; however, interviewed personnel reported they have yet to receive formal training. On October 7, 2022, the Monitor's Office received an orientation on the module from the Reform Office.  PRPB has yet to establish protocols for data quality control, guidelines, and mechanisms to determine accuracy and effective measuring standards, including frequency, for the module.  Additionally, the Reform Office validated that formal training has yet to take place.

---

[45] It is critical to improve administrative and operational practices; GO 803§IV(C)(3)(a).

*Pathway Forward*

To implement community policing and problem solving in practice, PRPB must adopt a significant geographic deployment of resources and reassess its staffing plan for resource allocation and personnel redeployment as noted in previous reports. In its reassessment, PRPB must consider crime trends and area demographics among other psycho-social factors to meet community needs. PRPB must deploy the right number of personnel and resources to reach problem solving objectives, provide continuity, and develop meaningful partnerships by constructively engaging to improve the quality of life of community residents. The Monitor's Office looks forward to PRPB's implementation of its updated staffing plan.

To improve deficiencies in the implementation of problem-solving through the SARA Model, PRPB should employ guided practices for full competency development and supervisory coaching[46] to assist in the analytical process[47] of the SARA Model in the field. Providing designated mentors for implementation support may also prove beneficial. This practice may serve as two-fold - by allowing supervisors' assistance in the analytical process for strategized responses and for supervisory measuring of development and proficiency, in support of mutually established objectives during evaluation.

## Paragraph 207: Community Engagement and Public Information - Community Oriented Policing

*PRPD shall continue to conduct outreach to a broad cross-section of community stakeholders to establish extensive problem-solving partnerships and develop cooperative strategies that build mutual respect and trusting relationships.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually for Compliance Targets #1 and #2. Bi-annually for all other Compliance Targets. |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | Met | Missed |
|---|---|---|
| 1. Policies incorporate all the requirements of Paragraph 207. | ☑ Met | ☐ Missed |
| 2. Community partnerships and problem-solving strategies trainings are consistent with approved policies. | ☐ Met | ☑ Missed |
| 3. 95% of sampled PRPB members are trained and certified in community partnerships and problem-solving strategies. | ☐ Met | ☑ Missed |
| 4. 95% of sampled districts, precincts, and units conduct outreach to a broad cross-section of community stakeholders. | ☐ Met | ☑ Missed |

---

[46] https://doi.org/10.1177%2F1098611103260558 Genaro F. Vito, William F. Walsh, Julie Kunselman, 2005; Community policing: The middle manager's perspective.

[47] https://cops.usdoj.gov/RIC/Publications/cops-p018-pub.pdf: Using Analysis for Problem-Solving: A Guidebook for Law Enforcement.

*Compliance Assessment*

PRPB's alliances, partnerships, and outreach endeavors are integral parts of community policing and fall under GO 803. The policy was updated and approved during CMR-6. The Monitor's Office has reviewed the policy and found that it satisfied the requirements of this paragraph.

SAEA as the sole certifying unit for PRPB's workforce, must consistently facilitate the development of multiple competencies and allocate resources, including technological equipment throughout the 13 police areas for continued education, professional development, and demonstrated compliance with certifying processes. Although the Reform Office developed a comprehensive training program in support of this policy and forwarded it to SAEA for implementation, effective training remains longstanding.

Under the current policy, PRPB must direct its outreach efforts and engage in developing partnerships and alliances with the public and private sectors, faith-based groups, academia, and the media to improve its relationship with the community; strengthen support and social networks; consolidate initiatives to improve quality of life; reduce criminal activity; and increase crime solving. The Agreement, on the other hand, requires reaching out to stakeholders to establish extensive problem-solving partnerships and develop collaborative strategies that facilitate mutual respect and trusting relationships.

During CMR-6, PRPB engaged in multiple activities geared towards education, crime prevention, school orientations, workshops, and community interactions through, interagency efforts, health and safety fairs, and informational tables through local shopping malls. The Monitor's Office also reviewed purposeful and meaningful activities focused on gender-based violence, the legal aspects of domestic violence, female self-defense, domestic violence during courtship, safety within the home, domestic violence issues for school personnel, child abuse, and stolen vehicles, among other relevant topics, facilitated through SAIC. Also, the Bureau of Community Relations (BCR), through SAOC, facilitated awareness, prevention, and education activities under the Athletic League (LAP), "Somos Parte de Tu Gente" (We are part of your People), focusing on community empowerment, youth programming and recreation as part of the "Plan Integral de Seguridad" (Comprehensive Safety Plan). The Monitor's Office was encouraged by the involvement and participation from the community safety councils. Although evidence in support of these latter efforts was limited for review, there were some steps in the right direction. However, during the CMR-7 reporting period the evidence submitted by PRPB demonstrated a substantial decrease in these activities Bureau-wide. The Monitor's Office found that although Utuado, including its precincts of Casatañer, Jayuya, Adjuntas and Angeles, certified having engaged in outreach activities, failed to provide evidence in support of the efforts including the scope of the activity, action plans, targeted groups, topic discussed, attendance sheets, and outcome reports. Similar findings were noted for the San Juan highway patrol unit and the highway patrol units of Aguadilla and Humacao. The Explosives Unit submitted a list of 16 outreach activities for the areas of Mayaguez, Ponce, Aguadilla, Arecibo, and Humacao, but failed to include evidence in support of any of those efforts. In cases where evidence was available for review, the activities were not directly associated to outreach.[48]

---

[48] See control nos. 1683 (escort services), 1800 (food delivery), 1084, 1748, 1086, and 1110 as examples.

Most specialized units certified not having engaged in any outreach activities during this reporting period. Among those units reviewed by the Monitor are: FURA (Arecibo, Ceiba, Central, Guanica), stolen vehicles units, Bayamon and Aguadilla motorized units and highway patrol's units, Arecibo and Jayuya DOT, Metro Explosives, Carolina Norte, Carolina Airport, San Juan-Cupey, Hato Rey Oeste, Tourism Unit-Loiza Precincts, and Fajardo. San Juan specifically certified that it lacked resources to engage in outreach activities. The Monitor's Office also noted that specialized units can engage in initiatives focusing on orientation to the public about their duties and primary responsibilities and how the public can facilitate performing their duties more effectively; including Q&A sessions to clarify public misconceptions.

In the area of alliances development, the Monitor's Office interviewed PRPB facilitators, zone and area commanders, and district/precinct directors for the police areas of Mayaguez, Arecibo, Aguadilla, Bayamon, Guayama, Caguas, Fajardo, San Juan, Carolina (Airport), and the auxiliary superintendencies SARP and SAEA.  As in CMR-6, SAEA's engagement and participation with MOSPBA (Movimiento Social Pro Bienestar Animal) for community awareness, prevention, and education against animal cruelty was confirmed. The Monitor's Office recommended integrating MOSPBA's educational programming into in-service training in alignment with SAEA's mission to educate and train its workforce to fulfill requirements in support of GO 641 (Animal Protection and Wellbeing), Law 154 (Law for the Welfare and Protection of Animals) and incorporate the newly created law on animal cruelty within Law 54 for Domestic Violence. The Monitor's Office noted that although the alliance is supported by an MOU for a year as indicated during CMR-6, the document was not submitted for the Monitor's review for validation and expiration/renewal dates. During field interviews, SAEA also reported an alliance with Homeland Security (ICE), (currently in the developmental stages), to focus on education of child pornography. Prospectively, materials and resources will be facilitated by Homeland Security Investigations (HSI) for in-house training to subsequently replicate training and resources through the 13 police areas. However, evidence on these efforts was not produced for the Monitor's review. On the other hand, SARP reported that no alliances were developed for the CMR-7 reporting period. Among cited reasons for the non-compliance were lack of training and the need of structured strategies to engage in the development of alliances and outreach activities. The Monitor's Office was informed that an auxiliary commander was appointed in May 2022, as the designated coordinator, wherein SARP may assume a more active role. The Monitor's Office will continue to review these activities in support of the institutionalization of community policing and compliance determination.

Notably, through those interviews, the Monitor's Office found a disconnect from PRPB at higher ranks, regarding the number and nature of alliances developed within their areas and the frequency in which they are monitored, denoting little if no involvement in the implementation processes. Some units or auxiliary superintendency's directors were unable to report if semester reports (PPR 803.6) had been prepared and rendered. Facilitators interviewed reported that most of them were engaged in developing or working on one or two alliances within their areas. However, a respectable number of those facilitators reported that they were either newly designated, in need of formal training, or in need of direct guidance; at the time, relying on their interest and good intentions to complete the task at hand. Others interviewed also reported they were no longer directly involved as facilitators because they were assigned to a district or on post at their local precincts. The Monitor's Office also found that among those facilitators selected by PRPB for interviews and who were directly engaged in collaborative partnerships and alliances, most belong to the Community Relations Bureau.

Among the alliances reported by the interviewed facilitators, were Juan de Dios Quinones' School in Moca, Green Culebra, Mujeres Isla, Radio Hoy in Salinas, CAPAZ Program in Bayamon, Sabana Grande City Hall, Gotita de Amor, and the Sports and Recreation Department. While some facilitators reported having formalized collaborative agreements for some of those alliances, documentation to validate and support these assertions, such as corresponding PPRs (803.5 to document formal alliances, MOUs; PPR-803.6 for informal alliance semester report), were not submitted by PRPB during the CMR-7 reporting period.

During CMR-5, PRPB submitted evidence of alliances for the district of Cidra with UBUNTU, Accion Social in Arecibo, Proyecto Escudo in Fajardo, Mano Amiga in Comerio, Desarrollo Local de la Montana in Aibonito, and Solo por Hoy in San Juan. However, during the CMR-6 and 7 reporting periods, the Monitor's Office did not receive any evidence about these alliances' sustainment. Also, during CMR-6, the Monitor's Office reviewed a submitted memorandum from the P.A.R.E. (Prevencion, Apoyo, Rescate, Educacion) Committee against gender violence, engaged in the investigation of feminicides and trans-feminicides per public policy, but the extent of PRPB's participation in this alliance remains unknown to the Monitor's Office because no supporting documents were submitted for review. During the CMR-7 reporting period, no evidence was submitted for review.

The Monitor's Office finds that PRPB's reported alliances during this assessment period is substantially limited, indicating unsuccessful or vested efforts in the development of purposeful community alliances and from compliance to the Agreement.

The community policing module, operationally available to all PRPB members, including the Commissioner's Office and auxiliary superintendencies as of July 1, 2022, intended to record and evaluate direct initiatives and programming is in its initial stages. It will be subject to full compliance review during CMR-8. PRPB has engaged in a self-assessment of the system's functionality to ascertain implementation accuracy for improvement. In alignment with this new system, the Monitor's Office interviewed PRPB in the field for feedback and implementation processes. PRPB reported that some of them attended a system orientation to begin submitting their activities electronically; while others were unaware of the availability of the system or yet to receive training. The Monitor's Office corroborated this information through document reviews, wherein most of the documents were still handwritten and the electronic ones were incomplete due to missing supportive data for assessing compliance, miscoded under non-applicable initiatives, or missing supervisory approval. The Reform Office noted that document uploading was prospective and not comprehensive of this reporting period.

Based on the documents submitted for the Monitor's review, the Monitor's Office found that some of the alliances were poorly developed because they were established by individuals without the involvement of government agencies and other key stakeholders' support.[49] Other alliances implemented were to assist with quality-of-life issues, such as abandoned vehicles using, and followed SARA Model implementation. Other PPRs reviewed (803.5) in most cases were incomplete or demonstrated prospective work plans, while others lacked the name of the alliance but cited a site or ward instead. These deficiencies reveal the need to develop the necessary competencies through training and practice and to distinguish between formal and informal alliances for appropriate

---

[49] See CO 5285-5288 Emotional support to crime victims, alliance name unspecified and Nuevo amanecer.

classification, development, planning, responses, outcomes, and sustainment.  However, the Monitor's Office is motivated by the new system launch, which in turn, would enable PRPB to effectively demonstrate proactive efforts at mobilizing resources, transforming relationships, developing networks to collectively solve problems, engaging in delinquency and crime prevention activities, improving the communities' quality of life, and meeting the requirements of the Agreement.

*Pathway Forward*

PRPB must actively reach out to the public, community organizations, public and private sectors, faith-based groups, academia, and other key stakeholders to build relationships and work on organized collaboration strategies to achieve results.[50] PRPB must reach out to stakeholders, through available local directories, to initiate contact, demonstrate openness, interest, and availability. To expand contacts, PRPB must develop its own database and seek Community Safety Councils and CICs' resources and assistance for referenced, comprehensive, and continued engagement. Those efforts must focus on meaningful and extensive problem-solving[51] and must be efficiently documented through structured action plans and progressive outcome reports for uniform and effective outcome measurements. Considering recent crime trends, the Monitor's Office further encourages engaging with marginalized and underrepresented community advocates to focus on prevention, education, and extensive problem-solving alliances, working as a catalyst for change. The Monitor's Office further recommends that PRPB update its deployed personnel listings to accurately reflect personnel directly involved in the development and facilitation of alliances and that PRPB conduct an advanced needs assessment for training and expedite competency development for extensive compliance during the CMR-8 reporting period.

## Paragraph 208: Community Engagement and Public Information - Community Oriented Policing

*Paragraph 208 are assessed annually and will be reviewed in CMR-8.*

## 2. Community Interaction Councils

CICs are a group of volunteers representing diverse members of the community within the 13 police areas. They advise, review, and provide recommendations to PRPB on policies, recruitment, and implemented strategies based on the experiences and needs of their communities. They work closely with the area commands to develop strategies and implement initiatives focusing on a comprehensive community policing approach to address crime and safety issues.

During CMR-6 the committees were impaired by a substantial decrease in representative participants from a cross-section of the community. Newly secured members were not confirmed and are pending training to fulfill their mission and meet certification requirements for active committee participation. The Monitor's Office also found that proactive measures needed to be taken to ensure organizational

---

[50] Rinehart, T.A., A.T. Laszlo, and G.O. Briscoe. 2001. Collaboration Toolkit: How to Build, Fix, and Sustain Productive Partnerships. Washington, DC: Office of Community Oriented Policing Services. http://ric-zai-inc.com/ric.php?page=detail&id=COPS-CD019

[51] Cohen, D. 2001. Problem-Solving Partnerships. Including the Community for a Change. Washington, DC: Office of Community Oriented Policing Services. http://ric-zai-inc.com/Publications/cops-p006-pub.pdf.

commitment at all levels, coupled with the need to jointly develop strategies and work plans focusing on each police areas' specific needs and documenting all efforts.

During the CMR-7 reporting period, the Monitor's Office found some improvement in CIC efforts to recruit new community members for the 13 police areas. However, most CICs still lack full community representation and the confirmation of new members. Interviews conducted by the Monitor's Office with CIC facilitators and committee members reveal that although new members have been secured, and background investigations have been successfully completed, they remain pending confirmation due to the lack of required multi-theme workshops to fulfill their mission. Per policy, confirmation is contingent upon members' completion of orientation and multi-themed workshops, facilitated through SAEA. As in CMR-6, new members' confirmation is longstanding, thereby, also impacting their ability to fully secure resources to fulfill their mission, and PRPB's compliance remains significantly unchanged.

## Paragraphs 209 - 210: Community Engagement and Public Information – Community Interaction Councils

*Paragraphs 209 and 210 are assessed annually and will be reviewed in CMR-8.*

## Paragraph 211: Community Engagement and Public Information - Community Interaction Councils

*PRPD shall allocate sufficient resources and authority to ensure that CICs possess the means, staffing, access, training, and mandate necessary to fulfill their mission and the requirements of this Agreement. The operating budget shall be revisited on an annual basis in consultation with the CICs.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually for Compliance Targets #1 and #2. Bi-annually for all other Compliance Targets. |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies related to CICs incorporate the requirements of the paragraph. | ☑ Met | ☐ Missed |
| 2. CIC orientation course is consistent with approved policies. | ☐ Met | ☑ Missed |
| 3. PRPB makes CIC orientation available to all members of the CICs. | ☐ Met | ☑ Missed |
| 4. 85% of CICs possess the means, staffing, and access necessary to fulfill their mission and the requirements of this Agreement. | ☐ Met | ☑ Missed |

*Compliance Assessment*

CIC policy, (GO 801) was reviewed and approved on November 1, 2021, during the CMR-6 assessment compliance period.  The Monitor's Office reviewed the policy and found it satisfied the requirements of this paragraph.

During CMR-7, the Monitor's Office did not receive any evidence of training for the CICs, nor received any evidence on courses/workshops developed by SAEA for suitability evaluation in accordance with the approved policy.

Interviews conducted by the Monitor's Office with CIC facilitators and committee members from Carolina, Humacao, Bayamon, Guayama, Aibonito, Mayaguez, and Central CIC, reveal that although new members have been secured and the background investigation processes were favorably concluded, those community volunteers remain pending confirmation awaiting the required multi-theme workshops to fulfill their mission; thereby also impacting committee's representation throughout the island. Per policy, confirmation is contingent upon members' completion of the multi-themed workshops, facilitated through SAEA. CIC members interviewed added that trainings for continued development have also not been offered. The Monitor's Office noted that the required multi-themed workshops are an integral part of the policy. It is within policy that new members cannot be confirmed to actively participate until those workshops are completed and full orientation is received. As conveyed during interviews, such lack of training is discouraging, and precludes new members from committee participation, leading to the candidates' ultimate withdrawal from the engagement. This longstanding issue is concerning to the Monitor's Office, considering CICs continued difficulties to secure cross sectional community representation and participation. Guayama appears to be the only police area in need of nine members out of the eleven. However, the Monitor's Office confirmed through a site visit and recent interview with its spokesperson, that those nine members' background investigations were favorably completed. Because the multi-themed workshops have not been available, they remain pending confirmation. No training certificates were received from SAEA or the Community Relations Bureau. The Monitor's Office noted that PRPB has demonstrated no effort to make orientations available to all CIC members and warns that per the Agreement, training is an integral part of the CIC resources required to fulfill their mission.

Supporting evidence for compliance determination as to CICs' means, staffing, and access necessary to fulfill their mission for the CMR-7 reporting period indicates that the CICs from Utuado, Ponce, Guayama, and Fajardo attested possessing all necessary means and resources. The Monitor's Office noted that a certificate was also received on Aibonito CIC's behalf; however, the certifying PRPB's name and signature was left blank. Additionally, the Monitor's Office learned through an interview, that although the police area of Guayama certified that its CIC possesses all its resources to fulfill its mission, a formal request was made to the CIC's Executive Director on May 5, 2022,[52] for equipment and supplies, among them, a canopy, portable sound system including microphones, a banner stand, extension cords, a reliable vehicle, chairs, and tables. This information is contradictory to the certificate received for the area.

---

[52] SAOC-NRCDRC-CG-1-103

The Bayamon CIC reiterated the request of needed equipment and supplies to fulfill its mission, as reported during CMR-6.[53] PRPB failed to submit evidence, on behalf of the CICs, for Caguas, San Juan, Carolina, Humacao, Aguadilla, Mayaguez, and Arecibo.

CIC members and facilitators for San Juan and Carolina added that although they possess most resources to fulfill their mission, they are still lacking a vehicle for community contacts. Both CICs reported that sharing vehicles between the Bureau limit their ability to provide continuity to initiatives and/or attend simultaneous engagements as recently experienced.

The Monitor's Office noted that most CICs hold their respective meetings within police headquarters. Only the Guayama CIC reported holding its meetings at a local public school facilitated through the City Hall and away from police headquarters. The Monitor's Office reiterates that such meetings must be held at a convenient and accessible location to the community. A neutral meeting point is conducive to the exchange of community concerns. Additionally, PRPB is advised to revisit its operating budget to address longstanding needs.

As in CMR-5, 6, and now 7, the Monitor's Office continues to express great concerns about PRPB's inefficient and disconnected responses to address these issues. It is certain that these inefficiencies discourage community volunteers from any vested interest to assist PRPB at improving the quality of life in their communities. PRPB's expedited attention is warranted to facilitate community outreach, further initiatives, and keep the public informed on initiatives on behalf of the community. Additionally, SAEA bears the ultimate responsibility for ensuring and implementing CIC access to training to effectively fulfill their mission and comply as stipulated in the Agreement. Education, training, and policy directives are within SAEA's scope of competency and duties, and as such, is its responsibility to deliver.

### Pathway Forward

The Monitor's Office reiterates PRPB's need to expeditiously conduct a needs assessment for training to develop a complete instructional program for the CICs in support of the GO, and the Agreement. Expedited attention is warranted to facilitate purposely reaching out to the community, further initiatives, and keep the public informed. SAEA bears the ultimate responsibility for ensuring competence development and CIC access to training to effectively fulfill their mission and comply as stipulated in the Agreement. Education, training, and policy directives are within SAEA's scope of competency and duties and must be effectively demonstrated. Additionally, facilitating CIC training through other police areas for efficacy, productivity, and efficiency, is reaffirmed.

### Paragraph 212: Community Engagement and Public Information - Community Interaction Councils

*PRPD shall work closely with CICs to develop a comprehensive community policing approach that collaboratively identifies and implements strategies to address crime and safety issues. In order to foster this collaboration, PRPD shall share appropriate information and documents with CICs, provided adequate safeguards are taken not to disclose confidential or otherwise law enforcement sensitive information. PRPD shall seek CIC assistance, counsel, recommendations, or participation in areas including:*

---

[53] CMR-7CO 354

a) reviewing and assessing the propriety and effectiveness of law enforcement priorities and related community policing strategies, materials, and training;

b) reviewing and assessing the propriety and effectiveness of PRPD policies on matters such as discriminatory policing, search and seizure, use of force, the civilian complaint process, and victim services;

c) reviewing and assessing concerns or recommendations about specific PRPD policing tactics and initiatives;

d) providing information to the community and conveying feedback from the community to PRPD;

e) advising the Superintendent on recruiting a qualified, diverse workforce; and

f) advising the Superintendent on ways to provide data and information, including information about PRPD's compliance with this Agreement, to the public in a transparent and public-friendly format, to the greatest extent allowable by law.

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | October 2021 – September 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | Met / Missed |
|---|---|
| 1. PRPB developed a community policing approach working closely with CIC as per the requirements of the paragraph. | ☐ Met ☑ Missed |
| 2. PRPB protects confidential and law enforcement sensitive information in documents and information it shares with the CICs.. | ☐ Met ☑ Missed |
| 3. Every six months, PRPB sought assistance, counsel, recommendations or participation from the CICs, collectively, at least once in all areas specified by the Paragraph. | ☐ Met ☑ Missed |

*Compliance Assessment*

As in CMR-5, 6, and now 7, PRPB has consistently failed to provide evidence supporting the development of comprehensive community policing methods in collaboration with the CICs. Said assistance includes recommendations to the Commissioner for best recruitment practices to secure a qualified workforce, training needs, and feedback from the representative community sector's perspective. The documents reviewed by the Monitor's Office, along with interviews of randomly selected CIC members and agent facilitators, revealed little if no input or participation in recruitment processes, very few policies shared by PRPB to gather input from the CICs, or follow through with recommendations provided. CIC members interviewed shared the concern that input and recommendations on reviewed policies, appear not taken into consideration when rendered. They reported that once recommendations were made, no response from PRPB was received acknowledging the recommendations or rationale behind non-adoption. On August 15, 2022, CIC members were invited by SAEA to review the curriculum and coursework for CAMC6061 (Use and Management of Body Cameras). Two CIC spokespersons attended and rendered their recommendations, as verified through SAEA. However, those recommendations were not

submitted for the Monitor's review nor was the Monitor's Office made aware if such recommendations were adopted by PRPB.

During the CMR-7 reporting period, CIC members interviewed reported that among the policies reviewed were GO 413 (Firearms Tracing), GO 309 (Confiscations), GO 641 (Animal Protection and Wellbeing Investigations), GO 150 (Emergency Management System), GO 626 (Intervention with Foreign Persons), and GO 312 (Rules for Emergency Management within PR Police Bureau). Each CIC selected the policies they wished to comment, some individually from their community's perspective and others made recommendations collectively. However, no documents were submitted by PRPB for review in support of assessment compliance. No work plans or structured initiatives have been made available for the Monitor's review within the past two reporting periods or in relation to CMR-7. The Monitor's Office noted that the exchange of information and communication between PRPB and the CICs, towards identifying and implementing strategies to address crime and safety issues, is fundamental for continued engagement with the community to address issues of mutual concerns and facilitate reciprocal collaboration. It remains a challenge for PRPB in some police areas. The committee members' resourcefulness, expertise, and availability to assist in closing gaps between the community and PRPB is only constructive, if the engagement is demonstrated, articulated, and validated by PRPB.

*Pathway Forward*

The Monitor's recommendations during previous reports remain unchanged: PRPB must document contributions made by the CICs for any purposeful and meaningful initiatives engaged within area commands, including developed approaches, work plans, and any other jointly undertaken activities to address crime and safety concerns. PRPB must capitalize on CIC's field knowledge and expertise; they hold first-hand understanding on the specific needs and concerns affecting their community and must be fully integrated for the successful implementation in community policing.

PRPB must make efforts to inform CICs about PRPB's compliance with the Agreement and provide the CICs with the opportunity to share concerns and feedback during central committee meetings and through monthly meetings with area commands. The committee members' resourcefulness, expertise, and availability assist in closing gaps between the community and PRPB. It is only constructive if engagement is demonstrated and validated by PRPB.

## Paragraph 213: Community Engagement and Public Information - Community Interaction Councils

*Paragraph 213 is assessed annually and will be reviewed in CMR-8.*

## 3. Public Information

Informing the community and keeping the public abreast of new policies, directives, and initiatives, including improved mechanisms to provide statistics on crime, encompassing those for domestic violence, sexual offenses, and hate crimes in a meaningful transparent and understandable ways, are fundamental elements for PRPB to demonstrate accountability and regain the public's trust.

The Agreement requires the dissemination of accurate and updated crime statistics monthly, including statistics on hate crimes and domestic violence. PRPB's continued failure to comply with this requirement and the insufficient progress assessed during CMR-6, is carried into CMR-7. Recommendations made during the reporting periods of CMR-5 and CMR-6 are sustained for CMR-7. Relying on two systems (PRPB's website and the Virtual Library), to inform the public officially and formally is thus far, ineffective.

Under optimal operational capabilities, the Virtual Library is intended to provide a central location for all policies and procedures, including general and administrative orders, internal rules and regulations, the Agreement, including methodologies to meet compliance with the Agreement, action plans, public reports such as UOF reports, community alliances, CIC reports, the Monitor's reports, a calendar of community events, activities of community interest per police area, and open recruitment announcements, among others. During the CMR-7 reporting period, the Monitor's Office found that most policies (some dated)[54] and internal procedural manuals are primarily available along with PRPB's semester public reports, the annual community alliances' report for 2020, and the Monitor's compliance status reports (all of them available in the English language only). No information was found or was readily available on protocols, open recruitment announcements, or documents from the Academy including curriculum materials.

There is no information on crime statistics or an available link directing the user to relevant information or data source, such as PRPB's website. As it stands, the Virtual Library offers a limited selection of resources to the public, and more notably, does not have the capability to allow members of the public to comment on PRPB policies or review a calendar of community events including Community Encounters (open meetings), per GO805, outreach activities, or CIC meetings, as they are non-existent.

During CMR-6, PRPB established additional methods to inform the public about processes to file administrative complaints or commend PRPB members for any outstanding performance of duties, (GO 311). Per the new policy, SARP, in coordination with the Press Office, is directed to engage in developing and implementing broadcasting mechanisms to inform the public about their rights to report any illegal, arbitrary, and/or discriminatory practices or alleged misconduct by PRPB. The Assistant Superintendency of Managerial Services (SASG) was entrusted the development of methods for community members to channel such performance in coordination with the Press Office and SARP. However, during the CMR-7 reporting period, the Monitor's Office was not provided with any supporting evidence of this operational implementation.

PRPB's longstanding struggles to implement effective mechanisms to inform the public and comply with the Agreement must be operationally resolved. PRPB's social media accounts, public service announcements, and internal resources such as the Press Office, must be strategically used to report monthly crime statistics, facilitate capsules on prevention, public education, advise the public on their rights to file administrative complaints/commendations on PRPB members, rights to decline voluntary searches, convey strategies to fight crime, report crime trends, invite community participation through

---

[54] i.e.: GO 201 (Written Communications System) dated 2012, GO 106 (SAOC) dated 2019, GO 621 (Management of Incident Reports or Police Services) dated 2018, GO 114 (SARP) dated 2018.

structured programming, review policy and practices, and to communicate the Bureau's progress on the Reform.

## Paragraph 214: Community Engagement and Public Information - Public Information

*PRPD shall develop a Community Outreach and Public Information program in each of the former thirteen police regions or in other operational subdivisions with comparable geographic coverage.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Not Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Community Outreach and Public Information program was developed in each of the former thirteen police regions or geographic equivalent. | ☐ Met | ☑ Missed |
| 2. At least bi-annual open meetings were held during the first two years of the Agreement. Then annually until the end of the Agreement. | ☐ Met | ☑ Missed |
| 3. 95% of the meetings were widely publicized at least one week before such meeting. | ☐ Met | ☑ Missed |
| 4. During 95% of the meetings reviewed the public was informed of the requirements of this Agreement, PRPB's progress meeting these requirements, and addressed areas of community concern. | ☐ Met | ☑ Missed |
| 5. 95% of the Outcome Reports of open meetings reviewed comply with the parameters established by this Paragraph. | ☐ Met | ☑ Missed |
| 6. 95% of the meetings reviewed included public education on an individual's right to decline consent to voluntary searches, consistent with Paragraph 77 of this Agreement. | ☐ Met | ☑ Missed |
| 7. Community Outreach and Public Information program meetings comply with Paragraphs 214-216 and parameters established in Worksheets # 3. | ☐ Met | ☑ Missed |

### Compliance Assessment

PRPB has a policy for Community Encounters and Outreach (GO 805), which has been in effect since June 2018. During CMR-5, 6, and 7, the Monitor's Office made recommendations to the policy submitted for review under paragraph 229 of the Agreement. The Monitor's Office recommended that CICs actively plan and participate in Encounters, along with the assistance of Community Safety Councils. The Monitor's Office also recommended that PRPB include a resource from SARP to facilitate public orientation about complaints and commendations and involuntary searches in support of a brief presentation, to complement any available written material.  Additional recommendations incorporated the use of audio-visual presentations containing open captions to address the needs of individuals with functional disabilities, and the availability of sign language interpreters, consistent and in support of

255

equal rights and non-discriminating practices, and public policy (Law 22-2021). The Monitor's Office further recommended the availability of printed material on: victims' advocacy services; immigration rights; Community Safety Councils and CICs (including meeting dates and locations); diverse functionality information; children and family services programs, community mental health resources; addiction and rehabilitation services; and advocacy services for a broader community outreach. However, the policy remains pending approval. The Monitor's Office also noted that during the past four years, SAEA has not provided training related to Community Encounters.

Documents reviewed in support of Community Encounters revealed that from the 13 police areas, only 2 police areas (Caguas and Humacao) held these open meetings. The Monitor's Office observed the Caguas event. The presentation delivered, met most policy requirements, but failed to include SARP's presentation or orientation other than written materials to inform the public on their right to file administrative complaints or commendations on PRPB in the performance of duties and an individual's right to decline consent to voluntary searches. Additionally, documents reviewed by the Monitor's Office failed to include any evidence by way of work plans, agendas, crime and administrative complaint statistics, attendance sheets, Q&A sections, written materials, and outcome reports. PRPB only submitted the publicity for the event (poster); no evidence on the means used to inform the public and publicize the event as required per policy and the Agreement were submitted.

The Monitor's Office also observed a community meeting held by San Juan on August 24, 2022. This meeting could not be considered a Community Encounter[55] nor a Conversatorio[56] as neither of them met policy requirements. The Monitor further noted that per policy (GO 805), these open meetings hold an intended purpose in practice and should not be comingled with any other outreach efforts undertaken by PRPB.

Although an internal calendar was submitted to the Monitor's Office by the Reform Office in support of open meetings scheduled for the police areas of Carolina, Mayaguez, Guayama, Aguadilla, Fajardo, Utuado, and Aibonito, no documents were submitted to determine compliance. The calendar did not include the police areas of San Juan, Arecibo, and Ponce. Based on the reported dates, the latter three police area events are subject to assessment compliance during CMR- 8 reporting period.  Bayamon scheduled its event for August 31, 2022 but rescheduled for November 16, 2022; also subject to compliance determination during CMR-8. Notwithstanding, none of these events could be found on PRPB's website or its Virtual Library, as required by policy and the Agreement.

*Pathway Forward*

The Monitor's Office noted that without the required training and institutionalization of community policing, including strategic efforts for inclusiveness and a demonstrated vested interest to keep the public informed, PRPB's efforts will continue rendering insufficient results.

The Monitor's Office recommends the development of a uniform presentation by SAEA in coordination with the Reform Office to fulfill the primary requirements in the Agreement, including its progress and compliance throughout the 13 police areas. The availability of such a presentation for each police area may facilitate supplementing the local presentation with its own statistics on crime per police area, topic

---

[55] GO 805 (Community Encounters)
[56] GO 801 (CICs) (I)(5)(b)

of discussion, resources, CIC and Safety Council's information and participation, along with any other outreach activity including community partnerships/alliances developed in the area.  Effectively using multi-media sources along with the Press Office and the Virtual Library in a consistent and readily accessible and available manner to publicize coordinated events at least a month in advance, will also assist in meeting compliance. These meetings are essential to address areas of community concerns and inform the public about PRPB's progress in meeting the requirements of the Agreement, educate, develop connections conducive to trust building, and address issues of community concern.

## Paragraph 215: Community Engagement and Public Information - Public Information

*The Community Outreach and Public Information program shall require at least bi-annual open meetings for the first two years of this Agreement. During the meetings, PRPD officers from the police region and/or the Reform Unit shall inform the public about the requirements of this Agreement, PRPD's progress meeting these requirements, and address areas of community concern. At least one week before such meetings, PRPD shall widely publicize the meetings using print media, the Internet, and public service announcements on television or radio.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### Compliance Targets

Note: This Paragraph is assessed with Paragraph 214.

### Compliance Assessment

As indicated at paragraph 214, only two police areas held the required Community Encounters during the CMR-7 reporting period and none met full compliance, based on the evidence submitted. PRPB did not submit any supporting evidence of open meetings held in any other police areas. Compliance with policy also requires the publication of a calendar in advance to inform the public on these events, which PRPB has failed to make public.

### Pathway Forward

PRPB must develop a calendar per police area with proposed dates including date, time, place, and discussion topics along with an outlined work plan three months prior to the activity. The calendar should be made easily accessible and available to the public within PRPB's Virtual Library. Additionally, PRPB must use its Press Office and the media, including social platforms, to publicize events at least two weeks in advance.

## Paragraph 216: Community Engagement and Public Information - Public Information

*The Community Outreach and Public Information meetings shall, with appropriate safeguards to protect sensitive information, include summaries of all audits and reports completed pursuant to this Agreement and any policy changes made and other significant action taken as a result of this Agreement. The meetings shall also include public education on an individual's right to decline consent to voluntary searches, consistent with Paragraph 77 of this Agreement.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2022 –September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 214.

### Compliance Assessment

Out of the 13 police areas required to hold public information meetings (Community Encounters), only two police areas held the required Community Encounters during this reporting period, and none met full compliance, based on the documents submitted for the Monitor's review. Of these two meetings, one was held on the topic of the regulation of active alerts and the other on public order codes. Neither meeting included discussion of summaries of all audits and reports completed nor any policy changes made, and other significant action taken. Further, neither meeting included include public education on an individual's right to decline consent to voluntary searches, consistent with Paragraph 77 of this Agreement.

### Pathway Forward

The Monitor's Office will continue to assess PRPB's compliance with this paragraph and continues to stress the importance of including summaries of all audits and reports, any policy changes made, and other significant action taken as discussion points in its community outreach meetings. Further, these meetings should also include public education on an individual's right to decline consent to voluntary searches, consistent with Paragraph 77 of this Agreement.

## Paragraph 217: Community Engagement and Public Information - Public Information

*PRPD shall maintain and publicly disseminate accurate and updated crime statistics, including those related to hate crimes, on a monthly basis.*

| Compliance Status | Assessment Schedule |
|---|---|

| Not Compliant | | Review Period | April 2022 – September 2022 |
|---|---|---|---|
| Policy: | Not Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

## Compliance Targets

| | | | |
|---|---|---|---|
| 1. PRPB disseminates crime statistics on a monthly basis. | | ☐ Met | ☑ Missed |
| 2. 95% of reviewed crime statistics were publicly disseminated on a monthly basis. | | ☐ Met | ☑ Missed |
| 3. 100% of hate crimes were publicly disseminated once they occurred. | | ☐ Met | ☑ Missed |
| 4. PRPB communicated hate crimes statistics to the public in a clear and easily accessible way. | | ☐ Met | ☑ Missed |

Note: The portion of this paragraph that requires that PRPB maintain updated crime statistics is assessed together with Paragraph 219 of the Agreement (Information Systems and Technology), and Paragraph 148 (Early Identification System).

## Compliance Assessment

Incident reports are of public domain, except for victim information, sexual assaults, and if individuals involved have mental health issues, and/or are juveniles. The established policy to record crime incidents of crime is GO 621 (Management of Incident Reports or Police Services). Per policy, these incidents are recorded on forms PPR 621.1 and PPR 615.8, as applicable. The SASG administers the information system based on the incidents recorded in NIBRS, which results in the management and production of crime statistics.

The review of PRPB's website revealed that Type I crimes, for each police area, were only globally and partially available through January 2022, along with a crime comparison. However, no monthly statistics for the subsequent months are available to the public. The Monitor's Office also reviewed statistics for domestic and gender-based violence and sexual offenses, finding outdated statistics covering the period of January-December 2021, and no additional information.

During previous assessment periods, the Crime Statistics Division reported that statistics were collected and recorded but were not publicly available. During CMR-5, SASG assured that they were working on rectifying the issue through IT. As in CMR-6, during the CMR-7 reporting period, PRPB failed to submit any supporting evidence of its Crime Statistics Division indicating that it rectified the technical difficulty to make hate crimes statistics publicly available. The lack of data driven processes to collect and analyze incidents is longstanding. Relevant documentation must be made available to the Monitor's Office for assessment, including complete investigation reports, NIBRS statistical reports, hate crime reports to the FBI, and documentation of interactions with transexual or transgender individuals.

*Pathway Forward*

PRPB must resolve the above-mentioned limitations to keep the public informed and comply with the Agreement. PRPB must implement the use of social media accounts, the Press Office, multi-media resources, including public service announcements, to report crime statistics and to communicate to the public its progress on the Reform among other related issues. Additionally, mass media and all communication resources should be used to publicly convey strategies to fight crime, crime trends, and quality of life concerns for education, awareness, and prevention. The Monitor's Office does note, that during the CMR-7 reporting period, PRPB used the written press to provide some information to the public about community policing, and most recently, about the implementation and use of body cameras under a pilot program with the transit and highway patrol units. Such efforts must be replicated to reach broader community sectors.

# XI. Information Systems and Technology

The Commonwealth made some progress during the CMR-7 reporting period but not without direct involvement from the Monitor's Office, subject matter experts for AHDatalytics and Gartner Inc, USDOJ, and the Court. This cannot be understated. While correcting the functionality of its technology capabilities is positive, the Commonwealth has yet to demonstrate a self-sustaining capacity, or sufficient advocacy from senior leadership, to drive the PRPB Bureau of Technology efforts forward and deliver effective technology solutions. During the CMR-7 reporting period this was evident in the continuing troubled developments in the operationalization of PTMS and implementation of NIBRS, the numerous corrections needed to GTE in response to UOF data flaws exposed during data entry, the inconsistent use and operational status of Promedia, and the Bureau of Technology's continuing mischaracterization of the "operational availability" of its systems. Technology best case convention requires that to meet full operational availability, functionality minimums must be met, key performance parameters must be satisfied, full testing has been completed, and training is available. This is not actually the case. Basic development continues on most projects, and training from SAEA is unavailable. For these reasons the Commonwealth is at risk of backsliding technologically and operationally despite past progress made. Also impactful to the above conditions, senior leadership involvement and support of IT activities has yet to occur unambiguously. The apparent lack of involvement raises the question of top-down commitment to the priority of technology modernization.

On February 28, 2022, a Join Stipulation on IT was filed with the Court by the Commonwealth of Puerto Rico and USDOJ. The Joint Stipulation, updated on April 12, 2022, established the timeline and tasks associated with the IT Needs Assessment and development of the Action Plan. On April 18, 2022, the Court approved the updated Joint Stipulation. In July 2022, the Monitor's Office contracted Gartner, Inc. to conduct the IT Needs Assessment and subsequently work with the Commonwealth and PRPB, through its executive-level committee, to develop the Action Plan.

The IT Needs Assessment and subsequent Action Plan will be completed by March 2023, as such much of the impact that this work will have on PRPB's progress in achieving compliance will likely not become a reality until 2023 – 2024.

In addition to the IT Needs Assessment, PRPB's work with AHDatalytics will also complement and assist progress towards compliance. During the August monthly review with AHDatalytics, the Monitor's Office was encouraged by their success with mocking-up useful dashboards. Also positive, AHDatalytics noted that the Reform Unit had been using the new awareness to rethink questions and ask for more dashboard content, the exact outcome sought from the re-platforming of PRPB's analytics practice.

During the May field visit to Arecibo, the team received CAD, GTE, and PTMS demonstrations from the IT coordinator. His very successful efforts to repurpose machines and build out a dedicated training center that also reduced agent travel time to Gurabo are laudable and should be replicated throughout PRPB. Disappointingly, the comments the Monitor's Office heard during this visit also spoke to the limits and challenges faced including that most staff are not trained on the systems, that data in CAD and GTE were not being scrubbed all the way through to reconciliation, and that there are lags in editing.

The Bureau of Technology continues to be hampered by limited resources and access to experienced subject matter experts. Fortunately, the availability of both AH Datalytics and Gartner Inc. has been immediately beneficial. Retaining the knowledge and practices that have emerged must be a priority for senior leadership at both PRPB and DSP. AHDatalytic's output is and will have direct bearing on PRPB's ability to establish its analytical capacity and knowledge base for transforming operations. Similarly, Gartner Inc's perspective will add context to PRPB's ability to impact its management maturity level. Their report will be available during CMR-8.

Lack of mission procedure clarity is the most significant contributing factor to IT functionality deficits and sufficient development progress. IT demonstrations have borne out that procedural inconsistencies across PRPB jeopardize the quality of data collected, entered, and retrieved from GTE and complicates its portability. Comments from agents during field visits and in dialog with the Chief Information Officer's (CIO) staff in May showed this condition to be consistent with NIBRS as well. Finally, although easy to presume these shortcomings are the responsibility of the Bureau of Technology, in fact, the instability of operational processes falls squarely on both senior leadership and supervisors in operations for the lack of operational process definition, as well as the Bureau of Technology.

Overall, the Commonwealth's compliance with the six Information Systems and Technology paragraphs is unchanged from CMR-6 where 33% of paragraphs (two paragraphs) were found to be partially compliant and 66% of paragraphs (four paragraphs) were found to be not compliant. This holds true for the CMR-7 reporting period. See figure 10.



*Figure 10. Information Systems and Technology: Paragraph Compliance Status*

## Paragraph 218: Information Systems and Technology

*PRPD shall establish information systems and utilize technology to support the implementation of this Agreement in an efficient and effective manner.*

| Compliance Status | Assessment Schedule | |
|---|---|---|
| Partially Compliant | Review | April 2022 – September 2022 |

262

| | | | |
|---|---|---|---|
| Policy: | Implemented | Period | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

## Compliance Targets

Note: Compliance will be determined on two separate, but inter-dependent bases: (1) the implementation of Paragraphs 219 – 224 in tandem with applicable Paragraphs in sections III through XII and (2) the results of outcome assessments, pursuant to Paragraph 243.

## Compliance Assessment

PRPB is partially compliant regarding technology. Procedural and data inconsistencies continue. Recurring dialog during the CMR-7 reporting period centered primarily on system issues facing UOF, domestic violence, sexual abuse, GTE, and Promedia operational functionality. Further, the Monitor's Office notes that there are no revisions to the existing assessment criteria for this paragraph.

| System | Technology Compliance | Compliance Targets Filed 10/30/19 |
|---|---|---|
| Project Management System | Substantial | Substantial |
| CAD/CAD Mobile | Partial | Partial |
| NIBRS | Minimally Partial | Not Compliant |
| NCIC – National Crime Information Center | Minimally Partial | Not Compliant |
| Forms in GTE | Partial | Partial |
| Promedia (Performance Evaluation System) | Partial | Not Compliant |
| PTMS - Store digitized files, records, curricula and Teaching Plans | Partial | Not Compliant |
| Formal Community Partnerships / Alliances – distribute data and information | Partial | Not Compliant |
| EIS | Not Compliant | Not Compliant |
| Supervisory Module | Partial | Not Compliant |
| Domestic Violence and Sex Crimes | Partial | Partial |
| Inspections – Operational, Investigative & Administrative | Substantial | Deferred |
| Crime Mapping | Substantial | Not Applicable |
| SAEC – Computerized Analysis and Statistics | Substantial | Not Applicable |
| Virtual Library – publish policies, procedures, forms, implement n PRPB Website | Substantial | Substantial |
| UOF | Partial | Partial |

*Table 1. Information Systems and Technology Systems Reviewed During the Reporting Period*

## Pathway Forward

During CMR-8, PRPB must overcome its current lack of adequate management maturity, governance, oversight, and development issues if it is to achieve a self-sustaining capability to successfully maintain its technology enterprise. PRPB must follow through fully and apply the lessons learned from AHDatalytics and Gartner Inc. and at minimum, upgrade CAD and GTE properly to resolve the issues

with supervisory reviews of incidents. The Commonwealth, through its executive-level committee, must also complete an IT Action Plan in accordance with the Court Order and incorporate the Monitor's recommendations from CMR's 5, 6 and 7.

## Paragraph 219: Information Systems and Technology

*PRPD shall collect and maintain all data and records necessary to: (a) document implementation of and compliance with this Agreement, including assisting the TCA's outcome assessments and the data collection and reporting required by this Agreement; (b) perform ongoing performance improvement activities in each of the areas addressed by this Agreement; (c) facilitate and ensure transparency and wide public access to information related to PRPD decision making and activities, as permitted by law; and (d) promote officer and civilian safety.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

### *Compliance Targets*

| | | |
|---|---|---|
| 1. Data dictionary includes all data sets necessary to access compliance with the Agreement. | ☑ Met | ☐ Missed |
| 2. The data systems permit PRPB to engage in ongoing performance improvement activities in each of the areas addressed by this Agreement. | ☐ Met | ☑ Missed |
| 3. PRPB makes publicly available all data that the Agreement requires be published, in accordance with PRPB policy and applicable laws. | ☐ Met | ☑ Missed |
| 4. PRPB collects and maintains data that is relevant, useful, and applicable to officer and civilian safety. | ☐ Met | ☑ Missed |
| 5. PRPB maintains data and records in compliance with the Agreement and applicable laws. | ☐ Met | ☑ Missed |

Note: Review frequency, consistent with the periodicity of assessments in areas III through XII and XIV.

### *Compliance Assessment*

Although PRPB is partially compliant with regard to technology (see paragraph 218) data errors and inconsistencies within systems, like GTE, continue. Further the process has not stabilized sufficiently. As noted throughout this CMR, recurring dialog during the CMR-7 period centered primarily on data quality issues regarding UOF and GTE. Further, Promedia and PTMS are not operational. The use of Promedia for performance evaluations is limited and does not allow for effective tracking and supervisory alerts related to evaluations. The Monitor's Office has continuously brought the shortcomings of the use and operationalization of PTMS to PRPB's attention. Although training records for each officer are housed within PTMS, the system does not allow for comprehensive queries, and does not contain all relevant training materials, training schedules, and systems to record and track

264

which officers are due for required training. The training coordinators in each area supplement the inadequacies of the system by developing their own tracking sheets and records. A manual system that is complicated when officers are transferred to different area commands.

The Monitor's Office notes that PRPB has started working with AHDatalytics to develop various dashboards and build out the ReformStat process. Working alongside the Reform Unit, AHDataltyics has built various draft dashboards to assist the Reform Unit in tracking PRPB's compliance with various aspects of the Reform, including UOF reporting, STU deployments, and arrests. The Monitor's Office participates in biweekly calls with PRPB and AHDatalytics to maintain awareness of this work and provide input.

*Pathway Forward*

PRPB must improve data collection procedures and master the data analytic methods developed by AHDatalytics. Further, PRPB must also revise the Data Dictionary to ensure currency and alignment with progress to date.

## Paragraph 220: Information Systems and Technology

*PRPD shall develop protocols for collecting, analyzing, and reporting the information required by this Agreement. These protocols shall be developed and implemented in coordination with the TCA and shall be approved by the DOJ prior to implementation.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | April 2022 – September 2022 |
| Policy: | Implemented | | |
| Training: | N/A | Assessment Frequency | Bi-annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

Note: This Paragraph is assessed with Paragraph 219.

*Compliance Assessment*

Although PRPB is partially compliant with regard to technology reporting and data publishing (see paragraph 218), the operationalization of such technology remains not compliant. The Virtual Library as a platform is functional and available; however, as noted in the Community Engagement and Public Information and Policies and Procedures sections, the Virtual Library is not updated frequently with the most up to date policies and procedures making the tool not compliant. Further, as noted in the Equal Protection and Non-Discrimination section, paragraph 85, NIBRS is not compliant. The use of NIBRS and related policies and training have yet to be developed and conducted.

*Pathway Forward*

PRPB must complete the development of tools and protocols for collecting, analyzing, and reporting the information required by the Agreement. Tools like the Virtual Library, the development of systems to analyze data comprehensively and accurately such as UOFs and arrests, and implementing NIBRS, are just a few examples of what PRPB must do to become compliant with this paragraph.

## Paragraph 221: Information Systems and Technology

*PRPD shall develop and maintain an automated record management system and electronic files as part of the Action Plans developed for each subsection above.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Partially Compliant | | Review Period | September 2021 – October 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| 1. A record management system accounts for all the elements of the Paragraph and outcome measures as required by Paragraph 243. | ☐ Met   ☑ Missed |
|---|---|

*Compliance Assessment*

PRPB is partially compliant with this paragraph. As noted in previous CMRs, although the technology is available, PRPB has not yet demonstrated effective availability and integration of GTE with its operational systems which has been seen in the discrepancies regarding UOF data and the inconsistency of processes from precinct to precinct. PRPB's inability to accurately track and report UOFs and capture accurate demographic data are just a few examples of the limitations of the current GTE. Further, as noted in the UOF section, issues with GTE have resulted in the appearance of missing data (i.e., missing supervisory signatures) in UOF reports. Limitations in the system's ability to run queries have also hampered PRPB's ability to draw down data in a systematic manner. Further, the Agreement requires that the Commonwealth track all vehicle and pedestrian stops, which the Commonwealth has yet to implement. Doing so will increase the number of "events" or "incidents" that will need to be captured and stored in PRPB's record management system.

Although AHDatalytics has worked with PRPB to develop dashboards that assist the Bureau with viewing the data in a comprehensive manner, if the quality and integrity of the data being entered into GTE is poor and/or inconsistent, the dashboards and reports will have limited capability to provide an accurate picture of the status of reports, reforms, etc.

266

## Pathway Forward

PRPB must address data entry flaws and revise GTE functionality to ensure the accurate capturing of incident data and data retrievability. The Monitor's Office also recommends that PRPB assess and address the current capabilities and limitations of GTE and CAD, which are designed primarily (if not exclusively) to capture and store incidents or complaints (querellas) often associated with arrests.

## Paragraph 222: Information Systems and Technology

*PRPD shall provide each supervisor with handheld recording devices and require that supervisors use these devices to record complainant and witness statements taken as part of use of force or misconduct complaint investigations.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | September 2021 – October 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

### Compliance Targets

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of this Paragraph. | ☑ Met | ☐ Missed |
| 2. Handheld recording device trainings are consistent with approved policies. | ☐ Met | ☑ Missed |
| 3. 95% of sampled personnel are trained and certified in relevant policies related to handheld recording devices (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 4. Complaint and witness statements are recorded in 95% of use of force reviews. | ☐ Met | ☑ Missed |
| 5. Complaint and witness statements are recorded in 95% of misconduct complaint investigations. | ☐ Met | ☑ Missed |
| 6. All sampled units had access to functional handheld recording equipment. | ☐ Met | ☑ Missed |

### Compliance Assessment

As was the case in the previous reporting period, PRPB is not compliant with this paragraph. During the CMR-7 reporting period, the Monitor's Office reviewed GO 123 (Negociado de Tecnología y Comunicaciones) and provided comments to PRPB, which included streamlining and simplifying the GO and clarifying the roles and responsibilities of the personnel assigned to leadership in the division. Further, training will need to be developed and conducted for PRPB to demonstrate improved compliance.

In addition, capacity to operationalize handheld recording devices, as well as other similar devices like, body-worn cameras, is nonexistent. PRPB's use of these tools and practices need to be demonstrated.

267

Further, PRPB has not demonstrated proficiency with the installed hardware for the required recording devices.

*Pathway Forward*

As noted in previous CMRs, PRPB must provide evidence of their efforts to comply with the Agreement. PRPB should prepare for and brief its plan for development, operations, and support to the Monitor's Office.

## Paragraph 223: Information Systems and Technology

*All officers shall have access to National Crime Information Center ("NCIC") data for valid law enforcement purposes only. PRPD shall develop a protocol for the handling and use of NCIC data.*

| Compliance Status | | Assessment Schedule | |
|---|---|---|---|
| Not Compliant | | Review Period | September 2021 – October 2022 |
| Policy: | Implemented | | |
| Training: | Not Implemented | Assessment Frequency | Annually |
| Practice: | Not Implemented | | |

*Compliance Targets*

| | | |
|---|---|---|
| 1. Policies incorporate all the requirements of this Paragraph. | ☑ Met | ☐ Missed |
| 2. NCIC data trainings are consistent with approved policies. | ☐ Met | ☑ Missed |
| 3. 95% of sampled personnel are trained and certified in relevant policies related to handling and use of NCIC data (or scheduled for training, in the case of mid-year reviews). | ☐ Met | ☑ Missed |
| 4. NCIC data is considered in 95% of patrol interventions and investigations. | ☐ Met | ☑ Missed |
| 5. All sampled units had access to NCIC data. | ☐ Met | ☑ Missed |
| 6. PRPB safeguards appropriately protect sensitive data. | ☐ Met | ☑ Missed |

*Compliance Assessment*

PRPB is not compliant with this paragraph. As noted in previous CMRs, all officers have not received National Crime Information Center (NCIC) training. Training and access to NCIC is limited to a few personnel located at the Centro de Mandos at the various area commands. Officers that need NCIC information must relay their requests to the Centro de Mandos. Although the relay of information is typically timely, as observed by the Monitor's Office during past site visits, direct access to this information by officers in the field is prudent to officer and public safety.

*Pathway Forward*

As noted in previous CMRs, PRPB must continue integrating and implementing NCIC to ensure roll out beyond headquarters and the Area Centro de Mandos. Availability to all authorized and trained officers

must be achieved and be in alignment with NCIC operational use criteria. Additionally, effective training throughout PRPB is required from SAEA and the Bureau of Technology.

## Paragraph 224: Information Systems and Technology

Nothing in this Agreement shall be construed as prohibiting PRPD from contracting services related to technology and data collection, entry, and analysis.

### *Compliance Assessment*

As noted in previous CMRs, PRPB is compliant with the allowances of this paragraph. PRPB has contracted with analytic experts from AHDatalytics who are assisting with the development of dashboards and improvements to the auditing capabilities with the Reform Unit. Further, the Monitor's Office has contracted with Gartner Inc. to assist with conducting the IT Needs Assessment and collaborating with PRPB to develop the IT Action Plan.

## Appendix A: Background to PRPB Monitoring Mission

In 2008, USDOJ initiated an investigation of PRPB into an alleged pattern or practice of using excessive force, conducting unlawful searches and seizures, and unlawful discrimination, all of which are proscribed by the United States Constitution. USDOJ conducted their investigation pursuant to the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141, and the anti-discrimination provisions of the Omnibus Crime Control and Safe Streets Act, 42 U.S.C. § 3789d. PRPB accepted the grounds for the investigation and pledged cooperation and has worked in partnership with USDOJ to establish the reforms outlined in this Agreement.

As part of its investigation, USDOJ and its police practices expert consultants conducted a detailed fact-finding review with the assistance and full cooperation of PRPB, including: a) tours of police areas; b) interviews with PRPB officers, supervisors, command staff, Commonwealth officials, members of the public, and other stakeholders; c) review of many thousands of documents, including policies and procedures, incident reports, internal investigation of civilian complaint records, external audit reports, and legislative materials; and d) accompanying line officers and supervisors during their respective tours of duty. PRPB's Superintendent and command staff officials met personally with USDOJ representatives and consultants on multiple occasions and pledged their full support and cooperation.

In response to the concerns raised by USDOJ during its practice investigation of PRPB, and in recognition of the need to modernize and professionalize its operations, PRPB undertook its own internal reform efforts. These efforts culminated in the issuance in March 2011 of PRPB's own internal reform plan. The plan included: 1) the development and implementation of new policies regarding UOF and a wide range of other substantive areas; 2) the training of all appropriate officers in the new UOF policies through "train-the-trainer" pedagogy; 3) the adoption of a reformed disciplinary system; 4) the improvement of citizen complaint procedures; 5) the strengthening of community outreach efforts through Citizen Interaction Committees; and 6) a staffing review to improve supervisor to officer ratios.

In September 2011, USDOJ issued a written report of its investigative findings ("the Report"). The Report presented USDOJ's findings related to UOF, UOF to suppress the exercise of First Amendment rights, and searches and seizures. The Report identified several additional areas of serious concern, including discriminatory policing and the insufficient quality of investigation into sex crimes and domestic violence. Finally, the Report outlined a series of other performance issues: 1) systemic deficiencies in PRPB's policies and procedures; 2) conduct of specialized units; 3) formative and in-service training; 4) supervision; 5) intake, internal investigation, and institutional adjudication of administrative misconduct complaints; 6) corrupt acts and other crimes committed by PRPB officers; 7) substandard processes for promotion in rank; 8) lack of risk management; 9) poor external oversight and accountability; and 10) a lack of sufficient community engagement. The Report concludes that the performance of PRPB was undermined by several entrenched and long-standing problems, which in the estimation of USDOJ called for a systemic remedy.

While the Commonwealth did not concur with all the findings and conclusions in the Report, the Parties met throughout 2012 to exchange ideas and proposals for modernizing and professionalizing PRPB and to discuss numerous reforms already underway at PRPB's own initiative. Once the newly elected Commonwealth administration took office in January 2013, the administration familiarized itself with the Agreement and continued negotiating to reach a final Agreement. The Agreement is the product of

these good faith negotiations. In July 2013, the draft Agreement was presented to the Honorable Gustavo A. Gelpi, Chief Judge of the U.S. District Court for the District of Puerto Rico, who approved the draft, formalizing the Agreement.

On June 5, 2014, the Court approved the selection and hiring of an independent monitor to help PRPB and the Commonwealth during the capacity building phase and thereafter monitoring the compliance period of the Agreement.

Unlike other consent decrees throughout the United States and its territories and owing to the unique institutional development and needs of the Commonwealth, the Agreement between the USDOJ and Commonwealth of Puerto Rico included a four-year "capacity-building" phase. During that phase, PRPB and the Commonwealth were expected to develop policies, procedures, and technologies to address serious deficiencies within the Bureau. The Monitoring Team, which is comprised of subject matter experts, was expected to provide substantive expertise and technical assistance to guide PRPB in its implementation and development efforts, while at the same time providing the public with assurance that PRPB's progress would be evaluated in a reliable, independent, and transparent manner.

The capacity-building period concluded on October 8, 2018, at which time the "monitoring phase" was to commence according to the Agreement. However, at that time the Monitor and Parties were unable to come to a consensus on the methodology matrices that the Monitor's Office proposed to use to measure PRPB's compliance with the Agreement. This resulted in a delay in the start of the monitoring phase, and the Court subsequently suspended monitoring measures pending the finalization and acceptance of a compliance assessment methodology agreeable to the Parties. The Commonwealth, legal counsel, and the USDOJ conferred with the Monitoring Team over the course of six months to develop methodology matrices necessary to measure compliance for the 11 performance areas outlined in the Agreement. After review, and with the assent of the Parties, the Court accepted the objective methodologies put forth by the Monitor's Office.

In March 2020, the court approved and published the First Report of the Federal Monitor, which focused primarily on policies and procedures, UOF, and IT. CMR-1 found broad compliance on policy and procedure and certain areas of UOF, but nevertheless found a series of key lapses in UOF investigations and IT infrastructure. Later that same year, CMR-2 provided a more comprehensive overview of PRPB's performance, covering a significantly larger number of Consent Decree paragraphs. The format and comprehensiveness of our CMRs has evolved with each report. CMR-5 represents the first full comprehensive assessment and report and the first report in which PRPB's status in the implementation of policy, training, and practice was documented. As such, CMR-5 provided a model for Monitor's reports going forward. As some areas, and paragraphs, of the Agreement are only assessed biannually, CMR-6 along with CMR-7 jointly provide the most comprehensive assessment provided by the Monitor's Office thus far.

## Appendix B: Methodology

In agreement with the approved methodology, the Monitoring Team uses a combination of quantitative and qualitative research methods to assess the Commonwealth's compliance with the Agreement in the areas of performance selected for this report. These methods include but are not limited to 1) document reviews of forms that PRPB uses in the daily conduct of its activities; 2) content analysis of policies, training materials, internal investigation files, and other documents the provide detailed evidence of PRPB's efforts to comply with the Agreement; 3) interviews with sworn and civilian PRPB personnel, members of the public who can directly verify PRPB's community outreach and public information activities, personnel from other criminal justice components with Puerto Rico, and additional stakeholders in the reform process; 4) site visits to PRPB facilities, patrol locations, crowd control incidents, CIC meetings, and public information sessions; and 5) analysis of PRPB's data systems and the knowledge management practices that make use of these systems.[57]

## Compliance Levels

Each paragraph in the Agreement has been assigned a methodology that was agreed on by the Parties and approved by the court. These methodologies include information on the data source, sampling method (if relevant), and compliance target. The compliance targets provided for each paragraph outline the objectives and thresholds the Commonwealth must meet to reach full compliance with the paragraph. Further, if applicable, the compliance targets outline whether the Commonwealth and PRPB have incorporated the requirement into an implemented policy; trained all relevant personnel in the requirement and policy; and fully implemented the requirement in practice. PRPB and the Commonwealth's status in the implementation of policy, training, and practice are noted for each paragraph assessed, see figure B.1. For those paragraphs where training is not a requirement of the paragraph training is listed as not applicable (N/A).



*Figure 11. Implementation Status: Policy, Training, Practice*

The compliance levels are defined as follows:

- **Fully Compliant**: Where PRPB has objectively demonstrated substantial compliance with the cited portion of the Agreement for a period of more than two years;

---

[57] The full methodology can be accessed at the Monitor's website at https://www.fpmpr.org.

- **Substantially Compliant**: Where PRPB has objectively demonstrated extensive compliance with the cited portion of the Agreement (as defined by the compliance targets for a given paragraph) for a period of less than two years;
- **Partially Compliant**: Where PRPB has objectively demonstrated a sub-optimal level of compliance with the cited portion of the Agreement, as defined by the compliance targets for a given paragraph;
- **Not Compliant**: Where PRPB has not objectively demonstrated compliance with the cited portion of the Agreement, either due to a lack of evidence, or due to evidence of significant shortfalls in compliance relative to the targets outlined for a given paragraph;
- **Rating Deferred**: Where the Monitoring Team has not obtained sufficient evidence to reach a determination as to compliance status with a given paragraph, due to no fault on the part of PRPB.

The Court draws a clear distinction between a deferred rating and a rating of non-compliance due to lack of information. In the latter case, the Monitor's Office is unable to reach a determination of compliance because PRPB and the Commonwealth failed to provide the Monitor's Office with requested data, and thus failed to provide evidence of compliance. In the former case, the Monitor's Office could not obtain sufficient data to reach a determination of compliance due to no fault on the part of PRPB or the Commonwealth, e.g., travel restrictions prevented the Monitor's Office from conducting required site visits.

## Sampling Methodology

The Monitor's Office uses a variety of sampling methods to draw valid and representative samples for the data sources noted above. These sampling methods include the following:

1. Simple random sampling: Used for large datasets such as arrest reports and search/seizure incidents that occur in very large volumes each reporting period.
2. Stratified random sampling: Used for large but varied datasets such as training, performance, and disciplinary records for sworn PRPB personnel who are stratified by rank.
3. Purposive sampling: Used for datasets that require intentional selection to investigate key topics and cover all stakeholders over the course of successive CMRs, such as interviews with CIC members, training and counseling staff, and PRPB personnel assigned to specialized units.
4. Full enumeration: Used for sources that monitors must review exhaustively, such as revisions to policies and training curricula, exemplars of forms that PRPB uses to interact with the public, and records for critical incidents such as deployment of chemical agents to disperse crowds.

In addition, the Monitor's Office uses a rolling sampling method for key data sources that require analyzing significant amounts of data on a tight deadline, such as arrests and searches, internal investigations, UOF incidents, etc. These data sources present a significant workload for the Monitor's Office, and for PRPB, because the relevant incidents either occur in large volumes during each reporting period or involve large amounts of documentation per incident. The Monitor's Office has addressed the

tradeoff between sample frequency, sample size, and margin of error, by adapting a "rolling" sampling method that the U.S. Census Bureau has developed for the American Community Survey.[58]

Using this method, the Monitor's Office draws quarterly samples for large data sources that are reviewed biannually. Sample sizes are calculated for each quarter by examining the past six months of incidents and drawing a proportional number of cases for the present quarter. Sample size is determined so that the margin of error for two years of combined data (consistent with the above definition of full compliance) is under 5%, allowing the Monitor's Office to state confidently whether PRPB has maintained substantial compliance on a given paragraph for the past two years and has therefore achieved full compliance.

## CMR-7 Samples

The Monitor's Office requested the following samples from PRPB for CMR-7:

| Paragraph(s) | Primary Section | Data Source |
|---|---|---|
| **Common** | Common | Training records (PTMS) for a random sample of 92 personnel, drawn from a population of 11067 active duty sworn personnel. |
| **Common** | Common | Electronic records & materials for a total of 8 in-service trainings provided during the evaluation period. |
| **Common** | Common | Site visits to a sample of PRPB precincts and units during the assessment period. |
| **60-64, 84, 145-146, 205** | Common | Disciplinary record for 35 officers, provided in response to request for performance evaluations and disciplinary records for a random sample of 92 sworn personnel. |
| **84, 136-140, 144-153** | Common | Training records for a random sample of 65 civilian personnel, drawn from a population of 704 active civilian personnel. |
| **16-20, 60-64, 154-156** | Professionalization | Assessment reports and supporting documents for a random sample of 8 operational assessments, drawn from a total of 16 audits. |
| **23-24, 27, 32-35 36-39, 41, 44-47** | Use of Force | Forms PPR-605.1, PPR-605.2, PPR-605.3, and PPR-126.2 for the indicated random sample of 69 UOF incidents, drawn from a total of 861 UOF incidents; PPR-605.1 and PPR-605.2 for all UOF incidents in the sample by STU officers; PPR 113.2 for UOF incidents investigated by FIU. |
| **Special Item** | Use of Force | In support of Judge Besosa's request to review UOF incidents in GTE, PRPB provided all PPRs 126.2, 605.1, and 605.3 related to all UOF incidents in the GTE system for the month of June. |
| **25** | Use of Force | PPR-605.1 and PPR-605.2 for a total of 4 reported incidents in which STUs deployed chemical agents. |

---

58   United States Census Bureau, American Community Survey Design and Methodology, January 2014, https://www.census.gov/history/pdf/acsdesign-methodology2014.pdf

| 25, 32-35 | Use of Force | Unannounced site visits to a purposive sample of 2 SWAT and DOT armories, and review of inspection reports, from a total of 10 armories. |
|---|---|---|
| 26, 54 | Use of Force | Weapons training certificates for a random sample of 91 officers, drawn from a population of 11067 active duty sworn personnel. |
| 28 | Use of Force | Activation/deployment records for a random sample of 65 STU deployments for preventive patrol and policing functions, drawn from a total of 711 incidents. |
| 28 | Use of Force | Deployment records for a random sample of 30 STU officers assigned to general patrol and policing functions, drawn from a population of 190. |
| 29 | Use of Force | Training records, performance evaluations, and disciplinary records for a random sample of 45 officers assigned to STUs and STU evaluation boards, drawn from a population of 190. |
| 30 | Use of Force | Activation/deployment records for a random sample of 46 STU activations, drawn from a total of 206 incidents. |
| 32-35 | Use of Force | Incident reports and after action reports for a random sample of 31 planned and unplanned incidents involving crowds, drawn from a total of 157 incidents. |
| 44-47, 222 | Use of Force | FRB evaluation files for a random sample of 22 use of force incidents classified as Level 2-3 with injuries, drawn from a total of 88 incidents. |
| 46 | Use of Force | Training records and certificates for a random sample of 22 FRB members to determine whether all board members are fully trained and certified to serve on the Force Review Board, drawn from a population of 77. |
| 49 | Use of Force | Investigation files for a random sample of 38 FIU investigations, drawn from a total of 159 incidents. |
| 49 | Use of Force | Evaluation files for a random total of 15 CFRB reviews, drawn from a total of 25 reviews. |
| 56 | Use of Force | Incident reports for a random sample of 36 incidents involving persons in mental health crisis, drawn from a total of 208 incidents. |
| 56 | Use of Force | Training records and additional relevant data for a total of 14 CIT officers/coordinators demonstrating that the personnel met all eligibility criteria. |
| 60-64, 74-76 | Searches and Seizures | Incident reports, search warrants, and related documents a random sample of 73 searches, drawn from a total of 800 incidents. |
| 65-72, 223 | Searches and Seizures | Arrest reports and related incident reports for a random sample of 89 arrests, drawn from a total of 9013 incidents. |
| 65-72 | Searches and Seizures | Radio recordings for a sample of 4 arrests involving obstruction, resisting arrests and/or assaulting an officer, in response to a request for a sample of 16 arrests. |

| 72 | Searches and Seizures | Investigation files for a random sample of 4 administrative investigations involving seized property, drawn as part of the broader sample of administrative investigations. |
|---|---|---|
| 83 | Equal Protection | Exemplars of all 9 PPR forms used to report an officer-civilian interaction, including electronic forms. |
| 89 | Equal Protection and Non-Discrimination | Reports from 7 interactions with transgender or transsexual individuals, provided in response to a request for a total of 23 reported incidents. |
| 92 | Equal Protection and Non-Discrimination | Investigation files for a total of 4 reported incidents involving allegations of abuse and mistreatment originating in secure correctional facilities. |
| 96 | Equal Protection and Non-Discrimination | Call records for a sample of 93 hotline complaints, drawn from a total of 981 incidents. |
| 99 | Equal Protection and Non-Discrimination | Investigation files for a random sample of 23 sexual assault and domestic violence investigations involving PRPB officers, drawn from a total of 57 incidents. |
| 82, 197 | Equal Protection and Non-Discrimination | Investigation files for a random sample of 11 misconduct complaints involving allegations of unequal protection, drawn as part of the broader sample of administrative investigations. |
| 87 | Equal Protection and Non-Discrimination | Documents for a list sample of 18 PRPB programs, initiatives, and activities demonstrating that these programs are applied and administered without discrimination, drawn from a sample of 33 programs. |
| 93, 94 | Equal Protection and Non-Discrimination | Investigation files for a random sample of 45 sexual assault investigations (67 requested), drawn from a total of 380 incidents. |
| 93, 98 | Equal Protection and Non-Discrimination | Investigation files for a random sample of domestic 79 violence investigations (112 requested), drawn from a total of 1886 incidents. |
| 95, 97, 100 | Equal Protection and Non-Discrimination | Interviews with a purposive sample of 18 relevant personnel to discuss PRPB's classification protocols for crimes involving sexual assaults are being assessed and revised as needed, drawn from a population of 41. |

| 112-113 | Policies and Procedures | Interviews with a purposive sample of personnel from the PRPB Reform Unit to determine PRPB's protocols and practices for reviewing. |
|---|---|---|
| 114-116 | Policies and Procedures | Agency transmittal receipts for policies and procedures emailed to a random sample of 92 sworn personnel, drawn from a total of 11067 active duty sworn personnel. |
| 114-116, 136-140, 147-153, 197, 206, 207, 211, 212 | Supervision and Management | Interviews with a random sample of 49 PRPB personnel, drawn from a population of 11,771 active duty sworn and civilian personnel. |
| 13, 81, 136-140, 205, 207 | Supervision and Management | Two months of staffing documents for a random sample of 40 PRPB precincts and units, drawn from a total of 232 precincts/units with patrolling functions; documents included evidence that each precinct/unit in the sample sought and obtained feedback from a broad cross-section of community stakeholders to solve problems. |
| 60-64, 144 | Supervision and Management | Training records, performance evaluations, disciplinary records, and any SARP investigations, for a random sample of 16 supervisors and command officers, drawn from the broader sample of sworn personnel. |
| 60-64, 145-146 | Supervision and Management | Training records, performance evaluations, disciplinary records, and any SARP investigations, for a random sample of 55 officers assigned to specialized units, drawn from the broader sample of sworn personnel. |
| 12, 163-165, 168-170, 172-175, 180-189 | Civilian Complaints, Internal Investigations, and Discipline | Supervisory reviews and initial investigation files for a random sample of 29 misconduct complaints that have completed their initial investigation, drawn from a total of 773 investigations. |
| 170 | Civilian Complaints, Internal Investigations, and Discipline | SARP investigation files and related data and communications for a purposive sample of 9 civil lawsuits and criminal prosecutions filed involving PRPB personnel, drawn from a total of 51 lawsuits. |
| 200 | Civilian Complaints, Internal Investigations, and Discipline | Documentation stating the rate of positive test results among 1,148 drug tests conducted during the period. Test results and related records requested for a random sample of 58 PRPB personnel who were drug tested during the assessment period, but only summary statistics provided. |
| 177-179, 190, 192, 193, 198-199 | Civilian Complaints, Internal | SARP investigation files and related data for a random sample of 24 closed and fully adjudicated misconduct investigations, drawn from a total of 188 investigations. |

| | Investigations, and Discipline | |
|---|---|---|
| **194-196** | Civilian Complaints, Internal Investigations, and Discipline | Training records, performance assessments, and disciplinary records for a sample of 28 members of the internal investigation unit, drawn from a population of 109. |
| **201-204** | Civilian Complaints, Internal Investigations, and Discipline | Interviews with a purposive sample of 8 personnel responsible for administering and providing mental health training and counseling services to PRPB personnel and their families, out of a population of 17. |
| **73, 82, 170, 181, 193-196** | Civilian Complaints, Internal Investigations, and Discipline | Interviews with a sample of 28 SARP investigators and supervisors, drawn from a population of 109. |
| **206** | Community Engagement and Public Information | PPR forms and related materials that demonstrate that a random sample of 38 precincts/units used the S.A.R.A. model to identify recurring quality of life problems and collaborate with the community on problem-solving activities, drawn from a total of 232 precincts/units with patrolling functions. |
| **207** | Community Engagement and Public Information | Documents for a list sample of PRPB 69 programs, initiatives, and activities demonstrating that PRPB collaborated with a broad cross-section of community stakeholders to establish problem solving strategies, drawn from a sample of 235 programs. |
| **210** | Community Engagement and Public Information | Recruitment plans and selection mechanisms for a sample of 5 CICs, drawn from a total of 14 CICs (one for each command area and the central CIC). |
| **211** | Community Engagement and Public Information | Documents that demonstrate that PRPB has offered a multi-themed workshop and orientation to all members of a sample of 5 CICs, drawn from a total of 14 CICs (one for each command area and the central CIC). |
| **211** | Community Engagement and Public Information | Documents that demonstrate that a sample of 5 CICs possess the means to function per the requirements of policy and the Agreement, drawn from a total of 14 CICs (one for each command area and the central CIC). |
| **212** | Community Engagement and Public Information | Documents that demonstrate that PRPB safeguards all confidential and sensitive law enforcement data before sharing documents with a sample of 5 CICs, drawn from a total of 14 CICs (one for each command area and the central CIC). |

278

| 212 | Community Engagement and Public Information | Documents that demonstrate that PRPB sought assistance, counsel, recommendations, and general collaboration from a sample of 5 CICs to address community safety concerns, obtain community feedback, facilitate recruitment and share of information, drawn from a total of 14 CICs (one for each command area and the central CIC). |
| --- | --- | --- |
| 209 | Community Engagement and Public Information | Documents demonstrating that a sample of 5 CICs held meetings every three months during the assessment period, drawn from a total of 14 CICs (one for each command area and the central CIC). |
| 214-216 | Community Engagement and Public Information | Site visit and review of documents from a purposive sample of 13 Community Outreach and Public Information program meetings; documentation was requested for a sample of 22 Community Outreach and Public Information program meetings, drawn from a total of 35 meetings. |
| 88, 160, 207 | Community Engagement and Public Information | Semi-structured interviews with a purposive sample of eight pertinent community advocates who can attest to PRPB's public outreach efforts. |
| 88, 160, 207 | Community Engagement and Public Information | Semi-structured interviews with a purposive sample of seven PRPB personnel who can attest to PRPB's public outreach efforts. |

*Table 2. CMR-7 Data Samples*

# Appendix C: Compliance Status by Paragraph and Sub-Section

The following sections were assessed in this report:

## I. Professionalization

| Professionalization Sub-Section | Count of Paragraphs per Section by Compliance Status | | | |
|---|---|---|---|---|
| | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 0 | 1 | 0 | 0 |
| Staffing & Community Policing | 0 | 1 | 0 | 0 |
| Promotions | 1 | 1 | 0 | 5 |
| Commander Corps | 0 | 1 | 0 | 0 |
| **Total** | **1** | **4** | **0** | **5** |

## II.  Use of Force

| Use of Force Sub-Section | Count of Paragraphs per Section by Compliance Status | | | | |
|---|---|---|---|---|---|
| | Fully Compliant | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 1 | 0 | 4 | 0 | 0 |
| Specialized Tactical Units | 0 | 2 | 3 | 0 | 0 |
| Crowd Control | 0 | 1 | 3 | 0 | 0 |
| Force Reporting | 0 | 0 | 0 | 0 | 4 |
| Force Review & Investigation | 0 | 0 | 1 | 2 | 0 |
| Supervisory and FRB Reviews | 0 | 0 | 2 | 1 | 2 |
| FIU Investigations & SFRB Reviews | 0 | 0 | 3 | 2 | 0 |
| Use of Force Training | 0 | 0 | 3 | 0 | 0 |
| Responding to Mental Health Crisis | 0 | 0 | 1 | 1 | 0 |
| **Total** | **1** | **3** | **20** | **6** | **6** |

## III.  Searches & Seizures

| Searches and Seizures Sub-Section | Count of Paragraphs per Section by Compliance Status | | | |
|---|---|---|---|---|
| | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 0 | 2 | 0 | 0 |
| Investigatory Stops and Searches | 0 | 0 | 5 | 0 |
| Arrests | 0 | 1 | 8 | 0 |
| Searches | 0 | 2 | 2 | 0 |
| Training on Stops, Searches, and Seizures | 0 | 0 | 2 | 0 |
| **Total** | **0** | **5** | **17** | **0** |

## IV. Equal Protection and Non-Discrimination

| Equal Protection and Non-Discrimination Sub-Section | Count of Paragraphs per Section by Compliance Status | | | |
|---|---|---|---|---|
| | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 1 | 3 | 3 | 0 |
| Discriminatory Policing | 0 | 3 | 3 | 0 |
| Sexual Assault and Domestic Violence | 1 | 5 | 2 | 0 |
| **Total** | **2** | **11** | **8** | **0** |

## V. Policies and Procedures

| Consent Decree Section/Sub-Section | Count of Paragraphs per Section by Compliance Status | | | |
|---|---|---|---|---|
| | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | **2** | **6** | **0** | **0** |

## VI. Supervision and Management

| Supervision and Management Sub-Section | Count of Paragraphs per Section by Compliance Status | | | |
|---|---|---|---|---|
| | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 0 | 0 | 1 | 0 |
| Duties of Supervisors | 0 | 0 | 5 | 0 |
| Supervisor Training | 0 | 0 | 0 | 0 |
| Performance Evaluation | 0 | 2 | 0 | 0 |
| Early Identification System | 0 | 0 | 7 | 0 |
| Internal Audits and Interagency Feedback | 1 | 1 | 2 | 0 |
| **Total** | **1** | **3** | **15** | **0** |

## VII. Civilian Complaints, Internal Investigations, and Discipline

| Civilian Complaints, Internal Investigations, and Discipline Sub-Section | Count of Paragraphs per Section by Compliance Status | | | | |
|---|---|---|---|---|---|
| | Fully Compliant | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 0 | 0 | 2 | 0 | 0 |
| Civilian Complaints | 0 | 2 | 0 | 0 | 0 |
| Internal Investigations | 0 | 0 | 3 | 0 | 0 |
| Complaint Intake & Handling | 0 | 6 | 3 | 2 | 0 |
| Investigation of Complaints | 1 | 5 | 8 | 2 | 1 |
| Staffing, Selection, & Training Requirements | 0 | 0 | 2 | 1 | 0 |

| | | | | |
|---|---|---|---|---|
| Preventing Retaliation | 0 | 0 | 1 | 0 | 0 |
| Discipline | 0 | 1 | 2 | 0 | 0 |
| Officer Assistance and Support | 0 | 2 | 1 | 1 | 0 |
| **Total** | **1** | **16** | **22** | **6** | **1** |

## VIII.  Community Engagement and Public Information

| Community Engagement and Public Information Sub-Section | Count of Paragraphs per Section by Compliance Status | | | |
|---|---|---|---|---|
| | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 0 | 1 | 0 | 0 |
| Community Oriented Policing | 0 | 2 | 0 | 0 |
| Community Interaction Councils | 0 | 1 | 1 | 0 |
| Public Information | 0 | 0 | 4 | 0 |
| **Total** | **0** | **4** | **5** | **0** |

## IX.  Information Systems and Technology

| Information Technology Sub-Section | Count of Paragraphs per Section by Compliance Status | | | |
|---|---|---|---|---|
| | Substantially Compliant | Partially Compliant | Not Compliant | Rating Deferred |
| General Provisions | 0 | 2 | 4 | 0 |

## Appendix D: After-Action Report of the August 25, 2022 Demonstration/Protest in Fortaleza

# MEMORANDUM

To      :   Honorable Judge Besosa

Cc      :   Roberto Abesada-Agüet, Esq., General Counsel to the Federal Monitor

Date   :   August 26, 2022

From  :   John Romero, Federal Monitor
            Denise Rodríguez, Deputy Federal Monitor

Re      :   *After-Action Report of the August 25, 2022 Demonstration/Protest in Fortaleza*

On Thursday, August 25, 2022, at 4:45pm the Monitor's Office was present at a demonstration/protest at the Fortaleza against LUMA Energy. Upon arrival at the demonstration/protest the Monitor conferred with the Incident Commander, Commandante Santos. Also present was Colonel Caceres, Commanding Officer of Field Operations.

Topics discussed included the operations plan, units participating in the operation, and crowd size – at the time there was 450 – 500 protestors, but this would increase to an estimated 850 protestors by 6:00pm. PRPB used a drone flown by a Federal Aviation Administration (FAA) licensed Department of Public Safety (DSP) firefighter to determine crowd size. This is a proactive step on the part of PRPB given the difficulty in determining crowd size in the narrow streets of Old San Juan.

Present on the scene was Puerto Rico Police Bureau (PRPB) attorney Maldonado who is also a sworn member of PRPB. DOT was also on scene in a standby capacity. Officers on the frontline were in regular uniform commensurate with the actions and demeanor of the protesters at the time and were rotate every half-hour.

At 7:00pm a well-known protester, Tito Kayak, was arrested after stating over the loudspeaker that he was crossing the police lines to be arrested. He was arrested without incident.

PRPB reported that at approximately 9:05pm the crowd dwindled to between 50 – 70 protesters at which time the protesters began throwing projectiles at the officers on the line. At which time the Incident Commander took immediate action to activate DOT to replace the officers on the line to minimize possible injuries to the officers.

Per General Order 625 (Management and Crowd Control) PRPB gave multiple orders to the protesters to desist and leave the area. Protesters ignored police instructions and continued throwing projectiles at officers on the police line. The Incident Commander authorized the use of gas and smoke bombs to disperse the crowd. PRPB then proceeded to disperse protesters who continued throwing projectiles. Three additional protesters were arrested - two males and one female.

PRPB reports using the following less-than-lethal weapons to disperse unruly protesters:
- tear gas,
- smoke bombs, and
- rubber bullets

Additional details will be added to this memo as they become available.

# Appendix E: After-Action Report of the September 29, 2022 Demonstration/Protest in Fortaleza



# MEMORANDUM

**To**      :      Honorable Judge Besosa

**Cc**      :      Roberto Abesada-Agüet, Esq., General Counsel to the Federal Monitor

**Date**   :      September 29, 2022

**From** :      John Romero, Federal Monitor
                 Denise Rodríguez, Deputy Federal Monitor

**Re**      :      *After-Action Report of the September 29, 2022, Demonstration/Protest in Fortaleza*

On Thursday, September 29, 2022, the Monitor's Office was present at a demonstration/protest at the Fortaleza against LUMA Energy. Upon arrival at the demonstration/protest the Monitor conferred with the Incident Commander, Captain Walker and Inspector Rodriguez regarding the operations plan, units participating in the operation, and crowd size. At the peak of the protest, 50 protestors were present, but this would decrease to an estimated 25-30 protestors by 7:00pm.

Present on the scene was Puerto Rico Police Bureau's (PRPB) Contention and DOT Units in a standby capacity. Officers on the frontline were in regular uniform commensurate with the actions and demeanor of the protesters at the time. Officers were rotated every half-hour.

By 9:15pm the crowd dwindled to 25 protesters and the role of Incident Commander was passed to Inspector Rodriguez.

There were no untoward incidents during the protest and no reported arrests.

Additional details will be added to this memo as they become available.

## Appendix F: REA 114 Training Observations

The following are observations made by the Monitor's Office during the observation of the REA 114 Training Course held for new SARP Investigators in August 2022.

Generally, it is best to have training initiatives follow policy changes, and not vice versa. Based upon feedback from this Monitor in previous CMRs, the PRPB is still creating policy changes for its SARP investigations, particularly involving investigations that have a criminal as well as administrative focus. The Monitor expects to see PRPB's proposed policy changes in the very near future as they apply to SARP investigative methodology. REA-114 will then undergo changes to bring it into line with updated PRPB policies.

As far as SARP formative pedagogy is concerned, the Monitor observes that the present iteration of REA-114, aside from future updates related to imminent policy changes, could use a few suggested improvements or refinements. While Monitor finds the present version of the course to be both interactive and engaging for adult learners, there are some areas of the program that could either be reduced or eliminated. For example, there is a basic orthography component, which officers with 5 years of report writing experience should already be able to effectively demonstrate. The present course contains a component that describes how SARP investigators are assessed for suitability as candidates for the investigator's position, which we may safely assume is already understood, as every person in the classroom had each already cleared that bar. Finally, there is also a two-hour block concerning the PRPB drug testing program, the responsibility for which doesn't fall under the exclusive purview of a SARP internal investigator. This material may be condensed to include only "for cause" scenario drug testing.

The Monitor's Office noted multiple instances of instructors defining the term, "preponderance of evidence," which ranged from highly legal/technical to the more basic. Understanding the practical application of this standard of proof is crucial in order to properly analyze all evidence and reach the correct conclusion in a SARP case. It was made clear through dozens of interviews of current SARP investigators that some misconceptions of this standard of proof still exist, especially as to how it relates to prior and remarkably similar accusations of misconduct by a given officer. At a later point in the course, there was at least one lecture that actually mentioned a straightforward 50.1% versus 49.9% probability analysis, which given the absence of legal jargon, is easier to both comprehend and apply. The next iteration of REA-114 should contain examples of prior cases wherein the accused's alleged misconduct is uncannily similar to the case under investigation, and where this evidence effectively pushes the probability from 50-50 to 51-49 or higher, resulting in a sustained finding against the accused PRPB member.

The Monitor next turns to specific recommendations for the investigative interview component of the course. So much of an internal investigation relies upon obtaining information that subjects may not consciously wish to divulge – or worse - information that the subject wishes to intentionally conceal from the investigator. The Monitor strongly recommends that more time be devoted to recognizing and interpreting non-verbal cues, to include all generally accepted cues that tend to indicate levels of discomfort or distress in an interview subject. The Federal Bureau of Investigation's Behavioral Science

286

Unit (FBI/BSU) is a great resource, as well as texts on the subject written by field experts.  As the entire body can reveal important non-verbal cues, the students should be instructed to remove or reposition any objects, such as desks or tables, which may obstruct their view of the subject's entire body. The Monitor also suggests that a short video be commissioned, which would show a staged interview of a subject with ideal seat placement to create an unobstructed view of the subject.  In this video, the subject would demonstrate a series of nonverbal cues and micro expressions that are considered dependable indicators of discomfort or distress in an interview subject.  This methodology will help students to identify some of the exact types of behaviors they should be on alert for.

The Monitor suggests that any additional classroom time made available by streamlining REA-114 provide an optimal 8 hours of classroom and practical interviewing training instead of the current allotment of 2 hours of lecture followed by 4 hours of practical exercise.  The Monitor specifically recommends teaching students to avoid the formal questioning and answering technique, and to promote a conversational style that puts the subject at ease and more communicative. Instead of the current practice of performing three interviews simultaneously in one classroom, these mock interviews should be staged individually and in a private setting, much like an investigator would do in the field.  PRPB may also explore the possibility of live streaming several of these interviews into the classroom, so that other students may pick up on a subject's non-verbal cues that the interviewer may have missed, or the missed opportunities to follow up on areas of apparent discomfort expressed by the subject.   Those who play the subject roles of these practical exercises should familiarize themselves with and be able to identify many of these non-verbal cues and micro expressions and later recognize them as called for in the practical exercise.